45

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )        Case No.  01-CR-794
                                  )
            Plaintiff,            )
VS.                               )
                                  )
                                  )        Judge Stuard
NATHANIEL JACKSON ,               )
                                  )
            Defendant.            )

### DEFENDANT'S MOTION TO COMPEL ALL STATE AGENTS TO TURN OVER TO THE PROSECUTING ATTORNEYS AND TO ADVISE THEM OF ALL INFORMATION ACQUIRED DURING THE COURSE OF THE INVESTIGATION OF THIS CASE

Now comes the Defendant, by and through counsel, and respectfully moves this Court to order all state agents, including law enforcement officials, involved in the investigation of the case, to turn over to the prosecuting attorneys, and advise them of all information obtained during the course of the investigation leading up to the above-referenced indictment and continuing beyond, if applicable.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

<u>MEMORANDUM IN SUPPORT</u>

This motion is a necessary corollary to a Request For Discovery. Legally, the knowledge of the prosecutor' agents is imputed to the prosecutor. <u>See Kyles v. Whitley</u>, ___ U.S. ___, 115 S.Ct. 1555, 1567-68 (1995) (as the prosecutor has the means to discharge the governments duty under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), there can be no argument for excusing the prosecutor from disclosing what she or he does not know). As a practical matter, however, the defense will simply not get all of the appropriate material if the attorneys for the other side are not aware of the material.

Counsel for the Defendant desires proper discovery, not an appellate issue.  Defendant is entitled to obtain discovery of "all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment."  Ohio R. Evid. 16(B)(1)(f).  This rule is a codification of the governments obligation as set forth in <u>Brady</u>, 373 U.S. 83, and progeny. <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>United States v. Bagley</u>, 473 U.S. 667 (1985).  Recently, <u>Kyles</u> made clear that regardless of request by the defense, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."  <u>Kyles</u>, 115 S.Ct.

at 1567. Failure to do so does not absolve the prosecutor of responsibility. Id. at 1567-68. This is a fundamental rule of fairness rooted in the constitutional principles of due process; effective assistance of counsel; and the right to confront witnesses contained in Article I, Sections 10 and 16 of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

In order to honor these constitutional rights and to avoid surprises at trial that occur when law enforcement officials and other state agents fail to turn over their entire file to the prosecutor, Defendant respectfully requests that this Court order all State Agents involved in the instant case to turn over their entire file to the prosecuting attorney.

Respectfully submitted,


DAVID H. BODIKER #0016590
OHIO PUBLIC DEFENDER


ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL


JAMES F. LEWIS #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL


BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio 44483
(330)393-7727 FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the forgoing DEFENDANT'S MOTION TO COMPEL ALL STATE AGENTS TO TURN OVER TO THE PROSECUTING ATTORNEYS AND TO ADVISE THEM OF ALL INFORMATION ACQUIRED DURING THE COURSE OF THE INVESTIGATION OF THIS CASE was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this _22_ day of _____, 2002.

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

46

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    Case No.  01-CR-794
                                  )
           Plaintiff,             )
VS.                               )
                                  )
                                  )    Judge Stuard
NATHANIEL JACKSON ,               )
                                  )
           Defendant.             )

## DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE

Now comes the Defendant, through counsel, and respectfully moves this Court to order the prosecution to disclose to the defense all evidence of an exculpatory nature or evidence which could be used for impeachment purposes, regardless of whether counsel for the State or any other law enforcement officials personally believes that such evidence is in fact exculpatory or impeaching.  This request is made pursuant to Ohio R. Crim. P. 16(B)(1)(f) and relevant case law, including Brady v. Maryland, 373 U.S. 83 (1963).

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314

ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

<u>MEMORANDUM IN SUPPORT</u>

## I.  **DUTY OF THE STATE TO DISCLOSE**

Due process requires that the government come forward with evidence favorable to the accused or unfavorable to the State's own case. Upon request, the State must disclose to the defense all such information. <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).   This Court's supervisory power to safeguard the proper administration of justice reinforces the due process and compulsory process requirements of disclosure.  <u>See</u> <u>United States v. Miller</u>, 411 F.2d 825 (2d Cir. 1969); <u>United States v. Consolidated Laundries Corp.</u>, 291 F.2d 563 (2d Cir. 1961); <u>United States v. Leja</u>, 528 F.2d 493 (6th Cir. 1977).

It is essential that the prosecution disclose or allow inspection of favorable information as it is obtained.  As pointed out in <u>United States v. Pollack</u>, 534 F.2d 964, 973, <u>cert. denied</u> 429 U.S. 924 (1976):

> Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in preparation and presentation of its case, even if satisfaction of this criterion requires pretrial disclosure.  See, e.g. <u>United States v. Elmore</u>, 423 F.2d 775 (4th Cir., 1970); <u>United States v. Deutsch</u>, 373 F.Supp. 289, 290-291 (S.D.N.Y. 1974).

In <u>Brady</u>, the Supreme Court stated:

> A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or <u>reduce the penalty</u> helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.

373 U.S. at 87-88, (emphasis added). Any information or evidence which the prosecution has knowledge of or access to, and which might be exculpatory in nature, must be disclosed to the defense in a timely manner. The same is true of any evidence which is "favorable to the defendant and material either to guilt or punishment." Ohio R. Crim. P. 16(B)(1)(f).

Although the <u>Brady</u> rule is often phrased in terms of information "known to the prosecution," the prosecution's "knowledge" clearly extends beyond the personal knowledge of the prosecutor. The prosecutor has an obligation to learn of all evidence favorable to the defendant. "But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see <u>Brady</u>, 373 U.S. at 87), the prosecution's responsibility for failing to disclose known, favorable evidence ... is inescapable." <u>Kyles v. Whitley</u>, ___ U.S. ___, 115 S.Ct. 1555, 1567-68 (1995). In justification of this burden on the prosecutor, the Supreme Court explained:

> In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.' <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1927). Since, then, the prosecutor has the means to discharge the government's

> Brady responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

Id. at 1568.

Regardless of whether the defendant makes a specific discovery request, a general request, or no request at all, the prosecutor is obligated to learn about and disclose all material evidence favorable to the defense. Id. at 1565; United States v. Bagley, 473 U.S. 667 (1985). The prosecutor's obligation is continuing throughout the trial proceedings, and includes scientific test results. State v. Kassow, 28 Ohio St. 2d 141 (1971), vacated on other grounds, 408 U.S. 939 (1972). See also United States v. Kelley, 420 F.2d 26 (2d Cir. 1969). This duty extends to correcting misleading or incorrect testimony given by State witnesses during trial. State v. Staten, 14 Ohio App. 3d 78, 420 N.E.2d 249 (1984).

When it occurs, suppression of exculpatory or impeachment evidence is not only unethical and a violation of the criminal rules, but it also undermines the reliability of the guilt determination process. In such a situation, reversal of the conviction is the appropriate remedy.

II. **DEFENDANT'S SPECIFIC REQUESTS FOR DISCLOSURE**

As with any such Motion, Defendant is limited in [his/her] ability to specifically identify those matters [he/she] believes to be subject to disclosure since neither [he/she] nor [his/her] counsel are in possession of either the prosecutor's or the police file. Notwithstanding that impediment, Defendant can at this juncture specifically requests the following categories of information:

1. Any and all evidence of any kind regarding the existence of and the identity of other persons

who are suspected of being involved in the events leading up to and/or in the actual criminal acts with which Defendant has been indicted, whether or not the existence of other suspects exonerates or in any way exculpates Defendant in the opinion of either the prosecutor or the law enforcement officials. Defendant, through counsel, asserts that the mere existence of such persons is "favorable to the defendant and material either to guilt or punishment." Ohio R. Crim. P. 16(B)(1)(f).

2.  The names and addresses of any and all persons interviewed by law enforcement officials in connection with what eventually resulted in the indictment *sub judice*, including but not limited to those persons whom law enforcement officials did not regard as providing information useful for the goal of successfully prosecuting Defendant for the crimes in the Indictment.

3.  The requests for and/or results of any and all forensic tests conducted in connection with the instant case, whether or not such tests yielded results deemed favorable from the perspective of successfully prosecuting Defendant.

4.  Any and all evidence pertaining to the States' experts, including information which may undermine the experts' credibility.

Further, Defendant is entitled to all information acquired by law enforcement officials and other state agents (which encompasses the prosecutor's office) since the time of the alleged incident:

1) Any exculpating information not passed on to the Grand Jury, and/or 2) Any information which indicates at some later date that the prosecuting witnesses altered their versions of events in such a way as to call into question their credibility or reliability. Defendant's Ohio and United States

Jackson Apx. Vol. 2
Page 163

Constitutional rights to Due Process, Effective Assistance of Counsel, Fair Trial and Confrontation of Adverse Witnesses mandates the disclosure of this information.

Counsel will supplement this Motion with any other specific requests as may come to counsel's attention.

For the foregoing reasons, the Defendant respectfully moves this Court to order the prosecution to disclose to the defense all exculpatory or impeachment evidence.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I herby certify that a true copy of the foregoing DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this ___ day of _____, 2002.

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

47

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )      Case No. 01-CR-794
                                  )
            Plaintiff,            )
VS.                               )
                                  )
                                  )      Judge Stuard
NATHANIEL JACKSON ,               )
                                  )
            Defendant.            )

## DEFENDANT'S MOTION FOR AN ORDER DIRECTING THAT A COMPLETE COPY OF THE PROSECUTOR'S FILE BE MADE AND TURNED OVER TO THE COURT FOR REVIEW AND TO BE SEALED FOR APPELLATE REVIEW, IF NECESSARY

Defendant, through counsel, requests the issuance of an Order requiring the prosecutor to make a complete copy of the State's file and turn it over to this Court for a pretrial review of its contents to ensure compliance with the rules of discovery. Defendant further requests the State's file to be sealed for appellate review.

Respectfully submitted,

_David H. Bodiker / JFL_
DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

_Anthony Consoldane_
ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

_James F. Lewis_
JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio 44483
(330)393-7727 FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>MEMORANDUM IN SUPPORT</u>

It is well-established that in a criminal case, the prosecutor is required to disclose to the Defendant evidence that, if suppressed, would deprive the Defendant of a fair trial. This includes exculpatory as well as impeachment evidence. <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>United States v. Bagley</u>, 473 U.S. 667, 675-76 (1985). If the suppressed evidence is material, in that it undermines confidence in the outcome of the trial, constitutional error occurs and the conviction must be reversed. <u>Bagley</u>, at 678. <u>See also</u> <u>State v. Johnston</u>, 39 Ohio St. 3d 48, 529 N.E.2d 898 (1988). Further, the materiality test is *not* determined by viewing each item of evidence in isolation, but the suppressed evidence is considered collectively in light of all the other evidence. <u>Kyles v. Whitley</u>, ___ U.S. ___, 115 S.Ct. 1555, 1567 (1995).

Counsel for Defendant has filed a MOTION TO COMPEL DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE and a MOTION TO COMPEL ALL STATE AGENTS TO TURN OVER TO THE PROSECUTING ATTORNEYS, AND TO ADVISE THEM OF, ALL INFORMATION ACQUIRED DURING THE COURSE OF THE INVESTIGATION OF THIS CASE. The instant Motion is a corollary to these other motions, designed to ensure complete disclosure of all information to which the Defendant is entitled.

The United States Supreme Court stated:

> Bagley held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'

Id. at 1565 (quoting Bagley, 473 U.S. at 682 (opinion of Blackmun, J.) (remainder of cite omitted)).  Where courts have found that evidence was wrongly suppressed, the records do not indicate how the suppression was discovered.  In the case at bar, if the Defendant is convicted, the prosecutor's file will be necessary to determine whether the State has complied with defense counsel's requests for disclosure.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing DEFENDANT'S MOTION FOR AN ORDER DIRECTING THAT A COMPLETE COPY OF THE PROSECUTOR'S FILE BE MADE AND TURNED OVER TO THE COURT FOR REVIEW AND TO BE SEALED FOR APPELLATE REVIEW, IF NECESSARY was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this _____ day of _____, 2002.

_____
ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

48

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | |
| | ) | |
| | ) | Judge Stuard |
| NATHANIEL JACKSON , | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S CONSTITUTIONAL MOTION TO DISMISS

Defendant, through his attorneys, respectfully moves this Court for an order dismissing that portion of the aggravated murder indictment in the above-captioned matter which elevates the potential penalty from life imprisonment to death, on the grounds that  Ohio Rev. Code Ann §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.  The reasons in support of this motion are set out in the accompanying memorandum.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

1

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL
BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>MEMORANDUM IN SUPPORT</u>

A.    THE DEATH PENALTY AUTHORIZED BY THE OHIO REVISED CODE
      DEPRIVES CAPITALLY-CHARGED DEFENDANTS OF THEIR LIVES
      WITHOUT DUE PROCESS OF LAW, DENIES EQUAL PROTECTION AND
      IMPOSES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE
      OHIO AND UNITED STATES CONSTITUTIONS.

