IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

Co3

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | |
| | ) | |
| | ) | Judge Stuard |
| NATHANIEL JACKSON , | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO PROHIBIT ANY REFERENCES TO THE FIRST PHASE AS THE "GUILT PHASE"

NATHANIEL JACKSON, through his attorney, respectfully moves this Court for an order in limine to prohibit the State and the Defense, and to restrain itself, from referring to the first phase of this matter as the "guilt phase" of the proceedings, or to otherwise use the word "guilt" as an adjective to refer to that state of the proceedings at which Defendant's innocence or guilt is determined. The reasons in support of this motion are set out in the accompanying memorandum.

Respectfully submitted,

DAVID H. BODIKER #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076


<u>MEMORANDUM IN SUPPORT</u>


Sections 9, 10, and 16, Article I of the Ohio Constitution, as well as the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, guarantee every criminal defendant the right to a fair trial.  This right requires the court to conduct trial in a manner which does not appear to indicate that a particular outcome of the trial is expected or likely.  <u>State</u> v. <u>Hopkins</u> (1982), 69 Ohio St. 2d 80.

Although participants, including some defense counsel, have lapsed into referring to the verdict-determination process as the "guilt phase" of a capital proceeding (apparently to distinguish it from the "mitigation" or "punishment" phase), the "guilt" label creates an unfair inference that the very purpose of the evidentiary phase is to find a defendant guilty.  The terms "evidentiary stage," "trial stage," or "fact-finding stage" would more

appropriately designate that phase of the matter without unfairly predisposing the jury toward assuming Defendant's guilt. Present use of the phrase "guilt phase" makes no more sense than referring to the trial as the "innocence phase."

Therefore, Defendant hereby moves this Court for an order in limine to prevent the use of the word "guilt," in general designated reference to this phase of these proceedings.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and Memorandum was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this ___ day of _____, 2002.

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

4

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

64

| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | |
| | ) | |
| | ) | Judge Stuard |
| NATHANIEL JACKSON , | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO ALLOW THE DEFENSE TO ARGUE
## FIRST AND LAST AT THE SENTENCING HEARING

Now comes NATHANIEL JACKSON, by and through counsel, and respectfully requests this Honorable Court to allow the defense to present closing arguments first and last at the Sentencing Hearing. The reasons in support of this request are set out in the accompanying memorandum in support.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER

328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

MEMORANDUM IN SUPPORT

In <u>State v. Jenkins</u> (1984), 15 Ohio St. 3d 164, 214-215, the Ohio Supreme Court stated that the decision to allow the defense to open and close final argument in the penalty phases is within the sound discretion of the trial court.  <u>Jenkins</u> makes it clear that the trial court properly may allow the defense the right to argue to the jury first and last.  Support for this order of argument can also be found in R.C. 2945.10(D), which states that in the furtherance of justice, the trial court may permit evidence to be offered by either side out of its order.  In addition, R.C. 2929.04(C) states that Defendant shall be given great latitude in the presentation of evidence at the mitigation phase.  While these two statutes deal with the presentation of evidence, their permissive nature and their underlying purposes apply equally to issues involving closing arguments.  These statutes indicate that the order of proceedings should be determined in accord with the principles of fairness and due process.  R.C. 2929.04(C) indicates that the Legislature determined that in the penalty phase of a capital trial, these principles call for the granting of special privileges to the Defendant.  In

2

light of the fact that the purpose of the mitigation phase is to allow the Defendant to show reasons why he should not be put to death, justice would be furthered if the Defendant is allowed to argue first and last.

Due process considerations support allowing the Defendant to argue first and last.  A case of this magnitude deserves the maximum judicial consideration to guarantee a fair trial.  The United States Supreme Court has recognized that "death is a different kind of punishment, than any other which may be imposed in this country."  Gardner v. Florida (1977), 430 U.S. 349.  It is clear that a higher standard of due process is required in death cases then other cases because of the severity and finality of the punishment which may be involved.  The Supreme Court, has stated:

"[I]t is the universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations." Griffin v. Illinois (1956), 351 U.S. 12, 28.  Furthermore, the Court has repeatedly held: "[T]he extent to which procedural due process must    be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," ... Goldberg v. Kelly (1970), 397 U.S. 254 at 262-263, quoting Joint Anti-Fascist Refugee Committee v. McGrath (1951), 341 U.S. 123, 168 (Frankfurter, J. concurring).

It is fundamentally unfair and certainly incongruous to prevent a person who faces the loss of his life from arguing last at a proceeding which

is intended to allow him an opportunity to plead for his life.  This second phase of trial is unique in the American system of justice.  What is also unique is that the prosecution and the Defendant do not start from scratch, since the prosecution has already proven its case and on the specifications at the first trial.  The statute, to comply with In Re Winship (1969), 397 U.S. 358, had to state that the burden of proving what punishment is appropriate is on the prosecution, but in actuality it is not.

Section 2929.03(D)(1) of the Ohio Revised Code states that the prosecution must prove beyond a reasonable doubt that the aggravating circumstances of which Defendant was convicted outweigh the mitigating circumstances.  It might at first glance appear that the prosecution actually bears the burden at the mitigation phase.  However, a more careful examination of the practical application of the statute indicates that the burden is largely illusory.  Once the prosecution proves the specifications, it need do nothing at the mitigation phase.  If the Defendant chooses not to put on any mitigating evidence, a death sentence will result.  Contrary to the words of the statute, then, the Defendant has the burden of proving that he should be allowed to live.  If Defendant fails to prove sufficient mitigating circumstances to create a reasonable doubt in the minds of the jurors, he may well lose his life.  The Defendant should be allowed to argue first and last to alleviate the burden improperly placed on Defendant.

4

At least two other jurisdictions have sought to alleviate the inherent unfairness in allowing the prosecution to speak last before the jury.  The Kentucky statute which prescribes a penalty phase hearing states: The prosecuting attorney shall open and the defendant shall conclude the argument.  Ky. Rev. Stat. Section 532.025(1)(A).  California has reached the same result through judicial interpretation.  In People v. Bandhauer (1967), 66 Cal. 2d 524, 530-531, the court stated:

> Equal opportunity to argue is *** consistent with the Legislature's strict neutrality in governing the jury's choice of penalty ***, Accordingly, hereafter the prosecution should open and the defense respond.  The prosecution may then argue in rebuttal and the defense
> close in surrebuttal.

Considerable precedent exists in the rulings of trial courts across the State as well as Franklin County for permitting the defense to argue first and last in the penalty phase.  Set forth below is merely an informal list of capital trial proceedings that are known to counsel to have granted the defense motion to argue first and last:

State v. Herman Rucker, (Wayne Cty., 82-CR-1018)

State v. Robert Shields, (Cuyahoga Cty., CR-273004-B)

State v. David Steffen, (Hamilton Cty., B824004)

State v. Randy Fellos, (Trumbull Cty., 82-CR-470)

State v. John Wm. Byrd, (Hamilton Cty., B831662)

State v. David Russell, (Clermont Cty., 82CR-5246)

5

State v. Andrew Majoris, (Cuyahoga Cty., CR-182588-A)

State v. Timothy Wingo, (Ross Cty., 83-CR-79)

State v. Donald Sumser, (Stark Cty., CR-83-3466)

State v. Gregory Esparza, (Butler Cty., CR-84-02-0125)

State v. Earnest Gaither, (Lucas Cty., CR-83-6603)

State v. Bradley Dotson, (Franklin Cty., 85 CR-06-1725

    (See Appendix A)

State v. Kevin Myers, (Licking Cty., 92 CR 189)

    (See Appendix B)

WHEREFORE, NATHANIEL JACKSON respectfully requests this Court to structure the penalty phase so that the defense speaks to the jury last.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483

6

(330)393-7727  FAX (330)393-7076
COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and Memorandum was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this ____ day of _____, 2002.

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

7

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

65

STATE OF OHIO,                )      Case No.  01-CR-794
                              )
            Plaintiff,        )
VS.                           )
                              )
                              )      Judge Stuard
NATHANIEL JACKSON ,           )
                              )
            Defendant.        )

## MOTION TO CHALLENGE THE ARRAY OF
## THE GRAND JURY AND PETIT JURY

Now comes Defendant, NATHANIEL JACKSON, through counsel, and

moves this Court to dismiss the Indictment against Defendant and the array

of petit jurors called in the above case.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>MEMORANDUM IN SUPPORT</u>

This motion is brought pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Article X of the Constitution of the State of Ohio, Rule 24(E) of the Ohio Rules of Criminal Procedure and Sections 2313.01 to 2313.46 of the Ohio Revised Code.

The grand jury and the prospective petit jury in the above case have been improperly drawn and do not constitute a fair cross section of the community and prejudice the Defendant.

The jurors drawn and to be drawn in the above case were not drawn in compliance with Sections 2313.01 to 2313.46 of the Ohio Revised Code. Procedures for drawing jurors under the Ohio Revised Code violate Defendant's United States and Ohio Constitutional rights.  Defendant has been prejudiced by the violation of his rights and therefore we respectfully ask for the dismissal of the Indictment against Defendant and discharge the petit jury called in the above case.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

2

_[signature]_

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

_[signature]_

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL


BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON



<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion and Memorandum was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this 23 day of _____, 2002.

_[signature]_

ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT


3

66

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Stuard |
| | ) | |
| VS. | ) | |
| | ) | |
| NATHANIEL JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION FOR A CHANGE OF VENUE

NATHANIEL JACKSON, through his attorneys, Anthony V. Consoldane and James F. Lewis of the Trumbull County Branch Office of the Ohio Public Defender's Commission respectfully moves this Court for a change of venue under Crim. R. 18(B) and R.C. 2901.12(J). The extensive news coverage concerning the nature of the alleged offenses and  supposed involvement in the offenses has unfairly prejudiced him.  Wide community exposure to this information creates a substantial likelihood that  will be denied his constitutional rights to a fair and impartial jury and a fair trial.  An immediate change of venue is in the best interests of justice.

If an immediate change of venue is not granted, extensive individual voir dire of the venire should be allowed to detect any prejudice and ensure that community exposure to information related to this trial does not violate the rights to a fair trial or fair and impartial jury.  The reasons in support of this motion are set out in the accompanying memorandum.

<u>MEMORANDUM IN SUPPORT</u>

## I. <u>INTRODUCTION</u>

NATHANIEL JACKSON requests a change of venue because of the wide, detailed media coverage of the facts of this case and of his alleged involvement in the offenses.  If an immediate change of venue is not granted, this Court should authorize extensive individual voir dire prior to trial to ensure that venire members hold no predispositions or prejudice which would prevent them from acting as fair and impartial jurors and from deciding the trial fairly on the merits. Every person accused of crime is entitled to be tried by a fair and impartial jury of his peers and to be convicted, if at all, on the basis of evidence properly adduced at trial.  The Supreme Court has stated:

> In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.  "A fair trial in a fair tribunal is a basic requirement of due process."  <u>In re Murchison</u>, 349 U.S. 133, 136.  In the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as "indifferent as he stands unsworn." His verdict must be based upon the evidence developed at trial.    This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies *** "The theory of the law is that a juror who has formed an opinion cannot be impartial."  <u>Reynolds v. United States</u>, 98 U.S. 145, 155.

<u>Irvin</u> v. <u>Dowd</u> (1961), 366 U.S. 717, 722, from <u>Goins</u> v. <u>McKeen</u> (C.A.6,

1979), 605 F. 2d 947.

In order that a jury be deemed impartial, it is not necessary that the jurors be totally ignorant of the facts and issues involved in the case. Rather, the test is whether any potential juror who has been exposed to publicity can set aside his impression and render a verdict based on the evidence presented in court. United States v. Johnson (C.A.6, 1978), 584 F. 2d 148, 154, certiorari denied (1979), 440 U.S. 918.

