**The Supreme Court of Ohio**
Clerk's Office
65 South Front Street, 8th Floor
Columbus, Ohio 43215-3431
614.387.9000
614.387.9530

Marcia J. Mengel
Clerk of Court

## Search Results: Case Number 2003-0137

# The Supreme Court of Ohio
## CASE INFORMATION

### GENERAL INFORMATION

**Case:** **2003-0137** Death Penalty Case (offense committed on or after 1/1/95)

**Filed:** 01/22/03

**Status:** Case Is Disposed

### State of Ohio v. Nathaniel E. Jackson

### PARTIES and ATTORNEYS

| |
|---|
| Jackson, Nathaniel E. (Appellant) |
|     Represented by: |
|         Porter, Randall (5835) , Counsel of Record |
|         Laczko, John (51918) |
|         Lager, Dennis (26073) |
| State of Ohio (Appellee) |
|     Represented by: |
|         Annos, LuWayne (55651) , Counsel of Record |
|         Watkins, Dennis (9949) |

### PRIOR JURISDICTION

| Jurisdiction Information | Prior Decision Date | Case Number(s) |
|---|---|---|
| Trumbull County, 11th District | 12/09/2002 | 01CR794 |

### DOCKET ITEMS

- Most documents that were filed in Supreme Court cases after December 1, 2006, are scanned. They are available for viewing via the online dockets, generally within one business day from their date of filing.

- Supreme Court orders that were issued after January 1, 2007, are also available via the online dockets as PDFs. Although original orders issued by the Court bear the signature of the Chief Justice, the signature usually will not appear in the online versions. In all other respects, the online versions will be

Jackson Apx. Vol. 6
Page 1

identical to the original signed orders on file with the Clerk's Office.

- A ⬚ symbol in an online docket denotes a scanned filing or an electronic version of a Supreme Court order. Clicking the icon opens an image of the filing or order.

| Date Filed | Description |
|---|---|
| 01/22/03 | Notice of appeal of Nathaniel E. Jackson<br>*Filed by:* Jackson, Nathaniel |
| 01/22/03 | Copy of praecipe to court reporter<br>*Filed by:* Jackson, Nathaniel |
| 01/22/03 | Copy of entry of appointment of counsel<br>*Filed by:* Jackson, Nathaniel |
| 01/23/03 | Copy of notice of appeal sent to clerk of court of common pleas |
| 01/23/03 | Order to clerk of court/custodian to certify record |
| 03/18/03 | Motion for extension of time to transmit record<br>*Filed by:* Jackson, Nathaniel |
| | 03/21/03: Granted; record due 5/5/03 |
| 05/01/03 | Motion for extension of time to transmit record |
| | 05/09/03: Granted; record due 7/7/03 |
| 07/09/03 | Record |
| 07/09/03 | Clerk's notice of filing of record |
| 10/07/03 | Stipulation to extension of time to file merit brief to 10/27/03<br>*Filed by:* Jackson, Nathaniel |
| 10/27/03 | Appellant's merit brief<br>*Filed by:* Jackson, Nathaniel |
| 12/01/03 | Motion for stay of execution<br>*Filed by:* Jackson, Nathaniel |
| | 12/04/03: Granted |
| 12/22/03 | Stipulation to extension of time to file merit brief to 1/15/04<br>*Filed by:* State of Ohio |
| 01/14/04 | Appellee's merit brief<br>*Filed by:* State of Ohio |
| 01/21/05 | Notice of oral argument to be held May 10, 2005 |
| 05/10/05 | Oral Argument Held |
| 01/04/06 | <u>DECISION: Affirmed; sentence to be carried into execution on 04/04/2006. See opinion at 2006-Ohio-1</u> ⬚ |
| 01/09/06 | Return receipt received by John Laczko, Esq. |
| 01/11/06 | Return receipt received by Luwayne Annos |
| 01/19/06 | Certified copy of judgment entry/mandate sent to clerk |
| 01/19/06 | Notice of appearance and substitution of counsel of Randall L. Porter for Dennis Day Lager and John Paul Laczko<br>*Filed by:* Jackson, Nathaniel |

| 01/19/06 | Motion for stay of execution pending exhaustion of state post-conviction remedies<br>    *Filed by:*  Jackson, Nathaniel |
|---|---|
| | 01/24/06: Granted; counsel shall notify this Court when all proceedings for postconviction relief have been exhausted. |
| 01/23/06 | Return receipt received by Sandra Shaffer |
| 01/23/06 | Return receipt received by Warden |
| 01/24/06 | Return receipt received by John Barron |
| 01/26/06 | Return receipt for Sandra Shaffer |
| 01/26/06 | Return receipt for John Barron |
| 01/30/06 | Return receipt received by Clerk of Courts |
| 01/30/06 | Return receipt for Luwayne Annos |
| 01/30/06 | Return receipt for Warden |
| 01/30/06 | Return receipt for Clerk of Courts |
| 02/01/06 | Return receipt for John P. Laczko, Esq. |
| 02/16/06 | Application for attorney fees by Dennis Day Lager |
| | 05/10/06: Granted in the amount of $9,039.95 |
| 02/22/06 | Application for attorney fees by John P. Laczko |
| | 05/10/06: Granted in the amount of $9,320.29 |
| 04/04/06 | Application for reopening under S.Ct.Prac.R. XI(6) (With 2 Volume Appendix)<br>    *Filed by:*  Jackson, Nathaniel |
| | 10/04/06: Denied |
| 04/10/06 | Notice of filing petition for certiorari in U.S.S.C. |
| 05/02/06 | Opposition to application for reopening<br>    *Filed by:*  State of Ohio |
| 06/09/06 | Notice of U.S.S.C. denial of petition for writ of certiorari |

Back

Supreme Court | State of Ohio

© 2004-2007 Enabling Technologies, Inc.

Question or Comments?

ECMS Online 1.2.9

Jackson Apx. Vol. 6
Page 3

http://www.sconet.state.oh.us/clerk_of_court/ecms/resultsbycasenumber.asp?type=3&year...    4/13/2007

IN THE SUPREME COURT OF OHIO

NATHANIEL E. JACKSON ) 03-0197

     Appellant ) **ON APPEAL FROM THE**
**TRUMBULL COUNTY**
**COURT OF COMMON PLEAS**

     vs. )

STATE OF OHIO ) **TRUMBULL COUNTY**
**COURT OF COMMON PLEAS**
**CASE NO.  01 CR 794**

     Appellee )

---

## NOTICE OF APPEAL OF APPELLANT, NATHANIEL E. JACKSON

---

JOHN P. LACZKO  #0051918
4800 Market St., Ste. C
Youngstown, Ohio   44512
(330)   788-2480
Counsel for Appellant, Nathaniel E. Jackson

LUWAYNE ANNOS #0055651
Trumbull County Prosecutor's Office
160 High St.
Fourth Floor
Warren, Ohio   44481
Counsel for Appellee, State of Ohio

ON COMPUTER-SMW



RECEIVED
JAN 2 2 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

FILED
JAN 2 2 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## NOTICE OF APPEAL OF APPELLANT, NATHANIEL E. JACKSON

Appellant, Nathaniel E. Jackson, hereby gives notice of his appeal to the Supreme Court of Ohio from the judgment entry of the Trumbull County Court of Common Pleas, entered in Court of Common Pleas Case No. 01 CR 794, journalized on December 9, 2002, and from the Court's separate R.C. 2929.03(F) opinion, journalized on December 10, 2002.

The following are applicable in this case:

1. The case involves a death penalty conviction;

2. The case raises substantial constitutional questions;

3. The case involves a felony;

4. The case is one of public or great general interest.

Respectfully submitted,

JOHN P. LACZKO   #0051918
4800 Market St., Ste. C
Youngstown, Ohio  44512
(330)  788-2480
Counsel for Defendant-Appellant

## CERTIFICATE OF SERVICE

A copy of the foregoing Notice of Appeal has been mailed this  _21ˢᵗ_

day of  _January_  ,2003, to:  Atty. Luwayne Annos, Trumbull County Prosecutor's

Office, 160 High St., Fourth Floor, Warren, Ohio  44481, Counsel for Plaintiff-

Appellee.


JOHN P. LACZKO
Counsel for Defendant-Appellant

appealmca bk

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.    01-CR-794 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN M. STUARD |
| | ) | |
| -vs- | ) | JUDGEMENT ON THE VERDICT |
| | ) | |
| NATHANIEL E. JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

The Jury, on November 27, 2002, having returned verdicts of "Guilty" on Count One:

Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut with two

(2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1:

Aggravated Burglary (O.R.C. §2929.04(A)(7)); Specification No. 2Aggravated Robbery

(O.R.C. §2929.04(A)(7)): Count Two:  Aggravated Murder (O.R.C. §§2903.01(B)) of Robert

S. Fingerhut with two (2) separate Specifications of Aggravating Circumstances, to wit:

Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)); Specification No. 2:

Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Three: Aggravated Burglary with

Firearm Specification (O.R.C. §2911.11(A)(1)(2) and 2941.145); and Count Four Aggravated

Robbery with Firearm Specifciation (O.R.C. §2911.01(A)(1)(3) and 2941.145), and the Court

having examined the same and finding the same regular as to form, it is hereby ORDERED,

ADJUDGED and DECREED that judgment is hereby rendered on said verdicts.

-1-

Dated: _____ 12/12/05 _____

HON. JOHN M. STUARD
Judge, Court of Common Pleas

cc:    Trumbull Co. Prosecutor's Office
       Atty. James Lewis/ Atty. Anthony Consoldane

-2-

0989   423

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.    01-CR-794 |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN M. STUARD |
| -vs- | ) | |
| | ) | **OPINION OF THE COURT** |
| NATHANIEL E. JACKSON, | ) | |
| | ) | **FINDINGS   OF   FACT   AND** |
| Defendant. | ) | **CONCLUSIONS OF LAW REGARDING** |
| | ) | **IMPOSITION OF DEATH PENALTY** |

On November 8, 2002, a Trumbull County Jury returned a verdict finding the Defendant, Nathaniel E. Jackson, guilty of two (2) counts of Aggravated Murder arising from the death of Robert S. Fingerhut. Since Count One and Count Two of the Indictment merge for sentencing purposes, the State elected to dismiss Count Two and proceed to the mitigation phase on the first count of the indictment. Therefore, for purposes of this opinion, the Defendant was convicted, under the first count of the indictment, of purposely, and with prior calculation and design, causing the death of Robert S. Fingerhut. The jury further found that the State had proved beyond a reasonable doubt two (2) specifications of aggravating circumstances. After the mitigation hearing, the jury concluded that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and returned a verdict recommending that the sentence of death be imposed upon the Defendant.

Factually, the evidence revealed that while the Defendant was in prison for a prior conviction unrelated to the present case, he along with the Co-Defendant, Donna Roberts, who is precedently awaiting trial for her involvement, plotted the murder of her house mate, and ex-husband, Robert S. Fingerhut. Indeed, both of them concocted a plan to kill Fingerhut to permit

-1-

the Defendant and Roberts to live happily ever after.  However, the plan went awry when Jackson, who was in the house where Fingerhut stayed, was shot in the left index finger during the execution of Fingerhut.  He then took Fingerhut's car keys, and drove the vehicle which Fingerhut typically operated to Youngstown.  Shortly thereafter, Roberts took the Defendant to a motel in Boardman, getting him a room where he could hide out.  Ultimately, the Defendant was captured at a home in Youngstown, and he gave a statement to the police alleging self-defense.

More specifically, the State introduced evidence that on December 11, 2001, two (2) days after the Defendant was released from prison, Robert S. Fingerhut, while in his home, was pistol whipped, and shot three(3) times, causing at least four (4) injuries from gun shots.  Two of the injuries were to the back, with one grazing the back, and the other entering near the shoulder before exiting out the chest area of the victim.  Fingerhut also sustained a defensive gun shot wound to the webbing of his left hand between the thumb and forefinger.  The fatal gun shot was to the top of the head and from a short distance.  This injury would "would have dropped him like a sack of potatoes," as testified to by Dr. Germaniuk.

Police responded to the crime scene as a result of a 911 call.  When they arrived at approximately 12:01 a.m., they were met by the Co-Defendant, who informed them that her husband's car was missing.  She also granted them permission to search the residence and her car.  During this search, police found more than 140 letters from the Defendant to Roberts in her dresser, and an equal number of letters from Roberts to the Defendant, in the trunk of the Co-Defendant's car, in a paper bag bearing the Defendant's name and prison number.

Additionally, law enforcement officers were able to obtain nineteen (19) telephone

conversations, lasting more than three (3) hours, which were recorded while the Defendant was incarcerated in Lorain Correctional Institution.  These telephone conversations, along with the letters which spanned three (3) months, revealed a continuing and evolving plan to kill Fingerhut immediately upon the Defendant's release from prison.

Specifically, during these telephone conversations, and in the written letters, the Defendant requested that Roberts obtain for him, black gloves to conceal his fingerprints, a ski mask, and a pair of handcuffs.  Further, the Defendant, during the December 8, 2001, telephone conversation, which was recorded the day before he was discharged from Lorain, and three (3) days before the murder, stressed to Roberts that he "need[ed] to be in the house [in which Fingerhut lived] before he [got] home " in order to carry out the premeditated murder.  Roberts, in a letter written to the Defendant acknowledged that she has found thin, fleece line,  leather gloves, but was still looking for the ski mask.

Indeed, the State introduced black leather gloves with fleece lining which were recovered from the house where the Defendant was arrested.  These gloves, which had gun shot residue on them, had a hole in the left index finger, and a reddish substance which appeared to be blood was also observed in that same area.  This damaged matched the injury that the Defendant had sustained to his finger.  Although the actual handcuffs were never recovered by police, an empty handcuff box was found in Donna Robert's car.

The evidence also revealed that Roberts, near the time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived.  Furthermore, within two (2) hours from the last time Fingerhut was seen alive, Roberts rented a hotel room for the Defendant.  In this room, bloody bandages and other medical supplies were

-3-

found by hotel cleaning people and were subsequently collected by police.

The car which was usually driven by Fingerhut, and which had been reported stolen by the Co-Defendant the night of Fingerhut's murder was recovered in Youngstown, Ohio. Blood stains were located throughout the vehicle and were collected by law enforcement. DNA analysis revealed that the blood matched that of DNA profile of the Defendant.

The State also introduced evidence that Roberts and the Defendant discussed purchasing a "new Lincoln" or "2002 Cadillac DeVille" for the Defendant. Additionally, Fingerhut had two (2) life insurance policies with a total death benefit of $550,00.00, and with Donna Roberts named as the beneficiary.

Based upon this and other evidence, the jury properly concluded that the Defendant committed a burglary to facilitate the premeditated and purposeful murder of the victim Fingerhut along with Roberts. The Defendant after executing his plan then stole Fingerhut's vehicle which allowed the jury to find that the murder was committed while committing the aggravating circumstances of Aggravated Burglary and Aggravated Robbery.

In a case of this nature, pursuant to R.C. 2929.03(D)(3), the Court is required to determine whether the State has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Indeed, the Supreme Court of Ohio has stated in *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344:

> "[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. *** [I]n the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." *Wogenstahl* (1996), 75 Ohio St. 3d 344 at 356.

-4-

In performing its statutory duty, the a review of the aggravating circumstances is required.

1.)    *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.*

The evidence presented at trial reflected that the Defendant trespassed in the victim's dwelling and murdered him. The Court finds that the Defendant entered into 254 Fonderlac Drive, in Howland Township.  He was wearing gloves and armed with a gun, with which he struck the victim leaving a mark on Fingerhut's face. Once in the house, he fired the gun three times causing four (4) separate wounds.  The fatal shot was to the top of Fingerhut's head, and nearly straight down.

From the aforementioned evidence, the Jury concluded that the defendant committed the Aggravated Murder of while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

2.)    *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.*

After the Defendant had murdered the victim, he took the victim's car keys and his car As he was driving away from the crime scene, and prior to abandoning the vehicle in Youngstown, he left blood evidence throughout the car.  This evidence was subjected to DNA testing, which confirmed that forensically, it was his blood.  Quite simply, the Defendant committed the Aggravated Robbery to escape the consequences of his prior murderous act.

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

To be weighed against the aggravating circumstances are the mitigating factors. In this case, the following factors were considered by the Court as possible mitigation against each specification and against the imposition of the death penalty:

1.)   *The nature and circumstances of the offense, the history, character, and background of the offender.*

As was noted in *Wogenstahl, supra,* the nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. However, in this case, reviewing the nature and circumstances, the Court does not find any credible evidence which would allow the Court to accord any weight to the nature and circumstances of the offense against the imposition of the death penalty.

In considering the history, character and background of the offender, this Court considered the home life of the Defendant and the fact that he grew up in a relatively poor environment, and that he was cared for and raised by his mother and maternal grandmother. His biological father had little, if any, real involvement with him, and this lack of a father figure likely contributed to his behavioral problems .

Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the Defendant's step-father, his sister, his mother, and Dr. McPherson.  These witnesses testified that the Defendant was respectful to both is mother and grandmother.  His sister, who described as smart and really kind, noted that they

attended church.  Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused.  His mother also declined to say that his home was in a "rough neighborhood, or that the Defendant had any problems in school.  Dr. McPherson's report noted that the Defendant had not been hospitalized for any physical or mental condition.   The witnesses also noted that they practiced moral tenets and that responsibility and respect were taught.

In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

2.)     *Whether the victim of the offense induced or facilitated the killing.*

Although under R.C. 2929.04(B)(1), the mitigating factor regarding whether the victim of the offense induced or facilitated it was not specifically argued by the Defendant during the penalty phase of the trail as mitigating, the Court did consider the Defendant's video taped statement presented in evidence during the trial phase.  In the self-serving statement, the Defendant claimed that the killing of the victim was as a result of the Defendant protecting himself from an unprovoked attack by the victim.

This statement to the police attempted to construct a scenario wherein the victim approached the Defendant to purchase marijuana and then invited the Defendant into his home. The Defendant then claims that the victim then pulled a gun on him. The Defendant asserted that he attempted to disarm the victim, but the gun went off apparently striking the victim. However, the other facts illustrating the planning and execution of the murder along with the physical evidence introduced causes the Defendant's version not to be credible.  As such, the

Court does not accord any weight to this mitigating factor.

    3.)    *Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.*

Again, while the Defendant did not specifically argue this mitigating factor, the Court, upon reviewing the video tape, noticed that the Defendant claimed that the victim made derogatory statements about the Defendant's race which angered the Defendant. However, the this comment is likewise not convincing for the same reasons noted previously. This mitigating factors has no weight.

    4.)    *Any other factors that are relevant to the issue of whether the offender should be sentenced to death.*

Under R.C. 2929.04 (B)(7), commonly referred to as the "catch all provision" the Court reviewed the Defendant's capacity to appreciate the criminality of his conduct in light of the defense expert testimony regarding his mental history and mental state at the time of the offense was considered as a possible factor under R.C. 2929.04(B)(3).

This testimony revealed that the Defendant suffered from Attention Deficit Disorder/Hyperactivity Disorder, Chemical Dependency, and a reported history of alcohol abuse. Further, the evidence disclosed that the Defendant had an Antisocial Personality Disorder and was considered low average or better in intelligence.

Significantly, however, there was no evidence presented that the Defendant, at the time of the offense, had any mental disease or defect or that he lacked the capacity to appreciate the criminality of his conduct. His Antisocial Personality Disorder only showed that he had a history of inappropriate and impulsive behavior from his early childhood to the present. He was

incarcerated four (4) times. According to the Defendant's own expert, the Defendant, throughout his juvenile and adult life had received repeated treatment and/or probation for his criminal transgressions and his drug and alcohol abuse. He did not learn from his past mistakes, but only escalated his antisocial conduct.

In summary, this Court gives very little weight in mitigation to the Defendant's mental status, and his drug and alcohol abuse history especially in light of the Defendant's elaborate scheme to kill the victim, elude capture, and finally deceive police officers with a statement blaming the victim.

Further under 2929.04(B)(7), the Court examined the Defendant's ability to maintain himself in a stable fashion in a structured setting. Indeed, it was suggested by the Defense that he could be a productive member of the general prison population, and that this should be considered as mitigating. However, the Court gives slight weight to this particular factor.

The Defendant's last incarceration was the result of him not learning from his past mistakes, and from his tendency to act out impulsively without looking at the consequences. Furthermore, he repeatedly was placed on probation, but he continued to digress, committing more serious criminal acts. Indeed, during the last incarceration, the Defendant claimed to have "found God" and that he was going to straighten out his life. At the same time, it is abundantly clear that he was plotting to commit the ultimate criminal act, a premeditated burglary and murder, while pre-textually presenting himself to prison officials as a good candidate for a release program. Quite simply, in the very setting in which the Defense suggests that he could be a productive member, the Defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder Robert S. Fingerhut so that in effect he could assume Fingerhut's lifestyle,

-9-

including running the Greyhound bus business, managing rental properties, and living in his home with his ex-wife.

The Defendant also offered an unsworn statement, wherein he stated that he was "very sorry for what happened." The Court likewise gives this statement slight weight as the statement lacked sincerity. The tone and tenor of the apology did not, in the Court's opinion, come from someone who was genuinely remorseful. Even assuming that the Defendant was remorseful, such retrospective remorse is not entitled to any significant weight. To the contrary, the Court believes that the Defendant's feigned remorse stems from the fact that the Defendant was apprehended. The Defendant was disappointed that the fool-proof, premeditated murder plot ,which he developed over nearly three (3) months, and which included shooting the victim "in the 'F' ing head," failed.

When independently weighing the aggravating circumstances as to the Aggravated Murder as previously outlined against the collective factors in mitigation, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to any defendant who commits an Aggravated Murder during the commission of these certain felonies. In the case at bar, the underlying felonies are Aggravated Burglary and Aggravated Robbery.

In this particular case, the Court accords substantial weight to the Aggravated Burglary specification. In order to prove an Aggravated Burglary, the State is required to demonstrate that the Defendant trespassed in the occupied structure for the purpose of committing a criminal

-10-

act.  In most instances, this criminal act is a theft offense.  Occasionally, a Defendant will trespass to commit a kidnapping or even a rape.  Such criminal acts provide the basis upon which a Defendant can be convicted of Aggravated Burglary.  Then, if during any of these underlying criminal acts, the victim is purposely killed, an Aggravated Murder with the specification of Aggravated Burglary has been committed.  These alone can permit the imposition of the death penalty should the aggravating circumstance of the Aggravated Burglary be found to outweigh the mitigating factors.

Under the facts in the instant case, this Court can not foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater.  The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to rather to carry out the premeditated, cold blooded execution Robert S. Fingerhut.  This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight.  Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

The Court further gives weight to the Aggravated Robbery specification.  After shooting the Defendant in the head, the Defendant took personal property of the victim to effectuate his escape.  Indeed, the Defendant stole the victim's keys and his car.

Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct.  From the

overwhelming evidence, it is this Court's opinion that the Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,00.00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him.

Upon consideration of the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the defendant, and the arguments of counsel, it is the judgment of this Court that the aggravating circumstances, outweighed, by proof beyond a reasonable doubt, the collective mitigating factors.

Dated: 12/9/02

HON. JOHN M. STUARD
Judge, Court of Common Pleas

I hereby certify that a copy of the foregoing opinion was hand delivered to Attorney James Lewis, Attorney Anthony Consoldane, and Prosecutor Dennis Watkins this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court, Supreme Court of Ohio, State Office Tower, 30 E. Broad Street, Columbus, Ohio 43266-0419, this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

-12-

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, | ) CASE NO. 01-CR-794 |
| Plaintiff | ) |
| | ) **DEATH PENALTY** |
| -vs- | ) SENTENCE TO CORRECTIONAL |
| | ) RECEPTION CENTER |
| NATHANIEL E. JACKSON, | ) |
| | ) **ENTRY ON SENTENCE** |
| Defendant | ) |

The Defendant herein having been indicted by the September Eighth, 2001, Term of the

Grand Jury of Trumbull County, Ohio, for Count One: Aggravated Murder (O.R.C. §§2903.01(A)

and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating

Circumstances, to wit: Specification No. 1 Aggravated Burglary (O R.C. §2929.04(A)(7)), and

Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Two: Aggravated

Murder (O.R.C. §§2903.01(B)) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate

Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary

(O.R.C. §2929.04(A)(7)), and    Specification No. 2:    Aggravated Robbery (O.R.C.

§2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R C.

§2911.11.(A)(1)(2) and 2941.145); and   Count Four: Aggravated Robbery (F1) With Firearm

Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145), and on the 8th day of October, 2002,

having been brought into Court for trial before a petit jury and being represented by counsel,

Attorney Anthony Consoldane and Attorney James Lewis, and the jury having been empaneled,

and after due deliberation on November 8, 2002, was found guilty of Count One: Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Two: Aggravated Murder (O.R.C. §§2903.01(B) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R.C. §2911.11.(A)(1)(2) and 2941.145); and Count Four: Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145). Thereafter, Count Two was removed from the Jury pursuant to a Motion to Dismiss by the State.

On November 14, 2002, the Defendant having been brought into Court to give evidence in mitigation on Count One of the indictment, and after arguments of counsel and instructions of law, and after due deliberation, it was the finding and recommendation of the Jury on November 15, 2002, that the sentence of death be imposed on the Defendant.

On December 9, 2002, Defendant's sentencing hearing was held pursuant to O.R.C. Section 2929.19. Defense Attorney Anthony Consoldane and Attorney James Lewis, and Prosecutor Dennis Watkins and Assistant Prosecutor Charles L. Morrow, were present, as was Defendant who was afforded all rights pursuant to Criminal Rule 32. The Court has considered the record and oral statements, as well as the principles and purposes of sentencing under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, December 9, 2002, having determined in a separate opinion of specific findings that the aggravating circumstances as to the count of Aggravated Murder outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say why judgment should not be pronounced against him, and the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under O.R.C. §2929.14, and makes the following findings: (1) the shortest prison term will demean the seriousness of the Defendant's conduct; (2) the longest prison term is appropriate because the defendant committed the worst form of the offense; (3) multiple prison terms are necessary to protect the public from future crime and to punish the offender; (4) consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the offender poses to the public; (5) the harm caused by the multiple offenses was so great that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the defendant's conduct; and (6) the defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant, NATHANIEL E. JACKSON, be taken from the courtroom to the Trumbull County Jail and from thence to the Correction Reception Center at Lorain, Ohio, and thereafter be sentenced to death on December 10, 2003 on Count One; and imprisoned therein for the stated prison term of ten (10) years on Count Three; plus a mandatory term of three (3) years on the Firearm Specification to be served prior to and consecutive to the sentence imposed in Count Three; ten (10) years on

Count Four, plus a mandatory term of three (3) years on the Firearm Specification to be served prior to and consecutive to the sentence imposed in Count Four, sentence in Count Four to be served consecutively to the sentence imposed on Count Three. Firearm Specifications in Count Three and Count Four shall merge as one sentence in Count Three as a matter of law. Defendant is Ordered to pay the cost of prosecution taxed in the amount $_____ for which execution is awarded.

_____12/10/02_____
DATED

_____
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD
_____
JUDGE

2/10/02 -
Copied sent to:

Pros.
a. Consoldone
Supreme Court of Ohio

You are hereby notified that you have been convicted of a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code, you are prohibited from acquiring, having, carrying or using any firearm or dangerous ordinance.

ORIGINAL

# IN THE SUPREME COURT OF OHIO

## CAPITAL CASE PRAECIPE

| | | |
|---|---|---|
| STATE OF OHIO | ) | DATE OF OFFENSE: ___DECEMBER 11, 2001 |
| | ) | |
| Appellee | ) | TRIAL COURT CASE NO. 01 CR 794 |
| | ) | |
| vs. | ) | DATE OF FINAL JUDGMENT |
| | ) | IN TRIAL COURT: Dec. 10, 2002 |
| NATHANIEL E. JACKSON | ) | TRIAL COURT JUDGE; JOHN A. STUARD |
| | | TRUMBULL COUNTY COURT OF |
| | ) | COMMON PLEAS |
| Appellant | | |

**TO THE COURT REPORTERS:**

Immediately prepare a complete transcript of <u>all</u> proceedings, including but not limited to, <u>all</u> pretrial hearings, motion hearings, in-chambers conferences, trial phase (including voir dire) proceedings, penalty phase proceedings and sentencing proceedings, in conformance with S. Ct. Prac. R. XIX, Section 3, and along with all physical exhibits, and deliver to the clerk of the Ohio Supreme Court.

JOHN P. LACZKO #0051918
4800 Market St., Ste. C
Youngstown, Ohio 44512
(330) 788-2480
Counsel for Appellant Jackson

ON COMPUTER-SMW

FILED

JAN 2 2 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document has been sent in via regular U.S. mail this _21ST_ day of _JANUARY_, 2003, to the following:

Atty. Luwayne Annos, Trumbull County Prosecutor's Office, l60 High St., Fourth Floor, Warren, Ohio 44481, Counsel for Appellee.

JOHN P. LACZKO
Counsel for Appellant Jackson

## ACKNOWLEDGMENT OF COURT REPORTER:

I received a copy of the foregoing Praecipe to Court Reporters this _21ST_ day of _JANUARY_, 2003.

Mary Ann Mills

Kelly Wilson

Lori Rittwage
Court Reporters

Suppraec

ORIGINAL

IN THE SUPREME COURT OF OHIO

NATHANIEL E. JACKSON          )

    Appellant          )          TRUMBULL COUNTY COURT OF
                             COMMON PLEAS

vs.                           )

                       )          TRUMBULL COUNTY COURT OF
                             COMMON PLEAS
                             CASE NO.   01 CR 794

                       )

STATE OF OHIO                 )

                       )          <u>PERMISSION TO WAIVE DOCKET
                             FEE IN FORMA PAUPERIS</u>

    Appellee          )

Now comes Appellant, in forma pauperis, who respectfully asks of the Court that the docket fee of the within appeal be waived due to his indigent status.  Appellant was convicted of capital Murder wherein he has an appeal of right.

Attached as Exhibit A is the Journal Entry which appoints counsel for purposes of appeal.

Respectfully submitted,



JOHN P. LACZKO  #0051918
4800 Market St., Ste. C
Youngstown, Ohio   44512
(330) 788-2480
Counsel for Appellant

ON COMPUTER-SMW

FILED

JAN 2 2 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## THE SUPREME COURT OF OHIO

In the Common Pleas Court of _Trumbull_ County

### Disposition of a Capital Case by the Trial Court

This form is used pursuant to Rule 20 of the Rules of Superintendence for the Courts of Ohio to report the disposition of a capital case. **Return this form within two weeks of disposition to:** ~~Nan Cairney,~~ **Supreme Court of Ohio, 30 E. Broad Street, Third Floor, Columbus, OH 43266-0419.**

Defendant's Name: _Nathaniel E. Jackson_ Case No. _01-CR-794_

Lead Trial Counsel: _Anthony V. Consoldane_ Trial Co-Counsel _James F. Lewis_

Outcome of the Proceedings in this Court:

\_\_\_\_\_ ~~Found not guilty~~
\_\_\_\_\_ Pleaded guilty
\_\_\_\_\_ Pleaded guilty to lesser offense: _____
✓ Found guilty of aggravated murder & specification by jury
\_\_\_\_\_ Found guilty of lesser offense by jury: _____
\_\_\_\_\_ Found guilty of aggravated murder & specification by three judge panel
\_\_\_\_\_ Found guilty of lesser offense by three judge panel: _____
\_\_\_\_\_ Other: _____

Sentence: _Death Penalty_

**Complete the following ONLY if the defendant was sentenced to death. Attach a copy of the sentencing entry.**

**This court has appointed the following two counsel to represent defendant on appeal:**

Name: John P. Laczko            Name: _____
Atty. Reg. No. 0051918          Atty.Reg. No. _____
Address: 4800 Market St., Ste. C    Address: _____
Youngstown, OH 44512            _____
Telephone: (330) 788-2480       Telephone: _____

Certified under Sup.R. 20 as:       Certified under Sup.R. 20 as:
Lead Counsel _____            Lead Counsel _____
Co-Counsel _____             Co-Counsel _____
Appellate Counsel   X              Appellate Counsel _____

Judge: _John M. Stuard_
JOHN M. STUARD                   Date of Appointment: _1/15/03_

### ATTORNEY CERTIFICATION

We hereby accept appointment as appellate counsel in this case, affirm that we are currently certified under Sup.R. 20 to accept appointment as appellate counsel, and certify that this appointment will not create a total workload so excessive that it interferes with or prevents the rendering of quality representation in accordance with constitutional and professional standards.

_____    _January 3 2003_    _____  _____
Appellate Counsel               Date         Appellate Counsel          Date
Rev. 7/1/97

# The Supreme Court of Ohio

FILED

JAN 23 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

To the Clerk of Court of Common Pleas for

Trumbull _____ County,

Warren _____, Ohio

State of Ohio _____

v.

Nathaniel E. Jackson _____

ORDER TO CERTIFY RECORD
IN DEATH PENALTY CASE

S.C. Case No. _____03-137_____

C.P. Case No. _____01CR794_____

You are hereby ORDERED, pursuant to Rule XIX, Section 4, of the Rules of Practice of the Supreme Court of Ohio, to prepare and forward the record in the above-captioned case to the Clerk's Office of the Supreme Court, no later than March 24, 2003, unless the Supreme Court grants an extension of time under Rule XIX, Section 4(C)(1).

Pursuant to Rule XIX, Section 3(A), the record shall consist of the following:

- The original papers filed in the trial court and exhibits to those papers;

- The transcript of proceedings, including all exhibits, and computer diskettes of the transcript, if available; and

- A certified copy of the docket and journal entries prepared by the clerk of the trial court.

You are further ORDERED, pursuant to Rule XIX, Section 4(B)(1), to number the documents and exhibits comprising the record; to prepare an index of the documents and exhibits, correspondingly numbered and identified with reasonable definiteness; to briefly describe all exhibits listed in the index; and to send a copy of the index to all counsel of record in the case and transmit the index with the record to the Clerk of the Supreme Court.

THOMAS J. MOYER
Chief Justice

Jackson Apx. Vol. 6
Page 29

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | SUPREME COURT CASE NO. 03-137 |
| Appellee | ) | |
| | ) | |
| vs. | ) | Capital Case |
| NATHANIEL E. JACKSON | ) | |
| Appellant | ) | |

FILED

MAR 18 2003

MARCIA J. MENGEL, CLERK

---

### APPELLANT, NATHANIEL E. JACKSON'S MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

Now comes Appellant, Nathaniel E. Jackson, through his undersigned attorneys, JOHN P. LACZKO and DENNIS DAY LAGER, who, pursuant to S. Ct. Prac. R. 19(C)(1), respectfully request a forty (40) day extension of time for the Court Reporters, Mary Ann Mills, Kelly Wilson and Lori Rittwage , to transmit the complete record of the trial to the Clerk of the Supreme Court of Ohio. Appellant is under a sentence of death and he is entitled to have a complete record before the Supreme Court for his appeal as of right under Ohio Rev. Code Ann. Sect. 2929.05(A). See **State ex rel. Spirko v. Court of Appeals, (1986), 27 Ohio St. 3d 625.**

The notice of appeal was filed on January 22, 2003. Under S. Ct. Prac. R. XIX, Section 4(A), the trial record must be transmitted to the clerk of the court of appeals by March 23, 2003; however, this record is voluminous and it cannot be transcribed by the court reporters in only sixty (60) days. This extension is necessary due to the very heavy caseload that the court reporters currently have assigned to them.

Accordingly, Appellant Jackson requests an initial forty (40) day extension of time from this Court  to transmit the complete trial record to the clerk of the Ohio Supreme Court.

The Court may grant this Motion pursuant to S. Crt. Prac. R. XIX, Section 4(C).

Respectfully submitted,

JOHN P. LACZKO  #0051918
4800 Market St., Ste C
Youngstown, Ohio   44512
(330)  788-2480
Co-Counsel for Appellant

DENNIS DAY LAGER #0026073)
1025 Chapel Ridge St. N.E.
Canton, Ohio   44714
(330) 494-5736
Co-Counsel for Appellant

CERTIFICATE OF SERVICE

A copy of the foregoing document has been sent via regular U. S. mail this _18th_

day of March, 2003, to the following:  LuWayne Annos, Trumbull County Prosecutor's Office

160 high St., Fourth Floor, Warren, Ohio   44481.

_____
JOHN P. LACZKO
Co-Counsel for Appellant

_____
DENNIS DAY LAGER
Co-Counsel for Appellant

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO.   03-137 |
| Plaintiff-Appellee | ) | |
| vs. | ) | |
| NATHANIEL E. JACKSON | ) | |
| Defendant-Appellant | ) | |

---

AFFIDAVIT OF JOHN P. LACZKO IN SUPPORT OF
DEFENDANT-APPELLANT NATHANIEL E. JACKSON'S
MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

COUNTY OF MAHONING        )
                          )SS
STATE OF OHIO             )

I, JOHN P. LACZKO, being sworn according to law, state as follows:

1) I am one of the attorneys appointed to represent Appellant Nathaniel E. Jackson in his appeal as of right in the above captioned case.

2) Defendant-Appellant Jackson's Notice of Appeal was filed on January 22, 2003.

3) Under the Supreme Court Rules of Practice, the trial record in this case, including a transcription of the trial of proceedings, must be transmitted to the clerk of the court of appeals by March 23, 2003.

4) On March 7, 2003, I discussed the progress on the preparation of the transcript with Mary Ann Mills, Kelly Wilson and Lori Rittwage, the court reporters assigned to the above captioned case.

5) The court reporters informed me they are unable to complete the transcript in this case before March 23, 2003.

6) The court reporters explained that they needed additional time to complete this transcript because of their heavy caseload and that the trial in Jackson's case was lengthy.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JOHN PAUL LACZKO

Sworn to and subscribed in my presence this _14th_ day of March, 2003.

_____
NOTARY PUBLIC

EVELYN SUE LACZKO, Notary Public
State of Ohio
My Commission Expires March 25, 2004

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 03-137 |
| Plaintiff-Appellee | ) | |
| v. | ) | |
| NATHANIEL E. JACKSON | ) | |
| Defendant-Appellant | ) | |

---

AFFIDAVIT OF MARY ANN MILLS IN SUPPORT OF DEFENDANT-APPELLANT NATHANIEL E. JACKSON'S MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

COUNTY OF TRUMBULL )
)SS
STATE OF OHIO )

I, MARY ANN MILLS, being sworn according to law, state as follows:

1) I am one of the court reporters transcribing the record of Appellant, Nathaniel E. Jackson's trial in Trumbull County Common Pleas Court (Case No. 01 CR 794).

2) Defendant Appellant's Notice of Appeal was filed on January 22, 2003 by Attorney John P. Laczko.

3) Under the Supreme Court Rules of Practice, the trial record in this case, including a transcription of the trial of proceedings, must be transmitted to the clerk of the court of appeals by March 23, 2003.

4) I am unable to complete the transcript in this case before March 23, 2003.

5) I am in need of additional time to complete this transcript because of my heavy caseload and that the trial in Jackson's case was lengthy.

FURTHER AFFIANT SAYETH NAUGHT.

MARY ANN MILLS

Sworn to and subscribed in my presence this _12th_ day of March, 2003.

NOTARY PUBLIC

## CERTIFICATE OF SERVICE

A copy of the foregoing document has been sent via regular U. S. mail this _18th_ day of March, 2003, to the following: LuWayne Annos, Trumbull County Prosecutor's Office 160 high St., Fourth Floor, Warren, Ohio 44481.

JOHN P. LACZKO
Co-Counsel for Appellant

DENNIS DAY LAGER
Co-Counsel for Appellant

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 03-137 |
| Plaintiff-Appellee | ) | |
| v. | ) | |
| NATHANIEL E. JACKSON | ) | |
| Defendant-Appellant | ) | |

---

AFFIDAVIT OF LORI RITTWAGE IN SUPPORT OF DEFENDANT-APPELLANT NATHANIEL E. JACKSON'S MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

COUNTY OF TRUMBULL )
)SS
STATE OF OHIO )

I, LORI RITTWAGE, being sworn according to law, state as follows:

1) I am one of the court reporters transcribing the record of Appellant, Nathaniel E. Jackson's trial in Trumbull County Common Pleas Court (Case No. 01 CR 794).

2) Defendant Appellant's Notice of Appeal was filed on January 22, 2003 by Attorney John P. Laczko.

3) Under the Supreme Court Rules of Practice, the trial record in this case, including a transcription of the trial of proceedings, must be transmitted to the clerk of the court of appeals by March 23, 2003.

4) I am unable to complete the transcript in this case before March 23, 2003.

5) I am in need of additional time to complete this transcript because of my heavy caseload and that the trial in Jackson's case was lengthy.

FURTHER AFFIANT SAYETH NAUGHT.

_____
LORI RITTWAGE

Sworn to and subscribed in my presence this _____ day of March, 2003.

_____
NOTARY PUBLIC

## CERTIFICATE OF SERVICE

A copy of the foregoing document has been sent via regular U. S. mail this _____

day of March, 2003, to the following: LuWayne Annos, Trumbull County Prosecutor's Office

160 high St., Fourth Floor, Warren, Ohio   44481.

_____
JOHN P. LACZKO
Co-Counsel for Appellant

_____
DENNIS DAY LAGER
Co-Counsel for Appellant

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 03-137 |
| Plaintiff-Appellee | ) | |
| v. | ) | |
| NATHANIEL E. JACKSON | ) | |
| Defendant-Appellant | ) | |

---

AFFIDAVIT OF KELLY WILSON IN SUPPORT OF DEFENDANT-APPELLANT NATHANIEL E. JACKSON'S MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

COUNTY OF TRUMBULL )
)SS
STATE OF OHIO )

I, KELLY WILSON, being sworn according to law, state as follows:

1) I am one of the court reporters transcribing the record of Appellant, Nathaniel E. Jackson's trial in Trumbull County Common Pleas Court (Case No. 01 CR 794).

2) Defendant Appellant's Notice of Appeal was filed on January 22, 2003 by Attorney John P. Laczko.

3) Under the Supreme Court Rules of Practice, the trial record in this case, including a transcription of the trial of proceedings, must be transmitted to the clerk of the court of appeals by March 23, 2003.

4) I am unable to complete the transcript in this case before March 23, 2003.

5) I am in need of additional time to complete this transcript because of my heavy caseload and that the trial in Jackson's case was lengthy.

FURTHER AFFIANT SAYETH NAUGHT.

_____
KELLY WILSON

Sworn to and subscribed in my presence this _____ day of March, 2003.

Mary K. Vassis, Notary Public
State of Ohio
My Commission Expires _____

_____
NOTARY PUBLIC

## CERTIFICATE OF SERVICE

A copy of the foregoing document has been sent via regular U. S. mail this _____ day of March, 2003, to the following:  LuWayne Annos, Trumbull County Prosecutor's Office 160 high St., Fourth Floor, Warren, Ohio   44481.

_____
JOHN P. LACZKO
Co-Counsel for Appellant

_____
DENNIS DAY LAGER
Co-Counsel for Appellant

ON COMPUTER-SMW

# The Supreme Court of Ohio

FILED

MAR 2 1 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,               :        Case No.  03-137
        Appellee,            :

             v.              :

Nathaniel E. Jackson,        :        E N T R Y
        Appellant.           :


This cause is pending before the Court as an appeal from the Court of Common Pleas for Trumbull County.  Upon consideration of appellant's motion for extension of time to transmit the record,

IT IS ORDERED by the Court that the motion for extension of time to transmit the record be, and hereby is, granted, and the time for transmitting the record is extended to May 5, 2003.

(Trumbull County Court of Common Pleas;  No. 01CR794)

THOMAS J. MOYER
Chief Justice

1208r032003

IN THE SUPREME COURT OF OHIO

STATE OF OHIO                          )     SUPREME COURT CASE NO. 03-137
    Plaintiff-Appellee                )     TRUMBULL COUNTY COMMON
                                      )     PLEAS COURT NO. 01-CR-794
                                      )
                                      )
-vs-                                   )
                                      )
NATHANIEL E. JACKSON                   )          CAPITAL CASE
    Defendant-Appellant               )

---

## JOINT MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

DENNIS WATKINS (Atty. Reg. # 0009949)
Trumbull County Prosecuting Attorney
LuWAYNE ANNOS (Atty. Reg. #0055651) (Counsel of Record)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County Administration Building
160 High St. N.W., 4th Floor
Warren, Ohio      44481
Telephone No. (330) 675-2426
Facsimile No. (330) 675-2431

COUNSEL FOR PLAINTIFF APPELLEE
THE STATE OF OHIO

JOHN P. LACZKO (Att. Reg. #0051918)
4800 Market St., Ste. C
Youngstown, Ohio    44512
Telephone No. (33) 788-2480

DENNIS DAY LAGER (#0026073)
1025 Chapel Ridge St. N.E.
Canton, Ohio   44714
Telephone No. (330) 494-5736

COUNSEL FOR DEFENDANT-
APPELLANT
NATHANIEL E. JACKSON



FILED

MAY 0 1 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Now comes the Plaintiff-Appellee, the State of Ohio, along with counsel for Defendant-Appellant Nathaniel E. Jackson, and jointly motions this Court pursuant to S.Ct. Prac. R. XIX ( C ) (1) for a sixty (60) day extension of time to transmit the complete record of Appellant's trial to the Clerk of Courts for this Court.   Appellant is under a sentence of death and he is entitled to have a complete record before this Court for his appeal of right under R.C. 2929.05(A).  See, *State ex rel. Spirko v. Court of Appeals* (1986), 27 Ohio St. 3d 625.

Appellant filed notice of appeal in this matter January 22, 2003.  Pursuant to S.Ct. R. XIX, Sec. 4(A), the trial record was originally due in this Court by March 23, 2003.  Due to the voluminous nature of the record, Appellant sought, and was granted, an extension to file the record by May 5, 2003.

However, two impediments to the filing the record by May 5, 2003 have developed. First, the State of Ohio is now trying Appellant's co-defendant, Donna Roberts, in Trumbull County Common Pleas Court No. 01-CR-793.  Jury selection in her case began April 8, 2003, and the guilt phase of her trial will be on-going when the record in Appellant's case is due.  The State submits all of its 402 physical exhibits entered in Appellant's case will be needed in its case against Roberts.  See attached affidavit by Assistant Prosecuting Attorney Christopher Becker.  Likewise, counsel for Ms. Roberts will need 12 defense exhibits and one joint exhibit to defend her case.  See attached affidavit by Atty. John B. Juhasz.   Counsel for the State and the defense submit the penalty phase of Roberts' trial should conclude by the end of May 2003, and if convicted of the death specifications, the case will proceed to a mitigation phase which counsel estimates will conclude before the end of June, 2003.  Counsel, therefore, must retain these essential exhibits here in Warren, Ohio, and would ask that this Court extend the due date for the

record to July 7, 2003 (in recognition of the weekend and legal holiday).

Likewise, Appellant moves this Court to extend the due date July 7, 2003. For cause, Mary Ann Mills, one of three court reporters who transcribed Appellant's case, is unable to complete her portion of the transcript by May 5, 2003, due to her usual heavy caseload and her additional duties as the chief court reporter in the Roberts case. See attached affidavit of Mary Ann Mills.

Accordingly, the State and Appellant jointly request a sixty (60) day extension of time from this Court to transmit the complete trial record to the Clerk of this Court.

This Court may grant this Motion pursuant to S.Ct. Prac. R. XIX, Sec. 4 ( C ).

Respectfully Submitted,

DENNIS WATKINS (Atty. Reg. # 0009949)
Trumbull County Prosecuting Attorney

JOHN P. LACZKO (Atty. Reg. #0051918)
4800 Market St., Ste. C
Youngstown, Ohio  44512
Telephone No. (33) 788-2480

LuWAYNE ANNOS (Atty. Reg. #0055651)
Assistant Prosecuting Attorney
Trumbull County Administration Bldg.
160 High St., 4th Floor
Warren, Ohio  44481
Telephone No. (330) 576-2426

DENNIS DAY LAGER (#0026073)
1025 Chapel Ridge St. N.E.
Canton, Ohio  44714
Telephone No. (330) 494-5736

COUNSEL FOR PLAINTIFF APPELLEE
THE STAT E OF OHIO
Trumbull County Prosecutor's Office
Trumbull County Administration Building
160 High St. N.W., 4th Floor
Warren, Ohio    44481
Telephone No. (330) 675-2426

COUNSEL FOR DEFENDANT-
APPELLANT
NATHANIEL E. JACKSON

-2-

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to

John P. Laczko (#0051918), 4800 Market St. Ste. C, Youngstown, Ohio, 44512 and Dennis Day

Lager (#0026073) 1025 Chapel Ridge St. N.E., Canton, Ohio   44714 on this 3o[Th] Day of April

2003.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

-3-

IN THE SUPREME COURT OF OHIO

STATE OF OHIO                                )    SUPREME COURT CASE NO. 03-137
    Plaintiff-Appellee              )    TRUMBULL COUNTY COMMON
                                             )    PLEAS COURT NO. 01-CR-794
                                             )
                                             )
-vs-                                         )
                                             )
                                             )
NATHANIEL E. JACKSON                         )         CAPITAL CASE
    Defendant-Appellant

---

## AFFIDAVIT OF CHRISTOPHER BECKER
## TRUMBULL COUNTY ASSISTANT PROSECUTING ATTORNEY

---

COUNTY OF TRUMBULL )
STATE OF OHIO          ) SS
                       )

I, the affiant, Christopher Becker, being deposed and sworn, state as follows:

1)    The affiant is  presently employed by the Office of the Trumbull County Prosecuting Attorney as an assistant prosecuting attorney.  Affiant is presently a licensed attorney in the State of Ohio, and is assigned Attorney Registration No.  0047252.

2)    As an assistant prosecuting attorney, the affiant handles felony cases in the Trumbull County Common Pleas Court.

3)    The Affiant is presently assigned to prosecute the State's capital murder case pending against one Donna Roberts in Trumbull County Common Pleas Case No. 01-CR-793 in the Courtroom of the Honorable John M. Stuard. Jury selection began in Ms. Roberts case on April 8, 2003, and is on-going at this writing.

4)    Ms. Roberts is a co-defendant of Nathaniel E. Jackson who was previously convicted and sentenced to death in Trumbull County Case No. 01-CR-794, and whose direct appeal is pending in this Court under Case No.03-137.  The record in Mr. Jackson's case is due in this Court May 5, 2003.

5)    The record in Mr. Jackson's case includes approximately 402 State's exhibits which are necessary for the case pending against Ms. Roberts.  The State cannot effectively prosecute Ms. Roberts without these exhibits.

6)     The affiant estimates that testimony will begin in Ms. Roberts' case sometime during the week of May 5, 2003.  The guilt phase in Ms. Roberts' case should conclude before the end of May 2003.  If the State wins a conviction on the death specifications and Ms. Roberts' case proceeds to a mitigation phase, the case should conclude before end of June, 2003.

7)     The affiant therefore respectfully requests that this Court grant a sixty (60) day extension for the due date of the record in Mr. Jackson's case so that the vital exhibits to the State's case in *State v. Jackson* will remain in the custody of the Trumbull County Common Pleas Court for use in the Roberts case.

AFFIANT FURTHER SAYETH NAUGHT.

4/29/03
_____
DATE

_____
CHRISTOPHER BECKER
ASSISTANT PROSECUTING
ATTORNEY

Sworn to and subscribed in my presences on this ___ day of April 2003.

Mary K. Vassis, Notary Public
State of Ohio
My Commission Expires 1-14-2004

Mary K Vassis
Notary Public

PROOF OF SERVICE

I do hereby certify that a copy of the foregoing document was sent by ordinary U.S. Mail

this 30th Day of April, 2003 to John P. Laczko (#0051918), 4800 Market St. Ste. C,

Youngstown, Ohio  44512 and to Dennis Day Lager (#0026073), 1025 Chapel Ridge St. N.E.

Canton, Ohio, Counsel for Appellant Nathaniel E. Jackson.

_____
LuWAYNE ANNOS (#0055651)

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | SUPREME COURT CASE NO. 03-137 |
| Plaintiff-Appellee | ) | TRUMBULL COUNTY COMMON |
| | ) | PLEAS COURT NO. 01-CR-794 |
| | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| NATHANIEL E. JACKSON | ) | CAPITAL CASE |
| Defendant-Appellant | | |

AFFIDAVIT OF JOHN B. JUHASZ
ATTORNEY FOR DONNA ROBERTS

COUNTY OF TRUMBULL )
                 ) SS
STATE OF OHIO      )

I, the affiant, John B. Juhasz, being deposed and sworn, state as follows:

1)     The affiant is a licensed attorney in the State of Ohio assigned Attorney Registration No. 0023777.

2)     The affiant is death penalty certified pursuant to Supp. R. 20.

3)     The affiant and Atty. Gerald J. Ingram are privately retained to represent Donna Roberts in a capital murder case pending against her in Trumbull County Common Pleas Court No. 01-CR-793. Offices for both Affiant and Atty. Ingram are located at 7330 Market St. Youngstown, Ohio 44512.

4)     Ms. Roberts is a co-defendant with Nathaniel E. Jackson who was convicted and sentenced to death in Trumbull County Common Pleas Court No. 01-CR-794.

5)     Mr. Jackson's direct appeal is pending with this Court in Case No. 03-137 and the record in that case is currently due May 5, 2003.

6)     The affiant states that included with Mr. Jackson's record are 12 Defendant's Exhibits and one Joint Exhibit which are vital to Ms. Roberts' defense.

7)     If the record is timely filed in the Jackson case, and the above-mentioned exhibits are unavailable to Ms. Roberts, the affiant states he will not be able to effectively represent

her and Ms. Roberts defense will suffer prejudice.

8)   As of today's date, counsel for Ms. Roberts and the government are in the process of questioning prospective jurors in her case.  Affiant projects Ms. Roberts' guilt phase will conclude before May 31, 2003.  If the outcome of the trial necessitates a mitigation phase, this portion of the trial will most likely conclude by June 30, 2003.

9)   For the above stated reasons, Affiant requests that this Court extend the due date of the Jackson record for sixty (60) days so that exhibits vital to Ms. Roberts' defense will remain accessible to her and her defense team in Trumbull County.

FURTHER AFFIANT SAYETH NAUGHT.

_4/29/03_
DATE

_____
JOHN B. JUHASZ

Sworn to and subscribed in my presences on this ___29th___ day of April 2003.

Mary K. Vassis, **Notary Public**
State of Ohio
My Commission Expires _1-14-2004_   _Mary K Vassis_
_Notary Public_

PROOF OF SERVICE

I do hereby certify that a copy of the foregoing document was sent by ordinary U.S. Mail this 30th Day of April, 2003 to LuWAYNE ANNOS, Counsel for Plaintiff-Appellee The State of Ohio, 160 High St., 4th Floor, Warren, Ohio   44481.

_____
JOHN P. LACZKO (#0051918)

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO<br>Plaintiff-Appellee | ) | SUPREME COURT CASE NO. 03-137<br>TRUMBULL COUNTY COMMON<br>PLEAS COURT NO. 01-CR-794 |
| -vs- | ) | |
| NATHANIEL E. JACKSON<br>Defendant Appellant | ) | CAPITAL CASE |

---

AFFIDAVIT OF MARY ANN MILLS IN SUPPORT OF APPELLANT'S MOTION FOR EXTENSION OF TIME TO TRANSMIT RECORD

---

COUNTY OF TRUMBULL )
) SS
STATE OF OHIO )

I, MARY ANN MILLS, being sworn according to law, state as follows:

1) I am one of the court reporters transcribing the record of Appellant, Nathaniel L. Jackson's trial in Trumbull County Common Pleas Court (Case No. 01 CR 794).

2) Appellant's notice of appeal was filed with this Court by Atty. John P. Laczko on January 22, 2003.

3) Under the Supreme Court Rules of Practice, the trial record in this case, including a transcription of proceedings was originally due in this Court March 23, 2003. This Court granted one extension at Appellant's request to May 5, 2003.

4) I am unable to complete the transcript in this case by May 5, 2003.

5) I am in need of additional time to complete the transcript because of my heavy caseload, which now includes taking the record in Appellant's co-defendant's capital murder case in *State v. Donna Roberts,* Trumbull County Common Pleas Court No. 01 CR 793, and because the trial transcript in Appellant's case was lengthy.

FURTHER AFFIANT SAYETH NAUGHT.


_Mary Ann Mills_
MARY ANN MILLS


Sworn to and subscribed in my presences on this _30th_ day of April 2003.

_Debra L Gutierrez_

Debra L. Gutierrez
Notary Public
State of Ohio
Commission Expires 9-9-2003

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing document was sent by ordinary U.S. Mail

this 29th Day of April, 2003 to LuWAYNE ANNOS, Counsel for Plaintiff-Appellee The State of

Ohio, 160 High St., 4th Floor, Warren, Ohio   44481.


_John P. Laczko_
JOHN P. LACZKO
Co-Counsel for Appellant

_Dennis Day Lager/JPL_
DENNIS DAY LAGER
Co-Counsel for Appellant

ON COMPUTER-SMW

# The Supreme Court of Ohio

FILED

MAY 09 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 03-137 |
| Appellee, | : | |
| | : | |
| v. | : | |
| | : | |
| Nathaniel E. Jackson, | : | E N T R Y |
| Appellant. | : | |

This cause is pending before the Court as an appeal from the Court of Common Pleas for Trumbull County. Upon consideration of the joint motion for extension of time to transmit the record because exhibits in the record will be needed in the case against appellant's co-defendant, now pending in the Trumbull County Common Pleas Court,

IT IS ORDERED by the Court that the motion for extension of time to transmit the record be, and hereby is, granted, and the time for transmitting the record is extended to July 7, 2003.

(Trumbull County Court of Common Pleas; No. 01CR794)

THOMAS J. MOYER
Chief Justice

1208r050103

S.C. Case No. 03 - 0137

Date 7-9-03

# Item(s) to be Docketed

☑ OPF    Record.

☐ APF    Supplemental record.

☐ DEP    $100 deposit for costs by _____,
           receipt #_____. (REL)

☐ OBP    Original board papers. (BDC)

☐ ARC    Attorney registration card. (REP/REA)

☐ CAR    Certificate of admission. (REP/REA)

☐ PCP    Payment of publication costs in the amount of $_____
           by _____; receipt #_____. (REP)

☐ PPC    Payment of board costs in the amount of $_____
           by _____; receipt #_____. (REP)

☐ DPS    $500 deposit for costs by _____,
           receipt #_____. (REP)

☐ CAG    Board costs collected by Attorney General in the amount of
           $_____, less AG fee of $_____; check
           total $_____; receipt #_____. (NON)

☐ AAF    Application for attorney fees by _____. (    )

☐ OPC    Cost of copying record or portions of record; $_____
           billed to _____. (    )

☐ OPT    Copy of record sent to _____; _____
           pages copied at 15¢/page.

☐ CRM    Copies of record made in office by _____;
           total paid $_____; receipt #_____. (    )

☐ XXX    _____
           _____. (    )

☐ NRJ    Notice of recusal of Justice _____, received
           by _____.

# THE SUPREME COURT OF OHIO

State of Ohio
v.
Nathaniel E. Jackson

Case No. 03-0137

Receipt of Record
OPF

The record in the above-named case was received in the Clerk's Office of The Supreme Court of Ohio from the undersigned.

List Contents:

7 Boxes
1 Poster

_____
SIGNATURE

6/10/03
DATE

Michael Bracone-Records Coordinator (614)752-8946

01CR794

# The Supreme Court of Ohio

30 EAST BROAD STREET, COLUMBUS, OHIO 43215-3431

THOMAS J. MOYER, CHIEF JUSTICE
ALICE ROBIE RESNICK
FRANCIS E. SWEENEY
PAUL E. PFEIFER
EVELYN LUNDBERG STRATTON
MAUREEN O'CONNOR
TERRENCE O'DONNELL

MARCIA J. MENGEL
CLERK OF COURT

(614) 466-3931
(614) 466-5201

July 9, 2003

John Paul Laczko
4800 Market Street
Suite C
Youngstown OH 44512

Re: 03-0137

State of Ohio
        v.
Nathaniel E. Jackson

Dear John Paul Laczko:

    This is to notify you that the record in the above-styled case was filed with the Clerk's Office on July 9, 2003.

    If, after reviewing the Supreme Court Rules of Practice, you have any questions about filing deadlines in the case, please feel free to call me at 614/644-9323.

                        Sincerely,

                        Rita A. Nash
                        Senior Deputy Clerk

/ran

# The Supreme Court of Ohio

30 EAST BROAD STREET, COLUMBUS. OHIO 43215-3431

THOMAS J. MOYER, CHIEF JUSTICE
ALICE ROBIE RESNICK
FRANCIS E. SWEENEY
PAUL E. PFEIFER
EVELYN LUNDBERG STRATTON
MAUREEN O'CONNOR
TERRENCE O'DONNELL

MARCIA J. MENGEL
CLERK OF COURT

(614) 466-3931
(614) 466-5201

July 9, 2003

LuWayne Annos
Trumbull County Prosecutor's Office
County Administration Building
160 High Street
Warren OH 44481

Re: 03-0137

State of Ohio
    v.
Nathaniel E. Jackson

Dear LuWayne Annos:

    This is to notify you that the record in the above-styled case was filed with the Clerk's Office on July 9, 2003.

    If, after reviewing the Supreme Court Rules of Practice, you have any questions about filing deadlines in the case, please feel free to call me at 614/644-9323.

Sincerely,

Rita A. Nash
Senior Deputy Clerk

/ran

ORIGINAL
IN COMPUTER - HC

## IN THE SUPREME COURT OF OHIO

STATE OF OHIO
    Plaintiff-Appellee

-vs-

NATHANIEL E. JACKSON
    Defendant-Appellant

)
)
)
)
)
)
)
)
)

SUPREME COURT CASE NO. 03-137
TRUMBULL COUNTY COMMON
PLEAS COURT NO. 01-CR-794

CAPITAL CASE

---

### STIPULATION OF EXTENSION OF TIME TO FILE APPELLANT'S BRIEF

---

DENNIS WATKINS (Atty. Reg. #0009949)
Trumbull County Prosecuting Attorney
LuWayne ANNOS (Atty. Reg. #0055651) (Counsel of Record)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
Trumbull County Administration Building
160 High St. N.W., 4th Floor
Warren, Ohio 44481
Telephone No. (330) 675-2426
Facsimile No. (330) 675-2431

**COUNSEL FOR PLAINTIFF APPELLEE**
**THE STATE OF OHIO**

JOHN P. LACZKO (Atty. Reg. #0051918)
4800 Market St, Ste. C
Youngstown, Ohio 44512
Telephone No. (330) 788-2480

DENNIS DAY LAGER (#0026073)
1025 Chapel Ridge St., N.E.
Canton, Ohio 44714
Telephone No. (330) 494-5736

**COUNSEL FOR DEFENDANT-**
**APPELLANT**
**NATHANIEL E. JACKSON**

FILED
OCT 0 7 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO



RECEIVED
OCT 0 7 2003
MARCIA J. MENGEL
SUPREME COURT OF OHIO

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,

             Plaintiff-Appellee,

-vs-

NATHANIEL E. JACKSON,

             Defendant-Appellant.

Ohio Supreme Court
Case No. 03-137

On appeal from the Mahoning County
Court of Common Pleas
Case No. 01-CR-794

STIPTULATION OF EXTENSION
OF TIME TO FILE APPELLANT'S
BRIEF

Pursuant to Ohio Supreme Court Practice Rule XIV, Sec. 3(B)(2)(a), the parties stipulate to a twenty-day extension of time for the Appellant, Nathaniel E. Jackson, to file his brief on October 27, 2003.

LuWAYNE ANNOS (0055651)
Assistant Prosecuting Attorney
160 High St. N.W., 4th Floor
Warren, Ohio 44481
(330)675-2426

Per telephone approval 10-3-03

JOHN P. LACZKO (0051918)
Co-Counsel for Appellant
4800 Market St, Ste C
Youngstown, Ohio 44512
(330)788-2480

DENNIS DAY LAGER (0026073)
Co-Counsel for Appellant
1025 Chapel Ridge St., N.E.
Canton, Ohio 44714
(330)494-5736

COUNSEL FOR APPELLEE

COUNSEL FOR APPELLANT

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document has been sent via regular U.S. mail this _6th_ day of October 2003 to the Trumbull County Prosecutor's Office at 160 High Street, N.W., 4th Floor Warren, Ohio 44481.

John P. Laczko (0051918)
Co-Counsel for Appellant

Dennis Day Lager (0026073)
Co-Counsel for Appellant

# IN THE SUPREME COURT OF OHIO

| | |
|---|---|
| STATE OF OHIO | ) |
| Plaintiff-Appellee | ) Case No. __03-137__ |
| vs. | ) **DEATH PENALTY CASE** |
| NATHANIEL E. JACKSON | ) |
| Defendant-Appellant | ) |

## MERIT BRIEF OF APPELLANT, NATHANIEL E. JACKSON

On Appeal from the Court of Common Pleas, Trumbull County, Ohio
Case Number _01 CR 794_

JOHN P. LACZKO  #0051918
4800 Market St., Suite C
Youngstown, Ohio  44512
(330) 788-2480

DENNIS DAY LAGER #0026073
1025 Chapel Ridge St., N.E.
Canton, Ohio  44714
(330) 494-5736
ATTORNEYS FOR DEFENDANT-
APPELLANT-NATHANIEL E.
JACKSON

DENNIS WATKINS #0009949
Trumbull County Prosecutor
LuWAYNE ANNOS #0055651
Assistant Prosecutor
Prosecutor's Office
Trumbull County Administration Bldg.
160 High St. N.W., 4th Floor
Warren, Ohio  44481
(330) 675-2426
ATTORNEYS FOR PLAINTIFF-APPELLEE
THE STATE OF OHIO

FILED

OCT 27 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| TABLE OF CONTENTS  -  -  -  -  -  -  -  - | | i |
| TABLE OF AUTHORITIES  -  -  -  -  -  -  - | | vi |
| STATEMENT OF FACTS -  -  -  -  -  -  -  - | | 1 |
| PROPOSITION OF LAW NO. 1  -  -  -  -  -  - | | 6 |

APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED
ITS DISCRETION AND OVERRULED A MOTION TO SUPPRESS HIS
STATEMENT CONTRARY TO THE PROTECTIONS OF THE FIFTH AND SIXTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

| PROPOSITION OF LAW NO. 2  -  -  -  -  -  - | | 11 |
|---|---|---|

THE DEFENDANT'S  RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
IS VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE
DEFENDANT'S PREJUDICE.  U.S. CONSTITUTION, AMENDMENT VI; OHIO
CONSTITUTION, ARTICLE I, SECTION 10.

| PROPOSITION OF LAW NO. 3  -  -  -  -  -  - | | 21 |
|---|---|---|

A CRIMINAL DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL IS
VIOLATED WHEN THE PROSECUTION ENGAGES IN EXTENSIVE,
DELIBERATE, MISLEADING AND PREJUDICIAL MISCONDUCT. U.S.
CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I,
SECTION 14.

| PROPOSITION OF LAW NO. 4  -  -  -  -  -  - | | 36 |
|---|---|---|

RULINGS OF THE TRIAL COURT ALLOWING IMPROPER EVIDENCE AND
ARGUMENT BEFORE THE JURY, AND INAPPROPRIATE COMMENT THEREON
BY THE COURT AS TO THE PROPRIETY OF SUCH EVIDENCE AND
ARGUMENT, DENIES A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS
AND A FAIR AND IMPARTIAL TRIAL.  U.S. CONSTITUTION, AMENDMENT
VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

| PROPOSITION OF LAW NO. 5  -  -  -  -  -  - | | 41 |
|---|---|---|

A DEFENDANT'S SUBSTANTIAL CONSTITUTIONAL RIGHTS ARE INFRINGED

i

BY JURY INSTRUCTIONS THAT RELIEVE THE STATE OF ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT ON THE <u>MENS REA</u> ELEMENT OF A CAPITAL CRIME.  U.S. CONST. AMENDS. VI, VIII, XIV; OHIO CONST. ART. 1 SECTIONS 5, 9, 16.

PROPOSITION OF LAW NO. 6 -       -       -       -       -       -       -       47

A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT.  U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, SECTION 16.

PROPOSITION OF LAW NO. 7       -       -       -       -       -       -       52

WHEN THE TRIAL COURT CONSIDERS AND WEIGHS BOTH R.C. 2929.04(A)(7) ALTERNATIVES, AND REDUCES MITIGATION TO A 'JUSTIFICATION,' A CAPITAL DEFENDANT IS  DEPRIVED OF THE RIGHT TO INDIVIDUALIZED SENTENCING AND OF HIS LIBERTY INTEREST IN THE STATUTORY SENTENCING SCHEME THUS VIOLATING RIGHTS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 9 AND 16, ARTICLE I, OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 8       -       -       -       -       -       -       59

IT IS PREJUDICIAL ERROR FOR A TRIAL COURT TO SENTENCE DEFENDANT TO THE DEATH PENALTY, WHEN, BASED UPON THE LAW AND THE RECORD OF THIS  CASE, THE SENTENCE OF DEATH HEREIN IS INAPPROPRIATE AND IS DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, IN VIOLATION OF DEFENDANT'S RIGHTS AS GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTIONS 5, 9, 10, AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 9       -       -       -       -       -       -       62

THE  PROPORTIONALITY REVIEW THAT THIS COURT MUST CONDUCT IN THE PRESENT CAPITAL CASE PURSUANT TO OHIO REVISED CODE SECTION 2929.05 IS FATALLY FLAWED AND THEREFORE THE PRESENT DEATH SENTENCE MUST BE  VACATED PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, SECTIONS 5 AND 10, ARTICLE 1 OF THE OHIO CONSTITUTION AND OHIO REVISED CODE 2929.05, IN VIOLATION OF DEFENDANT'S RIGHTS AS

GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION AND SECTIONS 5, 9, 10 AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 10    -    -    -    -    -    -    69

IT IS ERROR FOR A TRIAL COURT TO IMPOSE A DEATH SENTENCE WHEN THE DEATH PENALTY LAW AS CURRENTLY APPLIED IN OHIO VIOLATES R.C. 2929.05(A) BY REQUIRING APPELLATE COURTS AND THE SUPREME COURT, IN CONDUCTING THEIR R.C. 2929.04(A) REVIEW OF "SIMILAR CASES" FOR PROPORTIONALITY, TO EXAMINE ONLY THOSE CASES IN WHICH A DEATH SENTENCE WAS IMPOSED AND IGNORE THOSE IN WHICH A SENTENCE OF LIFE WITH PAROLE ELIGIBILITY AFTER TWENTY-FIVE FULL YEARS OR LIFE WITH A PAROLE ELIGIBILITY AFTER THIRTY FULL YEARS WAS IMPOSED. THE CURRENT METHOD ALSO VIOLATES THE RIGHTS TO A FAIR TRIAL AND DUE PROCESS, RESULTS IN CRUEL AND UNUSUAL PUNISHMENT, AND IMPLICATES OTHERS OF APPELLANT'S PROTECTED RIGHTS AS WELL, ALL AS SET FORTH IN THE FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND IN SECTIONS 1, 2, 5, 9, 10, 16 AND 20, ARTICLE I OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 11    -    -    -    -    -    -    71

R.C.  2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05 AS READ TOGETHER AND AS APPLIED IN THIS CASE VIOLATE THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2, 9, 10, AND 16 OF ARTICLE I OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 12    -    -    -    -    -    -    87

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL OHIO REV. CODE ANN. & 2903.01, 2929.02, 2929.021, 2929.022, 2929.023,2929.03,2929.04, AND 2929.05 ,DO NOT MEET THE  PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO APPELLANT. U.S. CONST. AMENDS V, VI,VIII,XIV, OHIO CONST. ART 1, SECTIONS 2,9,10,16 FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

CONCLUSION    -    -    -    -    -    -    -    107

CERTIFICATE OF SERVICE    -    -    -    -    -    -    108

iii

## APPENDIX

| | |
|---|---|
| Judgment Entry of Sentence | A-1 |
| Trial Court Opinion | A-2 |
| U. S. Const. Amend. V | A-3 |
| U. S. Const. Amend. VI | A-3 |
| U. S. Const. Amend. VIII | A-3 |
| U. S. Const., Amend. XIV | A-4 |
| Ohio Const. Art. I, Sec. 5 | A-5 |
| Ohio Const. Art. I, Sec. 9 | A-5 |
| Ohio Const. Art. I, Sec. 10 | A-5, 6 |
| Ohio Const. Art. I, Sec. 14 | A-6 |
| Ohio Cons. Art. I, Sec. 16 | A-6 |
| O.R.C. 2903.01 | A-7 |
| O.R.C. 2911.01 | A-8 |
| O.R.C. 2911.11 | A-8, 9 |
| O.R.C. 2929.02 | A-10 |
| O.R.C. 2929.021 | A-10 |
| O.R.C. 2929.022 | A-l0, 11 |
| O.R.C. 2929.023 | A-11 |
| O.R.C. 2929.03 | A-11, 12 |
| O.R.C. 2929.04 | A-13 |
| O.R.C. 2929.05 | A-14 |

<u>State v. Johnson</u> (8th App. Dist.), 1997 Ohio App. Lexis 100  -    -    A-15

<u>State v. Powers</u> (l0th App. Dist.), 1992 Ohio App. Lexis 1009  -    -    A-16

<u>State v. Treesh</u> (11th App. Dis.), 1998 Ohio App. Lexis 4886  -    -    A-17

v

## TABLE OF AUTHORITIES

PAGE

CASES

Arizona v. Roberson (1988) 486 U.S. 675 — — — — 9

Barclay v. Florida (1983) 463 U.S. 939 — — — — 78, 81

Beck v. Alabana (1980) 447 U.S. 625 — — — — 46

Berger v. United States (1935) 295 U.S. 78 — — — — 26, 33

Boyde v. California (1990) 494 U.S. 370 — — — — 45

Boyle v. Million (6th Cir. 2000) 201 F. 3d 711 — — — — 21

Cage v. Louisiana (1990) 498 U.S. 39 — — — — 47

California v. Brown (1987) 479 U.S. 538 — — — — 21, 55

Chapman v. California (1967) 386 U.S. 18 — — — — 45

Clark v. Allen (1947) 331 U.S. 503 — — — — 97

Clemons v. Mississippi (1990) 494 U.S. 738 — — — — 57

Clinton v. City of New York (1998) 524 U.S. 417 — — — 102

Coker v. Georgia (1977) 433 U.S. 584 — — — — 74, 87

Commonwealth v. O'Neal (1975) 327 N.E. 2d 662 — — — 76, 77

Commonwealth v. O'Neal II (1975) 339 N.E. 2d 676 — — — 76, 77, 89

Cross v. Ledford (1954) 161 Ohio St. 469 — — — — 50

Davis v. United States (1994) 512 U.S. 452 — — — — 9

Delo v. Lashley (1993) 507 U.S. 272 — — — — 90

Donnely v. DeChris Oforo (1974) 416 U.S. 637 — — — — 20

Eddings v. Oklahoma (1982) 455 U.S. 104 — — — — passim

Edmund v. Florida (1982) 458 U.S. 782 - - - - 90

Edwards v. Arizona (1981) 451 U.S. 477 - - - - 9

Espinosa v. Florida (1992) 505 U.S. 1079 - - - - - 56

Evitts v. Lucy (1985) 469 U.S. 387 - - - - - 63, 83, 97

Filartiga v. Pena-Irala (2nd Cir. 1980) 630 F. 2d 876 - - - 98

Forti v. Suson (1987) 672 F. 2d 876 - - - - - 98

Francis v. Franklin (1985) 471 U.S. 307 - - - - 43, 44, 45

Franklin v. Lynaugh (1988) 487 U.S. 164 - - - - 55

Frolova v. Union of Soviet Socialists Republics (7th Cir. 1985) 761 Fd 370    103

Furman v. Georgia (1972) 408 U.S. 238 - - - - passim

Gideon v. Wainright (1963) 372 U.S. 335 - - - - - 11

Godfrey v. Georgia (1980) 446 U.S. 420 - - - - - 60, 90

Gravely v. Mills (6th Cir. 1996) 87 F. 3d 779 - - - - 12

Gregg v. Georgia (1976) 428 U.S. 153 - - - - 65, 77, 89

Griffin v. Illinois (1956) 351 U.S. 12 - - - - 63

Harris v. Wood (9th Cir. 1995) 64 F. 3d 1432 - - - - 19

Hicks v. Oklahoma (1980) 447 U.S. 343 - - - - - - 57, 63

Holland v. United States (1954) 348 U.S. 121 - - - - 49, 51

In Re Winship (1970) 397 U.S. 358 - - - - 42, 47

Jackson v. Denno (1964) 378 U.S. 368 - - - - 6

Johnson v. Texas (1993) 509 U.S. 350 - - - - 90

Johnson v. Zerbst (1938) 304 U.S. 458 - - - - 76

Kansas v. Colorado (1907) 206 U.S. 46   -  -  -  -   97

Louis v. Jeffers (1990) 497 U.S. 764   -  -  -  -   94

Lockett v. Ohio (1978) 438 U.S. 685   -  -  -  -   passim

Lowenfield v. Phelps (1988) 484 U.S. 231 -   -  -  -  -   79

Marbury v. Madison (1803) 5 U.S. 137   -  -  -  -  -   103

Maynard v. Cartwright (1988) 486 U.S. 356   -  -  -  -   94, 95

McCallaskill v. State (1977) 344 S. 2d 1276   -  -  -  -   62

Miranda v. Airzona (1967) 284 U.S. 436   -  -  -  -   6

Monk v. Zelez (10th Cir. 1990) 901 F. 2d 885   -  -  -  -   49

Morgan v. Illinois (1992) 504 U.S. 719   -  -  -  -   13

Pavilonis v. Valenine (1929) 120 Ohio St. 154   -  -  -  -   12

People v. Anderson (1972) 493 P. 2d 880 -   -  -  -  -   75

Penry v. Lynaugh (1989) 492 U.S. 302   -  -  -  -   90

Pulley v. Harris (1984) 465 U.S. 37   -  -  -  -   63, 81, 96

Rhodes v. Chapman (1981) 452 U.S. 337 -   -  -  -  -   74, 87

Robinson v. California (1962) 370 U.S. 660   -  -  -  -   87

Robinson v. California (1972) 408 U.S. 238   -  -  -  -   73, 75

Roe v. Wade (1973) 410 U.S. 113   -  -  -  -   76

Roney v. State (1982) 632 S.W. 2d 598   -  -  -  -   60

Rose v. Clark (1986) 478 U.S. 570   -  -  -  -   45

Sandstrom v. Montana (1979) 442 U.S. 510 - - - - 43, 44, 45

Satterville v. Texas (1988) 486 U.S. 249 - - - - 21

Scurry v. United States (DC Cir. 1965) 347 F. 2d 468 - - - 49

Skinner v. Oklahoma (1941) 316 U.S. 535 - - - - 93

Smith v. North Carolina (1982) 459 U.S. 1056 - - - - 84

Spaziano v. Florida (1984) 468 U.S. 447 - - - - 83, 84, 97

State v. Anderson (1995) 100 Ohio App. 3d 688 - - - - 9

State v. Apanovitch (1987) 33 Ohio St. 3d 19 - - - - 25, 56

State v. Bey (1999) 85 Ohio St. 3d 487 - - - - 31, 32

State v. Brown (C.A. 1999) 97 C.O. 27 unreported - - - 9

State v. Buell (1986) 22 Ohio St. 3d 124 - - - - 73

State v. Canter (1995) 72 Ohio St. 3d 548 - - - - 44

State v. Clemons (1998) 82 Ohio St. 3d 438 - - - - 33

State v. Clifton (1999) 85 Ohio St. 3d 433 - - - - 11

State v. Cowans (1967) 10 Ohio St. 2d 96 - - - - 8

State v. Crenshaw (1977) 51 Ohio Ap. 3d 63 - - - - 50

State v. Depew (1988) 38 Ohio St. 3d 275 - - - - 24, 31

State v. Dunlap (1995) 73 Ohio St. 3d 308 - - - - 9

State v. Fears (1999) 86 Ohio St. 3d 329 - - - - 20, 21

State v. Fox (1994) 169 Ohio St. 3d 183 - - - - 90

State v. Frost (C.A. 10 1978) Case No. 77 App 728, unreported - 49

ix

State v. Garner (1995) 74 Ohio St. 3d 49  -   -   -   -   -   31

State v. Gross (2002)  97 Ohio St. 3d 121   -   -   -   -   13

State v. Hanna (2002) 95 Ohio St. 3d 285   -   -   -   -   13

State v. Hart (1994) 94 Ohio App. 3d 665   -   -   -   -   24

State v. Henness (1997) 79 Ohio St. 3d 53   -   -   -   -   9

State v. Henderson (1988) 39 Ohio St. 3d 24   -   -   -   -   45

State v. Hessler (2000) 90 St. 3d 108   -   -   -   -   33

State v. Holloway (1988) 38 Ohio St. 3d 239   -   -   -   -   13, 55

State v. Jenkins (1984) 15 Ohio St. 3d 164   -   -   -   -   73, 78

State v. Johnson (8th App. Dist.) 1997 Ohio App. Lexis 100   -   -   16

State v. Jones (2001) 91 Ohio St. 3d 355   -   -   -   -   14

State v. Keenan (1993) 64 Ohio St. 3d 402   -   -   -   -   20, 24, 26

State v. Lilly (1999) 87 Ohio St. 3d 97   -   -   -   -   18

State v. Lloyd (C.A. 7 1998) Case No. 96 BA 31, unreported -  -   -   9

State v. Lockett (8th Cir. l994) 23 F. 3d 1280   -   -   -   12

State v. Lott (1990) 51 Ohio St. 3d 160   -   -   -   -   23

State v. Lundgren (1995) 73 Ohio St. 3d 474   -   -   -   -   15

State v. Maurer (1984) 15 Ohio St. 3d 239   -   -   -   -   60

State v. Murphy (2001) 91 Ohio St. 3d 516   -   -   -   -   96

State v. Nabozny (1978) 54 Ohio St. 2d 195   -   -   -   -   48

State v. O'Neal (2000) 87 Ohio St. 3d 402   -   -   -   -   18

x

State v. Phillips (1995) 74 Ohio St. 3d 72 - - - - 55

State v. Pierre (1977) 572 P. 2d 1338 - - - - 76, 89

State v. Powers (10th App. Dist.) 1992 Ohio App. Lexis 1009 - - 12

State v. Psnix (1987) 32 Ohio St. 3d 369 - - - - 54

State v. Rhodes (1982) 2 Ohio St. 3d 74 - - - - 18

State v. Rojas (1992) 64 Ohio St. 3d 131 - - - - 93

State v. Smith (1984)  14 Ohio St. 3d 13 - - - 33

State v. Smith (1998) 130 Ohio App. 3d 360 - - - 24

State v. Steffen (1987)  31 Ohio St. 3d 111 - - - passim

State v. Scott (1980) 61 Ohio St. 2d  155 - - - - 42

State v. Sheppard (1998) 84 Ohio St. 3d 230 - - - 24

State v. Stephens (1970) 24 Ohio St. 2d 76 - - - 23

State v. Strassman (C.A. 4, 1998) Case No. 98 CA 10, unreported - 9

State v. Tibbets (2001) 92 Ohio St. 3d 146 - - - - 33

State v. Treesh (11th App.Dist.), 1998 Ohio App. Lexis 4886 - - 12

State v. Treesh (2001) 90 Ohio St. 3d 460 - - - - 12

State v. Tyler (1990) 50 Ohio St. 3d 24 - - - - 34

State v. Williams (l996) 74 Ohio St,. 3d 569 - - - 93

State v. Wilson (1996) 74 Ohio St. 3d 381 - - - - 15, 44

State v. Winnand (1996) 115 Ohio App. 3d 286 - - - 9

State v. Wohenstahl (1996) 75 Ohio St. 3d 344 - - - 94, 95

xi

Shelton v. Tucker (1960) 364 U.S. 479 - - - - - 77, 89

Strickland v. Washington (1984) 466 U.S. 668 - - - - 11

Sullivan v. Louisiana (1993) 508 U.S. 275 - - - - 48

The Paquete Habana (1900) 175 U.S. 677 - - - - 97, 98

Trop v. Dulles (1958) 356 U.S. 85 - - - - - 74, 87

Tuilaepo v. California (1994) 512 U.S. 967 - - - - 94

U. S. v. Colon (2nd Cir. 1987) 835 F. 2d 27 - - - - 49

U. S. v. Conley (8th Cir. 1975) 523 F. 2d 650 - - - - 49

U. S. v. Jackson (1968) 390 U.S. 570 - - - - - 80, 91

U. S. v. Pink (1942) 315 U.S. 203 - - - - - 97

U. S. v. Pinkney (D.C. Cir. 1976) 551 F. 2d 1241 - - - 49

U. S. v. Smith (1820) 18 U.S. 153 - - - - - 102

Victor v. Nebraska (1994) 511 U. S. 1 - - - - - 50

Vitek v. Jones (1980)  445 U.S. 480 - - - - - 63

Walker v. Engle (6th Cir. 1983) 703 F 2d 959 - - - - 20

Walton v. Arizona (1980) 497 U.S. 639 - - - - - 94, 95

Washington v. Hofbauer (6th Cir. 2000) 228 F. 3d 698 - - - - -20

Wilbur v. Mulaney (1975) 421 U.S. 684 - - - - - 43

Wolf v. McDonald (1974) 418 U.S. 539 - - - - - 63

Woodson v. North Carolina (1976) 428 U.S. 280 - - - passim

Yick Wo v. Hopkins (1885)  118 U.S. 356 - - - - 64, 76

xii

Zant v. Stephens (1993)  462 U.S. 862    -    -    -    -    -    passim

Zschernig v. Miller (1968) 389 U.S. 429    -    -    -    -    -    97

**CONSTITUTIONAL PROVISIONS**

Ohio Constitution, Art. 1, Sect. 1    -    -    -    -    -    69

Ohio Constitution, Art. 1, Sect. 2    -    -    -    -    -    69,71

Ohio Constitution, Art. 1, Sect. 5    -    -    -    -    -    passim

Ohio Constitution, Art. 1, Sect. 9    -    -    -    -    -    passim

Ohio Constitution, Art. 1, Sect. 10    -    -    -    -    -    passim

Ohio Constitution, Art. 1, Sect. 14    -    -    -    -    -    20,36,41

Ohio Constitution, Art. 1, Sect. 16    -    -    -    -    -    passim

Ohio Constitution, Art. 1, Sect. 20    -    -    -    -    -    69

Fifth Amendment to the United States Constitution    -    -    -    passim

Sixth Amendment to the United States Constitution    -    -    -    passim

Eighth Amendment to the United States Constitution    -    -    -    passim

Fourteenth Amendment to the United States Constitution -    -    -    passim

**STATUTES**

R.C. 1.47(B)    -    -    -    -    -    -    -    -    69

R.C. 2901.05(D)    -    -    -    -    -    -    -    -    49,50,51

R.C. 2901.22(A)    -    -    -    -    -    -    -    -    43

R.C. 2903.01    -    -    -    -    -    -    -    -    55,71

R.C. 2903.01(B)    -    -    -    -    -    -    -    -    passim

xiii

R.C. 2929.02          -    -    -    -    -    -    -    -    46,71

R.C. 2929.021         -    -    -    -    -    -    -    -    passim

R.C. 2929.022         -    -    -    -    -    -    -    -    71

R.C. 2929.023         -    -    -    -    -    -    -    -    72

R.C. 2929.03(A)       -    -    -    -    -    -    -    -    72

R.C. 2929.03(D)(1)  -    -    -    -    -    -    -    -    80,91,94

R.C. 2929.03(D)(3)  -    -    -    -    -    -    -    -    56.57

R.C. 2929.03(F)       -    -    -    -    -    -    -    -    66,67

R.C. 2929.03(G)       -    -    -    -    -    -    -    -    62.66.67

R.C. 2929.04(A)(7)  -    -    -    -    -    -    -    -    passim

R.C. 2929.04(B)       -    -    -    -    -    -    -    -    33.55

R.C. 2929.04(C)       -    -    -    -    -    -    -    -    32

R.C. 2929.05(A)       -    -    -    -    -    -    -    -    passim

R.C. 2953.21(A)(2)  -    -    -    -    -    -    -    -    88

## RULES

Ohio Rule Criminal Procedure 11(C)(3)    -    -    -    -    -    80, 91

## OTHER AUTHORITIES

Ohio Capital Confusion:  The Effect of Jury Instructions of the Decision to
  Impose Death (1994) 85 J. Crim. 1. &Criminology 532, 544-557          90

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities"
  U. S. General Accounting Office, Repot to Senate and House Committees
  On the Judiciary (February 1990)                                       88

Ohio Public Defender Commission Report (1999) -    -    -    -    88

The Report of the Ohio Commission on Racial Fairness (1999)  -    -    88

xiv

## STATEMENT OF FACTS

On December 12, 2001 at 12:01 a.m., a 9-1-1 telephone call was initiated by Donna Roberts, resident at 254 Fonderlac, Warren, Ohio, advising that she had just discovered her ex-husband, Robert Fingerhut, severely wounded and motionless in the kitchen of her home (TR- 2102, 2107, 2206, 2528).  The 9-1-1 operator, who described the caller as hysterical, dispatched the call to the Howland Police Department, which in turn dispatched officers to the scene at 12:05 a.m. (TR- 2103, 2205, 2206).

Investigation at the 254 Fonderlac residence by Howland police officers and detectives found the deceased body of Robert Fingerhut, age 56, 5'6", 215 lbs., lying face down in a pool of blood in the kitchen of the residence near an open garage door entrance, an apparent homicide victim who had suffered two gunshot wounds to the back, one gunshot wound to the head, and one gunshot wound to the webbing between the thumb and forefinger of the left hand, believed to be a simultaneous injury caused by the gunshot wound to the head (TR- 2205, 2540-2543, 2549).  Additional blunt force injuries to Robert Fingerhut included bruises and contusions to the forehead, a three-quarter inch by one-sixteenth inch laceration/tear to the forehead, and a one-quarter inch by one-quarter inch upside down v-type abrasion on the left side of the nasal bridge (TR- 2556-2558, 2577), all of which were consistent with a physical struggle (TR- 2577).   Discovered near the body of Robert Fingerhut was a loaded .38 caliber Taurus revolver which had not been fired, and a pair of broken eyeglasses located in the garage underneath the parked red Chrysler 300 M of Donna Roberts (TR- 2238-39, 2242).  Also recovered at the scene were two spent .38 caliber bullets, believed to have caused the wounds to the back and chest of Robert Fingerhut (TR- 2220,

1

2531-2533).  Recovered during the autopsy of Robert Fingerhut was a third projectile which was removed from the brain of Robert Fingerhut (TR- 2538-2539).

An interview of Donna Roberts at the scene by Howland Police Department detectives, who described her as being alternately coherent and hysterical (TR- 2208), resulted in a consent search of the 254 Fonderlac residence and the 300 M Chrysler automobile (TR- 2208).  Obtained during the search of the residence were one hundred thirty-nine (139) letters from Donna Roberts to appellant, Nathaniel Jackson, dating from January 2001 to December 2001, written and posted during a time that Nathaniel Jackson was in the custody and control of the Ohio Department of Corrections (TR- 2231, 2294-2302).  Obtained during the search of Donna Robert's vehicle were one hundred forty-five (145) letters from Nathaniel Jackson to Donna Roberts, dating from May 1, 2001 to December 1, 2001 (TR- 2294-2302).  Significant about the letters from the State's perspective was the purported detailing and planning by Donna Roberts and Nathaniel Jackson of Robert Fingerhut's murder by Nathaniel Jackson upon his release from prison on December 9, 2001 (TR- 2076, 3431-3437).

On December 20, 2001, warrants were issued for the arrest of Donna Roberts and Nathaniel Jackson for the aggravated murder of Robert Fingerhut (TR- 3, 5-6), resulting in the arrest on December 21, 2001, of Donna Roberts at her 254 Fonderlac residence, and of Nathaniel Jackson at the residence of a Sheila Fields at 791 Wirt Avenue, Youngstown, Ohio (TR- 194-202, 204, 2336-2337, 2408-2409, 2414).

Subsequent to his arrest, Nathaniel Jackson gave statements to police, memorialized via video recording and unrecorded summaries, detailing his account of the incident on

2

December 11, 2001, resulting in Robert Fingerhut's death (TR- 215-218). In those statements, Nathaniel Jackson indicated that he had dinner with Donna Roberts in Warren, Ohio, on December 11, 2001; that subsequent to dinner, Donna Roberts dropped him off at Sheila Fields' residence at 791, Wirt Avenue, Youngstown, Ohio; that he thereupon walked to the Greyhound Bus Station in Youngstown and saw Robert Fingerhut loading a bus; that a conversation ensued between him and Fingerhut at the bus station regarding employment and then ultimately to the subject of a marijuana purchase by Fingerhut; that after he finished working, Fingerhut then collected Jackson near a Youngstown store and the two then drove to the residence at 254 Fonderlac, where Fingerhut began insulting Jackson, resulting in Fingerhut drawing a weapon and firing at Jackson, shooting him in the index finger of the left hand; that a struggle thereupon ensued, with Jackson wresting control of the gun resulting in Jackson then shooting Fingerhut dead; and that Jackson then jumped in Fingerhut's car and drove to Youngstown, Ohio, to the residence of Sheila Fields, disposing of the gun somewhere in route (TR- 215-218, State Exhibit 325).

Further investigation subsequent to Roberts and Jackson's arrest revealed the existence of nineteen monitored and recorded telephone calls initiated from the Lorraine Correctional Institution by Jackson to Roberts during a period of October 25, 2001 to December 8, 2001, all of which purported to again discuss plans for Jackson to murder Robert Fingerhut upon Jackson's release from prison on December 9, 2001 (TR- 3014-3017, State's Exhibits 361, 362A-380A).

On December 28, 2001, Nathaniel Jackson was indicted by a Trumbull County Grand Jury for the offenses of: Aggravated Murder (Count One) in violation of R.C. 2903.01(A);

3

Aggravated Murder (Count Two) in violation of R.C. 2903.01(B); Aggravated Burglary (Count Three) in violation of R.C. 2911.11(A)(1)(2); and Aggravated Robbery (Count Four) in violation of R.C. 2911.01(A)(1)(3). O.R.C. Sec. 2929.04(A)(7) capital specification was attached to counts one and two. O.R.C. Sec. 2945.145 firearm specification was attached to counts three and four.

Jackson's trial commenced with voir dire on October 8, 2002, resulting in the seating of a jury on October 21, 2001 (TR- 381, 423,1857, 2050). Trial to jury thereupon commenced on October 23, 2002 (TR- 2054). In its case-in-chief, the State of Ohio presented thirty-one witnesses (TR- 2100-3106). After the State rested, the defense presented six witnesses (TR- 3106-3334). At the close of the State's case and the defendant's case, the trial court denied Jackson's motions to dismiss (TR- 3207-3238)

On November 8, 2002, the jury found Nathaniel Jackson guilty of all counts and specifications (TR- 3602, 3612-3617). The jury also found Jackson guilty of being both the principal offender and of acting with prior calculation and design with respect to the O.R.C. Sec. 2929.04(A)(7) specification attached to counts one and two of the indictment (TR- 3612-3615).

During the penalty phase, the defense presented five witnesses, including Nathaniel Jackson's step-father, sister, daughter, mother and psychologist, Dr. Sandra McPherson, the latter of whom detailed Jackson's social and relationship histories, his functioning ability with ADHD (Attention Deficit Hyperactivity Disorder), his I.Q. and the impact and influence of his relationship with Donna Roberts (Penalty Phase TR- 23-59). Jackson also gave an unsworn statement wherein he apologized for taking the life of Robert Fingerhut (Sentencing

4

TR- 106).

On November 15, 2002, after deliberating four hours and thirty minutes, the jury returned a verdict recommending that a sentence of death be imposed upon Nathaniel Jackson for the aggravated murder of Robert Fingerhut (Sentencing TR- 181-183).

On December 9, 2002, the trial court rendered a sentence of death to Nathaniel Jackson for his conviction of the aggravated murder of Robert Fingerhut as set forth in count one of the indictment (Sentencing TR- 217). In referring to its signed sentencing opinion, journalized December 10, 2001, the trial court found that the aggravating circumstances outweighed, by proof beyond a reasonable doubt, the collective mitigating circumstances, and that the aggravated circumstance of burglary was sufficient by itself to outweigh all of the evidence presented in mitigation (Sentencing TR- 212-213).

Thereafter, Nathaniel Jackson filed a timely notice of appeal of the trial court's judgment and sentence, and is now before this court on his direct appeal of right.

5

## PROPOSITION OF LAW NO. 1

APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED
ITS DISCRETION AND OVERRULED A MOTION TO SUPPRESS HIS STATEMENT
CONTRARY TO THE PROTECTIONS OF THE FIFTH AND SIXTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION.

In dealing with custodial interrogation statements and their admissibility, the

applicable appellate standard for reviewing the overruling of a motion to suppress evidence

stems from the Supreme Court's landmark decision in Miranda v. Arizona (1967) 284 U.S.

436, in which the court held:

> That the prosecution has the burden of proving the following facts
> in order for a statement made by an accused at the time of custodial
> interrogation to be admitted into evidence (1) the accused, prior to
> any interrogation, was given the Miranda warnings: (2) at the receipt
> of the warnings, or thereafter, the accused made "an express statement"
> that he desired to waive his Miranda constitutional rights; (3) the
> accused effected a voluntary, knowing, and intelligent waiver of those
> rights."

The Court in Miranda, supra further stated:

> "A confession, in order to be admissible, must be free and voluntary;
> that is, must not be extracted by any sorts of threats or violence, nor
> obtained by any direct or implied promises, however slight, nor by
> exertion of any improper influence.:

The United States Supreme Court in Jackson v. Denno (1964) 378 U.S. 368 stated a

fundamental rule of law that a criminal Defendant is denied due process if the Defendant's

conviction is based in whole or in part, on a confession that was not given voluntarily. The

Court held that although the jury could still consider the question of voluntariness as

affecting the weight of and credibility of the confession as evidence, a trial Court is required

to hold a prior, separate hearing where the State has the burden of establishing that the

confession was voluntary.

On April 17, 2002, the trial court conducted a hearing on the Motion to Suppress Statements made by Appellant and filed with the court on January 23, 2002. The basis of the motion only challenges whether Appellant knowingly, intelligently and voluntarily waived his right to counsel and to remain silent as guaranteed by Miranda, supra. The motion fails to challenge the admissibility of the Appellant's statement based upon his request to terminate questioning and request for an attorney, although this issue was improperly reviewed by the Court.

At the suppression hearing, the Appellee presented the testimony of both Detective Jeffrey Hoolihan of the Warren Police Department, Detective Paul Monroe of the Howland Township Police Department; the officers who interviewed and videotaped Appellant's statement and the videotape. The Appellant testified on his own behalf. Prior to the creation of the videotaped statement, Appellant admittedly gave the officers a detailed account of the events which transpired. Thereafter on the videotaped statement, Appellant was reluctant to answer questions, requested to cease questioning and requested counsel until finally after an hour of questioning Appellant, the interview was concluded. Initially, as acknowledged by the trial court in its decision, at the beginning of the interview the Appellant was hesitant to talk because he had already told his story to the detectives. (Videotape transcript p. 2).

After additional questioning Appellant further indicated he no longer wanted to talk to detectives (Videotape transcript p. 29) and further goes on to say:

> ". . .I don't even want to talk about it no more, man.  I'm, I'm, I'm through
> with it, man, just, man, you know what I mean, police, you know, I mean, I,
> I talked to a lawyer or something, man, . . .cause I, I mean, I ain't got time

7

tojust, just keep on, over and over, man, I'm, I'm through, man.  I'm through man, you know what I'm saying.  I say, I mean, I, I ain't mean to do it, I', sorry I did it, you know what I'm saying,. . .I was left, I had no choice, man. and that's it.  End of discussion, man."

The Appellant further requested to sum up his statement when he talks to his lawyer (Videotape transcript p. 30) and the statement finally concluded when after one (1) hour the Appellant again told detectives the interview had to stop.  (Videotape transcript p. 38).  This state of mind and intent of the Appellant was clarified by Appellant in his testimony at the suppression hearing when he testified he told Detective Hoolihan he wanted an attorney and that he did not want to answer any more questions.  (TR-139).  Despite all these assertions and testimony, the trial court overruled Appellant's Motion to Suppress in a Findings of Fact and Conclusions of Law dated September 10, 2002.  The Court erroneously concluded Appellant was properly mirandized and waived his rights and did not unequivocally ask that the questioning cease or that he be afforded an attorney.

The Ohio Supreme Court stated in State v. Cowans (1967) 10 Ohio St. 2d 96 that under the Miranda rule, where there is interrogation in absence of counsel, which brings forth a confession, the government has a heavy burden to demonstrate the criminal defendant knowingly and intelligently waived his or her statutory and constitutional rights.

Additionally, the Court erroneously concluded Appellant was in control of his words and actions during the interview after being arrested, held in the weight room for over an hour and medical department of the jail (TR-321) repeatedly requesting counsel in vain (TR-318,320) and reluctantly giving the videotape statement after previously telling the story of the events to the detectives before the videotape.  The Appellant was obviously coerced into

8

giving the statement on videotape despite his protestations and requests for counsel as

Appellant was videotaped by two experienced police investigators.

The Court concluded in State v. Henness (1997) 79 Ohio St. 3d 53, 63 that:

> "If a suspect in a criminal investigation requests counsel at any time
> during questioning, he is not subject to further interrogation until a
> lawyer is provided or the suspect reinitiates the interrogation.  Arizona
> v. Roberson (1988), 486 U.S 675.. . .Edwards v. Arizona  (1981), 451
> U.S. 477. . . .However, the invocation of the right to counsel requires,
> at a minimum, some statement that can reasonably be construed to be
> an expression of a desire for the assistance of any attorney.  Davis v.
> United States (1994), 512 U.S. 452.. . .If the statement is ambiguous or
> equivocal in that a reasonable police officer in light of the circumstances
> would have understood only that the suspect might be invoking the right
> to counsel, the cessation of questioning is not required.  Id"

The Court further went on to quote Davis, supra and indicate that a defendant's

full comprehension of the rights to remain silent and request an attorney is sufficient to

dispel the coercion to give the statement initiated by the detectives evident in the

interrogation process herein.  This assertion was contrary to the findings of the trial court

herein when considering the previously set forth evidence.

The Seventh District Court of Appeals in State v. Brown (CA. 7, 1999) Case no. 97

CO 27, unreported decided:

> "Our standard of review in an appeal of a suppression issue is two-fold.
> State v. Lloyd (April 25, 1998), Belmont App. No. 96 BA 31, unreported, 2.
> As the trial court is in the best position to evaluate witness credibility, we
> must uphold the trial court's findings of fact if they are supported by
> competent, credible evidence.  State v. Dunlap (1995) 73 Ohio St. 3d 308,
> 314, 652 N.E. 2d 988; State v. Winnand (1996), 115 Ohio App. 3d 286, 688 N.E.
> 2d 9.  However, we must then conduct a de novo review of the trial court's
> application of the law to the facts.  State v. Anderson (1995) 100 App. 3d 688,
> 691 N. E. 2d 1034; State v. Strassman (Nov. 20, 1998) Athens App. No. 98
> CA 10, unreported at 1; Lloyd, supra at 2.  Thus, whether the trial court met
> the applicable legal standard is a question of law answered without deference

9

to the trial court's conclusion."

The trial court based its decision to overrule Appellant's Motion to Suppress upon the totality of the circumstances concluding the Appellant was sufficiently advised of his Miranda, supra warnings, voluntarily waived his rights and the Appellant did not unambiguously and unequivocally request counsel pursuant to Henness, supra. Based on the preceding discussion, evidence and case law, the decision of the Court is contrary to the evidence.

Wherefore, Appellant requests this Honorable Court overturn the trial court ruling regarding his Motion to Suppress.

10

## PROPOSITION OF LAW NO. 2

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS
VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE
DEFENDANT'S PREJUDICE.  U.S. CONSTITUTION, AMENDMENT VI; OHIO
CONSTITUTION, ARTICLE I, SECTION 10.

The Sixth Amendment right to counsel applies to the states through the Fourteenth
Amendment.  Gideon v. Wainright (1963), 372 U.S. 335.  The test for whether that right has
been violated is found in Strickland v. Washington (1984), 466 U.S. 668, which obliges
reviewing courts to determine if counsel's performance is deficient. Id. at 687.  If counsel's
performance is deficient, the reviewing court must determine if the accused was thereby
prejudiced.  Id.  In order to establish prejudice, the accused need not establish outcome
determinative error.  Id. at 693-694. State v. Clifton (1999), 85 Ohio St. 3d 433, 450.
Instead, the accused is prejudiced when the reviewing court loses confidence in the fairness
of the trial.  Id.

Strategic choices by appointed counsel are virtually unassailable.  Id. at 690.
Strickland makes clear, however, that a reasonable investigation of both the facts and the
applicable law is required before counsel's choice may be deemed strategic. Id. At 691.
Furthermore, Strickland requires that appointed counsel in a criminal case meet a "duty to
advocate the defendant's cause . . . [and] . . . bring to bear such skill and knowledge as will
render the trial a reliable testing process." Id. At 688.  Federal courts have consistently
recognized that Strickland's duties to advocate and to employ "skill and knowledge" include
the necessity for trial counsel to object or otherwise preserve federal issues for review.

11

Gravely  v. Mills (6th Cir. 1996), 87 F.3d 779;  State  v. Lockhart (8th Cir. 1994), 23 F.3d 1280;

**Argument:**   **Nathaniel Jackson's Sixth Amendment right to counsel was violated by defense counsel's prejudicially deficient performance at both phases of this capital case.**

**Defense counsel failed to object to the prosecution's extraction of guilty verdict and death verdict promises from all twelve impaneled jury members during the voir dire phase of the trial.**

It is improper in voir dire to extract promises from a jury. State v. Powers (10th App. Dist.), 1992 Ohio App. LEXIS 1009; State v. Treesh (11th App. Dist.), 1998 Ohio App. LEXIS 4886;  State v. Treesh (2001), 90 Ohio St. 3d 460.

In the instant cause, the prosecuting attorney extracted promises from all twelve impaneled jurors that each would render a finding of guilty in the trial phase of the case if the State proved all elements of its case by proof beyond a reasonable doubt, and that each would render a verdict of death if the state in the penalty phase proved beyond a reasonable doubt that the aggravating circumstances in the case outweighed any mitigating factors which the defendant might offer. (TR- 686-87, 936, 952, 955, 1044, 1163, 1165, 1260, 1289, 1316, 1346, 1389, 1400, 1494, 1502).

In general, the purpose of voir dire of a prospective juror is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. Pavilonis v. Valentine (1929), 120 Ohio St. 154, 165 N.E. 730, paragraph one of the syllabus.  The primary purpose of voir dire examination in a capital murder case is to determine whether a juror will truly consider aggravating circumstances and mitigating factors in determining appropriate penalty and not ultimately vote to impose the death

12

penalty merely because a murder has been committed. See Morgan v. Illinois (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222. The purpose of voir dire is not to prejudice a jury and predispose its verdict or viewpoint prior to the offer and consideration of evidence.

In State v. Treesh, supra, at 465, this court held that notwithstanding the timely objection by defense counsel to the prosecutor's extraction of promises for a guilty verdict, and counsel's argument that said conduct constituted constitutional misconduct which created a biased and partial jury, that Treesh "ha[d] failed to demonstrate how the question affected a substantial right." Id. at 465. In the case sub judice, defense counsel failed to object to any of the extracted promises from the twelve jurors impaneled who ultimately found defendant guilty and recommended a sentence of death. Although this court has previously held that "'the failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel,'" where "appellant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial..." State v. Hanna (2002), 95 Ohio St. 3d 285, citing State v. Holloway (1988), 38 Ohio St. 3d 239 at 244, appellant notes that failure of counsel to object to the prosecutors extracted promises thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test. State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury and one that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in this duty by allowing the prosecutor to condition and predispose the jury to a guilty and death sentence mindset; and that the so-called "death qualification" of the jury as

13

recognized in Witherspoon took on an expanded and new meaning in the instant cause and thereby prejudiced the right of defendant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Counsel repeatedly failed to object during voir dire to the prosecutor's comments and questions which sought to limit the type of mitigating factors which might justify a sentence other than death.**

During voir dire, the prosecutor questioned ten of the twelve impaneled jurors on matters relating to mitigation, limiting his examples of mitigators that might compel a jury to vote for life instead of death to "mental disease or defect" (TR- 826, 923, 959, 1164, 1258) and to youthful "age" (1288, 1314, 1344, 1396, 1500).  Notwithstanding that the purported use of these mitigators was to insure that the jury would nonetheless weigh aggravating circumstances against mitigating factors, regardless of their type or variety, the use of just two mitigators by the prosecutor, which he acknowledged as perhaps justifying life, and which he knew were inapplicable to the appellant, nonetheless conditioned and predisposed the jury to await for those mitigators and those mitigators only during the penalty phase. Defense counsel failed routinely and repeatedly to object to this inappropriate trial tactic, which effectively denigrated appellant's mitigation evidence.

In State v. Jones (2001), 91 Ohio St. 3d 335, this court considered the claimed error of appellant who argued that he should have been permitted to ask prospective jurors about their views on specific mitigating factors; that the trial court's refusal to permit that line of questioning left several jurors confused as to the meaning of mitigation; and that his inability to ask about specific mitigating factors, coupled with juror confusion about the meaning of

14

mitigation, limited his ability to uncover potential biases in prospective jurors and may have resulted in the empanelling of jurors who were unwilling to consider mitigating evidence.

In rejecting appellant's claim, this court held that "[d]uring voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors, State v. Wilson (1996), 74 Ohio St. 3d 381, 385-386, 659 N.E.2d 292, 300-301; State v. Lundgren (1995), 73 Ohio St. 3d 474, 481, 653 N.E.2d 304, 315, [and that] [r]ealistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." State v. Jones, supra, at 338.

In light of Jones, supra, it is clear that the prosecutor in the instant cause was improperly asking jurors to weigh and consider specific mitigating factors during voir dire, all of which he limited for his own purpose, and all without routine objection from appellant's counsel. Again, by failing to object to the prosecutors misconduct, counsel for appellant thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test.  State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury that was open to considering mitigation evidence of any variety and that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in his duty by allowing the prosecutor to condition and predispose the jury to consider only two mitigating factors which were given the imprimatur by the prosecutor of possibly being worthy of a life sentence verdict; and that the failure, inaction and unawareness of his trial counsel to the law

15

thereby prejudiced the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel failed repeatedly to object to inappropriate statements and misconduct of the prosecutor during voir dire that materially prejudiced and predisposed the jury to guilty and death sentence verdicts.**

During voir dire, the prosecutor made inappropriate statements to five impaneled jurors, either by mis-stating the law or discussing facts and evidence not alleged in the indictments or proven at trial, all of which prejudiced and predisposed the jurors to guilty and death sentence mindsets, namely, (1) that "[t]he first trial deals with the state proving beyond a reasonable doubt, the defendant committed aggravated murder" (TR- 820); (2) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?" (TR- 826); (3) "So we're dealing with charges where the person committed the crime, the defendant is alleged killing a homeowner" (TR- 930); (4) "in this case the aggravating circumstances accuse the defendant of purposely killing a homeowner in the commission of an aggravated burglary" (TR- 1046); (5) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the defendant's guilt based only on the evidence, right?" (TR- 1157); and (6) "In this case, the defendant is charged with killing a homeowner in an aggravated murder" (TR- 1392-1393).

During voir dire, it is improper for counsel to discuss evidence. State v. Johnson (8th App. Dist.), 1997 Ohio App. LEXIS 100. In the instant cause, the prosecutor not only mis-stated the law during voir dire, but also sought on three occasions to repeatedly discuss evidence with jurors ultimately empanelled, that would not be proven, namely, that the

16

defendant killed a homeowner, a fact that the prosecutor would ultimately acknowledge during trial as wrong (TR- 3383, 3397), only to re-assert the mis-statement of fact and evidence three times during final argument in the penalty phase, namely: that "it was his specific intent to kill the victim, to commit an aggravated murder against a homeowner" (Penalty Phase TR- 142/2-4); that "it can't get any worse than being in prison and planning the execution of a homeowner who just comes home" (Penalty Phase TR- 142/19-21); and that "[i] t is the worst form. The other is that after he kills a homeowner" (Penalty Phase TR- 143/15-16).

Appellant's counsel sat silently during voir dire without objection as the prosecutor mis-stated the law and commented on evidence that would not be proven at trial, and only finally objected to the prosecutor's mis-statement of fact after the prosecutor's third re-statement of the error during final argument in the penalty phase (TR- 143/17-18). By reason of this negligence and inaction, counsel failed repeatedly in their duty to appellant by allowing the prosecutor to appeal to the passion of the jury and thereby predispose it to a guilty and death sentence mindset, thereby prejudicing the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel fashioned a defense to death penalty specifications of Aggravated Burglary and Aggravated Robbery under R.C. 2929.04(A)(7) which demonstrated counsel's unawareness of the law relative to the proof and elements of those specifications.**

Appellant was convicted on counts one and two of the indictment charging appellant with the aggravated murder of Robert Fingerhut while committing the acts of aggravated

17

burglary and aggravated robbery while acting as the principal offender in the murder (TR-3612-3615), and was sentenced to death on count one of the indictment after the trial court on motion of the State dismissed count two of the indictment subsequent to appellant's conviction (Penalty Phase TR- 159, 181-182).

In fashioning a defense to the capital specifications of aggravated burglary and aggravated robbery, defense counsel argued that because Donna Roberts, a separately indicted co-defendant, was the titled owner of the residence at 254 Fonderlac and the titled owner of the 2001 Chrysler 300 M automobile driven by Robert Fingerhut on December 11, 2001; and that because Donna Roberts had given appellant permission to enter upon her premises at 254 Fonderlac and use the 2001 Chrysler 300 M  automobile, that appellant could not therefore be a trespasser on the premises at 254 Fonderlac on December 11, 2001, and could not have committed theft of the automobile on that date given the permissible use of that vehicle by the titled owner (TR- 3355, 3361, 3365, 3366-3369).

In fashioning this defense, counsel was apparently unaware of reported case law on the elements of trespass, theft, burglary and robbery, all as this court has provided in the cases of *State v. Rhodes* (1982), 2 Ohio St. 3d 74; *State v. Steffin* (1987), 31 Ohio St. 3d 111; *State v. Lilly* (1999), 87 Ohio St. 3d 97, and *State v. O'Neal* (2000) 87 Ohio St. 3d 402, which  preclude argument and instruction on the defense to burglary and robbery which defense counsel advocated, proposed and requested (TR- 3369).

In reviewing the effectiveness of defense counsel's representation of appellant under the *Strickland* standard, it is incumbent to note that *Strickland* requires that appointed counsel in a criminal case meet a "duty to advocate the defendant's cause . . . [and] . . . bring

18

to bear such skill and knowledge as will render the trial a reliable testing process." Id. At 688.  It cannot reasonably be argued that counsel met that standard in this cause, given counsel's patent unawareness of the law which only became evident to them after close of the evidence in the trial stage and discussion of jury instructions thereafter with the court and opposing counsel (TR- 3344-3371).

Appellant submits that counsel had a responsibility to provide him a reasonable and legally sound defense to the capital charges brought against him; that they failed in that duty and obligation, and effectively rendered no defense to the capital specifications at the trial phase; and that the failure of counsel in this regard calls into question whether the trial in this matter constituted a reliable testing process causing a reviewing court to lose confidence in the fairness of the trial.  *Strickland v. Washington*, supra.

**Defense counsel failed to object to the admission into evidence of State's Exhibits 271D-1 to 271D-139, letters from Donna Roberts to Nathaniel Jackson from January 2001 to December 2001, without requiring authentication of writing as a predicate to admission.**

During the offer of State's exhibits into evidence, defense counsel allowed admission without objection of 139 letters purportedly written by Donna Roberts to Nathaniel Jackson between January 2001 to December 2001, which were argued by the State to contain information and evidence regarding Donna Roberts and appellant's plan to murder Robert Fingerhut (TR- 2076, 2231, 2294-2302, 3151, 3431-3437).

Unlike the letters from Nathaniel Jackson to Donna Roberts which were admitted into evidence after authentication of the author was established by testimony of a handwriting

analysis expert (TR- 2852-2875), no such authentication was offered for the letters purportedly written by Donna Roberts (TR- 2879). Accordingly, there was no reliable and appropriate predicate for the admission of State's Exhibits 271D-1 to 271D-139. Indeed, the only basis offered for the admission of the letters was through the testimony of Detective Paul Monroe, Howland Police Department, who testified that the letters were recovered from a search of Donna Robert's vehicle and were located in the trunk of her automobile (TR-2294-2295). Given that there was no evidence offered at trial that Donna Roberts admitted authoring the letters that were marked and received as evidence; and given that there was no evidence offered at trial establishing that appellant acknowledged and identified State's Exhibits 271D-1 to 271D-139 as letters he had received from Donna Roberts, the letters purportedly written by Donna Roberts should not have been admitted into evidence.

Because the letters identified by the State as being sent by Donna Roberts to appellant were critical to the State's proof that Donna Roberts and appellant had committed Robert Fingerhut's murder by prior calculation and design, all as set forth in count one of the indictment, for which appellant was convicted and sentenced to death, the admission of said letters through the negligence of defense counsel cannot be considered as a harmless error

Based upon the foregoing, appellant submits that the cumulative effect of the foregoing errors and omissions by trial counsel infringed upon his right to effective assistance of counsel, *Harris v. Wood* (9th Cir. 1995), 64 F. 3d 1432, 1438; that his convictions must be therefore reversed and his case remanded for a new trial; or alternatively, that his death sentence be vacated and his case remanded for re-sentencing.

20

## PROPOSITION OF LAW NO. 3

A CRIMINAL DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL IS VIOLATED WHEN THE PROSECUTION ENGAGES IN EXTENSIVE, DELIBERATE, MISLEADING AND PREJUDICIAL MISCONDUCT. U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

Implicit in a criminal defendant's Sixth Amendment right to a trial is his right to a fair trial before an impartial jury untainted by improper influences. A defendant's right to due process is violated when the prosecutor engages in acts of misconduct that deny the defendant a fair trial. *State v. Keenan* (1993), 66 Ohio St. 3d 402, 410, citing *Donnely v. DeChrisoforo* (1974), 416 U.S. 637, 643-645. In assessing whether acts of misconduct deny the defendant a fair trial, "Ohio jurisprudence and federal constitutional law have long recognized that errors, whether or not they are independently prejudicial, must be considered for their cumulative effect on the defendant's due process rights. This includes even th[o]se errors to which defense counsel did not object." *State v. Fears* (1999), 86 Ohio St. 3d 329, 354 (Moyer, C.J., dissenting), citing *State v. Keenan*, supra, at 410; *Walker v. Engle* (6th Cir. 1983), 703 F.2d 959.

The Sixth Circuit for the United States Court of Appeals analyzes a due process claim of misconduct under a two-part test. *Washington v. Hofbauer* (6th Cir. 2000), 228 F. 3d. 689, 698-699. First, it determines if the prosecutor's acts "were improper." Id. Second, it looks at "four factors [to] determine if the comments were sufficiently flagrant to warrant reversal. . ." Id. Those four factors are: " 1) the likelihood that the remarks would mislead the jury or prejudice the accused; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally presented to the jury; 4) whether other

21

evidence against the defendant was substantial." Id.

The last factor, the strength of evidence should not be given inordinate weight by the reviewing court.  Indeed, in *Boyle v. Million* (6th Cir. 2000), 201 F. 3d 711 the Sixth Circuit reversed the habeas petitioner's conviction based on a finding of misconduct by the prosecutor even though the evidence of guilt was quite strong.  Moreover, the strength of the evidence at the trial phase is irrelevant to claims of misconduct occurring at the penalty phase.  This is so because the penalty phase involves an assessment of the offender's moral guilt and not his legal guilt.  *State v. Holloway* (1988), 38 Ohio St. 3d 239, 248 (Douglas, J., concurring); *California v. Brown* (1987), 479 U.S. 538, 545 (O'Connor, J., concurring); *State v. Fears*, 86 Ohio St. 3d at 354 (Moyer, C.J., dissenting), citing *Satterville v. Texas* (1988), 486 U.S. 249, 258-59, for the proposition that harmless error standard is "stringent" for penalty phase error involving prosecutor misconduct.

### Prosecutor's Trial Phase Misconduct

### First Instance

The first instance of  trial phase misconduct occurred during voir dire when the prosecutor extracted  guilty verdict and death verdict promises from all twelve impaneled jury members. Appellant incorporates Proposition of Law No. 2  by reference for brevity of discussion of the facts and resulting prejudice from this error.

### Second Instance

The second instance of trial phase misconduct occurred during voir dire when the prosecutor made comments and asked questions to ten impaneled jurors which sought to limit the type of mitigating factors which might justify a sentence other than death.

Appellant incorporates Proposition of Law No. 2 by reference for brevity of discussion of the facts and resulting prejudice from this error.

### Third Instance

The third instance of trial misconduct occurred during voir dire when the prosecutor made inappropriate statements to five impaneled jurors, either by mis-stating the law or discussing facts and evidence not alleged in the indictments or proven at trial, all of which prejudiced and predisposed the jurors to guilty and death sentence mindsets. Appellant incorporates by reference Proposition of Law No. 2 by reference for brevity of discussion of the facts and resulting prejudice resulting from this error.

### Fourth Instance

The fourth instance of trial misconduct occurred during opening statement when the prosecutor expanded his statement to argument before any offer of evidence, all of which prompted defense counsel to object and request a mistrial, resulting in the trial court giving a curative instruction to the jury, advising them that "[i]t is not proper to get into the realm of opinion on the opening statement." (TR- 2088-2089).

### Fifth Instance

The fifth instance of trial misconduct occurred during witness testimony by the State's chief investigating officer, Detective Paul Monroe, Howland Police Department, where the prosecutor sought to elicit repetitive hearsay evidence regarding the activities of appellant and separately indicted co-defendant, Donna Roberts, all of which prompted defense counsel to object and request a mistrial (TR- 2322-2323), resulting in the trial judge denying the motion for mistrial, all while stating that "several answers . . . have gone beyond

23

the scope of what you have directly asked . . . they [defense counsel] have a right to object.
. . You can argue about whether it's offered for the truth of the matter or not. It's still
hearsay in the context of the way it's presented" (TR- 2324).

## Sixth Instance

The sixth instance of trial misconduct came during final argument during the penalty
phase of trial when the prosecutor accused defense counsel of "creating a diversion" for the
jury so that it could not properly determine what is important in the case (TR- 3420/7-15,
3421/22, 3422/11-15, 3425/10-11), prompting defense counsel to object on the grounds that
the prosecutor's statement constituted prohibited commentary that inveighed defense
counsel with the imputation and implication that defense counsel was somehow lying,
deceiving, engaging in trickery or committing a fraud upon the court (TR- 3422/11-
15,3424/15-18).

## Test For Impropriety

In determining whether a prosecutor's actions during closing argument constitute
improper remarks and, if so, whether those remarks prejudicially affected substantial rights
of the accused, this court has articulated a two-part test for determining whether prosecutorial
misconduct may serve as the basis for reversing a conviction, namely, (1) whether the
prosecutor's remarks were improper and, if so, (2) whether they prejudicially affected
substantial rights of the accused. See *State v. Lott* (1990), 51 Ohio St.3d 160. While a
prosecutor has wide latitude in summation as to what the evidence has shown and what
reasonable inferences can be drawn from it, he or she may not engage in conduct or make
comments that taint the fairness of the trial. See *State v. Stephens* (1970), 24 Ohio St.2d 76;

24

*State v. DePew* (1988), 38 Ohio St.3d 275.   Further, it has been held that although a prosecutor may argue that evidence does not support a conclusion proposed by defense counsel, the prosecutor may not denigrate the role of defense counsel.   See *State v. Smith* (1998), 130 Ohio App.3d 360, certiorari denied (1999), 85 Ohio St.3d.

### Improper Remarks

Though there is no brightline definition of what constitutes an improper remark on the part of the prosecutor, it has been held that remarks that improperly denigrate defense arguments and the role of defense counsel, as well as remarks demonstrating the prosecutor's opinion of the defense strategy, are clearly improper.   See *State v. Hart* (1994), 94 Ohio App.3d 665, 674, certiorari denied (1994), 70 Ohio St.3d 1446; *State v. Sheppard* (1997), 1997 Ohio App. LEXIS 2501, unreported, affirmed (1998), 84 Ohio St.3d 230.   In *Hart* the prosecutor injected his own personal frustration with defense tactics, stating "[a]nd when you think about that you gain valuable insight into their whole method of operation. Crank up the fog machine.  Let's try to conjure up reasonable doubt."  Id.  The court held that the remarks constituted improper conduct because the argument told the jury the defense was resorting to smoke and mirrors instead of its own theory of the case Id. at 675. Likewise, in *Sheppard*, the prosecutor claimed that the defense was trying to "throw some red pepper in [the jury's] eyes."  The court cited Hart in holding that such a comment was improper.

This court has consistently looked with disfavor on prosecutorial remarks that comment on and insult defense strategy.  In *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-406, the court held that it was error for the prosecutor to argue that the defense had no defense and, in referring to the defense strategy, state that when "you have no defense you

attack the police, you attack the prosecutor, you attack everybody....You want to look at things that aren't important to this particular case, you want to deflect, you want to look for something that doesn't exist, you want smoke so he can't be seen." The court found that such remarks denigrated defense counsel for doing their job and thereby denigrated the defendant Id.

The rulings in *Sheppard*, *Hart*, and *Keenan* demonstrate that where a prosecutor alleges that defense counsel is attempting to distract from the truth, such comments are improper. The facts of the instant case are strikingly similar to these decisions.

Clearly, the prosecutor's comments in closing argument were improper. For the prosecutor to suggest to the jury that defense counsel was intentionally deceiving them was to call into question the integrity of the trial itself.

### Substantial Rights of the Accused Prejudicially Affected

The impropriety of the prosecuting attorney's remarks tainted the fairness of the trial hence prejudicially affecting substantial rights of the Appellant. Defense counsel objected during the prosecutor's closing argument thus allowing this court to review the case sub judice by a prejudicial error standard (TR 394/1-3, 395/9-12). Ohio law is clear that the conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24.

Appellant submits that the impropriety of the prosecutor's remarks are compounded by the influential role the prosecutor plays in a trial. The United States Supreme Court has set the bar high for prosecutors by requiring they adhere to standards and avoid improper

26

conduct. *Berger v. United States* (1935), 295 U.S. 78. Likewise, this court has followed suit holding that "[t]he prosecutor carries into court the prestige of 'the representative of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest is not that it shall win a case, but that justice shall be done. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'" Keenan at 406, quoting Berger at 88.  Here, the prosecutor held himself out as the noble proponent of truth, while at the same time vilifying the defense whose goal, he declared, was to create a "diversion" for the jurors so that they wouldn't know what was important. In so doing, the prosecutor did not stay within the parameters established by the United States Constitution and, thus, he violated Appellant's rights.

### Seventh Instance

The seventh instance of trial misconduct occurred again during final argument in the penalty phase when the prosecutor's argument strayed outside the scope of the evidence, resulting in the prosecutor theorizing about the evidence, all of which created the following exchange:

PROSECUTOR:    She (Donna Roberts) had the ability to walk out of the relationship with her significant other.  There wasn't a marriage; there was a divorce.  And she had legal title to cars, legal title to the home, she had everything.  But we will go into when you read and listen to the evidence that she depended on Robert and she was not in a position to financially take on the  relationship and have the way of life she had been used to with this guy. (TR- 3397/3-10).

27

MR. CONSOLDANE: Your Honor, I'm going to object.  There's been no evidence of that in this trial. (TR- 3397/11-12).

PROSECUTOR:        Your Honor. (TR- 3397/13)

MR. LEWIS:        All the evidence is that she . . . (TR- 3397/14-15).

THE COURT: This is argument.  I don't think that's beyond the scope of his interpretation of the facts and the matter. (TR- 3397/16-18).

MR. LEWIS:        Yeah, sure it is.  (TR- 3397/19)

THE COURT: Your objection is noted for the record. Overruled. (TR- 3397/20-21)

Thereafter, as the prosecutor continued to offer argument which prompted objections by defense counsel that the prosecutor was again arguing facts and circumstances not in evidence (TR- 3401/16-23), the trial court advised defense counsel that in argument, the prosecutor is "not limited to the stipulation or the facts of the case." (TR- 3402/5/-6).

### Eighth Instance

The eighth instance of trial misconduct occurred during rebuttal in final argument in the penalty phase when the prosecutor's argument again strayed outside the scope of the evidence, resulting in the prosecutor theorizing about the evidence, all of which created the following exchange:

PROSECUTOR:        This man and Donna Roberts plotted the murder and what their plan was (sic) was to go to the house and when Robert Fingerhut got home pull a gun on Robert Fingerhut, handcuff him and forcibly take him from the house at 254 Fonderlac, take him down to Youngstown and execute him in Youngstown and leave the car there.  That was the plan.  Then after they were done, had finished executing him . . . (TR- 3506/11-17).

28

MR. CONSOLDANE: Your Honor, I'm going to object. There is no evidence of that plan. (TR- 3506/18-19).

PROSECUTOR:       This is my -- this is what we believe the evidence will show. (TR- 3506/20-21).

THE COURT: Yeah. (TR- 3506/22).

PROSECUTOR:       Or what we believe the evidence – (TR- 3506/23, 3507/1).

THE COURT: Objection noted and overruled. Okay. (TR- 3507/2-3).

PROSECUTOR:       What we believe the evidence in this case suggests was going to happen. (TR- 3507/4-5).

Remarkable about the comments of the prosecutor during final argument rebuttal is the following: (1) that the errant remark "this is what we believe the evidence will show," is consistent with the remark of the prosecutor in opening statement regarding the State's theory of a plan where the prosecutor said: "We submit from all the evidence that the plan was to take the victim from his house, put him in the trunk, drive him to Youngstown, kill him and dump him so he's not found in Trumbull County, in Howland Township." (TR- 2076/18-22); and (2) that the remark of the prosecutor in rebuttal that "we believe the evidence in this case suggests [what] was going to happen," establishes the prosecutor's sheer speculation and conjecture on the evidence, all of which was perhaps permissible in opening statement, when counsel forecasts a belief of what the evidence will show, but which is not permissible in final argument when counsel is presumed to be limited to discussing what the evidence has shown. By reason of arguing facts not in evidence, the prosecutor effectively attributed nefarious conduct to appellant which had not been proven

and which thereby prejudiced appellant and his defense, all of which could not be corrected by final instructions from the court that arguments of counsel are not evidence, especially when the trial court refuses to correct the error when it occurs, leaving the impression with the jury that the comment on the evidence was appropriate.

### Ninth Instance

The ninth instance of trial misconduct occurred during final argument in the penalty phase where the prosecutor sought to rebut mitigation factors which had not been offered by the defense, but rather which had been presaged by the prosecutor during his voir dire (see Second Instance of Misconduct infra, and Proposition of Law No. 2), and which were elicited by the prosecutor during his cross-examination of appellant's psychological expert, Dr. McPherson, (TR- 78/19-21, 79/1-12), apparently for the purpose of preparing and executing an improper rebuttal of mitigation evidence which he knew the defense would not offer, all as evidenced by the following:

PROSECUTOR:      "I would just mention that if you can recall, one of the statutory mitigating factors was whether or not a person has a mental disease or defect that substantially impacts behavior.  That is where the law requires you to give weight to that.  This lady testified that there was no mental disease or defect, that mitigating factor does not exist in this case.  However, his Honor will instruct you --  (Penalty Phase TR- 137/20-22, 138/1-6).

MR. CONSOLDANE: "I am going to object." (TR- 138/7-8).

(At Side Bar with reporter present).

30

MR. CONSOLDANE: "It has long been established by the case law, that the Prosecutor cannot comment on what mitigating factors I did not present. He can only discuss on what mitigation that I can. He can't say that I didn't bring up this or didn't bring up that. That is improper argument and I would object to that. (Penalty Phase TR- 138/10-16).

PROSECUTOR:        "I'm not going to go through the mitigating factors at all. This particular factor was covered in the testimony of the psychologist and I directly asked her and she's saying that this factor exists and she said no.  What I  was about to say was however, you can consider history, background, and character, and the catch-all phrase that you can consider what she says is mitigation, if you let me continue." (Penalty Phase TR- 138/17-22, 139/1-3).

MR. CONSOLDANE: "It is still improper to mention something that I didn't prove. It is like showing – it is an improper thing.  He can only talk about the quality of the evidence I did present, not what I did not present.  I told you at the start, I was not going to bring in anything about mental defect.  I put that on the record before we started.  It was an improper question that you asked her to begin with.  I didn't have a chance to object.  I knew what the answer would be, but it still cannot be brought up in final argument and I would request that the Jury be instructed that they have to, that whatever mitigating that I didn't bring up. (Penalty Phase TR- 139/4-17).

THE COURT: "His argument is to counter what argument she gave on this.  Let me see what I can say.  If I don't say it right, come back up." (Penalty Phase TR- 139/18-20).


(End of Side Bar discussion).

31

THE COURT: "Ladies and gentlemen, there's been an objection raised, and I don't know that Mr. Watkins had gotten to the point where it might be a perfectly valid objection or not, but let me state this to you to correct any misunderstanding.  The State at this point, is limited to the bounds of rebutting any evidence or argument that has been put on in the mitigation phase of the trial.  I don't know that from the question which was only a partial question, had Mr. Watkins continued along the line that he might have, then he would be getting outside the boundaries of proper argument.  Mr. Watkins, I would ask you to rephrase your question.  (Penalty Phase TR- 140/1-14).

PROSECUTOR:       "What I said was not wrong." (Penalty Phase TR- 140/15-16).

THE COURT: "Anything you said up to this point, I don't think at all was improper, but please continue." (Penalty Phase TR- 140/17-19).

PROSECUTOR:       "Thank you.  I was going to continue that his Honor will give you an instruction, it is very clear, you can consider what Mrs. McPherson, Dr. McPherson said as mitigating.  I was simply pointing out there was no mental defect or disease or mental retardation.  (Penalty Phase TR- 141/1-4)

### Misconduct Interpreted

As this court noted in *State v. Garner* (1995), 74 Ohio St. 3d 49, 55, " pursuant to R.C. 2929.04(C), 'it is the defendant who has the right to present and argue the mitigating factors. If he does not do so, no comment on any factors not raised by him is permissible.' Similarly, the trial court should only instruct the jury on those mitigating factors  raised by the defense." Id. at  55, citing *State v. Depew* (1988), 38 Ohio St. 3d 275, 289. In *State  v. Bey* (1999), this court held that "if counsel exceeded the limits established by the cases from

32

this court or as counseled by the trial judge, it is the trial court's role to discourage such misstep with sanctions when appropriate." *State v. Bey* (1999), 85 Ohio St. 3d 487, 495.

### Violation of Pre-Trial Rulings and Orders

On January 23, 2002, appellant filed a pre-trial motion with the trial court captioned as a "Motion to Prohibit the Prosecutor from Arguing and the Court from Giving Instructions Regarding Statutory Mitigating Factors Not Raised by the Defense (R. 69).  In his motion, appellant asked that the court to prohibit "the prosecutor . . . from arguing the non-existence of any of the seven mitigating factors found in R.C. 2929.04(B)," given that such argument would "permit[] the jury to consider the lack of proof on these factors as an aggravating circumstance." (R. 69).  On September 11, 2002, the trial court granted appellant's motion (R. 209).

### Intentional Misconduct

It is clear from the record in this cause that the prosecutor's comment on the absence of "mental disease or defect" as a mitigating factor was intentional and planned, all as evidenced by the presaging of that tactic during the prosecutor's voir dire; the fact that the prosecutor was the one who had to elicit the evidence from the defense expert on cross-examination to make it available for him to rebut, given that defense counsel had previously advised the prosecutor that they had no intention to raise the issue of "mental disease or defect;" and the blatant manner in which he announced to the jury the absence of it as a mitigating factor (Penalty Phase TR- 137/20-22, 138/1-6).  By doing so, the prosecutor violated the trial court's pre-trial order and turned the non-existence of a mitigating factor

33

into an aggravating circumstance for the jury's consideration, all to the material and substantial prejudice of appellant.

### Tenth Instance

The tenth instance of trial misconduct occurred again during final argument in the penalty phase where the prosecutor labeled appellant as a psychopathic killer, telling the jury that "[t]his is a cold blooded psychopathic killing that takes place in its planning stages in prison." (Penalty Phase TR- 143/4-6). In response, defense counsel objected on the grounds that there was no evidence to support the prosecutor's characterization, prompting the court to sustain the objection, all while instructing the jury to disregard. (Penalty Phase TR- 143/7-11).

### Misconduct in Argument

This court has analyzed "prosecutorial misconduct in closing arguments by asking 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Tibbets* (2001), 92 Ohio St. 3d 146, 168, citing *State v. Hessler* (2000), 90 Ohio St. 3d 108, 125, quoting *State v. Smith* (1984), 14 Ohio St. 3d 13. "While a prosecutor may not make excessively emotional arguments tending to inflame the jury's sensibilities, the prosecutor is entitled to some latitude in making a closing argument to the jury," Id. at 169, mindful that while striking hard blows in argument, he may not strike foul ones. *Berger v. United States* (1935), 295 U.S. 78.

Generally referring to or alluding to a defendant by name calling or labeling is improper, however, in that it conveys the prosecutor's personal belief, *State v. Clemons*

34

(1998), 82 Ohio St.3d 438, unless "the prosecutor's characterization . . .is . . . based upon the evidence at trial. *State v. Tyler* (1990), 50 Ohio St.3d 24.

In the instant cause, the prosecutor's effort's to label appellant as a psychopath was not supported by the evidence, and yet the prosecutor sought to stigmatize the appellant with that label in the penalty phase, all for the purpose of inflaming the jury's passion so that it would render a recommendation of death.  The conduct of the prosecutor therefore prejudicially affected substantial rights of the appellant.

## Conclusion

The cumulative effect of misconduct by the prosecutor violated appellant's due process right to a fair trial at both phases of this capital case.  This court should therefore grant appellant a new trial, or in the alternative, vacate the death sentence and remand this case for a new penalty phase if it finds that the prosecutor's misconduct affected only the death sentence.

35

## PROPOSITION OF LAW NO. 4

RULINGS OF THE TRIAL COURT ALLOWING IMPROPER EVIDENCE AND ARGUMENT BEFORE THE JURY, AND INAPPROPRIATE COMMENT THEREON BY THE COURT AS TO THE PROPRIETY OF SUCH EVIDENCE AND ARGUMENT, DENIES A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR AND IMPARTIAL TRIAL.   U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

### First Instance of Judicial Error

During final argument in the penalty phase of trial, the prosecutor accused defense counsel of "creating a diversion" for the jury so that it could not properly determine what is important in the case (TR- 3420/7-15, 3421/22, 3422/11-15, 3425/10-11), prompting defense counsel to object on the grounds that the prosecutor's statement constituted prohibited commentary that inveighed defense counsel with the imputation and implication that defense counsel was somehow lying, deceiving, engaging in trickery or committing a fraud upon the court (TR- 3422/11-15,3424/15-18; See Proposition of Law No. 3, Sixth Instance of Misconduct, infra).

During a chambers conference recess, prompted by the challenged comment of the prosecutor and the defense counsel's objection, the following colloquy occurred:

MR. LEWIS:  "What he said was, judge, that the defense is creating a diversion and he says creating so it sounds like we're doing the trickery, we are falsifying something, we are defrauding the Court.  That's what it implies.  And – (TR- 3422/11-15).

THE COURT: "Well, the (sic) advocation is probably there, but I think it is proper comment because that's what he does, do you not, on behalf of the defense often times? (TR- 3422/16-20).

Notwithstanding an admonishment by the court to counsel in chambers that neither side should attack each other and infer sinister motives or objectives, the court failed to rule

36

on defense counsel's objection and then returned to court without a curing instruction and proceeded to allow the prosecutor to renew the argument that defense counsel was creating a diversion for the jury with respect to what was important in the case (TR- 3423/4-8, 3425/7-14).

## Second Instance of Judicial Error

During final argument in the penalty phase, the prosecutor's argument strayed outside the scope of the evidence, resulting in the prosecutor theorizing about the evidence, prompting an objection from defense counsel which the trial court summarily overruled (TR-3397; See Proposition of Law No. 3, Seventh Instance of Misconduct, infra). Thereafter, as the prosecutor continued to offer argument which prompted objections by defense counsel that the prosecutor was again arguing facts and circumstances not in evidence (TR- 3401/16-23), the trial court advised defense counsel that in argument, the prosecutor is "not limited to the stipulation or the facts of the case." (TR- 3402/5/-6).

## Third Instance of Judicial Error

During final argument in the penalty phase, the prosecutor commented on the absence of mitigation factors which had not been raised by appellant, i.e.,  the absence of "mental disease or defect" (Penalty Phase TR- 137-141; See Proposition of Law No. 3, Ninth Instance of Misconduct, infra).

Prior to the commencement of trial, the trial court on September 11, 2002, granted a defense motion which asked that the court prohibit the prosecutor from arguing and the court from giving instructions regarding statutory mitigating factors not raised by the defense

37

(R. 209). Notwithstanding this pre-trial ruling, the prosecutor in penalty phase argument stated the following:

"I would just mention that if you can recall, one of the statutory mitigating factors was whether or not a person has a mental disease or defect that substantially impacts behavior. That is where the law requires you to give weight to that. This lady testified that there was no mental disease or defect, that mitigating factor does not exist in this case. However, his Honor will instruct you --   (Penalty Phase TR- 137/20-22, 138/1-6).

Despite the unequivocal statement of the prosecutor, all in violation of the court's pre-trial order of September 11, 2002, the trial court addressed the jury and advised them that the court didn't "know if the prosecutor had gotten to the point" where the defense objection was a "valid objection or not" (Penalty Phase TR- 140/1-14).  When the prosecutor decried the objection and stated in the presence of the jury that "[w]hat I said was not wrong," (Penalty Phase TR- 140/15-16), the trial court responded in the presence of the jury by stating: "Anything you said up to this point, I don't think at all was improper, but please continue." (Penalty Phase TR- 140/17-19).  Thereafter, the trial court, without sustaining defense counsel's trial objection, and without enforcing its pre-trial order prohibiting comment on non-existing mitigating factors, allowed the prosecutor to again advise the jury that "there was no mental defect or disease. . .  (Penalty Phase TR- 141/1-4).

### Fourth Instance of Judicial Error

During its case-in-chief, the State of Ohio called Frank Reynolds as its fourth witness, a former employee of Robert Fingerhut, for the purpose of testifying to a conversation that he had overheard between Robert Fingerhut and Donna Roberts on December 10, 2001, regarding Donna Roberts' need for $3,000.00 and Robert Fingerhut's refusal of her request (TR- 2172-2173, 2176-2177). Upon testifying that he heard Donna

<div align="center">38</div>

Roberts "ask[] him for money," (TR- 2177/7-9), defense counsel objected on the grounds that conversation between Robert Fingerhut and Donna Roberts was inadmissible hearsay (TR- 2177/10-11, 2183-2187).  In response, the prosecutor argued that the testimony was relevant to their case because their theory as to the motive of the killing was that Robert Fingerhut was cutting her off from money, and that was her reason for killing him, namely, to collect insurance (TR- 2177/18-23, 2178/1-2).  In responding specifically to the hearsay objection, the prosecutor stated that the testimony of Mr. Reynolds was not hearsay because "[i] t [was] not being offered to prove that it was $3,000.00 being requested. It's only being offered to prove that he observed the conversation and he observed the hostility between the two." (TR- 2186/22-23. 2187/1-2). Whereupon, the trial court overruled defense counsel's objection and allowed the following testimony:

PROSECUTOR:     I believe that it's in the afternoon on Tuesday  that you see a conversation between Donna and Robert Fingerhut.  I should say Donna Roberts and Robert Fingerhut? (TR- 2188/3-6).

REYNOLDS:     Yes. (TR- 2188/7).

PROSECUTOR:     And that conversation, would you tell the jury what you observed? (TR- 2188/8-9).

REYNOLDS:     All I heard is Donna asking Robert for three grand (TR- 2188/10).

PROSECUTOR:     And what  happened? (TR- 2188/11).

REYNOLDS:     He just told her he ain't giving her no money (TR- 2188/12).

PROSECUTOR:     And how would you describe the emotional or the reaction of Donna Roberts that you observed? (TR- 2188/13-14).

REYNOLDS:     She was really nervous, shaky, and she gave him the dirtiest look like it can kill a person (TR- 2188/15-16).

39

## Conclusion

The cumulative errors of the trial court regarding admission of improper evidence and argument violated appellant's due process right to a fair trial at both phases of this capital case.  This court should therefore grant a new trial, or in the alternative, should vacate the death sentence and  remand this case for a new penalty phase if it finds that the errors of the trial court affected only the death sentence.

40

## PROPOSITION OF LAW NO. 5

A DEFENDANT'S SUBSTANTIAL CONSTITUTIONAL RIGHTS ARE INFRINGED BY JURY INSTRUCTIONS THAT RELIEVE THE STATE OF ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT ON THE MENS REA ELEMENT OF A CAPITAL CRIME.  U.S. CONST. AMENDS. VI, VIII, XIV; OHIO CONST. ART. 1 SECTIONS 5, 9, 16.

On December 28, 2001, Appellant was charged in the indictment for two (2) counts of Aggravated Murder with aggravating circumstances for the death of Robert Fingerhut in violation of R.C. 2903.01(B).  In order to find Appellant guilty of either of those counts, the State had to prove beyond a reasonable doubt that Appellant purposely caused Robert Fingerhut's death during the course of aggravated and or aggravated robbery.  During instructions to the jury, the trial court defined purpose to kill in counts one and two as follows:

"A person acts purposely when it is his or her specific intention to cause a certain result.  It must be established in this case that at all times in question there was present in the mind of the defendant a specific intention to murder Robert Fingerhut and/or rob him.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not accidently.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to himself, unless that person expresses it to others or indicates it by his conduct.

The purpose with which a person does an act is determined from the manner in which it is done, the means and weapons used, and all the other facts and circumstances in evidence."  (TR-3550-3551)

. . .

Now, in Count One of the indictment the defendant is charged with aggravated murder.  With respect to this count, aggravated murder is purposely causing the death of another with prior calculation and design.

41

Before you can find the defendant guilty of aggravated murder in Count One you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the defendant purposely, and with prior calculation and design, caused the death of Robert S. Fingerhut.

Some more terms.  I previously defined purpose."  (TR-3559-3560).

. . .

In Count Two of the indictment the defendant is charged with  County Two, aggravated murder.  Now, with respect to this count, aggravated murder is purposely causing the death of another while committing, attempting to commit, or fleeing immediately after committing aggravated robbery and/or aggravated burglary.

Before you can find the defendant guilty of aggravated murder on this count you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the defendant purposely caused the death of Robert S. Fingerhut while the defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery and/or aggravated burglary.

Again, I've defined all relevant terms for you."  (TR-3573-3574).

Those instructions on the essential element of purpose to kill relieved the State of its burden of proof on that element thereby denying Appellant his due process right to a fair trial.

The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants that the State must prove each essential element of the crime charged beyond a reasonable doubt.  In re Winship (1970) 3397 U.S. 358, 364 (1970).  Purpose to kill is an essential element of aggravated felony murder pursuant to O.R.C. section 2903.01(B).  Under Ohio Law, "[t]he existence of an accused's purpose to kill must be found by the jury under proper instructions from the trial court and can never be determined by the Court as a matter of law."  State v. Scott (1980) 61 Ohio St. 2d 155.

42

Because the State had to prove the mens rea element of aggravated murder beyond a reasonable doubt, the burden of proof regarding Appellant's purpose to kill could not be shifted to him.  [See *Wilbur v. Mulaney* (1975) 421 U.S. 684.]   Accordingly, a jury instruction that relieves the State of its burden of proof regarding the mens rea element of the offense is unconstitutional. Id. The United States Supreme Court has concluded that burden-shifting instructions on the mens rea element of the offense are unconstitutional whether the presumption of the mens rea is conclusive or rebuttable.

*Francis v. Franklin* (1985) 471 U.S. 307, *Sandstrom v. Montana* (1979) 442 U.S.  510.

Clearly, the trial court's instructions to the jury in this case violated the constitutional principles set forth above.  R.C. 2901.22(A) defines "purpose as follows:

> "A person acts purposely when it is his specific intention to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature."

The statutory definition of "purpose" is written in the alternative:  A person acts purposely when he specifically intends to cause a certain result or when the "gist of the offense" is prohibited "conduct" of a certain nature. Id. Both definitions should not be given in a capital case as the comment to Section 4090.01 of the Ohio jury instructions makes clear:

> COMMENT;  Section 3 [conduct definition] will be given in rare cases where conduct is prohibited, e.g. Corruption of a minor, R.C. Section 2907.04. The trial bench has been giving both Section 2 and Section 3 instructions in "result" situations (aggravated murder) and it is both incorrect and confusing."

<div align="center">43</div>

Further, this Court has condemned the use of the conduct definition of purpose in capital cases.  [See *State v. Wilson* (1996) 74 Ohio St. 3d 381, citing *State v. Carter* (1995) 72 Ohio St. 3d 545.]

Accordingly, the trial court should not have given the conduct definition of purpose in this capital case.  The effect of this instruction was to relieve the State of its burden to prove the mens rea element of aggravated murder.  The proper result definition of purpose was completely undermined by the improper conduct definition. See *Francis* at 322 (instruction unconstitutional when incorrect language contradicts correct language and discrepancy is unexplained).  The conduct definition stated that Appellant acted purposely if he engaged in prohibited conduct "regardless of what he may have intended to accomplish." This conduct definition told the jurors that it was unnecessary for them to find the specific purpose to kill in order for them to find Appellant guilty of the mens rea element. The State was thereby relieved of its burden to prove Appellant's purpose to kill in violation of the Due Process Clause.  See *Francis* 471 U.S. at 313; *Sandstrom* 442 U.S. at 520-23.

The trial court's instruction on purpose also created a mandatory rebuttable presumption of the mens rea element from the mere use of a deadly weapon.  The trial court herein instructed the jury that:

> "The purpose with which a person does an act is determined from the manner in which it is done, the means and weapons used, and all the other facts and circumstances in evidence."  (TR-3551).

That instruction relieved the State of its burden to prove the element of purpose to kill because "a reasonable juror could . . .have understood that the instructions placed the

44

burden of proof on the Appellant [to rebut the inference of purpose to kill]."  Boyde v. *California* (1990) 494 U.S. 370, quoting *Francis* at 315-16).

The jury should not have been allowed to presume purpose to kill simple from the use of a weapon.  The jury had to make an independent finding that Appellant had a purpose or specific intent to kill, unaided by any presumptions.  [See *Sandstrom* at 524.] The instruction created an impermissible evidentiary presumption where purpose or intent to kill was presumed upon proof that a weapon was used.  Once the jury found that the victim was shot to death, the instruction allowed the jury to presume that the firearm was used with specific purpose to kill.  Purpose to kill cannot be presumed from the mere use of a weapon.

These instructional errors are not harmless beyond a reasonable doubt.  See *Rose v. Clark* (1986) 478 U.S. 570; *Chapman v. California* (1967) 386 U.S. 18.  True, the jury was instructed that it had to find a specific intent to kill in order to convict.  However, the jury was also instructed that "purpose and intent mean the same thing."  (TR-3551).  Intent was not defined and purpose was improperly defined by the "prohibition against conduct" definition.  Therefore, the jury could not rely on any common and ordinary understanding of the word "intent" with regard to the mens rea element.  The jury had to understand "intent" by the flawed definition of "purpose" because the jury was specifically instructed that "intent" was synonymous with "purpose".  See *State v. Henderson* (1988) 39 Ohio St. 3d 24. The instructional errors are not harmless beyond a reasonable doubt and they violate Appellant's right to due process.

The instructional errors also violate Appellant's right against cruel and unusual punishment under the Eighth Amendment of the U. S. Const.  Appellant could not

45

become death eligible without a guilty verdict on the aggravated murder charges under O.R.C. Section 2929.02.  Even at the trial phase, a heightened degree of reliability is required in the process of instructing the jury on the question of death eligibility.  See *Beck v. Alabama* (1980) 447 U.S. 625, 633-43.   The instructional flaws in this case severely undermined the reliability of the jury's guilty verdict on the aggravated murder counts.  As such, the crucial function of narrowing Appellant's offense into the class of death eligible offense was also undermined in violation of Eighth and Fourteenth Amendments.  Appellant's convictions of aggravated murder must be reversed and his case remanded for a new trial.

46

## PROPOSITION OF LAW NO. 6

A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT. U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, SECTION 16.

To maintain confidence in system of laws proof beyond a reasonable doubt must be held to be proof of guilt "with utmost certainty." In Re *Winship* (1970) 397 U.S. 358. Thus, a capital defendant's conviction and death sentence must be reversed where the court's instruction on reasonable doubt could have led jurors to find guilt "based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana* (1990) 498 U.S. 39. The instruction given by the trial court herein allowed the jurors to find Appellant guilty on "a degree of proof below that required by the Due Process Clause." Accordingly, Appellant's convictions and death sentence must be reversed.

During the trial phase, the trial court instructed the jury on "reasonable doubt" as follows:

> "Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, no matter who produced it, you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own personal affairs. (TR-3543).

During the mitigation or sentencing phase, the trial court instructed the jury on "reasonable doubt" as follows:

47

"Remember that reasonable doubt is presented when after you have carefully considered and compared all of the evidence, you cannot say your are firmly convinced that the aggravating circumstances outweigh the factors in mitigation.

Reasonable doubt is a doubt based on reason and common sense. And reasonable doubt is not mere possible doubt because everything relating to human affairs and depending on moral evidence, is open to some possible or imaginary doubt.  Proof beyond a reasonable doubt is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs."  (Sentencing TR-l62, l63).

The trial court's charge, taken as whole, did not adequately convey to jurors the stringent "beyond a reasonable doubt" standard.  The "willing to act" language of R.C. 2901.05 did not guide the jury because it is too lenient.  Further, the statutory definition of reasonable doubt is flawed because the "firmly convinced" language represents only a clear and convincing standard.  Finally, the Court's use of "moral evidence" was improper.

The trial court's erroneous instructions resulted in the jury convincing Appellant herein on a standard below that required by the Due Process Clause of the Fourteenth Amendment.  This is a fundamental, structural error that requires reversal of Appellant's convictions.  See *Sullivan v. Louisiana* (1993) 508 U.S. 275.

The trial court's definition of reasonable doubt, which included instructing the jury that reasonable doubt was "proof of such character that an ordinary person would be willing to rely and act upon it in the most important of her or his own affairs,"  allowed the jurors to find guilt on proof below that required by the Due Process Clause.  This Court has held that Ohio's statutory reasonable doubt definition is not an unconstitutional dilution of the State's burden of proof  *State v. Nabozny* (1978) 54 Ohio St. 2d 195, 202-03.  However, the

48

Supreme Court of the United States, several federal circuit courts, and lower Ohio courts have condemned the language in the statute that defines reasonable doubt in this way. The United States Supreme Court expressed strong disapproval of the "willing to act" language when defining proof beyond a reasonable doubt in Holland v. United States (1954) 348 U.S. 121. The United States Court of Appeals has also noted that "there is a substantial difference between a juror's verdict of guilt beyond a reasonable doubt and a person making a judgment in a matter of personal importance to him." Scurry v. United States (D.C. Cir. 1965) 347 F. 2d 468, 470. The Scurry court articulated that human experience shows that a prudent person, called upon to act in his more important business or family affairs, would gravely weigh the risks and considerations tending in both directions. After weighing these considerations, however, a person would not necessarily be convinced beyond a reasonable doubt that he had made the right judgment. Id. As a result of this disapproval, several of the federal circuit courts have disapproved the "willing to act" phrase and adopted a preference for defining proof beyond a reasonable doubt in terms of a prudent person who would hesitate to act when confronted with such evidence. See e.g. *Monk v. Zelez* (10th Cir. 1990) 901 F. 2d 885; *United States v. Colon* (2nd Cir. 1987) 835 F. 2d 27; *United States v. Pinkney* (D.C. Cir. 1976) 551 F. 2d 1241; *United States v. Conley* (8th Cir. 1975) 523 F. 2d 650.

Ohio Courts have also criticized the "willing to act" language of R.C. 2901.05(D). The Franklin County Court of Appeals concluded that the final sentence of R. C. 2901.05(D) should be eliminated or modified by adding the word "unhesitating" to the last sentence before the phrase "in the most important of his own affairs." *State v. Frost* (C.A. 10 1978) Case No. 77 App. 728 unreported. Ordinary people who serve as jurors are

49

frequently required to make important decisions based upon proof of a lesser nature by choosing the most preferable action. The "willing to act" language is the traditional test for the clear and convincing evidence of proof. *State v. Crenshaw* (1977) 51 Ohio App. 2d 63. "A standard based upon the most important affairs of the average juror. . .reflects adversely upon the accused." Id.

The "firmly convinced" language in the first sentence of R.C. 2901.05(D) does not define the reasonable doubt standard, but rather defined the clear and convincing standard. This Court in *Cross v. Ledford* (1954) 161 Ohio St. 469 defined clear and convincing evidence as that "which will provide in the mind of the trier of facts a firm belief or conviction to the facts sought to be established." That definition is similar to R.C. 2901.05(D), where reasonable doubt is present only if jurors "cannot say they are firmly convinced of the truth of the charge." As such, the jurors were given a definition of reasonable doubt that failed to satisfy the Due Process Clause.

The Court's definition of reasonable doubt was further flawed because it informed the jury that "[r]easonable doubt is not mere possible doubt because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt." (TR-3543).

The phrase "moral evidence" improperly shifter the focus of this jury to the subjective morality of Appellant and from the required legal quantum of proof, Victor v. Nebraska (1994) 511 U.S. 1.

Ohio juries are convicting criminal defendants on a clear and convincing evidence standard. The "willing to act" language found in R.C. 2901.05(D) represents a

50

standard of proof below that required by the Due Process Clause. The "firmly convinced" language in the first sentence of R.C. 2901.05(D) defines the presence of reasonable doubt in terms nearly identical to the accepted definition of clear and convincing evidence. Courts that have disapproved the "willing to act" language have generally allowed it to be used only when the instruction, taken in its entirety, conveyed the true meaning of "reasonable doubt" as required by the Due Process Clause. See *Holland* at 140.

This is not, however, the case in Ohio R.C. 2901.05(D) defines reasonable doubt in terms far too similar to the definition of "clear and convincing" evidence. The "willing to act" language in the last sentence of R.C. 2901.05(D) is defective because reasonable doubt is also defined in a clear and convincing standard from the outset in the phrase "firmly convinced." Taken as a whole, R.C. 2901.05(D), as applied to this case, defines reasonable doubt by an insufficient standard. Furthermore, the reference to "moral evidence" improperly shifts the jury's focus to appellant's subjective moral culpability. Accordingly, the instructions in this trial allowed the jury to find guilt "based on a degree of proof below that required by the Due Process Clause." Case at 141. Appellant's convictions and death sentence must be reversed.

51

## PROPOSITION OF LAW NO. 7

WHEN THE TRIAL COURT CONSIDERS AND WEIGHS BOTH R.C. 2929.04(A)(7) ALTERNATIVES, AND REDUCES MITIGATION TO A 'JUSTIFICATION,' A CAPITAL DEFENDANT IS DEPRIVED OF THE RIGHT TO INDIVIDUALIZED SENTENCING AND OF HIS LIBERTY INTEREST IN THE STATUTORY SENTENCING SCHEME THUS VIOLATING RIGHTS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 9 AND 16, ARTICLE I, OF THE OHIO CONSTITUTION.

On November 15, 2002, the jury recommended that Appellant be sentenced to death.  On December 9, 2002, the trial court filed its opinion sentencing Appellant to death.  However, in its sentencing opinion, the trial court improperly weighed both R.C. 2929.04(A)(7) alternatives and reduced mitigation to a "justification."  These errors denied Appellant the individualized sentencing guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.  Woodson v. North Carolina (1976) 428 U.S. 280; Lockett v. Ohio  (1978) 438 U.S. 586;  Eddings v. Oklahoma (1982) 455 U.S. 104; Zant v. Stephens (1993) 462 U.S. 862.

The trial court's opinion plainly considers and weighs both alternatives of the R.C. 2929.04(A)(7) specification.  In pertinent part, the court stated:

> "Based upon this and other evidence, the jury properly con-
> cluded that the Defendant committed a burglary to facilitate
> the premeditated and purposeful murder of the victim
> Fingerhut along with Roberts.  The Defendant after executing
> his plan then stole Fingerhut's vehicle which allowed the jury
> to find that the murder was committed while committing the
> aggravating circumstances of Aggravated Burglary and Aggravated
> Robbery.
> . . .
>
> In performing its statutory duty, the a review of the aggravating
> circumstances is required.

52

1) The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

. . .

From the aforementioned evidence, the Jury concluded that the defendant committed the Aggravated Murder of while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

2) The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

. . .

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he as committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

. . .

The Defendant was disappointed that the fool-proof, premeditated murder plat, which he developed over nearly three (3) months, and which included shooting the victim 'in the F'ing head' failed.

. . .

The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to rather to carry out the premeditated, cold blooded execution of Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight.  (Trial Court Opinion at 4, 5 6, 10, 11).

The trial court was persuaded to impose the death penalty"particularly" because

Appellant was both the principal offender and because he acted with prior calculation and

design:

53

> "From the overwhelming evidence, it is this Court's opinion
> that the Defendant and the Co-Defendant plotted the murder
> of Robert S. Fingerhut solely to collect $550,000.00 in
> insurance proceeds.  This was accomplished by trespassing
> in the residence where Fingerhut resided, for the sole purpose
> of ambushing and murdering him." (Trial Court Opinion at 11, 12).

Pursuant to R.C. 2929.04(A)(7), a defendant who murders during the commission of a felony is eligible for the death penalty only if the defendant "was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."  In State v. Penix (1987) 32 Ohio St. 3d 369, the trial court instructed a capital jury on both (A)(7) alternatives, which led both the jury and the trial court to consider both alternatives in sentencing Penix.  In reversing Penix, this court held that "principal offender" and "prior Calculation and design" are not to be charged and proven in the same cause.  See id.

The trial court's opinion demonstrates that it weighed the aggravating circumstances against the mitigating factors in a manner contrary to Penix.  The opinion demonstrates that the trial court gave great weight to both principal offender and prior calculation and design.  In essence, the trial court weighed the (A)(7) specification case twice.  The trial court's consideration and weighing of both alternatives deprived Appellant of the protection against cruel and unusual punishment and his right to a reliable sentence.  U. S. Const. Amends. VIII, XIV:  Ohio Const. Art. I, Sections  9, 16.  An independent weighing which results in a life sentence, coupled with the other sentences imposed, as a practical matter assures that Appellant would never be released from prison.

54

In the trial court's weighing process and findings, the trial court dismissed the impact of Appellant's neighborhood in growing up, his lack of a father figure contributing to his behavioral problems, Appellant's contention the homicide was committed in self-defense, under duress, his mental history of ADHD and low I.Q., recurrent drug and alcohol addictions and statement of remorse. (Trial Court Opinion at 6-10). Absent a justification or excuse, the court refused to give real weight to compelling mitigation evidence.

Few homicides are justified. Further, if a homicide is justified, an aggravated murder conviction does not flow from that act. By convicting Appellant of aggravated murder, the jury implicitly found that there was no justification for Robert Fingerhut's death. The trial court held appellant's mitigation evidence to an impossible standard.

Beyond being an impossible standard, the standard applied by the trial court was legally inaccurate. Mitigating circumstances are "facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death." *Franklin v. Lynaugh* (1988) 487 U.S. 164, 188. In Ohio, "mitigating factors under R.C. 2929.04(B) are not related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *State v. Holloway* (1988) 38 Ohio St. 3d 239, 242. See also *California v. Brown* (1987) 479 U.S. 538; *Eddings v. Oklahoma* (1982) 455 U.S. 104.

The trial court assessed Appellant's mitigation evidence as unpersuasive because the court did not believe appellant's justification of self-defense in Fingerhut's death. The sentencing phase is the time to determine punishment, not the time for "assessment of 'blame' or culpability." [See *State v. Phillips* (1995) 74 Ohio St. 3d 72, 101]. Further,

<center>55</center>

mitigating factors "do not justify or excuse the crime," but in "fairness and mercy may be considered" in "reducing the degree of the Defendant's blame or punishment." Id.

By finding that Appellant's mitigation evidence and self-defense argument did not justify Fingerhut's death, the trial court assessed blame or culpability as the definitive factor in sentencing.  The trial court asked that Appellant perform an impossible task, explaining away a horrible crime.  It was error for the trial court to hold Appellant's mitigation evidence to this standard.

Ohio has split its weighing process in two.  The trial court must weigh the aggravating circumstances against the mitigating factors.  Therefore, it is essential to comporting with the Eighth and Fourteenth Amendments, that the trial court weigh property the aggravating circumstances against the appropriate mitigating factors.  *Espinosa v. Florida* (1992) 505 U.S. 1079, 1082.

Either the jury or the trial  court can prevent Appellant from receiving a sentence of death.  The jury can recommend life or death.  Then the trial court, independent of the jury's recommendation, can impose either life or death.  R.C. 2929.03(D)(3).  As a result, the trial court's sentencing decision must comport with the requirements of R.C. 2929.04.  By considering and weighing both R.C. 2929.04(A)(7) alternatives and reducing mitigation to a justification, the trial court failed to properly perform its role as a sentencer. U. S. Const. Amends. VIII, XIV:  Ohio Const. Art. I, Sections 9, 16.

Ohio's trial courts have an essential role in the imposition of sentences on capital defendants.  The trial court must be independently persuaded that the aggravating circumstance outweighs any mitigating factors.  *State v. Apanovitch* (1987) 33 Ohio St. 3d

19. After a jury recommends death, the trial court still has the power to find that the aggravating circumstances do not outweigh the mitigating factors, and to thus spare the capital defendant's life.

Through R.C. 2929.03(D)(3), Ohio has directed the trial court to make an independent determination in sentencing of capital defendants. Thus, "state law creates for a defendant a liberty interest" in having the trial court make that determination. See *Clemons v. Mississippi* (1990) 494 U.S. 738, 746, (citing *Hicks v. Oklahoma* (1980) 447 U.S. 343 had a liberty interest in the trial court's sentencing determination.

The trial court's failure to appropriately perform its statutory duties infringed upon that liberty interest. Considering and weighing both R.C. 2929.04(A)(7) alternatives and reducing mitigation to a justification - each is inconsistent with the statutory obligations placed on the trial court by R.C. 2929.04. The trial court repeatedly infringed upon Appellant's liberty interest in that statutory sentencing scheme. U. S. Const. Amends. V, XIV; Ohio Const. Art. Section 16.

In every capital case, an "individualized decision" must be made regarding imposition of the death penalty. *Lockett at* 605. In attempting to develop "a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual," the Court arrived at *Lockett's* holding. *Edding* at 110.

In sentencing Appellant to death, the trial court did not treat Appellant as a unique individual. Further, Appellant had a liberty interest in the trial court's independent sentencing determination. Further, a review of the trial court's sentencing opinion comments indicate that the shocking nature of the crimes influenced the judge, as they must have the

57

jury. But the death penalty requires guided discretion, not the unguided passion present here.

Appellant's death sentence therefore violates U.S. Const. Amend. VII and XIV and Ohio

Const. Art. I, Section 9.  The sentence of death must therefore be vacated.

58

## PROPOSITION OF LAW NO. 8

IT IS PREJUDICIAL ERROR FOR A TRIAL COURT TO SENTENCE DEFENDANT TO THE DEATH PENALTY, WHEN, BASED UPON THE LAW AND THE RECORD OF THIS  CASE, THE SENTENCE OF DEATH HEREIN IS INAPPROPRIATE AND IS DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, IN VIOLATION OF DEFENDANT'S RIGHTS AS GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTIONS 5, 9, 10, AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

O.R.C. 2929.05(A) requires this Court to review all death sentences in this State to determine:

1)    Whether the sentence of death in the particular case is appropriate, and:

2)    Whether the sentence of death in the particular case is excessive or disproportionate to the penalty imposed in similar cases.

R.C. 2929.05(A) directs the appellate Courts to "affirm a sentence of death only if the particular Court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and the sentence of death is the appropriate sentence in the case." The record in this case merits the independent conclusion by this Court that the sentence of death is not appropriate for Appellant. The aggravated murder at issue in this case was brutal, cruel, and senseless. The crime is a tragedy. But tragedy is not the measure of appropriateness. The issue, as the United States Supreme Court has repeatedly emphasized, is how to balance the narrow discretion to impose a death sentence so as to avoid caprice with the broad discretion not to impose the death sentence so as to permit individualized consideration in the

59

determination of whether the offender should live or die.  *Furman* v. *Georgia* (1972) 408 U.S. 238; *Lockett v. Ohio* (1978) 438 U.S. 586.

The Court in *Roney v. State* (1982) 632 S.W. 2d 598 concluded the imposition of a death sentence simply because the crime was callous or the offense senseless would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. See Godfrey v. Georgia (1980) 446 U.S. 420.

The Court vacated Godfrey's death sentence holding that the aggravating circumstance that the murder was outrageously or wantonly vile, horrible or inhuman was overbroad.  The Court reasoned that a person of ordinary sensibility could fairly conclude that virtually every murder is outrageously or wantonly vile, horrible or inhuman.  Thus, the Court said, the aggravating circumstance did not sufficiently distinguish Godfrey, where a death sentence was imposed.  See, generally, the discussion of Godfrey in *State v. Maurer* (1984) 15 Ohio St. 3d 239, 242-243, cert denied (1985) 472 U.S. 1012.

Under the Eighth and Fourteenth Amendments to the United States Constitution, the sentence of death is not appropriate in any case where there is not the highest degree of reliability to support it.  *Woodson v. North Carolina* (1976) 428 U.S. 280.

Appellant submits that it is impossible to do an accurate proportionality review, since there is no statutory record-keeping system for cases in which the death penalty is not imposed; therefore, a meaningful proportionality review is difficult, if not impossible

60

to conduct.  Concerning the required proportionality review, Appellant requests that to whatever extent this can be done, that the Court do so pursuant to the existing statute. Appellant submits that, particularly based upon his detailed social and relationship histories, his functioning ability, his I.Q. and the impact and influence of his relationship with Donna Roberts (Sentencing TR-23-59), the sentence of death herein is inappropriate and disproportionate to the sentence imposed in similar cases.

This Court in *State v. Steffen* (1987) 31 O.S. 3d 111  stated that R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed.  This court based its decision  not on the Statute because the Statute did not offer direction but upon logic stating that "logic dictates that only those cases which result in a commutation have any use in proportionality review."  The Court found it equally logical that only Convictions of capital crimes are relevant. This Appellant does not agree with this logic.  It is a lot more logical to assume that the legislature intended its statistics to be applied across the state in a uniform fashion.  Our State's new sentencing structure requires trial courts to do some proportionality review in every case. The new Statute uses the word similar also.  Are different standards to be accepted in Mahoning County, Trumbull County and Franklin County?  Accordingly, this is not what the legislature anticipated.  Rather, a system of uniformity needs to be implemented and a stringent review of Appellant's sentence conducted herein.

61

## PROPOSITION OF LAW NO. 9

THE PROPORTIONALITY REVIEW THAT THIS COURT MUST CONDUCT IN THE PRESENT CAPITAL CASE PURSUANT TO OHIO REVISED CODE SECTION 2929.05 IS FATALLY FLAWED AND THEREFORE THE PRESENT DEATH SENTENCE MUST BE VACATED PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, SECTIONS 5 AND 10, ARTICLE 1 OF THE OHIO CONSTITUTION AND OHIO REVISED CODE 2929.05, IN VIOLATION OF DEFENDANT'S RIGHTS AS GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION AND SECTIONS 5, 9, 10 AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

When the Ohio Legislature re-enacted the death penalty, it required the appellate courts of Ohio to conduct a proportionality review of any death sentence that it reviews. R.C. section 2929.05. To insure that the courts had a sufficient body of data by which to conduct a proportionality review, the legislature created an information gathering system as to capital cases. R.C. sections 2929.03(G), 2929.021, and 2929.05(A).

Like any other informational resource, the capital tracking system is only as valuable as the completeness of its information. Information as to cases in which life imprisonment was imposed after a capital sentencing hearing is essential for the reviewing courts to fulfill their responsibility of assuring that excessive, disproportionate sentences of death are not imposed. Woodson v. North Carolina (1976) 428 U.S. 280; McCaskill v. State (1977) 344 So. 2d 1276.

Common sense dictates that life sentences should be included in the informational tracking system. When the individual judges have to determine if a death sentence is appropriate, they will surely wish to know when a death sentence was previously

62

found to be inappropriate.  There is no other manner in which a knowledgeable, intelligent decision can be made.

The trial courts in Ohio have repeatedly failed to file sentencing opinions in those cases in which a jury has returned a life verdict in a capital case.  The result has been an information tracking system that contains only death verdicts.  Failure to conduct the required proportionality review with an adequate informational base violates Appellant's statutory right to a meaningful proportionality review and Appellant's constitutional rights to due process and to not be subject to cruel and unusual punishment.

A state need not require a proportionality review with respect to capital case.  Pulley v. Harris (1984) 465 U.S. 37.  However, the United States Supreme Court has further held that State law "may create . . .interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."  Vitek v. Jones (1980) 445 U.S. 480, 488.  Through its statutory provisions for mandatory appellate review of death sentences, the State of Ohio has created an "interest" entitled to Fourteenth Amendment protection.  That "interest" is a defendant's rightful expectation that each appellate court which reviews his death sentence compared to other death sentences to insure that it is not excessive.  Such a state-created interest cannot be arbitrarily abrogated without violating the Due Process Clause.  Vitek v. Jones, supra at 488-8°.  Wolff v. McDonald (1974) 418 U.S. 539;  Hicks v. Oklahoma (1980) 447 U.S. 343.  Evitts v. Lucy (1985) 469 U.S. 387; Griffen v. Illinois (1956) 351 U.S. 12.  The defendant has a substantial and legitimate expectation that he will be deprived of his life only in accordance with the procedures prescribed by state law.

63

In the present case, due process procedures cannot be followed in conducting the required proportionality review.  The trial courts have not filed opinions in which life sentences were imposed.  These may be the only decisions that support a capitally convicted Appellant's argument that his sentence was disproportionate.  A hearing cannot be termed "fair" if the only evidence that supports a party's claim is excluded.

Although death penalty statutes may be constitutional on their face, discrimination in the administration of an otherwise facially valid statute is unconstitutional.

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."  Yick Wo v. Hopkins (1885) 118 U.S. 356, 373-374.

Notwithstanding the divergent views expressed by the majority Justices in Furman v. Georgia (1972) 408 U.S. 238, the opinions contain a vital common denominator, expressed in the two following formulations:

> "***[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be *** wantonly and *** freakishly imposed.  Furman, supra at 310 (concurring opinion of Justice Stewart).***[T]he Eighth and Fourteenth Amendments are violated if the death penalty is exacted with great infrequency even for the most atrocious crimes and *** there is no meaningful basis for distinguishing the few cases in which it is not."  Id. at 313.

Furman therefore stands for the proposition that the arbitrary and capricious application of the death penalty violates the Eighth and Fourteenth Amendments.

64

The prevailing opinions in Gregg v. Georgia (1976) 428 U.S. 153 explicity reasserted that "the basic concern of Furman centered on those defendants who were being condemned to death capriciously and arbitrarily" and that Furman's basic requirement of a regularity in the capital sentencing process was designed to eliminate "a substantial risk that uncontrolled procedures would result in juries acting wantonly and freakishly to impose the death sentence."  Gregg, supra at 206.

When the Ohio Legislature rewrote the Ohio death penalty, it attempted to avoid the arbitrary and capricious application of the death penalty by imposing a statutorily mandated duty upon the Courts of Appeals and the Ohio Supreme Court to review each death sentence to determine whether a particular sentence is excessive or disproportionate to the penalty imposed in similar cases.  R.C. section 2929.05(A).

The shallow proportionality review currently conducted in Ohio does not accomplish this goal of insuring that the death penalty is not arbitrarily and capriciously imposed.  The nearsighted review which focuses only on death verdicts does not guarantee that there is any meaningful rationale for distinguishing the limited number of cases in which the death penalty is imposed from the large number in which it is not.

Instead, the review system has guaranteed that no meaningful review can be conducted.  Cases that would support the arbitrariness of a particular death sentence have been eliminated from the data bank.  A system that was designed to eliminate capricious death sentences has now been implemented in a way that arbitrary death sentences will not be eliminated during the appellate process.

R.C. 2929.05(A) imposes a statutorily mandated duty upon this Court and the Ohio Supreme Court to review each death sentence to determine if a particular sentence is in fact appropriate.  Included within this appropriateness review is a comparison of the death-sentenced defendant to sentences in all other capitally indicted defendants:

> "***In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases***"  O.R.C. 2929.05(A).

In an effort to insure meaningful proportionality review, the Ohio Legislature adopted several comprehensive procedures:

1)  If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances, the clerk of the court in which the indictment is filed shall file a notice with the supreme court indicating that the indictment was filed.  R.C. 2929.021.

2)  The trial court is required to prepare a written opinion identifying the aggravating and mitigating factors and the resulting balance when it imposes a life or death sentence.  R.C. 2929.03F).

3)  The appellate court is required to prepare its own written opinion when it reviews a death sentence. R.C. 2929.05(A).

4)  The above opinions are required to be filed with the Ohio Supreme Court.  R.C. 2929.03(G) and 2929.05(A).

The purpose of the information collecting system of R.C. 2929.03(G), 2929.021 and 2929.05(A) is obvious:  It provides the Ohio appellate courts with a body of information based on Ohio cases from which to determine whether a particular death sentence is excessive or disproportional when compared to other cases.  An appellate court may request information at any time on the outcome of a particular factual pattern or type

66

of capital case.  The value of such a detailed and accessible body of case law cannot be over-emphasized.

No proper legal determination is made in the abstract.  One can only decide that death is the appropriate punishment in a particular case by comparing it to those cases in which the ultimate punishment has been found to be inappropriate.  The Ohio Legislature reached the same conclusion when enacting the Ohio death penalty.  For this reason, the Ohio Legislature required the court or panel to write a decision when a life sentence was imposed.

> "(F)  The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.  The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific finding of which of the mitigating factors set forth in division (B) of Section 2929.04 of the Revised Code it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors.  The court or panel shall file the opinion required to be prepared by this division with the clerk of the appropriate court of appeals and with the clerk of the supreme court within fifteen days after the court or panel imposes sentence.  The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed.  (Emphasis added).  O.R.C. 2929.03(F)

The statute is quite clear and concise.  When the court imposes a life sentence, it shall make specific findings and file its opinion.

Ohio courts have consistently refused to file these opinions in life verdicts. There exists no rational reason to have a trial judge make findings of fact when he rejects a jury's death  recommendation and not make such findings when he accepts a life recommendation.  In both cases, findings of fact are needed to have a complete data bank for the purposes of R.C. 2929.03(G), 2929.021, and 2929.05(A).

The Ohio Legislature created proportionality review as a safeguard to insure that the death penalty was not wrongly imposed.  The system has failed miserably.  With its biased data base, the proportionality review has ceased to be a safeguard and become a justification for imposing death sentences.  The creation of the biased data bank not only ignores the plain language of the statute, but denies Appellant the right to a fair proportionality review and results in the arbitrary and capricious imposition of the death penalty in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Section 16, Article 1  of the Ohio Constitution.

68

## PROPOSITION OF LAW NO. 10

IT IS ERROR FOR A TRIAL COURT TO IMPOSE A DEATH SENTENCE WHEN THE DEATH PENALTY LAW AS CURRENTLY APPLIED IN OHIO VIOLATES R.C. 2929.05(A) BY REQUIRING APPELLATE COURTS AND THE SUPREME COURT, IN CONDUCTING THEIR R.C. 2929.04(A) REVIEW OF "SIMILAR CASES" FOR PROPORTIONALITY, TO EXAMINE ONLY THOSE CASES IN WHICH A DEATH SENTENCE WAS IMPOSED AND IGNORE THOSE IN WHICH A SENTENCE OF LIFE WITH PAROLE ELIGIBILITY AFTER TWENTY-FIVE FULL YEARS OR LIFE WITH A PAROLE ELIGIBILITY AFTER THIRTY FULL YEARS WAS IMPOSED.  THE CURRENT METHOD ALSO VIOLATES THE RIGHTS TO A FAIR TRIAL AND DUE PROCESS, RESULTS IN CRUEL AND UNUSUAL PUNISHMENT, AND IMPLICATES OTHERS OF APPELLANT'S PROTECTED RIGHTS AS WELL, ALL AS SET FORTH IN THE FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND IN SECTIONS 1, 2, 5, 9, 10, 16 AND 20, ARTICLE I OF THE OHIO CONSTITUTION.

This Proposition of Law challenges the application of syllabus law from State v. Steffen (1987) 31 Ohio St. 3d 111, which case appellant believes to have been wrongly determined as a matter of statutory construction and in violation of the appellant's rights under the constitutions of the United States and of the State of Ohio.  Appellant maintains that for proportionality review to mean anything significant, the "similar cases" to be examined must include not only cases where the death penalty was, in fact, imposed but also those cases in which the sentence imposed was life imprisonment.

Appellant notes that the total lack of Ohio cases in which an appellate court or the Supreme Court of Ohio has held an imposed death sentence disproportional evidences the meaninglessness of proportionality review as currently conducted.  That cannot have been what the legislature meant by imposing the requirement of proportionality review.  See R.C. 1.47(B).

69

Moreover, the current system violates the rights to fair trial and due process provided in the Constitutions of Ohio and of the United States.  This Court must reverse the Death Penalty Conviction.

70

## PROPOSITION OF LAW NO. 11

R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05 AS READ TOGETHER AND AS APPLIED IN THIS CASE VIOLATE THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2, 9, 10, AND 16 OF ARTICLE I OF THE OHIO CONSTITUTION.

On January 23, 2002, Appellant filed a written motion to dismiss this capital case. The trial court denied this motion. The specific constitutional grounds upon which this motion was based are as follows:

1.   The death penalty authorized by the Ohio Revised Code, deprives capitally-charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

2.   R.C. 2929.022, 2929.03 and 2929.04 violate the accused's rights to of counsel and to a trial before an impartial jury, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the united States Constitution, and Sections 9, 10. and 16, Article I of the Ohio Constitution.

3.   R.C. 2929.03, 2929.04 and 2929.022 violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution by failing to provide adequate guidelines for deliberation, leaving the jury without prior guidelines in balancing the aggravating circumstances and mitigating factors.

4.   R.C. 2929.022, 2929.03 and 2929.04 and Crim. R. 11(C)(3) place an unconstitutional burden on the accused's right to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution and his rights to be free from compulsory self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

5.   R.C. 2929.03 fails to provide a meaningful basis for distinguishing

71

between life and death sentences, as it does not explicitly require the jury, when it recommends life imprisonment, to specify the mitigating factors found, or to identify its reasons for such sentence. This denies the accused his rights under R.C. 2929.03(A), the Ohio Constitution and the Federal Constitution.

6. R.C. 2929.021, 2929.03 and 2929.05 fail to assure adequate appellate analysis or arbitrariness, excessiveness and dis-proportionality of death sentences and the Ohio Supreme Court fails to engage in a level of analysis that ensures against arbitrary death sentencing.

7. The Appellate review provision of R.C. 2929.05 fails to specif-ically require inquiry and findings regarding arbitrariness, passion, or prejudice, and thus is constitutionally inadequate under the Eighth and Fourteenth Amendments to the United States Con-stitution and Section 9 and 16, Article I of the Ohio Constitution.

8. The Ohio Death Penalty Statute impermissible mandates imposition of the death penalty and precludes a mercy option in the absence of mitigating evidence or when aggravating circumstances outweigh mitigating factors.

9. The statute also fails to require a determination that death is the appropriate punishment.

10. R.C. 2929.03, 2929.04 and 2929.05 violate the Eighth and Fourteenth Amendments of the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution by failing to require the jury to decide the appropriateness of the death penalty.

11. The Ohio Death Penalty scheme permits imposition of the death penalty on a less than adequate showing of culpability by failing to require a conscious desire to kill, premeditation, or deliberation as the culpable mental state.

12. The Ohio "Beyond a Reasonable Doubt" standard of proof fails to meet the requirement of higher reliability for the guilt determination phase of a capital case.

A. The statute fails to require proof beyond all doubt as to guilt that aggravating circumstances outweigh mitigating factors, and

the appropriateness of death as a punishment before the death sentence may be imposed.

B.  Ohio's definition of proof "beyond a reasonable doubt" results in a burden of proof insufficiently stringent to meet the higher reliability requirement in capital cases at the guilty phase, and this has not been cured by appellate courts in their review of convictions or death sentences.

13.    R.C. 2929.03, 2929.04 and 2929.05 violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution by failing to properly allocate the burden of proof during mitigation phase of trial.

Appellant acknowledges that these general federal constitutional claims have been rejected by the Ohio Supreme Court in State v. Jenkins (1984) 15 Ohio St. 3d 164; State v. Buell (1986) 22 Ohio St. 3d 124, and several other cases, but have not yet been tested in the federal courts.  Further, the Ohio courts have not yet addressed these issues under the Ohio Constitution.  The issue is raised here so that it will be preserved for further and later review.

However, Appellant maintains that these arguments compel a determination that the Ohio death penalty statutes are unconstitutional under both the United States and Ohio Constitution for the following reasons.

The Eighth Amendment of the United States Constitution and Article I, Section 9 of the Ohio Constitution, explicitly prohibit the infliction of cruel and unusual punishment upon a convicted criminal offender.  The Eighth Amendment protections are applicable to the State through the Fourteenth Amendment.  Robinson v. California (1972)

73

408 U.S. 238, Rhodes v. Chapman (1981) 452 U.S. 337, 361, Trop v. Dulles (1958) 356 U.S. 86.

The prohibition against cruel and unusual punishment promises to all that the States power to punish will be exercised within the limits of civilized standards. Id. What constitutes cruel and unusual punishment is not a static concept, but rather a concept which "must draw" [its] meaning from the evolving standards of decency that mark the progress of a maturing society." Id at 101. This concept must be interpreted in a flexible and dynamic manner. Punishment which is "excessive" constitutes cruel and unusual punishment. Coker v. Georgia (1977) 433 U.S. 584. A punishment is excessive if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the gravity of the offense. Id at 592. Thus, if the death penalty makes no measurable contribution to acceptable goals of punishment or if it is disproportionate to the seriousness of the offense committed, it is excessive and therefore unconstitutional.

Equal protection under the law, as guaranteed by the Fourteenth Amendment, requires that similarly situated persons be treated similarly. This right extends to the protection against cruel and unusual punishment.

> "The high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are even handed, and nonarbitrary, and to require judges to see to it that non-selective general laws are not applied sparsely, selectively, and spottily to unpopular groups." Furman at 256.

74

A death penalty imposed in violation of the Equal Protection guarantee is a cruel and unusual punishment.

Capital punishment, because it involves the taking of life, is qualitatively different from other punishments. Id. at 287. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind." Id. at 306. "[I]n assessing the cruelty of capital punishment. . .we are not concerned only with the 'mere extinguishment of life'. . .but with the total impact of capital punishment from the pronouncement of judgment of death through the execution itself, both on the individual and on the society which sanctions its use." People v. Anderson (1972) 493 P. 2d 880. The Eighth Amendment concept of cruelty is not a prohibition against all suffering, but it is a prohibition against inflicting suffering greater than is necessary to serve the legitimate needs underlying a compelling state interest of society. Necessarily every punishment contains an element of cruelty. A convicted defendant who is deprived of his freedom and imprisoned will feel society has been cruel. Generally, society tolerates that degree of cruelty that is necessary to serve its legitimate needs. However, when the level of cruelty is disproportionate to the crime, and consequently does not serve the needs of society, courts must find the punishment to be "cruel" within the meaning of the cruel and unusual punishment clause. Robinson, supra.

The Ohio capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner, in violation of the protections mandated in Furman and its progeny. The virtually uncontrolled discretion of prosecutors in

indictment decisions allows for arbitrary and indiscriminatory imposition of the death penalty.

The United States Supreme Court's decision in Woodson v. North Carolina (1976) 428 U.S. 280, made it clear that the fatal flaw of mandatory death penalty statutes is that without specific standards the process of deciding who is to be sentenced to death is shielded from judicial review.

Uncontrolled discretion of the prosecutor is one way Ohio's capital statutes circumvent this requirement. Also, the Ohio system has resulted in the imposition of death penalties in a racially discriminatory manner, with blacks and those who killed white victims being much more likely to get the death penalty.

The right to life is a constitutionally protected fundamental right. Commonwealth v. O'Neal (1975) 327 N.E. 2d 662, Roe v. Wade 1973) 410 U.S. 113, Johnson v. Zerbst (1938) 304 U.S. 458, Yick Wo v. Hopkins (1886) 118 U.S. 356. The Fifth and Fourteenth Amendments to the Constitution state explicitly that neither the United States Government nor any of the individual state governments may deprive a person of his life without due process of law. "Aside from its prominent place in due process clause itself, the right to life is the basis for all other rights. In the absence of life all other rights do not exist." O'Neal at 688.

Due process guarantees prohibit the taking of life unless the State can show a legitimate and compelling State interest. Id. at 668; Commonwealth v. O'Neal II (1975) 339 N.E. 2d 676, State v. Pierre (1977) 572 P. 2d 1338. Moreover, when fundamental rights are involved, substantive due process requires that "[e]ven though the governmental purpose

76

be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved *Shelton v. Tucker* (1960) 364 U.S. 479.  "In order for the State to justify the taking of life by legislative mandate, it must demonstrate that such action is the least restrictive means toward furtherance. . .[the] compelling governmental end." O'Neal at 668.

The social interests commonly advanced to justify capital punishment are (1) saving lives, (2) protecting citizens, and (3) ensuring justice.  O'Neal II at 681.  These goals are often referred to, in penological terms, as (l) deterrence, (2) incapacitation/isolation, and (3) retribution/moral reinforcement.  Id.; *Gregg v. Georgia* (1976) 428 U.S. 153.

The death penalty is neither the lease restrictive nor an effective means of deterrence.  Isolation of the offender can be effectively served by means less restrictive than the death penalty, as can retribution.  These social interests do not justify the death penalty, thus such punishment is cruel and unusually applied.

Due process and equal protection rights require that States not impose a capital sentence through procedures that create a substantial risk of arbitrary and capricious application.  The Ohio scheme does not meet these requirements.  For example, by failing to require the conscious desire to kill, or premeditation and deliberation as the culpable mental state, R.C. 2903.01(B) and 2929.04(A)(7) run afoul of the Federal and State Constitutions.  Nor does the Ohio Code require that imposition of death penalty only be allowed after proof beyond all doubt.

Another deficiency is that the statutes do not require the State to prove the absence of any mitigating factors and that death is the only appropriate penalty.  The

77

statutory scheme is also unconstitutionally vague which can lead to arbitrary imposition of the death penalty.  Moreover, the statutes have impermissibly devalued the importance of mitigation because no method exists to ensure a proper "weighing and consideration" is accomplished.  Because of these deficiencies, the Ohio statutory scheme does not meet the requirements of Furman and its progeny.  Also, the Ohio Supreme Court has interpreted the Ohio statutory scheme to require that capital defendants must prove the existence of a mitigating factor by a preponderance of the evidence.  State v. Jenkins (1984) 15 Ohio St. 3d 164.  This standard is unconstitutional, violating the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, because it prevents the sentencer from considering relevant mitigating evidence.

The Ohio statutes also violate the mandates of the constitutional protections by requiring proof of aggravating circumstances in the guilt phase of capital trials.  The United States Supreme Court has approved schemes which separate the consideration of statutory aggravating circumstances from the determination of guilt because of their ability to provide an individualized determination and to narrow the category of defendants eligible for the death penalty.  See Zant v. Stephens (1983) 462 U.S. 862, Barclay v. Florida (1983) 463 U.S. 939.  Ohio's statutory scheme cannot provide for these constitutional safeguards.  By requiring proof of the aggravating specifications simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing as required by post-Furman cases.  See Woodson at 961.  The jury must be free to determine whether death is the appropriate punishment for a defendant.  By not requiring the State to establish guilt on the question of murder prior to the jury's consideration of the aggravating

78

circumstances, the jury is unconstitutionally barred from making the necessary individualized determination of appropriateness. This is especially prejudicial where, as in Ohio, the consideration of aggravating circumstances is accomplished without consideration of any mitigating factors.

The statutory scheme for capital felony murder also fails to comply with the requirements set forth in *Lowenfield v. Phelps* (1988) 484 U.S. 231 Ohio's scheme allows an aggravating circumstance R.C. 2929.04(A)(7) to merely repeat an element of aggravated murder pursuant to R.C. 2903.01(B). No effective narrowing is performed when a capital defendant is indicted for felony murder and the felony murder specification. As a result, the scheme is unconstitutional. Without strict adherence to the *Furman* constraints, the possibility of unbridled discriminatory application of the death penalty violates the constitutional provisions under the Eighth and Fourteenth Amendments of the United States Constitution and related provisions of the Ohio Constitution. Ohio's procedural system, by requiring proof of aggravating circumstances in the guilt-determining state of a capital trial, precludes strict adherence to the *Furman* constraints. Without these safeguards, the risk of discriminatory and cruel punishment without application of due process or equal protection guarantees is unacceptably increased. Such a statutory scheme is unconstitutional and cannot be the basis for imposition of the death penalty.

The Ohio scheme is also unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. A defendant who decides to plead guilty or no contest to an indictment, which contains one or more capital specifications, receives the benefit of having the trial court judge vested with

the discretion to dismiss the specifications "in the interest of justice." (Ohio R. Crim. P. 11(C)(3). Accordingly, the capital indictment may be dismissed regardless of the presence or absence of mitigating circumstances. No such corresponding provision exists if a capital defendant elects to proceed to trial before a jury.

In *Lockett v. Ohio* (1978) 438 U.S. 586, Justice Blackmun, in his concurring opinion, found this discrepancy in Ohio's law to be a constitutional infirmity, and that this disparity violated the United States Supreme Court's pronouncement in *United States v. Jackson* (1968) 390 U.S. 570, 617. Further, it needlessly burdened the defendant's exercise of his right to a trial by jury. Since the United States Supreme Court's decision in Lockett, the infirmity has not been cured, and Ohio's scheme remains unconstitutional.

The Ohio capital statutes are also unconstitutional because they require submission of the presentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant. R.C. 2929.03(D)(1) provides:

> "A presentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division."

This mandatory submission prevents a capital defendant from effectively presenting his case in mitigation. This requirement of R.C. 2929.03(D)(1) violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I. Sections 2, 9,10 and 16 of the Ohio Constitution.

Another aspect of the unconstitutionality of Ohio's scheme concerns excessiveness and disproportionality issues. The Ohio Revised Code, through provisions in Sections 2929.021 and 2929.03, requires reporting of some data to the Court of Appeals and this Court; although as discussed above, there is a critical omission of a written life recommendation report from the panel. There are also substantial doubts as to the adequacy of the information perceived after guilty pleas to lesser offenses, or after charge reductions at trial. R.C. 2929.021 requires the reporting of only minimal information on these cases. There has been no determination by this Court that additional information will be required to be reported. Additional data is necessary to make an adequate comparison in these cases. There is no system of adequate tracking under the Ohio scheme. This prohibits adequate appellate review.

Adequate appellate review is a precondition to a finding that a State death system is constitutional. Pulley v. Harris (1984) 465 U.S. 37. The standard for review is one of careful scrutiny. Barclay at 958. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. Id.

Adequate appellate review is undercut by the failure of the Ohio statutes to require the jury or three judge panel recommending life imprisonment to identify the mitigating factors. Without this information, no significant comparison of cases is possible since no written findings exist to serve as a basis for comparison. Without a significant comparison of cases, there can be no meaningful appellate review.

81

Careful scrutiny in the comparison of cases is possible only if a sufficient date base and a standardized method of comparison exists.  There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significant --to provide a relevant basis for distinguishing cases and appropriate penalties from each other.  A standardized method of comparison is necessary for a consistent process of comparison.  Yet, Ohio's system provides for procedures which are incompatible with the meaningful comparison of cases.  These include accelerated review, the requirement that only minimal information be included in written findings at sentencing, the use of an as yet undetermined method of comparison, and the gathering of incomplete and inadequate data.

The proportionality system in Ohio is also constitutionally flawed because of the method used for case comparison.  This Court in State v. Steffen (1987) 31 Ohio St. 3d 111, held that "the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing Court in which the death penalty has been imposed."  By only reviewing those cases in which death is imposed, the capital defendant is prevented from receiving a fair proportionality review.  No meaningful manner exists in which to distinguish those capital defendants who are deserving of the death penalty, and those who are not.  This violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

The appropriateness analysis used by the Ohio Courts of Appeals and this Court is also constitutionally inform.  R.C. 2929.05(A) requires the appellate courts of Ohio determine the appropriateness of the death penalty in each capital case they review.  The statute directs the court to "affirm a sentence of death only if the particular court is persuaded

82

from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case."

This Court and the Courts of Appeals have failed to follow the dictates of the statute. The appropriateness review ultimately conducted in each case is very cursory. it does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida* (1984) 468 U.S. 447. Any death sentence upheld on appeal under these circumstances does not comport with the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. The Ohio legislature has chosen to provide capital defendnats with the statutory right in R.C. 2929.05. When a State opts to act in a field where its action has significant discretionaly elements, it must nonetheless act in accord with the dictates of the constitution and the due process clause. *Evitts v. Lucey* (1985) 469 U.S. 387. The R.C. 2929.05 review currently employed by the Ohio courts violates tthis constitutional mandate. The Ohio scheme is also unconstitutional in that it fails to provide the sentencing authority with an option to choose a life sentence when there are only aggravating circumstances. By foreclosing the jury orthree judge panel's ability to return a life sentence unless aggravating factors fail to outweigh mitigating factors, Ohio's statutes violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution and create a mandatory death penalty. Merely concluding that the aggravating circumstances

83

be inadequate, as a jury or three judge panel may still conclude that a "comparison of the aggravating factors with the totality of the mitigating factors leaves it in doubt as to proper penalty," i.e., in doubt as to whether death is the appropriate punishment in a specific case. Smith v. North Carolina (1982) 459 U.S. 1056.  Under R.C. 2929.05 courts affirming a death sentence in Ohio are required to find that death is the only appropriate remedy, but the original sentencer has no such statutory requirement, and they must.  The jury or three judge panel must make this decision and must make it in a fashion that will allow it to be reviewed objectively at the appellate level.  Due process requires that the same standards apply at both levels.  Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

The "fundamental issue" in a capital sentencing proceeding is the"determination of the appropriate punishment to be imposed on an individual." Spaziano, supra.  The sentencer must "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Id. at 352.  Appropriateness of the penalty thus appears to be the core, and indispensable element of a constitutionally valid sentencing scheme.  Yet, Ohio's laws do not proved the jury or three judge panel with an opportunity to consider this.

The Eighth Amendment of the United States Constitution and Article I, Section 9 of the Ohio Constitution prohibit infliction of cruel and unusual punishment.  The meaning of the term "cruel and unusual" must be established based on the values and ideals of an enlightened society.  Current social values have progressed from those of the past where the "justice" system called for "an eye for an eye."  Contemporary societal values are

84

inconsistent with the purposeless extinction of life.  The death penalty, by these standards, is cruel and unusual punishment.

The Fifth and Fourteenth Amendments of the United States Constitution, as well as Article I, Sections 2 and 16 of the Ohio Constitution, provide guarantees to equal protection of the law and due process.  These guarantees are further safeguards against imposition of the death penalty, even if it is not found to be inherently cruel and unusual.

Due process guarantees that, where fundamental rights are at risk, the life of the defendant may not be taken without substantive safeguards first being met.  Governmental action cannot be justified unless the interest to be served is a compelling governmental interest.  Further, that interest must be promoted through use of the least restrictive means that can effectively serve the stated interest.  The State of Ohio has failed to establish a compelling state interest.  Moreover, the State has failed to show that a less restrictive means, such as life imprisonment, could not effectively serve the interests the State has asserted as justifying the death penalty.  Due process also guarantees fair proceedings through which sentencing is accomplished.  Where procedures implemented do not adequately ensure reliability in the guilt and sentencing determinations, there is an increased risk that the death penalty will be imposed arbitrarily and discriminatorily, in violation of the Equal Protection guarantees.  Where this occurs the death penalty, as applied, constitutes cruel and unusual punishment.

Ohio's statutory scheme under which the death penalty is authorized fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur.  The procedures utilized under this scheme actually promote the imposition of the death penalty

85

and, thus, are constitutionally intolerable.  Ohio's death penalty contained in R.C. 2903.01,

2929.02,, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 violate the Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I,

Sections 2, 9, 10 and 16 of the Ohio Constitution.  Appellant's death sentence must be

reversed.

86

## PROPOSITION OF LAW NO. 12

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL OHIO REV. CODE ANN. & 2903.01, 2929.02, 2929.021, 2929.022, 2929.023,2929.03,2929.04, AND 2929.05 ,DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO APPELLANT. U.S. CONST. AMENDS V, VI,VIII,XIV, OHIO CONST. ART 1, SECTONS 2,9,10,16 FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

The Eighth Amendment of the United States Constitution and Article 1 & 9 of the Ohio Constitution prohibit the infliction of cruel and unusual punishment.  The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment.  Robinson v. California (1962) 370 U.S. 660.  Punishment that is "excessive" constitutes cruel and unusual punishment.  Coker v. Georgia (1977) 433 U.S. 584.  The underlying principle of governmental respect for human dignity is the Court's guideline to determine whether this statute is constitutional.  See Furman v. Georgia (1972)  408 U.S. 238, Rhodes v. Chapman (1981) 452 U.S. 337, 361 (1981), Trop v. Dulles (1958) 356 U.S. 86.  The Ohio scheme offends this  principle in the following ways:

The Fourth Amendment's guarantee of equal protection requires similar treatment of similarly situated persons. This right extends to the protection against cruel and unusual punishment. Furman at 249.  A death penalty imposed in violation of the Equal Protection guarantee is a cruel and unusual punishment.  See Id.  Any arbitrary use of the death penalty also offends the Eight Amendment.  Id.

Ohio's capital punishment scheme allows the death penalty to be imposed in an arbitrary and discriminatory manner in violation of Furman and its progeny.  Prosecutors'

87

virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposition of a death sentence and were therefore removed from judicial review. Woodson v. North Carolina (1976) 428 U.S 280. Prosecutors' uncontrolled discretion violates this requirement.

Ohio's system imposes death is a racially discriminatory manner. Blacks and those who kill white victims are much more likely to get the death penalty. While African-Americans are less than twenty percent of Ohio's population, forty-nine percent (49%) of Ohio's death row inmates are African-American. See Ohio Public Defender Commission Report, 1999; see also The Report of the Ohio Commission on Racial Fairness, 1999. While few Caucasians are sentenced to death for killing African-Americans, over forty African-Americans sit on Ohio's  death row for killing a Caucasian. Id. Ohio's statistical disparity is tragically consistent with national findings. The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases. "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990).

Ohio courts have not evaluated the implications of these racial disparities. While the General Assembly established a disparity appeals practice in post-conviction that may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race, R.C. 2953.21 (A)(2), no rule has been adopted. Further, this practice does not track the

88

victim's race and does not apply to crimes committed before July 1, 1996.  In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest.  Commonwealth v. O'Neal II (1975) 339 N.E. 2d 676; Utah v. Pierre (1977) 572 P.2d 1338.  Moreover, where fundamental rights are involved personal liberties cannot be broadly stifled "when the end can be more narrowly achieved".  Shelton v. Tucker (1960) 364 U.S. 479.  To take a life by mandate, the State must show that it is the "least restrictive means" to a "compelling governmental end".  O'Neal at 678.

The death penalty is neither the least restrictive nor an effective means of deterrence.  Both isolation of the offender and retribution can be effectively served by less restrictive means.  Society's interests do not justify the death penalty.

The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the State's application of capital punishment.  Gregg v. Georgia (1976) 428 U.S. 153; Furman at 255.  Ohio's scheme does not meet those requirements.  The statute does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty.

The statutory scheme is unconstitutionally vague which leads to the arbitrary imposition of the death penalty.  The language "that the aggravating circumstances...outweigh the mitigating factors" invites arbitrary and capricious jury decisions.  "Outweigh" preserves reliance on the lesser standard of proof by a preponderance of the evidence.  The statute requires only that the sentencing body be convinced beyond a

reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors. This creates an unacceptable risk of arbitrary or capricious sentencing.

Additionally, the mitigating circumstances are vague. The jury must be given "specific and detailed guidance" and be provided with "clear and objective standards" for their sentencing discretion to be adequately channeled. Godfrey v. Georgia (1980) 446 U.S. 420.

Ohio courts continually hold that the weighing process and the weight to be assigned to a given factor is within the individual decision-maker's discretion. *State v. Fox* (1994) 69 Ohio St. 3d 183. Giving so much discretion to juries inevitably leads to arbitrary and capricious judgments. The Ohio open discretion scheme further risks that constitutionally relevant mitigating factors that must be considered as mitigating {youth or childhood abuse} *Eddings v. Oklahoma* (1982) 455 U.S. 104, mental disease or defect *Penry v. Lynaugh (*1989) 492 U.S. 302, level of involvement in the crime *Edmund v. Florida* (1982) 458 U.S. 782, or lack of criminal history *Delo v. Lashley* (1993) 507 U.S. 272 will not be factored into the sentencer's decision. While the federal constitution may allow states to shape consideration of mitigation, see *Johnson v. Texas* (1993) 509 U.S. 350, Ohio's capital scheme fails to provide adequate guidelines to sentencers, and fails to assure against arbitrary, capricious, and discriminatory results.

Empirical evidence is developing in Ohio and around the country that, under commonly used penalty phase jury instructions, juries do not understand their responsibilities and apply inaccurate standards for decision. See *Cho,* Capital Confusion: The Effect of Jury

90

Instructions on the Decision to Impose Death, (1994) 85 J. Crim L. & Criminology 532, 549-557.  This confusion violates the federal and state constitutions.  Because of these deficiencies, Ohio's statutory scheme does not meet the requirements of Furman and its progeny.

      The Ohio scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial.  A defendant who pleads guilty or no contest benefits from a trial judge's discretion to dismiss the specifications "in the interest of justice".  Ohio R. Crim P.11 (C)(3).  Accordingly, the capital indictment may be dismissed regardless of mitigating circumstances.  There is no corresponding provision for a capital defendant who elects to proceed to trial before a jury.

      Judge Blackmun found this discrepancy to be constitutional error. Lockett v. Ohio (1978) 438 U.S. 586.  This disparity violated United States v. Jackson (1968) 390 U.S. 570, and needlessly burdened the defendant's exercise of his right to a trial by jury.  Since Lockett, this infirmity has not been cured and Ohio's statute remain unconstitutional.

      Ohio's capital statutes are unconstitutional because they require submission of the presentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant.  R.C. 2929.03 (D)(1).  This mandatory submission prevents defense counsel from giving effective assistance and prevents the defendant from effectively presenting his case in mitigation.

      Appellant was sentenced to death pursuant to R.C. 2903.01(B) with the aggravating circumstances found in      2929.04 (A)(3) and  (A)(7).   "(To avoid {the} constitutional flaw of vagueness and overbreadth under the Eighth Amendment, an

<div align="center">91</div>

aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence of a defendant as compared to others found guilty of (aggravated) murder". Zant v. Stephens (1983) 462 U.S. 862. Ohio's statutory scheme fails to meet this constitutional requirement because R.C. 2929.04 (A)(7) fails to genuinely narrow the class of individuals eligible for the death penalty.

R.C. 2903.01 (B) defines the category of felony-murderers. If any factor listed in R.C. 2929.04 (A) is specified in the indictment and proved beyond a reasonable doubt the defendant becomes eligible for the death penalty. R.C. 2929.02(A) and 2929.03.

The scheme is unconstitutional because the O.R.C. 2929.04 (A)(7) aggravating circumstance merely repeats, as an aggravating circumstance, factors that distinguish aggravated felony-murder from murder. R.C. 2929.04 (A)(7) repeats the definition of felony-murder as alleged, which automatically qualifies the defendant for the death penalty. R.C. 2929.04 (A)(7) does not reasonably justify the imposition of a more severe sentence on felony-murderers. But, the prosecuting attorney and the sentencing body are given unbounded discretion that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification. The aggravating circumstance must therefore fail. Zant at 877.

As compared to other aggravated murderers, the felony-murderer is treated more severely. Each R.C. 2929.04 (A) circumstance, when used in connection with R.C. 2903.01 (A), adds an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death. But the aggravated

92

murder defendant alleged to have killed during the course of a felony is automatically eligible for the death penalty-not a single additional proof of fact is necessary.

The killer who kills with prior calculation and design is treated less severely, which is also nonsensical because his blameworthiness or moral guilt is higher, and the argued ability to deter him less. For a retributive stance, this is the most culpable of mental state.

Felony-murder also fails to reasonably justify the death sentence because this Court has interpreted R.C. 2929.04 (A)(7) as not requiring that intent to commit a felony precede the murder. State v. Williams (1996) 74 Ohio St. 3d 569. The asserted state interest in treating felony-murder as deserving of greater punishment is to deter the commission of felonies in which individuals may die. Generally courts have required that the killing result from an act done in furtherance of the felonious purpose. Id., referencing the Model Penal Code. Without such a limitation, no state interest justifies a stiffer punishment. This Court has discarded the only arguable reasonable justification for the death sentence to be imposed on such individuals, a position that engenders constitutional violations. Zant v. Stephens (1983) 462 U.S. 862. Further, this Court's current position is inconsistent with previous cases, thus creating the likelihood of arbitrary and inconsistent applications of the death penalty. See e.g. State v. Rojas (1992) 64 Ohio St. 3d 131.

Equal protection of the law requires that legislative classifications be supported by, at least, a reasonable relationship to legitimate State interests. Skinner v. Oklahoma (1941) 316 U.S. 535. The State has arbitrarily selected one class of murderers who may be subjected to the death penalty automatically. This statutory scheme is

93

inconsistent with the purported State interests.  The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are automatically eligible for the death penalty.  There is no rational basis or any State interest for this distinction and its application is arbitrary and capricious.

R.C. 2929.03(D)(1)'s reference to "the nature and circumstances of the aggravating circumstance" incorporates the nature and circumstances of the offense into the factors to be weighed in favor of death.  The nature and circumstances of an offense are, however, statutory mitigating factors under R.C. 2929.04 (B).  R.C. 2929.03 (D)(1) makes Ohio's death penalty weighing scheme unconstitutionally vague because it gives the sentencer unfettered discretion to weigh a statutory mitigating factor as an aggravator.

To avoid arbitrariness in capital sentencing, states must limit and channel the sentencer's discretion with clear and specific guidance.  Lewis v. Jeffers (1990) 497 U.S. 764: Maynard v. Cartwright (1988) 486 U.S. 356.  A vague aggravating circumstance fails to give that guidance.  Walton v. Arizona (1980) 497 U.S. 639.  Moreover, a vague aggravating circumstance is unconstitutional whether it is an eligibility or a selection factor. Tuilaepa v. California (1994) 512 U.S. 967.  The aggravating circumstances in R.C. 2929.04 (A)(1)-(8) are both.

R.C. 2929.04 (B) tells the sentencer that the nature and circumstances of the offense are selection factors in mitigation.  Moreover, because the nature and circumstances of the offense are listed only in R.C. 2929.04 (B), they must be weighed only as selection factors in mitigation.  See State V. Wogenstahl (1996) 75 Ohio St. 3d 344.  However, the

94

clarity and specificity of R.C. 2929.04 (B) is eviscerated by R.C. 2929.03 (D)(1); selection factors that are strictly mitigating become part and parcel of the aggravating circumstance.

Despite wide latitude, Ohio has carefully circumscribed its selection factors into mutually exclusive categories. See R.C. 2929.04 (A) and (B); Wogenstahl at 356, 662, N.E. 2d at 321-22. R.C. 2929.03 (D)(1) makes R.C. 2929.04 (B) vague because it incorporates the nature and circumstances of an offense into the aggravating circumstances. The sentencer cannot reconcile this incorporation. As a result of R.C. 2929.03 (D)(1), the "nature and circumstances" of any offense become "too vague" to guide the jury in its weighing or selection process. [See Walton, at 654.] R.C. 2929.03 (D)(1) therefore makes R.C. 2929.04 (B) unconstitutionally arbitrary.

R.C. 2929.03 (D)(1) is also unconstitutional on its face because it makes the selection factors in aggravation in R.C. 2929.04 (A)(1)-(8) "too vague". Walton at 654. R.C. 2929.04 (A)(1)-(8) gives clear guidance as to the selection factors that may be weighed against the defendant's mitigation. However, R.C 2929.03 (D)(1) eviscerates the narrowing achieved. By referring to the "nature and circumstances of the aggravating circumstance." R.C. 2929.03 (D)(1) gives the sentencer "open-ended discretion" to impose the death penalty. Maynard at 362. That reference allows the sentencer to impose death based on (A)(1)-(8) plus any other fact in evidence arising from the nature and circumstances of the offense that the sentencer considers aggravating. This eliminates the guided discretion provided by R.C. 2929.04 (A). [ See Stringer at 232.

R.C. 2929.021 and 2929.03 require data be reported to the courts of appeals and to the Supreme Court of Ohio. There are substantial doubts as to the adequacy of the

95

information received after guilty pleas to lesser offenses or after charge reductions at trial. R.C. 2929.021 requires only minimal information on these cases. Additional data is necessary to make an adequate comparison in these cases. This prohibits appellate review.

Adequate appellate review is a precondition to the constitutionality of a state death penalty system. Zant at 879: Pulley v. Harris (1984) 465 U.S. 37. The standard for review is one of careful scrutiny. Zant at 884-85. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. Id.     Ohio's statutes' failure to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors undercuts adequate appellate review. Without this information, no significant comparison of cases is possible. Without a significant comparison of cases, there can be no meaningful appellate review. See State v. Murphy (2001) 91 Ohio St. 3d 516, (Pfeifer, J. dissenting). ("When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality. The lowest common denominator becomes the standard").

The comparison method is also constitutionally flawed. Review of cases where the death penalty was imposed satisfies the proportionality review required by R.C. 2929.05(A). State v. Steffan (1987) 311 Ohio St. 111. However, this prevents a fair proportionality review. There is no meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not.

This Court's appropriateness analysis is also constitutionally infirm. R.C. 2929.05 (A) requires appellate courts to determine the appropriateness of the death penalty

in each case.  The statute directs affirmance only where the court is persuaded that the aggravating circumstances outweigh the mitigating factors and that death is the appropriate sentence.  Id.  This Court has not followed these dictates.  The appropriateness review conducted is very cursory.  It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."  Spaziano v. Florida (1984) 468 U.S. 447.

The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United State Constitution.  The General Assembly provided capital appellants with the statutory right of proportionality review.  When a state acts with significant discretion, it must act in accordance with the Due Process Clause.  Evitts v. Lucey (1985) 469 U.S. 387.  The review currently used violates this constitutional mandate.  An insufficient proportionality review violates Appellant's due process, liberty interest in R.C. 2929.05.

International law binds each of the states that comprise the United States.  Ohio is bound by international law whether found in treaty or in custom.  Because the Ohio death penalty scheme violates international law, Appellant's capital convictions and sentences cannot stand.

"International law is a part of our law[.]"  The Paquete Habana (1900) 175 U.S. 677.  A treaty made by the United States is the supreme law of the land.  Article VI, United States Constitution.  Where state law conflicts with international law, it is the state law that must yield.  See Zschernig v. Miller (1968) 389 U.S. 429.  Clark v. Allen (1947) 331 U.S. 503.  United States v. Pink (1942) 315 U.S. 203.  Kansas v. Colorado (1907) 206 U.S.

97

46. The Paquete Habana at 700.  In fact, international law creates remediable rights for United States citizens.  Filartiga v. Pena-Irala (2nd Cir. 1980) 630 F.2d 876.  Forti v Suson (1987) 672 F. 2d 876.

The united Sates' membership and participation in the United Nations (U.N.) and the Organization of American States (OAS) creates obligations in all fifty states. Through the U.N. Charter, the United States committed itself to promote and encourage respect for human rights and fundamental freedoms.  Art. 1(3).  The United States bound itself to promote human rights in cooperation with the United Nations.  Art. 55-56.  The United States again proclaimed the fundamental rights of the individual when it became a member of the OAS.  OAS Charter, Art. 3.

The U.N. has sought to achieve its goal of promoting human rights and fundamental freedoms through the creation of numerous treaties and conventions.  The United States has ratified several of these including: the International Covenant on Civil and Political Rights (ICCPR) ratified in 1992, the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) ratified in 1994, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) ratified in 1994.  Ratification of these treaties by the United States expressed its willingness to be bound by these treaties.  Pursuant to the Supremacy Clause, the ICCPR, the ICERD, and the CAT are the supreme laws of the land.  As such, the United States must fulfill the obligations incurred through ratification.  President Clinton recently reiterated the United States' need to fulfill its obligations under these conventions when he issued Executive Order 13107.  In pertinent part, the Executive Order states:

<center>98</center>

By the authority vested in me as President by the Constitution and the laws of the United States of America, and bearing in mind the obligations of the Unites States pursuant to the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), the Convention on the Elimination on all Forms of RacialDiscrimination (CERD),and other relevant treaties concerned with the protection and promotion of human rights to which the United States is now or may become a party in the future, it is hereby ordered as follows:

Section I. Implementation of Human Rights Obligations.

(a) It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under the international human rights treaties to which it is a party, including the ICCPR, the CAT and the CERD.

Ohio is not fulfilling the United States' obligations under these conventions. Rather, Ohio's death penalty scheme violates each convention's requirements and thus must yield to the requirements of international law. (See discussion infra Subsection 1).

Both the ICCPR and the ICERD guarantee equal protection of the law. ICCPR Art. 2(l). 3, 14, 26; ICERD Art. 5(a). The ICCPR further guarantees due process via Articles 9 and 14, which includes numerous considerations: a fair hearing (Art. 14(1)), an independent and impartial tribunal (Art. 14(1)), the presumption of innocence (Art. 14(2)), adequate time and facilities for the preparation of a defense (Art. 14(3)(a)), legal assistance (Art. 14(3)(d)), the opportunity to call and question witnesses (Art. 14(3)(e)), the protection against self-incrimination (Art. 14(3)(g)), and the protection against double jeopardy (Art.

99

14(7)).  However, Ohio's statutory scheme fails to provide equal protection and due process to capital defendants as contemplated by the ICCPR and the ICERD.

Ohio's statutory scheme denies equal protection and due process in several ways.  It allows for arbitrary and unequal treatment in punishment.  Ohio's sentencing procedures are unreliable.  Ohio's statutory scheme fails to provide individualized sentencing.  Ohio's statutory scheme burdens a defendant's right to a jury.  Ohio's requirement of mandatory submission of reports and evaluations precludes effective assistance of counsel.  R.C. 2929.04(B)(7) arbitrarily selects certain defendants who may be automatically eligible for death upon conviction.  Ohio's proportionality and appropriateness review is wholly inadequate.  As a result, Ohio's statutory scheme violates the ICCPR's and the ICERD's guarantees of equal protection and due process.  This is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

The ICCPR speaks explicitly to the use of the death penalty.  The ICCPR guarantees the right to life and provides that there shall be no arbitrary deprivation of life.  Art. 6(1).  It allows the imposition of the death penalty only for the most serious offenses.  Art. 6(2).  Juveniles and pregnant women are protected form the death penalty.  Art. 6(5).  Moreover, the ICCPR contemplates the abolition of the death penalty.  Art. 6(6).

However, several aspects of Ohio's statutory scheme allow for the arbitrary deprivation of life.  Punishment is arbitrary and unequal.  Ohio's sentencing procedures are unreliable.  Ohio's statutory scheme lacks individualized sentencing.  The (A)(7) aggravator maximizes the risk of arbitrary and capricious action by singling one class of

100

murderers who may be eligible automatically for the death penalty.  The vagueness of R.C. 2929.03(D)(1) and 2929.04 similarly render sentencing arbitrary and unreliable.  Ohio's proportionality and appropriateness review fails to distinguish those who deserve death from those who do not.  As a result, executions in Ohio result in the arbitrary deprivation of life and thus violate the ICCPR's death penalty protection.  This is a direct violation of international law and a violation of the Supremacy Clause of the United States Constitution.

The ICERD, speaking to racial discrimination, requires that each state take affirmative steps to end race discrimination at all levels.  Art. 2.  It requires specific action and does not allow states to sit idly by when confronted with practices that are racially discriminatory.  However, Ohio's statutory scheme imposes the death penalty in a racially discriminatory manner  A scheme that sentences blacks and those who kill white victims more frequently and which disproportionately places African-Americans on death row is in clear violation of the ICERD. Ohio's failure to rectify this discrimination is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

The ICCPR prohibits subjecting any person to torture or to cruel, inhuman or degrading treatment or punishment.  Art. 7.  Similarly, the CAT requires that states take action to prevent torture, which includes any act by which severe mental or physical pain is intentionally inflicted on a person for the purpose of punishing him for an act committed. See Art. l-2.  As administered, Ohio's death penalty inflicts unnecessary pain and suffering in violation of both the ICCPR and the CAT.  Thus, there is a violation of international law and the Supremacy Clause of the United States Constitution.

<div align="center">101</div>

While conditions, reservations, and understandings accompanied the United State's ratification of the ICCPR, the ICERD, and the CAT, those conditions, reservations, and understandings cannot stand for two reasons.  Article 2 section 2 of the United States Constitution provides for the advice and consent of two-thirds of the Senate when a treaty is adopted.  However, the United States Constitution makes no provision for the Senate to modify, condition, or make reservations to treaties.  The Senate is not given the power to determine what aspects of a treaty the United States will and will not follow.  Their role is to simply advise and consent.

Thus, the Senate's inclusion of conditions and reservations in treaties goes beyond that role of advice and consent.  The senate picks and chooses which items of a treaty will bind the United States and which will not.  This is the equivalent of the line-item veto, which is unconstitutional.  Clinton v. City of New York (1998) 524 U.S. 417, 438.  The Unites States Supreme Court specifically spoke to the enumeration of the president's powers in the Constitution in finding that the president did not possess the power to issue line item vetoes.  Id.  If it is not listed, then the President lacks the power to do it.  See id.  Similarly, the Constitution does not give the power to the Senate to make conditions and reservations, picking and choosing what aspects of a treaty will become law.  Thus the Senate lacks the power to do just that.  Therefore, any conditions or reservations made by the Senate are unconstitutional.  See id.

The Vienna Convention on the Law of Treaties further restricts the Senate's imposition of reservations.  It allows reservations unless:  they are prohibited by the treaty, the treaty provides that only specified reservations, not including the reservations in question,

102

may be made, or the reservation is incompatible with the object and purpose of the treaty. Art. 19(a)-(c).  The ICCPR specifically precludes derogation of Articles 6-8, 11, 15-16, and 18.  Pursuant to the Vienna Convention, the United States' reservations to these articles are invalid under the language of the treaty.  See id.  Further, it is the purpose of the ICCPR to protect the right to life and any reservation inconsistent with that purpose violates the Vienna Convention.  Thus, United States reservations cannot stand under the Vienna Convention as well.

The Senate indicated that the ICCPR is not self-executing.  However, the question of whether a treaty is self-executing is left to the judiciary.  Frolova v. Union of Soviet Socialist Republics (7THcIR. 1985) 761 F. 2d 370.  It is the function of the courts to say what the law is.  See Marbury v. Madison (1803) 5 U.S. 137.

Further, requiring the passage of legislation to implement a treaty necessarily implicates the participation of the House of Representatives.  By requiring legislation to implement a treaty, the House can effectively veto a treaty by refusing to pass the necessary legislation.  However, Article 2, section 2 excludes the House of Representatives from the treaty process.  Therefore, declaring a treaty to be not self-executing gives power to the House of Representatives not contemplated by the United States Constitution.  Thus, any declaration that a treaty is not self-executing is unconstitutional.  See Clinton at 438.

International law is not merely discerned in treaties, conventions and covenants. International Law "may be ascertained by consulting the works of jurists, writing professedly on public law: or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law."  United States v. Smith (1820) 18 U.S. 153.

103

Regardless of the source "international law is a part of our law[.]"  The Paquete Habana at 700.

The judiciary and commentators recognize the Universal Declaration of Human Rights (DHR) as binding international law.  The DHR "no longer fits into the dichotomy of 'binding treaty' against 'non-binding pronouncement,' but is rather an authoritative statement of the international community."  Filartiga at 883.

The DHR guarantees equal protection and due process (Art. 1, 2, 7, 11), recognizes the right to life (Art. 3), prohibits the use of torture or cruel, inhuman or degrading punishment (Art. 5) and is largely reminiscent of the ICCPR.  Each of the guarantees found in the DHR are violated by Ohio's statutory scheme.  Thus, Ohio's statutory scheme violates customary international law as codified in the DHR and cannot stand.

However, the DHR is not alone in its codification of customary international law.  Smith directs courts to look to "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law" in ascertaining international law.  Smith at l60-1651.  Ohio should be cognizant of the fact that its statutory scheme violates numerous declarations and conventions drafted and adopted by the United Nations and the OAS, which may, because of the sheer number of countries that subscribe to them, codify customary international law.  See Id.  Included among those are:

l.  The American Convention on Human Rights, drafted by the OAS and entered into force in l978.  It provides numerous human rights guarantees, including; equal protection (Art. 1, 24), the right to life, (Art. 4(l)), prohibition against arbitrary deprivation

<div align="center">104</div>

of life (Art. 4(l)), imposition of the death penalty only for the most serious crimes (Art. 4(2)), no-reestablishment of the death penalty once abolished (Art. 4(3)), prohibits torture, cruel, inhuman or degrading punishment (Art. 5(2)), and guarantees the right to a fair trial (Art. 8).

2. The United Nations Declaration on the Elimination of All Forms of Racial Discrimination proclaimed by U.N. General Assembly resolution 1904 (XVIII) in l963. It prohibits racial discrimination and requires that states take affirmative action in ending racial discrimination.

3. The American Declaration of the Rights and Duties of Man adopted by the Ninth International Conference of American States in l. It includes numerous human rights guarantees: the right to life (Art. 1), equality before the law (Art. 2), the right to a fair trial (Art. 16) and due process (Art. 26).

4. Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment adopted by the U.N. General Assembly in Resolution 3452 (XXX) in l975. It prohibits torture, defined to include severe mental or physical pain intentionally inflicted by or at the instigation of a public official for a purpose including punishing him for an act he has committed, and requires that the states take action to prevent such actions. Art. l,4.

5. Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty adopted by the U.N. Economic and Social Council in Resolution l984/50 in l984. It provides numerous protections to those facing the death penalty, including: permitting capital punishment for only the most serious crimes, with the scope not going beyond intentional crimes with lethal or other extremely grave consequences (l), requiring

105

that guilt be proved so as to leave no room for an alternative explanation of the facts (4), due process, and the carrying out of the death penalty so as to inflict the minimum possible suffering (9).

      6. The Second Optional Protocol to the ICCPR, aiming at the abolition of the death penalty, adopted and proclaimed by the U.N. General Assembly in Resolution 44/128 in l989. This prohibits execution (Art. 1(1)) and requires that states abolish the death penalty (Art. 1(2)).

      These documents are drafted by the people Smith contemplates and are subscribed to by a substantial segment of the world. As such they are binding on the United States as customary international law.

      Ohio's death penalty scheme fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur. The procedures actually promote the imposition of the death penalty and, thus, are constitutionally intolerable. Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 2, 9, 10, and 16 of the Ohio Constitution and international law.

## CONCLUSION

For all the above stated reasons, and for other reasons apparent from the record, Appellant asks that his convictions be reversed and that his death sentence be vacated.

Respectfully submitted

_____
JOHN P. LACZKO #0051918
4800 Market St., Ste. C
Youngstown, Ohio   44512
(330- 788-2480

_____
DENNIS DAY LAGER
1025 Chapel Ridge St., N.E.
Canton, Ohio   44714
(330) 494-5736
ATTORNEYS FOR DEFENDANT-
APPELLANT, NATHANIEL E.
JACKSON

107

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document has been sent via

regular U. S. mail this  27th day of October, 2003 to the following:

LuWayne Annos
Assistant Prosecutor
Prosecutor's Office
Trumbull County Administration Bldg.
160 High St., N.W., 4th Floor
Warren, Ohio    44481

JOHN P. LACZKO

DENNIS DAY LAGER
ATTORNEYS FOR DEFENDANT-
APPELLANT, NATHANIEL E.
JACKSON

108

# A P P E N D I X

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                     )        CASE NO. 01-CR-794

         Plaintiff                )

                                   )        **DEATH PENALTY**

-vs-                              )        SENTENCE TO CORRECTIONAL

                                   )        RECEPTION CENTER

NATHANIEL E. JACKSON,       )

                                     )        **ENTRY ON SENTENCE**

         Defendant            )

The Defendant herein having been indicted by the September Eighth, 2001, Term of the Grand Jury of Trumbull County, Ohio, for Count One: Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1 Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Two: Aggravated Murder (O.R.C. §§2903.01(B)) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R.C. §2911.11.(A)(1)(2) and 2941.145); and Count Four: Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145), and on the 8th day of October, 2002, having been brought into Court for trial before a petit jury and being represented by counsel, Attorney Anthony Consoldane and Attorney James Lewis, and the jury having been empaneled,

and after due deliberation on November 8, 2002, was found guilty of Count One: Aggravated Murder (O.R.C. §§2903.01(A) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. §2929.04(A)(7)); Count Two: Aggravated Murder (O.R.C. §§2903.01(B) and 2941.14(C)) of Robert S. Fingerhut, with two (2) separate Specifications of Aggravating Circumstances, to wit: Specification No. 1: Aggravated Burglary (O.R.C. §2929.04(A)(7)), and Specification No. 2: Aggravated Robbery (O.R.C. 2929.04(A)(7)); Count Three: Aggravated Burglary (F1) With Firearm Specification (O.R.C. §2911.11.(A)(1)(2) and 2941.145); and Count Four: Aggravated Robbery (F1) With Firearm Specification (O.R.C. §2911.01(A)(1)(3) and 2941.145). Thereafter, Count Two was removed from the Jury pursuant to a Motion to Dismiss by the State.

On November 14, 2002, the Defendant having been brought into Court to give evidence in mitigation on Count One of the indictment, and after arguments of counsel and instructions of law, and after due deliberation, it was the finding and recommendation of the Jury on November 15, 2002, that the sentence of death be imposed on the Defendant.

On December 9, 2002, Defendant's sentencing hearing was held pursuant to O.R.C. Section 2929.19. Defense Attorney Anthony Consoldane and Attorney James Lewis, and Prosecutor Dennis Watkins and Assistant Prosecutor Charles L. Morrow, were present, as was Defendant who was afforded all rights pursuant to Criminal Rule 32. The Court has considered the record and oral statements, as well as the principles and purposes of sentencing under O.R.C. Section 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, December 9, 2002, having determined in a separate opinion of specific findings that the aggravating circumstances as to the count of Aggravated Murder outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say why judgment should not be pronounced against him, and the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under O.R.C. §2929.14, and makes the following findings: (1) the shortest prison term will demean the seriousness of the Defendant's conduct; (2) the longest prison term is appropriate because the defendant committed the worst form of the offense; (3) multiple prison terms are necessary to protect the public from future crime and to punish the offender; (4) consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the offender poses to the public; (5) the harm caused by the multiple offenses was so great that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the defendant's conduct; and (6) the defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.

It is therefore ORDERED, ADJUDGED, and DECREED that the Defendant, NATHANIEL E. JACKSON, be taken from the courtroom to the Trumbull County Jail and from thence to the Correction Reception Center at Lorain, Ohio, and thereafter be sentenced to death on December 10, 2003 on Count One; and imprisoned therein for the stated prison term of ten (10) years on Count Three; plus a mandatory term of three (3) years on the Firearm Specification to be served prior to and consecutive to the sentence imposed in Count Three; ten (10) years on

Count Four, plus a mandatory term of three (3) years on the Firearm Specification to be served prior to and consecutive to the sentence imposed in Count Four, sentence in Count Four to be served consecutively to the sentence imposed on Count Three.  Firearm Specifications in Count Three and Count Four shall merge as one sentence in Count Three as a matter of law.  Defendant is Ordered to pay the cost of prosecution taxed in the amount $_____ for which execution is awarded.

_____12/10/02_____
DATED

_____JC. M. Stuard_____
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

**THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF THIS
ENTRY TO ALL COUNSEL OF RECORD**
_____JC. M. Stuard_____
JUDGE

12/10/02 –
copies sent to:

Pros.

a. Consoldane

Supreme Court of Ohio

You are hereby notified that you have been convicted of a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code, you are prohibited from acquiring, having, carrying or using any firearm or dangerous ordinance.

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                              )          CASE NO. 01-CR-794
                                           )
    Plaintiff                          )
                                           )          **DEATH PENALTY**
                                           )
-vs-                                       )          WRIT TO CONVEY PRISONER
                                           )          FOR EXECUTION OF PENALTY
NATHANIEL E. JACKSON,                      )
                                           )
    Defendant                          )


A Writ is hereby directed to Thomas Altiere, Sheriff of Trumbull County, Ohio for conveyance of  NATHANIEL E. JACKSON to the Correctional Reception Center at Lorain, Ohio, and deliverance to its warden.  Said Writ is issued pursuant to Section 2949.21 of the Ohio Revised Code for the execution of the death penalty against Nathaniel E. Jackson on December 10, 2003.


_12/10/02_
DATED

_C. M. Stuart_
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

A-2

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY OHIO

STATE OF OHIO,                    )    CASE NO.    01-CR-794
                                  )
          Plaintiff,              )    JUDGE JOHN M. STUARD
                                  )
     -vs-                         )    **OPINION OF THE COURT**
                                  )
NATHANIEL E. JACKSON,             )    **FINDINGS OF FACT AND**
                                  )    **CONCLUSIONS OF LAW REGARDING**
          Defendant.              )    **IMPOSITION OF DEATH PENALTY**
                                  )

On November 8, 2002, a Trumbull County Jury returned a verdict finding the Defendant, Nathaniel E. Jackson, guilty of two (2) counts of Aggravated Murder arising from the death of Robert S. Fingerhut. Since Count One and Count Two of the Indictment merge for sentencing purposes, the State elected to dismiss Count Two and proceed to the mitigation phase on the first count of the indictment. Therefore, for purposes of this opinion, the Defendant was convicted, under the first count of the indictment, of purposely, and with prior calculation and design, causing the death of Robert S. Fingerhut. The jury further found that the State had proved beyond a reasonable doubt two (2) specifications of aggravating circumstances. After the mitigation hearing, the jury concluded that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and returned a verdict recommending that the sentence of death be imposed upon the Defendant.

Factually, the evidence revealed that while the Defendant was in prison for a prior conviction unrelated to the present case, he along with the Co-Defendant, Donna Roberts, who is precedently awaiting trial for her involvement, plotted the murder of her house mate, and ex-husband, Robert S. Fingerhut. Indeed, both of them concocted a plan to kill Fingerhut to permit

-1-

the Defendant and Roberts to live happily ever after.  However, the plan went awry when Jackson, who was in the house where Fingerhut stayed, was shot in the left index finger during the execution of Fingerhut.  He then took Fingerhut's car keys, and drove the vehicle which Fingerhut typically operated to Youngstown.  Shortly thereafter, Roberts took the Defendant to a motel in Boardman, getting him a room where he could hide out.  Ultimately, the Defendant was captured at a home in Youngstown, and he gave a statement to the police alleging self-defense.

More specifically, the State introduced evidence that on December 11, 2001, two (2) days after the Defendant was released from prison, Robert S. Fingerhut, while in his home, was pistol whipped, and shot three(3) times, causing at least four (4) injuries from gun shots.  Two of the injuries were to the back, with one grazing the back, and the other entering near the shoulder before exiting out the chest area of the victim.  Fingerhut also sustained a defensive gun shot wound to the webbing of his left hand between the thumb and forefinger.  The fatal gun shot was to the top of the head and from a short distance.  This injury would "would have dropped him like a sack of potatoes," as testified to by Dr. Germaniuk.

Police responded to the crime scene as a result of a 911 call.  When they arrived at approximately 12:01 a.m., they were met by the Co-Defendant, who informed them that her husband's car was missing.  She also granted them permission to search the residence and her car.  During this search, police found more than 140 letters from the Defendant to Roberts in her dresser, and an equal number of letters from Roberts to the Defendant, in the trunk of the Co-Defendant's car, in a paper bag bearing the Defendant's name and prison number.

Additionally, law enforcement officers were able to obtain nineteen (19) telephone

-2-

conversations, lasting more than three (3) hours, which were recorded while the Defendant was incarcerated in Lorain Correctional Institution.  These telephone conversations, along with the letters which spanned three (3) months, revealed a continuing  and evolving plan to kill Fingerhut immediately upon the Defendant's release from prison.

Specifically, during these telephone conversations, and in the written letters, the Defendant requested that Roberts obtain for him, black gloves to conceal his fingerprints, a ski mask, and a pair of handcuffs.  Further, the Defendant, during the December 8, 2001, telephone conversation, which was recorded the day before he was discharged from Lorain, and three (3) days before the murder, stressed to Roberts that he "need[ed] to be in the house [in which Fingerhut lived] before he [got] home " in order to carry out the premeditated murder.  Roberts, in a letter written to the Defendant acknowledged that she has found thin, fleece line,  leather gloves, but was still looking for the ski mask.

Indeed, the State introduced black leather gloves with fleece lining which were recovered from the house where the Defendant was arrested.  These gloves, which had gun shot residue on them, had a hole in the left index finger, and a reddish substance which appeared to be blood was also observed in that same area.  This damaged matched the injury that the Defendant had sustained to his finger.  Although the actual handcuffs were never recovered by police, an empty handcuff box was found in Donna Robert's car.

The evidence also revealed that Roberts, near the time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived.  Furthermore, within two (2) hours from the last time Fingerhut was seen alive, Roberts rented a hotel room for the Defendant.  In this room, bloody bandages and other medical supplies were

-3-

found by hotel cleaning people and were subsequently collected by police.

The car which was usually driven by Fingerhut, and which had been reported stolen by the Co-Defendant the night of Fingerhut's murder was recovered in Youngstown, Ohio. Blood stains were located throughout the vehicle and were collected by law enforcement. DNA analysis revealed that the blood matched that of DNA profile of the Defendant.

The State also introduced evidence that Roberts and the Defendant discussed purchasing a "new Lincoln" or "2002 Cadillac DeVille" for the Defendant. Additionally, Fingerhut had two (2) life insurance policies with a total death benefit of $550,00.00, and with Donna Roberts named as the beneficiary.

Based upon this and other evidence, the jury properly concluded that the Defendant committed a burglary to facilitate the premeditated and purposeful murder of the victim Fingerhut along with Roberts. The Defendant after executing his plan then stole Fingerhut's vehicle which allowed the jury to find that the murder was committed while committing the aggravating circumstances of Aggravated Burglary and Aggravated Robbery.

In a case of this nature, pursuant to R.C. 2929.03(D)(3), the Court is required to determine whether the State has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Indeed, the Supreme Court of Ohio has stated in *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344:

> "[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. *** [I]n the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." *Wogenstahl* (1996), 75 Ohio St. 3d 344 at 356.

-4-

In performing its statutory duty, the a review of the aggravating circumstances is required.

1.)     *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.*

The evidence presented at trial reflected that the Defendant trespassed in the victim's dwelling and murdered him. The Court finds that the Defendant entered into 254 Fonderlac Drive, in Howland Township. He was wearing gloves and armed with a gun, with which he struck the victim leaving a mark on Fingerhut's face. Once in the house, he fired the gun three times causing four (4) separate wounds. The fatal shot was to the top of Fingerhut's head, and nearly straight down.

From the aforementioned evidence, the Jury concluded that the defendant committed the Aggravated Murder of while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

2.)     *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.*

After the Defendant had murdered the victim, he took the victim's car keys and his car As he was driving away from the crime scene, and prior to abandoning the vehicle in Youngstown, he left blood evidence throughout the car. This evidence was subjected to DNA testing, which confirmed that forensically, it was his blood. Quite simply, the Defendant committed the Aggravated Robbery to escape the consequences of his prior murderous act.

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

To be weighed against the aggravating circumstances are the mitigating factors. In this case, the following factors were considered by the Court as possible mitigation against each specification and against the imposition of the death penalty:

1.)  *The nature and circumstances of the offense, the history, character, and background of the offender.*

As was noted in *Wogenstahl, supra,* the nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. However, in this case, reviewing the nature and circumstances, the Court does not find any credible evidence which would allow the Court to accord any weight to the nature and circumstances of the offense against the imposition of the death penalty.

In considering the history, character and background of the offender, this Court considered the home life of the Defendant and the fact that he grew up in a relatively poor environment, and that he was cared for and raised by his mother and maternal grandmother. His biological father had little, if any, real involvement with him, and this lack of a father figure likely contributed to his behavioral problems .

Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the Defendant's step-father, his sister, his mother, and Dr. McPherson.  These witnesses testified that the Defendant was respectful to both is mother and grandmother.  His sister, who described as smart and really kind, noted that they

attended church. Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused. His mother also declined to say that his home was in a "rough neighborhood, or that the Defendant had any problems in school. Dr. McPherson's report noted that the Defendant had not been hospitalized for any physical or mental condition. The witnesses also noted that they practiced moral tenets and that responsibility and respect were taught.

In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

2.) *Whether the victim of the offense induced or facilitated the killing.*

Although under R.C. 2929.04(B)(1), the mitigating factor regarding whether the victim of the offense induced or facilitated it was not specifically argued by the Defendant during the penalty phase of the trail as mitigating, the Court did consider the Defendant's video taped statement presented in evidence during the trial phase. In the self-serving statement, the Defendant claimed that the killing of the victim was as a result of the Defendant protecting himself from an unprovoked attack by the victim.

This statement to the police attempted to construct a scenario wherein the victim approached the Defendant to purchase marijuana and then invited the Defendant into his home. The Defendant then claims that the victim then pulled a gun on him. The Defendant asserted that he attempted to disarm the victim, but the gun went off apparently striking the victim. However, the other facts illustrating the planning and execution of the murder along with the physical evidence introduced causes the Defendant's version not to be credible. As such, the

-7-

Court does not accord any weight to this mitigating factor.

    3.)    *Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.*

Again, while the Defendant did not specifically argue this mitigating factor, the Court, upon reviewing the video tape, noticed that the Defendant claimed that the victim made derogatory statements about the Defendant's race which angered the Defendant. However, the this comment is likewise not convincing for the same reasons noted previously. This mitigating factors has no weight.

    4.)    *Any other factors that are relevant to the issue of whether the offender should be sentenced to death.*

Under R.C. 2929.04 (B)(7), commonly referred to as the "catch all provision" the Court reviewed the Defendant's capacity to appreciate the criminality of his conduct in light of the defense expert testimony regarding his mental history and mental state at the time of the offense was considered as a possible factor under R.C. 2929.04(B)(3).

This testimony revealed that the Defendant suffered from Attention Deficit Disorder/Hyperactivity Disorder, Chemical Dependency, and a reported history of alcohol abuse. Further, the evidence disclosed that the Defendant had an Antisocial Personality Disorder and was considered low average or better in intelligence.

Significantly, however, there was no evidence presented that the Defendant, at the time of the offense, had any mental disease or defect or that he lacked the capacity to appreciate the criminality of his conduct. His Antisocial Personality Disorder only showed that he had a history of inappropriate and impulsive behavior from his early childhood to the present. He was

incarcerated four (4) times.  According to the Defendant's own expert, the Defendant, throughout his juvenile and adult life had received repeated treatment and/or probation for his criminal transgressions and his drug and alcohol abuse. He did not learn from his past mistakes, but only escalated his antisocial conduct.

In summary, this Court gives very little weight in mitigation to the Defendant's mental status, and his drug and alcohol abuse history especially in light of the Defendant's elaborate scheme to kill the victim, elude capture, and finally deceive police officers with a statement blaming the victim.

Further under 2929.04(B)(7), the Court examined the Defendant's ability to maintain himself in a stable fashion in a structured setting.  Indeed, it was suggested by the Defense that he could be a productive member of the general prison population, and that this should be considered as mitigating.  However, the Court gives slight weight to this particular factor.

The Defendant's last incarceration was the result of him not learning from his past mistakes, and from his tendency to act out impulsively without looking at the consequences. Furthermore, he repeatedly was placed on probation, but he continued to digress, committing more serious criminal acts.  Indeed, during the last incarceration, the Defendant claimed to have "found God" and that he was going to straighten out his life.  At the same time, it is abundantly clear that he was plotting to commit the ultimate criminal act, a premeditated burglary and murder, while pre-textually presenting himself to prison officials as a good candidate for a release program.  Quite simply, in the very setting in which the Defense suggests that he could be a productive member, the Defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder Robert S. Fingerhut so that in effect he could assume Fingerhut's lifestyle,

-9-

including running the Greyhound bus business, managing rental properties, and living in his home with his ex-wife.

The Defendant also offered an unsworn statement, wherein he stated that he was "very sorry for what happened." The Court likewise gives this statement slight weight as the statement lacked sincerity. The tone and tenor of the apology did not, in the Court's opinion, come from someone who was genuinely remorseful. Even assuming that the Defendant was remorseful, such retrospective remorse is not entitled to any significant weight. To the contrary, the Court believes that the Defendant's feigned remorse stems from the fact that the Defendant was apprehended. The Defendant was disappointed that the fool-proof, premeditated murder plot ,which he developed over nearly three (3) months, and which included shooting the victim "in the 'F' ing head," failed.

When independently weighing the aggravating circumstances as to the Aggravated Murder as previously outlined against the collective factors in mitigation, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to any defendant who commits an Aggravated Murder during the commission of these certain felonies. In the case at bar, the underlying felonies are Aggravated Burglary and Aggravated Robbery.

In this particular case, the Court accords substantial weight to the Aggravated Burglary specification. In order to prove an Aggravated Burglary, the State is required to demonstrate that the Defendant trespassed in the occupied structure for the purpose of committing a criminal

-10-

act. In most instances, this criminal act is a theft offense. Occasionally, a Defendant will trespass to commit a kidnapping or even a rape. Such criminal acts provide the basis upon which a Defendant can be convicted of Aggravated Burglary. Then, if during any of these underlying criminal acts, the victim is purposely killed, an Aggravated Murder with the specification of Aggravated Burglary has been committed. These alone can permit the imposition of the death penalty should the aggravating circumstance of the Aggravated Burglary be found to outweigh the mitigating factors.

Under the facts in the instant case, this Court can not foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater. The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to rather to carry out the premeditated, cold blooded execution Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

The Court further gives weight to the Aggravated Robbery specification. After shooting the Defendant in the head, the Defendant took personal property of the victim to effectuate his escape. Indeed, the Defendant stole the victim's keys and his car.

Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct. From the

overwhelming evidence, it is this Court's opinion that the Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,00.00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him.

Upon consideration of the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the defendant, and the arguments of counsel, it is the judgment of this Court that the aggravating circumstances, outweighed, by proof beyond a reasonable doubt, the collective mitigating factors.

Dated: _12/9/02_

_HON. JOHN M. STUARD_
Judge, Court of Common Pleas

I hereby certify that a copy of the foregoing opinion was hand delivered to Attorney James Lewis, Attorney Anthony Consoldane, and Prosecutor Dennis Watkins this ___9th___ day of December, 2002.

_HON. JOHN M. STUARD_

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court, Supreme Court of Ohio, State Office Tower, 30 E. Broad Street, Columbus, Ohio 43266-0419, this ___9th___ day of December, 2002.

_HON. JOHN M. STUARD_

-12-

# AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES

*Articles in addition to, and amendments of the Constitution of the United States of America, proposed by Congress, and ratified by the Legislatures of the several States, pursuant to the fifth article of the original Constitution.*

---

## AMENDMENT I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

(Effective 1791)

**Comparative Legislation**

Freedom of speech, press, Ohio Const. art. I, § 11.
Rights of assembly petition, Ohio Const. art. I, § 3.

## AMENDMENT II

A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 4.

## AMENDMENT III

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 13.

## AMENDMENT IV

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 14.

## AMENDMENT V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

(Effective 1791)

**Comparative Legislation**

Compensation for taking for public use, Ohio Const. art. I, § 19.

Double jeopardy, Ohio Const. art. I, § 10.
Due process, art. I, § 16.
Indictment by grand jury, Ohio Const. art. I, § 10.
Self-incrimination, Ohio Const. art. I, § 10.

## AMENDMENT VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

(Effective 1791)

**Comparative Legislation**

Compulsory process, Ohio Const. art. I, § 10.
Confronting witnesses, Ohio Const. art. I, § 10.
Nature of charge, Ohio Const. art. I, § 10.
Right to counsel, Ohio Const. art. I, § 10.
Right to trial by jury, Ohio Const. art. I, § 5.
Speedy and public trial by jury, Ohio Const. art. I, § 10.

## AMENDMENT VII

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 5.

## AMENDMENT VIII

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 9.

## AMENDMENT IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 20.

## AMENDMENT X

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

(Effective 1791)

**Comparative Legislation**

Ohio Const. art. I, § 20.

A.14

## AMENDMENT XI

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

(Effective 1798)

## AMENDMENT XII

The Electors shall meet in their respective states and vote by ballot for President and Vice President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice President, and of the number of votes for each; which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;— The President of the Senate shall, in the presence of the Senate and House of Representatives; open all the certificates and the votes shall then be counted; — The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice President shall act as President, as in the case of the death or other constitutional disability of the President. — The person having the greatest number of votes as Vice President, shall be the Vice President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice President of the United States.

(Effective 1804)

## AMENDMENT XIII

SECTION 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

SECTION 2. Congress shall have power to enforce this article by appropriate legislation.

(Effective 1865)

Comparative Legislation
Ohio Const. art. 1, § 6.

## AMENDMENT XIV

SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

SECTION 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

SECTION 3. No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

SECTION 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

SECTION 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

(Effective 1868)

Comparative Legislation
Due process, Ohio Const. art. 1, § 16.
Equal protection, Ohio Const. art. 1, § 2.

## AMENDMENT XV

SECTION 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

SECTION 2. The Congress shall have power to enforce this article by appropriate legislation.

(Effective 1870)

The Congress sha[...]
taxes on incomes, fro[...]
out apportionment a[...]
out regard to any ce[...]
(Effective 1913)

Comparative Legislat[...]
Taxation, Ohio Const. [...]

The Senate of the[...]
of two Senators from[...]
thereof, for six years[...]
vote. The electors in[...]
tions requisite for ele[...]
of the State legislatu[...]
When vacancies ha[...]
State in the Senate, [...]
State shall issue writ[...]
Provided, That the [...]
power the executive [...]
pointments until the [...]
as the legislature ma[...]
This amendment s[...]
the election or term [...]
becomes valid as pa[...]
(Effective 1913)

Comparative Legisla[...]
Vacancies, Ohio Const[...]

SECTION 1. After [...]
this article the man[...]
intoxicating liquors v[...]
or the exportation the[...]
territory subject to t[...]
purposes is hereby [...]

SECTION 2. The C[...]
have concurrent pow[...]
priate legislation.

SECTION 3. This [...]
it shall have been [...]
Constitution by the [...]
as provided in the C[...]
the date of the sub[...]
Congress.

(Effective 1919)

The right of citize[...]
not be denied or ab[...]
any State on accoun[...]
Congress shall ha[...]
appropriate legislati[...]
(Effective 1920)

Comparative Legisla[...]
Elective franchise, OI[...]

AM[...]
the te[...]
dent shall end at no[...]
the terms of Senate[...]



1322

resident transmits to the
Senate and the Speaker
his written declaration
e powers and duties of
mits to them a written
powers and duties shall
nt as Acting President.

President and a major-
rs of the executive de-
dy as Congress may by
sident pro tempore of
House of Representa-
nat the President is un-
nd duties of his office,
tely assume the powers

t transmits to the Pres-
ate and the Speaker of
his written declaration
sume the powers and
Vice President and a
officers of the executive
dy as Congress may by
r days to the President
e Speaker of the House
en declaration that the
e the powers and duties
's shall decide the issue,
urs for that purpose if
within twenty-one days
declaration, or, if Con-
termines by two-thirds
President is unable to
of his office, the Vice
harge the same as Acting
ident shall resume the

7.

XXVI

ns of the United States,
or older, to vote shall
the United States or by

t. V, § 1.

l have power to enforce
ation.

XXVII

tion for the services of
s, shall take effect, until
shall have intervened.

---

# CONSTITUTION OF THE STATE OF OHIO

### ADOPTED MARCH 10, 1851

SELECTED PROVISIONS INCLUDING LATEST AMENDMENTS EFFECTIVE FEBRUARY 1, 1999

---

## ARTICLE I: BILL OF RIGHTS

### § 1 Right to freedom and protection of property.

All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.

### § 2 Right to alter, reform, or abolish government, and repeal special privileges.

All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly.

### § 3 Right to assemble together.

The people have the right to assemble together, in a peaceable manner, to consult for their common good; to instruct their representatives; and to petition the general assembly for the redress of grievances.

### § 4 Bearing arms; standing armies; subordination of military power.

The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power.

### § 5 Trial by jury; reform in civil jury system.

The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury.

(As amended September 3, 1912.)

### § 6 Slavery and involuntary servitude.

There shall be no slavery in this state; nor involuntary servitude, unless for the punishment of crime.

### § 7 Rights of conscience; education; necessity of religion and knowledge.

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to at-

tend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall interference with the rights of conscience be permitted. No religious test shall be required, as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction.

### § 8 Writ of habeas corpus.

The privilege of the writ of habeas corpus shall not be suspended, unless, in cases of rebellion or invasion, the public safety require it.

### § 9 Bailable offenses; of bail, fine, and punishment.

All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great and a person who is charged with a felony where the proof is evident or the presumption great and who poses a potential serious physical danger to a victim of the offense, to a witness to the offense, or to any other person or to the community. Excessive bail shall not be required; excessive fines shall not be imposed; and cruel and unusual punishments shall not be inflicted. Procedures and standards to determine whether a person who is charged with a felony where the proof is evident or the presumption great poses a potential serious physical danger to a victim of the offense, a witness to the offense, or to any other person or to the community shall be fixed by law.

(As amended January 1, 1998.)

### § 10 Trial of accused persons and their rights; depositions by state and comment on failure to testify in criminal cases.

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law. In any trial, in any court, the party accused shall be allowed to appear and defend in person and with

Case: 4:11-cr-00586-SL Doc #: 34-24 Filed: 03/07/13 204 of 221. PageID #: 1152

P.11

counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be made the subject of comment by counsel. No person shall be twice put in jeopardy for the same offense.

(As amended September 1, 1912.)

## § 10a Rights of victims of crime.

Victims of criminal offenses shall be accorded fairness, dignity, and respect in the criminal justice process, and, as the general assembly shall define and provide by law, shall be accorded rights to reasonable and appropriate notice, information, access, and protection and to a meaningful role in the criminal justice process. This section does not confer upon any person a right to appeal or modify any decision in a criminal proceeding, does not abridge any other right guaranteed by the Constitution of the United States or this constitution, and does not create any cause of action for compensation or damages against the state, any political subdivision of the state, any officer, employee, or agent of the state or of any political subdivision, or any officer of the court.

(Adopted November 8, 1994.)

## § 11 Freedom of speech and of the press; libel.

Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press. In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and, if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted.

## § 12 Transportation, etc., for crime.

No person shall be transported out of the state, for any offense committed within the same; and no conviction shall work corruption of blood, or forfeiture of estate.

## § 13 Quartering of troops.

No soldier shall, in time of peace, be quartered in any house, without the consent of the owner; nor, in time of war, except in the manner prescribed by law.

## § 14 Search warrants and general warrants.

The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized.

## § 15 No imprisonment for debt.

No person shall be imprisoned for debt in any civil action, on mesne or final process, unless in cases of fraud.

## § 16 Redress in courts.

All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

[Suits against the state.] Suits may be brought against the state, in such courts and in such manner, as may be provided by law.

## § 17 Hereditary privileges, etc.

No hereditary emoluments, honors, or privileges, shall ever be granted or conferred by this state.

## § 18 Suspension of laws.

No power of suspending laws shall ever be exercised, except by the general assembly.

## § 19 Inviolability of private property.

Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money, and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.

## § 19a Damage for wrongful death.

The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law.

## § 20 Powers reserved to the people.

This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people.

## ARTICLE II: LEGISLATIVE

## § 39 Regulating expert testimony in criminal trials.

Laws may be passed for the regulation of the use of

expert witnesses and ex
and proceedings.

(Adopted September 3,

## ARTICLE

## § 11 May grant r
pardons.

The Governor shall b
grant reprieves, comm
crimes and offenses, e
peachment, upon such
think proper; subject, h
to the manner of apply
dons, as may be prescr
for treason, the Govern
of the sentence, and r
Assembly, at its next me
bly shall either pardon,
its execution, or grant a
shall communicate to
regular session, each ca
pardon granted, statin
convict, the sentence,
commutation, pardon, o
reasons therefor.

(As amended January 1

## ARTICLE

## § 1 In whom jud

The judicial power of
court, courts of appeal
divisions thereof, and s
supreme court as may f
by law.

(Amended May 7, 1968

## § 2 The supreme

(A) The supreme cou
by law, consist of sever
the chief justice and ju
disability of the chief jus
of longest total service t
chief justice. If any men
by reason of illness, disa
consider and decide a c
or the acting chief just
court of appeals to sit
court in the place and
majority of the suprem
constitute a quorum or

(B)(1) The supreme
tion in the following:

(c) Habeas corpus;

(d) Prohibition;

(e) Procedendo;

# CHAPTER 2903: HOMICIDE AND ASSAULT

Section

[HOMICIDE]

2903.01  Aggravated murder.
2903.02  Murder.
2903.03  Voluntary manslaughter.
2903.04  Involuntary manslaughter.
[2903.04.1] 2903.041  Reckless homicide.
2903.05  Negligent homicide.
2903.06  Aggravated vehicular homicide; vehicular homicide; vehicular manslaughter.
2903.07  Repealed.
2903.08  Aggravated vehicular assault; vehicular assault.
2903.09  Legal abortions and acts or omissions of pregnant woman excepted from liability.
2903.10  Definitions: functionally impaired person; caretaker.

[ASSAULT]

2903.11  Felonious assault.
2903.12  Aggravated assault.
2903.13  Assault.
2903.14  Negligent assault.
2903.15  Permitting child abuse.
2903.16  Failing to provide for a functionally impaired person.

[MENACING]

2903.21  Aggravated menacing.

[STALKING]

[2903.21.1] 2903.211  Menacing by stalking.
[2903.21.2] 2903.212  Consideration in setting amount and conditions of bail for violations of certain protection orders.
[2903.21.3] 2903.213  Motion for protection order.
[2903.21.4] 2903.214  Petition for protection order to protect victim of menacing by stalking.
[2903.21.5] 2903.215  Repealed.
2903.22  Menacing.
2903.31  Hazing.

[PATIENT ABUSE AND NEGLECT IN CARE FACILITIES]

2903.33  Definitions.
2903.34  Patient abuse; neglect.
2903.35  Filing false patient abuse or neglect complaints.
2903.36  Discrimination, retaliation prohibited.
2903.37  License revocation.

[HOMICIDE]

## § 2903.01  Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.

(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

(2) It is the offender's specific purpose to kill a law enforcement officer.

(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(G) As used in this section:

(1) "Detention" has the same meaning as in section 2921.01 of the Revised Code.

(2) "Law enforcement officer" has the same meaning as in section 2911.01 of the Revised Code.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 146 v S 239 (Eff 9-6-96); 147 v S 32 (Eff 8-6-97); 147 v H 5 (Eff 6-30-98); 147 v S 193 (Eff 12-29-98); 149 v S 184. Eff 5-15-2002.

Not analogous to former RC § 2903.01 (GC § 12423-1; 109 v 45; 121 v 557 (572); Bureau of Code Revision, 10-1-53; 126 v 114), repealed 134 v H 511, § 2, eff 1-1-74.

## § 2903.02  Murder.

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

(D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 146 v S 239 (Eff 9-6-96); 147 v H 5. Eff 6-30-98.

Not analogous to former RC § 2903.02 (RS § 6808; S&S 377; 59 v 65; 83 v 202; GC §§ 12962, 12963; Bureau of Code Revision, 10-1-53; 131 v 671), repealed 134 v H 511, § 2, eff 1-1-74.

## § 2903.03  Voluntary manslaughter.

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.

(B) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v H 103 (Eff 5-19-82); 139 v S 199 (Eff 1-5-83); 146 v S 2 (Eff 7-1-96); 146 v S 239. Eff 9-6-96.

Not analogous to former RC § 2903.03 (RS § 6937; S&C 667; 54 v 196; GC § 12964; 105 v 864; Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.



# CHAPTER 2911: ROBBERY, BURGLARY, TRESPASS AND SAFECRACKING

Section

[ROBBERY]

2911.01  Aggravated robbery.
2911.02  Robbery.
2911.03-2911.10  Repealed.

[BURGLARY]

2911.11  Aggravated burglary.
[2911.11.1] 2911.111  Repealed.
2911.12  Burglary.
2911.13  Breaking and entering.
[2911.13.1] 2911.131  Repealed.
2911.14-2911.20  Repealed.

[TRESPASS]

2911.21  Criminal trespass.
[2911.21.1] 2911.211  Aggravated trespass.
2911.22-2911.30  Repealed.

[SAFECRACKING]

2911.31  Safecracking.
2911.32  Tampering with coin machines.
2911.33-2911.49  Repealed.
2911.71-2911.73  Repealed.

## [ROBBERY]

### § 2911.01  Aggravated robbery.

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

(3) Inflict, or attempt to inflict, serious physical harm on another.

(B) No person, without privilege to do so, shall knowingly remove or attempt to remove a deadly weapon from the person of a law enforcement officer, or shall knowingly deprive or attempt to deprive a law enforcement officer of a deadly weapon, when both of the following apply:

(1) The law enforcement officer, at the time of the removal, attempted removal, deprivation, or attempted deprivation, is acting within the course and scope of the officer's duties;

(2) The offender knows or has reasonable cause to know that the law enforcement officer is a law enforcement officer.

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

(D) As used in this section:

(1) "Deadly weapon" and "dangerous ordnance" have the same meanings as in section 2923.11 of the Revised Code.

(2) "Law enforcement officer" has the same meaning as in section 2901.01 of the Revised Code and also includes employees of the department of rehabilitation and correction who are authorized to carry weapons within the course and scope of their duties.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 1-5-83); 140 v S 210 (Eff 7-1-83); 146 v S 2 (Eff 7-1-96); 147 v H 151, Eff 9-16-97.

Not analogous to former RC § 2911.01 (RS § 7076; 70 v 39; 73 v 20; 74 v 41; GC § 13104; 124 v 466; Bureau of Code Revision, 10-1-53; 129 v 344), repealed 134 v H 511, § 2, eff 1-1-74.

### § 2911.02  Robbery.

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control;

(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;

(3) Use or threaten the immediate use of force against another.

(B) Whoever violates this section is guilty of robbery. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) of this section is a felony of the third degree.

(C) As used in this section:

(1) "Deadly weapon" has the same meaning as in section 2923.11 of the Revised Code.

(2) "Theft offense" has the same meaning as in section 2913.01 of the Revised Code.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 7-1-83); 146 v S 2 (Eff 7-1-96); 146 v S 269, Eff 7-1-96.

Not analogous to former RC § 2911.02 (RS § 7075; 59 v 193; 102 v 114; GC § 13105; 124 v 466; Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

The effective date is set by section 5 of SB 269.

### §§ 2911.03, 2911.04, 2911.05

Repealed, 134 v H 511, § 2 [GC §§ 13105-1, 13108, 13108-1; 111 v 257, 258; 124 v 466; Bureau of Code Revision, 10-1-53; 126 v 575]. Eff 1-1-74.

These sections concerned false statements and stock brokers.

### §§ 2911.06, 2911.07, 2911.08

Repealed, 134 v H 511, § 2 [GC §§ 13108-2—13108-4; 111 v 258; Bureau of Code Revision, 10-1-53; 126 v 575]. Eff 1-1-74.

These sections concerned false statements and stock brokers.

### §§ 2911.09, 2911.10  Repealed, 134 v

H 511, § 2 [GC §§ 13108-5, 13108-6, 111 v 258, 259; Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

These sections concerned false statements and stock brokers.

## [BURGLARY]

### § 2911.11  Aggravated burglary.

(A) No person, by force, stealth, or deception, shall

trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

(B) Whoever violates this section is guilty of aggravated burglary, a felony of the first degree.

(C) As used in this section:

(1) "Occupied structure" has the same meaning as in section 2909.01 of the Revised Code.

(2) "Deadly weapon" and "dangerous ordnance" have the same meanings as in section 2923.11 of the Revised Code.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 1-5-83); 140 v S 210 (Eff 7-1-83); 146 v S 2 (Eff 7-1-96); 146 v S 269. Eff 7-1-96.

Not analogous to former RC § 2911.11 (RS § 7085; S&C 422; 50 v 132; 57 v 56; GC § 13115; Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

The effective date is set by section 5 of SB 269.

## [§ 2911.11.1] § 2911.111 Repealed,
134 v H 511, § 2 [132 v S 97]. Eff 1-1-74.

This section concerned checks drawn on insufficient funds.

## § 2911.12 Burglary.

(A) No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense;

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense;

(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense;

(4) Trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present.

(B) As used in this section, "occupied structure" has the same meaning as in section 2909.01 of the Revised Code.

(C) Whoever violates this section is guilty of burglary. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) is a felony of the third degree. A

violation of division (A)(4) of this section is a felony of the fourth degree.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 7-1-83); 143 v H 837 (Eff 7-3-90); 146 v S 2 (Eff 7-1-96); 146 v S 269. Eff 7-1-96.

Not analogous to former RC § 2911.12 (RS § 7080; S&C 703; 70 v 40; GC § 13126; Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

The effective date is set by section 5 of SB 269.

## § 2911.13 Breaking and entering.

(A) No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony.

(B) No person shall trespass on the land or premises of another, with purpose to commit a felony.

(C) Whoever violates this section is guilty of breaking and entering, a felony of the fifth degree.

HISTORY: 134 v H 511 (Eff 1-1-74); 146 v S 2. Eff 7-1-96.

Not analogous to former RC § 2911.13 (RS §§ 7076-4—7076-6; 95 v 306; GC § 13130; 123 v 700; Bureau of Code Revision, 10-1-53), repealed 134 v H 511, § 2, eff 1-1-74.

The effective date is set by section 6 of SB 2.

## [§ 2911.13.1] § 2911.131 Repealed,
134 v H 511, § 2 [133 v H 192]. Eff 1-1-74.

This section concerned false motor vehicle repair estimates and fraudulent charges.

## §§ 2911.14, 2911.15, 2911.16
Repealed, 134 v H 511, § 2 [RS §§ 7017-4, 7017-5, 7076a—7076c, 7087; S&C 422; 44 v 34; 83 v 138; 94 v 20, 363; 99 v 115, 116; GC §§ 13131, 13143, 13145; 110 v 29; Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

These sections concerned miscellaneous frauds.

## § 2911.17 Repealed, 134 v H 511, § 2 [RS §
7017-6; 95 v 68; GC § 13148; Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

This section prohibited the performance of dramatic compositions without consent of owner.

## § 2911.18 Repealed, 129 v 13 (182), § 2 [RS §
6993; 66 v 93; GC § 13149; Bureau of Code Revision, 10-1-53]. Eff 7-1-62

This section concerned taking or selling note for patent right.

## §§ 2911.19, 2911.20 Repealed, 134 v
H 511, § 2 [RS §§ 7076-3, 7105-1; 88 v 64; 90 v 131; GC §§ 13146, 13158; Bureau of Code Revision, 10-1-53]. Eff 1-1-74.

These sections concerned misrepresentation by married man, and furnishing false pedigree.

### [TRESPASS]

## § 2911.21 Criminal trespass.

(A) No person, without privilege to do so, shall do any of the following:

(1) Knowi[...] ises of anoth[...]

(2) Knowi[...] ises of anoth[...] to certain p[...] the offender[...] tion or is re[...]

(3) Reckl[...] ises of anoth[...] access or pr[...] the offender[...] posting in a[...] the attentio[...] other enclos[...]

(4) Being[...] gently fail o[...] so by the o[...] of either.

(B) It is in[...] the land or p[...] in custody o[...]

(C) It is [...] that the offe[...] the land or p[...] was secure[...]

(D) Who[...] trespass, a [...]

(E) As us[...] cludes any [...] to, controll[...] separate en[...]

HISTORY:[...]

Not analog[...] 2; 84 v 213; [...] 385; 126 v [...]

## [§ 29[...]
vated tresp[...]

(A) No p[...] premises of [...] land or tho[...] of which in[...] son or caus[...] fender will [...]

(B) Who[...] vated trespa[...]

HISTORY:[...]

## §§ 29[...]
Repealed, [...] v 242; 83 v [...] 406; Burea[...]

These sec[...] tobacco, and [...]

## §§ 29[...]
Repealed, [...] 7088-2; 85 [...] 675]. [...]

These sec[...] or badge. [...]

(PP) "Detention" and "detention facility" have the same meanings as in section 2921.01 of the Revised Code.

(QQ) "Third degree felony OMVI offense" means a violation of division (A) of section 4511.19 of the Revised Code that, under section 4511.99 of the Revised Code, is a felony of the third degree.

(RR) "Random drug testing" has the same meaning as in section 5120.63 of the Revised Code.

(SS) "Felony sex offense" has the same meaning as in section 2967.28 of the Revised Code.

(TT) "Body armor" has the same meaning as in section 2941.1411 [2941.14.11] of the Revised Code.

HISTORY: 146 v S 2 (Eff 7-1-96); 146 v S 269 (Eff 7-1-96); 146 v H 445 (Eff 9-3-96); 146 v H 480 (Eff 10-16-96); 146 v S 166 (Eff 10-17-96); 146 v H 180 (Eff 1-1-97); 147 v H 378 (Eff 3-10-98); 147 v S 111 (Eff 3-17-98); 148 v S 9 (Eff 3-8-2000); 148 v S 107 (Eff 3-23-2000); 148 v S 22 (Eff 5-17-2000); 148 v H 349 (Eff 9-22-2000); 148 v S 222 (Eff 3-22-2001); 148 v S 179, § 3 (Eff 1-1-2002); 149 v H 327. Eff 7-8-2002.

Not analogous to former RC § 2929.01 (134 v H 511; 136 v H 300; 137 v H 565; 139 v S 199; 140 v S 210; 142 v H 261; 145 v H 571; 145 v S 186), repealed 146 v S 2, § 2, eff 7-1-96.

See provisions, § 4 of HB 327 (149 v —) following RC § 2919.25.

See provisions, § 11 of SB 179 (148 v —) following RC § 2923.36.

[PENALTIES FOR MURDER]

## § 2929.02  Penalties for murder.

(A) Whoever is convicted of or pleads guilty to aggravated murder in violation of section 2903.01 of the Revised Code shall suffer death or be imprisoned for life, as determined pursuant to sections 2929.022 [2929.02.2], 2929.03, and 2929.04 of the Revised Code, except that no person who raises the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code and who is not found to have been eighteen years of age or older at the time of the commission of the offense shall suffer death. In addition, the offender may be fined an amount fixed by the court, but not more than twenty-five thousand dollars.

(B) Whoever is convicted of or pleads guilty to murder in violation of section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of fifteen years to life, except that, if the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that were included in the indictment, count in the indictment, or information that charged the murder, the court shall impose upon the offender a term of life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code. In addition, the offender may be fined an amount fixed by the court, but not more than fifteen thousand dollars.

(C) The court shall not impose a fine or fines for aggravated murder or murder which, in the aggregate and to the extent not suspended by the court, exceeds the amount which the offender is or will be able to pay by the method and within the time allowed without undue hardship to the offender or to the dependents of the offender, or will prevent the offender from making

reparation for the victim's wrongful death.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 146 v H 180 (Eff 1-1-97); 147 v S 107. Eff 7-29-98.

See provisions, § 4 of HB 180 (146 v —) following RC § 2921.34.

## [§ 2929.02.1] § 2929.021  Notice to supreme court of indictment charging aggravated murder; plea.

(A) If an indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the clerk of the court in which the indictment is filed, within fifteen days after the day on which it is filed, shall file a notice with the supreme court indicating that the indictment was filed. The notice shall be in the form prescribed by the clerk of the supreme court and shall contain, for each charge of aggravated murder with a specification, at least the following information pertaining to the charge:

(1) The name of the person charged in the indictment or count in the indictment with aggravated murder with a specification;

(2) The docket number or numbers of the case or cases arising out of the charge, if available;

(3) The court in which the case or cases will be heard;

(4) The date on which the indictment was filed.

(B) If the indictment or a count in an indictment charges the defendant with aggravated murder and contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the defendant pleads guilty or no contest to any offense in the case or if the indictment or any count in the indictment is dismissed, the clerk of the court in which the plea is entered or the indictment or count is dismissed shall file a notice with the supreme court indicating what action was taken in the case. The notice shall be filed within fifteen days after the plea is entered or the indictment or count is dismissed, shall be in the form prescribed by the clerk of the supreme court, and shall contain at least the following information:

(1) The name of the person who entered the guilty or no contest plea or who is named in the indictment or count that is dismissed;

(2) The docket numbers of the cases in which the guilty or no contest plea is entered or in which the indictment or count is dismissed;

(3) The sentence imposed on the offender in each case.

HISTORY: 139 v S 1. Eff 10-19-81.

## [§ 2929.02.2] § 2929.022  Determination of aggravating circumstances.

(A) If an indictment or count in an indictment charging a defendant with aggravated murder contains a specification of the aggravating circumstance of a prior conviction listed in division (A)(5) of section 2929.04 of the Revised Code, the defendant may elect to have the panel of three judges, if he waives trial by jury, or the trial judge, if he is tried by jury, determine the existence of that aggravating circumstance at the sentencing hear-

ing held pursuant to [...]
2929.03 of the Revi[...]

(1) If the defenda[...]
tence of the agravat[...]
the sentencing heari[...]
the charge of aggrav[...]
of the aggravating c[...]
listed in division (A)[...]
Code, and on any ot[...]
circumstance listed [...]
of the Revised Cod[...]
criminal case in whi[...]
vated murder and sp[...]

(2) If the defenda[...]
of the aggravating c[...]
listed in division (A)[...]
Code determined at [...]
lowing a verdict of [...]
murder, the panel o[...]
shall:

(a) Hold a senten[...]
(B) of this section,[...]
under division (A)(2[...]

(b) If the offender[...]
pursuant to section 2[...]
Code and is not fou[...]
years of age or olde[...]
of the offense, cond[...]
specification of the a[...]
conviction listed in [...]
of the Revised Code[...]
doubt. After conclud[...]
shall proceed as follo[...]

(i) If that aggravati[...]
a reasonable doubt or[...]
victed of any other sp[...]
cumstance, the pane[...]
according to division [...]
vised Code;

(ii) If that aggrava[...]
beyond a reasonable [...]
was not convicted of a[...]
vating circumstance, [...]
sentence of life imp[...]
after serving twenty [...]
fender.

(B) At the sentenc[...]
if the defendant was [...]
or the trial judge, if [...]
shall, when required [...]
section, first determi[...]
vating circumstance c[...]
sion (A)(5) of section[...]
proven beyond a rea[...]
judges or the trial jud[...]
tion of the aggravatin[...]
tion listed in division[...]
Revised Code is prov[...]
if they do not determi[...]
beyond a reasonable [...]
was convicted of any [...]
circumstance listed in[...]
judge, [...]
fen[...]
section 2929.04 of th[...]

death.

ก v S 1 (Eff 10-19-81);
-29-98.

—) following RC §

**021** Notice to
rging aggravated

n an indictment
murder and con-
ggravating circum-
ion 2929.04 of the
which the indict-
.e day on which
.e supreme court
The notice shall
k of the supreme
ge of aggravated
e following infor-

d in the indictment
ated murder with

ers of the case or
ailable;

ses will be heard;
ent was filed.

n an indictment
d murder and con-
ggravating circum-
2929.04 of the
leads guilty or no
r if the indictment
smissed, the clerk
ed or the indict-
a notice with the
was taken in the
n fifteen days after
it or count is dis-
d by the clerk of
t least the follow-

entered the guilty
n the indictment

ases in which the
l or in which the

offender in each

**022** Determi-
ces.

indictment charg-
r contains a spec-
ce of a prior con-
ion 2929.04 of the
elect to have the
al by jury, or the
ine the existence
e sentencing hear-

ing held pursuant to divisions (C) and (D) of section
2929.03 of the Revised Code.

(1) If the defendant does not elect to have the exis-
tence of the aggravating circumstance determined at
the sentencing hearing, the defendant shall be tried on
the charge of aggravated murder, on the specification
of the aggravating circumstance of a prior conviction
listed in division (A)(5) of section 2929.04 of the Revised
Code, and on any other specifications of an aggravating
circumstance listed in division (A) of section 2929.04
of the Revised Code in a single trial as in any other
criminal case in which a person is charged with aggra-
vated murder and specifications.

(2) If the defendant does elect to have the existence
of the aggravating circumstance of a prior conviction
listed in division (A)(5) of section 2929.04 of the Revised
Code determined at the sentencing hearing, then, fol-
lowing a verdict of guilty of the charge of aggravated
murder, the panel of three judges or the trial judge
shall:

(a) Hold a sentencing hearing pursuant to division
(B) of this section, unless required to do otherwise
under division (A)(2)(b) of this section;

(b) If the offender raises the matter of age at trial
pursuant to section 2929.023 [2929.02.3] of the Revised
Code and is not found at trial to have been eighteen
years of age or older at the time of the commission of
the offense, conduct a hearing to determine if the
specification of the aggravating circumstance of a prior
conviction listed in division (A)(5) of section 2929.04
of the Revised Code is proven beyond a reasonable
doubt. After conducting the hearing, the panel or judge
shall proceed as follows:

(i) If that aggravating circumstance is proven beyond
a reasonable doubt or if the defendant at trial was con-
victed of any other specification of an aggravating cir-
cumstance, the panel or judge shall impose sentence
according to division (E) of section 2929.03 of the Re-
vised Code;

(ii) If that aggravating circumstance is not proven
beyond a reasonable doubt and the defendant at trial
was not convicted of any other specification of an aggra-
vating circumstance, the panel or judge shall impose
sentence of life imprisonment with parole eligibility
after serving twenty years of imprisonment on the of-
fender.

(B) At the sentencing hearing, the panel of judges,
if the defendant was tried by a panel of three judges,
or the trial judge, if the defendant was tried by jury,
shall, when required pursuant to division (A)(2) of this
section, first determine if the specification of the aggra-
vating circumstance of a prior conviction listed in divi-
sion (A)(5) of section 2929.04 of the Revised Code is
proven beyond a reasonable doubt. If the panel of
judges or the trial judge determines that the specifica-
tion of the aggravating circumstance of a prior convic-
tion listed in division (A)(5) of section 2929.04 of the
Revised Code is proven beyond a reasonable doubt or
if they do not determine that the specification is proven
beyond a reasonable doubt but the defendant at trial
was convicted of a specification of any other aggravating
circumstance listed in division (A) of section 2929.04
of the Revised Code, the panel of judges or the trial
judge and trial jury shall impose sentence on the of-
fender pursuant to division (D) of section 2929.03 and
section 2929.04 of the Revised Code. If the panel of

judges or the trial judge does not determine that the
specification of the aggravating circumstance of a prior
conviction listed in division (A)(5) of section 2929.04
of the Revised Code is proven beyond a reasonable
doubt and the defendant at trial was not convicted of
any other specification of an aggravating circumstance
listed in division (A) of section 2929.04 of the Revised
Code, the panel of judges or the trial judge shall termi-
nate the sentencing hearing and impose a sentence of
life imprisonment with parole eligibility after serving
twenty years of imprisonment on the offender.

HISTORY: 139 v S 1. Eff 10-19-81.

## [§ 2929.02.3] § 2929.023 Defendant
may raise matter of age.

A person charged with aggravated murder and one
or more specifications of an aggravating circumstance
may, at trial, raise the matter of his age at the time of
the alleged commission of the offense and may present
evidence at trial that he was not eighteen years of age
or older at the time of the alleged commission of the
offense. The burdens of raising the matter of age, and
of going forward with the evidence relating to the matter
of age, are upon the defendant. After a defendant has
raised the matter of age at trial, the prosecution shall
have the burden of proving, by proof beyond a reason-
able doubt, that the defendant was eighteen years of
age or older at the time of the alleged commission of
the offense.

HISTORY: 139 v S 1. Eff 10-19-81.

## [§ 2929.02.4] § 2929.024 Investi-
gation services and experts for indigent.

If the court determines that the defendant is indigent
and that investigation services, experts, or other services
are reasonably necessary for the proper representation
of a defendant charged with aggravated murder at trial
or at the sentencing hearing, the court shall authorize
the defendant's counsel to obtain the necessary services
for the defendant, and shall order that payment of the
fees and expenses for the necessary services be made
in the same manner that payment for appointed counsel
is made pursuant to Chapter 120. of the Revised Code.
If the court determines that the necessary services had
to be obtained prior to court authorization for payment
of the fees and expenses for the necessary services,
the court may, after the services have been obtained,
authorize the defendant's counsel to obtain the neces-
sary services and order that payment of the fees and
expenses for the necessary services be made as provided
in this section.

HISTORY: 139 v S 1. Eff 10-19-81.

## § 2929.03 Imposing sentence for aggra-
vated murder.

(A) If the indictment or count in the indictment
charging aggravated murder does not contain one or
more specifications of aggravating circumstances listed
in division (A) of section 2929.04 of the Revised Code,
then, following a verdict of guilty of the charge of aggra-
vated murder, the trial court shall impose sentence on
the offender as follows:

(1) Except as provided in division (A)(2) of this section, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(2) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, the trial court shall impose upon the offender a sentence of life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(B) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge, and, if guilty of the principal charge, whether the offender was eighteen years of age or older at the time of the commission of the offense, if the matter of age was raised by the offender pursuant to section 2929.023 [2929.02.3] of the Revised Code, and whether the offender is guilty or not guilty of each specification. The jury shall be instructed on its duties in this regard. The instruction to the jury shall include an instruction that a specification shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification, but the instruction shall not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification.

(C)(1) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge but not guilty of each of the specifications, and, regardless of whether the offender raised the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code, the trial court shall impose sentence on the offender as follows:

(a) Except as provided in division (C)(1)(b) of this section, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(b) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, the trial court shall impose upon the offender a sentence of life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(2)(a) If the indictment or count in the indictment contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code and if the offender is found guilty of both the charge and one or more of the specifications, the penalty to be imposed on the offender shall be one of the following:

(i) Except as provided in division (C)(2)(a)(ii) of this section, the penalty to be imposed on the offender shall be death, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(ii) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, the penalty to be imposed on the offender shall be death or life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(b) A penalty imposed pursuant to division (C)(2)(a)(i) or (ii) of this section shall be determined pursuant to divisions (D) and (E) of this section and shall be determined by one of the following:

(i) By the panel of three judges that tried the offender upon the offender's waiver of the right to trial by jury;

(ii) By the trial jury and the trial judge, if the offender was tried by jury.

(D)(1) Death may not be imposed as a penalty for aggravated murder if the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense. When death may be imposed as a penalty for aggravated murder, the court shall proceed under this division. When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. No statement made or information provided by a defendant in a mental examination or proceeding conducted pursuant to this division shall be disclosed to any person, except as provided in this division, or be used in evidence against the defendant on the issue of guilt in any retrial. A pre-sentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender. The defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and of any other factors in mitigation of the imposition of the sentence of death. If the offender chooses to make a statement, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation.

The defendant shall ha[...] with the evidence of an[...] imposition of the senten[...] shall have the burden o[...] reasonable doubt, that [...] the defendant was foun[...] cient to outweigh the fac[...] tion of the sentence of d[...]

(2) Upon considerati[...] raised at trial, the testim[...] of the offender, argumen[...] the reports submitted p[...] this section, the trial jud[...] a jury, shall determine w[...] stances the offender was [...] are sufficient to outweigh[...] in the case. If the trial ju[...] beyond a reasonable dou[...] stances the offender w[...] outweigh the mitigating [...] ommend to the court [...] imposed on the offend[...] jury shall recommend t[...] to one of the following [...]

(a) Except as provid[...] section, to life imprison[...] onment with parole elig[...] full years of imprisonm[...] parole eligibility after se[...] onment;

(b) If the offender al[...] to a sexual motivation sp[...] predator specification [...] ment, count in the ind[...] charged the aggravated[...] without parole.

If the trial jury rec[...] sentenced to life impri[...] prisonment with parol[...] five full years of imp[...] with parole eligibility [...] imprisonment, the cou[...] ommended by the jur[...] tence is a sentence of l[...] imposed under divisio[...] sentence shall be ser[...] of the Revised Code. [...] the sentence of death [...] the court shall proceed[...] division (D)(3) of this [...]

(3) Upon consider[...] raised at trial, the testi[...] of the offender, argum[...] the reports submitted [...] (D)(1) of this sectio[...] division (D)(2) of this [...] dation that the senten[...] finds, by proof beyo[...] panel of three judges [...] yond a reasonable de[...] stances the offender [...] outweigh the mitigati[...] con[...] the co[...] of the following sent[...]

The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

(2) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following:

(a) Except as provided in division (D)(2)(b) of this section, to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment;

(b) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, to life imprisonment without parole.

If the trial jury recommends that the offender be sentenced to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the sentence is a sentence of life imprisonment without parole imposed under division (D)(2)(b) of this section, the sentence shall be served pursuant to section 2971.03 of the Revised Code. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section.

(3) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

(a) Except as provided in division (D)(3)(b) of this section, one of the following:

(i) Life imprisonment without parole;

(ii) Life imprisonment with parole eligibility after serving twenty-five full years of imprisonment;

(iii) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(b) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(E) If the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code, was convicted of aggravated murder and one or more specifications of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court or the panel of three judges shall not impose a sentence of death on the offender. Instead, the court or panel shall impose one of the following sentences on the offender:

(1) Except as provided in division (E)(2) of this section, one of the following:

(a) Life imprisonment without parole;

(b) Life imprisonment with parole eligibility after serving twenty-five full years of imprisonment;

(c) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(2) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(F) The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code it found to exist, what other mitigating factors it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors. For cases in which a sentence of death is imposed for an offense committed before January 1, 1995, the court or panel shall file the opinion required to be prepared by this division with the clerk of the appropriate court of appeals and with the clerk of the supreme court within fifteen days after the court or panel imposes sentence. For cases in which a sentence of death is imposed for an offense committed on or after January 1, 1995, the court or panel shall file

Case: 4:07-cv-00880-JG Doc #: 34-12 Filed: 05/07/13 212 of 221. PageID #: 1460

A-13

the opinion required to be prepared by this division with the clerk of the supreme court within fifteen days after the court or panel imposes sentence. The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed.

(G)(1) Whenever the court or a panel of three judges imposes a sentence of death for an offense committed before January 1, 1995, the clerk of the court in which the judgment is rendered shall deliver the entire record in the case to the appellate court.

(2) Whenever the court or a panel of three judges imposes a sentence of death for an offense committed on or after January 1, 1995, the clerk of the court in which the judgment is rendered shall deliver the entire record in the case to the supreme court.

HISTORY: 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 146 v S 4 (Eff 9-21-95); 146 v S 2 (Eff 7-1-96); 146 v S 269 (Eff 7-1-96); 146 v H 180. Eff 1-1-97.

† The number was changed from twenty to twenty-five years by SB 269 (146 v —), effective 7-1-96, division (D)(2)(a).

The effective date is set by section 3 of HB 180.

See provisions, § 4 of HB 180 (146 v —) following RC § 2921.34.

The provisions of §§ 3, 4 of SB 269 read as follows:

SECTION 3. That Section 5 of Am. Sub. S.B. 2 of the 121st General Assembly be amended to read as follows:

"Sec. 5. The provisions of the Revised Code in existence prior to July 1, 1996, shall apply to a person upon whom a court imposed a term of imprisonment prior to that date and, notwithstanding division (B) of section 1.58 of the Revised Code, to a person upon whom a court, on or after that date and in accordance with the law in existence prior to that date, imposes a term of imprisonment for an offense that was committed prior to that date.

The provisions of the Revised Code in existence on and after July 1, 1996, apply to a person who commits an offense on or after that date."

SECTION 4. That existing Section 5 of Am. Sub. S.B. 2 of the 121st General Assembly is hereby repealed.

**Comment, Legislative Service Commission**

Section 2929.03 of the Revised Code is amended by this act [Am. Sub. S.B. 269] and also by Am. Sub. H.B. 180 of the 121st General Assembly. Comparison of these amendments in pursuance of section 1.52 of the Revised Code discloses that they are not irreconcilable so that they are required by that section to be harmonized to give effect to each amendment.

## § 2929.04 Criteria for imposing death or imprisonment for a capital offense.

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

(1) The offense was the assassination of the president of the United States or a person in line of succession to the presidency, the governor or lieutenant governor of this state, the president-elect or vice president-elect of the United States, the governor-elect or lieutenant governor-elect of this state, or a candidate for any of the offices described in this division. For purposes of this division, a person is a candidate if the person has been nominated for election according to law, if the person has filed a petition or petitions according to law

to have the person's name placed on the ballot in a primary or general election, or if the person campaigns as a write-in candidate in a primary or general election.

(2) The offense was committed for hire.

(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

(4) The offense was committed while the offender was under detention or while the offender was at large after having broken detention. As used in division (A)(4) of this section, "detention" has the same meaning as in section 2921.01 of the Revised Code, except that detention does not include hospitalization, institutionalization, or confinement in a mental health facility or mental retardation and developmentally disabled facility unless at the time of the commission of the offense either of the following circumstances apply:

(a) The offender was in the facility as a result of being charged with a violation of a section of the Revised Code.

(b) The offender was under detention as a result of being convicted of or pleading guilty to a violation of a section of the Revised Code.

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

(6) The victim of the offense was a law enforcement officer, as defined in section 2911.01 of the Revised Code, whom the offender had reasonable cause to know or knew to be a law enforcement officer as so defined, and either the victim, at the time of the commission of the offense, was engaged in the victim's duties, or it was the offender's specific purpose to kill a law enforcement officer as so defined.

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding.

(9) The offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design.

(10) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit terrorism.

(B) If one or more [...]
listed in division (A) [...]
indictment or count i [...]
yond a reasonable do [...]
raise the matter of ag [...]
[2929.02.3] of the Rev [...]
raising the matter of [...]
been eighteen years o [...]
commission of the offe [...]
of three judges shall [...]
aggravating circumsta [...]
doubt, the nature and [...]
history, character, and [...]
all of the following fa [...]

(1) Whether the vi [...]
facilitated it;

(2) Whether it is un [...]
been committed, but [...]
under duress, coercio [...]

(3) Whether, at the [...]
the offender, because [...]
lacked substantial cap [...]
of the offender's cond [...]
conduct to the requir [...]

(4) The youth of th [...]

(5) The offender's l [...]
criminal convictions a [...]

(6) If the offender w [...]
not the principal offe [...]
participation in the o [...]
fender's participation [...]
of the victim;

(7) Any other factor [...]
whether the offender [...]

(C) The defendant [...]
the presentation of e [...]
division (B) of this se [...]
mitigation of the impo [...]

The existence of an [...]
in division (B) of thi [...]
imposition of a senten [...]
shall be weighed purs [...]
of section 2929.03 of [...]
court, trial jury, or th [...]
the aggravating circum [...]
guilty of committing [...]

HISTORY: 134 v H 511 [...]
147 v S 32 (Eff 8-6-97); [...]
(Eff 12-29-98); 149 v S 18 [...]

The provisions of § 3 [...]

SECTION 3. Section 292 [...]
in this act as a composit [...]
Sub. H.B. 151 and Am. S [...]
with the new language o [...]
letters. This is in recogni [...]
(B) of section 1.52 of the [...]
are to be harmonized w [...]
and constitutes a legislat [...]
version in effect prior to [...]

## § 2929.05 A
tence.

(A) Whenever senten [...]
to section 2929.03 an [...]
the court of appeals, [...]

on the ballot in a
· person campaigns
r general election.
r hire.
for the purpose of
rial, or punishment
e offender.
hile the offender
ffender was at large
ed in division (A)(4)
same meaning as
Code, except that
ation, institutional-
al health facility or
tally disabled facil-
ion of the offense
s apply:

y as a result of being
ion of the Revised

ction as a result of
ay to a violation of

offender was con-
nent of which was
to kill another, or
course of conduct
r attempt to kill two

a law enforcement
.01 of the Revised
nable cause to know
icer as so defined,
the commission of
n's duties, or it was
l a law enforcement

hile the offender
nit, or fleeing im-
mpting to commit
aggravated robbery,
e offender was the
of the aggravated
der, committed the
ation and design.

rder was a witness
led to prevent the
roceeding and the
ed during the com-
flight immediately
commission of the
ness, or the victim
tness to an offense
ion for the victim's
g.

on of the offense,
her who was under
the commission of
· was the principal
fense or, if not the
offense with prior

hile the offender
nit, or fleeing im-
mpting to commit

---

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

(1) Whether the victim of the offense induced or facilitated it;

(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

(4) The youth of the offender;

(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(C) The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death.

The existence of any of the mitigating factors listed in division (B) of this section does not preclude the imposition of a sentence of death on the offender but shall be weighed pursuant to divisions (D)(2) and (3) of section 2929.03 of the Revised Code by the trial court, trial jury, or the panel of three judges against the aggravating circumstances the offender was found guilty of committing.

**HISTORY:** 134 v H 511 (Eff 1-1-74); 139 v S 1 (Eff 10-19-81); 147 v S 32 (Eff 8-6-97); 147 v H 151 (Eff 9-16-97); 147 v S 193 (Eff 12-29-98); 149 v S 184. Eff 5-15-2002.

The provisions of § 3 of SB 193 (147 v —) read as follows:

SECTION 3. Section 2929.04 of the Revised Code is presented in this act as a composite of the section as amended by both Sub. H.B. 151 and Am. S.B. 32 of the 122nd General Assembly, with the new language of neither of the acts shown in capital letters. This is in recognition of the principle stated in division (B) of section 1.52 of the Revised Code that such amendments are to be harmonized where not substantively irreconcilable and constitutes a legislative finding that such is the resulting version in effect prior to the effective date of this act.

## § 2929.05 Appellate review of death sentence.

(A) Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals, in a case in which a sentence of

---

death was imposed for an offense committed before January 1, 1995, and the supreme court shall review upon appeal the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They also shall review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case.

A court of appeals that reviews a case in which the sentence of death is imposed for an offense committed before January 1, 1995, shall file a separate opinion as to its findings in the case with the clerk of the supreme court. The opinion shall be filed within fifteen days after the court issues its opinion and shall contain whatever information is required by the clerk of the supreme court.

(B) The court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall give priority over all other cases to the review of judgments in which the sentence of death is imposed and, except as otherwise provided in this section, shall conduct the review in accordance with the Rules of Appellate Procedure.

(C) At any time after a sentence of death is imposed pursuant to section 2929.022 [2929.02.2] or 2929.03 of the Revised Code, the court of common pleas that sentenced the offender shall vacate the sentence if the offender did not present evidence at trial that the offender was not eighteen years of age or older at the time of the commission of the aggravated murder for which the offender was sentenced and if the offender shows by a preponderance of the evidence that the offender was less than eighteen years of age at the time of the commission of the aggravated murder for which the offender was sentenced. The court is not required to hold a hearing on a motion filed pursuant to this

division unless the court finds, based on the motion and any supporting information submitted by the defendant, any information submitted by the prosecuting attorney, and the record in the case, including any previous hearings and orders, probable cause to believe that the defendant was not eighteen years of age or older at the time of the commission of the aggravated murder for which the defendant was sentenced to death.

**HISTORY:** 139 v S 1 (Eff 10-19-81); 146 v S 4 (Eff 9-21-95); 147 v S 107. Eff 7-29-98.

### § 2929.06 Resentencing after vacation of death sentence or life imprisonment without parole.

(A) If the sentence of death that is imposed upon an offender is vacated upon appeal because the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, or the supreme court, in cases in which the supreme court reviews the sentence upon appeal, could not affirm the sentence of death under the standards imposed by section 2929.05 of the Revised Code, is vacated upon appeal for the sole reason that the statutory procedure for imposing the sentence of death that is set forth in sections 2929.03 and 2929.04 of the Revised Code is unconstitutional, or is vacated pursuant to division (C) of section 2929.05 of the Revised Code, the trial court that sentenced the offender shall conduct a hearing to resentence the offender. At the resentencing hearing, the court shall impose one of the following sentences upon the offender:

(1) Except as provided in division (A)(2) of this section, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five† full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment;

(2) If the sentence of death was imposed for an aggravated murder committed on or after January 1, 1997, and if the offender also was convicted of or pleaded guilty to a sexual motivation specification and a sexually violent predator specification that were included in the indictment, count in the indictment, or information that charged the aggravated murder, life imprisonment without parole that shall be served pursuant to section 2971.03 of the Revised Code.

(B) If the sentence of death that is imposed upon an offender is vacated upon appeal because of error that occurred in the sentencing phase of the trial and if division (A) of this section does not apply, the trial court that sentenced the offender shall conduct a new hearing to resentence the offender. If the offender was tried by a jury, the trial court shall impanel a new jury for the hearing. If the offender was tried by a panel of three judges, that panel or, if necessary, a new panel of three judges shall conduct the hearing. At the hearing, the court shall follow the procedure set forth in division (D) of section 2929.03 of the Revised Code in determining whether to impose upon the offender a sentence of death, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(C) If the sentence of life imprisonment without parole that is imposed upon an offender pursuant to section 2929.021 [2929.02.1] or 2929.03 of the Revised Code is vacated upon appeal for the sole reason that the statutory procedure for imposing the sentence of life imprisonment without parole that is set forth in sections 2929.03 and 2929.04 of the Revised Code is unconstitutional, the trial court that sentenced the offender shall conduct a hearing to resentence the offender to life imprisonment with parole eligibility after serving twenty-five full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

**HISTORY:** 139 v S 1 (Eff 10-19-81); 146 v S 4 (Eff 9-21-95); 146 v S 2 (Eff 7-1-96); 146 v S 269 (Eff 7-1-96); 146 v S 258 (Eff 10-16-96); 146 v H 180 (Eff 1-1-97); 147 v S 107. Eff 7-29-98.

† Division (A)(1), the number of years was changed from twenty to twenty-five in SB 269 (146 v —), effective 7-1-96.

The provisions of § 3 of SB 107 (147 v —) read as follows:

SECTION 3. Section 2929.06 of the Revised Code is presented in this act as a composite of the section as amended by Am. Sub. S.B. 269, Sub. S.B. 258, and Am. Sub. H.B. 180 of the 121st General Assembly, with the new language of none of the acts shown in capital letters. This is in recognition of the principle stated in division (B) of section 1.52 of the Revised Code that such amendments are to be harmonized where not substantively irreconcilable and constitutes a legislative finding that such is the resulting version in effect prior to the effective date of this act.

See provisions, § 4 of HB 180 (146 v —) following RC § 2921.34.

See provisions, §§ 3, 4 of SB 269 (146 v —) following RC § 2929.03.

[PENALTIES FOR FELONY]

### § 2929.11 Purposes of felony sentencing; discrimination prohibited.

(A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

(C) A court that imposes a sentence upon an offender for a felony shall not base the sentence upon the race, ethnic background, gender, or religion of the offender.

**HISTORY:** 146 v S 2. Eff 7-1-96.

Not analogous to former RC § 2929.11 (134 v H 511; 137 v S 119; 139 v S 199; 140 v S 210; 140 v H 265; 140 v S 4; 141 v H 284; 143 v H 51; 143 v S 258), repealed 146 v S 2, § 2, eff 7-1-96.

The effective date is set by section 6 of SB 2.

### § 2929.12
tors.

(A) Unless otherw[...] 2929.14 of the Revi[...] sentence under this [...] felony has discretio[...] way to comply with t[...] tencing set forth in s[...] In exercising that d[...] the factors set forth[...] section relating to t[...] the factors provided[...] section relating to t[...] vism and, in additio[...] that are relevant to a[...] ples of sentencing.

(B) The sentenci[...] following that apply[...] or the victim, and a[...] ing that the offend[...] conduct normally c[...]

(1) The physical [...] victim of the offense[...] was exacerbated be[...] dition or age of the [...]

(2) The victim of [...] cal, psychological, [...] offense.

(3) The offender [...] trust in the commu[...] office or position.

(4) The offender[...] fession obliged the [...] bring others comm[...]

(5) The offender[...] tion, elected office[...] the offense or is li[...] of others.

(6) The offende[...] tated the offense.

(7) The offende[...] as a part of an org[...]

(8) In committi[...] vated by prejudice [...] gender, sexual ori[...]

(9) If the offens[...] a violation of sect[...] the Revised Code [...] or household mem[...] offender committe[...] or more children [...] and the offender o[...] guardian, custodia[...] or more of those [...]

(C) The senten[...] following that appl[...] or the victim, and [...] ing that the offen[...] duct normally co[...]

(1) The offend[...]
(2) In committi[...] Article 1.5 1 provi[...] committi[...] cause or expect t[...] or property.

STATE OF OHIO, Plaintiff-Appellee -vs- EUGENE JOHNSON, Defendant-Appellant
1997 Ohio App LEXIS 1001997 Ohio App. LEXIS 100
NO. 70234
January 16, 1997, DATE OF ANNOUNCEMENT OF DECISION
COURT OF APPEALS OF OHIO, EIGHTH APPELLATE DISTRICT, CUYAHOGA COUNTY
JAMES M. PORTER, JUDGE, SPELLACY, C.J., and TIMOTHY E. McMONAGLE, J., CONCUR.


Disposition
JUDGMENT: Affirmed
Counsel
APPEARANCES:
STEPHANIE TUBBS JONES, Cuyahoga County Prosecutor, MICHAEL D. HORN, Assistant Prosecuting Attorney, Cleveland, Ohio.
For Defendant-Appellant: MICHAEL G. POLITO, ESQ., JOHN J. RUSSO, ESQ., Hildebrand, Williams, & Farrell, Fairview Park, Ohio.
Opinion
Editorial Information: Prior History
CHARACTER OF PROCEEDINGS: Criminal appeal from Court of Common Pleas, Case No. CR-324431.
Editorial Information: Subsequent History
Application for Reopening Denied February 6, 2002, Reported at: 2002 Ohio App. LEXIS 559.
Opinion by:      JAMES M. PORTER
JOURNAL ENTRY AND OPINION
JAMES M. PORTER, J.,
Defendant-appellant Eugene Johnson appeals from his conviction following a jury trial for the murder of Clifton Hudson with a firearm specification. Defendant contends that the trial court erred in permitting improper identification of the defendant where the previous photographic identification was unduly suggestive and unreliable; and in not declaring a mistrial for prosecutorial references to defendant as a member of a gang and evidence of improper communications with the jury respecting their personal safety and intimidation. We find no error and affirm.
Clifton Hudson, Jr., age 19, was shot to death on February 10, 1995, on Strathmore Road in East Cleveland. The State's principal witness to the shooting was Tamika Harris, age 15, who was on her way home around 5:45 p.m. with her friend, Monique, when they heard gunshots. Monique ran off, but according to Tamika's testimony, she observed a boy shooting another boy. The victim was lying on the sidewalk and she heard five more shots as she stood up against the bridge.
Ms. Harris said she saw a black four-by-four vehicle stopped on Strathmore at the time of the shooting. The assailant later identified by Ms. Harris as defendant Eugene Johnson, had come from the rear of the van toward the victim, after two shots were fired. After the last shots were fired, the black four-by-four turned, sped off and turned right on Manhattan Avenue, almost hitting another car.

Appellant argues in this assignment that numerous instances of prosecutor misconduct occurred during cross-examination of defense witnesses and during closing argument, thereby denying him a fair trial. In evaluating claims of prosecutorial misconduct, "we must remember that 'the touchstone of analysis "*** is the fairness of the trial, not the culpability of the prosecutor."*** The Constitution does not guarantee an "error free, perfect trial."'" State v. Hall (Aug. 3, 1994), 1994 Ohio App. LEXIS 3376, Montgomery App. No. 13805, 1994 WL 409639, unreported, quoting State v. Landrum (1990), 53 Ohio St. 3d 107, 112, 559 N.E.2d 710, 718.

Additionally, the following must be kept in mind by a reviewing court:

"The Supreme Court set forth the standard in evaluating a claim of prosecutorial misconduct in State v. Keenan (1993), 86 Ohio St. 3d 402, 613 N.E.2d 203, as follows:

"'*** The prosecutor carries into court the prestige of "the representative*** of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest*** is not that it shall win a case, but that justice shall be done.*** Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States (1935), 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 [, 633]***.' Id. at 406 [613 N.E.2d at 207.]

"At the same time, this court must remember that the conduct of a prosecuting attorney during the trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. See State v. Apanovitch (1987), 33 Ohio St. 3d 19, 24, 514 N.E.2d 394 [400]. In State v. Gillard (1988), 40 Ohio St. 3d 226, 533 N.E.2d 272, the Ohio Supreme Court found that a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists. State v. Pond (Feb. 16, 1995), 1995 Ohio App. LEXIS 567, Franklin App. No. 94APA07-1007, unreported, 1995 WL 68076; see, also, State v. Maurer (1984), 15 Ohio St. 3d 239, 15 Ohio B. Rep. 379, 473 N.E.2d 768.

The State made a statement concerning the defendant's gang membership during voir dire. At that point, the State told potential jurors that they would decide whether or not the defendants are gang members. Upon objection, the court then instructed the jurors that:

Evidence is not what the lawyers discuss with you during this voir dire. So there is a question that may be determined by you at some later date as to whether or not any of the defendants are, or are not members of any group. But that is for your determination. If it becomes a disputed fact or testimony. And I don't know whether it will or it won't.

But anything that the lawyers say during the course of voir dire, and their opening statements, and closing arguments is not evidence. The evidence is what will transpire from the witness stand.

(Tr. 91).

The court's instruction during voir dire was proper and we find no error. "A jury is presumed to follow the instructions, including curative instructions, given it by a judge. State v. Garner (1995), 74 Ohio St. 3d 49, 59, 656 N.E.2d 623. It should be noted that defendant's attorneys also voir dired the jury concerning their feelings concerning gangs, a recognition on their part that the issue may arise in the case and appropriate for voir dire.

Defendant claims that the prosecution made a statement regarding the defendant's gang affiliation in opening argument. The statement defendant refers to is the prosecutor's

State of Ohio, Plaintiff-Appellee, v. Michael Powers, Defendant-Appellant.

1992 Ohio App LEXIS 10091992 Ohio App. LEXIS 1009

No. 91AP-927

March 5, 1992, Rendered

COURT OF APPEALS OF OHIO, TENTH APPELLATE DISTRICT, FRANKLIN COUNTY

BRYANT, YOUNG, WHITESIDE

Disposition          Judgment affirmed.

Counsel              MR. MICHAEL MILLER, Prosecuting Attorney, and MS. JOYCE S. ANDERSON, for appellee.

                     MR. JAMES KURA, Public Defender, and MR. PAUL SKENDELAS, for appellant.

Opinion

Editorial Information: Prior History

APPEAL from the Franklin County Court of Common Pleas.

Opinion by:          BRYANT

OPINION

BRYANT, J.

Defendant-appellant, Michael Powers, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of two counts of rape in violation of R.C. 2907.02 , and one count of kidnapping in violation of R.C. 2905.01 .

On October 16, 1990, Donna Bacus was at Shannon's Pub in training as a bartender. Following work, she sat near defendant; he bought her a beer, and during their conversation they discovered that Michael Beckelheimer, who had committed suicide, was a mutual friend. Ultimately, they decided to visit Beckelheimer's gravesite, as well as the gravesite of Bacus' child.

Defendant and Bacus left Shannon's Pub and drove to a Kroger store, where Bacus purchased two long-stemmed roses, one for each grave; defendant went to My Place Lounge next door and waited for Bacus. When she arrived, defendant ordered her a drink and, after conversation, they left for the cemetery. At the cemetery, Bacus and defendant were emotional at the gravesite of their friend. Although defendant initially was comforting Bacus, he then hugged her in a sexual manner, making her somewhat leery of him. They went back to his car and Bacus asked him to take her to her car, as she needed to return to her children. He agreed. Nonetheless, defendant pulled into a bar and suggested that they have a "drink to Mikey." When Bacus refused, defendant became angry, and he drove down some country roads. Being afraid, she told defendant she had to stop at a bathroom. Defendant drove into a bar near New Rome, let her exit the car, and waited for her. Given his willingness to accede to her request, Bacus began to think that she was "imagining a little bit of this." When she came out of the bathroom, defendant was standing at the bar and agreed to take her to her car.

Bacus thought she was being returned to her car until defendant made a turn inconsistent with that goal. She repeatedly asked defendant what he was doing and defendant ultimately stopped the car in an isolated area. Bacus kept saying "please don't do this"; and when she reached for the door, defendant grabbed her arm. She told him that if he did not stop, she would tell the police; and he responded "you think you will."

proceeded to an isolated area where Bacus asserts she was raped. Under those facts, defendant's kidnapping by deception involved a significant asportation apart from that incident to the rapes. Applying the reasoning of Higgins herein, the trial court did not error in sentencing defendant on all three convictions. Defendant's fifth assignment of error is overruled.

In his sixth and final assignment of error, defendant contends that the trial court erred in limiting the area of his inquiry during voir dire; that the trial court erred in prohibiting him from asking prospective jurors whether the fact of his marriage would affect the juror's impartiality toward him.

During voir dire, defense counsel asked the following:

"Is there anyone here that would feel uncomfortable with the -- a fact if it were to come out that my client here committed an adultery offense? If you feel that he committed an adultery offense, would that hurt you, would that cause you to sort of lean in favor of finding him guilty, that alone? Does anybody have a problem with it?

"If I could explain. If you were to have a finding that he were, he had committed a sex act with an individual not his wife, would that make you more apt to convict him? Maybe I'll just ask an individual." (Tr. 126.)

Sua sponte, the court interrupted counsel and advised that "* * * we're not going to pre-try the case in voir dire. We're not going to elicit promises one way or another from the jury with respect to any evidence that you think may be presented in this case. It's not proper voir dire."

The trial court's admonition to defense counsel seems not so much directed to the area of inquiry, but to the form of defendant's question. In particular, the trial court did not interrupt defendant as he first forayed into the line of questioning. Rather, the court stopped defendant when he began to explain and, in doing so, to inquire about the jury's potential verdict. Inartfully phrased, defense counsel's question in effect asked for an indication from the jury what they might do in response to certain evidence.

While the trial court perhaps could have explained more fully the basis for interrupting defendant, we note that, rather than rephrase his question, defense counsel dropped the area of questioning and moved to another area of inquiry to the prospective jurors.

In the final analysis, we are unable to conclude that the trial court limited defendant's ability to inquire about the prospective jurors' reaction to the assertions against defendant in light of his marital status; rather, the trial court simply intervened to prevent an improper form of question to the jury. Defense counsel having failed to rephrase the question, we cannot conclude the trial court would not have allowed a properly phrased question with respect to defendant's marital status.

Defendant's sixth assignment of error is overruled.

Having overruled all six assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

YOUNG, P.J., and WHITESIDE, J., concur.

Footnotes

Footnotes

1      Defendant also asserts that the trial court erred in allowing the doctor to testify that, assuming a woman is sexually active, he is less likely to find evidence of physical trauma as a result of rape. Specifically, defendant asserts that the record contained no evidence of Bacus' sexual activity; and defendant was precluded from inquiring in that

STATE OF OHIO, Plaintiff-Appellee, - vs - FREDERICK TREESH, Defendant-Appellant.

1998 Ohio App LEXIS 48861998 Ohio App. LEXIS 4886

CASE NO. 95-L-057

October 16, 1998, Decided

COURT OF APPEALS OF OHIO, ELEVENTH APPELLATE DISTRICT, LAKE COUNTY

HON. DONALD R. FORD, P.J., HON. JUDITH A. CHRISTLEY, J., HON. WILLIAM M. O'NEILL, J. CHRISTLEY, J., concurs, O'NEILL, J., dissents with Dissenting Opinion.


Disposition

JUDGMENT: Affirmed.

Counsel        CHARLES E. COULSON, LAKE COUNTY PROSECUTOR, VINCENT A. CULOTTA, ASSISTANT PROSECUTOR, Painesville, OH, (For Plaintiff-Appellee).

ATTY. THOMAS G. LOBE, Cleveland, OH, ATTY. JOHN P. KESHOCK, Rocky River, OH, (For Defendant-Appellant).

Opinion

Editorial Information: Prior History

CHARACTER OF PROCEEDINGS: Criminal Appeal with Death Penalty. Court of Common Pleas. Case No. 94 CR 000514.

Opinion by:        DONALD R. FORD

OPINION

FORD, P.J.

This is an appeal from the Lake County Court of Common Pleas. Appellant, Frederick Treesh, appeals from his conviction and sentence on one count of aggravated murder, R.C. 2903.01(B) , with two specifications of aggravating circumstances and one firearm specification; two counts of attempted aggravated murder, R. C. 2923.02 and 2903.01(B), each count with a firearm specification; one count of felonious assault, R.C. 2903.11 , with a firearm specification; and one count of aggravated robbery, R.C. 2911.01 , with a firearm specification.

The charges against appellant arose in connection with the events occurring August 27-28, 1994. On August 27, 1994, appellant, Keisha Harth ("Harth"), and Benjamin Brooks ("Brooks") were driving around the Cleveland area in a blue Pontiac Sunbird seeking to purchase drugs. Earlier in the day, the group was 'ripped off" when they made two "bad buys" of what was sold as cocaine, but turned out to be baking soda. The parties later purchased more drugs after being directed to a seller by Anthony Washington ("Washington"). After consuming those drugs, and being in need of additional funds to purchase more cocaine, appellant, Harth, Brooks, and Washington decided to find a place to rob, and were directed by Washington to the Vine Street News, an adult bookstore in Eastlake, Lake County, Ohio.

The parties subsequently arrived at the bookstore and parked in the store's parking lot. At approximately 11:35 p.m., on August 27, 1994, appellant and Brooks entered the Vine Street News. Louis Lauver ("Lauver"), the store clerk, testified that he initially observed a black male and a white female browsing through the magazines prior to the time that

three years of actual incarceration on the firearm specification. The court further held that count four, felonious assault of a peace officer, would merge into count three, attempted aggravated murder, for purposes of sentencing. On those counts, the court sentenced appellant to an indefinite term of ten to twenty-five years of imprisonment, to be served consecutively to the three years of actual incarceration on the firearm specification.

On count five, aggravated robbery, the court sentenced appellant to an indefinite prison term of ten to twenty-five years. The court also found that the firearm specification in this count would merge with the firearm specification in count one.

On March 7, 1995, the trial court issued its opinion pursuant to R.C. 2929.03(F) , in which it concluded that the aggravating circumstance regarding appellant's aggravated murder conviction outweighed the mitigating factors beyond a reasonable doubt. Thus, the court sentenced appellant to death on count one.

On April 5, 1995, the trial court granted appellant's stay of execution pending appeal. Appellant now timely appeals to this court, asserting the following twenty-one assignments of error:

"[1.] The trial court erred to the prejudice of the appellant by denying the appellant's motion for transfer of venue.

"[2.] The trial court erred to the prejudice of the appellant in not suppressing statements made by him to law enforcement officers and evidence obtained from those statements.

"[3.] The trial court erred to the prejudice of the appellant by denying the appellant's motion to dismiss due to missing and intentionally destroyed evidence.

"[4.] The trial court erred to the prejudice of the appellant by denying the appellant's motion to produce [the] record of grand jury proceedings.

"[5.] The trial court erred to the prejudice of the appellant by failing to provide appellant with daily transcripts.

"[6.] The trial court erred to the prejudice of the appellant by denying the appellant's motion to increase [the] number of peremptory challenges.

"[7.] The prosecutor's misconduct during voir dire violated appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 9, 10, and 16, Article I of the Ohio Constitution.

"[8.] The Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution guarantee an accused a fair trial and an impartial jury. The inclusion of juror Lynn Volke denied appellant these constitutional guarantees.

"[9.] The trial court committed prejudicial error by allowing the appellee to argue in an improper and inflammatory manner during the guilt phase before the jury, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Sections 9, 10, and 16, Article I of the Ohio Constitution.

"[10.] The trial court committed prejudicial error by overruling the motions for acquittal made by appellant, in violation of appellant's rights as guaranteed him by the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution and Sections 9 and 10, Article I of the Ohio Constitution.

"[11.] Appellant was denied his right to a fair trial and due process by the trial court's denial of his motion for mistrial in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10, and 16, Article I of the Ohio Constitution.

then his conviction will not be reversed. State v. Smith (1984), 14 Ohio St. 3d 13, 15, 470 N.E.2d 883. See, also, State v. Loza (1994), 71 Ohio St. 3d 61, 78, 641 N.E.2d 1082; United States v. Hasting (1983), 461 U.S. 499, 510-511, 76 L. Ed. 2d 96, 103 S. Ct. 1974. In the case at bar, appellant's objections to two of the prosecutor's questions during the general voir dire were sustained. He now identifies these questions as being the basis of a claim of prosecutorial misconduct. First, the prosecutor stated during the general voir dire:

"Another thing that would prevent either the State of Ohio or the Defendant from having a fair trial, if you are selected on the jury, is to consider sympathy, sympathy doesn't have a part in the Courtroom. Does everybody understand that, sympathy can't enter your deliberations either."

The prosecutor's statement is a proper statement of the law. In State v. Jenkins (1984), 15 Ohio St. 3d 164, 473 N.E.2d 264, paragraph three of the syllabus, the Supreme Court of Ohio held that an instruction to a jury to exclude bias, sympathy, and prejudice in their deliberations during the sentencing phase of a death penalty case is appropriate to assure that the jurors apply the proper sentencing guidelines. Furthermore, sympathy "is irrelevant to the duty of jurors." State v. Lorraine (1993), 66 Ohio St. 3d 414, 418, 613 N.E.2d 212. The prosecutor's question, therefore, is simply a request to the jurors to follow the law, which is certainly proper. Thus, appellant has failed to demonstrate a valid claim of prosecutorial misconduct on this basis.

Next, appellant contends that the prosecutor inappropriately stated:

"I have one final question for each of you, even though I am asking as a group I'd like you to seriously consider and think about it before you give me your answer, because it's important to both sides to have a fair and impartial jury. If in each and every count that the Defendant is charged with, if you are convinced beyond a reasonable doubt, according to the law that the Judge gives you, the facts of this case, the Defendant is guilty, will you give me your word if that happens, that is proven, you will all return a verdict of guilty?"

The problem with this question is that the prosecutor asked the jurors to promise him that they would convict appellant if they felt that the evidence showed beyond a reasonable doubt that appellant was guilty. However, the only promise that the jurors must make is their oath, which states: "'You shall well and truly try, and true deliverance make between the State of Ohio and the defendant (giving his name). So help you God.'" R.C. 2945.28 .

However, a conviction will not generally be reversed solely because the court sustains a defendant's objection to a question asked by the prosecutor. See State v. Love (1988), 49 Ohio App. 3d 88, 91, 550 N.E.2d 951. Although the prosecutor's statement was improper, appellant has not identified, and we do not perceive, any prejudice to appellant's substantial rights that would mandate a reversal. Therefore, appellant's prosecutorial misconduct assertion based upon purportedly improper questioning during voir dire is not well-founded. The seventh assignment of error is meritless.

ASSIGNMENT OF ERROR 8

"The Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution guarantee an accused a fair trial and an impartial jury. The inclusion of juror Lynn Volke denied appellant these constitutional guarantees."