ORIGINAL
ON COMPUTER - HC2

# IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. __03-137__ |
| Appellee-Respondent | ) | |
| v. | ) | **Capital Case** |
| | ) | |
| NATHANIEL E. JACKSON | ) | |
| Appellant-Petitioner | ) | |

---

## ON APPEAL FROM THE TRUMBULL COUNTY COURT OF COMMON PLEAS, WARREN, OHIO
## CASE NO. 01 CR 794

---

## MOTION FOR STAY OF EXECUTION
## EXECUTION DATE: December 10, 2003

---

DENNIS WATKINS  #0021024
Trumbull County Prosecutor
LuWAYNE ANNOS #0055651
Trumbull County Prosecutor's Office
Trumbull County Admin. Bldg..
160 High St. N.W., 4th Floor
Warren, Ohio  44481
#0026073(330) 675-2426
**ATTORNEYS FOR PLAINTIFF-
    APPELLEE**

JOHN P. LACZKO #0051918
4800 Market St., Ste. C
Youngstown, Ohio  44512
(330) 788-2480
**Co-Counsel of Record**

DENNIS DAY LAGER #0026073
1025 Chapel Ridge St., N.E.
Canton, Ohio  44714
(330) 494-5736
**Co-Counsel of Record**



RECEIVED
DEC 0 1 2003
MARCIA J. MENGEL, CLERK



FILED
DEC 0 1 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

# IN THE SUPREME COURT OF OHIO

STATE OF OHIO                         )     SUPREME COURT CASE NO. 03-137

    Appellee-Respondent         )

v.                                    )          Capital Case

NATHANIEL E. JACKSON                  )

    Appellant-Petitioner

---

## MOTION FOR STAY OF EXECUTION

---

Now comes Appellant-Petitioner, Nathaniel E. Jackson, by and through undersigned counsel, and requests this Honorable Court for a  stay of Appellant's execution to appeal his convictions and death sentence.  Appellant is scheduled to be executed on December 10, 2003.  A timely Notice of Appeal of Appellant's conviction and death sentence were filed with this court on January 22, 2003, a copy of which is attached as Exhibit "A", and undersigned counsel have filed Appellant's merit brief with this Court on October 27, 2003.    To date, the State of Ohio has not yet completed its merit brief to this Court.  Without a stay of execution from this Court, Appellant will be executed before this Court completes its mandatory review of this case.  See O.R.C. 2929.05(a).  Accordingly, Appellant requests a stay of execution from this Honorable

Court to pursue his appeal as of right from the judgment below.

Respectfully submitted,

DENNIS DAY LAGER #0026073
Attorney at Law
1025 Chapel Ridge St., N.E.
Akron, Ohio 44313
(330) 494-5736
**Co-Counsel of Record**

JOHN P. LACZKO #0051918
Attorney at Law
4800 Market St., Ste. C
Youngstown, Ohio 44512
(330) 788-2480
**Co-Counsel of Record**
APPELLANT PETITIONER

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion for Stay of

Execution was forwarded by regular U. S. mail to LuWayne Annos, Trumbull County

Assist. Prosecutor, Prosecutor's Office, Trumbull County Admin. Bldg., l60 High St.

N.W., 4th Floor, Warren, Ohio 44481 on this _26_ day of ___November___, 2003.

JOHN P. LACZKO #0051918
AND
DENNIS DAY LAGER #0026073
CO-COUNSEL FOR APPELLANT-
PETITIONER

# The Supreme Court of Ohio

FILED

DEC 0 4 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio,                          :           Case No.   03-137
      Appellee,                     :

        v.                         :              E N T R Y

Nathaniel E. Jackson,                   :
      Appellant.                    :           (Trumbull County)


    Upon consideration of the appellant's motion for stay of
execution of sentence pending disposition of this appeal,

    IT IS ORDERED by the Court that the motion be, and hereby
is, granted, pending further order of this Court.

(Court of Common Pleas No. 01CR794)


                      THOMAS J. MOYER
                      Chief Justice

0051r120103

ORIGINAL

ON COMPUTER - HC6

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          )
                                        )
        Plaintiff-Appellee              )        CASE No. 03-137
                                        )
-vs-                                    )
                                        )        Appeal from the Trumbull
                                        )        County Court of Common Pleas
NATHANIEL E. JACKSON                    )        Case No. 01-CR-794
                                        )
        Defendant-Appellant             )

---

## STIPULATED EXTENSION OF TIME

---

DENNIS WATKINS
Atty.  Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Telefax No. (330) 675-2431


COUNSEL FOR PLAINTIFF-APPELLEE

JOHN P. LACZKO
Atty Reg. No.0051918
4800 Market St. Ste. C
Youngstown, Ohio  44512
Telephone No. (330) 788-2480

DENNIS DAY LAGER
Atty. Reg. No. 0026073
1025 Chapel Ridge, St. N.E.
Canton, Ohio    44714
Telephone No. (330) 494-5736


COUNSEL FOR DEFENDANT-
APPELLANT

DEC 2 2 2003

RECEIVED
DEC 2 2 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

ORIGINAL

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| Plaintiff-Appellee | ) | CASE No. 03-137 |
| | ) | |
| -vs- | ) | |
| | ) | Appeal from the Trumbull |
| | ) | County Court of Common Pleas |
| NATHANIEL E. JACKSON | ) | Case No. 01-CR-794 |
| | ) | |
| Defendant-Appellant | ) | |

STIPULATED EXTENSION OF TIME

Defendant-Appellant, Nathaniel Jackson, and the Plaintiff-Appellee, the State of Ohio ("State"), hereby stipulate to an extension of time of twenty days, pursuant to S.Ct. Prac. R. XIV, Sec. 3, (B)(2)(a), for the filing of the State's merit brief in the above-captioned matter.  Parties hereby agree that the State's brief originally due on December 26, 2003, is now due on January 15, 2004.

Respectfully submitted,

LuWAYNE ANNOS
Atty. Reg. No.0055651
COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Telefax No. (330) 675-2431

_____

JOHN P. LACZKO
Atty. Reg. No. 0051918
4800 Market St. Ste. C.
Youngstown, Ohio  44512
Telephone No. (330) 788-2480

DENNIS DAY LAGER
Atty. Reg. No. 0026073
1025 Chapel Ridge, St. N.E.
Canton, Ohio   44714
Telephone No. (330) 494-5736

COUNSEL FOR DEFENDANT-APPELLANT NATHANIEL E. JACKSON

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing stipulation was sent by ordinary U.S. Mail on this *19th* Day of December, 2003 to Atty. John P. Laczko (#0051918), 4800 Market St. Ste. C, Youngstown, Ohio 44512, and Atty. Dennis Day Lager (#0026073), 1025 Chapel Ridge St., N.E.,  Canton, Ohio 44714

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Counsel for Plaintiff-Appellee, The State
Of Ohio

ORIGINAL
ON COMPUTER - PC

## IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          )
                                        )
      Plaintiff-Appellee              )        CASE No. 03-137
-vs-                                    )
                                        )        Appeal from the Trumbull
                                        )        County Court of Common Pleas
NATHANIEL E. JACKSON                    )        Case No. 2001 CR 794
                                        )
      Defendant-Appellant             )

---

### MERIT  BRIEF PLAINTIFF-APPELLEE  OF STATE OF OHIO

---

DENNIS WATKINS
Atty.  Reg. No. 0009949
LuWAYNE ANNOS (Counsel of Record)
Atty Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor, Administration Building
Warren, Ohio  44481
Telephone No.(330)675-2426
Telefax No. (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE
STATE OF OHIO

JOHN P. LACZKO
Atty. Reg. No.  0051918
4800  Market St., Suite C
Youngstown, Ohio   44512
Telephone No. (330) 788-2480

DENNIS DAY LAGER
Atty. Reg. No. 0026073
1025 Chapel Ridge St. N.E.
Canton, Ohio    44714
(330) 494-5736

COUNSEL FOR DEFENDANT-
APPELLANT NATHANIEL E. JACKSON

FILED
JAN 1 4 2004


RECEIVED
JAN 1 4 2004
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.................................................................................................iii

STATEMENT OF FACTS.................................................................................................1

ARGUMENT..................................................................................................9

**APPELLEE'S PROPOSITION OF LAW NO. 1:**
**A trial court does not err in admitting inculpatory statements made by a criminal**
**defendant who signs a Miranda rights waiver and then engages in an hour-long**
**conversation with two investigators.**..........................................................................9

**APPELLEE'S PROPOSITION OF LAW NO. 2:**
**Appellant's trial counsel's failure to object to contrived instances of prosecutorial**
**misconduct, effective voir dire of prospective jurors, proposed instructions beneficial to**
**Appellant, and evidence ultimately used by the defense did not rise to a level of ineffective**
**assistance of counsel.**....................................................................................14

**APPELLEE'S PROPOSITION OF LAW NO. 3:**
**The prosecutor for the State of Ohio engaged in no misconduct.  Appellant's trial**
**was a fair one, and none of the prosecutor's acts prejudiced any substantial rights of**
**Appellant.** ..................................................................................................26

**APPELLEE'S PROPOSITION OF LAW NO. 4:**
**Appellant cites to no "judicial error" which was in fact improper.  None of the alleged**
**irregularities, even if found to be "error" were outcome determinative due to the**
**overwhelming evidence of Appellant's guilt.**...............................................39

**APPELLEE'S PROPOSITION OF LAW NO. 5:**
**A jury instruction which requires the State to prove beyond a reasonable doubt**
**a capital defendant's intent to kill does not relieve the State of its burden to**
**prove that the defendant purposely caused the death of another and therefore**
**is not constitutionally infirm.**.....................................................................44

**APPELLEE'S PROPOSITION OF LAW NO. 6:**
**The "reasonable doubt" definition as promulgated in R.C. 2901.05(D) is**
**constitutionally sound and did not prejudice Appellant in the case sub judice.**...................48

TABLE OF CONTENTS (Cont'd)

PAGE

**APPELLEE'S PROPOSITION OF LAW NO. 7**:
**A trial court that weighs an aggravated murder committed during the commission of the violent crimes of both aggravated burglary and aggravated robbery against minimal, "catchall" mitigating evidence does not err in imposing a death sentence**.................................................................................................51

**APPELLEE'S PROPOSITION OF LAW NO. 8**:
**The trial court properly weighed the aggravating circumstances against the mitigating factors in determining that a sentence of death was neither excessive nor disproportionate**..........................................................................58

**APPELLEE'S PROPOSITION OF LAW NO. 9**:
**A capital defendant has no constitutional right to a proportionality review, therefore he cannot claim constitutional error as a result of precedent from this Court to compare death sentences only with death sentences**...........................62

**APPELLEE'S PROPOSITION OF LAW NO. 10**:
**A lack of legislative changes to Ohio proportionality review strong suggests that this Court has consistently and properly interpreted R.C. 2929.05 for the past 17 years**......................................................................................65

**APPELLEE'S PROPOSITION OF LAW NO. 11**:
**This Court has repeatedly recognized the constitutional soundness of Ohio's current death penalty scheme and has systematically rejected Appellant's claims of biased trial and guilty phases, and an "inadequate" appellate review process**............................................................................66

**APPELLEE'S PROPOSITION OF LAW NO. 12**:
**Ohio's death penalty statutes are neither arbitrary, discriminatory, vague, risk inducing, nor violative of international laws, treaties or resolutions**.........................................................................................73

CONCLUSION.........................................................................................78

PROOF OF SERVICE...............................................................................78

APPENDIX                                                           Appx. Page
    *State v. Goodwin* (April 17, 1997), Cuyahoga App. No. 98531......................A-1

## TABLE OF AUTHORITIES

PAGE

CASES:

*Arnold v. Cleveland* (1993), 67 Ohio St. 3d 35............................................66

*Buell v. Mitchell* (6th Cir. 2001), 274 F3d 337...........................................76

*Columbus v. Hamilton* (1992), 78 Ohio App. 3d 653....................................28

*Davis v. United States* (1994), 512 U.S. 452..............................................12

*Furman v. Georgia* (1972), 408 U.S. 238...................................................68

*Maggio v.  City of Cleveland* (1949), 151 Ohio St. 3d 136, .........................28

Smith v. Phillips (1982), 455 U.S. 209.......................................................19

*State ex rel Montgomery v. Villa* (1995), 101 App. 3d 478, ........................23

*State v. Bedford* (1988), 39 Ohio St. 3d  122........................................60, 64

*State v. Berry* (1995), 72 Ohio St. 3d 354,................................................61

*State. v. Bey* (1999), 85 Ohio St. 3d 487.............................................41, 76

State v. Branham (1995), 104 Ohio App.3d 355...........................................14

*State v. Braxton* (1995), 102 Ohio App. 3d. 28...........................................32

*State v. Buell* (1986), 22 Ohio St. 3d 124............................................71, 74

*State v. Carter* (1992), 64 Ohio St. 3d 218..........................................72, 76

*State v. Carter* (1995), 72 Ohio St. 3d 545................................................26

*State v. Coe* (2003), 153 Ohio App. 3d 44.................................................40

 *State v. Combs* (1991), 62 Ohio St. 3d 278...............................................62

*State v. Chinn* (1999), 85 Ohio St. 3d 548...........................................55, 56

State v. DePew (1988), 38 Ohio St. 275.................................................36, 41

TABLE OF AUTHORITIES (Cont'd)

PAGE

*State v. Edwards* (1976), 49 Ohio St. 2d 31............................................................9, 13

*State v. Fears* (1999), 86 Ohio St. 3d 329..................................................15, 19, 31

*State v. Fox* (1994), 69 Ohio St. 3d 183............................................................55

*State v. Goff* (1998), 82 Ohio St. 3d 123,...........................................................25

*State v. Goodwin* (April 17, 1997), Cuyahoga App. No. 98531...........................54, 55

*State v. Green* (2000), 90 Ohio St. 3d 352............................................................37

*State v. Gumm* (1995), 73 Ohio St. 3d 413............................................................76

*State v. Henness* (1997), Ohio St. 3d 53............................................................12

*State v. Holloway* (1988), 38 Ohio St. 3d 239............................................................15

*State v. Jenkins* (1984),15 Ohio St. 3d 164....................................48, 67, 69, 70, 73

*State v. Jones* (2001), 91 Ohio St. 3d 335............................................................18

*State. v. Keenan* (1993), 66 Ohio St. 402..............................................30, 32, 33

*State v. Kidder* (1987), 32 Ohio St. 3d 279............................................................43

*State v. LaMar* (2002), 95 Ohio St. 3d 181............................................................32

*State v. Long* (1978), 53 Ohio St. 2d. 91;............................................................25

*State v. Lott* (1990), 51 Ohio St. 160............................................................26

*State v. Loza* (1994), 71 Ohio St. 3d 61..............................26, 27, 37, 39, 40

State v. Lundgren (1995), 73 Ohio St. 3d 474............................................................18

*State v. Maurer* (1984), 15 Ohio St. 3d 239..........................................32, 42

*State v. McNeill* (1998), 83 Ohio St. 3d 438............................................................76

-iv-

TABLE OF AUTHORITIES (Cont'd)

PAGE

*State v. Mills* (1992), 62 Ohio St. 3d 357.................................................................9

*State v. Murphy* (2001), 91 Ohio St. 3d 516...........................................................12

*State v. Nabozny* (1978), 54 Ohio St. 2d 195.............................................48, 49, 71

*State v. Nields* (2001), 93 Ohio St. 3d 6................................................................34

*State v. Noling* (2002), 98 Ohio St. 3d 44..............................................................55

*State v. Palmer* (1997), 80 Ohio St. 3d 543...........................................................56

*State v. Penix* (1987), 32 Ohio St. 3d 369..............................................................53

*State v. Phillips* (1995), 74 Ohio St. 3d. 72.....................................................14, 76

*State v. Poindexter* (1988), 36 Ohio St. 3d 1.........................................................62

*State v. Raglin* (1998), 83 Ohio St. 3d 253............................................................31

*Roe v. Wade* (1973), 410 U.S. 113.........................................................................68

*Solon v. Solon Baptist Temple* (1982) 8 Ohio App. 3d 347....................................39

*State v. Sheppard* (1994), 94 Ohio App. 3d 665.....................................................32

*State v. Smith* (1985), 17 Ohio St. 3d 98................................................................14

*State v. Smith* (1991), 61 Ohio St. 3d 284. ......................................................36, 37

*State v. Stallings* (2000), 89 Ohio St. 3d 280.........................................................46

*State v. Steffen* (1987), 31 Ohio St. 3d 111.......................59, 60, 61, 62, 63, 64, 68, 74

*State v. Stumpf* (1987), 33 Ohio St. 3d 95..............................................................74

*State v. Thompkins* (1996), 75 Ohio St. 3d 558................................................66, 73

*State v. Tibbets* (2001), 92 Ohio St. 3d 146............................................................41

<u>TABLE OF AUTHORITIES (Cont'd)</u>

<u>PAGE</u>

*State v. Treesh* (2001), 90 Ohio St. 3d 460...................................................... 17, 28, 29, 30, 40

*State v. Tumbleson* (1995), 105 Ohio App. 3d 693..................................................30

*State v. Twyford* (2002), 94 Ohio St. 3d 340..................................................18, 53

*State v. Underwood* (1983), 3 Ohio St. 3d 12..................................................44, 48

*State v. Vance* (1994), 98 Ohio App. 3d 56..................................................9

*State v. Williford* (1990), 49 Ohio St. 3d 247..................................................74

*State v. Wilson* (1996), 74 Ohio St. 3d 381..................................................18, 46, 47

*State v. Wogenstahl* (1996), 75 Ohio St. 3d 344..................................................56

*State v. Yarbrough* (2002), 95 Ohio St. 3d 227..................................................54

*Strickland v. Washington* (1984), 466 U.S. 668..................................................14

*United States v. Hastings* (1983), 461 U.S. 499..................................................26

<u>CONSTITUTIONAL PROVISIONS; RULES; STATUES:</u>

Article I, Sec. 9, Ohio Constitution..................................................66

App. R. 16(D)..................................................29

Crim. R. 11(C)(3)..................................................71

Crim. R. 52..................................................31

Crim. R. 52(B)..................................................25

Eighth Amendment, U.S. Constitution..................................................66

Evid R. 801(C)..................................................42

Evid. R. 801(D)(2)(e)..................................................43

TABLE OF AUTHORITIES (Cont'd)

PAGE

Evid. R. 901(A)..................................................................................................23

R.C. 2901.05....................................................................................................49

R.C. 2901.05(D)................................................................................................48

R.C. 2901.22(A)................................................................................................46

R.C. 2903.01...............................................................................................67, 75

R.C. 2903.01(A)................................................................................................70

R.C. 2903.01(B)................................................................................................75

R.C. 2929.03(D)(1)......................................................................................71,75

R.C. 2929.03(F)...........................................................................................63, 64

R.C. 2929.04(A)...........................................................................................52, 67

R.C. 2929.04(A)(7)...........................................................................................70

R.C. 2929.04(B)................................................................................................36

R.C. 2929.04(B)(3)......................................................................................36,41

R.C. 2929.04(B)(7)............................................................................................71

R.C. 2929.05....................................................................................................65

<u>STATEMENT OF FACTS</u>

During most of 2001, Defendant-Appellant Nathaniel Jackson ("Appellant") was incarcerated in the Lorain Correctional Institution for an undisclosed offense. (T.p. Vol. 12, p. 2994-3003). Apparently prior to his incarceration, he began an affair with Donna Roberts, a divorcee 27 years his senior.  Roberts' personal life was somewhat unconventional.  Though having divorced her husband, Robert Fingerhut, in 1985, the pair continued to live together in a home located at 254 Fonderlac Dr, . Howland Township, Trumbull County, Ohio. Their shared residence was solely in Roberts' name.  Both drove late model Chrysler 300-M automobiles, yet, they too were leased to Roberts, not to Fingerhut.  Fingerhut ran Greyhound bus terminals in both Warren and Youngstown, Ohio, yet both businesses were in Roberts' name as owner/ operator. Not surprisingly, Fingerhut's $550,000 life insurance policy named Roberts as the sole beneficiary.  (T.p. Vol.  12, p. 2940-2952, State's Ex.  322, 323).

During the course of Appellant's incarceration, he and Roberts hatched a plan to kill Fingerhut, collect the insurance proceeds, and continue their affair.  The plot was memorialized in a series of letters exchanged between the two, and 19 tape recorded phone calls. (State's Ex. 271-D-1 to 271-D-139; State's Ex. 261, 362-A-to 380A).

Upon his release from the Lorain Correctional facility December 9, 2001, Roberts and Appellant were spotted together several times.  Roberts paid for an evening together at the Wagon Wheel motel on Market Street  in Youngstown, Ohio, where a group of friends would visit him.  (T.p. Vol. 11 p. 2590-2597, 2648-2649 State's Ex. 312).  The owner of Final Cut Barber Shop, located near the Warren Greyhound terminal, testified that a woman matching Roberts' description, whom she recognized from the bus terminal, brought in an African

-1-

American man for a hair cut Dec. 11, 2001. (T.p. Vol. 12, p. 2883-2886).  A server from the Red

Lobster restaurant in Niles, Ohio, recalled waiting on a couple matching Roberts' and

Appellant's description on Dec. 11, 2001,  from 5:54 p.m. to 6:43 p.m. The server, Jill Kenyon,

selected Appellant's picture from a six-man photo line up and identified him in court. (T.p. Vol

12, p. 2903-2908).

Sometime before midnight on Dec. 11, 2001, a 911 dispatcher received a call from a

frantic Roberts claiming that her husband had been shot at the Fingerhut/Roberts residence.  (T.p.

IX, p. 2102, State's. Ex 1).  Arriving on the scene shortly thereafter was Howland Police Det.

Paul Monroe who immediately encountered Roberts.  Det. Monroe described her as

intermittently coherent and incoherent.  He discovered Fingerhut lying face down in a pool of his

own blood in the kitchen.  Roberts instructed Monroe to do what ever necessary to apprehend the

perpetrator. She also stated five or six times that someone had stolen her husband's car. T.p. Vol.

IX, p. 2204 -2208).

Det. Monroe and other officers began to process the crime scene.  (T.p.  Vol. IX , p.

2215-2221, State's 2, 69-144).  Det. Monroe discovered a fully loaded Taurus revolver

approximately 18 inches from Fingerhut's body.  (T.p. Vol. IX, p. 2239). Fingerhut's glasses

were discovered under the maroon Chrysler 300-M, commonly driven by Roberts.  (T.p. Vol. IX,

p. 2242).  Trumbull County Sheriff's Det. Anthony Leshnack removed a bullet from the kitchen

wall.  He also preserved blood and fingerprint evidence.  (T.p. Vol. X, p.  2448-2451).  Det.

Monroe searched Roberts' 300-M Chrysler where he discovered a bag containing  145

handwritten letters from Roberts to Appellant, along with the phone number for the Lorain

Correctional Institution and an empty box of handcuffs.  The letters in question were specifically

-2-

addressed to Appellant and were signed by Roberts.  Roberts admitted to Monroe that the letters were hers. (T.p. Vol.  IX, p. 2230-2233, 2294-2296).  Inside the Roberts/Fingerhut residence, Det. Monroe also located a series of letters from Appellant to Roberts in the master bedroom which were mailed from January, 2001 through December 2001, and addressed to a post office box to facilitate the prison pen pal romance.  (T.p. Vol. IX, p. 2300-2301).

Many of the letters recovered by Det. Monroe were sexually graphic.  Several detailed Roberts' contempt for Fingerhut, and spoke of both parties' desire to kill Fingerhut and to enjoy the benefits of his lucrative insurance proceeds.  For example, in a letter dated Oct. 20, 2001, at 11:20 p.m., Roberts wrote,  "And I get sick when he is about to come home at night.  I wonder what's going to happen in our house....If there was any way I could leave and just live half as well as I do - I would leave that house right now." (State Ex. 271-D-82).  Roberts complains in a letter dated Nov. 10, 2001,  that she hasn't got enough for marijuana and is accustomed  to having $200 on her. "I have got to figure a way to get some money before you get home!  That's for sure.  He has me on a real short rope here. ...I HAVE TO ASK PERMISSION TO USE A CREDIT CARD OR WRITE A FUCKING CHECK!" (State's Ex. 271-D-35).  Fingerhut's curtailment of Roberts' usual spending practices were apparently rooted in business down turns, because in a letter date Nov. 20, 2001,   Roberts tells Appellant that business is down $19,000 at the Youngstown terminal.  (State's Ex 271-D-20).  In a letter dated Oct. 20, 2001, "And I haven't been allowed to use any of my 52 charge cards -emergency only.  I am not used to living like this. I am used to loving plenty of cash for whatever I want and buying everything I want.  Maybe those days will return again soon....Do whatever you want to him ASAP. Amen."  (State's Ex. 271-D-81).

In another letter to Appelllant , Roberts stated she had obtained a map to the Lorain

Correctional Institution, a ski mask, boxers, and fleece-lined black gloves.  (State's Ex.271-D-2).

Appellant wrote Roberts on Oct. 2, 2001, "...let me do what I was gonna do to him...Its getting

done when I come home." (State's Ex. 273-N-58).   Six days later on Oct. 8, 2001, Appellant

wrote, "Donna, I got it already planned out on how we're gonna take care of the Robert situation?

An baby, it's the best plan ever!....I promise on my kids."  (State's Ex.273-N-53).  On Oct. 14,

2001, Appellant referenced putting "the gun to that dummy's head." (State Ex 273-N-49).  In

letters dated Oct. 20 and 23, 2001, Appellant repeated that "Robert has to go."  (State Ex 273-N-

42 & 273-N-38).  He promised to carry out his plan Monday, December 10, 2001, in a letter

dated Oct. 24, 2001. (State's Ex 273-N-37).  Appellant reiterated the Dec. 10, 2001, target date in

another letter dated Oct. 26, 2001, in which he drew a tombstone engraved with "Rest in piss."

(State's Ex. 275 B).  Apparently dissatisfied with the selection of Chryslers at the

Fingerhut/Roberts residence, Appellant in a letter Oct. 29, 2001, requested that Roberts get him a

2002 Cadillac Deville.  He further wrote, "An even if I gotta come to the house an shoot Robert

in his f-ing head you're gonna be with me.  An do you know what mandatory means?....I want

you marry me...Will you marry me after I take care of things."  (State's Ex 275-A).

As previously stated, Appellant was released from the Lorain Correctional Institution on

December 9, 2001,  and that evening spent the night with Roberts at the Wagon Wheel hotel in

Youngstown, Ohio.  In an apparent effort to both conceal Appellant and to facilitate time alone

with him, Roberts thereafter reserved and paid for a room at the Boardman, Ohio Days Inn.  The

pair checked in at this second motel  on Dec. 11, 2001 and out on Dec. 17, 2001.  A search of the

motel's dumpster  revealed a plastic garbage bag containing stained bandage dressings, a stained

washcloth, a plastic cigar mouthpiece, used condoms and a bottle of Walgreens Hydrogen

peroxide . (T.p. Vol. IX, p. 2313-2319).  Special Agent Edward Lulla, Bureau of Criminal

Identification and Investigation ("BCI&I"), processed the room, and even after it had been

cleaned by housekeeping, Agent Lulla discovered blood on the bed's comforter, blood stains on

the wall, blood stains on the bathroom floor and blood and semen stained towels.  (T.p. X, p.

2206-2610).

Fingerhut's silver Chrysler 300-M was located at the corner of Victoria and Pershing

Avenues in Youngstown, Ohio, on Dec. 12, 2001.  Det. Monroe noticed blood on the passenger's

door handle, right front seat, drivers headrest and trunk release.  (T.p. Vol. IX, p.  2272-2279).

The State produced several expert witnesses to connect physical evidence collected to

Appellant.  Brenda Gerardi, BCI & I serologist, established a DNA match of one in 29

quadrillion African Americans to Appellant in blood stains recovered from gauze bandages

found in the Days Inn dumpster.   She could exclude neither Appellant nor Fingerhut as

contributors to a blood stain removed from the visor of Fingerhut's car.  Gerardi also found a

mixture of Fingerhut's and Appellant's DNA on the trunk release, noting that Appellant was a

major contributor and Fingerhut as a minor contributor by a match of one in 29 quintillion in the

African American population to Appellant's portion of the mixture.  (T.p. Vol. 12, p. 2823,

2833-2840).

Michael Roberts, a firearms expert with BCI & I, concluded that none of the bullets

recovered from Fingerhut during his autopsy was fired from the gun found near his body.

Roberts also examined a pair of black leather  gloves which was recovered from a Wirt Street

home in Youngstown where Appellant was arrested.  One of those gloves had damage to the

index finger.  Roberts noted a "vaporous lead" in the glove which is indicative of having been fired at close range.  He also notice blood on the gloves and turned them over to serology.  (T.p. Vol. 11, p. 2685-2694).

Also testifying for the State was Cynthia Mayle, a latent finger print expert.  She matched Appellant's finger prints to the room key for room 129 at the Days Inn.  (T.p. Vol. 11, p. 2726).  BCI & I document handler and hand writing expert, Steve Green, testified that he matched known samples of Appellant's handwriting to the letters recovered from the Roberts/Fingerhut home.  (T.p. Vol. 12, p. 2875).

Forensic pathologist Dr.  Humphrey Germaniuk performed the autopsy on Fingerhut.  He noted gunshot wounds to the left side of the top of his head, right side back and chest, and a graze wound to the upper right back.  The doctor noted an injury to the webbing of his left hand. He found a laceration to Fingerhut's head which he stated was consistent with being pistol whipped.  Dr. Germaniuk also found a v-shaped abrasion to the nose consistent with being struck while wearing eye glasses.  He testified that other than the gunshot wounds, the remaining injuries were consistent with those sustained in a struggle.  (T.p. Vol. 11, p. 2541-2558, 2577). Trumbull County Coroner Dr. Ted Soboslay ruled the cause of death homicide secondary to multiple gunshot wounds.  (T.p. Vol. 11, p. 2519).

Appellant was arrested for Fingerhut's murder December 21, 2001.  After being fully Mirandized, Appellant gave a recorded statement to Det. Monroe and Det. Jeffery Hoolihan of the Warren Police Department.  In the statement, he claimed that he met Fingerhut at the Youngstown Greyhound terminal to ask him for a job.  Fingerhut then drove Appellant to purchase marijuana for him, and then drove him to the Roberts/Fingerhut residence.  While at the

house, Appellant stated the two became embroiled in a bitter argument when Fingerhut became

disrespectful to him.  Fingerhut pulled a gun on Appellant, and a struggle ensued during which

Appellant was shot in the finger, and Fingerhut sustained numerous gunshot wounds.  He

claimed he tossed the murder weapon out the car window while driving Fingerhut's silver

Chrysler 300-M back to Youngstown after the shooting.(State's Ex. 325).   When arrested,

Appellant's right hand index finger was bandaged. (T.p. Vol. X, p. 2415).

     Several witnesses disputed various details of Appellant's statement.  For example, Dr.

Germaniuk testified that Fingerhut had no drugs or alcohol present in his system at the time of

the autopsy. (T.p. Vol. 11, p. 2555).  Despite claims of Appellant looking for a job at the

Youngstown Greyhound terminal, a WTRA security guard claimed he never saw Appellant there

the day of murder, but had seen him there previously with Roberts.  (T.p. Vol. IX, p.2150, 2156).

     Based on the above evidence, the jury returned guilty verdicts on all charges and

attendant specifications.  The case proceeded to a mitigation hearing wherein a variety of

conflicting testimony was offered by the Appellant for the jury's consideration.  For example,

Appellant's sister, Taushia Korneagay, testified that Appellant was never a street person as he

relayed to defense-hired pyschologist, Dr. Sandra McPherson. (T.p. Vol. 16, p. 27, 40).  His

mother, Pauline Korneagay, testified Appellant did well in school until he decided to drop out.

To the contrary, Dr. McPherson testified Appellant suffered from Attention Deficit Hyperactivity

Disorder (ADHD) and exhibited "fairly serious behavioral problems" from the first grade.  (T.p.

Vol. 16, p. 37).  Appellant also told the doctor that he lived in a violent neighborhood, claiming

to have been shot four or five times, yet his mother adamantly denied that the family lived in a

rough neighborhood.  (T.p. Vol. 16, p. 32, 68).  Dr. McPherson testified that Appellant had no

-7-

mental disease or defect, was not physically abused as a child, abused drugs, and did not learn

from his mistakes.  (T.p. Vol. 16, p. 38-39, 78-79, 88).  Despite defense counsel's closing

argument in the trial phase that there was no "plan" between Roberts and Appellant to murder

Fingerhut, Dr. McPherson testified that Appellant planned to kill Fingerhut for money and to be

with Roberts.  (T.p. Vol. 16, p. 98).

      Based on the above testimony, the jury found that the aggravating circumstances

outweighed the mitigating factors and recommended a death sentence.  The trial court concurred

and imposed the death sentence.  Other pertinent facts will be brought to the Court's attention in

the argument portion of this brief..

## ARGUMENT

### APPELLEE'S PROPOSITION OF LAW NO. 1:

> **A trial court does not err in admitting inculpatory statements made by a criminal defendant who signs a Miranda rights waiver and then engages in an hour-long conversation with two investigators.**

In his first Proposition of Law, Appellant challenges the trial court's denial of his motion to suppress the video-taped statement he made with Detectives Hoolihan and Monroe shortly after his arrest. This proposition lacks merit.

As a general principle, when deciding a motion to suppress, the trial court as the trier of fact, resolves all questions of fact. It determines the weight to be given the evidence and the credibility to be accorded to each witness. *State v. Mills* (1992), 62 Ohio St. 3d 357, 366. The court makes its determinations of fact based on the totality of the circumstances surrounding the questioning or interrogation. *State v. Edwards* (1976), 49 Ohio St. 2d 31, 49. The standard of review regarding motions to suppress is whether the trial court's findings are supported by competent, credible evidence. *State v. Vance* (1994), 98 Ohio App. 3d 56, 58-59.

In his brief, Appellant takes little issue with the admission of his initial statements to Det. Hoolihan upon his arrest Dec. 20, 2001. Though Appellant testified to the contrary at his suppression hearing, (T.p. Vol. I, p. 316), Det. Hoolihan stated he immediately Mirandized Appellant when he was placed in a cruiser for transport from the point of his arrest on Wirt Street in Youngstown, Ohio, to the Trumbull County Jail in Warren, Ohio. (T.p. Vol. I, p. 205). Upon receiving his Miranda warning, Appellant volunteered an exculpatory statement saying he didn't kill anybody. (T.p. Vol. I, p. 207). During his ride to the jail, Appellant made no complaints and did not ask for an attorney. (T.p. Vol. I,  p. 212).

-9-

Appellant was placed in the jail's weight room for approximately one hour, and then escorted to a captain's office at the sheriff's department which adjoins the jail.  Det. Hoolihan and Det. Monroe saw to Appellant's comfort by supplying him with coffee and cigarettes.  Det. Hoolihan reminded Appellant that he was Mirandized earlier and the trio engaged in conversation.  Essentially, Appellant advised he supplied the victim, Robert Fingerhut,  with marijuana and then Mr. Fingerhut, at Appellant's request, drove him to his home in Howland. While in the kitchen of the home, Mr. Fingerhut began to make racially offensive statements to Appellant, Appellant became upset, Mr. Fingerhut pulled a gun and shot Appellant in the finger. Appellant then wrestled the gun from Mr. Fingerhut and shot him twice.  Appellant bolted from the Fingerhut residence taking Mr. Fingerhut's Chrysler and ditching the gun somewhere along Route 82.  (T.p. Vol. I, p. 217-218, State's Supp. Ex. 4).

After making these statements to Det. Monroe and Det. Hoolihan, Appellant agreed to make a video tape discussing the salient points of his earlier statements with the detectives.  For the second time in two-and-a-half hours, Appellant was advised of his Miranda rights.  This time he was supplied a written form wherein he initialed each of the rights he was waiving, and signed the bottom of the form.  (T.p. Vol. I, p. 223-224, State's Supp. Ex. 3).  The execution of the rights waiver is captured on video tape.  (State's Supp. Ex. 5, State's Supp. Ex. 4, p. 1-2). During the execution of the rights waiver form, Appellant volunteers, "[a]nd, I didn't mean to do this shit, man...I really didn't mean to do that shit, man....I just didn't mean to do it, man...I didn't man; I'm sure I didn't, man.  Sorry man" (State's Supp. Ex. 4, p.2).

Though perhaps initially evasive, Appellant launched into lengthy descriptions of his activities on the night of the murder.  For 40 minutes covering 29 pages of transcript, Appellant

never declined to answer the detectives' questions, never asked that questioning cease, and never

asked for an attorney. At one point, Appellant tells the detectives:

> "***I don't even want to talk about it no more, man.  I'm, I'm, I'm
> through with it man, just man, you know what I mean, police, you know, I mean,
> I, I talked to a lawyer or something, man, you know what I mean, cause I, I mean,
> I ain't got time to just keep on, over and over, man.  I'm, I'm through, man.  I'm
> through man, you know what I'm saying.  I say, I mean, I, I ain't mean to do it,
> I'm sorry I did it, you know what I'm saying, I mean, but I was left, I had no
> choice, man. And that's it.  End of discussion."

(State's Supp. Ex. 4, p. 29).  Det. Monroe then asked Appellant if he had further to say, he again

stated he "didn't mean to do it, man.  I mean, I mean, I's sorry it happened."  (State's Supp. Ex.

4, p. 29).  The detectives then inquired about a pair of gloves recovered at the Wirt Street. home

where he was arrested, and Appellant denied any knowledge thereof. (State's Supp. Ex. 4, p. 30).

Det. Monroe gave him an additional chance to tell his side of the story, at which point Appellant

acknowledged being good friends with Donna Roberts, and that he used to write her during his

incarceration.  (State's Supp. Ex. 4, p. 32).  He claimed their relationship was irrelevant to Mr.

Fingerhut's death, and claimed she had nothing to do with the homicide.  (State's Supp. Ex. 4, p.

33).  Appellant said he had no more else to say, and the questioning ceased.  (State's Supp. Ex.

4, p. 38).

Appellant argues in his brief that he repeatedly asked for an attorney and was

coerced into giving his video-taped statement.  The trial court, however, found that "such

statements are not supported by the evidence. To the contrary, the court specifically finds that the

evidence clearly shows that the Defendant was advised of his Miranda rights at the onset of the

video taped statement rather than the end." (T.d. # 205,  p. 4). The trial court's finding is clearly

supported by the evidence adduced at trial.

The trial court further noted that while Appellant stated he did not *like* talking about the events at the Fingerhut residence, he nevertheless kept talking and was all too anxious to proclaim that he did not mean to kill Mr. Fingerhut.  (T.d. # 205, p. 9).

> "He (Appellant) was not clearly and unequivocally asserting that he did not want to talk to the officers anymore or that he specifically wanted an attorney. In fact, when Det. Monroe (on page 3 of the Transcript) asked: 'Could you, now that we got the camera rolling, could you just talk about this with me one more time, we got it clear it up alright.  This is Your side.  Robert picks you up, right?" the defendant began to talk and freely repeated what he had told the officers earlier."

(T.d.# 205p. 10).    The court analyzed the issue of a clear and unequivocal assertion of Appellant's right to counsel in the context of *Davis v. United States* (1994), 512 U.S. 452, which held that when a defendant invokes his right to counsel, police must cease questioning until counsel is present.  However, officers are not required to cease questioning based on "ambiguous or equivocal reference to an attorney."  *Davis, supra,* at 459.  "[The suspect] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  If the statement fails to meet the requisite level of clarity, *Edwards* [1] does not require that the officers stop questioning the suspect."  Id.  This Court found in *State v. Murphy* (2001), 91 Ohio St. 3d 516, 521, that a suspect's statement "I'm ready to quit talking now and I'm ready to go home, too" was not "an unequivocal assertion of his right" to remain silent.  In *State v. Henness* (1997), Ohio St. 3d 53, 62-63, this Court held that the remark "I think I need a lawyer" was not an unequivocal assertion of the defendant's right to counsel.

Appellant's entire video-taped statement is a paragon of ambiguity, equivocation, and

---

[1] *Edwards v. Arizona* (1981), 451 U.S. 477

obfuscation.  The State submits no reasonable officer could ascertain that Appellant ever asked for an attorney or that he wanted questioning to cease.  Even after Appellant told the detectives at page 29 that he did not have time to continue the conversation, he continued to answer officers' questions and proclaim that he didn't mean to kill Mr. Fingerhut, and he was sorry for what happened. This caused the trial court to write, "As such, when viewing the totality of the questioning and the defendant's attitude or demeanor is not unambiguously requesting counsel as required by *Davis, supra.*  In fact, the Defendant continues with the dialogue than invoking his right to counsel or his right to remain silent." (T.d. #205, p.14).

The State submits that the trial court properly overruled Appellant's motion to suppress his video-taped statement.  The record reflects a written rights waiver,  the execution of which is captured on video tape for this Court's review.  This Court will find no evidence in the video-taped interview that Appellant wished to assert his Fifth Amendment right to silence or Sixth Amendment right to counsel.  Appellant's first Proposition of Law is without merit.

-13-

## APPELLEE'S PROPOSITION OF LAW NO. 2:

**Appellant's trial counsel's failure to object to contrived instances of prosecutorial misconduct, effective voir dire of prospective jurors, proposed instructions beneficial to Appellant, and evidence ultimately used by the defense did not rise to a level of ineffective assistance of counsel.**

Appellant, in Proposition of Law No. 2, argues he was denied ineffective assistance of counsel during the voir dire, guilt phase and mitigation phase of his trial.  This proposition lacks merit.

As a general principle, it is well-settled law that a properly licensed attorney is presumed competent. *State v. Smith* (1985), 17 Ohio St. 3d 98, 100.  The burden of proving ineffective assistance of counsel rests squarely with the defendant. Id. A reviewing court will reverse a conviction on the grounds of ineffective assistance of counsel only when the defendant demonstrates (1) "that counsel's performance was deficient," and that (2) "the deficient performance prejudiced the defense***so serious[ly] as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687. This standard of review requires a defendant to demonstrate that counsel was ineffective, Appellant must show that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.***A reasonable probability is a 'probability sufficient to undermine confidence in the outcome' of the proceeding." *State v. Branham* (1995), 104 Ohio App.3d 355, 362 quoting *Strickland* at 694. Furthermore, debatable strategic and tactical decisions will not form the basis of a claim of ineffective assistance of counsel even if there had been a better strategy available. *State v. Phillips* (1995), 74 Ohio St. 3d. 72, 85.

-14-

**"Extraction" of promises during voir dire.**

In his first subsection of arguments in this proposition, Appellant postulates that his trial counsel failed to object to so-called "promises" which the prosecuting attorney elicited from prospective jurors during the voir dire process.  As a general matter, this Court has consistently held that  failure to object alone is not sufficient to sustain a claim of ineffective assistance of trial counsel. *State v. Holloway* (1988), 38 Ohio St. 3d 239, 244; *State v. Fears* (1999), 86 Ohio St. 3d 329, 347.

Nevertheless, the State first takes issue with Appellant's characterization that the prosecution "extracted promises" from any potential juror in this case.  For example, Appellant cites to the prosecution's voir dire of Kim Mancini:

> "Atty.Watkins: You are telling the State here, that you're right in the middle here, and you find nothing wrong with what the Judge told you, and from your life experiences and the way you fell about things, you could be fair in this case and be open to consider the law, listen to the evidence, and decide at the end whether or not the death penalty is merited, fair to state?
>
> "Ms. Mancini: I can be fair, yes.
>
> "Atty. Watkins: And in the event that the State could prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, you could and you would, sign the verdict recommending Nathaniel Jackson's death?
>
> "Ms. Mancini: I could."

(T.p. Vol 3 , p. 687-688). Clearly no promises whatsoever were extracted by the prosecution or made by Ms. Mancini.   Any representation by Appellant to the contrary is not supported by the record.  She merely stated that she would listen to the evidence and be fair.  She further stated that if called upon to do so she "could" recommend the death penalty.  In short, Ms. Mancini made no promises.

-15-

Likewise, Angela M. DeSantis made no promises.  She agreed with the prosecutor that it was her duty to recommend a death penalty if aggravating circumstances outweighed mitigating factors, but it was equally her duty to recommend one of three possible terms of life imprisonment if the converse occurred.  (T.p. Vol. IV, p. 936).  Cynthia M. Angelo assured the prosecutor she would be fair, she would be able to return a guilty verdict if the State proved its case beyond a reasonable doubt, and would acquit Appellant if the State failed to meet its burden of proof.  (T.p. Vol. IV, p. 952).  Ms. Angelo then expressed her ambivalence with the death penalty because DNA evidence has exonerated certain death row inmates.  Nevertheless, she stated such concerns would not automatically cause her to return a life, rather than death recommendation.  (T.p. Vol. IV, p. 953-955).  Like Ms. Angelo,  Betty Falatic and Dawn Waggoner agreed to return a guilty verdict only if the State proved his guilt beyond a reasonable doubt, and would return a not guilty verdict if the State failed to so prove.  (T.p. Vol. IV, p. 1044, Vol. 6, p. 1494).  Courtney Gore agreed that she "could" sign a death verdict if the evidence warranted it, but could return a life verdict as well. (T.p. Vol. 5, p. 1163-1166).  Carol Swanson, Paula Reep, Sherri Murphy, Margaret Paden stated likewise (T.p. Vol. 5, p. 1260-1261, 1289-1291, 1316-1317, Vol. 6, p. 1389, 1400, 1502-1503 ).   Harold Rogers agreed to keep an open mind in weighing the aggravating circumstances against the mitigating factors.  (T.p. Vol. V. p. 1346).

Thus, a review of Appellant's string cite at page 12 of his brief will reveal that the prosecutor never elicited any "promises" from any juror.  None of the jurors in questions made any promises, though all assured the prosecutor they would be fair and would consider both sides, whether deciding Appellant's guilt or punishment.  Appellant relies on this Court's

-16-

decision in *State v. Treesh* (2001), 90 Ohio St. 3d 460, to support his theory that defense counsel's failure to object to any of these "extractions" constitutes ineffective assistance of counsel.  To begin with, the prosecutor in the *Treesh* case specifically inquired of the jurors, "[I]f you are convinced beyond a reasonable doubt, according to the law that the judge gives you, the facts of this case, the Defendant is guilty, will you give me your word if that happens, that is proven, you will all return a verdict of guilty?" *Treesh* at 465.  The prosecutor in the case sub judice made no such inquiry.  Nevertheless, even when this Court supposed for argument's sake that the *Treesh* statement was improper, this Court held that no substantial right was affected.  Even if this Court were to construe the prosecutor's question to somehow elicit promises from any of the above quoted jurors, this Court must again reach the same conclusion that no substantial right of Appellant was affected, and therefore, counsel was not ineffective for failing to object.

**"Predisposing" mitigating factors**

In this subsection, Appellant argues ineffective assistance of counsel because during voir dire his trial counsel did not object to examples cited by the prosecutor of mitigating factors which, by Appellant's own admission, were wholly irrelevant, inconsequential, and inapplicable to counsel's mitigation theory and strategy.  (Appellant's Brief at page 14).  Specifically, Appellant takes issue with the prosecutor using hypothetical examples of the mitigating factors of age and mental disease or defect.  One of the string cites referenced by Appellant, "TR 923" is actually an instruction by the trial court, and makes no reference whatsoever to any specific mitigating factors.

By way of introduction, this Court has stated, "[j]urors weigh mitigating factors together,

-17-

not singly, and do so collectively as a jury in the context of a penalty hearing. Realistically, jurors cannot be asked to weigh specific factors until they have hearing all the evidence and been fully instructed on the applicable law." *State v. Lundgren* (1995), 73 Ohio St. 3d 474, 481. Nevertheless, Appellant relies upon this Court's opinions in *State v. Jones* (2001), 91 Ohio St. 3d 335 and *State v. Wilson* (1996), 74 Ohio St. 3d 381 regarding trial courts' *restriction* of defense questions about specific and applicable mitigating factors. In these two cases, this Court held that the individual trial courts did not abuse their discretion in disallowing questioning regarding specific mitigating factors. *Jones* at 337, *Wilson* at 386-387. Appellant now seeks to turn these decisions inside out and upside down by saying the prosecution cannot inquire, by way of example, about mitigating factors which are wholly inapplicable to the case sub judice, and that his trial counsel was ineffective for failing to object to these inquiries. This theory is wholly unsupported by any known authority.

It is clear from the record in this case that each of the seated jurors indicated a willingness to listen to both State and the defense in their presentation of aggravating circumstances and mitigating factors and to engage in the appropriate weighing process. Most importantly, the record reveals that none of the seated jurors expressed any predisposition toward a life or a death sentence.

Nevertheless, this Court held in *State v. Twyford* (2002) 94 Ohio St. 3d 340, 349, that an appellant is required to show that his jury was actually tainted in order for his death sentence to be vacated. "[C]onstitutional error will arise in this instance only when the trial court permits an obviously unqualified juror to sit on the jury that invokes the death penalty and defense counsel objected to the trial court's failure to remove that juror for cause. " Id. Appellant cites to none of

-18-

his jurors who were unqualified.  Therefore, this Court can find no error in trial counsel's "failure" to object to either the questions posed by the prosecutor or their failure to remove a juror for cause.

**Prosecutorial misconduct**

Appellant next alleges ineffective assistance of counsel based on their "failure" to object to six purported instances of prosecutorial misconduct during the course of the voir dire of the jurors.

As a general principle, when prosecutorial misconduct is alleged, a reviewing court must determine whether the alleged statements were improper and, if so, whether those remarks deprived defendant of a fair trial.  *State v. Fears* (1999) 86 Ohio St. 3d 329, 332.  The standard of review is the fairness of the entire trial, not the wrongfulness or culpability of the prosecutor. *Smith v. Phillips* (1982), 455 U.S. 209, 219.

The State first asserts that none of the six statements by the prosecutor listed at page 16 of Appellant's brief constitute prosecutorial misconduct.  The first statement by the prosecutor, "[t]he first trial deals with the state proving beyond a reasonable doubt, the defendant committed aggravated murder," is not a misstatement of law or fact.  Appellant was charged with aggravated murder and the State needed to prove him guilty by a standard of proof beyond a reasonable doubt.  The only possible misstatement by the prosecutor was referring to the guilt phase as a "trial," a minor misspeak which hardly constitutes prosecutorial misconduct, the remark was not improper, and certainly did not deprive Appellant of a fair trial.

Appellant next complains of the prosecutor's statement "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return

-19-

a verdict recommending the death penalty, do you understand that?" To make this a letter-perfect, accurate statement of law, the prosecutor should have said *could* instead of *would*. Nevertheless, when the single sentence is viewed in the context of the entire line of questioning, rather than just in a hyper-technical difference of one letter in one word, it is clear the prosecutor properly inquired whether Ms. Lee understood that the finding of one or more mitigating factors would not automatically require a recommendation of a life sentence. (T.p. Vol. 3, p. 825-827). Trial counsel's election not to object did not deprive Appellant of a fair trial as the remark, when viewed under the totality of line of questioning, constituted an accurate statement of law. It was not improper and did not deprive Appellant of a fair trial.

The same argument must be made of Appellant's complaint of the prosecutor's statement, "So that means that you would be able, if you were one of 12 jurors, to listen to the evidence and decide the Defendant's guilt based only on the evidence, right?" First of all, there is nothing improper about the statement per se. R.C. 2901.05 places upon the State the burden of proving its case beyond a reasonable doubt. Furthermore, jurors must confine their decision to the evidence presented and the jurors were so instructed by the court: "Now, you must determine the issues in this case from the evidence and the evidence is all the testimony received from the witnesses, the exhibits during the trial, and any stipulations or agreement by counsel. Evidence itself may be either direct or circumstantial or both." (T.p. Vol. 15, p. 3543-3544). That aside, the State would once again direct this Court to consider the prosecutor's remark in the full context in which it was made. Specifically, the prosecutor inquired whether Ms. Lee had personal knowledge of the case, and if so, if she agreed that preconceived notions of Appellant's guilt *or* innocense would compromise her standing as a fair and impartial juror. (T.p. Vol. 5, p.

-20-

1156-1158). Whether the question is viewed on its own, or in the context of the entire line of questioning, Appellant's trial counsel was not ineffective for not objecting. The remark was not improper, and did not deprive Appellant of a fair trial.

Furthermore, it cannot go without mention that Appellant failed to detail in his brief why any of these three foregoing remarks constituted "prosecutorial misconduct," how he was prejudiced, or how any of these wholly innocuous and inconsequential remarks deprived him of a fair trial. This might explain while Appellant never even postulated an argument of their prejudicial effect.

Appellant goes into somewhat more detail in his complaints about the prosecutor's three characterizations of Robert Fingerhut as a "homeowner" during voir dire, and his counsel's "failure" to object. The State finds this argument curious in that none of the elements in any of the four counts of Appellant's indictment or any of the six attendant specification require that the State prove that Robert Fingerhut was a "homeowner." Secondly, mere renters, occupants and squatters can also fall victim to an aggravated murder. Home ownership is not a prerequisite to murder. Third, Appellant raised the affirmative defense of self-defense. (T.p. Vol. 15, p. 3562-3564). Appellant does not argue that a lack of home ownership constitutes an affirmative defense to either aggravated murder, aggravated burglary or aggravated robbery. Regardless of whether the home was or was not in Mr. Fingerhut's name, Appellant is no less guilty of his aggravated murder. Appellant suffers no prejudice whether the prosecution refers to Mr. Fingerhut as a homeowner, resident or occupant. As such, trial counsel was not ineffective for not objecting. Even though the defense would later introduce evidence that co-defendant Donna Roberts actually held title to the property, the characterizations were not improper, nor did they

-21-

deprive Appellant of a fair trial.  Thus, trial counsel cannot be held ineffective for not objecting.

**Donna's ownership defense**

Appellant argues that because his trial counsel urged the court to adopt an instruction supposedly precluded by several cases already decided by this Court, their duty to advocate for Appellant's defense was compromised and their representation was ineffective.

Appellant specifically cites to the instruction sought by defense counsel at "TR 3369." At T.p. Vol. 15, p. 3368-3369, defense counsel stated:

> "I am requesting that you make an instruction that you tell the Jury that if he has been given permission by the either the license holder of the vehicle to drive it, or the owner of the deed to the property, that then it is no longer trespass, and it is up to them."

Obviously, had the court adopted such an instruction, it would have been of benefit to Appellant. Therefore, whether or not prior decisions state such an instruction is improper, Appellant would have suffered no prejudice.  However, the trial court declined to adopt these proposed instructions, and while Appellant may argue an abuse of discretion on the trial court's part for declining to so instruct the jury, Appellant cannot label his counsel ineffective for requesting a clearly beneficial instruction.

It cannot go without mention that appellate counsel now criticizes trial counsel for requesting an instruction which may be contrary to this Court's prior rulings, yet nevertheless argues Propositions of Law 8, 9, 10, 11, and 12 despite the fact, as will be argued infra, this Court has summarily rejected all of these constitutional challenges to Ohio's death penalty scheme in a myriad of prior death penalty cases.  Such is done to preserve the issue for appellate review.  Why then, is it ineffective for trial counsel to do the same?  The State submits the

-22-

requested instruction does not indicate deficient performance on trial counsel's part, nor was the defendant prejudiced by the request.

**Admission of Donna Roberts' Letters:**

Appellant next argues ineffective assistance of counsel because they did not object to the admission of State's Ex. 271-D-1 to 271-D-139, the letters from Roberts to Appellant written during the course of his incarceration at the Lorain Correctional Institution, and recovered from the red 300-M Chrysler parked in the garage at 254 Fonderlac, Howland Township, and commonly driven by Roberts.

Appellant argues the State did not authenticate the letters, and therefore, they were not reliable evidence. The State disagrees. Evid. R. 901(A) provides, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Moreover, "the threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require *conclusive* proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be." *State ex rel Montgomery v. Villa* (1995), 101 App. 3d 478, 285, citing *State v. Easter* (1991), 75 Ohio App. 3d 22, 25. (Italics original). Circumstantial evidence, as well as direct evidence, may be used to show authenticity. Id.

In the case sub judice, the State presented substantial circumstantial evidence to prove co-defendant Roberts authored the letters marked State's Ex. 271-D-1 to 271-D-139. Det. Monroe testified that the letters were recovered from the trunk of her car parked in her garage at 254 Fonderlac. (T.p. Vol. IX, p. 2230-2231). The letters had her signature, and without objection,

-23-

Det. Monroe testified that Roberts stated that the letters belonged to her.  (T.p. IX, p. 2295).

Thus, the State submits that even if counsel had objected, such objection would have been

overruled because the State had established the authenticity of the letters through circumstantial

evidence.

Significantly, the State submits trial counsel did not object to the letters as a matter of

trial strategy because they intended to use the correspondence to bolster their own case.  For

example, during closing arguments in the guilt phase, defense counsel quoted from Roberts'

letter of October 16, 2001, to demonstrate Fingerhut's alleged abuse. "Plus the fact that he is on

the warpath again taking it all out on me.  He calls me a piece of shit now along with other sweet

greetings.  You have to understand how bad it is for me." (T.p. Vol 15, p. 3462, State's Ex. 271-

D-93). "I guess I'll just let him continue to bully me and lash out at me and just stay cool." (T.p.

Vol. 15, p. 3464, State's Ex. 271-D-35).

Defense counsel quoted from Roberts' letter of October 20, 2001 to demonstrate that

Fingerhut knew about Jackson.  (T.p. Vol. 15, p. 3463, State's Ex. 271-D-82).   In an apparent

effort to prove their client lack the courage to murder Fingerhut, defense counsel read Roberts'

letter of October 24, 2001, to the jury.  "I have never once stopped you from doing anything to

Robert.  Yes, you can do whatever you want to accomplish our goal.  But I really don't want to

believe you want to do it. So there."  (T.p. 15, p. 3479, State's Ex. 271-D-72).

Therefore, given defense counsel's own reliance on the letters to support their own

theories of the case, there is little wonder that they lodged no objection to their admission.

Assuming arguendo that any objection to Roberts' letters had been sustained, the jury would still

have  Appellant's own letters which were authenticated by a handwriting expert,  along

-24-

with taped conversations of the pair recorded during Appellant's incarceration, and Appellant's admission that he was in the Fingerhut/Roberts residence the night of the murder, that he shot Fingerhut, stole his car keys, took his car and ditched the murder weapon.  Appellant was not prejudiced by the lack of an objection, nor was his counsel's performance deficient.

With respect to all of the foregoing subsections, the State argues that because no objections were lodged to any of these alleged errors, the burden is upon the defendant to demonstrate that plain error occurred. *State v. Long* (1978), 53 Ohio St. 2d. 91; Crim. R. 52(B). In order to prevail under a plain error analysis, Appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *Long,* supra at 97. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus. Appellant demonstrates no exceptional circumstances in any of his above sub arguments, nor can he seriously persuade any reviewing court that but for each of these errors, the outcome of the trial would have been different.  Therefore, though the State concedes no error, it argues in the alternative that any of the above purported errors are at worse harmless error and in no way rise to a level of plain error.

Likewise, with respect to his cumulative error argument at page 20 of Appellant's brief, this Court has held, " in order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed in this case." *State v. Goff* (1998), 82 Ohio St. 3d 123, 140.  It is obvious from the record that  Appellant, like Goff,  received a fair trial, and any errors were harmless or non-prejudicial, cumulatively as well as individually. Id.

For these reasons, Appellant's Proposition of Law No. 2 is without merit.

**APPELLEE'S PROPOSITION OF LAW NO. 3:**

**The prosecutor for the State of Ohio engaged in no misconduct.  Appellant's trial was a fair one, and none of the prosecutor's acts prejudiced any substantial rights of Appellant.**

In his Proposition of Law No. 3, Appellant argues the prosecutor engage in numerous acts of prosecutorial misconduct which prejudiced the outcome of his trial.  This allegation is meritless.

This Court has limited the instances wherein a judgment may be reversed on the grounds of prosecutorial misconduct.  *State v. Lott* (1990), 51 Ohio St. 160, 166.    The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor.  Id. A reviewing court is to consider the trial record as a whole, and is to ignore harmless error "including most constitutional violations." Id. quoting *United States v. Hastings* (1983), 461 U.S. 499, 508-509.  Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial.  *State v. Carter* (1995), 72 Ohio St. 3d 545,  557.  In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court must determine if the prosecutor's acts prejudiced the substantial rights of the defendant.  See *State v. Smith* (1984), 14 Ohio St. 13, 14.  Moreover, the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different.  See *State v. Loza* (1994), 71 Ohio St. 3d 61, 78.

With this analysis in mind, the State will direct its attention to Appellant's individual allegations of misconduct.

-26-

**First Instance**

Appellant briefly re-states his argument in Proposition of Law No. 2 arguing that the prosecutor "extracted" promises of jurors to find Appellant guilty and to impose the death penalty once they did.  For reasons stated supra, the prosecutor made no extractions, but ascertained for the record that all twelve seated jurors would fairly and impartially consider the evidence produced by both sides, and would, as the law mandates, impose the death penalty if the panel found that the aggravating circumstances outweighed the mitigating factors.  The State would incorporate by reference its previous argument concerning specific examples of purported prosecutorial misconduct.  In short, the voir dire demonstrates no improper conduct, Appellant was not deprived of a fair trial, nor did Appellant suffer any prejudice.

**Second Instance**

Appellant next argues that the prosecutor made inquiry of ten jurors in a manner designed to limit mitigating factors.  Again referencing Proposition of Law No. 2, this Court has been inclined to disallow defense attorneys from inquiring about specific and applicable mitigating factors during voir dire.  Appellant cites no authority to suggest that either side may not reference by example factors which will not be argued by the defense.  The questions were not improper, Appellant was not deprived of a fair trial, nor did he suffer any prejudice.

**Third Instance**

As stated in the previous Proposition of Law No. 2, none of the complained of "misstatements" constitute prosecutorial misconduct.  None of the jurors were tainted to the point where they could not serve as jurors.  The statements do not amount to prosecutorial misconduct, he was not deprived of a fair trial and none of Appellant's substantial rights were

-27-

prejudiced.

**Fourth Instance**

As best as can be discerned by this sub-argument as presented, Appellant argues that the prosecutor's omission of the phrase, "I expect the evidence will show" in his opening statement, is tantamount to prosecutorial misconduct which should have been addressed not with a curative instruction, but with a mistrial. First, this Court has held that "the function of an opening statement is to inform the jury in a concise and orderly way of the nature of the case and the questions involved, and to outline the facts intended to be proved." *Maggio v. City of Cleveland* (1949), 151 Ohio St. 3d 136, 140. Attorneys are generally afforded wide latitude in opening statements, so long as the matters referred to can be shown by competent or admissible evidence. *Columbus v. Hamilton* (1992), 78 Ohio App. 3d 653, 657.

By the example presented, Appellant is not criticizing the prosecutor for what he *did* say, but for what he *did not* say. As such, the prosecutor did not exceed acceptable bounds established in *Maggio* or *Hamilton*. Therefore, no misconduct occurred. For this Court to hold that the State will be held responsible for remarks it did not make is not just unfair, but unworkable in a court of law.

Nevertheless, before opening statements, the court advised the panel, "[t]he bottom line of course, is your determination of what you understand from the evidence what the actual facts of this case are. And I would again remind you that anything that the attorneys say throughout the trial is not evidence. The evidence presentation will begin after the opening statements are concluded." (T.p. Vol. VIII, p. 2063-2064). It is a well-established premise that the jury is presumed to follow cautionary or curative instructions from the court. *State v. Treesh* (2001), 90

Ohio St. 3d 460, 480.  Therefore, even if the jury noticed that the prosecutor did not repeat the "I-expect-the-evidence-will-show" mantra before discussing every aspect of the evidence, the panel was not tainted because the court advised them from the outset that what they were hearing was not evidence. Even if this Court were to make the giant leap in logic and common sense and find that the absence of the disclaimer was prosecutorial misconduct, the panel was directed from the outset to decide the case from the evidence and not the arguments, so Appellant suffered no prejudice and none of his substantial rights were affected.

**Fifth Instance**

Appellant alleges in this instance that during the testimony of Det. Paul Monroe, the prosecutor improperly elicited hearsay evidence.  Appellant cites to no specific portion of the Monroe direct examination where such eliciting occurred.  App. R. 16(D) states that "[r]eferences in the brief to parts of the record shall be to the pages of the parts of the record involved.***" Courts throughout Ohio have held that "[i]t is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error.***An appellate court is not a performing bear, required to dance to each and every tune played on an appeal." *State v. Watson* (1998), 126 Ohio App. 3d 316, 321. (Internal cite omitted).  This Court should reject Appellant's argument solely on the basis that he fails to support it with the record.

Secondly, in the portion of the transcript which Appellant troubles himself to cite, the trial court opines that the prosecutor was not eliciting hearsay, but that Det. Monroe was going beyond the pale of the prosecutor's questions with his answers:

"I think one of the basic problems here is the officer is going beyond the scope of the question.  I think you should caution him when we start again that he should answer the question as you put it.  I've only heard two questions really that

-29-

I thought may be getting on the edge of something they might object to, but I've heard several answers that have gone beyond the scope of what you directly asked."

(T.p. Vol. IX, p. 2324).  Appellant now argues misconduct by the prosecutor for remarks volunteered by Det. Monroe.  The trial court specifically found that the prosecutor did not elicit the mystery remarks which Appellant claims to be error.

Appellant offers no specifics as to the prosecutor's conduct, does not explain how these unidentified questions deprived him of a fair trial, nor does he identify a single substantial right which was prejudiced.

**Sixth Instance**

Appellant next criticizes the prosecutor for stating during closing arguments that defense counsel was "creating a diversion." This Court has stated repeated that "[t]he prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh* (2001), 90 Ohio St. 3d 460, 466.   The test for prosecutorial misconduct during closing argument is whether the prosecutor's conduct at trial was improper and prejudicially affected the substantial rights of the defendant. In making closing arguments, both the prosecution and defense have considerable latitude "as to what the evidence has shown, and what reasonable inferences may be drawn therefrom." *Lott,* supra, at 165. An appellate court must review the entire closing argument to determine if a prosecutor's remarks are prejudicial to the accused. *State v. Tumbleson* (1995), 105 Ohio App. 3d 693, 699.   An appellate court should also consider whether the alleged misconduct was an isolated incident in an otherwise properly tried case.  *State. v. Keenan* (1993), 66 Ohio St. 402, 410.

At T.p. Vol. 15, p. 3420 the transcript reads as follows:

-30-

"Mr. Watkins: Seldom does the jury have the quality and quantity of the evidence in a case that you can hear the words and see the writing of the plan to kill. Seldom does the jury get so much evidence.  But the diversion, and it's try a diversion in my opinion–

"Mr. Consoldane: That I'm creating a diversion.

"Mr. Watkins: Absolutely

"Mr. Consoldane: I object to that, Your Honor."

After that single  exchange in front of the jury, (not a series of exchanges as Appellant would suggest with the string cite at page 24 of his brief)  parties adjourned to the judge's chambers where the judge admonished both sides to avoid "personalizing" their arguments.  (T.p. Vol. 15, p. 2423).  It should be noted that after a brief break during which the remark was discussed in chambers, the prosecutor briefly repeated the statement, and trial counsel did not renew the objection.  Therefore, all but plain error is waived with respect to this issue.  Crim. R. 52.

The State disagrees with Appellant's contention that by using the term "diversion" the jury would infer that Appellant's trial counsel was lying, deceiving, engaging in trickery, or committing a fraud on the Court.  Instead, the prosecutor's comments could easily be construed as trying to refocus the jury based on the evidence that had been presented at trial. Furthermore, it should be noted that before adjourning to chambers, the trial court instructed the jury to disregard the remark.  The jury is presumed to follow the trial court's instruction.  *State v. Raglin* (1998), 83 Ohio St. 3d 253, 264.

By comparison, this Court in *State v. Fears* (1999), 86 Ohio St. 3d 329, 333-334, found no reversible error in a prosecutor's closing arguments when he stated that a defense expert was a hired mouthpiece at tax payer expense whose sole function was to parrot the opinions of defense

counsel.  Likewise, this Court found no reversible error when the prosecutor, in closing arguments, denigrated defense counsel because he referred to the defendant by his first name throughout the trial in an effort to humanize him. *State v. LaMar* (2002), 95 Ohio St. 3d 181, 216.  Likewise,  The Eighth Appellate district found no reversible error in a prosecutor telling the jury that the defense was setting up and hiding behind a smoke screen.  *State v. Braxton* (1995), 102 Ohio App. 3d. 28, 42-45.

This Court in *State v. Maurer* (1984), 15 Ohio St. 3d 239, 267, held that "It must be clear beyond a reasonable doubt that absent the prosecutor's comments, the jury would have found the defendant guilty."  The State  presented overwhelming evidence of Appellant's guilt. Appellant received a fair trial and suffered no prejudice as a result, nor were his substantial rights affected by  the "diversion" comment.

Appellant in his brief at page 25, cites to the case of *State v. Sheppard* (1994), 94 Ohio App. 3d 665, 674, and notes that the First District found the prosecutor's references to "cranking up a fog machine" and trying to "conjure up" reasonable doubt "improper."  Such is an accurate reflection of the court's opinion, but the State would note that the court specifically stated that such remarks were not worthy of reversal.  Instead, the First District reversed and remanded the case because the prosecutor inflamed the jury with pictures of the victim's fly-infested body and stated that the victim died of starvation when the coroner testified she died of mechanical asphyxiation. Likewise, in *State v. Keenan* (1993), 66 Ohio St. 3d 402, as decided by this Court and cited by Appellant, the prosecutor's conduct, which did result in a reversal, was far more egregious than the "diversion" comment.  To wit, the prosecutor argued to the jury that defense counsel was "paid to get [Keenan] off the hook," that defense counsel did not believe in their

-32-

own client's innocense, argued it was permissible for the jury to feel outraged about the homicide, referred to Keenan as "an animal," and argued the bad character of certain defense witness. *Keenan,* supra, 402-407. The State submits the isolated comment of the prosecutor that defense counsel was creating a "diversion" pales in comparison to the prosecutor's emotion-saturated closing in *Keenan.*

**Seventh Instance**

Appellant avers that the prosecutor argued facts that were not evidence at pages 3397, 3401 and 3402. Appellant does not specifically state what "facts" the prosecutor alluded to which are not in evidence, so the State must at this point speculate as to the specific error in question here.

At page 3397, the defense interrupted with an objection as the prosecutor argued that if co-defendant Donna Roberts chose Appellant over Fingerhut, she would see an erosion of the life style to which she had become accustomed. The defense objected saying there was no such evidence before the jury. The State disagrees. First, the Fingerhut/Roberts' upper middle class life style was a matter of record, as was Appellant's status as a recently released ex-con. The Roberts/Fingerhut home was valued at $174,000, and each drove a $33,000 automobile. (T.p. 12, p. 2963, T.p. Vol. 13, p. 3275). It should be self evident, even without the prosecutor's argument, that Appellant would not be able to provide Donna Roberts with a comparable lifestyle if she merely walked away from Fingerhut without the benefit of his insurance proceeds. Beyond that, State's Ex.271-D-35 and 271-D-81, letters from Roberts to Appellant, detailed her "financial problems" because Fingerhut had taken away her fifty-two credit cards, and suddenly, she was feeling constrained by his spending restrictions. Therefore, despite Appellant's vague

-33-

claim, the prosecutor was not arguing facts not in evidence, but asking the jurors to draw their own conclusions from the obvious.

At pages 3401 and 3402 the prosecutor was attempting to illustrate that the jury could find a person guilty of burglarizing a home which the victim does not own, to an aggravated robbery involving someone driving a car they did not own (with the owner's permission) and having it taken by gun point.  Defense counsel objected, but expressed placation at the trial court's assurance that in the same context, they would be able to make the same argument. Once again, the prosecutor did not argue facts not in evidence.

Even if this Court were to disagree and find that the prosecutor commented on facts not in evidence (a point which the State does not concede), this Court has previously stated that both sides are accorded some "creative latitude" in closing argument, even in a death penalty case. *State v. Nields* (2001), 93 Ohio St. 3d 6, 38.  At worst, such was the situation here.  Appellant suffered no prejudice by the prosecutor stating that Appellant's co-defendant was accustomed  to a lifestyle which Appellant could not sustain, or in drawing an analogy concerning the aggravated burglary of a house which the victim did not own, or an aggravated robbery of a car which the driver did not own.

**Eighth Instance**

Appellant next argues prosecutorial misconduct because during closing argument, the prosecutor briefly theorized that Appellant  intended to remove Fingerhut from his home, drive him to Youngstown, and execute him.  Again, the prosecutor is permitted some creative latitude in closing arguments.  Plus, the prosecutor carefully prefaced his remarks with the caveat, "[w]hat happened?  Well, I don't know for certain, but I think what the evidence is going to

disclose is here is what happened." (T.p. Vol. 15, p. 3506).  The State submits the prosecutor's

theory was fair comment on the evidence presented.  First, Appellant requests handcuffs, along

with oversized gloves and a ski mask in his letter of Oct. 30, 2001. (State's Ex. 273-N-29).

Second, Det. Monroe discovers an empty box of handcuffs in the trunk of Roberts' car the night

of the homicide.  (T.p Vol. IX, p. 2202).  Finally, in the taped conversations between Roberts and

Appellant, Appellant is heard to say, "I just need to be in that house when he come home.

***Baby, it ain't gonna happen in the house.  It ain't gonna happen in the house, man, I promise

you.***I just need to be in there man. It ain't gonna happen in the house.  I mean I ain't gonna

jeopardize that man."  (State's Ex. 261).  It is logical to conclude that if he needs to be in the

house when Fingerhut gets home, yet the murder "ain't gonna happen in the house," Appellant

intended to transport  Fingerhut to shoot him elsewhere. Ultimately, this did not happen, but the

evidence certainly suggests there was plan to that end.

Even if this Court disagrees and construes the theory unsupported by the evidence, the

statement would not prejudice Appellant.  If anything, the remark benefits him when it becomes

apparent to the jury  that the reality of Fingerhut's murder did not square with a plan to take him

to Youngstown and kill him.  Alternatively, Appellant is no less guilty of aggravated murder with

prior calculation and design if he plans to shoot Fingerhut in Youngstown, yet carries out that

plan in Howland.

**Ninth Instance**

Appellant next complains  the prosecutor argued in his closing arguments in mitigation

that Appellant had no mental disease or defect, a mitigating factor which he says he did not

intend to introduce.  Nevertheless, Appellant's witness, Dr. Sandra McPherson, testified

-35-

concerning Appellant's Attention Deficit Disorder which translates to a neurological disability, his two childhood I.Q. scores of 70[2] placing him in the borderline region of mental retardation, his prior drug use, and his diagnosis of an anti-social personality disorder. (T.p. Vol. 16, p. 37-39, 46, 50). Without objection, the prosecutor inquired of the witness whether Appellant had ever been hospitalized for mental illness or neurological problems, and whether or not a conduct disorder was a mental disease of defect. (T.p. Vol 16, p. 63, 78-79). Therefore, the comment was a correct statement of the evidence. Furthermore, it should be noted that defense counsel commented on Appellant's 70 I.Q. score during his closing arguments, (T.p. Vol. 16, p. 132), thereby raising the specter of a mental disease or defect. It is not inconceivable that as a result of the doctor's testimony, and despite earlier representations by trial counsel, Appellant may have requested an instruction as to the mitigating factor of mental disease or defect as promulgated in R.C. 2929.04 (B)(3). As such, the comment was proper.

This Court in *State v. DePew* (1988), 38 Ohio St. 275, considered a case wherein the prosecutor commented on statutory mitigation factors not raised by the defendant and the trial court then instructed on *all* the mitigating factors enumerated in R.C. 2929.04(B), some of which were not they were introduced by the defendant. While this Court found that such comment and instructions were improper, it did not find reversible error. "This was certainly not prejudicial error, though the better practice is certainly to refrain from even referring to mitigating factors not raised by the defendant." *DePew*, supra, at 290. This Court revisited this issue in *State v. Smith* (1991), 61 Ohio St. 3d 284. This Court again found no reversible error where "the prosecutor only briefly referred to some statutory factors simply to demonstrate those factors

---

[2]Appellant later tested at 84. (T.p. Vol. 16, p. 46-48).

were not involved." Id. at 292. Furthermore, the trial court instructed the panel that the closing statements of counsel were not evidence. (T.p. Vol. 16, p. 164). Furthermore, the Court gave a curative instruction prompted by defense objection (T.p. Vol. 16, p. 140). As stated previously, a jury is presumed to follow the court's instruction. *Loza,* supra.

Therefore, the State submits, the prosecutor's remark was brief, justified by the evidence introduced concerning Appellant's low I.Q., affected no substantial right of Appellant, was non-prejudicial, and if error at all, was harmless error at worst.

**Tenth Instance**

In his final alleged instance of misconduct, Appellant argues that it was improper for the prosecutor to categorize Robert Fingerhut's pre-planned murder for lust and money "a cold blooded psychopathic killing." As the Appellant notes in his brief, the trial court sustained trial counsel's objection and instructed the jury to disregard the remark. Again, the jury is presumed to follow the trial court's instruction. *Loza,* supra.

The State submits there was no error in the remark, and that the trial court's sustaining of the objection was an unnecessary prophylactic measure. In *State v. Green* (2000), 90 Ohio St. 3d 352, 374, this Court found no error in the prosecutor asking a defense witness if an antisocial personality disorder diagnosis would encompass psychopaths and sociopaths. The expert in that case said that it would. Appellant was diagnosed by Dr. McPherson as having an anti-social personality disorder. (T.p. Vol. 16, p. 50). Therefore, by a standard definition, Appellant is a psychopath and it was not improper for the prosecutor to label Robert Fingerhut's killing as a "psychopathic killing."

Should this Court disagree, the jury was instructed to disregard the remark, no substantial

rights of the Appellant were affected, he suffered no prejudice, and in spite of the remark, Appellant received a fair trial.

CONCLUSION

None of the above instances singularly or cumulatively denied Appellant a fair trial.  No substantial rights of the Appellant were prejudiced.  Appellant does not argue, nor can he demonstrate, that but for the ten complained instances, the outcome of the trial would have been different.  The State concedes no error of ten examples cited by Appellant, but would argue that any error was harmless at worst.  As is abundantly clear from the rest of the record, the State presented overwhelming evidence of his guilt and despite these alleged errors, the jury would have found Appellant guilty as charged.  Appellant's Proposition of Law No. 3 is without merit.

<u>**APPELLEE'S PROPOSITION OF LAW NO. 4**</u>:

> **Appellant cites to no "judicial error" which was in fact improper.  None of the alleged irregularities, even if found to be "error" were outcome determinative due to the overwhelming evidence of Appellant's guilt.**

In his Proposition of Law No. 4, Appellant argues a due process deprivation due to a grand total of four instances of "judicial error."  As will be discussed in infra, none of Appellant's enumerated "instances" rise to the level of an error, and Appellant was in no way deprived of a fair trial.

**First Instance**

Appellant reprises his argument from the previous Proposition of Law, wherein the prosecutor stated, in closing arguments during the guilt phase, that the defense counsel was "creating a diversion" in a manner which was actually never explained to the jury because counsel interrupted with an objection.  Appellant first criticizes the trial court for not ruling on the objection.  However, it is well-settled law that "when a court fails to rule on a motion or objection, the motion or objection is implicitly overruled." *Solon v. Solon Baptist Temple* (1982) 8 Ohio App. 3d 347, 351-352.   Appellant also argues  the court failed to give a curative instruction.  The State would direct the Court's attention to the record where, as the prosecutor and defense counsel debated over the "diversion" issue, trial court stated:

> "THE COURT: Just a minute. Just a minute. Ladies and gentleman, please disregard this little exchange.  It's not part of this case.  Please approach the bench."

(T.p. Vol. 15, p. 3420).   Therefore, even though the court did not say "objection sustained" or "overruled," the jury was told to disregard the "diversion" debate. The jury is presumed to follow

the court's instructions. *State v. Loza* (1994), 71 Ohio St. 3d 61, 75.  And while Appellant argues that the prosecutor was permitted to argue that defense counsel was creating a diversion for the jury with respect to the facts, the record shows that the prosecutor repeated the "diversion" remark and trial counsel did not object.  The prosecutor then moved on to the State's evidence it had introduced regarding the rocky relationship between Robert Fingerhut and Donna Roberts.  (T.p. Vol.15, p. 3425-3427). Nevertheless, because there was no objection to the fleeting comment, the trial court had no opportunity to rule on objection. "A court may only prevent or correct potential errors when they are timely brought to the court's attention. A defendant should not be permitted to benefit from an alleged error by waiting to raise the objection until there is no opportunity for the trial court to correct it." *State v. Coe* (2003), 153 Ohio App. 3d 44, 50. Therefore, Appellant cannot now argue judicial error on something that his trial counsel failed to draw to the court's attention.

In sum, the trial court initially instructed the jury to disregard any exchange involving the diversion remark, and when it was repeated, the defense failed to object so Appellant cannot now argue he was prejudiced.

**Second Instance**

Counsel again accuses the prosecutor of arguing facts not in evidence during his closing argument during the penalty phase.  As previously stated, "[t]he prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh* (2001), 90 Ohio St. 3d 460, 466. Furthermore, the Roberts/Fingerhut upper-middle class lifestyle had been well established through the State's evidence, as had been Donna Robert's frustration with having her financial wings clipped by Fingerhut. Both were subjects of the prosecutor's close where Appellant now

-40-

complains.   Therefore, the trial court did not err in permitting fair comment on the evidence

presented. The prosecution may make fair comments on the evidence and reasonable inferences

that the jury could draw from the evidence. *State v. Tibbets* (2001), 92 Ohio St. 3d 146, 169.

Therefore, there was no judicial error in permitting the comment.

Even if this Court finds the argument improper, which the State does not concede,

Appellant's guilt has been established by overwhelming evidence, and therefore, Appellant

suffered no prejudice from the remark.  See *State. v. Bey* (1999), 85 Ohio St. 3d 487, 495.

**Third Instance**

Appellant argues error in the trial court's election not to sustain an objection to the

prosecutor's comment during closing argument that Appellant did not have a mental disease or

defect.   This issue was discussed extensively in Proposition of Law No. 3.  Without being

repetitive, Appellant opened the door to the remark by introducing evidence about Appellant's

I.Q. which at one time tested at 70.  He further introduced evidence of Appellant having  an anti-

social personality disorder.  Therefore, it was fair game for the prosecutor to establish that

Appellant was not suffering from a mental disease or defect which would qualify as a mitigating

factor under R.C. 2929.04(B)(3).  In the past, this Court has found no reversible error when the

trial court listed all the mitigating factors, even though the defendant had not argued all of them.

*State v. DePew* (1988), 38 Ohio St. 275, 290.  The trial court in the case sub judice made no such

error in permitting the isolated remark by the prosecutor.

**Fourth Instance**

In his fourth and final instance of alleged judicial error, Appellant cites to the testimony

offered by State's witness Frank Reynolds, an employee of Robert Fingerhut's, who overheard a

-41-

conversation between Fingerhut and co-defendant Donna Roberts occurring the day before the homicide. When Reynolds testified that Roberts asked Fingerhut for money, defense objected and a lengthy exchange occurred in chambers. (T.p. Vol. IX, p. 2177-2186). Appellant claims error in the court's overruling an objection . (T.p. Vol. IX, p. 2187). Once questioning resumed, the sum and substance of Reynold's testimony involved very little of what he heard, but more of what he observed. (T.p. Vol. IX, p. 2188-2190).

The State submits that Reynold's testimony was not hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Evid. R. 801 (C). This Court has held that to constitute hearsay, two elements are required. "First, there must be an out-of-court statement. Second, that statement must be offered to prove the truth of the matter asserted." *State v. Maurer* (1984), 15 Ohio St. 3d 239, 262. If either element is missing, the testimony is not hearsay. Id.

As the State argued at trial, and as the court found, the contents of the Roberts/Fingerhut discussion were not offered for proof of the matter asserted, and were therefore not hearsay per *Maurer* and Evid. R. 801(C). Though Reynolds' testified that he heard Roberts ask Fingerhut for "three grand," he further testified that he observed her become nervous, shaky and gave Fingerhut a look "like it can kill a person." (T.p. Vol. IX, p. 2188). The State did not offer the testimony to prove that Roberts asked Fingerhut for $3,000. The State offered the testimony to detail Roberts' reaction when Fingerhut declined to give her money. Her reaction was part and parcel to the State's theory that Roberts and Appellant conspired to kill Fingerhut to facilitate their romantic relationship and to acquire $500,000 in insurance proceeds to continue Roberts' upscale lifestyle after Fingerhut's death.

-42-

Furthermore, the State submits Roberts' request for the $3,000 is in furtherance of the conspiracy to kill Fingerhut, and therefore qualifies as an exception pursuant to Evid. Rd. 801(D)(2)(e). Roberts was out to have Fingerhut killed because he was worth far more dead to her than alive. The State demonstrated Appellant's participation in that conspiracy to the point of proving that Appellant was the actual killer. Therefore, Roberts' request for $3,000 and her drama queen reaction once refused was all part of her conspiracy to have Fingerhut murdered.

Even if this Court disagrees that Reynolds' testimony constitutes inadmissible hearsay, which the State does not concede, this Court has held that such testimony will not cause a reversal of the conviction wherein the evidence absent the hearsay is overwhelming in favor of conviction. *State v. Kidder* (1987), 32 Ohio St. 3d 279, 284. Certainly, whether or not Reynolds' testified Roberts asked Fingerhut for $3,000, Appellant would have been convicted. Therefore, any error in the admission of this testimony is at worst harmless error.

## CONCLUSION

The State submits that none of the four alleged judicial errors violated Appellant's due process rights. He enjoyed the benefit of a fair trial, and no substantial rights were affected. Based on the overwhelming evidence of his guilt, any alleged error is at worst harmless. This Proposition of Law lacks merit.

**APPELLEE'S PROPOSITION OF LAW NO. 5**:

**A jury instruction which requires the State to prove beyond a reasonable doubt a capital defendant's intent to kill does not relieve the State of its burden to prove that the defendant purposely caused the death of another and therefore is not constitutionally infirm.**

In Proposition of Law No. 5, Appellant argues that the trial court improperly defined the element "purposely" and in the process relieved the State of its burden to prove all elements of the offense of aggravated murder.

It must first be noted that Appellant failed to object at trial to the "purposely" definition which he now contests. Though parties consumed considerable time and transcript space objecting and defending various segments of the instruction, Appellant did not object to the instruction as submitted on the definition of "purposely." (T.p. Vol. 14, p.3334-3372, T.p. Vol. 15, p. 3374-3389, 3526-3541). Failure to object to a jury instruction waives any claim of error relative to that instruction unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood* (1983), 3 Ohio St. 3d 12, 13-14.

Indeed, not only did trial counsel *not* object to the "purposely" instruction, they tacitly endorsed it:

"Mr. Lewis: On the old set, page 12. Purpose. Purpose has been previously defined for you. And it says in addition – well, it is just the way –it is an instruction from OJI. Okay.

"Mr. Consoldane: That is a very rough reading paragraph.

"Mr. Lewis: It is out of OJI. Normally what they do is they simply put a heading, dangerous weapon. It doesn't say purpose. That is true. It says dangerous weapon. Just put dangerous weapon.

"Mr. Morrow: I'll put dangerous weapon.

-44-

"Mr. Lewis: Correct.

"Mr. Morrow: This is the one from *Shaffer* on prior calculation and design.  I know that was the one that you argued quite extensively in *State v. Shaffer* case.

"Mr. Lewis: I guess we're all right."

(T.p. Vol. 14, p. 3371-3372).  Appellant quotes the trial court's instruction citing pages 3350-3551, 3559-3560, 3573-3574, and makes the conclusory statement that the instruction somehow relieved the State of its duty to establish the proper mens rea for aggravated murder, and shifted the burden to the Appellant.

The portion of the instruction quoted by Appellant at pages 41 and 42 of his brief in no way suggests to the jury that the burden of proving "purposely" rests with any party but the State of Ohio.  At no point in these instructions does the court link the element of "purposely" with any rebuttable or mandatory presumption which somehow shifts to the defense.  The language quoted by Appellant is clear and unambiguous: it is the State which must prove these elements beyond a reasonable doubt.

From the very beginning of the instructions, the panel was told:

"***The plea of not guilty is a denial of the charges and specifications and that puts in issue all of the essential elements of each charge and specification. *That puts the burden of proof upon the State to prove each and every element of each offense.*

"Now the defendant is presumed innocent unless his guilt is established beyond a reasonable doubt, and *the defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense and specification charged in the indictment.*"  (Emphasis added).

(T.p. Vol. 15, p. 3543).

Nothing concerning the court's definition of purpose (which the court actually defined

-45-

during its explanation of the elements of aggravated burglary) shifts the burden of proof or places any presumption whatsoever upon Appellant.

Appellant complains in his brief at page 43 about the "gist of the offense" language in R.C. 2901.22(A)'s definition of "purpose," but said language appears *nowhere* in the instruction. Furthermore, this Court found the "gist" language "confusing" in a murder prosecution. *State v. Wilson* (1996), 74 Ohio St. 3d 381, 393.

Appellant next argues that the trial court's instruction that a defendant's purpose may be determined by the manner and means a crime is committed, including the use of weapons, is improper. Appellant has taken this portion of the definition and perverts it to suggest that the instruction "created a mandatory rebuttable presumption of the mens rea element from the mere use of a deadly weapon." Appellant's Brief at page 44. Such is not a reasonable or logical conclusion. This Court has held that  intent to kill "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." *State v. Stallings* (2000), 89 Ohio St. 3d 280, 290, quoting *State v. Robinson* (1954), 161 Ohio St. 13, paragraph five of the syllabus. Therefore, any instruction regarding the determination of purpose relative to the use of a deadly weapon was not improper, but wholly consistent with this Court's prior holdings. Appellant's bold statement that "[p]urpose to kill cannot be presumed from the mere use of a weapon" (Appellant's brief at p. 45) is simply wrong. Nor did the court instruct the jury to find that the "mere" use of a weapons determinative of purpose.

The State submits no plain error occurred as a result of the trial court's definition of "purposely." The instruction was not improper, and was certainly not outcome determinative in

-46-

light of the weight of the evidence against Appellant which included his admission to shooting Fingerhut in his own home, as well as a series of letters and phone calls between Appellant and his co-defendant Roberts which clearly detailed a plan for Fingerhut's murder. See *Wilson*, supra, at 393.  As such Appellant's Proposition of Law No. 5 lacks merit.

**APPELLEE'S PROPOSITION OF LAW NO. 6:**

> **The "reasonable doubt" definition as promulgated in R.C. 2901.05(D) is constitutionally sound and did not prejudice Appellant in the case sub judice.**

Appellant again challenges the jury instruction in this matter, this time complaining that the trial court gave a constitutionally infirm definition of " reasonable doubt." This proposition lacks merit.

Again, as in the previous proposition of law, Appellant failed to object to the instruction about which he now complains. Failure to object to a jury instruction waives any claim of error relative to that instruction unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood* (1983), 3 Ohio St. 3d 12, 13-14. The State submits that the trial court's definition of reasonable doubt was not improper, nor does Appellant demonstrate that it was outcome determinative.

Nevertheless, the trial court's definition of reasonable doubt is wholly consistent with the definition promulgated in R.C. 2901.05(D) which reads:

> " 'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs."

This Court in *State v. Jenkins* (1984),15 Ohio St. 3d 164, 212, clearly held that "the standard of proof in a capital prosecution is proof beyond a reasonable doubt as defined in R.C. 2901.05***." In *Jenkins,* this Court relied upon its analysis of the definition of beyond a reasonable doubt as espoused in *State v. Nabozny* (1978), 54 Ohio St. 2d 195, 202-203:

"***We are cognizant of the difficulty inherent in any attempt to define this abstract legal concept. The United States Supreme Court recognized this problem in *Miles v. United States* (1880), 103 U.S. 304, at page 312,: 'Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury.' Scrutiny of the definition provided by the General Assembly in R.C. 2901.05 reveals a substantial similarity to the explanation of 'reasonable doubt' upheld in *Holland v. United States* (1954), 348 U.S. 121****. In *Holland*, supra, at page 140, the United States Supreme Court found, concerning 'reasonable doubt,' that 'the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some.***'

"The General Assembly has attempted, in R.C. 2901.05 and the definition of 'reasonable doubt' therein, to provide not only a degree of consistency as to the meaning of the term throughout the courts of this state, but also to have a definition comprehensible to all the members of the jury and not merely those trained in the subtle nuance of legalese. Considering the inherent difficulty in defining this abstract concept of reasonable doubt, the similarity of the definition under consideration with that in Holland, supra, and the beneficial aspects of the legislative mandated definition, we find that the General Assembly has pronounced a rational definition of 'reasonable doubt' which, when taken as a whole, correctly conveyed the concept of 'reasonable doubt' to the jury." (Footnotes and parallel cites omitted).'

This Court has not strayed beyond the R.C. 2901.05 definition in twenty-five years.

Furthermore, pursuant to *Nabozny,* the definition as supplied by the trial court would not mislead a jury into finding *no* reasonable doubt where *some* in fact existed. As stated in the previous proposition of law, the evidence of Appellant's guilt was overwhelming. Appellant does not offer any speculation as to just what reasonable doubt existed in his case, with or without the edits he now proposes to the trial court's definition of "reasonable doubt." In other words, the State submits the jury would have still found Appellant guilty on all counts and specifications even *if* the court had adopted the amendments he now proposes.

The trial court committed no plain error in reading a definition of beyond a reasonable doubt perfectly consistent with that promulgated in R.C. 2901.05. Despite the fact that various

-49-

courts, whose decisions are not controlling on this Court, have, over the years, parceled out

language used by the trial court  and found it objectionable, the definition still stands in this

State.  Appellant gives no valid reason to amend the definition.  He suffered no Due Process error

as a result of the definition read.  His sixth Proposition of Law lacks merit.

**APPELLEE'S PROPOSITION OF LAW NO. 7**:

> **A trial court that weighs an aggravated murder committed during the commission of the violent crimes of both aggravated burglary and aggravated robbery against minimal, "catchall" mitigating evidence does not err in imposing a death sentence.**

In his seventh Proposition of Law, Appellant argues that the trial court improperly weighed the aggravating circumstances and mitigating factors in determining whether to follow the jury's recommended sentence of death. This argument is without merit.

Appellant first attacks the trial court's Findings of Fact and Conclusions of Law Regarding Imposition of the Death Penalty by claiming that the trial court reduced mitigation to a "justification." The State is at a total loss to deduce how Appellant arrived at this characterization, especially when the trial court instructed the jury as follows:

> "What are mitigating factors? *Mitigating factors are factors that while they do not justify or excuse the crimes of aggravated murder*, nevertheless, if you find they exists, shall be considered by you as extenuating, lessening, weakening, excusing to some extent or reducing the degree of sentence. Mitigating factors are not related to Nathaniel E. Jackson's culpability, but rather are those factors that are relevant to the issue of whether Nathaniel E. Jackson should be sentenced to death." (Emphasis added).

(T.p. Vol. 15, p. 169-170). If a jury is presumed to follow the trial court's instruction, it should be axiomatic that the court itself would heed its own instruction. Nevertheless, not once in the entire Findings of Fact and Conclusions of Law does the trial court define a mitigating factor as "justification" for Appellant's actions. (T.d. #274). For this reason alone, this Court should discount Appellant's averment.

Nevertheless, Appellant first alleges the trial court found Appellant committed the aggravated murder of Fingerhut with prior calculation and design, *and* that he was the principal

-51-

offender. R.C. 2929.04(A) precludes the imposition of the death penalty except under ten very

limited circumstances, including those enumerated in R.C.2929.04(A)(7) which reads:

> " The offense was committed while the offender was committing,
> attempting to commit, or fleeing immediately after committing or attempting to
> commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated
> burglary, and either the offender was the principal offender in the commission of
> the aggravated murder or, if not the principal offender, committed the aggravated
> murder with prior calculation and design."

A review of the jury verdicts reveals  the panel found Appellant guilty of two counts of

aggravated murder, Counts One and Two of the indictment.   For sentencing purposes, the Court,

at State's request, dismissed Count Two.  Count One  contained two specifications.  The wording

of the jury's findings is as follows:

**COUNT ONE**:
> "We, the jury in this case, duly impaneled and sworn or affirmed, find the
> Defendant, NATHANIEL E. JACKSON, guilty of Aggravated Murder (did
> purposely cause the death of Robert Fingerhut with *prior calculation and design*)
> on December 11, 2001, in the manner and form as he stands Charged in Count
> One of the indictment. "

**SPECIFICATION ONE:**
> "We, the jury in this case, duly impaneled and sworn, find and specify by proof
> beyond a reasonable doubt, that the Defendant, NATHANIEL E. JACKSON, is
> guilty of committing, attempting to commit, or fleeing immediately after
> committing Aggravated Burglary and that said NATHANIEL E. JACKSON was
> *the principal offender in the commission of the Aggravated Murder, or committed*
> *the Aggravated Murder with prior calculation and design.*

**SPECIFICATION TWO:**
> "We, the jury in this case, duly impaneled and sworn, find and specify by proof
> beyond a reasonable doubt, that the Defendant, NATHANIEL E. JACKSON, is
> guilty of committing, attempting to commit, or fleeing immediately after
> committing Aggravated Robbery and that said NATHANIEL E. JACKSON was
> *the principal offender in the commission of the Aggravated Murder, or committed*
> *the Aggravated Murder with prior calculation and design.*

(T.d. # 262, 263, 264). (Emphasis added).  The jury verdict, in its entirety, referenced both the

-52-

"principal offender" language within the body of the aggravated murder charge itself, and the "principal offender" and the alternative "prior calculation and design" language within the specifications.  This Court has repeatedly rejected the logic postulated by Appellant that a court may not find that the defendant fell into both categories. For example, in *State v. Twyford* (2002), 94 Ohio St. 3d 340, this Court gave no credence to a defense argument that the jury verdict forms were erroneous because they contained both the "prior calculation and design" and the "principal offender" language.

> "Appellant is incorrect. In fact, the indictment, the trial and penalty instructions, and the jury's findings as to the death specifications all followed the statutory language set forth in R.C. 2929.04(A)(7) and specified alternatives, *i.e.,* that appellant "was the principal offender" in the murder, "*or, if not,*" committed the murder with prior calculation and design. (Emphasis added.) This court has repeatedly declined to find prejudicial error from similar instructional language."

*Twyford,* supra,  at 351.

The verdict forms, which Appellant do not challenge, were *Twyford* compliant.  Therefore, when the sentencing entry reflects that Fingerhut's murder was premeditated and that Appellant was the principal offender, both are an accurate reflection of the jury verdict and is therefore not error.

Furthermore, the court's  opinion clearly does not, as cautioned against by this Court in *State v. Penix* (1987), 32 Ohio St. 3d 369, convert one aggravating circumstance into two. Appellant stands convicted of two specifications because he committed an aggravated murder, during the course of an (1) aggravated burglary *and* an (2) aggravated robbery, and was the principal offender in the aggravated murder. (T.d # 262, 263, 264).  The jury verdict forms and the Findings of Fact clearly state this distinction.   While the trial court may have referenced at

-53-

various portions of the Findings of Fact that the murder was premeditated or that Appellant

"plotted" with co-defendant Roberts to kill Fingerhut, the Court, when specifically enumerating

the aggravating circumstances it weighed against the aggravating factor, referenced only the

"principal offender" language and made *no* reference to the "prior calculation and design"

language.   (T.d.# 274, p.5). Therefore, the State submits Appellant's claim that "[t]he trial court

was persuaded to impose the death penalty 'particularly' because Appellant was both the

principal offender and because he acted with prior calculation and design," (Appellant's brief at

p. 52), is not supported by the trial court's findings.

Furthermore, it is patently obvious that Appellant was indeed the principal offender, and

that he committed his crime with a considerable amount of prior calculation and design.  The

term "principal offender" has been held by this Court to be synonymous with the term "actual

killer." *State v. Yarbrough* (2002), 95 Ohio St. 3d 227, ¶168.  Not even Appellant disputes the

fact that he was the actual killer in this case.  While Roberts stands  indicated and convicted as a

co-defendant, nothing in the record indicates that she fired any of the three shots which killed her

ex-husband. Though Appellant mounted an unsuccessful self-defense argument, he never argued

that he was not the actual killer.  Likewise, though Appellant's trial counsel tried to down play

the long-running and well documented plot to kill Fingerhut, the jury and the trial court both

justifiably  concluded that the murder was committed with prior calculation and design. As a

result, even if this Court were to concur with Appellant's tortured logic that the trial court

dissected one specification of an aggravated circumstance and gave it double the weight in the

sentencing opinion (a point which the State does not concede),  any error would be harmless.

A similar argument to the case at bar was unsuccessfully raised in *State v. Goodwin*

(April 17, 1997) Cuyahoga App. No. 98531, wherein Goodwin averred that the trial court erred in finding "[t]there is no reasonable doubt that the defendant was the principal offender who purposely executed [the victim] with prior calculation and design in the course of his aggravated robbery," Id. at *6.   Though not controlling on this Court, the Eighth Appellate District's logic is sound and applicable to the case sub judice:

> "If the trial court did err by weighing both alternatives against appellant's mitigating evidence, there is no reversible error.  The trial court found little mitigating evidence in this case.  It is unlikely the outcome would have changed if the trial court considered that appellant was the principal offender only without the factor of prior calculation and design.  Further, any error that may have occurred would be cured by the independent review and the weight of the aggravating circumstance and mitigation by this court.  Unlike *Penix,* the jury did not improperly consider both R.C. 2929.04(A)(7) alternatives as separate aggravating circumstances. ***There is no reason to vacate appellant's sentence of death."

*Goodwin,* supra, at 6.  Likewise, this Court found no reason to reverse Goodwin's death sentence either, and affirmed it in *State v. Goodwin* (1999), 84 Ohio St. 3d 331.  Furthermore, like the lower court's decision in *Goodwin,* this Court has repeatedly held that even *if* the trial court's sentencing entry is flawed, such an error may be cured by this Court's independent review process. *State v. Noling* (2002), 98 Ohio St. 3d 44, 67; *State v. Fox* (1994), 69 Ohio St. 3d 183, 191.For example, this Court can remedy  any error related to duplicative aggravating circumstances by merging the  specifications of aggravating circumstances as part of its independent sentencing review. *State v. Chinn* (1999), 85 Ohio St. 3d 548, 558.

The State maintains there is no error here to cure.  It is clear from the face of the Findings of Fact that the trial court did not impose the death penalty because it sub divided one aggravating circumstance into two.  Instead, the trial court sentenced Appellant to death because

the two aggravating circumstances found by the jury outweighed the minimal mitigating evidence

presented by Appellant.

The trial court reasoned:

"Under the facts in the instant case, this Court can not foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater.  The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to [sic] rather to carry out the premeditated, cold blooded execution [sic] Robert S. Fingerhut.  This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight.  Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

"The Court further gives weight to the Aggravated Robbery specification. After shooting the Defendant [sic] in the head, the Defendant took personal property of the victim to effectuate his escape.  Indeed, the Defendant stole the victim's keys and his car.

"Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct.***"

(T.d. # 274, p. 11-12).  The State submits that this Court should easily conclude that even if

Appellant had not murdered Fingerhut on anything more than a whim or spur-of-the-moment

decision, the aggravating circumstances would still outweigh the paltry mitigating factors.  This

Court has frequently held that even if the weighing process is somehow flawed, reversal is not

required when the legitimate aggravating circumstances are weighed against a dearth of

mitigating evidence.  *Chinn,* supra, at 557; *State v. Palmer* (1997), 80 Ohio St. 3d 543, 575; *State

v. Wogenstahl* (1996), 75 Ohio St. 3d 344, 368.

For the reasons thus stated, the trial court engaged in a proper weighing exercise

-56-

violated no constitutional rights of Appellant in the process. The court individualized Appellant's sentence and violated no liberty interest in imposing the death penalty,    Appellant's Proposition of Law No. 7 is without merit.

**APPELLEE'S PROPOSITION OF LAW NO. 8:**

> **The trial court properly weighed the aggravating circumstances against the mitigating factors in determining that a sentence of death was neither excessive nor disproportionate.**

Appellant's Proposition of Law No. 8 attacks his death sentence on two fronts. First, he argues that while his murdering Fingerhut was brutal and senseless, the mitigating factors of his social history and total infatuation with Donna Roberts render his death sentence inappropriate and disproportionate. (Appellant's Brief at 61). Second, Appellant submits that a meaningful proportionality review of his sentence is impossible, therefore, Ohio's death penalty scheme is constitutionally flawed.  Neither argument has merit.

Though conceding that Fingerhut's death is a "tragedy," Appellant argues the sentence is nonetheless inappropriate for him.  The jury and the trial judge obviously disagreed, as should this Court.  He concludes his sentence is inappropriate because of his "detailed social and relationship histories, his functioning ability, his I.Q. and the impact and influence of his relationship with Donna Roberts."  (Appellant's brief at page 61).

The mitigation record reflects a sound and solid foundation for the trial court's decision. Appellant's social history includes an absentee father who was eventually replaced by an involved stepfather.  (T.p. Vol. 16, p. 24).  His sister described Appellant as a churchgoer who knew right from wrong.  (T.p. Vol. 16, p. 29).  While his own handpicked expert, Dr. Sandra McPherson, an anti-death penalty forensic psychologist, testified that he scored "at or around 70" on I.Q. tests in the fourth and tenth grades,  his mother stated he did well in school until he opted to drop out. (T.p. Vol 16, p. 32, 46, 60). Currently, Appellant has a full scale I.Q. of 84.  (T.p. Vol. 16, p. 46). Dr. McPherson testified  that Appellant had never been hospitalized for mental

-58-

illness, that his conduct disorder was not a mental disease or defect, that his upbringing is devoid

of any examples of physical or sexual abuse, and that he does not learn from his mistakes. (T.p.

Vol. 16, p. 63-88). While Dr. McPherson attributed Appellant's earlier criminal history to his

drug dependency, she conceded that Appellant plotted to kill Fingerhut for money, and for the

love of Roberts. (T.p. Vol 16, p. 98).

 The trial court found most compelling that Appellant committed, "the most heinous form

of Aggravated Burglary, and it is entitled to unsurpassed weight." The court wrote that "the

evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence

was not to commit a theft, a kidnapping or a rape, but to [sic] rather to carry out the

premeditated, cold blooded execution [of] Robert Fingerhut." (T.d. # 274, p. 11). The court

concluded that his above-cited mitigating evidence had "very little effect in minimizing,

lessening, or excusing the degree of the Defendant's murderous conduct." Id.    Therefore, it is

clear that the trial court did not impose the death penalty in this matter because Fingerhut's

murder was tragic, brutal, cruel, senseless, vile, horrible or inhuman. Instead, the trial court

imposed the death penalty because the State produced overwhelming evidence that Appellant

committed an aggravated burglary with the sole intention of killing Fingerhut so that he could

share in Fingerhut's insurance proceeds, and simultaneously have Fingerhut's ex-wife all to

himself.

 Additionally, in this proposition of law, Appellant argues that his death sentence should

be reversed because, he claims, a meaningful proportionality review is not possible. (Appellant's

brief at p. 60). This Court fully explained its position on the proportionality review in *State v.*

*Steffen* (1987), 31 Ohio St. 3d 111 . "The purpose of proportionality review is to determine

whether the penalty of death is unacceptable in the cause under review because it is disproportionate to the punishment imposed on other convicted of *the same crime*." Emphasis added. *Steffen,* supra at 123  quoting *Pulley v. Harris* (1984), 465 U.S. 37, 43. It should further be noted that in *Pulley,* supra, at 45, the U.S. Supreme Court held that proportionality reviews are not constitutionally required. As a result, this Court has stated, "because a proportionality review is not mandated in a constitutionally valid sentencing scheme, Ohio is free to define the proportionality review."  *State v. Bedford* (1988), 39 Ohio St. 3d  122, 131. In *Steffen,* supra, this Court discussed its rationale for limiting the cases ripe for comparison to those in which the death penalty has been imposed:

> "Logic dictates that only those cases which result in conviction have any use in proportionality review, since only then will a penalty result with which the death sentence under review may be compared.  It is equally logical that only convictions of a capital crime are relevant for comparison purposes, since such cases are necessarily so qualitatively different from all others that comparison with non-capital offenses would be a profitless exercise.  In fact, R.C. 2929.05(A), in requiring proportionality review, limits the scope of review to 'similar' cases. We are further persuaded that a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has decided itself.  Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness."

*Steffen,* at 123.

Appellant criticizes  this Court's decision that "[n]o reviewing court need consider any cases where the death penalty was sought but not obtained or where the death sentence could have been sought but was not."  *Steffen,* supra  at 124.  As has been previously stated in this argument, this Court decided this issue in *Steffen* and thus far has not changed its position.   The State submits Appellant has presented no compelling rationale to this Court to deviate from these

-60-

holdings, particularly in Appellant's case wherein he plotted and executed the annihilation of Fingerhut to collect on his insurance proceeds and then presented precious little mitigation to excuse his conduct. It cannot go without mention that the United States Supreme Court has yet to accept jurisdiction on this issued to force a change in Ohio's proportionality review.

This Court has considered similar cases wherein the death penalty was imposed. In *State v. Berry* (1995), 72 Ohio St. 3d 354, the defendant was charged with aggravated murder with the same specifications as Appellant. In *Berry*, the defendant ambushed the owner of a Cleveland bakery in his store. Both he and a co-defendant shot the victim to death. Berry took the store's van keys to facilitate his get-a-way. Berry presented mitigating evidence of a personality disorder with schizoid symptoms and anti-social features, a history of hearing audible voices, instances of molestation as a child, and the fact that his co-defendant received a life sentence. Nonetheless, this Court found his death sentence was neither excessive nor disproportionate. *Berry,* supra, at 363-366. This Court held, "[w]eighing the aggravated circumstances against the evidence presented in mitigation, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt." Id. at 366.

Thus, when compared to the fact pattern in *Berry,* the trial court's decision appropriate and was neither excessive nor disproportionate. Indeed, an apples to apples comparison can be made here. Even with more documented mental problems than Appellant, this Court found that the aggravating circumstances outweighed the mitigating factors presented in *Berry.* For this Court to likewise find that the death penalty is warranted in the case at bar would be appropriate and supported by prior authority from this very Court. Appellant's eighth Proposition of Law lacks merit.

-61-

**APPELLEE'S PROPOSITION OF LAW NO. 9**:

> **A capital defendant has no constitutional right to a proportionality review, therefore he cannot claim constitutional error as a result of precedent from this Court to compare death sentences only with death sentences.**

Appellant, in this proposition of law, reprises his complaint from the preceding argument that Ohio's proportionality review is flawed, thereby rendering the entire death penalty scheme contrary to the U.S. and Ohio Constitutions.  Again, this contention  lacks merit.

Appellant's new spin on the old proportionality argument proposes  that because Ohio judges "have repeatedly failed to file sentencing opinions in those cases in which a jury has returned a life verdict in a capital case" the whole death penalty process is skewed in favor of death.  (Appellant's brief at p. 63).

Appellant's conclusion is supported by neither law nor fact.  Appellant submits no authority or empirical data  whatsoever for his conclusory statement that common pleas judges are not filing  sentencing opinions when the jury recommends a life verdict. However, it is the State's position that if they are not filing the these opinions it is because there is no requirement to do so. While Appellant insists that R.C. 2929.03(F) requires the filing of the "life verdicts" for the compilation of a death penalty data bank to be tapped for future proportionality reviews, this Court has held repeatedly that reviewing courts are to compare death sentences only with other death sentences, and not life sentences. *State v. Steffen* (1987), 31 Ohio St. 3d 111, 123; *State v. Poindexter* (1988), 36 Ohio St. 3d 1, 4; *State v. Combs* (1991), 62 Ohio St. 3d 278, 289.

Indeed, this Court made its position clear on this issue in *Steffen, supra,* when it wrote,

"***[w]e hold, therefore, that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the

-62-

reviewing court in which the death penalty has been imposed.  Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate .  Similarly, proportionality review in this court will be limited to a review of cases we have already announced.  No reviewing court need consider any case where the death penalty was sought but no obtained or where the death sentence could have been sought but was not."

*Steffen,* at 123-124.

At first blush it would appear the *Steffen* case is in conflict R.C. 2929.03(F) as reprinted by  Appellant at page 67 of his brief.  The implication being, in the R.C.2929.03(F) excerpt as "quoted" by Appellant, that the sentencing courts must file with *this* Court the sentencing opinions when the death penalty is sought, but a life sentence is ultimately imposed.  But a careful reading of R.C. 2929.03(F) *in its entirety* shows that Appellant made a few creative edits for this Court's review:

"(F) The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code it found to exist, what other mitigating factors it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors. *For cases in which a sentence of death is imposed for an offense committed before January 1, 1995,* the court or panel shall file the opinion required to be prepared by this division with the clerk of the appropriate court of appeals and with the clerk of the supreme court within fifteen days after the court and panel imposes sentence. *For cases in which a sentence of death is imposed for an offense committed on or after January 1, 1995,* the court or panel shall file the opinion required to be prepared by this division with the clerk of the supreme court within fifteen days after the court or panel imposes sentence. The judgment in a case in which a sentencing

hearing is held pursuant to this section is not final until the opinion is filed.

(Italics indicate portions omitted by Appellant in his brief at p. 67).  Therefore it is clear that even if a so called "pool" or "data bank" of death penalty cases is to be created for purposes of comparison proportionality review pursuant to R.C. 2929.03(F), that pool is to be filled only with cases wherein the death penalty is actually imposed. R.C. 2929.03(F) requires the trial judges to *prepare* sentencing opinions for both life and death sentences in aggravated murder cases, but the statute clearly requires that they file for appellate review only the death verdicts.

To conclude, there is no statutory requirement or precedential authority from this Court to mandate that life verdicts be factored into a proportionality review. In fact, this Court has consistently held just the opposite.   Therefore, even if Appellant's unsupported claim that the trial courts are not filing their life sentencing opinions with this court is true, it would be of no consequence  because appellate courts, including this one, must focus solely on death and not life verdicts to conduct a proportionality analysis.  As mentioned in the previous proposition of law, there is no constitutional right to a proportionality review, and as such, Ohio is free to design its own proportionality review. *State v. Bedford* (1988), 39 Ohio St. 3d  122, 131.  Therefore, Appellant can argue no constitutional violation with respect to his proportionality review when he has no constitutional  right to such a review in the first place.   For the above stated reasons, Appellant's Proposition of Law No. 9 is without merit.

**APPELLEE'S PROPOSITION OF LAW NO. 10:**

    **A lack of legislative changes to Ohio proportionality review strong suggests that this Court has consistently and properly interpreted R.C. 2929.05 for the past 17 years.**

    In his Proposition of Law No. 10, Appellant informs this Court that it wrongly decided *State v. Steffen* (1987), 31 Ohio St. 3d 111, and that its interpretation of R.C. 2929.05, wherein trial courts compare death cases only with other death cases for purposes of a proportionality review, is contrary to legislative intent. The State disagrees.

    For reasons of judicial economy, the State will not reprint its previous arguments regarding Ohio's proportionality review, and would simply refer the Court to Appellee's Propositions of Law Nos. 8 and 9. Suffice it to say, Ohio's proportionality review has survived the slings and arrows of capital defendants for nearly two decades. In all that time, not one single federal court has agreed with Appellant's contention that life verdicts need to be factored into the proportionality analysis.

    Appellant's bold assertion that the Ohio General Assembly's legislature intent is thwarted by this Court's interpretation of R.C. 2929.05 is equally groundless. If indeed the General Assembly viewed this Court's interpretation of the statute as flawed, it has had since 1987 to rewrite it and clarify any discrepancies between its intent versus this Court's interpretation. Despite other changes to Ohio's death penalty legislation since the *Steffen* decision, the General Assembly has chosen to leave R.C. 2929.05 unchanged. This Court should find the General Assembly's disinclination to change R.C. 2929.05 as more dispositive of its intent than Appellant's unsupported arguments.

    Appellant's tenth Proposition of Law has no merit.

**APPELLEE'S PROPOSITION OF LAW NO. 11:**

> **This Court has repeatedly recognized the constitutional soundness of Ohio's current death penalty scheme and has systematically rejected Appellant's claims of biased trial and guilty phases, and an "inadequate" appellate review process.**

Appellant, in Proposition of Law No. 11, assails Ohio's death penalty statutes from a variety of well worn and repeatedly rejected constitutional challenges. All are without merit, as Appellant concedes, and the State will respond only briefly to each individual challenge.

Generally speaking, all legislative enactments enjoy a strong presumption of constitutionality. *State v. Thompkins* (1996), 75 Ohio St. 3d 558, 560; *Arnold v. Cleveland* (1993), 67 Ohio St. 3d 35, 38. Moreover, legislation will not be invalidated unless the challenger establishes beyond a reasonable doubt that the enactment was unconstitutional. *Thompkins,* supra, at 560. Appellant's shotgun approach to the Ohio General Assembly's death penalty statues misses the mark entirely.

Appellant first contents that Ohio's death penalty scheme is violative of the Eighth Amendment of the U.S. Constitution and Article I, Sec. 9 of the Ohio Constitution's prohibition against cruel and unusual punishment. This Court rejected this argument in *State v. Jenkins* (1984), 15 Ohio St. 164,168-169 :

> "***[A]ppellant argues that the death penalty violates the prohibition under the Eighth Amendment against cruel and unusual punishment and is therefore *per se* unconstitutional. We disagree. Clearly, any vitality which this argument may have had at the time of *Furman v. Georgia* (1972), 408 U.S 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 was rejected in *Gregg* and its companion cases when the high court stated: 'We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.'

"Moreover, since the decision in *Gregg,* the recurring theme has been that states may constitutionally impose the sentence of death as long as the discretion of the sentencing authority is 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' in imposing the sentence. *Zant v. Stephens* (1983), 462 U.S. 862, at ---, 103 S.Ct. 2733, at 2741, 77 L.Ed.2d 235, at 248. The Supreme Court has stressed the necessity of 'genuinely narrow[ing] the class of persons eligible for the death penalty,' *id.* 462 U.S. at ---, 103 S.Ct. at 2741, 77 L.Ed.2d at 249, while requiring the capital sentencing procedure guide and focus 'the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.' *Jurek, supra,* 428 U.S. at 273-274, 96 S.Ct. at 2957. With these principles in mind, appellant's argument, which requests the erection of a *per se* rule against the death penalty, must be rejected." (Footnote omitted.)."

Appellant next argues that the prosecutors have uncontrolled discretion in their charging of death penalty specifications.  This Court also dismissed this argument in *Jenkins* stating,

" 'Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.' " *Jenkins,* supra at 169, quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 225.  Furthermore, the State submits that Ohio's death penalty scheme seriously narrows and curtails the number of cases which prosecutors may try as capital cases.  By deliberate design, not all homicides are potential death penalty cases.  Indeed, the potential capital defendant must have committed an aggravated murder pursuant to R.C 2903.01, which in turn must fall under one of a mere ten criteria articulated in R.C. 2929.04(A).  See, also, *Jenkins* at 177.

Appellant next briefly argues that Ohio's death penalty statutes are unconstitutional because the death sentences are imposed in a racial discriminatory manner. In fact, the United States Supreme Court and the Supreme Court of Ohio have refused to accept even statistical

-67-

evidence purporting to show a racial disparity in the imposition of the death penalty as grounds for finding the death penalty to be unconstitutional. Appellant submitted no empirical evidence to support his claim which makes it all the less trustworthy. These courts have held instead that a defendant "must show that racial considerations affected the sentencing process *in his case* " for equal protection to be implicated. (Emphasis sic.) *State v. Steffen* (1987), 31 Ohio St. 3d 111, 124, citing *McClesky v. Kemp* (1987), 481 U.S. 279, 292. Appellant neither argues, nor demonstrates that racial considerations affected his jury's recommendation, or his judge's sentence. Indeed, Appellant's co-defendant,[3] who is a white female, was also sentenced to death for Fingerhut's murder. Under these circumstances, this Court should be hard pressed to find any racial bias or motivation in his death sentence.

Appellant next claims the death penalty violates the federally protected "right to life," ironically citing *Roe v. Wade* (1973), 410 U.S. 113, which legalized the abortion of unborn fetuses who never murdered anyone for sex or insurance proceeds. The U.S. Supreme Court, however, addressed the "right to life" vis a vis the death penalty in *Furman v. Georgia* (1972), 408 U.S. 238, 359-360, Fn 141:

> "The concepts of cruel and unusual punishment and substantive due process becomes so close as to merge when the substantive due process argument is stated in the following manner: because capital punishment deprives an individual of a fundamental right (i.e., the right to life), * * * the State needs a compelling interest to justify it. * * * Thus stated the substantive due process argument reiterates what is essentially the primary purpose of the Cruel and Unusual Punishment Clause of the Eighth Amendment, i.e., punishment may not be more severe than is necessary to serve the legitimate interest of the State."

The State submits it has both a legitimate and compelling state interest in protecting the public

---

[3]*State v. Roberts,* Ohio Supreme Court No. 03-1441, appeal pending.

from a seasoned criminal who capped off his career by engaging in the cold blooded and premeditated murder of a man for sheer greed and lust.

Though Appellant argues that a trial court must impose the least restrictive means to achieve those above stated interests, this Court, in *Jenkins,* rejected the "least restrictive" argument in *Jenkins,* supra, at 168.  He next assails Ohio's death penalty scheme claiming R.C. 2903.01(B) and 2929.04(A)(7) run afoul the federal and state constitutions because they do not require a "conscious desire" to kill.  Though recent updates to R.C. 2903.01 have revised the section "D" upon which this Court relied to dismiss this argument in *Jenkins* in 1984, the Court's reasoning  still remains the same. *Jenkins,* at 212.    The State is required, pursuant to R.C. 2903.01(B), to prove the element of "purposely."  The trial court in the case at bar distinctly defined "purposely" as "a specific intention to cause a certain result....Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result." (T.p. Vol. 15, p. 3550). This instruction was initially read in conjunction with the court's charge on aggravated burglary, and then referenced as a prior definition during the instruction on aggravated murder. (T.p. Vol. 15, p. 3560). The State submits the trial court's definition of "purposely" equates to a "conscious desire to kill."

Appellant briefly criticizes the Ohio Revised Code for not upping the standard of proof from "beyond a reasonable doubt" to proof "beyond all doubt."  However, this Court rejected this unreasonable and legally groundless standard in *Jenkins* at 211-212.   Likewise, contrary to Appellant's argument, the state need not prove the absence of mitigating factors, but the State is required to prove beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors. *Jenkins,* at 172.  Therefore, any contention by Appellant that the court is somehow

-69-

hampered in the weighing of mitigating factors is without merit.

This Court dismissed Appellant's next contention, that the jury should be prohibited from determining aggravating circumstances during the guilt phase of the trial in *Jenkins* at 173-174. Appellant next claims a constitutional infirmity because R.C. 2929.04(A)(7), the "felony murder" aggravating circumstance is repetitive of the language in R.C. 2903.01(B), the aggravated murder definition. Appellant was indicted and convicted of aggravated murder under both R.C. 2903.01(A) and R.C. 2903.01(B). Nevertheless, in *Jenkins* at Fn 17 at p. 177, this Court first drew the distinction that the two statutes were hardly identical to one another. Specifically, crimes such as robbery, arson, or burglary contained under R.C. 2903.01(B) are noticeably absent from R.C. 2929.04(A)(7). Additionally, while under R.C. 2903.01(B) a conviction cannot be sustained unless the jury finds the capital defendant intended to cause the death of another, the panel under R.C. 2929.04(A)(7), must find the defendant was the principal offender, or if not, must determine the aggravated murder was committed with prior calculation and design. That being said, this Court found:

> "Applying *Jurek*[4] to the arguments raised by appellant in the present case demonstrates that even if we were to construe the aggravated conduct of felony murder set forth within R.C. 2903.01(B) as functionally equivalent to the aggravating circumstances under R.C. 2929.04(A)(7), no constitutional infirmities would arise. On the contrary, any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the penalty becomes available as a sentencing option."

*Jenkins* at 178.

Appellant's next criticizes Ohio's death penalty scheme because, he submits, it imposes

---

[4]*Jurek v. Texas* (1976), 428 U.S. 262

-70-

an impermissible risk of death on capital defendants who elect to proceed with a jury trial rather than to plead guilty.  This Court discounted his argument in *State v. Buell* (1986), 22 Ohio St. 3d 124, 138,  noting that while Crim. R. 11(C)(3) permits a judge to dismiss a specification at a plea hearing, it does not require or guarantee any such dismissal.  See, also, *State v. Nabozy* (1978), 54 Ohio St. 2d 195, paragraph one of the syllabus.

Next, Appellant alleges a constitutional infirmity because R.C. 2929.03(D)(1) permits the capital defendant, at his own choosing, decide whether or not to undergo a presentence investigative report or a mental health examination for the perusal of the judge and jury.  The State finds this argument rather unusual because it is the *defendant* who makes the decision as to whether these reports are compiled or the examination takes place.  This Court apparently found this argument equally unusual in *Buell,* supra at 138, when it held, "the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. There is no constitutional infirmity in providing the defendant with such an option."

Appellant again rehashes his complaint that death and life verdicts are not properly documented for comparison purposes, and therefore, he asserts, meaningful appellate review is not possible.  Again, this Court rejected these arguments in *Jenkins* at 176-177,  and *Steffen* at 122-124.  This Court in *Buell,* supra, at 141, rejected Appellant's claim that Ohio's death penalty scheme is unconstitutional because it fails to provide a life option if only aggravating circumstances are presented.  The State would also point out that such an argument does not apply to Appellant.  He submitted several mitigating factors pursuant to the "catchall" mitigating factors of R.C. 2929.04(B)(7). However, both the jury and the trial judge found that the

-71-

aggravating circumstances outweighed those mitigating factors.

Appellant filed with the trial court on Jan. 23, 2002, a Constitutional Motion to Dismiss (T.d. # 57). The motion was the standard boilerplate document and raised a host of constitutional challenges to Ohio's Death Penalty scheme. However, this Court has held that when a capital defendant fails to raise at the trial level any constitutional arguments, he waives them for purposes of appellate review. *State v. Carter* (1992), 64 Ohio St. 3d 218, 227. In this case, Appellant did not argue at the trial court that a separate jury should decide the existence of aggravating circumstances, nor did he argue that the capital defendant who elects to proceed to trial rather than plead guilty faces an impermissible risk of death. (T.d. #57). As such, the State submits these arguments are waived for purposes of appellate review.

To conclude, Ohio's death penalty scheme does not run afoul of either the U.S. or Ohio Constitutions. The State has tried to address each of Appellant's individual constitutional claims. If the State has inadvertently overlooked any of Appellant's individualized averments, the State concedes none. Ohio's death penalty scheme promotes a constitutionally sound approach in both imposing the death penalty and the in the subsequent appellate review. Appellant's Proposition of Law No. 11 is without merit.

**APPELLEE'S PROPOSITION OF LAW NO. 12**:

      Ohio's death penalty statutes are neither arbitrary, discriminatory, vague, risk
inducing, nor violative of international laws, treaties or resolutions.

      In his twelfth and final proposition of law, Appellant regurgitates numerous arguments
already addressed in the previous proposition of law regarding alleged constitutional infirmities
within Ohio's Death Penalty scheme. None of these reconstituted arguments had merit in the
previous proposition of law, and none has merit here.

      Generally speaking, all legislative enactments enjoy a strong presumption of
constitutionality. *State v. Thompkins* (1996), 75 Ohio St. 3d 558, 560; *Arnold v. Cleveland*
(1993), 67 Ohio St. 3d 35, 38. Moreover, legislation will not be invalidated unless the challenger
establishes beyond a reasonable doubt that the enactment was unconstitutional. *Thompkins,*
supra, at 560. Appellant fails to rebut this presumption.

      The State would first restate its position and incorporate by reference its previous
argument that neither this Court, nor the federal courts have found Ohio Death Penalty statutes
violative of either the Ohio or federal constitutions' prohibition against cruel and unusual
punishment. See Appellee's Proposition of Law 11.

      This Court has repeatedly held that the death penalty in Ohio is not imposed in either an
arbitrary or capricious manner. *State v. Jenkins* (1984), 15 Ohio St. 3d. 164, 169. As argued
previously, there is no "uncontrolled discretion" on the part of the prosecutor. Ohio law provides
a variety of checks and safeguards to curtail the zeal of even the most death-penalty enthused
prosecutor, if such a creature exists. Included in those factors are laws whereby a jury must
recommend, and a judge must follow a death penalty recommendation before the sentence of

-73-

death may be imposed, and a statutory narrowing of the class of persons eligible from the outset for the death penalty.

Unlike his previous Proposition of Law whereby he makes only conclusory statements concerning any racial disparity in the imposition of the death penalty, Appellant does reference some statistics as cited by the Ohio Public Defender Commission Report and The Report of the Ohio Commission on Racial Fairness.  However, as stated in Appellee's previous Proposition of Law, Appellant has failed to demonstrate, or even argue, that his race or his victim's race had any impact on the outcome of *his* case as required by *State v. Steffen* (1987), 31 Ohio St. 3d 111, 124, citing *McClesky v. Kemp* (1987), 481 U.S. 279, 292. See Appellee's Proposition of Law No. 11.

Again, Appellant postulates the "least restrictive means" argument which this Court rejected in *Jenkins,* supra.  See Appellee's Proposition of Law No. 11. Likewise, the State addressed the absence-of-mitigating-factors argument in the previous Proposition of Law.

Appellant argues a Due Process and Equal Protection violation alleging Ohio statutory scheme is void for vagueness and leads to the arbitrary imposition of the death penalty.  This Court has rejected this proposition numerous times over. *Jenkins,* 169-170, *State v. Buell* (1986), 22 Ohio St. 3d 124, 139; *State v. Stumpf* (1987), 33 Ohio St. 3d 95, 103, 104.

Appellant asserts that the weighing process now in place gives too much discretion to juries, and leaves open the possibility that the sentencer might discount constitutionally relevant factors.  He fails to cite one single Ohio death penalty case where this ever actually occurred, nor does he articulate a relevant mitigating factor his own trial judge failed to consider in his sentencing opinion.

-74-

Next, Appellant argues, based wholly on a law review article, that capital juries may not understand their responsibilities or may apply inaccurate standards for their decisions due to confusing jury instructions.  First, Appellant never objected at trial to any of the jury instructions because they were too confusing, or did not accurately spell out the responsibilities and standards expected of the jurors.  Therefore, any claimed error is waived on appeal.  *State v. Williford* (1990), 49 Ohio St. 3d 247, 251.  Second, Appellant never argues nor demonstrates that his own jury was confused by the instructions or did not have a working knowledge of its responsibilities and standards.  Therefore, this argument should carry no weight with this Court.

Appellant's argument that the Ohio scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who exercise their right to trial was addressed in the previous Proposition of Law, as was any constitutional attack on R.C. 2929.03(D)(1), the alleged duplicative nature of R.C.2929.04(A)(7) and R.C. 2901.03(B).  See Appellee's Proposition of Law No. 11.

Appellant next criticizes Ohio's capital scheme stating a felony murderer is treated more severely under the system than one that commits the crime with mere prior calculation and design.  The State submits Appellant has no standing to raise this argument because he was charged with and convicted of both R.C. 2903.01 (A) and (B). He not only committed the murder of Fingerhut during the course of a robbery and burglary, but also engaged in substantial premeditation for this killing.   Appellant's suggestion that the killer who commits a murder with prior calculation and design is treated less severely than the killer who commits a felony murder is untenable.  Because  both killers are equally death eligible, this argument collapses under its own light weight.  Such an inclusion of both sets of killers does not make Ohio's death penalty

laws arbitrary or capricious.

Next, Appellant opines that R.C. 2929.03(D)(1) is unconstitutionally vague and gives the sentencer unfettered discretion to weigh a statutory mitigating factor as an aggravator.  This Court rejected this argument first in *State v. Gumm* (1995), 73 Ohio St. 3d 413, 416-423, and reiterated its position in *State v. McNeill* (1998), 83 Ohio St. 3d 438, 453.

Appellant briefly revisits the issue of the reporting of guilty pleas to lesser offenses in capital cases.  He argues that additional data is necessary to make an adequate review in death cases.  He fails to state just what additional data is needed, or more significantly, what data would have possibly swayed his jury to recommend and his judge to impose a life rather than a death sentence in this case. See, also, Appellee's Proposition of Law No. 11, wherein the State also discusses Appellant's attacks on the proportionality review and appropriateness analysis.

In the final pages of this proposition, Appellant argues that Ohio's death penalty violates various international treaties and conventions.  This Court dismissed these attacks in both *State v. Bey* (1999), 85 Ohio St. 3d 487, 502 and *State v. Phillips* (1995), 74 Ohio St. 3d 72, 103-104.  Furthermore,  in  *Buell v. Mitchell* (6th Cir. 2001), 274 F. 3d 337, 372, the U.S. Sixth  Circuit Court of Appeals held that there is no customary international law prohibiting the death penalty for adult offenders.   Furthermore, Appellant failed to raise this issue in the trial court, and it is therefore waived for purposes of appellate review.  *State v. Carter* (1992), 64 Ohio St. 3d 218, 227.  Therefore, Appellant's claim of a constitutional infirmity based on the United States' treaties or United Nations resolutions must fail.

To conclude, Ohio's death penalty scheme does not violate  either the U.S. or Ohio Constitutions.  The State has tried to address each of Appellant's individual  constitutional

claims.  If the State has inadvertently overlooked any of Appellant's individualized averments, the State concedes none.  Ohio's death penalty scheme promotes a constitutionally sound approach in both imposing the death penalty and the in the subsequent appellate review.

Appellant in this Proposition of Law merely resurrects well-settled issues which can be and have been  summarily rejected by this Court.  *State v. Campbell* (1994), 69 Ohio St. 3d 38, 54.

Appellant's Proposition of Law No. 12 is without merit.

## CONCLUSION

For the reasons articulated in the preceding Propositions of Law, the State urges this

Court to affirm Appellant's convictions and death sentence.

Respectfully submitted by:

DENNIS WATKINS (#0009949)
Prosecuting Attorney

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio       44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-APPELLEE,
THE STATE OF OHIO

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing brief was sent by ordinary U.S. Mail to
Atty. John P.  Laczko (#0051918), 4800 Market St., Suite C, Youngstown, Ohio, 44512 and
Dennis Day Lager (#0026073), 1025 Chapel St., N.E. Canton, Ohio, 44714, on this 14th Day of
January, 2004.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

-78-

# APPENDIX

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

Page 1

**H**
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth District, Cuyahoga County.

STATE of Ohio, Plaintiff-Appellee,
v.
Michael GOODWIN, Defendant-Appellant.

**No. 98531.**

April 17, 1997.

Criminal Appeal From the Common Pleas Court Case No. CR-314527, AFFIRMED.

Stephanie Tubbs Jones, Cuyahoga County Prosecutor, by Thomas Conway, Assistant County Prosecutor, Cleveland, for Plaintiff-Appellee.

Stephen A. Ferrell, Assistant State Public Defender, Counsel of Record, J. Joseph Bodine, Jr. , Assistant State Public Defender, Ohio Public Defender Commission, Columbus, Robert M. Ingersoll, Assistant Public Defender, Cleveland, for Defendant-Appellant.

OPINION

SPELLACY, Presiding Judge:

**\*1** Defendant-appellant Michael Goodwin ("appellant") appeals from one count of aggravated murder in violation of R.C. 2903.01(A), one count of aggravated murder in violation of R.C. 2903.01(B), and from the imposition of the death penalty.

Appellant assigns the following errors for review:
1. THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY AT THE PENALTY PHASE REGARDING THE FACTORS TO CONSIDER IN RECOMMENDING

PUNISHMENT AND WHEN IT INDEPENDENTLY CONSIDERED MORE THAN ONE AGGRAVATING CIRCUMSTANCE. U.S. CONSTITUTION AMENDMENTS VI, VIII AND XIV; OHIO CONSTITUTION ARTICLE I, SECTIONS 9, 10 , AND 16.
2. DEFENSE COUNSEL'S ACTIONS AND OMISSIONS AT THE PENALTY PHASE OF APPELLANT GOODWIN'S CAPITAL TRIAL DEPRIVED HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.
3. DEFENSE COUNSEL'S ACTIONS AND OMISSIONS AT THE GUILT PHASE OF GOODWIN'S CAPITAL TRIAL DEPRIVED HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.
4. PROSECUTORIAL MISCONDUCT IN APPELLANT GOODWIN'S CAPITAL TRIAL DENIED MR. GOODWIN HIS DUE PROCESS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
5. A COURT OF APPEALS CANNOT, CONSISTENT WITH THE MANDATE OF OHIO REV. CODE ANN. SECTION 2929.05 (ANDERSON 1993), CONDUCT A REVIEW OF A CAPITAL CASE WHEN THE RECORD ON APPEAL IS INCOMPLETE.
6. APPELLANT GOODWIN'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT VOIR DIRE.
7. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT GOODWIN WHEN IT FAILED TO ASSURE APPELLANT OF A FAIR AND IMPARTIAL JURY BY COMMITTING ERRORS IN VOIR DIRE. U.S. CONSTITUTION AMENDMENT VI, VIII AND XIV; OHIO CONSTITUTION ARTICLE I

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*A - 1*

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

SECTIONS 9, 10 AND 16.

8. A CAPITAL DEFENDANT IS DENIED HIS RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION WHEN THE TRIAL COURT ADMITS EVIDENCE OF LITTLE PROBATIVE VALUE THAT IS HIGHLY PREJUDICIAL.

9. WHEN A TRIAL COURT RECEIVES AND CONSIDERS A VICTIM'S REQUEST FOR THE DEATH PENALTY, A RESULTING SENTENCE OF DEATH IS UNRELIABLE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

10. THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO PROVE THE ELEMENT OF PRIOR CALCULATION AND DESIGN BEYOND A REASONABLE DOUBT. APPELLANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

11. THE TRIAL COURT ERRED BY GIVING THE JURY AN INSTRUCTION ON REASONABLE DOUBT THAT WAS BASED UPON A DEGREE OF PROOF BELOW THAT REQUIRED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

*2 12. THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER. U.S. CONSTITUTION AMENDMENTS VI, VIII AND XIV, OHIO CONSTITUTION ARTICLE I, SECTIONS 9, 10 AND 16.

13. WHEN THE DEATH SENTENCE IS EXCESSIVE AND DISPROPORTIONATE TO THE SENTENCES IN SIMILAR CASES, AND WHEN IT IS INAPPROPRIATE, THE DEATH SENTENCE MUST BE VACATED AND A LIFE SENTENCE IMPOSED.

14. OHIO'S DEATH PENALTY SCHEME IS UNCONSTITUTIONAL.

Finding none of the assignments of error to have merit, the judgment of the trial court is affirmed.

I.

On September 13, 1994, appellant and Jermaine Brown went to the home of Derrick Flonnory between 8:15 and 8:30 a.m. Appellant asked Flonnory to assist appellant in robbing a neighborhood grocery store, the Big Star Market, located at East 55th Street and Quimby in Cleveland. Flonnory refused because he was tired. Appellant and Brown left. Appellant did not ask Brown to accompany him to the Big Star Market. The two parted ways as appellant told Brown he had to take care of some business downtown.

Appellant succeeded in recruiting James Padgett and James Johnson to join in his plan. The three walked to the Big Star Market. Appellant was armed with a .357 revolver he had illegally purchased from Brown two weeks earlier. Johnson carried a .45 semi-automatic gun. Padgett later denied having a weapon that day and no one saw Padgett with a gun during the robbery. The three wore hats pulled low over their faces. The trio arrived at the store between 9:30 and 9:45 a.m.

Appellant entered the store first and then stepped back outside to signal to Johnson and Padgett to continue with the scheme to rob the store. Inside the store that day were two employees, cousins Mustafa Sammour and Almohannad Ismail Sammour, known as Shorty. Each stood behind separate counters on either side of the door. As the three cohorts entered the store, Padgett sought to distract Shorty by asking for some merchandise. Shorty turned his back to the men to retrieve the requested item and was grabbed by Padgett or Johnson. Appellant did the same to Mustafa and pulled out his weapon.

Appellant was screaming at Mustafa to move and to take him to where the money was. Mustafa stood with his hands up over his head. Appellant pressed the muzzle of his .357 Magnum to Mustafa's forehead. Appellant then fired a bullet through Mustafa's head, killing Mustafa Sammour instantly.

Appellant stood for a few seconds before going to the other side of the store and grabbing Shorty. Appellant demanded Shorty accompany him to the store's safe which was located in a small room toward the front of the store. While Shorty walked toward the small room, appellant kept his gun to Shorty's head. Shorty succeeded in opening the safe and began to give appellant the money. Appellant could not reach into the safe because the open

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

H-2

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

office door prevented the safe from being fully opened. Appellant fired a second shot into the floor. After all of the money was removed from the safe, appellant told Shorty to take him to the lottery machine. As the two stepped out of the small room into the store, appellant was informed that a milk delivery truck had pulled up outside the store. Appellant shoved Shorty aside. The three began to run from the store. On his way out, appellant reached into the open cash register drawer above Mustafa Sammour's body and removed some more cash. Appellant shoved the money into his pocket as he exited the store, dropping some of the bills to the pavement.

**\*3** Appellant, Padgett, and Johnson went to appellant's home where the money was divided. Appellant had splatters of blood on his shirt and blood on his shoes. Appellant reportedly told Padgett Mustafa was shot because Mustafa reached for appellant's mask. No one saw Mustafa make any movements. Mustafa Sammour's hands were above his head at the time of the shooting. Johnson testified appellant stated he had not meant to shoot the clerk.

The morning of the robbery, appellant telephoned a friend, Tyrone Griffin, and asked Griffin to throw something away for him. Griffin went to appellant's house and removed a bag from the stairs as appellant had directed. Griffin took the bag to his grandfather's home. Griffin removed a shirt with a "7" on it that appellant wore during the robbery and a pair of pants and burned the clothing in a fire his grandfather had lit in his backyard.

The police recovered a partially mangled bullet at the scene. The bullet could not have been fired from a .45 caliber semi-automatic handgun but had to have been fired from a .357 revolver or a .38 revolver. There was no evidence a semi-automatic weapon was fired at the crime scene.

The police arrested appellant for the robbery and murder the next day, September 14, 1994. Appellant gave a statement to the police in which he admitted his involvement in the crime but claimed he had acted alone. Appellant averred his gun just went off, killing Mustafa. The gun unexpectedly fired again when appellant tried to reach into the safe and remove money.

While in jail, appellant met a friend of his, Antoine

Robinson. Robinson asked appellant if he committed the murder. Appellant replied in the positive and said that he already had given police a statement admitting his culpability. Appellant asked Robinson how long a prison term he thought appellant would receive. Robinson replied fifteen or twenty to life. Appellant said he could do it, whatever they gave him. Appellant then went to sleep.

Police later brought appellant back to the Homicide Unit and again advised appellant of his *Miranda* rights. The police told appellant he was being charged with capital murder in connection with the Big Star Market homicide. Appellant was quite surprised the case would be prosecuted as a death penalty case. The police let appellant know they were aware that at least three people were involved in the robbery. Appellant asked for a couple of hours to think about whether he wished to speak further to police.

Appellant returned later and gave a second statement in which he identified the other two men. Appellant stated Padgett had the .357 Magnum and was responsible for the murder. The police arrested both Johnson and Padgett. While in jail, appellant and Johnson spoke. Appellant revealed to Johnson that he would blame the killing on Padgett as Padgett was the only one of the three without children.

The police identified appellant as the shooter. Padgett and Johnson both were offered plea bargains in which the two pled guilty to murder and aggravated robbery in exchange for their testimony at appellant's trial. Padgett and Johnson were sentenced following appellant's trial.

**\*4** Appellant was charged with aggravated murder in violation of R.C. 2903.01(A) with felony murder and firearm specifications; aggravated murder in violation of R.C. 2903.01(B) with felony murder and firearm specifications; aggravated robbery in violation of R.C. 2911.01(A)(1) with a firearm specification, and with having a weapon while under a disability in violation of R.C. 2923.13. Appellant was brought to trial on December 5, 1994. The defense rested after the close of the prosecution's case. The jury returned a verdict of guilty on all counts. No mitigation evidence was presented during the penalty phase of the trial. The jury recommended death. On December 29, 1994,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A -3

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

the trial court sentenced appellant to death.

## II.

In his first assignment of error, appellant contends the trial court committed reversible errors during the penalty phase of the trial. Appellant first asserts the trial court erred in not instructing the jury to weigh separately the aggravating circumstance for each count of murder against the mitigation evidence. Appellant argues the trial court's instruction incorrectly led the jury to group the aggravating circumstance from both counts of murder and weigh the aggregate against his mitigation.

Appellant was convicted for two counts of aggravated murder. The first count charged that appellant purposely with prior calculation and design caused the death of Sammour. The second count was for causing the death of Sammour while committing an aggravated robbery. Both counts also contained the same felony murder specification that the offense was committed while the offender was committing aggravated robbery and that the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

The trial court defined aggravating circumstances as specification one of Count One and specification one of Count Two of the indictment. The jury was instructed to weigh the evidence offered in mitigation against the aggravating circumstances. The aggravating circumstances would outweigh the mitigating factors if the aggravating circumstances were more important. The trial court stressed that the quality of the evidence was to receive the jury's primary consideration. The trial court did state that the jury was not only to consider the quantity of the aggravating circumstances against the quantity of the mitigating factors but must consider the quality or importance of both.

In *State v. Cooey* (1989), 46 Ohio St.3d 20, paragraph three of the syllabus, the court held:
When a capital defendant is convicted of more than one count of aggravated murder, the penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count.

Under *Cooey*, the trial court erred in not instructing the jury that only one aggravating circumstance could be weighed against appellant's mitigation evidence for each count of murder. Such an error will be deemed prejudicial where the aggravating circumstances would not have outweighed mitigation unless the aggravating circumstances were combined.

**\*5** It must be noted that appellant failed to object to the jury instruction. Therefore, any claim of error is waived unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood* (1983), 3 Ohio St.3d 12. The jury instruction will be reviewed under Crim.R. 52(B) to determine if plain error is present. The plain error rule is applied only with utmost caution and invoked under exceptional circumstances in order to prevent a manifest miscarriage of justice. *State v. Cooperrider* (1983), 4 Ohio St.3d 226.

The aggravating circumstance was the same for both counts. There were no factors to be considered by the jury that were different for either count and that should not have been considered for one count and not the other. The trial court spoke of the importance of the quality of the aggravating circumstances and mitigating factors over any consideration of the quantity of both. Further, little evidence of mitigation was present in the instant case. The paucity of mitigating factors leaves little to weigh against the sole aggravating specification. Appellant was not prejudiced by the instruction, especially not to the level of plain error.

As noted by the court in *State v. Cook* (1992), 65 Ohio St.3d 516, any error which may occur by a jury combining aggravating specifications in one count with those in another is cured by a reviewing court's independent review of the record and reweighing of aggravating circumstances against mitigating factors. *Id.*, at 527. Appellant argues he invoked his right to have his penalty be determined by a jury and that independent review will not cure the error as he would no longer be sentenced by a jury. Appellant points out that the defendant in *Cooey* was tried before a three judge panel and not to a jury. This contention is rejected as *Cook* was a jury trial yet it was held that any error would be cured by independent review and the reweighing of aggravating circumstances versus mitigating evidence.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

Appellant next asserts the jury and trial court weighed the separate components of the R.C. 2929.04(A)(7) specification as separate aggravating circumstances. The aggravating specification for both counts of which appellant was convicted was that found in R.C. 2929.04(A)(7). This aggravating circumstance provides for the imposition of the death penalty if the offense was committed
    \* \* \* while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.
Appellant argues the trial court failed to charge the jury it was to find appellant was the principal offender or, if not the principal offender, committed the murder with prior calculation or design. The jury was not instructed to find appellant unanimously guilty of only one of the alternatives. Appellant claims because of the failure to so instruct the jury, the jury could have found appellant guilty of both components or guilty of a different component for each count of the aggravated murders.

**\*6** Under R.C. 2929.04(A)(7), a defendant may be found to be the principal offender or actual killer in order to impose the death penalty. If not the actual killer, the defendant must be found to have committed the murder with prior calculation and design. The two are alternative provisions and are not to be charged or proven in the same case. *State v. Penix* (1987), 32 Ohio St.3d 369, 371.

Again, appellant never requested the jury be instructed it must reach a unanimous verdict on one alternative or objected to the instruction. Appellant's conviction would be reversed only if it can be determined the outcome of his trial clearly would have been different but for the alleged error. *State v. Woodard* (1993), 68 Ohio St.3d 70, 75.

In its argument during the penalty phase, the state specifically told the jury that the provisions of R.C. 2929.04(A)(7) are stated in the disjunctive. A review of the jury charge reflects that the statutory language was repeated to the jury. The trial court never referred to "principal offender" and "prior calculation and design" as separate, independent

aggravating circumstances. Cf. *Penix, supra*. See *State v. Williams* (1996), 74 Ohio St.3d 569. The jury instructions adequately conveyed to the jury that appellant was to be found guilty of one of the alternatives of R.C. 2929.04(A)(7).

The state's theory of the case was that appellant was the principal offender or actual killer. There was no argument otherwise. The evidence presented at trial supported this theory. In his first statement to the police, appellant admitted to shooting Sammour. Both of his co-defendants and the surviving clerk testified appellant committed the murder. While incarcerated, appellant also told a friend he committed the murder. Appellant was the only one armed with a .357 firearm. The physical evidence showed that was the type of weapon fired during the murder and robbery. Appellant had a friend burn his clothing shortly after the offense occurred. The state argued appellant was the principal offender. The evidence admitted at trial strongly supported the state's case. As the jury instructions tracked the statutory language and the state's contention was that appellant was the actual killer, it is clear the jury found appellant to be the principal offender. This was not a patchwork verdict.

Appellant also finds error in the trial court's **sentencing opinion**. It stated in part:
    There is no reasonable doubt that the defendant was the **principal offender** who purposely executed Mustafa Sammour with **prior calculation** and design in the course of his aggravated robbery on September 14, 1994. There is no reasonable doubt as to the defendant's guilt of the Capital Felony Murder specification to consider or weigh.
If the trial court did err by weighing both alternatives against appellant's mitigating evidence, there is no reversible error. The trial court found little mitigating evidence in this case. It is unlikely the outcome would have changed if the trial court considered that appellant was the **principal offender** only without the factor of **prior calculation** and design. Further, any error that may have occurred would be cured by the independent review and the weighing of the aggravating circumstance and mitigation by this court. Unlike *Penix*, the jury did not improperly consider both R.C. 2929.04(A)(7) alternatives as separate aggravating circumstances. Appellant will not be denied his right to have the jury that heard his trial

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

H-5

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

Page 6

recommend what sentence be imposed. Appellant's jury properly considered the R.C. 2929.04(A)(7) specification. Any possible error by the trial court would be cured by independent appellate review. There is no reason to vacate appellant's sentence of death.

*7 Appellant's first assignment of error is overruled.

III.

In his second assignment of error, appellant contends his counsel was ineffective during the penalty phase of his trial. Defense counsel presented no witnesses or evidence in mitigation but instead relied on closing argument to present appellant's case in contravention to the imposition of a sentence of death. Appellant argues the failure to present any mitigation evidence created a greater risk of a death penalty sentence being imposed than if mitigation evidence had been offered.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 687. Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Hamblin* (1988), 37 Ohio St.3d 153. To establish prejudice, a defendant must show that there is a reasonable possibility that, but for the counsel's errors, the result of the proceeding would have been different. *Strickland, supra,* at 694.

A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. *State v. Smith* (1987), 36 Ohio St.3d 162. The burden is on the defendant to prove ineffectiveness of counsel. *State v. Smith* (1985), 17 Ohio St.3d 98. Judicial scrutiny of counsel's performance must be highly deferential. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland, supra,* at 689. Hindsight will not be used to distort the assessment of what was reasonable in light of counsel's perspective at the time. *State v. Cook* (1992), 65 Ohio St.3d 516. This includes a counsel's decision not to pursue every possible trial tactic. *State v. Brown* (1988), 38 Ohio St.3d 305, 319. After all, the Constitution does not guarantee

an error-free trial but only a fair trial and a competent attorney. *Engle v. Isaac* (1982), 456 U.S. 107, 134. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *State v. Frazier* (1991), 61 Ohio St.3d 247, 254.

Appellant first argues his attorney failed in his duty to appellant by not requesting a psychiatric evaluation. When asked by the trial court if an evaluation should be ordered, appellant's attorney replied in the negative stating nothing was psychiatrically wrong with appellant. Appellant contends his counsel was not qualified to make this determination and that such an evaluation could have provided useful information regarding appellant's intelligence, social history and the effects of certain traumatic events in appellant's childhood. A report may also have suggested other avenues for counsel to investigate for mitigation purposes.

*8 No witnesses testified on appellant's behalf at the penalty phase of his trial. Appellant's counsel informed the trial judge that they had thoroughly prepared and evaluated the case. Counsel had spoken with appellant's family. Trial counsel determined it would be problematic for appellant's defense to present any evidence because it would risk the door being opened for otherwise inadmissible and very negative evidence being presented by the state. Some of that evidence was appellant's five prior aggravated robbery offenses. Counsel stated the calculated decision to proceed with only closing argument had been thoroughly discussed with appellant. In counsel's judgment, the decision enhanced appellant's chance of receiving a life sentence.

The decision of whether to request a pre-sentence report or a mental evaluation generally is considered to be one falling within the realm of sound trial strategy. See *State v. Williams* (1991), 74 Ohio App.3d 686. Copies of any pre-sentence investigation or mental examination report would be provided to the trial court, the prosecutor, and the jury. R.C. 2929.03(D). Therefore, any information damaging to appellant would have been available for the prosecution's use against appellant and for the jury's consideration. Appellant's counsel was familiar with appellant and averred his case was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A-6

evaluated. There is no evidence the result of the trial would have been different had counsel requested a mental evaluation.

The mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel or deprive a defendant of a fair trial. This may be the result of a tactical, informed decision by counsel. *State v. Johnson* (1986), 24 Ohio St.3d 87. A defense counsel has a duty to investigate his client's background for mitigating factors. An utter lack of informed, calculated decision-making by defense counsel is an abdication of the attorney's duty to his client. *Id.* The evidence in the instant case reflects appellant's counsel did investigate appellant's background and made a calculated decision not to present evidence. This decision is one of trial tactics and will not be disturbed upon appeal. Appellant has not met his burden to show his counsel's performance was deficient. See *State v. Hutton* (1990), 53 Ohio St.3d 36.

Trial counsel decided to focus on argument in an attempt to sway the jury to vote for a life sentence. The specter of residual doubt as to appellant's identity as the actual killer was raised. This is a proper subject for consideration in mitigation. *State v. Gillard* (1988), 40 Ohio St.3d 226, 234. Counsel further focused on the relatively light sentences which Johnson and Padgett would receive and asked the jury for proportionality when sentencing appellant. This may have been appellant's best argument for mitigation.

Counsel disregarded appellant's age in argument. While this may be a questionable tactic as age is a statutory mitigating factor, it was not prejudicial as the trial court instructed the jury that appellant's age of nineteen was to be considered. Appellant's attorney also informed the jury that no psychologist or social worker would testify in appellant's behalf because counsel did not believe the issue was to be decided on whether appellant had as good a chance in life as anyone else. Although this again may be a debatable tactic, appellant had experienced counsel who made strategic decisions which will not be second-guessed on appeal without a further showing of prejudice.

*9 Appellant argues there was mitigation evidence to be presented including his drug-dependent birth, mental abuse by his mother, and some sort of

physical problem with the development of his intestines at birth. However, counsel averred they did investigate appellant's background and thought it best not to present witnesses on appellant's behalf due to other information which could have been revealed. Aside from the prior aggravated robberies, it is unknown what other damaging information existed in order to evaluate prejudice. Counsel made a tactical decision.

Appellant argues trial counsel should have asked the trial court to instruct the jury that only one aggravating circumstance be weighed and that the jury could not weigh both components of R.C. 2929.04(A)(7). It already has been determined the trial court's instruction regarding R.C. 2929.04(A)(7) was not erroneous. Any error in the trial court's instruction on the aggravating circumstance was cured by the trial court's independent weighing of the aggravating circumstance against mitigating factors. Further, there was little evidence in mitigation to weigh against the aggravating circumstance. It is unlikely the result of the trial would have been different if the correct instruction was given.

Appellant also asserts his counsel should have objected to statements made by the prosecutor during closing arguments. The failure to object alone is not enough to sustain a claim of ineffective assistance of counsel. Objections tend to disrupt the flow of a trial and can be considered technical and bothersome to a jury. *State v. Campbell* (1994), 69 Ohio St.3d 38. The failure to object to the state's argument was not prejudicial to appellant.

Appellant failed to meet his burden to establish his counsel's performance was deficient or that his defense was prejudiced during the penalty phase of the trial.

Appellant's second assignment of error is overruled.

IV.

Appellant's third assignment of error asserts that his counsel did not provide appellant with effective assistance of counsel during the guilt phase of his trial. Appellant argues defense counsel made stipulations of fact which had the result of relieving the prosecution of its burden of proof. Appellant contends counsel should have challenged his *Miranda* rights, the legitimacy of the police line-up,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

and the qualifications of the coroner. However, a defense attorney is not required to raise meritless issues. *State v. Hill* (1996), 75 Ohio St.3d 195. There is absolutely no evidence there was any *Miranda* issue or problem with the way the line-up was conducted. There was no dispute appellant was involved in the robbery of the Big Star Market. The coroner was well- qualified to be an expert witness. There is nothing in the record to suggest that the stipulations were anything but sound trial strategy.

Appellant maintains the trial court's instruction on aiding and abetting and both sides' arguments on the subject led the jury to believe it had no option but to convict appellant of the death penalty specifications even if it believed appellant was not the actual shooter. However, the prosecution only pursued the theory that appellant was the killer and not one of his co- defendants.

**\*10** There was overwhelming evidence appellant committed the murder. Clearer instructions on aiding and abetting which differentiated between the proof required for the count versus the specification would not have made a difference in the verdict.

Appellant also argues his attorneys were ineffective for failing to assure a complete record was made of his trial including all bench conferences and pre-trial hearings. Without knowing what occurred during these sidebar conferences and pre-trial hearings, this court cannot find prejudicial error in the failure to record them. Accord *State v. Tyler* (1990), 50 Ohio St.3d 24.

None of the instances complained of by appellant rise to the level of a deprivation of effective counsel. There was not a breakdown of the adversarial process which rendered the result of appellant's trial unreliable.

Appellant's third assignment of error is overruled.

V.

In his fourth assignment of error, appellant contends prosecutorial misconduct denied him a fair trial. Appellant asserts the prosecutor's references throughout the trial to the victim's good character encouraged the jury to consider improper evidence during its deliberation. Appellant argues that the introduction of Mustafa Sammour's character by the

prosecutor was inflammatory, prejudicial and used to evoke sympathy and rage in the jury. Because the argument encouraged the jury to convict based on their emotional reaction to the crime, it became a non-statutory aggravating circumstance which should not have been weighed against appellant's mitigation evidence.

Appellant did not object to any of the arguments, questions, or comments by the prosecutor which he now claims denied him a fair trial. "A claim of error in a criminal case cannot be predicated upon the improper remarks of counsel during his argument at trial, which were not objected to, unless such remarks serve to deny a defendant a fair trial." *State v. Wade* (1978), 53 Ohio St.2d 182, paragraph one of the syllabus. Any claim of error is waived and will be reviewed only for plain error. Crim.R. 52(B) . Notice of plain error is taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Landrum* (1990), 53 Ohio St.3d 107, 111.

A prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219. The effect of the prosecutor's alleged misconduct must be considered in light of the whole trial. *State v. Maurer* (1984), 15 Ohio St.3d 239, 266.

Most of the remarks to which appellant objects occurred during closing argument. The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14. A prosecutor is afforded wide latitude in closing arguments. *State v. Jacks* (1989), 63 Ohio App.3d 200, 210. It is within the trial court's sound discretion to determine if a prosecutor has gone beyond the bounds permitted. *State v. Benge* (1996), 75 Ohio St.3d 136. A judgment will not be reversed if it is clear beyond a reasonable doubt that, absent the prosecutor's remarks, the jury would have found the defendant guilty. *State v. Loza* (1994), 71 Ohio St.3d 61, 78.

**\*11** In *State v. Frazier* (1995), 73 Ohio St.3d 323,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*H-8*

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

the prosecutor referred to the victim as a young, innocent girl and a loving, caring individual although no character evidence regarding the victim was offered. The court found the remarks to be intemperate but no so prejudicial as to deprive the defendant of a fair trial. In the instant case, there was limited testimony that some customers never had a problem with Mustafa Sammour. During closing argument, the prosecutor described Sammour as a decent, hardworking man. However, this was but a small part of the prosecutor's argument which primarily focused on the facts and evidence of the case. There was no argument that the character of the victim or the facts and circumstances of the murder were aggravating circumstances to be weighed against mitigation. Cf. *State v. Gumm* (1995), 73 Ohio St.3d 143. During closing argument, the prosecutor accurately stated what the aggravating circumstance was and did not mislead the jury. Although the prosecutor should not have commented on Mustafa Sammour's good character, the appellant was not deprived of a fair trial as the remarks did not prejudicially affect his substantial rights.

Appellant next argues the prosecutor denied appellant his due process rights by interjecting victim-impact evidence into the trial. During closing argument, the prosecutor stated that Mustafa Sammour suffered before he died. The prosecutor further remarked that Sammour's family sustained a loss due to Sammour's death.

The remark by the prosecutor that Mustafa Sammour suffered before his death was in response to defense counsel's statement that Sammour had not suffered as he was killed instantly. Both the state and defense have latitude in responding to the arguments of opposing counsel. *Loza, supra,* at 78. Further, appellant did not object. A review of the entire record indicates appellant was not deprived of a fair trial due to the prosecutor's statement in response to defense counsel's argument.

In argument, the state should not have brought up the pain suffered by the victim's family. Victim-impact statements generally should not be interjected into capital sentencing considerations. *State v. Greer* (1988), 39 Ohio St.3d 236, 251. As in *Greer,* the prosecutor did not introduce victim-impact evidence which directly quoted family members and the statement was brief. Therefore, the error did not rise to the level of prejudicial impact.

Appellant argues the prosecutor committed reversible error by referring to matters allegedly within his personal knowledge and by bolstering the testimony of appellant's co-defendants. Appellant objects to the prosecutor's statement appellant deserved the death penalty because he was the actual shooter. Appellant contends whether he was the shooter was a factual issue to be decided by the jury, yet the prosecutor presented it as an issue which already had been determined by the state.

Prosecutors should not express their personal beliefs or opinions regarding a defendant's guilt. They are not to allude to matters not supported by admissible evidence. *State v. Lott* (1990), 51 Ohio St.3d 160, 166. However, a prosecutor may express his personal opinion about the guilt of the accused if that opinion is based on evidence presented at trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 408. Even unobjected to references to matters outside the record have been found to not constitute prejudicial error if the references are short, oblique, and justified as a reply to defense arguments. *Lott, supra.*

*12 The foundation of the state's case against appellant was that appellant shot Mustafa Sammour. Ample evidence supported that theory. The defense sought to cast doubt on the state's case by arguing either Johnson or Padgett was the actual shooter and not appellant. The prosecutor's statement that Johnson and Padgett were allowed to plead to a lesser offense because neither was the killer was a response to defense arguments and based on evidence admitted at trial. No prejudicial error occurred.

Appellant lastly contends the state bolstered the testimony of Johnson and Padgett by declaring in opening statement that the two were allowed to plead in exchange for their truthful, forth-right testimony at appellant's trial. In response to a question by the prosecutor, Padgett testified he would tell the truth.

A prosecutor can bolster his own witnesses by stating the evidence will show the witnesses were truthful. The prosecutor may not say he believes the witnesses by personally vouching for the integrity of the state's witnesses. *State v. Daughn* (1992), 76 Ohio App.3d 664, 670. If such remarks do occur, a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

13-9

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

Page 10

judgment will be reversed only if the defendant is deprived of a fair trial due to the statements. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24.

In *State v. Woodard* (1993), 68 Ohio St.3d 79, the prosecutor's final argument in the penalty phase included the statement that a witness would not have been allowed to plead to a straight murder if the witness had been the trigger man. The court considered this a response to the defendant's unsworn statement that the witness was the killer. The court further found no prejudicial error from the remark.

In the instant case, the prosecutor elicited the terms of the plea bargain from his witness but did not state either Johnson or Padgett was telling the truth. The trial court instructed the jury how to view the testimony of accomplices. It is presumed the jury followed the instructions given to it by the trial court. *Loza, supra* at 79. Defense counsel was quite skillful in pointing out inconsistencies in the testimony of the co-defendants and in casting doubt upon the reliability of their testimony. The prosecutor's conduct did not deprive appellant of a fair trial. Appellant was not prejudiced.

Appellant's fourth assignment of error is overruled.

VI.

In his fifth assignment of error, appellant contends appellate review is precluded as the record is incomplete. Appellant avers twenty-seven bench conferences, eight pretrial hearings and the written jury instructions are missing from the record before this court. A motion to correct the record was filed with the trial court pursuant to App.R. 9(E).

A defendant in a capital murder case is to be given a complete, full, and unabridged transcript of all of the proceedings which occur at the trial level. *State ex rel. Spirko v. Court of Appeals* (1986), 27 Ohio St.3d 13. This holding was predicated upon the court's conclusion that unless a complete transcript was provided, the defendant cannot prosecute an effective appeal from his conviction. In support of this holding, the court further emphasized that without a complete transcript, neither it nor an appellate court can independently reweigh the aggravating and mitigating evidence as required by R.C. 2929.05. *Id.*

*13 However, even though this requirement is constitutionally mandated, the failure to provide a complete transcript does not always deny a defendant an effective appeal. In *State v. DePew* (1988), 38 Ohio St.3d 275, parts of the proceedings could not be transcribed because the tapes were inaudible. Upon noting that the defendant only had maintained that the missing information might be vital to his case, the court held that the failure to provide the entire transcript was not prejudicial because there was no indication that effective appellate review had been denied as a result of the omissions.

In the instant case, the trial court denied appellant's App.R. 9(E) motion to correct the record. In its journal entry, the trial court stated:

> All motions on the defense requested rulings received same and were made a part of the record in open court prior to trial. Side bar conferences regarding legal issues were recorded as opposed to those concerning procedural matters. The written jury instructions are available to the State Public Defenders' Office through the Court Reporters' office, complete with markings made by the jury.

Where a party seeks to have the record corrected, it is within the province of the trial court to resolve disputes about the record on appeal. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 81. An appellate court will not reverse a trial court's decision concerning correction of the record absent an abuse of discretion. *Id.,* at 82.

The trial court's ruling adequately addressed appellant's concerns regarding the record. The trial court found that all rulings on legal issues were made a part of the record. Appellant really has only made the general assertion that the missing discussions possibly could be a source of information that might lead to issues being raised on appeal. The trial court stated all pertinent rulings are a part of the record. Further, this court has carefully reviewed the record before it and finds it adequate for review and to permit an independent reweighing of the aggravating circumstances against mitigation evidence.

Appellant's fifth assignment of error is overruled.

VII.

In his sixth assignment of error, appellant contends

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A -10

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

his trial counsel was ineffective during voir dire. Appellant argues his attorney should have used voir dire to explore the feelings of prospective jurors to the death penalty and mitigation evidence. Appellant points out his counsel failed to ask any questions of most of those who eventually sat on the jury or to question some of the prospective jurors who seemed to strongly support the use of the death penalty.

To show ineffective assistance of counsel, a defendant must show his attorney's performance was deficient due to errors so serious the attorney was not functioning as the counsel guaranteed a defendant by the Sixth Amendment. The defendant must then show his counsel's errors were so serious it resulted in depriving the defendant of a fair trial or one for which the result is reliable. *Strickland v. Washington* (1984), 466 U.S. 668, 687. It is presumed that a properly licensed attorney executes his duty in an ethical and competent manner. The burden of establishing otherwise rests on the defendant. *State v. Smith* (1985), 17 Ohio St.3d 98.

**\*14** In a capital case, the scruples, attitudes, and opinions of the prospective jurors regarding capital punishment should be brought out during voir dire. This is because the beliefs concerning capital punishment held by many individuals may prevent them from fairly and impartially applying the law to the facts of the case. These attitudes, both for and opposed to the death penalty, might prevent a fair and impartial adjudication of guilt or innocence. *State v. Lockett* (1976), 49 Ohio St.2d 48, 56. Both the trial court and respective counsel should conduct the inquiry.

Appellant's primary concern is that his attorney did not ask many jurors questions about the death penalty. A review of the record reveals the jurors adequately expressed their viewpoints regarding capital punishment through questioning by the trial judge and the prosecutor. Defense counsel need not repeat questions about topics already covered by group voir dire, opposing counsel or the judge. *State v. Watson* (1991), 61 Ohio St.3d 1, 13; *State v. Seiber* (1990), 56 Ohio St.3d 4, 12. None of the jurors' responses indicated he would automatically vote for the death penalty but that he would follow the law. Each stated he would vote for a life sentence if required to do so by law.

The conduct of voir dire by defense counsel does

not have to take a particular form, nor do specific questions have to be asked. *State v. Evans* (1992), 63 Ohio St.3d 231, 247. Asking "yes" or "no" questions, not questioning certain prospective jurors or asking too few questions of others falls within the wide range of reasonable professional assistance. *State v. Bradley* (1989), 42 Ohio St.3d 136. Trial counsel is better able to determine which members of the venire merit in-depth examination than a reviewing court. *State v. Phillips* (1995), 74 Ohio St.3d 72, 86. Just because defense counsel did not question all of the prospective jurors regarding the death penalty does not mean appellant was denied effective assistance. After all, a juror's death-penalty views will lead to exclusion only if the beliefs prevent or substantially impair that juror's ability to follow the law. *Morgan v. Illinois* (1992), 504 U.S. 719, 728. The trial court's questioning adequately determined the issue. A defense attorney is under no obligation to "educate" the venire about capital punishment and hardly fails to function as the counsel guaranteed by the Constitution by not doing so.

Appellant further argues careful questioning by defense counsel was necessary to effectively exercise peremptory challenges. All of those who eventually comprised the jury in the instant case stated they could set aside their personal feelings regarding the death penalty and apply the law. Defense counsel did utilize one peremptory challenge. There is no indication defense counsel's performance was so deficient as to deprive appellant of a fair trial. All of the jurors understood through questioning by the trial judge, the prosecutor and defense counsel that the death penalty only could be imposed by following the law. The law requires weighing any aggravating circumstances against mitigation. A trial court need not even permit specific mitigation questions. See *State v. Bedford* (1988), 39 Ohio St.3d 122, 129. Asking questions relating to mitigation is not essential to rendering competent representation. *Phillips, supra.*

**\*15** A review of the record fails to reflect appellant received ineffective assistance of counsel during voir dire.

Appellant's sixth assignment of error is not well taken.

VIII.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*H - 11*

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

Appellant's seventh assignment of error asserts certain errors committed during voir dire led to the lack of assurance that a fair and impartial jury was seated in his trial. Appellant challenges the prosecutor's use of peremptory challenges to remove three potential jurors who expressed reservations about the death penalty. The practice of using peremptory challenges to remove prospective jurors opposed to the death penalty is proper. *State v. Esparza* (1988), 39 Ohio St.3d 8. Apart from excluding jurors based on race or gender, prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control. *State v. Brooks* (1996), 75 Ohio St.3d 148.

Appellant argues comments made by the prosecutor were prejudicial. The prosecutor asked two jurors to assume appellant was found guilty. In both cases, the prosecutor then asked the prospective jurors about their feelings regarding the death penalty. There was no inference appellant actually was guilty. The trial court asked each potential juror similar questions, stressing the questions merely were hypothetical and routinely asked in a capital case. The venire was told not to presume there would be a second phase of the trial. The statements by the prosecutor just continued this same line of questioning in an attempt to discover the attitudes of the prospective jurors toward capital punishment.

Appellant finally argues his counsel was ineffective for failing to use peremptory challenges to remove two jurors. The first indicated she had a problem seeing blood and did not know if she could look at the photographs which might be admitted at trial.

During voir dire, this juror first stated she would have problems with seeing blood. Under questioning by the state, the juror stated that someone bleeding in her presence caused an adverse affect but did not know if the same would be true of viewing photographs. The state made a motion to excuse this juror for cause. The defense opposed the motion regarding it as premature as no pictures had been presented yet. This may be considered to be sound trial strategy which is given deferential treatment by a reviewing court. *State v. Braxton* (1995), 102 Ohio App.3d 28. Appellant has not demonstrated prejudice. There is no indication or evidence this juror did not fairly consider all of the evidence admitted at trial.

Appellant also objects to the seating of a juror whose daughter had been molested. Appellant states this juror was predisposed to favor the death penalty and was biased toward the imposition of harsh penalties.

In *State v. Allen* (1995), 73 Ohio St.3d 626, the defendant argued the trial court erred by not excusing a juror for cause whose brother had been murdered. The juror admitted to some bitterness but said she could set her feelings aside and base her vote on the evidence. The decision not to excuse the juror for cause was upheld as the juror's testimony supported the trial court's ruling that the juror was unbiased.

**\*16** In the instant case, the juror indicated he favored the death penalty but would vote for life imprisonment if the decision was the correct one. The juror would look at the criteria to see what penalty should be imposed. The juror's daughter, then aged three years, was molested by a neighbor. The man served eleven months after pleading guilty. The juror stated he was not bitter at the justice system but was dissatisfied the man served so little time. The juror averred the incident would not influence his ability to serve on appellant's case.

There was adequate reassurance this juror would not impose the death penalty in contravention to the law. The juror was thoroughly questioned regarding the crime committed against his daughter. A juror who favors the death penalty does not render a verdict which necessarily is unfair to a defendant. The juror stated several times he would follow the law. Appellant was not prejudiced by the juror's inclusion on the jury.

Appellant's seventh assignment of error is overruled.

IX.

In his eighth assignment of error, appellant argues that the prosecution's introduction of photographs of the crime scene and autopsy were so gruesome and cumulative that any probative value was outweighed by unfair prejudice to the accused. This argument is without merit.

"Under Evid.R. 403 and 611(A), the admission of photographic evidence is left to the discretion of the trial court." *State v. Frazier* (1995), 73 Ohio St.3d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A-12

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

323, 333, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 264. "'Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.'" *Id.,* citing *Maurer, supra* at paragraph seven of the syllabus.

As the Supreme Court stated in *Maurer,* "the fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." *Id.* at 265. Additionally, "relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *Id.,* citing *United States v. Brady* (C.A.6, 1979), 595 F.2d 359.

As previously stated, "[i]t is well settled * * * that the determination of whether photographs meet the test for admissibility rests within the sound discretion of the trial court." *State v. Phillips* (1995), 74 Ohio St.3d 72, 77, citing *State v. Slagle* (1992), 65 Ohio St.3d 597, 601. Thus, the trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, a reviewing court should be slow to interfere. *Maurer, supra* at 265.

*17 In the case *sub judice,* four photographs of the crime scene were admitted into evidence. Three of the four photographs, each being very similar, show the victim's body as it appeared on the store floor after being shot. Therefore, two of the photographs are cumulative and admission of both photographs was erroneous on that basis. However, notwithstanding the cumulative nature of these photographs, overwhelming evidence demonstrating appellant's guilt was presented at trial. The jury would have convicted the appellant even if the cumulative photographs had not been shown. See *State v. Taylor* (November 9, 1995), Cuyahoga App. No. 65711, unreported. The court's error was harmless beyond a reasonable doubt.

In addition to the crime scene photographs, three autopsy photographs were entered into evidence to corroborate the expert testimony of the coroner. These photographs are indeed gruesome since they depict the homicide caused by the bullet wound. The photographs show the victim's head and detail the bullet hole and the victim's collapsed left eye, as well as the path which the bullet took once it entered the victim's head. None of the autopsy photographs admitted into evidence, however, were cumulative or repetitive.

The Supreme Court has held that "'the state must prove, and the jury must find, that the killing was purposely done. The number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause death. * * * '" *Maurer, supra* at 265, citing *State v. Strodes* (1976), 48 Ohio St.2d 113, 116. The total probative value of the autopsy photographs was not outweighed by the danger of prejudicial effect upon the appellant.

Appellant's eighth assignment of error is overruled.

X.

In his ninth assignment of error, appellant asserts his sentence of death is unreliable because the trial court asked for victim-impact evidence in which the victim's brother requested the trial court impose the death penalty. It is error for a trial court to admit victim-impact statements which relate to sentencing recommendations. *State v. Fautenberry* (1995), 72 Ohio St.3d 435. As appellant did not object to the statements, the plain error rule again must be applied.

In *State v. Allard* (1996), 75 Ohio St.3d 482, a similar situation to the instant case occurred. The trial court considered two letters regarding the effect of the victim's death on his family, one of which stated death was the only appropriate sentence for the defendant. There was no indication the trial court was influenced by or specifically relied on the recommendation when sentencing the defendant to death. The Supreme Court of Ohio pointed out that to establish plain error, the defendant must be able to demonstrate that, but for the victim impact statements, the trial judge would have imposed a sentence of life imprisonment. The trial court found the aggravating circumstance outweighed the mitigation evidence without the victim impact statement being a factor.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A-13

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

Page 14

*18 In the instant case, the trial court did state it would consider what the victim's family had to say regarding Mustafa Sammour when sentencing appellant. However, the sentencing opinion reflects no influence or reliance on the victim impact statement. There is no indication that the trial court would have sentenced appellant to a life term but for this statement.

Appellant's ninth assignment of error is meritless.

XI.

In his tenth assignment of error, appellant contends the state produced insufficient evidence to prove the element of prior calculation and design beyond a reasonable doubt. Appellant points out that both of his co-defendants testified that, while the three men planned to rob the Big Star Market, there was no discussion regarding killing or harming any of the store's employees. Johnson testified appellant said he did not mean to shoot Mustafa Sammour. Appellant's first statement to the police reflected he did not intend to shoot the clerk.

When reviewing a challenge to the sufficiency of evidence, an appellate court must view the evidence in a light most favorable to the prosecution and determine if any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307; *State v. Jenks* (1991), 61 Ohio St.3d 259. The essential elements of aggravated murder are that a person (1) purposefully, (2) with prior calculation and design, (3) causes the death of another. R.C. 2903.01. Appellant contends there was not sufficient evidence to show prior calculation and design.

The statute does not define "prior calculation and design." In *State v. Cotton* (1978), 56 Ohio St.2d 8, the court held that instantaneous deliberation is not sufficient to constitute prior calculation and design. *Id.,* paragraph two of the syllabus. The phrase requires more than a few moments of deliberation. *Id.* at 11. The evidence admitted at trial must reveal the presence of sufficient time and opportunity to plan the homicide and the circumstances show a scheme designed to implement the calculated design to kill. *Id.,* paragraph three of the syllabus. It is not required that a prolonged thought process be present. Even when a defendant only has instants to design the death of the victim, it will be sufficient.

*State v. Bailey* (1992), 90 Ohio App.3d 58, 73. A momentary deliberation is insufficient although neither the length of time nor degree of care are critical factors. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185. There is no bright-line test that distinguishes between the presence or absence of prior calculation and design. Each case turns on the particular facts and evidence presented at trial. *State v. Taylor* (1997), 78 Ohio St.3d 15, 20.

In *State v. Jenkins* (1976), 48 Ohio App.2d 99, this court set forth some factors to be considered when assessing whether sufficient evidence of prior calculation and design are present. The factors are whether the accused knew the victim prior to the crime, as opposed to a random meeting; whether thought and preparation were given by the accused to the weapon used in the killing or where the site of the homicide was to occur; and whether the act was drawn out over a period of time as against an almost instantaneous eruption of events. *Id.* at 102.

*19 There was little evidence appellant knew the victim aside from appellant having previously shopped in the store. However, this was not a random meeting as appellant chose to rob the Big Star Market. It was appellant who conceived of the robbery plan and then recruited others to join him in the crime. Appellant armed himself with a loaded .357 revolver which he recently had illegally purchased. Appellant picked the site of the crime.

Appellant essentially argues the shooting was an accident or at least unintended and not planned out over a period of time. The evidence adduced at trial showed appellant placed his armed weapon snugly against the forehead of an unresisting victim who stood with his arms raised above his head. Appellant then pulled the trigger, killing Mustafa Sammour instantly. Appellant showed no shock or remorse over the shooting he supposedly did not expect. Instead, he grabbed Mustafa's cousin and, once again, placed his loaded revolver to his victim's head while screaming for Almohanned Ismail Sammour to take him to where the money was. While Sammour was removing money from the store's safe, appellant fired a second shot into the floor. Appellant then directed Sammour to go to the lottery machine. Only the arrival of the milk delivery truck interrupted appellant from continuing the robbery. Appellant admitted to police that before he ran out the door, appellant took some more money from the open cash register drawer

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A-14

Not Reported in N.E.2d
(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))

Page 15

above where Mustafa Sammour lay dead on the floor.

Although Johnson and Padgett testified there was no plan to shoot anyone at the store, both tried to downplay their own involvement in the incident. Johnson initially denied having a weapon or receiving any of the money stolen from the store. Padgett also lied about receiving his share of the day's proceeds. Appellant allegedly told Johnson he did not mean to shoot Mustafa Sammour. Yet Padgett testified appellant said he shot the victim because Sammour reached for appellant's mask and appellant thought Sammour saw his face. This implies purpose.

In this case, appellant's actions speak louder than his statement regarding his lack of intent made to the police. According to appellant's police statement, his .357 revolver went off twice unexpectedly in a matter of minutes. This defies belief. Appellant intentionally placed his loaded weapon to Sammour's head and pulled the trigger. Appellant's actions subsequent to this act do not show any surprise or shock at the shooting. He continued on with the robbery and intimidated the second clerk into compliance by again firing his weapon. There was no evidence of an instantaneous eruption of events but rather sufficient evidence of a cold-blooded murder in which appellant held his victim's life in cheap regard. Appellant planned the robbery and the murder was used to further his plans. The state submitted sufficient evidence to prove prior calculation and design.

Appellant's tenth assignment of error is overruled.

XII.

*20 In his eleventh assignment of error, appellant asserts he was denied a fair trial due to erroneous jury instructions during both the guilt and penalty phases of his trial. Appellant first challenges the statutory definition of reasonable doubt with which the trial court instructed the jury as being constitutionally infirm under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In *State v. Nabozny* (1978), 54 Ohio St.2d 195, paragraph two of the syllabus, the court held:

The definition of "reasonable doubt" set forth in R.C. 2901.05 correctly conveys the concept of reasonable doubt and, therefore, is not an

unconstitutional dilution of the state's requirement to prove guilt beyond a reasonable doubt.
Subsequently, the Supreme Court of Ohio has upheld the holding of *Nabozny*. See *State v. Frazier* (1995), 73 Ohio St.3d 323; *State v. Van Gundy* (1992), 64 Ohio St.3d 230; *State v. Maurer* (1984), 15 Ohio St.3d 239; and *State v. Jenkins* (1984), 15 Ohio St.3d 164. The trial court's definition of "reasonable doubt" was constitutionally correct.

Appellant next argues the trial court's instruction regarding "cause" and "foreseeability" was error as it conveyed to the jury that it could convict by applying a negligence standard. Appellant contends this instruction negated the necessity to convict after a finding of specific intent to cause the death of another.

Appellant objects to the following portion of the jury charge:
Cause is an essential element of the offense charged. The State charges that the act of the defendant caused the death of Mustafa Sammour. Cause is an act or failure to act which in the natural and continuous sequence directly produces the death of a person and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act or failure to act.
A death is the result of an act or failure to act when it is produced directly by the act or failure to act in a natural and continuous sequence, and would not have occurred without it. Result occurs when the death is naturally and foreseeable caused by the act.
The causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act.
Foreseeability. Now, that's another term used. The test for foreseeability is not whether the defendant should have foreseen the injury in its precise form or as to a specific person. The test is whether a prudent reasonably prudent person, in the light of all the circumstances, would have anticipated that death was likely to result to anyone from the performance of the unlawful act.
(Tr. 1471-72). According to appellant, the last two paragraphs undermine the specific intent to kill *mens rea* which is required for aggravated murder.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A - 25

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

**\*21** Appellant never objected to any of the instructions as required by Crim.R. 30(A). Therefore, he must show that the trial's outcome clearly would have been different but for the alleged errors. *State v. Campbell* (1994), 69 Ohio St.3d 38. This same instruction was addressed in *State v. Burchfield* (1993), 66 Ohio St.3d 261. A jury instruction must be viewed in the context of the entire charge and not in isolation. *State v. Thompson* (1987), 33 Ohio St.3d 1, 13. The *Burchfield* court considered the entire charge and found extensive instructions regarding purpose were relayed prior to the causation instruction. The court noted that the usefulness of the foreseeability instruction was questionable and should only be used cautiously. However, after considering the entire charge, the court determined it was clear the jury understood it had to determine the defendant intended to kill. See also *State v. Phillips* (1995), 74 Ohio St.3d 72.

A review of the entire jury charge reveals extensive instructions on purpose, specific intent, and the use of a deadly weapon. The instructions adequately conveyed to the jury that it had to find appellant had the specific intent to kill.

Appellant additionally objects to the trial court's definition of "principal offender" under the R.C. 2929.04(A)(7) specification. The trial court stated:

The term, principal offender, means the one who personally performs every act constituting the offense, in this case, aggravated murder; that the defendant is the actor or absolute perpetrator, that is, that Michael Goodwin's conduct directly produced the death of Mustafa Sammour.

(Tr. 1476). Appellant argues this instruction permitted the jury to convict him on a lesser standard as R.C. 2929.04(A)(7) requires proof he was the actual killer. The trial court's definition was that appellant had, to be the one who personally performed every act constituting the offense of murder and that appellant had to be the absolute perpetrator. This is virtually the same as stating the jury had to find appellant was the actual killer. The jury instruction was correct under R.C. 2929.04(A)(7).

Finally, appellant argues the trial court denied him a fair trial by refusing to include an instruction on the lesser included offense of murder. To support his contention, appellant falls back on his argument that the state failed to present evidence of prior calculation and design as required under Count

One. It already has been determined that the state presented sufficient evidence to support the element of prior calculation and design.

Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial could reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.

*State v. Thomas* (1988), 40 Ohio St.3d 213, paragraph two of the syllabus. If the evidence presented at trial meets this test with regard to the lesser included offense, the trial court must instruct the jury on the lesser offense. *State v. Loudermill* (1965), 2 Ohio St.2d 79. If the test is not met, the lesser included offense charge need not be given. *State v. Kidder* (1987), 32 Ohio St.3d 279. An instruction is not required every time some evidence is presented. There must be sufficient evidence admitted at trial to allow the jury to reasonably reject the greater offense and find the defendant guilty on the lesser included offense. *State v. Shane* (1992), 63 Ohio St.3d 630.

**\*22** Murder is a lesser included offense of aggravated murder. *State v. Bailey* (1992), 90 Ohio App.3d 58. Murder is defined as purposely causing the death of another. R.C. 2903.02. The element of prior calculation and design is the sole difference between aggravated murder (R.C. 2903.01(A)) and murder. There was sufficient evidence presented by the state to support the element of prior calculation and design. The jury would not have reasonably rejected the greater offense to find appellant guilty of murder.

Additionally, appellant was convicted of another count of aggravated murder under R.C. 2903.01(B) for which even the defendant admits no instruction on murder was required. Appellant argues this does not result in the failure to give the murder instruction for the R.C. 2903.01(A) count as amounting to harmless error. Appellant asserts having a finding of guilty to two counts of aggravated murder may have had a significant impact on the jury's verdict and sentencing recommendation. Appellant's contention that the jury would not have returned a recommendation of death if appellant was convicted of only one count of aggravated murder is pure speculation. Additionally, if there was any error with regard to sentencing, this court's independent review would

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A - 16

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

cure the error.

Appellant also contends his counsel was ineffective for failing to object to the instructional errors. Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45. A review of the entire instruction fails to reflect there was a reasonable probability that, but for the failure to object, the result of the proceeding would have been different. *Strickland, supra.*

Appellant's eleventh assignment of error is overruled.

### XIII.

Appellant's twelfth assignment of error is that the trial court erred by not instructing the jury regarding the lesser included offense of involuntary manslaughter. Appellant argues the jury could have reasonably found he did not purposely kill Mustafa Sammour during the commission of an aggravated robbery but could have reasonably found the victim was killed as the proximate result of the aggravated robbery. Appellant points to the evidence in his statement that the gun just went off and that his intent was not to shoot Sammour. There also was evidence appellant drank some gin that morning and felt it a little.

Involuntary manslaughter is a lesser included offense of aggravated murder. *State v. Thomas* (1988), 40 Ohio St.3d 213, paragraph one of the syllabus. The difference between the two is that aggravated murder requires a purpose to kill. Involuntary manslaughter only requires a killing as a proximate result of a felony. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 218. A person acts purposefully when he specifically intends to cause a certain result. A person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts. A homicide is a natural and probable consequence of using an inherently dangerous instrumentality during the commission of a felony. *Thomas, supra,* at 217.

**\*23** Appellant placed a loaded revolver against his victim's forehead. Although in his statement, appellant said the gun just went off, he also stated the gun just happened to fire again a few minutes later. The likelihood of appellant's weapon

accidentally firing twice within a matter of minutes is slight. Appellant used an inherently dangerous instrumentality in committing aggravated robbery and it must be presumed he intended the natural consequence of the use of that instrumentality.

Appellant points to his statement to Johnson that he did not intend to kill Sammour. Appellant does not mention the evidence that he told Padgett he shot Sammour because Sammour reached for appellant's hat. This statement shows intent.

It cannot be ignored that appellant placed a loaded weapon to Mustafa Sammour's head and killed Sammour. Immediately after the murder, appellant then placed his firearm to the head of the second clerk and later fired a second shot into the floor of the store. All of this evidence points to purpose.

The trial court did not err in failing to give an involuntary manslaughter instruction.

Appellant's twelfth assignment of error lacks merit.

### XIV.

In his thirteenth assignment of error, appellant maintains his death sentence is excessively disproportionate to the sentences received by his two co-defendants. Appellant asserts that the imposition of the death sentence for him while Johnson and Padgett received lesser sentences is an arbitrary and capricious use of capital punishment. This argument was rejected in *State v. Eley* (1996), 77 Ohio St.3rd 174, in which the court held: "[D]isparity of treatment between accomplices does not justify reversal of a death sentence where the sentence is neither illegal nor an abuse of discretion." *Id.* at 185. There is no reason to vacate appellant's sentence because his accomplices received lesser punishment.

Appellant again argues he did not receive effective assistance of counsel resulting in an inappropriate sentence of death. These issues already were addressed in assignment of error two.

Appellant's thirteenth assignment of error is meritless.

### XV.

Appellant's fourteenth assignment of error raises a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A - 17

number of challenges to the constitutionality of Ohio's death penalty statute. If the merits of a question of law in a capital murder case have previously been addressed by the Supreme Court of Ohio, it is not necessary to fully consider the question in a subsequent case. *State v. Poindexter* (1988), 36 Ohio St.3d 1, syllabus. Appellant's arguments have been addressed and determined by that court. *State v. Nabozny* (1978), 54 Ohio St.2d 195; *State v. Jenkins* (1984), 15 Ohio St.3d 164; *State v. Maurer* (1984), 15 Ohio St.3d 239; *State v. Buell* (1986), 22 Ohio St.3d 124; *State v. Stumpf* (1987), 32 Ohio St.3d 95; *State v. Henderson* (1988), 39 Ohio St.3d 24; *State v. VanHook* (1988), 39 Ohio St.3d 256; *State v. Sowell* (1988), 39 Ohio St.3d 322; *State v. Grant* (1993), 67 Ohio St.3d 465; *State v. Phillips* (1995), 74 Ohio St.3d 72; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344.

**\*24** Appellant's fourteenth assignment of error is overruled.

Judgment affirmed.

XVI.

Pursuant to R.C. 2929.05(A), this court must make an independent evaluation of whether the aggravating circumstance in this case outweighs any mitigating factors in order to determine whether appellant's death sentence is appropriate.

The evidence shows beyond a reasonable doubt that appellant murdered Mustafa Sammour while committing an aggravated robbery and that appellant was the principal offender in the aggravated murder. R.C. 2929.04(A)(7). Against this specification, any mitigating factors must be considered and weighed. Of the criteria listed in R.C. 2929.04(B), only those relating to youth and to any other relevant factors are applicable.

Appellant was nineteen years old at the time he committed the offense. Generally, the element of youth is entitled to little weight. *State v. Carter* (1995), 72 Ohio St.3d 545. There is no evidence appellant's youth played much of a part in the murder. Appellant planned the robbery, recruited acquaintances to join him in the crime, cold-bloodedly shot the unresisting store clerk in the head at point-blank range, and then put his weapon to the head of the second clerk. There is nothing in the episode of inexperience or the

emotional immaturity one might ascribe to youth.

Appellant's attorney attempted to raise residual doubt appellant was the actual killer during his penalty argument. There is no doubt appellant killed Sammour. The evidence amply supports this conclusion. Defense counsel also asked for a sentence more proportionate to that of his co-defendants. This factor also is afforded little weight.

There is nothing in the nature and circumstances of the offense which is mitigating. Appellant killed an unresisting victim in furtherance of a robbery.

There was some evidence regarding circumstances surrounding appellant's birth and upbringing but nothing which is heavily mitigating.

In weighing the aggravating circumstance against the mitigation evidence, the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

XVII.

After reviewing several cases involving aggravated robbery - murder in which the death penalty was imposed, this court finds appellant's sentence of death to be neither excessive nor disproportionate. *State v. Martin* (1985), 19 Ohio St.3d 122; *State v. Scott* (1986), 26 Ohio St.3d 92; *State v. Byrd* (1987), 32 Ohio St.3d 79; *State v. Jester* (1987), 32 Ohio St.3d 147; *State v. Post* (1987), 32 Ohio St.3d 380; *State v. Esparza* (1988), 39 Ohio St.3d 8; *State v. Jamison* (1990), 49 Ohio St.3d 182; *State v. Carter* (1995), 72 Ohio St.3d 545; *State v. Eley* (1996), 77 Ohio St.3d 174.

Appellant's conviction and death sentence are affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed any bail pending appeal is terminated. Case remanded to the trial

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A-18

Not Reported in N.E.2d
**(Cite as: 1997 WL 186770 (Ohio App. 8 Dist.))**

court for execution of sentence.

**\*25** A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

PORTER and O'DONNELL, JJ., concur.

N.B. This is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 27. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(B) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(B). See, also S.Ct.Prac.R. II, Section 2(A)(1).

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A -19

ON COMPUTER-SMW

# The Supreme Court of Ohio

State of Ohio,
        Appellee,

      v.

Nathaniel E. Jackson,
        Appellant.

To Wit:  January 21, 2005

Case No. 03-0137

**NOTICE OF HEARING**

TO:    LuWayne Annos

John Laczko

      The Supreme Court of Ohio will hold a hearing on the merits in this case on Tuesday, the 10th day of May, 2005.  Time allowed for oral argument shall be 30 minutes per side.

      Attorneys who argue before the Court must comply with the provisions of Rule IX of the Rules of Practice of the Supreme Court of Ohio and the instructions that follow. Pursuant to Rule IX, Section 3, counsel for either or both parties may waive oral argument and submit the case upon briefs.  The Clerk must be notified in writing of such waiver at least ten days before the date scheduled for the oral argument.

      Court convenes promptly at 9 a.m.  Counsel in all cases are expected to be present when court convenes.  Counsel should register with the assignment clerk **prior to 8:45 a.m.** in front of the attorney waiting room, adjacent to the courtroom on the first floor of 65 South Front Street, Columbus, Ohio.  Cell phones may not be activated in the courtroom.  Court sessions are televised.

      An attorney should not begin oral argument until called by the Chief Justice. Counsel for appellant shall argue first.  Multiple parties per side should divide the time allocated for argument by agreement if more than one party wishes to argue; in that event, counsel shall advise the assignment clerk of how the time will be divided when counsel registers with the assignment clerk.

      The attorney who opens the argument has the right to close the argument and divide the allocated time at his or her discretion.  Any attorney desiring to reserve time for rebuttal shall advise the Chief Justice at the opening of argument of the number of minutes to be reserved.  Counsel shall be responsible for timely concluding initial argument so as to reserve the rebuttal time requested.

A light on the lectern will indicate that there are two minutes of counsel's argument time remaining.  Another light on the lectern will indicate that counsel's allotted time has expired and that counsel should end the argument or request permission from the Chief Justice to continue.  When multiple parties per side are represented by multiple attorneys who will share argument time, the second light will indicate the end of each attorney's allocated time; the two-minute light will be activated only for the last attorney arguing on that side.

**Note: Assignments in the Supreme Court take precedence over other assignments.**

MARCIA J. MENGEL          CLERK

_____ DEPUTY CLERK

Service: Get by LEXSEE®
Citation: 107 Ohio St. 3d 300

*107 Ohio St. 3d 300, \*; 2006 Ohio 1, \*\*;*
*839 N.E.2d 362, \*\*\*; 2006 Ohio LEXIS 1*

THE STATE OF OHIO, APPELLEE, v. JACKSON, APPELLANT.

No. 2003-0137

SUPREME COURT OF OHIO

107 Ohio St. 3d 300; 2006 Ohio 1; 839 N.E.2d 362; 2006 Ohio LEXIS 1

May 10, 2005, Submitted
January 4, 2006, Decided

**SUBSEQUENT HISTORY:** Stay granted by State v. Jackson, 108 Ohio St. 3d 1408, 2006 Ohio 216, 841 N.E.2d 314, 2006 Ohio LEXIS 46 (2006)
Post-conviction relief denied at State v. Jackson, 2006 Ohio 1007, 2006 Ohio App. LEXIS 919 (Ohio Ct. App., Trumbull County, Mar. 3, 2006)
US Supreme Court certiorari denied by Jackson v. Ohio, 126 S. Ct. 2359, 165 L. Ed. 2d 285, 2006 U.S. LEXIS 4408 (U.S., 2006)
Reopening denied by State v. Jackson, 2006 Ohio 5083, 2006 Ohio LEXIS 2712 (Ohio, Oct. 4, 2006)

**PRIOR HISTORY:** APPEAL from the Court of Common Pleas for Trumbull County, No. 01-CR-794. State v. Jackson, 100 Ohio St. 3d 1514, 2003 Ohio 6460, 800 N.E.2d 33, 2003 Ohio LEXIS 3283 (2003)

**DISPOSITION:** Judgment affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant appealed a judgment from the Court of Common Pleas for Trumbull County (Ohio), which convicted him of two counts of aggravated murder, in violation of Ohio Rev. Code Ann. § 2903.01(A) and (B), with felony-murder death-penalty specifications under Ohio Rev. Code Ann. § 2929.04(A)(7). Defendant was also convicted of aggravated burglary and aggravated robbery with a specification, and he was sentenced to death.

**OVERVIEW:** The victim's former wife let defendant into her home to wait for the victim to return from work. Upon his return, defendant shot him and stole his car. The wife then went to the home and called 911. Other evidence included blood from the stolen car and other physical evidence, and letters and tape recorded phone calls between the wife and defendant. Defendant initially told the police he acted in self-defense. After a jury trial, he was convicted and sentenced to death. On appeal, the court held that denial of suppression as to defendant's pretrial statement was proper, as defendant waived his Miranda rights. The trial court's rulings on objections to the prosecution's comments were either proper, or if erroneous, it was harmless error. The jury instructions on purpose and reasonable doubt were not plain error, and defendant's counsel did not render ineffective assistance. There was no prejudicial prosecutorial misconduct, and the court summarily rejected defendant's constitutional claims. The court's independent review resulted in a finding that the sentence was proportionate to the conduct, and that the aggravating circumstances outweighed the mitigating factors.

**OUTCOME:** The court affirmed the judgment of the trial court.

**CORE TERMS:** prosecutor, murder, aggravated, mitigating, ain't, voir dire, mitigation, jurors, phone, burglary, questioning, prison, beyond a reasonable doubt, self-defense, happened, shot, closing argument, detective, conversation, aggravating circumstances, prejudiced, killing, robbery, fair trial, couple, night, kill, talk, gun, right to remain silent

### LexisNexis(R) Headnotes ❖ Hide Headnotes

Criminal Law & Procedure > Pretrial Motions > Suppression of Evidence
Evidence > Testimony > Credibility

*HN1* ⚓ At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
Criminal Law & Procedure > Interrogation > Miranda Rights > Right to Counsel During Questioning

*HN2* ⚓ Under the Fifth Amendment, an accused must clearly invoke his constitutional right to counsel in order to raise a claim of deprivation of counsel. The suspect must unambiguously request counsel. He must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the subject. More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Interrogation > Miranda Rights > Right to Counsel During Questioning

*HN3* ⚓ "I think I need a lawyer" is not an unequivocal assertion of the right to counsel. "Don't I supposed to have a lawyer present" is "at best ambiguous." Other courts have found similar remarks to be ambiguous and thus not invoking the constitutional right to counsel. More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
Criminal Law & Procedure > Interrogation > Miranda Rights > Right to Counsel During Questioning
Criminal Law & Procedure > Interrogation > Miranda Rights > Self-Incrimination Privilege

*HN4* ⚓ The United States Supreme Court has held that once a suspect invokes the right to remain silent, police must cease questioning him. However, similar to the invocation of the right to counsel, invocation of the right to stop questioning must be honored by police only if it is unambiguous. More Like This Headnote | *Shepardize:* Restrict By Headnote

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > General Overview

*HN5* ⚓ Not every intemperate remark by counsel can be a basis for reversal. More Like This Headnote

Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response

*HN6* ⚓ The prosecution is entitled to a certain degree of latitude in summation. More Like This Headnote

Criminal Law & Procedure > Trials > Closing Arguments > Evidence Not Admitted

*HN7* ⚓ Prosecutorial comment is appropriate only with regard to those factors actually offered in mitigation by a defendant. More Like This Headnote

Criminal Law & Procedure > Jury Instructions > Particular Instructions > Reasonable Doubt

*HN8* ⚓ Court have repeatedly upheld use of reasonable-doubt instructions based on the statutory language of Ohio Rev. Code Ann. § 2901.05(D). More Like This Headnote

Criminal Law & Procedure > Sentencing > Proportionality

*HN9* ⚓ Proportionality review needs to entail only those cases in which the death sentence

has been imposed.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Counsel > Effective Assistance > Tests
Criminal Law & Procedure > Trials > Burdens of Proof > Defense

HN10 ⚓ Reversal of a conviction for ineffective assistance requires two showings. First, a defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. Proving prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. A demonstration of prejudice requires a showing of a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Counsel > Effective Assistance > Pretrial
Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

HN11 ⚓ The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. An appellate court will normally defer to defense counsel's judgment in voir dire and not find ineffective assistance.  More Like This Headnote

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview
Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances
Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview

HN12 ⚓ During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors. However, attorneys are not prohibited from referring to specific mitigating factors as examples of mitigating evidence during voir dire questioning. A trial court does not abuse its discretion in allowing that type of question.  More Like This Headnote | *Shepardize: Restrict By Headnote*

Criminal Law & Procedure > Counsel > Effective Assistance > Tests
Criminal Law & Procedure > Appeals > Standards of Review > General Overview

HN13 ⚓ An appellate court ordinarily refrains from second-guessing strategic decisions counsel makes at trial, even when counsel's trial strategy was questionable.  More Like This Headnote

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > General Overview

HN14 ⚓ Whether improper remarks constitute prosecutorial misconduct requires analysis as to: (1) whether the remarks were improper and, (2) if so, whether the remarks prejudicially affected an accused's substantial rights. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor. An appellate court will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments.  More Like This Headnote | *Shepardize: Restrict By Headnote*

Criminal Law & Procedure > Jury Instructions > Particular Instructions > General Overview
Evidence > Inferences & Presumptions > Presumptions

HN15 ⚓ Courts presume that the jury follows a court's instructions.  More Like This Headnote

Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response

HN16 ⚓ Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence. A prosecutor may state his or her opinion if it is based on the evidence presented at trial.  More Like This Headnote | *Shepardize: Restrict By Headnote*

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

HN17 ⚓ Errors that are harmless or curable cannot become prejudicial by sheer weight of

Get a Document - by Citation - 98 Ohio St. 3d 30  Page 16 of 22

numbers.  More Like This Headnote

❖ Hide Headnotes

**HEADNOTES:** *Criminal law -- Aggravated murder -- Death penalty upheld.*

**COUNSEL:** Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

John P. Laczko and Dennis Day Lager, for appellant.

**JUDGES:** LANZINGER, J. MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

**OPINION BY:** LANZINGER

**OPINION: [\*300]  [\*\*\*365] LANZINGER, J.**

[\*\*P1]  In the very early morning of December 12, 2001, Donna Roberts phoned 911 to report the shooting death of her former husband, Robert Fingerhut, at their home in Howland Township, Trumbull County, Ohio. Over the next few days, police learned that she and Nathaniel Jackson had plotted to kill Fingerhut. Both Roberts and Jackson were arrested, convicted of aggravated murder, and sentenced to death. This opinion addresses the appeal by defendant-appellant, Jackson.

[\*\*P2]  As evidence at trial showed, Roberts and Fingerhut had been divorced in 1985, but were living together in the Howland Township home. Almost all of the couple's assets, including two Greyhound bus terminals in Warren and Youngstown, [\*\*\*366] were in Roberts's name. Fingerhut managed the terminals. Many of those who dealt with the couple assumed that they were married, and Fingerhut referred to Roberts as his wife in many business dealings.

[\*\*P3]  Donna Roberts and Nathaniel Jackson met and began having an affair sometime before 2001. Their romantic relationship was interrupted during most of 2001 while Jackson was incarcerated in the Lorain Correctional Institution. At the time of Fingerhut's murder, Jackson was 29 years old, Roberts was 57, and Fingerhut was 56.

[\*\*P4]  While Jackson was in prison, he and Roberts exchanged letters and spoke on the phone. Because phone calls from prisoners are routinely recorded at the Lorain Correctional Institution and kept for at least six months, there were digital recordings of 19 of their phone conversations. Many of the letters and conversations were sexually graphic, describing the couple's plans after Jackson's release. The couple used veiled terms in their letters and conversations to discuss how they would deal with Fingerhut once Jackson was out of prison.

[\*301]  [\*\*P5]  Three days before Jackson was released from prison on December 9, 2001, a woman reserved a Jacuzzi suite at the Wagon Wheel Motel in Youngstown. The woman paid for the room, and she and Jackson stayed there on the night of his release.

[\*\*P6]  For the next few days, Roberts and Jackson were seen together at various places. On the afternoon of December 10, Frank Reynolds, an employee of the Youngstown Greyhound bus terminal, saw Roberts and Jackson talking near the terminal before Fingerhut arrived for work. Later, Reynolds overheard Roberts ask Fingerhut for $ 3,000, which he refused to give her. According to Reynolds, Roberts was nervous and shaky and gave Fingerhut "the dirtiest look like it can kill a person."

[\*\*P7]  The next afternoon, December 11, the day of the murder, at approximately 4:35 p.m., bus driver Jim McCoy saw Fingerhut working alone at the Youngstown terminal. Shortly afterwards, McCoy drove his bus to the Warren bus terminal, where he saw Roberts with a

black male who identified himself as "Nathaniel." According to McCoy, the two appeared to be in a hurry to leave.

[**P8]  Shortly before 6:00 p.m. that evening, a waitress at the Red Lobster restaurant in Niles began serving Roberts and Jackson. The two paid for their dinner at 6:43 p.m. and left the restaurant.

[**P9]  Fingerhut left the Youngstown bus terminal at 9:00 p.m., telling the security guard that he was going home.

[**P10]  Near 9:30 p.m. the same evening, a neighbor of Roberts saw her driving near her home. Although no one else was on the road at the time, Roberts was driving very slowly. Meanwhile, Fingerhut left the Youngstown bus terminal at 9:00 p.m., telling the on-duty security guard, "I'm going home."

[**P11]  Later that night, Roberts reserved a room for a week at the Days Inn Motel in Boardman. The room receipt indicates that she paid for the room at 11:33 p.m.

[**P12]  Shortly after midnight, December 12, 2001, Roberts called 911 screaming that there was something wrong with her husband. The computer showed that the call came from Roberts and Fingerhut's home in Howland Township.

[**P13]  These facts from the trial record are consistent with the state's theory that Roberts let Jackson into her home to wait for Fingerhut to return from work; that [***367]  when Fingerhut got home, Jackson shot him and stole his car and then called Roberts's cell phone from the cell phone in Fingerhut's car; that Jackson abandoned Fingerhut's car, and Roberts picked him up and took him to Days Inn, where she reserved a room for a week; and that Roberts then went home and called 911.

[*302]  [**P14]  Upon arriving at the scene, police found Fingerhut's bloody corpse lying face down on the kitchen floor near the door to the garage. Roberts told police to do whatever they had to do to catch the killer. She also gave police permission to search the house and her car in the garage. She asked police several times where her "husband's car" was, but told police later that somebody had stolen it. Roberts's emotional state fluctuated. At times she was very coherent, while at other times she was screaming, crying, and asking police why they were not doing anything. Eventually, police arranged for Roberts's brother to come and get her while police continued to process the crime scene.

[**P15]  The deputy coroner for Trumbull County, Dr. Humphrey Germaniuk, observed the victim at the crime scene and later performed an autopsy. Fingerhut had sustained lacerations and abrasions to his left hand and head, as well as three gunshot wounds: one to his head, a perforating wound that started at the right side of his back and went through his chest, and a grazing wound to the right side of his back. Germaniuk concluded that the gunshot to his head was fatal.

[**P16]  During the search of the crime scene, police found a fully loaded .38-caliber revolver near Fingerhut's body. Near the gun was a bloody shoe print. A firearms expert with the Bureau of Criminal Identification and Investigation ("BCI") concluded that the bullets recovered from the crime scene and the victim had all been fired from the same weapon, but not from the one found at the scene.

[**P17]  In a dresser in the master bedroom of the house, police discovered 145 letters and cards handwritten by Jackson to Roberts. Most were addressed to Roberts at a post office box in Warren.

[**P18]  In the trunk of Roberts's car parked in the garage, police found a brown paper bag with Jackson's name on it. Inside the bag were clothing and 139 handwritten letters from Roberts to Jackson dated from October through early December 2001. Roberts told police that she had written the letters. Also in the trunk, police found an empty handcuffs box.

[**P19]  During the ensuing investigation, police learned that Jackson and Roberts had spent a night at the Wagon Wheel Motel and that Roberts had registered for a room (room No. 129) at the Days Inn and had paid for a week. Police and a BCI agent found bloodstains in room No. 129. Police also recovered a garbage bag that had been in room No. 129 containing a nearly empty bottle of hydrogen peroxide and bloodstained bandages and gauze. The DNA of the blood was later determined to be consistent with Jackson's DNA profile. Fingerprints lifted from inside room No. 129 and from a Days Inn room-key envelope marked "129," which was also found in the garbage bag, matched Jackson's fingerprints.

[*303]  [**P20]  Police also learned that Fingerhut had two life-insurance policies naming Roberts as sole beneficiary. The aggregate benefit from the two policies was $ 550,000.

[**P21]  Police discovered Fingerhut's car abandoned on the east side of Youngstown. A BCI forensic scientist found blood on the driver's visor and elsewhere inside the car. The blood on the visor was a mixture consistent with both Jackson's and Fingerhut's  [***368] DNA profiles. Blood recovered from the trunk-release lever inside the car was a mixture with a major profile consistent with Jackson's DNA and a minor profile consistent with Fingerhut's DNA. The occurrence frequency of the DNA profile from blood found on the trunk-release lever is one in 45 quintillion, 170 quadrillion in the Caucasian population, one in 29 quadrillion, 860 trillion in the African-American population, and one in 22 quintillion, 400 quadrillion in the Hispanic population.

[**P22]  Passages from the letters exchanged between Jackson and Roberts, as well as recorded phone calls Jackson made to Roberts from prison, revealed a plot to murder Robert Fingerhut. The subject was raised on more than one occasion.

[**P23]  For example, on October 2, 2001, Jackson wrote to Roberts: "Why don't you leave Robert an lets carry on with a world of our own? Or let me do what I was gonna do to him, because you know that -- that was our little thing so you better not go an try to get know one else to do it, because I told you its getting done when I come home."

[**P24]  On October 8, 2001, Jackson wrote: "Donna I got it already planned out on how we are gonna take care of the Robert situation. An baby its the best plan ever! Because Donna its now time that we really be together so that we can really see the true side of our love because I'm tired of not being able to be with you * * *."

[**P25]  In an October 20, 2001 letter, Jackson wrote: "An Donna I don't care what you say but Robert has to go! An I'm not gonna let you stop me this time. An Donna you know that I've always wanted to live my life with you an only you but everytime that I wanted to take care of the situation by myself you wouldn't never let me. * * * Because you wouldn't let me do what I wanted to do to make you happy an that was get rid of him! So Donna can I do this so that we can go on an live happy? An then maybe we can sell the house an move on to somewhere else in our own world. An I'm not gonna be happy until that happens!"

[**P26]  On October 26, 2001, Jackson wrote: "An then after that you don't ever have to worry about making know more excuses to him, because he will no longer be with us after 12-10-01 an then it'll be me an you totally an completely * * *." Within that same passage, Jackson drew a tombstone with the inscription, "Rest  [*304]  In Piss." Later in the same letter, Jackson wrote: "Hey Donna just think come 12-11-01 you'll be waking up to me or maybe we'll give it a couple of days to let things look cool an then after the funeral baby when I come home I'm never leaving an we're only doing it like that just to make it look good * * *. Alls I need is for my baby not to worry an leave everything else up to me."

[**P27]  On October 29, 2001, Jackson wrote: "An as far as the Robert problem? Yes I'm taking care of that the next night, because I told you I'm tired of living like this when I don't have to. An after that will you get me a 2002 Cadillac Deville?" Later in the same letter, Jackson wrote: "An even if I gotta come to the house and shoot Robert in his fucking head you're gonna be with me."

[**P28]  On October 30, Jackson wrote: "Well I see now you know that I'm about my business when I get out as far as our little situation? An get me a size large leather gloves an see if you can find me a ski mask hat okay? An I need them handcuffs you have an its mandatory, so get them for me, because the way that I'm gonna do it is gonna be right okay?"

[**P29]  [***369]  In recorded phone conversations between Jackson and Roberts during November 2001, the two continued to discuss Jackson's plans for Fingerhut. In a November 8, 2001 conversation, Jackson told Roberts that he wanted Fingerhut to see her perform fellatio on him before Fingerhut "goes away man." In their conversation on November 22, Roberts expressed worries that Jackson would get caught:

[**P30]  "[Jackson]: * * * You know what I'm saying, the next day after. You know what I told you I wanted to do right?

[**P31]  "[Roberts]: I'm afraid Nate.

[**P32]  "[Jackson]: What you, man.

[**P33]  "[Roberts]: I can't afford to lose you.

[**P34]  "[Jackson]: And I, listen, listen here.

[**P35]  "[Roberts]: I can not lose you. Like I will kill myself.

[**P36]  "[Jackson]: Man, look. See man.

[**P37]  "[Roberts]: If you go away from me again.

[**P38]  "[Jackson]: Just forget about it man, * * * when a person, man, know what he's doing, man, * * * that's like jinxing, man. * * *.

[**P39]  "[Roberts]: But what was the story with the trunk and handcuffs, that's too involved.

[**P40]  "[Jackson]: Just, just, just leave it alone, alright.

[**P41]  "[Roberts]: It's too much involved. Your gonna leave hair, your gonna leave prints, your gonna,

[*305]  [**P42]  "[Jackson]: Leave it alone, man. Leave it alone, alright.

[**P43]  "* * *

[**P44]  "[Jackson]: Come on man. This ain't Perry Mason man.

[**P45]  "[Roberts]: I don't want to know anything about it ever."

[**P46]  Two days later, on November 24, Jackson tried to reassure Roberts about his plan:

[**P47]  "[Jackson]: Man, * * * we gonna really talk when I come home, ok.

[**P48]  "[Roberts]: Ok.

[**P49]  "[Jackson]: Especially about our, that situation, man. You know.

[**P50]  "[Roberts]: Yeah.

**[\*\*P51]** "[Jackson]: I mean, it just, you know, you get too nervous at times, that's all the deal is.

**[\*\*P52]** "[Roberts]: Yeah I know, it part of my nature.

**[\*\*P53]** "[Jackson]: And then you said DNA, the only way they can do a DNA is if they got the other, the person's, you know what I'm saying. If they got the person and the hair cause they can't just take no hair and say this is such and such hair. \* \* \* The laws that we got in the State of Ohio and the laws from everywhere else, you know what I'm saying, I mean they way different. \* \* \*.

**[\*\*P54]** "[Roberts]: Really.

**[\*\*P55]** "[Jackson]: Hell yeah. We'll, we'll talk about it when I come home Donna. Ok, I don't want to talk about it over the phone."

**[\*\*P56]** On December 8, the day before Jackson was released from prison, Jackson and Roberts had one final recorded conversation. Roberts expressed misgivings about what Jackson was planning to do to Fingerhut, but Jackson told her, "I got to do this Donna. I got to." Roberts told Jackson that she did not want to know about it, and then the following colloquy took place:

**[\*\*P57]** **[\*\*\*370]** "N. Jackson: Just consider it a done deal. Only thing I'm gonna need is one thing.

**[\*\*P58]** "D. Roberts: What?

**[\*\*P59]** "\* \* \*

**[\*\*P60]** "N. Jackson: I just need to be in that house when he come home.

**[\*\*P61]** "D. Roberts: Oh no.

**[\*\*P62]** "\* \* \*

**[\*\*P63]** "N. Jackson: Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you.

**[\*\*P64]** "\* \* \*

**[\*306]** **[\*\*P65]** "N. Jackson: I just need to be in there man. It ain't gonna happen in the house man. I mean I ain't gonna jeopardize that man.

**[\*\*P66]** "D. Roberts: Well, let's not talk about it now.

**[\*\*P67]** "N. Jackson: Ok. We'll talk, we'll, I'll just wait until tomorrow."

**[\*\*P68]** Police arrested Roberts at her home on the night of December 20, 2001. Shortly afterwards, police arrested Jackson at the Youngstown home of Sheila Fields, Jackson's friend. Jackson surrendered without incident, and police noticed that he had a bandage on his left index finger. Police searched the home, with Fields's consent, and seized a pair of tennis shoes and a pair of black leather gloves. The index finger of the left glove appeared to have been torn off, and there was a red substance on what remained of that finger. The tread pattern of the shoes was consistent with the print left in blood near Fingerhut's body.

**[\*\*P69]** Police brought Jackson to the Trumbull County Sheriff's Office around 2:00 a.m. on December 21, 2001, and advised him of his *Miranda* rights. Jackson initialed and signed the waiver-of-rights form. Jackson told Detectives Monroe and Hoolihan, "I just didn't mean

to do it, man." Jackson then related on videotape his version of what happened, essentially claiming that he had shot Fingerhut in self-defense.

[**P70]  Jackson's story was that he approached Fingerhut at the Youngstown bus terminal about getting a job and Fingerhut told him to meet him outside a restaurant later that evening. Jackson claimed to have known Fingerhut for a couple of years. Jackson claimed to have sold Fingerhut "some weed" when Fingerhut picked him up at the restaurant. Once inside Fingerhut's car, the two discussed a job at the bus terminal. Jackson asked whether he could stay at Fingerhut's house for the night and then get an early start on learning the job at the terminal the next day. Fingerhut agreed and took Jackson to his home, which Jackson acknowledged having visited before.

[**P71]  Inside the home, Jackson claimed, Fingerhut started "disrespecting" him, and the two argued. Jackson said that Fingerhut then pointed a gun at him and shot him in the finger as Jackson tried to disarm him. Jackson claimed that he and Fingerhut had struggled over the gun and then Jackson got control of it and shot Fingerhut a couple of times. Jackson then grabbed car keys off the kitchen counter and fled in Fingerhut's car.

[**P72]  Jackson asserted that he had been scared and had not meant to kill Fingerhut. He threw the gun from the car window while driving on the freeway back to Youngstown. He then called Roberts on the cell phone in Fingerhut's car and asked her to pick him up at Sheila Fields's house and get him a room at Days Inn. Jackson said he did not tell Roberts what had happened with Fingerhut and claimed, "Donna ain't had nothing to do with it at all, man."

[*307]  [***371]  [**P73]  On December 28, 2001, a grand jury indicted Jackson on two counts of aggravated murder for killing Robert Fingerhut in violation of R.C. 2903.01(A) and (B). Both murder counts carried two felony-murder death-penalty specifications: murder during an aggravated burglary and during an aggravated robbery. R.C. 2929.04(A)(7). The grand jury also indicted Jackson on separate counts of aggravated burglary and aggravated robbery with a firearm specification on each count.

[**P74]  Before a jury, the state presented numerous witnesses establishing the facts already mentioned. The defense presented three witnesses, whose testimony revealed that ownership documents for most of the property shared by Roberts and Fingerhut named Roberts as the owner. This evidence was intended to undermine the financial motive for the killing asserted by the state.

[**P75]  The jury found Jackson guilty as charged.

[**P76]  At the conclusion of the penalty phase of the trial, the jury recommended death, and the court imposed the death sentence on Jackson.

[**P77]  Jackson has raised 12 propositions of law. We have reviewed each and have determined that none justifies reversal of Jackson's conviction for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigating factors. We find that the aggravating circumstances outweigh any mitigation beyond a reasonable doubt. Therefore, we affirm Jackson's sentence of death.

PRETRIAL ISSUES

*Suppression Issues*

[**P78]  In proposition of law I, Jackson argues that the trial court abused its discretion in overruling the motion to suppress his pretrial statement to police. Jackson contended at the suppression hearing that he repeatedly requested counsel but that police ignored his requests. He also claims that he told detectives that he did not want to answer any more questions but that the detectives continued to interrogate him.

[**P79]  At the suppression hearing, Warren Police Detective Jeff Hoolihan testified that he arrested Jackson the night of December 20, 2001, and told him he was under arrest for aggravated murder. Hoolihan advised Jackson of his *Miranda* rights on the ride to the Trumbull County Jail. According to Hoolihan, without being questioned, Jackson denied killing anybody and asked whether he had the right to an attorney at any time. Hoolihan replied that he did. Jackson then told Hoolihan that he was on the phone with Roberts when he saw that police were surrounding the home where he was arrested. Hoolihan then told Jackson that Roberts had "snitched him out" and that he would have a chance to tell his side of the story when they arrived at the county jail.

[*308]  [**P80]  Jackson was taken to the jail, where he waited with Howland Township Police Sgt. Dillon and a corrections officer for approximately an hour until Captain Bacon arrived to open the interview room. Jackson was not questioned before Captain Bacon arrived. At approximately 1:45 a.m. on December 21, 2001, he was taken to the interview room, where Hoolihan and Howland Township Police Detective Paul Monroe questioned him. Jackson was given coffee and cigarettes and was very polite, cooperative, and alert. Jackson claimed that Fingerhut shot him in the finger and that he then wrested the gun from Fingerhut and shot him. Jackson agreed to allow police to videotape his statement. According to Hoolihan, Jackson  [***372]  did not ask for a lawyer or decline to answer questions.

[**P81]  At 2:13 a.m., police began videotaping the interview and again informed Jackson of his *Miranda* rights and gave him a waiver-of-rights form, which he initialed and signed, thereby waiving his *Miranda* rights. The interview lasted approximately an hour. Jackson claimed that he did not mean to kill Fingerhut and essentially claimed that he had acted in self-defense.

[**P82]  At the suppression hearing, Jackson testified that during the interview, he had asked to speak to an attorney. Jackson testified, "I didn't want to speak to them unless I had an attorney around." Jackson claimed that the police persisted in questioning him, even though he asserted, several times, his rights to say nothing more and to have an attorney present. Jackson also asserted that he had been high on painkillers and marijuana at the time. Although Jackson admitted signing the waiver, he claimed that no one had read him his rights beforehand.

[**P83]  The trial court overruled the motion to suppress Jackson's confession after according no weight to Jackson's testimony. Instead, the trial court found Det. Hoolihan's testimony to be more persuasive. The court concluded that Jackson had been sufficiently advised of his *Miranda* rights and had voluntarily waived those rights. The court also found that Jackson had not unambiguously or unequivocally requested counsel before or during questioning. *HN13* "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

[**P84]  During the videotaped statement, Jackson recounted his version of his interaction with Fingerhut before the shooting, described shooting Fingerhut in self-defense, and explained meeting with Roberts after the shooting. The detectives then asked Jackson how he was able to treat the wound to his finger. Jackson now asserts that at that point in the questioning, he requested counsel. He claims that the request is clear from the following portion of the transcript of the interview:

[*309]  [**P85]  "Det Hoolihan: Okay, but then she goes to Walgreens and brings the stuff to the room?

[**P86]  "Jackson: (Mumbles) I, you know, I, I, I told you, you know what I'm saying, but what I had to say, man, I mean, I mean, I can't just sit here, you know what I'm saying, I mean, just, keep on, you know what I'm saying, back-tracking, I mean, I don't even want to talk about it no more, man. I'm, I'm, I'm through with it, man, just, man, you know what I mean, police, you know, I mean, I, I talked to a lawyer or something, man, you know what I

mean, 'cause I, I mean, I ain't got time to just, just keep on, over and over, man, I'm, I'm through, man, I'm through, man, you know what I'm saying. I say, I mean, I, I ain't mean to do it, I'm sorry I did it, you know what I'm saying, I mean, but, I was left, I had no choice, man. And that's it. End of discussion, man.

[**P87] "Det Monroe: Anything else you want to say?

[**P88] "Jackson: (Inaudible) all I got to say, man, I didn't mean to do it, man. I mean, I mean, I'm sorry it happened.

[**P89] "* * *

[**P90] "Det Monroe: Well, there's, there's more here that we didn't get to.

[**P91] "Jackson: We, we just sum it up like I said, man, when, when I talk to my lawyer, man, you know what I'm saying. Other than that, man, you know, I mean."

[**P92] The interrogation continued a little longer and then stopped at 3:15 a.m., [***373] when Jackson said: "I have to go lay down, I don't want to, but shit, I got to, you know."

[**P93] _HN2_ Under the Fifth Amendment, an accused must clearly invoke his constitutional right to counsel in order to raise a claim of deprivation of counsel. "The suspect must unambiguously request counsel. * * * [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, _Edwards [v. Arizona_ (1981), 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378] does not require that the officers stop questioning the subject." _Davis v. United States_ (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362.

[**P94] Here, we find that Jackson's alleged request for counsel was neither clear nor unambiguous. In _State v. Henness_ (1997), 79 Ohio St.3d 53, 62-63, 1997 Ohio 405, 679 N.E.2d 686, we held that _HN3_ "I think I need a lawyer" is not an unequivocal assertion of the right to counsel. In _State v. Brown,_ 100 Ohio St.3d 51, 2003 Ohio 5059, 796 N.E.2d 506, P19, we held that "don't I supposed to have a lawyer present" was "at best ambiguous." Other courts have found similar remarks to be ambiguous and thus not invoking the constitutional right to counsel. See, e.g., _Mueller v._ [*310] _Angelone_ (C.A.4, 1999), 181 F.3d 557, 573-574 (defendant's question to police, "do you think I need an attorney here" answered by headshaking, a shrug, and the statement "You're just talking to us," was not an unequivocal request); _Dormire v. Wilkinson_ (C.A.8, 2001) 249 F.3d 801 ("Could I call my lawyer?" followed by police response of "yes" did not invoke the right to counsel); _United States v. Zamora_ (C.A. 10, 2000), 222 F.3d 756, 766 ("I might want to talk to an attorney" was not "an unequivocal request for counsel").

[**P95] Because Jackson's words "I talked to a lawyer or something" or "when I talk to my lawyer" did not amount to a clear, unambiguous, or unequivocal invocation of the right to counsel, the trial court did not abuse its discretion in overruling his motion to suppress.

[**P96] Nor did Jackson unequivocally assert his right to remain silent during questioning by the police detectives. In _Michigan v. Mosley_ (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, _HN4_ the United States Supreme Court held that once a suspect invokes the right to remain silent, police must cease questioning him. However, similar to the invocation of the right to counsel, invocation of the right to stop questioning must be honored by police only if it is unambiguous. _State v. Murphy_ (2001), 91 Ohio St.3d 516, 520, 2001 Ohio 112, 747 N.E.2d 765, citing _Davis v. United States,_ 512 U.S. at 461-462, 114 S.Ct. 2350, 129 L.Ed.2d 362. In _Murphy,_ we held that the statement "I'm ready to quit talking now and I'm ready to go home, too" was ambiguous and not a clear invocation of the right to remain silent. _Id._ at 519, 521, 747 N.E.2d 765.

[**P97]  Here, Jackson initially told the detective at the beginning of the videotaped interview, "I don't even like talking about it man * * * cause you know what I mean, it's fucked for me, man, * * * I told you * * * what happened, man, * * * I mean, I don't even want to, you know what I'm saying, discuss no more about it, man, you know, 'cause it ain't gonna, you know, it ain't gonna to bring, ain't gonna bring the man back."

[**P98]  Later, in the colloquy set forth above during which Jackson alleges that he invoked his right to counsel, he stated: "I don't even want to talk about it no [***374] more, man. I'm, I'm, I'm through with it, man," and then a few phrases later says: "And that's it. End of discussion, man." Those statements alone might suggest that Jackson invoked his right to remain silent; but between those statements Jackson said, "I ain't mean to do it, I'm sorry I did it, * * * but, I was left, I had no choice, man." Given his equivocation, it is unclear whether Jackson wanted to end the discussion by invoking his right to remain silent.

[**P99]  Although the police should have stopped their questioning once Jackson asserted, "And that's it. End of discussion," the statements Jackson made after this assertion did not add anything of any consequence or implicate him further.  [*311]  We find that the admission of the subsequent statements by Jackson was harmless error.

[**P100]  Thus, the trial court's finding that Jackson was properly advised of his *Miranda* rights and that he waived those rights is amply supported in the record. Jackson neither unequivocally nor unambiguously asserted his right to counsel. Any infringement of his right to remain silent during his custodial interrogation was nonprejudicial. Accordingly, we overrule proposition I.

TRIAL ISSUES

*Judicial Errors*

[**P101]  In proposition of law IV, Jackson asserts that four instances of error committed by the trial court denied him due process and a fair trial.

[**P102]  Two incidents cited by Jackson occurred during guilt-phase closing argument. First, Jackson complains that the prosecutor improperly accused defense counsel of creating a diversion, thereby implying that the defense was somehow lying or committing a fraud upon the court and jury. After an in-chambers conference regarding Jackson's objection to the prosecutor's characterization, the trial court failed to rule on the objection or issue a curative instruction.

[**P103]  However, after the defense objected, the trial court told the jury: "Please disregard this little exchange. It's not part of this case." Even if the prosecutor's diversion comment were improper, Jackson must also show he was prejudiced. *HN5* "Not every intemperate remark by counsel can be a basis for reversal." *State v. Landrum* (1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710. Defense counsel directly rebutted the prosecution's diversion accusation by stating during closing argument: "When he says * * * the defense is going to give you a diversion, he wants you to believe that I'm going to trick you somehow, okay. Well, I'm not going to trick you. You're smarter than that * * *." In our view, the trial court's failure to directly rule on the defense objection did not materially prejudice Jackson.

[**P104]  Second, Jackson argues that the trial court improperly allowed the prosecutor to theorize about the evidence. The prosecutor stated during closing argument that Donna Roberts "depended on Robert [Fingerhut] and she was not in a position to financially take on the relationship [with Jackson] and have the way of life she had been used to with this guy." The defense objection was overruled.

[**P105]  Nevertheless, *HN6* "the prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 2001 Ohio 4, 739 N.E.2d 749. Several witnesses testified to the upper-middle-class lifestyle Roberts and Fingerhut enjoyed.

In a letter to Jackson, Roberts complained that **[*312]** Fingerhut had begun restricting her spending and that she was not used to living that way. She wrote, "I am used to having plenty of cash for whatever I want and buying everything **[***375]** I want." The prosecutor's comments were fair inferences based on this evidence. See, e.g., _State v. Myers,_ 97 Ohio St.3d 335, 2002 Ohio 6658, 780 N.E.2d 186, P144. The trial court did not err in overruling defendant's objection, and Jackson does not demonstrate how he was prejudiced by the remarks.

**[**P106]** The third instance cited by Jackson took place during penalty-phase closing argument. Jackson complains that the prosecutor commented on the absence of a mitigating factor not raised by Jackson. Specifically, the prosecutor stated: "This lady [Jackson's expert psychologist] testified that there was no mental disease or defect, that mitigating factor does not exist in this case." Jackson's objection was essentially overruled by the trial court after a sidebar conference.

**[**P107]** The court erred here in permitting the prosecutor to argue the absence of a mitigating factor not raised by Jackson. _HN7_ Prosecutorial comment is appropriate only with regard to those factors actually offered in mitigation by defendant. _State v. DePew_ (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542; _State v. Mills_ (1992), 62 Ohio St.3d 357, 373, 582 N.E.2d 972.

**[**P108]** The state contends that the defense opened the door to the issue when the defense expert testified that Jackson had once tested at a 70 IQ. Although the prosecutor was entitled to minimize that evidence by emphasizing Jackson's mental abilities, it was misconduct to cast his comments explicitly in terms of the absence of a statutory mitigating factor. Nevertheless, we find that the prosecutor's comment was harmless error, given the overwhelming weight of the aggravating circumstances over the mitigating factors. See _State v. Dixon,_ 101 Ohio St.3d 328, 2004 Ohio 1585, 805 N.E.2d 1042, P90.

**[**P109]** Jackson also claims that error occurred during the testimony of prosecution witness Frank Reynolds, Fingerhut's former employee. Reynolds recalled overhearing a conversation between Fingerhut and Roberts the day before the murder. According to Reynolds, Roberts asked Fingerhut for $ 3,000, and when Fingerhut refused, she gave Fingerhut "the dirtiest look like it can kill a person."

**[**P110]** The defense objected on hearsay grounds. The trial court correctly overruled the defense objections. Roberts's request for money was not a statement as defined in Evid.R. 801(A), and thus Reynolds's testimony was not hearsay. _State v. Carter_ (1995), 72 Ohio St.3d 545, 1995 Ohio 104, 651 N.E.2d 965, paragraph two of the syllabus. Fingerhut's response was not offered for the truth of the matter asserted.

**[*313]** **[**P111]** Last, Jackson claims that cumulative errors by the trial court denied him a fair trial. We disagree. Jackson received a fair trial. Accordingly, we overrule proposition IV.

_Jury Instructions_

**[**P112]** In propositions of law V and VI, Jackson argues that he was prejudiced by the trial court's jury instructions on purpose and reasonable doubt.

**[**P113]** In proposition V, Jackson contends that the trial court's instruction on purpose relieved the state of its burden of proof on the mens rea element of a capital crime. He further asserts that the purpose instruction created a mandatory, rebuttable presumption of the mens rea element from the mere use of a deadly weapon.

**[**P114]** But Jackson's failure to object to the purpose instruction waived all but plain error. _State v. Underwood_ (1983), 3 Ohio St.3d 12, 13-14, 3 OBR 360, 444 N.E.2d 1332. This court has repeatedly **[***376]** rejected similar arguments. The trial court's instructions on mens rea, purpose, and causation were similar to the instructions this court

upheld in, e.g., _State v. Loza_ (1994), 71 Ohio St.3d 61, 80-81, 1994 Ohio 409, 641 N.E.2d 1082; and _State v. Taylor,_ 98 Ohio St.3d 27, 2002 Ohio 7017, 781 N.E.2d 72, P71-75. The instructions were therefore not plain error.

[**P115] In addition, Jackson's reliance on _State v. Wilson_ (1996), 74 Ohio St.3d 381, 393, 1996 Ohio 103, 659 N.E.2d 292, is misplaced. The instruction criticized there appears nowhere in any of the trial court's jury instructions on purpose.

[**P116] In proposition VI, Jackson complains that the trial court's reasonable-doubt instructions in both phases of the trial based on the language of R.C. 2901.05(D) were erroneous. Jackson's failure to object to either reasonable-doubt instruction waived all but plain error. _State v. Underwood,_ 3 Ohio St.3d at 13-14, 3 OBR 360, 444 N.E.2d 1332. This HN87 court has repeatedly upheld use of reasonable-doubt instructions based on the statutory language. E.g., _State v. Jenkins_ (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; _State v. Skatzes,_ 104 Ohio St. 3d 195, 2004 Ohio 6391, P65, 819 N.E.2d 215. Accordingly, proposition VI is overruled.

SENTENCING ISSUES

_Sentencing Opinion_

[**P117] In proposition of law VII, Jackson argues that the trial court, in its sentencing opinion, improperly weighed both R.C. 2929.04(A)(7) alternatives contrary to _State v. Penix_ (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, and in effect required mitigation to be justification.

[*314] [**P118] In contending that the trial court weighed both R.C. 2929.04(A)(7) alternatives (principal offender, prior calculation and design), Jackson points to the following passages in the court's sentencing opinion:

[**P119] "The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to [sic] rather to carry out the premeditated, cold blooded execution [of] Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. * * *

[**P120] "* * *

[**P121] "* * * From the overwhelming evidence, it is this Court's opinion that the Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $ 550,00[0].00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him."

[**P122] Jackson's arguments are not well taken. The jury found Jackson guilty of aggravated murder with prior calculation and design in count one. In count two, the jury found Jackson guilty of aggravated murder while committing aggravated burglary and aggravated robbery. The jury also found Jackson guilty of the two specifications attached to each count, and the (A)(7) alternatives were listed in the disjunctive.

[**P123] In its sentencing opinion, the trial court noted that the two counts had merged for sentencing purposes and that the state had elected to dismiss count two. The trial court, however, did not err in its opinion by referring to the murder as "premeditated" and "plotted," because the jury found in count one that Jackson murdered Fingerhut with prior calculation and design. Additionally, in its review of the jury's verdict on the specifications attached to the aggravated-murder counts, the trial court referred to the defendant as [***377] the principal offender and made no mention of "prior calculation and design." Although the trial court's commentary on the aggravated-burglary charge gives the appearance that it improperly weighed both R.C. 2929.04(A)(7) factors, in our independent review, we find that the trial court's ultimate decision was correct.

**[\*\*P124]** In this case, the evidence clearly established that Jackson was the actual killer of Fingerhut. See *State v. Yarbrough,* 95 Ohio St.3d 227, 2002 Ohio 2126, 767 N.E.2d 216, P168. Jackson admitted that he had killed Fingerhut, although he claimed self-defense. There is no merit to Jackson's contention that the trial court equated "mitigation" with "justification" in its sentencing opinion. Nothing in the sentencing opinion states this. The trial court specifically defined mitigating factors to the jury as "factors that while they do not justify or excuse the crimes of aggravated murder * * * shall be considered by you as extenuating lessening, weakening, excusing to some extent or reducing the degree of sentence. " **[\*315]** Thus, the trial court clearly understood that mitigating factors "do not justify or excuse" the offense.

*Appropriateness of the Sentence*

**[\*\*P125]** In proposition of law VIII, Jackson contends that his death sentence is inappropriate and disproportionate to the penalty imposed in similar cases. Jackson's arguments will be considered as part of our independent review of sentence.

*Proportionality Review*

**[\*\*P126]** In propositions of law IX and X, Jackson asserts that proportionality review in Ohio is fatally flawed under R.C. 2929.05 because only cases in which the death penalty has been imposed are used for comparison. Neither proposition has merit. *HN9* Proportionality review needs to entail only those cases in which the death sentence has been imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 123-124, 31 OBR 273, 509 N.E.2d 383; *State v. Jordan,* 101 Ohio St.3d 216, 2004 Ohio 783, 804 N.E.2d 1, P86.

EFFECTIVE ASSISTANCE OF COUNSEL

**[\*\*P127]** In proposition of law II, Jackson asserts that trial counsel rendered ineffective assistance. *HN10* Reversal of a conviction for ineffective assistance requires two showings. "First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. Proving prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. In no instance, however, does Jackson demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.

**[\*\*P128]** *Voir Dire.* Jackson first argues that defense counsel failed to object to what he characterizes as the prosecutor's "extraction of guilty verdict and death verdict promises from all twelve impaneled" jurors during voir dire, relying on *State v. Treesh* (2001), 90 Ohio St.3d 460, 465, 2001 Ohio 4, 739 N.E.2d 749. Yet" *HN11* "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Fears* (1999), 86 Ohio St.3d 329, 347, 1999 Ohio 111, 715 N.E.2d 136, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. This court will normally defer to defense counsel's judgment in voir dire and not find **[\*\*\*378]** ineffective assistance. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189. Like the prosecutor in *Treesh,* the prosecutor here asked potential jurors whether they would return a guilty verdict if the state **[\*316]** proved guilt beyond a reasonable doubt. There is nothing wrong with such questions, and *Treesh* does not hold otherwise.

**[\*\*P129]** All of the jurors Jackson mentions indicated that they could return either a death sentence or life sentence depending on whether the state proved its case beyond a reasonable doubt based on evidence presented at trial. Accordingly, we reject Jackson's claim of ineffective assistance in this regard.

**[\*\*P130]** Next, Jackson contends that counsel were ineffective by failing to object during voir dire to the prosecutor's use of only mental disease and age as examples of mitigating

factors. Jackson asserts that in limiting examples to these two, the prosecution predisposed most jurors who sat on the case to expect those mitigating factors during the penalty phase. Jackson relies on _State v. Jones_ (2001), 91 Ohio St.3d 335, 338, 2001 Ohio 57, 744 N.E.2d 1163, in which this court stated, [HN12] "During voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors." According to Jackson, _Jones_ stands for the proposition that it is improper to ask prospective jurors to weigh or consider specific mitigating factors during voir dire.

[**P131] Jackson's counsel were not ineffective for failing to object. Jackson misconstrues the _Jones_ holding. _Jones_ reiterated the proposition that a trial court does not err or abuse its discretion in refusing to allow attorneys to ask prospective jurors about specific mitigating factors. See _State v. Wilson,_ (1996), 74 Ohio St.3d 381, 386, 1996 Ohio 103, 659 N.E.2d 292. _Jones,_ however, does not prohibit attorneys from referring to specific mitigating factors as examples of mitigating evidence during voir dire questioning. A trial court does not abuse its discretion in allowing that type of question.

[**P132] Jackson also does not demonstrate how jurors were predisposed to expect mitigating factors that were not raised or did not apply. Whenever the prosecutor referred to specific mitigating factors during voir dire, he used them solely as a hypothetical and cautioned the individual prospective jurors that the factors being discussed did not necessarily apply to Jackson's case. Counsel's decision not to object to the prosecutor's use of specific mitigating factors in voir dire inquiries did not constitute deficient performance. Therefore, Jackson's arguments are not well taken.

[**P133] Jackson next argues that counsel were ineffective for not objecting to inappropriate statements and misconduct of the prosecutor that prejudiced and predisposed the jury to return guilty and death verdicts. Jackson cites six prosecutorial comments that he claims were inappropriate: (a) "The first trial deals with the state proving beyond a reasonable doubt, the Defendant committed aggravated murder"; (b) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?"; (c) "So we're dealing [*317] with charges where the person committed the crime, the Defendant is alleged of killing a homeowner"; (d) "in this case the aggravating circumstances accuse the Defendant of purposely killing a homeowner in the commission of an aggravated burglary"; (e) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the Defendant's guilt based only on the evidence, [***379] right?"; and (f) "In this case, the Defendant is charged with killing a home owner in an aggravated murder."

[**P134] None of the foregoing statements constituted prosecutorial misconduct, and counsel were not deficient in failing to object to any of them. Statement (a) is largely accurate, although a more complete statement would have referred to "the first trial" as the first phase or the guilt phase. Statement (b) was confusing and a misstatement because it was not limited to the situation in which the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. R.C. 2929.03(D)(2). Nevertheless, soon after this misstatement, the prosecutor correctly stated the state's burden of proof in the penalty phase.

[**P135] Statements (c), (d), and (f) are inaccurate because Fingerhut was not a homeowner, and homeowner status is not an element of any crime or specification that Jackson was charged with committing. Jackson's claims of prejudice, however, are not persuasive. Statement (e) was not improper in the context of the voir dire questioning concerning pretrial publicity. The prosecutor followed up this alleged prejudicial statement with "And that is why we ask the question, because if you come into Court believing the Defendant was guilty from prior publicity, you wouldn't be fair, right?"

[**P136] _Guilt phase._ Jackson next contends that counsel were deficient in fashioning a defense based on the fact that Roberts owned the house and car and that she had given Jackson permission to enter, thus supposedly negating the burglary and robbery charges.

[**P137]  Defense counsel unsuccessfully sought a jury instruction that would have provided that if the owner -- i.e., Roberts -- had given Jackson permission to enter the property or use the car, then there was no trespass. Jackson asserts that counsel were apparently unaware that such a defense to burglary and robbery was precluded, he claims, by decisions of this court. See *State v. Steffen*, 31 Ohio St.3d 111, 115, 31 OBR 273, 509 N.E.2d 383, and *State v. Rhodes* (1982), 2 Ohio St.3d 74, 2 OBR 629, 442 N.E.2d 1299.

[**P138]  However, counsel's decisions in this area were trial strategy. *HN13* This court ordinarily refrains from second-guessing strategic decisions counsel makes at trial, even when counsel's trial strategy was questionable. *State v. Clayton*, 62 Ohio St.2d at 49, 402 N.E.2d 1189. Given the abundant evidence of Jackson's guilt, counsel were left with few options in attempting to create reasonable doubt in the minds of the jury. Assuming that the jury could have found merit in the [*318]  defense claim that Jackson had killed Fingerhut in self-defense, the requested jury instruction would have been consistent with that defense. In any event, we find that counsel's pursuit of this strategy did not prejudice Jackson or affect the outcome of his trial.

[**P139]  Jackson next asserts ineffective assistance in defense counsel's failure to object to admission of letters allegedly written by Roberts to Jackson without requiring authentication of her writings as a predicate to admission. In contrast, Jackson points out, his letters to Roberts were admitted only after authentication of his authorship was established by testimony of a handwriting expert.

[**P140]  Detective Monroe did properly identify the letters pursuant to Evid.R. 901(A). Roberts told Monroe that she had written the letters. They were found in the trunk of Roberts's car in a bag with Jackson's name on it. They were signed "Donna Marie." They had a return address of a post office box registered to Roberts. Counsel were not ineffective in [***380]  failing to object to the admission of Roberts's letters to Jackson, for they were properly authenticated, and defense counsel used them as part of their trial strategy to bolster Jackson's claim of self-defense.

[**P141]  Finally, Jackson asserts that the cumulative effect of errors and omissions by trial counsel infringed his right to effective assistance of counsel. However, Jackson received a fair trial. Accordingly, proposition II is overruled.

PROSECUTORIAL MISCONDUCT

[**P142]  In proposition of law III, Jackson alleges ten instances of prosecutorial misconduct during trial. *HN14* Whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and, (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. This court will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.

[**P143]  ***Voir Dire.*** The first three instances cited by Jackson are the same as those he sets forth in proposition II, in which he claims that counsel were ineffective for failing to object. As was discussed under proposition II, we determine that the prosecutor did not improperly extract promises from prospective jurors to find guilt and vote for a death verdict. The prosecutor's questions during voir dire on life and death were not improper.

[*319]  [**P144]  Likewise, the prosecutor's use of two mitigating factors with prospective jurors to illustrate the weighing process was not improper. As we explained under proposition II, those examples were set forth as hypotheticals, and the trial court had discretion to allow them.

[**P145]  In addition, as we noted under proposition II, none of the alleged misstatements constituted prosecutorial misconduct. Even the statements that were not accurate did not prejudice Jackson's substantial rights.

[**P146]  *Guilt Phase.* In the fourth instance, Jackson complains that the prosecutor expanded his opening statement into argument at the beginning of the guilt phase. The prosecutor's opening statement was at times argumentative, and the prosecutor conceded at a sidebar conference that he should have prefaced his remarks by stating: "The evidence is gonna show * * *." Defense counsel objected and moved for a mistrial. Although the trial court overruled the motion, it immediately gave the jury a curative instruction, stating: "[T]he purpose for opening statements is to present what either side expects to show. * * * It is not proper to get into the realm of opinion on the opening statement. * * * So you should listen to what the State expects to show and disregard anything else that may have been said that might delve into the realm of opinion at this point." Because $^{HN15}$ we presume that the jury followed the court's instructions, *State v. Treesh,* 90 Ohio St.3d at 480, 739 N.E.2d 749, prejudice to Jackson is lacking.

[**P147]  In the fifth instance, Jackson contends that the prosecutor improperly solicited repetitive hearsay from Detective Monroe. While on direct examination, Monroe sometimes responded beyond the scope of the prosecutor's questions. Defense counsel complained about [***381] this behavior in chambers and moved for a mistrial. The court overruled the motion but agreed that defense counsel's concern was legitimate because Monroe was answering beyond the scope of the questions. The prosecutor was instructed by the court to talk to Monroe and tell him to limit his answers. On his allegation of repetitive hearsay, Jackson does not provide specific instances. He also does not show how the prosecutor's direct examination of Monroe prejudiced his substantial rights.

[**P148]  The sixth instance raised by Jackson is the prosecutor's characterization during guilt-phase closing argument of the defense's interpretation of evidence as a diversion. However, as we noted under proposition IV, even if it is assumed that the prosecutor's comment was improper, prejudice to Jackson is lacking. "Not every intemperate remark by counsel can be a basis for reversal." *State v. Landrum,* 53 Ohio St.3d at 112, 559 N.E.2d 710. Even without the prosecutor's remark, the jury would have found Jackson guilty, given the overwhelming evidence of guilt. See *State v. Maurer,* 15 Ohio St.3d 239, 267, 15 OBR 379, 473 N.E.2d 768.

[*320]  [**P149]  Jackson alleges in his seventh instance that the prosecutor argued facts not in evidence. He cites these comments of the prosecutor during the closing argument: "She [Donna Roberts] had the ability to walk out of the relationship with her significant other. There wasn't a marriage; there was a divorce. And she had legal title to cars, legal title to the home, she had everything. But we will go into when you read and listen to the evidence that she depended on Robert and she was not in a position to financially take on the relationship and have the way of life she had been used to with this guy." The defense's objection was overruled.

[**P150]  As we noted under proposition IV, these comments were fair inferences that the jury could adopt based on the evidence and testimony. See, e.g., *State v. Myers,* 97 Ohio St.3d 335, 2002 Ohio 6658, 780 N.E.2d 186, P144.

[**P151]  In the eighth instance, Jackson argues that the prosecutor improperly theorized about the evidence during rebuttal guilt-phase closing argument. The prosecutor stated:

[**P152]  "What happened? Well, I don't know for certain, but I think what the evidence is going to disclose is here is what happened. This man and Donna Roberts plotted the murder and what their plan was was to go to the house and when Robert Fingerhut got home pull a gun on Robert Fingerhut, handcuff him and forcibly take him from the house at 254 Fonderlac, take him down to Youngstown and execute him in Youngstown and leave the car there. That was the plan."

**[\*\*P153]** The defense's objection was overruled.

**[\*\*P154]** *HN16* Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence. *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 1992 Ohio 44, 595 N.E.2d 915, overruled on other grounds, *State v. McGuire* (1997), 80 Ohio St.3d 390, 402-404, 1997 Ohio 335, 686 N.E.2d 1112. A prosecutor may state his or her opinion if it is based on the evidence presented at trial. See, e.g., *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674.

**[\*\*P155]** We find in Jackson's case that the prosecutor's theory was based on the evidence at trial. In his letter to Roberts dated October 30, 2001, Jackson asked Roberts to obtain for him leather gloves, a ski mask, and handcuffs. Detective Monroe found an empty handcuffs box in the trunk of Roberts's car shortly after the **[\*\*\*382]** murder. In a recorded phone conversation the day before his release from prison, Jackson assures Roberts, "Baby it ain't gonna happen in the house. It ain't gonna happen in the house man, I promise you. * * * I just need to be in there man. It ain't gonna happen in the house man."

**[\*321]** **[\*\*P156]** In our view, the prosecutors' comments were fair inferences based on the evidence at trial and therefore were not improper. There is also no showing that the comments prejudiced Jackson's substantial rights.

**[\*\*P157]** *Penalty Phase.* In Jackson's ninth alleged instance, the prosecutor improperly argued during penalty-phase closing argument that Jackson had no mental disease or defect, a mitigating factor not raised by the defense.

**[\*\*P158]** As we discussed under proposition IV, the prosecutor erred in arguing the absence of a mitigating factor not raised by defendant. Prosecutorial comment is appropriate only about those factors actually offered in mitigation by defendant. See, e.g., *State v. Mills,* 62 Ohio St.3d at 373, 582 N.E.2d 972. Nevertheless, the comment was harmless error.

**[\*\*P159]** Jackson claims in the tenth instance that the prosecutor improperly referred to the homicide as a "cold blooded psychopathic killing." The defense objected, and the trial court sustained the objection, instructing the jury to disregard the comment. In instructing in this way, the trial court ameliorated any error. See *State v. Wilson* (1972), 30 Ohio St.2d 199, 204, 59 O.O.2d 220, 283 N.E.2d 632.

**[\*\*P160]** Last, Jackson's claim that the cumulative effect of misconduct by the prosecutor during both phases of trial deprived him of a fair trial lacks merit. We believe that Jackson received a fair trial, and any error was either harmless or curable by our independent review of his sentence. *HN17* "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill,* 75 Ohio St.3d 195, 212, 1996 Ohio 222, 661 N.E.2d 1068. Furthermore, it is clear beyond a reasonable doubt that the jury would have found Jackson guilty even without the alleged improper comments. *State v. Treesh,* 90 Ohio St.3d at 464, 739 N.E.2d 749. Accordingly, proposition III is rejected.

CONSTITUTIONALITY

**[\*\*P161]** In propositions of law XI and XII, Jackson challenges Ohio's death-penalty statutes on numerous constitutional grounds and concedes that many of his constitutional claims have been rejected by this court in a number of cases. We summarily reject all of Jackson's constitutional claims. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. McNeill* (1998), 83 Ohio St.3d 438, 1998 Ohio 293, 700 N.E.2d 596; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 1999 Ohio 283, 709 N.E.2d 484; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

INDEPENDENT REVIEW AND PROPORTIONALITY

*Aggravating Circumstances*

**[\*\*P162]** Upon our independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstances in this case: that Nathaniel **[\*322]** Jackson murdered Robert Fingerhut while committing aggravated burglary and aggravated robbery.

*Mitigating Evidence*

**[\*\*P163]** In the penalty phase, Jackson presented five witnesses and gave an unsworn statement.

**[\*\*P164]** **[\*\*\*383]** Raymond Dickerson, Jackson's stepfather, has known Jackson since Jackson was 15 years old. He testified that Jackson was respectful to him and to Jackson's mother and grandmother. Dickerson noted that he did not see much of Jackson after Jackson turned 17 years old.

**[\*\*P165]** Taushia Korneagay, Jackson's sister, stated that Jackson was kind and treated her well and did a lot for her. Korneagay noted that Jackson helped her in many ways with her four children. She said that she wanted the jury to spare Jackson's life.

**[\*\*P166]** Lorraine Rue, the mother of Jackson's daughter, Shaylese, and Shaylese herself, a second-grader, appeared on the witness stand together. Rue testified that Jackson had visited Shaylese in the past and had brought her toys.

**[\*\*P167]** Pauline Korneagay, Jackson's mother, briefly described Jackson's upbringing and stated that Jackson did "pretty good" in school. She answered "no" when asked whether Jackson had grown up in a rough neighborhood. She did not remember Jackson's being shot while in school, or that she had written a letter to excuse him from school for that reason. Pauline said that she keeps in touch with Jackson.

**[\*\*P168]** Dr. Sandra McPherson, a clinical and forensic psychologist, was the principal mitigation witness. Dr. McPherson interviewed Jackson, reviewed his school and other records, and submitted a report on her findings. She noted that Jackson's father had little, if any, involvement with his son and that Jackson grew up under the care of his mother and maternal grandmother. According to Dr. McPherson, Jackson exhibited serious behavioral problems from the first grade on, "which is fairly unusual." By third grade, Jackson had already been suspended from school because of his behavioral difficulties.

**[\*\*P169]** Dr. McPherson observed that Jackson's school record reflected an attention-deficit hyperactivity disorder ("ADHD") characterized by impulsiveness and an inability to stop his behavior. Jackson was never put in any kind of structured program to deal with his ADHD until the eighth grade, the only time Jackson recalled liking school.

**[\*\*P170]** Jackson began using alcohol and drugs early in life, but does not seem to have developed a primary alcohol dependency. He began using marijuana at around age 13 and quickly became dependent on it. He also used cocaine to **[\*323]** some degree. Jackson never used other serious drugs. Nevertheless, Dr. McPherson noted that Jackson's repeated involvement in crimes as an adult was mostly related to his drug habit.

**[\*\*P171]** Dr. McPherson said that Jackson had worked very little in his life. His longest period of work was about six months, and he never worked fulltime. Jackson dropped out of school in the 11th grade and decided to live independently of his mother. His idea of independence was to live on the streets. Jackson has been shot at least four times. Even before he dropped out of school, Jackson had been a target of gunfire. Dr. McPherson testified that Jackson's school records indicate that his mother had once sent a note to school to excuse Jackson because he had been shot at and had to make a police report.

**[\*\*P172]** Jackson has fathered two children, but has never been in a position to assume parental responsibilities. One of the children has cerebral palsy, and the mother's family does

not allow Jackson any contact with the child.

[**P173] Dr. McPherson administered several tests to Jackson. Although Jackson's [***384] IQ had twice been tested at 70 in grade school, a more recent test put him at a full-scale IQ of 84. Dr. McPherson attributed the difference in scores to the fact that Jackson had not been motivated to cooperate when he took the test in school and that he did better under the more structured environment of prison. Taking into account Jackson's minimal education, Dr. McPherson believes him to be of average ability. She noted that Jackson possesses some artistic talent.

[**P174] Jackson suffers from an antisocial personality disorder, but has shown the capacity to be loyal to those within his own group. According to Dr. McPherson, Jackson displayed loyalty to Roberts and did not try to avoid responsibility and blame the murder on her. Dr. McPherson testified that Jackson does have the ability to get along with other people and has done well in the structured environment of prison. Dr. McPherson opined that as far as Jackson's future behavior was concerned, he would function best in a prison environment.

[**P175] Dr. McPherson described Jackson's relationship with Donna Roberts as "very destructive." She stated that Jackson is very insecure and received a certain amount of reassurance in his relationship with Roberts, which made him feel like somebody special. According to Dr. McPherson, Jackson felt that his life would be more stable with Roberts.

[**P176] Jackson gave an unsworn statement in which he stated: "I would like to apologize for what happened to the victim. I am very sorry for what happened and I know by me saying sorry ain't going to bring his life back. This is something I have to live with for the rest of my life, and also like for my daughter, to know that she still has a father that is alive and I would like to see her grow up."

[*324] *Sentence Evaluation*

[**P177] The nature and circumstances of the offense offer nothing in mitigation. Jackson, with the aid and support of Roberts, planned to murder Fingerhut to get him out of the way and reap the insurance proceeds Roberts would obtain from Fingerhut's death. In correspondence and phone conversations, Jackson assured Roberts that the murder was something he had to do and that he had it all figured out. Jackson murdered Fingerhut in his home and then fled the scene in Fingerhut's car. Jackson's self-defense claim lacks credibility in light of all the evidence.

[**P178] Jackson's history, character, and background offer some mitigating features. His father was never part of his life, and he suffered from behavioral problems in school, mostly because of his ADHD. Although Jackson's mother denied that Jackson had grown up in a rough neighborhood, the school records and evaluation by Dr. McPherson indicate otherwise. Jackson's drug dependency was fueled by his involvement in crime, which consisted mostly of burglaries.

[**P179] Jackson appears to have the love and support of his family. He indicated in his unsworn statement that he cares about his daughter. Dr. McPherson testified that despite his problems, Jackson has also displayed loyalty -- sometimes, as in his relationship to Roberts, to his detriment.

[**P180] With respect to the statutory mitigating factors of R.C. 2929.04(B), none appear applicable except for "other mitigating factors" under (B)(7). Although Jackson claimed that Fingerhut pulled a gun on him, thus forcing him to kill Fingerhut in self-defense, the factor of victim-inducement under (B)(1) is not implicated because the claim of self-defense lacks any [***385] credibility under the evidence. Likewise, there is no credible evidence of the factor of victim provocation under (B)(2). Jackson's mitigation expert dispelled any claim that he suffers from a mental disease or defect, the factor under (B)(3). Since Jackson was 29 years old at the time of the homicide, the youthful-offender factor under (B)(4) does not apply. There is no mitigation in the factor of a clean record under (B)(5), for Jackson had a

history of prior criminal convictions. Finally, since Jackson was the principal offender in the murder, the factor of being an accomplice rather than the principal offender under (B)(6) does not apply.

**[\*\*P181]** Under R.C. 2929.04(B)(7), Jackson's ADHD and antisocial personality disorder deserve some weight in mitigation, as well as his ability to overcome his ADHD and adaption to the structured setting of prison. See *State v. Scott,* 101 Ohio St.3d 31, 2004 Ohio 10, 800 N.E.2d 1133, P106.

**[\*\*P182]** On the other hand, Jackson's expression of remorse "for what happened to the victim" deserves little weight in mitigation. See *State v. Bryan,* 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433, P226.

**[\*325] [\*\*P183]** Upon independent weighing, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Jackson murdered Fingerhut during a burglary and stole his car. These were the aggravating circumstances that merit imposition of the capital penalty. Those were weighed against the mitigating evidence found in the nature and circumstances of the offense, Jackson's history, character, and background, and the statutory factors of R.C. 2929.04(B). We find that the aggravating circumstances of this case outweigh the minimal mitigating factors.

**[\*\*P184]** We further find that the death penalty is both appropriate and proportionate when compared with capital cases also involving aggravated murder during aggravated burglary, see *State v. Davie* (1997), 80 Ohio St.3d 311, 1997 Ohio 341, 686 N.E.2d 245, and aggravated murder during aggravated robbery, see *State v. Burke* (1995), 73 Ohio St.3d 399, 1995 Ohio 290, 653 N.E.2d 242; *State v. Raglin* (1998), 83 Ohio St.3d 253, 1998 Ohio 110, 699 N.E.2d 482.

**[\*\*P185]** We therefore affirm the convictions and sentences, including the death sentence.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

Service:   **Get by LEXSEE®**
Citation:  **107 Ohio St. 3d 300**
View:      Full
Date/Time: Friday, April 20, 2007 - 10:25 AM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®      About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

ON COMPUTER-KMR

FILED

# The Supreme Court of Ohio

## 103-001

JAN 0 4 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio

v.

Nathaniel E. Jackson

Case No. 03-137

JUDGMENT ENTRY

APPEAL FROM THE
COURT OF COMMON PLEAS

This cause, here on appeal from the Court of Common Pleas for Trumbull County, was considered in the manner prescribed by law.  On consideration thereof, the judgment of the court of common pleas is affirmed consistent with the opinion rendered herein.

Furthermore, it appearing to the Court that the date heretofore fixed for the execution of judgment and sentence of the court of common pleas has passed,

IT IS HEREBY ORDERED by the Court that said sentence be carried into execution by the Warden of the Southern Ohio Correctional Facility or, in his absence, by the Deputy Warden on Tuesday, the 4th day of April, 2006, in accordance with the statutes so provided.

IT IS FURTHER ORDERED that a certified copy of this entry and a warrant under the seal of this Court be duly certified to the Warden of the Southern Ohio Correctional Facility and that said Warden shall make due return thereof to the Clerk of the Court of Common Pleas for Trumbull County.

It is further ordered that a mandate be sent to the Court of Common Pleas for Trumbull County to carry this judgment into execution: and that a copy of this entry be certified to the Clerk of the Court of Common Pleas for Trumbull County for entry.

(Trumbull County Court of Common Pleas; No. 01CR794)

THOMAS J. MOYER
Chief Justice

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

     Plaintiff-Appellee               :

-vs-                                          :        Case No.  03-137

NATHANIEL E. JACKSON              :        **THIS IS A DEATH PENALTY CASE**

     Defendant-Appellant.

---

## RANDALL L. PORTER'S NOTICE OF SUBSTITUTION OF COUNSEL

---

DAVID H. BODIKER
Ohio Public Defender

RANDALL l. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 752-9215 (Voice)
(614) 644-0703 (Facsimile)

DENNIS WATKINS  - 0009949
Trumbull Count Prosecuting Attorney

LUWAYNE ANNOS - 0055651

COUNSEL FOR NATHANIEL  JACKSON

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor Administration Building
Warren, Ohio  44481
(330)- 675-2426 (Voice)

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

     Plaintiff-Appellee          :

-vs-                                    :        Case No.  03-137

NATHANIEL  JACKSON                      :        **THIS IS A DEATH PENALTY CASE**

     Defendant-Appellant.

---

## RANDALL L. PORTER'S NOTICE OF SUBSTITUTION OF COUNSEL

---

Assistant State Public Defender Randall L. Porter provides this Notice of Appearance and  his substitution for Attorneys Dennis Day Lager and John Paul Laczko, who previously represented Nathaniel E. Jackson on his direct appeal before this Court.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL l. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 752-9215 (Voice)
(614) 644-0703 (Facsimile)
COUNSEL FOR NATHANIEL JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel E. Jackson's Notice of Substitution of Counsel was forwarded by regular U.S. Mail to Dennis Watkins, Trumbull Count Prosecuting Attorney and Luwayne Annos Assistant Prosecution Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building Warren, Ohio 44481; Dennis Day Lagar, 209 Chestnut Street, Suite 400, Ravenna, Ohio 44266; and John Paul Laczko, 4800 Market Street, Suite C, Youngstown, Ohio  44512  on this ____ day of January , 2006.

RANDALL L. PORTER
Counsel For Nathaniel E. Jackson

IN THE SUPREME COURT OF OHIO

ORIGINAL
ON COMPUTER - TAI

STATE OF OHIO,                              :

    Plaintiff-Appellee                    :

-vs-                                        :        Case No.  03-137

NATHANIEL E. JACKSON                        :        **THIS IS A DEATH PENALTY CASE**

    Defendant-Appellant.

---

# NATHANIEL E. JACKSON'S MOTION FOR A STAY OF EXECUTION PENDING EXHAUSTION OF STATE POST-CONVICTION REMEDIES

---

DAVID H. BODIKER
Ohio Public Defender

RANDALL l. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 752-9215 (Voice)
(614) 644-0703 (Facsimile)

DENNIS WATKINS  - 0009949
Trumbull Count Prosecuting Attorney

LUWAYNE ANNOS - 0055651

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor Administration Building
Warren, Ohio  44481
(330)- 675-2426 (Voice)

COUNSEL FOR NATHANIEL  JACKSON

JAN 1 9 2005

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                           :

     Plaintiff-Appellee                 :

-vs-                                     :        Case No.  03-137

NATHANIEL  JACKSON                       :        **THIS IS A DEATH PENALTY CASE**

     Defendant-Appellant.

---

## NATHANIEL E. JACKSON'S MOTION FOR A STAY OF EXECUTION PENDING EXHAUSTION OF STATE POST-CONVICTION REMEDIES

---

Now comes Nathaniel E. Jackson, and moves this Court for a stay of execution pending exhaustion of his state post-conviction remedies.  A post-conviction appeal is pending in the Court of Appeals, Eleventh Appellate District, Trumbull County, Ohio, and a stay of execution is necessary to complete the post-conviction process.  Nathaniel Jackson has attached a Memorandum of Law and incorporates that by reference.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 466-5394
FAX - (614) 728-3670
COUNSEL FOR NATHANIEL JACKSON

## MEMORANDUM IN SUPPORT

Nathaniel Jackson was convicted of Aggravated Murder and sentenced to death. On January 5, 2004, he timely filed his post-conviction petition in the Trumbull County Court of Common Pleas, Case Number 01-CR-794. On June 14, 2004, the trial court denied the amended post-conviction petition.

Subsequently, on July 12, 2004, Nathaniel Jackson filed his post-conviction appeal with the Court of Appeals, Eleventh Appellate District, Trumbull County, Ohio, Case Number 2004 –TR- 89. The parties have completed their briefing and that Court has entertained oral argument.

On January 4, 2006, the Court affirmed on direct appeal Nathaniel Jackson's convictions and death sentence. *State v. Jackson* 107 Ohio St. 3d 300, 2006 Ohio 1 (2006). The Court *sua sponte* set an execution date of April 4, 2006.

Nathaniel E. Jackson now moves this Court for a stay of execution. A stay of execution is necessary so that the Court of Appeals may decide his appeal from the trial court's denial of his post-conviction petition and, if necessary, that this Court may consider an appeal from the judgment of the Court of Appeals. Capital defendants are "entitled to … review before paying the ultimate penalty. The right of review is otherwise rendered utterly meaningless." *McDonald v. Missouri*, 464 U.S. 1306, 1307 (1984)(Blackmun, J., Circuit Justice). Pursuant to previous decisions of this Court, a capital defendant is entitled to a stay of execution until he has completed at least one round of post-conviction review. *State v. Steffen*, 70 Ohio St.3d 399, 412 (1994); *State v. Glenn*, 33 Ohio St.3d 601 (1987). As set forth above, Nathaniel E. Jackson has not completed his first post-conviction review of his conviction and sentence.

WHEREFORE, based on the foregoing legal authorities, Nathaniel E. Jackson respectfully requests that this Court stay his execution date so that he may exhaust his state post-conviction remedies.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 752-9215 (Voice)
(614) 728-3670 (Facsimile)

COUNSEL FOR NATHANIEL E. JACKSON

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel E. Jackson's Motion For A Stay Of Execution Pending Exhaustion Of State Post-Conviction Remedies was forwarded by regular U.S. Mail to Dennis Watkins, Trumbull Count Prosecuting Attorney and Luwayne Annos Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building Warren, Ohio  44481 on this _____ day of January , 2006.

RANDALL L. PORTER
Counsel For Nathaniel E. Jackson

**ON COMPUTER-VJC**

## The Supreme Court of Ohio

## 103-032

FILED

JAN 24 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio

v.

Case No. 03-137

E N T R Y

Nathaniel E. Jackson

    This cause came on for further consideration of appellant's motion for stay of execution scheduled for April 4, 2006.  Upon consideration thereof,

    IT IS ORDERED by the Court that the motion for stay is granted.

    IT IS FURTHER ORDERED that this stay shall remain in effect until exhaustion of all state postconviction proceedings, including any appeals.

    IT IS FURTHER ORDERED that counsel for appellant and for the appellee shall notify this Court when all proceedings for postconviction relief before the courts of this state have been exhausted.

(Trumbull County Court of Common Pleas: No. 01CR794)

THOMAS J. MOYER
Chief Justice

# SUPREME COURT OF OHIO
## MOTION, ENTRY, AND CERTIFICATION FOR APPOINTED COUNSEL FEES

State of Ohio,
Plaintiff

V.

Nathaniel E. Jackson
Defendant

FEB 16 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

ORIGINAL

Supreme Court No. __03-137__

Appeals Court No. _____

Trial Court No. __01-CR-794__

ON COMPUTER-RV

---

## MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES

The undersigned, having been previously appointed counsel for the defendant for the appeal to this court, as evidenced by the attached entry of appointment, now moves for an order approving payment of fees earned and expenses incurred as reflected by the itemized statement of the reverse hereof, pursuant to R.C. 2941.51.

| | IN COURT | OUT OF COURT | | |
|---|---|---|---|---|
| Hours Worked: | 1.00 | 297.90 | Expenses (if any): | $ 149.82 |

O.R.C. charge section number, name and classification

A.
R.C. 2903.01(A) and (B) Aggravated Murder, Unclassified

B.
R.C. 2929.04(A)(7) Capital Specification

C.

| SUPREME COURT DECISION | TERMINATION DATE |
|---|---|
| Judgment of Trumbull County Court of Common Pleas affirmed; death sentence to be carried into execution. | January 4, 2006 |

| ATTORNEY'S NAME | SOC. SEC. NO. | ATTORNEY'S SIGNATURE |
|---|---|---|
| Dennis Day Lager | 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 | |

| ATTORNEY'S ADDRESS | NUMBER AND STREET | CITY | STATE | ZIP |
|---|---|---|---|---|
| 1025 Chapel Ridge St. N.E., Canton, OH 44714 | | | | |

---

INFORMATION BELOW TO BE COMPLETED BY SUPREME COURT AND COUNTY AUDITOR ONLY

## JUDGMENT ENTRY

This court finds that counsel performed the legal services set forth in the itemized statement on the reverse hereof, and that the fees and expenses hereinafter approved are reasonable. IT IS THEREFORE ORDERED that appointed counsel fees are approved in the sum of $ _____ and expense in the sum of $ __SEE ATTACHED ENTRY__ for a total allowance of $ _____, which amount is ordered certified to the __ATTACHED ENTRY__ County Auditor for payment.

SEE ATTACHED ENTRY

CHIEF JUSTICE

## CERTIFICATION

The County Auditor, in executing this certification, attests to the accuracy of the figures contained herein. A subsequent audit by the Ohio Public Defender Commission and/or Auditor of the State which reveals unallowable or excessive costs may result in future adjustments against reimbursement or repayment of audit exceptions to the Ohio Public Defender Commission.

| COUNTY NUMBER | WARRANT NUMBER | WARRANT DATE |
|---|---|---|
| | | |

COUNTY AUDITOR

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio

| DATE | ACTIVITY | TOTAL TIME |
|------|----------|-----------|
| 01/10/03 | Review of letter by Hon. John M. Stuard to Supreme Court requesting expedited appointment of Attorney Lager as appellate counsel in captioned case. | .10 hrs. |
| 01/21/03 | Review of notice of appeal and attachments in captioned cause | .50 hrs. |
| 02/06/03 | Preparation of acceptance of appointment form; drafting and mailing of letter to Judge John Stuard enclosing appointment form | 1.00 hrs. |
| 03/11/03 | Review of draft of motion for extension of time to file record | .20 hrs. |
| 03/12/03 | Review of letter to client re: preparation of appeal | .20 hrs. |
| 03/14/03 | Phone conference with co-counsel re: completion of motion for extension of time to file record | .40 hrs. |
| 03/17/03 | Review of letter and motions from co-counsel re: extension of time to file record; execution of same; mailing of motions to Supreme Court for filing | 1.00 hrs. |
| 03/20/03 | Phone conference with co-counsel re: filing of motions | .30 hrs. |
| 03/24/03 | Review of Supreme Court entry extending time to transmit record on appeal to May 5, 2003 | .10 hrs. |
| 03/25/03 | Review of letter from client re: appeal | .20 hrs. |
| 03/27/03 | Facsimile transmission of extension of time to file record on appeal and client letter dated March 22, 2003, to Attorney Randall Porter, Ohio Public Defender's Office, counsel for client re: post-conviction relief | .50 hrs. |
| 03/27/03 | Review of facsimile transmission from Attorney Randall Porter re: letter from client to Attorney Randall Porter | .20 hrs. |
| 05/12/03 | Review of Supreme Court entry extending time to transmit record on appeal to July 7, 2003 | .10 hrs. |
| 05/13/03 | Facsimile transmission of second extension of time to file record on appeal to Attorney Randall Porter, Ohio Public Defender's Office, counsel for client re: post-conviction relief | .50 hrs. |
| 07/11/03 | Review of letter from Rita A. Nash, Senior Deputy Clerk, Supreme Court of Ohio, re: filing of record on appeal on July 9, 2003 | .10 hrs. |
| | **Sub-total hours preparatory to transmission of record** | **5.40 hrs.** |
| 07/19/03 | Commence reading and highlighting of sixteen volume 3,845 page transcript | 3.00 hrs. |
| 07/20/03 | Continued reading and highlighting of transcript | 4.00 hrs. |
| 07/22/03 | Continued reading and highlighting of transcript | 2.50 hrs. |
| 07/24/03 | Continued reading and highlighting of transcript | 2.50 hrs. |
| 07/26/03 | Continued reading and highlighting of transcript | 3.00 hrs. |
| 07/27/03 | Continued reading and highlighting of transcript | 4.00 hrs. |
| 08/02/03 | Continued reading and highlighting of transcript | 3.00 hrs. |
| 08/03/03 | Continued reading and highlighting of transcript | 4.00 hrs. |
| 08/05/03 | Continued reading and highlighting of transcript | 2.00 hrs. |
| 08/07/03 | Continued reading and highlighting of transcript | 2.00 hrs. |
| 08/09/03 | Continued reading and highlighting of transcript | 3.00 hrs. |
| 08/10/03 | Continued reading and highlighting of transcript | 3.00 hrs. |
| 08/12/03 | Continued reading and highlighting of transcript | 2.00 hrs. |
| 08/14/03 | Continued reading and highlighting of transcript/finish | 2.00 hrs. |
| | **Sub-total hours reading and highlighting sixteen volume 3,845 page transcript** | **40.00 hrs.** |
| 08/16/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 3.00  hrs. |
| 08/17/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 3.00 hrs. |
| 08/19/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 08/20/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.50 hrs. |
| 08/21/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 08/23/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 3.00 hrs. |
| 08/24/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 3.00 hrs. |
| 08/25/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 08/26/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.50 hrs. |
| 08/27/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 08/28/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 08/30/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 5.00 hrs. |
| 08/31/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 5.00 hrs. |
| 09/02/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 09/03/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 00/04/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.50 hrs. |
| 09/05/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 09/06/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 5.00 hrs. |

| Date | Description | Hours |
|---|---|---|
| 09/07/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 5.00 hrs. |
| 09/09/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.00 hrs. |
| 09/11/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 2.50 hrs. |
| 09/13/03 | Reading highlights and Indexing transcript preparatory to drafting brief | 3.00 hrs. |
| 09/14/03 | Reading highlights and Indexing transcript preparatory to drafting brief/finish | 3.00 hrs. |
| | **Sub-total hours reading highlights and indexing 16 volume 3,845 page transcript** | **66.00 hrs.** |
| 09/18/03 | Commence drafting merit brief's statement of facts | 4.00 hrs. |
| 09/19/03 | Continued drafting of merit brief's statement of facts | 4.50 hrs. |
| 09/20/03 | Continued drafting of merit brief's statement of facts | 4.00 hrs. |
| 09/21/03 | Continued drafting of merit brief's statement of facts/finish | 4.00 hrs. |
| | **Sub-total hours drafting merit brief's statement of facts with 70 citations to record** | **16.50 hrs.** |
| 09/22/03 | Commencing research of case law re: ineffective assistance of counsel – assignment of error two | 2.50 hrs. |
| 09/23/03 | Continued research of case law re: ineffective assistance of counsel  - assignment of error two | 2.00 hrs. |
| 09/23/03 | Continued research of case law re: ineffective assistance of counsel – assignment of error two | 2.00 hrs. |
| 09/24/03 | Continued research of case law re: ineffective assistance of counsel – assignment of error two | 2.00 hrs. |
| 09/26/03 | Continued research of case law re: ineffective assistance of counsel  - assignment of error two | 2.00 hrs. |
| 09/27/03 | Continued research of case law re: ineffective assistance of counsel  - assignment of error two | 8.00 hrs. |
| 09/28/03 | Completion of research of case law re: ineffective assistance of counsel – assignment of error two | 2.00 hrs. |
| | **Sub-total hours of research re: ineffective assistance of counsel resulting in twenty-one discovered cases relevant to assignment of error** | **20.50 hrs.** |
| 09/30/03 | Commence drafting of assignment of error  two re: ineffective assistance of counsel | 2.50 hrs. |
| 10/01/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 2.00 hrs. |
| 10/02/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 2.50 hrs. |
| 10/03/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 2.00 hrs. |
| 10/04/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 8.00 hrs. |
| 10/05/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 6.00 hrs. |
| 10/06/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 4.00 hrs. |
| 10/07/03 | Continued drafting of assignment of error two re:   ineffective assistance of counsel | 8.00 hrs. |
| | **Sub-total hours of drafting assignment of error two re: ineffective assistance of counsel, consisting of ten drafted pages, twenty-one case citations and sixty-three citations to record** | **35.00 hrs.** |
| 10/09/03 | Commencing research of case law re: prosecutorial misconduct -  assignment of error three | 2.00 hrs. |
| 10/10/03 | Continued research of case law re: prosecutorial misconduct – assignment of error three | 2.50 hrs. |
| 10/11/03 | Continued research of case law re: prosecutorial misconduct – assignment of error three | 8.00 hrs. |
| 10/12/03 | Continued research of case law re: prosecutorial misconduct – assignment of error three | 8.00 hrs. |
| 10/13/03 | Continued research of case law re: prosecutorial misconduct – assignment of error three/finish | 4.00 hrs. |
| | **Sub-total hours of research re: prosecutorial misconduct resulting in twenty-two discovered cases to assignment of error** | **24.50 hrs.** |
| 10/14/03 | Commence drafting of assignment of error three re: prosecutorial misconduct | 3.00 hrs. |
| 10/15/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct | 3.00 hrs. |
| 10/16/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct | 2.50 hrs. |
| 10/16/03 | Travel to Warren, Ohio, to review records and discuss case with trial counsel of record | 4.00 hrs. |
| 10/17/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct | 4.00 hrs. |
| 10/18/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct | 10.00 hrs. |
| 10/19/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct | 8.00 hrs. |
| 10/20/03 | Continued drafting of assignment of error three  re: prosecutorial misconduct/finish | 3.00 hrs. |
| | **Sub-total hours of drafting assignment of error three re: prosecutorial misconduct, consisting of fifteen drafted pages, twenty-two case citations and forty-six citations to record** | **37.50 hrs.** |
| 10/21/03 | Commence drafting of assignment of error four  re: improper admission of evidence by trial court | 3.00 hrs. |
| 10/22/03 | Continued drafting of assignment of error four re: improper admission of evidence by trial court | 3.00 hrs. |
| 10/23/03 | Continued drafting of assignment of error four re: improper admission of evidence by trial court | 2.00 hrs. |
| 10/24/03 | Continued drafting of assignment of error four re: improper admission of evidence by trial court/finish | 4.00 hrs. |
| | **Sub-total hours of drafting assignment of error four re: improper admission  of evidence by trial court, consisting of five drafted pages and thirty-four citations  to record** | **12.00 hrs.** |
| 10/26/03 | Meeting with   co-counsel re: marriage of drafted statement of facts, table of contents, table of authorities, assignments of error, assembly of brief and copying | 12.00 hrs. |
| 10/27/03 | Roundtrip travel from Canton, Ohio to Columbus, Ohio for filing brief | 7.00 hrs. |
| 10/28/03 | Drafting and mailing of letter to client enclosing merit brief and advising client as to status of his appeal and procedure that would be followed | 1.00 hrs. |
| | **Sub-total hours re:  assembly of brief, copying and filing** | **20.00 hrs.** |
| 12/12/03 | Review of letter from Asst. Prosecutor LuWayne Annos, Trumbull County, re: extension of time to file | .50 hrs. |

| | | |
|---|---|---|
| | appellee' brief; signing and mailing of stipulated extension of time | |
| 01/17/04 | Reading and review of State of Ohio's answer brief/analysis of arguments | 1.00 hrs. |
| 01/18/04 | Continued reading and review of State of Ohio's answer brief/analysis of arguments | 1.00 hrs. |
| 01/19/04 | Continued reading and review of State of Ohio's answer brief/analysis of arguments | 1.00 hrs. |
| 05/07/05 | Review of merit briefs preparatory for oral argument; review of applicable case law; preparation of oral argument outline | 4.00 hrs. |
| 05/08/05 | Continued review of merit briefs preparatory for oral argument; continued review of applicable case law; continued preparation of oral argument outline | 4.00 hrs. |
| 05/09/05 | Travel from Canton, Ohio to Columbus, Ohio, for oral argument; final preparation for oral argument | 5.00  hrs. |
| 05/10/05 | Oral argument before Supreme Court | 1.00 hrs. |
| 05/10/05 | Return travel from Columbus, Ohio to Canton, Ohio | 2.50 hrs. |
| | **Sub-total hours committed to travel, preparation and presentation of oral argument before Supreme Court** | **20.00  hrs.** |
| 05/18/05 | Review of letter to Nathaniel Jackson summarizing oral argument before Supreme Court | .10 hrs. |
| 01/04/06 | Review of judgment entry and published opinion of the Supreme Court denying Nathaniel Jackson's appeal and ordering execution for April 4, 2006 | .90 hrs. |
| 01/04/06 | Review of e-mail from Ohio Public Defender's Office re: opinion of Supreme Court and contact source for Nathaniel Jackson | .10 hrs. |
| 01/12/06 | Drafting of letter to Randall Porter, Ohio Public Defender's Office re: contact with Nathaniel Jackson and procedure for further appeal | .30 hrs. |
| 01/21/06 | Review of notice of substitution of counsel filed in the Supreme Court by Randall Porter, Ohio Public Defender's Office | .10 hrs. |
| | **Sub-total hours committed to post oral argument activity resulting in relinquishment of case to Ohio Public Defender's Office for further appeal** | **1.50 hrs.** |

*Time is to be recorded in tenth of an hour (6 minute) increments*

| EXPENSE | PAID TO | AMOUNT |
|---|---|---|
| Binding of transcripts (16 volumes) | Quick Copy Print Center, Ravenna, Ohio | $39.95 |
| One night's lodging, Columbus, Ohio | Baymont Inn & Suites, Dublin, Ohio | $105.87 |
| Parking | Verne Riffe Center, Columbus, Ohio | $4.00 |
| TOTAL | | $149.82 |

**To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00**

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

Applicant's Signature

OPD-1031 (4/96)



**INNS & SUITES**

BAYMONT COLUMBUS
6145 PARK CENTER CIRCLE
DUBLIN, OH  43017
6147928300

**Folio:** 10300014242
**Arrival:** 05/09/05
**Departure:** 05/10/05
**Rate:** $89.99
**Room:** 308

LAGER,DENNIS

209 SOUTH CHESTNUT SU 400
RAVENNA, OH  44266

| DATE | DESCRIPTION | COMMENT | CHARGE/PAYMENT | BALANCE |
|------|-------------|---------|----------------|---------|
| 05/09/05 MOVIE | MOVIE | MOVIE | $11.99 | $11.99 |
| 05/09/05 ISSTAX | INTERACTIVE SRVC SA | INTERACTIVE SRVC SALES T | $0.81 | $12.80 |
| 05/09/05 ROOM | ROOM | #308 LAGER,DENNIS | $89.99 | $102.79 |
| 05/09/05 OCTYTX | CITY OCC TAX | CITY OCC TAX | $9.00 | $111.79 |
| 05/09/05 OSTAX | STATE OCC TAX | STATE OCC TAX | $6.07 | $117.86 |
| 05/10/05 MC | MASTER CARD PAYMEN | XXXXXXXXXXXX2513 | ($117.86) | ($0.00) |

**CREDIT DUE:** (0.00)

Signature: _____

I agree that my liability for this bill is not waived.



4152 3470 1432 2724                    5109255

DO NOT WRITE ABOVE THIS LINE
32766

DENNIS D LAGER

| | | DATE 6/19/03 | AUTHORIZATION 121990 | CLERK | | |
|---|---|---|---|---|---|---|
| QTY. | | DESCRIPTION | | | PRICE | AMOUNT |
| 16 | Binding | | | | | 37 60 |
| | | | | | SUB TOTAL | 37 60 |
| | | | | | SALES TAX | 2 35 |
| | | | | | TOTAL | 39 95 |

SALES SLIP
MERCHANT COPY

GRAPHIC QUICK

VERNE RIFFE CENTER
COLUMBUS, OHIO
OPERATED BY APCOA/STANDARD PARKING CO.

05/10/05 10:09  L# 1 AM  3  Txn#227819
05/10/05 07:52 In  05/10/05 10:09 Out
DAILY RATES    $    4.00
Total Fee      $    4.00
Cash PAID      $    4.00-
Cash Tender    $    5.00
Change Due     $    1.00
        PLEASE DRIVE SAFELY
            THANK YOU!

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

STATE OF OHIO,                    )

      Plaintiff          )

vs.                               )           JUDGMENT ENTRY

NATHANIEL JACKSON,                )

      Defendant          )


MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED.

ATTY. DENNIS LAGER IS APPOINTED AS COUNSEL.  THIS ORDER IS

EFFECTIVE NUNC PRO TUNC TO FEBRUARY 6, 2003.


_____6/27/05_____

DATE

_____

JUDGE JOHN M. STUARD

6/30/05 Copies:
P. 100
A Consolara
J Lewis
J Laczko
E Porter

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH-
WITH BY ORDINARY MAIL

Judge John M. Stuard

2005 JUN 29 A 11: 58
TRUMBULL COUNTY
CLERK OF COURTS

*copy*

# THE SUPREME COURT OF OHIO

In the Common Pleas Court of *Trumbull* _____ County

## Disposition of a Capital Case by the Trial Court

This form is used pursuant to Rule 20 of the Rules of Superintendence for the Courts of Ohio to report the disposition of a capital case.  **Return this form within two weeks of disposition to:** ~~Nan Cuirney,~~ **Supreme Court of Ohio, 30 E. Broad Street, Third Floor, Columbus, OH  43266-0419.**

Defendant's Name: *Nathaniel E. Jackson* Case No. *01-CR-794*

Lead Trial Counsel: *Anthony V. Consoldane* Trial Co-Counsel *James F. Lewis*

Outcome of the Proceedings in this Court:

_____ ~~Found not guilty~~
_____ Pleaded guilty
_____ Pleaded guilty to lesser offense:_____
__✓__ Found guilty of aggravated murder & specification by jury
_____ Found guilty of lesser offense by jury:_____
_____ Found guilty of aggravated murder & specification by three judge panel
_____ Found guilty of lesser offense by three judge panel:_____
_____ Other:_____

Sentence: *Death Penalty*_____
_____

**Complete the following ONLY if the defendant was sentenced to death.  Attach a copy of the sentencing entry.**

**This court has appointed the following two counsel to represent defendant on appeal:**

Name:  John P. Laczko
Atty. Reg. No.  0051918
Address:  4800 Market St., Ste. C
          Youngstown, OH  44512
Telephone:  (330) 788-2480

Name:  Dennis Day Lager
Atty.Reg. No.  0026073
Address:  1025 Chapel Ridge St. N.E.
          Canton, Ohio  44714
Telephone: 330-494-5736

Certified under Sup.R. 20 as:
Lead Counsel _____
Co-Counsel _____
Appellate Counsel    X

Judge: *John M. Stuard*
JOHN M. STUARD

Certified under Sup.R. 20 as:
Lead Counsel    X
Co-Counsel _____
Appellate Counsel    X

Date of Appointment: *1/15/03* Appellate
                              Counsel

1988 – Lead Counsel

## ATTORNEY CERTIFICATION

We hereby <u>accept</u> appointment as appellate counsel in this case, <u>affirm</u> that we are currently certified under Sup.R. 20 to accept appointment as appellate counsel, and <u>certify</u> that this appointment will not create a total workload so excessive that it interferes with or prevents the rendering of quality representation in accordance with constitutional and professional standards.

Appellate Counsel                    *January 3, 2003*
Rev. 7/1/97                          Date

Appellate Counsel                    *2/6/03*
                                     Date

# 103-684

# The Supreme Court of Ohio

**FILED**

MAY 10 2006

## ON COMPUTER-KMR

MARCIA J. MENGEL, **CLERK**
SUPREME COURT **OF OHIO**

State of Ohio : Case No. 03-0137
:
v. : E N T R Y
:
Nathaniel E. Jackson :
:

The Court finds that counsel performed the legal
services set forth in the application for attorney fees
filed on February 16, 2006, and that the fees and expenses
hereinafter approved are reasonable.

IT IS THEREFORE ORDERED that Dennis Day Lager is
granted appointed counsel fees in the sum of $9,000.00 and
expense in the sum of $39.95 for a total allowance of
$9,039.95, which amount is ordered certified to the Trumbull
County Auditor for payment.

IT IS FURTHER ORDERED that travel expenses are approved
and shall be paid by the county auditor in accordance with
applicable county standards.

(Trumbull County Court of Common Pleas; No. 01CR794)

THOMAS J. MOYER
Chief Justice

# SUPREME COURT OF OHIO
## MOTION, ENTRY, AND CERTIFICATION FOR APPOINTED COUNSEL FEES

ORIGINAL

State of Ohio,
Plaintiff

FILED

FEB 22 2006

V.

*Nathaniel Jackson*

Defendant

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Supreme Court No. *03-0137*

Appeals Court No. _____

Trial Court No. *01 cr 794*

ON COMPUTER-RV

## MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES

The undersigned, having been previously appointed counsel for the defendant for the appeal to this court, as evidenced by the attached entry of appointment, now moves for an order approving payment of fees earned and expenses incurred as reflected by the itemized statement of the reverse hereof, pursuant to R.C. 2941.51.

| Hours Worked: | IN COURT | OUT OF COURT | | Expenses (if any): $ |
|---|---|---|---|---|
| | *1* | *317.1* | | $ *480.65* |

O.R.C. charge section number, name and classification

A. *O.R.C. 2903.01(A) 2929.01(A)* *Aggravated Murder w/Death Specification (Agg F-1)* *Death Penalty*

B. *O.R.C. 2903.01(B) 2929.04(A)(7)* *Aggravated Murder w/Death Specification (Agg F-1)* *Death Penalty*

C. *O.R.C. 2911.11(A)(3)* *Aggravated Burglary* *(F-1)* *10 year sentence*

| SUPREME COURT DECISION | TERMINATION DATE |
|---|---|
| *The Ohio Supreme Court Affirmed the Trial Court's Conviction and Imposition of the Death Penalty to Defendant* | *January 4, 2006* |

| ATTORNEY'S NAME | SOC. SEC. NO. | ATTORNEY'S SIGNATURE |
|---|---|---|
| *Attorney John P. Laczko LLC* | *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* | *John P. Laczko LLC* |

| ATTORNEY'S ADDRESS  NUMBER AND STREET | CITY | STATE | ZIP |
|---|---|---|---|
| *4800 Market St  Suite C* | *Boardman* | *Ohio* | *44512* |

INFORMATION BELOW TO BE COMPLETED BY SUPREME COURT AND COUNTY AUDITOR ONLY

## JUDGMENT ENTRY

This court finds that counsel performed the legal services set forth in the itemized statement on the reverse hereof, and that the fees and expenses hereinafter approved are reasonable. IT IS THEREFORE ORDERED that appointed counsel fees are approved in the sum of $ _____ and expense in the sum of $ ~~SEE ATTACHED ENTRY~~ for a total allowance of $ _____, which amount is ordered certified to the ~~SEE ATTACHED ENTRY~~ County Auditor for payment.

SEE ATTACHED ENTRY

CHIEF JUSTICE

## CERTIFICATION

The County Auditor, in executing this certification, attests to the accuracy of the figures contained herein. A subsequent audit by the Ohio Public Defender Commission and/or Auditor of the State which reveals unallowable or excessive costs may result in future adjustments against reimbursement or repayment of audit exceptions to the Ohio Public Defender Commission.

| COUNTY NUMBER | WARRANT NUMBER | WARRANT DATE |
|---|---|---|
| | | |

COUNTY AUDITOR

RECEIVED

FEB 22 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT

I hereby certify that the following time was expended in representation of the defendant before the Supreme Court of Ohio

| DATE | ACTIVITY | TOTAL TIME |
|---|---|---|
| 12/10/02 | Telephone conference with trial court judge re: appellate counsel capital case | .3 |
| 12/27/02 | Telephone conference with trial court judge re: consideration of appointment for death penalty  appeal- discussion of charges/ case/ appointment | .5 |
| 1/9/03 | Telephone conference with court re: appointment  for death penalty appeal Trumbull County - agreement to appointment- conference re: co-counsel | .4 |
| 1/10/03 | Appearance in Trumbull County - signed Rule 20 form acceptance appointment - travel to trial court  to file motion with address of co-counsel for court file/appointment | 1.0 |
| 1/15/03 | Telephone  conference  with court reporter re: names of all court reporters worked on transcripts to process appeal | .3 |
| 1/17/03 | Telephone call to court re: sentencing entries/ filings- preparation of motion for transcripts/ judgment entry -telephone conference with prosecutor office re: name/address of Appellate Counsel | 1.0 |
| 1/20/03 | Preparation of notice of appeal/capital case praecipe/ motion to waive filing fee- review of Ohio Supreme Court  Rules for filing-preparation of letter to court with filing | 2.0 |
| 1/21/03 | Travel to Trumbull County review signature of court reporters on docket review of their court docket- pull copy of docketing statement opinion/ judgment entry | 4.0 |
| 1/22/03 | Preparation of letter to court reporter with copy of orders- preparation of response letter to prosecutor | .4 |
| 3/4/03 | Telephone conference with court reporter regarding completion of transcript/ extension of time | .3 |
| 3/7/03 | Telephone conference with court reporter regarding transcript- call to Supreme Court regarding  motion extension of time - review of Supreme Court Rules | .5 |
| 3/10/03 | Preparation of motion extension time transmit record with affidavits- Prepare letter  to court reporters for signature- fax of motion/ affidavits to co- counsel for review | 1.2 |
| 3/12/03 | Preparation of letter to client regarding preparation of issues for appeal - request for information | .4 |
| 3/14/03 | Telephone conference with co-counsel regarding completion / filing motion extension time /signature/ travel to Warren to review affidavit/ prepare letter with motion for signature to co- counsel | 2.0 |
| 3/20/03 | Telephone conference with co- counsel regarding filing of motion/ preparation of cover sheet for other filings | .3 |
| 3/24/03 | Receipt and review client letter regarding case/issues of appeal- receipt/ review Ohio Supreme Court notice extending time for filing  of transcripts/ receipt-call to court reporter/ fax of notice | .8 |
| 3/27/03 | Prepare fax of extension time file record/ client letter to Attorney Porter for post conviction relief-review of Porter fax regarding client letter | .5 |
| 4/11/03 | Telephone conference with court reporter- regarding transcripts not compete/ request additional extension of time | .4 |
| 4/25/03 | Preparation of joint motion for extension time transmit the record and affidavit s | 2.5 |
| 4/25/03 | Telephone conference with prosecutor regarding joint motion extension of time  to file record/transcripts- fax to prosecutor | .4 |
| 4/28/03 | Telephone conference with co-counsel regarding case exhibits/ trial/ extension time for filing exhibit's case discussion | .5 |
| 4/29/03 | Telephone conference with prosecutor regarding pickup signature or motion / filing with court | .3 |
| 4/30/03 | Travel to Trumbull County- conference with prosecutors- review/ signature  on joint motion extension of time- meeting with co- counsel /signature filing with court with letter | 2.0 |
| 5/7/03 | Prepare letter to prosecutors regarding time stamped copy of motion extension of time | .2 |
| 5/12/03 | Receipt/ review court entry extending time to file record on appeal | .1 |
| 5/13/03 | Prepare fax of second extension time filed record to Attorney Porter regarding post conviction relief | .3 |
| 7/7/03 | Telephone conference with court clerk regarding filing record/ transcripts with court review of filing date | .4 |
| 7/11/03 | Receipt/ review court notice of filing of record on appeal on July 3, 2003 | .2 |
| 7/19/13 | Review of record on appeal- court docketing statement/ motions/ judgment entry's | 6.5 |
| 7/20/03 | Reading and highlighting transcript | 2.0 |
| 7/21/03 | Reading and highlighting transcript | 3.0 |
| 7/24/03 | Reading and highlighting transcript | 3.5 |
| 7/25/03 | Reading and highlighting transcript | 3.0 |
| 7/27/03 | Reading and highlighting transcript | 4.0 |
| 7/28/03 | Reading and highlighting transcript | 4.5 |
| 8/2/03 | Reading and highlighting transcript | 4.0 |
| 8/3/03 | Reading and highlighting transcript | 4.0 |
| 8/5/03 | Reading and highlighting transcript | 4.0 |
| 8/7/03 | Reading and highlighting transcript | 3.5 |
| 8/10/03 | Reading and highlighting transcript | 4.0 |
| 8/11/03 | Reading and highlighting transcript | 2.5 |
| 8/12/03 | Reading and highlighting transcript | 5.0 |
| 8/14/03 | Reading and highlighting transcript | 4.0 |
| 8/15/03 | Reading and highlighting transcript | 3.0 |

| Date | Description | Hours |
|---|---|---|
| 8/17/03 | Completion of reading and highlighting transcripts | 4.0 |
| 8/19/03 | Reading highlights and indexing transcripts for brief | 2.5 |
| 8/20/03 | Reading highlights and indexing transcripts for brief | 4.0 |
| 8/21/03 | Reading highlights and indexing transcripts for brief | 3.0 |
| 8/24/03 | Reading highlights and indexing transcripts for brief | 4.0 |
| 8/26/03 | Reading highlights and indexing transcripts for brief | 5.0 |
| 8/27/03 | Reading highlights and indexing transcripts for brief | 4.0 |
| 8/30/03 | Reading highlights and indexing transcripts for brief | 3.0 |
| 8/31/03 | Reading highlights and indexing transcripts for brief | 2.5 |
| 9/3/03 | Reading highlights and indexing transcripts for brief | 5.0 |
| 9/5/03 | Reading highlights and indexing transcripts for brief | 3.0 |
| 9/7/03 | Reading highlights and indexing transcripts for brief | 4.0 |
| 9/8/03 | Reading highlights and indexing transcripts for brief | 4.0 |
| 9/10/03 | Reading highlights and indexing transcripts for brief | 3.5 |
| 9/11/03 | Reading highlights and indexing transcripts for brief | 3.0 |
| 9/13/03 | Reading highlights and indexing transcripts for brief | 3.0 |
| 9/14/03 | Review transcripts notes- research issues on appeal | 2.5 |
| 9/17/03 | Research issues and case law | 2.0 |
| 9/19/03 | Prepare assignments of error- work on brief | 2.0 |
| 9/20/03 | Prepare assignments of error- work on brief | 3.0 |
| 9/21/03 | Prepare assignments of error- work on brief | 3.0 |
| 9/22/03 | Research issues and case law | 4.0 |
| 9/27/03 | Prepare assignments  of error- work on brief | 2.0 |
| 9/28/03 | Prepare assignments  of error- work on brief | 2.0 |
| 9/30/03 | Prepare assignments  of error- work on brief | 2.0 |
| 10/1/03 | Prepare assignments  of error- work on brief | 2.0 |
| 10/3/03 | Telephone conference with prosecutor regarding stipulated extension time file brief- receipt/ review fax of extension from prosecutors- preparation  of motion- fax to prosecutors | 1.0 |
| 10/5/03 | Prepare assignments error- work on brief | 3.0 |
| 10/6/03 | Prepare letter and stipulation of extension time- filing with court | .5 |
| 10/8/03 | Research issues/ case law | 4.0 |
| 10/9/03 | Research issues/ case laws | 4.0 |
| 10/10/03 | Prepare assignments error- work on brief | 7.0 |
| 10/12/03 | Prepare assignments error- work on brief | 5.0 |
| 10/13/03 | Prepare assignments error- work on brief | 10.0 |
| 10/14/03 | Prepare assignments error- work on brief | 4.0 |
| 10/15/03 | Prepare assignments error- work on brief | 6.0 |
| 10/16/03 | Prepare assignments error- work on brief | 5.0 |
| 10/17/03 | Prepare assignments error- work on brief | 4.0 |
| 10/18/03 | Prepare assignments error- work on brief | 8.5 |
| 10/19/03 | Prepare assignments error- work on brief | 4.5 |
| 10/20/03 | Prepare assignments error- work on brief | 10.0 |
| 10/21/03 | Telephone conference with client sister regarding status of appeal/ brief preparation/ filing deed/ discussion of issues | .5 |
| 10/22/03 | Drafting issues for brief- review transcripts/ files | 8.0 |
| 10/23/03 | Drafting issues for brief- review transcripts/ files | 7.5 |
| 10/24/03 | Drafting issues for brief- review case law | 5.0 |
| 10/25/03 | Completion of issues for brief- review/ corrections | 10.0 |
| 10/26/03 | Meeting with co-counsel - preparation of brief/ statement of facts/ assignments of error/ tables- assembly of brief filing | 12.0 |
| 10/29/03 | Receipt and review co-counsel letter to client regarding case status and brief | .4 |
| 11/25/03 | Telephone conference with co-counsel regarding stay exeacution sentence- prepare motion for stay | 1.0 |
| 11/26/03 | Prepare letter and motion stay execution- filing with court | .5 |
| 12/8/03 | Receipt and review  court entry granting stay or execution | .1 |
| 12/10/03 | Telephone conference with counsel requesting approval for exetension time to file response brief- will send entry for signature | 0.3 |
| 12/13/03 | Receipt and review prosecutor stipulated extension time to file brief- signature-return to prosecutor | .5 |
| 1/18/04 | Receipt and review State of Ohio answer brief and arguments on appeal | 3.0 |
| 1/24/05 | Receipt and review notice of hearing from court regarding oral argument on case- contuance with co-counsel | .4 |
| 5/7/05 | Review of brief and issues on appeal and case law- prepare for oral argument | 4.5 |
| 5/8/05 | Continued review of brief and issues on appeal and case law- prepare for oral argument | 5.0 |
| 5/9/05 | Travel from Youngstown to Columbus for oral argument- final preparation of outline for oral argument | 7.0 |
| 5/10/05 | Oral argument before Ohio Supreme Court | 1.0 |

| | | |
|---|---|---|
| 5/10/05 | Return travel from Columbus, Ohio to Youngstown, Ohio | 3.0 |
| 5/18/05 | Prepare letter to client regarding oral argument issues and case status | .5 |
| 5/27/05 | Receipt and review client letter regarding status of case and arguments before court | .3 |
| 7/1/05 | Receipt and review trial court judgment entry of nunc pro tunc order of counsel appointment | .3 |
| 1/4/06 | Telephone conference  with court clerk regarding decision in client case- access to court website- review court decision | 2.5 |
| 1/6/06 | Receipt and review with court judgment entry  affirming client conviction- with opinion | .4 |
| 1/10/06 | Conference with co-counsel - discussion of court opinion and motion to stay execution sentence- case disposition | 1.0 |
| 1/21/06 | Receipt and review letter and notice of substitution of counsel on client case | .4 |
| 1/25/06 | Telephone conference with Randall Porter regarding notice of substitute counsel and filing motion for stay execution- general case discussion | .5 |
| 1/26/06 | Receipt and review of court entry regarding client stay of execution | .3 |

*Time is to be recorded in tenth of an hour (6 minute) increments*

| EXPENSE | PAID TO | AMOUNT |
|---|---|---|
| Fed Ex (notice of appeal shipping) | Fed Ex | $21.25 |
| Fed Ex (motion of extension shipping) | Fed Ex | $18.56 |
| Kinko's (Supreme Court Brief Preparation) | Kinko's | $264.26 |
| Fed Ex ( stay of execution shipping) | Fed Ex | $16.22 |
| B.P. oil (gas travel to Columbus oral argument) | B.P. oil company | $38.00 |
| Waffle House (meals) | Waffle House | $17.30 |
| Baymont Inns and Suites | Baymont Inns and Suites | $105.06 |
| TOTAL: | | $480.65 |

**To obtain reimbursement, the purpose of each expense must be clearly identified, and a receipt provided for each expenditure over $1.00**

I hereby certify the above is a true and accurate account of the time spent and expenditures incurred in representing the defendant in the Supreme Court of Ohio.

Applicant's Signature

OPD-1031 (4/96)



**Invoice Number:** 4-553-50200
Invoice Date:      Jan 29, 2003
Account Number:   2185-1229-1
Page:             4 of 4

## FedEx Express Shipment Detail By Payment Type (Original)

**Picked up: Jan 21, 2003**          **Payor: Shipper**          **Reference: JACKSON NATE**

- Fuel Surcharge - FedEx has applied a fuel surcharge of 3.00% to this shipment.
- Distance Based Pricing, Zone 2
- FedEx has audited this shipment for correct packages, weight, and service. Any changes made are reflected in the invoice amount.

| | | |
|---|---|---|
| Tracking ID | 833385384804 | |
| Service Type | FedEx Priority Overnight | |
| Package Type | FedEx Pak | |
| Zone | 2 | |
| Packages | 1 | |
| Weight | 2.0 lbs, 0.9 kgs | |
| Delivered | Jan 22, 2003 10:17 | |
| Svc Area | A1 | |
| Signed by | T.IMBER | |
| FedEx Use | 022023260/01486/_ | |

**Sender**
ERIE
LACZKO, JOHN, ATTY
4800 MARKET ST STE C
YOUNGSTOWN OH 44512-2119  US

**Recipient**
MARCIA MENGIL
OHIO SUPREME CT
30 EAST BROAD ST SECOND FL
COLUMBUS OH 43215  US

| | |
|---|---|
| Transportation Charge | 16.75 |
| Fuel Surcharge | 0.50 |
| Courier Pickup Charge | 4.00 |
| **Total Transportation Charges**       USD $ | **21.25** |
| | |
| Shipment Detail Subtotal ...................................................................       USD $ | **21.25** |

*J. P. Pd. 2-10-03*
*#2406*
*$46.62*
*Nathaniel Jackson*

Security enhanced document. See back for details.

2406

**ATTORNEY JOHN P. LACZKO**
4800 MARKET ST. STE; C
BOARDMAN, OH 44512

6-103/410
229

DATE _2/10/03_

PAY TO THE ORDER OF _Fed Ex_                  $ _46 62/100_

_Forty Six + 62/100_                          DOLLARS

KeyBank National Association
Boardman, Ohio 44512
1-800-KEY2YOU®  Key.com

FOR _Supreme Ct. Filing Alicea 25,37_

⑆002406⑆ ⑆041001039⑆ 35 829100083 9⑆



**Invoice Number:** **4-697-15582**
Invoice Date:   May 07, 2003
Account Number:  2185-1229-1
Page:       4 of 4

---

## FedEx Express Shipment Detail By Payment Type (Original)

---

**Picked up: Apr 30, 2003**     **Payor: Shipper**     **Reference: JACKSON**

---

- Fuel Surcharge - FedEx has applied a fuel surcharge of 5.50% to this shipment.
- Distance Based Pricing, Zone 2
- 1st attempt May 01, 2003 at 01:20 AM.

| | | |
|---|---|---|
| Tracking ID | 833385385167 | |
| Service Type | FedEx Priority Overnight | |
| Package Type | FedEx Envelope | |
| Zone | 2 | |
| Packages | 1 | |
| Weight | 1.0 lbs, 0.5 kgs | |
| Delivered | May 01, 2003 01:27 | |
| Svc Area | A1 | |
| Signed by | J.JONES | |
| FedEx Use | 120085860/00186/_ | |

Sender
ERIE
LACZKO, JOHN, ATTY
4800 MARKET ST STE C
YOUNGSTOWN OH 44512-2119  US

Recipient
ILLEGIBLE
OHIO SUGRIME CONST
30 E BROAD ST SECOND FL
COLUMBUS OH 43215  US

| | |
|---|---|
| Transportation Charge | 13.80 |
| Fuel Surcharge | 0.76 |
| Courier Pickup Charge | 4.00 |
| **Total Transportation Charges**     **USD $** | **18.56** |

Shipment Detail Subtotal ............................................................ USD $    18.56

---

**ATTORNEY JOHN P. LACZKO**
4800 MARKET ST. STE; C
BOARDMAN, OH 44512

2521

6-103/410
229

PAY TO THE ORDER OF _Fed Ex_     DATE _5/14/03_     $ _18 56/100_

_Eighteen & 56/100_       DOLLARS

KeyBank National Association
Boardman, Ohio 44512
1-800-KEY2YOU® Key.com®

FOR _Svc. Ext. Ltr. Ext - Jackson_

⑆002521⑆ ⑆041001039⑆ 352291000839⑆

123411

**ATTORNEY JOHN P. LACZKO**
4800 MARKET ST. STE; C
BOARDMAN, OH 44512

ph: 330-788-2480

2697

6-103/410
229

DATE _October 26, 2003_

PAY TO THE ORDER OF _KINKO'S_                                    $ _264.26_

_Two Hundred Sixty Four Dollars and 26/100_                      DOLLARS

KeyBank National Association
Boardman, Ohio 44512
1-800-KEY2YOU® Key.com®

FOR _Brief Prep - Jackson, Nathaniel_

⑈002697⑈ ⑈041001039⑈ 35229⑆000839⑈                    ⑈00000 264 26⑈

---

Kinko's                    (330) 726-2020
48 BOARDMAN POLAND R
BOARDMAN,        OH 44512

QTY/LIST     DISC     PRICE     AMOUNT
3564    FS B&W S/S WHITE STD
        0.08     0.03     0.05     178.20
23      BIND COMB BIND NO COVER
        2.99     0.00     2.99      68.77

SUB   246.97  TX   17.29  TOT   264.26
                          CHECK  264.26
                          CHG     0.00
        CUSTOMER ID              JOHN


        TOTAL DISCOUNT:    $106.92

CW 106 TR   593369 RG 2  10/26/03 22:49
        Visit us @ http://www.kinkos.com



| | |
|---|---|
| | **Invoice Number:** 4-985-54008 |
| | Invoice Date: Dec 11, 2003 |
| | Account Number: 2185-1229-1 |
| | Page: 4 of 4 |

## FedEx Express Shipment Detail By Payor Type (Original)

**Dropped off: Nov 26, 2003**       **Payor: Shipper**       **Reference: NO REFERENCE INFORMATION**   *Nathaniel Jackson*

- Fuel Surcharge - FedEx has applied a fuel surcharge of 3.00% to this shipment.
- Distance Based Pricing, Zone 2
- FedEx has audited this shipment for correct packages, weight, and service. Any changes made are reflected in the invoice amount.
- Holiday - Business closed.

| | | | | |
|---|---|---|---|---|
| Tracking ID | 843508274522 | **Sender** | **Recipient** | |
| Service Type | FedEx Priority Overnight | ERNIE | GLENDA OFF | |
| Package Type | FedEx Pak | LACZKO, JOHN, ATTY | SUGREME COURT OF OHIO | |
| Zone | 2 | 4800 MARKET ST STE C | 30 E BROAD ST SECOND FL | |
| Packages | 1 | YOUNGSTOWN OH 44512-2119 US | COLUMBUS OH 43215 US | |
| Weight | 1.0 lbs, 0.5 kgs | | | |
| Delivered | Dec 01, 2003  09:52 | Transportation Charge | | 15.75 |
| Svc Area | A1 | Fuel Surcharge | | 0.47 |
| Signed by | J.COOREY | **Total Charge** | **USD $** | **16.22** |
| FedEx Use | 330097280/01486/_ | | | |

**Shipment Detail Subtotal** ..................................................................................... USD $   16.22

*To ensure proper credit, please return this portion with your payment to FedEx.*
*Please do not staple or fold. Please make your check payable to FedEx.*

☐ For change of address, check here and complete form on reverse side.

## Remittance Advice
**Your payment is due by Dec 26, 2003**

| Invoice Number | Account Number | Amount Due |
|---|---|---|
| 4-985-54008 | 2185-1229-1 | USD $ 16.22 |

218512294985540089300000162206

AT 01  020117  92979B134  A**3DGT

JOHN LACZKO ATTY
4800 MARKET ST # S-C
YOUNGSTOWN OH 44512-2119

FedEx
P.O. Box 371461
Pittsburgh PA 15250-7461

---

**ATTORNEY JOHN P. LACZKO**
4800 MARKET ST, STE. C
BOARDMAN, OH 44512

2743

6-103/410
229

PAY TO THE ORDER OF   *Fed Ex*                              DATE  12-19-03        $ 16 22/100

*Sixteen + 22/100*                                                                 DOLLARS

KeyBank National Association
Boardman, Ohio 44512
1-800-KEY2YOU  Key.com

FOR *Nathaniel Jackson - / # 4-985-54008*

⑆002743⑆  ⑆041001039⑆  352291000839⑆

123411

```
5099 TUTTLE CROSSING
DUBLIN         OH

Date   05/10/05
CF9904
Expires
Inv.#1127180010
Ref.#4000011074
App.#255314
Pump#10  1Regula/Self
GALLONS  ....  19.904
$/Gal  .......$1.909
Fuel Sale ...$ 38.00
Total Sale ..$ 38.00




        THANKS FOR
      SHOPPING BP
```



**WAFFLE HOUSE**®
"GOOD FOOD FAST"

THANK YOU!

TOTAL  17 30

# BAYMONT
## INNS & SUITES

BAYMONT COLUMBUS
6145 PARK CENTER CIRCLE
DUBLIN, OH 43017
6147928300

**Folio:** 10300014243
**Arrival:** 05/09/05
**Departure:** 05/10/05
**Rate:** $89.99
**Room:** 411
**Returns Club No:** H103010158

LOCKO, JOHN

4407 WARWICK SOUTH
CANFIELD, OH 44406

| DATE | DESCRIPTION | COMMENT | CHARGE/PAYMENT | BALANCE |
|------|-------------|---------|----------------|---------|
| 05/09/05 ROOM | ROOM | #411 LOCKO, JOHN | $89.99 | $89.99 |
| 05/09/05 OCTYTX | CITY OCC TAX | CITY OCC TAX | $9.00 | $98.99 |
| 05/09/05 OSTAX | STATE OCC TAX | STATE OCC TAX | $6.07 | $105.06 |
| 05/10/05 MC | MASTER CARD PAYMEN | XXXXXXXXXXXX2764 | ($105.06) | $0.00 |
| | | **BALANCE DUE:** | | 0.00 |

Signature: _____
I agree that my liability for this bill is not waived.

# 2005 Year-End Summary



Your 2005 Year-End Summary of Charges shows at a glance when and where you used your account between January 1, 2005, and December 31, 2005. To easily track tax deductions, just mark the "Deduct" column next to each charge.

Charges are listed by spending category and date, including transactions from upgraded or lost/stolen accounts. December charges that posted in January 2006 are not shown.

Some purchases may be categorized differently than you expect. This often occurs when the business is owned by another company. Please note this recap of charges may not be used to dispute charges.

If you have questions, Customer Satisfaction specialists are always at your service.

**The 2005 Year End Summary can HELP you ...**

- **Budget for 2006**

- **Track seasonal spending**

- **Identify tax-deductible charges**

The Year-End Summary is for informational purposes only and does not extend an expired billing dispute period. Written disputes must be sent within 60 days of the first statement listing the transaction. See your statement for details. The Summary covers any upgraded account and lost or stolen account. Credits for fraudulent charges do not appear. **By responding to any of the offers in this Summary, you are disclosing that you are an MBNA credit card Customer.** This credit card program is issued and administered by MBNA America Bank, N.A. MasterCard is a federally registered service mark of MasterCard International Inc., and is used by MBNA pursuant to license. Visa is a registered trademark of Visa International Service Association, and is used by MBNA pursuant to license from Visa U.S.A., Inc. MBNA, MBNA America, Platinum Plus, the MBNA logo and the tree symbol are service marks of MBNA America Bank, N.A. ©2006 MBNA America Bank, N.A.

2                                                                                                          6469-000012745



### Hotel
Book your hotel reservation with your credit card, and be guaranteed for late arrival at most hotels worldwide.

| Date | Description | Location | | Amount | Deduct |
|------|-------------|----------|---|--------|--------|
| 05/10/05 | BAYMONT #1030 | DUBLIN | OH | 105.06 | ☐ |
| Total: | | | | $105.06 | |



### Clothing
Spruce up your wardrobe, or buy that special outfit. Your credit card is accepted at most boutiques and stores worldwide.

| Date | Description | Location | | Amount | Deduct |
|------|-------------|----------|---|--------|--------|
| 12/27/05 | VICTORIA'S SECRET 0107 | YOUNGSTOWN | OH | 103.31 | ☐ |
| Total: | | | | $103.31 | |



### Transportation
Travel with ease knowing your credit card is accepted for most train, bus, and taxi fares.

| Date | Description | Location | | Amount | Deduct |
|------|-------------|----------|---|--------|--------|
| 09/03/05 | SHELL OIL 57424204006 | AUSTINTOWN | OH | 72.00 | ☐ |
| Total: | | | | $72.00 | |

*Notes*
_____

**Everything you need.
All in one place.**

**www.mbna.com**

Online services at their best.

❖ Get up-to-the-minute credit card
   account information.

❖ Consolidate your bills with an
   online Balance Transfer.

❖ Enjoy exclusive offers from
   merchants you know and trust.

❖ Finance your personal or business
   needs at competitive rates.

MBNA, the MBNA logo, and the tree symbol are
service marks of MBNA America Bank, N.A.
© 2006 MBNA America Bank, N.A.
Member FDIC





**2005 Year-End
Summary
of Charges**

```
1215536456469  6469  0021
JOHN P LACZKO
4800 MARKET ST
SUITE C
YOUNGSTOWN, OH 44512-2119
```

6469-000012745



**2005 Year-End
Summary
of Charges**

*A valuable planning resource
specially prepared for:*

JOHN P LACZKO

Includes a recap and
analysis of your credit
card account which
ends in:  **6469**

To access your
account, go to:
**www.mbna.com**




121553645646900012



JUDGE JOHN M. STUARD

COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

January 10, 2003

Supreme Court of Ohio
30 E. Broad Street  Third floor
Columbus, OH  43266-0419

              IN RE: STATE vs. NATHANIEL E. JACKSON
              CASE NO. 01-CR-794

Dear Justices:

      I am charged with obtaining qualified appellate counsel
on the above-captioned case.  I have had great difficulty in
doing so, as there are so few registered appellant attorneys.

      I am sending herewith the appointment of
Attorney John P. Laczko (regis no. 0051918) and requesting
that, if possible, the application of Attorney Dennis Lager be
processed expeditiously as he has agreed to handle the case
with Attorney Laczko once his appellate status is approved.  I
understand all the necessary paperwork on his certification
has been forwarded to the certifying authority.

      Please advise if you have any suggestions on a more
appropriate manner to handle this matter.  Thank you for your
assistance.

                              Sincerely yours,

                              JUDGE JOHN M. STUARD

Enc.
Cc:  Cindy Johnson

# 103-685

## The Supreme Court of Ohio

**FILED**

MAY 1 0 2006

ON COMPUTER-KMR

MARCIA J. MENGEL, **CLERK**
SUPREME COURT OF **OHIO**

| | | |
|---|---|---|
| State of Ohio | : | Case No. 03-0137 |
| | : | |
| v. | : | E N T R Y |
| | : | |
| Nathaniel E. Jackson | : | |
| | : | |

The Court finds that counsel performed the legal services set forth in the application for attorney fees filed on February 22, 2006, and that the fees and expenses hereinafter approved are reasonable.

IT IS THEREFORE ORDERED that John P. Laczko is granted appointed counsel fees in the sum of $9,000.00 and expense in the sum of $320.29 for a total allowance of $9,320.29, which amount is ordered certified to the Trumbull County Auditor for payment.

IT IS FURTHER ORDERED that travel expenses are approved and shall be paid by the county auditor in accordance with applicable county standards.

(Trumbull County Court of Common Pleas; No. 01CR794)

THOMAS J. MOYER
Chief Justice