# IN THE SUPREME COURT OF OHIO

ORIGINAL

ON COMPUTER-ALM

STATE OF OHIO,                                    :

      Appellee,                                 :

-vs-                                              :          Case No. 03-137

NATHANIEL JACKSON,                                :

      Appellant.                                :          Death Penalty Case

---

On Appeal From The Court Of Common Pleas
Of Trumbull County, Case No. 01 CR 794

---

# APPLICATION FOR REOPENING
## PURSUANT TO S.CT. PRAC. R. XI, SECTION 5

---

David H. Bodiker
Ohio Public Defender

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, OH 43215
(614) 752-9215 (Voice)
(614) 644-0703 (Facsimile)

DENNIS WATKINS - 0009949
Trumbull Count Prosecuting Attorney

COUNSEL FOR NATHANIEL JACKSON

LUWAYNE ANNOS - 0055651
Assistant Prosecutor

Trumbull County Prosecutor's Office
160 High Street, N.W.
4th Floor Administration Building
Warren, Ohio  44481
(330) 675-2426 (Voice)

COUNSEL FOR STATE OF OHIO



FILED

APR 0 4 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| Appellee, | ) | Case No. 03-137 |
| | ) | |
| -vs- | ) | |
| | ) | Trumbull C.P. No. 01 CR 794 |
| NATHANIEL E. JACKSON, | ) | |
| | ) | |
| Appellant. | ) | |

---

## APPLICATION FOR REOPENING
## PURSUANT TO S.CT. PRAC. R. XI, SECTION 5

---

Appellant Nathaniel E. Jackson moves this Court, pursuant to S.Ct. Prac. R. XI, Section 5(A), to reopen his direct appeal to this Court because he was denied his constitutional right to effective assistance of counsel during that direct appeal. A Memorandum in Support is attached and incorporated by reference.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL PORTER (0005835)
Assistant State Public Defender
**Counsel of Record**

Office of the Ohio Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215-2998
(614) 466-5394 (Voice)
Fax: (614) 644-0703  (Facsimile)

COUNSEL FOR APPELLANT

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

This Court in State v. Murnahan, 63 Ohio St. 3d 60, 584 N.E.2d 1204 (1992), and S.Ct. Prac. R. XI, Section 5(A) established the procedure for raising claims of ineffective assistance of appellate counsel in this Court. This Court, pursuant to that precedent, should order that Appellant's direct appeal be reopened. Appellate counsel never met with Appellant and did not even notify him of this Court's adverse ruling. [Exhibit B]. Despite the voluminous record in the present case, appellate counsel raised only twelve issues, four of which were systemic issues which could have been raised without even any knowledge of the case and two which involved a reweighing of the evidence. [Exhibit C].

### II.    PROCEDURAL HISTORY

A Trumbull County Court of Common Pleas jury convicted Appellant of two counts of aggravated murder, with capital specifications, one count of aggravated burglary and one count of aggravated robbery. The trial court sentenced him to death.

Appellant timely appealed his convictions and sentence to this Court. On January 4, 2006 this Court affirmed the judgment of the trial court. State v. Jackson, 107 Ohio St. 3d 300, 2006-Ohio-1. Attorneys John P. Laczko and Dennis Day Lager represented Jackson on his direct appeal to this Court. As an initial matter it should be noted that appellate counsel failed to obtain a complete record for this Court. They did not move this Court to order that the transcript from co-defendant Donna Roberts' ("Roberts") be supplemented into the record.

### III.    APPELLATE COUNSEL FAILED TO RAISE MERITIOUS ISSUES

The Due Process Clause of the Fourteenth Amendment guarantees a defendant the right to effective assistance of counsel on a criminal appeal of right. Evitts v. Lucey, 469

U.S. 387, 396 (1985). If direct appeal counsel presented the following ten propositions of law to this Court, there is a reasonable probability that the outcome of this appeal would have been different.

### Proposition of Law No. I

**A defendant's waiver of his constitutional rights must be knowingly and intelligently entered to be effective. Fifth, Sixth and Fourteenth Amendments to the United States Constitution.**

The police, prior to conducting custodial interrogation of a suspect, must obtain a knowing and intelligent waiver right of a defendant's constitutional rights. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Appellant did not graduate from high school. [Sent Tr. 40 ]. He reads on the level of a fifth grader [Sent Tr. 84-85]. He scored in the borderline range on the intelligence tests that the school officials administered to him. [Sent Tr. 46 ]. As a result, Appellant did not grasp the significance of the rights waiver he executed. [Tr. 326, 328]. In addition, Appellant was having emotional difficulties at the time of the interrogation [Tr. 309, 310]. He was on medication [Tr. 339]. The interrogating officer lied to Appellant [Tr. 298, 303].The totality of factors document that Appellant did not knowingly and intelligently waive his constitutional rights. Direct appeal counsel raised a related issue, but not this issue.

### Proposition of Law No. II

**A trial court cannot exclude a juror from service based upon his views on the death penalty unless those views would substantially impair his performance. Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

A prosecutor in a capital case may not remove potential jurors simply because they have religious scruples, or are otherwise opposed to the death penalty. In <u>Wainwright v. Witt</u>, 469 U.S. 412, 850 (1985), the United States Supreme Court established that "[A] juror may not be challenged for cause based on his views about capital punishment unless those views

would prevent or substantially impair the performance of his duties as a juror." The trial court incorrectly excluded the following prospective juros because of their views on the death penalty: Harold Fenton [Tr. 698-719]; Lynn Bowers [Tr. 726-749]; Carol Jigert [Tr. 1417-1438]; Tammie McCale [Tr. 1564-1574]; Brian Davis [Tr. 1721-1734].

      In addition, the trial court failed to grant defense counsel's motion to excuse for cause prospective juror Toni Thompson who knew a number of the prosecutor's witnesses [Tr. 626-640].  Hughes v. United States, 258 F.3d 453, 460 (6th Cir. 2001).

### Proposition of Law No. III

**Where trial counsel's performance during voir dire fails to meet the prevailing professional standards, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights. Sixth and Fourteenth Amendments to the United States Constitution**

      Appellant's constitutional right to effective assistance of counsel extended to voir dire.  Quintero v. Bell, 368 U.S. 892 (6th Cir. 2004).  The Sixth Amendment also guarantees a criminal defendant the right to a trial by an impartial jury.  Turner v. Louisiana, 379 U.S. 466, 472 (1965).

      Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify biased or unqualified jurors.  Morgan v. Illinois, 504 U.S. 719, 729 (1992) At Appellant's trial, defense counsel failed to adequately question the following prospective jurors Jim Cuttings [Tr. 436]; Melba Hook (Tr. 506-507]; Raymond Miller [Tr. 1066-1094]; Florence Zdunick [Tr. 1175-1210]; Joseph Miller [Tr. 1211-1245]; Mary Menten [Tr. 1643-1645]; Kathy DeJoy [Tr. 1771-1774].

      Counsel's duty in voir dire extends to not only developing the basis for challenges for cause, but to actually challenging those prospective jurors who indicate that they cannot be fair.

Miller v. Webb, 385 F. 3d 666, 678 (6th Cir. September 22, 2004).  Trial counsel unreasonable

failed to challenge the following prospective jurors for cause: Dennis Jones [Tr. 575-589]; Jack

Schrecengast [Tr. 594-612]; Florence Zdunick [Tr. 1175-1210]; Grace Melinda [Tr. 1462-1487];

Don Schoonover [Tr. 1529-1564].

### Proposition of Law No. IV

**A jury venire in a capital case must represent a fair cross section of the community and cannot contain an underrepresentation of African Americans.  Sixth and Fourteenth Amendments to the United States Constitution.**

The trial court in the present case summoned four hundred jurors to serve on the

venire One-hundred-forty persons appeared for jury duty [Tr. 1846-1848.]. The parties agreed

that only one African-American was questioned during individual voir dire [Tr. 1846-1848,

1854.]   African Americans comprised 7.9 percent of the population in Trumbull County

Consequently there should have been approximately eleven African-Americans in the one-

hundred-forty-persons who appeared for jury duty.

The underrepresentation of African-American in the petit jury venire constituted a

denial of the Due Process Clause of the Fourteenth Amendment,  Peters v. Kiff, 470 U.S. 493,

501 (1972); the Equal Protection Clause of the Fourteenth Amendment, Taylor v. Louisiana, 419

U.S. at 522, 531 (1975), and the Fair Cross Section requirement of the Sixth Amendment, Id. .

### Proposition of Law No. V

**Testimony that contains statements made by persons other than the witness is not admissible for the truth of the matter asserted, unless the other person is subject to cross-examination.  Sixth and Fourteenth Amendments to the United States Constitution.**

The trial court admitted a voluminous amount of hearsay.   While direct appeal

counsel raised some of the instances of this error, they failed to raise all of the examples of the

trial court's improper admission of this testimony.   Appellant's right to confrontation was violated when all of the admissible testimony is viewed in its entirety.  Crawford v. Washington, 541 U.S. 36 (2004).

The trial court improperly admitted 1) statements made by Roberts concerning her needing money [Tr. 2196], 2) statements of Detective Dillon concerning what occurred at the hotel [Tr. 2316], 3) testimony of Detective Monroe concerning statements made by other individuals [Tr. 2322], 4) the contents of telephone records [Tr. 2366], 5) a statement made by an unidentified female during the search of the Youngstown residence [Tr. 2432], 6) statements made by Roberts to the investigating officers [Tr. 2528] and 7) matters concerning the DNA testing results that were not within the personal knowledge of the BCI agent who testified as to DNA [Tr. 2824-2832].

## Proposition of Law No. VI

**A trial court should permit a defendant to adduce testimony concerning illegal and/or inappropriate acts when it is necessary either to rebut the prosecution's evidence or to support the defendant's theory of the case. Sixth and Fourteenth Amendments to the United States Constitution.**

The United States Supreme Court has held that the right to present evidence is a crucial component of Due Process of the Fourteenth Amendment. Washington v. Texas, 388 U.S. 14, 19 (1967). It gives him the right to put on evidence in his favor.  Specht v. Patterson, 386 U.S. 605, 610 (1967); Ferguson v. Georgia, 365 U.S. 570 (1961).

The trial court violated Appellant's federal rights to due process and compulsory process when it precluded him from adding evidence concerning Fingerhut's background including illegal activities [Tr. 3086-3101].  The evidence would have rebutted the State's good character evidence and furthered Appellant's theory of the case.

## Proposition of Law No. VII

**Where trial counsel's performance in the trial phase of a capital case fails to meet the prevailing standards of practice, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights.  Sixth and Fourteenth Amendments to the United States Constitution.**

Appellant had the federal constitutional right to effective assistance of counsel at the trial stage.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  Appellate counsel raised a similar issue, but based upon different facts Defense counsel in the trial phase unreasonably failed to present evidence minimizing his role in the murder *vis-à-vis* Roberts.  She was much more intelligent than Appellant.  She had a habit of currying favor with African-American males by supplying them with clothes, money, fast cars and sex.  She similarly supplied Appellant.

Defense counsel made no effort to link Roberts with the actual shooting.  She was seen in the immediate area of her residence at the time of the shooting.  [Tr. 2924-2936].  She had bloodstains on her shirt.  There were spots of blood in a part of the house in which the shooting did not occur.  The police administered a gun shot residue test to Roberts and the results were inconclusive.  Defense counsel failed to retain a crime scene reconstruction expert to address the facts that surround the offense and the status of the crime scene.

## Proposition of Law No. VIII

**A trial court, when it instructs a jury as to alternative theories should instruct the jury that a finding of guilt required unanimity as to the theory.  Sixth and Fourteenth Amendments to the United States Constitution.**

The trial court charged the jury in alternative as to the capital specifications [Tr. 3571-3573, 3579].  In addition, it charged the jury in the alternative as to Count II [Tr. 3573].  It did not instruct the jury that it had to be unanimous as to which alternative was applicable.  In

Richardson v. United States, 526 U.S. 813, 818-819 (1999), the United States Supreme Court held that when a criminal charge is composed of alternative theories, the court must instruct the jury that any finding has to be unanimous as which theory applied  *See also*  United States v. Burns, 298 F.3d 528, 536 (6th Cir. 2002).

### Proposition of Law No. IX

**A trial court, when it instructs a jury as to a lesser included offense, should not tell the jury that it must first find the defendant not guilty of the greater offense to consider the lesser offense.  Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

The trial court as to Counts One and Two instructed the jury on the lesser included offense of murder.  [Tr. 3565, 3577].  The trial court improperly told the jury that it could not consider the lesser included offense until it found Appellant not guilty of the greater offense. [Id.]

The trial court should have instructed the jury that it could consider the lesser included offense if it acquitted Petitioner of the greater offense or could not agree as to his guilt as to the greater offense.  State v. Thomas, 40 Ohio St. 3d 213 (1988).    An acquittal first instruction, when used in a capital case, can improperly coerce the jury into finding the defendant guilty of the greater offense.  Beck v. Alabama, 447 U.S. 625, 637 (1979).

### Proposition of Law No. X

**Where trial counsel's performance in the mitigation phase in a capital case falls below professional standards for reasonableness, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights.  Sixth and Fourteenth Amendments to the United States Constitution.**

Appellant had the constitutional right to effective assistance of counsel at the mitigation state.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  Appellant was denied this

right through his attorneys substandard performance that prejudiced the outcome of his capital trial.

Lead counsel became ill prior to the mitigation hearing and new counsel was substituted who was not certified by this Court and knew nothing about Appellant's capital case. [Sent. Tr. 4-6.] Counsel who remained on the case admitted to knowing little about the evidence that was to be presented to the jury. [Sent. Tr. 7.] As a result he requested that the psychologist, who he incorrectly believed had spoken to the mitigation witness, be permitted to sit at counsel table. [Sent. Tr. 8.]

Trial counsel gave no opening statement at the mitigation phase. [Sent. Tr. 23.] Counsel called four lay witnesses to testify. Their direct testimony was sparse and uninformative. [pages, Sent. Tr. 23-25, 25-27, 30-31 and 31-33). Trial counsel's final witness was Dr. Sandra McPherson who testified that Appellant was not mentally retarded, despite his low scores on high school intelligence tests [Sent. Tr. 45-49], was anti-social [Sent. Tr. 50-52] and no analysis as to Appellant's involvement with the commission of the offense [Sent. Tr. 54-55].

### Proposition of Law No. XI

**In a capital case a trial court cannot delegate to the prosecutor, it statutory duty to draft the sentencing opinion. Sixth, Eight and Fourteenth Amendments.**

The trial court conducted the sentencing hearing for co-defendant Donna Roberts and imposed a sentence of death. The prosecutor and court had combined efforts to draft the sentencing opinion. [ Roberts, Tr. 6336, 6365]. The trial court gave conflicting versions of the prosecutor's involvement in the sentencing process. [Roberts, Tr. 6366-6371]

The trial court in Roberts' case attempted to defend the prosecutor's involvement by citing to the fact that it had occurred in other Trumbull County cases, "It is the system that is

used here because it is the most practical." [Roberts Tr.. 6371]. Since Nathaniel Jackson's case involved the same judge, and the court conducted the trial during the same time period, it is reasonable to conclude that "the system" for drafting the sentencing opinion in the Roberts' case "was used here [in this case] because it is the most practical".

### E.  RELIEF REQUESTED

Appellant Nathaniel Jackson has shown that there are genuine issues regarding whether he was deprived of effective assistance of counsel on appeal.  Appellant requests that this Court grant this Application and reopen his direct appeal.

Respectfully submitted,
DAVID H. BODIKER
Ohio Public Defender

RANDALL PORTER (0005835)
**Counsel of Record**
Assistant State Public Defender
Office of the Ohio Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215-2998
(614) 466-5394   Fax: (614) 644-0703

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel E. Jackson's Notice of Application for Reopening was forwarded by regular U.S. Mail to Dennis Watkins, Trumbull Count Prosecuting Attorney and Luwayne Annos Assistant Prosecution Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building Warren, Ohio  44481 on this 4th day of April, 2006.

RANDALL L. PORTER
Counsel For Nathaniel E. Jackson

<u>Exhibit A</u>

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| Appellee, | ) | Case No. 03-137 |
| | ) | |
| -vs- | ) | |
| | ) | Trial Court Case No. 01 CR 794 |
| NATHANIEL JACKSON, | ) | |
| | ) | |
| Appellant. | ) | |

## AFFIDAVIT OF RANDALL L. PORTER

STATE OF OHIO     )
               ) ss:
COUNTY OF FRANKLIN  )

I, Randall L. Porter, after being duly sworn, hereby state as follows:

1.    I am an attorney licensed to practice law in the state of Ohio since 1977. I have been an Assistant State Public Defender in Ohio since 1985. My primary area of practice is capital litigation. I am certified under Sup. R. 20 as lead counsel at trial and appellate counsel in capital cases.

2.    Due to my focused practice of law and my attendance at death-penalty seminars, I am aware of the standards of practice involved in the appeal of a case in which the death sentence was imposed or recommended.

3.    The Due Process Clause of the Fourteenth Amendment guarantees effective assistance of counsel on an appeal as of right. <u>Evitts v. Lucey</u>, 469 U.S. 587 (1985).

4.    The initial responsibility of appellate counsel, once the transcript is filed, is to ensure that the entire record has been filed with this Court. Appellate counsel has a fundamental duty in every criminal case to ensure that the entire record is before the reviewing courts on appeal. Ohio R. App. P. 9(B); Ohio Rev. Code Ann. § 2929.05 (Anderson 1995); <u>State ex rel. Spirko v. Judges of the Court of Appeals, Third Appellate District</u>, 27 Ohio St. 3d 13, 501 N.E. 2d 625 (1986).

5.    After ensuring that the transcript is complete, counsel must then review the record for purposes of issue identification.  This review of the record not only includes the transcript, but also the pleadings and exhibits.

6.    For counsel to properly identify issues, they must have a good knowledge of criminal law in general.  Most trial issues in capital cases will be decided by criminal law that is applicable to non-capital cases.  As a result, appellate counsel must be informed about the recent developments in criminal law when identifying potential issues to raise on appeal.  Counsel must remain knowledgeable about recent developments in the law after the merit brief is filed.

7.    Since the reintroduction of capital punishment in response to the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238 (1972), the area of capital litigation has become a recognized specialty in the practice of criminal law.  Numerous substantive and procedural areas unique to capital litigation have been carved out by the United States Supreme Court.  As a result, anyone who litigates in the area of capital punishment must be familiar with these issues in order to raise and preserve them for appellate and post-conviction review.

8.    Appellate representation of a death-sentenced client requires recognizing that the case will most likely proceed to the federal courts at least twice: first on petition for Writ of Certiorari in the United States Supreme Court, and again on petition for Writ of Habeas Corpus filed in a federal district court.  Appellate counsel must preserve all issues throughout the state court proceedings on the assumption that relief is likely to be sought in federal court.  The issues that must be preserved are not only issues unique to capital litigation, but also case-and fact-related issues, unique to the case, that impinge on federal constitutional rights.

9.    It is a basic principle of appellate practice that to preserve an issue for federal review, the issue must be exhausted in the state courts.  To exhaust an issue, the issue must be presented to the state courts in such a manner that a reasonable jurist would have been alerted to the existence of a violation of the United States Constitution.  The better practice to exhaust an issue is to cite directly to the relevant provisions of the United States Constitution in each proposition of law and in each assignment of error to avoid any exhaustion problems in the federal courts.

10.   It is important that appellate counsel realize that the capital reversal rate in the state of Ohio is eleven percent on direct appeal and less than one percent in post-conviction.  It is my understanding that forty to sixty percent (depending on which of several studies is relied upon) of all habeas corpus petitions are granted.  Therefore, appellate counsel must realize that in Ohio, a capital case is very likely to reach federal court and, therefore, the real audience of the direct appeal is the federal court.

11.     Based on the foregoing standards, I have identified five propositions of law that should have been presented to this Court by appellate counsel. The propositions of law identified in this application for reopening were not presented to this Court.

13.     Based on my evaluation of the record and understanding of the law, I believe that if these propositions of law had been properly presented for review, this Court would have granted relief.  Also, those errors would have been preserved for federal review.

14.     Therefore, Nathaniel E. Jackson was prejudiced as a direct result of the deficient performance of his appellate counsel on his direct appeal to this Court.

RANDALL L. PORTER
Counsel for Appellant Nathaniel E. Jackson

Sworn to and subscribed before me
this 4th day of April, 2006.

Notary Public

KATHRYN L. SANDFORD, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

## IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                          :

-vs-                                    :        Case No. 03-137

NATHANIEL E. JACKSON,                   :

      Appellant.                        :        Death Penalty Case

---

Relevant Transcript Portions

---

## IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                                :

      Plaintiff-Appellee,                    :          Case No.  03-137

-vs-                                                   :

NATHANIEL E. JACKSON,                  :

      Defendant-Appellant.               :

### ~~Affidavit of Indigency~~

I, Nathaniel E. Jackson, after being duly sworn according to law states as follows:

1.     I am the defendant in this case.  I was in special eduction classes in school.  I do not read and write very well.  I never graduated from high school.

2.     The judge who sentenced me to death appointed attorneys John P. Laczko and Dennis Day Lager to represent me on my appeal.  These attorneys never came to visit me.

3.     I wrote my attorneys and left them telephone messages to call me.  They did not answer my letters or telephone calls.

4.     They did not write me even after I lost my case in this Court.  The first thing that I heard about the decision was from my post-conviction attorney.

_Nathaniel Jackson_
Nathaniel E. Jackson

Sworn to, or affirmed, and subscribed in my presence this 29ᵗʰ day of March , 2006.

_Notary Public_

My Commission Expires: _____.

EXHIBIT
B

RANDALL L. PORTER  Attorney ...
Notary Public, State of Ohio
MY COMMISSION IS NON-EXPIRING

IN THE SUPREME COURT OF OHIO

STATE OF OHIO                    )
                                          Case No. ___03-137
        Plaintiff-Appellee          )

vs.                                    )    **DEATH PENALTY CASE**

NATHANIEL E. JACKSON          )

        Defendant-Appellant        )

---

## MERIT BRIEF OF APPELLANT, NATHANIEL E. JACKSON

---

On Appeal from the Court of Common Pleas, Trumbull County, Ohio
Case Number  01 CR 794

JOHN P. LACZKO  #0051918
4800 Market St., Suite C
Youngstown, Ohio  44512
(330) 788-2480

DENNIS DAY LAGER #0026073
1025 Chapel Ridge St., N.E.
Canton, Ohio  44714
(330) 494-5736
ATTORNEYS FOR DEFENDANT-
APPELLANT-NATHANIEL E.
JACKSON

DENNIS WATKINS #0009949
Trumbull County Prosecutor
LuWAYNE ANNOS #0055651
Assistant Prosecutor
Prosecutor's Office
Trumbull County Administration Bldg.
160 High St. N.W., 4th Floor
Warren, Ohio  44481
(330) 675-2426
ATTORNEYS FOR PLAINTIFF-APPELLEE
THE STATE OF OHIO

FILED

OCT 2 7 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Jackson EXHIBIT 8
Page 17

TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS - - - - - - - - i

TABLE OF AUTHORITIES - - - - - - - vi

STATEMENT OF FACTS - - - - - - - - 1

PROPOSITION OF LAW NO. 1 - - - - - - 6

APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION AND OVERRULED A MOTION TO SUPPRESS HIS STATEMENT CONTRARY TO THE PROTECTIONS OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

PROPOSITION OF LAW NO. 2 - - - - - - 11

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE DEFENDANT'S PREJUDICE. U.S. CONSTITUTION, AMENDMENT VI; OHIO CONSTITUTION, ARTICLE I, SECTION 10.

