1242

1     is very difficult thing to do, and that

2     is why we're asking the question.  It is

3     not to put you on trial or anything else.

4     We just have to try to find out if that

5     is the case.  You tell me.  It is up to

6     you.  You are not going to disappoint

7     anybody here or anything else and we're

8     not going to think anything one way or

9     the other.  All we're going to say is you

10    have got courage and you have got

11    character.

12    A.    The only thing I can tell you, I can try to be

13          fair.  I'll try to listen to the stuff

14          and I can be fair.  You heard the way I

15          believe, and that is the way I believe.

16          I would try to be fair and that is the

17          only thing I can tell you.  I have never

18          done any of this before.  It is all new

19          to me.

20    Q.    When you say you would be fair, what you are

21          telling me is that you can state

22          unequivocally that you can set those

1243

1  opinions aside and follow just what the

2  Judge instructs you?

3  A.  I'll try.  Somebody said, I tried, but it

4  still comes up in there.  You can try.

5  Who can say that they can?  You said it

6  yourself, it is going to creep back in

7  there.  Didn't you say that?

8  Q.  Yes.

9  A.  You want me to say, yes, I can, but yet you

10  are telling me, no, other people can't,

11  but I can.  I can't say that.  I don't

12  know what you want me to say.

13  Q.  It is not what I want you to say.  All I'm

14  saying is that you have to realize that

15  it will creep back in.  It may

16  potentially, because you can't get rid of

17  those thoughts, and all I'm trying to say

18  to you is that we need a commitment from

19  you to say that, "Yes, I can do this,"

20  whatever, realize what the situation is.

21  That is what we're really looking for.

22  A.  I told you I would try to do the best I can.

1244

1    Q.    Don't get mad at me.  I understand, we're

2          going around in circles.  One other thing

3          about the sentencing.  We have talked

4          about potential sentences and you read

5          them in the orientation instructions, and

6          one of the options are capital

7          punishment.  The other options are three

8          life sentences.  And there's a belief out

9          there a lot of times that people come in

10         with the idea that they hear somebody got

11         a life sentence and then they turn around

12         and get out in five or six years or

13         something.  Well, when he gives you the

14         instructions, and he tells you what the

15         penalties are, life without parole means

16         life without parole.  Forget the outside.

17         If he gives you that instruction, that is

18         what it means.  He's 30 years old and you

19         give him life without parole, is he's

20         there.  If he dies at 60, he's been there

21         30 years.  At the same time, the life

22         with parole eligibility at 25 means

1245

1    parole eligibility only at 25 years,

2    after serving full 25 years, or the 30,

3    serving 30 full years, with parole

4    eligibility.  Doesn't mean he gets it,

5    but that is what it means.  It means what

6    it says.  A lot of times we have people

7    that think in the back of their mind, he

8    said life, but I heard, and the outside

9    influences are coming in, and we can't do

10   that because we won't be operating with

11   the same rules.

12         MR. LEWIS:  Thank you.

13         MR. WATKINS:  We're satisfied.

14         MR. LEWIS:  We're satisfied.  No

15   objection.

16         THE COURT:  I would ask you to call

17   that number given to you after 4:30 each evening

18   until you are requested to come back in.  You will

19   be part of the pool from which we'll seat a Jury.

20   (Juror number 53 excused from the Courtroom.)

21   (Juror number 56, Carol Swanson entered the

22   Courtroom.)

1417

1   selected.  If you will please call that number each

2   evening until you are notified to return.  Thank

3   you very much.

4   (Juror number 69 excused from the Courtroom.)

5   (Juror number 70, Carol Tigert entered the Courtroom.)

6              THE COURT:  Good morning.  You have

7   read the material that was given to you?

8              MS. TIGERT:  Yes, Sir.

9              THE COURT:  We're here to select a

10  Jury for the case brought by the State against

11  Mr. Nathaniel Jackson, wherein he's charged with

12  two counts of aggravated murder with

13  specifications.  And in order to have a proper

14  Jury, it is necessary to have 12 people who are

15  able to consider if the Jury makes a finding of

16  guilty.  Now the State has the burden of going

17  forward.  The Defendant doesn't have to do

18  anything.

19         The State has to prove each and every

20  element of these crimes to the unanimous

21  satisfaction of all 12 members of the Jury, by the

22  burden of proof known as beyond a reasonable doubt.

1418

1    If they fail to do that, of course, this Jury would

2    properly return a verdict of not guilty.  If the

3    State, however, does maintain that burden of proof

4    and the Jury returns a finding of guilty, then the

5    matter will go to a second phase.  And during that

6    second part of the trial, the State would be called

7    upon to present what is known as aggravating

8    circumstances.  Those are reasons why the Jury

9    should consider imposing the death penalty.

10           The Defense would present mitigating

11   factors.  Those are things that would persuade the

12   Jury that in this particular case, the death

13   penalty would not be an appropriate remedy.  The

14   point is, it takes 12 people that are at least

15   willing to follow the law and to be able to

16   consider the question of the death penalty.  Some

17   people could never sit on such a Jury, and there

18   are others who would be very comfortable, because

19   they think a person unlawfully takes the life of

20   another, then they should give up their life.  But

21   that isn't the law of Ohio.  If you have either

22   extreme opinion and you are on this Jury, you could

1419

1  not be fair to one side or the other and both sides

2  are entitled to a fair and impartial Jury.

3       So, let me put this question to you.  Do

4  you hold any reason or belief that would make it

5  difficult or impossible for you to sit and to

6  follow the law in this case?

7       MS. TIGERT:  Well, to be honest with

8  you, I was even out there reading.  I kept reading

9  it and I was the last one done and thank God, I

10  wasn't the first one to come in, because I still

11  wasn't done reading it.  I have a hard time with

12  saying an eye for an eye or tooth for a tooth,

13  because I am a forgiving type person.  That would

14  be like pulling the trigger on somebody, and

15  myself, I cannot kill anybody unless the Lord put

16  it in me to do it.  I have that conviction because

17  I am always hoping that the Lord will get ahold of

18  their heart before they die and those years in

19  prison that they get rehabilitated.  I pray for

20  people.

21       THE COURT:  Do you not see that that

22  is the reason our legislature has drawn the law as

1420

1  they have?  The law of Ohio is not an eye for an

2  eye.  The law of Ohio says in effect, we're going

3  to make a two stage trial here.  First is

4  determined the question of innocence or guilt.

5  Guilty or not guilty.  Once that is done, if it is

6  the type of case, and it is only certain types of

7  cases where the death penalty ever comes up.  And

8  one of the possibilities is a person is killed

9  unlawfully, then the commission of an aggravated

10  burglary or robbery or -- only then does the

11  question even come up and then our legislature

12  said, well, before that final decision is made,

13  both sides have an opportunity to present other

14  factors to the Jury, so that they can look at this

15  individual fact situation and determine is the

16  death penalty appropriate here.  That is the reason

17  that both sides have an opportunity to present

18  facts to the Jury, to make that determination.

19          So, there's no cut and dried thing that

20  follows anywhere.  It is up to the Jury to take the

21  information, to analyze it, and to see what is the

22  right thing to do.  The just thing.  You understand

1421

1    that?

2                   MS. TIGERT:  Yes.

3                   THE COURT:  So with that in mind,

4    are you telling me that you could not sit and make

5    that determination?

6                   MS. TIGERT:  It would be a very

7    tough thing, because I'm just that type of person

8    that if someone shoots me, I wouldn't defend

9    myself.  I would say, "It is in the Lord's hands."

10   I'm not a person, whether it is right or wrong, it

11   is how I feel.

12                  THE COURT:  Fair enough.  The other

13   question that we put to you is about whether you

14   have read a lot about this case, or something that

15   you could not set aside, because the case has to be

16   decided on the evidence presented to the Jury here.

17   Do you have any prior exposure to the facts?

18                  MS. TIGERT:  The first I heard about

19   it was when we first came last week.

20                  THE COURT:  You don't remember

21   anything before then?

22   A.   No.

1422

1    EXAMINATION BY MR. WATKINS OF MS. TIGERT:

2    Q.    Good morning.  My name is Dennis Watkins,

3             County Prosecutor, along with Charles

4             Morrow, Assistant Prosecutor.  We have

5             the responsibility of representing the

6             State and prosecuting the Defendant,

7             Nathaniel Jackson.  I'm sure you are

8             aware of that now?

9    A.    Yes.

10    Q.    And Mr. Lewis will probably ask you questions,

11             but it could be Mr. Consoldane, the

12             attorneys for the Defendant.  And His

13             Honor has covered this important issue

14             with you, and I listened and think I have

15             a feeling of what you are saying.  I'm

16             not trying to pry, but I have to know

17             some answers.  In order for me to

18             determine whether you can be a fair juror

19             in this case, not that you are not a fair

20             person, but it is this case.  This is not

21             a breaking and entering, where somebody

22             questions whether they broke into a

1423

1    garage.  This is the most serious case

2    possible, because the person involved,

3    the Defendant, is eligible for the death

4    penalty possibly, if you would find that

5    we proved beyond a reasonable doubt his

6    guilt at that first part of the trial.

7    You understand that?

8  A.  Yes.

9  Q.  Now I think you told the Judge that you didn't

10      know anything about this case, and that

11      now that you realize from coming to

12      Court, this is a death penalty case that,

13      and I believe you said, "The Lord put it

14      in me," that you don't feel you could

15      sentence someone to death?

16 A.  I don't have that in my heart to take

17      someone's life.  I just don't have that.

18      It is in the Lord's hands.  If someone is

19      going to kill me, I say, "Kill me."  It

20      is in the Lord's hands whether I'm going

21      to die or not.

22 Q.  You don't agree with the State, through the

1424

```
 1            Government, of executing people?
 2   A.   Unless the Lord just came and told me, or put
 3              it in my heart, from how I am, my makeup,
 4              I just --
 5   Q.   Do you favor capital punishment as a general
 6              idea?  Do you favor capital punishment?
 7   A.   That is the death penalty?
 8   Q.   Yes.
 9   A.   Not really, no.  Because I think that is
10              taking life.  I feel like I am actually
11              pulling the trigger, which I could never
12              pull a trigger on somebody.
13   Q.   You said if somebody shot you, you wouldn't
14              even defend yourself?
15   A.   No.
16   Q.   In serving on a Jury, I think you understand
17              that if the State of Ohio is going
18              forward with the idea if it can, to prove
19              his guilt beyond a reasonable doubt and
20              to seek the death penalty, that if we
21              would have a juror that would never give
22              the death penalty, even though it is
```

1425

| | | |
|---|---|---|
| 1 | | provided in the law, you would agree we |
| 2 | | wouldn't get a fair trial, would we? |
| 3 | A. | No.  I'm just being honest. |
| 4 | Q. | I appreciate that.  That is why I'm asking |
| 5 | | these questions.  You are trying, you are |
| 6 | | trying to do what the Judge has told to |
| 7 | | you do, and you took your oath, that is, |
| 8 | | to answer truthfully whether or not you |
| 9 | | can serve in this case, and answer the |
| 10 | | questions, right? |
| 11 | A. | Right. |
| 12 | Q. | Now, let's put it another way.  We go forward, |
| 13 | | and in this case, the Defendant is |
| 14 | | charged with killing a home owner, and |
| 15 | | there's an aggravated murder with |
| 16 | | aggravating circumstances, involving |
| 17 | | aggravated burglary and aggravated |
| 18 | | robbery.  That is this case, and the law |
| 19 | | says the possibility of death penalty |
| 20 | | exists in this case.  Do you remember any |
| 21 | | cases where, that you can remember |
| 22 | | reading about, locally where the death |

1426

| 1 | | penalty has been imposed? |
| 2 | A. | I hear about it going on, the different ones |
| 3 | | in Texas, but I don't know the case. |
| 4 | Q. | So you don't know of any local case where |
| 5 | | somebody has been sentenced to death? |
| 6 | A. | No. |
| 7 | Q. | Reading it in the newspaper or anything? |
| 8 | A. | No. |
| 9 | Q. | Assume that we go forward with our case, and |
| 10 | | we prove beyond a reasonable doubt the |
| 11 | | Defendant committed aggravated murder and |
| 12 | | aggravating circumstances, and the Judge |
| 13 | | in his outline to you and what he told |
| 14 | | you, then we come to a point where you |
| 15 | | have to listen to the Defense, and |
| 16 | | factors that favor life in prison, right? |
| 17 | A. | Yes. |
| 18 | Q. | And you would listen to their evidence, |
| 19 | | wouldn't you? |
| 20 | A. | Yes. |
| 21 | Q. | As you would listen to our evidence? |
| 22 | A. | Yes. |

1427

1  Q.    And His Honor has indicated that if you find

2         him guilty of aggravated murder with

3         aggravating circumstances, then you go on

4         and listen to the Defense's evidence in

5         favor of life in prison, and then, at the

6         end you have to fairly consider the

7         evidence and determine, whether or not

8         you are going to sign a piece of paper

9         recommending his death.  That is what the

10        Judge is basically telling you, what you

11        possibly would have to do, and are you

12        telling me no matter what the evidence

13        is, no matter how much proof there is

14        that the aggravating circumstances

15        outweigh the mitigating factors, that you

16        would not join 11 other people in signing

17        a verdict, recommending his death?

18  A.    Honestly, I have got a conviction in my heart

19        not to take an eye for an eye.  To me, it

20        is still doing that.  I would still feel

21        like I'm pulling the trigger, even though

22        I read the whole thing twice over.  And

1428

1    in my heart for me to do that, I would

2    hope that the person would go in prison

3    for life, and I'm just worried about his

4    soul more.

5  Q.   So, you would be leaning towards automatically

6    going for life in prison?

7  A.   If it came to that, because to do the death

8    penalty to me, that would tear my heart

9    out, because I wouldn't even save my own

10   self.

11 Q.   So, you are saying, for strong moral reasons,

12   you would never sentence him to death?

13          MR. CONSOLDANE:  I object.  He's

14 leading.

15          MR. WATKINS:  That is, of course, a

16 leading question.

17          THE COURT:  He has the right to ask

18 her a question.

19          MR. CONSOLDANE:  He can ask her.

20 Don't put words in her mouth.

21          THE COURT:  Just ask your question.

22 Q.   Then you are saying that at the end of the

1429

1         day, you heard all of the evidence, under

2         no circumstances would you sign a verdict

3         recommending his death?

4    A.  Not unless the Lord actually told me.  I don't

5         have it in my heart to do that.

6    Q.  The only way you will do that, you would have

7         to have some epiphany or something coming

8         down from God himself?

9    A.  He talks to me.  I am close to him.

10   Q.  Right now, as you know it, you would never

11        sign a verdict recommending his death?

12   A.  No, not unless I told you, if it was told to

13        me by the Lord to do it.  I can't pull a

14        trigger on somebody even for my own life.

15           MR. WATKINS:  Thank you very much.

16   EXAMINATION BY MR. LEWIS OF MS. TIGERT:

17   Q.  Carol, my name is Jim Lewis, and along with

18        Anthony Consoldane, that distinguished

19        gentleman over there, we represent

20        Nathaniel in this case.  And, from what

21        you have told Judge Stuard and

22        Mr. Watkins here just a few moments ago,

1430

1           you said that the Lord -- you talk to the

2           Lord, right?

3  A.  Yes.

4  Q.  And has the Lord since you were in this

5           circumstance -- don't be nervous, just

6           relax.  Nobody is going to hurt you here

7           at all.  Since you are in these

8           circumstances, has the Lord told you not

9           to sit on this Jury?

10  A.  I have my convictions when it goes against

11           that, what I really feel in my heart, and

12           I'm just being honest.

13  Q.  Well, here's the difficult problem is that the

14           Lord is up, all around, whatever.  We, as

15           humans are here on earth.  We're here in

16           the State of Ohio.  Some states don't

17           have the death penalty, some states do

18           have the death penalty.  The Lord watches

19           over all, and other jurors come in here,

20           potential jurors come in here, and they

21           are of the mind --

22                MR. WATKINS:  I'll object, what the

1431

1  mind of the other jurors are.

2          MR. LEWIS:  Potential jurors.  I am

3  giving her a hypothetical.  Other citizens.

4          THE COURT:  I'll allow him a little

5  bit of latitude, like I have with both sides here.

6          MR. WATKINS:  I withdraw.  I thought

7  the way it was phrased, that is all.

8          THE COURT:  Each juror has to decide

9  everything to their own satisfaction, and then

10 there has to be a consensus agreed to among

11 everybody.  Go on.

12 Q.   Carol, the citizenry, the people out there

13          have a lot of different opinions about

14          the death penalty.  There's the law, and

15          the way the law is set up, is that it is

16          not set up as an automatic thing.  After

17          reading those orientation instructions,

18          you have to go through a trial, find him

19          guilty, find him guilty beyond a

20          reasonable doubt of the aggravated murder

21          with aggravating circumstances, and then

22          there's a second phase.  And the citizens

1432

1  out there who are potentially brought in
2  here as potential jurors, they have all
3  different kinds of views.  Some of which
4  are liken to you.  Other ones are on the
5  other side of the spectrum, but the Lord
6  is over all.  The Lord is over all.  And
7  they come into Court, and they have
8  indicated on occasion where they strongly
9  believe in the death penalty, and they
10  strongly believe in if you take a life,
11  your life should be forfeited.  But they
12  have come in and said, "Okay, well, the
13  law, says that I can't do that exactly.
14  Even though my personal opinion says if I
15  find him guilty of aggravated murder and
16  aggravating circumstance," under normal
17  circumstances, under their personal
18  opinion, that is it.  They would just
19  liquidate and execute at that point.  But
20  the law says you can't do that.  The law
21  says you have to have a sentencing
22  hearing where we're allowed to bring out

1433

1         things about an individual in that case.

2         And you have to weigh that. Well, if

3         we're all a part of the citizenry here

4         and the Lord is looking over all, all

5         should participate in some form or manner

6         if they can. And those individuals have

7         indicated to us that they can, yes, even

8         though those are the convictions, they

9         say, "Well, we can set those aside, and

10        we can sit on this case, and we can

11        approach it and follow the law." So, the

12        law is, it is up there. And in this

13        case, what we're asking you to do is to

14        do anything that they said they would do,

15        the same as any potential other juror

16        would say. You know, I believe this, I

17        believe this, I believe so, but I can set

18        that aside. I can come in here and

19        follow the law. The Lord wants everybody

20        to participate, not to rule out anybody,

21        and in order to do that, you have to set

22        aside some opinions, and he lets us

1434

1       function that way.  So, the question to

2       you is that even though that is the

3       situation, and even though you may not

4       favor the death penalty, other people

5       favor it very heavily, even for

6       non-murder cases, but in this instance,

7       could you participate?  All you have to

8       do is be able to consider the death

9       penalty.  And the Lord hasn't come down

10      and told you not to sit on this Jury,

11      would you do that?

