ORIGINAL

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :

      Appellee,                      :                                    ON COMPUTER-ALM

-vs-                                    :        Case No. 03-137

NATHANIEL E. JACKSON,                   :

      Appellant.                     :        Death Penalty Case

---

# VOLUME II

## APPELLANT'S APPENDIX OF TRANSCRIPT PAGES
## IN SUPPORT OF HIS APPLICATION FOR REOPENING

---

FILED

APR 0 4 2006

MARCIA J. MENGEL
SUPREME COURT OF OHIO

# NATHANIEL JACKSON

# MITIGATION TRANSCRIPT

4

1    <u>Thursday, November 14, 2002, Mitigation Hearing,</u>

2    <u>In Open Court at 1:00 p.m.:</u>

3            THE COURT:  We have several matters

4    for the record before we call the Jury up.  It is

5    come to my attention that Mr. Lewis, co-counsel on

6    the defense team, has had a little stay in the

7    hospital, nothing serious.  He's back home now, but

8    because he's medicated, does not feel it would be

9    appropriate to appear on the defense team today.

10   Mr. Consoldane, I have asked you, with the

11   Prosecutor, whether or not you had any motion or

12   wish to have this matter continued until Mr. Lewis

13   is available, and what is your reply to that?

14           MR. CONSOLDANE:  I have talked with

15   Mr. Jackson and we do not think that any delay at

16   this point would be wise.  I have also talked with

17   Tom Wright, who has a contract to work with our

18   office.  Mr. Wright has gone through the three day

19   death penalty seminar.  He also meets the other

20   requirements.  He, however, is not certified.  He

21   has not applied for the certification and would ask

22   the Court to permit him to sit as co-counsel in

5

1   this case with me, so we can get this finished.

2                   THE COURT:  May I speak to your

3   client?

4                   MR. CONSOLDANE:  Yes.

5                   THE COURT:  Mr. Jackson, are you in

6   agreement with proceeding without Mr. Lewis being

7   here and having Mr. Wright and Mr. Consoldane?

8                   THE DEFENDANT:  Yes, Sir, Your

9   Honor.

10                  THE COURT:  I understand that I

11  would consider a continuance until probably Monday,

12  if you wished.

13                  THE DEFENDANT:  Yes, Sir.

14                  THE COURT:  You have talked with

15  your attorney and have agreed with him that it is

16  in your best interest to go forward today?

17                  THE DEFENDANT:  Yes, Sir, Your

18  Honor.

19                  THE COURT:  Fine.  In regard to Mr.

20  Wright, the Court is aware that he practices in our

21  county and practices before this Court on a regular

22  basis.  And I have no problem with allowing him for

6

1  the purposes of this particular part of the

2  proceeding to proceed.  I think that even if Mr.

3  Lewis is not available and Mr. Consoldane and his

4  client wishes to proceed with just the one lawyer,

5  that I would find no problem with that, but two

6  heads are better than one.  The request of

7  Mr. Consoldane to have Mr. Wright seated at counsel

8  table to assist in any way possible, is approved.

9  The State have any objection to that?

10              MR. WATKINS:  No.  The State would

11  make it clear that we would not object to a

12  continuance if the Defendant and his counsel, and I

13  recognize that Attorney Consoldane is first chair

14  in this case, and I respect their desire, but I

15  want the record to reflect that the State also

16  would concur with the continuance if the Defendant

17  desired to have that in order that Mr. Lewis

18  participate in the second chair.

19              MR. CONSOLDANE:  Dennis, do you

20  object to Mr. Wright sitting as co-counsel, even

21  though he doesn't have the actual certification at

22  this point?

7

1          MR. WATKINS:  I have no objection

2    with Mr. Wright.  I think he could fill in and as I

3    understand it, the Defendant is waiving any right

4    that he would have under the statute to have

5    someone certified; is that right, Tony?

6          MR. CONSOLDANE:  That is right.

7          THE COURT:  Very good.  Now was

8    there another issue?

9          MR. CONSOLDANE:  Yes.  Dr. McPherson

10   is our expert, which we were allowed to hire

11   through permission of the Court and she has written

12   a summary and a background about Mr. Jackson, but I

13   think it is also important that she be able to talk

14   to the Jury about his family members and she's

15   going to, but I think it would be better able to

16   help me in Court, when I am interviewing the family

17   members, if she's here with me.  She knows far more

18   about the background of the family than I do, and

19   it was -- I got a little shorthanded with Mr. Lewis

20   going into the hospital and I just got ahold of Mr.

21   Wright this morning, and there's nothing that she's

22   going to testify to any differently.  She's already

8

1   filed her report and given a copy to the

2   Prosecutor, and I'll have a copy for the Court.

3   And I just believe that her aid in this matter

4   would help me a lot.

5                THE COURT:  The State?

6                MR. WATKINS:  We object to the

7   presence of an expert witness in the Courtroom.

8   Obviously, these witnesses that testify, I may have

9   questions of the expert and if the expert were

10   here, it would defeat the purpose of separation of

11   witnesses.  At no time in my memory, has any expert

12   witness been at trial table in this kind of

13   scenario, and therefore, we strongly object.  I

14   would further note that if Attorney Consoldane

15   feels he's not prepared because of the short

16   notice, that this case should be continued until

17   he's prepared and able to go forward without the

18   witness being in the courtroom, because to me that

19   is not good reason to have a witness in the

20   courtroom, when there's a separation of witness

21   order.

22                MR. CONSOLDANE:  We had the

17

1    Jury present at 1:20 p.m.)

2              THE COURT:  Good afternoon.  We're

3    now ready to proceed with the second phase of this

4    trial, which is necessary because of the finding on

5    phase one.  You will be requested at the conclusion

6    of this presentation to make a recommendation on

7    sentencing to this Court.  I would like to tell you

8    that that word recommendation is argued back and

9    forth between counsel as to the meaning of it.

10   Under our law, a Judge has no power to ever

11   increase a penalty, only to decrease a penalty, but

12   only if after an independent finding by the Court,

13   the Judge, there's a finding that there was not

14   sufficient evidence for the Jury, to make the

15   finding that they did.  So, your recommendation is

16   a recommendation to the Court, and it is more than

17   that.  It is your decision, and it would not be

18   tampered with by the Judge unless you have gone

19   awry somewhere.  I would like to know at this time,

20   if any of you have now formed such a fixed opinion

21   on what sentence you should -- that should be

22   entered in this second phase, or has so closed your

23

1   introduce the evidence that was on the record and

2   admitted under phase one.  You wish to proceed?

3             MR. CONSOLDANE:  I'll enter an

4   objection at this time until they can prove that

5   what individual pieces of evidence are necessary

6   for the second portion.

7             THE COURT:  We have reserved that

8   right to you on the record.  You may proceed.

9                 RAYMOND DICKERSON

10  having been duly sworn according to law, on his oath,

11  testified as follows:

12  DIRECT EXAMINATION BY MR. CONSOLDANE:

13            MR. CONSOLDANE:  Before I start, all

14  of the witnesses have requested that they not be

15  photographed.

16            THE COURT:  They have been notified.

17  Q.   Raymond, would you state your name for the

18        Jury?

19  A.   Raymond Dickerson.

20  Q.   Where do you live?

21  A.   I live in Youngstown.  I live at 13 South

22        Pearl Street.

24

1  Q.  Do you know Nathaniel sitting over there?

2  A.  He's my stepson.

3  Q.  You have known him since he's been about 15?

4  A.  Since 15 years old, I have known Nathaniel.

5  Q.  And the entire time that you have known him,

6      has he always been respectful to you?

7  A.  Yes, Sir.

8  Q.  Has he been respectful to his mother?

9  A.  Yes, he has.

10 Q.  And was his grandmother, how about his

11     grandmother?

12 A.  Very respectful with his grandmother.

13 Q.  You didn't know him much before 13, but after

14     the age of 15, did he continue to live

15     with his mother?

16 A.  Yes, he has.

17 Q.  And did there come a time when he moved out?

18 A.  He got older, when he moved out.

19 Q.  How old was he, 17 when he moved out?

20 A.  About 17, somewhere like that.

21 Q.  And do you know where he moved, when he moved

22     out?

25

1    A.    No, I did not.

2    Q.    After age 17, you didn't see a whole lot of

3              Nathaniel?

4    A.    No, I haven't, no, I didn't.

5                   MR. CONSOLDANE:  Thank you.  Nothing

6    further.

7                   MR. WATKINS:  No questions.  We

8    thank the witness.

9                   THE COURT:  You may step down.

10                 <u>TAUSHIA KORNEAGAY</u>

11   being duly sworn according to law on her oath,

12   testified as follows:

13   <u>DIRECT EXAMINATION BY MR. CONSOLDANE:</u>

14   Q.    How are you today?

15   A.    Fine.

16   Q.    Would you introduce yourself to the Jury,

17              please?

18   A.    Taushia Korneagay.

19   Q.    And where do you live, Taushia?

20   A.    203 East Florida Street.

21   Q.    And how are you related to Nathaniel Jackson?

22   A.    I am his sister.

26

1    Q.    You have known him pretty much all of your

2          life?

3    A.    Yes, I have.

4    Q.    Are you older or younger?

5    A.    I am the next to the youngest.  There's four

6          of us.

7    Q.    And how has Nathaniel treated you?

8    A.    He treated me really good.  He loved me just

9          like I love him.  He's really kind.  He

10         did a lot for me.  I got four kids.

11   Q.    He come over and help out with the kids?

12   A.    Yes, he helped out a lot with the kids.  Kept

13         them, washed them, everything.  He kept

14         them, he loved them.  He did a lot for

15         us.

16   Q.    And did there come a time when you were still

17         living at home and Nathaniel moved out?

18   A.    Yes.

19   Q.    And do you know where he went out and moved

20         to?

21   A.    I was young at the time, because I am only 25.

22         He stayed with my grandmother.

27

1   Q.   Pretty much living on the street?

2   A.   He ain't living on the street, because my

3          grandma took him in.

4   Q.   You like to see -- would you like to see the

5          Jury save his life?

6   A.   Yes, I would.

7   Q.   Would you like to be able to write to your

8          brother in prison?

9   A.   Yes.

10           MR. CONSOLDANE:  Thank you.  Nothing

11  further.

12  CROSS EXAMINATION BY MR. WATKINS:

13   Q.   Taushia, you remember me, we have talked a

14          couple of times?

15   A.   Yes.

16   Q.   You are 25 and your brother is 30 years old?

17   A.   Yes.

18   Q.   And have you visited him in jail?

19   A.   Yes, I have.

20   Q.   And when you were raised in Youngstown, you

21          had your mother and your grandmother next

22          door?

28

1    A.    Yes.

2    Q.    And would you describe Nathaniel as a very

3          smart person?

4    A.    I describe him as very smart.

5    Q.    Did he have talent as an artist?  Could he

6          draw?

7    A.    Yes.  He always kept busy, yes.

8    Q.    When you were a child growing up, did you ever

9          see your brother abused?

10   A.    No.

11   Q.    He was treated well by your mother and your

12         grandmother?

13   A.    Yes, he was.

14   Q.    And by his stepfather?

15   A.    Yes.

16   Q.    And you really didn't know his father, did

17         you?

18   A.    No, not too good.

19   Q.    And you work pretty hard yourself to bring up

20         your four children?

21   A.    Yes, I have.

22   Q.    And you haven't been in any real problem, have

29

1         you?

2    A.   No.

3    Q.   And when you were a child and when he was a

4              child, were you taught right from wrong?

5    A.   Yes, we have been.

6    Q.   Did Nathaniel Jackson go to church?

7    A.   Yes, my Mom kept us at church.

8    Q.   He knew right from wrong?

9    A.   He knows right from wrong.

10   Q.   And your mother bring you up to be responsible

11             for what you do to others?

12   A.   Yes.

13             MR. WATKINS:  Thank you.

14             THE COURT:  Any redirect?

15   REDIRECT EXAMINATION BY MR. CONSOLDANE:

16   Q.   You still keep in contact with Nathaniel?

17   A.   I still have contact with him.

18             MR. CONSOLDANE:  Thank you.  Nothing

19   further.

20             THE COURT:  You may step down.

21   Thank you very much.

22

30

1                       <u>LORRAINE RUE</u>

2    having been duly sworn according to law, on her oath,

3    testified as follows:

4                   MR. WATKINS:  I have no objection

5    for her to remain, the mother to remain there.

6    (Also seated on the witness chair is Shaylese

7    Townsend Jackson.  Both Lorraine and Shaylese are

8    on the witness chair.)

9    <u>DIRECT EXAMINATION BY MR. CONSOLDANE</u>:

10   Q.    Lorraine, Shaylese is your daughter?

11   A.    Yes.

12   Q.    It is also Nathaniel's daughter?

13   A.    Yes.

14   Q.    Has Nathaniel seen his daughter before?

15   A.    Yes.

16   Q.    And has he brought her things?

17   A.    Yes.

18   Q.    And what grade is Shaylese in school now?

19   A.    Second grade.

20   Q.    Shaylese, what is your favorite subject in

21             school?

22   A.    (Shaylese)  Playing games.

32

1    Q.      Pauline, I'm going to direct your attention

2            back to when Nathaniel was growing up.

3            When he went to school, how did he do in

4            school?

5    A.    He did pretty good in school.

6    Q.    Did he have any problems in school?

7    A.    No, not really.

8    Q.    There come a time when Nathaniel quit school?

9    A.    Yes, he did.

10   Q.    Where did he go to live at after that?

11   A.    He was staying with me and my mother.  I was

12           staying with my mother at the time.

13   Q.    Was this a pretty rough neighborhood?

14   A.    No.  We don't stay in a rough neighborhood.

15   Q.    One time you wrote a letter to the school

16           telling them to excuse Nathaniel, because

17           he had been shot?

18   A.    No.

19   Q.    You don't remember that?

20   A.    No.

21   Q.    You don't remember Nathaniel being shot?

22   A.    No, I don't.  Our neighborhood was not rough.

33

1   Q.   Do you keep in touch with Nathaniel?

2   A.   Yes, I do.

3   Q.   You come visit him?

4   A.   Yes.

5   Q.   And if he was going to be sent to prison,

6         would you continue to visit him?

7   A.   Yes, I would.  I would love to.

8   Q.   You would rather visit him in prison than

9         visit his grave?

10   A.   I would visit him in prison, yes.

11           MR. CONSOLDANE:  Thank you.

12           MR. WATKINS:  No questions.

13           THE COURT:  You may step down.

14           DR. SANDRA McPHERSON

15 having been duly sworn according to law, on her oath,

16 testified as follows:

17 DIRECT EXAMINATION BY MR. CONSOLDANE:

18 (Defendant's Exhibit P Marked for Identification.)

19 Q.   Doctor, how are you this afternoon?

20 A.   Just fine.

21 Q.   Would you introduce yourself to the Jury,

22         please?

40

1    those who work with them.  He has had

2    very little in the way of work history.

3    He's 30 years old, but I think his

4    longest period of work was about six

5    months, maybe less.  Perhaps less.  And

6    it was a piece work or periodic work

7    situation.  He was never full time.  He

8    dropped out of school at the 11th grade,

9    and his involvement or his record at that

10   point included juvenile offenses.  He

11   wound up once he was an adult, going off

12   and living on his own.  He talked about

13   deciding he wanted to be on his own.  His

14   mother kind of hoping he wouldn't leave,

15   but supporting him in being independent

16   as he saw it.  Unfortunately, his idea of

17   independence was to basically survive on

18   the streets and the streets he was

19   surviving on were fairly violent ones.

20   During the ensuing ten years or so, he

21   was shot at least four or five times.

22   When he was -- well, before he left the

45

1          accessible.

2                    My read on his situation is that the

3          family has been able to function only in

4          a relatively marginal fashion and

5          certainly has not been able to intervene

6          in the patterns of behavior that have

7          been present practically since he was

8          visible in the community.

9    Q.    One thing as part of this process, you and the

10         psychologist you work with, have

11         administered several tests to Nathaniel,

12         is that not correct?

13   A.    That is correct.

14   Q.    First of all, would you explain to the Jury

15         what the level of mental retardation

16         would be?

17   A.    We generally consider a person to have mild

18         mental retardation if they are testing at

19         or below 60 on an I Q test and also if

20         there are other indications, that their

21         life adjustment is impaired and in need

22         of certain kinds of support or help.   A

46

1          person who is functioning above that

2          level is in a borderline range and as we

3          move on upward into a low average range,

4          an average range and above.

5  Q.   What I noticed is that you tested Nathaniel

6          and he had a full scale IQ of 84.  Is

7          that correct?

8  A.   That is correct.

9  Q.   And but looking at where you cited in the

10          school records, is that he had an IQ of

11          about 70 when he was tested twice in

12          school?

13  A.   Correct.

14  Q.   That is kind of amazing that somebody could

15          raise their IQ so many points?

16  A.   Yes, it is.  It is a very unusual pattern.

17          There were two testings during school and

18          I realize the report I put down fourth

19          grade and tenth.  It was actually seventh

20          and tenth grade.  In both of those

21          testings he was at or around the 70

22          level.  His improvement and IQ quite

47

1   frankly, I attribute it to a couple of
2   things.  First of all, his level of
3   cooperation and attention and focus was
4   very poor during his school years,
5   throughout.  At no time was he ever
6   tested, for example, after being
7   medicated for his condition, because he's
8   never been medicated for his condition
9   except what he might be doing to himself.
10  When we tested him, he was in an entirely
11  structured situation in the jail and he
12  had spent some time in a structured
13  situation prior to that time when he was
14  incarcerated.  His degree of attentional
15  deficit was somewhat less and certainly
16  his degree of cooperation was higher in
17  that he wanted to try and produce what he
18  could for us, since we were working on a
19  defense for him.  So, he did better.  The
20  pattern of the scores is consistent with
21  the educational deficit and also with
22  some underlying learning disabilities.

48

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | But his full scale IQ is 84.  In fact,                 |
| 2  |    | based partly on the sub test and partly                |
| 3  |    | on what we know about the test bias, he's              |
| 4  |    | an African American who has not had a                  |
| 5  |    | good education, the test is biased                     |
| 6  |    | against him.  The chances are he's of                  |
| 7  |    | average ability, and under the right                   |
| 8  |    | circumstances could have been quite                    |
| 9  |    | reasonably successful in life.                         |
| 10 | Q. | And he even has a little bit of artistic               |
| 11 |    | ability, too?                                          |
| 12 | A. | This is noted in the records and mentioned by          |
| 13 |    | others, yes.                                           |
| 14 | Q. | Now, you mentioned that he kind of self                |
| 15 |    | medicated himself.  The proper medication              |
| 16 |    | for him at the time, probably would have               |
| 17 |    | been Ritalin?                                          |
| 18 | A. | Ritalin or there's psycho-stimulants is what           |
| 19 |    | they are, but what they appear to do is                |
| 20 |    | to intervene in the operation of the                   |
| 21 |    | systems, so that it works better.  They                |
| 22 |    | don't appear, for at least for those for               |

49

1        whom they work, and we need to know more

2        about that, but for that subsection of

3        people for whom they work, they appear to

4        allow the inhibiters to work better.

5        Clearly he was never tried, even tried on

6        any kind of medication program.  There's

7        a letter in the school records from a

8        teacher, who identifies him in her eyes

9        as being emotionally ill and talks about

10       his behavior, talking to himself and

11       talking to something which is not there.

12       There are no signs that he's psychotic,

13       but I am quite sure she was seeing a lot

14       of discontrolled verbal behavior, that is

15       part of his situation.

16   Q.  Matter of fact, in your summary, one of your

17       diagnoses was a major impairment.  What

18       does that mean?

19   A.  I am looking at the --

20   Q.  That would be Axis V.

21   A.  That is the -- it is an adjustment scale and

22       40, there are behavior descriptions for

50

1 assigning different level numbers. His

2 behavior and functioning allows me to

3 assign him a score of 40, which is

4 indicative of major impairment in several

5 areas of function. You can also get a 40

6 if you have an impairment in one specific

7 area of function, if it is psychotic,

8 lack of ability to appreciate reality.

9 That is not the case here, but what we

10 have is a number of areas where he has

11 not got the skills to succeed, most of

12 them relating to society, but also his

13 ability to deal in relationship context,

14 his ability to work in a consistent

15 fashion, to use whatever abilities he has

16 have never been in evidence.

17 Q. And then on Axis II, you indicated he has an

18 anti-social personality disorder.

19 A. That is correct.

20 Q. You added a caveat to that though?

21 A. The anti-social personality disorder is a

22 diagnosis that describes a long term

51

1    impairment in an individual's ability to

2    conform their behavior to social

3    expectations, to stay out of trouble, to

4    not get into legal difficulties, to

5    control their reactions and not behave

6    impulsively indestructive ways.  All of

7    which describe aspects of this

8    Defendant's behavior.  However, the

9    category also overlaps with a group of

10   people who are particularly serious, we

11   call them psychopaths or sociopaths and

12   they have no ability or very little

13   ability to identify with the needs of

14   others, to exhibit loyalty, to have any

15   real kind of connectness to others and

16   they often commit extraordinarily heinous

17   crimes when they are seen in the context

18   such as this.  This gentleman certainly

19   meets the requirements for an anti-social

20   personality disorder.  He does not meet

21   the requirements for that other category

22   and he has shown the capacity to be loyal

52

1    within his own group.  In his discussion

2    of his own life, one of the

3    disappointments he detailed was finding

4    out that a friend betrayed him.  He

5    expected, since he had a friendship, that

6    that wouldn't happen, so he has the sense

7    of what a friend is supposed to do, and

8    he was surprised when that doesn't take

9    place.  He himself was loyal to the

10   codefendant, rather than simply trying to

11   get out of it and blame everything on

12   her.  People who would do the latter are

13   more in that category of sociopathic

14   behavior.  So he's clearly a person whose

15   behavior has been formed in an

16   anti-social world and who has exhibited

17   anti-social qualities.  He merits the

18   diagnosis as do a significant proportion

19   of those who are incarcerated, but he

20   does not mirror the diagnosis of an

21   individual who is incapable of relating

22   to people.

