# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                    :   Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      :

    Defendant.                    :

---

# NATHANIEL JACKSON'S POST-CONVICTION PETITION
# VOLUME II

---

DAVID H. BODIKER
Ohio Public Defender

RANDALL PORTER (0005835)
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio 43215-2998
(614) 466-5394
Fax: (614) 644-0703
COUNSEL FOR PETITIONER

1        MR. WILLE:  Thank you.

2    (Messrs. Lazarow and Mezibov conferred privately.)

3        MR. LAZAROW:  No further questions, Your Honor.

4        THE COURT:  Is this witness released?

5        MR. LAZAROW:  Yes, Your Honor.

6        MR. WILLE:  Yes, Your Honor.

7        THE COURT:  Thank you very much, Mrs. Leahy.

8    (Witness excused.)

9        THE COURT:  Call your next witness.

10       MR. MEZIBOV:  Dr. Parran.

11       THE CLERK:  Raise your right hand, please.

12   (Duly sworn by the Clerk.)

13       THE CLERK:  Thank you.  Please be seated.

14         THEODORE V. PARRAN, JR., M.D.

15  a witness herein, having previously been sworn, testified as

16  follows:

17          DIRECT EXAMINATION

18  BY MR. MEZIBOV:

19  Q.  Good morning, Dr. Parran.

20  A.  Good morning.

21  Q.  Dr. Parran, before I begin to ask you any questions, the

22  first thing I would ask of you is that you state your full

23  name and spell your last name for the record, please.

24  A.  My that is Theodore Van Doran Parran -- P-a-r-r-a-n --

25  Junior.

EXHIBIT

19

1  Q.  Dr. Parran, where do you reside?

2  A.  I live in Shaker Heights, Ohio.

3  Q.  And could you tell us your occupation, please?

4  A.  I'm a physician.

5  Q.  And a physician licensed to practice medicine in the

6  State of Ohio?

7  A.  In Ohio, yes.

8  Q.  Dr. Parran, could you give us the benefit of your

9  educational background?

10  A.  I went to college at Kenyon College in Ohio, and then

11  went to medical school at Case Western Reserve University,

12  School of Medicine; graduated in 1982.  I did my residency in

13  internal medicine for three years at Johns Hopkins Hospital,

14  in Baltimore City Hospital, in Baltimore, Maryland, and I

15  spent an additional year as a medical chief residence there,

16  so that is my formal education and training.

17  Q.  And, Dr. Parran, could you give us the benefit of your

18  professional experience as a physician since the time you

19  graduated from medical school?

20  A.  Yes, having graduated from medical school, as I mentioned

21  I spent four years in residency training in Baltimore.  I

22  then spent another two years living in Baltimore working on

23  the faculty at Johns Hopkins School of Medicine and helping

24  to direct both the general internal medicine Clinic as well

25  as a drug and alcohol treatment program in Baltimore City

1    Hospital.   In 1988 I moved back -- I moved back to Cleveland,
2    taking a faculty position at Case Western Reserve University
3    School of Medicine in helping to direct both the general
4    internal medicine Clinic and several drug and alcohol
5    treatment programs and consultation programs in the Greater
6    Cleveland area.
7    Q.   And where are you employed at the present time?
8    A.   Currently I'm employed part-time by Case Western Reserve
9    School of Medicine as the Director of the Clinical Science
10   Program as well as the Director of the Addiction Medicine
11   Fellowship Program.   I'm also employed part-time by the
12   Cleveland V. A. Medical Center helping to -- as the Medical
13   Director of their extensive Drug and Alcohol Treatment
14   Program.   And then finally I am part-time or privately
15   employed as a member of a group practice of two of us
16   providing addiction medicine services to hospitals and
17   substance abuse treatment centers in Cleveland.
18   Q.   How long have you been working at the V. A. at Cleveland?
19   A.   I started working at the V. A. in 19 -- 1993.   In 1993,
20   we applied through the V. A. for a grant to support our
21   addiction medicine fellowship program and that was funded as
22   one of only six in the country, and have been employed
23   part-time with the V.A. since then.
24   Q.   Dr. Parran, over the course of time have you developed
25   certain areas of specialization in the practice of medicine?

1   A.  Yes, I'm board certified in internal medicine and I

2   continue to practice, a small percentage of my time, in

3   general internal medicine.  I'm also certified by the

4   American Society of Addiction Medicine in the area of drug

5   and alcohol dependence and treatment.  And I honestly spend

6   the majority of my time working in the area of substance

7   abuse treatment, as well as researching, education in the

8   area of addictions.

9   Q.  When you say "majority" of your time, could you assign a

10  percentage of your time to that area of practice?

11  A.  Probably 70 percent at this point.

12  Q.  What is the American Society of Drug Addictions?

13  A.  The American Society of Addiction --

14  Q.  Addiction Medicine.  I'm sorry.

15  A.  Yes.  It's a multi-disciplinary group of physicians,

16  about 4,000, maybe 4500 members.  Approximately 3,000 of us

17  are certified --

18  Q.  How do you become certified?

19  A.  -- of the organization.

20      In order to be certified in addictions medicine, you have

21  to be able to provide documentation that you have worked

22  full-time in the area of drug and alcohol dependence

23  treatment for at least two years, and then you have to take a

24  certification examination.

25  Q.  Now, you have treated, I take it, individuals who have

1    been addicted to alcohol or drugs?

2    A.  Yes.  Since -- since 1985, I've treated somewhere between

3    1200 and 3,000 patients a year, each year, with a history of

4    addictions, approximately split 50/50 between alcohol

5    dependent and drug dependent.

6    Q.  Dr. Parran, in addition to the board certifications that

7    you've told us about, are you a member of any professional

8    boards or associations or organizations?

9    A.  Yes, I'm a member, as I mentioned, of ASAM, the American

10   Society of Addiction Medicine.  I'm also a member and have in

11   the past served on the board of the -- of an organization

12   called AMERSA, which is the Association for Medical Education

13   and Research in Substance Abuse.  I'm a member of the Society

14   for General Internal Medicine.  I'm a fellow in the American

15   College of Physicians.  And I am a fellow and a member of the

16   Executive Committee on the American Academy of Physician and

17   Patient.

18   Q.  Now, Dr. Parran, have you over the course of time

19   published any books or writings or treatises or studies in

20   your particular areas of specialization?

21   A.  Yes, I have.  I've written, oh, probably more than a

22   dozen maybe, close to two dozen but at least a dozen papers,

23   book chapters, syllabus modules on the treatment of

24   addictions, screening for chemical dependency, screening for

25   chemical dependence, how to present the diagnosis, how to

1   form a treatment plan with patients, management of

2   detoxification and the acute effects of drugs and alcohol,

3   syllabus materials on cocaine dependency, prescription drug

4   abuse, et cetera.

5   Q.  Finally, Dr. Parran, have you had occasion before today

6   to testify in court in matters in which you are a specialist

7   or in areas in which you practice?

8   A.  Yes, I have.  I've testified in both criminal and civil

9   proceedings in the area of management of chemical dependency

10  and/or addiction medicine, especially in the area of the

11  management of acute drug induced delirium.  That was a civil

12  case.  In the area of prescription drug abuse and stimulant

13  abuse, especially diet pills, those have been criminal cases.

14  Q.  And, Dr. Parran, at my request did you bring down to us

15  today a copy of your current CV?

16  A.  Yes.

17     (Mr. Mezibov distributing documents to the Court and

18  counsel.)

19  Q.  Dr. Parran, I've handed you what's been marked

20  Plaintiff's Exhibit 14.  Can you identify that for us,

21  please?

22  A.  Yes, it's my C.V. which was updated last summer.

23  Q.  So this is current up through the summer of '96?

24  A.  It's at least current through, oh, probably July of '96.

25  Q.  Now, Dr. Parran, let's turn our attention to this matter

1    involving John Hicks.  Could you tell us when you were first

2    hired by myself and Mr. Lazarow in connection with this

3    matter?

4    A.  It probably was either late 1994 or early 1995.

5    Q.  And do you recall what we asked you to do initially?

6    A.  Yes, you asked me to look at the data about the case,

7    especially the information that was gathered around the time

8    of the events in early August of 1985, in order to form an

9    opinion about whether or not cocaine played a role or

10   appeared to have played a role in those events.  And,

11   secondly, you asked me to look at the trial proceedings and

12   the testimony to see if I could form an opinion about the

13   quality of the information there regarding the pharmacology

14   of cocaine and how it might relate to this case.

15   Q.  And, Dr. Parran, could you tell us how you went about

16   conducting your evaluation in connection with these matters

17   which we asked you to look into?

18   A.  Yes.  I read through a sort of summary or excerpts of

19   both the police investigation, the police interviews, and

20   then some of the testimony in terms of pretrial, trial and

21   mitigation proceedings.

22   Q.  Were you provided the actual trial transcripts then?

23   A.  Yes.  Yes.  And I was able to look at some notes taken by

24   Ms. Leahy.  I was able to look at the affidavits of a couple

25   of different physicians or a couple of different doctors.  I

1    can give you the doctor's name if you want.

2    Q.   Is that Dr. Baum?

3    A.   Yes, Dr. Baum.

4    Q.   And Julia Hawgood?

5    A.   Hawgood, yes.

6    Q.   Psychologist?

7    A.   And I was able in July of 1995 to actually go in and

8    interview Mr. Hicks.  And, finally, I received the

9    depositions of Dr. Schmidt --

10   Q.   Schmidtgoessling?

11   A.   'Goessling, and Doctor -- starts with an R.

12   Q.   Reardon?

13   A.   Reardon.

14   Q.   All right.

15   A.   Yes.

16   Q.   Could you tell us when you interviewed Mr. Hicks?

17   A.   It was in July of 1995.  I don't remember the exact date.

18   Q.   Okay.  And could you tell us approximately how much time

19   you spent with Mr. Hicks?

20   A.   About an hour-and-a-half.

21   Q.   And what was the purpose of your speaking with Mr. Hicks?

22   A.   I wanted to have a chance to talk with him both about his

23   previous experiences with cocaine prior to the events of

24   August of 1985, to speak with him about how cocaine tended to

25   affect him when he was using it, to get at least his

1  recollections of that point in 1995 of what went on in August

2  of 1985, and, finally, just to get my own sense of him and

3  his mental status, perhaps psychological or psychiatric

4  background.  Although my background is in internal medicine

5  and not in psychiatry or psychology, I spend lots of time

6  interviewing people with issues in those areas and I wanted

7  to get a chance to interview him myself about those kinds of

8  things.

9  Q.  Dr. Parran, when you were provided these materials -- the

10  trial transcripts, the affidavits and depositions and then

11  actually speaking with Mr. Hicks in person -- were there

12  particular matters you were looking for in order to aid you

13  in your evaluation?

14  A.  I was looking for specific descriptions of his mind

15  state, his thinking processes, his sensations when under the

16  influence of cocaine both prior to August of '85 as well as

17  in August of '85, and any descriptions or evidence from

18  interviews that he had provided at that time that might give

19  some evidence or some clue from a clinical standpoint to me

20  as to what state he was in.

21  Q.  At the time these offenses were committed?

22  A.  Yes.

23  Q.  Now, over the course of looking at these materials and

24  speaking with Mr. Hicks, were you able to find any credible

25  evidence of drug use or its effect in connection with

1   Mr. Hicks?

2   A.  Yes, absolutely.  His history that he provided to

3   interviewers, provided to me as well, the history that his

4   family members had been able to provide to interviewers, as

5   well as some records from previously mandated court -- or

6   court-mandated treatment from the chemical dependency

7   standpoint, all indicated Mr. Hicks had had a significant

8   addiction problem in the past.

9   Q.  You used the term dependence, cocaine dependence.  Can

10  you tell us what that means from your standpoint?

11  A.  Well, there's sort of an over-arching view or diagnosis

12  we use of chemical dependency, which means the person meets a

13  certain criteria in DSM-IV -- which is the Diagnostic and

14  Statistical Manual-IV edition -- criteria for what would be

15  called in the vernacular "addiction."

16      Chemical dependency -- in this case dependency to cocaine

17  and alcohol -- includes:  Compulsive use; use to levels of

18  intoxication that weren't planned; adverse consequences from

19  repetitive use; loss of control of use once initiating that

20  use.  So a person, as long as they haven't used any of the

21  drug in a given day, tends to be fairly predictable; but when

22  they do it again, they tend to lose control and over use,

23  resulting in adverse consequences.

24      (Continuing)  Increase in preoccupation with use; use

25  despite repetitive and multiple, as I mentioned, adverse

1  consequences; sometimes increased tolerance, and at times

2  physical dependence, including withdrawal from the drug when

3  it's taken away -- although, I must say that 80 percent of

4  people who meet the criteria for a diagnosis of chemical

5  dependency or addiction don't have physical dependence to the

6  drug, meaning they don't use it every day and they don't go

7  through withdrawal when they stop using it.

8  Q.  What you've just listed, are those objective signs and

9  symptoms of chemical dependency?

10  A.  Yes, they are objective.  They're verifiable.  They're

11  primarily based on history.  But a careful history taken from

12  an individual can generally rule in or rule out chemical

13  dependency.

14  Q.  Did you find signs and symptoms of cocaine or chemical

15  dependency in connection with Mr. Hicks?

16  A.  Yes, absolutely.

17  Q.  Can you describe to us what those objective signs and

18  symptoms of chemical dependency was or were?

19  A.  Yes.  Mr. Hicks' background with alcohol and drug abuse

20  -- primarily marijuana early on -- resulted in repetitive

21  adverse consequences in his life from a performance

22  standpoint in school, from a performance standpoint at work,

23  from a financial standpoint, and from a legal standpoint from

24  his late teens on.

25      He, during periods of less use or abstinence, tended to

1  function quite well, and at times of increasing use

2  developed, as I mentioned, repetitive adverse consequences

3  resulting in pain and suffering in his life as well as in

4  those surrounding him.

5      Sometime in, the best of my recollection, the late

6  '70s/early '80s, Mr. Hicks' drug of choice seemed to switch

7  from alcohol and marijuana to cocaine and alcohol.  And he

8  developed, I think, inarguable evidence of cocaine addiction,

9  including in 1982 or '83 going through a significant amount

10  of money -- several thousand dollars that he had in a

11  retirement fund -- in cocaine use, and actually in the year

12  of 1985, earlier that year, going through probably a couple

13  thousand dollars in his bank account and his wife's bank

14  account for cocaine use.  So that indicates cocaine

15  dependence to me.

16      Another thing that indicates cocaine dependence is

17  actually the way he tends to use.  Initially, he started to

18  use cocaine by snorting it, and fairly soon shifted to using

19  I.V.  And the data about cocaine use and the routes of

20  administration indicates that of the 35 million Americans or

21  so who have intermittently tried cocaine, there's about three

22  million or three-and-a-half million, 10 percent, that develop

23  cocaine addiction or cocaine dependence.  And the vast

24  majority of those who shift from intermittent use of cocaine,

25  what might be casual use of cocaine and cocaine dependence,

FARNAN - DIRECT

3-35

1    tend to change their route of administration.  They either

2    use an I.V. or, more recently now, smoking the cocaine.

3         So, when I see a person who has a history of shifting

4    their route of administration to an I.V. form, that is

5    powerful evidence of a move to addiction.

6         And then, finally, the pattern with which he tended to

7    use.  He tended to use an intermittent binge pattern of

8    cocaine.  And, once again, people who are casual users or

9    occasional users of cocaine tend to use it casually and

10   occasionally.  People who tend to lose control of cocaine,

11   like most other stimulants that we have experienced with over

12   the last hundred years or so, tend to shift to a pattern

13   where they intermittently binge on the cocaine where they

14   initially use it, and then use it several times to multiple

15   times over the next few hours to few days until their money

16   runs out, or they become too paranoid, or they become too

17   exhausted, and then they sort of quit using the cocaine and

18   crash and go to sleep and sleep off the binge.  And it tends

19   to be a -- sadly, sort of a payday phenomenon where people

20   get paid on Friday and have strong urges and connect the use

21   of cocaine with the handling of money, and then people tend

22   to binge in the middle part of the week, recover on the

23   weekend to go to work on Monday.

24   Q.  What you describe, is that a phenomenon you observed or

25   found in the history of Mr. Hicks?

1   A.   Absolutely.

2   Q.   Now, can an individual feign or fake cocaine dependency

3   or chemical dependency?

4   A.   No, not really.   It's -- it's really not possible to fake

5   addiction to the point of spending several thousand dollars

6   of a retirement fund in a matter of several weeks to a couple

7   of months intermittent binging on cocaine and then earlier in

8   1985 a couple of thousand dollars' worth of the entire bank

9   account of oneself and one's spouse.   That is just not a

10  pattern that people are able to put on.

11  Q.   What was the significance of this history that you found

12  with regard to Mr. Hicks in your evaluation that we asked you

13  to do for us?

14  A.   Well, the history that I found with Mr. Hicks in terms of

15  his shifting from marijuana to cocaine, people who have

16  previously been dependent on marijuana -- which is a sort of

17  a small scale or fairly weak stimulant on the dopamine

18  system -- a person who's been a habitual dependent or

19  addicted marijuana smoker, if they start using cocaine, tend

20  to in a high percentage of cases, I would say 85 percent of

21  the time, develop cocaine dependence, and it's certainly what

22  happened to Mr. Hicks.

23  Q.   You mentioned the dopamine phenomenon.   What is that?

24  A.   Uh-huh.   Cocaine has three primary effects in the body,

25  three primarily pharmacological effects.   It's first effect

1   is to basically short circuit the peripheral nerves.  It

2   blocks the sodium potassium-pumping peripheral nerves and,

3   therefore, it is a very good anesthetic, and cocaine is used

4   as a local anesthetic.  Since the peripheral nerves are short

5   circuited, they can't transmit pain sensation and so they

6   become deadened or numb, the area where it's applied.

7        The second effect of cocaine is systemic effect, a

8   through-the-body effect, and that is a blocking of the

9   reuptake of norepinephrine and also to some degree

10  stimulating the release of norepinephrine.

11  Q.   And norepinephrine is?

12  A.   Norepinephrine is known in the vernacular as adrenaline,

13  a hormone, a systemic hormone released by the adrenal gland

14  which tends to stimulate increased heart rate, increased

15  blood pressure, increased reflexes, decreased appetite, gets

16  rid of a need for sleep, so people don't sleep and they don't

17  eat and they're all jazzed up.  And the rush of cocaine, the

18  -- what's described as the initial rush of cocaine, is a

19  norepinephrine or adrenaline surge.

20       The third effect of cocaine is a central effect in the

21  central nervous system where cocaine blocks the reuptake of

22  dopamine and it also stimulates the release of dopamine.

23  Dopamine is a neurotransmitter.

24  Q.   A neurotransmitter is what?

25  A.   A neurotransmitter -- a neurotransmitter is a chemical

1   release by one nerve or neuron in the brain which then

2   stimulates a second nerve or neuron in the brain and produces

3   a reaction or a feeling.  And dopamine is the -- is the

4   neurotransmitter which produces euphoria in the human brain.

5   For example, on the first sunny, warm day in spring, if we

6   were able to measure dopamine levels in our brain compared to

7   the last snowy, cold day in February, all of our dopamine

8   levels would be a little higher because our spirits would be

9   a little higher because of that external stimuli.

10  Q.   Spring fever actually has a physiological effect?

11  A.   Clearly.  Absolutely.  Dopamine is deficient, or the

12  brain is relatively immune to normal levels of dopamine when

13  people have clinical depression and, therefore, most

14  antidepressant medications work either directly or indirectly

15  to intensify the brain's sensitivity to dopamine so that our

16  spirits are lifted and the depression eases.  Dopamine

17  honestly is released during any pleasurable experience.

18       Cocaine is the most potent drug that's been identified

19  which blocks the reuptake and stimulates the release of large

20  amounts of dopamine in the brain, and, hence, it produces

21  variant euphoria.  So, pretty much all addictive drugs that

22  we know of, from nicotine to marijuana, from heroin to

23  cocaine, including things like alcohol and Valium and even

24  prescription pain medications, all either directly or

25  indirectly increase dopamine levels in the brain.  Dopamine

1    is clearly a final, common pathway of addictive drugs.

2    Q.  Now, Dr. Parran, what I'm going to ask you is this

3    question:  Based on all of the materials you were provided

4    which you reviewed in connection with this matter, and

5    drawing on your professional experience and knowledge, do you

6    have an opinion, to a reasonable degree of medical certainty,

7    whether Mr. Hicks was cocaine- or chemically dependent at the

8    time he committed the offenses in question?

9    A.  Yes, he certainly was cocaine dependent and alcohol

10   dependent and, hence, he had chemical dependence with a drug

11   of choice, of cocaine, and a secondary drug of choice, of

12   alcohol -- that would be the current terminology we use

13   clinically.

14   Q.  You described how the cocaine affects an individual

15   pharmacologically; correct?

16   A.  (Nods head affirmatively.)

17   Q.  Could you tell us what cocaine psychosis is?

18   A.  Yes.  I just described the sort of three pharmacological

19   effects of a single dose of cocaine:  Peripheral nerve

20   numbing, of how the drug was administered, and then sort of

21   systemic rush of a surge of norepinephrine, and then central

22   release of dopamine and euphoria.  That's what happens when

23   anyone takes a single dose of cocaine.

24       As people take more and more cocaine, as people

25   repetitively administer cocaine, several things happen:  Less

1   and less dopamine is released because the dopamine nerves in

2   the brain only have a certain supply.  Since the cocaine

3   stimulates too much release of dopamine and doesn't let the

4   nerve take it back up to recycle it, the nerve becomes

5   depleted of dopamine and, hence, subsequent administrations

6   of the drug produce lower and lower amounts of euphoria.  At

7   the same time when the drug wears off, people have what is

8   called dysphoria, or a hangover.  It's almost better to

9   grasp --

10  Q.  Is it easier to chart that?

11  A.  The euphoria -- it would be easier to draw it out.

12          MR. MEZIBOV:  Your Honor, may I use the chart?

13          THE COURT:  We'll recess and he can draw his

14  diagram.

15          MR. MEZIBOV:  Thank you, Judge.

16          THE CLERK:  All rise.

17      (At 10:12 a.m., a brief recess was taken.)

18                      * * *        (10:35 a.m.)

19          THE COURT:  Is the petitioner ready to proceed?

20          MR. MEZIBOV:  Yes.

21          THE COURT:  Respondent ready to proceed?

22          MR. WILLE:  Yes.

23          THE COURT:  Proceed.

24  BY MR. MEZIBOV:

25  Q.  Dr. Parran, during the break you have prepared a couple

3-41

1    of exhibits for us; have you not?

2    A.   Yes, I have.

3    Q.   And we were talking about cocaine psychosis and the

4    pharmacological effects of that.

5    A.   Yes.

6    Q.   Could you, with the Court's permission, come down and

7    show us what you prepared for us?

8    A.   Okay.

9          THE COURT:  Proceed.

10         MR. MEZIBOV:  Your Honor, with your permission.

11   Maybe if we all came closer.  Is it okay?

12         THE COURT:  I can see.

13         MR. MEZIBOV:  Okay.

14     (Witness positioned by the easel.)

15   A.   What I've tried to graph out here is the effects that one

16   might receive from the administration of a fixed dose of

17   cocaine by two different routes.

18     What I've drawn in a solid line here, sort of this wavy

19   shape, is the effect that one might receive from snorting or

20   intranasally administering perhaps 10 milligrams of cocaine.

21     And along this axis here is sort of a person's mental

22   state, base line, euphoria and dysphoria, and at the bottom

23   end of dysphoria, paranoia.

24     And what I've drawn along this axis is time.

25     If a person snorts, for example, 10 milligrams of

1    cocaine, it takes about two minutes for a person to really

2    start getting high.  It's because cocaine is fairly slowly

3    absorbed across the nose membrane and there isn't very much

4    membrane in the nose to absorb it.

5        Also, we mentioned that one of cocaine's initial effects

6    is to produce a lot of norepinephrine in the system, a lot of

7    adrenaline in the system, and that causes a spasm of smooth

8    muscles which closes down blood vessels.  So, there isn't

9    much blood to the nose when one snorts, so the cocaine is

10   slowly absorbed.  The peak euphoria is after 20 minutes.  The

11   total duration of euphoria is 40 minutes, possibly a little

12   longer, possibly a little shorter, and then there is

13   dysphoria, there is a hangover.  And as with any

14   mood-altering drug that a human self-administers, the

15   euphoria is always followed by dysphoria.  It doesn't matter

16   if it is alcohol or nicotine or cocaine.  And the intensity

17   of the low is pretty directly proportional to the intensity

18   of the high, to use the example of alcohol that many people

19   are more familiar with.  How intoxicated a person gets is

20   proportional to their hangover.  And it'd take approximately

21   the same time to come back to base line from dysphoria to

22   euphoria, that is, if you snort cocaine.

23            THE COURT:  So the episode is 80 minutes?

24            THE WITNESS:  Eighty minutes from snorting cocaine,

25   yes.  When you look at this kind of a curve, you see a curve

1  that actually resembles having a mixed drink at a party.  A

2  person, after a little while, gradually becomes a little

3  disinhibited (sic) or euphoric.  It wears off after a period

4  of time with dysphoria and a person comes back to base line.

5      If you take those same 10 milligrams of cocaine, instead

6  of administering intranasally, if you use it in an I.V. or if

7  you smoke it -- it is just that the cocaine that was

8  available in 1985 generally was cocaine hydrochloride, the

9  acid form of cocaine, it was not smokeable.  Cocaine

10  carbonate (phonetic) or base, so-called freebase, is crack

11  cocaine.  This is what's marketed now and it is easily

12  smokeable by changing it from its acid to base form, which

13  most people cocaine dependent smoke it.  Back in '85, most

14  people with cocaine dependence couldn't turn cocaine

15  hydrochloride into cocaine chlorate (phonetic) and smoke it,

16  so they tended to use it in an I.V.  And if you take the 10

17  milligrams of cocaine, if I had drawn it proportionally, this

18  area below this curve here should be equal to the area under

19  this curve here because it's the same 10 milligrams of

20  cocaine.  But what happens is this onset of the high begins

21  in 15 to 30 seconds instead of two minutes.

22          THE COURT:  That is I.V.?

23          THE WITNESS:  I.V., or smoking.  But for purposes

24  of this discussion, I.V.  It begins in 15 seconds; takes

25  about that long for blood circulation to move through the arm

3-44

1    to the inferior vena cava to the lungs to the brain. It

2    peaks at about two minutes. It is pretty much done, in terms

3    of the measurable or reported euphoria, within about ten

4    minutes, and then there is a very deep dysphoria that follows

5    the very high euphoria, and then much more gradually the

6    dysphoria comes back to base line.

7    Q. What is the impact or the dysphoria with respect to the

8    paranoia that you've also outlined on the chart?

9    A. Well, if a person uses a small amount of cocaine I.V.,

10   they get very intensively euphoric for a short period of time

11   and then their actual mood, their spirits -- this is what is

12   called dysphoria, depression, despondency, lack of interest

13   in anything in life, except perhaps using more cocaine is

14   what sort of dysphoria would be defined as. And if the

15   dysphoria gets deep enough, people tend to repetitively

16   report paranoid ideation, paranoid feelings, and that will

17   become more important when I show you the next graph which

18   demonstrates multiple self-administered doses of cocaine.

19      The reason why I said if a person shifts to an I.V. form

20   of cocaine from a snorting form of cocaine that it indicates

21   to me addiction, is that when a person is this high, this is

22   not a "social high." The high is so intense at this point

23   that the human brain has a tough time processing other

24   stimuli. When a person is this intoxicated, it's often

25   considered a so-called social lubricant. When a person is

1   this intoxicated, it probably doesn't matter to the person
2   whether they are at a party or isolated.  It's just tough to
3   interpret much else here.  And then the low is so low, the
4   hangover is so intense, that most social users of the drug,
5   whatever that drug may be, if they're used to do doing this
6   and they ever do this kind of intense experience with the
7   drug, they say "This is too high.  This is too low.  The
8   whole thing was gone too quick.  I'll never do that again."
9        When a person has the disease of addiction, this is
10  interpreted, this intense high is interpreted as Nirvana.
11  And this intense low, by some strange neurochemical mechanism
12  of addiction that we don't -- that we haven't identified yet,
13  this intense low is actually interpreted by the addicted
14  brain as a reason to use again now, which is the difference
    between social users of mood-altering substances and people
    with chemical dependency.  It is clearly a brain lesion.  It
17  is clearly a disease of neurochemistry.  But we don't know
    why this -- what would be a called a negative reinforcer, a
    reason not to do that behavior again -- is interpreted in the
    addicted brain as a reason to use now.
    Q.  Before we turn the chart, for purposes of the record
    we'll indicate that Dr. Parran has signed his name and
    initialed his first chart.  We've marked that as Exhibit 15.
    A.  Seeing this sort of basic pharmacology of cocaine, sort
    of regardless of chemical dependency or not, this is the same

1   a gradual tail.

2           THE COURT:  But now you're changing it.  You had it

3   about 50 or 60 minutes, and now you're changing to 80

4   minutes.  Aren't you?

5           THE WITNESS:  Well, this is the dysphoria, or the

6   -- or the intense low that people feel.  They gradually come

7   back to base line, but the craving for more cocaine is

8   described to last -- to last significantly longer than that.

9   But this is actually the low mood state, and this is 60

10  minutes, 50 minutes, somewhere in that range.

11          THE COURT:  I'm just using your charts now.

12          THE WITNESS:  Okay.  That's fine.

13          THE COURT:  So, the line, the diagonal line that

14  you were just talking with before I interrupted you --

15          THE WITNESS:  Yes.

16          THE COURT:  -- is a 60- to 80 minute line?

17          THE WITNESS:  Certainly an hour.

18          THE COURT:  All right.

19          THE WITNESS:  Certainly an hour.

20          THE COURT:  So in Mr. Hicks' case, we're dealing

21  now with the first hour?

22          THE WITNESS:  This would be the first

23  self-administration, so it would be about the first hour.

24          THE COURT:  So the euphoria was felt again  --

25  before the euphoria was felt again, we're dealing with an

1  hour of time?

2          THE WITNESS:  I'd have to go back and look through

3  the notes for exactly the period of time that was reported,

4  but it's -- it's my recollection now that the first

5  administration took place, and then within -- between an hour

6  and two hours the second administration took place.  And then

7  once again there is some differing reports of between three

8  and five injections; about an hour or so, maybe two hours,

9  with a third injection, yes.

10          THE COURT:  Proceed.

11          THE WITNESS:  Okay.

12  A.  (Continuing) What will typically happen in a cocaine

13  binge is a person will use cocaine, they'll feel high,

14  they'll feel very low.  They'll grad -- their spirits will be

15  very low here.  They'll self-administer again sometime.  When

16  they self-administer again, the peak of the high is

17  significantly lower than the initial, partly because they're

18  starting from a lower base line state when they use again,

19  but partly because there isn't as much dopamine in the

20  original nerve as there was in the first place because so

21  much was released in the initial -- in the initial use of the

22  drug.  And so you're dealing with a functionally

23  dopamine-depleted nerve and, hence, it can't release as much

24  dopamine.  So, with the second administration, people never

25  report being anywhere near as high as with the first

PARRAN  -  DIRECT

3-49

1  administration, and always report that the low is much lower

2  than after the first administration.

3      So, if we have a second administration, at some point

4  during that same binge, honestly these administrations in

5  some cocaine binges are every 15 to 20 minutes.  Sometimes

6  they're spaced out by a few to several hours.  Usually it's

7  in the range --

8          THE COURT:  When do they become fatal?

9          THE WITNESS:  Cocaine -- cocaine binges actually

10  are surprisingly rarely fatal, considering we have about

11  three million people intermittently binging on cocaine per

12  year in the United States.  We only have about somewhere

13  between a thousand and 1500 fatal overdoses from cocaine per

14  year.

15          THE COURT:  How much -- how much does that take?

16  Or does it vary with the size of the individual?  Or is it

17  something that can be -- can't be determined except on a

18  case-by-case basis?

19          THE WITNESS:  It is a case-by-case-basis.  The

20  reason being, because the fatality of cocaine tends to

21  involve one of three mechanisms -- actually four; the most

22  common I'll get to last.  The first is spasm of the coronary

23  arteries, smooth muscle in the arteries in the heart which

24  spasm lead to a heart attack and then death.  And that is

25  just sort of an intermittent thing that is unpredictable.

PARRAN   -   DIRECT

3-50

1    Secondly, a seizure.  And it's entirely unpredictable

2    when a person can have a seizure associated with cocaine

3    use.

4         Thirdly, rarely will people have a stroke from cocaine

5    use, and it can be a large stroke and produce death.  The

6    most common way that cocaine produces death is suicide, and

7    there's lots of suicides as well as homicides associated with

8    this sort of bizarre paranoid behavior that begins when

9    people are in the midst of a binge.  We don't have good

10   numbers on that.  The numbers that I gave you of about 1500

11   people a year, maybe 2000, who die of cocaine overdoses are

12   from heart attacks, seizures or strokes.

13        THE COURT:  And you say that cocaine base leads to

14   this episode that you've just described in Exhibit 16 more

15   than just powder cocaine?

16        THE WITNESS:  Actually, cocaine hydrochloride,

17   powdered cocaine and cocaine base, rock cocaine or crack

18   cocaine, are pharmaceutically the same thing.  It's -- it's

19   just that in order to get enough cocaine hydrochloride, the

20   powdered cocaine, into one's system to experience this, it

21   really has to be used in an I.V., and most Americans are

22   terrified of needles and won't use an I.V.  Cocaine base is

23   pharmaceutically identical.  It is just if you smoke cocaine,

24   it is all instantly absorbed by the lung.  The nicotine

25   companies have known that any mood-altering substance that

PARRAN - DIRECT

3-51

1   can be volatilized or vaporized and, hence, inhaled, can be

2   instantly absorbed by the lung and, hence, delivered pretty

3   much directly to the brain, and so it's two different

4   delivery systems for really, honestly, the same drug.

5          THE COURT:  And it's only cocaine base that can be

6   delivered to the lung?

