## AFFIDAVIT OF DORIAN HALL

STATE OF OHIO )
) ss:
COUNTY OF FRANKLIN )

I, Dorian Hall, after being duly sworn according to law, state as follows:

1) I am an investigator employed by the Ohio Public Defender ("OPD").

2) In the course of my employment, OPD requested that I verify the race of individuals who had served as grand jury forepeople in Hamilton County, Ohio.

3) I verified that Foreperson George Morrison is a white male.

4) I verified that Foreperson Robert W. Wynne is a white male.

5) I verified that Foreperson Louis Steinberg is a white male.

Further affiant saith naught.

_____
DORIAN HALL

Sworn to and subscribed in my presence this 18th day of February, 2000

_____
NOTARY PUBLIC



JOHN W. LEE
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOV. 5, 2003

## AFFIDAVIT OF MARK ROOKS

STATE OF OHIO        )
                             )    ss:
COUNTY OF FRANKLIN  )

I, Mark Rooks, after being duly sworn according to law, state as follows:

1)      I am an investigator employed by the Ohio Public Defender ("OPD").

2)      In the course of my employment, OPD requested that I verify the race of individuals who had served as grand jury forepeople in Hamilton County, Ohio.

3)      I verified that Foreperson Winifred Carroll is a white female.

4)      I verified that Foreperson Inge Stoller is a white female.

5)      I verified that Foreperson Robert Haney is a white male.

6)      I verified that Foreperson Kenneth Ruzick is a white male.

7)      I verified that Foreperson Samuel Ackley is a white male.

8)      I verified that Foreperson Robert Byles is a white male.

9)      I verified that Foreperson Frank M. Yunger is a white male.

10)      I verified that Foreperson Kenneth M. Keefe is a white male.

Further affiant saith naught.

_____
MARK ROOKS

Sworn to and subscribed in my presence this 18 day of February, 2000

_____
NOTARY PUBLIC

## AFFIDAVIT OF JOHN LEE

STATE OF OHIO            )
                         )    ss:
COUNTY OF FRANKLIN       )

I, John Lee, after being duly sworn according to law, state as follows:

1)      I am an investigator employed by the Ohio Public Defender ("OPD").

2)      In the course of my employment, OPD requested that I verify the race of individuals who had served as grand jury forepeople in Hamilton County, Ohio.

3)      I verified that Foreperson Raymond L. Helferich is a white male.

4)      I verified that Foreperson John Jaspers is a white male.

5)      I verified that Foreperson William J. Krueger is a white male.

Further affiant saith naught.

_____
JOHN LEE

Sworn to and subscribed in my presence this 18 day of February, 2000

_____
NOTARY PUBLIC

DORIAN L. HALL
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES JULY 7, 2003

# Friendly Foremen

## Are Hamilton County Judges Calling on Friends to Help Issue Death Penalty Indictments?

*by Jamie Pietras*

You can't talk criminal justice in Ohio without talking race and economics.

Proportionally speaking, there are far more African-Americans in jail and on death row than other demographic groups. African-Americans make up only 12 percent of Ohio's population, but make up about 50 percent of those waiting to be executed in Lucasville's death chamber. Likewise, Ohio jails as a whole are just over 50 percent black.

Conversely, the powers that hold the keys to the justice system—the attorneys and judges—are overwhelmingly white. In a report issued last year, the Ohio Commission for Racial Fairness surveyed judges and attorneys across the state. Ninety-six percent of judges were white, as were 86 percent of attorneys.

Now, attorneys in the Ohio Public Defender's office have discovered information that adds fuel to the already inflammatory racial undertones of death-penalty politics.

The public defender found that in Hamilton County, the runaway leader in death-penalty convictions, grand jury forepersons seem to have a lot in common with the judges and prosecutors: They're very white and they're very male.

The Hamilton County prosecutors and judges contacted by *Columbus Alive* didn't think this was a big deal. The wheels of justice turn at the same pace for all, regardless of race, they contend. But public defenders argue the finding smacks of racial insensitivity.

The revelation came out of the pending federal appeals of African-American death row inmates William Henry Smith and Shawn Hawkins.

In 1995, U.S. District Judge for Southern Ohio S. Arthur Spiegel gave Smith's attorneys access to the names and addresses of all grand jurors and grand jury forepersons that had returned death indictments in Hamilton County since 1982. In 1998, U.S. District Judge Susan Dlott allowed updated information to be released in the Hawkins case.

Smith was indicted in 1987 for the rape and murder of a 47-year-old Cincinnati woman. Hawkins was indicted in 1989 for shooting and then robbing two men. Both Hawkins and Smith were sentenced to death. Like all death cases, their eventual convictions began with indictments from a grand jury.

Completely secret judicial bodies kept away from the public eye, grand juries help turn the keys on the ignition of the death machine. Unlike the trial juries that actually hear death penalty cases and deliver sentences, the identity of grand jurors is never made public. They hear evidence from the prosecutor and then choose whether or not to indict someone with death-penalty specifications. In Hamilton County, 12 grand jurors are needed to indict—11 randomly

selected from a random sample of registered voters supplied by the local board of elections. The foreperson, however, is selected by a judge.

According to public defender data, the same six people each served twice as grand jury forepersons. Two people each served as forepersons on three different grand juries.

"It's pretty apparent there's something wrong in that county," said Larry Komp, a public defender working on Smith's case.

"You don't see something like that unless you're in the deep South," added fellow public defender Jane Perry.

The public defenders suspected judges were merely choosing their friends to serve as grand jury forepersons.

In an interview last week with *Columbus Alive*, Hamilton County Common Pleas Court Judge Thomas Crush as much as confirmed this fear while pooh-poohing the public defenders' concerns. "Maybe [judges'] friends are mostly white and that accounts for the white forepersons," Crush admitted. "Public defenders will make significant anything they can."

While he said he usually picked a foreperson from the random pool provided by the board of elections, Crush said he may have chosen someone he knew once. "I just say, 'Who's available?'" said Crush,

foreperson.

Using the grand jury information released by both judges, the public defender's office tracked down the 87 grand jury forepersons that returned death indictments from 1982 through 1998.

The public defender hired the Minnesota-based National Jury Project Midwest to help crunch the numbers, and when the results came back earlier this year, the public defender's attorneys had their worst suspicions confirmed: In Hamilton County, there were a mere four African-American forepersons of grand juries returning death-penalty indictments from 1982 through 1998.

Had this been consistent with the number of African-Americans in Hamilton County, there should have been 18 or 19 African-American forepersons. In the first five years after capital punishment was reinstated in Ohio, when 13 men were sentenced to death in Hamilton County, there were no African-American forepersons.

Women, too, were underrepresented. Roughly 22 percent of the 87 forepersons were women, though more than half the county's residents are women.

Why the discrepancy?

> ## "Is there some law that says you have to have a certain number of African Americans serve as grand jury forepersons? Then they weren't underrepresented."
> ## —Judge Thomas Crush, Hamilton County Common Pleas Court

In Hamilton County, grand juries are selected from a random sample of registered voters supplied by the local board of elections. The foreperson, however, is selected by a judge.

for second-degree murder, alleged that African Americans had been excluded from the selection of grand jurors—specifically, grand jury forepersons.

The Supreme Court rejected the state of Louisiana's argument that "no harm is inflicted when a single grand juror is selected based on racial prejudice because the discrimination is invisible to the grand jurors on that panel and only becomes apparent when a pattern emerges over the course of the years."

Justice Anthony Kennedy wrote the court's decision, which reversed Campbell's sentence and sent the case back to the trial court. "This argument underestimates the seriousness of the allegations here," the Supreme Court held. "If they are true, the impartiality and discretion of the judge himself would be called into question."

Joe Bodine, head of the Ohio Public Defender's federal appeals section, thinks the grand jury findings epitomize problems in Hamilton County. "When you have a county that statistically death-indicts African Americans who kill white people and not the reverse, then race is an issue," Bodine said. "Where African Americans are grossly underrepresented in that indictment process, then yeah, it's a big concern."

Crush is tired of the race-baiting. "I don't give a damn about race," he said,

cases, "You can't assume that just because a judge appoints someone he knew, that [the foreperson] is a stooge...It's insulting to people who've been appointed to say these haven't been good grand juries."

State Treasurer Joe Deters, who put 22 men on death row in his tenure as Hamilton County prosecutor from 1992 to 1998, said the foreperson's role shouldn't be overstated. "They're quite insignificant. They handle the bookkeeping and clerical duties for the jury itself."

But they do have a vote, just like other grand jurors.

When asked about the significance of the public defender's findings, Crush offered a simple answer. "Is there some law that says you have to have a certain number of African Americans serve as grand jury forepersons?" the judge asked rhetorically, then concluded that "they weren't underrepresented."

While there may not be a state constitutional statute or court precedent dictating the proper composition of grand jury forepersons, the U.S. Supreme Court ruled in April 1998 on a similar claim brought forth by a defendant in Louisiana.

Terry Campbell, a white man indicted

be taken. "I've never appointed a Chinaman, Japanese, an Aleut," Crush said. He likened the efforts of the anti-capital-punishment movement to those of liberal groups such as Greenpeace. "The anti-capital-punishment people will never stop," he said.

Deters was aware the public defender's office had the grand jury information, but didn't know about the National Jury Project's analysis. "I'm not familiar with that study, but there's a series of studies, so to speak, and generally they're all shams," Deters said. "I can tell you categorically that some of our toughest and staunchest jurors in these cases have been African-Americans, and to infer otherwise is a pretty racist thing to do."

He continued, "I don't know what the race of a juror has to do with their ability or inability to follow the law. To infer that African-Americans won't follow the law, I think, is a very racist thing to allege...If I filed a motion saying we're not getting white jurors, could you imagine the outrage from the liberal community? It would be deafening how upset everyone would get, and rightfully so."

"The bottom line on all these things," Deters said, "is that the state public defender's office and those who wish we didn't have a death penalty in this state are grasping at straws and trying to throw everything they can against the wall and hoping something sticks."

Ohio Supreme Court Chief Justice Thomas Moyer wouldn't comment specifically on the grand jury foreperson issue, but said, "I do know from talking to people who've been forepersons that it's a commitment of time and sort of mental resources. But, I don't know why there would be, in a county that large, somebody that served three times."

In Cuyahoga County, judges also handpick grand jury forepersons, who don't have to come from the jury pool. Usually, the court opts for a noteworthy member of the community, said Noble Guila, commissioner of the Cuyahoga County Court of Common Pleas. The *Cleveland Plain Dealer* always publishes pictures and bios of grand jury forepersons.

In Franklin County, nine members sit on a grand jury and seven are needed to indict. Grand jurors are randomly drawn from registered voter rolls. A foreperson is selected from the existing jurors by prosecutors and Common Pleas Court Bailiff Melanie McCoy.

When asked whether she thought racial composition of a grand jury was significant, McCoy said, "The thought's never come across my mind." She noted that women have always been well represented on Franklin County grand juries.

David Bodiker, the Ohio Public Defender, admits that, practically speaking, the composition of the grand jury won't do much to affect the outcome of an indictment.

"My experience is that the grand jury would indict a ham sandwich if the prosecutor told them to," Bodiker said. "What I'm sure is involved is the fact that we have such difficulty with Hamilton County, with the judges, with the attorneys.... When you get an obvious and apparent defect, it's a chink in the armor and you can go after it."

EXHIBIT 43

EXHIBIT
**44**

1. RSF HAD BEGUN TO GET FAKE ID YEARS AGO. HE HAD THIS OBSESSION ABOUT FAKING HIS OWN DEATH BY PARKING HIS CAR SOMEWHERE, SPRINKLING SOME OF HIS BLOOD AROUND. THEN HE SAID HE WOULD GO TO MICHAEL'S FOR A YEAR. IN FACT, HE SAID ST. FARM ASKS NO QUESTIONS AND WOULD PAY FAST. ~~xxxxxxxxxxxxxxxxxxxx~~ ? I TOLD HIM HE WAS CRAZY AND NEVER BELIEVED HE WOULD DO SUCH A STUPID THING. HE SAID HE WAS SICK OF WORKING SO HARD BUT STILL WANTED TO LIVE THE GOOD LIFE. MICHAEL KNEW ALL ABOUT IT.

AS FAR AS A LOOK ALIKE, I CAN'T BELIEVE YOU HIT ON THAT! YOUR ATTY. SHOULD SPEAK TO ONE OF OUR FORMER EMPLOYEES WHO NOW HAS THE WARREN GREYHOUND STATION, LARRY SOUTHWICK WHO WAS PART TIME WITH US + FULL TIME FOR AN AMBULANCE CO (IN WARREN) - CAN'T RECALL THE NAME. BUT HE + RSF WERE ALWAYS TALKING ABOUT GETTING A VAGRANT'S BODY WHO COULD REPLACE RSF. I KEPT TELLING THEM THEY WERE NUTS. LARRY ENCOURAGED HIM SINCE HE WAS AN OPERATOR AND KNEW WHEN PHONE (DISPATCHER) BODIES CAME IN. LARRY + ROBERT EVEN AGREED ON LARRY'S 'FEE' OF $100,000 AS I RECALL.

I THINK THAT'S WHY HE KEPT TRYING TO GET TOGETHER WITH KATHY THOMAS, OUR INSURANCE AGENT FOR ANOTHER MILLION IN COVERAGE, AND SAYING IT WAS FOR ME BECAUSE I WOULDN'T BE ABLE TO TAKE CARE OF MYSELF. SHE TESTIFIED THAT THE 3 OF US WERE PLAYING 'PHONE TAG' IN NOVEMBER AT MY TRIAL - DID SHE SAY THAT AT YOURS?

*[left margin notes, partially cut off]*
Y THE WAY,
THE POLICE
DID SEARCH
THE WARREN
OFFICE, THEY
FOUND HIS
DUCK BAG -
HIS GUN - HE
TOOK IT
WITH HIM,
BUT THERE
WERE AND
OTHER THINGS,
THOSE METAL
THINGS YOU
THROW AT PEOPLE

2

BUT THE HOLIDAYS WERE BUSY SO RSF SAID HE'D DO IT IN JANUARY WHEN THINGS SLOWED DOWN. SO, I KNEW ABOUT THE MILLION BECAUSE I WAS INVOLVED IN THE 'PHONE TAG' TRYING TO HELP MAKE AN APPOINTMENT. HE WAS DETERMINED TO GET IT ASAP IN JANUARY. HE HAD TO SCHEDULE A COMPLETE EXAM TO GET A MILLION. I BELIEVE HE UPPED THE ST. FARM FROM 250K TO 300K BECAUSE HE DIDN'T NEED AN EXAM FOR THE EXTRA 50K. I SWEAR I DID NOT KNOW ABOUT THE EXTRA 50K.

HE HAD A PRIVATE INVESTIGATOR'S LICENSE IN THE STATE OF FLORIDA AND SOLD IT JUST BEFORE I MET HIM. WAIT— HE WAS STILL SERVING SUPOENAS - I WENT FOR THE RIDES WITH HIM. HE HAD ALREADY BEEN WORKING FOR W. W. GRANGER, INC. (ON THE STOCK EXCHANGE). BUT A COUPLE OF YEARS LATER HE WAS AFRAID THEY WERE GOING TO TAKE PART OF HIS AREA AWAY (LESS COMMISSIONS) SO HE SAID HE HURT HIS BACK AT THE OFFICE/WAREHOUSE AND WENT ON WORKMEN'S COMP. FOR A COUPLE OF YEARS AND MADE A SETTLEMENT, PLUS GOT 100% OF HIS RETIREMENT FUND.

I DIDN'T PAY A LOT OF ATTENTION TO HIS GOINGS ON, I WAS AFRAID OF HIM SOMETIMES. HE COULD BE QUITE VIOLENT. IN FACT, WHEN HE MET ME, HE WAS STILL MARRIED + LIED AND SAID HE WAS DIVORCED BECAUSE HE WAS AFRAID I WOULDN'T WANT TO GO THROUGH THAT. HE PAINTED HER SILVER LINCOLN WITH BLACK PAINT WHILE SHE WAS AT WORK, STOLE HER BAG WITH #?.!!@# PICTURES IN IT, TOLD EVERYONE SHE SLEPT WITH HER

3

EX-HUSBANDS FATHER (HER FATHER-IN-LAW). HE SOLD ME THE
HOUSE SO SHE WOULDN'T GET ANY MONEY. HE WAS PLANNING
HOW TO THROW A MOLOTOV COCKTAIL THROUGH HER ATTY'S
HOUSE WINDOW. AT THE SAME TIME HE WAS FIGHTING
WITH HIS FIRST WIFE OVER CHILD SUPPORT + TRANSFERRED A
25K CD INTO MY NAME. HE SAID HE WAS PENNILESS AND
HAD NO PLACE TO LIVE. HE WAS A VICIOUS MAN, ONE
YOU'D BETTER NEVER PISS OFF. HONEST. HE RIPPED OFF
MANY CREDIT CARD COMPANIES. WE WERE EARNING OVER
200K A YEAR, BUT IT WAS NEVER ENOUGH. IT'S LIKE
HE JUST HAD THAT IN HIM.

AS FOR ME, I WAS ALREADY WORKING FOR THE PLASTIC
SURGEON FOR 9 YEARS WHEN WE MET, IN JUNE, 1981.
WE WERE DIVORCED IN 1985 TO PROTECT MY ASSETS. HE
DIDN'T WANT TO TAKE ANY CHANCE OF HIS TWO SONS EVER
GETTING ANYTHING. JUDGE THOMAS SWIFT (WARREN) IN PROBATE
SAW HIS WILL! 1¢ TO THEM, OF COURSE. HIS KIDS
CAME UP TO OHIO TO FIGHT IT — AFTER HIS FUNERAL.
THEY ARE EXACTLY LIKE HIM, MONEY GRUBBERS.

MARRIED
6,22, 1983

KATHY THOMAS          LARRY SOUTHWICK
C/O STATE FARM        C/O GREYHOUND BUS STATION
MAHONING AVE.         E, MARKET ST.
Y-TOWN 44515          WARREN, OHIO  44
330-793-1136

Tony Consoldane

04-CR-794

Dear Honorable

Judge Stuard:

I Nathaniel Jackson Am writing in regards to Different council, Due to the fact that my Attorney Anthony Consoldane is not representing me right An I have a capitol Murder ca An not one time has he been to bring none of the tapings so that I can hear them, An everytime he came to see me he was always supose to been have bringi them but keep coming with excuses An its starting to scare me because he's got me thinking now that he's against me, An then he laughed in my face An told me that he didn't have to come in on his off Day, but wh was the purpose when he still didnt bring the informati that I've been asking for since December, An he got very personal when I asked if he had time to take my case because when he came in he quote I've been very busy An haven't had the time to get down to see you so I came on my off Day An when I asked about the information that he's been putting off he got rather personal An told me that he was finish talking with me, but your Honor he has not been working with me An I would like for the courts to appoint me new council because Im Dealing with my life An he's not taking my case serious, An I would rather stand trial by myself then to have Anthony Consoldane so please your Honor take this Request into consideration because my life is at stake. Thank you

Nathaniel Jackson

EXHIBIT
45

# INDIVIDUALIZED EDUCATION PROGRAM

School Year _89-90_

Initial Placement: Date _2-18-86_
Periodic Review: Date _____

Pupil's Name (Print) _NATE JACKSON_     Birthdate _2-13-72_ Age _17_ Handicap _MH(SBH-DH)_

Parent/Guardian _PAULINE KORNEGAY_     Address _309 S. PEARLE_     Phone _—_

School District of Residence: _YOUNGSTOWN_     School District or Educational Agency of Attendance: _EAST_ (Home School)     _STAMBAUGH_ (Service School)

Student Number _0016-77-20_     Grade _11_     Plan Date _11-17-89_

| PROGRAM & SERVICES | CHECK NEEDS | DATE TO BE INITIATED | ANTICIPATED DURATION | COMMENTS |
|---|---|---|---|---|
| Regular Class | | | | |
| Supplemental Service | | | | |
| Ind. Sm. Group Inst. | | | | |
| Spec. Class/L.C. | ✓ | 11/89 | one year w/review | (MH UNIT STAMBAUGH) |
| Home Instruction | | | | |
| Speech & Hearing | | | | |
| Work-Study | | | | |
| Adapted Phys. Ed | | | | |
| Transportation | ✓ | 11/89 | one year w/ review | |
| Other | 11-13-89 to | | | |
| Other | | | | |

EVALUATION PROCEDURES COMPLETED:     INFORMATION GATHERED
Date Completed:     Comments:

| | |
|---|---|
| _6-1-86_ | Medical _10-1-89_ |
| _2-16-89_ | Psychological _BINET_ |
| _1-18-89_ | Hearing-Screening _PASSED AT 20 DECIBELS._ |
| _4-21-89_ | Speech/Language, Testing _TOAL-2_ |
| _1-18-89_ | Audiogram ____ |
| _1-18-89_ | Visual Screening _FAILED_ |
| | Teacher Assistant Team (TAT) ____ |
| _6-10-89_ | Placement Conf. (Parent) ____ |
| | Orthopedic ____ |
| | Other ____ |

Evaluation Date Conform to Rules:  Yes: _✓_  No: ____

EXTENT OF PARTICIPATION IN REGULAR EDUCATION PROGRAM: _NONE_

PRESENT LEVELS OF PERFORMANCE in the following appropriate areas:

Medical: _NONE_ Diet Restrictions _NONE_ Medication _NONE_

Vision: Wears Corrective Lens     Yes _X_     No ___

Reading Level: Word Rec. _10.0_     Oral Reading _11.0_

Reading Comprehension _10.0_     Spelling - _GR. 8_

Math Calculation _5.0_     BRIGANCE - SEPT. 1989

Math Reasoning _4.0_

Intelligence: _BINET_ Verbal _—_     Performance _—_     Full _70_

Adaptive Behavior _VINELAND_

Learning Modality ____

Classroom Behavior _DES - SIGNIFICANT_

Behavior Expectancy _BEHAVIOR IS DIRECTLY RELATED TO HANDICAP._

FOR USE OF SP/LANG. CLINICIAN: Present Levels of Performance in appropriate areas:

Oral Expression _CA:17-2, SS:79, M:100, O:15_

Listening Comprehension _CA: 17-2, SS:52, M:100, O:15_

Written Expression _CA 17-2, SS: 76, M:100, O:15_

Articulation

Voice  } _NORMAL_

Fluency

Hearing  _PASSED._

White—CIMS
Canary—Parent
Pink—Coordinator
Goldenrod—CIMS

6915

**EXHIBIT 46**

| ANNUAL GOALS | SHORT TERM INSTRUCTIONAL OBJECTIVES | EVALUATION PROCEDURES & CRITERIA |
|---|---|---|
| 1. TO ACQUIRE INTERNAL BEHAVIOR MANAGEMENT CONTROLS NECESSARY TO RESPOND POSITIVELY TO THE LEVEL MANAGEMENT SYSTEM 85% OF THE DAYS IN ATTENDANCE USING BASELINE DATA CHARTS. | A. TO GAIN POSITIVE BEHAVIOR POINTS ON A DAILY BASIS 85% OF THE DAYS IN ATTENDANCE USING BASELINE DATA CHARTS. | A. BASELINE DATA CHARTS - 85% ACCURACY. |
| 2. NATE WILL REDUCE PSYCHOSOMATIC PHYSICAL SYMPTOMS AND FEARS RELATING TO SCHOOL AND PERSONAL PROBLEMS. | A. NATE WILL EXPRESS WORRIES AND CONCERNS REGARDING HOME OR SCHOOL IN AN APPROPRIATE MANNER. | A. Teacher observation - 85% performance. |
|  | B. NATE WILL REDUCE THE NEGATIVE COMMENTS HE MAKES ABOUT SCHOOL BY TWO SLIPS PER DAY. | B. Baseline data charts - 85% performance. Teacher observation. |

THIS IEP WAS DEVELOPED BY THE FOLLOWING CONFERENCE PARTICIPANTS (Include name and title): S. Gregory
(Teacher)

_____

_____

_____

11-27-89  William Esterly
Date    Placement Committee Chairperson

**LEAST RESTRICTIVE ENVIRONMENT**
If placement is in a separate facility, document needs that necessitate;

The continuum of program options for which my child is eligible has been explained to me. I have received these brochures and I understand that the indicated placement is the least restrictive.
I HAVE REVIEWED THE IEP AND ACCEPT ___✓___ DO NOT ACCEPT _____ THE PROGRAM AND PLACEMENT RECOMMENDATION

11-27-89   PARENT INVITED - DID NOT ATTEND.
Date                                              (Signature of Parent)
I AGREE TO WAIVE MY RIGHT TO RECEIVE NOTIFICATION OF PROPOSED PLACEMENT LETTER BY CERTIFIED MAIL.

_____
Date                                              (Signature of Parent)

CRITERIA AND SCHEDULES FOR PERIODIC (ANNUAL) REVIEW:                    Date _____
a. Are Instructional Objectives being achieved?    1. Met as stated    ☐ Yes    ☐ No
   2. Made progress   ☐ Yes   ☐ No    No observable progress _____
b. Is the current placement appropriate?    ☐ Yes   ☐ Data Base _____
c. REVIEW SCHEDULE: ANNUAL ____ SEMI-ANNUAL ____ Other (Specify)_____
d. Recommendations for placement and general program for next school year:

State and Federal Rules and Regulations mandate that every handicapped child be re-evaluated at least every three years. This is to NOTIFY YOU THAT YOUR CHILD WILL BE PROVIDED THAT MANDATED RE-EVALUATION prior to your child's next Periodic Review.
Mark if applicable:

White—CIMS
Canary—Parent
Pink—Program Coordin
Goldenrod—CIMS

Conference Chairperson          Parent/Guardian          Teacher          Parent Signature

_89-90_
School Year

_NATE JACKSON._
Student's Name

Page _3_ of _5_

| Annual Goals: | Short Term Instructional Objectives: | Evaluation Procedures & Criteria: |
|---|---|---|
| 3. NATE WILL INCREASE WORD RECOGNITION SKILLS. | A. WHEN PRESENTED W/ A LIST OF 10 WORDS COMMONLY FOUND AT THE TENTH GRADE LEVEL, NATE WILL PRONOUNCE THE WORDS W/ 85% ACCURACY. <br><br> B. WHEN PRESENTED W/ A 10th grade PASSAGE, NATE WILL READ ORALLY W/O EXPERIENCING DIFFICULTY IN PRONOUNCING MORE THAN TWO WORDS IN 20. | A. INFORMAL TESTING - 85% ACCURACY <br><br> B. INFORMAL TESTING - 85% ACCURACY. |
| 4. NATE WILL INCREASE HIS ABILITY TO SOLVE COMPREHENSION QUESTIONS FROM 10.0 TO 10.5 | A. NATE WILL ANSWER WHO, WHAT, WHERE, WHEN, + HOW QUESTIONS CONCERNING A PASSAGE AT IN-STRUCTIONAL LEVEL - READ ORALLY OR SILENTLY. <br><br> B. NATE WILL BE ABLE TO DRAW CONCLUSIONS FROM A READING SELECTION READ SILENTLY OR ORALLY 85% OF THE TIME. | A. INFORMAL TESTING - 85% ACCURACY. <br><br> B. INFORMAL TESTING- 85% ACCURACY. |
| 5. NATE WILL INCREASE MATH GRADE LEVEL FROM 5.0 TO 5.5. | A. Nate WILL BE ABLE TO ADD AND SUBTRACT FRACTIONS W/ LIKE AND UNLIKE DENOMINATORS W/ 85% ACCURACY. <br><br> B. NATE WILL COMPLETE EXER-CISES USING DECIMALS IN ADDITION, SUBTRACTION, MULTIPLICATION, + DIVISION W/ 85% ACCURACY. | A. INFORMAL TESTING - 85% ACCURACY. <br><br> B. INFORMAL TESTING - 85% ACCURACY. |
| 6. NATE WILL INCREASE HIS ABILITY TO SOLVE COMPREHENSION PRO-BLEMS FROM 4.0 TO 4.5, | A. NATE WILL DETERMINE THE OPERATION NEEDED TO SOLVE A WORD PROBLEM 85% OF THE TIME <br><br> B. NATE WILL SOLVE WORD PROBLEMS BY ADDING, SUBTRACTING, MULTIPLYING, OR DIVIDING W/ 85% ACCURACY. | A. INFORMAL TESTING - 85% ACCURACY. <br><br> B. INFORMAL TESTING- 85% ACCURACY. |

89-90
School Year

NATE JACKSON
Student's Name

Page 4 of 5

| Annual Goals: | Short Term Instructional Objectives: | Evaluation Procedures & Criteria: |
|---|---|---|
| 7. NATE WILL INCREASE HIS KNOWLEDGE OF ROCKS and HOW THEY ARE FORMED. | A. NATE WILL BE ABLE TO LIST THE THREE TYPES OF ROCKS FOUND IN THE EARTH'S CRUST + WILL STATE HOW THEY ARE FORMED.<br><br>B. NATE WILL STATE AT LEAST ONE WAY THAT IGNEOUS, SEDIMENTARY, AND METAMORPHIC ROCKS CAN BE IDENTIFIED. | A. INFORMAL TESTING - 85% ACCURACY.<br><br>B. INFORMAL TESTING - 85% ACCURACY |
| 8. NATE WILL INCREASE HISTORY SKILLS IN ORDER TO INCREASE UNDERSTANDING OF AMERICAN HISTORY. | A. NATE WILL LIST 5 BASIC RIGHTS OF ALL AMERICAN CITIZENS.<br><br>B. NATE WILL LIST 4 BELIEFS STATED IN OUR CONSTITUTION W/ 85% ACCURACY. | A. INFORMAL TESTING - 85% ACCURACY.<br><br>B. INFORMAL TESTING - 85% ACCURACY. |
| 9. NATE WILL INCREASE GRAMMAR SKILLS. | A. GIVEN 10 SENTENCES, NATE WILL UNDERLINE THE SIMPLE SUBJECT ONCE + THE SIMPLE PREDICATE TWICE.<br><br>B. GIVEN 10 SENTENCES, NATE WILL WRITE WHETHER THE SENTENCE IS DECLARATIVE, INTERROGATIVE, IMPERATIVE, OR EXCLAMATORY W/ 85% ACCURACY. | A. INFORMAL TESTING - 85% ACCURACY.<br><br>B. INFORMAL TESTING - 85% ACCURACY. |
| 10. NATE WILL INCREASE HIS PERFORMANCE IN DAILY HABITS OF BODY CARE and CLEANLINESS. | A. NATE WILL PRACTICE REGULARITY IN BATHING AND SHOWERING HABITS.<br><br>B. NATE WILL PRACTICE REGULARITY IN CHANGING INTO CLEAN CLOTHES ON A DAILY BASIS. | A. Teacher observation<br><br>B. Teacher observation. |

88-89                          NATE JACKSON.                    Page 5 of 5
_____               _____
School Year                     Student's Name

Annual Goals:                   Short Term Instructional Objectives:        Evaluation Procedures & Criteria:

| | | |
|---|---|---|
| 11. TO ENABLE STUDENTS TO ACQUIRE AND DEVELOP THEIR POWERS OF EXPRESSION BY VISUAL MEANS USING VARIOUS MEDIAS. | A. NATE WILL DISCOVER IDEAS FOR ART IN PERSONAL EXPERIENCES. B. NATE WILL TRANSFER HIS IDEAS TO CREATE ART. C. NATE WILL WORK WITH MEDIA TO MAKE ART. D. NATE WILL PERCEIVE AND DESCRIBE WORKS OF ART. | 11A - 11D: STUDENTS SHALL HAVE SUCCESSFULLY COMPLETED 80% OF ALL PROJECTS, TO BE DETERMINED BY A CHECKLIST OF ALL PROJECTS FOR THE YEAR. |
| 12. TO IMPROVE NATE'S LEVEL OF PHYSICAL FITNESS IN AT LEAST FOUR OR MORE OF THE 11 PARTS OF FITNESS. | A. NATE WILL BE ABLE TO DO AT LEAST TEN PUSH-UPS. B. NATE WILL BE ABLE TO ENDURE A TWO-THREE MINUTE RUN. | 12A + 12B: TEACHER OBSERVATION. |
| 13. | | |
| 14. | | |

# Least Restrictive Environment Options
### (Confidential Student Information)

The following continuum of program options has been considered for _NATE  JACKSON_ ,

(Student's Name)

on ___11-17-04___ , at the IEP meeting with the following participants:

_S.OSEGUEZ (TEACHER)     BILL ESTERLY_ _____

_____     _____

| What is the least restrictive environment in which this child can be educated? | Circle the appropriate answer. | If "yes" is below the middle line, document the needs which necessitate placement in a separate facility. |
|---|---|---|
| Regular class | Yes (No) | NATE EXHIBITS THESE |
| Regular class with supplemental services | Yes (No) | BEHAVIORS: |
| Regular class with individual/small group instruction | Yes (No) | 1. TALKING-OUT 2. EXCESSIVE DRUG TALK. |
| Special class/learning center located in | | 3. OUT OF SEAT |
| Public school building | Yes (No) | 4. HAS A DIFFICULT |
| Separate school in the district | (Yes) No | TIME RECEIVING CONSTRUCTIVE CRITICISM. |
| County board of mental retardation and developmental disabilities facility | Yes (No) | |
| State School for the Blind or the Ohio School for the Deaf | Yes (No) | 5. Negative attitude towards school. |
| State institution operated by Ohio departments of Mental Health; Mental Retardation and Developmental Disabilities; or Youth Services | Yes (No) | |
| Home instruction | Yes (No) | |

I have been informed of the continuum of alternative placements for which children are considered. I agree that the least restrictive environment for my child is the one indicated above.

_Parent did not attend_ _____
Parent's Signature

_____
Date

NOTE: This information must be a part of the IEP or attached to the IEP of each student placed in a separate facility.

# INDIVIDUALIZED EDUCATION PROGRAM

Student's Name __Nathaniel Jackson__   Date of Birth _2-13-72_   School _Stambaugh_

Special Service Program _Multi-Handicapped_   Related Service _Work Study_   School Year _1989-90_

| Annual Goals: | Short Term Instructional Objectives: | Evaluation Procedures & Criteria: |
|---|---|---|
| Nate will complete his job training hours as part of the Try_out Program and be retained as part of the employers regular employees.<br><br>Date: February 9, 1990<br>Chair: _Joane Haywarth_<br><br>Coordinator: _Colh Kostil_<br><br>Student: _Nathaniel Jackson_ | Nate will exhibit appropriate retention and execution of learned job tasks thru-out his training.<br><br>Nate will evidence appropriate school attendance and work attendance.<br><br>Nate will exhibit appropriate benaviors related to employability: Time management, good communication and sociability, appropriate attitude with co-workers and customers, cooperation, responsibility ability to accept constructive criticism.<br><br>Nate will maintain appropriate academic attitude and competence and school cooperation thru-out his job training.<br><br>* Nate will follow ALL THE RULES AND PROCEDURES AT THE WORKPLACE FOR BEHAVIOR, CALLING OFF AND SIGNING IN. | Periodic written/oral work evaluations from th employer will be shared with teacher, parent, principal and program coord. |

CRITERIA & SCHEDULES FOR PERIODIC (ANNUAL) REVIEW:    Date: _____

a.  Are Instructional Objectives being achieved?   Yes ☐   No ☐

   1.  Met as stated:  Yes ☐   No ☐

   2.  Made progress:  Yes ☐   No ☐

b.  Is the current placement appropriate?   Yes ☐   No ☐   Data Base _____

c.  Review Schedule:   Annual ☐   Semi-Annual ☐   ☐Other (Specify) _____

d.  Recommendations for placement and general program for next school year: _____

_____

| Conference Chairperson | Parent/Guardian | Teacher |
|---|---|---|

Enter information in pencil

Birthdate **2-13-72**  Home Address **313 South Pearl**  Phone **743-5365**

Father's Name _____  Business Phone _____  Mother's Name **Pauline**  Business Phone _____

1) School **Roosevelt** **Trinity Hayes '9/86** 2) School _____ 3) School **Transitional '89** 4) School _____

## IMMUNIZATIONS

| TYPE | Date | Date | Date | Date | Date |
|------|------|------|------|------|------|
| • DPT | 4/10/72 | 6/5/72 | 8/7/72 | 8/13/73 | 3/23/76 |
| Td | | | | | |
| • Polio Sabin(Tri) | 4/10/72 | 6/5/72 | 8/7/72 | 8/13/73 | 3/23/76 |
| • Measles | 3/5/72 | 8/13/73 | | | |
| • Rubella | 2/28/73 | | | | |
| Mumps | 10/23/84 | | | | |
| Other Tine | 3/14/77 ⊖ | | | | |

• Required by Compulsory Immunization Law, Section 3301.07 of Ohio Revised Code

Indicate any conditions and/or diseases of the student the teacher should know of _____

| | Date | Test | Result |
|---|------|------|--------|
| Additional Screening | 5-77 | DH | N |
| Dental | 10-80 | DH | 1 Perm. LLM |
| | 1/24/84 | Scoliosis | N |

| Health Examinations | Date | Date | Date | Date | Date |
|---|------|------|------|------|------|
| | 11-74 2 P | | | | |

# SCHOOL HEALTH RECORD

## HEARING

(Under Result indicate Pass or Fail)

| Date | Result | | Date | Result | |
|------|--------|--------|------|--------|--------|
| | Right | Left | | Right | Left |
| 12/6/74 | N | F | 1-18-89 | P | P (MFE) |
| 10/23/80 | N | N | | | |
| 3/84 | N | N | | | |

## SPEECH

☐ Normal  ☐ Articulation Problem  ☐ Rhythm
☐ Voice Disorder  ☐ Language Problem
Other _____
Check appropriate box when applicable:
☐ Maximum Improvement  ☐ Corrected

## VISION

| | Date | | Date | |
|---|------|---|------|---|
| | 12/14/78 | Passed | 1/89 | Pass |
| Muscle Balance | 11/80 | Passed | | |
| Farsightedness | | | | |
| Color | | | | |

| | Date | Right | Left | | Right | Left |
|---|------|-------|------|---|-------|------|
| Distance Acuity | 12/14/78 | 50 | 40 | | | |
| | 11/80 | 30 | 70 | | | |
| | 11/82 | 50 | 50 | | | |
| | 12/5/86 | *50 | 100 | | | |
| | 1-18-89 | *seeinside Fail | Fail | | | |

## TUBERCULIN

| Date | Type | Result | Date | Type | Result |
|------|------|--------|------|------|--------|
| 2/22/78 | TINE | ⊖ | | | |

| STUDENT NAME | | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | | HOME ROOM |
|---|---|---|---|---|---|---|---|
| JACKSON NATE | | 0016-77-20 | 1989-90 | 11 | STAMBAUGH | | 107 |

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 2-CONDUCT 3-ABSENT | | | SEMESTER | | 1-MARK 2-CONDUCT 3-ABSENT | | | | | | FINAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | EXAM | MARK | 1 | 2 | 3 | 1 | 2 | 3 | EXAM | MARK |
| SA4 | ENGLISH III | GREGORY SUZETTE | A | S | | | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SB4 | READING III | GREGORY SUZETTE | C | S | | | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SC5 | U.S. HIST | GREGORY SUZETTE | C | S | | | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SF4 | CON MATH I | GREGORY SUZETTE | C | S | | | | D | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SG4 | ECOLOGY | GREGORY SUZETTE | C | S | | | | D | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SI4 | AD P.E. III | GREGORY SUZETTE | W | S | | | | D | S | 5 | F | S | 20 | F | S | 44 | F | F |

| CURRENT YEAR | | CUMULATIVE | | |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
| | | 18.75 | 12.50 | |

| | ATTENDANCE | | | DATA | | | |
|---|---|---|---|---|---|---|---|
| REPORT PERIOD | ABSENT ① TARDY | ABSENT ② TARDY | ABSENT ③ TARDY | ABSENT ④ TARDY |
| | | 5.0 | 29.0 | 44.0 |

**MARKING CODE**

A - EXCELLENT
B - ABOVE AVERAGE
C - AVERAGE
D - BELOW AVERAGE
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

**CONDUCT CODE**

S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

## REPORT TO PARENTS

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS/HER PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH THE TEACHER AND / OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR
GUARDIAN'S SIGNATURE_____

| | | | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | | | | | | | | | | | | | | | HOME ROOM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 0016-77-20 | 1988-89 | 10 | STAMBAUGH | | | | | | | | | | | | | | | 107 |

| | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK | 2-CONDUCT | 3-ABSENT | | | | SEMESTER | | 1-MARK | 2-CONDUCT | 3-ABSENT | | | | FINAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 1 | 2 | 3 | EXAM | MARK | 1 | 2 | 3 | 1 | 2 | 3 | EXAM | MARK |
| 50 | SBH HEALTH | SUZETTE GREGORY | A | S | 1 | F | S | 17 | | | C | S | 9 | D | S | 9 | F | D |
| SI3 | SBH AD P.E. II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | | | B | S | 9 | D | S | 9 | C | D |
| SF3 | SBH GEN MATH II | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | C | S | 9 | F | D |
| SB3 | SBH READING II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | | | C | S | 9 | C | S | 9 | | D |
| SC3 | SBH WORLD HIST | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | D | S | 9 | A | D |
| SA3 | SBH ENGLISH II | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | D | S | 9 | B | D |
| ST1 | SBH CONS ED | SUZETTE GREGORY | | | | F | S | | | | C | S | 9 | F | S | 9 | F | F |
| SK4 | SBH ART HANDWK | SUZETTE GREGORY | | | | F | S | 17 | | | C | S | 9 | B | S | 9 | F | C |
| SG3 | SBH BIOLOGY | SUZETTE GREGORY | | | | F | S | 17 | | | D | S | 9 | D | S | 9 | B | D |

| CURRENT YEAR | | CUMULATIVE | | |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
| 6.25 | | 13.50 | 12.50 | |

| | ATTENDANCE | | | DATA | | | |
|---|---|---|---|---|---|---|---|
| REPORT PERIOD ▶ | ① ABSENT | TARDY | ② ABSENT | TARDY | ③ ABSENT | TARDY | ④ ABSENT | TARDY |
| | 1.0 | | 17.0 | 2 | 9.5 | | 9.0 | 1 |

**MARKING CODE**
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

**CONDUCT CODE**
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

## REPORT TO PARENTS

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR
GUARDIAN'S SIGNATURE_____

# DISCHARGE SUMMARY

NAME: Nathaniel Jackson
RECORD#: 200457
ADMISSION DATE: 3-18-00
DISCHARGE DATE: 3-22-00
DISCHARGE STATUS: w. s. A.
PROGRAM: Stabilization
REFERRAL SOURCE: Self

## DIAGNOSTIC IMPRESSIONS

AXIS I    304.20 Cocaine dep., 303.90 Alcohol Dep., 304.30 Cannabis Dep.
AXIS II   799.9 deferred
AXIS III  Asthma self reported
AXIS IV   homeless, relationships, financial, work
AXIS V    Current GAF 45

## IDENTIFYING DATA:

This 28 year old African American male was self Referred to stab. due to Daily use of Cannabis and cocaine. Has a history of three prior treatments one in 98 and two in 99. Reports no Psych. history or treatment. Has been using chemicals since age 13.

