# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,  :

    Plaintiff,  : Case No. 01-CR-794

-vs-  :

NATHANIEL JACKSON,  :

    Defendant.  :

---

## VOLUME II, EXHIBITS TO NATHANIEL JACKSON'S AMENDED POST-CONVICTION PETITION

*Sandra B. McPherson, Ph.D.*

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

*Sensitive Material – Discretion is Necessary*

## PSYCHOLOGICAL REPORT

SUBJECT: Nathaniel Jackson

DATE: 11/12/02

### REASON FOR REFERRAL:

Mr. Jackson was evaluated as part of developing information relevant to the mitigation phase of his capital murder trial.

### PROCEDURE:

Interviews of Mr. Jackson by S. McPherson and D. McPherson; psychological assessment administered by D. McPherson, M.Ed., assisting psychologist: Thematic Apperception Test, WAIS-3, MMPI-2, WRAT-3, and Bender Gestalt. Rorschach administered by S. McPherson. Review of records from discovery and from other sources. Contact with family members.

## RESULTS

### Defendant's Retrospective on His Own History:

He was asked to discuss his life in stages. When asked about his first five years, he said that his maternal grandmother was very important to him, as was his mother. He had an older brother, Charles, and a younger sister and brother, Taushia and Anthony, respectively. He did not have very much contact with his biological father (Charles Paige), remembering perhaps two times when he saw the man. He lived with his mother, and he frequently spent time with his maternal grandmother. (Other records indicated the two younger children were the product of his mother's marriage to Anthony Kornegeay.)

With respect to his elementary school years, he said that he tried to do his best and in many ways he really liked school, but he also got into a lot of difficulty and tended to have problems with other students at times. He knew that he had been identified as having a behavior problem, and he stated that when he was placed in the Stambaugh School Special Program he did best. Interestingly, he remembered being taken out of that program after he had apparently done somewhat well and put back into the mainstream curriculum with the result that he immediately got into trouble again and was put back in

EXHIBIT
61

Stambaugh's Special Program where, at least per his recollection, he did better once again. He left school at the age of 17 while he was still in the 11ᵗʰ grade.

From that time onward, his life involved basically living on the street in what was a crime-ridden and violent environment. He did have some regular jobs from time to time, but none of them were high paying. His drug use (see below) was also a part of his problem. He began getting into trouble almost immediately upon moving out from his mother's house.

He had a series of relationships, and he began getting into more and more trouble of a legal type (see below). Throughout the ensuing years, he had several relationships, one with the mother of his daughter, now age seven. That individual is now married, but he has tried to have some contacts with his daughter. He also has a son who would now be four years of age. He has had no contact with that child whose life has been a somewhat tragic story in and of itself. The child was born to Mr. Jackson and his then significant other. Shortly after birth, the child had a stroke and went into some seizures and was life-flighted to Rainbow Babies' & Children's Hospital. Over an ensuing period of time, the youngster was stabilized and diagnosed upon exit as having cerebral palsy. To the best of his knowledge, the child continues to be wheelchair bound or in a brace with limited ability. Subsequently, the relationship broke up, and the mother of the child placed the youngster with her mother, essentially abandoning him. When Mr. Jackson tried to visit his son, the maternal grandmother obtained a Restraining Order, and he has never been allowed to see him since.

Mr. Jackson indicated he grew up in an extremely violent neighborhood. (Consistently, there is the letter in the school records from his mother indicating that he should be given an excused absence because a man and a woman had been shooting at him.) After he left his mother's home, he was still primarily living on the street and in a neighborhood of significantly antisocial and violent people. He himself was shot four or five times. He indicated that for the most part, he had not obtained any hospital or medical attention for these events; in fact, he said he carried a bullet in his torso somewhere which causes him periodic difficulty. He sometimes more or less freezes and is unable to move until the spasm passes. He has been shot in the left arm, elbow, and head, all of these wounds involving grazing injuries. In addition, he indicated that he had a significant relationship with a woman and, in fact, was considering a permanent union when she was killed. She was apparently involved in some type of merchandising occupation and was killed by someone who wished not to pay for the merchandise obtained from her. Mr. Jackson also recounted that there was an occasion in which he left some clothes at the home of a person whom he viewed as a friend and with whom he had stayed briefly. When he returned to get his clothing, that individual confronted him with a gun and was not willing to give Mr. Jackson his clothes. He noted that he had a particularly nice set of outfits at the time. He felt the man's turning on him was a major wrong because he had trusted him and viewed him as a friend.

The relationship that he had with Donna was one where he thought he would avoid the problems he had had with some of the younger women with whom he engaged. He acknowledged that Donna was significantly older than he. He said that he thought perhaps it would work out better because she would be more stable and more able to provide responsibly for him. He said that she indicated to him that she was divorced in 1985 and that her ex-husband, though he now lived with her, was not romantically involved with her.

Test Results:

Results from the WAIS-3 were as follows:

| | | | |
|---|---|---|---|
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 6 |
| Arithmetic | 5 | Block Design | 7 |
| Digit Span | 12 | Matrix Reasoning | 13 |
| Information | 5 | Picture Arrangement | 10 |
| Comprehension | 5 | | |
| | | | |
| Verbal IQ | 82 | Performance IQ | 89 |

Full Scale IQ – 84

Above results showed significant variation among the subtests but overall performance, given test bias factors and educational deficit, reflected low average or better capacity. Deficit areas would be consistent with longstanding learning problems.

Results from the Bender-Gestalt showed no significant deficits of performance. There were some distortions and inadequacies that appear to be reflective of some lack of investment in performance.

Results from the Wide Range Achievement Test – 3 were as follows:

| | Raw Score | Std. Score | %tile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | 36 | 75 | 5 | 5 | 503 |
| Spelling | 43 | 103 | 58 | HS | 524 |
| Arithmetic | 46 | 111 | 77 | HS | 532 |

Above results reflected significant relative deficit in reading skills.

3

Results from the MMPI-2 indicated a need to present well and to overstate virtues. At the same time, there was a tendency toward some endorsement of symptoms that suggested an over-presentation of pathology. The overall handling of the test was inconsistent at times and interpretation, therefore, has to be somewhat guarded. What can be stated, however, is that there was neither a consistent attempt to look bad nor a consistent attempt to overstate positives. The main scale profile did not show over-statement of pathology. There was a spike 4 configuration that reflects endorsement of antisocial attitudes and/or impulsive behaviors. He showed concerns and anxiety about his current situation and the likely outcome. There were also some problems when it came to storing of angry feeling and he appeared to be an individual who can lose control because he has been storing and suppressing a lot of negative feeling without being aware of the degree to which he does so. Sub-scales reflected his sense that he is being pursued and persecuted, which is not inconsistent with his current reality situation and also that he feels a sense of alienation from his own functioning. He attempts to put on a facade of being in control and not caring what is happening but, in fact, there is an underlying significant apprehension. At the same time, he can affect a kind of cynicism which may mislead others to believe that he is in control of himself and the situation. Critical items include acknowledging misuse of alcohol and use of marijuana as well as endorsing that he has made mistakes in his life. There is some tendency toward blaming of others but it is not a pronounced assertion.

Projective tests provided some; insight into underlying personality characteristics and potentials. Analysis of thematic materials on the TAT indicated an individual who does not know how to go about managing life but who has incorporated that he should know better than he does. He has no real concept of how to proceed and there is no one available to provide him with guidance. Life tends to hand down punishment for bad behavior and he has learned to accept what happens but not to evaluate and plan to avoid negative consequences. He does not see much potential in the workplace, which is consistent with the reality of his environment. He cannot figure out how people fit into situations or what they are thinking. In effect, he is a poor reader of people even though he thinks he knows about them.

Results from the Rorschach, evaluated using the Exner protocol, indicated a valid and reliable record for interpretation. There were no indications of any serious mental health pathology, but rather he appears to be an individual who lacks the capacity to cope adequately with his environment. He tries to keep emotions at bay but doesn't have the wherewithal to do so and still adequately manage other and often pressing demands. He is rather constricted and limited in how he responds to others. The avoidance of processing emotional stimulation is extreme and suggests a defense in order to avoid feeling the painful affect that comes about when he lets himself be vulnerable to contacts by others. This feature is consistent with the history of behavioral deficit and lack of environmental support and effective intervention. There are underlying negative to self attitudes which he also tries to avoid directly experiencing. At the same time, there is self focus, a pattern associated with insecurity and neediness. He is significantly limited when it comes to dealing relationally as might be expected, and again his history has

4

involved difficulties that he has sought to remediate but has not the least idea as to how to handle. He tends to be guarded in how he approaches situations but the defensive stance means that he is not aware of all the aspects of the world that he needs to be in order to manage. He makes decisions on inadequate information and thus adds impulsivity of thinking to the existing disinhibitions that are part of the hyperactivity complex.

Legal History

His initial problems with the legal system occurred in his mid-teens when he did about six months in detention home. He had been charged in connection with driving violations and unruly behavior. He apparently was absenting himself from school. After he became an adult he worked at various jobs but did not have any regular or ongoing employment of any substance. He was incarcerated four times at Lorain Correctional as follows: 1/92 for aggravated burglary; 2/96 for having a weapon under disability (as a convicted felon he is not allowed to have a gun); 2/01 for charges in connection with a stole vehicle and stolen license plates. He apparently was briefly released but did not follow up appropriately while on parole and was returned to the facility and then released on 12/12, after which the crime took place. He was also arrested in connection with receiving stolen property, unauthorized use of a vehicle, and driving under suspension. According to the defendant and his counsel, during his time in prison he did not present as an adjustment problem.

School Records:

He did not complete the 11th grade and there was inconsistent attendance and involvement before he finally dropped out. He attended a number of different schools. School records indicated the following.

Behavioral problems were noted as of the 1st grade, or immediately upon his entry into a formal academic setting. Those behavior problems continued throughout the time that he was in school up through the 11th grade level, which was the point at which he left. By the 3rd grade, he had been suspended. He was finally assessed at the 4th grade level and found to have significant problems and to be in need of special educational assistance. At that time, His Wechsler Intelligence Scale results were: Verbal IQ, 72; Performance, IQ, 78; and, Full Scale IQ, 73. Interestingly, while he had below grade level achievement, he was not deficient at the level that the above score, particularly the Verbal one, might have suggested, particularly given that he was coming out of an environment that was not conducive to correcting or assisting him with his problems. However, consistent with the 4th grade results, in 1989 at the 10th grade level, he was tested with the Stanford-Binet and obtained an IQ of 70.

Other information from the school records indicated a pattern of absenteeism which tended to increase over the course of the year, a high potential for getting involved in altercations with peers, behavior problems on the bus and it was also noted as of the 9th grade that he was at high risk for chemical dependency.

Axis IV – Problems with primary support group, Problems related to social environment, Educational problems, Legal Problems.

Axis  V – GAF = 40; major impairment in several areas of function

<u>Summary:</u>

Mr. Jackson is an individual who was raised in an environment that was significantly violent and dyscontrolled that persons surviving in the situation would have been more likely than not to develop a sense of chronic threat and insecurity. Consistently, his own story is one where he has had to defend himself and where fights have not been infrequent, with fairly serious consequences to those participating. Early educational difficulties and current test results are consistent with the presence of an AD/HD component. The history of significant drug abuse starting at the age of 13 and probable dependency on marijuana is also a pattern that is well known for AD/HD persons. There is vulnerability to use, abuse and dependency on drugs to alleviate the chronic tensions and to escape the punishment that comes from the environment as a result of behavioral dyscontrol. Consistently, he chose not to abuse drugs such as methamphetamines or PCP. His use also reflected an occupational component in that he was living in a drug infested environment and, at least sometimes, involved in the lifestyle of using and selling. Given his educational limitations and social situation, obtaining employment with reasonable compensation in the depressed area in which he lived was unlikely.

His mother was on her own much of the time. Although he loves her and his grandmother, they were unable to intervene effectively with his special behavioral and learning needs. As time went on, the family system fragmented further. At the present time, his mother indicates she does not know the status of his sister and cannot be sure how to reach her. Similarly, she was unsure of the current situation of either of his brothers. She stated she works at a physically demanding job and has little energy except to go home and rest so as to be able to work the next day.

He had no male figure immediately available to him to provide him with alternative guidance from what was occurring as a function of his finding his own way in a hostile situation. There was thus no real functioning family system for him as he tried to deal with his needs for support. He does have the capacity to relate to other human beings, and it has been indicated in the records obtained that he has some artistic potentials.

His vulnerability to influence within the context of the relationship to Donna was high: she was older, apparently stable to his view, held out a promise of a more financially secure existence, and catered to his need to be seen as adequate.

He has been able to maintain himself in a stable fashion when he was prior incarcerated and, therefore, it can be reasonably inferred that he can be a productive member of the general population.

Sandra B. McPherson, Ph.D. ABPP
Clinical and Forensic Psychologist

1

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                      DAYTON

5

6                     - - -

7     LAWRENCE LANDRUM,          :

8              Plaintiff,        :

9          Vs.                   :   Case No. C-196-641

10    BETTY MITCHELL,            :   Thursday, 9:00 a.m.

11            Defendant.         :   September 4, 2003

12                     - - -

13          EVIDENTIARY HEARING BEFORE

14          JUDGE MICHAEL R. MERZ

15                     - - -

16    APPEARANCES:

17         FOR THE PLAINTIFF:

18              Gerald W. Simmons, Esq.

19              Randall L. Porter, Esq.

20         FOR THE DEFENDANT:

21              Jonathan R. Fulkerson, Esq.

22              Michael L. Collyer, Esq.

23

24    COURT REPORTER:

25              Shandy Ehde, RPR

EXHIBIT
6 2

74

1    person who did this terrible, terrible thing, you

2    know.

3    Q.    You indicated that at the time you did your work

4    before the post-conviction process, that some of the

5    records that you might have wanted to see had been

6    destroyed or were missing.  And I note that you were

7    initially involved in the case in '91, you were asked

8    to do the social history in '93, you completed the

9    social history in '96.  Do you have any idea why there

10   was such a long delay between trial and

11   post-conviction?

12   A.    No.  I mean every state is different in terms of

13   how it moves cases.

14           THE COURT:   You may step down.

15           THE WITNESS:   Thank you.

16           (Witness was excused.)

17           THE COURT:   Mr. Simmons, you may call your

18   next witness.

19           MR. SIMMONS:   Yes, your Honor.  Dr. Smith.

20                ROBERT L. SMITH, Ph.D

21   witness herein, being first duly sworn, testified as

22   follows:

23                   DIRECT EXAMINATION

24           MR. SIMMONS:   I think counsel has -- she's

25   going to stay a while to hear the doctor's testimony.

75

1           THE COURT:   Once she's testified, she has a

2     right to be here.

3     BY MR. SIMMONS:

4     Q.   Would you please tell the Court your name and

5     address?

6     A.   Robert Lee Smith, Ph.D.  My address is 31470 St.

7     Andrews Street, West Lake, Ohio.

8     Q.   Would you please tell the Court what your

9     practice entails?

10    A.   Yes.  I'm a clinical psychologist and a certified

11    addiction specialist.

12    Q.   What is the nature of the certification?  Where

13    does that come from?

14    A.   The license in psychology is from the State of

15    Ohio.  Basically it comes as a result from having my

16    doctorate from an APA approved from an academic

17    program, and then I did an internship and

18    post-doctorate internship in psychology and addiction.

19    The certification addiction specialist is a national

20    certification and is awarded once you're able to

21    demonstrate appropriate educational and clinical

22    experience.

23    Q.   Have you had occasion to testify as an expert

24    witness previously?

25    A.   Yes, I have.

76

1   Q.   Could you please tell the Court in general terms

2   the quantity and nature of the testimony in which

3   you've engaged?

4   A.   I've probably testified in about 25 to 30 cases

5   nationwide.  Most of those have been either death

6   penalty cases or appeals, but I've also worked in some

7   civil litigation as well.

8   Q.   And what is the nature of the testimony that you

9   have generally given?

10  A.   Generally what I've been asked to do is to

11  conduct an evaluation of the defendant and determine

12  whether or not there are any valid psychological

13  diagnoses or disorders that could be presented to the

14  court for mitigation.

15  Q.   Could you please look at Exhibit 7?

16  A.   (Witness complied.)

17  Q.   What is Exhibit 7, please?

18  A.   It's my curriculum vitae.

19  Q.   Is it accurate and complete?

20  A.   As far as I can tell it looks accurate, yes.

21  Q.   Okay.  Now there's a reference here to Behavior

22  Management Associates, Inc,  What is that?

23  A.   It's a private practice group in which I'm one of

24  the associates.  I basically rent space from them and

25  conduct a private practice in a suburb of Cleveland

1    with Behavior Management Associates.

2    Q.    What is the nature of your private practice?

3    A.    It's a clinical practice.  I work with adults and

4    adolescents.  Basically a full range of psychological

5    disorders as well as addictive disorders.

6    Q.    What types of people do you deal with in your

7    practice?

8    A.    In my private practice, generally they will be

9    men and women who have marital problems, occasionally

10   will be individuals with depression and anxiety

11   disorders.  Most of the clients that have addictive

12   disorders come because they are having difficulties

13   maintaining abstinence.  Most of them have a history

14   of physical or sexual abuse that has not been

15   adequately addressed so that interferes with their

16   recovery.

17   Q.    Do you do any clinical work in addition to your

18   private practice?

19   A.    Yes, I do.

20   Q.    And tell the Court, please, what that involves.

21   A.    I work as a director of operations for an

22   organization called Stella Maris.  Stella Maris is an

23   alcohol and drug treatment facility in Cleveland.

24   They have a 16-bed detoxification unit in a 42-bed

25   therapeutic community.  I began working with that

78

1    organization about four years ago.

2          Currently I'm a project director on a

3    national federal grant.  The goal of the grant is to

4    conduct a research project.  We're examining the

5    treatment of homeless, chemically dependent and

6    mentally ill male offenders.  These men are referred

7    through the court system in Cleveland.  They're all

8    homeless.  They have a long-standing history of

9    addiction, and about 60 percent of them have a

10   co-curring mental illness.  The treatment model that

11   we have put together is, as a demonstration project,

12   we're about a year and a half through the project.

13   Our goal is to gather information about the

14   effectiveness of the treatment and to hopefully come

15   up with ideas and approaches that are more effective.

16   Q.   Have you applied for, and have you received, any

17   government grants in this area?

18   A.   I have the current grant, and I also had a grant

19   in 1993 with the Federal Government.  Again the goal

20   was to look at the treatment of homeless, chemically

21   dependent women.  The women who came into treatment

22   were either pregnant or who had custody of one or two

23   children.  We developed a treatment design that

24   allowed the women to come into treatment and bring

25   their children with them.  Again about 40 percent of

79

1    the women had a co-curring mental illness, and

2    approximately 80 percent of them had a history of

3    being physically and sexually abused.

4    Q.   Have you done any work with the hospitals in the

5    Cleveland area?

6    A.   Yes, I have.

7    Q.   And would you please tell the Court what that has

8    involved?

9    A.   Currently there's two primary hospitals that I

10   have ongoing work with.  I work with University

11   Hospitals of Cleveland.  I conduct a residency

12   assistance program.  If an intern or a medical

13   resident has some type of personal problem,

14   depression, anxiety, perhaps abuse of alcohol or

15   drugs, marital difficulties, the university -- I mean

16   the hospital will contact me.  I'll do an assessment

17   of the intern or resident, and then either do

18   short-term therapy or link them to appropriate

19   services.

20        I also work with Metro Health Medical Center,

21   which used to be Cleveland Metropolitan General

22   Hospital.  I helped develop the employee assistance

23   program when I worked there many years ago, and so

24   what has happened is they have continued to keep me as

25   a consultant even though I'm in private practice.  So

1   I work with them on a weekly basis, looking at more

2   difficult cases and helping the counselors sort of

3   manage those cases.

4   Q.   Have you done any lecturing in this field?

5   A.   Yes, I have.

6   Q.   And could you again tell the Court, please, what

7   you have done in that regard?

