PARRAN   -   CROSS

3-96

1   chemical dependency regarding Mr. Hicks was a more thorough

2   evaluation and had more information than was available from

3   the earlier charts, yes.

4   Q.  Well, correct my recollection if I'm wrong, but do you

5   recall Dr. Baum referring to instances of hallucinations and

6   other aberrant behavior by Mr. Hicks?

7   A.  Yes.

8   Q.  And isn't it fair to say that Dr. Baum was relying on, to

9   some extent, on Mr. Hicks' assertions of hallucinations

10  following his apprehension?

11  A.  Yes.

12  Q.  Dr. Parran, you testified that Mr. Hicks' actions on the

13  night of the murders were consistent with the symptoms of

14  cocaine psychosis.  You would agree, I'm sure, that there are

15  persons who commit violent acts that are not necessarily

16  operating under the influence of a cocaine psychosis?

17  A.  Yes.

18  Q.  Now, you stated on direct -- again, tell me if I'm wrong

19  -- 50 to 70 percent of persons under the influence of

20  cocaine psychosis suffer paranoid ideation?

21  A.  That's not quite, but it's --

22  Q.  Pretty fair summary?

23  A.  Actually, 70 percent of people who intermittently binge

24  on cocaine describe clinically significant paranoid ideation.

25  Q.  Could you be more specific as to you say "clinically

1  significant of paranoid ideation?"  Are you saying 50 to 70

2  or 60, or whatever, persons would exhibit violent behavior

3  comparable to Mr. Hicks' behavior?

4  A.  Well, I think my statement was that most clinically

5  rigorous data we have right now about cocaine binging and

6  paranoid ideation is that 70 percent of people who binge on

7  cocaine have paranoid ideation.  Of those 70 percent who have

8  paranoid ideation, more than half report repetitively having

9  armed themselves with a weapon of some sort because of the

10  paranoid ideation while binging on cocaine.  And that of that

11  half who have armed themselves, half of them, a quarter of

12  the overall 70 percent, report having acted violently toward

13  themselves or others during the cocaine binge subsequent to

14  the paranoid ideation.  That's what I said.

15  Q.  If I understand this correctly then, you have started

16  with 50, 60, 70 percent and you've broken that down to where

17  you're saying now that 25 -- actually 25 percent of these

18  persons exhibit or actually exhibited some form of violent

19  behavior?

20  A.  Might be a little less than that.  Probably in the range

21  of 18 to 20 percent.

22  Q.  Now, I don't know if you have the statistics on this or

23  not, Dr. Parran, but of that 25 percent or less --

24  A.  Yes.

25  Q.  -- of the people who do violent behavior --

1   A.  Yes.

2   Q.  -- how many of those people commit two murders?

3   A.  I honestly don't think anyone has that data.  I tried to

4   find credible research data on that and was not able to.

5   What I -- what I can say is that -- is that the leading cause

6   of death from cocaine addiction is violence by several times

7   greater than heart attacks, strokes, seizures, as we

8   discussed before.  But I can't -- that information honestly

9   doesn't exist.

10              THE COURT:  Excuse me.  Before you leave that

11  point, when you say "violence," do you mean

12  self-destruction?

13              THE WITNESS:  Suicide or homicide.

14              THE COURT:  So that --

15              THE WITNESS:  And at times both.

16              THE COURT:  And how -- what is the percentage of

17  suicides, homicides?

18              THE WITNESS:  I tried to find that as well and was

19  not able to.

20              THE COURT:  Thank you.

21  A.  (Continuing)  I can give a little bit of information, but

22  it isn't specific to cocaine.  The -- the information I was

23  able to get, or the information that I heard when I was

24  testifying at the American Bar Association's Special

25  Committee on Drug Crisis and Special Committee on Violent

PARRAN  -  CROSS

1    Crime -- I was testifying about drug dependence to them --

2    the information that I heard there was that they estimated

3    that 70 percent of homicides in the United States on an

4    annual basis took place with a significant involvement of

5    alcohol and drugs, but that was testimony from someone else

6    at an ABA hearing and I can't verify it, the veracity of it.

7    Q.  Dr. Parran, I would like to ask a question about that.

8    Of course, you testified on direct that there is an important

9    distinction between cocaine psychosis and cocaine

10   intoxication; correct?

11   A.  Yes, there is.

12   Q.  So, therefore, those statistics with respect to how many

13   persons commit crimes under the influence or intoxication of

14   drugs would, wouldn't you suggest, would not be determinative

15   or substantially relevant in your diagnosis?

16   A.  Yes.  I don't know that anyone has bothered interviewing

17   those people to find out what percentage exhibited

18   significant paranoid or cocaine psychosis behavior.

19   Q.  So that's not available, in other words?

20   A.  It's not available data, no.

21   Q.  Now, Dr. Parran, if I could just break down your

22   diagnosis in three -- three parts:  Part 1, would you agree

23   that maybe Part 1 would be the things that Mr. Hicks told you

24   himself?

25   A.  Yes.

PARRAN  -  CROSS

3-100

1   Q.  Now, by doing this, I don't mean to suggest any relative

2   importance; I'm just kind of breaking it down logically.  And

3   Part 2 would be things that Mr. Hicks' family members or

4   contacts or other things from his social history from which

5   you were able to make some determinations as to his possible

6   frequency of cocaine use?

7   A.  Yes.

8   Q.  And the third aspect would be your analysis of Mr. Hicks'

9   behavior on the night of the offenses?

10  A.  That certainly is part of it.  Certainly a big part is

11  the actual interviews by others, the detectives and --

12  especially the detectives and Ms. Leahy of Mr. Hicks.

13  Q.  I guess I'm including that.

14  A.  Lump them in one or the other.

15  Q.  Exactly.  Now, in terms of the third component, wouldn't

16  you agree that an important aspect of your diagnosis is your

17  opinion as to whether Mr. Hicks' behavior was irrational or

18  bizarre?

19  A.  Yes.

20  Q.  And would you agree that perhaps reasonable minds could

21  differ, reasonable expert minds could differ, as to whether

22  Mr. Hicks' behavior manifested irrationality or bizarre

23  character?

24  A.  Yes, I think that reasonable minds could differ on the

25  amount of -- on the amount of weight they lend to the -- to

PARRAN  -  CROSS

1   the irrationality or the bizarreness of the behavior,

2   although it -- from what I remember from reading through the

3   other people's opinions, pretty much everyone's opinion,

4   especially Dr. Schmidtgoessling's opinion, was that this was

5   irrational, erratic, uncharacteristic behavior for -- for

6   him.

7   Q.  You did review Dr. Reardon's transcript, I take it?

8   A.  Yeah, I just reviewed that in the last couple days.

9   Q.  And it's fair to say that Dr. Reardon -- or Dr. Reardon

10  found some of Mr. Hicks' behavior to be not irrational or

11  erratic in his opinion?

12  A.  Yeah, I think that he found some of the behavior

13  irrational and erratic and some of it not so much.

14  Q.  Now, you mentioned before, Dr. Parran, you used the word

15  "weight" in terms of -- in relationship to the opinion about

16  whether someone's acting irrationally or bizarrely.  Do you

17  have any knowledge or information with respect to a person's

18  behavior in relationship to the mitigating factors that are

19  possible under Ohio law with respect to a capital case?

20  A.  I honestly am not aware.  I am -- I know nothing about

21  mitigating factors in Ohio law regarding capital cases.

22  Q.  Would it be fair to say that in determining the

23  rationality or bizarreness of a person's behavior in

24  relationship to the issue of whether there's a mitigating

25  circumstance which is permissible under Ohio law, that a

PARRAN  -  CROSS

3-102

1    person who had experience, professional experience, in the

2    latter regard, in the regard of presenting evidence or in

3    assisting in these types of issues, that their opinion might

4    have more validity than yours?

5              MR. MEZIBOV:  Objection.

6              THE COURT:  He may answer.  If you understand the

7    question.

8    Q.  I admit it is a pretty tough question.

9    A.  I think I do.  My opinion was requested about cocaine

10   pharmacology and about the clinical and to give a clinical

11   opinion about what was going on with Mr. Hicks on that day,

12   and that is what my opinion is about.  I think that the

13   weight of my opinion is -- my personal feeling about this is

14   that my personal opinion should be based on my own knowledge

15   of cocaine pharmacology, my knowledge of cocaine dependence,

16   my knowledge of working with patients with cocaine

17   dependence, cocaine psychosis, and my ability to look at an

18   indication and interpret the signs and symptoms that I see in

19   the case in terms of my background.

20   Q.  Now, Dr. Parran, you're aware, of course, that your

21   opinion is being offered with respect to an allegation of

22   ineffective assistance of counsel?

23   A.  I'm sure that I've heard that.  I'm not sure I understand

24   what that means.

25   Q.  I see.  Would it be fair to say -- withdraw that.

PARRAN  -  CROSS

3-103

1    And you're aware, Dr. Parran, that the allegation of

2    ineffective assistance of counsel involved the attorneys'

3    alleged negligence in failing to consult an expert such as

4    yourself?

5         MR. MEZIBOV:  Objection.

6         MR. WILLE:  Your Honor, may I state why I'm going

7    into this?  Your Honor, the State's position is that this

8    hearing, of course, is not really at the first instance about

9    Mr. Hicks' cocaine psychosis or state of mind.  In the first

10   instance, it's about his attorneys' reasonableness in

11   deciding whether to pursue this line of defense in either

12   trial or mitigation; therefore, any evidence or any testimony

13   relative to whether this information would have been in fact

14   viewed by the attorneys is relevant to mitigation in Ohio, is

15   relevant and should be explored.

16        THE COURT:  Thank you, Mr. Wille.  Denied.

17        MR. WILLE:  Thank you, Your Honor.

18   Q.  Now, you mentioned, Dr. Parran, that you relied in part

19   on Mr. Hicks' statement to the police?

20        THE COURT:  I'm sorry.  Did he answer the last

21   question?

22        THE WITNESS:  No, I didn't.

23   Q.  I'm sorry?

24   A.  I don't know what it was.

25   Q.  I didn't give you the opportunity to answer the question.

PARRAN   -   CROSS

3-104

1      MR. WILLE:  Thank you, Your Honor.

2      THE COURT:  I was interested in it.

3      MR. WILLE:  I'm glad you were, Your Honor.  I

4  apologize.  I lost my train.  Could you read it back to me?

5  I don't remember.

6  Q.  Well, are you aware, Dr. Parran, that this case involves

7  the allegation that counsel, Mr. Hicks' counsel, was

8  ineffective for failing to explore or hire an expert such as

9  yourself?

10 A.  I'm aware that that's -- that that's one of the things

11 they asked me about early on, which was to form an opinion

12 about the quality of the testimony as it related to cocaine

13 pharmacology of cocaine psychosis, yes.

14 Q.  You testified on direct that you felt that the jury was

15 given inadequate or inaccurate information --

16 A.  Yes.

17 Q.  -- on this issue, but you would offer no opinion or you

18 do not claim any expertise with respect to whether that

19 inaccuracy in any way is related to a case in mitigation in

20 Ohio.

21 A.  Since I don't know what any criteria are for mitigation,

22 I'd be on pretty thin ice on giving an opinion on it.

23 Q.  Now, Dr. Parran, is it fair to say that you relied in

24 forming your diagnosis on Mr. Hicks' statement to the police;

25 is that a fair statement?

PARRAN   -   CROSS

1   A.  Yes, I certainly weighed that very carefully.

2   Q.  Now, Dr. Parran, would you consider Mr. Hicks' statement

3   to the effect that he left the door open of the apartment so

4   he could return later without being detected, would that be

5   an indication of bizarre or irrational behavior in your

6   opinion?

7   A.  Returning to the apartment struck me as fairly irrational

8   behavior, having already taken what he was taking to go get

9   more cocaine.  But, leaving the door open and/or taking the

10  key, I don't remember which, or both --

11  Q.  Well, let me clarify that.  Do you recall Mr. Hicks

12  saying he had left the door open when he left so when he came

13  back he could get in without, I guess, without being detected

14  or being seen?

15  A.  Uh-huh.

16  Q.  Now --

17          MR. MEZIBOV:  There is an objection, unless

18  Mr. Wille can go to the record and be precise, because he's

19  apparently now speculating as to what may or may not be in

20  the record and asking a witness to answer with respect to

21  what may be illusory statements.

22          THE COURT:  This is cross-examination, testing the

23  credibility of the opinion of this witness.  Denied.  And,

24  Doctor, if it's something you didn't consider, just tell us

25  that.  You don't have to -- if you can't recall it or you

PARRAN  -  CROSS

3-106

1   didn't consider it, just tell us that and we'll go on.

2   A.   It's something that I noticed when reading the

3   statement.   It's not something that struck me one way or the

4   other in terms of whether this individual was paranoid and

5   potentially involved in cocaine psychosis.   The reason I say

6   that is because reading -- reading that statement one way --

7   and I certainly can find it in here, if I need to --

8        (Witness reviewing the transcript.)

9   A.   Hmmm.  Well, I can't find it right at the moment.  But

10  looking at that statement one way, it lended (sic) support

11  for an idea of being paranoid about being seen and being

12  paranoid about or being suspicious and paranoid in

13  behaviors.

14  Q.   Dr. Parran, would you think that a person who's

15  committing a crime may be paranoid about being apprehended or

16  detected even though they're not under the influence of

17  cocaine?

18  A.   Yeah, I think there is certainly a difference between a

19  person being worried or suspicious and being paranoid.

20  Q.   Well, then let me rephrase my question.  You would agree

21  or you would concede that a person that was committing a

22  crime would show some worry and suspicion --

23  A.   Yes.

24  Q.   -- show worry and suspicion about being detected?

25  A.   Certainly.

PARRAN  -  CROSS

3-107

1  Q.  Now, do you recall Mr. Hicks' statement to the effect

2  that he brought the tape from the car when he went up to the

3  apartment the second time and murdered Brandy?

4  A.  Yes.

5  Q.  You recall that statement?

6  A.  Yes.

7  Q.  Now, in your opinion is that indicative of irrational or

8  bizarre behavior?

9  A.  No.

10  Q.  Now, Dr. Parran, do you recall a deposition taken by my

11  office with respect to this case?

12  A.  (Nods head affirmatively.)

13  Q.  And you were asked the question, I believe, that did you

14  find anything inconsistent in these facts with your diagnosis

15  of cocaine psychosis?

16  A.  Yes.

17  Q.  And you recall answers that you felt there was nothing

18  inconsistent with a diagnosis of cocaine psychosis?

19  A.  Yes.

20  Q.  Wouldn't it be fair to say your testimony that you've

21  just made that Mr. Hicks' taking the tape with him to go up

22  to the apartment before he murdered Brandy, if viewed as

23  indications of rational and thoughtful behavior, indeed would

24  be inconsistent with your diagnosis that he was under the

25  influence of a cocaine psychosis?

PARRAN  -  CROSS

3-108

1  A.  By not characterizing it as irrational, I certainly

2  wouldn't characterize it as rational or thoughtful behavior.

3  Secondly, it is not -- I would disagree.  As I -- as I tried

4  to explain this morning, and as I think is a widely held

5  misconception, perhaps, regarding this case, but certainly in

6  many areas, a person who has a cocaine psychosis is moving

7  from the paranoia, from mild paranoia of cocaine use to more

8  severe paranoia, and what we would call cocaine psychosis is

9  a person who is not.  And clinically there's no evidence that

10  these people behave like a completely disorganized, paranoid,

11  schizophrenic, delirious individual, that some of their

12  actions and behaviors appear to be and are extremely erratic,

13  impulsive with intrusive thoughts, paranoid ideations

14  oftentimes with auditory hallucination.  Oftentimes their

15  behaviors are those of a person who is much less disorganized

16  than that, although certainly much more disorganized than

17  they would normally be in life.  And these sort of "waxes and

18  wanings" of this phenomenon during the time of the cocaine

19  psychosis is what makes the individual so unpredictable and

20  what makes their -- their actions so unpredictable.

21  Q.  Would it be fair to say, Dr. Parran, that in your opinion

22  during a cocaine psychosis there are times when a person may

23  act rationally and with intent and premeditation with respect

24  to a particular act?

25  A.  I have to make the disclaimer that not being trained in

1  forensic psychiatry I'm not in a position to respond to

2  exactly the terms that you used.  But what I can say is that

3  when a person is involved in a paranoid, severely paranoid or

4  psychotic episode around the use of cocaine, some of their

5  actions are less disorganized and more purposeful than

6  others.  But what's characteristic of the overall phenomenon,

7  that is that the person tends to intermittently lose track of

8  their -- of their purpose and -- and go off on various

9  tangents and side behaviors that are fairly indicative of

10  this very unstable sort of psychiatric moment that the

11  patient is in, and that is -- is what actually the cases that

12  you're citing indicate to me.

13  Q.  Let me go back to what you said at the very beginning.

14  You're saying that perhaps you would not feel qualified in

15  terms of rendering an opinion as to the possibilities of --

16  from a psychological standpoint of a person acting rationally

17  and with premeditation and specific intent during a cocaine

18  psychosis?

19  A.  I am not familiar or trained with issues of

20  premeditations, et cetera.  I can, as a clinician, look at

21  patterns of behavior, rationality and irrationality, levels

22  of organization and disorganization of thought and come up

23  with clinical opinions about that.

24  Q.  Doctor, may I refer to your chart?  During these times of

25  cocaine psychosis, would it be possible for a person to act

PARRAN  -  CROSS

1  rationally and logically and with premeditation during the

2  course of this period?

3  A.  The most consistent actions that people clin --

4  clinically that people pursue during a cocaine binge is

5  seeking more cocaine.  And as they become -- as they progress

6  in the binge and as they self-administer the drug a second or

7  a third or fourth or sometimes many more times than that, the

8  amount of paranoia in their behavior and the irrationality of

9  their behaviors tend to become intensified.

10  Q.  Would it be possible, however, Doctor, for Mr. Hicks,

11  assuming that he was operating under a cocaine psychosis

12  during these periods, to perform purposeful, intentful (sic)

13  and seemingly premed -- acts of premeditation, even though in

14  your clinical diagnosis he was suffering under a cocaine

15  psychosis?

16  A.  Certainly people are able to perform purposeful actions;

17  I certainly could agree with that.  There were purposeful

18  actions in this case.  They tended not to be extended,

19  purposeful actions.  They tended to be pretty short lived and

20  then using more cocaine.  But certainly people can do

21  purposeful actions when they're involved in cocaine

22  psychosis.

23      MR. WILLE:  One moment, Your Honor.

24    (Mr. Wille and his colleagues conferred privately.)

25      MR. WILLE:  Just a couple more brief questions.

PARRAN  -  REDIRECT

3-111

1    Q.  Dr. Parran, on direct you referenced a Dr. Nelson?

2    A.  Don Nelson, yes.

3    Q.  Could you tell us again who Don Nelson is?

4    A.  Don is a clinical pharmacologist on the staff of the

5    University of Cincinnati School of Medicine who has received

6    a -- who received a training award and was trained in

7    chemical dependence and early -- pharmacology -- in the early

8    1980s and was teaching in this area, teaching about chemical

9    dependence, about pharmacology of mood-altering substances in

10   this area.  He -- and probably knows many of the people in

11   this area who may have been more clinical experts as opposed

12   to pharmacology experts.

13   Q.  In reviewing the materials in this case, did you recall

14   seeing a letter by Mr. Hicks' defense counsel to Mr. Nelson?

15   A.  No, I don't.

16   Q.  Were you aware -- and you would have no knowledge whether

17   they in fact did or did not in fact try to contact

18   Mr. Nelson?

19   A.  No, I do not.  But the reason why Dr. Nelson's name came

20   up is because he is one person who I know is from Cincinnati,

21   lives in the area, I'm certain was practicing in this area in

22   the mid-1980s and had a good deal of experience with

23   amphetamine psychosis and cocaine psychosis as a clinical

24   pharmacologist.

25            MR. WILLE:  Thank you.

PARRAN  -  REDIRECT

REDIRECT EXAMINATION

BY MR. MEZIBOV:

Q.  Dr. Parran, I just have a couple followup questions to Mr. Wille's.

The first, Mr. Wille asked you some questions concerning your knowledge that the record contains references to feigned mental illness by Mr. Hicks.  You remember those questions?

A.  Yes.

Q.  And my question is, what effect does the fact that Mr. Hicks may have feigned mental illness have on the opinions you've offered regarding cocaine psychosis and its impact on Mr. Hicks and the actions which he committed that night?

A.  I can't give a clinical opinion about whether there was feigned mental illness or not.  I certainly can give, because I'm not a psychiatrist or psychologist, but I can certainly give my opinion that the people who did the examining seem to be very appropriate in that decision.  Mr. Hicks' history of attempting to feign mental illness, and not very well, didn't really have any negative impact on my opinion; that the record is very clearly supportive of cocaine psychosis.

Q.  So, regardless of the fact that Mr. Hicks may or may not have been feigning mental illness with his attorneys or any of the people who interviewed him after the fact, your opinions regarding cocaine psychosis and its impact in

PARRAN   -   REDIRECT

3-113

1   connection with the acts remains the same?

2   A.  Yes, absolutely.

3   Q.  Now, Mr. Wille also mentioned a Dr. Reardon.  Is that

4   correct?

5   A.  Yes.

6   Q.  And is it accurate that we provided you a copy of

7   Dr. Reardon's deposition --

8   A.  Yes.

9   Q.  -- that we took just a week or so ago?

10  A.  Yes.  I actually read it yesterday, on Tuesday, because I

11  just got back from a week teaching overseas on Monday.

12  Q.  I'm going to ask you -- I don't know if you have the

13  deposition in front of you.

14  A.  I left them in the car.

15  Q.  Let me do this.

16       MR. MEZIBOV:  If I might approach, Your Honor.

17  (Mr. Mezibov handing the witness the document.)

18  Q.  Dr. Parran, what I've done is placed in front of you

19  Dr. Reardon's deposition and I have highlighted excerpts --

20  an excerpt from Page 38 in yellow.

21  A.  Yes.

22  Q.  Which lines does that run from?

23  A.  Page 38, line 12 through 20.

24  Q.  I would ask you to read that passage to us, first.

25  A.  "In my opinion, the description that Mr. Hicks provided

PARRAN  -  REDIRECT

3-114

1    is not indicative of someone who was in such a state of

2    cocaine psychosis that they were unable to reason, that they

3    were unable to plan, that they were unable to form intent,

4    that they were unable to calculate a course of conduct, delay

5    initiating parts of that course of conduct, plan ahead as

6    opposed to the kind of grossly disorganized, erratic,

7    inconsistent, savage kind of behavior that I have seen in a

8    number of either cocaine psychosis or schizophrenic psychosis

9    cases."

10   Q.  Now, my first question with regard to that passage that

11   you read is, as an individual with the qualifications you

12   have provided to us, do you agree with that comment or that

13   passage by Dr. Reardon?

14   A.  I do not agree with the passage or the comment.

15   Q.  Why not?

16   A.  Because I think that this comment, once again, speaks to

17   the misconception that people with clinically significant,

18   meaningful cocaine -- degrees of cocaine psychosis that are

19   heavily influencing their behavior need to look like "grossly

20   disorganized, erratic, inconsistent, savage kind of behavior

21   seen with schizophrenic psychosis cases."  I have a clinical

22   problem with that.

23   Q.  Why is that?

24   A.  Because cocaine psychosis is something which involves --

25   which certainly involves intermittent intrusive thoughts,

PARRAN  -  REDIRECT

1    almost a -- a waxing and waning, of people sort of beginning

2    to exert some control and then losing control of their

3    thought processes, paranoid ideation, sometimes auditory

4    hallucinations and the impulsivity.  It certainly waxes and

5    wanes with cocaine psychosis.  And as I said, it's one of the

6    reasons why it's so easy from a clinical standpoint to

7    underestimate a patient's dangerousness, for example in the

8    Emergency Room, and to, therefore, take them less seriously

9    than one needs to and then have the person accelerate ten or

10   fifteen minutes later and become extremely dangerous.  That

11   is not only my clinical experience, but in the literature and

12   from the literature from the early '80s about cocaine

13   psychosis.  And, therefore, the fact that this patient at the

14   time exhibits clearly disorganized -- although in this

15   expert's opinion not grossly disorganized -- but clearly

16   disorganized, clearly erratic, clearly inconsistent behavior

17   with everything in his life, the best I could tell and most

18   other experts, and very savage behavior.  I think it's there.

19   Q.  If I understand your testimony correctly, do you take

20   exception to Dr. Reardon's descriptions as either savage or

21   disconnected?

22   A.  Yes, I take exception.  I think that the record certainly

23   indicates disorganized thinking and behavior, very erratic

24   behavior, quite inconsistent behavior not only during the

25   evening but entirely inconsistent behavior from -- comparing

PARRAN   -   REDIRECT

3-116

1   the evening to his life leading up to there, and a degree of

2   violence and savagery which is shocking, and I think that's

3   all in the case and that is what I see in the case.

4   Q.  And in addition to the descriptions that you take

5   exception to, do you also take exception to the conclusions

6   drawn there by Dr. Reardon?

