's CRUSHED AN OVER, BECAUSE FOR ONE I DON'T HAVE
KNOW WHERE TO go, I DON'T HAVE NO-ONE BUT yo
I DON'T WANNA TRY TO SURVIVE IN THE STREETS NO
MORE, AN I DON'T WANNA COME BACK TO THIS PLACE
OR NO OTHER JAILS, AN BABY ITS GONNA BE WINTER
TIME, SO I JUST hope I'm WRONG BY THINKING THAT
you ARE GONNA BE AGAINST WHAT I'M GONNA DO, BECAU
IF you DO JUST THINK ABOUT MY life AN WHAT ITS
GONNA BE like FOR ME IF I CAN'T BE ABLE TO
COME home TO you, AN DONNA THIS IS THE only
WAY WE CAN HAVE A life, AN THAT WILL BE MY only
CHANCE AT DOING IT BECAUSE WON'T NOBODY KNOW
THAT I'M home, AN you KNOW IF I DON'T DO
IT THEN AN PEOPLE START seeing us TOGETHER AGAIN
AN IF WE DID PAY SOMEBODY TO DO IT you KNOW
THE BLAME IS STILL coming TO ME BECAUSE THEY SEE
US TOGETHER AN THEN he come UP MISSING, BUT AS
long AS THEY KNOW I'M locked UP WELL THE FINGER
CAN'T BE POINTED AT ME OR you, SO DONNA THIS IS W
GOT TO BE DONE, THE NEXT DAY OR MY life AN EVERY-
THING THAT I ever DREAMED ABOUT THAT WOULD MAKE
THE REST OF OUR life wonderful WOULD BE CEASING,
BECAUSE WE WOULD HAVE TO KEEP SNEAKING AN THEN WE WON'T BE
ABLE TO SHOW OURSELVES TOGETHER like WE WANT, AN EVERY OTHER
wonderful THING THAT WE TALKED ABOUT WOULD BE WHAT A
DREAM DONNA I HAVE TO DO THIS! BABY I LOVE you WITH
ALL OF MY life AN I CAN'T TAKE IT ANYMORE! DONNA

THAT lonely cold world Any longer, knowing THAT I
CAN BE coming home To you, An I hate To risk my
life By Just walking into The station An doing
it An Taking The risk of getting Away, so If you
Really wanna Be with me like you say, An if you Really
want me To have A real life, well Then you would
Just sit Back Do As I say Don't give me know
lecture An let Things get Done An over with, Because
The next lecture That you try To give me I'm Just gonna
change my mind. An Ask you To never Talk To me About
it Again, Because Donna you fail To realize That you're
very weak with True street surviving, An I seen chumps
like him get Bumped off Alot Throught my life An
Aint nothing never happened, so If you Don't want This
Done Just Tell me, An I Don't wanna keep hearing
That shit About what if! fuck what if! I can only
go By what's happening At That Time, Because in street
life what if is BAD luck An I hate That word more
Than I hate The life I'm living, so If I Tell you I'm
gonna Be Alright An I know what I'm Doing, All I
should hear coming from you is BABY Just Be careful
Because Donna This is my last option, Because I won't
have A life if I Don't Do This, BABY I need you! Donna
Do you understand That I'm scared To Be in The streets Again
Donna, BABY I love you An I need you in my life
Desperately... well I'll close for now, BABY Just Think About
how far we've come, An how much love that we still have

Nathaniel Jackson

Prism 2 yrs
P 3-4 days
he's black — couple who are
has termin. to or go
r wife _ person
_ _ _ _ _ _
r b o o r
ced to wife —

fun t o x3 x4 x2 5

C 2940

(Sents)    ↓    Premeditated
                Agg buy/bottes
                r 8yo cau

Youngstown family
j sister

Judge Stuart $

Jim cround

just arraigned
No pretrial t/ Both

DR. MCPHERSON                                    124

co Δ - & girlfriend -
reg't of 30's that she & best had fairly
swinging life style

influence →
(engage
as active)
get me in initiation of this relationship
letters -- any indication wit 1 was probably the killing ?

drugs → Δ using crack day of offense

from morons ? →
diff words)
Tel conversations - quote Δ th again
why not hardlier -

*Sandra B. McPherson, Ph.D.*

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

## AUTHORIZATION TO RELEASE INFORMATION

TO: Rayen High

Youngstown City Schools

RE: Nathaniel Jackson

DOB: 2/13/72

SSN: 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

You are hereby authorized to release to:

Sandra B McPherson, Ph D

or Donald M McPherson, MEd

and/or their agents or representatives any and all records or other documents which concern me and which are in your posession. You are hereby requested and authorized to permit the aforementioned individuals and/or their agents or representatives to examine and copy any and all of my medical, psychological, legal, education, and/or employment records or any other records they may deem necessary in their work on my behalf. You are further authorized to discuss these records and any other matters concerning me with the foregoing individuals and are asked to assist them in the current investigation.

Signed: Nathaniel Jackson                  Date: 8/19/02

Witness: Donald M McPherson              Date: August 19, 2002

135                  Mr. Schulay said OK to

DR. MCPHERSON                                    126

Nathaniel Jackson, psychologist working on Tim Lewis & Consaldy defense team.

called him

helped around house

good qualities

have you attended any of his trial, been following it

can you attend the sentencing trial and make a statement pleading for his life.

Birth normal

Early childhood

Said he had a lot of behavior problems in school.

Did you know anything about Nathaniel relationship with Omma Roberts

First legal problems 1950, about this time he transferred to the transition school

26 H22
30 TH

A good kid, never got in trouble

J.T. Jackson 947-6915 — uncle, brother of Nathaniel's mom

[illegible handwritten notes]

Office    11/19/85  or  11/20/85

(12:30 p.m)

This child exhibited signs of _emotional illness_ —— he was talking to himself, laughing out loud, jumping up and down, having conversation with invisible people, and playing with his imaginary dog "Butch." There was no one else in the office around him at this time — "empty seats."

I, Mrs. L. McElroy, walked into the office to get mail out of my mailbox and observed this student seated in the office. Principal and other students were in the doorway. My presence did not distract or deter his actions, in the least.

Mrs. L. L. McElroy
11/26/85

DR. MCPHERSON                                    128

Dear teacher
Please Excuse Nathaniel Jackson from School Monday
he had to go to the place before the painment
is thursday at 1.30. So he Dont be in school thursday
at all because a Woman and Man shood put him
So I got to take Nathaniel Back down to the place
office. Wach my. set 1:30 thursday
                    Thank You
                    Mrs Pauline Kiernayy

Student Number: 0016-77-20

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

NAME JACKSON, NATHANIEL      DOB 2-13-72      TEST  DATE 1-17-86

ADDRESS 314 Pearl Street      SEX M      REFERRED BY School
            Charles/Pauline
PARENT(S) Korneagay      GRADE 7      SCHOOL Adams Jr. High

HOME PHONE 743-5365      C.A. 13-11      EXAMINER J. Seiser

REASON FOR REFERRAL Disruptive behavior,  Low Achievement

TEST RESULTS

INTELLIGENCE

Wechsler Intelligence Scale for Children - Revised

    Verbal I.Q. 72      Performance I.Q. 72      Full Scale I.Q. 73

Bender-Gestalt Test            1 Errors

ACHIEVEMENT

| | Grade Placement | Standard Score | Discrepancy Score |
|---|---|---|---|
| **Reading** | | | |
| Woodcock-Johnson Letter-word Ident. | 6.4 | 88 | -1.0 |
| Woodcock-Johnson Passage Compre. | 4.6 | 75 | -.13 |
| **Math** | | | |
| Woodcock-Johnson Calculation | 4.3 | 63 | +.67 |
| Woodcock-Johnson Applied Problems (reasoning) | 5.2 | 75 | -.13 |

12-19-85  Vision Screening - Failed - Referred for further testing
            Hearing Screening - Passed

| Scales of Independent Behavior | Age Score | Standard Score |
|---|---|---|
| Math Skills | 12-3 | 92 |
| Social & Communication Skills | 6-5 | 55 |
| Personal Living Skills | 9-3 | 63 |
| Community Living Skills | 9-3 | 63 |
| Broad Independence | 9-0 | 58 |

DR. MCPHERSON                                    130

,THANIEL
. High

BACKGROUND INFORMATION

Nate is the second of four children in his family of 3 boys and 1 girl. Both parents reside in the home. According to his mother, his birth history and early development were normal and there has never been any eating or sleeping problems. His health is generally good and there are no known allergies. According to Mrs. Jackson, Nate gets along all right at home. The only problem she noted is stubbornness.

School records show that Nate made fair progress in primary grades in school. Both behavior problems and poor work habits were cited in early reports. He failed four subjects in sixth grade and repeated that year. In his second year of sixth grade he was absent 48-1/2 days, tardy 15 days. Approximately 40 days of those absences were due to disruptions in class and refusal to obey rules. Stanford Achievement test scores on 5/84 indicated both reading and math scores were in the first stanins. Nate is presently in seventh grade and receives remedial services in both reading and math. Behavior has continued to be a problem with frequent reports of constant disruption and disrespect of authority. He is presently failing all subjects and was referred for a multifactored evaluation.

Observations

Nate was first seen in the assistant principal's office where he was sent after about an hour's search to locate him in school. He is rather small for his age, was somewhat unkempt, and sat slouched in his chair. He was somewhat resistant to coming into the testing session and walked up the stairs at a snail's pace. He spoke very freely with a great deal of prejudice and hostility towards whites and made many tough, verbal threats. At first, he refused to complete some of the testing and called it "baby stuff" he didn't have to do. Eye contact was very poor throughout and he sometimes, roamed about the room in a very casual manner. As the session progressed, he loosened up a bit and worked efficiently at tasks he enjoyed. As he became more cheerful, he spoke freely of celebrating his upcoming birthday and bragged about the drinking and drugs he was to enjoy. He was pleased with himself on a few occasions when he felt he had good success. Eventually all requested tasks, including the "baby ones" he'd originally refused to do, were completed. While those behaviors may have depressed the scores somewhat, the scores are probably in the appropriate ranges.

Test Results

Ability. Nate's scholastic ability, measured on the WISC-R, is in the Borderline (Slow Learner range). Overall, his Verbal and Performance I.Q.'s were similar. Relative strengths for him were his auditory, short term memory, attention to visual details, and ability to do oral arithmetic problems. His vocabulary, ability to formulate verbal concepts, and visual-perceptual organizational skills are below average. Some of those

DR. MCPHERSON                                                                              131

NATHANIEL
High

scores may be depressed by a lack of cultural opportunities or by his
impulsive responses.

Achievement. Nate's reading and math skills are fairly consistent
with his measured ability. He demonstrated ability to decode words
promptly. He made accent errors in more difficult words which it is
suspected he would have correctly identified in context. His reading
comprehension score was weaker and it appeared that he was losing interest.
In the math calculation, he completed complex addition, subtraction with
borrowing, some multiplication and division. He did one double-division
division problem by doing repeated addition. He did not attempt more
difficult division or fraction work. He was successful in solving word
problems involving money. He had no difficulty in restating the word
problem and seemed to know what was expected. A few careless errors
depressed his math problem solving score.

A teacher checklist on his communicative status indicates that Nate's
skills are below average. Further testing may be completed by the speech
clinician.

Visual-Motor. Nate copied the nine Bender designs without error. The
work was fairly well organized on the page. While some of the designs were
weak in angulation, visual-motor maturity is adequate for his age.

Social-Emotional. The Scales of Independent Behavior, a measure of
adaptive skills, was completed by Mrs. Pavlone, one of Nate's teachers.
His gross and fine motor skills are appropriately developed for his age.
Independent functioning is subaverage in the areas of social/emotional,
personal living, and community living. Specific difficulties include
negative peer interaction (hits, fights, name calling, accepts no
criticism), inappropriate use of language (vulgarity), cleanliness in
personal care, lack of personal responsibility for being in proper place at
proper time, and poor work skills (little attention to tasks). Nate also
demonstrates disregard for personal property.

The Hahnemann High School Behavior Rating Scale (HHSB), a classroom
behavior rating scale, reflects many of these problems. Significant
behavior factors on that measure which hamper educational progress include
poor interaction, weak reasoning ability, poor work habits, expressed
inability, and restless, disturbing behavior. Nate is on task occasionally
but not for very long.

In the projectives administered (House-Tree-Person, Incomplete
Sentences), Nate made no bones about the fact that he is aggressive, hates
whites (except for one boy) and intends to hurt them or anyone else who
tries to get "through him". There was no evidence of positive feelings
towards anyone, including his teachers and parents. ("Ain't nothin' to
me"). He projected the idea that he is afraid of nothing, including
consequences of his own misbehavior and he admits he feels no guilt about

ATHANIEL

High

it.  Nate wants to project a tough guy image and works hard at not letting down his guard.  He did admit, but quickly retracted the statement that he is afraid of getting hurt.

He was openly hostile and antagonistic at the beginning of the testing session.  While he did let down a bit, he never did relax in the session. It is possible that he views others as a threat and wants everyone to know he's not to be tampered with.

<u>Summary and Recommendations</u>

Nate's cognitive, academic, and social development scores are all at subaverage levels.  As indicated, his behaviors in the testing may have depressed some of the scores somewhat but the ranges are probably appropriate.  A major concern is the constant, open expression of hostility, both verbal and physical, towards others.  It appears that this is often done without provocation and without a sense of guilt.  Nate expressed deep prejudiced feelings and seems to believe it is right to act in aggressive ways.  Several teachers have documented persistent, aggressive behavior in his classes which interferes with work production.  Nate failed sixth grade classes for two years and is presently failing all classes in seventh grade.  Without some intervention, it is conceivable that he will continue to fail and, also, could cause personal injury to others, including student and teachers.  A team conference should be held as soon as possible, to review all data and determine appropriate interventions.

1.  Nate needs to develop an appropriate set of standards and values to develop a conscience about his actions and to understand the consequences of behavior.

2.  He needs to develop tolerance for those he perceives to be unworthy and to learn acceptable behaviors towards them.  His prejudices seem to permeate his thoughts and behaviors.  Disruptive behaviors must be remediated.

3.  Positive interactive skills with peers and respect for authority need to be learned.

4.  The possibility of substance abuse should be explored.

Jo Seiser
School Psychologist

fb

DR. MCPHERSON                                                133

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

## PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

Name: Nathaniel Jackson

Address: 309 S. Pearl St.

Parent(s): Pauline Korneagay

Home Phone: none listed

DOB: 2-13-72

Sex: M

Grade: 10

C.A.: 17-0

Report Date: 2-23-89

Referred By: S. Gregor

School: Stambaugh

Examiner: J. Ciarrochi

### REASON FOR REFERRAL

Mandatory three-year reevaluation to determine if Nathaniel continues to qualify for special education services.

### SENSORY EVALUATION

Testing by school nurse D. Halloran on 1-18-89, reveals that hearing is within normal limits.  Nathaniel failed visual acuity screening.  He pass the eye muscle balance test.  No vision referral was made because Nathani was in the process of getting glasses at the time of the screening.

### BACKGROUND INFORMATION

Nathaniel said that he lives with his mother, 18-year-old brother Charles 13-year-old sister Tasha, and ten-year-old brother Patrick.  HIs brother Charles will be graduating from the transitional school this year.

Nathaniel was placed in the Severe Behavior Handicapped (SBH) program during his seventh grade year (2-18-86).  Referring behaviors included disrespect toward authority figures, leaving the classroom without permission, disrupting the class, threatening others, and passive-aggressive behavior.

Nathaniel was placed at Stambaugh Transitional with teacher Sara Revetti for the remainder of his seventh grade year. He remained at Stambaugh for grade eight. Because of good behavioral progress, he was placed in a less restrictive setting, the SBH satellite unit at Rayen High School the following year.  During this school year (1988-89), Nathaniel was transferred back to Stambaugh because of threatening, aggressive behavior One day he burned his and another student's worksheets, lay across a tab in the classroom, and refused to go to timeout.  When the teacher

DR. MCPHERSON                                                    134

Confidential Psychological Report - N. Jackson

Page 2

Nathaniel's progress in the SBH program has been inconsistent, which may be due to periodic poor attendance. Current teacher, Suzette Gregory, said that his behavior is average for her class and that his academic progress is above average. Nathaniel is on the fifth grade level in math and on the eighth grade level in spelling and reading. He failed all subjects the second grade period because of poor attendance, but earned A's, B's and C's for the first grade period. Nathaniel is on Level IV of the five-step behavioral management system. His current problem behaviors are frequent talking out, including drug talk; trying to sleep in class instead of working; and resisting direction. In general, Nathaniel gets along adequately with peers and the teacher. However, he often teases others.

While Nathaniel was at Rayen, he had a vocational evaluation. The evaluation report stated that he had a low level of involvement and excessive absenteeism. He did interact adequately with co-workers and was receptive to supervision. Marginal consideration for a program was recommended.

## CLASSROOM OBSERVATION

Nathaniel was observed for 20 minutes in Home Economics class on 2-16-89. Time-sampling at four second intervals and anecdotal observation were used. The three other boys in the class served as the rotating comparison peer. The activity observed was cleanup after cooking.

Nathaniel was on-task for more of the sampled intervals than was the rotating comparison peer (68% compared to 32%). His off-task behavior differed from that of the other boys in frequency, not in type. When Nathaniel was not on-task, he was walking around the room or talking with others.

## TEST BEHAVIOR

During individual assessment, Nathaniel was sullen, but followed directions and put forth adequate to good effort. He was guarded and suspicious when asked to draw a picture of his family.

## TEST RESULTS AND INTERPRETATION

### OVERALL ABILITY

Stanford-Binet Intelligence Scale - Form L-M

| | |
|---|---|
| Chronological Age: | 17-0 |
| Mental Age: | 11-6 |
| Quotient (IQ) | 70 |

DR. MCPHERSON                                                   135

ED 158

# THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
## PUPIL'S ANNUAL SHEET
### PRIMARY SCHOOL

| BORN MO. DAY YEAR | ENTRY DATE | YEAR MONTH AGE at SEPT. 1 | SEX | (LAST NAME) (FIRST NAME) (MIDDLE NAME) |
|---|---|---|---|---|
| 2-19-72 | 9-80 | 8-7 | M. | Jackson, Nathaniel Edwin |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| 313 S. Pearl | Charley Pauline | | 744-8429 |

| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1980-81 | 3 | 100 | Diane Wilson |

Marking code: Subjects printed in large capital letters will receive letter marks using the following code:

E = Excellent   G = Good   S = Satisfactory   U = Unsatisfactory.

A ☑ indicates the need for improvement. The absence of check-marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | S |
| MUSIC | S | S | U | S |
| PHYSICAL EDUCATION | S | S | S | S |
| **Social Growth** | | | | |
| Conduct | U | U | U | S- |
| Accepts responsibility | S- | S | S- | S- |
| Respects authority | U | U | U | S |
| Respects rights & property of others | U | U | U | S |
| Observes school and safety rules | U | U | U | S |
| Is courteous | S-U | U | U | S |
| Works and plays well with others | U | U | U | S |
| **Study Habits** | | | | |
| Listens well in class | U | U | U | U |
| Follows directions | S- | S | U | U |
| Completes assignments | U | U | U | U |
| Works independently | U | U | U | U |
| Participates in class discussions | U | S- | S- | S- |
| **Supplemental Programs:** | | | | |
| Lamps (math) | | | | |

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| READING Level II "Never Give Up" | S | U | U | U |
| * Reading level (Ex. 21, etc.) 3' Reader | S | 3' | 3' | 3' |
| Applies phonics skills | S | S | S- | S- |
| Reads with understanding | S | S | U | U |
| Knows basic sight words | S | S | S- | S- |
| LANGUAGE | S- | S- | U | U |
| Expresses ideas well orally | S- | S | S- | S- |
| Expresses ideas well in written work | S- | S | U | U |
| SPELLING | S- | G | S- | U |
| WRITING | U | U | U | U |
| MATHEMATICS | U | U | S- | S- |
| Knows number facts | U | U | S- | S- |
| Works accurately with numbers | U | U | S- | S- |
| Solves problems with understanding | U | U | S- | S- |
| SOCIAL STUDIES | U | U | U | U |
| SCIENCE - HEALTH | U | U | S | U |
| HEALTH | | S | S | S |

## ATTENDANCE

KEY:
E - ENTERED
W - WITHDRAWN
/ - ABSENT A.M. ONLY
\ - ABSENT P.M. ONLY
X - ABSENT WHOLE DAY
O - TARDY (NO. MINUTES)
= - NOT IN SESSION
EX - EXCLUDED

| REPORT PERIOD BEGINS | M T W T F M T W T F M T W T F M T W T F M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|
| 1 | 4-3  E ... X ... X | 43 | 4 | 0 | 47 | sick; suspended |
| | 11-7  XX ... X | | | | | |
| 2 | 11-10 ... XXXXX ... | 33 | 8 | 1 | 41 | cold |
| | 1-23 ... XXXXX  o | | | | | sick bedcold |
| | | | | | | cold weather cold Babysit |
| 3 | Vob XXXXX ... XX ... | 36 | 12 | 0 | 48 | |
| | 3/9 | | | | | |
| 4 | | 31 | 10½ | 1 | 42 | |

DR. MCPHERSON

1st Period   11/7/80

Nathaniel is doing satisfactory work in reading and enjoys reading. He spells his words correctly in tests, but does not complete his daily work. The same goes in Math & other subjects. He has shown some improvement, but still has difficulty in writing. His understanding of Math is very poor and he is attending Lamps. I'm sure Nathaniel's work would improve if his behavior would improve.     9/80 - Reading Level 11

6/19/81 Completed Units 1 + 2 of Level 12
unsatisfactory

3rd. Period   5/15/81

Nathaniel is improving in Math and Working on his Writing. He still does not complete his work and is not progressing well in Reading. Nathaniel still does get into trouble and has not learned to control his behavior. He can be very nice when he tries.

6/19/81 Nathaniel wastes his time and does not do his work. He could do much better than he is doing. Nathaniel's behavior has shown some improvement, but he needs to improve much more.     D. Wilson

Nathaniel's parents came once after school. His father gave Nathaniel to understand that he is to behave himself & learn.

Passed to Grade 4   Rm. 206
6/19/81

DR. MCPHERSON                                        137

Jackson   Nathaniel

Reading Tex BBB - slow -
Completency in word attacking, word perception
+ word meaning. needs reinforcement in study skills
& needs retraining in Comprehension skill
— main idea, sequence, details + conclusions

Poor behavior — always talking — talks back
Paddled — fools around —

Finally settled down — Doing daily written
-work of Group I — Tries to jump a book — but
it was too hard —

3/20  Completed 2' — Constant in everything
except needs reinforcement in comprehension
& study skills

Does well in SRA

6/10 Completed 2² - reader. Mustard Seed magic
last week of school — too late to be
tested —

Did 1½ yrs reading this year —
Good reader — but fools around
all the time. Must be kept after to
do his work

Promoted to 3' room —  Room 00

DR. MCPHERSON                                    138

# MAHONING COUNTY COURT OF COMMON PLEAS

## JUVENILE COURT DIVISION

### James M. McNally
*Judge*

September 19, 1989

Stambaugh Transitional School
2420 Donald Avenue
Youngstown, OH  44509

RE: Nathaniel Jackson
DOB: 2/13/72

*sent 9-26-89*

Dear   To Whom It May Concern:

Enclosed is a release of information form regarding the above
captioned youth.  I would appreciate a copy of   his  grades for
the   past     school year and attendance record.  Please include any
disciplinary reports you may have available.

This information is to be reviewed by  Mark Melnek, Probation Officer
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
prior to a dispositional hearing on

I appreciate your time and cooperation on this matter.

Sincerely,

*Mark Melnek/mmy*

Probation Officer

Youngstown, Ohio 445

DR. MCPHERSON                                                139

v

when asked (to on both occasions.
A short while later after constantly
talking out and an endless string
of negative comments Mrs. Siemlicki
tried to remove Nate from his
seat to bring him to "time out." He
became very hostile and verbally abusive.
Mrs. Siemlicka managed to get him out
of his seat at which time he swung
his arm out and thrust his
pointing finger very close to her
face saying "You better never
touch me again or it will be the
last MF'ing thing you ever do!"
At 9:12 a.m. Nate left the school building
when Mr. Bruno was summoned
to remove him from the classroom

# BUS CONDUCT REPORT

| STUDENT'S NAME | | DRIVER'S NAME | |
|---|---|---|---|
| Nate  Jackson | | Gary L. Gurley | 10-31-88 |

| BUS NO. | TRIP NO. | | |
|---|---|---|---|
| S-29 | 126 | | |

STMB'

## NOTICE TO PARENTS

1. The purpose of this report is to inform you of a disciplinary incident involving the student on the school bus.
2. You are urged to both appreciate the action taken by the driver and to cooperate with the corrective action initiated today.

## DRIVER'S REPORT:

☐ VIOLATION OF SAFETY PROCEDURES    ☒ EXCESSIVE MISCHIEF    ☐ EATING · DRINKING · LITTERING
☐ DESTRUCTION OF PROPERTY    ☐ WRITING    ☒ RUDE · DISCOURTEOUS · ANNOYING
☒ FIGHTING · PUSHING · TRIPPING    ☐ SMOKING    ☒ UNACCEPTABLE LANGUAGE

## PRELIMINARY ACTION:                    PRESENT ACTION AND RECOMMENDATIONS:

☐ CHECKED STUDENT'S FOLDER    ☐ STUDENT REGRETS INCIDENT, COOPERATIVE    ☐ STUDENT PLACED ON PROBATION
☐ HELD CONFERENCE WITH STUDENT    ☐ RECURRING INCIDENTS WILL BE REPORTED    ☐ STUDENT SUSPENDED
☐ CONSULTED COUNSELOR    ☐ STUDENT DENIED BUS PRIVILEGE    ☒ CASE REFERRED TO
☐ SENT PREVIOUS REPORT HOME    ☐ UNTIL
☐ TELEPHONED PARENT

_____          _____
DRIVER'S SIGNATURE                      ADMINISTRATOR'S SIGNATURE

PARENT'S COPY · WHITE    OFFICE COPY · YELLOW    TRANSPORTATION COPY · PINK    DRIVER'S COPY · GOLD

# THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
## PUPIL'S ANNUAL SHEET
### PRIMARY SCHOOL

| 2-13-72 | 9-5-78 | 6-7 | M | Jackson, Nathaniel Edw |
|---|---|---|---|---|
| BORN  MO.  DAY  YEAR | ENTRY DATE | YEAR MONTH AGE at SEPT. 1. | SEX | (LAST NAME)  (FIRST NAME)  (MIDDLE NAME) |

| 309 S. Pearl | Charles Brush | | 744-842 |
|---|---|---|---|
| ADDRESS | PARENT | OCCUPATION | TELEPHONE |

| Roosevelt | 1978-79 | 1 | 101 | A. Stanley |
|---|---|---|---|---|
| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |

**Marking code:** Subjects printed in large capital letters will receive letter marks using the following code:

E = Excellent    G = Good    S = Satisfactory    U = Unsatisfactory.

