**IN WITNESS WHEREOF,** the said **Grantor(s)**, **William Howard Dennis Jr.** and **Mary M. Dennis**, who hereby release their respective rights of dower herein, if any, have hereunto set his/her/their hand(s) this 15 day of June, 2001.

Signed and acknowledged in the presence of:

Witnesses:

Printed name: _Paul J. Mikula_

Printed name: _Patricia M. Mikula_

William Howard Dennis Jr.

Mary M. Dennis

**STATE OF Ohio ,**
**COUNTY OF Trumbull**

SS:

Be it remembered, that on this 15 day of June 2001, before me, the subscriber, personally came the above named William Howard Dennis Jr. and Mary M. Dennis, the **Grantor(s)** in the foregoing deed, and acknowledged the signing of the same to be his/her/their voluntary act and deed.

**In testimony whereof,** I have hereunto subscribed my name and affixed my seal on the day and year last aforesaid.

_____
Notary Public

This Instrument prepared by:
ATTORNEY RICHARD G. BAUMAN

PAUL J. MIKULA, Notary Public
State of Ohio
My Commission Expires March 25, 2006

File No.  B-01-642

Instr:200107160026542    07/16/2001
P:2 of 2        F:$14.00      2:31PM
Diana Marchese          T20010024069
Trumbull County Recorder  BABWMAN

Jackson Apx. Vol. 25
Page 117

1300169877
258163

Return To:

SKY BANK
101 E WASHINGTON
NEW CASTLE, PA   16101

STATE OF OHIO, THUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL _November 4_ , 20 _03_

B-01-642

INST. # _2001071600.20543_ , RECORDER

BY: _Diana Marchese_

Instr:200107160026543   07/16/2001
P:1 of 20    F:$86.00    2:36PM
Diana Marchese    T20010024069
Trumbull County Recorder  BXBAUMAN L

———————————————[Space Above This Line For Recording Data]———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   JULY 16, 2001
together with all Riders to this document.
**(B) "Borrower"** is

DONNA M ROBERTS
UNMARRIED

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is   SKY BANK

Lender is a        BANK
organized and existing under the laws of   THE STATE OF OHIO

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3036  1/01

**VMP** -6(OH) (0005)

Page 1 of 15          Initials: _____

VMP MORTGAGE FORMS - (800)521-7291







Instr:200107160025543    07/16/2001
P:2 of 20    F:$86.00    2:35PM
Diana Marchese    T200100240069
Trumbull County Recorder  BXBAUMAN L

Lender's address is    10 EAST MAIN ST
                        SALINEVILLE, OH  43945
Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated    July    16    2001    .
The Note states that Borrower owes Lender
Twenty Nine Thousand Eight Hundred and no/100----------------------------------------------------- Dollars
(U.S. $ 29,800.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    August    15    2031        .

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _Dm_

VMP®-6(OH) (0005)    Page 2 of 15    Form 3036  1/01



Instr:200107160026543    07/16/2001
P:3 of 20    F:$86.00    2:35PM
Diana Marchese    T200100024069
Trumbull County Recorder  BXBAUMAN L

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the
COUNTY                         of       TRUMBULL                              :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]


SEE ATTACHED LEGAL DESCRIPTION EXHIBIT "A"


Parcel ID Number: 3104655                            which currently has the address of
253 WASHINGTON NE AVE                                          [Street]
WARREN              [City] , Ohio       44484       [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

-6(OH) (0005)                     Page 3 of 15          Initials: _____          Form 3036   1/01



Instr:200107160026543    07/16/2001
P:4 of 20      F:$86.00      2:35PM
Diana Marchese         T200100024059
Trumbull County Recorder  BXBAUMAN L

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts



Instr:200107160026543     07/16/2001
P:5 of 20        F:$86.00      2:35PM
Diana Marchese            T20010024069
Trumbull County Recorder  BXBRUMAN L

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



Instr:200107160026543          07/16/2001
P:6 of 20      F:$86.00        2:35PM
Diana Marchese                 T200100024069
Trumbull County Recorder  BXBAUMAN L

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



Instr:200107160026543        07/16/2001
P:7 of 20        F:$96.00        2:35PM
Diana Marchese              T200100240690
Trumbull County Recorder  BXBAUMAN L

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



Inetr:200107160025543      07/16/2001
P:8 of 20      F:$86.00      2:35PM
Diana Marchese      T20010024069
Trumbull County Recorder  BXBAUMAN L

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials: _[signature]_

VMP®-6(OH) (0005)      Page 8 of 15      Form 3036  1/01



Instr:200107160026543    07/16/2001
P:9 of 20        F:$86.00      2:35PM
Diana Marchese          T20010024069
Trumbull County Recorder  BXBRUMAN L

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:



Instr:200107160026543     07/16/2001
P:10 of 20     F:$86.00     2:35PM
Diana Marchese          T20010024069
Trumbull County Recorder  BXBAUMAN L

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____



Instr:200107160026543       07/16/2001
P:11 of 20       F:$86.00       2:35PM
Diana Marchese       T20010024069
Trumbull County Recorder  BXBAUMAN L

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



Instr:200107160026543     07/16/2001
P:12 of 20    F:$86.00    2:35PM
Diana Marchese          T200100240869
Trumbull County Recorder  BXBAUMAN L

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



Instr:200107160026543          07/16/2001
P:13 of 20        F:$86.00        2:36PM
Diana Marchese              T20010024069
Trumbull County Recorder    BXBAUMAN L

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender** shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office,
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.



Instr:200107160026543    07/16/2001
P:14 of 20    F:$86.00    2:35PM
Diana Marchese              T20010024069
Trumbull County Recorder  BXBAUMAN L

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____              _____ (Seal)
JOANNE L. LEWIS                           DONNA M ROBERTS          -Borrower

NOTARIAL SEAL

_____              _____ (Seal)
BUFFIE D. SCHEHL                                                   -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                -Borrower

 -6(OH) (0005)          Page 14 of 15          Form 3036  1/01

Instr:200107160026543    07/16/2001
P:15 of 20    F:$85.00    2:35PM
Diana Marchese    T20010024069
Trumbull County Recorder  BXBAUMAN L

**STATE OF OHIO,**                    TRUMBULL                    County ss:

On this   16th        day of            July          2001      , before me, a Notary Public in
and for said County and State, personally appeared

**DONNA M ROBERTS**
**UNMARRIED**

the individual(s) who executed the foregoing instrument and acknowledged that he/she/they did examine
and read the same and did sign the foregoing instrument, and that the same is his/her/their free act and
deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

My Commission Expires:

Notary Public

NOTARIAL
SEAL.

JOANNE L. LEWIS, NOTARY PUBLIC
State of Ohio
My Commission Expires July 6, 2004

This instrument was prepared by
DONNA KRASINSKI
SKY BANK
10 EAST MAIN ST
SALINEVILLE, OH  43945

Initials:

VMP-6(OH) (0005)                    Page 15 of 15                    Form 3036   1/01

Jackson Apx. Vol. 25
Page 132

Situated in the City of Warren, County of Trumbull, and State of Ohio: and known as Lot Number Ninety-three (93) in the Perkins 4th Addition of said addition being recorded in Trumbull County Records of Maps, Vol. 5, Page 20, and furthermore known as being part of original Lot Number twenty-one (21) in Warren Township and situated on East Washington Avenue in said City.

Bounded: Commencing at a point on the northerly line of Washington Avenue: one hundred and sixty three and two third (16.-2/3) feet easterly from the east line of Mercer Street ,thence northerly from said Washington Avenue and parallel to said Mercer Street, one hundred ninety eight (198) feet to a point; thence easterly parallel to said  Washington Avenue forty-five  (45) feet to a point, thence southerly parallel to said Mercer Street, one hundred and ninety eight (198) feet to the northerly line of Washington Avenue, thence westerly along the northerly line of said Washington Avenue, forty five (45) feet to the place of beginning.

Said lot has a frontage of forty five (45) feet on the north side of Washington Street, N. E., and is one hundred ninety eight (198) feet deep, and is known as house number 253 and 255 Washington Street, N. E., and is subject to and including all the right, title and interest in and to that certain joint drive-way over the west part of said lot number ninety three (93) and the east part of lot number ninety four (94) in said addition.

Instr:200107160026543        07/16/2001
P:16 of 20      F:$86.00      2:35PM
Diana Marchese              T200100024069
Trumbull County Recorder  BXBAUMAN L



Instr:200107160026543        07/16/2001
P:17 of 20    F:$86.00         2:35PM
Diana Marchese          T200100240689
Trumbull County Recorder   BXBAUMAN L

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **16th** day of **July** **2001** ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to **SKY BANK**
**10 EAST MAIN**
**SALINEVILLE, OH  43945** (the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
**253 WASHINGTON NE AVE**
**WARREN, OH  44484**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Initials: _____
Page 1 of 4
Form 3170 1/01
VMP-57R (0008)
VMP MORTGAGE FORMS - (800)521-7291



Instr:200107160026543      07/16/2001
P:18 of 20    F:$86.00      2:35PM
Diana Marchese          T20010024069
Trumbull County Recorder  BXBAUMAN L

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

Initials: _____

VMP-57R (0008)                    Page 2 of 4                    Form 3170 1/01

Instr:200107160026543      07/16/2001
P:19 of 20     F:$86.00        2:35PM
Diana Marchese          T20010024069
Trumbull County Recorder  BXBAUMAN L

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
DONNA M ROBERTS          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

VMP-57R (0008)            Page 4 of 4            Form 3170 1/01



Instr:200107160026543    07/16/2001
P:20 of 20    F:$86.00    2:36PM
Diana Marchese    T20010024069
Trumbull County Recorder  BXBAUMAN L

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Initials: _____

Form 3170 1/01

VMP-57R (0008)

Page 3 of 4

# WARRANTY DEED

Inst:200202080004707       02/08/2002
P:1 of 2       F:$14.00   3:26PM
Diana Marchese         T20020003958
Trumbull County Recorder  BX#52 RICH

## KNOW ALL MEN BY THESE PRESENTS, That

**DONNA ROBERTS, UNMARRIED,**

the Grantor who claims title by or through instrument, recorded in Volume O.R. 200107160026542, Page, County Recorder's Office, for the consideration of One Dollar and other valuable consideration ($1.00 and o.v.c.) received to Grantors full satisfaction of

**DUANE LANG,**

the Grantee, whose TAX MAILING ADDRESS will be **253 WASHINGTON AVE. N.E., WARREN, OHIO 44483**

does

**Give, Grant, Bargain, Sell and Convey** unto the said Grantee, his/her heirs and assigns, the following described premises:

Situated in the City of Warren, County of Trumbull and State of Ohio:

And known as Lot No. 93 in the Perkins 4th Addition of said addition being recorded in Trumbull County Records of Maps, Vol. 5, Page 20, and furthermore known as being part of original Lot No. 21 in Warren Township and situated on East Washington Avenue in said City.

BOUNDED: Commencing at a point on the northerly line of Washington Avenue; one hundred and sixty-three and two third feet easterly from the east line of Mercer Street; thence northerly from said Washington Avenue and parallel to said Mercer Street, one hundred ninety-eight feet to a point, thence easterly parallel to said Washington Avenue forty-five feet to a point, thence southerly parallel to said Mercer Street, one hundred and ninety-eight feet to the northerly line of Washington Avenue, thence westerly along the northerly line of said Washington Avenue, forty-five feet to the place of beginning.

Said lot has a frontage of forty-five feet on the north side of Washington Street N.E., and is one hundred ninety-eight feet deep, and is known as house number 253 and 255 Washington Street N.E., and is subject to and including all the right, title and interest in and to that certain joint drive-way over the west part of said Lot No. 93 and the east part of Lot No. 94 in said addition, as appears by said plat, be the same more or less, but subject to all legal highways.

The property is known for street numbering purposes as 253 WASHINGTON AVE. N.E., WARREN, OHIO 44483.

P.P.N.39-104655

REAL PROPERTY TRANSFER TAX
TRANSFERRED AND **PAID**

$0      FEB 0 8 2002

In the Amount Of _152.00_
David A. Hines, Trumbull County Auditor   RJ

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY NAME AND OFFICIAL SEAL _November 4_ , 20_02_
Diana Marchese, RECORDER
INST.# _200202080004707_
BY: _Edward Marie A. Mary Roach_

Be the same more or less, but subject to all legal highways.



STATE'S
EXHIBIT
400-C

**To Have and to Hold** the above granted and bargained premises, with the appurtenances thereunto belonging, unto the said Grantee, his/her heirs and assigns forever.

And the said Grantor, for his/herself and his/her heirs, executors and administrators, hereby covenant with the said Grantee, his/her heirs and assigns, that said Grantor is the true and lawful owner of said premises, and is well seized of the same in fee simple, and has good right and full power to bargain, sell and convey the same in the manner aforesaid, and that the same are free and clear from all encumbrances, except conditions and restrictions of record and taxes and special assessments which will be prorated to the date of transfer, if any,

and further, that said Grantor will warrant and defend the same against all claims of all persons whatsoever, except as hereinbefore provided.

And for valuable consideration

release and forever quit-claim unto the said Grantee, his/her heirs and assigns, all     does hereby remise, right and expectancy of **Dower** in the above described premises.

**In Witness Whereof** he/she has hereunto set his/her hand, the ___3/st___ day of __January__, in the year of our Lord two thousand (2002).

Signed and acknowledged in presence of:

_Louis Scarlino_

_Debra Vanwhy_

_Debra Vanwhy_

_Donna Roberts by_
_Janice M Perry POA_
**DONNA ROBERTS**
BY: JANICE M. PERRY
POWER OF ATTORNEY

STATE OF CONNECTICUT )
                 ) ss.
COUNTY OF FAIRFIELD )

Before me, a **Notary Public** in and for said County of State, personally appeared the above named

**DONNA ROBERTS, UNMARRIED,**
who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed.

**In Testimony Whereof, I** have hereunto set my hand and official seal this __3/st__ day of __January__, A.D. 2002.

**NOTARIAL SEAL**

_Mary Ann Oertel_
Notary Public

This instrument prepared by:

ATTORNEY RICHARD J. LACIVITA
8009 E. MARKET STREET
WARREN, OHIO 44484

(330) 856-2510

File No. 02H2142

**MARY ANN OERTEL**
*Notary Public*
My Commission Expires Nov. 30, 2006
_Fairfield County_

Instr-200202080004707     02/09/2002
P:2 of 2        F:$14.00      3:26PM
Diana Marchese     T20020003958
Trumbull County Recorder  BX#52 RICH

Instr:200205020016746      05/02/2002
P:1 of 1      F:$20.00      3:37PM
Diana Marchese      T20020013479
Trumbull County Recorder  EP5KY BANK

## SATISFACTION OF MORTGAGE

**THIS IS TO CERTIFY THAT THE CONDITIONS OF THE MORTGAGES GIVEN BY THE FOLLOWING AND FOUND IN THE RECORDS OF** Trumbull **COUNTY, HAVE BEEN FULLY COMPLIED WITH AND ARE HEREBY SATISFIED AND DISCHARGED:**

| MORTGAGOR: | Dated | Date Filed | VOL: PAGE: | INST. |
|---|---|---|---|---|
| Donna M. Roberts 1300169877 | 7/16/01 | 7/16/01 | | 200107160026543 |
| Julia I. Szabo 1300178523 | 5/24/00 | 5/25/00 | | 200005250019353 |
| Jill L. Finch 1300178019 | 6/22/00 | 6/22/00 | | 200006220022938 |

**SIGNED THIS** 23rd **DAY** April **, 2002.**
**IN PRESENCE OF:**

*Kathryn Creaturo*
**KATHRYN CREATURO**

*Patricia K. Devitt*
**PATRICIA K. DEVITT**

**SKY BANK**

*Bf Ct*
**BEVERLY ESTES**
**ASS'T. VICE-PRESIDENT**

**STATE OF OHIO**
**COLUMBIANA COUNTY**          **SS:**

**BEFORE ME, A NOTARY PUBLIC, THE UNDERSIGNED OFFICER, PERSONALLY APPEARED** Beverly Estes**, WHO ACKNOWLEDGED HIMSELF/HERSELF TO BE THE** Ass't. Vice-President **OF SKY BANK, A CORPORATION, AND THAT HE/SHE AS SUCH OFFICER, BEING AUTHORIZED TO DO SO, EXECUTED THE FOREGOING INSTRUMENT FOR THE PURPOSE THEREIN CONTAINED BY SIGNING THE NAME OF THE CORPORATION BY HIMSELF/HERSELF AS** Ass't. Vice-President.
**IN WITNESS WHEREOF, I HEREUNTO SET MY HAND AND OFFICIAL SEAL THIS** 23rd **DAY OF** April **,** 2002**.**

**THIS INSTRUMENT PREPARED BY:**
**SKY BANK**
**70 EAST MAIN STREET**
**SALINEVILLE, OH   43945-1134**

*Kathryn Creaturo*
**KATHRYN CREATURO, NOTARY PUBLIC, STATE OF OHIO**
**MY COMMISSION EXPIRES 5-8-04**

**NOTARIAL SEAL**

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL November 4, 20 03
Dia Marsh, RECORDER
INST. # 200205020016746
BY Frederick Altone Deputy Record

STATE'S
EXHIBIT
400 D

STATE'S
EXHIBIT
401

Exhibit 401
494 Olive

Supreme Court of Ohio
Case No. 03-0137
Date Rec'd 7/9/03

# WARRANTY DEED



Instr:200107130026296          07/13/2001
P:1 of 2          F:$14.00          2.05PM
Diana Marchese          T20010023857
Trumbull County Recorder  BXQM LAND

## *Know all Men by These Presents:*

That, **I,  Kenneth R. Eichorn, married**, the Grantor, who claims title by or through Volume 857, Page 359 Trumbull County Recorder's Office, for the consideration of One Dollar and Other Good & Valuable Consideration ($1.00 & O.V.C.)------received to my full satisfaction of

### Donna M. Roberts

the Grantee, whose Tax Mailing Address will be 254 Fonderlac, Warren, Ohio  44484 · do ***Give, Grant, Bargain, Sell and Convey*** unto the said Grantee, her heirs and assigns, the following described premises:

Situated in the City of Warren, County of Trumbull and State of Ohio:

And known as the South end of Lots Nos. twenty-two (22) and twenty-three (23) in the Sutliff Addition to the City of Warren, Ohio, as recorded in Trumbull County Records of Plats, Book 6, Page 18, and bounded and described as follows:

Beginning at the southwest corner of Lot No. twenty-three (23) thence along the south line of said Lots Nos. twenty-two (22) and twenty-three (23), one hundred (100) feet; thence north along the east line of said Lot No. twenty-two (22), forty-five (45) feet; thence west along a line drawn parallel with the south line of said Lots Nos. twenty-two (22) and Twenty-three (23) and forty-five (45) feet north therefrom to the west line of Lot No. twenty-three (23); thence south along the west line of Lot No. twenty-three (23), forty-five (45) feet to the place of beginning.

