322-323, 473 N.E.2d 264, 279-280;  *Buell, supra,* 22 Ohio St.3d at 141-142, 22 OBR at 218, 489 N.E.2d at 810-811; *State v. Barnes* (1986), 25 Ohio St.3d 203, 206-207, 25 OBR 266, 269, 495 N.E.2d 922, 924-925. For the reasons set forth in those decisions, we adhere to that position today.

In his fourth, fifth, sixth and seventh propositions of law, appellant attacks the legal sufficiency of his conviction for aggravated burglary and of the aggravating circumstance based thereon. His threshold argument maintains that the trial court erred in instructing the jury that one who lawfully enters premises becomes a trespasser  [FN2] subject to conviction for burglary by virtue of the commission of a felony on the premises.  Citing this court's holding in *State v. Barksdale* (1983), 2 Ohio St.3d 126, 2 OBR 675, 443 N.E.2d 501, appellant argues that once the privilege to enter the premises is granted, as here, [FN3] that privilege is not vitiated by the subsequent commission of a felony thereon.

> FN2. R.C. 2911.11, aggravated burglary, provides in pertinent part:
> "(A) No person, by force, stealth, or deception, shall *trespass* in an occupied structure * * *."  (Emphasis added.)

> FN3. Appellant, the only surviving witness to the encounter between himself and Karen Range, testified that Karen permitted him to enter her home.

We cannot agree with this application of our holding in *Barksdale, supra.*  There, the accused entered an automobile dealer's car lot, open to the public, and broke into a locked car.  This court struck down the accused's subsequent *115 conviction for breaking and entering on the basis that the state had failed to prove the essential element of trespass.  In so holding, we reasoned that the automobile dealer's tacit invitation to the general public to enter the lot was a grant of privilege and that one who entered the lot with the purpose of committing a felony thereon did not relinquish that privilege and, therefore, no trespass had been demonstrated.

The instant case is readily distinguishable from *Barksdale.*  First, a private home is involved herein while *Barksdale* involved a used car lot open to the general public.  The interest of a private person in the inviolability of his home is materially greater than that of a business owner in his business premises,

particularly where the business premises are open to the public.  Moreover, a privilege once granted may be revoked.  In the case *sub judice,* unlike in *Barksdale,* the felony committed, once on the premises, was one of violence, directed against a human being who had the ability and the authority to revoke the privilege of initial entry, if such privilege was in fact granted as appellant testified. [FN4]  We note further that R.C. 2911.21(A), defining criminal trespass, provides that:

> FN4. The car lot in *Barksdale* was closed at the time of the accused's entry thereon.  Thus, it may safely be assumed that there was no one present to revoke the privilege of entry.

**389 "No person, without privilege to do so, shall do any of the following:

"(1) Knowingly enter *or remain* on the land or premises of another * * *." (Emphasis added.)

[3][4] Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in Karen's parents' home terminated the moment he commenced his assault on her.  Appellant does not deny striking Karen repeatedly before killing her. From that undisputed fact, a powerful inference arises that appellant was no longer privileged to remain in Karen's parents' home, and that he knew his privilege had terminated.  In our view, this inference is so strong that it excludes the possibility of drawing from the same facts any other reasonable inference supporting a theory of innocence.  See *State v. Kulig* (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, syllabus.  We find no error in the trial court's instruction to the jury, nor are we persuaded that the state failed to prove the essential element of trespass.

[5] In his eighth proposition of law, appellant contends that the trial court erred in considering the nature and circumstances of the offense, the future dangerousness of the accused, and the public demand for retribution as aggravating factors in making its sentencing determination, while giving no consideration whatsoever to the mitigating factors of youth and cooperation with law enforcement authorities. [FN5] As to the trial court's purported *116 reliance on the factors of appellant's future dangerousness and the public's demand for retribution, the remarks to which appellant objects [FN6] appear only in the court's oral statement in open court before sentencing.  No mention of such factors is made in the actual written opinion of the court.  Viewing the record as a whole, we are

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

of the presumption of correctness in the proceedings below, we do not consider these two brief remarks to carry such significance as to taint the entire process of sentence determination in this case.  See *State v. Coombs* (1985), 18 Ohio St.3d 123, 125, 18 OBR 153, 155, 480 N.E.2d 414, 416-417.

FN5. R.C. 2929.04 provides in pertinent part:
"(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, * * * the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
"(1) Whether the victim of the offense induced or facilitated it;
"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
"(4) The youth of the offender;
"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

FN6. The relevant remarks by the trial court read as follows:
" * * * [Appellant's] battered childhood was terribly unfortunate but has not, from the overwhelming weight of the professional evidence, caused him to be psychotic.  It has perhaps been responsible, to some degree, in causing him to be a person with superficial and shallow restraints.  More significantly, it has developed a person with dangerous

propensities likely to explode at any time. The * * * [appellant] has been described as a human time bomb waiting to explode.  He did just that in this case and the results were devastating.  There is no evidence to suggest that the same type of delayed explosive reaction could not occur again unless action is now taken to permanently prevent it.
"This is what the Legislature had in mind when it passed the new death penalty law. The Legislature was reacting to the demands of the public for retribution and this is an appropriate case to provide such retribution."

[6]  Nor do we find error in the trial court's consideration of the nature and circumstances **390 of the offense. [FN7] R.C. 2929.04(B) provides that the *117 court, in determining whether death is an appropriate penalty, "*shall consider,* and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense* * * *.*" (Emphasis added.)  Thus, the court is *required* to review this factor.  However, appellant appears to contend that the trial court's remarks on this subject reveal that it viewed the nature and circumstances of the offense herein as aggravating rather than mitigating as required by R.C. 2929.04(B). We do not agree.  The statute merely requires that the court consider this factor in determining the mitigating factors to be weighed against the proven aggravating circumstances.  Obviously, the nature and circumstances of certain offenses will be such that no mitigating feature can be extracted.  By its statement on the gruesome and vicious nature of the murder, the trial court herein was merely justifying its conclusion that no mitigating factors can be gleaned from the nature and circumstances of this particular offense. We find nothing improper in the court's remarks.

FN7. The relevant text in the trial court's opinion reads:
" * * * The true circumstances of the offense can be gleaned from the testimony of the State's witnesses who described the scene, the victim's condition, the condition and location of her torn clothes and the presence of semen both in the victim's vagina and in her panties and the presence of spermatozoa.  There is ample evidence to indicate the very sordid nature of the offense and its specific consequences.
"It should be noted, from the * * * [appellant's] appearance in the courtroom that he was physically over-developed. Perhaps

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

massively well developed chest and upper arms. It is evident that he either exercised regularly or worked out on muscle developing equipment. He looked every bit the part of an extremely strong person even though he wore glasses, suggesting that he had very poor eyesight and spoke very softly. The last moments in the life of Karen Range, in that small bathroom, and in very close proximity to the * * * [appellant], it must logically be inferred were filled with horror and pain."

[7][8] Nor did the trial court fail to consider the mitigating factors of appellant's youth and cooperation with law enforcement authorities. The court did in fact consider the youth of the offender, but found it to be nonmitigating. [FN8] As to appellant's cooperation with law enforcement authorities, [FN9] appellant offered almost no evidence on this factor, [FN10] and, in any event, appellant's cooperation was minimal at best. He attempted to cover up his involvement in the crime by concealing evidence and giving a false robbery report to police. While it is true that appellant eventually confessed to the murder, this came only after initially denying involvement when confronted and then concocting a story about an imaginary adopted brother who committed the murder while appellant was in the next room. Appellant has always denied the rape. We do not consider this history as depicting cooperation with law enforcement authorities.

FN8. The trial court's remarks regarding the youth of the offender read as follows:
"(4) 'The youth of the offender.' The Court finds that the defendant was born December 22, 1959, and at the time of this trial was twenty-three years of age. There is absolutely no evidence to suggest that he was a youthful offender or that his age was a factor that should be taken into account in mitigation of the sentence of death. This factor was not present."

FN9. The factor of the offender's cooperation with law enforcement authorities is not among those specifically enumerated in R.C. 2929.04(B)(1) through (6), but it may arguably fall within the catch-all provision of R.C. 2929.04(B)(7).

FN10. The probation officer who prepared the presentence report agreed at trial, in response

to questioning, that appellant's behavior during the interview was "cooperative."

[9][10] *118 By propositions of law nine, ten and eleven, appellant attacks the sufficiency of the evidence to support his conviction of rape and the corresponding specification. Our review of the record reveals that the evidence was such that the jury could reasonably find that the victim had been raped and that appellant was the perpetrator. [FN11] Whether a rape had been **391 committed, and by whom, are questions for the jury. A reviewing court will not disturb a jury verdict where there is substantial evidence supporting a reasonable conclusion that all elements of the offense were proven beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. Appellant's rape conviction and the corresponding specification must stand.

FN11. Quantities of semen were found in the victim's vagina, around the pubic region and on her underwear. Tests conducted on the semen failed to exclude appellant as the depositor, and disclosed the presence of living sperm, indicating that the semen was recently deposited. Further evidence established that the semen was probably deposited while the victim was prone without her ever again being ambulatory. A bruise was observed on the inside of the victim's upper thigh, consistent with the use of force. The victim's shorts and panties had been ripped open to expose her pubic region, and her blouse was also torn, exposing her breasts. A perfectly formed, uncongealed drop of unsmeared blood was found on the victim's pubic region, indicating that had sexual intercourse occurred after the drop had fallen there, it would have been smeared, leading to an inference that intercourse had taken place before, and very recently before, the drop fell. At the time she was found, the victim's hair was still wet from a shower, again indicating that the semen had been very recently deposited, since the shower would have rinsed it away. All this evidence leads to a compelling conclusion that a rape had occurred and that appellant was the perpetrator.

[11] Appellant contends in his thirteenth proposition of law that the trial court erred in failing to state in a separate opinion its specific findings regarding mitigating and aggravating circumstances as was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

latter outweighed the former, as required by R.C. 2929.03(F). [FN12] We have thoroughly examined the opinion of the trial court and we conclude that it reflects full compliance with the requirements of the statute. The opinion outlines the aggravating circumstances of which appellant was found guilty beyond a reasonable doubt and considers in detail each of the potential mitigating factors.   In a lengthy analysis of the evidence offered in mitigation, the trial court repeatedly explained why this evidence was entitled to relatively little weight.   In sum, the opinion reveals that the trial judge was fully cognizant of his duties under R.C. 2929.03(F) and complied with the statute diligently and completely.   Appellant's argument is without merit.

> FN12.  R.C. 2929.03(F) provides in pertinent part:
> "The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.  * * * "

The fourteenth proposition of law involves appellant's motion to the *119 court of appeals, filed over two years after the trial court's entry of its judgment of convictions and sentence, requesting remand of the cause to the trial court for a ruling by that court on appellant's motion for a new trial. The trial court denied the new trial motion without prejudice to its eventual refiling.   The court of appeals then denied the motion for remand on the basis that the grounds for retrial were insufficient.   Appellant argues that the court of appeals erroneously considered the merits of the motion for a new trial, which motion was not before that court.

[12] We note at the outset that appellant's notice of appeal to this court appeals only from the appellate court's judgment of December 11, 1985 affirming his conviction and sentence.   Thus, the appellate court's ruling on the motion for remand is not properly before this court.   In any event, we fail to see any prejudice resulting to appellant from the appellate court's denial of his motion to remand since the trial court had already denied the motion for new trial without prejudice.

Appellant's fifteenth proposition of law alleges

prejudicial error in the admission of certain testimony by the victim's mother.   The following exchange occurred during direct examination of Mrs. Range by the prosecutor:

"Q. Did you have occasion to discuss sexual matters with * * * [your daughter Karen]?"

"A. Yes, we did.

"Q. What did she tell you?"

**392 "A. She said that she would remain a virgin until--

"MR. STUEVE:  Objection to that, Your Honor. That's hearsay.

"THE COURT:  Objection overruled.   The answer may stand."

Appellant asserts that Karen's statement to her mother was inadmissible hearsay, subject to no exception, and its admission constituted prejudicial error.   The state counters that the statement was hearsay, but admissible under the exception to the rule relating to statements of then existing physical condition.   We cannot agree completely with either argument.

[13] Karen's statement of her intent to remain a virgin is hearsay under Evid.R. 801(C). [FN13]  It clearly qualifies as an out-of-court statement "offered in evidence to prove the truth of the matter asserted" within the meaning of the rule.   The state does not dispute this.   As hearsay, the statement is not admissible unless subject to a relevant exception. Evid.R. 802.

> FN13.  Evid.R. 801(C) provides:
> "Hearsay. 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[14] We do not agree with the state's contention that the statement falls within the exception embodied in Evid.R. 803(3)  [FN14] for a then existing *120 physical condition.   In discussing this "physical condition" exception, the authorities repeatedly speak solely in terms of physical pain, symptoms or sensations.   See, e.g., 4 Weinstein & Berger, Weinstein's Evidence (1985) 803-103, Paragraph 803(3)[01]; 4 Louisell & Mueller, Federal Evidence (1980) 518, Section 440; 2 Gard, Jones on Evidence (6

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Ed.1972) 266, Section 10:6; 11 Moore's Federal Practice (2 Ed.1985) VIII-83, Section 803(3)[5]. We believe that this exception was never intended to apply to a physical condition such as virginity.

> FN14. Evid.R. 803(3) provides in pertinent part:
> *"Then existing mental, emotional or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) * * *."

[15][16] An argument may be made that Karen's statement is admissible under the "then existing state of mind" exception in Evid.R. 803(3) in that the statement evinced Karen's intent to refrain from sexual intercourse until some point in time, unidentified, but with a strong implication that she would remain a virgin until her impending marriage. In that light, the statement apparently would have been offered to show that Karen would not have consented to intercourse with appellant. "It has long been settled that the state-of- mind exception may be used as the basis for introducing statements showing the forward-looking intent of the declarant for the purpose of proving that he thereafter acted in accordance with that intent." 4 Louisell & Mueller, Federal Evidence, *supra,* at 540, Section 442.

However, this argument is unpersuasive. The relevance of Karen's statement to the issue of her non-consent is tenuous at best. Even clearly relevant evidence is inadmissible if its probative value is substantially outweighed by a danger of unfair prejudice. Evid.R. 403(A). The potential for prejudice in Karen's statement is considerable. We believe it should not have been admitted. However, we are compelled to conclude that this error was, in the final analysis, harmless. Even if this hearsay testimony were excluded from consideration, the overwhelming persuasiveness of the remaining evidence would still be undeniable. Appellant confessed to the murder and there was substantial physical evidence to support his conviction of rape beyond a reasonable doubt. Thus, the error was harmless. See Crim.R. 52(A); *Buell, supra,* 22 Ohio St.3d at 135, 22 OBR at 212-213, 489 N.E.2d at 805- 806.

[17] Appellant urges in his sixteenth proposition of law that the trial court erred in granting the state's motions to excuse six prospective jurors because of their objections to capital punishment where four of these six persons were not unequivocal in their opposition to the death penalty and where none of the six was asked whether **393 he would follow the instructions of the court in spite of his personal beliefs. However, appellant misapprehends the standards applicable in this setting. This court has held that "[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of *121 his duties as a juror in accordance with his instructions and oath." State v. Rogers (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. An examination of the record reveals that each of the prospective jurors in question stated either that under no circumstances whatsoever could he join in a recommendation of death or that he believed his conscience or religious beliefs would prevent him from following the court's instructions in that regard. This court is satisfied that the trial court's orders excusing these jurors for cause are amply supported by the record in each instance.

By his seventeenth proposition of law, appellant contends that the trial court deprived him of due process and the effective assistance of his counsel by affording inadequate time to prepare for the penalty phase of the proceedings. The trial court granted the defense a three-day continuance. Appellant argues that this was inadequate time for preparation. We do not agree.

[18] At the conclusion of the guilt phase on May 17, 1983, over seven months had elapsed since appellant was arraigned on the instant charges. During that time, appellant was provided a psychologist to assist him in his defense. At the trial, defense counsel developed an extensive review of appellant's troubled childhood, personal background and emotional makeup, both through appellant's own testimony and through a psychological expert. At least two psychiatric reports were made at the request of the defense. Friends and family of the appellant were interviewed, many of whom testified at trial. Given the fact that defense counsel, in the face of appellant's admission to the murder and the quantity of evidence against him, must have at least contemplated the possibility of a guilty verdict, this court is persuaded that counsel had sufficient time and opportunity to prepare adequately for the penalty phase of this proceeding.

[19] Appellant's eighteenth proposition of law challenges the admission of a presentence report prepared by a probation officer, where the officer had advised appellant that any statements made to him by appellant would remain confidential. This argument is without merit. Appellant requested this report himself. Indeed, no such report may be made ~~Jackson, App.~~ Vol. 26

except upon the request of the defendant.   R.C. 2929.03(D)(1).   R.C. 2929.03(D)(1) further provides that once a presentence report is made, copies " * * * *shall* be furnished to the court, *to the trial jury if the offender was tried by a jury,* to the prosecutor, and to the offender or his counsel" (emphasis added) for consideration in determining the appropriate sentence. As this court has noted previously, " * * * the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. * * * [T]he jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that defendant be put to death." *Buell, supra,* 22 Ohio St.3d at 138, 22 OBR at 215, 489 N.E.2d at 808.

*122 Appellant's reliance on *Estelle v. Smith* (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359, is misplaced.   There, the defendant submitted to a court-ordered pretrial psychiatric examination to determine his competency to stand trial for a capital offense.   Over defense objection, the psychiatrist was later permitted to testify during the penalty phase concerning this examination and his conclusions, even though the psychiatrist's name did not appear on the prosecution's witness list.   The United States Supreme Court vacated the sentence of death, holding that the admission of this testimony violated the defendant's Fifth Amendment privilege against compelled self-incrimination, since defendant was not **394 advised before the psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a capital sentencing proceeding. *Id.* at 461- 469, 101 S.Ct. at 1872-76.   In so holding, the court emphasized that the examination was conducted in a custodial setting, under the coercion of a court order, without notice to the defendant that the information extracted from him could later be used to secure the death penalty. *Id.* at 467, 101 S.Ct. at 1875. This scenario is readily distinguishable from the instant case.   Here, the interview by the probation officer was instigated *at appellant's request.* Unlike in *Estelle,* appellant's counsel had every reason to know that the resulting presentence report would be revealed to the jury, since R.C. 2929.03(D)(1) so requires.   The interview of appellant, and his responses to the probation officer, were free of any of the coercive aspects so central to the court's analysis in *Estelle.* This court is persuaded that the considerations which compelled the holding in *Estelle* are absent in this case.

Appellant's nineteenth and twentieth propositions of law contend that the death penalty in this case is disproportionately severe compared to penalties imposed in similar cases in the same county and that proportionality review must encompass not only cases where the death penalty was sought, but cases where it could have been, but was not.   We reject both arguments.

R.C. 2929.05(A) provides, in pertinent part:

" * * * The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine * * * whether the sentence of death is appropriate.   In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. * * * The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record * * * that the sentence of death is the appropriate sentence in the case."

This court has held that "R.C. 2929.05 requires the review of the proportionality *123 of death sentences regardless of whether counsel has provided evidence of disproportionality." *Jenkins, supra,* at paragraph seven of the syllabus.   We have also held that "[t]he proportionality review required of the court of appeals pursuant to R.C. 2929.05(A) need not include criminal cases outside its geographical jurisdiction." *Rogers, supra* (17 Ohio St.3d 174, 170 B.R. 414, 478 N.E.2d 984), at paragraph nine of the syllabus.

Appellant urges that the court of appeals is required to consider not only cases where the death penalty was imposed, but cases where the death sentence could have been sought, but was not.   This court has previously rejected this argument.   " * * * R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review, nor is a similar requirement imposed by the United States Constitution." *Jenkins, supra,* 15 Ohio St.3d at 209, 15 OBR at 350, 473 N.E.2d at 304.

We take this opportunity to clarify the procedures which must be followed by this court and the court of appeals in conducting the statutorily required proportionality review.   The statute itself does not describe the scope of this review.   Since proportionality review is not constitutionally mandated, *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29, this court is relatively free, within the confines of the statute, to determine the proper scope

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

be used for comparison. _Rogers, supra_ (17 Ohio St.3d 174), at 186, 17 OBR at 425, 478 N.E.2d at 996.

[20][21] The purpose of proportionality review is to determine whether the penalty of death is unacceptable in the case under review because it is disproportionate to the punishment imposed on others convicted of the same crime. **395_Pulley, supra,_ 465 U.S. at 43, 104 S.Ct. at 875. For the following reasons, we are persuaded that the proportionality review contemplated by R.C. 2929.05(A) should be limited to cases already decided by the reviewing court in which the death penalty has been imposed.