The right to life is a constitutionally protected fundamental right.
<u>Massachusetts v. O'Neal</u>, 327 N.E.2d 662, 668 1975).  The enjoyment of life is
also explicitly guaranteed as an "inalienable right" by Article I, § 1, Ohio
Constitution.  Therefore, "in order for the state to allow the taking of life
by legislative mandate, it must demonstrate that such action is the least
restrictive means toward furtherance of ... a compelling governmental
end."  <u>O'Neal</u>, 327 N.E.2d at 668.

The societal interests commonly advanced to justify capital
punishment are, as the United States Supreme Court noted in <u>Gregg v.
Georgia</u>, 428 U.S. 153 (1976), "deterrence of capital crimes by prospective
offenders," "incapacitation of dangerous criminals and the consequent
prevention of crimes that they may otherwise commit in the future," and
"retribution."  <u>Id.</u> at 183, and fn.28.  The court in <u>Gregg</u>, however, was not

presented with and did not decide whether capital punishment is the least restrictive means for achieving the purported societal interests.

Despite the most exhaustive research by noted experts in the field, there is no convincing evidence that the death penalty is a deterrent superior to lesser punishment. "In fact, the most convincing studies point in the opposite direction." Massachusetts v. O'Neal II, 339 N.E.2d 676, 682 (1975) [hereinafter O'Neal, II]. Studies in Ohio, more particularly, have similarly failed to show any deterrent effect by imposition of the death penalty. Over twenty years ago, a study spanning fifty (50) years of executions in Ohio found no evidence that executions have any discernible negative effect on homicide rates. Ohio Legisl. Serv. Comm'n., Capital Punishment(1961). See also, Bailey, The Deterrent Effect of the Death Penalty for Murder in Ohio. A Time-Series Analysis, 28 Cleve. St. L. Rev. 51, 68, 70(1979). The Supreme Court of Ohio has not addressed the issue of lack of evidence supporting deterrence in its previous decisions upholding the death penalty.

Indeed, several more recent studies and articles demonstrate executions bring about higher murder rates; apparently executions dehumanize persons, brutalize and desensitize society to killing, and allow persons to think of killing as an accepted and expedient means of solving problems. Cochran, Chanmlin and Seth, Deterrence or Brutalization? An Impact Assessment of Oklahoma's Return to Capital Punishment, 32 Criminology 107(1994)); Verhovek, With Practice, Texas is the Execution Leader, New York Times, Sunday, September 5, (1993), at 6E; Tabak and Lane, The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty, 23 Loyola L.A. L. Rev. 59, 114-125(1989); See also Bailey and Peterson, Murder, Capital Punishment and Deterrence: A Review of the

Evidence and an Examination of Police Killings, Vol. 50 Journal of Social Issues 53, 57(1994).

The second purported justification for the death penalty, that of incapacitation of the offender, can be achieved by restraint, a less restrictive means than destruction of human life.  Retribution cannot serve as the compelling state interest justifying capital punishment because there is no evidence that a less onerous penalty would not equally satisfy the public's outrage and its desire for punishment.  See O'Neil II, 339 N.E.2d at 686-7.  The State's possible reliance on retribution as a justification for the death penalty is further weakened by the imminent threat that the irreversible deprivation of life may befall an innocent or less culpable person.

The failure of the State to meet "its heavy burden of demonstrating that, in pursuing its legitimate objectives, it has chosen means which do not unnecessarily impinge on the fundamental constitutional right to life,"O'Neill II 2d at 688, requires the rejection of death as a punishment as it is violative of due process.

The punishment also violates the Cruel and Unusual Punishment Clause because it is "more severe than is necessary to serve the legitimate interests of the State," Furman v. Georgia, 408 U.S. 238, at 359-60(1972) (Marshall, J., concurring).  Additionally, the actual physical and psychological pain of execution itself is immeasurable.  Electrocution does not produce instantaneous loss of consciousness.

Studies have established that past experience with the death penalty in this state and others are fraught with discrimination violative of equal protection.  Ohio's capital sentencing provisions are patterned after those previously studied, which appear to have been applied in a racially-

4

4

discriminatory manner as to the victim and defendant. See Bowers and Pierce, Arbitrariness and Discrimination Post-Furman Capital Statutes, Crime and Delinquency, 563, 594-595 (Oct.1980); See also, Greenberg, Capital Punishment as a System, 91 Yale L.J. 908(1982). Such arbitrariness and discrimination persists under the Ohio statutory scheme which gives even greater discretion in sentencing to the trier of fact. While African-Americans number less than eleven percent (11%) of Ohio's population, half (50%) of those on Ohio's death row are African-American. U.S. Census Bureau, (last modified March 14, 1997) <http://www.census.gov:80>; "Death Penalty Report," State Public Defender's Report (as of March 21, 1997). In all, fifty-four percent (54%) of death row residents are minorities. Id. Further, while only four (4) Caucasians were on Ohio's death row for killing African-Americans (three (3) with Caucasian victims), compared to ten times that number, forty-one (41), with African-Americans sit on Ohio's death row for killing a white person. Id. Ohio's statistical disparity in sentencing, by race of defendant and race of victim, is tragically consistent with the national findings of a 1990 General Accounting Office Study. The GAO reported "a strong race of victim influence was found at all stages of the criminal process," and the evidence was stronger at the earlier stages involving prosecutorial discretion in charging and trying cases. Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities, U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (Feb.1990).

Ohio courts have not evaluated the implications of these racial disparities in imposition of the death penalty for several years. [Although the Ohio legislature has recently established in S.B.2's Revised Code § 2953.21A)(2), a disparity appeals practice in post-conviction that may

encourage the Supreme Court of Ohio to adopt a rule requiring the Courts of Common Pleas to track the offender's race, there is no suggestion that this practice track the victim's race or that race of the victim is a litigable issue; no rule has yet been adopted, and the statute itself does not apply to crimes committed before July 1, 1996.] In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

"Discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S. at 189. Yet, the prosecuting attorney has acquired "virtually unlimited control over charging, inconsistent with a system of criminal procedure fair to defendants and to the public." Vorenberg, Decent Restraint of Prosecutorial Power, 42 Harv. L. Rev. 1521, 1525(1981)). See also Sonner, "Asking for the Death Penalty," ABA Criminal Justice 32 (Fall 1986).

In Ohio no fair and consistent determination is made. The determination  as to whether one is indicted with a death penalty specification is apparently largely a function of where a defendant is charged, not of the circumstances of the crime and the character of the individual. Cuyahoga County contains approximately thirteen percent (13%) of Ohio's population and has handed down approximately twenty-two point eight percent (22.8 %) of Ohio's death penalty indictments. "Death Penalty Report," State Public Defender's Report (as of October 1990). [Call the Office of the Ohio Public Defender for specific county numbers]]This geographical disparity in indictments, as expected, yields a concomitant disparity in death sentences; Cuyahoga County has handed down approximately twenty-three (23%) of Ohio's death sentences. "Death Penalty Report," State Public Defender's Report (as of March 21, 1997).  Furthermore, no independent review of the propriety of the

6                                    6

charging decision is conducted. No judicial body considers the appropriateness of the charging decisions.

In effect, Ohio's system is designed so as to permit a prosecuting attorney to sidestep the procedural safeguards of Supreme Court decisions by allowing arbitrary charging decisions that unfairly impinge on defendants' rights before the trial safeguards commence. This denies equal protection and imposes cruel and unusual punishment if the product of intentional discrimination on the basis of an improper classification, or results in arbitrary, freakish imposition of death sentences. See McCleskey v. Kemp, 481 U.S. 279(1987); State v. Zuern, 32 Ohio St. 3d 56, 512 N.E.2d 585(1987). Defendant acknowledges that several of these general federal constitutional claims have been rejected by the Supreme Court of Ohio in State v. Jenkins, 15 Ohio St. 3d 164, 473 N.E.2d 264(1984), but have not yet been tested in the federal courts. Further, the Ohio courts have not yet addressed these issues under the State constitution.

B.    O.R.C. §§ 2929.022, 2929.03, AND 2929.04 VIOLATE THE DEFENDANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO A TRIAL BEFORE AN IMPARTIAL JURY, AS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, §§9, 10, AND 16 OF THE OHIO CONSTITUTION.

Ohio's capital statutory scheme provides for a sentencing recommendation by the same jury which determines the facts at trial if the accused is found guilty. This procedure violates the defendant's rights to effective assistance of counsel and to a fair trial before an impartial jury as guaranteed by the State and Federal constitutions.

1.    Denial of Effective Assistance of Counsel.

Ohio's bifurcated capital trial process with the same jury violates the defendant's right to effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution; McMann v. Richardson, 397 U.S. 759, 771(1970), fn.14; Powell v. Alabama, 287 U.S. 45, 47(1932); Ohio Const. ER. I §§ 10 & 16; State v. Hester, 45 Ohio St. 2d 71, 341 N.E.2d 304(1976).

First, under the operation of the current statute, if counsel argues to the jury a defense which loses at the guilt phase of the trial, in effect he is forced to simultaneously destroy the defendant's credibility prior to the start of the trial's sentencing phase.  By invoking the defendant's right to strenuously argue for his innocence in the first phase, a loss for the defense in the first phase means that counsel will have significantly reduced the credibility desperately needed to successfully argue for a life sentence.

The legislature should have eliminated this constitutional dilemma by providing for two separate juries, the first for determining guilt and the second for determining punishment.  It is respectfully suggested that at the second trial the prosecuting attorney would be allowed to reiterate the specific evidence of aggravating circumstances.  This proposed order of trial would eliminate the impairment of the right to have a defense presented with the effective assistance of counsel.  The State essentially has "prevented (counsel) from assisting the accused during a critical stage of the proceeding." United States v. Cronic, 466 U.S. 648, 659, fn.25(1984). This creates constitutional error without any showing of prejudice necessary. Id.

Extensive voir dire on the subject of the death penalty before the guilt phase places the accused in the untenable position of appearing to

8                                    8

the jury to feel his case is so poor on the merits insomuch as he is already discussing the topic of punishment. In <u>Grigsby v. Mabry</u>, 569 F. Supp. 1273 (E.D. Ark. 1983), <u>aff'd</u>, 758 F.2d 226 (8th Cir.1985), the adverse affect that "death qualification" of prospective jurors has on the right to an impartial jury was noted:

> ... it denies the accused a trial by a jury representative of a cross-section of the community;
> ... it creates juries that are conviction prone.

Admittedly, the United States Supreme Court granted certiorari and reversed the Eighth Circuit. <u>Lockhart v. McCree</u>, 476 U.S. 162(1986). In doing so, however, Justice Rehnquist did not deny that the death-qualification process results in a jury more likely to convict. <u>Id.</u> at 173. Rather, the Court found that "Witherspoon Excludables" do not constitute a cognizable group for the purpose of a "fair cross section" analysis. <u>Id.</u> at 174. The Court employed a balancing test which, in effect, balanced the State's interest in having a single jury for both phases of the trial against the defendant's right to have a fair and impartial guilt phase jury. In so holding, the Court held:

> . . . we will assume for the purposes of this opinion that the studies are both methodologically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction-prone" than "non-death-qualified" juries. We hold, nonetheless, that the Constitution does not prohibit the states from "death qualifying" juries in capital cases.

<u>Id.</u> at 173.

This identical issue is raised here on both federal and independent state constitutional grounds. The Ohio Constitution does guarantee a capitally-charged defendant the right to an impartial jury during the guilt

9                              9

phase and one composed of a fair cross-section of the community under Article I, §§ 5, 10, and 16. Where a jury is not representative of the fair cross-section of the community as constitutionally required, it is clear that such a jury cannot be considered fair and impartial with respect to the issue of the innocence of defendants in capital cases. Id. at 172.

The Supreme Court of Ohio has not dealt with this issue on the independent State constitutional grounds here asserted. This Court's decision in Jenkins, cited Keeton v. Garrison, 742 F.2d 129 (4th Cir.1984), for the proposition that a criminal defendant "feels entitled to a jury more likely to acquit rather than an impartial jury." Jenkins, 15 Ohio St. 3d at 188, 473 N.E.2d 264, 287 citing, 742 F.2d at 134. This language in Keeton was discredited by Justice Rehnquist himself in Lockhart. Keeton was never an accurate statement of what the scientific research in this area had established. Non-death-qualified juries are impartial. To hold otherwise one must then assert that the normal jury in the ordinary criminal trial is acquittal-prone. This obviously absurd position is the necessary logical result of the ratio decondendi of Keeton. However, Lockhart clearly rejected this and held that while the death-qualification process does result in a conviction-prone jury, that fact does not offend the federal constitution. This Court's decision in State v. Zuern, 32 Ohio St. 3d 56, 63, 512 N.E.2d 585, 592(1987), relied simply on Lockhart and so also failed to address the state's constitutional protections to a fair and impartial jury pursuant to Article I, §§ 5, 10, and 16.

The State's claim that it has an interest in having a single jury for both phases of the trial and that this should surmount the defendant's right to a fair and impartial trial phase jury is also belied by the Attorney General's recent efforts in the Ohio legislature (through H.B. 585 and S.B.