As the court in Forsythe v. State (1967), 12 Ohio Misc. 99, noted, an assumption by a trial judge that a juror could disregard pretrial publicity because he was so instructed, was a triumph of faith over experience. The court held that an accused should not have to stake his life on the possible failure of the juror to so triumph, but should be granted a change of venue. Clearly, when vast pretrial publicity has been revealed, it becomes a legal fiction to assume that the jurors will preserve the presumption that the accused is innocent. In United States v. Aaron Burr (1907), 25 Fed. Cas. 30 (1789-1880), Case No. 14, 692, Chief Justice Marshall stated:

> Why do personal prejudices constitute a just cause of challenge? Solely because the individual who is under their influence is presumed to have a bias on his mind which will prevent an impartial decision on the case according to the testimony. He made it clear that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; but the law will not trust him *** he will listen with more favor to that testimony which confirms, than to that which would change his opinion.

## II. CONTENT OF NEWSPAPER COVERAGE IN THE PRESENT CASE

In the present case, a number of articles appeared in the newspapers. (See appendix.) While the sheer number of articles is

important in deciding the venue issue, the actual content of the newspaper articles is more important. The following facts are evident from a review of these articles: (1) the receptiveness of the community to this publicity which was highly negative to the Accused; (2) the clear inflammatory impact which this publicity created against the Accused; (3) publication of the Accused's confession; (4) publication of the Accused's prior criminal record; (5) publicity which was sympathetic to the victim; (6) publication that the Accused was an "outsider" in the community; and (7) publication of inadmissible evidence. These facts demonstrate the need for a change of venue.

1. <u>The Trumbull County Community</u> - This county is a small county. The United States Census Bureau estimates that the population is 227,000. In <u>Nebraska Press Association</u> v. <u>Stuart</u> (1961), 427 U.S. 539, 600, Justice Brennan stated:

> The smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed.

This county has previously had homicides that still affect the county, including the Danny Lee Hill case, the Marie Poling case and the Kenneth Biros case.

Therefore, the Trumbull County community is more susceptible to a change of venue motion. Not only is the community small, but because of prior homicides occurring in the county, the residents are more likely to become upset about another homicide.

2. <u>The Inflammatory Impact of the Newspaper Articles</u> - When the original indictment was returned, the Warren Tribune Chronicle published articles sensationalizing this case.

These circulating articles and sensational editorializing in conjunction with stressing the Accused's prior record and emphasizing the good deeds of the victim constituted highly inflammatory coverage. Any potential juror not only knows "all the facts" because of the extensive newspaper coverage, but also risks public ridicule in the newspaper if his or her verdict does not satisfy the wishes of the county newspaper.

3. <u>Publication of a Confession</u> - Publication of a confession is one of the strongest possible grounds for a change of venue. <u>Rideau</u> v. <u>Louisiana</u> (1963), 373 U.S. 723, 726. In the present case, numerous newspaper articles have appeared in which it was reported that the Accused had confessed.

After reading these headlines or any of the different stories containing the fact that the Accused had confessed, potential jurors will simply not be able to give the Accused a fair trial.

4. <u>Publication of the Accused's Prior Record</u> - The courts have consistently recognized that media reports which refer to prior convictions or arrests of an accused are highly prejudicial. <u>Marshall</u> v. <u>United States</u> (1959), 360 U.S. 310; <u>United States</u> v. <u>Williams</u> (C.A.5, 1978), 568 F. 2d 464. In the present case, there were numerous newspaper articles that referred to the fact that the Accused had a prior criminal record.

Numerous headlines were printed concerning the Accused's prior records:

In <u>State</u> v. <u>Allen</u> (1987), 29 Ohio St. 3d 53, 55, a unanimous Ohio Supreme Court stated:

> The existence of a prior offense is such an

> inflammatory fact that ordinarily is should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand. For this reason, we do not consider the trial court's admonitions to the jury that appellee's prior convictions are immaterial to his guilt of the present charge sufficient to cure the error.

Because of the numerous newspaper articles concerning the Accused's prior record, he will not be able to receive a fair trial in this county.

7. Publication of Inadmissible Evidence - The disclosure of inadmissible information creates the danger that the jury's verdict will rest on an impermissible basis. United States v. Engleman (E.D. Mo. 1980), 489 F. Supp. 48, 50; United States v. Herring (C.A.5, 1978), 568 F. 2d 1099; Marshall, supra; Williams, supra, at 466.

The problem becomes magnified because this case is a capital case. Pursuant to R.C. 2929.03, a jury in a capital case not only decides the issue of guilt, but also punishment (if the accused is found guilty of the death penalty specifications(s) in the first phase). Hence publicity concerning inadmissible evidence can taint not only the guilt determination, but also the sentencing decision. The Accused bears the burden of production regarding any mitigating factor. R.C. 2929.03(D)(1). The prosecutor is limited to rebutting any mitigation factor raised by the Accused. State v. Jenkins (1984), 15 Ohio St. 3d 164; State v. Johnson (1986), 24 Ohio St. 3d 87. It is error for the prosecutor to attempt to introduce or prove any aggravating factor in the mitigation phase not already charged and proven in the guilt phase. Jenkins, supra.

Therefore, if the Accused chooses not to raise the mitigating factor of lack of significant criminal record, pursuant to R.C. 2929.04(B)(5), then the State is precluded from raising or rebutting this particular mitigating factor. <u>State</u> v. <u>DePew</u> (1988), 38 Ohio St. 3d 275.

[e.g.:]    will not be raising the mitigating factor of lack of a significant criminal record. R.C. 2929.04(B). This Accused will not be raising the issue of the victim's character. This Accused will not be raising the mitigating factor that the Accused will be a model prisoner if a life sentence is imposed. See <u>Skipper</u> v. <u>South Carolina</u> (1986), 476 U.S. 1, 90 L. Ed. 2d 1.

However, because the newspaper coverage has in fact emphasized these factors, the jury in its mitigation deliberation may well consider these nonstatutory aggravating factors. The jury's consideration of any of these factors will lead to an unreliable verdict in the sentencing phase. <u>Booth</u>, <u>supra</u>; <u>Caldwell</u> v. <u>Mississippi</u> (1984), 472 U.S. 320.

8.    <u>The Publication of Factual Publicity</u> - The newspaper media has printed a number of articles concerning detailed accounts of the alleged homicide.

Even if the publicity is not inflammatory or hostile, it imparts information that tends to create a belief that the Accused is guilty. See <u>Corona</u> v. <u>Superior Court</u> (App. 1972), 101 Cal. Rptr. 411; <u>People</u> v. <u>Tidwell</u> (1970), 89 Cal. Rptr. 44, 473 P. 2d 748. An accused is entitled to have the evidence against him or her  presented in court where it is subject to the scrutiny and analysis of defense counsel on cross-examination. <u>Farese</u> v. <u>United States</u>, 1970), 428 F. 2d 178, 180. When the jurors see or hear the evidence from media reports and form opinions prior to trial, the right to confront and cross-examine

witnesses is denied. Sheppard v. Maxwell (1966), 384 U.S. 333, 351. The presumption of innocence would be destroyed if defense counsel had to present evidence in order to convince jurors to be open minded. See, e.g., Beck v. Washington (1962), 369 U.S. 541.

Because of the widespread coverage of "the facts" in the present case, the Accused will be unable to receive a fair trial in this county. The articles have again and again repeated the same facts and stated that these facts were testified to while the witnesses were under oath at the preliminary hearing.  Potential jurors will simply be unable to decide the case based upon facts developed solely in the common pleas courtroom.

9.  Conclusion - While this memorandum examined the impact of the news coverage in a piecemeal fashion, any resulting prejudice will be multiplied because the prejudicial factors combine together to give a resulting prejudice much greater than the sum of the parts. The average potential juror will have been exposed to testimony under oath and believe that the Accused, killed and confessed to killing a member of the community.  Furthermore, the potential juror will be aware that local newspapers will deal harshly with any individual who does not  impose the death penalty against the Accused.

### III.  THE STANDARD TO BE APPLIED IN RULING UPON A CHANGE OF VENUE MOTION

Crim. R. 18(B), R.C. 2901.12(J) and 2931.29 provide for a change of venue when it appears to the trial court that a fair and impartial trial cannot be had in the county where a cause is pending.  Two standards can be applied in deciding the change of venue issue:  (1) presumed prejudice,  see  Coleman  v.  Kemp  (C.A.11,  1985),  778  F.  2d  1487,

rehearing denied en banc (C.A.11, 1986), 7.. F. 2d 1487, certiorari denied (1986), 476 U.S. 1163; and (2) a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.  See Sheppard v. Maxwell, supra, at 363.

In a previous section of this memorandum, the newspaper articles were reviewed for content to predict the effect the newspaper coverage would have upon the population of this county. However, it is necessary at this point to examine the effect that the coverage has had upon this county's residents.  This can be ascertained by looking at the newspaper coverage itself.

In such a situation, as in the present case, when public outcry is so great, and it is intensified extraordinarily by the media coverage, prejudice should be presumed pursuant to Coleman and venue changed.  The Coleman court recognized the dangers of pretrial publicity and stated that:

> The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere.  In such a case, due process requires the trial court to grant defendant's motion for a change of venue, Rideau v. Louisiana 373 U.S. 723, 726, (1963), or a continuance, Sheppard v. Maxwell 384 U.S. 333, 362-63 (1966).

Coleman, supra, at 1489.  In reviewing these types of claims, the court stated that change of venue should be granted when there is "presumed prejudice."  Although this standard is normally applied in appellate review of a trial court's decision regarding the motion for change of venue, the analysis is certainly applicable here.  Regarding "presumed prejudice" the Coleman court stated that:

Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. Rideau v. Louisiana, 373 U.S. at 726-27.

\* \* \*

The particular standard was clearly stated in Mayola v. Alabama:  "Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'"  623 F.2d at 997 (quoting in part from United States v. Capo 595 F.2d 1086, 1090 (5th Cir. 1979), cert. den. 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed. 2d 641 (1980).

Id. at 1490.  This standard has been applied repeatedly. See, e.g., Harris v. Pulley (1988), 852 F. 2d 1546.

NATHANIEL JACKSON, clearly meets the "presumed prejudice" standard.  The vast amount of pretrial media coverage in the community constitutes overwhelming evidence of "inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community."  The press and people of this county have become so obsessed with this case that it was impossible to seat a fair and impartial jury from this community.

Assuming arguendo that this Court does not find presumed prejudice, then a change of venue should be granted pursuant to the "reasonable likelihood" standard adopted by the United States

Supreme Court in Sheppard, supra. The Court stated:

> Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the Judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.

Sheppard, at 363.

The Ohio Supreme Court had adopted the Sheppard standard and ruled that a showing of a mere likelihood of prejudice will support a venue change.  State v. Fairbanks (1972), 32 Ohio St. 2d 34, 37.  The Court has applied the "reasonable likelihood" analysis in State v. Maurer (1984), 15 Ohio St. 3d 239, 251-52.  Although the Court in Fairbanks pointed out that news reports which are factual and without distortion, or  which are non-inflammatory in character, do not establish the impossibility of a fair and impartial trial where the jurors are uninformed or undecided, the Court mandated that the rigid Sheppard standard or "mere likelihood" be applied.  When faced with trial in a county that has been subjected to extensive publicity and public comment about the case such that there is present a likelihood of prejudice, the trial court should transfer the case to another county.  See, also, State, ex rel. Dayton Newspaper, Inc., v. Phillips (1976), 46 Ohio St. 2d 457.