PROPOSITION OF LAW NO. 3 - - - - - - 21

A CRIMINAL DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL IS VIOLATED WHEN THE PROSECUTION ENGAGES IN EXTENSIVE, DELIBERATE, MISLEADING AND PREJUDICIAL MISCONDUCT. U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

PROPOSITION OF LAW NO. 4 - - - - - - 36

RULINGS OF THE TRIAL COURT ALLOWING IMPROPER EVIDENCE AND ARGUMENT BEFORE THE JURY, AND INAPPROPRIATE COMMENT THEREON BY THE COURT AS TO THE PROPRIETY OF SUCH EVIDENCE AND ARGUMENT, DENIES A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR AND IMPARTIAL TRIAL. U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

PROPOSITION OF LAW NO. 5 - - - - - - 41

A DEFENDANT'S SUBSTANTIAL CONSTITUTIONAL RIGHTS ARE INFRINGED

i

BY JURY INSTRUCTIONS THAT RELIEVE THE STATE OF ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT ON THE <u>MENS REA</u> ELEMENT OF A CAPITAL CRIME.  U.S. CONST. AMENDS. VI, VIII, XIV; OHIO CONST. ART. 1 SECTIONS 5, 9, 16.

PROPOSITION OF LAW NO. 6 -  -  -  -  -  -  -  -  47

A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT.  U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, SECTION 16.

PROPOSITION OF LAW NO. 7  -  -  -  -  -  -  -  52

WHEN THE TRIAL COURT CONSIDERS AND WEIGHS BOTH R.C. 2929.04(A)(7) ALTERNATIVES, AND REDUCES MITIGATION TO A 'JUSTIFICATION,' A CAPITAL DEFENDANT IS DEPRIVED OF THE RIGHT TO INDIVIDUALIZED SENTENCING AND OF HIS LIBERTY INTEREST IN THE STATUTORY SENTENCING SCHEME THUS VIOLATING RIGHTS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 9 AND 16, ARTICLE I, OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 8  -  -  -  -  -  -  -  59

IT IS PREJUDICIAL ERROR FOR A TRIAL COURT TO SENTENCE DEFENDANT TO THE DEATH PENALTY, WHEN, BASED UPON THE LAW AND THE RECORD OF THIS  CASE, THE SENTENCE OF DEATH HEREIN IS INAPPROPRIATE AND IS DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, IN VIOLATION OF DEFENDANT'S RIGHTS AS GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTIONS 5, 9, 10, AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 9  -  -  -  -  -  -  -  62

THE  PROPORTIONALITY REVIEW THAT THIS COURT MUST CONDUCT IN THE PRESENT CAPITAL CASE PURSUANT TO OHIO REVISED CODE SECTION 2929.05 IS FATALLY FLAWED AND THEREFORE THE PRESENT DEATH SENTENCE MUST BE  VACATED PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, SECTIONS 5 AND 10, ARTICLE 1 OF THE OHIO CONSTITUTION AND OHIO REVISED CODE 2929.05, IN VIOLATION OF DEFENDANT'S RIGHTS AS

GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE U. S. CONSTITUTION AND SECTIONS 5, 9, 10 AND 16
OF ARTICLE ONE OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 10   -   -   -   -   -   -   69

IT IS ERROR FOR A TRIAL COURT TO IMPOSE A DEATH SENTENCE WHEN THE
DEATH PENALTY LAW AS CURRENTLY APPLIED IN OHIO VIOLATES R.C.
2929.05(A) BY REQUIRING APPELLATE COURTS AND THE SUPREME COURT,
IN CONDUCTING THEIR R.C. 2929.04(A) REVIEW OF "SIMILAR CASES" FOR
PROPORTIONALITY, TO EXAMINE ONLY THOSE CASES IN WHICH A DEATH
SENTENCE WAS IMPOSED AND IGNORE THOSE IN WHICH A SENTENCE OF
LIFE WITH PAROLE ELIGIBILITY AFTER TWENTY-FIVE FULL YEARS OR LIFE
WITH A PAROLE ELIGIBILITY AFTER THIRTY FULL YEARS WAS IMPOSED.
THE CURRENT METHOD ALSO VIOLATES THE RIGHTS TO A FAIR TRIAL AND
DUE PROCESS, RESULTS IN CRUEL AND UNUSUAL PUNISHMENT, AND
IMPLICATES OTHERS OF APPELLANT'S PROTECTED RIGHTS AS WELL, ALL AS
SET FORTH IN THE FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND IN SECTIONS 1,
2, 5, 9, 10, 16 AND 20, ARTICLE I OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 11   -   -   -   -   -   -   71

R.C.  2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND
2929.05 AS READ TOGETHER AND AS APPLIED IN THIS CASE VIOLATE THE
FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION AND SECTIONS 2, 9, 10, AND 16 OF ARTICLE I OF THE
OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 12   -   -   -   -   -   -   87

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL OHIO REV. CODE
ANN. & 2903.01, 2929.02, 2929.021, 2929.022, 2929.023,2929.03,2929.04, AND 2929.05
,DO NOT MEET THE  PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND
ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO APPELLANT.
U.S. CONST. AMENDS V, VI,VIII,XIV, OHIO CONST. ART 1, SECTIONS 2,9,10,16
FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED
STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

CONCLUSION   -   -   -   -   -   -   -   107

CERTIFICATE OF SERVICE   -   -   -   -   -   -   -   108

iii

## IN THE SUPREME COURT OF OHIO

ORIGINAL

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | ON COMPUTER-ALM |
| -vs- | : | Case No. 03-137 |
| NATHANIEL E. JACKSON, | : | |
| Appellant. | : | Death Penalty Case |

---

# VOLUME I

# APPELLANT'S APPENDIX OF TRANSCRIPT PAGES IN SUPPORT OF HIS APPLICATION FOR REOPENING

---



# NATHANIEL JACKSON

# TRIAL TRANSCRIPT

298

| | | |
|---|---|---|
| 1 | Q. | From the Wirt Street address, because he was |
| 2 | | out there, also? |
| 3 | A. | Bacon? |
| 4 | Q. | Yes. |
| 5 | A. | Yes. |
| 6 | Q. | He's the guy that had the magic keys that |
| 7 | | opened the door in the Sheriff's |
| 8 | | department? |
| 9 | A. | Right. |
| 10 | Q. | What did Officer Hoolihan tell you? |
| 11 | A. | Hoolihan had told me that they had received |
| 12 | | permission to search the residence from |
| 13 | | Sheila Fields, who is not really known to |
| 14 | | me at that time. |
| 15 | Q. | This was over on Wirt Street? |
| 16 | A. | Correct.  He told me that they had arrested |
| 17 | | Jackson without incident.  He didn't put |
| 18 | | up a struggle.  He told me that he had |
| 19 | | planted a seed in Jackson's head that |
| 20 | | Donna Roberts had been cooperating with |
| 21 | | us, and that he had made that known to |
| 22 | | Jackson. |

303

1    Q.    You and Officer Hoolihan went in Officer

2          Bacon's office and talked to Mr. Jackson

3          in regard to this, correct?

4    A.    Yes.

5    Q.    And as you indicated, Officer Hoolihan planted

6          the seed and indicated to Nathaniel that

7          the woman gave him up, basically, and

8          that is an investigative technique or

9          tactic or whatever, if somebody or more

10         than one person was involved in the

11         crime, it is always nice to say the other

12         guy squealed on you or giving it all up

13         and he's going to blame you.  That kind

14         of loosens up the tongue?

15   A.    That is what was done.

16   Q.    You went in and you had the conversation with

17         Nathaniel and Nathaniel basically gave

18         what is contained in this summary, which

19         is Exhibit No. 2.  Is that correct?

20   A.    What is your question?

21   Q.    Once you had the conversation with, in regard

22         to Mr. Jackson along with Mr. Hoolihan

310

1   Q.   So, you had to develop some rapport with him?

2   A.   He seemed to have been having some emotional

3        difficulties with the fact that he had

4        killed somebody.

5   Q.   So you talked to him.  Jeff could be a pretty

6        gentle guy and you can be a pretty gentle

7        guy with people?

8   A.   I don't understand your question.

9   Q.   You can talk to somebody in a very relaxed

10       form or whatever, and try to get their

11       attention, talk to them about what

12       happened, right?

13  A.   Yes.

14  Q.   And it is obvious from that summary, that is

15       what you did here, somewhere along the

16       line you got his confidence and you were

17       talking to him and he told you basically

18       what happened?

19  A.   Correct.

20  Q.   And is there anything else that you did or did

21       you give him anything during that

22       interview or on the video tape?  Is there

309

| | | |
|---|---|---|
| 1 | A. | Should have been in their possession a longer |
| 2 | | period of time. |
| 3 | Q. | So, we don't have the original notes, this is |
| 4 | | the compilation and this is the best you |
| 5 | | recall of what happened between Nathaniel |
| 6 | | Jackson, yourself, and Officer Hoolihan, |
| 7 | | right? |
| 8 | A. | Yes. |
| 9 | Q. | You could have just put the video on right |
| 10 | | away, could you not, or asked him to do a |
| 11 | | video, but you decided not do that? |
| 12 | A. | Initially I didn't know whether Mr. Jackson |
| 13 | | would want to go on video right away.  We |
| 14 | | were developing a rapport with him. |
| 15 | Q. | Tell me about the rapport. |
| 16 | A. | Mr. Jackson seemed to be somewhat despondent. |
| 17 | | He didn't want to look at either of us. |
| 18 | | He would frequently -- you and I were |
| 19 | | talking right now.  He would always look |
| 20 | | away from me.  He didn't want to talk |
| 21 | | directly at me.  Always looked the other |
| 22 | | way. |

326

1          halfway house violated me and sent me

2          back down.

3   Q.    You had an aggravated burglary conviction some

4          time ago, too; isn't that correct?

5   A.    Yes.

6   Q.    You went to prison for that?

7   A.    Yes.

8   Q.    And there were other times that you were

9          arrested for various theft offenses,

10         right?

11  A.    Yes.

12  Q.    And some of those times the police officers

13         would give you a Miranda warning?

14  A.    Yes.

15  Q.    So, you understood from your experience with

16         police, what a Miranda warning is, right?

17  A.    Most definitely.

18  Q.    Would you tell the Judge what Miranda means?

19  A.    I guess it is right there.

20  Q.    I mean in your own words, what rights do you

21         have when the police arrest you?

22  A.    I am arrested.  That is it.  I am arrested.

328

```
 1              because my finger was in pain and I had
 2              smoked some marijuana earlier that day
 3              and I was high.  I'm figuring I'm just
 4              cooperating with them, trying to go ahead
 5              and stop asking me these questions.
 6   Q.   The times before when you were arrested, there
 7              were times when you told the police, "I
 8              don't want to talk to you," right?  Isn't
 9              that true?
10   A.   I never been in a situation like this.
11   Q.   You have never been arrested?
12   A.   I ain't never been in a situation like this I
13              been arrested for.  I mean I understood
14              it.
15   Q.   But you were given Miranda warnings before,
16              correct, by other police departments,
17              correct?  Am I correct?
18   A.   I don't know what you mean by that.
19   Q.   I'm asking you, on your prior arrest, were you
20              given Miranda warnings?
21   A.   What is the Miranda warnings, Sir?
22   Q.   What you just --
```

339

```
1   A.    Right.

2   Q.    And so you are stating that if the video shows

3               you receiving your Constitutional rights

4               at the beginning of the video, then that

5               video is not correct, is that what you

6               are saying?

7   A.    I didn't receive none.  I can't remember, I

8               was high.

9   Q.    You distinctly remembered and told Judge

10              Stuard that you absolutely remember that

11              they didn't give you the -- that is

12              Hoolihan did not give you your

13              Constitutional rights an hour and a half

14              before in the car, so you should be less

15              on drugs now?

16  A.    I know when they first picked me up, I know

17              about that.

18  Q.    But now you are not so sure about what happens

19              at 2:00 or 1:45, an hour and 45 minutes

20              later; is that what you're saying?

21  A.    The pills started kicking in.

22  Q.    The pills started kicking in.  Well, is it
```

506

1    A.    Yes, I think I can be fair.

2    Q.    You would be able to give us your time and

3          attention and decide this case on the

4          facts and the law that comes forth in the

5          trial?

6    A.    Yes.

7                MR. WATKINS:  Thank you.

8    EXAMINATION BY MR. CONSOLDANE OF MS. HOOK:

9    Q.    Are you going to the fundraiser, O'Brien

10         Memorial tomorrow night?

11   A.    No.

12   Q.    The clam bake?

13   A.    No.

14   Q.    That was a tragic thing that happened.

15   A.    Yes, it was.

16   Q.    Did you know Lee Olashetti, the son?  The one

17         that is my age, not the father.  Knowing

18         all this, you really think you can be a

19         fair juror?

20   A.    I truthfully think I can be.

21   Q.    Would you like to serve on the Jury?

22   A.    I think I would.

507

1    MR. CONSOLDANE:   Pass for cause.

2    THE COURT:   You are in the pool.

3    Please call that number after 4:30.

4    (Juror number 224 excused from the Jury room.)

5    MR. WATKINS:   We're satisfied for

6    the record.

7    (Juror number 226, Raymond Harrison entered the

8    Jury room.)

9    THE COURT:   You raised your hand

10   this morning.

11   MR. HARRISON:   My wife has got

12   multiple sclerosis.   I can't leave her.

13   THE COURT:   Mr. Watkins?

14   EXAMINATION BY MR. WATKINS OF MR. HARRISON:

15   Q.    I take it that you are telling me that the

16         condition of your wife and sickness is

17         such that you cannot give three, four

18         weeks of your time listening all day to a

19         trial.

20   A.    I couldn't.

21   Q.    And your mind will be on the medical situation

22         at home?

575

1           not a problem.  It is the consecutive

2           money.

3    Q.    There's no way you can get around that?

4    A.    No.

5           MR. WATKINS:  I don't have any

6    problem with her being excused.

7           MR. CONSOLDANE:  We have no

8    objection to her being excused.

9           THE COURT:  You are excused.  We

10   thank you for your time.

11   (Juror number 286 excused from the Courtroom.)

12   (Juror number 297, Dennis Jones entered the

13   Courtroom.)

14          THE COURT:  Good morning.

15          MR. JONES:  Good morning.

16          THE COURT:  Mr. Jones, you held your

17   hand up yesterday, what was the reason for that?

18          MR. JONES:  Mostly to the media

19   exposure.  I remember the initial T.V. announcement

20   a year ago.

21          THE COURT:  The case got its usual

22   amount of media.  Here's the question that is

577

1    had been exposed to it before, but on my summons,

2    it had Judge Logan's name on it, but your name was

3    mentioned for the case, and I read the article,

4    trying to watch up on what I had seen on the T.V.

5    the year before, so I thought about a few things of

6    it.

7                    THE COURT:   Certain things you have

8    read that you remember?

9                    MR. JONES:   Yes, it is preordained,

10   but things that seem to stick in my memory.

11                   THE COURT:   That is only natural.

12   Mr. Watkins, why don't you inquire?

13   EXAMINATION BY MR. WATKINS OF MR. JONES:

14   Q.   Hi, Mr. Jones.  Sorry about the inconvenience,

15             hopefully we'll have this one fixed.

16             Myself and Chuck Morrow are Prosecutors

17             in this case and I'm sure you are aware,

18             and Attorney Consoldane and Attorney

19             Lewis are Defense attorneys, and as we go

20             through this process, both sides have the

21             opportunity to ask you some questions as

22             the Judge directs.  You understand that?

578

```
1    A.   Yes.

2    Q.   And we all have a journey here to find a fair

3              Jury and that may be a difficult process

4              and we have to have some understanding of

5              what you know.  Now, my understanding

6              when you raised your hand, did you know

7              any of the people that were read to you?

8    A.   No one on the witness list, no.

9    Q.   So, the major reason that you raised, the sole

10             reason you raised your hand was the fact

11             that you read something in the newspaper?

12   A.   Basically, yes.

13   Q.   And you read something on Monday?

14   A.   Right, the day before we came.

15   Q.   And you are from Newton Falls?

16   A.   Yes.

17   Q.   And you read the Tribune?

18   A.   Yes.

19   Q.   And that sort of triggered past memory of

20             something that you read or heard?

21   A.   It reminded me of the T.V. exposure in

22             December of last year.
```

579

1  Q.  Have you ever served on a Jury before?

2  A.  I was here two years ago, not on a Jury, but I

3       was on Jury duty, but not selected.

4  Q.  I take it, I believe you work at BCI.

5  A.  Yes.

6  Q.  I would believe that, tell me if I am wrong,

7       that you don't believe everything you

8       read in the newspaper?

9  A.  Especially about the steel industry, I hope.

10 Q.  So you have your personal experience?

11 A.  I make my own conclusions based on different

12      aspects.

13 Q.  And therefore, you would you would like to

14      know the facts yourself rather than

15      relying on hearsay or second hand

16      information?

17 A.  Basically, yes.

18 Q.  Now, when you read the newspaper on Monday,

19      could you please tell me what you can

20      recall reading that sticks in your mind?

21 A.  I believe I remember that the Defendant had

22      some sort of relationship with Mr.

580

1          Fingerhut's wife.  I believe I remember

2          there being correspondence between them

3          previous to the act that happened.

4          Basically, that is the largest thing that

5          happened, the relationship between him

6          and his wife.  Possibly a conspiracy that

7          I thought.

8     Q.   The relationship and that is what you

9          remembered?

10    A.   Affair and correspondence.

11    Q.   Once you heard that or read that, what else do

12         you remember from reading or hearing

13         before?

14    A.   I think it was also mentioned something about

15         the wife and the Defendant, but I wasn't

16         sure about the correlation until I read

17         it in the paper.

18    Q.   And you were here when the Judge told you that

19         there have been two persons charged in

20         this case?

21    A.   Yes.

22    Q.   And that is information that you have gained

581

1           through the Court?

2    A.    No.   I believe I read that in the paper.

3    Q.    He also mentioned it.

4    A.    Yes.

5    Q.    Now, is there anything in that information,

6           whether it was before you read the

7           newspaper on Monday, or at any time,

8           including right up to the present time,

9           that made you come to a conclusion as to

10          the guilt or innocence of the Defendant?

11   A.    It seemed like a fairly preordained motive, if

12          indeed he did do that, having an affair

13          and the correspondence previous to the

14          crime.

15   Q.    The fact that somebody wrote in the newspaper

16          there was an affair or correspondence,

17          does that make him guilty in your mind?

18   A.    Not so much guilty, it leans towards a motive

19          that I can see.

20   Q.    Do you agree or would you agree with me, that

21          if the Judge would tell you, you have to

22          set all of that aside and decide his

582

1              guilt from witnesses and evidence, would

2              you be able to do that?

3    A.    Consciously, yes, subconsciously, I couldn't

4              say, once I heard the facts.

5    Q.    Your problem is that you feel that the fact

6              that there was information concerning an

7              affair, that that would mean he would be

8              guilty?

9    A.    Not unless the evidence would point to that

10             more heavily during the trial, but I

11             can't ignore what I have read and heard.

12             It is always in your mind.

13   Q.    I know that.  It is hard to say I read it and

14             forget about it.  The law would require

15             you to say with certainty that you are

16             not going to judge your guilt on anything

17             you read, but only from the evidence that

18             comes forth in this trial; could you do

19             that?

20   A.    If the preponderance was towards his

21             innocence, probably.

22   Q.    He doesn't have to prove his innocence?

583

```
1    A.    I know.

2    Q.    The State must prove beyond a reasonable doubt

3                his guilt, and at this point in time, if

4                you can't accord him his presumption of

5                innocence, you really can't be a juror in

6                this case, and you only can decide

7                whether or not you can tell me, you can

8                tell the Judge, you can tell Defense

9                counsel, Mr. Watkins, I can tell you

10               right now and I can tell the Defendant,

11               that he's innocent at this time, and

12               whatever I read doesn't prove his guilt,

13               and I am only going to decide his guilt

14               on the evidence that is given in this

15               Courtroom; could you do that?

16   A.    I would like to say yes, but when the time

17               would come, I don't know if I would

18               revert to something previous I read or

19               not.  I would like to do it based on

20               facts.  I am a factual person.  I work

21               with numbers a lot.  They are either one

22               way or the other.
```

584

```
 1   Q.   Are you saying what you read means that he's

 2        guilty at this point in your mind?

 3   A.   No, I can't say that.

 4   Q.   As best you can say to your ability to give an

 5        opinion or a statement now, do you feel

 6        you could be a fair and impartial juror

 7        in this case?

 8   A.   I would do my very best to do that.

 9   Q.   And you would feel comfortable, if you were on

10        trial yourself, and you had a person of

11        your mental view at this point in time?

12   A.   50-50 thing.  Maybe someone else would be

13        better than I am, I don't know.

14   Q.   Would be better in the sense --

15   A.   Less exposure, less knowledge.

16   Q.   You think a person that didn't know anything

17        would be better than you?

18   A.   Probably.

19   Q.   But you still feel that you could be fair and

20        impartial?

21   A.   I would have to write it down.  One side of

22        the line to the other and make up my mind
```

585

1          on the facts.

2                  MR. WATKINS:  I have no further

3    questions.

4                  THE COURT:  Mr. Lewis?

5    <u>EXAMINATION BY MR. LEWIS OF MR. JONES:</u>

6    Q.   Mr. Jones, my name is Jim Lewis and long with

7              Tony Consoldane, we represent Nathaniel

8              in this case?  May I call you Dennis.

9    A.   Surely.

10   Q.   We're not the mechanically inclined around

11             this Courthouse.  We have always had

12             problems with a lot of things,

13             microphones, we can't do it.  The Court

14             reporters, that technology are way ahead

15             of us.  From the comments you made with

16             Mr. Watkins, I can sincerely appreciate

17             what you are telling us, and what you are

18             telling us basically is what I believe a

19             good honest person would tell people,

20             because when we hear or read something in

21             the newspaper, we just kind of are

22             inclined to the way we have been brought

587

```
 1              and so forth, everything you are going to
 2              make your decision on in this case is
 3              really going to be presented in this
 4              Courtroom and that is the only thing you
 5              can make the decision on, right?
 6    A.   Yes.
 7    Q.   And you understand, that is the only way it
 8              can be.  We can't worry about reporters
 9              or people trying to sell newspapers or
10              any of that, we have to depend on this,
11              and this is the way you would want it if
12              you were charged with a speeding ticket,
13              right?  You don't want newspaper articles
14              saying, Officer Jones is a wonderful
15              fellow and a newspaper the day before you
16              go to trial and he believes that Dennis
17              really committed this crime or whatever
18              and everybody comes in and says, "I read
19              that."  So, what you are telling us is
20              that you are going to do the best you
21              can.  That is all we can ask.  That is
22              all we're going to ask.  You are going to
```

588

1            do the best you can, if you do sit on

2            this Jury, is to separate and recognize

3            what is presented in this Courtroom as

4            opposed to maybe what you read before.

5            Right?

6     A.    That is the job, yes.

7     Q.    Is there anything else that would make it

8            difficult for to you sit in this case?

9            Anything the Judge mentioned yesterday,

10           any of those other items?

11    A.    I have a property I'm trying to get people to

12           move into the end of this month.  I have

13           been working on it every spare minute I

14           have.  I get off at quarter to three and

15           the Juries last until five or six.

16    Q.    Even though good citizenship requires or has

17           people come in and be jurors, it is

18           difficult, because we're interrupting

19           lives, as I think Mr. Watkins indicated,

20           you may be called here one more time

21           during the next week and a half or two

22           weeks and then we may go for the ten days

589

1              or whatever, and that would probably be

2              the scenario.  We can't tell you

3              perfectly, we're not General Motors, we

4              don't put pieces together, trials just

5              don't work that way.  That would be the

6              general scenario.  You think you would be

7              okay with it?

8    A.    Yes.  I think so.

9                   MR. LEWIS:  Thank you very much.

10                  MR. WATKINS:  Satisfied.

11                  MR. LEWIS:  No objection.

12                  THE COURT:  Dennis, you will be in

13   the pool and if you will call that number, they

14   will tell you when to come back.

15   (Juror number 297 excused from the Courtroom.)

16   (Juror number 310, Bonnie Wildman entered the

17   Courtroom.)

18                  THE COURT:  You heard the questions

19   yesterday and you held your hand up.  Would you

20   tell us what that was for?