12 A.  I just know my conviction, and some people

13       have a closer walk with the Lord.  It is

14       a makeup of me.  It might be different

15       for somebody else.  It is just my makeup.

16       I'm very tender hearted.  What I feel is

17       what I said, and I can't judge what the

18       Lord is doing in everybody's heart.

19 Q.  Well, the Lord is allowing us to function this

20       way.  This is what you are in.  The Lord

21       has created all this.  This is the

22       mechanism.  He allows it to go on.  So

1435

```
1          who is to say, is the Lord telling you

2          not to participate in this case?

3    A.   I am being honest.  I can't even pull a

4          trigger to save myself.  I would give it

5          to the Lord's hands.  He has the eternal

6          power.  If I'm not supposed to die -- I

7          am supposed to die.

8    Q.   We're not talking about self-defense?

9    A.   I'm saying if I can't save myself, how can I

10         pull the trigger on someone else?  I feel

11         like that is what I would be doing.

12   Q.   So you would, even though the circumstances of

13         the case may be bad and all of that, you

14         don't feel that you could follow the law?

15         In other words, participate and follow

16         the law as it is written?

17   A.   I would feel that I would always want that

18         person not to go to hell, give them time

19         to serve time in jail and repent of their

20         sins, give them time.  Because I just

21         hate to see anybody go to hell, and they

22         might be in a stance now that they would
```

1436

1    go to hell, because they didn't have time

2    to repent.  To be in hell is a terrible

3    thing.  I want to give everybody the best

4    chance they can not to be there.  They

5    may need to have some time to consider

6    what they have done and get it right with

7    the Lord.

8  Q.    Who said they are going to get it right?

9  A.    Who said they aren't?

10                  MR. LEWIS:  All right.  No further

11  questions.

12                  MR. WATKINS:  We would object.  I

13  think it is clear that she's substantially impaired

14  under Wainwright vs. Wade.

15                  MR. CONSOLDANE:  I disagree and I

16  object.  She said she can follow the instructions.

17  She may have to listen to God, but a lot of people

18  have to listen to their conscience.  It is the same

19  theory as to whether you listen to your conscience

20  or whether you listen to God, and we hope everybody

21  would do that on the Jury.  I don't think that

22  she's impaired at all.

1437

1    MR. WATKINS:  That is not what she

2  answered to the questions.

3    THE COURT:  I think that there's a

4  distinction between the two positions.  I know that

5  the Defense feels that there's no distinction and I

6  understand why.  But, Ma'am, the question that has

7  been put to you repeatedly and I think I understand

8  what you are saying, but just one more time.  Could

9  you in good faith sit on this Jury, and if the Jury

10  decided that the Defendant was guilty, and you went

11  into the second phase and the State presented

12  aggravating circumstances that outweighed any

13  mitigating factors, if that was the conclusion the

14  Jury arrived at, you included, could you then

15  recommend the death penalty?

16    MR. LEWIS:  That is probable if the

17  Jury, you can't say as a whole, you are talking

18  about her individually is the one.

19    THE COURT:  I'm saying to her that

20  it only becomes an individual choice, that isn't

21  the way to put it.  Each member of this Jury has to

22  first individually come to that conclusion before

1438

1  that could be the finding of the Jury.  You would

2  be one portion, the other 11 would also have to

3  make that decision before you would have to sign.

4  But if that occurred, all 12, in their mind, felt

5  that the State had proven their case on the

6  aggravating circumstances beyond a reasonable doubt

7  that those circumstances outweighed the mitigating

8  factors, would you be able to participate in

9  recommending the death penalty?

10          MS. TIGERT:  In my heart, I don't

11 believe I could.  I have already dealt with this

12 with the Lord, and I believe in my mind, won't

13 change because of my convictions.

14          THE COURT:  You feel it is the

15 Lord's decision, not yours?

16          MS. TIGERT:  Yes.

17          THE COURT:  I'm going to excuse this

18 juror and your objection is noted for the record.

19 We thank you very much for your participation.

20 (Juror number 70 excused from the Courtroom.)

21          MR. CONSOLDANE:  I have been sitting

22 here waiting to put something on the record and I

1462

1    you put mitigating factors on one side.

2    They are always saying about weighing and

3    putting the aggravating circumstances on

4    the other and see how the scale balances.

5    You are going to have to do this pretty

6    much in your mind.  You can do that?

7  A.    Yes.

8         MR. CONSOLDANE:  Thank you.

9         MR. CONSOLDANE:  Pass for cause.

10 We're satisfied with this juror.

11        MR. WATKINS:  We have no objection.

12        THE COURT:  You will be in the pool

13 from which this Jury is selected, so if you will

14 call that number each evening after 4:30,

15 eventually, you will be notified when to come in.

16 (Juror number 73 excused from the Courtroom.)

17 (Juror number 74, Grace Melidona entered the

18 Courtroom.)

19        THE COURT:  Good morning.

20 Mrs. Melidona, you read the hand-out that was given

21 to you?

22        MS. MELIDONA:  Yes.

1463

1     THE COURT:  The Defendant in this

2   case, Mr. Nathaniel Jackson, is charged with two

3   counts of aggravated murder with specifications, of

4   aggravated burglary and aggravated robbery.  That

5   means that under Ohio law this Jury, depending on

6   what their initial decision is, may be requested to

7   go through a second hearing, when the question of

8   the death penalty may arise.  Now, the burden is

9   upon the State to proceed.  The Defendant need do

10   nothing during the trial if they care not to.  The

11   burden is on the State to show good and sufficient

12   evidence that convinces the Jury beyond a

13   reasonable doubt, and that is all 12 members of the

14   Jury, of the truth of the charges brought.  If the

15   State should fail to do that, then this Jury will

16   properly return a verdict of not guilty.  If,

17   however, the State does carry its burden of proof,

18   and the Jury would return a finding of guilty, then

19   that second phase of the trial would start, and at

20   the second phase, the State is called upon to

21   present what we call aggravated circumstances.

22   Those are reasons that are presented to the Jury as

1464

1   to why the Jury should consider and possibly impose

2   the death penalty.

3         The Defense presents during that hearing,

4   mitigating factors which are things presented to

5   the Jury to show why in this particular fact

6   situation, the death penalty would not be

7   appropriate.  There are some people who could never

8   under any circumstances, sit on such a Jury because

9   of their belief that we should not have the death

10  penalty.  On the other side of the spectrum, there

11  are people who believe that if you unlawfully take

12  the life of another human being, you should forfeit

13  yours, an eye for an eye, tooth for a tooth.

14        Well, a person with those extreme

15  positions could not give a fair trial to both

16  sides.  One would favor the State, one would favor

17  the Defendant.  And both sides are entitled to a

18  fair trial.  So the purpose of these questions put

19  to each of you individually, is to find out and it

20  also helps you understand in your own mind, whether

21  you would be qualified to sit on such a Jury.  So

22  my question to you is, is there anything in your

1465

1    mind that would make it difficult or impossible for

2    you to sit and to follow the law, and if the course

3    of events takes us there, be in a position to

4    consider the question of the death penalty and if

5    need be, to impose it.

6                    MS. MELIDONA:  No.

7                    THE COURT:  You would not be able to

8    do that?

9                    MS. MELIDONA:  No.

10                    THE COURT:  I can tell you not to be

11   nervous, but I know that is an easy thing to say,

12   but please, this is something that, we're not

13   trying to put you on the hot seat or anything,

14   something we have to go through, part of the

15   process.  You will find that both of these

16   gentlemen that are going to talk to you, will be

17   very nice in their approach.  Don't be nervous.

18   EXAMINATION BY MR. WATKINS OF MS. MELIDONA:

19   Q.    My name is Dennis Watkins.  How are you?

20   A.    Fine.

21   Q.    I am County Prosecutor, along with Chuck

22          Morrow, Assistant Prosecutor, we have the

1466

1            responsibility of prosecuting the

2            Defendant.  I'm sure you are aware of

3            that by now.  His Honor has given both

4            sides an opportunity to ask questions.

5            Mr. Lewis and Mr. Consoldane will follow,

6            so we can decide whether you can be a

7            juror in this case.  And I'm not sure I

8            understood your answer to the Judge, but

9            did you feel that you could or could not

10           impose the death penalty?

11 A.    I think I could.

12 Q.    Okay.  Now this case involves a charge or

13            charges against the Defendant that go

14            back to December of 2001, where he's

15            accused of taking the life of Robert

16            Fingerhut.  And he's charged with

17            aggravated murder and two counts, but

18            there's only one death and two

19            specifications of aggravated burglary,

20            aggravated robbery.  And there's also two

21            other third and fourth counts of the

22            indictment of aggravated burglary and

1467

```
 1                aggravated robbery.  The bottom line is
 2                that these are charges, and the
 3                indictment is the vehicle by which we get
 4                here at this time under our law.  And I'm
 5                sure you agree with me that as the Court
 6                has pointed out, the Defendant is
 7                presumed innocent.  And you haven't heard
 8                any evidence, and therefore, in order to
 9                try this case we need 12 people that
10                would be willing to listen to our
11                evidence, consider the Defense's cross
12                examination, whatever it does, and decide
13                what the truth of the charges are.  You
14                understand that?
15    A.   Yes, Sir.
16    Q.   I'm interested in whether or not you have any
17                personal recollection of this case that
18                may come from a news source or from
19                talking to people?
20    A.   Yes, I have.  I have read about it.
21    Q.   Now, I know that you -- I have your
22                questionnaire.  May I call you Grace?
```

1468

1    A.    Yes.

2    Q.    I know you are from Niles and you are retired

3          from Delphi?

4    A.    Yes.

5    Q.    You probably get the Tribune or Vindicator?

6    A.    Vindicator.

7    Q.    Could you tell me what you recall reading?

8    A.    Just about how it was the robbery, and the

9          shooting and murder of the gentleman.

10   Q.    And what else, if anything, do you remember

11         about the facts?

12   A.    I don't know.

13   Q.    You are nervous?

14   A.    I just remember reading it.

15   Q.    It will be necessary to speak loudly so they

16         can hear.  It is fair to state you don't

17         remember very much?

18   A.    No.  Not in detail.  I have read it over and

19         over.

20   Q.    Did it have any impact on you where you made a

21         decision in your mind, that the person

22         was guilty or not guilty?

1469

```
1    A.    I did at the time when I read it, yes.

2    Q.    And what did you feel at the time?

3    A.    At the time, I thought he was guilty.

4    Q.    Now, would you agree with me that the

5          newspaper isn't always right?

6    A.    Right.

7    Q.    In what it writes?

8    A.    Right.

9    Q.    And would you agree with me, it wouldn't be

10         fair to decide a person's guilt on a

11         newspaper article?

12   A.    That is right.

13   Q.    So, would you be able to set that aside?

14   A.    I could.

15   Q.    And only decide the case on evidence, rather

16         than newspaper?

17   A.    Yes, Sir.

18   Q.    So, at this point in time, you have no problem

19         agreeing with the idea that the Defendant

20         is presumed innocent?

21   A.    Right.

22   Q.    And, you would require us to prove his guilt
```

1470

```
 1              with evidence that shows that that guilt
 2              is proven beyond a reasonable doubt?
 3   A.   Yes, Sir.
 4   Q.   And, I assume that if we were able to persuade
 5              you with proof beyond a reasonable doubt
 6              he's guilty of the charges, you would and
 7              could sign a verdict of guilty?
 8   A.   Yes, Sir.
 9   Q.   And in the event that we didn't, you could
10              just as equally sign a verdict of not
11              guilty, correct?
12   A.   Yes, Sir.
13   Q.   You would call it like you see it?
14   A.   Yes.
15   Q.   Now, His Honor has explained to you, and he
16              also gave you the written instructions
17              that the reason we're talking to you now,
18              is to understand you, regarding the issue
19              of capital punishment.  Because you
20              understand that if you were to find the
21              Defendant guilty of the aggravated
22              murder, and at least one of the
```

1471

1           aggravating factors, aggravating

2           circumstances, excuse me, then you would

3           go onto the stage where you would

4           determine penalty, right?

5   A.   Yes.

6   Q.   Prior to coming to Court, Grace, did you ever

7           give any thought to what your opinion,

8           whether it is based on personal or

9           religious or moral grounds, what your

10          opinion is regarding the death penalty?

11  A.   No.  I just feel if someone did something that

12          drastic, they should be severely punished

13          for it.

14  Q.   And that would include in some cases, the

15          death penalty?

16  A.   Yes, Sir.

17  Q.   So you have not been opposed to the death

18          penalty?

19  A.   No.

20  Q.   And you understand what the Judge told you,

21          that there's no automatic death penalty?

22  A.   Yes.

1472

1  Q.  Does that sound fair to you?

2  A.  Yes, Sir.

3  Q.  So that would mean, assuming we prove beyond a

4        reasonable doubt the Defendant committed

5        aggravated murder and the specifications,

6        you still have to have an open mind, and

7        listen to the mitigating evidence, and

8        you would be able to do that?

9  A.  Yes.

10 Q.  Now, the mitigating evidence would be

11       presented by the Defense, and you would

12       have to decide whether or not it exists,

13       you understand that?  Just like you would

14       decide from being in one of these chairs,

15       whether or not our evidence proved to you

16       that the Defendant was guilty, right?

17 A.  Yes.

18 Q.  That is, as a juror, you decide the

19       credibility of witnesses.  And that would

20       be your job and you would be able to give

21       us two weeks of your time to listen to

22       our witnesses, and any witnesses, if we

1473

1         would get to that mitigating phase, that

2         they would present and judge their

3         credibility?

4 A.   I think so.

5 Q.   In that process, I think you understand that

6         for example in a death penalty case, and

7         this is not the situation here, it is

8         hypothetical, under the law that the

9         Judge outlined, and I know it is

10        complicated, right, and you need guidance

11        from the Court.  That if we were to

12        prosecute somebody that was 18 years of

13        age, the law in Ohio would be they would

14        be eligible, if there was an aggravating

15        circumstance, like this case, but let's

16        just say hypothetical, an 18 year old,

17        and one of the mitigating factors would

18        be the youth of the offender, that is, it

19        would be something -- you have got a

20        death penalty case, you have got a young

21        person, may be charged with killing

22        somebody in a gas station robbery.  And

1474

1        the Judge would tell you, "By the way,

2        Grace," and all of the other jurors a

3        mitigating factor, if you find evidence

4        that the person was 18, would be his

5        young age.  His youth.  And you would

6        have to give some consideration to that,

7        in considering life in prison.  You

8        understand that?  Now there was a case or

9        two that I had that a juror would say,

10       "Hey, Watkins, if you got an 18 year old,

11       I would never, ever give the death

12       penalty."  You understand?  It is

13       hypothetical.  Obviously, if a juror

14       would say that they were going to

15       automatically give life in prison,

16       because that's a mitigating factor, then

17       they wouldn't be fair, because the law

18       requires them to consider the aggravating

19       circumstances and the mitigating factors,

20       and not automatically lean one way or the

21       other.  You understand that?

22  A.   Yes.

1475

1   Q.   You feel you would be such a person that you

2        would not lean one way or the other

3        simply because I present evidence, or

4        simply because the Defense presents

5        evidence?

6   A.   I feel I could do that.

7   Q.   That is, you would go in there wanting to know

8        what the evidence was, and evaluate the

9        evidence as the Judge will tell you, and

10       in the end, you would be able to compare

11       if you had to, the things, the

12       aggravating circumstances that favor the

13       death penalty against the things that

14       favor life in prison, which would be

15       known as mitigating factors.  And you

16       understand there's -- you have life with

17       no parole in the sentence as a possible

18       recommendation, you have life sentence

19       with 30 full years as a recommendation,

20       and you have a life sentence with 25 full

21       years in prison.  Those are the three

22       possible sentences of life that you could

1476

1    give.  And you also have, as you know,

2    the death penalty.  So, in short, you

3    would be called upon to listen to the

4    evidence, and in the appropriate case,

5    decide what four penalties you would

6    recommend, right?

7  A.    Yes.

8  Q.    And the Judge would say, and this is what he's

9    already mentioned to you, that if the

10   State would prove beyond a reasonable

11   doubt the aggravating circumstances,

12   those things that favor the death

13   penalty, outweigh the factors that you

14   would find that favor life imprisonment,

15   that you would recommend a sentence of

16   death.  Now, could you, if it was

17   appropriate, and can you tell the State

18   that if we would prove the necessary

19   requirements of law, would you be willing

20   to sign a verdict recommending the

21   Defendant's death?

22  A.    Yes.

1477

| | | |
|---|---|---|
| 1 | Q. | And I think you can understand the importance |
| 2 | | of that.  If we would not have each juror |
| 3 | | be willing to do that, we would start the |
| 4 | | case with having a juror that would not |
| 5 | | fairly consider our side, right? |
| 6 | A. | Yes. |
| 7 | Q. | But you feel comfortable with yourself, and |
| 8 | | you know yourself better than anyone that |
| 9 | | you could do this if you were called |
| 10 | | upon? |
| 11 | A. | I think so, yes. |
| 12 | Q. | Now on the other side of the coin, it is |
| 13 | | equally important that if we would fail |
| 14 | | at any point in time to do our job, |
| 15 | | especially at the end, then it is your |
| 16 | | duty to recommend life in prison.  And |
| 17 | | you could do that, also? |
| 18 | A. | Yes. |
| 19 | Q. | You are going to do what the law and the |
| 20 | | evidence requires, not what I want, not |
| 21 | | what the Defense wants, but what you |
| 22 | | conscientiously believe is necessary, |

1478

1           right?

2    A.   Yes.

3           MR. WATKINS:  Thank you very much.

4    <u>EXAMINATION BY MR. LEWIS OF MS. MELIDONA:</u>

5    Q.   Grace, my name is Jim Lewis, along with

6           Attorney Consoldane, we represent

7           Nathaniel in this case.  You are so soft

8           spoken.  You are like my fiancee'.  She's

9           got me convinced, I'm totally deaf.  I

10          know I'm going deaf.  It is a little hard

11          to hear back there.  In any event, from

12          what I gathered though, after reading the

13          instructions, orientation instructions.

14          And talking to Judge Stuard, and also

15          Mr. Watkins here, that you have got a

16          pretty good idea of what the structure of

17          this is.  In other words, we have very --

18          like all of the conventional criminal

19          cases, we have the actual trial to

20          determine guilty or not guilty.

21   A.   Yes.

22   Q.   You have got to say yes.  You have got to say

1479

1     the words because Mary Ann has to put

2     that down.  That part is everybody knows

3     that part, but because this involves

4     potentially the death penalty, the case

5     goes on where the jury actually makes a

6     decision in the sentencing phase.  And

7     going back for a moment, I might indicate

8     to you that, well -- strike that.  The

9     death penalty itself, you indicated, I

10    think I heard you, is that or what is

11    your personal opinion about the death

12    penalty before you read the instructions

13    and all of that?