54

```
 1            follow.  The fact that he tends not to

 2            get into trouble also fits with the fact

 3            that he does have the capacity to get

 4            along with other people and to have some

 5            people oriented skills.  So, he also

 6            retains, of course, a loyalty and a love

 7            for his family.  So, there's human

 8            feeling that is part of the way in which

 9            he operates.

10    Q.   And how about the relationship with Donna

11            Roberts?

12    A.   It was clearly a very destructive relationship

13            for the victim most assuredly, but also

14            for the people involved.  Up until the

15            time that relationship took place,

16            Mr. Jackson, although he had an

17            anti-social life style, criminal life

18            style in many respects, he had not been

19            involved in this kind of activity that

20            leads to murder or serious harm to other

21            human beings.  He's basically an

22            individual -- well, he's an individual
```

55

1        who has had some bad experiences in a

2        relatial context.  He's very

3        insecure, though he tries to pretend that

4        he's very adequate.  Again, something

5        that we find in ADHD kids who have been

6        in an environment that basically tells

7        them they are bad kids, so they have to

8        do something about how they feel about

9        themselves.  In this relationship, I

10       think he received a certain amount of

11       reassurance.  He was told that he was a

12       great guy.  It made him feel good.  It

13       made him feel like he was somebody

14       special.  The relationship was built on

15       that.  The relationship has a couple of

16       interesting characteristics.  It was a

17       bi-racial relationship.  And it was also

18       a relationship between Mr. Jackson and a

19       much older woman.  Mr. Jackson's prior

20       relationships though at least in one

21       instance, perhaps more than one, but

22       certainly in one, there was a white

84

1    A.    Yes.

2    Q.    What does this mean?

3    A.    It meant that it was somewhat sloppily

4          executed, but I did not see the kinds of

5          signs that I would expect to see if there

6          was a gross neurological defect of a type

7          that you might get with serious cerebral

8          damage.

9    Q.    Was the Defendant at times like indifferent,

10         didn't care?

11   A.    The performance would suggest he was not

12         invested in this test.

13   Q.    Then you dealt with the wide range of

14         achievement tests; do you recall that?

15   A.    Correct.

16   Q.    And then you conclude above results reflected

17         significant relative deficit in reading

18         skills?

19   A.    Correct.

20   Q.    What does that mean?

21   A.    It means that the reading sub test, he did not

22         do as well as he did on the spelling and

85

1         arithmetic sub test, which were clearly

2         at an average or better level.  Reaching

3         a high school grade equivalent

4         performance, whereas his reading grade

5         level on this test was fifth grade.  In

6         all cases, the achievement was adequate

7         for day-to-day living.

8   Q.    You read Donna Roberts' letters, the

9         communication between the two?

10   A.    Correct.

11   Q.    Did you find that there was pretty good

12         communication and use of words, even

13         though some words he would not spell

14         correctly?

15   A.    That is a reasonable statement.

16   Q.    Now, what is the MMPI II?

17   A.    The Minnesota Multi-Phasic Personal Inventory,

18         second revision is a true, false item

19         test, which allows one to make inferences

20         as to whether there are any serious

21         psychological or mental illness problems,

22         whether there are some character traits

179

1    MR. WATKINS:  Thank you.  Take ten
2  minutes and assemble outside.  Do not express
3  anything or form any opinion until you get back
4  there.
5  (Jurors in recess at 11:45 A.M.)
6  (Jurors commenced deliberations at 11:55 A.M.)
7    THE COURT:  To the alternates, we
8  have had a meeting at Side Bar, and at this point,
9  it is proper that I discharge you from any further
10  duties.  We could not put you into the Jury at this
11  point if something would happen to one of them.  We
12  would have to deal with that on its own merits.  It
13  is only possible to put you in up to the point
14  where I sent them out just now.
15    I do wish to sincerely thank each of you.
16  You have been very attentive.  I can't stress to
17  you how unusual that is.  We get this many people,
18  and I have been watching the Jury, whenever I had
19  my eyes open, I have been watching the Jury and I
20  have never seen anybody other than giving full
21  attention to what is going on.  It's unusual.  You
22  folks have served us well.  Thankfully, we did not

# DONNA ROBERTS

# TRIAL TRANSCRIPT

1   or not, not what the defendant does or doesn't do.  Okay?

2   Very good.

3           Mr. Bailey, are you ready to proceed with your -- or

4   I'm sorry.  Mr. Becker.

5                   MR. BECKER:  Yes, Your Honor.

6                   THE COURT:  I always give deference to age

7   is what it is; right?

8                   MR. BAILEY:  Judge, may we approach for a

9   second?

10                  THE COURT:  Yeah.  Sure.

11  (Whereupon, a conference was held at the bench.)

12                  THE COURT:  I mentioned yesterday, both

13  sides wanted me to emphasize this, that the opening

14  statements are not evidence.  Remember, I told you, nothing

15  the attorneys say throughout the trial is evidence.  The

16  evidence will proceed and start right after the opening

17  statements.  And the simplest way to cover the opening

18  statements is you should give equal attention to both sides,

19  whatever they say.  Okay?

20          Mr. Becker.

21                  MR. BECKER:  Thank you, Your Honor.

22

23                              *  *  *

1         OPENING STATEMENT ON BEHALF OF THE STATE OF OHIO

2         MR. BECKER: May it please the Court,

3 Mr. Juhasz, Mr. Ingram, Miss Roberts, the defendant in this

4 case, and most importantly, you, Ladies and Gentlemen of this

5 jury. First of all, I want to thank you, each and every one

6 of you, for this important civic duty that you are about to

7 undertake. I think, as we mentioned in the voir dire, I

8 believe probably short of serving your country in the

9 military this is the most important civic duty that you can

10 perform for this country and for your community.

11       In every criminal trial, as an attorney, you look

12 for a theme or you look for maybe a catch phrase to present

13 to the jury. Maybe you try and interwove it or interweave it

14 with some themes from a television show or a news headline or

15 historical context. And I sat long and hard trying to think

16 about what I should present to you as a theme for this case.

17 And after awhile, it became apparent. I don't have to

18 present a theme for you for this case because this defendant

19 spoke the theme, wrote the theme and did the theme.

20       This case is going to be about a relationship.

21 Actually, two relationships. The first relationship is

22 between Donna Roberts and Robert Fingerhut, and that

23 relationship started over 20 years ago when they got married.

5066

1    They lived in the Miami, Florida region.  They lived there

2    for a number of years.  Eventually, they returned to

3    northeast Ohio.  Miss Roberts is from Austintown.  They moved

4    to Howland to 254 Fonderlac Drive.  They operated the two

5    Greyhound bus stations in this area, the one in Youngstown

6    and one in Warren.  At one point during their relationship

7    they opened a restaurant at the Youngstown bus station.  And

8    at one point during the operation of those Greyhound bus

9    stations, this defendant met an individual by the name of

10   Nathaniel Jackson.  Now you're gonna hear a lot of things

11   about Nathaniel Jackson.  You're gonna hear his voice.

12   You're probably gonna read letters he wrote.  You will hear

13   testimony about him.

14          Early on in this case, and I think when you were

15   voir dired, defense counsel repeatedly asked you not to find

16   her guilty because of some things that she said that were

17   sexually explicit.  And to be quite honest with you, the

18   State is not going to ask you to find her guilty of anything

19   she or Mr. Jackson discussed that may be sexually explicit.

20   She's not charged with that.  And what she does in her sexual

21   affairs, that's her own business.  And we have no objection

22   to that.  But that evidence is gonna be offered to you to

23   show the depth of her emotion and her love for Nathaniel

5067

1    Jackson, a young, 29, 28-year-old black male from the

2    Youngstown area who she fell in love with.  And it was in the

3    course of that love that, really, she wrote the theme for

4    this case.  And it involves the three most basic human

5    emotions.  Love, hatred and greed.  And from her own words,

6    from her own writings, and from her own actions, you will see

7    how she acted upon those three emotions.

8         And what you'll find in this case essentially is

9    that she and Mr. Jackson thought about it, they talked about

10   it, they wrote about it, and they did it.  And the evidence

11   in this case is basically going to show that sometime in

12   September of 2001 Nathaniel Jackson was sent back to the Ohio

13   state penitentiary system.  This was very depressing to

14   Mrs. Roberts.  And you'll read about it in her letters.

15   You'll read about how she missed him, how she cared about him

16   and, yeah, there's some things in there about the sexually

17   explicit stuff.  It really has no importance in terms of the

18   actual deeds that they did, but it does have importance to

19   show you the depth and the connection that those two had with

20   each other and, really, the love that they had for each

21   other.

22        You'll discover that they were intimate, that in

23   fact they were lovers.  They hid their relationship from

1    Mr. Fingerhut.  They snuck around.

2          And the testimony will clearly show that while

3    Mr. Jackson was incarcerated in the Lorain Correctional

4    Center, which is on the west side of Cleveland, they

5    formulated a plan to eliminate Robert Fingerhut, to kill him.

6    The motive for this killing was pure greed, $550,000 in life

7    insurance policies.  You will be introduced and the evidence

8    will show that there were two insurance policies.  They will

9    show and she will discuss in her conversations and letters

10   the thing with all of the zeros and how she talked to her

11   accountant about the things with all the zeros to make sure

12   that it was paid up until the end of the year.

13         You'll hear testimony and you'll see exhibits from

14   Mr. Jackson talking about what he'll do with those proceeds,

15   how he would like a new Cadillac Deville, and you'll hear and

16   read her words which promise to get him a Cadillac Deville.

17   In fact, she'll tell you in her letters about how they should

18   get a personalized license plate for Mr. Nate Jackson on his

19   new Cadillac Deville.

20         Now, the first part of this case will be devoted to

21   hearing it.  You will hear 19 phone calls from the Ohio state

22   penitentiary system.  We will introduce witnesses who will

23   tell you that when an inmate is incarcerated at the Lorain

5069

1    Correctional Institution, they are given a pin number.  It's

2    sort of like a bank code number.  And when you make a call

3    from the institution, which you're permitted to do or

4    Mr. Jackson was permitted to do every Thursday and Saturday,

5    you have to enter that pin number.  That is recorded.  And

6    you will hear on the conversations that they are being

7    recorded.  You'll hear a prerecorded voice at the first part

8    of those conversations and in the middle of those

9    conversations advising that this call is made from the Lorain

10    Correctional Institute and may be recorded or monitored.

11    Mr. Jackson and Miss Roberts, at their peril, disregarded

12    those warnings.

13         And the evidence will show and those phone calls

14    will show that initially Mr. Jackson was to be incarcerated

15    until April of 2002.  And again, you'll hear words and

16    letters from this defendant that that saddened her because

17    she was in love with Mr. Jackson and she needed Mr. Jackson

18    there.  However, on October 25th, 2001, the evidence will

19    show Nate Jackson found out that he was getting out of prison

20    on December 9th, 2001.  He was given credit for time served

21    that he spent at a place called CCA, which is in Youngstown,

22    which is a place he was incarcerated at before he went to

23    Lorain Correctional Center.

1           And on October 25th, 2001, in addition to writing

2   letters to this defendant advising her that he was getting

3   out, he called this defendant.  And he called her collect

4   because that's the only way you can call someone from the

5   Ohio state penitentiary is collect.  She accepted the calls.

6   And you will hear Nate Jackson describe how -- well, he will

7   ask her what does she want for Christmas.  And her reply is,

8   "You."  She wants Nate Jackson for Christmas.

9           And Nate Jackson will tell her in that phone call

10  he's getting out December 9th, that she's gonna have him for

11  Christmas.  And she will squeal like a little teenager with

12  delight that Nate Jackson is getting out.

13          And in that same conversation, you will hear

14  Mr. Jackson say he's going to do it the next day.  He's gonna

15  go ahead and do it the next day, referring to the murder of

16  Robert Fingerhut.

17          And this Defendant's reply is, "Oh, no.  Don't do

18  that," or, "What are you talking about?"

19          Her reply is, "Oh, I just wrote to you that I didn't

20  think you meant it."

21          And you'll read that in the letters, the numerous

22  letters of which there are almost 300 in this case.

23          You'll see during these phone calls and these

1   letters that she sends him money.  She sends him things that

2   he needs so he can buy things from the commissary.  She even

3   goes so far as to get him a subscription to the Youngstown

4   Vindicator because, my goodness, he's in prison.  He doesn't

5   know what's going on in Youngstown.  He needs to know the

6   news.

7        The next phone call you'll hear will be on November

8   8th, 2001.  And you will find that this defendant had written

9   a letter dated November 11th, 2001 and you will hear the next

10  part of this case which is her hatred for Robert Fingerhut.

11  And you will hear, quote, you will read her words, quote, in

12  the letter of November 11th, 2001, "I would really love for

13  him to see me sucking that dick of yours just before he

14  leaves planet Earth.  I wouldn't have to yell or swear or say

15  a word.  That would be more than a sufficient send-off."

16       And during the phone call of November 8th, 2001,

17  Nate Jackson will comment about reading that letter of

18  November, that November 8th letter.  And Nate Jackson will

19  say, "I was reading a letter where you wrote you would like

20  him to see you suck my dick before it goes away.  I love

21  that."  I asked if you -- "I asked you if we could do it like

22  that in my letter."

23       And on the phone you'll hear this defendant say,

1   "Mmm, of course."

2         She wants him dead and she wants him dead now.

3         During the course of those telephone calls, they do

4   decide to get a little bit smarter and they will eventually

5   refer and debate -- degrade Mr. Fingerhut's life to a

6   package.  They will refer to Mr. Fingerhut as "the package"

7   and the death of Mr. Fingerhut and the murder of

8   Mr. Fingerhut will be referred to as the delivery of the

9   package.

10         On November 22d, 2001, there's a phone call.  Mind

11   you, this is less than three weeks before Mr. Fingerhut was

12   ultimately murdered on November 11th, or I'm sorry,

13   December 11, 2001.  Nate Jackson has to take care of

14   something else before he kills Mr. Fingerhut and that is he

15   has to have sex with this defendant.  And Mr. Jackson says

16   that he was talking to some friends in prison and there's a

17   place called the Wagon Wheel Room in Boardman, Ohio.  And he

18   tells this defendant to go put a deposit on the room because

19   it's quite a popular place for lovers in the area, seeing as

20   how it has a jacuzzi filled tub or a large, rather, walk-up

21   jacuzzi and it's sort of a lovers' rendezvous, a lovers' nest

22   in the area.  He needs her to go there and make a deposit and

23   get the room for them.

5073

1          The State will present to you evidence from credit

2   cards and receipts that, in fact, she went to the Wagon Wheel

3   and she got the room.

4          And Mr. Jackson requests for their little love

5   rendezvous that she wear some red panties because he wants to

6   see her in a red thong panties and that would be so romantic.

7   Well, you'll hear testimony from the people who rented that

8   room to this defendant, people who saw this defendant with

9   Mr. Jackson there, and they will also tell you that after

10  they checked out, low and behold they found some red thong

11  panties in the room which was rented, by the way, for

12  December 9th, Mr. Jackson's first day out of prison.

13         The evidence will show that she checked out that

14  room, she put the deposit on it, see left a pair of red thong

15  panties.  You'll hear testimony from the credit card receipt

16  or about the credit card receipt and you'll hear testimony

17  about finding those red thong panties that she left there.

18         Now, back to the phone call of November 22d of 2001.

19  Nate Jackson reiterates on that phone call that he is going

20  to kill Robert Fingerhut the next day.  And he says -- or she

21  says, rather, "I'm afraid, Nate."

22         And Nate Jackson asked her on that phone call what

23  she's afraid of.  She doesn't say she's afraid of losing

1   Robert Fingerhut, the man she's lived with for twenty some

2   years.  No.  She's afraid of one thing, of losing Nate

3   Jackson.  And she says, "I can't afford to lose you again."

4       She doesn't want Nate Jackson to go back to prison

5   again because it's tearing her up.  And you'll read through

6   the course of these letters how much it pains her that Nate

7   Jackson is in prison.

8       Nate Jackson goes on to explain that he knows, in

9   fact, what he's doing in this case.  And this defendant will

10  tell you on that phone call or tell Nate Jackson in that

11  phone call and you'll hear more evidence of their plan or the

12  delivery of the package.  And this defendant says, "But what

13  was the story with the trunk and the handcuffs?  That's too

14  involved.  You're going to leave hair.  You're going to leave

15  prints."

16      She's concerned about what evidence they may leave

17  if they commit this crime the way Mr. Jackson has discussed.

18      On November 24th, 2001, once again, Mr. Jackson

19  makes a collect call that's accepted by this defendant.  And

20  you'll hear that telephone call.  And Nate Jackson assures

21  her that he knows the laws in the State of Ohio.  They won't

22  have his DNA so they don't have to worry about DNA.

23      She also goes on to discuss a number of cars that

5075

1    she would like to buy for him, maybe a Lincoln, maybe a

2    Cadillac, and they talk about what he has to do the next day

3    after he gets out of prison.  They both agree, as they do on

4    a number of occasions, that they'll talk about it later when

5    he gets out because they do know that the phone calls are

6    being recorded.  Because each and every phone call, there is

7    a warning telling them that the phone calls are recorded.

8         Now we get to the most intriguing of the phone calls

9    you'll hear.  December 8th, 2001.  One day before Nate

10   Jackson gets out, three days before Robert Fingerhut is

11   murdered in his home in Howland Township.  And he tells her

12   that it's better to be an older woman's heart than a younger

13   woman's fool.  And she makes arrangements to spend the night.

14   They've already got it planned out.  If you read the letters

15   and hear the phone calls, she's gonna tell Mr. Fingerhut, the

16   excuse she's going to give him is apparently she has a niece

17   that lives in the Cleveland area.  And she's going to tell

18   Mr. Fingerhut that Saturday night, December 7th -- or I'm

19   sorry, December 8th -- she's gonna drive up to Cleveland and

20   spend the night with her niece and go to church the next

21   morning when, in fact, you'll read from the letters and the

22   phone calls that Mr. Jackson gets out of prison on Sunday,

23   December 8th, 2001, and he's released at 8:00 in the morning.

1    She's gonna pick him up and bring him back to the Wagon Wheel

2    and have their rendezvous.  So she lies to Mr. Fingerhut

3    about where she's going.

4         She makes the arrangements.  And on the December 8th

5    phone call, Mr. Jackson makes sure that they're going to

6    spend the night together.  And she promises him that they

7    will.

8         And during that December 8th, 2001 phone call, in

9    the middle of the conversation, in fact, quite humorously,

10   although sadly for Mr. Fingerhut, Nate Jackson makes one

11   request of Donna Roberts for when he is going to kill

12   Mr. Fingerhut.  And his quote is, "There's only one thing I

13   need.  I need to be in the house."

14        And she says, "No, not in the house."  She doesn't

15   want him killed in the house.

16        And finally, this defendant says, "Well, we'll talk

17   about it later," knowing full well she's going to see him the

18   next day.

19        You will hear the testimony and see the exhibits of

20   their first night together at the Wagon Wheel.  Jose Flores

21   will identify the defendant as getting that room.  He will

22   identify Mr. Jackson.  You will also hear the testimony about

23   how she got that room and about the red thong panties.  You

1    will hear their thoughts.  They will express them to you.

2    They will talk about doing it.

3         The next piece of evidence, and the biggest portion

4    of evidence, you will have a box about the size of that

5    bankers box filled with letters.  And those letters are the

6    next step of their hatred of Mr. Fingerhut, their love for

7    each other and their greed.  And in those letters, she writes

8    with her own words and her own handwriting.  First you'll

9    hear of her own hatred for Mr. Robert Fingerhut.  You'll have

10   all these letters and you'll have all the time you need once

11   you deliberate to read these, this evidence.  But I want to

12   give you a glimpse and a taste of the hatred that this

13   defendant had for Robert Fingerhut.

14        Quote, "Last night he said he wished he was dead.

15   That is one wish I hope comes true for him.  I can't even

16   stand to look at him anymore.  I hate it when he talks to me

17   too.  I hate to look at him.  I can't stand to even handle or

18   do his laundry anymore.  I hate his face, hair, nose, eyes,

19   body.  Everything about him makes me nauseous."

20        Her words.  Her handwriting.

21        Then she says, "And, yes, sneaking to see you a

22   couple of hours doesn't do it.  It leaves us both with no

23   real life together.  And when you go your way, you have to

5078

1    fend for yourself and eat alone and sleep alone and be out

2    with the wolves," because Nate Jackson is a street person

3    from the streets of Youngstown.

4          "And me, I exist in hell on earth.  Like last night,

5    I got so sick of just looking at him and hearing the same

6    shit over and over and smelling his breath and every other

7    little thing.  It's all bad.  And seeing his skin and

8    watching him walk or breathe.  I can't hold in my disgust and

9    contempt for him well at all."

10         Once again, her words.  Her writing.

11         "So there's one extra time in my life I had to look

12   at him.  Help me.  That's one too many times for me.  I have

13   never lived like this with so much animosity and hatred."

14         That's her telling you how much animosity and hatred

15   she has.

16         "And it's really hard since he has been controlling

17   the money for the last year or so."

18         We'll get to the greed in a minute.

19         On October 24th, 2001, she writes to Nate Jackson in

20   prison.  "It is his birthday.  He is 56."  That's true.

21   Mr. Fingerhut did turn 56 on October 24th, 2001, the last

22   birthday he was alive.

23         She says, "He's 56.  I can't stand to say his name

5079

1    anymore.  He is so totally crude now.  My only birthday wish

2    for him is that this should be his last birthday."

3         And that's that.  And, in fact, it was Robert

4    Fingerhut's last birthday.

5         Quote, "It's enough I have to go through with this

6    schmuck now, Robert.  Sometimes I almost feel sorry for him.

7    Not.  It's a good thing all the 38s were in the car because

8    when he slapped me real hard, I would have lost it and

9    emptied that all into his mouth."