7          THE WITNESS:  Yes.  Cocaine hydrochloride, powdered

8   cocaine.  If you heat it, you have to heat it to 400 degrees

9   centigrade for it to burn, and then it actually burns and

10  denatures, rather than vaporizes.  Cocaine chlorate -- or

11  what we know as crack cocaine, rock cocaine or base -- if you

12  heat it, since it's in the base form, it vaporizes at a

13  hundred degrees centigrade; temperature that is easy to reach

14  in, you know, any sort of smokeable form.  And, hence, since

15  it volatilizes and vaporizes, it is able to be smoked,

16  inhaled in the lungs and absorbed directly by the lungs, much

17  like nicotine.  And the -- I hate to say it, but the

18  advantage -- but the advantage of delivering a mood-altering

19  drug to the brain by the lung is that it's all absorbed into

20  the lung immediately in a very small -- one heartbeat's worth

21  of blood, when then in the next heartbeat it gets delivered

22  to the left heart, which then in the next heartbeat is

23  delivered to the brain.  So, we're really talking from the

24  time you smoke cocaine it is -- from the time you inhaled to

25  the time the cocaine hits your brain is, for all practical

PARRAN  -  DIRECT

3-52

1  purposes, three to four heartbeats, and so it's an even

2  quicker, more concentrated way to deliver a boulis of the

3  drug to the brain, hence, it tends to, if anything, be even a

4  little bit more reinforcing with even a little bit more acute

5  onset and possibly a higher peak than using an I.V.

6          THE COURT:  So, the use of cocaine base is more

7  likely to result in an episode that you've described on

8  Exhibit 16 than the use of cocaine hydrochloride?

9          THE WITNESS:  The use of cocaine base is just as

10  likely to produce this kind of a binging situation

11  (indicating) as the use of cocaine hydrochloride I.V.  And

12  the use of cocaine hydrochloride by snorting, the intranasal

13  route, tends to be less likely to produce this kind of a

14  phenomenon.

15          THE COURT:  And this episode you say results in

16  violence or death?

17          THE WITNESS:  Well, yes.

18          THE COURT:  Violence against self, violence against

19  others?

20          THE WITNESS:  Especially with subsequent

21  self-administrations.  Each time a person uses, the high is

22  less high and the low is even more low.  With more and more

23  dysphoria, more and more paranoia, more and more intrusive

24  thoughts, more and more difficulty interpreting normal

25  stimuli as being non-threatening.  It tends to lead to people

FARRAN - DIRECT

3-53

1    arming themselves on often a regular basis, using more and

2    more by themselves, being more paranoid in their ideation,

3    misinterpreting external cues and participating in what

4    everyone else would observe as unprovoked random violence.

5            THE COURT:  As a practical matter, a user of

6    cocaine -- "addict," if you will -- the only way they can use

7    it or assimilate it is by self-administration; isn't it?

8    There is only one to administer to?

9            THE WITNESS:  No, I've interviewed lots of patients

10   with positive toxicology tests for cocaine, all of which are

11   certain someone slipped it in their drink.  And when the

12   story comes out, that doesn't happen.

13           THE COURT:  Proceed.  I'm sorry.

14           THE WITNESS:  No.  The important aspect with this

15   kind of a graph is that as people in the midst of a binge

16   with cocaine, repetitive self-administration of cocaine, as

17   they become more and more dysphoric, the paranoia and then

18   more clearly psychotic symptoms of cocaine psychosis become

19   prominent.  The estimates are that when people use cocaine

20   I.V. or they smoke it, and if they use it in an intermittent

21   binge crack pattern, the estimates are at least 50 percent

22   and probably 70 percent of people develop significant

23   paranoid ideation during the end -- during binges after the

24   initiation, or binges lasting for a few to several hours

25   after the end of a binge; 50 to 70 percent.  One would say,

1  "Well, if this drug produces euphoria first and then all of

2  this terrible dysphoria and more and more paranoia and after

3  a while a person is using and not getting back to base line,

4  why on earth do people continue to use it?" -- that is

5  addiction.    If I had an answer to that, it would be even

6  simpler to treat people.

7      The paranoia, sort of the continuum from dysphoria to

8  paranoia to psychosis with cocaine -- and it honestly is a

9  continuum, almost like a continuum of white to black with

10  many shades of gray in between -- is one which has clearly

11  been identified and honestly was identified back in the early

12  '80s as a phenomenon which was susceptible to something

13  called the "kindling effect."  And let me just describe the

14  kindling effect and then I'll stop and answer questions, I

15  guess.

16      The kindling effect was first identified in manic

17  depressive disease or so-called bipolar disease, where it was

18  observed that if a person had manic depressive disease, when

19  they first developed it, their manic episodes would last a

20  long time and not be real manic and they're depressive

21  episodes would last a long time and not be very depressed.

22  And as a person went through the cycling of manic depressive

23  disease, it required less stimulation of a mania to bring

24  upon a more and more intense depression and then less

25  stimulation of a depression to bring on more an more intense

1    mania.  And it seemed that person seemed to cycle more and

2    more rapidly between mania and depression and it's been

3    hypothesized as an electrical phenomenon in the brain called

4    the Kindling phenomena.

5        It was next demonstrated in the early '60s in Lexington,

6    Kentucky at the Addiction Research Center at the Federal

7    Penitentiary for Drug Offenders that the Kindling phenomenon

8    was clearly present in opium dependents.  The way that they

9    studied this is, they basically took federal prison

10    volunteers who had a history of opium dependence and they

11    gave them morphine for six weeks -- six times a day by

12    injection and then they put them in a small room with bizarre

13    wallpaper for five days and let them go through untreated

14    withdrawal.  And they took -- and morphine withdrawal lasts

15    for five days.  Then they'd take them out of that room and

16    put them back in prison for six months with no morphine, and

17    they would bring them back and just put them back in the room

18    with bizarre wallpaper without any morphine, and 100 out of

19    100 patients would develop dilated pupils, runny noses,

20    objective and substantive signs and symptoms of opiate

21    withdrawal just being in the context where they had been in

22    previously untreated withdrawal before.  Sort of a Pavlovian

23    learned response, one might say.

24        What was demonstrated in research in the late '70s and

25    the early '80s with cocaine psychosis and with

1  cocaine-associated seizures is that clearly a kindling

2  phenomenon is present with cocaine as well, especially in the

3  area of cocaine-associated paranoia, cocaine-associated

4  psychosis and cocaine-associated seizures.  The earliest

5  research was with the seizure in the late 1970s.  They

6  identified people tended not to have a cocaine-associated

7  seizure unless they had been on an extensive binge,

8  tremendous quantities of cocaine, a couple thousand dollars

9  worth of cocaine on a weekend, and then they would finally

10  surpass the level of cocaine toxicity in their system where

11  they would have a seizure.  And once they had that one

12  seizure, subsequent use of cocaine to a much lower level --

13  just two or three or four administrations of cocaine -- could

14  produce a seizure in the same person, where previously it had

15  required 20 or 30 self-administrations.  Once the wiring

16  mechanism or the response of a seizure to cocaine

17  intoxication had happened in those people's brains, it took

18  less of an insult from the drug to produce the same effect.

19      What was then identified in the early 1980s is that it

20  was exactly the same with cocaine-associated paranoia and

21  cocaine psychosis.  Then originally when people began using

22  cocaine in an addictive way, it required a lot of cocaine, a

23  heavy, heavy binge maybe for a day and -- a day or two days

24  for a person to really start getting toxic from a paranoid

25  and sort of psychotic delusional standpoint.  But once they

PARRAN - DIRECT

1   had reached that, subsequently -- even if they had been off

2   cocaine for six months or a year -- subsequently only a

3   couple, three, four, five administrations of cocaine could

4   produce similar paranoid and psychotic symptoms, a kindling

5   phenomena, which was identified in the literature in the

6   early '80s -- clearly in the early '80s but also in --

7   associated with amphetamine psychosis, and cocaine is

8   scheduled as an amphetamine-like drug.  The kindling

9   phenomenon with amphetamine psychosis has been well known

10  since the 1950s. I'll stop.

11  Q.  Dr. Parran, I'm going to ask you to resume your seat, if

12  you would.

13      (Witness regained the witness stand.)

14  Q.  Dr. Parran, you've mentioned three central features, I

15  believe, in this discussion here:  One is cocaine psychosis;

16  two is this concept of binging; and third is that of the

17  concept of kindling, kindling effect.

18      Could you relate all of those concepts or phenomena with

19  the history of John Hicks as you understood it from the

20  materials that you were provided?

21  A.  Yes.  Certainly Mr. Hicks, his past history over the last

22  three to four years prior to the crimes that were committed,

23  demonstrated an intermittent binge-type dependence or

24  addiction on cocaine.  His pattern clearly was a binging-type

25  pattern where he wouldn't use it for several days, often

PARRAN   -   DIRECT

3-58

1    several weeks; occasionally a few to several months.  But

2    then once he did use, he'd use repetitively and then try to

3    stop it.  And once -- once he had used, he used repetitively

4    on that occasion and then he stopped it, but he'd only be

5    able to be stopped for a short period of time and then he was

6    repetitively again.  Sort of a gradually accelerating

7    intermittent binge pattern.  Periods between binges got

8    shorter and shorter.  That certainly is what he described in

9    his interview with Dr. Baum in 1990 and it is what he

10   described to some degree in his interview with Ms. Leahy.

11        And certainly the descriptions that Mr. Hicks gave to

12   Ms. Leahy as well as the detectives in Knoxville when they

13   interviewed indicated there was a cocaine binge that he had

14   -- that the events of August 4th or 5th, I can't remember

15   which date it was, had the hallmarks of a binge:  Hadn't used

16   for a while, pay day, got paid, got his money, all of his

17   plans for the day went out the window; used cocaine --

18   actually initially had a little bit of trouble getting the

19   initial cocaine and started getting edgy and restless and

20   irritable, used the cocaine, felt very high.  As it went

21   away, he got increasingly crescendo urgings or cravings to

22   use more cocaine, again began to cast about on how to get

23   money for more cocaine, et cetera.  So, it's -- it's classic

24   for a cocaine binge.

25        The paranoia, moving towards cocaine psychosis, is

PARRAN  -  DIRECT

3-59

1  actually there's some evidence in the interview done in

2  Knoxville with the detectives that supports there being

3  paranoia, intrusive thoughts, difficulty following through

4  and maintaining one thought pattern, erratic, irrational, and

5  uncharacteristic out-of-control behavior on his part is all

6  there.  Even in the interview it was concluded by people, you

7  know, who will -- who are law enforcement professionals, not

8  clinicians -- had clinicians been conducting that interview,

9  I think several points would have been followed up on and a

10  lot more data in the interview, but, I think there is clearly

11  some data there and then much more data in the interview done

12  by Ms. Leahy about the mental state or the thinking state,

13  psychological state that Mr. Hicks was in after or during

14  this binge of cocaine.

15      And then the kindling phenomenon also is -- there's some

16  evidence for the kindling phenomenon in Mr. Hicks' history in

17  the assessment done by Dr. Baum, the really good chemical

18  dependency evaluation done by Dr. Baum in 1990, as well as

19  some in Ms. Leahy's interview indicating previous sort of

20  binging patterns and suspiciousness and paranoid ideation in

21  the past when he had used the cocaine -- much more heavily

22  in the past than at this time.  So, I think there is evidence

23  of all of that.

24  Q.  Now, let me ask you -- let me ask you some ultimate

25  opinions in a moment.  But before I do, in looking through

1  paranoia comes on after the intoxication has worn off, when
2  the dysphoria has kicked in, and it tends to get worse and
3  worse with subsequent administrations.  So, the dysphoria
4  paranoia and psychosis tends to increase with subsequent
5  administrations, whereas the intoxication tends to decrease
6  with subsequent administrations.

7       And clearly the literature, both now and in the early
8  1980s, indicates that once this severe paranoia or cocaine
9  psychosis begins, it tends to last for a matter of hours
10 after the last administration of cocaine.  It rarely, if ever
11 -- and, frankly, lasts up until the time of the crash.  What
12 I teach medical student residents -- honestly, what I teach
13 Emergency Room doctors, I have many talks about the cocaine-
14 intoxicated and cocaine-agitated person.  What I especially
15 tell Emergency Room doctors, because they're the ones that
16 see people in this state all the time, is when a person has
17 been binging on cocaine, they're getting more and more
18 agitated, paranoid, irritable, interpreting external stimuli
19 as threats.  They frequently also are experiencing tightness
20 in the chest, chest pain, other things, so they often wind up
21 in the Emergency Room.  And when they come in, they're very
22 dangerous and they need to be sedated immediately in order to
23 -- in order to ensure the safety of the Emergency Room
24 staff.  Once -- what tends to happen is a person binges on
25 cocaine for a certain period of time and then there is a

1  peri-binge period of a few hours, several hours.  People are

2  restless, irritable, paranoid, and then they crash.  And the

3  crash means basically going to sleep and sleeping it off and

4  eating a lot, because in the midst of a binge, the

5  norepinephrine effects of cocaine cause people not to eat and

6  not to sleep.  So, the recovery -- the crash from cocaine

7  tends to involve hypersomnolence and hyperphasia:  Eating a

8  lot of things and sleeping a lot.

9        Rarely -- in fact, clinically it is almost unheard of now

10  -- people still have some cocaine psychosis after they wake

11  up at the end of the crash.  Very, very rarely.  But,

12  typically, a fair number of people are paranoid right up

13  until the time of the crash, of the time when they fall

14  asleep.

15        When we look at -- at this case and we hear the

16  descriptions of a single use, strong cravings to use more,

17  hocking a VCR, erratic thoughts, commission of a murder, use

18  of more cocaine, commission of another murder and sort of

19  agitated period of time where a person is hypervigilant, goes

20  home, sees their spouse, used some sedating drugs -- people

21  frequently self-treat that agitated, restless time with

22  things such as marijuana or alcohol, sedatives which were

23  self-administered, and then leaving, driving, still being

24  sort of irrational, crashing, going to sleep, waking up and

25  driving to the police station and turning one's self in and

PARRAN - DIRECT

3-63

1  confessing, is classic for cocaine psychosis.

2  Q.  Now, I think you've answered in a substantial way my next

3  question, but let me ask you anyways:  What are the outside

4  signs and symptoms of cocaine psychosis?

5  A.  Let me add -- I'll list a few things and then I'll

6  specifically list a few things that are not described with

7  cocaine psychosis which I think have shown up in some of the

8  transcripts as confusing points.  Cocaine psychosis, or --

9  cocaine psychosis is a phenomenon which is characterized by

10  paranoid thoughts, misperceptions, intrusive thoughts.  So

11  the feeling, like thoughts are coming into one's head,

12  suddenly having a thought, frequently irrational, intrusive

13  thoughts, hallucinations, overwhelmingly tend to be either

14  auditory, hearing voices -- although they're usually

15  interpreted as thoughts as coming in their mind -- but

16  hearing voices and tactile -- occasionally people feel what

17  is called cocaine fleas, or feel things crawling on their

18  skin, less and less ability to follow consistently through on

19  a plan, more jumping and jumping from one plan to another and

20  from one thought to another and more and more bizarre ways.

21      What typically is not present with cocaine psychosis is

22  florid delirium.  I mean, these people aren't talking out of

23  their minds, acting, you know, bizarrely, schizophrenic or

24  talking like they're in delirium or DTs, or whatever, but

25  their thoughts and their behaviors are erratic and irrational

1   and frequently moving from being mildly paranoid, to being

2   armed, to being actually violent.

3   Q.   Now, were these classic signs and symptoms of cocaine

4   psychosis present in the record that you have reviewed

5   relating to Mr. Hicks?

6   A.   Yes.  I think as I mentioned there's evidence of it even

7   in the interview with the detectives in Knoxville, although

8   that interview was an interview aimed at an entirely

9   different topic.  I mean, it was a difficult task.  Even

10  given the fact it was, you know, a law enforcement,

11  professional interview, there is evidence in that interview

12  that some of this was going on, and a lot of evidence in the

13  interview done with Ms. Leahy.

14  Q.   And, Dr. Parran, do you have an opinion, to a reasonable

15  degree of medical certainty, whether Mr. Hicks was in the

16  throes of a cocaine psychosis at the time of these two

17  murders?

18  A.   Yes, I -- in reading the -- having read the transcript

19  from the confession and having read the history of the client

20  in terms of the past, my initial opinion and my overwhelming

21  opinion since then is that from a clinical standpoint, if I

22  had to create a differential diagnosis, my differential

23  diagnosis in this case would be cocaine psychosis, cocaine

24  psychosis, cocaine psychosis, cocaine psychosis, and then

25  maybe something else, but I can't imagine what else it would

PARRAN  -  DIRECT

3-65

1  be.

2  Q.  What were the indicia, if you will, of cocaine psychosis

3  that you observed in the record as surrounding the murder of

4  these two individuals?

5  A.  What would be the addition?

6  Q.  The indicia, the indications that Mr. Hicks was in the

7  throes of cocaine psychosis when these two murders were

8  committed.

9  A.  I can -- I can open up the transcript and give you a

10  couple specific examples --

11  Q.  That would be helpful.

12  A.  -- if you like.

13      The first I'll mention is the transcript from the

14  Knoxville Police Department, and this transcript on its

15  second page -- or on the first page, it says, "I went over to

16  this guy's house that I knew and had some cocaine.  So I

17  bought me some."  And then there's some information about the

18  person he bought it from, and then "I used it and some after

19  I went home and then that craving came, you know, to get some

20  more dope.  So what I did, I called the man and asked if he

21  had some for me.  He said okay.  So I took the VCR we had at

22  the home.  So I went over there, and a little bit later I

23  gave it to him, so he gave me some more.  So I told him I

24  would pay him back tomorrow.  I realize I didn't have the

25  money to get the video recorder because it wasn't mine, so I

1  got to thinking -- I said I've got to do something, you know,

2  because the video recorder didn't belong to me.  I knew

3  there'd be a lot of bullshit going on with my wife, so what I

4  did, I got to thinking well, since I'm supposed to have went

5  to the ball game -- well, I didn't.  Okay?  So I called her"

6  and he was calling his mother-in-law.

7      Those sorts of things, indicating sort of the person buys

8  some cocaine, doesn't have any more money, is moving toward a

9  cocaine binge regularly and routinely, hocks about anything

10  they have that's valuable in order to get some more cocaine,

11  and then once that's been done, frequently tries to figure

12  out how to get some more money, it becomes more and more

13  irrational.

14      So, "I need some more money.  Maybe I should go rob my

15  mother-in-law."  That's entirely irrational, compared to

16  robbing someone else who doesn't know you, who you would

17  knock over the head and would never recognize you.  That is

18  crazy.  But this man isn't crazy.  This man does haven't a

19  history of schizophrenia.  He doesn't have a history of

20  serious mental illness.  That is an indication there of

21  cocaine psychosis.

22      He states on the next page, "But getting back to where I

23  was just going to leave," he said to the detective he was

24  just going to leave the apartment, and then -- "So she was

25  wondering about that cage and what the bird cage had in it

1   and blah, blah, blah.  She turned around and I just grabbed

2   her and started strangling her."  That once again sounds

3   like, you know, sort of the erratic sort of impulsive

4   behavior of a person who's getting more and more sort of

5   psychotic on a cocaine binge.

6       A little further on they talk about finding a gun.  He

7   said -- the interviewer said, "You could not find the gun?"

8   And the defendant said, "Yeah, at first, then all of a sudden

9   I realized that.  I said, well, you know, Brandy knew I was

10  the last one here, so, you know, it was like I was, 'No, I

11  shouldn't do that to her,' you know."  That sounds very much

12  to me -- giving a law enforcement interview as opposed to a

13  clinical interview -- of a person describing intrusive

14  thoughts that are coming in that are bizarre and completely

15  irrational sort of, you know, coming into a person's mind.

16      "And so, after I got the money, I said 'I'll leave and

17  come back and clean up this mess.'  So I called the man and I

18  finally caught up with him."  I think that -- "...finally

19  caught up with him."  In the interview with Shirley Lehmann

20  (sic) later on, he talks about how he couldn't call the

21  person, there was no answer on the phone, the phone was busy,

22  he was pacing around the apartment, more and more edgy,

23  irrational, and dashed out and got more cocaine and came back

24  here and used cocaine right here in the same place.  Despite

25  having already gotten the money and gun and everything else

1    is -- is -- clearly the most likely clinical explanation is

2    cocaine psychosis.

3         So, he went and got some more cocaine. "And then must

4    have been around 12:30, something like that, I went on ahead

5    and shot up the dope.  I got -- I got a 50-cent piece and all

6    of a sudden I got to thinking again" -- "I got to thinking

7    again," just typical cocaine psychosis and shortly thereafter

8    intrusive thoughts, "I started thinking again well, I'd

9    better go ahead and do this because she's going to be the

10   only" -- referring to Brandy, and so, you know, he committed

11   the second murder.

12   Q.  Well, is that evidence of rational thinking, to cover up

13   a crime, or does it reflect something else in your clinical

14   opinion?

15   A.  All of it -- I mean, from -- from the trying to figure

16   out how to unhock the VCR on is some of the most bizarre and

17   irrational thought patterns that one can imagine, or at least

18   that I can imagine, and indicates more and more paranoia and

19   bizarre behavior and is quite indicative of cocaine

20   psychosis.

21        Later, it says "It was in the living room, but I dragged

22   it to the bedroom" -- which is Maxine's body. "...then I got

23   to thinking I need to do something with it before someone

24   discovered it, so I was going to cut her in half and put her

25   in the freezer, and all of sudden I did and then I stopped."

1    I mean, that is crazy.  That is not the actions of a person

2    who is -- whatever.  And then --

3            THE COURT:  You used the term "crazy," Dr. Parran.

4    Could you relate that to the opinions you've expressed about

5    cocaine and psychosis?

6            THE WITNESS:  I'm using the vernacular "crazy,"

7    that is, bizarre thoughts and actions of a person who is --

8    who is clinically most likely involved in a cocaine psychosis

9    given a past history of no mental illness.

10   A.  (Continuing) And then finally on the next page there

11   talking about the sexual abuse of the girl:  First, you know,

12   I was thinking all weird.  Thinking all weird."  Here's a

13   person, a day later even, describing his own thoughts of, you

14   know, thinking all weird, and so those are the evidences in

15   the police report.

16       And then it takes some time, but reading through the

17   report from Ms. Leahy, there's what I consider to be just

18   much more data from a trained clinician interviewing about

19   these issues, asking followup questions about "What do you

20   mean 'thinking all weird'?  What kind of thoughts were you

21   having?" -- and those sorts of things.

22   Q.  Based on the information you were able to obtain from the

23   record, your conversations with Mr. Hicks and any other

24   materials that you were provided, do you have an opinion, to

25   a reasonable degree of medical certainty, as to the duration

PARRAN   -   DIRECT

3-70

1   of the cocaine psychosis which you've just testified about?

2   A.   The -- my best clinical judgment would be that the

3   cocaine psychosis and -- that the cocaine psychosis certainly

4   continued through the time that Mr. Hicks went home to his --

5   his and his wife's apartment.   Probably until the time that

6   he drove out of town and maybe until the time he actually

7   went to sleep in Knoxville.

8   Q.   Let me ask you this question --

9            THE COURT:   When did it start?

10  Q.   That was my next question, the onset.   In your opinion,

11  to a reasonable degree of medical certainty, what was the

12  onset of this cocaine psychosis?

13  A.   The onset was probably shortly after the second

14  self-administration of cocaine; the cocaine that was used --

15  the cocaine that was bought with the VCR.

16  Q.   Now, Dr. Parran, in your professional opinion, were the

17  Court and the jury properly and accurately informed through

18  the testimony of the witnesses who were presented at trial as

19  to the nature and extent of Mr. Hicks' cocaine dependency and

20  psychosis at the time he committed these acts?

21  A.   No.

22  Q.   And why is that?

23  A.   It's clear from my reading of the transcript that the

24  information that was provided about cocaine pharmacology was

25  inaccurate during the trial; that the information given

1   regarding the timing of -- the difference between cocaine

2   intoxication and the cocaine psychosis was not entirely but

3   largely inaccurate, and that the information that was given

4   about the signs and symptoms of cocaine psychosis were

5   substantially inaccurate.  The information given regarding

6   the expected onset of cocaine psychosis, based upon the

7   timing of the use of the drug, was inaccurate, as well as the

8   expected duration of cocaine psychosis.  That also was

9   inaccurate.  And, finally, the idea that cocaine psychosis

10  was more likely to happen in a person who was a chronic,

11  daily user of cocaine with day in and day out cocaine use,

12  which is actually very rare for people to actually do that

13  but even more rare for people who have cocaine psychosis, but

14  that was entirely inaccurate.

15  Q.  Dr. Parran, if you're able to do so, are you able to

16  refer to portions of the record in which you feel that there

17  were substantial inaccuracies or errors with respect to the

18  information that was provided to the Court and the jury

19  concerning Mr. Hicks' cocaine --

20  A.  Sure.

21  Q.  -- situation?

22  A.  Sure.  And I'll do it in whichever way is usually most

23  appropriate in these settings.  I can give the page and --

24  the page number and the line number.

25  Q.  Are you able to pinpoint who the witness is?

PARRAN  -  DIRECT

3-72

1   A.  If you want me to read the statement --

2   Q.  If you could summarize perhaps what the statements are,

3   but also if you could indicate which witness is providing

4   this inaccurate information to the jury.

5   A.  Okay.  The primary information which was inaccurate was

6   provided in the testimony of Nancy Schmidtgoessling, and her

7   testimony started on Page 1175.  The areas where the

8   inaccuracies were most notable is on Page 1178 -- I'm sorry

9   1187, where they talk about the difference between snorting

10  cocaine and using cocaine I.V.  And Dr. Schmidtgoessling gave

11  clearly wrong information from Line 22 on that page through

12  Line 6 on Page 1188.  The information -- should I read the

13  information, or just --

14  Q.  If you could summarize it.

15  A.  Okay.  Well, it basically said that that cocaine goes

16  into the bloodstream faster if you snort it than if you use

17  it I.V., which is wrong.  She says that the intensity of the

18  symptoms of the intoxication of cocaine are equal, whether

19  you used an I.V. or snort it, which is clearly wrong.  And

20  she said that the reaction would be -- that the only

21  difference between using cocaine nasally versus I.V. is that

22  the reaction might be quicker nasally rather than I.V., and

23  it is not the only difference and, in fact, that's wrong.

24      Then on Page 1191, starting at Line 11, they talked about

25  the levels of intoxication from cocaine being similar to the

1  levels of alcohol, various degrees of intoxication.  And the
2  question -- or the response of the expert was that they were
3  similar; that, you know, there were sort of a linear
4  intoxication effect from cocaine similar to alcohol, which is
5  -- which is not the case.  Cocaine has much too short a half
6  life to be able to look at levels of intoxication.

7       Then at the top of the next page on 1192, the question
8  was would cocaine be the same curve of dysfunction?  Can the
9  effect and degree of one's ability to perform depend upon the
10  amount that a person took in? -- meaning if you only took in
11  a little cocaine now, it will have a little effect, and if
12  you took a lot of cocaine, it will have a lot of effect.  And
13  the expert said "Yes," definitely demonstrating no evidence
14  of the knowledge of the kindling phenomena that we talked
15  about before where one has activated kindling with cocaine
16  addiction.  Even reasonably small amounts of the drug can
17  precipitate in large behavior, rational changes.

18       Page 1193, the description of why people die from
19  cocaine:  "In fact, when people die of cocaine overdose, it
20  is usually from a respiratory problem."  Virtually no one
21  dies of a cocaine overdose from a respiratory problem.  It is
22  a seizure, stroke or heart attack.  It has little to do with
23  the lung.

24       She then points out later on that page that this patient
25  -- or this defendant was able to retain his orientation and

1  his goal directedness and, therefore, he was not

2  significantly affected by cocaine when he was committing the

3  crimes.  As I described earlier, it is in the literature, and

4  in the 1980s, in the literature now, when a person is

5  involved in cocaine psychosis, they are oriented, they know

6  who they are, and where they are, and when it is.  They are

7  oriented to person, time and place.  They are nct delirious

8  and they frequently follow through with impulsive actions,

9  although they tend not to be able to follow through in a

10  single plan of action over an extended period of time.

11      And then, finally, throughout this entire section, all of

12  the statements were about the -- about whether he was

13  intoxicated at the time, not whether there was the dysphoria

14  and the paranoia and cocaine psychosis.

15      There's just a couple more here.  On Page 1195, starting

16  at line 18, the question is:

17          "Let's talk about that.  This stuff reaches a peak

18      in fifteen to twenty minutes."

19  And the response from the witness was...

20          "Yes, that is customarily thought to be the

21      peak."

22  Well, that certainly is not when you're using I.V. cocaine.

23  It is gone in ten.

24      The question then was...

25          "Then the person returns to normal later

1    rapidly?"

2    And the response was...

3        "Yes, usually sort of a crash, as they refer to

4        it.   It usually takes ten to fifteen minutes."

5    Actually, the crash is, after a binge, often a few hours

6    after a binge, which tends to last proportional to the length

7    of the binge.

8        "Question:  The whole thing is less than half an

9        hour?"

10       "Answer:  Not if there is something mixed in, but,

11       yes."

12       "Question:  Doctor, did you actually" --

13   I'm sorry, the next page, 1196, pretty close to the end...

14       "Doctor, did you actually make an examination of

15       the life background as part of your history to determine

16       his work record, the way he dealt with his peers and so

17       forth?"

18       "Yes, I did."

19       "Question:  Did you see anything in there that

20       indicated either cocaine usage or chronic usage of

21       cocaine?"

22   And the answer on Page 1197 reads...

23       "I didn't see anything as far as chronic usage.  He

24       was regular to work, he was cooperative with his

25       co-workers, he was a good employee and reliable."

PARRAN   -   DIRECT

3-76

1        All of that information, given a history of binging on

2   several thousand dollars of cocaine a few years earlier, a

3   couple thousand dollars use of cocaine six months earlier,

4   and given the history of a person who went to work and

5   participated normally in working during the day and wound up

6   committing two murders and other things later during the

7   night, is absolutely diagnostic of cocaine addiction and

8   cocaine psychosis, and her statement is that is that it's no

9   indication of chronic use.  I think -- I think that's it.

10  Q.  Dr. Parran, in your professional opinion, based on the

11  information that was presented at trial and which you've just

12  commented on, do you believe the jury was fairly and

13  accurately apprised of the effects of cocaine on Mr. Hicks'

14  conduct that night?

15  A.  Absolutely not.

16  Q.  Okay.  For the reasons you've stated?

17  A.  Yes.

18  Q.  Now, Dr. Parran, this case took place in 1985; that's

19  when the trial took place.  What was the current state of

20  medical knowledge of cocaine and cocaine psychosis at that

21  time?

22  A.  Well, that's a very good question.  Certainly we know

23  more about cocaine now than we knew in 1985 and 1986, but

24  that's because we've experienced our current cocaine epidemic

25  which started honestly in probably 1976.  But we've

PARRAN  -  DIRECT

3-77

1   experienced it for another decade since then.  But in 1985

2   and '86 -- and I think the trial actually took place in

3   February of '86 -- cocaine addiction was well-known.  It was

4   in the DSM-III, and then subsequently published a little

5   later in 1986, the DSM-III-R, and now in 1995 the DSM-IV,

6   cocaine psychosis and stimulant psychosis.  Amphetamine

7   psychosis has been described in the literature since the

8   1950s.  In fact, there are a few descriptions later in the

9   Western European literature, the German literature from the

10   1930s, of paranoid ideation and bizarre behavior from

11   cocaine.

12      But what would be most available to practitioners in our

13   community in Ohio in 1985 are several articles from

14   well-respected psychiatric journals and widely-read

15   psychiatric journals from the mid- to late-'70s right up

16   until 1986, and certainly since.  They talk about cocaine

17   psychosis, paranoia associated with cocaine, these long last

18   -- longer lasting effects of cocaine than just the mere

19   intoxication.

20   Q.  Dr. Parran, let me stop you there and ask if I might hand

21   you an exhibit, Plaintiff's Exhibit 17.

22      Could you identify that exhibit for us, please?

23   A.  Yes, it's a face sheet or a Xeroxed copy of a face sheet

24   of a list of articles in the medical literature, that I wrote

25   down the initial or the earliest one being in 1931, the last

PARRAN   -   DIRECT

3-78

1   one being in 1986, early 1986 -- I think published in

2   February of 1986 -- basically listing articles in the medical

3   literature about cocaine dependence, cocaine addiction,

4   including references and descriptions of cocaine paranoia,

5   cocaine psychosis.

6   Q.  So what Exhibit 17 is, is a compendium or a list of the

7   articles?

8   A.   The first page is a list and attached are the actual

9   articles.

10  Q.  And these are examples of the type of materials that were

11  available to practitioners by February of 1986?

12  A.  Absolutely, yes.

13  Q.  Is there anything about which you have testified this

14  morning relating to cocaine, cocaine psychosis, the kindling

15  effect, the binging, the psychosis, the paranoia, the

16  duration of cocaine psychosis which would not have been

17  available to practitioners in this field in 1985 and 1986?

18  A.  In general, no.  There is one -- I did cite one piece --

19  one statistic where it's thought that 50 to 70 percent of

20  people who -- who use cocaine in a binge-crash pattern

21  experience clinically significant paranoid ideation, with

22  better than half of them actually arming themselves with

23  weapons during cocaine binges, and that was published after

24  1986.

25      But the description of the kindling phenomenon with

1 cocaine psychosis, as well as cocaine seizures, the

2 description of the typical binge-crash pattern and the

3 description of cocaine psychosis itself and cocaine paranoia

4 coming on after the intoxication of cocaine and lasting well

5 beyond the intoxication of cocaine are all very well

6 documented in the medical literature in 1985, '86 and before.

7 Q. And to your knowledge, Dr. Parran, was that information

8 and examples of that literature available to practitioners in

9 that field of addiction in Cincinnati, Ohio in 1985 and 1986?

10 A. Oh, absolutely. One of the articles is from the American

11 Journal of Psychiatry, the most widely distributed, widely

12 read journal, psychiatric journal in the country, and that is

13 from March of 1975 and its titled is "Cocaine Psychosis:

14 A Continuum Model."

15 There is an article from 1976 in the same journal, the

16 American Journal of Psychiatry, and the title is "Cocaine,

17 Kindling, and Psychosis." That was a decade before these

18 events.

19 And then I have a few here, one in 1986 "Neuroleptic

20 Reduction of Cocaine-Induced Paranoia" in the Journal of

21 psychopharmacology published in February of 1986, the same

22 month of the trial. Even the Psychiatric Annals in 1984 --

23 the psychiatric annals are very widely distributed -- have

24 articles describing -- describing the same thing.

25 MR. MEZIBOV: Your Honor, if I may have one minute,

PARRAN   -   DIRECT

1    that may be it.

2        (Messrs. Mezibov and Lazarow conferred privately.)