## CLINICAL SUMMARY:

Male was in stab. program. He participated in individual/group and educational programming. He was also introduced to self help support groups of AA/NA/CA. He completed stab. with compliance.

## DISCHARGE INFORMATION:

① Abstain from all mood altering chemicals ② Attend at least 3 AA/NA/CA meetings per month. ③ Keep appointment at Neonatal on 3/23/00

_____
Counselor Signature        Date: 3/22/00

_____
Physician Signature        Date:

As required by Section 2.02 ... of ... "This information has been ... whose confidentiality is protected by Federal Law. Federal regulations (42 ... and 2) prohibit you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient for this purpose. The Federal rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug client."

EXHIBIT
48

NEIL KENNEDY DISCOVERY CLINIC

LEVEL OF CARE ASSESSMENT

CLIENT NAME: 200457
Nathaniel Jackson

CLIENT NUMBER

Date: 3/18/00

## Placement Recommendations

RESIDENTIAL: ___Detox ___Rehab ___TON ✓Stabilization ___Diversion

OUTPATIENT: ___Partial Hosp. ___R-IOP ___CO-IOP ___KAR-IOP

___Assessment Only ___Other_____

CRESTWOOD: ___A-IOP ___D-IOP ___E-IOP ___Adolescent L/I Group

___Adult L/I Group ___L/I Individual ___Adolescent Ed. Grp.

## Diagnostic Impressions

Axis I (*Primary Diagnosis*)    304.20 cocaine dependence
                                303.90 alcohol dependen
                                304.30 cannabis dependen
Axis II (*Personality/MR*)  305.50 opioid abuse    799.9 deferred
                            in full rem
Axis III (*Physical*)           Asthma - none current

Axis IV (*Psycho/soc stress*)   homeless, relationship,
                                financial, work, street lifestyle

Axis V (*Adaptive functioning*):    Current GAF: 45

DSM IV Criteria Met:   Dependence: 6 of 7 (*Minimum 3 necessary for Dx*)
                       Abuse: ___ of 4 (*Only 1 necessary for Dx*)

Case Mgmt. Services Needed: Bodnar

Assessment Counselor: _____ LSW

Diagnostic Counselor (*if different*) Jim Evans MS PCC

Revised 7-99

[small print block — illegible federal confidentiality notice]

NEIL KENNEDY ~~~~~ VERY CLINIC          CLIENT ~~~~ E:
LEVEL OF CARE ASSESSMENT               CLIENT NUMBER:

| 3 | Frequency that alcohol/drugs used more or for longer period than intended? |
|---|---|
| | ✓ Very often ___ Often ___ Occasionally ___ Seldom ___ Never |
| 4 | Persistent desire or unsuccessful efforts to cut down/control use? ✓ Yes ___ No |
| 5 | Great deal of time spent using, procuring, recovering from use? ✓ Yes ___ No |

**BIOMEDICAL CONDITIONS:**     (1)  2  3  4  5  6  7  8  9

___High Blood Pressure   ___Heart Disease   ___Diabetes   ___Liver Disease

___Recent Weight Change   ___Disabilities/Impairments   ___Other (describe)_____

_Asthma - no current problems.   Bullets in both_
_leg taken_
Recent accidents/injuries? _none reported_ _con_
_ing_

Current medications, including psychotropics:
| Name | Condition | Dose | Frequency | Last Dose |
|---|---|---|---|---|
| None reported | | | | |

Comments: _used to have inhaler - asthma -_
_has borrowed others a couple time_

**EMOTIVE/BEHAVIORAL CONDITIONS:**     (1)  2  3  4  5  6  7  8  9

Existing/prior psychiatric condition or diagnosis? _none reported_

Psychiatric hospitalizations (dates & treatment results) _none reported_

Any suicidal/homicidal thoughts or gestures ___Past ___Current
_denies past or current ideation_

Any recent, major losses or past emotionally traumatic experiences? _friend killed;_
_stated in last assessment - could_
_not remember who - stated brain all_
_"tore up" from drug use_

STEEL KENNEDY RECOVERY CLINIC

**LEVEL OF CARE ASSESSMENT**

CLIENT NAME:

CLIENT NUMBER:

**RELAPSE POTENTIAL:**  1  2  3  4  5  6  7  (8)  9

Knowledge of or ability to avoid environmental triggers (people, places, things) __Good __Poor __?

Openness to AA/CA/NA involvement __Eager __Willing __Hesitant __Resistant

Any prior 12-step involvement? _Went to a couple after vict harvest_

Primary weaknesses/barriers to maintaining abstinence (preoccupation, people, environment, etc.)
_Airmen - Sex + Drug_

Primary strengths/assets that can help maintain abstinence and complete treatment objectives?
_parents relationship - tired of life_

Longest abstinence from all mood altering chemicals? _____ When? _____

**Comments:** _5½ yrs in prison 3 in OH, in 89 - + went down again 96 - 8 mo no._
_drug he snaps - temper - goes all the ones_

**RECOVERY ENVIRONMENT:**  1  2  3  4  5  6  7  8  (9)

Present home environment: __Stable __Supportive __Contentious __Chaotic __Unsafe

Exposure to alcohol/drugs in the home (presence of or usage) _has been drinking tempe arnd -_

Person (s) client is willing to involve in treatment: _Donna, girlfriend_

Exposure to drugs/alcohol in __Social __Work __School environments _____

Currently exposed to or at risk of __Physical __Emotional __Verbal __Sexual Abuse

Past/Current legal problems? _none current_  _1989 - Complicity murder_
_1996 - CCW having weapon while disabilitid_

Currently on probation/parole? __No __Yes

Current life stressors: __Family __Marital/(Relationship) __Work __Friends __Legal
__Financial __Educational __Health __Housing __Other _street lifestyle_

_status mother has drinking temper like his_

Problems/Barriers that may impact ability to attend/participate in recommended treatment _____
__Transportation __Child Care __Disability __Other _____

**Comments:** _____

# Neil Kennedy Recovery Clinic
## Level of Care Review

200457
Nathaniel Jackson

Client Name _____ Client Case No. _____ Admit Date 3/17/00

New Address _____ City, State, Zip _____ New Phone No. _____

New Revenue Source _____ Date of Change _____

Change in Tx Level _____ Date of Change _____

Other Change (specify) _____ Reopen Case # _____

Date of Discharge _____ Diagnosis Code _____ Type of Discharge: ____ WSA ____ ASA ____ ASR

## Case Disposition

A. Case Closed w/ Referral to AD Tx   B. Case Closed w/ Referral to Aftercare   C. Goals Met - No Add'l Svcs Needed
D. Needed Services not Available   E. Client Rejects Continuation   F. Client did not return
G. Client Moved   H. Client Died   I. Other _____

## Treatment Plan Review

Client Name _Nathaniel Jackson_ Record # 200457

Review # 1   Reason for Review: _Stability/admit_   Review Date 3/18/00

Current Level of Care: _Stabilization_   Anticipated Transfer/Discharge On: 3/20/00 To: _Residential_

Tx Plan Recommendations: ___ Treatment Plan(s) Reviewed; current Plan(s) Appropriate
___ Treatment Plan Modification Required; See Updated Master Treatment Plan
___ Additional Treatment Plans /Objectives Required

Dimension 1: Intoxication / Withdrawal ___ _stable_

Dimension 2: Biomedical Conditions ___ _none reported_

Dimension 3: Emotional / Behavioral ___

Dimension 4: Treatment Acceptance / Resistance ___ _wants long term treatment_

Dimension 5: Relapse Potential ___ _high_

Dimension 6: Recovery Environment ___ _homeless – street lifestyle_

Current GAF _45_ PY GAF ___ Client meets DSM IV criteria for Substance Abuse or Dep. ____ Yes ____ No

Counselor/Reviewer Signature & Credentials: _____ CCDCIII

Others Present: _____

Rev 2/99
NKRC 1094

NEIL KENNEDY RECOVERY CLINIC

CLIENT NAME:
CLIENT NUMBER:

200457
Nathaniel Jackson

CLIENT PROBLEM AND TREATMENT PLAN                    Plan # _____

LEVEL OF TREATMENT (at the time of the initial plan formulation)

## STABILIZATION

PROBLEM DESCRIPTION: _Client unable to maintain_
_abstinence outside a controlled environment_

Date of problem identification: _3-17-00_
How was the problem identified: _assessment_

## CLIENT RESOURCES:

Strengths (to help solve the problem)               Weaknesses (that hinder problem resolution)
_willing to participate_                             _history of lack of follow-through_

## DESIRED BEHAVIOR CHANGE (s)    (Goal of Treatment Plan) :

_will be able to maintain abstinence_
_outside a controlled environment_

EXPECTED DATE WHEN THE BEHAVIOR CHANGE WILL OCCUR: _____

## WHAT WILL THE CLIENT DO TO ACHIEVE THIS BEHAVIORAL CHANGE
(objectives):

| | DATE IDENTIFIED | COMPLETE DATE |
|---|---|---|
| 1) In individual counseling discuss 3-4 negative consequences of chemical use. | 3-17-00 | 3-20-00 |
| 2) Eat 3 balanced meals a day and sleep throughout the night. | | |
| 3) By 3/20 report to counselor a willingness to follow treatment recommendations | | |

Criteria for Discharge: Client will be eligible for discharge when he/she has met treatment objectives with an (*) on this tx. Plan.



# County of Mahoning

Youngstown, Ohio 44507

COMMON PLEAS COURT
DEPARTMENT OF ADULT PROBATION

1507 Market Street
Youngstown, Ohio 44507
(330) 744-5143

September 4, 2001

Judge R. Scott Krichbaum
Mahoning County Court of Common Pleas
120 Market Street
Youngstown, Ohio 44503

Re:   Nathaniel Jackson - # 00 CR 306

Honorable Judge Krichbaum:

On 5/24/01, the above defendant appeared before you for purposes of Judicial Release under docket 00-CR-306, for the offense of Receiving Stolen Property, a Felony of the Fifth Degree. He was granted Judicial Release and one (1) year community control, with the condition he enter and successfully complete the residential program at the Community Corrections Association. Subsequently, he was additionally granted Judicial Release on 5/24/01, in Judge Lisotto's Court under docket 00-CR-1114, for the offense of Receiving Stolen Property, a Felony of the Fourth Degree. This Court imposed two (2) years community control, with the condition he enter and successfully complete the residential program at the Community Corrections Association. He entered said program on 5/25/01.

On 9/01/01, at 9:30 a.m., Mr. Jackson was to return to the facility from his employment at Dinesol Plastics, 195 Park Avenue, Niles, Ohio. Facility staff member Erica Bowie made approximately six (6) telephone calls between 9:30 a.m. and 11:00 a.m., in an attempt to communicate with him. A call was placed at 11:00 a.m. to his mother's residence (Pauline Korneagay), at 309 South Pearl, Youngstown, Ohio, in which an unidentified male stated that Mr. Jackson was there, but left for the store. A message was left for him to contact the facility upon his return.

At approximately 1:00 p.m., an administrative decision was made and Mr. Jackson was considered an absconder and was negatively terminated from the program.



EXHIBIT 47

To:     Judge R. Scott Krichbaum
Re:     Nathaniel Jackson - # 00 CR 306                                    2

---

     Due to Mr. Jackson not successfully completing the program at C.C.A. as ordered, we are respectfully requesting that a bench warrant be issued for the alleged Probation Violation.

                                   Respectfully submitted,

                                   _____

                                   Jeremy Simpson
                                   Probation Officer

Approved by,

_____
Richard J. Billak, Ph.D.
Chief Executive Officer

JS:kjk

IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

CLERK OF COURTS
MAHONING COUNTY, OHIO

MAY 2 5 2001

FILED
ANTHONY VIVO, CLERK

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 00 CR 1114 |
| Plaintiff | ) | JUDGE ROBERT G. LISOTTO |
| vs. | ) | JUDGMENT ENTRY OF MODIFICATION TO SENTENCE |
| NATHANIEL JACKSON | ) | |
| Defendant | ) | |

On May 24, 2001, a hearing was held pursuant to R.C. 2929.20 upon Defendant's request for judicial release.  Court Reporter, Donna Gerlach, Defense Attorney, Mark Carfolo, and the State's Attorney, Robert Andrews, were present as was Defendant.  Pursuant to R.C. 2929.20(D) the victim or victim's representative was notified.

After due consideration of the record, any oral or written statements prepared, as well as the principles and purposes of sentencing under R.C. 2929.11, and the seriousness and recidivism factors under R.C. 2929.12, the Court finds that Defendant is eligible for judicial release, not now being subject to a mandatory prison term, and further finds ALL of the following:

that a non-prison sanction does not demean the seriousness of the offense;
that a non-prison sanction will adequately punish Defendant and protect the public;
that factors decreasing seriousness outweigh those increasing seriousness;
that there is less likelihood of recidivism.

Finding the Defendant now amenable to community control, the Court modifies Defendant's sentence AND THEREFORE imposes 2 years of community control to be monitored by the Adult Parole Authority specifically to include Correctional Treatment Facility for up to six months.

As a condition of probation, Defendant shall abide by all laws and shall not leave the State of Ohio without the permission of his probation officer.  As a further condition of probation, Defendant shall obey the rules and regulations of the Community Corrections Association.

Violation of this sanction may lead to reimposition of the sentence reduced pursuant to judicial release.

Defendant is notified that if a prison term is imposed for violation of community control, the parole board may extend prison time up to 50% of the stated term in 15, 30, 60 or 90 day increments for crimes committed while in prison.  After prison release, if post-release control is imposed, for

violating post release control conditions, the adult parole authority or parole board may impose a more restrictive or longer control sanction, return defendant to prison for up to nine months for each violation, up to a maximum of 50% of the stated term.  If the violation is a new felony, Defendant may receive a new prison term of the greater of one year or the time remaining on post release control.

Pursuant to R.C. 2929.20, Defendant is ORDERED RELEASED to the custody of the Community Corrections Association.

Defendant is found to be indigent and all costs are suspended.

Defendant is ORDERED to avoid any contact with the victim in this matter.

Dated: _5 /24/01_

_____

HON. ROBERT G. LISOTTO

cc:     State's Attorney
        Defendant's Attorney
        Adult Parole Authority
        Mahoning County Justice Center
        Community Corrections Association

JE(k).wpd

IN THE COURT OF COMMON PLEAS
MAHONING COUNTY, OHIO

STATE OF OHIO
        PLAINTIFF

VS.

NATHANIEL JACKSON
        DEFENDANT

CASE NUMBER:   00-CR-306

JUDGE R. SCOTT KRICHBAUM

JUDGMENT ENTRY OF
MODIFICATION TO SENTENCE

MAY 2 5 2001

On May 24, 2001, a hearing was held pursuant to RC. 2929.20 upon Defendant's Motion for Judicial Release.  Present in open Court were the defendant Nathaniel Jackson and his counsel Mark Carfolo.  The State of Ohio was represented by Assistant Prosecuting Attorney Patrick Pochiro. Pursuant to RC. 2929.20(D), the victim was notified of today's hearing and did attend and did address the Court.

After due consideration of the record, all statements made or presented at the hearing, any written statements prepared, as well as the principles and purposes of sentencing under RC. 2929.11, and the seriousness and recidivism factors under RC. 2929.12, the Court finds that defendant is eligible for judicial release, not being subject to a mandatory prison term, and further finds all of the following: that since defendant has now served time in the penitentiary for this crime, that a non-prison sanction does not demean the seriousness of the offense, that a non-prison sanction will adequately punish defendant and protect the public, that factors decreasing seriousness outweigh those increasing seriousness, and that there is now less likelihood of recidivism.

Finding that the defendant is now amenable to community control, and that there is no objection from the Prosecuting Attorney, the Court modifies Defendant's sentence, and, therefore, the Court sentences Defendant to a period of community control. As conditions of community control, Defendant is not to violate any laws, Defendant is not to leave the State of Ohio without the permission of his probation officer or this Court.  Defendant is not to own, use, or possess any drugs or firearms or alcohol.  Defendant is not to cause or attempt to cause any harm or threat of harm to any person(s) or property.

JISco
P 0359

As a further condition of community control, Defendant is to enter and successfully complete the residential program at the Community Corrections Association.  While a resident of said program, Defendant shall be subject to the supervision of Community Corrections Association and shall abide by its rules, regulations, treatment plans and after care programs and recommendations of the Community Corrections Association.

Upon the defendant's successful completion of the program at the Community Corrections Association, Defendant is to immediately report to the Adult Parole Authority at 2503 Belmont Ave., Youngstown, Ohio.  At that time, the supervision of the defendant's community control is transferred to the Adult Parole Authority for a period of One (1) year.  Defendant is to obey all of the rules and regulations of the Adult Parole Authority as a condition of his community control sanction and is further Ordered to comply with all the other terms and conditions of community control imposed herein for the entirety of his probationary term.

Violation of any of the terms and conditions of this probation can result in reincarceration.

Upon defendant's release from the Community Corrections Association, he is to immediately report to the Adult Parole Authority.

Defendant is ordered released from the Mahoning County Justice Center to the custody of the Community Corrections Association.

JUDGE R. SCOTT KRICHBAUM

Clerk:   Copies to
         Patrick Pochiro
         Mark Carfolo
         Adult Parole Authority
         Community Corrections Association
         Mahoning County Justice Center

Please send certified copy to  Belmont Correctional Facility
                               PO Box 540
                               St. Clairsville, OH 43950

0360

## PRE-SENTENCE INVESTIGATION REPORT

### Judge R. Scott Krichbaum

### Nathaniel Edwin Jackson

### # 00 CR 306

CONFIDENTIAL
TO BE USED ONLY IN ACCORDANCE WITH THE
PROFESSIONAL PRACTICES OF CORRECTIONAL
WORK UNLESS OTHERWISE ORDERED BY THE
COURT.  (2951.03 O.R.C.)

5-24-01
- Judicial Release
  granted
- enter CCA
- 1 yr. probation upon
Compliance of CCA to APA

# MAHONING COUNTY COURTS
## ADULT PROBATION DEPARTMENT

PRE-SENTENCE INVESTIGATION

DEFENDANT:   NATHANIEL EDWIN JACKSON

ADDRESS:     309 S. PEARL
             YOUNGSTOWN, OHIO 44506

LEGAL ADDRESS:   SAME AS ABOVE

EDUCATION:   11TH GRADE

AGE:   28     DATE OF BIRTH:   2/13/72

DEPENDENTS:   -0-

CITIZENSHIP:   UNITED STATES

SOC. SEC. NO.:   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

FBI NO.:   UNKNOWN

BCI NO.:   UNKNOWN

DETAINERS OR CHARGES PENDING:     NONE KNOWN

CO-DEFENDANTS (DISPOSITION OR STATUS
             OF CASE):        N/A

DOCKET NO.:   00 CR 306

                          HONORABLE
PRESIDING JUDGE:   R. SCOTT KRICHBAUM

DEFENSE COUNSEL:

      MARK A. CARFOLO
      21 S. PHELPS STREET
      YOUNGSTOWN, OHIO 44503

PROSECUTING ATTORNEY:

      PAUL J. GAINS,
      PATRICK POCHIRO, ASSISTANT
      MAHONING COUNTY PROSECUTOR'S OFFICE
      120 MARKET STREET
      YOUNGSTOWN, OHIO 44503

DATE REFERRED:     8/03/00

DATE SUBMITTED:    8/31/00

DATE TYPED:        9/12/00

---

INDICTMENT:   RECEIVING STOLEN PROPERTY

DATE OF PLEA:   8/03/00

PLEA:     GUILTY AS CHARGED

STATUTORY PENALTY:

F5° -  6,7,8,9,10,11 OR 12 MONTHS
       IMPRISONMENT AND UP TO A $2,500 FINE.

ORC NUMBER:    2913.51 (A)(C)

AMOUNT AND TYPE OF BOND:

      $2,500 SURETY BOND,
      POSTED ON 3/29/00.

DATE OF ARREST:     3/26/00

JAIL CREDIT:    4 DAYS

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                                              1

---

## DETAILS OF THE INSTANT OFFENSE

According to information received from the Boardman Police Department, the following details occurred in regard to the Instant Offense:

On 3/26/00, at approximately 9:25 a.m., Officer Spatar ran a random license plate check on a 1982 Honda Accord.  The plate came back to a 1989 Dodge.  Subsequently, the vehicle was stopped. During the traffic stop, it was discovered that the driver of the vehicle, Nathaniel Jackson, the defendant, was driving under an FRA suspension, and that the license plate was reported stolen out of the Youngstown Police Department.  The defendant was arrested for Receiving Stolen Property and transported to the Mahoning County Sheriff's Department.  He was given traffic citations for FRA and Seat Belt violations.

It should be noted that the victim of the Instant Offense, Pauline Korneagay, is the defendant's mother.  It should also be noted that Anthony Sedita was a passenger in the vehicle when the defendant was arrested.

## VICTIM'S STATEMENT

The victim, Pauline Korneagay, was contacted by telephone on 8/30/00, regarding the offense. Ms. Korneagay stated that her son is not living with her currently and was not living with her at the time of the offense.  She stated that her son needs to get a job and needs "rehabilitation." She indicated that no restitution is due.

## DEFENDANT'S STATEMENT

The defendant provided the following written statement on his Mahoning County Adult Probation questionnaire:    "I feel that I was wrong for taking my mothers license plate an at the time I was on drugs but I feel if I get into this 9 month program that it will do me a lot good because I would love to get my life back on the right track."    (sic)

## PRIOR RECORD

## JUVENILE

According to the Mahoning County Juvenile Court, the defendant possesses the following juvenile record:

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION
2

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 09/19/88 | 88 JV 963<br>Unruly | Mahoning County,<br>Ohio | Probation<br>11/09/88<br>Probation terminated |
| 07/26/89 | 89 JV 1061<br>Robbery | Mahoning County,<br>Ohio | 9/13/89<br>Probation |
| 10/10/89 | 89 JV 1607<br>Aggravated<br>Burglary | Mahoning County,<br>Ohio | 12/07/89<br>Probation<br>3/28/90<br>Probation terminated |

## ADULT

According to information received from the Austintown P.D., Boardman P.D., Campbell P.D., Canfield P.D., Girard P.D., Liberty Township P.D., Mahoning County Sheriff's Dept., McDonald P.D., Niles P.D., Poland Township P.D., Struthers P.D., Trumbull County Sheriff's Dept., Warren P.D. and Youngstown P.D., the defendant possesses the following adult record:

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 01/20/91 | Receiving Stolen<br>Property | Youngstown, Ohio | 2/08/91<br>180 days jail, suspended, $100<br>fine & costs, 1 year probation |
| 08/07/91 | 91 CR 724<br>Aggravated Burglary | Youngstown, Ohio | 1/17/92<br>5 to 25 years LCI<br>9/25/92<br>Granted shock probation,<br>sentence suspended, placed<br>on 2 years probation with<br>condition defendant complete<br>CCA<br>8/15/94<br>Probation terminated |
| 05/19/93 | Loitering for Drugs | Youngstown, Ohio | 5/19/93<br>$250 fine, $200 suspended,<br>costs suspended, 6 months<br>probation |

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION

3

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 08/14/93 | Aggravated Burglary (amended to Criminal Trespass) | Youngstown, Ohio | <u>8/16/93</u><br>30 days jail, suspended, $250 fine & costs, $200 suspended, 6 months probation |
| 08/26/93 | Theft | Youngstown, Ohio | <u>10/26/93</u><br>180 days house arrest |
| 09/20/93 | Theft | Youngstown, Ohio | <u>10/25/93</u><br>6 months county jail, $1000 fine |
| 01/22/94 | Ct. 1 - Theft,<br>Ct. 2 - Disorderly Conduct,<br>Ct. 3 - Resisting Arrest | Youngstown, Ohio | <u>2/14/94</u><br>Count 1 - 180 days county jail,<br>Count 2 - 30 days jail,<br>Count 3 - 90 days jail |
| 05/26/94 | Possession of Drug Paraphernalia | Youngstown, Ohio | <u>7/11/97</u><br>7 days county jail, 7 days credit |
| 11/27/94 | Possession of Drug Abuse Instrument | Youngstown, Ohio | <u>11/28/94</u><br>60 days jail, suspended, $500 fine, $450 suspended, costs, 6 months probation, drug rehab |
| 12/22/94 | Ct. 1-Criminal Trespass,<br>Ct. 2-Theft | Youngstown, Ohio | <u>1/03/95</u><br>Count 1 - 30 days jail, suspended, $250 fine & costs, suspended, 12 months reporting probation<br>Count 2 - 180 days jail, 120 days suspended, 3 days credit for time served, $1000 fine & costs, $900 suspended, 12 months probation |
| 03/20/95 | Theft on Warrant | Youngstown, Ohio | <u>5/01/95</u><br>30 days county jail |
| 04/22/95 | Theft on Warrant | Youngstown, Ohio | <u>5/01/95</u><br>30 days county jail |

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                                          4

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 04/26/95 | Possession of Drug Paraphernalia | Youngstown, Ohio | <u>4/27/95</u><br>90 days jail |
| 09/19/95 | <u>95 CR 877</u><br>Weapons Under Disability | Youngstown, Ohio | <u>2/14/96</u><br>18 months Lorain, credit for 113 days jail, fine, suspended |
| 03/09/97 | Criminal Trespass | Youngstown, Ohio | 12 days jail, 10 days suspended, 2 days credit, $100 fine, $58 suspended |
| 03/23/97 | Attempted Aggravated Burglary (amended to Attempted Breaking and Entering) | Youngstown, Ohio | <u>4/11/97</u><br>90 days jail, 60 days suspended, $500 fine & costs, $250 suspended, 18 days jail credit |
| 07/05/97 | Possession of Drug Paraphernalia | Youngstown, Ohio | <u>7/11/97</u><br>7 days jail, 7 days credit |
| 07/30/97 | Theft (amended to Unauthorized Use of a Motor Vehicle | Youngstown, Ohio | <u>8/08/97</u><br>$100 fine, suspended, $46 costs, suspended, 1 year reporting probation |
| 11/14/97 | Possession of Drug Paraphernalia | Youngstown, Ohio | <u>11/14/97</u><br>30 days jail, 180 day Ohio driver's license suspension |
| 09/06/98 | Receiving Stolen Property (Auto) [amended to Theft] | Youngstown, Ohio | <u>11/20/98</u><br>180 days jail, $1000 fine, $60 costs |
| 06/15/99 | Receiving Stolen Property (Auto), Receiving Stolen Property (Credit Card) | Youngstown, Ohio | <u>6/28/99</u><br>6 months jail |
| 03/26/00 | Receiving Stolen Property | Boardman, Ohio | INSTANT OFFENSE |

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                                                        5

---

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 05/09/00 | Receiving Stolen Property (amended to Unauthorized Use of a Motor Vehicle) | Liberty Twp., Ohio | 5/17/00 180 days jail, 135 days suspended, 8 days credit, $500 fine, $400 suspended, reporting probation |
| 08/04/00 | Theft | Youngstown, Ohio | 8/22/00 60 days jail, 42 days suspended, 18 days credit, $100 fine, $60 costs, suspended, $40 restitution, 1 year probation |

The Mahoning County Prosecutor's Office may be able to provide additional information concerning the defendant's criminal history.

### DISMISSED, NOLLIED AND UNKNOWN DISPOSITIONS

| DATE | OFFENSE | PLACE | DISPOSITION |
|------|---------|-------|-------------|
| 08/30/93 | Aggravated Robbery | Youngstown, Ohio | Unknown |
| 01/15/94 | Theft | Youngstown, Ohio | No charges filed |
| 12/22/94 | Drug Abuse (Cocaine) | Youngstown, Ohio | 1/03/95 Dismissed |
| 09/19/95 | Aggravated Menacing | Youngstown, Ohio | 11/21/95 Dismissed |
| 01/11/97 | Receiving Stolen Property | Youngstown, Ohio | Unknown |
| 07/30/97 | Theft | Youngstown, Ohio | Dismissed |
| 06/29/98 | Unauthorized Use of a Motor Vehicle | Youngstown, Ohio | Dismissed |
| 09/06/98 | Falsification | Youngstown, Ohio | Unknown |
| 06/15/99 | Drug Paraphernalia | Youngstown, Ohio | Dismissed |
| 08/04/00 | Resisting Arrest | Youngstown, Ohio | Dismissed |

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                                                  6

---

## INSTITUTIONAL AND/OR SUPERVISORY ADJUSTMENT

In reviewing the defendant's criminal history, it appears that he was granted probation on at least seven occasions, with new offenses committed during each period of supervision.

Therefore, the defendant's history of supervision in the community would be rated as poor.

## SOCIAL SUMMARY

The defendant was born on 2/13/72, in Youngstown, Ohio, out of wedlock to the relationship of Pauline Jackson and Charles Paige.  The defendant reported a 30-year-old brother, Charles Jackson, who was also born to this relationship.  The defendant's mother married one Anthony Korneagay, and together they produced one Taushi Korneagay, the defendant's 24-year-old half-sister.  He described his childhood as "fair," and denied any type of abuse or neglect throughout his formative years.

The defendant stated he attended Rayen High School through the 11th grade, then dropped out due to drugs.  He reports that he enrolled in the Choffin Career Center a few years ago, but did not obtain his G.E.D.

The defendant denies ever being married, however, has fathered two children with two separate women.  He has a 6-year-old daughter, Shaylese Jackson, with one Lorainne Townsend; and a 1-year-old son, Nathaniel Edwin Jackson Jr., with one Tursha Armitage.  The defendant stated that he is not ordered to pay child support.

The defendant self-reported a history of "crack" cocaine and marijuana abuse.  He has been using marijuana since 1985, and currently smokes one half ounce on a daily basis.  He reports using "crack" cocaine since 1989, and states he uses as much as he can get on a daily basis.  The defendant further reported consuming "a couple cans of beer" every other day.  The defendant admitted to being under the influence of "crack" cocaine when he committed the Instant Offense.  He has received treatment for substance abuse several times in the past.  He attended the residential treatment program at the Community Corrections Association from 9/25/92 to 3/05/93.  His prognosis upon release was rated as poor.  He also reported attending the Salvation Army, but was negatively terminated due to a verbal conflict with another resident.  He was admitted to the Neil Kennedy Recovery Clinic on 7/22/00, for detoxification from alcohol.  He was released from their facility on 7/24/00.

The defendant described his physical health as "good."  He did state that he has asthma.  He denies ever being examined by a mental health professional.

The defendant has never served in any branch of the United States Armed Forces.

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION

7

---

The defendant listed no financial assets and no financial obligations.  He is not receiving any type of financial assistance from the Mahoning County Department of Human Services.

The defendant is currently unemployed.  He reports his only prior employment as being with Dinesol Plastics, Inc., for a few months in 1997.


Reviewed by,

Nick Palazzo, Jr.
Intake Director

Respectfully submitted,

Philip A. Danchise
Probation Officer

Approved by,

Richard J. Billak, Ph.D.
Chief Executive Officer

PAD:kjk

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                                                    8

---

PRE-SENTENCE INVESTIGATION SUMMARY

Before the Court is a 28-year-old African-American male who pled guilty to the offense of Receiving Stolen Property, a Felony of the Fifth Degree. The Instant Offense involves the defendant driving a vehicle with a stolen license-plate.

The defendant has juvenile adjudications for Unruly, Robbery, and Aggravated Burglary. As an adult, he has convictions for Receiving Stolen Property (2), Aggravated Burglary, Loitering for Drugs, Criminal Trespass, Theft (6), Disorderly Conduct, Resisting Arrest, Drug Paraphernalia (3), Possession of Drug Abuse Instrument, Weapons Under Disability, Attempted Breaking and Entering, Unauthorized Use of a Motor Vehicle (2), and the Instant Offense.

The defendant was born on 2/13/72, in Youngstown, Ohio, out of wedlock to the relationship of Pauline Jackson and Charles Paige. His mother later married Anthony Korneagay. The defendant listed one brother and one half-sister. He described his childhood as "fair," and reported no abuse or neglect.

The defendant completed the 10th grade at Rayen High School. Although he stated that he enrolled in the Choffin Career Center, school records could not be located. The defendant has not yet obtained his G.E.D.

The defendant denies ever being legally married. However, he listed two children (ages 1 and 6 years), born to relationships with two different women. He indicated that he is not ordered to pay child support.

The defendant reports an ongoing problem with "crack" cocaine since 1989, and marijuana since 19985. He admits to using crack cocaine at the time of the Instant Offense. He reports that he consumes "a couple cans of beer" every other day. The defendant received residential treatment previously at the Community Corrections Association from 9/25/92 to 3/05/93. He reported that he was negatively terminated from a program at the Salvation Army due to a verbal conflict with another resident. He was admitted to Neil Kennedy for detoxification from alcohol on 7/22/00, and was released from that facility on 7/24/00.

The defendant described his physical health as "good," with the exception of having asthma. He reports no mental health problems or previous treatment.

The defendant has never served in any branch of the United States Armed Forces.

The defendant listed no financial assets and no financial obligations. According to the Mahoning County Department of Human Services, the defendant does not currently receive any type of financial assistance.

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION                                               9

---

The defendant is currently unemployed.  He reported no significant employment history.

Reviewed by,                                        Respectfully submitted,


Nick Palazzo, Jr.                                   Philip A. Danchise
Intake Director                                     Probation Officer


Approved by,


Richard J. Billak, Ph.D.
Chief Executive Officer


RAD:kjk

NATHANIEL EDWIN JACKSON - # 00 CR 306
PRE-SENTENCE INVESTIGATION

10

---

RECOMMENDATION

The defendant has been granted probation on numerous previous occasions.  As indicated by his criminal record, the defendant has a poor history of supervision in the community.  Since his arrest for the Instant Offense, he has been sentenced on two additional misdemeanor charges.  It is noted that the defendant was previously granted shock probation in 1992, and was given the opportunity for residential treatment at the Community Corrections Association.  He completed the program with a poor prognosis at that time.

Based on the above, it is respectfully recommended that the defendant be sentenced to a period of incarceration as deemed appropriate by the Court.  Since the defendant does report an ongoing substance abuse problem and has expressed a desire for treatment, it is further recommended that he be ordered to complete a residential treatment program if considered for Judicial Release.