8   A.   The bulk of the research -- I mean the lecturing

9   has been related to my research and clinical

10  experience, and it's at Case Western Reserve

11  University.  I currently have an academic appointment

12  with the department of psychology, and last year

13  taught a course on mental illness and substance abuse,

14  but I also have taught for the medical school and for

15  the law school at Case.

16  Q.   Have you done any continuing legal education for

17  attorneys?

18  A.   Yes, I have.

19  Q.   And would you tell the Court, have you written

20  any articles of any significance in this area that you

21  think are pertinent to your experience?

22  A.   I have several articles that we've published.

23  Most of them have focused on identification and

24  diagnosis of addiction, but we also have taken a look

25  at the treatment of minorities and special

81

1   populations, and that's really where my research area

2   is now.

3   Q.   I take it that you have had an opportunity to

4   review the work of Miss Miller, that is, the

5   post-conviction work, the affidavit and the report

6   that she did?

7   A.   Yes, I did.

8   Q.   And I take it you've also had a chance to review

9   the court records of Mr. Landrum's trial, initial

10  trial?

11  A.   That's correct.

12  Q.   Would you please look at Exhibit 4 and -- I'm

13  sorry.   John?

14          MR. FULKERSON:   Before we proceed into the

15  specifics on Mr. Landrum's case, I would like to

16  clarify a few points on the witness' qualifications if

17  this is the proper time to do that.

18          THE COURT:   The voir dire may be allowed.

19          MR. FULKERSON:   Thank you.

20                  VOIR DIRE EXAMINATION

21  BY MR. FULKERSON:

22  Q.   May it please the Court, counsel.

23       Dr. Smith, I'm Jonathan Fulkerson.   We met

24  briefly before we started.   I want to ask you a couple

25  questions about some of your qualifications before we

82

1    proceed this morning.

2         Do you have a board certification in psychology?

3    A.    No, I do not.

4    Q.    Are you a member of the, or do you know what the

5    ABPP is; American Board of Professional Psychology?

6    A.    Yes, I am aware of that.

7    Q.    Are you a member of that organization?

8    A.    No, I am not.

9    Q.    You said on your initial testimony that you have

10   a national certification as an addiction specialist?

11   A.    That's correct.

12   Q.    Where is that from?

13   A.    I'm sorry, where is --

14   Q.    Who gave you that certification; what

15   organization?

16   A.    The American Academy of Healthcare Providers and

17   Addictive Disorders.

18   Q.    Okay.  And when did you obtain that

19   certification?  What year, do you remember?

20   A.    No, I don't know offhand.

21   Q.    Was it before 1996?

22   A.    Yes.

23   Q.    Okay.  That organization's certification, you

24   didn't have to take an exam to get that certification,

25   did you?

83

1    A.    No, I did not.

2    Q.    And you were allowed to join without taking a

3    national examination in order to get that

4    certification; correct?

5    A.    That's correct.

6    Q.    Okay.  You said that you do a lot of work as an

7    associate with Behavior Management Associates?

8    A.    I have a small private practice with them.

9    Q.    Small practice.  You do a lot of work with adults

10   and adolescents that have addictive disorders; is that

11   what you said?  Am I correct?

12   A.    Again based on Behavior Management Associates.

13   Q.    I'm sorry, just talking about behavior

14   management.

15   A.    That's correct.

16   Q.    You don't really deal with criminal assessments

17   with Behavior Management Associates, do you?

18   A.    Occasionally I will have a forensic evaluation

19   through the organization, but that's a small part of

20   my caseload there.

21   Q.    But essentially Behavior Management Associates is

22   kind of an employee assistance program; isn't that

23   correct?

24   A.    No, that's not correct.

25   Q.    I want to have you refer to volume I of the

84

1   binder that I have provided to the Court and you, and

2   I'd like to have you look at page 1 of that.  And for

3   your reference and the Court's, I've caused the bottom

4   right corner of all these pages to be Bates stamped

5   for convenience.

6       If I can ask you just to look at page 1, can you

7   identify what that page and the preceding few pages

8   are behind that?

9   A.   Yes.

10  Q.   What is that?

11  A.   That's the employee assistance program that is

12  the subset of what Behavior Management Associates

13  does.

14  Q.   And doesn't that say there that, "Behavior

15  Management Associates provides complete program that

16  addresses employee problems that include comprehensive

17  work/life services and can be enhanced with ancillary

18  service"?

19  A.   That's correct.

20  Q.   But it's not an employee service program?

21  A.   You misunderstood my response.  I said Behavior

22  Management Associates is not an employee assistance

23  program.  This employee assistance program is called

24  Impact, that's the employee assistance program.  I

25  have nothing to do with it.

85

1    Q.    Thank you.  Your CV also says you are a member of

2    the College of Examiners?

3    A.    That's correct.

4    Q.    Are you a life member or yearly member of that

5    organization?

6    A.    I'm not sure of the distinction.

7    Q.    Well, doesn't that organization -- there are two

8    ways you can join.  You can either join every year and

9    pay every year or you can pay a larger fee and be a

10    member for life?

11    A.    I'm an annual member.

12    Q.    Your are an annual member?

13    A.    That's correct.

14    Q.    Isn't it true to become a member of the

15    organization you essentially self-certify yourself and

16    agree to abide by their code of ethics to become a

17    member?

18    A.    That is part of it, correct.

19    Q.    Is there an additional part of that that is

20    required?

21    A.    Yes.  They now have testing.  They also have

22    continuing education requirements --

23    Q.    Could you explain?

24    A.    -- that are part of becoming certified.

25    Q.    Okay.

1        MR. FULKERSON:    That's all I have about

2    his qualifications your Honor.    Thank you.

3        THE COURT:    You may resume your

4    examination, Mr. Simmons.

5                FURTHER DIRECT EXAMINATION

6    BY MR. SIMMONS:

7    Q.    Thank you, your Honor.

8        Dr. Smith, I'd like to ask you to please look at

9    Exhibit 4 in the exhibit book.

10    A.    (Witness complied.)

11        MR. SIMMONS:    Just to keep things

12    confusing, your Honor, it actually has an Exhibit 5

13    in the lower right-hand corner.

14        THE COURT:    I'm going to mark that out on

15    my copy.

16        THE CLERK:    I'm restickering.

17        THE COURT:    Thank you.

18    Q.    Dr. Smith, have you, based upon your review of

19    the records in the initial trial and your review of

20    Miss Miller's work, and the other investigation you've

21    done, formed some opinions about Mr. Landrum's

22    psychological state at the time of the murder and also

23    at the time of his trial?

24    A.    That's correct.

25    Q.    Could you please in a general way state to the

87

1    Court what you have, what these opinions are, and then

2    we'll get into some specifics.

3    A.    Sure.    Basically I believe that at the time of

4    the offense Mr. Landrum was dependent upon several

5    chemicals.    Alcohol, sedatives and cannabis, or

6    marihuana.    I also believe at the time of the offense

7    that he was under the influence of alcohol and

8    sedatives, that he was suffering from a psychological

9    disorder that had been long standing from adolescence.

10         This depressive disorder is called dysthymia or

11   disthymic disorder, and he as a child suffered a

12   number of significant traumas and abuse that led to

13   his development of depression and later his addiction

14   to alcohol and other drugs.

15         THE COURT:    Before we proceed, would you be

16   gracious enough to spell dysthymia for the record?

17         THE WITNESS:    D-y-s-t-h-y-m-i-a.

18         THE COURT:    Thank you.

19   Q.    And did this disorder that you have described

20   have an impact on his cognitive abilities during this

21   period of time?

22   A.    Absolutely.

23   Q.    And what was that?

24   A.    In order to understand Mr. Landrum's function,

25   you would have to take a look at all the disorders in

88

1   combination.

2       Disthymic disorder in and of itself has a number

3   of influences upon both how a person feels, how they

4   think and how they act.  When a person has this type

5   of chronic depression they often feel hopeless,

6   helpless.  There's a sense of agitation in their

7   ability, low self-esteem, feeling they can't be

8   successful, they can't do anything right.  There's an

9   underlying despair which leads to them to engaging in

10  self-defeating behaviors.

11      Oftentimes they will attempt to do things, but

12  because they believe they'll fail, they do.  And so

13  people with dysthymia have failed relationships,

14  oftentimes are unable to maintain employment, and will

15  turn to alcohol and drugs as a way of coping with this

16  ongoing depression.

17      The use of alcohol and drugs of course changes

18  the way the brain works.  Alcohol is a central nervous

19  system depressant.  It slows down the brain, it

20  results in impulsist mood swings, agitation,

21  irritability, sometimes aggressive behavior.  Mixing

22  that with another drug, which Mr. Landrum did

23  frequently, such as Ativan which is a sedative, in

24  fact Ativan directly enhances the effects of alcohol

25  so that it's not just an additive factor but

1    multi-flexitive factor, so that an individual taking

2    alcohol and Ativan together will be significantly

3    impaired in terms of their ability to focus,

4    concentrate, interpret events that are going on around

5    them.

6         Their motor movements may be, but it depends.

7    People using with high tolerances, abusing substances

8    for a long time, their body develops an ability to

9    adapt to the effects of the chemicals, so they may be

10   able to walk a straight line, they may be able to

11   speak without slurring their words too badly.  But in

12   fact what's happening is their cognitive functioning

13   is significantly impaired, just it's masked by their

14   ability to walk and talk.

15        Putting the depression together with the effects

16   of alcohol and the sedative, the individual's ability

17   to comprehend a situation, concentrate, focus,

18   consider their options, weigh the pros and cons,

19   consider the consequences of their actions would all

20   be significantly impaired.

21   Q.   Was there any effort in the mitigation phase of

22   this case to explain, for example, the relationships

23   that you've just discussed between various drugs and

24   alcohol?

25   A.   I did not see any attempt to make that connection

90

1    explanation.

2    Q.    Was there any discussion of any relationship

3    between Mr. Landrum's depression or this disorder that

4    you've described and his use of these substances?

5    A.    Not that I'm aware of.

6    Q.    In working with -- in coming to your conclusions,

7    could you tell the Court what events or what history

8    of Mr. Landrum, what events in his life to you were

9    significant in coming to your opinions, and in

10   particular if, while you're doing it, you could

11   mention which of those, if any, were not dealt with in

12   the original trial?

13   A.    Yes.

14   Q.    Just sort of go through his life, the

15   significance of the various events and explain whether

16   they were or were not dealt with in your view properly

17   or at all at the original trial.

18   A.    Okay.  As a beginning statement, I think I would

19   say that most of what I'm going to say I do not feel

20   was adequately developed and discussed in the original

21   trial.

22        What I'm looking at when I look at Mr. Landrum's

23   background is a developmental history.  I'm looking at

24   how do these events impact the development of the

25   child, how does that child cope with those events,

1    what is their response, what choices do they have

2    available to them, what disorders may they develop,

3    how do those developed disorders then affect ongoing

4    sort of maturation and life choices, and then how,

5    ultimately, did all of those things impact

6    Mr. Landrum's behavior at the time of the offense.

7            I don't believe that the initial trial did

8    much of that at all. I can kind of walk through these.

9            First things to become important are the

10   absence of a father.  For the first four years

11   Mr. Landrum has no father figure that's present.  His

12   mother is somewhat present, but because of her

13   schooling and work and because of the home

14   environment, her involvement with Mr. Landrum was also

15   limited.

16           THE COURT:  What about the maternal

17   grandfather?

18           THE WITNESS:  We do have a maternal

19   grandfather.  Now he becomes very significant because

20   he uses alcohol, and it's not every day but it is

21   regular and it's excessive, and when he drinks to

22   excess, he's abusive.  Now that becomes important

23   because Larry's going to be forming some opinions

24   about the use of alcohol and what is appropriate

25   behavior when you drink.  His grandfather uses

92

1    regularly, becomes out of control, becomes violent.

2    That becomes a socially acceptable behavior in some

3    ways.

4    A.    Then we have maternal aunts and uncles who also

5    abuse alcohol and drugs.  Now there's a couple ways to

6    look at it, and I'm going to kind of talk about the

7    development for Larry in several areas.  If we want to

8    look at his development of addiction, there are three

9    things that put a child at risk for addiction.

10   Genetic factors, environmental factors and

11   psychological factors.

12        In Larry's family, we have genetic factors,

13   we have a maternal grandfather who abuses alcohol and

14   drugs, and we have maternal aunts and uncles, so we

15   know there's a family history of substance abuse.

16        THE COURT:  We don't know.  Of course we

17   know there's a family history.  We don't have any

18   determined, clinically determined patterns of tracing

19   that genetic occurrence, do we have, in the matter of

20   available science?

21        THE WITNESS:  What the literature has shown

22   us, if you have immediate family members, defined as

23   parents, grandparents, aunts and uncles, if you have a

24   significant history of substance abuse, the children

25   are predisposed.  It's not a direct genetic

93

1    inheritance but a predisposition, sort of like with

2    cancer, so that children who come from a family

3    history where there's cancer, we know that they're at

4    risk.  That's what we really know about the children.

5           The literature is suggesting that it's five

6    times greater risk than for children who do not have a

7    significant family history.  But that's only one of

8    the factors.

9    A.    The second factor becomes environment.  Children

10   who grow up in a home where alcohol and drugs are

11   readily available and where the parental figures or

12   adult figures use alcohol and drugs are more likely to

13   experiment and use drugs than their peers.  What we

14   have is, we have a grandfather, we have the aunts and

15   uncles, later we have the stepfather, all who use

16   alcohol and/or drugs on a regular basis, and that's

17   part of family life.  So that is another factor that

18   contributes to it being okay to Larry to begin

19   experimenting with alcohol and drugs.

20          The final factor is that we know that children

21   who suffer physical abuse or sexual abuse are much

22   more likely to begin using alcohol and drugs as

23   adolescents.  When we look at Larry's background, we

24   have sexual abuse at the age of five.  We have

25   physical abuse by the stepfather over a number of

94

1    years.  And we have numerous losses, the death of his

2    grandmother, that he now is trying to cope with.

3        As a result, what we have is all three factors

4    contributing to Larry's use of alcohol and drugs.  It

5    wasn't just one factor, but all three.

6        The other thing you begin to look at is, well,

7    what makes something traumatic for a child?  Why

8    should these events have an impact on Larry?  We've

9    got dad out of the picture, we've got mom who is

10   preoccupied, and then we've got the death of

11   grandmother.  We've got physical and sexual abuse.

12   We've got the stepfather.  Why should all those be

13   significant?

14       Well, what we know from the research now is there

15   are a number of things you can look at.  One is to

16   what extent is the event something that normally

17   occurs in childhood.  If it's a normal event, the

18   child should be able to talk to friends, family and

19   others, and work it through.  It's not something

20   that's strange or odd or something they should be

21   embarrassed or ashamed about.  The problem is that a

22   number of things that happened in Larry's background

23   were not normal events.  Being sexually abused at the

24   age of four and five is not a normal event for a

25   child.

95

1          THE COURT:   How abnormal is it,

2     ideologically speaking, do you know?

3          THE WITNESS:   In terms of percentages we're

4     probably looking at less than three percent of the

5     population overall experiences sexual abuse at the age

6     of four or five.  We do know that for females,

7     adolescence is a more likely period for sexual abuse

8     to occur.

9     A.   The other thing that becomes significant is the

10    age and the mental status of the victim when the

11    trauma occurs.  The less capable they are to process

12    what happened to them, to talk about it, verbalize it

13    and work it through, the more they're going to be

14    traumatized by the event.  So the age becomes

15    significant, the level of maturity, the intellectual

16    functioning are all factors.

17         Many of these events that occurred in Larry's

18    life, he was very young, did not have the mental

19    capability and the maturity to be able to work it

20    through.

21         The next thing becomes how many traumas you have

22    occur in your life.  A single trauma can leave a

23    lasting scar throughout a person's life, but multiple

24    trauma becomes significant, because trauma basically

25    tells me the world is a dangerous place and I have to

96

1    be very cautious, in fact maybe I need to even be

2    aggressive to keep myself safe.  If I have repeated

3    trauma, that just keeps reinforcing to me that the

4    world is dangerous and that life is filled with all

5    sorts of hurt and pain and loss.

6         The last thing has to do with the recovery

7    environment when a child has gone through repeated

8    trauma.  How supportive, how nurturing, how aware of

9    the trauma are the family members, the parents with

10   the child?  Do they talk about it, do they work it

11   through, do they get the child counseling and

12   assistance for those disorders?

13        When we look at Larry's childhood there just

14   wasn't the type of recovery environment to help him

15   work through the traumas that he went through which

16   again then contributes to his turning to alcohol and

17   drugs as a way to sort of medicate himself and deal

18   with his emotional pain.

19   Q.   You have discussed the family situation as a

20   young child, and I just wanted to be sure that you

21   had, you feel you fully explored that.  Have you

22   discussed the situation in Sault Ste. Marie until he

23   moved to the fullest you think appropriate?

24   A.   Well, I think the other part that I would want to

25   add is dysthymia is a chronic underlying depression

1   that oftentimes begins in the early adolescence and

2   can persistent for many years.  It is somewhat

3   biologically based, but what we have been able to

4   discover is that ongoing trauma tends to be one of the

5   contributing factors to a person developing this kind

6   of depression.  That sense of helplessness and

7   hopelessness, the inability to correct my situation,

8   make my life better, that I continually seem to fail,

9   no matter what I do I can't seem to make my life right

10  becomes an underlying theme, and so that then builds

11  into a depressive state that persists into adulthood.

12  Q.   Is there any significance to your view in the

13  remarriage of Mr. Landrum's mother and the move to

14  Chillicothe in this analysis?

15       THE COURT:   I think technically we're not

16  talking about a remarriage.  I think we're talking

17  about a first marriage.

18       MR. SIMMONS:   I think we are.  Excuse me.

19  Marriage.

20  A.   The marriage becomes significant in several ways.

21  First, mother moves and lives with in-laws, which

22  allows Larry to be alone without his mother for about

23  a month, which when you're looking at the age that

24  he's at, is pretty traumatic.  Even though the mother

25  was not necessarily the best mother and always

1  present, she was there.  Now she's completely absent.

2      Then after about a four- to six-week period, the

3  mother removes Larry from his family completely, moves

4  to another city, and now he's not able to see his

5  grandparents, aunts, uncles, cousins.  He's completely

6  removed from them.  And then lastly he's now adapting

7  to this parental figure who is rather stern, has bouts

8  of rage and abuses alcohol, and then at a later point

9  discovers that this in fact is not his father but is

10  his stepfather.

11      So there were a number of events that occurred in

12  that transition that contributed to Larry's feelings

13  again of loss, depression and attitudes about the use

14  of alcohol.

15  Q.   Is there any significance to Larry's experiences

16  in his teenage years at either Upham Hall, the

17  Fairfield School or elsewhere that you think fit into

18  this analysis?

19  A.   Yes.  I think the records, particularly at Upham

20  Hall, provided significant data regarding Larry's

21  function at age 16.  At that point he had overdosed on

22  drugs, which clearly tells us at that point that his

23  use of alcohol and drugs had already progressed to a

24  point where it was causing significant problems in his

25  life.

1  The records repeatedly document his feeling sad

2  and presenting with symptoms of depression, and the

3  problems with the stepfather's violent temper, and

4  that that needed to be addressed and needed to be

5  treated.

6      Unfortunately, it was not treated.  The

7  stepfather opted to not get counseling or therapy for

8  himself.  Larry did not want to go home.  He had asked

9  to go live with relatives in Michigan.  The family,

10  the mother and father, stepfather, decided not to

11  allow that, that Larry needed to come back home.

12      Things did not go well when he went back home.

13  He was violated for his probation, went to Fairfield

14  School, and again removed from the family.  He did

15  fairly well.  His grades improved in school, his

16  behavior was appropriate.

17      What we find is that his behavior deteriorated

18  from the point that his grandmother died, his mother

19  married his stepfather, and the physical abuse began.

20  You can see this progression.  Progression in terms of

21  alcohol and drug use, progression in terms of

22  depression, progression in terms of behavior that

23  becomes more and more erratic and out of control and

24  unpredictable.

25      THE COURT:  Meaning his behavior, not his

100

1    stepfather's?