7   A.  Yes, I do.  I read the beginning of the sentence of

8   Dr. Reardon.  The description that Mr. Hicks provided is not

9   indicative of someone who was in such a state of cocaine

10  psychosis.  I interpret that as an opinion that the patient

11  probably was in a state of cocaine psychosis, but that this

12  person's opinion is that the extent was not great enough to

13  be considered to contribute to the behavior, and I take

14  exception to that conclusion.

15  Q.  Now, Dr. Parran, again as an individual with the

16  experience in cocaine and cocaine psychosis and matters

17  surrounding cocaine, do you have an opinion as to whether or

18  not Dr. Reardon is competent to offer an opinion with respect

19  to cocaine psychosis and its effects?

20  A.  I have some concerns, and let me tell you my concerns.

21  In reading through his deposition yesterday, it concerned me

22  that Dr. Reardon did not know the pharmacology of cocaine;

23  didn't know the appropriate half life of cocaine; the

24  duration of intoxication; didn't know that norepinephrine was

25  the same thing as adrenaline, that they're the same thing;

PARRAN  -  REDIRECT

1  didn't know that norepinephrine -- although he stated it was

2  a neurotransmitter, which is partially true -- is actually a

3  systemic hormone which when it is released from the brain

4  functions as an neurotransmitter, but it is basically a

5  systemic hormone throughout the body. He seemed to think the

6  majority of cocaine effects were through sera -- he seemed to

7  think the majority of euphoric effects were mediated through

8  seratonin, when they are clearly by dopamine; did vaguely

9  recall dopamine and thought that was involved in some ways

10  but at least that's what I saw in the deposition.  So that

11  concerned me, from a knowledge of pharmacology standpoint.

12       The other thing that concerned me was his description of

13  his clinical background in addiction medicine.  He stated

14  that although -- and certainly he was the clinical director

15  or administrator, director of a big treatment program in the

16  Columbus area for several years, he didn't know what ASAM,

17  American Society of Addiction Medicine was.  And, actually,

18  treatment programs in Ohio that have medical directors who

19  are not certified by ASAM, are not able to receive

20  reimbursement by third-party insurers for the treatment they

21  provide because it's considered that an ASAM-certified

22  medical director is one way that insurance companies can

23  verify that it's a legitimate and well-run treatment

24  program.  That concerned me that he didn't know what that

25  was.

PARRAN  -  REDIRECT

3-118

1     It concerned me he didn't know what an addiction medicine

2     fellowship was, even though he is a psychologist and not a

3     physician.  Being an expert in the field or being able to

4     give expert opinions about aspects of addiction medicine,

5     cocaine psychosis, without even knowing what an addiction

6     medicine fellowship is concerned me.

7     And then, finally, the description that he gave of the

8     treatment program and the cocaine psychosis patients he's

9     seen concerned me.  My impressions -- and this is just an

10    impression based on the -- the deposition as well as his CV,

11    is that a significant amount of the treatment program that he

12    supervised, which sounds like a big comprehensive treatment

13    program, was Methadone maintenance, which is for heroin

14    addiction, residential treatment, which certainly could be

15    for cocaine addicts, but generally well after the cocaine

16    psychosis is done, and outpatient treatment.  And when he was

17    asked whether he had seen patients who had cocaine -- who

18    were acutely using cocaine -- and the question seemed to be

19    framed sort of along the lines of in an Emergency Room

20    setting, or whatever, he stated he certainly saw lots of

21    patients in outpatient treatment within a matter of a few

22    hours of using, or even patients who came in intoxicated, and

23    that was his experience with patients with -- my impression

24    was that was his statement of experience with patients with

25    cocaine psychosis.  Actually, certainly lots of patients who

PARRAN  -  REDIRECT

1   have just used cocaine recently or just used it on the bus or

2   at the corner to -- before coming into treatment, that

3   happens all the time.  But the ones who use cocaine just

4   before they come to treatment and trigger cocaine psychosis

5   don't walk in the door.  They go off; they go off to get more

6   cocaine.  So, those statements concerned me significantly

7   regarding his qualifications to give an expert opinion about

8   something having to do with cocaine.

9   Q.  Dr. Parran, how important, in your professional

10  estimation, is it to have an expert knowledge of

11  pharmacological effects of cocaine to be able to explain the

12  dynamics and the impact of cocaine psychosis in a given

13  instance?

14  A.  Well, I think especially -- let me back up.  It's perhaps

15  not critically important to have a clear understanding of all

16  the pharmacology of cocaine to be able to talk about cocaine

17  addiction to some degree, although even that would be a

18  serious liability.  Not knowing the pharmacology -- really

19  knowing it well -- of cocaine, and certainly psychologists do

20  know the pharmacology of cocaine -- I worked with many

21  psychologists in our V.A. treatment who know the pharmacology

22  of cocaine quite well.  But, not knowing the pharmacology of

23  cocaine when we're talking about something that is different

24  than cocaine intoxication, that is different than the cocaine

25  crash and is this sort of peri-binge, paranoid, at times

1  psychotic period, I think is -- renders a person in not a

2  solid position to give an opinion.

3  Q.  And finally, Dr. Parran, in your professional opinion,

4  how important is it to be familiar with or expert in the

5  pharmacology of cocaine in understanding Mr. Hicks' condition

6  in connection with the matters in this case?

7  A.  I think it's very important and it -- not knowing the

8  pharmacology of cocaine and also how the pharmacology of

9  cocaine measures with the disease of addiction to produce

10  typical patterns of cocaine dependence, cocaine binging, the

11  kindling phenomenon, and paranoia and psychosis, not knowing

12  that I think renders a person in -- in a very weak position

13  to be able to give a credible opinion about this case.

14  Q.  From what you read in the transcript of Dr. Reardon, did

15  it appear to you that he had an appreciation of the kindling

16  effect as you've described?

17  A.  No.  My initial reading when he was asked about the

18  kindling phenomenon, it appeared to me it was the first time

19  he ever heard of it.  I can't say that for sure.  But then

20  his response of what his understanding of it was, he thought

21  he had a vague understanding of it, some sort of

22  understanding.  I can read the exact thing if you want --

23  oops, there it is.  Page 49:

24          "Do you know what the kindling effect is?"

25          "Answer:  Kindling?"

PARRAN  -  REDIRECT

1     "Question:  Kindling, k-i-n-d-l-i-n-g."

2     "Answer:  Not specifically.  Not that term."

3     "Do you know what it refers to?"

4     "Answer:  Well, I'm assuming it refers to something

5     with regard to timing of onset and so forth."

6     The response indicated that he really did not know what

7     kindling was at all.

8     Q.  And how important in your estimation is or was the

9     kindling effect insofar as Mr. Hicks' situation is concerned?

10    A.  Well, the kindling effect is what explains the reason why

11    some patients -- and apparently at least -- to the best of my

12    professional opinion, in this case a patient can binge on a

13    tremendous amount of cocaine at one time and finally trigger

14    a certain cascade of symptoms in themselves.  In maybe five

15    percent of cocaine addicts, a person by binging on cocaine

16    will trigger a seizure.  And then in that five percent,

17    almost every time they use cocaine after that, even if it is

18    a small amount, they'll have a seizure thereafter, and that's

19    the kindling phenomena.

20         In terms of this case, using a tremendous amount of

21    cocaine in the few years previously, intermittent and huge

22    binges triggered the paranoid ideation when using cocaine,

23    explains the crux of how a person can do somewhere between

24    three and five runs of I.V. cocaine in an evening and develop

25    very bizarre, very savage, very disorganized behavior that

PARRAN   -   REDIRECT

3-122

1   looks like cocaine psychosis, more than anything else

2   clinically in a differential diagnosis.  So I think it is

3   really a critical issue.

4          MR. MEZIBOV:  Thank you, Dr. Parran.  That's all I

5   have.

6          MR. WILLE:  Nothing further, Your Honor.

7          THE COURT:  Do I understand that when the kindling

8   effect is invoked or occurs, that then the person will binge

9   on I.V. cocaine?

10          THE WITNESS:  The kindling effect can -- the

11   phenomenon of kindling can affect several different --

12   several different parts of cocaine use.  Certainly the

13   phenomenon known as kindling can affect whether a person has

14   a subsequent seizure after they've had one.

15          THE COURT:  We know Mr. Hicks didn't have seizures.

16          THE WITNESS:  Yes.

17          THE COURT:  So let's talk --

18          THE WITNESS:  The kindling effect certainly

19   explains how people have significant paranoid ideation and

20   psychosis-type actions.

21          THE COURT:  As far as we know, that never happened

22   prior to this time with -- of the murders with Mr. Hicks; do

23   we?

24          THE WITNESS:  Well, the description -- the

25   description in the 1990 report of Dr. Baum -- I think that's

PARRAN  -  REDIRECT

1    his name -- granted, that was after the fact and it was

2    information gathered in 1990, but the description there of

3    the cocaine dependence that Mr. Hicks had had in the previous

4    few years did describe no violent behavior but certainly

5    described intense binges that involved paranoid ideation,

6    using by himself, using in solitary environments, no longer

7    using socially with other people.  All of which is, at least

8    I read, is pretty strong evidence for that.

9         THE COURT:  Well, the only information you have in

10   that regard is the amount of --

11        THE WITNESS:  I can try to look for it here if you

12   want me to.

13        THE COURT:  Well, do you have -- I understood that

14   you based your opinion on the fact that he used his life

15   savings to buy cocaine.

16        THE WITNESS:  That was my opinion regarding cocaine

17   dependence.  My opinion regarding the fact that it's my

18   opinion that he had significant paranoia with previous

19   binges, previous heavy binges with cocaine, was based both on

20   my interview with Mr. Hicks in 1995 as well as data from 1990

21   and Dr. Baum's record which he shifted his pattern of use to

22   more and more solitary use by himself during these binges,

23   which generally happens because of the paranoia coming on

24   with heavier and heavier binges.

25        THE COURT:  And when he is on a binge, the only

PARRAN  -  REDIRECT

3-124

1   thing he is interested in is getting more cocaine?

2        THE WITNESS:  That's what most patients describe.

3        THE COURT:  Did Mr. Hicks?

4        THE WITNESS:  Mr. Hicks did, yeah, and he described

5   that in his --

6        THE COURT:  So Mr. Hicks was on a binge?

7        THE WITNESS:  Yes.

8        THE COURT:  And all he was interested in was

9   getting more cocaine?

10        THE WITNESS:  That -- that sounds --

11        THE COURT:  Am --

12        THE WITNESS:  I mean, that seemed to be my reading

13   of it.

14        THE COURT:  All right.  All right.  Now, when did

15   he start the binge?

16        THE WITNESS:  I'll have to look at it, but it's --

17   from the detective's report, I believe -- I have it right

18   here.  He first used --

19        THE COURT:  Well, I thought --

20        THE WITNESS:  I'm sorry, Your Honor, but it's -- I

21   thought it was about 8 o'clock in the evening.

22        THE COURT:  On the Friday?

23        THE WITNESS:  On Friday.

24        THE COURT:  After --

25        THE WITNESS:  Between 8:00 and 9:00 in the evening,

PARRAN  -  REDIRECT

3-125

1    I think.

2                THE COURT:  All right.  And that's when the binge

3    started?

4                THE WITNESS:  That was the first use of cocaine.

5                THE COURT:  Now, when did the binge start?  I

6    understand there is a difference between the simple use of

7    cocaine, if there is such a descriptive phrase, and a binge.

8                THE WITNESS:  What I would say is that once a

9    person has cocaine dependence and they've -- and they've

10   established it in a binge-crash pattern, which is the most

11   common, the initial use of cocaine is the initial start of

12   that binge.

13               THE COURT:  All right.  So, then if Mr. Hicks'

14   situation was such that if he took a drop or a -- any amount

15   of cocaine, it was the start of a binge?

16               THE WITNESS:  That's consistent with the history

17   that I heard in here, especially from Dr. Baum and my history

18   with him.

19               THE COURT:  And so the binge started with the first

20   use of cocaine?

21               THE WITNESS:  Yes.

22               THE COURT:  When did it end?

23               THE WITNESS:  Usually we classify the binges ending

24   with the last use of cocaine.

25               THE COURT:  Last use.  So --

PARRAN  -  REDIRECT

3-126

1        THE WITNESS:  Maybe ten minutes after that, when

2   the peak goes away.

3        THE COURT:  Now, in this situation the binge was

4   over with the last use of cocaine?

5        THE WITNESS:  I would say, yes.

6        THE COURT:  Around 12:30 that evening?

7        THE WITNESS:  Yeah, I think it was right around

8   then, 12:30.  Maybe -- let's see.  Oh, must have been 12:30;

9   something like that.  "So, I went up ahead and shot up the

10   dope I got."  So, I think he went around 12:30 and got his

11   last cocaine and came back to the apartment and used it.  So,

12   probably sometime between 12:30 and 1:00 or so.

13        THE COURT:  Thank you.

14        THE WITNESS:  Okay.

15        MR. MEZIBOV:  Your Honor, may I clarify one point?

16              FURTHER REDIRECT EXAMINATION

17   BY MR. MEZIBOV:

18   Q.  Dr. Parran, His Honor has asked the onset and the

19   duration of the cocaine binge; correct?

20   A.  Yes.

21   Q.  And what about the onset and the duration of the cocaine

22   psychosis?

23   A.  Most patients -- and I can't say for Mr. Hicks, because

24   by the time I interviewed him in 1995, he said that his

25   recollection of all of the events that evening was not clear

PARRAN  -  REDIRECT

1  enough to tell me exactly.  But, most patients, once they

2  have had cocaine psychosis or paranoia associated with the

3  cocaine binge in the past, get some degree of paranoia,

4  usually mild, after the first use of cocaine and then it is

5  multiplied each time they use the cocaine thereafter.  So, I

6  generally consider serious paranoia to be starting after the

7  second time that people use cocaine.

8  Q.  When in connection with Mr. Hicks then would the serious

9  onset of psychosis set in?

10  A.  Once again, the only thing I have to base my opinion on

11  is his confession, and during his confession he said he got

12  edgy, he got restless, that he got an incredible urge to use

13  cocaine after the first I.V. cocaine use and he went and

14  hocked the VCR.  When he used the second I.V. cocaine, he

15  suddenly started thinking about robbing his grandmother -- or

16  his mother-in-law; and as that got closer, he began

17  considering murdering his grandmother, and that -- so

18  clinically for me it would be right around the time or

19  shortly after the second I.V. administration of cocaine.

20  Q.  And do you have an opinion, to a reasonable degree of

21  medical certainty, whether Mr. Hicks was in the midst of a

22  cocaine psychosis throughout the times these two murders were

23  committed?

24  A.  Yes.

25          MR. MEZIBOV:  Okay.

PARRAN  -  REDIRECT

3-128

1    MR. WILLE:  Nothing further, Your Honor.

2    THE COURT:  Is this witness released?

3    MR. MEZIBOV:  Yes, Your Honor.

4    THE COURT:  Is this witness released?

5    MR. WILLE:  Thank you.  Yes.  Thank you, Your

6  Honor.

7    THE COURT:  Thank you, Doctor.

8    (Witness excused.)

9    THE COURT:  We'll have a 15-minute recess.

10    THE CLERK:  All rise.

11    (At 2:43 p.m., a recess was taken.)

12    * * *    (3:05 p.m.)

13    THE COURT:  Is the petitioner ready to proceed?

14    MR. MEZIBOV:  Yes.

15    THE COURT:  Respondent ready to proceed?

16    MR. WILLE:  Yes, Your Honor.

17    THE COURT:  Call your next witness.

18    MR. MEZIBOV:  Your Honor, we've agreed with

19  Mr. Wille that we can call certain witnesses out of order,

20  and we defer to Mr. Wille.

21    THE COURT:  Proceed.

22    MR. WILLE:  Thank you, Your Honor.  We would call

23  Dr. Reardon.

24    THE CLERK:  Raise your right hand, please.

25    (Duly sworn by the Clerk.)

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

STATE OF OHIO                                :

    Plaintiff                              :        Case No. 01-CR-794

-vs-                                         :

NATHANIEL JACKSON                            :

    Defendant                              :

EXHIBIT_____

AFFIDAVIT OF ROBERT G. KAPLAN, PH.D.

STATE OF OHIO          :
                : ss:
COUNTY OF CUYAHOGA :

Robert G. Kaplan, Ph.D., after being duly sworn according to law states as follows:

1.    I am a clinical and forensic psychologist licensed to practice psychology in the State of Ohio, with professional offices located in Cuyahoga County, Ohio.

2.    My professional background and qualifications are set forth in my Curriculum Vitae which is attached and made part of herein as Exhibit "A".

3.    One of my professional specialties is the assessment and treatment of substance abuse.

4.    I have reviewed, regarding the defendant, Nathaniel Jackson, several documents which contain the following information about him:

    a.    Nathaniel Jackson abused crack cocaine and wanted to stop abusing this substance.

    b.    Nathaniel Jackson stole to support his drug habit.



EXHIBIT
64

c.      Nathaniel Jackson's  mother  had to lock her freezer to keep him from stealing food to sell for drugs.

d.      Nathaniel Jackson's mother also  had to lock her bedroom in order to keep him from stealing her valuables and selling them for drugs.

e.      Nathaniel Jackson stole his son's clothes as well as his mother's car in order to obtain money to buy crack cocaine.

f.      The mother of Nathaniel Jackson's daughter  left Nathaniel Jackson due to his drug abuse.

g.      Other family members would not let Nathaniel Jackson live with them because he would  steal from them in order to support his drug abuse.

h.      Nathaniel Jackson was  forced to live on the street due to his drug abuse.

i.      Nathaniel Jackson  received treatment for drug abuse at the Bellmont Drug Treatment Center but was unable to complete this treatment.

j.      Nathaniel Jackson's  mother was alleged to be a binge drinker.

k.      Nathaniel Jackson was alleged to associate with drug dealers and users.

l.      Nathaniel Jackson's girlfriend, Donna Roberts,  provided him with money, clothes and drugs.

m.      Nathaniel Jackson was not known to be a violent person before the instant offense was committed.

n.      Nathaniel Jackson had  been ordered by a court to have treatment for drug abuse.

5.      Based upon the information listed above in paragraph four of this affidavit and

2

assuming that it is correct,  it can be stated, with reasonable psychological certainty that Mr.  Nathaniel Jackson requires an evaluation in order to determine if he has a substance abuse problem, if he is chemically dependent and/or if he has any mental disorder.

6.   Based upon the  information listed above in paragraph four of this affidavit, and assuming it is correct,  it can be stated, with reasonable psychological certainty, that Mr.  Nathaniel Jackson requires an evaluation in order to determine if any substance abuse problem, chemical dependency problem, and/or any mental disorder was a contributing or mitigating factor with regard to the instant offense.

7.   I am available and able to conduct a psychological evaluation of the defendant for the purposes stated in paragraphs five and six of this affidavit.

8.   My fees for conducting a psychological evaluation are set forth in my Fee Schedule which is attached and made part of herein as Exhibit "B".

9.   I will charge a per-diem rate of $2400.00 (two-thousand, four-hundred dollars and zero cents) for the time that I spend evaluating the defendant and estimate that it will take no longer than one day to evaluate the defendant, including travel time.

10. I will charge an hourly rate of $300.00 (three-hundred dollars and zero cents) per hour for the time that I spend reviewing any additional documents and records, consulting with counsel, and writing any additional reports. I estimate that it will take two to four hours of additional time to review documents and records, two to four hours of additional time to consult with counsel, and one to two hours to write a report of my evaluation.

11. I will charge a fee of $150.00 (one-hundred, fifty dollars and zero cents) per psychological test that I administer to the defendant. I estimate that I will need to administer three to four tests.

12. I will charge a per-diem rate of $2400.00 (two-thousand, four-hundred dollars and zero cents) for the time that I spend testifying outside of Cuyahoga County, Ohio. I will charge an hourly rate of $300.00 (three-hundred dollars and zero cents) for any video-taped testimony provided in Cuyahoga County, Ohio, with a two-hour minimum charge.

Further affiant saith naught.

ROBERT G. KAPLAN, PH.D.

Sworn to and subscribed in my presence this twenty-sixth day of December, 2003.

NOTARY PUBLIC

4

ANNETTE DEL PIZZO
Notary Public, State of Ohio, Cuy. Cty.
My commission expires Mar. 21, 2007

# Curriculum Vitae

## Dr. Robert G. Kaplan
Clinical Psychologist
Board Certified Forensic Examiner
Fellow, American College of Forensic Examiners
Diplomate, American Board of Psychological Specialties,
Psychological Disability Evaluation

## Kaplan Consulting & Counseling, Inc.
3401 Enterprise Parkway, Suite 340
Cleveland, Ohio 44122-7340
Call: (216) 766-5743
Fax: (216) 766-5796
Email: Rkaplan@KaplannCC.com
Internet: www.KaplanCC.com



## *Current Employment Position*

President, Kaplan Consulting & Counseling, Inc.  (April, 2002 to Present)

A forensic psychologist who specializes in trauma, psychological disability evaluation, workplace violence, sexual harassment, discrimination, substance abuse prevention and criminal behavior. He is an experienced crisis manager who has successfully helped employers and individuals resolve several hundred crises involving suicidal, homicidal, intoxicated and psychotic individuals without the loss of a single life throughout his career. He also advises employers on the development of policies, programs and strategies in his areas of specialization. In his private practice he specializes in treating individuals who suffer from trauma, substance abuse, depression and anxiety.

## *Previous Employment Positions*

### Executive Vice President, Behavior Management Associates, Inc. (May, 1985 to April, 2002)

A founding principal of a firm that provides employee assistance programs, managed behavioral health care services, organizational training and development programs, and evaluations for hiring and promotion to over 200 employers across the United States and Canada. Services were provided to over 250,000 covered lives of the firm's *IMPACT* Employee Assistance Program. The firm also provides psychological assessment and counseling services to individuals, couples

1

and families in the greater Cleveland metropolitan area. His responsibilities included the management of forensic and assessment services, clinical services, crisis intervention services, program development, employer policy consultation, risk management, information and communication technology, contracting, and development of marketing materials.

### Psychologist, Management Psychologists of Ohio (December, 1983 to June 1984, Part-time, July, 1984 to May, 1985)

An employee of a firm that provided management consulting and employee assistance programs to employers in the greater Cleveland metropolitan area. Responsibilities included individual, group, family and marital psychotherapy, biofeedback, psychological assessment and vocational counseling. Extensive assessment services were provided for attorneys, insurance and rehabilitation companies, employers, the Ohio Bureau of Workers Compensation, the Ohio Bureau of Vocational Rehabilitation and the U.S. Social Security Administration.

### Counselor, City of Cleveland Office of Mental Health & Substance Abuse (October, 1982 to June, 1984)

An employee of a city agency that provided outpatient mental health and substance abuse services primarily to low-income, poor and indigent residents. Responsibilities included individual, group and marital psychotherapy, outreach services, social services, substance abuse counseling and consultation to medical staff in the adult and adolescent clinics of the Thomas F. McCafferty Health Center, an inner-city outpatient health care facility. Psychological assessment and consultation services were performed for agency staff located throughout the City of Cleveland. Additional responsibilities included group therapy for substance abusers, individual psychotherapy, and psychological assessment of prisoners in the City of Cleveland House of Corrections.

## Internship

### Cleveland MetroHealth Medical Center (Formerly Cleveland Metropolitan General Hospital, September, 1981 to September, 1982)

Psychology Intern at a county teaching hospital of Case Western Reserve University Medical School, accredited by the American Psychological Association. Responsibilities included psychological assessment and neuropsychological testing of infants through elderly on both inpatient and outpatient units, individual outpatient psychotherapy of children, adolescents and adults, crisis intervention and emergency services, group psychotherapy of inpatient adolescents, psychological consultation to pediatric and adult medical wards, psychological assessment and intervention with medical patients, psychological support to medical staff, case management of adolescent and adult psychiatric inpatients, and provision of psychological services to multi-disciplinary treatment teams for adolescent and adult psychiatric inpatient units.

## Training Placements

### Case Western Reserve University Student Health Service (September 1980 to September, 1981)

Psychology Assistant at a university counseling center. Responsibilities included outpatient psychotherapy with graduate and undergraduate students of the university.

### Cleveland Veterans Administration Medical Center (September, 1978 to September, 1980)

Psychology Assistant at a large Veterans Administration psychiatric hospital. Responsibilities included one year of providing psychological services for an acute-care psychiatric ward, six months of providing psychological services for  the drug dependency treatment unit, six months of providing psychological services for the day hospital program (full-day treatment of hospital outpatients).  Services included psychological assessment, individual and group psychotherapy, case management, therapeutic community intervention, biofeedback and multi-disciplinary treatment team planning.

### Lake County Mental Health Center (September, 1977 to September 1978)

Psychology Assistant at a large suburban mental health center. Responsibilities included individual and group psychotherapy, crisis intervention and psychological assessment of children, adolescents, adults and elderly county residents.