A ☑ indicates the need for improvement. The absence of check-marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | |
| MUSIC | S | S | S | |
| PHYSICAL EDUCATION | S | S | S | |
| **Social Growth** | | | | |
| Conduct | U | U | S | U |
| Accepts responsibility | ✓ | ✓ | | N |
| Respects authority | | | | |
| Respects rights & property of others | ✓ | ✓ | | |
| Observes school and safety rules | ✓ | ✓ | | |
| Is courteous | | | | |
| Works and plays well with others | ✓ | ✓ | | |
| **Study Habits** | | | | |
| Listens well in class | ✓ | ✓ | | |
| Follows directions | ✓ | ✓ | | |
| Completes assignments | | | | |
| Works independently | ✓ | ✓ | | |
| Participates in class discussions | | | | |
| **Supplemental Programs:** | | | | |

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| READING | S | S | G | G |
| *Reading level (Ex. 21, etc.) | R | P₁ | P | 1 |
| Applies phonics skills | | | | |
| Reads with understanding | | | | |
| Knows basic sight words | S | S | S | |
| LANGUAGE | S | S | S | S |
| Expresses ideas well orally | | | | |
| Expresses ideas well in written work | | | | |
| SPELLING | | S | S | S |
| WRITING | U | S | S | S |
| MATHEMATICS | S | S | S | S |
| Knows number facts | | | | |
| Works accurately with numbers | | | | |
| Solves problems with understanding | | | | |
| SOCIAL STUDIES | S | S | S | S |
| SCIENCE - HEALTH | S | S | S | S |

## ATTENDANCE

| KEY: | E - ENTERED      / - ABSENT A.M. ONLY | X - ABSENT WHOLE DAY | = - NOT IN SESSION |
|---|---|---|---|
| | W - WITHDRAWN   \ - ABSENT P.M. ONLY | O - TARDY (NO. MINUTES) | EX - EXCLUDED |

| REPORT PERIOD BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1  9/5 | E  X X X | | | | | 4½ | 0 | 45 | | cold |
| 2  11/10 | | | | | | 2½ | 0 | 46 | | no excuse |
| 3  1/29 | X | X | | | | 2 | 0 | 44 | | no excuse |
| 4  4/ | | | | | | 1 | 0 | 43 | | no excuse |

Period I ... and his work. He
Nathaniel needs to learn, if be tried but he wants to fool around
could be a very good student and tells with friends. He gets out of his seat without permission.
He must practice his writing. as.

Period II Jan. 26
Nathaniel always completes his work but depends on
others for help. He is beginning to have trouble with math.
He doesn't know the addition and subtraction facts. If he con-
tinues his poor behavior his work will get worse. He
bothers everyone around him. as.

Period III Mar. 30, 1979
Nathaniel has been trying to turn things
around. His work is better and his behavior is
improving. He should have tried sooner. He
could have been the best student in the class. He
is a really good reader. Keep after him. as.

Period IV June, 1979
Nathaniel is back tracking again. Although I
have tutored him in reading to help him move up
to where I felt he belonged, He didn't appreciate
it. Instead he misbehaved and gave himself
and classmates a bad time. Should be more
grown up and able to work better next year.

To next year's teacher
Completed level 9 MacMillan Readers
Completed Math Book I

Potential behavior problem. Must be
kept busy. He is a good worker so don't
let him fool you. Usually completes all
work begun but would goof-off if given

DR. MCPHERSON                                    144



The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

Request for Child Study or
Multifactored Evaluation

I.  NAME _Jackson, Nathaniel_  SEX (M) F  DATE OF BIRTH _2-13-72_  AGE _13_
    ADDRESS _313 S. Pearl St_  PHONE _7448429_ FATHER _Chas. Korneakay_ MOTHER _Pauline K._
    SCHOOL _Adams Jr. High_  GRADE _7_  TEACHER _____  REQUEST DATE _9/13/85_
    _746 6905_

II.  RECENT TEST RESULTS:

| Date | Individual Test | C.A. | M.A. | I.Q. | Evaluator |
|------|-----------------|------|------|------|-----------|

| Date | Group Test | C.A. | M.A. | I.Q. | STN 1 2.4 Read. G.E | STN 1 3.8 Arith. G.P. |
|------|-----------|------|------|------|---------|---------|
| 5/84 | SAT | | | | | |

III.  REASONS FOR REFERRAL  (Check appropriate space or spaces)

A.  Behavior
   ✓ Aggressive
   ✓ Anti-social
     (lying, chronic
     truancy, etc.)
   ✓ Emotional
     (daydreaming,
     withdrawn)
   ✓ Immature

B.  Learning
   ✓ Academic Failure
   ✓ Attitude
   ✓ Establish Mental
     Limits
   ___ Language/Speech
   ___ Motivation/Interest
   ___ Over-achieving
   ___ Rapid Learner
   ✓ Under-achieving

C.  Placement
   ___ Blind-Partially
       Sighted
   ___ Crippled
   ___ Deaf-Hard of
       Hearing
   ___ Exclusion
   ___ Home Instruction
   ___ New Pupil
   ___ Retention in Grade
   ___ Severely Retarded
   ___ Slow Learner
   ___ Work Permit

D.  ___ Other (Please specify)

IV.  IMPORTANT RELATED DATA
     What strategies have been attempted?  What resulted from those efforts?


     Additional information pertinent to this study:

     Referred by _Mary Ann Pavlone_

     Approved _____

DR. McPHERSON                                                      145

# Youngstown Public Schools

| | |
|---|---|
| Hayes School | 250 Benita Ave |
| (School) | (Address) |
| N. Traficant | F. Zetts |
| Principal | Assistant Principal |
| Charles/Pauline | February 12, 1988 |
| (Parent/Guardian) | (Date) |
| 913 S. McPar1 | Youngstown, Ohio 44506 |
| (Address) | (City) |

This is to advise you that following a hearing, __Nathaniel Jackson__ __6616-77-20__ has been
                                         (Student)        (I.D. No.)

suspended from school for __4__ school days beginning __February 16, 1988__ He/she is
to return to school on __February 22, 1988__ The reason(s) for the suspension is/are
as follows: __disorderly conduct; fighting__
                           (Reason(s)

_____

which violates Rule(s) No. __7__ of the Student Conduct Code

While suspended, __Nathaniel__, is not to be on school premises (grounds) during
normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:
                                                                        a.m
_____ Please accompany _____ to school on _____ at _____ p.m
       for re-admittance and a conference in _____ office.
                                            (Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
       notified of the time and date should a hearing be scheduled.

__X__ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied b
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal
please address a written request for a hearing within five (5) school days from the date of this notification to:

> Office of School and Community Relations
> Youngstown City School District
> P.O. Box 550
> Youngstown, Ohio 44501

cc: Treasurer

DR. MCPHERSON                                                    146

# Youngstown Public Schools

_____      550 Benita Ave
(School)                       (Address)

_____      A. Cassano
Principal                    _Assistant Principal_

_____      January 20, 1988
(Parent/Guardian)              (Date)

313 S. Perri      Youngstown, Ohio  44506
(Address)                    (City)

This is to advise you that following a hearing, ____ Nathaniel Jackson ____ 0016-77-20 ____ has been
(Student)            (I.D. No.)

suspended from school for ___ 3 ___ school days beginning ____ January 20, 1988 ____ He/she is

to return to school on ____ January 27, 1988 ____ The reason(s) for the suspension is/are

as follows: ____ smoking on school grounds ____
(Reason(s))

_____ of the Student Conduct Code

which violates Rule(s) No. ____ 9a ____

While suspended, ____ Nathaniel ____, is not to be on school premises (grounds) during

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below: _____ at _____ a.m
p.m

_____ Please accompany _____ to school on _____ office.

for re-admittance and a conference in _____
(Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
notified of the time and date should a hearing be scheduled.

__X__ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied b
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal
please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

DR. MCPHERSON                              147

The ARNOLD Corporation    906474    Jnc

**STUDENT NAME:** NATHANIEL JACKSON

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR |
|---|---|---|
| 580 | ENGLISH | HEGEL |
| 580 | READING | HEGEL |
| 580 | SOCIAL STUDIES | HEGEL |
| 580 | MATH | HEGEL |
| 560 | SCIENCE | HEGEL |
| 510 | ART | DAVIS |
| 510 | PE | BARRON |
| 510 | MUSIC | CASSELL |

MARKING CODE:
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE:
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

REPORT TO PARENTS

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSE TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PATIENT'S OR GUARDIAN'S SIGNATURE

SE-8

Copies:
CIMS
Parent

PERIODIC/ANNUAL REVIEW

AND

DEVELOPMENT OF INDIVIDUALIZED EDUCATION PROGRAM (IEP)

Name of Student _Nathaniel Jackson_ Birthdate _2-13-72_
School _Hayes Jr High_ Special Program _MH(DH/SBH)_
Date Sent _10-31-86_

Dear Parent(s): _Mrs. Kornegay_

As stated to you at the time of your child's placement in our special program, a periodic review of your child's Individualized Education Program (IEP) would be made at least once a year.

This letter is to inform you that a periodic review of your child's Individualized Education Program is scheduled for:

Date: _Nov. 13, 1986_   Time: _8:00_   Place: _Rm. 120_
Participants will include: _Mrs Kornegay_  _Miss Revett,_
_Mr. Terlesky_ _____

The purpose of this conference is to review your child's current IEP, and, if necessary, to develop a new one.

We hope you will be able to attend the review conference and participate in the discussions. Your participation in the review process will be helpful in planning the most effective program for your child. Your cooperation with the school staff is very much appreciated. If you have questions, or need additional information, contact:

_Miss Sara Revett,_ at _744-7602 744-7603, 744-76_
(name and title) _MH(DH/SBH)_        (phone)
_Teacher_ Sincerely,

_Miss Sara Revett,_
(name and title) _MH(DH/SBH)_
_Teacher_

PLEASE VERIFY YOUR RESPONSE BELOW AND SEND THIS REPLY
BACK TO THE SCHOOL CONTACT PERSON AS SOON AS POSSIBLE - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pupil's Name _____
_____ I can attend the Conference at the time given.
_____ I cannot attend the Conference at the appointed time, but would be able
         to come at the following times: _____

_____ I hereby waive my right to participate in my child's periodic/annual re-
         view and development of my child's new Individualized Education Program.

_____
(signature of parent/guardian)   (date)

9/86

DR. MCPHERSON                                                    150

# PROGRESS REPORT

PLEASE RETURN TO THE ATTENDANCE
OFFICE WHEN COMPLETED.

⑨

A hearing has been set at the ___I.E.P. CONFERENCE___

*SBH*
*Eng I*

for ___NATHANIEL JACKSON___                    Please give a concise

report concerning ___Wed. 11-11-87___ attendance, grades, conduct, and

cooperation.   Return this report by _____ to the attendance office.

|          | 1st. | 2nd. | 3rd. | 4th. | Total |
|----------|------|------|------|------|-------|
| Absence  | 7    |      |      |      |       |
| Tardiness| 0    |      |      |      |       |

|               | 1st. | 2nd. | 3rd. | 4th. |
|---------------|------|------|------|------|
| Grade to Date | D    |      |      |      |

**Conduct** *little & evidently disruptive disrespect, excessive swearing*
*talking out, slows learning, hostile toward staff*

**Cooperation** – *uncooperative, doesn't follow directions*
*Must be removed from class about twice a week*

**Work Habits** – *refused to do assigned tasks. Completes only*
*task he wants to.*

**Other Comments** – *days absent were due to suspension*
*physical + death threats directed toward staff*
*fights with other students*
*disrespect toward staff*
*Resorts to physical violence when doesn't get*
*own way. (Has been physically aggressive*
*and verbally abusive toward staff)*
*Should I enroll in bench at Twin*

DR. MCPHERSON                                        151

 **mahoning county alcoholism services**
4214 market street, youngstown, ohio 44512
(216) 782-1188
another service of the alcoholic clinic of youngstown

December 17, 1986

Mr. Saul
Hayes Jr. High School
1616 Ford
Youngstown, Ohio 44504

Re:  Nathaniel Jackson

<u>Chemical Dependency Assessment Results</u>

Dear Mr. Saul:

This is to inform you of the impressions gained as a result of the session held with Nathaniel and his parents.

The available data indicated Nathaniel to be harmfully involved with chemicals and at high risk for continued problems.

Nathaniel agreed to sign a 6 month no use contract and he and parents are aware if he violates this contract he will need to be reassessed at Mahoning County Alcoholism Services for further recommendations.  It was also recommended that Nathaniel become involved in counseling at Mahoning County Chemcial Dependency Program which the parents agreed to pursue at this time.

If there are further questions please contact me at 782-1188.

Sincerely,

Becky Beck, A.C.
Adolescent Coordinator

BB/ar

be helped and are worth helping.

DR. MCPHERSON                                                    153

JACKSON, Nathaniel

-2-

_____ABILITY PLANNING:

     __ ractors into consideration, such as performance scores, interests, __navioral observations, physical stamina and all other pertinent evaluative data, the following areas of training and employability are suggested for planning:

    1.  <u>Nathaniel has indicated a low level of involvement, excessive absenteeism and no significant strengths in his performance. Marginal consideration should be taken for placement within the Auto Reconditioning Training</u>

Immediate supportive services suggested:      <u>Program only.</u>

| | |
|---|---|
| _____ | Remediation in basic academic skills |
| _____ | Remediation in social skills |
| X | Vocational counseling |
| X | Other ancillary services: <u>Nathaniel has shown a high level of absenteeism. This should be taken into consideration. His reliability and dependability were low.</u> |

II.  RATIONALE FOR SUGGESTIONS:

Nathaniel has indicated difficulties attending. He was often observed in his home environment without making a significant effort to obtain transportation and to arrive at the assessment center. He has shown a low level of motivation and no significant involvement in work tasks.

He has indicated a preference for auto body, small engines, auto mechanics and auto reconditioning. Those were the expressions he has indicated in a questionnaire. A subsequent completion of the Career Maturity Inventory has shown deficiencies in career maturity. His low level of involvement and willingness to participate to reduce his chances for completing numerous assignments successfully.

Nathaniel has indicated a minimal functionality in verbal and numerical skills. He was not able to measure, and he could not quantify environmental conditions readily. He has no knowledge of basic concepts in reference to linear and volume measurements. He has shown a moderate ability to follow instructions, and he could manipulate with larger hand tools and equipment successfully.

His absenteeism prevented him from participating successfully in various work samples. He has completed two work samples successfully under time and quality criteria. His performance would be considered limited in general, because of absenteeism and because of his low level of involvement. He was able to manipulate sufficiently in elemental work tasks with a clear three dimensional structure.

He has shown no significant negative behavioral manifestations. He has indicated a tendency to verbalize excessively and to want to engage other members into conversation. This required specific attention. He was cooperative in general, and he interacted appropriately with coworkers and supervision. Please see additional behavioral comments under EMPLOYABILITY ATTITUDES on page 4.

DR. MCPHERSON

NOTICE OF  (INTENT TO SUSPEND)

Name: _Nathaniel JAckson_____ Date: ___5/29/84____

   This notice is to tell you that you may be suspended from school.

The reason(s) you may be suspended is/are: _Rule I. Disruption of_

_School (Fighting)_____

   To be suspended from school means that while you are suspended you are not permitted to come to school

nor attend any extra curricular activities.

   You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your

side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony DePino, Jr._____
                                                Principal

_____
                                                Assistant Principal

Copy received by student: _Nathaniel Jackson_____
                                                Student's Name

Copy refused by student: _____
                                   Witness                                    Ed 200

While suspended, ___Nathaniel Jackson___, is not to be on school premises (grounds) duri

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:                                          a.
                                                                                          p.

____ Please accompany _____ to school on _____ at _____

      for re-admittance and a conference in _____ office.
                                          (Principal)

____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
      notified of the time and date should a hearing be scheduled.

_X_  It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanie

a representative of your choice and may request that the hearing be held in executive session. If you intend to app

please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc:  Treasurer                                                          Student file

DR.  MCPHERSON                                                          155

NOTICE OF (INTENT TO SUSPEND)

Name: Nathaniel Jackson          Date: 2/1/85

This notice is to tell you that you may be suspended from school.

The reason(s) you may be suspended is/are: Rule 8. Refuse to obey
School Rules. Refuses to follow directions of teacher. Disrespectful

To be suspended from school means that while you are suspended you are not permitted to come to school nor attend any extra curricular activities.

You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony DeNiro Jr._
Principal

_____
Assistant Principal

received by student: X _Nathaniel Jackson_
Student's Name

used by student: _____
Witness                                    Ed 200

While suspended, _Nathaniel Jackson_

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____ a.
                                                                              p.
for re-admittance and a conference in _____ office.
                                              (Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be notified of the time and date should a hearing be scheduled.

   X    It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied a representative of your choice and may request that the hearing be held in executive session. If you intend to appe please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc: Treasurer

DR. MCPHERSON                                              156

Nathaniel hasn't completed his assignments in most areas.

He plays quite a bit with small toys and doesn't follow directions.

He is being retained this year.


Retained in 6th grade
Mrs. Heri - Room 300
A. Palaganis

6Th grade


Stanford Achievement

# THE PUBLIC SCHOOLS  YOUNGSTOWN, OHIO
## PUPIL'S ANNUAL SHEET
### Grades 4, 5, & 6.

ED 159

| 2 - 13 - 72 | 9 - 83 | 11 - 6 | m | Jackson Nathaniel |
|---|---|---|---|---|
| BORN  MO.  DAY  YEAR | ENTRY DATE | YEAR  MONTH  AGE AT SEPT. 1 | SEX | (LAST NAME)  (FIRST NAME)  (MIDDLE NAME) |

| 313 | S. Pearl | Chester Pauline | | 744-8429 |
|---|---|---|---|---|
| ADDRESS | | PARENT | OCCUPATION | TELEPHONE |

| Roosevelt | 1983 - 84 | 6 | 301 | S. Palizzares |
|---|---|---|---|---|
| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |

| | REPORT PERIODS | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |

**1. HEALTH HABITS**
Sit, stand and walk correctly

Be more careful of appearance

Practice safety

**2. WORK HABITS**
Use greater effort

Follow directions

Carelessness

Complete the work

**3. CITIZENSHIP HABITS**
Be Courteous

Respect authority

Respect rights of others

Respect all property

**4. CONDUCT**

### PROGRESS IN ACHIEVEMENT

| SUBJECT | 1 | 2 | 3 | 4 | |
|---|---|---|---|---|---|
| Reading | D⁵ | D⁵ | D⁵ | D⁵ | D |
| English | D | D | C | D | D |
| Spelling | B | B | C | D | C |
| Writing | F | F | F | F | F |
| Social Science | F | D | F | F | F |
| Science | C | D | D | F | D |
| Arithmetic | D | F | F | F | F |
| Health | B | C | C | D | C |
| Art | A | A | A | A | A |
| Music | N | U | U | U | U |
| Physical Education | A | A | A | A | A |

Reading 2.9   Stanine 2
Math 3.1                  1

## ATTENDANCE

KEY: E- ENTERED   ✓- ABSENT A.M. ONLY   X- ABSENT WHOLE DAY   ═ NOT IN SESSION
W- WITHDRAWN   /- ABSENT P.M. ONLY   O- TARDY (NO. MINUTES)   EX- EXCLUDED

| REPORT PERIODS BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | / | | 46½ | ½ | | 47 | |
| 2 | O | O | | | | 44 | 0 | 2 | 44 | |
| ? | | O | / X | X | X | 36½ | 2½ | 1 | 39/43 | |
| 4 | | | | | X | 35 | 9 | 0 | 44 | |

DR. MCPHERSON                              158

PERMANENT RECORD – PERSONAL
(Follow Manual of Procedure)

1. NAME: JACKSON NATHANIEL EDWIN    Sex: F ___ M ✓
   Last        First      Middle

   ADDRESS: 304
   Pencil

   TELEPHONE: 746
   Pencil

   Parents or Guardian  Charles
                        Pauline

   Address _____ (if different from above)

2. KINDERGARTEN AND PRIMARY

| | SCHOOL | ENTRY DATE | GR. | AGE YR. MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|---|---|---|---|---|---|---|---|---|
| ACADEMIC PROGRESS: | Roswell | 8/77 | K | 5 | Thompson | 10 | 1 | 1 |
| ACADEMIC PROGRESS: | Roswell | 9/78 | 1 | 6 | Stanley | 10 | 0 | P2 |
| ACADEMIC PROGRESS: | Roswell | 9/79 | 2 | 7 | Johnson | 9 | 0 | P3 |
| ACADEMIC PROGRESS: | Roswell | 9/80 | 3 | 8 | Wilson | 34½ | 1 | 4 |

3. INTERMEDIATE – 4-5-6    Validation BC

| SCHOOL | | | |
|---|---|---|---|
| DATE OF ENTRY | 9-81 | 9-82 | 9-83 | 9-84 |
| AGE | 9-7 | 10-6 | 11-6 | 12-6 |
| GRADE | 4 | 5 | 6 | 6 |
| TEACHER | | | |
| ABSENT | 14½ | 21 | 10 | |
| TARDY | 2 | 3 | 3 | |
| NEXT YEAR | 5 | 6 | 6 | Retained |
| READING | D | C | | |
| ENGLISH | D | C | | |
| SPELLING | D | D | | |
| WRITING | C | B | | |
| SOCIAL SCIENCE | D | C | | |
| SCIENCE | D | C | | |
| ARITHMETIC | D | B | | |
| ART | C | A | | |
| MUSIC | C | C | | |
| PHYS. ED. | A | C | | |
| Health | B | C | | |

UNGRADED INTERMEDIATE – 4-5-6
Academic Progress:  Grade

4. TRANSFER AND WITHDRAWAL – Elementary

| DATE | GRADE | FROM WHERE | TO WHERE | DATE REC'D | COMMENT |
|---|---|---|---|---|---|
| 6/83 | | | | | |
| 6/85 | 6 | Roosevelt | Adams | | |
| 2/86 | 7 | Adams | Krumroch | 10/21/86 | |

ED 163

**STAMBAUGH**

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 2-CONDUCT 3-ABSENT | | | EXAM | MARK | SEMESTER | | | 1-MARK 2-CONDUCT 3-ABSENT | | | FINAL EXAM | MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | | | 1 | 2 | 3 | 1 | 2 | 3 | | |
| | SBH HEALTH | SUZETTE GREGORY | A | S | 1 | F | S | 17 | C | S | 9 | D | S | 9 | F | D |
| 13 | SBH AD P.E. II | SUZETTE GREGORY | S | S | 1 | F | S | 17 | B | D | S | 9 | C | S | 9 | C | F |
| SF3 | SBH GEN MATH II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | D | S | 9 | C | D | S | D | D |
| SB3 | SBH READING II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | D | S | 9 | D | S | S | A | B |
| SC3 | SBH WORLD HIST | SUZETTE GREGORY | C | S | 1 | F | S | 17 | D | S | 9 | C | D | S | B | F |
| SA3 | SBH ENGLISH II | SUZETTE GREGORY | C | S | 1 | F | S | | C | S | D | S | 9 | F | B |
| ST1 | SBH CONS ED | SUZETTE GREGORY | | | F | S | 17 | C | S | B | D | S | 9 | C | D |
| SK4 | SBH ART HANDWK | SUZETTE GREGORY | | | F | S | | D | S | 9 | D | S | 9 | | |
| SG3 | SBH BIOLOGY | SUZETTE GREGORY | | | F | S | 17 | D | S | | | | | | |

| CURRENT YEAR | | CUMULATIVE | | GRADE POINT AVERAGE |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | |
| 6.25 | | 13.50 | 12.50 | |

| ATTENDANCE | | | | | | | | DATA | |
|---|---|---|---|---|---|---|---|---|---|
| REPORT PERIOD | ABSENT | TARDY | ABSENT | TARDY | ABSENT | TARDY | ABSENT | TARDY | |
| 1-0 | | 17-0 | 2 | 9-5 | | 9-0 | 1 | | |

**MARKING CODE**
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

**CONDUCT CODE**
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

**REPORT TO PARENTS**

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE _____

---

| STUDENT NAME | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | HOME ROOM |
|---|---|---|---|---|---|
| JACKSON NATE | 0016-77-20 | 1989-90 | 11 | STAMBAUGH | 107 |

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 2-CONDUCT 3-ABSENT | | | EXAM | MARK | SEMESTER | | | 1-MARK 2-CONDUCT 3-ABSENT | | | FINAL EXAM | MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | | | 1 | 2 | 3 | 1 | 2 | 3 | | |
| SA4 | ENGLISH III | GREGORY SUZETTE | A | S | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SB4 | READING III | GREGORY SUZETTE | C | S | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SC5 | U.S. HIST | GREGORY SUZETTE | C | S | | C | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SF4 | CON MATH I | GREGORY SUZETTE | C | S | | B | D | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SE4 | ECOLOGY | GREGORY SUZETTE | C | S | | D | S | 5 | F | S | 20 | F | S | 44 | F | F |
| SI4 | AD P.E. III | GREGORY SUZETTE | W | S | | D | S | | F | S | 20 | F | S | 44 | F | F |

| CURRENT YEAR | | CUMULATIVE | | GRADE POINT AVERAGE |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | |
| | | 18.75 | 12.50 | |

| ATTENDANCE | | | | | | | | DATA | |
|---|---|---|---|---|---|---|---|---|---|
| REPORT PERIOD | ABSENT | TARDY | ABSENT | TARDY | ABSENT | TARDY | ABSENT | TARDY | |
| | 5-0 | | 29-0 | | 44-0 | | | | |

**MARKING CODE**
A - EXCELLENT
B - ABOVE AVERAGE
C - AVERAGE
D - BELOW AVERAGE
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WITHDRAWN FAILING

**CONDUCT CODE**
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

**REPORT TO PARENTS**

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS/HER PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH THE TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE _____

DR. MCPHERSON                                             160

Nathaniel has made slow progress in reading and unsatisfactory progress in math. His attention span is short and he likes to play.