Said parcel has a frontage of forty-five (45) feet on the east side of Olive Street, and is one hundred (100) feet in depth or equal width, being the same more or less but subject to all legal highways.

Known for street numbering purposes as 494 Olive Street, N.E., Warren, Ohio

REAL PROPERTY TRANSFER TAX
TRANSFERRED AND PAID
.50                                        JUL 1 3 2001

In the Amount Of  127.20
David A. Hines, Trumbull County Auditor    RT

STATE OF OHIO, THUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL  November 4 , 2022
_Diana Marchese_ , RECORDER
INST. #  200107130026296
BY:



x. Vol. 25
Page 142

*To Have and to Hold* the above granted and bargained premises, with the appurtenances thereof, unto the said Grantee, her heirs and assigns forever.

And the said Grantor, does for himself and his heirs, executors and administrators, covenant with the said Grantee, her heirs and assigns, that at and until the ensealing of these presents, I am well seized of the above described premises, as a good and indefeasible estate in FEE SIMPLE, and have good right to bargain and sell the same in manner and form as above written, and that the same are free from all encumbrances whatsoever except taxes and assessments, prorated to date of transfer; recorded easements, covenants, conditions, restrictions and rights of way; and zoning ordinances, and that I will **Warrant and Defend** said premises, with the appurtenances thereunto belonging, to the said Grantee, her heirs and assigns, against all lawful claims and demands whatsoever except as aforesaid.

And for valuable consideration I, Anna Eichorn, wife of Kenneth R. Eichorn, Grantor Herein, do hereby remise, release and forever quitclaim unto the said Grantee, her heirs and assigns, all my right and expectancy of Dower in the above described premises.

*In Witness Whereof,* We have hereunto set our hands, the _____10th_____ day of July, in the year of our Lord two thousand one.

Signed in presence of:

_Valerie A. Fisher_
Valerie A. Fisher

_Lori Brendlinger_
Lori Brendlinger

_Kenneth R. Eichorn_
Kenneth R. Eichorn

_Anna Eichorn_
Anna Eichorn   (Releasing dower)

State of Ohio          Trumbull County:ss

Before me, a Notary Public in and for said County and State, personally appeared the above named

Kenneth R. Eichorn and Anna Eichorn

who acknowledged that they did sign the foregoing instrument and that the same is their free act and deed.

*In Testimony Whereof*   I have hereunto set my hand and official seal, at _____Niles, Ohio_____ this _10th_ day of July A.D. 2001

_Valerie A. Magyar Fisher_
Notary Public

Valerie A. Magyar Fisher
Notary Public, State of Ohio
My Comm. Expires Sept. 10, 2004

NOTARIAL
SEAL

This instrument prepared by   Jack C. Lorenzetti, Jr., Co., L.P.A.
Record & Return to:        American Land Title Agency, Inc.
                           815 Youngstown-Warren Road, Suite 2
                           Niles, Ohio 44446

Instr:200107130025296   07/13/2001
Pg:2 of 2     F:$14.00      2:06PM
Diana Marchese          T200100023867
Trumbull County Recorder   EXAM LAND

Jackson Apx. Vol. 25
Page 143

1300169796
258163

Return To:          SKY BANK
                    101 E WASHINGTON
                    NEW CASTLE, PA    16101

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL _November 4_ , 20_02_
_____, RECORDER
INST.# _200107130026297_
BY: _____

Instr:200107130026297        07/13/2001
P:1 of 20      F:$86.00         2:06PM
Diana Marchese           T20010023867
Trumbull County Recorder   BXAM LAND

───────────────[Space Above This Line For Recording Data]───────────────

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   JULY 13, 2001
together with all Riders to this document.
(B) "Borrower" is

       DONNA M ROBERTS
       SINGLE

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is    SKY BANK

Lender is a         BANK
organized and existing under the laws of  THE STATE OF OHIO

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3036  1/01

-6(OH) (0005)
Page 1 of 15                     Initials: _____
        VMP MORTGAGE FORMS - (800)521-7291



Lender's address is    10 EAST MAIN ST
                       SALINEVILLE, OH  43945

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated    July        13      2001       .
The Note states that Borrower owes Lender
Thirteen Thousand Nine Hundred and no/100----------------------------------------------------------- Dollars
(U.S. $ 13,900.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    July        15    2031            .

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: _____

-6(OH) (0005)                    Page 2 of 16                              Form 3036  1/01

Instr:200107130026297      07/13/2001
p.2 of 20          F:$86.00    2:06PM
Diana Marchese      T20010023867
Trumbull County Recorder    BXAM LAND

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the
        COUNTY                          of          TRUMBULL                                :
      [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]


See Exhibit A Attached Hereto And Made A Part Hereof,


Parcel ID Number: 39448900                                    which currently has the address of
                494 OLIVE ST                                                        [Street]
                WARREN                          [City], Ohio        44484        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

                                                    Initials: ___

-6(OH) (0005)                          Page 3 of 15                          Form 3036  1/01

Instr:200107130026297        07/13/2001
P:3 of 20      F:$86.00        2:06PM
Diana Marchese              T20010023867
Trumbull County Recorder   BXAM LAND

Jackson Apx. Vol. 25
Page 146

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

Instr:200107130026297      2:06PM
P:4 of 20      F:$86.00      T200100023867
Diana Marchese      BXAM LAND
Trumbull County Recorder      077/9/2901

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: ___

Instr:200107130025297    07/13/2001
P:5 of 20    F:$86.00    2:06PM
Diana Marchese          T20010023857
Trumbull County Recorder  BXAM LAND

Jackson Apx. Vol. 25
Page 148

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Instr:200107130026297    07/13/2001
P:6 of 20    F:$86.00    2:36PM
Diana Marchese    T20010023867
Trumbull County Recorder  BXRM LAND

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6(OH) (0005)                    Page 7 of 15                              Form 3036   1/01

Initials: [signature]

Instr:200107130026297          07/13/2001
P:7 of 20      F:$86.00        2:06PM
Diana Marchese       T20010023957
Trumbull County Recorder  BXAM LAND

Jackson Apx. Vol. 25
Page 150

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Instr:200107130026297      07/13/2001
P:8 of 20     F:$86.00         2:06PM
Diana Marchese          T200100023867
Trumbull County Recorder  BXAM LAND

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Instr:200107130026297          07/13/2001
P: 10 of 20        F:$86.00        2:06PM
Diana Marchese              720010023867
Trumbull County Recorder    BXRM LAND

Jackson Apx. Vol. 25
Page 153

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: [signature]

Instr:200107130026297    07/13/2001
P:11 of 20              2:06PM
Diana Marchese    F:$86.00
Trumbull County Recorder    T200103023867
                            BXAM LAND

Jackson Apx. Vol. 25
Page 154

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Instr:200107130028397          07/13/2001
P:12 of 20        F:$86.00          2:06PM
Diana Marchese                  T200100023867
Trumbull County Recorder    BXAM LAND

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office,
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

Instr:200107130026297    07/13/2001
P:13 of 20    F:$86.00    2:06PM
Diana Marchese    T20010023867
Trumbull County Recorder  BXAM LAND

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
Robert S. Fingerhut

_____
Paul J. Drotar, Jr.

_____ (Seal)
DONNA M ROBERTS                                    -Borrower

_____ (Seal)
                                                                   -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                                       -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                                       -Borrower

_____ (Seal)          _____ (Seal)
                                    -Borrower                                                       -Borrower

-6(OH) (0005)                          Page 14 of 15                          Form 3036   1/01

Instr:200107130026297        07/13/2001
P:14 of 20      F:$86.00        2:06PM
Diana Marchese              T20010023867
Trumbull County Recorder  BXRM LAND

Jackson Apx. Vol. 25
Page 157

**STATE OF OHIO,**        **TRUMBULL**      **County ss:**

On this  13th    day of      July      2001     , before me, a Notary Public in and for said County and State, personally appeared

DONNA M ROBERTS
SINGLE

the individual(s) who executed the foregoing instrument and acknowledged that he/she/they did examine and read the same and did sign the foregoing instrument, and that the same is his/her/their free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

My Commission Expires:

Paul J. Drotar Jr., Notary Public
State of Ohio
My Commission Expires 1-17-2006

Notary Public

**NOTARIAL
SEAL**

This instrument was prepared by
DEBBIE KAUFMAN
SKY BANK
10 EAST MAIN ST
SALINEVILLE, OH  43945

-6(OH) (0009)      Page 15 of 15     Initials:      Form 3036  1/01

Instr:20010713026297  07/13/2001
P:15 of 20  F:$86.00  2:06PM
Diana Marchese  T20010323867
Trumbull County Recorder  EXAM LAND

Jackson Apx. Vol. 25
Page 158

Borrower: Donna M. Roberts
Property: 194 Olive Street, N.E., Warren, Ohio 44484
Lender: Sky Bank

"EXHIBIT A"

Situated in the City of Warren, County of Trumbull and State of Ohio:

And known as the South end of Lots Nos. twenty-two (22) and twenty-three (23) in the Sutliff Addition to the City of Warren, Ohio, as recorded in Trumbull County Records of Plats, Book 6, Page 18, and bounded and described as follows:

Beginning at the southwest corner of Lot No. twenty-three (23) thence along the south line of said Lots Nos. twenty-two (22) and twenty-three (23), one hundred (100) feet; thence north along the east line of said Lot No. twenty-two (22), forty-five (45) feet; thence west along a line drawn parallel with the south line of said Lots Nos. twenty-two (22) and Twenty-three (23) and forty-five (45) feet north therefrom to the west line of Lot No. twenty-three (23); thence south along the west line of Lot No. twenty-three (23), forty-five (45) feet to the place of beginning.

Said parcel has a frontage of forty-five (45) feet on the east side of Olive Street, and is one hundred (100) feet in depth or equal width, being the same more or less but subject to all legal highways.

Known for street numbering purposes as 494 Olive Street, N.E., Warren, Ohio

Instr:200107130026297    07/13/2001
P:16 of 20    F:$86.00    2:06PM
Diana Marchese           T200100233367
Trumbull County Recorder  BXRM LAND

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **13th** day of **July** **2001** ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to **SKY BANK**
**10 EAST MAIN**
**SALINEVILLE, OH  43945** (the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
**494 OLIVE ST**
**WARREN, OH  44484**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Initials: _____
Page 1 of 4                                                                   Form 3170 1/01
~57R (0008)                    VMP MORTGAGE FORMS - (800)521-7291

Instr:200107130026297    07/13/2001
P:17 of 20    F:$86.00    2:06PM
Diana Marchese    T20010023867
Trumbull County Recorder  BKDH LAND

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

Initials

Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
**DONNA M ROBERTS**                    -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

_____ (Seal)
                                       -Borrower

-57R (0008)                    Page 4 of 4                    Form 3170 1/01

Instr:200107130026297     07/13/2001
P:20 of 20    F:$86.00     2:06PM
Diana Marchese
Trumbull County Recorder  BXRR LAND

Jackson Apx. Vol. 25
Page 163

SURVIVORSHIP DEED

Instr. 200202260031771    06/26/2002
P:1 of 2    F:$14.00    3:30PM
Diana Marchese    T20020025779
Trumbull County Recorder  BX(62)SCHU

# 𝕶𝖓𝖔𝖜 𝖆𝖑𝖑 𝕸𝖊𝖓 𝖇𝖞 𝖙𝖍𝖊𝖘𝖊 𝕻𝖗𝖊𝖘𝖊𝖓𝖙𝖘:

*That*  I, DONNA M. ROBERTS, Single

*of*    Trumbull    County, Ohio,

*for valuable consideration paid, Grant(s), (Covenants, if any), to*

**ANDRE L. RILEY and ADEA B. RILEY, Husband and Wife**

*for their joint lives, remainder to the survivor of them,*

*whose tax mailing address is (addresses are):*    494 Olive Street NE
Warren, Ohio  44483

*the following described Real Property: (Description of land or interest therein and encumbrances, reservations, and exceptions, if any)*

Situated in the City of Warren, County of Trumbull and State of Ohio:

And known as the South end of Lots Nos. twenty-two (22) and twenty-three (23) in the Sutliff Addition to the City of Warren, Ohio, as recorded in Trumbull County Records of Plats, Book 6, Page 18, and bounded and described as follows:

Beginning at the southwest corner of Lot No. twenty-three (23) thence along the south line of said Lots Nos. twenty-two (22) and twenty-three (23), one hundred ( 100) feet; thence north along the east line of said Lot No. twenty-two (22), forty-five (45) feet; thence west along a line drawn parallel with the south line of said Lots Nos. twenty-two (22) and Twenty-three (23) and forty-five (45) feet north therefrom to the west line of Lot No. twenty-three (23); thence south along the west line of Lot No. twenty-three (23), forty-five (45) feet to the place of beginning.

Said parcel has a frontage of forty-five (45) feet on the east side of Olive Street, and is one hundred (100) fee in depth or equal width, being the same more or less but subject to all legal highways.

PERMANENT PARCEL #39-448900

KNOWN FOR STREET NUMBERING PURPOSES AS:    494 Olive Street NE
Warren, Ohio  44485

REAL PROPERTY TRANSFER TAX
TRANSFERRED AND PAID
$0⁴  AUG 2 6 2002
In the Amount Of  76⁶⁰
David A. Hines, Trumbull County Auditor

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY NAME AND OFFICIAL SEAL December 4 , 2002
Diana Marchese , RECORDER
INST. # 200202260031771
BY:

*Prior Instrument Reference: Instrument #200107130026296*    *of the Deed Records*
*of*    TRUMBULL    *County, Ohio.*



Instr:200208260331771    08/26/2002
P:2 of 2          F:$14.00       3:30PM
Diana Marchese             T20020325779
Trumbull County Recorder  BX(62)SCHU

And _____, wife/husband of the Grantor

Releases all rights of dower therein.

*WITNESS*  my/our hands this _22ND_ day of _AUG._, 2002.

X *Donna M Roberts Poa Janice Perry*

DONNA M. ROBERTS poa JANICE PERRY

_____

STATE OF ~~OHIO~~          COUNTY OF ~~TRUMBULL~~              ss: STRATFORD
        CT                          FAIRFIELD

**Be it remembered,** that on the _22ND_ day of _AUGUST_, 2002, before me,

the subscriber, a Notary Public, in and for said County and State, personally appeared

DONNA M. ROBERTS pos JANICE PERRY, the Grantor(s) in the foregoing Deed, and

acknowledged the signing thereof to be her voluntary act and deed.

*In Testimony Whereof,* I have hereunto subscribed my name and affixed my

official seal on the day and year last aforesaid.

X *Scott M Jacob*                    **NOTARIAL
                                        SEAL**
NOTARY PUBLIC

My Commission Expires: _12/3/03_

SCOTT M. JACOB
*NOTARY PUBLIC*
MY COMMISSION EXPIRES DEC 31, 2003

This instrument was prepared by:    **THOMAS E. SCHUBERT, J.D.**
                                     **138 E. Market Street**
                                     **Warren, Ohio  44481**

Exhibit 402
254 Fonderlac



Supreme Court of Ohio
Case No. 03-0137
Date Rec'd 7/9/03

B-95-205/md/3-3-95

**362796**
WARRANTY DEED, General, Short Form, No. 102-B (Ohio Statutory Form)

The Ohio Legal Blank Co., Cleveland
Publishers and Dealers Since 1883

# Know all Men by these Presents

**That**

VERNON C. KISTLER and MARY L. KISTLER,
husband and wife

(insert marital status)

of      Trumbull      County, Ohio,

*for valuable consideration paid, Grant(s), with general warranty covenants, to*

DONNA M. ROBERTS

*whose tax mailing address is*      254 Fonderlac
Warren, Ohio 44484

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL November 4 , 2022
_____, RECORDER
INST.# Official record 918 pg 853
BY: Frederick A. Moore/Deputy Recorder

*the following described Real Property:*

Situated in the Township of Howland, County of Trumbull and State of Ohio:

Being all of Lot 39 in the Avalon Estates Plat No. 3 as recorded in Volume 39, Page 14, Trumbull County Record of Plats.

Said Lot No. 39 has a frontage of 100 feet on the westerly side of Fonderlac Drive and extends back therefrom between parallel lines a distance of 173 feet and has a rear line of 100 feet, as appears by said plat, be the same more or less but subject to all legal highways.

Subject to restrictions, easements and conditions of record, if any.

RECEIVED FOR RECORD
AT 11:51 O'CLOCK A M
MAR 13 1995
DIANA J. MARCHESE
Recorder of Trumbull County
14.00

REAL PROPERTY TRANSFER TAX
TRANSFERRED AND PAID

MAR 13 1995

In the Amount Of 572.00
David A. Hines
DAVID A. HINES, COUNTY AUDITOR

*Prior Instrument Reference: Vol.*      OR 842      *Page*      749      *of the Deed*

*Records of*      Trumbull      *County, Ohio.*

*This is a General Warranty Deed—Ohio Statutory Form*

* See Sections §302.05 and §302.06 of the Revised Code of Ohio as to covenants made and the warranties given by the Statutory Form of General Warranty Deed.