Logic dictates that only those cases which result in a conviction have any use in proportionality review, since only then will a penalty result with which the death sentence under review may be compared. It is equally logical that only convictions of a capital crime are relevant for comparison purposes, since such cases are necessarily so qualitatively different from all others that comparison with non-capital offenses would be a profitless exercise. In fact, R.C. 2929.05(A), in requiring proportionality review, limits the scope of such review to "similar" cases. We are further persuaded that a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has itself decided. Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness. See _Rogers, supra_ (17 Ohio St.3d 174), at 186, 17 OBR at 425, 478 N.E.2d at 996.

We hold, therefore, that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the *124 reviewing court in which the death penalty has been imposed. Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate. Similarly, proportionality review in this court will be limited to a review of cases we have already announced. No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not.

[22] Turning now to the instant case, we find that, compared with the death penalty cases decided by this court, the sentence herein is not excessive or disproportionate. The penalty of death has previously been imposed in cases involving rape-murder and the sentences have been upheld as appropriate. _Rogers,_

_supra_ (17 Ohio St.3d 174); _State v. Maurer_ (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768. The death penalty was upheld in _State v. Williams_ (1986), 23 Ohio St.3d 16, 23 OBR 13, 490 N.E.2d 906, where the victim was a seventy-six-year-old woman, beaten and shot to death in her home in the course of an aggravated robbery. These cases are similar to the instant cause in that each involved terrorizing and even torturing the victim by beatings and/or sexual assault before viciously murdering her. We find that the death penalty in the case _sub judice_ is not inappropriate as either excessive or disproportionate given its appalling facts and its similarity to other cases resulting in a sentence of death.

In his twenty-first proposition of law, appellant argues that his right to equal protection was violated by virtue of the fact that the death penalty is almost uniformly imposed on those who kill whites while those who kill blacks are usually spared. The United States Supreme Court has rejected an identical argument in the recent case of _McCleskey v. Kemp_ (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262. In _McCleskey,_ the defendant, a black, was convicted in Georgia of killing a white police officer and was sentenced to death. The defendant claimed that the Georgia capital sentencing process was administered in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments. In support of this argument, defendant proffered a statistical study purportedly showing a disparity in the imposition of the death penalty, such that black defendants who kill white victims face a greater likelihood of receiving the death penalty, as compared to white killers of either black or white victims.

[23] The court rejected defendant's argument, holding that mere statistics do not establish that the administration of capital punishment in Georgia violates equal protection. To sustain his claim, defendant **396 must show that racial considerations affected the sentencing process _in his case._ _Id._ 1756 at ----, 107 S.Ct. at 1767, 95 L.Ed.2d at 278. The court acknowledged that it has accepted statistics as proof of discriminatory purpose in other scenarios, such as employment and jury selection. However, the criminal law is fundamentally different. Discretion is essential to the functioning of the criminal justice system. Thus, exceptionally clear proof is required before an abuse *125 of that discretion will be presumed. _Id._ at ----, 107 S.Ct. at 1769, 95 L.Ed.2d at 281. Apparent discrepancies are inevitable in the criminal justice system. The Constitution is satisfied where sufficient safeguards exist to prevent arbitrary and capricious imposition of the death penalty.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[24] Appellant herein has offered absolutely no evidence that improper racial considerations prompted the jury's recommendation of death in this case. Without any evidence that racial bias affected the sentencing process *in his case,* appellant's claim of violation of his right to equal protection must fail.

[25] Appellant's twenty-second proposition of law contends that the trial court erred to his prejudice by instructing the jury in the penalty phase to disregard feelings of sympathy in their deliberations. This court has previously rejected this argument, and we adhere to that position today. *Jenkins, supra,* at paragraph three of the syllabus; *State v. Scott* (1986), 26 Ohio St.3d 92, 108, 26 OBR 79, 93, 497 N.E.2d 55, 68. Our conclusion that such an instruction does not constitute error is buttressed by the recent decision of the United States Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934. In *Brown,* the court upheld an instruction, given during the penalty phase of a capital trial, cautioning the jury to disregard " 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.' " *Id.* at ----, 107 S.Ct. at 839, 93 L.Ed.2d at 939. In so holding, the court rejected the contention that such an instruction impermissibly prevents the jury from giving due consideration to mitigating factors raised by the defendant. The court looked at the instruction as a whole, and determined that no reasonable juror would extract the word "sympathy" from the litany of factors and regard it as a license to ignore defendant's evidence in mitigation. Rather, a reasonable juror would interpret the term from its context as forbidding reliance on *mere* sympathy, *i.e.,* extraneous emotional factors. *Id.* at ----, 107 S.Ct. at 840, 93 L.Ed.2d at 940-941. The instruction was not error.

[26][27] Appellant's twenty-third proposition of law, comprising subparts (A) through (G), attacks from various angles the constitutionality of the statutory scheme for the imposition of the death penalty in Ohio. A review of appellant's argument reveals that all aspects thereof have previously been rejected by this court. The contentions that the statutory death penalty scheme serves no rational state interest, that it is impermissibly quasi- mandatory, that it impermissibly prevents juries from extending mercy, that it provides too little guidance to the sentencing authority, and that it fails to narrow the class of death-eligible offenders, were all rejected by this court in *Jenkins, supra.* The argument that the death penalty is inflicted disproportionately on those who kill whites as opposed to those who kill blacks has already been disposed of *supra.* Finally, the proposition that Crim.R. 11(C)(3) improperly encourages guilty pleas to avoid the death penalty in violation of *126 *United States v. Jackson* (1968), 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, has been rejected by this court in *Buell, supra,* 22 Ohio St.3d at 138, 22 OBR at 215, 489 N.E.2d at 808.

Our final task today is to undertake the independent weighing process required by R.C. 2929.05(A) [FN15] to determine whether the **397 aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case.

> FN15. R.C. 2929.05(A) states in pertinent part:
> "Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case * * *."

The aggravating circumstances found to exist in this case consist of rape and aggravated burglary.

Appellant presented two witnesses [FN16] in the penalty phase of this proceeding as well as two psychiatric reports, a poem written by appellant and a letter also composed by him. Appellant addressed the jury in a very brief unsworn statement expressing his remorse.

> FN16. Appellant attempted to introduce the testimony of a third witness, Claude Crowe, the assistant prosecuting attorney trying this case. The request for his testimony was later withdrawn.

The first defense witness was the probation officer who prepared the presentence report. He testified that his report had been hurriedly prepared in one day instead of the usual ten, that he did not know of the defense contention that appellant was mentally ill, and that

appellant was cooperative in the interview. The second defense witness was appellant's sister. She testified about appellant's troubled childhood in which he suffered from excessive, often brutal discipline administered by his stepfather in whose eyes appellant could never do anything right. She further testified that appellant was sent away to a Catholic school for troubled children, that he had normal relationships with women, that he was very protective of her, that he wrote poetry, and that he is a "wonderful person." Many of these matters were treated in greater detail in the psychological reports submitted by Drs. Fisher and Schmidtgoessling.

Dr. Fisher's report describes appellant's background in some detail, including the sadistic discipline, appellant's frequent running away from whatever placement he was in, and his petty crimes as a child escalating into more serious offenses as he grew older. Dr. Fisher's conclusion, entitled "Factors in Mitigation of Punishment," is enlightening:

"As noted above, the history I have obtained certainly indicates an extremely *127 unfortunate, highly negative childhood. However it must be noted that other children from this same household were able to survive and become well-adjusted, stable adults. Mr. Steffen's brother, Paul, indicated to me over the telephone that it was his belief (and that of much of the rest of his family as well) that his brother David seemed to crave negative attention and to do everything within his power at all times to seek it. In any event, I believe that Mr. Steffen is free from any significant disease or defect of his mind. The personality structure which characterizes him is a maladaptive, self-defeating one, but does not, in my opinion, constitute mental illness as it is recognized either within the profession of psychology or by the law of this state. Furthermore, it is my opinion that at the time of the criminal acts of which he has been convicted, Mr. Steffen possessed the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. The screams which he reports having the effect of 'explosions' in his mind certainly panicked and provoked him. However, it is my opinion that this provocation was similar in magnitude and nature to that which he had experienced at other times in his life when he had been seen as acting impulsively and recklessly. The evidence does not suggest that a mental illness was precipitated at any of those times or in the current offense."

Dr. Schmidtgoessling's report also reviewed appellant's childhood and background. She concluded that "[h]is behavior at the time of the offense, specifically his loss of rational control, is typical of a personality disorder but is not the product of a mental disease or defect." She further stated that any "marked improvement in behavior is unlikely."

**398 A letter written by appellant to his victim's parents was admitted into evidence. The letter expressed his regrets at having committed the offense and his sympathy for the grief that they had to bear as a consequence. However, Dr. Schmidtgoessling remarked in her report that appellant showed no remorse for his offense and no sympathy for his victim or her family.

R.C. 2929.04(B) provides that, in weighing the mitigating factors, the sentencing authority "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

*128 "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

[28] We find that, of the above-enumerated factors, numbers (1), (2), (3) and (6) do not exist under these facts. Number (4) is not compelling, as appellant was twenty-two years old at the time, substantially beyond the age of majority, and the evidence demonstrated that appellant was sufficiently mature to appreciate the consequences of his conduct. [FN17]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

number (5), appellant's past history of criminal convictions or delinquency adjudications cannot be characterized as insignificant.  He had been convicted in 1977 of robbery and was sentenced to one to ten years' imprisonment.  In 1979, he escaped from the reformatory and served one year in an Indiana State Prison.  His juvenile offenses date back to 1972 and include arson, shoplifting, illegal entry, theft, burglary, larceny, escape, malicious trespass, carrying a concealed weapon and possession of marijuana.  This statutory mitigating factor is entitled to little, if any, weight.

FN17. In fact, Dr. Fisher's report characterized appellant as "very intelligent."

[29] With regard to factor number (7), we have considered all the evidence of appellant's unfortunate childhood, his apparent lack of positive role models, and his attempts to straighten himself out through church youth group activities.  Our view of the totality of the evidence compels us to conclude that these combined factors, if in fact these factors are mitigating, [FN18] are insufficient to outweigh the aggravating circumstances of rape and aggravated burglary.

FN18. Black's Law Dictionary (5 Ed.1979) 903, defines "mitigating circumstances" as those which "do not constitute a justification or excuse of the offense in question, but which, in fairness and in mercy, may be considered as extenuating or reducing the degree of moral culpability.  * * *"

Nor does our consideration of "the nature and circumstances of the offense, the history, character, and background of the offender" alter this conclusion. The nature and circumstances of this offense are so harrowing that no mitigating feature can possibly be imagined.  The history, character and background of the offender have already been explored, *supra,* with no mitigating factors found sufficient to outweigh the aggravating circumstances. The mitigating factors are deemed insufficient on the basis that the evidence demonstrates that appellant's traumatic personal history **399 did not substantially impair his capacity to appreciate the wrongfulness of his conduct or to control his actions.  Dr. Fisher so concluded in his report.  All four psychiatric experts who testified in the guilt *129 phase of this proceeding agreed that appellant was not incapable of distinguishing right from wrong. Appellant's siblings were raised in the same abusive

environment and yet were able to mature into well-adjusted, functioning adults.  While we are sympathetic towards appellant's obviously lamentable past, we must conclude that the mitigating factors are inadequate to outweigh the aggravating circumstances in this case.

[30][31] We would remark at this juncture that while R.C. 2929.04t(B)(7) evinces the legislature's intent that a defendant in a capital case be given wide latitude to introduce any evidence the defendant considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant and admitted.  The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight.  For example, a defendant may introduce the testimony of his high school English teacher to the effect that defendant behaved well and was always prepared.  However, the jury, or the court in its own independent weighing process, may properly choose to assign absolutely no weight to this evidence if it considers it to be non- mitigating.  Only that evidence which lessens the moral culpability of the offender or diminishes the appropriateness of death as the penalty can truly be considered mitigating. Evidence which is not mitigating is not entitled to any weight as a mitigating factor in determining whether such factors outweigh the aggravating circumstances.

In conclusion, we uphold appellant's convictions and sentence of death.  We are persuaded from the record that appellant was accorded a fair trial and a thorough, impartial review by the court of appeals.  We are convinced that the death penalty is an appropriate sanction under these facts.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., and SWEENEY, LOCHER, and HERBERT R. BROWN, JJ., concur.

HOLMES and WRIGHT JJ., concurs in judgment only.

509 N.E.2d 383, 31 Ohio St.3d 111, 31 O.B.R. 273

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

717 N.E.2d 322
1999-Ohio-251
**(Cite as: 87 Ohio St.3d 97,  717 N.E.2d 322)**

**H**

Supreme Court of Ohio.

The STATE of Ohio, Appellant,
v.
LILLY, Appellee.

**No. 98-1111.**

Submitted March 31, 1999.
Decided Oct. 20, 1999.

Husband appealed his conviction for burglary of his estranged wife's apartment. The Court of Appeals, Montgomery County, reversed. Discretionary appeal was allowed. The Supreme Court, Lundberg Stratton, J., held that: (1) statute addressing the privileges of a husband and wife with respect to the property of the other is civil in nature and was not meant to be enforced criminally and does not affect criminal liabilities; (2) a spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling; and (3) evidence sustained husband's burglary conviction.

Court of Appeals reversed.

Douglas, J., concurred in the judgment.

Cook, J., concurred in the judgment only, and filed an opinion.

Moyer, C.J., concurred in part, dissented in part, and filed an opinion.

West Headnotes

**[1] Husband and Wife** ⚚1
205k1 Most Cited Cases

**[1] Husband and Wife** ⚚68
205k68 Most Cited Cases

At common law, husband and wife were regarded as one, and the legal existence of the wife during coverture was merged with that of her husband; as such, the wife was incapable of making contracts, of acquiring property, or disposing of property without her husband's consent.

**[2] Husband and Wife** ⚚68
205k68 Most Cited Cases

Statute addressing the privileges of a husband and wife with respect to the property of the other is civil in nature and was not meant to be enforced criminally and does not affect criminal liabilities.  R.C. § 3103.04.

**[3] Burglary** ⚚7
67k7 Most Cited Cases

**[3] Trespass** ⚚78
386k78 Most Cited Cases

A spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising cus- tody or control over that dwelling. R.C. §§ 2911.12(A)(2), 2911.21(A)(1), (E), 3103.04.

**[4] Burglary** ⚚7
67k7 Most Cited Cases

**[4] Trespass** ⚚78
386k78 Most Cited Cases

One can commit a trespass and burglary against property of which one is the legal owner if another has control or custody of that property.  R.C. §§ 2911.12(A)(2), 2911.21(A)(1), (E).

**[5] Trespass** ⚚84
386k84 Most Cited Cases

Civil, peaceful avenues of redress exist to enforce the rights of a person who believes he or she has been wrongfully excluded from certain property, and thus, there is no privilege, as a defense against criminal trespass, to use force, stealth, or deception to regain possession.  R.C. § 2911.21(C).

**[6] Burglary** ⚚41(4)
67k41(4) Most Cited Cases

Evidence that estranged wife's apartment was leased solely in wife's name, husband did not pay any part of wife's rent, husband never lived in the apartment and did not have a key to it, and husband entered the apartment through a door he had previously and by deception left unlocked, supported trespass element of burglary conviction.  R.C. §§ 2911.12(A)(2), 2911.21(A)(1), (E).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

**[7]** **Criminal Law** ☞1144.13(3)
110k1144.13(3) Most Cited Cases

Sufficiency of the evidence is considered in a light most favorable to the prosecution.
*Syllabus by the Court*

**\*97** 1. A spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling.

2. R.C. 3103.04 is inapplicable in criminal cases.

**\*\*323** On February 5, 1997, Harold Dean Lilly, Jr., defendant-appellee, was indicted on nineteen criminal counts: twelve counts of rape, two counts of attempt to **\*98** commit rape, three counts of possessing criminal tools, one count of kidnapping, and one count of burglary.   All offenses were alleged to have been against his estranged wife, Jacqueline K. Lilly.   Count nineteen of the indictment stated that on or about January 26, 1997, defendant had trespassed in Jacqueline Lilly's residence when she was present or likely to have been present, with the purpose of committing a criminal offense therein. Defendant pled not guilty on February 11, 1997 to all of the charges.

Defendant and Jacqueline K. Lilly ("Mrs. Lilly") married in August 1988.  They separated in early 1996 and got back together in September of that year. In November 1996, they separated again and Mrs. Lilly moved in with defendant's sister.  Mrs. Lilly lived with defendant's sister **\*\*324** until January 1997, when she leased an apartment in West Carrollton, Ohio. Defendant and Mrs. Lilly's only child, Harold Dean Lilly III ("DJ"), lived with his mother, Mrs. Lilly, at her apartment.   Defendant moved in with his own mother after the couple separated.

Mrs. Lilly testified that on January 26, 1997, she and the defendant spent the morning and afternoon together doing various errands.The defendant repeatedly asked Mrs. Lilly if they could watch the Super Bowl that evening together, but she declined.  Mrs. Lilly testified that over the course of the evening, defendant asked her to have sex with him and she asked him to leave. She told the jury that defendant became angry, slapped her repeatedly, and burned her with a cigarette.   She further explained that, to avoid further harm, she engaged in various sexual acts with defendant, which Mrs. Lilly testified were against her will.

Mrs. Lilly testified that later in the evening, the defendant drove her to two bars.   At the 1470 Club, in Kettering, Ohio, Mrs. Lilly quietly asked one of the bar employees to call the police.  After defendant followed her into the women's restroom at the bar, one of the bar's security guards went into the restroom to check on Mrs. Lilly.   The security guard told defendant that he wanted to speak to Mrs. Lilly alone and defendant refused.   The security guard pushed defendant out of the way while Mrs. Lilly and a female bar employee ran into the back office and locked the door.   After the defendant's attempts to kick the door in were unsuccessful, he fled.

Mrs. Lilly was taken to the hospital to be examined and then to the police station to be interviewed in the early morning hours of January 27. Police officers then took her to her apartment to get some clothing and personal items in order for her to stay in a shelter.   At her apartment, Mrs. Lilly discovered that her purse was missing and about six pairs of her jeans had been ripped up.   Officers noticed that the attic cover was open. When officers walked into the attached garage, they smelled fresh cigarette smoke.

**\*99** After Mrs. Lilly had collected her belongings and was ready to get in her car, she discovered that her automatic garage door opener was missing from her car.  She tried to start her car, and when it would not start, officers investigated and found that the car's spark plug wires had been detached.    In addition, Mrs. Lilly noticed a pair of defendant's gym shoes that were not there previously.     At approximately 8:00 a.m. on January 27, officers drove Mrs. Lilly to a shelter.

Detective Mark Allison testified that on the afternoon of January 27, he informed defendant that a warrant had been issued for his arrest.    The next day, Detective Allison interviewed defendant in the presence of two other detectives regarding the charges.    Defendant admitted to the officers that he drove back to Mrs. Lilly's apartment in the early morning of January 27 after leaving the 1470 Club. Mrs. Lilly later testified that she had locked the door when she left the evening of January 26, but that it was unlocked when she arrived with police the next morning.  Defendant stated that he had left the door unlocked prior to leaving with Mrs. Lilly earlier in the evening so he could get back in. Defendant told the detectives that he ripped up several pairs of Mrs. Lilly's jeans, yanked the spark plug wires on her car, and took her purse.   Defendant stated that he arrived at the apartment around 12:30 a.m. on January 27, after leaving the bar and was there until 12:00 p.m. that day.   Defendant admitted that he was hiding at the apartment when police searched it.

At trial, Mrs. Lilly testified that the lease for her apartment was in her name and the defendant did not have a key.  Mrs. Lilly testified that defendant did not contribute money for her apartment.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

testified that defendant knew that it was her place.

**325 During the trial, the state withdrew one count of rape and one count of attempted rape.  The jury returned a verdict of guilty on the burglary charge (in violation of R.C. 2911.12[A][2] ) and not guilty on the remaining charges.  Defendant appealed his burglary conviction, and the Montgomery County Court of Appeals reversed the trial court's conviction, finding that R.C. 3103.04 negated the state's proof of the element of trespass as a matter of law.

This cause is now before this court upon the allowance of a discretionary appeal.

Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, John J. Amarante and Cheryl A. Ross, Assistant Prosecuting Attorneys, for appellant.

Altick & Corwin Co., L.P.A., and Dennis J. Adkins, Dayton, for appellee.