10

10

258, introduced early 1996) to require that a second jury be selected for purposes of resentencing trials when a capital defendant's death sentence is overturned on appeal. The Attorney General's present claims that this two-jury practice would be workable and inexpensive fly in the face of the State's earlier urgings against just such a two-jury practice at the initial trial. The State cannot have it both ways, and the capital criminal justice system must not force defendants into trial before a less than impartial jury. No Ohio court has yet considered the impact that the State's contradictory positions have on the fairness of the present capital scheme.

This highly prejudicial situation, as imposed on defense counsel by Ohio's statutory scheme again renders his assistance to the accused ineffective. Under Ohio's statutory scheme, the defense counsel must choose between either engaging in sufficient voir dire on the death penalty issue and risk the appearance to the jury of a surrender on the guilt issue, or forego voir dire on the death penalty issue and risk the empanellment of jurors whose undetected bias toward the death penalty would render them unfit to sit on the jury. State v. McClellan, 12 Ohio App. 2d 204, 232 N.E.2d 414(1967). Both choices created by the statute are constitutionally unacceptable to a defendant facing death as a possible punishment.

Ineffective assistance of counsel is also caused by the application of O.R.C. § 2929.03 (D)(1) because once an accused requests a mental examination, presumably with the hope that the results will be in mitigation of the offense, defense counsel has no control over the distribution of the results to the jury regardless of whether the results are in favor of or against the defendant's best interest. Counsel must play a

11                                11

blind guessing game when requesting the examination and has no way to prevent the jury from reviewing the results if they are adverse to his client's interests or suffer from procedural irregularities. Without any right to review the examination results prior to distribution to the jury, defense counsel is unable to fully and effectively serve the best interests of his clients. O.R.C. § 2920.03 must be struck down as an unconstitutional deprivation of the defendant's right to effective assistance of counsel as guaranteed by both the Constitutions of Ohio and of the United States.

2.    Denial of an Impartial Jury

Accused has an absolute right to an impartial jury under the Sixth Amendment to the United States Constitution. Sheppard v. Maxwell, 384 U.S. 333 (1966). A sentencing hearing is part of the criminal prosecution, Mempa v. Rhay, 389 U.S. 128 (1967), and therefore, as a federal constitutional matter, a criminal defendant has the right to an impartial jury at his sentencing hearing. Ohio guarantees a criminal defendant the right to an impartial jury pursuant to Article I, § 10 of the Ohio Constitution.

Ohio's bifurcated trial procedure wherein a single jury hears and decides both the guilt and penalty phases of trial violates the defendant's rights to an impartial jury at the sentencing hearing. Once a jury has found an accused guilty of aggravated murder a very high probability exists that jury bias and animosity towards the accused will exist at the sentencing hearing, the existence of which should be a basis for challenge for cause during voir dire at the start of the trial.

Under Ohio's death penalty statutory scheme, an intolerable risk exists that a defendant's life may be put in the hands of a hostile venire, which in effect creates uncertainty in the reliability of the determination

12                                12

reached.  Such a risk cannot be tolerated in a capital case.  <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980).  Therefore, the statute must be struck down as an unconstitutional violation of the defendant's right to an impartial jury under the State and federal constitutions.

C.  O.R.C. §§ 2929.03, 2929.04 AND 2929.022 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION BY FAILING TO PROVIDE ADEQUATE GUIDELINES FOR DELIBERATION, LEAVING THE JURY WITHOUT PROPER GUIDELINES IN BALANCING THE AGGRAVATING AND MITIGATING CIRCUMSTANCES.

The language contained in the Ohio death penalty statutory scheme; "that the aggravating circumstances ... outweigh the mitigating factors" violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution by inviting arbitrary and capricious jury decisions.  These constitutional guarantees require that the aggravating circumstances must merely "outweigh" the mitigating factors to result in imposition of the death penalty.  The use of the term "outweigh" preserves reliance on the lesser standard of proof by a preponderance of the evidence.  The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors.  In that instance, any perceived marginal difference in weight between aggravating circumstances and mitigating factors would result in execution.  Such a sentencing scheme is unconstitutional because it creates an unacceptable risk of arbitrary or capricious sentencing.  As the Ohio provisions do not explicitly provide for merciful discretion on the part of the trier of fact and the death penalty is mandatory once the

criteria are established, it is particularly important that the scales not be more heavily skewed toward death.

Additional problems exist because the mitigating circumstances are vague. The jury must be given "specific and detailed guidance" and be provided with "clear and objective standards" of their sentencing discretion to be adequately channeled, according to Gregg and Godfrey v. Georgia, 446 U.S. 420 (1980). Without such guidance, a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur. The mitigating circumstances stated in O.R.C.§ 2929.04 (B) are so vague in terminology that there is a "substantial risk that sentencing authorities will inflict the death penalty in an arbitrary and diversified manner." Delaware v. White, 395 A.2d 1082, 1091 (1978).

Caselaw from Ohio continuously reaffirms that "[t]he process of weighing factors, as well as the weight, if any, to assign a given factor, is a matter for the discretion of the individual decision maker." State v. Fox, 69 Ohio St. 3d 183, 193, 631 N.E.2d 124, 132 (1994), and State v. Loza, 71 Ohio St. 3d 61, 82, 641 N.E.2d 1082, 1105 (1987) ("the individual decision maker ... must be allowed to freely decide whether to give any weight to the mitigating evidence"). Giving so much discretion to sentencing juries respecting both aggravating and mitigating factors inevitably leads to arbitrary and capricious judgments. Aggravating factors must not be applied arbitrarily or inconsistently, yet that is unchecked in Ohio. The Ohio open discretion scheme further risks that constitutionally relevant mitigating factors which must be considered as mitigating and recognized as such [for instance youth or childhood abuse (Eddings v. Oklahoma, 455 U.S. 104 (1982), mental disease or defect (Penry v. Lynaugh, 492 U.S. 302 (1989), level of involvement in the crime (Enmund v. Florida, 458 U.S. 782

14                              14

(1982), or lack of criminal history (Delo v. Lashley, 507 U.S. 272 (199319)] will not be factored into the sentencer's decision. While the federal constitution may allow states to shape consideration of mitigation in order to obtain more rational and equitable imposition of the death sentence, see Johnson v. Texas, 509 U.S. 350 (1993), Ohio's capital scheme fails to provide adequate guidelines to sentencers, and fails to assure against arbitrary, capricious, and discriminatory results.

Empirical evidence is developing in Ohio and around the country that, under commonly used penalty phase jury instructions, juries do not understand their responsibilities and apply inaccurate standards for decision. See Cho, Capital Confusion: The Effect of Jury Instructions on the Decision To Impose Death, 85 Journal of Criminal Law and Criminology 532, 549-557 (1994), and findings of Zeisel discussed in Free v. Peters, 12 F.3d 700 (7th Cir.1993). A series of studies of jury instructions are now being conducted in several states, some under grants from the National Science Foundation. As yet unpublished data from University of Cincinnati Professor James Frank, who presented a penalty case and jury instructions to jurors who appeared for non-capital cases in Franklin County, concludes, among other findings, that with commonly used Ohio penalty phase jury instructions: 72% of jurors unconstitutionally concluded that the jury had to unanimously agree on a particular mitigating factor, 61% would not weigh the mitigating factor until unanimity was achieved, 51% would not consider a factor not specifically identified as a mitigating factor in the court's instructions, 76% believed the defense had to prove a mitigating factor by proof beyond a reasonable doubt, and 38% still would not give a life sentence even though the aggravating factors did not outweigh the mitigating factors. There is a substantial risk that the law is presently being

15                                      15

misapprehended in ways fundamentally prejudicial to defendants. This confusion violates the federal and state constitutions.

D.     O.R.C. §§ 2929.022, 2929.03 AND 2929.04 AND OHIO R. CRIM. P. 11(C)(3) PLACE AN UNCONSTITUTIONAL BURDEN ON THE DEFENDANT'S RIGHT TO A JURY TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 10 OF THE OHIO CONSTITUTION AND HIS RIGHTS TO BE FREE FROM COMPULSORY SELF-INCRIMINATION UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 10 OF THE OHIO CONSTITUTION.

Under the Ohio death penalty statutory framework, an accused indicted under the statute has two initial choices; go to trial or plead guilty. This statute, however, needlessly and unconstitutionally encourages guilty pleas. If there is a close issue of whether an attempted murder was committed, or a killing was purposeful, an accused may choose to demand a trial by jury. If an accused pursues this defense at the trial and loses, i.e., is found guilty of the offense and specifications, he is put in a precarious position. At the sentencing hearing he may suffer a loss of credibility due to the posture taken at the trial, and furthermore, he may face a hostile and biased jury, if the jury is also death-qualified. Against this backdrop the accused will have to submit mitigating facts to save his own life.

These choices are the result of an unconstitutional burden being placed on the defendant's Federal and Ohio Constitutional right to trial by jury and his right against compelled self-incrimination by the Ohio death penalty statute. In <u>United States v. Jackson</u>, 390 U.S. 570 (1968), the United States Supreme Court declared unconstitutional a statute which it held unnecessarily and needlessly encouraged guilty pleas. In that case the pertinent statute provided that an accused indicted under the death

16          16

penalty statute could be sentenced to death by a jury but only to a mandatory life sentence by a judge if the accused pleaded guilty to the charge. The Court found that statute to be unconstitutional because it needlessly encouraged the accused to waive his right to trial by jury and his privilege against self-incrimination by pleading guilty in order to escape the risk of death.

Similarly, the Ohio death penalty statute operates in much the same manner, i.e., a guilty plea greatly increases the defendant's chance to demonstrate mitigating facts and thus save his own life. The constitutional problem in the Jackson case is not confined to the situation where the accused can absolutely escape the possibility of death by waiving his constitutional rights, contrary to the Supreme Court of Ohio's attempt at distinction in State v. Buell, 22 Ohio St. 3d 124, 489 N.E.2d 795 (1986). The Supreme Court has expressly avoided the conclusion that the Jackson rationale is confined to such a situation. Corbitt v. New Jersey, 439 U.S. 212, 217 (1973). See also, Lockett v. Ohio, 438 U.S. 586, 617-619 (1978) (Blackmun, J., concurring). Therefore, the Court's scrutiny of this problem should focus on the necessity in Ohio of placing the accused in a position that encourages him to waive his constitutional rights.

Needless pressure is also placed on the accused to plead guilty as a result of Ohio R. Crim. P.11(C)(3). O.R.C. § 2929.02 was amended in 1978 to provide that whomever "pleads guilty to, or pleads no contest and is found guilty of aggravated murder" shall be sentenced in accordance with the new law, as are those who are convicted after trial. This was apparently an attempt to answer the concerns expressed by Justice Blackmun, concurring in Lockett, at 618, regarding the "disparity between a defendant's prospects" Las to sentence when pleading guilty or

17                          17

proceeding to trial.  See Note, The Death Penalty and Guilty Pleas Ohio Rule 11(C)(3)--A Constitutional Dilemma, 50 Ohio North. L. Rev. 687 (1978).  However, the disparity Justice Blackmun spoke of was occasioned by Ohio R. Crim. P. 11(C)(3), which is still in effect, and still needlessly encourages guilty pleas.

Under Ohio R. Crim. P. 11(C)(3), "if the (aggravated murder) indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose the specifications and impose sentence accordingly, in the interests of justice."   Although Ohio's present sentencing statute is not quite as harsh as the previous law (in that greater consideration is given to mitigating factors), after a trial the sentencing judge or judges are not given unbridled discretion to simply disregard the aggravating factors "in the interests of justice."  On its face, O.R.C. § 2929.04(D)(2) compels the jury and judges to consider aggravating circumstances and to balance them when imposing a sentence.   They are required to impose the death sentence if the aggravating factors outweigh those presented in mitigation.   Thus, if an accused has doubtful or no mitigating circumstances, he is strongly encouraged to plead guilty and to waive all of his constitutional rights at the trial with the hope of evading death through an injected discretionary capital sentencing decision.

The issue of whether this provision creates an impermissible burden on the defendant's exercise of his right to plead not guilty was not addressed by the Court majority in Lockett because the death sentence was reversed on other grounds. Lockett, at 608, fn.16.  Justice Blackmun, however, would have reversed the sentence because, "a defendant can plead not guilty only by enduring a semi-mandatory, rather than a purely

18

18

discretionary, capital sentencing provision." Id. at 619. The Supreme Court of Ohio has rejected the alleged constitutional violation. See State v. Weind, 5 Ohio St. 2d 224, 364 N.E.2d 224 (1977); State v. Jackson, 50 Ohio St. 2d 253, 364 N.E.2d 224 (1977); and State v. Nabozny, 54 Ohio St. 2d 195, 375 N.E.2d 784 (1978).

In State v. Zuern, 32 Ohio St. 3d 56, 65, 512 N.E.2d 585, 594 (1987), this Court returned to this precedent, and again failed to provide any guidance to lower courts which would limit the discretion under Ohio R. Crim. P. 11(C)(3), and correct this encouragement to plead guilty. Further, the Supreme Court of Ohio's present practice of considering only other death-sentence imposed cases in its proportionality review means that instances of dismissals of the specifications will not be reviewed or considered in the future. This maintains the totally unchecked discretion of the trial courts under Ohio R. Crim. P. 11(C)(3).