In this case, there is a present likelihood of prejudice.  The media account repeatedly made reference to the Accused's supposed involvement in the offenses charged and prior criminal record. See Appendix. The news "story" of the offense charged has been widely circulated.  There is present the great risk to the Accused that many prospective jurors have been repeatedly exposed to the news "story" of the offense.  If trial is conducted in this county, the Accused will be denied the kind of impartial jury that the

Sixth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution guarantee. In addition, the failure to grant a change of venue will deny his rights to due process, fair trial, effective assistance of counsel, equal protection, and against cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under corresponding provisions of the Ohio Constitution. Thus, the Accused respectfully requests that the Court order a change of venue.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATION

I hereby certify that a copy of the foregoing MOTION FOR CHANGE OF VENUE was delivered to the Trumbull County Prosecutor's Office, 160 High   Street, Warren, Ohio 44483 this _23rd_ day of 2002.

ANTHONY V. CONSOLDANE

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

67

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No.01-CR-794 |
| | ) | |
| Plaintiff, | ) | Judge Stuard |
| VS. | ) | |
| | ) | |
| NATHANIEL JACKSON, | ) | |
| | ) | |
| Defendant, | ) | |

### VOIR DIRE MEMORANDUM:  THE DEFENSE MUST BE ALLOWED TO EXAMINE PROSPECTIVE JURORS REGARDING THEIR VIEWS ON CAPITAL PUNISHMENT PRIOR TO THEIR EXCUSAL

Ohio Revised Code Section 2945.27 provides that:

> The judge of the trial court shall examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel.  (Emphasis added.)

Crim. R. 24(A) also discusses the court's duty to permit the defense to examine each venireperson.  The rule states:

> Examination of jurors.  Any person called as a juror for the trail of any cause shall be examined under oath or upon affirmation as to his qualifications.  The court may permit the attorney for the defendant, or the defendant if appearing pro se, and the attorney for the state to conduct the examination of the prospective jurors or may itself conduct the examination.  In the latter event, the court shall permit the state and defense to supplement the examination by further inquiry.  (Emphasis added.)

The Ohio Revised Code and Criminal Rules clearly establish that the defense must be afforded sufficient opportunity to question each member of the venire before excusal.  A venireperson may not be excused

unilaterally from the panel and one party or the court before the other party has a chance to examine the prospective jury person.

Case law indicates that this principle is well-established in Ohio. The Ohio Supreme Court noted with emphasis that the court "shall permit reasonable examination of such jurors by ***defendant or his counsel." State v. Anderson (1972), 30 Ohio St. 2d 66, 72. In that same case, the court elaborated:

> Whatever may be the practice in other jurisdictions, it is a rule of longstanding in Ohio that counsel for the respective litigants be given a reasonable opportunity to personally examine prospective jurors.

Anderson, id.

The Court has confirmed the right of a capital defendant to have his counsel personally voir dire the venire. This right specifically extends to questions regarding death qualification and the ability of venirement to follow the Court's instructions regarding the imposition of the death penalty. State v. Huertas (1990), 51 Ohio St. 3d 22.

In State v. Proctor (1977), 51 Ohio App. 2d 151, where the Court held that it was not intended by Crim. R. 24(A) to allow the trial court to foreclose personal inquiry of the jurors by counsel as allowed under R.C. 2945.27 As the Eighth District Court of Appeals recognized:

> Unreasonable and excessive limitation may trench upon litigant's ability to challenge prospective jurors intelligently. ***(I)t may deprive counsel of the information necessary to an informed action.

State v. Swanson (1984), 16 Ohio App. 3d 375, 376.

The Ohio Supreme Court has recognized that the defense retains an absolute right to at least some personal examination of the venire on important issues directly affecting the question of whether a juror is fit to sit on the jury.

In <u>State v. Jenkins</u> (1984), 15 Ohio St. 3d 164, the Supreme Court stated that the scope of voir dire is within the discretion of the trial court and that the judgment will only be reversed upon a showing that the trial court abused its discretion in restricting the scope. The reliance of the <u>Jenkins</u> decision on <u>State v. Anderson</u>, <u>supra</u>, indicates that <u>Jenkins</u> must be compatible with prior cases.

The trial court's complete foreclosure of defense voir dire is an abuse of discretion in light of the well-established right of the parties to reasonable examination of the venire. Crim. R. 24; R.C. 2945.27.

In capital cases it routinely happens that jurors first examined and challenged for cause under R.C. 2945.25, <u>Witherspoon v. Illinois</u> (1968), 391 U.S. 510, and <u>Wainwright v. Witt</u> (1985), 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841, by the State can be rehabilitated by defense questioning. Often the defense voir dire can establish a challenged jurors' ability to fairly consider the imposition of the death penalty and to follow the court's instructions regarding its application. In these common instances, a rehabilitated juror may not be excused for cause without violating a defendant's constitutional rights to a fair an impartial jury, due process, equal protection, and against cruel and unusual punishment. The failure to allow defense examination of jurors under these circumstances will result in an arbitrary and unreasonable ruling and an abuse of discretion as defined in <u>Pembauer v. Leis</u> (1982), 1 Ohio St. 3d 89, 91.

In addition to being an abuse of discretion, the trial court's foreclosure of defense voir dire would violate the Accused's rights to a fair trial and an impartial jury for another reason. Ohio law states that an irregularity which materially affects a substantial right of the Accused, and which prevents him from being tried by a legally constituted jury, requires that the verdict be set aside and a new trial be granted. <u>McGill v. State</u> (1877), 34 Ohio St. 228. The failure to allow defense examination is extremely irregular in comparison to established Ohio practice. Such a

failure will materially affect the Accused's substantial rights and deprive him of a fair trail. If the defense is not allowed to examine venirepersons, a new trial will be necessary.

R.C. 2945.18 and 2945.19 provide for the drawing of a special venire in capital cases. These special statutes indicate the great importance that Ohio law attaches to the proper selection of a fair and impartial jury in a capital murder case. These statutes are clear evidence that added safeguards have been prescribed in order to preserve the due process and fair and impartial jury rights of the capital defendant in Ohio.

Given the increased stature of the constitutional rights of the capital defendant, it is logical to presume from any violation of State voir dire procedures that a capital defendant's substantial State and federal constitutional rights have been violated.

Further, excusal of venirepersons without allowing defense examination will violate the Accused's rights to the effective assistance of counsel. Such excusal makes it impossible for defense counsel to render effective assistance in choosing a fair and impartial jury. Premature excusal, made contrary to law, has foreseeable consequences. The action so materially interferes with the Accused's ability to require the prosecutions, case to survive the crucible of meaningful adversarial testing as to raise a presumption that defense counsel could not have been able to provide effective assistance of counsel. Blake v. Kemp (C.A.11, 1985), 758 F. 2d 523, 532-33, certiorari denied (1985), 474 U.S. 998, applying United States v. Cronic (1984), 466 U.S. 648.

By way of example, the Blake court indicated the process used to determine whether a violation occurred. Application of the Blake formula to the issue of excusing jurors without defense examination demonstrates that the failure to allow examination results in the ineffectiveness of defense counsel.

The steps involved in that court's analysis are: (1) that the issue is fairly in question; (2) that the issue is material; (3) that the defense took steps to develop its view of the issue; (4) that the State or trial court took action that prevented development of the issue by the defense; (5) that the steps taken by the State or the court violated a rule, principle, law, or court order; (6) that the trial court foreclosed other avenues through which the defense could develop the issue; (7) that the defense was left unable to develop the issue; (8) that prejudice to the accused exists where steps (1 through 7) are proved; and (9) that the prejudice was not cured by action of the court or State that undoes the previous action, but which does not make development of this issue possible—if development of the issue remains impossible despite the later action, prejudice is not cured.

Application of this analysis demonstrates that counsel is rendered ineffective when not allowed to examine prospective jurors. The excusal of jurors for cause necessarily involves the choice of a fair and impartial jury. Whether the excusal is proper is material to the issue of whether a fair and impartial jury was chosen. Excusal without examination precludes any opportunity by defense counsel to test the constitutional qualifications of jurors. Similarly, defense counsel would be unable to rehabilitate other jurors so that they could be retained. Such foreclosure of defense examination violates the rules requiring that examination be allowed. The effect of the excusal of venirepersons without defense examination is to prevent defense counsel from adequately and competently choosing a fair and impartial jury.

Excusal without examination also violates the Accused's rights to equal protection and against cruel and unusual punishment. Premature excusals not made in compliance with long-standing practice or the law is an arbitrary and capricious exercise of judicial authority that prevents the capitally accused from receiving a fair and impartial jury and unreasonably increases the likelihood that he will be sentenced to death. The excusal

also denies the accused the protection of the laws governing selection of a fair and impartial jury that are grated to all other criminal defendants.

R.C. 2945.27, Crim. R. 24(A), State v. Anderson, supra, and State v. Huertas, supra, all indicate that the defense must be allowed to examine venirepersons before they are excused.  Excusal without examination does not conform to Ohio Law.  It is an abuse of discretion.

The excusal of a juror without allowing the defense an opportunity to participate in voir dire would violate  NATHANIEL JACKSON's rights to due process, to present a defense, to fair trial, fair and impartial jury, compulsory process, confrontation of witnesses against him, effective assistance of counsel, and against cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under corresponding provisions of the Ohio Constitution.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATION

I hereby certify that a copy of the foregoing Motion was delivered to the Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, this _____ day of _____, 2002.

Anthony V. Consoldane
Attorney for Defendant

7

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No.01-CR-794 |
| | ) | |
| Plaintiff, | ) | Judge Stuard |
| VS. | ) | |
| | ) | |
| NATHANIEL JACKSON, | ) | |
| | ) | |
| Defendant, | ) | |

### VOIR DIRE MEMORANDUM: VENIREPERSONS WHO CANNOT FAIRLY CONSIDER MITIGATING EVIDENCE AND WHO WOULD AUTOMATICALLY VOTE FOR DEATH UPON A SHOWING OF GUILT MUST BE EXCUSED

Just as prospective jurors who are unequivocally opposed to the imposition of the death penalty are not permitted to sit as jurors in a capital case, venirepersons who cannot fairly consider mitigating evidence which may be presented by the Accused are not qualified to be jurors. Similarly, venirepersons who would vote automatically for the death penalty upon a showing of the Accused's guilt are not fit to be capital jurors.

In Woodson v. North Carolina (1976), 428 U.S. 280, the United States Supreme Court ruled that a statute which imposed a mandatory death penalty was unconstitutional because the fundamental respect for humanity underlying the Eighth Amendment required consideration of the character and record of the particular offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the death penalty. In Lockett v. Ohio (1978), 438 U.S. 586, the Court had ruled that for a capital sentencing procedure to pass constitutional muster, the death penalty statute must not preclude consideration of relevant mitigating circumstances. In Eddings v. Oklahoma (1982), 455 U.S. 104, 113-114, the Court stated that "just as the state may not by statute preclude the sentencer from considering any

mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any mitigating evidence."

Ohio, when it reenacted capital punishment, attempted to meet the constitutional requirements of <u>Lockett</u>, <u>Woodson</u>, and <u>Eddings</u> by requiring the jury to consider certain mitigating factors when imposing the death penalty.  R.C. 2929.04(B) requires that the jury must consider the existence of mitigating evidence, and also more generally requires jurors to consider the background, character and history of the Accused as reasons why a life sentence is more appropriate.  R.C. 2929.04(B).