21                  MS. WILDMAN:  You asked if we had a

22   problem if we're sequestered, and I do.  It is a

605

| | | |
|---|---|---|
| 1 | | this time, and you wouldn't be fair to |
| 2 | | the State, now, it is important to |
| 3 | | recognize he's presumed innocent by law, |
| 4 | | but if you had a fixed opinion, you could |
| 5 | | never find him guilty, you wouldn't be |
| 6 | | fair to the State; you see what I'm |
| 7 | | saying? |
| 8 | A. | That is true. |
| 9 | Q. | And so if you have a fixed opinion, you have |
| 10 | | to set that aside.  You can do that? |
| 11 | A. | I believe so. |
| 12 | Q. | And right now, you would require the State if |
| 13 | | it can, to prove his guilt with proof |
| 14 | | beyond a reasonable doubt? |
| 15 | A. | Yes. |
| 16 | Q. | And only on the evidence that comes in the |
| 17 | | Courtroom and only on the law that the |
| 18 | | Judge would give? |
| 19 | A. | I hope so, yes. |
| 20 | | MR. WATKINS:  Thank you. |
| 21 | EXAMINATION BY MR. LEWIS OF MR. SCHRECENGOST: | |
| 22 | Q. | Good morning, Mr. Schrecengost.  My name is |

606

| | | |
|---|---|---|
| 1 | | Jim Lewis and along with Anthony |
| 2 | | Consoldane, we represent Nathaniel in |
| 3 | | this case.  May I call you Jack? |
| 4 | A. | Yes. |
| 5 | Q. | Jack, I think Dennis has gone over the |
| 6 | | important points here and the things that |
| 7 | | you raised were, one, your knowledge of |
| 8 | | Mr. -- or acquaintance with Mr. Tackett; |
| 9 | | and number two, what you read in the |
| 10 | | newspaper.  Maybe another way of looking |
| 11 | | at this is flipping the coin, always put |
| 12 | | yourself in the other guy's shoes, type |
| 13 | | of thing.  So, let me do that for an |
| 14 | | example here.  Let's assume that I was |
| 15 | | going to represent you in a speeding |
| 16 | | ticket and we had to go to Warren |
| 17 | | Municipal Court, and just the day before, |
| 18 | | they wrote an article about an officer |
| 19 | | who was the one who gave you the ticket, |
| 20 | | and they say, this is what happened in |
| 21 | | this case, he got you on laser beam, |
| 22 | | speeding, 20 miles over the speed limit. |

609

```
 1              say that I'm going to do the best I can."
 2              That is all you can really tell me.  "I'm
 3              going to do the best I can to set aside
 4              anything I read in that newspaper.  I
 5              recognize what it is, I'll set it aside
 6              and I'll listen to exactly what is in
 7              this Courtroom and I'll make my decision
 8              only on what comes from this Courtroom."
 9              What do you feel?  You feel you can do
10              that?  You think you would do the best
11              job you can?
12  A.   I think I could, yes.
13  Q.   And this is another example.  Let's flip the
14              coin with Mr. Tackett, that would be the
15              same story.  All of the potential jurors
16              that come in, your speeding case, you are
17              next to me again and I ask him, "Do you
18              know anybody that is going to testify in
19              this case.  I know Officer Jones," and he
20              just happened to be the one that gave you
21              the ticket.  I am acquainted with him, I
22              know him, whatever.  Then I ask him,
```

610

1        "Well, can you put all of that

2        acquaintance and relationship out of your

3        mind and just judge his testimony on what

4        he says in Court?"  You see how you flip

5        that around and you are going to nudge me

6        and say, "Jim, gee, he knows me.  He's a

7        friend.  He's got a leg up.  He's going

8        to believe him."  You see how that goes?

9   A.   Yes.

10  Q.   Again I would ask you the same question, even

11       though you know Officer Tackett,

12       officers, in the normal course of things,

13       they may lie, they may not, but a lot of

14       people, we're just human beings and when

15       we convey testimony and think what we

16       see, many times we're mistaken.  We

17       believe we're right, many times we're

18       mistaken.  Sometimes you see somebody and

19       you recognize and say I know that person,

20       I know that person, and it turns out when

21       you finally get close enough it, doesn't

22       turn out to be the person that you

611

```
 1                    thought it was.  If I would have asked
 2                    you five minutes before, you would have
 3                    said, that has got to be so and so,
 4                    because you believe it, right?
 5   A.     Yes.
 6   Q.     We all make mistakes, and police officers are
 7                    no different, I am no different, the
 8                    Judge is no different.  We're all in the
 9                    same boat, right?
10   A.     Right.
11   Q.     Do you think you can do the best you can in
12                    regard to evaluating Officer Tackett's
13                    testimony if he does testify from like a
14                    ground zero or start at an even scale and
15                    say, "I may know him, but he's in this
16                    trial and I'm going to listen carefully
17                    to what he says, I'm going to listen to
18                    Mr. Lewis cross examine him and see if he
19                    really knows what he's talking about
20                    here."  And if it doesn't seem right to
21                    you or you say, "Well, maybe he's
22                    mistaken about that," and we establish
```

612

1          something else, could you go the other

2          way and just say, "I don't care who that

3          testimony comes from, I'm going to

4          evaluate the testimony.  It doesn't make

5          any difference if it comes from Officer

6          Tackett or anybody else, I'm going to

7          evaluate the testimony the way I am

8          supposed to according to the instructions

9          as they come from the Judge?"

10    A.    I certainly hope I can do that.

11          MR. LEWIS:  Thank you.

12          MR. WATKINS:  We're satisfied.

13          MR. LEWIS:  We're satisfied.

14          THE COURT:  You will remain in the

15    pool.  You will be notified to call that number

16    every evening after 4:30.)

17    (Juror number 316 excused from the courtroom.)

18          MR. WATKINS:  I would make a

19    suggestion, we're right now at 3:16, and it is

20    probably in my opinion, that we won't get to these

21    people between 3:20 and 4:00 as jurors, so my

22    suggestion if they come in and say they read

594

1           night or something like that, if it comes

2           about.  We don't know if it will or not,

3           we can't tell you, but you would be okay

4           with that?

5    A.    I'll probably find somebody that would get her

6           to the kennel, that would be her only

7           problem.

8    Q.    Everything else all right?

9    A.    Yes.

10                   MR. LEWIS:  Thank you.

11                   MR. WATKINS:  We're satisfied.

12   Thank you.

13                   MR. LEWIS:  We're satisfied.

14                   THE COURT:  You will be in the pool

15   and if you will call that number given to you after

16   4:30 each evening, you will be told when to come

17   back.

18   (Juror number 310 excused from the Courtroom.)

19   (Juror number 316 Jack Schrecengost entered the

20   Courtroom.)

21                   THE COURT:  You heard the questions

22   put yesterday and you held your hand up.  Would you

595

1   tell us what that was about?

2                   MR. SCHRECENGOST:  There was some

3   witnesses named and I was in the corner, and I

4   think it was Tackett and Bogus.

5                   THE COURT:  How well do you know

6   those gentlemen?

7                   MR. SCHRECENGOST:  Pretty good.

8                   THE COURT:  Have you worked with

9   them?

10                  MR. SCHRECENGOST:  I believe they

11  worked at CSC.

12                  THE COURT:  No matter how well you

13  know them, the question is, if they testify, are

14  you able to evaluate their testimony the same as

15  you would any other person, even though -- or do

16  you know them so well that you have a tendency to

17  believe whatever they said and liken it to other

18  evidence that would be in the case?

19                  MR. SCHRECENGOST:  That is a hard

20  one to answer.

21                  THE COURT:  Both sides here are

22  entitled to have jurors that will decide this case

596

1    only on the merits of the evidence produced?

2                    MR. SCHRECENGOST:  When you say it

3    would be easier to believe somebody you know if

4    they are lying or telling the truth?

5                    THE COURT:  I think it is only

6    natural if you know somebody and think that you are

7    going to start out from a position of accepting

8    what they say as being true.  With a total

9    stranger, you don't have even your mind made up to

10   that regard, you listen to what they say and then

11   you evaluate it.  The gist of the thing is that

12   assuming one of these people you know were

13   testifying to something, and they may well believe

14   that it is true, but if you found from all of the

15   evidence that maybe they are mistaken on that

16   point, do you know them so well that you would set

17   aside that other evidence and merely take what they

18   say, or do you think you could decide the case on

19   the totality of the evidence?

20                   MR. SCHRECENGOST:  I think I could

21   do that.

22                   THE COURT:  Did you raise your hand

597

1    for any other reason?

2                    MR. SCHRECENGOST:  About reading it

3    in the paper, I read it.

4                    THE COURT:  Do you recall much about

5    what you read or just --

6                    MR. SCHRECENGOST:  Quite a bit.

7                    THE COURT:  It is a case that got a

8    lot of publicity, as many of them do.  The question

9    there is are you able to accept the reality that

10   many times the information in the newspapers is not

11   correct?  Sometimes it is very wrong.  And again,

12   do you feel that you could sit and listen to the

13   evidence, anything that happened prior to when this

14   case starts is not evidence.  The case has to be

15   decided by each of the jurors on the basis of what

16   takes place in this Courtroom.  Now, assume that

17   you sat and listened to the trial and there was

18   something that was mentioned in one of those

19   articles that wasn't presented here.  In order to

20   do your job properly, you would have to set that

21   aside, because it isn't evidence.  You can't

22   discuss that with anybody else, "I remember this, I

598

```
 1   read it in the newspaper," you can't do any of

 2   that.  It has to be decided on the evidence you

 3   hear here.  You think because of what you read in

 4   the past, that would cause a problem?

 5            MR. SCHRECENGOST:  I don't think so.

 6            THE COURT:  You feel that you could

 7   decide this case then on the merits of what you

 8   hear presented by the State and the Defense if they

 9   wished to present any evidence?

10            MR. SCHRECENGOST:  I would certainly

11   hope so, yes.

12            THE COURT:  Mr. Watkins?

13   EXAMINATION BY MR. WATKINS OF MR. SCHRECENGOST:

14   Q.   Good morning, Mr. Schrecengost.  My name is

15            Dennis Watkins, and along with Chuck

16            Morrow, we're the Prosecutors in this

17            case.  You are probably aware of that

18            from yesterday.

19   A.   Yes.

20   Q.   The procedure is when we talk to you this time

21            and maybe one other time is that the

22            State goes first and then Mr. Lewis, and
```

599

```
1              Mr. Consoldane will follow, and both
2              sides in fairness, get to ask you
3              questions once the Court directs that to
4              happen.  You understand that?
5    A.   Yes.
6    Q.   I'm not trying to pry, but we're just trying
7              to make sure that we feel comfortable
8              with each and every juror.  Now, I
9              understand that you told Judge Stuard
10             that you knew Rick Tackett.
11   A.   Yes.
12   Q.   With the Trumbull County Sheriff's Department?
13   A.   And Borger that works for the Trumbull County
14             Sheriff's Department.  His wife served on
15             a committee at the Credit Union with me.
16   Q.   You work for the mill?
17   A.   Yes, CSC.
18   Q.   You are retired from CSC?
19   A.   Yes.
20   Q.   When was the last time you dealt with Deputy
21             Tackett, personally?
22   A.   Since the mill shut down.  I don't know how
```

600

1           long that has been.

2    Q.   We're dealing with several years?

3    A.   It has been a year.

4    Q.   You didn't retire before the shut down?

5    A.   Six months before the shut down.

6    Q.   It has been some months?

7    A.   Yes.

8    Q.   Now, would you describe him as a personal

9           friend?

10   A.   Not personal friend, no.

11   Q.   So, you told the Judge that if he were to be a

12          witness in this case, you would be able

13          to evaluate his testimony, as you would

14          evaluate anybody else that testified,

15          fair to state?

16   A.   I would say, yes.

17   Q.   You see, we're going to present witnesses, and

18          Deputy Tackett may be or may not be a

19          witness.  There's a good chance he may

20          not be, but if we do, he's on our witness

21          list.  If he would become a witness and

22          testify, it is important that you would

601

1    judge his testimony whether or not you

2    believe all, part, of or none of his

3    testimony, on what he would say at that

4    time, and not on your prior knowledge of

5    him.  You think you could do that?

6  A.  Yes, I do.

7  Q.  This is the way it would go.  In the event the

8    State couldn't convince you beyond a

9    reasonable doubt the Defendant is guilty,

10   and you know it would be your duty to

11   say, "not guilty," right?  We couldn't

12   prove our case.

13  A.  I would say that, yes.

14  Q.  And you go out to the Eastwood Mall and you

15   walk in and see Tackett, would you be

16   concerned about the fact of what your

17   verdict was, that you didn't please him?

18  A.  No.

19  Q.  If you had some real close friend, it may

20   influence you, but this man is not that?

21  A.  No.

22  Q.  Now, you told the Court that you also read

602

```
1              some newspaper articles.
2    A.   Yes.
3    Q.   And can you tell me briefly what you remember,
4              factually what you read?
5    A.   I think the guy's wife, they didn't have the
6              same name, so I figured it was a live-in,
7              and this gentleman here was supposed to
8              have conspired against him and shot him.
9              Mr. Fingerhut owned the Greyhound bus
10             station.
11   Q.   And did you read that in the Tribune?
12   A.   Yes.
13   Q.   Now, did you see anything on television?
14   A.   Not really, I don't watch much television.
15   Q.   When you read the newspaper, was that on
16             Monday, two days ago?
17   A.   That has been a long time ago.
18   Q.   When it happened?
19   A.   Yes.
20   Q.   When you read about the shooting and the fact
21             that the victim owned or managed a
22             Greyhound bus terminal and that the wife
```

603

```
 1                or live-in was involved, as you

 2                classified it, do you believe that that

 3                is true?

 4    A.    That is a tough one.

 5    Q.    Do you believe everything you read in the

 6                newspaper?

 7    A.    No.

 8    Q.    Would you want to convict somebody because of

 9                what is written in the newspaper?

10    A.    No.

11    Q.    You see what I am getting at?

12    A.    Yes.

13    Q.    Can you set that aside and decide this case on

14                the facts that come from that witness

15                stand and not from the newspaper?

16    A.    I believe so.

17    Q.    I guess another question, another way of

18                asking it would be, when you read the

19                newspaper, did you come to a conclusion,

20                that Nathaniel Jackson, the person who

21                did this, is guilty?

22    A.    At the time, yes.
```

604

1    Q.    When see somebody is arrested in your mind,

2          you are thinking honestly, you are

3          saying, he probably did it?

4    A.    Yes.  It depends on how they put it in the

5          paper.

6    Q.    And you feel, however, that even though at the

7          time you read it in the newspaper, that

8          you are not going to deliberate in this

9          case, consider this case on what you came

10         to a conclusion to briefly in the

11         newspaper?

12   A.    No.  I wouldn't do that.

13   Q.    And you can see the importance, right?

14   A.    Yes.

15   Q.    Because if this man, at this time, if you had

16         an opinion that was fixed in your mind,

17         he's guilty, and you don't listen to the

18         evidence, you couldn't be fair to him,

19         right?

20   A.    No.

21   Q.    On the other side of the coin, if you had a

22         fixed opinion that he was innocent at

626

1       THE COURT:  You are excused.  We

2  thank you for your participation.

3  (Juror number 352 excused from the Courtroom.)

4  (Juror number 371, James Cole enter the Courtroom.)

5       THE COURT:  Good morning.  Yesterday

6  you held your hand up when I asked certain

7  questions about whether you would have a problem

8  with serving.  What were those questions in regard

9  to?

10      MR. COLE:  The questions regarding

11  from your question was, I know everyone in this

12  room except one person.  I personally feel that my

13  impartiality would be complicated by the knowledge

14  of a lot of friends this room.

15      MR. WATKINS:  I have no objection.

16  I know Jim well.  I don't think we'll get to him

17  anyways.

18      MR. CONSOLDANE:  No objection.

19      THE COURT:  That is fine.

20  (Juror number 371 excused from the Courtroom.)

21  (Juror number 376, Toni Thompson entered the

22  Courtroom.)

627

1          THE COURT:  Good morning.  When I

2    asked various questions yesterday, you held your

3    hand up.  What was that in regard to?

4          MS. THOMPSON:  I know witnesses on

5    the State's behalf.

6          THE COURT:  Which ones?

7          MS. THOMPSON:  Some of the Howland

8    officers, Officer Dillon, Officer Monroe.  I worked

9    with Officer Hughes for a short period of time,

10   Officer Hoso, and Jim Kralik was my boss in loss

11   prevention for about two and a half years.

12         THE COURT:  The question about your

13   acquaintances, would that have any effect upon your

14   ability to sit and listen to testimony and judge it

15   the same as you would any other testimony that

16   would be given?

17         MS. THOMPSON:  No.

18         THE COURT:  You do not know any of

19   them well enough that you would tend to believe or

20   disbelieve anything they said?

21         MS. THOMPSON:  No.

22         THE COURT:  You could compare that

629

```
 1              The other ones I'm just familiar with, I

 2              see them when they have come in for

 3              certain things, when they have had to

 4              come in and taking people out.

 5     Q.    Describe what you do.

 6     A.    When we detain somebody at the store, when I

 7              used to work there, and they would have

 8              to arrest someone and take them to jail.

 9     Q.    Have you ended up testifying in cases or been

10              involved with criminal cases with any of

11              those officers?

12     A.    No.

13     Q.    The question I have for you is this.  I'm

14              going to give you an example.  The

15              obvious thing we're asking here is that

16              most people would like to say, "Yes, I

17              know all of these people.  If they come

18              in and testify that wouldn't influence me

19              at all.  I'm not going to worry about any

20              past relationship.  I'm not going to care

21              about any past relationship, I'm going to

22              put that all out of my mind and I'm going
```

632

1        cited you for the speeding ticket, and

2        the Jury gets up there and says, "I know

3        Mr. Jones, I am familiar with him, I know

4        him, I have talked to him," whatever, and

5        Mr. Watkins or myself asks a question,

6        "Well, can you set all of that aside and

7        treat his testimony no different than you

8        would any other witness that you don't

9        even know, that you have to judge from

10       the trial itself, and not know from

11       before?"  Would you be able to do that?

12       A potential juror says, "I can do that."

13       You nudge me and say, "Jim, that doesn't

14       sound that good."  Would you be

15       apprehensive, if you were sitting there

16       and nudging me, saying, "These potential

17       jurors, they know the witnesses that are

18       in this case."  Would that cause you any

19       concern?

20   A.  It might, but I know myself well enough.

21   Q.  Why would it cause you any concern?  What

22       would be the concern?

634

1          that cannot come into this case at all.

2          You have to mentally put that out of your

3          mind that you know them or had a

4          relationship with them or anything, in

5          order to try to start from zero and just

6          judge their testimony.  The fact that you

7          work with Mr. Kralik and believed him

8          before, you have got to forget it.  That

9          is under oath.  You have got to do that.

10         And with that conscience, you have got to

11         set that aside if he testifies and it

12         doesn't -- and it turns out it is not

13         very credible.  It is not that he's

14         lying.  People mistake identities, we're

15         only human.  A police officer is no

16         different than any other human, right?

17  A.    No.

18  Q.    The question to you is this.  Can you give me

19         an answer which, and it is sometimes,

20         I'll tell you what, a lot of times people

21         come in here, and this is difficult, it

22         is a difficult situation.  You are

636

```
 1            person in the world.  It is not -- don't

 2            come in here with the idea of giving the

 3            answer that supposedly you think we want

 4            to hear, because that is really not the

 5            case.  We don't want that.  Actually what

 6            we want is people to be people and say,

 7            this is what the problem is, we might

 8            have, and if it is a problem, and I

 9            wouldn't want to be judged that way, you

10            have to always put yourself in the other

11            guy's shoes and say, "That is pretty

12            difficult, and I wouldn't want to be

13            judged by everybody that happened to know

14            all of the witnesses in the case for the

15            Prosecution."  That is what we're looking

16            for.  You have got to tell me now, what

17            do you think.

18   A.    I feel that it wouldn't be a problem.  If it

19            was, I would have come in here and said

20            that Jim Kralik would influence me or

21            Howland Police Officers would influence

22            me to believe a certain way and I
```

637

1              wouldn't be here.  If that was the

2              situation, I would have said that.

3    Q.    I hope they will not influence you.  What do

4              you mean influence?

5    A.    Just by the comments they make or the facts

6              they give would make me believe them over

7              anybody else.

8    Q.    What you're telling me is you can start from

9              zero here and as far as you are

10             concerned, knowing them makes no

11             difference at all to you, and you would

12             be able to judge their testimony without

13             any influence of any relationship in the

14             past or anything of that nature?

15   A.    Yes.

16   Q.    Unequivocally, you can do that?

17   A.    I believe I could.

18   Q.    No big deal?

19   A.    No.

20                  MR. LEWIS:  Thank you.

21                  MR. WATKINS:  We're satisfied.

22                  MR. LEWIS:  I'm going to object.

639

1   A.   No.

2   Q.   So you are acquaintances of all of them?

3   A.   Yes, those that I just mentioned.

4   Q.   You have been asked this before, but I'm going
5        to ask you again.  Would you find it
6        embarrassing if you find yourself on the
7        Jury and you found after the evidence and
8        the law is presented, that in your mind,
9        that the Defendant was not guilty, would
10       that have any bearing on your thought
11       process as to what somebody else,
12       particularly these officers would think?

13  A.   No.

14  Q.   It wouldn't be any consideration for you to
15       worry about?

16  A.   No.

17  Q.   If you saw one of them on the street later and
18       they said to you, "What's the matter with
19       you?"

20  A.   No.

21  Q.   You could handle that?

22  A.   Yes.

640

1   Q.   You are telling us then in your mind that

2            these acquaintances would have no bearing

3            on your ability to sit and be fair and

4            impartial to both sides?

5   A.   No, it wouldn't.

6   Q.   No reservation about that?

7   A.   No.

8            THE COURT:  I'm going to deny your

9   motion for cause.  You will remain in the Jury

10  pool.  Please call that number and you will be

11  notified when to come back.

12  (Juror number 376 excused from the Courtroom.)

13  (Juror number 393, Thomas Boardley entered the

14  Courtroom.)

15           THE COURT:  Good morning.  Yesterday

16  you held your hand up when I had asked for various

17  questions.  For what reason did you hold your hand

18  up?

19           MR. BOARDLEY:  I have a medical

20  problem.  I have no colon, and I take pills in the

21  morning for high blood pressure, plus right now, I

22  am being checked out for a heart problem, plus a

698

1    (Juror number 2 excused from the Courtroom.)

2                THE COURT:  We're going to take a

3    lunch break and suggest we start at 1:15 this

4    afternoon.

5    (Court in recess at 12:20 p.m.)

6    (Resumed in Open Court at 1:40 p.m.)

7    (Juror number 3, Harold Fenton, entered the

8    Courtroom.)

9                THE COURT:  Mr. Fenton, good

10   afternoon.  This is what we call individual Voir

11   Dire.  There will be questions asked of you,

12   primarily about your view on the type of case that

13   we have, and secondly on whether you have been

14   exposed to very much pre-trial publicity.  As you

15   understand, this is the case that the State has

16   brought against Nathaniel Jackson on two counts of

17   aggravated murder with the specifications attached,

18   including aggravated burglary and aggravated

19   robbery.  A trial of this nature is different from

20   other types because of the seriousness of the

21   charges wherein there's a trial that is held with

22   12 jurors, and five alternates.  The Jury is called

699

1    upon to listen to the evidence presented by the

2    State.  As you know, a Defendant is never required

3    to produce any evidence if they care not to.  They

4    have the right, the right to do so, but they are

5    under no burden to present anything.  The entire

6    burden is upon the State to proceed and to prove to

7    the Jury's unanimous satisfaction, beyond a

8    reasonable doubt, that is the burden of proof, very

9    high burden of proof, that each and every element

10   of the charges are true before the Jury could

11   properly return a verdict of guilty.

12           Now, if after that Jury hears the

13   evidence in this case, they would decide that the

14   State has failed to prove each and every element,

15   then the proper verdict would be one of not guilty.

16   If that should occur, then the trial would be at an

17   end.  If the Jury decides, however, on a guilty

18   finding then it would be necessary to go to a

19   second phase of the trial.  And at that time, the

20   State is called upon again to prove beyond a

21   reasonable doubt that aggravating circumstances,

22   the seriousness of what happened, outweighs in the

700

1    Jury's mind any mitigating factors that would be

2    presented.  Mitigating factors would be in favor of

3    the Defendant, so that the Jury would feel that the

4    death penalty is not justified.  If the State

5    proves that the aggravating circumstances outweigh

6    those mitigating factors, then the Jury would be

7    called upon to decide the issue of finding of

8    recommendation of death.