14  A.   I always felt if someone killed someone, their

15       life should be terminated, too, after a

16       finding, of course.

17  Q.   So really your idea is basically, it is a

18       matter of retribution if their life is

19       taken, their life should be taken as

20       well?

21  A.   Yes.

22  Q.   And is that a matter of retribution in that

1480

```
 1              sense, your belief in that, or is that a

 2              religious thing, is it?  Because that is

 3              an eye for an eye type situation, or is

 4              it a matter of deterrents in some form or

 5              fashion, what undermines that idea?  Can

 6              you give me, articulate it for me in any

 7              way.

 8   A.   Just feel it is wrong to take someone's life.

 9              Should be punished.

10   Q.   It is wrong, no question about that.  Some

11              people may say, "Well, as far as we're

12              concerned, life imprisonment takes care

13              of it," or "We don't necessarily want to

14              give the death penalty."  But on the

15              other side of the coin, you are saying if

16              somebody's life is taken, then their life

17              should be taken as well, right?

18   A.   Yes.

19   Q.   Now, that is not what you can apply in this

20              case.  And you have to set those opinions

21              or beliefs aside because the structure of

22              this is different, correct?
```

1481

```
 1    A.   Yes.

 2    Q.   Do you think you will have any problem doing

 3              that?

 4    A.   I don't think so.

 5    Q.   And can you tell me why?

 6    A.   What he said, I'm going to listen to whatever

 7              is presented, and make my decision that

 8              way.

 9    Q.   But what I'm saying is, I understand that the

10              evidence will be presented.  If it is

11              presented in the first phase of the

12              trial, if we get to the second phase, of

13              course, the same thing is present.  When

14              the Judge gives you the instructions,

15              those personal beliefs, say for instance,

16              if we have the trial and he's found

17              guilty of aggravated murder and

18              aggravating circumstances, your own

19              personal beliefs at that point in time

20              would say, that is it, right.  Isn't that

21              true?

22    A.   Yes.
```

1482

1    Q.    Well, that is all I'm trying to bring out, to

2           see your natural beliefs.  I mean you

3           have those.  We can't take them and

4           extract them from you.  We can't take the

5           disk out of the computer.  We can't

6           eliminate the file.  We can't do that.

7           Your personal beliefs are your personal

8           beliefs.  We respect those personal

9           beliefs and we're not going to get rid of

10           those personal beliefs.  The whole

11           problem is, you have got to set those

12           aside and you can't let those influence

13           your ability to go ahead and follow the

14           instructions and do what they say.  What

15           I'm asking basically is simply, and you

16           are under oath, you have taken an oath

17           and if you are sworn in as a juror here,

18           you take an oath and good conscientious

19           people, you have got to live up to that.

20           If you don't live up to that, then, the

21           whole mechanism won't work, and it is a

22           personal -- I would think from a personal

1483

1  standpoint that would be pretty bad.  If

2  you are going to get in the ball game,

3  you take an oath, you have got to say, "I

4  can do this.  I know what my personal

5  beliefs are, but I can truly say that I

6  can set those aside, and I can follow the

7  instructions of law.  I'm not going to

8  let that come back in and influence me in

9  making my decision here."  If it does,

10  then you may not be able to give any

11  consideration, any of those mitigating

12  factors.  Normally, your personal

13  opinion, they don't make any difference

14  to you.  That is all I'm trying to say.

15  It really comes into focus if you kind of

16  trade places.  If you take the position,

17  just reverse these roles here, and I was

18  going to represent you, and not in a

19  death penalty case, just a traffic case.

20  And a juror came in, or they said -- I

21  was going to represent you in a speeding

22  case and they came in, and I would say,

```
                                                        1484

 1                "Well, the Defendant works at Delphi

 2                Packard.  Well, they have money, they

 3                don't care about people, that is the way

 4                it is."  So if somebody, if you were

 5                sitting there and you were my client, you

 6                would go, "Hey, Jim," and I would say,

 7                "Wait a minute folks, you have got to set

 8                that aside."  You see how if you were

 9                sitting here, saying, "Gee, they don't

10                even like me, they have already kind

11                of" -- you follow what I'm saying?

12      A.   Yes, Sir.

13      Q.   Don't be nervous, don't crush your hands.  You

14                are going to make them black and blue

15                here.  It is all right.  I'm not going to

16                bite you or anything else.  The thing is,

17                what we're going to do here, I'm just

18                trying to find these things out.  I'm not

19                doing this to pry or embarrass you, I'm

20                just trying to find out something in

21                order to make sure we have people that

22                can honestly say that they can set these
```

1485

| | | |
|---|---|---|
| 1 | | things aside, because it is really |
| 2 | | important.  The system won't work unless |
| 3 | | it is done that way.  It just doesn't |
| 4 | | work.  So -- |
| 5 | A. | I'm sure I can do that. |
| 6 | Q. | And in regard to the life sentences, we're |
| 7 | | talking about the other options besides |
| 8 | | the death penalty.  Those mean actually |
| 9 | | what they say.  In other words, life |
| 10 | | without parole means life without parole. |
| 11 | | In other words, if he's convicted and |
| 12 | | he's given a life sentence without |
| 13 | | parole, that means he spends all of his |
| 14 | | life in prison.  He will die in prison is |
| 15 | | basically what it means.  There's a lot |
| 16 | | of people out there that think, you see |
| 17 | | Dateline or you see 20-20 and they say, |
| 18 | | "The man got life in prison, but all of a |
| 19 | | sudden, he's out in eight years."  The |
| 20 | | people go, that is not the case, so that |
| 21 | | would be an example, too, of people in |
| 22 | | this case if they went back there, and |

1486

```
1              one of the jurors said, "Well, it is life
2              without parole."  And they interject,
3              "Wait a minute, you can't really mean
4              that, because I have seen people get" --
5              that is interjecting something that
6              doesn't belong there.  That is why the
7              system won't work.  So, it means what it
8              says, life without parole.  At the same
9              time, the life imprisonment at parole
10             eligibility at 25 years, means he's only
11             eligible for parole.  It means he has to
12             spend 25 years in prison.  It doesn't
13             mean he gets out.  It is the same with
14             life imprisonment for 30 years.  Can you
15             think of any reason that, what we have
16             been talking about, the issues we have
17             been talking about, or anything we have
18             talked about, why you couldn't sit on the
19             Jury and do the best job you can, live up
20             to your oath and do the best job you can
21             on it?
22      A.   There's nothing.
```

1487

1   MR. LEWIS:  Thank you.

2   MR. WATKINS:  We're satisfied.

3   MR. LEWIS:  Satisfied.

4   THE COURT:  Ma'am, you are in the

5   pool then from which this Jury will be selected.

6   If you will be kind enough to call that number each

7   evening until you are notified to come back.  Thank

8   you.

9   (Juror number 74 excused from the Courtroom.)

10  (Juror number 75, Dawn Waggoner entered the

11  Courtroom.)

12  THE COURT:  Good morning.  You read

13  the hand-out?

14  MS. WAGGONER:  Yes.

15  THE COURT:  By the way, I think a

16  copy of that hand-out should be marked and entered

17  into the record.

18  MR. LEWIS:  That is fine.

19  THE COURT:  You understand that this

20  case involves the State of Ohio versus Nathaniel

21  Jackson.  Mr. Jackson stands charged with two

22  counts of aggravated murder with specifications of

1529

1   will be a witness.

2            MR. WATKINS:  You will give some

3   time to the State?

4            MR. LEWIS:  Yes.

5            THE COURT:  I think the motion

6   should be referred back in something in writing for

7   the record.  Even if you just put what you just

8   said on the thing.

9   (Juror number 79, Dan Schoonover entered the

10  Courtroom.)

11           THE COURT:  Good afternoon.  You

12  read the hand-out that was given to you?

13           MR. SCHOONOVER:  Yes.

14           THE COURT:  You are aware that this

15  is a case of State of Ohio versus Nathaniel

16  Jackson?

17           MR. SCHOONOVER:  Yes, Sir.

18           THE COURT:  Mr. Jackson has been

19  charged with two counts of aggravated murder with

20  specifications attached.  Those specifications

21  being aggravated burglary and aggravated robbery.

22  Just because a person unlawfully murders another

1530

1   person in Ohio, does not automatically mean that

2   they qualified for the death penalty.  There has to

3   be certain facts that occur, according to the

4   statute.  And that statute has numerous things in

5   it.  Two of them would be if a person commits a

6   murder while committing an aggravated robbery or an

7   aggravated burglary, that brings the possibility of

8   the death penalty.

9            The State of Ohio is required to prove

10  beyond a reasonable doubt each and every element of

11  these two murder charges and the specifications,

12  before they would be entitled to an aggravated

13  murder conviction.  If they fail to do that, then

14  this Jury will return a verdict of not guilty.  If

15  the State maintains that burden of proof, then the

16  State will be entitled to a finding of guilty.  If

17  that should occur, this case would go into a second

18  hearing, and that same Jury will have to listen to

19  aggravating circumstances, which will be brought

20  forth by the State.  And those will be factors that

21  the Jury will be faced with, that would tend to say

22  that a death penalty should be considered in this

1531

1  case.

2        The Defense will offer mitigating factors

3  at that same hearing, and those are things that the

4  Jury would consider and possibly say, well, because

5  of these mitigating factors, the aggravating

6  circumstances do not outweigh them, so they would

7  not give the death penalty but some lesser penalty.

8        So that requires 12 people who are able

9  to sit and listen to all of the evidence, and to

10  possibly entertain that second hearing, in regard

11  to the question of the death penalty. Now some

12  people could not under any circumstances, ever sit

13  on such a Jury because they are opposed to the

14  death penalty. That type of person could not

15  possibly give a fair trial to the State. There are

16  others who firmly believe that if a life is taken,

17  that person's life should be taken. Such a person

18  could not give the Defendant a fair trial. Because

19  even if the State is able to maintain this murder

20  was caused as alleged, that does not necessarily

21  automatically mean that the death penalty will come

22  up. It means that the Jury has to evaluate those

1532

1 aggravating circumstances and mitigating factors,

2 and the Jury has to decide whether a death penalty

3 on the facts of this case would be appropriate or

4 not.

5       So, we need 12 people who have an open

6 mind in that they are able to follow the law, and

7 that may mean, no one knows at this point, may not

8 get to the second phase, but if we do, we have to

9 have 12 people on the Jury, that are able to

10 listen, to give their consideration to imposing the

11 death penalty, and not be swayed one way or the

12 other because of some deep seated feeling they

13 have.

14       So my question to you is do you feel that

15 you would be able to serve on such a Jury?

16         MR. SCHOONOVER: Yes.

17         THE COURT: You could?

18         MR. SCHOONOVER: Yes.

19         THE COURT: The other question is,

20 have you been exposed to so much pre-trial

21 publicity about this case that it would be

22 difficult to set that aside?

1533

1    MR. SCHOONOVER:  No.  I'm working 12

2  hours.

3    THE COURT:  You don't have your mind

4  made up on any facts?

5    MR. SCHOONOVER:  No.

6    THE COURT:  Thank you.

7  <u>EXAMINATION BY MR. WATKINS OF MR. SCHOONOVER:</u>

8  Q.   Good afternoon.  How are you?

9  A.   Good.

10  Q.   I'm Dennis Watkins, we talked once before.

11       All right if I call you Danny?

12  A.   Yes.

13  Q.   Chuck Morrow is my assistant and we're going

14       to prosecute the case against the

15       Defendant.  I'm sure you understand that

16       at this point?

17  A.   Yes.

18  Q.   And like before, the Court has allowed both

19       parties, both sides, to ask you some

20       questions, so either Mr. Consoldane or

21       Mr. Lewis will follow me.  So we both

22       have equal opportunities to get to you

1534

1    and decide whether you could be a juror.

2    Not trying to pry, because we have got to

3    understand a little bit more about

4    yourself, so we can make a decision.

5    Now, I understand that in fact, I have

6    your questionnaire -- and you recall

7    writing on your questionnaire?

8  A.  Yes.

9  Q.  That you believe in the death penalty, and not

10     abortion in certain cases?

11 A.  Yes.

12 Q.  And that the purpose was that, so obviously,

13     we get some understanding of what

14     principles you have.

15 A.  Right.

16 Q.  Now, His Honor has told you that the death

17     penalty is not an automatic thing in

18     Ohio.  And that you have possibly two

19     trials; the first part of the case, the

20     State would have to put people in that

21     witness chair and provide evidence.  You

22     would be one of 12 jurors, and you would

1535

1    listen to our evidence?

2   A.    Right.

3   Q.    You would judge the credibility of our

4         witnesses and decide whether or not we

5         proved beyond a reasonable doubt the

6         Defendant committed the aggravated

7         murder, and one or more of the

8         specifications.  Right?

9   A.    Right.

10  Q.    And if the State failed to proval his guilt

11        beyond a reasonable doubt, what would you

12        do?

13  A.    Find him not guilty.

14  Q.    Exactly.  The point is, you indicated to the

15        Judge you don't have any knowledge of the

16        case from publicity?

17  A.    Right.

18  Q.    You work 12 hours a day, and you are busy with

19        your life?

20  A.    Right.

21  Q.    That would make you the kind of juror that we

22        would want, somebody that comes into

1536

1    Court, has not taken a side and is going

2    to follow the law.  Do you think you

3    could do that?

4  A.  Yes.

5  Q.  That would mean you would find at this point

6    in time, if you had to decide the case,

7    this guy is not guilty because you have

8    no evidence to prove to you beyond a

9    reasonable doubt, his guilt?

10  A.  Right.

11  Q.  So, assuming, however, that we could prove his

12    guilt beyond a reasonable doubt, and he

13    committed aggravated murder, and the

14    Judge outlined to you the charges on

15    Tuesday; he's accused of killing a home

16    owner intentionally, and as part of that,

17    there were two specifications in the

18    indictment, aggravated burglary and

19    aggravated robbery.  You remember that?

20  A.  Yes.

21  Q.  We would have to prove he did those things.

22    If we did, and you found him guilty, then

1537

1       you go to that second part of the trial,

2       right?

3  A.   Right.

4  Q.   Well, you understand that there's no automatic

5       death penalty?

6  A.   Right.

7  Q.   That you would have to consider things that

8       would favor life imprisonment?

9  A.   Right.

10 Q.   Do you think you could do that?

11 A.   Yes.

12 Q.   Now, before you came to Court, and you wrote

13      that you believed in the death penalty, I

14      want to go into your personal feelings.

15      We know what the law is.  You have got to

16      set your personal feelings aside, but I

17      would like to know how you felt,

18      personally, about the death penalty

19      before you came to Court.

20 A.   I felt that the death penalty, if you kill

21      somebody, you should pay for it.

22 Q.   And that would mean --

1538

```
 1    A.    Maybe they would think twice before they did
 2              it again.
 3    Q.    So you think that the death penalty is a
 4              deterrent?
 5    A.    Right.
 6    Q.    That if people commit a serious murder, that
 7              that would deter others if we had the
 8              death penalty?
 9    A.    Right.
10    Q.    Now, do you believe in an eye for an eye, a
11              tooth for a tooth?
12    A.    Kind of, yes.
13    Q.    Now, what the Judge said was that we don't do
14              that in the law, right?
15    A.    Right.
16    Q.    That is, you understand, that there's no
17              automatic death penalty for every time
18              somebody kills in the State of Ohio.
19              They don't get an automatic death
20              penalty.  You understand that?
21    A.    Right.
22    Q.    Could you go along with that?
```

1539

1   A.   Yes.

2   Q.   Don't you think that is fair?

3   A.   Yes.

4   Q.   What I am getting at, when somebody is charged

5        with aggravated murder and they are shown

6        to be guilty of aggravated murder, don't

7        you think it is important that you know a

8        little bit about the Defendant, if

9        there's things such as there's mental

10       problems, there maybe some duress that

11       they were suffering, somebody threatened

12       them?  Things that could affect the

13       reason for why they did that?

14  A.   Right.

15  Q.   You see what I'm saying?

16  A.   Yes.

17  Q.   So before when you said, yes, if you kill

18       somebody, I think you should get the

19       death penalty, and now the Court is

20       saying the law in Ohio is -- "Wait a

21       minute, the fact that you committed an

22       aggravated murder and are eligible for

1540

```
 1           the death penalty, we don't do that in
 2           Ohio."  And to be a juror, you have to
 3           consider the evidence that would favor
 4           life imprisonment.  Now, would you be
 5           able to do that?
 6   A.   Yes.
 7   Q.   No problem?
 8   A.   No.
 9   Q.   You see what I am getting at?
10   A.   Right.
11   Q.   Sort of like when you come into Court with
12           your personal beliefs, we want to know
13           about them and some people can set them
14           aside, some people can't.  Sometimes
15           we'll have people that say, "I would
16           never give the death penalty.  I am
17           against it for religious reasons."  They
18           wouldn't be fair to the State.  Because
19           right at the beginning of the case before
20           I even started, they have already made up
21           their mind.  No death penalty.  I'm going
22           to give life.  That juror couldn't serve,
```

1541

1             right?

2 A.   Right.

3 Q.   Now, on the other side of the coin would be a

4             juror that would say, "If you show me you

5             killed somebody, I'm going to give the

6             death penalty every single time."  This

7             man would not get a fair trial with that

8             kind of juror, right?

9 A.   No.

10 Q.   Because, he's only looking at the murder and

11             not looking at what the law requires.

12             You look at the murder, then you look at

13             the Defendant, and the things that would

14             favor life imprisonment.  You could do

15             that?

16 A.   Yes.

17 Q.   Now, Danny, what kind of cases if you can

18             think of any locally, where you felt the

19             death penalty was appropriate or any case

20             even nationally that comes to your mind,

21             if you have any?

22 A.   None, really.

1542

1    Q.   You really don't follow cases where you have

2              got this case, that case?  You are busy,

3              you do your job?

4    A.   Right.

5    Q.   Now, if we prove beyond a reasonable doubt he

6              committed aggravated murder and the

7              circumstances that make one eligible in

8              Ohio, is set up by the legislature, the

9              law says, if you commit certain

10             aggravating circumstances, you are

11             eligible.  You can accept the law, right?

12   A.   Right.

13   Q.   And then you remember, you read the

14             instructions the Judge gave you?

15   A.   Yes.

16   Q.   Mitigating factors?

17   A.   Right.

18   Q.   By way of hypothetical, you know earlier, I

19             talked about, if we didn't prove our

20             case, you would find him not guilty?