10        Once again, these are her words.  At one point,

11   she's referring to cleaning in a letter she writes to

12   Mr. Jackson.  "My heart just isn't in it, especially because

13   he keeps saying it looks like a N blank blank blank blank

14   blank R house just because of some dust and stuff.  Well, let

15   it look that way I say because soon it will be just that if I

16   have anything to say about it.  Soon the door is going to

17   open and the wrong man is going to enter.  I hope some day I

18   can just roll over and say good night to you," referring to

19   Mr. Jackson.

20        "He gets me so sick now I can barely stand it

21   anymore.  I've been living with a moron for the last 20

22   years."

23        Once again, the testimony and the evidence will show

5080

1   that they reduced Mr. Fingerhut's life to nothing more than a

2   delivery of a package.  It was gonna be like a UPS delivery.

3   Knock on the door, be done with it, delivery's done.

4        These are her words again.  "Ok.  I'll only say

5   this.  Go ahead and take care of business.  I'm sorry about

6   the worry over the package.  It's just such a major move and

7   with very serious consequences and severe.  I can't stand

8   even to think about losing you again," referring to

9   Mr. Jackson.

10       "Do whatever you decide is best.  If our prayers are

11   answered, we will be together next Thanksgiving."

12       She talks about enjoying the first snow of the year

13   together with Mr. Jackson.  She talks about waking up

14   Christmas morning next to each other with Mr. Jackson.

15       "I've been thinking a lot about the delivery of that

16   package and I get real scared.  All I worry about, though, is

17   losing you forever to prison.  And the more complicated the

18   plan, the more that can go wrong.  A fingerprint, a hair, an

19   article of clothing, a witness, the weapon.  I will be in the

20   line of fire, too, and could end up you know where.  We have

21   to make certain that all of this is as fool proof as it can

22   be.  I guess we'll get it down when you get home.  I'm so

23   worried about the delivery.  I don't want to see you in

1   orange again, Nate.  Do you really have the nerve and the

2   guts to deliver this package?  What do you think about when

3   you think of doing it?  Will you tell me everything about it?

4   It's a real shame that they have such advanced DNA testing or

5   I'd tell you to spit on the package while you were delivering

6   it.  That's a mean thing to say and it's really not my

7   character to say such things, but this package just begs for

8   it, don't you think?"

9         Now, in addition to the hatred of Mr. Fingerhut, she

10  also has to feign grief because Mr. Fingerhut will die.  How

11  is she going to feign this grief?  She tells you how she's

12  going to feign this grief.  She writes it in her letters.

13        "Once again, I worry about my reaction and any

14  authority's reaction to my reaction.  I mean how do you

15  appear to be sad when you feel like throwing a party, but I

16  know I can do whatever I must for all to be well.  I'm so

17  worried to think how I will be able to even act sorrowful.

18  There will be a lot of interrogations and perhaps a lot of

19  suspicion.  Can we handle that?"

20        And quote, "It's all gonna come down to when I get

21  that call.  And I can handle that because it means everything

22  to both of us," referring to Mr. Jackson.

23        "I am not even worried about it any longer because

1    I've thought about it a lot and I'm prepared.  Instead of

2    laughing and cheering, I will concentrate on losing someone

3    that I would go nuts over and react accordingly."

4         That's how she's gonna react when she finds out

5    Mr. Fingerhut's dead.

6         Now the State is not required to show motive.  But

7    in this case, she wrote the motive, she spoke the motive.

8    And that motive is on one of those three emotions, one of

9    those strong human emotions.  And that emotion is greed.  The

10   State will introduce evidence that will show there were two

11   life insurance policies out on Mr. Fingerhut's life, $550,000

12   in life insurance on Mr. Fingerhut.

13        You will also hear testimony about the financial

14   condition, through her words, of the Greyhound bus terminals.

15   And I want you to keep this case in the context of

16   September 11, 2001.  All of us remember that tragic day.

17   Probably each and every one of you remembers where you were

18   at.  But the evidence in this case will show and the facts of

19   this case will show and you'll recall travel was way down.

20   People weren't going anyplace.  People weren't flying.  They

21   weren't even taking the buses.  And she'll write in her

22   letters about how business is down, how they're not making

23   much money at the bus station.  You'll hear testimony that

1    she really doesn't know much about the business.  In fact,

2    the reason she doesn't work in the Youngstown terminal is

3    because she doesn't know how to use the computers.  So what

4    better way to get out from this financial debt and to get out

5    from this bad business than to collect $550,000 in insurance

6    money?

7              You will hear testimony about how her and

8    Mr. Fingerhut, it's in her own letters, had 52 credit cards.

9    You'll hear testimony about she refers to Mr. Fingerhut as

10   the Grinch, about how he controls her spending.  She only

11   gets so much a month, a week, and she's used to having money

12   whenever she wants.  But times are bad in late December and

13   November and October of 2001.  People aren't traveling.

14   People aren't taking the Greyhound bus.  You'll hear how the

15   business is down 30, 40, 50 percent.  Through her own words

16   she'll tell you that.  She's used to having money whenever

17   she wants.  She's hoping that those days will return again

18   soon.  And she tells Mr. Jackson that and her problems with

19   money and how she hopes that those days when she can spend

20   money again will return soon.

21             And she says, "Do whatever you want to him ASAP.

22   Amen.  Yes, you can do whatever you want to accomplish our

23   goal."

1          She writes in the one of the letters, "I found out

2     that those things with the zeros are paid up to the end of

3     the year as per our accountant's suggestion.  Yes, I didn't

4     want you to worry about that," writing to Mr. Jackson.

5          Why would Nate worry?  Because you're gonna find out

6     he's gonna get a Cadillac out of this deal.  He talks about

7     dreaming of a Cadillac Deville.  And she talks about getting

8     him personalized plates.  Nate Dog or Nathaniel or whatever

9     else might pop into their minds.  In fact, I think in one of

10    the letters she refers to a personalized plate that says D

11    loves N.  They'd like to get a little license plate to

12    express their love to the world.  And she'll talk about that

13    and talk about how she'd like to express their love to the

14    world.  What will people think when they see Mr. Jackson and

15    I walking down the street together, walking together, walking

16    through the malls?  An older white woman like myself with a

17    young black man.  We'll have to hold hands a lot so people

18    will know our, show the world our love.

19         Now, eventually this defendant looks into getting

20    Mr. Jackson the Cadillac that he so desires.  She writes in

21    one of her letters, though, there's going to be some problems

22    because her and Mr. Fingerhut are leasing two Chrysler

23    300 Ms.  Pretty nice cars.  You'll hear testimony from

1   witnesses who will tell you that those cars were in

2   Mrs. Roberts' name.  And what you're gonna hear basically is

3   at one point in their relationship, and she'll tell you, that

4   Mr. Fingerhut requested that all of the assets that Miss

5   Roberts and he had be placed in her name.  And the first

6   thing they did was they got an official divorce.

7   Mr. Fingerhut was worried about being sued through the

8   terminals and losing everything.  So they got this divorce of

9   convenience basically or really for financial reasons.  They

10  still lived together.  They transferred the house to her

11  name.  She signed all the leases to the two vehicles they

12  owned.  Even the Greyhound terminal, the Greyhound bus

13  business, was in her name.  So she had everything.  But don't

14  be mistaken.  Mr. Fingerhut still drove the cars.  He took

15  care of them.  In fact, we will present testimony from Barry

16  Ricker and Carmen Olivia from Preston Auto Group out on the

17  strip out in Niles who will tell you that Mr. Fingerhut did

18  all the negotiating for the contracts and the leases, that

19  Mr. Fingerhut brought the vehicles in for service.  That

20  Preston has a deal where if you buy a car, they'll wash it

21  every week or every month and detail it.  And Mr. Fingerhut

22  predominantly was the one who brought those vehicles in.  So

23  don't be fooled by who owns what because Mr. Fingerhut still

1   lives in that house and he still drives those cars.

2            But what you're gonna hear this defendant tell Nate

3   Jackson in one of those phone calls is that she can't really

4   get out of the lease after they kill Mr. Fingerhut so they'll

5   have to slum around in these 2000 and 2001 Chrysler 300 Ms.

6            Now Mr. Bailey and I were very forthright with you

7   when we started this case, each and every one of you when you

8   sat in that chair and were voir dired in this case.  We told

9   you right from the beginning she's not the shooter.  She's an

10  aider and abetter.  And the Court will define that term for

11  you, but we usually use that term to mean help.

12           She talks at one point about someone else doing it.

13  And you'll read in the letters that she talks about getting a

14  professional delivery service.  But Mr. Jackson is confident

15  that he can pull this off himself.  And at one point she

16  says, "I really do believe you intend on taking care of

17  business.  Here's how I feel about it.  What size gloves do

18  you wear?  Ok?"

19           Because Mr. Jackson is going to need some things to

20  commit this crime.  He's going to need some gloves, he's

21  going to need the firearm, he's going to need to be in the

22  house, and he's going to need a ski mask.  You will hear and

23  read her words.  She looked all over.  In fact, in one of her

1    letters, she said she had to look for four stores for that

2    ski mask.  But you know what?  She found it.  She was real

3    proud of herself, proud that she got it for Mr. Jackson.  And

4    she got the gloves.  No, not the thick ones.  She got thin

5    ones because they're easier to work with.

6           You'll hear testimony and you'll see exhibits that

7    she had guns.  Now unfortunately, we never recovered the gun

8    that killed Robert Fingerhut.  But, quite conveniently, about

9    two or three weeks before Mr. Fingerhut's murder, she reports

10   a gun stolen and to be stolen by a guy named Santiago Mason.

11   Boy, she writes these letters what a terrible guy he is.  He

12   did all these terrible things.  We are gonna hear from Mr.

13   Santiago Mason.  Mr. Santiago Mason is gonna get on that

14   witness stand and he's gonna tell you, "I went to her house

15   one time.  She wanted to have sex with me,"

16   Mr. Santiago Mason being the persuasion that she prefers, a

17   large black man.  And Mr. Mason is gonna tell you, "I didn't

18   steal anything from her.  She tried to set me up for murder."

19          And Mr. Mason will sit there and tell you how angry

20   she was when he rebuffed her sexual advances.  And quite

21   coincidentally, a few days later, she goes to the Warren

22   Police Department to report a firearm stolen by Mr. Santiago

23   Mason.  And she writes in her letters, "Oh, he said he's

1    gonna do bad things with it."  Why not create a third party

2    to make it look as if the murder was committed not by Nate

3    Jackson and Donna Roberts, but by this bad Santiago Mason?

4         Now she goes on in her letters to aid and abet

5    Mr. Jackson.  And she says, "I will have the gloves and the

6    rest waiting for your arrival.  But why the handcuffs?  I

7    would feel better if I knew this was gonna be quick and

8    painless."

9         In the same letter she says, "I would really love

10   for him to see me sucking that dick of yours just before he

11   leaves plant Earth.  I wouldn't have to yell and scream or

12   say a word.  That would be more than a sufficient send-off."

13        She also asks when she can't find a ski mask at one

14   point, she asks Mr. Jackson, "I can't find a ski mask because

15   the places I'm shopping at only have the knit caps.  Any

16   suggestions?"

17        Finally she found that.  She was so proud of

18   herself.

19        And the last thing that Nate Jackson needed and

20   you'll hear on that phone call December 8th, the one request

21   he made was that he needed to be in that house.

22        And the evidence and the testimony from the Howland

23   Police Department will be that at about midnight on

1   December 11th, 2001, they received a phone call from 254

2   Fonderlac.  Miss Roberts had put herself into the mind set

3   that she needed to be like she talked about in the letters.

4   She wasn't gonna be happy and cheery.  She had to think about

5   losing someone that she really cared about.  And she cried

6   and cried.  And the police will tell you she was so upset

7   they could hardly understand her.  But they'll also tell you

8   that when they asked her to go to the bedroom in the house

9   that as they discussed the scene and what they had discovered

10  and Mr. Fingerhut with three bullet wounds, one through his

11  hand that entered the shoulder, one coming through the back

12  of his shoulder and then finally a fatal shot to the head,

13  they'll tell you that when they started to discuss things

14  that all of a sudden the sobbing and the crying stopped and

15  it was as if she was listening at the door.  And they'd go

16  back and check on her and she'd start crying again.  "How

17  terrible.  My poor Robert."

18          Of course the police didn't know that there were all

19  these phone calls and letters at that time.  They had no

20  reason to suspect Miss Roberts.

21          And the police will also tell you that they searched

22  that house.  They walked around it.  They looked at the

23  windows.  They looked at the doors.  There was no forced

1   entry.  Someone had stealthily snuck in there or perhaps was

2   waiting for Mr. Fingerhut when he got home.

3        And the evidence and the testimony will show that

4   this defendant then gave statements to the Howland Police

5   Department.  And she told them what she did.  "Well, I went

6   out shopping and I went to Wal-Mart.  In fact, here's my

7   receipt.  Oh, I did have dinner at Red Lobster that night.  I

8   went out and had dinner with Red Lobster.  And Mr. Fingerhut,

9   well, he works the late shift at the Youngstown bus station

10  and he doesn't get to leave until the last bus comes in about

11  9:00."

12       And the State will present testimony to you showing

13  you that Mr. Fingerhut left the Youngstown terminal at about

14  9:30.  In fact, you'll have the video tape from the security.

15  Now, the times are a little bit off on the tape, but you'll

16  hear testimony from one of the security guards that, in fact,

17  Mr. Fingerhut left about 9:30, his usual time.  He was really

18  a creature of habit.

19       You will see phone calls between Miss Roberts and

20  Mr. Jackson because Mr. Jackson had this defendant's cell

21  phone.  You'll have the records and the times.  And when Miss

22  Roberts is questioned about this Nathaniel Jackson, she says,

23  "Oh, I haven't seen him since Sunday.  I picked him up from

1   prison, but I haven't seen him since then."

2       Well, guess what?  The State will present to you

3   evidence that she was with Mr. Jackson all day on

4   December 11th.  The State will present testimony to you from

5   Kris Ellington who owns a hairstyling place right beside the

6   Warren bus terminal.  Miss Ellington will tell you that this

7   defendant came in with an individual, Nate Jackson.

8       A bus driver who works for the Greyhound who stops

9   in at the 5:00 stop, he's the last stop at the Warren

10  station, he will tell you that when he came to, into the

11  station, he saw this defendant with Nate Jackson.  Funny how

12  Miss Roberts neglects to tell the Howland Police that she was

13  with Mr. Jackson all day the day of the murder.

14      Then you will hear the testimony from Jill Kenyon.

15  She is a waitress at the Red Lobster out by the Eastwood

16  Mall.  And Miss Kenyon will tell you, "Yeah, I waited on a

17  woman," who she identifies.  And she'll also identify that

18  she was with Nate Jackson.  She kind of forgot to tell the

19  police she was with Nate Jackson all day.  She lied.  And

20  that's what the evidence will show.

21      They had it all planned out.  The gloves, being in

22  the home when Mr. Fingerhut arrives, the gun, reporting the

23  gun mysteriously missing a few weeks before.  It's all

1  planned out.  The handcuffs.  But there was one thing they

2  didn't count on, one part of their plan that the evidence

3  will show didn't go the way they wanted it to.  Mr. Fingerhut

4  was not gonna leave his house.  When he walked into that

5  house and saw this black male there with a gun, he fought and

6  he struggled.  And that's what the injuries will show you,

7  the hand up, the bullet through the webbing of the hand, the

8  bullet into the chest, the grazing wound on his shoulder as

9  he was trying to fight with his assailant.

10  And contrary to what Mr. Jackson's concerns and

11  knowledge of Ohio law and the DNA was, he was wrong.  And she

12  was wrong.  Because the evidence is going to show that Mr.

13  Jackson did leave DNA.  He left DNA everywhere and

14  fingerprints everywhere.  And the worst part about this case

15  is not what happened before.  It's what happened afterwards.

16  Because Miss Roberts will tell you how grieving she was, how

17  terrible it was and you'll hear the police say, "Oh, she was

18  crying December 11th around midnight when we got there."

19  But she forgot to tell the Howland Police Department

20  one other piece of evidence that you'll have.  She checked

21  Nate Jackson into a Days Inn Motel in Boardman between 10 and

22  12 on December 11 because Mr. Jackson had shot his finger

23  during the struggle and he had shot his index finger on his

1    left hand.  He was injured.  And she took him down to

2    Boardman, paid for it with her own credit card.  Kind of

3    forgot to tell the Howland Police about that part.

4              When questioned by the Howland Police about

5    Mr. Jackson, "Oh, Nate would never do such a thing."

6              And the evidence will show that they made one other

7    mistake.  It was a pretty big one.  In addition to talking on

8    the phone, despite these repeated warnings, and they were

9    pretty careful on the phone, albeit, I'll admit that, they

10   didn't get rid of the letters.  He kept all of hers and she

11   kept all of his.  And in fact you'll see letters that she

12   wrote.  In her letters, "Maybe we should get rid of these.

13   We should destroy all these parts or at least the pages where

14   we talk about Robert."

15             But she couldn't give 'em up.  She couldn't get rid

16   of 'em because there was so much love for Nate Jackson in

17   those letters.  And she'll tell you that.  It's in her

18   letters.  She couldn't destroy them because of the love that

19   she felt from Nate in those letters.  And fortunately for the

20   Howland Police and you and the State of Ohio and for Robert

21   Fingerhut, we have those letters.  And you will see those

22   letters.  They are the evidence in this case.

23             You will hear a lot of testimony from forensics

1    people.  The room that she got down in Boardman, the Days

2    Inn, Paul Monroe and this detective, Sergeant Dillon, went

3    down there.  Paul Monroe got in a dumpster, he pulled out the

4.   trash and he found gauze, tape, bandages from where Nate

5    Jackson had taped up his finger.  And of course it's Nate

6    Jackson's DNA.  BCI experts came in.  They found Nate

7    Jackson's fingerprints in that room that was rented by her

8    for a week.  Just like their plan.  Just like the discussions

9    in the letter.  He needed to get a place to stay to sort of

10   stay low until they could move in together before Christmas.

11   I guess apparently two weeks is all you need.

12           But the evidence in this case will show beyond all

13   doubt what I started out this morning telling you.  They

14   thought about it, they talked about it, they wrote about it,

15   and they did it.  And at the end of this case, it will be

16   Mr. Bailey and I's sworn duty to ask you to return verdicts

17   of guilty to all four counts, aggravated robbery, aggravated

18   burglary, aggravated murder with a death specification and

19   another count of aggravated murder.  They planned it.  They

20   set it up.  Even though it was her house, it was

21   Mr. Fingerhut's home as well.  It was his home that was

22   burglarized.  It was his home that Mr. Fingerhut came home to

23   where he found Mr. Jackson stealthily planted in there in

1    preparation of this plan.  It was his car that he drove.  He

2    may not have owned it.  They may not have been in his name,

3    but the evidence will show they were his just as much as they

4    were hers.  At the close of this case, we will ask you to

5    return verdicts of guilty to each and every count and each

6    and every specification.

7          I want to thank you very much for your attention.

8                    THE COURT:  Thank you, Mr. Becker.

9          Does the defense wish to address the jurors?

10               MR. INGRAM:  Yes, Your Honor.  Donna

11   Roberts, pursuant to statute, will give the defense opening

12   statement.

13          **OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

14               THE DEFENDANT:  Good morning.  Will the

15   real Donna Roberts please stand up?  Ladies and Gentlemen,

16   the real Donna Roberts stands before you.  The testimony and

17   evidence will establish that I played no part in Robert'S

18   death.  The Donna Roberts you'll hear portrayed in the

19   letters and on those tapes is not the real Donna Roberts.

20          My attorneys will test the State's evidence and ask

21   important questions in cross examination.  Please, please

22   listen carefully for those questions.

23          Perhaps I'll have more to say later.  Regardless, I

1     you.

2     (Whereupon, a recess was had commencing at 2:30 p.m. and

3     concluding at 2:47 p.m.)

4                    THE COURT:  Okay.  I believe we're ready

5     to proceed.  Call your next witness.

6                    MR. BECKER:  Your Honor, the State would

7     call Santiago Mason.

8     WHEREUPON,

9                    SANTIAGO MASON,

10    having been first duly sworn, according to law, was examined

11    and testified as follows:

12                    DIRECT EXAMINATION

13    BY MR. BECKER:

14    Q        All right.  Would you please introduce yourself to

15    this jury?

16    A        My name is Santiago Mason.

17    Q        All right.  And Mr. Mason, you still may want to

18    maybe scoot a little bit closer.

19    A        Santiago Mason.

20    Q        Okay.  Very good.  Mr. Mason, where do you live at?

21    A        Right now, I live at 407 Southern Boulevard,

22    apartment 215.

23    Q        And Mr. Mason, what is your date of birth?

1    A        11-13-68.

2    Q        Mr. Mason, I want to direct your attention to

3    October, November, December of 2001.  Actually, I guess just

4    the fall, September, October, November of 2001.  Were you

5    going to the Warren bus station at certain intervals at that

6    time?

7    A        Yes.

8    Q        What was your reason in going to the Warren bus

9    terminal?

10   A        I have family live in Cleveland.  I'm from Cleveland

11   myself.

12   Q        Okay.  And is that the transportation method you

13   would use to go visit that family?

14   A        Yes.  Yes.

15   Q        While you were going to -- well, how often would you

16   use the Greyhound station here in Warren?

17   A        Like on a, right now I don't use it, but back then,

18   I was using it like every other weekend.

19   Q        All right.  And when you would go to the Warren bus

20   station, did you become familiar with any of the employees

21   there or any of the people that were there?

22   A        Yes.

23   Q        Do you recall who you became familiar with?

1    A       Yes.

2    Q       Do you recall the name?

3    A       Donna Roberts.

4    Q       All right.  And just in your own words, tell us how

5    you got to know Donna Roberts.

6    A       Well, I was going to Cleveland and she was writing

7    her boyfriend, Mr. Jackson, at the time and there was a

8    picture and I was incarcerated myself in Belmont Institution

9    myself so I remembered the background.  I was like just

10   passing conversation since I was sitting there.  And I was

11   like, "That picture like he in Belmont."

12           And she's like, "He is.  Do you know him?"

13           I'm like, "No, I don't know him, but I know the

14   background of the picture because I was, I took pictures in

15   that room before."