3    Q.  Two final questions, Doctor.  First, with respect to this

4    information and the availability of these materials as an

5    extension of that question, were there, and to your

6    knowledge, practitioners in the field which you study and

7    about which these articles have been written who were

8    available in Cincinnati to have this information at their

9    disposal?

10   A.  Well, certainly there were in the early 1980s.  The

11   Cincinnati V. A. has a big Addiction Medicine Treatment

12   Program that was active then.  They had a specific drug

13   treatment branch, as well as a separate alcohol treatment

14   branch.  They treated them separately then.  We're now

15   treating them together with a psychiatrist as well as

16   internists on their staff.  In fact, the National Institute

17   on Alcohol Abuse and Alcoholism and the National Institute on

18   Drug Abuse, two branches of NIH in 1980 developed a career

19   teacher's program where they supported individuals of medical

20   schools to acquire more education and then teach about

21   addiction and the pharmacology of addictive drugs.  And Don

22   Nelson, who is a clinical pharmacologist at the University of

23   Cincinnati, was a career teacher with NIAAA and NIDA from

24   1981, and was teaching a pharmacology course at the

25   University of Cincinnati Medical School on drugs of abuse in

PARRAN  -  DIRECT

3-81

1   the '80s and is still there now.

2   Q.  Dr. Parran, you also mentioned there was a study that

3   evaluated or reported on the violence associated with cocaine

4   psychosis, people being armed and the like.  What is the

5   correlation between cocaine psychosis and violent behavior?

6   A.  The study that was reported, they studied a couple of

7   hundred people who used cocaine in a binge, binge-crash kind

8   of pattern, either smoking it or using it I.V.  Seventy

9   percent reported clinically significant paranoid ideation

10  happening around the time of cocaine binges.  The -- 50

11  percent of those who had paranoid ideation reported that the

12  paranoid ideation lasted all the way through to the time of

13  the crash, so it lasted for a few to several hours after the

14  cessation of the cocaine use.  Better than half of people

15  with paranoid ideation reported that they had intermittently

16  armed themselves during a cocaine binge with various

17  weapons.  And of that 50 percent who had armed themselves, a

18  quarter reported having actually been violent.  None reported

19  actually ever having killed someone, but a quarter reported

20  having been violent, including jumping out of windows because

21  they were sure the police were coming through the door;

22  beating up a significant other because -- thinking they were

23  sending messages about the person using cocaine to law

24  enforcement; misperceiving external stimuli and then reacting

25  in a violent, arming way.

1    If you remember, norepinepherine adrenaline is the

2    hormone which produces our fight or flight response.  People,

3    when they're overstimulated with norepinepherine, tend to get

4    more and more paranoid, have more and more tough time

5    focusing on something and tend to be hyper-reflexic, and

6    really sort of armed.  It's -- it's a hormone which -- which

7    has tremendous survival benefits for humans; but when

8    overstimulated with it, people can be very violent.

9    Q.  The facts that you found in the record in Mr. Hicks'

10   case, they're consistent with the findings of these studies

11   you've just mentioned with respect to violence?

12   A.  Yes.

13        MR. MEZIBOV:  That's all the questions I have of

14   this witness.  Thank you, Doctor.

15        THE COURT:  Doctor, in your history that you

16   accumulated on Mr. Hicks, was there a history of seizures?

17        THE WITNESS:  No, there was no history in his case

18   of cocaine-associated seizures and that sort of kindling

19   phenomenon.  Just a kindling phenomenon in terms of the

20   paranoid thoughts as such.

21        THE COURT:  Can an addict that has become an

22   intermittent binge-type pattern individual, can that addict

23   reasonably be expected to overcome the addiction?

24        THE WITNESS:  I couldn't give you worthwhile

25   information in 1985 because the epidemic was too early at

PARRAN  -  DIRECT

3-83

1   that point.  But at this point, I think we have some pretty

2   good information, and the information that we have now is

3   that if you take a thousand people with cocaine addiction,

4   intermittent binging, whether they're smoking it or using it

5   I.V., and you follow them up over 15 years or so, at the end

6   of 15 years, better than a third of them will be sober and in

7   stable recovery.  Of the ones that survive -- because there

8   is a highly fatal condition here -- that a third will be

9   sober, in stable recovery, about another third will have

10  switched to a different pattern of drug use, and that's

11  honestly what we're seeing in Ohio now:  People are switching

12  to heroin since cocaine has sort of a short life; people are

13  switching to mixing cocaine with heroin.  They get jazzed up

14  on the first use of cocaine, feel very -- euphoria.  And when

15  the dysphoria of the cocaine should be kicking in, that is

16  when the sort of euphoric period, the mellow high of the

17  heroin kicks in.  And instead of going on a full-blown binge,

18  a person tends to use cocaine and heroin together twice a

19  day.

20      So, we've seen, sadly, about a third of our addicted

21  patients, who normally were bingers on cocaine, just switch

22  pharmacologically to a different approach but still be out of

23  control with chemical dependence.

24      And, finally, another third are either incarcerated or

25  dead.

FARRAN        DIRECT

3-84

1          THE COURT:  So, it's reasonable to believe that

2     approximately a third could be sober?

3          THE WITNESS:  If -- if people escape either death

4     or jail, the statistics are that 50 percent of the people,

5     whether they have alcoholism or cocaine dependence, over time

6     will eventually get sober and stay sober for outstanding

7     periods of time.

8          THE COURT:  Does the snorting of cocaine have any

9     detrimental effect on those membranes and so forth?  Is that

10    permanent?

11         THE WITNESS:  That can be permanent.  It's probably

12    not the cocaine itself that damages the nasal membrane, but

13    what happens is when a person snorts cocaine, when the

14    norepinepherine is released, there's spasm of the smooth

15    muscle and the blood vessels that go in the nose, so people

16    stop absorbing it.  The nasal septum is made of cartilage and

17    cartilage doesn't have its own blood supply.  It depends on

18    blood vessels to passively supply oxygen to the cartilage.

19    And so, cartilage is exquisitely sensitive to not enough

20    blood supply, and so what happens is actually the cartilage

21    in the septum dies and deteriorates and falls out.  To cite a

22    famous example, Linda Ronstadt had cocaine addiction and was

23    afraid of needles and didn't know how to turn it into

24    freebase, so she just snorted and snorted and lost her nasal

25    septum, went into treatment and had to have a nasal septum

FARRAN  -  DIRECT

3-85

1    replaced several years later by a plastic surgeon so she

2    could sing again.

3            THE COURT:  Did you conduct any physical

4    examination of Mr. Hicks?

5            THE WITNESS:  No.

6            THE COURT:  Wouldn't that be medically prudent to

7    help you make your opinion here today?

8            THE WITNESS:  It may have been, although it was ten

9    years after the fact.

10           THE COURT:  Well -- well, I prefaced my question:

11   Is it permanent --

12           THE WITNESS:  The physical --

13           THE COURT:  -- and you agreed.

14           THE WITNESS:  The permanent signs I'd look at, that

15   if I had thought of that, would honestly be from track marks,

16   from I.V. marks.

17           THE COURT:  You didn't see the I.V. track marks?

18           THE WITNESS:  No.

19           THE COURT:  They would still exist?

20           THE WITNESS:  Track marks would probably exist,

21   although the disclaimer that I would give you is that track

22   marks in people who are opiate dependent tend to be much more

23   chronic and long lasting, because people tend to use opiates

24   in a chronic pattern.  People tend to do intermittent binging

25   on cocaine.  They tend not to use the same vein, and so the

PARRAN - DIRECT

3-86

1   track marks tend to be much less permanent scars with cocaine

2   use.

3           THE COURT:  Did you examine, in reaching your

4   opinion, any criminal history of Mr. Hicks?

5           THE WITNESS:  Very superficially.  I read one of

6   the background psychological reports that talked about his

7   history of domestic violence in the past while intoxicated.

8   I didn't read that extremely carefully.

9           THE COURT:  You don't know of any specific crime or

10  criminal experiences with the law other than domestic

11  violence?

12          THE WITNESS:  At least based on my memory right now

13  it was a domestic violence incident and a court-mandated

14  outpatient counseling program in '82, I think.

15          THE COURT:  Any other history which was not

16  significant in your opinion?

17          THE WITNESS:  Well, when I interviewed him myself

18  and when I quickly looked through the past psychological

19  record, I was looking for evidence of previous psychotic

20  behavior, behavior that would indicate any mental illness or

21  the behavior that indicated extreme violence, and all I saw

22  was the domestic violence.

23          THE COURT:  Thank you, Doctor.  We'll recess until

24  1:15.  1:15.  Thank you, Doctor.

25          THE WITNESS:  You're welcome.

PARRAN  -  CROSS

3-87

1           THE CLERK:  All rise.

2      (At which time, the luncheon recess was taken.)

3                    *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION          (1:31 p.m.)

2          THE COURT:  Is the petitioner ready to proceed?

3          MR. MEZIBOV:  We are, Your Honor.

4          THE COURT:  Respondent ready to proceed?

5          MR. WILLE:  Yes, Your Honor.

6          THE COURT:  Doctor, I believe you're on the stand.

7    Proceed, Mr. Wille.

8          MR. WILLE:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. WILLE:

11   Q.  Doctor Parran, have you ever testified at trial in a

12   capital case?

13   A.  No, sir.

14   Q.  Have you ever testified in a criminal case involving

15   cocaine as an issue?

16   A.  No.

17   Q.  Are you familiar with the factors set forth in Ohio law

18   as to mitigation with respect to a capital offense?

19   A.  No, I'm not.

20   Q.  Now, you are not a psychologist or a psychiatrist; is

21   that correct?

22   A.  That is correct.

23   Q.  Now, are you aware that Dr. Schmidtgoessling rendered an

24   opinion in conjunction with this case that Mr. Hicks at one

25   point had been feigning the symptoms of mental illness?

1  You're aware of her opinion in that regard?

2  A.  Yes.

3  Q.  Now, I take it -- or would you consider yourself to be

4  competent, qualified to render an opinion as to the validity

5  of her opinion in the latter regard?

6  A.  I can certainly give you my opinion about that as an

7  internist and a physician.

8  Q.  Would you consider yourself to be an expert with respect

9  to -- I'll withdraw that.

10      Would you offer an expert opinion as to the validity of

11  her expert opinion?

12  A.  I would not offer it regarding her opinion of his

13  diagnosis of malingering or feigned mental illness.

14  Q.  And that's what my question was directed to --

15  A.  Okay.

16  Q.  -- if I was not clear on that.

17      Now, Dr. Parran, would you think that you are qualified

18  to render an opinion as to whether a person is suffering from

19  a mental disease or defect?

20  A.  I'm certainly qualified to render an opinion, but as a

21  non-psychiatrist, I would probably not be considered

22  qualified to render an expert opinion.

23  Q.  Now, Dr. Parran, am I correct you did speak with

24  Mr. Hicks?

25  A.  Yes, I did.

CROSS

1   Q.  And you mentioned in direct testimony that you were, I

2   guess, I don't know how you put it, but you were looking

3   forward to the opportunity to speak with Mr. Hicks in the

4   sense of the experience of doing so?

5   A.  No, I wouldn't -- I wouldn't -- I wouldn't say that.  I

6   did think that it was important for me to have a chance to

7   talk to Mr. Hicks once I had looked through the materials

8   that had been forwarded to me and was -- and was at the place

9   of beginning to form an opinion about cocaine psychosis.

10  Q.  Would it be fair to say that your experience is somewhat

11  limited in talking with persons who have been convicted of

12  serious felonies?

13  A.  Yes.

14  Q.  And I take it -- it may seem to be an obvious question,

15  but I take it you've never interviewed before someone who had

16  been convicted of murder and sentenced to death?

17  A.  I have interviewed people who been convicted of murder in

18  the past, but no one who has been sentenced to death.

19  Q.  Now, Dr. Parran, in forming your opinion with respect to

20  Mr. Hicks, I take it that you gave weight to what he told you

21  during the interview?

22  A.  Yes.

23  Q.  And now, Dr. Parran, in normally -- in normally dealing

24  with persons with cocaine psychosis, do you on occasion rely

25  on such things as, say, urinalysis tests or blood tests?

1   A.  Yes; not -- not as it relates to cocaine psychosis, but

2   as it relates to documentation of cocaine use.

3   Q.  Now, Dr. Parran, you've testified that you assisted with

4   the training of interns with respect to handling persons in

5   emergency situations.  Is that a fair statement?

6   A.  Yes.

7   Q.  And I take it that in that circumstance you would be

8   dealing with a situation where the person that may be

9   suffering from a cocaine psychosis is right before you at the

10  critical time, if you know what I mean?

11  A.  Yes.

12  Q.  So, I take it then that you would consider that to be a

13  very important thing to consider, namely the opportunity to

14  actually observe the person under -- appear or under the

15  possibility -- strike that -- actually observe the person in

16  the highly agitated state which would be consistent with

17  cocaine psychosis?

18  A.  Certainly the people who observe patients the most when

19  patients are actively involved in a state of cocaine

20  psychosis are people who work in Emergency Rooms, ambulances,

21  intake offices, those sorts of things.

22  Q.  Would you say you're one of those persons?

23  A.  I certainly have done a lot of consultations in Emergency

24  Rooms, yes.

25  Q.  Have you -- in your function as a consultant, would you

1   say that -- I take it you have actually seen people that

2   appear to be under the symptoms of a cocaine psychosis?

3   A.   Yes.

4   Q.   And in this particular case, however, you've never seen

5   Mr. Hicks under --

6   A.   No.

7   Q.   -- apparent influence of a cocaine psychosis?

8   A.   No.

9   Q.   Now, Dr. Parran, are you aware or have you reviewed Dr.

10  Hawgood's report with respect to Mr. Hicks?

11  A.   I'm sure that I have because I'm -- I think it was in the

12  materials that I looked at, yes.

13  Q.   If I were to represent to you that during an interview

14  with Dr. Hawgood Mr. Hicks admitted that at one point he

15  feigned the symptoms of mental illness, that would -- that

16  would be consistent with your recollection of Dr. Hawgood's

17  report?

18  A.   Yes, as well as Dr. Schmidtgoessling's opinion.

19  Q.   Exactly.  And would it be -- or do you recall that in the

20  course of her report, Dr. Hawgood indicated that Mr. Hicks

21  stated that he had been advised by certain jailhouse lawyers

22  to feign these symptoms of mental illness because it might be

23  beneficial to his case?  That would be consistent with your

24  recollection as to her --

25  A.   Yes, I think it was multiple personality disorder, or

PARRAN - CROSS

3-93

1   something like that.

2   Q.  If I were to tell you that Dr. Hawgood testified in a

3   deposition in this case that in fact Mr. Hicks had indicated

4   to her that "Yes, I -- I did feign some mental illness

5   because I was advised by jailhouse lawyers," that would be

6   consistent with your recollection of --

7   A.  Uh-huh.

8   Q.  -- your review of that deposition?

9   A.  Yes.

10  Q.  Now, would it be fair to say, Dr. Parran, that in that

11  circumstance Mr. Hicks appeared to be willing to tell Dr.

12  Hawgood a falsehood -- strike that.

13       Would it appear, based on Dr. Hawgood's statements, that

14  Mr. Hicks had occasion to lie because he thought it would

15  help his case?

16  A.  Yes.

17  Q.  Now, have you considered the possibility that when

18  Mr. Hicks described his cocaine use to you, that perhaps he

19  was entertaining the same intent to lie?

20  A.  Yes; I must -- that's certainly a possibility that I've

21  thought about, and thought about at the time I interviewed

22  him.  I must say that the majority of my opinion is based

23  upon the data in the interview with the detectives in

24  Knoxville and based upon information and, secondarily, based

25  on information in the interview with Ms. Leahy, I think in

PARRAN  -  CROSS

1   September of '85, both of which, at least to my review,

2   appear to have taken place prior to much of the other

3   behavior that Mr. Hicks demonstrated with other examiners.

4   Q.   Would you be -- are you aware that Mr. Hicks demonstrated

5   some aberrant and bizarre behavior to Mrs. Leahy?

6   A.   The second -- the second day, the second interview day,

7   yes.

8   Q.   And are you also aware that after Mrs. Leahy's interview

9   with Mr. Hicks, that Mr. Hicks expressed similar -- or showed

10  similar behavior in his interview with Dr. Schmidtgoessling?

11  A.   Yes.  My impression was that his initial interview with

12  Ms. Leahy was an extended interview in which he appeared to

13  be giving consistent information which anticipated to be

14  reasonably backed up with interviews with other family

15  members and the second interview was much more bizarre.  And

16  from there on, the interviews were -- were difficult.

17  Q.   Now, Dr. Parran, you have examined, I take it, much of

18  the information that Mrs. Leahy gathered?

19  A.   Yes, I think I read the report entirely.

20  Q.   Are you aware or do you recall that at one point

21  Mr. Hicks himself stated in the course of

22  Dr. Schmidtgoessling's investigation as to his sanity that

23  he, in fact, did not abuse cocaine or alcohol?

24  A.   Yes.

25  Q.   And would it be fair to say, Dr. Parran, that some of the

PARRAN   -   CROSS

3-95

1    information cited by Mr. Hicks in support of his -- his

2    allegation or assertion of cocaine psychosis was developed in

3    State post-conviction proceedings?  Would that be a fair

4    recollection or statement as to your recollection of the

5    record?

6    A.   I have a problem with Mr. Hicks -- with the beginning

7    part of your statement, because it was not my impression from

8    reading any of the materials that Mr. Hicks claimed a cocaine

9    psychosis.

10   Q.   Are you familiar with the affidavit of Dr. Baum?

11   A.   I'm familiar with Dr. Baum's affidavit, which was

12   obtained in 1990.

13   Q.   Yes.  And, therefore, it was obtained -- you would have

14   no reason to doubt it was obtained in conjunction with

15   Mr. Hicks' post-conviction action; correct?

16   A.   My understanding is that Dr. Baum's opinions were formed

17   in 19 -- late 1989-90, after the conviction.

18   Q.   And isn't it true that Dr. Baum relied on information in

19   forming his opinion that was brought out following Mr. Hicks'

20   conviction and during his post-conviction action?

21   A.   Yes, with -- interviews with Mr. Hicks and others.

22   Q.   So, it is then fair to say that at least in part your

23   diagnosis is based on information which was developed

24   subsequent to Mr. Hicks' conviction?

25   A.   Certainly the information in Dr. Baum's evaluation of

1    chemical dependency regarding Mr. Hicks was a more thorough

2    evaluation and had more information than was available from

3    the earlier charts, yes.

4    Q.  Well, correct my recollection if I'm wrong, but do you

5    recall Dr. Baum referring to instances of hallucinations and

6    other aberrant behavior by Mr. Hicks?

7    A.  Yes.

8    Q.  And isn't it fair to say that Dr. Baum was relying on, to

9    some extent, on Mr. Hicks' assertions of hallucinations

10   following his apprehension?

11   A.  Yes.

12   Q.  Dr. Parran, you testified that Mr. Hicks' actions on the

13   night of the murders were consistent with the symptoms of

14   cocaine psychosis.  You would agree, I'm sure, that there are

15   persons who commit violent acts that are not necessarily

16   operating under the influence of a cocaine psychosis?

17   A.  Yes.

18   Q.  Now, you stated on direct -- again, tell me if I'm wrong

19   -- 50 to 70 percent of persons under the influence of

20   cocaine psychosis suffer paranoid ideation?

21   A.  That's not quite, but it's --

22   Q.  Pretty fair summary?

23   A.  Actually, 70 percent of people who intermittently binge

24   on cocaine describe clinically significant paranoid ideation.

25   Q.  Could you be more specific as to you say "clinically

PARRAN    -    CROSS

3-97

1    significant of paranoid ideation?"  Are you saying 50 to 70

2    or 60, or whatever, persons would exhibit violent behavior

3    comparable to Mr. Hicks' behavior?

4    A.  Well, I think my statement was that most clinically

5    rigorous data we have right now about cocaine binging and

6    paranoid ideation is that 70 percent of people who binge on

7    cocaine have paranoid ideation.  Of those 70 percent who have

8    paranoid ideation, more than half report repetitively having

9    armed themselves with a weapon of some sort because of the

10   paranoid ideation while binging on cocaine.  And that of that

11   half who have armed themselves, half of them, a quarter of

12   the overall 70 percent, report having acted violently toward

13   themselves or others during the cocaine binge subsequent to

14   the paranoid ideation.  That's what I said.

15   Q.  If I understand this correctly then, you have started

16   with 50, 60, 70 percent and you've broken that down to where

17   you're saying now that 25 -- actually 25 percent of these

18   persons exhibit or actually exhibited some form of violent

19   behavior?

20   A.  Might be a little less than that.  Probably in the range

21   of 18 to 20 percent.

22   Q.  Now, I don't know if you have the statistics on this or

23   not, Dr. Parran, but of that 25 percent or less --

24   A.  Yes.

25   Q.  -- of the people who do violent behavior --

1  A.  Yes.

2  Q.  -- how many of those people commit two murders?

3  A.  I honestly don't think anyone has that data.  I tried to

4  find credible research data on that and was not able to.

5  What I -- what I can say is that -- is that the leading cause

6  of death from cocaine addiction is violence by several times

7  greater than heart attacks, strokes, seizures, as we

8  discussed before.  But I can't -- that information honestly

9  doesn't exist.

10        THE COURT:  Excuse me.  Before you leave that

11  point, when you say "violence," do you mean

12  self-destruction?

13        THE WITNESS:  Suicide or homicide.

14        THE COURT:  So that --

15        THE WITNESS:  And at times both.

16        THE COURT:  And how -- what is the percentage of

17  suicides, homicides?

18        THE WITNESS:  I tried to find that as well and was

19  not able to.

20        THE COURT:  Thank you.

21  A. (Continuing)  I can give a little bit of information, but

22  it isn't specific to cocaine.  The -- the information I was

23  able to get, or the information that I heard when I was

24  testifying at the American Bar Association's Special

25  Committee on Drug Crisis and Special Committee on Violent

1    Crime -- I was testifying about drug dependence to them --

2    the information that I heard there was that they estimated

3    that 70 percent of homicides in the United States on an

4    annual basis took place with a significant involvement of

5    alcohol and drugs, but that was testimony from someone else

6    at an ABA hearing and I can't verify it, the veracity of it.

7    Q.  Dr. Parran, I would like to ask a question about that.

8    Of course, you testified on direct that there is an important

9    distinction between cocaine psychosis and cocaine

10   intoxication; correct?

11   A.  Yes, there is.

12   Q.  So, therefore, those statistics with respect to how many

13   persons commit crimes under the influence or intoxication of

14   drugs would, wouldn't you suggest, would not be determinative

15   or substantially relevant in your diagnosis?

16   A.  Yes.  I don't know that anyone has bothered interviewing

17   those people to find out what percentage exhibited

18   significant paranoid or cocaine psychosis behavior.

19   Q.  So that's not available, in other words?

20   A.  It's not available data, no.

21   Q.  Now, Dr. Parran, if I could just break down your

22   diagnosis in three -- three parts:  Part 1, would you agree

23   that maybe Part 1 would be the things that Mr. Hicks told you

24   himself?

25   A.  Yes.

1  Q.  Now, by doing this, I don't mean to suggest any relative

2  importance; I'm just kind of breaking it down logically.  And

3  Part 2 would be things that Mr. Hicks' family members or

4  contacts or other things from his social history from which

5  you were able to make some determinations as to his possible

6  frequency of cocaine use?

7  A.  Yes.

8  Q.  And the third aspect would be your analysis of Mr. Hicks'

9  behavior on the night of the offenses?

10  A.  That certainly is part of it.  Certainly a big part is

11  the actual interviews by others, the detectives and --

12  especially the detectives and Ms. Leahy of Mr. Hicks.

13  Q.  I guess I'm including that.

14  A.  Lump them in one or the other.

15  Q.  Exactly.  Now, in terms of the third component, wouldn't

16  you agree that an important aspect of your diagnosis is your

17  opinion as to whether Mr. Hicks' behavior was irrational or

18  bizarre?

19  A.  Yes.

20  Q.  And would you agree that perhaps reasonable minds could

21  differ, reasonable expert minds could differ, as to whether

22  Mr. Hicks' behavior manifested irrationality or bizarre

23  character?

24  A.  Yes, I think that reasonable minds could differ on the

25  amount of -- on the amount of weight they lend to the -- to

PARRAN - CROSS

1   the irrationality or the bizarreness of the behavior,

2   although it -- from what I remember from reading through the

3   other people's opinions, pretty much everyone's opinion,

4   especially Dr. Schmidtgoessling's opinion, was that this was

5   irrational, erratic, uncharacteristic behavior for -- for

6   him.

7   Q.  You did review Dr. Reardon's transcript, I take it?

8   A.  Yeah, I just reviewed that in the last couple days.

9   Q.  And it's fair to say that Dr. Reardon -- or Dr. Reardon

10  found some of Mr. Hicks' behavior to be not irrational or

11  erratic in his opinion?

12  A.  Yeah, I think that he found some of the behavior

13  irrational and erratic and some of it not so much.

14  Q.  Now, you mentioned before, Dr. Parran, you used the word

15  "weight" in terms of -- in relationship to the opinion about

16  whether someone's acting irrationally or bizarrely.  Do you

17  have any knowledge or information with respect to a person's

18  behavior in relationship to the mitigating factors that are

19  possible under Ohio law with respect to a capital case?

20  A.  I honestly am not aware.  I am -- I know nothing about

21  mitigating factors in Ohio law regarding capital cases.

22  Q.  Would it be fair to say that in determining the

23  rationality or bizarreness of a person's behavior in

24  relationship to the issue of whether there's a mitigating

25  circumstance which is permissible under Ohio law, that a

PARRAN   -   CROSS

3-102

1    person who had experience, professional experience, in the

2    latter regard, in the regard of presenting evidence or in

3    assisting in these types of issues, that their opinion might

4    have more validity than yours?

5            MR. MEZIBOV:  Objection.

6            THE COURT:  He may answer.  If you understand the

7    question.

8    Q.  I admit it is a pretty tough question.

9    A.  I think I do.  My opinion was requested about cocaine

10   pharmacology and about the clinical and to give a clinical

11   opinion about what was going on with Mr. Hicks on that day,

12   and that is what my opinion is about.  I think that the

13   weight of my opinion is -- my personal feeling about this is

14   that my personal opinion should be based on my own knowledge

15   of cocaine pharmacology, my knowledge of cocaine dependence,

16   my knowledge of working with patients with cocaine

17   dependence, cocaine psychosis, and my ability to look at an

18   indication and interpret the signs and symptoms that I see in

19   the case in terms of my background.

20   Q.  Now, Dr. Parran, you're aware, of course, that your

21   opinion is being offered with respect to an allegation of

22   ineffective assistance of counsel?

23   A.  I'm sure that I've heard that.  I'm not sure I understand

24   what that means.

25   Q.  I see.  Would it be fair to say -- withdraw that.

1     And you're aware, Dr. Parran, that the allegation of

2 ineffective assistance of counsel involved the attorneys'

3 alleged negligence in failing to consult an expert such as

4 yourself?

5          MR. MEZIBOV:  Objection.

6          MR. WILLE:  Your Honor, may I state why I'm going

7 into this?  Your Honor, the State's position is that this

8 hearing, of course, is not really at the first instance about

9 Mr. Hicks' cocaine psychosis or state of mind.  In the first

10 instance, it's about his attorneys' reasonableness in

11 deciding whether to pursue this line of defense in either

12 trial or mitigation; therefore, any evidence or any testimony

13 relative to whether this information would have been in fact

14 viewed by the attorneys is relevant to mitigation in Ohio, is

15 relevant and should be explored.

16          THE COURT:  Thank you, Mr. Wille.  Denied.

17          MR. WILLE:  Thank you, Your Honor.

18 Q.  Now, you mentioned, Dr. Parran, that you relied in part

19 on Mr. Hicks' statement to the police?

20          THE COURT:  I'm sorry.  Did he answer the last

21 question?

22          THE WITNESS:  No, I didn't.

23 Q.  I'm sorry?

24 A.  I don't know what it was.

25 Q.  I didn't give you the opportunity to answer the question.

1     MR. WILLE:  Thank you, Your Honor.

2     THE COURT:  I was interested in it.

3     MR. WILLE:  I'm glad you were, Your Honor.  I

4  apologize.  I lost my train.  Could you read it back to me?

5  I don't remember.

6  Q.  Well, are you aware, Dr. Parran, that this case involves

7  the allegation that counsel, Mr. Hicks' counsel, was

8  ineffective for failing to explore or hire an expert such as

9  yourself?

10  A.  I'm aware that that's -- that that's one of the things

11  they asked me about early on, which was to form an opinion

12  about the quality of the testimony as it related to cocaine

13  pharmacology of cocaine psychosis, yes.

14  Q.  You testified on direct that you felt that the jury was

15  given inadequate or inaccurate information --

16  A.  Yes.

17  Q.  -- on this issue, but you would offer no opinion or you

18  do not claim any expertise with respect to whether that

19  inaccuracy in any way is related to a case in mitigation in

20  Ohio.

21  A.  Since I don't know what any criteria are for mitigation,

22  I'd be on pretty thin ice on giving an opinion on it.

23  Q.  Now, Dr. Parran, is it fair to say that you relied in

24  forming your diagnosis on Mr. Hicks' statement to the police;

25  is that a fair statement?

1  A.  Yes, I certainly weighed that very carefully.

2  Q.  Now, Dr. Parran, would you consider Mr. Hicks' statement

3  to the effect that he left the door open of the apartment so

4  he could return later without being detected, would that be

5  an indication of bizarre or irrational behavior in your

6  opinion?

7  A.  Returning to the apartment struck me as fairly irrational

8  behavior, having already taken what he was taking to go get

9  more cocaine.  But, leaving the door open and/or taking the

10  key, I don't remember which, or both --

11  Q.  Well, let me clarify that.  Do you recall Mr. Hicks

12  saying he had left the door open when he left so when he came

13  back he could get in without, I guess, without being detected

14  or being seen?

15  A.  Uh-huh.

16  Q.  Now --

17          MR. MEZIBOV:  There is an objection, unless

18  Mr. Wille can go to the record and be precise, because he's

19  apparently now speculating as to what may or may not be in

20  the record and asking a witness to answer with respect to

21  what may be illusory statements.

22          THE COURT:  This is cross-examination, testing the

23  credibility of the opinion of this witness.  Denied.  And,

24  Doctor, if it's something you didn't consider, just tell us

25  that.  You don't have to -- if you can't recall it or you

1  didn't consider it, just tell us that and we'll go on.

2  A.  It's something that I noticed when reading the

3  statement.  It's not something that struck me one way or the

4  other in terms of whether this individual was paranoid and

5  potentially involved in cocaine psychosis.  The reason I say

6  that is because reading -- reading that statement one way --

7  and I certainly can find it in here, if I need to --

8       (Witness reviewing the transcript.)

9  A.  Hmmm.  Well, I can't find it right at the moment.  But

10  looking at that statement one way, it lended (sic) support

11  for an idea of being paranoid about being seen and being

12  paranoid about or being suspicious and paranoid in

13  behaviors.

14  Q.  Dr. Parran, would you think that a person who's

15  committing a crime may be paranoid about being apprehended or

16  detected even though they're not under the influence of

17  cocaine?

18  A.  Yeah, I think there is certainly a difference between a

19  person being worried or suspicious and being paranoid.

20  Q.  Well, then let me rephrase my question.  You would agree

21  or you would concede that a person that was committing a

22  crime would show some worry and suspicion --

23  A.  Yes.

24  Q.  -- show worry and suspicion about being detected?

25  A.  Certainly.

PARRAN - CROSS

1 Q. Now, do you recall Mr. Hicks' statement to the effect

2 that he brought the tape from the car when he went up to the

3 apartment the second time and murdered Brandy?

4 A. Yes.

5 Q. You recall that statement?

6 A. Yes.

7 Q. Now, in your opinion is that indicative of irrational or

8 bizarre behavior?

9 A. No.

10 Q. Now, Dr. Parran, do you recall a deposition taken by my

11 office with respect to this case?

12 A. (Nods head affirmatively.)

13 Q. And you were asked the question, I believe, that did you

14 find anything inconsistent in these facts with your diagnosis

15 of cocaine psychosis?

16 A. Yes.

17 Q. And you recall answers that you felt there was nothing

18 inconsistent with a diagnosis of cocaine psychosis?

19 A. Yes.

20 Q. Wouldn't it be fair to say your testimony that you've

21 just made that Mr. Hicks' taking the tape with him to go up

22 to the apartment before he murdered Brandy, if viewed as

23 indications of rational and thoughtful behavior, indeed would

24 be inconsistent with your diagnosis that he was under the

25 influence of a cocaine psychosis?

PARRAN  -  CROSS

1    A.  By not characterizing it as irrational, I certainly

2    wouldn't characterize it as rational or thoughtful behavior.

3    Secondly, it is not -- I would disagree.  As I -- as I tried

4    to explain this morning, and as I think is a widely held

5    misconception, perhaps, regarding this case, but certainly in

6    many areas, a person who has a cocaine psychosis is moving

7    from the paranoia, from mild paranoia of cocaine use to more

8    severe paranoia, and what we would call cocaine psychosis is

9    a person who is not.  And clinically there's no evidence that

10   these people behave like a completely disorganized, paranoid,

11   schizophrenic, delirious individual, that some of their

12   actions and behaviors appear to be and are extremely erratic,

13   impulsive with intrusive thoughts, paranoid ideations

14   oftentimes with auditory hallucination.  Oftentimes their

15   behaviors are those of a person who is much less disorganized

16   than that, although certainly much more disorganized than

17   they would normally be in life.  And these sort of "waxes and

18   wanings" of this phenomenon during the time of the cocaine

19   psychosis is what makes the individual so unpredictable and

20   what makes their -- their actions so unpredictable.

21   Q.  Would it be fair to say, Dr. Parran, that in your opinion

22   during a cocaine psychosis there are times when a person may

23   act rationally and with intent and premeditation with respect

24   to a particular act?

25   A.  I have to make the disclaimer that not being trained in

1  forensic psychiatry I'm not in a position to respond to

2  exactly the terms that you used.  But what I can say is that

3  when a person is involved in a paranoid, severely paranoid or

4  psychotic episode around the use of cocaine, some of their

5  actions are less disorganized and more purposeful than

6  others.  But what's characteristic of the overall phenomenon,

7  that is that the person tends to intermittently lose track of

8  their -- of their purpose and -- and go off on various

9  tangents and side behaviors that are fairly indicative of

10  this very unstable sort of psychiatric moment that the

11  patient is in, and that is -- is what actually the cases that

12  you're citing indicate to me.