Reviewed by,

Nick Palazzo, Jr.
Intake Director

Respectfully submitted,

Philip A. Danchise
Probation Officer

Approved by,

Richard J. Billak, Ph.D.
Chief Executive Officer

PAD:kjk

# MAHON...G COUNTY PROBATION DEP...TMENT
## ~ Seriousness ~ Amenability Factors ~
### F-1 thru F-5 (non-drug)

## RECIDIVISM FACTORS

### Recidivism Likely

___ Offender out on bail before trial or sentencing, under court sanction or under post-release control or parole when offense was committed. *Explanation:*

_X_ Prior adjudication of delinquency or history of criminal convictions. *Explanation:*  **See prior record.**

_X_ Failure to respond favorably in the past to sanctions imposed for criminal convictions. *Explanation:*  **Poor history of supervision.**

___ Demonstrated a pattern of drug or alcohol abuse related to the offense and refuses to acknowledge the pattern or refuses treatment. *Explanation:*

___ Shows no remorse for the offense. *Explanation:*

### Recidivism Unlikely

___ Not adjudicated delinquent prior to offense. *Explanation:*

___ No prior criminal convictions. *Explanation:*

___ Law abiding for significant number of years prior to offense. *Explanation:*

___ Occurred under circumstances unlikely to reoccur. *Explanation:*

_X_ Offender shows a genuine remorse. *Explanation:*  **Defendant appears to be remorseful.**

## SERIOUSNESS FACTORS

### More Serious

___ Injury to victim was worsened by the physical or mental condition or age of the victim. *Explanation:*

___ Victim suffered serious physical, psychological, or economic harm as result of offense. *Explanation:*

___ Offender held a public office or position of trust and the offense was related to that office or position. *Explanation:*

___ Offender's occupation or office required the offender to prevent the offense or bring others committing it to justice. *Explanation:*

___ Professional reputation, occupation or office facilitated the offense or is likely to influence future conduct of others. *Explanation:*

___ Relationship with victim facilitated the offense. *Explanation:*

___ Offense committed for hire or as part of organized criminal activity. *Explanation:*

___ Crime motivated by prejudice based on race, ethnicity, gender, sexual orientation or religion. *Explanation:*

### Less Serious

___ Victim induced or facilitated the offense. *Explanation:*

___ Offender acted under strong provocation. *Explanation:*

_X_ No physical harm to persons or property expected or caused. *Explanation:*  **Theft offense.**

# MAHONING COUNTY PROBATION DEPARTMENT
## ~ Seriousness ~ Amenability Factors ~
### (Non-drug or drug offense under 2929.13 (B)(1)

Yes    No

___    _X_    Physical harm caused to a person.

___    _X_    Attempt to cause or made an actual threat of physical harm with a weapon.

___    _X_    Attempt to cause or made an actual threat of physical harm to a person and has a prior conviction that caused physical harm to a person.

___    _X_    Offender held public office or position of trust and offense related to that office or position, position obligated the offender to prevent the offense or bring those committing it to justice or offender's reputation or position facilitated the offense or was likely to influence the conduct of others.

___    _X_    Committed for hire or as part of an organized criminal activity.

___    _X_    Crime is a sex offense.

_X_    ___    Offender previously served a prison term.

___    _X_    Offense committed while under a community control sanction.

## Amenability to Community Control Sanction

(To be used if one or more of the 8 factors above are marked Yes and if Seriousness and Recidivism Factors weigh toward More Likely and/or More Serious.)

Offender is/is not amenable to an available community control sanction.

# COMMUNITY CORRECTIONS ASSOCIATION, INC.
## EMPLOYMENT VERIFICATION

Resident Name: _Nate Jackson_

Employer: _Diuial Plastic_

Address: _195 Park Ave._

_Niles, Ohio_

Supervisor: _Tammy_

Phone Number: _544-7171_

(X) Cell Phone_____ Business _✓_ Pager_____

*Additional Addresses Required (Job Sites) Yes_____ No_____

Start Date: _7/25/01_

Position: _labor_

Salary: _6.25 h._

Method Of Payment: Personal Check_____ Money Order_____
Business Check _✓_ Other_____
Taxes Withheld _✓_

First Pay Date: _8/3/01_

Pay Periods: _bi-weekly_

Work Hours: _M - sun  8p - 8A_

Are Work Hours Subject to Change? Yes _✓_ No_____

Mode of Transportation: _✓_ Private Auto _____Bus _____Van _____Taxi

Verified By: _Trudy McDonald_ Date Verified: _7/25/01_

Case Manager Approval: _____

Director Approval: _____ Date: _7-26-01_

Federal Bureau Of Prisons requires our facility to notify the employer of the legal status of _____ who is currently residing at Community Corrections Association.

The resident is:

_____ Under the custody of the U.S. Attorney General
_____ Supervised by the Federal Probation Department

Signature of Employer:



# Certificate of Completion

## This is to Certify that:

NATHANIEL JACKSON

Has Successfully Completed
Thinking For A Change

Conducted by: Community Corrections Association.

This _____ Day Of _July_ 20 _01_

This Certificate is Hereby Issued

_Facilitator_

_Director_



Certificate of Achievement

This is to Certify that:

NATE JACKSON

Has Successfully Completed
Job Readiness Training

Conducted by: Community Corrections Association.

This Certificate is Hereby Issued

This 26th Day Of July 20 02

Instructor

Director



Certificate of Achievement

This is to Certify that:

NATE JACKSON

Has Successfully Completed
Vocational Planning

Conducted by: Community Corrections Association.

This Certificate is Hereby Issued

This 30th Day Of July, 20 04

Instructor

Director

## COMMUNITY CORRECTIONS ASSOCIATION, INC.
### DRUG AND ALCOHOL ABUSE ASSESSMENT

( 60 )

1. Name _Nathaniel E. Jackson_
2. Address _309 S. Peall_
    _Yo, OH 44506_
3. Age _29_    Birthdate _2-13-72_
4. Presenting Problem and Need for Assessment _____

❏ Court Referred          ❏ Referral for Rehab

❏ Case Manager Referred   ❏ In-patient      ❏ Other

                          ❏ Out-patient     ❏ In-House

5. Person Referring _John_

6.

| Substances | Daily & Amount | Weekly & Amount | Monthly & Amount | Method | First Use | Last Use |
|---|---|---|---|---|---|---|
| Alcohol | | 2 BEERS | | Dial | (18) 1990 | 6/00 |
| Marijuana | | 4 BLUNTS | | smoke | (17) 1989 | 6/00 |
| Cocaine | 1 GRAM | | | smoke | (18) 1990 | 6/00 |
| Speed | Denies | | | | | |
| Heroin | Denies | | | | | |
| Acid | Denies | | | | | |
| Steroids | Denies | | | | | |
| OTC | Denies | | | | | |
| Scripts | Denies | | | | | |
| Inhalants | Denies | | | | | |

7. Have you ever experienced:
    _Denies_
    ❏ Blackouts          ☑ Confusion          ☑ Mood Changes

    ☑ Increased Decreased Tolerance   ❏ Physical Withdrawal   ❏ Psychological Withdrawal

8. Did chemical use play any part in your arrest? _No_  How? _Receiving stolen property - license plates or car - belong to mother who had reported them stolen._

9. History of Treatment for Chemical Dependency

| Where | When | Length | Results |
|---|---|---|---|
| NKLC | 2000 - Detox | 4 Days | WSA |
| Donofro | 4 Years ago | | |

-2-

10. What was the longest period of abstinence? _one year (current)_

11. Have you attended self-help groups? _Yes_  Which ones? _AA/NA/CA_

12. Do you have or have you had any series medical problems or disability? _asthma_

13. Do you have any allergies? Yes (No)  Explain: _____

14. Are you presently on medication? (Yes) No  List: _inhaler - last used in prison_

15. Do you have a medical doctor?  Yes (No)  Who? _____

16. When was the last time you saw a doctor? _in prison_ .

17. Employment history in the last 5 years:

| Employer | Dates | Reasons for Termination |
|---|---|---|
| Dinosol | 1999 | quit - to many hours |
| Buckeye Elks | 1994 - 99 | occasional |
| | | |
| | | |
| | | |

18. Have you ever been discharged due to chemical use? Yes (No)

19. Have you ever been in the Armed Services?  Branch _N/A_
    When? _____  Type of Discharge _____

20. Educational History:                    Highest Grade Completed _11^{TH}_
    Vocational Training _N/A_         College _____

21. List any difficulties in school: _none Reported_

22. Legal history & present reason for incarceration. List times incarcerated.
    ☑ Jail _10_          ☑ Prison _1_          ☑ Correctional Facility _2_

    ☐ Misdemeanors - List: _____
    ☐ Felonies - List: _recieving stolen Property - Burglary 1992_

23. History of mental health counseling or hospitalization _None Reported_

| Where | When | Problem |
|---|---|---|
| | | |
| | | |

-3-

24. Medications. List (psychiatric only) _None reported_

25. Have you ever had suicidal thoughts? Yes/(No) When? _____

26. Have you ever attempted suicide? Yes/(No) When? _____

27. Results/Hospitalization Yes/No  No Treatment _____  Emergency Room _____

28. Was there any follow-up with a psychiatrist, counselor or other mental health personnel? Yes/No
List _____

29. Do you feel suicidal now? Yes/(No)

30. Have you had homicidal thoughts? Yes/(No) When? _____

31. Do you presently feel homicidal? Yes/(No) Towards whom? _____

32. Do you suffer from any of these?  Anxiety _No_  Depression _No_  Bi-Polar _No_
Emotional problems _No_  Sleep Disorders _No_  Family Problems _No_

33. What is your motivation TO accept treatment? _to Keep Clean - Maintain_

34. What is your motivation NOT to accept treatment _none_

35. What are your strengths? _GOD / Family / Girlfriend_

36. What are your weaknesses? _Drugs - Unemployed - lack of $ support_

37. Diagnostics:  SASSI _High Prob._
OPI _____
SAQ _____
MMPI Profile _R/o 304.0, 3063, 292.84, 300.40, 311, 305.40, 305.00_
_300.7, 301.81  VALID Profile_

38. Diagnostic Impression:  _304.20 Cocaine Dep_
_Cannabis    Alcohol   300.40 Dysthymic Disor_
Axis I _304.30 Dep   305.00 Abuse   300.40 Dysthymic Disor_
Axis II _799.9 Deferred Dx Dx  301.7 Antisocial Personality Dis._
Axis III _Deferred_
Axis IV _Legal - Vocational, Education_
Axis V _52_  _56_

40. Progress Report and Outcome: _Noted is a 29 yr old single Black
unemployed male. He reports his Chemical
use Hx to include Marijuana, 4 Blunts Weekly
since 1989 and Cocaine, 1 gram Daily since 1989.
He reports various symptoms as a result of
his use. The initial Clinical recommendation
is the 60 Day SH tract._

Length of Time for Assessment: _One (1) hour_
Person Assessing: _____ (Must be CCDCIII, CCDCII, CCDCI, LPC)
Reviewed/Approved: _____ (be LPC, LPCC, or Psychologist)
Date:

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

*PROGRESS REPORTS*
*(TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)*

RESIDENT'S NAME: _Nate Jackson_     DATE: _8/30/9_

P.O.'S NAME: _____
(IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

|  |  |  |  |
|---|---|---|---|
| 1. VOCATIONAL | (GOOD) | FAIR | POOR |
| 2. GED / ABE | GOOD | (FAIR) | POOR |
| 3. DRUG / ALCOHOL ISSUES | (GOOD) | FAIR | POOR |
| 4. INDIVIDUAL COUNSELING | (GOOD) | FAIR | POOR |
| 5. GROUP COUNSELING | (GOOD) | FAIR | POOR |
| 6. UNIT ADJUSTMENT | (GOOD) | FAIR | POOR |
| 7. REC/LEISURE ACTIVITIES — | GOOD | FAIR | POOR |
| 8. BUDGETING | GOOD | FAIR | POOR |
| 9. FAMILY ISSUES | GOOD | FAIR | POOR |
| 10. TRANSPORTATION | (GOOD) | FAIR | POOR |
| 11. JOB SEARCH / EMPLOYMENT | (GOOD) | FAIR | POOR |
| 12. PROGRAM PLAN / GOALS | (GOOD) | FAIR | POOR |
| 13. RELEASE PLANNING | (GOOD) | FAIR | POOR |
| 14. INCIDENT REPORTS | (GOOD) | FAIR | POOR |
| 15. URINE / BAC'S | (GOOD) | FAIR | POOR | POS. _____ |

EMPLOYER: _Diesel Plastics_     WAGE: _____
TENTATIVE RELEASE DATE: _9-19-0_     TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____ (IF APPLICABLE

PROGRESS: _Mr Jackson has adjusted very well to the facility. He is currently working full-time @ Diesel Plastics - He follows all itenararies and meet w/ casemanager as needed_

AREAS NEEDING IMPROVEMENT: _Mr Jackson needs to be more active in looking for a sponsor and a homeglow_

RESIDENT'S SIGNATURE: _____ STAFF: _____
DATE REVIEWED WITH RESIDENT: _____

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

### PROGRESS REPORTS
### (TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)

RESIDENT'S NAME: Nate Jackson                    DATE: 8/15

P.O.'S NAME: Phil Danelese
                                    (IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

| | | | |
|---|---|---|---|
| 1. VOCATIONAL | GOOD | FAIR | POOR |
| 2. GED / ABE | GOOD | (FAIR) | POOR |
| 3. DRUG / ALCOHOL ISSUES | (GOOD) | FAIR | POOR |
| 4. INDIVIDUAL COUNSELING | (GOOD) | FAIR | POOR |
| 5. GROUP COUNSELING | (GOOD) | FAIR | POOR |
| 6. UNIT ADJUSTMENT | (GOOD) | FAIR | POOR |
| 7. REC/LEISURE ACTIVITIES | GOOD | FAIR | POOR |
| 8. BUDGETING | GOOD | FAIR | POOR |
| 9. FAMILY ISSUES | GOOD | FAIR | POOR |
| 10. TRANSPORTATION | GOOD | FAIR | POOR |
| 11. JOB SEARCH / EMPLOYMENT | GOOD | FAIR | POOR |
| 12. PROGRAM PLAN / GOALS | (GOOD) | FAIR | POOR |
| 13. RELEASE PLANNING | GOOD | FAIR | POOR |
| 14. INCIDENT REPORTS | (GOOD) | FAIR | POOR |
| 15. URINE / BAC'S | (GOOD) | FAIR | POOR  POS. _____ |

EMPLOYER: Dinesol Plastics                    WAGE: _____

TENTATIVE RELEASE DATE: 11/25          TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____                    (IF APPLICABLE

PROGRESS: MR JACKSON HAS ADJUSTED FAIRLY WELL TO THIS FACILITY HE IS CURRENTLY WORKING FULL-TIME AT DINESOL PLASTICS. HE IS FOLLOWING ALL ORDINARINES AND MEETS W/ CASEMANAGER AS NEEDED

AREAS NEEDING IMPROVEMENT: MR JACKSON NEEDS TO ATTEND ABE MORE REGULARLY AND ALSO NEEDS TO BE SERIOUS ABOUT LOOKING FOR A SPONSOR

RESIDENT'S SIGNATURE: Nathaniel Jackson    STAFF: Josh Sn

DATE REVIEWED WITH RESIDENT:

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

### PROGRESS REPORTS
### (TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)

RESIDENT'S NAME: _Nate Jackson_       DATE: _7/30/01_

P.O.'S NAME: _____
      (IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

| | | | |
|---|---|---|---|
| 1. VOCATIONAL | GOOD | FAIR | POOR |
| 2. GED / ABE | GOOD | (FAIR) | POOR |
| 3. DRUG / ALCOHOL ISSUES | (GOOD) | FAIR | POOR |
| 4. INDIVIDUAL COUNSELING | (GOOD) | FAIR | POOR |
| 5. GROUP COUNSELING | (GOOD) | (FAIR) | POOR |
| 6. UNIT ADJUSTMENT | (GOOD) | (FAIR) | POOR |
| 7. REC/LEISURE ACTIVITIES  - | (GOOD) | FAIR | POOR |
| 8. BUDGETING | (GOOD) | FAIR | POOR |
| 9. FAMILY ISSUES | (GOOD) | (FAIR) | POOR |
| 10. TRANSPORTATION | (GOOD) | FAIR | POOR |
| 11. JOB SEARCH / EMPLOYMENT | (GOOD) | FAIR | POOR |
| 12. PROGRAM PLAN / GOALS | (GOOD) | FAIR | POOR |
| 13. RELEASE PLANNING | GOOD | FAIR | POOR |
| 14. INCIDENT REPORTS | (GOOD) | FAIR | POOR |
| 15. URINE / BAC'S | (GOOD) | FAIR | POOR | POS. _____ |

EMPLOYER: _Dinesol Plastics_       WAGE: _____

TENTATIVE RELEASE DATE: _11/01_       TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____ (IF APPLICABLE

PROGRESS: _Mr Jackson has adjusted fairly well to the facility. He is currently working @ Dinesol Plastics. He has only received one incident report and all BAC's & urines have came back clean_

AREAS NEEDING IMPROVEMENT: _Mr Jackson needs to attend ABE classes and not to disrupt them. He needs to take his education more serious_

RESIDENT'S SIGNATURE: _Nathaniel Jackson_    STAFF: _____

DATE REVIEWED WITH RESIDENT: _____

# COMMUNI. Y CORRECTIONS AS. OCIATION, INC.

## PROGRESS REPORTS
### (TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)

RESIDENT'S NAME: _Nate Jackson_      DATE: _7/15/__

P.O.'S NAME: _____
### (IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

| | | | |
|---|---|---|---|
| 1. VOCATIONAL | (GOOD) | FAIR | POOR |
| 2. GED / ABE | GOOD | FAIR | POOR |
| 3. DRUG / ALCOHOL ISSUES | (GOOD) | FAIR | POOR |
| 4. INDIVIDUAL COUNSELING | (GOOD) | FAIR | POOR |
| 5. GROUP COUNSELING | (GOOD) | FAIR | POOR |
| 6. UNIT ADJUSTMENT | (GOOD) | FAIR | POOR |
| 7. REC/LEISURE ACTIVITIES | GOOD | FAIR | POOR |
| 8. BUDGETING | GOOD | FAIR | POOR |
| 9. FAMILY ISSUES | GOOD | FAIR | POOR |
| 10. TRANSPORTATION | GOOD | FAIR | POOR |
| 11. JOB SEARCH / EMPLOYMENT | GOOD | FAIR | POOR |
| 12. PROGRAM PLAN / GOALS | (GOOD) | FAIR | POOR |
| 13. RELEASE PLANNING | GOOD | FAIR | POOR |
| 14. INCIDENT REPORTS | (GOOD) | FAIR | POOR |
| 15. URINE / BAC'S | (GOOD) | FAIR | POOR | POS. _____ |

EMPLOYER: _____ WAGE: _____
TENTATIVE RELEASE DATE: _11/23/01_ TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____ (IF APPLICABLE
PROGRESS: Mr Jackson has adjusted very well to the facility. He follows itemizes and is very respectful of all staff. He does what is asked of him. And is very cooperative

AREAS NEEDING IMPROVEMENT: Mr Jackson needs to be more vocal in groups regarding his abstinence. He needs to share his experiences in order to deal w/ his issues

RESIDENT'S SIGNATURE: _Nathaniel Jackson_ STAFF: _John Ry__
DATE REVIEWED WITH RESIDENT:
APPROVED BY:

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

## DRUG AND ALCOHOL PROGRESS REPORTS
### (TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)

RESIDENT'S NAME: _Nate Jackson_ DATE: _6/30/01_

P.O.'S NAME: _Phil Danchise_
(IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

|     |                          |        |      |      |
|-----|--------------------------|--------|------|------|
| 1.  | VOCATIONAL               | GOOD   | FAIR | POOR |
| 2.  | GED / ABE                | (GOOD) | FAIR | POOR |
| 3.  | DRUG / ALCOHOL ISSUES    | (GOOD) | FAIR | POOR |
| 4.  | INDIVIDUAL COUNSELING    | (GOOD) | FAIR | POOR |
| 5.  | GROUP COUNSELING         | (GOOD) | FAIR | POOR |
| 6.  | UNIT ADJUSTMENT          | (GOOD) | FAIR | POOR |
| 7.  | REC/LEISURE ACTIVITIES   | (GOOD) | FAIR | POOR |
| 8.  | BUDGETING                | (GOOD) | FAIR | POOR |
| 9.  | FAMILY ISSUES            | GOOD   | (FAIR) | POOR |
| 10. | TRANSPORTATION           | GOOD   | FAIR | POOR |
| 11. | JOB SEARCH / EMPLOYMENT  | GOOD   | FAIR | POOR |
| 12. | PROGRAM PLAN / GOALS     | (GOOD) | FAIR | POOR |
| 13. | RELEASE PLANNING         | GOOD   | FAIR | POOR |
| 14. | INCIDENT REPORTS         | (GOOD) | (FAIR) | POOR |
| 15. | URINE / BAC'S            | (GOOD) | FAIR | POOR | POS. _____ |

EMPLOYER: _____N/A_____ WAGE: _____

TENTATIVE RELEASE DATE: _11/24/01_ TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _N/A_ (IF APPLICABLE

PROGRESS: _Mr Jackson has adjusted fairly well to the facility. He is always respectful of staff and cooperative w/ casemanager. He follows treatment, attends all groups, and meets with casemanager as needed_

AREAS NEEDING IMPROVEMENT: _Mr Jackson needs to be more vocal in groups to get better deal w/ issues regarding substance abuse. He also needs to deal w/ some family issues he has had for a while_

RESIDENT'S SIGNATURE: _Nathaniel Jackson_ STAFF: _Joel Syh_

DATE REVIEWED WITH RESIDENT: _6-30-01_

APPROVED BY: _____
(CREDENTIALS: LSW, CCDC I OR ABOVE)

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

## *DRUG AND ALCOHOL PROGRESS REPORTS*
## *(TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)*

RESIDENT'S NAME: _Nate Jackson_                    DATE: _6/15/01_

P.O.'S NAME: _Phil Dundise_
                              (IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

| | GOOD | FAIR | POOR | |
|---|---|---|---|---|
| 1. VOCATIONAL | GOOD | FAIR | POOR | |
| 2. GED / ABE | (GOOD) | FAIR | POOR | |
| 3. DRUG / ALCOHOL ISSUES | (GOOD) | FAIR | POOR | |
| 4. INDIVIDUAL COUNSELING | (GOOD) | FAIR | POOR | |
| 5. GROUP COUNSELING | (GOOD) | FAIR | POOR | |
| 6. UNIT ADJUSTMENT | (GOOD) | FAIR | POOR | |
| 7. REC/LEISURE ACTIVITIES | GOOD | FAIR | POOR | |
| 8. BUDGETING | GOOD | FAIR | POOR | |
| 9. FAMILY ISSUES | GOOD | FAIR | POOR | |
| 10. TRANSPORTATION | GOOD | FAIR | POOR | |
| 11. JOB SEARCH / EMPLOYMENT | GOOD | FAIR | POOR | |
| 12. PROGRAM PLAN / GOALS | (GOOD) | FAIR | POOR | |
| 13. RELEASE PLANNING | GOOD | FAIR | POOR | |
| 14. INCIDENT REPORTS | (GOOD) | FAIR | POOR | |
| 15. URINE / BAC'S | (GOOD) | FAIR | POOR | POS. |

EMPLOYER: _____ NA _____ WAGE: _____

TENTATIVE RELEASE DATE: _18/25/01_ TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____ (IF APPLICABLE

PROGRESS: _Mr Jackson just entered the facility on 5/25 and appears to be adjusting very well. He is attending all groups + is always respectful of all staff_

AREAS NEEDING IMPROVEMENT: _Mr Jackson (He) is need of working and we are looking (good) at places in the area He also needs to be more vocal in Groups_

RESIDENT'S SIGNATURE: _Nathaniel Jackson_ STAFF: _Jed Syre_

DATE REVIEWED WITH RESIDENT: _6/19/01_

APPROVED BY: _____

(CREDENTIALS: LSW, CCDC-I OR ABOVE)

# COMMUNITY CORRECTIONS ASSOCIATION, INC.

## DRUG AND ALCOHOL PROGRESS REPORTS
## (TO BE COMPLETED ON 1ST & 15TH OF EVERY MONTH)

RESIDENT'S NAME: Nate Jackson                    DATE: 5/1/01

P.O.'S NAME: _____
(IF APPLICABLE)

CLIENT WAS COUNSELED WITH REGARD TO:

| | | | |
|---|---|---|---|
| 1. VOCATIONAL | GOOD | FAIR | POOR |
| 2. GED / ABE | GOOD | FAIR | POOR |
| 3. DRUG / ALCOHOL ISSUES | GOOD | FAIR | POOR |
| 4. INDIVIDUAL COUNSELING | GOOD | FAIR | POOR |
| 5. GROUP COUNSELING | GOOD | FAIR | POOR |
| 6. UNIT ADJUSTMENT | GOOD | FAIR | POOR |
| 7. REC/LEISURE ACTIVITIES | GOOD | FAIR | POOR |
| 8. BUDGETING | GOOD | FAIR | POOR |
| 9. FAMILY ISSUES | GOOD | FAIR | POOR |
| 10. TRANSPORTATION | GOOD | FAIR | POOR |
| 11. JOB SEARCH / EMPLOYMENT | GOOD | FAIR | POOR |
| 12. PROGRAM PLAN / GOALS | GOOD | FAIR | POOR |
| 13. RELEASE PLANNING | GOOD | FAIR | POOR |
| 14. INCIDENT REPORTS | GOOD | FAIR | POOR |
| 15. URINE / BAC'S | GOOD | FAIR | POOR | POS |

EMPLOYER: _____  WAGE _____

TENTATIVE RELEASE DATE: _____  TENTATIVE RELEASE ADDRESS: _____

PROJECTED HOME CONFINEMENT DATE: _____  (IF APPLICAB

PROGRESS: Mr. Jackson just entered the facility on 5/25/01 and
is still adjusting to facility.

AREAS NEEDING IMPROVEMENT: Mr. Jackson will be attending
Substance Abuse, Vocational Employment, and ABE

RESIDENT'S SIGNATURE: X Nathaniel Jackson      STAFF: _____
DATE REVIEWED WITH RESIDENT: _____ 5-21-01 _____
APPROVED BY: _____
(CREDENTIALS: LSW, CCDC-I OR ABOVE)

A Contractual Agreement

_Nate Jackson_ Between and _C.C.A_

## DRUG AND ALCOHOL ABUSE TREATMENT CONTRACT

Goals:

1. Complete a thorough substance abuse history and assessment by _6-1-01_.

2. Discuss, review and demonstrate that you know and understand the Denial and Problem Identification phase by _6-14-01_.

3. Complete the Denial and Problem Identification Insight Series by _6-19-01_

4. Discuss, review and demonstrate that you know and understand the Cravings Management phase by _7-3-01_.

5. Complete the Cravings Management Insight Series by _7-7-01_.

6. Discuss, review and demonstrate that you know and understand the Relapse Prevention phase by _7-17-01_.

7. Complete the Relapse Prevention Insight Series by _7-20-01_.

8. Successfully complete the Post-Treatment Evaluation by _7-24-01_.

## DRUG AND ALCOHOL TREATMENT CONTRACT

Resident's Obligations:

1. Read all materials, complete each assessment instrument and provide all necessary information openly and honestly.

2. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

3. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

4. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

5. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

6. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

7. Read all material, attend all required meetings, complete all reading and writing assignments thoroughly.

Contractual Agreement      ween _____  _____

—2—

## DRUG AND ALCOHOL TREATMENT CONTRACT

Program's Commitment:

1.   Administer, interpret and with, treatment team input, develop an accurate assessment.

2.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

3.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

4.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

5.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

6.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

7.   Provide information, discuss tasks and facilitate insight, review each assignment and provide constructive feedback.

8.   Summarize for treatment team all data to date.  Complete evaluations and assess depth of insight developed and motivation to change.  Make recommendations regarding program progression.

| TARGET DATES | OUTCOME | DATE |
|---|---|---|
| 1. 6-1-01 | complete | 6-1-1 |
| 2. 6-14-01 | complete | 6-14-01 |
| 3. 6-19-01 | complete | 6-19-1 |
| 4. 7-3-01 | complete | 7-3-01 |
| 5. 7-7-01 | complete | 7-7-01 |
| 6. 7-17-01 | complete | 7-17-1 |
| 7. 7-20-01 | complete | 7-20-0 |
| 8. 7-29-01 | complete | 7-29- |

| CONTRACT NUMBER | AGREED TO/FOR DATES | THROUGH |
|---|---|---|
| One | 6-1-01 | 7/29-01 |

OUTCOME SUMMARY AND SUBSEQUENT ACTION:

_____

_____

_____

DRUG AND ALCOHOL TREATMENT CONTRACT                    -3-

\* In addition to your Drug and Alcohol Treatment Contract, you will be responsible for the following goals:

1.   Education: Attend Adult Basic Education 4-5 a week. Prepare to take the G.E.D. Utilize staff in regards to preparing for the GED

Completion Date: __Ongoing__          Date Completed: _____

2.   Budgeting Issues: Develop a budget based on $30 allowed in facility. With your casemanger discuss if the $30 is sufficient to care for all expenses in facility

Completion Date: __6-16-01__          Date Completed: __6-16-01__

3.   Individual Leisure Plans: Begin attending recreational activities provided while in program. On paper discuss any leisure activities, or diet plans in which you intend to pursue

Completion Date: __6-26-01__          Date Completed: __6-26-01__

4.   Employment Preparation: Begin attending vocational planning classes, complete job readiness, a working resume and begin preparing for job search as well. Discuss any issues regarding employment w/ vocational specialist

Completion Date: __7-26-01__          Date Completed: _____

5.   Groups: Attend Thinking For A Change, Substance Abuse Therapy, AA, CA, NA WAA, 37 day group and any other groups assigned by casemanager. Participate openly in groups and discuss w/ your casemanager any additional related areas of concern.

Completion Date: __7-26-01__          Date Completed: _____

6.   Other: With your casemanager any issues of concern regarding your abstinence. Also discuss which extend meetings you wish to attend. Discuss the importance of gaining a sponsor as well

Completion Date: __7-22-01__          Date Completed: __7-22-01__
Agreed to/for dates: _____ through _____
Outcome Summary: _____
_____
_____

Resident Signature: Nathaniel Jackson
Case Manager / Credentials: _____
Unit Director Signature: _____
Approved by: _____

(CREDENTIALS (LSW, CCDC-I or above)

# A CONTRACTUAL AGREEMENT

Nate Jackson BETWEEN AND CCA

## CLIENT GOALS:

1. SUBSTANCE ABUSE ISSUES: ① ATTEND RELAPSE PREVENTION THERAPY GROUP REGULARLY ② ATTEND A MINIMUM OF 3 EXTERNAL 12 STEP MEETINGS OF RECOVERY PER WK ③ OBTAIN A SPONSOR AND A NETWORK - PEOPLE FOR YOUR SUPPORT GROUP

1. COMPLETION DATE: ONGOING  DATE COMPLETED: _____
2. COMPLETION DATE: ONGOING  DATE COMPLETED: _____
3. COMPLETION DATE: 8/21/01  DATE COMPLETED: _____

2. BUDGETING ISSUES: ① UPON EMPLOYMENT DEVELOP A WRITTEN BUDGET BASED ON YOUR NET INCOME. ALSO INCLUDE A PLAN FOR SAVINGS. ② DISCUSS W/ YOUR CASE-MANAGER WHY YOU FEEL IT IS IMPORTANT TO FOLLOW A BUDGET

1. COMPLETION DATE: ONGOING  DATE COMPLETED: _____
2. COMPLETION DATE: ONGOING  DATE COMPLETED: _____
3. COMPLETION DATE: _____  DATE COMPLETED: _____

3. INDIVIDUAL LEISURE PLANS: ① LIST ON PAPER 10 POSITIVE ACTIVITIES YOU WILL PURSUE WHEN LEAVING CCA - ② ON PAPER ALSO DISCUSS, WHY YOU FEEL IT IS IMPORTANT TO HAVE A BALANCE OF WORK, REST & PLAY

1. COMPLETION DATE: 8/10/01  DATE COMPLETED: _____
2. COMPLETION DATE: 8/12-01  DATE COMPLETED: _____
3. COMPLETION DATE: _____  DATE COMPLETED: _____

4. EDUCATION: ① ATTEND ADULT BASE CLASSES AT LEAST 4 (8) TIMES A WK. ② DISCUSS W/ CASE-MANAGER AND ABE TEACHER WHY YOU FEEL IT'S IMPORTANT TO OBTAIN YOUR GED

1. COMPLETION DATE: ONGOING  DATE COMPLETED: _____
2. COMPLETION DATE: 8/12/01  DATE COMPLETED: _____
3. COMPLETION DATE: _____  DATE COMPLETED: _____

CONTRACTUAL AGREEMENT                                          PAGE 2

5. INTERPERSONAL ISSUES: ① ON PAPER LIST ALL 12
STEPS OF RECOVERY AND HOW IT WILL
AFFECT YOUR RECOVERY.
② LIST ON PAPER HOW
— YOU WILL APPLY THESE STEPS TO
YOUR DAILY RWUTINE.

1. COMPLETION DATE: 8/20    DATE COMPLETED: _____
2. COMPLETION DATE: 8/21    DATE COMPLETED: _____
3. COMPLETION DATE: _____    DATE COMPLETED: _____

6. EMPLOYMENT: ① SECURE FULLTIME EMPLOYMENT
UNTIL RELEASED FROM CCA
② ATTEND JOB SEARCH 3 TO UNTIL
FULL-TIME IS SECURED

1. COMPLETION DATE: ONGOING    DATE COMPLETED: _____
2. COMPLETION DATE: _____    DATE COMPLETED: _____
3. COMPLETION DATE: _____    DATE COMPLETED: _____

7. OTHER: ① LIST ON PAPER YOUR GOALS
FOR 1 MONTH, 6 MONTH, AND 1 YEAR WHEN
IT COMES TO FAMILY, FRIENDS AND EMPLOYMENT.
② WRITE AN OUTLINE ON HOW YOU WILL
(FEEL) OR ABLE ON CONTACTING YOUR CHILDREN
AND BEING PART OF THEIR LIVES

1. COMPLETION DATE: 8/21    DATE COMPLETED: _____
2. COMPLETION DATE: 8/23    DATE COMPLETED: _____
3. COMPLETION DATE: _____    DATE COMPLETED: _____

8. OTHER: DESIGN MARRIAGE ① ON PAPER WRITE DOWN
HOW YOUR THOUGHT PROCESS HAS
CHANGED SINCE ENTERING CCA.
② ALSO WRITE DOWN THE NEGATIVE
CONSEQUENCES YOU HAVE SUFFERED AND WHAT YOU
HAVE LEARNED FROM THEM

1. COMPLETION DATE: 9/1    DATE COMPLETED: _____
1. COMPLETION DATE: 9/10    DATE COMPLETED: _____
3. COMPLETION DATE: _____    DATE COMPLETED: _____

A CONTRACTUAL AGREEMENT
BETWEEN
_____ AND _____

## CLIENT OBLIGATIONS:

- ATTEND AND PARTICIPATE IN ALL GROUPS AND CLASSES.
- ATTEND ALL GROUPS AND CLASSES ON TIME.
- BE OPEN AND HONEST WITH STAFF DURING ALL DISCUSSIONS.
- COMPLETE ALL ASSIGNMENTS ON TIME AND TURN IN TO STAFF.
- DISCUSS ALL PROBLEMS OR CONCERNS AS THEY ARISE.
- OTHER: _____
- OTHER: _____

## STAFF COMMITMENT

- DISCUSS UNTIL INSIGHT IS DEVELOPED.
- SCHEDULE ALL CLASSES AND GROUPS.
- PROVIDE NECESSARY ASSIGNMENTS TO BE COMPLETED.
- MONITOR PROGRESS ON COMPLETION OF ALL ASSIGNMENTS.
- PROVIDE NECESSARY FEEDBACK.
- ASSIST WITH ALL PROBLEMS AND CONCERNS.
- OTHER: _____
- OTHER: _____

CONTRACT NUMBER: _2_

AGREED TO FOR DATES: _7/22_ THROUGH _9/19_

OUTCOME SUMMARY AND SUBSEQUENT ACTION: _____
_____
_____

RESIDENT SIGNATURE: _Nathaniel Jackson_ DATE: _7-25-01_

CASE MANAGER: _____ DATE: _7/15/0_

UNIT DIRECTOR APPROVAL: _____ DATE: _7/22/01_

USPO APPROVAL: _____ DATE: _____

USPO COMMENTS: _____
_____
_____
_____

# SASSI-3  Substance Abuse Subtle Screening Inventory

For free consultation on this profile  1-888 BY SASSI • 1-888-297-2774 • M–Th 8–6 • Fri 8–5 EST



Name  Nate Jackson                                  Gender  **M**  Age _____

Client ID _____  Test Date  5·25·10

  **RAP**  Random Answering Pattern

⬭  Check if RAP is 2 or more.
— Results may not be meaningful.
Try to resolve problem before proceeding.

## Adult Male Profile

| | Face Valid Alcohol | Face Valid Other Drugs | Symptoms | Obvious Attributes | Subtle Attributes | Defensiveness | Supplemental Addiction Measure | Family vs. Controls | Correctional |
|---|---|---|---|---|---|---|---|---|---|
| | **FVA** | **FVOD** | **SYM** | **OAT** | **SAT** | **DEF** | **SAM** | **FAM** | **COR** |
| Scores | 4 | 21 | 7 | 8 | 4 | 5 | 9 | 5 | 7 |

Check every rule, yes or no.

**Rule 1**  FVA 18 or more?  yes / **no**

**Rule 2**  FVOD 16 or more?  **yes** / no

**Rule 3**  SYM 7 or more?  **yes** / no

**Rule 4**  OAT 10 or more?  yes / **no**

**Rule 5**  SAT 6 or more?  yes / **no**

**Rule 6**  OAT  7 or more ____ and
SAT  5 or more ____.  Both?  yes / **no**

**Rule 7**  FVA  9 or more OR }
FVOD  15 or more }  ____and
SAM  8 or more ____.  Both?  yes / **no**

**Rule 8**  OAT  5 or more ____and
DEF  8 or more ____and
SAM  8 or more ____.  All three?  yes / **no**

**Rule 9**  FVA  8 or more OR }
FVOD  6 or more }  ____and
SAT  2 or more ____ and
DEF  4 or more ____ and
SAM  4 or more ____.  All four?  yes / **no**

### THE DECISION RULE:

ANY rule answered "yes"?  ➡  **HIGH PROBABILITY** of having a Substance Dependence Disorder

ALL rules answered "no"?  ➡  LOW PROBABILITY of having a Substance Dependence Disorder

____ Check if DEF is 8 or more. Elevated DEF scores increase the possibility of the SASSI missing substance dependent individuals. Elevated DEF may also reflect situational factors.