2              THE WITNESS:    No.  Meaning Larry's behavior.

3    The overdose when he's in the military.  His behavior

4    becomes out of control.  At times he's AWOL for days

5    at a time.  He's not able to maintain his life in an

6    orderly fashion because of the depression and the

7    effects of the alcohol and drugs.

8    Q.   Did you perform any tests or ask Mr. Landrum to

9    undergo any testing in terms of your analysis of his

10   situation?

11   A.   Yes, I did.

12   Q.   And could you please explain to the Court what

13   testing you did and what, if any, significance it has

14   on your overall opinion?

15   A.   I basically did four things.  I conducted the

16   Michigan Alcoholism Screening Test.  This is a

17   screening instrument to look at an individual's use of

18   alcohol.  A score of 5 suggests the person has a

19   problem with alcohol.  Larry's score was 35.

20        I also administered the Drug Abuse Screening

21   Test.  This is used to screen for drugs other than

22   alcohol.  Again the cutoff score is 5 to indicate a

23   problem, and Larry's score was 23.

24        These screening tools just simply reinforced what

25   the records had shown and what my interview had

101

1   demonstrated, that Larry's use of alcohol and drugs

2   was clearly a problem and was at a level to support a

3   diagnosis of dependence.

4        Also I administered the Wechsler Adult

5   Intelligence Scale to screen for intellectual

6   functioning, found that Larry functions in the average

7   range overall, or full scale IQ was 105.  Then I also

8   conducted the Minnesota Multiphasic Personality

9   Inventory.

10            THE COURT:   I or II?

11            THE WITNESS:   II.

12   A.   Basically it demonstrated that his clinical

13   scales were all within normal limits.  There were no

14   significant elevations.  The only sub-scale that was

15   significantly elevated was the scale that's used to

16   identify individuals who have a high susceptibility to

17   abusing alcohol and drugs.

18   Q.   Now you know there was some testimony at the

19   trial, I think even in the mitigation phase --

20            THE COURT:   I'm sorry, when were these tests

21   administered?

22            THE WITNESS:   The MAST and DAST were July

23   30th, 1993, and the WAIS and the MMPI were December

24   10th, 1993.

25            THE COURT:   Thank you.

1    Q.    Doctor, as you know, there were some references

2    in the trial, and as I say, even in the mitigation

3    phase that Larry drank too much.  In your view is what

4    you're saying just a repeating that kind of statement

5    or is what you're saying something significantly

6    different?

7    A.    I think it's significantly different in that,

8    yes, that is one of the symptoms that Larry had was

9    that he drank too much.  But more importantly, I think

10   it's imperative that we understand that he had an

11   underlying depression, that his use of alcohol and

12   other drugs, not just alcohol, was a self-medicating

13   approach to treating his depression and dealing with a

14   number of early life traumas and ongoing losses

15   throughout adolescence and into adulthood, he had a

16   number of losses as an adult, and his way of coping

17   was to use alcohol and drugs.

18        So that understanding that, I think we have a

19   better understanding of why the alcohol was there and

20   how the addiction developed, because once an addiction

21   develops, then the individual, yes, they drink because

22   of other factors, but they're also now drinking

23   because they're addicted to the substance.

24        MR. SIMMONS:    That's all I have, your

25   Honor.

103

1        THE COURT:    Thank you.  Cross.

2        Let me ask, I suppose, Mr. Fulkerson, it

3   being 10 minutes of 12:00, whether you anticipate a

4   brief or extended cross-examination such that it would

5   be appropriate to take the lunch break now?

6        MR. FULKERSON:    I would think not more than

7   30 minutes at the most.

8        THE COURT:    All right.  We'll go ahead then.

9        MR. FULKERSON:    Okay.

10                   CROSS-EXAMINATION

11   BY MR. FULKERSON:

12   Q.   Dr. Smith, when did you first become involved

13   with this case?

14   A.   I don't know the exact date.  It was in the early

15   part of 1994.

16   Q.   And you became involved in the case through the

17   Ohio Public Defender's Office?

18   A.   That's correct.

19   Q.   And were you paid for your services at that time

20   to prepare the affidavit that is in the record in this

21   case now?

22   A.   For this affidavit?  Yes.

23   Q.   Correct.  And how much were you paid for your

24   services for the entire post-conviction process that

25   you were involved in in this case?

104

1    A.    I have no idea.  I know what I charge per hour

2    but I don't recall the total amount.

3    Q.    What do you charge per hour?

4    A.    A hundred seventy-five dollars per hour.

5    Q.    Do you have any reasonable estimate of how many

6    hours you put in to prepare the affidavit in your

7    investigation for post-conviction?

8    A.    Not at this point I don't.

9    Q.    Okay.  And you're also being paid for your

10   services today?

11   A.    That's correct.

12   Q.    And you're charging $175 an hour?

13   A.    No, it's $225 an hour for court time and

14   testimony.

15   Q.    It's been almost 10 years since your previous

16   investigation.  How were you contacted to testify in

17   this proceeding?

18   A.    Again I was contacted by the Ohio Public

19   Defender's Office.

20   Q.    That's fine.  Do you support the death penalty?

21   A.    Yes.

22   Q.    Your CV says that you do some work with the

23   Catholic Charity Services of Cuyahoga County?

24   A.    I have in the past.

25   Q.    Are you a practicing Catholic?

105

1    A.    Yes, I am.

2    Q.    And you have no opposition to the death penalty

3    based on your religious beliefs?

4    A.    No, I do not.

5    Q.    Okay.  Would you agree that it's not the role of

6    your role in mitigation to make decisions about what

7    strategies the trial counsel should employ?

8    A.    I'm sorry, can you say that again?

9    Q.    You testified on direct that your role is to

10   present a valid diagnosis of somebody at the time of

11   the crime and provide that to the defense?

12   A.    That's correct.

13   Q.    You would agree with me then that it's not your

14   role to develop trial strategies, it's for a lawyer to

15   do; correct?

16   A.    That's correct.

17   Q.    And you're not a lawyer?

18   A.    No, I'm not.

19   Q.    Would you agree then as a general matter that

20   it's up to counsel to make the decision about what

21   evidence to present in mitigation?

22   A.    Yes.  I just have one qualifier.  Certainly when

23   I'm asked by attorneys to do an evaluation, I will

24   tell them records that I would like to review,

25   individuals that I would like to interview, if I need

106

1    more time with the defendant, so that I want to give

2    them a thorough evaluation so I will ask for those

3    things.  It would be their determination whether or

4    not I receive them, but I will let them know what I

5    need or what I at least feel I need to have a full and

6    comprehensive assessment.

7    Q.   Okay.  In other words then is it important for

8    you testifying in mitigation that you are presenting

9    testimony that is consistent with the defense theory

10   of the case?

11   A.   That's their determination whether or not what I

12   have is consistent with their theory, but what is

13   important to me is that I have as much information as

14   possible to feel confident that the opinions that I'm

15   giving are valid.

16   Q.   Do you know the defense strategy Mr. Landrum's

17   attorneys used at trial, at the guilt phase of the

18   trial?

19   A.   Their strategy?  I'm not sure.

20   Q.   Do you know what their strategy was in the

21   mitigation phase of Mr. Landrum's trial?

22   A.   No, I'm not sure.

23   Q.   You don't know then whether counsel's strategy

24   was to admit Mr. Landrum's guilt or blame someone else

25   for the crime or show that Mr. Landrum was remorseful?

107

1   A.   No, I didn't work with the attorneys so I don't

2   know their strategies.

3   Q.   Of the people that you work with through Stella

4   Maris and Behavior Management Associates and your work

5   with Case Western, those are people that generally are

6   seeking your help; is that a fair statement?

7   A.   No.

8   Q.   That's not a fair statement?

9   A.   No.

10  Q.   People are -- just come to you?  How do they get

11  to you for assistance?

12  A.   I have several different groups that I work with.

13  The Hitchcock Center for Women, probably 80 percent of

14  those are coming on their own.  Twenty percent are

15  court-ordered treatment.

16  Q.   So it's fair to say that some are coming to you

17  really not of their own will, but because of the court

18  direction?

19  A.   Right.  And then the men's program at Stella

20  Maris is one hundred percent offenders, so they have a

21  choice, the choice is to either go to prison or go to

22  treatment.  It's not exactly the same as choosing the

23  treatment.

24  Q.   I understand.  Would you agree then that somebody

25  in that situation might have a motive to fabricate

108

1    information to you as a clinician because they're

2    under judicial pressure to do so?  I don't mean

3    judicial pressure but --

4                THE COURT:   It is judicial pressure.  That's

5    right.

6    Q.   Well, so would you agree with me that someone in

7    that situation has a different motivation than someone

8    who comes to you of their own free will seeking your

9    help?

10   A.   It can.  It can be different.

11   Q.   And when someone's not forthcoming with you about

12   their background and personal information for whatever

13   reason, that's corrupting your opinion; is that true?

14   A.   It limits your opinion.  It may not -- there may

15   be sufficient additional sources or whatever that you

16   can still draw a valid opinion, but it would be

17   helpful if they're forthcoming and give you the

18   information themselves.

19   Q.   But when they're not giving you good data, your

20   opinion is compromised as a result; is that correct?

21   A.   Well, no.  That's why I said no.  I think again

22   it depends on the number of other sources you have.

23   If I have school records and medical records and

24   psychiatric records and mother and father telling me

25   something and the defendant doesn't necessarily

109

1    disclose that, that doesn't necessarily corrupt my

2    opinion.  What it means is I know what the defendant

3    is telling me but I've got 12 other sources that say

4    it's true.

5    Q.    Do you remember testifying in the Mark Brown

6    capital case?

7    A.    No.  Not necessarily, no.

8    Q.    If I refer you to volume II of the book that I've

9    provided, page 126 of that book, and again the page

10   numbers are on the bottom right-hand corner of that.

11   A.    (Witness complied.)

12   Q.    I'll represent to you that that page is from your

13   testimony in the Mark Brown capital case, and if I can

14   refer you down to lines 17 through 20, could you just

15   read that very briefly?  Page 126, lines 17 through

16   20?

17   A.    Yes.

18   Q.    You were asked a question about whether someone

19   is forthcoming with you or not corrupts your opinion

20   and you answered correct?

21   A.    That's true.

22   Q.    Okay.  I just wanted to clarify that.

23         Now you were talking a little bit about testing

24   and interviews.  Would you say as a general matter

25   that it's important for you to personally interview

110

1    someone in a situation like Mr. Landrum before giving

2    your opinion for mitigation purposes?

3    A.    I think it depends upon the circumstances of the

4    request by the attorneys so that I don't know that I

5    can say yes or no to that.  It's a very broad

6    statement.

7    Q.    Do you have to interview somebody to provide the

8    opinions that you're providing?

9    A.    It depends on what the circumstances are and what

10   opinion they're asking for.

11   Q.    If they're asking you to provide an opinion about

12   someone's psychological diagnosis, do you have to

13   interview them or is that just not necessary if you're

14   given, let's say school records, medical records, test

15   records, that kind of thing?

16   A.    I think again it's an awkward question.  If I was

17   shown that the defendant had been given an IQ test

18   four or five different times and all of the IQ's were

19   the same, I would probably say there's not much reason

20   to do a full assessment again.  Why?  We have a steady

21   IQ, there's been no head trauma, the individual's

22   verbal presents normal, I wouldn't see that.  If we're

23   trying to diagnose a very significant psychological

24   disorder that may have been only developed recently,

25   it would be important to be able to see them because

111

1    records may not necessarily reflect that.

2    Q.    But you interviewed Mr. Landrum twice?

3    A.    That's correct.

4    Q.    At least in this case it was important for you to

5    interview him?

6    A.    Correct.

7    Q.    And you also reviewed some of his school records?

8    A.    That's correct.

9    Q.    Would you say that's important to review in

10   preparing your opinion?

11   A.    Again I think that it's useful.

12   Q.    Okay.  Just to recap, you did do diagnostic

13   interviews of Mr. Landrum; correct?

14   A.    Yes.

15   Q.    You gave him four tests which you've described,

16   MMPI-II, the WAIS, you gave him the Michigan

17   Alcoholism Screening Instrument and then the --

18   A.    Drug Abuse Screening Test.

19   Q.    Drug Abuse Screening Instrument.  Did you do any

20   other independent investigation on Mr. Landrum's case

21   other than the tests you did and what was given to you

22   in order to prepare your affidavit?

23   A.    Review of records. (Witness nodded.)

24   Q.    Did you review records not listed in your

25   affidavit?

112

1    A.    No, I did not.

2    Q.    So you reviewed what was given to you by the

3    defense?

4    A.    That's correct.

5    Q.    You didn't do any independent investigation on

6    your own?

7    A.    No, I did not.

8    Q.    You didn't review any other reports or materials,

9    again that were not given to you specifically?

10   A.    The things I reviewed are in my affidavit.

11   Q.    Okay.  Let me talk a little bit about your

12   affidavit and get into some specifics.

13        How many questions are on the Michigan Alcoholism

14   Screening Test?

15   A.    Approximately 28.  Twenty-eight, I think.

16   Q.    And the Drug Abuse Screening Test is 20

17   questions?

18   A.    Twenty-eight as well.

19        THE COURT:    Let me just ask a question about

20   that while it's on my mind.

21        THE WITNESS:  Sure.

22        THE COURT:    If I want to take the MMPI or

23   the Myers-Briggs for example, I have to take it with

24   somebody who's got the right to administer it.  What

25   about the MAST.  Is it on line?

113

1      THE WITNESS:   The MAST is on line, you could

2      get it as well as the DAST.

3      THE COURT:    Go ahead.

4      Q.    Looking at your affidavit, in paragraph 14 that

5      you have in front of you there -- I'm sorry just want

6      to back up one second.   Paragraph 13.   I believe

7      that's on page 7 of your affidavit.   In there, you

8      talked about this on direct examination, you talked a

9      lot about Mr. Landrum's background and family and how

10     that affected him later in life.   Is that fair to say?

11     A.    Yes.

12     Q.    Are you aware that the defense in mitigation

13     tried to show that Mr. Landrum in fact had a good

14     family background?

15     A.    I know that when I reviewed the transcript, that

16     there were statements that certain parts of his life

17     were good, yes.

18     Q.    Don't you think the testimony that you're

19     proposing here today would conflict with what that

20     trial strategy was, that he came from a good family?

21     A.    Again I can't comment on trial strategy.

22     Q.    Okay.   You also testified fairly extensively

23     about Mr. Landrum's addictive disorders and the

24     effects on him.   I'm going to get into that in a

25     little more detail, but are you aware also that

114

1   defense argued in mitigation that Mr. Landrum did have

2   a background with serious drug and alcohol abuse?

3   A.    I know that they mentioned that he abused those

4   substances, yes.

5   Q.    Looking at paragraph 14 of your affidavit, and

6   again you talked about this a little bit on direct,

7   Mr. Landrum's time at the Fairfield School for Boys

8   and his time that he was in the Navy.  How long was he

9   at the Fairfield School for Boys, do you know?

10  A.    I don't recall offhand.

11  Q.    It's fair to say from your review of those

12  records that's a pretty structured environment, it's

13  not an open school?

14  A.    Very structured environment, yes.

15  Q.    But he graduated; correct?

16  A.    He completed that school and had very good grades

17  there.

18  Q.    Got good grades, got a diploma.  Got a driver's

19  license, too, didn't he?

20  A.    That's correct.

21  Q.    Is it fair to say that he did fairly well while

22  he was there for a substantial period of time?

23  A.    I thought that he did exceptionally well there.

24  I was very pleased to see his response to a structured

25  environment without alcohol and drugs.

1    Q.    Let's talk a little bit more about the alcohol

2    and drugs, and specifically at the time of the crime.

3    Do you know how much Mr. Landrum weighed at the time

4    of the crime?

5    A.    Not offhand.  I know that he's always been small

6    in stature.

7    Q.    Is it fair to say that your body mass and weight

8    affects the ability, or affects how drugs and alcohol

9    react within your body?

10   A.    Yes.  What we know is the smaller the individual,

11   the less it requires for an individual to become

12   intoxicated.  So someone smaller in stature would

13   require a smaller amount of actual drug in order to be

14   impaired and intoxicated.

15   Q.    But you're not sure what his body weight was at

16   the time of the crime?

17   A.    Not exactly.  I mean I know that he was small in

18   stature.  That was documented throughout the medical

19   records that he was always rather small, and with that

20   in mind, the amount of alcohol, even if he had been a

21   large person, based upon the transcript indicating

22   that he had 12 to 18 beers and somewhere around six to

23   eight Ativan would have been enough for a person who

24   weighed 250 pounds to be grossly intoxicated.

25   Q.    Okay.  Your affidavit, also your direct testimony

116

1   was that you concluded influence of alcohol and

2   sedatives was prominent in Mr. Landrum at the time of

3   the crime; is that fair to say?

4   A.   That's correct.

5   Q.   Would that affect his memory of the events at

6   that time?

7   A.   Absolutely.

8   Q.   Are you aware that Mr. Landrum testified at

9   trial?

10  A.   Yes, I am.

11  Q.   Are you aware that he testified in some detail

12  about going into Mr. White's apartment and what

13  happened?

14  A.   That's correct.

15  Q.   It's fair to say he had a very clear memory of

16  what's going on?

17  A.   I don't know that at all.

18  Q.   In fact, Landrum on cross-examination by the

19  prosecutor said that he knew what he was doing and it

20  was hard to forget what had happened.  Did you read

21  that part of the testimony?

22  A.   Yes, I did.

23  Q.   Mr. Landrum also testified about him and Mr., he

24  and Mr. Swackhamer's drinking a case of beer.  In fact

25  you talked about this a little bit on direct, that he

117

1    had taken eight Ativans and had consumed approximately

2    14 to 18 beers before the crime.  Landrum are you

3    aware testified that he had been drinking beers about

4    every five minutes before the crime?

5    A.    Yes.

6    Q.    Is that consistent with someone with the

7    diagnoses that you provided?

8    A.    Yes.

9              THE COURT:    Hang on just a second.

10             Okay.

11   Q.    Pretty fast drinker, isn't he?  Drinking a beer

12   every five minutes is a pretty fast drinker?

13   A.    It's very fast for a social drinker.  Again you

14   have to think about a person who is a heavy drinker,

15   an alcoholic.  I have seen alcoholics to drink two

16   cases of beer a day, fifth of whiskey and a case a

17   beer a day, so no.

18   Q.    Okay.  I want to talk about paragraph 18 of your

19   affidavit.  I'm going to break this down just a little

20   bit.  You concluded within a reasonable degree of

21   psychological certainty that he was dependent on

22   alcohol, sedatives and cannabis at the time of the

23   offense?

24   A.    That's correct.

25   Q.    And that he was under the influence of alcohol

118

1    and sedatives at the time of the offense?

2    A.    That's correct.

3    Q.    And I'm just reading from -- that he was

4    suffering from a depression called dysthymic disorder?

5    A.    Disthymic.

6    Q.    Thank you.  And that was exacerbated by the use

7    of alcohol and sedatives, and that he was in a state

8    of diminished capacity.

9         Are you aware that the State of Ohio doesn't

10   recognize the defense of diminished capacity?

11   A.    I think I've read that.

12   Q.    Okay.  Is it fair to say that your conclusion

13   that Mr. Landrum didn't understand the situation and

14   that his judgment was inappropriate is based on the --

15   Let me strike that.  Start over again.

16        Mr. Landrum, in your opinion, did he know right

17   from wrong at the time of the crime?

18   A.    I believe that he knew that he was committing a

19   robbery and that was going on.

20   Q.    Do you believe that he knew that he was

21   committing a murder?  If he was committing murder

22   would he know that he was doing it?

23   A.    I don't know that there was deliberation to

24   commit a murder so I don't know about that.

25   Q.    But there was a lot of deliberation before the

1  murder; correct?

2  A.   Well, there was to break into his home and to rob

3  it.  There was planning for that.

4  Q.   In fact, there was a lot of planning.  That's

5  when he was intoxicated; right?

6  A.   Again I don't know what a lot is, but I know

7  there was planning and that occurred while he was

8  using substances.

9  Q.   We'll walk down it.  He armed himself with a

10  railroad bolt before he went there.  He had the

11  foresight to gather a weapon of some kind; correct?