## Education

Ph.D., Clinical Psychology, 1983,  Case Western Reserve University, Cleveland, Ohio

M.A.,  Clinical Psychology, 1981, Case Western Reserve University, Cleveland, Ohio

B.A., Cum Laude, Psychology, 1976, University of Pennsylvania, Philadelphia, Pennsylvania

## License and Certifications

Psychologist, State of Ohio, License Number 3518, 1984

Fellow, American College of Forensic Examiners, 1999 to Present

Diplomate, American Board of Psychological Specialties, Psychological Disability Evaluation, 1996

Board Certified Forensic Examiner of the American College of Forensic Examiners, 1996 to Present

Diplomate, American College of Forensic Examiners, 1996 to 1999

U.S. Dept. of Transportation Substance Abuse Professional 1998 to Present

Critical Incident Stress Debriefing, International Critical Incident Stress Foundation, 1995 to Present

CPR & First Aid, American Red Cross, 1998 to Present

## Hospital Affiliations

University Hospitals Health System, Laurelwood Hospital, Cleveland, Ohio, 1992 to Present

Parma Community General Hospital, Cleveland, Ohio 1996 to Present

## Professional Associations

President, Cleveland Psychological Association, 1999

Treasurer, Cleveland Psychological Association, 1998

Chief, Information & Referral Service, Cleveland Psychological Association, 1998

Chairperson, Speakers Bureau, Cleveland Psychological Association, 1997

Chairperson, Public Education & Marketing Committee, Cleveland Psychological Association, 1997

Member, International Society of Traumatic Stress Studies, 1994 to Present

Member, Cleveland Psychological Association, 1985 to Present

Member, Ohio Psychological Association, 1985 to Present

Member, American Psychological Association, 1985 to Present

Member, Employee Assistance Professionals Association 1985 to Present

Member, Program Committee, Employee Assistance Professionals Association, Northern Ohio Chapter, 1985 to 1987

American Management Association 1985 to 1987

## Teaching Experience

Guest Lecturer, Critical Incident Stress Debriefing, Cleveland State University, Cleveland, Ohio, 1997

Instructor, Behavior Modification, Ursuline College, Cleveland, Ohio, 1987

Graduate Assistant, Psychological Assessment, Case Western Reserve University, 1980-1981

Undergraduate Assistant, Statistics, Case Western Reserve University, 1980-1981

## Professional Publications

Kaplan, Robert G., (1998) Preventing Workplace Violence, in *The Best of Labor & Employment Law, 1997, Volume #703,* Carl F. Muller, Ed., Columbus, Ohio, Ohio CLE Institute Publications

Workplace Violence Technical Advisor, Gustin, Joseph F. (1996), *Safety Management, A Guide for Facility Managers,* New York, New York, Upword Publishing, Inc.

Weiner, Irving B., & Kaplan, Robert G., (1978), Supervising the Beginning Therapist, in *Psychotherapy Supervision: Theory, Research and Practice,* New York, New York, John Wiley & Sons, Inc.

## Government Consultation

Consultant and Expert Witness, Personal Injury, Office of the Attorney General of Ohio, 2003

Expert Witness, Personal Injury, Department of Justice, Canada, Winnipeg, Manitoba, 2002

Expert Witness, Death Penalty, Federal Public Defender, Phoenix, Arizona, 2002

Consultant, Police Homicide, Erie County Prosecutor's Office, Buffalo, New York, 1999

Expert Witness, Death Penalty, Indiana Public Defender's Office, Indianapolis, Indiana, 1997 to 1999

Consultant & Expert Witness, Workers' Compensation, Greater Cleveland Regional Transit Authority, 1997 to Present

Volunteer Mediator, City of Lakewood Prosecutor's Office, Lakewood, Ohio, 1990 to Present

5

Consultant, Stress Management, U.S. National Aeronautics and Space Administration, John Glenn Research Center, (formerly Lewis Research Center), Cleveland, Ohio 1986 to 1988

Expert Witness, Juvenile Homicide, Cuyahoga County Prosecutor's Office, Cleveland, Ohio, 1985

Consultant, Ohio Bureau of Workers Compensation, Cleveland, Ohio 1984 to 1986

Consultant, Ohio Bureau of Vocational Rehabilitation, Cleveland, Ohio 1984 to Present

Consultant, U.S. Social Security Administration, Cleveland, Ohio 1984 to 1986

## Community Affiliations

Founding Board Member, Cuyahoga County Critical Incident Stress Debriefing for Emergency Responders, Cleveland, Ohio, 1995

Volunteer Coordinator, Mental Health Disaster Team, American Red Cross, Cleveland, Chapter, 1992 to Present

Board Member, Cleveland Clinic Foundation Children's Hospital Advisory Board, 1990 to 1992

Board Member, Glenbeigh Chemical Dependency Hospital Community Advisory Board, Rock Creek, Ohio, 1990 to 1992

Board Member, Adam Walsh Foundation for Missing Children, Cleveland Chapter, 1987

## Professional Presentations (Partial Listing)

*Verifying Psychological Claims,* VocWorks Employer Seminar, Cleveland, Ohio October, 2003 and Youngstown, Ohio October, 2003

*Better Evaluation & Management of Candidates and Employees*, Ohio Staffing Services Association, Cleveland, Columbus, Cincinnati, and Dayton, Ohio, September, 2003.

*Workplace Violence Prevention,* Ohio Bar Association, Columbus, Ohio, August, 2003

*Psychological Issues and the Law,* 16th Annual Labor and Employment Conference, Benesch, Friedlander, Coplan & Aronoff, LLP, Cleveland, Ohio, May 16, 2002

*Take a Proactive Approach to Protecting Your Company and Employees From Workplace Violence and Conflict,* Personnel Law Update, Council on Education in Management, June 20, 2000

*Stress Management, Healthy People: Mental Health Program,* The Health Museum of Cleveland, February 8, 1997

*Critical Incident Stress,* Business and Industry Council for Emergency Planning and Preparedness, American Red Cross, Cleveland, Ohio, January 14, 1997

*Violence in the Workplace and the Impact it has on Victims and Their Families,* In Your Interest, WQHS-TV, Silver King Broadcasting, Cleveland, Ohio January 10, 1997

*Preventing Violence in the Workplace: The Growing Threat That Can Happen Anywhere at Any Time,* 1996 Ohio Employment Law Seminar, Ohio Chamber of Commerce & Manufacturers Education Council, Columbus, Ohio, October 22, 1996

*The Human Equation,* Business Survival and Recovery Seminar, Contingency Planners of Ohio, Cleveland, Ohio, October 15, 1996

*Managing Employees After a Branch Robbery,* Robbery Seminar, Star Bank, Cleveland, Ohio, September 24, 1996

*Stress Management,* Future Leaders of Medina County, Medina County Schools, Medina, Ohio, March 7, 1996

*Diagnosis & Treatment of Anxiety Disorders with Particular Emphasis on Post Traumatic Stress Disorder,* Continuing Professional Education, Cuyahoga Community College, Cleveland, Ohio, March 5, 1996

*Substance Abuse Prevention,* Representing Closely Held Businesses, Cohen & Company, Cleveland, Ohio, November 14, 1995

*Dealing with Catastrophic Stress,* Business Disaster Recovery, Contingency Planners of Ohio, Cleveland, Ohio, July 19, 1995

*Workplace Violence Prevention,* Crime and Violence in the Ohio Workplace, Institute of Business Law, Cleveland, Ohio, May 17, 1995

*Evaluation of Emotional & Psychological Distress,* 1995 Spring Meeting Program, Ohio Association of Civil Trial Attorneys, Columbus, Ohio, May 12, 1995

*Workplace Violence Prevention,* Crime and Violence in the Ohio Workplace, Institute of Business Law, Columbus, Ohio, May 10, 1995

*Managing Traumatized Employees,* Disaster Planning Symposium, American Red Cross, Cleveland, Ohio, March 21, 1995

7

*Managing Distressed Employees,* Annual Meeting, Personnel Association of Central Ohio, Columbus, Ohio, January 12, 1995

*Warning Signs: How to Identify and Intercept Potential Violence,* Preventing Workplace Violence, Council on Education in Management, Cleveland, Ohio March 30, 1994
*Safe Handling of the Volatile Employee,* Personnel Law Update, 1994, Council on Education in Management, Cleveland, Ohio, January 28, 1994

*Emotional Damages and Claims of Sexual Harassment,* Labor & Employment Law Seminar, Duvin, Cahn, Barnard & Messerman, Cleveland, Ohio, October 28, 1993

*Controlling Emotional Damages in Catastrophic Cases,* Joint Seminar, Mississippi Claims Association & Mississippi Defense lawyers Association, Jackson, Mississippi, April 30, 1993

*Substance Abuse Prevention Program,* Drug Testing and Litigation: Understanding the Process, Ohio State University Continuing Legal Education, Cleveland, Ohio May 8, 1992

## Training Programs Developed & Presented

Substance Abuse Prevention (For Employees & Managers)

Sexual Harassment Prevention (For Employees)

Stress Management (For General Public)

Traumatic Stress, Post Traumatic Stress Disorder & Critical Incident Stress Debriefing (For Mental Health Professionals)

Dealing with Catastrophic Stress (For Managers)

Dealing with Victims of Catastrophic Claims (For Insurance Adjusters)

Managing Distressed Employees (For Managers)

Coping with Change (For Managers)

Making the Most of Differences Between Yourself & Others (Diversity Training for Employees)

Proving & Disproving Emotional Damages (For Attorneys)

Dealing with Volatile Customers (For Employees)

Dealing with Volatile or Difficult People (For General Public & Employees)

8

Workplace Violence Prevention (For Employees & Managers)

Verifying Psychological Claims (For Attorneys & Claim Represenatives)

## *Media Appearances*

Wall Street Journal (September 11, 2001, Working in Tall Buildings)

Cleveland Plain Dealer (Employee Assistance Programs, Stress Management, Workplace Violence)

Inside Business Magazine (Psychological Effects of Economic Change in Cleveland, Ohio)

WKYC-TV3, Cleveland, Ohio (September 11, 2001, Murderers, Seasonal Affective Disorder)

WJKW-TV8, Cleveland, Ohio (September 11, 2001, American Red Cross) Named to "America Responds" Team for features on coping with terrorism

WEWS-TV5, Cleveland, Ohio (September 11, 2001, Post Traumatic Stress Disorder)

EXHIBIT "B"


PROFESSIONAL FEE SCHEDULE OF ROBERT G.  KAPLAN, PH.D.

# Kaplan Consulting & Counseling, Inc.

## Fees for Forensic Evaluation, Consultation and Testimony

### Evaluation

| | |
|---|---|
| Diagnostic Evaluation | $300/hr. |
| Record Review & Analysis | $300/hr. |
| Report Preparation | $300/hr. |
| Consultation in Person or by Phone | $300/hr. |
| Psychological Tests | $150/test |

### Testimony

| | |
|---|---|
| Deposition Testimony* | $300/hr. (2 hr. minimum) |
| Court Testimony* | $300/hr. (4 hr. minimum) |
| Preparation for Testimony | $300/hr. |

### Other Charges

| | |
|---|---|
| Per Diem for Evaluation or Testimony | $2,400/da. (8 hr. maximum) |
| Local Travel Time** | $300/hr. Portal to Portal |
| Non-local Travel Time | $1,200 flat rate each way per separate day |
| Record Copying | $0.20/copy plus $25/hr. Administrative and Secretarial Time |

### Retainer Policy

$3,000 Must be prepaid and will be charged at prevailing rates.  Unused portion will be refunded.
*Retainer not required for government entities.*

*Fees for testimony are non-refundable and must be paid seven days in advance to reserve time.

** Local travel time applied for locations within 60 miles of Beachwood or Lakewood, Ohio offices.  Non-local travel time applied for locations outside of 60 miles of Beachwood or Lakewood, Ohio offices.

LARRY SOUTHWICK STATEMENT TO
HOOLIHAN & DILLON AT W.P.D.

Larry Southwick, date of birth is 5-23-53, Social is 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.  He lives at 379
Belmont Avenue N.W, Warren, Ohio, 44483.  He works full time at MedStar
Ambulance as a dispatcher.  He is currently the manager of the Warren terminal of
the Greyhound Station.

Larry has worked for Fingerhut since 1998.  At that time there was a West
Warren Terminal.  He worked as a ticket agent in the mornings from 8:30 until
12:00 at which time Fingerhut would come in.  They would close the terminal, go to
lunch together and then re-open the station.  Larry then went to his regular job at
1:00.

Larry helped Fingerhut move the West Warren station to it's current location on
East Market.  In the process of moving Larry asked Robert what was in the bag
(which was in a box of stuff they were moving).  He told him it was a gun and
showed it to him.  Larry describes it as a .38 revolver that was silver with light
brown handles.   In the bag also were an eyeglass repair kit, ammunition and a
couple of knives.  Larry said this bag was always at the terminal in a little cubbie
hole in the wall.  When Fingerhut worked it was either in the back office with him
or near his briefcase.

Either Robert or Donna would call in to the terminal everyday to see if everything
was all right with Larry.  He didn't actually meet Donna for approximately 4-6
months after coming on board.  Larry describes Robert as a good boss who was laid
back and a fair payer.  Larry wasn't aware of any relationships outside of the
marriage.  Robert introduced Donna as his 'wife'.  He said that they argued from
time to time, like normal couples.

Larry said that Donna spent a lot of time back then at the Youngstown terminal.
There was a restaurant in the terminal called Just The Ticket where Donna was
most of the time.  Apparently she's been arrested at least a half dozen times in
that restaurant.  He could only recall why on one occasion.  The charge was
obstruction of justice.  There was a white security guard that was always hassling
the black customers and Donna would go off on him.  Her arrest was the result of
this.  When Donna would call Robert to bail her out he would call her an idiot and
tell her he wasn't going to bail her out.

EXHIBIT
65

The hours of the Youngstown station are approximately 7:00, 7:30 to 9:00, 9:30.

Larry quit the terminal in 2000 because some phone cards came up missing from the safe and Robert blamed him. Robert said it had to be one of Larry's family members or someone he let in the back. He repeatedly said this to Larry and Larry finally wrote Fingerhut a letter and quit. Fingerhut only listed Larry's name as a possible suspect on the arrest report. Larry said he even had some of his own money (rolled coin) in the safe and why would someone leave that behind and just take the cards. Donna let people back there, even passengers (as was witnessed by Larry's wife). Even inmates were in there a lot. Several times a week TCI would bring inmates to the terminal who had been released. Larry quit in October of 2000.

Donna called him to come back to work in November of 2000. Robert wanted him to come back as well and told him he could when things picked up. However, he didn't go back until the Saturday after Robert's funeral.

Larry said there was no indication of marital problems. Fingerhut joked once about "she must have a boyfriend' after a telephone call with Donna. That was a couple of months ago, Larry said.

When Larry came back on December 15th, the bag with the gun was in the cubbie hole. He didn't look inside at that time. The following Monday he looked and sure enough, the gun was gone. He called the Howland Police Department to report it missing.

Larry attended the funeral and said Donna was crying the whole time. She met with him afterwards (at the funeral) and gave him the keys to the Warren terminal to open up the next day.

Larry didn't know of any boyfriends of Donna's and had never seen or heard of Nate. He did witness her writing a long letter a week before Robert's death. He didn't know if Donna carried a gun or not. The target in the terminal was from a target practice she attended next door to the old West Warren terminal. There is apparently a shooting range there.

There was a computer at the Warren terminal with internet access.  Larry never witnessed Donna on it.

Larry first heard about the Santiago-gun incident after Fingerhut was murdered.

When police asked him if he thought Donna would have any use for the missing phone cards he said she could use them for private, untraceable calls if she wanted to.  He never witnessed this though.

At night, Robert and Donna, would take the daily cash home with them and one would deposit it in the morning on their way to work.

Larry said that Fingerhut was distanced from his son in Florida and that he didn't trust any members of his family.

Larry didn't know EVERYTHING was in Donna's name, only the Greyhound business.  Larry was told it would be harder for someone to sue them if it was in Donna's maiden name.  Larry also thought Donna was laid back and easy going.

Larry said Fingerhut really liked eBay and that's where he got all the team jackets and other sports memorabilia.

Larry called Donna after the funeral to console her.  They never discussed the actual death.  Talked about 3 times just consoling.  She then asked him to run the station because he was the only one in Warren who knew how and she trusted him.

Larry never saw any bullet holes in the basement of the Warren terminal.  He said they weren't there when they moved to the new location.

Robert never mentioned Nate and Larry never saw them together.

Jenny Smith is Larry's Sales Manager.  She heard from both, Jamie Wozak for the Akron terminal and Melvin, from the Youngstown terminal that driver (the 5:15 bus), Jimmy McCoy, told them that jokingly he said, upon coming into the Warren terminal and finding Donna on the computer, "You're in a chat room talking to your boyfriend again".  And she replies "My man, Nate, is in the back".  At that point Nate comes from the back office to the front office.  This was one week before the homicide.  (???)

CHRISTINE ELLINGTON
INTERVIEW WITH HOOLIHAN AND DILLON (H.P.D) AT THE W.P.D.

Christine owns The Final Cut hair salon at 402 East Market.  She lives in Liberty and her Social is 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, date of birth is 4-9-67.  Hours are 9-5 on Tuesday thru Friday, and 7-4 on Saturdays.  Closed Sunday and Monday.

She had seen Donna and knew she worked at the Greyhound Station.

Donna brought Nate in on the 11th and said "Here's another cut".

Christine said she didn't converse with Nate at all during the cut because it slows her down and the fact that she didn't know Nate.  Donna went back to the terminal.

Chris said Nate was wearing dark clothing, and paid for the cut himself ($13.00).

Christine said that Donna has brought 3 or 4 black guys in for cuts previously and all she would ever say was "I have a cut for you".

Christine said she had never seen Fingerhut and Nate together.



EXHIBIT
66

01-31815

**WARREN MUNICIPAL COURT**
141 South St., Warren, Ohio 44483

STATE OF OHIO
CITY OF WARREN

CASE NO. 01CRH3570

VS.

**COMPLAINT (Rule 4)**

SANTIAGO MASON

Name 358 Reo Blvd

Address Warren, Ohio 44484

Soc. Sec. # 270 72 2483

D/O/B 11 13 1966

Sex

Complainant being duly sworn states that ____ SANTIAGO MASON

Def. Name

at ____ CITY OF WARREN ____ Trumbull Co., Ohio; on or

about ____ November 20 ____ 20 01

State essential facts

did with purpose to deprive the owner, Donna Roberts,
one(1) .38 cal Smith & Wesson handgun, Three Hundred
Twenty Dollars in U.S.Currency and telephone cards
the value being over $500.00 knowingly obtained or
exerted control over said property by deception

in violation of ORD/ORC ____ ORC 2913.02 THEFT F 5th dg

complainant ____ Donna Roberts

address ____

Complainant Signature

Sworn to and subscribed before me on
NOVEMBER 23 ____ 20 01

Judge - Clerk - Deputy Clerk - Notary

**WARRANT ON COMPLAINT**

To ____ You are ordered to arrest
above defendant and bring him/her before this court without unnecessary delay. You
may/may not issue a summons in lieu of arrest under Rule 4 (A) (2) or issue summons
after arrest under Rule 4 (F) because ____

State reason if restricted

Judge - Clerk - Deputy Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SUMMONS ENDORSEMENT**

This warrant was executed by arrest/by issuing the following summons:
You are hereby summoned and ordered to appear at ____ o'clock ____ M. on
____ 20 ____ at Warren Municipal Court. If you fail to
appear at the time and place stated above you may be arrested.

Issuing Officer - Title

**EXHIBIT**
**67**

Highlight of the notes of the tape of Santiago Mason at the Prosecutor's Office.  Detective Hoolihan and Detective Dillon (Howland P.D.) took this statement.

Santiago is married and he has one kid.  He apparently goes to the Greyhound bus station in Warren where he was going to purchase a ticket to go to Cleveland to visit his relatives the next day.  As he is at the window, he approaches Donna and she is sitting there writing a letter.  He sees a picture of a black guy and it looks like he is in incarcerated.  Santiago recognized the bars, because they were both apparently housed in Belmont.  They didn't know each other though.  He buys the ticket and then Donna starts coming on to Santiago pretty heavy.  Telling him, "You are so cute.  I always liked black guys cause they got big dicks."  Santiago in turn says, "I got a big dick."  One thing leads to another and she is asking him "Can we hook up later on tonight.  I get off work at 5:00, why don't you come back down to the station at 5:15 and we'll hang out.  Maybe go to my house."   So, Santiago goes back to the Greyhound station at 5:15 and he goes around to the front door and she tells him to go to the back door where she comes out and tells him she will be right out, she has to lock everything up.  They get

in the car and Donna fires up a bad ass joint.  They get to Donna's house and apparently they are in the living room.  They are only there for about 45 minutes.  Donna proceeds to say, "Let me see how big your dick is." Santiago gets his tool out and Donna has her way with it and she is begging him, "Why don't you fuck me.  Why don't you fuck me."  Santiago says, "No."  He keeps saying no.  He's mumbling about he doesn't want to get any disease or anything like that cause he is married.  Anyway, Donna finally gets pissed off and Santiago wants to go back to the Greyhound station, he's asking questions about Donna's husband, whether he will be home or not and he was real nervous about being there seeing that he just met her that same day and here he is in her car, in her big house, getting high with her and having sex with her to an extent.  Just oral sex on Donna's part.

Donna tells him that Nate…she is always going on about Nate, how much she loves him and how much he loves her and she can't wait until he gets out…  That her and Fingerhut don't even sleep in the same rooms, they are actually separated, but they are just living in the same house.  She tells him she doesn't want a divorce because everything is in her name.  Donna tells him that Nate is going to shoot some guy that's been hitting on her and later on in the tape, it reveals that this happened before Nate went to prison.  He

and Donna were in a car and a gang of black guys comes over and they are like sizing her up and saying stuff and that's what that led to.  Since they were hitting on Donna he was going to shoot them.

She takes him back to the Greyhound station and he walks home and then two or three days later, Donna calls him and Santiago apparently had her cell phone number.  She gave it to him.  He actually rattled it off by heart during his interview.  She calls him and tells him she wants to see him and suck his dick again.  Apparently, they end up going to meet back at the Greyhound station and Santiago comes of course and they get in the car and she is listening to this wild rap music and he was laughing, "What you doing woman?  Listening to music like that!"   She's all old and everything you know. (Santiago)  On the way there, Donna is asking Santiago why don't you drive and he says I drive, I have a car, I just don't have a license.  I have fines and costs and it is going to cost money to get unsuspended or whatever and she says, "Well, I will loan you the cash.  If you want so you can get your license back."  He was like, "Cool, that works for me."  She reaches in her pocket and gives him $220.00, by this time they are back at the house.  They are in the other living room this time, Donna performs oral sex on him again and she says, "Don't worry about the money honey.  I don't ever have

to worry about money. I don't worry about money at all. When you gonna fuck me?" Again he says, "No." She gets mad and she goes back to the bedroom and comes out with another joint and she is smoking it. They were only there at the house for 20 to 25 minutes. She is still mad, so she takes him back to the station and then about one week later she shows up at his place of employment, Vista Windows, (Elm Road? Old Stambaugh Thompson's behind Perkins, I am not real sure) Anyway, she is all irate, she's mother fucking him up and down and screaming, "I want my money back!" There was a couple of witnesses there, his friend Wali, he spends every night over at his house in the evenings. Another guy name Walt. She is going on and on, mfing him, "You got my money and my gun!" Santiago is like, "Your gun? I don't have your gun, I don't have your money." She is saying, "I am going to have you fucked up." So they keep interrogating him about whether they ever stopped anywhere, have they ever just stopped anywhere at all, other than just go to the Greyhound and straight to her house and back and Santiago is adamant that they have never stopped anywhere. Including the Dairy Mart where supposedly the gun was stolen from her and the money. He swears he has never seen any envelopes or any bags, never saw a gun, he never stopped, but Donna did tell him at one point earlier on the first ride that she kept two guns in the car. She ends up telling

him that she is going to call the police and she filed that report on him November 20th, missing Smith and Wesson 38, phone cards, and cash. He told the detectives that before she wasn't worried about the money, she never had to worry about money, and now she is all pissed off about the money and that she is a liar and that she will fuck any black guy. She's always kissing on the bus drivers all the time at the Greyhound station. He tells Hoolihan that he would take a polygraph whenHoolihan asked him and he wanted Donna take one too. He says she is a psycho type of woman and one other thing that he said was that she was a fast driver. That she drives like a "bat out of hell."  (Maybe she was just pissed?) DetectiveHoolihan asked Santiago, "Why would Donna file this report on you?"  He says, "Because of the sex."  He wouldn't give it to her. Santiago called Robert Fingerhut at the Youngstown Greyhound and tells him about everything, that he's had an affair with her and she is accusing him of stealing this gun and money. Fingerhut asks him, "How do you know her?"  He says, "From the Greyhound station in Warren."  He just says, "Oh, okay." And hangs up the phone.

Early on she told him that she would love to have a three some with two black guys, how it would be great to be sucking on one black guy and have the other black guy in her ass.

His friend's name that he spends every evening with Wali, one of the witnesses at Vista Windows, his last name is Akram.  I don't know where he lives or anything.

I guess that's it.

# HOWLAND POLICE DEPARTMENT

### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page  1 of 5



On Wednesday, December 12, 2001 at 1:00pm Donna Roberts came to the Howland
Police Department with her brother Ralph Roberts and sister in law Rita Roberts.
Donna came into the Detective Bureau Conference Room along with Capt.
Compton, Det. Sgt. Dillon and R/O. Ralph and Michael Roberts, Donna's brothers
waited in the lobby of the police station.