Writing - Unsatisfactory

Spelling - Good

Behavior - Needs to improve.

Conferences - None.

Reading - Completed Unit 5 - Level 13

Next Year - Grade 5 - Room 302
June 11, 1982
D. Martin

| | OHIO SURVEY TESTS | | OHIO SURVEY TESTS | | ACADEMIC ABILITY TEST | | | ACHIEVEMENT TESTS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| STUDENT NAME: JACKSON NATHANIE | | GRADE: 4A | RAW SCORE | 19 V E R B | 18 M A T H | 37 T O T A L | 19 R E A D I N G | 17 E N G E X P | 13 M A T H |
| | | ADM. | O H | % ILE | 20 | 26 | 21 | 5 | 14 | 5 |
| | | DATE: 9/31 | I S | STA 9 | 3 | 4 | 3 | 2 | 3 | 2 |

THE PUBLIC SCHOOLS, YOUNGSTOWN, OHIO
PUPIL'S ANNUAL SHEET
Grades 4, 5, & 6.

ED 159

| BORN MO. DAY YEAR | ENTRY DATE | YEAR MONTH AGE AT SEPT. 1 | SEX | (LAST NAME) (FIRST NAME) (MIDDLE NAME) |
|---|---|---|---|---|
| 2 - 13 - 72 | 9 - 81 | 9 - 7 | m | Jackson, Nathaniel Edw. |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| 313 S. Pearl | Charles Pauline | | 744-842 |

| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1981-82 | 4 | 206 | R. Martin |

| | REPORT PERIODS | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| **1. HEALTH HABITS** Sit, stand and walk correctly | | | | |
| Be more careful of appearance | | | | |
| Practice safety | | | | |
| **2. WORK HABITS** Use greater effort | | | | |
| Follow directions | | | | |
| Carelessness | | | | |
| Complete the work | | | | |
| **3. CITIZENSHIP HABITS** Be Courteous | | | | |
| Respect authority | | | | |
| Respect rights of others | | | | |
| Respect all property | | | | |
| **4. CONDUCT** | D | D | C | C |

| PROGRESS IN ACHIEVEMENT SUBJECT | REPORT PERIODS | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| Reading | D | D | C- | C |
| English | C | C | D | C |
| Spelling | B | B | B | B |
| Writing | D | D | D | D |
| Health | C | C | C | C |
| Social Science | C | F | D | D |
| Science | D | C | C | D |
| Arithmetic | D | D | F | D |
| Art | S | S | S | S |
| Music | S | S | S | S |
| Physical Education | S | S | S | S |

**ATTENDANCE**

KEY: E - ENTERED   √ - ABSENT A.M. ONLY   X - ABSENT WHOLE DAY   ＊ - NOT IN SESSION
W - WITHDRAWN   / - ABSENT P.M. ONLY   0 - TARDY (NO. MINUTES)   EX - EXCLUDED

| REPORT PERIODS BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9-9 81 | E | 0 | | | 47 | 0 | 1 | 47 | |
| 2 | 11-16 81 | = = | X | = = | = = | 41 | 3 | 0 | 44 | |
| 3 | 2-1 82 | 0 | = = | | X = | 40½ | 2½ | 0 | 43 | |
| | -12 | X X X X | L M M | X | | 35 | 9 | 0 | 44 | |

**Nate Jackson**

| TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT I |
|---|---|---|---|---|
| 1:50 | Room 219 English class | shouting out — out of seat — banging desk with a comb | Asked him several times to sit down and settle down | He refused 10" in seat |
| 1:50 | same | Walked in with no books. I gave him pencil. Asked to use lav 2:10 | Filled in discipline form as I gave him permission that time | He did... [illegible] REFUSED, he said "all I want is my pencil" |
| 1:50 → | Room 215 | Walked in with no books, putting a radio bottle? and earphone on | Asked him where his book was — I asked him to put it away. I asked him to get his materials? | He said he didn't... [illegible] |
| 1:29 – 86 | | Walked in with no books, putting a radio bottle? and earphone on | Gave him a SIMPLE worksheet assignment. | (illegible) No, he... [illegible] |

NAME: N. Jackson

TEACHER: Killa

BUILDING: _____

EDUCATIONAL PLAC[E]

| TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE |
|---|---|---|---|---|
| :05 | Reading in room 104 O.P.F. | Nathaniel had fallen asleep during our individual silent reading – 10 min. | (1) Called student by name to wake up. 2) Student sitting next to him tapped him on the leg to wake up. (3) I walked over to Nate and shook him by the shoulder. (4) I put my arm around him and sat him straight in his chair. | (1) No response from when his name was called. (2) No response from he kept sleeping. No response from Nate, he kept sle[eping] (4) He woke up and continued his work. |
| 10:30 | Reading in room 104 O.P.F. | Nathaniel earned a 100% on his spelling test. | I gave him a reading award for his good work. Praised him. Gave him praise up | He was very happy and proud. |

Jackson

| SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE | EDUCATIONAL PLACEMENT | ESTIMATED INCIDENT |
|---|---|---|---|---|---|
| | Minimizing my class instruction & steps moved his seat behind my desk & continued while I pleaded not to. | Told him to stop and go back to seat. Took 5 minutes until he walked out. | He finally walked back to seat. Few minutes later walked out. | | 5 min |
| | Walks in, disrupts everything, walks his seat. | Said something | He walked out. | | 2 min |
| | Came in, proceeded to Shake hands with Skeleton kept in class. | Tried to stop to — Sit down. | Replaced — No, Mr. McKelvey asked to remain from class. | | 4 min |
| | How many? 35 | Class this group by — Physics — How much tension / stress on chair — Constant disruption — how much repeated explained exercise. | Told to stop | refused — no it ignored him as it while quiet words so I quiet teach. | | 45 |
| | Chatted on Robert etc. kept just on chair with stillen billiard sign. managed students. did less. | | Low assured him to get away Silence to make with emphasis, sat & did no work. | | 2 min |
| | Chatted a girl. Wandered coming into class. | Protected for prone Baiting him step | | | 45 min |

88-89

YOUNGSTOWN PUBLIC SCHOOLS
DEPARTMENT OF PUPIL PERSONNEL SERVICES

FOR PROFESSIONAL USE ONLY                          NOT FOR RELEASE

SPECIAL EDUCATION VOCATIONAL PLACEMENT MEETING

STUDENT'S NAME: _Nathaniel Jackson_          DATE: _6/16/88_

HOME SCHOOL: _Rayen_

SPECIAL SERVICE PROGRAM: _SBH_

PSYCHO-EDUCATIONAL ASSESSMENTS COMPLETED/RESULTS: _1/17/86 - IQ 73 -_
_Woodcock-Johnson Reading 4.6, Math 4.3._
_Strengths in auditory, short-term memory, visual_
_details, oral math problems._

LEVEL OF READING/MATH: _6/88  Reading 7.8, Spelling 6.9,_
_Math 6.9. Measurement - 140._

VOCATIONAL ASSESSMENT RECOMMENDATIONS: _6/88 - Special Needs Program,_
_Vocational counseling, personal counseling, behavior_
_monitoring._

PREVIOUS MAINSTREAMING EXPERIENCE: _None_

COMMITTEE RECOMMENDATIONS (Priority order): _Auto Reconditioning_
_with reservations (marginal) Math/Reading_
_support as needed. Monitor behavior._

COMMENTS: _Responds to individual attention, praise,_
_conferences, feedback. Needs glasses. Seat_
_near front of room._

PARENTS: _Paulie Kinman_          STUDENT: _Nathaniel Ingram_

CHOFFIN REP: _Ann K. Ellis_          TEACHER: _Carol M Mills_

HOME SCHOOL          PROGRAM
COUNSELOR: _P. Susey_          COORD.: _[illegible]_ Voc Assesst
                                              _Marginal placement for_
                                              _Auto Rec._
SP. ED. VOC.
COORD: _D. Lalondio_

                                              AM
THREE VISITS                    CHOICE
1.                              1. Auto Reconditioning
2.      N/A                     2. Auto Body
3.

Original:   CIMS File
White:      Special/Voc. Education Coordinator
Yellow:     Special Ed. Program Coordinator
Pink:       Vocational Supervisor
Goldenrod:  Special Needs

Form 69

# YOUNGSTOWN PUBLIC SCHOOLS

## DEPARTMENT OF PUPIL PERSONNEL SERVICES

### REQUEST FOR RETURN TO REGULAR CLASS OR TRANSFER OF PROGRAM

Pupil's Name _Nathaniel Jackson_   Student # _016-77-36_ Birthdate _2-13-79_

Address _311 Pool_   Home School _Adams_

Date of Request _10-13-86_   Service to Begin Date _10-17-86_

The following person(s):

_William Esterly_ _____   _SBH Coordinator_ _____
Name                                                    Title

_____   _____
Name                                                    Title

Request(s) that the above named student be changed from the:

_MH_ _____   _St. Ambrough_ _____   _8_ ___
Name of Program                Name of School           Grade

to

_MH_ _____   _Adams_ _____   _8_ ___
Name of Program                Name of School           Grade

| D.H. | V.I. | Orthopedic | H.I. | S.B.H. |
|------|------|-----------|------|--------|
| ☐ Vineland | ☐ Acuity | ☐ Orthopedic Report | ☐ Audiogram | ☑ Medical |
| ☐ I.E.P. | ☐ Medical | ☐ I.E.P. | ☐ Medical | ☑ Anecdotal Records |
|  | ☐ I.E.P. |  | ☐ I.E.P. | ☑ Devereux |
|  |  |  |  | ☑ T.E.P. |

| Other Medical | L.D. | S.C.D. |
|---------------|------|--------|
| ☐ Medical Rpt. | ☐ Devereux | ☐ Medical |
| ☐ I.E.P. | ☐ I.E.P. | ☐ Devereux |
|  |  | ☐ I.E.P. |

Reason(s) for the request: _Student has shown behavior that is_
_appropriate for placement in the MH Unit at Adams_

_____   _Ben McGee_____
Signature of Parent                        Signature of Principal

_____   _Piedmont A. Otis__
Signature of Spec. Ser. Teacher            Signature of Psychologist

_William Esterly_ _____   _____
Signature of Sending Coordinator           Signature of Receiving Coordinator

Request approved _____   Denied _____

Date _10/29/86_ _____   _____
                                             Signature of Director of Pupil Personnel Services

PRINCIPAL: WILL FILE THIS REQUEST IN THE CIMS FOLDER AFTER ALL

DR. MCPHERSON                                         167

Student's Name ___Nathaniel Jackson___  Date of Birth __2-13-72__  School __Stambaugh__

Special Service Program __Multi-Handicapped__  Related Service __Work Study__  School Year 1989-90

**Annual Goals:**

Nate will complete his job training and execution of learned job tasks thru-out his training.

Nate will evidence appropriate school attendance and work attendance.

Nate will exhibit appropriate behaviors related to employability: Time management, good communication and sociability, appropriate attitude with co-workers and customers, cooperation, responsibility, ability to accept constructive criticism.

Nate will maintain appropriate academic attitude and competence and school cooperation thru-out his job training.

Nate will follow ALL THE RULES AND PROCEDURES AT THE WORKPLACE FOR BEHAVIOR, CALLING OFF AND SIGNING IN.

**Short Term Instructional Objectives:**

Nate will exhibit appropriate retention and work evaluations from the employer will be shared with teacher, parent, principal and program coord.

**Evaluation Procedures & Criteria:**

Periodic written/oral work evaluations from the employer will be shared with teacher, parent, principal and program coord.

Date: February 9, 1990

Chair: _____

Coordinator: _____

Student: _____

**CRITERIA & SCHEDULES FOR PERIODIC (ANNUAL) REVIEW:**

a. Are Instructional Objectives being achieved? Yes ☐ No ☐

1. Met as stated: Yes ☐ No ☐
2. Made progress: Yes ☐ No ☐  Data Base _____

b. Is the current placement appropriate? Yes ☐ No ☐

c. Review Schedule: Annual ☐ Semi-Annual ☐ Other (Specify) _____

d. Recommendations for placement and general program for next school year: _____

Conference Chairperson _____

Parent/Guardian _____

Date: Feb. 13, 1990

White—Program Coordinator; Canary—CIMS; Pink—Parent; Goldenrod—CIMS

DR. MCPHERSON

168

Jackson, Nathaniel    0016-77-20    9    9/01/87    Hayes

314 S. Pearl

Youngstown, Ohio  44506

02/13/72

743-5365            9/22/88  Transitional

Charles, Pauline

1987-88 - 9

1988-89 - 10

DR. MCPHERSON         169

while gone. Nate left the room saying
that he was leaving the building (9:15).
When I returned, Nate was still out
of the room. I went for Mr. Cassano—
Nate returned. While I was in the hall
Nate walked out of the classroom again
and Mr. Cassano called him at which
time he went to time out.

J. Seinheiler

Nate came into Class on Monday Sep. 19
and took his seat with his headgear. A word
search activity was on the desk of the students
to earn points. Nate started burning his
paper. Mrs. Howe told him to stop. He
stopped momentarily — then got up to burn
another student's (Lattra) paper. Again he
was asked to stop. He did. In his seat,
Nate was constantly talking out & swearing.
He also laid on the table and refused to
leave to go to time out.

Nate was not permitted to leave between
periods but Nate got out of the room
and went to bother another teacher, Miss
Quinn. When he returned he continued
speaking out and swearing. I asked
Nate to go to time out. He refused. I
went to the back of the room by the
door and asked Nate to come with me.
Nate refused again. I went to Nate
and put my hand on Nate to guide
him to time out. Nate jumped up and
swung his hand to me, missing my face
by approximately 3 inches. I went for help

DR. MCPHERSON                                           171

**FILED**
COURT OF APPEALS

IN THE COURT OF COMMON PLEAS    APR 19 1993

TRUMBULL COUNTY, OHIO    TRUMBULL COUNTY, OHIO
MARGARET R. O'BRIEN, Clerk

State of Ohio,    )
    )    Case No. 91-CR-288
-vs-    )    Court of Appeals #
    )    Judge John M. Stuard
Roderick  Davie,    )
    )    <u>JURY TRIAL TRANSCRIPT</u>
    Defendant    )    <u>VOIR DIRE - VOLUME I</u>
    )


Jury Trial Commencing on Tuesday, February 18, 1992

Before the Honorable John M. Stuard at the Trumbull

County Court of Common Pleas, Courtroom Number 2.


<u>APPEARANCES:</u>

ON BEHALF OF THE STATE OF OHIO:
    Mr. Dennis Watkins, Prosecuting Attorney
    Mr. Thomas Gysegem, Assistant Prosecuting Attorney
    Mr. Patrick McCarthy, Assistant Prosecuting Attorney


ON BEHALF OF THE DEFENDANT, RODERICK DAVIE:
    Mr. James Lewis, Public Defender
    Mr. Paul Choppa, Public Defender

FILED
APR 15 1996
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

OFFICIAL COURT REPORTER:  Lori J. Hiland, RPR

FORM AZ-13 PENGAD/INDY 1-800-631-6989

EXHIBIT
6

in order to maintain the highest degree of integrity in our system.  Shortly, we will proceed with the examination.  That will be done by the Court and the attorneys with you individually.

Now, we do not ask for the impossible, but we do ask for your understanding and cooperation to make the system work.  We are all involved in this system, not just the Judge and the lawyers up here, but you folks.  You are members of our society.  You are residents of Trumbull County, and you are part of the system.  A very essential part.  Now, ladies and gentlemen, I ask each of you to please stand up at this time and raise your right hand so that the bailiff may administer the oath in preparation for the examination of the attorneys.  If there is anyone who has an objection to being sworn in, just remain standing for an oath of affirmation.

(Oath given to all prospective jurors.)

THE COURT:  Thank you very much.

UNIDENTIFIED PROSPECTIVE JUROR:  Excuse me, maybe I'm out of order.  I can't understand -- I can be out of line.  I can't understand why we have the people -- how come he is the only black guy here?

THE COURT:  Let me explain it this way.  The prospective jurors are called from a voters wheel.  A voters wheel is charged with names from a voters list.  Now,

1    that is perfectly or strictly a random selection.  To answer

2    your question, all I can say is that jury selection is accord-

3    ing to statute.  It's by names as drawn.  Sometimes we have

4    different ethnic groups in large abundance.  According to

5    the question of the draw, that is something that these two

6    gentlemen up here are charged with the responsibility of

7    seeing that there has been a fair jury selection.  I think

8    that's about all that I can say on that.

9                    If you're inferring that there is a reason

10   for that --

11                   UNIDENTIFIED PROSPECTIVE JUROR:  Your

12   Honor, I'm not inferring anything.

13                   THE COURT:  That's up to counsel to inquire.

14                   UNIDENTIFIED PROSPECTIVE JUROR:  It's

15   kind of strange that you have 50,000 people in the City

16   of Warren and there's only one black man here.

17                   THE COURT:  Gentlemen, approach the bench,

18   please.

19                   (Conference held at the bench.)

20                   THE COURT:  Ladies and gentlemen, as

21   we go through each of you individually, any questions that

22   you have of whatever nature, you will have an opportunity

23   to ask at that time.  Okay.  Although all of you have been

24   called as prospective jurors, only 12 of you may serve as

25   trial jurors in this case, together with a number of

1  alternates.   Bearing in mind what I have told you, I will
2  now list the questions that the Court will ask each of you
3  generally and individually when you are questioned by your-
4  self.  You need not answer now, but will have an opportunity
5  when you are questioned individually.  I just wish you to
6  know what some of the questions will be.  Do you hold any
7  personal convictions concerning the death penalty which
8  would preclude your returning a verdict creating the possibility
9  of a death penalty if the facts and the law in the case
10  should warrant?  Do you hold any personal convictions which
11  would prevent you from recommending the death penalty as
12  a punishment in this case if the facts and the law in this
13  case should warrant?  Do you know the Defendant or any member
14  of his family or his attorneys?  Do you know counsel for
15  the State or any member of the staff of the prosecuting
16  attorney?  Do you know the victims of the crime charged;
17  John Coleman, Tracey Jefferys, William J. Everett, or any
18  members of their families?  Do you, of your own personal
19  knowledge, know anything about this case?  Have you heard
20  or read anything about this case from any source?  As a
21  result of what you have heard or read, have you formed an
22  opinion with respect to the guilt or innocence of the Defendant'
23  If so, will you be able to set aside any opinion you may
24  now have and decide this case based upon the evidence presented
25  to you in Court and the law and instructions given by the

1  Court?  If you have heard or read anything about this case,
2  will you be able to set aside any such information or know-
3  ledge and make it formally part of your deliberations if
4  called upon to sit in this case?  Would participation in
5  this case as a juror represent a personal hardship of such
6  magnitude that it would interfere with your ability to tent-
7  atively receive the evidence, follow the instructions of
8  law given to you by the Court, and to be fair and impartial
9  on this case, both to the State of Ohio and to the Defendant?
10         Gentlemen, do you have prospective witness lists
11  available in this matter?
12              MR. WATKINS:  Yes, Your Honor.
13              THE COURT:  We're going to ask both the
14  prosecution and the defense to read a list of those witnesses
15  that they anticipate calling at this time.  I would ask
16  you to catalog any of those names with whom you are familiar.
17  That should be brought up when we go through your individual
18  questioning.
19              MR. WATKINS:  Do you want me to read
20  them, Your Honor?
21              THE COURT:  If you would be so kind.
22              MR. WATKINS:  May I approach the bench?
23              THE COURT:  Sure.
24              (Conference held at the bench.)
25              THE COURT:  Ladies and gentlemen, the

1   names that are going to be read by both sides do not necess-
2   arily mean that each and every one of those witnesses will
3   be called or doesn't mean that it is all inclusive.  There
4   may be others that both sides may call.  The reason that
5   I ask that this be done is that's another possibility that
6   someone may not be able to be totally impartial if they
7   should find that a witness appears during the trial that
8   they know extremely well.  Whether they look favorably or
9   unfavorably on that witness.  The purpose is to allow you
10  to have some more knowledge of the persons who may be called
11  in this case.  Mr. Watkins.

12  MR. WATKINS:  Thank you.  Sergeant William
13  Carnahan, Warren Police;  Donna J. Smith, Mineral Ridge,
14  Ohio; Charles Sines, Warren Police Department; Dennis
15  Steinbeck, Warren Police Department; Sharon Allen, BCI,
16  Richfield, Ohio, Bureau of Criminal Identification and
17  Investigation.  That's out of the Attorney General's office.
18  Sonya Barnes, Warren, Ohio; Carl Miller, Warren, Ohio; Sondra
19  Lough, Warren, Ohio; Lori Moore, Canfield, Ohio; William
20  Everett, Warren, Ohio; Gary Vingle, Warren Police Department;
21  Dale Laux, BCI, Richfield; Patricia Rogers, St. Joseph's
22  Hospital, Warren, Ohio; Duane Thomas, Warren, Ohio; Randy
23  Smith, Warren, Ohio; Kenneth Morelli, Warren, Ohio; Joe
24  Wolfe, Warren, Ohio; Dr. Ted Soboslay, Trumbull County Coroner;
25  Mike Albanese, Warren, Ohio, City Police; Tim Downs, City

1  Police of Warren, Ohio; Nancy Bulger; Rodney Cole; Jeffrey

2  Lynn, BCI, Richfield; Dr. Roberto Ruiz; Dr. H. S. Shin,

3  out of Summit County Coroner's office acting in St. Joseph's

4  Hospital; Dick Turbock, BCI, Richfield; Dr. Robert Alcorn,

5  Beechwood, Ohio; Buster Janin, Warren, Ohio.  I believe

6  that's it, Your Honor.

7            THE COURT:  Thank you.  Mr. Lewis.

8            MR. LEWIS:  Ladies and gentlemen, on

9  behalf of the defense, these may be witnesses called in

10  this case:  Roderick Davie; Elaine Davie; William Davie;

11  Dr. James Brown from Cleveland; Dr. John Kenny from Cleveland;

12  Sherman Davie; Andre Davie.

13            THE COURT:  Okay.  Thank you very much.

14       Now, you are all aware that it is your duty as

15  citizens to serve on a jury.  It is also your duty to reveal

16  to the Court any reason whatsoever that you cannot serve

17  to all involved.  You are all undoubtedly qualified to serve

18  as jurors.  You would not be here otherwise.  However, there

19  may be something that would interfere with your ability

20  to serve as a juror in this particular case.  For that reason,

21  and in order to obtain a fair and impartial jury, questions

22  will be asked of each of you until we have selected 12 of

23  your number and five alternates.

24       Now, you have, through the questionnaires which

25  you returned to the Court, already answered inquires concerning

1   your background as to your family, employment and so on.

2   Additional questions will be asked of you. All of these

3   questions will be of an informal nature. I would ask you

4   to please be frank and honest in your answers. There will be

5   nothing asked with any intention to embarrass or to pry

6   into your personal affairs. You, by now, are aware of what

7   we're trying to do and the purpose of it. I would ask you

8   to keep in mind that if there is any question asked that

9   you do not understand, it's proper for you to call that

10  to my attention, and I will see that the question is reframed

11  or restated.

12          Now, it is our hope to schedule the voir dire so

13  that all of you do not have to spend days sitting in the

14  courthouse waiting to be called. You have each been assigned

15  a number. And again, please remember that number, the panel

16  and the number, and we will obtain that when you leave.

17  You have also been given a phone number to call into the

18  courthouse. I would ask you to be sure and write it down.

19  Take it and keep it. That phone number is your link to

20  this Court for further instructions.

21          Okay. At this time, I'm going to ask those who

22  held their hands up and gave numbers to remain in the court-

23  room. We'll have 15 from panel 1 also remain for the rest

24  of the day. Before we get to that, Mr. Prosecutor or Mr.

25  Lewis, on those numbers that have been written down, if

1   we have panel 1, one through 15 of those stay, how many

2   of those are people that have held their hands up?

3                       MR. LEWIS:  We believe just one, Your

4   Honor.

5                       THE COURT:  Just one?

6                       MR. CHOPPA:  There was one I didn't get

7   the last number.  He's on panel 1.  I believe he was in

8   the back there, Your Honor.

9                       THE COURT:  Clear in the back, what is

10  your number?

11                      PROSPECTIVE JUROR 32:  I'm 32, Your Honor.

12                      THE COURT:  Panel 1, 32.

13                      MR. WATKINS:  Yes.  We had No. 7 also

14  for vacation.

15                      THE COURT:  Okay.  I am going to ask

16  on panel 1, one through 20, to remain in the courtroom in

17  addition to those other persons who specifically gave their

18  numbers with problems.  The rest of you I will ask you to

19  phone that number each evening during the week after 4:30,

20  and you will be given instructions.  Please keep in mind

21  that the panel number is as important as your number, you

22  know, whether it's 1 or 2.

23                      Finally, this is important.  You are instructed,

24  each of you, from this time forward until this case is con-

25  cluded to, at no time during this case, to discuss anything

about this case with anyone else, including other potential

jurors.  And you will allow no one to discuss the case with

you.  You also will attempt to read nothing or to listen

to anything or to do any research concerning any facts about

this case.  That applies until I finally discharge you from

any further responsibilities in this matter.  Any questions?

I trust that you have an idea why we're here and what we

are attempting to do.  Ma'am?

PROSPECTIVE JUROR 41:  Who do I talk

to -- do I talk to you about being excused?  I have two

preschoolers, and I don't have anybody to watch them.

THE COURT:  Okay.  I would ask you to

remain.  What is your number, please?

PROSPECTIVE JUROR 41:  Panel 2, 41.

THE COURT:  Yes, sir?