918 PAGE 853

STATE'S
EXHIBIT
402 A

918 PAGE 854

And                                          wife (husband) of the Grantor releases

all rights of dower therein.

**Witness**    our    hand(s) this    6th    day of    March    19 95.

Signed and acknowledged in presence of:

_Michele R. Duncan_                      _Vernon C. Kistler_
Witness    Michele R. Duncan              Vernon C. Kistler

_Kimberly Cunningham_                    _Mary L. Kistler_
Witness    Kimberly Cunningham            Mary L. Kistler

**State of**    Ohio              **County of**    Trumbull              ss.

**Be It Remembered,** That on the    6th    day of    March    19 95,

before me, the subscriber, a    Notary Public    in and for said county,

personally came    Vernon C. Kistler and Mary L. Kistler,
                   husband and wife

the Grantor(s) in the foregoing Deed, and acknowledged the signing thereof to be

their voluntary act and deed.

**In Testimony Whereof,** I have hereunto subscribed

my name and affixed my    Notary    seal

on the day and year last aforesaid.

_Kimberly Cunningham_
Notary Public

KIMBERLY CUNNINGHAM, Notary Public
State of Ohio
My Commission Expires July 22, 1999

This instrument was prepared by    Richard G. Bauman
                                   Attorney-at-Law

**Warranty Deed**

(Statutory Form)

362796

FROM

Vernon C. Kistler
and
Mary L. Kistler

TO

Donna M. Roberts

Transferred _____ 19___

_____ County Auditor

State of Ohio, _____ County, ss.

Presented for record on the _____ day

of _____ 19___, at

_____ o'clock, _____ M.

Recorded _____ 19___

in Deed Book No. _____ Page _____

_____ County Recorder

BAUMAN LAND TITLE, LTD.

362797

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL November 4 , 20 22

INST. # Official record 918 Pg 855 , RECORDER
BY:

RECEIVED FOR RECORD
AT 11:52 O'CLOCK A M

MAR 13 1995

DIANA J. MARCHESE
Recorder of Trumbull County

19

---

[Space Above This Line For Recording Data]

95073                06-16-16314

## OPEN-END MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on    March 9
19   95      .The mortgagor is DONNA M. ROBERTS, a single woman

("Borrower"),

and whose mailing address is  254 FONDERLAC                    WARREN, OH  44484

This Security Instrument is given to  METROPOLITAN SAVINGS BANK OF OHIO
, which is organized and existing under the laws of  OHIO        , and whose address is
1 Federal Plaza West, Youngstown, Ohio 44501                   ("Lender").
Borrower owes Lender the principal sum of      Eighty Thousand and No/100 ------------------------
------------------------------ Dollars (U.S. $  80,000.00       ). This debt
is evidenced by the Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on  April 1, 2025
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications; (b) the payment of all other sums, with interest, advanced under
paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant
and convey to Lender the following described property located in    TRUMBULL                County, Ohio:

Situated in the Township of Howland, County of Trumbull, and State of Ohio:

Being all of Lot 39 in the Avalon Estates Plat No. 3 as recorded in Volume 39, Page 14,
Trumbull County Records of Plats.

Said Lot No. 39 has a frontage of 100 feet on the westerly side of Fonderlac Drive and
extends back therefrom between parallel lines a distance of 173 feet and has a rear line
of 100 feet, as appears by said plat, be the same more or less but subject to all legal
highways.

which has the address of      254 FONDERLAC                    WARREN
                                       [Street]                       [City]

Ohio        44484        ("Property Address");

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights,
appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or
hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.
All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to
mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM (R) / METMG1 / 6/92

OHIO- Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

MET FORM# 31-42-99

918 PAGE 855

Form 3036   9/90

TLG

STATE'S EXHIBIT

Pages 2 through 5 have been previously recorded as part of a master mortgage form in the counties listed below:

By executing and delivering this Mortgage and the promissory note or notes secured hereby, the parties agree that pursuant to Section 5302.16 of the Ohio Revised Code all of the provisions of the Master Mortgage Form hereinafter referred to are hereby incorporated into this mortgage by reference. The Mortgagor hereby acknowledges receipt of a copy of said Master Mortgage Form prior to the execution of this mortgage. The said Master Mortgage Form above referred to was recorded in the mortgage records of the Recorder's Offices of the following counties in Ohio in the volume and page designated after the name of each county, to wit:

| | | |
|---|---|---|
| BELMONT COUNTY: | Volume 593 | Page 313 |
| COLUMBIANA COUNTY: | O.R.V. 344 | Page 203 |
| JEFFERSON COUNTY: | Volume 112 | Page 989 |
| MAHONING COUNTY: | O.R. 1707 | Page 111 |
| TRUMBULL COUNTY: | O.R. 716 | Page 959 |

24. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

[x] Adjustable Rate Rider    [ ] Condominium Rider    [ ] 1-4 Family Rider

[ ] Graduated Payment Rider    [ ] Planned Unit Development Rider    [ ] Biweekly Payment Rider

[ ] Balloon Rider    [ ] Rate Improvement Rider    [ ] Second Home Rider

[ ] Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
Eric Hartin        DONNA M. ROBERTS      -Borrower

_____    _____ (Seal)
Audrey Rice                        -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

———————————————— [Space Below This Line For Acknowledgment] ————————————————

STATE OF OHIO,      TRUMBULL      County ss:

On this, the _9th_ day of _March_, 19 _96_, before me, a Notary Public in and for said County and State, personally appeared DONNA M. ROBERTS

the individual(s) who executed the foregoing instrument and acknowledged that ___she___ did examine and read the same and did sign the foregoing instrument, and that the same is __her__ free act and deed.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(Seal)

My Commission expires:    Oct 5, 1999           _____
                                           Notary Public

This Instrument Prepared By:

METROPOLITAN SAVINGS BANK OF OHIO

Form 3036 9/90

# ADJUSTABLE RATE LOAN RIDER

### 3 YEAR ADJUSTABLE RATE MORTGAGE

**NOTICE: THE SECURITY INSTRUMENT CONTAINS A PROVISION ALLOWING FOR CHANGES IN THE INTEREST RATE. INCREASES IN THE INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS.**

This Rider is made of even date, and is incorporated into and shall be deemed to amend and supplement the Mortgage Deed of Trust, or Deed to Secure Debt(the "Security Instrument") of the same date given by the "Borrower" to secure Borrower's Note to **METROPOLITAN SAVINGS BANK OF OHIO** (the "Lender") of the same date(the "Note") and covering the property described in the Security Instrument.

Modifications: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**1. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

Beginning on the date of this Note, I will pay interest at a yearly rate of __8.3750__ % (the "Initial Interest Rate"). The interest rate that I will pay will change in accordance with Section 4 of this Note until my loan is paid. Interest rate changes may occur on the 1st day of the month beginning on __April__ , 19 __98__ and on that day of the month every 36 months thereafter. Each date on which the rate of interest may change will be called a "Change Date".

[Check one box to indicate Index.]

**(A) The Index**

Beginning with the first Change Date, my interest rate will be used on an Index. The "Index" is the:

[Check one box to indicate index.]

[X] * (i) Weekly average yield on United States Treasury securities adjusted to a constant maturity of __3__ years, as made available by the Federal Reserve Board.

[ ] * (ii) "Contract Interest Rate, Purchase of Previously Occupied Homes, National Average for all Major Types of Lenders" published by the Federal Home Loan Bank Board.

[ ] * (iii) The interest rates offered by the Lender on similar property classifications and loan to value (based on your original loan to value) 45 days prior to each Change Date.

[ ] * (iv) _____

*If more than one box is checked or if no box is checked, and Lender and Borrower do not otherwise agree in writing, the first Index named will apply.

The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(B) Setting the New Interest Rate**

(i) Before each Change Date, the Note Holder will calculate my new interest rate by adding __Two and Three-Fourths__ percentage points ( __2.7500__ %) to the Current Index. The sum, subject to the provisions set forth in section (B)(ii) and (B)(iii) will be my new interest rate until the next Change Date.

(ii) The interest rate cannot be changed by more than __2.0000__ percentage points at any Change Date.

(iii) My interest rate will never be greater than __14.3750__ %, which is called the "Maximum Rate".

**2. LOAN CHARGES**

It could be that the loan secured by the Security Instrument is subject to a law which sets maximum loan charges and that law is interpreted so that the interest or other loan charges collected in connection with the loan would exceed permitted limits. If this is the case, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.

**3. PRIOR LIENS**

If Lender determines that all or any part of the sums secured by this Security Instrument are subject to a lien which has priority over this Security Instrument, Lender may send Borrower a notice identifying that lien. Borrower shall promptly act with regard to that lien as provided in paragraph 4 of the Security Instrument or shall promptly secure an agreement in a form satisfactory to Lender subordinating that lien to this Security Instrument.

**4. TRANSFER OF THE PROPERTY**

If there is a transfer of the Property subject to paragraph 17 of the Security Instrument, Lender may require (1) an increase in the current Note interest rate, or (2) an increase in (or removal of) the limit on the amount of any one interest rate change (if there is a limit), or (3) a change in the Base Index figure, or all of these, as a condition of Lender's waiving the option to accelerate provided in paragraph 17.

By signing this, Borrower agrees to all of the above.

_x_ _Donna H. Roberts_ (Seal)
DONNA H. ROBERTS                        -Borrower

_____ (Seal)
                                         -Borrower

ADJUSTABLE RATE LOAN RIDER - Revised 11/92

Form # 30-07-99          918 857 95073          06-16-16314

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN **IS A TRUE AND CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS OFFICE.**
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED **MY NAME AND OFFICIAL SEAL** November 4 , 20 02

INST. # Official 1053 Pg 471 , RECORDER
BY: _____ A Moms Deputy Branch

This instrument prepared by, recording requested by, and when recorded mail to:

First Deposit National Bank
c/o Mortgage Processing
P.O. Box 9120
Pleasanton, CA 94566

RECEIVED FOR RECORD
09/13/1996 15:09:17
Diana Marchese
Recorder
TRUMBULL COUNTY, OH
Document No. 96001869
Book/Page 1053  471
Receipt No. 7364
Date 09/13/1996 15:09:16
Total       30.00

SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

## OPEN-END MORTGAGE

**THIS MORTGAGE** ("Mortgage") is made on September 09, 1996 by DONNA M. ROBERTS, SINGLE ("Borrower") whose address is 254 FONDERLAC STREET SOUTHEAST, WARREN, Ohio 44484 and First Deposit National Bank, which is organized and existing under the laws of the United States of America, and whose address is 295 Main Street, Tilton, NH 03276 ("Lender"). Borrower owes Lender the principal sum of Thirty One Thousand Two Hundred and No/100 Dollars (U.S. $31,200.00) (the "Credit Limit") as evidenced by Borrower's First Deposit National Bank Account Agreement dated even date herewith ("Agreement"). This Mortgage secures to Lender: (a) the repayment of the debt evidenced by the Agreement, with interest thereon, and all renewals, future advances, extensions and modifications of the Agreement; (b) the payment of all other sums, with interest thereon, advanced to protect the security of this Mortgage; and (c) the performance of Borrower's covenants and agreements under this Mortgage and the Agreement. For this purpose, Borrower irrevocably does hereby mortgage, warrant, grant and convey to Lender, the following described property located in TRUMBULL County, State of Ohio which has the address of 254 FONDERLAC STREET SOUTHEAST, WARREN, Ohio 44484 ("Property Address") and which is more particularly described in Exhibit "A" attached hereto and made a part hereof;

**TOGETHER WITH** all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Mortgage. All of the foregoing are hereinafter referred to as the "Property."

Borrower and Lender covenant and agree as follows:

**1. TITLE.** Borrower warrants and covenants that Borrower has good and marketable title to the Property and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower will defend title to the Property against all claims and demands, subject to any encumbrances of record.

**2. ADJUSTABLE MORTGAGE LOAN PROVISIONS.** The Agreement contains provisions which permit (a) increases and decreases to the rate of interest provided in the Agreement on a monthly basis prior to the Conversion Date (as defined herein) and thereafter; (b) increases and decreases to the rate of interest and payments of principal and interest on a semi-annual basis; and (c) a limitation on increases and decreases to said interest rate and monthly payment amount. Reference is made to the Agreement for a complete description of the variable rate terms of the indebtedness secured by this Mortgage.

**3. OPEN-END CREDIT.** The Agreement provides that for the first 10 years after the date of the Agreement, the credit secured by the Property is an open-end revolving line of credit. At the end of approximately 10 years from the date of the Agreement (the "Conversion Date"), any principal amounts owed and outstanding under the Agreement will convert to an adjustable rate, adjustable payment, non-revolving fully amortizing 5 year term loan, as provided in the Agreement, with a maturity date of September 09, 2011. All outstanding interest is due and payable no later than the Conversion Date. The Mortgage will continue to secure payment of all sums due and payable under the terms of the Agreement. Borrower's obligations under the Agreement shall be satisfied, and this Mortgage shall be released and a satisfaction of mortgage shall be furnished to Borrower upon (i) receipt by Lender of a written request from Borrower to close the First Deposit National Bank Account (the "Account") evidenced by the Agreement; and (ii) payment in full of the indebtedness secured hereby.

**4. FUTURE ADVANCES.** The lien of the Mortgage secures the existing indebtedness under the Agreement and any future advances made under the Agreement or the Mortgage plus interest thereon, attorneys' fees, if permitted by law, and costs. All advances will have the same lien priority as the advance initially made under the Agreement. The unpaid balance of the revolving line of credit under the Agreement may at certain times be zero; the interest of Lender herein will remain in full force and effect notwithstanding a zero balance at any time.

SF0544
Ohio Mortgage
July 17, 1996


STATE'S EXHIBIT 403 C

OR Book 1053 Page 471

Page 1

5. **RIDERS TO THIS MORTGAGE.** If one or more riders are executed by Borrower and recorded together with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were a part of this Mortgage. [Check applicable box(es)]

☐ Condominium/Planned Unit Development Rider          ☐ 1-4 Family Rider

**NOTICE:**    See the attached pages which are incorporated herein by this reference into this Mortgage for additional agreements, terms and provisions contained in this Mortgage.

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Mortgage and in any rider(s) executed by Borrower and recorded with it and acknowledges receipt of a copy of this Mortgage and any rider.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

Witnesses:

_Colleen Mann_                                   _Donna M. Roberts_                        (Seal)
Print Name: _Colleen Mann_                Borrower DONNA M. ROBERTS

_Christine M. Adkins_                          _____        (Seal)
Print Name: _Christine M. Adkins_       Borrower


STATE OF OHIO _____ _Cuyahoga_ _____ County ss:

On this ___9___ day of _September_ 19 _96_ before me, a Notary Public in and for said County and State, personally appeared _Donna M. Roberts_ _____ the individual(s) who executed the foregoing instrument and acknowledged that _S_ he ___ did examine and read the same and did sign the foregoing instrument, and that the same is _____ _her_ _____ free act and deed.

**IN WITNESS WHEREOF,** I have hereunto set my hand and official seal.

My Commission expires: _____

COLLEEN MANN, Notary Public
State of Ohio, Cuyahoga County
My Commission Expires May 10, 1____

_Colleen Mann_                        [SEAL]
Notary Public

This instrument was prepared by:         First Deposit National Bank
                                         295 Main Street
                                         Tilton, NH 03276


-----------------------------------[Space Below This Line Reserved For Lender and Recorder]-------------------

SE0544
Ohio Mortgage
July 17, 1996

OR Book 1053 Page 472                Page 2

## ADDITIONAL TERMS OF MORTGAGE

**A.  IMPOUND ACCOUNTS.**  So long as Borrower pays, prior to delinquency, all yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over the Mortgage and ground rents on the Property, if any, plus all premiums for hazard insurance and mortgage insurance, if any, Lender waives the requirements of the following.  Thereafter, until the Agreement is paid in full, Borrower will pay to Lender when monthly payments are due under the Agreement, a sum ("Funds") for: (a) one-twelfth yearly taxes and assessments which may attain priority over this Mortgage as a lien on the Property; (b) one-twelfth yearly leasehold payments or ground rents on the Property, if any; (c) one-twelfth yearly hazard or property insurance premiums; (d) one-twelfth yearly flood insurance premiums, if any; (e) one-twelfth yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in lieu of the payment of mortgage insurance premiums.  These items are called "Escrow Items."  Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount allowed by law.  Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge.  However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise.  Unless applicable law requires interest to be paid, Lender is not required to pay Borrower any interest or earnings on the Funds.  Lender will give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made.  The Funds are pledged as additional security for all sums secured by this Mortgage.

If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower will pay to Lender the amount necessary to make up the deficiency.  Borrower will make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums and closing of the account secured by this Mortgage, Lender will promptly refund to Borrower any Funds held by Lender.  If Lender acquires or sells the Property, Lender, prior to the acquisition or sale of the Property, will apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Mortgage.

**B.  LIENS; PRESERVATION OF PROPERTY.**  Borrower will perform all of its obligations under any security agreement with a lien which has priority over this Mortgage, including making payments when due.  Borrower will pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments, or ground rents, if any.  Borrower will keep the Property in good condition and repair and will not commit waste or permit impairment or deterioration of the Property or use it in a destructive manner and shall comply with any lease provisions if this Mortgage is a leasehold.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.  Lender may make or cause to be made reasonable entries upon and inspection of the Property, including, without limitation, for the purpose of conducting environmental inspections and audits.  If Borrower is in default, or if any proceeding is commenced which materially affects Lender's interest in the Property, or the Property is damaged, Lender may without notice to or demand on Borrower make such appearances, advance such sums, and take such actions as Lender deems necessary or advisable to protect Lender's interest.  Any amounts which Lender advances on Borrower's behalf will be added to Borrower's indebtedness and this Mortgage shall from the date thereof secure the repayment of such advances with interest.