LUNDBERG STRATTON, J.

This case presents the court with the question of whether R.C. 3103.04 precludes prosecution of one spouse for burglary committed *100 in the residence of the other spouse.  For the reasons that follow, we hold that a spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling.  R.C. 3103.04 is inapplicable in criminal cases.

In this case, the evidence showed that defendant entered by deception the separately leased property of his estranged spouse with intent to commit a crime.  However, the court of appeals concluded that in the absence of a court order, R.C. 3103.04 prevented Mrs. Lilly from excluding defendant from her apartment and therefore the element of trespass could not be proven.  Although the defendant did not raise this alleged R.C. 3103.04 privilege in the trial court, the court of appeals, nevertheless, found that it amounted to plain error.  [FN1]  We disagree with the court of appeals' application of R.C. 3103.04 to this case.

FN1. Some Ohio appellate courts, including the court in this case, have applied R.C. 3103.04 in criminal contexts. See, e.g., State v. Brooks (1995), 101 Ohio App.3d 260, 655 N.E.2d 418;  State v. Middleton (1993), 85 Ohio App.3d 403, 619 N.E.2d 1113;  and State v. Herder (1979), 65 Ohio App.2d 70,

19 O.O.3d 47, 415 N.E.2d 1000.

[1] At common law, husband and wife were regarded as one.  The legal existence of the wife during coverture was merged with that of her husband.  As such, the wife was incapable of making contracts, of acquiring property, or of disposing of property without her husband's consent.  In pursuance of a more liberal policy in favor of the wife, statutes were passed across the country to relieve the married woman from the disabilities imposed upon her as a femme covert by the common law.  See Thompson v. Thompson (1910), 218 U.S. 611, 614-615, 31 S.Ct. 111, 54 L.Ed. 1180, 1181.

Ohio's Married Women's Act was enacted in 1861.  58 Ohio Laws 54.  "By the act concerning the rights of married women, passed April 3, 1861 (S. & S. 389), as amended March 23, 1866 (S. & S. 391), the general estate, as well as the separate estate, of a married woman, belonging to her at her marriage, and all her estate, legal and equitable, which may come to her during coverture, by conveyance, gift, devise, or inheritance, or by purchase with her separate means or money, together with the rents and issues thereof, becomes her separate property and under her control, free from the marital rights of the husband at common law over the same." Levi v. Earl (1876), 30 Ohio St. 147, paragraph one of the syllabus.

In that same vein, in 1887, the General Assembly enacted what is now R.C. 3103.04 "to define the rights and liabilities of husband and wife." 84 Ohio Laws 132.  The Act related both to the relationship between husband and wife and to the rights of each in the property of the other.  The 1887 Act contained the exclusion at issue in this case:

**326 *101 "Section 3111. Neither husband nor wife has any interest in the property of the other, except as mentioned in sections 3110 [husband must support himself and wife] and 4188 [dower] but neither can be excluded from the other's dwelling." 84 Ohio Laws 132.

The statute today is reflected in R.C. 3103.04:

"[Interest in the property of the other]

"Neither husband nor wife has any interest in the property of the other, except as mentioned in section 3103.03 of the Revised Code, the right to dower, and the right to remain in the mansion house after the death of either. Neither can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction."

Jackson Apx. Vol. 26
Page 103

In 1973, the Court of Appeals for Cuyahoga County considered the history of R.C. 3103.04 and attempted to unravel the reason behind the spousal exclusion prohibition. That court determined that one plausible explanation is that the General Assembly was unfavorably influenced by the New York experience with spousal exclusions prior to 1887. *Slansky v. Slansky* (1973), 33 Ohio App.2d 127, 131-132, 62 O.O.2d 235, 237-238, 293 N.E.2d 302, 306. The *Slansky* court cited two New York cases in which married women brought ejectment actions against their husbands to recover possession of their homes. In each case, the home was owned by the wife and was previously used as the marital dwelling before the husband forced the wife out of the dwelling. See *Slansky*, 33 Ohio App.2d at 132, 62 O.O.2d at 237-238, 293 N.E.2d at 306, citing *Minier v. Minier* (N.Y.S.Ct.1870), 4 Lans. 421, and *Wood v. Wood* (App.1881), 83 N.Y. 575, 1881 WL 14707.

The *Slansky* court concluded that the purpose of R.C. 3103.04 was to "limi [t] their *[i.e.,* spouses'] respective rights so that neither spouse can effect a separation, revengeful or otherwise, simply because one has full title to the marital dwelling house." *Slansky*, 33 Ohio App.2d at 137, 62 O.O.2d at 240, 293 N.E.2d at 309. Thus, one can reasonably conclude that the basis behind the spousal exclusion is the fear that one spouse would eject the other from the marital dwelling.

This court, in 1893, considered the purpose of the Married Women's Act and held that "[t]he legal effect of the statutes as to the property rights of married women is to place husband and wife upon an exact equality as to the property of each; that is, 'neither husband nor wife has any interest in the property of the other,' except as to dower, distribution, and support." *Heckman v. Adams* (1893), 50 Ohio St. 305, 312, 34 N.E. 155, 156.

[2] Notably, R.C. 3103.04 is situated in the domestic relations chapter of the Revised Code. Further, a review of the 1887 Act reveals that it primarily concerned property rights as they relate to domestic relations. See, *e.g.*, Section 3112 (property rights), Section 3114 (taking and holding property), Section 4106 **\*102** deeds), Sections 4108 and 4109 (powers of attorney), Sections 4163-4177 (descent and distribution), Sections 4188-4194 (estates in dower). 84 Ohio Laws 132-136.

A review of other jurisdictions reveals seven other jurisdictions with a statute similar to R.C. 3103.04. See Cal.Fam.Code Ann. 752 and 753 (1994); Guam Code Ann., Title 19, Section 6101(h) (1993); Mont.Code Ann. 40-2-201 (1997); N.M.Stat.Ann. 40-3-3 (1994); N.D. Century Code Ann. 14-07-04

(1997); Okla.Stat., Title 43, Section 203 (1991); S.C. Cod.Laws 25-2-4 (1992). Significantly, we note that our review indicates that none of these jurisdictions applies this civil statute in criminal contexts.

Thus, we conclude that R.C. 3103.04 was intended to address property ownership rights of married persons, matters of a civil nature. Privileges of a husband and wife with respect to the property of the other were not meant to be enforced criminally and do not affect criminal liabilities. **\*327** See *State v. Middleton* (1993), 85 Ohio App.3d 403, 406, 619 N.E.2d 1113, 1115. Because we find that the General Assembly never intended for R.C. 3103.04 to apply in criminal contexts, we must turn to the Criminal Code to address this issue.

The crime of burglary, with which defendant was charged, provides:

"(A) No person, by force, stealth, or deception, shall do any of the following:

" \* \* \*

"(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense \* \* \*." R.C. 2911.12(A)(2).

"Criminal trespass" is defined as:

"(A) No person, without privilege to do so, shall do any of the following:

"(1) Knowingly enter or remain on the land or premises of another." R.C. 2911.21.

The law of burglary evolved out of a desire to protect the habitation. Because intrusions into the habitation are dangerous to occupants, "the offense is viewed as serious, because of the higher risk of personal harm involved in maliciously breaking and entering an occupied, as opposed to an unoccupied, structure." 1974 Legislative Service Commission Comment to R.C. 2911.12.

[3][4] Because the purpose of burglary law is to protect the dweller, we hold that custody and control, rather than legal title, is dispositive. See R.C. 2911.21(E), providing that " 'land or premises' includes any land, building, structure, or place belonging to, *controlled by, or in custody of another,* and any separate enclosure or room, or portion thereof." (Emphasis added.) Thus, in Ohio, one can commit a trespass and burglary against

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

property of which one is the legal owner if another has control or custody of that property.

*103 A majority of other jurisdictions that have addressed this issue have found that the entry of an estranged spouse upon the property of the other spouse constitutes an unauthorized entry to support charges of trespass and burglary. See *People v. Johnson* (Colo.1995), 906 P.2d 122; *People v. Hollenbeck* (Colo.App.1996), 944 P.2d 537; *Davis v. State* (Tex.Crim.App.1990), 799 S.W.2d 398; *White v. State* (Ala.Crim.App.1990), 587 So.2d 1218; *Parham v. State* (1989), 79 Md.App. 152, 161-162, 556 A.2d 280, 284-285; *Matthews v. Commonwealth* (Ky.1985), 709 S.W.2d 414; *State v. Cox* (1985), 73 N.C.App. 432, 326 S.E.2d 100; *Knox v. Commonwealth* (1983), 225 Va. 504, 304 S.E.2d 4; *State v. Schneider* (1983), 36 Wash.App. 237, 673 P.2d 200; *Cladd v. State* (Fla.1981), 398 So.2d 442.

[5] Civil, peaceful avenues of redress exist to enforce the rights of a person who believes he or she has been wrongfully excluded from certain property. There is no privilege to use force, stealth, or deception to regain possession. See R.C. 2911.21(C) ("It is no defense to a charge under this section that the offender was authorized to enter or remain on the land or premises involved, when such authorization was secured by deception.").

[6] In this case, there is no evidence that defendant had any right to custody or control of the leased property. The apartment was leased solely in Mrs. Lilly's name. Defendant did not pay any part of the rent on Mrs. Lilly's apartment. While defendant claims that he may have stayed at the apartment occasionally and performed maintenance tasks there for Mrs. Lilly, defendant never lived at the apartment, did not have a key to the apartment, and did not keep any of his belongings in the apartment. Accordingly, it was reasonable for the jury to find that when, without permission, defendant entered Mrs. Lilly's apartment through a door he had previously by deception left unlocked, **328 he trespassed. When he trespassed in Mrs. Lilly's apartment for the purpose of committing a crime, *i.e.,* theft of her purse and damage to her property, it was reasonable for the jury to conclude that defendant committed a burglary.

[7] Thus, there was ample evidence at trial for the jury to have determined that the defendant trespassed in Mrs. Lilly's dwelling and that he did so with the purpose or intent of committing a crime. Sufficiency of the evidence is considered in a light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v.*

*Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. As such, we find that there was sufficient evidence of burglary to sustain his conviction. Therefore, we reverse the judgment of the court of appeals and reinstate defendant's conviction for burglary under R.C. 2911.12(A)(2).

*Judgment reversed and cause remanded.*

*104 RESNICK, FRANCIS E. SWEENEY, Sr. and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment.

COOK, J., concurs in judgment only.

MOYER, C.J., concurs in part and dissents in part.

COOK, J., concurring in judgment only.

I disagree with the majority's decision to address the applicability of R.C. 3103.04, since Lilly waived the issue by failing to raise it in the trial court. The court of appeals, on the strength of "plain error," allowed the defendant to introduce, on appeal, the concept that he had a spousal privilege to enter his wife's dwelling. The appellate court held that "[c]onvicting Lilly of a burglary offense, where, because of the operation of R.C. 3103.04, the trespass element of that offense had not been established, constituted a miscarriage of justice * * * [and] Lilly's burglary conviction upon insufficient evidence was plain error."

Appellate courts may only invoke the plain error doctrine "with the utmost caution, under exceptional circumstances." *State v. Long* (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 808. Plain error is "obvious error prejudicial to a defendant, neither objected to nor affirmatively waived by him, which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings. The error must be obvious on the records, palpable, and fundamental, and in addition it must occur in exceptional circumstances where the appellate court acts in the public interest because the error affects 'the fairness, integrity or public reputation of judicial proceedings.'" *State v. Craft* (1977), 52 Ohio App.2d 1, 7, 6 O.O.3d 1, 4, 367 N.E.2d 1221, 1225-1226, quoting *United States v. Atkinson* (1936), 297 U.S.

Page 6

160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557. I would
find that this was not plain error. Even if R.C. 3103.04
would have obviated the element of trespass so as to aid
Lilly's defense, the failure to raise the issue decides the
case.

MOYER, C.J., concurring in part and dissenting in
part.

I concur in the first paragraph of the syllabus and the
judgment. I do not concur in the discussion of R.C.
3103.04 and the second paragraph of the syllabus for
the reasons stated in the concurrence of Justice Cook.

717 N.E.2d 322, 87 Ohio St.3d 97, 1999-Ohio-251

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

721 N.E.2d 73
2000-Ohio-449
**(Cite as: 87 Ohio St.3d 402,  721 N.E.2d 73)**

H

Supreme Court of Ohio.

The STATE of Ohio, Appellee,
v.
O'NEAL, Appellant.

**No. 98-147.**

Submitted May 4, 1999.
Decided Jan. 5, 2000.

Defendant, who was charged with aggravated murder of his wife and aggravated burglary, moved to dismiss all aggravated burglary-related claims or specifications. The Court of Common Pleas, Hamilton County, granted motion. State appealed. The Court of Appeals, 103 Ohio App.3d 151, 658 N.E.2d 1102, reversed and remanded. Defendant was then convicted in the Court of Common Pleas of aggravated murder with aggravated burglary death penalty specifications and aggravated burglary and was sentenced to death. Defendant appealed. The Court of Appeals affirmed. Defendant appealed. The Supreme Court, Douglas, J., held that: (1) a spouse can be convicted of trespass and aggravated burglary in dwelling of other spouse who owns, has custody of, or has control over property where crime has occurred; (2) evidence established that defendant's former marital residence was in custody or control of wife, for purposes of trespass element of aggravated burglary; (3) trial court's acceptance of state's race-neutral explanations for exercising peremptory challenges was not clearly erroneous; (4) errors in admitting hearsay statements of wife as excited utterances were harmless; (5) prosecutor's closing argument was not an improper request for jury to render verdict based on emotion at penalty phase of trial; and (6) fact that jury considered two aggravated murder counts for a single victim did not unfairly affect penalty phase.

Affirmed.

Pfeifer, J., dissented and filed an opinion.

West Headnotes

**[1] Sentencing and Punishment ⊂⟩1788(11)**
350Hk1788(11) Most Cited Cases
(Formerly 110k1134(3))

Appellate court is not required to address, in detail, each and every contention raised by the parties in a death penalty appeal.

**[2] Husband and Wife ⊂⟩6(1)**
205k6(1) Most Cited Cases

**[2] Husband and Wife ⊂⟩8**
205k8 Most Cited Cases

**[2] Husband and Wife ⊂⟩54**
205k54 Most Cited Cases

Statute providing that "[n]either [husband nor wife] can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction" was intended to address property ownership rights of married persons, which are matters of a civil nature, and was not meant to be enforced criminally and does not affect criminal liabilities. R.C. § 3103.04.

**[3] Burglary ⊂⟩10**
67k10 Most Cited Cases

Trespass is an essential element of aggravated burglary. R.C. § 2911.11(A).

**[4] Trespass ⊂⟩78**
386k78 Most Cited Cases

A spouse can be convicted of trespass and aggravated burglary in the dwelling of the other spouse who owns, has custody of, or has control over the property where the crime has occurred. R.C. §§ 2911.11(A), 2911.21(A)(1), (E).

**[5] Burglary ⊂⟩41(8)**
67k41(8) Most Cited Cases

Evidence that marital residence was leased in wife's name, that husband had moved out following an altercation, that wife had filed motion for temporary protection order, and that husband shattered glass in front door to enter the residence and kill wife established that the residence was in custody or control of wife, for purposes of trespass element of aggra-vated burglary. R.C. §§ 2911.11(A), 2911.21(A)(1), (E).

**[6] Criminal Law ⊂⟩1144.13(3)**
110k1144.13(3) Most Cited Cases

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

The appellate court considering a defendant's appeal must construe the evidence in a light most favorable to the prosecution.

**[7] Constitutional Law** ⬤⟹**221(4)**
92k221(4) Most Cited Cases

If a criminal defendant makes a prima facie case of discriminatory use of peremptory challenges in violation of equal protection, the state must provide a race-neutral explanation, but the explanation need not rise to the level justifying exercise of a challenge for cause.  U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law** ⬤⟹**221(4)**
92k221(4) Most Cited Cases

**[8] Jury** ⬤⟹**33(5.15)**
230k33(5.15) Most Cited Cases

Trial court's acceptance of state's explanation that it used peremptory challenge against juror because juror was "the lowest rated juror as far as applying the death penalty" was not clearly erroneous and therefore established that peremptory challenge was exercised for race-neutral reason rather than for discriminatory reasons in violation of equal protection.  U.S.C.A. Const.Amend. 14.

**[9] Constitutional Law** ⬤⟹**221(4)**
92k221(4) Most Cited Cases

**[9] Jury** ⬤⟹**33(5.15)**
230k33(5.15) Most Cited Cases

Acceptance by trial court of state's explanation that it used peremptory challenge against juror because juror had "mixed feelings regarding the death penalty" and was single and lived at home with his mother and thereby lacked "a stake in the community" was not clearly erroneous and therefore established that peremptory challenge was exercised for race-neutral reason rather than for discriminatory reasons in violation of equal protection.  U.S.C.A. Const.Amend. 14.

**[10] Constitutional Law** ⬤⟹**221(4)**
92k221(4) Most Cited Cases

**[10] Jury** ⬤⟹**33(5.15)**
230k33(5.15) Most Cited Cases

Trial court's acceptance of state's explanation that it used peremptory challenge against juror because she was a social worker, which state felt was not a "pro-conviction" occupation, and because she agreed

with verdict finding O.J. Simpson not guilty despite her admission she had not followed the case, was not clearly erroneous and therefore established that peremptory challenge was exercised for race-neutral reason rather than for discriminatory reasons in violation of equal protection.  U.S.C.A. Const.Amend. 14.

**[11] Criminal Law** ⬤⟹**366(6)**
110k366(6) Most Cited Cases

Murder victim's statements to police officer four days before her death regarding her husband's alleged assault of her were made under stress of excitement relating to startling event or condition, as element of excited utterance exception to hearsay rule, where the assault had reportedly just occurred and officer testified that victim was very excited, very upset, crying, and very fearful.  Rules of Evid., Rule 803(2).

**[12] Criminal Law** ⬤⟹**366(6)**
110k366(6) Most Cited Cases

Statements by murder victim to co-worker, before her death, regarding her husband's alleged assault of her and her relationship with husband were not made under stress of excitement relating to startling event or condition, as required for excited utterance exception to hearsay rule, where the statements were made hours after the assault, though co-worker testified that victim was "really stressed" and was "shaking, scared."  Rules of Evid., Rule 803(2).

**[13] Criminal Law** ⬤⟹**366(6)**
110k366(6) Most Cited Cases

Murder victim's statements to her son regarding her husband's alleged assault of her before her death were not made under stress of excitement relating to startling event or condition, as required for excited utterance exception to hearsay rule, where the conversation occurred hours after the assault, giving victim considerable time to reflect.  Rules of Evid., Rule 803(2).

**[14] Criminal Law** ⬤⟹**1169.2(6)**
110k1169.2(6) Most Cited Cases
Confessions.

Trial court's error in admitting murder victim's statements to her co-worker and her son under excited-utterance exception to hearsay rule was harmless, where the description of her husband's prior alleged assault of her duplicated other admissible testimony, her filing for protective order was established by other admissible evidence, and husband

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

confessed he had shot her. Rules of Evid., Rule 803(2).

[15] **Criminal Law** ⟿**419(2.20)**
110k419(2.20)  Most Cited Cases

[15] **Criminal Law** ⟿**419(6)**
110k419(6)  Most Cited Cases

Murder victim's statements, before her death, that she was feeling stressed, she was afraid of her husband, and she was planning to end her marriage were admissible under state-of-mind exception to hearsay rule in husband's murder trial. Rules of Evid., Rule 803(3).

[16] **Indictment and Information** ⟿**189(8)**
210k189(8)  Most Cited Cases

Murder, which does not require proof of prior calculation and design, is a lesser included offense of aggravated murder. R.C. §§ 2903.01(A), 2903.02.

[17] **Homicide** ⟿**1456**
203k1456  Most Cited Cases
(Formerly 203k308(5))

Evidence that defendant had attacked his wife four days before the murder, had made threatening telephone call to her on day of murder, and within period of 30 seconds broke into her home with his jacket collar pulled up and cap over large portion of his head in apparent attempt to conceal his identity and then chased her up the stairs and stood over her before shooting her, would not have allowed jury to find lack of prior calculation and design, and thus, defendant was not entitled to instruction on murder as lesser included offense of aggravated murder. R.C. §§ 2903.01(A, B), 2903.02.

[18] **Homicide** ⟿**1165**
203k1165  Most Cited Cases
(Formerly 203k235)

Evidence that defendant's wife had custody or control of marital residence but that defendant broke in and killed her established aggravated burglary, as underlying offense for felony murder. R.C. §§ 2903.01(A), 2911.11.