The Supreme Court of Ohio's view in Buell and Zuem that the issue is not raised unless a "plea is offered or accepted" is improperly narrow, as a corollary impact of Rule 11(C)(3) is to create an unchecked arbitrariness in the State's death penalty statutory scheme. This practice has not yet been addressed by the federal courts, and has not been rectified by Ohio decisions. As the present statutes and rules create an unnecessary encouragement to waive State and Federal Constitutional rights, this renders the Ohio capital sentencing scheme unconstitutional.

E.    O.R.C. § 2929.03 FAILS TO PROVIDE A MEANINGFUL BASIS FOR DISTINGUISHING BETWEEN LIFE AND DEATH SENTENCES, AS IT DOES NOT EXPLICITLY REQUIRE THE JURY, WHEN IT RECOMMENDS LIFE IMPRISON-MENT, TO SPECIFY THE MITIGATING CIRCUMSTANCES FOUND, OR TO IDENTIFY ITS REASONS FOR SUCH SENTENCE. THIS DENIES THE ACCUSED HIS RIGHTS UNDER O.R.C. § 2929.03(A), THE OHIO CONSTITUTION AND THE FEDERAL CONSTITUTION.

19

[Defendant is indicted for a crime committed after January 1, 1995. Under Issue One (1994), an amendment to the Ohio Constitution Article IV, Sec. 3, and under legislation implementing same (S.B. 4, effective 9/21/95 and S.B.2, effective 7/1/96), if he is sentenced to death he will have but one state court appellate review, in the Ohio Supreme Court. Issue One creates its own constitutional difficulties, which are specifically discussed in subsection 3, below. The remainder of this Section F addresses the general inadequacy of the review which has been conducted in both the courts of appeals an the Ohio Supreme Court under the 1981-passed scheme. At this time, there is no reason to believe that Issue One will prompt the Ohio Supreme Court to alter these inadequate review practices.]

Ohio's appellate review practices offend rights guaranteed under the State and federal constitutions to due process, to equal protection of the laws, and to be free from cruel and unusual punishment. The courts of appeals and the Supreme Court of Ohio are constitutionally and statutorily required, pursuant to O.R.C. § 2929.05(A), and Article I, §§ 9 and 16 of the Ohio Constitution to determine whether a particular sentence of death is excessive or disproportionate to that imposed in similar cases. Although the United States Supreme Court has declined to require proportionality review in all cases, Pulley v. Harris, 465 U.S. 37 (1984), it continues to recognize that proportionality review "serves as a check against the random or arbitrary imposition of the death penalty." Gregg v. Georgia, 428 U.S. 153, 206 (1976).

While Ohio's capital sentencing provisions require collection of certain data relating to capital cases to facilitate this review, i.e., the entire records of cases in which the death penalty is imposed, O.R.C. § 2929.03 (G);

20

and information as to each capital indictment including name of defendant, court, date of capital indictment, disposition (by plea, dismissal, or trial) and sentence imposed, O.R.C. § 2929.021, there is a fundamental omission in the collection scheme.  This flaw arises from the failure to require of the jury when recommending life imprisonment to identify the mitigating factors found to exist, and why these outweigh the aggravating factors.

Information as to cases in which life imprisonment was imposed after a capital sentencing hearing is essential for the reviewing courts to carry out their responsibility of assuring that excessive, disproportionate sentences of death are not imposed.  Baldus, Pulaski, Woodworth and Kyle, Identifying Comparatively Excessive Sentences of Death:  A Quantitative Approach, 33 Stan. L. Rev. 1, 7, fn.15 (1980); Woodson v. North Carolina, 428 U.S. 280 at 305-316 (1976) (Rehnquist, J., dissenting); McCaskill v. Florida, 344 So.2d 1276, 1280 (1977).  The majority of states follow the practice of comparing cases in which life sentences were imposed.  Van Duizend, Comparative Proportionality Review in Death Sentence Cases. What Why?, State Court Journal, Vol. 8, No. 3, at fn.26 (pub. draft) (1984).

Because the jury's recommendation of life is binding and no opinion is required to be prepared by the jurors setting forth the mitigating factors found and the reasons why one outweighed the other, there is no means in Ohio to accurately compare a case in which a binding jury's life recommendation was made to that in which a death sentence was imposed.  While a finding of aggravation is necessarily made and specified by the jury in the guilt phase, this finding cannot substitute for the life recommendation of the jury because it cannot serve to distinguish among

death-eligible defendants or explain why some of them are sentenced to death while others are not.

In Eddings v. Oklahoma, 455 U.S. 104, 111 (1982), the Court stated that the Constitution mandated both "measured, consistent application (of the death penalty) and fairness to the accused," and again that "capital punishment (must) be imposed fairly, and with reasonable consistency, or not at all." (Emphasis added.)  These aims of consistency and fairness cannot be achieved within the present Ohio capital sentencing scheme. Without requiring the jury to identify and specify its reasons, arbitrary and capricious decisions are masked by jury secrecy and the general verdict of a binding life recommendation.

F.    O.R.C. §§ 2929.021, 2929.03 AND 2929.05 FAIL TO ASSURE ADEQUATE APPELLATE ANALYSIS OF ARBITRARINESS, EXCESSIVENESS AND DISPROPORTIONALITY OF DEATH SENTENCES AND THE SUPREME COURT OF OHIO FAILS TO ENGAGE IN A LEVEL OF ANALYSIS THAT ENSURES AGAINST ARBITRARY DEATH SENTENCING.

1.    O.R.C. §§ 2929.021, 2929.03 and 2929.05 are Inadequate to Ensure Non-Arbitrary and Non-Excessive Sentences.

O.R.C. §§ 2929.0221, 2929.03 and 2929.05 require the reporting of some data to the courts of appeals and the Supreme Court of Ohio, although, as discussed above, there is the critical omission of a written life recommendation report from the jury.  There is substantial doubt about the adequacy of the information received on guilty pleas to lesser offenses, or after charge reductions at trial under the statute.  O.R.C. § 2929.021 requires the reporting of only minimal information on these cases and the defense respectfully contends that additional data is necessary to make an adequate comparison in these cases.

O.R.C. § 2929.021 is incomplete in the required tracking aspects because:

> (1)    The statute does not explicitly require the employment of resources (personnel, data collection and retrieval systems) to adequately compile and summarize the requisite data for this comparative evaluation, and use it. See Delaware v. White, 395 A. 2d 1082, 1094-1095 (1978).

> (2)    There is no statutory requirement that the courts identify the types of cases considered, the particular cases considered, or submit written findings comparing the cases.

"Adequate" or "meaningful" appellate review is a precondition to a finding that a state death penalty system is constitutional. Zant v. Stephens, 462 U.S. 862, 890 (1983); Pulley v. Harris, 465 U.S. 37 (1984). The standard for review is one of careful scrutiny. Barclay v. Florida, 463 U.S. 939, 960 (1983). Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. Id. Death sentences will be reversed where there is a significant risk of arbitrary sentencing. Zant, 462 U.S. at 879.

Meaningful appellate review is undercut by the failure of the Ohio statutes to require the jury recommending life imprisonment, or the judge who gives a life sentence upon such a recommendation, to identify the mitigating factors found to exist and to state why these outweigh the aggravating circumstances. Without this information, no comparison of cases is possible since no written findings of fact exist to serve as a basis for comparison. Without this essential basis for comparison of cases, the defendant respectfully asserts that there can be no meaningful appellate review.

Careful scrutiny in the comparison of cases is possible only if a sufficient database and a standardized method of comparison exists. There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significant to provide a relevant basis for distinguishing cases and appropriate penalties from each other. A standardized method of comparison is necessary for a consistent process of comparison, yet Ohio's system provides for procedures which are incompatible with the meaningful comparison of cases. These include accelerated review, the requirement that only minimal information be included in written findings at sentencing, the vagueness of the method of comparison and the gathering of incomplete and inadequate data.

Ohio's death penalty statutory scheme is unconstitutional without the certainty of meaningful appellate review. A substantial risk exists that sentences of death will thus be arbitrarily and capriciously imposed. In fact, this is precisely what is occurring under this statute.

2. <u>The Supreme Court of Ohio Has Wholly Failed to Assure Against Arbitrary Death Sentences</u>.

While the Supreme Court of Ohio claims to perform an excessiveness, proportionality and arbitrariness review of the death penalty imposed in capital cases, this review is in fact quite illusory. This Court has concluded that the review mandated by O.R.C. § 2929.04 of "similar cases" will be so limited that it can no longer serve to ensure against non-arbitrary sentences.

A short chronology of the Court's approach to its review reveals these inadequacies. The Court presently purports to consider only other death-sentence imposed cases. The court's sorting process of looking at only death-sentenced cases wholly abdicates the responsibility which the

24

legislature entrusted to it pursuant to O.R.C. § 2929.05.  The previously discussed statutes explicitly required notice to the Supreme Court of Ohio and the courts of appeals of the filing of capital indictments, the case number and the disposition thereof.  O.R.C. § 2929.021.  The statutes further require that an opinion be filed identifying the aggravating circumstances and mitigating factors and the reasons why the mitigating factors outweighed the aggravating circumstances in all cases that proceed to a sentencing hearing, at the very least those before a three-judge panel which result in the imposition of a life sentence.  O.R.C. § 292903 (F).  In fact, a judgment cannot be deemed final until this opinion is filed with the Court of Appeals and the Supreme Court of Ohio.  The reasons for the legislature's mandates in these instances are patently obvious:  these are the minimal tools provided to the reviewing courts to carry out their O.R.C. § 2929.05 responsibilities.  Indeed, the Supreme Court of Ohio recognized this purpose in the first death penalty case it reviewed and then proceeded to rely on these provisions to stave off claims that Ohio's capital sentencing scheme failed to assure against arbitrary sentencing.

In its first death penalty decision, Jenkins, the Supreme Court of Ohio rejected the arguments that the Ohio sentencing scheme violated the Eighth Amendment as it failed to specifically require "a jury, when recommending a sentence of life imprisonment over the imposition of the death penalty, to identify the existence of mitigating factors and why those factors outweigh the aggravating circumstances."  Jenkins, 15 Ohio St. 3d at 177, 473 N.E.2d at 279.  The Jenkins Court acknowledged that "state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct for

which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. See Gregg, 428 U.S. at 204-206, and," Proffitt v. Florida, 428 U.S. 242, 259-260 (1976)." Jenkins then found that:

> [t]he system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to all capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority.

Id. 15 Ohio St. 3d at 177, 473 N.E.2d at 279. See O.R.C. § 2929.021 Due to this other information available to it, the Supreme Court of Ohio rejected the claim that the statutes were inadequate:

> Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct.

Id. at 177, 473 N.E.2d at 279.  This Court therefore relies on the information it receives pursuant to O.R.C. § 2929.021 to validate the statute, and to demonstrate that it adequately checks arbitrariness.

It is absolutely clear from cases following Jenkins that this **avowed necessary check has been totally ignored**.  In Jenkins, the Supreme Court of Ohio stated that nothing could be discovered in the cases cited by appellant which would establish that his sentence was "arbitrary." Id. at 210, 473 N.E.2d at 304. Jenkins also stands for the proposition that O.R.C. §

26

26

2929.05 does not require a comparison of death sentences with sentences imposed in non-capital murder cases.  Id. at 209, 473 N.E.2d at 304.  A review of the subsequent cases reveals that the court also does not compare death sentences with life sentences handed down in capital murder cases, or even the life sentences imposed on co-defendants in separate jury trials.

In State v. Maurer, 15 Ohio St. 3d 239, 246-247, 473 N.E.2d 768, 777-778 (1984), no comparison of cases was undertaken at all.  Further, the trial court wholly neglected to justify the imposition of the death sentence.  The Supreme Court allowed the appellate court to provide the rationale for the death sentence even though O.R.C. § 2929.05 expressly requires the trial court to explain the death sentence. Id. 15 Ohio St. 3d at 246-247, 473 N.E.2d at 777-778.

Later cases reveal what Jenkins foreshadowed; that when a review of proportionality is conducted, it will only be conducted among cases in which the death sentence was imposed.  Life sentences handed down in death cases are excluded.  See State v. Rogers, 17 Ohio St. 3d 174, 187, 478 N.E.2d 984, 997 (1985); State v. Mapes, 19 Ohio St. 3d 108, 118-119, 484 N.E.2d 140, 149 (1985).  Rogers also held that the appellate courts need only consider death verdicts within their own geographical boundaries. Rogers, 17 Ohio St. 3d at 186, 478 N.E.2d 996.

In State v. Martin, 19 Ohio St. 3d 122, 483 N.E.2d 1157 (1985), the Court developed an expedited procedure for the proportionality review in certain cases holding that, "In view of the lack of mitigating factors in this case, the death sentence imposed in this case is not disproportionate to similar sentences imposed ..." Id. at 133, 483 N.E.2d 1167.  Thus, in a case where no mitigation is presented, the sentence is automatically

27                          27

proportionate because death sentences have been affirmed in cases with mitigation. There is thus no consideration of the significance of the aggravating circumstances or their worthiness to call for a death sentence. See Barclay v.Florida, at 964 (Stevens, J., with Powell, J., concurring in judgment); Smith v. North Carolina, 459 U.S. 1056 (1982) (Stevens, J, dissenting from denial of certiorari).