In <u>Adams v. Texas</u> (1980), 448 U.S. 38, the United States Supreme Court created the following standard for granting excusal for cause in death penalty cases:

> A juror may not be challenged for cause based upon his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his  instructions and his oath.  The State may insist, however, the jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

<u>Adams</u>, <u>supra</u>, at 589.  The application of this minimum constitutional standard was confirmed by the Court in <u>Wainwright v. Witt</u> (1985), 469 U.S. 412.

Section 10, Article I of the Ohio Constitution also guarantees the Accused the right to a fair trial.  R.C. 2313.42 establishes when a prospective juror should be removed by a challenge for cause.

> (J) That he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the Court.

R.C. 2313.43 further states that this challenge should:

> Be sustained if the Court has any doubt as to the juror's being <u>entirely unbiased.</u>  (Emphasis added.)

This standard has existed in Ohio since 1885, when the Ohio Supreme Court held that a prospective juror who shows himself not to be impartial is not competent to sit at trial simply because the prospective juror "believes" himself able to render an impartial verdict.  Palmer v. State (1885), 42 Ohio St. 596.   That case was recently cited with favor in Hawkinson v. Brown (1981), 3 Ohio App. 3d 249.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee an individual charged with a felony the right to a jury trial.  This right encompasses a fair, neutral, impartial and informed jury.  Sinclair v. United States (1979), 279 U.S. 749; Irwin v. Dowd (1961), 366 U.S. 717.  Section 10, Article I of the Ohio Constitution gives the Accused an identical right.

A court must excuse a prospective juror if actual bias is discovered during voir dire.  Bias can be revealed by a juror's express admission of that fact, but more frequently, jurors are reluctant to admit actual bias and the reality of their biased attitudes must be revealed by circumstantial evidence.  United State v. Allsup (C > A > 9, 1977), 566 F. 2d 68, 71.

Consistently with these principles, this court must diligently ascertain whether venirepersons circumstantially express an inability to fairly consider, as a reason to give a life sentence, evidence of the Accused's background, history, character, or any of the specific factors (e.g. youth) set out in R.C. 2929.04 (B).

Typically, prospective jurors who cannot fairly consider such factors are identifiable by their expression of strong personal feelings that mitigating factors such as youth have no place in the decision whether to sentence the Accused to death or not.  Biased venirepersons also may be identified by statements that an Accused's personal history and background do not have anything to do with the sentence to be imposed.  Finally, members of the venire who indicate that they would give the death sentence once guilt was proved, and who indicate that mitigating evidence has little or

no effect on the sentencing decision, are also unfairly and unconstitutionally biased against the Accused.

If firmly and clearly stated, such statements are strong circumstantial evidence of the inability of the venirepersons to be fair and impartial sentencers.  Unless the prospective jurors can unequivocally state that they can fairly give the mitigating factors weight in their sentencing decision, they are constitutionally prohibited from sitting on a capital case. Lockett, Eddings, Adams.

In determining the propriety of seating a particular venireperson who has expressed an inability to consider mitigating evidence in his or her sentencing decision, the court must be wary of confronting a juror too directly about his inability.  If a venireperson understands from the court's questioning that he or she is expected to say he can consider mitigating evidence even though he does not personally feel it has a place in his decision, the juror will obediently mouth the answer indicated by the question.  The venireperson will not have become any more fair or constitutionally suitable, but he will have satisfied his natural human desire to "fit in".

Where prospective jurors circumstantially indicate their inability to consider mitigating evidence or their tendency to automatically impose the death sentence upon a showing of the Accused's guild, they must be excused for cause.  Under such circumstances the failure to excuse the venireperson for cause will deny the Accused due process and a fair trial by an impartial jury.  The Accused will also be forced prematurely to exhaust his or her peremptory challenges by excluding such venirepersons peremptorily.

The failure to excuse such jurors is reversible error where the composition of the jury panel as a whole could be effected by leaving such jurors on the panel. Gray v. Mississippi (1987), 481 U.S.____,95 L. Ed. 2d 622.  If such jurors remain on the panel after the Court has refused to

excuse them and the defense has exhausted its peremptory challenges in an attempt to clear them from the panel, reversible error will result. <u>Ross v Oklahoma</u> (1988), 487 U.S._____, 108 S. Ct. 2273. In order to avoid reversal, therefore, the Court must excuse all jurors who are unable to consider mitigating evidence or who would tend to automatically impose the death sentence upon a conviction of the Accused.

The failure to excuse such jurors would violate NATHANIEL JACKSON' rights to due process, to present a defense, to fair trial, fair and impartial jury, compulsory process, confrontation of witnesses against him, effective assistance of counsel, and against cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under corresponding provisions of the Ohio Constitution.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL


BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATION

I hereby certify that a copy of the foregoing Motion was delivered to the Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, this _____ day of _____, 2002.

_____
Anthony V. Consoldane
Attorney for Defendant

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No.01-CR-794 |
| | ) | |
| Plaintiff, | ) | Judge Stuard |
| VS. | ) | |
| | ) | |
| NATHANIEL JACKSON | ) | |
| | ) | |
| Defendant, | ) | |

<u>MOTION TO PROHIBIT DEATH QUALIFICATION OF THE JURY,
OR IN THE ALTERNATIVE, IF NECESSARY, TO SEAT A
SEPARATE JURY DURING THE PENALTY PHASE OF TRIAL</u>

Now comes the defendant, by and through counsel, and respectfully moves this Court <u>in limine</u> to prohibit any questions during <u>voir dire</u> of prospective jurors concerning their attitudes toward the death penalty and to, in all ways, refrain from engaging in any inquiry relating to penalty considerations. Alternatively, counsel requests that two separate juries be empaneled: one for the trial phase; and a separate jury for the penalty phase, if needed. As a third alternative, counsel requests that death qualification be continued until and unless it is needed at the penalty phase. A sufficient number of alternates could be empaneled prior to the trial to allow replacement of any jurors who state that they are unalterably opposed to the death penalty and could not set such belief aside and fairly consider the imposition of death. As a fourth, and least desirable, alternative, counsel requests that this Court instruct each potential juror prior to any death qualification questioning that the inquiry has no relationship to the defendant's guilt or innocence of any of the indicted

offenses.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>MEMORANDUM IN SUPPORT</u>

It is an established principle of law that a criminal defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and, more importantly, under Article I, Section 10 of the Ohio Constitution, are violated if the trier of fact is predisposed to convict.  This is a principle well known to Ohio law as it was an Ohio case that established it for the entire land.  In <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927), the Supreme Court struck down as violative of due process an Ohio prohibition statute which authorized mayors to recover twelve dollars as costs for convictions

2

attained in the mayor's courts.  No showing of prejudice was required.  The Court has also implicated a due process concern in cases involving pervasive pretrial publicity, given the possibility that the jurors will not confine their deliberations solely to the law and facts presented in a given case.  The Court stated in Estes v. Texas, 381 U.S. 532 (1965) that:

> "it is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused.  Nevertheless, at times a procedure employed by the state involves such a probability that prejudice will result that it is deemed inherently lacking in due process."  381 U.S. at 542-543.  (Emphasis added).

This sentiment was echoed in another Ohio case, Sheppard v. Maxwell, 384 U.S. 333 (1966), wherein the Court stated that:

> "(d)ue process requires that the accused receive a trial by an impartial jury free from outside influences.  Given...the difficulty of effacing prejudicial publicity from the minds of jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.  And appellate tribunals have the duty to make an independent evaluation of the circumstances." 384 U.S. at 362.

The defendant's right to due process of law is violated when the voir dire is conducted in such a manner that the resulting jury is less than impartial with respect to guilt.  Witherspoon v. Illinois, 391 U.S. 510, 520 (1968).  In Witherspoon, the Supreme Court held that an Illinois statute allowing the exclusion of jurors who expressed any opposition to the death penalty resulted in an unconstitutional conviction, violating the defendant's right to a fair trial under the Sixth Amendment and to due process under the Fourteenth Amendment.

A criminal defendant is denied his right to an impartial jury under the Sixth Amendment (and under Article I, Section 10 of the Ohio Constitution) when the jury selected fails to fairly represent a cross-section of the local community.  See Duncan v. Louisiana, 391 U.S. 145 (1968) (extending Sixth Amendment right to impartial jury to the states); Taylor v. Louisiana, 419 U.S. 522 (1975) (systematic exclusion of women from criminal juries violates defendant's Sixth Amendment rights).  See also pre-Duncan development of the concept: Strauder v. West Virginia, 100 U.S. 303 (1880) (exclusion of blacks from jury panels violates equal protection); Hernandez v. Texas, 347 U.S. 475 (1954) (exclusion of Mexican-Americans violates equal protection).

It is absolutely essential to our system of jurisprudence that the jury be representative of the community:

> "...it is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community..." Smith v. Texas, 311 U.S. 128, 130 (1940).

It is both an unsound public policy and an unconstitutional act to exclude any particular segment of the community from jury service.  The Court in Peters v. Kiff, 407 U.S. 493 (1972) stated that:

> "(w)hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the juryroom qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable...It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce..." 407 U.S. at 503-504.

Ohio's death penalty law provides for a trial bifurcated the guilt and

penalty issues. Sentencing is, of course, irrelevant to any legitimate concern during the guilty determination. Indeed, jurors in all other types of criminal cases are specifically so instructed. In fact, the reason the United States Supreme Court imposed the guilt/penalty bifurcation requirement was to insulate the jury during the guilt determination phase from irrelevant and prejudicial considerations which arise during the penalty phase. Gregg v. Georgia, 428 U.S. 153 (1976). Ohio law has incorporated the letter, but not the spirit, of this principle. Revised Code Section 2929.03. The failure to so separate and insulate the jury results in a violation of the Eighth Amendment's prohibition.

What a potential juror thinks or feels about the death penalty is, from a legal point of view, wholly irrelevant to his qualification to sit during the evidentiary phase of the trial. There are numerous psychological and sociological studies, however, which indicate a close correlation between an individual's distinctive attitudes about the death penalty and decisional outlook in determining the fundamental issue of guilt or innocence.

In 1968, the Witherspoon majority determined that a jury from which all veniremen with any quantum of conscientious scruples against the death penalty were excluded violated the defendant's right to due process of law. See also Winrick, Prosecutorial Preemptory Challenge Practice in Capital Cases: An Empirical Study And A Constitutional Analysis, 81 Mich. L. Rev. 1, 40, n. 118, and accompanying text (1982). The Court specifically considered, but

5

left undecided, the petitioner's contention that a death qualified jury may be unconstitutionally conviction prone, citing the paucity of empirical research then available. Witherspoon, 391 U.S. at 520 n. 18.

Since that decision, eighteen years of empirical studies have consistently found that death qualified juries are more conviction prone than the raw pool of veniremen or the population at large.  Many of these studies were charted and commented upon in Hovey v. Superior Court of Alameda County, 28 Cal. 3d 1, 168 Cal. Rptr. 128, 616 P. 2d 1310 (1980).

Hovey, supra, is the leading state court decision which considers the mandate of Witherspoon in light of empirical evidence relative to the conviction proneness of "death qualified juries".  A "death qualified jury" is one where during voir dire prior to the guilt phase, all jurors with strong conscientious objections to the death penalty are removed for cause.  Only jurors who say that they can vote for the death penalty are allowed to sit. The others are excluded under Witherspoon and Wainwright v. Witt, 469 U.S. 412 (1985).  Expert witnesses testifying for the defense in Hovey, supra, concluded that the empirical evidence: "...indicates that the departure from representativeness created by the process of restricting juries in capital cases to (Witherspoon) qualified jurors only may have important negative consequences for defendants in death penalty trials."  28 Cal. 3d at 39, excerpting Ellsworth, et al., Juror Attitudes and Conviction Proneness: The Relationship Between Attitudes Towards the Death Penalty and

6

Predisposition to Convict (1979, pre pub. draft at p. 7) (hereinafter, the Ellsworth Conviction-Proneness Study)).  One of two expert witnesses called by the prosecution, Dr. Gerald Shure, commented upon the Ellsworth Conviction-Proneness Study, stating that:

> "...the evidence presented suggest that in fact a death-qualified juror is likely to be more biased in certain respects..." 28 Cal. 3d at 42.