9              Now each of us carry our own personal

10   religious, philosophical beliefs about matters of

11   this nature.  You have on the one extreme, a person

12   who believes under the old covenant of the Bible

13   that an eye for an eye, a tooth for a tooth.  If

14   someone murders another person, then they deserve

15   the death penalty.  That is not the law of Ohio.

16   You have on the extreme opposite, a person who has

17   very deep seated religious beliefs or whatever,

18   that it is never right to take another human life.

19   That person should not be a juror, either because

20   they could not follow the law.  The law of Ohio

21   allows for the system, in fact, requires that the

22   system that we're using here, be implemented.  And

701

1    along with that, we must have jurors who are able

2    to follow the law that is given and to apply the

3    law.  That doesn't mean everyone on this Jury is

4    going to favor the death penalty, or what it is

5    going to mean that if we have a proper Jury of 12

6    people, there will be, they will be somewhere in

7    that middle spectrum.  Might not particularly favor

8    the death penalty, but they realize that the law at

9    certain times requires them to consider the death

10   penalty, and in fact, if the State meets its burden

11   to make that finding.

12         Now there's nothing wrong with whatever

13   your attitude is.  Each of us are entitled to your

14   own attitude and belief, but the purpose of this

15   questioning by these gentlemen will be to delve

16   into your feelings, and you should express your

17   feelings freely.  The other issue, which they will

18   get into is whether or not you have read anything,

19   seen anything in the media, that would influence

20   your ability to sit and decide this case fairly on

21   the evidence.  Anyone who decides the ultimate

22   questions in this matter, not on the evidence, is

702

1    again not doing their job.  There have been several

2    articles in the newspaper, since the time of this

3    event.  Some of that information may be correct,

4    some of it may be totally false, and no one should

5    ever be tried on what appears in the newspaper.  It

6    has to be based on the evidence that the Jury will

7    receive in this Courtroom, and on the law as given

8    by the Court.  Do you have any of questions about

9    that?

10                    MR. FENTON:  No.  Not yet.

11                    THE COURT:  If you do, you stop and

12   ask me.  In the meantime, Mr. Watkins, you may

13   inquire.

14   EXAMINATION BY MR. WATKINS OF MR. FENTON:

15   Q.   Good afternoon, Mr. Fenton.  My name is Dennis

16            Watkins, I am County Prosecutor, along

17            with Chuck Morrow, Assistant County

18            Prosecutor.  We have the duty to present

19            the case against the Defendant, who is

20            represented by Attorneys Lewis and

21            Consoldane, and they -- one of them will

22            ask questions when I am done, I'm sure.

703

```
 1              And I notice that on your questionnaire,

 2              the one that you filled out for the

 3              Court, that you indicate you were on Jury

 4              duty before?

 5    A.   Yes.

 6    Q.   Some time ago?

 7    A.   Some time ago.

 8    Q.   Do you recall whether it was a criminal case

 9              or civil case?

10    A.   Drug case, it was in this Court here.

11    Q.   Did the Jury come to a verdict?

12    A.   Yes.

13    Q.   And obviously you had that experience to fully

14              understand the importance of following

15              the law and working together with 12, 11

16              others to decide if the State has proved

17              its case beyond a reasonable doubt.

18    A.   The part I understand.  When it comes to the

19              second session, it says death penalty.

20              There I am against that actually.

21    Q.   You are against the death penalty?  I'll get

22              to that.  You heard the Judge indicate
```

704

| | |
|---|---|
| 1 | | that you could have a person who is so |
| 2 | | strongly against it or a person so |
| 3 | | strongly for it, that they wouldn't be in |
| 4 | | the middle, and be able to have an open |
| 5 | | mind, right? |
| 6 | A. | I laid awake half the night last night |
| 7 | | thinking about this, and I come to the |
| 8 | | same conclusion, I'm not morally or |
| 9 | | mentally able to say, "Okay, put him |
| 10 | | away." You know what I mean? |
| 11 | Q. | You don't feel that you personally could -- |
| 12 | A. | Personally I don't feel I have the ability to |
| 13 | | say that. |
| 14 | Q. | And that is okay. That is why we're doing |
| 15 | | this. I think the bottom line here is |
| 16 | | that the State is entitled to a Jury that |
| 17 | | could, if the evidence and the law |
| 18 | | demands it, right? |
| 19 | A. | Right. |
| 20 | Q. | And if we had somebody that wouldn't under any |
| 21 | | circumstances be able to do that because |
| 22 | | of their own personal feelings, you |

705

1              couldn't be a juror in this case, right?

2    A.    Right.

3    Q.    I guess, I would put it the other way, if you

4              had somebody that would always give the

5              death penalty in any murder case the

6              Defendant wouldn't get a fair trial?

7    A.    They would not.

8    Q.    Tell me a little bit about the thought that

9              you have given the past day or two.  You

10             said last night as to whether you could

11             serve in this case?

12   A.    The idea I would have it on my conscience the

13             rest of my life.  I don't want that on my

14             conscience.  I am 69 years old, and

15             there's no sense keeping me awake at

16             night with that on my conscience.

17   Q.    Let's say that the State could prove its case

18             beyond a reasonable doubt that the

19             Defendant committed the crime.  And we

20             prove it beyond a reasonable doubt that

21             the aggravating circumstances in favor of

22             the death penalty are there, and that the

706

```
 1              law requires you to recommend, as the
 2              Judge indicated to you, the death
 3              penalty, are you telling me you wouldn't
 4              be able to do that?
 5    A.   I don't think I would be able to do that.
 6    Q.   Are you saying that under no circumstances
 7              would you be able to sign a verdict
 8              recommending the death of Nathaniel
 9              Jackson?
10    A.   I don't think I could sign it.
11    Q.   And this position, you thought about last
12              night?
13    A.   I have been thinking about it ever since I
14              knew I was going on this panel, in the
15              back of my mind.  It is something I have
16              always wondered what I would do when I
17              would come to it.  It bothered me last
18              night.
19    Q.   It bothers you now?
20    A.   It bothers me now.
21    Q.   And you feel that you just could not recommend
22              the death penalty for a person?
```

707

1    A.    Right.

2    Q.    Do you base this on your personal philosophy

3          or your religious background or both?

4    A.    My personal philosophy.

5    Q.    And how long have you held that personal

6          philosophy on this issue?

7    A.    Way back.

8    Q.    And so, when we see people that get the death

9          penalty you have held the position, "I

10         wouldn't want to be part of that

11         process"?

12   A.    Right.

13   Q.    Because you don't believe in the death

14         penalty?

15   A.    If he shoots at a policeman or fireman on the

16         job, that would be a different situation,

17         unless the policeman was sitting in the

18         bar drinking, then he's no different than

19         you or I.  That might be a different

20         story, but this, no.

21   Q.    So, in this case, we have, as the Judge has

22         outlined to you, the Defendant has been

708

1            charged with committing murder, and again

2            we have to prove this, but just for the

3            purpose of the question, he killed a home

4            owner in the course of a burglary and a

5            robbery.  In your mind, no matter what

6            the evidence, if you are dealing with

7            killing somebody in their home in a

8            burglary or robbery, you would be unable

9            to recommend the death penalty?

10  A.   Yes.

11  Q.   The law is in Ohio that if you commit an

12            aggravated murder in the commission of a

13            felony, such as burglary and robbery, you

14            must consider the death penalty?  You are

15            telling me that you would not consider

16            it?

17  A.   Right.

18  Q.   And you would not sign any verdict

19            recommending his death?

20  A.   Right.

21  Q.   And you feel strong about that?

22  A.   I feel strongly about that.

709

1              MR. WATKINS:  I have no questions at

2    this time, any further questions.

3    EXAMINATION BY MR. CONSOLDANE OF MR. FENTON:

4    Q.   Hi, Mr. Fenton, how are you today?

5    A.   I'm here.

6    Q.   My name is Tony Consoldane and that is Jim

7              Lewis.  We're representing Nathaniel

8              Jackson.  And I see by this that we're

9              almost neighbors.  You live on Roselawn,

10             I live on Oak Knoll.

11   A.   Just one up.

12   Q.   I am a little closer to Woodland than you are,

13             and matter of fact, you are not that many

14             years older than me, we're still in the

15             same decade.  It is kind of difficult to

16             get a Jury in these type of cases, to get

17             a fair Jury.  The people that are 100

18             percent in favor of the death penalty,

19             they all want to line up to get on the

20             Jury like this, and they will say

21             anything they can to stay on.

22             MR. WATKINS:  I'm going to object.

710

1   He said that are in favor of the death penalty will

2   say anything to get on.  I object.

3                    MR. CONSOLDANE:  I'll withdraw that.

4                    THE COURT:  Okay.

5   Q.   But, let me explain to you a little bit about

6              how the process works, and then I want to

7              ask you a couple of questions.  A lot of

8              times a criminal will come into the

9              Court, this Courtroom, and they will

10             either go through a Jury trial and be

11             found guilty, or a lot of times they will

12             enter a plea of guilty, and then it

13             becomes incumbent upon the Judge to issue

14             the sentence.  Now, a lot of these

15             sentences such as like a first degree

16             felony, it starts at a low of three years

17             and a high of ten years.  Do you think it

18             would be fair for the Judge to always

19             give everybody the maximum penalty?

20  A.   No, I guess not.

21  Q.   It wouldn't be fair for him to give the

22             minimum penalty all the time either,

711

```
 1            would it?
 2   A.   No.
 3   Q.   What the Judge does is the Judge orders a
 4            pre-sentence investigation.  The
 5            probation officers talk to the individual
 6            and find out about his background, what
 7            kind of other crimes there have been,
 8            what kind of family life, maybe some of
 9            the reasons why he committed the crime,
10            and then they write up a report to the
11            Judge, and the Judge then issues a
12            sentence.  Now, in a capital case such as
13            this, of course there's always the death
14            penalty, that is fine, but there's three
15            other options.  There's the option of
16            life with no chance of parole, and that
17            is exactly what it means.  They are in
18            there forever.  There's life with parole
19            after 30 years, and life with parole,
20            after 25 years, and they have to do the
21            full 25 or 30 years.  Now, the next thing
22            down -- well, that is just with the
```

712

1          capital case, and that would be your job

2          to determine what would be the

3          appropriate sentence.  Once the

4          Prosecutor proves enough evidence, they

5          get to that point, then we have another

6          trial, it is not very long, it is usually

7          only a day where we present other

8          evidence to the Jury so they can go back

9          and then intelligently apply the correct

10         sentence.  That explains it a little

11         more?

12    A.   It is all a bunch of --

13    Q.   You are not really -- you told Mr. Watkins,

14         you are not really against the death

15         penalty, are you?

16    A.   If it is a policeman in his line of duty, yes,

17         but other than that --

18    Q.   How about Osama Bin Laden, would you give him

19         the death penalty?

20    A.   Yes.

21    Q.   Well, there are times when you would consider

22         the death penalty?

713

```
1   A.    At times, yes, but right now, it takes a lot
2             of thinking for me to get to that spot.
3   Q.    That is the kind of juror that we would like
4             to have, somebody that would take a lot
5             of thought to get to that spot.
6   A.    I still don't think, even with Osama Bin
7             Laden, I would still have to think about
8             it.
9   Q.    That is a very serious penalty on whether you
10            would impose it on Bin Laden or someone
11            that killed a police officer.  How about
12            somebody that -- I'm not asking you would
13            you impose the death penalty on these
14            people, but rather, would you seriously
15            consider it?  That is the question.  You
16            have to be able to follow the Judge's
17            instructions and seriously consider
18            imposing the death penalty.  You can also
19            seriously consider imposing one of the
20            life sentences, also.  In a matter where
21            you would have a person that would rape
22            and kill a 12 year old girl, could you
```

714

```
 1              consider imposing the death penalty on

 2              somebody like that?

 3   A.   Possibly.

 4   Q.   You would consider it?

 5   A.   That is entirely different than murder.  Maybe

 6              it is not, but everything is all mixed

 7              up.

 8   Q.   There's a lot of things in this case, too,

 9              that you were just given the bare bones,

10              there's going to be a lot of other

11              evidence coming in, and the only thing

12              that I'm asking you to do is to keep an

13              open mind and not decide whether you want

14              to impose the death penalty, whether you

15              can or you can't, until you have heard

16              all of the evidence.  That is all we're

17              asking.  We're not asking you to say,

18              yes, I can impose the death penalty on

19              him right now.

20   A.   Question, I am sitting on the Jury and he's

21              found guilty by the State.  You go to the

22              other one and the other 11 jurors want to
```

715

1          put him on the death, and I don't.  Then

2          we have got a hung Jury, right?

3    Q.   I can't tell you what happens after that,

4          but --

5    A.   Then it starts all over again.

6    Q.   No, it does not.

7               MR. WATKINS:  Your Honor, it depends

8    on when it is.  I don't think counsel --

9               MR. CONSOLDANE:  He just said it

10   starts all over again.  That is not true.  Not in

11   the penalty phase.

12              MR. WATKINS:  Not relevant.

13              MR. CONSOLDANE:  If the Court wants

14   to instruct what would happen in that case or I

15   would if the Court wants me to, but I don't think

16   that is necessary right now.

17              THE COURT:  The question here is

18   whether Mr. Fenton is going to change his

19   apparently entrenched belief on the question of the

20   death penalty.

21   Q.   He did say that there's certain cases where he

22          could impose the death penalty.  That

716

1          doesn't mean that he's against the death

2          penalty.  He was saying that, if I

3          understand you correctly, that from what

4          you have heard about this case, you

5          wouldn't impose the death penalty.

6   A.   Last night I laid in bed half the night

7          thinking about it, and I figured, morally

8          and mentally for some reason or another,

9          I wouldn't be able to do it.  Just like

10         the other ones, I probably would be the

11         same way, even if the policeman, I would

12         probably be the same way.  It is not

13         religious, because I haven't been to

14         church for a few years.  It is just by my

15         own gut feeling about it.

16              MR. WATKINS:  I'm going to move that

17  this man is substantially impaired under the

18  standard and repeatedly to go through the same

19  thing is unnecessary.

20              MR. CONSOLDANE:  I get to finish.  I

21  have never cut him off before.

22              THE COURT:  Let me just ask one

717

1    question here.  I'm not stopping you.  Mr. Fenton,

2    did you answer one question to Mr. Consoldane that

3    you thought under certain circumstances that a

4    person, that a Jury would be justified in giving

5    the death penalty?  Is that what you said?

6                    MR. FENTON:  Yes, something like

7    that.

8                    THE COURT:  My understanding though,

9    from what you have said and you correct me if I am

10   wrong, is that you would find it hard to imagine

11   yourself on such a Jury?

12                   MR. FENTON:  Right.

13                   THE COURT:  And Mr. Consoldane is

14   trying to ask you whether or not there's not

15   possibly circumstances where the law would justify

16   the imposition of the death penalty that you could

17   agree to?

18                   MR. FENTON:  That, I don't know.  I

19   could listen to all of the evidence and still be me

20   that has to say that and I don't know if I have got

21   the moral or mental standards to do that.

22   Q.   (By Mr. Consoldane)  I believe you heard the

718

```
 1              Judge talk yesterday about how important
 2              Jury service is.  Without this, our whole
 3              system would collapse, the legal system.
 4              We need to have jurors.  We need to have
 5              people serve.
 6    A.   I understand all of that stuff.
 7    Q.   When we get important cases like this, it is
 8              important that we have good jurors and we
 9              have good people on the Jury, and if this
10              would go against something that you
11              morally couldn't do, I can understand
12              that, but you are willing to impose the
13              death penalty in certain cases, but yet,
14              you say you would have a hard time with
15              this one.
16    A.   Just like I said, I could hear the evidence
17              and don't matter who it is or what it is
18              or when it is, I still don't think I
19              could put the death penalty on.
20    Q.   Even if it was Bin Laden?
21    A.   Even if it was Bin Laden.
22    Q.   You would like to see him killed, but you
```

719

1       don't want to do it?

2   A.    Right, and I don't want anything to do with

3           it.

4               MR. CONSOLDANE:  I'm finished.

5               MR. WATKINS:  I move that he be

6   relieved of this responsibility because there's

7   cause because of his personal beliefs.

8               THE COURT:  Any objections?

9               MR. CONSOLDANE:  No, Your Honor.

10              THE COURT:  Mr. Fenton, we thank you

11  for your time.

12              MR. CONSOLDANE:  Your Honor, we want

13  to register an objection no matter what.  We think

14  he should not be excused.

15              THE COURT:  Objection is noted and

16  overruled.  Thank you for your appearance, Sir.

17  (Juror number 3 excused from the Courtroom.)

18  (Juror number 7, Arthur Phillips entered the

19  Courtroom.)

20              THE COURT:  Good afternoon,

21  Mr. Phillips.  The reason we have asked you in

22  today, this is what we call this individual Voir

726

1   A.    With the amount of changes that are happening,

2            at my place of employment, no, I could

3            not.

4                 MR. WATKINS:  I don't have any

5   further questions.

6                 MR. CONSOLDANE:  We have no

7   objection.

8                 MR. WATKINS:  No objection.

9                 THE COURT:  You are excused.  We

10  thank you for your time.  I hope your personal

11  matters are resolved.

12  (Juror number 7 excused from the Courtroom.)

13  (Juror number 8, Lynn Bowers entered the Courtroom.)

14                 THE COURT:  Miss Bowers, good

15  afternoon.  This part of the procedure is something

16  called the individual Voir Dire.  That is an

17  opportunity that both sides have to ask any

18  prospective jurors certain questions, and they

19  would be related to two areas primarily.  This case

20  involves aggravated murder, as you know.  And it

21  has two specifications attached, aggravated

22  burglary and aggravated robbery.  That means that

727

1    if the State proves its case beyond a reasonable

2    doubt to the satisfaction of all 12 members of the

3    Jury, then that raises the spector of the death

4    penalty.

5            Now if the State, after presenting the

6    evidence, and the Jury applies the law that will be

7    given, if they fail to maintain the burden of proof

8    beyond a reasonable doubt, then the Jury would be

9    called upon to return a not guilty verdict.  If the

10   State succeeds in their burden, then the Jury would

11   be called upon to deliver a guilty verdict.  If

12   that occurs, then the Jury has to sit through a

13   second mini trial and wouldn't take nearly as long,

14   but the purpose of that trial is for, and it is all

15   the same trial, but the purpose of that hearing

16   would be for the State to present evidence showing

17   that aggravating circumstances, that is the

18   nastiness I guess of the murder, outweigh the

19   mitigating factors.  The mitigating factors would

20   be things presented to the Jury to justify why the

21   death penalty should not be imposed.  If the State

22   proves beyond a reasonable doubt that those

728

1    aggravating circumstances outweigh the mitigating

2    factors, then the Jury would be called upon to

3    consider the sentence of death.  Some of us under

4    no circumstances could ever, because of religious

5    beliefs or philosophical beliefs, impose the death

6    penalty.  Others of us feel just as strongly that

7    the person who commits a murder, unjustified

8    murder, should receive the death penalty.

9           Now a person with either of those of

10   exactly opposite opinions should not serve on the

11   Jury because they could not follow the law of Ohio.

12   The law of Ohio says that after all of these steps

13   are gone through, if the State proves its case in

14   each trial, the portion of the trial, then the Jury

15   has to be able to seriously consider the death

16   penalty, and if justified in their minds to impose

17   it.

18          So, my question to you is, do you have

19   any deep set belief either way that would make it

20   impossible for you to do what this Jury is going to

21   be called upon to do?

22                 MS. BOWERS:  Due to personal

729

1   feelings, I don't think I could vote in favor -- I

2   don't believe I could vote in favor of imposing the

3   death person on someone.

4             THE COURT:  Even if the State proved

5   its case, and the law required that that was

6   something that would be called for?

7             MS. BOWERS:  I don't feel I could

8   participate in that.

9             THE COURT:  You are entitled to your

10  belief.  The other question is about any pre-trial

11  publicity.  Have you read much or heard much about

12  this case?

13            MS. BOWERS:  I have read probably

14  two articles about it, possibly three.

15            THE COURT:  Are those articles

16  something that you have a deep seated conviction of

17  one sort or the other that you would not be able to

18  set aside if called upon on the Jury?

19            MS. BOWERS:  Not at all.

20            THE COURT:  You could have an open

21  mind and decide the case on the evidence presented

22  in this Courtroom?

730

1              MS. BOWERS:  Yes.

2    EXAMINATION BY MR. WATKINS OF MS. BOWERS:

3    Q.    Good afternoon, I am Dennis Watkins.  Chuck

4          Morrow is Assistant Prosecutor, and I am

5          Prosecutor for Trumbull County.  Jim

6          Lewis and Tony Consoldane represent the

7          Defendant, and the Defendant will be

8          given the opportunity to ask some

9          questions through his counsel, after I am

10         finished.  That is the procedure the

11         Court has set up.  Now, I think that you

12         made it fairly clear to the Court and I

13         want to go over this issue.  It is

14         important to the State, obviously.  You

15         understand that Ohio is one of

16         approximately 35 states that have the

17         death penalty?

18   A.    Yes.

19   Q.    And some legislatures, for moral or just

20         simply social reasons, don't have the

21         death penalty.  And in Ohio, our

22         legislature has felt that in certain

731

```
1              circumstances that the death penalty is
2              appropriate, you understand that?
3    A.   Yes.
4    Q.   And the Court pointed out to you that there
5              are two groups of people, and they are
6              very good people.  In certain cases, some
7              people just aren't qualified, you can
8              understand that?  The people that have
9              strong moral beliefs, eye for an eye,
10             tooth for a tooth, you kill somebody, you
11             should automatically forfeit their life,
12             they are good people who have a strong
13             biblical background, but they are so
14             strongly in favor of the death penalty,
15             they would never be fair to the
16             Defendant, right?
17   A.   Right.
18   Q.   Even though they are good people.  And the
19             Court pointed out, there's another group,
20             and some could not impose the death
21             penalty.  They oppose the death penalty
22             in any circumstances.  They aren't
```

732

```
1              willing to follow the law in Ohio.  And I

2              take it from your answer to the Court,

3              and there are at least two on this issue,

4              that you have personal, moral or

5              religious reasons opposing the death

6              penalty?

7    A.   I just don't feel I could make a decision like

8              that.  I can't say that it is the wrong

9              thing to do, but I don't feel like I

10             could.

11   Q.   You, in a theoretical sense, don't oppose the

12             death penalty?

13   A.   Not in all cases.

14   Q.   You don't have a religious belief against it?

15   A.   No, I do not.

16   Q.   And you don't have a moral belief against the

17             death penalty?  Do you think it is

18             immoral for the State to kill someone

19             that has been convicted of murder?

20   A.   No, I do not.

21   Q.   So, we're really dealing with Lynn Bowers

22             ability to do something in this case,
```

733

```
 1          right?
 2   A.     Yes.
 3   Q.     That is what we're dealing with and only you
 4          know yourself, right?
 5   A.     Yes.
 6   Q.     You know yourself better than anyone in the
 7          world.  You live with yourself as we live
 8          with ourselves every day.  And I notice
 9          that you gave some thought and attention
10          when you answered the question, or
11          questions of the Judge.  You feel
12          strongly that if it were appropriate
13          under all of the law and the evidence in
14          this case, we overwhelmingly proved that
15          the Defendant was guilty of aggravated
16          murder, and one or more of the
17          specifications, and we go to the second
18          mini trial as the Judge described it and
19          we present evidence, and I should say, we
20          don't necessarily present evidence, but
21          after you hear the evidence, and the
22          Court tells you if the mitigating
```

734

1                evidence that the Defense would offer,

2                was presented to you, you would consider

3                it fairly.  But when you go back to

4                deliberate and the Court tells you if the

5                aggravating circumstances outweigh the

6                mitigating factors, then you shall, that

7                is, Lynn Bowers, recommend the death

8                penalty and personally sign a verdict

9                recommending Nathaniel Jackson's death?

10  A.    I understand that.

11  Q.    That would be the possibility, you understand

12          that?

13  A.    I understand that.

14  Q.    And are you telling me and the Court, that you

15          would never sign such a verdict

16          recommending his death?