21   A.   Right.

22   Q.   In order to prove our case, we have got to put

1543

1    people in that chair, witnesses under

2    oath, and you would be one of the 12

3    persons seated to hear the case.  And you

4    would have to determine the credibility

5    of our witnesses, right?

6  A.  Right.

7  Q.  Because, if Watkins says, this happened, I

8       might not believe what Watkins says, I

9       want to hear from the evidence, right?

10 A.  Right.

11 Q.  And so, you are going to listen and you are

12      going to decide from giving two weeks of

13      your time or whatever it takes, full

14      attention to this case, you can do that?

15 A.  Yes.

16 Q.  Nothing on the outside is going to interfere

17      from you listening to all of the

18      evidence?

19 A.  No.

20 Q.  And then you are going to decide by judging

21      the credibility of our witnesses, their

22      evidence, whether or not it is true, that

1544

1       the Defendant committed aggravated

2       murder, right?

3  A.   Right.

4  Q.   Now, assuming we get to that second part, then

5       as you know, the Defense has the

6       opportunity to present mitigating

7       factors.  And you would have to listen to

8       their witnesses, right?

9  A.   Right.

10 Q.   And because they say there's mitigating

11      evidence doesn't mean it is true, does

12      it?

13 A.   No.

14 Q.   You have to decide just like you would decide

15      our evidence, right?

16 A.   Right.

17 Q.   You want to treat everybody equally?

18 A.   Right.

19 Q.   Now, in looking and considering their

20      evidence, some things, the law may

21      require you to at least consider, how

22      much importance it has is up to you, but

1545

1   His Honor for example, could say you must

2   consider something.  You remember reading

3   the outline, there's certain things.

4   Now, in this case, the evidence is going

5   to show the Defendant is 30 years old.

6   Hypothetical, nothing to do with this

7   case, if you had an 18 year old accused

8   of aggravated murder, and one of the

9   mitigating factors under the law, is if

10   you are a young person, of youthful age,

11   the Jury must consider that as a factor,

12   that favors life in prison.  Do you

13   understand that?

14  A.   Yes.

15  Q.   That is something that the law says, "Listen,

16   you have got a young 18 year old kid, you

17   should look at his young age as something

18   that would be favorable for life in

19   prison."  And if you were in such a case

20   and the Judge told you to consider that,

21   you would consider that?

22  A.   Right.

1546

1   Q.    Well, you know I had a couple of trials where

2          I had a couple of jurors, and in that

3          kind of case, they would look at me and

4          say, "I would never give the death

5          penalty to an 18 year old." Now, once

6          that juror said that to me, that would

7          tell me I wouldn't get a fair trial,

8          right?

9   A.    Right.

10   Q.    Because if the law provides that you can

11          execute with that factor, that means you

12          have got to give that consideration,

13          which you would do, but you wouldn't

14          automatically once you hear their

15          evidence, say, "I'm going to give life in

16          prison." You see what I am getting at?

17   A.    Yes.

18   Q.    Because His Honor has told you that you got

19          four possible penalties here. You got

20          the death penalty. You got life with no

21          parole, no opportunity to get out. You

22          got life imprisonment with 30 full years

1547

```
 1              before you are considered for parole, and
 2              then you have got life imprisonment with
 3              25 years.  Now, how do you determine what
 4              penalty you give?  As the Judge
 5              indicated, you have to consider those
 6              aggravating circumstances, right?
 7   A.   Right.
 8   Q.   Things that favor the death penalty, and then
 9              you have to consider the mitigating
10              factor or factors you found to be true,
11              right?
12   A.   Right.
13   Q.   And so, you weigh both.  And at the end, after
14              the lawyers argued in final argument, the
15              Judge will tell you, you don't give life
16              because you feel like it, you don't give
17              death because you like the penalty.  That
18              is not the way it works.  The way it
19              works, you have to weigh the aggravating,
20              against the mitigating.  And His Honor
21              indicated to you in his instructions to
22              you, if the State would prove beyond a
```

1548

1    reasonable doubt that the aggravating

2    circumstances, the things that favor the

3    death penalty in this case outweigh the

4    mitigating factor or factors that favor

5    life imprisonment, it is your duty to

6    recommend the death penalty.  That is a

7    pretty awesome responsibility, isn't it?

8  A.  Yes, it is.

9  Q.  If we could meet that burden as the Judge

10    outlined, you would be able, and I'm

11    asking this question, could you sign a

12    verdict yourself, recommending his death?

13  A.  Yes.

14  Q.  You see what I am getting at?

15  A.  Yes.

16  Q.  You could do that, if we did our job you can

17    do your job?

18  A.  Right.

19  Q.  Bottom line?

20  A.  Right.

21  Q.  On the other side of the coin, if we would

22    fail to prove beyond a reasonable doubt

1549

1   that the death penalty is merited in this

2   case, then it is your duty to recommend

3   life in prison.  It is whatever the

4   evidence requires you to do under the

5   law.  Not what you like to do, it is what

6   the law requires.  And you think you

7   could give us your time and attention to

8   make sure the law works?

9   A.   Yes.

10          MR. WATKINS:  Thank you very much.

11  EXAMINATION BY MR. LEWIS OF MR. SCHOONOVER:

12  Q.   My name is Jim Lewis.  And would it be okay if

13       I called you Danny, also?

14  A.   Yes.

15  Q.   And you don't have to be nervous up there.  We

16       have had a lot of people with their hands

17       clenched like that and I think they have

18       bruises.  They were letting all of that

19       tension off in their hands.  I could I

20       could see them shaking.  That is not the

21       kind of experience we're talking about

22       here.  The gentleman over there,

1550

```
 1              Mr. Consoldane, along with myself,
 2         represent Nathaniel in this case.  From
 3         the orientation instructions and from
 4         Mr. Watkins and also the Judge, you have
 5         got a pretty good flavor of what the
 6         structure of this case is about.
 7  A.   Yes.
 8  Q.   And you have indicated to Mr. Watkins, that
 9         your personal belief, it is not what the
10         law is, but your personal belief is that
11         you believe in the death penalty, and
12         that if somebody's life is taken, that
13         their life should be taken; basically is
14         that the idea?
15  A.   Yes.
16  Q.   And you indicated, I think to Mr. Watkins,
17         sometimes there's a reason for that
18         opinion or whatever.  Everybody has
19         reasons for everything, they may be
20         different.  And you indicated it was for
21         deterrents, so that somebody else would
22         not be killed.  If we execute this person
```

1551

1     then, we're going to be all right here,

2     nobody is going to get killed, and

3     everything is going to be fine, right?

4   A.   Right.

5   Q.   Is there any other reason you can think of?

6   A.   No.

7   Q.   Have you given it any thought?

8   A.   No, not really.

9   Q.   Listen, Danny, when people are put on the hot

10     seat like that, you are all right.  Don't

11     be nervous.  What we're trying to do

12     here -- let me reverse this a little bit.

13     Let's say that you are driving out in

14     Warren Township, I notice you have a

15     friend who is a Warren Township

16     policeman?

17  A.   Yes.

18  Q.   You are driving out there, and Officer Bishop

19     has the laser out and by God, he got you

20     speeding.  At least he says he's got you

21     speeding.  And we we come to Court and

22     we're going to have a Jury trial, just

1552

1  like we're going to have here, and I'm

2  going to represent you.  For good or for

3  bad, it is okay, but we're going to go to

4  Court together.  And the jurors come in,

5  like yourself, and we're able to ask them

6  questions about things or whatever, and

7  some of the jurors, we ask them a

8  question, they get up there and I say,

9  "Well, do you know any Township police

10 officers?  I know officer Bishop.  He's a

11 fine officer, do you believe him?  I

12 believe him all the time."  And you are

13 sitting next to me listening to this, and

14 then we say, "Well, Mr. Juror, you have

15 got to understand now, you have got to

16 set that out of your mind, and put your

17 opinion aside that you know Officer

18 Bishop.  You have to set aside your whole

19 relationship with Officer Bishop.  You

20 can't let that affect you at all in this

21 case."  The juror says, "No problem, I

22 can do that."  You are sitting next to

1553

1    me, and you have got a nice husky arm,

2    you are a press operator, you go, "Jim,"

3    would you feel uncomfortable with that

4    when a juror, potential juror would say

5    that?  Do you follow what I'm saying?

6  A.   Yes, I understand.

7  Q.   This is very, very important, because this

8    whole system won't function.  A lot of

9    people, some people would get on the Jury

10   just to say, "Well, there's too much

11   criminal activity out there.  I'm going

12   to get on there and do my job.  I am

13   going to get somebody."  We have people

14   like that.  But this system will work if

15   everybody just says, "This is how I

16   feel."  And we understand that, we

17   respect your opinion.  I respect your

18   opinion, he respects your opinion, we all

19   do.  Out there, you can think anything

20   you want.  But when you come in here, it

21   gets a little tougher.  It gets tough.

22   And that is the reason, that is the

1554

1            reason why when you are down there in

2            that Courtroom one, that huge Courtroom,

3            the Judge asks you to stand up, and you

4            raise that right hand -- but anyhow,

5            raise your right hand and that is why we

6            swear to God that we're going to answer

7            questions honestly.  And not only that,

8            not only this stage, but the next stage,

9            if you are picked for the Jury and chosen

10           to sit on it, he's going to have you

11           raise your hand to God again.  Because,

12           why that is important and why we do that,

13           is that we're asking people, and we know

14           the law, figured it out a long time ago,

15           some smarter cats than I, they knew a

16           long time ago to say, juror is going to

17           come in and they are going to have their

18           own opinions and feelings about things,

19           and we're going to have to have some

20           mechanism here where we're going to ask

21           questions of jurors, how they feel.  But

22           we have got to put them under oath.  We

1555

1  want honest answers, because we need

2  jurors that even though they have

3  opinions, strong beliefs, they have got

4  to be able to put those aside if it

5  conflicts with what the case is about.

6  Sometimes you have a gambling case, and

7  if the Prosecutor here charges somebody

8  with gambling, and the potential jurors

9  come in and they all say, "I don't see

10  anything wrong with gambling.  And not

11  only that, as far as I am concerned,

12  Mr. Prosecutor, you represent the

13  Government that has got the biggest one

14  going in Ohio.  It is called the Lotto.

15  It takes everybody's money.  It is worse

16  than Las Vegas."  He would say, "Judge,

17  this person has a strong opinion."  And

18  then you say, "Can you set that aside?"

19  And the juror says, "Yes, I can do that,

20  I have no problem with that."  That is

21  pretty tricky, isn't it?

22  A.  Yes.

1556

1  Q.    You follow what I'm saying?

2  A.    Yes.

3  Q.    And I'm not doing this to go after you or

4            anything else.  What is important here is

5            you have an opinion already that your

6            personal opinion would be, if somebody

7            took a life, their life has to be given.

8            Now, if you sit on this Jury, that

9            personal opinion conflicts with what we

10           have here, doesn't it, in that second

11           phase?  The mitigation phase, the

12           sentencing phase?

13 A.    Yes.

14 Q.    It is okay.  I keep telling everybody that she

15           gets paid by the word.  If she really

16           did, she would be super wealthy.  The

17           point being, don't get nervous -- what

18           we're asking for here, is that you really

19           do have to set that personal opinion

20           aside, because if you didn't and you went

21           to that second phase, even though we talk

22           about mitigating factors, there's

1557

1  something about the Defendant or

2  whatever -- you see, if you let your

3  personal opinion come in, you wouldn't

4  think much of that stuff, didn't make any

5  difference to you personally anyhow.  And

6  that is what makes it difficult to follow

7  those instructions, because you are

8  conflicting your personal opinions with

9  what the law is.  That is a tough thing

10  to do.  It takes character, it takes a

11  person with a lot of character to do

12  that.  I mean, there's all kinds of

13  examples of people that they show their

14  greatest character in the most adverse

15  situations, but that is where we're at

16  here with that.  And what I have got to

17  know from you is that you recognize what

18  we're talking about, and if you can give

19  me the most honest answer you can, if you

20  think it is going to influence you in any

21  way, then now is the time to tell us.

22  You would be surprised, it takes more

1558

1  courage to say, "Yes, maybe I wouldn't be

2  the best juror in this case, because that

3  is the way I do feel, and he's entitled

4  to a fair shot."  If I was in the same

5  boat, I would want people to come in here

6  and say, "Yes, I can set those aside,"

7  and if they honestly say that, they have

8  got to do it.  They are under oath to do

9  it, and they have sworn to God to do it.

10  That is a heavy thing.  You tell me.  Do

11  you really believe you can do that?  Let

12  me interject one thing.  I know I'm doing

13  all of the talking.  Let me say this to

14  you also, is that there are no right or

15  wrong answers in this thing.  This is not

16  a quiz or a test, even though you were

17  read those instructions.  A lot of people

18  think they are going to come in here and

19  have multiple choices.  It is not that.

20  There are no right or wrong answers in

21  these things.  Nobody thinks badly of

22  anybody that says -- when they say, in

1559

1             fact, we have got a number of examples

2             where people said, "I think it may

3             influence my opinion," and those, we

4             commend them for what they are saying.

5             So a lot of people think, if I get a

6             wrong answer, somebody is going to think

7             I'm a bad person.  No way.  You follow

8             what I'm saying on that?

9   A.   Yes.

10  Q.   You have got to tell me, you have got to tell

11            me if you were put in the shoes of the

12            Defendant, I don't care if it is a

13            traffic case or whatever, it applies in

14            every case, you have got to tell me, do

15            you really think you can put those

16            opinions aside and not let them influence

17            your ability to judge that case, if it

18            gets to that penalty phase, that

19            sentencing phase?

20  A.   I think I could.

21  Q.   And you would be very conscientious of the

22            fact that that opinion has got to go by

1560

1    the boards and/or information they give

2    you in mitigation?  You can sit there and

3    say, "Well, it is going to be hard to

4    give it some value," isn't it, because

5    your personal opinion is otherwise.

6    Wouldn't you think?

7  A.   I don't know.  I think I could do it.

8  Q.   We really need a commitment.  What I'm trying

9    to say to you, this is so important.  I'm

10   not trying to put you on the spot or

11   berate you.  This is the question.  If I

12   had to sit on the jury, they would be

13   asking me this stuff and even though I am

14   a lawyer, I got my personal beliefs.  And

15   I would answer those questions flat out

16   and upright and say what it is.  So, all

17   I'm asking you is, it is really

18   important, because you can have somebody,

19   you can have a family member, somebody in

20   the same boat.  That is the whole problem

21   about this, everybody could be in the

22   same boat and people think, "No, that

1561

1    can't happen."  B.S., it can't happen.

2    It does a lot.  And it is like treat your

3    neighbor the way you want to be treated.

4    That is all this boils down to.  They got

5    an eye for an eye, but they also say when

6    it comes to trying somebody -- you tell

7    me, what do you think?

8  A.   I think I could put it aside.

9  Q.   Very important.  Once you take that oath, you

10   are guaranteeing that fellow up there,

11   and saying to God that you are going to

12   do it.  Also, we're talking about the

13   life sentences here.  Those are options,

14   obviously along with the death penalty.

15   And life imprisonment with no parole

16   means exactly what it says.  There's some

17   misconception out there, sometimes you

18   see on 20-20, I know you work a lot of

19   hours, but once in a while from the

20   newspaper or somebody talks to you, Joe

21   Blow, he got sentenced to life, but he

22   was out in six years.  The life without

1562

1    parole here means exactly that.  This

2    would be another example of these are the

3    Court instructions, and this is what it

4    is saying.  Life is without parole.  The

5    man dies in prison.  He watches the world

6    go by.  Everybody else lives and he rots.

7    That is the name of the game there.  The

8    life with 30 year parole eligibility

9    means exactly that.  He would have to

10   serve 30 full years before he would be

11   eligible for parole.  Doesn't mean he

12   gets it.  People are eligible and they

13   die in prison also, and the same with the

14   25 year.  And, that would be an example

15   of a situation where somebody, if you go

16   back in the Jury room, it happens a lot

17   of times, different things come from the

18   outside, and well, these are the options.

19   Well, I don't know, if I don't think

20   those aggravating circumstances outweigh

21   those mitigating factors beyond a

22   reasonable doubt, that is another thing.

1563

1   There's a standard, it applies in the
2   trial of the case and it applies in the
3   sentencing phase. Did you ever hear that
4   beyond a reasonable doubt thing?
5   A.   Yes.
6   Q.   That is the standard we use for proof. And it
7        applies in the trial to find guilt. It
8        applies in the trial to find those
9        specifications or aggravating
10       circumstances. You remember what the
11       aggravating circumstances would be or
12       what they are, the instructions? Can you
13       give me an idea of what they would be?
14  A.   Burglary is one of them.
15  Q.   And that applies there. We get to the
16       sentencing phase, it is the same
17       standard, beyond a reasonable doubt. It
18       is a high standard. It is not just,
19       well, maybe we'll go to lunch, maybe we
20       won't. It is a high standard. It would
21       apply there, too, in the sentencing
22       phase. You would feel comfortable with

1564

1    that?

2  A.    Yes.

3  Q.    You think there's any reason why you couldn't

4        sit and do the best job you possibly can?

5  A.    No.

6  Q.    You can live up to that oath?

7  A.    Yes.

8              MR. LEWIS:  Thank you very much.

9              MR. WATKINS:  We're satisfied.

10              THE COURT:  Mr. Lewis?

11              MR. LEWIS:  Yes.

12              THE COURT:  Dan, you will be in the

13  pool from which this Jury is selected.  If you will

14  please call that number each evening until you are

15  notified to be here.  Thank you very much for your

16  time.

17  (Juror number 79 excused from the Courtroom.)

18  (Juror number 87, Tammie McCale entered the

19  Courtroom.)

20              THE COURT:  Good afternoon.  You

21  read the hand-out that was given to you?

22              MS. McCALE:  Yes.

1565

1     THE COURT:  The purpose of this is

2 to ask you some questions pertaining to two items,

3 and the one is whether or not you have had any

4 pre-trial publicity that would make it difficult

5 for you to sit here and decide this case on the

6 evidence.  Have you read much about it?

7     MS. McCALE:  No.

8     THE COURT:  Mr. Jackson, the

9 Defendant here, is charged with two counts of

10 aggravated murder with specifications of aggravated

11 burglary and aggravated robbery.  Now the State has

12 the burden of going forward and of proving the

13 elements of those murder charges beyond a

14 reasonable doubt.  They have to convince all 12

15 members of the Jury of the truth of the charges.

16 Unless, if they fail to do that, then Mr. Jackson

17 would be entitled to a finding of not guilty.  If

18 the State, however, is able to maintain that burden

19 of proof, then they would be entitled to, the State

20 would be entitled to a finding of guilty.  If that

21 should occur, then the trial will go to a second

22 phase.  And the evidence presented in that second

1566

1   phase would be aggravating circumstances put to the

2   Jury by the State.  Those would be factors that

3   would persuade the Jury to consider and perhaps

4   impose the death penalty.