16           And we just started talking and everything.

17   Q       So you became familiar with Miss Roberts through

18   some previous incarceration that you had been in trouble for?

19   A       Yes.

20   Q       And can you tell this jury what you were

21   incarcerated for?

22   A       Oh, I was incarcerated for not watching my parole

23   officer.  They put it for escape.  Up under the new law, it's

1   escape right now.

2   Q       All right.  And were you on parole at the time?

3   A       Yes, I was on parole at the time.

4   Q       All right.  Now, at some point, I believe in

5   November of 2001, did Miss Roberts offer to do something with

6   you?

7   A       Oh, she just told me to stop back at the bus stop

8   when I get back from Cleveland.  And we just started talking

9   and that's kind of what, we started getting better with each

10  other and we, I sat there until she got off work and we got

11  in her car or whatever.

12  Q       Now do you recall approximately what date of the,

13  what date in November?

14  A       It was a little after my birthday.

15  Q       So sometime after November 13th?

16  A       My birthday is the 13th of November so it was like a

17  couple days after my birthday.

18  Q       And, in fact, you took her up on her offer to meet

19  her after work?

20  A       Yes.

21  Q       And can you tell this jury in your own words what

22  you did that particular day?

23  A       Well, after she got off, she locked up the building

1    and everything.  We got in the car, she had a red Chrysler,

2    and I thought she was pulling out a pack of cigarettes and

3    she pull out a big old pack of fat joints.  And I'm like, I'm

4    thinkin' she's gonna smoke a cigarette so I rolled my window

5    down because I don't smoke cigarettes at all.  So we ridin'

6    and I smell, I'm like, "What you smokin'?  You smokin' weed?"

7            And she like, "Yeah."

8            I'm like, "Oh, man, you a live old lady."

9            You know what I'm saying?  So she throw on her

10   little CD player and started playing thug music and stuff.

11   I'm like --

12   Q    What kind of music was it?

13   A    Thug music.

14   Q    Okay.  What is thug music?

15   A    Like Trick Daddy, I'm A Thug, whatever.

16   Q    Okay.  Is it what we call rap music?

17   A    Yes.  Rap music.

18   Q    Okay.

19   A    Yeah.  And I asked her, I'm like, "What is you doin'

20   listening to this type of music, you know what I'm saying, at

21   your age"?

22           She like, "My boyfriend hook me onto this kind of

23   music," or whatever.

5441

1  Q       And at that time, you knew her boyfriend to be?

2  A       Her boyfriend was Nathaniel Jackson at that time.

3  Q       And that's the same person --

4  A       That's the same guy I seen she was writin' and the

5  picture that was on the desk and everything.

6  Q       And what did you do after she drove you around?

7  Where did you go?

8  A       Well, we went into her house out there.

9  Q       And do you know where her house was?

10  A       In Howland.

11  Q       All right.  I'm gonna show you what's been marked

12  for purposes of identification as State's Exhibit 126 -- 126,

13  104, 249 and 124.  I'm gonna show you up here on this screen

14  what's been marked for purposes of identification as State's

15  Exhibit 126.  Do you recognize what State's Exhibit 126 is?

16  A       I recognize the house.

17  Q       That you went to in November of 2001?

18  A       Yes.

19  Q       All right.  And when you were in that house, did you

20  observe anything or what did you do in the house I guess?

21  A       Well, we went in the house.  I sat down and

22  observed.  There was a leather couch.  The house was nice.

23  You know what I'm saying?  The house was really nice.

```
 1    Q         What kind of couch was it?

 2    A         Leather black couch.

 3    Q         All right.  I'm going to show you State's Exhibit

 4    124 and ask if you recognize State's Exhibit 124?

 5    A         That's the couch.

 6    Q         And what did you do on that couch?

 7    A         She gave me a blow job on that couch.

 8    Q         All right.  And I'm gonna show you now State's

 9    Exhibit 104 and ask if you recognize State's Exhibit 104?

10    A         We took it to the room, that room right there, and

11    she wanted me to have sex with her and I told her no.

12    Q         All right.  Why did you tell her you didn't want to

13    have -- she wanted to have vaginal sex with you?

14    A         Intercourse.  She wanted me to stick it in.

15    Q         Was this before or after she had given you oral sex?

16    A         This was out there on the couch, she gave me oral

17    sex and then we worked our way back to the room.

18    Q         What did you distinctly remember about the room?

19    A         All them jerseys.

20    Q         Why did that catch your eyes?

21    A         Because I love jerseys myself.  You know what I'm

22    saying?

23    Q         And did you ask her anything?
```

5443

1    A        Yeah.  I asked her could I get one.  They was all

2    too small for me because they was all mediums and smalls and

3    large.  I wear like a 3X so they was all too small for me.

4    And she told me --

5    Q        You're a rather large individual?

6    A        Yeah.

7    Q        What's your height and weight?

8    A        6'1", 240.

9    Q        Is that about the same height and weight you were --

10   A        Back then, I was weighin' a little bit more then.  I

11   was weighin' like 250 then.  I lost a little weight.

12   Q        And I'm gonna show you State's Exhibit 249 and ask

13   if you recognize State's Exhibit 249?

14   A        Yes.  I remember that.

15   Q        What is State's Exhibit 249?

16   A        The plants, the background of brass and the glass

17   back there in the background.

18   Q        And was that in that residence?

19   A        Yes.  That's at that residence.

20   Q        And do you recognize the individual there?

21   A        Yes.

22   Q        And who is it?

23   A        Donna Roberts.

5444

1    Q       Now, Mr. Mason, do those photographs fairly and

2    accurately depict Donna Roberts in the residence at 254

3    Fonderlac?

4    A       That's what I seen in the house when I was there,

5    yes.

6    Q       Now, after you refused to have intercourse with her,

7    what happened?

8    A       She got attitude.

9    Q       What do you mean when you say she got attitude?

10    A       For one thing, she come up to my job.  First, she

11    called.

12    Q       Well, right, right that day.  What happened?

13    A       That day, she got mad and she wanted me to walk

14    home, but she gave me a ride back to Greyhound.

15    Q       Did she say anything to you about you refusing to

16    have intercourse with her?

17    A       She just balled her face up, got attitude and, "Come

18    on, I'm taking you back where you came from," or whatever and

19    dropped me off.

20    Q       Where did she take you?

21    A       She dropped me right back off at Greyhound.

22    Q       Here in Warren?

23    A       Yeah.  Here in Warren.

5445

1    Q        Now, a few days later, did you have a chance to see

2    Donna Roberts again?

3    A        Yes.  We talked.

4    Q        And tell this jury how you came to see Donna Roberts

5    again.

6    A        She had called up to my job.

7    Q        And where were you working?

8    A        I was workin' at Vista Windows at this time up on

9    Elm.

10    Q        Up on Elm Road?

11    A        Elm Road, yes.  It's right behind Perkins.

12    Q        And what did she do when she came to see you?

13    A        Well, I thought she was coming up there to take me

14    out to lunch.  Then I pulled up from Wendy's.  She's standing

15    outside with her cell phone callin' me all kind of black MFs

16    and, "Mother Fucker, you took my gun.  Why in the fuck you

17    take my money?"  And this and that and all this.

18            And I'm looking at her like she crazy.  Like what

19    the hell is you talkin' about?  I said, "You must deal with

20    too many black guys.  You can't point the finger at me

21    because you deal with too many of 'em."

22            And she was like, "I know you done it.  I'm gonna

23    have the police come up here and arrest you for stealing my

5446

1    gun and stealing my money," and some kind of phone calls and

2    crap.  Trying to just claim all kind of craps on me.  So

3    after that, she left.

4            Before she left, my boss came outside and told her,

5    asked her what she was waiting on.  And she said, "I'm

6    waiting on Howland Police," and he said, "Good.  Because they

7    can come and take you to jail, too, for being on private

8    property."

9            So that's when she left.  The next day, I go to

10   work, Howland Police come up there again and ask me to come

11   up to the police station for questioning.

12   Q       Right.

13   A       So I go up there, they put me in the room and record

14   me or whatever, ask me questions about the last time I seen

15   her and did I know anything about a gun and all this and

16   that.  I'm telling 'em no.  So next thing I know, they tell

17   me I have a warrant out for my arrest.  I'm like, "For what?"

18           "For a stolen gun."

19           I'm like, "How could you put a warrant out for

20   somebody's arrest and I ain't done anything?"

21           They say, "Well, this is the law," or whatever.

22   "You going to jail.  You going down to the county."

23           So they took me down to the county.  I was down

5447

1    there for like two or three days.  I lost my job behind that.

2    Q        You lost your job because you were incarcerated for

3    those two or three days?

4    A        Yes.  Because, first, my boss was gonna get me out,

5    but they couldn't get me out because I had a speeding ticket

6    too.  See what I'm sayin'?  So they were holding me down for

7    that.  So that's another reason they probably hold me a

8    couple of days, too, because I had a speeding ticket.

9             But other than that, they hold me in there and I

10   finally got out.  I think it was on a Tuesday I got out of

11   jail.  And as soon as I done that, I got me an attorney.  But

12   at the time, I was still talking to Detective Hoolihan and

13   another detective.  I forgot his name.  I just seen the

14   fellow here.  He was here today.

15   Q        So eventually what happened with this accusation

16   that you stole Miss Roberts' gun?

17   A        Yeah.  She said I pulled her gun.  I went to work.

18   Then at the time, I remember right before I got fired from my

19   job, I went to work, they was like detectives came back up

20   there again and told me that I had to come up there and take

21   care of, go to the police station and talk to some more

22   police officers and everything.

23   Q        Were you ever convicted of that crime, of stealing

5448

1    her gun?

2    A        No, I was not convicted.

3    Q        Now, Mr. Mason, the individual that you've described

4    as Donna Roberts, is she here in this courtroom?

5    A        Yes, she is.

6    Q        Can you please identify or point to her?

7    A        She right there (indicating.)

8                        MR. BECKER:  Please allow the record to

9    reflect that the witness has identified Donna Roberts.

10                       THE COURT:  The record will so reflect.

11                       MR. BECKER:  Give me one moment, Your

12   Honor.

13                       THE COURT:  Sir, do you mind being

14   photographed while you're on the stand?  You have the right

15   not to be photographed.  If you don't mind, then that's okay.

16                       THE WITNESS:  I don't want to be

17   photographed.  I don't want to be in the newspaper, anything.

18                       THE COURT:  I'm sorry?

19                       THE WITNESS:  I do not want to be

20   photographed because I don't want to be in the newspaper, my

21   picture.

22                       THE COURT:  You do not wish to?

23                       THE WITNESS:  Huh?  Excuse me?

5449

```
 1                    MR. INGRAM:  He does not.

 2                    MR. BECKER:  I have nothing further, Your

 3    Honor.

 4                      CROSS EXAMINATION

 5    BY MR. INGRAM:

 6    Q        Afternoon, Mr. Mason.  How are you?

 7    A        How's it going?

 8    Q        You first meet Donna Roberts back in the fall of

 9    2001 at the Greyhound bus station?

10    A        It was like in November, yes.

11    Q        And you're using public transportation at that time;

12    am I correct?

13    A        Yes, sir.

14    Q        And that's because your license was suspended?

15    A        Yes, sir.

16    Q        Was your license suspended as a result of a failure

17    to pay a fine?

18    A        Yes, sir.  I wasn't working at that time.  I was on

19    my way payin' that fine and I thought because I was

20    incarcerated that it would be gettin' tooken care of, but it

21    didn't.

22    Q        Okay.  But your license was suspended because you

23    had not paid a fine?
```

5450

1    A      Yes.

2    Q      And you go to the Greyhound bus station to purchase

3    a ticket to go to Cleveland?

4    A      Yes.

5    Q      To see your family?

6    A      Yes.

7    Q      And she strikes up a conversation with you?

8    A      No.  I strikes up a conversation with her.

9    Q      Well --

10    A      Because I noticed the picture.  And she was writing.

11    I noticed the picture and I said, "Oh, he must be in

12    Belmont."

13           She didn't strike it with me.  I struck it up with

14    her.

15    Q      Okay.  Well, at some point that day, did she tell

16    you that you were so cute?

17    A      No.  She -- yeah.  She said that.  I wouldn't --

18    Q      Did she tell you that you were so cute?

19    A      Yeah.  She said I was cute, yeah.

20    Q      And that's about the same time you see this

21    photograph?

22    A      No.  She says I was cute afterwards, before -- after

23    all that.

5451

1    Q      Okay.  Well, when you look at this photograph, you

2    recognize the background of the photograph as the Belmont

3    Correctional Facility?

4    A      Yeah.

5    Q      Well, Belmont, were you in the Belmont Correctional

6    Facility?

7    A      Yes, I was.

8    Q      And Belmont only takes felons; am I correct?

9    A      Yes, they do.

10    Q      So how many felonies you been convicted of in the

11    last ten years?

12    A      Oh, in the last ten years of my life, I've been

13    locked up three times.  I have three numbers.

14    Q      Okay.  What felonies have you pled to or been

15    convicted of?

16    A      Well, I've been convicted of when I seen my parole

17    officer back in '99.

18    Q      Is that the escape charge?

19    A      Yes.

20    Q      You were on parole for another felony?

21    A      No.

22    Q      You were on parole for a misdemeanor?

23    A      That's not a misdemeanor.  That's a felony because

5452

```
1     I --

2     Q       Escape?

3     A       Escape.   That's a felony.

4     Q       I you thought you got charged with escape for

5     failure to report to your parole officer?

6     A       That's the same thing, sir.

7     Q       So you have two escapes?

8     A       One escape.

9     Q       What got you put on parole the first time?

10    A       Back in the day, I was living in Cleveland.   I was

11    hangin' around the wrong crowd.   I was selling drugs.

12    Q       You were selling drugs?

13    A       Yes, I was.

14    Q       What kind of drugs were you selling?

15    A       I was selling crack cocaine.

16    Q       And is that what got you sent to Belmont the first

17    time?

18    A       No.   The first time I got locked up was in Grafton.

19    It was in Grafton, Lorain.   I was real young.

20    Q       And what got you, you had to be 18 or you don't go

21    to Grafton; right?

22    A       Yeah.   I was like 25, 24.

23    Q       What got you sent to Grafton that time?
```

1     A       My very first time, I was selling drugs.  That was

2    my first time.

3     Q       The second time was selling drugs?

4     A       The second time was aggravated assault.

5     Q       And then the third time?

6     A       The third time was failing to see my parole officer.

7     Q       So while you and Donna are in the Greyhound bus

8    station, she's writing a letter to Nate; is that right?

9     A       I guess so.  That's what she was writin'.  She had

10   his picture beside the letter.

11    Q       So at the same time she's writing the letter to

12   Nate, she's fixin' up a date with you for 5:00 that day when

13   work is over?

14    A       Yes, sir.  Not that day because I was going to

15   Cleveland that day.  When I got back from Cleveland, we set

16   up that thing.  When I got back, we set up an appointment

17   where we were gonna hook up.  When I got back, she was there,

18   and that's when we started hookin' up with each other.

19    Q       Was that the same day or a different day?

20    A       A different day.

21    Q       How many days later?

22    A       About two days.

23    Q       And is that the occasion that she takes you to her

5454

1 home?

2 A  Yeah, she do.  We rode around for a minute before

3 she took me there because she smoked a fat joint, a couple of

4 fat joints, and then she rode to her house.

5 Q  And while you are with her, she tells you that her

6 boyfriend is Nate Jackson; right?

7 A  She asked me did I know him because I was in

8 Belmont.  I told her no.  I asked her his name.  She told me

9 his name.  I told her I didn't know him.

10 Q  She told you his name?

11 A  She asked -- yeah.  She told me his name because she

12 asked me did I know him.  I told her I didn't know him.

13 Because I was down there.  I wasn't trying to associate with

14 a lot of people down there.

15 Q  Did she indicate to you that that was her boyfriend?

16 A  Yes, she did.  She said that was her little lover on

17 the side.  And I asked her was she married.  And she's like,

18 "Yeah."

19   I said, "What you doing with a boyfriend on the

20 side?"  Flat out.  Like that.

21   She's like, "Well, my husband don't take, don't

22 satisfy my needs."

23 Q  Did she tell you she was separated?

5455

1    A        Yeah.  Something like that.

2    Q        That her and her husband had separate bedrooms?

3    A        Yeah.

4    Q        So while she's telling you that she had separate

5    bedrooms with her husband and she loves Nate Jackson, she's

6    performing fellatio on you on the couch?

7    A        I guess I remind her of Nate.  That's what it was.

8    You know what I'm saying?  I think we favored or whatever in

9    certain ways and that's why, that's what made her really like

10   me because I guess I reminded her of him a little bit.

11   Q        Well, would you agree that regardless of her

12   feelings about Nate, whatever those feelings were, they

13   weren't strong enough to stop her from throwing herself right

14   at your feet?

15   A        True.

16   Q        Isn't that what you're telling us?  She wanted to

17   have sex with you?

18   A        Exactly.  As soon as I came back, she wanted me.

19   Q        Now, you owed a fine at this time; right?

20   A        Yeah.  I owed a fine.

21   Q        Of $238 or thereabouts?

22   A        No.  It was $280 to be exact.  It was in east

23   Cleveland.

1    Q        $280?

2    A        Yes.

3    Q        Did you have to pay that $280 in order to get your

4    license reinstated?

5    A        I paid, I went down to east Cleveland and made a

6    payment plan with them and they dropped the charges because

7    they found out I was in Belmont so they dropped the charges.

8    Q        Did you borrow the money from Donna to pay that

9    fine?

10    A        I didn't get no money from Donna.

11    Q        Did you borrow $238 from Donna?

12    A        I didn't borrow no money from Donna.

13    Q        Do you recall talking, giving a tape-recorded

14    statement to Detective Hoolihan from the Warren Police

15    Department and Detective Dillon, this gentleman right here?

16    A        Uh-huh.

17    Q        On December 13th of 2001?

18    A        Yes.  I remember talking to them guys.

19    Q        And you're telling us under oath that you never told

20    them you borrowed $238 from Donna Roberts?

21    A        She wanted to give me some money for having some sex

22    with her.  That was all it was about.  It wasn't about me

23    borrowing no money.  She really told me, "If you need any

5457

1    money, I will help you out."

2           That's what this lady told me.

3    Q        So your position is it wasn't a loan, it was payment

4    for services rendered?

5    A        Yeah.  She didn't tell me it was no loan because I

6    didn't ask her for nothing.  She told me, "I will help you

7    out," because I was talking about my fines.  That's why I was

8    taking Greyhound.

9    Q        You were telling her about your fines?  Did she give

10   you money?

11   A        She offered to give me some money.  It wasn't no --

12   Q        Did you tell them that she, in fact, gave you $238?

13   A        She gave me a hundred and like 80 bucks.

14   Q        Do you want me to play the tape where you talk about

15   238?

16   A        You can play the tape.  It might refresh my memory.

17           MR. INGRAM:  Did you guys bring that tape

18   with you?

19           MR. BECKER:  Yeah.  It's right here.

20           MR. INGRAM:  Get it out.  I want to use

21   it.

22           MR. BECKER:  You have a copy of it, right,

23   or do you want the tape?  Oh, we got it.  We got it.

5458

1    Q      (By Mr. Ingram) Did you use that money to pay your

2    fine?

3    A      Yes, I did.  Like I say, I went down there to get me

4    a payment plan.

5    Q      She ask you to do anything in return for that money?

6    A      She wanted me to have sex with her flat out and I

7    wouldn't have sex.  She had oral sex on me and she got mad

8    because I wouldn't have sex with her.

9    Q      Well, she never asked to you kill her husband, did

10    she?

11    A      No way.

12    Q      As a matter of fact, she never said anything to you

13    bad about her husband at all, did she?

14    A      No way.

15    Q      She told you when she gave you the money that money

16    meant nothing to her, didn't she?

17    A      She said that money ain't nothin' to her.  She had

18    plenty of money.  That's what she said.  Money don't mean

19    nothin' to her.

20    Q      She also told you all the property was in her name?

21    A      Yes, she did.

22    Q      She ever take you for a haircut?

23    A      No, she didn't.  The haircut place is right next

5459

1    door to the Greyhound.  I just go there and get my hair cut

2    at Final Cut.  I still go there to this day.

3    Q        Now, you have, as you and I are talking, you filed a

4    lawsuit against Donna for money damages, haven't you?

5    A        Yes.  I lost my job behind that.  I was up under

6    stress because I thought I was gonna get accused for

7    something I didn't do because people do get locked up for

8    something they didn't do lots of time.

9    Q        Let's talk for a second because there are actually

10   some ground rules here.  If you can answer, fairly and

11   reasonably answer my questions yes or no, you should.  The

12   question was have you filed a lawsuit for money damages?

13   A        Yes.

14   Q        And is that gentleman sitting back there in the blue

15   shirt your lawyer?

16   A        Yes, he is.

17   Q        That's Mr. Bluedorn.  And that lawsuit asks for

18   money damages for some amount in excess of $25,000?

19   A        Yes.

20   Q        And how much money do you hope to get?

21   A        I don't know how much money I hope to get.  I'm

22   letting my lawyer take care of that.

23   Q        But you're just hoping it's some sum over $25,000?

```
1    A        This procedure made me lose my job.  I lost my job

2    behind it.  It put me in a bad character.

3    Q        It's a fact, is it not, that your lawsuit is based

4    on a theory that Donna tried to frame you, that Donna Roberts

5    instigated, instituted and perpetuated the criminal

6    proceedings against you in order to frame you for the murder

7    of Robert Fingerhut?

8    A        True.

9    Q        Did you come up with that theory on your own or did

10   the police help?

11   A        No.  I came up with that.  After the police told me

12   what was going on, after Detective Dillon and Hoolihan told

13   me what was going on, that she was trying to say I stole her

14   gun and point the finger at me so her and Nate, Mr. Jackson,

15   go in the clear, that's what made me come up with that

16   theory.

17   Q        Okay.  They gave you the facts and then you put them

18   together to come up with that theory; is that right?

19   A        That's all I can think of.

20   Q        When were you arrested on this complaint?

21   A        Excuse me?

22   Q        You were arrested on the complaint Donna filed

23   against you?
```

5461

1   A       Yeah.  She put a warrant out for my arrest.

2   Q       You were arrested on December 3d?

3   A       Yes.

4   Q       And as I understand your answers to Mr. Becker, you

5   were unable to make bail so you spent two or three days in

6   jail?