13  Q.  Let me go back to what you said at the very beginning.

14  You're saying that perhaps you would not feel qualified in

15  terms of rendering an opinion as to the possibilities of --

16  from a psychological standpoint of a person acting rationally

17  and with premeditation and specific intent during a cocaine

18  psychosis?

19  A.  I am not familiar or trained with issues of

20  premeditations, et cetera.  I can, as a clinician, look at

21  patterns of behavior, rationality and irrationality, levels

22  of organization and disorganization of thought and come up

23  with clinical opinions about that.

24  Q.  Doctor, may I refer to your chart?  During these times of

25  cocaine psychosis, would it be possible for a person to act

1  rationally and logically and with premeditation during the

2  course of this period?

3  A.   The most consistent actions that people clin --

4  clinically that people pursue during a cocaine binge is

5  seeking more cocaine.  And as they become -- as they progress

6  in the binge and as they self-administer the drug a second or

7  a third or fourth or sometimes many more times than that, the

8  amount of paranoia in their behavior and the irrationality of

9  their behaviors tend to become intensified.

10  Q.   Would it be possible, however, Doctor, for Mr. Hicks,

11  assuming that he was operating under a cocaine psychosis

12  during these periods, to perform purposeful, intentful (sic)

13  and seemingly premed -- acts of premeditation, even though in

14  your clinical diagnosis he was suffering under a cocaine

15  psychosis?

16  A.   Certainly people are able to perform purposeful actions;

17  I certainly could agree with that.  There were purposeful

18  actions in this case.  They tended not to be extended,

19  purposeful actions.  They tended to be pretty short lived and

20  then using more cocaine.  But certainly people can do

21  purposeful actions when they're involved in cocaine

22  psychosis.

23         MR. WILLE:  One moment, Your Honor.

24      (Mr. Wille and his colleagues conferred privately.)

25         MR. WILLE:  Just a couple more brief questions.

PARRAN  -  REDIRECT

3-111

1   Q.  Dr. Parran, on direct you referenced a Dr. Nelson?

2   A.  Don Nelson, yes.

3   Q.  Could you tell us again who Don Nelson is?

4   A.  Don is a clinical pharmacologist on the staff of the

5   University of Cincinnati School of Medicine who has received

6   a -- who received a training award and was trained in

7   chemical dependence and early -- pharmacology -- in the early

8   1980s and was teaching in this area, teaching about chemical

9   dependence, about pharmacology of mood-altering substances in

10  this area.  He -- and probably knows many of the people in

11  this area who may have been more clinical experts as opposed

12  to pharmacology experts.

13  Q.  In reviewing the materials in this case, did you recall

14  seeing a letter by Mr. Hicks' defense counsel to Mr. Nelson?

15  A.  No, I don't.

16  Q.  Were you aware -- and you would have no knowledge whether

17  they in fact did or did not in fact try to contact

18  Mr. Nelson?

19  A.  No, I do not.  But the reason why Dr. Nelson's name came

20  up is because he is one person who I know is from Cincinnati,

21  lives in the area, I'm certain was practicing in this area in

22  the mid-1980s and had a good deal of experience with

23  amphetamine psychosis and cocaine psychosis as a clinical

24  pharmacologist.

25       MR. WILLE:  Thank you.

REDIRECT EXAMINATION

BY MR. MEZIBOV:

Q.  Dr. Parran, I just have a couple followup questions to
Mr. Wille's.

    The first, Mr. Wille asked you some questions concerning
your knowledge that the record contains references to feigned
mental illness by Mr. Hicks.  You remember those questions?

A.  Yes.

Q.  And my question is, what effect does the fact that
Mr. Hicks may have feigned mental illness have on the
opinions you've offered regarding cocaine psychosis and its
impact on Mr. Hicks and the actions which he committed that
night?

A.  I can't give a clinical opinion about whether there was
feigned mental illness or not.  I certainly can give, because
I'm not a psychiatrist or psychologist, but I can certainly
give my opinion that the people who did the examining seem to
be very appropriate in that decision.  Mr. Hicks' history of
attempting to feign mental illness, and not very well, didn't
really have any negative impact on my opinion; that the
record is very clearly supportive of cocaine psychosis.

Q.  So, regardless of the fact that Mr. Hicks may or may not
have been feigning mental illness with his attorneys or any
of the people who interviewed him after the fact, your
opinions regarding cocaine psychosis and its impact in

1   connection with the acts remains the same?

2   A.  Yes, absolutely.

3   Q.  Now, Mr. Wille also mentioned a Dr. Reardon.  Is that

4   correct?

5   A.  Yes.

6   Q.  And is it accurate that we provided you a copy of

7   Dr. Reardon's deposition --

8   A.  Yes.

9   Q.  -- that we took just a week or so ago?

10  A.  Yes.  I actually read it yesterday, on Tuesday, because I

11  just got back from a week teaching overseas on Monday.

12  Q.  I'm going to ask you -- I don't know if you have the

13  deposition in front of you.

14  A.  I left them in the car.

15  Q.  Let me do this.

16          MR. MEZIBOV:  If I might approach, Your Honor.

17      (Mr. Mezibov handing the witness the document.)

18  Q.  Dr. Parran, what I've done is placed in front of you

19  Dr. Reardon's deposition and I have highlighted excerpts --

20  an excerpt from Page 38 in yellow.

21  A.  Yes.

22  Q.  Which lines does that run from?

23  A.  Page 38, line 12 through 20.

24  Q.  I would ask you to read that passage to us, first.

25  A.  "In my opinion, the description that Mr. Hicks provided

1    is not indicative of someone who was in such a state of

2    cocaine psychosis that they were unable to reason, that they

3    were unable to plan, that they were unable to form intent,

4    that they were unable to calculate a course of conduct, delay

5    initiating parts of that course of conduct, plan ahead as

6    opposed to the kind of grossly disorganized, erratic,

7    inconsistent, savage kind of behavior that I have seen in a

8    number of either cocaine psychosis or schizophrenic psychosis

9    cases."

10   Q.  Now, my first question with regard to that passage that

11   you read is, as an individual with the qualifications you

12   have provided to us, do you agree with that comment or that

13   passage by Dr. Reardon?

14   A.  I do not agree with the passage or the comment.

15   Q.  Why not?

16   A.  Because I think that this comment, once again, speaks to

17   the misconception that people with clinically significant,

18   meaningful cocaine -- degrees of cocaine psychosis that are

19   heavily influencing their behavior need to look like "grossly

20   disorganized, erratic, inconsistent, savage kind of behavior

21   seen with schizophrenic psychosis cases."  I have a clinical

22   problem with that.

23   Q.  Why is that?

24   A.  Because cocaine psychosis is something which involves --

25   which certainly involves intermittent intrusive thoughts,

PARRAN  -  REDIRECT

3-115

1    almost a -- a waxing and waning, of people sort of beginning

2    to exert some control and then losing control of their

3    thought processes, paranoid ideation, sometimes auditory

4    hallucinations and the impulsivity.  It certainly waxes and

5    wanes with cocaine psychosis.  And as I said, it's one of the

6    reasons why it's so easy from a clinical standpoint to

7    underestimate a patient's dangerousness, for example in the

8    Emergency Room, and to, therefore, take them less seriously

9    than one needs to and then have the person accelerate ten or

10   fifteen minutes later and become extremely dangerous.  That

11   is not only my clinical experience, but in the literature and

12   from the literature from the early '80s about cocaine

13   psychosis.  And, therefore, the fact that this patient at the

14   time exhibits clearly disorganized -- although in this

15   expert's opinion not grossly disorganized -- but clearly

16   disorganized, clearly erratic, clearly inconsistent behavior

17   with everything in his life, the best I could tell and most

18   other experts, and very savage behavior.  I think it's there.

19   Q.  If I understand your testimony correctly, do you take

20   exception to Dr. Reardon's descriptions as either savage or

21   disconnected?

22   A.  Yes, I take exception.  I think that the record certainly

23   indicates disorganized thinking and behavior, very erratic

24   behavior, quite inconsistent behavior not only during the

25   evening but entirely inconsistent behavior from -- comparing

1   the evening to his life leading up to there, and a degree of

2   violence and savagery which is shocking, and I think that's

3   all in the case and that is what I see in the case.

4   Q.  And in addition to the descriptions that you take

5   exception to, do you also take exception to the conclusions

6   drawn there by Dr. Reardon?

7   A.  Yes, I do.  I read the beginning of the sentence of

8   Dr. Reardon.  The description that Mr. Hicks provided is not

9   indicative of someone who was in such a state of cocaine

10  psychosis.  I interpret that as an opinion that the patient

11  probably was in a state of cocaine psychosis, but that this

12  person's opinion is that the extent was not great enough to

13  be considered to contribute to the behavior, and I take

14  exception to that conclusion.

15  Q.  Now, Dr. Parran, again as an individual with the

16  experience in cocaine and cocaine psychosis and matters

17  surrounding cocaine, do you have an opinion as to whether or

18  not Dr. Reardon is competent to offer an opinion with respect

19  to cocaine psychosis and its effects?

20  A.  I have some concerns, and let me tell you my concerns.

21  In reading through his deposition yesterday, it concerned me

22  that Dr. Reardon did not know the pharmacology of cocaine;

23  didn't know the appropriate half life of cocaine; the

24  duration of intoxication; didn't know that norepinephrine was

25  the same thing as adrenaline, that they're the same thing;

1    didn't know that norepinephrine -- although he stated it was

2    a neurotransmitter, which is partially true -- is actually a

3    systemic hormone which when it is released from the brain

4    functions as an neurotransmitter, but it is basically a

5    systemic hormone throughout the body. He seemed to think the

6    majority of cocaine effects were through sera -- he seemed to

7    think the majority of euphoric effects were mediated through

8    seratonin, when they are clearly by dopamine; did vaguely

9    recall dopamine and thought that was involved in some ways

10   but at least that's what I saw in the deposition. So that

11   concerned me, from a knowledge of pharmacology standpoint.

12       The other thing that concerned me was his description of

13   his clinical background in addiction medicine. He stated

14   that although -- and certainly he was the clinical director

15   or administrator, director of a big treatment program in the

16   Columbus area for several years, he didn't know what ASAM,

17   American Society of Addiction Medicine was. And, actually,

18   treatment programs in Ohio that have medical directors who

19   are not certified by ASAM, are not able to receive

20   reimbursement by third-party insurers for the treatment they

21   provide because it's considered that an ASAM-certified

22   medical director is one way that insurance companies can

23   verify that it's a legitimate and well-run treatment

24   program. That concerned me that he didn't know what that

25   was.

1      It concerned me he didn't know what an addiction medicine

2 fellowship was, even though he is a psychologist and not a

3 physician.  Being an expert in the field or being able to

4 give expert opinions about aspects of addiction medicine,

5 cocaine psychosis, without even knowing what an addiction

6 medicine fellowship is concerned me.

7      And then, finally, the description that he gave of the

8 treatment program and the cocaine psychosis patients he's

9 seen concerned me.  My impressions -- and this is just an

10 impression based on the -- the deposition as well as his CV,

11 is that a significant amount of the treatment program that he

12 supervised, which sounds like a big comprehensive treatment

13 program, was Methadone maintenance, which is for heroin

14 addiction, residential treatment, which certainly could be

15 for cocaine addicts, but generally well after the cocaine

16 psychosis is done, and outpatient treatment.  And when he was

17 asked whether he had seen patients who had cocaine -- who

18 were acutely using cocaine -- and the question seemed to be

19 framed sort of along the lines of in an Emergency Room

20 setting, or whatever, he stated he certainly saw lots of

21 patients in outpatient treatment within a matter of a few

22 hours of using, or even patients who came in intoxicated, and

23 that was his experience with patients with -- my impression

24 was that was his statement of experience with patients with

25 cocaine psychosis.  Actually, certainly lots of patients who

PARRAN  -  REDIRECT

3-119

1   have just used cocaine recently or just used it on the bus or

2   at the corner to -- before coming into treatment, that

3   happens all the time.  But the ones who use cocaine just

4   before they come to treatment and trigger cocaine psychosis

5   don't walk in the door.  They go off; they go off to get more

6   cocaine.  So, those statements concerned me significantly

7   regarding his qualifications to give an expert opinion about

8   something having to do with cocaine.

9   Q.  Dr. Parran, how important, in your professional

10  estimation, is it to have an expert knowledge of

11  pharmacological effects of cocaine to be able to explain the

12  dynamics and the impact of cocaine psychosis in a given

13  instance?

14  A.  Well, I think especially -- let me back up.  It's perhaps

15  not critically important to have a clear understanding of all

16  the pharmacology of cocaine to be able to talk about cocaine

17  addiction to some degree, although even that would be a

18  serious liability.  Not knowing the pharmacology -- really

19  knowing it well -- of cocaine, and certainly psychologists do

20  know the pharmacology of cocaine -- I worked with many

21  psychologists in our V.A. treatment who know the pharmacology

22  of cocaine quite well.  But, not knowing the pharmacology of

23  cocaine when we're talking about something that is different

24  than cocaine intoxication, that is different than the cocaine

25  crash and is this sort of peri-binge, paranoid, at times

1  psychotic period, I think is -- renders a person in not a

2  solid position to give an opinion.

3  Q.  And finally, Dr. Parran, in your professional opinion,

4  how important is it to be familiar with or expert in the

5  pharmacology of cocaine in understanding Mr. Hicks' condition

6  in connection with the matters in this case?

7  A.  I think it's very important and it -- not knowing the

8  pharmacology of cocaine and also how the pharmacology of

9  cocaine measures with the disease of addiction to produce

10  typical patterns of cocaine dependence, cocaine binging, the

11  kindling phenomenon, and paranoia and psychosis, not knowing

12  that I think renders a person in -- in a very weak position

13  to be able to give a credible opinion about this case.

14  Q.  From what you read in the transcript of Dr. Reardon, did

15  it appear to you that he had an appreciation of the kindling

16  effect as you've described?

17  A.  No.  My initial reading when he was asked about the

18  kindling phenomenon, it appeared to me it was the first time

19  he ever heard of it.  I can't say that for sure.  But then

20  his response of what his understanding of it was, he thought

21  he had a vague understanding of it, some sort of

22  understanding.  I can read the exact thing if you want --

23  oops, there it is.  Page 49:

24          "Do you know what the kindling effect is?"

25          "Answer:  Kindling?"

PARRAN - REDIRECT

1        "Question:  Kindling, k-i-n-d-l-i-n-g."

2        "Answer:  Not specifically.  Not that term."

3        "Do you know what it refers to?"

4        "Answer:  Well, I'm assuming it refers to something

5    with regard to timing of onset and so forth."

6    The response indicated that he really did not know what

7    kindling was at all.

8    Q.  And how important in your estimation is or was the

9    kindling effect insofar as Mr. Hicks' situation is concerned?

10   A.  Well, the kindling effect is what explains the reason why

11   some patients -- and apparently at least -- to the best of my

12   professional opinion, in this case a patient can binge on a

13   tremendous amount of cocaine at one time and finally trigger

14   a certain cascade of symptoms in themselves.  In maybe five

15   percent of cocaine addicts, a person by binging on cocaine

16   will trigger a seizure.  And then in that five percent,

17   almost every time they use cocaine after that, even if it is

18   a small amount, they'll have a seizure thereafter, and that's

19   the kindling phenomena.

20       In terms of this case, using a tremendous amount of

21   cocaine in the few years previously, intermittent and huge

22   binges triggered the paranoid ideation when using cocaine,

23   explains the crux of how a person can do somewhere between

24   three and five runs of I.V. cocaine in an evening and develop

25   very bizarre, very savage, very disorganized behavior that

1   looks like cocaine psychosis, more than anything else

2   clinically in a differential diagnosis.  So I think it is

3   really a critical issue.

4         MR. MEZIBOV:  Thank you, Dr. Parran.  That's all I

5   have.

6         MR. WILLE:  Nothing further, Your Honor.

7         THE COURT:  Do I understand that when the kindling

8   effect is invoked or occurs, that then the person will binge

9   on I.V. cocaine?

10        THE WITNESS:  The kindling effect can -- the

11  phenomenon of kindling can affect several different --

12  several different parts of cocaine use.  Certainly the

13  phenomenon known as kindling can affect whether a person has

14  a subsequent seizure after they've had one.

15        THE COURT:  We know Mr. Hicks didn't have seizures.

16        THE WITNESS:  Yes.

17        THE COURT:  So let's talk --

18        THE WITNESS:  The kindling effect certainly

19  explains how people have significant paranoid ideation and

20  psychosis-type actions.

21        THE COURT:  As far as we know, that never happened

22  prior to this time with -- of the murders with Mr. Hicks; do

23  we?

24        THE WITNESS:  Well, the description -- the

25  description in the 1990 report of Dr. Baum -- I think that's

PARRAN - REDIRECT

3-123

1    his name -- granted, that was after the fact and it was

2    information gathered in 1990, but the description there of

3    the cocaine dependence that Mr. Hicks had had in the previous

4    few years did describe no violent behavior but certainly

5    described intense binges that involved paranoid ideation,

6    using by himself, using in solitary environments, no longer

7    using socially with other people. All of which is, at least

8    I read, is pretty strong evidence for that.

9            THE COURT: Well, the only information you have in

10   that regard is the amount of --

11           THE WITNESS: I can try to look for it here if you

12   want me to.

13           THE COURT: Well, do you have -- I understood that

14   you based your opinion on the fact that he used his life

15   savings to buy cocaine.

16           THE WITNESS: That was my opinion regarding cocaine

17   dependence. My opinion regarding the fact that it's my

18   opinion that he had significant paranoia with previous

19   binges, previous heavy binges with cocaine, was based both on

20   my interview with Mr. Hicks in 1995 as well as data from 1990

21   and Dr. Baum's record which he shifted his pattern of use to

22   more and more solitary use by himself during these binges,

23   which generally happens because of the paranoia coming on

24   with heavier and heavier binges.

25           THE COURT: And when he is on a binge, the only

PARRAN   -   REDIRECT

1   thing he is interested in is getting more cocaine?

2           THE WITNESS:  That's what most patients describe.

3           THE COURT:  Did Mr. Hicks?

4           THE WITNESS:  Mr. Hicks did, yeah, and he described

5   that in his --

6           THE COURT:  So Mr. Hicks was on a binge?

7           THE WITNESS:  Yes.

8           THE COURT:  And all he was interested in was

9   getting more cocaine?

10          THE WITNESS:  That -- that sounds --

11          THE COURT:  Am --

12          THE WITNESS:  I mean, that seemed to be my reading

13  of it.

14          THE COURT:  All right.  All right.  Now, when did

15  he start the binge?

16          THE WITNESS:  I'll have to look at it, but it's --

17  from the detective's report, I believe -- I have it right

18  here.  He first used --

19          THE COURT:  Well, I thought --

20          THE WITNESS:  I'm sorry, Your Honor, but it's -- I

21  thought it was about 8 o'clock in the evening.

22          THE COURT:  On the Friday?

23          THE WITNESS:  On Friday.

24          THE COURT:  After --

25          THE WITNESS:  Between 8:00 and 9:00 in the evening,

PARRAN  -  REDIRECT

3-125

1    I think.

2         THE COURT:  All right.  And that's when the binge

3    started?

4         THE WITNESS:  That was the first use of cocaine.

5         THE COURT:  Now, when did the binge start?  I

6    understand there is a difference between the simple use of

7    cocaine, if there is such a descriptive phrase, and a binge.

8         THE WITNESS:  What I would say is that once a

9    person has cocaine dependence and they've -- and they've

10   established it in a binge-crash pattern, which is the most

11   common, the initial use of cocaine is the initial start of

12   that binge.

13        THE COURT:  All right.  So, then if Mr. Hicks'

14   situation was such that if he took a drop or a -- any amount

15   of cocaine, it was the start of a binge?

16        THE WITNESS:  That's consistent with the history

17   that I heard in here, especially from Dr. Baum and my history

18   with him.

19        THE COURT:  And so the binge started with the first

20   use of cocaine?

21        THE WITNESS:  Yes.

22        THE COURT:  When did it end?

23        THE WITNESS:  Usually we classify the binges ending

24   with the last use of cocaine.

25        THE COURT:  Last use.  So --

1    THE WITNESS:  Maybe ten minutes after that, when

2    the peak goes away.

3    THE COURT:  Now, in this situation the binge was

4    over with the last use of cocaine?

5    THE WITNESS:  I would say, yes.

6    THE COURT:  Around 12:30 that evening?

7    THE WITNESS:  Yeah, I think it was right around

8    then, 12:30.  Maybe -- let's see.  Oh, must have been 12:30;

9    something like that.  "So, I went up ahead and shot up the

10   dope I got."  So, I think he went around 12:30 and got his

11   last cocaine and came back to the apartment and used it.  So,

12   probably sometime between 12:30 and 1:00 or so.

13   THE COURT:  Thank you.

14   THE WITNESS:  Okay.

15   MR. MEZIBOV:  Your Honor, may I clarify one point?

16                 FURTHER REDIRECT EXAMINATION

17   BY MR. MEZIBOV:

18   Q.  Dr. Parran, His Honor has asked the onset and the

19   duration of the cocaine binge; correct?

20   A.  Yes.

21   Q.  And what about the onset and the duration of the cocaine

22   psychosis?

23   A.  Most patients -- and I can't say for Mr. Hicks, because

24   by the time I interviewed him in 1995, he said that his

25   recollection of all of the events that evening was not clear

PARRAN - REDIRECT

3-127

1  enough to tell me exactly. But, most patients, once they

2  have had cocaine psychosis or paranoia associated with the

3  cocaine binge in the past, get some degree of paranoia,

4  usually mild, after the first use of cocaine and then it is

5  multiplied each time they use the cocaine thereafter. So, I

6  generally consider serious paranoia to be starting after the

7  second time that people use cocaine.

8  Q.  When in connection with Mr. Hicks then would the serious

9  onset of psychosis set in?

10  A.  Once again, the only thing I have to base my opinion on

11  is his confession, and during his confession he said he got

12  edgy, he got restless, that he got an incredible urge to use

13  cocaine after the first I.V. cocaine use and he went and

14  hocked the VCR. When he used the second I.V. cocaine, he

15  suddenly started thinking about robbing his grandmother -- or

16  his mother-in-law; and as that got closer, he began

17  considering murdering his grandmother, and that -- so

18  clinically for me it would be right around the time or

19  shortly after the second I.V. administration of cocaine.

20  Q.  And do you have an opinion, to a reasonable degree of

21  medical certainty, whether Mr. Hicks was in the midst of a

22  cocaine psychosis throughout the times these two murders were

23  committed?

24  A.  Yes.

25           MR. MEZIBOV:  Okay.

PARKAN - REDIRECT

3-128

1       MR. WILLE:  Nothing further, Your Honor.

2       THE COURT:  Is this witness released?

3       MR. MEZIBOV:  Yes, Your Honor.

4       THE COURT:  Is this witness released?

5       MR. WILLE:  Thank you.  Yes.  Thank you, Your

6  Honor.

7       THE COURT:  Thank you, Doctor.

8    (Witness excused.)

9       THE COURT:  We'll have a 15-minute recess.

10       THE CLERK:  All rise.

11    (At 2:43 p.m., a recess was taken.)

12           * * *        (3:05 p.m.)

13       THE COURT:  Is the petitioner ready to proceed?

14       MR. MEZIBOV:  Yes.

15       THE COURT:  Respondent ready to proceed?

16       MR. WILLE:  Yes, Your Honor.

17       THE COURT:  Call your next witness.

18       MR. MEZIBOV:  Your Honor, we've agreed with

19  Mr. Wille that we can call certain witnesses out of order,

20  and we defer to Mr. Wille.

21       THE COURT:  Proceed.

22       MR. WILLE:  Thank you, Your Honor.  We would call

23  Dr. Reardon.

24       THE CLERK:  Raise your right hand, please.

25    (Duly sworn by the Clerk.)

LARRY SOUTHWICK STATEMENT TO
HOOLIHAN & DILLON AT W.P.D.

Larry Southwick, date of birth is 5-23-53, Social is 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. He lives at 379
Belmont Avenue N.W, Warren, Ohio, 44483. He works full time at MedStar
Ambulance as a dispatcher. He is currently the manager of the Warren terminal of
the Greyhound Station.

Larry has worked for Fingerhut since 1998. At that time there was a West
Warren Terminal. He worked as a ticket agent in the mornings from 8:30 until
12:00 at which time Fingerhut would come in. They would close the terminal, go to
lunch together and then re-open the station. Larry then went to his regular job at
1:00.

Larry helped Fingerhut move the West Warren station to it's current location on
East Market. In the process of moving Larry asked Robert what was in the bag
(which was in a box of stuff they were moving). He told him it was a gun and
showed it to him. Larry describes it as a .38 revolver that was silver with light
brown handles. In the bag also were an eyeglass repair kit, ammunition and a
couple of knives. Larry said this bag was always at the terminal in a little cubbie
hole in the wall. When Fingerhut worked it was either in the back office with him
or near his briefcase.

Either Robert or Donna would call in to the terminal everyday to see if everything
was all right with Larry. He didn't actually meet Donna for approximately 4-6
months after coming on board. Larry describes Robert as a good boss who was laid
back and a fair payer. Larry wasn't aware of any relationships outside of the
marriage. Robert introduced Donna as his 'wife'. He said that they argued from
time to time, like normal couples.

Larry said that Donna spent a lot of time back then at the Youngstown terminal.
There was a restaurant in the terminal called Just The Ticket where Donna was
most of the time. Apparently she's been arrested at least a half dozen times in
that restaurant. He could only recall why on one occasion. The charge was
obstruction of justice. There was a white security guard that was always hassling
the black customers and Donna would go off on him. Her arrest was the result of
this. When Donna would call Robert to bail her out he would call her an idiot and
tell her he wasn't going to bail her out.

EXHIBIT
20

The hours of the Youngstown station are approximately 7:00, 7:30 to 9:00, 9:30.

Larry quit the terminal in 2000 because some phone cards came up missing from the safe and Robert blamed him.  Robert said it had to be one of Larry's family members or someone he let in the back.  He repeatedly said this to Larry and Larry finally wrote Fingerhut a letter and quit.  Fingerhut only listed Larry's name as a possible suspect on the arrest report.  Larry said he even had some of his own money (rolled coin) in the safe and why would someone leave that behind and just take the cards.  Donna let people back there, even passengers (as was witnessed by Larry's wife).  Even inmates were in there a lot.  Several times a week TCI would bring inmates to the terminal who had been released. Larry quit in October of 2000.

Donna called him to come back to work in November of 2000.  Robert wanted him to come back as well and told him he could when things picked up. However, he didn't go back until the Saturday after Robert's funeral.

Larry said there was no indication of marital problems.  Fingerhut joked once about "she must have a boyfriend' after a telephone call with Donna.  That was a couple of months ago, Larry said.

When Larry came back on December 15th, the bag with the gun was in the cubbie hole.  He didn't look inside at that time.  The following Monday he looked and sure enough, the gun was gone.  He called the Howland Police Department to report it missing.

Larry attended the funeral and said Donna was crying the whole time.  She met with him afterwards (at the funeral) and gave him the keys to the Warren terminal to open up the next day.

Larry didn't know of any boyfriends of Donna's and had never seen or heard of Nate.  He did witness her writing a long letter a week before Robert's death.  He didn't know if Donna carried a gun or not.  The target in the terminal was from a target practice she attended next door to the old West Warren terminal.  There is apparently a shooting range there.

There was a computer at the Warren terminal with internet access.  Larry never witnessed Donna on it.

Larry first heard about the Santiago-gun incident after Fingerhut was murdered.

When police asked him if he thought Donna would have any use for the missing phone cards he said she could use them for private, untraceable calls if she wanted to.  He never witnessed this though.

At night, Robert and Donna, would take the daily cash home with them and one would deposit it in the morning on their way to work.

Larry said that Fingerhut was distanced from his son in Florida and that he didn't trust any members of his family.

Larry didn't know EVERYTHING was in Donna's name, only the Greyhound business.  Larry was told it would be harder for someone to sue them if it was in Donna's maiden name.  Larry also thought Donna was laid back and easy going.

Larry said Fingerhut really liked eBay and that's where he got all the team jackets and other sports memorabilia.

Larry called Donna after the funeral to console her.  They never discussed the actual death.  Talked about 3 times just consoling.  She then asked him to run the station because he was the only one in Warren who knew how and she trusted him.

Larry never saw any bullet holes in the basement of the Warren terminal.  He said they weren't there when they moved to the new location.

Robert never mentioned Nate and Larry never saw them together.

Jenny Smith is Larry's Sales Manager.  She heard from both, Jamie Wozak for the Akron terminal and Melvin, from the Youngstown terminal that driver (the 5:15 bus), Jimmy McCoy, told them that jokingly he said, upon coming into the Warren terminal and finding Donna on the computer, "You're in a chat room talking to your boyfriend again".  And she replies "My man, Nate, is in the back".  At that point Nate comes from the back office to the front office.  This was one week before the homicide.  (???)

CHRISTINE ELLINGTON
INTERVIEW WITH HOOLIHAN AND DILLON (H.P.D) AT THE W.P.D.

Christine owns The Final Cut hair salon at 402 East Market.  She lives in Liberty and her Social is 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, date of birth is 4-9-67.  Hours are 9-5 on Tuesday thru Friday, and 7-4 on Saturdays.  Closed Sunday and Monday.

She had seen Donna and knew she worked at the Greyhound Station.

Donna brought Nate in on the 11th and said "Here's another cut".

Christine said she didn't converse with Nate at all during the cut because it slows her down and the fact that she didn't know Nate.  Donna went back to the terminal.

Chris said Nate was wearing dark clothing, and paid for the cut himself ($13.00).

Christine said that Donna has brought 3 or 4 black guys in for cuts previously and all she would ever say was "I have a cut for you".

Christine said she had never seen Fingerhut and Nate together.



EXHIBIT

21

tabbies

WARREN MUNICIPAL COURT
141 South St., Warren, Ohio 44483

STATE OF OHIO
CITY OF WARREN

CASE NO. 01RH3570

VS.

COMPLAINT (Rule 4)

SANTIAGO MASON

Name   336 Reo Blvd

Address   Warren, Ohio 44483

Soc. Sec. # 270 72 2483

D/O/B   11 13 1938

Sex

Complainant being duly sworn states that   SANTIAGO MASON

Def. Name

at   CITY OF WARREN                                    Trumbull Co., Ohio; on or

about   November 20        20   01

State essential facts

did with purpose to deprive the owner, Donna Roberts,
one(1) .38 cal Smith & Wesson handgun, Three Hundred
Twenty Dollars in U.S. Currency and telephone cards
the value being over $500.00 knowingly obtained or
exerted control over said property by deception

in violation of ORD/ORC   ORC 2913.02 THEFT F 5th dg

complainant   Donna Roberts

address

Complainant Signature
NOVEMBER 23

Sworn to and subscribed before me on

Judge - Clerk - Deputy Clerk - Notary

20  01

WARRANT ON COMPLAINT

To _____   You are ordered to arrest
above defendant and bring him/her before this court without unnecessary delay. You
may/may not issue a summons in lieu of arrest under Rule 4 (A) (2) or issue summons
after arrest under Rule 4 (F) because _____

State reason if restricted

Judge - Clerk - Deputy Clerk

*************************************************************
SUMMONS ENDORSEMENT

This warrant was executed by arrest/by issuing the following summons:
You are hereby summoned and ordered to appear at _____ o'clock ____ M. on
_____ 20____ at Warren Municipal Court. If you fail to
appear at the time and place stated above you may be arrested.

Issuing Officer - Title

EXHIBIT
22

Highlight of the notes of the tape of Santiago Mason at the Prosecutor's Office.  Detective Hoolihan and Detective Dillon (Howland P.D.) took this statement.

Santiago is married and he has one kid.  He apparently goes to the Greyhound bus station in Warren where he was going to purchase a ticket to go to Cleveland to visit his relatives the next day.  As he is at the window, he approaches Donna and she is sitting there writing a letter.  He sees a picture of a black guy and it looks like he is in incarcerated.  Santiago recognized the bars, because they were both apparently housed in Belmont.  They didn't know each other though.  He buys the ticket and then Donna starts coming on to Santiago pretty heavy.  Telling him, "You are so cute.  I always liked black guys cause they got big dicks."  Santiago in turn says, "I got a big dick."  One thing leads to another and she is asking him "Can we hook up later on tonight.  I get off work at 5:00, why don't you come back down to the station at 5:15 and we'll hang out.  Maybe go to my house."  So, Santiago goes back to the Greyhound station at 5:15 and he goes around to the front door and she tells him to go to the back door where she comes out and tells him she will be right out, she has to lock everything up.  They get

in the car and Donna fires up a bad ass joint.  They get to Donna's house and apparently they are in the living room.  They are only there for about 45 minutes.  Donna proceeds to say, "Let me see how big your dick is." Santiago gets his tool out and Donna has her way with it and she is begging him, "Why don't you fuck me.  Why don't you fuck me."  Santiago says, "No."  He keeps saying no.  He's mumbling about he doesn't want to get any disease or anything like that cause he is married.  Anyway, Donna finally gets pissed off and Santiago wants to go back to the Greyhound station, he's asking questions about Donna's husband, whether he will be home or not and he was real nervous about being there seeing that he just met her that same day and here he is in her car, in her big house, getting high with her and having sex with her to an extent.  Just oral sex on Donna's part.


Donna tells him that Nate…she is always going on about Nate, how much she loves him and how much he loves her and she can't wait until he gets out…  That her and Fingerhut don't even sleep in the same rooms, they are actually separated, but they are just living in the same house.  She tells him she doesn't want a divorce because everything is in her name.  Donna tells him that Nate is going to shoot some guy that's been hitting on her and later on in the tape, it reveals that this happened beforeNate went to prison.  He

and Donna were in a car and a gang of black guys comes over and they are like sizing her up and saying stuff and that's what that led to.  Since they were hitting on Donna he was going to shoot them.