Copyright © 1988, 1994, 1997 Glenn A. Miller          B-P301 P-B 7/99

# SASSI - 3
# ADULT FORM

If a statement tends to be TRUE for you, fill in the square in the column headed T: that is,

If a statement tends to be FALSE for you, fill in the square in the column headed F: that is,

Please try to answer all questions.

|  | T | F |  |
|---|---|---|---|
| 1. | ☐ | ☐ | Most people would lie to get what they want. |
| 2. | ☐ | ☐ | Most people make some mistakes in their life. |
| 3. | ☐ | ☐ | I usually "go along" and do what others are doing. |
| 4. | ☐ | ☐ | I have never been in trouble with the police. |
| 5. | ☐ | ☐ | I was always well behaved in school.* |
| 6. | ☐ | ☐ | My troubles are not all my fault.* |
| 7. | ☐ | ☐ | I have not lived the way I should. |
| 8. | ☐ | ☐ | I can be friendly with people who do many wrong things. |
| 9. | ☐ | ☐ | I do not like to sit and daydream.* |
| 10. | ☐ | ☐ | No one has ever criticized or punished me. |
| 11. | ☐ | ☐ | Sometimes I have a hard time sitting still. |
| 12. | ☐ | ☐ | People would be better off if they took my advice.* |
| 13. | ☐ | ☐ | At times I feel worn out for no special reason.* |
| 14. | ☐ | ☐ | I think I would enjoy moving to an area I've never been before. |
| 15. | ☐ | ☐ | It is better not to talk about personal problems. |
| 16. | ☐ | ☐ | I have had days, weeks or months when I couldn't get much done because I just wasn't up to it. |
| 17. | ☐ | ☐ | I am very respectful of authority. |
| 18. | ☐ | ☐ | I like to obey the law. |
| 19. | ☐ | ☐ | I have been tempted to leave home.* |
| 20. | ☐ | ☐ | I often feel that strangers look at me with disapproval. |
| 21. | ☐ | ☐ | Other people would fall apart if they had to deal with what I handle. |
| 22. | ☐ | ☐ | I have avoided people I did not wish to speak to. |
| 23. | ☐ | ☐ | Some crooks are so clever that I hope they get away with what they have done. |
| 24. | ☐ | ☐ | My school teachers had some problems with me.* |
| 25. | ☐ | ☐ | I have never done anything dangerous just for fun. |
| 26. | ☐ | ☐ | I need to have something to do so I don't get bored. |
| 27. | ☐ | ☐ | I have sometimes drunk too much.* |
| 28. | ☐ | ☐ | Much of my life is uninteresting. |
| 29. | ☐ | ☐ | Sometimes I wish I could control myself better.* |
| 30. | ☐ | ☐ | I believe that people sometimes get confused. |
| 31. | ☐ | ☐ | Sometimes I am no good for anything at all.* |
| 32. | ☐ | ☐ | I break more laws than many people. |
| 33. | ☐ | ☐ | If some friends and I were in trouble together, I would rather take the whole blame than tell on them. |

|  | T | F |  |
|---|---|---|---|
| 34. | ☐ | ☐ | Crying does not help anything. |
| 35. | ☐ | ☐ | I think there is something wrong with my memory.* |
| 36. | ☐ | ☐ | I have sometimes been tempted to hit people. |
| 37. | ☐ | ☐ | My most important successes are not a direct result of my effort. |
| 38. | ☐ | ☐ | I always feel sure of myself. |
| 39. | ☐ | ☐ | I have never broken a major law.* |
| 40. | ☐ | ☐ | There have been times when I have done things I couldn't remember later. |
| 41. | ☐ | ☐ | I think carefully about all my actions.* |
| 42. | ☐ | ☐ | I have used alcohol or "pot" too much or too often. |
| 43. | ☐ | ☐ | Nearly everyone enjoys being picked on and made fun of. |
| 44. | ☐ | ☐ | I know who is to blame for most of my troubles. |
| 45. | ☐ | ☐ | I frequently make lists of things to do. |
| 46. | ☐ | ☐ | I guess I know some pretty undesirable types.* |
| 47. | ☐ | ☐ | Most people will laugh at a joke at times. |
| 48. | ☐ | ☐ | I have rarely been punished.* |
| 49. | ☐ | ☐ | I smoke cigarettes regularly. |
| 50. | ☐ | ☐ | At times I have been so full of energy that I felt I didn't need sleep for days at a time. |
| 51. | ☐ | ☐ | I have sometimes sat about when I should have been working.* |
| 52. | ☐ | ☐ | I am often resentful. |
| 53. | ☐ | ☐ | I take all my responsibilities seriously.* |
| 54. | ☐ | ☐ | I have neglected obligations to family or work because of drinking or using drugs. |
| 55. | ☐ | ☐ | I have had a drink first thing in the morning to steady my nerves or get rid of a hangover. |
| 56. | ☐ | ☐ | While I was a teenager, I began drinking or using other drugs regularly. |
| 57. | ☐ | ☐ | My father was/is a heavy drinker or drug user. |
| 58. | ☐ | ☐ | When I drink or use drugs I tend to get into trouble. |
| 59. | ☐ | ☐ | My drinking or other drug use causes problems between me and my family. |
| 60. | ☐ | ☐ | I do most of my drinking or drug use using away from home. |
| 61. | ☐ | ☐ | At least once a week I use some non-prescription antacid and/or diarrhea medicine. |
| 62. | ☐ | ☐ | I have never felt sad over anything. |
| 63. | ☐ | ☐ | I am rarely at a loss for words.* |
| 64. | ☐ | ☐ | I am usually happy.* |
| 65. | ☐ | ☐ | I am a restless person. |
| 66. | ☐ | ☐ | I like doing things on the spur of the moment. |
| 67. | ☐ | ☐ | I am a binge drinker/drug user. |

Fill in this way ■

Not like this ☑

Name _____  Date 5-25-07  Sex M  Age 59

IT IS ILLEGAL TO REPRODUCE THIS FORM

©Copyright, June 1997 by Glenn Miller

*these items are taken from the Psychological Screening Inventory, Copyright 1968 by Richard L. Lanyon, Ph.D. and are used here by permission.

S·A·S·S·I

Form SASSI-3    #2-14-97

# MMPI-2 ADULT INTERPRETIVE SYSTEM

developed by
Roger L. Greene, PhD
and PAR Staff

## Client Information

| | |
|---|---|
| Name : | Nathaniel Edwin Jackson |
| Age : | 29 |
| Gender : | Male |
| Marital Status : | Never Married |
| Birth Date : | 02/13/1972 |
| Admin. Date : | 6 /10/2001 |

---

    The interpretive information contained in this report should be viewed as only one source of hypotheses about the individual being evaluated.  No decisions should be based solely on the information contained in this report.  This material should be integrated with all other sources of information in reaching professional decisions about this individual.  This report is confidential and intended for use by qualified professionals only. It should not be released to the individual being evaluated.

Copyright (c) 1990, 1997, 1998 by
Psychological Assessment Resources, Inc.
All rights are reserved.
MMPI-2  is a registered trademark of the University of Minnesota

MMPI-2 Adult Interpretive System
cca
Nathaniel Edwin Jackson
Page:2

# PROFILE MATCHES AND SCORES FOR STANDARD VALIDITY AND CLINICAL SCALES

|  | Scale | Client's Profile | Best Fit Prototype Profile |
|---|---|---|---|
| Codetype: |  | Spike 4-(2) | Spike 4-(2) |
| rc: |  | 0.848 | 0.848 |
| D2: |  | 400 | 400 |
|  | L | 70+ | 56 |
|  | F | 51 | 51 |
|  | K | 56 | 51 |
|  | 1 Hs | 45 | 49 |
|  | 2 D | 59 | 60 |
|  | 3 Hy | 47 | 52 |
|  | 4 Pd | 74 | 72 |
|  | 5 Mf | 42 | 43 |
|  | 6 Pa | 42 | 50 |
|  | 7 Pt | 55 | 51 |
|  | 8 Sc | 56 | 49 |
|  | 9 Ma | 47 | 49 |
|  | 0 Si | 47 | 50 |

| Mean Clinical Elevation: | 53 | 53 |
|---|---|---|
| Scatter: | 10 | 10 |
| Client Age: | 29 | 34 |
| Men (Percent): | X | 80% |
| Women (Percent): |  | 20% |

MMPI-2 Adult Interpretive System
cca
Nathaniel Edwin Jackson
Page:3

# CONFIGURAL VALIDITY SCALES INTERPRETATION

There is no interpretation available for this configuration of the L, F, and K scales.  The validity of this administration of the MMPI-2 will need to be ascertained by reviewing these three scales individually as well as other measures of consistency and accuracy of item endorsement.

# CONFIGURAL CLINICAL SCALES INTERPRETATION

Codetype: Spike 4-(2)

CLINICAL PRESENTATION:

Moods

He reports mild emotional distress. Although life is not a strain for him and he is happy most of the time, he wishes that he could be as happy as others seem to be, and he thinks that he has not lived the "right kind of life. He also feels useless at times. That is, there are undercurrents of a chronic dysphoria that he may not recognize.

Cognitions

He thinks clearly and rationally and reports good insight into his behavior. His memory and concentration skills are very good. His confidence and assurance in his abilities may be a facade for underlying feelings of insecurity, inadequacy, and dependency. Criticism or scolding bothers him greatly.

Interpersonal Relations

He is extraverted and makes a good first impression on others, but this impression does not last long. His interpersonal relations are often shallow and superficial. These relations typically are not reciprocal and are marked by distrust, a lack of empathy, and irresponsibility. His family is critical of him, and he is alienated from them. He wanted to leave home.

Other Problem Areas

He is very likely to abuse substances. He is very likely to have engaged in antisocial

MMPI-2 Adult Interpretive System
cca
Nathaniel Edwin Jackson
Page:4

behaviors during his school years and to continue to engage in reckless behaviors that may
or may not be explicitly illegal. He believes that he is in good physical health and that
he is as able to work now as he was in the past. He is unlikely to have suicidal ideation.

## TREATMENT:

His prognosis is guarded unless treatment begins early in his life. He is experiencing
little emotional distress, and he expects others to change to meet his expectations. He is
not inclined to undertake any serious examination of his behavior. Short-term, behavior
interventions focused on his reasons for entering treatment will be most effective.

## POSSIBLE DIAGNOSES:

Axis I - R/O Adjustment Disorders
309.0  Adjustment Disorder with Depressed Mood
309.3  Adjustment Disorder with Disturbance of Conduct
R/O Mood Disorders
292.84 Substance-Induced Mood Disorder
300.4  Dysthymic Disorder
311    Depressive Disorder NOS
R/O Substance-Related Disorders
305.00 Alcohol Abuse
305.40 Sedative, Hypnotic, or Anxiolytic Abuse
Axis II - R/O Personality Disorders
301.7  Antisocial Personality Disorder
301.81 Narcissistic Personality Disorder

# VALIDITY AND CLINICAL SCALES

# VALIDITY SCALES

L     T = 70

He may be either a normal individual who is very self-controlled, rigid, and lacking in insight;
a person who uses excessive repression and denial; or a naive and unsophisticated individual who is
attempting to create a very favorable impression of himself.  Psychiatric patients who score in this
range and have all clinical scales below a T score of 65 may exhibit a psychotic disorder.

F     T = 51

MMPI-2 Adult Interpretive System
cca
Nathaniel Edwin Jackson
Page:5

He responded to the test items as do most individuals who are relatively free of stress.

K     T = 56

He exhibits an appropriate balance between self-disclosure and self-protection.  He is psychologically well-adjusted and capable of dealing with problems in his daily life.  Scores in this range also are indicative of good ego strength, sufficient personal resources to deal with problems, a positive self-image, adaptability, and a wide range of interests.  Prognosis for psychological intervention is generally good.

# CLINICAL SCALES

1 Hs = 45

This score is considered to be within normal limits.

2 D = 59

He is not satisfied with his current life situation or with himself.  He may not be aware of the degree to which he feels dissatisfied, or he may have learned to adjust to long-term dissatisfaction.  Persons experiencing acute distress will rarely score within this range.

3 Hy = 47

This score is considered to be within normal limits.

4 Pd = 74

He is characterized as angry, belligerent, rebellious, resentful of rules and regulations, and hostile toward authority figures. He is likely to be impulsive, unreliable, egocentric, and irresponsible.  He often has little regard for social standards. He often shows poor judgment and seems to have difficulty planning ahead and benefiting from his previous experiences.  He makes a good first impression, but long-term relationships tend to be rather superficial and unsatisfying. Analysis of the Content Scales and/or the Harris-Lingoes Subscales may facilitate interpretation of scores within the lower end of this range (T scores 60-80).

5 Mf = 42

He identifies strongly with the traditional masculine role. He may overemphasize his strength and physical ability.

MMPI-2 Adult Interpretive System
cca
Nathaniel Edwin Jackson
Page:6

6 Pa = 42

He may be overly trusting and insensitive to and unaware of the motives of other people.

7 Pt = 55

This score is considered to be within normal limits.

8 Sc = 56

This score is considered to be within normal limits.

9 Ma = 47

Scores in this range are considered to be within normal limits.  Adolescents and college students tend to score in the upper end of this range (T scores of 54-57).  Persons older than 55 years who score in the upper end of this range are likely to be overly energetic and active.

0 Si = 47

This score is considered to be within normal limits.


**+++ END OF REPORT +++**

# MMPI-2™

## Minnesota Multiphasic Personality Inventory-2™

Profile for Basic Scales

Copyright © 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved. Copyright © 1942, 1943
(renewed 1970), 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.  Distributed exclusively
by National Computer Systems, Inc., P. O. Box 1416, Minneapolis, MN 55440. 800-627-7271  www.ncs.com
Printed in the United States of America.
"MMPI-2" and "Minnesota Multiphasic Personality Inventory-2" are trademarks of the University of Minnesota. The NCS
logo is a registered trademark of National Computer Systems, Inc.

Name _____

Address _____

Occupation _____ Age 29  Marital Status ___ 5

Education Test GEO  Date Tested 5/25/08

Referred By _____

MMPI-2 Code _____

Scorer's Initials _____

LEGEND
L  Lie   70
F  Infrequency 51
K  Correction 54  45
Hs  Hypochondriasis 45
D  Depression 59
Hy  Conversion Hysteria 47
Pd  Psychopathic Deviate 42
Mf  Masculinity-Femininity 55
Pa  Paranoia 48
Pt  Psychasthenia 55
Sc  Schizophrenia 54
Ma  Hypomania 45
Si  Social Introversion 4

MALE

|  | L | F | K | Hs+5K | D | Hy | Pd+4K | Mf | Pa | Pt+1K | Sc+1K | Ma+2K | Si |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score | 6 | 5 | 18 | 2 | 22 | 20 | 26 | 22 | 8 | 11 | 12 | 15 | 23 |
| K to be Added |  |  |  | 9 |  |  | 7 |  |  | 18 | 18 | 4 |  |
| Raw Score with K |  |  |  | 11 |  |  | 33 |  |  | 29 | 30 | 19 |  |



Softcover Answer Sheet
Hand Scoring

**DIRECTIONS:**

Please follow these directions when completing the identification areas on this page and responding to the MMPI-2 items on page 3.

1. Print your name, birth date, age, sex, and test date in the area to the right.

2. Use a pencil only and fill in the circles on page 3 with heavy, dark marks.

3. If you make a mistake or change your mind, erase your first response completely and then fill in the correct circle.

4. Do not make any marks outside the circles.

Jackson   Nathaniel   Edwin
Last Name          First              Middle

2 /13 /72      29        M
Birth Date       Age       Sex

5 /25 /01
Test Date

 ®

**DO NOT SEND TO NATIONAL COMPUTER SYSTEMS
USE ONLY FOR HAND SCORING**

National Computer Systems  P. O. Box 1416  Minneapolis MN  55440  1-800-627-7271  www.ncs.com

Copyright © 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA.  All rights reserved.  Copyright © 1942, 1943 (renewed 1970), 1989 REGENTS OF THE UNIVERSITY OF MINNESOTA.  All rights reserved.  Distributed exclusively by National Computer Systems, Inc.
Printed in the United States of America.
"Minnesota Multiphasic Personality Inventory-2" and "MMPI-2" are trademarks of the University of Minnesota.  The NCS logo is a registered trademark of National Computer Systems, Inc.

Product Number
24018

SCORES:

| | | | |
|---|---|---|---|
| ? | _____ | Pa | 8 |
| L | 8 | Pt | 11 |
| F | 5 | Sc | 13 |
| K | 18 | Ma | 15 |
| Hs | 2 | Si | 23 |
| D | 22 | | |
| Hy | 20 | | |
| Pd | 26 | | |
| Mf | 22 | | |

**MARKING DIRECTIONS:**

- Make dark, heavy marks that completely fill the circle.

- Use a soft, black lead pencil.

- Erase mistakes cleanly.

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                               :

      Plaintiff,                         :   Case No. 01-CR-794

-vs-                                          :

NATHANIEL JACKSON,                            :

      Defendant.                         :

### EXHIBIT _____

### AFFIDAVIT OF PAULINE KORNEAGAY

STATE OF OHIO          :
                : ss:
COUNTY OF MAHONING  :

Pauline Korneagay, after being duly sworn according to law, states as follows:

1.      I am the mother of Nate Jackson.

2.      I have lived with Raymond Dickerson for the past twenty years.

3.      Nate was not a behavior problem when he was a kid.  However, he often failed to attend school and when he did he talked back to the teachers.  I told him that he should go to school, but he would not listen.  I never knew that he pushed a teacher down the steps.

4.      Nate was close to his real dad Charles Paige who died recently.  Nate was also close to his sister, Tausha.

5.      Nate lived with his grandmother for a while because he was too unruly to live with me.  His grandmother would often talk to him about his behavior.

6.      After Nate became an adult he started hanging around with drug dealers and users.

EXHIBIT
49

*Pauline Korneagay*

7.      Nate had to go to a doctor because someone broke his jaw when he tried to break into someone else's house.

8.      Nate lived where he could once he became addicted to crack.  Family members would not let him stay with them because he would steal from them to support his habit.

9.      I had to put locks on our two deep freezers because Nate would steal meat from the house and sell it to get drugs.  I also had to put locks on our bedroom door.  Nate stole the license plate off my car.  I bought my mother a rose and Nate stole the rose.

10.     Nate was close to his children.  However his crack problem got so bad that he stole his son's clothes as well as the mother's car.

11.     After Nate became an adult, I would have problems with him and have to call the police.

12.     Nate was with Donna for about two years.  I tried to warn him about Donna but he would not listen to me.  Donna provided him with money, clothes and drugs.  Nate enjoyed the lifestyle and he saw no reason to change.

13.     I did not hear from Nate's attorney until I went to the courthouse to testify.  I met the attorneys in a room at the court house.  They asked me questions about the facts of the case.  They asked me very different questions when I testified.  I never heard from the attorney again. If asked I would have told the jury the facts in this paper.

Further affiant saith naught.

_____
PAULINE KORNEAGAY

Sworn to and subscribed in my presence this ___8th___ day of ~~December, 2003~~ MARCH, 2004.

_____
NOTARY PUBLIC



**JESSICA H. LOVE**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOVEMBER 22, 2008

2

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO
### CASE NO. 01-CR-794

STATE OF OHIO,                     :

      Plaintiff,           :   Case No. 01-CR-794

-vs-                         :

NATHANIEL JACKSON,       :

      Defendant.        :

## EXHIBIT _____

### AFFIDAVIT OF TAUSHA KORNEAGAY

STATE OF OHIO         :
                            : ss:
COUNTY OF MAHONING :

Tausha Korneagay, after being duly sworn according to law states as follows:

1.      I am the sister of Nate Jackson.

2.      Nate and I lived with our grandmother when growing up. Her house was right next door to my mother's house. I began living with my grandmother when I was in elementary school.

3.      Nate did not do well in school. He dropped out in the eleventh grade. He was sent to Stambaugh Middle School because he would not listen to his teachers and he would talk back to them.

4.      Nate once got beat up by some guys who broke his ribs.

5.      Nate would steal anthing to get money for his drug habit. My mom put a lock on the freezer to keep him from stealing food. She also kept her bedroom locked. Nate did not sell drugs, he just used them.



EXHIBIT

50

6.      Someone shot at Nate and hit him with a bullet.  Nate said he stole something from the guy who shot him.

7.      Nate has a daughter.  They are real close.  The mother of his daughter left him because he was a drug addict. He also has a son. The mother of his son is a drug addict.

8.      Nate was living on the street because of his addiction.

9.      Kevin Perry and I tried to get Nate help for his drug problem.  We got him into Bellmont Drug Treatment Center when he dropped out after two weeks.

10.      Nate seemed really happy after he met Donna.  She bought Nate drugs and nice clothes.  Donna let Nate drive real nice cars.  She gave him whatever he wanted.  Nate was impressed by her.

11.      Nate was real impressed with Donna's status.  I felt that there was something wrong with Donna but I did not tell Nate.

Further affiant saith naught.

_____
TAUSHA KORNEAGAY

Sworn to and subscribed in my presence this ____ day of December, 2003.
MARCH, 2004

_____
NOTARY PUBLIC



**JESSICA H. LOVE**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOVEMBER 22, 20__

2

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                          :    Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      :

    Defendant.                          :

## EXHIBIT _____

## AFFIDAVIT OF ANTHONY KORNEAGAY

STATE OF OHIO          :
                  : ss:
COUNTY OF MAHONING   :

Anthony Korneagay, after being duly sworn according to law, states as follows:

1.     I am the brother of Nate.  I am six years younger than Nate.

2.     Nate and I grew up in a rough neighborhood.  We often heard gunshots.  It was tough to go out and play. The neighborhood is better now.

3.     When Nate got older he got addicted to drugs.  He used to stay out with Shawn and Mike Rushton.  They are now in jail. Some of the guys he used to stay out with are now in jail.  Nate carried drugs for the dealers.

4.     After Nate got addicted, he stole from everyone, including his family. Nate stole from so many people that they used to walk up to me and tell me that they were going to kill Nate.  My family had to leave our house at times because there were so many threats from people he stole from.

EXHIBIT
51

*Anthony Korneagay*

5.      When Nate would get high he would not get mean.  He might get mad, but he would just cuss you out.  Nate was afraid of me. I had beat him up. Nate never carried a gun. He was afraid of guns.  I never saw Nate hurt anyone to get drugs.  He was a thief and addict, not a murderer.

6.      I used to smoke weed and I have spent some time in jail.  I made a change in my life.  I do not know why Nate did not change. The Court once told him to get drug treatment. It did not help his problem.

7.      I saw Nate around Donna Roberts. She gave him money, drugs and other stuff. This made Nate feel real good. There was something about Donna that was just not right.  If contacted I would have been willing to testify for him and give the jury the information contained in this paper.

8.      I was never contacted by Nate's attorneys at the time of his trial.

Further affiant saith naught.

*Anthony Korneagay* 3-8-04
ANTHONY KORNEAGAY

Sworn to and subscribed in my presence this _8th_ day of ~~December, 2003~~. MARCH 4

*Jessica H. Love*
NOTARY PUBLIC

#191152



JESSICA H. LOVE
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOVEMBER 22, 20

2

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                              :

     Plaintiff,                         :   Case No. 01-CR-794

-vs-                                        :

NATHANIEL JACKSON,                          :

     Defendant.                         :

## EXHIBIT _____

## AFFIDAVIT OF RAYMOND DICKERSON

STATE OF OHIO            :
                  : ss:
COUNTY OF MAHONING  :

Raymond Dickerson, after being duly sworn according to law, states as follows:

1.    I am a long time friend of Nate's mother and I have lived with her for about twenty years.

2.    Nate was never very good about listening to me.  I quit trying to tell him what to do because he would not listen.

3.    Nate started hanging with the wrong people.  He used to be close to Shawn and Mike Rushton.  They are now in jail.

4.    Nate started living on the streets when he got hooked on crack.

5.    Nate started hanging with Donna Roberts.  She used to give him drugs and money. She let him drive big, new cars. I knew that something was wrong with Donna but Nate would not listen to me.

*R.D.*

**EXHIBIT**

**52**

6.    I was with Nate's mom when we heard about his arrest.  It really surprised us because Nate was not violent.  Pauline and I were so upset that we went out and got drunk.

7.    I first talked to Nate's attorney when I came to court to testify.  The questions they asked me before testifying had nothing to do with what they asked me in court.

Further affiant saith naught.

_Raymond Dickerson_
RAYMOND DICKERSON

Sworn to and subscribed in my presence this ___8th___ day of ~~December, 2003~~. MARCH 2009

_Jessica H. Love_
NOTARY PUBLIC



**JESSICA H. LOVE**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOVEMBER 22, 2008

2

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                          :   Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      :

    Defendant.                          :

### EXHIBIT _____

### AFFIDAVIT OF KEVIN PERRY

STATE OF OHIO          :
                  : ss:
COUNTY OF MAHONING  :

Kevin Perry, after being duly sworn according to law, states as follows:

1.      I am the fiancée of Nate Jackson's sister, Tausha Korneagay.  I have known Nate for a number of years.

2.      For as long as I have known Nate, he never had any contact with his real dad.

3.      Nate does not have a good relationship with his mother.

4.      Nate's mother never showed any love for him.  She gave all her love to her son Tony.  She never wanted to have anything to do with her other children.  This hurt Nate real bad.

5.      Nate's mother is a binge drinker.  When my fiancée was about to deliver her child, Nate's mother showed up drunk at the hospital.

6.      I learned that Nate's mother previously shot someone.

7.      Nate and his sister Tausha lived for a number of years with their grandmother because their mother was not a good mother to them.

8.      Nate's stepfather Raymond Dickerson was not there for Nate. He drinks and does not hold down jobs. He disappears for weeks.

9.      Nate did not have a person in his life who acted like a father.

EXHIBIT 53

*KP*

10.     Nate is very close to his sister, Tausha.  She has been the only person there for him.

11.     Nate has had a drug problem all the time that I knew him. He uses crack.  Nate wanted to get off crack, but for the wrong reasons.  It was always to please others, but not to help himself.

12.     Nate always wanted people to think that he was a tough guy, but he never really was.  Nate used to tell people he was a "crip" and his brother was a "blood".  This was just Nate bragging.  Members of the same gang could not live in the same house.  Nate was neither tough nor a drug dealer.

13.     Nate  was never good at picking up women. He always seemed to pick the wrong ones.

14.     Donna Roberts took advantage of Nate. She used to give Nate stuff he never had.

15.     I never talked with Nate's attorney at the time of trial.  If they had subpoenaed me I would have come to court and testified to the facts in this paper.  Nate is not a killer.

Further affiant saith naught.

_____
KEVIN PERRY

Sworn to and subscribed in my presence this _____ day of December, 2003.    8ᵗʰ  MARCH, 2004



_____
NOTARY PUBLIC

#191098

**JESSICA H. LOVE**
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOVEMBER 22, 2008

2

JURR8045

Service:  C10-8

SORT: NUMERIC

| Service No. | Name | Address | DOB | SSN | Annual No. | |
|---|---|---|---|---|---|---|
| 1 | BISHOP JR, WALTER A | 504 MONTROSE AVE YOUNGSTOWN OH 44505 | 03/18/1954 | | 10761 | 6 |
| 2 | MANCINI, KIMBERLY A | 307 CLIFTON DR NE WARREN OH 44484 | 09/01/1978 | | 7269 | |
| 3 | FENTON, HAROLD W | 148 ROSELAWN AVE NE WARREN OH 44483 | 02/09/1933 | 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 | 9739 | |
| 4 | GREGORY, BILL L | 5140 KUSZMAUL AVE NW WARREN OH 44483 | 05/03/1933 | 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 | 5263 | 10 |
| 5 | CALDWELL, CASSENDRA A | 5947 DOWNS RD NW WARREN OH 44481 | 08/27/1982 | | 5804 | 219 |
| 6 | BARTZ, JAMES N | 1143 WESTOVER DR SE WARREN OH 44484 | 01/10/1933 | 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 | 11623 | 2708 |
| 7 | PHILLIPS, ARTHUR P | 1179 LESLIE LANE GIRARD OH 44420 | 02/11/1950 | 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 | 13118 | 1647 |
| 8 | BOWERS, LYNN M | 163 KENILWORTH AVE NE WARREN OH 44483 | 07/08/1960 | 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 | 7414 | 1829 |
| 9 | STAN, EUGENE | 3945 ALEESA DR SE WARREN OH 44484 | 05/21/1934 | 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 | 12622 | 196 |
| 10 | BURR, NAUDEAN B | 485 NILES CORTLAND RD NE WARREN OH 44484 | 06/26/1935 | 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 | 1963 | 90 |
| 11 | SPRAGUE, JEFF | 1260 FLAGG RD E ORWELL OH 44076 | 03/21/1963 | 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 | 872 | 1924 |
| 12 | LEE, KIM R | 492 ORIOLE PL SW WARREN OH 44485 | 02/26/1956 | 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 | 10441 | 2376 |
| 13 | SEEKINS, WILLIAM W | 421 HOGARTH AVE NILES OH 44446 | 02/04/1931 | 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 | 4878 | 2641 |
| 14 | MENZ, HARRY P | 2524 FOREST SPRINGS DR SE WARREN OH 44484 | 09/01/1943 | 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 | 7737 | 202 |
| 15 | MIDDLETON, DEBRA R | 5809 DOWNS RD NW WARREN OH 44481 | 02/16/1959 | 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 | 861 | 2189 |
| 16 | GILMORE, JUDITH R | 3033 POTHOUR WHEELER RD HUBBARD OH 44425 | 06/16/1951 | 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 | 5542 | 940 |
| 17 | CUTTINGS JR, JIM | 4193 NELSON MOSIER RD LEAVITTSBURG OH 44430 | 09/20/1959 | 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 | 12432 | 2259 |
| 18 | ANGELO, CYNTHIA M | 2982 CARLTON DR NW WARREN OH 44485 | 04/19/1955 | 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 | 10581 | 2097 |
| 19 | TERRILL, CLARK | 7679 STATE ROUTE 5 APT 3 KINSMAN OH 44428 | 04/13/1975 | | 9470 | 62 |
| 20 | MCCURDY JR, WILLIAM F | 609 PRATT ST NILES OH 44446 | 04/07/1946 | 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 | 8089 | 408 |
| 21 | PERLINE, MICHAEL J | 467 HELEN DR HUBBARD OH 44425 | 12/07/1921 | 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 | 711 | 794 |
| 22 | LEPOSA, MATTHEW | 167 STEWART AVE NW WARREN OH 44483 | 09/22/1977 | 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 | 13526 | 1050 |
| 23 | HAYES, KELLY A | 12 WYN DR BROOKFIELD OH 44403 | 08/14/1963 | 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 | 3827 | 144 |

EXHIBIT

JURR8045

SORT: NUMERIC

Service:    C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 24 | BUTCHER, GUY B | 1174 BAILEY ANDERSON RD LEAVITTSBURG OH 44430 | 05/13/1942 | 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 | 5295 | 235 |
| 25 | RICHARDSON, DAMIAN | 547 PHILLIPS DR SW WARREN OH 44485 | 08/01/1977 | | 6467 | 1751 |
| 26 | KEEN, DAVD J | 200 PEGOTTY CT NE WARREN OH 44484 | 10/06/1982 | 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 | 9639 | 2369 |
| 27 | GOLLAN, LORI C | 3781 WARREN SHARON RD VIENNA OH 44473 | 02/22/1961 | 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 | 10155 | 16 |
| 28 | MILLER, BONNIE Q | 1253 GRANDVIEW AVE NILES OH 44446 | 01/16/1947 | 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 | 10373 | 1780 |
| 29 | JETHROE, JAMES A | 2805 HEATHER LANE NW WARREN OH 44485 | 06/01/1942 | 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 | 12277 | 373 |
| 30 | FALATIC, BETTY M | 1398 HAZELWOOD AVE SE WARREN OH 44484 | 05/27/1934 | 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 | 3875 | 1235 |
| 31 | MILES, RAYMOND L | 8935 ALTURA DR NE WARREN OH 44484 | 06/04/1945 | 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 | 11892 | 1517 |
| 32 | BRACKEN, JENNIFER R | 76 LAKEVIEW RD NILES OH 44446 | 09/09/1981 | 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 | 1281 | 2128 |
| 33 | KACZMARK, JACK M | 400 IDAHO ST GIRARD OH 44420 | 08/26/1927 | | 2643 | 125 |
| 34 | HEDRICK, RENE M | 984 GLENWOOD ST NE WARREN OH 44483 | 03/01/1958 | 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 | 1140 | 314 |
| 35 | DESANTIS, ANGELA M | 529 REBECCA AVE HUBBARD OH 44425 | 06/28/1961 | 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 | 12428 | 1443 |
| 36 | LUTHER, MICHELLE D | 111 LIBERTY ST E GIRARD OH 44420 | 08/27/1964 | 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 | 7174 | 2475 |
| 37 | SANFREY, CONNIE L | 1525 EDGEWOOD ST NE WARREN OH 44483 | 06/20/1963 | | 6148 | 492 |
| 38 | SCHARBA, RICHARD D | 6761 CHAGRIN FALLS GREENVILLE RD KINSMAN OH 44428 | 03/06/1953 | 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 | 12356 | 2301 |
| 39 | DICKERSON, JERRY L | 132 BROOK DR BROOKFIELD OH 44403 | 05/26/1942 | 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 | 5539 | 541 |
| 40 | BARTLOMAIN, JOSEPH V | 606 KLINE ST E GIRARD OH 44420 | 09/05/1934 | 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 | 3865 | 2367 |
| 41 | STEIN, CARL E | 391 SCOVILLE DR VIENNA OH 44473 | 12/02/1940 | 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 | 10615 | 2670 |
| 42 | LATRONICA, DIANE L | 701 SUMMIT AVE APT 76 NILES OH 44446 | 09/26/1949 | 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 | 2465 | 2027 |
| 43 | BAYTOS, REBECCA A | 3526 KIMBERLY DR NE WARREN OH 44483 | 09/04/1960 | 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 | 6424 | 399 |
| 44 | GORE, COURTNEY | 1233 NORTH PARK LANE BROOKFIELD OH 44403 | 08/28/1981 | 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 | 3752 | 435 |
| 45 | EGBERT, JASON | 344 REBECCA AVE HUBBARD OH 44425 | 02/15/1966 | 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 | 4479 | 1567 |
| 46 | POSPISIL, LINDA S | 4991 BUSHNELL CAMPBELL RD KINSMAN OH 44428 | 02/26/1960 | 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 | 8300 | 951 |

JURR8045

SORT: NUMERIC

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 47 | LOYCHIK, R E | 615 DEBRA PLACE #4 CORTLAND OH 44410 | 02/12/1966 | 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 | 10049 | 490 |
| 48 | KUBIAK, ROBERT A | 689 SHADOWOOD LN SE WARREN OH 44484 | 09/28/1947 | 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 | 10082 | 1339 |
| 49 | CRANK, MARSHA | 102 ANDREA BLVD NILES OH 44446 | 08/26/1945 | | 9649 | 1234 |
| 50 | HALL, BRIAN | 615 PHILLIPS DR SW WARREN OH 44485 | 04/30/1965 | | 10361 | 1330 |
| 51 | ZDUNIAK, FLORENCE | 1255 NILES CORTLAND RD NE WARREN OH 44484 | 08/24/1948 | 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 | 9495 | 1015 |
| 52 | DAVIS, ROSE I | 44 PLEASANT AVE N NILES OH 44446 | 11/09/1922 | 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 | 1054 | 1622 |
| 53 | MILLER, JOSEPH L | 1146 BRACEVILLE ROBINSON RD NW APT B SOUTHINGTON OH 44470 | 05/11/1967 | 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 | 11524 | 1283 |
| 54 | HELMUTH, ERVIN E | 9153 CREASER RD N BLOOMFIELD OH 44450 | 04/07/1946 | 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 | 11677 | 1792 |
| 55 | KIDWELL, KENNY K | 9720 KINSMAN PYMATUNING RD KINSMAN OH 44428 | 03/13/1953 | 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 | 79 | 2595 |
| 56 | SWANSON, CAROL J | 1518 SPRUCE CT NILES OH 44446 | 09/06/1940 | 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 | 6640 | 577 |
| 57 | MENOLD, MARLENE R | 1614 JUDITH LN GIRARD OH 44420 | 01/19/1937 | 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 | 6015 | 524 |
| 58 | SMITH, LUCILLE M | 450 QUARRY LN NE WARREN OH 44483 | 02/28/1923 | 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 | 10484 | 385 |
| 59 | LANHAM, GILBERT J | 654 NORTH RD SE WARREN OH 44484 | 04/29/1941 | 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 | 4918 | 1906 |
| 60 | SANDERS, JAMES E | 329 OAK KNOLL ST NEWTON FALLS OH 44444 | 06/18/1921 | 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 | 10738 | 1265 |
| 61 | SOLLITTO, CAROL F | 3548 KIMBERLY DR NE WARREN OH 44483 | 10/19/1939 | 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 | 1453 | 277 |
| 62 | TORRES-REEP, PAULA L | 2981 STATE ROUTE 5 LEAVITTSBURG OH 44430 | 12/23/1965 | 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 | 9853 | 64 |
| 63 | TAKAT-MURPHY, SHERRIE L | 6145 STODDARD HAYES RD FARMDALE OH 44417 | 10/05/1963 | 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 | 7502 | 1385 |
| 64 | VISLOSKY, ELAINE P | 225 TERRE HILL DR CORTLAND OH 44410 | 06/13/1938 | 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 | 13972 | 2222 |
| 65 | ROGERS, HAROLD | 471 HIGH ST S CORTLAND OH 44410 | 06/12/1942 | | 11640 | 223 |
| 66 | DAVIS, CAROL N | 3481 NILES CORTLAND RD LOT 24 CORTLAND OH 44410 | 12/24/1944 | 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 | 13296 | 2264 |
| 67 | DELBENE, SANDRA L | 1125 WOODLAWN AVE GIRARD OH 44420 | 02/20/1952 | 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 | 8824 | 1673 |
| 68 | MCCULLOUGH, MARILYN M | 304 FONDERLAC DR SE WARREN OH 44484 | 05/01/1949 | 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 | 6758 | 1913 |

Date: 09/26/2002
Time: 09:52:13
JURR8045

10/08/2002 TO 10/22/2002

PETIT COURT
SORT: NUMERIC

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 69 | PADEN, MARGARET E | 2568 CHESTNUT ST GIRARD OH 44420 | 05/03/1963 | 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 | 8963 | 2058 |
| 70 | TIGERT, CAROL A | 94 ROYAL MALL DR NILES OH 44446 | 07/10/1958 | 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 | 10166 | 2282 |
| 71 | SHEPHERD, GREGORY | 518 LIBERTY ST W #337 HUBBARD OH 44425 | 01/11/1984 | 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 | 13500 | 545 |
| 72 | ARNAUT, CAROL A | 503 WENDEMERE DR HUBBARD OH 44425 | 02/25/1946 | 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 | 7846 | 2599 |
| 73 | CHEHOVITS, K D | 8531 BLACK OAK DR WARREN OH 44484 | 11/21/1958 | 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 | 10535 | 2582 |
| 74 | MELIDONA, GRACE J | 1608 MORRIS PL NILES OH 44446 | 04/12/1946 | 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 | 9905 | 968 |
| 75 | WAGGONER, DAWN | 2230 BARCLAY MESSERLY RD SOUTHINGTON OH 44470 | 07/18/1979 | 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 | 1911 | 1671 |
| 76 | GLOSSER, RALPH W | 164 TURQUOISE DR CORTLAND OH 44410 | 09/19/1935 | 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 | 2073 | 2726 |
| 77 | DRAGHI, SUSAN D | 301 VENTURA DR YOUNGSTOWN OH 44505 | 12/31/1952 | 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 | 938 | 14 |
| 78 | SAMMARONE, CHRISTOPHER | 94 ORIOLE DR YOUNGSTOWN OH 44505 | 05/14/1972 | 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 | 11996 | 381 |
| 79 | SCHOONOVER, DANNY | 55 LEAVITT RD S LEAVITTSBURG OH 44430 | 09/10/1955 | 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 | 2749 | 2046 |
| 80 | JOLTIN, SHELLEY | 4738 MICHIGAN BLVD YOUNGSTOWN OH 44505 | 12/21/1949 | 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 | 8746 | 288 |
| 81 | GABRIELE, PATRICK E | 5412 BRADLEY BROWNLEE RD FOWLER OH 44418 | 09/09/1929 | 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 | 11846 | 1582 |
| 82 | SEIFER, MARY E | 3065 LYNWOOD DR NW WARREN OH 44485 | 02/04/1945 | 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 | 6145 | 1098 |
| 83 | ZAP, LINDA J | 261 SECOND ST E GIRARD OH 44420 | 07/20/1948 | 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 | 1194 | 2115 |
| 84 | RIDGEWAY, PENELOPE | 9544 CREASER RD N BLOOMFIELD OH 44450 | 09/10/1950 | 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 | 11239 | 414 |
| 85 | MENDENHALL, CHARLES F | 6517 PARK RD NW LEAVITTSBURG OH 44430 | 01/30/1970 | 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 | 7673 | 2078 |
| 86 | STOIAN, ELISABETH | 2065 CLERMONT AVE NE WARREN OH 44483 | 10/11/1929 | 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 | 10423 | 2118 |
| 87 | MCCALE, TAMMIE | 2360 MCDONALD OHLTOWN RD MCDONALD OH 44437 | 09/28/1958 | 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 | 4294 | 2326 |
| 88 | WINTERS, RODERICK N | 2326 ESTABROOK AVE NW WARREN OH 44485 | 10/07/1963 | | 9036 | 2312 |
| 89 | WILKERSON, RICHARD | 3000 NORTH RIVER RD NE UNIT F20 WARREN OH 44483 | 03/28/1952 | | 1361 | 750 |
| 90 | MILLER, JUDITH D | 526 LIBERTY ST E HUBBARD OH 44425 | 10/19/1946 | | 13003 | 1226 |
| 91 | GLESS, JEREMY A | 877 YOUNGSTOWN KINGSVILLE RD NE VIENNA OH 44473 | 08/23/1984 | 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 | 10936 | 83 |

```
Date:  09/20/____
Time:  09:52:13                              PETIT COURT
JURR8045                                     SORT: NUMERIC

Service:    C10-8
```