12  A.   I know that he had a railroad bolt, or someone

13  did.  I don't know that he brought that or who brought

14  that.

15  Q.   He and Mr. Swackhamer cased the apartment before

16  they went there; right?

17  A.   That's my understanding. (Witness nodded.)

18  Q.   Okay.  He had the foresight to wear surgical

19  gloves during the burglary?

20  A.   Correct.

21  Q.   He told Carolyn Brown that he would kill the

22  victim if the victim returned; right?

23  A.   I've heard of that.  I don't know about that.

24  Q.   Well, the Ohio Supreme Court found that in their

25  factual findings.  Were you aware of that?

120

1    A.    That could be.

2    Q.    Okay.  He waited for White to leave the

3    apartment.  You are aware of that?

4    A.    Yes.

5    Q.    He was given the -- When Mr. White returned,

6    Mr. White, according to the Ohio Supreme Court said

7    something along the lines of, what are you doing, get

8    out of here, and Mr. Landrum didn't leave?

9    A.    That's correct.

10   Q.    So all those things kind of indicate some level

11   of understanding of what's going on.  Isn't that

12   inconsistent with your opinion that he didn't

13   understand the situation?

14   A.    No.

15   Q.    Despite the fact that he did all these things up

16   to the time of the crime?

17   A.    That's correct.

18   Q.    What do you think would have been an appropriate

19   judgment in that situation?  You say Mr. Landrum

20   didn't utilize appropriate judgment.  What would have

21   been appropriate judgment?

22   A.    Well, again I think that what we're looking at is

23   the difference between the ability to think and the

24   ability to think in a logical and in a sort of higher

25   order thinking.  Certainly Mr. Landrum was thinking.

121

1    He's not unconscious, he's not mentally retarded, he's

2    making a plan to do something, but doing it and doing

3    it well are two different things.  And clearly he

4    waited for the victim to leave to rob the house and

5    then everything went wrong from that point on.

6         I would suggest that had he not been depressed,

7    not been under the influence of alcohol and drugs,

8    that his response to the situation might have been

9    much different.

10   Q.   Do you think most people not having Mr. Landrum's

11   condition that are in a situation where they're

12   burglarizing an apartment, are surprised by the owner,

13   wouldn't react in kind of a panicked kind of reaction?

14   A.   I think that would be part of it, and I think

15   adding alcohol and drugs to depression only makes it

16   that much worse.

17   Q.   Okay.  You talk about his inability to comprehend

18   the situation.  What do you understand the situation

19   to have been at the time Mr. White came back into the

20   apartment?

21   A.   I didn't say that he was unable.  I said it was

22   impaired.

23   Q.   His ability to comprehend the situation was

24   impaired?

25   A.   Correct.

122

1    Q.   What do you understand is the facts that actually

2    took place when Mr. White was murdered?

3    A.   Again I don't know all the facts because I don't

4    have that in front of me at this point.  But what I do

5    know is the cognitive functioning of Mr. Landrum at

6    the time, and it's one of those things where it's not

7    really about something willful.  If someone injects

8    certain drugs, they have an effect.  If someone has a

9    psychiatric disorder, it has symptoms.  And the

10   problem with those things, they don't go away.

11   They're persistent, they're present.

12        So a person with depression, those symptoms will

13   be present.  If you have injected these drugs, within

14   a period of time they're going to have the effect they

15   have.  And so we know that his cognitive functioning

16   must be impaired given what he injected only several

17   hours prior to the offense.

18             MR. FULKERSON:   If I can have just a moment?

19             THE COURT:    Sure.

20   Q.   You gave Mr. Landrum an MMPI; correct?

21   A.   That's correct.

22   Q.   And that was the second version?

23   A.   Uh-huh.

24   Q.   The court reporter is taking everything down.

25   A.   Yes.

123

1    Q.    Did you do a validity determination on the MMPI

2    that you gave Mr. Landrum?

3    A.    It has validity scales and reliability scales,

4    and those indicated that the MMPI was both reliable

5    and valid.

6    Q.    Did anyone else review the MMPI that you gave Mr.

7    Landrum?  Has anyone else ever reviewed it?

8    A.    I'm not aware anyone has.

9    Q.    You have given MMPI tests to people in the past

10   in this context, capital cases.  Has anyone ever

11   looked at your results and determined they were

12   invalid, the test was invalid?

13   A.    Looked at the test that I gave that I said was

14   valid and then they found it to be invalid?

15   Q.    Correct.

16   A.    No.

17   Q.    Okay.  You didn't give Mr. Landrum a Symptom

18   Checklist test, did you?

19   A.    No, I did not.

20   Q.    You didn't give him an Impact of Life Events

21   test?

22   A.    No.

23   Q.    And you didn't give him a Millon Clinical

24   Multiaxial test?

25   A.    MCI.  No, I did not.

124

1  Q.  Do you need to give those tests to do a thorough

2  examination in this context?

3  A.  No.  Many of those would be competitive and

4  result in possible invalidity of the test.

5  Q.  Did you diagnose Mr. Landrum with a social

6  personality disorder?

7  A.  No.

8  Q.  Have you ever diagnosed anyone in a capital

9  context with an antisocial disorder?

10  A.  Absolutely.

11  Q.  You have testified in several of these cases;

12  correct?

13  A.  Where I found them to be antisocial?

14  Q.  Just in general, you have testified in several

15  capital cases in this context?

16  A.  Yes, I have.

17  Q.  Would you characterize Mr. Landrum's family life

18  growing up as dysfunctional?

19  A.  Yes.

20  Q.  Isn't it true that not everyone that comes from a

21  dysfunctional family suffers from the kinds of

22  disorders Mr. Landrum does?

23  A.  I think the problem is taking the term

24  dysfunctional and applying it to all families.

25  Individuals who come from Mr. Landrum's dysfunctional

125

1   background will present with the symptoms that he has.

2   Q.   Okay.

3           THE COURT:   Unless he gets treatment, or

4   regardless of whether he gets treatment?

5           THE WITNESS:   It will depend upon the type

6   of treatment.  Part of the difficulty that I had as a

7   professional was reviewing the Upham Hall records.  It

8   was very disappointing to see that they referred to

9   his alcohol and drug abuse repeatedly, yet there was

10  nothing in the treatment plan to address the alcohol

11  and drug addiction.

12  Q.   On the MMPI test that you gave Mr. Landrum, did

13  you disregard any of the answers to any of his

14  questions when you scored the test?

15  A.   No.

16  Q.   Have you ever given an MMPI where you have

17  disregarded answers to questions before that didn't --

18  A.   I'm not sure.  Do you understand the MMPI?

19  Q.   Let me ask this.  Have you ever -- you have given

20  MMPI's in other contexts; correct?

21  A.   I have given MMPI's throughout my career.  In

22  fact my research is on the MMPI.

23  Q.   In giving an MMPI test, have you ever looked at

24  the results and thrown out questions that suggest

25  things that are inconsistent with your diagnosis?

126

1    A.    Absolutely not.  That would be both unethical and

2    inappropriate.  In fact you can't even determine what

3    questions are going to be used or not used.  That's

4    not the way the MMPI is scored.

5    Q.    You're saying that you have never --

6    A.    It's not based on individual items.

7    Q.    Pick and chose?

8    A.    The whole idea is that the MMPI is 76 or 77 items

9    and it's based upon profiles, not on individual items.

10   And taking items out, any items out based upon the

11   clinician's determination, would be inappropriate.

12   The only time that you ever look at items individually

13   are what are called the critical items of the MMPI.

14   Q.    What are critical items?

15   A.    Critical items are items that suggest very severe

16   pathology.  Suicidal ideation, alcohol, drug addition.

17          MR. FULKERSON:   Can I have just one moment,

18   your Honor?

19          THE COURT:   Of course.

20          MR. FULKERSON:   Thanks.

21          Your Honor, there will be no further

22   questions.

23          THE COURT:   Redirect?

24          MR. SIMMONS:   Yes, your Honor.  Very

25   briefly, I promise.

127

REDIRECT EXAMINATION

BY MR. SIMMONS:

Q.   I just wanted to be sure if I haven't already covered this, Doctor.  We have in this case as Exhibit 3 an affidavit of Jill Miller, which I'm sure you've seen, I know you've seen.  And a confidential memorandum attached to it that she did and submitted as part of her post-conviction proceedings in state court.  You are familiar with those?

A.   Yes.

Q.   Were those important documents for your analysis?

A.   Those are very important.  Oftentimes they are summaries affidavits that are provided regarding interviews that were done with family members and friends that I would then rely upon as additional data to corroborate or not corroborate opinions that I have.

Q.   That's all I have.

            THE COURT:   Anything further based on that?

            MR. FULKERSON:   No, your Honor.

            THE COURT:   I have a couple things myself.

                        EXAMINATION

BY THE COURT:

Q.   Maybe just one area.  I think you've said that you believe that Mr. Landrum panicked when Mr. White

128

1    returned, and that that panic was exaggerated by the

2    effect of the alcohol and Ativan that he had consumed.

3    Did I hear you correctly?

4    A.   I think that his response was not a logical

5    response but was a reaction, not a thought-through

6    action but a reaction to the situation that then was

7    based upon an impaired mind that's been sedated by

8    both alcohol and Ativan.

9    Q.   Is it at all likely that a person in those

10   circumstances when reacting would chose a pattern of

11   action that he had proposed before?

12   A.   That would be a possibility.  I think that some

13   of it has to do with -- what's going through my mind

14   is that Mr. Landrum has no history of violence that

15   we're aware of.

16   Q.   No history of violence at all?

17   A.   Right.

18   Q.   The point I'm adverting to is his statement prior

19   to the murder during the course of planning the

20   robbery, that if Mr. White comes back, I'll kill him.

21   He may have been rehearsing that in his head.

22   A.   Again I wouldn't want to speculate about what was

23   going on in his head.  When people are intoxicated or

24   sedated, thoughts tend to not be as logical and flow

25   as smoothly as we would expect or anticipate, so that

129

1    oftentimes there's missing logic, there's missing,

2    sort of sequential thinking. And again it's more

3    reaction to an event rather than I'm thinking about.

4    Q.    Right.

5    A.    He denies saying this so I don't know.

6    Q.    Right.

7    A.    That statement, I'm not sure what it means.

8    Q.    You may step down.

9    A.    Okay. Thank you.

10        (Witness excused.)

11        THE COURT: I believe that concludes the

12    testimony to be presented in this matter, and so the

13    next question is briefing schedule.

14        MR. SIMMONS: Could we move to admit the

15    exhibits, please?

16        THE COURT: Of course.

17        MR. COLLYER: Your Honor, just for the

18    record, we're going to object to the exhibits to the

19    extent there are witnesses they did not call and

20    could have called for purposes of this hearing, and

21    we would rely on Williams vs. Coyle for that. That

22    is inadmissible. When the Court orders an

23    evidentiary hearing even though these are exhibits

24    admitted to the state court, if these witnesses are

25    available then those affidavits and reports are

1          MR. WILLE:  Thank you.

2     (Messrs. Lazarow and Mezibov conferred privately.)

3          MR. LAZAROW:  No further questions, Your Honor.

4          THE COURT:  Is this witness released?

5          MR. LAZAROW:  Yes, Your Honor.

6          MR. WILLE:  Yes, Your Honor.

7          THE COURT:  Thank you very much, Mrs. Leahy.

8     (Witness excused.)

9          THE COURT:  Call your next witness.

10         MR. MEZIBOV:  Dr. Parran.

11         THE CLERK:  Raise your right hand, please.

12    (Duly sworn by the Clerk.)

13         THE CLERK:  Thank you.  Please be seated.

14              THEODORE V. PARRAN, JR., M.D.

15    a witness herein, having previously been sworn, testified as

16    follows:

17                    DIRECT EXAMINATION

18    BY MR. MEZIBOV:

19    Q.  Good morning, Dr. Parran.

20    A.  Good morning.

21    Q.  Dr. Parran, before I begin to ask you any questions, the

22    first thing I would ask of you is that you state your full

23    name and spell your last name for the record, please.

24    A.  My that is Theodore Van Doran Parran -- P-a-r-r-a-n --

25    Junior.

EXHIBIT

63

PARRAN   -   DIRECT

3-24

1    Q.  Dr. Parran, where do you reside?

2    A.  I live in Shaker Heights, Ohio.

3    Q.  And could you tell us your occupation, please?

4    A.  I'm a physician.

5    Q.  And a physician licensed to practice medicine in the

6    State of Ohio?

7    A.  In Ohio, yes.

8    Q.  Dr. Parran, could you give us the benefit of your

9    educational background?

10   A.  I went to college at Kenyon College in Ohio, and then

11   went to medical school at Case Western Reserve University,

12   School of Medicine; graduated in 1982.  I did my residency in

13   internal medicine for three years at Johns Hopkins Hospital,

14   in Baltimore City Hospital, in Baltimore, Maryland, and I

15   spent an additional year as a medical chief residence there,

16   so that is my formal education and training.

17   Q.  And, Dr. Parran, could you give us the benefit of your

18   professional experience as a physician since the time you

19   graduated from medical school?

20   A.  Yes, having graduated from medical school, as I mentioned

21   I spent four years in residency training in Baltimore.  I

22   then spent another two years living in Baltimore working on

23   the faculty at Johns Hopkins School of Medicine and helping

24   to direct both the general internal medicine Clinic as well

25   as a drug and alcohol treatment program in Baltimore City

PARRAN  -  DIRECT

3-25

1  Hospital.  In 1988 I moved back -- I moved back to Cleveland,

2  taking a faculty position at Case Western Reserve University

3  School of Medicine in helping to direct both the general

4  internal medicine Clinic and several drug and alcohol

5  treatment programs and consultation programs in the Greater

6  Cleveland area.

7  Q.  And where are you employed at the present time?

8  A.  Currently I'm employed part-time by Case Western Reserve

9  School of Medicine as the Director of the Clinical Science

10  Program as well as the Director of the Addiction Medicine

11  Fellowship Program.  I'm also employed part-time by the

12  Cleveland V. A. Medical Center helping to -- as the Medical

13  Director of their extensive Drug and Alcohol Treatment

14  Program.  And then finally I am part-time or privately

15  employed as a member of a group practice of two of us

16  providing addiction medicine services to hospitals and

17  substance abuse treatment centers in Cleveland.

18  Q.  How long have you been working at the V. A. at Cleveland?

19  A.  I started working at the V. A. in 19 -- 1993.  In 1993,

20  we applied through the V. A. for a grant to support our

21  addiction medicine fellowship program and that was funded as

22  one of only six in the country, and have been employed

23  part-time with the V.A. since then.

24  Q.  Dr. Parran, over the course of time have you developed

25  certain areas of specialization in the practice of medicine?

PARRAN - DIRECT

3-26

1    A.   Yes, I'm board certified in internal medicine and I

2 continue to practice, a small percentage of my time, in

3 general internal medicine.  I'm also certified by the

4 American Society of Addiction Medicine in the area of drug

5 and alcohol dependence and treatment.  And I honestly spend

6 the majority of my time working in the area of substance

7 abuse treatment, as well as researching, education in the

8 area of addictions.

9    Q.   When you say "majority" of your time, could you assign a

10 percentage of your time to that area of practice?

11    A.   Probably 70 percent at this point.

12    Q.   What is the American Society of Drug Addictions?

13    A.   The American Society of Addiction --

14    Q.   Addiction Medicine.  I'm sorry.

15    A.   Yes.  It's a multi-disciplinary group of physicians,

16 about 4,000, maybe 4500 members.  Approximately 3,000 of us

17 are certified --

18    Q.   How do you become certified?

19    A.   -- of the organization.

20      In order to be certified in addictions medicine, you have

21 to be able to provide documentation that you have worked

22 full-time in the area of drug and alcohol dependence

23 treatment for at least two years, and then you have to take a

24 certification examination.

25    Q.   Now, you have treated, I take it, individuals who have

PARRAN  -  DIRECT

3-27

1   been addicted to alcohol or drugs?

2   A.  Yes.  Since -- since 1985, I've treated somewhere between

3   1200 and 3,000 patients a year, each year, with a history of

4   addictions, approximately split 50/50 between alcohol

5   dependent and drug dependent.

6   Q.  Dr. Parran, in addition to the board certifications that

7   you've told us about, are you a member of any professional

8   boards or associations or organizations?

9   A.  Yes, I'm a member, as I mentioned, of ASAM, the American

10  Society of Addiction Medicine.  I'm also a member and have in

11  the past served on the board of the -- of an organization

12  called AMERSA, which is the Association for Medical Education

13  and Research in Substance Abuse.  I'm a member of the Society

14  for General Internal Medicine.  I'm a fellow in the American

15  College of Physicians.  And I am a fellow and a member of the

16  Executive Committee on the American Academy of Physician and

17  Patient.

18  Q.  Now, Dr. Parran, have you over the course of time

19  published any books or writings or treatises or studies in

20  your particular areas of specialization?

21  A.  Yes, I have.  I've written, oh, probably more than a

22  dozen maybe, close to two dozen but at least a dozen papers,

23  book chapters, syllabus modules on the treatment of

24  addictions, screening for chemical dependency, screening for

25  chemical dependence, how to present the diagnosis, how to

1   form a treatment plan with patients, management of

2   detoxification and the acute effects of drugs and alcohol,

3   syllabus materials on cocaine dependency, prescription drug

4   abuse, et cetera.

5   Q.  Finally, Dr. Parran, have you had occasion before today

6   to testify in court in matters in which you are a specialist

7   or in areas in which you practice?

8   A. Yes, I have.  I've testified in both criminal and civil

9   proceedings in the area of management of chemical dependency

10  and/or addiction medicine, especially in the area of the

11  management of acute drug induced delirium.  That was a civil

12  case.  In the area of prescription drug abuse and stimulant

13  abuse, especially diet pills, those have been criminal cases.

14  Q.  And, Dr. Parran, at my request did you bring down to us

15  today a copy of your current CV?

16  A.  Yes.

17     (Mr. Mezibov distributing documents to the Court and

18  counsel.)

19  Q.  Dr. Parran, I've handed you what's been marked

20  Plaintiff's Exhibit 14.  Can you identify that for us,

21  please?

22  A.  Yes, it's my C.V. which was updated last summer.

23  Q.  So this is current up through the summer of '96?

24  A.  It's at least current through, oh, probably July of '96.

25  Q.  Now, Dr. Parran, let's turn our attention to this matter

PARRAN   -   DIRECT

3-29

1   involving John Hicks.  Could you tell us when you were first

2   hired by myself and Mr. Lazarow in connection with this

3   matter?

4   A.   It probably was either late 1994 or early 1995.

5   Q.   And do you recall what we asked you to do initially?

6   A.   Yes, you asked me to look at the data about the case,

7   especially the information that was gathered around the time

8   of the events in early August of 1985, in order to form an

9   opinion about whether or not cocaine played a role or

10  appeared to have played a role in those events.  And,

11  secondly, you asked me to look at the trial proceedings and

12  the testimony to see if I could form an opinion about the

13  quality of the information there regarding the pharmacology

14  of cocaine and how it might relate to this case.

15  Q.   And, Dr. Parran, could you tell us how you went about

16  conducting your evaluation in connection with these matters

17  which we asked you to look into?

18  A.   Yes.  I read through a sort of summary or excerpts of

19  both the police investigation, the police interviews, and

20  then some of the testimony in terms of pretrial, trial and

21  mitigation proceedings.

22  Q.   Were you provided the actual trial transcripts then?

23  A.   Yes.  Yes.  And I was able to look at some notes taken by

24  Ms. Leahy.  I was able to look at the affidavits of a couple

25  of different physicians or a couple of different doctors.  I

PARRAN  -  DIRECT

1   can give you the doctor's name if you want.

2   Q.   Is that Dr. Baum?

3   A.   Yes, Dr. Baum.

4   Q.   And Julia Hawgood?

5   A.   Hawgood, yes.

6   Q.   Psychologist?

7   A.   And I was able in July of 1995 to actually go in and

8   interview Mr. Hicks.  And, finally, I received the

9   depositions of Dr. Schmidt --

10  Q.   Schmidtgoessling?

11  A.   'Goessling, and Doctor -- starts with an R.

12  Q.   Reardon?

13  A.   Reardon.

14  Q.   All right.

15  A.   Yes.

16  Q.   Could you tell us when you interviewed Mr. Hicks?

17  A.   It was in July of 1995.  I don't remember the exact date.

18  Q.   Okay.  And could you tell us approximately how much time

19  you spent with Mr. Hicks?