Donna told officers she last saw Robert Fingerhut alive at 8:00am on 12-11-01 in the
master bedroom of their 254 Fonderlac SE residence. Robert was getting ready for
work and Donna was lying awake in bed. Donna thought Robert went to work at the
Warren Greyhound terminal. Donna said she also helps out at the Warren terminal
but never the Youngstown office. She sells tickets in Warren and does basic office
work. She told officers she doesn't work in the Youngstown office because
everything is computerized and she does not know how to use the equipment.

Donna met Robert in Miami, Florida and married August 22, 1983. Robert was a
licensed private investigator in Florida. He had a permit to carry a gun there.
Robert bought a BCI badge in Miramar, Florida. Donna worked for Dr. Morton
Freiman MD a plastic surgeon in North Miami Beach, Florida. Donna told officers
she was the office manager and as part of her duties she conducted billing, kept,
wrote and maintained medical records. Donna further told officers she was Dr.
Freiman's only employee and also served as his medical assistant during surgical
procedures. Donna also traveled to Israel with Freiman and did trauma work with
him during two wars on fresh battle injured soldiers in the field. Donna said she
provided treatment for gunshot wounds and performed skin graphs.

Donna was born in Youngstown, Ohio and married three times. Her first marriage
was to William Raymond and lasted six years. The second marriage was to Bert
Gelfand for ten years and then to Robert Fingerhut in 1983 for three years. Donna
said the only reason her and Robert were divorced was because of financial benefits
in the case of a civil suit against Robert. Donna told officers the divorce was Roberts
idea. He wanted to put all of their assets in Donna's name so they would be
protected in the case of a lawsuit or failure of their business.

1


EXHIBIT
68

Donna told officers her and Robert got along great and had no real problems with their relationship. They had small problems like any couple. She stated they argued over little things like changing the dog's water, but nothing major. They purchased their 254 Fonderlac residence in 1995. Donna also mentioned Robert was a collector of sports memorable and World War II relics. Donna bought Robert a Cleveland Browns, Brian Sipe field worn football jersey in the early eighties and that is how he got started collecting jerseys, making jerseys and collecting other memorabilia.

Donna told R/O on the day of Robert's murder she woke up around 8:00am when Robert was leaving for work. Donna said she just stayed in bed relaxing until 9:30 or 10:00am. She got out of bed, washed her hair, did her makeup and took care of the girls, "her dogs". At 12:30 she arrived at the Warren Greyhound Bus Terminal and worked until 5:15pm. When Donna arrived Robert had already left the terminal and Donna did not know where he was. Donna said she called Mr. Daniels at the Youngstown terminal to see if Robert was there. She was told Robert had not yet arrived. During her worked period Donna said everything was normal and nothing unusual happened. She said she spent the day alone in the office.

After work Donna went to Giant Eagle and purchased a cooked roast chicken for her dogs to eat. She arrived at 254 Fonderlac SE at 5:45pm and Robert was not there. Robert usually worked in the Youngstown terminal from 2:30pm until the last bus at 9:00pm. Donna called Robert once at the Youngstown terminal after coming home from work. Robert called Donna a couple of times between 5:45 and 9:00pm. Robert called to see what Donna was doing, ask what was for diner and to tell her things were slow at the office.

At 9:00pm, Donna said she called Robert at the Youngstown terminal, he told her he was going to be a little late, but did not say why. Robert told Donna she should go shopping at the mall and buy herself something nice, because she deserved it. Donna said she did not go to the mall, but to Wal-Mart instead.

Donna then said," there is something you don't know about Robert, and you can't let this get back to anyone because no one knows. Robert goes both ways." Robert has never met any of Robert's male friends, but she knows Robert met one of them at the Avalon Inn sometime last year. He has a friend named Bobbie who would call him at the house until last week. Bobbie would call a couple times a week and ask for Robert. Donna said, "Robert has his friends and I have mine, I guess we are just a pretty cool couple".

Donna said, customers have threatened Robert at the bus terminal in Youngstown. Some of the customers are crazy. Donna had no specific details as to who may have made the threats or who the crazy customers were, just that there were a lot of people like that.

2



Donna told officers Robert has several firearms, a big rifle with a bayonet, 38-caliber Taurus revolver with a short barrel, 38-caliber revolver with an unexposed hammer, unknown brand and a Smith and Wesson 38 caliber revolver.

On November 20, 2001, the Smith and Wesson 38 caliber revolver was stolen from Donna's car while parked at the Dairy Mart on Logan and East Market St. in Warren, Ohio. Donna said, she helped this guy she really didn't know and gave him a ride. She knows him only as Santiago, who is a black male subject. Donna gave him a ride and he stole the gun and $320.00 Greyhound deposit, which was in the car. Donna said, she ran into the store to buy cigarettes and when she returned to the car, Santiago, the gun and money were all gone. Donna immediately reported this theft to the Warren City Police Department.

Donna told officers six months to a year ago she was dating a guy named Carlos. Donna dated Carlos for two or three months, but she cannot remember his last name. Carlos is a male, half black and half Hispanic of average height and weight. Donna met Carlos at the bus terminal in Warren. Donna's relationship with Carlos was for sex and she had no emotional attachment to him. R/O asked Donna if there was anyone else she had any type of relationships with and she said, "no".

R/O asked Donna if she knew Nate Jackson and she said, "oh yea, I forgot about him. He calls me from prison and he just got out on Sunday, 12-09-01". Donna told officers she went to Lorain and picked Nate Jackson up Sunday when he was released from prison. She has known Jackson for two years and seeing him on a regular basis since they met. They met at the Youngstown bus terminal. Donna told officers Jackson was in prison for being a passenger in a stolen car. Donna also told officers Nate has been in and out of jail for stupid little thing, nothing bad. Donna told officers Robert and Nate were friends. When Donna and Nate got back into Youngstown from Lorain on Sunday, 12-09-01 she dropped Nate off at Shelia and Oscars. Their house is somewhere in Youngstown with red shingles on the side of it, instead of siding. Donna didn't talk to Nate again until Tuesday morning, 12-11-01 on the telephone. Nate called Donna, she did not know where he called from, he just called to say hello. Donna did not see Nate on Tuesday, December 11, 2001.

Donna said, "Nate was not jealous of Robert and Robert understood about Nate. Robert knew all about my relationship with Nate". Donna told officers her and Robert had an understanding and out of respect for Robert she would not bring men to their home to have sex. The last time Nate Jackson was at the 254 Fonderlac with Donna was the weekend before Labor Day. Nate was serving time at CCA in Youngstown and was on a weekend pass. During this visit by Nate, Donna said Robert was home and she did not have sex with Jackson. Over Labor Day weekend, Nate was on a pass from CCA and she had sexual relations with him, but not in the house. Donna said, "her relationships were just a game and the game had only one rule. You don't say I love you to whoever you're dating and Robert was very strict about that".



Donna told officers the music she likes to listen to is older stuff and pop. Nate likes listening to rap and rhythm and blues. Donna said she stopped at the house on Sunday, 12-09-01 with Nate. She said they were both in the house from 1:00pm to 2:00pm, feed her dogs and picked up some pot, "marijuanna". Nate last spoke with Donna in the morning on the eleventh of December 2001, from a payphone somewhere in Youngstown.

Donna describes Nate as 5'10", thin but with a muscular build, short black hair with dark skin. Donna told officers her and Nate wrote each other a lot. They wrote each other about three times a week. On Thursday and Saturday Nate would call Donna collect from prison.

Donna told officers Robert was a very hyper person and when he got mad he was flaky. About a week, week and a half before Robert's death he was acting kind of nutty up until yesterday. Robert was missing Tuesday, from 11:30am to 2:15pm when he showed up at the Youngstown Terminal for work. Donna said this is out of character for Robert to go or do something without her knowing about it. Robert kept a gun in the center console of his car or tucked between the seat and the console.

Donna went back over what she had done late Tuesday evening on the eleventh of December with officers. At 9:00pm she went to Giant Eagle to buy chicken for her dogs, but they did not have any. Donna was in Giant Eagle approximately five minutes. Donna then went to Wal-Mart and shopped for approximately 30 minutes. Donna bought make up and a cigarette lighter. About 10:30 Donna arrived at Super Kmart and made no stops or detours along the way. Donna told officers she was there a long time and just looked around. She likes looking around at Super Kmart. Donna did not buy anything. Donna said she did not see anyone she knew at Super Kmart, but she did talk with a lady who had a cute little boy with her. Donna left Super Kmart at 11:30pm and went straight home. Donna came down her street and pushed the garage door opener. The garage light came on and the overhead door began to close, so she pushed it again. Donna parked the car in the garage and closed the overhead door.

Donna told officers she has a pending lawsuit against a policeman who worked in the Youngstown bus terminal. She thought the officer's name was Bettencougher and he wore a black uniform. Donna said she did not know what police department the officer was from. Donna said the suit is a couple years old and was dismissed by the court. They have file an appeal with the court and she does not know where the case currently stands. Donna said Attorney Steve Chuparkoff, (330) 744-3010 was handling the appeal.

Donna told officers Robert has a life insurance policy worth $250,000.00 with State Farm and she has one worth $50,000.00, their agent is Cathy Thomas. Thomas can be reached at (330) 793-1136. Donna said Robert was going to increase his life

4



### JANET CLAY STATEMENT TO:
### HOWLAND POLICE

Janet lives at 779 Fairmont, Youngstown, Ohio. Her date of birth is 2-6-67.  Her Social is 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.  Her phone number is 743-6913.

Janet met Nate on the 10th @ Sheila's house in the afternoon.  Just Janet, Sheila and Nate were present.

Donna picked Nate up in her car on the 10th.  They came back later that night and Donna & Nate went into the bedroom to smoke crack.  This was done in exchange, of course, for crack paid to Shiela.  Nate gave Sheila a gram for the room rental at that time.

Janet said she then saw Nate again the next day (11th) when Nate called Sheila looking for someone to 'kick it' with at the Days Inn.  He offered Janet crack and money to come to the Days Inn to 'kick it'.

John takes Janet and Sheila to the Days Inn.  He leaves Janet there with Nate, and after getting a hit for bringing her, John and Sheila return to Sheila's house.  Sheila told Janet to call for a ride back when she was ready.

Janet said that Nate went to the Kings Motel on the 12th and he had another girl there.

Nate calls Sheila to come and get Janet and John does so.  He goes in and gets his hit and then takes Sheila and Nate back to Sheila's house.  There, at Sheila's they smoke more crack and Janet said they were up all night.  Nate was still there in the morning (of the 12th).

Nate told Janet he cut his hand.  She said he was very nervous and jittery, pacing back and forth continually looking out the window and peep hole of the door.  She said that Nate was smoking a lot of crack (and this really means something coming from her).  She approximated over a gram.

Janet said that Nate was staying at Sheila's house.



On the night he was arrested, (early morning hours of the 20th) Janet said that Nate had been waiting all day for Donna to come pick him up.  She never came. Nate was talking to Donna when the police came.  Nate was really upset with Donna that she didn't come get him.  Donna said she couldn't because she was at her moms and that she couldn't leave her mom because Mom was so upset with everything. Donna never bothered to call Nate and tell him she wasn't coming.

Janet said that Nate and Donna talked to each other numerous times and Nate would always go off to another room to talk to her.

Janet said that even she knew that something happened.  She figured Nate just robbed somebody or something.

Janet never saw any gloves, gun or ski mask.

END

# HOWLAND POLICE DEPARTMENT

### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page  1 of 5



On Tuesday, December 12, 2001, shortly after 0005 hours R/O was contacted by Ptl. Ray who advised he was at 254 Fonderlac SE where a shooting had occurred. Ptl. Ray advised he was at the crime scene and had one dead male white subject lying on the kitchen floor with a handgun near the body. Ptl. Ray believed the subject had been shot in the head. Ptl. Ray requested assistance processing the crime scene and advised he would also contact Det. Sgt. Dillon and the Corners Office. R/O told Ray to secure the scene and not disturb anything until detectives arrived.

At 0035, R/O arrived at 254 Fonderlac SE and spoke with Ptl. Ray and Ptl. Pollcino. Officers advised there was no sign of forced entry into the residence. Ptl. Pollcino walked around the entire exterior of the residence and found nothing unusual.  The victim's wife, Donna Roberts, called 911 and reported the incident. Ptl. Ray further advised Roberts was in the master bedroom.

After quickly surveying the scene, R/O told Captain Phillips of the Howland Fire Departments EMS squad there was no need for his personnel to stand by any long. R/O then contacted Trumbull County Sheriffs Detective Tony Leshnack and Warren City Police Detective Daniel Mason and requested their assistance processing and photographing the crime scene. Det. Sgt. Dillon videotaped the scene.

R/O and Ptl. Ray went into the master bedroom and spoke with the victim. She seemed very excited, anxious, curious and inquisitive as to what had happened. R/O told the victim it appears her husband had been shot. She said, "shot, oh my god, someone murdered my Robert". The victim then started screaming, crying and appeared very emotional for several minutes. R/O told the victim she had to be strong and answer a few questions to assist in the investigation. After a couple of minutes Donna composed her self and began answering questions.

Roberts told officers we have a couple of guns in the house, a small silver gun and a second gun Robert keeps in his car, the silver Chrysler 300 which is missing. R/O



EXHIBIT
70

asked Donna where her husband's car was and she said, "I already answered all these questions. Where is Roberts car, someone stole his car".

Donna said her husband does not drink or do any kind of drugs. She told officer, Robert doesn't have any enemies, and everyone loves him. She said that the pot in the kitchen was hers and Robert never smokes it. Donna said, when she drove down the street around midnight, she tried to use the garage door opener from down the street. She noticed when she pressed the opener the light came on in the garage and the overhead garage door began to close, so she pushed it again and the door went back up. She parked on the right side of the garage as usual and got out of the car. She walked around the back of her car and began to enter the house. She noticed the man door from the garage to the house was standing open, her husband was lying on the floor with blood all around him and coming out of his mouth. She went into the house grabbed the portable telephone and called 911. She then thought an intruder might still be in the house so she went out the front door and stood on the front lawn giving information to 911 until the police arrived. R/O asked Donna if the front door was locked and she said it was. Donna said, she had to turn the deadbolt to open and unlock the front door. Further she indicated they rarely ever use the front door.

R/O explained to Donna, the entire house needed to be handled as a crime scene, searched and officers have no idea where or what the perpetrator may have done or where in the house the perpetrator may have gone and there may be evidence somewhere else in the house. Donna told R/O, do what ever you have to do, just find who ever did this. R/O further explained to Donna, it would be necessary to search the entire house for evidence and it would probably take all night. Donna said, "I told you, do what ever you have to do, search the whole place, just find the guy." R/O asked Donna if anything appeared to be missing and she said no. Donna told R/O, I saw blood coming from Robert's mouth, and did someone stab him.

R/O asked Donna to tell officers everything she had done since she woke up Tuesday, morning December 11, 2001. At approximately 8:00am, Donna awoke to Robert getting ready for work and said goodbye to him. Robert left and went to the Warren Greyhound Terminal. She told officers she stayed in bed until around 10:00am, but did not go back to sleep she just lye there relaxing. At 10:00 she got out of bed, washed her hair and got ready for work. She arrived at work around 12:30pm at the Greyhound bus terminal in Warren and stayed there until 5:30pm. Donna said she was driving the red 2000 Chrysler 300m, which was parked, in the garage. Donna said that is her car and Robert has a silver one just like it.

After work Donna said she went to the Red Lobster Restaurant and had a nice diner alone. Donna paid cash for diner but could not remember what she ate. R/O notice a plastic container on the floor of the passenger side of her vehicle with a clear plastic lid. There were crab legs in the container. When asked about the container with the



crab legs, Donna said, "Oh yes, I remember, I had the king crab legs and an absolute vodka martini". After diner Donna went straight home.

At 9:00pm Robert Fingerhut called Donna from the Youngstown Greyhound Station and told Donna he was going to be late. Donna said," Robert told me I should go shopping at the mall and get myself something nice, because I deserved it". Donna instead went to Giant Eagle to buy chicken for the dogs at 9:00pm. Donna went from her house on Fonderlac to Firestone to Avalon to East Market Street and pulled into the Giant Eagle parking lot from the traffic light. She said the first handicapped parking space was open and she parked there. Donna ran into the store looking for roasted chicken, which they did not have so she left. Donna said she was in the store approximately five minutes. Donna then went to Wal-Mart on Elm Rd. and took the by-pass to get there. She did not stop anywhere else along the way. While at Wal-Mart, Donna purchased make-up and a cigarette lighter. These items were found on the kitchen table of the residence with at receipt for such, dated 12-11-01 at 9:37pm. Donna thought she was at Wal-Mart approximately ten minutes. She then got back on the by-pass and exited on State Route 46/Niles Cortland Rd. and went to Super Kmart. Donna told officers she arrived a Super Kmart shortly before 10:00pm and walked around the store looking at thing, which she often does. Donna said she did not purchase anything she just looked around. Just before midnight Donna left the store and went straight home. That is when Donna found Robert lying on the floor in the kitchen and called the police. Donna then started screaming, "Oh my god my Roberts gone, Oh my god my Roberts gone". Donna also told R/O she was seeing Dr. Ariza for postmenopausal depression.

Officers noticed while processing the scene, Donna would start screaming and murmuring loudly when officers were not talking. When officers would begin talking about findings at the scene, Donna would become very quiet, as if she was listening to officers. At one point Sgt. Dillon walked toward the bedroom from the dining room and found Donna standing in the bedroom doorway leaning against the doorframe listening to officers. R/O spoke with Donna and suggested a family member be called to come sit with her and possible take her to another location for the night. Donna provided her brother Ralph Roberts's telephone number to Ptl. Ray.

Donna's brother, Ralph Roberts was contacted by the Austintown Police Department and asked to come to the scene at the request of HPD. Donna spoke with Ralph and decided to leave with her brother and sister in-law Rita Roberts. Donna asked R/O what are you going to do now. R/O told Donna, officers are going to continue processing the crime scene and search for more evidence. Donna said, "Ok you do what ever you have to do". R/O again told Donna officers would need to spend most of the night processing the house and it would be best if she left with her



brother for support. R/O also told Donna officers would need to speak with her later in the day to further discus the investigation. Donna told R/O to contact her anytime at Ralph's. Ralph Roberts provided R/O, his address, 931 Kirwan St., Austintown, Ohio, telephone number (330) 792-9554 and told R/O to call if anything was needed. Ralph told R/O, Donna could stay with him as long as needed. Ralph also gave R/O his and Donna's parent's address and telephone number, Mike and Pauline Roberts of 406 South Racoon Rd., Youngstown, Ohio 44515, (330) 792-4987.

While conducting the crime scene inventory the telephone rang. At 3:38am R/O answered the portable telephone, which was upon the dining room table. R/O said hello several time and the caller hung up. R/O entered *57 and *69, causing a telephone trace of the call to be done by the telephone company. When R/O entered *69 an electronic transmission indicated the previous telephone call came from (330) 506-0373. At 3:48am, R/O called said telephone number and whoever answered the telephone immediately hung the telephone up without saying anything. R/O observed two life insurance polices on Robert Fingerhut, both together inside a cabinet on the upper left side of the master bedroom headboard. These two policies were on top of all the other documents in the cabinet. One of the life insurance policies was with State Farm Insurance valued at $300,000.00; the effective date was from 08-12-99, policy number LF-1717-3705, agent Cathy Thomas, (330) 793-1136. The other was with New York Life and it was also a life insurance policy valued at $25,000.00, effective 02-12-01, policy number AO966059, telephone number 1 (800) 695-5164.

R/O conducted the inventory at the crime scene and cataloged the items removed. R/O also administered a gunshot residue test on Donna Roberts before she left the residence. Det. Sgt. Dillon noticed what appeared to be a small amount of blood on Donna's shirt. Donna told R/O she never touched anything at the house nor did she touch Robert. R/O asked Donna if she could change her shirt and allow officers to look at the yellow shirt she was wearing and Donna complied. While at the scene R/O opened the trunk compartment of Donna Roberts's vehicle. Red 2000 Chrysler 300m, Ohio license number CPA 8226. Inside the trunk R/O found a brown paper bag with the name Nate Jackson and the number 399-469 upon the bag. R/O looked inside the bag and found men's clothing and a second bag containing the items listed on HPD property form as item # 26. Part of item # 26 is 145 hand written letters to Nathaniel Jackson by Donna Roberts.

Those items remained with the all other items secured at the scene. The vehicle was towed by May's Towing to the Trumbull County Sheriffs Department for further processing. Det. Leshnack followed the vehicle in tow and secured it indoors at the Trumbull County Sheriffs evidence-processing garage. Det. Leshnack and Det. Sgt. Pizzulo of the Trumbull County Sheriffs Department later processed the vehicle. At



# HOWLAND POLICE DEPARTMENT

169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:    01-078868
Date:        12-12-01
Investigator: Sgt. Dillon
Page 1 of 5



0011 Hours – I received a telephone call at my residence from Howland PD Officer Albert E. Ray asking me to respond to 254 Fonderlac Dr. SE in reference to a dead body being discovered in the residence. I told Ptl. Ray that I would be enroute shortly.

0026 Hours – I notified the Trumbull County 911 Dispatch Center that I was enroute to the scene.

0029 Hours – I notified the TC911 that I was on the scene.

Upon my arrival, I spoke with Ptl. Ray who informed me that Donna Roberts had called 911 to inform them that she had returned home and found her husband Robert Fingerhut laying on the kitchen floor. Ptl. Ray told me that he and Ptl. Ron Policino arrived on the scene and were met in the front yard by a hysterical Donna Roberts, who came running out the front door of the residence with the phone.

Upon entering the residence, I was informed by Howland Fire Department paramedic George Beck that he had checked the victim's vital signs, he was unable to locate any and that the victim appeared to be expired. I approached the area where the victims body was and noted that the victim was laying face down on the floor to the east of the man doorway that leads from the attached garage into the kitchen. I noted that the victim was laying with his head to the south and his feet to the north. I noted that the victims left arm was raised above his head. I noted that the web of the victim's left hand appeared to have a bleeding wound between his first finger and his thumb. The victim's right arm was resting below his shoulders and was pointing towards his feet. I noted a pool of blood underneath and around the injury to the victim's left hand. I noted a pool of blood underneath and around the victims head and blood drops and smears of blood to the right, (west), of the victims body between his body and the open door. I also noted blood spots north of the victim's feet. A pair of boots rested on the floor above the victims left arm, a green thermos type mug, blood, miscellaneous papers and a case of Pepsi Cola in cans lay between the victims body and the kitchen cabinets and countertops to his east. I noted that a rug at the feet of the victim appeared to have been moved by the victim's feet as he fell to the floor and a case of bottled water was resting to the right



EXHIBIT
71

of his feet. I noted the victim was wearing a red satin Cincinnati Reds medium weight sports jacket, a baseball uniform shirt of some type, (white with red pinstripes), blue jeans, white athletic socks and dirty white high top tennis shoes. The floor to the right, (west), of the victim's torso had scattered blood pooling in many different spots. I noted just outside the door, (on a step in the garage), lay a stainless steel handgun with brown wooden grips. The weapon was lying near the southwest edge of the step, pointing north. There was blood on the step and what appeared to be a partial footprint in the blood near the gun. I noted blood on the kitchen cupboard to the left of the victims body, (on the eastside), below the kitchen counter. Blood was on the wall to the left of the victim's head and the kitchen cabinets below the countertop, (in the southeast corner). There was blood both in the southeast portion of the cupboard below the counter as well as from the southeast corner to the northeast corner. I noted blood just north of the victim's feet on the kitchen floor also.

The victims wife, Donna Roberts told us that the victims vehicle was missing from the garage. I asked Donna if she had any idea who may have the vehicle and she stated she didn't. TC911 was notified and a BOLO was put out on the LEADS/NCIC computer system listing the vehicle as stolen. I asked Donna Roberts if the man door from the garage into the kitchen was routinely kept locked or if it was kept unlocked. Donna Roberts told me that she and the victim kept the door unlocked because they had the electric garage door opener on the overhead door of the garage and that made it very secure. I asked Donna Roberts to calm down long enough to tell me briefly what had happened this evening. Donna began to talk, then suddenly stated, "I can't take this, everywhere I look, everything I see, is Robert laying there on the floor, with all that blood!" I calmed Donna down and again asked what happened tonight. Donna eventually calmed down enough to tell me that she had talked with Robert earlier this evening on the telephone several times, the last time she said she thought it was on his cellular phone. Donna told me that Robert told her that he was going to be a little late and that she should go out shopping since he knew she loved to shop. Donna told me that as a result of her conversation with Robert she left the house and went to Giant Eagle on E. Market St., Wal-Mart on Elm Rd. and Super Kmart on SR46. Donna told me that she didn't buy anything at Giant Eagle or Super Kmart, but she did buy something at Wal-Mart and the bag was on the kitchen table. Donna told me that when she came home, she turned down her street and as she approached her house, she hit the button to open the overhead garage door. Donna told me she was startled because she saw the light come on and the door began to go down. Donna told me that she thought that was unusual because Robert never left the door standing open when they weren't at home. Donna told me that she pulled into the garage, got out of the car, walked around the back of it and over to the door that leads from the garage and it was standing open. Donna told me that was when she saw Robert laying there. Donna then began to shout, Oh My God, Oh My God, I can't believe my Roberts on the floor bleeding, I can't get that picture out of my head!" I gave Donna



some time to calm down again and asked her what she did when she saw Robert. Donna told me that she, "freaked out," ran into the kitchen and grabbed the portable phone, ran into the bedroom and called 9-1-1. Donna told me that then she realized that someone may still be in the house, so she ran out the front door while on the phone and the police arrived about that time. I asked Donna if she saw anybody near the house or on the property when she was coming down the street and she said no.