PROSPECTIVE JUROR 55:  Can I talk to

you, too?  Panel 1, 55.

THE COURT:  Yes, surely.  Okay.

PROSPECTIVE JUROR 38:  I also have a

prepaid vacation.  No one saw me with my hand before.

THE COURT:  What is your number?

PROSPECTIVE JUOR 38:  Thirty-eight, panel

1.

THE COURT:  One, 38.  Okay.  Ma'am?

PROSPECTIVE JUROR 67:  I also have a

1    lot of medical --

2                        THE COURT:  Your number, please?  Your

3    number, please?

4                        PROSPECTIVE JUROR 67:  Panel 1, 67.

5                        THE COURT:  Okay.  We thank you all for

6    coming this morning.

7                        MR. WATKINS:  Your Honor, may we approach

8    the bench?

9                        THE COURT:  Yes.

10                       (Conference held at the bench.)

11                       THE COURT:  Okay.  Two last points.  Ladies

12   and gentlemen, panel 1, numbers one through 30, rather than

13   one through 20, anyone from No. 1 through 30 on panel No.

14   1, you are requested to remain seated this morning.  Everyone

15   else -- oh, part of my instruction to you is that you will

16   not avail yourself of any reports in the newspaper, TV,

17   in addition to discussing this matter.  You are to keep

18   your own counsel as you presently are in this courtroom

19   and not absorb any other information about this case until

20   I finally discharge you from that instruction.  We thank

21   you very much.

22                       (Designated prospective jurors excused.)

23                       THE COURT:  Ladies and gentlemen, we're

24   going to handle each of you individually, as we will all

25   prospective jurors.  So, you are all free to take a break.

1     Wait in the hall.  There's a possibility you may be able

2 to sit in the courtroom downstairs, if it's not being used.

3 In any event, I would ask you to leave.  Make yourself avail-

4 able in the courthouse, and you will be called individually.

5 We will get through this process as quickly as possible.

6 There's a coffee machine downstairs, some other machines

7 dispensing candy and what have you.  Nos. 1 through 7, we

8 would ask you to remain in the courtroom until we begin

9 this process.

10         We have taken Juror No. 22, panel 2, Mr. Arnold

11 A. Fall.

12         Mr. Fall, it is quite noticeable that you have

13 a medical problem.  You have an oxygen supply.  Would you

14 be able to serve as a juror on this case, or would you find

15 that very difficult?

16         PROSPECTIVE JUROR 22:  No, this only

17 lasts four to six hours maximum time.

18         MR. WATKINS:  We have no objection.

19         MR. LEWIS:  We have no objection either.

20         THE COURT:  Thank you for coming.

21         (Prospective Juror Fall excused.)

22         THE COURT:  You have appeared in Court

23 with two children.

24         PROSPECTIVE JUROR 41:  I would be working

25 if I could go out.  I don't have a baby sitter.  My parents

1    are old and they can't take care of them.

2                    MR. LEWIS:  You have no one available

3    to watch the children?

4                        PROSPECTIVE JUROR 41:  No one at all.

5                    THE COURT:  Gentlemen, is there an objection?

6                    MR. WATKINS:  No objection.

7                    MR. LEWIS:  No objection, Your Honor.

8                    THE COURT:  You are excused.

9                    (Prospective Juror Brenner excused.)

10                   MR. LEWIS:  Judge, I'd like to, at this

11   time, renew the motion in regard to the motion filed previously

12   in this case in regard to the choosing out of the venire

13   for selection of jurors out of this case.  We previously

14   filed a motion in regard to allowing the driver's licenses

15   to be used, and it was denied.  The jury commissioners have

16   either chose not to do it, or have not implemented the pro-

17   cedure provided by the statute.  Although it's an alternative

18   procedure, it was placed in there for a reason, to get a

19   more adequate cross section of the jury.  Today, we have

20   venire that has appeared to counsel that I think there has

21   probably been at least 20 of the venire, some of which who

22   did not show originally today, as well as possibly maybe

23   10 who were previously excused.  There is not one black

24   person among the entire venire.  We have approximately 130

25   people in the courtroom, and to me, as far as I know, there

1    was not one individual who was a black person in the venire

2    or chosen in this venire.  I don't know the exact person

3    percentage of the population.  The prosecution has indicated

4    six percent.  I'll go along with six percent.  But even

5    if six percent is the population of Trumbull County, it

6    would seem to me that you would get at least five or six

7    out of 100.  In this case, we have 175.  We did not have

8    one black person.  It seems to me that normally, under the

9    circumstances, that if you get an accurate cross section

10   you might have nine, 10 or 11 or somewhere in that area.

11   There was not one black person chosen from the venire.  We

12   are not questioning the actual method in which it was chosen

13   or anything was incorrectly done, but drawing upon only

14   voters does not adequately represent the cross section of

15   the community.  And I think that's the reason, by the statute,

16   for driver's licenses.  I think this is evidence of the

17   fact that it does not draw a cross section of the community.

18   Therefore, I renew my motion.

19             THE COURT:  Okay.  Mr. Watkins.

20             MR. WATKINS:  Your Honor, my response

21   is that the Court has already ruled.  I would add this.

22   When the Court has ruled, its journal entry reflected the

23   Supreme Court of Ohio as to jury selection in this state

24   that to my knowledge, and I think the demographics can be

25   validated through judicial notice of the census, that there

1    is six percent of the population in Trumbull County are

2    black. That any minority in a county of our size with that

3    percentage in the minority, that is a small minority. There

4    is no possible way that every single case that you're going

5    to get black individuals on the jury. And it's a case-

6    by-case thing. Our system is a system where all citizens

7    are to be considered fair and impartial. And the inference

8    is a sad one. That that means that people who happen to

9    be of another race or origin can't sit, and I don't think

10   that's a fair inference. I would also note that there were

11   at least one that I know, because we did some checking,

12   black that was on the original list as selected by the jury

13   commission. His name is Hugley. However, he was -- they

14   were unable to serve him. This is a problem that we have

15   in the jury process in that you don't necessarily have every-

16   body served.

17              THE COURT: Okay. The Court, in handling

18   the previous motion similar to this, has gone through the

19   statutes. The Court participated in the original selection.

20   The Court witnesses the selection from the jury wheel. Argu-

21   ments can be made on practically everything we do throughout

22   every case. It's my reasoning that the statute, as it is

23   in place in Ohio, has been complied with strictly in the

24   choosing of this jury. And, you know, I have no control

25   over what names come up, nor does anyone. That's the whole

purpose for having it the way that it is.  The names that
go into the jury wheel, you have no control over, nor does
anyone, because it is based on the voting list.

MR. WATKINS:  Your Honor, may I make
a further comment?  I would also note, even if we were going
to take the Jim Lewis method, statistically, there would
be cases where even with that method you would not have
blacks because the number of blacks in the community.  I
am talking about the Trumbull County community.  There would
probably be a few more.  I don't even know.  But, the point
is, it would not change the results necessarily.  We still
could have and do have juries that would not have blacks.

THE COURT:  The point is, we are dealing
with a total unknow.  You can speculate.  There is a method
as set forth in the legislature.  We have strenuously tried
to and have followed that method.  Your motion will be over-
ruled.

MR. LEWIS:  I just want to add a further
note, Judge.  That the implementation -- this has been
implemented in a number of counties.  If the legislation
was so absolutely happy in thinking that was just a wonderful
thing, then they would have left it alone.  Evidently, they
derived a reason for promulgating and putting this section
in providing for driver's licenses.  And actually, the Courts
do have control over that, as far as what the jury commissioner

1   system is that they can utilize.  I think the reason and

2   the presence there is that there would be no other reason

3   for it.  It is there, and trying to give representation

4   to more people in the community.  In the event then I assume

5   the Court is overruling the motion, I would object to the

6   venire in its total, and the Defendant's violation of his

7   constitutional rights in the Sixth and Fourteenth Amendments

8   of the Constitution.

9                    THE COURT:  Thank you.

10            For the record, I have something here from Edward

11  J. Urban which says, "Please be advised the above patient

12  is unable to participate in jury duty due to health problems."

13  Signed by Dr. Urban.  Mr. Slusher, would you find it difficult

14  to sit as a juror in this matter due to health problems?

15                    PROSPECTIVE JUROR 7:  Yes, Your Honor.

16                    THE COURT:  Do you gentlemen wish to

17  inquire?

18                    MR. WATKINS:  I have no objection, Your

19  Honor.

20                    MR. LEWIS:  If I could, Mr. Slusher,

21  I don't mean to pry.  Do you have a specific medical problem?

22                    PROSPECTIVE JUROR 7:  Yes.

23                    MR. LEWIS:  Okay.  You also have any

24  trouble hearing?

25                    PROSPECTIVE JUROR 7:  No, I'm okay.

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel Jackson's Appendix to his Memorandum Contra To The Prosecutor's Motion To Dismiss was forwarded by first-class, postage prepaid U.S. Mail to Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481, on this 1ST day of June, 2004.

RANDALL L. PORTER
COUNSEL FOR NATHANIEL JACKSON

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    :

     Plaintiff,                   :

-v-                               :          Case No. 01-CR-794

NATHANIEL JACKSON,                :

     Defendant.                   :

---

## NATHANIEL JACKSON'S MOTION FOR
## LEAVE OF COURT TO CONDUCT DISCOVERY

---

    Nathaniel Jackson moves this Court for leave to conduct discovery.  A Memorandum of

Law is attached and incorporated herein.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER – 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio  43215
(614) 466-5394
(614) 728-3670 Fax

COUNSEL FOR NATHANIEL JACKSON

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

On January 5, 2004, Nathaniel Jackson filed his initial Post-Conviction Petition.  On March 29, 2004 he filed his Amended Post-Conviction Petition in which he requested discovery ("Amended Petition").

On March 30, 2004 the prosecutor filed her initial answer ("Answer I").  On April 13, 2004 she filed her supplemental answer ("Answer II").  The prosecutor in both documents asked this Court to deny Nathaniel Jackson the opportunity to conduct discovery.  [Answer I, pp. 6, 10, 13, 19, 27, 31, 35, 37, 47, 48; Answer II, pp. 3-5, 9, 14-17, 22.]

On May 20, 2004 Nathaniel Jackson filed his Memorandum Contra to the State's Motion to Dismiss ["Memo Contra"].  In that pleading he indicated his intent to file this pleading ["Nathaniel Jackson will forthwith file a Motion for Leave of Court to Conduct Discovery."]  Id. at p.4.  For the reasons that will be identified herein, the Court should grant Nathaniel Jackson leave of court to conduct discovery.

### II.    NATHANIEL JACKSON HAS PLEAD CLAIMS WHICH REQUIRE FACTUAL DEVELOPMENT.

In his Amended Post-conviction Petition Nathaniel Jackson raised constitutional violations that warrant factual development. He seeks to discover facts are not within his control, but within the control of government entities and individuals who have no incentive to disclose the facts necessary to fully develop his causes of action.

### A.    UNCONSTITUTIONAL CHARGING POLICIES OF THE TRUMBULL COUNTY PROSECUTOR'S OFFICE [Amended Petition, First Cause of Action, ¶¶16-24]

The population of Trumbull County is 7.9% African-American [Amended Petition, Exhibit 1]. Of the ten death sentences imposed by Trumbull County Common Pleas Court, five

(fifty percent) were imposed against African-American offenders. [Id. at Exhibit 2]. In nine of the ten cases in which the trial courts of this County have sentenced a defendant to death at least one of the victims was Caucasian [Id.]. No Caucasian defendant has ever been sentenced to death in Trumbull County in a case where the victim was a person of color [Id.]. In almost all of thirty-six cases in which the prosecutor has sought the death penalty at least one of the victims was Caucasian [Id. at Exhibits 2-36]. The prosecutor in the present case offered the Caucasian co-defendant a plea bargain, but did not similarly offer Nathaniel Jackson, who is African-American, a plea bargain. [Id. at Exhibit 35.]

A prosecutor functions as the government's representative "[W]hose obligation to govern impartially is as compelling as its obligation to govern at all . . . ." Berger v. United States, 295 U.S. 78, 88 (1935) The duty of the prosecutor is to seek justice, not merely to convict. ABA Standards for Criminal Justice, Standard 3-1.1(a).

The charging practices of the Trumbull County Prosecutor's Office reflect a racial bias in charging and prosecuting capital offenses. That Office places a higher value on Caucasian victims of murder than on minority victims, while it targets African-Americans for a disproportionate share of death sentences. Racism in the imposition of the death penalty is the ultimate example of arbitrary, disproportionate, and cruel and unusual punishment. It is the antithesis of any evolving standard of decency. Racism makes a mockery of equal justice, equal protection and due process of law, and it can never be condoned. Any system which discriminates, either de facto or de jure, cannot withstand constitutional scrutiny.

Nathaniel Jackson is African-American. The policies and procedures employed by the Trumbull County Prosecutor's Office in seeking and securing a capital conviction and death sentence against Nathaniel Jackson deprived him of his rights to due process, equal protection,

3

and a fair trial.  In order to further develop the factual underpinnings of his claim as to the constitutional infirmities of the charging policies of the Trumbull County Prosecutor's Office, Nathaniel Jackson requests leave of this court to conduct the following discovery:

1. ***Requests for Production of Documents***

Request for Production No. 1:  All documents, including, but not limited to, training manuals or other materials; formal or informal guidelines; memoranda; generated computer e-mails and any other reports maintained by the Trumbull County Prosecutor's Office relating to the procedures by which members of that Office determine which suspects arrested in connection with aggravated murder will be charged with capital specifications.

Request for Production No. 2:  All documents maintained by the Trumbull County Prosecutor's Office relating to the procedures followed in determining that Nathaniel Jackson and Donna Roberts would be charged with capital specifications in connection with the aggravated robbery and homicide of Robert Fingerhut.

Requests for Production No. 3:  All documents, including, but not limited to, training manuals or other materials; formal or informal guidelines, and any related memoranda, including computer generated e-mails, maintained by the Trumbull County Prosecutor's Office relating to the procedures by which members of that Office determine which suspects arrested in connection with homicides will receive plea bargains.

Requests for Production No. 4:  All documents, including, but not limited to, computer generated e-mails, notes, memoranda, and correspondence to Donna Roberts' trial counsel, maintained by the Trumbull County Prosecutor's Office relating to the procedures followed in determining that Donna Roberts would receive a plea bargain in connection with the aggravated robbery and homicide of Robert Fingerhut.

4

2. *Requests for Deposition*

Request for Deposition No. 1: DEPONENT(S) INCLUDING BUT NOT LIMITED TO THE TRUMBULL COUNTY PROSECUTING ATTORNEY DESIGNATED BY THE TRUMBULL COUNTY PROSECUTOR'S OFFICE – concerning the standard operating procedures in effect between the years of 1981-2004 pertaining to plea bargains in homicide cases, and the determination whether to charge a suspect with capital specifications.

Request for Deposition No. 2: DEPONENT(S) DESIGNATED BY THE TRUMBULL COUNTY PROSECUTOR'S OFFICE -- concerning the decision to charge Nathaniel Jackson and Donna Roberts with capital specifications in connection with the aggravated robbery and homicide of Robert Fingerhut.

Request for Deposition No. 3: DEPONENT(S) DESIGNATED BY THE TRUMBULL COUNTY PROSECUTOR'S OFFICE -- concerning the decision to offer Donna Roberts a plea bargain that would have spare her life.

**B.    IMPERMISSIBLE EXCLUSION OF POTENTIAL JURORS BASED UPON RACE [Amended Petition, Second Cause of Action, ¶¶25-34; Third Cause of Action, ¶¶35-44; And Seventh Cause of Action, ¶¶72-84]**

The trial court in the present case summoned four hundred jurors to serve on the venire. [Amended Petition, Exhibit 54.] One-hundred-forty persons appeared for jury duty. [Tr. 1846-1848.] The parties initially agreed that only one African-American was questioned during individual voir dire. [Tr. 1846-1848.] The prosecutor stated that "I'm positive we had one other black juror that was excused". [Tr. 1854.] Later, the prosecutors, attempted to preclude this constitutional challenge by stating "I meant the representation of one, and I want to say there were two, maybe three." [Tr. 1855.] African-Americans comprise 7.9 percent of the population in Trumbull County. [Amended Petition, Exhibit 1.] Consequently there should have been

approximately eleven African-Americans in the one-hundred-forty-persons who appeared for jury duty. Even if the prosecutors' second statement was accurate, there was still a substantial underrepresentation of African-Americans.

The same court officials who selected the petit jury venires in the above cases selected the grand jury venire in the present case. O.R.C. §§ 2939.02, 2113.07, 2313.08 and 2313.35. Likewise the same source list from which the petit juror venire were drawn in the present case was used to construct the grand jury venire in the present case. Id. Consequently it was most likely that there existed an underrepresentation of African Americans in the grand jury venire in the present case.

In the State of Ohio, the common pleas court judge may select anyone to be the grand jury foreperson who satisfies the qualifications of a juror. See O.R.C. § 2939.02. Janice Winans, who is Caucasian, was the foreperson of the grand jury that capitally indicted Nathaniel Jackson. [Amended Petition, Exhibit 41.]  Other counties that used this foreperson selection procedure have acted in a racially discriminatory manner. [Amended Petition, Exhibits 42 and 443.]

An individual may not be excluded on the basis of race from a venire for either a grand jury or a petit jury. Taylor v. Louisiana, 419 U.S. 522, 530 (1975); Cassell v. Texas, 339 U.S. 292 (1950). State court judges cannot select predominantly white males for the position of foreperson. Campbell v. Louisiana, 523 U.S. 392, 398 (1998) Nathaniel Jackson's trial counsel were ineffective for failing to properly raise these constitutional violations.

In order to further develop the factual underpinnings of each of these three causes of actions, Nathaniel Jackson requests leave of this Court to conduct the following discovery:

1.    *Requests for Production of Documents*

Request for Production No. 5:  All documents concerning the present case maintained by the Trumbull County Prosecutor's Office regarding the selection of the grand jurors, including, but not limited to, background information on all prospective grand jurors included in the grand jury venire, regardless of whether the prospective grand juror was voir dired or seated on the grand jury.

Request for Production No. 6:  All documents concerning the present case, maintained by the Trumbull County Prosecutor's Office relating to the selection of petit jurors, including, but not limited to, background information on all prospective jurors included in the venire, regardless of whether the prospective juror was voir dired or seated on the jury, and any documentation relating to prospective jurors who were excused prior to being called or reporting for jury duty.

Request for Production No. 7:  All documents maintained by the Trumbull County Jury Commissioners relating to the selection procedures for grand jury venires in Trumbull County between the years of 1990—2002, including, but not limited to, the method by which names of potential grand jurors were drawn from voter registration lists, the method by which the grand jury venire was selected from any preliminary list, and any methods employed by the Trumbull County Jury Commissioners to excuse individuals prior to the individuals being called to report for grand jury duty.

Request for Production No. 8:  All documents maintained by the Trumbull County Jury Commissioners relating to the selection procedures in petit venires for criminal cases in Trumbull County between the years of 1995-2002, including, but not limited to, the method by which names of potential jurors were drawn from voter registration lists, the method by which

7

the jury venire was selected from any preliminary list, and any methods employed by the Trumbull County Jury Commissioner to excuse individuals prior to the individuals reporting for jury duty.

Request for Production No. 9:  All documents maintained by the Trumbull County Jury Commissioner identifying individuals drawn from voter registration lists for prospective petit jury or grand jury service between the years of 1990-2002.

Request for Production No. 10:  All documents maintained by the Trumbull County Jury Commissioners relating to the selection procedures for grand jury forepersons and the identification of said persons for the time period of 1990 through and including 2000 including the identification of persons chosen.

Request for Production No. 11:  All documents maintained by the Trumbull County Common Pleas Court relating to procedures by which the Trumbull County Common Pleas Court chose Grand Jury Forepersons between the years of 1990 and 2002.

Request for Production No. 12:  All documents maintained by the Trumbull County Common Pleas Court concerning the identification of individuals selected as grand jury forepersons for the years 1990-2002.

## 2. *Requests for Depositions*

Request for Deposition No. 4: TRUMBULL COUNTY JURY COMMISSIONER CONNIE PIERCE – concerning the method by which names of potential jurors were drawn from voter registration lists between the years of 1990-2002, the method by which the grand and petit jury venires were selected from that preliminarily list, and any methods employed by the Trumbull County Jury Commissioner to excuse individuals prior to the individuals' being called to report for jury duty or actually reporting for jury duty.

8

Request for Deposition No. 5: FORMER TRUMBULL COUNTY JURY COMMISSIONER(S) – concerning the methods by which names of potential jurors were drawn from voter registration lists between the years of 1990-2002, the methods by which jury venires were selected from any preliminarily lists, and any methods employed by former Trumbull County Jury Commissioners to excuse individuals prior to the individuals' being called to report for jury duty or appearing for jury duty.

Request for Deposition No. 6: DEPONENTS DESIGNATED BY THE TRUMBULL COUNTY COMMON PLEAS COURT – concerning the methods by which grand jury forepersons were chosen for the period of 1990 to 2002.

C. **THE SUPPRESSION OF EXCULPATORY EVIDENCE [Amended Habeas Petition, Fourth Cause of Action, ¶¶45-54; Eighth Cause of Action, ¶¶85-97].**

The law enforcement agencies suppressed a police report that indicates that the decedent had made plans to fake his own death. [Amended Petition, Exhibit 35.] Trial counsel for Ms. Roberts confirmed the existence of a such a police report. [Id.] Ms. Roberts herself confirmed the existence of such a plot by the decedent. [Memorandum Contra, Exhibit 2.]

The trial prosecutor had an obligation to provide to trial counsel with all exculpatory and impeachment evidence regarding both the trial and sentencing phases. Kyles v. Whitley, 514 U.S. 419, 432 (1995). That obligation was not diminished because the prosecutor claimed to have an open file discovery policy [Tr. 79, 91, 161, 366]. Strickler v. Greene, 527 U.S. 263, 384-5 (1999).

The information which the prosecutor permitted trial counsel to review, but not copy, is also relevant to claims of ineffectiveness. Jones v. Wood, 114 F.3d 1002 (9th Cir. 1997). In that case, the Court of Appeals held that the lower court had abused its discretion in refusing to allow discovery of material concerning the reasonableness of the investigation that was

9

conducted by defense counsel. This case is analytically indistinguishable.  Nathaniel Jackson cannot adequately litigate his effective assistance of counsel claims without access to the material that was in the prosecutor's files and was available to trial counsel prior to trial.

The prosecutor has no legitimate basis for claiming that this information is protected by the work product privilege. The prosecutor waived that protection when he voluntarily opened his file. In addition, the prosecutor's representation that he maintained an "open file" bars him from concealing any relevant material in that file. McKee v. State, 917 P.2d 940, 944 (Nev. 1996).  The Court should permit Nathaniel Jackson to conduct discovery to support these factual allegations concerning suppressed evidence.

### *Requests for Production of Documents*

Request for Production No. 13:    The Trumbull County Prosecutor's Office for all documents in its possession concerning the investigation of the homicide of Robert Fingerhut which occurred on December 11, 2001.

Request for Production No. 14:   The Trumbull County Sheriff's Department for all documents in its possession concerning the investigation of the death of Robert Fingerhut which occurred on December 11, 2001.

Request for Production No. 15: The Howland Police Department for all documents in its possession concerning the investigation of the death of Robert Fingerhut which occurred on December 11, 2001.

Request for Production No. 16: The Ohio Bureau of Criminal Identification for all documents in its possession including bench notes concerning the investigation of the deaths of Robert Fingerhut which occurred on December 11, 2001.

10

Request for Production No. 17:  For all documents from any other law enforcement agency that was involved in the investigation of the death of Robert Fingerhut which occurred on December 11, 2001.

### C.   THE PRETRIAL EFFORTS OF NATHANIEL JACKSON TO OBTAIN NEW COUNSEL. [Amended Petition, Fifth Cause of Action, ¶¶55-62.]

Prior to the commencement of the trial, Nathaniel Jackson wrote the Court and requested the appointment of new counsel. [Amended Petition, Exhibit 45.] Nathaniel Jackson's request was premised on trial counsels' failures to 1) regularly communicate with him, 2) provide him with copies of the information that the prosecutor provided to counsel in discovery and 3) treat him in an appropriate manner. [Id.]

It is the duty of the trial court to inquire into a complaint that a defendant raises concerning his appointed counsel. State v. Deal, 17 Ohio St. 2d 17 (1969) Syllabus; State v. Pruitt, 18 Ohio App. 3d 50, 57 (1984). That inquiry is to be conducted on the record.  The colloquy must be more than an cursory exercise.   Id. The trial court must make a meaningful inquiry into the defendant's complaints concerning his attorney.  In this case the Court conducted no inquiry, cursory or otherwise.  It is the good faith belief of Nathaniel Jackson that the Court, instead of addressing the issue, forwarded the letter to trial counsel.

In order to further develop the factual underpinnings of this constitutional violation, Nathaniel Jackson requests leave of court to conduct the following discovery.

### 1.   *Request for Production of Documents*

Request for Production No. 18:  All documents maintained by the Trumbull County Sheriff's Department concerning the handling of inmate mail, including the inspection and reading of that mail.

Request for Production No. 19:  All documents maintained by the Trumbull County Sheriff concerning the inspection, copying, reading or censoring of Nathaniel Jackson's mail while he was awaiting trial in the present case.

2.    **Request for Depositions**

Request for Deposition No. 7:  DEPONENT(S) DESIGNATED BY THE TRUMBULL COUNTY SHERIFF'S DEPARTMENT – concerning the handling and review of inmate mail in 2000-2002.

Request for Deposition No. 8:  DEPONENT(S) DESIGNATED BY THE TRUMBULL COUNTY SHERIFF'S DEPARTMENT – concerning the handling and review of Nathaniel Jackson's mail while he was awaiting trial in the present case.

Request for Deposition No. 9: ANTHONY CONSOLDANE – concerning his receipt of Nathaniel Jackson's letter and any discussion that he had with anyone (including Nathaniel Jackson) concerning that letter.