**C.  INSURANCE.**  Borrower will maintain and pay for property damage and flood (if required) insurance on the improvements now existing or hereafter erected on the Property as required by the Agreement.  In the event of loss, Borrower will give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, insurance proceeds will be applied to restore or repair the Property damaged if economically feasible and Lender's security is not lessened.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds will be applied to the sums secured by this Mortgage, whether or not then due, with any excess paid to Borrower and such application will not extend or postpone the due date of the monthly payments due under the Agreement or change the amount of the payments.  If Borrower abandons the Property, or does not answer within 30 days after the date the notice is given by Lender to Borrower that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds.  Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not the sums are then due and such application will not extend or postpone the due date of the monthly payments due under the Agreement or change the amount of the payments.  If Lender acquires the Property, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition will pass to Lender to the extent of the sums secured by this Mortgage immediately prior to the acquisition.

SE0544
Ohio Mortgage
July 17, 1996

Page 3

OR Book1053 Page473

Jackson Apx. Vol. 25
Page 174

**D. CONDEMNATION.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender and will be applied to the sums secured by this Mortgage whether or not the sums are then due and such application will not extend or postpone the due date of any payments under the Agreement.  If Borrower abandons the Property, or does not answer within 30 days after the date notice is given by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, then Lender can collect and apply the proceeds, at its option, either to restore or repair the Property or to the sums secured by this Mortgage, whether or not the sums are then due and such application will not extend or postpone the due date of any payments under the Agreement.

**E. DEFAULT:** Borrower will be in default hereunder if Borrower fails to meet the repayment terms in the Agreement or Borrower's action or inaction adversely affects the Property or Lender's rights in the Property, including, but not limited to:

(a) failure to maintain required insurance on the Property;
(b) Borrower's transfer of the Property;
(c) failure to maintain the Property, or use of it in a destructive manner;
(d) commission of waste;
(e) failure to pay taxes on the Property or otherwise fail to act and thereby cause a lien to be filed against the Property that is senior to this lien;
(f) death of all Borrowers;
(g) the Property is taken through eminent domain;
(h) a judgment is filed against Borrower and subjects Borrower and the Property to action that adversely affects Lender's interest;
(i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected; or
(j) Borrower engages in fraud or material misrepresentation, in connection with any phase of this home equity line of credit.

If Borrower is in default, Lender has all the remedies provided under the Agreement and this Mortgage and by law, including, without limitation, terminating the Account, requiring Borrower to pay the entire outstanding balance in one payment, charging Borrower any fees related to the collection of the amount owing, and for protection of the Property including, without limitation, costs and expenses incurred in connection with environmental inspections and audits.

**F. FORECLOSURE.** In the event of a default, Lender may immediately commence foreclosure proceedings against the Property through judicial proceeding, pursuant to applicable law and proceed to sell the Property or to cause the same to be sold in accordance with said statutes in a single parcel or in several parcels at Lender's option.  Lender will apply sale proceeds derived from a judicial foreclosure sale, first, to all reasonable costs; then to sums secured by the Mortgage; and then to the persons legally entitled to it.  "Costs" include attorneys' fees (including fees for attorneys employed by us or our agents) if permitted by law, Mortgagee's fees, expenses of attempted collection, protecting the Property, including, without limitation, costs and expenses incurred in connection with environmental inspections and audits, providing insurable title to a purchaser, and other expenses Lender incurs to enforce its rights under the Agreement or the Mortgage.

**G. LIEN ON RENTS.** To the extent allowed under applicable law, as additional security hereunder, Borrower hereby grants to Lender a lien on the rents of the Property, provided that prior to acceleration of the Mortgage or abandonment of the Property, Borrower can collect and retain such rents as they become due and payable.  Upon acceleration of the Mortgage or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver will be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due.  All rents collected by Lender or the receiver will be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, any premium on receiver's bonds and reasonable attorneys' fees, if permitted by law, and then to the sums secured by this Mortgage.  Lender and the receiver are liable to account only for those rents actually received.

**H. SUCCESSORS AND ASSIGNS BOUND; JOINT AND SEVERAL LIABILITY.** The covenants and agreements of this Mortgage shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph K. Borrower's covenants and agreements shall be joint and several.  Any Borrower who co-signs this Mortgage but does not execute the Agreement: (a) is co-signing this Mortgage only to mortgage and warrant such Borrower's interest in the Property under the terms of this Mortgage; (b) is not personally obligated to pay the sums secured by this Mortgage; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Mortgage or the Agreement without that Borrower's consent.

**I. NOTICES.** Except as otherwise required by law, notices to Lender or Borrower shall be given in the manner provided in the Agreement.

SE0544
Ohio Mortgage
July 17, 1996

Page 4

OR Book1053 Page474

**J.  GOVERNING LAW, SEVERABILITY.**  Subject to principles governing choice of law, this Mortgage is made pursuant to, and shall be construed and governed by, the laws of the United States applicable to national banks, and, where no such federal laws or regulations apply, by the laws of the State of New Hampshire, and the *in rem* rights, remedies and procedures of the state in which the Property is located and by the rules and regulations promulgated thereunder.  If any paragraph, clause or provision of this Mortgage or the Agreement or any other obligation secured by this Mortgage is construed or interpreted by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those paragraphs, clauses or provisions so construed or interpreted and shall not affect the remaining paragraphs, clauses and provisions of this Mortgage or the Agreement or other obligations secured by this Mortgage.

**K.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.  If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.**

**L.  HAZARDOUS SUBSTANCES.**  Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law; notwithstanding foreseeing the presence, use, or storage on the Property results from small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.  Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge.  If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  As used herein, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; and "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**M.  INJURY TO PROPERTY.**  All causes of action of Borrower, whether accrued before or after the date of the Mortgage, for damage or injury to the Property described in the Mortgage or any part hereof, or in connection with the transaction financed in whole or in part by the funds loaned to Borrower by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of material fact are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by the Mortgage or to any deficiency under the Mortgage or release any moneys so received by it or any part thereof, as Lender may elect.  Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof.  Borrower agrees to execute such further assignments and other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

**N.  FEES.**  Lender, or its successors and assigns, may charge and Borrower agrees to pay a reasonable preparation of payoff demand fee and a release fee for each full or partial release of the Mortgage together with any fees or charges assessed for recording each such full or partial release if permitted under applicable law at the time of any release.  Lender may charge Borrower a reasonable fee for any services rendered to Borrower or on Borrower's behalf pursuant to the Mortgage or the Agreement to the extent permitted under applicable law.  Any such charge shall be secured by the Mortgage, and Borrower agrees to pay the same upon demand, together with interest thereon from the date of such charges at the rate payable from time to time on outstanding principal under the Agreement.

**O.  OFFSETS.**  No indebtedness secured by this Mortgage shall be deemed to be offset or to be offset or compensated by all or part of any claim, cause of action, or counterclaim, whether liquidated or unliquidated, which Borrower now or hereafter may have or may claim to have against Lender.

**P.  SEVERABILITY.**  Any provision of this Mortgage which is prohibited or unenforceable shall be ineffective to the extent of such prohibition to such unenforceability without invalidating the remaining provisions thereof.

SE0544
Ohio Mortgage
July 17, 1996

OR Book 1053 Page 475

Page 5

Jackson Apx. Vol. 25
Page 176

EXHIBIT "A"

SITUATED IN THE TOWNSHIP OF HOWLAND, COUNTY OF TRUMBULL AND STATE
OF OHIO: BEING ALL OF LOT 39 IN THE AVALON ESTATES PLAT NO. 3 AS
RECORDED IN VOLUME 39, PAGE 14, TRUMBULL COUNTY RECORDS OF PLATS.
SAID LOT NO. 39 HAS A FRONTAGE OF 100 FEET ON THE WESTERLY SIDE OF
FONDERLAC DRIVE AND EXTENDS BACK THEREFROM BETWEEN PARALLEL
LINES A DISTANCE OF 173 FEET AND HAS A REAR LINE OF 100 FEET, AS APPEARS
BY SAID PLAT, BE THE SAME MORE OR LESS BUT SUBJECT TO ALL LEGAL
HIGHWAYS.

ADDRESS KNOWN AS: 254 FONDERLAC STREET SE, TRUMBULL, OHIO 44484

PP# 28-900554



SE0544
Ohio Mortgage
July 17, 1996

OR Book 1053 Page 476

Page 6

Jackson Apx. Vol. 25
Page 177

Instr:200104242014330    04/24/2001
Pages:1 of 6  F:$30.00    1:49PM
Diana Marchese
Trumbull County Recorder  EPFIRST UN    T20010013875

**Prepared By:**
Donna Carey
First Union National Bank of Delaware
C/O Service Center
1000 Louis Rose Place
2nd Floor, Suite B
Charlotte, NC  28262
**Parcel Number:** 28-900554
**Account Number:** 888   8881304931/0006695690

**When Recorded, Return To:**

First Union National Bank of Delaware
C/O Service Center
1000 Louis Rose Place
2nd Floor, Suite B
Charlotte, NC  28262

82-352825

# MORTGAGE

THIS MORTGAGE is made this day **April 12, 2001**, between the Mortgagor, **DONNA M ROBERTS, UNMARRIED WOMAN**, whose mailing address is the property address (herein "Borrower"), and the Mortgagee, **First Union National Bank of Delaware**, a national banking association organized and existing under the laws of the United States of America, whose address is One Rodney Square, 920 King Street, Wilmington, DE  19801 (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. **$75,000.00**, which indebtedness is evidenced by Borrower's Note dated **April 12, 2001** and extensions, modifications and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness, if not sooner paid, due and payable on **April 17, 2031**.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County of **TRUMBULL**, State of **OHIO**:

### SEE ATTACHED SCHEDULE A.

which has the address of **254 FONDERLAC ST SE, WARREN, OH 44484** and Parcel No. 28-900554 (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

**Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenant and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.**

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest.**  Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note.  This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

2. **Prior Mortgages and Deeds of Trust; Charges; Liens.**  Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due.  Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

3. **Hazard Insurance.**  a) Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards, including floods or flood, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.  If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 5.

b) All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause.  Lender shall have the right to hold the policies and renewals.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  In the event of loss, Borrower

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY NAME AND OFFICIAL SEAL _____ , 20___
_____ , RECORDER
INST. # 2001 0424 2014330
BY: _____

OH Mortgage
230522 ohmtg (Rev 13, 03-01)

Loan Number: 888   8881304931/0006695690



Instr:200104240014330    04/24/2001
Pages:2 of 6  F:$30.00       1:49PM
Diana Marchese        T200100130TS
Trumbull County Recorder  EPFIRST UN

shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly to Borrower.

c)  Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower.  If Borrower abandons the Property or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds.  Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due.  The 30-day period will begin when the notice is given.

d)  Except as provided in subparagraph 3(e) below, should partial or complete destruction or damage occur to the Property, Borrower hereby agrees that any and all instruments evidencing insurance proceeds received by Lender as a result of said damage or destruction, shall be placed in a non-interest bearing escrow account with Lender.  At Lender's discretion, Lender may release some or all of the proceeds from escrow after Borrower presents Lender with a receipt(s), invoice(s), written estimates(s) or other document(s) acceptable to Lender which relates to the repair and/or improvements of the Property necessary as a result of said damage and/or destruction.  Absent an agreement to the contrary, Lender shall not be required to pay Borrower any interest on the proceeds held in the escrow account.  Any amounts remaining in the account after all repairs and/or improvements have been made to the Lender's satisfaction, shall be applied to the sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage.  Borrower further agrees to cooperate with Lender by endorsing all, checks, drafts and/or other instruments evidencing insurance proceeds; and any necessary documents.  Should Borrower fail to provide any required endorsement and/or execution within thirty (30) days after Lender sends borrower notice that Lender has received an instrument evidencing insurance proceeds, or document(s) requiring Borrower's signature, Borrower hereby authorizes Lender to endorse said instrument and/or document(s) on Borrowers behalf, and collect and apply said proceeds at Lender's option, either to restoration or repair of the Property or to sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage.  It is not the intention of either party that this escrow provision, and/or Lender's endorsement or execution of an instrument(s) and/or document(s) on behalf of Borrower create a fiduciary or agency relationship between Lender and Borrower.

e)  Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments.  If under paragraph 15 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument.

**4.   Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.**  Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold.  If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**5. Protection of Lender's Security.**  If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 5, with interest thereon, from the date of disbursal, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage.  Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof.  Nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder.

6.  Inspection.  Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

7.  Condemnation.  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

8.  Borrower Not Released; Forbearance By Lender Not a Waiver.  The Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following:  (a) the sale of all or a part of the premises, (b) the assumption by another party of the Borrower's obligations hereunder, (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the



Instr: 200104240014330    04/24/2001
Pages: 3 of 6   F: $30.00        1:48PM
Diana Marchese          T200100013875
Trumbull County Recorder  EPFIRST UN

property, and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same. None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder to the extent permitted by applicable law.

Any forbearance by Lender in exercising any right or remedy hereunder or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**9. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 14, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**10. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate in writing by notice to Lender as provided herein, and any other person personally liable on this Note as these person's names and addresses appear in the Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**11. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**12. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

**13. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**14. Transfer of the Property or a Beneficial Interest in Borrower, Assumption.** As used in this Section 14, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 10 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies by this Security Instrument without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**15. Default; Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this entire Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without demand or notice, notice of the exercise of such

OH Mortgage
230522 ohmtg (Rev 13, 03-01)          Page 3          Loan Number: 888  8881304931/0006695690



Instr:200104240014330    04/24/2001
Pages:4 of 6  F:$30.00           1:49PM
Diana Marchese        T200100130875
Trumbull County Recorder  EPFIRST UN

option being hereby expressly waived. Lender may invoke the power of sale hereby granted. Lender shall have the right to enter upon and take possession of the property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash, after first giving notice of the time, place and terms of such sale by publication once a week for three consecutive weeks prior to said sale, in some newspaper published in said county, and upon payment of the purchase money, the Lender, or owner of the debt and Mortgage, or auctioneer, shall execute to the purchaser for and in the name of the Mortgagors, a good and sufficient deed to the property sold; the Lender shall apply the proceeds of said sale: first, to the expense of advertising, selling and conveying said property, including a reasonable attorney's fee; second, to the payment of any amounts that may have been expended or that may then be necessary to expend in paying insurance, taxes and other encumbrances, with interest thereon; third, to the payment in full of the principal indebtedness and interest thereon, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the date of said sale; and fourth, the balance if any, shall be paid over to the said Borrowers or to whom ever then appears of record to be the owner of said property. The Lender may bid and become the purchaser of the mortgaged property at any foreclosure sale hereunder.

**16. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued if: (a) Borrower pays Lender all sums which would be then due under this Mortgage, this Note and Notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in Paragraph 15 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action, as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**17. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that so long as Borrower is not in default hereunder, Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration and/or foreclosure under paragraph 15 hereof, or abandonment of the Property, Lender, in person or by agent, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the property including those past due. The Lender shall be liable to account only for those rents actually received prior to foreclosure sale as provided in paragraph 15. Lender shall not be liable to account to Borrower or to any other person claiming any interest in the Property for any rents received after foreclosure.

**18. Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**19. Legislation.** If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Mortgage or any Rider, unenforceable according to their terms, or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Mortgage to be immediately due and payable.

20. Satisfaction. Upon payment of all sums secured by this Mortgage, the conveyance of the property pursuant to this Mortgage shall become null and void and Lender shall release this Mortgage. Borrower shall pay all costs of recordation, if any. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee.

21. Waiver of Homestead. Borrower hereby waives all rights of homestead exemption in the Property and relinquishes all rights of dower and courtesy in the Property.

22. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower



Instr:200104240014330        04/24/2001
Pages:5 of 6  F:$30.00          1:49PM
Diana Marchese              T20310213875
Trumbull County Recorder   EPFIRST UN

learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 22, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials.   As used in this paragraph 22, "Environmental law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

**IN WITNESS WHEREOF,** Borrower has executed this Mortgage and adopted as his seal the word ("SEAL") appearing beside his name.

Signed, sealed and delivered in the presence of:

_McKenzie Roberts_
**Witness (sign name)**
_McKenzie Roberts_
**Witness (print name)**

_Donna M Roberts_ **[SEAL]**
**DONNA M ROBERTS**

_Joy Lamb_
**Witness (sign name)**
_Joy Lamb_
**Witness (print name)**

```
Instr:200104240014338    04/24/2001
Pages:6 of 6 F:$30.00       1:40PM
Diana Marchese          T200100013875
Trumbull County Recorder  EPFIRST UN
```

[Space Below This Line For Acknowledging]

STATE OF **OHIO**                )
                                 ) SS
COUNTY OF  _TRUMBULL_            )

On (date) _APRIL 11, 2001_ before me personally appeared **DONNA M ROBERTS** , whose name(s) is/are signed to the foregoing conveyance and who is/are personally known to me or proved to me on the basis of satisfactory evidence, who acknowledged before me on this day, that, being informed of the contents of this conveyance, he/she/they executed the same voluntarily.

WITNESS my hand and official seal.