[19] **Criminal Law** ⟿**412.2(5)**
110k412.2(5)  Most Cited Cases

Police officers' failure to inform defendant, during question about his wife's murder, of her death did not constitute deception that prevented knowing and intelligent waiver of defendant's right against self-incrimination, where officers did not lie about her condition and did not ask about her condition. U.S.C.A. Const.Amend. 5.

[20] **Sentencing and Punishment** ⟿**1780(2)**
350Hk1780(2)  Most Cited Cases
(Formerly 110k723(2))

It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are aggravating circumstances.

[21] **Sentencing and Punishment** ⟿**1780(2)**
350Hk1780(2)  Most Cited Cases
(Formerly 110k730(14))

If prosecutor improperly referred during closing argument in penalty phase of capital murder trial to nature andcircumstances of the offense as aggravating circumstance, there was no plain error, where both prosecutor and defense counsel otherwise properly identified the aggravating circumstance and trial court properly instructed the jury on weighing process and the proper aggravating circumstance, thereby curing any misstatement of law.

[22] **Criminal Law** ⟿**1037.1(2)**
110k1037.1(2)  Most Cited Cases

Failure to object to prosecutor's closing argument at penalty phase of capital trial waives all but plain error. Rules Crim.Proc., Rule 52(B).

[23] **Criminal Law** ⟿**730(5)**
110k730(5)  Most Cited Cases

Proper instructions can cure misstatements of law by the parties.

[24] **Sentencing and Punishment** ⟿**1780(2)**
350Hk1780(2)  Most Cited Cases
(Formerly 110k723(1))

Prosecutor's reference to emotions felt by victim's children witnessing her murder, and prosecutor's statement that the feelings "were brought from [murder scene] into this room. I felt them and so did you" was not an improper request for jury to render verdict based on emotion at penalty phase of capital murder trial.

[25] **Criminal Law** ⟿**1038.1(3.1)**
110k1038.1(3.1)  Most Cited Cases

Failure to object to penalty phase jury instructions at capital trial waives all but plain error. Rules Crim.Proc., Rule 52(B).

Jackson Apx. Vol. 26
Page 109

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

**[26] Sentencing and Punishment** ☞**529**
350Hk529 Most Cited Cases
(Formerly 110k984(7))

Aggravated murder counts involving the same victim are to be merged for sentencing. R.C. § 2941.25(A).

**[27] Criminal Law** ☞**1177**
110k1177 Most Cited Cases

Sentencing an accused on each of two murder counts, involving a single victim, represents a procedural error that is harmless beyond a reasonable doubt. R.C. § 2941.25(A).

**[28] Criminal Law** ☞**1177**
110k1177 Most Cited Cases

Fact that jury considered two aggravated murder counts for a single victim did not unfairly affect penalty phase of capital murder trial. R.C. § 2941.25(A).

**[29] Sentencing and Punishment** ☞**1780(3)**
350Hk1780(3) Most Cited Cases
(Formerly 203k311)

Trial court's disjunctive jury charge of "prior calculation and design" and "principal offender" language of aggravated circumstance of offense committed during aggravated burglary was proper in penalty phase of capital murder trial. R.C. § 2929.04(A)(7).

**[30] Sentencing and Punishment** ☞**1780(3)**
350Hk1780(3) Most Cited Cases
(Formerly 203k311)

Trial court properly instructed jury to arrive at its findings without sympathy in penalty phase of capital murder trial.

**[31] Sentencing and Punishment** ☞**1780(3)**
350Hk1780(3) Most Cited Cases
(Formerly 110k796)

Instruction to exclude sympathy in penalty phase of capital trial is intended to insure that the sentencing decision is based upon guidelines fixed by statute. R.C. § 2929.04.

**[32] Sentencing and Punishment** ☞**1646**
350Hk1646 Most Cited Cases
(Formerly 110k1208.1(5))

Mercy is not a mitigating factor at penalty phase of capital trial. R.C. § 2929.04.

**[33] Criminal Law** ☞**1134(3)**
110k1134(3) Most Cited Cases

For purposes of independent review of death sentence, the two counts of aggravated murder of a single victim had to be merged. R.C. § 2929.05(A).

**[34] Sentencing and Punishment** ☞**1717**
350Hk1717 Most Cited Cases
(Formerly 203k357(4))

**[34] Sentencing and Punishment** ☞**1718**
350Hk1718 Most Cited Cases
(Formerly 203k357(4))

Defendant's attempt to turn his life around and become a responsible citizen after years of selling drugs, and his attempt to be a father to two of his children by taking custody of them and encouraging them to get an education, was entitled to some weight in mitigation, at independent review of defendant's death sentence for murdering his wife. R.C. § 2929.04.

**[35] Sentencing and Punishment** ☞**1718**
350Hk1718 Most Cited Cases
(Formerly 203k357(4))

Defendant's attempt at legitimate, steady employment after his earlier prison term was entitled to some, but very minimal, mitigating weight at independent review of defendant's death sentence for murdering his wife. R.C. § 2929.04.

**[36] Sentencing and Punishment** ☞**1761**
350Hk1761 Most Cited Cases
(Formerly 203k357(4))

Testimony from two psychologists that defendant has organic brain problems but is not mentally retarded, that he functions in lower two to three percent of general population, that his judgment, thinking process, and ability to learn from mistakes are all impaired, and that he suffers from mixed personality disorder was entitled to some weight in mitigation, at independent review of defendant's death sentence for murdering his wife. R.C. § 2929.04(B)(7).

**[37] Sentencing and Punishment** ☞**1718**
350Hk1718 Most Cited Cases
(Formerly 203k357(4))

**[37] Sentencing and Punishment** ☞**1719**
350Hk1719 Most Cited Cases
(Formerly 203k357(4))

Defendant's expression of regret and remorse for

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

murdering his wife out of anger for what he perceived to be mistreatment of his sons, his cooperation with police, and his ability to adapt to prison were entitled to some weight as mitigating circumstances at independent review of death sentence. R.C. § 2929.04.

[38] **Sentencing and Punishment** ☞1735
350Hk1735 Most Cited Cases
(Formerly 203k357(4), 110k1213.8(8))

Death sentence was not disproportionately severe in relation to sentences visited upon others for the same crime, in violation of Eighth and Fourteenth Amendments, even though defendant attempted to distinguish his crime from others on ground that it involved a domestic dispute and the victim was defendant's wife. U.S.C.A. Const.Amends. 8, 14.

**77 On November 14, 1992, appellant, James Derrick O'Neal, and Carol O'Neal were married. Initially, they lived together in Corryville, Ohio, with Carol's four children. In September 1993, Carol, individually, entered into a lease agreement for a home at 4938 Plainville Road in Madisonville. Subsequently, Carol, appellant, and Carol's four minor children moved into the home. Thereafter, two of appellant's minor children also moved into the home.

By December 1993, the marital relationship between appellant and Carol had deteriorated **78 due, in part, to discord among the children and problems between appellant and Carol's oldest son, Ricardo. During this time, Carol worked at Ampco Parking during the day and at a convenience store at night. Patricia Carr, a friend of Carol's and a coworker at Ampco, stated that Carol acted tired and stressed and that she wanted to end her marriage with appellant.

On December 7, 1993, an altercation occurred between Carol and appellant. As a result, Officer Michael Mercer from the Cincinnati Police Department responded to a call for assistance at the Plainville Road residence. Mercer found Carol to be "very upset" and "very fearful" of appellant. Carol told Mercer that she had argued with appellant over food stamps and that she had asked him to leave. Carol also informed Mercer that appellant had struck her in the face numerous times, choked her, shoved her to the ground, and kicked her. Mercer noticed that Carol's face and neck were bruised. Carol also advised Mercer that appellant had recently moved out of the house.

That same day, December 7, 1993, Carol filed, in the Hamilton County Municipal Court, a domestic violence complaint and a temporary protection order against appellant. [FN1] A warrant was then issued for appellant's arrest.

FN1. The temporary protection order was issued on December 12, 1993, the day after Carol was killed.

*403 Carr testified that she saw Carol at Ampco Parking on December 7 and noticed that her jaw was swollen and that Carol was "very upset." Carol told Carr that when appellant tried to take food stamps out of her purse, they argued and appellant hit her in the jaw. According to Carr, Carol planned to change the locks on the house and was "scared [appellant] would kill her." Carr also stated that every day thereafter Carol was nervous, shaky, and drained, and explained that whenever the telephone rang at work, "[Carol] would be shaking, scared, thinking it was going to be [appellant] on the phone."

On December 11, 1993, appellant telephoned Carol at her place of employment. Jamie Wright, who worked with Carol and also knew appellant, answered the telephone and advised Carol that she suspected the caller was appellant. The telephone was then placed in speaker mode so that both Carol and Wright could hear the conversation. Wright testified that after Carol said hello, appellant stated, "Bitch, it ain't over yet." Appellant then started laughing and hung up. According to Wright, Carol stumbled backward, appeared to nearly faint, and was shaking and "nervous and jittery" the rest of the work day.

Later that evening, appellant broke the glass portion of the front door and entered the residence at 4938 Plainville Road. At the time, Carol was coming down the stairs. When the glass broke, Carol ran upstairs screaming, and she and her three youngest children retreated into a bedroom. Carol directed the children into a closet and she stood pushing on the bedroom door trying to keep appellant from entering. Two of Carol's children, who were looking out of the closet, testified that appellant fired a shot at the bedroom door and that Carol fell to the floor behind the bedroom door. Appellant then entered the bedroom and, while standing over Carol, fired two or three shots at her. One of the bullets struck Carol in the upper left chest.

Appellant left the bedroom and confronted Carol's oldest child, Ricardo, who was then fourteen years old. According to Ricardo, appellant pointed the gun at his neck and pulled the trigger at least twice. When the gun did not fire, appellant hit him in the face with the gun and left the house.

**79 Timothy Schopmeyer, who was delivering a pizza at a neighbor's home on the day of the murder,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

testified that he saw appellant approach the front door at 4938 Plainville Road. Schopmeyer noticed that appellant was wearing a thick jacket with the collar pulled up and a hat that was pulled down over a large portion of his head. Moments later, Schopmeyer heard breaking glass and realized that appellant had entered the neighboring house. Schopmeyer testified that within seconds after appellant had entered the home, he (Schopmeyer) heard a woman screaming "No, no, no."

The cries of "no" were then followed by several gunshots. Schopmeyer saw appellant leave the house and walk quickly up the street. Schopmeyer stated that approximately thirty seconds passed from the *404 time he heard the breaking glass until appellant left the house. After appellant left the home, Schopmeyer approached the house and he heard children shouting that their mother had been shot. Schopmeyer entered the house, went upstairs, and saw Carol lying on a bed. When he asked her who had done this, she answered, faintly, "My husband." Schopmeyer then ran to get help.

Police officers responding to the 911 calls noticed that the glass to the front door had been shattered. The police went upstairs and found Carol lying on a bed suffering from a chest wound. They also noticed that Ricardo had a severe "gash" on his face.

Later that day, during surgery, Carol died. The forensic pathologist concluded that a bullet had lacerated one of Carol's lungs and a major vein to her heart, and that she died as a result of blood loss.

Later that night, on December 11, 1993, a police canine unit discovered appellant hiding inside a house that he had broken into near the Plainville Road residence. Appellant surrendered and, in the process, he slid a .25 caliber Raven semiautomatic pistol across the floor to the police. Officer Kevin York took possession of the pistol and later testified that the gun appeared to be jammed.

After being advised of his *Miranda* rights, appellant told Detective Charles Beaver that he and Carol had argued about the children on December 7 and that he had hit her. During the questioning, appellant acknowledged that he was aware that Carol had filed a complaint against him following the December 7 altercation. Appellant also indicated that, on December 11, he had not been living at the Plainville Road home. Appellant stated that prior to that date he had "moved out" when Carol demanded that he and his sons leave the home and that since that time he had been living on the streets. Appellant also stated that he did not know where his sons were living. Appellant told police that he had entered the residence by kicking

the front door glass and that he had chased Carol up the stairs. Appellant further confessed that he forced his way into the bedroom and as Carol lay "huddled" on the floor behind the bedroom door "crying and screaming" he shot her "two or three times." Appellant also stated that he "wanted to teach her a lesson," and that he did not care if she died.

During appellant's confession, Beaver did not tell appellant that Carol had died and appellant never asked about her condition. At the end of the police interview, Beaver told appellant that Carol had died during surgery. Beaver testified that appellant "showed exactly no emotion one way or the other as to whether he cared." When asked whether he would do anything differently considering that Carol died as a result of the shooting, appellant stated, "I have no regrets what I did. It hurt what she did to my kids."

William Schrand, a forensic firearms expert, testified that the bullet found in Carol's body came from the Raven semiautomatic pistol recovered from appellant. *405 This same pistol was linked to a spent bullet and three cartridge shells that police recovered from the bedroom.

**80 In December 1993, appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Carol. Count 1 of the indictment charged appellant with purposely causing the death of Carol during the commission of an aggravated burglary (R.C. 2903.01[A] ). Count 1 also carried two death penalty specifications: one alleged a course of conduct involving the purposeful attempt to kill two or more persons (R.C. 2929.04[A][5] ); and a second alleged murder during an aggravated burglary (R.C. 2929.04[A][7] ). Count 2 of the indictment charged appellant with purposely causing the death of Carol with prior calculation and design (R.C. 2903.01[B] ). Count 2 also carried the same two death penalty specifications as count 1. Appellant was also indicted on one count of attempted murder of Ricardo (count 3) and one count of aggravated burglary (count 4). Each count in the indictment also carried a firearm specification.

Appellant filed a pretrial motion pursuant to Crim.R. 12(B) to dismiss all charges and specifications relating to aggravated burglary. In his motion, appellant claimed that he could not be guilty of an aggravated burglary offense because trespass is an essential element of the offense and, in the absence of a court-imposed protection order, one spouse cannot technically trespass upon the residence of the other spouse. The trial court agreed and dismissed count 1 of the indictment (purposely causing the death

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

during the commission of an aggravated burglary) and its specifications.   The court also dismissed the aggravated burglary death penalty specification with respect to count 2, and the court further dismissed count 4.   Thus, the course-of-conduct death penalty specification regarding count 2 remained.   Thereafter, the state, pursuant to R.C. 2945.67, [FN2] appealed the holding of the trial court to the court of appeals.

> FN2.   R.C. 2945.67(A) provides that "[a] prosecuting attorney * * * may appeal as a matter of right any decision of a trial court in a criminal case * * * which * * * grants a motion to dismiss all or any part of an indictment."

Upon appeal, the court of appeals reversed the judgment of the trial court and remanded the cause, holding that "the issue of whether the state can prove that the defendant trespassed on the premises is to be determined at trial, not by a motion to dismiss.   If, at the end of the state's case, the evidence is insufficient to prove that the defendant committed a trespass, then the court must dismiss the aggravated burglary charges and specifications pursuant to a Crim.R. 29 motion for acquittal."  *State v. O'Neal* (1995), 103 Ohio App.3d 151, 154, 658 N.E.2d 1102, 1103.   The court further noted that "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that *both* parties had made the decision *406 to live in separate places.   Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly.   In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary." (Emphasis *sic.*)  *Id.* at 155, 658 N.E.2d at 1104.

On remand to the trial court, the jury found appellant guilty of both counts of aggravated murder (counts 1 and 2), both aggravated burglary death penalty specifications, three of the firearm specifications, and the aggravated burglary charge (count 4).   The jury found appellant not guilty of attempted murder (count 3) and the course-of-conduct death penalty specifications.

Following a penalty hearing, the jury recommended that appellant be sentenced to death on both aggravated murder counts.   The trial court conducted an independent review of the evidence pursuant to R.C. 2929.03(F) and accepted the jury's recommendation and

imposed the sentence **81 of death.    For the aggravated burglary charge (count 4) and firearm specifications, appellant was sentenced in accordance with the law.   On appeal, the court of appeals affirmed.

The cause is now before this court upon an appeal as of right.

Michael K. Allen, Hamilton County Prosecuting Attorney, and William E. Breyer, Assistant Prosecuting Attorney, for appellee.

Elizabeth E. Agar and Roxann H. Dieffenbach, Cincinnati, for appellant.

DOUGLAS, J.

Appellant presents seventeen propositions of law for our consideration.  (See Appendix, *infra.*)  We have considered each of appellant's propositions of law and have reviewed the death penalty for appropriateness and proportionality.  For the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

¢[1] We have held time and again that this court is not required to address, in detail, each and every contention raised by the parties in a death penalty appeal.   We continue to adhere to that position today.   We have carefully considered all of the propositions of law and allegations of error and have thoroughly reviewed the record in its entirety.   Many of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases.   Therefore, these issues require little, if any, discussion.   Upon a careful review of the record and the governing law, we fail to detect any errors requiring reversal of appellant's convictions and death sentence.   We have *407 found nothing in the record or in the arguments advanced by appellant that would, in any way, undermine our confidence in the outcome of appellant's trial.   Accordingly, we address and discuss, in detail, only those issues that merit detailed analysis.

II
Propositions of Law Nos. I, II and XII

¢[2] In his first proposition, appellant challenges the conclusions reached by the court of appeals in *State v. O'Neal* (1995), 103 Ohio App.3d 151, 658 N.E.2d 1102 ("*O'Neal I* "), that he could be found to have trespassed

on the premises in question and that therefore he could have committed an aggravated burglary.  In support of this proposition, appellant contends that the holding in *O'Neal I* is in direct conflict with R.C. 3103.04, [FN3] which, according to appellant, provided him with a privilege, absent a court order, to enter the residence leased by his spouse at 4938 Plainville Road.

> FN3. R.C. 3103.04 provides:
> "Neither husband nor wife has any interest in the property of the other, except as mentioned in section 3103.03 of the Revised Code, the right to dower, and the right to remain in the mansion house after the death of either. Neither can be excluded from the other's dwelling, except upon a decree or order of injunction made by a court of competent jurisdiction."

We disagree.  Recently, in *State v. Lilly* (1999), 87 Ohio St.3d 97, 717 N.E.2d 322, paragraph two of the syllabus, we held that R.C. 3103.04 is inapplicable in criminal cases.  In *Lilly*, this court reviewed the historical implications of R.C. 3103.04 and concluded that the statute "was intended to address property ownership rights of married persons, matters of a civil nature.  Privileges of a husband and wife with respect to the property of the other were not meant to be enforced criminally and do not affect criminal liabilities." *Id.* at 102, 717 N.E.2d at 326.  Thus, we find appellant's contention regarding the applicability of R.C. 3103.04 not well taken.

Appellant also argues that the holding in *O'Neal I* is contrary to law and that it is an "unnecessary act of judicial legislation" **82 redefining criminal trespass. Again, we disagree.

In the case at bar, the jury convicted appellant of, among other charges, aggravated murder with aggravated burglary death penalty specifications, and the separate charge of aggravated burglary.  R.C. 2911.11 sets forth the crime of aggravated burglary:

"(A) *No person,* by force, stealth, or deception, shall *trespass* in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is *408 present, with the purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

"(1) The offender inflicts, or attempts or threatens to

inflict physical harm on another;

"(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."  (Emphasis added.)

[3] As can be gleaned, trespass is an essential element of aggravated burglary.  A criminal trespass occurs when a person "without privilege to do so," "[k]nowingly enter[s] or remain[s] on the land or premises of another." R.C. 2911.21(A)(1).  "Land or premises" includes "any land, building, structure, or place belonging to, controlled by, or in custody of another." R.C. 2911.21(E).

[4] R.C. 2911.21(A)(1), when read in conjunction with 2911.21(E), establishes that *any* person can indeed commit a trespass against property that belongs to, is controlled by, or is in the custody of, someone else. Therefore, a spouse can be convicted of trespass and aggravated burglary in the dwelling of the other spouse who owns, has custody of, or control over the property where the crime has occurred.  *Lilly,* paragraph one of the syllabus ("A spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling").

[5][6] In his second and twelfth propositions, appellant contends that there was insufficient evidence to find that he trespassed on the property in question. Specifically, appellant claims that the record does not support a finding that the Plainville Road property was in the custody or control of Carol.  However, construing the evidence in a light most favorable to the prosecution, which we are required to do, see *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573, and *State v. Fears* (1999), 86 Ohio St.3d 329, 341, 715 N.E.2d 136, 149, we disagree with appellant's contentions.