In State v. Williams, 23 Ohio St. 3d 16, 490 N.E.2d 906 (1986), the Court developed an interesting counterpoint to Martin. The Court engaged in no independent proportionality review. Rather, it dealt with appellant's argument that his sentence was disproportionate because other capitally-charged defendants with only one aggravating circumstance had received life. The Court dismissed the argument noting that the United States Supreme Court has not held that, "the number of aggravating circumstances is the only factor permitted to be considered in a decision of whether to impose a death sentence." Id. at 25, 490 N.E.2d at 915. Of course, little guidance is provided by the Court as to what is to be considered.

> State v. Buell appears to be a standard approach:
>> Additionally, we find the sentence of death to be appropriate as it is neither excessive nor disproportionate to the penalty imposed in similar cases.

Buell, 22 Ohio St. 3d at 144, 489 N.E.2d at 813. No mention of which "similar cases" were used in the comparison, nor is there exposition as to why this particular case warrants similar treatment. Moreover, in State v. Brooks, 25 Ohio St. 3d 144, 495 N.E.2d 407(1986), the Court held the death sentence was appropriate ". . . when compared to the other cases in Ohio where the death penalty has been imposed."

Jackson Apx. Vol. 2
Page 197

28                                28

In other Supreme Court of Ohio decisions, a similar pattern is followed:  only other death sentences will be considered.  State v. Zuern, 32 Ohio St. 3d 56, 64-65, 512 N.E.2d 585, 593 (1987); State v. Steffen, 31 Ohio St. 3d 111, 509 N.E.2d 383 (1987), syllabus one; State v. Stumpf, 32 Ohio St. 3d 95, 107, 512 N.E.2d 598, 610 (1987).  The Court now disavows any ability to assure equal treatment of all capital defendants .Zuern, 32 Ohio St. 3d at 64, 512 N.E.2d at 593.    While it acknowledges "The purpose of a proportionality review is therefore to insure that the death penalty is not imposed in a random freakish, arbitrary or capricious manner" Id. at 64, 512 N.E.2d at 593, the Court's present review provides no means of achieving this.

The Court claims "Ohio's system well documents why particular murderers receive the death sentence, which has removed the vestiges of arbitrariness."   Id. at 64, 65, 512 N.E.2d at 594.    However, that documentation, provided by collection of life sentence opinions and dispositions, is never consulted by this Court.   This Court refuses to consider life sentence cases, even when these are presented to them by the capital defendant/appellant.  See Stumpf Ohio St. 3d at 106-107, 512 N.E.2d at 610.  The Court simply  states it need not consider these, then does not.  Id. at 106-107, 512 N.E.2d at 610.

In fact, the Supreme Court of Ohio has proven itself unwilling to undertake meaningful review of any issues in capital cases.  In State v. Poindexter, 36 Ohio St. 3d 1, 520 N.E.2d 568 (1988), the Court determined that it need not give any consideration to errors raised by a capital appellant.  The Court held that when issues of law in capital cases have been considered and decided by the Court and are raised again in a

29

Jackson Apx. Vol. 2
Page 198

subsequent capital case, the Court will summarily dispose of the issues in all following cases.

In State v. Spisak, 36 Ohio St. 3d 80, 521 N.E.2d 800 (1988), the Court demonstrated the extent to which it applies the Poindexter ban on review. Upon being presented with a brief containing sixty-four (64) propositions of law and exceeding four hundred ninety-four (494) pages, the court refused to review practically all of these errors and filed a four and one-half page opinion. Instead the court chastised appellant for vigorously exercising his rights to raise error on appeal. Id. at 82, 521 N.E.2d at 802, fn.1.

In Ohio the right to meaningful appellate review has been reduced to the right of having no review at all under Poindexter and Spisak. The constitutional requirement of meaningful appellate review recognized by Zant, Pulley and Barclay , is flagrantly violated by the Ohio courts. Under present Ohio "review" standards, capital appellants may raise errors, but by doing so they open themselves to criticism for seeking review. The only "guarantee" under present review standards is that Ohio courts can ignore the appellate errors raised. This situation is constitutionally intolerable.

This Court's statement that the system "well documents" why a death sentence is imposed could not be more wrong. So far as one can discern, all these collected documents reflecting why many persons received life sentences are laying in totally ignored files in the clerk's office. The Supreme Court of Ohio has no notion of whether the death case before them represents a departure from a common practice of life sentencing on the same facts since they refuse to consider their "collected documents." The Accused agrees that the appellate courts' responsibility

to assure against arbitrary sentencing does not require absolute equal treatment among capital defendants and does not require that every possibility of arbitrariness be obliterated. But, as the Supreme Court of the United States recently stated, the Eighth Amendment is offended if there is "a significant risk of arbitrary sentencing" that is unchecked. McCleskey v.Kemp, 481 U.S. 279 (1987). In McClesky, the Court required "rationality in the system" and approved Georgia's practice of reviewing the proportionality of sentences as achieving "a reasonable level of proportionality" among the class of eligible defendants. Id. 481 U.S. at 298. Georgia reviews life sentences, and actively compares life and death sentences. Zant, 462 U.S. at 879, fn.19.

Common sense demonstrates that the Supreme Court of Ohio's approach cannot adequately check arbitrariness. If the frequency of jury leniency (i.e., life sentences in a particular kind of capital case) is high, then the occasional death sentence in that kind of case, even if justified by the evidence, is aberrant and comparatively excessive. See Baldus, Pulaski, Woodworth and Kyle, Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach, 33 Stan. L. Rev. 1, 16 (1980). But the Supreme Court of Ohio cannot identify the aberrant death sentence, because it does not consider whether life sentences are generally imposed in this type of case. The oft-quoted saying that "justice is blind" has been turned on its head by the Supreme Court of Ohio. This type of blind justice, with claims of documentation while maintaining a willful blindness and conscious ignorance as to why persons receive life or death sentences in this state, creates a constitutionally intolerable risk of arbitrary sentencing.

Conclusory rulings regarding excessiveness or proportionality also deny capital defendants the findings necessary to support a just decision and deny a fair and adequate opportunity to refute or rebut this conclusion. Because Ohio appellate courts are sentencing courts, they must provide basic procedural due process guarantees to assure reliable determinations. Such is not the case under the present scheme and this also undermines the protection against cruel and unusual punishment. When the Supreme Court of Ohio does on occasion undertake some actual comparison of other death sentence cases, there is no rational explanation why it does in some cases and does not in others. This Court's practices perpetuate arbitrary decision-making by the disparities in the level and scope of it's own appellate review. This denies due process, equal protection, and cruel and unusual punishment protections to those Ohio capital defendants given short-shrift review. Even when attempted, the Court's comparative review is generally a totally one-sided analysis. The Court's discussion in Stumpf is among its best efforts at comparative review, but even so, it is almost exclusively an evaluation of the aggravating circumstances, or at most, the nature and circumstances of the offense. Stumpf, 32 Ohio St. 3d at 107-108, 512 N.E.2d at 611. The Court simply ignores the mitigation side of the equation. When the Supreme Court of Ohio conducts a proportionality review, the automatic response is, "we have previously upheld the death penalty in a case where the same aggravating factor or type of offense had occurred." Id. at 107-108, 512 N.E.2d at 610, and see Zuern, 32 Ohio St. 3d at 65, 512 N.E.2d at 593; State v. Morales, 32 Ohio St. 3d 252, 262, 513 N.E.2d 267, 277 (1987); State v. Poindexter, 36 Ohio St. 3d 1, 8, 520 N.E.2d 568, 574 (1988); State v. Spisak, 36 Ohio St. 3d at 84, 521 N.E.2d at 803. The Court does not refer to

whether in other cases mitigation of a similar type has resulted in a life sentence. Those life and death sentence opinions could conceivably reflect that more than ninety-five percent of the cases with those aggravating circumstances and mitigating factors result in life sentences, but the Supreme Court of Ohio's failure and refusal to consider this information and its consideration of only one half of the equation always arbitrarily leads to an affirmation of the death sentence.

Blind reliance on the presence of an aggravating circumstance cannot adequately assure against arbitrariness. Aggravating circumstances only make one capitally eligible. It is up to the Court to assure that the sentencing among those who are capitally eligible is done without a significant risk of arbitrary results. That requires examination of both sides of the equation, aggravation and mitigation.

It is not unreasonable to expect some consideration of life sentences. This check against arbitrariness is regularly followed in other states. See e.g., Herzog v. Florida, 439 So.2d 1372 (1983); North Carolina v. Williams, 301 S.E.2d 335 (1983); Zant

In short, no rationale supports the Supreme Court of Ohio's present approach. It is contrary to the legislative intent. The statutes read as a whole in *pari materia* make very clear that the courts are at least to consider life sentence cases. Why else are the lower courts required to file these with the Supreme Court? To analyze Stumpf, 32 Ohio St. 3d at 99, 512 N.E.2d at 604, it would be illogical for the legislature to require the collection of these opinions (note, not just journal entries, or other statistical information) in one section, and then intend them to beirrelevant to the appellate courts required to receive them. Why impose these filing requirements, and provide the added incentive that

33

these judgments aren't final until so filed, if these filings are not intended to provide highly relevant information?

The Supreme Court of Ohio has obliterated any ability to rationally distinguish between life and death sentences.  The Court's failure to know what a life sentence case looks like and what the lower courts have decided as mitigating circumstances, has rendered them unable to ensure against arbitrariness.

If the Ohio courts had demonstrated a willingness to check excessive sentences by an occasional reversal on such grounds, there would be less concern.  But that has not yet happened and there is serious doubt whether it ever could, given the state of capital appellate "review."  The system and its application does not carry out the constitutionally and statutorily mandated responsibility to assure against arbitrariness.

Ohio's statutory scheme on its face has flaws; in application, these are compounded by a failure to exercise a constitutionally necessary review.    No capital indictment can be sustained under these circumstances.

The epitome of the Court's willful blindness is presented by State v.Stumpf. Stumpf argued his co-defendant received a life sentence of 20 years in a trial to a different jury and that his own death sentence was excessive and arbitrary.  Stumpf, 32 Ohio St. 3d at 108, 512 N.E.2d at 611. Not only did the Court refuse to consider whether a similar degree of mitigation was present in the two cases, the Court completely ignored its usual criteria of ratifying the death sentence on the basis of the aggravating circumstances and the nature and circumstances of the offense.  Even if a life sentence imposed upon a co-defendant following trial is not necessarily an impediment to affirming the death sentence, it is

34                                    34

at the least a very relevant consideration.  But the Supreme Court of Ohio simply ignored this factor.  The Court's rationale was that the co-defendant's sentence "is the verdict of a jury in a separate trial." Id. at 108, 512 N.E.2d at 611.  This reasoning begs the question of whether or not the sentence imposed upon Stumpf was an arbitrary one.

3.  Issue One, Removing Appellate Review Jurisdiction of the Courts of Appeals and Limiting Capital Defendants to But One Review In The Ohio Supreme Court, Denies Rights Guaranteed Under the Federal and State Constitutions.

On November 8, 1994, the general public of Ohio voted to amend the Constitution of the State of Ohio. "Issue One" amended Article IV, Sections 2(B)(2)(c) and 3(B)(2) of the Constitution of the State of Ohio creating a direct appeal of right directly to the Supreme Court of Ohio but eliminating the direct appeal of right to the courts of appeals in death penalty cases.

The amendment of the Constitution of Ohio invalidates Ohio's death penalty scheme by violating the Sixth, Eighth, Ninth and the Fourteenth Amendments to the Constitution of the United States.  The Ohio legislature enacted the death penalty scheme in an attempt to comply with the Supreme Court of the United States' import and great general or public interest and therefore would be entitled to an appeal from the courts of appeals to the Supreme Court of Ohio but for the amendment at issue.  By eliminating review by the courts of appeals the State has given non-capital defendants greater process and protection than capital defendants.  On its face, this denial of due process and equal protection violates the Eighth, Ninth and Fourteenth Amendments to the Constitution of the United States.

The very purpose of the Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to replace them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638 (1943).  "If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano v. Florida, 468 U.S. 447, 460 (1984).  The Issue One amendment substantially diminishes the reliability of Ohio's death penalty process.

The public bloodlust for executions is, in fact, one of the strongest arguments for the orderly process of law, due deliberation and review of death sentences, and restraint from a rush of judgment.  How society and a system of laws treat the most forlorn, despised, and outcast individuals reflect the true value of that society and system of laws.  To deny capital defendants the two-tiers of appellate review guaranteed to a convicted petty thief, based upon public opinion, is to forsake all that this country stands for.

G.    THE APPELLATE REVIEW PROVISION OF R.C. 2929.05 FAILS TO SPECIFICALLY REQUIRE INQUIRY AND FINDINGS REGARDING ARBITRARINESS, PASSION, OR PREJUDICE, AND THUS IS CONSTITUTIONALLY INADEQUATE UNDER THE EIGHTH AND FOURTEENTHAMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION.