The Ellsworth Conviction-Proneness Study, however, was eventually dismissed by the Hovey court because the study did not contemplate the exclusion of those jurors who would automatically vote for the death penalty in a capital case.  This automatic death penalty (i.e. "ADP") group, required by statute to be excluded in California (28 Cal. 3d at 63-64 n. 110) presumably cannot be excluded under the Witherspoon rationale.  28 Cal. at 63.  (The Ohio Supreme Court has ruled that ADP's are to be excluded for cause.  State v. Anderson, 30 Ohio St. 2d 66, 70 n. 2 (1972).  Since the Ellsworth Conviction-Proneness Study took into consideration the exclusion of Witherspoon Excludibles (W.E.'s), but did not also factor in the exclusion of ADP's, the Court would not rely on the conclusions of the study:

> (t)herefore, until further research is done which makes it possible to draw reliable conclusions about the non-neutrality of 'California death-qualified' juries in California, this court does not have a sufficient evidentiary basis on which to bottom a constitutional holding under Witherspoon and Ballew v. Georgia, 435 U.S. 223, 55 L. Ed. 2d 234 (1978); misdemeanor criminal conviction by five person jury violative of Sixth and Fourteenth Amendments).  28 Cal. 3d at 68.  (Emphasis added.) (Bracketed material added.)

The "...further research..." referred to in the Hovey opinion has now been conducted. At least one federal court has exhaustively considered this additional research. This evidence was presented in the form of exhibits and expert testimony to the court during the evidentiary hearing on the mater. Based on this evidence, a federal court was compelled to find a constitutional violation in the Arkansas jury selection system. Grigsby v. Mabry, 569 F. Supp. 1273 (E.D. Ark. 1983), affirmed, 758 F. 2d 226 (8th Cir. en banc, 1985), reversed as Lockart v. McCree, 476 U.S. 162, 39 Cr. L. 3085 (1986) (hereinafter referred to as Grigsby III).

The Hovey Court was simply continuing the tradition commenced by the United States Supreme Court in Witherspoon when it noted that future capital defendants might attempt to prove that death-qualified juries were "less than neutral with respect to guilt" (391 U.S. at 518) but required reliable empirical evidence. The habeas corpus petitioners in Grigsby III presented such evidence and proved to the Court that:

> "... the number of those who would automatically vote for the death penalty in Arkansas said nationwide is negligible when compared to the number of those who would never under any circumstances vote for the death penalty. Therefore, to give a defendant the right to challenge and remove ADP's contributes only to the appearance of fairness. In fact, so long as WE's (Witherspoon excludibles) are excluded form the guilt innocence phase of the trial, the guilt-proneness of the resulting jury remains, to the great disadvantage of defendants." 569 F. Supp. at 1308.

It is now an empirically proven fact that culling from the jury all Witherspoon excludable death penalty opponents results in a panel which is

8

prosecution prone.   See H. Zeisel, <u>Some Data on Juror Attitudes Toward Capital Punishment</u>, (1968); Goldberg, <u>Towards Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Uses of Psychological Data to Raise Legal Presumptions</u>, 5 Harv. Civ. Rights---Div. L. Rev. 53 (1970); Bronson, <u>On the Conviction Proneness and Representativeness of the Death-Qualified Jury: And Empirical Study of Colorado Veniremen</u>, 42 U. Colo. L. Rev. 1 (1970); Jurow, <u>New Data on the Effect of the "Death Qualified" Jury on the Guilt Determination Process</u>, 84 Harv. L. Rev. 567 (1971).

A defendant's constitutional right to have his guilt determined by a jury drawn from a fair and representative cross-section of the community is violated when a group of persons with distinctive attitudes is systematically excluded from the panel.  <u>Taylor</u>, 419 U.S. at 526-527.  <u>See also Witherspoon</u>, 391 U.S. at 524 (Douglas, J., dissenting).   The Sixth and Fourteenth Amendment provisions for an impartial jury is a criminal prosecution guarantees the presence of a fair cross-section of the community in the venire from which the jury is eventually selected.  <u>Taylor</u>, 419 U.S. at 530. Further, Ohio's Constitution clearly requires a "...trial by an impartial jury..." Article I, Section 10.

Persons opposed to the death penalty constitute a distinct and recognizable group in American society.  <u>Witherspoon</u>, 391 U.S. at 520 n. 16. The subset of this group who can be excluded form the penal on the basis of <u>Witherspoon</u> also constitute a distinct group.  <u>Spinkellink v. Wainwright</u>,

578 F. 2d 582 (5th Cir., 1978).  This group of people exists in the population of potential veniremen in this community.  Death qualifying the panel results in the systematic exclusion of these persons from the jury ultimately selected.  While such exclusion may be justified during the penalty phase of the trial, their exclusion during voir dire results in the underrepresentation of a distinct group during the evidentiary phase of the trial.

It has been held that a prima facie violation of the fair cross-section requirement is established when the following elements are present:

1.  The person excluded form the jury selection process constitute a distinct group in the community.

2.  This group is underrepresented in relation to the number of persons in the community.

3.  The underrepresentation is caused by the systematic exclusion of this group during the jury selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

Death qualification of the jury insures that the second and third parts of the Duren test are satisfied and a prima facie constitutional violation is present.  In addition, it is an empirical fact that death qualified juries are juries in which women and blacks are disproportionately underrepresented. Grigsby III, 569 F. Supp. at 1293; Hovey, 28 Cal. 3d at 54-57.

The Court in Grigsby III outlines the consequences of a prima facie showing of disproportionality, stating that:

"(o)nce the challenging party establishes a prima facie case under Duren, the state must justify the procedure used.  As stated in Duren the state must show that 'a significant state

10

interest...(is) manifestly and primarily advanced by those aspects of the jury - selection process...that result in the disproportionate exclusion of a distinctive group'. 439 U.S. at 367-68. And, as previously pointed out, <u>one a violation of the fair cross-section requirement has been established, prejudice to the defendant is presumed</u>". 569 F. Supp. at 1282. (Emphasis added).

The "state's interest" in death qualifying a trial-phase capital jury, however, must be compelling and the means employed to achieve that interest must be narrowly drawn:

"(t)he reach of the Court's holding in <u>Taylor</u> and <u>Duren</u> extend to every criminal trial. The state's interests in qualifying prospective jurors on the penalty issue in a capital case undoubtedly places some limitations on a capital defendant's fair cross-section rights. The manner in which any limitations are imposed must be approached from the premise that a capital defendant has a fundamental right to impanel a single set of jurors in a capital case. Since the states do not presently have the right, the court should accommodate the 'states' legitimate interests in a manner which least restricts the constitutional rights of a capital defendant."
Colussi, <u>The Unconstitutionality of Death Qualifying a Jury Prior to the Determination of Guilt: The Fair Cross Section Requirement in Capital Cases</u>, 15 Creighton Law Review, 595, 614 (1982).

This Court should not countenance a Constitutional violation when a simple order could prevent it from occurring. The State must be required to show a compelling state interest which justifies the infringement of the defendant's fair cross-section right during the evidentiary phase of the trial. While the State does have an interest in a jury that could impose a death penalty, it must demonstrate a significant and compelling interest in having <u>exactly the same</u> jurors determine this defendant's guilt. The simplest and

11

most obvious order that could be made in order to prevent error of State, if not federal, constitutional magnitude would be to prohibit any and all questions relating to personal feelings about the death penalty. Alternatively, this Court should order that the trial and penalty phases be tried to separate juries, with only the penalty jury being death-qualified. This procedure would be the type envisioned by the Supreme Court in Witherspoon wherein it questioned:

> "whether the state's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's innocence--given the possibility of accommodating both interest by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment." 391 U.S. at 520 n.18.

A third possible alternative is to impanel a sufficient number of alternates to allow counsel to death-qualify the jury prior to the penalty stage but after the trial, if that becomes necessary. It is statistically very unlikely that more than six members of the guilt panel would be Witherspoon or Wainwright excludible at penalty. A fourth alternative, although the least desirable one, is to have the Court instruct each potential juror prior to death qualification that the questioning as to penalty has absolutely no relationship to the defendant's guilt or innocence of the underlying charges. The following is an example of type of instruction which the defendant reluctantly requests as a last alternative:

> As this is  capital case, one possibility, if guilt is established beyond a reasonable doubt, is that the death penalty could, under certain circumstances, be imposed.  Because of that

possibility, it is proper for counsel and the court to ask you at this time certain questions about your views regarding the death penalty. This inquiry, however, has absolutely no relationship to whether or not the defendant is guilty of the crime for which he is charged. Do not conclude, merely because an attorney or the Court itself asks questions about your attitude about the death penalty that this should be taken as any indication whatever that they believe the defendant to be guilty or presuppose that a finding of guilt will be made. The defendant is to be presumed innocent unless and until his guilt is proven beyond a reasonable doubt.

As stated previously, the Eight Circuit Court of Appeals affirmed the District Court's decision in Grigsby III. Grigsby v. Mabry, 758 F. 2d 226 (8th Cir. en banc 1985). Certiorari was granted, and the united States Supreme Court reversed Lockhart v. McCree, 476 U.S. 162 39 Cr. L. 3085 (1986). None of the issues which have been discussed infra have been addressed on independent state grounds, which are here asserted. Defense counsel contends that the federal law cited which is contra to, and reversed by, the decision in McCree should be persuasive in interpreting the protection to be afforded the citizens of Ohio accused of capital offenses.

This logic recommends itself. In the first place, the McCree majority did not dispute the validity of the respondent's empirical data. Indeed, they could not. Rather, the majority felt: "...constrained to point out...flaws..." 476 U.S. at 168, 39 Cr. L. at 3087. The majority was so constrained because there exists absolutely no empirical evidence against the propositions set forth herein. As a matter of fact, even after Lockhart v. McCree, death qualified juries remain more punitive and thus more likely to

convict, and, further, they are not and cannot be composed of a fair cross-section of the community.  As Justice Marshall, joined by Justices Stevens and Brennan, stated in dissent in <u>McCree</u>:

> (f)aced with the near unanimity of authority supporting respondent's claim that death qualification gives the prosecution a particular advantage in the guilt phase of capital trials, the majority here makes but a weak effort to contest that proposition.  Instead, it merely assumes for the purposes of this opinion "that 'death-qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries", ante, at -----, and then holds that this result does not offend the Constitution.  This disregard for the clear import of the evidence tragically misconstrues the settle constitutional principles that guarantee a defendant the right to a fair trial and an impartial jury whose composition is not biased toward the prosecution.  476 U.S. at 192, 39 Cr. L. at 3093.

While it may be the case that a capitally charged defendant has no right to a fair and impartial jury under the federal constitution, it is the position of the defense that the same is not true under Article I, Section 10 of the Ohio Constitution.  In fact, the Ohio Supreme Court has held that the right of the accused to an impartial jury may not be abrogated, stating that:

> (t)he right of the accused to an impartial jury cannot be abridged.  To secure this right it is necessary that the body of triers should be composed of men indifferent between the parties, and otherwise capable of discharging their duty as jurors.  Whether, in the practical administration of justice, the right is infringed, is necessarily a judicial question; and whether, in a particular case, a proposed juror has the state of mind which will render him impartial, is a question of fact which it is the duty of the court trying the case to decide.  This duty is enjoined by the constitution, and, it is true, can not be impaired, or the right abridged by legislative action.  <u>Cooper v. State</u>, 16 Ohio St. 328 (1865).