17  A.    I don't believe I could.  I understand what I

18          would be doing but saying no.

19  Q.    You would say no, you are saying no?

20  A.    Yes.

21  Q.    And is it fair to characterize that, that the

22          State of Ohio here, no matter how much

735

1          evidence we would have in this case, you

2          just could not put yourself to sign a

3          verdict recommending his death?

4   A.   That is correct.

5   Q.   And so you are telling me that in this

6          particular kind of case, if this was a

7          burglary case or rape case, you could

8          sign a verdict of guilty, right?

9   A.   Yes.

10  Q.   But you could not personally under any

11         circumstances sign a verdict recommending

12         his death?

13  A.   That is correct.

14  Q.   And therefore, you feel at this present time,

15         that you could not consider the State's

16         position arguing for the death penalty?

17  A.   No, I couldn't.

18             MR. WATKINS:  Thank you.

19  EXAMINATION BY MR. LEWIS OF MS. BOWERS:

20  Q.   Miss Bowers, how are you today?

21  A.   Fine, thank you.  How are you?

22  Q.   I'm going to survive.  The question is usually

736

1   with people sitting there on the hot seat

2   and we can appreciate the difficult and

3   the tremendous situation we put people

4   in.  We bring them from all walks of

5   life, and bring them into a Courtroom

6   setting where they have to make,

7   especially in this case, this is a very,

8   very serious case, and we pound the

9   questions to them, and all we're asking

10  for are good honest answers and that is

11  really what we want.  My name is Jim

12  Lewis.  Along with Tony, we represent

13  Nathaniel in this case, and as

14  Mr. Watkins indicated, a lot of people,

15  the Judge indicated, too, that there's

16  groups of people that are not necessarily

17  a definable group per se.  Everybody fits

18  on a broad spectrum, let's put it that

19  way, of all beliefs about this death

20  penalty, whatever.  And as he indicated,

21  some states have it, some states don't

22  have it.  It just so happens the State of

737

1    Ohio, we have the possibility of the

2    death penalty if there's certain things

3    that are fulfilled and performed by the

4    Prosecution.  On the other side of the

5    coin, in order to have people sit as

6    jurors, they may have difference of

7    opinions regarding their personal beliefs

8    about the death penalty.  And we'll have

9    people come in here and say, "Well, I am

10   for the death penalty."  And that is

11   their personal belief, so we ask them,

12   "Well, can you consider, though, you just

13   can't do this automatically, you must

14   listen to all of the evidence, you must

15   listen to the mitigation phase.  You must

16   do that to follow the law."  And some

17   people say, "Yes, we can do that."  The

18   idea I am getting to here is this, is

19   that every citizen has an obligation in

20   our society, they are drawn and it

21   happens to be by ballot is the way we do

22   it, is because they are voters.  Some

738

1    states do it by licenses.  In this case,

2    we draw the citizens in.  Everybody that

3    is accused of a crime as Judge Stuard

4    indicated, the first day we were in here

5    or in the other Courtroom, is that we

6    need the responsibility of all citizens

7    to come in and try to perform Jury duty

8    to the best of their ability.  Some

9    people may not be able to perform that

10   duty, but we need people to come in and

11   indicate to us if they possibly can, they

12   can follow the instructions and the law.

13   And a lot of people come in here thinking

14   that, I can't do that, or a lot of people

15   think that just because the man is

16   sitting over there, he's guilty, and we

17   have to say, no, he's presumed innocent.

18   That's a lot of things that people have

19   that on the outside world, outside the

20   windows and the large block of this

21   Courthouse, you are allowed to think

22   anything you want.  Just walking down the

739

1    street, saying, "I don't like the way

2    that guy walks.  I think he's a

3    criminal."  It is okay to say that.  The

4    thing is, though, we have the judicial

5    system and everybody that comes in here

6    has notions about a lot of different

7    things.  They have their own personal

8    beliefs about it, but one demanding thing

9    we have of all our citizens in order to

10   make the system work, is we have to rise

11   above that and say, and if we're able to,

12   say, "Well, this is the instructions of

13   law to be given by the Judge."  And

14   there's going to be a lot of them.  It is

15   how you evaluate the testimony of the

16   witnesses, the presumption of innocence,

17   the burden of proof.  There's a lot of

18   things in there, that have to be

19   followed.  People may disagree with it

20   personally, but they have to be followed,

21   and in order to do that, we have to have

22   people step up to the plate to do it.  If

740

1   everybody just said, "I don't want to do

2   it," or "I can't do it," we wouldn't be

3   able to have jury trials.  We wouldn't

4   have our only citizens be able to

5   determine the guilt or the innocence of

6   our individuals, and we don't want to

7   leave it up to somebody, say, "Well, I

8   don't want to do it, let's have Joe

9   Blow."  And all of a sudden, we have one

10   person determining guilt or innocence and

11   we know that doesn't work.  We have all

12   kinds of systems around the world that

13   are looked down upon.  We think we have a

14   pretty good system.  It is not perfect.

15   We're human beings, but it is the best

16   thing we have got going and it has

17   survived this long, and regardless of how

18   they beat away at it and say bad things

19   about it, whatever it is, it still

20   endures.  So, that is what I am getting

21   to is that we need all kinds of citizens,

22   and if they come in and they say, "I just

741

1    would rather not, I don't want to be in a

2    situation where I may have to impose

3    that," I can understand how you feel.  At

4    the same time though, you have got to

5    understand that we need people who can

6    come in here and say, "Well, that may be

7    my personal belief," but then I have got

8    to say, "You know something, you did take

9    some time in thinking about that," and

10   say for instance, I gave you Osama Bin

11   Laden, he would be somebody you would

12   consider the death penalty for, would you

13   not, would you consider it?

14   A.   I would consider it.

15   Q.   That is the idea here.  The whole thing is the

16        idea whether you would consider it.  It

17        is not whether you ask a point blank

18        question, if I do this, if we prove this,

19        this, and that, kind of abstract thing,

20        can you impose the death penalty on him

21        because you haven't heard the case,

22        that's the problem with this whole thing.

742

1        We're asking you hypotheticals about it.

2        All we're asking is, basically is to

3        consider everything on a fair basis.  In

4        other words, be impartial here, we know

5        you haven't heard the evidence, but going

6        in you may hear things that convince you

7        that he's guilty beyond a reasonable

8        doubt, and most people say, can you find

9        the guy guilty.  Theoretically, you can

10       consider finding him guilty, because you

11       haven't heard a doggone thing yet and

12       that is tough for people saying, they

13       haven't proved anything to you yet.  That

14       is difficult, and that is what we're

15       asking.  Could you consider sitting as a

16       fair and impartial juror in the trial

17       phase?  Can you consider, if you get to

18       that stage, and you do find him guilty,

19       you can get to the next stage and

20       consider it?  If they don't accomplish

21       what they are supposed to accomplish to

22       your satisfaction, according to the

743

1   instructions, then you can consider life

2   sentences.  If they do accomplish what

3   they say they are going to accomplish

4   beyond a reasonable doubt, according to

5   the instructions, then the question is,

6   can you consider and can you impose it?

7   And these are hypotheticals, because you

8   haven't heard the evidence yet, so all

9   we're asking you is, can you consider the

10  possibility of that death penalty there?

11  That is all that is really needed in this

12  case, that is all we're talking about.

13  It is not whether you are going to or

14  whatever, because we're putting the cart

15  before the horse.  As a matter of fact,

16  we're talking about penalty and there

17  hasn't been a trial yet.  That is really

18  strange, but we have to talk about it up

19  front.  And what we're asking people to

20  do is a lot of mental gymnastics.  It is

21  like, well, if I have a child, are you

22  going to send him necessarily to jail?  I

744

```
1              don't know.  A girl, a boy.  Maybe they
2              want to be an actor.  You can't do that.
3              I would consider it, because I don't know
4              what is going to happen in the future.
5              The point is, do you have an open enough
6              mind, can you consider it?  And that is
7              what the question is, would you be able
8              to consider it?
9    A.   I could consider it.
10   Q.   And that is all we're asking of our citizens.
11              MR. WATKINS:  I'm going to object.
12   It is more than consider.  It is consider and
13   impose.  It is whether you consider and impose a
14   life sentence or death sentence.
15              THE COURT:  Let him ask his
16   questions.
17   Q.   You understand what I'm asking you here,
18              basically, don't you?  You understand?
19   A.   You are asking me just to consider it.
20   Q.   Yes, if you believe that it is necessary, if
21              you believe based on the evidence, and if
22              they accomplish what they have to under
```

745

1          the instructions the Judge gives you,

2          because everybody has to follow the same

3          rules and everything else, if that is the

4          case, could you impose in other words --

5          you haven't heard the evidence, I know

6          that.  But the point is, can you consider

7          it at that point and could you impose it

8          if they accomplish what they have to

9          accomplish and you are following the law?

10  A.   I don't believe I could.

11  Q.   You indicated to Dennis, Mr. Watkins, that it

12          is not really a moral thing in that

13          sense, correct?

14  A.   I have seen the death penalty has been imposed

15          in other cases, and I can't say I

16          disagreed with it personally, but had I

17          been asked to sit on a Jury of that case

18          and make the decision to do it, I don't

19          know that I could have done that.

20  Q.   The problem is, if anybody, a lot of people

21          are in doubt about it and they have

22          apprehensions about coming in and serving

746

1    as jurors, a lot of people have

2    apprehensions when they walk in here and

3    going to be talked to by a guy like me.

4    It is scary.  It is scary for us when we

5    try cases and it is scary for jurors that

6    sit on cases.  There are a lot of things

7    out there that we don't know the exact

8    answer to, but we do them anyhow.  We're

9    up to the challenge.  We don't know what

10   we're going to do every day.  The police

11   officer gets up and actually doesn't know

12   if he's going to be alive at the end of

13   the day.  We do things according to what

14   our society has framed, and Jury duty is

15   one of those things, and I know, it is

16   difficult for jurors.  It is easy for me.

17   I have a position.  It is easy for him in

18   a sense, he has a position that he

19   advocates.  You are the one that has to

20   be the judge.  That is what we have.

21   That is why we have a Constitution.  That

22   is why we have the structure we have.

747

1    That is why it works as beautifully as it

2    does, is because citizens do come in and

3    say, "You know, I can tell you honestly,

4    I'm going to do the best I can."  We ask

5    people all the time, "Can you set that

6    aside?"  And they say, "Absolutely."

7    There are people that say, "I'm going to

8    do my best."  It is like saying, "Don't

9    picture in your mind, a pink elephant,"

10   and you can't stop from doing it, you do

11   it.  But the point is, we ask people to

12   do the best they possibly can.  Is it

13   going to absolutely happen?  No.  We

14   don't know.  Because we can't tell the

15   future.  If I could tell the future

16   exactly, I would be down playing the

17   lottery or I wouldn't be here.  But all

18   I'm saying to you is this, is if you say

19   you can sit on the Jury and you don't

20   know whether you would or would not

21   impose it per se in this case, what I'm

22   trying to ask you is, would you

748

1            consider -- can you consider the death

2            penalty if it is fulfilled what they have

3            to do, can you consider it or follow the

4            law, that is the real key here?  It is

5            not whether you are going to do it, that

6            is the whole point.

7 A.   I understand.

8 Q.   You go ahead and give me an answer, whatever

9            you think is okay with us.  It is okay

10           with the Judge.  It is okay with

11           Mr. Consoldane and I.  It is okay with

12           these gentlemen.  I'm not trying to brow

13           beat you.  What I'm trying to say is,

14           this is the way the system is, and we

15           need people who give a lot of thought to

16           things.  We really do.  That is why we

17           have a Jury system.  They give a lot of

18           thought to things and they are not coming

19           from any particular direction.  They just

20           follow the law, if they can do that.

21           That takes a pretty upstanding type

22           person.  That is what we really need are

749

1          people that step to the plate.  You go

2          ahead and tell us.

3  A.    I think if I were in that position, I could

4          not consider, if I sat there, I could not

5          consider imposing the death penalty.

6  Q.    Are you sure about that?

7  A.    Yes, I am.

8          MR. LEWIS:  Thank you.

9          MR. WATKINS:  We move that Miss

10 Bowers has been very frank and I appreciate her

11 answer, but she's impaired under the circumstances.

12          THE COURT:  She's answered the

13 questions fairly.  Any objection by the Defense?

14          MR. CONSOLDANE:  Yes.

15          THE COURT:  Objection overruled.  We

16 thank you.  Always hate to see somebody put through

17 this where you have to answer these questions.  It

18 is part of the process, and we appreciate your

19 candor.  You are excused from any further

20 responsibility.

21 (Juror number 8 excused from the Courtroom.)

22 (Juror number 10, Naudean Burr entered the Courtroom.)

1   we can see if it -- if that is, that will give us a better, a

2   bunch of information to work with.  Then we can make an

3   exception the day after.  Okay.

4   WHEREUPON,

5                           RAYMOND MILES

6   being previously duly sworn, according to law, was examined

7   and testified as follows:

8                           EXAMINATION

9   BY THE COURT:

10  Q        Mr. Mills.

11  A        Miles.

12  Q        Oh, it is.  I saw two Ls there, I would have swore

13  to that.

14           Mr. Miles, we're here for, as part of the process

15  this is where both sides have an opportunity to ask you

16  questions concerning two particular areas.  This is, as you

17  know, a case for aggravated murder, two counts filed against

18  the Defendant, Mr. Jackson.

19           If the State fails to prove the elements of those

20  charges and prove the specifications attached, being the

21  robbery, aggravated robbery and burglary, then this jury

22  would be called upon to return a verdict of not guilty.  And

23  if that would occur, then that would be the end of the trial.

1    If, however, the State sustains their burden of

2  proof and proves everything necessary for a conviction, then

3  the jury would properly return a verdict of guilty.  Should

4  that occur, then we would go to a second phase of the trial

5  at which time the State would present aggravating factors,

6  that is factors that would tend to convince the jury that the

7  death penalty would be appropriate.  And the defense is

8  allowed, of course, an opportunity to present mitigating

9  factors to show factors that the jury should consider that

10  would weigh against a death penalty finding.

11    Some people could never sit on a jury where they

12  would have to make a decision of such moment, to possibly

13  recommend the death penalty.  There are others who believe

14  just as strongly that a person who takes another life,

15  another's life, should stand to forfeit their own life.  A

16  person from those two polarized opposites would not be fair

17  jurors to have on a jury because that is not the law of Ohio.

18    The law of Ohio does under certain circumstances by

19  law require the imposition of the death penalty if certain

20  things are found by the jury.  The person who thinks an eye

21  for an eye could not follow the law because the law does not

22  require that the death penalty be imposed just because

23  there's an unlawful killing.  There has to be more than that.

1       And they also, the law of Ohio also requires this

2   balancing between aggravating circumstances and mitigating

3   factors before a jury is in a position to make that

4   determination.  Because the law allows that if the mitigating

5   factors outweigh the aggravating circumstances then the jury

6   is called upon to consider life without chance of parole and

7   two other possibilities.  So the primary reason of what we go

8   through today is to ask each of you what your personal

9   feelings are in regard to the death penalty.

10      Would you be able, if called upon to sit on this

11  jury and to follow the law as it is, would you be able if the

12  State proves everything that is necessary to consider the

13  imposition of the death penalty?

14  A       You're asking me?  Yes, yes, I would.

15  Q       The second area of inquiry will be concerning

16  whether you had pretrial publicity through the newspapers or

17  media that you've partaken that would make it difficult for

18  you to set that aside and listen to the evidence?

19  A       No, I wouldn't.

20  Q       You don't have any fixed opinions at this point?

21  A       No, I don't.

22              THE COURT:  Fair enough.  I thank you.

23  Mr. Watkins.

1                    MR. WATKINS:  Thank you, Your Honor.

2                      EXAMINATION

3    BY MR. WATKINS:

4    Q        Good afternoon, Mr. Miles.

5    A        Good afternoon.

6    Q        My name is Dennis Watkins, and along with Chuck

7    Morrow in my office, we represent the County Prosecutor's

8    Office in prosecuting the Defendant in this case, Nathaniel

9    Jackson.  Either Mr. Consoldane or Mr. Lewis will follow me

10    and have questions.  Is that all right that we ask you

11    questions?

12    A        Yes.

13    Q        His Honor has allowed us to get to know you a little

14    bit so we can make a decision whether you can be one of the

15    jurors in this case.  Okay.  Is it all right -- is it Ray?

16    Do you go by Ray?  Is it all right if I call you Ray?

17    A        Sure.

18    Q        Thanks.  I see that you seem to understand pretty

19    well this portion of the case.  You have read the jury

20    instructions?

21    A        Yes.

22    Q        And you've indicated to the Court, and I'm going to

23    take this second issue first, that you didn't have any

1   preconceived opinion as to the Defendant's guilt or

2   innocence?

3   A        No, I don't.

4   Q        And do you recall reading anything about this case

5   in the newspaper or seeing anything or hearing anything on TV

6   or radio?

7   A        Only what the media put in the paper and on

8   television about, he was accused of a crime.  But --

9   Q        Do you recall what facts you remember that the media

10  had written?  I notice you're from Howland.

11  A        Yes.  What facts?  You mean like --

12  Q        What do you remember about what was involved with

13  the crime that he's been charged with?  What do you remember

14  about it, if anything?

15  A        He was, supposedly broke into a home.  Somebody was

16  murdered in the home, and he was accused of the crime.  But

17  other than that -- it was like a year ago, I believe.

18  Q        Yeah.  It would have been in December.  And so other

19  than that, you don't know very much?

20  A        No.

21  Q        Okay.  Is it fair to state that you didn't form an

22  opinion as to his guilt from reading that or hearing

23  anything?

1   A        No.  I really didn't, no.

2   Q        I would take it you would agree with me that not

3   everything in the newspaper is necessarily true?

4   A        I agree with that, yes.

5   Q        And would you agree there can be people that are

6   innocent that are charged by the police?

7   A        Happens every day, right.

8   Q        So you are, you recognize from your experience in

9   life that mistakes are made?

10  A        Yes, I do.

11  Q        And, therefore, you at this point in time under our

12  law must and do believe that he is innocent as he sits there?

13  A        Under our law, yes, he's innocent.

14  Q        There's that presumption of innocence; right?

15  A        Right.

16  Q        And it's our burden as prosecutors to get some

17  witnesses and put evidence to you if you're a juror, to prove

18  beyond a reasonable doubt he's guilty; right?

19  A        Yes.

20  Q        And because you don't have an opinion, you don't

21  have a bias one way or another, you're willing to follow the

22  law?

23  A        Yes, I am.

1072

```
1    Q        And I will take it you are open to receive our
2    evidence?
3    A        Yes.
4    Q        And if we can prove our case beyond a reasonable
5    doubt you could convict the Defendant?
6    A        Yes.  If it's beyond a reasonable doubt, yes.
7    Q        You understand if we would get any juror that, if we
8    would come into any case and prove the case and the juror
9    wouldn't sign a verdict of guilty, we wouldn't get a fair
10   trial, would we?
11   A        No.
12   Q        On the other side of the coin, if we don't prove our
13   case he should be found not guilty?
14   A        Yes.
15   Q        Whatever that case would be; right?
16   A        Yes.
17   Q        You would call it like you see it?
18   A        Yes.  I would like to think I would do that, yes.
19   Q        And that's all both sides are entitled to, an
20   individual that's open to both sides.
21   A        Yes.
22   Q        Look at each side, decide after listening to the
23   Judge what the law is and decide what's true, what you find
```

1  to be true?

2  A       Yes.

3  Q       Now, in this particular case, in Ohio we have a

4  death penalty.  And the State legislature passed a law, a

5  death penalty law that sets out the various circumstances

6  that one would be eligible to receive the death penalty.  You

7  understand that?

8  A       Yes.

9  Q       And the circumstance that's charged in this case --

10  and really there are two circumstances.  If you would

11  intentionally kill a homeowner in the commission of a

12  burglary, that would be aggravated murder.  And there would

13  be elements which would be involved in the crime of

14  aggravated burglary; do you understand that?

15  A       Okay.

16  Q       I'm not going through all of the details.  The Judge

17  has read the indictment.  But at the end of the day if you

18  were a juror the Judge would instruct you that these are the

19  elements of aggravated murder.  These are the elements of

20  aggravated burglary.  And there's also a charge of aggravated

21  robbery.  And we would have to prove the elements of the

22  crimes; you understand that?

23  A       Yes.

1    MR. CONSOLDANE:  Your Honor, I objected

2  to this before, and I just want to note my continuing

3  objection.  He can use other examples.  This is too close to

4  what the actual charges are.  He's trying to get a commitment

5  from the juror ahead of time.  I think that's improper.

6    If he wants to explain how it works, there's

7  examples that you used in your, the instructions that you

8  gave the juror which I think would be fine.  But I think he

9  should stay away from --

10    THE COURT:  I think Mr. Lewis gave an

11  example earlier where he put it outside.  And there was an

12  objection to that.  I don't know.

13    MR. WATKINS:  Your Honor, I'm just asking

14  to follow the law.  That's all.  I'm not going into details

15  at all.  Just the law.

16    THE COURT:  I don't know that there's any

17  correlation between using a fact pattern that's exactly the

18  same here or not.  There might be.  If you can frame it in

19  some different way, then Mr. Consoldane may be satisfied.

20    The point that the Prosecutor makes to you, sir, is

21  that, whatever the facts in this case there are certain

22  things that the State has to prove.  Those will be explained

23  to you in detail in the instructions.  And the point is, are

1    you willing and able to follow the law as it will be given to

2    you?

3    A        Yes, I am.

4                     THE COURT:  All right.

5    Q        Take it to a next step, Ray, if I may.  Obviously

6    I'm interested to see whether or not you would apply the law

7    as it is; you understand that?

8    A        Yes.

9    Q        In your experience, whether it be at work or school,

10   talking with friends and neighbors, have you ever taken a

11   position or formed a personal opinion about the death

12   penalty?

13   A        I probably have because I feel that the people that

14   don't like the death penalty, if you had your son or your

15   daughter or your wife murdered brutally by somebody you might

16   change your mind.  And I try to incorporate that into my mind

17   to think about that.  If this was my wife or my child, how I

18   would feel about it.  That's why I'm able to accept that.

19   Q        That is, you feel in looking at humanity if you kill

20   another neighbor's child it's like killing your child?

21   A        Well, I can, that's how I can accept that.  It's not

22   an eye for an eye thing.  It's not that.  It's just that I

23   feel that people that don't, you know, that are so far, so

1    much against this I think maybe they haven't had that

2    experience for somebody who has been brutally murdered close

3    to them.  And I think that's, that's the, what I try to look

4    at or accept, or whatever.  That's the reason I feel that

5    way.

6    Q        That's sort of a philosophical belief?

7    A        For me.

8    Q        You don't have any religious belief?

9    A        No.

10   Q        That is, an eye for an eye.  And I think you made

11   that clear?

12   A        No, I don't.

13   Q        Now, therefore, you believe the death penalty is

14   appropriate as a penalty?

15   A        Yes.  If, if it meets all the criteria, right.

16   Q        And I'm just -- yeah, that's the other part.  Can

17   you give me some examples of cases where you felt the death

18   penalty was appropriate, if you can think of any?

19   A        Let me think a second.  Raymond Fife, I felt was

20   brutally murdered and it was proven, so I think that there

21   should be death penalty there.  Offhand, I really --

22   Q        I understand.  I'm not trying to put you on the

23   spot.

1   A        I mean locally --

2   Q        That's one case that comes to mind.  And you

3   understand that your views of the death penalty, the personal

4   feelings you have, you have to set those aside and follow the

5   Judge's instructions?

6   A        Right.

7   Q        You can do that?

8   A        I believe I could.  Right.  I know I could.

9   Q        That's good.  Now, for example, there is no language

10  in the law dealing with brutal or heinous.  The law deals

11  with elements of, if you commit a rape in the commission of

12  an intentional murder, or if you commit a kidnapping or

13  robbery, those are things that we have to prove as

14  prosecutors.  And if we prove beyond a reasonable doubt those

15  things, which would be aggravated murder with those

16  aggravating circumstances, then the person is eligible for

17  the death penalty; you understand that?