5       The Defense would put forth mitigating

6   factors to the Jury, which would be reasons why the

7   Jury should find that in this particular case, the

8   death penalty is not warranted.  Some people could

9   never sit on such a Jury because they are totally

10  opposed to the death penalty.  Could never

11  participate.  Others are at the opposite extreme,

12  and they just as firmly believe that a person who

13  unlawfully takes the life of another human being

14  should forfeit their life.

15      Well, neither of those could provide a

16  fair trial to one side or the other.  The law of

17  Ohio says that there's no automatic death penalty

18  for unlawful killing.  It is only when certain

19  other criteria are present as in this case, with

20  the aggravated burglary, aggravated robbery.

21      So, the people on this Jury will have to

22  be somewhere in between the two extremes, are able

1567

1  to listen to the evidence and the law and follow

2  the law.  And the law would say that if the State

3  proved that the aggravating circumstances

4  outweighed the mitigating factors on that second

5  phase, then the Jury would be called upon to

6  consider and if their decision is such to impose

7  the death penalty.  If they decided that the State

8  did not carry that burden of proof, then they have

9  other options.  Life in prison, and so on.  So my

10  question to you is, are you able and willing to sit

11  on such a Jury?

12                 MS. McCALE:  No.

13                 THE COURT:  Why do you say that?

14                 MS. McCALE:  Because I don't believe

15  in the death penalty.

16                 THE COURT:  That hard and fast?

17                 MS. McCALE:  It is a religious

18  thing.  I just couldn't do it.  I just could not do

19  it.

20                 THE COURT:  You are not alone.

21  There are many people that hold that view as there

22  are many people that hold the opposite view.

1568

1   <u>EXAMINATION BY MR. WATKINS OF MS. McCALE:</u>

2   Q.   My name is Dennis Watkins, I am County

3        Prosecutor, along with Chuck Morrow,

4        Assistant Prosecutor.  We, along with the

5        Defense, have the opportunity to ask

6        questions about the issues the Judge

7        discussed.  And, I understand you are a

8        teacher.

9   A.   Yes.

10  Q.   It seems pretty clear to me that you have

11       answered the questionnaire, you don't

12       believe in the death penalty.  And in

13       Ohio, we're a state that has the death

14       penalty.  And I'm sure you are aware that

15       there are other states that don't.  And

16       if you, perhaps yourself in my shoes, if

17       you were going to try a case and the law

18       is a given thing, in this case there's a

19       death penalty.  If I would have a juror

20       that would never consider the death

21       penalty, I obviously couldn't get a fair

22       trial, right?

1569

1  A.    Right.

2  Q.    And you are being honest.  It doesn't mean

3        that you are a bad person, there are

4        people that are excellent citizens that

5        may be good in a gambling case or

6        burglary case, but sometimes they have

7        religious or moral views that they just

8        could not consider something that the law

9        allows; is that fair to state?

10 A.    That is absolutely correct.

11 Q.    And your opposition to the death penalty, is

12       it religious, is it moral, is it both?

13       How would you describe your position?

14 A.    It is absolutely morally religious, both.

15 Q.    And this is something that you feel strongly

16       about?

17 A.    Yes.

18 Q.    That you could never set it aside and you

19       would never, no matter what the evidence,

20       no matter how strong the case would be

21       that we could present to you, you would

22       never ever sign a verdict recommending

1570

1    his death?

2    A.    No.

3          MR. WATKINS:    Thank you very much.

4    EXAMINATION BY MR. CONSOLDANE OF MS. McCALE:

5    Q.    My name is Tony Consoldane.  Along with Jim

6          Lewis, we're representing Nathaniel

7          Jackson.  You know to have the Jury

8          system work, we have to have people from

9          all walks of life.  And sometimes we have

10         cases where for example that gambling

11         case, gambling, certain types of gambling

12         are illegal in Ohio.  However, the law,

13         the lottery, the State gambling is legal,

14         but if some enterprising people try and

15         run what they used to call the bug, which

16         is the same as the three day number, the

17         daily three number game, that is illegal.

18         Now, there's a lot of people that believe

19         in gambling.  They think it is all right.

20         The State does it, why should it be a

21         crime?  If they can't set that aside,

22         they can't sit on a Jury.  You see what I

1571

1    mean?

2  A.   Yes.

3  Q.   And the same way, there's people that

4       absolutely don't believe in gambling,

5       even if it is legal, and they can't,

6       unless they would be able to set those

7       ideas aside, those beliefs, just for the

8       purpose of the Jury, they couldn't sit.

9       And matter of fact earlier today, we had

10      a guy that wrote on the bottom of his

11      questionnaire, "I believe in the death

12      penalty."  And he was able though, to say

13      that he would listen to the Judge, and

14      follow his instructions.  And whatever

15      you believe in your heart, is fine.  I

16      mean nobody here wants to change your

17      mind about that.  The only thing that

18      we're asking you today, is if you could

19      set it aside and follow the instructions

20      of the Judge as to this case.  After the

21      case is over, you can pick those beliefs

22      up at the door and take them with you.

1572

1          Could you set them aside?

2    A.   No.

3    Q.   For this trial?

4    A.   No.

5    Q.   You are absolutely sure about that?

6    A.   Absolutely.

7               MR. CONSOLDANE:  Thank you.

8               MR. WATKINS:  I think there's enough

9    evidence that she's impaired in this case because

10   of her honest belief.

11              MR. CONSOLDANE:  I think she would

12   make a fine juror.

13              MR. LEWIS:  So do I.

14              THE COURT:  I do too, except for any

15   other case maybe.  You are excused.  We thank you

16   for your candor and for your time.

17              MR. LEWIS:  Just for the record, I'm

18   going to object.

19   (Juror number 87 excused from the Courtroom.)

20              MR. MORROW:  I would like to report

21   that the clothing was delivered yesterday morning

22   and also there's additional clothing that has been

1573

1    delivered as well to the jail for the Defendant.

2                THE COURT:  Thank you.

3                MR. LEWIS:  With the exception of

4    the shoes.

5                MR. MORROW:  With the exception of

6    one pair of red and black shoes.

7                THE COURT:  Do those need laundered?

8                MR. MORROW:  I know the one pair was

9    the pair when the Defendant was arrested, the

10   second were a pair that were recovered at the time

11   of his arrest.

12               THE COURT:  If he's going to wear

13   those, they maybe have to have something done to

14   them.

15               MR. WATKINS:  We're giving the pair

16   he was wearing, we believe at the time of the

17   offense, we're keeping.  The other pair was with

18   him where he was at when he was arrested, where he

19   was staying, we're returning to him.

20               MR. LEWIS:  Whatever we have, I'm

21   sure the Prosecutor will send it out to the

22   laundry.

1574

1    THE COURT:  I don't wish to have him

2  come in with crumpled clothes that have been stuck

3  in a bag.

4    MR. WATKINS:  The clothing that we

5  have, the one set was in his bag, because he had

6  come home from prison, and then in Donna Roberts

7  trunk --

8    THE COURT:  Those were packed.

9    MR. WATKINS:  He had packaged those

10  himself.

11    THE COURT:  That is fine.

12  (Juror number 91, Jeremy Gless entered the Courtroom.)

13    THE COURT:  Mr. Gless, how are you?

14    MR. GLESS:  Good.

15    THE COURT:  You read that hand-out

16  that was given to you?

17    MR. GLESS:  Yes.

18    THE COURT:  This case is the State

19  of Ohio versus Nathaniel Jackson.  And Mr. Jackson

20  stands charged with two counts of aggravated murder

21  with specifications.  Under Ohio law, just because

22  there's an unlawful killing of another human being

1643

1     MR. MORROW:  Thank you.

2     EXAMINATION BY MR. CONSOLDANE OF MS. MENTEN:

3     Q.    Hi, Mary Ann.  This is another Mary Ann.  Mary

4           Ann, it is kind of unusual that we're

5           talking about penalty, because at this

6           moment Nathaniel Jackson is presumed

7           innocent.  But, we can't wait until after

8           the trial and talk to the jurors about

9           this.  And I think you understand we have

10          to have somebody that can look at both

11          sides and decide fairly.  And also,

12          jurors usually don't ever get involved in

13          the sentence.  Once they make a finding

14          of innocence or guilt, guilty or not

15          guilty, they leave, and it is up to the

16          Judge after that, to take over.  This is

17          the only case where the Jury actually

18          gets involved in the penalty.  Almost

19          every day somebody walks in this

20          Courthouse and one of the four

21          Courtrooms, and either enters a plea of

22          guilty or is found guilty by a Jury.

1644

```
 1              Now, whenever they plead guilty to a
 2              sentence, it could be maybe a minimum of
 3              two years and a maximum of ten years.
 4              You don't think it would be fair for the
 5              Judge to give everybody the minimum every
 6              day?
 7   A.   No.
 8   Q.   On the other side, you don't think it would be
 9              fair to give him the maximum sentence?
10   A.   No.
11   Q.   In fact, what the Judge does do, is he sends
12              them to the probation department and they
13              conduct what is called a pre-sentence
14              investigation.  It is also termed the
15              PSI, and the probation officers check the
16              record, naturally, but they also look at
17              school records, talk to his friends,
18              family, trying to find out a little bit
19              what makes this person tick, why he might
20              have done some of the things he did.  And
21              then they report back to the Judge.  It
22              is a written report.  He reads it over,
```

1645

1   and then he hands out the sentence.

2   Sounds like a pretty good way.  That is

3   pretty much what the Jury does in this,

4   is that you already, once you have gone

5   past the point of finding that someone

6   was guilty at such a level to allow the

7   death penalty to be imposed, then we have

8   what is called a mitigation hearing and

9   it is something, similar to that, except

10  it is not a written report.  It is just

11  facts that are put into Court, and then

12  you have to decide.  There's no scales

13  back in the Jury room, where they got all

14  of this weighing.  You are going to have

15  to just look at both sides.  You feel you

16  can do that?

17  A.   Yes.

18  Q.   You could be fair?

19  A.   Yes.

20          MR. CONSOLDANE:  Thank you.  Pass

21  for cause.

22          MR. MORROW:  Pass for cause.

1724

1     So, the question is, are you able to sit

2    on such a case?

3              MR. DAVIS:  Yes.

4              THE COURT:  The other question is,

5    have you had any exposure to pre-trial publicity in

6    this case, that would make it difficult to listen

7    to the evidence?  Do you have your mind made up

8    about any of the facts?

9              MR. DAVIS:  No.

10             THE COURT:  Did you read much about

11   it at the time it happened?

12             MR. DAVIS:  Yes, a little, in the

13   paper.

14             THE COURT:  You are not unusual

15   there.  The question is whether you can decide the

16   truth or non-truth of the State's case based on the

17   evidence in this Courtroom, not something that you

18   read before, because that has nothing to do with

19   this case.  You understand?

20             MR. DAVIS:  Yes.

21   EXAMINATION BY MR. MORROW OF MR. DAVIS:

22   Q.   Mr. Davis, my name is Chuck Morrow.  This is

1725

1    Mr. Dennis Watkins, the Trumbull County

2    Prosecutor, and I am one of his

3    assistants.  I'm going to have an

4    opportunity to ask you a couple of

5    questions about some of your views, and

6    then either Mr. Lewis or Mr. Consoldane

7    will have an opportunity to ask you some

8    similar questions.  And as you are aware,

9    Mr. Watkins and I are prosecuting

10   Nathaniel Jackson for the aggravated

11   murder of Robert Fingerhut.  And the

12   potential penalty in this case could

13   conceivably be the death penalty, and I

14   assume you are aware of that.  And that

15   is kind of what the focus of our

16   questioning is going to be on about your

17   views on the death penalty.  But before

18   we get there, I know you told the Judge

19   that you had read a little bit about this

20   in the paper.

21   A.   Yes.

22   Q.   What paper would you have read it in, if you

1726

```
1              remember?

2    A.   The Tribune Chronicle.

3    Q.   And can you tell me when you would have read

4              this?

5    A.   It was last year.  It was right after it

6              happened.

7    Q.   Do you remember what it was that you read?

8    A.   Just about this, this guy getting murdered,

9              and that is about it.  I can't remember a

10             lot of details.

11   Q.   That is all I'm asking is what details you

12             remember.  Other than the fact that a guy

13             got murdered?

14   A.   No.

15   Q.   Any memory of who was involved with it or

16             where it happened, anything like that?

17   A.   I just remember it happened in Howland

18             Township.  That was about it.

19   Q.   And would you agree with me that the

20             newspapers aren't always exactly correct?

21   A.   Right.

22   Q.   A lot of times they make mistakes?
```

1727

1    A.    Yes.

2    Q.    And you wouldn't want to rely upon the

3            newspaper in making a decision as to

4            whether somebody was guilty or not

5            guilty?

6    A.    No.

7    Q.    As you sit here today would it be fair to say

8            that you haven't formed any opinions as

9            to the Defendant's guilt or innocence at

10          this point?

11   A.    No.

12   Q.    Whether it is based upon newspaper or

13         conversation with somebody else, or even

14         the discussion that the Judge had with

15         you last week?

16   A.    No.

17   Q.    The interesting thing with this trial is that

18         there will be two parts, assuming that

19         the State is able to prove in the first

20         part, that the Defendant's guilty of what

21         he did.  And if we prove it beyond a

22         reasonable doubt, we go to the second

1728

1     part of the trial where it would be up to

2     the jurors to make a recommendation to

3     the Judge, as to what kind of penalty

4     should be imposed.  And again, as I told

5     you, one of the penalties is that

6     involving the death penalty.  And the

7     reason for this questioning that we're

8     doing here is we wanted to -- both sides

9     are trying to get people that are fair.

10    On one instance there are those people

11    that believe that their personal beliefs

12    are an eye for an eye.  You take a life,

13    doesn't matter what it is, you should

14    forfeit your life.  You probably heard of

15    those kinds of people.  And on the other

16    hand, you have people that say under no

17    circumstances, moral, religious, personal

18    conviction, under no circumstance, could

19    I ever recommend the death penalty for

20    somebody.  Would you fall into either one

21    of those two camps?

22  A.    Yes.   I don't believe in taking somebody's

1729

1   life and sentencing them to death for

2   what they have done.

3   Q.   Your personal belief is that you don't believe

4        in the death penalty?

5   A.   Yes.

6   Q.   Can you tell me what the basis is for that

7        belief?

8   A.   I just don't feel it is in my power to do

9        something like that, to sentence someone

10       else to death.

11  Q.   Is it a religious belief, moral belief?

12  A.   Moral belief.

13  Q.   Is it something that you have been brought up

14       with?

15  A.   Yes.

16  Q.   And is that a belief that you hold very near

17       to your heart?

18  A.   Yes.

19  Q.   And I know that there have been a number of

20       high profile situations that have

21       happened where there's been murders and

22       where people have been convicted of

1730

```
1              various crimes, and in some of those
2              situations, the people have been
3              sentenced to the death penalty.  Even in
4              those most heinous of offenses, the most
5              vicious kind, you could never make a
6              recommendation for the death penalty?
7   A.  No.
8   Q.  And again, you can understand, and I
9              appreciate your candor, and we're not
10             here to try to change your beliefs or
11             change your views, your personal beliefs.
12             That is what makes our country what it
13             is, we have our personal beliefs.  I
14             guess the question is, is that you
15             understand that in Ohio, along with 35
16             other states, Ohio has the death penalty.
17             Or actually 34 other states.  And if for
18             example as you sit here and say, "I could
19             never, ever impose the death penalty,"
20             you can understand how the State would
21             feel, that you may not be a fair juror.
22             Would that be fair to say?
```

1731

1  A.    Yes.

2  Q.    And even if the Judge were to instruct you and

3        say that the law would require if the

4        State proves beyond a reasonable doubt

5        the aggravating circumstances outweigh

6        mitigating factors, you would need to

7        impose the death penalty, you would tell

8        the Judge you could not do that?

9  A.    Right.

10 Q.    You would not follow the Judge's instructions

11       on that point?

12 A.    No.

13 Q.    And I appreciate your candor.  I suppose I

14       need you to say yes or no.  That is a

15       deep rooted belief and under no

16       circumstance could you impose the death

17       penalty?

18 A.    Right.

19 EXAMINATION BY MR. CONSOLDANE OF MR. DAVIS:

20 Q.    Good afternoon, Brian.  My name is Tony

21       Consoldane, and along with Jim Lewis,

22       we're representing Nathaniel Jackson.

1732

1          You have been involved in a Jury before?

2  A.  Yes.

3  Q.  And was it a criminal case or civil case?

4  A.  Civil.

5  Q.  And you saw how the importance of having the

6        Jury to decide the arguments between two

7        people that are basically in a civil

8        case.  This is a little different.  And,

9        you understand, that to have a juror, you

10       have to have diversity.  You have to have

11       people from all walks of life.  We had

12       everybody the same on the Jury, they

13       would all just think one way.  We need to

14       have diversity to look at different

15       things that are going on in the Courtroom

16       and look at the evidence.  And, there are

17       people that absolutely believe in the

18       biblical interpretation of the death

19       penalty, an eye for an eye, tooth for a

20       tooth.  And they have that conviction

21       very strong in their hearts.  You take a

22       life, you lose a life.  However, it

1734

1    THE COURT:  Overruled.  Mr. Davis,

2    we thank you for your time.  We thank you for your

3    truthfulness.  You are excused from any further

4    responsibility in this matter.

5    (Juror number 112 excused from the Courtroom.)

6    (Juror number 124, Richard Simkins, entered

7    the Courtroom.)

8    THE COURT:  Good afternoon.  You

9    read that hand-out that was given to everyone?

10   MR. SIMKINS:  Yes, I did.

11   THE COURT:  This case is one of

12   about two counts of aggravated murder with

13   specifications filed against the Defendant,

14   Mr. Jackson.  Under Ohio law, just because a person

15   unlawfully kills another person does not mean that

16   they automatically get the death penalty or are

17   eligible for it.  But under certain circumstances,

18   according to law, that becomes a possibility if

19   certain elements are present.  Now the elements are

20   presented in the indictments that have been

21   returned against Mr. Jackson.  If the State is

22   unable, after the presentation of their case, to

1733

1    doesn't mean that those people are

2    automatically disqualified from sitting

3    on a Jury.  They have to be able to set

4    that aside and follow the instructions

5    that the Judge gives them.  Now, in your

6    case, just because you have that belief

7    doesn't automatically disqualify you from

8    sitting on the Jury.  The real test is if

9    you say, "I can't set my beliefs aside

10   and follow the instructions of the

11   Judge."  Do you believe that you could

12   set that aside and follow the

13   instructions of the Judge?