7   A       Yes, I did.

8   Q       Money's tight; right?

9   A       Yeah.

10  Q       Hard to come up with money?

11  A       Yeah, when you ain't working at the time.  I had

12  that money from my mother-in-law.  She had got me out the

13  third day.

14  Q       You weren't working when you were arrested?

15  A       Yes, I was working.

16  Q       Okay.  So even though you were working, money was

17  tight?

18  A       Because that wasn't my pay week.

19  Q       Oh.  Well, I guess Donna is lucky that you posted

20  bail, isn't she?

21  A       Why you say that?

22  Q       Well, you're telling us she tried to set you up as a

23  patsy; right?

5462

1   A        That's how I feel.

2   Q        If you hadn't posted bail, you would have been in

3   jail on December 11th; am I right?

4   A        If I hadn't posted bail, I probably would have sat

5   there until I went to court again.

6   Q        You were arrested on December 3d; correct?

7   A        I don't know practically what time I was arrested,

8   but --

9   Q        Well, here.  Take a gander at your lawsuit, young

10  man, and you tell me if you allege that you were arrested on

11  December 3d.  I'm sorry.  I have a copy of that for the

12  prosecuting attorney.  Excuse me one minute.

13  A        Excuse me.  My lawyer have all the copies and

14  everything what day I was arrested and everything.  I don't

15  remember everything.

16  Q        Here's certified records from Youngstown Municipal

17  Court.  You're arrested on December 3d.  You want to argue

18  about that date or do you want to concede that date?

19  A        I don't want to argue about no date because I know I

20  was arrested.  I don't know what exact day I was arrested,

21  but like I said, my lawyer have copies and everything when I

22  was arrested and everything.

23  Q        I don't care what your lawyer has copies of.  You're

1     telling this jury she tried to set you up for a patsy when,

2     in fact, she had you arrested on December 3d; correct?

3     A        Yeah.  She did try to set me up for it.

4     Q        And she knows you don't have money, doesn't she,

5     because you couldn't pay your fine to get your license

6     reinstated?

7     A        No, I could have paid my fines, but I was working at

8     the time.  I have other bills.  I'm a family man.

9     Q        You couldn't pay your fine.  Why didn't you pay?

10    A        Because I have bills down here.  I have a family

11    down here.

12    Q        So if you can't come up with money after you're

13    arrested, you stay in jail; correct?

14    A        I guess so, but I came up, my mother-in-law got me

15    out.

16    Q        Well, is she telepathic?  Is she gonna know your

17    mother-in-law is gonna get you out?

18    A        I don't know what she know, but I know I called my

19    peoples and they got me out.

20    Q        Now when you were questioned by the police on

21    December 13th of 2001, that's Detective Dillon and Detective

22    Hoolihan, you actually go, where, to the Howland Police

23    Department; right?

5464

1   A       Excuse me?  Say that again.

2   Q       Did you go to the Howland Police Department and they

3   questioned you?

4   A       Yes, I did.

5   Q       And they question you about your whereabouts on

6   December 11th; correct?

7   A       Yes, they did.

8   Q       And you're married?

9   A       Yes, I am.

10  Q       And you have kids?

11  A       I have kids.  I have one son in Cleveland and I have

12  a daughter down here in Warren.

13  Q       Does the girl you have down here in Warren, does she

14  live with you and your wife?

15  A       Yes.

16  Q       And back at this time, you were working Monday

17  through Friday from about 9 to 2?

18  A       9 to 3.

19  Q       9 to 3?

20  A       Yes.

21  Q       And when they were talking with you, they asked you

22  about your whereabouts on December 11th; do you recall that?

23  A       I told 'em I was at the Fiesta.  I like to shoot

5465

1    pool a lot.

2    Q        What?

3    A        I like to shoot pool a lot so I was at the Fiesta

4    shootin' pool.

5    Q        Up until about 10:00; right?

6    A        About 10:30, 10:00.  Go to the house, go to bed,

7    ready to go to work the next day.

8    Q        Okay.  So when the police asked you where you were

9    at midnight on Tuesday, December 11th, you say that, "I was

10   at home and in bed with my wife"?

11   A        Oh, yeah.  At that time, I was in bed at the time.

12   Q        And as a matter of fact, if I asked you where you

13   were on any given Tuesday when you were working, your answer,

14   at midnight, your answer would be, "At home in bed with my

15   wife;" correct?

16   A        Yeah.  Because I had to go to work in the morning,

17   true.

18   Q        Right.  How many Tuesdays would we have to go back

19   in time before your answer would be different?

20   A        I don't know how many Tuesdays.  I do something

21   different almost every day.

22   Q        But you go to work every morning; right?

23   A        Exactly.

5466

1    Q       So you go to bed at a reasonable hour?

2    A       I go to bed no later than 10:30, 11:00.

3                MR. INGRAM:  Can I have a moment, Your

4    Honor?

5                THE COURT:  Yes.

6    Q       (By Mr. Ingram)  When Donna presented herself at

7    your place of employment, that didn't make you a happy

8    camper, did it?

9    A       No, it didn't.  At first, I was happy to see her

10   until she started sticking me with her phone like she wanted

11   to shoot me like, "Mother fucker, you took my gun," and all

12   this and that.

13           I'm like, "What is you talkin' about?"

14   Q      And eventually you learned that she had sworn out a

15   warrant for your arrest?

16   A      Yeah.  Later on that, later on that, later on the

17   next day when the detectives come up there.

18   Q      And right around that same time, you placed a

19   telephone call to Robert Fingerhut, did you not?

20   A      Oh, yeah.  I called her husband at the Greyhound

21   station and told him that she was threatenin' me and talking

22   about some gun or whatever and talkin' about I took some

23   money or whatever.  Yes, I did call her husband, but I didn't

5467

1    get --

2    Q        And you also told her husband that, "Donna is

3    cheating on you"?

4    A        Oh, I didn't tell her husband nothing like that.

5                    MR. INGRAM:  Okay.  Your Honor, could we

6    have a recess so I can get this tape set up?

7                    THE COURT:  Yes.  How much time do you

8    need?

9                    MR. INGRAM:  Probably five, ten minutes.

10                   THE COURT:  Let's take ten minutes.  You

11   are not to discuss anything about the case until you return.

12   You are not to form an opinion.

13   (Whereupon, a recess was had commencing at 3:17 p.m. and

14   concluding at 3:35 p.m.)

15                   THE COURT:  Mr. Ingram.

16                   MR. INGRAM:  Thank you, Your Honor.

17   Q        (By Mr. Ingram)  Mr. Mason, do you recall having a

18   conversation with Detective Hoolihan and Detective Dillon

19   back on December 13th, 2001 at approximately 2:35 in the

20   afternoon?

21   A        Yes.

22   Q        I'm gonna play for you and hopefully the microphone

23   will pick it up so that the jury can hear a portion of your

5468

1     conversation with those detectives on that date.

2     (Whereupon, counsel played a portion of an audio tape for the

3     witness.)

4     Q        (By Mr. Ingram)  I asked you previously if you had

5     told Mr. Fingerhut that Donna was cheating on him and you

6     said no.

7     A        Well, that would have been around --

8     Q        Sir, sir, answer my question, please.  Did that tape

9     refresh your recollection?

10    A        Yes.  Yes, it does.

11    Q        Did you tell Mr. Fingerhut that Donna was cheating

12    on him?

13    A        Yeah.  It was on the recording.  I must have said

14    something.  I was mad at the time.

15    Q        So when you said no, that was an incorrect answer

16    under oath?

17    A        I didn't remember all that.  You know what I'm

18    sayin'?

19    Q        You didn't remember all that?

20    A        I was so mad that day.

21    Q        You didn't say you didn't remember what you said to

22    Mr. Fingerhut, did you?  You said you had not told him that

23    Donna was cheating on him?

1    A        Like I said, I told him, I talked to him on the

2    phone.  I don't remember the conversation I said because I

3    was mad at the time because she came into my job and kept on

4    harassing me.

5    Q        Okay.  So now -- let's be clear about this.  Now you

6    remember calling him and telling him that Donna was cheating

7    on him?

8    A        Yeah.

9    Q        And you told the police that you made that telephone

10   call to Mr. Fingerhut about a month before the interview.  So

11   the interview was on December 13th.  And if it's a month

12   before, that's about the middle of November; is that right?

13   A        I guess so.  I don't remember.  I can't remember

14   that far back.  That's like a year ago.

15   Q        You remembered far back when you were talking to the

16   gentlemen from the prosecution here.

17   A        I remember the discussions I had with the

18   detectives, but I don't know the exact words I was saying

19   then because I was mad at the time when I was talking to them

20   telling them about the situations that happened at my job.

21   Q        Do you have a selective recollection?

22   A        What?

23   Q        Do you have, can you only remember what you want to

1    remember?

2    A        Ain't about what I want to remember.  I just knew I

3    was pissed off at the time and I was just, just telling the

4    detectives what was on my mind right when I had done.

5    Q        Okay.  You were pissed off so you called

6    Mr. Fingerhut to tell Mr. Fingerhut that Donna was cheating

7    on him?

8    A        True.  It was on the recorder.  Yeah.  I must have

9    started that.

10   Q        Well, if we had never got this recording, would you

11   have ever told us the truth?

12   A        It ain't about me telling the truth.

13   Q        It's not about you telling the truth?  Did you take

14   an oath?

15   A        Excuse me?

16   Q        Did you take an oath to tell the truth?

17   A        Yes, I did, but I couldn't remember.

18   Q        Let me tell you something, sir.  While you are here,

19   everything is about you telling the truth.

20   A        I am telling the truth about everything, but I

21   couldn't remember everything.

22   Q        And when you said you had not called Mr. Fingerhut,

23   that simply was not the truth?

5471

1    A       I said I called Mr. Fingerhut, but I couldn't recall

2    all the words, all the conversations that we had though.  I

3    did say I called him.

4    Q       You said you called him, but you said you had not

5    said anything about Donna cheating.  That was not the truth,

6    was it?

7    A       It's the truth.  It's on the recorder.  The tape is

8    the truth.

9    Q       We now know it's the truth.  The question is, your

10    previous testimony under oath was not the truth?

11    A       Well, it's the truth.  I know I didn't steal no gun.

12    I didn't murder nobody.

13    Q       I agree with that.  You want to go back and talk

14    about the $220?

15    A       You can record, we can go rewind that and go back

16    and talk about it.

17    Q       Well, do we have to?

18    A       You don't have to.

19    Q       She gave you $220, didn't she?

20    A       She gave me some money.

21    Q       About $220?

22    A       I would say about $180.  It was about $180.

23                MR. INGRAM:  I have no further questions.

5472

1                    THE COURT:  Any redirect?

2                    **REDIRECT EXAMINATION**

3    **BY MR. BECKER:**

4    Q       Mr. Mason, who took Donna Roberts' gun?

5    A       I don't know.

6    Q       Did you take Donna Roberts' gun?

7    A       I didn't take no gun.

8    Q       And when were you accused of taking Donna Roberts'

9    gun?  When were you accused of doing it?  Approximately.

10    A       (No response.)

11    Q       Well, let me withdraw that question.

12            Let me ask you this.  How long after you rebuffed

13    her sexual advances to you were you accused of taking her

14    gun?

15    A       I can't remember.  I think it was about three to

16    four days afterwards.  Somethin' like that.

17    Q       And who was responsible for you being charged for

18    taking a firearm in December of 2001?

19    A       She was responsible for saying I took her gun.

20                MR. BECKER:  I have nothing further.

21              **RECROSS EXAMINATION**

22    **BY MR. INGRAM:**

23    Q       Donna Roberts is responsible for getting you thrown

5473

1    in jail on December 3d, 2001?

2    A        Yes, because she put a warrant out for my arrest

3    that I stole a gun from her.

4    Q        I'm gonna ask you this question again.  Try to

5    answer my question.  She's responsible for getting you thrown

6    in jail on December 3d, 2001.  Yes or no?

7    A        The day I went to jail, she's responsible.  Yes, she

8    is responsible for that.

9    Q        And you went to jail before December 11th, 2001,

10   didn't you?

11   A        Yeah, I went to jail before -- you say the 11th?

12   Like I say, I can't remember the exact day or whatever

13   because it's been almost a year ago, but --

14   Q        Well, you wouldn't file a false or frivolous

15   lawsuit, would you?

16   A        Yes, I filed a lawsuit.

17   Q        Yes, you would?

18   A        Yes, I filed a lawsuit.

19   Q        I didn't ask you if you filed one.  I said you

20   wouldn't file a false and frivolous one.  That's a false one.

21   A        No, I didn't file no false --

22   Q        Read to the jury paragraph five.

23   A        Which one?

1    Q        Paragraph five.

2    A        "On or about December 3d, 2001, the Warren Police

3    arrested plaintiff, Santiago Mason, pursuant to warrant

4    issued upon defense.  The plaintiff was taken to and confined

5    in the Trumbull County Jail for two days before release on

6    bond answering to the charges before Warren Municipal Court."

7    Q        The truth is, you're arrested on December 3d;

8    correct?

9    A        The truth is, I don't know exactly what day I was

10   arrested, but I know I was put in jail.

11   Q        If your lawyer said it was December 3d, are you

12   gonna tell him he's wrong?

13   A        If my lawyer got the paper that show me the day I

14   was in jail, it's right.  If it's on this paper, it's right

15   then.

16   Q        Okay.  It says December 3d.  So it's right?

17   A        Yeah.

18   Q        And that's before December 11th, isn't it?

19   A        Exactly.

20                    MR. INGRAM:  No further questions.

21                    THE COURT:  Redirect?

22                         *  *  *

23

1                <u>FURTHER REDIRECT EXAMINATION</u>

2   <u>BY MR. BECKER:</u>

3   Q      Mr. Mason, have you ever heard of a typographical

4   error?

5   A      No.

6   Q      All right.  Do you think that sometimes people put

7   the wrong dates in documents?

8   A      Mistakes can happens.

9   Q      Okay.  Could you have been arrested on December 13th

10   rather than December 3d?

11   A      Like I said, I don't know what day I got arrested on

12   because I don't remember.

13   Q      So we need to check the Trumbull County records --

14   A      Yes.

15   Q      -- to see when exactly you were arrested in

16   December?

17   A      Yes.

18   Q      Whether it was before December 11th or after

19   December 11th?

20   A      Yes.

21   Q      Correct?

22   A      Because I don't know exactly what day.  I know I was

23   in jail.  That's all I know.  I went to jail for something I

1    didn't do.

2    Q        And you don't know the exact date, even regardless

3    of what it says in that lawsuit?

4    A        Exactly.

5    Q        That may be, someone may have forgot to put the one

6    in before the three?

7    A        I don't know.

8                    MR. BECKER:  I have nothing further.

9                    MR. INGRAM:  Chris, where is that, those

10   certified records?

11                   MR. BECKER:  Right there.

12                   FURTHER RECROSS EXAMINATION

13   BY MR. INGRAM:

14   Q        Regardless of whether your lawyer made a

15   typographical error, she comes to your place of employment

16   with the cell phone and calls the police well before December

17   11th; correct?

18   A        I don't know the exact date it was, but I know she

19   came to my job.

20   Q        Well, it was the same day that you told the police

21   you called Mr. Fingerhut; is that correct?

22   A        Like I said, I don't know the exact date that I

23   called and what exact date that I went to jail, but I know I

5477

1    was jail and I know I called her husband.  I'm not

2    remembering, I don't remember dates.  I know it was cold

3    outside.

4        Q        When Dillon here and Hoolihan came to talk to you,

5    were you home or were you in jail?

6        A        I was at work when they came and talked to me.

7        Q        Did they come to talk to you on December 13th, 2001?

8        A        I don't recall.  I can't remember what date it was,

9    sir.

10       Q        Okay.

11       A        I just know that they came up to my job and told me

12   to come up to Howland Police station.

13                MR. INGRAM:  Your Honor, I know I'm gonna

14   aggravate, sorry Ladies and Gentlemen, I'm gonna try the

15   jury's patience.  I have to rewind this for a second.

16                MR. BECKER:  I'm sorry?

17                MR. INGRAM:  I'm rewinding.

18                THE COURT:  Is there a transcript of that

19   tape?

20                MR. INGRAM:  I don't have one.

21                MR. BECKER:  No.  There is no transcript

22   of that tape.

23                MR. INGRAM:  I guess it would be real

1    simple if Detective Dillon could tell us what day the

2    interview took place.

3                      MR. BECKER:  Do you want to call him for

4    limited purposes?

5                      MR. INGRAM:  Yes.

6                      DETECTIVE FRANK DILLON:  The 13th.

7                      MR. BECKER:  Okay.  Are you done with

8    Mr. Mason?

9                      MR. INGRAM:  Yes.

10                      THE WITNESS:  You done with me?

11                      THE COURT:  You're excused then.  Thank

12    you very much.

13                      DEPUTY GARY BACON:  Is he excused or just

14    temporarily?

15                      MR. INGRAM:  Temporarily.  I may have more

16    questions.

17                      MR. BECKER:  Just wait in the hallway.

18                      THE WITNESS:  All right.

19                      MR. BECKER:  Your Honor, I guess that the

20    defense has requested that Detective Sergeant Dillon be

21    called for the limited purpose, and we have no objection to

22    him being taken out of order, for the limited purpose of --

23                      MR. INGRAM:  Establishing the date of the

1    interview.

2                      MR. BECKER:  -- the day that Mr. Mason was

3    arrested.

4                      THE COURT:  This should be pretty easy to

5    clear up as to whether it was the 3d or the 13th.

6    WHEREUPON,

7                          FRANK DILLON,

8    having been first duly sworn, according to law, was examined

9    and testified as follows:

10                         CROSS EXAMINATION

11   BY MR. INGRAM:

12   Q       When did the Mason interview take place?

13                      THE COURT:  Okay.  Let me stop you just

14   one minute.  This is for purposes of cross examination at

15   this point.

16                      MR. BECKER:  I don't -- yeah.

17                      MR. INGRAM:  It doesn't matter.

18                      MR. BECKER:  We have no objection to

19   Mr. Ingram leading off the questioning of this witness at

20   this time.

21                      THE COURT:  Okay.  Fair enough.  Go ahead.

22   A       According to my report --

23                      MR. INGRAM:  I'll withdraw that.

6336

1    easier to get through, and I suspect it makes for a

2    more just result, also.

3              Everybody has had their say and I hope

4    have been afforded a fair trial.  This will be

5    reset for sentencing once the Court has reviewed

6    the matter.  I thank you all very much.

7    (Court adjourned at 4:25 p.m.)

8

9

10

11   Friday, June 20, 2003; In Open Court at 1:50 p.m.:

12   Sentencing Hearing before Judge Stuard:

13              THE COURT:  On May 28, 2003, a

14   Trumbull County Petit Jury returned a unanimous

15   verdict finding the Defendant, Donna Marie Roberts,

16   guilty of two counts of complicity to commit

17   aggravated murder, arising from the death of Robert

18   S. Fingerhut.  Each count contained two

19   specifications of aggravating circumstances, listed

20   in division A of section 2929.04 of the Revised

21   Code.

22              Since Counts One and Two of the

6337

1  indictment merge for sentencing purposes, the State

2  elected to dismiss Count Two and the specifications

3  thereto prior to the commencement of the mitigation

4  phase.  Therefore, for purposes of this opinion,

5  the Defendant was convicted of the first count of

6  the indictment or purposely and with prior

7  calculation and design, causing the death of Robert

8  S. Fingerhut.

9          On June 4, 2003, the mitigation or second

10 phase of the trial began.  The Jury in that phase,

11 unanimously found that the State had proven beyond

12 a reasonable doubt, that the aggravating

13 circumstances, to-wit, Specification One to Count

14 One, that the Defendant was a complicitor in

15 committing or attempting to commit or in fleeing

16 immediately after committing, or attempting to

17 commit aggravated burglary, and that the Defendant

18 committed the aggravated murder with prior

19 calculation and design.  And Specification Two to

20 Count One, that the Defendant was a complicitor in

21 committing or attempting to commit or in fleeing

22 immediately after committing or attempting to

6338

1   commit aggravated robbery.  And that the Defendant

2   committed the Aggravated Murder with prior

3   calculation and design outweighed the mitigating

4   factors, and returned two verdicts recommending the

5   death sentence.

6          Pursuant to Revised Code, Section

7   2929.04(F), the Court is now obligated to file a

8   separate written opinion independently weighing the

9   aggravating circumstances of each specification

10  against the mitigating factors.  The weighing

11  process reflected in this opinion is based upon

12  evidence heard by the Jury, but is done

13  independently and without regard to the findings of

14  the Jury.

15         Factually, the evidence at trial revealed

16  that the Defendant planned the murder of her

17  ex-husband and housemate, Robert S. Fingerhut, for

18  $550,000 in insurance proceeds.  The Defendant

19  plotted the murder for at least three months prior

20  to December 11, 2001.  The Defendant corresponded

21  with her convict lover and codefendant, Nathaniel

22  Jackson while he was in prison at the Lorain

6339

1   Correctional Institution.

2          She also accepted 19 collect telephone

3   calls from Jackson while he was incarcerated,

4   wherein they planned the details of the murder.

5   The telephone calls were recorded, and the letters

6   and phone calls were seized by police during the

7   course of the murder investigation.

8          The murder plot included a plan whereby

9   the Defendant would pick up Jackson from prison on

10  December 9, 2001, and take him to the Wagon Wheel

11  Motel in Boardman, Ohio, and rent a room with a

12  mirrored ceiling and Jacuzzi tub where they would

13  have sexual relations.  The Defendant would obtain

14  handcuffs, a firearm, ski mask, leather gloves to

15  conceal fingerprints and would ensure Jackson

16  access to the Defendant's residence so that Jackson

17  could abduct the victim and take him out of the

18  house and kill him.  The conspirators discussed

19  forcing the victim to watch the Defendant perform

20  oral sex on Jackson before executing the victim.