She takes him back to the Greyhound station and he walks home and then two or three days later, Donna calls him and Santiago apparently had her cell phone number.  She gave it to him.  He actually rattled it off by heart during his interview.  She calls him and tells him she wants to see him and suck his dick again.  Apparently, they end up going to meet back at the Greyhound station and Santiago comes of course and they get in the car and she is listening to this wild rap music and he was laughing, "What you doing woman?  Listening to music like that!"   She's all old and everything you know. (Santiago)  On the way there, Donna is asking Santiago why don't you drive and he says I drive, I have a car, I just don't have a license.  I have fines and costs and it is going to cost money to get unsuspended or whatever and she says, "Well, I will loan you the cash.  If you want so you can get your license back."  He was like, "Cool, that works for me."  She reaches in her pocket and gives him $220.00, by this time they are back at the house.  They are in the other living room this time, Donna performs oral sex on him again and she says, "Don't worry about the money honey.  I don't ever have

to worry about money. I don't worry about money at all. When you gonna fuck me?" Again he says, "No." She gets mad and she goes back to the bedroom and comes out with another joint and she is smoking it. They were only there at the house for 20 to 25 minutes. She is still mad, so she takes him back to the station and then about one week later she shows up at his place of employment, Vista Windows, (Elm Road? Old Stambaugh Thompson's behind Perkins, I am not real sure) Anyway, she is all irate, she's mother fucking him up and down and screaming, "I want my money back!" There was a couple of witnesses there, his friend Wali, he spends every night over at his house in the evenings. Another guy name Walt. She is going on and on, mfing him, "You got my money and my gun!" Santiago is like, "Your gun? I don't have your gun, I don't have your money." She is saying, "I am going to have you fucked up." So they keep interrogating him about whether they ever stopped anywhere, have they ever just stopped anywhere at all, other than just go to the Greyhound and straight to her house and back and Santiago is adamant that they have never stopped anywhere. Including the Dairy Mart where supposedly the gun was stolen from her and the money. He swears he has never seen any envelopes or any bags, never saw a gun, he never stopped, but Donna did tell him at one point earlier on the first ride that she kept two guns in the car. She ends up telling

him that she is going to call the police and she filed that report on him November 20th, missing Smith and Wesson 38, phone cards, and cash. He told the detectives that before she wasn't worried about the money, she never had to worry about money, and now she is all pissed off about the money and that she is a liar and that she will fuck any black guy. She's always kissing on the bus drivers all the time at the Greyhound station. He tells Hoolihan that he would take a polygraph when Hoolihan asked him and he wanted Donna take one too. He says she is a psycho type of woman and one other thing that he said was that she was a fast driver. That she drives like a "bat out of hell." (Maybe she was just pissed?) Detective Hoolihan asked Santiago, "Why would Donna file this report on you?" He says, "Because of the sex." He wouldn't give it to her. Santiago called Robert Fingerhut at the Youngstown Greyhound and tells him about everything, that he's had an affair with her and she is accusing him of stealing this gun and money. Fingerhut asks him, "How do you know her?" He says, "From the Greyhound station in Warren." He just says, "Oh, okay." And hangs up the phone.

Early on she told him that she would love to have a three some with two black guys, how it would be great to be sucking on one black guy and have the other black guy in her ass.

His friend's name that he spends every evening with Wali, one of the witnesses at Vista Windows, his last name is Akram.  I don't know where he lives or anything.

I guess that's it.

# HOWLAND POLICE DEPARTMENT

### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page  1 of 5



On Wednesday, December 12, 2001 at 1:00pm Donna Roberts came to the Howland Police Department with her brother Ralph Roberts and sister in law Rita Roberts. Donna came into the Detective Bureau Conference Room along with Capt. Compton, Det. Sgt. Dillon and R/O. Ralph and Michael Roberts, Donna's brothers waited in the lobby of the police station.

Donna told officers she last saw Robert Fingerhut alive at 8:00am on 12-11-01 in the master bedroom of their 254 Fonderlac SE residence. Robert was getting ready for work and Donna was lying awake in bed. Donna thought Robert went to work at the Warren Greyhound terminal. Donna said she also helps out at the Warren terminal but never the Youngstown office. She sells tickets in Warren and does basic office work. She told officers she doesn't work in the Youngstown office because everything is computerized and she does not know how to use the equipment.

Donna met Robert in Miami, Florida and married August 22, 1983. Robert was a licensed private investigator in Florida. He had a permit to carry a gun there. Robert bought a BCI badge in Miramar, Florida. Donna worked for Dr. Morton Freiman MD a plastic surgeon in North Miami Beach, Florida. Donna told officers she was the office manager and as part of her duties she conducted billing, kept, wrote and maintained medical records. Donna further told officers she was Dr. Freiman's only employee and also served as his medical assistant during surgical procedures. Donna also traveled to Israel with Freiman and did trauma work with him during two wars on fresh battle injured soldiers in the field. Donna said she provided treatment for gunshot wounds and performed skin graphs.

Donna was born in Youngstown, Ohio and married three times. Her first marriage was to William Raymond and lasted six years. The second marriage was to Bert Gelfand for ten years and then to Robert Fingerhut in 1983 for three years. Donna said the only reason her and Robert were divorced was because of financial benefits in the case of a civil suit against Robert. Donna told officers the divorce was Roberts idea. He wanted to put all of their assets in Donna's name so they would be protected in the case of a lawsuit or failure of their business.

1



EXHIBIT

23

Donna told officers her and Robert got along great and had no real problems with their relationship. They had small problems like any couple. She stated they argued over little things like changing the dog's water, but nothing major. They purchased their 254 Fonderlac residence in 1995. Donna also mentioned Robert was a collector of sports memorable and World War II relics. Donna bought Robert a Cleveland Browns, Brian Sipe field worn football jersey in the early eighties and that is how he got started collecting jerseys, making jerseys and collecting other memorabilia.

Donna told R/O on the day of Robert's murder she woke up around 8:00am when Robert was leaving for work. Donna said she just stayed in bed relaxing until 9:30 or 10:00am. She got out of bed, washed her hair, did her makeup and took care of the girls, "her dogs". At 12:30 she arrived at the Warren Greyhound Bus Terminal and worked until 5:15pm. When Donna arrived Robert had already left the terminal and Donna did not know where he was. Donna said she called Mr. Daniels at the Youngstown terminal to see if Robert was there. She was told Robert had not yet arrived. During her worked period Donna said everything was normal and nothing unusual happened. She said she spent the day alone in the office.

After work Donna went to Giant Eagle and purchased a cooked roast chicken for her dogs to eat. She arrived at 254 Fonderlac SE at 5:45pm and Robert was not there. Robert usually worked in the Youngstown terminal from 2:30pm until the last bus at 9:00pm. Donna called Robert once at the Youngstown terminal after coming home from work. Robert called Donna a couple of times between 5:45 and 9:00pm. Robert called to see what Donna was doing, ask what was for diner and to tell her things were slow at the office.

At 9:00pm, Donna said she called Robert at the Youngstown terminal, he told her he was going to be a little late, but did not say why. Robert told Donna she should go shopping at the mall and buy herself something nice, because she deserved it. Donna said she did not go to the mall, but to Wal-Mart instead.

Donna then said," there is something you don't know about Robert, and you can't let this get back to anyone because no one knows. Robert goes both ways." Donna has never met any of Robert's male friends, but she knows Robert met one of them at the Avalon Inn sometime last year. He has a friend named Bobbie who would call him at the house until last week. Bobbie would call a couple times a week and ask for Robert. Donna said, "Robert has his friends and I have mine, I guess we are just a pretty cool couple".

Donna said, customers have threatened Robert at the bus terminal in Youngstown. Some of the customers are crazy. Donna had no specific details as to who may have made the threats or who the crazy customers were, just that there were a lot of people like that.

2



Donna told officers Robert has several firearms, a big rifle with a bayonet, 38-caliber Taurus revolver with a short barrel, 38-caliber revolver with an unexposed hammer, unknown brand and a Smith and Wesson 38 caliber revolver.

On November 20, 2001, the Smith and Wesson 38 caliber revolver was stolen from Donna's car while parked at the Dairy Mart on Logan and East Market St. in Warren, Ohio. Donna said, she helped this guy she really didn't know and gave him a ride. She knows him only as Santiago, who is a black male subject. Donna gave him a ride and he stole the gun and $320.00 Greyhound deposit, which was in the car. Donna said, she ran into the store to buy cigarettes and when she returned to the car, Santiago, the gun and money were all gone. Donna immediately reported this theft to the Warren City Police Department.

Donna told officers six months to a year ago she was dating a guy named Carlos. Donna dated Carlos for two or three months, but she cannot remember his last name. Carlos is a male, half black and half Hispanic of average height and weight. Donna met Carlos at the bus terminal in Warren. Donna's relationship with Carlos was for sex and she had no emotional attachment to him. R/O asked Donna if there was anyone else she had any type of relationships with and she said, "no".

R/O asked Donna if she knew Nate Jackson and she said, "oh yea, I forgot about him. He calls me from prison and he just got out on Sunday, 12-09-01". Donna told officers she went to Lorain and picked Nate Jackson up Sunday when he was released from prison. She has known Jackson for two years and seeing him on a regular basis since they met. They met at the Youngstown bus terminal. Donna told officers Jackson was in prison for being a passenger in a stolen car. Donna also told officers Nate has been in and out of jail for stupid little thing, nothing bad. Donna told officers Robert and Nate were friends. When Donna and Nate got back into Youngstown from Lorain on Sunday, 12-09-01 she dropped Nate off at Shelia and Oscars. Their house is somewhere in Youngstown with red shingles on the side of it, instead of siding. Donna didn't talk to Nate again until Tuesday morning, 12-11-01 on the telephone. Nate called Donna, she did not know where he called from, he just called to say hello. Donna did not see Nate on Tuesday, December 11, 2001.

Donna said, "Nate was not jealous of Robert and Robert understood about Nate. Robert knew all about my relationship with Nate". Donna told officers her and Robert had an understanding and out of respect for Robert she would not bring men to their home to have sex. The last time Nate Jackson was at the 254 Fonderlac with Donna was the weekend before Labor Day. Nate was serving time at CCA in Youngstown and was on a weekend pass. During this visit by Nate, Donna said Robert was home and she did not have sex with Jackson. Over Labor Day weekend, Nate was on a pass from CCA and she had sexual relations with him, but not in the house. Donna said, "her relationships were just a game and the game had only one rule. You don't say I love you to whoever you're dating and Robert was very strict about that".

3



Donna told officers the music she likes to listen to is older stuff and pop. Nate likes listening to rap and rhythm and blues. Donna said she stopped at the house on Sunday, 12-09-01 with Nate. She said they were both in the house from 1:00pm to 2:00pm, feed her dogs and picked up some pot, "marijuanna". Nate last spoke with Donna in the morning on the eleventh of December 2001, from a payphone somewhere in Youngstown.

Donna describes Nate as 5'10", thin but with a muscular buiid, short black hair with dark skin. Donna told officers her and Nate wrote each other a lot. They wrote each other about three times a week. On Thursday and Saturday Nate would call Donna collect from prison.

Donna told officers Robert was a very hyper person and when he got mad he was flaky. About a week, week and a half before Robert's death he was acting kind of nutty up until yesterday. Robert was missing Tuesday, from 11:30am to 2:15pm when he showed up at the Youngstown Terminal for work. Donna said this is out of character for Robert to go or do something without her knowing about it. Robert kept a gun in the center console of his car or tucked between the seat and the console.

Donna went back over what she had done late Tuesday evening on the eleventh of December with officers. At 9:00pm she went to Giant Eagle to buy chicken for her dogs, but they did not have any. Donna was in Giant Eagle approximately five minutes. Donna then went to Wal-Mart and shopped for approximately 30 minutes. Donna bought make up and a cigarette lighter. About 10:30 Donna arrived at Super Kmart and made no stops or detours along the way. Donna told officers she was there a long time and just looked around. She likes looking around at Super Kmart. Donna did not buy anything. Donna said she did not see anyone she knew at Super Kmart, but she did talk with a lady who had a cute little boy with her. Donna left Super Kmart at 11:30pm and went straight home. Donna came down her street and pushed the garage door opener. The garage light came on and the overhead door began to close, so she pushed it again. Donna parked the car in the garage and closed the overhead door.

Donna told officers she has a pending lawsuit against a policeman who worked in the Youngstown bus terminal. She thought the officer's name was Bettencougher and he wore a black uniform. Donna said she did not know what police department the officer was from. Donna said the suit is a couple years old and was dismissed by the court. They have file an appeal with the court and she does not know where the case currently stands. Donna said Attorney Steve Chuparkoff, (330) 744-3010 was handling the appeal.

Donna told officers Robert has a life insurance policy worth $250,000.00 with State Farm and she has one worth $50,000.00, their agent is Cathy Thomas. Thomas can be reached at (330) 793-1136. Donna said Robert was going to increase his life

4



JANET CLAY STATEMENT TO:
HOWLAND POLICE

Janet lives at 779 Fairmont, Youngstown, Ohio. Her date of birth is 2-6-67.  Her Social is 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.  Her phone number is 743-6913.

Janet met Nate on the 10th @ Sheila's house in the afternoon.  Just Janet, Sheila and Nate were present.

Donna picked Nate up in her car on the 10th.  They came back later that night and Donna & Nate went into the bedroom to smoke crack.  This was done in exchange, of course, for crack paid to Shiela.  Nate gave Sheila a gram for the room rental at that time.

Janet said she then saw Nate again the next day (11th) when Nate called Sheila looking for someone to 'kick it' with at the Days Inn.  He offered Janet crack and money to come to the Days Inn to 'kick it'.

John takes Janet and Sheila to the Days Inn.  He leaves Janet there with Nate, and after getting a hit for bringing her, John and Sheila return to Sheila's house.  Sheila told Janet to call for a ride back when she was ready.

Janet said that Nate went to the Kings Motel on the 12th and he had another girl there.

Nate calls Sheila to come and get Janet and John does so.  He goes in and gets his hit and then takes Sheila and Nate back to Sheila's house.  There, at Sheila's they smoke more crack and Janet said they were up all night.  Nate was still there in the morning (of the 12th).

Nate told Janet he cut his hand.  She said he was very nervous and jittery, pacing back and forth continually looking out the window and peep hole of the door.  She said that Nate was smoking a lot of crack (and this really means something coming from her).  She approximated over a gram.

Janet said that Nate was staying at Sheila's house.


EXHIBIT
24

On the night he was arrested, (early morning hours of the 20th) Janet said that Nate had been waiting all day for Donna to come pick him up.  She never came. Nate was talking to Donna when the police came.  Nate was really upset with Donna that she didn't come get him.  Donna said she couldn't because she was at her moms and that she couldn't leave her mom because Mom was so upset with everything. Donna never bothered to call Nate and tell him she wasn't coming.

Janet said that Nate and Donna talked to each other numerous times and Nate would always go off to another room to talk to her.

Janet said that even she knew that something happened.  She figured Nate just robbed somebody or something.

Janet never saw any gloves, gun or ski mask.

END

# HOWLAND POLICE DEPARTMENT

169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page 1 of 5



On Tuesday, December 12, 2001, shortly after 0005 hours R/O was contacted by Ptl. Ray who advised he was at 254 Fonderlac SE where a shooting had occurred. Ptl. Ray advised he was at the crime scene and had one dead male white subject lying on the kitchen floor with a handgun near the body. Ptl. Ray believed the subject had been shot in the head. Ptl. Ray requested assistance processing the crime scene and advised he would also contact Det. Sgt. Dillon and the Corners Office. R/O told Ray to secure the scene and not disturb anything until detectives arrived.

At 0035, R/O arrived at 254 Fonderlac SE and spoke with Ptl. Ray and Ptl. Pollcino. Officers advised there was no sign of forced entry into the residence. Ptl. Pollcino walked around the entire exterior of the residence and found nothing unusual. The victim's wife, Donna Roberts, called 911 and reported the incident. Ptl. Ray further advised Roberts was in the master bedroom.

After quickly surveying the scene, R/O told Captain Phillips of the Howland Fire Departments EMS squad there was no need for his personnel to stand by any long. R/O then contacted Trumbull County Sheriffs Detective Tony Leshnack and Warren City Police Detective Daniel Mason and requested their assistance processing and photographing the crime scene. Det. Sgt. Dillon videotaped the scene.

R/O and Ptl. Ray went into the master bedroom and spoke with the victim. She seemed very excited, anxious, curious and inquisitive as to what had happened. R/O told the victim it appears her husband had been shot. She said, "shot, oh my god, someone murdered my Robert". The victim then started screaming, crying and appeared very emotional for several minutes. R/O told the victim she had to be strong and answer a few questions to assist in the investigation. After a couple of minutes Donna composed her self and began answering questions.

Roberts told officers we have a couple of guns in the house, a small silver gun and a second gun Robert keeps in his car, the silver Chrysler 300 which is missing. R/O



EXHIBIT
25

asked Donna where her husband's car was and she said, "I already answered all these questions. Where is Roberts car, someone stole his car".

Donna said her husband does not drink or do any kind of drugs. She told officer, Robert doesn't have any enemies, and everyone loves him. She said that the pot in the kitchen was hers and Robert never smokes it. Donna said, when she drove down the street around midnight, she tried to use the garage door opener from down the street. She noticed when she pressed the opener the light came on in the garage and the overhead garage door began to close, so she pushed it again and the door went back up. She parked on the right side of the garage as usual and got out of the car. She walked around the back of her car and began to enter the house. She noticed the man door from the garage to the house was standing open, her husband was lying on the floor with blood all around him and coming out of his mouth. She went into the house grabbed the portable telephone and called 911. She then thought an intruder might still be in the house so she went out the front door and stood on the front lawn giving information to 911 until the police arrived. R/O asked Donna if the front door was locked and she said it was. Donna said, she had to turn the deadbolt to open and unlock the front door. Further she indicated they rarely ever use the front door.

R/O explained to Donna, the entire house needed to be handled as a crime scene, searched and officers have no idea where or what the perpetrator may have done or where in the house the perpetrator may have gone and there may be evidence somewhere else in the house. Donna told R/O, do what ever you have to do, just find who ever did this. R/O further explained to Donna, it would be necessary to search the entire house for evidence and it would probably take all night. Donna said, "I told you, do what ever you have to do, search the whole place, just find the guy." R/O asked Donna if anything appeared to be missing and she said no. Donna told R/O, I saw blood coming from Robert's mouth, and did someone stab him.

R/O asked Donna to tell officers everything she had done since she woke up Tuesday, morning December 11, 2001. At approximately 8:00am, Donna awoke to Robert getting ready for work and said goodbye to him. Robert left and went to the Warren Greyhound Terminal. She told officers she stayed in bed until around 10:00am, but did not go back to sleep she just lye there relaxing. At 10:00 she got out of bed, washed her hair and got ready for work. She arrived at work around 12:30pm at the Greyhound bus terminal in Warren and stayed there until 5:30pm. Donna said she was driving the red 2000 Chrysler 300m, which was parked, in the garage. Donna said that is her car and Robert has a silver one just like it.

After work Donna said she went to the Red Lobster Restaurant and had a nice diner alone. Donna paid cash for diner but could not remember what she ate. R/O notice a plastic container on the floor of the passenger side of her vehicle with a clear plastic lid. There were crab legs in the container. When asked about the container with the



crab legs, Donna said, "Oh yes, I remember, I had the king crab legs and an absolute vodka martini". After diner Donna went straight home.

At 9:00pm Robert Fingerhut called Donna from the Youngstown Greyhound Station and told Donna he was going to be late. Donna said," Robert told me I should go shopping at the mall and get myself something nice, because I deserved it". Donna instead went to Giant Eagle to buy chicken for the dogs at 9:00pm. Donna went from her house on Fonderlac to Firestone to Avalon to East Market Street and pulled into the Giant Eagle parking lot from the traffic light. She said the first handicapped parking space was open and she parked there. Donna ran into the store looking for roasted chicken, which they did not have so she left. Donna said she was in the store approximately five minutes. Donna then went to Wal-Mart on Elm Rd. and took the by-pass to get there. She did not stop anywhere else along the way. While at Wal-Mart, Donna purchased make-up and a cigarette lighter. These items were found on the kitchen table of the residence with at receipt for such, dated 12-11-01 at 9:37pm. Donna thought she was at Wal-Mart approximately ten minutes. She then got back on the by-pass and exited on State Route 46/Niles Cortland Rd. and went to Super Kmart. Donna told officers she arrived a Super Kmart shortly before 10:00pm and walked around the store looking at thing, which she often does. Donna said she did not purchase anything she just looked around. Just before midnight Donna left the store and went straight home. That is when Donna found Robert lying on the floor in the kitchen and called the police. Donna then started screaming, "Oh my god my Roberts gone, Oh my god my Roberts gone". Donna also told R/O she was seeing Dr. Ariza for postmenopausal depression.

Officers noticed while processing the scene, Donna would start screaming and murmuring loudly when officers were not talking. When officers would begin talking about findings at the scene, Donna would become very quiet, as if she was listening to officers. At one point Sgt. Dillon walked toward the bedroom from the dining room and found Donna standing in the bedroom doorway leaning against the doorframe listening to officers. R/O spoke with Donna and suggested a family member be called to come sit with her and possible take her to another location for the night. Donna provided her brother Ralph Roberts's telephone number to Ptl. Ray.

Donna's brother, Ralph Roberts was contacted by the Austintown Police Department and asked to come to the scene at the request of HPD. Donna spoke with Ralph and decided to leave with her brother and sister in-law Rita Roberts. Donna asked R/O what are you going to do now. R/O told Donna, officers are going to continue processing the crime scene and search for more evidence. Donna said, "Ok you do what ever you have to do". R/O again told Donna officers would need to spend most of the night processing the house and it would be best if she left with her



brother for support. R/O also told Donna officers would need to speak with her later in the day to further discus the investigation. Donna told R/O to contact her anytime at Ralph's. Ralph Roberts provided R/O, his address, 931 Kirwan St., Austintown, Ohio, telephone number (330) 792-9554 and told R/O to call if anything was needed. Ralph told R/O, Donna could stay with him as long as needed. Ralph also gave R/O his and Donna's parent's address and telephone number, Mike and Pauline Roberts of 406 South Racoon Rd., Youngstown, Ohio 44515, (330) 792-4987.

While conducting the crime scene inventory the telephone rang. At 3:38am R/O answered the portable telephone, which was upon the dining room table. R/O said hello several time and the caller hung up. R/O entered *57 and *69, causing a telephone trace of the call to be done by the telephone company. When R/O entered *69 an electronic transmission indicated the previous telephone call came from (330) 506-0373. At 3:48am, R/O called said telephone number and whoever answered the telephone immediately hung the telephone up without saying anything.
R/O observed two life insurance polices on Robert Fingerhut, both together inside a cabinet on the upper left side of the master bedroom headboard. These two policies were on top of all the other documents in the cabinet. One of the life insurance policies was with State Farm Insurance valued at $300,000.00; the effective date was from 08-12-99, policy number LF-1717-3705, agent Cathy Thomas, (330) 793-1136. The other was with New York Life and it was also a life insurance policy valued at $25,000.00, effective 02-12-01, policy number AO966059, telephone number 1 (800) 695-5164.

R/O conducted the inventory at the crime scene and cataloged the items removed. R/O also administered a gunshot residue test on Donna Roberts before she left the residence. Det. Sgt. Dillon noticed what appeared to be a small amount of blood on Donna's shirt. Donna told R/O she never touched anything at the house nor did she touch Robert. R/O asked Donna if she could change her shirt and allow officers to look at the yellow shirt she was wearing and Donna complied. While at the scene R/O opened the trunk compartment of Donna Roberts's vehicle. Red 2000 Chrysler 300m, Ohio license number CPA 8226. Inside the trunk R/O found a brown paper bag with the name Nate Jackson and the number 399-469 upon the bag. R/O looked inside the bag and found men's clothing and a second bag containing the items listed on HPD property form as item # 26. Part of item # 26 is 145 hand written letters to Nathaniel Jackson by Donna Roberts.

Those items remained with the all other items secured at the scene. The vehicle was towed by May's Towing to the Trumbull County Sheriffs Department for further processing. Det. Leshnack followed the vehicle in tow and secured it indoors at the Trumbull County Sheriffs evidence-processing garage. Det. Leshnack and Det. Sgt. Pizzulo of the Trumbull County Sheriffs Department later processed the vehicle. At



# HOWLAND POLICE DEPARTMENT
### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:      01-078868
Date:          12-12-01
Investigator: Sgt. Dillon
Page 1 of 5



0011 Hours – I received a telephone call at my residence from Howland PD Officer Albert E. Ray asking me to respond to 254 Fonderlac Dr. SE in reference to a dead body being discovered in the residence. I told Ptl. Ray that I would be enroute shortly.

0026 Hours – I notified the Trumbull County 911 Dispatch Center that I was enroute to the scene.

0029 Hours – I notified the TC911 that I was on the scene.

Upon my arrival, I spoke with Ptl. Ray who informed me that Donna Roberts had called 911 to inform them that she had returned home and found her husband Robert Fingerhut laying on the kitchen floor. Ptl. Ray told me that he and Ptl. Ron Pollcino arrived on the scene and were met in the front yard by a hysterical Donna Roberts, who came running out the front door of the residence with the phone.

Upon entering the residence, I was informed by Howland Fire Department paramedic George Beck that he had checked the victim's vital signs, he was unable to locate any and that the victim appeared to be expired. I approached the area where the victims body was and noted that the victim was laying face down on the floor to the east of the man doorway that leads from the attached garage into the kitchen. I noted that the victim was laying with his head to the south and his feet to the north. I noted that the victims left arm was raised above his head. I noted that the web of the victim's left hand appeared to have a bleeding wound between his first finger and his thumb. The victim's right arm was resting below his shoulders and was pointing towards his feet. I noted a pool of blood underneath and around the injury to the victim's left hand. I noted a pool of blood underneath and around the victims head and blood drops and smears of blood to the right, (west), of the victims body between his body and the open door. I also noted blood spots north of the victim's feet. A pair of boots rested on the floor above the victims left arm, a green thermos type mug, blood, miscellaneous papers and a case of Pepsi Cola in cans lay between the victims body and the kitchen cabinets and countertops to his east. I noted that a rug at the feet of the victim appeared to have been moved by the victim's feet as he fell to the floor and a case of bottled water was resting to the right


EXHIBIT
26

of his feet. I noted the victim was wearing a red satin Cincinnati Reds medium weight sports jacket, a baseball uniform shirt of some type, (white with red pinstripes), blue jeans, white athletic socks and dirty white high top tennis shoes. The floor to the right, (west), of the victim's torso had scattered blood pooling in many different spots. I noted just outside the door, (on a step in the garage), lay a stainless steel handgun with brown wooden grips. The weapon was lying near the southwest edge of the step, pointing north. There was blood on the step and what appeared to be a partial footprint in the blood near the gun. I noted blood on the kitchen cupboard to the left of the victims body, (on the eastside), below the kitchen counter. Blood was on the wall to the left of the victim's head and the kitchen cabinets below the countertop, (in the southeast corner). There was blood both in the southeast portion of the cupboard below the counter as well as from the southeast corner to the northeast corner. I noted blood just north of the victim's feet on the kitchen floor also.

The victims wife, Donna Roberts told us that the victims vehicle was missing from the garage. I asked Donna if she had any idea who may have the vehicle and she stated she didn't. TC911 was notified and a BOLO was put out on the LEADS/NCIC computer system listing the vehicle as stolen. I asked Donna Roberts if the man door from the garage into the kitchen was routinely kept locked or if it was kept unlocked. Donna Roberts told me that she and the victim kept the door unlocked because they had the electric garage door opener on the overhead door of the garage and that made it very secure. I asked Donna Roberts to calm down long enough to tell me briefly what had happened this evening. Donna began to talk, then suddenly stated, "I can't take this, everywhere I look, everything I see, is Robert laying there on the floor, with all that blood!" I calmed Donna down and again asked what happened tonight. Donna eventually calmed down enough to tell me that she had talked with Robert earlier this evening on the telephone several times, the last time she said she thought it was on his cellular phone. Donna told me that Robert told her that he was going to be a little late and that she should go out shopping since he knew she loved to shop. Donna told me that as a result of her conversation with Robert she left the house and went to Giant Eagle on E. Market St., Wal-Mart on Elm Rd. and Super Kmart on SR46. Donna told me that she didn't buy anything at Giant Eagle or Super Kmart, but she did buy something at Wal-Mart and the bag was on the kitchen table. Donna told me that when she came home, she turned down her street and as she approached her house, she hit the button to open the overhead garage door. Donna told me she was startled because she saw the light come on and the door began to go down. Donna told me that she thought that was unusual because Robert never left the door standing open when they weren't at home. Donna told me that she pulled into the garage, got out of the car, walked around the back of it and over to the door that leads from the garage and it was standing open. Donna told me that was when she saw Robert laying there. Donna then began to shout, Oh My God, Oh My God, I can't believe my Roberts on the floor bleeding, I can't get that picture out of my head!" I gave Donna



some time to calm down again and asked her what she did when she saw Robert. Donna told me that she, "freaked out," ran into the kitchen and grabbed the portable phone, ran into the bedroom and called 9-1-1. Donna told me that then she realized that someone may still be in the house, so she ran out the front door while on the phone and the police arrived about that time. I asked Donna if she saw anybody near the house or on the property when she was coming down the street and she said no.

As we waited for the arrival of the coroner's office, Ptl. Pollcino and I began checking the interior of the residence for any evidence that someone else may still be in the house as well as any evidence that items may have been taken from the house. Ptl. Pollcino and I checked the entire interior of the residence, no one was located and nothing appeared to be missing from our point of view, (no obvious things such as TV's, VCR's, Stereo Components, Computer Equipment, etc.). However, we did find what appeared to be a droplet of blood on the ceramic tile floor in the hallway that led from the front door to the master bedroom. The droplet was later swabbed by Det. Leshnack and entered into evidence, since it was the only sign of blood evidence in the residence other than the area where the victims was found. After an interior check, I exited the residence and made a complete check of the exterior of the residence for any signs of forced entry, with negative results. Inside the residence itself, I found damage to the main bathroom door near the doorknob. I was unable to locate any signs of damage to any of the exterior man doors or windows. Upon checking the interior of the garage, I noted a metal support bar that ran along the entire inside of the bottom of the overhead door panel was damaged, it appeared to have been partially detached from the door itself and the parts were laying on the garage floor. While checking the exterior of the residence, I noted what appeared to be vehicle tire tracks in the front yard on the north side of the driveway in the northeast corner of the lawn. I also detected slight rubber tire marks on the roadway that appeared to travel south on Fonderlac SE, from the marks on the lawn.

A short time later Trumbull County Forensic Pathologist Dr. Humphrey Germaniuk arrived and began his investigation of the scene. Upon the arrival of Dr. Germaniuk, Shelley Mazanetz of the coroner's office also arrived to assist. At the direction of Howland PD Det. Sgt. Paul Monroe, I began to videotape the area around the body. Upon the arrival of Det. Anthony Leshnack of the Trumbull County Sheriff's Office, photos of the entire residence began.

While conducting our investigation inside the residence, Donna Roberts could be repeatedly heard screaming hysterically, "Oh My God, has Robert been stabbed in the face, Oh My God, why isn't he moving, I can't believe I came home to find my Robert like this," from the master bedroom. At the same time, I noted that Donna would stop shouting hysterically and then become quiet. On one occasion when Donna Roberts stopped screaming, I walked back toward the bedroom from the



dining room and found Donna standing in the bedroom doorway leaning against the door frame listening attentively to any and all conversations the officers on the scene were saying. I startled Donna Roberts and when she noticed me in the hallway, she began to break down again, screaming, "Why isn't my Robert moving, I can't believe that I saw him that way!" I remained in the master bedroom with Donna Roberts while Det. Sgt. Monroe entered and conducted gun shot residue tests on Donna Roberts hands. While in the room, we noticed what appeared to be bloodstains on the front of the shirt Donna Roberts was wearing near the bottom. The shirt was also collected and entered into evidence. Upon my initial entrance into the residence, I noticed a tray on the dining room table with stems and seeds that appeared to be marijuana as well as matches, cigarette rolling machines, cigarette rolling papers, 2 empty plastic sandwich size baggies and several small pipes that are commonly used to smoke marijuana and crack cocaine. Det Sgt. Monroe and I asked Donna if the drug paraphernalia was the victims and she replied that it was not and insisted that it was hers.

I began checking the entire residence for prescription medication that belonged to the victim as well as Donna Roberts and collected a very large inventory list of medication throughout the residence. Donna Roberts informed me that the victim was taking medication for allergies and high cholesterol.

From that time on, I assisted Dr. Germaniuk, Det. Leshnack and Det. Sgt. Monroe with the collection of evidence. Upon the inspection of the handgun on the step outside the man door by Det. Leshnack, it was learned that the weapon was loaded with five live rounds and no spent rounds.

At approximately 0150 hours, Donna Roberts brother Ralph Roberts and his wife Rita Roberts arrived on the scene to assist Donna in her time of need. Det. Sgt. Monroe asked Mr. Roberts if it was possible for him to take Donna to his residence for the night to get her away from the graphic scene at the residence as well as to provide her with the emotional support she would need at this time. Mr. Roberts told Det. Sgt. Monroe that he would take Donna home. I was standing in the dining room of the residence at the time of Mr. Roberts and his wife's arrival. Prior to Donna Roberts leaving the residence and while in the hallway between the master bedroom and the front door, Det. Sgt. Monroe explained to Donna, Ralph and Rita Roberts that it was best that she leave the house because we, (the police), were going to be there for some time and the entire residence would have to be checked for any evidence of this crime. Det. Sgt. Monroe stated to Donna Roberts, "We are going to have to go through the entire house and check everything Donna." I noted Donna's response to Det. Sgt. Monroe to be, "You do whatever you have to do, I don't care." Donna Roberts then began to explain to her brother Ralph for the second time that her Robert was just laying there and wouldn't move and that it looked like someone stabbed him in the face. Dr. Germaniuk began his inspection of the victim's body by rolling him over. Upon my initial look at the front of the victim's body, I noted his



Page 5 of 5

face was covered in blood and snot was evident from his nose. I noted the right side of the victim's face and back of his head were swollen and out of proportion. Dr. Germaniuk inspected the victim's head and found a wound on the back near the top. As Dr. Germaniuk began removing the victims clothing, he discovered a bullet inside the layers of three shirts the victim was wearing, as well as bullet holes in his clothing and jacket. I noted that when all the victims shirts were removed, he had a wound on the back of his right upper arm along with what Dr. Germaniuk described as a graze wound on his back near the top to the right of the center of his back. Ptl. Pollcino then found a hole in the ceiling of the basement stairway, (which was directly across the kitchen), (directly north), of the man door from the garage into the house. Another bullet was later recovered from inside that ceiling above the basement stairs.

Eventually during the investigation of the interior portion of the crime scene, Donna Roberts car was removed from the garage. Once it was moved, we discovered a pair of glasses with brown plastic frames as well as a lens from the glasses lying on the floor. I videotaped the glasses where they lay as well as the lens, the damaged rail on the interior of the overhead garage door and the parts from it that were on the garage floor.