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 92 | HAUN, RAY G | 7591 FRANCIS ST MASURY OH 44438 | 01/07/1937 | 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 | 10163 | 1143 |
| 93 | MOWATT-LARSSEN, COURTNEY | 8911 STONE RIDGE DR SE WARREN OH 44484 | 06/21/1974 | 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 | 6404 | 2106 |
| 94 | SHIVELY, LARRY B | 32 BENTLEY AVE N NILES OH 44446 | 02/23/1945 | 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 | 5227 | 382 |
| 95 | BOYE, PAULINE R | 1056 HOWLAND SPRINGS BLVD SE WARREN OH 44484 | 01/13/1934 | 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 | 12997 | 1206 |
| 96 | MENTEN, MARY A | 607 KENILWORTH AVE NE WARREN OH 44483 | 10/22/1953 | 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 | 4165 | 306 |
| 97 | BEIL, LINDA L | 4773 WARREN SHARON RD VIENNA OH 44473 | 03/19/1961 | 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 | 6270 | 565 |
| 98 | MOORE, JOHN D | 5641 RIDGE RD CORTLAND OH 44410 | 09/27/1940 | 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 | 9500 | 290 |
| 99 | TODA, KAREN M | 407 TURNBERRY CT NE WARREN OH 44484 | 11/27/1949 | 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 | 5398 | 146 |
| 100 | STRINGER, AUDREY | 2513 LINDA DR NW WARREN OH 44485 | 07/22/1954 | 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 | 3056 | 1510 |
| 101 | PITTS, HILDA G | 1192 MOORELENE DR GIRARD OH 44420 | 02/04/1924 | 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 | 13100 | 527 |
| 102 | GAYDOSH, DEBRA | 195 HAZELWOOD AVE SE WARREN OH 44483 | 09/28/1957 | 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 | 11013 | 272 |
| 103 | ISOM, MONICA | 677 THIRD ST SW WARREN OH 44483 | 01/04/1967 | 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 | 10468 | 985 |
| 104 | RANKIN, GRACE E | 2131 MILLER GRABER RD NEWTON FALLS OH 44444 | 09/20/1916 | 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 | 10355 | 2068 |
| 105 | HENRY, ORRIN E | 2276 HYDE SHAFFER RD BRISTOLVILLE OH 44402 | 12/31/1946 | 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 | 2785 | 939 |
| 106 | CROYTS, JENNIFER D | 204 WHEELOCK DR NE WARREN OH 44484 | 09/02/1975 | 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 | 2829 | 302 |
| 107 | THURBER, MARILYN M | 6161 BEACH SMITH RD KINSMAN OH 44428 | 09/03/1925 | | 4452 | 809 |
| 108 | TOTO-BINION, CARMELA D | 2360 SALT SPRINGS RD WARREN OH 44481 | 05/04/1923 | 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 | 7059 | 1654 |
| 109 | ROOK, RAYMOND R | 226 EMMA ST NILES OH 44446 | 02/19/1954 | 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 | 5202 | 1427 |
| 110 | OPRITZA, MARY | 155 HENN HYDE RD NE WARREN OH 44484 | 01/05/1924 | 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 | 5634 | 18 |
| 111 | RAFFERTY, BRIAN | 2574 ELM DR GIRARD OH 44420 | 09/01/1977 | | 8640 | 2743 |
| 112 | DAVIS, BRIAN A | 10041 STATE ROUTE 46 N BLOOMFIELD OH 44450 | 04/04/1969 | 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 | 4335 | 1167 |
| 113 | STEWART, WILBUR E | 2780 WARREN MEADVILLE RD CORTLAND OH 44410 | 06/19/1947 | 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 | 9777 | 40 |
| 114 | COX, JACQUELINE K | 3003 REPUBLIC AVE SE WARREN OH 44484 | 12/10/1947 | 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 | 6047 | 803 |

PETIT COURT
SORT: NUMERIC

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 115 | KAPPAS, DEAN D | 5508 PHILLIPS RICE RD CORTLAND OH 44410 | 09/12/1951 | | 12530 | 1848 |
| 116 | SANCHEZ, LILLIAN | 2920 OAKLAND AVE YOUNGSTOWN OH 44505 | 08/17/1954 | 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 | 5165 | 1607 |
| 117 | OSIPCHAK, RICHARD D | 7703 PEGOTTY DR NE WARREN OH 44484 | 10/05/1944 | 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 | 1837 | 2086 |
| 118 | BURAN, JOSEPH J | 774 HOLLYWOOD ST NE WARREN OH 44483 | 01/14/1955 | 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 | 8699 | 2083 |
| 119 | SMITH, ALFREDA W | 1315 HOLLYWOOD ST NE WARREN OH 44483 | 11/03/1910 | 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 | 3544 | 2594 |
| 120 | MILLER, E G | 3329 SODOM HUTCHINGS RD FOWLER OH 44418 | 12/19/1974 | 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 | 10642 | 201 |
| 121 | REESE, TRISHA A | 3873 FOREST RIDGE CT MINERAL RIDGE OH 44440 | 10/29/1967 | 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 | 4890 | 2180 |
| 122 | PALKO, HELEN | 379 SEABURN ST BROOKFIELD OH 44403 | 01/08/1930 | 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 | 2644 | 333 |
| 123 | LYKINS SR, DONALD R | 619 SUGAR PINES DR SW WARREN OH 44481 | 03/06/1938 | 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 | 9159 | 1795 |
| 124 | SIMKINS, RICHARD L | 1070 PATRICIA DR APT 6 GIRARD OH 44420 | 03/09/1947 | 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 | 12042 | 2465 |
| 125 | GRAY II, MICHAEL D | 273 ATLANTIC ST NE WARREN OH 44483 | 11/21/1976 | | 7086 | 1993 |
| 126 | GARLITZ, BEVERLY A | 3936 CADWALLADER SONK RD CORTLAND OH 44410 | 02/29/1936 | 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 | 6904 | 188 |
| 127 | AMORGIANOS, GEORGE N | 369 MACKEY DR VIENNA OH 44473 | 12/30/1980 | 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 | 5947 | 1189 |
| 128 | AIRHART, CHRISTINE | 316 ILLINOIS AVE MCDONALD OH 44437 | 11/30/1978 | | 5293 | 1771 |
| 129 | HITCHINGS, THOMAS R | 192 CAMROSE DR NILES OH 44446 | 06/12/1954 | 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 | 4956 | 453 |
| 130 | DEJOY, KATHY A | 7192 LEE RD NE BROOKFIELD OH 44403 | 03/31/1951 | 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 | 8476 | 1534 |
| 131 | SIMMONS, JENNIFER A | 6233 OAK HILL DR W FARMINGTON OH 44491 | 09/24/1968 | 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 | 7969 | 1202 |
| 132 | FLASK JR, JAMES H | 4331 STATE ROUTE 87 FARMDALE OH 44417 | 09/27/1942 | 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 | 7318 | 1927 |
| 133 | BISSELL, BARBARA J | 626 WYOMING AVE NILES OH 44446 | 11/26/1938 | 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 | 10848 | 141 |
| 134 | DRUMMOND, SALLY A | 3643 WOODBINE AVE HUBBARD OH 44425 | 05/29/1946 | 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 | 13114 | 2290 |
| 135 | RUBINS, EDWARD E | 4095 KING GRAVES RD VIENNA OH 44473 | 10/29/1926 | 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 | 13388 | 2623 |
| 136 | PAPPA JR, FREDERICK J | 6847 STEWART SHARON RD BROOKFIELD OH 44403 | 12/21/1951 | 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 | 550 | 2485 |
| 137 | HOFFMAN, NANCY H | 520 HIGH ST NEWTON FALLS OH 44444 | 01/08/1952 | 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 | 11064 | 2200 |

PETIT COURT
SORT: NUMERIC

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 138 | NICULA, CYNTHIA L | 5077 WILSON SHARPSVILLE RD FOWLER OH 44418 | 11/30/1956 | | 7040 | 2031 |
| 139 | BAIN, KATHLEEN A | 536 OAK CIR SW WARREN OH 44485 | 07/08/1957 | 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 | 7119 | 1743 |
| 140 | NATALE, DENNIS G | 111 MAPLE DR CORTLAND OH 44410 | 03/20/1951 | 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 | 503 | 1240 |
| 141 | MARLOWE, JAMES A | 714 KALE ADAMS RD LEAVITTSBURG OH 44430 | 12/22/1916 | 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 | 1781 | 875 |
| 142 | WALLACE, JOHN W | P O BOX 392 CORTLAND OH 44410<br>3836 MCCLEARY JACOBY RD CORTLAND OH 44410 | 01/14/1937 | 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 | 8613 | 1169 |
| 143 | CROWE, KARRIE L | 638 PROSPECT NW WARREN OH 44483 | 10/01/1969 | 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 | 2893 | 2229 |
| 144 | LAMB, MARY F | 634 INDIANA AVE NILES OH 44446 | 01/21/1948 | 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 | 13010 | 2055 |
| 145 | SHOENBERGER, RANDEE S | 871 BENTZ RD LEAVITTSBURG OH 44430 | 02/02/1951 | 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 | 7958 | 1279 |
| 146 | ROSTAN, RICHARD E | 2236 SIXTH ST MCDONALD OH 44437 | 02/10/1954 | 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 | 11350 | 1948 |
| 147 | MADERITZ, BYRON | 1233 KEEFER ROAD GIRARD OH 44420 | 11/22/1953 | 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 | 13487 | 1214 |
| 148 | STEWART, TANGA C | 7203 CORINTH COURT RD FARMDALE OH 44417 | 05/23/1956 | 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 | 929 | 1417 |
| 149 | BEADLING, HOWARD J | 480 CATHERINE ST YOUNGSTOWN OH 44505 | 08/13/1911 | 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 | 8274 | 653 |
| 150 | LEW, ANGELA | 778 GREENVILLE RD NW BRISTOLVILLE OH 44402 | 01/27/1979 | | 4270 | 169 |
| 151 | OBRIEN, RITA A | 536 KLINE ST E GIRARD OH 44420 | 02/10/1936 | 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 | 1162 | 1956 |
| 152 | HOLLAND, CHRISTINE | 1748 MORRIS ST MINERAL RIDGE OH 44440 | 10/24/1966 | 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 | 7562 | 2271 |
| 153 | OBLINGER, DENNIS R | 169 WEST RIVER RD PB355 NEWTON FALLS OH 44444 | 06/01/1955 | 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 | 9727 | 1717 |
| 154 | SEREDAY, DOROTHY | 7762 ADDISON RD MASURY OH 44438 | 08/22/1925 | 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 | 13431 | 597 |
| 155 | DINARD, MARY A | 428 SEVENTH ST E MCDONALD OH 44437 | 10/09/1915 | | 8281 | 2054 |
| 156 | SIMEONE, KARI J | 860 YOUNGSTOWN KINGSVILLE RD SE VIENNA OH 44473 | 09/03/1968 | 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 | 10348 | 379 |
| 157 | JACKSON, JOHN W | 6495 WASHINGTON AVE HUBBARD OH 44425 | 01/26/1938 | 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 | 11668 | 786 |
| 158 | EUCKER, BONNIE D | 6579 STATE ROUTE 305 FOWLER OH 44418 | 12/11/1948 | 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 | 8713 | 972 |
| 159 | DANDREA, MICHAEL A | 1330 GYPSY LN NILES OH 44446 | 10/17/1962 | 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 | 7589 | 9 |

PETIT COURT
SORT: NUMERIC

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 160 | THIRY, MARCEL S | 3455 OAKMONT DR HUBBARD OH 44425 | 02/25/1959 | | 3458 | 151 |
| 161 | KNIGHT, CYNTHIA L | 830 WARREN AVE NILES OH 44446 | 01/26/1959 | | 2082 | 738 |
| 162 | RIEDMANN, CONNIE | 1740 IRENE AVE NE WARREN OH 44483 | 01/03/1964 | 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 | 1613 | 454 |
| 163 | WILLIAMS, NANCY A | 201 HIDDEN TRAIL NW WARREN OH 44483 | 03/13/1949 | 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 | 6377 | 376 |
| 164 | HARRIS, JENNIFER J | 713 NORTH AVE GIRARD OH 44420 | 03/12/1978 | 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 | 7652 | 274 |
| 165 | SCHULTZ, RHEANNE | 100 RUTH AVE CORTLAND OH 44410 | 05/20/1983 | 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 | 12120 | 1408 |
| 166 | PERSKY, ARNETTA K | 2035 CRESTWOOD BLVD YOUNGSTOWN OH 44505 | 11/23/1946 | 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 | 9665 | 2176 |
| 167 | KRONER, MAE | 1392 WARNER RD NE BROOKFIELD OH 44403 | 09/22/1931 | 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 | 11329 | 1070 |
| 168 | YOUNG, TABATHA J | 1543 NILES CORTLAND RD NILES OH 44446 | 06/14/1981 | | 12548 | 2656 |
| 169 | EBINGER, AMY S | 103 ATLANTIC AVE, APT 2R BROOKLYN NY 11201 | 04/28/1973 | 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 | 3714 | 5 |
| 170 | GASKILL, SUSAN M | 529 MASON ST NILES OH 44446 | 08/13/1959 | | 6777 | 101 |
| 171 | SPIEGEL, LEONARD B | 455 ARBOR CIR YOUNGSTOWN OH 44505 | 05/26/1929 | 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 | 5193 | 1069 |
| 172 | MARINO, MARY K | 1263 THOMAS RD HUBBARD OH 44425 | 02/01/1953 | 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 | 2623 | 726 |
| 173 | BOWSER, HEATHER J | 9782 STATE ROUTE 7 KINSMAN OH 44428 | 02/17/1970 | 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 | 7161 | 1726 |
| 174 | RUSCITTI, ANGELO M | 703 LAKEVIEW DR CORTLAND OH 44410 | 12/25/1956 | 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 | 7653 | 1289 |
| 175 | ECKENROD, MARION | 2415 YOUNGSTOWN RD SE WARREN OH 44484 | 10/13/1921 | 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 | 2910 | 1439 |
| 176 | DIXON, WALTER R | 3686 HOMEWOOD AVE HUBBARD OH 44425 | 12/09/1968 | 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 | 7320 | 1434 |
| 177 | JONES, JOSH J | 735 BROOKFIELD AVE MASURY OH 44438 | 02/11/1941 | 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 | 236 | 1768 |
| 178 | DUEZ, TRACY A | 637 RAYMOND DR HUBBARD OH 44425 | 09/20/1964 | 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 | 13752 | 929 |
| 179 | HURTON, AMY | 116 GREENBRIAR DR CORTLAND OH 44410 | 06/22/1976 | 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 | 12240 | 1958 |
| 180 | BAILEY, LAUREN | 501 MELODY LN HUBBARD OH 44425 | 02/14/1981 | 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 | 3618 | 2175 |
| 181 | DIGLAW, JAMES M | 7718 PEGOTTY DR NE WARREN OH 44484 | 05/26/1957 | 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 | 7785 | 2608 |
| 182 | SWEGAN, MEGAN L | 733 POTIC DR LEAVITTSBURG OH 44430 | 10/14/1974 | 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 | 6833 | 232 |

Date: 09/20/2002
Time: 09:52:15
JURR8045

PETIT COURT
SORT: NUMERIC

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 183 | THOMPSON, DONNA | 1536 MORRIS ST MINERAL RIDGE OH 44440 | 01/18/1984 | 000-00-000 | 10394 | 2447 |
| 184 | WEST, TIM | 6859 SHAFFER RD NW WARREN OH 44481 | 10/29/1959 | | 6228 | 1527 |
| 185 | BATSON, SCOTT B | 915 JOHN ST NILES OH 44446 | 03/29/1969 | | 2682 | 672 |
| 186 | FRIEDMAN, ANNA  MAE | 5080 SAMPSON DR YOUNGSTOWN OH 44505 | 10/15/1922 | 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 | 225 | 1465 |
| 187 | BROWN, DANIEL L | 402 HYDE AVE NILES OH 44446 | 12/07/1983 | | 11381 | 147 |
| 188 | PALM, DONALD L | 3011 MALIBU DR SW WARREN OH 44481 | 04/12/1947 | 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 | 1582 | 1321 |
| 189 | HARDIN, WILLIAM C | 148 DRUMMOND AVE HUBBARD OH 44425 | 10/05/1923 | 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 | 9565 | 1353 |
| 190 | MURRAY, JEFFRY L | 876 KENILWORTH AVE SE WARREN OH 44484 | 02/11/1963 | 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 | 1824 | 1219 |
| 191 | SZEGEDI, LENA N | 328 OHIO AVE MCDONALD OH 44437 | 11/24/1959 | 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 | 532 | 787 |
| 192 | ELBEL, GERALD R | 2585 LEWIS SEIFERT RD HUBBARD OH 44425 | 04/27/1942 | 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 | 3624 | 2193 |
| 193 | LEASURE, KAREN S | 623 DAKOTA AVE NILES OH 44446 | 11/12/1969 | 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 | 5709 | 2640 |
| 194 | MCCULLOUGH, JOHN A | 2045 BEATTY RD HUBBARD OH 44425 | 12/07/1929 | 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 | 512 | 2179 |
| 195 | MCKINNISS, JENNIFER R | 2934 CARRIE AVE SOUTHINGTON OH 44470 | 05/09/1958 | | 9956 | 2563 |
| 196 | ALTAFFER, MARGARET J | 724 NEW YORK AVE MCDONALD CH 44437 | 06/02/1935 | 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 | 5643 | 1496 |
| 197 | TURK, SANDRA L | 338 PARK AVE MCDONALD OH 44437 | 07/19/1953 | 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 | 2728 | 1193 |
| 198 | WALLS, DENISE L | 3183 WILDWOOD DRIVE MCDONALD OH 44437 | 08/15/1958 | 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 | 69 | 1211 |
| 199 | MILLER, NICHOLAS J | 5683 HOFFMAN NORTON RD BRISTOLVILLE OH 44402 | 04/26/1962 | | 12872 | 2386 |
| 200 | FOTY JR, ANTHONY | 123 PROSPECT ST E GIRARD OH 44420 | 05/13/1936 | 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 | 1786 | 2342 |
| 201 | ROOD JR, RONALD F | 1196 BRACEVILLE ROBINSON RD NW SOUTHINGTON OH 44470 | 05/28/1976 | 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 | 6286 | 2107 |
| 202 | CRUMP, MARY | 2420 HUBBARD MASURY RD HUBBARD OH 44425 | 02/16/1937 | 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 | 13324 | 966 |
| 203 | HYATT, FRANK T | 2381 GRIFFITH DR CORTLAND OH 44410 | 05/20/1962 | 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 | 3910 | 1918 |
| 204 | SALCONE, EILEEN J | 750 ROSELAWN AVE NE WARREN OH 44483 | 01/16/1930 | 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 | 11967 | 21 |
| 205 | DZEDA, EDWARD R | 1624 SQUAW CT GIRARD OH 44420 | 04/10/1917 | 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 | 4629 | 73 |

Service:    C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 206 | BUBON, KIMBERLY L | 3629 SOUTHWOOD DR SE WARREN OH 44484 | 07/09/1960 | 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 | 12072 | 2198 |
| 207 | BELLINO, NICHOLAS D | 557 MURRAY HILL DR YOUNGSTOWN OH 44505 | 05/18/1982 | 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 | 8229 | 2041 |
| 208 | LOEW, JANET | 1438 TOMILU DR GIRARD OH 44420 | 01/21/1950 | 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 | 11481 | 1653 |
| 209 | RUPERT, LAURELIN | 4863 KINGSHILL DR, APT 322 COLUMBUS OH 43229 | 04/08/1979 | 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 | 2400 | 207 |
| 210 | CLONCH, RONALD A | 5060 WOODLAWN AVE NEWTON FALLS OH 44444 | 10/16/1965 | 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 | 2939 | 2164 |
| 211 | FAMOR, PATRICIA A | 1530 SUNNY ESTATES DR NILES OH 44446 | 12/16/1946 | 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 | 1996 | 2239 |
| 212 | GALATI, JUDITH L | 45 NORTH OURTER DR VIENNA OH 44473 | 11/23/1952 | 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 | 1813 | 1026 |
| 213 | RAVIZEE, JOHN H | 344 MARYLAND ST NW WARREN OH 44483 | 12/28/1941 | 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 | 11413 | 55 |
| 214 | HETTRICK, NANCY J | 105 LIBERTY ST W APT 104 HUBBARD OH 44425 | 11/28/1936 | 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 | 10268 | 582 |
| 215 | RICHARDS, FRED C | 1760 DODGE DR NW WARREN OH 44485 | 11/03/1927 | 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 | 12364 | 165 |
| 216 | THIRION JR, THAD H | 2976 FOREST AVE NILES OH 44446 | 11/18/1944 | 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 | 8973 | 2029 |
| 217 | KRUK, LILLIAN A | 1078 GREENVILLE RD NW BRISTOLVILLE OH 44402 | 08/05/1918 | 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 | 30 | 676 |
| 218 | POKRIVNAK, CARLA C | 1216 GEORGE ST MASURY OH 44438 | 01/17/1974 | 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 | 8167 | 1896 |
| 219 | ENGLISH, LAURA A | 3753 EAGLE CREEK RD LEAVITTSBURG OH 44430 | 05/26/1963 | 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 | 1808 | 1335 |
| 220 | CULVER JR, LARRY | 3382 WARREN RAVENNA RD NEWTON FALLS OH 44444 | 03/28/1979 | 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 | 3600 | 2515 |
| 221 | SWAUGER, TERRY A | 1480 BUTTERFIELD CIR NILES OH 44446 | 04/14/1969 | 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 | 4690 | 1953 |
| 222 | TALKINGTON JR, BILLY C | 2831 HOAGLAND BLACKSTUB RD CORTLAND OH 44410 | 08/25/1931 | 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 | 2398 | 2718 |
| 223 | MILLER, GREGORY A | 1868 TAFT AVE NILES OH 44446 | 08/28/1960 | 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 | 12795 | 1507 |
| 224 | HOOK, MELBA L | 1219 BEDFORD RD MASURY OH 44438 | 08/29/1942 | 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 | 12374 | 739 |
| 225 | WAGNER, BRADLEY E | 2007 BURNING TREE LN YOUNGSTOWN OH 44505 | 09/28/1983 | 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 | 11716 | 630 |
| 226 | HARRISON, RAYMOND D | 293 OLD OAK DR CORTLAND OH 44410 | 04/15/1940 | 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 | 12392 | 1730 |
| 227 | FRANCIS, JOYCE E | 8098 LIBERTY ST E HUBBARD OH 44425 | 08/21/1948 | 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 | 12507 | 1798 |
| 228 | PUSIN, KATHRYN D | 1454 MARLANE DR GIRARD OH 44420 | 05/09/1939 | 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 | 6655 | 367 |

```
Date:  09/26/2002
Time:  09:52:16
JURR8045
```

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 229 | COOK, MARION M | 3379 MAIN ST MINERAL RIDGE OH 44440 | 05/22/1927 | 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 | 261 | 2126 |
| 230 | KOTANCHEK, ALAN L | 7490 JEWELL NORTH RD KINSMAN OH 44428 | 04/19/1974 | 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 | 1254 | 508 |
| 231 | DAVIES, WAYNE D | 434 JOHNSON PLANK RD NE WARREN OH 44481 | 09/23/1949 | 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 | 6084 | 1678 |
| 232 | MILLS, NICOLE E | 304 BROADWAY ST W GIRARD OH 44420 | 06/13/1981 | 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 | 201 | 1003 |
| 233 | SFERRA, SUSAN R | 3409 EAGLES LOFT UNIT A CORTLAND OH 44410 | 11/08/1954 | 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 | 12088 | 2323 |
| 234 | RODRIGUEZ-DIRANDO, GEORGEANN | 1774 DUMONT DR MINERAL RIDGE OH 44440 | 07/05/1975 | 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 | 1881 | 1820 |
| 235 | HOSTETLER, EDWIN L | 1350 FLAGG RD E ORWELL OH 44076 | 07/01/1980 | | 4590 | 1116 |
| 236 | DULKA, THERESA A | 2089 MAHAN DENMAN RD NW BRISTOLVILLE OH 44402 | 10/07/1961 | 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 | 2453 | 1847 |
| 237 | WYSENSKI, JUDY D | 1840 FOX NORTH RD N HUBBARD OH 44425 | 07/27/1959 | 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 | 10429 | 444 |
| 238 | BRUNETTE, MATTHEW G | 7862 SUTTON PLACE DR NE WARREN OH 44484 | 08/31/1980 | | 6737 | 1858 |
| 239 | WILMOTH, RONALD L | 125 EMERT RD LEAVITTSBURG OH 44430 | 04/14/1951 | | 12803 | 1919 |
| 240 | MORRISON, ROBERT H | 1676 HUBBARD MASURY RD MASURY OH 44438 | 05/22/1967 | 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 | 8838 | 1183 |
| 241 | PELLEGRENE, DENNIS G | 102 HAZEL ST GIRARD OH 44420 | 02/03/1945 | 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 | 383 | 1590 |
| 242 | PERRONE, ANTHONY C | 1363 KEARNEY ST NILES OH 44446 | 01/13/1972 | 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 | 12937 | 975 |
| 243 | ATWAY, SALWA | 2760 BELMAR DR YOUNGSTOWN OH 44505 | 02/01/1960 | 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 | 6136 | 2145 |
| 244 | BRODA, CURTIS P | P O BOX 27 FOWLER OH 44418 | 02/28/1953 | 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 | 9032 | 2255 |
| 245 | ANDRELLA, THOMAS M | 5969 EAGLE CREEK RD LEAVITTSBURG OH 44430 | 10/31/1941 | 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 | 8321 | 2022 |
| 246 | MCBRIDE, JOHN F | 8 TUTTLE LN GIRARD OH 44420 | 03/15/1952 | | 6576 | 2756 |
| 247 | GORDON, MICHELE L | 5267 MILLER SOUTH RD BRISTOLVILLE OH 44402 | 08/18/1968 | 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 | 5352 | 2742 |
| 248 | DAUGHERTY, JANET D | 663 MELWOOD DR NE WARREN OH 44483 | 02/07/1926 | 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 | 2936 | 2039 |
| 249 | EATON, CARL E | 375 ORCHARD LN CORTLAND OH 44410 | 12/01/1952 | 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 | 7365 | 2638 |
| 250 | HAINES, AMY M | 117 MAIN ST E GIRARD OH 44420 | 10/10/1981 | 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 | 3159 | 160 |

Date: 09/20/2002
Time: 09:52:16
JURR8045

10/08/2002 TO 11/22/2002
PETIT COURT
SORT: NUMERIC

Page:  12

Service:  C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 251 | KLINGER, ELMER R | P O BOX 7 W FARMINGTON OH 44491 | 04/15/1929 | 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 | 13525 | 1767 |
| 252 | MARTIN, REX A | 457 IOWA AVE GIRARD OH 44420 | 05/28/1953 | 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 | 4392 | 860 |
| 253 | SMITH, KIM D | 2737 ANDERSON MORRIS RD NILES OH 44446 | 12/16/1956 | 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 | 4237 | 932 |
| 254 | MCDONALD, JUDITH A | 526 VENTURA DR YOUNGSTOWN OH 44505 | 01/27/1947 | 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 | 5163 | 1535 |
| 255 | RICCI, LUCY | 245 YORK AVE NW WARREN OH 44485 | 07/25/1932 | 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 | 6003 | 1444 |
| 256 | MCQUEEN, SHARHONDA C | 3030 NORTHGATE DR YOUNGSTOWN OH 44505 | 12/15/1977 | 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 | 4269 | 2605 |
| 257 | MASON JR, DAVID H | 2549 ELM ROAD CORTLAND OH 44410 | 01/12/1967 | 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 | 562 | 833 |
| 258 | MARTINO, MICHAEL A | 1304 SURREY POINTE DR SE WARREN OH 44484 | 09/19/1939 | 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 | 4369 | 539 |
| 259 | DAVANZO, PAUL P | 962 WOODLAWN AVE GIRARD OH 44420 | 05/16/1956 | 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 | 10115 | 1325 |
| 260 | MERCER, ROBERT P | 299 AIRPORT RD NW WARREN OH 44481 | 04/20/1980 | 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 | 1470 | 2509 |
| 261 | MCMONAGLE, LESLIE | 3641 LIBERTY AVE HUBBARD OH 44425 | 11/25/1956 | | 3805 | 2539 |
| 262 | NORTH JR, WILLIAM W | 3514 CARDINAL DR SW WARREN OH 44481 | 06/14/1963 | 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 | 1260 | 2364 |
| 263 | WHITE, CHARLES E | 1000 COLONIAL DR YOUNGSTOWN OH 44505 | 09/27/1955 | 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 | 10399 | 2305 |
| 264 | SABLE, ALICE M | 223 FAIRMOUNT AVE NE WARREN OH 44483 | 04/08/1916 | 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 | 12912 | 1636 |
| 265 | MARSH, RAMONA L | 4920 SOUTH ST LEAVITTSBURG OH 44430 | 12/30/1970 | 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 | 624 | 1421 |
| 266 | SCHRECKENGOST, CATHERINE A | 315 TIBBETTS WICK RD GIRARD OH 44420 | 12/30/1957 | 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 | 5060 | 1106 |
| 267 | FRAZIER, CHARLES A | 1823 NORTH RD NE WARREN OH 44483 | 12/10/1915 | 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 | 401 | 1055 |
| 268 | WELLS, REGINALD | 185 CAMROSE DR NILES OH 44446 | 10/08/1957 | 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 | 1319 | 585 |
| 269 | GIANCOLA, SHERRY S | 3599 CREED AVE HUBBARD OH 44425 | 07/19/1956 | 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 | 2539 | 1966 |
| 270 | GUMINO JR, ANTHONY J | 5136 STATE ROUTE 5 NEWTON FALLS OH 44444 | 03/19/1978 | 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 | 1658 | 1299 |
| 271 | POWELL JR, GEORGE W | 353 STAHL AVE CORTLAND OH 44410 | 09/02/1957 | | 6167 | 1194 |
| 272 | OCONNELL, JOHN F | 968 KREHL AVE GIRARD OH 44420 | 06/21/1950 | 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 | 7418 | 177 |

```
Date: 09/26/2002                                                                          Page:   13
Time: 09:52:17                        10/08/2002 TO 11/22/2002
JURR8045                                  PETIT COURT
                                          SORT: NUMERIC
Service:   C10-8
```

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 273 | RUMBLE, JEANNE M | 3420 FIFTH AVE YOUNGSTOWN OH 44505 | 10/08/1949 | 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 | 11682 | 2740 |
| 274 | BUTERBAUCH, BENJAMIN B | 1068 PARK DR S BROOKFIELD OH 44403 | 07/06/1977 | | 4747 | 984 |
| 275 | BURNHAM, ROBERT M | 34 JAMES LANE GIRARD OH 44420 | 03/19/1970 | 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 | 1763 | 394 |
| 276 | FUNGI, ALICE B | 39 SUMMIT AVE N GIRARD OH 44420 | 10/01/1932 | 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 | 6251 | 78 |
| 277 | SENEDAK, KATHRYN P | 3861 NORTHLAWN DR YOUNGSTOWN OH 44505 | 09/08/1938 | | 7811 | 1333 |
| 278 | HEFNER, ROBERT D | 160 WILLARD AVE SE WARREN OH 44483 | 05/10/1926 | 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 | 3719 | 1245 |
| 279 | PARNABY, GERALD | 168 THIRD ST N W FARMINGTON OH 44491 | 05/27/1941 | 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 | 4175 | 1420 |
| 280 | CASSIDY, MARY F | 3572 LIBERTY AVE HUBBARD OH 44425 | 05/27/1941 | 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 | 4176 | 1001 |
| 281 | SALEM, EMIR | 4857 HOFFMAN NORTON RD BRISTOLVILLE OH 44402 | 09/27/1974 | 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 | 3582 | 1947 |
| 282 | DESIMONE, RALPH F | 1855 MEADOWLARK LN NILES OH 44446 | 12/29/1949 | | 3721 | 1230 |
| 283 | KUZMICK, PATRICIA | 4839 FISHER CORINTH RD FARMDALE OH 44417 | 01/12/1953 | | 5045 | 727 |
| 284 | SLATER, TERISA | 625 ARLINGTON RD NEWTON FALLS OH 44444 | 07/10/1962 | 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 | 5007 | 1150 |
| 285 | PRINCE, JAMIE L | 451 CLIFTON DR NE WARREN OH 44484 | 08/24/1972 | 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 | 8729 | 992 |
| 286 | STEVENS, ANNIE R | 8493 MAIN ST KINSMAN OH 44428 | 09/08/1963 | | 10184 | 2472 |
| 287 | MARADO, JEAN L | 8052 CASTLE ROCK DR NE WARREN OH 44484 | 07/19/1961 | | 2670 | 226 |
| 288 | BAUMAN, DEBRA L | P O BOX 276 CORTLAND OH 44410<br>7311 STATE ROUTE 46 CORTLAND OH 44410 | 08/25/1957 | 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 | 10241 | 2457 |
| 289 | WAGNER, ROSALIE | 100 OLD PALISADES RD, APT 2115 FORT LEE NJ 07024 | 10/12/1978 | 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 | 1842 | 467 |
| 290 | TRICKER, MELINDA O | 1159 MONCREST DR NW WARREN OH 44485 | 07/20/1964 | 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 | 5362 | 755 |
| 291 | BODNAR, JUDY | 1255 THOMAS RD HUBBARD OH 44425 | 12/10/1938 | 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 | 3076 | 1365 |
| 292 | FRITZ, RUTH A | 46 LAKEVIEW RD NILES OH 44446 | 02/25/1947 | 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 | 7845 | 1596 |
| 293 | ABERNATHY, CAROL J | 202 SAYERS AVE NILES OH 44446 | 05/08/1934 | 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 | 4423 | 36 |
| 294 | HUBER, THOMAS M | 1900 FOX NORTH RD N HUBBARD OH 44425 | 09/23/1951 | 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 | 6829 | 1164 |

Date: 09/26/2002
Time: 09:52:17
JURR8045

Case: 4:07-cv-00880-JG   Doc #: 35-5   Filed: 03/07/13   100 of 196.   PageID #: 3127

Page: 14

10/08/2002 TO 11/22/2002
PETIT COURT
SORT: NUMERIC

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 295 | DAILEY  ROBERT J | 1836 SHERIDAN AVE NE WARREN OH 44483 | 02/08/1934 | 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 | 2546 | 1228 |
| 296 | PHILLIPS, ROBERT S | 7826 STATE ROUTE 193 FARMDALE OH 44417 | 06/08/1942 | 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 | 8098 | 813 |
| 297 | JONES, DENNIS E | 670 RAVENNA RD NEWTON FALLS OH 44444 | 10/03/1949 | 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 | 2791 | 1701 |
| 298 | SMITH, ROSE MARIE M | 1689 SUNNY ESTATES DR NILES OH 44446 | 08/08/1940 | 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 | 9978 | 2458 |
| 299 | MORETON, TAMMY | 132 WESTGATE DRIVE NEWTON FALLS OH 44444 | 08/05/1977 | 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 | 1157 | 510 |
| 300 | WISE, CAROL | 3982 SODOM HUTCHINGS RD CORTLAND OH 44410 | 07/12/1960 | | 2324 | 2381 |
| 301 | MILKON, ANTHONY | 163 STATE RD W WARREN OH 44483 | 10/02/1942 | 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 | 6221 | 2503 |
| 302 | VALERIO, DONNITA J | 3370 FRANKLIN AVE HUBBARD OH 44425 | 02/06/1959 | 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 | 9983 | 709 |
| 303 | DAYLIDA, RAYMOND | 1800 GRACEWOODS DR APT 22 NILES OH 44446 | 07/26/1912 | 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 | 6318 | 396 |
| 304 | EMERY, EUGENE R | 203 GOLF DR CORTLAND OH 44410 | 04/13/1938 | 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 | 2183 | 1813 |
| 305 | CRENSHAW JR, FRANK | 241 FEDERAL ST NE WARREN OH 44483 | 02/16/1929 | 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 | 13009 | 2505 |
| 306 | CULLISON, TONY R | 1058 PERKINS JONES RD - APT B-3 WARREN OH 44483 | 11/06/1976 | 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 | 5004 | 1045 |
| 307 | CARAWAY, DOROTHY A | 1678 LARCHMONT AVE NE WARREN OH 44483 | 05/23/1965 | 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 | 11169 | 2349 |
| 308 | SHAFER, GLENN A | 270 CENTENNIAL DR VIENNA OH 44473 | 10/20/1965 | 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 | 1051 | 2483 |
| 309 | GALLO-SCHADL, NATALIE | 350 NEBRASKA AVE MCDONALD OH 44437 | 05/05/1972 | 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 | 5572 | 1438 |
| 310 | WILDMAN, BONNIE L | 1730 MAPLEWOOD ST NE WARREN OH 44483 | 09/26/1951 | 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 | 12631 | 439 |
| 311 | MOCELLA-MERTEN, MICHELE | 830 BELVEDERE AVE NE WARREN OH 44483 | 09/07/1965 | 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 | 7678 | 100 |
| 312 | BRYAN, SCOTT J | 986 RIVERVIEW DR LEAVITTSBURG OH 44430 | 04/07/1968 | 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 | 1873 | 2541 |
| 313 | HUMENIK SR, JACK D | 322 YOUNGSTOWN KINGSVILLE RD SE VIENNA OH 44473 | 12/28/1964 | 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 | 8659 | 258 |
| 314 | HAINES, MILO F | 4686 PHILLIPS RICE RD CORTLAND OH 44410 | 06/16/1931 | 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 | 4250 | 334 |
| 315 | HOMICK, THOMAS E | 6947 MCCLURE RD HUBBARD OH 44425 | 09/01/1954 | 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 | 2487 | 977 |
| 316 | SCHRECENGOST, JACK L | 4009 NORTHWOOD DR SE WARREN OH 44484 | 05/24/1936 | 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 | 7982 | 990 |
| 317 | HEARN, ANITA L | 372 DAVID LN NE BROOKFIELD OH 44403 | 05/15/1946 | 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 | 8969 | 2564 |