20  A.   About an hour-and-a-half.

21  Q.   And what was the purpose of your speaking with Mr. Hicks?

22  A.   I wanted to have a chance to talk with him both about his

23  previous experiences with cocaine prior to the events of

24  August of 1985, to speak with him about how cocaine tended to

25  affect him when he was using it, to get at least his

1    recollections of that point in 1995 of what went on in August

2    of 1985, and, finally, just to get my own sense of him and

3    his mental status, perhaps psychological or psychiatric

4    background.  Although my background is in internal medicine

5    and not in psychiatry or psychology, I spend lots of time

6    interviewing people with issues in those areas and I wanted

7    to get a chance to interview him myself about those kinds of

8    things.

9    Q.  Dr. Parran, when you were provided these materials -- the

10   trial transcripts, the affidavits and depositions and then

11   actually speaking with Mr. Hicks in person -- were there

12   particular matters you were looking for in order to aid you

13   in your evaluation?

14   A.  I was looking for specific descriptions of his mind

15   state, his thinking processes, his sensations when under the

16   influence of cocaine both prior to August of '85 as well as

17   in August of '85, and any descriptions or evidence from

18   interviews that he had provided at that time that might give

19   some evidence or some clue from a clinical standpoint to me

20   as to what state he was in.

21   Q.  At the time these offenses were committed?

22   A.  Yes.

23   Q.  Now, over the course of looking at these materials and

24   speaking with Mr. Hicks, were you able to find any credible

25   evidence of drug use or its effect in connection with

1  Mr. Hicks?

2  A.  Yes, absolutely.  His history that he provided to

3  interviewers, provided to me as well, the history that his

4  family members had been able to provide to interviewers, as

5  well as some records from previously mandated court -- or

6  court-mandated treatment from the chemical dependency

7  standpoint, all indicated Mr. Hicks had had a significant

8  addiction problem in the past.

9  Q.  You used the term dependence, cocaine dependence.  Can

10  you tell us what that means from your standpoint?

11  A.  Well, there's sort of an over-arching view or diagnosis

12  we use of chemical dependency, which means the person meets a

13  certain criteria in DSM-IV -- which is the Diagnostic and

14  Statistical Manual-IV edition -- criteria for what would be

15  called in the vernacular "addiction."

16      Chemical dependency -- in this case dependency to cocaine

17  and alcohol -- includes:  Compulsive use; use to levels of

18  intoxication that weren't planned; adverse consequences from

19  repetitive use; loss of control of use once initiating that

20  use.  So a person, as long as they haven't used any of the

21  drug in a given day, tends to be fairly predictable; but when

22  they do it again, they tend to lose control and over use,

23  resulting in adverse consequences.

24      (Continuing)  Increase in preoccupation with use; use

25  despite repetitive and multiple, as I mentioned, adverse

FARRAN  -  DIRECT

3-33

1    consequences; sometimes increased tolerance, and at times

2    physical dependence, including withdrawal from the drug when

3    it's taken away -- although, I must say that 80 percent of

4    people who meet the criteria for a diagnosis of chemical

5    dependency or addiction don't have physical dependence to the

6    drug, meaning they don't use it every day and they don't go

7    through withdrawal when they stop using it.

8    Q.  What you've just listed, are those objective signs and

9    symptoms of chemical dependency?

10   A.  Yes, they are objective.  They're verifiable.  They're

11   primarily based on history.  But a careful history taken from

12   an individual can generally rule in or rule out chemical

13   dependency.

14   Q.  Did you find signs and symptoms of cocaine or chemical

15   dependency in connection with Mr. Hicks?

16   A.  Yes, absolutely.

17   Q.  Can you describe to us what those objective signs and

18   symptoms of chemical dependency was or were?

19   A.  Yes.  Mr. Hicks' background with alcohol and drug abuse

20   -- primarily marijuana early on -- resulted in repetitive

21   adverse consequences in his life from a performance

22   standpoint in school, from a performance standpoint at work,

23   from a financial standpoint, and from a legal standpoint from

24   his late teens on.

25       He, during periods of less use or abstinence, tended to

PARRAN   -   DIRECT

3-34

1    function quite well, and at times of increasing use

2    developed, as I mentioned, repetitive adverse consequences

3    resulting in pain and suffering in his life as well as in

4    those surrounding him.

5        Sometime in, the best of my recollection, the late

6    '70s/early '80s, Mr. Hicks' drug of choice seemed to switch

7    from alcohol and marijuana to cocaine and alcohol.  And he

8    developed, I think, inarguable evidence of cocaine addiction,

9    including in 1982 or '83 going through a significant amount

10   of money -- several thousand dollars that he had in a

11   retirement fund -- in cocaine use, and actually in the year

12   of 1985, earlier that year, going through probably a couple

13   thousand dollars in his bank account and his wife's bank

14   account for cocaine use.  So that indicates cocaine

15   dependence to me.

16       Another thing that indicates cocaine dependence is

17   actually the way he tends to use.  Initially, he started to

18   use cocaine by snorting it, and fairly soon shifted to using

19   I.V.  And the data about cocaine use and the routes of

20   administration indicates that of the 35 million Americans or

21   so who have intermittently tried cocaine, there's about three

22   million or three-and-a-half million, 10 percent, that develop

23   cocaine addiction or cocaine dependence.  And the vast

24   majority of those who shift from intermittent use of cocaine,

25   what might be casual use of cocaine and cocaine dependence,

FARRAN - DIRECT

3-35

1   tend to change their route of administration.  They either

2   use an I.V. or, more recently now, smoking the cocaine.

3       So, when I see a person who has a history of shifting

4   their route of administration to an I.V. form, that is

5   powerful evidence of a move to addiction.

6       And then, finally, the pattern with which he tended to

7   use.  He tended to use an intermittent binge pattern of

8   cocaine.  And, once again, people who are casual users or

9   occasional users of cocaine tend to use it casually and

10  occasionally.  People who tend to lose control of cocaine,

11  like most other stimulants that we have experienced with over

12  the last hundred years or so, tend to shift to a pattern

13  where they intermittently binge on the cocaine where they

14  initially use it, and then use it several times to multiple

15  times over the next few hours to few days until their money

16  runs out, or they become too paranoid, or they become too

17  exhausted, and then they sort of quit using the cocaine and

18  crash and go to sleep and sleep off the binge.  And it tends

19  to be a -- sadly, sort of a payday phenomenon where people

20  get paid on Friday and have strong urges and connect the use

21  of cocaine with the handling of money, and then people tend

22  to binge in the middle part of the week, recover on the

23  weekend to go to work on Monday.

24  Q.  What you describe, is that a phenomenon you observed or

25  found in the history of Mr. Hicks?

PARRAN   -   DIRECT

3-36

1    A.   Absolutely.

2    Q.   Now, can an individual feign or fake cocaine dependency

3    or chemical dependency?

4    A.   No, not really.  It's -- it's really not possible to fake

5    addiction to the point of spending several thousand dollars

6    of a retirement fund in a matter of several weeks to a couple

7    of months intermittent binging on cocaine and then earlier in

8    1985 a couple of thousand dollars' worth of the entire bank

9    account of oneself and one's spouse.  That is just not a

10   pattern that people are able to put on.

11   Q.   What was the significance of this history that you found

12   with regard to Mr. Hicks in your evaluation that we asked you

13   to do for us?

14   A.   Well, the history that I found with Mr. Hicks in terms of

15   his shifting from marijuana to cocaine, people who have

16   previously been dependent on marijuana -- which is a sort of

17   a small scale or fairly weak stimulant on the dopamine

18   system -- a person who's been a habitual dependent or

19   addicted marijuana smoker, if they start using cocaine, tend

20   to in a high percentage of cases, I would say 85 percent of

21   the time, develop cocaine dependence, and it's certainly what

22   happened to Mr. Hicks.

23   Q.   You mentioned the dopamine phenomenon.  What is that?

24   A.   Uh-huh.  Cocaine has three primary effects in the body,

25   three primarily pharmacological effects.  It's first effect

PARRAN  -  DIRECT

3-37

1    is to basically short circuit the peripheral nerves.  It

2    blocks the sodium potassium-pumping peripheral nerves and,

3    therefore, it is a very good anesthetic, and cocaine is used

4    as a local anesthetic.  Since the peripheral nerves are short

5    circuited, they can't transmit pain sensation and so they

6    become deadened or numb, the area where it's applied.

7        The second effect of cocaine is systemic effect, a

8    through-the-body effect, and that is a blocking of the

9    reuptake of norepinephrine and also to some degree

10   stimulating the release of norepinephrine.

11   Q.   And norepinephrine is?

12   A.   Norepinephrine is known in the vernacular as adrenaline,

13   a hormone, a systemic hormone released by the adrenal gland

14   which tends to stimulate increased heart rate, increased

15   blood pressure, increased reflexes, decreased appetite, gets

16   rid of a need for sleep, so people don't sleep and they don't

17   eat and they're all jazzed up.  And the rush of cocaine, the

18   -- what's described as the initial rush of cocaine, is a

19   norepinephrine or adrenaline surge.

20       The third effect of cocaine is a central effect in the

21   central nervous system where cocaine blocks the reuptake of

22   dopamine and it also stimulates the release of dopamine.

23   Dopamine is a neurotransmitter.

24   Q.   A neurotransmitter is what?

25   A.   A neurotransmitter -- a neurotransmitter is a chemical

1  release by one nerve or neuron in the brain which then

2  stimulates a second nerve or neuron in the brain and produces

3  a reaction or a feeling.  And dopamine is the -- is the

4  neurotransmitter which produces euphoria in the human brain.

5  For example, on the first sunny, warm day in spring, if we

6  were able to measure dopamine levels in our brain compared to

7  the last snowy, cold day in February, all of our dopamine

8  levels would be a little higher because our spirits would be

9  a little higher because of that external stimuli.

10  Q.  Spring fever actually has a physiological effect?

11  A.  Clearly.  Absolutely.  Dopamine is deficient, or the

12  brain is relatively immune to normal levels of dopamine when

13  people have clinical depression and, therefore, most

14  antidepressant medications work either directly or indirectly

15  to intensify the brain's sensitivity to dopamine so that our

16  spirits are lifted and the depression eases.  Dopamine

17  honestly is released during any pleasurable experience.

18      Cocaine is the most potent drug that's been identified

19  which blocks the reuptake and stimulates the release of large

20  amounts of dopamine in the brain, and, hence, it produces

21  variant euphoria.  So, pretty much all addictive drugs that

22  we know of, from nicotine to marijuana, from heroin to

23  cocaine, including things like alcohol and Valium and even

24  prescription pain medications, all either directly or

25  indirectly increase dopamine levels in the brain.  Dopamine

PARRAN  -  DIRECT

3-39

1  is clearly a final, common pathway of addictive drugs.

2  Q.  Now, Dr. Parran, what I'm going to ask you is this

3  question:  Based on all of the materials you were provided

4  which you reviewed in connection with this matter, and

5  drawing on your professional experience and knowledge, do you

6  have an opinion, to a reasonable degree of medical certainty,

7  whether Mr. Hicks was cocaine- or chemically dependent at the

8  time he committed the offenses in question?

9  A.  Yes, he certainly was cocaine dependent and alcohol

10  dependent and, hence, he had chemical dependence with a drug

11  of choice, of cocaine, and a secondary drug of choice, of

12  alcohol -- that would be the current terminology we use

13  clinically.

14  Q.  You described how the cocaine affects an individual

15  pharmacologically; correct?

16  A.  (Nods head affirmatively.)

17  Q.  Could you tell us what cocaine psychosis is?

18  A.  Yes.  I just described the sort of three pharmacological

19  effects of a single dose of cocaine:  Peripheral nerve

20  numbing, of how the drug was administered, and then sort of

21  systemic rush of a surge of norepinephrine, and then central

22  release of dopamine and euphoria.  That's what happens when

23  anyone takes a single dose of cocaine.

24      As people take more and more cocaine, as people

25  repetitively administer cocaine, several things happen:  Less

3-40

1   and less dopamine is released because the dopamine nerves in

2   the brain only have a certain supply.  Since the cocaine

3   stimulates too much release of dopamine and doesn't let the

4   nerve take it back up to recycle it, the nerve becomes

5   depleted of dopamine and, hence, subsequent administrations

6   of the drug produce lower and lower amounts of euphoria.  At

7   the same time when the drug wears off, people have what is

8   called dysphoria, or a hangover.  It's almost better to

9   grasp --

10  Q.  Is it easier to chart that?

11  A.  The euphoria -- it would be easier to draw it out.

12          MR. MEZIBOV:  Your Honor, may I use the chart?

13          THE COURT:  We'll recess and he can draw his

14  diagram.

15          MR. MEZIBOV:  Thank you, Judge.

16          THE CLERK:  All rise.

17      (At 10:12 a.m., a brief recess was taken.)

18                      * * *          (10:35 a.m.)

19          THE COURT:  Is the petitioner ready to proceed?

20          MR. MEZIBOV:  Yes.

21          THE COURT:  Respondent ready to proceed?

22          MR. WILLE:  Yes.

23          THE COURT:  Proceed.

24  BY MR. MEZIBOV:

25  Q.  Dr. Parran, during the break you have prepared a couple

PARRAN  -  DIRECT

3-41

1  of exhibits for us; have you not?

2  A.  Yes, I have.

3  Q.  And we were talking about cocaine psychosis and the

4  pharmacological effects of that.

5  A.  Yes.

6  Q.  Could you, with the Court's permission, come down and

7  show us what you prepared for us?

8  A.  Okay.

9       THE COURT:  Proceed.

10      MR. MEZIBOV:  Your Honor, with your permission.

11  Maybe if we all came closer.  Is it okay?

12      THE COURT:  I can see.

13      MR. MEZIBOV:  Okay.

14  (Witness positioned by the easel.)

15  A.  What I've tried to graph out here is the effects that one

16  might receive from the administration of a fixed dose of

17  cocaine by two different routes.

18     What I've drawn in a solid line here, sort of this wavy

19  shape, is the effect that one might receive from snorting or

20  intranasally administering perhaps 10 milligrams of cocaine.

21     And along this axis here is sort of a person's mental

22  state, base line, euphoria and dysphoria, and at the bottom

23  end of dysphoria, paranoia.

24     And what I've drawn along this axis is time.

25     If a person snorts, for example, 10 milligrams of

PARRAN  -  DIRECT

3-42

1   cocaine, it takes about two minutes for a person to really

2   start getting high.  It's because cocaine is fairly slowly

3   absorbed across the nose membrane and there isn't very much

4   membrane in the nose to absorb it.

5       Also, we mentioned that one of cocaine's initial effects

6   is to produce a lot of norepinephrine in the system, a lot of

7   adrenaline in the system, and that causes a spasm of smooth

8   muscles which closes down blood vessels.  So, there isn't

9   much blood to the nose when one snorts, so the cocaine is

10  slowly absorbed.  The peak euphoria is after 20 minutes.  The

11  total duration of euphoria is 40 minutes, possibly a little

12  longer, possibly a little shorter, and then there is

13  dysphoria, there is a hangover.  And as with any

14  mood-altering drug that a human self-administers, the

15  euphoria is always followed by dysphoria.  It doesn't matter

16  if it is alcohol or nicotine or cocaine.  And the intensity

17  of the low is pretty directly proportional to the intensity

18  of the high, to use the example of alcohol that many people

19  are more familiar with.  How intoxicated a person gets is

20  proportional to their hangover.  And it'd take approximately

21  the same time to come back to base line from dysphoria to

22  euphoria, that is, if you snort cocaine.

23          THE COURT:  So the episode is 80 minutes?

24          THE WITNESS:  Eighty minutes from snorting cocaine,

25  yes.  When you look at this kind of a curve, you see a curve

PARRAN - DIRECT

3-43

1  that actually resembles having a mixed drink at a party.  A

2  person, after a little while, gradually becomes a little

3  disinhibited (sic) or euphoric.  It wears off after a period

4  of time with dysphoria and a person comes back to base line.

5      If you take those same 10 milligrams of cocaine, instead

6  of administering intranasally, if you use it in an I.V. or if

7  you smoke it -- it is just that the cocaine that was

8  available in 1985 generally was cocaine hydrochloride, the

9  acid form of cocaine, it was not smokeable.  Cocaine

10  carbonate (phonetic) or base, so-called freebase, is crack

11  cocaine.  This is what's marketed now and it is easily

12  smokeable by changing it from its acid to base form, which

13  most people cocaine dependent smoke it.  Back in '85, most

14  people with cocaine dependence couldn't turn cocaine

15  hydrochloride into cocaine chlorate (phonetic) and smoke it,

16  so they tended to use it in an I.V.  And if you take the 10

17  milligrams of cocaine, if I had drawn it proportionally, this

18  area below this curve here should be equal to the area under

19  this curve here because it's the same 10 milligrams of

20  cocaine.  But what happens is this onset of the high begins

21  in 15 to 30 seconds instead of two minutes.

22          THE COURT:  That is I.V.?

23          THE WITNESS:  I.V., or smoking.  But for purposes

24  of this discussion, I.V.  It begins in 15 seconds; takes

25  about that long for blood circulation to move through the arm

3-44

1    to the inferior vena cava to the lungs to the brain.  It

2    peaks at about two minutes.  It is pretty much done, in terms

3    of the measurable or reported euphoria, within about ten

4    minutes, and then there is a very deep dysphoria that follows

5    the very high euphoria, and then much more gradually the

6    dysphoria comes back to base line.

7    Q.  What is the impact or the dysphoria with respect to the

8    paranoia that you've also outlined on the chart?

9    A.  Well, if a person uses a small amount of cocaine I.V.,

10   they get very intensively euphoric for a short period of time

11   and then their actual mood, their spirits -- this is what is

12   called dysphoria, depression, despondency, lack of interest

13   in anything in life, except perhaps using more cocaine is

14   what sort of dysphoria would be defined as.  And if the

15   dysphoria gets deep enough, people tend to repetitively

16   report paranoid ideation, paranoid feelings, and that will

17   become more important when I show you the next graph which

18   demonstrates multiple self-administered doses of cocaine.

19       The reason why I said if a person shifts to an I.V. form

20   of cocaine from a snorting form of cocaine that it indicates

21   to me addiction, is that when a person is this high, this is

22   not a "social high."  The high is so intense at this point

23   that the human brain has a tough time processing other

24   stimuli.  When a person is this intoxicated, it's often

25   considered a so-called social lubricant.  When a person is

1   this intoxicated, it probably doesn't matter to the person

2   whether they are at a party or isolated.  It's just tough to

3   interpret much else here.  And then the low is so low, the

4   hangover is so intense, that most social users of the drug,

5   whatever that drug may be, if they're used to do doing this

6   and they ever do this kind of intense experience with the

7   drug, they say "This is too high.  This is too low.  The

8   whole thing was gone too quick.  I'll never do that again."

9        When a person has the disease of addiction, this is

10   interpreted, this intense high is interpreted as Nirvana.

11   And this intense low, by some strange neurochemical mechanism

12   of addiction that we don't -- that we haven't identified yet,

13   this intense low is actually interpreted by the addicted

14   brain as a reason to use again now, which is the difference

15   between social users of mood-altering substances and people

16   with chemical dependency.  It is clearly a brain lesion.  It

17   is clearly a disease of neurochemistry.  But we don't know

18   why this -- what would be a called a negative reinforcer, a

19   reason not to do that behavior again -- is interpreted in the

20   addicted brain as a reason to use now.

21   Q.  Before we turn the chart, for purposes of the record

22   we'll indicate that Dr. Parran has signed his name and

23   initialed his first chart.  We've marked that as Exhibit 15.

24   A.  Seeing this sort of basic pharmacology of cocaine, sort

25   of regardless of chemical dependency or not, this is the same

1  graph --

2      (New chart displayed.)