As we waited for the arrival of the coroner's office, Ptl. Pollcino and I began checking the interior of the residence for any evidence that someone else may still be in the house as well as any evidence that items may have been taken from the house. Ptl. Pollcino and I checked the entire interior of the residence, no one was located and nothing appeared to be missing from our point of view, (no obvious things such as TV's, VCR's, Stereo Components, Computer Equipment, etc.). However, we did find what appeared to be a droplet of blood on the ceramic tile floor in the hallway that led from the front door to the master bedroom. The droplet was later swabbed by Det. Leshnack and entered into evidence, since it was the only sign of blood evidence in the residence other than the area where the victims was found. After an interior check, I exited the residence and made a complete check of the exterior of the residence for any signs of forced entry, with negative results. Inside the residence itself, I found damage to the main bathroom door near the doorknob. I was unable to locate any signs of damage to any of the exterior man doors or windows. Upon checking the interior of the garage, I noted a metal support bar that ran along the entire inside of the bottom of the overhead door panel was damaged, it appeared to have been partially detached from the door itself and the parts were laying on the garage floor. While checking the exterior of the residence, I noted what appeared to be vehicle tire tracks in the front yard on the north side of the driveway in the northeast corner of the lawn. I also detected slight rubber tire marks on the roadway that appeared to travel south on Fonderlac SE, from the marks on the lawn.

A short time later Trumbull County Forensic Pathologist Dr. Humphrey Germaniuk arrived and began his investigation of the scene. Upon the arrival of Dr. Germaniuk, Shelley Mazanetz of the coroner's office also arrived to assist. At the direction of Howland PD Det. Sgt. Paul Monroe, I began to videotape the area around the body. Upon the arrival of Det. Anthony Leshnack of the Trumbull County Sheriff's Office, photos of the entire residence began.

While conducting our investigation inside the residence, Donna Roberts could be repeatedly heard screaming hysterically, "Oh My God, has Robert been stabbed in the face, Oh My God, why isn't he moving, I can't believe I came home to find my Robert like this," from the master bedroom. At the same time, I noted that Donna would stop shouting hysterically and  then become quiet. On one occasion when Donna Roberts stopped screaming, I walked back toward the bedroom from the



dining room and found Donna standing in the bedroom doorway leaning against the door frame listening attentively to any and all conversations the officers on the scene were saying. I startled Donna Roberts and when she noticed me in the hallway, she began to break down again, screaming, "Why isn't my Robert moving, I can't believe that I saw him that way!" I remained in the master bedroom with Donna Roberts while Det. Sgt. Monroe entered and conducted gun shot residue tests on Donna Roberts hands. While in the room, we noticed what appeared to be bloodstains on the front of the shirt Donna Roberts was wearing near the bottom. The shirt was also collected and entered into evidence. Upon my initial entrance into the residence, I noticed a tray on the dining room table with stems and seeds that appeared to be marijuana as well as matches, cigarette rolling machines, cigarette rolling papers, 2 empty plastic sandwich size baggies and several small pipes that are commonly used to smoke marijuana and crack cocaine. Det Sgt. Monroe and I asked Donna if the drug paraphernalia was the victims and she replied that it was not and insisted that it was hers.

I began checking the entire residence for prescription medication that belonged to the victim as well as Donna Roberts and collected a very large inventory list of medication throughout the residence. Donna Roberts informed me that the victim was taking medication for allergies and high cholesterol.

From that time on, I assisted Dr. Germaniuk, Det. Leshnack and Det. Sgt. Monroe with the collection of evidence. Upon the inspection of the handgun on the step outside the man door by Det. Leshnack, it was learned that the weapon was loaded with five live rounds and no spent rounds.

At approximately 0150 hours, Donna Roberts brother Ralph Roberts and his wife Rita Roberts arrived on the scene to assist Donna in her time of need. Det. Sgt. Monroe asked Mr. Roberts if it was possible for him to take Donna to his residence for the night to get her away from the graphic scene at the residence as well as to provide her with the emotional support she would need at this time. Mr. Roberts told Det. Sgt. Monroe that he would take Donna home. I was standing in the dining room of the residence at the time of Mr. Roberts and his wife's arrival. Prior to Donna Roberts leaving the residence and while in the hallway between the master bedroom and the front door, Det. Sgt. Monroe explained to Donna, Ralph and Rita Roberts that it was best that she leave the house because we, (the police), were going to be there for some time and the entire residence would have to be checked for any evidence of this crime. Det. Sgt. Monroe stated to Donna Roberts, "We are going to have to go through the entire house and check everything Donna." I noted Donna's response to Det. Sgt. Monroe to be, "You do whatever you have to do, I don't care." Donna Roberts then began to explain to her brother Ralph for the second time that her Robert was just laying there and wouldn't move and that it looked like someone stabbed him in the face. Dr. Germaniuk began his inspection of the victim's body by rolling him over. Upon my initial look at the front of the victim's body, I noted his



Page 5 of 5

face was covered in blood and snot was evident from his nose. I noted the right side of the victim's face and back of his head were swollen and out of proportion. Dr. Germaniuk inspected the victim's head and found a wound on the back near the top. As Dr. Germaniuk began removing the victims clothing, he discovered a bullet inside the layers of three shirts the victim was wearing, as well as bullet holes in his clothing and jacket. I noted that when all the victims shirts were removed, he had a wound on the back of his right upper arm along with what Dr. Germaniuk described as a graze wound on his back near the top to the right of the center of his back. Ptl. Pollcino then found a hole in the ceiling of the basement stairway, (which was directly across the kitchen), (directly north), of the man door from the garage into the house. Another bullet was later recovered from inside that ceiling above the basement stairs.

Eventually during the investigation of the interior portion of the crime scene, Donna Roberts car was removed from the garage. Once it was moved, we discovered a pair of glasses with brown plastic frames as well as a lens from the glasses lying on the floor. I videotaped the glasses where they lay as well as the lens, the damaged rail on the interior of the overhead garage door and the parts from it that were on the garage floor.

O627 Hours – I cleared the scene of the crime. Report on file, investigation to continue.

Signature: _____  Date: _12-12-01_



# HOWLAND POLICE DEPARTMENT

169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:      01-078868
Date:          12-12-01
Investigator:  Sgt. Dillon
Page 1 of 2



The following is a list of prescription medications found in the residence that were written in the name of the victim Robert S. Fingerhut:

In a Kitchen Cabinet
    1) Naproxen - 500mgFull   3-28-00
    2) Naproxen - 500mgFull   2-16-00
Main Bathroom Cabinet
    1) Naproxen - 500mgFull   Dr, Benjamin Kulper
    2) Sonata - 10mg        8-25-01
    3) Alprazolam - 1mg    12-01-01
    4) Diazepam - 5mg     5-04-01
    5) SodSulfacet - 10% OPSOL 12-05-97
    6) Allegra D - 60   120ER Tab
Master Bedroom Cabinet on the Headboard of the Bed
    1) Allegra - 60mg     10-22-01
    2) Lipitor - 10mg      12-01-01
    3) Metroprolol - 50mg  11-17-01
    4) Metroprolol - 50mg  10-28-01
    5) Lorazepam - 2mg   6-14-01
    6) Lipitor - 10mg      11-03-01
    7) Allegra - 60mg     11-05-01
    8) Metroprolol - 50mg  12-13-98
    9) Allegra - 60mg     12-14-98

Per Donna M. Roberts, Mr. Fingerhut was a non-smoker.



EXHIBIT
72

Page 2 of 2

The following is a list of prescription medications found in the residence that were written in the name of the victims wife, Donna M. Roberts:

In a Kitchen Cabinet
    1) Hydroxyn Pam - 50mg    5-26-00       Full
    2) Ibuprofen - 600mg     11-15-99
    3) Hydroxyn Pam - 50mg    5-12-00
    4) Skelaxin - 400mg      7-26-99
    5) Risperdal - 2mg       3-01-01
    6) Premarin - 0.9mg   4-28-01
    7) Hydroxyz - 25mg   2-25-00
    8) Hydroxyz - 50mg   6-08-01
    9) Paxil - 20mg       12-09-00
   10) Medroxyp AC - 10mg   1-04-01
   11) Depakote - 250mg   11-09-00
   12) Hydroxyn Pam - 50mg  6-03-00
   13) Wellbutrin SR - 100mg  6-08-01
   14) Meclizine - 12.5mg   9-12-99
   15) Despramine - 25mg  6-25-99
   16) Paxil - 10mg     2-03-01
   17) Xenical - 120mg    8-31-00
   18) Correctol/Laxative Tablets

Front Living room Table
    1) Depakote - 250mg    10-21-01
    2) Wellbetrin SR - 150mg  11-13-01
    3) Wellbetrin SR - 150mg  12-03-01
    4) Hydroxyn Pam - 50mg  12-03-01
    5) Hydroxyn Pam - 50mg  11-13-01

Donna M. Roberts told me that she was a smoker and smoked Newport brand cigarettes.

Signature: _____    Date: _12-12-01_



(1)

MONROE :

ASK FOR LIST OF EFFECTS FOUND ON RSF :

BESIDES $300 IN CASH

A $3500 GOLD BRACELET WITH DIAMOND INITIALS         DMR BOUGHT IT AS A

A $1200 WATCH (DMR BOUGHT FOR HIM AS A GIFT)        WEDDING GIFT 1983

A SOLID GOLD STAR OF DAVID CHARM

5 OR 6 GOLD CHAINS — BIG + THICK

3 OR 4 OTHER CHARMS — SOLID GOLD

LAW
'T
ERE ←  MONROE HAD 10 DAYS TO ESTABLISH OWNERSHIP OF
AUTOMOBILE AND HOUSE — HE DID NOT. I ASKED HIM
HOW COULD I STEAL MY OWN PROPERTY. HE DIDN'T CARE.

HE WAS SO HAPHAZARD AND JUDGEMENTAL THAT AS SOON
AS HE READ EXAGGERATED 'PRISON TALK'. HE WANTED IT
TO BE CAPITAL MURDER — A BIG CASE FOR HIM TO MAKE
A NAME FOR HIMSELF — BE IN THE MEDIA.

10 DAYS. ISN'T THIS A CASE OF A "RUSH TO
JUDGEMENT? A WHITE WOMAN + A BLACK MAN — YOUNG
A WHITE MAN IS DEAD. HE WAS RELENTLESS.
BY CHARGING DMR + NEJ WITH A CAPITAL MURDER — HE
KNEW THERE WOULD BE NO BONDING OUT. WE SIT HERE
NOW FOR ALMOST 11 MONTHS. AS A RESULT — DMR LOST
A HOME, 2 CARS, 2 BUSINESSES, 2 APT. BLDG. A HOUSE
FULL OF FURNISHINGS AND 2 10 YEAR OLD MOMMIES LITTLE
GIRLS — FLUFFY + BLOSAM.

EXHIBIT 23

ADULTERY IS NOT MURDER

BECAUSE MONROE WANTED DRAMA - HE THOUGHT THE 'PRISON' LETTERS + CONVERSATIONS were 100% TRUE.
TALK

THEREFORE, HE WENT TO DMR HOUSE ALMOST DAILY TO LOOK FOR NATE.
HE HAS TAPES OF CONVERSATIONS OF NEJ +

☆ DMR THAT HE GOT IN THE BEDROOM WHERE HE INSTALLED HIS TAPE MACHINE. WHERE ARE THESE TAPES ??? CONVENIENTLY MISSING? 3 TIMES
HE SENT THE SWAT TEAM WITH DOGS IN TO ~~RELEASE~~ ARREST DMR THINKING IN HIS MELODRAMATIC MIND THAT THERE WOULD BE A GOOD OLE WESTERN SHOOT OUT.

OUT
WHEN DMR CAME FROM HER GARAGE AND 3 CARS FOLLOWED HER, STOPPED HER ON THE HIGHWAY SCARED THE DAYLIGHTS OUT OF HER PULLING HER TO "CHECK THE TRUNK FOR NEJ!" HONEST.

MONROE WENT TO TCJ ON THE FIRST DAY OF DMR INCARCERATION TO GET A DNA SAMPLE TO COMPARE IT WITH DNA THAT WAS ON CONDOMS IN MOTEL ROOM - JUST TO SHOW HE THOUGHT A WHITE WOMAN + A BLACK MAN WERE ? TOGETHER MERE DAYS AFTER RSF DEATH. WHY. WHAT DID THIS HAVE TO DO WITH MURDER?

# EVERY GUY IN TALKS TOUGH.

EVEN THE POLICE SHOULD'T BELIEVE EVERYTHING THEY READ OR HEAR! (LETTERS & TAPES)

# P. MONROE:

PRESUMED ALL THE MISINFORMATION AS FACTS.

RUSH TO JUDGEMENT CAUSED JACKSON AND ROBERTS TO BE ARRESTED FOR CAPITAL MURDER — NO BOND — HE NEVER CHECKED OWNERSHIP OF VEHICLES HE SAID WAS STOLEN.

FINGERKUT HAD A $3000 GOLD & DIAMOND BRACELET ON. HIS $1200 WATCH WAS STILL ON HIM. CREDIT CARDS AND CASK.

THEY HAD 10 DAYS TO INVESTIGATE THIS TO BE SURE PROPER CHARGES WERE FILED

AS SOON AS DMR TOLD HIM ABOUT JACKSON — HIS MIND WAS MADE-UP OF NES GUILT.
HE WENT TO THE HOUSE ALMOST EVERYDAY. HE TAPED CALLS FROM ROBERTS BEDROOM PHONE TO JACKSON. FULL CO-OPERATION.
MR. BACON FOLLOWED ROBERTS ONE DAY WITH OTHER POLICE UNITS — GOT HER OUT + DEMANDED SHE OPEN THE TRUNK ASSUMING JACKSON WAS IN IT

SWAT TEAM TO ARREST ROBERTS THINKING JACKSON THERE

THIS ENTIRE CASE WAS MISHANDLED AT IT'S ONSET. AS SOON AS MONROE (P.M.) ASK DMR IF SHE HAD A BOYFRIEND AND SHE SAID SO IMMEDIATELY - SHE WAS GUILTY IN HIS MIND. CASE OVER. NOW: A CONCLUSION AND LET'S MAKE THE EVIDENCE FIT AROUND IT. TOUGH THUG TALK. TOUGH PRISONER TALK = TAKEN AS THOUGH IT WAS 100% TRUE.

IN 10 DAYS - FROM 12/11 TO 12/21, THE ARREST THAT WAS WHAT THEY WENT BY. IN THEIR EFFORT FOR DRAMA, THEY ADDED BURGLARY AND THEFT SO THAT THE "2 LIVING VICTIMS, DMR + NEJ WOULD BE CHARGED WITH CAPITAL MURDER, HENCE, NO BOND, SINCE 12/21/01. THIS IS AN UNFORGIVEABLE ABOMINATION. ONE WOULD PRESUME THAT BEFORE ARRESTING TWO PEOPLE WITH SUCH SEVERE CHARGES, THERE WOULD BE AT LEAST SOME INVESTIGATING TO ESTABLISH OWNERSHIP OF WHAT THEY CALLING STOLEN PROPERTY THUS SECURING THE CAPITAL CHARGES. DMR EVEN ASKED REPEATEDLY - HOW CAN I POSSIBLY STEAL MY OWN PROPERTY? NEJ ALWAYS DROVE THE CARS. HE HAD ETERNAL Rep PERMISSION FROM THE OWNER: DMR. THEY CAUSED NEJ TO BE IMPRISONED FOR ALMOST A YEAR RATHER THAN - HAVING COME OUT OF PRISON CLEAN, NO PAPERS, HE INTENDED TO SECURE EMPLOYMENT AND START A NEW LIFE. DUE TO NO BOND FOR THE 'CAPITAL' CHARGES, DMR LOST HER ~~lost~~ LIFE! HOMES, 2 BUSINESSES, CARS, COLLECTIONS - SPORTS, DOLLS, JEWELRY, CRYSTAL, 2 APT BLDG., DOGS. WHO WILL ANSWER FOR THIS PAUL MONROE? WHO? GOT ALL THE ANSWERS? HIDING EVIDENCE ARE YOU PAUL?



# Trumbull County Sheriff's Office
## Supplemental Report
### Investigative Division
Case # 2001-08795     12/12/01
Victim: Robert Fingerhut (Homicide Scene/Investigation)
     254 Fonderlac, Howland Twp.

At approximately 0012 Hrs. on 12/12/01, this officer was contacted at home by Det. Sgt. Paul Monroe of the Howland Township Police Department to assist with photographing a crime scene. This officer responded and took photographs of the entire scene (inside and out). I assisted Dr. Germaniuk with photographing and removal of the body. This officer volunteered to sketch the crime scene. One possible bloodstain was swabbed from the ceramic floor in the front door hallway and taken as evidence. This officer requested that Howland P.D. hold the scene so that myself and Det. Sgt. Pizzulo could return for further crime scene processing.

Det. Sgt. Pizzulo was unavailable for work this day. This officer returned at approximately 1400 Hrs. on 12/12/01 to collect additional bloodstain evidence and possible fingerprint evidence. Selected points in the kitchen and garage were processed for prints, including: the counter area near the body, some cups and glasses from the counter, and the screen door and man door between the kitchen/garage. Four bloodstains were taken from different locations as evidence. A placemat with a partial fingerprint in blood was taken as evidence and was located hanging on the inside of the kitchen/garage door.

On 12/13/01, Det. Sgt. Pizzulo accompanied this officer back to the scene. Additional photographs were taken of the scene. Four additional bloodstains were taken from the garage floor. Nothing further to report at this time.

Detective Anthony Leshnack



EXHIBIT
74



**Trumbull County
Sheriff's Office**

Investigative Division
Det. Sgt. Peter J. Pizzulo
| | |
|---|---|
| Administration | (330) 675-2540 |
| Desk / voice mail | (330) 675-2506 |
| Pager | (330) 675-0988 |
| Fax | (330) 675-7012 |

# Lab Report

Case #  Common Pleas  01-CR-794

From:  Det. Sgt. Peter J. Pizzulo

CC:  file, Howland PD, TCSO

Date:  Wednesday, May 01, 2002

Re:  Nathaniel E. Jackson , Judgement Entry Order

---

On 24 April 02 Judge Stuard issued an order for Handwriting Exemplars to be taken from Nathaniel Jackson.  Mr. Jackson's Council Anthony Consoldane agreed that this would be done on 29 April in Judge Stuard's Jury room.

Investigators met with Attorney Consoldane at 1230 on 29 April and after some discussion with Judge Stuard, it was acceptable that the Exemplars be done in an interview room of the TCSO Jail.  Originally Mr. Jackson was to re-write a 4 page letter three times for submission to BCI&I.  After some conversation between Attorney Consoldane and Prosecutor Watkins it was acceptable for him to re-write the first and last pages only along with addressing an envelope thee times.

At approx. 1250 on 29 April with Attorney Consoldane present Mr. Jackson was given the sample pages and asked to re-write them.

At 1320, Hrs Mr. Jackson stated that he did not want to continue due to the discomfort he was experiencing in his hand.   (NOTE)  Due to an injury that Mr. Jackson had incurred at the time of the alleged offence he can not use is index finger when holding a pen or pencil.

It was agreed by Attorney Consoldane that we would continue on 30 April 02 at 1100 hrs.   The Exemplar that was completed so far was sealed in an envelope with Attorney Consoldane Witnessing.

30 April 2002, 1100 hrs  Det. Sgt. Monroe and Contacted Mr. Jackson about continuing the Exemplar, he stated that he will no longer comply with the request and that he has contacted the Public Defenders office with his decision.    Attorney Consoldane was made aware of Mr. Jackson's unwillingness to continue.  County Prosecutors office was made aware of the status.

• Page 1

EXHIBIT

75

01 May 2002 , I spoke with Attorney Consoldane via telephone.

Attorney Consoldane indicated that he spoke with Nathaniel Jackson about his unwillingness to continue with the Exemplars and confirms that Mr. Jackson will not be providing further handwriting samples at this time.

The Exemplar that was obtained on 29 April was turned over to Det SGT Monroe for transport to BCI&I.

DET SGT Peter J. Pizzulo , TCSO



## PROPOSITION OF LAW NO. 2

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE DEFENDANT'S PREJUDICE.  U.S. CONSTITUTION, AMENDMENT VI; OHIO CONSTITUTION, ARTICLE I, SECTION 10.

The Sixth Amendment right to counsel applies to the states through the Fourteenth Amendment. Gideon v. Wainright (1963), 372 U.S. 335. The test for whether that right has been violated is found in Strickland v. Washington (1984), 466 U.S. 668, which obliges reviewing courts to determine if counsel's performance is deficient. Id. at 687. If counsel's performance is deficient, the reviewing court must determine if the accused was thereby prejudiced. Id. In order to establish prejudice, the accused need not establish outcome determinative error. Id. at 693-694. State v. Clifton (1999), 85 Ohio St. 3d 433, 450. Instead, the accused is prejudiced when the reviewing court loses confidence in the fairness of the trial. Id.

Strategic choices by appointed counsel are virtually unassailable. Id. at 690. Strickland makes clear, however, that a reasonable investigation of both the facts and the applicable law is required before counsel's choice may be deemed strategic. Id. At 691. Furthermore, Strickland requires that appointed counsel in a criminal case meet a "duty to advocate the defendant's cause . . . [and] . . . bring to bear such skill and knowledge as will render the trial a reliable testing process." Id. At 688. Federal courts have consistently recognized that Strickland's duties to advocate and to employ "skill and knowledge" include the necessity for trial counsel to object or otherwise preserve federal issues for review.

11


EXHIBIT
76

Gravely v. Mills (6th Cir. 1996), 87 F.3d 779;  State v. Lockhart (8th Cir. 1994), 23 F.3d 1280;

Argument:  Nathaniel Jackson's Sixth Amendment right to counsel was violated by defense counsel's prejudicially deficient performance at both phases of this capital case.

Defense counsel failed to object to the prosecution's extraction of guilty verdict and death verdict promises from all twelve impaneled jury members during the voir dire phase of the trial.

It is improper in voir dire to extract promises from a jury. State v. Powers (10th App. Dist.), 1992 Ohio App. LEXIS 1009; State v. Treesh (11th App. Dist.), 1998 Ohio App. LEXIS 4886;  State v. Treesh (2001), 90 Ohio St. 3d 460.

In the instant cause, the prosecuting attorney extracted promises from all twelve impaneled jurors that each would render a finding of guilty in the trial phase of the case if the State proved all elements of its case by proof beyond a reasonable doubt, and that each would render a verdict of death if the state in the penalty phase proved beyond a reasonable doubt that the aggravating circumstances in the case outweighed any mitigating factors which the defendant might offer. (TR- 686-87, 936, 952, 955, 1044, 1163, 1165, 1260, 1289, 1316, 1346, 1389, 1400, 1494, 1502).

In general, the purpose of voir dire of a prospective juror is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. Pavilonis v. Valentine (1929), 120 Ohio St. 154, 165 N.E. 730, paragraph one of the syllabus.  The primary purpose of voir dire examination in a capital murder case is to determine whether a juror will truly consider aggravating circumstances and mitigating factors in determining appropriate penalty and not ultimately vote to impose the death

12

penalty merely because a murder has been committed. See Morgan v. Illinois (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222. The purpose of voir dire is not to prejudice a jury and predispose its verdict or viewpoint prior to the offer and consideration of evidence.

In State v. Treesh, supra, at 465, this court held that notwithstanding the timely objection by defense counsel to the prosecutor's extraction of promises for a guilty verdict, and counsel's argument that said conduct constituted constitutional misconduct which created a biased and partial jury, that Treesh "ha[d] failed to demonstrate how the question affected a substantial right." Id. at 465. In the case sub judice, defense counsel failed to object to any of the extracted promises from the twelve jurors impaneled who ultimately found defendant guilty and recommended a sentence of death. Although this court has previously held that "'the failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel,'" where "appellant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial..." State v. Hanna (2002), 95 Ohio St. 3d 285, citing State v. Holloway (1988), 38 Ohio St. 3d 239 at 244, appellant notes that failure of counsel to object to the prosecutors extracted promises thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test. State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury and one that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in this duty by allowing the prosecutor to condition and predispose the jury to a guilty and death sentence mindset; and that the so-called "death qualification" of the jury as

13

recognized in Witherspoon took on an expanded and new meaning in the instant cause and thereby prejudiced the right of defendant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Counsel repeatedly failed to object during voir dire to the prosecutor's comments and questions which sought to limit the type of mitigating factors which might justify a sentence other than death.**

During voir dire, the prosecutor questioned ten of the twelve impaneled jurors on matters relating to mitigation, limiting his examples of mitigators that might compel a jury to vote for life instead of death to "mental disease or defect" (TR- 826, 923, 959, 1164, 1258) and to youthful "age" (1288, 1314, 1344, 1396, 1500).  Notwithstanding that the purported use of these mitigators was to insure that the jury would nonetheless weigh aggravating circumstances against mitigating factors, regardless of their type or variety, the use of just two mitigators by the prosecutor, which he acknowledged as perhaps justifying life, and which he knew were inapplicable to the appellant, nonetheless conditioned and predisposed the jury to await for those mitigators and those mitigators only during the penalty phase. Defense counsel failed routinely and repeatedly to object to this inappropriate trial tactic, which effectively denigrated appellant's mitigation evidence.