E.    THE INEFFECTIVE ASSISTANCE OF COUNSEL AND EXPERTS THAT NATHANIEL JACKSON RECEIVED THROUGHOUT THE PROCEEDINGS IN THIS COURT [Amended Post-Conviction Petition, Sixth Cause of Action, ¶¶63-71; Eighth Cause of Action, ¶¶85-97; Ninth Cause of Action, ¶¶98-109; Tenth Cause of Action, ¶¶110-122; and Eleventh Cause of Action, ¶¶123-135.]

In Strickland v. Washington, 466 U.S. 668 (1984) the Supreme Court established the test that courts were to apply to resolve ineffectiveness claims.

First, the Defendant must show that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the Defendant by the Sixth Amendment, Second, the Defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. at 687.

12

To determine whether trial performance was deficient, this Court must first determine whether counsel's representation of Nathaniel Jackson fell below an objective standard of reasonableness under prevailing professional norms. Id. at 668. Counsel . . . has a duty to bring to bear such skill and knowledge as well render the trial a reliable adversarial testing process." Id. at 689. Although trial counsel is accorded deference to make decisions as part of a sound trial strategy, there is no such thing as a strategic decision unless defense counsel first performs reasonable necessary investigations. Id. at 689, 691.

Trial counsel in the present case did not conduct an independent investigation and instead for the most part relied upon the discovery provided by the prosecution. As a result trial counsel did not develop any substantial information concerning co-defendant Roberts' role in the homicide, 2) the illegal activities of the decedent Robert Fingerhut, 3) the dysfunctional relationship of co-defendant Roberts and Robert Fingerhut, 4) the significant mental impairments of Nathaniel Jackson and 5) the impact that those impairments had upon his actions and involvement with co-defendant Roberts.  In addition trial counsel failed to file or properly support the pretrial motions that they did file.  [See Amended Petition, at ¶¶88-91.]

Trial counsel in the present case did not conduct any sentencing phase investigation. Instead they relied upon the spouse of the psychologist appointed by the Court.  The spouse collected one set of records.  The spouse and/or the psychologist interviewed one person, Petitioner's mother, who minimized the negative factors that impacted Petitioner's development. [Amended Petition, Exhibit 61.]

Trial counsel retained Dr. McPherson who conducted inappropriate testing and improperly scored some of the testing that she did conduct. The focus in the mitigation case is upon a defendant's development and not on a psychological diagnosis. [Exhibit 59.] Dr.

13

McPherson administered the WAIS-III and the Wide Range Achievement Test-III (WRAT) to determine Nathaniel Jackson's intelligence.  She committed errors in the scoring of both tests. [Exhibit 78.]

Counsel in the trial phase failed to address co-defendant Roberts' motive to kill Robert Fingerhut and her ability to manipulate Nathaniel Jackson. Co-defendant Roberts stood to benefit from Fingerhut's death, not Nathaniel Jackson because she was the individual listed on the large life insurance policies.  Co-defendant Roberts had an affinity for African American males.  She had been arrested several times for incidents involving African Americans.  [Amended Petition, Exhibit 65.]

Trial counsel never developed any facts involving the relationship between Nathaniel Jackson and Co-defendant Roberts. She was certainly much more intelligent than he.  She had previously served as an office administrator for a plastic surgeon's office in Miami, Florida. [Amended Petition, Exhibits 44, 68.] She had traveled extensively. [Id.] She provided Nathaniel Jackson with money, a car and clothing [Amended Petition, Exhibits 49-53, 58].  She supplied him with the drugs he craved. Co-defendant Roberts herself was an abuser of drugs. The night prior to the homicide they were together  in a crack house in Youngstown.  [Amended Petition, Exhibit 69.]

Lead counsel became ill prior to the mitigation hearing and new counsel was substituted [Sent. Tr. 4-6.]   New counsel was not certified by the Ohio Supreme Court to provide representation in a capital case.  [Id.]  He knew nothing about this capital case.  [Id.]  Trial counsel met for the first time with the mitigation witnesses just prior to the start of the mitigation hearing [Amended Petition, Exhibits 49-53, 58].  Counsel met with the witnesses as a group and

asked questions that were unrelated to the questions that would be asked of them a few minutes later at the evidentiary hearing. [Id.]

Counsel called four lay witnesses to testify. Their direct testimony was sparse and uninformative: Raymond Dickerson [Sent. Tr. 23-25]; Tausha Korneagay [Sent. Tr. 25-27]; Lorraine Rue [Sent. Tr. 30-31] and Pauline Korneagay (Sent. Tr. 31-33).

Nathaniel Jackson requests leave of court to conduct the following discovery in order to further develop the factual underpinnings of this case.

### _Requests for Depositions_

Request for Deposition No. 10: ANTHONY CONSOLDANE – concerning his representation of Nathaniel Jackson.

Request for Deposition No. 11: JAMES LEWIS – concerning his representation ;of Nathaniel Jackson.

Request for Deposition No. 12: THOMAS WRIGHT -- concerning his representation of Nathaniel Jackson.

Request for Deposition No. 13: SCOTT DIXON – concerning the investigative services that he provided Nathaniel Jackson.

Request for Deposition No. 14: DONALD M. MCPHERSON, M.Ed. – concerning the investigative services that he provided Nathaniel Jackson.

Request for Deposition No. 15: DR. SANDRA MCPHERSON – concerning the psychological services that she provided Nathaniel Jackson at trial.

15

E.     **THE PROTOCOL AND CHEMICALS THAT THE STATE OF OHIO WILL EMPLOY TO EXECUTE NATHANIEL JACKSON.** (Amended Post-Conviction Petition, Thirteenth Cause of Action, ¶¶153-161.]

Nathaniel Jackson alleges that the chemicals that will be used to bring about his execution will result in undue pain and suffering.  Typically, the chemicals include Sodium Thiopental or Sodium Pentothal; Pancuronium Bromide or Pavulon; and potassium chloride. [Amended Petition, Exhibits 80, 81.]  This particular combination of chemicals will cause Nathaniel Jackson to consciously suffer an excruciatingly painful and protracted death. [Amended Petition, Exhibit 82.]

In order to further develop the factual underpinnings of the constitutional violation, Nathaniel Jackson requests leave of court to conduct the following discovery:

1.     **_Request for Production of Documents_**

Request for Production No. 20:  All documents relating to present or prior procedures to implement lethal injection since the State of Ohio reinstated capital punishment in 1981.

Request for Production No. 21:  All documents received by Ohio Governmental Officials from government entities outside the State of Ohio concerning lethal injection.

Request for Production No. 22:  All documents relating to the selection of chemicals to be used in Ohio's lethal injection process.

Request for Production No. 23:  All documents relating to the existing and prior protocols used by the State of Ohio during the execution process.

2.     **_Request for Production of Documents_**

Request for Deposition No. 16:  DEPONENT(S) DESIGNATED BY THE DEPARTMENT OF REHABILITATION AND CORRECTION – concerning the selection of procedures and chemicals to administer lethal injection in the State of Ohio.

16

Request for Deposition No. 17:     DEPONENT(S) DESIGNATED BY THE DEPARTMENT OF REHABILITATION AND CORRECTION – concerning the actual experience of Ohio officials in administering lethal injection.

## III.   THE COURT SHOULD AUTHORIZE THE CONDUCTING OF THE LIMITED DISCOVERY IDENTIFIED HEREIN.

### A.   NATHANIEL JACKSON HAS ATTACHED THE NECESSARY DOCUMENTATION TO HIS PETITION.

Once a post-conviction petitioner attaches sufficient documents to his petition, he is entitled to conduct discovery pursuant to the Ohio Civil Rules. State v. Smith, 30 Ohio App. 3d 138, 140 (1986). Nathaniel Jackson attached sufficient documentation to his post-conviction petition to be afforded the opportunity to conduct discovery. The eighty-two exhibits present a prima facia case as to the constitutional violations contained in the petition. The facts alleged, if proven would entitle Nathaniel Jackson to relief.

### B.   NATHANIEL JACKSON IS ENTITLED TO CONDUCT THE DISCOVERY NECESSARY TO OPPOSE THE STATE'S MOTION TO DISMISS.

The Ohio Supreme Court has determined that a post-conviction action is a civil proceeding. State v. Nichols, 11 Ohio St. 3d 40, 41 (1984); State v. Milanovich, 42 Ohio St. 2d 46, 49 (1975). Thus, the civil rules govern an action for post-conviction relief. Milanovich, 42 Ohio St. 2d at 51-52.

Since the State is asking the Court to rule on the merits of this Cause of Action, it is incumbent upon Nathaniel Jackson to contest the State's factual allegations. He can not rest upon the mere allegations or denials of his pleadings. Instead his response, by affidavit or as otherwise, has to set forth specific facts showing that there is a genuine issue of judgment.

Ohio R. Civ. P. 56(F) provides as follows:

<u>When affidavits unavailable</u>. Should it appear from the affidavits of a party opposing the motion for summary judgment that he cannot for sufficient reasons stated present by affidavits facts essential to justify his opposition, the court may refuse the application for judgment or <u>may order a continuance to permit affidavits to be obtained or discovery to be had</u> or make any other order as may be just. (Emphasis added.)

In <u>Tucker v. Webb</u>, 4 Ohio St. 3d 121, 122 (1983), the Ohio Supreme Court held that summary judgment should not be granted in favor of the moving party before the non-moving party has had the chance to conduct discovery.

## C.    THE FOURTEENTH AMENDMENT REQUIRES THAT NATHANIEL JACKSON BE PERMITTED TO CONDUCT DISCOVERY.

Even if Nathaniel Jackson did not attach sufficient documentation to his petition, he is still entitled to conduct discovery.   When a state establishes a program or procedure, that program or procedure must be operated within the confines of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  <u>Goldberg v. Kelly</u>, 397 U.S. 254, 262 (1970). When a state creates a right to appellate review (even though the State is not so required), that system of appellate review also must meet the requirements of due process.  <u>Evitts v. Lucey</u>, 469 US. 387, 401 (1985); <u>See also</u> <u>Ohio Adult Parole Authority v. Woodard</u>, 523 U.S. 272 (1998).  The State of Ohio's post-conviction system, pursuant to <u>Evitts</u> and <u>Goldberg</u>, must meet the requirements of due process.

In the State of Ohio, the petitioner in a post-conviction proceeding has the initial burden of submitting documentation to demonstrate to the trial court that a hearing is warranted as to the constitutional violations alleged in the petition.  <u>State v. Kapper</u>, 5 Ohio St. 3d 36, 38 (1983); <u>State v. Cole</u>, 2 Ohio St. 3d 112, 114 (1982); <u>State v. Pankey</u>, 68 Ohio St. 2d 58, 59 (1981); <u>State v. Jackson</u>, 64 Ohio St. 2d 107, 111 (1980).

That documentation must consist of evidence dehors the record. State v. Milanovich, 42 Ohio St. 2d 46, 51 (1975); State v. Mishelek, 42 Ohio St. 2d 140 (1975). If the petitioner fails to submit exhibits in support of the allegations contained in the post-conviction petition, then the petition is subject to summary dismissal. State v. Milanovich, 42 Ohio St. 2d at 51.

The State, consistent with the Due Process Clause of the Fourteenth Amendment, cannot place this initial evidentiary burden upon a petitioner and subsequently deny him a meaningful opportunity to meet that burden. To deny petitioner the opportunity to meet this burden is to emasculate his right to pursue his post-conviction remedies.

**D.    THE EIGHTH AMENDMENT REQUIRES THAT THE COURT PERMIT NATHANIEL JACKSON TO CONDUCT DISCOVERY.**

The need for discovery in capital cases is especially acute.  Capital cases require that the procedures employed therein ensure heightened reliability in the determination of both the defendant's guilt and/or his sentence. Beck v. Alabama, 447 U.S. 625, 637 (1980).  Where an individual's life is at stake, the Supreme Court repeatedly has insisted upon higher standards of reliability and fairness. See, e.g., Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion) ("'the penalty of death is qualitatively different' from any other sentence . . . . We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.") (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976)).  "Because habeas corpus discovery is designed to aid courts in determining the validity of the petitioners' claims, it often can add – and may in fact be indispensable – to the reliability of habeas corpus proceedings in capital cases.

Unquestionably, Nathaniel Jackson raised colorable constitutional violations that he should be permitted to develop through the discovery of additional facts. See Wilson v. Butler, 825 F.2d 879, 883 (5th Cir. 1987) ("[I]f death is involved, the petitioner should be permitted

every opportunity possible . . . to present the facts relevant to his constitutional claims.") The claims on which Nathaniel Jackson seeks discovery are not so "'palpably incredible' [or] 'patently frivolous or false' as to warrant summary dismissal." <u>Blackledge v. Allison</u>, 431 U.S. 63, 76 (1977).

## IV. CONCLUSION

In accordance with Ohio R. Civ. P. 56(F), <u>Tucker v. Webb</u>, <u>State v. Milanovich</u>, and the Eighth and Fourteenth Amendments this Court should grant Nathaniel Jackson the opportunity to conduct the discovery necessary to oppose the State's Motion to Dismiss.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER – 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio 43215
(614) 466-5394
(614) 728-3670 Fax

COUNSEL FOR NATHANIEL JACKSON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Nathaniel Jackson's Motion For Leave Of Court To Conduct Discovery was forwarded by first-class, postage prepaid U.S. Mail to Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this 11th day of June, 2004.

RANDALL L. PORTER
COUNSEL FOR NATHANIEL JACKSON

#199629

21

THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )
     Plaintiff-Respondent,            )   CASE NO. 2001 CR 794
                      )
-vs-                                    )   JUDGE JOHN M. STUARD
                      )
NATHANIEL JACKSON,                      )   **FINDINGS OF FACT AND**
                      )   **CONCLUSIONS OF LAW**
     Defendant-Petitioner.            )   **DISMISSING PETITIONER'S**
                      )   **ORIGINAL AND AMENDED**
                      )   **PETITION FOR POSTCONVICTION**
                      )   **RELIEF**

     This matter came before the Court on Defendant-Petitioner Nathaniel Jackson (hereinafter, "Petitioner") Postconviction Petition, Volume I & II (hereinafter, "original Petition") filed with this Court January 5, 2004.  Pursuant to two extensions permitted by this Court, Plaintiff-Respondent State of Ohio's (hereinafter, the "State") filed its motion to dismiss the original petition on March 30, 2004. However, before the State filed its motion to dismiss the original petition, Petitioner filed an Amended Postconviction Petition, Volume I & II ("amended Petition") on March 29, 2004.  This Court permitted the State one extension to respond to the amended Petition.  The State filed its motion to dismiss the amended Petition on April 13, 2004, and the Petitioner followed with his Memorandum Contra to the Prosecutor's Motion to Dismiss("Memo Contra"). This Court has reviewed these submissions, the court file, the record and applicable law.

     Revised Code 2953.21(C) provides as follows:

        "Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the

clerk of the court, and the court reporter's transcript."

Furthermore, "[b]road assertions and general conclusory allegations without more to establish the requisite elements of incompetence and prejudice are inadequate to warrant a hearing on the petition." *State v. Davie* (Sept. 25, 1998), 11th Dist. No. 97-T-0175, citing *State v. Jackson* (1980), 64 Ohio St. 2d 107, 111.

In accordance with this authority, this Court has reviewed the above-listed materials so as to determine whether there are substantive grounds for relief warranting a hearing on the Petitioner's original and amended Petition.  Based upon this review, the Court finds Petitioner has failed to show substantive grounds for relief as to the Fourteen Causes of Action set forth in his Petition, and in his Fifteen Causes of Action set forth in the amended Petition. Therefore, both submissions[1] are subject to dismissal without a hearing.  In accordance with R.C. 2953.21(G), the Court's Findings of Fact and Conclusions of Law are set forth herein.

This Court makes the following findings of fact with respect to Petitioner's original Petition and amended Petition.

1)      On December 28, 2001, the Trumbull County Grand Jury returned an indictment charging Petitioner with: Count One, Aggravated Murder in violation of R.C. 2903.01(A); Count Two, Aggravated Murder, in violation of R.C. 2903. 01(B); Count Three, Aggravated Burglary (F1),

---

[1]This Court acknowledges that pursuant to R.C. 2953.21(F) a postconviction petitioner may amend his original petition at any time before the State files its answer or motion.  This Court will certainly consider any new exhibits and arguments made on Petitioner's behalf in the amended Petition.  However, this Court would request that Petitioner's counsel refrain from formatting the amended Petition in such a manner as to merely scramble earlier causes of actions, and in reality, add few new arguments or exhibits. Fashioning an entry in response to Petitioner's claims has proven to be a logistical nightmare and an unnecessary repetitive waste of resources for all parties concerned.

with a firearm specification, in violation of R.C. 2911.(A)(1)(2) & R.C. 2945.145 and Count Four, Aggravated Robbery (F1) with a firearm specification in violation of R.C. 2929.04 (A)(7) & R.C. 2945.145. All charges stem from the shooting death of Robert Fingerhut, which occurred Dec.11, 2001, at a residence which he shared with Petitioner's co-defendant, Donna Roberts ("Roberts"), in Howland Township, Trumbull County, Ohio.

2)    Jury selection in Petitioner's case commenced October 8, 2002. He was initially represented at trial by Atty. James Lewis and Atty. Anthony Consoldane.    After presentation of evidence on November 8, 2002, the jury returned a guilty verdict on all counts and specifications finding that Petitioner was both the principal offender and acted with prior calculation and design. Because Counts One and Two of the indictment merged for sentencing purposes, the State elected to dismiss Count Two and proceed to the mitigating hearing on Count One alone.  At mitigation, Petitioner was represented by Atty. Consoldane and Atty. Thomas Wright.  Atty. Wright substituted for Atty. Lewis who had unexpectedly taken ill.

3)    During his mitigation phase, Petitioner called six witnesses including one expert witness, Dr. Sandra McPherson and five lay witnesses.

4)    After due deliberation, the jury returned a recommendation of a death sentence for the aggravated murder of Robert Fingerhut.

5)    On December 9, 2002, this Court imposed the sentence of death on Petitioner for Count One of the indictment, a ten-year sentence on Count Three of the indictment to be preceded by a three-year sentence on a firearms specification and a ten-year sentence on Count Four, also preceded by a three-year sentence of a firearm specification. The principal sentences on Counts Three and Four were to be served consecutive to one another, and the firearms specifications

-3-

merged for sentencing purposes.

6)      Petitioner's appellate counsel, John P. Laczko and Dennis Day Lager, filed timely notice of appeal and  with the Supreme Court of Ohio under case number 03-137.  Both Petitioner and the State have filed their merit briefs and are awaiting an oral arguments date at this writing. Petitioner's appellate  brief contains Twelve Propositions of Law which Petitioner has listed at paragraph 12 of his original and his amended Petition. This Court would adopt and incorporate that listing here.

7)      Petitioner's amended and original Petition is filed by Atty. David Bodiker and Atty. Randall Porter, of the Office of the Ohio Public Defender. Petitioner proposes  Fourteen Causes of Action in his original Petition, and in his Fifteen Causes of Action  in the amended Petition which this Court will now address individually and where possible simultaneously.

## FIRST CAUSE OF ACTION (original Petition)
## FOURTEENTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this First Cause of Action (original Petition) and the Fourteenth Cause of Action (amended Petition).

1)      In his first Cause of Action in the original Petition, and Fourteenth Cause of Action in the Amended Petition, Petitioner argues that his sentence is void or voidable because Ohio's current postconviction scheme is cursory, inadequate and ineffective.

2)      He attaches no exhibits to support this claim and makes a request for discovery.

Based upon these findings, the Court makes the following conclusions of law as to The First Cause of Action (original Petition) and the Fourteenth Cause of Action (amended Petition):

1)      Revised Code § 2953.21(C) provides that before granting a hearing on a petition for postconviction relief, the trial court is required to determine whether there are substantive grounds for relief.

2)      The doctrine of res judicata applies to postconviction proceedings. *State v. Perry* (1967), 10 Ohio St.2d 175; *State v. Cole* (1982), 2 Ohio St. 3d 112.

-4-

3) Res judicata is a proper basis upon which to dismiss a claim for relief in a postconviction petition where the claim was raised or could have been raised at trial or on direct appeal, and where the claim could fairly have been determined without resort to evidence dehors the record. *Cole* supra at 112; *Perry*, supra at 180.

4) Throughout the original Petition and the amended Petition, Petitioner made numerous non-specific requests for discovery. The Eleventh District Court of Appeals held in *State v. Lorraine* (Feb. 23, 1996), 11th Dist. No. 95-T-5196, at *5 - 6. that the burden is on the petitioner to submit evidentiary documents to support a postconviction claim. It further held that the trial court has no statutory authority to compel discovery. Unless a hearing is granted, the petitioner is not entitled to discovery.

5) Likewise, the Ohio Supreme Court has held courts are not required to provide petitioners discovery in postconviction proceedings. *State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office* (1999), 87 Ohio St.3d 158, 159. "Whether discovery may be had on a postconviction claim is a matter committed to the discretion of the trial court." *State v. Wiles* (1998), 126 Ohio App.3d 71, 79. As this Court dismisses both the original and amended Petition without hearing, Petitioner is not entitled to conduct discovery. Therefore, this Court will not order discovery to support this claim.

6) This action is barred by the doctrine of res judicata. Petitioner is not entitled to discovery. Petitioner does not demonstrate substantive grounds for relief.

## SECOND CAUSE OF ACTION (original Petition)
## FIRST CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Second Cause of Action (original Petition) and First Cause of Action (amended Petition):

1) Petitioner argues that his judgment and sentence are void or voidable because the Trumbull County Prosecutor employed discretion in capital cases in a racially discriminatory manner.

2) To his Second Cause of Action (original Petition), he attaches Ex. 1 (Census Bureau breakdown of Trumbull County's Population by race, Ex. 2 (Ohio Public Defender Office's breakdown of Death Row inmate by race and sex and the race of their victims) Ex. 3 (Affidavit by Randall Porter, Assistant State Public Defender and counsel of record for this Postconviction claim). To his First Cause of Action in the Amended Petition, Petitioner attaches the same Ex. 1 and Ex 2. Ex. 3 through Ex. 34 appear to be a rouge's gallery collection of prison identification photographs along with miscellaneous filings from the Trumbull County Court of Common Pleas. All of the inmates are serving time

for some form of homicide, the most common charge being Aggravated Murder.  Ex. 35 is the Porter affidavit referenced previously.

3)   Petitioner in his direct appeal before the Ohio Supreme Court argues at page 76 of his brief that "the Ohio system has resulted in the imposition of death penalties in a racially discriminatory manner, with blacks and those who killed white victims being much more likely to get the death penalty." At page 88-89 of his brief, he argues that 49% of Ohio's Death Row inmates are African American, and that the victim's race influences prosecutorial discretion in charging decisions.

4)   Petitioner's co-defendant, Donna Roberts, is a Caucasian female who was also indicted by the grand jury on identical charges and specifications under Trumbull County Common Pleas Court No. 01-CR-793, and who was ultimately tried before this Court and sentenced to death.

The Court makes the following Conclusions of Law as to this Second Cause of Action (original Petition) and First Cause of Action amended Petition:

1)   Petitioner's statistics and photographs contribute no operative *facts* to his argument that a defendant's or a victim's race had any influence over the prosecutor's discretion in pursuing a death penalty.   Taking his evidence at face value, it is apparent that Trumbull County has sent both African Americans and Caucasians to Death Row, and has imposed life sentences for both African-Americans and Caucasians. Relying upon the Petitioner's pictorial evidence, it appears that five of Trumbull County's African American murderers are on Death Row, while another eight Trumbull County African American murders received life sentences.  At paragraph 21 of his amended petition, Petitioner lists sixteen defendants serving life prison terms for homicides wherein the victim was Caucasian. This evidence fails gives no credence to Petitioner's theory that his race or Mr. Fingerhut's race influenced the State's election to seek the death penalty in this matter. With a lack of operative facts, this Court finds no substantive grounds for relief. This claim is dismissed without hearing.  R.C. 2953.21 (C).

2)   "To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.' " (Quoting *United States v. Berrios* [C.A. 2, 1974] 501 F 2d 1207, 1211).  Petitioner's co-defendant, a white female, received the same death penalty for the same crime.  This Court is completely unpersuaded by Petitioner's argument that Roberts was possibly offered a plea to a life sentence in this

case, or that the State offered her a life sentence because of her race. Justice was ultimately as color blind as it could be in this case. Both of Fingerhut's killers, one white, one black, are awaiting execution.

3)    Petitioner offers no proof whatsoever that he was singled out for prosecution or that the prosecution's election to pursue the death penalty in this matter was made in bad faith, or based on any impermissible considerations such as his race or the race of his victim. Petitioner states in his Memorandum Contra to the Prosecutor's Motion to Dismiss at page 10 that nine of ten Trumbull County Death Row inmates are there as a result of killing a Caucasian. Petitioner's own Ex. 1 helps explain why: Over 90% of Trumbull County's population is white, so by pure population sampling it is likely that 90% of Death Row inmates' victims will be Caucasian as well. This Court sentenced Roderick Davie for the death of an African American, and a fellow judge in this Court sentenced Sean Carter to death for killing African American. Therefore, Petitioner can establish no pattern of discrimination on the part of the Trumbull County Prosecutor's Office for seeking the death penalty.

4)    As the alleged racial disparity was raised in Petitioner's merit brief to the Ohio Supreme this claim is barred by the doctrine of res judicata. *Cole, Perry,* supra. Petitioner claims in his Memorandum Contra at page 10 that "[d]irect appeal counsel made a theoretical, as opposed to factual argument. Counsel was limited to making that argument, as opposed to the factual argument that Nathaniel Jackson now makes, because the facts upon which Nathaniel Jackson relies are not contained in the trial record." However. in order to overcome a res judicata bar, the evidence dehors the record must not be evidence which was in existence and available for use at the time of trial and which could have been submitted at trial if the defendant wished to use it. *State v. Cowan* (2002) 151 Ohio App. 3d 228, ¶15. Clearly, Petitioner's pictorial evidence and racial statistics would have been available for pre-trial consideration and therefore, this claim is subject to a res judicata bar.

5)    Petitioner's request for discovery is denied. *Lorraine, Love, Wiles,* supra.