**NOTARIAL SEAL**

Signature: _Nancy ...___ (SEAL)

My Commission Expires: _8/31/05_

This Instrument Was Prepared By:   Donna Carey
                                   First Union National Bank of Delaware
                                   C/O Service Center
                                   1000 Louis Rose Place
                                   2nd Floor, Suite B
                                   Charlotte, NC  28262

## Legal Description

All that certain parcel of land situated in TOWNSHIP OF HOWLAND being known as All that certain property situated in TOWNSHIP OF HOWLAND in the county of TRUMBULL and state of OHIO and being described in a deed dated 03/06/1995 and recorded 03/13/1995 in book 918 page 853 among the land records of the county and state set forth above and referenced as follows: LOT 39, AVALON ESTATES # 3, PLAT BOOK 39, PLAT PAGE 14  254 FONDERLAC STREET SOUTHEAST WARREN OHIO 44484
PARCEL ID NUMBER: 28-900554 and being more fully described in Deed Book 918 Page 853 recorded on 03/13/1995 among the land records of TRUMBULL County, OH.
Parcel ID Number:  28-900554

Jackson Apx. Vol. 25
Page 183

OH Mortgage
230522 ohmtg (Rev 13, 03-01)          Page 6          Loan Number: 888  8881304931/0006695690

Instr:200108030029773    08/03/2001
P:1 of 2    F:$16.00    1:47PM
Diana Marchese    T200108026569
Trumbull County Recorder EPIRWIN HO

PNB#:4498451100413026

### ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is
hereby acknowledged, the undersigned,
**PROVIDIAN NATIONAL BANK,** a national bank organized
and existing under the laws of the United States, whose
address is 295 Main St., Tilton, NH 03276 (assignor),
by these presents does convey, grant, sell, assign, transfer and set
over the described mortgage/deed of trust together with the certain
note(s) described therein together with all interest secured thereby,
all beneficial interest under and any rights due or to become due
thereon to
**BANKERS TRUST COMPANY, as Trustee,** under the pooling and
servicing agreement dated as of April 1, 1999,
whose address is Four Albany Street, New York, NY 10006,
its successors and assigns (assignee).
Said mortgage executed by
**DONNA M ROBERTS**
to **FIRST DEPOSIT NATIONAL BANK**
and recorded in the record of mortgages Volume 1053     , Page 471
and or Instrument# 960011369        on   n/a    in the office of
then Recorder of TRUMBULL      , Ohio.
More particularly described as follows (if needed), to wit:

IN WITNESS WHEREOF, the undersigned has hereunto set its corporate hand
by its proper officers this  3rd day of June, 1999
**PROVIDIAN NATIONAL BANK, F/K/A First Deposit National Bank**

BY:_____        Attested by:_____
Kansas Wilson                                    J. Ursini
Vice President                                   Asst. Secretary

Signed and Acknowledged in the Presence of:

_____                _____
Edith Calderon          witness          Mary Lou Bagabaldo        witness

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
Before me, the undersigned, a Notary Public in and for said County,
personally appeared Kansas Wilson                        and
J. Ursini                                      respectively, of
PROVIDIAN NATIONAL BANK, F/K/A First Deposit National Bank
who as such officers for and on its behalf acknowledged the execution
of the foregoing instrument.
Witness my hand and Notary Seal.

_____          Notary Public
Jim Beasley
My commission expires:02/26/2003

JIM BEASLEY
COMM. # 1209431
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY ()
COMM. EXP. FEB. 26, 2003

Prepared by:
D.Colon/NTC,101 N. Brand #1800, Glendale, CA 91203 (800)346-9152
When recorded return to:
Bankers Trust Co., of CA
3 Park Plaza, 16th Fl,
Irvine, CA 92614

    PROVA   MH 93MH

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL November 4    , 2002
_____, RECORDER
INST# 200108030029773
BY:_____





Instr:200108030029773       08/03/2001
P:2 of 2       F:$16.00       1:47PM
Diana Marchese       T20010026589
Trumbull County Recorder  EPIRWIN HO

**EXHIBIT "A"**

SITUATED IN THE TOWNSHIP OF HOWLAND, COUNTY OF TRUMBULL AND STATE OF OHIO: BEING ALL OF LOT 39 IN THE AVALON ESTATES PLAT NO.3 AS RECORDED IN VOLUME 39, PAGE 14, TRUMBULL COUNTY RECORDS OF PLATS. SAID LOT NO. 39 HAS A FRONTAGE OF 100 FEET ON THE WESTERLY SIDE OF FONDERLAC DRIVE AND EXTENDS BACK THEREFROM BETWEEN PARALLEL LINES A DISTANCE OF 173 AND HAS A REAR LINE OF 100 FEET, AS APPREARS BY SAID PLAT, BE THE SAME MORE OR LESS BUT SUBJECT TO ALL LEGAL HIGHWAYS.

ADDRESS KNOWN AS : 254 FONDERLAC STREET SE, TRUMBULL, OHIO 44484

PP# 28-900554



Inst#: 200108030029774    08/03/2001
P:1 of 2    F:$16.00    1:49PM
Diana Marchese    T20010826589
Trumbull County Recorder  EPIRWIN HO

5002991

## SATISFACTION OF MORTGAGE

Know all Men by These Presents, That ___BANKERS TRUST COMPANY___

does hereby certify, that a certain MORTGAGE DEED, recorded the ___13TH___

day of ___SEPTEMBER___     ___1996,___    in Record of Mortgages, Vol ___1053___

Page ___471___     , in the Office of the Recorder of ___TRUMBULL___     County, ___OHIO___

executed by ___DONNA M. ROBERTS, SINGLE___

to ___BANKERS TRUST COMPANY___

on the following real estate, situated in the County of ___TRUMBULL___

State of ___OHIO___     ; 254 FONDERLAC STREET SOUTHEAST, WARREN, OH 44484

___SEE ATTATCHED EXHIBIT "A"___

has been FULLY PAID and SATISFIED, and the Recorder is authorized to discharge the same

of record.

IN WITNESS WHEREOF, the holder of said Mortgage has caused this instrument to be

Executed in its behalf by its duly authorized agent this _JUN 0 6 2001_ day of ___MAY___     ,2001.

Signed and Acknowledged in the Presence of

BANKERS TRUST COMPANY

Norma Resendiz

Aimee Kemmeter
Assistant Vice President

Martin Hernandez

STATE OF CALIFORNIA

COUNTY OF ___Orange___

I, ___T.S. Tripp___ , a Notary Public for said County and State do hereby certify

that ___Aimee Kemmeter___ personally appeared before me this day and acknowledged

that she is the

___Assistant Vice President___ of BANKERS TRUST COMPANY, a New York corporation

and that by the authority duly given, and as the act of the company, the foregoing instrument

was signed in its name by its ___Assistant Vice President___ .

WITNESS my hand and official seal or stamp, this _JUN 0 6 2001_ day of ___MAY___     ___2001___.

Notary Public



T.S. TRIPP
Commission # 1260410
Notary Public - California
Orange County
My Comm. Expires May 8, 2004

STATE'S
EXHIBIT
402-7

This Instrument Prepared By:
IRWIN HOME EQUITY
12677 ALCOSTA BLVD., SUITE 500
SAN RAMON, CA  94583
ATTN: RECONVEYANCE DEPT.

STATE OF OHIO, TRUMBULL COUNTY
THIS IS TO CERTIFY THAT THE WITHIN IS A TRUE AND
CORRECT COPY OF A DOCUMENT AS RECORDED IN THIS
OFFICE.
IN TESTIMONY WHEREIN HEREUNTO SUBSCRIBED MY
NAME AND OFFICIAL SEAL _December 4_, _2002_
INST. # 200108030029774 , RECORDER
BY: _____



Instr:200108030029774        08/03/2001
P:2 of 2            F:$16.00        1:49PM
Diana Marchese              T20010026589
Trumbull County Recorder   EPIRWIN HO

## EXHIBIT "A"

SITUATED IN THE TOWNSHIP OF HOWLAND, COUNTY OF TRUMBULL AND STATE OF OHIO:
BEING ALL OF LOT 39 IN THE AVALON ESTATES PLAT NO.3 AS RECORDED IN VOLUME 39,
PAGE 14, TRUMBULL COUNTY RECORDS OF PLATS. SAID LOT NO. 39 HAS A FRONTAGE OF
100 FEET ON THE WESTERLY SIDE OF FONDERLAC DRIVE AND EXTENDS BACK
THEREFROM BETWEEN PARALLEL LINES A DISTANCE OF 173 AND HAS A REAR LINE OF
100 FEET, AS APPREARS BY SAID PLAT, BE THE SAME MORE OR LESS BUT SUBJECT TO ALL
LEGAL HIGHWAYS.

ADDRESS KNOWN AS : 254 FONDERLAC STREET SE, TRUMBULL, OHIO 44484

PP# 28-900554

12:30 p.m

Office          11/19/85 or 11/20/85

This child exhibited signs of _emotional illness_ —— he was talking to himself, laughing out loud, jumping up and down, having conversation with invisible people, and playing with his imaginary dog "Butch." There was no one else in the office around him at this time — "empty seats".

I, Mrs. L. McElroy, walked into the office to get mail out of my mailbox and observed this student seated in the office. Principal and other students were in the doorway. My presence did not distract or deter his actions, in the least.

Mrs L. L. McElroy

11/26/85



STATE'S EXHIBIT 103.4

Dear teacher.

Please Excuse Nathaniel Jackson from School Monday he had to go to the place after the pluncetment is thursday at 1:30. So he wont be in school thursday at all because a Woman and Man shot at him. So I got to take Nathaniel Back down to the place office. Wed my. at 1:30 thursday

Thank You

Mrs Pauline Kavenaugy



Student Number: 0016-77-20

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

NAME JACKSON, NATHANIEL        DOB 2-13-73        TEST   DATE 1-17-86

ADDRESS 314 Pearl Street       SEX M              REFERRED BY School
        Charles/Pauline
PARENT(S) Kornegay             GRADE 7            SCHOOL Adams Jr. High

HOME PHONE 743-5365            C.A. 12-11         EXAMINER J. Seiser

REASON FOR REFERRAL Disruptive behavior, Low Achievement

TEST RESULTS

INTELLIGENCE

Wechsler Intelligence Scale for Children - Revised

    Verbal I.Q. 78     Performance I.Q. 72     Full Scale I.Q. 73

Bender-Gestalt Test            1 Errors

ACHIEVEMENT

| | Grade Placement | Standard Score | Discrepancy Score |
|---|---|---|---|
| Reading | | | |
| Woodcock-Johnson Letter-word Ident. | 6.4 | 88 | -1.0 |
| Woodcock-Johnson Passage Compre. | 4.6 | 75 | -.13 |
| Math | | | |
| Woodcock-Johnson Calculation | 4.3 | 63 | +.67 |
| Woodcock-Johnson Applied Problems (reasoning) | 5.2 | 75 | -.13 |

12-19-85  Vision Screening - Failed - Referred for further testing
          Hearing Screening - Passed

| Scales of Independent Behavior | Age Score | Standard Score |
|---|---|---|
| Math Skills | 12-3 | 92 |
| Social & Communication Skills | 6-5 | 55 |
| Personal Living Skills | 9-3 | 63 |
| Community Living Skills | 9-3 | |
| Broad Independence | 9-0 | 56 |

BACKGROUND INFORMATION

    Nate is the second of four children in his family of 3 boys and 1
girl. Both parents reside in the home. According to his mother, his birth
history and early development were normal and there has never been any
eating or sleeping problems. His health is generally good and there are no
known allergies. According to Mrs. Jackson, Nate gets along all right at
home. The only problem she noted is stubbornness.

    School records show that Nate made fair progress in primary grades in
school. Both behavior problems and poor work habits were cited in early
reports. He failed four subjects in sixth grade and repeated that year.
In his second year of sixth grade he was absent 48-1/2 days, tardy 15 days.
Approximately 40 days of those absences were due to disruptions in class
and refusal to obey rules. Stanford Achievement test scores on 5/86
indicated both reading and math scores were in the first stanine. Nate is
presently in seventh grade and receives remedial services in both reading
and math. Behavior has continued to be a problem with frequent reports of
constant disruption and disrespect of authority. He is presently failing
all subjects and was referred for a multifactored evaluation.

Observations

    Nate was first seen in the assistant principal's office where he was
sent after about an hour's search to locate him in school. He is rather
small for his age, was somewhat unkempt, and sat slouched in his chair. He
was somewhat resistant to coming into the testing session and walked up the
stairs at a snail's pace. He spoke very freely with a great deal of
prejudice and hostility towards whites and made many tough, verbal threats.
At first, he refused to complete some of the testing and called it "baby
stuff" he didn't have to do. Eye contact was very poor throughout and he,
sometimes, roamed about the room in a very casual manner. As the session
progressed, he loosened up a bit and worked efficiently at tasks he
enjoyed. As he became more cheerful, he spoke freely of celebrating his
upcoming birthday and bragged about the drinking and drugs he was to enjoy.
He was pleased with himself on a few occasions when he felt he had good
success. Eventually all requested tasks, including the "baby ones" he'd
originally refused to do, were completed. While those behaviors may have
depressed the scores somewhat, the scores are probably in the appropriate
ranges.

Test Results

    Ability. Nate's scholastic ability, measured on the WISC-R, is in the
Borderline (Slow Learner range). Overall, his Verbal and Performance
I.Q.'s were similar. Relative strengths for him were his auditory, short
term memory, attention to visual details, and ability to do oral arithmetic
problems. His vocabulary, ability to formulate verbal concepts, and
visual-perceptual organizational skills are below average. Some of those



scores may be depressed by a lack of cultural opportunities or by his impulsive responses.

**Achievement.** Nate's reading and math skills are fairly consistent with his measured ability. He demonstrated ability to decode words promptly. He made accent errors in more difficult words which it is suspected he would have correctly identified in context. His reading comprehension score was weaker and it appeared that he was losing interest. In the math calculation, he completed complex addition, subtraction with borrowing, some multiplication and division. He did one, double-division, division problem by doing repeated addition. He did not attempt more difficult division or fraction work. He was successful in solving word problems involving money. He had no difficulty in restating the word problem and seemed to know what was expected. A few careless errors depressed his math problem solving score.

A teacher checklist on his communicative status indicates that Nate's skills are below average. Further testing may be completed by the speech clinician.

**Visual-Motor.** Nate copied the nine Bender designs without error. The work was fairly well organized on the page. While some of the designs were weak in angulation, visual-motor maturity is adequate for his age.

**Social-Emotional.** The Scales of Independent Behavior, a measure of adaptive skills, was completed by Mrs. Pavione, one of Nate's teachers. His gross and fine motor skills are appropriately developed for his age. Independent functioning is subaverage in the areas of social/emotional, personal living, and community living. Specific difficulties include negative peer interaction (hits, fights, name calling, accepts no criticism), inappropriate use of language (vulgarity), cleanliness in personal care, lack of personal responsibility for being in proper place at proper time, and poor work skills (little attention to tasks). Nate also demonstrates disregard for personal property.

The Hahnemann High School Behavior Rating Scale (HHSB), a classroom behavior rating scale, reflects many of these problems. Significant behavior factors on that measure which hamper educational progress include poor interaction, weak reasoning ability, poor work habits, expressed inability, and restless, disturbing behavior. Nate is on task occasionally but not for very long.

In the projectives administered (House-Tree-Person, Incomplete Sentences), Nate made no bones about the fact that he is aggressive, hates whites (except for one boy) and intends to hurt them or anyone else who tries to get "through him". There was no evidence of positive feelings towards anyone, including his teachers and parents. ("Ain't nothin' to me"). He projected the idea that he is afraid of nothing, including consequences of his own misbehavior and he admits he feels no guilt about

NATHANIEL
. High                                                                    page 4 of 5

it.  Nate wants to project a tough guy image and works hard at not letting down his guard.  He did admit, but quickly retracted the statement that he is afraid of getting hurt.

He was openly hostile and antagonistic at the beginning of the testing session.  While he did let down a bit, he never did relax in the session.  It is possible that he views others as a threat and wants everyone to know he's not to be tampered with.

Summary and Recommendations

Nate's cognitive, academic, and social development scores are all at subaverage levels.  As indicated, his behaviors in the testing may have depressed some of the scores somewhat but the ranges are probably appropriate.  A major concern is the constant, open expression of hostility, both verbal and physical, towards others.  It appears that this is often done without provocation and without a sense of guilt.  Nate expressed deep prejudiced feelings and seems to believe it is right to act in aggressive ways.  Several teachers have documented persistent aggressive behavior in his classes which interferes with work production.  Nate failed sixth grade classes for two years and is presently failing all classes in seventh grade.  Without some intervention, it is conceivable that he will continue to fail and, also, could cause personal injury to others, including student and teachers.  A team conference should be held, as soon as possible, to review all data and determine appropriate interventions.

1.  Nate needs to develop an appropriate set of standards and values, to develop a conscience about his actions and to understand the consequences of behavior.

2.  He needs to develop tolerance for those he perceives to be unworthy and to learn acceptable behaviors towards them.  His prejudices seem to permeate his thoughts and behaviors.  Disruptive behaviors must be remediated.

3.  Positive interactive skills with peers and respect for authority need to be learned.

4.  The possibility of substance abuse should be explored.

Jo Geiser
School Psychologist

fb





The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services


PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only


Name: Nathaniel Jackson      DOB: 2-13-72          Report Date: 2-23-89

Address: 309 S. Pearl St.    Sex: M                Referred By: S. Gregory

Parent(s): Pauline Korneagay  Grade: 10            School: Stambaugh

Home Phone:  none listed     C.A.: 17-0            Examiner: J. Ciarrochi


### REASON FOR REFERRAL

Mandatory three-year reevaluation to determine if Nathaniel continues to qualify for special education services.


### SENSORY EVALUATION

Testing by school nurse D. Halloran on 1-18-89, reveals that hearing is within normal limits.  Nathaniel failed visual acuity screening.  He passed the eye muscle balance test.  No vision referral was made because Nathaniel was in the process of getting glasses at the time of the screening.


### BACKGROUND INFORMATION

Nathaniel said that he lives with his mother, 18-year-old brother Charles, 13-year-old sister Tasha, and ten-year-old brother Patrick.  His brother Charles will be graduating from the transitional school this year.

Nathaniel was placed in the Severe Behavior Handicapped (SBH) program during his seventh grade year (2-18-86).  Referring behaviors included disrespect toward authority figures, leaving the classroom without permission, disrupting the class, threatening others, and passive-aggressive behavior.

Nathaniel was placed at Stambaugh Transitional with teacher Sara Revetti for the remainder of his seventh grade year. He remained at Stambaugh for grade eight. Because of good behavioral progress, he was placed in a less restrictive setting, the SBH satellite unit at Rayen High School the following year.   During this school year (1988-89), Nathaniel was transferred back to Stambaugh because of threatening, aggressive behavior. One day he burned his and another student's worksheets, lay across the in the classroom, and refused to go to timeout.  When the teacher approached him, he swung at her.