There was sufficient evidence submitted at trial for the jury to find that, at the time appellant broke into the residence and murdered Carol, Carol was in sole custody of and control over the home.  Carol was the lessee under the lease agreement for the home. Appellant's name was not on the lease.  Further, on December 7, 1993, following an altercation with Carol, appellant moved out and began living somewhere else. Carol had also filed a motion for a temporary protection order against appellant.  Moreover, appellant admitted to the police that, prior to the day of the murder, he had moved out and no longer lived in the home.  On December 11, 1993, appellant shattered the glass in the front door, entered the residence, and killed Carol.  Clearly, the evidence was sufficient for the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

to conclude that, at the time of the murder, appellant did not live at 4938 Plainville Road and that the residence was in Carol's sole custody and/or control.

*409 Accordingly, appellant's second and twelfth propositions of law are not well taken.

III
Proposition of Law No. III

[7] In his third proposition, appellant contends that the prosecution peremptorily **83 excused jurors based on their race. In *Batson v. Kentucky* (1986), 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 82-83, the Supreme Court of the United States held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from petit juries. See, also, *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1313. If a defendant makes a prima facie case of discrimination, the state must provide a race-neutral explanation. However, the explanation need not rise to the level justifying exercise of a challenge for cause. *Id.* at 582, 589 N.E.2d at 1313, citing *Batson,* 476 U.S. at 96-98, 106 S.Ct. at 1723-1724, 90 L.Ed.2d at 87-89.

Appellant claims that the state's peremptory challenges against prospective jurors Anderson, Breckenridge, and Cowins were racially motivated. However, appellant has failed to show any facts or relevant circumstances that raise an inference that the prosecutor used the challenges for racial reasons. *State v. Hernandez,* 63 Ohio St.3d at 582, 589 N.E.2d at 1313. In fact, in at least one case an African-American replaced a juror challenged by the state, and two African-Americans sat on the jury.

[8][9] Nonetheless, the trial court requested that the state explain, for the record, the reasons for its challenges. The prosecutor noted that Anderson was dismissed because she was "the lowest rated juror as far as applying the death penalty." The state excused Breckenridge because of his "mixed feelings regarding the death penalty" and because he was single and lived at home with his mother and thereby lacked "a stake in the community."

[10] The state challenged Cowins because she was a social worker, which the state felt was not a "pro-conviction" occupation, and because she agreed with the verdict finding O.J. Simpson not guilty despite her admission that she had not followed the case. Cowins also stated that she would not openly deliberate with her fellow jurors.

These explanations are clearly race-neutral and are supported by the record.  " 'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839, quoting *410*Hernandez v. New York* (1991), 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (plurality opinion). We have held that a trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1313, following *Hernandez v. New York,* 500 U.S. at 369, 111 S.Ct. at 1871, 114 L.Ed.2d at 412. To that end, we conclude that the trial court's acceptance of the state's race-neutral explanations was not clearly erroneous. Cf. *State v. Sheppard* (1998), 84 Ohio St.3d 230, 234-235, 703 N.E.2d 286, 291-292; *State v. Moore* (1998), 81 Ohio St.3d 22, 28, 689 N.E.2d 1, 9; *State v. Dennis* (1997), 79 Ohio St.3d 421, 428, 683 N.E.2d 1096, 1104; *State v. Wilson* (1996), 74 Ohio St.3d 381, 388, 659 N.E.2d 292, 302.

Therefore, we reject appellant's third proposition of law.

IV
Proposition of Law No. IV

In his fourth proposition, appellant argues that the admission of multiple hearsay statements attributed to Carol denied him due process of law and the right to confront his accuser. In support, appellant points to testimony of Officer Mercer, Carol's friend Patricia Carr, and Carol's son Ricardo regarding statements that Carol made concerning the December 7 altercation between Carol and appellant, her fears of appellant, and her plans to end the marriage. In allowing the testimony into evidence, the trial court relied on the **84 "excited utterance" exception to the hearsay rule, Evid.R. 803(2), [FN4] and the "then existing mental, emotional, or physical condition" exception set forth in Evid.R. 803(3). [FN5]

FN4. The "excited utterance" exception, Evid.R. 803(2), excludes from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

FN5. The "then existing mental, emotional, or physical condition" exception to the hearsay rule is found at Evid.R. 803(3), which provides:

that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule.

[11] At trial, Officer Mercer testified that after he responded to a call for assistance on December 7, Carol told him that she had just had an altercation with appellant during which she struck her in the face numerous times, choked her, shoved her to the ground, and kicked her because she refused to give him food stamps.  Mercer also testified that Carol told him that appellant had moved out and no longer lived at the residence.

 We conclude that Carol's statements to Mercer were relevant to the issues tried and admissible under Evid.R. 803(2) as an excited utterance.   All of the above statements related to a startling event or condition, the assault by *411 appellant, which had reportedly just occurred.  Mercer testified that Carol was "very excited," "very upset," crying, and "very fearful."   In this regard, Carol was still "under the stress of excitement caused by the event or condition."  Evid.R. 803(2).  See _State v. Huertas_ (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068.  See, also, _State v. Duncan_ (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, paragraph one of the syllabus.

[12] Patricia Carr, Carol's friend and coworker, testified about statements Carol made to her, including details about the December 7 altercation and Carol's relationship with appellant.   Carr testified that Carol was "really stressed" in December and wanted to get out of the marriage.   Carr testified that after the December 7 altercation, whenever the phone rang, Carol was "shaking, scared," thinking it was going to be appellant on the phone.   Carr also testified that appellant no longer stayed at the marital home, and that Carol planned to get the locks changed.

[13] We agree with appellant that the trial court erred by admitting Carr's recitation of Carol's conversations as an excited utterance.   The trial court also erred by allowing Carol's son Ricardo to testify about his mother's description of the December 7 altercation to him.   For an excited utterance to be admissible, "[t]he central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought."  (Emphasis added.)  _State v. Taylor_ (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316, 322.  Because Carol's conversations with Ricardo and Carr

occurred hours after the altercation, she had considerable time to reflect, thereby negating the "excited utterance" status of the statement.  _Id._ at 300-305, 612 N.E.2d at 320-323;  _State v. Johnson_ (1994), 71 Ohio St.3d 332, 338, 643 N.E.2d 1098, 1104.

[14] However, we find beyond a reasonable doubt that any improperly admitted hearsay testimony did not contribute to the verdict and therefore was harmless error.  _Id._ Ricardo's and Carr's description of the December 7 altercation, as told to them by Carol, duplicated Mercer's admissible testimony.  Also, other admissible evidence established that Carol had filed a motion for a protective order and that appellant no longer lived in the home.  Moreover, appellant confessed that he had shot Carol.

[15] Carol's statements that she was feeling stressed and was afraid of appellant **85 were relevant to prove her intent to end the marriage.   These statements were properly admitted as evidence under Evid.R. 803(3), which permits hearsay evidence of a declarant's "then existing state of mind, emotion, sensation * * * (such as intent, plan, motive, design, mental feeling [or] pain)." To be sure, "testimony of state-of-mind witnesses, that the victim was fearful and apprehensive [is] not inadmissible hearsay and [is] properly admitted." *412 _State v. Apanovitch_ (1987), 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398.  Accord _State v. Frazier_ (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000, 1013;  _State v. Simko_ (1994), 71 Ohio St.3d 483, 491, 644 N.E.2d 345, 353.   In addition, statements about Carol's plans to separate and end the marriage were also admissible under Evid.R. 803(3).  _State v. Sage_ (1987), 31 Ohio St.3d 173, 182-183, 31 OBR 375, 383, 510 N.E.2d 343, 350 (victim's statements regarding intent to break up with defendant admissible).

 Accordingly, appellant's fourth proposition of law is not persuasive.

V
Proposition of Law No. V

[16] In his fifth proposition, appellant argues that the trial court erred in rejecting his request for an instruction on murder as a lesser included offense to the aggravated murder charged in counts 1 and 2. Murder, which does not require proof of prior calculation and design, R.C. 2903.02, is a lesser included offense of aggravated murder, R.C. 2903.01(A).  _State v. Goodwin_ (1999), 84 Ohio St.3d 331, 345, 703 N.E.2d 1251, 1264.   However, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Accord *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274.

[17] We conclude that the trial court did not err by refusing to instruct on murder as a lesser included offense to count 2. The state presented strong evidence of prior calculation and design, and a jury could not reasonably find appellant guilty of murder and not guilty of aggravated murder. Appellant attacked Carol four days before the murder. On the day of the murder, he made a threatening telephone call to Carol at her place of work, then several hours later broke into her home armed with a gun. He was wearing a jacket with the collar pulled up and a cap over a large portion of his head in an apparent attempt to conceal his identity. He chased Carol up the stairs and while standing over her, shot and killed her. The entire incident, breaking into the home, killing Carol, and leaving the home took place in approximately thirty seconds. These facts indicate a calculated plan of attack swiftly carried into execution. Cf. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 344-345, 703 N.E.2d 1251, 1263; *State v. Wilson,* 74 Ohio St.3d at 394-395, 659 N.E.2d at 306. Appellant's claim to police that he did not intend to kill Carol is irrelevant to an instruction on murder as a lesser offense, since murder involves a purposeful killing. See R.C. 2903.02.

[18] *413 With respect to count 1, we also find that the trial court did not err by refusing to instruct the jury that murder is a lesser included offense to the felony murder charge. The state also presented strong evidence that Carol was in custody and/or control of the home. Prior to killing Carol, appellant was not living at the residence. He broke into the home and mercilessly killed her. The findings of the jury that appellant committed an aggravated burglary were clearly in accord with the evidence produced by the state.

Therefore, appellant's fifth proposition of law is not well taken.

**86 VI
Proposition of Law No. VI

[19] In his sixth proposition, appellant contends that his postarrest statement to police should not have been admitted at trial because it was obtained through deception by police officers. Specifically, appellant asserts that the failure of police officers to inform him about Carol's death prevented a knowing and intelligent

waiver of his Fifth Amendment rights. We disagree. "A suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring* (1987), 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954, 968.

Further, the police did not lie to appellant about Carol's condition and appellant never asked about her condition while being questioned. The United States Supreme Court "has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights." *Id.* at 576, 107 S.Ct. at 858, 93 L.Ed.2d at 967.

Accordingly, appellant's sixth proposition of law is not persuasive.

VII
Proposition of Law No. VII

[20][21][22] In his seventh proposition, appellant asserts that the prosecutor's closing argument in the penalty phase of the trial appealed to the jury's emotions and improperly referred to the nature and circumstances of the offense as aggravating circumstances. Granted, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus. However, appellant failed to object to these remarks and thus waived all but plain *414 error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925; Crim.R. 52(B).

During the penalty phase, the prosecutor questioned whether mitigation "outweigh[s] the cruel manner in which he killed? How does the cruel manner in which he killed, the aggravating circumstances, weigh against the mitigation which you heard[?]" The prosecutor also referred to the "cruel manner in which he killed her" as giving additional weight to the aggravating circumstances.

[23] However, we find that the prosecutor's comments did not amount to plain error. During the penalty phase, both the prosecutor and defense counsel correctly identified the aggravating circumstance. Moreover, the trial court correctly instructed the jury on the weighing process and the relevant aggravating circumstance. In this regard, proper instructions can cure misstatements of law by the parties. See *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Page 12

1102-1104; *State v. Wogenstahl.* 75 Ohio St.3d at 360, 662 N.E.2d at 324-325; *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382, 400.

[24] Also during his penalty argument, the prosecutor referred to the emotions felt by Carol's children witnessing her murder, and noted that the feelings "were brought from that room into this room.  I felt them and so did you."  However, in making these statements, it is obvious that the prosecutor was not asking the jury to render verdicts based upon emotion. In any event, "criminal trials cannot be squeezed dry of all feeling." *State v. Keenan* (1993), 66 Ohio St.3d 402, 409, 613 N.E.2d 203, 209.

We find that the alleged errors did not affect the outcome of the trial.  The prosecutor's sentencing argument did not contribute unfairly to the death verdict, and it did not create outcome-determinative plain error.  Cf. **87*State v. Landrum* (1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710, 718; and *State v. Hill* (1996), 75 Ohio St.3d 195, 201-202, 661 N.E.2d 1068, 1077.

Accordingly, we reject appellant's seventh proposition of law.

VIII
Proposition of Law No. VIII

[25] In his eighth proposition, appellant contends that the trial judge erred in allowing the jury to recommend a sentence on each aggravated murder count because appellant killed only one person.  Because appellant did not object to the penalty phase jury instructions at trial, he waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

[26] Appellant is correct in that aggravated murder counts involving the same victim are to be merged for sentencing. *415*State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902, 913; R.C. 2941.25(A). [FN6] Here, during the trial court's review of the evidence, the trial court should have merged the two aggravated murder counts and imposed only a single death sentence.  See *id.*; *State v. Huertas,* 51 Ohio St.3d at 28, 553 N.E.2d at 1066.

FN6. R.C. 2941.25(A) provides:
"Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted

of only one."

[27][28] However, sentencing an accused on each of two murder counts, involving a single victim, represents a "procedural" error that is "harmless beyond a reasonable doubt." *State v. Moore,* 81 Ohio St.3d at 39, 689 N.E.2d at 17; *State v. Brown* (1988), 38 Ohio St.3d 305, 317-318, 528 N.E.2d 523, 538-539.  The fact that the jury considered two aggravated murder counts for a single victim did not unfairly affect the penalty hearing.  See *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81.

Therefore, appellant's eighth proposition of law is not well taken.

IX
Proposition of Law No. IX

[29] The imposition of the death penalty for aggravated murder is precluded unless one of the criteria contained in R.C. 2929.04 is specified in the indictment or count in the indictment and established beyond a reasonable doubt.  R.C. 2929.04(A).  At issue in this proposition is R.C. 2929.04(A)(7), which provides that the offense must have been "committed while the offender was committing [or] attempting to commit * * * aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."  We have held that the "principal offender" and the "prior calculation and design" language in R.C. 2929.04(A)(7) are not intended to be cumulative aggravating circumstances but are mutually exclusive alternatives that are not to be charged and proven together in the same cause. *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746.

In his ninth proposition of law, appellant asserts that the trial court's instructions to the jury violated our holding in *Penix.*  We disagree. Initially, we note that appellant failed to object to this instruction at trial and thus waived all but plain error.  *Underwood.*  Furthermore, the trial court's instruction to the jury was proper in all respects.  At trial, the court instructed the jury that "[t]he single aggravating circumstance which defendant has been convicted of committing is that the offense was committed while the offender was committing, *416 attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and either the offender was the principal **88 offender in the commission of the aggravated murder, or if not the principal offender, committed the aggravated murder with prior calculation

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

and design."

The trial court's instruction to the jury followed the language of R.C. 2929.04(A)(7). We have held that when the "prior calculation and design" and the "principal offender" language of R.C. 2929.04(A)(7) are charged disjunctively to the jury in a single specification, as was done in this case, no error is committed. *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82-83.

Accordingly, we reject appellant's ninth proposition of law.

X
Proposition of Law No. X

In his tenth proposition, appellant asserts that the "systematic exclusion of prospective jurors opposed to the death penalty violated [appellant's] right to a fair and impartial jury which reflects the community from which it is drawn." We summarily reject this argument on the authority of *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137; *State v. Moore*, 81 Ohio St.3d at 26, 689 N.E.2d at 8; *State v. Grant* (1993), 67 Ohio St.3d 465, 476, 620 N.E.2d 50, 64; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus.

XI
Proposition of Law No. XI

[30][31][32] In his eleventh proposition, appellant contends that the trial court's instruction to the jury during the penalty phase that the jury was to arrive at its findings without sympathy was improper because it effectively restricted the jurors from considering mercy as a mitigating factor. However, the instruction to exclude sympathy "is intended to insure that the sentencing decision is based upon * * * guidelines fixed by statute." *State v. Jenkins,* paragraph three of the syllabus. See, also, *State v. Taylor* (1997), 78 Ohio St.3d 15, 30, 676 N.E.2d 82, 96; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988, 995-996. Moreover, mercy is not a mitigating factor. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216.

Accordingly, we find appellant's eleventh proposition of law not persuasive.

XII
Proposition of Law No. XIII

In his thirteenth proposition, appellant contends that

Ohio's capital sentencing scheme is unconstitutional because the same operative fact used to elevate *417 murder to aggravated murder (aggravated burglary in this case) can then be used as a death penalty specification. However, appellant's claim lacks merit. We have previously considered and rejected this argument. *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraph one of the syllabus. See, also, *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568.

XIII
Proposition of Law No. XIV

In his fourteenth proposition, appellant challenges Ohio's death penalty statute. However, appellant does not present any arguments that would cause us to revise our position regarding the constitutionality of the statutory scheme. Appellant's contentions are rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

XIV
Proposition of Law No. XV

In his fifteenth proposition, appellant challenges the present structure of Ohio's proportionality review in capital cases. Specifically, appellant argues that his sentence should be compared to cases in which the death penalty was not imposed. **89 We reject this argument on the authority of *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

XV
Proposition of Law No. XVI

In his sixteenth proposition, appellant argues that imposing the death penalty in this case is inappropriate and disproportionate when compared to similar cases. This argument will be considered *infra* during the independent review of the sentence.

XVI
Proposition of Law No. XVII

In his seventeenth proposition, appellant asserts that the combined effect of errors in evidentiary rulings and on pretrial motions denied him a fair and impartial trial. However, appellant's argument lacks merit. " '[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.' " *418*State v. Hill, 75 Ohio St.3d at 212, 661 N.E.2d at 1083- 1084, quoting *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980-76

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

L.Ed.2d 96, 106.

We have reviewed the entire record in this case and we find that appellant received a fair trial, few errors were found, and any error did not prejudice his substantial rights. *State v. Hill,* 75 Ohio St.3d at 212, 661 N.E.2d at 1083-1084. Moreover, "[s]uch errors cannot become prejudicial by sheer weight of numbers." *Id.* at 212, 661 N.E.2d at 1084.

Therefore, we find appellant's seventeenth proposition of law not well taken.

### XVII

[33] Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality (also raised in appellant's sixteenth proposition of law). R.C. 2929.05(A). For purposes of independent review, the two counts of aggravated murder of a single victim must be merged. *State v. Lawson,* 64 Ohio St.3d at 351, 595 N.E.2d at 913.

We find that the aggravating circumstance appellant was found guilty of committing, murder during an aggravated burglary in which appellant was the principal offender (R.C. 2929.04[A][7] ), was proven beyond a reasonable doubt. The nature and circumstances of the offense reveal nothing of any mitigating value.

Testifying on behalf of appellant at the mitigation hearing were Dr. David Chiappone, a clinical psychologist; Dr. Robert Tureen, a clinical psychologist with a specialty in neuropsychology; Dorothy O'Neal, appellant's mother; Steve Dumas, appellant's long-time friend; Cortez O'Neal, appellant's son; and Jamie Powers, appellant's former workplace supervisor. Also, appellant read a statement to the jury.

Dr. Chiappone conducted lengthy interviews with appellant and administered several psychological tests. He also obtained information from appellant's family members and friends. The history he received indicated that appellant had two older and two younger sisters, that he had been the family favorite, that his mother had "doted" over him, and that his parents separated when he was nine years old.

Chiappone noted that appellant completed twelve years of education but was passed academically only because he was a very good basketball player. Appellant had been suspended from school several times for fighting. From 1972 to 1975, appellant served in the United States Marine Corps but was discharged for being absent without leave. From 1976 through approximately 1989, appellant supported himself by selling drugs. During this time, appellant was convicted of *419 selling marijuana. He also served approximately one year in prison for selling cocaine.

**90 After his release from prison, appellant apparently stopped selling drugs and held a number of jobs. Appellant and Carol were married in 1992. Appellant has nine children from different relationships. Appellant attributed his marital problems with Carol to their inability to raise their children together. According to Chiappone, appellant strongly resented Carol because he felt that she had thrown his children out on the street.

Chiappone concluded that appellant had a mixed personality disorder, with narcissistic self-centeredness and antisocial elements, and that he was borderline mentally retarded. Chiappone noted, however, that appellant was not mentally ill and that he understood the difference between right and wrong. Appellant abused alcohol and used cocaine sporadically, and he told Chiappone that he had ingested cocaine on the day that he killed Carol. Chiappone stated that he believed that appellant could adapt to a life in prison.

Chiappone believed that appellant may have suffered brain damage in his childhood and requested that Dr. Tureen, a clinical psychologist with a specialty in clinical neuropsychology, evaluate appellant. Tureen described appellant as suffering from both low intelligence and "minimal cerebral dysfunction," or a basic problem in the "hard wiring" of his brain. His poor academic performance showed evidence of "organicity" or brain damage. Because of this "mild to moderate degree of impairment," his ability to learn is impaired and his thinking tends to be very "concrete." Tureen further stated that he believed that appellant would have more difficulty thinking clearly under the stress of a failed relationship than would the average person. Tureen concluded that appellant killed Carol because appellant felt that it was the only way he could express his anger when Carol made appellant and his sons leave her home.