Appellate review of sentences to determine whether the death sentence is "imposed under the influence of passion, prejudice, or any other arbitrary factor," serves as "a check against the random and arbitrary

imposition of the death penalty." Gregg v. Georgia, 428 U.S. 153, 204, 206 (1976). Death sentences which are arbitrarily or capriciously imposed, due to freakish or infrequent imposition, bias, or discriminatory application, cannot be upheld under the Eighth and Fourteenth Amendments to the United States Constitution. See Furman v. Georgia, 408 U.S. 238, 309-310, 313 (1976). O.R.C. § 2929.05 does not specifically require an inquiry and findings as to the possible influence of passion, prejudice, or any other arbitrary factor. Such an inquiry is constitutionally necessary according to the state and federal constitutions.

The Supreme Court of Ohio's decision in State v. Thompson, 33 Ohio St. 3d 1, 514 N.E.2d 407 (1987), appears to engage in a review of whether passion or prejudice pervaded the capital sentencing proceeding. If the appellate courts consistently consider whether the sentence was possibly influenced by passions or prejudice, this statutory omission may be cured.

As written, however, Ohio's statutory scheme is inadequate to assure compliance with the Eighth and Fourteenth Amendments to the United States Constitution and similar provisions of the Ohio Constitution. If this review is not required explicitly by O.R.C. § 2929.05 (A), and is not deemed required by implication in every case through a construction of the statute, O.R.C. §1.47 (A)(B)(C), then Ohio's capital sentencing scheme must fail.

H.   THE OHIO DEATH PENALTY STATUTE IMPERMISSIBLY MANDATES IMPOSITION OF THE DEATH PENALTY AND PRECLUDES A MERCY OPTION IN THE ABSENCE OF MITIGATING EVIDENCE OR WHEN AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING FACTORS. THE STATUTE ALSO FAILS TO REQUIRE A DETERMINATION THAT DEATH IS THE APPROPRIATE PUNISHMENT.

The Ohio death penalty statutory scheme precludes a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes in those situations mandate that death shall be imposed. O.R.C. §§ 2929.03, 2929.04. The sentencing authority is IMPERMISSIBLY limited in its ability to return a life verdict by this provision.

In Gregg, the United States Supreme Court stated, "nothing" in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199. Furman held only that, "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Id. Gregg requires the State to establish, according to constitutionally sufficient criteria of aggravation and constitutionally mandated procedures, that capital punishment is appropriate for the defendant. Nothing requires the State to execute defendants for whom such a finding is made. Indeed the Georgia statute, approved in Gregg be ing consistent with Furman, permits the jury to make a binding recommendation of mercy even though the jury did not find any mitigating circumstances in the case. Fleming v. Georgia, 240 S.E.2d 37 (1977 Hayes v. Georgia, 282 S.E.2d 208 (1981). Subsequent to Lockett, the Fifth and Eleventh Circuits repeatedly reviewed and remanded cases for error in the jury instructions when the trial court failed to clearly instruct the jury that they had the option to return a life sentence even if the aggravating circumstances outweighed mitigation. Chenault v. Stynchcombe, 581 F.2d 444 (5th Cir.1978); Spivey v. Zant, 661 F.2d 464 (5th Cir.1981); Goodwin v. Balkcom,

38                                          38

684 F.2d 794 (11th Cir.1981); Westbrooke v. Zant, 704 F.2d 1487 (11th Cir.1983); Tucker v. Zant, 724 F.2d 882 (11th Cir.1984); Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982); Prejean v. Blackburn, 570 F. Supp. 985 (D. La.1983).

Capital sentencing that is constitutionally individualized requires a mercy option. An individualized sentencing decision requires that the sentencer possess the power to choose mercy and to determine that death is not the appropriate penalty for this defendant for this crime. In Barclay v.Florida, 463 U.S. at 950, the Court stated that the jury is free to "determine whether death is the appropriate punishment."

Absent the mercy option, the accused faces a death verdict resulting from Lockett-type statute, i.e., a statute that mandated a death verdict in the absence of one of three specific mitigating factors. Under current Ohio law, the sentencer lacks the option of finding a life sentence appropriate in the face of a statute which requires that when aggravating circumstances outweigh mitigating factors "it shall impose a sentence of death on the offender." O.R.C. § 2929.03 (D)(3). A non-mandatory statutory scheme that affords the jury the discretion to recommend mercy in any case "avoids the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of this risk is constitutionally necessary." Conner v. Georgia, 303 S.E.2d 266, 274 (1983). Other state courts have also required a determination of "appropriateness" beyond mere weighing of aggravating circumstances and mitigating factors. California v. Brown, 726 P.2d 516 (1985), reversed on other grounds, 479 U.S. 538 (1987).

The most recent case from the United States Supreme Court respecting the need for consideration of mercy is California v. Brown, 479 U.S. 538, 543 (1987), wherein the court repeated "the Eighth Amendment's

39

need for reliability in the determination that death is the appropriate punishment in a specific case." In <u>Brown</u>, the Court agreed that jurors may be cautioned against reliance on "extraneous emotional factors," and that it was proper to instruct the jurors to disregard "mere sympathy." <u>Id</u>. This instruction referred to the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase. The Court's analysis clearly approved and mandated that jurors be permitted to consider mercy, i.e., sympathy tethered or engendered by the penalty phase evidence.

The Ohio statute does not permit an appropriateness determination; a death sentence is mandated after a mere weighing. Finally, while the Supreme Court of Ohio has claimed that an "Ohio jury is not precluded from extending mercy to a defendant," <u>State v. Zuern</u>, 32 Ohio St. 3d 56, 512 N.E.2d 585 (1987), Ohio jurors are not in fact informed of this capability. In fact, the Supreme Court of Ohio has permitted penalty phase jury instructions in direct contradiction to this extension of mercy capability. The Ohio "no-sympathy" instructions to juries do not in any way distinguish between "mere" sympathy (untethered), and that sympathy tied to the evidence presented in penalty phase, and therefore commit the very violation of the Eighth Amendment which the California instruction had narrowly avoided. While the Supreme Court of Ohio claims extending mercy is permissible in Ohio, and acknowledges that "[s]entencing discretion is an absolute requirement of any constitutionally acceptable capital punishment statute," <u>Zuern</u>, at 65, 512 N.E.2d at 594, there is in fact no such indication on the statute's face, and no state court assurance that jurors are so informed. Bald, unsupported assertions of compliance with the constitution are inadequate.

I.  O.R.C. §§ 2929.03, 2929.04 AND 2929.05 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION BY FAILING TO REQUIRE THE JURY TO DECIDE THE APPROPRIATENESS OF THE DEATH PENALTY.

Pursuant to O.R.C. § 2929.05, Ohio appellate courts, when reviewing a death sentence, must make a determination that death is the only appropriate penalty.  The trial court is not required to make such a determination.

A finding of appropriateness is constitutionally required.  Coker v. Georgia, 433 U.S. 584 (1977).  In  Coker, the Court stated that the death penalty is unconstitutional "if it makes no measurable contribution to acceptable goals of punishment." 433 U.S. at 592.  The death penalty is unconstitutional if, in a particular case, it is not the only penalty that will appropriately serve the State's punishment goals.

The Court consistently refers to the "need for reliability in the determination that death is the appropriate punishment in a given case." Woodson v. North Carolina, 428 U.S. 305 (1976); See also, Lockett v. Ohio, 438 U.S. 586, 604 (1978); Zant v. Stephens, 462 U.S. 862 (1983); Barclay v. Florida, 463 U.S. 939, 958-959 (1983) (Stevens, J., with Powell, J., concurring in judgment); California v. Ramos, 463 U.S. 992, 998-999 (1983).

Merely concluding that the aggravating circumstances outweigh those in mitigation is inadequate, since a jury might still conclude that "a comparison of the totality of the aggravating factors with the totality of mitigating factors leaves it in doubt as to the proper penalty," i.e., in doubt as to whether death is the appropriate punishment in a specific case.  Smith v. North Carolina, 459 U.S. 1056 (1982), (Stevens, J., dissenting from denial of certiorari).

41

Whether the "ultimate penalty is warranted," Proffitt v. Florida, 428 U.S. 242, 253 (1976, must at times be considered by the jury in a manner analytically separate from the legislature's choice as to the significance of particular facts, labeled as aggravating circumstances. The jury, and sentencing judges, "maintain a link between contemporary community values and the penal system." Gregg v. Georgia, 428 U.S. 153, 190 (1976).

Thus, one of the constitutionally required functions of a death penalty scheme is that the aggravating circumstances "reasonably justify the imposition of a more severe sentence of the defendant compared to others found guilty of (aggravated) murder." Zant v.Stephens, 462 U.S. at 877. An opportunity for the jury to find the death penalty inappropriate when "statutory aggravating circumstances exist, and arguably outweigh ... mitigating circumstances, but the (aggravating circumstances) are insufficiently weighty to support the ultimate penalty" "helps to fulfill (this) constitutionally required function." Barclay v.Florida, 463 U.S. at 964, and fn.7 (Stevens, J., with Powell, J., concurring in the judgment). See also, Barclay at 954-955, and fn.12 (plurality opinion discussion of Lewis v. Florida, 398 So.2d 432 (1981). Thus, a jury's "opposition to a particular aggravating circumstance is a legitimate consideration for imposing a life sentence, (as it) represent(s) factors which may call for a less severe penalty." Lockett v.Ohio, 428 U.S. 586, 605 (1978). The Ohio statute cannot be interpreted in effect to instruct the sentencer to ignore this fact calling for a less severe penalty. Ledewitz, The Requirement of Death: Mandatory Language in the Pennsylvania Death Penalty Statute, 12 Duq. L. Rev. 103, 139-140 (1982). When an aggravating circumstance is present and no facts in mitigation are presented, for example, even though the aggravating circumstances outweigh the mitigating factors the sentencing

body "must (still) determine whether the aggravating circumstances ... are of such value, weight, importance, consequence, or significance as to be sufficiently substantial to call for the imposition of the death penalty." North Carolina v. McDougall, 301 S.E.2d 308, 324-328 (1983). See also, Louisiana v. Watson, 423 So. 2d 1130 (1983); King v. Mississippi, 461 U.S. 919 (1983) (Marshall, J., dissenting from the denial of certiorari); Note, Capital Punishment in Ohio, 31 Cleve. St. L. Rev. 495, 510-521 (1982).

The jury must be free to determine whether or not death is the appropriate punishment. Barclay v.Florida, 463 U.S. at 950, quoting California v. Ramos, 463 U.S. 992, 1008 (1983). The jury must make this decision and must make it in a fashion that will allow objective appellate review.

If the original sentencer does not make a finding that the penalty is appropriate in a particular case, then reviewing courts must speculate about whether the sentencer dealt with this issue. Arbitrary decisions will necessarily result where such a finding must be made for the first time on appeal because of speculation.

The present Ohio statutes create an unacceptable risk that death will be imposed in spite of factors in mitigation, or in the jury's decision that death is simply not an appropriate punishment for that man and that crime.

J.   THE OHIO DEATH PENALTY SCHEME PERMITS IMPOSITION OF THE DEATH PENALTY ON A LESS THAN ADEQUATE SHOWING OF CULPABILITY BY FAILING TO REQUIRE A CONSCIOUS DESIRE TO KILL, PREMEDITATION, OR DELIBERATION AS THE CULPABLE MENTAL STATE, BY DENYING LESSER OFFENSE INSTRUCTIONS AND BY ALLOWING AFFIRMANCE OF CAPITAL CONVICTIONS ON THE BASIS OF UNCONSTITUTIONAL PRESUMPTIONS RESPECTING THE PRESENCE OF AN INTENT TO KILL.

The United States Supreme Court has stated that as the death penalty "is an extreme sanction, (it is) only suitable to the most extreme crimes." Gregg, 428 U.S. at 187. In Coker, 433 U.S. at 592, the Court reaffirmed its prior holding in Gregg that the death penalty for a deliberate murder was not grossly disproportionate. However, in Lockett, at 613 (Blackmun, J., concurring), 619-620 (Marshall, J., concurring) and at 624 (White, J., concurring), members of the Court expressed their views that imposition of the death penalty upon one who did not possess at least a purpose to cause the death of the victim would likely violate the Eighth Amendment.

A majority of the Supreme Court in Enmund v. Florida, 458 U.S. 782 (1982), found the imposition of the death penalty upon a person who did not kill, attempt to kill, or intend to kill violated the Eighth and Fourteenth Amendments. The Court stated:

> It is fundamental that "causing harm intentionally must be punished more severely than causing the same harm unintentionally: ... (To do otherwise is) "impermissible under the Eighth Amendment."

Enmund, 458 U.S. at 798. (citations omitted.)

The Ohio Legislature has attempted to meet this constitutional issue by requiring that "No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another," and "that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt." O.R.C. §2903.01(D).

Nowhere, however, in the Ohio Revised Code is the phrase "specific intent" defined. There is considerable confusion over the meaning of this

term in the criminal law sector, particularly when attempts are made to distinguish this from "general intent."