Ohio's death penalty scheme is an effective legislative attempt to abridge the capitally charged defendant's right to an impartial jury. It is the position of the defense that if it can be established at an oral hearing that the death-qualification process abridges the right to an impartial jury or the right to a jury composed of a fair cross-section of the community, then the Court should prohibit the death qualification process in this case or grant one of the requested alternatives.  Here, as in McCree, supra, all the defendant asks:

> "...is the chance to have his guilt or innocence determined by a jury like those that sit in non-capital cases-one whose composition has not been tilted in favor of the prosecution by the exclusion of a group of prospective jurors uncommonly aware of an accused's constitutional rights but quite capable of determining his culpability without favor or bias."  476 U.S. at 185, 39 Cr. L. at 3091 (Marshall, J., dissenting).

For the foregoing reasons, the defendant respectfully moves this Court to order that no questioning concerning the jurors' attitudes about the death penalty shall be permitted during voir dire.  In the alternative, the defendant requests that the Court impanel a non-death penalty qualified jury for the trial phase of the case.  Should it become necessary to consider penalty, this Court should impanel a separate jury, which has been constitutionally death-qualified, so that it may consider the ranges of penalties required by law.

Respectfully submitted,

DAVID H. BODIKER  #0016590

15

OHIO PUBLIC DEFENDER

_Anthony Consoldane_ (signature)

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

_James F. Lewis_ (signature)

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL


BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON




## CERTIFICATION


   I hereby certify that a copy of the foregoing Motion TO PROHIBIT
DEATH-QUALIFICATION OF JURY: IN THE ALTERNATIVE, IF NECESSARY, TO SEAT A
SEPARATE JURY DURING PENALTY PHASE OF TRIAL was delivered to the
Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, 44481,
this 23 day of ____, 2002.

_Anthony Consoldane_ (signature)

Anthony V. Consoldane
Attorney for Defendant

16

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    Case No.  01-CR-794
                                  )
            Plaintiff,            )
VS.                               )
                                  )
                                  )    Judge Stuard
NATHANIEL JACKSON ,               )
                                  )
            Defendant.            )

## MOTION TO COMPEL DISCLOSURE OF PROSECUTING ATTORNEY'S JURY SELECTION DATA

NATHANIEL JACKSON, through his counsel, respectfully moves this Court for an order compelling the Prosecuting Attorney to disclose to the defense counsel any information and data compiled on prospective jurors in this case.

The above grounds are more fully set out in the accompanying memorandum.

## MEMORANDUM IN SUPPORT

### A.

### DUE PROCESS SUPPORTS RELEASE TO THE ACCUSED

One of the most fundamental values imbedded in the Due Process Clause of the Fourteenth Amendment and Sections 10 and 16, Article I of the Ohio Constitution is the right to a fair trial, which represents the preservation of the reliability and efficacy of the guilt-determining process of the Anglo-American jurisprudential system.  The United States Supreme Court has derived a number of

fair trial imperatives from the Due Process Clause, though they are not specified anywhere in the Constitution. For example, the court has prohibited the knowing use of false or perjured testimony by the prosecution, <u>Miller v. Pate</u> (1976), 386 U.S. 1, and has required the prosecution to divulge evidence favorable to the accused, <u>Brady v. Maryland</u> 1963), 373 U.S. 83.

Similarly, Due Process demands that a defendant be tried before a jury, which is not inherently prosecution-minded, a situation which would clearly offend any sense of fundamental fairness and justice and thereby bring into serious question any determination of guilt. The State, as well as the Accused, is interested in other values. The State has the duty to insure the fairness of the criminal process, which primarily involves the ascertainment of the truth.

These values and the function of the criminal trial are thwarted when the prosecution is able to use information regarding prospective jurors during voir dire, which is not available to the defense. The nature of this information enables the prosecutor to find jurors who are prosecution-minded, who may be more inclined to convict, and who may be more likely to impose a more severe sentence.

The United State Supreme Court has recognized the information-gathering advantages of the State prosecutorial system. Practices such as gathering of information regarding prospective jurors through means available only to the State provide nonreciprocal benefits to the State. As a result, the criminal defendant, particularly if he is indigent, is unfairly disadvantaged.

Due Process requires that the prosecution share this crucial data with the defendant:

> The adversary system of trial is hardly and end to itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as due process is concerned, for [a rule] which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the state ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.

Williams v. Florida  (1970), 399 U.S. 78.

Indeed, the United States Supreme Court has suggested that if there are to be any imbalances or advantages resulting from the discovery process, these should inure to the benefit of the Accused. Wardius v. Oregon (1973),  412 U.S. 470, 475, fn. 9.  As Justice Douglas succinctly stated: "Much of the Bill of Rights is designed to redress the advantage that inheres in a government prosecution." Id. 412 U.S. at 480 (Douglas, J., concurring).

At least two state courts have held that Due Process requires the prosecutor to disclose the data he has accumulated regarding prospective jurors.  In People v. Aldridge (1973), 47 Mich. App. 639, 209 N.W. 2d 796, the court ordered discovery of the prosecution's dossier on prospective jurors, noting that "our evaluation is founded upon the concept of fundamental fairness rather than upon the current underpinnings of criminal discovery." Id. At 209 N.W. 2d at 798.  The court considered a range of United States Supreme Court cases in which Due Process required disclosure of certain information.  It concluded at 801:

> Our sense of fundamental fairness requires placing

defendant upon an equal footing by requiring
disclosure of the prosecutor's investigatory report
upon prospective jurors.  Since jurors are so important
to our system of criminal justice, nondisclosure of in-
formation upon which defendant may exercise
peremptory challenges places a premium upon
"gamesmanship" to the subversion of the trial's search
for truth.

The court in Losavio v. Mayber (Colo. 1972), 178 Col. 184, 496 P.
2d 1032, reached a similar conclusion.  Therein, the court noted that
though the public defender has no right of access to police files
containing information on prospective jurors, the court concluded
that the "requirements of fundamental fairness and justice" require
disclosure once that information is obtained by the prosecuting
attorney.  Id.  496 P. 2d at 1035.

Thus, if the Accused is not provided with the prosecutor's data
on prospective jurors, the Due Process guarantee of a reliable guilt-
determining process would be severely jeopardized.

In a capital case, there is a particularly strong need for
disclosure of this information.  The capital defendant is entitled
under the Eighth and Fourteenth Amendments to a reliable
determination that death is the appropriate punishment.  Lockett v.
Ohio (1978), 438 U.S. 586, 597.  The Supreme Court has clearly
recognized that in "the special context of capital sentencing, *** the
range of jury discretion necessarily (gives) rise to far greater concern
over the possible effects of an imbalanced jury." Lockhart v. McCree
(1986), 476 U.S. 162, citing Witherspoon v. Illinois (1968), 391 U.S. 510,
519.  Acknowledging the special seriousness of the risk of improper
sentencing on a capital case, the Court has reversed a death
sentence where the judge failed to make an adequate inquiry as to

race prejudice on voir dire.  <u>Turner v. Murray</u> (1986), 476 U.S. 28.  This omission to inquire "created an unacceptable risk" of juror bias infecting the capital sentencing proceeding.

The <u>Turner</u> court considered the greater opportunities for improper factors to influence the jury's sentencing decision and the "ease with which this risk of prejudice could be minimized."  It then required the trial judge to inquire.

Similarly, NATHANIEL JACKSON, is charged with a capital crime, and if this case proceeds to a sentencing hearing, there will be serious constitutional concerns raised by the possible effect of an unbalanced jury on the determination of sentence.  The Ohio law apparently anticipates only one jury to try and sentence the defendant.  If that imbalance is to be uncovered and rectified, this is the time, for a later inquiry will only create a waste of precious judicial resources invested in the trial to that point.  The disclosure of the prosecutor's jury selection data is a simple, efficient, and the reliable means of uncovering a critical imbalance in the jury.

A final aspect of Due Process which would be furthered by disclosure of the requested data is the appearance of justice.  The function of the jury is not only to insure the reliability of the fact-finding process, but also to secure community confidence in the system:

> Fairness of course, requires an absence of actual bias in the trial of causes.  But our system of law has always endeavored to prevent even the probability of unfairness *** [T]o perform its high function in the best way "justice must satisfy the appearance of justice."

In re Murchison (1955), 349 U.S. 133.

To the extent the prosecutor is permitted to use information regarding prospective jurors without divulging the same to the defendant, there is, at the very least, the danger that this will give the appearance of bias. This court should avoid this danger, which is even greater in a prosecution where the death penalty is sought. By compelling disclosure of the data, this Court can protect the public confidence in the fairness of the criminal justice system and trial by jury, which is consistent with our democratic heritage. Taylor v. Louisiana (1975), 419

B.

THE CONSTITUTIONAL RIGHT TO AN IMPARTIAL
JURY SUPPORTS RELEASE TO THE ACCUSED

Many of the above-identified values of Due Process overlap into the guarantees of the Sixth Amendment rights to a public trial by an impartial jury. This guarantee is made applicable to the states through the Fourteenth Amendment. Duncan v. Louisiana (1967), 391 U.S. 145. Additionally, Section 10, Article I, of the Ohio Constitution explicitly provides for this guarantee.

This constitutional requirement of impartiality subsumes additional values. The United States Supreme Court has recognized that the jury has discretionary power, as representative of community values, to bend, mold, apply, or refuse to apply the law in any given case. Taylor, supra. This discretionary function has been viewed as necessary to prevent oppression by the government, either through prosecutorial over-zealousness or judicial bias. In order to protect this discretionary function and

combat potential governmental oppression, it is imperative that the jury represent a cross-section of the community:

> We accept the fair cross-section requirement as fundamental tot he jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation.  The purpose of a jury is to guard against the exercise of arbitrary power – to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge.

Taylor, supra, at 530.  See, also, Duncan, supra, at 155-156.

When the prosecutor is able to utilize data regarding prospective jurors, which is not made available to the Accused, the prosecutor can sidestep the safeguard of the jury's discretionary function against prosecutional zeal.  This advantage enables the prosecutor to fashion a jury which is unfairly "prosecution minded".

On a broader level, a jury which is chosen from a cross-section of the community will more accurately and fairly represent community values.  The necessity of impaneling jurors representative of community values and races was noted in Taylor, 419 U.S. at 529, fn. 7:  "As long as there are significant departures from the cross-sectional goal, biased juries are result-biased in the sense that they reflect a slanted view of the community they are supposed to represent."  Unless the prosecutor's data on prospective jurors is shared with the Accused, the prosecutor will be capable of impaneling a "slanted" jury.

Finally, and most importantly, a jury selected from a cross-section of the community will more fully protect both the Accused's

and State's interest in accurate fact-finding.  The extent that the jury represents a broader range of perception and therefore will be better able to weigh the significance of the evidence.  When the prosecution possesses information on prospective jurors not available to the Accused, it has a clear advantage in that voir dire manipulation is possible.  As a result, the Accused would be deprived "of the kind of fact-finder to which he [is] constitutionally entitled." Taylor, 419 U.S. at 526.

C.

THE WORK PRODUCT DOCTRINE DOES<br>NOT APPLY TO THE INFORMATION<br>RETAINED BY THE PROSECUTOR

The work product doctrine is inapplicable to NATHANIEL JACKSON'S request.  According to the American Bar Association Project on Standards for Criminal Justice:  Standards Relating to Discovery and Procedures Before Trail, Standard 2.6 (Approved Draft, 1970), work product is defined as follows:

> (a)  Work product.  Disclosure shall not be required of legal research or of records,  correspondence, reports or memoranda to the extent they contain the  opinions, theories or conclusion   of the prosecuting attorney or members of the legal staff. (Emphasis added.)