18  A        Right.

19  Q        And then we come to the next stage where you must be

20  open to listen to evidence that would favor life

21  imprisonment, mitigating factors?

22  A        Right.  Okay.  I remember reading that.

23  Q        And, for example, if you would find that a person

1078

1    would have committed a heinous, brutal murder, theoretically,

2    there's no automatic death penalty for that.  You have to

3    still consider before determining the penalty the factors or

4    reasons to explain the behavior by the Defendant.  That's the

5    law.  Would you be able to do that?

6    A       Yes.

7    Q       That would mean that if, assuming we can prove

8    beyond a reasonable doubt the Defendant's guilt in this case,

9    no decision on the penalty until you hear from them and the

10   mitigating evidence that may be present in this case; you

11   would be willing to do that?

12   A       Yes.

13   Q       Does that sound fair to you?

14   A       Yes.  It sounds -- that's the law, right?

15   Q       Right.  That's the law.

16   A       That's fair.

17   Q       And when you would hear our evidence there would be

18   persons that would testify.  There would be exhibits.  That

19   you would judge the credibility of our evidence and decide

20   whether or not we proved beyond a reasonable doubt he

21   committed the crimes in question; you understand that?

22   A       Yes.

23   Q       And you could believe or disbelieve our witnesses;

1   right?  That's your job?

2   A       Yes, right.

3   Q       And if we didn't prove our case, you didn't believe

4   our witnesses, you would find him not guilty; right?

5   A       Right.

6   Q       Now, if we got to that point where we proved our

7   case, that he was guilty, then you have to listen to their

8   evidence in mitigation; right?

9   A       Right.

10  Q       And you would have to decide whether you believe

11  their evidence; right?

12  A       Correct.

13  Q       You would apply the same rules for their evidence as

14  you apply for ours?

15  A       Yes.

16  Q       That is, you want to be convinced --

17  A       Right.

18  Q       By whatever is presented?

19  A       Right.

20  Q       Now, some of the evidence that may be presented may

21  involve, could involve -- this is hypothetical.  I'm not

22  going to say what they're going to present because I don't

23  know.  Just say that you read the instructions from Judge

1    Stuard.  If a person had a mental disease or defect, a slow

2    learner and there was some evidence that you believe, that

3    would be a mitigating factor.  And if the Court said you have

4    to weigh that in favor of life imprisonment, would you do

5    that?

6    A        Sure.  I would have to.

7    Q        And any other thing that weighs in favor of life

8    imprisonment that you find to be mitigating and the Judge

9    tells you you have to consider that, you would consider it?

10   A        Yes, I would.

11   Q        And at the end the Judge would tell you, you've got

12   that evidence in mitigation; right?

13   A        Yes.

14   Q        You already heard from the State because he's been

15   found guilty to get to that second stage; right?

16   A        Yes.

17   Q        And you've heard the aggravating circumstances that

18   gets you to that second stage; right?

19   A        Right.

20   Q        And the Court, if the Court would tell you you have

21   to weigh the aggravating circumstances against the mitigating

22   factors, the things for the death penalty, the things against

23   the death penalty, and the burden is still on the State, that

1    if we, the state of Ohio, have proved that the aggravating

2    circumstances outweigh the mitigating factors that you find

3    with proof beyond a reasonable doubt, it is your duty to

4    recommend the death penalty; could you be able to do that,

5    sign a verdict recommending his death?

6    A        If it's beyond a reasonable doubt.

7    Q        You could do that?

8    A        Yes.

9    Q        Do you see what I'm getting at?  If you couldn't,

10   then you couldn't be fair to the state of Ohio; right?

11   A        Right.

12   Q        Now, on the other side of the coin, it may be you

13   might not be convinced beyond a reasonable doubt.  And it's

14   equally your duty, if we don't do our job and convince you

15   beyond a reasonable doubt from the evidence, then you've got

16   a duty to recommend life with no parole, or one of two other

17   life sentences with 30 full years before a parole hearing or

18   25 full years before a parole hearing; you would do that;

19   right?

20   A        Yes, I would.

21   Q        You're telling me you don't know what you're going

22   to do now because you haven't heard the evidence.  But you're

23   going to follow the law Judge Stuard gives, and you can go

1    either way depending on the law and the evidence; is that

2    fair to state?

3    A        That's fair to state, yes.

4    Q        You're going to make up your mind based on the law

5    and the evidence?

6    A        Yes.   That's why I'm here.

7                    MR. WATKINS:   Thank you.

8                         EXAMINATION

9    BY MR. LEWIS:

10   Q        Mr. Miles, may I call you Ray also?

11   A        Yes.

12   Q        Ray, my name is Jim, Lewis, that is.  I can use

13   first names too.  And along with the distinguished gray hair

14   fellow, Mr. Consoldane, we represent Nate in this case.

15            And what we're talking about in this case, first

16   off, I think you have a pretty good idea of the -- relax.

17   A        I am.

18   Q        Are you okay?

19   A        Oh, yeah.

20   Q        Don't get nervous?

21   A        Very comfortable.

22   Q        Us lawyers, most people want to throw us in the

23   river, but that's besides the point.

1    What we're, I think you understand the instructions,

2    the orientation instructions you were given.  And I always

3    have to go last here.  That's how I -- I'm always last.  So I

4    repeat some of the things, whatever.  But I just want to have

5    a conversation with you.  But from what you told Judge Stuard

6    and also what you told Mr. Watkins is, basically I think you

7    have a pretty good idea of how this operates.

8    I know that Mr. Watkins normally when he does his

9    questioning he's always leading questions.  He gives you the

10   answer kind of in a yes or no type thing, or whatever.

11   Sometimes that's pretty hard to figure out.  Some people say

12   yes and give us the answers we want.  But based on that --

13   but they don't really understand.  So sometimes it's hard.

14   But it's a difficult situation for any potential

15   juror such as yourself coming in here because the real crux

16   of this whole thing and what we're talking about is that

17   people can have any ideas they want outside these walls and

18   outside this particular case.  Okay.  They can feel any way

19   they want.

20   They can say, death penalty, it's the greatest thing

21   that ever happened.  We ought to give the death penalty to

22   shoplifters.  We'll cure that real quick.  Or like over in

23   Iran, you steal something you cut off the arm.  Hey, that's

1    going to fix everything.  No problem.  Entitled to those

2    ideas.  Entitled to those beliefs.  That's what America is

3    all about.

4         But when you come in here and have to sit as a

5    potential juror in a case, okay, especially this kind of

6    case, it's very, very important that the potential jurors be

7    as honest as they can with us about their prior beliefs and

8    their beliefs currently.

9         We're not going to get rid of those beliefs.  The

10   most we can do is ask people, you know, if you believe in

11   something, it depends on how strong that is.  If it's strong

12   enough that it's going to influence your opinion and it's

13   going to be hard to follow the instructions given by the

14   Court, then it may not come out exactly right.  Okay.  And

15   you can understand, one of the simplest ways to understand

16   all of this is kind of put the shoe on the other foot.  And

17   that's exactly "Trading Places."  The old Eddie Murphy, Dan

18   Aykroyd comedy, if you like comedies.  If you trade places

19   it's interesting how things look.

20        So what I'm asking you here is that, from what you

21   have said is that your prior opinion and your current

22   opinion, your personal opinion, not what the Court has

23   instructed orientation-wise about the death penalty, is that

1  one of the things that in your mind would favor that, in

2  other words, you believe in it in the sense that you think

3  about the victim's family, what they go through.  In other

4  words, any time there is a loss of life, even natural causes,

5  of course, people have grief and everything else.  But

6  especially involving a crime where some human being has took

7  another human being's life you have sympathy for the family

8  and the victims, right, be the children, spouse, or whoever

9  it is.

10  A        Yes, I do.

11  Q        And that's absolutely natural.  Everybody in the

12  world has empathy.  And when you consider the death penalty

13  you're considering that, in other words, what they go

14  through.  And you indicated that people who are adamant

15  against the death penalty, you don't think they take that

16  into consideration, or whatever, which may well be true.

17  It's their opinion.  It's floating around out there.  It's

18  outside those walls again.

19        But here what we're asking you to do is, even though

20  you believe that, okay, and even though that would be --

21  that's kind of like, if I can ask you, that's really based

22  upon, is that more of a retribution type thing?  In other

23  words, when people, if they have a reason for supporting the

1    death penalty, they may support it for a couple reasons.

2    They may say, well, it's the law and I can do it.  Or they

3    say, it's good for deterrence.  If we have this then

4    hopefully we won't have any murders or any death.

5         Or some people say it's retribution.  If you do

6    this, it's the eye for the eye biblical thing, only it's on a

7    different level.  If they take a life then their life should

8    be taken.  So there's any number of things that people may

9    say that the death penalty, why it may be a good thing or we

10   should have it or whatever.

11        Your context, as I understand it, is that you would

12   believe in it in the sense that you relate it to what the

13   families go through and what they've lost.  So is that kind

14   of like a retribution or even the scale up type thing or

15   what?

16   A       No, I don't consider that retribution.  I'm not, I

17   don't see it as getting even with the other person.  That's

18   the eye for an eye thing.  I really don't believe in that.

19   My whole point of that whole thing is --

20   Q       Go ahead.

21   A       If your, you may not believe in the death penalty

22   yourself.  But I believe that if your wife or your daughter

23   or your son was taken out and hacked to pieces, you might

1 change your mind.

2 Q        Sure.

3 A        That's, that's my only point.  That's the only thing

4 I'm saying.

5 Q        Close to home, sure.

6 A        If it's close to home you change your mind.

7 Q        If it happens to us?

8 A        I haven't had the opportunity.  Nothing,

9 fortunately, has ever happened in my life.  So that's the

10 only thing I can base it on.

11 Q        It's not, it's, it's, it's a very good observation.

12 It's exactly it.  Things like, we don't worry about, you

13 don't worry about your job and everything else.  And then all

14 of a sudden your company, you have to go on strike and your

15 company is going to go out of business.  And all of a sudden

16 you're worried about, my God, people losing their jobs and

17 everything else.  It's like anything in life.  If it happens

18 to affect us all of a sudden then we change our mind about

19 things.  Okay.

20 A        Right.

21 Q        So in that sense then you're not firmly planted with

22 the idea that, you know, if we, because there are --

23 obviously Mr. Fingerhut had relatives and there is victims.

1   It's obvious.  So what I'm saying is, I'm trying to equate,

2   I'm trying to make sure that because there are victims,

3   everybody has somebody.  There has to be a victim involved.

4   Not just because there's a victim would you favor the death

5   penalty per se; right?

6   A        Could you go over that again?

7   Q        I'm sorry.  I don't mean to confuse you.

8   A        I want to get that straight.

9   Q        I'm a lawyer and I talk gibberish a lot of times.

10  And I don't want to confuse you.  I try to say this as simple

11  as possible.  Of course people around here say I don't say

12  anything simple.

13       What I was trying to get to is this:  Is that, you

14  said you would feel or you gave the thing about the relatives

15  and all this kind of stuff about the victims.  And it wasn't

16  really a matter of retribution.  But if it happened to you or

17  your family, or you, you would believe in the death penalty,

18  whatever; right?

19  A        Yes.

20  Q        You may change your mind about it.  What I was

21  trying to say is that in any case where there's a death there

22  has to be some relatives or some victims involved.  Okay.

23  And there's victims involved in this case.

1    A        Okay.

2    Q        From Mr. Fingerhut's standpoint.  So what I'm saying

3    is, just because there's victims and there's a loss, that

4    doesn't necessarily mean that you would impose the death

5    penalty because that did happen?

6    A        No.  I mean, this has to be proven, right?

7    Q        Right.

8    A        I mean --

9    Q        It has to be more than just that.  There's more than

10   -- because there's a two-phase trial.  That's what I'm

11   getting to.

12   A        Right.

13   Q        Some states don't have the death penalty.  We have

14   the death penalty.  We have a two-phase type deal here.

15   Okay.  The first one is the conventional trial.  Everybody

16   sees on TV, knows about or whatever.  And that's to determine

17   guilt or not guilt.  And that normally is the end of the

18   ballgame.

19            But they enacted the death penalty.  And the death

20   penalty as it's framed is they said, okay, fine, you can find

21   him guilty of aggravated murder.  You can find him guilty of

22   aggravating circumstances.  But we're not going to

23   arbitrarily say that just because that happened everybody is

1    going to die under those circumstances.  We're going to go to

2    another phase and we're going to try to find out something

3    about the defendant.  Who he is.  What he is.  What happened.

4    This kind of thing.  Okay.  All right.

5         And what's important here is that, if you have a

6    preconceived notion or an idea, which is fine on the outside,

7    that, you know, as long as you prove it to me.  Well, they

8    may well prove aggravated murder.  They may well prove the

9    aggravating circumstances.  But that doesn't automatically

10   mean death penalty.  You have to kind of keep an open mind

11   for that next phase where we can introduce the things of

12   mitigating factors.

13        For instance, if it weren't this type of case --

14   this is the only type of case where this man up here wearing

15   the robe doesn't necessarily -- or normally if you have a

16   trial where somebody is convicted he does the sentencing, the

17   Judge.  And in that case he asks for a presentence

18   investigation from our probation department.  And they will

19   look into the background of the individual, find out who they

20   are.  Where they came from.  Something about them, or

21   whatever.  Okay.  And when they do that they return the

22   report back to the judge and he reviews it.  He reviews the

23   crimes, and he reviews things about the defendant.  And when

1    he reviews that, he'll make a decision on sentencing.

2           And say, for instance, it's a crime that carries

3    anywhere from three to ten years, anywhere in between.  Do

4    you think it would always be fair, for instance, since we're

5    talking about this, is that he give ten years to everybody?

6    A       No.

7    Q       Do you think it would be fair if he always gave

8    three years?

9    A       No.

10   Q       So he's going to make a decision based upon what's

11   in that presentence investigation.  And every particular

12   instance is different.  Every crime is different.  Every

13   individual is different; right?

14   A       Yes.

15   Q       So all I'm trying to get to, Ray, is that if we get

16   to that second phase, the mitigation phase, and we bring in

17   evidence in regard to these mitigating factors, things about

18   Nate or something about him, your job as a juror in this

19   case, and honestly, you have to keep your mind open to those

20   kind of things.  In other words, it may be that he's

21   convicted of aggravated murder, convicted of aggravating

22   circumstances, but if you start thinking death penalty right

23   off the bat and favor the death penalty going in, you may not

1  listen too much to what is there; right?

2  A       That's right.  I wouldn't do that.

3  Q       And that wouldn't, that wouldn't be the fair thing

4  to do?

5  A       No, it wouldn't.

6  Q       Because anything can happen in this world.  Anything

7  can, any one of your loved ones can be in the same boat.

8  People say, oh, that can't happen.  That can't happen.  It's

9  surprising how things can happen.  And you would want to be

10  treated the same way.  In other words, if the shoe was on the

11  other foot would you feel comfortable with yourself as a

12  juror in a type of case where you were the defendant?  I'm

13  flipping coins here.

14  A       You mean if I --

15  Q       Would you feel comfortable with the answers you've

16  given if you were a defendant in a case?

17  A       Yes.  Because I feel I am open-minded about the

18  whole thing.  I haven't formed an opinion.  And so I feel,

19  but, you know, I just strictly would go on the evidence.

20  Q       Okay.

21  A       And so I would feel if I was in the other position I

22  would feel --

23  Q       You're an okay guy.

1    A        I believe I am.  Everybody is; right?

2    Q        Yeah.  But that's good enough for me.  One other

3    thing.  There's a conception out there that life

4    imprisonment, you hear a lot of stories about somebody

5    sentenced to life in prison and five years later they're out

6    walking the streets.  And everybody gets up in arms and says,

7    Oh, my God.

8            In this case when they say it's life imprisonment

9    without parole, that's exactly what they mean.  In other

10   words, it's not, this is another example of not bringing

11   something from the outside in here.  Because if he instructs

12   you and he tells you life without parole, that means exactly

13   that.  If he's 30 now and he lives until 80, he's going to be

14   behind bars for 50 years and that's where he's going to die.

15           And they also, the life imprisonment with 25 years

16   is 25 years before he's even eligible for parole.  It doesn't

17   say he gets parole.  He can die in prison as well.  And the

18   same with 30.  So it really means what it says.  Okay?

19   A        Yes.

20   Q        Thanks much.

21   A        Thank you.

22           MR. WATKINS:  We are satisfied, Your

23   Honor.

1    THE COURT:  Defense.

2    MR. LEWIS:  Yes.

3    MR. CONSOLDANE:  We are satisfied.

4    THE COURT:  Mr. Miles, you will be part of

5    the pool from which this jury will be selected.  If you will

6    please call that number after Tuesday and every night

7    thereafter, you will be given further instructions when you

8    return.  We thank you very much for your time.

9    * * *

10   WHEREUPON,

11   RENE M. HEDRICK

12   being previously duly sworn, according to law, was examined

13   and testified as follows:

14   EXAMINATION

15   BY THE COURT:

16   Q        You are Rene Hedrick?

17   A        Yes.

18   Q        Good afternoon to you.

19   A        Good afternoon.

20   Q        We are here this afternoon so that certain questions

21   can be put to you folks concerning two main categories.  One

22   is the question concerning whether you've been influenced by

23   any pretrial publicity.  And the second involves the very

1175

1   with that?

2   A.   No problem.

3               MR. LEWIS:  Thank you very much.

4               MR. WATKINS:  We're satisfied.

5               MR. LEWIS:  Satisfied.

6               THE COURT:  Miss Gore, you will be

7   in the pool from which this Jury is selected.  If

8   you will call that number after 4:30 each evening,

9   you will be notified when to be back.

10  (Juror number 44 excused from the Courtroom.)

11  (Juror number 51, Florence Zduniak entered the

12  Courtroom.)

13              THE COURT:  Florence, you read that

14  paper that was given to you?

15              MS. ZDUNIAK:  Yes.

16              THE COURT:  You understand why we're

17  here?  This case involves aggravated murder with

18  specifications.  Under the law of Ohio, just

19  because someone is responsible for the unlawful

20  taking of another human being, his life, that does

21  not necessarily mean that that person is entitled

22  to the death penalty.  There's some people who are

1176

1   not able to participate in such a trial because

2   they would never wish to have to make that

3   decision.   There are others who feel very strongly

4   also, that if you take a life, you should forfeit

5   your life.   But we need 12 jurors who will follow

6   the law.   The law of Ohio is that the death penalty

7   only becomes possible under certain circumstances.

8   Now this case involves those circumstances.   If the

9   State is unable to prove the case that they have

10  brought against Mr. Jackson, then this Jury would

11  would be called upon to make a not guilty finding.

12  If the State does prove their case, however, and

13  the Jury returns a finding of guilty, then the

14  matter would go to a second phase.   And at that

15  time, the State has the opportunity to present

16  aggravating circumstances which are presented to

17  the Jury in favor of the death penalty.   And the

18  Defense has an opportunity to present mitigating

19  factors, which would be things that the Jury would

20  be called upon to consider that would not call for

21  the death penalty.   Then the Jury has other choices

22  if they decide not to give the death penalty.   So

1177

1  it is found necessary to question each prospective

2  juror individually to see if that person holds any

3  deep seated values or ethics that would make it

4  difficult or impossible to sit on this type of

5  Jury.

6          My question to you is, from what you know

7  at this point, would you have any problem with

8  sitting and if necessary, deciding that question

9  that would be presented to you, as to whether or

10 not the death penalty should be recommended in this

11 case?

12          MS. ZDUNIAK:  I would have to listen

13 to everything, but I would have no problem.

14          THE COURT:  The other issue that

15 these gentlemen will ask you about concerns

16 pre-trial publicity.  Have you read or seen

17 anything about this case that would make it

18 difficult to set that aside in your mind?

19          MS. ZDUNIAK:  No.

20          THE COURT:  This case has to be

21 decided on the evidence presented in the courtroom,

22 not what may appear in the newspaper.  You have no

1178

1   problem with that?

2              MS. ZDUNIAK:  No.

3   EXAMINATION BY MR. WATKINS OF MS. ZDUNIAK:

4   Q.   Good morning.  May I call you Florence?

5   A.   Yes.

6   Q.   My name is Dennis Watkins, I am County

7              Prosecutor, along with Chuck Morrow,

8              chief criminal assistant.  We have the

9              responsibility of prosecuting Nathaniel

10             Jackson.  I'm sure you understand that by

11             now?

12  A.   Yes.

13  Q.   And Mr. Lewis or Mr. Consoldane, who represent

14             the Defendant, will follow me, because

15             the Judge has allowed both sides to ask

16             you questions at this time, so we get to

17             know you a little better and see whether

18             or not you can be a juror.  We're not

19             trying to pry, but we need to understand

20             you, to make our decision.  Now, His

21             Honor has allowed an inquiry into two

22             areas at this point.  And one deals with

1179

```
 1              whether or not you have any information

 2              or knowledge about the case.

 3    A.    The only thing I seen on T.V., we don't get

 4              the newspaper.  I didn't read that much.

 5    Q.    And I have your questionnaire and I know,

 6              Florence, you live in Howland?

 7    A.    Yes.

 8    Q.    And in fact, you work in Howland?

 9    A.    Yes, the school.

10    Q.    And this crime, it's alleged the Defendant

11              took a home owner's life that lived in

12              Avalon Estates?

13    A.    Yes.

14    Q.    You are aware of that?

15    A.    Yes.

16    Q.    And could you tell me what you can recall from

17              any source, knowing about the case,

18              before you came into Court today?

19    A.    On T.V.

20    Q.    Specifically what do you remember?

21    A.    I remember it happened last year in December,

22              in the Winter, and they couldn't figure
```

1180

```
 1              out at first what happened, and then it

 2              came about that the so-called, that

 3              Mr. Jackson was supposed to be involved

 4              and the wife.

 5   Q.   And the wife of the deceased?

 6   A.   Yes.  They found evidence.

 7   Q.   And do you recall what kind of evidence, if

 8              any?

 9   A.   Letters.

10   Q.   Anything else that you remember reading or

11              hearing about the case against

12              Mr. Jackson?

13   A.   Nothing that much, not much.  Him and her was

14              supposed to be having an affair and that

15              is what happened.

16   Q.   And this information mainly came from?

17   A.   The news.

18   Q.   And you said you don't really read the

19              newspaper?

20   A.   Only get it on Saturday and Sunday.

21   Q.   And do you get the Vindicator or Tribune?

22   A.   Tribune.
```

1181

1  Q.    Now, as a result of your reading and hearing

2              on the news some of the facts, I guess

3              before I ask this question, I'll put that

4              aside and I wonder if you agree with me

5              that not everything that is in the

6              Tribune or the newspaper is true?

7  A.    True.

8  Q.    And I'm sure you can realize that innocent

9              people could be wrongfully charged?

10 A.    True.

11 Q.    You agree with that?

12 A.    I agree.

13 Q.    And so from what you read, and what you heard

14             on the news, up until the present time,

15             have you at any point in time formed an

16             opinion of the guilt or innocence of the

17             Defendant?

18 A.    Not really.  Just reading, you know what you

19             read or see on the news, that is all you

20             know.  You don't know all of the facts.

21 Q.    You never came to a point where you thought

22             he's guilty in your mind?

1182

1    A.    No.

2    Q.    And that means that at this point, if you had

3          to vote guilt or innocence, how would you

4          vote?

5    A.    I'm not sure.

6    Q.    And if the law says every person is innocent

7          until proven guilty, that means at this

8          time, he's innocent?

9    A.    That is right.

10   Q.    And so, you have no problem with that law, if

11         the Judge tells you that is the law?

12   A.    No.

13   Q.    If you had to vote right now, you would vote

14         not guilty, right?

15   A.    Because I don't know anything.

16   Q.    There's no proof, and if there's no proof, the

17         person would always be innocent?

18   A.    Yes.

19   Q.    I know it is an intellectual type of activity,

20         but there's that presumption, that

21         whenever a person, every Defendant comes

22         into Court, they are presumed innocent.

1183

1          Now, if you were a juror in this case

2          that would mean that the State would have

3          to produce evidence from that witness

4          stand to prove the charges the Judge

5          discussed with you.  The aggravated

6          murder of Robert Fingerhut, and there's

7          two aggravating circumstances, on count

8          one and count two, it is basically the

9          same victim, but different types of

10         aggravated murder.  But we would have to

11         prove one or both of the aggravated

12         murders, and the aggravating circumstance

13         or circumstances.  There's two on each

14         count with proof beyond a reasonable

15         doubt, you understand that?