14  A.    No.

15  Q.    Not even for the purposes of this trial?

16  A.    No.

17          MR. CONSOLDANE:  I have no further

18  questions.

19          MR. MORROW:  The State would move to

20  excuse this juror for cause because he's

21  substantially impaired.

22          MR. CONSOLDANE:  Objection.

1721

1  the neighborhood of 15, give or take, of the 24

2  convictions, involve felonies or theft offenses,

3  which, we would view as crimes that we could

4  impeach the Defendant on.  And so, if there's any

5  question in the future, I would request that

6  obviously be brought to the attention of the Court,

7  so we can discuss it.  But we have finalized for

8  purposes of discovery, the exactitude that Mr.

9  Lewis wanted in regard to what we intend to use.

10  And so, that would be found in Supplemental 11.

11  (Juror number 112, Brian Davis, entered the

12  Courtroom.)

13           THE COURT:  Good afternoon,

14  Mr. Davis.  You read the hand-out that was given to

15  you?

16           MR. DAVIS:  Yes, Sir.

17           THE COURT:  The Defendant here,

18  Mr. Jackson, is charged with two counts of

19  aggravated murder with specifications.  It is up to

20  the State to present evidence to this Jury of 12

21  people, and convince them of the truth of every

22  element of the charges.  Now, if the State fails to

1722

1    do that, then the Jury will rightly return a

2    verdict of not guilty.  That is the end of the

3    trial.  If the State is able to maintain their

4    burden of proof and prove all of the elements

5    beyond a reasonable doubt and convince the Jury of

6    the guilt of Mr. Jackson, then a proper finding

7    will be guilty.  If that should occur, then this

8    Jury will be required to sit through a second phase

9    of the trial.

10           And at that time, first of all under the

11   law of Ohio, just because someone unlawfully takes

12   a life of another person, that does not

13   automatically mean the death penalty will be

14   imposed.  Do you understand that?

15                MR. DAVIS:  Yes.

16                THE COURT:  But it also means that

17   under certain circumstances, circumstance, if

18   proven true, that exists in this case, then the

19   State has the right to ask for the Jury's

20   consideration and imposition of the death penalty.

21           At the second phase, the State would

22   present what we call aggravating circumstances.

1723

1    That is reasons why the Jury should consider and

2    impose the death penalty.  At that same hearing,

3    the Defense would present mitigating factors, which

4    are reasons presented to the Jury for their

5    consideration of why the death penalty would not be

6    appropriate in this particular case.  So what that

7    means is if we have a juror on this Jury that would

8    never, under any circumstances, impose the death

9    penalty, the State can't get a fair trial.  But

10   conversely, if we have somebody that believes an

11   eye for an eye, tooth for a tooth, you kill

12   somebody, you lost your own life.  Then the

13   Defendant could not get a fair trial.  So we need

14   12 people who may cover a range of attitudes about

15   what they think about the death penalty.  Some may

16   be more in favor of it than others, but all of them

17   have to look within themselves and answer the

18   question before you can answer it for these folks.

19   And that is, "I can follow the law, and I am ready,

20   willing and able if called upon, to sit and listen

21   to this case, and if we get to that second phase,

22   I'll be able to do what the law requires of me."

1771

1      MR. MORROW:  Thank you.

2    <u>EXAMINATION BY MR. CONSOLDANE OF MS. DEJOY:</u>

3    Q.    Good morning.  My name is Tony Consoldane.

4          And I am representing Nathaniel Jackson

5          in this matter.  And this is a little

6          unusual for us to be talking about

7          penalties when we haven't even gone

8          through the trial.  Because under our

9          judicial code, is that everyone is

10         presumed innocent until such time that

11         he's proven to be guilty.

12   A.    Yes, Sir.

13   Q.    But, we have to do it now because this is the

14         only chance that we have to talk to you

15         about this.  We can't wait until the end.

16         And also, this is very unusual, because

17         the Juries usually don't get involved in

18         penalty.  A Jury will sit on a case, make

19         a decision as to either not guilty or

20         guilty, and then it is up to the Judge to

21         impose the penalty.  Every day in this

22         Courthouse, there's three other

1772

1    Courtrooms, somebody will walk in and

2    either plead guilty or found guilty of a

3    crime.  And there's a range of penalty

4    from two years to maybe ten years.  Do

5    you think it would be fair for the Judge

6    always to give the maximum amount of

7    penalties on every case?

8 A. No, Sir.

9 Q. And you think it would be fair for him to give

10    the minimum amounts on every case?

11 A. No.

12 Q. What happens is that the Judge refers the

13    person to the probation department, and

14    they conduct what is called a

15    pre-sentence investigation.  It is

16    commonly referred to as a PSI.  And the

17    probation officer checks the record,

18    talks to the person's family, friends,

19    checks his school records, work records,

20    and maybe talks to the Defendant, also,

21    to find out what made him do something

22    like this.  And writes that report to the

1773

```
 1              Judge, and then the Judge reads the

 2              report and issues the sentence.  Sounds

 3              like a pretty fair way to do it, isn't

 4              it?

 5   A.   Yes.

 6   Q.   That is kind of what you will be doing, if you

 7              are on the Jury in this case is that

 8              after the trial, the first part of the

 9              trial is over and he's found guilty, if

10              we get to that step, then we have the

11              second trial, where we present some

12              evidence as to maybe why the death

13              penalty shouldn't be imposed, and that is

14              when you and your other jurors will make

15              your decision.

16   A.   Yes.

17   Q.   Do you think you can do that?

18   A.   Yes, Sir.

19   Q.   And you can be fair?

20   A.   Yes, Sir.

21              MR. CONSOLDANE:  Thank you.

22              MR. MORROW:  The State is satisfied.
```

1774

1    MR. CONSOLDANE:  Pass for cause.

2    THE COURT:  You will be in the pool

3    from which this Jury will be selected.  If you will

4    be kind enough to call that number given to you

5    each evening after 4:30 until you are invited to

6    come back.  Thank you for your time.

7    (Juror number 130 excused from the Courtroom.)

8    (Juror number 132, James Flask entered the Courtroom.)

9    THE COURT:  Mr. Flask, this case is

10   State of Ohio versus Nathaniel Jackson.

11   Mr. Jackson has been charged by the Grand Jury by

12   way of indictment, with two counts of aggravated

13   murder with specifications.  Under the law of Ohio,

14   just because a person unlawfully kills another

15   person does not automatically mean that the death

16   penalty is even considered.  But this case has

17   elements in it that if proven by the State, would

18   bring the question of the death penalty.  If the

19   State fails to maintain the burden of proof beyond

20   a reasonable doubt, and fails to prove each and

21   every element of the crime, then of course, the

22   Jury will return properly a verdict of not guilty.

1846

1    _Wainwright_ case and those that came after, it was

2    to get people who are willing to follow the law,

3    able to follow the law.  And I think that is what

4    we endeavored to do here as much as humanly

5    possible to get people who have an open mind.  But

6    people who, if in the last instance are required

7    to, are able to sit and consider the question of

8    death, that is what the law calls for.

9                    So, for that reason, or reasons, the

10   motions of the Defendant are overruled.

11                   MR. WATKINS:  Thank you.

12                   MR. CONSOLDANE:  I also have -- I

13   make another objection to the array of the Jury

14   picked.  We only had one person of color on that

15   Jury and he was excused because he couldn't believe

16   in enforcing the death penalty, and that is far

17   less than what the population is in Trumbull

18   County.  I don't think that is respective of what

19   the black population is in Trumbull County, nor is

20   it fair to my client to have all elderly white

21   people judging him.

22                   MR. WATKINS:  Your Honor, the system

1847

1  of Trumbull County is a system that through the use

2  of an electronic random selection, voters, people

3  will come in order as we have gone through a Jury

4  list, there has been one African-American and I

5  agree with Tony, that the good gentleman that was a

6  pastor, that unequivocally could not consider the

7  death penalty.  The black population, I believe, in

8  Trumbull County is six percent, and so, you are not

9  going to get in any selection necessarily, a given

10  number, and as we know, there are still a number of

11  jurors to go, but we have gotten from the bottom

12  part of the panel.  I believe we're at 140, out of

13  the 400.  So, we're talking about population-wise,

14  very much a fraction of the population that we have

15  considered, and they are from all areas.  I noticed

16  that for example in this case, we had three people

17  from Farmdale, which is unusual considering the

18  population so -- and there were a number from

19  Brookfield.  That it seemed more than usual, but

20  you can't have an usual, because it is random.  It

21  is where your name appears.

22            And therefore, we maintain that the

1848

1  system here is Constitutional, and that there's

2  nothing unusual.  Sometimes I have had cases where

3  we would have a higher number of black individuals

4  that would be qualified, and there's no way of

5  knowing, and therefore, unless the Defense, under

6  the law, can prove that there's some discrimination

7  in the system, I believe this motion should be

8  dismissed.

9              MR. CONSOLDANE:  I want to say that

10  six percent out of 140, we should have had eight

11  people instead of one, and I think the

12  discrimination comes from the fact that they use

13  the voter registration, and not the license

14  registration as we suggested earlier on our earlier

15  motions.

16              THE COURT:  Again the law provides

17  that a county can choose either to be voter

18  registration rolls or the driver's license.  I am

19  only aware of a very few counties that tried the

20  process of using the license, driver's license and

21  that has proved to be almost unworkable and very

22  costly and very inefficient because of the change

1854

1  participate.  The voter registration rolls are

2  updated every two years, you vote every two years.

3  Some people, they might miss an election, it goes

4  four years, the driver's license is four years, and

5  that is what I understand the problem has been,

6  that the counties send out all of these notices and

7  they get a much higher return with no such address

8  or move and no forwarding address, whatever, by

9  using the other method.  We have voter, motor

10  registration.  Now, there's an attempt to get

11  everyone at least registered.  Having that in mind,

12  I think your argument 15 to 20 years ago, would be

13  much more valid than it is today.  For that reason,

14  I overrule your motion.

15          MR. WATKINS:  I believe we had one

16  other black juror that we excused during that first

17  day on cause.  I'm positive we had one other black

18  juror that was excused.

19          THE COURT:  My observation is no

20  matter whether they are white, black or green, you

21  put them on a Jury, they take their business

22  seriously.

1    A       No.

2    Q       Yep.  That would be a look that would kill; right?

3    A       Exactly.

4    Q       Yeah.  Well, I suppose in every day life when women

5    ask men for money or men ask women for money, there may be

6    some consternation, but -- you also told Mr. Watkins, except

7    for this one supposed incident, you never saw them fight

8    about anything before; is that correct?

9    A       Exactly.

10   Q       Okay.  And you were there every other day for 14

11   hours from October until, well, of course actually about

12   three months, it's only about three months; right?

13   A       Yeah.

14   Q       But you never saw 'em argue about anything?

15   A       No.

16   Q       Okay.  All right.  Did Donna run the restaurant at

17   that time or was that restaurant gone at that time?  Just the

18   Ticket.  Wasn't there a restaurant?

19   A       It was their restaurant, but they closed it.

20   Q       Okay.

21   A       Back in '99.

22   Q       Back in '99.  Okay.  All right.  You didn't work for

23   Robert at any time at the Warren station or anything, did

1    they actually did --

2                    THE COURT:  Just a minute.  This, I think,

3    has to be distinguished on this basis.  The officer doesn't

4    know that of his own personal knowledge.  It may or may not

5    be true.  The prosecution has the right to establish that,

6    the veracity of that through bringing whoever in that did the

7    test.  But for purposes of this cross examination, this

8    officer, in the scope of his employment, takes that as being

9    true.  Whether it is or not, his testimony at this point is

10   that he's assuming that's true.  Let's go on from there.

11                    MR. WATKINS:  Fine.

12   Q        (By Mr. Watkins)  Therefore, Detective Dillon was

13   the person who reported that to you; is that correct?

14   A        Yes, it was.

15   Q        And now, what did, what did you personally see at

16   that point when you went there?

17   A        On the 16th?

18   Q        Yes.

19   A        I saw item 211A.

20   Q        That's 311A?

21   A        311A, which is the registration form filled out with

22   Donna Roberts.

23            I was personally there when 311B was collected,

1    Monroe, but there's probably been about six to eight

2    instances where the prosecutor and Mr. Monroe have, they've

3    elicited hearsay testimony from Mr. Monroe in regard to

4    matters of other people telling him certain things or

5    whatever.  The last couple of times we've objected.  This is

6    becoming a constant situation where the prosecutor knows the

7    rules, how it's supposed to be done and what he's doing is

8    forcing us to object and that's simply making our side look

9    terrible in front of the jury.  It looks like we are

10   obstructionists and we don't want things to come in or

11   whatever and that puts us in a bad light.  The prosecutor

12   knows the rules.  He can do it by the numbers.  It goes back

13   to being in class 101.  So that's what we're asking.  If he

14   does it again, we're asking for a mistrial.  We're asking for

15   a mistrial now and definitely if he does it again.

16                THE COURT:  Do you have any response?

17                MR. WATKINS:  Yeah.  Your Honor, defense

18   counsel knows that if the question is improper he should

19   object.  Historically, with all the cases I've tried with

20   defense counsel, he has objected.  This witness, the things

21   that, and he should be specific, but the things that have

22   come out are going to be brought out by other witnesses, such

23   as there were four receipts, one was in the item that was

2366

1    provisions?

2                        MR. WATKINS:  It doesn't matter, Jim.  You

3    can argue that.  That's exactly what the rule says.

4                        MR. MORROW:  State Farm, it's --

5                        MR. CONSOLDANE:  How can you argue?

6                        THE COURT:  Over lunch, come up with the

7    case that varies my opinion at this time.  I think that the

8    phone record comes in.  That one case mentioned the -- the

9    predicate here is whether there is sufficient evidence to

10   support a finding in question is what it proposes to be.  I

11   don't think that there's any question, even by the defense at

12   this point, that that record is what it purports to be.

13                       MR. CONSOLDANE:  What about this, though,

14   321A?

15                       THE COURT:  Well, I'll get to that.

16                       MR. CONSOLDANE:  Okay.

17                       THE COURT:  That also comes under 902, the

18   phone record, 902(8).  It's accompanied by a certificate

19   authorized by law.  It's notarized.  The question on the

20   compilation, that's something that I don't think is proper

21   for an exhibit because it's a duplication of a portion of

22   321.

23                       MR. LEWIS:  Of the authenticated one.

1    belonged to our suspect there.

2    Q        And as a result of that information what, if

3    anything, did you do?

4    A        I collected a pair of tennis shoes that we believed

5    belonged to Nathaniel Jackson.

6    Q        Okay.  I'm gonna show you what's been marked as

7    State's Exhibit Number 227 and ask you to take a look at

8    that, please.

9    A        Yes.

10   Q        Are you able to identify that?

11   A        Yes.

12   Q        And could you briefly tell the Ladies and Gentlemen

13   of the jury what that is?

14   A        That is a hallway off of, I believe it was off the

15   dining room area and there was a pair of tennis shoes there.

16   Those are the ones that I collected at the scene.

17   Q        Okay.  And that hallway and dining area is located

18   where?

19   A        At 791 Wirt Street, Youngstown, Ohio.

20   Q        And does that picture accurately represent what you

21   saw on December 21st of 2001?

22   A        Yes.

23   Q        Okay.  I'm gonna hand you what's been marked as

2528

1    officers that are there.  And what we

2    found out was that according to police,

3    this individual's wife returned shortly

4    home, before midnight, and that she was

5    startled, because when she pushed the

6    garage door opener, instead of the garage

7    door opening, the garage door instead

8    closed and the light went on.  And again,

9    this is according to the police.  The

10   wife went into -- she pulled into the

11   garage and found her husband unresponsive

12   in the kitchen by the doorway and

13   subsequently called the police.  What I

14   saw was kind of a neat and somewhat tidy

15   home, except for the kitchen, which was a

16   bit messy, but not really unusual.  Went

17   in through the front door of the house,

18   to our right hand side was sort of a

19   parlor or sitting area.  To the left hand

20   side was a dining room area, and as I

21   turned into the dining room area, there's

22   a large glass table, and as I proceeded,

2824

1    MR. CONSOLDANE:  I'm going to

2  object.  She's been qualified as an expert in DNA,

3  but not in statistics.  I would object to her

4  giving statistical numbers.

5    THE COURT:  Isn't that part of what

6  a DNA expert does?

7    MR. CONSOLDANE:  She's expert in

8  testing, not in statistics.  Can we approach?

9  (In-chamber with counsel and witness, Brenda

10  Gerardi.)

11    THE COURT:  We're in-chambers out of

12  the hearing of the Jury.  The Defense waives

13  presence of Defendant?

14    MR. CONSOLDANE:  Yes.

15    THE COURT:  What is your objection?

16    MR. CONSOLDANE:  This young lady has

17  been qualified as an expert in DNA.  I understand

18  she knows how to run the test, how to perform the

19  test, how to read the test, but she has not been

20  qualified as a professional in the field of

21  statistics, and that is an entirely different

22  presented animal.  And to be able to give numbers

2825

1    like that in front of a Jury is -- it is out of her

2    field and it shouldn't be allowed.  It is only

3    someone that is an expert in statistics that can

4    testify as to the numbers.

5                    THE COURT:  What is your response?

6                    MR. WATKINS:  You have testified

7    previously, as to your reports?

8                    THE WITNESS:  Yes.

9                    MR. WATKINS:  The reports you

10   reported?  The report that you are testifying

11   about, is a report that you prepared?

12                   THE WITNESS:  Yes.

13                   MR. WATKINS:  And it is a standard

14   report?

15                   THE WITNESS:  Yes.

16                   MR. WATKINS:  That you do through

17   your training?

18                   THE WITNESS:  Yes.

19                   MR. WATKINS:  As a DNA expert?

20                   THE WITNESS:  Yes.

21                   MR. WATKINS:  And as part of your

22   training, and a part of your scientific work, you

2827

1    are accepted in the practice as far as your

2    testimony here concerning DNA analysis?

3                    THE WITNESS:  Yes.

4                    MR. WATKINS:  Thank you.

5                    MR. CONSOLDANE:  What kind of course

6    in statistics did you take?

7                    THE WITNESS:  I took a course, it

8    was by Columbus State University, or I'm sorry,

9    Columbus Community College, through BCI allowed me

10   to take that, plus we had a known statistician from

11   California, I believe, Charles Brenner came to us,

12   personally, to give us a statistics course on how

13   to do forensic statistics and he's world-wide

14   known.

15                   MR. CONSOLDANE:  How long was this

16   course that you took at Columbus Community College?

17                   THE WITNESS:  It was a day.

18                   MR. CONSOLDANE:  One day course?

19                   THE WITNESS:  Yes.

20                   MR. CONSOLDANE:  And how long was

21   the course that you had with this expert that came

22   in?