21         The Defendant planned to set up an alibi

22  at the time of the murder by driving around and

6340

1  going to various retail outlets and shopping, where

2  she would be filmed by the store's video security

3  cameras, and the Defendant made several telephone

4  calls to Fingerhut's place of employment, the

5  Greyhound bus station in Youngstown, Ohio, to

6  ensure that Fingerhut timely left work at

7  approximately 9:00 p.m. on December 11, 2001.

8       The Defendant also provided Jackson with

9  a cellular phone to keep in contact with her while

10  she was driving a red Chrysler 300-M, which

11  contained its own cellular phone.

12       The Defendant had previously checked on

13  the insurance policies, to ensure that they were in

14  effect, and that the premiums were paid until the

15  end of 2001.  The Defendant also discussed in the

16  letters and phone calls, obtaining a motel room for

17  Jackson after the killing, so Jackson could hide

18  out after the murder.

19       However, the plan began to go bad when

20  Jackson, who was in Fingerhut's residence,

21  sustained a gunshot wound to his left index finger

22  during a struggle with the victim.  Jackson shot

6341

1   Fingerhut three times including one fatal shot to

2   the head.  Jackson left the victim's body in the

3   residence, took Fingerhut's car keys, and

4   Fingerhut's silver Chrysler 300-M from the garage

5   of the residence.  Jackson drove Fingerhut's car to

6   Youngstown, Ohio, where he abandoned it

7   approximately three blocks from where he was

8   ultimately arrested on December 20, 2001.

9           A series of telephone calls occurred

10  between the Defendant's telephone and her red

11  Chrysler and her cellular telephone, which was in

12  the possession of Jackson during the time frame of

13  approximately 9:30 p.m. and 12 midnight, on

14  December 11, 2001.  Between 9:30 p.m. and 10:30

15  p.m., the Defendant drove Jackson to the Days Inn,

16  in Boardman, Ohio, and rented him a room for one

17  week.  Jackson's wound was treated and bandaged in

18  the room.

19          The Defendant returned to the residence

20  in Howland Township, Trumbull County, Ohio and

21  discovered her ex-husband's body just inside the

22  main door leading from the garage.  The Defendant

6342

1    called 911, and feigned hysteria.  The Defendant in

2    her letters to Jackson, had discussed how she would

3    fake grief upon discovering that her ex-husband had

4    been killed.

5            Howland Township police officers

6    responded to the 911 call, and were met by the

7    Defendant.  The police did not find any signs of

8    forced entry, and the only thing missing from the

9    residence were the victim's car keys and the

10   victim's automobile.  Two wallets containing a

11   large sum of cash and credit cards as well as other

12   valuables were undisturbed inside the residence.

13           The Defendant told the officers that her

14   husband's car was missing, and granted them

15   permission to search the residence, and her vehicle

16   for evidence that might lead to the killer.  And

17   during this search, police found approximately 140

18   letters from Jackson to the Defendant in her

19   dresser.  And approximately 140 letters from the

20   Defendant to Jackson, in the trunk of the

21   Defendant's red car, in a paper bag bearing

22   Jackson's name, prison number.

6343

1        As the investigation progressed, the law

2   enforcement officers were able to obtain the 19

3   recorded telephone conversations between the

4   Defendant and Jackson while Jackson was

5   incarcerated in the Lorain Correctional

6   Institution.   These tapes constituted approximately

7   three hours of conversation.   These telephone calls

8   along with letters which spanned the time frame of

9   approximately three months, revealed a continuing

10  and evolving plan to kill Fingerhut within days

11  after Jackson's release from prison.

12        Jackson was soon arrested at a house on

13  Wirt Street in Youngstown, Ohio, a few blocks from

14  where Fingerhut's vehicle was recovered.  And a

15  pair of black leather gloves with fleece lining

16  were recovered from that house at the time of his

17  arrest.

18        In a letter written to Jackson, the

19  Defendant acknowledged that she had found thin,

20  fleece lined leather gloves.   The recovered gloves

21  had gunshot residue, and a hole in the left index

22  finger along with the reddish substance, which

6344

1  appeared to be blood in that area.  This damaged

2  area matched the injury that Jackson had sustained

3  to his finger.

4          The evidence also revealed that the

5  Defendant, near the approximate time of the murder,

6  was seen driving her automobile in a very slow

7  manner away from the vicinity of the home where

8  Fingerhut lived.  Furthermore, within two hours

9  from the last time Fingerhut was seen alive, the

10  Defendant rented a motel room at the Days Inn in

11  Boardman, Ohio for Jackson.  In this room, bloody

12  bandages and other medical supplies were found by

13  hotel cleaning personnel and were subsequently

14  collected by the police.

15          Fingerhut's silver Chrysler, which had

16  been stolen by Jackson from the residence was

17  recovered in Youngstown, Ohio.  Blood stains in and

18  on the vehicle were collected by law enforcement

19  officers.  DNA analysis of the blood stains

20  collected on the trunk latch and the interior sun

21  visor, revealed that the blood matched the DNA

22  profiles of Nate Jackson, and the victim.  Blood

6345

1    stains collected from the Days Inn also matched the

2    DNA profile of Nathaniel Jackson.

3            The State also introduced evidence from

4    the letters that the Defendant and Jackson

5    discussed purchasing a new Lincoln or a Cadillac

6    Deville for Jackson.  The Defendant and Jackson

7    repeatedly discussed waking up together on

8    Christmas morning.  And the Defendant repeatedly

9    stated how much she hated Fingerhut.

10           Additionally, Fingerhut had two life

11   insurance policies with a combined benefit of

12   $550,000.  On December 12, 2001, shortly after

13   calling 911, Howland police officers noted the

14   Defendant's behavior, which included feigned crying

15   and listening in on conversations of investigators.

16   On December 12, 2001, shortly after calling 911,

17   the Defendant told investigators that she had been

18   out shopping at Wal-Mart, Super K-Mart, and Giant

19   Eagle.  Police could only confirm that the

20   Defendant was at Wal-Mart at approximately 9:30

21   p.m.  The Defendant never stated to police that she

22   had taken Jackson to the Days Inn in Boardman,

6346

1  Ohio.

2       Later in the afternoon of December 12,

3  2001, the Defendant provided police with a list of

4  suspects who may have wanted to kill Fingerhut,

5  including an alleged homosexual lover of the

6  victim.  A half Hispanic, half black man that the

7  Defendant had dated, a man named Santiago Mason.

8  And a number of people from the Greyhound bus

9  station.  When investigators asked the Defendant

10  about Nathaniel Jackson and the Defendant stated,

11  "Oh, I almost forgot about him."  And proceeded to

12  tell the officers that she had last seen Jackson on

13  Monday, December 10, 2001, and had last spoken to

14  him in the morning of Tuesday, December 11, 2001.

15       The investigation revealed that the

16  Defendant and Jackson worked together throughout

17  the afternoon and evening of December 11, 2001.

18  And the State presented evidence and testimony that

19  the Defendant took Jackson to get a haircut, ate

20  dinner with him at Red Lobster and was with him at

21  the Warren Greyhound bus terminal in Warren, Ohio,

22  which was the Defendant's place of employment.

6347

1        One witness, Frank Reynolds, testified

2    that after Jackson's release from prison and prior

3    to the murder, he was present at the Youngstown bus

4    terminal when the Defendant asked Fingerhut for

5    $3,000.  When Fingerhut refused to give her the

6    money, she gave him a dirty look.  The Defendant

7    had stated in her letters that she was tired of the

8    grinch doling out the money.  And was referring to

9    Fingerhut providing her with a set amount of cash

10   to spend each week.  The Defendant planned to

11   obtain a firearm for Jackson and to use it in order

12   to kill Fingerhut.

13        While the Defendant was supposedly in a

14   torrid love relationship with Jackson, she invited

15   the ex-con, Santiago Mason, into her residence

16   where she performed oral sex on him.  When he

17   refused her further sexual advances to engage in

18   intercourse, Mason was accused by the Defendant of

19   stealing a .38 caliber firearm.  Forensic evidence

20   revealed that the weapon used to kill Fingerhut was

21   consistent with the .38 caliber firearm.  The

22   investigation revealed that Roberts was missing two

6348

1   .38 caliber firearms at the time of Fingerhut's

2   murder.

3           In this case, the Jury found the

4   existence beyond a reasonable doubt, of two

5   aggravating circumstances, pursuant to Section

6   2929.04 (A)(7) of the Revised Code, to-wit,

7   Specification One to Count One, that the Defendant

8   was a complicitor in committing or attempting to

9   commit or in fleeing immediately after committing

10  or attempting to commit aggravated burglary, and

11  that the Defendant committed the aggravated murder

12  with prior calculation and design.  And

13  Specification Two to Count One, that the Defendant

14  was a complicitor in committing or attempting to

15  commit, or in fleeing immediately after committing

16  or attempting to commit aggravated robbery, and

17  that the Defendant committed the Aggravated Murder

18  with prior calculation and design.

19          With respect to the aggravating

20  circumstances relating to the aggravated burglary,

21  the evidence presented at trial proved that the

22  Defendant allowed Jackson to trespass in

6349

1  Fingerhut's residence, located at 254 Fonderlac

2  Drive, Howland Township, Trumbull County, Ohio,

3  with the specific purpose of killing Fingerhut with

4  prior calculation and design.

5  　　　　　Jackson was wearing leather gloves and

6  armed with a firearm, which he used to shoot the

7  victim three times causing his death.  The gloves

8  and the ski mask, firearm and access to the house

9  were all provided by the Defendant with prior

10  calculation and design, as evidenced by the

11  telephone calls and letters introduced by the

12  State.  The Defendant assured the victim's arrival,

13  by checking at his place of employment, and

14  determining when he left work by calling him on the

15  telephone while he was on his way home.

16  　　　　　The Defendant also checked on the status

17  of the life insurance policies and determined that

18  the premiums paid were up to the end of 2001, and

19  advised Jackson of the same.  Pursuant to her plan

20  to kill Fingerhut, the Defendant took Jackson to a

21  motel room in Boardman, Ohio, and rented the room

22  for one week which was consistent with the plans

6350

1   discussed in the letters and phone calls prior to

2   the murder.

3          Upon discovering Fingerhut's body, the

4   Defendant feigned grief exactly as discussed in her

5   letters with Jackson.  During the course of the

6   investigation, the Defendant continually threw out

7   red herrings to the Howland Police by mentioning a

8   number of possible suspects, including alleged

9   homosexual lovers of the victim, her ex-boyfriends,

10  crazy people from the bus terminal in Youngstown,

11  and Santiago Mason.  The Defendant only mentioned

12  Jackson, the convict she had corresponded with by

13  letters for three months, spoken to on the

14  telephone 19 times, picked up from prison and

15  engaged in sexual relations with just two days

16  prior, taken to get a haircut and ate dinner with

17  just hours previously and the person whom she had

18  driven to Boardman, Ohio on the night of the

19  murder, and who had an injured index finger, only

20  after the investigators confronted her with his

21  name.

22          From the aforementioned evidence, the

6351

1    Court concludes that the Defendant committed the

2    aggravated murder as a complicitor, while

3    committing or attempting to commit or in fleeing

4    immediately after committing or attempting to

5    commit aggravated burglary.  And that the Defendant

6    committed the aggravated murder with prior

7    calculation and design.  With respect to the

8    aggravating circumstance related to the aggravated

9    robbery, after Jackson had murdered the victim, he

10   took the victim's set of keys and the silver

11   Chrysler, 300-M.  Although the planned crime

12   involved Jackson stealing Fingerhut's car in order

13   to kidnap Fingerhut, it is clear that Jackson was

14   to take the victim's car to flee the residence.

15         The fact that Fingerhut struggled with

16   Jackson in the residence and was killed in the

17   residence, in no way, negates the Defendant's plan

18   that Jackson should steal the victim's car to

19   facilitate Jackson's own flight from the residence.

20   Ample DNA evidence was presented indicating that

21   Jackson was in the silver Chrysler 300-M following

22   the murder of Fingerhut.  Additionally, phone

6352

1   records were introduced showing that Jackson and

2   the Defendant called each other after the murder to

3   check on the status of the plan.

4           Finally, the vehicle was recovered a few

5   blocks from the location where Jackson was

6   arrested.  The Defendant, in accordance with the

7   plan to kill Fingerhut, paid for a hotel room for

8   Jackson following the murder.  The fact that the

9   silver Chrysler 300-M was found abandoned with the

10  victim's keys in the ignition, coupled with the

11  fact that the victim's wallet, money, credit cards

12  and other valuables were not stolen, clearly shows

13  that the plan to steal the victim's car with a

14  means of escape following the kidnapping and murder

15  of the victim was carried out in accordance with

16  the prior calculation and design, as set out by the

17  Defendant and Jackson.

18          From the aforementioned evidence, this

19  Court concludes that the Defendant committed the

20  Aggravated Murder, as a complicitor, while

21  committing or attempting to commit or in fleeing

22  immediately after committing or attempting to

6353

1   commit aggravated robbery, and that the Defendant

2   committed the aggravated murder with prior

3   calculation and design.

4          Now, to be weighed against the

5   aggravating circumstances, the Court must weigh any

6   mitigating factors.  On Tuesday, June 3, 2003, the

7   Defendant appeared in-chambers and on the record

8   with her retained attorneys, J. Gerald Ingram and

9   John B. Juhasz, and her retained psychologist,

10   Thomas Eberle.  The State was present and

11   represented by Assistant prosecutor Kenneth N.

12   Bailey and Christopher D. Becker.

13          At that time, the Defense indicated to

14   the Court that the Defendant had been evaluated by

15   Dr. Eberle for her competency to waive mitigating

16   evidence.  And that in the doctor's opinion, she

17   was competent to do same.

18          This Court personally addressed the

19   Defendant and inquired of her as to the importance

20   of presenting mitigating evidence, the use of such

21   evidence to offset the aggravating circumstances,

22   and the effect of failing to present such evidence.

6354

1   The Court was assured at that time by the

2   Defendant, that she understood these concepts by

3   both Defense counsel and Dr. Eberle.  This Court

4   personally inquired whether the Defendant desired

5   to waive the right to present mitigating evidence.

6   The Court having found no evidence to contradict

7   Dr. Eberle's findings on the Defendant's

8   statements, and her express desire to waive the

9   presentation of mitigating evidence, then found

10  that the Defendant was competent to waive her

11  presentation of mitigating evidence, and had done

12  so knowingly, voluntarily and intelligently, and

13  the Defendant indicated to the Court, that she only

14  desired to make an unsworn statement to the Jury,

15  which she was advised she was permitted to do and

16  would be permitted to make on June 4, 2003, which

17  was the date previously scheduled for the

18  mitigation or second phase.

19          On Wednesday, June 4, 2003, the Defendant

20  made an unsworn statement during which she stated

21  to the Jury that there were no mitigating factors,

22  and during which she requested the Jury to impose

6355

1    the death sentence.  This statement was articulate,

2    coherent and well organized.  The statement lasted

3    approximately one hour, during which the Defendant

4    showed no difficulty or fear in addressing a large

5    group of individuals, including the Jury, and a

6    large number of Courtroom observers.  The Defendant

7    spoke freely and although she had with her prepared

8    notes, she often extemporized.

9              Despite the preceding that I have

10   outlined, the Court is still bound to make an

11   independent weighing of any and all mitigating

12   factors that it feels may exist in this case

13   against the aggravating circumstances.  The

14   Defendant in this case was not the principal

15   offender.  Pursuant to section 2929.04 (B)(6), the

16   Court considers this factor, but gives it very

17   little weight.

18             The Defendant committed the Aggravated

19   Murder during the course of the commission of both

20   an aggravated burglary and aggravated robbery.  The

21   record is replete with instances where the

22   Defendant actively planned this Aggravated Murder

6356

1   with prior calculation and design in order to

2   collect $550,000 in life insurance proceeds.  The

3   Defendant's plan included buying her codefendant a

4   new Cadillac or Lincoln in exchange for killing her

5   ex-husband, promises of trips, a nice home in a

6   wealthy neighborhood, an overall 180 degree change

7   in life style for Nathaniel Jackson, her

8   codefendant.

9           The record is overwhelming that, but for

10  the Defendant's planning and actions, the victim

11  would be alive today.  The Defendant discussed and

12  planned for months with the principal offender, how

13  they would kill the victim.  The Defendant checked

14  on the status of the insurance policies in order to

15  ensure that she would be able to collect the

16  proceeds, and advised the principal offender of the

17  status of the policies.  The Defendant then

18  transported the principal offender in the

19  Aggravated Murder from prison to a predetermined

20  location, in order to engage in love making before

21  the murder.

22          The Defendant fed the principal offender

6357

1  prior to the crime.  The Defendant provided the

2  principal offender with gloves, a ski mask, murder

3  weapon and hideout after the Aggravated Murder, all

4  as planned and discussed prior to the Aggravated

5  Murder.

6          The Defendant gave the principal offender

7  entry into the residence of the victim for the sole

8  and exclusive purpose of killing the victim.  This

9  plan was clearly discussed in both the letters, and

10  recorded telephone conversations, including the

11  last telephone call on December 8, 2001, the day

12  before the principal offender was released from

13  prison.  The Defendant failed to advise police of

14  her relationship with the principal offender until

15  she was confronted with the evidence of the

16  relationship by the police.  And prior to being

17  confronted by the existence of this relationship,

18  the Defendant gave the police a number of red

19  herrings implicating a number of potential

20  suspects, but never mentioned the relationship with

21  the principal offender, and her discussions with

22  him regarding the Aggravated Murder of Robert

6358

1   Fingerhut.

2        The Court gives very slight weight to the

3   fact that the Defendant indicates in her letters

4   that the victim may have been physically abusive to

5   her.  This factor is pursuant to section 2929.04

6   (B)(1)(2).  However, the existence of this factor

7   is given very slight weight due to the fact that it

8   is unsubstantiated, and even if it were true, would

9   not warrant the Defendant's action in this case.

10        The Court gives very little weight to the

11  Defendant's unsworn statement.  During the course

12  of her unsworn statement the Defendant apologized

13  to her Defense team and thanked them for the hard

14  work.  The few positive things gleaned from this

15  statement were overshadowed by the Defendant's

16  personal attacks, and statements that were clearly

17  contrary to the evidence.  The Defendant denied

18  guilt and personally attacked the jurors by

19  claiming they were not a judge of her peers, not a

20  Jury of her peers.

21        The Defendant accused the lead

22  investigator as being motivated solely by career

6359

1  advancement and accusing him of obstruction of

2  justice and perjury.  The Defendant referred to the

3  other investigators as lackeys and claimed that one

4  member of the Prosecution team was anti-Semetic and

5  racist.

6       The Defendant also chastised jurors for

7  being uninformed about current events.  The

8  Defendant also stated to the Jury that she and the

9  victim had a loving relationship, and planned to

10  live happily ever after.

11       These statements are in direct

12  contravention of her statements in the letters and

13  the phone calls expressing her desire and wishes

14  that the victim meet an untimely death, and her

15  desire to marry and live with Nathaniel Jackson.

16       The Defendant also appeared to brag to

17  the Jury that she and the deceased have earned over

18  $200,000 per year and that the $550,000 in life

19  insurance proceeds was of little value to her,

20  because of that sum would only sustain her for a

21  few years.  It is difficult for this Court or any

22  finder of fact to give any weight to such a

6360

1    statement.

2         Pursuant to section 2929.04 (A)(7), the

3    Court will give very slight weight to the

4    Defendant's behavior during the course of this

5    trial.  The Defendant was courteous, pleasant and

6    properly addressed the Court at all times.  The

7    Defendant appeared intelligent and interested in

8    the proceedings, and appeared to assist in her

9    defense at all times.  The Defendant presented no

10   security problems to this Court and those who

11   transported her to Court each day.

12        Now the Court has carefully and

13   independently weighed the accumulation of all of

14   the mitigating factors against each aggravating

15   circumstance separately, as to each of the two

16   specifications.  In other words, the Court has

17   weighed the evidence twice, first the Court weighed

18   all of the mitigating factors against the

19   aggravating circumstances surrounding the

20   aggravated burglary, and then the Court engaged in

21   second weighing, whereby the Court again weighed

22   all of the mitigating factors against the

6361

1    aggravating circumstances surround the aggravating

2    robbery.

3         With respect to the first weighing of the

4    aggravating circumstances relating to the

5    aggravated burglary against all of the mitigating

6    factors, this Court finds that the aggravating

7    circumstances not only outweigh the mitigating

8    factors by proof beyond a reasonable doubt, but in

9    fact, they almost completely overshadow them.

10        The legislature of the State of Ohio, has

11   recognized that under certain circumstances, the

12   death penalty is an appropriate sanction to a

13   Defendant who commits an Aggravated Murder during

14   the commission of certain felonies.  In the case at

15   bar, the underlying felonies were aggravated

16   burglary and aggravated robbery.  In this

17   particular case, the Court accords substantial

18   weight to the aggravated burglary specification and

19   the weighing process.

20        In order to prove an aggravated burglary,

21   the State is required to prove that a Defendant

22   trespassed in an occupied structure, for the

6362

1  purpose of committing a criminal offense.  In this

2  particular case, the Defendant purposely had her

3  codefendant trespass in the occupied structure of

4  Robert S. Fingerhut, with the specific purpose of

5  committing an Aggravated Murder, which had been

6  meticulously planned over a number of months with

7  prior calculation and design.

8          Under the facts of this case, this Court

9  cannot see any other form of aggravated burglary

10  where the weight of this particular aggravating

11  circumstance could ever be greater.  The evidence

12  reveals that the aggravated burglary was committed

13  for the sole purpose of killing Robert S.

14  Fingerhut, pursuant to a planned and methodical

15  execution scheme designed by the Defendant and her

16  codefendant and whereby the Defendant would collect

17  $550,000 in insurance proceeds.  This is a most

18  heinous form of aggravated burglary and is entitled

19  to unsurpassed weight.