O627 Hours – I cleared the scene of the crime. Report on file, investigation to continue.

Signature: _____     Date: _12-12-01_



# HOWLAND POLICE DEPARTMENT

### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:     01-078868
Date:         12-12-01
Investigator: Sgt. Dillon
Page 1 of 2



The following is a list of prescription medications found in the residence that were written in the name of the victim Robert S. Fingerhut:

In a Kitchen Cabinet
     1) Naproxen - 500mgFull   3-28-00
     2) Naproxen - 500mgFull   2-16-00
Main Bathroom Cabinet
     1) Naproxen - 500mgFull   Dr, Benjamin Kulper
     2) Sonata - 10mg        8-25-01
     3) Alprazolam - 1mg    12-01-01
     4) Diazepam - 5mg      5-04-01
     5) SodSulfacet - 10% OPSOL 12-05-97
     6) Allegra D - 60    120ER Tab
Master Bedroom Cabinet on the Headboard of the Bed
     1) Allegra - 60mg      10-22-01
     2) Lipitor - 10mg       12-01-01
     3) Metroprolol - 50mg   11-17-01
     4) Metroprolol - 50mg   10-28-01
     5) Lorazepam - 2mg     6-14-01
     6) Lipitor - 10mg       11-03-01
     7) Allegra - 60mg      11-05-01
     8) Metroprolol - 50mg   12-13-98
     9) Allegra - 60mg      12-14-98

Per Donna M. Roberts, Mr. Fingerhut was a non-smoker.



EXHIBIT
27

The following is a list of prescription medications found in the residence that were written in the name of the victims wife, Donna M. Roberts:

In a Kitchen Cabinet
    1) Hydroxyn Pam - 50mg    5-26-00        Full
    2) Ibuprofen - 600mg    11-15-99
    3) Hydroxyn Pam - 50mg    5-12-00
    4) Skelaxin - 400mg    7-26-99
    5) Risperdal - 2mg    3-01-01
    6) Premarin - 0.9mg    4-28-01
    7) Hydroxyz - 25mg    2-25-00
    8) Hydroxyz - 50mg    6-08-01
    9) Paxil - 20mg    12-09-00
    10) Medroxyp AC - 10mg    1-04-01
    11) Depakote - 250mg    11-09-00
    12) Hydroxyn Pam - 50mg    6-03-00
    13) Wellbutrin SR - 100mg    6-08-01
    14) Meclizine - 12.5mg    9-12-99
    15) Despramine - 25mg    6-25-99
    16) Paxil - 10mg    2-03-01
    17) Xenical - 120mg    8-31-00
    18) Correctol/Laxative Tablets

Front Living room Table
    1) Depakote - 250mg    10-21-01
    2) Wellbetrin SR - 150mg    11-13-01
    3) Wellbetrin SR - 150mg    12-03-01
    4) Hydroxyn Pam - 50mg    12-03-01
    5) Hydroxyn Pam - 50mg    11-13-01

Donna M. Roberts told me that she was a smoker and smoked Newport brand cigarettes.

Signature: _____        Date: 12-12-01



(1)

MONROE :

ASK FOR LIST OF EFFECTS FOUND ON RSF :

BESIDES $300 IN CASH

A $3500 GOLD BRACELET WITH DIAMOND INITIALS

A $1200 WATCH (DMR BOUGHT FOR HIM AS A GIFT)

A SOLID GOLD STAR OF DAVID CHARM

5 OR 6 GOLD CHAINS - BIG + THICK

3 OR 4 OTHER CHARMS - SOLID GOLD

DMR BOUGHT IT AS A WEDDING GIFT 1983

LAW IT ERE

MONROE HAD 10 DAYS TO ESTABLISH OWNERSHIP OF AUTOMOBILE AND HOUSE - HE DID NOT. I ASKED HIM HOW COULD I STEAL MY OWN PROPERTY. HE DIDN'T CARE.

HE WAS SO HAPHAZARD AND JUDGEMENTAL THAT AS SOON AS HE READ EXAGGERATED 'PRISON TALK' HE WANTED IT TO BE CAPITAL MURDER - A BIG CASE FOR HIM TO MA A NAME FOR HIMSELF - BE IN THE MEDIA.

EXHIBIT 2P

10 DAYS. ISN'T THIS A CASE OF A "RUSH TO JUDGEMENT? A WHITE WOMAN + A BLACK MAN - YOUN A WHITE MAN IS DEAD. HE WAS RELENTLESS.

BY CHARGING DMR + NEJ WITH A CAPITAL MURDER - HE KNEW THERE WOULD BE NO BONDING OUT. WE SIT HERE NOW FOR ALMOST 11 MONTHS. AS A RESULT - DMR LOST A HOME, 2 CARS, 2 BUSINESSES, 2 APT. BLDG. A HOUSE FULL OF FURNISHINGS AND 2 10 YEAR OLD MOMMIES LITTLE GIRLS - FLUFFY + BLOSAM.

ADULTERY IS NOT MURDER

BECAUSE MONROE WANTED DRAMA - HE THOUGHT THE 'PRISON' LETTERS + CONVERSATIONS WERE 100% TRUE.
TALK

THEREFORE, HE WENT TO DMR HOUSE ALMOST DAILY TO LOOK FOR NATE.

HE HAS TAPES OF CONVERSATIONS OF NEJ +

DMR THAT HE GOT IN THE BEDROOM WHERE HE INSTALLED HIS TAPE MACHINE. WHERE ARE THESE TAPES??? CONVENIENTLY MISSING? 3 TIMES HE SENT THE SWAT TEAM WITH DOGS IN TO ARREST DMR THINKING IN HIS MELODRAMATIC MIND THAT THERE WOULD BE A GOOD OLE WESTERN SHOOT OUT.

WHEN DMR CAME FROM HER GARAGE AND 3 CARS
OUT
FOLLOWED HER, STOPPED HER ON THE HIGHWAY SCARED THE DAYLIGHTS OUT OF HER PULLING HER TO "CHECK THE TRUNK FOR NEJ!" HONEST.

MONROE WENT TO TCJ ON THE FIRST DAY OF DMR INCARCERATION TO GET A DNA SAMPLE TO COMPARE IT WITH DNA THAT WAS ON CONDOMS IN MOTEL ROOM — JUST TO SHOW HE THOUGHT A WHITE WOMAN + A BLACK MAN WERE TOGETHER MERE DAYS AFTER RSF DEATH. WHY. WHAT DID THIS HAVE TO DO WITH MURDER?

# EVERY GUY WHO TALKS TOUGH.

EVEN THEY SHOULD'T BELIEVE EVERYTHING THEY READ OR HEAR! 4 (LETTERS & TAPES

## P. MONROE :

PRESUMED ALL THE MISINFORMATION AS FACTS.

RUSH TO JUDGEMENT CAUSED JACKSON AND ROBERTS TO BE ARRESTED FOR CAPITAL MURDER — NO BOND — HE NEVER CHECKED OWNERSHIP OF VEHICLES HE SAID WAS STOLEN.

FINGERHUT HAD A $3000 GOLD + DIAMOND BRACELET ON. HIS $1200 WATCH WAS STILL ON HIM. CREDIT CARDS AND CASH.

THEY HAD 10 DAYS TO INVESTIGATE THIS TO BE SURE PROPER CHARGES WERE FILED

AS SOON AS DMR TOLD HIM ABOUT JACKSON — HIS MIND WAS MADE-UP OF NE'S GUILT. HE WENT TO THE HOUSE ALMOST EVERY DAY. HE TAPED CALLS FROM ROBERTS BEDROOM PHONE TO JACKSON. FULL CO-OPERATION. MR. BACON FOLLOWED ROBERTS ONE DAY WITH OTHER POLICE UNITS — GOT HER OUT + DEMANDED SHE OPEN THE TRUNK ASSUMING JACKSON WAS IN IT

SWAT TEAM TO ARREST ROBERTS THINKING JACKSON

THIS ENTIRE CASE WAS MISHANDLED AT IT'S ONSET. AS SOON AS MONROE (P.M.) ASK DMR IF SHE HAD A BOYFRIEND AND SHE SAID SO IMMEDIATELY - SHE WAS GUILTY IN HIS MIND. CASE OVER. NOW: A CONCLUSION AND LET'S MAKE THE EVIDENCE FIT AROUND IT. TOUGH THUG TALK. TOUGH PRISONER TALK = TAKEN AS THOUGH IT WAS 100% TRUE.

IN 10 DAYS - FROM 12/11 TO 12/21, THE ARREST THAT WAS WHAT THEY WENT BY. IN THEIR EFFORT FOR DRAMA, THEY ADDED BURGLARY AND THEFT SO THAT THE "2 LIVING VICTIMS, DMR + NEJ WOULD BE CHARGED WITH CAPITAL MURDER, HENCE, NO BOND, SINCE 12/21/01. THIS IS AN UNFORGIVEABLE ABOMINATION. ONE WOULD PRESUME THAT BEFORE ARRESTING TWO PEOPLE WITH SUCH SEVERE CHARGES, THERE WOULD BE AT LEAST SOME INVESTIGATING TO ESTABLISH OWNERSHIP OF WHAT THEY CALLING STOLEN PROPERTY THUS SECURING THE CAPITAL CHARGES. DMR EVEN ASKED REPEATEDLY - HOW CAN I POSSIBLY STEAL MY OWN PROPERTY? NEJ ALWAYS DROVE THE CARS. HE HAD ETERNAL PER PERMISSION FROM THE OWNER: DMR. THEY CAUSED NEJ TO BE IMPRISONED FOR ALMOST A YEAR RATHER THAN - HAVING COME OUT OF PRISON CLEAN, NO PAPERS, HE INTENDED TO SECURE EMPLOYMENT AND START A NEW LIFE. DUE TO NO BOND FOR THE 'CAPITAL' CHARGES, DMR LOST HER ~~1st~~ LIFE! HOMES, BUSINESSES, CARS, COLLECTIONS ~ SPORTS, DOLLS, JEWELRY, CRYSTAL, 2 APT BLDG., DOGS. WHO WILL ANSWER FOR THIS PAUL MONROE? WHO? GOT ALL THE ANSWERS? HIDING EVIDENCE ARE YOU PAUL?



# Trumbull County Sheriff's Office
## Supplemental Report
### Investigative Division

Case # 2001-08795    12/12/01

## Victim: Robert Fingerhut (Homicide Scene/Investigation)
### 254 Fonderlac, Howland Twp.

At approximately 0012 Hrs. on 12/12/01, this officer was contacted at home by Det. Sgt. Paul Monroe of the Howland Township Police Department to assist with photographing a crime scene. This officer responded and took photographs of the entire scene (inside and out). I assisted Dr. Germaniuk with photographing and removal of the body. This officer volunteered to sketch the crime scene. One possible bloodstain was swabbed from the ceramic floor in the front door hallway and taken as evidence. This officer requested that Howland P.D. hold the scene so that myself and Det. Sgt. Pizzulo could return for further crime scene processing.

Det. Sgt. Pizzulo was unavailable for work this day. This officer returned at approximately 1400 Hrs. on 12/12/01 to collect additional bloodstain evidence and possible fingerprint evidence. Selected points in the kitchen and garage were processed for prints, including: the counter area near the body, some cups and glasses from the counter, and the screen door and man door between the kitchen/garage. Four bloodstains were taken from different locations as evidence. A placemat with a partial fingerprint in blood was taken as evidence and was located hanging on the inside of the kitchen/garage door.

On 12/13/01, Det. Sgt. Pizzulo accompanied this officer back to the scene. Additional photographs were taken of the scene. Four additional bloodstains were taken from the garage floor. Nothing further to report at this time.

Detective Anthony Leshnack



EXHIBIT
29



**Trumbull County**
**Sheriff's Office**

Investigative Division
Det. Sgt. Peter J. Pizzulo
Administration          (330) 675-2540
Desk / voice mail      (330) 875-2506
Pager                        (330) 675-0988
Fax                           (330) 675-7012

# Lab Report

Case #   Common Pleas  01-CR-794

From:     Det. Sgt. Peter J. Pizzulo

CC:        file, Howland PD, TCSO

Date:     Wednesday, May 01, 2002

Re:        Nathaniel E. Jackson , Judgement Entry Order

---

On 24 April 02 Judge Stuard issued an order for Handwriting Exemplars to be taken from Nathaniel Jackson.  Mr. Jackson's Council Anthony Consoldane agreed that this would be done on 29 April in Judge Stuard's Jury room.

Investigators met with Attorney Consoldane at 1230 on 29 April and after some discussion with Judge Stuard, it was acceptable that the Exemplars be done in an interview room of the TCSO Jail. Originally Mr. Jackson was to re-write a 4 page letter three times for submission to BCI&I. After some conversation between Attorney Consoldane and Prosecutor Watkins it was acceptable for him to re-write the first and last pages only along with addressing an envelope three times.

At approx. 1250 on 29 April with Attorney Consoldane present Mr. Jackson was given the sample pages and asked to re-write them.

At 1320 Hrs Mr. Jackson stated that he did not want to continue due to the discomfort he was experiencing in his hand.   (NOTE)  Due to an injury that Mr. Jackson had incurred at the time of the alleged offence he can not use is index finger when holding a pen or pencil.

It was agreed by Attorney Consoldane that we would continue on 30 April 02 at 1100 hrs.  The Exemplar that was completed so far was sealed in an envelope with Attorney Consoldane Witnessing.

30 April 2002, 1100 hrs  Det. Sgt. Monroe and Contacted Mr. Jackson about continuing the Exemplar, he stated that he will no longer comply with the request and that he has contacted the Public Defenders office with his decision.    Attorney Consoldane was made aware of Mr. Jackson's unwillingness to continue.  County Prosecutors office was made aware of the status.

● Page 1

**EXHIBIT**
**30**

01 May 2002, I spoke with Attorney Considane via telephone.

Attorney Considane indicated that he spoke with Nathaniel Jackson about his unwillingness to continue with the Exemplars and confirms that Mr. Jackson will not be providing further handwriting samples at this time.

The Exemplar that was obtained on 29 April was turned over to Det SGT Monroe for transport to BCI&I.

DET SGT Peter J. Pizzulo , TCSO



## PROPOSITION OF LAW NO. 2

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE DEFENDANT'S PREJUDICE.  U.S. CONSTITUTION, AMENDMENT VI; OHIO CONSTITUTION, ARTICLE I, SECTION 10.

The Sixth Amendment right to counsel applies to the states through the Fourteenth Amendment.  Gideon v. Wainright (1963), 372 U.S. 335.  The test for whether that right has been violated is found in Strickland v. Washington (1984), 466 U.S. 668, which obliges reviewing courts to determine if counsel's performance is deficient. Id. at 687.  If counsel's performance is deficient, the reviewing court must determine if the accused was thereby prejudiced.  Id.  In order to establish prejudice, the accused need not establish outcome determinative error.  Id. at 693-694. State v. Clifton (1999), 85 Ohio St. 3d 433, 450.  Instead, the accused is prejudiced when the reviewing court loses confidence in the fairness of the trial.  Id.

Strategic choices by appointed counsel are virtually unassailable.  Id. at 690.  Strickland makes clear, however, that a reasonable investigation of both the facts and the applicable law is required before counsel's choice may be deemed strategic.  Id. At 691.  Furthermore, Strickland requires that appointed counsel in a criminal case meet a "duty to advocate the defendant's cause . . . [and] . . . bring to bear such skill and knowledge as will render the trial a reliable testing process." Id.  At 688.  Federal courts have consistently recognized that Strickland's duties to advocate and to employ "skill and knowledge" include the necessity for trial counsel to object or otherwise preserve federal issues for review.

11


EXHIBIT
31

Gravely v. Mills (6th Cir. 1996), 87 F.3d 779; State v. Lockhart (8th Cir. 1994), 23 F.3d 1280;

**Argument:** Nathaniel Jackson's Sixth Amendment right to counsel was violated by defense counsel's prejudicially deficient performance at both phases of this capital case.

**Defense counsel failed to object to the prosecution's extraction of guilty verdict and death verdict promises from all twelve impaneled jury members during the voir dire phase of the trial.**

It is improper in voir dire to extract promises from a jury. State v. Powers (10th App. Dist.), 1992 Ohio App. LEXIS 1009; State v. Treesh (11th App. Dist.), 1998 Ohio App. LEXIS 4886; State v. Treesh (2001), 90 Ohio St. 3d 460.

In the instant cause, the prosecuting attorney extracted promises from all twelve impaneled jurors that each would render a finding of guilty in the trial phase of the case if the State proved all elements of its case by proof beyond a reasonable doubt, and that each would render a verdict of death if the state in the penalty phase proved beyond a reasonable doubt that the aggravating circumstances in the case outweighed any mitigating factors which the defendant might offer. (TR- 686-87, 936, 952, 955, 1044, 1163, 1165, 1260, 1289, 1316, 1346, 1389, 1400, 1494, 1502).

In general, the purpose of voir dire of a prospective juror is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. Pavilonis v. Valentine (1929), 120 Ohio St. 154, 165 N.E. 730, paragraph one of the syllabus. The primary purpose of voir dire examination in a capital murder case is to determine whether a juror will truly consider aggravating circumstances and mitigating factors in determining appropriate penalty and not ultimately vote to impose the death

12

penalty merely because a murder has been committed. See Morgan v. Illinois (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222. The purpose of voir dire is not to prejudice a jury and predispose its verdict or viewpoint prior to the offer and consideration of evidence.

In State v. Treesh, supra, at 465, this court held that notwithstanding the timely objection by defense counsel to the prosecutor's extraction of promises for a guilty verdict, and counsel's argument that said conduct constituted constitutional misconduct which created a biased and partial jury, that Treesh "ha[d] failed to demonstrate how the question affected a substantial right." Id. at 465.  In the case sub judice, defense counsel failed to object to any of the extracted promises from the twelve jurors impaneled who ultimately found defendant guilty and recommended a sentence of death.  Although this court has previously held that "'the failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel,'" where "appellant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial..." State v. Hanna (2002), 95 Ohio St. 3d 285, citing State v. Holloway (1988), 38 Ohio St. 3d 239 at 244, appellant notes that failure of counsel to object to the prosecutors extracted promises thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test.  State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury and one that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in this duty by allowing the prosecutor to condition and predispose the jury to a guilty and death sentence mindset; and that the so-called "death qualification" of the jury as

13

recognized in Witherspoon took on an expanded and new meaning in the instant cause and thereby prejudiced the right of defendant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Counsel repeatedly failed to object during voir dire to the prosecutor's comments and questions which sought to limit the type of mitigating factors which might justify a sentence other than death.**

During voir dire, the prosecutor questioned ten of the twelve impaneled jurors on matters relating to mitigation, limiting his examples of mitigators that might compel a jury to vote for life instead of death to "mental disease or defect" (TR- 826, 923, 959, 1164, 1258) and to youthful "age" (1288, 1314, 1344, 1396, 1500).  Notwithstanding that the purported use of these mitigators was to insure that the jury would nonetheless weigh aggravating circumstances against mitigating factors, regardless of their type or variety, the use of just two mitigators by the prosecutor, which he acknowledged as perhaps justifying life, and which he knew were inapplicable to the appellant, nonetheless conditioned and predisposed the jury to await for those mitigators and those mitigators only during the penalty phase. Defense counsel failed routinely and repeatedly to object to this inappropriate trial tactic, which effectively denigrated appellant's mitigation evidence.

In State v. Jones (2001), 91 Ohio St. 3d 335, this court considered the claimed error of appellant who argued that he should have been permitted to ask prospective jurors about their views on specific mitigating factors; that the trial court's refusal to permit that line of questioning left several jurors confused as to the meaning of mitigation; and that his inability to ask about specific mitigating factors, coupled with juror confusion about the meaning of

14

mitigation, limited his ability to uncover potential biases in prospective jurors and may have resulted in the empanelling of jurors who were unwilling to consider mitigating evidence.

In rejecting appellant's claim, this court held that "[d]uring voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors, State v. Wilson (1996), 74 Ohio St. 3d 381, 385-386, 659 N.E.2d 292, 300-301; State v. Lundgren (1995), 73 Ohio St. 3d 474, 481, 653 N.E.2d 304, 315, [and that] [r]ealistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." State v. Jones, supra, at 338.

In light of Jones, supra, it is clear that the prosecutor in the instant cause was improperly asking jurors to weigh and consider specific mitigating factors during voir dire, all of which he limited for his own purpose, and all without routine objection from appellant's counsel. Again, by failing to object to the prosecutors misconduct, counsel for appellant thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test.  State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury that was open to considering mitigation evidence of any variety and that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in his duty by allowing the prosecutor to condition and predispose the jury to consider only two mitigating factors which were given the imprimatur by the prosecutor of possibly being worthy of a life sentence verdict; and that the failure, inaction and unawareness of his trial counsel to the law

15

thereby prejudiced the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

### Defense counsel failed repeatedly to object to inappropriate statements and misconduct of the prosecutor during voir dire that materially prejudiced and predisposed the jury to guilty and death sentence verdicts.

During voir dire, the prosecutor made inappropriate statements to five impaneled jurors, either by mis-stating the law or discussing facts and evidence not alleged in the indictments or proven at trial, all of which prejudiced and predisposed the jurors to guilty and death sentence mindsets, namely, (1) that "[t]he first trial deals with the state proving beyond a reasonable doubt, the defendant committed aggravated murder" (TR- 820); (2) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?" (TR- 826); (3) "So we're dealing with charges where the person committed the crime, the defendant is alleged of killing a homeowner" (TR- 930); (4) "in this case the aggravating circumstances accuse the defendant of purposely killing a homeowner in the commission of an aggravated burglary" (TR- 1046); (5) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the defendant's guilt based only on the evidence, right?' (TR- 1157); and (6) "In this case, the defendant is charged with killing a homeowner in an aggravated murder" (TR- 1392-1393).

During voir dire, it is improper for counsel to discuss evidence. State v. Johnson (8th App. Dist.), 1997 Ohio App. LEXIS 100. In the instant cause, the prosecutor not only mis-stated the law during voir dire, but also sought on three occasions to repeatedly discuss evidence with jurors ultimately empanelled, that would not be proven, namely, that the

16

defendant killed a homeowner, a fact that the prosecutor would ultimately acknowledge during trial as wrong (TR- 3383, 3397), only to re-assert the mis-statement of fact and evidence three times during final argument in the penalty phase, namely: that "it was his specific intent to kill the victim, to commit an aggravated murder against a homeowner" (Penalty Phase TR- 142/2-4); that "it can't get any worse than being in prison and planning the execution of a homeowner who just comes home" (Penalty Phase TR- 142/19-21); and that "[i] t is the worst form. The other is that after he kills a homeowner" (Penalty Phase TR-143/15-16).

Appellant's counsel sat silently during voir dire without objection as the prosecutor mis-stated the law and commented on evidence that would not be proven at trial, and only finally objected to the prosecutor's mis-statement of fact after the prosecutor's third re-statement of the error during final argument in the penalty phase (TR- 143/17-18).  By reason of this negligence and inaction, counsel failed repeatedly in their duty to appellant by allowing the prosecutor to appeal to the passion of the jury and thereby predispose it to a guilty and death sentence mindset, thereby prejudicing the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel fashioned a defense to death penalty specifications of Aggravated Burglary and Aggravated Robbery under R.C. 2929.04(A)(7) which demonstrated counsel's unawareness of the law relative to the proof and elements of those specifications.**

Appellant was convicted on counts one and two of the indictment charging appellant with the aggravated murder of Robert Fingerhut while committing the acts of aggravated

17

to bear such skill and knowledge as will render the trial a reliable testing process." Id. At

688.  It cannot reasonably be argued that counsel met that standard in this cause, given

counsel's patent unawareness of the law which only became evident to them after close of

the evidence in the trial stage and discussion of jury instructions thereafter with the court and

opposing counsel (TR- 3344-3371).

Appellant submits that counsel had a responsibility to provide him a reasonable and

legally sound defense to the capital charges brought against him; that they failed in that duty

and obligation, and effectively rendered no defense to the capital specifications at the trial

phase; and that the failure of counsel in this regard calls into question whether the trial in this

matter constituted a reliable testing process causing a reviewing court to lose confidence in

the fairness of the trial. *Strickland v. Washington*, supra.

**Defense counsel failed to object to the admission into evidence of State's Exhibits 271D-1 to 271D-139, letters from Donna Roberts to Nathaniel Jackson from January 2001 to December 2001, without requiring authentication of writing as a predicate to admission.**

During the offer of State's exhibits into evidence, defense counsel allowed admission

without objection of 139 letters purportedly written by Donna Roberts to Nathaniel Jackson

between January 2001 to December 2001, which were argued by the State to contain

information and evidence regarding Donna Roberts and appellant's plan to murder Robert

Fingerhut (TR- 2076, 2231, 2294-2302, 3151, 3431-3437).

Unlike the letters from Nathaniel Jackson to Donna Roberts which were admitted into

evidence after authentication of the author was established by testimony of a handwriting

19

analysis expert (TR- 2852-2875), no such authentication was offered for the letters purportedly written by Donna Roberts (TR- 2879). Accordingly, there was no reliable and appropriate predicate for the admission of State's Exhibits 271D-1 to 271D-139. Indeed, the only basis offered for the admission of the letters was through the testimony of Detective Paul Monroe, Howland Police Department, who testified that the letters were recovered from a search of Donna Robert's vehicle and were located in the trunk of her automobile (TR-2294-2295). Given that there was no evidence offered at trial that Donna Roberts admitted authoring the letters that were marked and received as evidence; and given that there was no evidence offered at trial establishing that appellant acknowledged and identified State's Exhibits 271D-1 to 271D-139 as letters he had received from Donna Roberts, the letters purportedly written by Donna Roberts should not have been admitted into evidence.

Because the letters identified by the State as being sent by Donna Roberts to appellant were critical to the State's proof that Donna Roberts and appellant had committed Robert Fingerhut's murder by prior calculation and design, all as set forth in count one of the indictment, for which appellant was convicted and sentenced to death, the admission of said letters through the negligence of defense counsel cannot be considered as a harmless error

Based upon the foregoing, appellant submits that the cumulative effect of the foregoing errors and omissions by trial counsel infringed upon his right to effective assistance of counsel, *Harris v. Wood* (9th Cir. 1995), 64 F. 3d 1432, 1438; that his convictions must be therefore reversed and his case remanded for a new trial; or alternatively, that his death sentence be vacated and his case remanded for re-sentencing.

20



# Ohio Department of Rehabilitation and Correction

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O Box 45699
Lucasville, Ohio 45699-0001

Bob Taft, Governor

www.drc.state.oh.us

Reginald A. Wilkinson, Director

April 19, 2002

Dear

I am in receipt of your request for information regarding the Scott and Byrd executions. I would like to apologize for the delay in responding to your inquiry. While reviewing files, I discovered your request, which I thought I had previously delegated to be completed.    This was my error.

I have enclosed a copy of DRC Policy 001-09, Executions, and I will provide you with information the Department has deemed to be public information.    The Department considers the record and names/roles of persons participating in the execution confidential based on security considerations, as well as the need to protect the safety of the persons involved in the process.

The gurney/bed and the restraints are manufactured by O.P.I., Ohio Penal Industries.

The intravenous equipment was purchased from a commercial source and consisted of:

01). Angiocath Abbocath-T
02). Primary IV Set No. 1820 (70 inch)
03). 0.9% Sodium Chloride, 1000 ml

The generic names of the pharmaceuticals used are:

01). Pancuronium Bromide
02). Potassium Chloride
03). Thiopental Sodium

There is no cardiac monitoring equipment used other than a stethoscope.

Once again, I apologize for the delay in responding.    If you have further questions, please contact me.

Sincerely,

SOUTHERN OHIO CORRECTIONAL FACILITY

James S. Haviland
Warden

TSH/hn

EXHIBIT
32



# Ohio Department of Rehabilitation and Correction

Bob Taft, Governor

www.drc.state.oh.us

1050 Freeway Drive North
Columbus, Ohio 43229

Reginald A. Wilkinson, Director

May 30, 2002

Re:  Your Letter to Warden Haviland dated April 28, 2002

Dear

I am responding on behalf of Warden Haviland to the above referenced letter. There you request certain information regarding the State's execution procedure pursuant to Section 149.43 of the Ohio Revised Code.  Please be aware that Ohio Public Record Law requires public offices to make records available as they are kept in the normal course of business.  It does not obligate them to perform research or create new files. Your letter does not request records.  Rather it requests information about training, procedures, and procurement.  As such, we believe it falls outside the scope of the statute. Nonetheless, the Department recognizes the public has legitimate interests in this subject, and we are providing the following information.

The execution team begins rehearsing the procedure thirty days from the execution date.  On the day of the execution, saline locks are placed in each of the prisoner's arms prior to entering the death chamber.  After the prisoner has been placed on the execution bed, tubing for the delivery of the chemicals is attached to each lock. The chemicals are administered via hand infusion.  Persons performing these functions have been certified as either a licensed practical nurse, paramedic or phlebotomy technician.  The chemicals are infused into one arm.  If the arm becomes unavailable, the other arm would be used.  A Medical Doctor has pronounced death.

The drugs are administered in the following dosages: two grams of thiopental sodium in normal saline concentration; one hundred milligrams of pancuronium bromide in normal saline concentration; and 100 milliequivalents of potassium chloride in normal saline concentration.  The thiopental sodium and pancuronium bromide are purchased from a local pharmacy.  The institution pharmacy purchases the drugs.  It turns the drugs over to the Warden and keeps a record of receipt and usage.  Purchase and record keeping procedures have been coordinated with the Drug Enforcement Agency and the Ohio State Board of Pharmacy.

EXHIBIT
33

I trust this information will be helpful.

Very Truly Yours,

Vincent Lagana
Staff Counsel

Copies: Assistant Director
Warden, SOCF
Chief Counsel

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,
    Plaintiff-Respondent        :        CASE NO. 01-CR-794

                      :        JUDGE JOHN M. STUARD
-vs-

NATHANIEL JACKSON,
    Defendant-Petitioner.               MOTION TO EXTEND TIME
                      :        TO RESPOND

Now comes the State of Ohio, by and through the undersigned counsel, and moves this Court pursuant to R.C. 2953.21(D) to fix the due date for the Plaintiff-Respondent, the State of Ohio's, answer or motion at March 1, 2004.

For cause, Defendant-Petitioner Nathaniel Jackson filed his Post-Conviction Petition with this Court January 5, 2004. The State was not served with a copy of this document until January 12, 2004. The State's current deadline to respond by answer or by motion is January 15, 2004. The State submits that three days is insufficient time to respond to said petition.

As the Court is aware, this is a death penalty case. The petition itself runs forty-three pages in length and is comprised of fourteen causes of action, plus exhibits. Additionally, the record in this matter is most voluminous, spanning sixteen volumes of transcript and over three-hundred exhibits. Undersigned counsel is the sole assistant prosecutor assigned to answer post-conviction petitions. Among her other duties, she is also the only assistant prosecutor assigned



to prepare briefs for both the Eleventh District Court of Appeals and the Ohio Supreme Court. Additionally, counsel also is occasionally assigned to cover matters in the Common Pleas Court.

Furthermore, the State submits Defendant-Petitioner will suffer no prejudice if this Court extends the State's due date. Defendant-Petitioner's direct appeal is pending with the Ohio Supreme Court under case number 03-137. The State has just today filed its merit brief in this matter, and oral arguments are not anticipated before 2005. Therefore, a forty-five day extension granted to the State will not cause an undue delay in the overall post-sentence/pre-execution timetable.

For these reasons, the State respectfully moves this Court to fix the due date for the State's answer or motion to Defendant-Petitioner's Post-Conviction Petition at March 1, 2004.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to Atty. David Bodiker and Atty. Randall Porter (#0005835),  Counsel for Defendant-Petitioner Nathaniel Jackson, Office of the Ohio Public Defender, 8 E. Long Street, 11th Floor, Columbus, Ohio, 43215 on this 14th Day of January, 2004.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,                           :
          Plaintiff-Respondent                        CASE NO. 01-CR-794
                                         :            JUDGE JOHN M. STUARD
-vs-

NATHANIEL JACKSON,
          Defendant-Petitioner.          :            JUDGMENT ENTRY


Pursuant to a motion by the Plaintiff-Respondent, the State of Ohio, and R.C.

2953.21(D), this Court fixes the due date for the State's response by answer or motion at March

1, 2004.  The State, per motion, has shown good cause to extend the due date from January 15,

2004 to March 1, 2004.


                                        IT IS SO ORDERED,

                                        _John M. Stuard_ (signature)

_1/21/04_
DATE                                    _____
                                        JOHN M. STUARD, JUDGE
                                        OF THE TRUMBULL COUNTY
                                        COMMON PLEAS COURT


The Clerk of Courts is hereby ordered to serve
a copy of this entry upon Atty. Bodiker & Atty. Porter,
and the Trumbull County Prosecutor's Office.

_John M. Stuard_ (signature)

_____
JOHN M. STUARD, JUDGE

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,                      :
    Plaintiff-Respondent                  CASE NO. 01-CR-794
                          :      JUDGE JOHN M. STUARD

-vs-                                :

NATHANIEL JACKSON,                        MOTION TO EXTEND TIME
    Defendant-Petitioner.        :        TO RESPOND

     Now comes the State of Ohio, by and through the undersigned counsel, and moves this

Court pursuant to R.C. 2953.21(D) to fix the due date for the Plaintiff-Respondent, the State of

Ohio's, answer or motion at March 31, 2004.

     For cause, Defendant-Petitioner Nathaniel Jackson filed his Post-Conviction Petition with

this Court January 5, 2004. The State was not served with a copy of this document until January

12, 2004. The State's current deadline to respond by answer or by motion is March 1, 2004. The

State submits that this is insufficient time to respond to this petition.

     As the Court is aware, this is a death penalty case. The petition itself runs forty-three

pages in length and is comprised of fourteen causes of action, plus exhibits. Additionally, the

record in this matter is most voluminous, spanning sixteen volumes of transcript and over three-

hundred exhibits. Undersigned counsel is the sole assistant prosecutor assigned to answer post-

conviction petitions. Among her other duties, she is also the only assistant prosecutor assigned



to prepare briefs for both the Eleventh District Court of Appeals and the Ohio Supreme Court.

Additionally, counsel also is occasionally assigned to cover matters in the Common Pleas Court.