Date: 09/26/2002
Time: 09:52:17
JURR8045

10/08/2002 TO 11/22/2002
PETIT COURT
SORT: NUMERIC

Page: 15

Service: C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 318 | DATTILO, GARY A | 338 JACKSON ST HUBBARD OH 44425 | 09/09/1946 | 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 | 13434 | 1053 |
| 319 | FAIVER, WANDA S | 48 MANOR DR BROOKFIELD OH 44403 | 03/03/1933 | 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 | 12812 | 2534 |
| 320 | JURATOVIC, KATICA | 6638 STEWART SHARON RD BROCKFIELD OH 44403 | 05/21/1952 | 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 | 11294 | 456 |
| 321 | BARNES, GARY W | 115 LUTHER AVE #2 KENT OH 44240 | 08/01/1973 | 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 | 10937 | 2308 |
| 322 | COLBRUNN, ROY I | 856 WARNER RD SE BROOKFIELD OH 44403 | 11/19/1926 | 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 | 4577 | 120 |
| 323 | MILLER, ROBERT E | 9425 STATE ROUTE 45 ORWELL OH 44076 | 11/01/1960 | 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 | 12839 | 1032 |
| 324 | RAMSEY, ROMA L | 5948 MAYBURN BARCLAY RD FARMDALE OH 44417 | 04/05/1969 | 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 | 8744 | 384 |
| 325 | HIGBY, DIVA C | 926 WASHINGTON AVE GIRARD OH 44420 | 07/21/1922 | 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 | 11422 | 2159 |
| 326 | BOONE, SANDRA J | 29 RANDOLPH AVE S GIRARD OH 44420 | 09/09/1949 | 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 | 9454 | 1745 |
| 327 | MCCREADY, TERESA R | 631 STATE RD W WARREN OH 44483 | 12/28/1979 | 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 | 3201 | 1079 |
| 328 | KOLLAR, REBECCA S | 3889 MEANDER DR MINERAL RIDGE OH 44440 | 05/25/1948 | 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 | 4012 | 895 |
| 329 | PRENTICE, KAREN J | 1873 ORIEL RODGERS RD GIRARD OH 44420 | 09/16/1943 | 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 | 12699 | 547 |
| 330 | FOULK, CAROL H | 849 MEADOWBROOK AVE SE WARREN OH 44484 | 10/21/1933 | | 9080 | 75 |
| 331 | THIRY, JUSTIN | 3455 OAKMONT DR HUBBARD OH 44425 | 08/18/1979 | 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 | 13117 | 1868 |
| 332 | RUMAN, SYLVIA J | 1850 PLEASANT VALLEY RD GIRARD OH 44420 | 02/01/1938 | 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 | 9368 | 1526 |
| 333 | JOHNSON, PATRICIA A | 4065 MCCLURE EAST RD NEWTON FALLS OH 44444 | 01/29/1961 | 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 | 250 | 2250 |
| 334 | SMITH, JOYCE L | 3389 IVY HILL CIR UNIT D CORTLAND OH 44410 | 02/20/1947 | 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 | 1797 | 1486 |
| 335 | LAPROCINA, MELANIE C | 1523 MAIN ST N NILES OH 44446 | 05/24/1983 | 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 | 2984 | 1297 |
| 336 | TUTOKI, AUDREY J | 860 KENILWORTH AVE SE WARREN OH 44484 | 04/08/1931 | 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 | 11965 | 1081 |
| 337 | LOMBARDI, DUILIA | 707 TRUMBULL AVE SE WARREN OH 44484 | 11/24/1935 | 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 | 6947 | 81 |
| 338 | CASEY, ALICE M | 212 REBECCA AVE HUBBARD OH 44425 | 01/19/1921 | 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 | 4805 | 1728 |
| 339 | BEESON, JOSEPH W | 5990 MT EVERETT RD HUBBARD OH 44425 | 03/26/1969 | 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 | 10803 | 276 |
| 340 | BIANCO, BERNARD T | 1200 PENNSYLVANIA AVE MCDONALD OH 44437 | 11/12/1957 | 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 | 5730 | 876 |

Date: 09/26/2002
Time: 09:52:18
JURR8045

Case: 4:07-cv-00880-JG  Doc #: 35-5  Filed: 03/07/13  102 of 196.  PageID #: 3129

10/08/2002 TO 11/22/2002
PETIT COURT
SORT: NUMERIC

Page: 16

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 341 | WEISS, HARRY M | 1442 BURNETT ST MINERAL RIDGE OH 44440 | 08/29/1952 | 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 | 1108 | 2231 |
| 342 | CASTOR, DOMINIC J | 397 MACKEY DR VIENNA OH 44473 | 06/03/1950 | 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 | 12782 | 1888 |
| 343 | NORI, MICHAEL J | 1695 ROOSEVELT AVE NILES OH 44446 | 07/10/1967 | 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 | 5551 | 1969 |
| 344 | WADE, SHIRLEY A | 5601 RIDGE RD CORTLAND OH 44410 | 04/16/1960 | 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 | 3648 | 1591 |
| 345 | BUTLER, ROCHELLE L | 3882 CRESTVIEW SE WARREN OH 44484 | 10/08/1976 | 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 | 4592 | 1267 |
| 346 | BUCKNER, ANDREW | 1753 DUMONT DR MINERAL RIDGE OH 44440 | 09/04/1983 | 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 | 10135 | 336 |
| 347 | SPELICH, MONICA S | 2520 CHESTNUT ST GIRARD OH 44420 | 06/22/1962 | 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 | 13066 | 1648 |
| 348 | ALLEN, JAY R | 4600 LAKE RD N W FARMINGTON OH 44491 | 01/01/1900 | 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 | 6988 | 1920 |
| 349 | PAPIERNIK, MARLIA | 175 HILLVIEW DR HUBBARD OH 44425 | 11/28/1964 | | 12246 | 1588 |
| 350 | DENYS, THEODORE A | 151 YOUNGSTOWN HUBBARD RD APT 31 HUBBARD OH 44425 | 05/25/1926 | 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 | 945 | 263 |
| 351 | CLAYMAN, DEBORAH L | 468 ARBOR CIR YOUNGSTOWN OH 44505 | 08/11/1960 | 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 | 5799 | 1146 |
| 352 | MEYERS, RODNEY J | 1991 WICK CAMPBELL RD HUBBARD OH 44425 | 07/11/1967 | 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 | 3125 | 1008 |
| 353 | LYNDES, KEITH J | 2909 HALLOCK YOUNG RD SW WARREN OH 44481 | 10/25/1955 | 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 | 5140 | 2717 |
| 354 | PENNER, BENITA M | 3506 SOMERSET DR APT B YOUNGSTOWN OH 44505 | 08/10/1940 | 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 | 5409 | 2601 |
| 355 | NIEMI, TIMOTHY A | 2287 WILSON SHARPSVILLE RD CORTLAND OH 44410 | 11/18/1966 | 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 | 2521 | 2313 |
| 356 | HENDERSON, KAREN L | 232 ALBERT ST NEWTON FALLS OH 44444 | 08/01/1943 | 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 | 10542 | 224 |
| 357 | LEMMON, KENNETH L | 317 PROSPECT ST NEWTON FALLS OH 44444 | 11/19/1925 | 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 | 7330 | 20 |
| 358 | GILKEY, RENEE M | 637 GROVER AVE MASURY OH 44438 | 07/24/1954 | 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 | 13711 | 1809 |
| 359 | CAPIRANO, RALPH J | 342 BROAD ST E NEWTON FALLS OH 44444 | 10/06/1942 | 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 | 10734 | 1104 |
| 360 | MARGO, LINDA S | 516 WASHINGTON AVE NILES OH 44446 | 10/10/1956 | 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 | 9481 | 1744 |
| 361 | OHLIN, MARGARET M | 404 OAK KNOLL AVE SE WARREN OH 44483 | 06/15/1936 | 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 | 12058 | 920 |
| 362 | WOGAN, THELMA J | 4218 ALEESA DR SE WARREN OH 44484 | 08/30/1934 | | 6647 | 1223 |
| 363 | MCWHIRTER, JENNIFER | 2268 CANAL ST S NEWTON FALLS OH 44444 | 01/17/1983 | 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 | 10104 | 1570 |

Date: 09/26/2002
Time: 09:52:18
JURR8045

Case: 4:07-cv-00880-JG   Doc #: 35-5   Filed: 03/07/13   103 of 196.   PageID #: 3130

10/08/2002 TO 11/22/2002
PETIT COURT
SORT: NUMERIC

Page:   17

Service:   C10-8

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 364 | MEASE, RODGER L | 715 KINSMAN ST NW WARREN OH 44483 | 02/17/1945 | 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 | 13700 | 2684 |
| 365 | PARIS, SUSAN A | 5673 BREEZEWOOD LAKE DR BROOKFIELD OH 44403 | 10/19/1958 | 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 | 8886 | 770 |
| 366 | CICERO, RENEE L | 1261 PLEASANT VALLEY DR NE WARREN OH 44483 | 09/27/1955 | 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 | 1316 | 2087 |
| 367 | POWERS, RICHARD A | 4504 WILSON SHARPSVILLE RD CORTLAND OH 44410 | 07/27/1959 | 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 | 11002 | 1666 |
| 368 | BOATRIGHT, BONITA N | 787 HOUSEL CRAFT RD CORTLAND OH 44410 | 01/14/1953 | 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 | 117 | 2037 |
| 369 | CRANK, SHAWN M | 293 HELEN AVE NILES OH 44446 | 04/03/1969 | 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 | 11032 | 1292 |
| 370 | LOHR, GEORGE C | 51 WILSON AVE E GIRARD OH 44420 | 08/14/1957 | 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 | 8473 | 790 |
| 371 | COLE JR, JAMES S | 700 THE GREENS NE WARREN OH 44484 | 07/31/1948 | 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 | 12429 | 1709 |
| 372 | HENDERSON, LINDA | 2771 BARCLAY MESSERLY RD SOUTHINGTON OH 44470 | 08/25/1943 | 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 | 12752 | 2249 |
| 373 | WARGO, RICHARD G | 411 WASHINGTON AVE NILES OH 44446 | 02/06/1934 | | 8291 | 1278 |
| 374 | SHERIDAN, DEBRA L | 5185 KING GRAVES RD VIENNA OH 44473 | 02/05/1952 | 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 | 8210 | 2102 |
| 375 | CHALKER, JAMES P | 222 THIRD ST N W FARMINGTON OH 44491 | 04/22/1946 | 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 | 3084 | 1216 |
| 376 | THOMPSON, TONI | 509 ROBBINS AVE NILES OH 44446 | 01/18/1977 | 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 | 1448 | 1313 |
| 377 | DIGIACOBBE, EMIDIO A | 1060 WILSON SHARPSVILLE RD CORTLAND OH 44410 | 02/09/1926 | 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 | 5810 | 1649 |
| 378 | GAVITT, VIOLET C | 1544 SHERIDAN AVE NE WARREN OH 44483 | 04/21/1945 | 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 | 4865 | 537 |
| 379 | GIULIANO, JOSEPHINE T | 117 ORCHARD AVE NILES OH 44446 | 05/05/1934 | 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 | 12675 | 2437 |
| 380 | A, MARY M | 963 BROADACRES DR SE WARREN OH 44484 | 02/26/1946 | 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 | 4362 | 2158 |
| 381 | KUZMAN, KATHLEEN | 463 LIBERTY ST E GIRARD OH 44420 | 12/07/1969 | 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 | 3687 | 2412 |
| 382 | BAKER, MARY D | 2200 MILTON BLVD NEWTON FALLS OH 44444 | 05/31/1916 | 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 | 4439 | 330 |
| 383 | PHILLIPS, GARY R | 1150 CARSON SALT SPRINGS RD #34 WARREN OH 44481 | 05/12/1981 | 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 | 1795 | 1864 |
| 384 | GARNER, SAMUEL E | 3316 RED FOX RUN DR NW WARREN OH 44485 | 10/30/1979 | 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 | 8038 | 2199 |
| 385 | CLICK, CHERYL A | 2264 CLEARVIEW AVE NW WARREN OH 44483 | 06/25/1949 | 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 | 13411 | 2468 |
| 386 | ROSS, HAYWARD L | 5430 HERNER COUNTY LINE RD SOUTHINGTON OH 44470 | 03/30/1938 | 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 | 10934 | 241 |

Date: 09/26/2002
Time: 09:52:19
JUAR8045

Service:    C10-8

                         10/09/2002 TO 11/22/2002
                                PETIT COURT
                              SORT: NUMERIC

| Service No. | Name | Address | DOB | SSN | Annual No. | Term No. |
|---|---|---|---|---|---|---|
| 387 | ZEREFOS, KIMBERLY D | 5579 US ROUTE 422 SOUTHINGTON OH 44470 | 07/25/1965 | 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 | 8768 | 22 |
| 388 | MCCAFFERTY, CONSTANCE A | 2861 DURST COLEBROOK RD CORTLAND OH 44410 | 04/11/1943 | 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 | 9261 | 1062 |
| 389 | KERIOTIS, THEODORE M | 1957 ROBERTS LN NE WARREN OH 44483 | 10/02/1931 | 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 | 12817 | 1316 |
| 390 | MALITO, CONNIE S | 366 MOCCASIN TRL GIRARD OH 44420 | 08/08/1941 | 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 | 2523 | 668 |
| 391 | GARWOOD, JULIE M | 993 PATRICIA DRIVE #2 GIRARD OH 44420 | 09/27/1972 | 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 | 7181 | 1054 |
| 392 | DIAZ-GONZALEZ, RAFAEL J | 707 BELVEDERE AVE SE WARREN OH 44484 | 02/11/1983 | 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 | 13456 | 203 |
| 393 | BOARDLEY, THOMAS C | 636 OHIO AVE NW WARREN OH 44485 | 10/03/1943 | 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 | 481 | 1760 |
| 394 | HANICK, TIMOTHY | 969 LANDSDOWNE AVE NW WARREN OH 44485 | 04/26/1958 | 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 | 7935 | 1099 |
| 395 | EUBANK, BARBIE J | 1732 FRONT ST SW WARREN OH 44485 | 12/18/1977 | | 13976 | 1060 |
| 396 | NELSON, JOHN | 6590 STATE ROUTE 87 KINSMAN OH 44428 | 04/05/1952 | 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 | 9736 | 447 |
| 397 | CAMPBELL, TIMOTHY L | 279 SUNSET DR CORTLAND OH 44410 | 11/13/1953 | 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 | 1922 | 1038 |
| 398 | RATCLIFF, JOYCE P | 383 ORCHARD LN CORTLAND OH 44410 | 09/07/1940 | 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 | 3101 | 1351 |
| 399 | FURILLO, RICHARD J | P O BOX 293 BROOKFIELD OH 44403 | 10/10/1939 | 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 | 638 | 93 |
| 400 | KRAUSE, STELLA L | 2975 SEDGEWICK ST NE APT 196 WARREN OH 44483 | 12/10/1923 | 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 | 9672 | 2173 |

Total Number of Jurors   400

                          *** End of Report ***

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                                    :

     Plaintiff,                               :     Case No. 01-CR-794

-vs-                                              :

NATHANIEL JACKSON,                                :

     Defendant.                               :

### EXHIBIT _____

### AFFIDAVIT OF DENNIS DAY LAGER, ESQ.

State of Ohio          :
                :          ss:
County of Portage      :

Dennis Day Lager, after being duly sworn according to law, states as follows:

1.     I am an attorney licensed to practice law in the State of Ohio.

2.     This Court appointed me to represent Nathaniel Jackson in his direct appeal to the Ohio Supreme Court.

3.     I attended in person the final day of co-defendant Donna Roberts' mitigation hearing.

4.     All of the individuals that sat on the jury in Ms. Roberts' case were Caucasian.

Further affiant saith naught.

_____
DENNIS DAY LAGER

Sworn to and subscribed in my presence this __5th__ day of January, 2004.

KATIE N. ARMSTRONG, Notary Public
Residence - Summit County
State Wide Jurisdiction, Ohio
My Commission Expires July 9, 2006

_____
NOTARY PUBLIC

EXHIBIT
55

Student Number: 0016-77-20

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

NAME JACKSON, NATHANIEL _____ DOB 2-13-72 _____ TEST DATE 1-17-86 _____

ADDRESS 314 Pearl Street _____ SEX M _____ REFERRED BY School _____

PARENT(S) Charles/Pauline Kornegay _____ GRADE 7 _____ SCHOOL Adams Jr. High _____

HOME PHONE 743-5365 _____ C.A. 13-11 _____ EXAMINER J. Seiser _____

REASON FOR REFERRAL Disruptive behavior. Low Achievement _____

TEST RESULTS

INTELLIGENCE

Wechsler Intelligence Scale for Children - Revised

Verbal I.Q. 72      Performance I.Q. 72      Full Scale I.Q. 73

Bender-Gestalt Test            1 Errors

| ACHIEVEMENT | Grade Placement | Standard Score | Discrepancy Score |
|---|---|---|---|
| **Reading** | | | |
| Woodcock-Johnson Letter-word Ident. | 6.4 | 88 | -1.0 |
| Woodcock-Johnson Passage Compre. | 4.6 | 75 | -.13 |
| **Math** | | | |
| Woodcock-Johnson Calculation | 4.3 | 63 | +.67 |
| Woodcock-Johnson Applied Problems (reasoning) | 5.2 | 75 | -.13 |

12-19-85  Vision Screening - Failed - Referred for further testing
          Hearing Screening - Passed

| Scales of Independent Behavior | Age Score | Standard Score |
|---|---|---|
| Math Skills | 12-3 | 92 |
| Social & Communication Skills | 6-5 | 55 |
| Personal Living Skills | 9-3 | 63 |
| Community Living Skills | 9-3 | |
| Broad Independence | 9-0 | |

EXHIBIT
56

THANIEL
HIGH

## BACKGROUND INFORMATION

Nate is the second of four children in his family of 3 boys and 1 girl.  Both parents reside in the home.  According to his mother, his birth history and early development were normal and there has never been any eating or sleeping problems.  His health is generally good and there are no known allergies.  According to Mrs. Jackson, Nate gets along all right at home.  The only problem she noted is stubbornness.

School records show that Nate made fair progress in primary grades in school.  Both behavior problems and poor work habits were cited in early reports.  He failed four subjects in sixth grade and repeated that year.  In his second year of sixth grade he was absent 48-1/2 days, tardy 15 days.  Approximately 40 days of those absences were due to disruptions in class and refusal to obey rules.  Stanford Achievement test scores on 5/94 indicated both reading and math scores were in the first stanine.  Nate is presently in seventh grade and receives remedial services in both reading and math.  Behavior has continued to be a problem with frequent reports of constant disruption and disrespect of authority.  He is presently failing all subjects and was referred for a multifactored evaluation.

## Observations

Nate was first seen in the assistant principal's office where he was sent after about an hour's search to locate him in school.  He is rather small for his age, was somewhat unkempt, and sat slouched in his chair.  He was somewhat resistant to coming into the testing session and walked up the stairs at a snail's pace.  He spoke very freely with a great deal of prejudice and hostility towards whites and made many tough, verbal threats.  At first, he refused to complete some of the testing and called it "baby stuff" he didn't have to do.  Eye contact was very poor throughout and he sometimes roamed about the room in a very casual manner.  As the session progressed, he loosened up a bit and worked efficiently at tasks he enjoyed.  As he became more cheerful, he spoke freely of celebrating his upcoming birthday and bragged about the drinking and drugs he was to enjoy.  He was pleased with himself on a few occasions when he felt he had good success.  Eventually all requested tasks, including the "baby ones" he'd originally refused to do, were completed.  While those behaviors may have depressed the scores somewhat, the scores are probably in the appropriate ranges.

## Test Results

Ability.  Nate's scholastic ability, measured on the WISC-R, is in the Borderline (Slow Learner range).  Overall, his Verbal and Performance I.Q.'s were similar.  Relative strengths for him were his auditory, short term memory, attention to visual details, and ability to do oral arithmetic problems.  His vocabulary, ability to formulate verbal concepts, and visual-perceptual organizational skills are below average.  Some of those

NATHANIEL
High

scores may be depressed by a lack of cultural opportunities or by his impulsive responses.

Achievement.  Nate's reading and math skills are fairly consistent with his measured ability.  He demonstrated ability to decode words promptly.  He made accent errors in more difficult words which it is suspected he would have correctly identified in context.  His reading comprehension score was weaker and it appeared that he was losing interest. In the math calculation, he completed complex addition, subtraction with borrowing, some multiplication and division.  He did one, double-division, division problem by doing repeated addition.  He did not attempt more difficult division or fraction work.  He was successful in solving word problems involving money.  He had no difficulty in restating the word problem and seemed to know what was expected.  A few careless errors depressed his math problem solving score.

A teacher checklist on his communicative status indicates that Nate's skills are below average.  Further testing may be completed by the speech clinician.

Visual-Motor.  Nate copied the nine Bender designs without error.  Th work was fairly well organized on the page.  While some of the designs wer weak in angulation, visual-motor maturity is adequate for his age.

Social-Emotional.  The Scales of Independent Behavior, a measure of adaptive skills, was completed by Mrs. Pavlone, one of Nate's teachers. His gross and fine motor skills are appropriately developed for his age. Independent functioning is subaverage in the areas of social/emotional, personal living, and community living.  Specific difficulties include negative peer interaction (hits, fights, name calling, accepts no criticism), inappropriate use of language (vulgarity), cleanliness in personal care, lack of personal responsibility for being in proper place a proper time, and poor work skills (little attention to tasks).  Nate also demonstrates disregard for personal property.

The Hahnemann High School Behavior Rating Scale (HHSB), a classroom behavior rating scale, reflects many of these problems.  Significant behavior factors on that measure which hamper educational progress includ poor interaction, weak reasoning ability, poor work habits, expressed inability, and restless, disturbing behavior.  Nate is on task occasional but not for very long.

In the projectives administered (House-Tree-Person, Incomplete Sentences), Nate made no bones about the fact that he is aggressive, hate whites (except for one boy) and intends to hurt them or anyone else who tries to get "through him".  There was no evidence of positive feelings towards anyone, including his teachers and parents.  ("Ain't nothin' to me").  He projected the idea that he is afraid of nothing, including consequences of his own misbehavior and he admits he feels no guilt about

NATHANIEL
L. High

it. Nate wants to project a tough guy image and works hard at not letting down his guard. He did admit, but quickly retracted the statement that he is afraid of getting hurt.

He was openly hostile and antagonistic at the beginning of the testing session. While he did let down a bit, he never did relax in the session. It is possible that he views others as a threat and wants everyone to know he's not to be tampered with.

Summary and Recommendations

Nate's cognitive, academic, and social development scores are all at subaverage levels. As indicated, his behaviors in the testing may have depressed some of the scores somewhat but the ranges are probably appropriate. A major concern is the constant, open expression of hostility, both verbal and physical, towards others. It appears that this is often done without provocation and without a sense of guilt. Nate expressed deep prejudiced feelings and seems to believe it is right to act in aggressive ways. Several teachers have documented persistent aggressive behavior in his classes which interferes with work production. Nate failed sixth grade classes for two years and is presently failing all classes in seventh grade. Without some intervention, it is conceivable that he will continue to fail and, also, could cause personal injury to others, including student and teachers. A team conference should be held, as soon as possible, to review all data and determine appropriate interventions.

1.  Nate needs to develop an appropriate set of standards and values to develop a conscience about his actions and to understand the consequences of behavior.

2.  He needs to develop tolerance for those he perceives to be unworthy and to learn acceptable behaviors towards them. His prejudices seem to permeate his thoughts and behaviors. Disruptive behaviors must be remediated.

3.  Positive interactive skills with peers and respect for authority need to be learned.

4.  The possibility of substance abuse should be explored.

Jo Seiser
School Psychologist

fb



EXHIBIT
57

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

Name: Nathaniel Jackson   DOB: 2-13-72   Report Date: 2-23-89

Address: 309 S. Pearl St.   Sex: M   Referred By: S. Gregory

Parent(s): Pauline Korneagay   Grade: 10   School: Stambaugh

Home Phone: none listed   C.A.: 17-0   Examiner: J. Ciarrochi

### REASON FOR REFERRAL

Mandatory three-year reevaluation to determine if Nathaniel continues to qualify for special education services.

### SENSORY EVALUATION

Testing by school nurse D. Halloran on 1-18-89, reveals that hearing is within normal limits. Nathaniel failed visual acuity screening. He passed the eye muscle balance test. No vision referral was made because Nathaniel was in the process of getting glasses at the time of the screening.

### BACKGROUND INFORMATION

Nathaniel said that he lives with his mother, 18-year-old brother Charles, 13-year-old sister Tasha, and ten-year-old brother Patrick. His brother Charles will be graduating from the transitional school this year.

Nathaniel was placed in the Severe Behavior Handicapped (SBH) program during his seventh grade year (2-18-86). Referring behaviors included disrespect toward authority figures, leaving the classroom without permission, disrupting the class, threatening others, and passive-aggressive behavior.

Nathaniel was placed at Stambaugh Transitional with teacher Sara Revetti for the remainder of his seventh grade year. He remained at Stambaugh for grade eight. Because of good behavioral progress, he was placed in a less restrictive setting, the SBH satellite unit at Rayen High School the following year. During this school year (1988-89), Nathaniel was transferred back to Stambaugh because of threatening, aggressive behavior. One day he burned his and another student's worksheets, lay across a table in the classroom, and refused to go to timeout. When the teacher approached him, he swung at her.

Confidential Psychological Report · N. Brown

Page 2

Nathaniel's progress in the SBH program has been inconsistent, which may be due to periodic poor attendance. Current teacher, Suzette Gregory, said that his behavior is average for her class and that his academic progress is above average. Nathaniel is on the fifth grade level in math and on the eighth grade level in spelling and reading. He failed all subjects the second grade period because of poor attendance, but earned A's, B's and C's for the first grade period. Nathaniel is on Level IV of the five-step behavioral management system. His current problem behaviors are frequent talking out, including drug talk; trying to sleep in class instead of working; and resisting direction. In general, Nathaniel gets along adequately with peers and the teacher. However, he often teases others.

While Nathaniel was at Raven, he had a vocational evaluation. The evaluation report stated that he had a low level of involvement and excessive absenteeism. He did interact adequately with co-workers and was receptive to supervision. Marginal consideration for a program was recommended.

## CLASSROOM OBSERVATION

Nathaniel was observed for 20 minutes in Home Economics class on 1-16-89. Time-sampling at four second intervals and anecdotal observation were used. The three other boys in the class served as the rotating comparison peer. The activity observed was cleanup after cooking.

Nathaniel was on-task for more of the sampled intervals than was the rotating comparison peer (68% compared to 32%). His off-task behavior differed from that of the other boys in frequency, not in type. When Nathaniel was not on-task, he was walking around the room or talking with others.

## TEST BEHAVIOR

During individual assessment, Nathaniel was sullen, but followed directions and put forth adequate to good effort. He was guarded and suspicious when asked to draw a picture of his family.

## TEST RESULTS AND INTERPRETATION

OVERALL ABILITY

Stanford-Binet Intelligence Scale - Form L-M

| | |
|---|---|
| Chronological Age: | 17-0 |
| Mental Age: | 11-6 |
| Intelligence Quotient (IQ) | 70 |

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                              :

     Plaintiff,                          :    Case No. 01-CR-794

-vs-                                        :

NATHANIEL JACKSON,                          :

     Defendant.                          :

EXHIBIT _____

**AFFIDAVIT OF JESSICA LOVE**

STATE OF OHIO        :
                : ss:
COUNTY OF FRANKLIN   :

Jessica Love after being duly sworn according to law, states as follows:

1.     I am investigator employed by the Office of the Ohio Public Defender.  I have been employed by the Office since June 1997.  I have a Bachelor of Arts degree in Sociology and Criminal Justice from Ohio University.  I have attended national and state conferences on the death penalty, including mitigation investigation training.

2.     In my capacity as an investigator, I have been assigned primarily to conduct sentencing investigations in capital cases.  I have conducted sentencing phase investigations in approximately 30 capital cases.  These cases have been both at the trial and post conviction levels.

3.     A necessary component of capital case preparation at the trial level is the mitigation phase investigation.  A mitigation investigation consists of collecting available records on the defendant and his family as well as interviewing the defendant and their family to obtain relevant information regarding the defendant and their family.  This information is used to develop a psychosocial history and understanding of the defendant to enable the defense team to prepare and present a quality mitigation phase presentation.

4.     My goal as an investigator is to conduct as many interviews as necessary to identify the relevant life experiences of the defendant and develop a psychosocial history of the defendant and their family.  These experiences include, but are not limited to prenatal injuries; problems which are heredity in nature; physical psychological and sexual abuse; learning and psychological disorders; substance abuse; lack of adequate resources including monetary and



EXHIBIT
58

food; inadequate parents; educational performance; mental health contacts and interaction with the criminal justice system.

5. I identify these relevant experiences by interviewing the defendant as well as significant others through out the defendant's life.  I start with the defendant plus his immediate family, parents, siblings, grandparents, cousins, aunts, and uncles.  I then attempt to interview friends of the defendant and his family including teachers, coaches, doctors and probation/parole officers.

6. To verify the information, I collect as many records as possible.  This includes medical, school, prison, legal, employment and mental health records.

7. This investigation can be a very time consuming process.  It can take the record holders some time to locate the older records.  Family members may need to be interviewed several times to develop their trust to uncover sensitive family issues.  For instance family members may be resistant to reveal information concerning sexual or physical abuse.  Also, I must spend time with the defendant to develop a rapport which facilitates the defendant's willingness to reveal sensitive information, typically presented in the mitigation phase.

8. As part of my duties with the Office of the Ohio Public Defender I was assigned to the case of Nathaniel Jackson ("Nate").  After conducting an initial interview with Nathaniel, I interviewed Pauline Korneagay (his biological mother); Raymond Dickerson (stepfather); Tausha Korneagay (sister); Anthony Korneagay (brother) and Kevin Perry (Nate's friend and Tausha's fiancée).

9. Nate was born to Pauline Korneagay and Charles Paige who died recently. Nate had two brothers (Anthony Korneagay and Charles Jackson) and one sister (Tausha Korneagay)

10. Nate's mother is a binge drinker.  When her daughter was about to deliver her child, Nate's mother showed up drunk at the hospital.   Nate's mother previously shot someone.

11. Nate and his siblings grew up in a rough neighborhood.  They often heard gunshots.  It was tough to go out and play.

12. Nate did not have a good relationship with his mother. She never showed any love for him.  She gave all her love to her son Tony.  She never wanted to have anything to do with her other children.  This hurt Nate and his sister.  However, neither Nate nor his sister have ever blamed their mother.  They act as if nothing was wrong.  In actuality only Nate's sister has been there to support him through out his life.

13. As a result Nate moved in with his grandmother, who lived in the house next to his mother.  Tausha, when she was in elementary school, also moved in with his grandmother.

14. Nate experienced problems in school.  He often failed to attend school and when he did he talked back to the teachers. He pushed a teacher down the steps.  He was eventually

sent to Stambaugh Middle School because of his inappropriate behavior. He dropped out in the eleventh grade.

15.     When Nate was, approximately fifteen years of age, Pauline, his mother, began to live with Raymond Dickerson.  The two individuals, though not married, still reside together. Raymond is a severe alcoholic who disappears for long periods of time.  He is unable to maintain steady employment.

16.     Because Raymond appeared so late in Nate's life, his stepfather never served as a role modal for Nate.  When Raymond gave Nate advice, Nate ignored it.  As a result Raymond quit trying to advice Nate.

17.     Nate began to socialize with drug dealers and users.  This had a negative impact upon him.  For instance he used to be closed to Shawn and Mike Rushton.  Both individuals are now in jail.  Other individuals that Nate chose as friends are now either in jail or dead.  Nate carried drugs for the dealers.

18.     Eventually when Nate became addicted to crack, Nate ceased to live with his grandmother and began to live on the streets.

19.     When Nate would get high he would not become mean.  Nate was afraid of his brother who had beaten him up. Nate never carried a gun.  He was afraid of guns. Nate always wanted people to think that he was a tough guy, but he never really was.  Nate used to tell people he was a "crip" and his brother was a "blood".  This was just Nate bragging.

20.     Nate committed property crimes to support his crack habit. His crimes did not involve violence, other than to Nate.  He had to go to a doctor because someone broke his jaw after he tried to break into that person's house.  Another time some male broke Nate's ribs. Another person shot Nate after he stole some personal property.  Nate stole from so many people that they used to walk up to his brother, Anthony and tell him that they were going to kill Nate. Nate's family had at times to leave their house because there were so many threats from people from whom Nate had stolen.

21.     Nate's theft offenses were not limited to strangers.  Family members would not let him stay with them because he would steal from them to support his habit.  When he visited his mother, she at times would have to call the police.  His mother had to put locks on her two deep freezers because Nate would steal meat from the house and sell it to get drugs.  She also had to put locks on her bedroom door.  Nate stole the license plate off his mother's car. His mother bought his grandmother a rose and Nate stole the rose.  Nate was close to his children.

22.     Nate has two children, by different women.  He is close to his daughter.  The mother of his daughter left him because he was a drug addict.  He also has a son. The mother of his son is a drug addict.  Nate's crack problem became so bad that he stole his son's clothes as well as the mother's car.

3

23.    Tausha and her fiancée, Kevin Perry, tried to get Nate help for his drug problem. They got him admitted into the Bellmont Drug Treatment Center where he dropped out after two weeks.

24.    Nate was never good at picking up women. He always seemed to pick the wrong ones. Approximately two years prior to the instant offense, Nate met Donna Roberts.  She gave him clothes, drugs, money and anything else that he wanted. She let him drive her cars.  Nate seemed really happy after he met Donna.  He was impressed with her status. Nate's family members recognized that Donna took advantage of Nate.  However Nate refused to listen to them. Nate enjoyed the lifestyle and he saw no reason to change.

25.    Nate's mother, Pauline and Raymond were together at a local bar when they learned of Nate's arrest for the murder of Mr. Fingerhut.  While Nate had a lengthy criminal record by that time, none of his illegal acts involved violence. They expressed surprise and got drunk.

26.    None of the family spoke to Nate's attorneys until the day they went to court to testify in the sentencing phase.  They met as a group with the attorneys and were asked questions about the crime.  They were not prepared for questions, when the attorneys eventually called them to testify.

Further affiant saith naught.

_____
JESSICA LOVE

Sworn to and subscribed in my presence this __4__ day of January, 2004.

_____
NOTARY PUBLIC
*notary public, State of Ohio*
*my Commission Expires 7-7-08*

4

IN THE COURT OF COMMON PLEAS
Trumbull COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff-Respondent            :

-vs.-                                   :      Case No. 01-CR-794

            ,                  :      Judge Stuard
Nathaniel Jackson
    Defendant-Petitioner.           :

EXHIBIT 14

AFFIDAVIT OF DORIAN  L. HALL, M.A., L.S.W.

IN THE STATE OF OHIO  )
                 )  SS:
COUNTY OF FRANKLIN  )

    I, Dorian L. Hall, M.A., L.S.W. being first duly sworn according to law, state the following:

    1)    I have a Bachelor of Arts degree in Sociology and Psychology from Miami University, a Master of Arts degree in Sociology from Ohio State University and am a licensed social worker in the State of Ohio.  I have been employed as a mitigation specialist by the Office of the Ohio Public Defender since August 1988 and have served as the supervisor of the mitigation section since August 1994.

    2)    I have trained with national experts in death penalty mitigation, remained current with the literature, and have lectured at state conferences on the topic of mitigation.

    3)    I have been involved in the investigation and/or preparation of over one hundred and fifty death penalty cases at both the trial and appellate level (i.e. state

1

EXHIBIT
59

post-conviction and federal habeas corpus proceedings) in the states of Ohio and Indiana.

4)    I have testified in federal court concerning the standards that exist with respect to the preparation of a mitigation investigation in a capital case.

5)    An essential element of capital case preparation, at the trial level, is the mitigation or sentencing phase investigation.  A mitigation investigation is conducted by obtaining any and all information available about the defendant and their family.  This information is used to construct a psychosocial history and understanding of the defendant, which is the cornerstone of the mitigation preparation.

6)    In preparing for a competent mitigation, the above-noted investigation necessitates development of a close relationship with the defendant so that he or she will be willing to reveal intimate information about his/her life and family's dynamics.  It is rare that a defendant or family member will reveal intimate information in the initial interview.  This can be very embarrassing information.   Often individuals who are abused protect their abuses for a number of reasons.  In addition, the clients, often are very guarded given all the negative events that have happened throughout their lives.

7)    The defendant's report of his/her psychosocial history and experiences must then be corroborated through in-depth interviews with family members, friends and professionals with whom the defendant has had contact, as well as records generated throughout the defendant's life.  Records that should be pursued include birth, medical, academic, employment, social service agency involvement, military, mental health and legal documents (including juvenile and adult criminal charges as well as incarceration records).   This information allows for a sound explanation and insight into the

2

defendant's behavior as it documents his/her psychosocial and personality development over a lifetime.

8)     It is important that information obtained about the defendant and his/her family reflects as much generational family history as possible so that significant family patterns may be assessed in relation to the defendant and his/her functioning. Likewise, it is also important to explore potential cultural, ethnic and religious aspects of the defendant and his/her life, which may greatly impact the psychosocial understanding of his/her behavior.  Some additional areas to explore are mental retardation, mental illness, substance abuse, medical conditions and trauma.

9)     In developing data, all information must be covered.  The investigation must not be limited to simply "good" information about a defendant, but must address all aspects of a defendant's psychosocial development so that a thorough understanding of the defendant's behavior can be reached.  Limiting information to only positive data about the defendant does not provide for a cohesive, integrated explanation of the defendant's behavior.

10)    All of this information serves to explain the defendant's behavior in light of his/her psychosocial development and history.  This investigation is a separate obligation from the investigation of issues regarding guilt or innocence as it often reveals different information than the investigation regarding guilt or innocence.  A psychosocial investigation is a minimal standard that must be met for an effective mitigation presentation, whether at trial or at post conviction.

11)    Once all of this data is collected, it must then be presented to a licensed psychologist who can provide further insight and assessment of the defendant's

behavior to the defense attorneys.  This assists the attorneys in developing a cohesive and sound theory of mitigation that can then explain the defendant's behavior during his/her offense.    The psychologist can further assist the attorneys in directing the mitigation investigation as well as developing a cohesive theory of mitigation.