3  A.  -- that typifies a cocaine binge or a person who

4  repeatedly self-administers cocaine by the I.V. route, as is

5  evidenced in this case.

6  Q.  This is again marked Exhibit 16 and bears your initials

7  and the date.

8  A.  Yes.  Yes.  What happens is that the initial use of the

9  cocaine produces an intense euphoria that goes away

10  relatively shortly; but the dysphoria lasts a long time.  The

11  dysphoria tends to produce in a person with an addiction an

12  overpowering urge to use again.  And so they use again, but

13  this time the place where they start from is actually at a

14  low level, as opposed to a normal base line.

15          THE COURT:  I'm sorry.  This is your addict?  Is

16  this your addict?  Are we dealing now with an addict?

17          THE WITNESS:  Yes.  A person with addiction, yes.

18          THE COURT:  All right.  And you say "a long time."

19  How long?

20          THE WITNESS:  The dysphoria after a single

21  administration of cocaine can certainly last -- can certainly

22  last 80 minutes.

23          THE COURT:  Well, now on the other chart it was a

24  short time, you told me.

25          THE WITNESS:  The dysphoria peaks soon, but it has

PARRAN - DIRECT

3-47

1   a gradual tail.

2           THE COURT:  But now you're changing it.  You had it

3   about 50 or 60 minutes, and now you're changing to 80

4   minutes.  Aren't you?

5           THE WITNESS:  Well, this is the dysphoria, or the

6   -- or the intense low that people feel.  They gradually come

7   back to base line, but the craving for more cocaine is

8   described to last -- to last significantly longer than that.

9   But this is actually the low mood state, and this is 60

10  minutes, 50 minutes, somewhere in that range.

11          THE COURT:  I'm just using your charts now.

12          THE WITNESS:  Okay.  That's fine.

13          THE COURT:  So, the line, the diagonal line that

14  you were just talking with before I interrupted you --

15          THE WITNESS:  Yes.

16          THE COURT:  -- is a 60- to 80 minute line?

17          THE WITNESS:  Certainly an hour.

18          THE COURT:  All right.

19          THE WITNESS:  Certainly an hour.

20          THE COURT:  So in Mr. Hicks' case, we're dealing

21  now with the first hour?

22          THE WITNESS:  This would be the first

23  self-administration, so it would be about the first hour.

24          THE COURT:  So the euphoria was felt again  --

25  before the euphoria was felt again, we're dealing with an

PARRAN - DIRECT

3-48

1  hour of time?

2          THE WITNESS:  I'd have to go back and look through

3  the notes for exactly the period of time that was reported,

4  but it's -- it's my recollection now that the first

5  administration took place, and then within -- between an hour

6  and two hours the second administration took place.  And then

7  once again there is some differing reports of between three

8  and five injections; about an hour or so, maybe two hours,

9  with a third injection, yes.

10          THE COURT:  Proceed.

11          THE WITNESS:  Okay.

12  A.  (Continuing) What will typically happen in a cocaine

13  binge is a person will use cocaine, they'll feel high,

14  they'll feel very low.  They'll grad -- their spirits will be

15  very low here.  They'll self-administer again sometime.  When

16  they self-administer again, the peak of the high is

17  significantly lower than the initial, partly because they're

18  starting from a lower base line state when they use again,

19  but partly because there isn't as much dopamine in the

20  original nerve as there was in the first place because so

21  much was released in the initial -- in the initial use of the

22  drug.  And so you're dealing with a functionally

23  dopamine-depleted nerve and, hence, it can't release as much

24  dopamine.  So, with the second administration, people never

25  report being anywhere near as high as with the first

PARRAN  -  DIRECT

3-49

1  administration, and always report that the low is much lower

2  than after the first administration.

3      So, if we have a second administration, at some point

4  during that same binge, honestly these administrations in

5  some cocaine binges are every 15 to 20 minutes.  Sometimes

6  they're spaced out by a few to several hours.  Usually it's

7  in the range --

8          THE COURT:  When do they become fatal?

9          THE WITNESS:  Cocaine -- cocaine binges actually

10  are surprisingly rarely fatal, considering we have about

11  three million people intermittently binging on cocaine per

12  year in the United States.  We only have about somewhere

13  between a thousand and 1500 fatal overdoses from cocaine per

14  year.

15          THE COURT:  How much -- how much does that take?

16  Or does it vary with the size of the individual?  Or is it

17  something that can be -- can't be determined except on a

18  case-by-case basis?

19          THE WITNESS:  It is a case-by-case-basis.  The

20  reason being, because the fatality of cocaine tends to

21  involve one of three mechanisms -- actually four; the most

22  common I'll get to last.  The first is spasm of the coronary

23  arteries, smooth muscle in the arteries in the heart which

24  spasm lead to a heart attack and then death.  And that is

25  just sort of an intermittent thing that is unpredictable.

1       Secondly, a seizure.  And it's entirely unpredictable

2   when a person can have a seizure associated with cocaine

3   use.

4       Thirdly, rarely will people have a stroke from cocaine

5   use, and it can be a large stroke and produce death.  The

6   most common way that cocaine produces death is suicide, and

7   there's lots of suicides as well as homicides associated with

8   this sort of bizarre paranoid behavior that begins when

9   people are in the midst of a binge.  We don't have good

10  numbers on that.  The numbers that I gave you of about 1500

11  people a year, maybe 2000, who die of cocaine overdoses are

12  from heart attacks, seizures or strokes.

13          THE COURT:  And you say that cocaine base leads to

14  this episode that you've just described in Exhibit 16 more

15  than just powder cocaine?

16          THE WITNESS:  Actually, cocaine hydrochloride,

17  powdered cocaine and cocaine base, rock cocaine or crack

18  cocaine, are pharmaceutically the same thing.  It's -- it's

19  just that in order to get enough cocaine hydrochloride, the

20  powdered cocaine, into one's system to experience this, it

21  really has to be used in an I.V., and most Americans are

22  terrified of needles and won't use an I.V.  Cocaine base is

23  pharmaceutically identical.  It is just if you smoke cocaine,

24  it is all instantly absorbed by the lung.  The nicotine

25  companies have known that any mood-altering substance that

PARRAN  -  DIRECT

3-51

1  can be volatilized or vaporized and, hence, inhaled, can be

2  instantly absorbed by the lung and, hence, delivered pretty

3  much directly to the brain, and so it's two different

4  delivery systems for really, honestly, the same drug.

5          THE COURT:  And it's only cocaine base that can be

6  delivered to the lung?

7          THE WITNESS:  Yes.  Cocaine hydrochloride, powdered

8  cocaine.  If you heat it, you have to heat it to 400 degrees

9  centigrade for it to burn, and then it actually burns and

10  denatures, rather than vaporizes.  Cocaine chlorate -- or

11  what we know as crack cocaine, rock cocaine or base -- if you

12  heat it, since it's in the base form, it vaporizes at a

13  hundred degrees centigrade; temperature that is easy to reach

14  in, you know, any sort of smokeable form.  And, hence, since

15  it volatilizes and vaporizes, it is able to be smoked,

16  inhaled in the lungs and absorbed directly by the lungs, much

17  like nicotine.  And the -- I hate to say it, but the

18  advantage -- but the advantage of delivering a mood-altering

19  drug to the brain by the lung is that it's all absorbed into

20  the lung immediately in a very small -- one heartbeat's worth

21  of blood, when then in the next heartbeat it gets delivered

22  to the left heart, which then in the next heartbeat is

23  delivered to the brain.  So, we're really talking from the

24  time you smoke cocaine it is -- from the time you inhaled to

25  the time the cocaine hits your brain is, for all practical

PARRAN  -  DIRECT

3-52

1  purposes, three to four heartbeats, and so it's an even

2  quicker, more concentrated way to deliver a boulis of the

3  drug to the brain, hence, it tends to, if anything, be even a

4  little bit more reinforcing with even a little bit more acute

5  onset and possibly a higher peak than using an I.V.

6          THE COURT:  So, the use of cocaine base is more

7  likely to result in an episode that you've described on

8  Exhibit 16 than the use of cocaine hydrochloride?

9          THE WITNESS:  The use of cocaine base is just as

10  likely to produce this kind of a binging situation

11  (indicating) as the use of cocaine hydrochloride I.V.  And

12  the use of cocaine hydrochloride by snorting, the intranasal

13  route, tends to be less likely to produce this kind of a

14  phenomenon.

15          THE COURT:  And this episode you say results in

16  violence or death?

17          THE WITNESS:  Well, yes.

18          THE COURT:  Violence against self, violence against

19  others?

20          THE WITNESS:  Especially with subsequent

21  self-administrations.  Each time a person uses, the high is

22  less high and the low is even more low.  With more and more

23  dysphoria, more and more paranoia, more and more intrusive

24  thoughts, more and more difficulty interpreting normal

25  stimuli as being non-threatening.  It tends to lead to people

FARRAN  -  DIRECT

3-53

1    arming themselves on often a regular basis, using more and

2    more by themselves, being more paranoid in their ideation,

3    misinterpreting external cues and participating in what

4    everyone else would observe as unprovoked random violence.

5          THE COURT:  As a practical matter, a user of

6    cocaine -- "addict," if you will -- the only way they can use

7    it or assimilate it is by self-administration; isn't it?

8    There is only one to administer to?

9          THE WITNESS:  No, I've interviewed lots of patients

10   with positive toxicology tests for cocaine, all of which are

11   certain someone slipped it in their drink.  And when the

12   story comes out, that doesn't happen.

13         THE COURT:  Proceed.  I'm sorry.

14         THE WITNESS:  No.  The important aspect with this

15   kind of a graph is that as people in the midst of a binge

16   with cocaine, repetitive self-administration of cocaine, as

17   they become more and more dysphoric, the paranoia and then

18   more clearly psychotic symptoms of cocaine psychosis become

19   prominent.  The estimates are that when people use cocaine

20   I.V. or they smoke it, and if they use it in an intermittent

21   binge crack pattern, the estimates are at least 50 percent

22   and probably 70 percent of people develop significant

23   paranoid ideation during the end -- during binges after the

24   initiation, or binges lasting for a few to several hours

25   after the end of a binge; 50 to 70 percent.  One would say,

PARRAN   -   DIRECT

3-54

1  "Well, if this drug produces euphoria first and then all of

2  this terrible dysphoria and more and more paranoia and after

3  a while a person is using and not getting back to base line,

4  why on earth do people continue to use it?" -- that is

5  addiction.   If I had an answer to that, it would be even

6  simpler to treat people.

7      The paranoia, sort of the continuum from dysphoria to

8  paranoia to psychosis with cocaine -- and it honestly is a

9  continuum, almost like a continuum of white to black with

10  many shades of gray in between -- is one which has clearly

11  been identified and honestly was identified back in the early

12  '80s as a phenomenon which was susceptible to something

13  called the "kindling effect."  And let me just describe the

14  kindling effect and then I'll stop and answer questions, I

15  guess.

16      The kindling effect was first identified in manic

17  depressive disease or so-called bipolar disease, where it was

18  observed that if a person had manic depressive disease, when

19  they first developed it, their manic episodes would last a

20  long time and not be real manic and they're depressive

21  episodes would last a long time and not be very depressed.

22  And as a person went through the cycling of manic depressive

23  disease, it required less stimulation of a mania to bring

24  upon a more and more intense depression and then less

25  stimulation of a depression to bring on more an more intense

PARRAN  -  DIRECT

3-55

1   mania.  And it seemed that person seemed to cycle more and

2   more rapidly between mania and depression and it's been

3   hypothesized as an electrical phenomenon in the brain called

4   the Kindling phenomena.

5       It was next demonstrated in the early '60s in Lexington,

6   Kentucky at the Addiction Research Center at the Federal

7   Penitentiary for Drug Offenders that the Kindling phenomenon

8   was clearly present in opium dependents.  The way that they

9   studied this is, they basically took federal prison

10  volunteers who had a history of opium dependence and they

11  gave them morphine for six weeks -- six times a day by

12  injection and then they put them in a small room with bizarre

13  wallpaper for five days and let them go through untreated

14  withdrawal.  And they took -- and morphine withdrawal lasts

15  for five days.  Then they'd take them out of that room and

16  put them back in prison for six months with no morphine, and

17  they would bring them back and just put them back in the room

18  with bizarre wallpaper without any morphine, and 100 out of

19  100 patients would develop dilated pupils, runny noses,

20  objective and substantive signs and symptoms of opiate

21  withdrawal just being in the context where they had been in

22  previously untreated withdrawal before.  Sort of a Pavlovian

23  learned response, one might say.

24      What was demonstrated in research in the late '70s and

25  the early '80s with cocaine psychosis and with

PARRAN  -  DIRECT

3-56

1   cocaine-associated seizures is that clearly a kindling
2   phenomenon is present with cocaine as well, especially in the
3   area of cocaine-associated paranoia, cocaine-associated
4   psychosis and cocaine-associated seizures.  The earliest
5   research was with the seizure in the late 1970s.  They
6   identified people tended not to have a cocaine-associated
7   seizure unless they had been on an extensive binge,
8   tremendous quantities of cocaine, a couple thousand dollars
9   worth of cocaine on a weekend, and then they would finally
10  surpass the level of cocaine toxicity in their system where
11  they would have a seizure.  And once they had that one
12  seizure, subsequent use of cocaine to a much lower level --
13  just two or three or four administrations of cocaine -- could
14  produce a seizure in the same person, where previously it had
15  required 20 or 30 self-administrations.  Once the wiring
16  mechanism or the response of a seizure to cocaine
17  intoxication had happened in those people's brains, it took
18  less of an insult from the drug to produce the same effect.
19      What was then identified in the early 1980s is that it
20  was exactly the same with cocaine-associated paranoia and
21  cocaine psychosis.  Then originally when people began using
22  cocaine in an addictive way, it required a lot of cocaine, a
23  heavy, heavy binge maybe for a day and -- a day or two days
24  for a person to really start getting toxic from a paranoid
25  and sort of psychotic delusional standpoint.  But once they

PARRAN  -  DIRECT

3-57

1    had reached that, subsequently -- even if they had been off

2    cocaine for six months or a year -- subsequently only a

3    couple, three, four, five administrations of cocaine could

4    produce similar paranoid and psychotic symptoms, a kindling

5    phenomena, which was identified in the literature in the

6    early '80s -- clearly in the early '80s but also in --

7    associated with amphetamine psychosis, and cocaine is

8    scheduled as an amphetamine-like drug.  The kindling

9    phenomenon with amphetamine psychosis has been well known

10   since the 1950s. I'll stop.

11   Q.  Dr. Parran, I'm going to ask you to resume your seat, if

12   you would.

13       (Witness regained the witness stand.)

14   Q.  Dr. Parran, you've mentioned three central features, I

15   believe, in this discussion here:  One is cocaine psychosis;

16   two is this concept of binging; and third is that of the

17   concept of kindling, kindling effect.

18       Could you relate all of those concepts or phenomena with

19   the history of John Hicks as you understood it from the

20   materials that you were provided?

21   A.  Yes.  Certainly Mr. Hicks, his past history over the last

22   three to four years prior to the crimes that were committed,

23   demonstrated an intermittent binge-type dependence or

24   addiction on cocaine.  His pattern clearly was a binging-type

25   pattern where he wouldn't use it for several days, often

PARRAN - DIRECT

3-58

1  several weeks; occasionally a few to several months.  But

2  then once he did use, he'd use repetitively and then try to

3  stop it.  And once -- once he had used, he used repetitively

4  on that occasion and then he stopped it, but he'd only be

5  able to be stopped for a short period of time and then he was

6  repetitively again.  Sort of a gradually accelerating

7  intermittent binge pattern.  Periods between binges got

8  shorter and shorter.  That certainly is what he described in

9  his interview with Dr. Baum in 1990 and it is what he

10  described to some degree in his interview with Ms. Leahy.

11      And certainly the descriptions that Mr. Hicks gave to

12  Ms. Leahy as well as the detectives in Knoxville when they

13  interviewed indicated there was a cocaine binge that he had

14  -- that the events of August 4th or 5th, I can't remember

15  which date it was, had the hallmarks of a binge:  Hadn't used

16  for a while, pay day, got paid, got his money, all of his

17  plans for the day went out the window; used cocaine --

18  actually initially had a little bit of trouble getting the

19  initial cocaine and started getting edgy and restless and

20  irritable, used the cocaine, felt very high.  As it went

21  away, he got increasingly crescendo urgings or cravings to

22  use more cocaine, again began to cast about on how to get

23  money for more cocaine, et cetera.  So, it's -- it's classic

24  for a cocaine binge.

25      The paranoia, moving towards cocaine psychosis, is

1   actually there's some evidence in the interview done in

2   Knoxville with the detectives that supports there being

3   paranoia, intrusive thoughts, difficulty following through

4   and maintaining one thought pattern, erratic, irrational, and

5   uncharacteristic out-of-control behavior on his part is all

6   there.  Even in the interview it was concluded by people, you

7   know, who will -- who are law enforcement professionals, not

8   clinicians -- had clinicians been conducting that interview,

9   I think several points would have been followed up on and a

10  lot more data in the interview, but, I think there is clearly

11  some data there and then much more data in the interview done

12  by Ms. Leahy about the mental state or the thinking state,

13  psychological state that Mr. Hicks was in after or during

14  this binge of cocaine.

15      And then the kindling phenomenon also is -- there's some

16  evidence for the kindling phenomenon in Mr. Hicks' history in

17  the assessment done by Dr. Baum, the really good chemical

18  dependency evaluation done by Dr. Baum in 1990, as well as

19  some in Ms. Leahy's interview indicating previous sort of

20  binging patterns and suspiciousness and paranoid ideation in

21  the past when he had used the cocaine -- much more heavily

22  in the past than at this time.  So, I think there is evidence

23  of all of that.

24  Q.  Now, let me ask you -- let me ask you some ultimate

25  opinions in a moment.  But before I do, in looking through

PARRAN   -   DIRECT

3-61

1    paranoia comes on after the intoxication has worn off, when

2    the dysphoria has kicked in, and it tends to get worse and

3    worse with subsequent administrations.  So, the dysphoria

4    paranoia and psychosis tends to increase with subsequent

5    administrations, whereas the intoxication tends to decrease

6    with subsequent administrations.

7        And clearly the literature, both now and in the early

8    1980s, indicates that once this severe paranoia or cocaine

9    psychosis begins, it tends to last for a matter of hours

10   after the last administration of cocaine.  It rarely, if ever

11   -- and, frankly, lasts up until the time of the crash.  What

12   I teach medical student residents -- honestly, what I teach

13   Emergency Room doctors, I have many talks about the cocaine-

14   intoxicated and cocaine-agitated person.  What I especially

15   tell Emergency Room doctors, because they're the ones that

16   see people in this state all the time, is when a person has

17   been binging on cocaine, they're getting more and more

18   agitated, paranoid, irritable, interpreting external stimuli

19   as threats.  They frequently also are experiencing tightness

20   in the chest, chest pain, other things, so they often wind up

21   in the Emergency Room.  And when they come in, they're very

22   dangerous and they need to be sedated immediately in order to

23   -- in order to ensure the safety of the Emergency Room

24   staff.  Once -- what tends to happen is a person binges on

25   cocaine for a certain period of time and then there is a

PARRAN  -  DIRECT

3-62

1  peri-binge period of a few hours, several hours.  People are

2  restless, irritable, paranoid, and then they crash.  And the

3  crash means basically going to sleep and sleeping it off and

4  eating a lot, because in the midst of a binge, the

5  norepinephrine effects of cocaine cause people not to eat and

6  not to sleep.  So, the recovery -- the crash from cocaine

7  tends to involve hypersomnolence and hyperphasia:  Eating a

8  lot of things and sleeping a lot.

9       Rarely -- in fact, clinically it is almost unheard of now

10  -- people still have some cocaine psychosis after they wake

11  up at the end of the crash.  Very, very rarely.  But,

12  typically, a fair number of people are paranoid right up

13  until the time of the crash, of the time when they fall

14  asleep.