In State v. Jones (2001), 91 Ohio St. 3d 335, this court considered the claimed error of appellant who argued that he should have been permitted to ask prospective jurors about their views on specific mitigating factors; that the trial court's refusal to permit that line of questioning left several jurors confused as to the meaning of mitigation; and that his inability to ask about specific mitigating factors, coupled with juror confusion about the meaning of

14

mitigation, limited his ability to uncover potential biases in prospective jurors and may have resulted in the empanelling of jurors who were unwilling to consider mitigating evidence.

In rejecting appellant's claim, this court held that "[d]uring voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors, State v. Wilson (1996), 74 Ohio St. 3d 381, 385-386, 659 N.E.2d 292, 300-301: State v. Lundgren (1995), 73 Ohio St. 3d 474, 481, 653 N.E.2d 304, 315, [and that] [r]ealistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." State v. Jones, supra, at 338.

In light of Jones, supra, it is clear that the prosecutor in the instant cause was improperly asking jurors to weigh and consider specific mitigating factors during voir dire, all of which he limited for his own purpose, and all without routine objection from appellant's counsel. Again, by failing to object to the prosecutors misconduct, counsel for appellant thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test.  State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury that was open to considering mitigation evidence of any variety and that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in his duty by allowing the prosecutor to condition and predispose the jury to consider only two mitigating factors which were given the imprimatur by the prosecutor of possibly being worthy of a life sentence verdict; and that the failure, inaction and unawareness of his trial counsel to the law

thereby prejudiced the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel failed repeatedly to object to inappropriate statements and misconduct of the prosecutor during voir dire that materially prejudiced and predisposed the jury to guilty and death sentence verdicts.**

During voir dire, the prosecutor made inappropriate statements to five impaneled jurors, either by mis-stating the law or discussing facts and evidence not alleged in the indictments or proven at trial, all of which prejudiced and predisposed the jurors to guilty and death sentence mindsets, namely, (1) that "[t]he first trial deals with the state proving beyond a reasonable doubt, the defendant committed aggravated murder" (TR- 820); (2) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?" (TR- 826); (3) "So we're dealing with charges where the person committed the crime, the defendant is alleged of killing a homeowner" (TR- 930); (4) "in this case the aggravating circumstances accuse the defendant of purposely killing a homeowner in the commission of an aggravated burglary" (TR- 1046); (5) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the defendant's guilt based only on the evidence, right?" (TR- 1157); and (6) "In this case, the defendant is charged with killing a homeowner in an aggravated murder" (TR- 1392-1393).

During voir dire, it is improper for counsel to discuss evidence. State v. Johnson (8th App. Dist.), 1997 Ohio App. LEXIS 100. In the instant cause, the prosecutor not only mis-stated the law during voir dire, but also sought on three occasions to repeatedly discuss evidence with jurors ultimately empanelled, that would not be proven, namely, that the

16

defendant killed a homeowner, a fact that the prosecutor would ultimately acknowledge during trial as wrong (TR- 3383, 3397), only to re-assert the mis-statement of fact and evidence three times during final argument in the penalty phase, namely: that "it was his specific intent to kill the victim, to commit an aggravated murder against a homeowner" (Penalty Phase TR- 142/2-4); that "it can't get any worse than being in prison and planning the execution of a homeowner who just comes home" (Penalty Phase TR- 142/19-21); and that "[i]t is the worst form. The other is that after he kills a homeowner" (Penalty Phase TR- 143/15-16).

Appellant's counsel sat silently during voir dire without objection as the prosecutor mis-stated the law and commented on evidence that would not be proven at trial, and only finally objected to the prosecutor's mis-statement of fact after the prosecutor's third re-statement of the error during final argument in the penalty phase (TR- 143/17-18).  By reason of this negligence and inaction, counsel failed repeatedly in their duty to appellant by allowing the prosecutor to appeal to the passion of the jury and thereby predispose it to a guilty and death sentence mindset, thereby prejudicing the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel fashioned a defense to death penalty specifications of Aggravated Burglary and Aggravated Robbery under R.C. 2929.04(A)(7) which demonstrated counsel's unawareness of the law relative to the proof and elements of those specifications.**

Appellant was convicted on counts one and two of the indictment charging appellant with the aggravated murder of Robert Fingerhut while committing the acts of aggravated

17

to bear such skill and knowledge as will render the trial a reliable testing process." Id. At

688.  It cannot reasonably be argued that counsel met that standard in this cause, given

counsel's patent unawareness of the law which only became evident to them after close of

the evidence in the trial stage and discussion of jury instructions thereafter with the court and

opposing counsel (TR- 3344-3371).

Appellant submits that counsel had a responsibility to provide him a reasonable and

legally sound defense to the capital charges brought against him; that they failed in that duty

and obligation, and effectively rendered no defense to the capital specifications at the trial

phase; and that the failure of counsel in this regard calls into question whether the trial in this

matter constituted a reliable testing process causing a reviewing court to lose confidence in

the fairness of the trial. *Strickland v. Washington*, supra.

**Defense counsel failed to object to the admission into evidence of State's Exhibits
271D-1 to 271D-139, letters from Donna Roberts to Nathaniel Jackson from January
2001 to December 2001, without requiring authentication of writing as a predicate to
admission.**

During the offer of State's exhibits into evidence, defense counsel allowed admission

without objection of 139 letters purportedly written by Donna Roberts to Nathaniel Jackson

between January 2001 to December 2001, which were argued by the State to contain

information and evidence regarding Donna Roberts and appellant's plan to murder Robert

Fingerhut (TR- 2076, 2231, 2294-2302, 3151, 3431-3437).

Unlike the letters from Nathaniel Jackson to Donna Roberts which were admitted into

evidence after authentication of the author was established by testimony of a handwriting

19

analysis expert (TR- 2852-2875), no such authentication was offered for the letters purportedly written by Donna Roberts (TR- 2879). Accordingly, there was no reliable and appropriate predicate for the admission of State's Exhibits 271D-1 to 271D-139. Indeed, the only basis offered for the admission of the letters was through the testimony of Detective Paul Monroe, Howland Police Department, who testified that the letters were recovered from a search of Donna Robert's vehicle and were located in the trunk of her automobile (TR-2294-2295). Given that there was no evidence offered at trial that Donna Roberts admitted authoring the letters that were marked and received as evidence; and given that there was no evidence offered at trial establishing that appellant acknowledged and identified State's Exhibits 271D-1 to 271D-139 as letters he had received from Donna Roberts, the letters purportedly written by Donna Roberts should not have been admitted into evidence.

Because the letters identified by the State as being sent by Donna Roberts to appellant were critical to the State's proof that Donna Roberts and appellant had committed Robert Fingerhut's murder by prior calculation and design, all as set forth in count one of the indictment, for which appellant was convicted and sentenced to death, the admission of said letters through the negligence of defense counsel cannot be considered as a harmless error

Based upon the foregoing, appellant submits that the cumulative effect of the foregoing errors and omissions by trial counsel infringed upon his right to effective assistance of counsel, *Harris v. Wood* (9th Cir. 1995), 64 F. 3d 1432, 1438; that his convictions must be therefore reversed and his case remanded for a new trial; or alternatively, that his death sentence be vacated and his case remanded for re-sentencing.



Attorney General
Betty D. Montgomery

BCI-30 (Rev. 3-95)

Bureau of Criminal Identification and Investigation                    Laboratory Report

| | | | |
|---|---|---|---|
| To: | Howland Police Department | BCI Lab Number: | 01-35755 |
| | 169 Niles Cortland Road. N.E. | | |
| | Warren, Ohio 44484 | | |
| | Attn:  Det. Sgt. Monroe | Analysis Date: | 12-14-01 |
| Re: | Homicide | Agency Number: | 2001-078868 |
| | Subject:   None Listed | | |
| | Victim:   Robert S. Fingerhut | | |

Submitted 12-14-01 by Det. Sgt. Monroe

1.        GSR kit from victim's wife

Findings

Scanning electron microscopy energy dispersive x-ray spectroscopy analysis was performed on the
samples from Donna M. Roberts (item 1).

Gunshot residue was not conclusively identified on the "Left Hand" or Right Hand" samples.


Donna L. Rose
Forensic Scientist

DLR:km
T-7-29-02

EXHIBIT
77

Please address inquiries to the office indicated, using the BCI case number.

[ ] BCI & I-Bowling Green Office   [ ]   BCI & I-London Office      [ X ]  BCI & I-Richfield Office    [ ]  BCI & I-Cambridge Office
      P. O. Box 928                              P. O. Box 365                       P. O. Box 336                        60788 Southgate Road
      Bowling Green, OH 43402              London, Ohio 43140               3333 Brecksville Road            Byesville, Ohio 43723
      Phone: (419) 353-5603                   Phone: (740) 245-2000           Richfield, Ohio 44286            Phone: (740) 439-3655
                                                                                          Phone: (330) 659-4600

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

STATE OF OHIO,                                    :

    Plaintiff,                               :  Case No. 01-CR-794

-vs-                                              :

NATHANIEL JACKSON,                               :

    Defendant                                :

**EXHIBIT _____**

**AFFIDAVIT OF THOMAS ANDREW BOYD, PSY.D.**

STATE OF OHIO              :
                           : ss:
COUNTY OF CUYAHOGA         :

Dr. Thomas Andrew Boyd, after being duly sworn according to law, states as follows:

1.      I am a licensed psychologist in the States of Ohio and Rhode Island (though I am currently inactive in Rhode Island).

2.      I have a Bachelor of Science Degree from the University of Massachusetts (I graduated Magna Cum Laude).  I have both a Masters of Science Degree and a Doctor of Psychology Degree in Clinical Psychology from Hahnemann University in Philadelphia, Pennsylvania (the program has since relocated to Widener University).

3.      I am a diplomate in four areas of psychology, including forensic clinical psychology and forensic neuropsychology.

4.      I am the director of Clinical and Forensic Services for Behavior Management Associates, Inc.  I have previously held faculty appointments at four universities and staff appointments at seven hospitals.

EXHIBIT
78

5.      I have attached to this Affidavit a copy of my vitae which is complete and accurate.

6.      Dorian Hall of the Office of the Ohio Public Defender retained my services in the above case.  Ms. Hall provided me with the following records: a) mitigation testimony of Dr. Sandra McPherson; b) file of Dr. McPherson; c) the report of Dr. McPherson; and d) records from the Neal Kennedy Recovery Clinic, Community Corrections, and Youngstown Alternative School.

7.      I reviewed the Wechsler Adult Intelligence Scale – Version ("WAIS-III") and the Wide Range Achievement Test – Version III ("WRAT-III") that Dr. McPherson administered to Nathaniel Jackson on or about March 13, 2002.

8.      Dr. McPherson recorded the data from the WAIS-III on a blank sheet of paper, rather than on the full test booklet, as proscribed by the testing protocol.

9.      Dr. McPherson reported on the blank sheet of paper and in her formal report the following results for the WAIS-III:

| VERBAL SCALE | | | PERFORMANCE SCALE | | |
|---|---|---|---|---|---|
| **Subtest** | **Raw Score** | **Scaled Score** | **Subtest** | **Raw Score** | **Scaled Score** |
| Vocabulary | 18 | 5 | Picture Completion | 18 | 8 |
| Similarities | 11[A] | 5 | Digit Symbol-Coding | 56 | 6 |
| Arithmetic | 7 | 5[B] | Block Design | 29 | 7 |
| Digit Span | 20 | 12 | Matrix Reasoning | 21 | 13 |
| Information | 6 | 5 | Picture Arrangement | 15 | 10 |
| Comprehension | 6 | 5[C] | | | |
| **Sum of Scaled Scores** | | 42[D] | **Sum of Scaled Scores** | | 42[F] |
| **VERBAL IQ** | | 82[E] | **PERFORMANCE IQ** | | 89[G] |

**FULL SCALE IQ = 84[H]**

2

10.     Dr. McPherson committed eight errors in the computing, recording and reporting of Nathaniel Jackson's scores on the WAIS-III.[1]

A.      The raw score for the Similarities subtest should have been 13, not 11, as reported by Dr. McPherson.  This errors was not material, because it yielded the same subtest Scaled Score of 5.

B.      The raw score of 7 on the Arithmetic subtest translates to a Scaled Score of 4, and not 5, as reported by Dr. McPherson.

C.      The raw score of 6 on the Comprehension subtest translates to a Scaled Score of 3, and not 5, as reported by Dr. McPherson.

D.      The Sum of Scaled Scores for the Verbal Scale is equal to the total sum of the Scaled Scores for the individual Verbal subtests.  Based on Dr. McPherson's reported Scaled Scores this tally should have been 37, and not 42, as reported by Dr. McPherson.  However, as a result of the errors identified in Subparagraphs B and C, the actual Sum of Scaled Scores for the Verbal subtests was 34.

E.      The revised value for the Verbal IQ was 74, and not 82, as was reported by Dr. McPherson.

F.      The Sum of Scaled Scores for the Performance Scale is equal to the total sum of the Scaled Scores for the individual Performance subtests.  Dr. McPherson incorrectly added these scores.  The actual tally was 44, and not 42, as reported by Dr. McPherson.

G.      The revised value for Nathaniel Jackson's Performance IQ was 91, and not 89, as reported by Dr. McPherson.

---

[1] The following paragraphs refer to the footnoted sections of the previous table.

11.    The actual Full Scale IQ for Nathaniel Jackson was 80, as opposed to 84, as reported by Dr. McPherson (at footnote H in the previous table).

12.    If the WAIS-III results had been scored and recorded correctly, Dr. McPherson would have reported the results as follows:

| VERBAL SCALE | | PERFORMANCE SCALE | |
|---|---|---|---|
| **Subtest** | **Scaled Score** | **Subtest** | **Scaled Score** |
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 6 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 12 | Matrix Reasoning | 13 |
| Information | 5 | Picture Arrangement | 10 |
| Comprehension | 3 | | |
| **VERBAL IQ** | **74** | **PERFORMANCE IQ** | **91** |

**FULL SCALE IQ = 80**

13.    In her report, Dr. McPherson reported the following results for the WRAT-III that she administered to Nathaniel Jackson:

| SUBTEST | RAW SCORE | STANDARD SCORE | PERCENTILE | GRADE SCORE | ABSOLUTE SCORE |
|---|---|---|---|---|---|
| Reading[I] | 36[J] | 75[K] | 5[L] | 5[M] | 503[N] |
| Spelling | 43[O] | 103[P] | 58[Q] | High School[R] | 524[S] |
| Arithmetic[I] | 46[T] | 111[U] | 77[V] | High School[W] | 532[X] |

14.    Dr. McPherson committed sixteen errors in the computing, recording and reporting of Nathaniel Jackson's scores on the WRAT-III.[2]

15.    On February 11, 2004 I administered to Nathaniel Jackson the WAIS-III.  He received a Verbal IQ of 71, a Performance IQ of 83, and a Full Scale IQ of 75.

---

[2] Identified errors occurred at the footnoted sections in the above WRAT-III table.

Further affiant saith naught.

_____
Thomas A. Boyd, Psy.D.
Licensed Clinical Psychologist


Sworn to and subscribed in my presence this 23rd day of March, 2004.

_____
NOTARY PUBLIC

Noah R. Frient
Notary Public, State of Ohio
My Commission Expires 9/29/07

#194851

5

# CURRICULUM VITAE

2004

## *THOMAS ANDREW BOYD, Psy.D.*
Licensed Clinical Psychologist

## PERSONAL INFORMATION

| | |
|---|---|
| **Date of Birth:** | July 25, 1952 |
| **Place of Birth:** | Malden, Massachusetts |
| **Citizenship:** | USA |
| **Social Security #:** | 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 |
| **Work Address:** | Behavior Management Associates, Inc. |
| | 23240 Chagrin Boulevard - Suite 500 |
| | Beachwood, Ohio  44122-5471 |
| **Work Telephone:** | (216) 292-6007 |
| **Fax:** | (216) 292-7352 |

## EDUCATION

1. **Institution:**   Hahnemann University, Philadelphia, PA
   (Now Widener University, Chester, PA)
   **Year:**   1982
   **Degree:**   Doctor of Psychology (Psy.D.)
   **Major:**   Clinical Psychology (APA-Approved Program)
   Clinical Neuropsychology Track
   **Dissertation:**   Neuropsychological Testing of Patients
   with Systemic Lupus Erythematosus
   Chair:  Sandra P. Koffler, Ph.D.

2. **Institution:**   Hahnemann University, Philadelphia, PA
   **Year:**   1979
   **Degree:**   Master of Science (APA-Approved Program)
   **Major:**   Clinical Psychology

3. **Institution:**   University of Massachusetts, Amherst, MA
   **Year:**   1975
   **Degree:**   Bachelor of Science
   **Major:**   Psychology
   **Honors:**   Magna Cum Laude

## CLINICAL TRAINING

### *Post-Graduate*

1. **Neuropsychology Associate**   Hahnemann University Hospital, Philadelphia, PA   1983 - 1984

| CURRICULUM VITAE | THOMAS ANDREW BOYD, Psy.D. | PAGE 2 |
|---|---|---|

| 2. | Post-Doctoral Fellow in Clinical Neuropsychology | Department of Psychiatry and Human Behavior Division of Biology and Medicine Brown University and Department of Psychology Bradley Hospital (East Providence, RI) | 1982 - 1983 |

## *Internship*

**Hahnemann University "Captive" Internship Training Program  (APA-Approved)**
Integrated with the Doctoral Program in Clinical Psychology
1979 - 1982 (part-time:  3600+ Hours)

**Rotations:**

| 1. | Neuropsychology Laboratory | Hahnemann University Hospital, Philadelphia, PA | 1981 - 1982 |
| 2. | Hay Associates | Philadelphia, PA | 1980 - 1981 |
| 3. | John F. Kennedy CMHC | Philadelphia, PA | 1979 - 1982 |

## *Psychology Trainee*

**Hahnemann University Graduate Program in Clinical Psychology Field Placements**  1977 - 1980

**Practica:**

| 1. | Outpatient Psychiatry Clinic | Jefferson Medical College & Hospital, Philadelphia, PA | 1978 - 1980 |
| 2. | Partial Hospitalization Program | Central Montgomery Community Mental Health Center Norristown, PA | 1977 - 1978 |

# PROFESSIONAL LICENSES & CERTIFICATIONS

| 1. | Licensure in Psychology | # 3893 | Ohio | 1987 to Present |
| 2. | Certification in Psychology | # PS-277 | Rhode Island | 1985 - 1987 Currently Inactive |
| 3. | Certified Neuropsychologist | | National Academy of Neuropsychology | Certification date 1/1/91 |
| 4. | Diplomate Board Certified Forensic Examiner | #8657 | American Board of Forensic Examiners | 1996 to Present |
| 5. | Fellow | #8657 | American College of Forensic Examiners | 1999 to Present |
| 6. | Diplomate and Senior Disability Analyst | #4291-97 | American Board of Disability Analysts | 1997 to Present |
| 7. | Diplomate in Forensic Neuropsychology | #8657 | American Board of Psychological Specialties | 1997 to Present |
| 8. | Diplomate in Forensic Clinical Psychology | #8657 | American Board of Psychological Specialties | 1997 to Present |

CURRICULUM VITAE    THOMAS ANDREW BOYD, Psy.D.    PAGE 3

## PROFESSIONAL POSITIONS

1. Director of Clinical and Forensic Services                                    2002 to Present

   Behavior Management Associates, Inc.
   23240 Chagrin Boulevard, Suite 500
   Beachwood, Ohio 44122-5471

2. Associate                                                                     1995 to 2002

   Behavior Management Associates, Inc.

3. Consulting Psychologist                                                       1996 to 2003

   Caloh, Inc.
   Statewide Independent Medical Examiners
   Specializing in Occupational/Industrial Medicine
   P.O. Box 1307
   Bath, Ohio  44210-1307

4. Consulting Psychologist                                                       1997 to 2002

   Managed Medical Assurance Company, LTD
   4150 Belden Village Street, Suite 503
   Canton, Ohio 44718

5. Director, Department of Psychology                                            1993 to 1995
   The Rehabilitation Hospital at Heather Hill
   12340 Bass Lake Road
   Chardon, Ohio 44024

6. Director, Psychological Assessment Center (PAC)                               1987 - 1993
   MetroHealth Medical Center (MHMC)
   (Formerly Cleveland Metropolitan General Hospital)
   2500 MetroHealth Drive
   Cleveland, Ohio  44109-1998

7. Chief Psychologist, Children's Inpatient Unit                                 1984 - 1987
   Bradley Hospital
   1011 Veterans' Memorial Parkway
   East Providence, Rhode Island

## FACULTY POSITIONS

1. Assistant Professor of Psychiatry and Psychology                             1987 to 1998
   Department of Psychiatry
   Case Western Reserve University School of Medicine
   Cleveland, Ohio

   | | | |
   |---|---|---|
   | | Full-Time Appointment | 1987 - 1993 |
   | | Adjunct Appointment | 1993 to 1998 |

2. Clinical Assistant Professor                                                  1984 - 1988
   Department of Psychiatry and Human Behavior
   Division of Biology and Medicine
   Brown University
   Providence, Rhode Island

**CURRICULUM VITAE**     **THOMAS ANDREW BOYD, Psy.D.**     **PAGE 4**

3. Assistant Professor of Psychology in Psychiatry     1983 - 1984
   Department of Mental Health Sciences
   Hahnemann University
   Philadelphia, PA

4. Assistant Instructor     1982 - 1983
   Department of Psychiatry and Human Behavior
   Division of Biology and Medicine
   Brown University

5. Instructor     1977 - 1982
   School of Allied Health Professions
   Program in Mental Health Technology
   Hahnemann University
   Philadelphia, PA

6. Lecturer     1980 - 1982
   Department of Speech Pathology
   The Graduate School
   Hahnemann University
   Philadelphia, PA

7. Assistant Instructor     1972 - 1974
   Orchard Hill Residential College
   University of Massachusetts
   Amherst, MA

## HOSPITAL APPOINTMENTS

| # | Title | | Institution | Dates |
|---|---|---|---|---|
| 1. | Member | Psychiatry/Psychology | Aultman Hospital | 1997 to 2002 |
| 2. | Director | Department of Psychology | Heather Hill, Inc. | 1993 to 1995 |
| 3. | Member | Medical Staff | Rehabilitation Hospital at Heather Hill | 1993 to 1995 |
| 4. | Director | Psychological Assessment Center | MetroHealth Medical Center | 1987 - 1993 |
| 5. | Member | Associate Medical Staff | MetroHealth Medical Center | 1994 - 1995 |
| 6. | Member | Adjunct Medical Staff | MetroHealth Medical Center | 1987 - 1994 |
| 7. | Consulting Psychologist | Medical Staff | MetroHealth Center for Skilled Nursing Care | 1988 - 1983 |
| 8. | Member | Associate Medical Staff | Health Hill Hospital | 1988 - 1993 |
| 9. | Chief Psychologist | Children's Inpatient Unit | Bradley Hospital | 1984 - 1987 |
| 10. | Neuropsychology Associate | Neuropsychology Laboratory | Hahnemann University Hospital | 1983 - 1984 |
| 11. | Postdoctoral Fellow | Department of Psychology | Bradley Hospital | 1982 - 1983 |

## OTHER APPOINTMENTS

| # | Title | Journal | Dates |
|---|---|---|---|
| 1. | Invited Reviewer | *Journal of Personality Assessment* | 1988 to Present |
| 2. | Ad Hoc Reviewer | *International Journal of Psychiatry in Medicine* | 1987 to 1993 |

| | | | |
|---|---|---|---|
| **CURRICULUM VITAE** | **THOMAS ANDREW BOYD, Psy.D.** | | **PAGE 5** |

| | | | |
|---|---|---|---|
| 3. | Ad Hoc Reviewer | *Neuropsychology* | 1987 - 1990 |
| 4. | Invited Reviewer | *Archives of Clinical Neuropsychology* | 2002 - Present |
| 5. | Co-Investigator | Cleveland Baby Study     MetroHealth Medical Center CWRU School of Medicine | 1988 to Present |
| 6. | Certified Disability Evaluator Panel | Ohio Bureau of Worker's Compensation | 1996 to Present |
| 7. | Independent Medical Examiner | Industrial Commission of Ohio | 1997 to Present |
| 8. | Consultant | Caloh, Inc., Independent Medical Examiners | 1996 to 2003 |
| 9. | Board of Trustees | Cleveland Psychological Association | 1997 to 1998 |
| | Co-Chair | Marketing Committee | 1997 to 1998 |
| 10. | Consultant, | Department of Thoracic & Cardiovascular Surgery, Aultman Hospital, Canton, Ohio | 1997 to 2002 |

## HONORS & AWARDS

| | | |
|---|---|---|
| 1. | Dean's List, University of Massachusetts; Graduated Magna Cum Laude | 1975 |
| 2. | Elected, Outstanding Young Men in America | 1983 |
| 3. | Elected, Who's Who in the Midwest (23rd Edition) | 1992 |
| 4. | Elected, Who's Who Among Human Service Professionals (3rd Edition) | 1992 |

## PROFESSIONAL MEMBERSHIPS

### *Present*

| | | | |
|---|---|---|---|
| 1. | Member (1717-1775)    Divisions: | American Psychological Association Division 12 – Clinical Psychology Division 40 -- Clinical Neuropsychology Division 41 – American Psychology - Law Society Division 42 -- Independent Practice | 1983 to Present |
| 2. | Member | International Neuropsychological Society | 1985 to Present |
| 3. | Member | Society for Personality Assessment | 1986 to Present |
| 4. | Member (Professional)    Committees: | National Academy of Neuropsychology Membership Committee Research Consortium | 1988 to Present 1991 to 1993 1991 to Present |
| 5. | Member (10290)    Committees: | Ohio Psychological Association Quality Assurance Committee | 1988 to Present 1993 - 1996 |
| 6. | Member | Prescribing Psychologist's Register | 1995 to Present |
| 7. | Diplomate    Subcommittees for developing Standards: | American College of Forensic Examiners Neuropsychology, Clinical Psychology, Clinical Psychology, Forensic Psychology, Psychological Assessment, Disabilities Evaluation | 1996 to Present |
| 8. | Member | Cleveland Psychological Association | 1997 to Present |
| 9. | Diplomate | American Board of Disability Analysts | 1997 to Present |

**CURRICULUM VITAE    THOMAS ANDREW BOYD, Psy.D.         PAGE 6**

*Past*

| | | | |
|---|---|---|---|
| 1. | Member | Rhode Island Psychological Association | 1985 - 1988 |
| 2. | Student Affiliate | American Psychological Association | 1980 - 1982 |
| 3. | Associate Member | Pennsylvania Psychological Association | 1980 - 1982 |
| 4. | Student Affiliate | Philadelphia Society of Clinical Psychologists | 1980 - 1982 |

## PUBLICATIONS

1. Boyd, T.A., Ernhart, C.B., & Greene, T.H.  Prenatal alcohol exposure and sustained attention in the preschool years.  (Abstract). *Psychiatry Digest*, in press.