## THIRD CAUSE OF ACTION (original Petition)
## SECOND CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Third Cause of Action (original Petition) and Second Cause of Action (amended Petition):

1)    Petitioner alleges that the grand jury venire which indicted him disproportionately excluded African-Americans.

2)    To support this claim he affixes Ex. 3 (original petition) and Ex. 35 (amended Petition)

-7-

(detailed in previous cause of action); Ex. 4 (original Petition) and Ex. 54 (amended Petition) a petit court jurors list which makes no reference to anyone's race; Ex. 5 (original Petition) and Ex. 37 (amended Petition) (original Petition), an Ohio News Bureau article from Feb. 20, 1992 entitled "Potential juror raises race question, a Tribune Chronicle article from Murder trial jury pool makeup questioned (Ex. 36, amended Petition), and an Akron Beacon Journal article from Feb. 20, 1992, entitled" Potential juror asks about lack of blacks" (Ex. 38, amended Petition); Ex. 6 (original Petition) and Ex. 39 (amended Petition), Affidavit of Diane Wiley, president of the National Jury Project Midwest, who opines that Trumbull County African Americans were "seriously underrepresented" in the Roderick Davie venire.

3) Prior to trial, Petitioner filed a motion entitled, "Defendant's Motion to Reduce Bias in Annual Jury List." (T.d. #174). This motion took issue with Trumbull County's method of compiling a jury list, from which both petit and grand jurors are selected. This Court denied the motion. (T.d. #176).

4) Petitioner attaches no evidence detailing the actual racial composition of the grand jury which indicted him.

5) Petitioner requests discovery and the appointment of experts to support this claim.

The Court makes the following Conclusions of Law as to this Third Cause of Action (original Petition) and Second Cause of Action (amended Petition):

1) None of the exhibits submitted make any reference to the racial composition of Petitioner's grand jury panel, much less that African Americans, or anyone else for that matter, were impermissibly excluded from his grand jury venire. Therefore, Petitioner fails to present sufficient operative facts to support substantive grounds for relief on this claim and this Court dismisses this claim without hearing. R.C. 2953.21(C); *Kapper,* supra, at 38.

2) In *State v. Williams* (1997), 79 Ohio St. 3d. 1, 17, the Supreme Court of Ohio held, "not every grand jury has to represent a 'fair cross-section,' so long as the selection process is nondiscriminatory." The Ohio Supreme Court in *State v. Issa* (2001), 93 Ohio St. 3d 49, 62, ruled that the use of voter registration roles as a source for grand and petit jurors does not intentionally exclude any specific racial group. Since both whites and blacks are equally entitled to register to vote, the process is nondiscriminatory. Petitioner fails to demonstrate that selecting his grand jurors from a list of registered voters intentionally excluded any African American or any other racial minority.

3) Furthermore, this issue was raised at trial and could have been raised on direct appeal. As such, res judicata bars this claims from further consideration by this Court. *Perry,* supra, at 180, *Cole,* supra, at paragraph one of the syllabus. Clearly, all of these exhibits would

-8-

have been available to Petitioner at the time of trial and could have been raised in the form of a pre-trial motion. Therefore, the res judicata bar is applicable. *Cowan,* supra.

4) In Ex. 36, 37, 38, and 39 (amended Petition), Petitioner relies on newspaper articles and one affidavit concerning alleged racial bias in the Roderick Davie capital case and its juror selection process. The Davie case was tried in this Court in 1992. Despite the newspaper coverage and the affidavit by Ms. Wiley, the Ohio Supreme Court specifically held that there was no racial bias in the Davie case. "Davie's claim that exclusive use of voter registration lists in jury selection deprived him of an impartial jury representing a fair cross-section also lacks merit. Utilization of voter rolls alone to choose prospective jurors is constitutional. See, *e.g., State v. Johnson* (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751, paragraph two of the syllabus; *State v. Hill* (1992), 64 Ohio St.3d 313, 325-326, 595 N.E.2d 884, 895. Davie has not demonstrated an unfair lack of representation of African Americans in Trumbull County juries, nor has he shown that such alleged underrepresentation resulted from a systematic exclusion by the state of that particular group. See State v. Puente (1982), 69 Ohio St. 2d 136, 138." *State v. Davie* (1997), Ohio St. 3d 311, 316-317

5) If the Ohio Supreme Court could find no racial discrimination in the Davie case, it would make positively no sense for this Court to construe Petitioner's submissions generated as a result of the Davie case as having any applicability to the case at bar.

6) These exhibits and averments do nothing to warrant an order for discovery in this case. *Lorraine,* supra, at *5, *Love; Wiles.* Nor do the arguments and exhibits compel discovery. The Eleventh District Court of Appeals has held that because postconviction proceedings are civil in nature, a petitioner has no constitutional right to court-appointed counsel. "Consequently, a petitioner would have no corresponding right to expert assistance." *State v. Williams* (Oct. 19, 1998), 11th Dist. No. 97-T-0153, at 9.

7) Therefore, Petitioner's Third Cause of Action, (original Petition), and Second Cause of Action (amended Petition) are dismissed without hearing.

## FOURTH CAUSE OF ACTION (original Petition)
## THIRD CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Fourth Cause of Action (original Petition) and Third Cause of Action (amended Petition):

1) Petitioner next complains that his grand jury foreperson may have been selected in a racially discriminatory manner.

2) To support this claim, he includes Petitioner's indictment (Ex. 7, original Petition; Ex. 40 amended Petition), an affidavit of Mark Rooks wherein he ascertained that the foreperson

-9-

of the grand jury which indicted Petitioner was Caucasian (Ex. 8, original Petition; Ex. 41 amended Petition), a second affidavit from Diane Wiley, previously identified, who opined in 1998 that Hamilton County's capital grand juries were underrepresented by African Americans (Ex. 9, original Petition, Ex. 42, amended Petition), and an article from Columbus Alive magazine quoting members of the Ohio Public Defender's Office alleging the Hamilton County grand jury forepersons are selected in a racially discriminatory manner. (Ex. 10, original Petition, Ex. 43, amended Petition).

3)      R.C. 2939.02 permits the presiding common pleas judge to select grand jury foreperson for capital cases from outside the annual grand jury lists.

The Court makes the following Conclusions of Law as to this Fourth Cause of Action (original Petition) and Third Cause of Action (amended Petition):

1)      None of the exhibits Petitioner relies upon suggest that The Trumbull County Common Pleas Court has *ever* utilized R.C. 2939.02 to go beyond the annual jury list to facilitate the selection of a grand jury foreman or forewoman. They do not present one scintilla of evidence that Petitioner's grand jury forewoman was selected in a racially discriminatory manner. Therefore, this claim is subject to dismissal without hearing. *Kapper*, supra, R.C. 2953.21(C).

2)      Petitioner seeks to have this Court extrapolate from the fact that Hamilton County's presiding judge may have hand-picked white, male grand jury foremen, the same practice must have occurred here. Such a proposition is far too tangential to be substantive. None of his exhibits remotely support this theory, nor is this Court aware of any instance where any of the four general division judges of this Court selected a grand jury foreman or forewoman from a source other than the annual jury list. Indeed, the only way this Court, or the other three common pleas judges, would ever reach beyond the jury list to fill the foreman's or forewoman's position would be if no qualified citizens appeared on the list to serve in that capacity. In the thirteen years this judge has been on the bench, there has never been a need to exercise this judge's prerogative of hand selecting a foreman or forewoman from a source other than the jury list.

3)      Furthermore, the First Appellate District in *State v. Hughbanks* (Jan. 17,2003), 1st Dist. No. C-010372, ruled that Hughbanks' claim based on the identical theory was barred by the doctrine of res judicata as the information regarding the composition of the grand jury would have been available to Hughbanks at the time of trial.

4)      This Court agrees that this matter is barred by the doctrine of res judicata. See *Perry, Cole,* supra. Certainly the Wiley affidavit and the Columbus Alive article were available to Petitioner at the time of his trial and could have been used to raise the appropriate challenge during pre-trial proceedings.

5)     Finally, Petitioner's far fetched speculation of a racially biased grand jury, rooted solely in Wiley's and the Ohio Public Defender's Office's obvious dissatisfaction with a perfectly legal method of foreman or forewoman selection, does not warrant an order of discovery in this case. See *Lorraine, Cowan*, supra.

6)     The claim is equally unworthy of the appointment of court-funded experts. As this Court will not be setting a hearing for this claim, Petitioner has no constitutional or statutory right to expert assistance. *Williams*, supra. The Martha Phillips affidavit attached to Petitioner's Memorandum Contra shows only that Ms. Phillips experienced some difficulties in tracking down information concerning the procedures used to draw the Roderick Davie trial jury. The Court gives little weight to this affidavit as it has no direct bearing on this case.

7)     For these reasons, these Causes of Actions are dismissed without hearing, and without court-appointed experts or court-order discovery.

VOL 1032 PAGE 888

## FIFTH CAUSE OF ACTION (original Petition)
## FOURTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Fifth Cause of Action (original Petition) and Fourth Cause of Action (amended Petition):

1) Petitioner maintains that law enforcement agencies suppressed a report that Mr. Fingerhut had "plans" to "fake" his own death. He claims that as such, the prosecution failed to disclose "favorable" evidence to the defense as required by *Brady v. Maryland* (1963), 373 U.S. 83, 86.

2) To support this allegation, Counsel of record Randall Porter attaches his own affidavit (Ex. 3, Ex. 35) to the petition stating Atty. John Juhasz, trial counsel for co-defendant Donna Roberts, told him of the existence of a police report which stated Fingerhut supposedly had planned to fake his own death by use of a body double. The Porter affidavit does not state that Atty. Juhasz said the report was withheld from him, nor does Petitioner's trial counsel provide an affidavit stating that they never saw the purported document or that they saw it and elected not to use it at trial.

3) Petitioner does not attach the police report in question. Therefore, there is no confirmation as to the existence of the police report as Petitioner states in his Memorandum Contra at page 16. To the contrary, Atty. Juhasz's hearsay statement offers no competent, credible evidence before this Court that a formal police report containing the body double story was *ever* filed with *any* police department.

4) In his amended Petition, Petitioner attaches Ex. 44, an unsigned, handwritten letter wherein the author states that "RSF" had an "obsession about faking his own death." This letter does not appear to be a police report, nor does it suggest that the police or the prosecutor was aware of this "obsession" or the existence of this letter. In Ex. 3 attached to Petitioner's Memorandum Contra Petitioner identifies the author of this letter as co-defendant Donna Roberts and claims she sent it to him.

The Court makes the following Conclusions of Law for the Fifth Cause of Action (original Petition) and Fourth Cause of Action (amended Petition):

1) Petitioner supplies no evidence to this Court to support his claim that the State withheld any evidence from him, exculpatory or otherwise. Petitioner supplies no credible evidence to suggest that a police report stating that Mr. Fingerhut planned to fake his own death ever existed Therefore, this Cause of Action is subject to dismissal without hearing. *Kapper*, R.C. 2953.21(C).

2) Petitioner in his Memorandum Contra tries to excuse his lack of evidence on this point by citing to *State ex rel Steckman v. Jackson* (1994) 70 Ohio St. 3d 420 and arguing that he

-12-

has been unable to review relevant law enforcement files to find this evidence.  This Court finds this claim disingenuous because despite *Steckman*, Petitioner was still able to secure such exhibits as amended Petition Ex. 67, 68, 69, 70, 71, 72 and 74 which police are reports.  This Court will not find a discovery violation for a report that he cannot prove ever existed.

3)   Additionally, in *State v. Calhoun* (1999) 86 Ohio St. 3d 279, 285, the Ohio Supreme Court lists several guidelines a trial court may follow in determining the credibility of a postconviction affidavit.  Among those factors are whether the affidavit relies on hearsay, and whether the affiant has an interest in the outcome of the case.  Id.  With respect to this issue, the affiant, Atty. Porter, relies upon hearsay evidence as supplied by Atty. Juhasz who has never backed up Atty. Porter's claim with his own affidavit.  Secondly, Atty. Porter has a clear interest in the outcome of this case as the Petitioner's counsel of record.  Therefore, this Court concludes that the Porter affidavit contains no competent, credible evidence for this Court to believe that such a report ever existed.

4)   Furthermore, the evidence is not exculpatory.  Even if Mr. Fingerhut engaged in musings regarding a "body double" homicide, and even if these musings were memorialized in a police report, Petitioner admitted to shooting a man in Robert Fingerhut's home who he identified as Fingerhut.  Even in the most unlikely occurrence that Petitioner shot a "body double," he still planned and executed an aggravated murder of a man who a forensic pathologist conclusively concluded was dead, and the evidence overwhelmingly demonstrates that Petitioner is responsible for that death.  The unfounded and baseless theory that Robert Fingerhut may be still roaming the face of the earth and enjoying his own insurance proceeds does not exonerate Petitioner from causing the death of another during the course of an aggravated burglary and aggravated robbery with well documented prior calculation and design.

5)   Moreover, even if this Court gave any credibility to allegation that this story appeared in an official police report, Petitioner obviously was on notice that Fingerhut had discussed the "body double" scenario because Petitioner claims to have received this information in a letter he insists is from co-defendant, Donna Roberts.  Memorandum Contra, Ex. 3.

6)   In his amended Petition at paragraph 54, Petitioner again makes a request for discovery to support this claim.  This will request will be denied pursuant to the previously stated rationale that Petitioner is not entitled to discovery because he is not entitled to a hearing.  *Lorraine*, at *5, *Love, Wiles*.

**FIFTH CAUSE OF ACTION (amended Petition)**

The Court makes the following Findings of Fact as to this Fifth Cause of Action (amended Petition):

1) Petitioner claims he was denied effective assistance of counsel because he did not have a "meaningful" relationship with his attorneys.

2) To support that claim to his amended Petition he attaches undated letter, Ex. 45, wherein Petitioner complains that Atty. Anthony Consoldane, one of two Ohio Public Defenders assigned to his case, failed to visit him frequently in jail and failed to play the audio-tape telephone conversations of himself co-defendant Donna Roberts.

3) In an affidavit submitted with his Memorandum Contra, Ex. 3 Petitioner claims Atty. Consoldane not only visited him, but visited him on weekends. He claims he sent Ex. 45 to this Court in February, 2001, which was ten months before Robert Fingerhut was murdered.

The Court makes the following Conclusions of Law as to this Fifth Cause of Action (amended Petition)

1) When a petitioner asserts a claim of ineffective assistance of counsel, he bears the initial burden to submit evidence to demonstrate that his defense was prejudiced by counsel's ineffectiveness. If he fails to do so, no evidentiary hearing is required. *State. v. Pankey* (1981), 68 Ohio St. 2d 58, 59 citing *Jackson, supra*, at syllabus.

2) In *State v. Pierce* (1998), 128 Ohio App. 3d 578, 586, the Eleventh District Court of Appeals held that in asserting an ineffective assistance claim, the petitioner must submit materials containing sufficient operative facts to demonstrate both prongs of the two-part test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. Prejudice will not be found unless appellant demonstrates there is a reasonable possibility that, if not for counsel's errors, the result of the trial would have been different.

3) "In the absence of positive proof to the contrary, certainly there is a reasonable inference that one licensed by the state to practice law and appointed by a court to represent an accused did competently and properly represent such accused during his trial." *Vaughn v. Maxwell* (1965), 2 Ohio St. 2d 299, 301. In order to overcome this presumption of effectiveness, the petitioner must submit sufficient operative facts or evidentiary documents that, if proven would show that the petitioner was prejudiced by ineffective assistance of counsel. *State v. Smith* (1987), 36 Ohio App. 3d 152, 163)

4) This Court finds that neither Ex. 45 nor Ex 3 suggest that either Atty. Consoldane or Atty. Lewis' performance was deficient pursuant to *Strickland*. They merely suggest that

-14-

Petitioner felt his attorneys were not paying enough attention to him ten months before he was even arrested for this crime, or, if the February 2001 date is in error, eight months before his trial started.

5) This Court has no independent recollection of reviewing this letter. This would be the sole explanation why the letter was not addressed within the record before this Court. However, this Court does specifically recall that during pre-trial hearings, voir dire, the guilt and penalty phase Petitioner made no complaints concerning either Atty. Lewis or Atty. Consoldane. This Court observed Petitioner communicating and interacting with them. In fact, there are references in the transcript where Petitioner communicated with Atty. Consoldane.   (T.p. Vol. 16, p. 4, 5, 196). Therefore, based on this Court's own observations and the lack of evidence to the contrary in the record, this Court cannot find that communication had broken down, nor was there an irreconcilable conflict.

6) Incarcerated defendants commonly find much to complain about with both publicly funded, and even privately retained attorneys. One complaint of dissatisfaction is not tantamount to ineffective assistance of counsel.

7) "A client and an attorney need not share "rapport" or a "meaningful relationship." *State v. McNeill* (1998), 83 Ohio St. 3d 438, 452; *State v. Herness* (1997), 79 Ohio St. 3d 53, 66 citing *Morris v. Slappy* (1983), 461 U.S. 1, 13. "To discharge a court- appointed attorney, the defendant must show 'a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman* (1988), 37 Ohio St. 3d 286, 292."

8) This Court finds nothing in Ex. 45 or Ex. 3 to suggest that there was a "breakdown" in the attorney-client relationship, just a dissatisfaction common among defendants in situations similar to Petitioner's. Having provided no operative facts to support his claim, this Court finds no substantive grounds for relief and dismisses this claim without hearing.

## SIXTH CAUSE OF ACTION (original Petition)
## SEVENTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Sixth Cause of Action (original Petition) and Seventh Cause of Action (amended Petition):

1) Petitioner argues that African Americans were systematically culled from the jury process.

2) Petitioner attaches the census data cited previously by the Court (Ex. 1 in amended and original Petitions), newspaper articles concerning the lack of African Americans in the Roderick Davie jury pool (Ex. 3, 4, 5,  original Petition, Ex. 36, 37, 38), the Diane Wiley

-15-

affidavit (Ex. 6 original Petition, Ex. 39 amended Petition), and an affidavit from Atty. Dennis Day Lager stating that all of the jurors in co-defendant Roberts' case were Caucasian.

The Court makes the following Conclusions of Law as to this Sixth Cause of Action (original Petition) and Seventh Cause of Action (amended Petition):

1) None of the exhibits submitted by Petitioner support his claim that African Americans, or any other minority members, were "systematically culled" from the jury selection process. The fact that no African American was ultimately *seated* on either the Davie, Roberts or Jackson juries is not indicative of a systemic *removal* of any potential juror. Because Petitioner provides no operative facts to support this claim, this Court finds no substantive grounds for relief and dismisses it without hearing.

2) Furthermore, the claim of underrepresentation of African Americans in the jury pool would have been evident at the time of trial, and therefore could have been raised on direct appeal. The claim is thus barred by res judicata. *State v. Wilson* (June 24, 1998), C.A. No.97CA006683, at *7; *Cole, Perry*, supra.

3) Also, the Ohio Supreme Court found the Wiley affidavit unpersuasive in the Davie case, and specifically held that Davie had not demonstrated an unfair lack of representation of African Americans in Trumbull County juries, nor did he show that such alleged underrepresentation resulted from a systematic exclusion by the state of that particular group. *State v. Davie* (1997), 80 Ohio St. 3d 311, 316-317. If Wiley's opinion failed to convince the panel reviewing Davie's allegation of underrepresentation, it is axiomatic that it must fail to persuade this Court in the case sub judice.

4) Finally, this Court again rejects Petitioner's request for discovery. He is not entitled to a hearing therefore he is not entitled to discovery. See *Lorraine*, supra, at *5

## SIXTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Sixth Cause of Action (amended Petition):

1) Petitioner argues his death sentence is void or voidable because his counsel failed to retain the services of a "mitigation specialist."

2) To his amended Petition he includes Ex. 46-53 which are fully described in the court's response to the Seventh/Eighth Cause of action.

-16-

3)  He attaches as part of his Memorandum Contra an order of this Court dated Jan. 18, 2002 authorizing $5,000 in public funds to hire Dr. Sandra McPherson and Donald McPherson "as expert assistance to aid in the Defense." Ex. 5.

The Court makes the following Conclusions of Law with respect to Petitioner's Sixth Cause of Action:

1)  Petitioner's exhibits fail to provide sufficient operative facts to suggest counsel did not obtain a "mitigation specialist." Dr. McPherson was Petitioner's handpicked expert. She told the jury, "my purpose was to understand the Defendant and to develop information for this trial."

2)  Dr. McPherson has testified in numerous capital murder cases as a mitigation expert in the State of Ohio. *State v. Tresh* (2001), 90 Ohio St. 3d 460; *State v. Carter* (2000), 89 Ohio St. 593; *State v. McNeill* (1998), 83 Ohio St. 3d 438; *State v. Otte* (1996), 74 Ohio St. 3d 555; *State v. Jenkins* (1984), 15 Ohio St. 3d 164.

3)  This Court finds that Dr. McPherson qualifies as a mitigation specialist as a result of her training, expertise, education, experience and prior testimony on behalf of capital defendants.

4)  Furthermore, any challenges to Dr. McPerhson's qualifications could have been raised in Petitioner's direct appeal and is therefore barred by the doctrine of res judicata. *Perry, Cole,* supra.

5)  Not only does Petitioner fail to raise sufficient operative facts pursuant to *Kapper,* supra, he raises a claim that is specifically belied by the record. He submits no evidence that trial counsel's selection of Dr. McPherson was not a reasonable trial strategy, particularly in light of her previous profession experience. This Claim is void of substantive grounds for relief and is hereby dismissed without hearing.

### SEVENTH CAUSE OF ACTION (original Petition)
### EIGHTH  CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Seventh  Cause of Action (original Petition) and Eighth Cause of Action (amended Petition):

1)  Petitioner alleges his trial counsel was ineffective for a variety of so called failures at several phases of his trial proceedings.

2)  To support this claim, Petitioner affixes the following exhibits to his Petitions: His Youngstown Public Schools Psychological Report from 1986 (age 13) listing his full

-17-

scale I.Q. at 73 (Ex. 11, original Petition, Ex.53 amended Petition ); His Youngstown Public Schools Psychological Report from 1989 (age 17) listing his full scale I.Q. at 70 (Ex. 12, original Petition, Ex.57, amended Petition); Affidavit of Public Defender Investigator Jessica Love (Ex. 13, original Petition, Ex.58, amended Petition); Affidavit of Dorian Hall Ohio Public Defender Mitigation Specialist (Ex. 14, original Petition Ex. 59, amended Petition); Testimony of Forensic Social Worker Jill Miller from the Lawrence Landrum evidentiary hearing (Ex. 15, original Petition, Ex 60. amended Petition), Report of Dr. Sandra McPherson (Ex. 16, original Petition, Ex 61, amended Petition); Affidavit of Forensic Psychologist Dr. Robert Kaplan (Ex. 17, original Petition, Ex. 64,amended Petition); Testimony of Dr. Robert Smith (Ex. 18, original Petition, 62 Amended Petition); Testimony of Dr. Theodore Van Doran Parran (Ex. 19, original Petition, Ex.63, amended Petition).  In the amended Petition, Petitioner adds Ex. 46, a Youngstown City School record of his Individualized Education Program; Ex. 47, a compilation of Petitioner's various adult and juvenile records and probation reports as maintained in Mahoning County; Ex. 48 - Petitioner's discharge summary from Neil Kennedy Recovery Clinic dated 3/22/00;Ex. 49  Affidavit of Pauline Korneagay, mother of Petitioner; Ex. 50, Affidavit of Tausha Korneagay, sister of Petitioner; Ex. 51, Affidavit of Anthony Korneagay, brother of Petitioner; Ex. 52, Affidavit of Raymond Dickerson, friend of Petitioner's mother; Ex. 53, Affidavit of Kevin Perry, fiancee of Tausha Korneagay.

The Court makes the following Conclusions of Law as to this Seventh  Cause of Action (original Petition) and Eighth  Cause of Action (amended Petition):

1)  When  a petitioner asserts a claim of ineffective assistance of counsel, he bears the initial burden to submit evidence to demonstrate that his defense was prejudiced by counsel's ineffectiveness.  If he fails to do so, no evidentiary hearing is required. *Pankey, Jackson,* supra. .

2)  In asserting an ineffective assistance claim, the petitioner must submit materials containing sufficient operative facts to demonstrate both prongs of the two-part test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 687: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. Prejudice will not be found unless appellant demonstrates there is a reasonable possibility that, if not for counsel's errors, the result of the trial would have been different. *Pierce,* supra.

3)  In order to overcome a presumption of effectiveness, the petitioner must submit sufficient operative facts or evidentiary documents that, if proven would show that the petitioner was prejudiced by ineffective assistance of counsel. *Maxwell, Smith,* supra.

4)  None of the exhibits attached to Petitioner's Petitions even remotely suggest that his trial counsel was ineffective.   In fact, the Hall affidavit, Miller testimony, and Van Doran

-18-

Parran testimony make no mention whatsoever of Petitioner, let alone his counsel and their trial performance. These exhibits are wholly irrelevant to Petitioner's claim of ineffective assistance of counsel.

5)      With respect to the Smith and Parron testimony and the Kaplan affidavit, this Court finds any reference to Petitioner's drug abuse as merely cumulative of the testimony offered by Dr. McPherson. It is painfully obvious from the trial testimony that the killing of Robert Fingerhut was not the product of a cocaine abuse episode. Petitioner and Roberts clearly planned this murder while Petitioner was in prison, and then executed Fingerhut in a manner essentially consistent with that plan. These factors alone suggest that if Petitioner had ingested cocaine before this killing that he was able to commit this crime in spite of the cocaine, not because of it. Thus, counsel was not ineffective for not trying to blame this crime on cocaine.

6)      The remaining exhibits, which actually reference Petitioner, do not support a claim of ineffectiveness.

7)      As an example, Petitioner's two I.Q. tests placing him at a 70 and 73 when he was 13 and 17 years of age would not have changed this Court's opinion that he gave a voluntary and self-serving statement to investigators. The fact that Petitioner sought portray himself as the victim in the Fingerhut shooting, and to promote his own interests by claiming self defense and by clearly attempting to minimize the involvement of his co-defendant, Roberts, far outweighs any import this Court would have placed upon his seventh and tenth grade I.Q. scores in determining the voluntariness of his statement. This Court finds no example of deficient performance or prejudice to Petitioner at the suppression hearing. Furthermore, this issue could have been raised in Petitioner's direct appeal, and is therefore barred by res judicata, *Cole, Perry,* supra.