Confidential Psychological Report - N. Jackson

Page 2

Nathaniel's progress in the SBH program has been inconsistent, which may be
due to periodic poor attendance.  Current teacher, Suzette Gregory, said
that his behavior is average for her class and that his academic progress
is above average.  Nathaniel is on the fifth grade level in math and on the
eighth grade level in spelling and reading.  He failed all subjects the
second grade period because of poor attendance, but earned A's,B's and C's
for the first grade period.  Nathaniel is on Level IV of the five-step
behavioral management system.  His current problem behaviors are frequent
talking out, including drug talk; trying to sleep in class instead of
working; and resisting direction.  In general, Nathaniel gets along
adequately with peers and the teacher.  However, he often teases others.

While Nathaniel was at Rayen, he had a vocational evaluation.  The
evaluation report stated that he had a low level of involvement and
excessive absenteeism.  He did interact adequately with co-workers and was
receptive to supervision.  Marginal consideration for a program was
recommended.

## CLASSROOM OBSERVATION

Nathaniel was observed for 20 minutes in Home Economics class on 2-16-89.
Time-sampling at four second intervals and anecdotal observation were used.
The three other boys in the class served as the rotating comparison peer.
The activity observed was cleanup after cooking.

Nathaniel was on-task for more of the sampled intervals than was the
rotating comparison peer (68% compared to 32%).  His off-task behavior
differed from that of the other boys in frequency, not in type.  When
Nathaniel was not on-task, he was walking around the room or talking with
others.

## TEST BEHAVIOR

During individual assessment, Nathaniel was sullen, but followed directions
and put forth adequate to good effort.  He was guarded and suspicious when
asked to draw a picture of his family.

## TEST RESULTS AND INTERPRETATION

OVERALL ABILITY

Stanford-Binet Intelligence Scale - Form L-M

| | |
|---|---|
| Chronological Age: | 17-0 |
| Mental Age: | 11-6 |
| Intelligence Quotient (IQ) | 70 |



THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO

ED 158

## PUPIL'S ANNUAL SHEET
### PRIMARY SCHOOL

| BORN | | | | ENTRY DATE | YEAR MONTH AGE at SEPT. 1 | SEX | (LAST NAME  (FIRST NAME)  (MIDDLE NAME) |
|---|---|---|---|---|---|---|---|
| 2-13-72 | MO. | DAY | YEAR | 9-80 | 8-7 | M. | Jackson, Nathaniel Edwin |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| 513 S. Pearl | Charles Pauline | | 744-8429 |

| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1980-81 | 3 | 100 | Diane Wilson |

Marking code:  Subjects printed in large capital letters will receive letter marks using the following code:

E = Excellent    G = Good    S = Satisfactory    U = Unsatisfactory.

A ☑ indicates the need for improvement.  The absence of check-marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | S |
| MUSIC | S | S | U | S |
| PHYSICAL EDUCATION | S | S | S | S |
| **Social Growth** | | | | |
| Conduct | U | U | U | S- |
| Accepts responsibility | S- | S | S- | S- |
| Respects authority | U | U | U | S |
| Respects rights & property of others | U | U | U | S |
| Observes school and safety rules | U | U | U | S |
| Is courteous | S- | U | U | S |
| Works and plays well with others | U | U | U | S- |
| **Study Habits** | | | | |
| Listens well in class | U | U | U | U |
| Follows directions | S- | S | U | U |
| Completes assignments | U | U | U | U |
| Works independently | U | U | U | U |
| Participates in class discussions | U | S | S- | S- |
| **Supplemental Programs:** | | | | |
| Lamps (Math) | | | | |

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| READING Level II "Never Give Up" | S | U | U | U |
| * Reading level (Ex. 21, etc.) 3¹ Reader | S | 3¹ | 3¹ | 3¹ |
| Applies phonics skills | S | S | S- | S- |
| Reads with understanding | S | S | U | U |
| Knows basic sight words | S | S | S- | S- |
| LANGUAGE | S- | S- | U | U |
| Expresses ideas well orally | S- | S | S- | S- |
| Expresses ideas well in written work | S- | S | U | U |
| SPELLING | S- | G | S- | U |
| WRITING | U | G | U | U |
| MATHEMATICS | U | U | S- | S- |
| Knows number facts | U | U | S- | S- |
| Works accurately with numbers | U | U | S | S- |
| Solves problems with understanding | U | U | S- | S- |
| SOCIAL STUDIES | U | U | U | U |
| SCIENCE - HEALTH | U | U | S | U |
| HEALTH | | S | S | |

## ATTENDANCE

KEY:
E - ENTERED    / - ABSENT A.M. ONLY    X - ABSENT WHOLE DAY    = - NOT IN SESSION
W - WITHDRAWN    \ - ABSENT P.M. ONLY    O - TARDY (NO. MINUTES)    EX - EXCLUDED

| REPORT PERIOD BEGINS | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  9-3  11-7 | | | | E | | X | X | | | | | | | | X | | | | | | X | | | | | 43 | 4 | 0 | 47 | sick attended |
| 2  11-10  1-23 | | | | | | | / | X | | | | | | / | O | | | | | | | | | | | 33 | 8 | 1 | 41 | cold sick bedridden |
| 3  1-26  4-3 | | | | | | | S | S | S | | S | | S | | X | | | X | | | | | | | | 36 | 12 | 0 | 48 | cold winter coat shoes |
| 4 | | | | | | | S | | | | | | | | | | | X | | | | | | | | 31 | 10½ | 1 | 42 | |
| | PT conference | | | | | Report Day | | | | | | | | | | | | | | | | | | | TOTALS | 153 | 34½ | 2 | 178 | |

Jackson Apx Vol 25

Nathaniel is doing satisfactory work in reading and enjoys reading. He spells his words correctly in tests, but does not complete his daily work. The same goes in Math & other subjects. He has shown some improvement, but still has difficulty in writing. His understanding of Math is very poor and he is attending Lamps.

I'm sure Nathaniel's work would improve if his behavior would improve.    9/80 - Reading Level 11

3rd. Period   5/15/81        6/19/81 Completed Units 1 + 2 of
                             unsatisfactory    Level 12

Nathaniel is improving in Math and Working on his Writing. He still does not complete his work and is not progressing well in Reading. Nathaniel still does get into trouble and has not learned to control his behavior. He can be very nice when he tries.

6/19/81 Nathaniel wastes his time and does not do his work. He could do much better than he is doing. Nathaniel's behavior has shown some improvement, but he needs to improve much more.         D. Wilson

Nathaniel's parents came once after school. His father gave Nathaniel to understand that he is to behave himself & learn.

Passed to Grade 4   Rm. 206
                                    6/19/81



[Reading test BDB scores]
Comprehension in word attack, word perception
& word meaning. Needs reinforcement in study skills,
& needs directions in Comprehension skills.
— [word attack] reinforcement, [phonics] [emphasized]

Poor behavior — always talking — talks back
Paddled — ~~fools around~~ —

Finally settled down — Doing daily written
work of Group I — Tried to jump a book — but
it was too hard —

3/20  Completed 2¹ — Consistent in everything
except needs reinforcement in comprehension
& study skills.

Does well in S.R.A.

6/10 Completed 2² — reader "Mustard Seed Magic"
last week of school — too late to be
tested —

Did 1½ yrs reading this year —
Good reader — but fools around
all the time. Must be kept after to
do his work

Promoted to 3¹ room —  Room 101
6/10/80  W Bolman

# MAHONING COUNTY COURT OF COMMON PLEAS

## JUVENILE COURT DIVISION

### James M. McNally
*Judge*

September 19, 1989

Stambaugh Transitional School
2420 Donald Avenue
Youngstown, OH  44509

RE: Nathaniel Jackson
DOB: 2/13/72

*sent 9-26-89*

Dear   To Whom It May Concern:

Enclosed is a release of information form regarding the above
captioned youth.  I would appreciate a copy of   his  grades for
the   past   school year and attendance record.  Please include any
disciplinary reports you may have available.

This information is to be reviewed by  Mark Melnek, Probation Officer
~~prior to a dispositional hearing on~~                              .

I appreciate your time and cooperation on this matter.

Sincerely,

*Mark Melnek/my*

Probation Officer

STATE'S
EXHIBIT
#D3 L

Jackson Apx, Vol. 25

Martin P. Joyce Juvenile Justice Center  •  300 E. Scott Street  •  Youngstown, Ohio 44505
(216) 740-2278     FAX (216) 740-2286

Nate Jackson

Nate attended class on 9/9/88, 9/12/88, 9/13/88 and 9/19/88. At which times he became extremely unruly and verbally abusive.

9/9/88 - Received a total of 65 slips with most of them concentrated in the negative comment, talking out and swearing areas. Most favorite line "F-this shit! Man!" received disciplinary referral slip on 9/12/88 for leaving area without permission did not returning after going to 4th lunch.
9/13/88 - Arrived late would not get admit to class permit, Brought food in from home bacon and eggs. Caused great confusion other students tried to take some of the food & this caused a fight between Raymond Waller and Nate. Mrs. Simbricha stepped into separate the two and got brushed in the process. Nate after being separated from Raymond continued throwing bacon and other food around the room at others, threw empty milk carton on floor.
9/19/88 - Started the morning off by harassing Ms. Quinn and her class, and was not permitted to leave the room. When told he became verbally abusive and then proceeded to light a piece of paper and then after extinguishing not a few minutes later tried to burn the tip of Latha Ruth's Shoe. He did stop

V

when asked to on both occasions.
A short while later after constantly
talking out and an endless string
of negative comments Mrs Siemiecki
tried to remove Nate from his
seat to bring him to "time out" He
became very hostile and verbally abusive.
Mrs Siemiecki managed to get him out
of his seat at which time he swung
his arm out and thrust his
pointing finger very close to her
face saying "You better never
touch me again or it will be the
last mf'ing thing you ever do!"
At 9:12 a.m. Nate left the school building
when Mr. Bruno was summoned
to remove him from the classroom





# BUS CONDUCT REPORT

| STUDENT'S NAME | CLASS · GRADE | DATE OF INCIDENT |
|---|---|---|
| Nate Jackson | | 10-88 |

| BUS NO. | TRIP NO. | DRIVER'S NAME |
|---|---|---|
| 5-29 | 126 | |

## NOTICE TO PARENTS

1. The purpose of this report is to inform you of a disciplinary incident involving the student on the school bus.
2. You are urged to both appreciate the action taken by the driver and to cooperate with the corrective action initiated today.

## DRIVER'S REPORT:

- ☐ VIOLATION OF SAFETY PROCEDURES
- ☐ DESTRUCTION OF PROPERTY
- ☐ FIGHTING · PUSHING · TRIPPING
- ☐ EXCESSIVE MISCHIEF
- ☐ WRITING
- ☐ SMOKING
- ☐ EATING · DRINKING · LITTERING
- ☐ RUDE · DISCOURTEOUS · ANNOYING
- ☐ UNACCEPTABLE LANGUAGE

## PRELIMINARY ACTION:

- ☐ CHECKED STUDENT'S FOLDER
- ☐ HELD CONFERENCE WITH STUDENT
- ☐ CONSULTED COUNSELOR
- ☐ SENT PREVIOUS REPORT HOME
- ☐ TELEPHONED PARENT

## PRESENT ACTION AND RECOMMENDATIONS:

- ☐ STUDENT REGRETS INCIDENT, COOPERATIVE
- ☐ RECURRING INCIDENTS WILL BE REPORTED
- ☐ STUDENT DENIED BUS PRIVILEGE
- ☐ UNTIL _____
- ☐ STUDENT PLACED ON PROBATION
- ☐ STUDENT SUSPENDED
- ☐ CASE REFERRED TO

| DRIVER'S SIGNATURE | ADMINISTRATOR'S SIGNATURE | DATE |
|---|---|---|

PARENT'S COPY · WHITE    OFFICE COPY · YELLOW    TRANSPORTATION COPY · PINK    DRIVER'S COPY · GOLD

ED 158

## THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
## PUPIL'S ANNUAL SHEET
### PRIMARY SCHOOL

| BORN MO. DAY YEAR | ENTRY DATE | YEAR MONTH AGE at SEPT. 1 | SEX | (LAST NAME)  (FIRST NAME)  (MIDDLE NAME) |
|---|---|---|---|---|
| 2-13-72 | 9-5-78 | 6 - 7 | M | Jackson, Nathaniel Elvin |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| 309 S. Pearl | Charles Phillip | | 744-8424 |

| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1978-79 | 1 | 101 | G. Stanley |

Marking code:  Subjects printed in large capital letters will receive letter marks using the following code:

E = Excellent    G = Good    S = Satisfactory    U = Unsatisfactory.

A [✓] indicates the need for improvement.  The absence of check-marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | S |
| MUSIC | S | S | S | S |
| PHYSICAL EDUCATION | S | S | G | S |

| Social Growth | | | | |
|---|---|---|---|---|
| Conduct | U | U | S | U |
| Accepts responsibility | ✓ | ✓ | | ✓ |
| Respects authority | | | | ✓ |
| Respects rights & property of others | ✓ | ✓ | | ✓ |
| Observes school and safety rules | ✓ | | | ✓ |
| Is courteous | | | | |
| Works and plays well with others | ✓ | ✓ | ✓ | ✓ |

| Study Habits | | | | |
|---|---|---|---|---|
| Listens well in class | ✓ | ✓ | | |
| Follows directions | ✓ | ✓ | | |
| Completes assignments | | | | |
| Works independently | ✓ | ✓ | | |
| Participates in class discussions | | | | |

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| READING | S | S | G | G |
| * Reading level (Ex. 21, etc.) | R | P¹ | P¹ | 1¹ |
| Applies phonics skills | | | | |
| Reads with understanding | | | | |
| Knows basic sight words | | | | |
| LANGUAGE | S | S | S | S |
| Expresses ideas well orally | | | | |
| Expresses ideas well in written work | | | | |
| SPELLING | | ✓ | | |
| WRITING | U | S | S | S |
| MATHEMATICS | S | S | S | S |
| Knows number facts | | | | |
| Works accurately with numbers | | | | |
| Solves problems with understanding | | | | |
| SOCIAL STUDIES | S | S | S | S |
| SCIENCE - HEALTH | S | S | S | S |

Supplemental Programs:

## ATTENDANCE

| KEY: | E - ENTERED  W - WITHDRAWN | / - ABSENT A.M. ONLY  \ - ABSENT P.M. ONLY | X - ABSENT WHOLE DAY  O - TARDY (NO. MINUTES) | = - NOT IN SESSION  EX - EXCLUDED |
|---|---|---|---|---|

| REPORT PERIOD BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/5 | | | | | 4½ | 0 | | 45 | cold |
| 2 | 11/10 | | | | | 2½ | 0 | | 46 | no excuse |
| 3 | 1/29 | | | | | 2 | 0 | | 44 | no excuse |
| 4 | 4/1 | | | | | 1 | 0 | | 43 | no excuse |
| | | | | TOTALS | | 10 | 0 | | 178 | |

Jackson Apx. Vol. 25
Page 203

Period I

Nathaniel needs to learn to be quiet and do his work. He could be a very good student if he tried but he wants to fool around and talks with friends. He gets out of his seat without permission. He must practice his writing. as.

Period II Jan. 2c

Nathaniel always completes his work but depends on others for help. He is beginning to have trouble with math. He doesn't know the addition and subtraction facts. If he continues his poor behavior his work will get worse. He bothers everyone around him. as.

Period III Mar. 30, 1979

Nathaniel has been trying to turn things around. His work is better and his behavior is improving. He should have tried sooner. He could have been the best student in the class. He is a really good reader. Keep after him. as.

Period IV June, 1979

Nathaniel is back tracking again. Although I have tutored him in reading to help him move up to where I felt he belonged, he didn't appreciate it. Instead he misbehaved and gave himself and classmates a bad time. Should be more grown up and able to work better next year.

To Next year's teacher —

Completed level 9 MacMillan Readers

Completed Math Book I

Potential behavior problem. Must be kept busy. He is a good worker so don't let him fool you. Usually completes all work begun but would goof off if given the chance.

Promoted to 2nd Grade R. Ann

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services



Request for Child Study or
Multifactored Evaluation

I.  NAME *JACKSON, NATHANIEL*     SEX (M) F   DATE OF BIRTH *2-13-72*   AGE *13*

ADDRESS *313 S. PEARL ST*     PHONE *744 8427* FATHER *CHAS. KORNEHGHY* MOTHER *PAULINE K.*
                                              *746 6905*

SCHOOL *ADAMS JR HIGH*  GRADE *7*  TEACHER _____  REQUEST DATE *9/13/85*

II.  RECENT TEST RESULTS:

| Date | Individual Test | C.A. | M.A. | I.Q. | Evaluator |
|------|-----------------|------|------|------|-----------|
|      |                 |      |      |      |           |

| Date | Group Test | C.A. | M.A. | I.Q. | Read. G.E | Arith. G.P. |
|------|-----------|------|------|------|-----------|-------------|
| *5/84* | *SAT* |  |  |  | *STN 1  2.4* | *STN 1  3.8* |

III.  REASONS FOR REFERRAL   (Check appropriate space or spaces)

A.  Behavior
  ✓ Aggressive
  ✓ Anti-social
     (lying, chronic
     truancy, etc.)
  ✓ Emotional
     (daydreaming,
     withdrawn)
  ✓ Immature

B.  Learning
  ✓ Academic Failure
  ✓ Attitude
  ✓ Establish Mental
     Limits
  ___ Language/Speech
  ___ Motivation/Interest
  ___ Over-achieving
  ___ Rapid Learner
  ✓ Under-achieving

C.  Placement
  ___ Blind-Partially
       Sighted
  ___ Crippled
  ___ Deaf-Hard of
       Hearing
  ___ Exclusion
  ___ Home Instruction
  ___ New Pupil
  ___ Retention in Grade
  ___ Severely Retarded
  ___ Slow Learner
  ___ Work Permit

D.  ___ Other (Please specify)

IV.  IMPORTANT RELATED DATA

What strategies have been attempted?  What resulted from those efforts?