Other defense witnesses supported these descriptions of appellant's history and background. Appellant's mother, Dorothy O'Neal, stated that appellant was a normal boy when growing up and that he loved basketball. Appellant's father died when appellant was young and this event significantly affected him because appellant and his father had been very close.

Dumas stated that he was a long-time friend of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

appellant, that appellant was like an older brother to him, and that appellant was not a violent person. Dumas described appellant as a peacemaker. Dumas noted that when appellant got out of prison in 1989, he stopped selling drugs. According to Dumas, appellant did not want his children to grow up in the streets, stressed education, and urged his children to stay in school.

\*420 Cortez, one of appellant's sons, testified that he loves his father. He also stated that he liked Carol and that she treated him well and was a like mother to him. Cortez stated that on December 7, 1993, he saw his father beat Carol.

Powers, one of appellant's former employers, stated that appellant had a positive attitude and did a good job even while working in an undesirable, low- paying job. Powers also stated that he had seen appellant act as a peacemaker on different occasions when fights would break out in the kitchen. Powers described appellant as having a really strong work ethic even though he had been fired several times for absenteeism and for being late to work. Powers rehired appellant each time after he had been fired and testified that he would rehire him now if he could.

In an unsworn statement that he read to the jury, appellant stated that he did not plan or mean to kill Carol, but that his feelings "got the best" of him. He stated that he was sorry for what he had done and for the pain he had caused Carol's family and his own family.

[34][35] Upon review of the evidence admitted in mitigation, we find that the evidence concerning appellant's history, character, and background is entitled to very little weight in mitigation. Specifically, \*\*91 we find that appellant's attempt to turn his life around and become a responsible citizen after years of selling drugs and his attempt to be a father to two of his children by taking custody of them and encouraging them to get an education is entitled to some weight in mitigation. Also, his attempt at legitimate, steady employment after his prison term is entitled to some, but very minimal, mitigating weight. See _State v. Mitts_ (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522, 533; _State v. Fox_ (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124, 133.

During the penalty phase, appellant presented no evidence regarding the mitigating factors set forth in R.C. 2929.04(B)(1) through (B)(6), and our review of the record reveals that these factors are inapplicable here. However, there are some "other factors" in the record that appear relevant and are entitled to weight in mitigation. R.C. 2929.04(B)(7).

[36] Testimony from both psychologists established that appellant has organic brain problems and although appellant is not mentally retarded, he functions in the lower two to three percent of the general population. His judgment, thinking process, and ability to learn from mistakes are all impaired, and he suffers from a mixed personality disorder. These conditions are entitled to some weight in mitigation. See, e.g., _State v. Biex_ (1996), 74 Ohio St.3d 320, 327, 658 N.E.2d 754, 761; _State v. Green_ (1993), 66 Ohio St.3d 141, 153, 609 N.E.2d 1253, 1263; _State v. Davis_ (1992), 63 Ohio St.3d 44, 51, 584 N.E.2d 1192, 1198.

[37] At the time of the murder, appellant was angry at Carol over what he perceived to be mistreatment of his sons. Appellant expressed regret and \*421 remorse, which are entitled to some mitigating weight. See _State v. Mitts_, 81 Ohio St.3d at 236-237, 690 N.E.2d at 533; _State v. Moore_, 81 Ohio St.3d at 44, 689 N.E.2d at 20. Further, appellant's cooperation with police is entitled to some weight in mitigation, _State v. Dunlap_, 73 Ohio St.3d at 319, 652 N.E.2d at 998, as is appellant's ability to adapt to prison, _State v. Smith_ (1997), 80 Ohio St.3d 89, 121, 684 N.E.2d 668, 696.

Pursuant to our statutory duty we have weighed the evidence presented in mitigation against the R.C. 2929.04(A)(7) aggravating circumstance appellant was found guilty of committing. We find that the aggravating circumstance clearly outweighs the mitigating factors beyond a reasonable doubt.

[38] As a final matter, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death penalty. Appellant's death sentence is neither excessive nor disproportionate in comparison to the penalty imposed in similar cases. See, e.g., _State v. Benge_ (1996), 75 Ohio St.3d 136, 661 N.E.2d 1019; _State v. Simko_ (1994), 71 Ohio St.3d 483, 644 N.E.2d 345; _State v. Huertas_, 51 Ohio St.3d 22, 553 N.E.2d 1058. In this regard, we also reject appellant's fifteenth proposition of law, _supra_. Appellant attempts to distinguish his crime from the crimes of others on the basis that this was a domestic dispute and the victim was his wife. Such a notion is repugnant to us. We vigorously reject this argument.

Accordingly, for the foregoing reasons, we affirm the judgment of the court of appeals and uphold the sentence of death.

_Judgment affirmed._

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

MOYER, C.J., RESNICK, FRANCIS E. SWEENEY, SR., COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents.


PFEIFER, J., dissenting.

**PFEIFER, J., dissenting.**   Every murder is a tragic act; this one is no different.   However, not every murderer warrants death.   The constitutional purpose of statutory aggravating circumstances is to narrow the class of murderers to those deserving society's ultimate punishment, the death penalty.   **92*Zant v. Stephens* (1983), 462 U.S. 862, 877, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235, 249-250.   See Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death (1990), 31 B.C. L.Rev. 1103, 1121.   At its core, this case is a murder case and it probably should have been prosecuted as a noncapital case.

Having reviewed and independently weighed all the facts and other evidence disclosed in the record and having considered the offense and the offender as required by R.C. 2929.05(A), I believe that the aggravating circumstance O'Neal *422 was found guilty of committing does not outweigh the mitigating factors beyond a reasonable doubt.   Accordingly, I believe that the sentence of death is not appropriate and dissent.

APPENDIX

"Proposition of Law No. I:  A person does not lose all possessory interest in the marital residence, nor the right to legally enter that residence, because he has temporarily left the residence as a result of a marital argument.

"Proposition of Law No. II:  Trespass is an essential element of aggravated burglary, and where defendant enters the marital residence, prior to the issuance of any court order restricting him from doing so, he does not commit a trespass or a burglary.

"Proposition of Law No. III:  The state's use of peremptories to excuse three Afro-American jurors, without articulating inadequate [*sic* ] non-discriminatory reason [*sic* ] for their dismissal, combined with the acknowledged fact that defendant is a member of a cognizable racial group, violates defendant's right to equal protection under the United States and Ohio Constitutions.

"Proposition of Law No. IV:  Admission of multiple hearsay statements allegedly made by the victim denies defendant the right to confront the witnesses against him, and to due process of law, where the admitted statements do not fall into any recognized hearsay exception.

"Proposition of Law No. V:  When the jury, on the basis of the evidence presented, could reasonably find for the state on all elements of aggravated murder except prior calculation and design, or commission of an underlying felony, the trial court must charge on the lesser included offense of murder if a timely request for such a charge is made.

"Proposition of Law No. VI:  Admission in evidence of statements elicited from defendant while in custody, which are obtained by deception, and are thus not the product of a knowing and intelligent waiver, violates the Fifth and Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the state of Ohio.

"Proposition of Law No. VII:  Ohio's death penalty statute mandates that the nature and circumstances of the offense can only be considered as mitigating factors; thus, their consideration as aggravating factors, as well as appeals to emotion, violates this statute and defendant's right to be free from arbitrary infliction of the death penalty as guaranteed by the Eighth Amendment to the United States Constitution, and parallel state provisions.

"Proposition of Law No. VIII:  Although multiple charges of aggravated murder may be submitted to the jury during the guilt phase of trial, where there *423 is only one death charge there can be only one conviction, and presentation to the jury of multiple counts, with multiple specifications, followed by imposition of multiple death sentences, violates defendant's right to be free from cruel and unusual punishment under the state and federal Constitutions.

"Proposition of Law No. IX:   The alternative provisions of O.R.C. § 2929.04(A)(7) are mutually exclusive and, where one is presented to the jury as an aggravating circumstance, inclusion of the other undermines the required reliability of the jury's **93 determination, in violation of the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

"Proposition of Law No. X: The Sixth Amendment to the United States Constitution, and the parallel provision in Ohio's Constitution, require that juries be a cross-section of the jurisdiction where a defendant is

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

tried, and systematic exclusion of prospective jurors opposed to the death penalty violated defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the state and federal Constitutions.

"Proposition of Law No. XI:  An instruction to the jury at the penalty phase of trial that it could not be governed by considerations of sympathy, improperly restricts consideration of legitimate mitigating factors, in violation of the prohibition against cruel and unusual punishment embodied in the state and federal Constitutions.

"Proposition of Law No. XII:  Imposition of the death penalty without proof beyond a reasonable doubt of all statutory aggravating circumstances violated defendant's rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and corresponding provisions of the Ohio Constitution.

"Proposition of Law No. XIII:  Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

"Proposition of Law No. XIV:  Imposition of the sentence of death on defendant violates his rights under the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the federal Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

"Proposition of Law No. XV:  Defendant's sentence violates the Eighth and Fourteenth Amendments to the Constitution of the United States, and parallel state provisions, because it is disproportionately severe in relation to the crime *424 committed, and to sentences visited upon others for the same crime in the same and other jurisdictions.

"Proposition of Law No. XVI:  Defendant's death sentence must be set aside because it is disproportionately severe when compared to other cases in Hamilton County and in the state of Ohio in which capital sentencing decisions were made.

"Proposition of Law No. XVII:  The combined effect of errors in evidentiary rulings, and rulings on pretrial motions denied defendant a fair and impartial disposition of his case, and made imposition of the death penalty arbitrary, all in violation of defendant's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitutions [sic ], and parallel state provisions."

721 N.E.2d 73, 87 Ohio St.3d 402, 2000-Ohio-449

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



EXHIBIT
4
(Court)
PENGAD-Bayonne, N. J.

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,        )    CASE NO. 01-CR-794

      Plaintiff,    )

-vs-            )    **JUDGE JOHN M. STUARD**

NATHANIEL E. JACKSON,   )    **JURY CHARGE**

      Defendant.    )

## CHARGE OF THE COURT

Members of the Jury: You have heard the evidence and the arguments of counsel. The Court and the jury have separate functions: you decide the disputed facts and the court provides the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You are not permitted to change the law, nor to apply your own conception of what you think the law should be. Similarly, the Court may not interfere in any way with your function as jurors.

A criminal case begins with the filing of an indictment. The indictment informs the Defendant that he has been charged with an offense. The fact that it was filed may not be considered for any other purpose. The plea of not guilty is a denial of the charges and specifications and puts in issue all of the essential elements of each charge and specification.

The Defendant is presumed innocent unless his guilt is established beyond a reasonable doubt. The Defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense and

1

specification charged in the indictment.

Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

You must determine the issues in this case from the evidence. Evidence is all the testimony received from the witnesses, the exhibits admitted during the trial, and any facts agreed to by counsel.

Evidence may be direct or circumstantial, or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies. It includes exhibits admitted during the trial.

Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

To infer, or to make an inference, is to reach a reasonable conclusion or deduction of fact which you may, but are not required to make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you. Direct and circumstantial evidence are of equal weight or probative value.

The evidence does not include the indictment or the opening statements or closing

2

arguments of counsel.  The opening statements and closing arguments of counsel are designed to assist you.  They are not evidence.

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.  You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been.  You must not draw any inference or speculate upon the truth of any suggestion included in a question that was not answered.  The things you saw during the jury view are not evidence, but they may help you understand the evidence.

You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence.  To weigh the evidence, you must consider the credibility of the witnesses.  You will apply the tests of truthfulness which you apply in your daily lives.  These tests include: the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of his or her testimony; the opportunity he or she had to see, hear, and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence; interest and bias, if any; together with all the facts and circumstances surrounding the testimony.  Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because he or she was under oath.  You may believe or disbelieve all or any part of the testimony of any witness.  It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

Generally, a witness may not express an opinion.  However, one who follows a

3

profession or special line of work may express his opinion because of his education, knowledge and experience.  Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

As with other witnesses, upon you alone rests the duty to decide what weight is to be given to the testimony of the experts.  In determining its weight, you may take into consideration his or her skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility and determining the weight to be given to testimony.

It is not necessary that the Defendant take the witness stand in his own defense.  He has a constitutional right not to testify.  The fact that the Defendant did not testify must not be considered for any purpose.

In this case it has been indicated that the defendant, fled from the vicinity of the crime and remained at large for a period of ten (10) days.  In regard to this evidence you are instructed that flight, in and of itself, does not raise a presumption of guilt, but it may tend to show consciousness of guilt or a guilty connection with the crime.  If, therefore, you find that the defendant did flee from the scene of the alleged crime you may consider the circumstances in the case in determining the guilt or innocence of the defendant.  Upon you alone rests the decision to determine what the weight, if any, you place upon the evidence you find, if any, which bears on this issue.

The right of the Court to try the Defendant depends on proof that the offense was committed in Trumbull County, Ohio.  This is called venue.  Venue is an essential element of the offenses charged in the indictment, and as with other elements, must be proven by the State beyond a reasonable doubt.

4

Now, getting to the indictment itself, the Defendant is charged with a total of four (4) counts and six (6) specifications, as follows: **COUNT ONE: AGGRAVATED MURDER** with two specifications; **COUNT TWO: AGGRAVATED MURDER** with two specifications; **COUNT THREE:  AGGRAVATED BURGLARY** with one specification; and **COUNT FOUR: AGGRAVATED ROBBERY** with one specification.

Although the counts are numbered in chronological order, I feel that it would make more sense to instruct you on the **AGGRAVATED BURGLARY** and **AGGRAVATED ROBBERY** counts before I instruct you on the **AGGRAVATED MURDER** counts as some of the same terms that I am going to define for you relative to those charges will also be used in the **AGGRAVATED MURDER** instructions.

In Count Three of the Indictment, the Defendant has been charged with **COUNT THREE: AGGRAVATED BURGLARY**.

Before you can find the Defendant guilty of **AGGRAVATED BURGLARY**, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant did by force, stealth or deception, trespass in an occupied structure when a person other that an accomplice of the offender was present and with purpose to commit Aggravated Murder or Aggravated Robbery, and that at the time, the defendant did inflict or attempted or threatened to inflict physical harm on others and/or the Defendant had a deadly weapon on or about his person or under his control, to-wit: a firearm.

I will now define some terms for you.

**FORCE**.  "Force" means any violence, compulsion or constraint used by any means upon or against a person or thing to gain entrance.

5

**STEALTH**. "Stealth" means a secret, sly, or clandestine act to gain entrance.

**DECEPTION.** "Deception" means knowingly deceiving or causing another to be deceived by any false or misleading representation or by any other conduct, act, or omission which creates, confirms or perpetuates a false impression in another, to gain entrance.

**TRESPASS**. "Trespass" means knowingly entering the land or premises of another without privilege to do so. Any entrance or remaining in knowingly made in a structure of another that is unlawful if it is without the authority, consent or privilege to do so.

Where a Defendant lawfully entered a residential premises, the privilege to be in or upon this premises can be inferred to have been revoked where the Defendant thereafter commits a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

Where one enters upon the property of another as an invitee or licensee, that person loses his status as an invitee or licensee and becomes a trespasser when it becomes evident that the purpose of such entry is to commit a criminal offense against the owner

**OCCUPIED STRUCTURE**. "Occupied structure" means any house, building, or other structure which is maintained as a permanent or temporary dwelling.

**PURPOSE.** A person acts "purposely" when it is his specific intention to cause a certain result. It must be established in this case that at all times in question, there was present in the mind of the Defendant a specific intention to murder Robert Fingerhut and /or rob him.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only

6

to himself, unless he expresses it to others or indicates it by his conduct.

The purpose with which a person does an act is determined from the manner in which it is done, the means and weapons used and all the other facts and circumstances in evidence.

Proof of motive is not required.  The presence or absence of motive is on of the circumstances bearing upon purpose.

**PRIVILEGE.** "Privilege" means an immunity, license or right conferred by law, or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity.

**AGGRAVATED   MURDER** and **AGGRAVATED ROBBERY** will be defined below

**PHYSICAL HARM TO PERSONS.**  "Physical harm to persons" means any injury, illness or other physiological impairment regardless of its gravity or duration.

**DEADLY WEAPON.**  "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED BURGLARY**, your verdict must be guilty of **AGGRAVATED BURGLARY**.

If you find that the State failed to prove any one of the essential elements of the offense of **AGGRAVATED BURGLARY**, your verdict must be not guilty.

Now, if you find the Defendant guilty of Count Three of **AGGRAVATED BURGLARY** it is your duty to deliberate further and decide one specification attached to Count

7

Three. You will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **AGGRAVATED BURGLARY**. If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty or not guilty of the specification.

The specification is that Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

**FIREARM**. "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. Firearm includes an unloaded firearm and any firearm which is inoperable, but which can be readily rendered operable.

**CAPABLE OF EXPELLING OR PROPELLING**. When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including but not limited to the statements and actions of the individual exercising control over the firearm.

**ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL**. On or about the defendant's person or under the defendant's control means that the firearm was on the defendant's person or so near the defendant as to be conveniently accessible and within the defendant's immediate physical reach.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

8

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count Four of the Indictment, the Defendant is charged with **COUNT FOUR: AGGRAVATED ROBBERY**.

Before you can find the Defendant guilty of **AGGRAVATED ROBBERY**, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant, while committing or attempting to commit a theft offense, had a deadly weapon on or about his person or under his control and either brandished it or used it, or that the Defendant inflicted serious physical harm on others.

I will now define some terms for you.

**ATTEMPT**. An "attempt" is when one purposely does anything which is an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose.

**WHILE COMMITTING OR ATTEMPTING TO COMMIT.** "While committing or attempting to commit" means that having a the deadly weapon on or about his person or under his control or the infliction of serious physical harm must occur as part of acts leading up to, or occurring during, or immediately after the theft or attempted theft set out in this charge and that the that having a the deadly weapon on or about his person or under his control or the infliction of serious physical harm was directly associated with the theft offense set out in this charge. The question of whether the Defendant had a the deadly weapon on or about his person

9

or under his control or the inflicted serious physical harm before or after he stole or attempted to steal is of no consequence.

**THEFT OFFENSE**.  A "theft offense" occurs when a person, with purpose to deprive the owner of property, knowingly obtains or exerts control over the property without the consent of the owner, beyond the scope of the express or implied consent of the owner or person authorized to give consent, or by deception, or by threat.

**KNOWINGLY.**  A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or that he is aware that his conduct will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.  You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant the intent to obtain exert control over the property.

**PROPERTY**.  "Property" means any property, real or personal, tangible or intangible, and any interest or license in such property.

**DEPRIVE**.  "Deprive" means to withhold property of another permanently, or for such a period as to appropriate a substantial portion of its value or use, or to dispose of property as to make it unlikely that the owner will recover it; or accept, use or appropriate money, property or services, with purpose not to give proper consideration in return for the money property or services, and without reasonable justification for not giving proper consideration.

**OWNER**.  "Owner" means any person, other than the actor, who is the owner of, or who

10

has possession or control of, or any license or interest in property or services, even if such ownership, possession, control, license, or interest is unlawful.

**CONSENT**. Consent may be either express or implied. Express consent is determined by the written or spoken words of the persons involved. Implied consent is determined by the facts and circumstances which surround those involved, including their words and acts, from which you may infer that consent was given to the defendant.

**THREAT**. "Threat" includes direct and indirect threat.

**DEADLY WEAPON**. "Deadly weapon" has been previously defined for you.

**SERIOUS PHYSICAL HARM TO PERSONS** "Serious physical harm to persons" means any of the following: (1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (2) Any physical harm that carries a substantial risk of death; (3) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (4) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (5) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED ROBBERY**, your verdict must be guilty of **AGGRAVATED ROBBERY**.

If you find that the State failed to prove any one of the essential elements of the offense of **AGGRAVATED ROBBERY**, your verdict must be not guilty.

11

Now, if you find the Defendant guilty of Count Four of **AGGRAVATED ROBBERY,** it is your duty to deliberate further and decide one specification attached to Count Four.  You will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **AGGRAVATED ROBBERY.** If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty or not guilty of the specification.

The specification is that Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

All relevant terms have been previously defined for you.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count One of the Indictment, the Defendant is charged with **COUNT ONE: AGGRAVATED MURDER.**  With respect to this Count, **AGGRAVATED MURDER** is purposely causing the death of another with prior calculation and design.