Even if the O.R.C. §2903.01 (B) "discussion" of specific intent is deemed to result in a finding by the jury that the defendant had a conscious desire or objective to kill the victim, imposition of the death penalty would still be an excessive punishment. To avoid disproportionality, the defendant must have been found to have acted with premeditation and deliberation, or with prior calculation and design.

By failing to require the conscious desire to kill, or premeditation and deliberation as the culpable mental state, O.R.C. §2903.01(B) and O.R.C. § 2929.04(A)(7) run afoul of the federal and state constitutions.

Even if Ohio's definition of culpable mental state is deemed constitutional, the Ohio court's method of determining the presence or absence of the culpable mental state is often fatally flawed. It is fundamental that it is a violation of due process to allow a jury to rely on a presumption that a person is presumed to intend the natural and probable consequences of his voluntary acts to find intent. Sandstrom v. Montana, 442 U.S. 510 (1979). Yet the Supreme Court of Ohio, even in capital cases, has expressly relied on this presumption to deny access to lesser included offense instructions, Clark v. Ohio, 38 Ohio St. 3d 252, 527 N.E.2d 844 (1988); State v. Williams, 74 Ohio St. 3d 569, 574, 660 N.E.2d 724, 730 (1996), and see also the non-capital case of State v. Thomas, 40 Ohio St. 3d 213, 533 N.E.2d 286 (1988). This practice violates the state and federal constitutional guarantees to a jury trial on the issue of intent, and violates due process and the cruel and unusual punishment provision. Beck v. Alabama, 447 U.S. 625, 635 (1980). Reliance on the unconstitutional presumption forecloses the ability to view the evidence in the light most

favorable to the defendant, as is essential when determining what must be referred to the jury for its consideration, and amounts to a directed verdict on an element of the crime. Id.; See also Gaudin v. United States, ___ U.S. ___, 115 S.Ct. 2310 (1995).

Further, the presumption itself is not supported by the beyond-a-reasonable-doubt level of connection between the proven fact and the presumed fact that is required under the due process clause. Barnes v. United States, 412 U.S. 837 (1973). It is simply not consistent with present-day experience that every probable consequence of a voluntary act is intended, and thus the presumption fails as a matter of law for purposes of substituting for the prosecution's proof of intent.

The Supreme Court of Ohio has also repeatedly relied on this unconstitutional presumption to find the evidence sufficient to sustain a capital conviction. See e.g. State v. Jester, 32 Ohio St. 3d 147, 152, 512 N.E.2d 962, 968 (1987); State v. Esparza, 39 Ohio St. 3d 8, 529 N.E.2d 192, 198-199 (1988); State v. Seiber, 56 Ohio St. 3d 4, 13, 564 N.E.2d 408, 419 (1990); State v. Carter, 72 Ohio St. 3d 545, 553, 651 N.E.2d 965, 974 (1995); State v. Garner, 74 Ohio St. 3d 49, 59, 656 N.E.2d 623, 634 (1995). This denies a fair and reliable assessment of the evidence and so dilutes  the mens rea element that it fails to meet that required for death-eligibility under the federal and state constitutions. See Lockett v.Ohio, 438 U.S. 586 (1978).

By maintaining a willingness to rely on this presumption, the Ohio courts maintain no rational distinction between the offenses of involuntary manslaughter and aggravated murder in terms of proof. This is wholly unconstitutional under the state and federal constitutions protections of due process, equal protection, and against cruel and unusual punishment.  Finally, the Ohio court's inconsistent practice

46

46

respecting demands for actual proof of intent (at times relying on the presumption and at other times making a genuine effort to engage a constitutionally appropriate analysis), produces arbitrary and inconsistent applications of the Ohio law denying rights guaranteed under the state and federal constitutions.

K.     THE OHIO "BEYOND A REASONABLE DOUBT" STANDARD OF PROOF FAILS TO MEET THE REQUIREMENT OF HIGHER RELIABILITY FOR THE GUILT DETERMINATION PHASE OF A CAPITAL CASE.

1.     <u>The statutes fail to require proof beyond all doubt as to guilt that aggravating circumstances outweigh mitigating factors, and the appropriateness of death as a punishment before the death sentence may be imposed</u>.

The standard of burden of proof required for capital cases should be proof beyond all doubt.  The jury should be instructed during both phases that the law requires proof beyond all doubt of all the required elements. Most importantly, death cannot be imposed as a penalty except upon proof beyond all doubt of both the crime itself and the fact that the aggravating circumstances outweigh the mitigating circumstances.

Insistence on reliability in guilt and sentencing determination is a vital issue in the Supreme Court's capital decisions.  This emphasis on the need for reliability and certainty is a product of the unique decision that must be made in every capital case - the choice of life or death.  The Supreme Court has consistently emphasized the "qualitative difference" of death as a punishment, stating that "death profoundly differs from all other penalties" and is "unique in its severity and irrevocability." <u>Woodson</u>, 428 U.S. at 305; <u>Lockett</u>, 438 U.S. at 605; <u>Gardner v. Florida</u>, 430 U.S. 349 (1977); <u>Gregg</u>, 428 U.S. at 187.

47                                    47

Proof beyond all doubt, a higher standard than the statutory proof beyond a reasonable doubt, should be required in a capital case because of the absolute need for reliability in both the guilt and penalty phases. The irrevocability of the death penalty demands absolute reliability. Absent such a safeguard, the accused may be subject to a sentence of death in violation of his Eighth and Fourteenth Amendment rights.

The proof beyond a reasonable doubt standard is required in criminal cases "to safeguard men from dubious and unjust convictions." In re Winship, 397 U.S. 358, 363 (1970). The petitioner in Winship was a juvenile facing a possible six years imprisonment. Crucial to the Court's decision was its assessment of the importance of the defendant's right not to be deprived of his liberty. Proof beyond a reasonable doubt was demanded in recognition that "the accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the convictions." Id. Only this standard of proof adequately commanded "the respect and confidence of the community in applications of the criminal law." Id. at 364.

In a capital case, far more than liberty and stigmatization are at issue. The defendant's interest in his life must be placed on the scales. Only then can an appropriate balancing of the interests be performed; only then can one know whether the "situation demands" a particular procedural safeguard. Given the magnitude of the interests at stake in a capital case and the necessity that the community "not be left in doubt whether innocent men are being condemned "Winship 397 U.S. at 364, a high standard is required which reduces the margin of error "as much as

humanly possible,"<u>Eddings</u>, 455 U.S. at 878. The most stringent standard of proof that is "humanly possible" is proof beyond all doubt.

The American Law Institute's Model Penal Code, cited by the United States Supreme Court as a statute "capable of meeting constitutional concerns, " adopts the beyond-all-doubt standard at the sentencing phase. <u>See</u> <u>Gregg v.Georgia</u>, 428 U.S. 153, 191-195 (1976). The Model Penal Code mandates a life sentence if the trial judge believes that "although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt." Model Penal Code §210.6 (1)(f). If the trial judge has any doubt of the defendant's guilt, life imprisonment is automatically imposed without a sentencing hearing. The words used are "all doubt," not merely "doubt" or "reasonable doubt."

2. <u>Ohio's definition of proof "beyond a reasonable doubt" results in a burden of proof insufficiently stringent to meet the higher reliability requirement in capital cases at the guilt phase, and this has not been cured by appellate courts in their review of convictions or death sentences.</u>

Ohio law provides standard jury instructions of "reasonable doubt" and "proof beyond a reasonable doubt" as the applicable burden of proof in capital cases. O.R.C. §2901.05 (D). Both definitions have been repeatedly challenged in the courts as inadequate. ". . . The restyling has changed and distorted the former definitions to such an extent that the statutory definition of reasonable doubt requires little more than a preponderance of the evidence." <u>State v. Frost</u>, No. 77AP-728 (Franklin Ct. App. May 2,1978) (Whiteside, J., dissenting). <u>See</u> <u>Cross v. Ledford</u>, 161 Ohio St. 469, 120 N.E.2d 118 (1954); <u>Holland v. United States</u>, 348 U.S. 121 (1954); <u>Scurry v. United States</u>, 347 F.2d 468, 470 (D.C. Cir. 1965), <u>cert. denied</u>, 289 U.S. 883 (1967) (. . . [I]mportant affairs is the traditional test for clear and convincing evidence

. . . The jury . . . is prohibited from convicting unless it can say beyond a reasonable doubt that defendant is guilty as charged. . . . To equate the two in the juror's mind is to deny the defendant the benefit of a reasonable doubt.) State v. Crenshaw, 51 Ohio App. 2d 63, 65, 366 N.E.2d 84, 85 (1977); cf. State v. Nabozny, 54 Ohio St. 2d 195, 375 N.E.2d 784 (1978); State v. Seneff, 70 Ohio App. 2d 171, 435 N.E.2d 680 (1980). Recently, the Sixth Circuit found in a non-capital case that "although we may disapprove of the 'willing to act language' (in O.R.C. §2901.05 (D)) . . . the instructions here, when taken as a whole, adequately convey the concept of reasonable doubt to the jury." Thomas v. Arn, 704 F.2d 865, 869 (6th Cir.1983).

The Ohio reasonable doubt instructions, subject as they are to some challenge for inadequacy in non-capital cases, fail to satisfy the requirement of reliability in a capital case. Even in Winship, when considering the reasonable doubt standard, the Court stated that the fact finder must be convinced of guilt "with utmost certainty," Winship, 397 U.S. 358, 364, and that the court must impress on the trier of fact the necessity of reaching a subjective state of certitude. Id. 397 U.S. at 363. Ohio's definition of a reasonable doubt is inadequate to meet even these standards. The old "proof to a moral certainty" instruction should be required at a minimum in death cases.

Recent cases have illustrated the gross inadequacy of the reasonable doubt standard in capital cases. In State v. Miller, 49 Ohio St. 2d 198, 361 N.E.2d 419 (1977), the defendant was sentenced to death solely upon fingerprint evidence that he had explained in an exculpatory manner. A five-Justice majority of the Supreme Court of Ohio concluded that "there was sufficient substantial evidence for the triers of fact to conclude that

50          50

Miller was the criminal agent of the crimes charged," Miller, 9 Ohio St. 2d at 203, 361 N.E.2d at 423, and therefore affirmed the conviction and sentence of death. Two members of the Court dissented on the ground that the evidence did not exclude "every reasonable hypothesis of innocence" and listed other evidence inconsistent with Miller's guilt. According to the dissent, the result of the majority's affirmance was the "impos(ition of) the death penalty on evidence insufficient to sustain a conviction." Id. at 206, 361 N.E.2d at 423 (Brown, J., dissenting). George Miller's death sentence was eventually commuted as a result of the decision in Lockett v. Ohio, 438 U.S. 586 (1978). If no such decision had been rendered by the United States Supreme Court, Miller would have been executed.

In Miller, doubt existed as to guilt of the accused. Yet Miller received a death sentence affirmed on appeal. Doubt on guilt is absolutely untenable in a capital case. The defendant's interest is not merely in liberty, but life itself. The State's interest in justice is also a vital one. It is not advanced by doubt about guilt. A compromise sentence exacts too great a price from both the State and the accused. The result is a manifest injustice.

Given this inadequate definition of proof beyond a reasonable doubt, one would hope some appellate review could assure the innocent are not executed. Unfortunately, the lower courts cannot rely on the Supreme Court of Ohio's review to cure the inadequacies in the proof standard. In State v. Apanovitch, 33 Ohio St. 3d 19, 514 N.E.2d 394 (1987), the four member court majority conceded the case before them was based solely on circumstantial evidence, and that the burden of proof then required exclusion of every reasonable hypothesis of innocence but then affirmed the conviction and death sentence as there was substantial

evidence upon which a jury could reasonably conclude that the elements were proven beyond a reasonable doubt. The death sentence was affirmed as the evidence was not, as a matter of law, insufficient. In other words, the court will affirm as long as reasonable jurors could differ as to the proof beyond a reasonable doubt showing.

Three justices dissented from the affirmance of Apanovitch's death sentence, as they believed they were statutorily bound to engage in a review of the appropriateness of the death sentence that goes beyond a bare sufficiency of the evidence test, and as they believed "there [was] a substantial possibility that the defendant may not be guilty." Apanovitch, 33 Ohio St. 3d at 29, 514 N.E.2d at 405 (Sweeney, Locher, and Brown, JJ., concurring in part and dissenting in part). Obviously, it is encouraging that three members of the court were willing to affirm a conviction, but vacate a death sentence when there is "lack of certainty as to guilt," and "even though the crime would merit that penalty if there were no doubt as to the defendant's guilt." Id. at 31, 514 N.E.2d at 406. But a minority of the Court cannot assure that an innocent person will not be executed.

3.    <u>The Ohio death penalty statutes fail to require that the jury consider as a mitigating factor pursuant to O.R.C. § 2929.04(B) that the evidence fails to preclude all doubt as to the defendant's guilt.</u>

The language of O.R.C. §§ 2929.04(B)(7) and 2929.03(D)(2) contemplates a balancing process focusing upon the mitigating factors present in the case as compared to the offender's "guilt" with respect to the aggravating specifications.