NATHANIEL JACKSON is not requesting the "opinions, theories, or conclusions" of the prosecutor regarding prospective jurors. Rather, the Accused is specifically requesting that he be furnished data, information, and reports which the prosecutor has relating to prospective jurors.  Therefore, the work product doctrine is inapplicable.

However, should the prosecutor claim that part or all of the requested data contains work product as defined by the above-quoted American Bar Association Standard, the Court could order an <u>in camera</u> inspection of the disputed data and pursuant to its powers under Crim. R. 16(E)(1), make any appropriate order or excise any protected material as it deems necessary.

In sum, disclosure of data concerning prospective jurors by the prosecuting attorney is necessary to protect the Accused's due process rights, which are concerned with the reliability and efficiency of the guilt-determining process and in addition, with the appearance of fairness and justice. Furthermore, the Accused's right to be tried by an impartial jury supports disclosure. Impartiality can be achieved only if the jury is truly representative of a cross-section of the community. This will protect the inherent right of jury discretion, protect against prosecutorial and judicial over-zealousness and bias, and more truly represent community values. It will also greatly contribute to a more accurate fact-finding process. The requested data falls outside any purported work product of the prosecuting attorney. In the event of such a claim, this Court has the power to conduct an <u>in camera</u> inspection and make any appropriate order.

Finally, the above constitutional considerations take on greater importance in capital punishment case. Pursuant to the provision contained in R.C. 2929.03, bifurcated process is employed whereby the same jury which determines guilt also determines whether the death penalty should be imposed. Thus, unlike other offenses, where the jury is concerned only with determining guilt, voir dire in a capital case becomes extremely crucial since counsel must question

prospective jurors on the issue of capital punishment. Counsel are faced with a complex and difficult task. To the extent the prosecution has superior information which the defense cannot obtain, the former could "pack" the venire with jurors who would be more willing to find out not only guilt, but to impose death. It is crucial, therefore, that both parties be on an equal footing with regard to information concerning prospective jurors.

The failure to order the disclosure of this information would violate NATHANIEL JACKSON'S rights to due process, to present a defense, to fair trial, fair and impartial jury, compulsory process, confrontation of witnesses against him, effective assistance of counsel, and against cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under corresponding provisions of the Ohio Constitution.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

CERTIFICATION

I hereby certify that a copy of the foregoing Motion was delivered to the Trumbull County Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, this 23 day of _____, 2002.

Anthony V. Consoldane
Attorney for Defendant

71

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )        Case No.  01-CR-794
                                  )
            Plaintiff,            )
VS.                               )
                                  )
                                  )        Judge Stuard
NATHANIEL JACKSON ,               )
                                  )
            Defendant.            )

## MOTION TO ALLOW THE DEFENSE TO ARGUE
## LAST AT THE PENALTY PHASE

NATHANIEL JACKSON, through his counsel, respectfully requests this Court to allow the defense to argue last at the penalty phase.  The reasons in support of this request are set out in the accompanying memorandum.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

<u>MEMORANDUM IN SUPPORT</u>

In <u>State</u> v. <u>Jenkins</u> (1984), 15 Ohio St. 3d 164, 214-215, the Ohio Supreme Court stated that the decision to allow the defense to open and close final argument in the penalty phase is within the sound discretion of the trial court. <u>Jenkins</u>, makes it clear that the trial court properly may allow the defense the right to argue to the jury last.

Support for this order or argument can also be found in R.C. 2945.10(D), which states that in the furtherance of justice, the trial court may permit evidence to be offered by either side out of its order. In addition, R.C. 2929.04(C) states that the accused shall be given great latitude in the presentation of evidence at the mitigation phase. While these two statutes deal with the presentation of evidence, their permissive nature and their and their underlying purposes apply equally to issues involving closing arguments. These statutes indicate that the order of proceedings should be determined in accord with the principles of fairness and due process. R.C. 2929.04(C) indicates that the legislature determined that in the penalty phase of a capital trial, these principles call for the granting of special privileges to the defense. In light of the fact that the purpose of the penalty phase is to allow the defendant to show reasons why he should not

2

be put to death, justice would be furthered if the defense is allowed to argue last.

Due process considerations support allowing the defense to argue last. A case of this magnitude deserves the maximum judicial consideration to guarantee a fair trial. The United States Supreme Court has recognized that "death is a different kind of punishment, than any other which may be imposed in this country." Gardner v. Florida (1977), 430 U.S. 349. It is clear that a higher standard of due process is required in death cases then other cases because of the severity and finality of the punishment which may be involved.

The Supreme Court, in considering the scope of due process stated:

> [I]t is the universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations.

Griffin v. Illinois (1956), 351 U.S. 12, 28.

Furthermore, the Court has repeatedly held:

> [T]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss, * * *"

Goldberg v. Kelly (1970), 397 U.S. 254 at 262-263, quoting Joint Anti-Fascist Refugee Committee v. McGrath (1951), 341 U.S. 123, 168 (Frankfurter, J. concurring).

3

R.C. 2929.03(D)(1) states that the prosecution must prove beyond a reasonable doubt that the aggravating circumstances of which the accused was convicted outweigh the mitigating factors.

It might at first glance appear that the prosecution actually bears the burden at the penalty phase. However, a more careful examination of the practical application of the statute indicates that the burden is largely illusory. Once the prosecution proves the specifications, it need do nothing at the penalty phase. If the defense chooses not to put on any mitigating evidence, a death sentence will result.

Contrary to the words of the statute, then, the Defendant has some burden, and bears at least some of the laboring oar, in arguing he should be allowed to live. If Defendant fails to present mitigating factors to create a reasonable doubt in the minds of the jurors, he may well lose his life. The defense should be allowed to argue last since he is the party who would be defeated if no evidence was offered on either side.

At least two other jurisdictions have sought to alleviate the inherent unfairness in allowing the prosecution to speak last before the jury. The Kentucky statute which prescribes a penalty phase hearing states:

> The prosecuting attorney shall open and the defendant shall conclude the argument.

Ky. Rev. Stat. Section 532.025(1)(A).

4

California has reached the same result through judicial interpretation.

In People v. Bandhauer (1967), 66 Cal. 2d 524, 530-531, the court stated:

> Equal opportunity to argue is *** consistent with the Legislature's strict neutrality in governing the jury's choice of penalty ***, Accordingly, hereafter the prosecution should open and the defense respond. The prosecution may then argue in rebuttal and the defense close in surrebuttal.

The essential fairness of this position has application in Ohio. The defense should open with mitigation and the prosecution may then counter. The prosecution should then make a closing statement, followed by the closing statement of the defense.

Allowing the defense to argue last at the penalty phase is not without precedent under Ohio's 1981 statutory death penalty scheme. In the following cases, the defense was permitted to give final summation during the penalty phase of the trial:

State v. Herman Rucker, (Wayne Cty., 82-CR-018)

State v. Robert Shields, (Cuyahoga Cty., CR-273004-B)

State v. David Steffen, (Hamilton Cty., B824004)

State v. Randy Fellows, (Trumbull Cty., 82-CR-470)

State v. John Wm. Byrd, (Hamilton Cty., B831662)

State v. David Russell, (Clermont Cty., 82-CR-5246)

State v. Andrew Majoris, (Cuyahoga Cty., CR-182588-A)

State v. Timothy Wingo, (Ross Cty., 83-CR-79)

State v. Donald Sumser, (Stark Cty., CR-83-3466)

State v. Gregory Esparza, (Lucas Cty., CR-83-6603)

State v. Earnest Gaither, (Butler Cty., CR-84-02-0125)

State v. Melvin Bonnell (Cuyahoga Cty., CR-223820)

There is something fundamentally unfair about a man facing death and the prosecutor having the last chance to speak to the jury. The Defendant should have the last opportunity to plead for his life. If this Court were doing a sentencing, the Court would certainly approach it this way.

Defendant respectfully requests this Court to structure the penalty phase so that the defense speaks to the jury last.

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue

Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076

COUNSEL FOR NATHANIEL JACKSON

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and Memorandum was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, on this _____ day of _____, 2002.

_____
ANTHONY V. CONSOLDANE
COUNSEL FOR DEFENDANT

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

72

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| Plaintiff, | ) | |
| -vs- | ) | Judge Stuard |
| NATHANIEL JACKSON, | ) | MOTION FOR TRANSCRIPT |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO HAVE THE COURT FOLLOW THE OHIO REV. CODE § 2945.25(C) STANDARD FOR "DEATH QUALIFICATION" OF VENIRE PERSONS

Defendant, through counsel, moves this Court to use the statutory standard found in Ohio Rev. Code Ann. §. 2945.25(C) for death qualification when seating jurors in this case.

## MEMORANDUM IN SUPPORT

The standard for excusing jurors in capital cases is set forth in Ohio Rev. Code Ann. § 2945.25(C). This Section provides:

> A person called as a juror in a criminal case may be challenged for the following causes:
>
> * * *
>
> (C) In the trial of a capital offense, that he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is no grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.

Jackson Apx. Vol. 3
Page 163

O.R.C. § 2945.25(C) is a codification of the United States Supreme Court decision in <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968), in which the following standard was announced for excusing jurors in capital cases if they make it clear:

> (1) That [they] would <u>automatically</u> vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [them], or (2) that [their] attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

<u>Id.</u> at 522, n. 21.

Thus, in Ohio a juror must unequivocally state that under no circumstances will he follow the law of the Court before the juror can be excused based on his views regarding the death penalty.

The standard for such excusals under the United States Constitution is different, despite the Ohio Supreme Court's view to the contrary in <u>State v. Roe</u>, 41 Ohio St. 3d 18, 525 N.E.2d 1351 (1989). In <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985), the United States Supreme Court established the federal standard to be followed in excluding jurors for their views on capital punishment:

> [A] juror may not be challenged for cause based on his views about capital punishment <u>unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.</u>

<u>Id.</u> at 420 (emphasis added).

The Court was quick to caution trial judges that the decision was not meant "to denigrate the importance of an impartial jury. . . .  The trial court has a serious duty to determine the question of actual basis . . . .  In exercising its discretion, the trial court must be zealous to protect the rights of an accused."  Id. at 429-30 (emphasis added), quoting United States v. Dennis, 339 U.S. 162, 168 (1950).  Furthermore, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality."  Id. at 423.  The State thus has the burden of proving that the juror is biased.

Witt reflects a minimum constitutional standard imposed by the United States Supreme Court.  Ohio, through O.R.C. § 2945.25(C), has chosen the narrow, stricter constitutional standard reflected in the Witherspoon decision.  O.R.C. § 2945.25(C) is in no way affected by the Witt decision.

The General Assembly has expressly provided for the manner in which to excuse death-scrupled jurors in a capital case.  The Ohio courts may not now adopt a different standard through judicial legislation.  "The Courts have no power to revise any enactment of the Legislature unless it violates some clauses of the Constitution."  Ohio Power Co. v. Diller, 18 Ohio App. 2d 167, 174, 247 N.E.2d 774, 779 (1969).  O.R.C. § 2945.24(C) violates no clauses of the constitution, and indeed satisfies the minimum requirements of Wainwright v. Witt.  A court is limited in its "analysis to construction and interpretation of a statute as written."  State ex rel. Myers v. Chiaramonte, Supt., 46 Ohio St. 2d 230, 238, 348 N.E.2d 323, 328

(1976) (emphasis added).  See also In re Columbus Skyline Securities, Inc., 74 Ohio St. 3d 495, 660 N.E.2d 427 (1996).  Accordingly, the Ohio courts must apply the Witherspoon standard as it is written in O.R.C. § 2945.25(C).

Strict compliance with O.R.C. § 2945.25(C) is required in order to protect Defendant's State and Federal constitutional rights to effective assistance of counsel, due process of law, equal protection of the law, confrontation of the state's evidence against him, and freedom from cruel and unusual punishment.  U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.  Assuming, arguendo, that this procedure itself does not emanate directly from clear constitutional provisions, nevertheless, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution - and, in particular, in accord with the Due Process Clause."  Evitts v. Lucey, 469 U.S. 387, 401 (1985).  This is all the more so when a petitioner's "life" interest (protected by the "life, liberty and property" language in the Due Process Clause) is at stake in the proceeding.  Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) (five Justices recognized a distinct "life" interest protected by the Due Process Clause in capital cases above and beyond liberty and property interests).  Death is different; for that reason more process is due, not less.  See Lockett v. Ohio, 438 U.S. 586 (1978); Woodson v. North Carolina, 428 U.S. 280 (1976).

Respectfully submitted,

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

ANTHONY V. CONSOLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076
COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT'S MOTION TO HAVE THE COURT FOLLOW THE OHIO REV. CODE ANN. § 2945.25(C) STANDARD FOR "DEATH QUALIFICATION" OF VENIRE PERSONS was delivered to the Prosecutor's Office, 160 High Street, Warren, ohio, 44481, on this 23rd day of Jan , 2002.

ANTHONY V. CONSOLDANE

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

73

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 01-CR-794 |
| Plaintiff, | ) | |
| -v- | ) | Judge Stuard |
| NATHANIEL JACKSON, | ) | MOTION FOR TRANSCRIPT |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO PROHIBIT THE STATE'S USE OF PEREMPTORY CHALLENGES TO EXCLUDE VENIRE PERSONS WITH CONCERNS ABOUT IMPOSING THE DEATH PENALTY

Defendant, through counsel, respectfully moves this Court for an order prohibiting the State from excluding, through the use of peremptory challenges, all prospective jurors who express concerns over the imposition of the death penalty and/or capital punishment in general.

### MEMORANDUM IN SUPPORT

Under present Ohio law, a defendant convicted of Aggravated Murder with capital murder specifications may be punished by execution. With the State's decision to seek the death penalty, however, goes the enhanced responsibility on the State to ensure that the constitutional rights of capital defendants are meticulously observed. As the United States Supreme Court noted in Woodson v. North Carolina, 428 U.S. 280 (1976), the fact that there is a qualitative difference between the penalty of death and a term of imprisonment creates "a corresponding difference in the need for

73

reliability in the determination that death is the appropriate punishment in a specific case." Id. at 305. When death is a possible penalty, all constitutional safeguards should be scrupulously observed. Keeten v. Garrison, 578 F. Supp. 1164, 1167 (W.D. N.C. 1984) overruled on other grounds 742 F.2d 129 (4th Cir. 1984).

One area which has been subjected to constitutional scrutiny since the Supreme Court decision in Witherspoon v. Illinois, 391 U.S. 510 (1968) has been the means by which a capital jury is selected. The composition of the capital jury is crucial to the fairness of the capital litigation. The systematic exclusion of jurors who express opposition to the death penalty implicates a number of constitutional rights, including the Fifth and Fourteenth Amendment due process rights and the "fair cross-section" right inherent in the Sixth and Eighth Amendment guarantees.

One of the most effective means by which the State can exclude "death scrupled" jurors has been through the use of peremptory challenges. The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry, and without being subject to the court's control. Swain v. Alabama, 380 U.S. 202, 220 (1964), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79 (1986). While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory challenge permits rejection for a real or imagined partiality that is less easily designated or demonstrable. Swain, 380 U.S. at 220; Hayes v. Missouri, 120 U.S. 68, 70 (1887).

The use of peremptory challenges by the prosecution to select a jury which does not oppose and may even favor the death penalty is a common practice. The United States Supreme Court in <u>Gray v. Mississippi</u>, 481 U.S. 648, 667 (1987), indicated that: "It appears that prosecutors often use peremptory challenges" to "remove all venire members who expressed any degree of hesitation against the death penalty." Such a tactic permits the State to select what the Supreme Court condemned: a "tribunal organized to return a verdict of death." <u>Witherspoon</u>, 391 U.S. at 521 (footnote omitted).

The removal of prospective jurors for cause whose opposition to the death penalty is so strong that it would prevent or substantially impair performance of their duties as jurors is permitted. <u>Lockhart v. McCree</u>, 476 U.S. 162 (1986); <u>State v. Jenkins</u>, 15 Ohio St. 3d 164, 473 N.E.2d 264 (1984). The Supreme Court, however, has ruled out the removal for cause of potential jurors who merely express general opposition to the death penalty but who are willing to consider the possibility of its imposition in at least some cases and to make an impartial decision on the issue of the accused's guilt. <u>Witherspoon</u>, 391 U.S. at 522-532, n. 21.

In <u>Witherspoon</u>, the accused was tried pursuant to a statute which gave the jury wide discretion in choosing between life imprisonment and the death penalty, and also permitted the prosecutor to challenge for cause any juror who stated "that he has conscientious scruples against capital punishment, or that he is opposed to the same." The trial court

eliminated forty-seven potential jurors because of their opposition to the death penalty. Of those eliminated, only five stated that they would not vote for the death penalty under the appropriate facts despite their general opposition to the death penalty. According to the Supreme Court, this violated one of the "basic requirements of procedural fairness ... that the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Id. at 521-522, n.20.

The exclusion, by use of peremptory challenges, of jurors who are not subject to removal for cause has precisely the same result as that condemned in Witherspoon. There is more than one way to select a jury "deliberately tipped toward death," and when the prosecutor accomplishes indirectly through use of the peremptory challenge the precise result prohibited in Witherspoon through the use of challenges for cause, the constitutional consequences should be the same.

The State's primary interest in the peremptory challenge – the avoidance of jurors biased against the State – is similar to the interest protected in Witherspoon. As in Witherspoon, this interest is fully protected by limiting exclusion in such a way that jurors may not systematically be removed because of their views on capital punishment on "any broader basis than inability to follow the law or abide by their oaths." Adams v. Texas, 448 U.S. 38, 48 (1980). Thus, the purpose of the peremptory challenge (attempting "to obtain a fair and impartial jury to try the case

before the court") can be preserved while the accused's right to a fair trial is protected.  <u>Swain</u>, 380 U.S. at 222.

The use of peremptory challenges to exclude "scrupled" jurors (neither excludable for cause nor strong supporters of the death penalty) creates further unfairness when used in combination with the challenges for cause allowed under <u>Witherspoon</u>.  The prosecution has such an initial advantage in being able to exclude a substantial number of death penalty opponents for cause before using any peremptory challenges.  That advantage makes the jury more death-prone than the general population.  Defense challenges, even if used exclusively against death penalty advocates, cannot offset this bias, resulting in a skewed panel prone to death.

As a function of the very fabric of our adversarial system, the prosecutor (unlike defense counsel) represents the power of the State and bears, with the Court, the duty to ensure that the Defendant receives a fair trial.  <u>United States v. Agurs</u>, 427 U.S. 97, 110-111 (1976); <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).  The use of peremptory challenges to systematically remove jurors solely because of death penalty opposition (not rising to the <u>Witherspoon</u> standard) is not justifiable by any State interest in attempting to offset defense peremptory practices.

Defendant submits that there are two possible solutions to abuses in the use of peremptory challenges.  The first solution is to allow capital defendants to establish a prima facie case of systematic exclusion of "death-scrupled" jurors based upon the prosecutor's conduct during voir dire.

Such a standard is similar to the approach adopted by the United States Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79 and <u>Powers v. Ohio</u>, 499 U.S. 400 (1991).  The prima facie showing can be established through a "pattern" of strikes against "death-scrupled" jurors or by examining the prosecutor's questions and statements during voir dire.  Once Defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging "death-scrupled" jurors.  Imposing such a burden would not unduly limit the State in its selection of a fair jury.  In <u>Batson</u>, the Court noted that while requiring the State to justify the challenge of black jurors "imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."  <u>Batson</u>, 476 U.S. at 97.  The prosecutor may not, however, "rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in individual selections.' " <u>Id.</u> at 98; <u>see also</u> <u>Alexander v. Louisiana</u>, 405 U.S. 625 (1972).

It is important to note that in <u>Batson</u> the Supreme Court expressly declined to address the "fair cross-section" challenge to the discriminatory use of peremptory challenges.  Nor did the decision in <u>Lockhart v. McCree</u>, resolve this issue.  Although the Court in <u>Lockhart</u> determined that it was proper to remove "<u>Witherspoon</u> excludables" from juries, the analysis was limited to that group.  The Court noted that:

It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law. Because the group of 'Witherspoon excludables' includes only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case, 'death qualification' hardly can be said to create an 'appearance of unfairness.'

* * *

In sum, 'Witherspoon excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement.

Lockhart, 476 U.S. at 162 (emphasis added).

A second solution to abuses in the use of peremptory challenges would be for this Court to restrict the prosecutor's ability to question prospective jurors concerning their attitudes toward the death penalty. Rather than asking whether prospective jurors have conscientious scruples against the death penalty, prosecutors could be restricted to an inquiry of whether any venireperson would "under no circumstances . . . follow the instructions of a trial judge and consider fairly the imposition of a sentence of death . . . ." Ohio Rev. Code Ann. § 2945.25(C).  See also Witherspoon v. Illinois, 391 U.S. 510 (1968), and Adams v. Texas, 448 U.S. 38 (1980).  If prospective jurors answer in the negative, no further questioning by the State concerning attitudes on the death penalty should be permitted.

Under the statute and <u>Witherspoon</u>, the juror's general attitude toward the death penalty is irrelevant to the person's qualification for jury service.

Prosecutorial abuse of the peremptory challenge presents very serious constitutional concerns, including:  constitutional right to a fair and impartial jury; the constitutional right to be tried by a jury drawn from a representative cross-section of the community; the constitutional right to be tried by a group of individuals capable of performing the purpose and function of a jury; the constitutional right to be free from cruel and unusual punishment; and the professional responsibility of prosecutors to refrain from using peremptory challenges to intentionally create juries biased in the State's favor.  This Court should adopt one of the two suggested procedures proposed to protect Defendant's State and Federal constitutional rights.  U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.

For the foregoing reasons, Defendant respectfully moves this Court for an order prohibiting the State from excluding, through the use of peremptory challenges, all prospective jurors who express concerns over concerns over the imposition of the death penalty.


Respectfully submitted,

*David H. Bodiker /TED*

DAVID H. BODIKER  #0016590
OHIO PUBLIC DEFENDER

_____
ANTHONY V. CONSØLDANE #0000761
ASSISTANT STATE PUBLIC DEFENDER
LEAD COUNSEL

_____
JAMES F. LEWIS  #0024314
ASSISTANT STATE PUBLIC DEFENDER
CO-COUNSEL

BRANCH OFFICE OF THE OHIO PUBLIC DEFENDER
328 Mahoning Avenue
Warren, Ohio  44483
(330)393-7727  FAX (330)393-7076
COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT'S MOTION TO PROHIBIT THE STATE'S USE OF PEREMPTORY CHALLENGES TO EXCLUDE VENIRE PERSONS WITH CONCERNS ABOUT IMPOSING THE DEATH PENALTY was delivered to the Prosecutor's Office, 160 High Street, Warren, Ohio, 44481, this _____ day of _____, 2002.

_____
ANTHONY V. CONSOLDANE

9