16  A.    Yes.

17  Q.    And if we failed to prove that the Defendant

18         committed the aggravated murder and the

19         specifications, I am assuming that you

20         would find him not guilty?

21  A.    Right.

22  Q.    So, you would put it up to the State of Ohio

1184

1  　　　　to prove his guilt?

2  A.　True.

3  Q.　Now, you understand you would have to give us

4  　　　　perhaps two weeks of your time?

5  A.　Yes.

6  Q.　You would be able to do that?

7  A.　Yes.  The school lets you.

8  Q.　So that is not going to interfere with you

9  　　　　paying attention, if you were a juror?

10 A.　No.

11 Q.　Now, you understand the witnesses that would

12 　　　　testify would be in that very chair, and

13 　　　　we would present the evidence that the

14 　　　　State has against the accused, and try to

15 　　　　convince you by the proof, that he's

16 　　　　guilty beyond a reasonable doubt.  If we

17 　　　　would do that, then we go to the second

18 　　　　stage, you understand that?

19 A.　Yes.

20 Q.　And do you recall what you would do at that

21 　　　　second part of the trial from reading

22 　　　　what the Judge gave you?

1185

| | | |
|---|---|---|
| 1 | A. | You have two Juries. |
| 2 | Q. | You have two trials? |
| 3 | A. | Yes.  The second one says what is going to |
| 4 | | happen. |
| 5 | Q. | As far as the penalty? |
| 6 | A. | Right.  We just say if he's innocent or |
| 7 | | guilty. |
| 8 | Q. | But the second part, you have to decide |
| 9 | | there's mitigating factors? |
| 10 | A. | Yes. |
| 11 | Q. | You know what that means? |
| 12 | A. | Different circumstances. |
| 13 | Q. | That would favor life imprisonment or the |
| 14 | | death penalty? |
| 15 | A. | Right. |
| 16 | Q. | That is the first part.  The aggravating |
| 17 | | circumstances, the charge here, involves |
| 18 | | committing an aggravated murder, and at |
| 19 | | the time, committing an aggravated |
| 20 | | burglary, and committing aggravated |
| 21 | | robbery.  We would have to prove all of |
| 22 | | those things existed, and if we showed |

1186

1             that the aggravated murder was committed

2             with an aggravated murder, I mean

3             aggravated burglary and aggravated

4             robbery, those are two aggravating

5             circumstances.  If we prove that beyond a

6             reasonable doubt, then that second part

7             of the trial, that second trial, the

8             Defense would present evidence known as

9             mitigating factors; you understand that?

10  A.    Yes.

11  Q.    Things that would favor life in prison.  You

12             would be willing to have an open mind and

13             listen to them?

14  A.    Yes.

15  Q.    Now, prior to coming to Court, Florence, what

16             view did you have on the death penalty?

17             How did you look at the death penalty?

18  A.    I agree with it.  But sometimes I think it is

19             too easy.

20  Q.    What is too easy?

21  A.    The death penalty.  I think there's a lot of

22             people that -- I am an animal person and

1187

```
 1              I think they should do things, people

 2              that have done people wrong, they should

 3              experiment on them.  That is how I feel.

 4    Q.   You are saying people who commit heinous acts,

 5              such as torture, they should be tortured?

 6    A.   Not tortured, but not the way it is done.

 7              They stay there forever and it is not

 8              fair to them, too.

 9    Q.   So, you are saying if it is an appropriate

10              case you feel comfortable with the death

11              penalty?

12    A.   Yes.

13    Q.   Now, you understand that in your thinking,

14              that how in the past did you decide, what

15              kind of case, you should get the death

16              penalty, what kind of case you shouldn't

17              get the death penalty?

18    A.   There's murder, and to children, if there's a

19              terrible thing to children.

20    Q.   That is examples of the way you felt before

21              coming to Court?

22    A.   Yes.
```

1188

1   Q.   How about somebody that is a home owner, the

2            killing of them in their home?

3   A.   That is still murder.

4   Q.   And so if the law provided the death penalty

5            in those kinds of cases, you would follow

6            the law?

7   A.   It depends on the circumstance, but yes, I

8            would still follow the law.

9   Q.   You see there's no automatic death penalty?

10  A.   No, there's no automatic.

11  Q.   In your mind, there's no automatic death?

12  A.   No, it has to be proven first.

13  Q.   Say we can prove beyond a reasonable doubt

14           someone hypothetically killed a child?

15  A.   And you have proven their case?

16  Q.   And they raped a child.

17  A.   There would be -- I would have no problem.

18  Q.   But even if you had a, my hypothetical, you

19           had a child that was murdered and raped

20           and he was found guilty, you still can't

21           give an automatic death penalty, even if

22           it is the most vicious crime, you still

1189

1    have to consider life imprisonment, at

2    least evidence that would favor life

3    imprisonment.  Do you think you could do

4    that?

5  A.    I would try to, but if it is as bad as you are

6        saying --

7  Q.    If it is bad, you may give the death penalty.

8        I'm not trying to talk you out of it, but

9        I'm saying the law requires that when you

10       get the evidence, that somebody did

11       something wrong and killed someone, that

12       you can't decide the penalty, once you

13       find him guilty because the Defense must

14       be given the opportunity to present

15       evidence that would favor life in prison.

16       You understand that?

17  A.   Yes.

18  Q.   And that is the law as the Judge gave it to

19       you?

20  A.   Yes.

21  Q.   Would you be able to do that?

22  A.   Yes.

1190

1  Q.   You see what I am getting at?

2  A.   You are trying to tell me that I have got to

3       make a choice.

4  Q.   I'm trying to tell you, you have to make a

5       choice and you have to have an open mind

6       that you are not going to decide the case

7       before you hear from them?

8  A.   You can't do that.

9  Q.   And I think the Judge more or less went to

10      that kind of thinking, as far as asking

11      you, the juror, that sometimes we get

12      jurors that believe from the Bible, that

13      if you kill somebody and you commit a

14      heinous crime, you should get the death

15      penalty automatically.  And those kind of

16      people, they would automatically favor

17      us, the State, because we're seeking the

18      death penalty, and we're entitled to

19      people that would consider it, but not

20      somebody that would automatically give

21      it.  You see what I am getting at?

22  A.   I understand that.  It is hard for anybody.  I

1191

| | | |
|---|---|---|
| 1 | | wouldn't really want to make that choice, |
| 2 | | but if I have to make that choice -- but |
| 3 | | no one wants to tell someone that they |
| 4 | | have to die. |
| 5 | Q. | But the point is that you have the open mind |
| 6 | | to say that you are going to make a |
| 7 | | choice based on the evidence, and the |
| 8 | | law, and not on something the way you |
| 9 | | felt before you came to Court? |
| 10 | A. | True. |
| 11 | Q. | You can set aside your personal thinking as |
| 12 | | far as how to run this Court, in the |
| 13 | | sense that the Judge is going to run this |
| 14 | | Court and you are going to be one of 12, |
| 15 | | and if 12 jurors would bring in their |
| 16 | | personal thinking about the law, in the |
| 17 | | death penalty and apply their own |
| 18 | | personal view, we have chaos.  That is |
| 19 | | why all 12 jurors have to follow the |
| 20 | | rules the same way.  And that means |
| 21 | | there's no automatic death penalty, and |
| 22 | | there's no automatic life in prison.  It |

1192

1    depends on the circumstances.  And you

2    are telling me that is the way you look

3    at it?

4  A.   Yes.

5  Q.   So, in the event that we prove beyond a

6        reasonable doubt the Defendant committed

7        aggravated murder, and one or both of the

8        aggravating circumstances, then they

9        would have the opportunity to present

10       witnesses and evidence that would favor

11       life imprisonment?  You remember reading

12       the Judge's instruction about mitigating

13       factors?

14  A.   Yes.

15  Q.   If a person would have a mental disease or

16       defect hypothetically, you have to

17       consider that in favor, not necessarily

18       in favor, but in considering life in

19       prison.  You understand that?

20  A.   Yes, I understand.

21  Q.   If the law would require, if it was proven,

22       you understand this is hypothetical.  If

1193

1    the Judge told you if it is proven that

2    there's a mental disease or defect that

3    substantially impacted the behavior of

4    the Defendant, you must consider that as

5    evidence in favor of life in prison.

6    Would you do that?

7    A.    Yes.

8    Q.    You see what I'm saying?

9    A.    Yes.

10   Q.    And so anything that comes in that is in favor

11         of life imprisonment from the Defense,

12         you have to consider it.  Would you do

13         that?

14   A.    Yes.

15   Q.    And that would mean you would consider theirs

16         and you would consider ours, and then at

17         the end a Judge will tell you that you

18         have to compare the aggravating

19         circumstances against the mitigating

20         factors, the things in favor of the death

21         penalty versus the things in favor of

22         life in prison.  You understand that?

1194

1    A.    Yes.

2    Q.    And you have to have that open mind and not

3          make up your mind, until you hear from

4          both sides.  Could you do that?

5    A.    Yes.

6    Q.    The State, at all times has the burden of

7          proof.  And if we couldn't prove beyond a

8          reasonable doubt, the aggravating

9          circumstances outweigh the mitigating

10          factors, then you understand it is your

11          duty to recommend life in prison?

12    A.    Yes.

13    Q.    You could do that?

14    A.    Yes.

15    Q.    If we prove beyond a reasonable doubt that the

16          things in favor of the death penalty

17          outweigh the mitigating factors, then you

18          must recommend the death penalty, you

19          understand that?

20    A.    Yes.

21    Q.    It is sort of like this.  You got a

22          responsibility to consider all of the

1195

```
 1            evidence at both stages.  And your
 2            decision, you don't know what it is going
 3            to be?
 4  A.    No.
 5  Q.    But it is going to be based on what you feel
 6            and believe at the end, and in the event
 7            the State proved its case as the law is
 8            given by Judge Stuard, then you would
 9            recommend the death penalty.  And you
10            could do that?
11  A.    Yes.
12  Q.    If we fail, then you recommend life with no
13            parole, life in prison with 30 full years
14            before parole hearing, life in prison
15            with 25 years before parole hearing.  So
16            you have four possible penalties.  You
17            can only decide the penalty, if we go
18            through these various stages.  And I take
19            it from your answer, that you feel that
20            you can be open to both sides, and make a
21            decision based on the law and the
22            evidence, and that is going to control
```

1196

1    what you do, nothing else?

2    A.    You have to.

3            MR. WATKINS:    Thank you very much.

4    EXAMINATION BY MR. LEWIS OF MS. ZDUNIAK:

5    Q.    Good morning.  My name is Jim Lewis.  May I

6          call you Florence?

7    A.    Yes.

8    Q.    You have survived this far.  That

9          distinguished gentleman over there is

10         Mr. Consoldane and along with myself, we

11         represent Nathaniel in this case.  And

12         Florence, regarding the death penalty

13         itself, prior to coming, prior to reading

14         the instructions, the orientation

15         instructions, we'll set those aside for a

16         minute.  You agreed with the death

17         penalty, you said?

18   A.    Yes.

19   Q.    And of course, there's a lot of states that

20         don't even have it, but Ohio has it, so

21         it is the law, but you say you agree with

22         it, right?

1197

1   A.   Yes.

2   Q.   And can you tell me why you agree with it?

3   A.   Because it is not right to take someone else's

4        life.

5   Q.   And that is translated then to what?  The idea

6        here is -- let me go back a little bit

7        here.  Normally, if there's a death

8        penalty or a personal belief, let's

9        forget what the law is.  A personal

10       belief, the death penalty, the idea being

11       that some people may believe in it for

12       deterrents sake.  If we execute everybody

13       that has killed somebody else, then we

14       won't have anybody dying.  It is going to

15       be a happy world.

16  A.   Doesn't happen.

17  Q.   Would it be deterrents?

18  A.   No.

19  Q.   Retribution, society's retribution for the

20       loss of a member of its own society, by

21       somebody else, so we have to liquidate

22       and take out that person.  Retribution.

1198

1    A.    I'm not sure about that, either.  It is the

2             law.  You kill somebody, you pay the

3             crime, you pay for the crime.

4    Q.    What I am getting to is, Mr. Watkins asked you

5             how you felt about the death penalty

6             before you came in here, and is that

7             based only on, it is the law for Ohio.

8             If you went to a couple of other states

9             where they don't have the death penalty,

10           would your opinion then be, no, I don't

11           believe in the death penalty, because it

12           wouldn't be wise?

13    A.    It wouldn't change.

14    Q.    So what I'm asking you, Florence, very simply

15           is why do you believe in it?  What would

16           you describe the reason to, is there any

17           reason you can give me?

18    A.    I guess because we have always had it.  And

19           when you kill somebody --

20    Q.    Somebody has to die?

21    A.    Not have to die.  They have to, they have --

22           it is just not right to take someone's

1199

```
 1              life for no reason.
 2    Q.    I understand that.  But the penalty, you are
 3              saying if that is the case, it is not
 4              right to take a life for no reason, then
 5              there has to be a death penalty.  He
 6              should die?
 7    A.    What I'm trying to say, too, is that you said
 8              there's different circumstances, so the
 9              death penalty is one of them and the
10              other one is life in prison.  You have
11              got both, but I believe in the death
12              penalty, because if you took a life, you
13              should have known what you were doing.
14              If you didn't know what you were doing,
15              there's more to it than just saying,
16              death penalty.  The death penalty -- what
17              would we do if we don't have it?  You
18              said other states don't have it, but we
19              do, and I believe we have to have it.  I
20              believe we have to have it.  I could do
21              other things to him.
22    Q.    What would you do?
```

1200

1  A.    It is not right what they do to animals, but

2          it is not right that they killed a

3          person, so something should -- you think

4          they should get away with it?

5  Q.    It is not, that is the whole point of this,

6          Florence, is the personal opinions.  You

7          indicated to us it is too easy.  What was

8          too easy?

9  A.    Sometimes, it is too easy because they have to

10          sit in prison for how many years to

11          appeal.

12  Q.    That is not fair to them, is it?

13  A.    No, it isn't.  If they know they have done it.

14  Q.    You should kill them pretty quick or

15          reasonably so?

16  A.    I think the waiting is wrong.

17  Q.    Waiting is wrong?

18  A.    That would drive me up a wall.

19  Q.    In fairness to them, it shouldn't take that

20          long, that is the biggest problem we have

21          got is that it takes too long?

22  A.    It is just not right.

1201

1   Q.   So, I would say, or you would say, you firmly

2           believe in the death penalty?

3   A.   Yes, I believe in it if you don't have

4           something -- well, no, it doesn't really

5           stop people from killing people.  What

6           else is there?

7   Q.   In this case, hypothetically your personal

8           opinion would be that you are for the

9           death penalty.  If they prove aggravated

10          murder, they prove the aggravating

11          circumstances, they prove to you beyond a

12          reasonable doubt that he's guilty, that

13          would be a situation where you give the

14          death penalty, right?  Intentionally took

15          the life of another, as he says, a home

16          owner.  That would be the death penalty

17          case for you, right?  At the same time,

18          if we go to that mitigation phase, you

19          still believe it is a death penalty case,

20          right?  He should get the death penalty?

21   A.   You have to hear all of the evidence.

22   Q.   So, we hear evidence in the second phase of

1202

1              the trial and that second phase of the

2              trial, we would try to introduce

3              something by way of mitigation.  Evidence

4              from our side.  And would you be open to

5              hear any of that evidence?

6  A.     You have to be open or you shouldn't be on the

7              Jury.

8  Q.     That is a reasonable answer.  And when you get

9              to that phase and you hear the evidence,

10             and you are weighing the aggravating

11             circumstances that he proved in the first

12             phase of the trial and the mitigating

13             evidence, that favors life imprisonment?

14  A.     Yes.

15  Q.     And if you felt that maybe they didn't really

16             prove beyond a reasonable doubt that

17             those mitigating factors are outweighed

18             by the aggravating circumstances, what

19             would you do beyond a reasonable doubt?

20  A.     You would have to weigh them both.  And if you

21             didn't prove their case, then we would

22             have to go with the State.

1203

1   Q.   The death penalty?

2   A.   Yes.

3   Q.   On the other side of the coin -- on the other

4        side of the coin, if you felt that the

5        mitigating factors, outweighed --

6   A.   Then I would go with life imprisonment.

7   Q.   It is not outweighed.  The aggravating

8        circumstances have to outweigh the

9        mitigating, beyond a reasonable doubt.

10       You hear that, beyond a reasonable doubt?

11  A.   Yes.

12  Q.   You think that is a very high burden or maybe

13       yes, maybe no?

14  A.   You have to consider everything.  It is not

15       just split second.  You have got to

16       think.  You have to listen.

17  Q.   That would be helpful.  Let's get back to the

18       mitigation.  You wouldn't really favor

19       life imprisonment for him, would you?

20  A.   It depends on what you tell me and what I find

21       out.

22  Q.   Remember now, you told us that your opinion is

1204

1            it is not fair to him, life imprisonment?

2    A.   But that is where there should be other ways.

3    Q.   What other ways?

4    A.   That he should, if you are going to have the

5            death penalty, and life imprisonment.

6            There's something you should be doing in

7            life imprisonment.  You shouldn't be

8            sitting there waiting.  I am talking

9            about, he should be doing, he should pay

10           for his crime.  If he did it, life in

11           prison, he should be doing something to

12           either improve circumstances he's in or

13           something.  He shouldn't be sitting

14           there.

15   Q.   He's not going to to anything if he just sits

16           there, that is no good either?

17   A.   That is what we found.  That is what you have

18           to go with when you find a person with

19           life imprisonment, they are stuck there

20           for the rest of their life.

21   A.   You don't consider that a punishment?  They

22           are not doing enough?

1205

1   A.   Sometimes no.

2   Q.   So, would that deter you from saying, "I don't

3        think he should get life in prison,

4        because he's not going to do anything.

5        He's going to sit there and eat my food

6        and use my electricity and cost me tax

7        money."

8   A.   They have to prove that.

9   Q.   They have to prove that?

10  A.   They have to prove that.  If there's 12

11       persons on that Jury and they come up

12       with that answer, that is what it would

13       be.

14  Q.   You would be one of the 12?

15  A.   Yes.

16  Q.   But your basic personal opinion, you would

17       favor the death penalty?

18  A.   I would have to hear both sides before I would

19       make a decision, but yes, Sir, I am in

20       favor of the death penalty when someone

21       commits a crime.

22  Q.   You realize if he was found guilty of

1206

```
 1              aggravated murder and the aggravating
 2              circumstances, you can't be thinking
 3              death penalty right then?
 4    A.   You have to hear the other side.
 5    Q.   What are you indicating that they do it to
 6              animals, what is that about?
 7    A.   Animals don't do anything to anybody, and they
 8              are experimented on all the time.  I
 9              think sometimes that people should get
10              that.  An animal doesn't do anything to
11              anybody and then they didn't kill
12              anybody, so why don't we try it on
13              prisoners, the ones that have done
14              terrible things?
15    Q.   So, you are saying that animals are killed for
16              no reason at all and humans do all of
17              these bad things and they are not killed?
18    A.   They have the power, an animal doesn't.  An
19              animal has no power.
20    Q.   So, we're not tough enough on the people
21              because people do bad things and they can
22              think, right?
```

1207

1   A.   Right.

2   Q.   And animals don't do anything and we hurt

3            them?

4   A.   Right.

5   Q.   So that is not a very fair system?

6   A.   That is what I thought, but no one listened.

7   Q.   I am listening.

8                MR. WATKINS:  I think he's gone

9   over.  She said several times she can follow the

10  law.

11               THE COURT:  She has said that.

12  Q.   Now you realize if you sit on this Jury, you

13           really have to put some of those personal

14           opinions aside.  You really have to do

15           that because say for instance, you are

16           married, aren't you?

17  A.   Yes, 32 years.

18  Q.   Maybe I better not use your husband for an

19           example.  You have got a nice daughter.

20  A.   Yes.

21  Q.   Now if she was to sit as a Defendant in a

22           case, not a death penalty case, just a

1208

1  speeding ticket.  And we had people come

2  in as potential jurors on that case, and

3  they got up there, and I was representing

4  Tracy in regard to her speeding ticket,

5  and you are sitting out in the gallery,

6  and I ask a potential juror the same

7  questions, specifically what I'm asking

8  you, and they say, "Well, if they are

9  accused of speeding, that is not, they

10  should be found guilty as far as I am

11  concerned.  The officers are right."

12  A.  They are not always right.

13  Q.  Then we'll get past that one.  Then the Judge,

14  he should give her the appropriate

15  sentence, if she's found guilty.  Take

16  her license away for ten years.

17  A.  It depends on the circumstance.

18  Q.  Because she knew what she was doing.  She's a

19  human.

20  A.  It depends on the circumstance.

21  Q.  What circumstances would help you in regard to

22  your daughter?  What would be the

1209

1    circumstances if she was doing 70 in a 40

2    mile an hour zone?

3         MR. WATKINS:  I'm going to object.

4  A.   She would have to pay just like anybody else,

5       but I would like to know why she was

6       going that fast.  I would ask her those

7       questions.  I would want to know why.

8  Q.   So the point being is that you can put

9       somebody like your daughter, trade

10      places?

11 A.   If she did wrong things, it would be the same

12      thing.  She's my daughter, but if she's

13      done something wrong, she's still at

14      fault.  There's nothing I can do.  I

15      didn't do it.  The thing is, just like if

16      I saw her with dope, I would turn her in.

17      That is me.

18 Q.   Once again, you can on your oath, set aside

19      any personal feelings you have in regard

20      to the matters we talked about, and just

21      follow the instructions given by the

22      Court?

1210

1  A.   Yes.  You have to.  That is, if you are going

2          to be a juror on a Jury, you have to

3          listen to the Judge and everybody else,

4          including you.

5  Q.   You don't want to.  That is all right.

6  A.   I handle teenagers every day.

7  Q.   I'm glad you called me a teenager.  That is

8          okay.

9              MR. WATKINS:  We're satisfied.

10             THE COURT:  Defense.

11             MR. LEWIS:  No objection.  We're

12  satisfied.

13             THE COURT:  Ma'am, you will be

14  notified.  You call that number after 4:30 each

15  evening until you are notified to be back here.

16             MS. ZDUNIAK:  I didn't get rejected,

17  no?

18             THE COURT:  No, you are part of the

19  pool from which this Jury would be selected.

20             MS. ZDUNIAK:  I was ready for

21  rejection.

22             THE COURT:  Let's take a break.

1211

1   (Court in recess at 11:10 A.M.)

2   (Resumed in Open Court at 11:30 A.M.)

3   (Juror number 53, Joseph Miller entered the

4   Courtroom.)

5           THE COURT:  Good morning.  You

6 understand, you read that hand-out that was given

7 to you?

8           MR. MILLER:  Yes.

9           THE COURT:  We're here on an

10 aggravated murder case the State has filed against

11 Mr. Jackson, seated over there.  In order to have a

12 Jury that will do what the law requires, it is

13 necessary that I have 12 people who are willing and

14 able to follow the law of the State of Ohio.  Just

15 because a person unlawfully kills somebody does not

16 necessarily mean that they qualify for the death

17 penalty.  The State will be called upon to present

18 this case to that Jury, and if they fail to

19 maintain the burden of proof beyond a reasonable

20 doubt necessary, to prove the elements of

21 aggravated murder with the specification, then this

22 Jury will be called upon to return a verdict of not

1212

1    guilty.  If the State, however, does carry that

2    burden of proof, then this Jury will be called upon

3    to return a verdict of guilty, and the case would

4    go into a second phase.  At that time, the State

5    would present a second phase, aggravating

6    circumstances, which are things that would be in

7    favor of the Jury giving the death penalty.  And

8    the State -- I'm sorry, would have to prove by

9    those aggravating circumstances that those reasons

10    outweigh the mitigating factors which the Defendant

11    would have an opportunity to present.

12          Mitigating factors are things that, for

13    the Jury to take into consideration, so that they

14    would not give the death penalty.  The State has to

15    do that by the same burden, beyond a reasonable

16    doubt.  Now some people are not able to sit on such

17    a Jury, they have a religious or philosophical

18    belief that it is not right to participate in the

19    death of any other human being.  Other people

20    believe the old covenant, an eye for an eye, tooth

21    for a tooth, and if you kill somebody your life

22    should be taken.  On both sides of that spectrum,

1213

1   neither of those could sit as a juror and be fair

2   to both sides.  So the questions that would be put

3   to you today go to two areas, primarily about the

4   death penalty, whether you could be fair and apply

5   the law.  You may have some personal feeling about

6   the death penalty, but everyone does one way or the

7   other.  It is whether you can follow the law.  The

8   other issue would be on pre-trial publicity.  Have

9   you read or seen anything that you would have your

10  mind made up about the case?

11              MR. MILLER:  No.

12              THE COURT:  Thank you.

13  EXAMINATION BY MR. WATKINS OF MR. MILLER:

14  Q.   Good morning.  My name is Dennis Watkins,

15           along with Chuck Morrow, we're

16           Prosecutors in this case.  And his Honor

17           has allowed us to ask you some questions.

18           We're not attempting to pry, you

19           understand that.  We have to make a

20           decision whether or not you can be a

21           juror.  In fact, the procedure is such

22           that Mr. Lewis or Mr. Consoldane, who

1214

```
1              represents the Defendant, will follow and

2              ask some similar questions.  We need to

3              make a decision regarding you serving as

4              a juror, and in order for us to do that,

5              we need to know a little bit about you,

6              and in this particular instance, the

7              Judge has allowed us to ask questions

8              concerning two areas.  And if there's

9              anything I ask that you don't understand,

10             please, don't hesitate to tell me you

11             don't understand.  I understand from your

12             questionnaire that this is your first

13             Jury trial?

14   A.   Yes.

15   Q.   You are a welder by occupation?

16   A.   Yes.

17   Q.   And you have a family?

18   A.   Yes.

19   Q.   And I think you can appreciate that it is

20             important to all of us to have jurors

21             that take time from their work and their

22             family life to come here in Court and
```

1215

1    decide cases?

2  A.   Yes.

3  Q.   And you would be able to give two weeks of

4       your time and do that?

5  A.   Yes.

6  Q.   And there's nothing that is going to distract

7       you from listening to the evidence?

8  A.   No.

9  Q.   Now, his Honor has asked you whether or not

10      you have read or heard anything about

11      this case.

12 A.   Not really.  I watched the news and stuff come

13      up, and I flip it.  I try not to get

14      involved in it, but that is all it has

15      been.

16 Q.   Do you get the newspaper?

17 A.   Yes, but all I look at is the classifieds.

18 Q.   And so, anything you have heard would be on

19      television?

20 A.   Yes, basically, if I heard anything.

21 Q.   And as you can recall when you were in Court

22      last Tuesday, the Judge read some facts

1216

1    about why we're in Court?

2  A.  Right.

3  Q.  Did that trigger anything in your mind as to

4       what you remember about it?

5  A.  No.  I don't really remember when it happened.

6       The only thing I really watch is the

7       weather and stuff like that.

8  Q.  Which means --

9  A.  I don't follow along with everything that is

10      going on in the society.

11 Q.  You got your own life to live?

12 A.  Right.

13 Q.  And you don't need to be burdened with a lot

14      of other's problems, is that fair to

15      state?

16 A.  Pretty much.

17 Q.  In this case, understand that Nathaniel

18      Jackson, the Defendant in this case, is

19      presumed innocent?

20 A.  Right.

21 Q.  And that is the way it should be?

22 A.  Right.

1217

1    Q.    Now we represent the State, and we have the

2          burden to prove his guilt beyond a

3          reasonable doubt, and I'm sure you have

4          heard that before, right?

5    A.    Yes.

6    Q.    And the reason we ask these questions is

7          because we need to have jurors that

8          aren't going to favor the State, and they

9          are not going to favor the Defense.  They

10         are going to be straight down the middle

11         and go by the law and the facts, and

12         therefore, you can see why it is

13         important to understand whether you read

14         something about it, because you could

15         have made up your mind?

16   A.    Right.

17   Q.    But you haven't?

18   A.    No.

19   Q.    And if the State would, from that witness

20         stand, and I shouldn't say stand, from

21         that witness chair, present evidence that

22         convinces you beyond a reasonable doubt

```
                                                    1218
 1              the Defendant is guilty of aggravated
 2              murder and the aggravating circumstances
 3              that he's charged with, could you and
 4              would you find him guilty?
 5  A.   Yes.
 6  Q.   On the other side of the coin, we wouldn't
 7              prove it to your satisfaction from our
 8              evidence, you would find him not guilty?
 9  A.   Right.
10  Q.   The bottom line is, you would call it like you
11              see it?
12  A.   Right.
13  Q.   That is all we can ask for.  This case is
14              different than other cases, because we
15              could have two trials.  The first trial,
16              you would decide whether or not the State
17              could prove the Defendant's guilt, and
18              the second part, you would decide the
19              penalty, you understand that?
20  A.   Yes.
21  Q.   You remember the orientation instruction the
22              Judge gave you?
```

1219

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Now, I would like to ask you what opinion, if |
| 3 | | any, you had regarding capital punishment |
| 4 | | before you came to Court? |
| 5 | A. | Eye for an eye, I'll be honest.  If you take |
| 6 | | somebody, somebody ought to be able to |
| 7 | | take from you.  That is fair. |
| 8 | Q. | Is that from religious upbringing, also? |
| 9 | A. | A little bit and it is just my personal |
| 10 | | feelings.  That is the way I feel. |
| 11 | Q. | You understand in Ohio, as the Judge has |
| 12 | | explained, if you kill somebody and under |
| 13 | | the eye for an eye, this is your personal |
| 14 | | view, that you don't get the automatic |
| 15 | | death penalty.  You understand that? |
| 16 | A. | Yes.  I am talking within a reasonable doubt. |
| 17 | | If you know that guy did it, I feel there |
| 18 | | should be no trouble.  It should be done |
| 19 | | and over with. |
| 20 | Q. | That is your personal view? |
| 21 | A. | My personal view. |
| 22 | Q. | Now, assume that we can prove beyond a |

1220

1    reasonable doubt, no doubt about it, that

2    the Defendant, Mr. Jackson here,

3    convicted aggravated murder and killed a

4    home owner in an aggravated burglary,

5    known as aggravated burglary, a

6    specification.

7         MR. CONSOLDANE:  I'm going to object

8  to him using the same examples out of the

9  indictment.  He's trying to get a pre-judged

10 decision from this juror before he presents any

11 evidence.  I wish if he's going to use examples,

12 use them, to use the same one he's going to use at

13 trial is not fair.

14         THE COURT:  What would an

15 appropriate example in your mind be?

16         MR. CONSOLDANE:  At one time he

17 used, "committed a murder while committing a rape."

18         MR. WATKINS:  I see the

19 difference --

20         THE COURT:  The point is, he's

21 trying to make is the State proves its case, no

22 matter on what it is, prove all of the elements.

1221

1    That is where you get it.  Go ahead.

2    Q.    Whatever the charges were, anybody that would

3          be charged with an aggravated murder, and

4          you would find that person guilty?

5    A.    Right.

6    Q.    No doubt about it.  You couldn't say, "I'm

7          going to give the death penalty

8          automatically."  You understand that?

9    A.    Right.

10   Q.    But your personal vow, you would do that,

11         right?

12   A.    Probably, yes.

13   Q.    You see what I'm saying, so the law doesn't,

14         even if you submit the worst crime in the

15         world, the Judge has told you that you

16         have got to go to the second stage and

17         consider evidence that they made, showing

18         you why you should consider life

19         imprisonment; that is the law.  You

20         understand?

21   A.    Right.

22   Q.    You think you could set your personal view,

1222

| | | |
|---|---|---|
| 1 | | and not, if we would prove for example in |
| 2 | | this case, the Defendant's guilt, you |
| 3 | | would not come to an opinion about the |
| 4 | | sentence, right, at that time? |
| 5 | A. | Right.  I would have to look to the second |
| 6 | | step. |
| 7 | Q. | You think you can do that? |
| 8 | A. | Yes. |
| 9 | Q. | If you couldn't do that, then you wouldn't |
| 10 | | give them a fair shot at life in prison, |
| 11 | | would you? |
| 12 | A. | Right. |
| 13 | Q. | You see what I am getting at? |
| 14 | A. | Yes. |
| 15 | Q. | That is why the Judge in his questioning, went |
| 16 | | into the fact, the way the law works in |
| 17 | | Ohio, there's no automatic death penalty, |
| 18 | | and also, there's no automatic life in |
| 19 | | prison.  That is, you have got to hear |
| 20 | | from both sides.  You think you can do |
| 21 | | that? |
| 22 | A. | Yes. |

1223

1    Q.    Which means that in the event we prove beyond

2                a reasonable doubt, the aggravated murder

3                and the aggravating circumstances, then

4                you would listen to witnesses that would

5                present evidence in mitigation, you

6                understand that?

7    A.    Right.

8    Q.    You would have to decide what you believe, and

9                what weight you give that evidence, but

10               you still have to consider the mitigating

11               evidence, and anything that the Judge

12               tells you, you must consider in favor of

13               life imprisonment?  Would you be able to

14               do that?

15   A.    Yes, I think so.

16   Q.    For example, and this is hypothetical, not

17               necessarily this case.  The law that you

18               read regarding mitigating factors, said

19               that if a person has a mental disease or

20               defect, and it substantially affected his

21               behavior at the time, that would be a

22               mitigating factor that you would give

```
                                                              1224
 1                  weight to, so if they had evidence of

 2                  that, the Judge says, you have got to

 3                  give consideration to that, would you be

 4                  able to do that?

 5   A.    Yes.

 6   Q.    Now, at the same time that doesn't mean you

 7                  give him life in prison, that means you

 8                  would consider it.  And if you must

 9                  consider something that the law says you

10                  consider, could you do that?

11   A.    Yes.

12   Q.    So that would mean that if we got to that

13                  second part of the trial, the Defense

14                  would present evidence in mitigation, you

15                  decide what you believe after you hear

16                  from them, the Judge would say, "You got

17                  to have an open mind," then you go to the

18                  end of the trial, after you hear all of

19                  the final arguments of both sides, and

20                  then you have to weigh the things that

21                  favor the death penalty versus the things

22                  that favor life in prison, which could be
```

1225

1    no parole, life with no parole.  It could

2    be life with 30 full years before parole

3    hearing, or it could be 25 full years

4    before parole hearing.  So you basically

5    have four options.  Death penalty, and

6    three types of life in prison.  The law

7    is you can't favor any one penalty.  You

8    understand that?

9  A.  Right.

10  Q.  You think you would be able to do that?

11  A.  I think I could.

12  Q.  And then at the end, the Judge would tell you,

13    "Okay, Jury, if the aggravating

14    circumstances that the State has shown

15    you outweigh the mitigating factors, that

16    favor life in prison, and the State's

17    evidence is proof beyond a reasonable

18    doubt, then you must recommend the death

19    penalty," would you and could you do

20    that?

21  A.  Yes.

22  Q.  Now on the other side of the coin, if we

1226

1      didn't prove with proof beyond a

2      reasonable doubt that the things in favor

3      of the death penalty outweigh the

4      mitigating factors, then it is your equal

5      obligation under the law, to recommend

6      life in prison.  One of the three

7      sentences, you understand that?

8   A.   Right.

9   Q.   It is a mechanical thing where you have to

10     weigh both sides and follow the law.  And

11     in order for you to be a juror, you have

12     got to set aside this eye for an eye

13     stuff.  You think you can do that?

14  A.   I hope so.

15  Q.   You can't be a juror unless you can --

16  A.   I'll be honest with you, yes, I hope I could.

17     I hope so.

18  Q.   At this time, you feel you could do that?

19  A.   At this time, I think I could.

20  Q.   And that means you are going to call it like

21     you see it.  Based on the law and the

22     evidence, and you can go any way,

1227

1   depending on the law and the evidence and

2   you are not going to let anything prior

3   to coming to Court influence you, other

4   than the law and the evidence?

5   A.   Right.

6           MR. WATKINS:   Thank you very much.

7   EXAMINATION BY MR. LEWIS OF MR. MILLER:

8   Q.   My name is Jim Lewis, Mr. Miller, and along

9        with Mr. Consoldane, we represent

10       Nathaniel in this case.  Is it okay if I

11       call you Joe?

12  A.   That is fine.

13  Q.   And you have gone through the orientation

14       instructions, and you have answered the

15       questions for the Judge, and also

16       Mr. Watkins here.  And you have indicated

17       that your belief in the death penalty is

18       a little bit on the religious side from

19       the eye for an eye, and you said it was a

20       part of your upbringing.  Is that is what

21       you thought for years, I assume?

22  A.   Right.

1228

1   Q.   And when you say an eye for an eye, sometimes

2             when people say that they believe in the

3             death penalty, some states have it, we

4             have it, some other states don't have it.

5             It is kind of unusual, but when you say

6             you believe in it, can you give me a

7             reasoning like, say for instance, some

8             people, they believe the death penalty

9             for deterrents, they think you have a

10            death penalty and you don't have anybody

11            murdered or that kind of thing.  And some

12            people say, "I believe retribution, that

13            society has lost a member of society and

14            the other person has to pay with an equal

15            law," there can be any number of reasons.

16            Can you give me any idea of the reasoning

17            of why you believe in it?

18  A.   Do you want an example?

19  Q.   Yes.

20  A.   I feel if there's somebody walking through the

21            park here and somebody walks up and

22            shoots him and there's a cop standing

1229

```
 1              there and he killed that guy that got

 2              shot, and there's no doubt that he shot

 3              him, yes, he should be sentenced to

 4              death.  Yes, that is the way I see it.

 5    Q.   That is the example.  And the reasoning behind

 6              that is he's taken a life.  His life

 7              should be forfeited.  It is as simple as

 8              that.  It is a simple equation and that

 9              is the way it ought to be.  I appreciate

10              your honesty.  The most important thing

11              we get from people here, is they have got

12              to be as honest as possible with you in

13              regard to these matters, because

14              sometimes a lot of people, they want to

15              give us the answer they think we want to

16              hear, which is not really what we want.

17              It is the opposite.  It is the opposite,

18              we want people to be frank with us and

19              honest about how they feel so we can

20              figure out if it is going to be difficult

21              for them to be on a Jury, because this

22              whole system if you flip it around and
```

1230

1    put the shoe on the other foot, if it is

2    one of your loved ones or if it is you,

3    and you are in a position where -- maybe

4    not a death penalty case, but just a

5    simple driving case, that is a criminal

6    case in Ohio, driving case, you would

7    want people to come in there and say,

8    "This is what I believed before, but I

9    can set those things aside, and do what

10   the Judge tells me to do."  You can

11   understand where that can be a little bit

12   difficult sometimes.  And I think you

13   were being honest with me when you said

14   you think you could, and you hope you

15   could, but your the feelings are pretty

16   strong, are they not?

17   A.    Under the circumstances, it depends on what it

18         is.  Sometimes, yes.  I try to raise my

19         kids not to do nothing like that, but if

20         they do something, they have got to pay

21         the price, too.  It is like if you are

22         speeding down the road and you get

1231

1    caught, you are going to pay the price.

2    If you got a guy crawling through the

3    window of your house and you shoot him, I

4    believe that is self-defense there,

5    because that guy is coming in your house.

6    You don't know what he's intending to do.

7    I try to, just on all causes.  If

8    somebody is walking down through the park

9    and the guy shoots him and kills him and

10   there's a cop standing there and knows

11   it, I believe he should get the death

12   penalty.

13  Q.    Now you realize that is contrary to what we're

14        doing here.  That is contrary to the

15        structure of this thing, and what you

16        have to understand, too, is Joe, that

17        we're asking a lot of, a pretty difficult

18        task of everybody, because people, we --

19        it would be neat if we could do this

20        probably scientifically, they will do

21        that some day.  The jurors will come in

22        here and say, "We want all of these

1232

1  opinions out of here and take the chip

2  out," but we can't do that.  This is a

3  human system, and human beings are what

4  they are, and they are great as far as I

5  am concerned.  There is, our system of

6  law is great and the great diversity of

7  what we have is how we have accomplished

8  what we have had, but in the context of

9  this case, when you come into the

10  Courtroom, it becomes a different ball

11  game.  And you just have to say that, "I

12  can set that aside," whatever, it is not

13  to please anybody and not only that, a

14  lot of people think if they say, "Well, I

15  answered that question," there's no right

16  or wrong answer in this thing.  That is

17  what everybody thinks.  "Well, there's a

18  right answer because I have to say yes to

19  everything they are asking me or I am a

20  bad person."  That is not true.  That is

21  the reverse of what the actuality is.

22  The actuality is the person gets up here

1233

1    and says, "This is what I believe."  And

2    then we ask you the question, "Would you

3    be able to set that aside," and that is a

4    very difficult thing to do.  Some people

5    can say, "I honestly think that may

6    affect me.  It may affect me.  It is not

7    so easy.  I can't push aside everything,

8    because it may affect me when I get into

9    the trial, and it may affect my

10   decision."  And those are the most

11   courageous people.  They say, "I can't do

12   that," and that is the way it is.  And

13   that is what makes the system work.  So,

14   understanding that, your example and all

15   of that, can you tell us just flat out,

16   that you can set those opinions aside and

17   operate within the structure of what the

18   Court is going to give you

19   instruction-wise here?

20   A.   I can try.  I try to be a fair man, and --

21   Q.   It has nothing to do with being a fair man.

22        You are a fair man.  Don't worry about

1234

1    it.  It has nothing to do with that.

2    That is not the idea here.  The idea is

3    to say, I have got these preconceived

4    notions if we had a trial here and all of

5    a sudden, we were trying to determine if

6    there was a God or not and we have got

7    all of the potential jurors here and they

8    say, "You understand, Joe, if you are a

9    religious man," and you say, "I am."  You

10   believe in God, yes, and they say, you

11   can't believe in him anymore.  You say,

12   "Wait a minute, you can't do that."  It

13   is going to be there, no matter what.  It

14   is always going to be there.  This is

15   what we're trying to get at here.  And

16   what we need is people that can actually

17   say that I'll set that aside because the

18   Judge has administered an oath and you

19   are under oath now, and during the course

20   of trial, put you under oath again, and

21   that is an awesome duty to get up there

22   and say, "Yes, I can do it.  I'm going to

1235

1    have to do it," because once you get in

2    the ball game, there's no turning back.

3    That is the problem here.  Once the ball

4    game starts, it is the World Series and

5    that is the end.  So, what we need is a

6    real commitment from you, if you can or

7    you can't, that is all right, too, is to

8    say that even though I believe, that it

9    is my personal belief.  I'm not asking

10   you to get rid of the sense that you have

11   to recognize what it is and you have to

12   be able to set it aside totally and to

13   operate from this.  You can't let it come

14   back in and start operating.  It may have

15   a tendency to do that.  That is only

16   natural, because we're doing what we feel

17   our opinions are going to do and that is

18   the question for you.  Do you really

19   believe you can do that or do you believe

20   at the same time it might affect you if

21   you get to that second phase, that

22   sentencing phase?

1236

```
1    A.    I think if you show me that it is this or

2          that, that he did it or shouldn't have

3          the death sentence or something, I

4          believe I can take it.  I'm not trying to

5          pick on him.  If you can show me that

6          there was a reason that he shouldn't get

7          the death penalty or something like that,

8          or he should get the 30 years or the 25

9          years or whatever, I think I could take

10         it under consideration.

11   Q.    Well, you remember now, if we get to that

12         mitigation phase, that sentencing phase,

13         you have already found him guilty of

14         aggravated murder, already found him

15         guilty of the aggravating circumstances,

16         and your personal beliefs, that would be

17         it for you under normal circumstances?

18   A.    Right.

19   Q.    Now we're going into that mitigation phase, so

20         what you are saying to me is that there

21         are mitigating factors.  There's

22         information we can put into the record.
```

1237

1    The question is, are you going to be able

2    to give it due consideration?  In other

3    words, a lot of people say if you show me

4    this and this, but you may have something

5    that might -- give me an example.  Do you

6    have something in mind that you want me

7    to produce at that stage?

8  A.    I don't know.

9                MR. WATKINS:  I'll object.  I don't

10  think a juror should be put in a position as to

11  what he wants.  It is up to what the law is.

12                THE COURT:  The question is whether

13  Mr. Miller can follow the law.  Jim, if I can

14  interrupt just a minute.  The example you gave, the

15  policeman sees somebody, walks up and shoots an

16  apparent stranger and this statement you made.

17  Don't you think -- or what do you think about

18  before that person is asked to give up his life,

19  that an inquiry be made to find out what caused

20  this.

21                MR. MILLER:  Right.

22                THE COURT:  Was the person who was

1238

1   the shooter mentally defective?

2            MR. MILLER:  Right.

3            THE COURT:  Would we want to put him

4   to death then?  What if that person that was

5   killed, that the shooter just found out that one of

6   his children had been brutally raped by that

7   person, would that enter into your equation, or do

8   you still think that the taking of the life is so

9   wrong?

10           MR. MILLER:  That would have to

11  enter.

12           THE COURT:  That is the point that

13  Mr. Lewis and Mr. Watkins are trying to make is

14  that the unlawful killing, that is the reason our

15  law is like it is, it is not an automatic thing.

16  The State, in addition to proving the person

17  committed the death, has to proffer that the

18  factors weigh more heavily in favor of imposing the

19  death penalty than other factors that would speak

20  against it.  And if you firmly believe in your

21  heart, an eye for an eye, that is your right to

22  believe that.  You see how you could not do what

1239

1  you are going to be requested to do by sitting on

2  the Jury?  So you have to answer the questions

3  along that line.

4             MR. MILLER:  No, I couldn't.  After

5  he talks like that, I couldn't be.

6  EXAMINATION BY MR. LEWIS OF MR. MILLER:

7  Q.   You wouldn't be able to consider it?

8  A.   I thought I could, but apparently, I can't.

9             MR. WATKINS:  I don't think he

10  understands.

11  A.   You guys are making me feel like I am on trial

12        here.

13  Q.   (By Mr. Lewis)  We're not trying to do that.

14        You know what the problem with this

15        procedure is, as opposed to you being a

16        welder and everything else, we're asking

17        you hypothetical questions.  We haven't

18        had a trial yet, we haven't had all of

19        this.  It is all in that hypothetical

20        area.  The only problem is, we have got

21        to go through this exercise first before

22        we get to that, and that is what makes it

1240

1    so difficult.  And all we're trying to do

2    is really, and you are not on trial,

3    believe me, it is not a matter of that at

4    all.  If you got that feeling, please

5    don't get that feeling at all.  That is

6    not the deal.  What we're trying just to

7    simply find out is if your opinions are

8    strong enough that you think they may

9    affect your ability to follow the

10   instructions of the Judge, then it is

11   time to opt out.  I mean it is time to

12   say, "I think my opinions are going to

13   influence me.  I know they shouldn't, but

14   I think they are," it is okay.  It is

15   fine.  You are not going to make him

16   unhappy -- anybody here.  You are going

17   to make probably, you make the best

18   potential juror, because you are saying

19   this is going to affect me.  It is like

20   if we had a gambling case here -- if we

21   had a gambling case and we were trying

22   somebody for gambling and everybody came

1241

1  up here and the State says, "I'm going to

2  try this guy for gambling," and everybody

3  sits there and says, "The State of Ohio

4  runs the biggest gambling operation there

5  is and they take all of our money."  He

6  would say we can't have a fair trial and

7  when they say a fair trial, all they are

8  talking about is you may not be the right

9  person to sit on that Jury.  It has

10  nothing to to do with whether you are

11  good, bad, or anything else.  It just

12  says, "I have a firm belief of this, and

13  I can't set that aside totally.  It may

14  influence me in this, and that is the

15  reason why."  If I was in reverse shoes,

16  if I was in somebody else's shoes and I

17  was listening to that, I would say, "I

18  want my daughter or my wife to be treated

19  to a fair person," in the sense when I

20  say fair -- I shouldn't say that, a

21  person says, "I can set those aside and

22  it won't influence me at all," because it