2828

1          THE WITNESS:  That was also a day,

2   but that does not cover all of the statistics

3   training that I have had.

4          MR. CONSOLDANE:  What other

5   statistics training have you had?

6          THE WITNESS:  Through out the whole

7   training of the two years that I have had --

8   throughout the training for two years, every case

9   that we work we have a statistic frequencies that

10  we're doing the math.  We have to read articles on

11  how the data basing has been produced through the

12  FBI, and we also have the FBI's manuals on how they

13  have come up.  Now I have not committed to memory

14  on how they have come up with their data base and

15  how the frequencies are collected, because those

16  are still ongoing.

17          MR. CONSOLDANE:  That is the point

18  I'm making.  You really don't know how they come up

19  with them.  You just read a manual and apply to

20  them.  If you apply it wrongfully, you end up with

21  the wrong statistics.

22          THE WITNESS:  FBI data base that

2829

1  comes through our computer, that is an FBI computer

2  and that cannot be tampered with.  We actually log

3  in our report and it generates the numbers for us.

4  The FBI does it.

5              MR. CONSOLDANE:  Then you didn't

6  generate this number yourself, it was generated by

7  someone else?

8              THE WITNESS:  It is a computer

9  generated formula.

10              MR. CONSOLDANE:  That is hearsay if

11  she didn't do it.

12              THE COURT:  Here's the way I see the

13  thing.

14              MR. WATKINS:  There's case law on

15  this.

16              THE COURT:  I know there's case law.

17  The Courts of Ohio have accepted it.  I personally

18  have problems with it, because I think the

19  foundation material upon which it is based is not

20  as complete as it could be, but that may not be

21  even a valid argument.  The manner in which it is

22  done, you only run certain portions of the total

2830

1    that could possibly be run, right?  You don't run

2    the DNA sequence out --

3                    THE WITNESS:  No, Sir.

4                    THE COURT:  That would be

5    economically impossible.

6                    THE WITNESS:  Right.

7                    THE COURT:  What the Courts have

8    accepted is that the amounts that they do gets it

9    into the statistics of having a probability in

10   favor of being correct.  The argument that this

11   lady or anyone else who does this is relying on

12   someone else's statistics.  Every time we get a

13   mortality table in there, we're doing the same

14   thing.  You tell the Jury that life expectancy is

15   such and such.  We rely on tables that are accepted

16   as being valid in our daily lives all the time.  It

17   has been accepted in the Courts of Ohio.  I see no

18   reason why this lady is not as qualified as any

19   other DNA expert to testify.  Part of her job, part

20   of her training is to utilize those statistics, and

21   to come up with a statistical analysis based on the

22   findings that she's had in this particular case.  I

2831

1    think your argument is better put to the methods

2    used.  That O.J. Simpson trial, that one attorney

3    from New York, he tore them apart on the

4    methodology used, but on the basis of your

5    objection, at this point I have to overrule it.

6            MR. CONSOLDANE:  I want to note my

7    exception.  I think that number one, that she's

8    relying on somebody else's work product which is

9    not subject to cross examination.

10           THE COURT:  That's entirely correct.

11           MR. CONSOLDANE:  And secondly, that

12   she doesn't have the admitted expertise, just two

13   days and some other work to be able to correctly

14   give what the statistics should be in the case.

15           THE COURT:  I doubt if there's a

16   person in the United States that could meet that

17   criteria.

18           MR. CONSOLDANE:  Then we shouldn't

19   be allowed to use DNA in Courts anyhow.  It is as

20   spurious as polygraph machines.

21           THE COURT:  It is a very valid

22   scientific thing, but it would cost a million bucks

2832

1    to do it, so there was absolutely no question about

2    the results, but the probabilities are on what

3    she's doing, the Court said it is enough to rely

4    on.

5              MR. WATKINS:  And that is why the

6    Defense can have their own witnesses if you have

7    contest on DNA.  Ohio allows to present whatever

8    statistical evidence they have.

9              THE COURT:  This guy doesn't happen

10   to be O.J. Simpson.

11             MR. WATKINS:  There are indigent

12   experts at times.  This Court has been generous in

13   its appointment throughout the years.

14             THE COURT:  That is the Court's

15   ruling.

16   (End of in-chamber discussion.)

17   Q.   (By Mr. Watkins)  Brenda, you indicated that

18             the visor had a mixture consistent with

19             the contributions from Robert Fingerhut

20             and Nathaniel Jackson, is that correct?

21   A.   That is correct.

22   Q.   And on the visor, what were your conclusions?

2924

1              to the Howland Police Department?

2  A.    Yes, they are.

3  Q.    Do you recall whom you gave them to?

4  A.    I know one gentleman was a Sergeant.  I don't

5              recall his name.

6  Q.    But those are the same records that you gave

7              to him?

8  A.    Yes, they are.

9  Q.    And the individual is Nathaniel E. Jackson?

10 A.    Yes.

11              MR. MORROW:  Nothing further.

12 CROSS EXAMINATION BY MR. LEWIS:

13 Q.    Kathy, my name is Jim Lewis, I represent

14              Nathaniel in this case along with

15              Mr. Consoldane.  Can I see the Exhibits

16              there?

17 A.    Yes.

18              MR. LEWIS:  Thank you very much.

19              THE COURT:  You may step down.

20 Thank you.

21              BRIDGET PAUL

22 being duly sworn according to law, on her oath,

2925

1    testified as follows:

2    <u>DIRECT EXAMINATION BY MR. MORROW</u>:

3    Q.   Could you please introduce yourself?

4    A.   I am Bridget Paul.

5    Q.   And Bridget, where do you live?

6    A.   Avalon, 203 Avalon.

7    Q.   Where is 203 Avalon located?

8    A.   In Howland.

9    Q.   Where is that in relation to Fonderlac?

10   A.   Just a block.  It is a street over.

11   Q.   And are you employed anyplace outside the

12        home?

13   A.   No.

14   Q.   And did you become familiar with a woman by

15        the name of Donna Roberts?

16   A.   In passing, yes.

17   Q.   And in particular, did you become familiar

18        with the kind of car that Donna Roberts

19        drives?

20   A.   I could recognize it.

21   Q.   If you could, just describe what the car kind

22        of looks like.

2926

1  A.   Burgundy and a sports car, and in good

2         condition.  Actually I'm not good at

3         brands of cars, but if I saw it, I would

4         know it.

5  Q.   I'm going to hand you what has been marked

6         previously as State's Exhibits 246, 247,

7         248 and 249 and ask you to take a look at

8         those, please.

9  A.   Okay.

10 Q.   Are you able to recognize those?

11 A.   Yes.

12 Q.   And if you could, tell the ladies and

13        gentlemen what they are.

14 A.   The last time you saw the car, this one, it

15        was the back end --

16 Q.   Does that appear to be the red burgundy car

17        that Donna Roberts would be driving?

18 A.   Yes.

19 Q.   And those four pictures show four different

20        angles of the car?

21 A.   Yes.

22 Q.   And what was it in particular that you

2927

```
 1            remember about that car now?

 2   A.   The bumper.

 3   Q.   And the back end?

 4   A.   Yes.  It was very unusual because I was behind

 5            it sitting and wanting it to go faster

 6            and I realized that it was different.  It

 7            had the license plate and then you had

 8            two orange reflecters on both sides.

 9   Q.   And the one picture there has the rear of the

10            car with those two orange reflecters?

11   A.   Right.

12   Q.   Now I am going to take you back to December

13            11, 2001.  Do you remember seeing that

14            car that evening?

15   A.   Yes.

16   Q.   And why do you remember that date in

17            particular?

18   A.   I was returning some tapes and I was behind

19            the car.

20   Q.   And did you get some information the next day

21            that made you remember that day in

22            particular?
```

2928

```
 1   A.    A friend called and said there was a homicide

 2              in Howland, down the street and I kind

 3              made a joke because I knew whose car I

 4              was behind.  I said I bet it is this

 5              person here and it was.

 6   Q.    And as a result of that, did you then contact

 7              the police and provide them with some

 8              information?

 9   A.    Yes.

10   Q.    And in particular, tell us when you first

11              remember seeing that car on Tuesday,

12              December 11?

13   A.    It was about 9:30, between nine and ten and I

14              saw it on Old 82.

15   Q.    And where is that in relation to your house?

16   A.    I am a block, I am actually -- my house is in

17              between Old 82 and New 82 and I was

18              taking Old 82, which is about two blocks

19              north of my house.

20   Q.    And where were you planning on going?

21   A.    To Giant Eagle.

22   Q.    What were you going to do at Giant Eagle?
```

2929

| | | |
|---|---|---|
| 1 | A. | Return tapes. |
| 2 | Q. | You started to leave your house with the tapes |
| 3 | | to go back to Giant Eagle? |
| 4 | A. | Yes. |
| 5 | Q. | Where did you first see -- you saw this car on |
| 6 | | Old 82? |
| 7 | A. | Yes. |
| 8 | Q. | And which direction was that car going? |
| 9 | A. | It was going towards Warren, which is west. |
| 10 | Q. | And it was on Old 82 as well? |
| 11 | A. | Yes. |
| 12 | Q. | And as you head -- why don't you describe a |
| 13 | | little bit about the area, Old 82, where |
| 14 | | it is around your house, how many lanes |
| 15 | | are on Old 82? |
| 16 | A. | It is two lanes. |
| 17 | Q. | One in each direction? |
| 18 | A. | Yes. |
| 19 | Q. | And as you continue, you said you were heading |
| 20 | | west towards Warren? |
| 21 | A. | Yes. |
| 22 | Q. | And what is the first major crossroad that you |

2930

1           would come to?

2    A.    46, it would be Howland Corners.

3    Q.    And 46 is --

4    A.    The first light you are saying.

5    Q.    The first major intersection?

6    A.    Okay, Route 46.

7    Q.    And does that 46 take you down, if you go

8          south, it takes you towards Eastwood

9          Mall?

10   A.    Yes.

11   Q.    And that is the back way into the mall?

12   A.    Yes.

13   Q.    And what is right there on the corner of 46

14         and 82?

15   A.    Giant Eagle.

16   Q.    It is kind of a plaza?

17   A.    A plaza, yes.

18   Q.    And are there other stores besides Giant Eagle

19         that is there?

20   A.    Yes.

21   Q.    And how do you get into the Giant Eagle

22         parking lot?  Are there a number of

2931

1          entrances to get into it?

2   A.   It would be on your left as you are going down

3          towards Howland, you would make a left.

4   Q.   And is Old 82 still two lanes at that point?

5   A.   No.  As soon as you cross through the light.

6          It goes into four lanes going towards

7          Warren.

8   Q.   And you have seen the car that Donna Roberts

9          has driven before, is that correct?

10  A.   Yes.

11  Q.   And was there anything characteristic about

12         the driver, that the driver of the car

13         would do that caught your attention?

14  A.   She would always when she smoked, she would

15         always put her hand out the window in a

16         certain manner and she would kind of

17         flick it like Hollywood style.  We would

18         make fun of it whenever we would see it

19         and once I got in the light, I could see

20         the hand and then I realized it was her.

21  Q.   So you followed this car from your allotment

22         down to 46?

2932

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And approximately how far is that? |
| 3 | A. | I'm not good at miles, maybe a mile. |
| 4 | Q. | And you are directly behind this red car? |
| 5 | A. | Yes. |
| 6 | Q. | And did you have to stop at the light at 46? |
| 7 | A. | Yes, we stopped.  Actually we were just going |
| 8 | | very slow, I think it just turned and we |
| 9 | | went through, so I don't think it was a |
| 10 | | red one, the one before that we stopped, |
| 11 | | which would be on the Howland-Wilson |
| 12 | | Road. |
| 13 | Q. | And that light changed and you proceeded on |
| 14 | | down to 46? |
| 15 | A. | Yes. |
| 16 | Q. | Do you know what the speed limit is out there? |
| 17 | A. | I think it is 40. |
| 18 | Q. | Do you know if you were doing the speed limit? |
| 19 | A. | No. |
| 20 | Q. | Did that appear odd to you? |
| 21 | A. | Yes, because no one was on the road but us and |
| 22 | | I was in a hurry and she was going very |

2933

1          slow and it was agitating me, so that is

2          why I was right on her tail and I

3          couldn't miss her license, because it was

4          right there and it took forever to get

5          down to Howland Corners.

6   Q.   And once you got to Howland Corners, what

7          happened then?

8   A.   She stayed in the right lane to the next light

9          and then I went off into Giant Eagle, I

10         cut the light there and went into the

11         Plaza on the left.

12  Q.   And what happened with her car?

13  A.   As I was going up to Giant Eagle, there was

14         like across, I glanced back and I saw her

15         car still sitting there, and I was just

16         wondering what is she doing, because it

17         was taking her forever to get down the

18         road, and then she was pausing awhile and

19         I don't think it was a red light.  Then I

20         went over and put my tape in the box and

21         I looked back and it looked like she was

22         moving.  As I pulled up, I dropped the

2934

1              tape off, I glanced over, and the car was

2              there and then I looked back again and it

3              wasn't there.

4    Q.   Did the length of time that she appeared to be

5              taking appear odd to you?

6    A.   It seemed, but now as I think back at how she

7              used to drive, she used to drive slow all

8              the time.  I don't know.  If no one was

9              on the road, I always go fast and I

10             thought she would be going faster, but

11             she was going pretty slow.

12   Q.   And this was approximately what time?

13   A.   Between 9:30 and 10:00.

14             MR. MORROW:  No further questions.

15   CROSS EXAMINATION BY MR. CONSOLDANE:

16   Q.   My name is Tony Consoldane, and I represent

17             Nathaniel and I'm going to ask you a

18             couple of questions.  How well do you

19             know Donna Roberts?

20   A.   I don't.

21   Q.   You have never met her?

22   A.   No.

2935

1   Q.   Have you ever seen her in the store shopping

2            or at any function?

3   A.   I have seen her in passing, but I never

4            stopped to make a conversation with her.

5   Q.   I guess the point I'm trying to make, have you

6            ever seen her outside of her automobile?

7   A.   Yes.

8   Q.   And where would that have been?

9   A.   At the store, Giant Eagle, and actually most

10           of the time in the car.

11  Q.   Did you ever see her drive any other car

12           besides this one?

13  A.   No.

14  Q.   And every time she would drive, she would have

15           her hand out with a cigarette in it?

16  A.   Pretty much.

17  Q.   Even in the Winter when it was cold?

18  A.   Actually, that night, it was a nice night and,

19           yes, she had her window down and her hand

20           was out, because I saw her flick the

21           cigarette and I am thinking -- she was

22           that type of person.

2936

1    Q.    You left your house on Avalon and you came up

2          to Market Street or Old 82.  Was she

3          already there at the stop sign or had she

4          already turned?

5    A.    You know, I don't know.  I didn't realize it

6          was her until --

7    Q.    You got to Howland Wilson?

8    A.    Yes.

9    Q.    So you don't know when she was coming out of

10         that street?

11   A.    I saw a light because the lighting is not good

12         in the allotment there and when I pull

13         out, there was a car, but I can't say if

14         it was her.

15              MR. CONSOLDANE:  Thank you.

16              MR. MORROW:  Nothing further.

17              THE COURT:  Thank you.

18              <u>KATHERINE THOMAS</u>

19   being duly sworn according to law, on her oath,

20   testified as follows:

21   <u>DIRECT EXAMINATION BY MR. MORROW:</u>

22   Q.    Could you please tell us your name?

3086

1          MR. CONSOLDANE:  We're here

2    in-chambers, out of the hearing of the Jury, and I

3    am waiving the presence of our client.  Yesterday

4    Mr. Lewis attempted to get some information from

5    Paul Monroe on to the record and the State objected

6    saying that they do not allow to attack the

7    credibility of a witness or the character of a

8    witness.  And I have never heard of anything of

9    that before.  I went home last night and tried to

10   research it.  I thought maybe this victims' rights

11   had been able to pass a new law or something, but

12   that is not true.  Nothing in there that says you

13   can't attack the character of the victim, and for

14   him to stop him from doing that was wrong.  It is

15   another reason to add to the list of the mistrial,

16   the reasons we should have a mistrial in this case.

17   And on top of that is that Mr. Watkins opened the

18   door.  He asked one of his own witnesses on direct

19   testimony, what kind of a guy was Robert Fingerhut,

20   and the guy went on to say, "Well, he was always

21   having jokes and he always had something to say."

22   Once he does that and he opens the doors, there's

3087

1   no reason why we can't talk about his character.

2   And we have indications that there are even some

3   credit card problems that happened, some credit

4   card fraud in his past, and the State has that

5   information, and I think that they should give that

6   to us, give it to Paul Monroe or Jim Teeple, and

7   let us get it in that way.

8              MR. LEWIS:  I would like to add,

9   Tony is correct, because the rules in evidence

10  actually indicate the fact is that if we have a

11  self-defense, which we're asserting here, that

12  we're allowed to go into the character of the

13  victim here.  The victim, as Mr. Watkins tried to

14  portray in the first part of the case, as a real

15  nice guy, everything above board, whatever, is not

16  true.  We have evidence of the fact that he

17  produced and had in his wallet, carrying with him,

18  a badge as a State's Attorney Special Investigator

19  from Florida which is a bogus thing.  He was never

20  ever a special investigator for the State office in

21  Florida.  He also carries a card and had in his

22  wallet he was carrying, was supposedly, he was a

3088

1    special agent for the Department of Justice and was

2    supposed to be issued by the U.S. Marshal's office

3    out of Cleveland.  Well, I contacted Cleveland and

4    David Harlow is the chief Marshal up there, and

5    before I indicated to him that Mr. Fingerhut was

6    deceased, he was going to have officers come down

7    here and talk to Mr. Fingerhut in regard to that

8    fraudulent card he was carrying, trying to

9    impersonate a special agent of the Department of

10   Justice.  And the point being is that Mr. Fingerhut

11   obviously is a violater of the law, and at the same

12   time the Prosecutor opened the door in regard to

13   that, so I think, and it is all relevant in regard

14   to this whole situation as to what means or what

15   steps he would take in order to try to secure his

16   own position in regard to this whole situation

17   involving all of the property in the name of Donna

18   Roberts.

19           This becomes very important because he's

20   the one who has the absolute motive in order to get

21   rid of Mr. Nathaniel Jackson.  Nathaniel Jackson is

22   a potential problem, and Donna Roberts could easily

3089

1   have married him or brought him in the house and

2   there's nothing in the name of Robert Fingerhut,

3   and that gives Mr. Fingerhut every motive in the

4   world to get rid of Mr. Nathaniel Jackson.  Because

5   he becomes the problem and if Donna Roberts says,

6   "Leave the house, it is not your car," everything

7   was in her name.  So, he had every reason in the

8   world to try and kill or to get rid of Nathaniel

9   Jackson.  There's no doubt about it because

10  everything that he enjoyed or whatever you want to

11  call it, belonged to Donna Roberts and he would be

12  out the door.  All of this is relevant.  It should

13  be brought in.  The Jury should know about it, and

14  there isn't anything about you can't attack the

15  character of a victim.  That is absolutely

16  incorrect.  Especially when you have a self-defense

17  according to the rules of evidence.

18          Now they can come back and say he was a

19  peaceful guy, but they have opened the door

20  already.  That is exactly what they have done.

21  They have started off with the idea that he's

22  peaceful, nice guy, and that is not the case.

3090

1      MR. WATKINS:  Your Honor, to start

2  with, the ruling that the Court made concerning the

3  collateral matters such as a badge or what he may

4  have done in Florida relative to a private

5  investigator, those matters clearly are not

6  relevant to this case, and there's nothing in the

7  record that in fact, the record would reflect that

8  the Defendant's version exactly, what happened, it

9  is already in the record.  What he was or what

10  identification he had, regarding Florida or what

11  credit cards he had, has nothing to do with this

12  case.  His character as to the past is irrelevant.

13  There's no information from the Defendant or

14  anyone, that that information has any bearing on

15  this case.  It is simply an effort to put on trial

16  the victim and there's plenty of law, that when you

17  go into character evidence, you have to have a

18  foundation.  And this is pure hearsay, what they

19  are talking about.  Secondly, the general rule on

20  self-defense and the rules of evidence would

21  clearly indicate that if the Defendant knew acts of

22  violence, obviously that could come in to be

3091

1    relevant in self-defense.  Even acts of violence

2    that were on record, we have no evidence, there's

3    nothing in our file.  They have had access to our

4    file regarding violence on the part of this victim.

5    That is irrelevant to this case because they don't

6    have anything regarding acts of violence by the

7    victim.  Therefore, the victim's character cannot

8    be an issue, because there's no evidence that deals

9    with the character of the victim as to propensity

10   for violence.  There's zero.  They have had

11   complete access and the reason they have

12   information about credit cards because they have

13   seen our whole file, and I think the rulings

14   yesterday were completely appropriate, and that

15   this case has to end at an appropriate time and

16   that this case should be dealing with what the

17   evidence is in the case, not Mr. Lewis'

18   speculation, not Mr. Consoldane's speculation of

19   what if, if this is possible.  We know that

20   Nathaniel Jackson, his only evidence is what the

21   admission is he made in his tape.  This stuff has

22   nothing to do with what Nathaniel Jackson said

3092

1    happened.

2         Now, I'm going to make a further motion

3    on my own.  I believe that the witnesses this

4    morning were listed by Mr. Lewis and

5    Mr. Consoldane, which deal with the lease dealing

6    with the vehicle or vehicles of the co-defendant in

7    this case, Donna Roberts, the business, the house

8    title, are totally irrelevant under Ohio law.

9    There's nothing in Ohio law that requires as a

10   matter of proof in evidence that a victim be the

11   owner of a vehicle.  In fact, the victim under Ohio

12   law, could be an owner that has possession, even if

13   it is unlawful.  So this evidence that we're

14   getting this morning is totally irrelevant, and

15   Your Honor, I would only request instead of making

16   a motion after each witness to strike, that we have

17   an opportunity that the Court would wait until

18   Monday, and let both sides brief this issue.  It is

19   important to the case because it is obvious that if

20   it isn't relevant, it can be confusing and the

21   purpose of Jury instructions and the purpose of

22   rulings is to make sure that the trial stays on

3093

1    track.

2                    MR. CONSOLDANE:  Your track.

3                    MR. WATKINS:  I said I am only

4    suggesting, Your Honor, that we brief this, as to

5    this issue, and then before the Jury, then the

6    Court could decide.

7                    MR. CONSOLDANE:  First of all, he

8    opened the door.  He opened the door when he talked

9    about his character.  He can't close it now.

10                   MR. WATKINS:  I was going to let

11   Chuck say a few words.

12                   THE COURT:  Go ahead.

13                   MR. MORROW:  Judge, evidence rule

14   404 talks about character evidence being

15   inadmissible to prove conduct, and indeed it says,

16   "Evidence of a persons's character or trait of his

17   character is not admissible for the purpose of

18   proving that he acted in conformity therewith on a

19   particular occasion, subject, to the following

20   exceptions.  Character of the accused."  And that

21   is 404-A(1).  "Evidence of a pertinent trait of his

22   character offered by an accused, or by the

3094

1  Prosecution to rebut the same is admissible;

2  however, in prosecutions for rape, gross sexual

3  imposition and prostitution, the exceptions

4  provided by the statute enacted by the General

5  Assembly applicable.  (2) Character evidence of the

6  victim.  Evidence of a pertinent trait of the

7  character of the victim of the crime offered by an

8  accused, or by the prosecution to rebut the same,

9  or evidence of a character trait of peacefulness of

10 the victim offered by the Prosecution in a homicide

11 case to rebut evidence that the victim was the

12 first aggressor is admissible."  In this case,

13 there has not been any evidence presented by the

14 Defense to suggest that the deceased was the first

15 aggressor.  We have speculation and allegations by

16 the Defendant that that is the case.  Indeed, now

17 that is the Defendant's own self-serving statement

18 that was made, and I think to allow -- to allow

19 allegations in respect to his character for

20 purposes of this badge that he was carrying, for

21 purposes of impeaching his character beyond

22 aggressiveness is irrelevant, and that is what they

3095

1    want to get into.  They are attacking his character

2    as a person, not his character as to whether he was

3    the first aggressor or not, so allow them to get

4    into questions about whether or not he had this

5    badge.  Whether or not the Cleveland Federal Office

6    was going to investigate him has nothing to do with

7    his aggressiveness tendencies.

8              MR. WATKINS:  And Jim Lewis would

9    have to bring witnesses to go into what position he

10   had in Florida, what position he had here.  That is

11   why you have the collateral evidence rule.

12             MR. LEWIS:  It is bogus.

13             MR. WATKINS:  You have to prove it.

14             MR. MORROW:  We're not attacking

15   whether he's truthful or not and that what their

16   attempt is to do to show that this man --

17             THE COURT:  I have been through this

18   with the Court of Appeals before and here's where

19   we're at.

20             MR. LEWIS:  Let me finish.  Now,

21   what Mr. Morrow said is that basically, just

22   because the Defendant's statement says

3096

1  self-defense, he calls it speculation, all of that,

2  and he doesn't consider that evidence at all.  It

3  is evidence.  The Jury can consider that.  They may

4  well believe that that is the fact in this case.

5  And in regard to the fact that Mr. Watkins says

6  there's not one iota of evidence in here that

7  Mr. Fingerhut was aggressive or did any violence,

8  whatever, that's not true.  And the letters from

9  Donna Roberts to Nathaniel Jackson within four or

10  five days of the time that this occurred, there's

11  an indication of the fact that he beat her up so

12  bad, he gave her black eyes, and she called

13  Someplace Safe and she also ran around town with

14  sunglasses on because he beat her up.  They

15  introduced it.  It is their letters.  They

16  introduced it.  It is in the record now.  So

17  there's evidence of that.

18          Let me make this simple.  In regard to

19  the witnesses we have this morning regarding these

20  properties, I'll give the Judge -- I'll give a

21  hypothetical.  Let's turn this around.  Let's turn

22  this around where Donna Roberts ends up dead.

3097

1    Mr. Fingerhut is the suspect and it just so happens

2    that Donna Roberts had a boyfriend named Nathaniel

3    Jackson.  And the Prosecution goes through and

4    finds out that all of the property was in the name

5    of Donna Roberts.  So Donna Roberts, it was all her

6    property to begin with.  Then they happen to find a

7    Will that says Donna Roberts decides to give

8    everything to a man by the name of Robert

9    Fingerhut.  Now, the State would turn around and

10   say that is introducible, this is evidence of

11   motive for him to kill her.  And if it is

12   introducible this way, it is introducible the other

13   way to show that this man had a motive to kill

14   Nathaniel Jackson because he was a threat to

15   whatever this man used and operated, during his

16   lifetime.  Even though he didn't own it, he was a

17   threat to him, and that is evidence of motive.

18   We're allowed to bring that in, and I don't care if

19   he calls it speculation, because that is evidence.

20   What we're doing, what he's trying to do is stop us

21   from presenting any defense at all and that is

22   ridiculous.

3098

1          MR. CONSOLDANE:  One other thing is

2   that whatever argument they had about character,

3   went out the door when they put a witness on the

4   stand and asked him what kind of a guy

5   Mr. Fingerhut was.  They did that.  If they did

6   that, once the door is opened, we're allowed to

7   walk through.

8          MR. WATKINS:  The questions about

9   employees' relationship is relevant in the sense of

10  to show that they knew, how well they knew him.

11  They had every opportunity with every employee to

12  deal with the relationship dealing with the

13  employee and the victim in this case.  They had

14  ample opportunity.  This evidence most importantly,

15  is the question of whether or not and the fact of

16  self-defense, they want to go into crimes dealing

17  with dishonesty or theft and fraud, dealing with

18  the self-defense case.  That is not appropriate.

19  It is not what the law --

20         MR. CONSOLDANE:  You opened the

21  door.

22         MR. WATKINS:  I did not.  I'll let

3099

1    the Court rule.

2                THE COURT:  Self-defense is an

3    affirmative defense.  And self-defense primarily is

4    based on the mental state of the, in this case, the

5    Defendant, at the time that the incident leading to

6    the claim of self-defense arises.  The Jury is told

7    through the instruction, you have to look within

8    the mind of the Defendant at the time that this

9    murder occurred, to see if a reasonable man would

10   think that he was justified in defending his own

11   life.  Now, the character of the victim is totally

12   irrelevant unless and until something occurs,

13   whereby it is made relevant and that is for the

14   presentation of the affirmative defense of

15   self-defense.  At that time, the Defense has a

16   right to go back and to review and to, if need be,

17   call the State's previous witnesses to establish

18   any actions maybe to establish that the victim had

19   a reputation for being aggressive, had made

20   threats.  But to bring that all up at this point it

21   is immaterial.  It is irrelevant because it only

22   becomes relevant if the affirmative defense of

3100

1   self-defense is raised.  You wish the Prosecution

2   to take it on good faith that you are going to

3   assert -- you have no duty to do anything.  So, you

4   get into the situation where you can get all kinds

5   of evidence in here.  If it exists, I don't know if

6   it does or not, of the deceased being this total

7   bad guy and a bum.  You know, one could infer that

8   he's some kind of a nut, because he carries these

9   bogus identifications around.  Or you can just as

10  easily infer, hey this guy collects these kinds of

11  things.  People collect all kinds of things.  You

12  ascribe a sinister motive to the fact that he had

13  those things, which may or may not be true.  It

14  only becomes relevant if self-defense is put up,

15  because the character of the victim himself, has

16  nothing to do with a justification for murder,

17  other than the relationship to the Jury question of

18  whether Nathaniel Jackson acted in self-defense.

19  If he had, within his knowledge, certain

20  propensities, or something had been said or done,

21  including the fact that he had beat up the wife a

22  couple of weeks before, only to lay the groundwork,

3101

1   as to what the Defendant was thinking at the time

2   he asserted the right of self-defense.  That is the

3   only relevancy that the character or history of

4   this victim has to this case.

5                   MR. CONSOLDANE:  How about the fact

6   that they made it an issue when they asked him what

7   kind of guy was Robert Fingerhut?  Now, am I

8   supposed to just ignore that and let them put that

9   in?

10                  THE COURT:  You didn't object to it.

11  The question was irrelevant to where we're at in

12  the case.

13                  MR. CONSOLDANE:  I didn't object.

14                  MR. WATKINS:  Also showed he was a

15  jokester.  Had all kinds of stupid stuff.

16                  MR. CONSOLDANE:  Once they go there

17  then, I am permitted to go there, also.

18                  THE COURT:  Tony, my point is, I

19  have no problem with whenever I have a close call,

20  I make it a practice to go with the Defendant, you

21  can't go wrong there.

22  (OFF THE RECORD)

3565

1        So, on the other hand, if you find that the State

2   failed to prove beyond a reasonable doubt that the aggravated

3   murder was done purposely or any of the other essential

4   elements of the offense of aggravated murder as charged in

5   Count One of the indictment, and the defendant has failed to

6   prove by a preponderance all of the essential elements of

7   self-defense, then your verdict must be not guilty of that

8   offense; and in that event, you will continue your

9   deliberations to decide whether the State has proven beyond a

10  reasonable doubt all of the essential elements of the lesser

11  included offense of murder.

12       Now, the offense of murder is distinguished from

13  aggravated murder in this count by the absence or failure to

14  prove prior calculation and design.

15       Before you can find the defendant guilty of the

16  lesser included offense of murder you must find beyond a

17  reasonable doubt that on or about the 11th day of December,

18  2001, and in Trumbull County, Ohio, the defendant purposely

19  caused the death of Robert S. Fingerhut.

20       I believe all the relevant terms have been

21  previously defined for you.

22       Now, with respect to this lesser included offense,

23  the defendant claims that at the time of the offense he acted

1    charges that the defendant committed the aggravated murder

2    while committing, attempting to commit, or fleeing

3    immediately after committing aggravated burglary, and that

4    the defendant was either the principal offender in the

5    commission of the aggravated murder or, if not the principal

6    offender, he committed the aggravated murder with prior

7    calculation and design.

8         Aggravated burglary has already been defined for

9    you.

10        Principal offender means one who personally performs

11    every act constituting the offense which, relative to this

12    specification, is aggravated murder.

13        While committing or attempting to commit means that

14    the aggravated burglary must occur as part of acts leading up

15    to or occurring during or immediately after the murder set

16    out in this charge and that the murder was directly

17    associated with the theft offense set out in this charge.

18    The question of whether the defendant killed Robert Fingerhut

19    before or after he committed a theft offense is not of any

20    consequence, that is it could occur leading up to, during, or

21    at the conclusion or immediately after.

22        Prior calculation and design has been previously

23    defined.

3572

1      Before you can find the defendant guilty of

2   Specification One to Count One you must find that the State

3   has proven beyond a reasonable doubt that the defendant

4   committed the aggravated murder while he was committing,

5   attempting to commit, or fleeing immediately after committing

6   aggravated burglary, and that the defendant was either the

7   principal offender in the commission of the aggravated murder

8   or, if not the principal offender, he committed the

9   aggravated murder with prior calculation and design.

10      If you find that the State proved beyond a

11   reasonable doubt all of the essential elements of this

12   specification, then your verdict must be guilty as to that

13   specification.  If you find that the State failed to prove

14   beyond a reasonable doubt any one of the essential elements

15   of this specification, your verdict must be not guilty as to

16   that specification.

17      Specification Two to Count One charges that the

18   defendant committed the aggravated murder while committing,

19   attempting to commit, or fleeing immediately after committing

20   aggravated robbery, and that the defendant was either the

21   principal offender in the commission of the aggravated murder

22   or, if not the principal offender, he committed the

23   aggravated murder with prior calculation and design.

1          I have previously defined, I believe, all relevant

2     terms to that.

3          Before you can find the defendant guilty of

4     Specification Two to Count One you must find that the State

5     has proven beyond a reasonable doubt that the defendant

6     committed the aggravated murder while he was committing,

7     attempting to commit, or fleeing immediately after committing

8     aggravated robbery, and that the defendant was either the

9     principal offender in the commission of the aggravated murder

10    or, if not the principal offender, he committed the

11    aggravated murder with prior calculation and design.

12          In Count Two of the indictment the defendant is

13    charged with, Count Two, aggravated murder.  Now, with

14    respect to this count, aggravated murder is purposely causing

15    the death of another while committing, attempting to commit,

16    or fleeing immediately after committing aggravated robbery

17    and/or aggravated burglary.

18          Before you can find the defendant guilty of

19    aggravated murder on this count you must find beyond a

20    reasonable doubt that on or about the 11th day of December,

21    2001, and in Trumbull County, Ohio, the defendant purposely

22    caused the death of Robert S. Fingerhut while the defendant

23    was committing, attempting to commit, or fleeing immediately

1    aggravated robbery but you also find that the defendant

2    proved by a greater weight of the evidence that he acted

3    knowingly while under the influence of sudden -- or sudden

4    passion -- influence of sudden passion or in a sudden fit of

5    rage, either of which was brought on by serious provocation

6    occasioned by the victim that was reasonably sufficient to

7    incite the defendant into using deadly force, then you must

8    find the defendant not guilty of murder and guilty of

9    voluntary manslaughter.

10        If you find defendant not guilty of aggravated

11   murder as charged in Count Two, you will not consider any

12   specification relative to Count Two.

13        If you find the defendant guilty of aggravated

14   murder as charged in the indictment, it is your duty to

15   deliberate further, this is aggravated murder on Count Two,

16   you must then decide additional factual questions, which we

17   call specifications, relative to this count.  This count sets

18   forth two specifications.  You will proceed to consider

19   whether each specification to this count has been proven

20   beyond a reasonable doubt if, and only if, you determine that

21   the defendant is guilty of this count.  If your verdict is

22   not guilty as to this count, then you would not consider any

23   of the specification attached.  If your verdict is guilty as

1   specification, then your verdict must be guilty as to that

2   specification.  If you find that the State failed to prove

3   beyond a reasonable doubt any one of the essential elements

4   of the specification, your verdict must be not guilty as to

5   that specification.

6          Specification Two as contained in Count Two charges

7   that the defendant committed the aggravated murder while

8   committing, attempting to commit, or fleeing immediately

9   after committing aggravated robbery, and that the defendant

10  was either the principal offender in the commission of the

11  aggravated murder or, if not the principal offender, he

12  committed the aggravated murder with prior calculation and

13  design.  And again I've defined all those terms for you.

14         Before you can find the defendant guilty of

15  Specification Two attached to Count Two you must find that

16  the State has proven beyond a reasonable doubt that defendant

17  committed the aggravated murder while he was committing,

18  attempting to commit, or fleeing immediately after committing

19  aggravated robbery, and that the defendant was either the

20  principal offender in the commission of the aggravated murder

21  or, if not the principal offender, he committed the

22  aggravated murder with prior calculation and design.

23         The specifications set forth in the indictment each

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Volume I Appendix to Nathaniel E. Jackson's Notice of Application for Reopening was forwarded by regular U.S. Mail to Dennis Watkins, Trumbull Count Prosecuting Attorney and Luwayne Annos Assistant Prosecution Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building Warren, Ohio 44481 on this 4th day of April, 2006.

RANDALL L. PORTER
Assistant State Public Defender