20          In this Court's view, this aggravating

21  circumstance standing alone, outweighs all of the

22  mitigating evidence in this case.  Therefore, with

6363

1  respect to Specification One to Count One, this

2  Court concurs with the Jury's recommendation, and

3  finds that the death sentence is an appropriate

4  penalty.

5        With respect to the aggravating

6  circumstances of the aggravated robbery, the Court

7  concedes that this offense is not quite heinous as

8  the circumstances surrounding those concerned with

9  the aggravated burglary; however, the aggravated

10  robbery was clearly committed to facilitate the

11  escape from the Aggravated Murder, and is extremely

12  close to being the worst form of aggravated

13  robbery.  This statement is galvanized by the fact

14  that the aggravated robbery was planned by the

15  Defendant to be part of a kidnapping, whereby the

16  victim was to be removed, taken to a different

17  location where the Defendant would then engage in

18  oral sex with her codefendant, while the Defendant

19  was forced to watch prior to his execution.  This

20  plot is clearly spelled out in the letters between

21  the Defendant and codefendant.  The plan clearly

22  went awry when the victim engaged the codefendant

6364

1  in the struggle at the residence.  Again this

2  scheme was hatched for the purpose of the Defendant

3  collecting the $550,000 in insurance proceeds.

4      Therefore, the aggravating circumstance

5  specification relating to the aggravated robbery,

6  when weighed against all of the mitigating factors

7  in this case, clearly and undeniably outweighs by

8  proof beyond a reasonable doubt, all of the

9  mitigating evidence in this case.

10      Therefore, with respect to Specification

11  Two to Count One, the Court concurs with the Jury's

12  recommendation and finds that the death sentence is

13  the appropriate penalty.  The Court recognizes that

14  the death sentence recommendation by the Jury must

15  be merged and the Court does hereby merge the death

16  sentences for purposes of sentencing.

17      For the reasons set forth herein, and

18  after independently and separately weighing the

19  aggravating circumstances against all of the

20  mitigating factors, it is the judgment of this

21  Court that the Jury's recommendation is accepted,

22  and the Court does find that the sentence of death

6365

1   is the appropriate penalty in this case.

2           Counsel approach the bench, please.

3   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

4   HEARING)

5           THE COURT:  The Court has asked at

6   side bar if counsel for either side wish to place

7   anything on the record before this Court proceeds

8   with sentencing.  Mr. Ingram, I believe you wish to

9   address something.

10          MR. INGRAM:  Your Honor, the record

11  should reflect that in pronouncing sentence, you

12  have apparently read from a written decision that

13  you have prepared in advance.  I guess I would ask

14  if I am correct in that assumption?

15          THE COURT:  That is correct.

16          MR. INGRAM:  As you read that

17  decision, Mr. Bailey sat at the Prosecution table

18  and reviewed a document as if he was reading along.

19  Every time you turned the page, Mr. Bailey turned

20  the page.  I would now ask on the record, that

21  Mr. Bailey be required to identify the documents

22  which are sitting in front of him.

6366

1      THE COURT:  Mr. Bailey is referring

2  to a document that I have had prepared.  I have

3  outlined the sum and substance of it to the

4  Prosecution.  They have a computer over there which

5  you are aware of, Mr. Ingram, we have used

6  throughout the trial, which makes it convenient to

7  correct, delete from a master copy and to come up

8  with a form that is present, which I presently

9  used.

10      MR. INGRAM:  Well, the record should

11  reflect the vehement Defense objection to the

12  State's participation in the drafting of the

13  Court's sentencing decision in ex parte proceeding.

14  We did not know this, we did not know of this.

15  That is prohibited.  I would ask that those

16  documents be sealed and become part of the

17  Appellate record in this case.

18      THE COURT:  That will be done.

19      MR. INGRAM:  I would ask that they

20  be given to the Court Reporter at this point.

21      THE COURT:  Mr. Bailey, please

22  deliver that copy.

6367

1          MR. INGRAM:  May I see it?  May I

2    ask Your Honor, when at what point in time, the

3    exchanges between you and Mr. Bailey occurred?

4          THE COURT:  I don't recall.  That

5    was probably about Wednesday.

6          MR. INGRAM:  Was there one such

7    exchange or more than one exchange?

8          THE COURT:  I believe that there was

9    one exchange.

10          MR. INGRAM:  We would also note an

11    objection to the Court's depriving the Defendant of

12    the right of allocution.  We object to the Court

13    depriving the Defendant of her right of allocution.

14          THE COURT:  Your objection is noted.

15          MR. BAILEY:  We haven't reached a

16    point of allocution yet.  We're just getting to

17    that point.  The Court had to do the independent

18    weighing and now we're at the point where the Court

19    has to advise the Defendant of her Appellate rights

20    and of allocution.

21          THE COURT:  I have to advise of Rule

22    32 now.

6368

1      MR. JUHASZ:  The objection is

2  because the Court has already determined sentence

3  without having heard from the Defendant.  Normally

4  in sentencing proceedings, the Court hears from the

5  Defendant before making a determination of the

6  appropriate sentence.  That is the basis for the

7  objection.

8      THE COURT:  Okay.  Could I see

9  counsel?

10  (In-chambers at 2:30 p.m.)

11  (OFF THE RECORD)

12      THE COURT:  We're in-chambers in

13  conference.  Are you waiving presence of the

14  Defendant?

15      MR. INGRAM:  Yes.

16      THE COURT:  Mr. Ingram, you have

17  another question?

18      MR. INGRAM:  Based upon our exchange

19  a few moments ago in the Courtroom, it is my

20  understanding that a draft or some document

21  relating to the Court's pronouncement of sentence

22  was provided to the Prosecuting Attorney on

6369

1  Wednesday.

2          THE COURT:  I believe it was

3  Wednesday.  I asked them to type this up and get a

4  copy back, so that we would all have it when I was

5  reading through it.  You weren't given a copy of

6  it, and I apologize for that.

7          MR. INGRAM:  We should probably ask

8  that that document that was provided to the

9  Prosecuting Attorney on Wednesday also be marked

10  and sealed as part of the Court's Exhibit in this

11  matter.

12          THE COURT:  Okay.

13          MR. BAILEY:  The only thing left is

14  the final one.  All prior ones were thrown out.

15  There were six or seven of them.

16          MR. INGRAM:  There's six or seven

17  drafts?

18          MR. BAILEY:  Not six or seven

19  drafts, there's one draft and there's corrections

20  and all of the corrections with the draft were

21  pitched.

22          MR. INGRAM:  Who made the

6370

1    corrections?

2            MR. BAILEY:  We made or the Court.

3    We kept finding typo's.

4            THE COURT:  Whatever you have, if

5    you have something, bring it over.

6            MR. BECKER:  Let me explain

7    something here.  This is my understanding of what

8    we were supposed to do.  We were to take that and

9    put it on the computer and print out the hard copy

10   of the sentencing order, which is what we did.  As

11   Ken and I would proofread it for typographical

12   errors, it was changed and just saved on the hard

13   drive of the computer.  It was never printed out

14   and kept as draft after draft after draft.  I would

15   type over the hard drive, and prepare it.

16   Eventually a final copy was provided to the Court

17   and I think the Court had some typographical errors

18   and maybe some changes.

19           THE COURT:  I made one phone call

20   back to you.

21           MR. BECKER:  And the Court had

22   indicated some changes.  I just simply changed

6371

1   that.  Essentially what I did, because I typed the

2   whole thing was I was the Court's typewriter, the

3   Court's secretary.

4                THE COURT:  We used that -- we don't

5   have the equipment here or the know-how to do

6   things expeditiously.  That is the way we were able

7   to get the final instructions.

8                MR. BECKER:  That is the way Jury

9   instructions are done.  Now I think --

10               THE COURT:  We have had this come

11  up.  Tony Consoldane always raises this issue about

12  the Prosecutor typing stuff as if the Prosecutor

13  is -- and it may be a legitimate point, I don't

14  know.  It is the system that is used here because

15  it is the most practical.

16               MR. INGRAM:  Does anybody have the

17  first draft?  They do not.  Do you?

18               THE COURT:  No.  I don't have

19  anything, no.

20               MR. INGRAM:  Who wrote the first

21  draft?

22               THE COURT:  I gave notes saying this

6372

1   is what I want.  This, this and this, and they sent

2   it back.  I read it over, made some corrections,

3   went back from there.

4              MR. INGRAM:  The record should

5   simply reflect that in this process, Defense

6   counsel was never involved, nor consulted.  Other

7   than that, I have nothing further.

8              MR. BECKER:  I just want to address

9   something on record here.  Rule 32 states that

10  sentence shall be imposed without unnecessary

11  delay.  Sentence shall be imposed without

12  unnecessary delay.  Pending sentence, the Court may

13  commit the Defendant or continue or alter the bail.

14  At the time of imposing sentence, and it doesn't

15  necessarily say before sentence is imposed, it says

16  at the time of imposing sentence, the Court shall

17  do all of the following:  Afford counsel an

18  opportunity to speak on behalf of the Defendant and

19  address the Defendant personally and ask if he or

20  she wishes to make a statement in his or her own

21  behalf; afford the Prosecution to make an

22  opportunity to speak; afford the victims the right

6373

1   provided by law; and then notify and then after --

2   it is very specific, the rule says after imposing

3   sentence in a serious offense, the Court shall

4   advise the Defendant has the right to appeal.  I

5   think what is important is Rule 32 does not say

6   before imposing sentence, Defendant or counsel

7   should be afforded an opportunity, it says at the

8   time of imposing sentence.  We haven't had the

9   sentence.  I don't think the actual sentence has

10  been handed down.  That is an important

11  distinction.  The Court by law had to make an

12  independent weighing and circumstances.

13          THE COURT:  Well, the record is

14  clear as to what has happened.  If you have a point

15  on appeal, you have got a point on appeal.

16          MR. INGRAM:  Thank you.

17  (End of in-chamber discussion)

18  (Back in Open Court)

19          THE COURT:  Gentlemen, would you

20  have your client come forward, please?  Does the

21  Defendant wish to address anything prior to

22  sentencing?

6374

1          THE DEFENDANT:  Yes, I think I

2   would.  I would like to have one of those notes

3   back.  Short and sweet this time.  You probably

4   wonder why I did what I did about asking for the

5   death penalty.  Because I think one small voice for

6   justice is going to count.  Maybe if it is for only

7   one person some day.  I didn't want to take the

8   stand on race equality and the criminal justice

9   system.  Criminal justice, an oxymoron, and two, to

10  expose and ask corrupt police officials who use a

11  badge to destroy rather than protect lives for

12  their own gain by committing perjury, planting and

13  transferring evidence, tampering, and using race

14  and religion to condemn.  Thank you.

15          Thank you for your decision.  I was a

16  little worried you might try to find something not

17  to do that.  I appreciate what you did.  Thank you.

18          MR. INGRAM:  The record should

19  reflect my migraine has returned.  We have nothing.

20          THE COURT:  Counsel have nothing

21  further?

22          MR. INGRAM:  No.

6375

1          THE COURT:  Miss Roberts, you have a

2     right to appeal the conviction filed in this case.

3     I would ask you, it is my duty to appoint counsel

4     to perfect that appeal for you.  I have had some

5     indication from someone that you may wish to hire

6     your own counsel or do you wish the Court to

7     appoint someone to represent you?

8          MR. INGRAM:  May I answer this

9     question?

10          THE COURT:  Yes.

11          MR. INGRAM:  The appeal in this

12     matter would be due in 45 days.  Donna, along with

13     Mr. Juhasz and I will make Appellate decisions in

14     due course, and at this time, there's no request

15     for Court appointed Appellate counsel.

16          THE COURT:  There's no request?

17          MR. INGRAM:  No request not at this

18     juncture.

19          THE COURT:  I would ask you to

20     apprise me, because the Supreme Court insists that

21     within a certain time period, within two weeks, I

22     have to either appoint Appellate counsel or they

6376

1    are not completely happy with me.

2            MR. INGRAM:  Okay.

3            THE COURT:  As I said, you have an

4    absolute right to file an appeal in this case, it

5    would be the Supreme Court to review the actions of

6    this Court and this Jury.  If you are unable to pay

7    the cost of that appeal, the appeal will be

8    perfected with no cost to yourself and counsel will

9    be appointed with no cost to you.  Any papers,

10   other expenses you are unable to pay for will be

11   provided by this Court.  You have the right to have

12   a notice of timely appeal filed on your behalf.  If

13   you fail to do that, this Court will see that that

14   is done.  Do you have any other questions about any

15   of that at this time?

16           THE DEFENDANT:  No.  Jerry says no.

17           THE COURT:  Anything that the

18   Defense or the Prosecution wish to place on the

19   record at this time before the Court enters

20   sentence?

21           MR. INGRAM:  Only that you take this

22   and mark it as a Court's Exhibit for sentencing

6377

1    purposes.

2              THE DEFENDANT:  I just request that

3    that fairy tale you told, not be told to children

4    at night.  Thank you.

5              THE COURT:  The Court has considered

6    the record and oral statements made as well as the

7    principles and purposes of sentencing under Ohio

8    Revised Code 2929.11, and has balanced the

9    seriousness and recidivism factors of O.R.C.

10   Section 2929.12.  Pursuant to law, the Trial Court,

11   this day, June 20, 2003, having determined in a

12   separate opinion of specific findings that the

13   aggravating circumstances as to the count of

14   Aggravated Murder, outweigh the mitigating factors

15   by proof beyond a reasonable doubt, then made

16   inquiry as to whether the Defendant had anything to

17   say, why judgment should not be pronounced against

18   her.  And the Defendant in answer showed no good

19   cause or sufficient reason why sentence should not

20   be pronounced.  Are you wondering what I am reading

21   from?

22             MR. INGRAM:  I am wondering what

6378

1    Mr. Bailey is reading from.  Mr. Bailey is reading

2    from a sentence.

3                    MR. BAILEY:  This is Nathaniel

4    Jackson's.

5                    THE COURT:  This is a copy of

6    Nathaniel Jackson's, which I have altered.  The

7    Court has considered the factors under Ohio Revised

8    Code 2929.14 and makes the following findings.  The

9    shortest prison term will demean the seriousness of

10   the Defendant's conduct; two, the longest prison

11   term is appropriate because the Defendant committed

12   the worst form of the offense; number three,

13   multiple prison terms are necessary to protect the

14   public from future crime and to punish the

15   offender; number four, consecutive prison sentences

16   are not disproportionate to the seriousness of the

17   Defendant's conduct and to the danger the

18   Defendant, the offender, opposes to the public.

19   Five, the harm caused by the multiple offenses was

20   so great that no single prison term for any of the

21   offenses committed as part of a single course of

22   conduct adequately reflects the seriousness of the

6379

1    Defendant's conduct.

2            It is therefore Ordered and Adjudged and

3    Decreed that the Defendant, Donna M. Roberts, be

4    taken from the Courtroom to the Trumbull County

5    jail, and from thence to the correction reception

6    center at Lorain -- I'm sorry, at Marysville, Ohio.

7            Counsel approach for a moment, please.

8    (SIDE BAR DISCUSSION, OFF THE RECORD AND

9    OUT OF HEARING)

10           THE COURT:  I'll read this over

11   again.  It is therefore Ordered and Adjudged and

12   Decreed that Defendant, Donna M. Roberts, be taken

13   from the Courtroom to the Trumbull County jail,

14   from thence to the correction reception center at

15   Marysville, Ohio, and thereafter be sentenced to

16   death on January 11, 2004 on Count One.  And

17   imprisoned therein for the stated prison term of

18   ten years on Count Three, plus a mandatory term of

19   three years on the firearms specification, to be

20   served prior to and consecutive to the sentence

21   imposed in Count Three.  Ten years on Count Four,

22   plus a mandatory term of three years on the

6380

1   firearms specification, to be served prior to and

2   consecutive to the sentence imposed in Count Four.

3   Sentence in Count Four to be served consecutively

4   to the sentence imposed on Count Three.  The

5   firearms specification in Counts Three and Four

6   shall merge as one sentence in Count Three as

7   matter of law.

8        The Defendant is ordered to pay the cost

9   of prosecution, once that is determined, for which

10  execution is awarded.  That is the judgment of this

11  Court.

12       Miss Roberts, I can't think of a more

13  unpleasant thing that anybody is called upon to do

14  than to sit here and review a record like this.

15                THE DEFENDANT:  I know.

16                THE COURT:  My heart goes out to

17  everyone that was involved in this thing.  I think

18  as most people who look at it, think that you used,

19  you appear from all of the contact I have had with

20  you, to be a normal person, which makes it more

21  difficult to explain the actions that the State has

22  been able to put forth.  And it almost appears to

6381

1  me that it was an abandoned, where there was no

2  thought of what was going to happen tomorrow or the

3  next day or down the road, almost some sort of a

4  fantasy world that you were living in.  But all of

5  our actions have consequences, and sadly, yours

6  have brought you to this point.  I do say this,

7  with heartfelt sincerity though, I wish you well.

8              THE DEFENDANT:  Thank you, Sir.

9              MR. INGRAM:  Thank you.

10  (End of Sentencing Hearing at 3:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing Volume II Appendix to Nathaniel E. Jackson's Notice of Application for Reopening was forwarded by regular U.S. Mail to Dennis Watkins, Trumbull Count Prosecuting Attorney and Luwayne Annos Assistant Prosecution Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building Warren, Ohio  44481 on this 4th day of April, 2006.

RANDALL L. PORTER
Assistant State Public Defender

104-373

FILED

ON COMPUTER-KMR

# The Supreme Court of Ohio

OCT 0 4 2006

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

State of Ohio

    v.

Nathaniel E. Jackson

Case No. 03-137

E N T R Y

    This cause came on for further consideration upon the filing of an application for reopening under S.Ct.Prac.R. XI(6).  Upon consideration thereof,

    It is ordered by the Court that the application is denied.

(Trumbull County Court of Common Pleas; No. 01CR794)

THOMAS J. MOYER
Chief Justice

ORIGINAL

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

ON COMPUTER - ACG

William K. Suter
Clerk of the Court
(202) 479-3011

April 5, 2006

Clerk
Supreme Court of Ohio
65 South Front Street
Columbus, OH  43215-3431

     Re:  Nathaniel E. Jackson
         v. Ohio
         No. 05-10187
         (Your No. 2003-0137)

Dear Clerk:

    The petition for a writ of certiorari in the above entitled case was filed on April 3, 2006 and placed on the docket April 5, 2006 as No. 05-10187.

                Sincerely,

                William K. Suter, Clerk

                by

                Gail Johnson
                Case Analyst





RECEIVED
APR 1 0 2006
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

FILED
APR 1 0 2006
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,
     Appellee,

-vs-

NATHANIEL JACKSON,
     Appellant.

)
)
)
)
)
)
)
)
)
)

CASE NO. 03-137

Death Penalty Case

On Appeal from the Trumbull
County Court of Common Pleas
No. 01 CR 794

---

## MEMORANDUM OF LAW IN OPPOSITION TO APPELLANT'S APPLICATION FOR REOPENING PURSUANT TO S.CT. PRAC. R. XI, Section 6(C)

---

DENNIS WATKINS
Ohio Reg. No. 0009949
LuWAYNE ANNOS
Ohio Reg. No. 0055651
Trumbull County Prosecutor's Office
160 High Street N.W.
4th Floor, Administration Bldg.
Warren, Ohio    44481
(330) 675-2426

COUNSEL FOR THE STATE OF OHIO

DAVID H. BODIKER
No Ohio Reg. No. Provided
Ohio Public Defender
RANDALL L. PORTER
Ohio Reg. No. 0005835
Assistant Ohio Public Defender
Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio    43215
COUNSEL FOR APPELLANT



FILED
MAY 0 2 2006
MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

RECEIVED
MAY 0 2 2006
MARCIA J MENGEL, CLERK
SUPREME COURT OF OHIO

**MEMORANDUM OPPOSING APPELLANT'S MOTION FOR RECONSIDERATION**

<u>Procedural History</u>:

In November 2002, following a jury trial of approximately four weeks, Defendant-Appellant Nathaniel Jackson  was found guilty of two counts of aggravated murder, one count of aggravated burglary, and one count of aggravated robbery in connection with the shooting death of Robert Fingerhut. Under both of the aggravated murder counts, the jury also returned a guilty verdict on two death penalty specifications. In addition, under each of the aggravated burglary and aggravated robbery counts, he was found guilty of a firearm specification.    The trial court sentenced Appellant to death.  At trial, Appellant was represented by Atty. James Lewis and Atty. Anthony Consoldane of the Trumbull Branch of the Office of the Public Defender.

For purposes of his direct appeal to this Court, the trial court appointed Atty.  John P. Laczko of Youngstown, Ohio and Atty. Dennis Day Lager of Canton.  This Court unanimously affirmed Appellant's conviction and death sentence in *State v. Jackson* (2006), 107 Ohio St. 3d 300, 2006-Ohio-1.  Appellant now seeks to reopen his direct appeal to this Court with the aid of the Ohio Public Defender's Office which  has filed an Application for Reopening Pursuant to S.Ct.Prac. R. XI, Section 5(sic).  He is now represented by Atty. David Bodiker and Atty. Randall Porter, who allege Attys. Laczko and Lager were ineffective in their representation of Appellant in his direct appeal.   For the reasons set forth below, the Plaintiff-Appellee The State of Ohio ("State") files the following memorandum in opposition pursuant to S.Ct. Prac. R. XI, Sec. 6(C).

**LAW AND ARGUMENT**

Before *briefly*  individually addressing each of Appellant's eleven propositions of law in

-1-

the space allotted by S.Ct. Prac. R. XI, Sec. 6(D), the State will review relative authority

concerning Applications for Reopening of appeals.  By this Court's own rule, S.Ct. Prac. R. XI,

Sec. 6(E) and its companion appellate rule, App. R. 26(B)(5), Appellant must demonstrate that

there is a "genuine issue" as to whether the applicant was denied effective assistance of appellate

counsel.

Moreover, the two-prong analysis found in *Strickland v. Washington* (1984), 466 U.S.

668, 687, is the appropriate standard to determine whether a criminal defendant received

ineffective assistance of appellate counsel.  *State v. Goff* (2003), 98 Ohio St. 3d 327, 2003-Ohio-

1017 at¶4.  Further, to justify reopening his appeal, Appellant  "bears the burden of establishing

that there is a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of

counsel on appeal." *State v. Spivey* (1998), 84 Ohio St. 3d 24, 25.

In order to show ineffective assistance, Appellant must prove that his counsel were

deficient for failing to raise the issues he now presents and that there was a reasonable probability

of success had those claims been presented on direct appeal.  *State v. Sheppard* (2001), 91 Ohio

St. 3d 329, 330. In addressing an alleged error, appellate counsel is not required to advance every

conceivable argument in order to provide the type of effective representation that the Sixth

Amendment requires. *State v. Sleppy* (March 5, 1999), 2nd Dist. No. 96 CA 1412 at * 7.  Based

on the foregoing authority, this Court can find no reason to reopen Appellant's appeal.

## Proposition of Law No. I

The knowing, intelligent, and voluntary waiver of Appellant's rights has been thoroughly

addressed in this Court's opinion. *Jackson,* supra, ¶78-100. "[T]he trial court's finding that

Jackson was properly advised of his *Miranda* rights and that he waived those rights is amply

supported in the record." Id. at ¶100.  Appellant supplies no authority to this Court to suggest that people who are high school drop outs and on some unspecified medication cannot knowingly and intelligently waive their rights and speak with the police.

**Proposition of Law No. II**

A review of the testimony submitted by Appellant with his memorandum shows that prospective jurors Fenton, Bowers, Jigert, McCale and Davis made it perfectly clear that they could not follow the court's instructions and vote in favor of the death penalty, even if the State proved that the aggravating circumstances outweighed the mitigating factors.  This Court has held that "the proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 178, vacated and remanded on other grounds (1985), 474 U.S. 1002.  It is plain even from the record submitted by Appellant that these potential jurors were prevented or substantially impaired in the performance of their duties as a death penalty juror.  As such, the trial court committed no error in the dismissal of these jurors for cause.

With respect to Mr. Fenton, the State would note that defense counsel did not object to his dismissal.  (T.p. 719). This Court  can only take notice of the error if it rises to the level of plain error. Crim.R. 52(B).  In order for this Court to apply Crim.R. 52(B), it must be clear that the outcome of the trial would have been different but for the alleged error. See *State v. Lane* (1995), 108 Ohio App.3d 477, 482.  The transcript presented by Appellant reveals that even *if* trial counsel had objected, Mr. Fenton would have been dismissed for cause because his beliefs

-3-

rendered him incapable of performing his duties as a capital juror.

## Proposition of Law III

Appellant alleges that defense counsel failed to "adequately question" potential jurors Cuttings, Hook, Miller, Zdunick, Miller, Menten and DeJoy. Appellant fails to state why these voir dires were inadequate, or what trial counsel should have done to improve their performance. Therefore, if Appellant cannot articulate at this juncture how his trial counsel were ineffective, he certainly cannot find error in his appellate counsel for failure to raise these non-articulated issues.

With respect to prospective jurors Jones, Schrecengast, Zdunick, Melinda, and Schoonover, again, Appellant cites to no reasons in the record why trial counsel should have objected to their inclusion in the jury pool, and what possible outcome determinative effect this failure to object would have had on appeal.

## Proposition of Law No. IV

Appellant misstates the holding in *Peters v. Kiff* (1972), 407 U.S. 493, by saying that an "underrepresentation of African-American[sic] in the petit jury constituted a denial of the Due Process Clause of the Fourteenth Amendment." (Appellant's Application at 4). In fact, the *Peters* case dealt with the systematic *exclusion* of African Americans from a grand jury. Appellant has never presented evidence to prove his baseless theory that African-Americans were culled from his jury pool. Judging by the arguments presented in this application, he would be unable to do so if this Court were to reopen this appeal. To demonstrate that there has been a violation of the fair cross-section requirement, a defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of

such persons in the community; and (3) that this underrepresentation is due to systematic

exclusion of the group in the jury-selection process." *Duren v. Missouri* (1979), 439 U.S.357,

364.

The mere absence of African-Americans in the jury pool is not dispositive of a systematic

exclusion. There is nothing in Appellant's application to suggest that a systematic exclusion of

*anybody* occurred. Therefore, his appellate counsel were not ineffective in excluding this non-

issue on direct appeal.

**Proposition of Law No. V**

Appellant alleges the trial court admitted "a voluminous amount of hearsay." Apparently,

Appellant's idea of "voluminous" is 14 pages, because that's all he cites to in his application.

(Appellant's Application at 5). Nonetheless, as for the cite at T. p. 2196, this is the cross

examination of Frank Reynolds. The defense did not object to their own questions, and appellate

counsel were not ineffective for failing to raise that on appeal. Det. Monroe, in identifying State's

Ex. 311, the Days Inn Receipt indicating Donna Roberts paid for a room there December 11

through 17, 2001, indicated that the time stamp was incorrect based upon information he

received from Det. Dillon. Dillon himself took the stand and explained the discrepancy of 46

minutes. (T.p. Vol. 2471-2472.). Therefore, any error, even if raised would be harmless.

With respect to the cite at T.p, 2322, defense counsel complained about alleged hearsay

statements by witness Paul Monroe, yet acknowledged he failed to object because he didn't want

to annoy the jury. Trial counsel did not identify these instances for the trial court. Appellant

does not identify them in his application. Therefore, one can hardly label appellate counsel

ineffective for failing to raise evidentiary challenges in an appellate brief when they were not

-5-

properly preserved for appellate review.

As for the phone records, the portion of the transcript supplied by Appellant states that the records were accompanied by an Evid. R. 902(8) notary acknowledgment. Thus, even if raised by appellate counsel, this argument would have fallen on deaf ears. At T.p. 2431, Det. Tackett testified he removed State's Ex. 227, a pair of tennis shoes, from the residence where Appellant was arrested because someone in the house identified them as his shoes. No objection was made, and the statement was not made for the truth of the matter asserted. Again, even if raised, appellate counsel would have had to demonstrate plain error on this point which given the overwhelming amount of evidence in this case, over and above the shoes, the outcome of the appeal would not change.

With respect to "hearsay" at T.p. 2528, no objection was made to the testimony of Dr. Humphrey Germaniuk concerning Donna Roberts' statement about her garage door going up when she thought it should go down.   Again, without the objection, this Court would have to find plain error on appeal. The State submits this case did not rise or fall on the rising or falling of the Fingerhut garage door.

Finally, Appellant challenges the testimony of BCI *serologist,* not agent, Brenda Gerardi, and claims error that the trial court permitted her to testify about the statistics she used to link DNA samples found inside and outside Mr. Fingerhut's car to Mr. Fingerhut and Appellant. At trial, defense counsel argued that as a serologist, she could not testify concerning the statics she used in making her comparisons because she did not compile the statistics. First, evidence Rule 703 permits the admission of "facts or data***which an expert bases an opinion on***." As Appellant's appendix details, Ms. Gerardi relied upon statistics collected by the FBI. Moreover,

-6-

at least two Ohio courts have held that the statistics relied upon by a DNA expert are not hearsay. *State v. Wages* (1993), 87 Ohio App. 3d 780, 786; *State v. Austin* (1998), 131 Ohio App. 3d 329, 337-338. Provided this Court considered *Austin* and *Wages,* and viewed Evid. R. 703 as controlling, the outcome of this appeal would not be changed.

## Proposition of Law No. VI

Appellant argues that the trial court erred because it refused to admit testimony concerning Mr. Fingerhut's character during the penalty phase of his trial. First, Evid. R. 404(A)(2) permits only pertinent character traits of the victim to be introduced that would rebut testimony of the victim's character of peacefulness in a homicide trial. Second, an alleged victim's claimed violent nature is not an essential element of self-defense. *State v. Baker* (1993) 88 Ohio App. 3d 204, 209-210. The evidence proposed by the defense was that Mr. Fingerhut carried a bogus special investigator's badge, and had some credit card problems. Neither of these proposals are relevant to Appellant's claim of self defense. Neither indicate he was violent. The trial court properly excluded this evidence. Therefore, even if raised on appeal, this Court would find that the evidence was properly ruled inadmissible, and the outcome of the appeal would not change.

## Proposition of Law No. VII

This Court's own opinion is replete with examples of Donna Roberts' participation in this killing. Neither the State, nor the defense, downplayed her involvement in the presentation of evidence. However, the fact that Donna Roberts was smarter than Appellant and had a predilection for African American males does not excuse the fact that Appellant is a self-confessed killer. The absence of a crime scene reconstruction expert changes none of that. Trial

-7-

counsel's performance does not fall below prevailing standards of practice in an inability to discount a confession corroborated by a mountain of evidence showing that Appellant was the actual shooter in this case.

## Proposition of Law No. VIII

The prevailing rule in Ohio is that a general unanimity instruction, such as the one given in this case (T.p. 3583), will ensure that the jury is unanimous on the factual basis for a conviction even where the indictment alleges numerous factual bases for liability. *State v. Johnson* (1989), 46 Ohio St.3d 96, 105.Moreover, it is presumed that " 'when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" *Id.,* quoting *Turner v. United States* (1970), 396 U.S. 398, 420.  Most significantly, trial counsel did not object to the solitary, rather than multiple, instructions on unanimity, therefore, any error on appellate is waived except for plain error.  *State v. Underwood* (1982), 3 Ohio St. 12, 13.  Given the panel obviously reached its unanimous verdicts to the charges in the indictment, Appellant suffered no prejudice and there is no appellate argument to make.

## Proposition of Law No. IX

As with the previous Proposition of Law, the trial counsel did not object to the "acquittal first" instruction.  Therefore, the issue is waived except for plain error.  Moreover, the alleged error is neither obvious nor outcome determinative.  In *State v. Thomas* (1988), 40 Ohio St. 213, as cited by Appellant, this Court refused to label the instruction, almost identical to the one at issue here, as an "acquittal first" instruction, and declined to find plain error. "In our opinion, this instruction has negligible coercive potential because it speaks to the jury's inability to find,

-8-

whether unanimously or not, a certain element of the greater offense. We are not persuaded that the trial court's instruction unduly prejudiced the appellee, and thus we affirm his conviction of aggravated murder." Id. at 220.  Appellate counsel is therefore not ineffective in foregoing this argument.

## Proposition of Law No. X

Appellant's allegations of ineffective assistance of counsel in mitigation are belied by the record and by this Court's very own opinion.  As for the substitute counsel, it was Appellant himself who insisted that the mitigation proceed with substitute counsel. (Mitigation T.p. 4,5) To permit him to argue this issue on a reopened appeal would open the door to the invited error doctrine.  Moreover, a lack of certification under Sup. R. 20 does not create a presumption of ineffective assistance of counsel.  *State v. Misch* (1995), 101 Ohio App. 3d 640, 651.  Because Appellant cites to no deficiencies in Atty. Wright's performance, much less any prejudice, he does not state a colorable claim of ineffectiveness.

With respect to Dr. McPherson's testimony, this own Court's opinion is replete with the mitigating evidence she offered on Appellant's behalf, but which paled in comparison to the overwhelming evidence and aggravating circumstances presented by the State of Ohio. *Jackson,* supra, at ¶177-185.  The reopening of this appeal would not alter these findings.

## Proposition of Law No. XI

This Court has yet to hold that it is improper for the State to draft a sentencing opinion in capital case.  Moreover, the record is devoid of any evidence as to who did or did not draft the sentencing opinion in *Appellant's* case.  Therefore, the reopening of his direct appeal will not resolve this issue.

## CONCLUSION

None of Appellant's proposed eleven propositions of law articulates a colorable claim of ineffective assistance of trial or appellate counsel.  Thus, there is no reasonable probability of success, and this Court must *DENY* Appellant's application to reopen his direct appeal.

Respectfully submitted,
DENNIS WATKINS (#0009949)
Prosecuting Attorney


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High Street, N.W.
4th  Floor, Administration Building
Warren, Ohio  44481
Telephone No.:  (330) 675-2426

COUNSEL FOR PLAINTIFF-APPELLEE
THE STATE OF OHIO

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing document  was sent by ordinary U.S. Mail on this 1st Day of May to Atty. David Bodiker and  Atty. Randall Porter(#0005835), Counsel for Appellant Nathaniel Jackson, Assistant State Public Defender, Office of the Ohio Public Defender, 8 East Long St. 11th Floor, Columbus, Ohio   43215.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

-10-

# APPENDIX

719

1           don't want to do it?

2    A.    Right, and I don't want anything to do with

3               it.

4                    MR. CONSOLDANE:  I'm finished.

5                    MR. WATKINS:  I move that he be

6    relieved of this responsibility because there's

7    cause because of his personal beliefs.

8                    THE COURT:  Any objections?

9                    MR. CONSOLDANE:  No, Your Honor.

10                   THE COURT:  Mr. Fenton, we thank you

11   for your time.

12                   MR. CONSOLDANE:  Your Honor, we want

13   to register an objection no matter what.  We think

14   he should not be excused.

15                   THE COURT:  Objection is noted and

16   overruled.  Thank you for your appearance, Sir.

17   (Juror number 3 excused from the Courtroom.)

18   (Juror number 7, Arthur Phillips entered the

19   Courtroom.)

20                   THE COURT:  Good afternoon,

21   Mr. Phillips.  The reason we have asked you in

22   today, this is what we call this individual Voir

1          MR. WATKINS:   311.   311.

2          MR. MORROW:   311.

3    A        Okay.  This is State's Exhibit 311, which was

4    covered, recovered from the Days Inn clerk, Rita Morrison,

5    while I was there on the 16th.

6    Q        What does it contain?

7    A        It contains a registration form which was marked

8    Exhibit 311-A which was filled out by the desk clerk on the

9    evening that they registered, or that Donna M. Roberts

10   registered.  It lists her address at 254 Fonderlac, Warren,

11   Ohio.  The signature here is of Donna Roberts.  Paid with a

12   credit card for one week's rental at a rate of $235.20.  It

13   shows that they checked in, she checked in December 11th and

14   the check-out date is December 17th.

15   Q        Now, do you know the time on December 11th?

16   A        Well, the check-in time was approximately 10:30 in

17   the evening.  We did a calibration of the machine they have

18   there and found that their machine is off almost an hour from

19   the time they checked in.  So the receipt actually shows that

20   they, that Donna Roberts checked in at 11:33.  And in

21   actuality, the clock is approximately an hour fast.  So it's

22   really --

23   Q        And who did that check?

2315

1   A        Detective Dillon did that on December 18th.

2   Q        And --

3                    MR. LEWIS:  Wait a minute.  Just a minute,

4   Dennis.  Wait a minute.

5                    THE COURT:  Just a minute.  Objection?

6                    MR. LEWIS:  The objection is I don't, I'm

7   trying to gather this.  Paul, do you know that for certain or

8   what?  I mean somebody told you that or what?  About the

9   clock.  Everybody's clock is wrong here.

10                   THE WITNESS:  I know that for certain and

11  I have a copy of a receipt dated 12-18 of 2001 when they,

12  when Detective Dillon went there and physically checked.

13  They ran a credit card through the machine to see what time

14  it would print out versus the actual time.

15                   MR. LEWIS:  Okay.  But you didn't do it

16  personally?

17                   THE WITNESS:  No, sir.

18                   MR. LEWIS:  You didn't see it?  You're

19  just testifying as to what Officer Dillon told you; right?

20  Is that basically it?

21                   THE WITNESS:  What Officer Dillon told me

22  and this receipt here has the date and the time they

23  conducted the audit when they scanned it and the time that

2316

1    they actually did --

2                    THE COURT:  Just a minute.  This, I think,

3    has to be distinguished on this basis.  The officer doesn't

4    know that of his own personal knowledge.  It may or may not

5    be true.  The prosecution has the right to establish that,

6    the veracity of that through bringing whoever in that did the

7    test.  But for purposes of this cross examination, this

8    officer, in the scope of his employment, takes that as being

9    true.  Whether it is or not, his testimony at this point is

10   that he's assuming that's true.  Let's go on from there.

11                   MR. WATKINS:  Fine.

12   Q        (By Mr. Watkins)  Therefore, Detective Dillon was

13   the person who reported that to you; is that correct?

14   A        Yes, it was.

15   Q        And now, what did, what did you personally see at

16   that point when you went there?

17   A        On the 16th?

18   Q        Yes.

19   A        I saw item 211A.

20   Q        That's 311A?

21   A        311A, which is the registration form filled out with

22   Donna Roberts.

23            I was personally there when 311B was collected,

1    Q        Now I'm gonna show you State's Exhibit 311 and

2    there's documents inside.  Would you tell the jury whether or

3    not you recognize that exhibit?

4    A        Yes, sir.  The top one.

5    Q        And what is it?

6    A        That is the transaction that we conducted, the

7    audit, to determine what time the machines showed it was when

8    the transaction was made.

9    Q        And who conducted the audit?

10   A        The employee, Jeff Pescarella, the desk clerk, and

11   with myself standing there.

12   Q        And you were participating?

13   A        Yes, sir.

14   Q        And explain exactly what was done.

15   A        However he uses the machine, he ran a transaction

16   through and had it print a receipt to show what the date and

17   time were at the actual date and time that we were conducting

18   this audit.

19   Q        And what did you find?

20   A        We found that the machine itself was off by

21   approximately 46 minutes I believe.  It was 46 minutes faster

22   than the actual time.

23   Q        And what document did you receive in there, and you

1  may take them out, that you personally received?

2  A        This document. It's a double receipt.

3  Q        Okay.

4  A        Carbonated receipt. Carbon receipt. And it shows,

5  it shows it to be December 18th, 2001, and the time to be

6  12:40 p.m. and it was actually 46 minutes earlier than 12:40.

7  I can't do the math in my head.

8  Q        Okay. And so that, what is the number of that

9  particular exhibit other than being 311? It's 311 what?

10  A        C.

11  Q        And that was done in your presence to establish --

12  A        Yes.

13  Q        -- that the clock was, that the time was off?

14  A        Yes, sir.

15  Q        Did you also go to the Greyhound bus terminal?

16  A        Yes, sir.

17  Q        And when did you go there?

18  A        I believe that was on the 14th.

19  Q        Okay.

20  A        Of December 2001.

21  Q        And what did you do there?

22  A        I spoke with several employees there about

23  Mr. Fingerhut and the day, the last day that he had worked

3583

One, indictment for aggravated murder, and it reads quite

simply, "We, the jury in this case, being duly impaneled and

sworn or affirmed, find the defendant Nathaniel E. Jackson,

..." and there's a blank space.  There's an asterisk beside

the name and down below there is an instruction, insert

whatever your decision is, guilty or not guilty, "... of

aggravated murder, did purposely cause the death of Robert

Fingerhut with prior calculation and design," on the date in

question and the manner and form as which he stands charged

in the indictment.

        Now, you will notice that there is a signature line

for a date.  The fore person that you pick should make sure

that each verdict form signed has the date on it.  There are

then 12 signature lines.  This being a criminal trial you

have to have the unanimous verdict on anything you decide to

have a proper finding.  Let me put that another way.  You

have to have the unanimous finding by 12 people in agreement

to have a guilty finding, okay?

        The second verdict is on the specification attached

to Count One.  The third form is Specification Two to the

first count of the indictment.  And depending on where you

are at according to the instructions that I've given, you

will also have, if you reach that point, Count One, lesser

# MITIGATION TRANSCRIPT

4

1  <u>Thursday, November 14, 2002, Mitigation Hearing,</u>

2  <u>In Open Court at 1:00 p.m.:</u>

3  THE COURT:  We have several matters

4  for the record before we call the Jury up.  It is

5  come to my attention that Mr. Lewis, co-counsel on

6  the defense team, has had a little stay in the

7  hospital, nothing serious.  He's back home now, but

8  because he's medicated, does not feel it would be

9  appropriate to appear on the defense team today.

10  Mr. Consoldane, I have asked you, with the

11  Prosecutor, whether or not you had any motion or

12  wish to have this matter continued until Mr. Lewis

13  is available, and what is your reply to that?

14  MR. CONSOLDANE:  I have talked with

15  Mr. Jackson and we do not think that any delay at

16  this point would be wise.  I have also talked with

17  Tom Wright, who has a contract to work with our

18  office.  Mr. Wright has gone through the three day

19  death penalty seminar.  He also meets the other

20  requirements.  He, however, is not certified.  He

21  has not applied for the certification and would ask

22  the Court to permit him to sit as co-counsel in

5

1    this case with me, so we can get this finished.

2                    THE COURT:  May I speak to your

3    client?

4                    MR. CONSOLDANE:  Yes.

5                    THE COURT:  Mr. Jackson, are you in

6    agreement with proceeding without Mr. Lewis being

7    here and having Mr. Wright and Mr. Consoldane?

8                    THE DEFENDANT:  Yes, Sir, Your

9    Honor.

10                   THE COURT:  I understand that I

11   would consider a continuance until probably Monday,

12   if you wished.

13                   THE DEFENDANT:  Yes, Sir.

14                   THE COURT:  You have talked with

15   your attorney and have agreed with him that it is

16   in your best interest to go forward today?

17                   THE DEFENDANT:  Yes, Sir, Your

18   Honor.

19                   THE COURT:  Fine.  In regard to Mr.

20   Wright, the Court is aware that he practices in our

21   county and practices before this Court on a regular

22   basis.  And I have no problem with allowing him for

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

**William K. Suter**
Clerk of the Court
(202) 479-3011

June 5, 2006

*ORIGINAL*

Clerk
Supreme Court of Ohio
65 South Front Street
Columbus, OH  43215-3431

*ON COMPUTER - TAI*

Re:  Nathaniel E. Jackson
v. Ohio
No. 05-10187
(Your No. 2003-0137)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

**William K. Suter**, Clerk

JUN 0 9 2006

CLERK
OF OHIO