Furthermore, the State submits Defendant-Petitioner will suffer no prejudice if this Court

extends the State's due date.  Defendant-Petitioner's direct appeal is pending with the Ohio

Supreme Court under case number 03-137. Both sides have filed their merit briefs, and oral

arguments are not anticipated before 2005.  Therefore, a thirty- day extension granted to the State

will not cause an undue delay in the overall post-sentence/pre-execution timetable. This Court

granted one other extension to the State, and the State does not anticipate the need for any

additional extensions.

For these reasons, the State respectfully moves this Court to fix the due date for the

State's answer or motion to Defendant-Petitioner's Post-Conviction Petition at March 31, 2004.

Respectfully submitted by:

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio          44481

Telephone: (330) 675-2426
Facsimile: (330) 675-2431

COUNSEL FOR PLAINTIFF-RESPONDENT,
THE STATE OF OHIO

<u>PROOF OF SERVICE</u>

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to

Atty. David Bodiker and Atty. Randall Porter (#0005835),  Counsel for Defendant-Petitioner

Nathaniel Jackson, Office of the Ohio Public Defender, 8 E. Long Street, 11th Floor, Columbus,

Ohio, 43215 on this 24th Day of Feb., 2004.


LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

:

STATE OF OHIO,                                    :
     Plaintiff-Respondent                               CASE NO. 01-CR-794

                              :         JUDGE JOHN M. STUARD
-vs-

NATHANIEL JACKSON,                               :
     Defendant-Petitioner.                       :         JUDGMENT ENTRY

       Pursuant to a motion by the Plaintiff-Respondent, the State of Ohio, and R.C.

2953.21(D), this Court fixes the due date for the State's response by answer or motion at March

31, 2004.  The State, per motion, has shown good cause to extend the due date from March 1,

2004 to March 31, 2004.

                           IT IS SO ORDERED,

_3/4/04_
DATE

                           JOHN M. STUARD, JUDGE
                           OF THE TRUMBULL COUNTY
                           COMMON PLEAS COURT

The Clerk of Courts is hereby ordered to serve
a copy of this entry upon Atty. Bodiker & Atty. Porter,
and the Trumbull County Prosecutor's Office.

JOHN M. STUARD, JUDGE

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff, | : | Case No. 01-CR-794 |
| -vs- | : | |
| NATHANIEL JACKSON, | : | |
| Defendant. | : | |

---

## NATHANIEL JACKSON'S AMENDED POST-CONVICTION PETITION

---

Now comes the Petitioner Nathaniel Jackson, by and through counsel, and petitions this Court for post-conviction relief pursuant to Ohio Rev. Code Ann. § 2953.21 as follows:

### I.    JURISDICTIONAL FACTS

1.    On December 28, 2001, the Trumbull County Grand Jury indicted Nathaniel Jackson ("Petitioner") for the offenses of: Aggravated Murder (Count One) in violation of O.R.C. § 2903.01(A); Aggravated Murder (Count Two) in violation of O.R.C. § 2903.01(B); Aggravated Burglary (Count Three) in violation of O.R.C. § 2911.11(A)(1)(2); and Aggravated Robbery (Count Four) in violation of O.R.C. § 2911.01(A)(1)(3). The indictment contained two capital specifications (pursuant to O.R.C. § 2929.04(A)(7)) as to each of the first two counts and one firearm specification (pursuant to O.R.C. § 2945.145) as to each of the last two counts.

2.    Petitioner's trial commenced with voir dire on October 8, 2002, and this Court seated a jury on October 21, 2001 [Tr. 381, 423, 1857, 2050]. The State's case in chief began on October 23, 2002 ]Tr. 2054].

1

3.     On November 6, 2002, at 7:35 p.m. the jury commenced its trial phase deliberations and concluded deliberations for that day at 11:15 p.m. [Tr. 3600]. On November 7, 2002 the jury again commenced deliberations at 9:30 a.m. and deliberated until 1:00 a.m. without reaching a verdict [Tr. 3601]. On November 8, 2002 the jury commenced deliberations at 9:25 a.m. and returned their verdicts at 4:50 p.m. [Tr. 3602].

4.     The jury found Petitioner guilty of all counts and specifications [Tr. 3602, 3612-3617]. As to the capital specification the jury also found Petitioner guilty of being both the principal offender and of acting with prior calculation and design with respect to the capital specifications attached to counts one and two of the indictment [Tr. 3612-3615].

5.     On November 14, 2002 at 1:20 p.m. the trial attorneys started their presentation of the sentencing phase evidence [Sent. Tr. 17]. On the same date at 3:55 p.m., less than three hours later the defense rested [Sent. Tr. 179].

6.     On November 15, 2002, after deliberating for four hours and thirty minutes, the jury returned a verdict recommending that a sentence of death be imposed upon Nathaniel Jackson for the aggravated murder of Robert Fingerhut [Sent. Tr. 181-183].

7.     On December 9, 2002, the trial court imposed a sentence of death upon Petitioner for his role in the aggravated murder of Robert Fingerhut as set forth in count one of the indictment [Sent. Tr. 217].

8.     During the pretrial, voir dire and trial phases of the proceedings, Attorneys Anthony V. Consoline and James L. Lewis represented Petitioner.

9.     During the mitigation phase of the proceedings Attorneys Anthony L. Consoline and Thomas Wright represented Petitioner. Attorney Wright was not qualified pursuant to Ohio Sup. Ct. R. 20 nor was he familiar with the case.

10.     On January 22, 2003, Petitioner timely filed his notice of appeal to the Ohio Supreme Court.

11.     On July 9, 2003, the Clerk of this Court filed the record with the Ohio Supreme Court.

12.     On October 27, 2003, Petitioner filed his Merit Brief with the Ohio Supreme Court. The appellate attorneys raised the following issues:

### PROPOSITION OF LAW NO. 1

APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION AND OVERRULED A MOTION TO SUPPRESS HIS STATEMENT CONTRARY TO THE PROTECTIONS OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### PROPOSITION OF LAW NO. 2

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE DEFENDANT'S PREJUDICE. U.S. CONSTITUTION, AMENDMENT VI; OHIO CONSTITUTION, ARTICLE I, SECTION 10.

### PROPOSITION OF LAW NO. 3

A CRIMINAL DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL IS VIOLATED WHEN THE PROSECUTION ENGAGES IN EXTENSIVE, DELIBERATE, MISLEADING AND PREJUDICIAL MISCONDUCT. U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

### PROPOSITION OF LAW NO. 4

RULINGS OF THE TRIAL COURT ALLOWING IMPROPER EVIDENCE AND ARGUMENT BEFORE THE JURY, AND INAPPROPRIATE COMMENT THEREON BY THE COURT AS TO THE PROPRIETY OF SUCH EVIDENCE AND ARGUMENT, DENIES A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR AND IMPARTIAL TRIAL. U.S. CONSTITUTION, AMENDMENT VI, XIV; OHIO CONSTITUTION, ARTICLE I, SECTION 14.

PROPOSITION OF LAW NO. 5

A DEFENDANT'S SUBSTANTIAL CONSTITUTIONAL RIGHTS ARE INFRINGED BY JURY INSTRUCTIONS THAT RELIEVE THE STATE OF ITS BURDEN OF PROOF BEYOND A REASONABLE DOUBT ON THE MENS REA ELEMENT OF A CAPITAL CRIME. U.S. CONST. AMENDS. VI, VIII, XIV; OHIO CONST. ART. 1 SECTIONS 5, 9, 16.

PROPOSITION OF LAW NO. 6

A CAPITAL DEFENDANT'S RIGHT TO DUE PROCESS IS VIOLATED WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT. U.S. CONST. AMEND. XIV; OHIO CONST. ART. I, SECTION 16.

PROPOSITION OF LAW NO. 7

WHEN THE TRIAL COURT CONSIDERS AND WEIGHS BOTH R.C. 2929.04(A)((7) ALTERNATIVES, AND REDUCES MITIGATION TO A 'JUSTIFICATION,' A CAPITAL DEFENDANT IS DEPRIVED OF THE RIGHT TO INDIVIDUALIZED SENTENCING AND OF HIS LIBERTY INTEREST IN THE STATUTORY SENTENCING SCHEME THUS VIOLATING RIGHTS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 9 AND 16, ARTICLE I, OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 8

IT IS PREJUDICIAL ERROR FOR A TRIAL COURT TO SENTENCE A DEFENDANT TO THE DEATHI PENALTY, WHEN, BASED UPON THE LAW AND THE RECORD OF THIS CASE, THE SENTENCE OF DEATH HEREIN IS INAPPROPRIATE AND IS DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, IN VIOLATION OF DEFENDANT'S RIGHTS AS GUARANTEED TO HIM BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTIONS 5, 9, 10, AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

PROPOSITION OF LAW NO. 9

THE PROPORTIONALITY REVIEW THAT THIS COURT MUST CONDUCT IN THE PRESENT CAPITAL CASE PURSUANT TO OHIO REVISED CODE SECTION 2929.05 IS FATALLY FLAWED AND THEREFORE THE PRESENT DEATH SENTENCE MUST BE VACATED PURSUANT TO THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED

STATES CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I, OF THE OHIO CONSTITUTION AND SECTIONS 5, 9, 10 AND 16 OF ARTICLE ONE OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 10

IT IS ERROR FOR A TRIAL COURT TO IMPOSE A DEATH SENTENCE WHEN THE DEATH PENALTY LAW AS CURRENTLY APPLIED IN OHIO VIOLATES R.C. 2929.05(A) BY REQUIRING APPELLATE COURTS AND THE SUPREME COURT, IN CONDUCTING THEIR R.C. 2929.04(A) REVIEW OF "SIMILAR CASES" FOR PROPORTIONALITY, TO EXAMINE ONLY THOSE CASES IN WHICH A DEATH SENTENCE WAS IMPOSED AND IGNORE THOSE IN WHICH A SENTENCE OF LIFE WITH PAROLE ELIGIBILITY AFTER TWENTY-FIVE FULL YEARS OR LIFE WITH A PAROLE ELIGIBILITY AFTER THIRTY FULL YEARS WAS IMPOSED. THE CURRENT METHOD ALSO VIOLATES THE RIGHTS TO A FAIR TRIAL AND DUE PROCESS, RESULTS IN CRUEL AND UNUSUAL PUNISHMENT, AND IMPLICATES OTHERS OF APPELLANT'S PROTECTED RIGHTS AS WELL, ALL AS SET FORTH IN THE FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND IN SECTIONS 1, 2, 5, 9, 10, 16 AND 20, ARTICLE I OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 11

R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05 AS READ TOGETHER AND AS APPLIED IN THIS CASE VIOLATE THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2, 9, 10 AND 16 OF ARTICLE I OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. 12

OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL. OHIO REV. CODE ANN. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, AND 2929.05 DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO APPELLANT. U.S. CONST. AMENDS V, VI, VIII, XIV, OHIO CONST. ART. 1, SECTIONS 2, 9, 10, 16 FURTHER, OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

13.    The State's Merit Brief is due to be filed in the Ohio Supreme Court on January 16, 2004.

14.     Attorneys John P. Laczko and Dennis Day Lager represent Petitioner on his direct appeal of right to the Ohio Supreme Court.

15.     On January 15, 2004, Petitioner Nathaniel Jackson filed his initial post-conviction petition with this Court.

## FIRST CAUSE OF ACTION

16.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in this Petition as if fully rewritten herein.

17.     Petitioner Jackson's judgment and sentence are void or voidable because the Trumbull County Prosecutor has employed his discretion in capital cases in a racially discriminatory manner. Capital cases are limited almost exclusively to those cases in which the victim is Caucasian. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20

18.     The Eighth and Fourteenth Amendments prohibit a death sentence which is based in part upon the race of the defendant or the victim.  African-Americans composed 7.8% of the population of Trumbull County in 2001.  [Exhibit 1.]

19.     The common pleas courts of Trumbull County have sentenced ten persons to death since the State of Ohio re-enacted its death penalty in 1981.

| Date of Sentence | Defendant | Race of Defendant | Race of Victim |
|---|---|---|---|
| 02/28/86 | Danny Hill | African-American | Caucasian |
| 12/09/86 | Charles Lorraine | Caucasian | Two Caucasians |
| 03/15/89 | Andre Williams | African-American | Caucasian |
| 10/29/91 | Kenneth Biros | Caucasian | Caucasian |
| 03/25/92 | Roderick Davie | African-American | Two Caucasians |
| 09/12/96 | Jason Getsy | Caucasian | Caucasian |
| 04/02/98 | Sean Carter | African-American | African-American |
| 10/01/01 | Stanley Adams | Caucasian | Two Caucasians |
| 12/09/02 | Nathaniel Jackson | African-American | Caucasian |
| 06/20/03 | Donna Roberts | Caucasian | Caucasian |

6

[Exhibits 2-12]

20.     Five of the ten individuals sentenced to death in Trumbull County are African-Americans.  In all but one of the ten cases the victims were Caucasian.  [Exhibits 2-12].

21.     The Trumbull County Prosecutor has sought the death penalty in approximately thirty-six cases.  The Prosecutor's Office has disportionately limited the charging of a capital offense to situations involving Caucasian victims

| Defendant | Race of Victim |
| --- | --- |
| Adams, Stanley Theodore | Two Caucasians |
| Alexander, Rickey | Caucasian |
| Armstrong, Shawn | Undetermined |
| Belden, Clifford | Caucasian |
| Bell, Arthur | Caucasian |
| Biros, Kenneth | Caucasian |
| Burrows, Scott | Two Caucasians |
| Carter, Sean | African-American |
| Clemmons, Carvin | Caucasian |
| Cromety, Warren | Undetermined |
| Daniels, Christopher W. | Caucasian |
| Davie, Roderick | Caucasian |
| Delker, Sherry | Caucasian |
| Fellows, Randy | Undetermined |
| Ferrell, Christopher | Undetermined |
| Fickes, Van Gentry | Undetermined |
| Foster, George | Caucasian |
| Foster, George | Caucasian |
| Freeman, Gentry | Caucasian |
| Getsy, Jason A. | Caucasian |
| Gothay, David D. | Caucasian |
| Hill, Danny | Caucasian |
| Huffman, Royden M. | Undetermined |
| Jackson, Nathaniel E. | Caucasian |
| Lee, Bernie | Caucasian |
| Lorraine, Charles | Two Caucasians |
| Might, Dustin | Caucasian |
| Porterfield, Eric Lee | Caucasian |
| Roberts, Donna | Caucasian |
| Shaffer, Ronald | Caucasian |
| Staples, John | African-American and Caucasian |

Williams, Andre           Caucasian
Worley, Mark

[Exhibits 2 - 35]

22.    The prosecutor is forbidden by the Fourteenth Amendment from basing his choice of whom to prosecute upon "impermissible factors" such as race or religion. Wayte v. United States, 470 U.S. 598, 607 (1985), citing Oyler v. Boles, 368 U.S. 448, 456 (1962). The Ohio Supreme Court has also recognized that a prosecutor may not choose whom to indict based upon "an unjustifiable standard . . . or . . . arbitrary classification" such as race. State v. Wolery, 46 Ohio St. 2d 316, 324, (1976), citing Oyler, 368 U.S. at 456. A death sentence which is based even in part upon "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant" violates the Eighth Amendment. Zant v. Stephens, 462 U.S. 862, 885 (1983).

23.    The present case involves the quintessential discrimination in the charging decision. The prosecution sought and received the death penalty against Petitioner who is African-American and of below average intelligence. The prosecution offered the Caucasian co-defendant, Donna Roberts a plea bargain that would have spared her life [Exhibit 3]. This is despite the fact that the co-defendant stood the most to gain by Fingerhut's death and certainly was the intellect in planning the charged capital crime.

24.    Petitioner Jackson has provided sufficient facts to warrant the granting of relief or in the alternative discovery to factual develop the prosecutor's discriminatory intent McCleskey v. Kemp, 481 U.S. 279 (1987).

**Exhibits in Support of this Ground for Relief:** 1-35

**Legal Authority:** U.S. Const. amends. VIII and XIV; Wayte v. United States, 470 U.S. 598, 607 (1985); Rodriguez v. Peters, 63 F.3d 546, 563 (7th Cir. 1995); McCoy v. court of Appeals of Wisconsin, 486 U.S. 429 (1988); Oyler v. Boles, 368 U.S. 448, 456 (1962); State v. Wolery, 46 Ohio St. 2d 316, 324, 358 N.E.2d 351, 358 (1976); Zant v. Stephens, 462 U.S. 862, 885 (1983); Yick Wo v. Hopkins, 118 U.S. 356 (1986);

## SECOND CAUSE OF ACTION

25.    Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

26.    Petitioner Jackson's convictions and sentence are void or voidable because the grand jury that indicted him was drawn from a venire in which African-Americans were disportionately excluded. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20

27.    In the Seventh Cause of Action Petitioner will demonstrate that African-Americans were under represented in the venire from which the jury was drawn that convicted him of capital murder and recommended that he be sentenced to death.    That same underrepresentation has occurred in other capital cases in this County. [Exhibits 36-39.]

28.    This racial discrimination is most likely not limited to the petit jury venire.  The venire from which the Grand Jury was selected that capitally indicted Petitioner was drawn using the same procedures as the petit jury venire.  O.R.C. §§ 2939.02, 2313.07, 2313.08, 2313.35.  Thus, there is a reasonable likelihood that the grand jury venire suffers from the same constitutional flaw that the petit jury suffered.

29.    The grand jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors.  Powers v. Ohio, 499 U.S. 400, 411 (1991).  It controls not only the initial decision to indict, but contradicts other significant decisions including the number of counts to charge and whether to charge a lesser offense.  Vasquez v. Hillery, 474 U.S. 254, 263. (1986). The integrity of these decisions depends on the integrity of the process used to select the grand jurors.  If that selection process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decision.  Rose, 433 U.S. at 555-556 (Selection of members of a grand

9

jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process).

30.     It is especially important that the grand jury in Trumbull County be as free as possible from racial discrimination.  As demonstrated in the Second Cause of Action, the Trumbull County has permitted the race of the victim to be an improper consideration in the decision of whom to charge.

31.     The grand jury process must be free of racial discrimination.  Rose v. Mitchell, 443 U.S. 545, 557 (1979); Vasquez v. Hillery, 474 U.S. at 261-262 .The Supreme Court in an unbroken line of cases has held that a criminal conviction cannot stand under the Equal Protection Clause if it is based on an indictment returned by a grand jury from which individuals were excluded on the basis of race.  Alexander v. Louisiana, 405 U.S. 625, 628 (1972); Castaneda v. Partida, 430 U.S. 482, 492-495 (1977).

32.     To achieve an impartial grand jury, the panels from which grand jurors are chosen must also be drawn from a "fair cross section" of the community.  Taylor v. Louisiana, 419 U.S. 522, 527 (1975); Atwell v. Blackburn, 800 F.2d 502, 505 (5th Cir. 1986) (fair cross section requirement applies to grand jury panels); Machetti v. Linahan, 479 F.2d 236, 239 (11th Cir. 1982) (same).

33.     Petitioner Jackson requires discovery, an evidentiary hearing and the appointment of experts to fully develop the factual predicate for this Cause of Action.  He will be filing the appropriate pleadings forthwith.

34.     This Court should presume prejudice as to this constitutional violation because it is a structural error. If racial discrimination occurs in the selection process of the grand jury, the conviction must be reversed notwithstanding" overwhelming" evidence of guilt. Vasquez, 474

10

U.S. at 263. In the alternative the prosecutor must be required to demonstrate by proof beyond a reasonable doubt that this racial discrimination did not infect the trial and mitigation phases.

**Exhibits in Support of this Ground for Relief:** 36-39

**Legal Authority:** O.R.C. §§ 2939.02, 2313.07, 2313.08, 2313.35; Rose v. Mitchell, 443 U.S. 545 (1979); Vasquez v. Hillery, 474 U.S. 254 (1986); Powers v. Ohio, 499 U.S. 400 (1991); Alexander v. Louisiana, 405 U.S. 625 (1972); Castaneda v. Partida, 430 U.S. 482 (1977); Taylor v. Louisiana, 419 U.S. 522 (1975); Atwell v. Blackburn, 800 F.2d 502 (5th Cir. 1986); Machetti v. Linahan, 479 F.2d 236 (116th Cir. 1982).

## THIRD CAUSE OF ACTION

35.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

36.     Petitioner Jackson's convictions and sentence are void or voidable because the grand jury foreperson may have been chosen in a racially discriminatory manner. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20

37.     On December 28, 2001, a Trumbull County grand jury indicted Petitioner Jackson for two counts of capital murder and one count of Aggravated Robbery and Aggravated Burglary. Janice Winans was the foreperson of the Grand Jury that indicted Petitioner Jackson. [Exhibit 40.] Ms. Winans is Caucasian. [Exhibit 8.]

38.     In the State of Ohio, the common pleas court judge may select anyone to be the grand jury foreperson who satisfies the qualifications of a juror.  See O.R.C. § 2939.02.  This person's name need not be included in the grand jury venire.  Id. The grand jury foreperson has the same voting powers as other grand jury members.  Id.

39.     Petitioner has a good faith basis to believe that the Trumbull County presiding common pleas court judges have traditionally chosen individuals who were not included in the grand jury venire for purposes of serving as the grand jury foreperson.  The United States Supreme Court in Campbell v. Louisiana, 523 U.S. 392, 398 (1998) recognized that an identical foreperson selection procedure in the State of Louisiana resulted in the underrepresentation of African-Americans because the state court judges used the system to select predominantly white males for the position of foreperson.

40.     In at least one other Ohio jurisdiction, Hamilton County, in which the judges have gone outside the grand jury venire to select forepersons, racial discrimination has systematically

12

occurred in the charging process. Between 1982 and 1998, there were eighty-seven grand juries in Hamilton County, which returned a total of 134 capital indictments.  There were only 4 African American forepersons on these eighty-seven grand juries. There were less than a quarter as many African American forepersons as would be expected, based upon the percentage of African Americans in Hamilton County. This underrepresentation is statistically significant. This method for choosing grand jury forepersons insured that all forepersons, at least in capital cases, during the relevant time period, were overwhelmingly were caucasian. [Exhibit 42] The choosing of all caucasian forepersons was not only improper, but it also further exacerbated the racial disparity in the grand jury composition.

41.    It is the belief of post-conviction counsel that if the Trumbull County Common Pleas Court judges do in fact choose grand jury forepersons from outside the venire, then significant racial discrimination occurred.  The Trumbull County Common Pleas Court has always been compiled solely of caucasian individuals.  Hamilton County Common Pleas Court Judge Crush has observed that discrimination will most likely result when judges go outside the grand jury venire to select forepersons and the judges are disportionately caucasian. [Exhibit 43 ]

42.    The improper selection of the foreperson exacerbates two other constitutional violations identified in this Petition.  The venires from which the grand juries were drawn contained an underrepresentation of African-Americans [Second Cause of Action].   The prosecutor has permitted race to play a part in his charging decisions [First Cause of Action].

43.    Petitioner Nathaniel Jackson requires discovery, the appointment of experts and an evidentiary hearing to fully develop the factual predicate for this Cause of Action.

13

44.    This Court should presume prejudice as to this constitutional error.   In the alternative the state should be required to demonstrate by proof beyond a reasonable doubt that this error did not  affect either the trial or sentencing phase proceedings.

**Exhibits in Support of this Ground for Relief:** 40-43

**Legal Authority:** O.R.C. § 2939.02; Campbell v. Louisiana, 523 U.S. 392 (1998)

14

## FOURTH CAUSE OF ACTION

45.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

46.     The convictions and sentences against Petitioner Jackson are void and/or voidable because the Trumbull County Prosecutor's Office failed to provide trial counsel with exculpatory evidence.  U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20, Brady v. Maryland, 373 U.S. 83 (1963).

47.     It is well-settled that the failure of the prosecutors to disclose favorable evidence to an accused in a criminal proceedings violates the Due Process Clause of the Fourteenth Amendment, when the evidence is material either to guilt or sentencing, regardless of the good or bad faith of the prosecutor.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  The Court has expanded the duty to disclose to include impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).

48.     In order to comply with Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Id, at 433-4.

49.     In the present case, trial counsel filed several pretrial motions to access the relevant exculpatory evidence in actual or constructive possession of the prosecutor.

50.     At the time of Petitioner's trial the prosecutors had not received any training in identifying exculpatory evidence.  The Trumbull County Prosecutor's Office did not have any guidelines in place for purposes of determining the existence of exculpatory evidence.  This lack

15

of training and guidelines, among other factors, has caused the Trumbull County Prosecutors to fail in their constitutionally imposed duty to provide in a timely manner exculpatory evidence to defense counsel.

51.    The fact that the Trumbull County Prosecutor's Office purportedly claimed to have an open file discovery policy in the present case does not insulate it from claims of failure to provide exculpatory evidence. Strickler v. Greene, 527 U.S. 273 (1991).

52.    Trial counsel frequently cited this Court during the trial to evidence that the prosecutor had not provided in discovery.

53.    In addition the prosecutor had actual or constitutional possession of a police report which documented that Robert Fingerhut had intended to stage or fake his own death by killing another person who matched his physical description.  Fingerhut had hired an individual to find the look-a-like for him.  [Exhibits 35, 44.]

54.    Petitioner requires discovery and an evidentiary hearing to demonstrate the existence of this constitutional violation, which will undermine the confidence in the court's verdicts in both phases of the proceedings.

**Exhibits in Support of this Ground for Relief:** 35, 44

**Legal Authority:** U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20, Brady v. Maryland, 373 U.S. 83 (1963) United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995); Strickler v. Greene, 527 U.S. 273 (1991)

## FIFTH CAUSE OF ACTION

55.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

56.     Petitioner Jackson had a right to effective assistance of counsel in both stages of his trial. While that constitutional right does not extend to counsel of his choosing, it did include the right to an attorney with whom he could have meaningful communication.

57.     The courts have repeatedly recognized that meaningful communication is critical if counsel is to receive competent legal investigation.  If counsel and client are unable to communicate, then counsel will not be able to investigate and prepare the case.

58.     Prior to the commencement of the trial, Petitioner wrote the Court and requested the appointment of new counsel. [Exhibit 45]

59.     The basis for the request was that lead counsel had 1) failed to regularly communicate with Petitioner, 2) failed to provide Petitioner with the information that he requested and 3) treated Petitioner in an inappropriate manner. [Exhibit 45]

60.     It is the duty of the trial court to inquire into a complaint that a defendant raises concerning his appointed counsel. That inquiry is to be conducted on the record. The colloquy must be more than an cursory exercise.  The trial court must make a meaningful inquiry into the defendant's complaints concerning his attorney.

61.     The failure of the trial court to conduct the necessary inquiry is by itself a constitutional error.  In this case the trial court conducted no inquiry cursory, or otherwise. Instead he merely forwarded Petitioner's letter to trial counsel.

17

62.    As a result Petitioner Jackson was forced to proceed with counsel with whom he could not communicate.  Accordingly Petitioner's convictions and death sentence are void or voidable.

**Exhibits in Support of this Ground for Relief:** 45

**Legal Authority:**  U.S. Const. Amends. V, VIII, IX, XIV, Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, and 20, Strickland v. Washington, 466 U.S. 668 (1984); State v. Deal, 17 Ohio St. 3d 17 (1969), State v. Pruitt, 18 Ohio App. 3d 50 (1984)

## SIXTH CAUSE OF ACTION

63.    Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

64.    Petitioner's death sentence is void or voidable because he was denied the effective assistance of counsel with respect to the pretrial proceeding and the investigation of the penalty phase.  Counsel failed to obtain and use the expert services of a mitigation specialist.

65.    Trial counsel's failure to request the opportunity or use the services of a mitigation specialist also denied Petitioner his Fourth Amendment right to the appointment of reasonably necessary experts.

66.    The Ohio Supreme Court has recognized the importance of the mitigation specialist in capital cases. Sup R. 20 (IV)(D) admonishes Ohio trial courts to provide various support services, including a mitigation specialist, in capital cases.  Likewise the ABA standards in capital cases recognized that counsel should employ a mitigation specialist to conduct the sentencing phase investigation.

67.    As a result of counsel's failure to obtain a mitigation specialist, no reasonable mitigation investigation was conducted.

68.    One of the duties of a mitigation specialist is to collect all relevant records concerning a defendant's life.  Other than the few records collected by the spouse of the psychologist appointed at trial, counsel failed to collect any records concerning Petitioner Jackson's life.  If a mitigation specialist had conducted the necessary record collection, he or she would have obtained the following records.

a.    Youngstown Alternative School – The record reflects that Petitioner Jackson had a full scale IQ of 70.  His spelling and math scores were very low.  The school set for him while he was in junior high the following goal 1) adding and subtracting fractions; 2)

19

underlining the subject and verb in sentences and 3) taking showers and wearing clean clothes. [Exhibit 46]

    b.  Community Corrections – Petitioner Jackson was in drug rehabilitation from May 24, 2001 to September 2, 2001.  He was a frequent abuser of marijuana and cocaine. He scored very high on the Substance Abuse Subtle Screening Inventory.  On the MMPI, which was administered to him on June 10, 2001, he was found to suffer from antisocial and narcissistic personality disorders. [Exhibit 47]

    c.  Neal Kennedy Recovery Clinic – the officials determined that Petitioner Jackson was addicted to cocaine, alcohol and marijuana.  His dependency rank was six out of seven.  His brother was also an alcoholic.  Petitioner Jackson lived in a crack house during 1994 to 1997.  His memory was impaired.  Petitioner Jackson reported that he had a temper like his mother. [Exhibit 48]

  69.  One of the other duties of a mitigation investigation is to conduct interviews of all relevant witnesses who have facts concerning a defendant's development since birth.  This would include family members, teachers, neighbors, friends, court officials and clergy.  Because trial counsel failed to retain a mitigation investigator the following individuals were not interviewed:

    a.  Pauline Korneagay – She is the mother of Nathaniel Jackson.  Petitioner Jackson did not regularly attend school and when he did attend he was disruptive.  After he became an adult he started associating with drug dealers and users.  Petitioner Jackson became addicted to crack and stole to support his habit  The family had to put locks on their freezer and bedroom doors to keep him from stealing from them.  Donna Roberts provided Petitioner with drugs, clothes and marijuana.  Ms. Korneagay warned Petitioner about Donna Roberts, but he would not listen. [Exhibit 49]

    b.  Tausha Korneagay – She is Petitioner's Jackson's sister.  Their maternal grandmother raised them.  Petitioner Jackson did not do well in school and as a result he was sent to Stamburgh Middle School.  He became addicted to crack and he would steal to get drugs. The mother of one of Petitioner's sons left him because he was an addict.  Donna Roberts gave him drugs and ice clothes.  He was really impressed by her. [Exhibit 50]

    c.  Anthony Korneagay – He is Petitioner Jackson's brother.  Petitioner was addicted to drugs and he would steal from anyone including his family to get drugs.  Petitioner Jackson was not a violent person, just a thief.  Donna Roberts gave him money, drugs, and other stuff. This made his brother feel good. [Exhibit 51]

    d.  Raymond Dickerson – He has lived with Petitioner's mother for about twenty years.  Petitioner became addicted to crack and started to live on the street.  Donna Roberts gave Petitioner drugs and money.  Petitioner Jackson would not listen when people warned him about Donna Roberts. [Exhibit 52]

    e.  Kevin Perry – He is the fiancé of Tausha Korneagay.  Petitioner's mother never demonstrated any love or affection for him. This upset Petitioner.  His mother and longtime boyfriend are very heavy drinkers.  Petitioner and his sister had to live with the maternal grandmother because the mother was such a bad parent.  Petitioner had a very bad drug problem. Donna Roberts used to give him material things. [Exhibit 53]

70.     A cohesive, sound theory of mitigation is essential to a capital trial.  A mitigation theory would have presented complete picture of the defendant over his lifetime so that the three judge panel could have understood the defendant's behavior in light of his lifelong development. The tasks required for a mitigation investigation are extensive and extremely time-consuming. Given the amount and variety of work involved in capital defense, the best approach to handling a capital defense is through a team approach.  In addition to the defense attorneys, the "defense team" typically includes a psychologist, mitigation specialist, criminal investigator and other experts as needed.  Defense counsel did not obtain a mitigation specialist in this case, thereby severely limiting the mitigation investigation..

71.     Petitioner's trial counsel abdicated their duty to utilize an available expert mitigation specialist to fully investigate, prepare, and present witnesses and evidence at Petitioner's capital trial.  Counsel's failure clearly undermined the adversarial process and rendered the outcome of his capital trial unreliable.  His sentencer did not have an opportunity to consider numerous relevant mitigating factors at the penalty phase

**Exhibits in Support of this Ground for Relief:** 46-53

**Legal Authority:**  U.S. Const. Amend. IV; Sup. R. 20; O.R.C. § 2929.04; Williams v. Taylor, 120 S. Ct. 1495 (2000); Strickland v. Washington, 466 U.S. 668 (1984); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1996).

## SEVENTH CAUSE OF ACTION

72.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

73.     Petitioner Jackson's convictions and sentences are void and/or voidable because Petitioner was denied his right to a fair and impartial jury and equal protection because there was an underrepresentation of African Americans in the venire from which his jury was drawn. Racial discrimination in the selection of the members of a petit jury venire constitutes a denial of an impartial jury as guaranteed by the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment.  U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

74.     The trial court in the present case summoned four hundred jurors to serve on the venire [Exhibit 54.]  One-hundred-forty persons appeared for jury duty [Tr. 1846-1848.]

75.     The parties agreed that only one African-American was questioned during individual voir dire [Tr. 1846-1848.]

76.     The prosecutor stated that "I'm positive we had one other black juror that was excused". Tr. 1854.]  The prosecutors later in an effort to preclude this constitutional challenge stated "I meant the representation of one, and I want to say there were two, maybe three." [Tr. 1855.]

77.     African Americans comprised 7.9 percent of the population in Trumbull County [Exhibit 1.]  Consequently there should have been approximately eleven African-Americans in the one-hundred-forty-persons who appeared for jury duty.  Even if the prosecutors second statement was accurate, there was still a substantial underrepresentation of African-Americans.

22

78.     In State v. Davie, Trumbull C.P. No. 91 CR 288, this Court presided over another capital case.  The clerk drew two hundred names and approximately one-hundred thirty of the one-hundred fifty individuals appeared for jury duty.  [Exhibits 36-38.]  Not one African-American appeared for jury duty. [Id.]

79.     Subsequent to Mr. Davie's jury trial, Diane Wiley of the National Jury Project reviewed the venire that was drawn in that case.  Ms. Wiley has conducted jury evaluations in more than fifty cases throughout the United States.  She is co-author of one of the leading treatises on juries, Jurywork: Systematic Techniques.  [Exhibit 39.] Ms. Wiley made the following findings concerning the racial discrimination in the Davie case:

> The number of African American citizens called to serve as jury venirepersons for State of Ohio v. Roderick Davie, on February 3, 1992 in Trumbull County Common Pleas Court underrepresented the percentage of African Americans in Trumbull County by 100%.

> This underrepresentation represents a statistically significant deviation from the number of African American persons who would be expected utilizing a truly random sampling method from a truly random pool representative of the county . . . .

> It is disturbing to find a venire of this size without even one African American juror being included in a jurisdiction with 6% African Americans.  This simply should not occur unless there was some kind of systematic discrimination. [Emphasis added.]

[Id. at p. 6.]

80.     The underrepresentation of African-Americans on juries in cases over which this Court presides continued in co-defendant Donna Roberts' case.  There were no African-Americans on the jury which convicted her of capital murder and returned a death recommendation.  [Exhibit 55]

81.     The underrepresentation of a cognizable group in a petit jury venire constitutes a denial of the Due Process Clause of the Fourteenth Amendment, Peters v. Kiff, 470 U.S. 493,

23

501 (1972); the Fair Cross Section requirement of the Sixth Amendment, <u>Taylor v. Louisiana</u>, 419 U.S. 522, 531 (1975); and the Equal Protection Clause of the Fourteenth Amendment, <u>Taylor v. Louisiana</u>, 419 U.S. at 531.

82.     Nathaniel Jackson requires discovery and an evidentiary hearing to demonstrate the third prong for both the Equal Protection and Fair Cross Section tests . On information and belief he alleges that African-Americans are systematically culled from the jury process during one or more of the pre-selection stages  It is further the belief of the counsel that each of these phases are being abused or are subject to abuse.

83.     The wrongful exclusion of African-Americans from the venire is a structural error and Petitioner Jackson is entitled to relief without the demonstration of prejudice.

84.     Petitioner must be granted a new trial or, at a minimum, discovery and an evidentiary hearing on this Cause of Action.

**Exhibits in Support of this Ground for Relief:**; 1, 36-39, 55

**Legal Authority:** U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; <u>Peters v. Kiff</u>, 470 U.S. 493 (1972); <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975); <u>State v. Davie</u>, Trumbull C.P. No. 91 CR 288; <u>Jurywork: Systematic Techniques</u>; Ohio Supreme Court's Commission on Racial Fairness ; and <u>State v. Jackson</u>, 64 Ohio St. 2d 107 (1980).

## EIGHT CAUSE OF ACTION

85.    Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

86.    Petitioner Jackson's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the pretrial stage of his capital case. U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

87.    Counsel did not conduct an independent investigation and instead for the most part relied upon the discovery provided by the prosecution. Counsel interviewed very few witnesses.  As a result counsel did not develop any significant information concerning co-defendant Roberts' role in the homicide, 2) the illegal activities of the victim Robert Fingerhut, 3) the dysfunctional relationship of Roberts and Fingerhut, 4) the significant mental impairment of Petitioner Jackson and 5) the impact that impairment had upon his actions and involvement with Roberts.

88.    Trial counsel timely filed a motion to suppress. However, they did not contest the voluntariness of Petitioner's statement and the knowing and intelligent waiver of his rights based upon the fact that Petitioner had full scale IQ scores of 70 and 72. [Exhibits 56, 57.]

89.    Trial counsel failed to effectively challenge through the use of experts and an evidentiary hearing, the venire from which the grand and petit juries were drawn.  [See Second and Seventh Causes of Action.]  In addition they failed to challenge the selection of the grand jury foreperson. [Third Cause of Action.]

90.     Trial counsel should have also challenged the charging practices of the Trumbull County Prosecutor.  The prosecutor almost exclusively institutes capital charges when the victim is caucasian.  [First Cause of Action.]

91.     In a capital case, defense counsel is also charged with the duty to conduct a reasonable investigation with respect to the mitigation phase.  The defendant's lifelong experiences must be investigated to identify the biological and environmental factors that caused him to commit the offense of aggravated murder. Counsel must interview the defendant's family members, friends, teachers, coaches, juvenile counselors and anyone else that has had contact with the defendant throughout his life. [Exhibits 49-53, 58-60.] In addition counsel must obtain all the records that documents the defendant's actions throughout his life. [Exhibits 46-48, 60.]

92.     Trial counsel in the present case did not conduct any sentencing phase investigation.  Instead they relied upon the spouse of the psychologist appointed by the Court. The spouse collected one set of records.  The spouse and/or the psychologist interviewed one person, Petitioner's mother who minimized the negative factors that impacted Petitioner's development.  [Exhibit 61.]

93.     An important part of a sentencing phase investigation is the retaining of a knowledgeable psychological expert who conducts the appropriate testing.  The goal of the psychological testing is to explain the defendant's development, not provide a diagnosis. Dr. McPherson, who trial counsel retained, conducted inappropriate testing, the MMPI and projective testing which provided a negative diagnosis, not an explanation as to Petitioner's involvement in the offense. [Exhibit 59.].

94.     In Atkins v. Virginia, 536 U.S. 304 (2002) the United States Supreme Court barred the execution of the mentally retarded.  The school authorities administered to Petitioner

26

two IQ tests to which placed him in the mentally retarded range.  [Exhibits 56, 57.]  In the cases in which the defendant has previously scored in the mentally retarded range, counsel generally should not conduct any additional IQ testing and should rely on those tests.

95.    In cases in which there is evidence that the defendant suffered from substance abuse, trial counsel needs to insure that the testing is conducted by an expert who has the appropriate training in substance abuse.  This type of mental health professional can document the degree of substance abuse, its impact upon the defendant at the time of the offense and any factors in the defendant's environment which led to the Petitioner's addiction. [Exhibits 62, 63, 64.] There was no such testing in the present case.

96.    Trial counsel had an affirmative duty to conduct a reasonable investigation into the character, history, and background of Petitioner Jackson. Williams v. Taylor, 529 U.S. 362 (2000). Only after a full investigation can counsel make an informed, tactical decision about which information would be helpful in a client's case. Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995); State v. Johnson, 24 Ohio St. 3d 87 (1986).

97.    Petitioner Jackson was denied his right to effective assistance of counsel. Petitioner must be granted a new trial or, at a minimum, discovery and an evidentiary hearing on this Cause of Action.

**Exhibits in Support of this Ground for Relief:** 46-53, 56-64

**Legal Authority:** U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984); Williams v. Taylor, 529 U.S. 362 (2000); Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995); State v. Johnson, 24 Ohio St. 3d 87 (1986).

## NINTH CAUSE OF ACTION

98.     Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

99.     Petitioner Jackson's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his capital case. The acts and omissions of trial counsel deprived him of the Sixth Amendment right to effective assistance of counsel. U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

100.    During voir dire, counsel did not address with the prospective jurors the defenses or issues they would later be raising in the trial phase. They should have included (but were not limited to) the following:  the race of Petitioner, Petitioner's interracial relationship with the co-defendant and the use of sexually explicit language.  Furthermore, trial counsel did not address any potential mitigating facts.

101.    Trial counsel failed to address co-defendant Donna Roberts' motive to kill Robert Fingerhut and her ability to manipulate Petitioner Jackson.  Ms. Roberts stood to benefit from Fingerhut's death.  She was the individual that was listed on the large life insurance policy, not Petitioner Jackson.

102.    Co-defendant Roberts had an affinity for African American males.  She had been arrested several times for incidents involving African Americans.  [Exhibit 65.]  Christine Ellington, who operates a barber shop testified that Roberts brought Petitioner in for a haircut the day prior to the homicide.  [Tr. 2881-2889].  Ellington did not tell the jury that Roberts had previously  brought three or four other African-Americans in to the barber shop for haircuts. [Exhibit 66]

28

103.    Roberts had been involved with an African American male Santiago Mason, just prior to Petitioner's release from prison in December 2001.  She met Mason, who was a felon, in the bus terminal where she worked.  She told Mason "you are so cute, I always liked black guys cause they got big dicks."  She took him to her home that night and told him "let me see how big your dick is."  She had oral sex with him but he refused to have intercourse with her. A few days later Roberts called Mason again, and asked Mason to drive her car and he refused. She gave him two hundred dollars and took him back to the residence.  She performed oral sex on him but he again refused to have sexual intercourse.  She again became enraged and took him back to the bus station.  One week later she appeared at Mason's place of employment and accused him of stealing her money and her gun. She filed charges against him.   After the charges were instituted in the present case, the prosecutor dismissed the charges against Mason. [Exhibit 67.]

104.    Trial counsel never developed any facts involving the relationship between Petitioner and the Roberts. She was certainly much more intelligent than Petitioner.  She had previously served as an office administrator for a plastic surgeon's office in Miami, Florida. [Exhibits 44, 68.]  She had traveled extensively. [Id.]  She provided Petitioner with the money, car and clothing that he needed [Exhibits 49-53, 58].  She supplied Petitioner with the drugs he craved. Donna herself was a frequent user of drugs. The night prior to the homicide they were in a crack house together in Youngstown.  [Exhibit 69.]

105.    Donna was seen in all areas of the residence at the time of the shooting.  [Tr. 2924-2936.]  She had bloodstains on her shirt [Exhibits 70, 71.] There were spots of blood in a part of the house in which the shooting did not occur.  [Exhibit 71].  The residence contained marijuana [Exhibit. 70] as well as prescription medicines for depression and schizophrenia. [Exhibit 72.] The co-defendant was the proud owner of two dogs, which she kept at the residence

[ Exhibit 73]  The dogs did not react to the altercation that lead to the death of Fingerhut.  The police administered a gun shot residue test to Ms. Roberts and the results were inconclusive [Exhibit 77].

106.    Defense counsel failed to retain an crime scene reconstruction expert to address the facts that surround the offense and the status of the crime scene. The police thought the shooting occurred in the kitchen where they found the body.  However, they found blood on the garage floor as well as the entrance hallway [Exhibits 71, 74].  Petitioner was shot in the left hand during the altercation and sustained a serious injury.  [Exhibit 75.]  Petitioner is left handed.

107.    On direct appeal Counsel raised a related issue involving the ineffective assistance of trial counsel.   Petitioner Jackson incorporates those arguments by reference. [Exhibit 76.]

108.    The right to effective assistance of counsel is violated when counsel's performance falls below an objective standard of reasonableness and the client is prejudiced by counsel's breach of duty.  Strickland, 466 U.S. at 696. There is a reasonable probability that if trial counsel had performed reasonably during voir dire and trial stage that the results of the proceeding would have been different.  Strickland, 466 U.S. at 694.   The jury would have returned verdicts rendering Petitioner ineligible for the sentencing phase.

109.    Petitioner Jackson must be granted a new trial or, at a minimum, discovery and an evidentiary hearing on this ground for relief.

**Exhibits in Support of this Ground for Relief:** 65-77

**Legal Authority:** U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995); State v. Johnson, 24 Ohio St. 3d 87 (1986)

## TENTH CAUSE OF ACTION

110.    Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

111.    Petitioner Jackson's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the mitigation stage of his capital case. The acts and omissions of trial counsel deprived him of the Sixth Amendment right to effective assistance of counsel. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984).

112.    Trial counsel did not conduct any mitigation investigation [Fifth and Sixth Causes of Action]. The spouse of the psychologist appointed by this Court conducted only one interview and collected only one set of records [Id.]

113.    Lead counsel became ill prior to the mitigation hearing and new counsel was substituted for Lead Counsel [Sent. Tr. 4-6.] New counsel was not certified by the Ohio Supreme Court to provide representation in a capital case. [Id.] He knew nothing about this capital case. [Id.]

114.    Trial counsel met with the mitigation witnesses at the courthouse for the first time just prior to the mitigation hearing [Exhibits 49-53, 58]. Counsel met with the witnesses as a group and asked questions that were unrelated to the questions that would be asked of them a few minutes later at the evidentiary hearing. [Id.]

115.    Counsel who remained on the case admitted to knowing little about the evidence that was to be presented to the jury. [Sent. Tr. 7.] As a result he requested that the psychologist be permitted to sit at counsel table. [Sent. Tr. 8.] This was the same psychologist who had

31

reviewed a single set of records and whose spouse had talked to a single witness. [Sixth Cause of Action.]

116.     Trial counsel gave no opening statement at the mitigation phase. [Sent. Tr. 23.] As a result the jury was not told what evidence it would hear or the manner in which the evidence would be mitigation.

117.     Counsel called four lay witnesses to testify. Their direct testimony was sparse and uninformative: Raymond Dickerson [two pages Sent. Tr. 23-25]; Tausha Korneagay [two pages Sent. Tr. 25-27]; Lorraine Rue [one page Sent. Tr. 30-31] and Pauline Korneagay (two pages Sent. Tr. 31-33). The prosecutor had twice interviewed Tausha Korneagay [Sent. Tr. 27] which was two more times than defense counsel prior to the day of the hearing.  [Exhibits 50-58.]

118.     The shortness of the direct examination of these witnesses did not mask the incompleteness and inaccuracies in their testimony.  Raymond Dickerson had not known Petitioner prior to the age of fifteen and not seen Petitioner since the age of seventeen. [Sent. Tr. 24-25.] Tausha Korneagay  testified that Petitioner lived on the street [Sent. Tr. 27] and was smart [Sent. Tr. 28]. In fact Petitioner's drug habit forced him to live on the street because he would steal from whomever he resided.  [Exhibits 56, 57.] Petitioner had twice scored in the mental retardation range on IQ tests [Exhibits 56, 57.]  Pauline Korneagay testified that Petitioner never had any problems in school and was raised in a good neighborhood. [Sent. Tr. 32.] In fact Petitioner, since the first grade had academic and behavioral problems in school. [Exhibits 50, 58] and was raised in a rough neighborhood.  [Exhibit 51, 58.]

119.     Trial counsel's final witness was Dr. Sandra McPherson who testified that Petitioner was not mentally retarded [Sent. Tr. 45-49], but instead was anti-social [Sent. Tr. 50-52]. The anti-social diagnosis was the product of testing that she should not have administered

[Exhibit 59].  The IQ testing was the product of testing that was improperly administered and scored.  [Tenth Cause of Action.]  The psychologist provided no analysis as to Petitioner's involvement with the commission of the offense and only superficial analysis of Petitioner's relationship with the co-defendant [Tr. 54-55].

120.  There is a reasonable probability that the result of the sentencing phase would have been different if trial counsel conducted a reasonable investigation and the psychologist administered appropriate testing.  The jury would have learned that Petitioner was neglected and ignored by his alcoholic mother and his biological father [Exhibit 50, 51, 53, 58].  His school performance was impaired by not only his ADHD but by his below average intelligence as reflected in the full scale IQ scores of 70 and 72 [Exhibits 56, 57].  Petitioner began to self medicate with illicit drugs as a result of this parental neglect, poor school performance and resulting self esteem.  He developed an addiction to crack which caused further rejection by his family.  [Exhibits 49-53, 58].  His need to support his addiction caused him to commit illegal acts which ultimately lead to his numerous convictions.  [Id.]

121.  The jury would have also learned that Petitioner's involvement with co-defendant Donna Roberts was one of the first "meaningful" relationships in his life.  She provided him with all of the material things he lacked including clothes, money and cars as well as drugs.  [Exhibits 49-53, 58].  She was much brighter than he was.  [Exhibits 44, 56, 57, 68].  She had reportedly manipulated African-American males in the past for her sexual and ego needs.  [Exhibits 66, 67.]

122.  Petitioner must be granted a new trial or, at a minimum, discovery and an evidentiary hearing on this ground for relief.

Exhibits in Support of this Ground for Relief: 44, 49-53, 56-59, 66-67.

Legal Authority: U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Strickland v. Washington, 486 U.S. 668 (1984)

33

## ELEVENTH CAUSE OF ACTION

123.    Petitioner Nathaniel Jackson fully incorporates each and every allegation contained elsewhere in the Petition as if fully rewritten herein.

124.    Petitioner Jackson's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel and an expert assistance during the mitigation stage of his capital case. The basis for this constitutional right is twofold.  Pursuant to the Sixth Amendment right to effective assistance, counsel has a duty to insure that a competent mitigation evaluation is conducted.   In addition, the Fourteenth Amendment creates an independent right to a competent evaluation. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Ake v. Oklahoma, 470 U.S. 68 (1985); Strickland v. Washington, 486 U.S. 668 (1984).

125.    Psychologist Dr. Sandra McPherson evaluated Petitioner Jackson and testified on his behalf at his mitigation stage. (Sent. Tr. 33-105).  Because Dr. McPherson's evaluation and testimony was incomplete and inaccurate, her participation on the case did not satisfy Petitioner Jackson's Sixth or Fourteenth Amendment guarantees.  [Exhibit 78.]

126.    The goal or focus of a mental health evaluation in a capital case is to explain the accused's commission of the homicide in terms of the accused's personal development.  The mental health expert must identify for the trier of fact those biological and environmental factors that impacted the accused's development and explain his commission of the offense in terms of those factors. [Exhibits 59, 60, 62, 63, 64.]

127.    The foundation for any adequate and complete psychiatric evaluation is a thorough social history.  In the present case defense counsel did not conduct any social history [See Sixth Cause of Action .]  They instead relied upon the spouse of the psychologist to conduct

a social history.  His social history consisted of interviewing Petitioner's mother.  [Exhibits 49-53, 58.]  The mother was not forthcoming with information.  As a result Dr. McPherson never received the necessary information.  [Exhibit 49, 58.]

128.    Further, Dr. McPherson conducted inappropriate testing and improperly scored some of the appropriate testing that she conducted. The focus in the mitigation case is upon a defendant's development and not on a psychological diagnosis.  The prevailing standard at the time of Petitioner's trial dictated that the mental health professional not administer to the defendant the Minnesota Multi Phasic Personality Test (MMPI) and projective testing such as the Rorschach and House-Tree-Person.  [Exhibit 59.] That is in fact what Dr. McPherson did in the present case.  As a result the jury learned that Petitioner is anti-social, impulsive and does not learn from past mistakes.  [Exhibit 61.]

129.    Dr. McPherson administered the WAIS-III to determine Petitioner's IQ. She should not have given the test because Petitioner had previously twice scored in the mental retardation range.  [Exhibits 56, 57.] Dr. McPherson did not follow the standard protocol for the administration of the WAIS-III.  She also committed errors in the scoring of the test.  [Exhibit 78.]

130.    Dr. McPherson also administered the Wide Range Achievement Test-III (WRAT).  She again incorrectly scored that test.  [Exhibit 78.]

131.    Dr. McPherson administered the Bendt Gestalt Test for purposes of determining the existence of brain damage.  The appropriate screening mechanism was the Trails Making Test [Exhibit 59.]  The wide disparity of the performance and verbal scores on the IQ test that Dr. McPherson administered was an indicator that Petitioner suffers from brain impairment.

132.    Dr. McPherson failed to conduct testing to determine the existence and degree of Petitioner's drug addiction.  A complete examination would have included the Michigan Alcohol Screening Test and Drug Abuse Screening Test.  [Exhibit 62.]

133.    In addition Dr. McPherson failed to explain Petitioner's Jackson's involvement in the offense in the context of his personal development.  At a minimum she should have been able to discuss 1) his lack of meaningful relationships prior to meeting Donna Roberts; 2) her ability to manipulate him and his susceptibility to that manipulation, and 3) his dependence on drugs, which she supplied him  [Exhibits 49-53, 58-60.]

134.    Nathaniel Jackson is entitled to relief because the information provided by the mental health professional to the jury was inaccurate and incomplete.  There is a "particularly critical interrelation between expert psychological assistance and minimally effective representation of counsel."  Beavers v. Balkcom, 636 F.2d 114, 116 (5th Cir. 1981), citing United Stated v. Fessel, 531 F.2d 1275, 1279 (5th Cir. 1976). There is a reasonable probability that the outcome of the sentencing phase would have been different if the jury had received all of the relevant information. Strickland, 486 U.S. 668.

135.    Petitioner must be granted a new trial or, at a minimum, discovery and an evidentiary hearing on this ground for relief.

**Exhibits in Support of this Ground for Relief:**  49-53, 56-64, 78

**Legal Authority:** U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Ake v. Oklahoma, 470 U.S. 68 (1985); Strickland v. Washington, 486 U.S. 668 (1984); Beavers v. Balkcom, 636 F.2d 114 (5th Cir. 1981), citing United Stated v. Fessel, 531 F.2d 1275 (5th Cir. 1976).

## TWELFTH CAUSE OF ACTION

136.    Petitioner Nathaniel Jackson fully incorporates each and every fact contained elsewhere in the Petition as if fully rewritten herein.

137.    Petitioner Jackson's death sentence is void or voidable because the jury did not receive all of the relevant information concerning the appropriate sentence.

138.    This Court summarized the mitigation testimony as follows:

> Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the defendant's step-father, his sister, his mother, and Dr. McPherson.  These witnesses testified that the Defendant was respectful to both his mother and grandmother.  His sister, who described as smart and really kind, noted that they attended church. Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused. His mother also declined to say that his home was in a "rough neighborhood, or that the Defendant had any problems in school.  Dr. McPherson's report noted that the defendant had not been hospitalized for any physical or mental condition.  The witnesses also noted that they practiced moral tenets and that responsibility and respect were taught.

> In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

[Exhibit 79, pp. 6-7.]

139.    This Court reached these factual conclusions only because trial counsel conducted an unreasonable investigation.

140.    Petitioner Jackson had little or no contact with his biological father.  His mother was a substance abuser, who after she separated from his biological father entered into another long term relationship with yet another substance abuser.  [Exhibits 53, 58.]

141.    Petitioner Jackson was raised by his maternal grandmother who did not have adequate resources to raise him.  Eventually things being so bad in the maternal mother's home,

37

Petitioner's sister came to also reside in the maternal grandmother's residence. [Exhibits 49-53, 58.]

142.    Petitioner as a result of his attention deficit disorder, learning disabilities and low intelligence was not a good student. From the first grade on he was very disruptive. When he was in the junior high he could not add fractions or identify the subject and verb in a sentence. He came to school without bathing and clean clothes. [Exhibit 46.]

143.    Petitioner eventually at a young age became involved with drugs. This lead him to associate with the "wrong" individuals who schooled him in the commission of illegal acts. Petitioner Jackson became a career thief to support his habit. [Exhibit 49-53, 58.]

144.    This Court after rejecting Petitioner Jackson's childhood as mitigating then proceeded to reject the testimony of Dr. McPherson. [Exhibit 78, pp. 8-9.]

145.    The Court should have never learned of the anti-social diagnosis. The MMPI, which was the basis for the diagnosis, should not have been administered to Petitioner. [Exhibit 59.] This is especially true since he had scored "poorly" on the MMPI a year prior to Dr. McPherson administering it to him. [Exhibit 47.]

146.    Dr. McPherson testified that Petitioner Jackson had a full scale IQ of 84. She misconducted the test and assuming that she properly applied the test he had a full scale IQ of 80. Dr. Thomas A. Boyd has now properly administered an IQ test to Petitioner Jackson and he scored 75. [Exhibit 78.]

147.    Dr. McPherson testified that she administered the Wide Range Achievement test (WRAT) to Petitioner. She again misscored the test and as a result testified that he was performing arithmetic and spelling on a high school level. He was actually performing on the level of a seventh grader. [Exhibit 78.]

38

148.    Dr. McPherson failed to fully appreciate the level of Petitioner's substance abuse. A year prior to the instant offense, a substance abuse clinic scored him six our of seven on a rate of substance abuse. [Exhibit 47.] He reported that his cocaine abuse was affecting his memory. [Id.]

149.    Dr. McPherson did not provide for this Court the information that Petitioner Jackson's abuse to cocaine was the dominant factor in his life.  He was stealing from his parents to support his habit.  He was also stealing from one of his sons.  He was subjected him to physical abuse as a result of his failure to pay off his debts linked to his drug dependence. [Exhibit 50, 51, 53.]

150.    Donna Roberts, the co-defendant, supplied Petitioner Jackson with drugs.  His dependent upon her (drugs) certainly gave her undue influence over him. [Exhibit 49-53.]

151.    None of the foregoing information was presented to the sentencing jury in this case.  The psychological explanation of Petitioner; Jackson and his behavior was critical to this case.  It provides the explanation for Petitioner's behavior which was otherwise totally absent. The jury (as in fact the mitigation witnesses who did testify) provide the jury with no insight into his behavior.  The jury was presented with no reason to spare Petitioner's life.

152.    Petitioner Jackson's rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated.

Exhibits in Support of this Ground for Relief: [Exhibits 46, 47, 49-53, 58, 78-79.]

Legal Authority: U.S. Const. amends. VIII, and XIV; O.R.C. § 2929.03; O.R.C. § 2929.04

## THIRTEENTH CAUSE OF ACTION

153.    Petitioner Nathaniel Jackson fully incorporates each and every fact contained elsewhere in the Petition as if fully rewritten herein.

154.    The death sentence against Petitioner Jackson is void and/or voidable because the death penalty as administered by lethal injection violates his constitutional right to protection from cruel and unusual punishment as guaranteed by the Eighth Amendment and to due process of law.  U.S. Const. amends. V, VIII, IX, XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, 20; Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases).

155.    Upon information and belief, Petitioner Jackson contends that the chemicals that will be used to bring about his execution will result in undue pain and suffering.  Typically, the chemicals include Sodium Thiopental or Sodium Pentothal (an ultra short-acting barbiturate); Pancuronium Bromide or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers living the inmate's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).  [Exhibits 80, 81.]

156.    This particular combination of chemicals will cause Petitioner Jackson to consciously suffer an excruciatingly painful and protracted death.  [Exhibit 82.]

157.    Sodium thiopental, or sodium pentothal, is an ultra short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise from the insertion of a breathing tube prior to the surgery.

40

Because of its brief duration, sodium thiopental may not provide a sedative effect of the sodium thiopental is neutralized by the second chemical typically use, pancuronium bromide. [Id.]

158.    The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.

159.    While Pavulon paralyzes skeletal muscles, including the diaphragm, it has no effect on consciousness or the perception of pain or suffering. To the extent that the first chemical, sodium thiopental, is neutralized by the second, Pavulon, the paralytic chemical (Pavulon) will serve only to mask Petitioner's excruciating pain. [Id.]

160.    The risk of inflicting severe and unnecessary pain and suffering upon Petitioner in the lethal injection process is particularly grave because, upon information and belief, the procedures and protocols designed by the State of; Ohio do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, and do not establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion during the lethal injection procedures.

161.    Executioners in administering to Petitioner Jackson chemicals that will cause unnecessary pain in the execution of a sentence of death, thereby depriving Petitioner of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

**Exhibits in Support of this Ground for Relief:** 80, 81, 82

**Legal Authority:** U.S. Const. amends. V, VIII, IX, XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, 20; Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998)

## FOURTEENTH CAUSE OF ACTION

162.    Petitioner hereby incorporates by reference all of the allegations contained elsewhere in this Petition as if rewritten fully herein.

163.    Petitioner Jackson's judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the constitution.  U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

164.    In theory, post-conviction offers a convicted defendant an opportunity to test the constitutional validity of his conviction and sentence. An adequate corrective process should be "swift and simple and easily invoked," should "eschew rigid and technical doctrines of res judicata of forfeiture, waiver or default," and should "provide for full fact hearings to resolve disputed factual issues."  Case v. Nebraska, 381 U.S. 336, 346-47 (1965) (Brennan, H., concurring); Goldberg v. Kelly 397 U.S. 254 (1970); Evitts v. Lucey, 469 U.S. 387 (1985).  This minimum standard for state post-conviction proceedings are not fulfilled by the cursory, inadequate, and ineffective process provided for in the relevant Ohio statutes, nor do the state courts, in practice, provide any meaningful review in these proceedings.  Since 1982, only one death row inmate has been granted relief from a trial court on a post-conviction petition.[1]

165.    The text of the statute provides that a petitioner must include affidavits or evidence dehors the record in support of the claims in a petition.  O.R.C. § 2953.21(A).  It is from the face of the petition that a trial court must determine if a hearing is required.  State v. Cooperrider, 4 Ohio St. 3d 226 (1984).  All this must be done without the benefit of the discovery processes available to every other civil litigant.  Without this access, Ohio's post-conviction process imposes an impossible pleading standard on petitioners.

166.    Recent amendments by the Ohio Supreme Court and the Ohio Legislature to Rule 35 of Criminal Procedure, which became effective on July 1, 1997, further curtail the post-conviction process.  Ohio R. Crim. P. 35(A) now demands that each cause of action contained in a post-conviction petition not exceed three pages.  The Staff Notes to the amendment state the purpose of this change is to "introduce some uniformity in post-conviction relief proceedings and aid in the administration of justice."  Uniformity in the post-conviction process may be a rational goal; however, it cannot be achieved at the expense of criminal defendants who are now facing death.  If the need for uniformity in post-conviction cases is balanced against the requirement that capital cases be afforded the highest degree of due process, the only acceptable, and constitutionally sound, resolution is to protect due process rights.

167.    The Sixth Circuit Court of Appeals has expressed its concerns regarding the State of Ohio's inadequate, excessively narrow, and ineffectual post-conviction scheme.  Keener v. Ridenour, 594 F.2d 581, 590 (6th Cir. 1979).  The basis for the Sixth Circuit's dissatisfaction with Ohio's lack of process can be traced to State v. Perry, 10 Ohio St. 2d 175 (1967).  After Perry, The Sixth Circuit recognized that "[b]ecause of the narrow limits placed on the Ohio post-conviction statute, there is no longer any effective State remedy open to the Appellant to exhaust. *The Perry decision has rendered such process ineffective to protect the rights of the Appellant.*"  Coley v. Alvis, 381 F.2d 870, 872  (6th Cir. 1967) (emphasis added).  Accord Allen v. Perini, 424 F.2d 134, 139-140 (6th Cir. 1970).

168.    The Ohio Legislature established a post-conviction procedure to effectuate the constitutional rights of those individual convicted of criminal offenses.  Assuming *arguendo* that those procedures do not emanate directly from clear constitutional provisions, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in

---

[1] State v. Barnes, No. CR-83-5911 (Lucas C.P. May 17, 1991).

43

accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause." Evitts v. Lucey, 469 U.S. 387, 401 (1985). Ohio's procedures for post-conviction review at both the trial and appellate court levels must comport with the constitutional requirements of due process.

169.   A viable, fair, effective means for Petitioner to raise collateral challenges to his criminal conviction and sentence is all the more critical here because petitioner's "life" interest (protected by the "life, liberty and property" language in the Due Process Clause) is at stake in the proceeding.  Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998).  Death is different; for that reason more process is due, not less.  See Lockett v. Ohio, 438 U.S. 586 (1978); Woodson v. North Carolina, 428 U.S. 280 (1976). Petitioner is entitled to an adequate post-conviction remedy in order to vindicate his Ohio and Federal constitutional rights to effective assistance of counsel, due process of law, equal protection of the law, confrontation of the State's evidence against him, and freedom from cruel and unusual punishment.  U.S. Const. amends. V, VI, VIII, IX and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16 and 20.  Due to the unconstitutionality of Ohio's post-conviction procedures, Petitioner must be granted a new trial or, at minimum, discovery and an evidentiary hearing on this Ground For Relief.

**Legal Authority:** U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; Case v. Nebraska, 381 U.S. 336 (1965); Goldberg v. Kelly 397 U.S. 254 (1970); Evitts v. Lucey, 469 U.S. 387 (1985); State v. Cooperrider, 4 Ohio St. 3d 226 (1984); Keener v. Ridenour, 594 F.2d 581(6th Cir. 1979); State v. Perry, 10 Ohio St. 2d 175 (1967); Coley v. Alvis, 381 F.2d 870 (6th Cir. 1967); Allen v. Perini, 424 F.2d 134 (6th Cir. 1970); Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998); Lockett v. Ohio, 438 U.S. 586 (1978); O.R.C. § 2953.21(A); Ohio R. Crim. P. 35.

## FIFTEENTH CAUSE OF ACTION

170.    Petitioner Nathaniel Jackson fully incorporates each and every fact contained elsewhere in the Petition as if fully rewritten herein.

171.    Petitioner Jackson's conviction and sentences are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in this Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition in paragraphs one through one-hundred-fifty-eight have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the United States and Ohio Constitutions.   When reviewing a criminal case where numerous violations of the Rules of Evidence occurred at trial, the Ohio Supreme Court has held that "a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." State v. DeMarco, 31 Ohio St. 3d 191, syl. 2 (1987). See also State v. Bunch, 62 Ohio App. 3d 801 (1989).

172.    Petitioner Jackson contends, again assuming *arguendo* that this court does not deem any individual Ground for Relief as meriting the relief sought, that the errors presented in his Post-Conviction Petition taken together, are of sufficient magnitude as to warrant the granting of a new trial or, at minimum, discovery and an evidentiary hearing on this Ground For Relief.

**Exhibits in Support of this Ground for Relief:** 1-79

**Legal Authority:** State v. DeMarco, 31 Ohio St. 3d 191 (1987); State v. Bunch, 62 Ohio App. 3d 801 (1989).

## IV. CONCLUSION

**WHEREFORE**, Petitioner Nathaniel Jackson requests the following relief:

A.     That this Court declare Nathaniel Jackson's judgment to be void or voidable and grant him a new trial;

B.     In the alternative, that this Court declare Nathaniel Jackson's death sentence to be void or voidable and grant him a new sentencing hearing before a jury;

C.     If this Court is not inclined to grant Nathaniel Jackson relief based on the matters raised in this petition and supported by the attached exhibits, then he requests that this Court grant him leave to pursue discovery to more fully develop the factual basis demonstrating the constitutional violations that render his conviction and death sentence void or voidable;

D.     If this Court is not inclined to grant Nathaniel Jackson relief based on the matters raised in this post-conviction petition and supported by the attached exhibits, then he requests that, after permitting him to pursue discovery, that this Court conduct an evidentiary hearing pursuant to Ohio Revised Code Ann. § 2953.21;

E.     That this Court grant any further relief to which Nathaniel Jackson might be entitled.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender


RANDALL PORTER (0005835)
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street, 11th Floor
Columbus, Ohio  43215-2998
(614) 466-5394
Fax:  (614) 644-0703
COUNSEL FOR PETITIONER

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **NATHANIEL JACKSON'S**

**AMENDED POST-CONVICTION PETITION** was forwarded by first-class, postage prepaid

U.S. Mail to Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's

Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio  44481, on this

____ day of March, 2004.

RANDALL L. PORTER
COUNSEL FOR PETITIONER

47