12)    The attorneys and mitigation investigators must assist the psychologist in identifying which, if any, tests that the psychologist should administer.  The psychologist ~~should~~ *may want to do* not administer to the defendant the MMPI, HAIRE or any projective testing. Such tests do not explain the factors which affected the defendant's development. These tests, instead, often give a negative diagnosis of the defendant.  For instance the results of the MMPI may demonstrate that the defendant is ant-social.  This will give the prosecutor an argument which he can use to support the imposition of the death penalty.  Instead the psychologist should take social history an identify the relevant factors which caused the defendant to develop the behavior qualities that he did.  Often a person who develops ant-social qualities will have had a dysfunctional childhood which is marked by tremendous neglect and abuse.  The psychologist should also conduct some preliminary testing to determine if the defendant suffers from brain impairment (brain damage).  The proper instrument for that is the Trail Making test and not the Bender Gestalt

13)    Since the United States Supreme Court declared that it is unconstitutional to execute the mentally retarded, the scope of the mitigation investigation has expanded.  Mental retardation now serves as an absolute bar to the execution of the mentally retarded.  The investigator must make sure that he obtains all prior intelligence testing of the defendant and evidence of impaired adaptive skills.  The defense team

4

also must make additional decisions concerning the psychological appropriate testing. If the defendant has prior IQ scores within the range of mental retardation, the team should advise the psychologist in most cases that she should not administer any additional IQ testing to the defendant.

14)    A cohesive, sound theory of mitigation must present a complete picture of the defendant over his/her lifetime so that the trier of fact can understand the defendant's behavior in light of his/her lifelong development.  A presentation of mitigation information cannot be limited to simply humanizing a client.  Although this is an important and necessary first step, information must also be presented that explains specific psychosocial strengths and weaknesses, which explain the defendant's behavior and level of personality integration.

15)    In those cases in which there is involvement of more than one person in the offense(s), the mitigation investigator must collect as much information as possible concerning the other individual(s).  The jury, if it is helpful to the defendant, must be informed concerning the interrelation of all of the accomplices.  This would include the identification of the dominant participant who may stand to gain the most from the commission of the offenses.  Often the more intelligent participant will conduct the planning and have the most to gain.  A defendant of lesser intellect, may be the principal offender, but not be the most culpable.  His participation may be aimed simply at pleasing another one of the other participantsl.

16)    The tasks required for a mitigation investigation, as described above, are extensive and extremely time-consuming.  Availability of records, ability to locate witnesses, interviews and resources can very greatly.  It is also a process that requires

patience and time to build a rapport with the defendant and his/her family, particularly those who are reluctant to cooperate.  Building a trusting relationship with those interviewed is a crucial step in obtaining complete and reliable information and is not something that automatically happens; repeated contacts and endless patience are essential.  A qualified mitigation expert should have –at a minimum- at least three months before the jury selection begins to conduct the investigation.

17)   Given the amount and variety of work involved in capital defense, the best approach to handling a capital defense is through a team approach.  In addition to the defense attorneys the "defense team" typically includes a psychologist, mitigation specialist, criminal investigator and other experts as needed.  The benefits of a team approach include increased efficiency, expanded knowledge, reduced duplication and increased support.

18)   In order for the team approach to be successful, effective communication among team members is essential.  Ultimately, problems with team communication can adversely effect the defense's presentation, which can lead to a death verdict.  As team leaders the attorneys hold the primary responsibility to establish and participate in effective team communication.

19)   To facilitate team communication ongoing team meetings, which include the attorneys, mitigation specialist, criminal investigator and often the psychologist and other experts, should be held throughout the pre-trial preparation.  These meetings should begin early on in the defense preparation to establish the objectives of the team as well as the duties each team member will be expected to perform. Team meetings

6

allow each member to share their information with the group, exchange ideas and provide input.

20)  Once the psychosocial investigation and psychological assessment is complete, the defense team should meet to brainstorm and strategize about the mitigation theory.  The planning and coordination of the mitigation strategy should occur well before voir dire.  The defense attorneys should include other team members in the discussion of mitigation strategy since the expertise that both the psychologist and the mitigation specialist have is invaluable in the development of a mitigation strategy.  The defense attorneys should utilize their experts and mitigation specialist as a resource in assisting to make strategy decisions.

21)  The defense attorneys should coordinate witness preparation of mitigation witnesses with the mitigation specialist and utilize the mitigation specialist to assist in this witness preparation.  Because of their expertise in mitigation, plus knowledge of the mitigation strategy and the potential witnesses, the mitigation specialist is in a unique position to assist in determining the mitigation witnesses as well as their testimony. The presence of the mitigation specialist during witness preparation can be beneficial to the attorneys by putting the lay witness at ease and in clarifying problem areas.  Also, while the attorneys are involved in the presentation of the mitigation theory to the court, the mitigation specialist can assist the attorneys by acting as liaison with the witnesses and coordinating the final preparations of the presentation.

Further Affiant sayeth naught.

DORIAN L. HALL, M.A., L.S.W.

7

Sworn to and subscribed before me this ___4th___ day of ___Jan___, 2003.

_____
NOTARY PUBLIC

Ronald L. P...
Atty - at - Law
Comm Non - expy

1

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                      DAYTON

5

6                      - - -

7   LAWRENCE LANDRUM,           :

8              Plaintiff,        :

9          Vs.                   :   Case No. C-196-641

10  BETTY MITCHELL,              :   Thursday, 9:00 a.m.

11             Defendant.        :   September 4, 2003

12                      - - -

13             EVIDENTIARY HEARING BEFORE

14             JUDGE MICHAEL R. MERZ

15                      - - -

16  APPEARANCES:

17       FOR THE PLAINTIFF:

18             Gerald W. Simmons, Esq.

19             Randall L. Porter, Esq.

20       FOR THE DEFENDANT:

21             Jonathan R. Fulkerson, Esq.

22             Michael L. Collyer, Esq.

23

24  COURT REPORTER:

25             Shandy Ehde, RPR

EXHIBIT
60

3

1               P R O C E E D I N G S

2            THURSDAY, SEPTEMBER 4, 2003

3                    9:00 A.M.

4        THE COURT:  Those of you who are in the

5   courtroom for the initial appearance in United States

6   versus Rodriguez Aguar matter, that matter is going to

7   be held as soon as we can obtain an interpreter, which

8   we do not yet have.

9            Given that, we're going to proceed with the

10  other matter, Case No. C-196-641, Lawrence Landrum

11  versus Betty Mitchell set for evidentiary hearing this

12  morning.

13            Is the petitioner ready to proceed?

14        MR. SIMMONS:  Yes, your Honor.

15        THE COURT:  And is the respondent ready to

16  proceed?

17        MR. COLLYER:  Yes, your Honor.

18        THE COURT:  Very well.  Mr. Simmons, you

19  may call your first witness.

20        MR. SIMMONS:  Yes, your Honor.  I'll call

21  Jill Miller.

22        MR. COLLYER:  We move for a separation of

23  witnesses.

24        THE COURT:  So ordered.

25                    JILL MILLER

4

1   witness herein, being first duly sworn, testified as

2   follows:

3                    DIRECT EXAMINATION

4   BY MR. SIMMONS:

5   Q.   Miss Miller, would you please tell Judge Merz

6   your name and address?

7   A.   Jill Miller, Madison, Wisconsin.

8   Q.   And what is your profession, Miss Miller?

9   A.   I'm a forensic social worker in private practice.

10  Q.   Would you look at Exhibit 6, please, in the book

11  that's before you?

12  A.   (Witness complied.)

13  Q.   What is Exhibit 6, Miss Miller?

14  A.   That's my resume.

15  Q.   And who prepared it?

16  A.   I did.

17  Q.   Is it accurate?

18  A.   It is.  I made one addition, I think, since I

19  sent this to you, which is a training I did in May of

20  this year in Albuquerque.

21  Q.   Is it complete?

22  A.   Yes.

23  Q.   Miss Miller, would you please tell the Court your

24  educational background?

25  A.   Yes.  I have a bachelor's and master's degrees in

5

1  social work, which I got from the University of

2  Wisconsin in Madison in 1967 and 1971.  I did also do

3  some doctorate work there.

4          THE COURT:   So a BSW and MSW?

5          THE WITNESS:   It's a BA major.

6  Q.   But no Ph.D?

7  A.   No, that's pretty much a research teaching

8  degree.

9  Q.   What did you do you in the way of -- I think you

10  said you did some work toward the Ph.D.  What did you

11  do in that regard?

12  A.   Three or four courses.  I don't remember which

13  ones right now.

14  Q.   All right.  What is your work history, Miss

15  Miller?  What have you done since getting your

16  degrees?

17  A.   Okay.  From 1967 to 1970, while I was a part-time

18  graduate school student, I did undergraduate social

19  work at the University of Wisconsin, Madison, where I

20  counseled students about their course requirements and

21  future plans and the sort of things that they needed

22  to do in getting their degree.

23          Following getting my master's degree, I

24  worked at the Legal Services Center of Dane County in

25  Madison from 1971 to '73, and at that time it was a

6

1    private nonprofit agency that had contracted to

2    provide representation in juvenile criminal matters,

3    and they also had a civil program.  I worked primarily

4    in the juvenile defender program and then supervised

5    students in the other programs.

6          In 1973 I joined the faculty of the School of

7    Social Work at the University of Wisconsin, where I

8    remained until 1985, although from 1976 to '78 I was

9    also the associate director of the Youth Policy and

10   Law Center, which was a private nonprofit agency

11   involved in juvenile justice policy issues in

12   Wisconsin.

13         In January of 1984 I went into private

14   practice.

15   Q.   Now what is the nature -- at that time, what was

16   the nature of your private practice?  And can you tell

17   the Court, please, how, if it progressed, how it

18   progressed from that point to the present?

19   A.   I actually had done some part-time private work

20   over the years before 1984 -- Oh, and I forgot a major

21   job actually that I had from 1979 to 1984.  I was the

22   Client Services Director at the Office of the State

23   Public Defender.  I was there under an arrangement

24   where the university can lend faculty people to state

25   government, and it was a newly created state public

7

1    defender so I set up and ran the social services of

2    that agency before going full time into private

3    practice.  Over the years I have done some private

4    cases, juvenile.

5    Q.    When you say you have done, I mean --

6    A.    Okay.

7    Q.    -- maybe we don't know what that means.  What

8    does that mean, to say you've done cases?

9    A.    I was retained by attorneys in matters like

10   juvenile cases.  Juvenile -- For example, a juvenile

11   waiver, where they're trying to waive someone, I'd

12   come in and do a history and assessment, and look at

13   information relevant to the question of waiver.

14         I did adult sentencing on behalf of

15   defendants, doing, you know, histories and sentencing

16   recommendations.  I worked on family matters, custody

17   disputes and divorces, mental commitments.  We had a

18   provision in our law that the prosecutor was

19   responsible for determining whether there were less

20   restrictive alternatives to mental commitment, and

21   actually the District Attorney's office hired me to

22   look into those cases and determine what the treatment

23   needs were of people, whether they could be met in the

24   community.

25         I did some guardianship cases.  Starting in

8

1    1984, I worked primarily on adult criminal sentencing

2    cases, juvenile cases, and a few family matters.

3    Q.    Do you have any licenses of any kind?

4    A.    Yes.  I'm a licensed clinical social worker in

5    the State of Wisconsin.

6    Q.    Now I think you were talking, and perhaps you

7    concluded in the late '70's or something.  Go on from

8    that point and just give the Court a general idea of

9    the type of work you've done since that time.

10   A.    Okay.  Well, I had talked a little bit about the

11   beginning of my private practice, the type of cases.

12   In 1986 I took my first capital case, which was a

13   post-conviction case in Illinois.  Over the years my

14   practice evolved to the point that in recent years

15   it's been totally capital work.

16   Q.    And so over what period of time have you been

17   involved in capital cases?

18   A.    Since 1986.

19   Q.    Now --

20         THE COURT:    But when did it become

21   exclusively capital work?

22         THE WITNESS:    Certainly, for the most part,

23   the last 10 years I might have occasionally done a

24   sentencing case, but I haven't for several years now.

25         THE COURT:    Okay.

9

1    Q.    Have you in your practice had occasion to testify

2    in court?

3    A.    Yes.

4    Q.    Could you please tell his Honor what your

5    experience has been in that regard?

6    A.    In all types of cases?

7    Q.    Well, let's start with all types and maybe break

8    it down into more relevant subcategories.

9    A.    I mean I started out in juvenile court and

10   testified --

11   Q.    I'm talking about capital.  I think we're -- I

12   mean to suggest capital cases, start with that and

13   just give the Court what you've done.

14   A.    This is my 30th time testifying in a capital

15   matter.

16   Q.    Have you testified as an expert witness?

17   A.    Yes.

18   Q.    As an expert witness --

19   A.    Yes.

20   Q.    -- in all of those cases?

21   A.    Yes.

22   Q.    Okay.  Now can you be a little more specific in

23   types of capital cases in terms of what types of

24   courts and matters, that sort of thing?

25   A.    I have testified in state trial cases 10 times,

10

1    in state court conviction cases 11 times, six times in

2    federal trials, one federal habeas and one military

3    trial level.

4              THE COURT:   Just a second.  Six times in

5    federal trials at the trial level when the court was

6    determining guilt and punishment under a federal

7    capital sentencing scheme?

8              THE WITNESS:   Yes.  Five of those in the

9    penalty phase, and one actually in the guilt phase

10   where mental state was an issue.

11             THE COURT:   All right.  Thank you.  Sir --

12             MR. SIMMONS:   Excuse me, your Honor?

13             THE COURT:   I'm sorry, I will interrupt one

14   more time.  Excuse me.

15             So this is your second time to testify in a

16   federal habeas proceeding?

17             THE WITNESS:   Yes.

18             THE COURT:   Okay.  Go ahead, sir.

19   Q.   Is the nature of the testimony that you're

20   supposed to give here today similar to the types of

21   testimony that you've given in these other cases?

22   A.   Yes.

23   Q.   And just in a general way, could you tell the

24   Court the type of testimony you propose to give here

25   and how it is similar or dissimilar to the other types

1   of testimony you've given?

2   A.   It's general social history information.  Some

3   assessment of the significance of some of those

4   factors, and then in post-conviction proceedings, that

5   I have also testified about the original penalty phase

6   and what were some of the problems in the preparation

7   and presentation of that in that penalty phase.

8   Q.   Okay.  So you've done that, did you say, in

9   federal court about a half a dozen times?

10  A.   In federal trials I've testified on social

11  history and psychosocial assessment.

12  Q.   Okay.  And is what you're planning to testify to

13  today rather similar to what you have testified to in

14  those cases in terms of approach?

15  A.   Yes.

16  Q.   Methodology?

17  A.   (Witness nodded.)

18  Q.   And nature of the opinions you're going to give?

19  A.   Yes.

20  Q.   Okay.  Do you have any professional memberships?

21  A.   Yes.  I'm a member of the American Academy of

22  Experts in Traumatic Stress, the National Association

23  of Sentencing Advocates and the National Legal Aid &

24  Defender Association.

25  Q.   Have you received any awards from any

12

1  organizations of this type?

2  A.  Yes.  In 2000 I received the "Life in the

3  Balance" Achievement Award, an award given by the

4  National Legal Aid & Defender Association for capital

5  defense representation.  And in 1999 I received the

6  "Outstanding Contributions to the Profession," Award

7  from the National Association of Sentencing Advocates.

8  Q.  What professional services have you rendered?

9  A.  Primarily training.  I have done a lot of

10  training over the years.  I trained probably several

11  times a year at national, state and local programs,

12  primarily on capital defense.  I started out training

13  in the juvenile area, and then adult sentencing.  In

14  the last few years, my training has primarily focused

15  on capital work.

16  Q.  Have you trained attorneys?

17  A.  Yes.

18  Q.  Could you give the Court an example of that?

19  ·A.  Well, I train annually at Life in the Balance, a

20  capital seminar put on by the National Legal Aid &

21  Defender Association.  I've trained at the annual

22  training done by the National Association of Criminal

23  Defense Lawyers, and the NAACP Legal Defense Fund

24  Capital Punishment Seminar, once at the ABA, and then

25  state programs have, I come in and do training for

13

1    their attorneys.

2    Q.   You mentioned the ABA.  Have you had any

3    involvement with the development of guidelines by the

4    ABA?

5    A.   Yes.

6    Q.   And would you tell the Court what that was,

7    please?

8    A.   Well, initially I was involved with "Guidelines

9    for the Appointment and Performance of Counsel in

10   Capital Cases" that were developed by the National

11   Legal Aid & Defenders Association in 1987.  Those were

12   then adopted by the ABA in, I believe, 1989.  More

13   recently the ABA has revised an update of their

14   guidelines and I consulted on that project last year,

15   and the ABA adopted those guidelines in February.

16   Q.   Have you done any publications, written any

17   papers, articles of that kind?

18   A.   Yes.

19   Q.   Tell the Court, please.

20   A.   Well, in the '70's I wrote an article that was

21   published in the Journal of Education for Social Work

22   titled "Teaching Law and Legal Skills to Social

23   Workers."  Then I've done a number of newsletter

24   articles over the years, but more recently I have an

25   article coming out in the Hofstra Law Review in

14

1    October on "The Defense Team in Capital Cases."  It's

2    part of an issue that's going to be devoted to the ABA

3    Guidelines.

4              THE COURT:  In October?

5              THE WITNESS:   Yes.  And they're doing a

6    symposium in late October to sort of present this

7    issue on the new guidelines.  I'll be speaking at

8    that.

9    Q.   Okay.  Have you received any grants in connection

10   with your work?

11   A.   My grant work was really earlier in my career.  I

12   wrote many grants beginning when I was at the Legal

13   Services Center of Dane County.  The large grants were

14   to establish the Youth Policy and Law Center.

15   Q.   Are there any other activities that you think

16   would be interesting or significant to the Court that

17   you have engaged in that might bear on your expertise

18   as a witness in the area you're going to testify to

19   today?

20   A.   Just I would say my work as a faculty member and

21   in the School of Social Work was to train students in

22   social work methods and supervise them in field

23   placements that were in legal settings.

24   Q.   How do you characterize what you do?  Is there a

25   name for it?

15

1    A.    Forensic social work.  The word forensic when

2    it's in front of another profession just means that

3    you use the skills and expertise of your profession in

4    the resolution of legal matters, so I just work

5    primarily or entirely in court cases.

6    Q.    All right.  I'd like to ask you to tell the Court

7    in general what is an -- Is the term "mitigation

8    specialist" familiar to you?

9    A.    Yes.

10    Q.    What does that mean in your view?

11    A.    It's a generic term that applies to people who

12    assist attorneys in capital cases by doing a number of

13    things.  The primary role of the mitigation

14    specialist -- and people come to this job with a

15    variety of educational backgrounds.  I think social

16    work is the most common, but some have other types of

17    educational backgrounds.  The primary role is to do

18    the social history investigation which is so critical

19    in a case and really the foundation of so many other

20    decisions that have to take place in a capital case.

21          They also, you know, assist with, you know,

22    working with the client and their family, helping to

23    identify potential witnesses, developing the themes

24    and strategy for the case.  Another key role is to

25    assist in identifying the need for other expert

16

1    assessments and then providing that social history

2    information that the other mental health experts need

3    in order to do competent evaluations.

4    Q.    Do you regard yourself as an expert in this area?

5    A.    Yes.

6    Q.    Is this the nature of the testimony that you have

7    given in these federal cases that you have previously

8    described?

9    A.    Yes.

10   Q.    Again speaking rather generally, I would like

11   you, if you could, to tell the Court what are the

12   types of -- let's say you come into a case initially

13   and you're brand new.  What is your methodology, what

14   is your approach to your work in general?

15   A.    You know, I start by asking the attorney for some

16   information about the case, what they know about the

17   client, the facts of the case, to send me whatever

18   records and reports they have related to the offense

19   in this case itself, and if they have any prior

20   history, to send me that.  If they've gotten any

21   information about the client, to send that so that I

22   have a little information to begin with.

23          I then would meet the client.  That's one of

24   the first things to do, and try to get a sense, one,

25   of their functioning at the time, and then to begin to

17

1    get the background information that I need.  So you

2    know, the first meeting is generally very long,

3    getting a lot of social history information.

4         But the other thing you need to do early on

5    then is identify all the records that you need to

6    collect and other collateral sources of information so

7    you can begin to develop a sense of, where do I need

8    to go to learn as much as I can about the life history

9    of this person.  So then we start to collect records.

10        I will then do other interviews.  You know,

11   each thing that you do leads you to someplace else.

12   So records will have names in them, and I'll go find

13   those people.

14        When I do interviews with family or others,

15   information comes out that I need to go back and talk

16   to the client about to explore further.

17        You know, it requires multiple visits with

18   some people because you need to develop a relationship

19   of trust and confidence with people so that they will

20   disclose sometimes very private and very sensitive and

21   shameful information.

22        The other thing I do early on as I'm

23   collecting this information is kind of analyze it to

24   see, are there some issues here that would indicate

25   the need for other experts to come in and evaluate the

18

1   client.

2   Q.   Miss Miller, I would like you to look at Exhibit

3   3, please.

4   A.   (Witness complied.)

5   Q.   Could you just tell the Court what Exhibit 3 is?

6   A.   That is an affidavit that I prepared in this

7   case.

8           THE COURT:   I note for the record that the

9   copy that I have has a copy of an exhibit tag 4 in the

10  lower right-hand corner.  Would you look at the lower

11  right-hand corner and see if that's --

12          THE WITNESS:   Yes.

13          THE COURT:   All right.

14  Q.   And this, I take it, was submitted in the

15  post-conviction state court proceeding?

16  A.   Yes.

17  Q.   And if you would look, Miss Miller, please, at

18  paragraphs 9, 10 and 11.  Are these the kind of

19  records that you would have been asking for and

20  looking for in a normal investigation of the type you

21  described?

22  A.   Yes.

23  Q.   All right.  Now is there in your view an issue

24  related to the timing of these kind of activities,

25  when they should occur?  And if so, would you just

19

1    describe that to the Court?

2    A.   Okay.   Absolutely an issue.   These kinds of

3    things need to be done early in the case and well in

4    advance of trial for a number of reasons.

5         One, you really need to understand the

6    functioning of your client.   There may be issues

7    related to mental state or competency, or just their

8    ability to relate to counsel and work with them in the

9    case.

10        There may be a need for other experts, and

11   for them to do their evaluations they require good,

12   documented and accurate social history information.

13        So you need to have that pulled together in

14   advance of having the experts do their assessments.

15   You need to have this information in order to develop

16   your trial strategy, to select the jury.

17        It's also used sometimes to try to work out

18   negotiated settlements of cases.   So for a number of

19   reasons you need to get this information early, and

20   again to be sure that the strategy that's developed

21   for trial is coordinated in terms of guilt phase and

22   penalty phase, and that you know in advance of trial

23   what that penalty phase strategy is going to be.

24        MR. COLLYER:   Your Honor, at this point we

25   would like to renew our objection to Miss Miller's

20

1      testimony as an expert witness, as we did in our

2      written objections.  If you would permit we would

3      like to ask a few brief questions to voir dire here

4      on the qualifications.

5              THE COURT:  Have you finished with your

6      qualifications?

7              MR. SIMMONS:  Yes, your Honor.

8              THE COURT:  Very well.  I'll permit the

9      voir dire now.

10                     VOIR DIRE EXAMINATION

11     BY MR. COLLYER:

12     Q.   Good morning, Miss Miller.

13     A.   Good morning.

14     Q.   You testified you started working on your first

15     death penalty case in 1986?

16     A.   Yes.

17     Q.   Okay.  Do you remember when in 1986 that was?

18     A.   I think in the fall.

19     Q.   Okay.  What types of training did you have before

20     the fall of 1986 to work on a capital case?

21     A.   I had been to trainings in the National Legal Aid

22     & Defenders Association.

23     Q.   Were these seminars that you attended, were these

24     national seminars that you attended?

25     A.   Yes.

21

1    Q.   Do you remember the titles of them?

2    A.   It would be their annual training conference.

3    Q.   And these were specifically for death penalty

4    cases?

5    A.   No.  It was an annual conference that had

6    sessions related to death penalty.

7    Q.   Did you have any training in Ohio for death

8    penalty mitigation investigation?

9    A.   No.

10    Q.   Are you familiar with when Ohio had their death

11    penalty law put on the books?

12    A.   I'm thinking it was 1980 or '81.  It wasn't one

13    of the first ones, I think, in the '70's.

14    Q.   Was there a national standard that was in place

15    at that point in time to govern all mitigation

16    specialists throughout the country?

17    A.   No.

18    Q.   So it varied?

19        THE COURT:   "At that time" meaning 1980?

20        MR. COLLYER:    I'll do both.

21    Q.   In 1981 was there a national standard?

22    A.   No.

23    Q.   How about by March of 1986?

24    A.   There was not a national standard per se, but I

25    think in the community in terms of training programs,

22

1    trial manuals and then looking at court decisions from

2    the Supreme Court, a general sense of what was

3    necessary to properly prepare.

4    Q.   Are you familiar with any training programs or

5    publications that existed in Ohio before March of 1986

6    governing how a mitigation specialist would perform in

7    a capital case?

8    A.   No.  And I have seen some newsletter articles

9    written by some people in Ohio, but I don't recall the

10   date.  It would have been in the '80's, but I can't

11   say if it was before '86.

12   Q.   Okay.  Are you familiar with any experts in the

13   field in Ohio who did mitigation specialist work

14   before March of 1986?

15   A.   Yes.

16   Q.   Who would those be?

17   A.   Susan Shore, Jane Core.  I'm trying to remember.

18   Debra Starkey was doing it, and I don't recall, you

19   know, when.  I don't know when Martha Jacoby or

20   Michael Curtis began, but I know they were working in

21   the '80's.

22   Q.   Now I think you identified three factors that you

23   would be giving expert testimony on, and let me know

24   if I have stated this correctly.  General social

25   history that's necessary in a capital case, is that

23

1    one of them?

2    A.    Yes.

3    Q.    The other is the significance of the factors that

4    would be developed in the social history?

5    A.    Yes.

6    Q.    And then also the problems in the preparation and

7    presentation in a penalty phase trial?

8    A.    Right.

9    Q.    Okay.  Now do you have a theory that you applied

10   to each of these three factors that will be tested?

11   A.    I'm not sure what you mean.

12   Q.    Well, I'm looking for your methodology in

13   determining as an expert witness your ultimate

14   conclusion on each of these three factors, what type

15   of a theory you applied to these three factors?

16   A.    Well, I think my affidavit lays out what is

17   necessary to do in a social history investigation,

18   describes the nature and scope of a competent social

19   history investigation.  So I look at what was done

20   relative to what ought to be done to do a thorough and

21   competent social history investigation.  And then look

22   at that information in terms of understanding the

23   significance of developmental factors and experiences

24   in someone's life, how they influence behavior,

25   personality.  In terms of analyzing, you know, what

24

1    was done at trial, I compare what was done to the

2    social history, and then, did people, you know,

3    understand, pick up on significant factors, develop

4    that and present it.

5    Q.    Now these list of factors that you have in your

6    affidavit, the things that you're looking for in

7    evaluating this case, are those types of factors

8    subjected to peer review in your community of

9    mitigation specialists?  I mean are these factors that

10   you list ones that appear in publications that other

11   experts in your field evaluate to determine whether

12   they agree with that or not?

13   A.    I'm not sure what you mean, but they're not in --

14   I don't know the articles.  There are a number of

15   people, myself included, who have developed sort of

16   affidavits, articles that are used as training

17   handouts that talk about what you need to do to do a

18   competent social history, so that a number of us

19   who -- we're actually right now working on pulling

20   them all together because of the great need for more

21   trial mitigation specialists.

22          THE COURT:   Let me back up a little bit and

23   see if I can assist my own understanding of where this

24   is going.  The notion of a social history as the work

25   product of a social worker is not something limited to

1   either forensic social work or capital forensic social

2   work, is it?

3          THE WITNESS:   No.  Absolutely not.

4          THE COURT:   So in your experience both as a

5   licensed social worker and as a faculty member in

6   doing social work, teaching, are there standards that

7   apply to the preparation of social histories that

8   would be generally accepted in the field of social

9   work, to put it perhaps --

10         THE WITNESS:   I don't know if it's sort of

11  written up.

12         THE COURT:   Put it perhaps colloquially, are

13  there textbooks?

14         THE WITNESS:   There are books.

15         THE COURT:   Textbooks?

16         THE WITNESS:   Books that talk about social

17  work methods.  When I taught methods, I didn't use a

18  single textbook, I used a lot of articles and

19  materials.

20         THE COURT:   One would expect no less of

21  someone teaching at the University of Wisconsin.

22         THE WITNESS:   In methods you teach, you

23  know, to be able to treat clients, which social

24  workers do, you first have to understand their history

25  and identify their problems and treatment needs.

26

1    That's really what I taught in methods.  And

2    fieldwork, how do you collect information, how do you

3    analyze information, how do you use it to figure out

4    treatment and rehabilitation needs, how do you set up

5    a plan for services, how do you deliver services.  It

6    all really derives from knowing the history and

7    circumstances of your client, so it's basic.  I've

8    been doing social histories since I started in

9    juvenile court in 1971.

10              THE COURT:   But as you said previously, that

11   would also be a matter of -- the preparation of a

12   social history would be something that would be done

13   by folks who were doing social work other than

14   forensic social work?

15              THE WITNESS:   Oh, yes.  You know, the county

16   social service agency which is -- most people know as

17   the most common social work agency, is doing child

18   welfare and family services, they need social history

19   information to help their clients.  In hospitals they

20   do it.  Mental hospitals of course routinely do social

21   histories to get a sense of the mental health issues

22   on a patient's, you know, life, and figure out

23   treatment plans.  So it's really a part of the social

24   work profession.

25              THE COURT:   Back to you, Mr. Collyer.

27

1    BY MR. COLLYER:

2    Q.    Now when you testified, though, that mitigation

3    specialists can come from a variety of different types

4    of background.  What types of background besides

5    social work do those specialists come from?

6    A.    There are people practicing -- there are lawyers

7    that decided they would rather be mitigation

8    specialists and then they go to trainings to learn how

9    to do that.  People with criminal justice backgrounds.

10   You know, one of the top people in the country has an

11   anthropology degree.  I know someone with a journalism

12   degree.  But all of them have gotten a lot of training

13   working in agency settings.

14   Q.    So there's no list of qualifications then to be a

15   mitigation specialist?

16   A.    Not per se.  It's more an understanding of the

17   kind of skills one needs in order to do the work.  And

18   there are people who are mitigation specialists and

19   have the information-gathering skills but don't have

20   the educational training to do the psychosocial

21   assessment component, so there are different models of

22   how you do it, so if they don't have that training,

23   like I'm a licensed clinical social worker that can do

24   that, they would then bring someone else in that they

25   would provide the information to who would make the

28

1   assessment.  And that I think has been typically

2   what's been done in Ohio where the mitigation

3   specialist collects the information, though they

4   understand indicators of key things they bring in a

5   psychologist very often to work with them.

6   Q.    Now would you agree that the practice of

7   mitigation specialist has developed since you first

8   became involved in the fall of 1986 to where you are

9   today?

10  A.    But starting before then, I actually did, which I

11  don't have, just a standard of care memorandum for a

12  post-conviction case in New Jersey where I, you know,

13  went through the history of the development.  There

14  were actually people doing mitigation work actually in

15  the '70's before the Furman and Gregg decision, and

16  then starting again after, so it's evolved.

17          MR. COLLYER:  Your Honor, I think at this

18  point that's sufficient for my voir dire.

19          THE COURT:  All right.

20          MR. COLLYER:  I could -- I would just make

21  my objection to her qualifications as an expert

22  witness on two principal grounds.  One is a temporal

23  ground, that she is giving testimony today as the

24  standards that would be in place for this particular

25  case, which would be the end of 1985 up to and

29

1    including March of 1986, and I don't think that

2    she's qualified to give testimony as to that time

3    period what standards were in place for mitigation

4    specialists.  And then also specifically as to what

5    standards were in place in Ohio.

6         Going to the thing -- the three areas what

7    she proposes to give testimony on, I don't have an

8    objection to testimony as to what a social history

9    is, and as an expert witness, what types of things

10   were done in the social history, but as to the

11   significance of the factors for penalty phase

12   preparation of what's developed in the social

13   history as to the problems of preparation of

14   presentation at the penalty phase of a trial, I

15   don't think this witness is qualified to give that

16   kind of testimony.

17        THE COURT:   Thank you, sir.  The testimony

18   will be taken subsequent to the objection.

19        DIRECT EXAMINATION (Continued)

20   BY MR. SIMMONS:

21   Q.   Miss Miller, we were looking, I believe, at

22   Exhibit 3, and there is -- Excuse me, I may not

23   recall, but have you stated generally what Exhibit 3

24   is?

25        THE COURT:   Yes, she has.

30

1          MR. SIMMONS:    Okay.

2     Q.   And there's an Exhibit B to Exhibit 3.  Would you

3     tell the Court, please, what that is?

4     A.   I believe it's my report regarding findings in my

5     social history.

6     Q.   Okay.  This is, it says "Confidential

7     Memorandum."  It's dated April 24, 1996.

8     A.   Yes.

9     Q.   Okay.  And just could you please tell the Court

10    in a bit more detail how you came to prepare this and

11    what it is and what its significance is in your view?

12    A.   How I came to -- I initially was brought into

13    this case in 1991 just to review the trial record and

14    comment on the social history that was done and the

15    advocacy of that preparation at the time of trial.  I

16    subsequent to that was asked in 1993, I believe, to do

17    the actual social history that I believe should have

18    been done, you know, prior to trial.

19    Q.   Now just so -- excuse me for interrupting.

20    Exhibit 3 is what you think should have been done?

21    A.   That's correct.

22    Q.   Go ahead.

23    A.   And even that, there are a number of people that

24    haven't been interviewed, but it was much more

25    extensive than what was done at the time in 1986.

31

1    Q.    All right.  Now what -- Could you tell the Court,

2    please, what your opinion is of what was done in 1996

3    in regards to mitigation?

4    A.    Well, it was a very, very incomplete social

5    history so it failed to uncover and develop many key

6    factors in Larry Landrum's life, and it was done way

7    too late to provide the attorneys with what they

8    needed to develop a strategy and presentation.

9    Q.    I don't know if it would help you or not, but you

10   certainly are welcome, I'm sure, to glance at your

11   affidavit if it would assist you, but I would like, if

12   you could, to be a little bit more specific with the

13   Court as to the inadequacies that you feel exist in

14   the mitigation work that was done in the original

15   trial.

16   A.    Well, first of all they didn't really begin to

17   work on the case until January 22nd of 1986 with a

18   February 10th trial date, and that's just -- all they

19   did then really was interview the client at that

20   point.  There were some other interviews, I believe,

21   that occurred on February 3rd.  Most of the work was

22   done after the guilt phase of the trial, which makes

23   it, of course, impossible to know the penalty phase

24   strategy and incorporate it into jury selection and

25   case strategy.

32

1          And with the time limits, and I understand

2     they had to have a caseload on other cases, there were

3     just very many things that weren't done, records that

4     weren't pursued, people that weren't interviewed.

5          There were things that they obtained that

6     simply weren't developed.  For example, the Upham Hall

7     records had very, very significant information in

8     them, and none of that information -- that information

9     really wasn't developed and presented.  I don't

10    believe they got those records until well into

11    February, so that was quite late.

12         The interviews that were done, there was a

13    lot of information that wasn't obtained in them that I

14    obtained in later interviews.  Some of them were done

15    as group interviews, and that's simply not a way to

16    get people to talk openly about difficult things in

17    their family, when they're sitting around with other

18    family members.  So the methods of getting the

19    information I thought were not appropriate, either, so

20    I mean it sort of violated almost every standard of

21    how you would go about conducting a thorough and

22    proper social history.  It was just very incomplete.

23    And then no one really even took what was there that

24    indicated some significant issues and developed them.

25    Q.    Could you be -- You described, I think, how you

33

1    feel about the methodology or the procedure that was

2    employed.  Could you be specific with the Court on

3    some of the things that you discovered that you think

4    were significant that were not uncovered and not

5    presented in the original trial?

6    A.    Well, some -- First I'll talk about some things

7    that there were some indications of depression.  In

8    particular I think in the Upham Hall records there

9    were clear indications --

10          THE COURT:   U-p-h-a-m Hall.  If I recall

11   correctly, Upham Hall is an agency of Ohio State

12   University.

13          THE WITNESS:   It was connected to the

14   University Hospitals but it was a psychiatric

15   treatment program for juveniles.

16          MR. SIMMONS:   All right.

17   Q.    You were in the process, I think, of

18   describing -- you covered Upham Hall, you were in the

19   process of describing some specific points that you

20   uncovered that you thought were significant.  Would

21   you just go on with that?

22   A.    There were clear indications that Larry suffered

23   from depression, that he had suicidal ideation, very

24   clear indications of his adopted father being abusive

25   to him.  He was afraid of him.  Even the father

34

1    admitted to becoming violent.  That was significant.

2            There were indications of sexual issues that

3    might lead one to explore the possibility of childhood

4    sexual abuse.  There were certainly clear indications

5    of a substance abuse problem by this time.

6    Q.   Now okay, I don't mean to interrupt, but the

7    first three or four points you made up to the

8    substance abuse, were those points that were uncovered

9    in the original report and/or presented at the

10   original trial, those first three or four items that

11   you just mentioned?

12   A.   No.

13   Q.   All right.  Now of course there was some

14   discussion at the trial of substance abuse?

15   A.   Oh, certainly, and there was a mention that he

16   had been to Upham Hall.

17   Q.   Okay.  Now you also mentioned something about

18   sexual -- you said something about sexual abuse.  What

19   did you uncover in that regard, please?

20   A.   There were two things in the Upham Hall records.

21   One was the testing that indicated problems with what

22   they called sexual differentiation.  To me that's sort

23   of a red flag that you quickly want to know what is

24   that about, did something happen in early childhood,

25   particularly when you have it in combination with

35

1    early substance abuse.  When people start to abuse

2    substances fairly early, like in childhood, usually

3    there's some underlying reasonableness to trauma of

4    some sort that leads to that.  So the two of those

5    together.

6              And there was an incident right before he was

7    discharged in which he exposed himself to a staff

8    member.  He clearly from the records was experiencing

9    extreme anxiety about going home and that clearly came

10   through in the records, and again to me would have

11   been a real red flag to pursue why was he so afraid of

12   going home.

13             THE COURT:   Excuse me.  I'm going to

14   apologize for interrupting the flow of testimony.  You

15   needn't step down but we have a half a dozen people

16   that have been waiting on this initial appearance and

17   I want to take care of that, so if you'll pardon the

18   interruption.

19                          (Whereupon another matter was

20                          taken up by the court.)

21                     *    *    *    *    *

22             THE COURT:   Mr. Simmons, you may resume.

23             MR. SIMMONS:   Thank you.

24   BY MR. SIMMONS:

25   Q.   Miss Miller, I was asking you to be a little

36

1    clearer if possible on this sexual abuse point to be

2    made.  What, if anything, beyond what you have

3    already said, did you discover in your investigation

4    in that regard?

5    A.    I learned from an older female cousin who

6    volunteered to me that she had indeed sexually

7    molested both Larry and another cousin who were

8    living in the household.  This household which I

9    haven't described yet, but is described in all the

10   records, is a very large, multi-generational

11   household in Sault Ste. Marie, where there were 15

12   children in the family and many of them came home or

13   lived at home with their own children, so at times

14   there were 20 or more people in the household.  And

15   so this is where this occurred.  In fact this person

16   who admitted to me being the perpetrator had herself

17   been victimized by an older uncle in this same home.

18   Q.    About how old was Larry when this happened?

19   A.    About four or five.

20   Q.    Now --

21          THE COURT:   One incident or many?

22          THE WITNESS:   More than one.  Probably not

23   many.  A few.

24   Q.    Now was that ever brought out in the original

25   trial or the mitigation phase?

37

1    A.   No.

2    Q.   In connection with that comment, you talked about

3    the family but I think that's worth a separate

4    discussion, if you don't mind, aside from the sexual

5    abuse part of it.

6        Could you describe to the Court, please, what you

7    discovered about the family situation when Mr. Landrum

8    was a young boy in Sault Ste. Marie?

9        THE COURT:  Now before you do that I will

10    tell you that I have read your affidavit very

11    carefully and so I would invite you to -- you needn't

12    recite it, but feel free to emphasize the things you

13    think are most important.

14        THE WITNESS:  Right.

15    A.   I think the most important thing was, because the

16    social history was incomplete and inadequate, his

17    family was portrayed in a way that really wasn't

18    accurate.  I think it was partially accurate, but

19    portrayed as this very positive, large and loving,

20    wonderful, warm environment.  In some ways it was, but

21    in other ways there were some very significant things

22    going on that I believe had an impact on Larry.  And

23    certainly the sexual abuse is one of them.

24        The other is that this is a family of,

25    multiple-generational family with a history of alcohol

38

1   and drug problems, and you know, when I have a client

2   who has a substance abuse problem I want to know that

3   family history because we know that there can be a

4   genetic predisposition.  So I wanted that information

5   and asked it, and found that at least eight of the

6   aunts and uncles had alcohol and/or drug problems, and

7   maybe more, because there were a couple not living in

8   Sault Ste. Marie.

9       The paternal grandfather had problems.  There

10  certainly was a family history of that, and it was

11  going on in the household when Larry was in the

12  household.  There were lots of people in and out of

13  that household who had drugs, and I think one of the

14  things that struck me was, I think, the relative

15  uninvolvement of his mother in his early care.  She

16  was working and she was, you know, 18, 19, 20, so she

17  was out socializing.

18      He had many different caregivers and that's

19  really not ideal for a young child.  But the primary

20  caregiver really was his grandmother to whom I think

21  he became most attached so that her death in 1968 when

22  he was, you know, six or seven, because I'm not sure

23  of the month, was a very significant loss for him.

24  Q.   Was that at all alluded to in the original

25  reports or the trial?

39

A.    No.   There may have been a brief mention of her

death, but not really talking about these other things

in the household.

Q.   Was there significance in your investigation in

his relationship with his father, and could you --

stepfather, and could you please discuss that in the

context of how the situation was actually presented in

the mitigation phase at trial?

A.    Well, it was presented that there was what they

called inconsistent discipline, you know, but why that

was significant wasn't explained.   It was sort of

inaccurately presented in that it was presented that

June was, you know, the stricter parent, and Dick

Landrum was the lenient one who sort of undermined her

discipline.   Indeed I think she was probably a harsh

disciplinarian and they seemed to believe that, but

her discipline at least related to infractions on

Larry's part and was predictable if you did something

wrong.

Dick on the other hand, and particularly

after he came back from Korea, was described as very

moody and volatile and explosive and exhibited

unpredictable violence to the level of where it was

abusive with Larry.   And not only is the abuse

significant, but the unpredictability of it for a

40

1   child, because then they don't know what can set a

2   parent off, and they sort of -- it creates a lot of

3   anxiety in a child.

4            It's clear, you know, and it was mentioned

5   that he had lots of run-aways, for example.  Well,

6   run-aways are not really run-aways if they're actions

7   to avoid abuse, and that's what they were on Larry's

8   part.  And that was never explained. Basically when he

9   would not go home, it was because he was afraid of his

10  stepfather, who then became his adopted father, and

11  afraid of being beaten.

12  Q.   Was there any significance in your investigation

13  in the move from Sault Ste. Marie to Chillicothe and

14  when it occurred in terms of his development?

15  A.   It occurred just as he had turned five years old,

16  and actually his mother went ahead without him.  One

17  of the other things that struck me about that move,

18  and then again looking at some things in the Upham

19  Hall records, were sort of what it said about Dick

20  Landrum, who apparently insisted, even though he was

21  going to be overseas in Korea, that his wife go to

22  live with his family, who she had never met, and then

23  his later described as being very restrictive of June

24  and not allowing her to do things outside the home,

25  which says to me something about his level of need for

41

1    control, his anger, his possessiveness, you know,

2    which really wasn't developed.

3         For Larry that was a significant move because

4    really he had not had that close of a relationship

5    with his mother in the home he was growing up in,

6    which was a large, you know, family.  So he went to

7    this family of virtual strangers, and apparently both

8    to Dorothy Landrum and June, things were very

9    uncomfortable in that house.  June didn't feel

10   accepted by Dorothy who later became his adopted

11   grandmother.  She would leave the room when June came

12   into it.  There was a level of tension in that home

13   which I think would be difficult for a young child,

14   and moves are always difficult for children when they

15   have to change schools and try to make new friends, so

16   it was a difficult transition for him.

17   Q.   And were these subjects developed by the original

18   investigation?

19   A.   No.  There was a brief mention that the move was

20   hard, but more because he was leaving what they

21   described as this wonderful family situation, you

22   know, which actually had its own set of problems.  So

23   it was alluded to, but again talking about how did

24   that affect Larry, how might it have contributed to

25   the depression, low self-esteem he suffers from, how

42

1    did that contribute eventually to using substances as

2    a way to self-medicate --

3    Q.   Could you just tell the Court in general your

4    evaluation, opinion of the mitigation presentation in

5    Larry's original trial?

6    A.   Well, it was --

7              MR. COLLYER:   Objection, your Honor.

8              THE COURT:   Under advisement.  Go ahead.

9    A.   It was very, very weak and ineffective, and

10   actually inaccurate in many of it's assertions.

11   Some of the assertions the mitigators tried to argue

12   actually were correct, but they didn't put on any

13   evidence to support them.

14             THE COURT:   Spell that out a little bit

15   more, please.

16             THE WITNESS:   Yes.  For example, they

17   talked about youthfulness.

18             THE COURT:   I'm sorry?

19             THE WITNESS:   Youthfulness.  As a

20   mitigator in my experience, and I, you know, I've

21   done a number of cases where this was an issue, and

22   also trained on it.  For youthfulness to be viewed

23   as mitigating jurors have to understand why it's

24   mitigating, and we've made it mitigating because we

25   understand that.

43

1          THE COURT:    "We" meaning the legislature?

2          THE WITNESS:    The legislature, the public,

3     those of us in the human service professions that

4     children, that there are behaviors that young people

5     engage in that are a product of that age and stage

6     in life, a product of immaturity.  They are

7     impulsive, they don't think past their nose, they

8     don't anticipate consequences.  But they mature out

9     of it.  So how we evaluate their culpability as it

10    relates to punishment is knowing these are behaviors

11    at a stage in life people will grow out of, so you

12    have to understand why it's mitigating.

13          Then you have to understand about Larry in

14    particular, you know.  And one of the arguments that

15    was made by the prosecution was that he was mature

16    because he had been in the Navy and had children.

17    Well, we know that doesn't necessarily make people

18    mature because they managed to do that.  In fact,

19    having children out of wedlock that young is

20    probably an example of immaturity.

21          But there are many ways in which Larry was

22    very socially and emotionally delayed and immature

23    that many people I talked to, you know, described to

24    me, and none of that was presented, so that the jury

25    couldn't really give any weight to that factor.

44

1    They didn't understand why it's mitigating and

2    didn't know the ways in which Larry was very

3    immature for his age.  And the fact that he was

4    involved with 15- and 16-year-olds as friends would

5    be one indicator, but they got, you know, nothing

6    else on that.

7             They also argued what we call skipper

8    evidence, which is his ability to make an adjustment

9    to incarceration, but again put on no evidence to

10   support it.  So a jury can't really evaluate that and

11   give any weight to that if they have no evidence about

12   his ability to make a real adjustment.  They did not

13   get the Fairfield records, which I understand were

14   destroyed, but they had some names of people that

15   worked at Fairfield and could have looked for staff

16   people, you know, that had been there to try to get

17   some information about Larry.  We do know he completed

18   his GED there and got his driver's license there.

19   They did not get the jail records or talk to any jail

20   staff, which I routinely do in every case that I work

21   on.

22             THE COURT:   Because?

23             THE WITNESS:   You know, either they didn't

24   have the time or they didn't know.

25             THE COURT:   Why do you get them?

45

1          THE WITNESS:  Because it's very significant

2     to a jury to know how a person can function in a

3     confined setting if they're deciding between a life

4     sentence and death.  The fact that someone will

5     adjust, will not cause problems, will get along with

6     the inmates, will be respectful of employees, partake

7     in programs, can be most compelling evidence.  Some of

8     the best witnesses I have seen are the correctional

9     officers that come over and say what a great guy this

10    is and he works, gets job assignments and he works and

11    helps other people.  That can be important evidence.

12          The other thing about the jail records in

13    this case and why I really wanted to get them, and by

14    the time I got them, many of them had been destroyed,

15    so I didn't get them.  But what I was wanting was that

16    I had been told that Larry went through withdrawal

17    early on in the jail, so I would have wanted to know

18    about that, and that he was on medication.

19          The first time the mitigation specialist

20    talked to him was three days after the birth, death of

21    his baby, and there's no mention, I don't believe, in

22    their notes about that, which to me is an extremely

23    significant factor.  And I would be very concerned

24    about the mental state of my client who just had a

25    baby die.

46

1          He told him he was on medication.  We had

2     been told that he was on medication throughout this

3     trial, which to me is significant, and attorneys

4     should have been aware just to know was he in a mental

5     state that he understood what was going on in the

6     trial and could participate in it when he was on

7     psychotropic medications.  And those records were

8     gone, were destroyed by the time I was involved in the

9     case but --

10          THE COURT:   No indication that they were not

11     destroyed pursuant to a regular pattern?  No

12     indication they were done --

13          THE WITNESS:   No, it's just become a common

14     practice, I have found, in recent years to destroy

15     records after a certain period of time.  Now the

16     Scioto records, those records actually still existed

17     at the time of his trial, but by the time I got in the

18     case had been destroyed, and they were never

19     requested.  So that kind of thing happened, and of

20     course the jail records would have been available then

21     that were later destroyed.

22     Q.   In responding to the, I think perhaps was the

23     Judge's question, maybe you've already covered this, I

24     just want to be sure.  I think you said something to

25     the effect in discussing immaturity and the

47

1   significance of it that it was -- that you had in

2   talking to people or doing your investigation,

3   uncovered other information that you thought was

4   relevant on the immaturity issue, and I'm just not

5   sure that you described it.  If you have, excuse me,

6   but if you haven't, would you please do so, aside from

7   his age and aside from having had the children?

8   A.   Well, he had difficulty in developing

9   relationships with age peers and tended to relate

10  better to younger people, age 15 and 16.  These were

11  his friends.  Had difficulty, you know, goal setting.

12  Was described as, you know, impulsive, you know, not

13  planning ahead, being sometimes just silly acting,

14  kind of silly and childish, and not necessarily

15  related to substance abuse.  People just generally

16  described him as immature.

17  Q.   Would you please look at Exhibit 8?

18  A.   (Witness complied.)

19  Q.   And please just tell the Court what that is?

20  A.   That's a chronology, some people call it a

21  timeline.  I just routinely do these in most of my

22  cases, where I take significant dates of the life

23  history and just sort of list them out in order so you

24  can get kind of a quick and easy overview of a

25  person's life and significant things that happened

48

1    over the course of it.

2              MR. SIMMONS:    That's all I have, your

3    Honor, of this witness.

4              THE COURT:    Thank you.  Cross?

5                   CROSS-EXAMINATION

6    BY MR. COLLYER:

7    Q.    Miss Miller, you started your work in this case

8    in 1991; is that correct?

9    A.    Yes.

10   Q.    And you finished at least for state

11   post-conviction purposes in 1996?

12   A.    Yes.

13   Q.    I believe your testimony was you felt that even

14   at that point it was still incomplete, there were

15   still other things out there that you could have been

16   able to find?

17   A.    There were names revealed in school records of

18   teachers.  We did find some people.  But there were,

19   you know, names of people, still other people that I

20   would have interviewed.

21   Q.    So then even after working on it on and off over

22   a period of five years, there were still other things

23   that could have been done for Larry Landrum's

24   investigation?

25   A.    Yes.

49

Q.   You spoke a little bit about how the late start for the mitigation specialists in this case was deficient in your opinion.

Now you mentioned that the trial began on February 10th.  Do you know what date the penalty phase began?

A.   March 17th.

Q.   Okay.  And you said that by starting late and having some of that investigation go on during the guilt phase, that that could have affected the voir dire, the attorneys asking the jurors and qualifying them, and also the guilt phase strategy.  Do you have an opinion as to what effect there was in voir dire in this case?  Did you read the voir dire in this case?

A.   No.

Q.   Do you know how the investigation you've done should have changed the strategy in the guilt phase in your opinion?

A.   You know, I have not read the guilt phase, although I have read police reports and other information related to the defense statements of other people that ended up being witnesses.  Possibly how they handled the substance abuse issue might have been different in the guilt phase.  I mean that's just speculating because I haven't seen it.

50

1          I know, for example, there was an

2     intoxication instruction, and that's part of many

3     statutes as a defense.  So how that would have been

4     developed might have been affected.  Certainly, you

5     know, an attorney should know that penalty phase

6     strategy when selecting the jury.  That's very

7     important.  And no, you know, I can't say without

8     having seen it how it would have influenced the guilt

9     phase, but you should know what you're going to do in

10    advance of trial so that -- because in a capital case

11    you know that a person's life is at stake and the

12    penalty phase presentation is going to be crucial and

13    want to be thinking about that and know where you're

14    going with it in advance of the beginning of the

15    trial.

16    Q.    Okay.  You also spoke a little bit about what the

17    mitigation specialists in this case did and didn't do.

18    For instance you mentioned some records that they did

19    not obtain.  How do you know what they did and didn't

20    do?

21    A.    I reviewed their file.

22    Q.    Okay.

23    A.    I have all -- I spoke actually with Jane Core,

24    but I had all of their typed product and all of their

25    handwritten notes and the records that they had

1    obtained and all of their requests for records.

2    Q.    Okay.  Did you submit any of that material in

3    connection with your report on this case to show what

4    they did and didn't do?

5    A.    I talk about it in the affidavit and somewhat in

6    the report in terms of what people I interviewed said.

7    Q.    So you reviewed that material in preparation of

8    your report.  Did you also review it in preparation

9    for your testimony today?

10   A.    Yes.  I reviewed it the first time just to do a

11   kind of an assessment of the performance before I was

12   asked to actually do my report.  Then I was asked to

13   do my history, and then, you know, sort of compared

14   them.  And then I reviewed everything.

15              MR. COLLYER:  Your Honor, at this time we

16   would request permission to see the materials that

17   were submitted to the expert upon which she's basing

18   her conclusion.  We don't want to look through -- we

19   know mostly what she's listed in her affidavit that

20   she considered that we don't need to look through,

21   but as to these types of materials, the notes and

22   records they claim they requested and didn't get, we

23   would like an opportunity to see what those are.

24              THE COURT:  Mr. Simmons?

25              MR. SIMMONS:  Your Honor, I don't believe

52

1    they're available right this minute, but I certainly

2    have no objection to it.

3              THE COURT:    They should be produced within

4    10 days.

5              MR. SIMMONS:    If counsel -- Maybe we can

6    do this off the record.  I would like him to be very

7    specific what he is asking for and what he isn't.

8              THE COURT:    I heard a standard Rule 26

9    request, anything that the expert reviewed in the

10   course of preparing her opinion should be disclosed.

11             MR. SIMMONS:    Fair enough.

12   Q.   Now in talking about some of the underdeveloped

13   issues, you mentioned the Upham Hall records and you

14   said that there was some testing that was done there

15   about sexual orientation, something along those lines?

16             THE COURT:    Differentiation I think was the

17   word used.  I don't know whether it's a distinction.

18             THE WITNESS:    It's their word.

19             THE COURT:    What test was it, can you tell

20   us?

21             THE WITNESS:    It was based on drawings, they

22   did an MMPI and then they did -- Drawings were

23   immature and showed poor sexual differentiation and

24   strong dependency needs.

25   Q.   For the record, what are you reviewing to make

53

1    that --

2    A.    My report.

3    Q.    What --

4    A.    Page 21.

5    Q.    Thank you.

6          What was the psychological diagnosis that the

7    Upham Hall people came up with for Larry Landrum?

8    A.    Run-away reaction of adolescence.

9    Q.    So now your testimony is, though, they should

10   have been able to diagnose him with some sort of

11   depression at that time?

12   A.    They probably should have.  In their records, you

13   know, are indications of his sadness, his anxiety.

14   They find him sobbing in his room one day, he appears

15   anxious and depressed.  They describe him in their own

16   records this way.  They didn't either go out and get

17   information about a lot of what was going on in the

18   home, although the father talked about himself, about

19   his own anger and violence, so they had information

20   both at Upham Hall, and then the mitigation people had

21   it.

22         You know, when I worked in juvenile court, I'd

23   see this, you know, behavior reaction to adolescence

24   thing all the time.  It doesn't really tell you

25   anything.

54

1          THE COURT:   It doesn't say anything more

2     than an adolescent is an adolescent.

3          THE WITNESS:   And again calling it run-away

4     when those run-aways were really about avoiding

5     beatings, you know, sort of mischaracterizes what that

6     was about.

7     Q.   And one of the other topics you touched on was

8     the inconsistent discipline and the way that played

9     out at trial, with the father being portrayed as the

10     more lenient of the two parents and the mother being

11     the strict disciplinarian; is that correct?

12     A.   Yes.

13     Q.   Did you find anything in your review of the

14     penalty phase to indicate that there was evidence

15     presented to the jury that the father had physically

16     abused Larry Landrum?

17     A.   I believe David Enderle, a friend, said he was

18     aware of it, but it was a brief mention and again not

19     developed because it was inconsistent with what the

20     parents were saying.  I'm not sure the jury would know

21     what to make of it.

22     Q.   So is it your testimony also that Dick Landrum

23     didn't mention anything about abusing Larry?

24     A.   You know, if he did, it was very superficial and

25     brief, not developed in a way that showed exactly the

55

1    nature and extent of what went on and how it related

2    to Larry's fear of going home, you know, when he was

3    in the community, and his extreme fear of going home

4    when they were discharging him from Upham Hall.  You

5    know, it's not enough to mention something briefly if

6    it isn't explained, wanting detail like I've been

7    trying to give detail, and what it means and how it

8    affected his behavior.

9    Q.   But would you find it to be significant if the

10   father admitted to a jury that he had physically

11   abused the son?

12   A.   Somewhat, but not enough if it isn't explained in

13   more detail and then someone doesn't explain what is

14   significant about that in terms of how it, the effect

15   it had on Larry.

16          THE COURT:   Do you have an opinion about the

17   effect it had?

18          THE WITNESS:   Yes.

19          THE COURT:   Are you prepared to state that

20   opinion this morning?

21          THE WITNESS:   Yes.  I mean I think it

22   created a great deal of anxiety in him, a great deal

23   of fear, and I think it was connected to his substance

24   abuse.  I think his substance abuse, you know, was

25   self-medication for a number of things that -- fear,

56

1    his depression.

2           The other thing that I hadn't mentioned that

3    there are very many mentions is the hyperactivity

4    disorder in him, and there are other cousins that have

5    that, and that is something that can run in families

6    and I see a lot of clients self-medicating for that,

7    particularly using central nervous depressants because

8    they calm a person.

9           So there are many things that are linked to

10   his substance abuse that I think were very important

11   to talk about that were not talked about.  So that the

12   jury might have known he abused substances, but if

13   they didn't know the underlying reasons, then how they

14   view that -- it's hard to view substance abuse as

15   mitigating if you don't understand why people abuse

16   substances and how it affects them.

17   Q.   Now you just mentioned the attention deficit

18   hyperactivity disorder.  Are you aware of any

19   psychological diagnosis even up to today that

20   Mr. Landrum suffered from that?

21   A.   No, it's just by description of many family

22   members describing both the level of activity and then

23   the concentration, attention problems and

24   distractibility.  Those are the things you see, but

25   there's not a diagnosis in the records.

57

1   Q.   One of the other mitigators you mentioned that

2   you felt wasn't sufficiently developed was

3   youthfulness.  How old was Mr. Landrum at the time of

4   the offense?

5   A.   Very close to 24, but still 23.

6   Q.   In your experience, what is the range of -- what

7   is considered to be youthfulness?  What age range is

8   it?

9   A.   You know, it can range well into the 20's because

10  you have to look at, you know, behavior, and whether

11  behavior is more indicative of a younger age.  And you

12  look at things that delay people's maturation.  Trauma

13  and abuse and depression, those are things that can

14  delay it.

15       The other thing we know is that the human

16  brain doesn't actually fully develop until well into

17  the 20's, and it's different for every person.  People

18  mature at different rates, so you can be -- and

19  especially we know boys compared to girls tend to

20  mature later.  And so they can be well into their 20's

21  and still behaving like 16-year-olds.  I have a son

22  like that myself so --

23  Q.   When you speak of well into your 20's, if you

24  could put a number range on it.  I suppose that

25  depends on what the state's lower limit is eligible

58

1    for the death penalty.  What's the upper number you

2    worked with in your experience?

3    A.   There really isn't an upper number because every

4    person is different, you know, and matures at

5    different paces, and so you really have to look at

6    behavior and level of maturity instead of a strict

7    chronological number.  It's hard to argue maturity I

8    suppose after the mid to late 20's, although even then

9    you can look at some people's behavior and say it's

10   immature, so there isn't a strict cut-off point on

11   that level.

12         THE COURT:  You tend to offer in your

13   testimony a psychological and/or neurological

14   explanation.  I infer that that's what you think from

15   what you have said.  Would you be inclined to find

16   credible sociological explanations as well, the

17   pattern that graduate schools encourage people to stay

18   forever?

19         THE WITNESS:  It's, you know, many things

20   that go into making the person and influencing the

21   development.  You know, you can have -- there are

22   environmental issues of nutritional deficits and toxic

23   exposure and the way the parents parent.  I mean, you

24   know, I found the paternal grandfather in this case

25   very interesting in that because he was orphaned at an

59

1    early age and shuffled around from foster home to

2    foster home, he had this need to have this large

3    family and keep them close, and he held on to them, I

4    think too tight.

5         I think that June Landrum sort of rebelled at

6    a point when she then had Larry and it was hard to get

7    away from that family, so that how his mother was

8    parented, why his grandfather didn't want to let him

9    go, that's part of what happened to his grandfather

10   when he was young, so you know, understanding how

11   people develop and become the person they are is

12   complicated and it requires looking at a lot of

13   things.

14   Q.   Now in your experience working with psychologists

15   doing mitigation specialist type of work, are you

16   aware of any types of psychological tests that can

17   put, even though chronological age is 24, a

18   psychological age or level of maturity?

19   A.   No, not specifically.  There are cognitive tests

20   that place, you know, mental age in terms of cognitive

21   functioning, so you know, Dr. Smith I think would know

22   that.

23   Q.   But in your review of all the records available

24   to you in this case, did you find anything to show

25   either a cognitive age or some other maturity age less

60

1   than 24?

2   A.   At that time?

3   Q.   Yes.

4   A.   There wasn't that kind of tests.  I haven't seen

5   any testing at the time.  The only records of testing

6   are the Upham Hall records.

7        THE COURT:   Mr. Collyer, I think at this

8   moment we'll take our morning recess for 10 or 15

9   minutes.  We'll be in recess.

10       (Short recess.)

11       THE COURT:   Mr. Collyer, you may resume your

12  cross-examination.

13  BY MR. COLLYER:

14  Q.   I just have a couple more topics to hit.

15       You spoke a little bit about adjustment to

16  incarceration.  What is your understanding, based on

17  the records you had at your disposal, about the

18  medication that Larry Landrum was on during his time

19  in jail?

20  A.   I believe initially Xanax, and then I think

21  Desyril and one other.  I know there were two.

22  Halcion and I believe he was on Desyril.

23       THE COURT:   Hold on just a second.  Halcion.

24       THE WITNESS:   And Desyril, which was an

25  antidepressant.  Halcion which was used for sleep has

61

1   caused a lot of problems for people when the dosage

2   isn't correct.  The first President Bush getting sick

3   in Japan when he was at a state dinner, that was

4   Halcion that caused him to pass out, so -- And he was

5   on that for sleep, and I believe put on those after

6   the baby died in late January.

7   Q.   Are you familiar with the types of effects that

8   one would have from taking this type of medication?

9   Do these medications, are they more sedatives or do

10  they excite you or --

11  A.   Halcion is used as a sedative.

12  Q.   Okay.

13  A.   And it can -- you know, I'm not an expert, so I

14  have some familiarity in terms of having what people

15  will call like a morning hangover where you're still

16  feeling tired, it can cause like confusion, and so it

17  can be a problem to be on it.  I wouldn't know, but

18  Dr. Smith would know for someone with Larry's

19  substance abuse history any issues related to those

20  medications.  But someone would want to know that and

21  find out more about it.

22  Q.   Okay.  How much are you being paid for your

23  testimony and your work in the federal habeas

24  proceedings here?

25  A.   A hundred dollars an hour.

62

1    Q.    How much time have you spent in the federal

2    habeas proceedings in this case?

3    A.    On this case?

4    Q.    Yes.  Can you estimate?

5    A.    I think by the end of today it will be between 50

6    and 60 hours.

7    Q.    And I take it from your testimony and the

8    organizations you're involved in, you're opposed to

9    the death penalty?

10   A.    Yes.

11   Q.    How many other cases would you say you've been

12   involved in where you have come in to evaluate the

13   mitigation investigation and presentation done by

14   others in capital cases?

15   A.    Where that's the only thing I've done, or done

16   that in addition?

17            THE COURT:    Both.

18   A.    I've done 32 post-conviction cases, you know, in

19   many states.  One on a federal death sentence

20   post-conviction and two military.  So I generally look

21   at -- I haven't -- there may be three, that I just did

22   that analysis and testified about that and didn't do

23   the whole history, the new history was done by someone

24   else, and the rest of them I actually then went out

25   and did the social history.

63

1    Q.    Okay.  Now in those cases where you were asked to

2    evaluate the work of other mitigation specialists, did

3    you find any of those cases to be complete in their

4    mitigation and investigation and preparation?

5    A.    No.

6              MR. COLLYER:   No further questions, your

7    Honor.

8              THE COURT:   Redirect?

9                    REDIRECT EXAMINATION

10   BY MR. SIMMONS:

11   Q.   Miss Miller, you were asked if you were opposed

12   to the death penalty and I just wanted you to state,

13   does your opposition -- what, if any impact has that

14   had on the work that you have done in this case or

15   generally?

16   A.    I think that not only because of that position

17   but because of being always hired by the defense

18   attorneys, I am very conscious of the need to be very

19   thorough in my histories and to try to document things

20   so that it's clear that I'm presenting accurate

21   information, because I know that, you know, people

22   will, you know, challenge me for that reason.

23   Q.   Was there any explanation or any further

24   discussion you wanted to give about your opposition to

25   the death penalty?

64

1    A.    Well, yes.  I think that it's -- you know, it's a

2    position I came to, I come from a nondeath penalty

3    state so when I first came into this work I really

4    hadn't had to think about it at all, but in now going

5    on 18 years of doing it and having worked in many

6    states and, you know, federal and military

7    jurisdictions, I think -- and reviewing cases of

8    people, and I had a client in Oklahoma, the other

9    federal habeas proceeding, where that man was

10   executed.  So to me when I look at who's on death row,

11   they're all poor, mostly minorities.  People who, many

12   people with mental illness, people who are retarded.

13   And hopefully we're dealing with that now, but when I

14   see, you know, how people get the death penalty and

15   who does and who doesn't, it doesn't seem to make a

16   lot of sense to me, and has to be very often a

17   function of resources, the quality of lawyering, where

18   you know, in the South it's much more common, so it

19   troubled me as I began to see that.

20          Then I think because I'm a social worker and

21   I've been a social worker for over 30 years, and it's

22   a profession that really is based on a belief in the

23   worth of the individual and the capacity of the

24   individual to change, but the values of this

25   profession are really inconsistent with the death

65

1    penalty.

2    Q.    Thank you.

3              THE COURT:    Recross?

4              MR. COLLYER:    No, your Honor.

5              THE COURT:    Okay.  My turn.

6                        EXAMINATION

7    BY THE COURT:

8    Q.    How much time did it take you to prepare?  I'm

9    talking about hours now, not -- we've already had

10   testimony that you had some initial involvement in

11   this case in '91, and I think you said it was in 1993

12   that you were finally asked to prepare the social

13   history.  So how many hours' work did it take?

14   Obviously this wasn't the only thing you did between

15   '91 and '93?

16   A.    Post-conviction, of course you have kind of a

17   jump-start because you have some things.  I had some

18   records and information --

19   Q.    Right.

20   A.    -- and names and addresses of people to start

21   with, which ordinarily I have to go looking for.  So

22   it was, I believe, just under 200 hours.  And that

23   actually is quite a bit less than what I actually

24   typically spend today getting ready for trial.  But we

25   had some things I had to work with in the contracts

66

1 provided to me by the Ohio Public Defender, which is

2 why I say there were names and records of people I

3 would have still liked to look for and interviewed had

4 I had the ability to do that, but so I would say close

5 to 200, I believe.

6 Q.   And you just indicated that that was

7 substantially less than you would spend if you were

8 doing a social history as a mitigation specialist at

9 the trial level today?

10 A.   Yes.

11 Q.   How much time would you spend typically?

12 A.   Typically now, because I have been working on a

13 lot of federal cases where, you know, they're very

14 good about giving you the resources you need to do a

15 thorough report, I would say I average 5 or 600.  Now

16 some of these cases, Larry's, involved geographic

17 locations.  The number of hours, too, are a function

18 of where everybody is.  I have had cases where I have

19 had to go to Africa and Korea.  Those take a lot more

20 time when you have a lot of travel and family members

21 spread throughout the country, or an extensive history

22 of records.  So there are a lot of factors that

23 influence it.

24     People have been -- I think the people at Hofstra

25 have been trying to get a handle on proper caseloads,

1   and their feeling in conducting a survey of mitigation

2   people around the country is that you can do four

3   cases a year, so that's, you know, 4 or 500 hours per

4   case is viewed to do a thorough history.

5   Q.   Five-hundred hours a year, four cases a year

6   comes out to 40 hours a week for 50 weeks?

7   A.   Yes

8   Q.   Less then many juniors in law firms are asking to

9   bill, but --

10  A.   Every case is different, though, you know.  And

11  that was one of the things that struck me looking at

12  this case was the caseload these people had, that they

13  were preparing for five or six other cases in the

14  weeks preceding this trial.  It's just impossible to

15  do what needs to be done to get ready for trial with

16  that kind of caseload and in that kind of time.

17  Q.   Speaking of the Hofstra matter, is your Hofstra

18  article in final form?

19  A.      I just sent the final edits on Tuesday and

20  they're turning it around to me.  I should have it

21  Friday.

22  Q.   Do you have any difficulty providing a copy of

23  that to Court and counsel?

24  A.   Sure.

25  Q.   I very much appreciate that.

68

1    A.   There are eight people who were asked to write

2    articles for this issue.  One article is all on the

3    role of the mitigation specialist.

4    Q.   We look forward to seeing the whole thing, but

5    it's important to have that in this record in this

6    case, I think.

7         MR. SIMMONS:   Do you just want her article

8    or all of them?

9         THE COURT:   I'm assuming all of them are not

10   available to us now, so let's talk about just getting

11   hers for the record in this case.

12        MR. SIMMONS:   Yes, your Honor.

13        THE COURT:   And then we'll worry about

14   getting the full issue later.

15   Q.   If you remember, in your experience in working in

16   capital cases, does the state ever retain somebody to

17   do a social history?

18   A.   No.  In federal cases they do send the FBI to get

19   like some records and talk to some people, but I

20   wouldn't call it a social history, so I don't know of

21   anyone who does that.  It might have aggravation

22   specialist, but no.  There are some states that still

23   do presentences in capital cases, that varies by

24   jurisdiction, but then that's generally, I think, done

25   after the sentence.  They don't do it before.

69

1    Q.   Right.   In Ohio we still have the possibility of

2    a presentence investigation in capital cases, but it's

3    very different from the structure in most other felony

4    cases.

5             Had you been retained at the trial level in

6    this case, what would have been your theory of

7    mitigation?

8    A.   Well, you know --

9    Q.   See, why that's critical, the question is not

10   what wasn't done, the question is what prejudice was

11   done?

12   A.   I think it would have been very important to look

13   at his developmental experiences much more carefully

14   to understand, you know, why he functioned the way he

15   did, and in particular to understand his substance

16   abuse problem because that's one of those issues that

17   can be viewed as aggravating or mitigating depending

18   upon how you explain it.

19            And there was a great deal of discussion by

20   the prosecutor of, you know, about choice, that he

21   chose to do this.  Well, we know that, you know, it

22   isn't that simple as choice when you have a genetic

23   predisposition, when you have the kind of life

24   experiences that Larry had, it's very common to choose

25   to self-medicate.  And while he came to the attention

70

1   of people over his life, and Upham Hall certainly saw

2   many of the problems, he never really got appropriate

3   treatment.  He certainly didn't get substance abuse

4   treatment.  But I find that standard alcohol and drug

5   treatment isn't adequate, either, if you don't address

6   the underlying issues.

7   Q.   Underlying psychological issues?

8   A.   Right.  The depression, hyperactivity, the

9   trauma, all of the things that led him to use this as

10  an escape, so you know, I think had the jury

11  understood that, had they heard about this boy who was

12  little or was beaten up on the way home from school,

13  who other children locked in a freezer when he was a

14  child to tease him, had the teacher come in and

15  described this child that wore the same shirt to

16  school every day, and on eighth grade graduation wore

17  the same shirt that night and no one from his family

18  come to the graduation, and had they understood how

19  afraid he was to go home; they heard about run-aways

20  but if you don't know this, they were -- because he

21  was afraid to go home, you know, I have to think that

22  would have an impact in terms of understanding him,

23  seeing the humanity in him, understanding how he was

24  caught up with these 16-year-olds, you know.

25           Upham Hall talks about him being susceptible

71

1    to negative peer influence, you know, and indeed he

2    was.  So I think that would have been good.  Again I

3    would -- I talked about youthfulness and explained it,

4    and I think I would have very much wanted to talk to

5    people from Fairfield and talk to people at the jail

6    and present evidence of his ability to do well in a

7    prison setting, I think that could have been very

8    important.

9    Q.   You indicated that, early on in your testimony,

10   that one of the important things about getting started

11   with the social history, with getting the mitigation

12   specialist involved is to be able to influence jury

13   selection.

14   A.   Uh-huh.

15   Q.   Would you agree with me that the rhetoric of

16   mitigation varies according to the audience that

17   you're addressing, what jury you got or what jury you

18   can get, or do you think that that's pretty -- Let me

19   explain why I ask the question.  Sometimes when

20   lawyers are trying to decide, should I file a case in

21   the Common Pleas Court in Montgomery County or should

22   I file in federal court, should I remove the case, it

23   is explained to them that Montgomery County juries are

24   all urban people whereas this Court's juries are drawn

25   from a much more mixed geographical setting.  The

72

1    typical joking reference is a lot of green gill

2    farmer's wives on juries in federal court.  Whether

3    that's true, I don't know.  That's a joke that's often

4    told.  Ross County is not a major metropolitan area.

5         I don't know in the course of your experience

6    whether you have had occasion to think about the

7    difference between choosing a jury and then arguing to

8    a jury in that setting as opposed to a major

9    metropolitan setting, or if you think that makes any

10   difference.

11   A.   Well, it does in terms of you need to know in

12   advance of trial who is the pool, where am I trying

13   this and what is the pool of jurors and what do I know

14   about my client and how do I find people.  You know,

15   how do I find people who understand or maybe have some

16   life experience with substance abuse in their family.

17   I would have been looking -- you know, I don't know

18   what kind of voir dire you have here.  I'm used to a

19   lot of individual voir dire on capital cases in most

20   places, and you do a questionnaire and you attempt to

21   know a lot.

22        I mean I think you can't control the pool,

23   but you have to know what is your client's story and

24   what is your theory to think about what questions to

25   ask and who are you looking for and who don't they

73

1   want on the jury because they do think it's always a

2   choice to do drugs or alcohol.  I would want to know

3   what people's experience is with that and what is

4   their attitude about people who do drugs.  That I

5   think would have been very important in voir dire

6   inquiry.

7          You know, there's been so much on TV about

8   the abuse excuse, so what are people's attitudes about

9   children who have been abused?  Do they think that

10  children are affected by those experiences; those

11  questions.

12         And you know, picking a jury for a noncapital

13  case is very different than picking a jury for a

14  capital case, and the penalty strategy has to be very

15  much in the mind of attorneys that are picking the

16  jury.  When you don't even know your client's history

17  at that time, you know, you just can't.  You know,

18  once there is a jury you have to say, what do I know

19  about these people, you know, and what do I need to

20  tell them about Larry that will help them understand

21  who he is and how he got to this place in his life.

22  Q.   The overall objective being to humanize him;

23  right?

24  A.   To make them see the person, uh-huh, the whole

25  person, and not just, you know, a murderer, but the

74

1  person who did this terrible, terrible thing, you

2  know.

3  Q.   You indicated that at the time you did your work

4  before the post-conviction process, that some of the

5  records that you might have wanted to see had been

6  destroyed or were missing.  And I note that you were

7  initially involved in the case in '91, you were asked

8  to do the social history in '93, you completed the

9  social history in '96.  Do you have any idea why there

10  was such a long delay between trial and

11  post-conviction?

12  A.   No.  I mean every state is different in terms of

13  how it moves cases.

14         THE COURT:   You may step down.

15         THE WITNESS:   Thank you.

16         (Witness was excused.)

17         THE COURT:   Mr. Simmons, you may call your

18  next witness.

19         MR. SIMMONS:   Yes, your Honor.  Dr. Smith.

20              ROBERT L. SMITH, Ph.D

21  witness herein, being first duly sworn, testified as

22  follows:

23              DIRECT EXAMINATION

24         MR. SIMMONS:   I think counsel has -- she's

25  going to stay a while to hear the doctor's testimony.