15       When we look at -- at this case and we hear the

16  descriptions of a single use, strong cravings to use more,

17  hocking a VCR, erratic thoughts, commission of a murder, use

18  of more cocaine, commission of another murder and sort of

19  agitated period of time where a person is hypervigilant, goes

20  home, sees their spouse, used some sedating drugs -- people

21  frequently self-treat that agitated, restless time with

22  things such as marijuana or alcohol, sedatives which were

23  self-administered, and then leaving, driving, still being

24  sort of irrational, crashing, going to sleep, waking up and

25  driving to the police station and turning one's self in and

1  confessing, is classic for cocaine psychosis.

2  Q.  Now, I think you've answered in a substantial way my next

3  question, but let me ask you anyways:  What are the outside

4  signs and symptoms of cocaine psychosis?

5  A.  Let me add -- I'll list a few things and then I'll

6  specifically list a few things that are not described with

7  cocaine psychosis which I think have shown up in some of the

8  transcripts as confusing points.  Cocaine psychosis, or --

9  cocaine psychosis is a phenomenon which is characterized by

10  paranoid thoughts, misperceptions, intrusive thoughts.  So

11  the feeling, like thoughts are coming into one's head,

12  suddenly having a thought, frequently irrational, intrusive

13  thoughts, hallucinations, overwhelmingly tend to be either

14  auditory, hearing voices -- although they're usually

15  interpreted as thoughts as coming in their mind -- but

16  hearing voices and tactile -- occasionally people feel what

17  is called cocaine fleas, or feel things crawling on their

18  skin, less and less ability to follow consistently through on

19  a plan, more jumping and jumping from one plan to another and

20  from one thought to another and more and more bizarre ways.

21      What typically is not present with cocaine psychosis is

22  florid delirium.  I mean, these people aren't talking out of

23  their minds, acting, you know, bizarrely, schizophrenic or

24  talking like they're in delirium or DTs, or whatever, but

25  their thoughts and their behaviors are erratic and irrational

1  and frequently moving from being mildly paranoid, to being

2  armed, to being actually violent.

3  Q.  Now, were these classic signs and symptoms of cocaine

4  psychosis present in the record that you have reviewed

5  relating to Mr. Hicks?

6  A.  Yes.  I think as I mentioned there's evidence of it even

7  in the interview with the detectives in Knoxville, although

8  that interview was an interview aimed at an entirely

9  different topic.  I mean, it was a difficult task.  Even

10  given the fact it was, you know, a law enforcement,

11  professional interview, there is evidence in that interview

12  that some of this was going on, and a lot of evidence in the

13  interview done with Ms. Leahy.

14  Q.  And, Dr. Parran, do you have an opinion, to a reasonable

15  degree of medical certainty, whether Mr. Hicks was in the

16  throes of a cocaine psychosis at the time of these two

17  murders?

18  A.  Yes, I -- in reading the -- having read the transcript

19  from the confession and having read the history of the client

20  in terms of the past, my initial opinion and my overwhelming

21  opinion since then is that from a clinical standpoint, if I

22  had to create a differential diagnosis, my differential

23  diagnosis in this case would be cocaine psychosis, cocaine

24  psychosis, cocaine psychosis, cocaine psychosis, and then

25  maybe something else, but I can't imagine what else it would

PARRAN  -  DIRECT

1   be.

2   Q.  What were the indicia, if you will, of cocaine psychosis

3   that you observed in the record as surrounding the murder of

4   these two individuals?

5   A.  What would be the addition?

6   Q.  The indicia, the indications that Mr. Hicks was in the

7   throes of cocaine psychosis when these two murders were

8   committed.

9   A.  I can -- I can open up the transcript and give you a

10   couple specific examples --

11   Q.  That would be helpful.

12   A.  -- if you like.

13      The first I'll mention is the transcript from the

14   Knoxville Police Department, and this transcript on its

15   second page -- or on the first page, it says, "I went over to

16   this guy's house that I knew and had some cocaine.  So I

17   bought me some."  And then there's some information about the

18   person he bought it from, and then "I used it and some after

19   I went home and then that craving came, you know, to get some

20   more dope.  So what I did, I called the man and asked if he

21   had some for me.  He said okay.  So I took the VCR we had at

22   the home.  So I went over there, and a little bit later I

23   gave it to him, so he gave me some more.  So I told him I

24   would pay him back tomorrow.  I realize I didn't have the

25   money to get the video recorder because it wasn't mine, so I

PARRAN   -   DIRECT

3-66

1   got to thinking -- I said I've got to do something, you know,

2   because the video recorder didn't belong to me.  I knew

3   there'd be a lot of bullshit going on with my wife, so what I

4   did, I got to thinking well, since I'm supposed to have went

5   to the ball game -- well, I didn't.  Okay?  So I called her"

6   and he was calling his mother-in-law.

7        Those sorts of things, indicating sort of the person buys

8   some cocaine, doesn't have any more money, is moving toward a

9   cocaine binge regularly and routinely, hocks about anything

10  they have that's valuable in order to get some more cocaine,

11  and then once that's been done, frequently tries to figure

12  out how to get some more money, it becomes more and more

13  irrational.

14       So, "I need some more money.  Maybe I should go rob my

15  mother-in-law."  That's entirely irrational, compared to

16  robbing someone else who doesn't know you, who you would

17  knock over the head and would never recognize you.  That is

18  crazy.  But this man isn't crazy.  This man does haven't a

19  history of schizophrenia.  He doesn't have a history of

20  serious mental illness.  That is an indication there of

21  cocaine psychosis.

22       He states on the next page, "But getting back to where I

23  was just going to leave," he said to the detective he was

24  just going to leave the apartment, and then -- "So she was

25  wondering about that cage and what the bird cage had in it

PARRAN  -  DIRECT

3-67

1  and blah, blah, blah.  She turned around and I just grabbed

2  her and started strangling her."  That once again sounds

3  like, you know, sort of the erratic sort of impulsive

4  behavior of a person who's getting more and more sort of

5  psychotic on a cocaine binge.

6      A little further on they talk about finding a gun.  He

7  said -- the interviewer said, "You could not find the gun?"

8  And the defendant said, "Yeah, at first, then all of a sudden

9  I realized that.  I said, well, you know, Brandy knew I was

10  the last one here, so, you know, it was like I was, 'No, I

11  shouldn't do that to her,' you know."  That sounds very much

12  to me -- giving a law enforcement interview as opposed to a

13  clinical interview -- of a person describing intrusive

14  thoughts that are coming in that are bizarre and completely

15  irrational sort of, you know, coming into a person's mind.

16      "And so, after I got the money, I said 'I'll leave and

17  come back and clean up this mess.'  So I called the man and I

18  finally caught up with him."  I think that -- "...finally

19  caught up with him."  In the interview with Shirley Lehmann

20  (sic) later on, he talks about how he couldn't call the

21  person, there was no answer on the phone, the phone was busy,

22  he was pacing around the apartment, more and more edgy,

23  irrational, and dashed out and got more cocaine and came back

24  here and used cocaine right here in the same place.  Despite

25  having already gotten the money and gun and everything else

PARRAN  -  DIRECT

1   is -- is -- clearly the most likely clinical explanation is

2   cocaine psychosis.

3       So, he went and got some more cocaine. "And then must

4   have been around 12:30, something like that, I went on ahead

5   and shot up the dope.  I got -- I got a 50-cent piece and all

6   of a sudden I got to thinking again" -- "I got to thinking

7   again," just typical cocaine psychosis and shortly thereafter

8   intrusive thoughts, "I started thinking again well, I'd

9   better go ahead and do this because she's going to be the

10  only" -- referring to Brandy, and so, you know, he committed

11  the second murder.

12  Q.  Well, is that evidence of rational thinking, to cover up

13  a crime, or does it reflect something else in your clinical

14  opinion?

15  A.  All of it -- I mean, from -- from the trying to figure

16  out how to unhock the VCR on is some of the most bizarre and

17  irrational thought patterns that one can imagine, or at least

18  that I can imagine, and indicates more and more paranoia and

19  bizarre behavior and is quite indicative of cocaine

20  psychosis.

21      Later, it says "It was in the living room, but I dragged

22  it to the bedroom" -- which is Maxine's body. "...then I got

23  to thinking I need to do something with it before someone

24  discovered it, so I was going to cut her in half and put her

25  in the freezer, and all of sudden I did and then I stopped."

PARRAN - DIRECT

3-69

1    I mean, that is crazy.  That is not the actions of a person

2    who is -- whatever.  And then --

3              THE COURT:  You used the term "crazy," Dr. Parran.

4    Could you relate that to the opinions you've expressed about

5    cocaine and psychosis?

6              THE WITNESS:  I'm using the vernacular "crazy,"

7    that is, bizarre thoughts and actions of a person who is --

8    who is clinically most likely involved in a cocaine psychosis

9    given a past history of no mental illness.

10   A.   (Continuing) And then finally on the next page there

11   talking about the sexual abuse of the girl:  First, you know,

12   I was thinking all weird.  Thinking all weird."  Here's a

13   person, a day later even, describing his own thoughts of, you

14   know, thinking all weird, and so those are the evidences in

15   the police report.

16        And then it takes some time, but reading through the

17   report from Ms. Leahy, there's what I consider to be just

18   much more data from a trained clinician interviewing about

19   these issues, asking followup questions about "What do you

20   mean 'thinking all weird'?  What kind of thoughts were you

21   having?" -- and those sorts of things.

22   Q.   Based on the information you were able to obtain from the

23   record, your conversations with Mr. Hicks and any other

24   materials that you were provided, do you have an opinion, to

25   a reasonable degree of medical certainty, as to the duration

PARRAN - DIRECT

3-70

1   of the cocaine psychosis which you've just testified about?

2   A.   The -- my best clinical judgment would be that the

3   cocaine psychosis and -- that the cocaine psychosis certainly

4   continued through the time that Mr. Hicks went home to his --

5   his and his wife's apartment.  Probably until the time that

6   he drove out of town and maybe until the time he actually

7   went to sleep in Knoxville.

8   Q.   Let me ask you this question --

9            THE COURT:  When did it start?

10  Q.   That was my next question, the onset.  In your opinion,

11  to a reasonable degree of medical certainty, what was the

12  onset of this cocaine psychosis?

13  A.   The onset was probably shortly after the second

14  self-administration of cocaine; the cocaine that was used --

15  the cocaine that was bought with the VCR.

16  Q.   Now, Dr. Parran, in your professional opinion, were the

17  Court and the jury properly and accurately informed through

18  the testimony of the witnesses who were presented at trial as

19  to the nature and extent of Mr. Hicks' cocaine dependency and

20  psychosis at the time he committed these acts?

21  A.   No.

22  Q.   And why is that?

23  A.   It's clear from my reading of the transcript that the

24  information that was provided about cocaine pharmacology was

25  inaccurate during the trial; that the information given

1    regarding the timing of -- the difference between cocaine

2    intoxication and the cocaine psychosis was not entirely but

3    largely inaccurate, and that the information that was given

4    about the signs and symptoms of cocaine psychosis were

5    substantially inaccurate.  The information given regarding

6    the expected onset of cocaine psychosis, based upon the

7    timing of the use of the drug, was inaccurate, as well as the

8    expected duration of cocaine psychosis.  That also was

9    inaccurate.  And, finally, the idea that cocaine psychosis

10   was more likely to happen in a person who was a chronic,

11   daily user of cocaine with day in and day out cocaine use,

12   which is actually very rare for people to actually do that

13   but even more rare for people who have cocaine psychosis, but

14   that was entirely inaccurate.

15   Q.  Dr. Parran, if you're able to do so, are you able to

16   refer to portions of the record in which you feel that there

17   were substantial inaccuracies or errors with respect to the

18   information that was provided to the Court and the jury

19   concerning Mr. Hicks' cocaine --

20   A.  Sure.

21   Q.  -- situation?

22   A.  Sure.  And I'll do it in whichever way is usually most

23   appropriate in these settings.  I can give the page and --

24   the page number and the line number.

25   Q.  Are you able to pinpoint who the witness is?

PARRAN  -  DIRECT

3-72

1   A.  If you want me to read the statement --

2   Q.  If you could summarize perhaps what the statements are,

3   but also if you could indicate which witness is providing

4   this inaccurate information to the jury.

5   A.  Okay.  The primary information which was inaccurate was

6   provided in the testimony of Nancy Schmidtgoessling, and her

7   testimony started on Page 1175.  The areas where the

8   inaccuracies were most notable is on Page 1178 -- I'm sorry

9   1187, where they talk about the difference between snorting

10  cocaine and using cocaine I.V.  And Dr. Schmidtgoessling gave

11  clearly wrong information from Line 22 on that page through

12  Line 6 on Page 1188.  The information -- should I read the

13  information, or just --

14  Q.  If you could summarize it.

15  A.  Okay.  Well, it basically said that that cocaine goes

16  into the bloodstream faster if you snort it than if you use

17  it I.V., which is wrong.  She says that the intensity of the

18  symptoms of the intoxication of cocaine are equal, whether

19  you used an I.V. or snort it, which is clearly wrong.  And

20  she said that the reaction would be -- that the only

21  difference between using cocaine nasally versus I.V. is that

22  the reaction might be quicker nasally rather than I.V., and

23  it is not the only difference and, in fact, that's wrong.

24      Then on Page 1191, starting at Line 11, they talked about

25  the levels of intoxication from cocaine being similar to the

1   levels of alcohol, various degrees of intoxication.  And the

2   question -- or the response of the expert was that they were

3   similar; that, you know, there were sort of a linear

4   intoxication effect from cocaine similar to alcohol, which is

5   -- which is not the case.  Cocaine has much too short a half

6   life to be able to look at levels of intoxication.

7       Then at the top of the next page on 1192, the question

8   was would cocaine be the same curve of dysfunction?  Can the

9   effect and degree of one's ability to perform depend upon the

10  amount that a person took in? -- meaning if you only took in

11  a little cocaine now, it will have a little effect, and if

12  you took a lot of cocaine, it will have a lot of effect.  And

13  the expert said "Yes," definitely demonstrating no evidence

14  of the knowledge of the kindling phenomena that we talked

15  about before where one has activated kindling with cocaine

16  addiction.  Even reasonably small amounts of the drug can

17  precipitate in large behavior, rational changes.

18      Page 1193, the description of why people die from

19  cocaine:  "In fact, when people die of cocaine overdose, it

20  is usually from a respiratory problem."  Virtually no one

21  dies of a cocaine overdose from a respiratory problem.  It is

22  a seizure, stroke or heart attack.  It has little to do with

23  the lung.

24      She then points out later on that page that this patient

25  -- or this defendant was able to retain his orientation and

1   his goal directedness and, therefore, he was not

2   significantly affected by cocaine when he was committing the

3   crimes.  As I described earlier, it is in the literature, and

4   in the 1980s, in the literature now, when a person is

5   involved in cocaine psychosis, they are oriented, they know

6   who they are, and where they are, and when it is.  They are

7   oriented to person, time and place.  They are nct delirious

8   and they frequently follow through with impulsive actions,

9   although they tend not to be able to follow through in a

10  single plan of action over an extended period of time.

11       And then, finally, throughout this entire section, all of

12  the statements were about the -- about whether he was

13  intoxicated at the time, not whether there was the dysphoria

14  and the paranoia and cocaine psychosis.

15       There's just a couple more here.  On Page 1195, starting

16  at line 18, the question is:

17           "Let's talk about that.  This stuff reaches a peak

18       in fifteen to twenty minutes."

19  And the response from the witness was...

20           "Yes, that is customarily thought to be the

21       peak."

22  Well, that certainly is not when you're using I.V. cocaine.

23  It is gone in ten.

24       The question then was...

25           "Then the person returns to normal later

PARRAN  -  DIRECT

3-75

1   rapidly?"

2   And the response was...

3          "Yes, usually sort of a crash, as they refer to

4      it.  It usually takes ten to fifteen minutes."

5   Actually, the crash is, after a binge, often a few hours

6   after a binge, which tends to last proportional to the length

7   of the binge.

8          "Question:  The whole thing is less than half an

9      hour?"

10          "Answer:  Not if there is something mixed in, but,

11      yes."

12          "Question:  Doctor, did you actually" --

13   I'm sorry, the next page, 1196, pretty close to the end...

14          "Doctor, did you actually make an examination of

15      the life background as part of your history to determine

16      his work record, the way he dealt with his peers and so

17      forth?"

18          "Yes, I did."

19          "Question:  Did you see anything in there that

20      indicated either cocaine usage or chronic usage of

21      cocaine?"

22   And the answer on Page 1197 reads...

23          "I didn't see anything as far as chronic usage.  He

24      was regular to work, he was cooperative with his

25      co-workers, he was a good employee and reliable."

PARRAN  -  DIRECT

3-76

1       All of that information, given a history of binging on

2  several thousand dollars of cocaine a few years earlier, a

3  couple thousand dollars use of cocaine six months earlier,

4  and given the history of a person who went to work and

5  participated normally in working during the day and wound up

6  committing two murders and other things later during the

7  night, is absolutely diagnostic of cocaine addiction and

8  cocaine psychosis, and her statement is that is that it's no

9  indication of chronic use.  I think -- I think that's it.

10  Q.  Dr. Parran, in your professional opinion, based on the

11  information that was presented at trial and which you've just

12  commented on, do you believe the jury was fairly and

13  accurately apprised of the effects of cocaine on Mr. Hicks'

14  conduct that night?

15  A.  Absolutely not.

16  Q.  Okay.  For the reasons you've stated?

17  A.  Yes.

18  Q.  Now, Dr. Parran, this case took place in 1985; that's

19  when the trial took place.  What was the current state of

20  medical knowledge of cocaine and cocaine psychosis at that

21  time?

22  A.  Well, that's a very good question.  Certainly we know

23  more about cocaine now than we knew in 1985 and 1986, but

24  that's because we've experienced our current cocaine epidemic

25  which started honestly in probably 1976.  But we've

PARRAN  -  DIRECT

3-77

1   experienced it for another decade since then.  But in 1985

2   and '86 -- and I think the trial actually took place in

3   February of '86 -- cocaine addiction was well-known.  It was

4   in the DSM-III, and then subsequently published a little

5   later in 1986, the DSM-III-R, and now in 1995 the DSM-IV,

6   cocaine psychosis and stimulant psychosis.  Amphetamine

7   psychosis has been described in the literature since the

8   1950s.  In fact, there are a few descriptions later in the

9   Western European literature, the German literature from the

10  1930s, of paranoid ideation and bizarre behavior from

11  cocaine.

12       But what would be most available to practitioners in our

13  community in Ohio in 1985 are several articles from

14  well-respected psychiatric journals and widely-read

15  psychiatric journals from the mid- to late-'70s right up

16  until 1986, and certainly since.  They talk about cocaine

17  psychosis, paranoia associated with cocaine, these long last

18  -- longer lasting effects of cocaine than just the mere

19  intoxication.

20  Q.  Dr. Parran, let me stop you there and ask if I might hand

21  you an exhibit, Plaintiff's Exhibit 17.

22       Could you identify that exhibit for us, please?

23  A.  Yes, it's a face sheet or a Xeroxed copy of a face sheet

24  of a list of articles in the medical literature, that I wrote

25  down the initial or the earliest one being in 1931, the last

PARRAN  -  DIRECT

3-78

1    one being in 1986, early 1986 -- I think published in

2    February of 1986 -- basically listing articles in the medical

3    literature about cocaine dependence, cocaine addiction,

4    including references and descriptions of cocaine paranoia,

5    cocaine psychosis.

6    Q.  So what Exhibit 17 is, is a compendium or a list of the

7    articles?

8    A.  The first page is a list and attached are the actual

9    articles.

10   Q.  And these are examples of the type of materials that were

11   available to practitioners by February of 1986?

12   A.  Absolutely, yes.

13   Q.  Is there anything about which you have testified this

14   morning relating to cocaine, cocaine psychosis, the kindling

15   effect, the binging, the psychosis, the paranoia, the

16   duration of cocaine psychosis which would not have been

17   available to practitioners in this field in 1985 and 1986?

18   A.  In general, no.  There is one -- I did cite one piece --

19   one statistic where it's thought that 50 to 70 percent of

20   people who -- who use cocaine in a binge-crash pattern

21   experience clinically significant paranoid ideation, with

22   better than half of them actually arming themselves with

23   weapons during cocaine binges, and that was published after

24   1986.

25        But the description of the kindling phenomenon with

PARRAN  -  DIRECT

3-79

1  cocaine psychosis, as well as cocaine seizures, the

2  description of the typical binge-crash pattern and the

3  description of cocaine psychosis itself and cocaine paranoia

4  coming on after the intoxication of cocaine and lasting well

5  beyond the intoxication of cocaine are all very well

6  documented in the medical literature in 1985, '86 and before.

7  Q.  And to your knowledge, Dr. Parran, was that information

8  and examples of that literature available to practitioners in

9  that field of addiction in Cincinnati, Ohio in 1985 and 1986?

10  A.  Oh, absolutely.  One of the articles is from the American

11  Journal of Psychiatry, the most widely distributed, widely

12  read journal, psychiatric journal in the country, and that is

13  from March of 1975 and its titled is "Cocaine Psychosis:

14  A Continuum Model."

15       There is an article from 1976 in the same journal, the

16  American Journal of Psychiatry, and the title is "Cocaine,

17  Kindling, and Psychosis."  That was a decade before these

18  events.

19       And then I have a few here, one in 1986 "Neuroleptic

20  Reduction of Cocaine-Induced Paranoia" in the Journal of

21  psychopharmacology published in February of 1986, the same

22  month of the trial.  Even the Psychiatric Annals in 1984 --

23  the psychiatric annals are very widely distributed -- have

24  articles describing -- describing the same thing.

25            MR. MEZIBOV:  Your Honor, if I may have one minute,

1    that may be it.

2        (Messrs. Mezibov and Lazarow conferred privately.)

3    Q.  Two final questions, Doctor.  First, with respect to this

4    information and the availability of these materials as an

5    extension of that question, were there, and to your

6    knowledge, practitioners in the field which you study and

7    about which these articles have been written who were

8    available in Cincinnati to have this information at their

9    disposal?

10   A.  Well, certainly there were in the early 1980s.  The

11   Cincinnati V. A. has a big Addiction Medicine Treatment

12   Program that was active then.  They had a specific drug

13   treatment branch, as well as a separate alcohol treatment

14   branch.  They treated them separately then.  We're now

15   treating them together with a psychiatrist as well as

16   internists on their staff.  In fact, the National Institute

17   on Alcohol Abuse and Alcoholism and the National Institute on

18   Drug Abuse, two branches of NIH in 1980 developed a career

19   teacher's program where they supported individuals of medical

20   schools to acquire more education and then teach about

21   addiction and the pharmacology of addictive drugs.  And Don

22   Nelson, who is a clinical pharmacologist at the University of

23   Cincinnati, was a career teacher with NIAAA and NIDA from

24   1981, and was teaching a pharmacology course at the

25   University of Cincinnati Medical School on drugs of abuse in

PARRAN  -  DIRECT

3-81

1    the '80s and is still there now.

2    Q.  Dr. Parran, you also mentioned there was a study that

3    evaluated or reported on the violence associated with cocaine

4    psychosis, people being armed and the like.  What is the

5    correlation between cocaine psychosis and violent behavior?

6    A.  The study that was reported, they studied a couple of

7    hundred people who used cocaine in a binge, binge-crash kind

8    of pattern, either smoking it or using it I.V.  Seventy

9    percent reported clinically significant paranoid ideation

10   happening around the time of cocaine binges.  The -- 50

11   percent of those who had paranoid ideation reported that the

12   paranoid ideation lasted all the way through to the time of

13   the crash, so it lasted for a few to several hours after the

14   cessation of the cocaine use.  Better than half of people

15   with paranoid ideation reported that they had intermittently

16   armed themselves during a cocaine binge with various

17   weapons.  And of that 50 percent who had armed themselves, a

18   quarter reported having actually been violent.  None reported

19   actually ever having killed someone, but a quarter reported

20   having been violent, including jumping out of windows because

21   they were sure the police were coming through the door;

22   beating up a significant other because -- thinking they were

23   sending messages about the person using cocaine to law

24   enforcement; misperceiving external stimuli and then reacting

25   in a violent, arming way.

PARRAN  -  DIRECT

3-82

1    If you remember, norepinepherine adrenaline is the

2    hormone which produces our fight or flight response.  People,

3    when they're overstimulated with norepinepherine, tend to get

4    more and more paranoid, have more and more tough time

5    focusing on something and tend to be hyper-reflexic, and

6    really sort of armed.  It's -- it's a hormone which -- which

7    has tremendous survival benefits for humans; but when

8    overstimulated with it, people can be very violent.

9    Q.  The facts that you found in the record in Mr. Hicks'

10   case, they're consistent with the findings of these studies

11   you've just mentioned with respect to violence?

12   A.  Yes.

13       MR. MEZIBOV:  That's all the questions I have of

14   this witness.  Thank you, Doctor.

15       THE COURT:  Doctor, in your history that you

16   accumulated on Mr. Hicks, was there a history of seizures?

17       THE WITNESS:  No, there was no history in his case

18   of cocaine-associated seizures and that sort of kindling

19   phenomenon.  Just a kindling phenomenon in terms of the

20   paranoid thoughts as such.

21       THE COURT:  Can an addict that has become an

22   intermittent binge-type pattern individual, can that addict

23   reasonably be expected to overcome the addiction?

24       THE WITNESS:  I couldn't give you worthwhile

25   information in 1985 because the epidemic was too early at

PARRAN  -  DIRECT

3-83

1  that point.  But at this point, I think we have some pretty

2  good information, and the information that we have now is

3  that if you take a thousand people with cocaine addiction,

4  intermittent binging, whether they're smoking it or using it

5  I.V., and you follow them up over 15 years or so, at the end

6  of 15 years, better than a third of them will be sober and in

7  stable recovery.  Of the ones that survive -- because there

8  is a highly fatal condition here -- that a third will be

9  sober, in stable recovery, about another third will have

10  switched to a different pattern of drug use, and that's

11  honestly what we're seeing in Ohio now:  People are switching

12  to heroin since cocaine has sort of a short life; people are

13  switching to mixing cocaine with heroin.  They get jazzed up

14  on the first use of cocaine, feel very -- euphoria.  And when

15  the dysphoria of the cocaine should be kicking in, that is

16  when the sort of euphoric period, the mellow high of the

17  heroin kicks in.  And instead of going on a full-blown binge,

18  a person tends to use cocaine and heroin together twice a

19  day.

20      So, we've seen, sadly, about a third of our addicted

21  patients, who normally were bingers on cocaine, just switch

22  pharmacologically to a different approach but still be out of

23  control with chemical dependence.

24      And, finally, another third are either incarcerated or

25  dead.

PARRAN - DIRECT

3-84

1      THE COURT: So, it's reasonable to believe that

2 approximately a third could be sober?

3      THE WITNESS: If -- if people escape either death

4 or jail, the statistics are that 50 percent of the people,

5 whether they have alcoholism or cocaine dependence, over time

6 will eventually get sober and stay sober for outstanding

7 periods of time.

8      THE COURT: Does the snorting of cocaine have any

9 detrimental effect on those membranes and so forth? Is that

10 permanent?

11      THE WITNESS: That can be permanent. It's probably

12 not the cocaine itself that damages the nasal membrane, but

13 what happens is when a person snorts cocaine, when the

14 norepinepherine is released, there's spasm of the smooth

15 muscle and the blood vessels that go in the nose, so people

16 stop absorbing it. The nasal septum is made of cartilage and

17 cartilage doesn't have its own blood supply. It depends on

18 blood vessels to passively supply oxygen to the cartilage.

19 And so, cartilage is exquisitely sensitive to not enough

20 blood supply, and so what happens is actually the cartilage

21 in the septum dies and deteriorates and falls out. To cite a

22 famous example, Linda Ronstadt had cocaine addiction and was

23 afraid of needles and didn't know how to turn it into

24 freebase, so she just snorted and snorted and lost her nasal

25 septum, went into treatment and had to have a nasal septum

PARRAN - DIRECT

3-85

1    replaced several years later by a plastic surgeon so she
2    could sing again.

3             THE COURT:  Did you conduct any physical
4    examination of Mr. Hicks?

5             THE WITNESS:  No.

6             THE COURT:  Wouldn't that be medically prudent to
7    help you make your opinion here today?

8             THE WITNESS:  It may have been, although it was ten
9    years after the fact.

10            THE COURT:  Well -- well, I prefaced my question:
11   Is it permanent --

12            THE WITNESS:  The physical --

13            THE COURT:  -- and you agreed.

14            THE WITNESS:  The permanent signs I'd look at, that
15   if I had thought of that, would honestly be from track marks,
16   from I.V. marks.

17            THE COURT:  You didn't see the I.V. track marks?

18            THE WITNESS:  No.

19            THE COURT:  They would still exist?

20            THE WITNESS:  Track marks would probably exist,
21   although the disclaimer that I would give you is that track
22   marks in people who are opiate dependent tend to be much more
23   chronic and long lasting, because people tend to use opiates
24   in a chronic pattern.  People tend to do intermittent binging
25   on cocaine.  They tend not to use the same vein, and so the

PARRAN - DIRECT

3-86

1    track marks tend to be much less permanent scars with cocaine

2    use.

3           THE COURT:  Did you examine, in reaching your

4    opinion, any criminal history of Mr. Hicks?

5           THE WITNESS:  Very superficially.  I read one of

6    the background psychological reports that talked about his

7    history of domestic violence in the past while intoxicated.

8    I didn't read that extremely carefully.

9           THE COURT:  You don't know of any specific crime or

10   criminal experiences with the law other than domestic

11   violence?

12          THE WITNESS:  At least based on my memory right now

13   it was a domestic violence incident and a court-mandated

14   outpatient counseling program in '82, I think.

15          THE COURT:  Any other history which was not

16   significant in your opinion?

17          THE WITNESS:  Well, when I interviewed him myself

18   and when I quickly looked through the past psychological

19   record, I was looking for evidence of previous psychotic

20   behavior, behavior that would indicate any mental illness or

21   the behavior that indicated extreme violence, and all I saw

22   was the domestic violence.

23          THE COURT:  Thank you, Doctor.  We'll recess until

24   1:15.  1:15.  Thank you, Doctor.

25          THE WITNESS:  You're welcome.

PARRAN  -  CROSS

3-87

1          THE CLERK:  All rise.

2      (At which time, the luncheon recess was taken.)

3                      *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3-88

1                    AFTERNOON SESSION            (1:31 p.m.)

2          THE COURT:  Is the petitioner ready to proceed?

3          MR. MEZIBOV:  We are, Your Honor.

4          THE COURT:  Respondent ready to proceed?

5          MR. WILLE:  Yes, Your Honor.

6          THE COURT:  Doctor, I believe you're on the stand.

7    Proceed, Mr. Wille.

8          MR. WILLE:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. WILLE:

11   Q.  Doctor Parran, have you ever testified at trial in a

12   capital case?

13   A.  No, sir.

14   Q.  Have you ever testified in a criminal case involving

15   cocaine as an issue?

16   A.  No.

17   Q.  Are you familiar with the factors set forth in Ohio law

18   as to mitigation with respect to a capital offense?

19   A.  No, I'm not.

20   Q.  Now, you are not a psychologist or a psychiatrist; is

21   that correct?

22   A.  That is correct.

23   Q.  Now, are you aware that Dr. Schmidtgoessling rendered an

24   opinion in conjunction with this case that Mr. Hicks at one

25   point had been feigning the symptoms of mental illness?

PARRAN  -  CROSS

3-89

1    You're aware of her opinion in that regard?

2    A.   Yes.

3    Q.   Now, I take it -- or would you consider yourself to be

4    competent, qualified to render an opinion as to the validity

5    of her opinion in the latter regard?

6    A.   I can certainly give you my opinion about that as an

7    internist and a physician.

8    Q.   Would you consider yourself to be an expert with respect

9    to -- I'll withdraw that.

10        Would you offer an expert opinion as to the validity of

11   her expert opinion?

12   A.   I would not offer it regarding her opinion of his

13   diagnosis of malingering or feigned mental illness.

14   Q.   And that's what my question was directed to --

15   A.   Okay.

16   Q.   -- if I was not clear on that.

17        Now, Dr. Parran, would you think that you are qualified

18   to render an opinion as to whether a person is suffering from

19   a mental disease or defect?

20   A.   I'm certainly qualified to render an opinion, but as a

21   non-psychiatrist, I would probably not be considered

22   qualified to render an expert opinion.

23   Q.   Now, Dr. Parran, am I correct you did speak with

24   Mr. Hicks?

25   A.   Yes, I did.

PARRAN  -  CROSS

3-90

1    Q.  And you mentioned in direct testimony that you were, I

2    guess, I don't know how you put it, but you were looking

3    forward to the opportunity to speak with Mr. Hicks in the

4    sense of the experience of doing so?

5    A.  No, I wouldn't -- I wouldn't -- I wouldn't say that.  I

6    did think that it was important for me to have a chance to

7    talk to Mr. Hicks once I had looked through the materials

8    that had been forwarded to me and was -- and was at the place

9    of beginning to form an opinion about cocaine psychosis.

10   Q.  Would it be fair to say that your experience is somewhat

11   limited in talking with persons who have been convicted of

12   serious felonies?

13   A.  Yes.

14   Q.  And I take it -- it may seem to be an obvious question,

15   but I take it you've never interviewed before someone who had

16   been convicted of murder and sentenced to death?

17   A.  I have interviewed people who been convicted of murder in

18   the past, but no one who has been sentenced to death.

19   Q.  Now, Dr. Parran, in forming your opinion with respect to

20   Mr. Hicks, I take it that you gave weight to what he told you

21   during the interview?

22   A.  Yes.

23   Q.  And now, Dr. Parran, in normally -- in normally dealing

24   with persons with cocaine psychosis, do you on occasion rely

25   on such things as, say, urinalysis tests or blood tests?

PARRAN  -  CROSS

3-91

1  A.  Yes; not -- not as it relates to cocaine psychosis, but

2  as it relates to documentation of cocaine use.

3  Q.  Now, Dr. Parran, you've testified that you assisted with

4  the training of interns with respect to handling persons in

5  emergency situations.  Is that a fair statement?

6  A.  Yes.

7  Q.  And I take it that in that circumstance you would be

8  dealing with a situation where the person that may be

9  suffering from a cocaine psychosis is right before you at the

10  critical time, if you know what I mean?

11  A.  Yes.

12  Q.  So, I take it then that you would consider that to be a

13  very important thing to consider, namely the opportunity to

14  actually observe the person under -- appear or under the

15  possibility -- strike that -- actually observe the person in

16  the highly agitated state which would be consistent with

17  cocaine psychosis?

18  A.  Certainly the people who observe patients the most when

19  patients are actively involved in a state of cocaine

20  psychosis are people who work in Emergency Rooms, ambulances,

21  intake offices, those sorts of things.

22  Q.  Would you say you're one of those persons?

23  A.  I certainly have done a lot of consultations in Emergency

24  Rooms, yes.

25  Q.  Have you -- in your function as a consultant, would you

PARRAN  -  CROSS

3-92

1   say that -- I take it you have actually seen people that

2   appear to be under the symptoms of a cocaine psychosis?

3   A.   Yes.

4   Q.   And in this particular case, however, you've never seen

5   Mr. Hicks under --

6   A.   No.

7   Q.   -- apparent influence of a cocaine psychosis?

8   A.   No.

9   Q.   Now, Dr. Parran, are you aware or have you reviewed Dr.

10  Hawgood's report with respect to Mr. Hicks?

11  A.   I'm sure that I have because I'm -- I think it was in the

12  materials that I looked at, yes.

13  Q.   If I were to represent to you that during an interview

14  with Dr. Hawgood Mr. Hicks admitted that at one point he

15  feigned the symptoms of mental illness, that would -- that

16  would be consistent with your recollection of Dr. Hawgood's

17  report?

18  A.   Yes, as well as Dr. Schmidtgoessling's opinion.

19  Q.   Exactly.  And would it be -- or do you recall that in the

20  course of her report, Dr. Hawgood indicated that Mr. Hicks

21  stated that he had been advised by certain jailhouse lawyers

22  to feign these symptoms of mental illness because it might be

23  beneficial to his case?  That would be consistent with your

24  recollection as to her --

25  A.   Yes, I think it was multiple personality disorder, or

PARRAN  -  CROSS

3-93

1    something like that.

2    Q.  If I were to tell you that Dr. Hawgood testified in a

3    deposition in this case that in fact Mr. Hicks had indicated

4    to her that "Yes, I -- I did feign some mental illness

5    because I was advised by jailhouse lawyers," that would be

6    consistent with your recollection of --

7    A.  Uh-huh.

8    Q.  -- your review of that deposition?

9    A.  Yes.

10   Q.  Now, would it be fair to say, Dr. Parran, that in that

11   circumstance Mr. Hicks appeared to be willing to tell Dr.

12   Hawgood a falsehood -- strike that.

13       Would it appear, based on Dr. Hawgood's statements, that

14   Mr. Hicks had occasion to lie because he thought it would

15   help his case?

16   A.  Yes.

17   Q.  Now, have you considered the possibility that when

18   Mr. Hicks described his cocaine use to you, that perhaps he

19   was entertaining the same intent to lie?

20   A.  Yes; I must -- that's certainly a possibility that I've

21   thought about, and thought about at the time I interviewed

22   him.  I must say that the majority of my opinion is based

23   upon the data in the interview with the detectives in

24   Knoxville and based upon information and, secondarily, based

25   on information in the interview with Ms. Leahy, I think in

PARRAN  -  CROSS

1   September of '85, both of which, at least to my review,

2   appear to have taken place prior to much of the other

3   behavior that Mr. Hicks demonstrated with other examiners.

4   Q.  Would you be -- are you aware that Mr. Hicks demonstrated

5   some aberrant and bizarre behavior to Mrs. Leahy?

6   A.  The second -- the second day, the second interview day,

7   yes.

8   Q.  And are you also aware that after Mrs. Leahy's interview

9   with Mr. Hicks, that Mr. Hicks expressed similar -- or showed

10  similar behavior in his interview with Dr. Schmidtgoessling?

11  A.  Yes.  My impression was that his initial interview with

12  Ms. Leahy was an extended interview in which he appeared to

13  be giving consistent information which anticipated to be

14  reasonably backed up with interviews with other family

15  members and the second interview was much more bizarre.  And

16  from there on, the interviews were -- were difficult.

17  Q.  Now, Dr. Parran, you have examined, I take it, much of

18  the information that Mrs. Leahy gathered?

19  A.  Yes, I think I read the report entirely.

20  Q.  Are you aware or do you recall that at one point

21  Mr. Hicks himself stated in the course of

22  Dr. Schmidtgoessling's investigation as to his sanity that

23  he, in fact, did not abuse cocaine or alcohol?

24  A.  Yes.

25  Q.  And would it be fair to say, Dr. Parran, that some of the

PARRAN   -   CROSS

3-95

1  information cited by Mr. Hicks in support of his -- his

2  allegation or assertion of cocaine psychosis was developed in

3  State post-conviction proceedings?  Would that be a fair

4  recollection or statement as to your recollection of the

5  record?

6  A.  I have a problem with Mr. Hicks -- with the beginning

7  part of your statement, because it was not my impression from

8  reading any of the materials that Mr. Hicks claimed a cocaine

9  psychosis.

10  Q.  Are you familiar with the affidavit of Dr. Baum?

11  A.  I'm familiar with Dr. Baum's affidavit, which was

12  obtained in 1990.

13  Q.  Yes.  And, therefore, it was obtained -- you would have

14  no reason to doubt it was obtained in conjunction with

15  Mr. Hicks' post-conviction action; correct?

16  A.  My understanding is that Dr. Baum's opinions were formed

17  in 19 -- late 1989-90, after the conviction.

18  Q.  And isn't it true that Dr. Baum relied on information in

19  forming his opinion that was brought out following Mr. Hicks'

20  conviction and during his post-conviction action?

21  A.  Yes, with -- interviews with Mr. Hicks and others.

22  Q.  So, it is then fair to say that at least in part your

23  diagnosis is based on information which was developed

24  subsequent to Mr. Hicks' conviction?

25  A.  Certainly the information in Dr. Baum's evaluation of