2. Greene, T., Ernhart, C.B., Sokol, R.J., Martier, S., Boyd, T.A. & Ager, J.  Neonatal Diagnosis of Fetal Alcohol Syndrome:  Not Necessarily a Hopeless Prognosis. *Alcoholism: Clinical and Experimental Research*, 1995, 19 (6), 1550-1557.

3. Boyd, T.A.  What have we forgotten:  A developmental framework for clinical memory assessment of children.  (Abstract). *Journal of Clinical and Experimental Neuropsychology*, 1995, 1 (4), 381.

4. Boyd, T.A. & Hooper, S.R.  WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery. *Perceptual and Motor Skills*, 1993, 77, 683-688.

5. Hooper, S.R., Boyd, T.A., Hynd, G.W., Rubin, J.  Definitional issues and neurobiological foundations of selected neurodevelopmental learning disorders. *Archives of Clinical Neuropsychology*, 1993, 8, 279-307.

6. Greene, T., Ernhart, C.B. Boyd, T.A.  Contributions of risk factors to elevated blood and dentine lead levels in preschool children. *The Science of the Total Environment*, 1992, 115, 239-260.

7. Cole, M., Winkelman, M., Morris, J., Simon, J.E., Boyd, T.A.  Thalamic Amnesia: Korsakoff syndrome due to left thalamic infarction. *Journal of the Neurological Sciences*, 1992, 110, 62-67.

8. Greene, T.H., Ernhart, C.B., & Boyd, T.A.  Contributions of risk factors to elevated blood lead levels in preschool children: Methodological implications.  (Abstract). *Archives of Environmental Health*, 1991, 46, 187-188.

9. Boyd, T.A., Ernhart, C.B., & Greene, T.H.  Prenatal and early childhood lead exposure and sustained attention in the preschool years.  (Abstract). *Archives of Clinical Neuropsychology*, 1991, 6 (3), 178-179.

10. Ernhart, C.B., Greene, T. & Boyd, T.A.  Response to H.L. Needleman, A. Schell, D. Bellinger, A. Leviton & E.N. Allred:  The  long-term effects of exposure to low doses of lead in childhood (Vol. 232, No. 2). (Letter). *New England Journal of Medicine*, 1991, 324 (6), 416.

11. Greene, T., Ernhart, C.B., Sokol, R.J., Martier, S., Marler, M., Boyd, T.A & Ager, J.  Prenatal alcohol exposure and preschool physical growth: A longitudinal analysis. *Alcoholism: Clinical and Experimental Research*, 1991, 15, 905-913.

12. Boyd, T.A., Ernhart, C.B., Greene, T., Sokol, R. & Martier, S.  Prenatal alcohol exposure and sustained attention in preschoolers. *Neurotoxicology and Teratology*, 1991, 13, 49-55.

13. Boyd, T.A., Ernhart, C.B., & Greene, T.H.  Prenatal alcohol exposure and sustained attention in the preschool years.  (Abstract). *Archives of Clinical Neuropsychology*, 1991, 6 (3), 178.

14. Greene, T., Ernhart, C.B., Ager, J., Sokol, R. Martier, S. & Boyd, T.A.  Prenatal alcohol exposure and cognitive development in the preschool years. *Neurotoxicology and Teratology*, 1991, 13, 57-68.

CURRICULUM VITAE     THOMAS ANDREW BOYD, Psy.D.          PAGE 7

15. Greene, T., Ernhart, C.B., Ager, J., Sokol, R. Martier, S. & Boyd, T.A.  Prenatal alcohol exposure and cognitive development in the preschool years. (Abstract). *Pediatrics Digest*, 1991, 7-8.

16. Boyd, T.A. Clinical assessment of memory in children:  Research, theory and prospects for practice. In M.G. Tramontana and S.R. Hooper (Eds.)  Assessment Issues in Child Neuropsychology.  New York: Plenum, 1988.

17. Boyd, T.A. & Hooper, S.R.   WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery. (Abstract). *Bulletin of the National Academy of Neuropsychologists*, 1988, 5 (1), 12.

18. Boyd, T.A. & Hooper, S.R.   Psychometric validity of proration and Digit Span substitution for estimating WISC-R Verbal and Full Scale IQs. *Perceptual and Motor Skills*, 1987, 65, 19-25.

19. Hooper, S.R. & Boyd, T.A.   Test review:  The Denman Neuropsychology  Memory Scale. *International Journal of Clinical Neuropsychology*, 1987, 9 (3), 141-144.

20. Boyd, T.A., Tramontana, M.G. & Hooper, S.R.   Cross-validation of a psychometric system for screening neuropsychological abnormality in older children. *Archives of Clinical Neuropsychology*, 1987, 1, 387-391.

21. Hooper, S.R. & Boyd, T.A.  Neurodevelopmental learning disorders.  In J.E Obrzut and G.W. Hynd (Eds.) Child Neuropsychology: Clinical Practice (Vol. II).  New York: Academic Press, 1986.

22. Boyd, T.A. & Tramontana, M.G.   Application of the Split-Half WISC-R with emotionally and behaviorally disturbed children. *Journal of Psychoeducational Assessment*, 1986, 4 (2), 113-122.

23. Boyd, T.A. & Tramontana, M.G.  WISC-R short forms: Long on problems. (Abstract). *Educational Resources Information Center* (*ERIC*), U.S. Department of Education, National Institute of Education, February 3, 1986.

24. Tramontana, M.G. & Boyd, T.A.  Psychometric screening of neuropsychological abnormality in older children. *International Journal of Clinical Neuropsychology*, 1986, 8 (2), 53-59.

25. Tramontana, M.G., Klee, S.H. & Boyd, T.A.  WISC-R interrelationships with the Halstead-Reitan and Children's Luria Neuropsycholgocal Batteries.  *International Journal of Clinical Neuropsychology*, 1984, 6, 1-8.

# PRESENTATONS

1. Boyd, T.A., Konrad, K., Bruening, & Goshe, G.  Why do they act that way:  Brain Injury and Behavior. Interdisciplinary inservice, The Rehabilitation Hospital at Heather Hill, Chardon, Ohio, November, 1994.

2. Boyd, T.A., Konrad, K., & Livingston, R.   Understanding adolescents (part I and II). Interdisciplinary inservice, The Rehabilitation Hospital at Heather Hill, Chardon, Ohio, October, 1994.

3. Boyd, T.A., Strenger, V.E., & Dickerson, P.B.  Coping with illness:  A family affair.  Heather Hill Family Education Series.  Heather Hill, Inc., Chardon, Ohio, May, 1994.

4. Boyd, T.A.  What have we forgotten: A developmental framework for clinical memory assessment of children.  Paper presented at the International Neuropsychological Society, Twenty-Second Annual Meeting. Cincinnati, Ohio, February 1994.

   Audiocassette  Tape.  Contained on G.A. Gioia, Organizer; G. Butterbaugh, Chair; E. Kaplan, Discussant:  "Symposium 7: Developmental theory and process in the examination of children's memory. #G117-37AB, InfoMedix, Garden Grove, CA, 1994

**CURRICULUM VITAE     THOMAS ANDREW BOYD, Psy.D.          PAGE 8**

5.  Greene, T., Sokol, R.J., Martier, S., Ernhart, C.B., Boyd, T.A., & Ager, J.  FAS: Not necessarily a hopeless prognosis.  Paper presented at The 6th Congress of The International Society for Biomedical Research on Alcoholism, held jointly with the Research Society on Alcoholism.  Marco Island, Florida, June 1991.

6.  Boyd, T.A., Ernhart, C.B., & Greene, T.H.  Prenatal alcohol exposure and sustained attention in the preschool years.  Paper presented at the 10th Annual Meeting of the National Academy of Neuropsychology.  Reno, Nevada, November 1990.

7.  Boyd, T.A., Ernhart, C.B., & Greene, T.H.  Prenatal and early childhood lead exposure and sustained attention in the preschool years.  Paper presented at the 10th Annual Meeting of the National Academy of Neuropsychology.  Reno, Nevada, November 1990.

8.  Boyd, T.A.  Comments on the Wide Range Assessment of Memory and Learning  (WRAML). Symposium:  Assessing Memory in Children: A new test battery.  Paper presented at the 98th Annual Convention of the American Psychological Association.  Boston, MA, 1990.

9.  Greene, T., Ernhart, C.B. & Boyd, T.A.  Contributions of risk factors to elevated blood lead levels in preschool children: Methodological implications.  Paper presented at The 2nd Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Berkeley, California, August 1990.

10. Greene, T., Ernhart, C.B., Sokol, R.J., Agar, J., Martier, S. & Boyd, T.A.  Fetal alcohol exposure and cognitive development.  Paper presented at The 5th Congress of The International Society for Biomedical Research on Alcoholism, held jointly with the Research Society on Alcoholism.  Toronto, Canada, June 1990.

11. Boyd, T.A.  Developmental and psychosocial impact of closed head injuries  in  children.  Paper presented at special conference, Pediatric Seizure Disorders and Closed Head Injuries:  A challenge to Health Care Professionals and Families.  Continuing Education Division, Education and Training, the MetroHealth System, December 1989.

12. Boyd, T.A., Irwin, M. & Fristad, M.A.  Serial Rorschach data in childhood bipolar illness.  Paper presented at the Annual Midwinter Meeting of the Society for Personality Assessment.  New Orleans, Louisiana, March 1988.

13. Boyd, T.A. & Hooper, S.R.  WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery.  Paper presented at the Seventh Annual Meeting of the National Academy of Neuropsychologists.  Chicago, Illinois, October 1987.

14. Boyd, T.A.  Clinical assessment of memory in children:  Toward a practical solution.  Paper presented at  the 94th Annual Convention of the American Psychological Association.  Washington, DC, 1986.

15. Hayden, R. & Boyd, T.A.  MMPI-168 regression equations with Adolescents:  Derivation and cross validation.  Paper presented at the  94th Annual Convention of  the American Psychological Association, Washington, DC, 1986.

16. Boyd, T.A.  The utility of neuropsychological testing in detecting CNS impairment in SLE patients. Grand Rounds, Division of Rheumatology, Brown University Program in Medicine and Roger Williams General Hospital, May 1985.

17. Boyd, T.A. & Tramontana, M.G.  WISC-R short forms: Long on problems.  Paper  presented at the 92nd Annual Convention of the American Psychological Association, Toronto, Canada, 1984.

18. Tramontana, M.G., Boyd, T.A. & Sherrets, S.D.  Predicting the long range effects of early childhood brain damage:  A lesson in humility.  Special Grand Rounds, Department of Psychiatry and Human Behavior, Brown University Program in Medicine and Bradley Hospital, August 1983.

19. Tramontana, M.G., Boyd, T.A. & Sherrets, S.D.  Psychometric screening of neuropsychological abnormality in older children.  Paper presented at the 91st Annual Convention of the American Psychological Association, Anaheim, CA, 1983.

# TEACHING ACTIVITIES

## *Training Duties*

1. Supervisor, PGY-III and PGY-II Residents in Psychiatry, Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth Medical Center, 1988 - 1993.

2. Supervisor, Practicum in Adult Psychological Assessment, Doctoral students in Clinical Psychology, Case Western Reserve University, MetroHealth Medical Center campus, 1988 - 1993

3. Supervisor, Field Placement in Adult Psychological Assessment, Doctoral students in Clinical Psychology, Case Western Reserve University, MetroHealth Medical Center campus, 1991 - 1993

4. Supervisor, Rotations in Clinical Child Psychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1984 - 1987.

5. Supervisor, Rotations in Clinical Child Neuropsychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1984 - 1987.

6. Supervisor, Postdoctoral Fellowship in Clinical Child Neuropsychology, Bradley Hospital and Brown University, 1984-1986.

7. Supervisor, Rotation in Clinical Neuropsychology, Hahnemann University "Captive" Internship Training Program, 1983 - 1984.

8. Supervisor (partial), Clinical Child  Neuropsychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1982 - 1983.

## *Lectures & Courses Taught*

1. Adult Psychological Testing, Medical Student Clerkship (Rotation in Psychiatry),Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth  Medical Center, 2-Part Lecture (Given quarterly), 1990 - 1993

2. Adult Psychological Testing, PGYII and PGY-III Residents in Psychiatry, Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth Medical Center, 5-Part Seminar (annually), 1988 -1993.

3. Neuropsychological  Assessment  in Outcome Studies for Acute Head Injury  (partial), Residents  in Neurology, Case Western Reserve University School of Medicine and Department of Neurology, MetroHealth Medical Center, Lecture, Spring, 1991.

4. Introduction to Psychological Testing, School of Nursing, MetroHealth Medical Center, Quarterly Lecture, 1990.

5. Neuropsychological Assessment in Acute Head Injury, Residents in Neurology and Rehabilitation Medicine, Case Western Reserve University School of Medicine and Department of Neurology, MetroHealth Medical Center, Lecture, Fall 1989 - 1992.

6. Research Issues in Child Neuropsychology, Case Western Reserve University, Department of Psychology, Graduate Program in Clinical Psychology, Pediatric Psychology Track, Lecture, Fall 1987.

7. Attention Deficit Disorder, Brown University Clinical Psychology Internship Consortium, Spring Lecture, 1986.

8. Clinical Assessment Methods with Children, Brown University Clinical Psychology Internship Consortium, Fall lecture, 1985 - 1986.

9. Psychological Assessment, Psychiatry Residents and Fellows in Child Psychiatry, Department of Psychiatry and Human Behavior, Brown University Program in Medicine, Summer lecture, 1985.

10. Basic Measurement in Psychodiagnostics, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Spring Semester, 1984.

11. History of Psychology, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Spring Semester, 1984.

12. Theories of Learning and Motivation, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Fall Semester, 1983.

13. Physiological Basis of Behavior, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Fall Semester, 1983.

14. Clinical Neuropsychology, Brown University Clinical Psychology Internship Consortium, 4-Part Seminar (partial), 1982 - 1983.

15. Neuropsychology of Language, Department of Speech Pathology, Hahnemann University, Spring Seminar Lectures, 1982.

16. Social Psychology, College of Allied Health Professions, Hahnemann University, Full Course, 1977 - 1979.

17. Juvenile Delinquency, Orchard Hill Residential College, University of Massachusetts, Amherst, Seminar, 1973 - 1974.

18. Practicum in Youth Work, Orchard Hill Residential College, University of Massachusetts, Amherst, 1973 - 1974.

# GRANTS

1. Executive Board of the Cuyahoga County Hospital Auxiliary.  December 1987.  Awarded $4,671.00 for purchase of IBM-compatible portable computer for Psychological Assessment Center.

2. Research Initiation Grant, Ohio Board of Regents and Case Western Reserve University.  1988. Awarded $5,000.00 for study entitled Neuropsychiatric Profiles of Lupus Patients with Patterns of High and Low Utilization of Clinic Services.

# REFERENCES:  Professional references are available upon request.

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY OHIO

STATE OF OHIO,⟩ CASE NO.  01-CR-794

 Plaintiff,⟩

-vs-⟩ JUDGE JOHN M. STUARD

⟩ OPINION OF THE COURT

NATHANIEL E. JACKSON,⟩

 Defendant.⟩ FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING
IMPOSITION OF DEATH PENALTY

On November 8, 2002, a Trumbull County Jury returned a verdict finding the Defendant, Nathaniel E. Jackson, guilty of two (2) counts of Aggravated Murder arising from the death of Robert S. Fingerhut. Since Count One and Count Two of the Indictment merge for sentencing purposes, the State elected to dismiss Count Two and proceed to the mitigation phase on the first count of the indictment.  Therefore, for purposes of this opinion, the Defendant was convicted, under the first count of the indictment, of purposely, and with prior calculation and design, causing the death of Robert S. Fingerhut. The jury further found that the State had proved beyond a reasonable doubt two (2) specifications of aggravating circumstances.  After the mitigation hearing, the jury concluded that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and returned a verdict recommending that the sentence of death be imposed upon the Defendant.

Factually, the evidence revealed that while the Defendant was in prison for a prior conviction unrelated to the present case, he along with the Co-Defendant, Donna Roberts, who is precedently awaiting trial for her involvement, plotted the murder of her house mate, and ex-husband, Robert S. Fingerhut. Indeed, both of them concocted a plan to kill Fingerhut to permit

-1-

EXHIBIT

81

the Defendant and Roberts to live happily ever after.  However, the plan went awry when Jackson, who was in the house where Fingerhut stayed, was shot in the left index finger during the execution of Fingerhut.  He then took Fingerhut's car keys, and drove the vehicle which Fingerhut typically operated to Youngstown.  Shortly thereafter, Roberts took the Defendant to a motel in Boardman, getting him a room where he could hide out.  Ultimately, the Defendant was captured at a home in Youngstown, and he gave a statement to the police alleging self-defense.

More specifically, the State introduced evidence that on December 11, 2001, two (2) days after the Defendant was released from prison, Robert S. Fingerhut, while in his home, was pistol whipped, and shot three(3) times, causing at least four (4) injuries from gun shots.  Two of the injuries were to the back, with one grazing the back, and the other entering near the shoulder before exiting out the chest area of the victim.  Fingerhut also sustained a defensive gun shot wound to the webbing of his left hand between the thumb and forefinger.  The fatal gun shot was to the top of the head and from a short distance.  This injury would "would have dropped him like a sack of potatoes," as testified to by Dr. Germaniuk.

Police responded to the crime scene as a result of a 911 call.  When they arrived at approximately 12:01 a.m., they were met by the Co-Defendant, who informed them that her husband's car was missing.  She also granted them permission to search the residence and her car.  During this search, police found more than 140 letters from the Defendant to Roberts in her dresser, and an equal number of letters from Roberts to the Defendant, in the trunk of the Co-Defendant's car, in a paper bag bearing the Defendant's name and prison number.

Additionally, law enforcement officers were able to obtain nineteen (19) telephone

-2-

conversations, lasting more than three (3) hours, which were recorded while the Defendant was incarcerated in Lorain Correctional Institution. These telephone conversations, along with the letters which spanned three (3) months, revealed a continuing and evolving plan to kill Fingerhut immediately upon the Defendant's release from prison.

Specifically, during these telephone conversations, and in the written letters, the Defendant requested that Roberts obtain for him, black gloves to conceal his fingerprints, a ski mask, and a pair of handcuffs. Further, the Defendant, during the December 8, 2001, telephone conversation, which was recorded the day before he was discharged from Lorain, and three (3) days before the murder, stressed to Roberts that he "need[ed] to be in the house [in which Fingerhut lived] before he [got] home" in order to carry out the premeditated murder. Roberts, in a letter written to the Defendant acknowledged that she has found thin, fleece line, leather gloves, but was still looking for the ski mask.

Indeed, the State introduced black leather gloves with fleece lining which were recovered from the house where the Defendant was arrested. These gloves, which had gun shot residue on them, had a hole in the left index finger, and a reddish substance which appeared to be blood was also observed in that same area. This damaged matched the injury that the Defendant had sustained to his finger. Although the actual handcuffs were never recovered by police, an empty handcuff box was found in Donna Robert's car.

The evidence also revealed that Roberts, near the time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, Roberts rented a hotel room for the Defendant. In this room, bloody bandages and other medical supplies were

-3-

found by hotel cleaning people and were subsequently collected by police.

The car which was usually driven by Fingerhut, and which had been reported stolen by the Co-Defendant the night of Fingerhut's murder was recovered in Youngstown, Ohio. Blood stains were located throughout the vehicle and were collected by law enforcement. DNA analysis revealed that the blood matched that of DNA profile of the Defendant.

The State also introduced evidence that Roberts and the Defendant discussed purchasing a "new Lincoln" or "2002 Cadillac DeVille" for the Defendant. Additionally, Fingerhut had two (2) life insurance policies with a total death benefit of $550,00.00, and with Donna Roberts named as the beneficiary.

Based upon this and other evidence, the jury properly concluded that the Defendant committed a burglary to facilitate the premeditated and purposeful murder of the victim Fingerhut along with Roberts. The Defendant after executing his plan then stole Fingerhut's vehicle which allowed the jury to find that the murder was committed while committing the aggravating circumstances of Aggravated Burglary and Aggravated Robbery.

In a case of this nature, pursuant to R.C. 2929.03(D)(3), the Court is required to determine whether the State has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Indeed, the Supreme Court of Ohio has stated in *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344:

> "[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. *** [I]n the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." *Wogenstahl* (1996), 75 Ohio St. 3d 344 at 356.

-4-

In performing its statutory duty, the a review of the aggravating circumstances is required.

1.) *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.*

The evidence presented at trial reflected that the Defendant trespassed in the victim's dwelling and murdered him. The Court finds that the Defendant entered into 254 Fonderlac Drive, in Howland Township. He was wearing gloves and armed with a gun, with which he struck the victim leaving a mark on Fingerhut's face. Once in the house, he fired the gun three times causing four (4) separate wounds. The fatal shot was to the top of Fingerhut's head, and nearly straight down.

From the aforementioned evidence, the Jury concluded that the defendant committed the Aggravated Murder of while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

2.) *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.*

After the Defendant had murdered the victim, he took the victim's car keys and his car As he was driving away from the crime scene, and prior to abandoning the vehicle in Youngstown, he left blood evidence throughout the car. This evidence was subjected to DNA testing, which confirmed that forensically, it was his blood. Quite simply, the Defendant committed the Aggravated Robbery to escape the consequences of his prior murderous act.

-5-

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

To be weighed against the aggravating circumstances are the mitigating factors. In this case, the following factors were considered by the Court as possible mitigation against each specification and against the imposition of the death penalty:

1.) *The nature and circumstances of the offense, the history, character, and background of the offender.*

As was noted in *Wogenstahl, supra,* the nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. However, in this case, reviewing the nature and circumstances, the Court does not find any credible evidence which would allow the Court to accord any weight to the nature and circumstances of the offense against the imposition of the death penalty.

In considering the history, character and background of the offender, this Court considered the home life of the Defendant and the fact that he grew up in a relatively poor environment, and that he was cared for and raised by his mother and maternal grandmother. His biological father had little, if any, real involvement with him, and this lack of a father figure likely contributed to his behavioral problems .

Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the Defendant's step-father, his sister, his mother, and Dr. McPherson.  These witnesses testified that the Defendant was respectful to both is mother and grandmother.  His sister, who described as smart and really kind, noted that they

-6-

attended church. Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused. His mother also declined to say that his home was in a "rough neighborhood, or that the Defendant had any problems in school. Dr. McPherson's report noted that the Defendant had not been hospitalized for any physical or mental condition. The witnesses also noted that they practiced moral tenets and that responsibility and respect were taught.

In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

2.)    *Whether the victim of the offense induced or facilitated the killing.*

Although under R.C. 2929.04(B)(1), the mitigating factor regarding whether the victim of the offense induced or facilitated it was not specifically argued by the Defendant during the penalty phase of the trail as mitigating, the Court did consider the Defendant's video taped statement presented in evidence during the trial phase. In the self-serving statement, the Defendant claimed that the killing of the victim was as a result of the Defendant protecting himself from an unprovoked attack by the victim.

This statement to the police attempted to construct a scenario wherein the victim approached the Defendant to purchase marijuana and then invited the Defendant into his home. The Defendant then claims that the victim then pulled a gun on him. The Defendant asserted that he attempted to disarm the victim, but the gun went off apparently striking the victim. However, the other facts illustrating the planning and execution of the murder along with the physical evidence introduced causes the Defendant's version not to be credible. As such, the

-7-

Court does not accord any weight to this mitigating factor.

3.)    *Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.*

Again, while the Defendant did not specifically argue this mitigating factor, the Court, upon reviewing the video tape, noticed that the Defendant claimed that the victim made derogatory statements about the Defendant's race which angered the Defendant. However, the this comment is likewise not convincing for the same reasons noted previously. This mitigating factors has no weight.

4.)    *Any other factors that are relevant to the issue of whether the offender should be sentenced to death.*

Under R.C. 2929.04 (B)(7), commonly referred to as the "catch all provision" the Court reviewed the Defendant's capacity to appreciate the criminality of his conduct in light of the defense expert testimony regarding his mental history and mental state at the time of the offense was considered as a possible factor under R.C. 2929.04(B)(3).

This testimony revealed that the Defendant suffered from Attention Deficit Disorder/Hyperactivity Disorder, Chemical Dependency, and a reported history of alcohol abuse. Further, the evidence disclosed that the Defendant had an Antisocial Personality Disorder and was considered low average or better in intelligence.

Significantly, however, there was no evidence presented that the Defendant, at the time of the offense, had any mental disease or defect or that he lacked the capacity to appreciate the criminality of his conduct. His Antisocial Personality Disorder only showed that he had a history of inappropriate and impulsive behavior from his early childhood to the present. He was

-8-

incarcerated four (4) times.  According to the Defendant's own expert, the Defendant, throughout his juvenile and adult life had received repeated treatment and/or probation for his criminal transgressions and his drug and alcohol abuse.  He did not learn from his past mistakes, but only escalated his antisocial conduct.

In summary, this Court gives very little weight in mitigation to the Defendant's mental status, and his drug and alcohol abuse history especially in light of the Defendant's elaborate scheme to kill the victim, elude capture, and finally deceive police officers with a statement blaming the victim.

Further under 2929.04(B)(7), the Court examined the Defendant's ability to maintain himself in a stable fashion in a structured setting.  Indeed, it was suggested by the Defense that he could be a productive member of the general prison population, and that this should be considered as mitigating.  However, the Court gives slight weight to this particular factor.

The Defendant's last incarceration was the result of him not learning from his past mistakes, and from his tendency to act out impulsively without looking at the consequences.  Furthermore, he repeatedly was placed on probation, but he continued to digress, committing more serious criminal acts.  Indeed, during the last incarceration, the Defendant claimed to have "found God" and that he was going to straighten out his life.  At the same time, it is abundantly clear that he was plotting to commit the ultimate criminal act, a premeditated burglary and murder, while pre-textually presenting himself to prison officials as a good candidate for a release program.  Quite simply, in the very setting in which the Defense suggests that he could be a productive member, the Defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder Robert S. Fingerhut so that in effect he could assume Fingerhut's lifestyle,

-9-

including running the Greyhound bus business, managing rental properties, and living in his home with his ex-wife.

The Defendant also offered an unsworn statement, wherein he stated that he was "very sorry for what happened." The Court likewise gives this statement slight weight as the statement lacked sincerity. The tone and tenor of the apology did not, in the Court's opinion, come from someone who was genuinely remorseful. Even assuming that the Defendant was remorseful, such retrospective remorse is not entitled to any significant weight. To the contrary, the Court believes that the Defendant's feigned remorse stems from the fact that the Defendant was apprehended. The Defendant was disappointed that the fool-proof, premeditated murder plot , which he developed over nearly three (3) months, and which included shooting the victim "in the 'F' ing head," failed.

When independently weighing the aggravating circumstances as to the Aggravated Murder as previously outlined against the collective factors in mitigation, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to any defendant who commits an Aggravated Murder during the commission of these certain felonies. In the case at bar, the underlying felonies are Aggravated Burglary and Aggravated Robbery.

In this particular case, the Court accords substantial weight to the Aggravated Burglary specification. In order to prove an Aggravated Burglary, the State is required to demonstrate that the Defendant trespassed in the occupied structure for the purpose of committing a criminal

-10-

act. In most instances, this criminal act is a theft offense. Occasionally, a Defendant will trespass to commit a kidnapping or even a rape. Such criminal acts provide the basis upon which a Defendant can be convicted of Aggravated Burglary. Then, if during any of these underlying criminal acts, the victim is purposely killed, an Aggravated Murder with the specification of Aggravated Burglary has been committed. These alone can permit the imposition of the death penalty should the aggravating circumstance of the Aggravated Burglary be found to outweigh the mitigating factors.

Under the facts in the instant case, this Court can not foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater. The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to rather to carry out the premeditated, cold blooded execution Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

The Court further gives weight to the Aggravated Robbery specification. After shooting the Defendant in the head, the Defendant took personal property of the victim to effectuate his escape. Indeed, the Defendant stole the victim's keys and his car.

Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct. From the

-11-

overwhelming evidence, it is this Court's opinion that the Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,00.00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him.

Upon consideration of the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the defendant, and the arguments of counsel, it is the judgment of this Court that the aggravating circumstances, outweighed, by proof beyond a reasonable doubt, the collective mitigating factors.

Dated: 12/9/02

HON. JOHN M. STUARD
Judge, Court of Common Pleas

I hereby certify that a copy of the foregoing opinion was hand delivered to Attorney James Lewis, Attorney Anthony Consoldane, and Prosecutor Dennis Watkins this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court, Supreme Court of Ohio, State Office Tower, 30 E. Broad Street, Columbus, Ohio 43266-0419, this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

-12-



# Ohio Department of Rehabilitation and Correction

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O Box 45699
Lucasville, Ohio 45699-0001

Bob Taft, Governor

www.drc.state.oh.us

Reginald A. Wilkinson, Director

April 19, 2002

Dear

I am in receipt of your request for information regarding the Scott and Byrd executions. I would like to apologize for the delay in responding to your inquiry. While reviewing files, I discovered your request, which I thought I had previously delegated to be completed. This was my error.

I have enclosed a copy of DRC Policy 001-09, Executions, and I will provide you with information the Department has deemed to be public information. The Department considers the record and names/roles of persons participating in the execution confidential based on security considerations, as well as the need to protect the safety of the persons involved in the process.

The gurney/bed and the restraints are manufactured by O.P.I., Ohio Penal Industries.

The intravenous equipment was purchased from a commercial source and consisted of:

        01). Angiocath Abbocath-T
        02). Primary IV Set No. 1820 (70 inch)
        03). 0.9% Sodium Chloride, 1000 ml

The generic names of the pharmaceuticals used are:

        01). Pancuronium Bromide
        02). Potassium Chloride
        03). Thiopental Sodium

There is no cardiac monitoring equipment used other than a stethoscope.

Once again, I apologize for the delay in responding. If you have further questions, please contact me.

Sincerely,

SOUTHERN OHIO CORRECTIONAL FACILITY

James S. Haviland
Warden

TSP/hn

EXHIBIT

28



# Ohio Department of Rehabilitation and Correction

Bob Taft, Governor

www.drc.state.oh.us

1050 Freeway Drive North
Columbus, Ohio 43229

Reginald A. Wilkinson, Director

May 30, 2002

Re: Your Letter to Warden Haviland dated April 28, 2002

Dear

I am responding on behalf of Warden Haviland to the above referenced letter. There you request certain information regarding the State's execution procedure pursuant to Section 149.43 of the Ohio Revised Code. Please be aware that Ohio Public Record Law requires public offices to make records available as they are kept in the normal course of business. It does not obligate them to perform research or create new files. Your letter does not request records. Rather it requests information about training, procedures, and procurement. As such, we believe it falls outside the scope of the statute. Nonetheless, the Department recognizes the public has legitimate interests in this subject, and we are providing the following information.

The execution team begins rehearsing the procedure thirty days from the execution date. On the day of the execution, saline locks are placed in each of the prisoner's arms prior to entering the death chamber. After the prisoner has been placed on the execution bed, tubing for the delivery of the chemicals is attached to each lock. The chemicals are administered via hand infusion. Persons performing these functions have been certified as either a licensed practical nurse, paramedic or phlebotomy technician. The chemicals are infused into one arm. If the arm becomes unavailable, the other arm would be used. A Medical Doctor has pronounced death.

The drugs are administered in the following dosages: two grams of thiopental sodium in normal saline concentration; one hundred milligrams of pancuronium bromide in normal saline concentration; and 100 milliequivalents of potassium chloride in normal saline concentration. The thiopental sodium and pancuronium bromide are purchased from a local pharmacy. The institution pharmacy purchases the drugs. It turns the drugs over to the Warden and keeps a record of receipt and usage. Purchase and record keeping procedures have been coordinated with the Drug Enforcement Agency and the Ohio State Board of Pharmacy.



EXHIBIT
83

I trust this information will be helpful.

Very Truly Yours,

Vincent Lagana
Staff Counsel

Copies: Assistant Director
        Warden, SOCF
        Chief Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

LEWIS WILLIAMS, JR., and
JOHN G. ROE,

       Plaintiffs,

v.

ROBERT TAFT,
REGINALD WILKINSON, and
JAMES HAVILAND,

       Defendants.

### AFFIDAVIT OF MARK J. S. HEATH, M.D., BOARD CERTIFIED ANESTHESIOLOGIST

I, Mark J. S. Heath, after being duly sworn and cautioned, hereby affirm as follows:

1.     My name is Mark J. S. Heath, M.D., I am an Assistant Professor of Clinical Anesthesiology in the Department of Anesthesiology at Columbia University in New York City, N.Y. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice Medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology, teaching residents, fellows and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar and proficient with the use and pharmacology of the chemicals used to perform lethal injection.

2.     Over the past several years, as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed several hundred hours of research into the techniques that are used during this procedure. I have been admitted as an expert medical witness in courts in Georgia, Tennessee, Pennsylvania, and Louisiana. I have filed affidavits that have been reviewed by courts in the above states and also Virginia, New York, Alabama, and by the United States Supreme Court. During court proceedings I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. My research regarding lethal injection has involved both extensive conversations with recognized experts in the field and personal correspondence with the individuals responsible for introducing lethal injection as a method of execution in Oklahoma and the United States.


EXHIBIT
82

3.     My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit A and incorporated by reference as if fully rewritten herein.

4.     I have reviewed the following information regarding Ohio's lethal injection procedures:  a letter written by Warden James S. Haviland and dated April 19, 2002, and a letter written by attorney Vincent Lagana, staff counsel for the Ohio Department of Rehabilitation and Correction, and dated May 30, 2002.  *See* Exhibit B (Warden Haviland's letter) and Exhibit C (attorney Lagana's letter).  This information was provided by attorney Gregory W. Meyers.  He informed me that a colleague of his tried to obtain additional details from a representative of Ohio's prison system, but that those attempts proved unsuccessful.

5.     The information contained in these two letters raises the following concerns about the Ohio lethal injection procedure.  These concerns arise both from the details disclosed in the letters and from medically relevant, logical inferences drawn from the omission of details in the letters (*e.g.*, details regarding the training of the personnel involved; details of all of the medical equipment used; and details of the precise methods by which the personnel involved use the equipment to carry out an execution by lethal injection).

6.     The letters by Warden Haviland and attorney Lagana state that as part of its protocol for lethal injection Ohio uses the drugs sodium thiopental (also know as "thiopental sodium" and "pentothal"), pancuronium bromide (also know as "pancuronium" and "Pavulon"), and potassium chloride (also known as "KCl")

7.     The information that is provided does not indicate the sequence in which the three drugs are administered during the course of an execution.  While no sequence of the above three drugs is acceptable (because of the use of pancuronium), if thiopental is administered as the second or third drug the execution is virtually certain to constitute torture.  Even if I assume that thiopental is the first drug administered, significant concerns remain based on the matters discussed below.

8.     A major concern about the protocol relates to the use of the drug pancuronium bromide.  Pancuronium paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation.  If the thiopental and potassium are to be given in doses sufficient to cause death, then it is my opinion held to a reasonable degree of medical certainty that there would be no rational or medically justifiable place in the protocol for pancuronium.

9.     If thiopental is not properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then it is my opinion held to a reasonable degree of medical certainty that the use of pancuronium places the condemned inmate at risk for consciously experiencing paralysis, suffocation, and the excruciating pain of the intravenous injection of high dose potassium chloride.

10.     Based on the information available to me, it is my opinion held to a reasonable degree of medical certainty that Ohio's lethal injection protocol creates an unacceptable risk that the inmate will not be anesthetized to the point of being unconscious and unaware of pain for the duration of the execution procedure. If the inmate is not first successfully anesthetized, then it is my opinion to a reasonable degree of medical certainty that the pancuronium will paralyze all voluntary muscles and mask external, physical indications of the excruciating pain being experienced by the inmate during the process of suffocating (caused by the pancuronium) and having a cardiac arrest (caused by the potassium chloride).

11.     If administered alone, a lethal dose of pancuronium would not immediately cause a condemned inmate to lose consciousness. It would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium. Rather, the loss of consciousness would be due to suffocation, and would be preceded by the torment and agony caused by suffocation.

12.     If taken alone, a lethal dose of potassium chloride would not immediately cause a condemned inmate to lose consciousness. It would first cause excruciating pain as it traveled through the venous system to the heart, and, once it reached the heart, it would cause a painful cardiac arrest that would deprive the brain of oxygen and rather quickly (but not immediately) cause death. If pancuronium were administered prior to the potassium chloride any visible signs of pain or agony caused by the potassium would be completely masked and undetectable to onlookers or witnesses.

13.     It is my understanding that Ohio's execution protocol requires the presence of media witnesses to the execution, and permits the presence of witness chosen by the inmate and chosen by the victim's surviving family members. It is my opinion based on a reasonable degree of medical certainty that the use of pancuronium effectively nullifies the ability of witnesses to discern whether or not the condemned prisoner is experiencing a peaceful or agonizing death. Regardless of the experience of the condemned prisoner, whether he or she is deeply unconscious or experiencing the excruciation of suffocation, paralysis, and potassium injection, he or she will appear to witnesses to be serene and peaceful due to relaxed, totally immobile facial and other skeletal muscles.

14.     Based on my research into issues related to lethal execution, I know that there was a time when pancuronium was an acceptable drug for use by veterinarians in the euthanasia of household pets such as dogs and cats; but that the use of pancuronium is now prohibited by many veterinary guidelines in this and other countries for precisely the reasons outlined above. Veterinary standards forbid creating the risk that household pets would die while pancuronium masks the type of excruciating pain

human beings are exposed to in Ohio's execution protocol.  The use of pancuronium fails to comport with the evolving "standard of decency" regarding the ending of life in household pets.  In my medical opinion, based on a reasonable degree of medical certainty, the use of pancuronium in the lethal injection protocol for executing human beings violates standards of decency designed to prevent the infliction of excruciating pain and suffering on human beings.

15.     Another major concern I have based on what I know about Ohio's lethal injection protocol relates to the use of sodium thiopental.  Sodium thiopental is an ultrashort-acting barbiturate with a very short shelf life in liquid form.  Thiopental is distributed in powder form to increase its shelf life; it must be mixed into a liquid solution by trained personal before it can be injected.

16.     When anesthesiologists use sodium thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical plane" of anesthesia (*i.e.*, a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure).  The medical utility of thiopental derives from its ultrashort-acting properties:  if unanticipated obstacles hinder or prevent successful intubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

17.     The benefits of thiopental in the operating room engender serious risks in the execution chamber.  Based on the information I have available to me concerning Ohio's execution protocol, a two (2) gram dose of sodium thiopental is apparently administered in a single injection from a single syringe.  By contrast, based on my research and the research of others into the procedures for executing human beings by means of lethal injection, the original design of the lethal injection protocol called for the **continuous** intravenous administration of an ultrashort-acting barbiturate.  Based on my research and the research of others, the central elements of the lethal-injection procedure used in Ohio is similar to the one adopted many years ago in Oklahoma (which, it appears, many states used as a model without substantive independent research).  Oklahoma requires the "continuous intravenous administration of an ultrashort-acting barbiturate" (Oklahoma Statutes, Title 22 Criminal Procedure, Chapter 17 part 1014 A).  It does not appear that Ohio's protocol includes this "continuous" requirement. The use of a continuous administration of the ultrashort-acting barbiturate is essential to ensure continued and sustained unconsciousness during the administration of pancuronium and potassium chloride.  It is my opinion based on a reasonable degree of medical certainty that the failure to require a continuous infusion of thiopental places the condemned inmate at a needless and significant risk for the conscious experience of paralysis during the excruciating pain of both suffocation and the intravenous injection of potassium chloride.

18.     Based on my research into lethal injection, the dose of pentothal described in the Ohio protocol, 2 grams, is considerably lower than the doses described

in the protocols of many states and the Federal Government. It is my opinion based on a reasonable degree of medical certainty that Ohio's relatively low dose of thiopental amplifies the concern relating to the single injection (as opposed to continuous infusion) of this ultrashort-acting barbiturate, thereby further elevating the risk that the condemned person will suffer excruciating pain masked by the pancuronium.

19.    The information provides no specifications regarding the timing of the administration of the drugs, thereby compounding the risks I am describing in this affidavit. This concern is greatly amplified by the use of an ultrashort-acting barbiturate.

20.    Above and beyond my concerns stated above about the drugs used in Ohio, the details of Ohio's lethal injection protocol that I have been made aware of do not account for procedures designed to ensure the proper preparation of the drugs used. I have not seen details regarding the credentials, certification, experience, or proficiency of the personnel who will be responsible for the mixing of the thiopental from powder form, or for the drawing up of the drugs into the syringes. Preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. It is my opinion based on a reasonable degree of medical certainty, and based on my review of lethal execution procedures in states that have disclosed more detailed information that what I have seen about Ohio's procedures, that there exist many risks associated with drug preparation that, if not properly accounted for, further elevate the risk that an inmate will consciously experience excruciating pain during the lethal injection procedures.

21.    Based on information in attorney Lagana's letter, it is possible that Ohio intends to employ one or more phlebotomists to administer the drugs by "hand infusion". In general, phlebotomists are neither trained nor certified to administer drugs. Rather, phlebotomists are trained primarily to collect blood specimens by venipuncture and capillary puncture. The personnel performing the lethal injection procedure should be trained, experienced, and proficient in the use and administration of intravenous drugs. It is my opinion based on a reasonable degree of medical certainty, and based on what I know about Ohio's lethal injection procedures, that if Ohio inappropriately relies on phlebotomists during the execution procedure, that fact demonstrates that Ohio designed its procedure without proper guidance from persons with requisite training in the areas of medical science implicated by Ohio's lethal injection protocol.

22.    The information available to me provides inadequate detail regarding the training, credentials, certification, experience, or proficiency of any prison employee, nurse or paramedic who performs the execution procedure. The absence of such detail raises critical questions about the degree to which condemned inmates risk suffering excruciating pain during the lethal injection procedure. It is my opinion based on a reasonable degree of medical certainty that the correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and can not be adequately performed by personnel lacking the requisite

training and experience.  The great majority of nurses are not trained in the use of ultrashort-acting barbiturates; indeed, this class of drugs is essentially only used by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few paramedics are trained or experienced in the use of ultrashort-acting barbiturates.  Based on my medical training and experience, and based upon my research of lethal injection procedures and practices, inadequacies in these areas elevate the risk that the lethal injection procedure will cause the condemned to suffer excruciating pain during the execution process.

23.  The information provided includes no exhaustive "equipment list", and is thereby lacking in any assurance that the necessary equipment and supplies are present to ensure that the placement of the intravenous catheter can be performed without needless suffering.

24.  The information I have about Ohio's lethal injection procedure provides no specifications regarding the set-up of the intravenous bag of fluids, the drip chamber, the flow regulator, the intravenous tubing, the stopcocks or injection ports or means of injection.  It is my opinion based on a reasonable degree of medical certainty, and based on my review of lethal execution procedures in states that have disclosed more detailed information than what I have seen about Ohio's procedures, that there exist many risks associated with whether the necessary equipment has been set up and utilized correctly by people properly trained in the use of the equipment necessary to properly administer any intravenous drugs, including those designed to cause death.

25.  The information available to me about Ohio's lethal injection execution protocol contains no reference to plans for dealing with the foreseeable circumstance wherein intravenous access cannot be obtained in the arm or leg.  In this setting, state lethal injection protocols typically specify the use of a "cut-down" procedure to access a vein adequate for the reliable infusion of the lethal drugs.  Based on my medical training and experience, and based on my research into lethal injection procedures and practices, it is my opinion to a reasonable degree of medical certainty that any reliable, humane lethal injection procedure must account for the foreseeable circumstance of a condemned inmate having physical characteristics that prevent intravenous access from being obtained by a needle piercing the skin and entering a superficial vein suitable for the reliable delivery of drugs.  No equipment or supplies for performing a cut-down procedure are listed in the Ohio lethal injection protocol, nor is there information regarding the training, experience, expertise, credentials, certification, or proficiency of the personnel who would perform the "cut down" procedure.

26.  Based on my research into methods of lethal injection used by various states and the federal government, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion based on a reasonable degree of medical certainty that, given the apparent absence of a central role for a properly trained medical or veterinary professional in Ohio's execution procedure, it can and should be presumed that the lethal injection procedure Ohio employees creates

medically unacceptable risks of infliction excruciating pain and suffering on inmates during the lethal injection procedure.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that everything I have said in the above document captioned AFFIDAVIT OF MARK J. S. HEATH, M.D., BOARD CERTIFIED ANESTHESIOLOGIST is true to the best of my knowledge.


_____

Mark J. S. Heath, M.D., AFFIANT


Sworn to and subscribed before me on this ___30th___ day of December, 2003.


LIA PASCALE
Notary Public - State of New York
No. 02PA6095971
Qualified in New York County
My Commission Expires July 21, 2007

<u>Curriculum Vitae</u>

1)     Date of preparation:     October 6, 2003

2)     Name:             Mark J. S. Heath

        Birth date:          March 28, 1960
        Birthplace:         New York, NY
        Citizenship:       United States, United Kingdom

3)     Academic Training:

| | |
|---|---|
| Harvard University | B.A., Biology, 1983 |
| University of North Carolina, Chapel Hill | M.D., 1987 |
| Medical License | New York:  177101-1 |

4)     Traineeship:

1987 – 1988   Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5)     Board Qualification:

        Diplomate, American Board of Anesthesiology, October 1991.

6)     Military Service:         None

7)     Professional Organizations:

        American Society of Anesthesiologists
        International Anesthesia Research Society
        Society of Cardiovascular Anesthesiology

8)     Academic Appointments:

1993 – 2002       Assistant Professor of Anesthesiology, Columbia University, New York, NY

2002 - present      Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)     Hospital/Clinical Appointments:

**EXHIBIT**

tabbies

A

1993 – present     Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY.

10)   Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11)   Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH    KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02,
$431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH    RO1 "Tachykinin regulation of anxiety and stress responses"
Principal Investigator, funding 9/1/2002 – 8/30/2007
$1,287,000 over 5 years

12)   Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3)
(2003 - present)

13)   Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave)*, Mt.Sinai School of Medicine, May 2002

*Anesthetic considerations of LVAD implantation.*  Recurrent lecture at Columbia University LVAD implantation course.

14)     Grant Review Committees:   None

15)    Publications:

**Original peer reviewed articles**
\*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. **Proc. Nat. Acad. Sci**., 98(4), 1912 – 1917.

\*    King, T.E. [δ], **Heath M. J. S**[δ]., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    δ authors contributed equally to this work

\*    **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.

\*    **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S.**, Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S**., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S.**, Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. **Journal of Physiology** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. **Journal of Biological Chemistry** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **Cold Spring Harbor Symposia of Quantitative Biology** 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of  Clinical Investigation** 97(2), 493 - 500.

**Case reports**                          none

**Review, chapters, editorials**

*        **Heath, M. J. S.**, Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*        Dickstein, M.L., Mets B, **Heath M.J.S.** (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

*        **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

*        **Heath, M.J.S.**, Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

*        **Heath, M. J. S.**,  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  IARS American-Japan Congress A-15.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  Anesthesiology 95:A-811.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.**, Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus.  Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.**, Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000).  NK1 receptor gene disruption alters the development of nociception.  Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997).   Delineation of spinal cord glial subpopulations expressing the NK1 receptor.  Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992).  Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties.  Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994).  Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord.  Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons.  Anesthesiology 75; 3A; A1037.