8)      This Court finds no example of ineffectiveness in trial counsel's "failure" to challenge the venire from which the grand or petit juries were drawn. First of all, trial counsel *did* challenge the jury array by making the following objection: "MR. CONSOLDANE: I also have – I make another objection to the array of the Jury picked. We only had one person for color on that Jury and he was excused because he couldn't believe in enforcing the death penalty, and this is far less than what the population is in the Trumbull County. I don't think that is respective of what the black population is in Trumbull County, nor is it fair to my client to have all elderly white people judging him." (T.p. Vol. 7, p. 1846).When directly questioned by this Court has to whether there was anything prejudicial or unconstitutional about the method employed by the Trumbull County Common Pleas Court for selecting jurors, trial counsel admitted they had nothing to support their theory. (T.p. Vol. 7, p. 1849). These Petitions present no evidence to counter trial counsel's admissions. Again, this Court can find no *Strickland* violation with respect to trial counsel's handling of the issue as to the racial make up of his jury or grand jury.

-19-

9) Likewise, these Petitions are totally devoid of any examples of impropriety in the selection of the grand jury forewoman. Therefore, no ineffective assistance of counsel claim will stand.

10) The Petitions' exhibits offer no proof of racially influenced charging practices on the part of the Trumbull County Prosecutor's Office. This particularly true in this case where by the Petitioner, and his co-defendant, a Caucasian woman, were indicted on identical charges. Therefore, trial counsel was not ineffective for failing to challenge the charging practices.

11) Allegations that trial counsel failed to adequately prepare for mitigation are not supported by the trial record. Per motion of trial counsel, this Court authorized the expenditure of public funds to hire Dr. Sandra McPherson to assistant trial counsel in uncovering potentially helpful information to Petition in his mitigation phase. Now, Petitioner uses affidavits from two Ohio Public Defender employees, Hall and Love, to suggest that either Dr. McPherson or trial counsel somehow dropped the ball in mitigation. This Court is wholly unimpressed with such criticism, particularly coming from two individuals who are not as credentialed or as experienced as Dr. McPherson in assessing mental health issues which are frequently fodder for mitigation arguments. Dr. McPherson is a licensed clinical forensic psychologist. Neither Hall nor Love are so qualified. Neither Hall nor Love are attorneys. Therefore, this Court cannot seriously consider Hall's boiler plate statement (which does not even reference this trial), or Love's post-sentence collection of affidavits to serve as a competent critique of either McPherson or counsel's performance. This Court finds absolutely no merit to the claim that trial counsel failed to hire a "mitigation specialist." Based on her training and experience, Dr. McPherson is eminently qualified as a mitigation specialist, and any argument that she is not wholly feckless.

12) Thanks to Dr. McPherson's efforts, the jury heard testimony concerning Petitioner's low I.Q. scores attained in adolescence, his drug addiction, his criminal history, and an explanation for his attraction to and involvement with Roberts. Through both Dr. McPherson's and the lay witness' testimony, trial counsel sought to portray Petitioner in a more sympathetic light to the jury than is being suggested in these Petitions, i.e., that counsel should have delegated blame for the Fingerhut killing to Petitioner's drug habit. In its sarcasm-laden argument in response, the State properly points out that an over-emphasis of Petitioner's history of drug abuse may have backfired on Petitioner. This Court agrees and will not brand trial counsel as ineffective for its strategic decision to downplay, though not entirely dismiss, Petitioner's drug habit and the life of crime he voluntarily elected to embark upon to support it. Petitioner submits no evidence to this Court that the outcome of his mitigation phase would have been different had counsel chosen to place more emphasis on Petitioner's drug use than they ultimately did. According to Petitioner's Ex. 16 (original Petition) and Ex. 61(amended Petition), Dr. McPherson or her assisting psychologist, administered a battery of tests to Petitioner,

-20-

including the Thematic Apperception Test, WAIS-3, MMPI-2, WRAT-3, Bender Gestalt, and Rorschach tests. This Court defers to Dr. McPherson's professional judgment as to which tests were appropriate in this matter. This Court finds no reason to infer ineffective assistance when trial counsel did likewise.

13) This Court also declines to find that counsel was ineffective for not arguing that Petitioner's mother was an alcoholic who neglected him. Regrettably, in our society far too many individuals blessed with the gift of children choose the drink or the drug over their precious children's welfare. However, not all of these children grow up to commit aggravated murder. This Court does not view Petitioner's mother's purported alcoholism and resulting neglect of Petitioner as outcome determinative to the mitigation phase. Therefore, this Court cannot find that counsel's performance was deficient in failing to bring this to the jury's attention. Furthermore, counsel sought to call Petitioner's mother to the stand as a mitigation witness, undoubtedly to humanize and engender sympathy for her son who was literally in a battle for his life. Portraying her as a drunk and neglectful mother would have seriously jeopardized her credibility before the jury.

14) Debatable trial tactics generally do not constitute a deprivation of effective assistance of counsel. *State v. Phillips* (1995), 74 Ohio St. 3d 72, 85. The decision of trial counsel not to pursue every possible trial tactic for reasons of strategy does not result in ineffective assistance of counsel. *State v. Brown* (1988), 38 Ohio St. 3d 305, 319. Though the family and friends who supplied affidavits to the amended Petition claim defense counsel did not interview them at all, or asked different questions from those posed during their interviews, their allegations do not support an ineffective assistance of counsel claim. This Court does not even find it "debatable" trial strategy to withhold information from the jury that Petitioner socialized with drug dealers and was alienated from the entire family because he would steal to support his habit (amended Petition Ex. 49), was a drug rehabilitation drop out (amended Petition Ex. 50), forced his family to leave their home because of Petitioner's stealing to support his habit (amended Petition. Ex. 51), lived on the streets because of his drug habit (amended Petition Ex. 52), or that he bragged about being a member of the "crips" street gang. (amended Petition Ex. 53). None of these facts would place Petitioner in a more favorable light for a jury who is trying to decide if the aggravating circumstances of his crime outweigh mitigating factors.

15) Petitioner's exhibits also do not support the claim that his trial counsel did not conduct an independent guilt phase investigation. The very exhibits submitted by Petitioner show that Dr. McPherson conducted a full and complete investigation into Petitioner's background. Petitioner submits no evidence, such as an affidavit from trial counsel, as to what they did or did not do by way of independent investigation. Therefore, he fails to demonstrate ineffectiveness.

16) For the reasons above, Petitioner has failed to submit evidence of ineffectiveness, therefore, this claim is dismissed without hearing and the Court denies any request for discovery. See *Jackson, Lorraine, supra.*

## EIGHTH CAUSE OF ACTION (original Petition)
## NINTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact as to this Eighth Cause of Action (original Petition) and Ninth Cause of Action (amended Petition):

1) Petitioner argues his trial counsel was ineffective for failing discuss with jurors the dynamics of the relationship between Petitioner and Donna Roberts, Roberts' motive for killing fingerhut, Roberts' affinity for African American males, Roberts' supposed superior intelligence and Roberts' full participation in the homicide.

2) To support this claim, Petitioner attaches the following Exhibits: Larry Southwick's interview with Det. Hoolihan and Sgt. Dillon (original Petition Ex. 20, amended Petition Ex. 65); Christine Ellignton's interview with Hoolihan and Dillon (original Petition Ex. 21, amended Petition Ex. 66); Complaint filed by Roberts against Santiago Mason after he purportedly declined her invitation for sex (original Petition Ex. 22, amended Petition Ex. 67); Supplemental Howland Police report in which Roberts claims Fingerhut knew of her relationship with Petitioner (original Petition Ex. 23, amended Petition Ex.68); Supplemental Howland Police report wherein Janet Clay states she saw Petitioner and Roberts smoking crack cocaine at her home (original Petition Ex. 24, amended Petition Ex. 69); Supplemental Howland Police report of Roberts' initial police interview at the scene (original Petition Ex. 25, amended Petition Ex. 70); Investigative notes made by Dillon (original Petition Ex. 26, amended Petition Ex. 71); A list of prescriptions recovered from the Fingerhut residence after the homicide (original Petition Ex. 27, amended Petition Ex. 72); An unsigned note regarding a supposed "rush to judgment" in the Fingerhut homicide (original Petition Ex. 28, amended Petition 73); Supplement Trumbull County Sheriff's report of possible bloodstains at the Fingerhut residence (original Petition Ex. 29, amended Petition Ex. 74); Supplemental Trumbull County Sheriff's Department stating Petitioner was uncooperative in completing handwriting exemplars (original Petition Ex. 30, amended Petition 75); A copy of Petitioner's Proposition of Law No. 2 as it appears in his pending brief to the Ohio Supreme Court (original Petition Ex. 31, amended Petition Ex. 76); Report of Forensic Scientist Donna L. Rose stating "[g]un shot residue was not conclusively identified" on Roberts' hands (amended Petition Ex. 77).

3) Petitioner requests discovery to support his claim.

The Court makes the following Conclusions of Law as to this Eighth Cause of Action (original Petition) and Ninth Cause of Action (amended Petition):

1) The doctrine of res judicata applies to postconviction proceedings. *State v. Perry* (1967), 10 Ohio St.2d 175.

-22-

2)     Res judicata is a proper basis upon which to dismiss a claim for relief in a postconviction petition where the claim was raised or could have been raised at trial or on direct appeal, and where the claim could fairly have been determined without resort to evidence dehors the record. *State v. Cole* (1982), 2 Ohio St. 3d 112; *Perry,* supra at 180.

3)     Petitioner raised an ineffective assistance of counsel argument in his brief to the Ohio Supreme Court.  Therefore, the doctrine of res judicata applies.

4)     Even though Petitioner attempts to raise new examples of ineffectiveness in his Petition, such of a lack of questioning of potential jurors, or Roberts' alleged propensity to take advantage  young, African-American males, such would have been apparent from the face of the trial record and could have been raised on appeal.

5)     Furthermore, in order to succeed on a claim of ineffective assistance of counsel, a petitioner must demonstrate that ineffective performance and prejudice to the defendant, or the claim is subject to dismissal without hearing. *Jackson, Pankey, Pierce,* supra.

6)     None of these examples persuades this Court of trial counsel's ineffectiveness.  The jury was well informed of Roberts' planning and participation in this homicide even if she was not the actual killer.   Petitioner admitted to killing Fingerhut.  Though Petitioner argues a crime scene reconstructionist *may* have yielded a new theory about the homicide, such a theory would undoubtedly pale in contrast to the premeditated killing and Petitioner's admission that he shot Fingerhut. Nor do his exhibits suggest what that theory might be.  His own Ex. 77 states that no experts found no gunshot residue on Roberts' hands, lending credence to  Petitioner's own statement that he was the lone shooter in this killing. Because Petitioner has failed to submit documents containing sufficient operative facts of his trial counsel's ineffectiveness, there are no substantive grounds for relief and this claim must be dismissed without hearing.

7)     Because Petitioner is not entitled to a hearing, he is also not entitled to discovery, *Lorraine,* supra at * 5.

### NINTH CAUSE OF ACTION (original Petition)
### TENTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact with respect to Petitioner's Ninth Cause of Action (original Petition) and Tenth Cause of Action (amended Petition):

1)     Petitioner argues ineffective assistance of counsel at the mitigation phase.

2)     To support this claim, he attaches Exhibits 44, 49-53, 56-59, 66-67 to his amended Petition and Exhibits 11, 12, 13, 14, 21, 22, and 23 to the original Petition and these exhibits have been already described in previous Causes of Actions.

3)      Petitioner again requests discovery to support this claim.

The Court makes the following Conclusions of Law with respect to Petitioner's  Ninth   Cause
of Action (original Petition) and Tenth Cause of Action (amended Petition):

1)      As stated in the previous Cause of Action, the doctrine of res judicata applies to
postconviction proceedings.  *Perry*, supra, and this Court finds that the issue of
deficiencies in the trial counsel's mitigation performance could have been raised in
Petitioner's direct appeal. Petitioner fashioned an ineffective assistance of counsel claim
within his Proposition of Law II, though for whatever reasons, did not address his
counsel's performance in mitigation.

2)      None of the Exhibits submitted with the Amended Petition overcome this bar.  There is
no evidence before this Court that trial counsel was aware of the Robert's letter saying
Fingerhut intended to fake his own death. (Ex. 44) Even if they were, Petitioner fails to
suggest how this is applicable to mitigation.  If Fingerhut had faked his own death (and
all the available evidence is to the contrary), such evidence would be germane to the guilt,
not the mitigation phase.  This Court is equally unpersuaded by the series of affidavits
from Petitioner's friend's and family. (Ex. 49-53).   Nothing in these affidavits offer
mitigating factors at all, let alone enough to outweigh the aggravating circumstances.
Petitioner's disruptive behavior, poor academic performance and absenteeism are not
mitigating, and do little to augment Dr. McPherson's mitigation testimony. (Ex. 56, 57).
Ex. 58 & 59 are discounted here for the same reasons as appears in the Seventh/Sixth
Cause of Action.  Finally, Ex. 66- 67 are simply irrelevant to a claim of ineffective
assistance of counsel.  While these exhibits may be been generated de hors the record,
they still offer no operative facts to overcome a res judicata bar.

3)      Because these exhibits offer no operative facts supportive of a claim of ineffective
assistance of trial counsel, Petitioner fails to demonstrate sufficient grounds for relief.
Therefore, this claim is subject to dismissal without hearing.  R.C. 2953.21(C), *Kapper*,
supra.

4)      In order to demonstrate counsel's ineffectiveness, Petitioner must prove that (1) counsel's
performance was deficient, and that (2) he was prejudiced by that performance.
*Strickland, Bradley*, supra.  Petitioner fails to develop either prong of the *Strickland* test
in his Petition.

5)      This Court will not find trial counsel's performance deficient just because Dr.
McPherson's  relied upon a psychological assistant to gather part of the data used to
compile her report.  With the aid of her assistant,  Dr. McPherson conducted a thorough
review of Petitioner's background in an effort to uncover potentially mitigating evidence.
Even Petitioner's post-trial exhibits make it abundantly clear that she omitted no

-24-

information which would have been outcome determinative at the mitigation phase. To an extent, the information is cumulative, and much of it is certainly negative information regarding Petitioner's character and background.

6)      Despite claims in two affidavits (Ex. 49, 52) that trial counsel spent a relatively short time interviewing family members prior to the mitigation hearing, this Court finds no deficiency in their performance as per *Strickland*. This Court is unpersuaded that more lengthy or in depth interviews would have unearthed any additional facts about the Petitioner which would have actually proved helpful to him. Furthermore, as part of the myriad of paperwork Petitioner filed as Ex. 5 along with his Memorandum Contra, this Court notices a typewritten note to "the Family of Nathaniel Jackson" urging them to contact either the McPhersons' professional offices, or Petitioner's trial counsel for purposes of preparing for mitigation. Obviously, the McPhersons were making every effort to contact family members to supplement their evaluations or to have them called as mitigation witnesses. This Court will not brand trial counsel ineffective if Petitioner's family members made themselves unavailable for pre-trial interviews.

7)      Parenthetically, the very nature of the testimony offered by family members and friends hardly requires exhaustive preparation.     Essentially, the family members were brought forward to give insight into Petitioner's background and to tug at the jury's heartstrings by saying how much he would be missed if ultimately executed.  Such testimony does not require lengthy interrogations.

8)      Nevertheless, it was trial counsel's theory that Petitioner's anti-social tendencies stemmed from a lack of a father figure, his untreated Attention Deficit disorder, and his infatuation with Donna Roberts. (T.p. Vol 16, p. 130-135) Petitioner now suggests mitigation strategy should have focused on his drug abuse and alcoholic mother. This Court cannot find that counsel was deficient or that Petitioner was prejudiced by trial counsel's election to paint Petitioner in the most positive light possible rather than to try to excuse his actions through his own self inflicted drug abuse.

9)      This trial court also finds no colorable claim of ineffective assistance of counsel through the substitution of Atty. Thomas Wright at the mitigation phase.  Atty. Consoldane, who had acted as trial counsel from the onset of this prosecution, remained on the case and acted as lead counsel in the penalty phase.  He conducted direct examination of all mitigation witnesses and gave closing arguments.  The fact that Mr. Wright was not certified by the Ohio Supreme Court as a death penalty litigant, or that he was brand new to the case, did not equate to deficient performance by either Atty. Wright or Atty. Consoldane.  Petitioner's exhibits offer no examples of deficient performance or prejudice to Petitioner.  Therefore, he had failed to demonstrate the *Strickland* standard for ineffectiveness.

10)     Furthermore, this Court personally inquired of Petitioner as to whether he wished to

-25-

VOL **1032** PAGE **902**

accept Atty. Wright's representation and proceed as scheduled, or whether he preferred this Court to continue the matter for several days to await Atty. Lewis' return. Petitioner specifically and unequivocally stated he wanted the matter to proceed as scheduled with Atty. Wright substituting for Atty. Lewis. (T.p. Vol 16, p. 5-6). Petitioner only reinforces his desire to decline the offered continuance when he writes "[b]y that time I was so upset with my attorneys I just wanted to get it over." (Memorandum Contra, Ex. 3). Pursuant to the doctrine of invited error, Petitioner may not argue prejudice over a situation which he clearly facilitated. See *State v. Campbell* (2000), 90 Ohio St. 3d 323, 324.

11)  Petitioner argues Atty. Consodane knew little about the evidence at mitigation, made no opening statement, and called only four lay witnesses who offered incomplete and inaccurate testimony. None of these claims are tantamount to a deficient performance. First, the record does not reveal that Atty. Consodane "knew little" about the mitigation evidence, only that he felt Dr. McPherson knew more about the family dynamics as a result of her extensive interviews pursuant to psychological testing. (T.p. Vol 16, p. 7). Second, the Supreme Court of Ohio has held that a waiver of opening statements at the penalty phase is not tantamount to ineffective assistance of trial counsel. *State v. Brewer* (1988), 48 Ohio St. 3d 50, 63. Finally, Petitioner called five, not four, lay witnesses at trial. They were (1) Raymond Dickerson, (2) Taushia Kornegay, (3)Lorraine Rue, (4) Shaylese Townsend Jackson and (5)Pauline Kornegay. The Kornegays and Dickerson supplied affidavits for the amended Petition. (Ex.49, 50, 52). The Court finds nothing in these affidavits which would have been more useful to Petitioner at mitigation beyond their testimony of record. Again, examples of Petitioner's drug use and the life crime he embarked upon to support it hardly mitigating.

12)  This Court gives absolutely no weight to Dorian Hall's affidavit (Amended Petition Ex. 59) criticizing Dr. McPherson's decision to administer an I.Q. test as part of her evaluation. In light of the U.S. Supreme Court's decision in *Atkins v. Virginia* (2002) 536 U.S. 304, it may well have been tantamount to malpractice to forego I.Q. testing, especially when the Petitioner's academic performance was below average and he previously scored in the 70s on two prior I.Q. tests. Ms. Hall has completely eroded her own credibility in this Court's eyes by even suggesting that a forensic psychologist forego I.Q. testing in this instance.

13)  Finally, this Court denies Petitioner's request for discovery per *Lorraine, Love,* and *While, supra.*

14)  This claim is dismissed without hearing because it is barred by the doctrine of res judicata, *Perry, supra,* and because Petitioner's exhibits de hors the record do not provide sufficient operative facts to demonstrate substantive grounds for relief. *Kapper, supra,* R.C. 2953.21(C).

-26-

## TENTH CAUSE OF ACTION (original Petition)
## ELEVENTH CAUSE OF ACTION (amended Petition)

The Court make the following Findings of Fact as to this Tenth Cause of Action (original Petition) and Eleventh Cause of Action (amended Petition):

1)   Petitioner again alleges ineffective assistance of trial counsel at the mitigating phase, this time due to purported short-comings in the evaluations conducted by Dr. McPherson.

2)   To support these allegations, he attaches the previously described Ex. 13, 14, 15, 18 and 19 to the original petition and Ex. 49,  58, 59, 60, 62, 63, 64 to the amended petition.

3)   Petitioner requests discovery to support his claim.

The Court makes the following Conclusions of Law as to  this Tenth Cause of Action (original Petition) and Eleventh Cause of Action (amended Petition):

1)   The Court adopts and incorporates paragraphs 1 through 3 from its Conclusions of Law from the Seventh/Sixth Cause of Action.

2)   Petitioner seeks to label his trial counsel ineffective because he has found a social worker and a second psychologist to state that Dr. McPherson either administered the wrong tests or scored tests incorrectly.  This Court will not and does not find trial counsel ineffective pursuant to the *Strickland* standard for professional decisions made by their expert, Dr. McPherson.

3)   None of the exhibits provided directly assess trial counsel's performance.  Therefore, Petitioner fails to support his claim with evidence de hors the record and this claim is subject to dismissal without hearing. *Kapper,* supra, R.C. 2953.21(C)

4)   Ex. 78, the affidavit of Dr. Thomas Andrew Boyd, states that Dr. McPherson improperly scored Petitioner's I.Q. test.  While it is refreshing to review an exhibit which actually references the participants and performances in *Petitioner's* case, this Court does not find that Dr. Boyd's recalculated I.Q. score of 75  in any way diminishes the overall  value of Dr. McPherson's evaluation or testimony.  The five-point deviation between Dr. McPherson's score and Dr. Boyd's score is not outcome determinative, and certainly has no impact on whether his trial counsel was ineffective. Furthermore, "[a] postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial. *State v. Combs* (1994), 100 Ohio App. 3d 90, 104.   Therefore, Petitioner does not demonstrate ineffective assistance of counsel pursuant the *Strickland* standard.

5)   This Court gives no credence to Ms. Hall's criticism that Dr. McPherson should have

-27-

abandoned the Bendt Gestalt Test for the Trails Making Test.  Nothing in Ms. Hall's affidavit suggests that she is even remotely qualified to critique the professional decisions of the licensed forensic psychologist, whether it be Dr. McPherson, or any other mental health professional potentially covered by her boilerplate affidavit which references this case only in its caption.

6)      Petitioner's request for discovery is denied pursuant to *Lorraine, Love,* and *Wiles,* supra.

## ELEVENTH CAUSE OF ACTION (original Petition only)

The Court makes the following Findings of Facts as to this Eleventh Cause of Action:

1)      Petitioner argues his sentence is void or voidable because he was mentally retarded at the time of his trial and cannot be sentenced to death.

2)      Petitioner attaches Ex. 11 and 12 to support this claim.

The Court makes the following Conclusions of Law as to this Eleventh Cause of Action.

1)      *Atkins v. Virginia* (2002), 536 U.S. 302, which bars the execution of mentally retarded persons was decided in June of 2002, approximately four months before Petitioner's trial began.  If Petitioner had a viable claim of mental retardation, he could have raised this bar at trial and on appeal.  Therefore, as a post-*Atkins* capital defendant, Petitioner's claim is barred by the doctrine of res judicata.  See *Perry,* supra.

2)      In a footnote, the *Atkins* decision printed the following definition of mental retardation: "***characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).  *Atkins* at 305, FN 3.

3)      The Supreme Court of Ohio adopted this definition in *State v. Lott* (2002), 97 Ohio St. 3d 303, and further stated that a capital defendant is rebuttably presumed to *not* be mentally retarded if his or her I.Q. is above 70.

4)      The record before this Court, and Petitioner's own exhibits show that Petitioner's full scale I.Q. at age 13 was 73, and at age 17 was 70. (Ex. 11, 12).  When tested just before trial, Petitioner score an 84.  McPherson testified at trial that Petitioner *never* tested in a range for mental retardation. (T.p. Vol. 16, p. 82).  Dr. McPherson twice testified that Petitioner's "actual ability is probably better than the test would indicate." (T.p. Vol. 16, p. 83, 48).  Dr. Boyd does not label Petitioner mentally retarded .   Therefore, Petitioner

-28-

fails to demonstrate significantly subaverage intellectual functioning.

5) Contrary to Petitioner's assertions, Ex. 11 and 12 do not provide examples of limitations in adaptive skills, nor does the trial record. The facts of the homicide alone point to well developed adaptive skills. For example, his series of letters and phone calls to Roberts show that he can effectively communicate love, lust, loneliness, and a desire for a more upscale life style. His ability to conspire with Roberts to murder Fingerhut and to carry out that plan shows his self-directed nature. He apparently chooses to spend his leisure time having sex and abusing drugs, and knew how to use Roberts to get both. This Court finds no deficit in Petitioner's adaptive skills.

6) This Court finds no evidence of onset of mental retardation prior to age 18.

7) Pursuant to *Lott* and *Atkins,* Petitioner fails to overcome the presumption of no mental retardation. Therefore, his claim is dismissed without hearing. *Kapper,* supra. R.C. 2953.21(C).

## TWELFTH CAUSE OF ACTION (original Petition only)

The Court makes the following Findings of Fact with regard to Petitioner's Twelfth Cause of Action, original Petition only:

1) Petitioner argues his death sentence is void or voidable because the jury did not make the requisite decision that he was not mentally retarded.

2) He attaches no exhibits to support this claim.

The Court makes the following Conclusions of Law with regard to Petitioner's Twelfth Cause of Action, original Petition only:

1) Petitioner relies upon the U.S. Supreme Court's decision in *Ring v. Arizona* (2002), 536 U.S. 584 to support this argument. As with the *Atkins* decision, *Ring* was decided in June of 2002, four months before the start of Petitioner's trial. Therefore, this issue could have been raised at trial and/or on direct appeal and is therefore barred by the doctrine of res judicata. *Perry,* supra.

2) Furthermore, courts throughout the country have held, contrary to Petitioner's position, that *Ring* clearly does not require a jury finding of no mental retardation prior to the imposition of the death penalty. See, i.e. *Russell v. State* (2003), 849 So. 2d 95, 148; *Walton v. Johnson* (2003), 269 F. Supp. 2d 692, N3; *Head v. Hill* (2003), 587 S.E.2d 613, 618-620; *Adams v. State* (Aug. 29, 2003), Court of Criminal Appeals of Alabama No. CR-98-0496, FN 9.

-29-

3)   Petitioner attaches no evidence de hors the record to support this claim.  He therefore fails to offer sufficient operative facts to support his argument, nor does he establish substantive grounds for relief.   This claim is dismissed without hearing.  *Kapper*, R.C. 2953.21(C).

## TWELFTH CAUSE OF ACTION (amended Petition only)

The Court makes the following Findings of Fact with regard to Petitioner's Twelfth Cause of Action, amended Petition only:

1)   Petitioner argues that his death sentence is void or voidable because the jury did not receive all of the relevant information concerning the appropriate sentence.

2)   Petitioner references Amended Petition Ex. 46, 47, 49-53, 58, 78-79, which have been previously described, excepting 79 which this Court is unable to locate.

The Court makes the following Conclusions of Law with regard to Petitioner's Twelfth Cause of Action, amended Petition only:

1)   For the reasons already stated in response to Petitioner's Seventh/Sixth and Tenth/Eleventh Causes of Action, this Court finds that these exhibits do not supply this Court with sufficient operative facts to support this claim.  Petitioner establishes no substantive grounds for relief, and this cause is dismissed without hearing.  *Kapper*, R.C. 2953.21(C).

2)   To suggest that any of the information presented in any of these exhibits would have swayed the jury to recommend a life, rather than death sentence is wholly speculative and do not render Petitioner's death sentence void or voidable.

3)   Furthermore, this Court disagrees with Petitioner's characterization that Dr. McPherson's report lacks a social history.  Dr. McPherson, in her testimony and report,  described his family environment, his academic history, interpersonal relationships with his children and significant others, his drug use, ADHD, anti-social personality disorder and criminal history.  The fact that Dr. McPherson did not link Petitioner's drug use to his mother's alcoholism is not indicative of a lack of a social history.  Petitioner ignores the very distinct possibility that his election "self medicate" with cocaine or other illegal substances was a personal choice wholly independent of his mother's purported problems. Perhaps the reason no expert testified to this nexus is because it does not exist.

## THIRTEENTH CAUSE OF ACTION (original and amended Petitions)

The Court makes the following Findings of Fact with respect to Petitioner's Thirteenth Cause of Action:

1) Petitioner argues that his death sentence is void or voidable because lethal injection, Ohio's present method of execution, is violative of the Eighth Amendment to the U.S. Constitution.

2) Petitioner submits a Letter from James Haviland, warden of the Southern Ohio Correctional Facility (Ex. 32, original Petition, Ex. 82, amended Petition) which details the intravenous equipment and pharmaceuticals used in the executions of Jay Scott and John Byrd, a letter from Vincent Lagana, Staff Counsel for the Ohio Department of Corrections (Ex. 33, original Petition, Ex. 83, amended Petition) which discusses the drugs and dosage used by the Department of Corrections in an execution, and finally, an affidavit from Dr. Mark J.S. Heath, an anesthesiologist. Dr. Heath composed this affidavit for the late Lewis Williams and John G. Roe's habeas proceedings, wherein Dr. Heath opines that if the condemned is not properly anesthetized, he may suffer excruciating pain during the execution process and that his distress may not be readily apparent to execution witnesses. This Exhibit is also labeled "82."

The Court makes the following Conclusions of Law with respect to Petitioner's Thirteenth Cause of Action:

1) This claim is barred by the doctrine of res judicata as the constitutionality of lethal injection could have been raised in Petitioner's direct appeal and was not. *Perry, Cole,* supra.

2) The Supreme Court of Ohio has previously held that the Eighth Amendment to the U.S. Constitution does not bar lethal injection as a method of execution in Ohio. *State v. Carter* (2000), 89 Ohio St. 3d 593, 608. Petitioner offers no authority to suggest that *any* court in the 37 states which use lethal injection as a method of execution has found it to be contrary to the Eighth Amended proscription against cruel and unusual punishment.

3) Petitioner's three exhibits do not provide this Court with sufficient operative facts to support his claim that lethal injection constitutes cruel and unusual punishment. The two letters from the Ohio Department of Corrections simply do not address whether the condemned suffers or not during the administration of the lethal dose of drugs. Dr. Heath's affidavit certainly raises the *possibility* that the condemned, under certain circumstances, may suffer. However, the affidavit offers no empirical evidence that in Ohio, or in any other state, a condemned inmate actually suffered in a manner consistent with his hypothetical scenarios. The Sixth Circuit Court of Appeals labeled Dr. Heath's concerns as "purely speculative." *Cooper v. Rimmer* (2004), 358 F. 3d 655, 659. Dr.

-31-

Heath's affidavit did not persuade the Sixth Circuit to block the execution of Lewis Williams. *In Re Williams* (2004), 359 F. 3d 811, 814.

4)   This Court must concur with the Sixth Circuit Court of Appeals and find that Dr. Heath's opinion is merely speculative. Furthermore, it is contingent upon several variables which may or may not occur at Petitioner's execution or any other. Included in that speculation is the use of the "cut-down" procedure which the U.S. Supreme Court recognized in its implementation of a stay of execution in *Nelson v. Campbell*, 2004 U.S. Lexis 3600, to determine whether the procedure violates the Eighth Amendment. It should be noted that unlike Nelson, Petitioner has never contended that his veins are compromised due to drug use, or any other malady, or that he might be subject to this procedure at the time of his execution.

5)   This Court cannot guarantee Petitioner a pain free execution, and neither does the U.S. constitution. The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. "Punishments are cruel when they involve torture or a lingering death...." *In Re Kemmler* (1890), 136 U.S. 436, 447. As used in the Constitution, "cruel" implies "something inhuman and barbarous, something more than the mere extinguishment of life." Id. None of Petitioner's exhibits convince this Court that lethal injection is torturous, inhuman or barbarous.

6)   As a result, Petitioner fails to present operative facts to support this claim, and fails to demonstrate substantive grounds for relief. This Cause of Action is therefore dismissed without hearing. *Kapper*, R.C. 2953.21(C).


## FOURTEENTH CAUSE OF ACTION (original Petition)
## FIFTEENTH CAUSE OF ACTION (amended Petition)

The Court makes the following Findings of Fact with respect to Petitioner's Fourteenth Cause of Action (original Petition) and Fifteenth Cause of Action (amended Petition):

1)   Petitioner argues that the cumulative effect of all the grounds for relief and the totality of the exhibits demonstrate that his conviction and sentences are void or voidable.

2)   Petitioner re-incorporates all of his exhibits and arguments.

3)   Petitioner renews his request for discovery.

The Court makes the following Conclusions of Law with respect to Petitioner's Fourteenth Cause of Action (original Petition) and Fifteenth Cause of Action (amended Petition):

1)    Petitioner fails to demonstrate that one single Cause of Action merits relief, nor does the cumulative effect of all the exhibits and arguments taken together.

2)    The exhibits from both the original and amended Petitions fail to supply this Court with sufficient operative facts to support any claim.  Petitioner demonstrates no substantive grounds for relief.  Therefore, both Petitions are subject to dismissal without hearing.  *Kapper,* R.C. 2953.21(C)

3)    Petitioner's request for discovery is denied pursuant to *Lorraine, Love* and *Wiles.*

This Court finds that State's motion to dismiss is well-taken with respect to all Fourteen Causes of Actions in the original Petition, and all Fifteen Causes of Action in the Amended Petition.  . It is therefore ORDERED, ADJUDGED and DECREED that  Petitioner's  Petition to Vacate or Set Aside Sentence  Pursuant to R.C. 2953.21 is hereby dismissed without a hearing.

IT IS SO ORDERED,

_____
DATE

JOHN M. STUARD, JUDGE
Of the Common Pleas Court Trumbull
County, Ohio

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH-
WITH BY ORDINARY MAIL

JUDGE

-33-

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

     Plaintiff,                      :

-v-                                     :        Case No. 01-CR-794

NATHANIEL JACKSON,                      :

     Defendant.                      :

---

## NATHANIEL JACKSON'S MOTION REQUESTING THE COURT NOT DELEGATE ITS JUDICIAL FUNCTION TO THE PREVAILING PARTY IN DRAFTING FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Now comes Nathaniel Jackson and requests this Court to **not** to delegate the Court's constitutional and statutory duty to make and file Findings of Fact and Conclusions of Law should this Court deny Mr. Jackson's petition for post-conviction relief.

A memorandum in support is attached and incorporated herein.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

RANDALL L. PORTER – 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio  43215
(614) 466-5394
(614) 728-3670 Fax

COUNSEL FOR NATHANIEL JACKSON

MEMORANDUM OF LAW

## I.     INTRODUCTION

The trial court, as fact finder, "is the most important agency of the judicial branch of the government precisely because on it rests the responsibility of ascertaining the facts." United States v. Forness, 125 F.2d 928, 942-43 (2nd Cir. 1942).  When a trial court delegates its duty to the prevailing party to make findings of fact and conclusions of law, it abandons its institutional role:

> Who shall prepare the findings? Rule 52 says the court shall prepare the findings. The court shall find the facts specially and state separately its conclusions of law. We all know what has happened. Many courts simply decide the case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules.

United States v. El Paso Natural Gas, 376 U.S. 651, 657 n. 4 (1964). (quoting J. Wright, The Nonjury Trial – Preparing Findings of Fact, Conclusions of Law, and Opinions, Seminars for Newly Appointed United States District Judges 159, 166 (1962)).

Many trial courts in this State to permit the prevailing party to write their findings of fact an conclusions of law in capital post-conviction cases.  For the reasons identified herein, the Court should not do so in the present case.

## II.    A TRIAL COURT THAT PERMITS THE PREVAILING PARTY TO WRITE THE COURT'S FINDINGS SUBVERTS THE JUDICIAL PROCESS.

Appellate courts have almost universally condemned the practice of the prevailing party "ghost writing" for the trial courts its findings of facts and conclusions of law.  Lawyers are adversarial and cannot be trusted to fairly draft an accurate version of the facts.  See, e.g., Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454, 459 (4th Cir. 1983) ("[t]he adversarial zeal of counsel . . . too often infects what should be disinterested findings").

2

A trial judge impermissibly distances himself from the case and abandons the position for which he was chosen - to make judgments and findings in a fair and impartial manner - when her permits a party to make required findings for him. "[T]he practice tends to deflect the court's attention from, or actually to obscure, the more difficult factual issues and credibility problems presented by the evidence. The natural tendency of counsel, given an opportunity free of adversary constraints to shore up weak points, to gloss over evidence or credibility problems at odds with necessary findings, and to argue inferences in the guise of 'findings' is obvious." Miller v. Mercy Hosp., Inc., 720 F.2d 356, 369 (1983). See also Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960, 962 (5th Cir. 1975)

In a capital case a trial court's delegation of its judicial function to an adversary conflicts with the need for both the reality and appearance that the process for imposing death is exactingly fair, objective and reliable. Johnson v. Mississippi, 486 U.S. 578, 584-5 (1988); Gardner v. Florida, 430 U.S. 349, 358 (1977).

## III. THE COURTS OUTSIDE THE JURISDICTION OF THE STATE OF OHIO HAVE CONSISTENTLY CRITICIZED THE PRACTICE OF THE PREVAILING PARTY DRAFTING THE TRIAL COURT'S FINDINGS

The Unites States Supreme Court has twice told the federal courts that they should make their own findings. Orders that simply adopt the fact-findings and legal arguments of one side are "not worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case." United States v. El Paso Natural Gas Co., 376 U.S. 651, 656 n.4 (1964). Twenty-one years later the Court again "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." Anderson v. Bessemer City, 470 U.S. 564, 572-573 (1985). This is true, in part, because of the "potential for overreaching and exaggeration on the part of attorneys preparing findings of fact." Id. at 572. In

3

Anderson, the Supreme Court did not reverse because [t]he court itself provided the framework for the proposed findings when it issued its preliminary memorandum." Id.

Similarly, the United States Court of Appeals for the Fifth Circuit has demanded that "rubber-stamped" findings receive increased scrutiny.  McClennan v. American Eurocopter Corp., Inc., 245 F.3d 403, 409 (5th Cir. 2001) ("the district court's decision to adopt one party's proposed findings and conclusions without change may cause us to approach such findings with greater caution, and as a consequence to apply the standard of review more rigorously"); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258 (5th Cir. 1980) ("[w]hile the practice of allowing counsel for the prevailing party to write the trial judge's opinion has not been pro- scribed by this circuit, it should nevertheless be discouraged"); James v. Stockham Valves & Fittings Co., 559 F.2d 310, 314 n.1 (5th Cir.) (1978) (the appellate court was "more confident in concluding that important evidence has been overlooked or inadequately considered when factual findings were not the product of personal analysis and determination by the trial judge"); See generally Monaghan, Constitutional Fact Review, 85 COLUM. L. REV. 229, 272 (1986).

The Seventh Circuit Court of Appeals has noted that, "We do prefer to see findings that reflect an effort of composition by the trial judge.  They furnish evidence that he really worked over and analyzed the fact issues.  He must avoid giving the impression that he first decided who should win, and then made findings that would best support the favored litigant on appellate review."  Garcia v. Rush Presbyterian St. Luke Medical Center, 660 F.2d 1217, 1220 (7th Cir. 1981).  That Court, when the findings are written by the prevailing party, "will examine the findings especially critically when deciding whether they are clearly erroneous."  Andre v. Bendix Corp., 774 F.2d 786, 800 (7th Cir. 1985); citing, Coates v. Johnson & Johnson, 756 F.2d 524, 533, n. 7 (7th Cir. 1985); see also Machlett Labs v. Techny Industries et. al., 665 F.2d 795,

4

797 (7th Cir. 1981) (preliminary injunction lifted where court adopted verbatim one party's findings and it appeared that the court had not even read them).

The Eleventh Circuit Court of Appeals has cited to the "utter lack of an appearance of impartiality in the text of the proposed orders" submitted by the prevailing party. Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1373 n.46 (11th Cir. 1997).  Ten years earlier that Court had strongly disapproved of the "ghost writing" of orders by a party, "[t]he cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion. " In re Colony Square Co., 819 F.2d 272, 273-75 (11th Cir. 1987).

The Fourth Circuit has also rejected this practice.  Shaw v. Martin, 733 F.2d 304, 309 n.7 (4th Cir. 1984) ("[t]he adoption of one party's proposed findings and conclusions is a practice with which we have expressed disapproval on a number of occasions"); E.E.O.C. v. Federal Reserve Bank of Richmond, 698 F.2d 633, 640 (4th Cir. 1983) (rev'd on other grounds 467 U.S. 867) (expressing "disapproval of a trial court's practice of announcing its decision and then requesting the prevailing party to prepare findings of fact and conclusions of law which the court adopts almost word-for-word in support of its previously announced decision").

The state courts has also questioned the soundness of this practice. Dobyne v. State, 805 So. 2d 733, 741 (Ala. Crim. App. 2000), aff'd, 805 So. 2d 763 (Ala. 2001); Smith v. Smith, 845 P.2d 1090, 1093 (Alaska 1993); Elliott v. Elliott, 796 P.2d 930, 936 (Ariz. Ct. App. 1990); Grayson v. Grayson, 494 A.2d 576, 581 (Conn. App. Ct. 1985); Stevens By and Through Stevens v. Humana of Delaware Inc., 832 P.2d 1076, 1082 (Colo. Ct. App. 1992); B.E.T. Inc. v. Board of Adjustment of Sussex County, 499 A.2d 811, 812 (Del. Super. Ct. 1985); Frederick v. United States, 741 A.2d 427, 436 (D.C. 1999); Sacks v. Rothberg, 569 A.2d 150, 153-4 (D.C. 1990); Corporate Management Advisors Inc., v. Boghos, 756 So.2d 246, 249 (Fla. Dist. Ct. App.

2000); Huff v. State, 622 So.2d 982, 983 (Fla. 1993); Rose v. State, 601 So.2d 1181, 1182-3 (Fla. 1992); PDA, Inc. v. Haas Corp., 366 S.E.2d 169, 169-70 (Ga. Ct. App. 1988); In Re Doe, 22 P.3d 987, 994 (Haw. Ct. App.), rev'd on other grounds, 26 P.3d 562 (Haw. 2001); Rosecrans v. Intermountain Soap & Chemical Co., 605 P.2d 963, 967 (Idaho 1980); Shaprio v. Regional Bd. of School Trustees of Cook County, 451 N.E.2d 1282, 1292 (Ill. App. Ct. 1983); Maloblocki v. Maloblocki, 646 N.E.2d 358, 361 (Ind. Ct. App. 1995); Kroblin v. RDR Motels Inc., 347 N.W.2d 430, 435-6 (Iowa 1984); Duffin v. Patrick, 512 P.2d 442, 445 (Kan. 1975) Mansfield v. Voedisch, 672 S.W.2d 678, 681 (Ky. Ct. App. 1984); Clifford v. Klein, 463 A.2d 709, 713 (Me. 1983); Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 518 N.E.2d 519, 526 (Mass. App. Ct. 1988); Rice Researchers Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987); First Nat. Montana Bank of Missoula v. McGuinness, 705 P.2d 579, 584-85 (Mont. 1985); Sisneros v. Garcia, 613 P.2d 422, 424 (N.M. 1980); Schmidkunz v. Schmidkunz, 529 N.W.2d 857, 858-59 (N.D. 1995); Golsen v. ONG Western, Inc. 756 P.2d 1209,1211 (Okla. 1988); Commonwealth v. Williams, 732 A.2d 1167, 1176 (Pa. 1999); Delevan-Delta Corp. v. Roberts, 611 S.W. 2d 51, 52-53 (Tenn. 1981); State ex. rel. Cooper v. Copperton, 470 S.E.2d 162, 168 (W. Va. 1996); University of Vermont v. Town of Colchester, 392 A.2d 413, 414 (Vt. 1978); Brenger v. Brenger, 125 N.W. 109, 113 (Wis. 1910).

## IV.    THE COURTS HAVE BEEN ESPECIALLY CAUTIOUS OF FACTS DRAFTED BY PROSECUTORS AND ADOPTED BY TRIAL COURTS IN CAPITAL CASES.

The courts have recognized the corrupting effect, on both the appearance and administration of justice, when a trial court in a capital case abdicates its responsibility to making findings.

The Supreme Court of Indiana, in the context of a capital post-conviction case, addressed the dangers of trial courts relying upon prosecutors to draft their findings.  Prowell v. State, 741 N.E.2d 704, 708 (Ind. 2001).  That court determined that many of the prosecutor's "proposed" findings were based upon inaccurate citations to the record or to testimony taken out of context.  Id. at 709-12.  The court cautioned that the practice can lead to an erosion of confidence:

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party.  The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning.  We recognize that the need to keep the docket moving is properly a high priority of our trial bench.  For this reason, we do not prohibit the practice of adopting a party's proposed findings. *But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court.*  This is particularly true when the issues in that case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony.  For the reasons explained below, most of the statements in the findings of fact and conclusions of law are correct if viewed in isolation, but many are presented out of context and, as a result are significantly misleading.

Id. at 708-09 (emphasis added).

The Pennsylvania Supreme Court in capital post-conviction cases has prohibited trial courts in that state from engaging in the wholesale adoption of a party's arguments Commonwealth v. Williams, 732 A.2d 1167 (Pa. 1999).  In that case the court ordered that the matter be remanded to the case to the trial court because "We cannot, however in this post-conviction case involving a review of the propriety of a death sentence, condone the wholesale adoption by the post-conviction court of an advocate's brief." Id. at p. 1176. The court continued that this was particularly true in that case, because the petitioner alleged that "the government, withheld material discovery at trial, suborned false testimony from an eyewitness, and engaged in a pattern of racial discrimination in the process of jury selection." Id.

The Florida Supreme Court requires that trial courts draft their own orders in capital cases. See, e.g., State v. Reichmann, 777 So. 2d 342, 351 (Fla. 2000) ( the trial judge must draft his own opinion when overriding a jury recommendation of a life sentence). The Florida Supreme Court had previously addressed a similar problem in another capital case in which the trial judge executed a sentencing order drafted by the State's Attorney. Card v. State, 652 So.2d 344, 344 (Fla. 1995). The trial judge in Card submitted an affidavit explaining the process:

> [I]t was customary for [him] to receive sentencing orders in capital cases from the State Attorney; that this customary practice was followed in the capital cases assigned to [him]; that [he] did not dictate findings to or request that the State Attorney submit the orders before the orders were prepared and given to [him]; that the prosecutors in [his] division provided the orders to [him] as a matter of course...[and] that [t]he orders would then have been issued as [the State's Attorney] provided [it] to [him].

Id. at 345. The court held that these allegations were "sufficient to require an evidentiary hearing on the question of whether [appellant] was deprived of an independent weighing of the aggravators and the mitigators." Id.

Capital cases require procedures that ensure heightened reliability in the determination of both the defendant's guilt and/or his sentence. Beck v. Alabama, 447 U.S. 625, 637 (1980). Where an individual's life is at stake, the Supreme Court repeatedly has insisted upon higher standards of reliability and fairness. See, e.g., Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion) ("'the penalty of death is qualitatively different' from any other sentence . . . . We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.") (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976)). The trial court's adoption of a party's reasoning for its own, does not in any sense of the matter increase the reliability of the decision making process.

8

## V.   THIS COURT SHOULD NOT EMPLOY A PROCEDURE THAT HAS BEEN ALMOST UNIVERSALLY CRITICIZED, ESPECIALLY IN CAPITAL CASES.

Nathaniel Jackson's post-conviction petition is currently before the Court pursuant to

O.R.C. § 2953.21.  That Section provides:

> If the court does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition. If no direct appeal of the case is pending and the court finds ground for relief or if a pending direct appeal of the case has been remanded to the court pursuant to a request made pursuant to division (D) of this section and the court finds grounds for granting relief, it shall make and file findings of fat and conclusions of law and shall enter a judgment that vacates and sets aside the judgment in question, and, in the case of a petitioner who is a prisoner in custody, shall discharge or resentence the petitioner or grant a new trial as the court determines appropriate. …

O.R.C. § 2953.21(G) (emphasis added).

That Section clearly provides that it is the trial court and not the prevailing party is to

make findings of fact.  Ohio R. Civ. P. 52 dictates the same result.  "When a request for findings

of fact and conclusions of law is made, the court, in its discretion, may require any or all of the

parties to submit proposed findings of fact and conclusions of law; however, only those findings

of fact and conclusions of law made by the court shall form part of the record."  (emphasis

added) Pursuant to this Rule there are two types of findings, that made those made by the trial

court and those made by the prevailing party.  The two findings are distinct and separate for the

reasons previously identified herein and it is the trial court's findings that are the basis of an

appeal.

While the Ohio courts have determined that it is not per se error for a trial court to adopt

the prevailing party's findings, they has warned against indiscriminate use of the procedure.

Kaechele v. Kaechele, 72 Ohio App. 3d 267, 276 ("blanket adoptions of a party's proposed

findings of fact breeds error and reversal"); Paxton v. Mcrahenahen, 1985 Ohio App. LEXIS

9

9094 (Cuyahoga Oct. 31, 1985), p.*10 (case remanded because lower court "adopted verbatim a biased, argumentative and inaccurate document submitted by attorneys for appellees.")

The rationales that the court have cited to in questioning the wisdom of the prevailing party writing the court's findings exist in the present case. That party will not know the rationale behind this Court's granting of judgment for that party.  Consequently the "proposed" findings will be inaccurate, if not biased.  The attorney for the prevailing party cannot be expected to shirk his or her role as advocate when writing the findings for this Court.  The appearance of justice will suffer if the prevailing parties drafts the pleading substituting its analysis for that of this Court.

## VI.   CONCLUSION:  THE COURT SHOULD PERFORM ITS OWN ANALYSIS AND ITS OWN DRAFTING OF THE FINDINGS OF FACTS AND CONCLUSIONS OF LAW.

In sum, the Court's unfettered adoption of the prevailing party's adversarial pleading simply will not the product of a fair and independent adjudicative process. The Court's findings will be nothing more than "the brief[]of advocates, containing one-sided, exaggerated 'findings'" that the party has tailored for strategic advantage on appeal.  Stephen B. Bright and Patrick J. Keenan, Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases, 75 Boston U. L. Rev. 759, 803-04 (1995).

WHEREFORE, after this Court has summarily dismissed Mr. Jackson's petition or has permitted sufficient factual development via discovery and an evidentiary hearing, this Court, itself, should determine the merits of all the constitutional issues and this Court, itself, should draft conclusions based upon those findings.

Respectfully submitted,

DAVID H. BODIKER
Ohio Public Defender

10

RANDALL L. PORTER – 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio 43215
(614) 466-5394
(614) 728-3670 Fax

COUNSEL FOR NATHANIEL JACKSON

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel Jackson's Motion Requesting

The Court Not To Delegate Its Judicial Function To The Prosecutor In Drafting Findings Of Fact

And Conclusions Of Law was forwarded by first-class, postage prepaid U.S. Mail to Luwayne

Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street,

N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this 17th day of June, 2004.

RANDALL L. PORTER
COUNSEL FOR NATHANIEL JACKSON

11

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

STATE OF OHIO,              )

      Plaintiff          )

vs.                        )          JUDGMENT ENTRY

NATHANIEL E. JACKSON,      )

      Defendant          )

DEFENDANT'S MOTION FOR LEAVE OF COURT TO CONDUCT
DISCOVERY RENDERED MOOT.  SEE FINDINGS OF FACT FILED ON
JUNE 14, 2004.

8/24/04
_____
DATE

_____
JUDGE JOHN M. STUARD

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

JUDGE

vol 1029 page 809

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

STATE OF OHIO,            )

       Plaintiff          )

vs.                       )          JUDGMENT ENTRY

NATHANIEL JACKSON,        )

       Defendant          )

MOTION FOR APPOINTMENT OF COUNSEL IS GRANTED.

ATTY. DENNIS LAGER IS APPOINTED AS COUNSEL.  THIS ORDER IS

EFFECTIVE NUNC PRO TUNC TO FEBRUARY 6, 2003.

_____6/27/05_____

DATE

JUDGE JOHN M. STUARD

6/30/05 Copies
P. Mo
a Consaldas
J Lewis
J Laczko
E Porter

TO THE CLERK OF COURTS  YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH-
WITH BY ORDINARY MAIL

_____John M. Stuard_____

1064  C18

5