Additional information pertinent to this study:

Referred by *Mary Ann Paoline*
                                              Jackson Apx. Vol. 25
Approved _____         Page 205

*cc. to school*

2

# Youngstown Public Schools

| | |
|---|---|
| (School) | (Address) |
| Principal | Assistant Principal |
| (Parent/Guardian) | (Date) |
| (Address) | (City) |

This is to advise you that following a hearing, _____ _____ has been
(Student)                    (I.D. No.)

suspended from school for _____ school days beginning _____. He/she is

to return to school on _____. The reason(s) for the suspension is/are

as follows: _____
(Reason(s))

_____

which violates Rule(s) No._____ of the Student Conduct Code

While suspended, _____, is not to be on school premises (grounds) during

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____ a.m.
p.m.

for re-admittance and a conference in _____ office.
(Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
notified of the time and date should a hearing be scheduled.

_____ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied by
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal,
please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501



cc:  Treasurer
Director of Pupil Personnel

White copy - Parent, Yellow copy - Treasurer, Pink copy - Pupil Personnel, Gold copy - Student file

Form 6928

# Youngstown Public Schools

(School)           (Address)

*J. Traficant*

Principal           *Assistant Principal*

(Parent/Guardian)           (Date)

(Address)           (City)

This is to advise you that following a hearing, _____ _____ has been

(Student)           (I.D. No.)

suspended from school for _____ school days beginning _____. He/she is

to return to school on _____. The reason(s) for the suspension is/are

as follows: _____

(Reason(s))

_____

which violates Rule(s) No._____ of the Student Conduct Code

While suspended, _____, is not to be on school premises (grounds) during

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____ a.m.
p.m.

for re-admittance and a conference in _____ office.

(Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
notified of the time and date should a hearing be scheduled.

_____ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied by
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal,
please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501



cc:     Treasurer
       Director of Pupil Personnel

White copy - Parent, Yellow copy - Treasurer, Pink copy - Pupil Personnel, Gold copy - Student file

VISITING TEACHER'S REPORT OF HEARING

DATE  5/18/86

NAME  Nathaniel Jackson          ADDRESS      313 S.Pearl

SCHOOL  Stambaugh     GRADE  7     DATE OF BIRTH  2/13/72

PARENTS: MOTHER  Pauline  Kornegay      FATHER

HEARING REQUESTED BY  Stambaugh

PLACE      Board Annex

REFEREE      Charles Burrelli

INTERESTED PERSONS PRESENT      Nathaniel and Mother

REASON FOR HEARING      Truancy

INFORMATION AND DEVELOPMENTS      Nathaniel has been absent 86 days from Adams

and 7 from Stambaugh

DISPOSITION      Charles Burrelli will refer Nathaniel to Joanne Hoxworth.

OO-24

A. Pomponio
Visiting Teacher

The ARNOLD Corporation 900474 Inc

| STUDENT NAME | | | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | HOME ROOM |
| --- | --- | --- | --- | --- | --- | --- | --- |
| NATHANIEL JACKSON | | | 006 77 20 | 85-86 | STAMBAUGH | | |

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR |
| --- | --- | --- |
| 510 | ENGLISH | HEGEL |
| 520 | READING | HEGEL |
| 530 | SOCIAL STUDIES | HEGEL |
| 510 | MATH | HEGEL |
| 570 | SCIENCE | HEGEL |
| 580 | NOT PE | DAVIS |
| 510 | ART | GARREN |
| 510 | MUSIC | GARRETT |

CURRENT YEAR — CREDITS EARNED — GRADE POINT AVERAGE

CUMULATIVE — CREDITS ATTEMPTED — CREDITS EARNED — GRADE POINT AVERAGE

MARKING CODE
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

1 - MARK  2 - CONDUCT  3 - ABSENT

REPORT PERIOD / ATTENDANCE (ABSENT / TARDY)

**REPORT TO PARENTS**
THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OF THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPIL'S HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE


STATE EXHIBIT 403 V

CIMS                                                                          SE-8
Parent

<u>PERIODIC/ANNUAL REVIEW</u>

<u>AND</u>

<u>DEVELOPMENT OF INDIVIDUALIZED EDUCATION PROGRAM (IEP)</u>

Name of Student _Nathaniel Jackson_ Birthdate _2-13-72_
School _Hayes Jr. High_ Special Program _MH (DH/SBH)_
Date Sent _10-31-86_

Dear Parent(s): _Mrs. Kornegay_

    As stated to you at the time of your child's placement in our special
program, a periodic review of your child's Individualized Education Program
(IEP) would be made at least once a year.

    This letter is to inform you that a periodic review of your child's
Individualized Education Program is scheduled for:

Date: _Nov. 13, 1986_     Time: _8:00_     Place: _Rm. 120_
Participants will include: _Mrs. Kornegay   Miss Revett,_
_Mr. Terlesky_

    The purpose of this conference is to review your child's current IEP, and,
if necessary, to develop a new one.

    We hope you will be able to attend the review conference and participate
in the discussions.  Your participation in the review process will be helpful
in planning the most effective program for your child.  Your cooperation with
the school staff is very much appreciated.  If you have questions, or need
additional information, contact:

_Miss Sara Revett_ at _744-7602, 744-7603, 744-7604_
   (name and title) _MH(DH/SBH)_     (phone)
            _Teacher_ Sincerely,

                              _Miss Sara Revett,_
                        (name and title) _MH(DH/SBH)_
                                      _Teacher_

        PLEASE VERIFY YOUR RESPONSE BELOW AND SEND THIS REPLY
      BACK TO THE SCHOOL CONTACT PERSON AS SOON AS POSSIBLE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pupil's Name _____
_____ I can attend the Conference at the time given.
_____ I cannot attend the Conference at the appointed time, but would be able
        to come at the following times: _____

_____ I hereby waive my right to participate in my child's periodic/annual re-
        view and development of my child's new Individualized Education Program.

                 _____
                 (signature of parent/guardian)  (date)

9/86


STATE'S EXHIBIT

# PROGRESS REPORT

PLEASE RETURN TO THE ATTENDANCE
OFFICE WHEN COMPLETED.

A hearing has been set at the ___I.E.P. CONFERENCE___

⑨

$SBH$

for ___NATHANIEL JACKSON___          Please give a concise   $Eng\ I$

report concerning ___Wed. 11-11-87___ attendance, grades, conduct, and

cooperation.   Return this report by _____ to the attendance office.

| | 1st. | 2nd. | 3rd. | 4th. | Total |
|---|---|---|---|---|---|
| Absence | 7 | | | | |
| Tardiness | 0 | | | | |

| | 1st. | 2nd. | 3rd. | 4th. |
|---|---|---|---|---|
| Grade to Date | D | | | |

Conduct _____

_____

Cooperation _____

_____

Work Habits _____

_____

Other Comments _____

_____

_____

_____

_____

_____

_____

_____

STATE'S
EXHIBIT
403 X

_____          _____
Teacher                    Subject

Dear teacher

Please Excuse Nathaniel Jackson Wednesday Thursday he had Went To the Hospital i will See Mon. I his Mon took Sick So Went Will me To the hospital My blood pressur was up Very high So I needed him at home Wish me Some Well and god To

Thank You Jo Bright To the A...

Mrs. paulie Kenney

Vol. 25
212



**mahoning county alcoholism services**
4214 market street, youngstown, ohio 44512
(216) 782-1188
**another service of the alcoholic clinic of youngstown**

December 17, 1986

Mr. Saul
Hayes Jr. High School
1616 Ford
Youngstown, Ohio 44504

Re:  Nathaniel Jackson

Chemical Dependency Assessment Results

Dear Mr. Saul:

This is to inform you of the impressions gained as a result of the session held with Nathaniel and his parents.

The available data indicated Nathaniel to be harmfully involved with chemicals and at high risk for continued problems.

Nathaniel agreed to sign a 6 month no use contract and he and parents are aware if he violates this contract he will need to be reassessed at Mahoning County Alcoholism Services for further recommendations.  It was also recommended that Nathaniel  become involved in counseling at Mahoning County Chemcial Dependency Program which the parents agreed to pursue at this time.

If there are further questions please contact me at 782-1188.

Sincerely,

Becky Beck, A.C.
Adolescent Coordinator

BB/ar

**alcoholics can be helped and are worth helping.**

JACKSON, Nathaniel

-2-

_____ABILITY PLANNING:

____ _actors into consideration, such as performance scores, interests,
____avioral observations, physical stamina and all other pertinent evaluative
data, the following areas of training and employability are suggested for
planning:

1. Nathaniel has indicated a low level of involvement, excessive absenteeism
and no significant strengths in his performance.  Marginal consideration
should be taken for placement within the Auto Reconditioning Training
Program only.

Immediate supportive services suggested:

| | |
|---|---|
| _____ | Remediation in basic academic skills |
| _____ | Remediation in social skills |
| X | Vocational counseling |
| X | Other ancillary services: Nathaniel has shown a high level of absenteeism. |

This should be taken into consideration.  His reliability and dependability
were low.

II. RATIONALE FOR SUGGESTIONS:

Nathaniel has indicated difficulties attending.  He was often observed in his home
environment without making a significant effort to obtain transportation and to arrive
at the assessment center.  He has shown a low level of motivation and no significant
involvement in work tasks.

He has indicated a preference for auto body, small engines, auto mechanics and auto
reconditioning.  Those were the expressions he has indicated in a questionnaire.  A
subsequent completion of the Career Maturity Inventory has shown deficiencies in
career maturity.  His low level of involvement and willingness to participate to
reduce his chances for completing numerous assignments successfully.

Nathaniel has indicated a minimal functionality in verbal and numerical skills.  He
was not able to measure, and he could not quantify environmental conditions readily.
He has no knowledge of basic concepts in reference to linear and volume measurements.
He has shown a moderate ability to follow instructions, and he could manipulate with
larger hand tools and equipment successfully.

His absenteeism prevented him from participating successfully in various work samples.
He has completed two work samples successfully under time and quality criteria.  His
performance would be considered limited in general, because of absenteeism and because
of his low level of involvement.  He was able to manipulate sufficiently in elemental
work tasks with a clear three dimensional structure.

He has shown no significant negative behavioral manifestations.  He has indicated a
tendency to verbalize excessively and to want to engage other members into conversa-
tion.  This required specific attention.  He was cooperative in general, and he
interacted appropriately with coworkers and supervision.  Please see additional
behavioral comments under EMPLOYABILITY ATTITUDES on page 4.

NOTICE OF  (INTENT TO SUSPEND)

Name: _Nathaniel Jackson_ Date: _5/24/84_

This notice is to tell you that you may be suspended from school.

The reason(s) you may be suspended is/are: _Rule I. Disruption of School. (Fighting)_

To be suspended from school means that while you are suspended you are not permitted to come to school nor attend any extra curricular activities.

You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony Depew, Jr._
Principal

_____
Assistant Principal

Copy received by student: _Nathaniel Jackson_
Student's Name

Copy refused by student: _____
Witness                                         Ed 200

While suspended, _____, is not to be on school premises (grounds) during normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____ a.m. p.m.

for re-admittance and a conference in _____ office.
(Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be notified of the time and date should a hearing be scheduled.

_X_ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied by a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal, please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc:  Treasurer
     Director of Pupil Personnel

White copy - Parent, Yellow copy - Treasurer, Pink copy - Pupil Personnel, Gold copy - Student file

Schools

Ed-201

NOTICE OF (INTENT TO SUSPEND)

Name: Nathaniel Jackson                     Date: 2/1/85

This notice is to tell you that you may be suspended from school.
The reason(s) you may be suspended is/are: Rule 8 Refuse to obey
School Rules Afollow direction of teacher. Disrespectful

To be suspended from school means that while you are suspended you are not permitted to come to school nor attend any extra curricular activities.

You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony DeNiro Jr._
Principal

_____
Assistant Principal

received by student: X _Nathaniel Jackson_
Student's Name

used by student: _____
Witness

While suspended, _____                     Ed 200

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____ a.m.
                                                                                                    p.m.

for re-admittance and a conference in _____ office.
                                                                    (Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be notified of the time and date should a hearing be scheduled.

_____ It is not necessary for you to accompany him/her to school.


You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied by a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal, please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc:  Treasurer
     Director of Pupil Personnel

White copy - Parent, Yellow copy - Treasurer, Pink copy - Pupil Personnel, Gold copy - Student file

Nathaniel hasn't completed his assignments in most areas.

He plays quite a bit with small Toys and doesn't follow directions.

He is being retained this year.

Retained in 6th grade
Mrs. Heri – Room 300

6th grade

Stanford Achievement



# THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO

## PUPIL'S ANNUAL SHEET

Grades 4, 5, & 6.

ED 159

| 2 - 13 - 72 | 9 - 83 | 11 - 6 | M | Jackson Nathaniel |
|---|---|---|---|---|
| BORN  MO.  DAY  YEAR | ENTRY DATE | YEAR MONTH AGE AT SEPT. 1 | SEX | (LAST NAME)  (FIRST NAME)  (MIDDLE NAME) |

| 313  S. Pearl | Charles Pauline | | 744-8429 |
|---|---|---|---|
| ADDRESS | PARENT | OCCUPATION | TELEPHONE |

| Roosevelt | 1983 - 84 | 6 | 301 | S. Salquiro |
|---|---|---|---|---|
| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |

| | | REPORT PERIODS | | | | | PROGRESS IN ACHIEVEMENT | REPORT PERIODS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | | SUBJECT | 1 | 2 | 3 | 4 |
| **1.** | **HEALTH HABITS** Sit, stand and walk correctly | | | | | | Reading | D² | D² | D³ | F⁵ | D⁵ |
| | Be more careful of appearance | | | | | | English | D | D | C | D | D |
| | Practice safety | | | | | | Spelling | B | B | C | D | C |
| | | | | | | | Writing | F | F | F | F | F |
| **2.** | **WORK HABITS** Use greater effort | | | | | | | | | | |
| | Follow directions | | | | | | Social Science | F | D | F | F | F |
| | Carelessness | | | | | | Science | C | D | D | F | D |
| | Complete the work | | | | | | Arithmetic | D | F | F | F | F |
| **3.** | **CITIZENSHIP HABITS** Be Courteous | | | | | | Music | E | C | C | C | C |
| | Respect authority | | | | | | Art | A | A | A | A | |
| | Respect rights of others | | | | | | Music | U | U | U | U | U |
| | Respect all property | | | | | | Physical Education | A | A | A | A | A |
| **4.** | CONDUCT | | | | | | | | | | |

Reading 29   Stanine 2
Math 31            1

## ATTENDANCE

KEY:  E - ENTERED  √ - ABSENT A.M. ONLY  X - ABSENT WHOLE DAY  = - NOT IN SESSION
W - WITHDRAWN  ⌐ - ABSENT P.M. ONLY  O - TARDY (NO. MINUTES)  EX - EXCLUDED

| REPORT PERIODS BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | 46½ | ½ | O | 47 | |
| 2 | | | | | | 44 | 0 | 2 | 44 | |
| 3 | | | X | | X | 36½ | 2½ | 1 | 39 | |
| 4 | | | | X | 6:55 5 5 5 | 35 | 9 | 0 | 44 | |
| | | | | | TOTALS | 162 | 12 | 3 | 174 | |

STATE'S EXHIBIT 401 EE

Jackson Apx Vol 25 Page 213

ED 163

PERMANENT RECORD – PERSONAL
(Follow Manual of Procedure)

PUPIL NUMBER  0 0 1 6 7 7 2 0   D.O.B. 2  13  72
Validation Mo. Day Yr.

1. NAME: JACKSON    NATHANIEL    EDWIN    Sex: F ___ M ✓
   Last          First          Middle

ADDRESS:
TELEPHONE:
   Pencil

Parents or Guardian    Charles
                       Pauline

Address    (If different from above)

2. KINDERGARTEN AND PRIMARY

| | SCHOOL | ENTRY DATE | GR. | AGE YR. | MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|---|---|---|---|---|---|---|---|---|---|
| ACADEMIC PROGRESS: | Roosevelt | 8/79 | K | 5 | 7 | Haughey | | | |
| ACADEMIC PROGRESS: | Roosevelt | 9/79 | 1 | 7 | | Sumner | | | |
| ACADEMIC PROGRESS: | Roosevelt | 9/80 | 2 | 7 | | Ramsey | | | |
| ACADEMIC PROGRESS: | Roosevelt | 9/81 | 3 | 7 | | | | | |
| ACADEMIC PROGRESS: | Roosevelt | 9/80 | 3 | 8 | Wilson | 34½ | 1 | 4 |
| ACADEMIC PROGRESS: Unit 3 - poor work habits. | | | | | | | | | |
| ACADEMIC PROGRESS: | | | | | | | | | |

3. INTERMEDIATE – 4-5-6

| | | | | |
|---|---|---|---|---|
| SCHOOL | | | | |
| DATE OF ENTRY | | | | |
| AGE | | | | |
| GRADE | 4 | 5 | 6 | |
| TEACHER | | | | |
| ABSENT | | | | |
| TARDY | | | | |
| NEXT YEAR | | | | |
| ENGLISH | | | | |
| READING | | | | |
| SPELLING | | | | |
| WRITING | | | | |
| SOCIAL SCIENCE | | | | |
| SCIENCE | | | | |
| ARITHMETIC | | | | |
| ART | | | | |
| MUSIC | | | | |
| PHYS. ED. | | | | |

UNGRADED INTERMEDIATE – 4-5-6
Academic Progress: Grade
Academic Progress:
Academic Progress:
Academic Progress:

4. TRANSFER AND WITHDRAWAL – Elementary

| DATE | GRADE | FROM WHERE | TO WHERE | DATE REC'D | COMMENT |
|---|---|---|---|---|---|
| 6/83 | | | | | |
| 6/85 | 6 | Roosevelt | Adams | | |
| 2/86 | 7 | Adams | Tryntwood | | |
| 10/86 | 8 | Simonbaugh | Hayes | 10/21/96 | |

STATE'S EXHIBIT 103/4

## Report Card 1

Student: NATE
Student Number: 0016-77-20

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | SEMESTER EXAM | SEMESTER MARK | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | FINAL EXAM | FINAL MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SBH HEALTH | SUZETTE GREGORY | A S 1 | F S 17 | | | | B S 9 | D S 9 | | | | | F | D |
| S13 | SBH AD P.E. II | SUZETTE GREGORY | B S 1 | F S 17 | | | | B S 9 | D S 9 | | | | | F | D |
| SF3 | SBH GEN MATH II | SUZETTE GREGORY | C S 1 | F S 17 | | | | D S 9 | C S 9 | | | | | F | D |
| SB3 | SBH READING II | SUZETTE GREGORY | B S 1 | F S 17 | | | | D S 9 | D S 9 | | | | | A | D |
| SC3 | SBH WORLD HIST | SUZETTE GREGORY | C S 1 | F S 17 | | | | D S 9 | D S 9 | | | | | B | D |
| SA3 | SBH ENGLISH II | SUZETTE GREGORY | | F S | | | | C S 9 | F S 9 | | | | | B | F |
| ST1 | SBH CONS ED | SUZETTE GREGORY | | F S 17 | | | | C S 9 | B S 9 | | | | | F | C |
| SK4 | SBH ART HANDWK | SUZETTE GREGORY | | F S 17 | | | | D S 9 | D S 9 | | | | | B | D |
| SG3 | SBH BIOLOGY | SUZETTE GREGORY | | | | | | | | | | | | | |

### Current Year / Cumulative

| CURRENT YEAR | | CUMULATIVE | | |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
| 6.25 | | 13.50 | 12.50 | |

### Attendance Data

| REPORT PERIOD | ABSENT 1 | TARDY 1 | ABSENT 2 | TARDY 2 | ABSENT 3 | TARDY 3 | ABSENT 4 | TARDY 4 |
|---|---|---|---|---|---|---|---|---|
| | 1.0 | | 17.0 | 2 | 9.5 | | 9.0 | 1 |

MARKING CODE
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

### REPORT TO PARENTS

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE _____

## Report Card 2

| STUDENT NAME | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | HOME ROOM |
|---|---|---|---|---|---|
| JACKSON NATE | 0016-77-20 | 1989-90 | 11 | STAMBAUGH | 107 |

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | SEMESTER EXAM | SEMESTER MARK | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | 1-MARK 1 | 2-CONDUCT 2 | 3-ABSENT 3 | FINAL EXAM | FINAL MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SA4 | ENGLISH III | GREGORY SUZETTE | A S | | C S 5 | | | F S 20 | F S 44 | | | | | F | F |
| SB4 | READING III | GREGORY SUZETTE | C S | | C S 5 | | | F S 20 | F S 44 | | | | | F | F |
| SC5 | U.S. HIST | GREGORY SUZETTE | C S | | C S 5 | | | F S 20 | F S 44 | | | | | F | F |
| SF4 | CON MATH I | GREGORY SUZETTE | C S | | D S 5 | | | F S 20 | F S 44 | | | | | F | F |
| SG4 | ECOLOGY | GREGORY SUZETTE | C S | | D S 5 | | | F S 20 | F S 44 | | | | | F | F |
| SI4 | AD P.E. III | GREGORY SUZETTE | W S | | D S 5 | | | F S 20 | F S 44 | | | | | F | F |

### Current Year / Cumulative

| CURRENT YEAR | | CUMULATIVE | | |
|---|---|---|---|---|
| CREDITS EARNED | GRADE POINT AVERAGE | CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
| | | 13.75 | 12.50 | |

### Attendance Data

| REPORT PERIOD | ABSENT 1 | TARDY 1 | ABSENT 2 | TARDY 2 | ABSENT 3 | TARDY 3 | ABSENT 4 | TARDY 4 |
|---|---|---|---|---|---|---|---|---|
| | 5.0 | | 29.0 | | 44.0 | | | |

MARKING CODE
A - EXCELLENT
B - ABOVE AVERAGE
C - AVERAGE
D - BELOW AVERAGE
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

### REPORT TO PARENTS

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS/HER PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH THE TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE _____

STATE Page 25 EXHIBIT 20 NO. GG

Nathaniel has made slow progress in reading and unsatisfactory progress in Math.    His attention span is short and he likes to play.

Writing - Unsatisfactory

Spelling - Good

Behavior - Needs to improve.

Conferences - None

Reading - Completed Unit 5 - Level 13

Next Year - Grade 5 - Room 202

June 11, 1982

D. Martin

STATE'S
EXHIBIT
403 H A

| OHIO SURVEY TESTS | | OHIO SURVEY TESTS | | | ACADEMIC ABILITY TEST | | | ACHIEVEMENT TESTS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| STUDENT NAME JACKSON   NATHANIE | | GRADE   4 A | | RAW SCORE | 19 V E R B | 18 | 37 | 19 | 17 | | |
| | | ADM | | | 20 | 26 | 21 | 5 | 14 | 5 | |
| | | DATE:   9/31 | | %ILE STA 9 | 3 | 4 | 3 | 2 | 3 | 2 | |

THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO

PUPIL'S ANNUAL SHEET

Grades 4, 5, & 6.

ED 159

| 2 - 13 - 72 | 9 - 81 | 9 - 7 | m | Jackson, Nathaniel Edw. |
|---|---|---|---|---|
| BORN   MO.   DAY   YEAR | ENTRY DATE | YEAR MONTH AGE AT SEPT. 1 | SEX | (LAST NAME)   (FIRST NAME)   (MIDDLE NAME) |

| 313 S. Pearl | Charles Pauline | | 744-8429 |
|---|---|---|---|
| ADDRESS | PARENT | OCCUPATION | TELEPHONE |

| Roosevelt | 1981-82 | 4 | 206 | D. Martin |
|---|---|---|---|---|
| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |

| | REPORT PERIODS | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| **1.  HEALTH HABITS** Sit, stand and walk correctly | | | | |
| Be more careful of appearance | | | | |
| Practice safety | | | | |
| **2.  WORK HABITS** Use greater effort | | | | |
| Follow directions | | | | |
| Carelessness | | | | |
| Complete the work | | | | |
| **3.  CITIZENSHIP HABITS** Be Courteous | | | | |
| Respect authority | | | | |
| Respect rights of others | | | | |
| Respect all property | | | | |
| **4.  CONDUCT** | D | D | C | C |

| PROGRESS IN ACHIEVEMENT | REPORT PERIODS | | | |
|---|---|---|---|---|
| SUBJECT | 1 | 2 | 3 | 4 |
| Reading | D | D | C | C |
| English | C | C | D | C |
| Spelling | B | B | B | B |
| Writing | D | D | D | D |
| Health | C | C | C | C |
| Social Science | C | F | D | D |
| Science | D | C | C | D |
| Arithmetic | D | D | F | F |
| Art | S | S | S | S |
| Music | S | S | S | S |
| Physical Education | S | S | S | S |

## ATTENDANCE

KEY:  E - ENTERED      √ - ABSENT A.M. ONLY      X - ABSENT WHOLE DAY      = - NOT IN SESSION
W - WITHDRAWN      \ - ABSENT P.M. ONLY      O - TARDY (NO. MINUTES)      EX - EXCLUDED

| REPORT PERIODS BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9-9 81 | E | O | | | 47 | 0 | 1 | 47 | |
| 2 | 11-16 81 | | X | | X | 41 | 3 | 0 | 44 | |
| 3 | 2-1 82 | O X | | | X | 40½ | 2½ | 1 | 43 | |
| 4 | -12 | X X X X | | | | 35 | 9 | 0 | 44 | |
| | | | | | TOTALS | 163½ | 14½ | 2 | 178 | |

Jackson ADMINISTRATE EXHIBIT 407.I.F

"Nate Jackson"

TEACHER Mrs. Trochlis   BUILDING Alabama   EDUCATION

| TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RES[PONSE] |
|---|---|---|---|---|
| -20-'85 1:50 | Room 219 English class | shouting out — banging desk with coins | Asked him several times to sit down and settle down | He refused 2 or 3 times |
| -17-'86 1:50 | same R | Walked in with no books | Asked him where his books were | All passing but didn't h... |
| | | Asked to see her 2:10 | → gave him permission to put them away | He refused to th... with an... |
| -29-'86 1:50 → | Room 219 | [He] Walked in playing a radio/cassette and earphone on | I asked him to put the radio away | He refused to the fir... |
| | | I gave him a SIMPLE worksheet assignment | | He refused to d... |

STATE'S
EXHIBIT
403 JLT

T NAME: N. Jackson    TEACHER Killer    BUILDING _____    EDUCATIONAL PLACEM

| TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE |
|---|---|---|---|---|
| 8:05 | Reading in room 104 NRPF | Nathaniel had failed to wake up, asleep during sustained silent reading - 10 min | (1) Called student by name to wake up when his name was called. (2) Stood by him sitting next to him tapped him on the leg to wake up (3) Walked over to Nate and shook him by the shoulder. (4) Put my arms around him and sat him up straight in his chair. | (1) No response from when his name was called. (2) No response from 1, he kept sleeping (3) No response from Nate, he kept sleeping (4) He woke up and continued with his work. |
| 8:30 | Reading in room 104 NRPF | Nathaniel earned a 100% on his spelling test. | Shook him on reading around for his good work. Praised him. | He was most happy and proud. Then, he perked up |

STATE'S EXHIBIT

Jackson TEACHER Paolone BUILDING Adams EDUCATIONAL PLACEMENT

| SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE | ESTIMATED INCIDENT |
|---|---|---|---|---|
| m 119 Science class | Mimicing my instructions to class. moved his seat behind my desk & continued while I passed out papers. | Told him to stop and go back to seat. | He finally went back to seat. Few minutes later walked out. | Min. |
| | Walks in, touches everything near his seat. | Said nothing | He walks out. | 2 Min |
| | Came in & proceeded to shake hands with skeleton kept in class. | Told to stop & sit down. | Refused - Mr. McKelvey came to remove from class | 4 Min |
| | Has missed 35 days this grading period - Has not taken 1 test or quiz - Doesn't bring - book pencil - paper. | | | |
| | Came in, No Book etc. Kept feet on chair - rolled dollar bills into cigar. annoyed students behind him | Told to stop | refused - so I ignored him as it was quiet enough so I could teach. | 45 Min |
| | Grabbed a girl's rear end coming into class. | Prevented her from "Beating him up" | Ran around room to get away | 2 Min |
| | | | Listened to radio with ear phones, sat & did no work | 45 Min |

STATE'S EXHIBIT

88-89

YOUNGSTOWN PUBLIC SCHOOLS
DEPARTMENT OF PUPIL PERSONNEL SERVICES

FOR PROFESSIONAL USE ONLY                    NOT FOR RELEASE

SPECIAL EDUCATION VOCATIONAL PLACEMENT MEETING

STUDENT'S NAME: _Nathaniel Jackson_                DATE: _6/16/88_

HOME SCHOOL: _Rayen_

SPECIAL SERVICE PROGRAM: _SBH_

PSYCHO-EDUCATIONAL ASSESSMENTS COMPLETED/RESULTS: _1/17/86 - IQ 73 -_
_Woodcock-Johnson  Reading 4.6,  Math 4.3._
_Strengths in auditory, short-term memory, visual_
_details oral math problems._

LEVEL OF READING/MATH: _6/88  Reading 7.8, Spelling 6.9,_
_Math 6.9. Measurement - 14o._

VOCATIONAL ASSESSMENT RECOMMENDATIONS: _6/88-Special Needs Program,_
_Vocational counseling, personal counseling, behavior_
_monitoring._

PREVIOUS MAINSTREAMING EXPERIENCE: _None_

COMMITTEE RECOMMENDATIONS (Priority order): _Auto Reconditioning_
_with reservations (marginal) Math/Reading_
_Support as needed. Monitor behavior._

COMMENTS: _Responds to individual attention, praise,_
_conferences, feedback. Needs glasses. Seat_
_near front of room._

PARENTS: _Rubie Jackson_          STUDENT: _Nathaniel Jackson_

CHOFFIN REP: _Ann K. Ellis_       TEACHER: _Carol M. Mills_

HOME SCHOOL                        PROGRAM
COUNSELOR: _P. Dubey_              COORD.: _____ Voc. Assess._
                                   _Marginal placement for_
SP. ED. VOC.                       _Auto Body._
COORD.: _D. Lalandie_

THREE VISITS                       CHOICE          AM
1.
2.   _N/A_                         1. Auto Reconditioning
3.                                 2. Auto Body

Original:   CIMS File
White:      Special/Voc. Education Coordinator
Yellow:     Special Ed. Program Coordinator
Pink:       Vocational Supervisor
Goldenrod:  Special Needs

9/84

# YOUNGSTOWN PUBLIC SCHOOLS

Form 6944

### DEPARTMENT OF PUPIL PERSONNEL SERVICES

REQUEST FOR RETURN TO REGULAR CLASS OR TRANSFER OF PROGRAM

Pupil's Name _Nathaniel Jackson_    Student # _016-77-28_    Birthdate _2-7-70_

Address _311 Pearl_         Home School _Hays_

Date of Request _10-13-86_       Service to Begin Date _10-17-86_

The following person(s):

_William Steele_                 _S.B.H. Coordinator_
       Name                                   Title

       Name                                     Title

Request(s) that the above named student be changed from the:

_MH_                     _St. Ambrose_       _8_
    Name of Program               Name of School      Grade

               _SBH_       to      _Hayes_        _8_
    Name of Program               Name of School      Grade

| D.H. | V.I. | Orthopedic | H.I. | S.B.H. |
|------|------|------------|------|--------|
| ☐ Vineland | ☐ Acuity | ☐ Orthopedic | ☐ Audiogram | ☐ Medical |
| ☐ I.E.P. | ☐ Medical | Report | ☐ Medical | ☐ Anecdotal Records |
| | ☐ I.E.P. | ☐ I.E.P. | ☐ I.E.P. | ☐ Devereux |
| | | | | ☐ I.E.P. |

|  | Other Medical | L.D. | S.C.D. |  |
|--|---------------|------|--------|--|
| | ☐ Medical Rpt. | ☐ Devereux | ☐ Medical | |
| | ☐ I.E.P. | ☐ I.E.P. | ☐ Devereux | |
| | | | ☐ I.E.P. | |

Reason(s) for the request: _Student has shown behavior that is_
_appropriate for placement in the SBH Unit at Hayes_

_____

_Ruth Jackson_                   _Paul M. Lee_
    Signature of Parent                   Signature of Principal

_____            _____
  Signature of Spec. Ser. Teacher            Signature of Psychologist

_William Steele_                   _____
  Signature of Sending Coordinator         Signature of Receiving Coordinator

Request approved_____    Denied _____

Date _____

                            Signature of Director of Pupil Pe...

## PRINCIPAL: WILL FILE THIS REQUEST IN THE CIMS FOLDER AFTER ALL SIGNATURES ARE IN PLACE.

White (Receiving Principal)    Yellow (Sending Principal)    Pink (Sending Co-ordinator)    Gold (R...

# INDIVIDUALIZED EDUCATION PROGRAM

Student's Name ___ Nathaniel Jackson ___  Date of Birth  2-13-72 ___  School ___ Steubenville ___

Special Service Program ___ Multi-Handicapped ___  Related Service ___ Work Study ___  School Year ___ 1989-90 ___

**Annual Goals:**

Nate will complete his job training hours as part of the Try_out Program and be retained as part of the employees regular employees.

Date: February 9, 1990
Chair: _(signature)_
Coordinator: _(signature)_
Student: _Nathaniel Jackson_

**Short Term Instructional Objectives:**

Nate will exhibit appropriate retention and execution of learned job task thru-out his training.

Nate will evidence appropriate school attendance and work attendance.

Nate will exhibit appropriate behaviors related to employability: Time management, good communication and sociability, appropriate attitude with co-workers and customers, cooperation, responsibility ability to accept constructive criticism.

Nate will maintain appropriate academic attitude and competence and school cooperation thru-out his job training.

* Nate will follow ALL THE RULES AND PROCEDURES AT THE WORKPLACE FOR BEHAVIOR, CALLING OFF AND SIGNING IN.

**Evaluation Procedures & Criteria:**

Periodic written and oral work evaluations from th employer will be shared with teacher, parent, principal and program coord.

## CRITERIA & SCHEDULES FOR PERIODIC (ANNUAL) REVIEW:

a. Are Instructional Objectives being achieved? Yes ☐ No ☐
  1. Met as stated: Yes ☐ No ☒
  2. Made progress: Yes ☒ No ☐
b. Is the current placement appropriate? Yes ☐ No ☒
c. Review Schedule: Annual ☐ Semi-Annual ☐ Other (Specify) _____
d. Recommendations for placement and general program for next school year:

_(handwritten notes throughout)_

Conference Chairperson _(signature)_

Date: Feb. 13 1990

STATE'S EXHIBIT

White—Program Coordinator; Canary—CIMS; Pink—Parent; Goldenrod—CIMS

Jackson, Nathaniel     0016-77-20     9     9/01/87     Hayes
314 S. Pearl
Youngstown, Ohio  44506
02/13/72
743-5365
Charles, Pauline

9/22/88  Transitional

1987-88  -  9
1988-89  -  10



9-19-88

Nate come into Class on Monday Sep r. 19th,
and took his seat with his bookpose. A word
search activity was on the desk & the students
to earn points. Nate started burning his
paper. Mrs. Hobbel told him to stop. He
stopped momentarily — then got up to burn
another student's (Lottia) paper. Again he
was asked to stop. He did. In his seat,
Nate was constantly talking out & swearing.
He also laid on the table and refused to
leave to go to time out.

Nate was not permitted to leave between
periods but Nate got out of the room
and went to bother another teacher, Miss
Quinn. When he returned he continued
speaking out and swearing. I asked
Nate to go to time out. He refused. I
went to the back of the room by the
door and asked Nate to come with me.
Nate refused again. I went to Nate
and put my hand on Nate to guide
him to time out. Nate jumped up and
swung his hand to me, missing my face
by approximately 3 inches. I went for help.

while gone. Nate left the room saying
that he was leaving the building (9.15).
When I returned, Nate was still out
of the room. I went for Mr. Cassaro.
Nate returned. While I was in the hall
Nate walked out of the classroom again
and Mr. Cassaro called him at which
time he went to time out.

J. Sinleiber