Before you can find the Defendant guilty of **AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely, and with prior calculation and design,

12

caused the death of Robert S. Fingerhut.

I will now define some terms for you.

**PURPOSE** has been previously defined for you.

**DANGEROUS WEAPON.**  In addition, if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause death may be inferred from the use of the weapon.

**SPECIFIC INTENT**.  No person shall be convicted of Aggravated Murder unless he is specifically found to have intended to cause the death of another.

**PRIOR CALCULATION AND DESIGN**.  "Prior calculation and design" means that the purpose to cause death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means with which to cause the death of another.

To be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death.  No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

**CAUSE**.  The State charges that the act of the Defendant caused the death of Robert S. Fingerhut.  Cause is an essential element of the offense.  Cause is an act or failure to act which in a natural and continuous sequence directly produces the death, and without which it would not have occurred.

13

**SELF DEFENSE.** The defendant is asserting an affirmative defense known as self defense. The burden of going forward with the evidence of self defense and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence.

**PREPONDERANCE OF THE EVIDENCE.** Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity witnesses.

In determining whether or not an affirmative defense has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that affirmative defense regardless of who produced it. If the weight of the evidence is equally balanced or if you are unable to determine which side of an affirmative defense has the preponderance, then the defendant has not established such affirmative defense.

If the defendant fails to establish the defense of self defense the state still must prove to you beyond a reasonable doubt all the elements of the crime charged or any lesser included offense.

To establish self-defense the defendant must prove: (A) he was not at fault in creating the situation giving rise to the shooting of Robert Fingerhut; and (B) he had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was by the use of deadly force; and (C) he had not violated any duty to retreat to avoid the danger.

14

The defendant had a duty to retreat if (A) the defendant was at fault in creating the situation giving rise to the shooting of Robert Fingerhut; or (B) the defendant did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from that danger was by the use of deadly force. But if the defendant retreated from the situation, he no longer had a duty to retreat, and if the defendant then had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that the only means of escape from that danger was by the use of deadly force, the defendant was justified in using deadly force, even though he was mistaken as to the existence of that danger.

**TESTS FOR REASONABLENESS**. Words alone do not justify the use of deadly force. Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative. In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, you must put yourself in the position of the defendant, with his characteristics, and his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him/her at the time. You must consider the conduct of Robert Fingerhut and decide if his acts and words caused the defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm.

**EXCESSIVE FORCE**. The law does not measure nicely the degree of force which may be used to repel an attack. However, if the defendant used more force that reasonably appears to be necessary under the circumstances and if the force used is so greatly disproportionate to his/her apparent danger as to show an unreasonable purpose to injure Robert Fingerhut, then the

15

defense of self-defense is not available.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED MURDER** as charged in Count 1 of the indictment and the defendant has failed to prove by a preponderance all of the essential elements of self-defense your verdict must be guilty as to Count One and in that event you will not consider any lesser offense.

If you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count One of the indictment, or if you find that the Defendant has proved by a preponderance of the evidence all of the essential elements of self-defense your verdict must be not guilty of that offense.

On the other hand, if you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count One of the indictment, and the defendant has failed to prove by a preponderance all of the essential elements of self-defense then your verdict must be not guilty of that offense; and in that event, you will continue your deliberations to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of **MURDER**.

The offense of **MURDER** is distinguished from **AGGRAVATED MURDER** in this Count is by the absence or failure to prove prior calculation and design.

Before you can find the Defendant guilty of the lesser included offense of **MURDER**, you must find beyond a reasonable doubt that on or about December 11, 2001, and in Trumbull County Ohio, the Defendant purposely caused the death of Robert S. Fingerhut.

16

All relevant terms have been previously defined for you.

With respect to this lesser included offense, the defendant claims that at the time of the offense, he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by Robert Fingerhut that was reasonably sufficient to incite the defendant into using deadly force.

The defendant is asserting an affirmative defense known as Serious Provocation or Sudden Fit of Rage.  The burden of going forward with the evidence of this and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence, which has been previously defined for you.

If the defendant fails to establish the defense of Serious Provocation or Sudden Fit of Rage, the state still must prove to you beyond a reasonable doubt all the elements of the crime charged or any lesser included offense.

**SUDDEN PASSION OR FIT OF RAGE**.  The defendant is "under the influence of sudden passion or in sudden fit of rage" when there is serious provocation occasioned by the victim that is reasonably sufficient to incite a person into using deadly force is an act done in the heat of blood without time to reflect or for passions to cool.

**SERIOUS PROVOCATION**. For provocation to be reasonably sufficient to bring on sudden passion or a sudden fit of rage, you must determine that the provocation was sufficient to arouse the passions of an ordinary person beyond the power of his/her control.

**EMOTIONAL STATE OF DEFENDANT**. In determining whether the defendant was actually under the influence of sudden passion or a sudden fit of rage, you must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him/her at the time of the act.

**DEADLY FORCE**. Deadly force has been previously defined for you.

17

**SUBSTANTIAL RISK**. "Substantial risk" means a strong possibility, as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist.

If you find that the State prove beyond a reasonable doubt that the defendant purposely caused the death of Robert Fingerhut and you also find that the defendant failed to prove by the greater weight of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of **MURDER.**

If you find that the state failed to prove beyond a reasonable doubt that the defendant purposely caused the death of Robert Fingerhut, then you must find the defendant not guilty of **MURDER**.

If you find that the state proved beyond a reasonable doubt that the defendant purposely cause the death of Robert Fingerhut, but you also find that the defendant proved by the greater weight of the evidence that he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant not guilty of **MURDER** and guilty of **VOLUNTARY MANSLAUGHTER.**

**PURPOSE FOR SUBMITTING THE LESSER INCLUDED OFFENSE**. If the evidence warrants it, you may find the defendant guilty of an offense lesser than that charged in the indictment; however, notwithstanding this right, it is your duty to accept the law as given to you by the court, and if the facts and the law warrant a conviction of the offense charged in the indictment, then it is your duty to make such finding uninfluenced by your power to find a lesser offense. This provision is not designed to relieve you from the performance of an

18

unpleasant duty. It is included to prevent failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser offense.

Now, if you find the Defendant guilty of **AGGRAVATED MURDER** as charged in the indictment, it is your duty to deliberate further and to decide additional factual questions which we call specifications relative to this count.

This count sets forth two (2) specifications. You will proceed to consider whether each specification to this count has been proven beyond a reasonable doubt if, and only if, you determine that the defendant is guilty of this count. If your verdict is not guilty as to **AGGRAVATED MURDER**, then you would not consider any of the specifications attached to this count. If your verdict is guilty as to this count, the Defendant may be found guilty or not guilty of any one or all of the specifications to that count.

Specification 1 to Count 1 charges that the defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

I will now define some terms for you relating to this specification.

**AGGRAVATED BURGLARY** has already been defined for you.

**PRINCIPAL OFFENDER**. "Principal offender" means one who personally performs every act constituting the offense, which, relative to this specification is **AGGRAVATED MURDER**.

**WHILE COMMITTING OR ATTEMPTING TO COMMIT.** "While committing or attempting to commit" means that the Aggravated Burglary must occur as part of acts leading up to, or occurring during, or immediately after the murder set out in this charge and that the

19

murder was directly associated with the Aggravated Burglary.

**PRIOR CALCULATION AND DESIGN**.  Prior calculation and design has been previously defined.

Before you can find the Defendant guilty of Specification 1 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

Specification 2 to Count 1 charges that the Defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design

**WHILE COMMITTING OR ATTEMPTING TO COMMIT.**  "While committing or attempting to commit" means that the Aggravated Robbery must occur as part of acts leading up to, or occurring during, or immediately after the murder set out in this charge and that the murder was directly associated with the Aggravated Robbery.

All other relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

In Count Two of the Indictment, the Defendant is charged with **COUNT TWO: AGGRAVATED MURDER**.  With respect to this Count, **AGGRAVATED MURDER** is purposely causing the death of another while committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and/or Aggravated Burglary.

Before you can find the Defendant guilty of **AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely caused the death of Robert S. Fingerhut while the Defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit  Aggravated Robbery and/or Aggravated Burglary.

All of the relevant terms have been previously defined for you.

As with Count One, the Defendant is asserting the Defense of self defense.  All relevant terms with respect to self defense have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of

21

the offense of **AGGRAVATED MURDER** as charged in Count Two of the indictment and the defendant has failed to prove by a preponderance all of the essential elements of self-defense your verdict must be guilty as to Count Two and in that event you will not consider any lesser offense.

On the other hand, if you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count Two of the indictment, and the defendant has failed to prove by a preponderance all of the essential elements of self-defense then your verdict must be not guilty of that offense; and in that event, you will continue your deliberations to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of **MURDER**.

The offense of **MURDER** is distinguished from **AGGRAVATED MURDER** in this Count is by the absence or failure to prove that the murder was purposely committed.

Before you can find the Defendant guilty of the lesser included offense of **MURDER**, you must find beyond a reasonable doubt that on or about December 11, 2001, and in Trumbull County Ohio, the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary and/or Aggravated Robbery.

All relevant terms have been previously defined for you.

With respect to this lesser included offense, the defendant claims that at the time of the offense, he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by Robert Fingerhut that was reasonably sufficient to incite the defendant into using deadly force.

All relevant terms have been previously defined for you.

22

If you find that the State prove beyond a reasonable doubt that the the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing, or attempting to commit Aggravated Burglary and/or Aggravated Robbery, and you also find that the defendant failed to prove by the greater weight of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of **MURDER.**

If you find that the state failed to prove beyond a reasonable doubt that the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary or Aggravated Robbery, then you must find the defendant not guilty of **MURDER.**

If you find that the state proved beyond a reasonable doubt that the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary and/or Aggravated Robbery, but you also find that the defendant proved by the greater weight of the evidence that he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant not guilty of **MURDER** and guilty of **VOLUNTARY MANSLAUGHTER.**

If you find Defendant not guilty of **AGGRAVATED MURDER** as charged in Count Two, you will not consider any specifications relative to this count.

23

Now, if you find the Defendant guilty of **AGGRAVATED MURDER** as charged in the indictment, it is your duty to deliberate further and to decide additional factual questions which we call specifications relative to this count. This count sets forth two (2) specifications. You will proceed to consider whether each specification to this count has been proven beyond a reasonable doubt if, and only if, you determine that the defendant is guilty of this count. If your verdict is not guilty as to this count, then you would not consider any of the specifications attached to this count. If your verdict is guilty as to this count, the Defendant may be found guilty or not guilty of any one or all of the specifications to that count.

Specification 1 to Count 2 charges that the defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements

24

of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

Specification 2 to Count 2 charges that the Defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 2, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

The specifications set forth in the indictment each constitute a separate and distinct matter. You must consider each count and each specification and the evidence applicable to

25

each count and each specification separately and you must state your finding as to each count and each specification uninfluenced by your verdict as to any other count or specification, except that, should you find the Defendant not guilty of a particular count, you will not consider the specification or specifications to that count.  The Defendant may be found guilty or not guilty of any of the offenses or any of the specifications.

You may not discuss or consider the subject of punishment.  Your duty is confined to the determination of whether the defendant is guilty or not guilty of the counts and the specifications.

You must not be influenced by any consideration of sympathy or prejudice.  It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdicts accordingly.  In fulfilling your duty, your efforts must be to arrive at a just verdict.  Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy, or prejudice, so that both the State of Ohio and Nathaniel E. Jackson will feel that their case was fairly and impartially tried.  If, during the course of the trial, the Court said or did anything that you consider an indication of the Court's view on the facts, you are instructed to disregard it.

It may be difficult to remember all the instructions that I have given you.  To assist you, you will have a copy of these instructions with you in the jury room.

Your initial conduct upon entering the jury room is a matter of importance.  It is not wise to immediately express a determination or to insist upon a certain verdict because if your sense of pride is aroused, you may hesitate to change your position even if you later decide you were wrong. Consult with one another, consider each other's views and deliberate with the objective

26

of reaching an agreement, if you can do so without disturbing your individual judgment.  Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors.  Do not hesitate to change an opinion if convinced it is wrong.  However, you should not surrender an honest conviction in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

You will have with you in the jury room fourteen (14) verdict forms.  I will now read the forms to you.

### READ VERDICT FORMS

From this time on, you will be in the charge of the bailiff.  You will follow her instructions in every regard.  If you desire to communicate with the Court, you should do so in writing and only after careful consideration of the language used so that the same does not unnecessarily disclose the status of your deliberations and making sure that any inquiry is clear and unambiguous.  These requests should be submitted in writing and signed by the foreman or forelady.

During all of the breaks in your deliberations, you will follow the instructions of the bailiff, but do not discuss the case with her or even yourselves during the breaks.  If, for example, you are at lunch or dinner, do not use those occasions for deliberations.

The court will place in your possession the exhibits and the verdict forms.  You will also have with you in the jury room a VCR, a TV, and a cassette player.  The foreman or forelady will retain possession of these records, including the verdicts, and return them to the courtroom. The foreman or forelady will see that your discussions are orderly and that each juror has the opportunity to discuss the case and to cast his or her vote; otherwise, the authority of the

27

foreman or forelady is the same as any other juror.  Until your verdict is announced in open court, you are not to disclose to anyone else the status of your deliberations or the nature of your verdict.

After you retire, select a foreman or forelady and whenever all twelve - I repeat, all twelve - jurors agree upon verdicts, you will sign the verdicts in ink and advise the bailiff.  You will then be returned to the courtroom.

Are all the jurors prepared to deliberate?

Does counsel desire anything further at this time?

28



Corrected Instruction

This Court had previously instructed use concerning a number of terms.  The Court has become aware that those instructions were either not correct or not complete.  As such, the Court is instructing you as follows:

Deprive means to withhold property of another permanently, or for such a period as to appropriate a substantial portion of its value or use, or to dispose of property as to make it unlikely that the owner will recover it; or accept, use or appropriate money, property or services, with purpose not to give proper consideration in return for the money property or services, and without reasonable justification for not giving proper consideration.

For purposes of Specification 1 to Counts One and Two "While committing or attempting to commit" means that the Aggravated Burglary  must occur as part of acts leading up to, or occurring during, or immediately after the murder set out in this charge and that the murder was directly associated with the Aggravated Burglary.

For purposes of Specification 2 to Counts One and Two  "While committing or attempting to commit" means that the Aggravated Robbery  must occur as part of acts leading up to, or occurring during, or immediately after the murder set out in this charge and that the murder was directly associated with the Aggravated Robbery.

You are to disregard the instructions that the Court gave to you on these terms earlier.  Furthermore, these corrected instructions will be contained in the Jury Charge which will be with you in the Jury Room.

We need another copy of

Specification # 1 to the Fourth count

of the Indictment

11-8-02   4:12 P.M.

Cindy Angelo



EXHIBIT

Court's 6

11-8-02   K

DEFENDANT'S
EXHIBIT
( COURT )
PENGAD-Bayonne, N.J.

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 01-CR-794 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JUDGE JOHN M. STUARD** |
| -vs- | ) | |
| | ) | |
| NATHANIEL E. JACKSON, | ) | **JURY CHARGE** |
| | ) | |
| Defendant. | ) | |

## CHARGE OF THE COURT

Members of the Jury: You have heard the evidence and the arguments of counsel. The Court and the jury have separate functions: you decide the disputed facts and the court provides the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You are not permitted to change the law, nor to apply your own conception of what you think the law should be. Similarly, the Court may not interfere in any way with your function as jurors.

A criminal case begins with the filing of an indictment. The indictment informs the Defendant that he has been charged with an offense. The fact that it was filed may not be considered for any other purpose. The plea of not guilty is a denial of the charges and specifications and puts in issue all of the essential elements of each charge and specification.

The Defendant is presumed innocent unless his guilt is established beyond a reasonable doubt. The Defendant must be acquitted of an offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of that offense and

1

specification charged in the indictment.

Reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

You must determine the issues in this case from the evidence.  Evidence is all the testimony received from the witnesses, the exhibits admitted during the trial, and any facts agreed to by counsel.

Evidence may be direct or circumstantial, or both.  Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies.  It includes exhibits admitted during the trial.

Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts which naturally and logically follow, according to the common experience of mankind.

To infer, or to make an inference, is to reach a reasonable conclusion or deduction of fact which you may, but are not required to make from other facts which you find have been established by direct evidence.  Whether an inference is made rests entirely with you.  Direct and circumstantial evidence are of equal weight or probative value.

The evidence does not include the indictment or the opening statements or closing

2

arguments of counsel.  The opening statements and closing arguments of counsel are designed to assist you.  They are not evidence.

Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them.  You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been.  You must not draw any inference or speculate upon the truth of any suggestion included in a question that was not answered.  The things you saw during the jury view are not evidence, but they may help you understand the evidence.

You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence.  To weigh the evidence, you must consider the credibility of the witnesses.  You will apply the tests of truthfulness which you apply in your daily lives.  These tests include: the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of his or her testimony; the opportunity he or she had to see, hear, and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence; interest and bias, if any; together with all the facts and circumstances surrounding the testimony.  Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because he or she was under oath.  You may believe or disbelieve all or any part of the testimony of any witness.  It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

Generally, a witness may not express an opinion.  However, one who follows a

3

profession or special line of work may express his opinion because of his education, knowledge and experience.  Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

As with other witnesses, upon you alone rests the duty to decide what weight is to be given to the testimony of the experts.  In determining its weight, you may take into consideration his or her skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility and determining the weight to be given to testimony.

It is not necessary that the Defendant take the witness stand in his own defense.  He has a constitutional right not to testify.  The fact that the Defendant did not testify must not be considered for any purpose.

In this case it has been indicated that the defendant, fled from the vicinity of the crime and remained at large for a period of ten (10) days.  In regard to this evidence you are instructed that flight, in and of itself, does not raise a presumption of guilt, but it may tend to show consciousness of guilt or a guilty connection with the crime.   If, therefore, you find that the defendant did flee from the scene of the alleged crime you may consider the circumstances in the case in determining the guilt or innocence of the defendant.  Upon you alone rests the decision to determine what the weight, if any, you place upon the evidence you find, if any, which bears on this issue.

The right of the Court to try the Defendant depends on proof that the offense was committed in Trumbull County, Ohio.  This is called venue.  Venue is an essential element of the offenses charged in the indictment, and as with other elements, must be proven by the State beyond a reasonable doubt.

Now, getting to the indictment itself, the Defendant is charged with a total of four (4) counts and six (6) specifications, as follows: **COUNT ONE: AGGRAVATED MURDER** with two specifications; **COUNT TWO: AGGRAVATED MURDER** with two specifications; **COUNT THREE: AGGRAVATED BURGLARY** with one specification; and **COUNT FOUR: AGGRAVATED ROBBERY** with one specification.

Although the counts are numbered in chronological order, I feel that it would make more sense to instruct you on the **AGGRAVATED BURGLARY** and **AGGRAVATED ROBBERY** counts before I instruct you on the **AGGRAVATED MURDER** counts as some of the same terms that I am going to define for you relative to those charges will also be used in the **AGGRAVATED MURDER** instructions.

In Count Three of the Indictment, the Defendant has been charged with **COUNT THREE: AGGRAVATED BURGLARY**.

Before you can find the Defendant guilty of **AGGRAVATED BURGLARY**, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant did by force, stealth or deception, trespass in an occupied structure when a person other that an accomplice of the offender was present and with purpose to commit Aggravated Murder or Aggravated Robbery, and that at the time, the defendant did inflict or attempted or threatened to inflict physical harm on others and/or the Defendant had a deadly weapon on or about his person or under his control, to-wit: a firearm.

I will now define some terms for you.

**FORCE**. "Force" means any violence, compulsion or constraint used by any means upon or against a person or thing to gain entrance.

5

**STEALTH**.  "Stealth" means a secret, sly, or clandestine act to gain entrance.

**DECEPTION.**  "Deception" means knowingly deceiving or causing another to be deceived by any false or misleading representation or by any other conduct, act, or omission which creates, confirms or perpetuates a false impression in another, to gain entrance.

**TRESPASS**.  "Trespass" means knowingly entering the land or premises of another without privilege to do so.  Any entrance or remaining in knowingly made in a structure of another that is unlawful if it is without the authority, consent or privilege to do so.

Where a Defendant lawfully entered a residential premises, the privilege to be in or upon this premises can be inferred to have been revoked where the Defendant thereafter commits a violent felony directed against another person in the premises who had the ability and authority to revoke the privilege.

Where one enters upon the property of another as an invitee or licensee, that person loses his status as an invitee or licensee and becomes a trespasser when it becomes evident that the purpose of such entry is to commit a criminal offense against the owner

**OCCUPIED STRUCTURE**.  "Occupied structure" means any house, building, or other structure which is maintained as a permanent or temporary dwelling.

**PURPOSE.**   A person acts "purposely" when it is his specific intention to cause a certain result.  It must be established in this case that at all times in question, there was present in the mind of the Defendant a specific intention to murder Robert Fingerhut and /or rob him.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only

6

to himself, unless he expresses it to others or indicates it by his conduct.

The purpose with which a person does an act is determined from the manner in which it is done, the means and weapons used and all the other facts and circumstances in evidence.

Proof of motive is not required.  The presence or absence of motive is one of the circumstances bearing upon purpose.

**PRIVILEGE**. "Privilege" means an immunity, license or right conferred by law, or bestowed by express or implied grant, or arising out of status, position, office, or relationship, or growing out of necessity.

**AGGRAVATED   MURDER** and **AGGRAVATED ROBBERY** will be defined below

**PHYSICAL HARM TO PERSONS**.  "Physical harm to persons" means any injury, illness or other physiological impairment regardless of its gravity or duration.

**DEADLY WEAPON**.  "Deadly weapon" means any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED BURGLARY**, your verdict must be guilty of **AGGRAVATED BURGLARY**.

If you find that the State failed to prove any one of the essential elements of the offense of **AGGRAVATED BURGLARY**, your verdict must be not guilty.

Now, if you find the Defendant guilty of Count Three of **AGGRAVATED BURGLARY** it is your duty to deliberate further and decide one specification attached to Count

7

Three.  You will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **AGGRAVATED BURGLARY**.  If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty or not guilty of the specification.

The specification is that Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

**FIREARM**.  "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant   Firearm includes an unloaded firearm and any firearm which is inoperable, but which can be readily rendered operable.

**CAPABLE OF EXPELLING OR PROPELLING.**  When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including but not limited to the statements and actions of the individual exercising control over the firearm.

**ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL.**  On or about the defendant's person or under the defendant's control means that the firearm was on the defendant's person or so near the defendant as to be conveniently accessible and within the defendant's immediate physical reach.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count Four of the Indictment, the Defendant is charged with **COUNT FOUR: AGGRAVATED ROBBERY**.

Before you can find the Defendant guilty of **AGGRAVATED ROBBERY**, you must find beyond a reasonable doubt that on or about the 11th day of December, 2001, and in Trumbull County, Ohio, the Defendant, while committing or attempting to commit a theft offense, had a deadly weapon on or about his person or under his control and either brandished it or used it, or that the Defendant inflicted serious physical harm on others.

I will now define some terms for you.

**ATTEMPT**. An "attempt" is when one purposely does anything which is an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose.

**WHILE COMMITTING OR ATTEMPTING TO COMMIT**. "While committing or attempting to commit" means that having a the deadly weapon on or about his person or under his control or the infliction of serious physical harm must occur as part of acts leading up to, or occurring during, or immediately after the theft or attempted theft set out in this charge and that the that having the deadly weapon on or about his person or under his control or the infliction of serious physical harm was directly associated with the theft offense set out in this charge. The question of whether the Defendant had a the deadly weapon on or about his person

9

or under his control or the inflicted serious physical harm before or after he stole or attempted to steal is of no consequence.

**THEFT OFFENSE**.  A "theft offense" occurs when a person, with purpose to deprive the owner of property, knowingly obtains or exerts control over the property without the consent of the owner, beyond the scope of the express or implied consent of the owner or person authorized to give consent, or by deception, or by threat.

**KNOWINGLY.**  A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or that he is aware that his conduct will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant the intent to obtain exert control over the property.

**PROPERTY**   "Property" means any property, real or personal, tangible or intangible, and any interest or license in such property.

**DEPRIVE**.  "Deprive" means to withhold property of another permanently, or for such a period as to appropriate a substantial portion of its value or use, or to dispose of property as to make it unlikely that the owner will recover it.

**OWNER.**  "Owner" means any person, other than the actor, who is the owner of, or who has possession or control of, or any license or interest in property or services, even if such ownership, possession, control, license, or interest is unlawful.

**CONSENT**. Consent may be either express or implied. Express consent is determined by the written or spoken words of the persons involved. Implied consent is determined by the facts and circumstances which surround those involved, including their words and acts, from which you may infer that consent was given to the defendant.

**THREAT**.  "Threat" includes direct and indirect threat.

**DEADLY WEAPON**.  "Deadly weapon" has been previously defined for you.

**SERIOUS PHYSICAL HARM TO PERSONS**  "Serious physical harm to persons" means any of the following: (1) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (2) Any physical harm that carries a substantial risk of death; (3) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (4) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;  (5) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED ROBBERY**, your verdict must be guilty of **AGGRAVATED ROBBERY**.

If you find that the State failed to prove any one of the essential elements of the offense of **AGGRAVATED ROBBERY**, your verdict must be not guilty.

Now, if you find the Defendant guilty of Count Four of **AGGRAVATED ROBBERY**, it is your duty to deliberate further and decide one specification attached to Count Four.  You

will proceed to consider whether the specification has been proven beyond a reasonable doubt if, and only if, you determine that the Defendant is guilty of **AGGRAVATED ROBBERY**. If your verdict is not guilty, then you would not consider the specification. If your verdict is guilty, the Defendant may be found guilty or not guilty of the specification.

The specification is that Nathaniel E. Jackson did at the time of the commission of the offense have a firearm on or about his person or under his control and displayed the firearm, brandished the firearm, or used it to facilitate the offense.

All relevant terms have been previously defined for you.

Thus, if, as to this specification, you find that the State proved beyond a reasonable doubt all the essential elements of the specification, your verdict must be guilty of that specification.

If, as to this specification, you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, then you must find the defendant not guilty of that specification.

In Count One of the Indictment, the Defendant is charged with **COUNT ONE: AGGRAVATED MURDER**. With respect to this Count, **AGGRAVATED MURDER** is purposely causing the death of another with prior calculation and design.

Before you can find the Defendant guilty of **AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely, and with prior calculation and design, caused the death of Robert S. Fingerhut.

I will now define some terms for you.

12

**PURPOSE** has been previously defined for you.

**DANGEROUS WEAPON.**  In addition, if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause death may be inferred from the use of the weapon.

**SPECIFIC INTENT**.  No person shall be convicted of Aggravated Murder unless he is specifically found to have intended to cause the death of another.

**PRIOR CALCULATION AND DESIGN**.  "Prior calculation and design" means that the purpose to cause death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means with which to cause the death of another.

To be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death.  No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

**CAUSE**.  The State charges that the act of the Defendant caused the death of Robert S. Fingerhut. Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death, and without which it would not have occurred.

**SELF DEFENSE.**  The defendant is asserting an affirmative defense known as self defense.  The burden of going forward with the evidence of self defense and the burden of

13

proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence.

**PREPONDERANCE OF THE EVIDENCE.** Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity witnesses.

In determining whether or not an affirmative defense has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that affirmative defense regardless of who produced it. If the weight of the evidence is equally balanced or if you are unable to determine which side of an affirmative defense has the preponderance, then the defendant has not established such affirmative defense.

If the defendant fails to establish the defense of self defense the state still must prove to you beyond a reasonable doubt all the elements of the crime charged or any lesser included offense.

To establish self-defense the defendant must prove: (A) he was not at fault in creating the situation giving rise to the shooting of Robert Fingerhut; and (B) he had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was by the use of deadly force; and (C) he had not violated any duty to retreat to avoid the danger.

The defendant had a duty to retreat if (A) the defendant was at fault in creating the situation giving rise to the shooting of Robert Fingerhut; or (B) the defendant did not have

14

reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from that danger was by the use of deadly force. But if the defendant retreated from the situation, he no longer had a duty to retreat, and if the defendant then had reasonable grounds to believe and an honest belief that he was in imminent  danger of death or great bodily harm and that the only means of escape from that danger was by the use of deadly force, the defendant was justified in using deadly force, even though he was mistaken as to the existence of that danger.

**TESTS FOR REASONABLENESS.**  Words alone do not justify the use of deadly force. Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative. In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, you must put yourself in the position of the defendant, with his characteristics, and his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him/her at the time. You must consider the conduct of Robert Fingerhut and decide if his acts and words caused the defendant  reasonably and honestly to believe that he was about to be killed or receive great bodily harm.

**EXCESSIVE FORCE.** The law does not measure nicely the degree of force which may be used to repel an attack. However, if the defendant used more force that reasonably appears to be necessary under the circumstances and if the force used is so greatly disproportionate to his/her apparent danger as to show an unreasonable purpose to injure Robert Fingerhut, then the defense of self-defense is not available.

If you find that the State proved beyond a reasonable doubt all the essential elements of

15

the offense of **AGGRAVATED MURDER** as charged in Count 1 of the indictment and the defendant has failed to prove by a preponderance all of the essential elements of self-defense your verdict must be guilty as to Count One and in that event you will not consider any lesser offense.

If you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count One of the indictment, or if you find that the Defendant has proved by a preponderance of the evidence all of the essential elements of self-defense your verdict must be not guilty of that offense.

On the other hand, if you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count One of the indictment, and the defendant has failed to prove by a preponderance all of the essential elements of self-defense then your verdict must be not guilty of that offense; and in that event, you will continue your deliberations to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of **MURDER**.

The offense of **MURDER** is distinguished from **AGGRAVATED MURDER** in this Count is by the absence or failure to prove prior calculation and design.

Before you can find the Defendant guilty of the lesser included offense of **MURDER**, you must find beyond a reasonable doubt that on or about December 11, 2001, and in Trumbull County Ohio, the Defendant purposely caused the death of Robert S. Fingerhut.

All relevant terms have been previously defined for you.

With respect to this lesser included offense, the defendant claims that at the time of the

offense, he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by Robert Fingerhut that was reasonably sufficient to incite the defendant into using deadly force.

The defendant is asserting an affirmative defense known as Serious Provocation or Sudden Fit of Rage. The burden of going forward with the evidence of this and the burden of proving an affirmative defense are upon the defendant. He must establish such a defense by a preponderance of the evidence, which has been previously defined for you.

If the defendant fails to establish the defense of Serious Provocation or Sudden Fit of Rage, the state still must prove to you beyond a reasonable doubt all the elements of the crime charged or any lesser included offense.

**SUDDEN PASSION OR FIT OF RAGE.** The defendant is "under the influence of sudden passion or in sudden fit of rage" when there is serious provocation occasioned by the victim that is reasonably sufficient to incite a person into using deadly force is an act done in the heat of blood without time to reflect or for passions to cool.

**SERIOUS PROVOCATION**. For provocation to be reasonably sufficient to bring on sudden passion or a sudden fit of rage, you must determine that the provocation was sufficient to arouse the passions of an ordinary person beyond the power of his/her control.

**EMOTIONAL STATE OF DEFENDANT**. In determining whether the defendant was actually under the influence of sudden passion or a sudden fit of rage, you must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him/her at the time of the act.

**DEADLY FORCE**. Deadly force has been previously defined for you.

**SUBSTANTIAL RISK**. "Substantial risk" means a strong possibility, as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain

17

circumstances may exist.

If you find that the State prove beyond a reasonable doubt that the defendant purposely caused the death of Robert Fingerhut and you also find that the defendant failed to prove by the greater weight of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of murder.

If you find that the state failed to prove beyond a reasonable doubt that the defendant purposely caused the death of Robert Fingerhut, then you must find the defendant not guilty of murder.

If you find that the state proved beyond a reasonable doubt that the defendant purposely cause the death of Robert Fingerhut, but you also find that the defendant proved by the greater weight of the evidence that he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant not guilty of murder and guilty of voluntary manslaughter.

**PURPOSE FOR SUBMITTING THE LESSER INCLUDED OFFENSE.**  If the evidence warrants it, you may find the defendant guilty of an offense lesser than that charged in the indictment; however, notwithstanding this right, it is your duty to accept the law as given to you by the court, and if the facts and the law warrant a conviction of the offense charged in the indictment, then it is your duty to make such finding uninfluenced by your power to find a lesser offense.  This provision is not designed to relieve you from the performance of an unpleasant duty. It is included to prevent failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser offense.

Now, if you find the Defendant guilty of **AGGRAVATED MURDER** as charged in the

18

indictment, it is your duty to deliberate further and to decide additional factual questions which we call specifications relative to this count.

This count sets forth two (2) specifications.  You will proceed to consider whether each specification to this count has been proven beyond a reasonable doubt if, and only if, you determine that the defendant is guilty of this count.  If your verdict is not guilty as to **AGGRAVATED MURDER**, then you would not consider any of the specifications attached to this count.  If your verdict is guilty as to this count, the Defendant may be found guilty or not guilty of any one or all of the specifications to that count.

Specification 1 to Count 1 charges that the defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

I will now define some terms for you relating to this specification.

**AGGRAVATED BURGLARY** has already been defined for you.

**PRINCIPAL OFFENDER**.  "Principal offender" means one who personally performs every act constituting the offense, which, relative to this specification is **AGGRAVATED MURDER**.

**WHILE COMMITTING OR ATTEMPTING TO COMMIT.**  "While committing or attempting to commit" means that the Aggravated Burglary must occur as part of acts leading up to, or occurring during, or immediately after the murder set out in this charge and that the murder was directly associated with the theft offense set out in this charge.  The question of whether the Defendant killed Robert Fingerhut before or after he committed a theft offense is of no consequence.

19

**PRIOR CALCULATION AND DESIGN.**  Prior calculation and design has been previously defined.

Before you can find the Defendant guilty of Specification 1 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

Specification 2 to Count 1 charges that the Defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and

20

design.

In Count Two of the Indictment, the Defendant is charged with **COUNT TWO: AGGRAVATED MURDER**.  With respect to this Count, **AGGRAVATED MURDER** is purposely causing the death of another while committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and/or Aggravated Burglary.

Before you can find the Defendant guilty of **AGGRAVATED MURDER** in this Count, you must find beyond a reasonable doubt that on or about the 11th day of December 2001, and in Trumbull County, Ohio, the Defendant purposely caused the death of Robert S. Fingerhut while the Defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit  Aggravated Robbery and/or Aggravated Burglary.

All of the relevant terms have been previously defined for you.

As with Count One, the Defendant is asserting the Defense of self defense.  All relevant terms with respect to self defense have been previously defined for you.

If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of **AGGRAVATED MURDER** as charged in Count Two of the indictment and the defendant has failed to prove by a preponderance all of the essential elements of self-defense your verdict must be guilty as to Count Two and in that event you will not consider any lesser offense.

On the other hand, if you find that the State failed to prove beyond a reasonable doubt that the **AGGRAVATED MURDER** was done "purposely" or any of the other essential elements of the offense of **AGGRAVATED MURDER** as charged in Count One of the indictment, and the defendant has failed to prove by a preponderance all of the essential elements of self-defense then your verdict must be not guilty of that offense; and in that event, you will continue your deliberations to decide whether the state has proved beyond a reasonable doubt all the essential elements of the lesser included offense of **MURDER**.

21

The offense of **MURDER** is distinguished from **AGGRAVATED MURDER** in this Count is by the absence or failure to prove that the murder was purposely committed.

Before you can find the Defendant guilty of the lesser included offense of **MURDER**, you must find beyond a reasonable doubt that on or about December 11, 2001, and in Trumbull County Ohio, the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary or Aggravated Robbery.

All relevant terms have been previously defined for you.

With respect to this lesser included offense, the defendant claims that at the time of the offense, he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by Robert Fingerhut that was reasonably sufficient to incite the defendant into using deadly force.

All relevant terms have been previously defined for you.

If you find that the State prove beyond a reasonable doubt that the the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary or Aggravated Robbery,  and you also find that the defendant failed to prove by the greater weight of the evidence that he knowingly acted while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant guilty of murder.

If you find that the state failed to prove beyond a reasonable doubt that the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary or Aggravated Robbery, then you must find the

22

defendant not guilty of murder.

If you find that the state proved beyond a reasonable doubt that the Defendant caused the death of Robert S. Fingerhut as a proximate result of the Defendant committing attempting to commit Aggravated Burglary or Aggravated Robbery, but you also find that the defendant proved by the greater weight of the evidence that he acted knowingly while under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, then you must find the defendant not guilty of murder and guilty of voluntary manslaughter.

If you find Defendant not guilty of **AGGRAVATED MURDER** as charged in Count Two, you will not consider any specifications relative to this count.

Now, if you find the Defendant guilty of **AGGRAVATED MURDER** as charged in the indictment, it is your duty to deliberate further and to decide additional factual questions which we call specifications relative to this count. This count sets forth two (2) specifications. You will proceed to consider whether each specification to this count has been proven beyond a reasonable doubt if, and only if, you determine that the defendant is guilty of this count. If your verdict is not guilty as to this count, then you would not consider any of the specifications attached to this count. If your verdict is guilty as to this count, the Defendant may be found guilty or not guilty of any one or all of the specifications to that count.

Specification 1 to Count 2 charges that the defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the

23

commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 1, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the **AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED BURGLARY** and that the defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

If you find that the State proved beyond a reasonable doubt all of the essential elements of this specification, then your verdict must be guilty as to that specification.

If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the specification, your verdict must be not guilty as to that specification.

Specification 2 to Count 2 charges that the Defendant committed the **AGGRAVATED MURDER** while committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

All of the relevant terms have been previously defined for you.

Before you can find the Defendant guilty of Specification 2 to Count 2, you must find that the State has proven beyond a reasonable doubt that the Defendant committed the

24

**AGGRAVATED MURDER** while he was committing, attempting to commit, or fleeing immediately after committing **AGGRAVATED ROBBERY** and that the Defendant was either the principal offender in the commission of the **AGGRAVATED MURDER** or, if not the principal offender, he committed the **AGGRAVATED MURDER** with prior calculation and design.

The specifications set forth in the indictment each constitute a separate and distinct matter. You must consider each count and each specification and the evidence applicable to each count and each specification separately and you must state your finding as to each count and each specification uninfluenced by your verdict as to any other count or specification, except that, should you find the Defendant not guilty of a particular count, you will not consider the specification or specifications to that count. The Defendant may be found guilty or not guilty of any of the offenses or any of the specifications.

You may not discuss or consider the subject of punishment. Your duty is confined to the determination of whether the defendant is guilty or not guilty of the counts and the specifications.

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdicts accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, and without bias, sympathy, or prejudice, so that both the State of Ohio and Nathaniel E. Jackson will feel that their case was fairly and impartially tried. If, during the course of the trial, the Court said or did anything that you

25

consider an indication of the Court's view on the facts, you are instructed to disregard it.

It may be difficult to remember all the instructions that I have given you. To assist you, you will have a copy of these instructions with you in the jury room.

Your initial conduct upon entering the jury room is a matter of importance. It is not wise to immediately express a determination or to insist upon a certain verdict because if your sense of pride is aroused, you may hesitate to change your position even if you later decide you were wrong. Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change an opinion if convinced it is wrong. However, you should not surrender an honest conviction in order to be congenial or to reach a verdict solely because of the opinion of other jurors.

You will have with you in the jury room ten (10) verdict forms. I will now read the forms to you.

<u>READ VERDICT FORMS</u>

From this time on, you will be in the charge of the bailiff. You will follow her instructions in every regard. If you desire to communicate with the Court, you should do so in writing and only after careful consideration of the language used so that the same does not unnecessarily disclose the status of your deliberations and making sure that any inquiry is clear and unambiguous. These requests should be submitted in writing and signed by the foreman or forelady.

During all of the breaks in your deliberations, you will follow the instructions of the

26

bailiff, but do not discuss the case with her or even yourselves during the breaks.  If, for example, you are at lunch or dinner, do not use those occasions for deliberations.

The court will place in your possession the exhibits and the verdict forms.  You will also have with you in the jury room a VCR, a TV, and a cassette player.  The foreman or forelady will retain possession of these records, including the verdicts, and return them to the courtroom. The foreman or forelady will see that your discussions are orderly and that each juror has the opportunity to discuss the case and to cast his or her vote; otherwise, the authority of the foreman or forelady is the same as any other juror  Until your verdict is announced in open court, you are not to disclose to anyone else the status of your deliberations or the nature of your verdict.

After you retire, select a foreman or forelady and whenever all twelve - I repeat, all twelve - jurors agree upon verdicts, you will sign the verdicts in ink and advise the bailiff.  You will then be returned to the courtroom.

Are all the jurors prepared to deliberate?

Does counsel desire anything further at this time?