In determining the appropriateness of the death penalty, the fact that the evidence presented failed to foreclose all doubt as to guilt must be considered as a relevant mitigating factor. "The jury should have

before it not only the prosecution's unilateral account of the offense but the defense version as well.  The jury should be afforded the opportunity to see the whole picture . . . ."  <u>California v. Terry</u>, 390 P.2d 381 (1964).  The failure to require jury consideration of the fact that the evidence does not foreclose all doubt as to guilt violates the constitutional standards established for the imposition of the death penalty.

The United States Supreme Court has ruled that Louisiana's definition of reasonable doubt as a grave or substantial uncertainty was unconstitutional, <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990), but that another state's instructions of substantial doubt, in the context of other instructions respecting the standard as an abiding conviction to a moral certainty did not offend the federal constitution.  <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994).  The federal courts have not yet reported on Ohio's definition in the context of a capital case.  Assurances against mistake are vital to a fair and just system free of cruel and unusual death-sentencing.

L.   THE AGGRAVATING CIRCUMSTANCE THE ACCUSED IS CHARGED WITH COMMITTING, O.R.C. § 2929.04(A)(7), IS CONSTITUTIONALLY INVALID WHEN USED TO AGGRAVATE O.R.C. §2903.01(B) AGGRAVATED MURDER.

1.   <u>To base a death sentence on O.R.C. § 2929.04(A)(7) and O.R.C. §2903.01(B) would be to deny the accused due process and would result in cruel and unusual punishment.</u>

The United States Supreme Court warned that "to avoid (the) constitutional flaw of (vagueness and overbreadth under the Eighth Amendment), an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence of a defendant as compared to others found guilty of (aggravated) murder."  <u>Zant v.Stephens</u>, 462 U.S. 862,

877 (1983). Ohio's statutory scheme fails to meet this constitutional requirement because the aggravating circumstance under O.R.C. § 292904 (A)(7) fails to genuinely narrow the class of individuals eligible for the death penalty.

O.R.C. §2903.01 (B) defines the category of felony-murderers as anyone who:

> ... purposely cause(s) the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

If any one of the aggravating factors listed in O.R.C. § 2929.04 (A) is specified in the indictment and proved beyond a reasonable doubt the defendant becomes eligible for the death penalty. O.R.C. §§ 2929.02 (A) and 2929.03.

What makes this scheme unconstitutional is the fact that the O.R.C. § 2929.04 (A)(7) aggravating circumstance merely repeats as an aggravating circumstance the factors that distinguish aggravated felony-murder from murder. Proof of the O.R.C. § 2929.04 (A)(7) circumstance here fails to reasonably justify the imposition of a more severe sentence on the Accused compared to others found guilty of aggravated murder. O.R.C. § 2929.04 (A)(7) does not reasonably justify the imposition of a more severe sentence on felony-murderers as compared to other aggravated murderers. The aggravating circumstance must therefore fail. Zant, 462 U.S. at 877. The aggravating circumstance of O.R.C. § 2929.04 (A)(7) merely repeats the definition of felony-murder as alleged to have been committed which automatically qualifies the defendant for the death

penalty.  As a result, the prosecuting attorney and the sentencing body is given an unbounded discretion that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification.

As compared to other aggravated murderers, the felony-murderer is treated more severely.  The person who purposely kills with prior calculation and design is not automatically subjected to the death penalty. He will receive a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment--if he is on good behavior in prison, he may be paroled after approximately sixteen years.  O.R.C. §2903.01 (A), O.R.C. §2967.19 ( B).  This is the maximum sentence he can receive, unless the prosecution can find and prove some evidence of additional facts beyond the fact that he killed, facts of the type described in O.R.C. § 292904 (A).  Each O.R.C. § 2929.04 (A) circumstance when used in connection with O.R.C. §2903.01 (A) adds additional measure of culpability to this offender such that society at least arguably should be permitted to punish him more severely with death.

But the aggravated murder defendant who is alleged to have actually killed another during the course of an enumerated felony pursuant to O.R.C. §2903.01 (B), is automatically eligible for the death penalty--not a single additional proof of fact is necessary.  If both of these persons who kill are aggravated murderers it makes no sense to accord one an ostensible opportunity for release after sixteen years, and to give the other death or imprisonment for at least twenty to thirty years, merely because one commits aggravated murder under O.R.C. §2903.01 (B) rather than 2903.01.

To treat the killer who acts with prior calculation and design less severely is also nonsensical because his blame worthiness or moral guilt is clearly higher, and the argued ability to deter him lesser.  From a retributive stance this is the most culpable of mental states, as shown by history, overall legislative action, and jury behavior (juries express reticence against the death penalty in felony-murder prosecutions even when the felon is the actual killer).  Comment, <u>The Constitutionality of Imposing the Death Penalty for Felony Murder</u>, 15 Hous. L. Rev. 356, 375 (1978).

To treat the prior calculation and design killer to an easier punishment is an irrational exercise of legislative authority.  The classification created by O.R.C. § 2929.01 (A)(7) must fail.

The Ohio capital punishment felony-murder scheme also fails to reasonably justify the death sentence because the Supreme Court of Ohio has stated that it will interpret O.R.C. § 2929.04 (A)(7)  not require that the intent to commit a felony precede the murder.  <u>State v. Williams</u>, 74 Ohio St. 3d 569, 660 N.E.2d 724, syl. 2 (1996). The historical basis for treating felony-murder as that which deserves greater punishment is the fact that the offender began his conduct with a felonious purpose (indeed, under the traditional felony-murder rule, this bad intent substituted for the required proof of malice otherwise needed to prove murder). See discussion of English and other authorities in <u>Michigan v. Aaron</u>, 299 N.W.2d 304 (1980). The asserted state interest in doing so was to deter the commission of felonies in which individuals may die. To this end, courts have generally required that the killing be the result of an act done in furtherance of the felonious purpose and not merely coincidental to the perpetration of a felony. <u>Id</u>., referencing the Model Penal Code. Without

56                                    56

such a limitation, no state interest justifies a stiffer punishment; rather, the offender should simply be punished for the homicide (and let the prosecution prove intent) and any other felonies that may have been committed. Now the Supreme Court of Ohio has discarded the only arguable reasonable justification for the death sentence to be imposed on such individuals, a position that engenders constitutional violations. <u>Zant v.Stephens</u>, 462 U.S. 862 (1983). Ohio would appear to allow death eligibility when the felony was merely an afterthought to the murder. This is constitutionally intolerable. <u>See</u> <u>Mann v. Scott</u>, 41 F.3d 968 (5th Cir.1994). Further, the Supreme Court of Ohio's current position is inconsistent with its previous announcements in <u>State v. Rojas</u>, 64 Ohio St. 3d 131, 592 N.E.2d 1376 (1992) and earlier cases, thus creating the grave likelihood of arbitrary and inconsistent applications of the death penalty.

2. <u>O.R.C. § 2929.04(A)(7) is unconstitutional as it delegates harsher punishment to the felony murderer than  the punishment imposed on a premeditation murderer.</u>

Equal protection of the law requires that legislative classifications be supported by, at least, a reasonable relationship to legitimate State interests. <u>Skinner v. Oklahoma</u>, 316 U.S. 535 (1941). Given that the State is attempting to take life, the most precious right of all, compelling State interest is necessary to sustain legislative classifications in capital sentencing statutes. The State has arbitrarily selected one class of murderers who may be subjected to the death penalty. This statutory scheme is inconsistent with the purported State interests. The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are eligible for the death penalty. Surely, if deterrence is a State objective, then this type of killing would be a prime

target for the imposition of the death penalty. Yet, this type of aggravated murderer is excluded from the group that is subject to the death penalty. There is no rational basis or any State interest which justifies this distinction. Its application is arbitrary and capricious.

M.    O.R.C. §§ 2929.03, 2929.04 AND 2929.05 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 9 AND 16 OF THE OHIO CONSTITUTION IN FAILING TO PROPERLY ALLOCATE THE BURDEN OF PROOF DURING MITIGATION PHASE OF TRIAL.

1.    Ohio Burden of Proof on Mitigation

O.R.C. § 2929.03 (D)(1) provides that the accused has the burden of going forward with the evidence in mitigation. The statute fails to allocate the burden of proof as to the existence of mitigating factors. This leaves the jury with no guidance. Arbitrary decisions will result from the vague scheme that now exists.

2.    Beyond a Reasonable Doubt Standard

The State of Ohio should have the burden of proving the absence of mitigating factors beyond a reasonable doubt because it will prevent arbitrary decisions in close cases. The accused cannot be obliged to bear the burden of proving the existence of mitigating factors. If the defense is so obligated, then in all close cases, where aggravation and mitigation are equally balanced, the jury would be required to recommend death. This statute must not be interpreted in a manner which allows the State to "win ties." This would be contrary to the requirements of the Constitution insofar as it mandates respect for humanity and the greater need for reliability as to the appropriateness of the death penalty. See Woodson, 428 U.S. at 305; Lockett, 438 U.S. at 604; and Mullaney v. Wilbur, 421 U.S. 684, 697-701, 703-704 (1975).

Placing the burden of proving the absence of mitigating factors on the prosecution will also prevent what has been called "state-administered suicide," Godfrey, 446 U.S. 420, 439.

The Supreme Court of Ohio held in State v.Jenkins, that the defense has the burden of proof by a preponderance at mitigation. If this is an obligation of the defense, it follows logically that as an affirmative defense, this is one right which the client may waive. Thus under the present statutory scheme, the State may participate in aiding a capitally-charged defendant's suicide, where such defendants want to be executed despite the existence of mitigating factors.

There are at least two reasons why an accused may want to die. The most obvious is that death may understandably be preferable to a long prison term. Another reason is that the murderer may truly feel that death is what he deserves for the crime he committed. Death is not necessarily the proper penalty in either case, however. If death is preferable to the convicted murderer, then clearly the death penalty fails as a deterrent. If the defendant feels he deserves to die for what he has done, then he is repentant and could probably be rehabilitated. In any case, society's decision to issue its most extreme sanction is not a decision to be based in any part upon a criminal defendant's desires. If it is to exist at all, then the penalty must be based upon external, objectively assessable factors.

O.R.C. § 2929.03 (D)(1) places the burden of going forward with evidence of mitigating factors on the accused. A particular defendant may have many items of mitigation in his favor, but if he declines to raise them, the death penalty is mandatory. The sentencing authority has no choice:   it must weigh the aggravating circumstance(s) (already

59

established) against the absence of mitigation.  Thus, two men with the same background can commit the same murder and be sentenced to grossly different penalties, merely because one has the will to live and the other does not.  A sentencing scheme which allows this result operates arbitrarily and capriciously in violation of equal protection and due process clauses.  See Greenberg, Capital Punishment As A System, 91 Yale L. J. 908 (1982).  In Lenhard v. Wolff, 444 U.S. 807 (1974), the defendant was allowed to stand mute in mitigation despite the readiness of standby counsel to go forward.  Justice Marshall (dissenting) pointed out that:

> We can have no assurance that the death sentence
> would have been imposed if the sentencing
> tribunal had engaged in the careful weighing
> process that was held to be constitutionally
> required in Gregg v. Georgia and its progeny.  This
> Court's toleration of the death penalty has
> depended on its assumption that the penalty will
> be imposed only after painstaking review of
> aggravating and mitigating factors.  In this case,
> that assumption has proved demonstrably false.
> Instead, the Court has permitted the state's
> mechanism of execution to be triggered by an
> entirely arbitrary factor:  the defendant's decision
> to acquiesce in his own death.  In my view, the
> procedure the Court approves today amounts to
> nothing less than state-administered suicide ...

Lenhard, at 815.  See also, Gilmore v. Utah, 429 U.S. 1012 (1976).

Justice Stevens in his concurring opinion in Barclay maintained that both Lockett v. Ohio and Eddings v. Oklahoma condemn any procedure in which evidence of mitigation has no weight at all.  463 U.S. at 961, fn.2.  Yet, this is the effect of the Ohio statute under the suicide fact pattern.  The statutory procedure does not compel introduction of mitigating evidence.  Making mitigation mandatory and proper allocation of the

burden of proof would address these concerns.  In the absence of this requirement, the statutory system is unconstitutional.

CONCLUSION

For the foregoing reasons, Defendant by and through his counsel, respectfully moves this Court for an order dismissing that portion of the aggravated murder indictment which elevates the potential penalty from life imprisonment to death.  In its present form, the Ohio statutory death penalty system violates Defendant's rights to due process, fair trial, equal protection, fair and impartial jury, effective assistance of counsel, and against cruel and unusual punishment.

While the Supreme Court of Ohio has ruled on the constitutionality of the Ohio Death Penalty Statutes, some of these issues have not yet been reviewed in the Supreme Court of Ohio on state and/or federal constitutional grounds.  Further, reported opinions of the federal courts have not yet reviewed the federal constitutional implications of these statues or practices.  Defendant urges this Court to grant his motion for dismissal of that portion of the charge which elevates his potential punishment.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

61

61

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio 44483
(330)393-7727 FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing DEFENDANT'S
CONSTITUTIONAL MOTION DISMISS was delivered to the Prosecutor's Office,
160 High Street, Warren, Ohio, 44481, on this 23rd day of Jan,
2002.

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT