**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | |
| **Plaintiff,** | : | **Case No. 01-CR-794** |
| **-vs-** | : | |
| **NATHANIEL JACKSON,** | : | **Judge John M. Stuard** |
| **Defendant.** | : | |

2008 JUN 24 AM 11:39
TRUMBULL COUNTY
CLERK OF COURTS
KAREN ...
CLERK OF ...
TRUMBULL ...

**APPENDIX TO**
**NATHANIEL JACKSON'S MOTION FOR A NEW TRIAL**

**VOLUME I, EXHIBITS B, B-1 to B-4**

JOHN P. PARKER - 0041243
988 East 185 Street
Cleveland, Ohio 44119
1-216-881-0900 (Voice)
johnpparker@earthlink.net
Pro Bono Counsel

And

OFFICE OF THE OHIO PUBLIC DEFENDER

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

COUNSEL FOR NATHANIEL E. JACKSON

368

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

| | |
|---|---|
| **STATE OF OHIO,** | : |
| **Plaintiff,** | : **Case No. 01-CR-794** |
| **-vs-** | : **Judge John M. Stuard** |
| **NATHANIEL JACKSON,** | : **ORAL ARGUMENT REQUESTED** |
| **Defendant.** | : **EVIDENTIARY HEARING REQUESTED** |

---

# NATHANIEL JACKSON'S MOTION FOR A NEW TRIAL

---

Now comes Nathaniel Jackson, pursuant to Crim R. 33(A)(1)(2)(5) and (6) moves this Court for a new trial. This Court and the prosecution impermissibly corroborated in the drafting of the findings of facts and conclusions of law overruling Nathaniel Jackson's motion to suppress. This collaboration violated the Fifth, Sixth, Eighth and Fourteenth Amendments. Nathaniel Jackson attaches a memorandum of law that he incorporates herein.

Respectfully submitted,

JOHN P. PARKER – 0041243
988 East 185 Street
Cleveland, Ohio 44119
1-216-881-0900 (Voice)
johnpparker@earthlink.net
Pro Bono Counsel

EXHIBIT
B

And

OFFICE OF THE
OHIO PUBLIC DEFENDER

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

By ______________________
COUNSEL FOR NATHANIEL JACKSON

**MEMORANDUM OF LAW**

Prior to trial, Nathaniel Jackson ("Jackson") filed a motion to suppress the recorded and oral statements that he made to the investigating officers at the time of his arrest. On April 17, 2001, this Court held an evidentiary hearing on the motion, which came down to an issue of credibility; whether the arresting officers advised Jackson of his constitutional rights and whether Jackson affirmatively requested counsel and that the interrogation cease. This Court found the arresting officers had advised Jackson of his rights and that Jackson had not requested that the interrogation cease or that he wanted to speak with counsel.

It has recently come to light that the Trumbull County Prosecutor's Office, at that time of Jackson's trial, routinely drafted, with respect to motions to suppress, the findings of fact and conclusions of law for

the Trumbull County Common Pleas Court Judges. That procedure violated Jackson's right to have the trial court "state its essential findings on the record" when factual issues are determinative of a motion to suppress. Crim R. 12(F). That procedure further deprived Jackson of a neutral judicial official to determine the credibility of the fact witness involved in Jackson's interrogations. Finally, that procedure denied Jackson his constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments.

**I. THE FACTUAL DISPUTES INVOLVING JACKSON'S PURPORTED WAIVER OF HIS MIRANDA RIGHTS WERE CRITICAL ISSUES AT TRIAL.**

Jackson testified that the arresting officers never advised him of his *Miranda* rights [4/17/02, Tr. 336, 338]; that he informed the arresting officers that he did not wish to speak with them [*Id.* at Tr. 316, 331/2, 335]; and that instead he wished to speak with counsel. [*Id.* at Tr. 316, 318, 322, 327, 333, 341]. If the trial court found any of these three assertions to be accurate, then the Fifth Amendment precluded the prosecution from introducing in its case in chief his custodial statements.

Law enforcement officers cannot validly interrogate an accused who is in custody without first obtaining a voluntary, knowing and intelligent waiver of both his rights to remain silent and to legal counsel. *Miranda vs. Arizona* (1966), 384 U.S. 436, 468-469. Therefore if the police officers failed to advise Jackson, after they arrested him, of his *Miranda* rights, any statement obtained from him would be inadmissible.

Even if the officers notified Jackson of his rights, Jackson must have also knowingly and intelligently waived his constitutional rights. *Moran v. Burbine* (1986), 475 U.S. 412, 421 (citations and quotations omitted). *See also Colorado v. Spring* (1987), 479 U.S. 564, 573. The analysis "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." *North Carolina v. Butler* (1979), 441 U.S. 369, 373. A defendant's waiver must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. at 421. Courts must examine "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. at 464; *Machacek v. Hofbaue* (6th Cir. 2000), 213 F.3d 947, 954. That review includes the mandatory consideration of a defendant's "age, experience, education, background and intelligence, and [ ] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.* (1979), 442 U.S. 707, 725. Jackson testified that he was impaired at the time of his arrest as a result of his drug consumption. [4/17/02 Tr. 324, 327-28, 335, 336, 339, 342]. In addition, Jackson has attention deficit disorder. [11/14/02 Tr. 37]. Jackson is of very limited intelligence, his two prior IQ scores were 70 and 72. [*Id.* at 46]. He reads at the fifth grade level. [*Id* at 85]. Therefore, if Jackson was significantly impaired, he could not have

validly waived his rights and his confession was inadmissible in the state's case in chief.

Once an individual who is in custody requests that all questioning of him cease, the arresting officers must "scrupulously honor his right to terminate the interrogation". *Michigan v. Mosley* (1975), 423 U.S. 96, 103. The courts apply a three part test to determine if the investigating officers scrupulously honored a suspect's request to cease interrogation; 1) a substantial period of time must have elapsed between when the suspect exercised constitutional right to terminate the interrogation, and the officer resumed interrogation; 2) the police must properly Mirandize the suspect when resuming the interrogation, and 3) the interrogation must involve a separate crime. *Id.* If Jackson, either at the time of his arrest or upon his initial questioning at the police station prior to the recording device being activated, requested that the interrogation cease, his statements were not admissible in the state's case in chief. There was not a substantial lapse in time between when he testified that he made the request and when the officers resumed the interrogation. *United States v. House* (8th Cir. 1991), 939 F.2d 659, 662 (nine hours); *Kelly v. Lynaugh* (5th Cir. 1988), 862 F.2d 1126, 1130 (interrogation spread over seven to twelve hours), *West v. Johnson* (5th Cir. 1996), 92 F.3d 1385, 1403 (three interrogation sessions spread out over twelve hours); *United States v. Schwensow* (7th Cir. 1998), 151 F.3d 650, 659 (resumption of questioning thirty-six hours later). The officers did not re-advise Jackson of his rights prior to resuming the interrogation. In addition, the investigating officers during all of

the interrogations focused on the same crime, the shooting of Mr. Fingerhut. The court have suppressed statements under facts similar to what Jackson testified. *United States v. Hernandez* (5th Cir. 1978), 574 F.2d 1362, 1369; *United States v. Barone* (1st Cir. 1992), 968 F.2d 1378, 1385; *United States v. Tyler* (3d Cir. 1998), 164 F.3d 150, 155.

In addition, once an accused invokes his right to counsel, the interrogating officers must immediately cease their questioning. *Edwards vs. Arizona* (1981), 451 U.S. 477, 484-485; *Roberson vs. Arizona* (1988), 486 U.S. 675. Therefore, if Jackson asserted his right to counsel, either at the time of his arrest or at the station house prior to the officers activating the recording device, Jackson's statements to the officers were inadmissible in the prosecution's case in chief.

**II. THE FOURTEENTH AMENDMENT GUARANTEED JACKSON A PRETRIAL RULING BY THE TRIAL COURT AS TO THE ADMISSIBILITY OF HIS CUSTODIAL STATEMENTS**

A defendant has the constitutional right at some stage in the proceedings to object to the use of a confession and to have a fair hearing and a reliable determination on the admissibility of his statement, a determination uninfluenced by the truth or falsity of the confession. *Rogers v. Richmond* (1961), 365 U.S. 534, 543-44; *Jackson v. Denno* (1964), 378 U.S. 368, 377. A defendant has a right to have the question of admissibility of evidence decided by the trial court rather than the jury. *Lego v. Twoney* (1972), 404 U.S. 477, 490. Once the defendant raises the issue of admissibility of a confession, the jury should not hear the confession until the trial judge has

determined that it was freely and voluntarily given. *Sims v. Georgia* (1967), 385 U.S. 538, 543-544. Similarly "[p]reliminary questions concerning *** the admissibility of evidence shall be determined by the court***." Ohio Evid. R. 104(A)

**III. THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT GUARANTEED JACKSON A NEUTRAL AND DETACHED JUDICIAL OFFICIAL TO DETERMINE THE ADMISSIBILITY ISSUE.**

Questions involving procedural due process do not address a defendant's guilt or innocence. Instead the analysis focuses upon the fair administration of justice. *Offutt v. United States* (1954), 348 U.S. 11, 16.

The fair administration of justice is grounded in the assumption that the judicial decisions will be based upon evidence and argument presented in open court, and not by any outside influences, whether of private talk or public support. *Patterson v. Colorado* (1907), 205 U.S. 454, 462. The courts do not condone individuals associated with one party having contact with the trier of fact during the deliberation process. *Agnew v. Lesbach* (7th Cir. 2001), 250 F.3d 1123, 1135, *Caliendo v. Warden of California Men's Colony* (9th Cir. 2004), 365 F.3d 691, 699.

Trials must not only be fair, they must also appear to be fair. *Taylor v. Hayes* (1974), 418 U.S. 488, 501. Judges must not only be fair they must appear to be fair. The courts "have always endeavored to prevent even the probability of unfairness." *In re Muchison*, 349 U.S. at 136; *Withrow v. Larkin* (1975), 421 U.S. 35, 47.

A due process violation occurs when a party assumes more than one role in the judicial process. *In re Oliver* (1948), 333 U.S. 257, 272 (the judge who served as a one person grand jury also served as the judge and jury); *In re Murchison*, 349 U.S. at 137 ("It would be very strange if our system of law permitted a judge to act as a grand juror and then try the person accused as a result of his investigations").

Judicial bias is not subject to a harmless error analysis. *Arizona v. Fulminate* (1991), 499 U.S. 297, 310-311. It does not matter that the court may actually have imposed the same sentence without impermissible contact. *Bracey v. Schoenig* (7th Cir. 2002), 286 F.3d 406, 414. The error is not corrected by the fact that there exists a statutory procedure that offers a defendant an impartial adjudication on appeal. *Ward v. Village of Monroeville, Ohio* (1972), 409 U.S. 57, 61-2.

## IV. THE EIGHTH AMENDMENT GUARANTEED JACKSON A MEANINGFUL APPELLATE REVIEW OF THE SUPPRESSION ISSUE.

The existence of a comprehensive and functional system of meaningful appellate review is an important safeguard in ensuring that the death penalty is not imposed arbitrarily. *See, e.g., Zant v. Stephens* (1985), 462 U.S. 862, 875; *Parker v. Dugger* (1991), 498 U.S. 308, 321 (granting habeas relief where Florida Supreme Court failed to undertake meaningful review of death sentence); *Clemons v. Mississippi* (1990), 494 U.S. 738, 749; *Stringer v. Black* (1992), 503 U.S. 222, 230 (holding that where sentencer considers an invalid factor, close appellate scrutiny of effect of that factors is required).

The Ohio Supreme Court, when it reviewed Jackson's direct appeal was required to address all errors that he raised. R.C. Ohio 2929.05(A). Jackson assigned as Proposition of Law No. I, this Court's denial of his motion to suppress his statements to the arresting officers. *State v. Jackson*, 107 Ohio St. 3d 300, 2006-Ohio-1, ¶ 78. The Ohio Supreme Court deferred to the findings of facts entered by this Court based upon the assumption that this Court "found that Jackson had not unambiguously or unequivocally requested counsel before or during questioning. 'At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact.'" *State v. Jackson* 2006-Ohio-1 at 83 (citation omitted) The Supreme Court's deference was ill placed if the prosecutor and not this Court made the requisite findings.

**V. THE FOURTEENTH AMENDMENT GUARANTEED JACKSON MEANINGFUL APPELLATE REVIEW OF THE SUPPRESSION ISSUE.**

Once a state creates a statutory right to appellate review, that review must be conducted in accordance with the Due Process Clause of the Fourteenth Amendment. *Evitts v. Lucey* (1985), 469 U.S. 387, 401. The Due Process Clause of the Fourteenth Amendment protects a state criminal defendant from the arbitrary deprivation of a state statutory right. *Hicks v. Oklahoma* (1980), 447 U.S. 343. The Court therein found that a defendant's federal due process rights were violated when he was denied his state statutory right to have a jury determine his punishment. *Id.* at 346. *See also Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (defendant has Due Process rights in

exclusion of evidence that unfairly infects sentencing proceeding); *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988) (defendant has Due Process rights in peremptory challenges provided under state law); *Evitts v. Lucey*, at 396 (defendant has Due Process rights in appellate procedure established by State); *Morrissey v. Brewer*, 408 U.S. 471, 480-490 (1972) (defendant has Due Process rights in State's exercise of discretion).

One of the cornerstones of Ohio's criminal justice system is the statutory right to appellate review. R.C. 2501.02 A prosecutor's drafting of findings of fact to which the appellate courts mistakenly defer violates a criminal defendant's right to both his statutory right and due process as guaranteed by the Fourteenth Amendment. The error is analogous to the violation the Ohio Supreme Court found to exist when the prosecutor is granted the discretion to determine whether a defendant may appeal. *State v. Sterling*, 113 Ohio St. 3d 255, 2007-Ohio-1790, ¶ 35. The prosecution's ability to bind the appellate courts to a specific set of facts can for all intents and purposes preclude a defendant's right to a meaningful appeal because most appeals will be dependent upon the underlying facts.

## VI. THE APPLICABLE JUDICIAL RULES OF CONDUCT GUARANTEED JACKSON A MEANINGFUL REVIEW BOTH AT TRIAL AND ON APPEAL OF HIS SUPPRESSION ISSUE.

The Ohio Supreme Court in *State v. Roberts*, 110 Ohio St. 3d 71, 2006-Ohio-2174 found that this Court's and the Trumbull County Prosecutor's Office ex parte drafting of the sentencing opinion violated several disciplinary rules. The Court referenced "The Code of Judicial Conduct, Canon 3(B)(7)

specifies, 'A judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *' Both the trial judge and the prosecutor should have known that any ex parte assistance in the preparation of the court's sentencing opinion was wholly inconsistent with these vital ethical constraints. See Disciplinary Rule 7-110(B)(2) and (3)." *State v. Roberts*, 2006-Ohio-2174, ¶ 161.

The disciplinary rules apply equally to pretrial motion to suppress proceedings as to trial court proceedings. Thus, the disciplinary violations committed herein constitutes yet another reason to grant this motion.

## VII. THE PROSECUTOR'S DRAFTING OF THE MOTION TO SUPPRESS FINDINGS OF FACT AND CONCLUSIONS OF LAW VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND THE RELEVANT JUDICIAL AND DISCIPLINARY PROVISIONS.

The Office of Disciplinary Counsel instituted proceedings against Judge Stuard and Prosecutors Becker and Bailey. *See In re Complaint against Judge John Mason Stuard, et al.*, Supreme Court of Ohio Board of Commissioners on Grievances and Discipline, Case Nos. 07-075, 07-078. The information contained in those disciplinary proceedings demonstrates the existence of misconduct in the drafting of the dispositive entry concerning Jackson's motion to suppress. While the disciplinary proceedings involve misconduct in co-defendant Donna Roberts' case, the factual development is relevant to this case. This Court has acknowledged that the drafting process that occurred in co-defendant Roberts' case occurred in other Trumbull County

capital cases, "It is the system that is used here because it is the most practical." [Exhibit 1 at p. 6371].

**A. The Prosecution Has A Lengthy History Of Drafting Entries For Judge Stuard.**

From at least the time that Judge Stuard took the Trumbull County Common Pleas Court Bench in January 1991, the Trumbull County Prosecutor's Office has drafted legal documents for the Trumbull County Common Pleas Court Judges. [Exhibit 2, p. 41; Exhibit 3, p. 66; Exhibit 4, pp. 58-59; Exhibit 5, p. 66-67, 80]. Prosecutor Becker described the drafting process as an "everyday event." [Exhibit 5, p. 177]. Prosecutor Bailey testified "Kontos, McKay, Stuard, Logan, there are four criminal judges, and I've done entries for all four Judges." [Exhibit 4, p. 67]. The Trumbull County Common Pleas Judges would either telephone or in person communicate with a prosecutor to request that a pleading be drafted. [Exhibit 3, p. 70; Exhibit 4, p. 68; Exhibit 5, p. 108]. Assistant Disciplinary Counsel Berger asked Prosecutor Bailey, "When you provided this draft entry to the Judge, were there instances where you also provided a copy to defense counsel?" Prosecutor Bailey answered "no." [Exhibit 4, p. 69].[1]

---

[1] Subsequent to the *Roberts* decision the Trumbull County Prosecutors Office has changed the process for the drafting of entries The prosecutors now serve defense counsel with a copy of the proposed entry. [Exhibit 3, p. 79]. Prosecutor Becker dislikes having to serve defense counsel because "it has created more work" for him, "[r]ather than place the entry on the hard drive and advise the Court or Court's staff that the entry is available, I am now mailing a copy entitled Proposed Findings to the, whatever defense counsel's on board." [*Id.* at p. 80]. Prosecutor Becker also dislikes the new system because it has created more expense;" it is "costing the county paper to print out on, ink, copies. It's taking up secretarial time in preparing a letter, putting it in an envelope, and 41 cents, soon to be God knows what postage." [*Id.*].

The prosecution's drafting of documents for the Trumbull County Common Pleas Court Judges extended to a wide variety of documents including sentencing entries, opinions on motions to suppress, findings of fact and conclusions of law for post-conviction proceedings, and sexual predator determinations. [Exhibit 3, pp. 66-68, 70; Exhibit 4, p. 96; Exhibit 5, p. 108].

To facilitate the drafting process, the Trumbull County Prosecutor's Office and Trumbull County Common Pleas Court shared a computer drive, referred to as either the " G Drive" or "I Drive." [Exhibit 3, pp. 19, 25, 56; Exhibit 4, pp. 48, 53; Exhibit 5, p. 92]. The prosecutors on their own office computers would prepare a pleading for a judge and with a simple push of a key on their computer key boards, transfer the document on the G or I drive to the judge's computer. [*Id.*]

The prosecutors believed this to be an exemplary system for preparing the pleadings for the Trumbull County Common Pleas Court Judges. The prosecutors rationalized that because they had to defend the judges' pleadings on appeal, the prosecutors should draft the entries to make them error proof. [Exhibit 5, pp. 108-110, 128-29]. Prosecutor Becker testified, "*we* [the prosecutors] *represent the courts*. I don't think that any judge wants to have a case resentenced [sic] or remanded." [*Id.* at p. 110] (emphasis added). Prosecutor Bailey testified '[a]nytime the Supreme Court or the Court of Appeals comes up with a decision that requires things to be added to the entries, the Judges, if – it's a lot easier for us [the Trumbull County Prosecutor's Office] to make sure that the required language that the court,

that the higher court requires be in the entry, that we're consistent in those entries. *Sometimes Judges tend to forget to put the language if in they would do it themselves.* If they - - I think there's - - we have to defend the entry..." [Exhibit 4, pp. 97-98]. (emphasis added)

**B. The Prosecutor's Involvement In The Drafting Of The Dispositive Pleadings Concerning Motions to Suppress Was Not An Administrative Act.**

This Court and Prosecutors Bailey and Becker have acknowledged that the drafting procedure employed in the Roberts' case was the same procedure employed in this case. [Exhibit 2, pp. 83-84, Exhibit 3, p. 19; Exhibit 5, pp. 97, 180]. Therefore, the testimony from the disciplinary proceedings must be considered when assessing the assertion that the prosecution's role in the drafting process was merely an "administrative matter."

In *Roberts*, this Court gave Prosecutor Becker two pages of handwritten notes on a yellow legal pad. [Exhibit 2, pp. 23-24; Exhibit 3, pp. 18, 23; Exhibit 5, pp. 46, 123]. Judge Stuard told Prosecutor Becker to use the sentencing entry from this case as a guide as to both formatting and content. [Exhibit 3, p. 43; Exhibit 5, pp. 49, 73, 85, 174-75]. The final Roberts' sentencing opinion was divided into sections. [Exhibit 6]. This Court's notes did not contain information as to all of those sections. [Exhibit 3 pp. 27; Exhibit 5, pp. 48, 49. 95, 177]. This Court's notes did not provide the Prosecutors with any section in its entirety. [Exhibit 3, pp. 27-30].

Prosecutors Bailey and Becker worked four hours converting the judge's two pages of handwritten notes into a seventeen page sentencing opinion. [Exhibit 3, p. 22; Exhibit 5, pp. 92, 169]. The two Prosecutors prepared several drafts before they sent their initial product to this Court Judge. [Exhibit 3, p. 25; Exhibit 5, pp. 97, 122]. Prosecutor Bailey destroyed all of the previous drafts. [Exhibit 4, pp. 22, 48]. The prosecutors were not able to rely on all of the facts contained in Jackson's sentencing opinion, because the witnesses had testified differently and the two defendants were alleged to have had different roles in the murder. [Exhibit 3, pp. 20-21; Exhibit 5, pp. 101, 175; Exhibits 6 and 7]. Thus, the two prosecutors relied upon their own memories of the trial to draft the factual findings. [*Id.*].[2]

This Court requested the prosecutors to make a few minor changes in their initial draft of the Roberts' sentencing opinion. [Exhibit 2, pp. 32-3; Exhibit 5, pp. 51, 171]. Other than those minor changes, this Court adopted the prosecutor's seventeen page sentencing opinion. [Exhibit 5, pp. 53, 94]. It can be inferred that a similar procedure was utilized in the drafting of motion to suppress findings and conclusions of law. In the present case the prosecution submitted fifteen pages of post-hearing briefing on the motion. [Exhibit 8]. This Court's findings of fact were fifteen pages in length and for the most part contained the exact wording contained in the prosecutor's briefing.

---

[2] For purposes of drafting documents for trial judges, Prosecutor Becker considers the following as administrative matters and not substantive matters: 1) typing, 2) proofreading, 3) copying language from other sentencing opinions, 4) choosing words to put in to the document, 5) "filling in blanks," 6) supplementing or adding information not supplied by the judges, 7) creating sentences, and 8) selecting facts. [Exhibit 3, pp 34-35].

[Exhibit 9]. This Court had more input into the Roberts' findings than it had in the motion to suppress findings in this case.

**C. This Court Has Now Admitted That The Drafting Process Constituted A Disciplinary Violation.**

The best evidence that the drafting process constituted serious misconduct was this Court's response to the disciplinary proceedings instituted against it. On March 3, 2008, this Court entered into a stipulation with the Office of Disciplinary Counsel. [Exhibit 10]. That stipulation was presented at the March 13, 2008 disciplinary hearing. [Exhibit 5, pp. 37-38, 58-59]. As part of the stipulation, this Court admitted that it committed an ethical violation when he permitted Prosecutors Becker and Bailey to draft the Roberts' sentencing opinion:

> STIPULATED VIOLATIONS
>
> 37. The conduct of Respondent Stuard violates the Code of Judicial Conduct Canon 2 [a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity of the judiciary] and 3(B)(7) [a judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding]....
>
> STIPULATED SANCTION
>
> 42. Respondent and relator stipulate that the appropriate sanction for Respondent Stuard's misconduct in this matter is a public reprimand....

[Exhibit 10, pp. 9-10].

This Court would not have admitted to judicial misconduct if the factual basis for the complaint constituted a purely administrative matter.

Instead, its admission, which was based upon the advice of counsel, was premised upon its belated recognition that his ex parte communications were a violation of they judicial canons.

**IV. CONCLUSION: THIS COURT SHOULD EITHER GRANT JACKSON A NEW TRIAL OR PERMIT FACTUAL DEVELOPMENT.**

Trial courts can grant motions for new trials for any of the reasons set forth in Ohio R. Crim. P. 33(A) if they "affect materially [a defendant's] substantial right." Jackson's right to a fair determination of his guilt as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments and the Judicial Canons was violated when this Court permitted the prosecutor in an *ex parte* manner to draft the dispositive findings of facts and conclusion of law as to Jackson's motion to suppress. The judicial and prosecutorial collaboration misconduct warrants the granting of a new trial. Crim R. 33(A)(1))2) (5) and (6). In the alternative, this collaboration at the very least warrants the granting of an evidentiary hearing.

The Ohio Supreme Court in *State v. Roberts* limited the remedy to remanding the case to permit this Court to conduct a new final sentencing hearing and the drafting of the sentencing opinion. *Roberts* at ¶167. This remedy does not cure the error in this case. The only cure is the granting of a new trial.

Respectfully submitted,

JOHN P. PARKER – 0041243
988 East 185 Street
Cleveland, Ohio 44119
1-216-881-0900 (Voice)

johnpparker@earthlink.net
Pro Bono Counsel

And

OFFICE OF THE
OHIO PUBLIC DEFENDER

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

By______________________________
COUNSEL FOR NATHANIEL JACKSON

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing *Nathaniel Jackson's Motion For A Trial* was forwarded by first-class, postage prepaid U.S. Mail to Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481, on this 24th day of June, 2008.

RANDALL L. PORTER
COUNSEL FOR PETITIONER

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | |
| **Plaintiff,** | : | **Case No. 01-CR-794** |
| **-vs-** | : | |
| **NATHANIEL JACKSON,** | : | **Judge John M. Stuard** |
| **Defendant.** | : | |

---

**AFFIDAVIT OF RANDALL L. PORTER**

---

State of Ohio

County of Franklin,

Randall L. Porter, after being duly sworn according to law, states a as follows:

1. I am an attorney duly licensed in the State of Ohio.

2. I am employed by the Office of the Ohio Public Defender as an Assistant State Public Defender. In that capacity, I am assigned to the Death Penalty Division of that Office.

3. I am currently one of the two attorneys who represent Nathaniel Jackson in the proceedings pending before this Court.

4. The historical facts alleged in Nathaniel Jackson's Motion for a New Trial are true and accurate to best of my knowledge.

5. The exhibits attached to the Motion for a New Trial, to the best of my knowledge, are true and accurate copies of the originals.

Further affiant sayeth naught.

Randall L. Porter

Sworn and subscribed to me this the 23rd day of June, 2008.

Teri Slack

NOTARY

TERI SLACK
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES APRIL 9, 20 12

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
TRIAL COURT CASE NO. 01-CR-793
SUPREME COURT OF OHIO CASE NO. 03-1441

STATE OF OHIO )
Plaintiff )
-vs- )
DONNA M. ROBERTS )
Defendant )

VOLUME XXVIII

BE IT REMEMBERED, that on Friday, May 23, 2003, Tuesday, May 27, 2003, Wednesday, May 28, 2003, Tuesday, June 3, 2003, Wednesday, June 4, 2003, and Friday, June 20, 2003, these proceedings came on to be heard before one of the Judges of this Court, John M. Stuard, in Courtroom No. 2, on High Street, Warren, Ohio, before the case heretofore filed herein

Mary Ann Mills, RPR
Official Court Reporter
Trumbull County, Ohio

EXHIBIT
1

indictment merge for sentencing purposes, the State elected to dismiss Count Two and the specifications thereto prior to the commencement of the mitigation phase. Therefore, for purposes of this opinion, the Defendant was convicted of the first count of the indictment or purposely and with prior calculation and design, causing the death of Robert S. Fingerhut.

On June 4, 2003, the mitigation or second phase of the trial began. The Jury in that phase, unanimously found that the State had proven beyond a reasonable doubt, that the aggravating circumstances, to-wit, Specification One to Count One, that the Defendant was a complicitor in committing or attempting to commit or in fleeing immediately after committing, or attempting to commit aggravated burglary, and that the Defendant committed the aggravated murder with prior calculation and design. And Specification Two to Count One, that the Defendant was a complicitor in committing or attempting to commit or in fleeing immediately after committing or attempting to

commit aggravated robbery. And that the Defendant committed the Aggravated Murder with prior calculation and design outweighed the mitigating factors, and returned two verdicts recommending the death sentence.

Pursuant to Revised Code, Section 2929.04(F), the Court is now obligated to file a separate written opinion independently weighing the aggravating circumstances of each specification against the mitigating factors. The weighing process reflected in this opinion is based upon evidence heard by the Jury, but is done independently and without regard to the findings of the Jury.

Factually, the evidence at trial revealed that the Defendant planned the murder of her ex-husband and housemate, Robert S. Fingerhut, for $550,000 in insurance proceeds. The Defendant plotted the murder for at least three months prior to December 11, 2001. The Defendant corresponded with her convict lover and codefendant, Nathaniel Jackson while he was in prison at the Lorain

Correctional Institution.

She also accepted 19 collect telephone calls from Jackson while he was incarcerated, wherein they planned the details of the murder. The telephone calls were recorded, and the letters and phone calls were seized by police during the course of the murder investigation.

The murder plot included a plan whereby the Defendant would pick up Jackson from prison on December 9, 2001, and take him to the Wagon Wheel Motel in Boardman, Ohio, and rent a room with a mirrored ceiling and Jacuzzi tub where they would have sexual relations. The Defendant would obtain handcuffs, a firearm, ski mask, leather gloves to conceal fingerprints and would ensure Jackson access to the Defendant's residence so that Jackson could abduct the victim and take him out of the house and kill him. The conspirators discussed forcing the victim to watch the Defendant perform oral sex on Jackson before executing the victim.

The Defendant planned to set up an alibi at the time of the murder by driving around and

going to various retail outlets and shopping, where she would be filmed by the store's video security cameras, and the Defendant made several telephone calls to Fingerhut's place of employment, the Greyhound bus station in Youngstown, Ohio, to ensure that Fingerhut timely left work at approximately 9:00 p.m. on December 11, 2001.

The Defendant also provided Jackson with a cellular phone to keep in contact with her while she was driving a red Chrysler 300-M, which contained its own cellular phone.

The Defendant had previously checked on the insurance policies, to ensure that they were in effect, and that the premiums were paid until the end of 2001. The Defendant also discussed in the letters and phone calls, obtaining a motel room for Jackson after the killing, so Jackson could hide out after the murder.

However, the plan began to go bad when Jackson, who was in Fingerhut's residence, sustained a gunshot wound to his left index finger during a struggle with the victim. Jackson shot

Fingerhut three times including one fatal shot to the head. Jackson left the victim's body in the residence, took Fingerhut's car keys, and Fingerhut's silver Chrysler 300-M from the garage of the residence. Jackson drove Fingerhut's car to Youngstown, Ohio, where he abandoned it approximately three blocks from where he was ultimately arrested on December 20, 2001.

A series of telephone calls occurred between the Defendant's telephone and her red Chrysler and her cellular telephone, which was in the possession of Jackson during the time frame of approximately 9:30 p.m. and 12 midnight, on December 11, 2001. Between 9:30 p.m. and 10:30 p.m., the Defendant drove Jackson to the Days Inn, in Boardman, Ohio, and rented him a room for one week. Jackson's wound was treated and bandaged in the room.

The Defendant returned to the residence in Howland Township, Trumbull County, Ohio and discovered her ex-husband's body just inside the main door leading from the garage. The Defendant

called 911, and feigned hysteria. The Defendant in her letters to Jackson, had discussed how she would fake grief upon discovering that her ex-husband had been killed.

Howland Township police officers responded to the 911 call, and were met by the Defendant. The police did not find any signs of forced entry, and the only thing missing from the residence were the victim's car keys and the victim's automobile. Two wallets containing a large sum of cash and credit cards as well as other valuables were undisturbed inside the residence.

The Defendant told the officers that her husband's car was missing, and granted them permission to search the residence, and her vehicle for evidence that might lead to the killer. And during this search, police found approximately 140 letters from Jackson to the Defendant in her dresser. And approximately 140 letters from the Defendant to Jackson, in the trunk of the Defendant's red car, in a paper bag bearing Jackson's name, prison number.

As the investigation progressed, the law enforcement officers were able to obtain the 19 recorded telephone conversations between the Defendant and Jackson while Jackson was incarcerated in the Lorain Correctional Institution. These tapes constituted approximately three hours of conversation. These telephone calls along with letters which spanned the time frame of approximately three months, revealed a continuing and evolving plan to kill Fingerhut within days after Jackson's release from prison.

Jackson was soon arrested at a house on Wirt Street in Youngstown, Ohio, a few blocks from where Fingerhut's vehicle was recovered. And a pair of black leather gloves with fleece lining were recovered from that house at the time of his arrest.

In a letter written to Jackson, the Defendant acknowledged that she had found thin, fleece lined leather gloves. The recovered gloves had gunshot residue, and a hole in the left index finger along with the reddish substance, which

appeared to be blood in that area. This damaged area matched the injury that Jackson had sustained to his finger.

The evidence also revealed that the Defendant, near the approximate time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two hours from the last time Fingerhut was seen alive, the Defendant rented a motel room at the Days Inn in Boardman, Ohio for Jackson. In this room, bloody bandages and other medical supplies were found by hotel cleaning personnel and were subsequently collected by the police.

Fingerhut's silver Chrysler, which had been stolen by Jackson from the residence was recovered in Youngstown, Ohio. Blood stains in and on the vehicle were collected by law enforcement officers. DNA analysis of the blood stains collected on the trunk latch and the interior sun visor, revealed that the blood matched the DNA profiles of Nate Jackson, and the victim. Blood

stains collected from the Days Inn also matched the DNA profile of Nathaniel Jackson.

The State also introduced evidence from the letters that the Defendant and Jackson discussed purchasing a new Lincoln or a Cadillac Deville for Jackson. The Defendant and Jackson repeatedly discussed waking up together on Christmas morning. And the Defendant repeatedly stated how much she hated Fingerhut.

Additionally, Fingerhut had two life insurance policies with a combined benefit of $550,000. On December 12, 2001, shortly after calling 911, Howland police officers noted the Defendant's behavior, which included feigned crying and listening in on conversations of investigators. On December 12, 2001, shortly after calling 911, the Defendant told investigators that she had been out shopping at Wal-Mart, Super K-Mart, and Giant Eagle. Police could only confirm that the Defendant was at Wal-Mart at approximately 9:30 p.m. The Defendant never stated to police that she had taken Jackson to the Days Inn in Boardman,

Ohio.

Later in the afternoon of December 12, 2001, the Defendant provided police with a list of suspects who may have wanted to kill Fingerhut, including an alleged homosexual lover of the victim. A half Hispanic, half black man that the Defendant had dated, a man named Santiago Mason. And a number of people from the Greyhound bus station. When investigators asked the Defendant about Nathaniel Jackson and the Defendant stated, "Oh, I almost forgot about him." And proceeded to tell the officers that she had last seen Jackson on Monday, December 10, 2001, and had last spoken to him in the morning of Tuesday, December 11, 2001.

The investigation revealed that the Defendant and Jackson worked together throughout the afternoon and evening of December 11, 2001. And the State presented evidence and testimony that the Defendant took Jackson to get a haircut, ate dinner with Him at Red Lobster and was with him at the Warren Greyhound bus terminal in Warren, Ohio, which was the Defendant's place of employment.

One witness, Frank Reynolds, testified that after Jackson's release from prison and prior to the murder, he was present at the Youngstown bus terminal when the Defendant asked Fingerhut for $3,000. When Fingerhut refused to give her the money, she gave him a dirty look. The Defendant had stated in her letters that she was tired of the grinch doling out the money. And was referring to Fingerhut providing her with a set amount of cash to spend each week. The Defendant planned to obtain a firearm for Jackson and to use it in order to kill Fingerhut.

While the Defendant was supposedly in a torrid love relationship with Jackson, she invited the ex-con, Santiago Mason, into her residence where she performed oral sex on him. When he refused her further sexual advances to engage in intercourse, Mason was accused by the Defendant of stealing a .38 caliber firearm. Forensic evidence revealed that the weapon used to kill Fingerhut was consistent with the .38 caliber firearm. The investigation revealed that Roberts was missing two

.38 caliber firearms at the time of Fingerhut's murder.

In this case, the Jury found the existence beyond a reasonable doubt, of two aggravating circumstances, pursuant to Section 2929.04 (A)(7) of the Revised Code, to-wit, Specification One to Count One, that the Defendant was a complicitor in committing or attempting to commit or in fleeing immediately after committing or attempting to commit aggravated burglary, and that the Defendant committed the aggravated murder with prior calculation and design. And Specification Two to Count One, that the Defendant was a complicitor in committing or attempting to commit, or in fleeing immediately after committing or attempting to commit aggravated robbery, and that the Defendant committed the Aggravated Murder with prior calculation and design.

With respect to the aggravating circumstances relating to the aggravated burglary, the evidence presented at trial proved that the Defendant allowed Jackson to trespass in

Fingerhut's residence, located at 254 Fonderlac Drive, Howland Township, Trumbull County, Ohio, with the specific purpose of killing Fingerhut with prior calculation and design.

Jackson was wearing leather gloves and armed with a firearm, which he used to shoot the victim three times causing his death. The gloves and the ski mask, firearm and access to the house were all provided by the Defendant with prior calculation and design, as evidenced by the telephone calls and letters introduced by the State. The Defendant assured the victim's arrival, by checking at his place of employment, and determining when he left work by calling him on the telephone while he was on his way home.

The Defendant also checked on the status of the life insurance policies and determined that the premiums paid were up to the end of 2001, and advised Jackson of the same. Pursuant to her plan to kill Fingerhut, the Defendant took Jackson to a motel room in Boardman, Ohio, and rented the room for one week which was consistent with the plans

discussed in the letters and phone calls prior to the murder.

Upon discovering Fingerhut's body, the Defendant feigned grief exactly as discussed in her letters with Jackson. During the course of the investigation, the Defendant continually threw out red herrings to the Howland Police by mentioning a number of possible suspects, including alleged homosexual lovers of the victim, her ex-boyfriends, crazy people from the bus terminal in Youngstown, and Santiago Mason. The Defendant only mentioned Jackson, the convict she had corresponded with by letters for three months, spoken to on the telephone 19 times, picked up from prison and engaged in sexual relations with just two days prior, taken to get a haircut and ate dinner with just hours previously and the person whom she had driven to Boardman, Ohio on the night of the murder, and who had an injured index finger, only after the investigators confronted her with his name.

From the aforementioned evidence, the

Court concludes that the Defendant committed the aggravated murder as a complicitor, while committing or attempting to commit or in fleeing immediately after committing or attempting to commit aggravated burglary. And that the Defendant committed the aggravated murder with prior calculation and design. With respect to the aggravating circumstance related to the aggravated robbery, after Jackson had murdered the victim, he took the victim's set of keys and the silver Chrysler, 300-M. Although the planned crime involved Jackson stealing Fingerhut's car in order to kidnap Fingerhut, it is clear that Jackson was to take the victim's car to flee the residence.

The fact that Fingerhut struggled with Jackson in the residence and was killed in the residence, in no way, negates the Defendant's plan that Jackson should steal the victim's car to facilitate Jackson's own flight from the residence. Ample DNA evidence was presented indicating that Jackson was in the silver Chrysler 300-M following the murder of Fingerhut. Additionally, phone

records were introduced showing that Jackson and the Defendant called each other after the murder to check on the status of the plan.

Finally, the vehicle was recovered a few blocks from the location where Jackson was arrested. The Defendant, in accordance with the plan to kill Fingerhut, paid for a hotel room for Jackson following the murder. The fact that the silver Chrysler 300-M was found abandoned with the victim's keys in the ignition, coupled with the fact that the victim's wallet, money, credit cards and other valuables were not stolen, clearly shows that the plan to steal the victim's car with a means of escape following the kidnapping and murder of the victim was carried out in accordance with the prior calculation and design, as set out by the Defendant and Jackson.

From the aforementioned evidence, this Court concludes that the Defendant committed the Aggravated Murder, as a complicitor, while committing or attempting to commit or in fleeing immediately after committing or attempting to

commit aggravated robbery, and that the Defendant committed the aggravated murder with prior calculation and design.

Now, to be weighed against the aggravating circumstances, the Court must weigh any mitigating factors. On Tuesday, June 3, 2003, the Defendant appeared in-chambers and on the record with her retained attorneys, J. Gerald Ingram and John B. Juhasz, and her retained psychologist, Thomas Eberle. The State was present and represented by Assistant prosecutor Kenneth N. Bailey and Christopher D. Becker.

At that time, the Defense indicated to the Court that the Defendant had been evaluated by Dr. Eberle for her competency to waive mitigating evidence. And that in the doctor's opinion, she was competent to do same.

This Court personally addressed the Defendant and inquired of her as to the importance of presenting mitigating evidence, the use of such evidence to offset the aggravating circumstances, and the effect of failing to present such evidence.

The Court was assured at that time by the Defendant, that she understood these concepts by both Defense counsel and Dr. Eberle. This Court personally inquired whether the Defendant desired to waive the right to present mitigating evidence. The Court having found no evidence to contradict Dr. Eberle's findings on the Defendant's statements, and her express desire to waive the presentation of mitigating evidence, then found that the Defendant was competent to waive her presentation of mitigating evidence, and had done so knowingly, voluntarily and intelligently, and the Defendant indicated to the Court, that she only desired to make an unsworn statement to the Jury, which she was advised she was permitted to do and would be permitted to make on June 4, 2003, which was the date previously scheduled for the mitigation or second phase.

On Wednesday, June 4, 2003, the Defendant made an unsworn statement during which she stated to the Jury that there were no mitigating factors, and during which she requested the Jury to impose

the death sentence. This statement was articulate, coherent and well organized. The statement lasted approximately one hour, during which the Defendant showed no difficulty or fear in addressing a large group of individuals, including the Jury, and a large number of Courtroom observers. The Defendant spoke freely and although she had with her prepared notes, she often extemporized.

Despite the preceding that I have outlined, the Court is still bound to make an independent weighing of any and all mitigating factors that it feels may exist in this case against the aggravating circumstances. The Defendant in this case was not the principal offender. Pursuant to section 2929.04 (B)(6), the Court considers this factor, but gives it very little weight.

The Defendant committed the Aggravated Murder during the course of the commission of both an aggravated burglary and aggravated robbery. The record is replete with instances where the Defendant actively planned this Aggravated Murder

with prior calculation and design in order to collect $550,000 in life insurance proceeds. The Defendant's plan included buying her codefendant a new Cadillac or Lincoln in exchange for killing her ex-husband, promises of trips, a nice home in a wealthy neighborhood, an overall 180 degree change in life style for Nathaniel Jackson, her codefendant.

The record is overwhelming that, but for the Defendant's planning and actions, the victim would be alive today. The Defendant discussed and planned for months with the principal offender, how they would kill the victim. The Defendant checked on the status of the insurance policies in order to ensure that she would be able to collect the proceeds, and advised the principal offender of the status of the policies. The Defendant then transported the principal offender in the Aggravated Murder from prison to a predetermined location, in order to engage in love making before the murder.

The Defendant fed the principal offender

prior to the crime. The Defendant provided the principal offender with gloves, a ski mask, murder weapon and hideout after the Aggravated Murder, all as planned and discussed prior to the Aggravated Murder.

The Defendant gave the principal offender entry into the residence of the victim for the sole and exclusive purpose of killing the victim. This plan was clearly discussed in both the letters, and recorded telephone conversations, including the last telephone call on December 8, 2001, the day before the principal offender was released from prison. The Defendant failed to advise police of her relationship with the principal offender until she was confronted with the evidence of the relationship by the police. And prior to being confronted by the existence of this relationship, the Defendant gave the police a number of red herrings implicating a number of potential suspects, but never mentioned the relationship with the principal offender, and her discussions with him regarding the Aggravated Murder of Robert

Fingerhut.

The Court gives very slight weight to the fact that the Defendant indicates in her letters that the victim may have been physically abusive to her. This factor is pursuant to section 2929.04 (B)(1)(2). However, the existence of this factor is given very slight weight due to the fact that it is unsubstantiated, and even if it were true, would not warrant the Defendant's action in this case.

The Court gives very little weight to the Defendant's unsworn statement. During the course of her unsworn statement the Defendant apologized to her Defense team and thanked them for the hard work. The few positive things gleaned from this statement were overshadowed by the Defendant's personal attacks, and statements that were clearly contrary to the evidence. The Defendant denied guilt and personally attacked the jurors by claiming they were not a judge of her peers, not a Jury of her peers.

The Defendant accused the lead investigator as being motivated solely by career

advancement and accusing him of obstruction of justice and perjury. The Defendant referred to the other investigators as lackeys and claimed that one member of the Prosecution team was anti-Semetic and racist.

The Defendant also chastised jurors for being uninformed about current events. The Defendant also stated to the Jury that she and the victim had a loving relationship, and planned to live happily ever after.

These statements are in direct contravention of her statements in the letters and the phone calls expressing her desire and wishes that the victim meet an untimely death, and her desire to marry and live with Nathaniel Jackson.

The Defendant also appeared to brag to the Jury that she and the deceased have earned over $200,000 per year and that the $550,000 in life insurance proceeds was of little value to her, because of that sum would only sustain her for a few years. It is difficult for this Court or any finder of fact to give any weight to such a

statement.

Pursuant to section 2929.04 (A)(7), the Court will give very slight weight to the Defendant's behavior during the course of this trial. The Defendant was courteous, pleasant and properly addressed the Court at all times. The Defendant appeared intelligent and interested in the proceedings, and appeared to assist in her defense at all times. The Defendant presented no security problems to this Court and those who transported her to Court each day.

Now the Court has carefully and independently weighed the accumulation of all of the mitigating factors against each aggravating circumstance separately, as to each of the two specifications. In other words, the Court has weighed the evidence twice, first the Court weighed all of the mitigating factors against the aggravating circumstances surrounding the aggravated burglary, and then the Court engaged in second weighing, whereby the Court again weighed all of the mitigating factors against the

aggravating circumstances surround the aggravating robbery.

With respect to the first weighing of the aggravating circumstances relating to the aggravated burglary against all of the mitigating factors, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The legislature of the State of Ohio, has recognized that under certain circumstances, the death penalty is an appropriate sanction to a Defendant who commits an Aggravated Murder during the commission of certain felonies. In the case at bar, the underlying felonies were aggravated burglary and aggravated robbery. In this particular case, the Court accords substantial weight to the aggravated burglary specification and the weighing process.

In order to prove an aggravated burglary, the State is required to prove that a Defendant trespassed in an occupied structure, for the

purpose of committing a criminal offense. In this particular case, the Defendant purposely had her codefendant trespass in the occupied structure of Robert S. Fingerhut, with the specific purpose of committing an Aggravated Murder, which had been meticulously planned over a number of months with prior calculation and design.

Under the facts of this case, this Court cannot see any other form of aggravated burglary where the weight of this particular aggravating circumstance could ever be greater. The evidence reveals that the aggravated burglary was committed for the sole purpose of killing Robert S. Fingerhut, pursuant to a planned and methodical execution scheme designed by the Defendant and her codefendant and whereby the Defendant would collect $550,000 in insurance proceeds. This is a most heinous form of aggravated burglary and is entitled to unsurpassed weight.

In this Court's view, this aggravating circumstance standing alone, outweighs all of the mitigating evidence in this case. Therefore, with

respect to Specification One to Count One, this Court concurs with the Jury's recommendation, and finds that the death sentence is an appropriate penalty.

With respect to the aggravating circumstances of the aggravated robbery, the Court concedes that this offense is not quite heinous as the circumstances surrounding those concerned with the aggravated burglary; however, the aggravated robbery was clearly committed to facilitate the escape from the Aggravated Murder, and is extremely close to being the worst form of aggravated robbery. This statement is galvanized by the fact that the aggravated robbery was planned by the Defendant to be part of a kidnapping, whereby the victim was to be removed, taken to a different location where the Defendant would then engage in oral sex with her codefendant, while the Defendant was forced to watch prior to his execution. This plot is clearly spelled out in the letters between the Defendant and codefendant. The plan clearly went awry when the victim engaged the codefendant

in the struggle at the residence. Again this scheme was hatched for the purpose of the Defendant collecting the $550,000 in insurance proceeds.

Therefore, the aggravating circumstance specification relating to the aggravated robbery, when weighed against all of the mitigating factors in this case, clearly and undeniably outweighs by proof beyond a reasonable doubt, all of the mitigating evidence in this case.

Therefore, with respect to Specification Two to Count One, the Court concurs with the Jury's recommendation and finds that the death sentence is the appropriate penalty. The Court recognizes that the death sentence recommendation by the Jury must be merged and the Court does hereby merge the death sentences for purposes of sentencing.

For the reasons set forth herein, and after independently and separately weighing the aggravating circumstances against all of the mitigating factors, it is the judgment of this Court that the Jury's recommendation is accepted, and the Court does find that the sentence of death

is the appropriate penalty in this case.

Counsel approach the bench, please.

(SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF HEARING)

THE COURT: The Court has asked at side bar if counsel for either side wish to place anything on the record before this Court proceeds with sentencing. Mr. Ingram, I believe you wish to address something.

MR. INGRAM: Your Honor, the record should reflect that in pronouncing sentence, you have apparently read from a written decision that you have prepared in advance. I guess I would ask if I am correct in that assumption?

THE COURT: That is correct.

MR. INGRAM: As you read that decision, Mr. Bailey sat at the Prosecution table and reviewed a document as if he was reading along. Every time you turned the page, Mr. Bailey turned the page. I would now ask on the record, that Mr. Bailey be required to identify the documents which are sitting in front of him.

THE COURT: Mr. Bailey is referring to a document that I have had prepared. I have outlined the sum and substance of it to the Prosecution. They have a computer over there which you are aware of, Mr. Ingram, we have used throughout the trial, which makes it convenient to correct, delete from a master copy and to come up with a form that is present, which I presently used.

MR. INGRAM: Well, the record should reflect the vehement Defense objection to the State's participation in the drafting of the Court's sentencing decision in ex parte proceeding. We did not know this, we did not know of this. That is prohibited. I would ask that those documents be sealed and become part of the Appellate record in this case.

THE COURT: That will be done.

MR. INGRAM: I would ask that they be given to the Court Reporter at this point.

THE COURT: Mr. Bailey, please deliver that copy.



MR. INGRAM: May I see it? May I ask Your Honor, when at what point in time, the exchanges between you and Mr. Bailey occurred?

THE COURT: I don't recall. That was probably about Wednesday.

MR. INGRAM: Was there one such exchange or more than one exchange?

THE COURT: I believe that there was one exchange.

MR. INGRAM: We would also note an objection to the Court's depriving the Defendant of the right of allocution. We object to the Court depriving the Defendant of her right of allocution.

THE COURT: Your objection is noted.

MR. BAILEY: We haven't reached a point of allocution yet. We're just getting to that point. The Court had to do the independent weighing and now we're at the point where the Court has to advise the Defendant of her Appellate rights and of allocution.

THE COURT: I have to advise of Rule 32 now.

MR. JUHASZ: The objection is because the Court has already determined sentence without having heard from the Defendant. Normally in sentencing proceedings, the Court hears from the Defendant before making a determination of the appropriate sentence. That is the basis for the objection.

THE COURT: Okay. Could I see counsel?

(In-chambers at 2:30 p.m.)

(OFF THE RECORD)

THE COURT: We're in-chambers in conference. Are you waiving presence of the Defendant?

MR. INGRAM: Yes.

THE COURT: Mr. Ingram, you have another question?

MR. INGRAM: Based upon our exchange a few moments ago in the Courtroom, it is my understanding that a draft or some document relating to the Court's pronouncement of sentence was provided to the Prosecuting Attorney on

Wednesday.

THE COURT: I believe it was Wednesday. I asked them to type this up and get a copy back, so that we would all have it when I was reading through it. You weren't given a copy of it, and I apologize for that.

MR. INGRAM: We should probably ask that that document that was provided to the Prosecuting Attorney on Wednesday also be marked and sealed as part of the Court's Exhibit in this matter.

THE COURT: Okay.

MR. BAILEY: The only thing left is the final one. All prior ones were thrown out. There were six or seven of them.

MR. INGRAM: There's six or seven drafts?

MR. BAILEY: Not six or seven drafts, there's one draft and there's corrections and all of the corrections with the draft were pitched.

MR. INGRAM: Who made the



 corrections?

MR. BAILEY: We made or the Court. We kept finding typo's.

THE COURT: Whatever you have, if you have something, bring it over.

MR. BECKER: Let me explain something here. This is my understanding of what we were supposed to do. We were to take that and put it on the computer and print out the hard copy of the sentencing order, which is what we did. As Ken and I would proofread it for typographical errors, it was changed and just saved on the hard drive of the computer. It was never printed out and kept as draft after draft after draft. I would type over the hard drive, and prepare it. Eventually a final copy was provided to the Court and I think the Court had some typographical errors and maybe some changes.

THE COURT: I made one phone call back to you.

MR. BECKER: And the Court had indicated some changes. I just simply changed

that. Essentially what I did, because I typed the whole thing was I was the Court's typewriter, the Court's secretary.

THE COURT: We used that -- we don't have the equipment here or the know-how to do things expeditiously. That is the way we were able to get the final instructions.

MR. BECKER: That is the way Jury instructions are done. Now I think --

THE COURT: We have had this come up. Tony Consoldane always raises this issue about the Prosecutor typing stuff as if the Prosecutor is -- and it may be a legitimate point, I don't know. It is the system that is used here because it is the most practical.

MR. INGRAM: Does anybody have the first draft? They do not. Do you?

THE COURT: No. I don't have anything, no.

MR. INGRAM: Who wrote the first draft?

THE COURT: I gave notes saying this

is what I want. This, this and this, and they sent it back. I read it over, made some corrections, went back from there.

MR. INGRAM: The record should simply reflect that in this process, Defense counsel was never involved, nor consulted. Other than that, I have nothing further.

MR. BECKER: I just want to address something on record here. Rule 32 states that sentence shall be imposed without unnecessary delay. Sentence shall be imposed without unnecessary delay. Pending sentence, the Court may commit the Defendant or continue or alter the bail. At the time of imposing sentence, and it doesn't necessarily say before sentence is imposed, it says at the time of imposing sentence, the Court shall do all of the following: Afford counsel an opportunity to speak on behalf of the Defendant and address the Defendant personally and ask if he or she wishes to make a statement in his or her own behalf; afford the Prosecution to make an opportunity to speak; afford the victims the right

provided by law; and then notify and then after -- it is very specific, the rule says after imposing sentence in a serious offense, the Court shall advise the Defendant has the right to appeal. I think what is important is Rule 32 does not say before imposing sentence, Defendant or counsel should be afforded an opportunity, it says at the time of imposing sentence. We haven't had the sentence. I don't think the actual sentence has been handed down. That is an important distinction. The Court by law had to make an independent weighing and circumstances.

THE COURT: Well, the record is clear as to what has happened. If you have a point on appeal, you have got a point on appeal.

MR. INGRAM: Thank you.

(End of in-chamber discussion)

(Back in Open Court)

THE COURT: Gentlemen, would you have your client come forward, please? Does the Defendant wish to address anything prior to sentencing?

THE DEFENDANT: Yes, I think I would. I would like to have one of those notes back. Short and sweet this time. You probably wonder why I did what I did about asking for the death penalty. Because I think one small voice for justice is going to count. Maybe if it is for only one person some day. I didn't want to take the stand on race equality and the criminal justice system. Criminal justice, an oxymoron, and two, to expose and ask corrupt police officials who use a badge to destroy rather than protect lives for their own gain by committing perjury, planting and transferring evidence, tampering, and using race and religion to condemn. Thank you.

Thank you for your decision. I was a little worried you might try to find something not to do that. I appreciate what you did. Thank you.

MR. INGRAM: The record should reflect my migraine has returned. We have nothing.

THE COURT: Counsel have nothing further?

MR. INGRAM: No.

THE COURT: Miss Roberts, you have a right to appeal the conviction filed in this case. I would ask you, it is my duty to appoint counsel to perfect that appeal for you. I have had some indication from someone that you may wish to hire your own counsel or do you wish the Court to appoint someone to represent you?

MR. INGRAM: May I answer this question?

THE COURT: Yes.

MR. INGRAM: The appeal in this matter would be due in 45 days. Donna, along with Mr. Juhasz and I will make Appellate decisions in due course, and at this time, there's no request for Court appointed Appellate counsel.

THE COURT: There's no request?

MR. INGRAM: No request not at this juncture.

THE COURT: I would ask you to apprise me, because the Supreme Court insists that within a certain time period, within two weeks, I have to either appoint Appellate counsel or they

are not completely happy with me.

MR. INGRAM: Okay.

THE COURT: As I said, you have an absolute right to file an appeal in this case, it would be the Supreme Court to review the actions of this Court and this Jury. If you are unable to pay the cost of that appeal, the appeal will be perfected with no cost to yourself and counsel will be appointed with no cost to you. Any papers, other expenses you are unable to pay for will be provided by this Court. You have the right to have a notice of timely appeal filed on your behalf. If you fail to do that, this Court will see that that is done. Do you have any other questions about any of that at this time?

THE DEFENDANT: No. Jerry says no.

THE COURT: Anything that the Defense or the Prosecution wish to place on the record at this time before the Court enters sentence?

MR. INGRAM: Only that you take this and mark it as a Court's Exhibit for sentencing

purposes.

THE DEFENDANT: I just request that that fairy tale you told, not be told to children at night. Thank you.

THE COURT: The Court has considered the record and oral statements made as well as the principles and purposes of sentencing under Ohio Revised Code 2929.11, and has balanced the seriousness and recidivism factors of O.R.C. Section 2929.12. Pursuant to law, the Trial Court, this day, June 20, 2003, having determined in a separate opinion of specific findings that the aggravating circumstances as to the count of Aggravated Murder, outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say, why judgment should not be pronounced against her. And the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced. Are you wondering what I am reading from?

MR. INGRAM: I am wondering what

Mr. Bailey is reading from. Mr. Bailey is reading from a sentence.

MR. BAILEY: This is Nathaniel Jackson's.

THE COURT: This is a copy of Nathaniel Jackson's, which I have altered. The Court has considered the factors under Ohio Revised Code 2929.14 and makes the following findings. The shortest prison term will demean the seriousness of the Defendant's conduct; two, the longest prison term is appropriate because the Defendant committed the worst form of the offense; number three, multiple prison terms are necessary to protect the public from future crime and to punish the offender; number four, consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the Defendant, the offender, opposes to the public. Five, the harm caused by the multiple offenses was so great that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the

Defendant's conduct.

It is therefore Ordered and Adjudged and Decreed that the Defendant, Donna M. Roberts, be taken from the Courtroom to the Trumbull County jail, and from thence to the correction reception center at Lorain -- I'm sorry, at Marysville, Ohio.

Counsel approach for a moment, please.

(SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF HEARING)

THE COURT: I'll read this over again. It is therefore Ordered and Adjudged and Decreed that Defendant, Donna M. Roberts, be taken from the Courtroom to the Trumbull County jail, from thence to the correction reception center at Marysville, Ohio, and thereafter be sentenced to death on January 11, 2004 on Count One. And imprisoned therein for the stated prison term of ten years on Count Three, plus a mandatory term of three years on the firearms specification, to be served prior to and consecutive to the sentence imposed in Count Three. Ten years on Count Four, plus a mandatory term of three years on the

firearms specification, to be served prior to and consecutive to the sentence imposed in Count Four. Sentence in Count Four to be served consecutively to the sentence imposed on Count Three. The firearms specification in Counts Three and Four shall merge as one sentence in Count Three as matter of law.

The Defendant is ordered to pay the cost of prosecution, once that is determined, for which execution is awarded. That is the judgment of this Court.

Miss Roberts, I can't think of a more unpleasant thing that anybody is called upon to do than to sit here and review a record like this.

THE DEFENDANT: I know.

THE COURT: My heart goes out to everyone that was involved in this thing. I think as most people who look at it, think that you used, you appear from all of the contact I have had with you, to be a normal person, which makes it more difficult to explain the actions that the State has been able to put forth. And it almost appears to

me that it was an abandoned, where there was no thought of what was going to happen tomorrow or the next day or down the road, almost some sort of a fantasy world that you were living in. But all of our actions have consequences, and sadly, yours have brought you to this point. I do say this, with heartfelt sincerity though, I wish you well.

THE DEFENDANT: Thank you, Sir.

MR. INGRAM: Thank you.

(End of Sentencing Hearing at 3:00 p.m.)

BEFORE THE BOARD OF COMMISSIONERS
ON
GRIEVANCES AND DISCIPLINE
OF
THE SUPREME COURT OF OHIO

CASE NO. 07-078

FILED
MAR 03 2008
BOARD OF COMMISSIONERS ON GRIEVANCES & DISCIPLINE

In Re:
Complaint Against

KENNETH NEIL BAILEY and
CHRISTOPHER DEAN BECKER and
JUDGE JOHN MASON STUARD

Respondents,

DISCIPLINARY COUNSEL

Relator.

DEPOSITION

OF

JUDGE JOHN MASON STUARD

DEPOSITION taken before me, Mary J. Carney, a Notary Public within and for the State of Ohio, on the 13th Day of February, 2008, pursuant to Agreement and at the time and place therein specified, to be used pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for Government of the Bar in the aforesaid cause of action, pending before the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio.

*NAGY-BAKER COURT REPORTING, INC.*
*(330) 746-7479*
*(800) 964-3376*

EXHIBIT
2

APPEARANCES

On Behalf of Respondent,
Judge John Mason Stuard:

Charles L. Richards, Attorney at Law
Hunter's Square
8600 East Market Street, Suite 1
Warren, OH 44484-2375

(Appearing first by telephone, then from Page 44 onward in person)
On Behalf of Respondents, Kenneth Neil Bailey and Christopher Dean Becker:

Geoffrey Stern, Attorney at Law
Rasheeda Z. Khan, Attorney at Law
Kegler, Brown, Hill & Ritter, L.P.A.
Capitol Square, Suite 1800
65 East State Street
Columbus, OH 43215-4294

On Behalf of Relator:

Robert R. Berger, Attorney at Law
Assistant Disciplinary Counsel of the Supreme Court of Ohio
250 Civic Center Drive, Suite 325
Columbus, OH 43215-7411

Also Present:

Christopher Dean Becker, Attorney at Law

(From Page 92 onward)
Kenneth Neil Bailey, Attorney at Law

INDEX

CROSS EXAMINATION BY MR. BERGER - PAGE 5

DIRECT EXAMINATION BY MR. RICHARDS - PAGE 89

OBJECTIONS AND MOTIONS:

BY MR. RICHARDS: PAGE(S) 46, 66, 78

EXHIBITS INTRODUCED:

NO. 1 - PAGE 6
NO. 2 - PAGE 6
NO. 3 - PAGE 7
NO. 4 - PAGE 8
NO. 5 - PAGE 8
NO. 6 - PAGE 8
NO. 7 - PAGE 25
NO. 8 - PAGE 34
NO. 9 - PAGE 47
NO. 10 - PAGE 53
NO. 11 - PAGE 59
NO. 12 - PAGE 73
NO. 13 - PAGE 81

STIPULATIONS

It is stipulated and agreed by and between counsel for the parties hereto that this deposition may be taken at this time, 9:15 a.m., February 13, 2008, in the offices of Charles L. Richards, Attorney at Law, Hunter's Square, 8600 East Market Street, Suite 1, Warren, Ohio.

It is further stipulated and agreed by and between counsel that the deposition may be taken in shorthand by Mary J. Carney, a Notary Public within and for the State of Ohio, and may be by her transcribed with the use of computer-assisted transcription; and that the witness will read and sign the finished transcript of his deposition.

easier to get through, and I suspect it makes for a more just result, also.

Everybody has had their say and I hope have been afforded a fair trial. This will be reset for sentencing once the Court has reviewed the matter. I thank you all very much.

(Court adjourned at 4:25 p.m.)

Friday, June 20, 2003; In Open Court at 1:50 p.m.: Sentencing Hearing before Judge Stuard:

THE COURT: On May 28, 2003, a Trumbull County Petit Jury returned a unanimous verdict finding the Defendant, Donna Marie Roberts, guilty of two counts of complicity to commit aggravated murder, arising from the death of Robert S. Fingerhut. Each count contained two specifications of aggravating circumstances, listed in division A of section 2929.04 of the Revised Code.

Since Counts One and Two of the

WHEREUPON,

JUDGE JOHN MASON STUARD,

of lawful age, being by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, as hereinafter certified, deposes and says as follows:

MR. BERGER: We're here today on the Disciplinary Complaint pending against Judge John Stuard, Board of Commissioners on Grievances and Discipline Case No. 07-078. This deposition is being taken pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for the Government of the Bar. Respondent is present with his counsel, Charles Richards. Also present is Chris Becker, and participating by speakerphone are counsel, Rasheeda Khan and Geoff Stern.

CROSS EXAMINATION:

BY MR. BERGER

Q If you could state your name, please?

A John Mason Stuard.

Q And, Mr. Stuard, what is your business address?

A 161 High Street, Warren, Ohio.

Q And I'm going to present you with what's

been marked as Exhibit 1 and ask if you could identify it?

MR. RICHARDS: Let me see that. Okay.

A This appears to be my response to the inquiry made by the Disciplinary Counsel concerning this matter.

Q All right. And it's your response dated October 26, 2006?

A I don't remember the date.

Q I believe there's a date on the first page in the letter. That's what I was referring to.

A Yeah, okay, fine. That's correct.

Q All right. And is this response accurate?

A To the best of my knowledge, yes, sir.

Q And are there any corrections or changes to be made?

A None that I've discerned.

Q All right. I'm going to present you with what's been marked as Exhibit 2, and I'll be asking you the same questions.

A Well, Exhibit 2 has a letter from my attorney, Mr. Richards, to yourself; and also there's the opinion that was filed in the Roberts case, the original opinion.

Q And this letter is dated December 28, 2006?
A That is correct.
Q And is this information accurate?
A As far as I've been able to understand it, yes.
Q All right. Any corrections or changes that you're aware of?
A None that I've discerned.
Q All right. I'm going to present you with what's been marked as Exhibit 3 and ask that you answer the same questions?
A This is again a letter dated January 10th, 2007, from Mr. Richards to yourself that has Findings of Fact and Conclusions of Law regarding the Imposition of the Death Penalty.
Q All right. And is this letter accurate to the best of your knowledge?
A To the best of my knowledge.
Q Any corrections or changes that need to be made to this letter?
MR. RICHARDS: Excuse me. The record should show that the findings and conclusions are in the Jackson case, Judge.

THE WITNESS: What's that?

MR. RICHARDS: The findings and conclusions are in the Jackson case.

THE WITNESS: Let me see. You're correct.

MR. RICHARDS: Mr. Berger, I should also advise, he has a little hearing problem.

MR. BERGER: All right.

MR. RICHARDS: Yeah, you got to be careful, yeah.

Q Any corrections or changes to Exhibit 3?

A Not that I'm aware of.

Q All right. I'm going to present you with what's been marked as Exhibit 4.

A This is a letter again from Mr. Richards to yourself dated September 21st, 2007.

Q Is the letter correct?

A As far as I am aware, yes.

Q Any corrections or changes?

A None that I have seen necessary.

Q All right. I'm going to present you with what's been marked as Exhibit 5 and Exhibit 6 and ask if you can identify those two documents for me?

A This is the Complaint that has been

filed against me by the Disciplinary Counsel.

Q Exhibit 5 is the Complaint?

A Yeah.

Q All right. And what is Exhibit 6?

A Exhibit 6 is the Answer that Mr. Richards filed on my behalf in response to the Complaint.

Q All right. I'm going to ask you a few questions about the Complaint and the Answer. First, Paragraph 1 of the Complaint, is there anything inaccurate in Paragraph 1?

MR. RICHARDS: Does inaccurate mean factually incorrect?

MR. BERGER: Yes.

MR. RICHARDS: All right.

A Not that I'm aware of. I do not specifically remember the date of October 27th, 1965, when I was admitted. I'm assuming that's correct. I did not individually check that.

Q All right. Paragraph 2 of Exhibit 5, is that correct?

A That is correct.

Q All right. After you were admitted to the practice in 1965, tell me about your legal career. What did you do first?

A I worked for the law firm of Battin, Downey & McKay for about a year and a half, and then I was employed as a City Prosecutor for the City of Warren, Ohio, and I had that job for about two and a half years. I then went in with the firm of Downey, DePietro & Brown and was with them for a period of probably seven years. I then went out on my own as an individual practitioner, practiced law for, I don't know how many years, ten, twelve.

I then stood for election for the County Court. It was a new court that came into being. We had had one County Court prior to that time. They divided the northern part of the county into a second county court. I ran for that in '80, 1980, I believe. I was elected and began sitting as Judge in the Cortland Central District Court I believe in January of '81. I was permitted to practice law in conjunction with the court.

I quit handling any felony cases at the Common Pleas level since I was a Judge up there, and I eventually quit taking any criminal cases. Somewhat -- County Court Judges have a problem with, when they appear in other courts, higher courts --

MR. STERN: Excuse me, I'm sorry, but could the Judge get any closer to the microphone?

MR. RICHARDS: I'm going to move the mike in a little bit on him, see if that works. Is that okay with you?

MR. BERGER: (Nodding).

A After a couple years of County Court level, I quit handling criminal matters because I found it uncomfortable to appear in front of other Courts, Municipal, County Courts, even Common Pleas Courts, because invariably the Judge will refer to you as a Judge, and that, it happens all the time. It just doesn't look right, I don't think.

I had had my civil practice, and a large part of that was domestic work, probate. In 1990 Judge Robert Nader retired from the Common Pleas Bench and advanced to the Court of Appeals. There was an open slot. There were several people that were interested in the job. And I had no ambitions to, for higher court. I was quite satisfied with my life.

I was approached by several people that I have known for years and I respect, and they thought it would be a good idea if I tried to get the position. I talked with my wife; she had no opinion one way or the other. So I figured, why not. It was, of course, more money, although it turns out money-wise I had a better position at the

County Court and my private practice; but there was a pension that was involved, and that seemed to have some -- so I threw my hat in the ring, so to speak.

It was Governor Celeste was to make the appointment. That whole procedure went on for several months. There was a lady lawyer in contention, another person that was backed by the unions primarily, and myself, that it boiled down to the three of us. We were asked to come to Columbus, were interviewed by several people down there, and eventually I was notified that I had received the appointment. I believe my term started the 3rd, 1st or 3rd of January, 1991. I have sat in that capacity ever since.

Q All right, thank you. If you could take a look at Paragraph 3 in Exhibit 5 and tell me if there's anything in that paragraph that is not accurate?

A I see nothing inaccurate.

Q All right. Paragraph 4?

A That is correct.

Q All right. Paragraph 5?

A That is correct also.

Q Paragraph No. 6?

A It's correct.

Q With regard to Paragraph No. 7, your

attorney, Mr. Richards, and I previously spoke and acknowledged the fact that the June 4th, 2004, date should be June 4th, 2003, in Paragraph 7?

A Yeah, I think that's correct.

Q Besides that, is Paragraph 7 correct?

A It appears to be, yes.

Q All right. In Paragraph 8 the date of June 20th, 2004, is listed, and again your attorney, Mr. Richards, and I previously discussed that that should be 2003 instead of 2004?

A Correct.

Q Beyond that, is Paragraph 8 correct?

A It appears to be.

Q All right.

A No, wait a minute, wait a minute. That's -- no, I disagree with that.

MR. RICHARDS: Which question, what number are we on?

MR. BECKER: No. 8.

A You're on 8; right?

Q Yes.

A No, no. The ex parte, there was never any ex parte communication between myself and the Assistant Prosecuting Attorneys. Not what I considered to

be ex parte communication.

Q All right. Well, let's take a look at -- let's break Paragraph 8 down. Paragraph 8 suggests that you had communications with Mr. Bailey and Mr. Becker regarding the Roberts sentencing opinion between June 4th and June 20th of 2003?

A I had communication with one of them -- I don't remember which one; you'll have to find that out from them -- about the preparation of the entry. At no time had ex parte communication about substantive matters.

Q Is it correct that that communication took place between June 4th and 20th, 2003?

A It would have had to have been within that time frame.

Q All right. Is there a more narrow time frame than that that you're aware of?

A May have been on the Wednesday or Thursday before. I don't know. I don't know the answer to that. It was prior to the date of the 20th.

Q All right. And we also know that it had to be after the June 4th penalty phase hearing; correct?

A That's correct, yeah.

Q So --

A Would have been probably a week or so

after that that I would have had the communication that I did have with one of them; correct.

Q All right. So you do not recall who you spoke with?

A I do not recall which one I spoke with. It could have been either. They I'm sure have remembrance, but I do not.

Q And, but you specifically recall it was only one of them?

A That's my recollection, yes, only one of them. Now, the initial --

MR. RICHARDS: The question's answered. Just let him --

THE WITNESS: Okay.

MR. RICHARDS: Yeah.

A That's my remembrance.

Q This first communication that you had, was it in person, a telephone call, an email, some other format?

A My recollection is that I became aware that whichever one it was, was out in front of my secretaries and were talking to them. And I had prepared what I intended to give to them, and I heard them out there down the hallway. Took the notes that I had made,



went out and said, you know, I want you to prepare the entry. These are my notes on the second phase. That would have been it. It probably would have been a 30-, 45-second communication.

Q All right. So we will call that communication your initial request?

A Right.

Q All right. Were there other communications beyond that initial request?

A One that I recall.

Q All right. When did that take place?

A Would have been after the draft had been sent over to me. And I don't recall what I called about other than that it was either a typographical or they had stated something in a manner on the -- you know, the whole thing is a matter of form. The substance has become almost meaningless.

MR. RICHARDS: He just wants to know what the communication was, Judge; that's all.

A Okay, communication was that there was something in error or I wished to have corrected on the final response.

Q And so you made a telephone call?

A Made a telephone call. I don't remember

which one I spoke to. Could have been either.

Q How was it that you received the draft?

A The ordinary way, it appears on my desk. I don't know who brought it over or whatever. Left out front probably.

Q So a paper copy was delivered to you?

A I had a paper copy.

Q And you reviewed this paper copy and then made a telephone call?

A Correct.

Q And what did you say during this telephone call?

A I do not recall. It was either a typographical -- there was some reason for me to have called. It would have either been a typographical error or errors that I had found or something was not the way that I wished to have it.

MR. RICHARDS: Rob, do you need anything?

(Discussion off the record.)

Q All right. So at this point in time you've identified your initial request; you've identified receipt of a paper copy; and you've identified a phone call that you made?

A That's correct.

Q Any other communications between you and Mr. Bailey or Mr. Becker?

A None. None that I recall. I believe there were none.

Q All right, let's go back to Exhibit 5, Paragraph 9. If you take a look at Paragraph 9, if we removed your objectionable words ex parte from Paragraph 9, would you agree the remainder of the paragraph was correct?

A That is correct. Well, it says, consisted of at least one person conversation. I guess that should be personal conversation. The "least" I object to because there was one personal conversation. At least indicates there may have been more. There were not. I would agree with the rest of it if you take "ex parte" and "least" out of that.

Q All right. Take a look at Paragraph 10 in Exhibit 6, your Answer.

A Yes.

Q Paragraph 10 says, "Says that all communications between himself and either Assistant Prosecuting Attorney was a communication for administrative purposes and was, therefore, not prohibited

by Canon 2 or Canon 3 of the Code of Judicial Conduct." Did I read that correctly?

A You did.

Q Can you explain to me what a communication from administrative -- I'm sorry -- a communication for administrative purposes is?

A Anything that is not of substantive interest in the case. Many times a Prosecutor or a defense lawyer may have communications with the Court. An example, the Prosecutor sticks his head in the door and says, Judge, we're having a problem with such and such a case; we're going to have to set up a hearing on the matter. I don't consider that an ex parte communication. A defense lawyer sticks his head in and says, Judge, this case is set for whatever. The Prosecutor is being a bonehead. I need some more time.

My answer would be, get ahold of the Prosecutor, find out, if you're having trouble, set it down for a hearing, formal or informal. Get the Prosecutor in here and we'll see what, where we're at. I don't consider that an ex parte communication. Well, that's my answer.

Q All right.

A Otherwise, a Judge would have to be locked up in his room and never have contact with anybody

unless both parties were there. It's a question of substance of a case.

Q All right, let's go back to Exhibit 5, Paragraph 10. Paragraph 10 is another paragraph that has a date of 2004 when it should be 2003?

A Correct.

Q Beyond that, is Paragraph 10 accurate?

A Essentially, yes.

Q The Respondents have alleged that, when you provided them with your notes, you said something like, here are my notes, please type up a sentencing opinion like the one I used in Jackson; is --

A That's probably pretty much correct because --

MR. RICHARDS: He didn't finish his question yet, John. I'm sorry, are you happy? I mean --

MR. BERGER: I was just going to say, is that correct?

MR. RICHARDS: Fine, go ahead.

A That's correct.

MR. RICHARDS: Go ahead, I'm sorry.

A Go ahead.

Q What was included on those two pages of notes?

A I can't tell you specifically, other than the whole purpose of the, what I was required to do, the facts were the same as they were in the Jackson case. In reviewing the Roberts case, as opposed to the review in the Jackson case, in Jackson there was -- there were mitigating factors that had been introduced in evidence. In this case my duty was to review the mitigating factors and compare them to the aggravating circumstances, and vice versa, to determine whether or not the jury had lost their way and did not take something into consideration, or whether, if they took something into consideration that I disagreed with, that if I found that they had in effect made some mistake on the evidence, then it would be my duty to possibly reverse. That has happened.

In this particular case, the Roberts case, it's a highly unusual case in that she not only forbade her attorneys to offer any mitigating evidence, she spent an hour and a half trying to convince the jury herself that they should return a verdict of the death penalty. Made some statement to the effect that, I heard each of you swear to do your duty here; I want you to go back into that jury room and return a death verdict.

There was very little, if anything, other than her husband had abused her on a few occasions; but that wasn't

even put in technically by way of mitigation. It came in through her unsworn statement to the jury. So it was a case, and I think a unique case, from the standpoint that there was really no mitigating factors that she had proffered for the Court to review.

I went over the aggravating circumstances, which were quite damning. The way the thing had been meticulously planned; they had written letters to each other; there were taped conversations through the prison telephone system of them actually planning this murder. And the way that she had lied repeatedly to the police. She had tried to cover it up by establishing an alibi. There was just a legion of aggravating circumstances with nothing much to balance it. That's the reason that I -- and I only had -- I don't even know if the two pages were filled, but I would have written down, did write down, the aggravating circumstances primarily and put that there were in effect no mitigating evidence that was contrary to the aggravating circumstances. That was my function, to make that determination.

Q So what was the structure or the format for these notes; I mean, did you write every word?

A No, I would have written facts, the facts are the same. That's what I remember in my

conversation with whomever, was that the facts are exactly the same. You may have to change a few things regarding the pronouns or whatever, but the facts were exactly the same. We'd gone through them on two different trials and through the sentencing on the -- well, that's my answer.

Q When you say the facts exactly the same, you were advising Mr. Bailey or Mr. Becker that you wished the facts that were used in the Jackson --

A Well, essentially I said. They were essentially the same. Of course, there were some things of a personal nature that she had done that he hadn't and vice versa. But the facts were the same. They played out exactly the same. The same evidence, the same witnesses were used in both cases. That's correct.

Q So you directed them to rely on the facts in the Jackson entry?

A Basically, yes.

Q These notes were handwritten?

A Yeah.

Q And were they on a legal pad?

A An 11-by-14 legal pad.

Q All right. And written on both sides?

A No, I don't write on both sides.

Q So it's safe to assume that every word

in the final entry was not in those two pages of notes?

A No, that's another factor. If you look at any capital murder case anywhere in the State of Ohio, well over half of it's going to be boilerplate. Doesn't change. You've got to have all the magic words in it or it doesn't meet the test. And I suspect -- well, yeah.

Q All right.

MR. RICHARDS: You started off, Judge, by saying no to his question. All right, his question was -- well, go ahead. I shouldn't interrupt you, Rob. I don't think he meant to say no to what you asked him, but that's all right.

A Please repeat. Maybe I misunderstood the question.

Q Sure. It's safe to assume that every word that was in the final entry was not in those two pages of notes that you gave Mr. Bailey and Mr. Becker?

A Yes, that's correct.

Q All right. And if by your estimate 50 percent of the entry in a death penalty case is boilerplate, that would mean the other 50 percent was unique material?

A Well, unique in the prospect that it was from the notes relevant to the Roberts case, which would

not be relevant to anything else.

Q And you did not provide Mr. Bailey and Mr. Becker with a writing that contained 50 percent of what became the Roberts decision?

A No; that is correct.

MR. RICHARDS: Keep your hand down if you can. I don't mean to pick on you.

THE WITNESS: Well, you can pick on me, Charlie. You're my attorney.

Q All right. I'm going to present you with what's been marked as Exhibit 7 and ask if you could identify it?

A This is the opinion we're talking about.

Q It's the Donna Roberts sentencing entry?

A That's correct.

MR. RICHARDS: Excuse me. Rob, there's another pleading in the Roberts case called sentencing entry, I believe. It's the one where he actually sentences her to death. You might want to distinguish that. Yeah, there is. I don't have my book here, but I think I'm more comfortable if this is the sentencing opinion, you know.

Q All right. This is the document we've been discussing thus far, and this is the one that's the

subject, this Exhibit 7, of the Disciplinary Complaint?

A That's my understanding, yeah.

Q Right. This Exhibit 7 is the document that was created based upon the notes that you gave to Mr. Bailey and Mr. Becker?

A That is correct.

MR. BERGER: All right. Did that clarify it to your satisfaction, Mr. Richards?

MR. RICHARDS: Yeah, I just don't want -- later we're going to read this, and I don't want sentencing --

MR. BERGER: Sure.

MR. RICHARDS: -- entry to refer to some other document, because there is another one called sentencing entry.

Q All right. In taking a look at Exhibit 7, it appears that it's divided into several different sections, and beginning on Page 1 there's a section called History. See where I'm referring to?

A Yes, sir. That goes into what led up to the thing being tried.

Q All right. The notes that you gave Mr. Bailey or Mr. Becker, did they contain any information on the history?

A No, they did not, because it was the same history essentially as was in the Jackson case, although related to Roberts.

Q All right. On Page 2 the next section begins which is entitled Facts?

A Right.

Q And it looks like it goes on 'til Page 7?

A Correct.

Q The two pages of notes that you gave to Mr. Bailey or Mr. Becker, did it contain the information referred to in the Facts section?

A No, they did not. They would have had -- they had facts in brackets. Facts were the same in both cases.

Q Explain to me what you -- facts in brackets, what does that mean?

A You'd have to state the facts. You can't go through the rest of the opinion unless you've recited what the facts are.

Q Sure. But you said something about something had facts in brackets?

A In my notes, facts at the top. You've got to put the facts in, the instructions for them.

Q Okay. So in the notes you indicated where the facts should go?
A Yeah.
Q But you did not provide --
A I did not provide each and every repetition of the facts, no.
Q I understand, all right. Beginning on Page 7 of Exhibit 7, there's a section called Aggravating Circumstances?
A Right.
Q Is this the section that your two pages of notes --
A That's exactly correct. It would have been a listing of the aggravating circumstances and then what, if any, mitigating factors, which appears again on Page 10, and --
Q Well, let's stay with the aggravating circumstances for a second. Is this section a word-for-word reproduction of what you gave to Mr. Bailey or Mr. Becker?
A No, it is not.
Q All right.
A I told you I did not write out in detail. I made notes covering what the aggravating

circumstances were.

Q All right. Let's go to Page 10 where there's a section entitled Mitigating Factors. And it looks like that goes from 10 to 14?

A Right.

Q Did you provide notes to Mr. Bailey or Mr. Becker, and/or Mr. Becker for this section?

A Yes, the mitigating factors have to be weighed against. Now again, I did not write the exact words that are here. I wrote out what, if any, the fact about the doctor and, you know, we had her in chambers. I tried to explain to her, almost pleaded with her, to not take the course she was. Just quite adamantly the position she had taken was that she would not permit her attorneys to present any mitigating evidence.

Q All right. And then the final section that begins on Page 14 is the Conclusions of Law?

A Correct.

Q And did you provide Mr. Bailey or Mr. Becker with the notes for this section?

A Not verbatim, but my conclusion was, with the information I had given them, was that the aggravating circumstances far outweighed any mitigating factors, even if I took into account things that weren't

officially entered on the record as mitigating factors.

Q And in your notes did you provide anything beyond just your conclusion that the mitigating circumstances did not outweigh the aggravating circumstances?

A And vice versa.

Q And vice versa?

A Yes.

Q Was there anything that you told them beyond that to allow them to create this section?

A No. No, there was nothing other than what was needed to complete this finding of fact and conclusion of law.

Q All right. I think a moment ago you indicated that about 50 percent of a death penalty sentencing entry generally is boilerplate?

A Well, don't hold me to 50 percent. I don't know what the percentage is. I know it's a large part of any pleading anymore.

Q Can you identify for me in Exhibit 7 which parts you consider boilerplate?

A Well, I am probably incorrect in saying that about this entry. It's more appropriate for the entry on the judgment of the jury. As an example --

Q Is there standard boilerplate language in Exhibit 7?

A No, I'm incorrect on that. Where's the entry, the final entry at? Maybe you haven't given that to me.

MR. RICHARDS: No.

Q I don't believe.

A No. What I was referring to there was, on the sentence itself, you have to put all the requisite requirements under the statute. That's boilerplate. That's recited in every case. In the final, on Exhibit 7, that's an incorrect statement on my part.

Q All right. Let's go back to Exhibit 5, the Complaint. Take a look at Paragraph 11, that one right there. I understand you disagree with the use of the term ex parte. Other than that, is there anything inaccurate in Paragraph 11?

A Well, I don't have any personal knowledge of who did what. I'm assuming that one of them, according to my instructions, prepared the draft.

Q All right. Mr. Bailey and Mr. Becker have previously used a term Court's secretary to describe the work that they did. Do you agree with that description?

A More or less, yes. Had it been my secretary that -- well, yeah, more or less.

Q You have a secretary?

A Technically, no, I have a bailiff and a court reporter. My court reporter at times types things for me, but I don't have a secretary as such. None of us do.

Q All right. You used the word secretary a moment ago?

A Well, referring to my reporter, who, when called upon, is required to type stuff.

Q All right.

A I don't like to use her when I don't have to. It's not her job really.

Q All right.

A She's a reporter. But she does type occasionally for me.

Q All right. Take a look at Paragraph 12 in Exhibit 5. Again, I understand your concern about the term ex parte in Paragraph 12. Beyond that disagreement, is Paragraph 12 accurate?

A It may be. I know that there were several corrections made. Whether they were alterations to the draft, I'm not quite sure about that. I don't know

what the reason was I called, whether it was typos or, you know, the striking of something or something I wished added. I don't remember that. But I called them for some reason. So with the removal of ex parte, I would say that it is probably essentially correct.

Q Tell me what the difference is for you between a correction and an alteration.

A Well, a correction would be a misspelled word, maybe the sentence structure I thought was improper, left out a comma. An alteration would be that if I thought there was something that was stated in a way that I would not state it, or that they had misread some portion of it and included something that I didn't think was proper. That would be an alteration.

Q Do you have any recollection of what these corrections or alterations were?

A No, I do not. I've stated I don't remember.

Q Do you recall how many they were?

A No. I have an impression. Not a recall, but I have an impression. Whatever it was, was rather insignificant.

Q Sorry, just one moment.

All right, if you could take a look at Paragraph 13

of Exhibit 5, excepting your concern about the term ex parte, is there anything else in Paragraph 13 that is not accurate?

A It's again essentially correct.

Q What is the I: drive?

A The what?

Q The I: drive.

A I: drive?

Q Yes. It's a computer drive of some sort?

A Oh, I have no familiarity; I'm not familiar with computer jargon at all.

Q All right. Is there some sort of a system there at the courthouse by which the Court is able to share documents with the Prosecutor's Office and the Prosecutor's Office shares documents with the Court called the I: drive?

A Not that I'm familiar with.

Q All right, if you want to take a look at Paragraph 14 on Exhibit 5?

A That's essentially correct.

Q All right. I'm presenting you with what's been marked as Exhibit 8, ask if you could identify it?

A That's the Nathaniel Jackson Findings of Fact and Conclusions of Law Regarding Imposition of the Death Penalty.

Q All right. Exhibit 8 is the document that you suggested Mr. Bailey or Mr. Becker rely on in the creation of the Roberts sentencing entry --

A That's correct.

Q -- Exhibit 7?

A That's correct.

Q The first paragraph of Exhibit 8?

A First paragraph of Exhibit 8, yes.

Q Is that the same as the History section --

A That's correct.

Q -- in Exhibit 7? All right. The second paragraph of Exhibit 8 that begins with the word, "Factually"?

A Those are the facts.

Q That's the factual section for the corresponding --

A Correct.

Q -- Roberts opinion? All right. Can you help me find where the -- it appears as if the Aggravating Circumstances section begins at the top of Page 5; is that

correct?

A Yes.

Q All right. And that would be a section that would --

A Be again a review of what aggravating circumstances existed.

Q All right. And then it appears as if near the top of Page 7 is where the mitigating factors are discussed?

A I think it starts back on Page 6.

Q All right. Can you tell me where that is on Page 6?

A The second paragraph, Page 6.

Q Oh, thank you. I didn't see that before. And where do the conclusions of law begin in Exhibit 8?

A I'd say on Page 10, second paragraph.

Q The paragraph that begins, "When independently"?

A Right.

Q I noticed the format for the sentencing entry for Jackson, Exhibit 8, is different than the format for the sentencing entry for Roberts in Exhibit 7?

A I -- yes, it is different. I --

Q Why is that?

A I suspect that a different person other than Mr. Bailey or Mr. Chris Becker prepared it.

Q All right, let's go back to the Complaint, Exhibit 5, and Paragraph 15.

A One of the reasons is, I had much more input into the other one as far as that I suspect if you inspect both of them, you will find that the previous entry follows more my style than, as far as the complete designation of by category. The customary way I believe that most of these are done is in the manner that the last, the Roberts case was done.

Q Just to make sure I understand you, so the Jackson entry is more along the style of how you would draft it?

A That's correct.

Q And the Roberts entry is more along the standard format that might be used?

A Well, as ordinarily prepared by the -- yeah, I think that's essentially correct. Although the Roberts case is a reflection of what my notes and conclusions were. That is my work as far as the ultimate result on the matter.

Q All right. Paragraph 15 of Exhibit 5,

excepting your concern about the usage of the word ex parte, is there anything in Paragraph 15 that is not correct?

A No.

Q Tell me why you didn't inform Mr. Ingram or Mr. Juhasz about your request to have Mr. Bailey or Mr. Becker prepare the sentencing entry?

A I don't have a reason other than that the procedure that was followed here is a procedure that I understand, I do not know, was followed in all the cases; that they were to be given a copy of this before, which they weren't. That was an error on my part. They were not delivered a copy prior to the day in court. I apologized to them for that.

There are many times in a civil case one will -- a Judge will call one side or sometimes both sides and say, prepare me an entry. Don't tell them what to put. They assume that they're going to -- you're -- the Judge assumes they're going to prepare an entry the way that they see it. In this case I think it would have been proper to have perhaps asked them to prepare an entry. That's not usually done.

Defense lawyers very seldom -- we've started a practice, and I believe all the Courts now, before the

Prosecutor prepares anything, which they've traditionally always prepared the judgment entries -- all the defense lawyers are aware of that -- but because of this case, they are now asking the defense lawyers, do you wish to prepare the entry? I've not had one yet say that they did, but -- I don't remember what your original question was. I'm sorry.

Q I had asked you why you didn't inform Mr. Ingram or Mr. Juhasz about your communications with Mr. Bailey or Mr. Becker?

A To tell you the truth, it never crossed my mind, as silly as that may seem to you, because I was just preparing an entry. It happened that the Prosecutor was typing the thing. There was no discussion at any time of anything that I would have considered of substance which would put it in the category of ex parte communication. And it probably just never crossed my mind that there was anything wrong with this. Now in hindsight, that's a different thing.

Q You mentioned a moment ago that it was your intention to provide a copy of the entry to Mr. Ingram or Mr. Juhasz?

A Yes.

Q When was it that they were going to be

provided that copy?

A That morning, before we started the thing.

Q All right.

A And I have to take responsibility for that not being done.

MR. RICHARDS: Well, you referred to that morning and the thing, Judge. What do you mean by before we started the thing?

A Well, the morning of the sentencing.

MR. RICHARDS: The sentencing, okay.

A Yeah. I know both these counsel. They're very able counsel. And if nothing else, out of common courtesy to them, they should have been provided with a copy.

Q And what benefit would have providing them the copy the day of the hearing prior to the hearing --

A Well, I don't know if it was going to give them any particular benefit, but I think they should have had a right to at least see the thing.

Q All right. It's been suggested that the practice of having the Prosecutor's Office draft entries for the Court without informing or consulting defense

counsel is a decades-old practice?

A It was the practice when I took the bench, that is.

Q All right.

A And as I say, defense counsel is well aware of that. Several of them have complained about it. And the thing is that there's some overreaching thought here, I'm sure, that there's some kind of a conspiracy or an incestuous relationship between the Prosecutor's Office and the Judge. That is the farthest thing from the truth. I get along well with the Prosecutors. They're all ladies and gentlemen. They show me due respect, and I try to do the same with them. I suspect that a lot of my decisions are not very well received over at the Prosecutor's Office because they're doing their job; they want convictions, and sometimes I don't see eye to eye with them on that. Sometimes they think I'm a real nitwit probably.

But I have never in the practice, since I've been practicing, or since I've been a Judge or as a practicing attorney, witnessed an ex parte communication with a Judge. There are many times in discussion, if an attorney is in the office on a pretrial on some case, and there's another case that he's involved in and he brings something up about it, he or she, if the conversation starts to get

into the substance of the matter, either the attorney will invariably say, Judge, I'm sorry, I think we're crossing the line here, or I will say to them, we can't discuss that; you know, notify the other party, get them in here.

I don't know who in their right mind would try to go ex parte with a Judge, because the Judge is responsible to report that. And that's a violation; that would be a violation of ethics. Ex parte communications in my experience do not occur because everyone is very well aware of the fact you cannot get into the merits or substance of a case if both sides aren't there.

Q You indicated a moment ago that it's your belief that defense counsel was aware of this entry-drafting process?

A I've not talked to them personally, but now they're from Youngstown, but they've been up here an awful lot. I think the rest of the Bar is pretty much aware of the fact that the Prosecutor prepares the judgment entries. I think that probably came into existence -- this is my opinion -- because the Prosecutor had the wherewithal to be probably one of the first computerized offices in the county. And that, I believe that was the genesis of why they prepared the entries.

Remember, years ago, probably before your time, a

sentencing would have been a Judge writing two or three lines in the judgment as a judgment. Defendant sent to prison, ten years or whatever, costs to defendant. That was a sentencing. Since 1985, thereabouts, we started getting all this stuff where everything has to be technically correct. You have to use the magic words. If you leave something out, it comes back on appeal. So everyone became aware of the fact that you just can't scribble down something and call it a judgment entry. You have to follow the form.

Well, computers lend themselves to words. You can put thousands of words into the touch of a finger. So many parts of these entries are very canned entries. They push the button and the person just fills in the essential language that's needed for that particular case. But that's my personal opinion of why that practice started. I don't know for sure.

Q I understand why it might be useful or convenient to have the Prosecutor's Office prepare the entry, but I don't understand why you wouldn't inform the other side and give them the opportunity for input?

A Because I didn't think it was ex parte communication is probably the answer that I must give you. Do I think it's a good practice? Probably not. For

someone within -- someone that isn't within the system that knows --

MR. RICHARDS: Hold on.

(Discussion off the record followed by a recess, during which time Ms. Khan and Mr. Stern appeared at the deposition in person.)

MR. BERGER: Let's go back on the record.

Q A moment ago when we were talking about the Court's practice of having the Prosecutor's Office draft judgment entries, you indicated that several attorneys had complained about the practice?

A Well, I say several. Actually it's only one. He's our local gadfly, very capable. He works for the Public Defender's Office, and he glories in the world of curmudgeon. And --

Q Who's this person?

A Anthony Consoldane. Very nice man, very good lawyer. But he nitpicks everything. That's one of the things that I've heard him mention, insinuating that the Prosecutor gets their way all the time. That's I'm sure what he's intending to mean, whether he does or not.

Q And how long has he been expressing these concerns?

A I don't know; the last ten years probably that I'm aware of since I've been on the bench. I don't know. I've heard him say it several times. Which came from me, do you wish to prepare the entry? Well, he doesn't wish to do that. So ideally it would seem that -- well, that's fine.

Q At the Roberts sentencing hearing, Mr. Ingram made several inquiries about the sentencing entry that indicated he was unaware that the Prosecutors had prepared the entry; isn't that correct?

A I believe he said something to that effect, yeah.

Q All right. So it's fair to conclude that Mr. Juhasz and Mr. Ingram weren't aware of this practice?

A One could assume that from that statement.

Q Do you know when this practice began?

A I do not.

Q Do you know who initiated it?

A I do not.

Q Do all of the Trumbull County Judges or did all of the Trumbull County Common Pleas Court Judges utilize this procedure?

A I run my court.

MR. RICHARDS: I'm going to object to questions about the conduct of other Judges and generally speaking in the courthouse. Go ahead, Judge.

A I run my court. I do not know what they do. I've never discussed specifically with them what their practice is.

Q I want to ask you a couple of questions about a defendant, Roderick Davie.

A Yeah.

Q You presided over a criminal case involving Mr. Davie?

A I did, my first capital case.

Q All right. And last year I think he requested a new sentencing hearing alleging that there had been some impropriety in the drafting of his sentencing entry akin to what he believed occurred in the Roberts case?

A That's an assumption on his part.

Q But that's basically what he alleged, though?

A That's what he alleged.

Q All right. And as a result of him filing a pleading requesting review of his concerns, you

issued a decision responding to that?

A I believe.

Q All right. I'm going to present you with what's been marked as Exhibit 9.

MR. BERGER: I don't know if you want them or you want me to give them to Geoff?

MR. STERN: No, that's all right. You can give them to Rasheeda.

MR. BERGER: All right.

Q Could you identify for me what Exhibit 9 is?

A That's a judgment entry that I caused to be filed in the Roderick Davie case.

Q All right. And in fact, it's the entry that you entered as a result of Mr. Davie's request for a new sentencing hearing --

A Correct.

Q -- that we were just discussing?

A Uh-huh.

Q All right.

A A little note on that.

MR. RICHARDS: There's no question on the floor, Your Honor.

THE WITNESS: Okay.

Q If you turn to Page 2 of Exhibit 9, the first full paragraph that begins with, "In any event," do you see where I'm referring to? "In any event, Defendant's arguments, as based on Roberts and Jackson, are inapposite in this case because, in this case, the Prosecutor played no role whatsoever in drafting the opinion of the Court filed of record on March 25, 1992." Did I read that correctly?

A That's correct.

Q So basically what you're saying there is, you prepared the Davie death penalty sentencing entry in its entirety with no input or assistance from the Prosecutor's Office?

A That is correct; in that case I did.

Q And --

A I did every entry.

Q And how is it that you recall that?

A Because of the three months of work that it took me to do what I did in that case.

Q All right. Why was it you didn't rely on the Prosecutor's Office to draft the Davie sentencing entry?

A Well, that case -- what was the date on that case? It was quite -- '91. It was right after I had

taken the bench. That wasn't my case. It had been referred by another Judge because he had two other capital cases. And I was not really aware of how -- well, I did everything. I took -- there's like a hundred motions that are filed. So many of them are just repetitious; the Supreme Court has already ruled on them, but they have to be filed in every case. And I wrote each of those out in longhand. I don't remember who typed them. It wasn't the Prosecutor. May have been my wife.

And after that case was prepared and finished, there was much speculation that I had not done the thing in an appropriate manner that was going to pass muster in the Appeal Court. It turns out it did. But the style in which I did it, I guess, was thought questionable; and the reason I did it was I was new to the bench and maybe too proud to ask anybody what should be done.

Q Did the Prosecutor's Office offer to draft it for you?

A Huh-uh, no.

Q Were you aware at that point in time that the Prosecutor's Office drafted the entries for the Courts?

A I knew that they drafted judgment entries on most of the cases. I never asked anybody about

on a capital case. I just did it.

Q How many capital cases have you handled?

A Four, three of which resulted in death penalties.

Q So it would be the Davie matter that we're talking about now, the Roberts and Jackson matters that we've previously discussed, and then what would the fourth be?

A Santine case. It was -- venue was moved up to Ashtabula County. We had a two-week trial with an Ashtabula jury. They did not return a death finding. It was a contract, murder by contract case.

Q And what was the defendant's first name in that, do you recall?

A I do not remember.

Q Do you recall how the last name is spelled?

A S-A-N-T-I-N-E.

Q All right. And was it a man or a woman?

A Man.

Q All right.

A There were I think three different people that were charged, three or four, with this killing. Santine had paid these other fellows to kill a

competitor that he had in his business. It's down in Hubbard. They went into the house, shot the place up, ended up killing the intended victim's mother but merely wounded him. And I think one of the others was convicted, given the death penalty, if I recall. I don't -- I didn't have those cases. And a couple of them I think may have pleaded out to something.

Q And what time period are we talking about that the Santine case took place?

A I would say probably the early '90's sometime.

Q All right. And did you rely on the Prosecutor's Office to draft entries for that proceeding?

A I don't recall. I don't know.

Q All right. If we could go back to Exhibit 9, the Davie entry, all the way at the bottom of the page in the last line there's a sentence that begins, "Regrettably." Do you see where I'm referring to, and then it continues on Page 2?

A "Regrettably."

Q Do you see where I'm referring to?

A (Nodding).

Q I'm going to read it if you want to follow along. "Regrettably, the Ohio Supreme Court

opinion in Roberts is based upon a Trial Court record which is absent critical facts about the Prosecutor's involvement in the preparation of the sentencing memorandum." Did I read that correctly?

A You did.

Q All right. Can you tell me what you were referring to were the missing critical factors?

A That perhaps is inartfully stated. I was referring to the, by reading the Supreme Court's opinion, they appeared to have a belief that there was communications back and forth and that there were six or seven drafts prepared based on those communications. And that does not follow the facts of the matter. One, I assume, from reading that opinion, that they thought that there was a -- we were having conferences or something, and it was a joint effort between the Prosecutor and myself to prepare this entry. That wasn't the case. I told them what I wanted and they typed it.

Q Your court has local rules?

A Yes, we do.

Q And the purpose of the rules is to set out established court procedures and expectations?

A That is the expectation, yeah.

Q I'm going to present you with what's

been marked as Exhibit 10, and if you could go to -- oh, I'm sorry. Is the entry-drafting process that we've been talking about part of the local rules?

A Not that I'm aware of.

Q All right. In fact, there's a rule that says a different procedure is to be followed, isn't there?

A Well, draw that to my attention, if you would.

Q All right, take a look at Rule 15, which is probably about three-fourths or four-fifths of the way through. Unfortunately it's not numbered, but you're looking for Rule 15.

A I would say that that's referring to civil cases.

Q Well, let's do this. You've found Rule 15?

A I did.

Q And it's entitled Judgment Entries?

A Uh-huh.

Q And I'm going to read it if you want to follow along. "Counsel for the party in whose favor an order, judgment or decree is announced shall, within 14 days thereafter unless the time is extended by the Court, prepare a proper judgment entry and submit the same to

counsel for the opposite party, who shall approve or reject the same within 5 days after its receipt by him and may, in case of rejection, file objections thereto in writing with the Court."

A Right.

Q I read that correctly?

A Uh-huh.

Q So you're saying that this doesn't apply to criminal matters?

A I don't know what the intent is. The way that I read that, that that would apply to civil cases, particularly because of the 14 days mentioned in there. That's a standard time under Civil Rules. I'm not familiar with any 14 days that applies to anything criminal.

Q Is there anything in the rules or the table of contents that indicates that this only applies to --

A No, I'm not familiar with anything in there that says one way or the other; but quite clearly to me it only applies to the civil docket.

Q And that's based upon just the reference to the 14 days?

A Yes. Oh, no. If you had a criminal

case, let's take a motion to suppress. You have a hearing. Ordinarily I will make a decision from the bench, so I've made a judgment on the matter. The Prosecutor almost invariably will prepare that. Recently we've been saying to the defense counsel, do you want to prepare this? No, they don't want to do that. The Prosecutor prepares it; they send a copy to the defendant. It eventually gets onto my desk and I will sign it.

If you apply that rule to the criminal law, I don't know how it would really apply, other than, counsel for the party to whose favor an order, judgment or decree is announced shall within 14 days, blah, blah, blah, blah, blah, blah. There's no 14-day rule that applies on who prepares a judgment entry, not that I'm aware of, in criminal court. The Prosecutor prepares it in a, usually within a few days.

Even if I would find for the defendant on a motion to suppress, Prosecutor still prepares it. So I'm saying, they don't always prepare things that they're in favor of, but they prepare them. The 14-day would be a good indication that it's applying to a civil. I don't think that that standard is used or meant to be used in the criminal, criminal cases.

Q And you're connecting the 14 days in

Rule 15 to something in the Civil Rules?

A Yeah, 14 days to file answers, 14 days to object to a Magistrate's decision. It's used all over the place. But nothing in my mind comes to mind as reference to the criminal law. There's no 14-day rule that I'm aware of in the criminal rules, criminal law.

Q But there's nothing to stop the Court in its rules from creating its own 14 days?

A Well, if they wished to, I imagine they could. I can see no reason to do so.

Q All right, let's go back to the Complaint, which is Exhibit 5, and I think this takes us to Paragraph 16. You indicated previously that you did not agree with the use of the term ex parte?

A Right.

Q Beyond that, is there anything in Paragraph 16 that is not correct?

A That's essentially correct.

Q All right. Paragraph 17, other than your concern about the use of the word ex parte, is there anything in Paragraph 17 that is incorrect?

A Not that I can see, no.

Q All right. Paragraph 18, anything that's not accurate in that Paragraph?

A No, that's correct.

Q All right. Paragraph 19, is there anything that's not correct in that?

MR. RICHARDS: Are you on 19?

MR. BERGER: Yes.

A No, that's when Counsel Ingram brought that fact to light, that Bailey apparently was reading something that was following what I was reading.

Q All right. So while you were sitting on the bench at the sentencing hearing reading your decision, Mr. Bailey was following along also reading your decision?

A That's what Mr. Ingram observed from his statement.

Q And that's ultimately what Mr. Bailey acknowledged as well when you spoke --

A Correct.

Q -- back in chambers?

A Correct.

Q All right. Where did Mr. Bailey get a copy of the entry from?

A I assume they had a copy from the one that they delivered to me.

Q All right. Did you provide --

A No.

Q -- the Prosecutor's Office with a copy of the entry?

A No.

Q All right. So it's your assumption that the copy of the entry that Mr. Bailey had was an unsigned copy?

A I would imagine it would have to be unsigned, yeah.

Q So you have no knowledge of anyone from your office providing a copy of the signed entry?

A No, I do not.

Q Do you sign the entry prior to the sentencing hearing?

A Not usually.

Q All right. Paragraph 20, excepting your concern about the term ex parte, is there anything in there that's not correct?

A No, that's essentially correct.

Q Do you understand why Mr. Ingram objected?

A What do you mean by that? If I were in his position, I would have objected also.

Q And why is that?

A Well, it just doesn't look right for the

Prosecutor to have a copy and defense counsel feeling that they were deprived of the copy. The copy should have been given to him. It wasn't.

Q So it's your belief that or your understanding that Mr. Ingram's objection was limited to the fact that they didn't receive a copy of the entry on the day of the hearing?

A Well, I think perhaps it went further than that.

MR. RICHARDS: Your Honor --

A That's my understanding.

MR. RICHARDS: I would instruct you not to attempt to read Mr. Ingram's mind.

THE WITNESS: Well, I'm not reading anything.

MR. RICHARDS: If you know why he objected, you should tell him. If you don't you should not attempt to read his mind.

A Yeah, okay, I don't know why he objected.

(Discussion off the record.)

Q All right. I want to present you with what's been marked as Exhibit 11. And do you agree with the fact that Exhibit 11 is a portion of the Roberts

transcript that includes the conversations between the Court, Mr. Bailey, Mr. Becker, and Mr. Ingram regarding his objections?

A That is in chamber recorded, yeah.

Q All right. If you could turn to the second page, which has the number 6366 in the upper right-hand corner, do you see where I'm referring to?

A Yes.

Q The second full paragraph that begins, "MR. INGRAM," I'm going to read it if you want to follow along. "MR. INGRAM: Well, the record should reflect the vehement Defense objection to the State's participation in the drafting of the Court's sentencing decision in ex parte proceeding. We did not know this; we did not know of this. That is prohibited. I would ask that those documents be sealed and become part of the Appellate record in this case."

Does that refresh your recollection as to the basis for Mr. Ingram's objection?

A Well, I read this before. I'm familiar with it.

Q So you'll agree that he was objecting to what he believed was the Prosecutor's participation in drafting the entry?

A That appears to be his objection.

Q When you read this before, did you see anything in here that indicated he was objecting to not receiving a copy of the entry on the day of the hearing?

A No, I'm not indicating to you that that was what his objection was. I think he quite clearly stated what his objection was.

Q All right. Paragraph 21 of Exhibit 5, the Complaint, is there anything in Paragraph 21 that is not correct?

A No.

Q All right. A moment ago I read a paragraph from Exhibit 11, the transcript, and that paragraph had Mr. Ingram requesting that some documents be sealed and be made a part of the record. Do you recall what those documents were?

A I do not.

Q He uses the plural, documents?

A Uh-huh.

Q Do you recall, was it one thing or multiple things?

A I don't know, and as I've read through this prior to this hearing here, I really don't know what he was referring to there.

Q All right. Back to Exhibit 5, the Complaint, Paragraph 22, is there anything in that paragraph that is not correct?
A Not that I'm aware of.
Q Paragraph 23, is there anything in that paragraph that is not correct?
A No.
Q Paragraph 24, is there anything in that paragraph that is not correct?
A No.
Q Paragraph 25, when I looked at your Answer, I didn't see an admission or a denial for this paragraph, so I wasn't able to determine --
A I'm not denying the Supreme Court held what they held, if that's what you mean.
Q All right. So you don't disagree with --
A I disagree with the finding, but I don't disagree with the fact that they made a finding, no.
Q All right, so Paragraph 25 is accurate?
A Right.
Q All right. Paragraph 26, is there anything in that paragraph that is not correct?
A I, of course, agree with the first

sentence, that I don't disagree that that was their finding.

Q All right. So you disagree with the finding, but the representation of what they found is correct in Paragraph 26?

A Yeah.

Q All right. Paragraph 27, is there anything that's not correct in Paragraph 27?

A Yeah, the ex parte basis.

Q All right. Is this another instance where you disagree with the Court's conclusions but you agree that Paragraph 27 represents the Court's conclusions?

A That's correct.

Q Is that fair?

A That's fair.

Q All right. In Paragraph 27 it refers to a section of the Court's opinion, and it says that you directly involved the Prosecutor in preparing the sentencing opinion. Do you see that part that I just read?

A Uh-huh.

Q Do you agree with the Court's statement that you directly involved the Prosecutor in preparing the

sentencing opinion?

A I agree that I directed the Prosecutor to prepare the sentencing opinion.

Q Do you agree with their characterization that you directly involved the Prosecutor in preparing the sentencing entry?

A Well, that's a question of semantics, I guess. I agree that I requested the Prosecutor to prepare the sentencing opinion. Directly involved makes it again sound like there's a collusion of some sort with the Prosecutor's Office, so I disagree with those words specifically, yes.

Q You agree that the Prosecutors were involved in preparing the sentencing opinion?

A I agree that they prepared the sentence entry at my request.

Q Which would require them to be involved in the preparation?

A One could say that.

Q Paragraph 28, is Paragraph 28 accurate?

MR. RICHARDS: Just a moment. Judge, the way this Complaint is drafted, Paragraph 28 simply states what the Supreme Court's opinion says. Okay, he's just restating what it says. So when you answer his

questions, be aware of that, that he's making an allegation that the Supreme Court's opinion says the following, okay? So you have to read it in that sense. Go ahead, you can answer his question.

A I agree that 28 is what the written conclusion of the Supreme Court stated.

Q All right. In the second line of Paragraph No. 28 it indicates that you provided your notes to Mr. Bailey and Mr. Becker; see where I'm referring to?

A Uh-huh.

Q Do you agree with the Court's characterization of you as providing notes to them?

A Yes.

Q All right. The Court further used the term guide to describe your communications, that you provided your notes to guide them in drafting the sentencing opinion?

A I would use the term directed them, but guide them is again a question of semantics.

Q All right. Paragraph 29, excepting the fact that you disagree with the Court's ultimate conclusions, is there anything in Paragraph 29 that is not correct?

A I agree that 29 essentially parallels

what the Supreme Court ruled in the Roberts case.

Q All right. Paragraph 30, would your answer be the same?

A Correct.

Q All right. I did not see a response in your Answer to Paragraph 31, and I'm operating under the assumption that you are denying violating any ethical rules, but because there wasn't anything in the Answer --

MR. RICHARDS: Look at Paragraph 8 of the Amended Answer.

MR. BERGER: Did I miss it?

MR. RICHARDS: You missed it.

MR. BERGER: All right.

MR. RICHARDS: We don't admit it as true. We deny it.

MR. BERGER: Oh, I see.

MR. RICHARDS: Yeah.

MR. BERGER: Thank you.

Q All right, let's talk about the preparation of entries by the Prosecutor's Office. What types of entries have you had the Prosecutor's Office prepare for you?

MR. RICHARDS: Well, we object to this entire line of questioning unless it's limited to the

preparation of entries relative to death penalty cases in which there's a specific statute that applies and was actually the basis of the Supreme Court's opinion. Having made that objection, you go right ahead, Mr. Berger; and, Judge, you answer his questions as he gives them to you.

A Again please?

Q Sure. What types of entries have you had the Prosecutor's Office prepare for you in the past?

A They probably prepare 70, 75 percent of all entries on a daily basis. We have a criminal morning in my court on Thursday. Each of the other Courts have three other days of the week. Many of those are agreed sentencings. They have a Rule 11 agreement. They will enter a plea. I advise them of their rights and go through all of what is necessary. That goes over to the Prosecutor's Office. They prepare a final entry. It's brought back and I sign it if it contains what I feel is proper. Many times other things that we have by way of motions, I will draft those myself. A motion for summary, I do a lot of those. I prepare those entries and my reporter will type them. I'm trying to think here.

MR. RICHARDS: Did you mean to say motions? You don't prepare motions, do you?

THE WITNESS: No, I prepare judgment

entries on the finding concerning the motion.

MR. RICHARDS: All right. You said you prepared motions. You didn't mean that.

A Yeah. I'm trying to think of other criminal matters that we still prepare them. We get requests all the time for, from prison; defendants file to have a suspension of fines or costs. There's a case, the White case, says that that must be done prior to sentencing, move on a PA to dismiss the cost and the fine. We type those. It's just a standard thing that comes through. There's other things I can't call to mind that we type on a regular basis. Motion for summary usually takes some time because I've got to -- sometimes counsel will cite cases. Many times I have to find cases myself to back up why I'm making the ruling that I'm making.

MR. RICHARDS: Judge, you again used the phrase motion for summary. What do you mean by that?

THE WITNESS: Oh, I'm sorry.

MR. RICHARDS: Yeah.

A Quite clearly I mean motion to suppress. If somebody moves on a constitutional basis to have evidence not admitted because of some -- that's almost a waste of time anymore because the Fourth Amendment is pretty much out of the way; but motions to suppress, I

usually do those.

Q You indicated earlier this morning that you spent a fair amount of years practicing law privately before you took the bench?

A Well, 33 years, yeah.

Q All right. In your prior career when you were representing criminal clients, would have you been comfortable with opposing counsel preparing an entry without your knowledge or input?

A In criminal cases it was done all the time because that's just the way it was. I'm not going to prepare a judgment entry that I don't have to. Judge would usually make a sentence; the entry would be prepared.

Q And --

A If I thought that there was some collusion or some advantage given to somebody, but that's not the case. At that point the Prosecutor's merely doing what the Judge directed. If the Prosecutor tries to add something or make a different finding or something, the Judge isn't going to sign it. That's the point.

Q How about in a civil case?

A Civil cases, all the time.

Q Without the knowledge or input from the

other side?

A The practice is that, a large percentage of the cases, if I have an entry that I want to put on, sometimes I'm not really quite sure what the proper answer is.

Q Oh, I'm sorry, Your Honor. Let me clarify. I was going back again to when you were in private practice.

A Oh, when I was in private practice?

Q Yeah, when you were in private practice, would have you been comfortable if you were representing a client and opposing counsel prepared an entry without your knowledge or input?

A Well, that's hard. Let me, if I can explain this to you. If I thought that there was some unfair advantage that other counsel had -- when I was in private practice, it was not unusual for a Judge to call me up, say, on a motion for summary judgment, and say, either he or his secretary or reporter, say, I want you to prepare me an entry on that summary judgment. Now, he didn't tell me that he was ruling in my favor. I could assume that he was calling the other attorney and telling him the same thing. Maybe he didn't. Maybe he just called me. I'd prepare a summary judgment motion.

I have used that at times. Sometimes I'll call both attorneys and say, prepare me a judgment entry. I don't tell them how to prepare a judgment entry. Prepare me a judgment entry. I instinctively know that they're going to -- I know that they're going to prepare a judgment entry in their favor. Sometimes on a close case, in filing that entry, they will, you know, when I get both of them, look at them and find some little gem that I overlooked. Another thing that becomes very valuable, say you have a case involving building of a house, contract on a house --

Q Your Honor, I'm sorry, I'm going to interrupt you for a second. I'm not sure that you're answering my question.

A Well, I'm trying to.

Q All right. My question was, as a private attorney, would you be okay with opposing counsel preparing an entry for the Court without your knowledge or input?

A Now, see, any answer I give at this point is going to be self-serving, or could be. I would not be uncomfortable if that's what the Judge's ruling was going to be. And you would never have a situation where that would happen unless the Judge had informed one or

both to prepare an entry. Why would a Judge -- why would an entry be prepared by one side and not the other unless there was some indication that an entry was solicited or wanted to be filed for that to occur. And I think if you talk to any Judge, that occurs all the time, where one side or the other is called and, or both, and said, prepare me a judgment entry. There's no direction as to how. It's just assumed you're going to prepare a judgment entry in your client's favor. So I don't know how any attorney's going to get a judgment entry in that the Judge didn't intend to come in.

Q Sure, I can see that. I guess I was looking for your perspective on whether or not you believed you could competently represent a client in those circumstances?

A Well, sure.

Q All right. So if the other side prepared the entry, and you were representing a client and the other side prepared the entry, and you didn't know about the request and you didn't have any input into it, that would not concern you?

A The Judge is going to do it whether he types it himself or he has the winning party type the thing. The result is the same.

Q All right.

A Now, what's a Judge going to think if one side submits a judgment entry and, you know, unsolicited? Is he going to sign that or is he going to look at the case and see whether it merits being signed or not? I guess that could happen. I've never had anybody submit a judgment entry out of the blue other than both sides are aware of it, you know.

Q All right. I'm going to present you with what's been marked as Exhibit 12 and ask if you can identify it?

A Yes, I am aware of that.

Q And is Exhibit 12 a December 5th, 2006, letter to all of the Judges on your court from the Prosecutor's Office?

A That is correct.

Q And in fact, this is a letter notifying you and the other Judges that the Prosecutor's Office will no longer be utilizing the same entry-drafting procedure?

A Well --

MR. RICHARDS: No, he's asking you, is that --

A Yes, yes, yes.

Q What is the procedure now?

A Now when a judgment is made, it's in court; and the defense lawyer is asked, do you mind, do you agree to have the Prosecutor prepare the entry, or do you wish to prepare it? And again, no one's volunteered on the defense side to prepare one. Those are the run-of-the-mill judgment entries I'm talking about that -- well, every judgment entry, no matter what type of case it is. And I still prepare that portion that I do on those. It's more convenient for me to just write it down and have it typed than to send it over to the Prosecutor's Office.

Q All right. So from what you've said, it sounds as if defense counsel are now notified at the hearing of both an opportunity to draft the entry?

A Well, they were always notified or aware of it because it happened in open court. It's just we didn't go to the point of explicitly placing on the record their agreement that the Prosecutor would prepare them. They always agreed. It's just that, because of this case, now it's specifically asked of them so there's a record of it.

Q But you'll agree Mr. Ingram and Mr. Juhasz didn't agree?

A I don't disagree with that.

Q All right. So it wasn't always that

people knew or it wasn't always that the request was made in the presence of all the parties?

A Give me your question again, please?

Q Sure. A moment ago you suggested that, and I think the word you used was always --

A Yeah.

Q -- that it was always done in the past in a way that the other side was aware that the Prosecutor's Office was drafting the entry, either because the request had been made in court or because the attorneys were apparently aware of this process. That's not the case; it wasn't that way always?

A Well, it reminds me of the statement, every absolute statement is incorrect, including this one, okay. Perhaps the term always is inappropriate. We'll say usually.

Q All right. I want to make sure I understand your description of the process now. The process now involves you letting opposing counsel opt to draft the entry, and if they're not interested in drafting it, advising them that the Prosecutor's Office is going to draft the entry?

A Correct; ask permission to or whether they object. Do you mind if the Prosecutor prepares it.

Q All right. Anything else that's done differently now?

A No, I don't believe there's anything that has come out of this except that everybody is wondering if the Supreme Court's definition of ex parte goes to the extreme, was that their intent, to mean no communication. I think everybody is much more aware of the fact that just because everybody does something doesn't mean that it's permissible.

Q Does the Prosecutor's Office provide a copy of the proposed entry to opposing counsel at the same time that they provide it to the Court?

A That I don't know.

Q You don't specifically request that they do that?

A Most attorneys probably after the judgment is made, you know, are not really concerned with, unless they would have some feeling that -- I don't know the answer to that.

Q All right. Earlier this morning we talked for a moment about Tony Consoldane?

A Uh-huh.

Q I just wanted to come back to that for a second. I think you indicated that Mr. Consoldane is a

public defender, and on a couple of occasions prior to the Court changing the entry-drafting process, he had objected to that process?

A Yeah, he's always done it in a manner such as, he's pushing for some point for his client, and if I would disagree with him, he would say, oh, you're in bed with the Prosecutor's Office; they always prepare the entries for you. Now, I know him very well. I've known him since I've been in practice. He started out years ago working before he was a lawyer in the Domestic Court. And it's his way of throwing a barb. He doesn't mean that he thinks -- I don't think he does, and I would be greatly surprised if he did -- that there's any merit to that remark. It's just a flip remark that he's made on several occasions to indicate that I never do anything for the, for his clients; I give everything to the Prosecutor's Office. That's the way I take it anyways. I don't know that he's ever formally objected, it's just a remark that he makes occasionally.

Q Prior to this issue being raised in the Roberts case, did you ever have any concerns about the process of having the Prosecutor's Office draft entries without the knowledge of the opposing counsel?

A I don't know that I can answer that. To

tell you the truth, I think that it probably did not cross my mind. In hindsight --

MR. RICHARDS: He's not asking you for hindsight, Your Honor.

THE WITNESS: Okay.

MR. RICHARDS: He's asking you what you've done.

A I don't know that that ever crossed my mind.

Q In our conversation this morning, a couple of times when we've been looking at the Complaint, you've raised a concern about the use of the term ex parte. Can you tell me how you define ex parte communication?

MR. RICHARDS: I object. It's asked and answered already at least once. Go ahead.

THE WITNESS: Go ahead?

MR. RICHARDS: Go ahead, answer it again.

A There are certain things, I guess it's like, I don't know who, Frankfurter or whoever said it -- it wasn't Frankfurter -- said, I can't define obscenity, but I know it when I see it. That's the same concept that applies here. It seems to me that there are certain

things that you instinctively, we all instinctively know what the rules are. You can't engage in something that is unfair to the other side. And in my mind there was nothing unfair to the defendant in this case. That I came to that conclusion; I came to the conclusion of fact that the jury made a proper decision. There were no mitigating factors that outweighed the aggravating circumstances. That was clear, much clearer than it would be in a case where there were circumstantial evidence only.

MR. RICHARDS: Judge, he's asked you to define the term ex parte. Can you do that for him?

THE WITNESS: Okay, yeah. I apologize, Charlie.

A You don't talk with one side of a case outside of the presence of the other side about anything that could reflect upon the other side or be unfair to the other side. That's the reason I'm saying, when you talk about housekeeping matters with one attorney or the other, you don't get into the substance of the case, the merits of the case. I don't deem that to be ex parte communication. As I say, a Judge would have to live in a cocoon otherwise.

Now, if you went to a social gathering or something, somebody comes up and tries to talk to you about a case,

that would be ex parte communication. Whether it's one of the other attorneys or not, it's just maybe a member of the family, that's ex parte communication.. You can't do that.

The whole basis is, is one party or the other being damaged by any communication that you're having with one of the parties. And that's perhaps a simple version, but that's my version. To say that you cannot ever talk with one attorney out of the presence of the other attorney I think is impractical, and I don't think that is the rule. So that's my definition.

Q All right. I noticed in your explanation you only referred to a conversation. Does the prohibition against an ex parte communication also encompass written?

A Quite naturally. Any communication that would be to the substance of a matter. Although victims can write letters, you know, to the Judge.

Q You're familiar with the Code of Judicial Conduct?

A I am.

Q All right.

A Not saying I'm an expert on it, but I'm familiar with it.

Q All right. I'm going to present you with what's been marked as Exhibit 13, and Exhibit 13 is a copy of Canon 3; is that correct?

A Yes.

Q And Canon 3 is where we find the restrictions on ex parte communications; isn't that correct?

A That's correct.

Q All right. And you were familiar with Canon 3 prior to June of 2003?

A Yes, I've been to seminars on it.

Q All right. On Page 1 of Exhibit 13, if you go to (B)(7), what I would like for you to do, (B)(7) lists four instances in which ex parte communications are permitted; isn't that correct?

A That is correct.

Q And you agree that your conduct in this matter does not encompass what's envisioned by (7)(b) where they talk about a disinterested expert?

A Referring to (7) what now?

Q (7)(b).

MR. RICHARDS: He says do you agree that's not applicable. That's how he puts it. He puts it in that sense.

A Oh, yeah, I would think that not to be applicable.

Q All right. And (7)(c) is not applicable as well?

A I would say not applicable.

Q All right. And based upon what you've told me today, I suspect that you are relying on the exception in (7)(a)?

A That's correct.

Q All right.

A "No party will gain a procedural or tactical advantage as a result."

Q Are you asserting that the creation of the Roberts sentencing entry was not a substantial matter?

A No, not at all.

Q All right. Are you asserting that the creation of the Roberts sentencing entry was not an issue on the merits?

A Well, that would be foolish of me.

Q Can you tell me what a substantial matter would be?

A I can think of nothing more substantial than this matter at hand. That is something not to be treated lightly.

Q When we spoke a good bit earlier today about your communications with Mr. Bailey and Mr. Becker, we identified an initial in-person conversation; we identified the delivery of the entry?

A Correct.

Q We identified a telephone call, and then was there a second delivery of the final entry then?

A Yeah, the final, final entry would have been, you know, the final pleading that I used.

Q And how was it that you received the final entry then; was that brought to your office or --

A I don't recall, but stuff, things of that nature or whatever are usually left with my bailiff outside, and she'll bring it in. I don't specifically remember in this case any variation from that.

Q Did you give Mr. Bailey or Mr. Becker anything in writing beyond your initial notes?

A No, I did not.

Q The Nathaniel Jackson sentencing entry which we had previously marked as Exhibit 8, you utilized the same entry-drafting process for that as you did for the Donna Roberts sentencing entry?

A I did much -- I did more detail in I think going through the history of the thing, as well as

the second portion, because it had not been reduced to writing yet.

Q But with the Nathaniel Jackson matter, you provided notes to the Prosecutor's Office; they prepared something; you --

A Approved it or disapproved of it, yes.

Q All right. And these particular interactions between you and the Prosecutor's Office, you didn't advise defense counsel of that?

A I don't remember whether they were advised or not. You'd have to check with them. That was the Public Defender's Office, Mr. Consoldane and Mr. Lewis.

Q Well, I've got two pages left here. I know everyone's glad to hear that.

All right. I want you to take a look at Exhibit 4, which is the September 21st, 2007, letter from your attorney to my office.

MR. RICHARDS: What was Canon 3, Rob?

MR. BERGER: Exhibit 13. That was our last one.

MR. RICHARDS: Thank you.

A Yes, sir.

Q All right, let's go to Page 5. There

is, on Page 5, there's a heading VI entitled Conclusion?

A Yeah.

Q The second paragraph under that, if you could read that paragraph, I have a question I want to ask you about it.

A "Judge Stuard wants it to be" --

MR. RICHARDS: No, to yourself.

Q You can read it to yourself.

A Oh, okay. Yes.

Q All right, I have a couple questions I want to ask you about that paragraph. In the one, two, three, four, in the fourth and fifth sentence --

A Uh-huh.

Q -- it refers to your contacts with Assistant Prosecuting Attorney Becker. Is there a reason why Mr. Becker is identified in this letter and not Mr. Bailey?

A I think that through this process it became known that Becker may have been the person. Your questions of what I remembered at the time is the way I've answered the questions. It appears that Becker was the one that I had given this to. So that's I think the reason that it is framed that way.

Q So based upon additional information

that you've obtained as a result of our investigation into this matter, you've now come to the reasonable conclusion that the communications that you had were with Mr. Becker?

MR. RICHARDS: Just a moment. You didn't write this letter. He's asking you if you made the conclusion that it was Becker?

A No, I didn't. That's what I've answered here. That would be the only way that -- that's something my attorney put from his conversations with other parties. I don't remember who I talked with.

Q All right.

A I have no reason to doubt that it was Becker, though.

Q And why do you say that?

A Well, if he has stated that, then I would, you know, assume that he's -- he has no reason to lie about it. But I don't have recollection of which one it was. They're both over there quite often. Or they were at that period of time.

Q All right. That sentence further indicates that your appearances, I'm sorry, your contacts with Mr. Becker gave the appearance of impropriety; do you see where I'm referring?

A Yeah. What's your question, please?

Q How so? How did your contacts with Mr. Becker give the appearance of impropriety?

A Well, any way you look at this, even if there's not been a violation here, I think any reasonable minded person would have to say, again, particularly from somebody outside the system that would look at this, would say, oh, that doesn't look right. It's a possible appearance of impropriety. Caesar's wife is what this situation is, in my opinion. That, you know, we have not -- my attorney has not during any of this procedure put on that everybody else is doing it so it's right. It's either right or it's wrong. The Court's going to decide that.

In my mind, I've done nothing wrong. I've not -- I've fulfilled my duty and acted accordingly. I found nothing wrong with having them prepare the entry. That's my opinion. But in looking back, there's a possible appearance of impropriety. I can't deny that. I'd be a fool to deny that. Doesn't look good. But I find that quite different from me intentionally trying to do something that I thought was improper. I can assure you that I've never during the course of my career as a lawyer ever done anything I thought was improper. So --

Q When did you first come to the

conclusion that your contacts with Mr. Becker gave the appearance of impropriety?

A Well --

MR. RICHARDS: To the extent that requires you to disclose any conversations you've had with me, you shall not answer.

THE WITNESS: No, no.

A Well, I kind of got hit right between the eyes with the Roberts decision, okay. That's the first time it looked to me like, whoa, wait a minute here, you know, what have I done or not done that has put me in this position?

Q All right, let's go back to Exhibit 4 and continue on in the same paragraph. The last sentence on Page 5, halfway through the sentence the letter refers to -- it's the page before, Your Honor -- halfway through the last sentence, it states, "There was a different and undoubtedly better way to approach the matter." Do you see where I'm referring to?

A Oh, yeah.

Q Okay. What is it that you're referring to there?

A Well, quite clearly, had I asked both sides to just submit an entry, which would be a highly

unusual way to do it, or if I had advised the defendant, hey, I'm going to have the Prosecutor type this up, then this situation would not have arisen. That's quite simply what I think is meant by that.

MR. BERGER: All right, that's the last of my questions. I didn't know if you had any questions that you wanted to ask?

MR. RICHARDS: Do you folks have any?

MR. STERN: No, sir.

MR. RICHARDS: Well, for the first time in my career, which spans almost 40 years, I'm going to do something I've never before done, and I'm going to ask my own client some questions.

DIRECT EXAMINATION:

BY MR. RICHARDS

Q Your Honor, there's only going to be two questions. Can you hear me?

A Uh-huh.

Q Mr. Becker directed your attention to Canon 7, which I believe is Exhibit 13.

A You mean Mr. Berger.

MR. STERN: Mr. Berger.

MR. RICHARDS: I mean Mr. Berger. What did I say?

MR. STERN: Mr. Becker.

THE WITNESS: He's elevated you, Becker.

(Discussion off the record.)

Q Now, Judge, with respect to the questions put to you about substantial matter, I want to ask you first whether in your conversation, your brief conversation that you said was 30 to 45 minutes, whether you discussed the facts of the case with the Assistant Prosecuting Attorney who you asked to type the opinion?

A I said 35 minutes?

Q No.

A Seconds.

Q You told us that that conversation was a 30- to 45-minute conversation.

A Second.

MR. STERN: Second.

Q Second I mean, 30- to 45-second conversation.

A Yeah.

Q In that conversation -- and I'm only using the 30 to 45 reference to identify it --

A Uh-huh.

Q -- the conversation where you gave them your notes, did you discuss the facts of the case?

*NAGY-BAKER COURT REPORTING, INC.*
*(330) 746-7479*
*(800) 964-3376*



A No, not at all.

Q All right. Evidence?

A No.

Q Okay. Did you discuss the merits of the case in any way?

A During that conversation I undoubtedly said, if it was Becker, I would have said to him, you know, what are you doing; how are you doing; what are you over here for? By the way, I made my decision; here's what it is; draft me an entry. That was it.

Q All right. Mr. Berger got you to admit that you discussed a substantial matter with Mr. Becker. When you said that, did you mean you discussed the merits of the case or the substance of the case?

A No, no, no, I don't remember saying it. I don't remember that specific question. I must have missed the word substantial. He asked me whether he thought this was a substantial matter. Well, of course it is.

Q What is?

A The reason we're here, the death penalty case. I mean, you can't get any more substantial than that. That was my understanding of what he was referring to.

Q All right, fine. I have no further questions.

A I had no further conversation than what I've said with Becker. Did I say that?

MR. BECKER: That's the issue. That's the whole issue.

Q Never mind what you said. Just answer my questions. Did -- I have one last question.

(Mr. Bailey entered the deposition room.)

Q Did Mr. Becker, in that conversation or any other, influence your decision to sentence Donna Roberts to death?

A Absolutely not.

Q All right, that's it.

A I doubt if Becker ever said anything.

MR. RICHARDS: All right, that's all. I have nothing else. Rob, I didn't pay attention, but was he sworn?

MR. BERGER: Yes.

MR. RICHARDS: Okay.

THE WITNESS: Yeah.

MR. BERGER: Just a couple of procedural things we need to deal with. I assume that he's going to want to review the transcript?

MR. RICHARDS: He will read.

MR. BERGER: All right. I've already asked the court reporter to produce an expedited transcript in light of the fact that the hearing is in short order. And pursuant to Civil Rule 30(E), he'll have seven days, since the deposition is within 30 days of the hearing. So you'll just want to coordinate with the court reporter to arrange.

MR. RICHARDS: Hearing's on the 13th?

MR. BERGER: I think it's on the 14th.

MR. RICHARDS: Of March?

MR. STERN: I think it's on the 13th.

MR. BERGER: Oh, it's on the 13th, okay. All right.

MR. RICHARDS: Okay, what's the question? What's the issue here?

MR. BERGER: No, I just wanted to make sure that we were on the same page with regard to the amount of time he's got to do the review.

MR. RICHARDS: I'm computing 29 days, so I guess he has seven days to do the review. How do you want to do this, Mary? You want to get it to me and I'll get it to him?

THE COURT REPORTER: Sure.

(Discussion off the record.)

(Deposition concluded at 12:00 p.m.)

SIGNATURE NOT WAIVED

REPORTER'S CERTIFICATE

I HEREBY CERTIFY that the above and foregoing is a true and correct transcript of all the testimony introduced and proceedings had in the taking of the testimony in the above-entitled matter, as shown by my stenotype notes taken by me at the time said testimony was taken.

Mary J. Carney
Mary J. Carney
Registered Merit Reporter

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

I, JUDGE JOHN MASON STUARD, have read the foregoing pages of my testimony or have had the foregoing pages of my testimony read to me and have noted any changes in form or substance of my testimony together with their respective corrections and the reasons therefor on the following errata sheet(s).

(Signature) John M. Stuard

(Date) 2/26/08

*******************************************************

TO BE COMPLETED BY NOTARY PUBLIC:

I, CHARLES L RICHARDS, a Notary Public in and for the State of OHIO, hereby acknowledge that the above-named deponent personally appeared before me, swore to the truth of the foregoing statements and affixed his/her signature above as his/her own true act and deed.

(Signature) C Richards

(Date) FEB 26, 2008

My Commission Expires: ATTORNEY COMMISSION

MC

CHARLES L. RICHARDS, Attorney at Law Notary Public, State of Ohio My Commission has no expiration date

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
(800) 964-3376

TO THE WITNESS: DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN. Please note any word changes/corrections on this sheet only. Thank you.

TO THE REPORTER: I have read the entire transcript of my deposition taken on the 13th Day of February, 2008, or the same has been read to me. I request that the following changes be entered upon the record for reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

PAGE LINE CORRECTION OR CHANGE & REASON THEREFOR

2/26/08
Today's Date

[signature]
JUDGE JOHN MASON STUARD

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
(800) 964-3376

BEFORE THE BOARD OF COMMISSIONERS
ON
GRIEVANCES AND DISCIPLINE
OF
THE SUPREME COURT OF OHIO

CASE NO. 07-078

FILED
MAR 03 2008
BOARD OF COMMISSIONERS
ON GRIEVANCES & DISCIPLINE

In Re:
Complaint Against

KENNETH NEIL BAILEY and
CHRISTOPHER DEAN BECKER and
JUDGE JOHN MASON STUARD

Respondents,

DISCIPLINARY COUNSEL

Relator.

DEPOSITION

OF

CHRISTOPHER DEAN BECKER

DEPOSITION taken before me, Mary J. Carney, a Notary Public within and for the State of Ohio, on the 14th Day of February, 2008, pursuant to Agreement and at the time and place therein specified, to be used pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for Government of the Bar in the aforesaid cause of action, pending before the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio.

*NAGY-BAKER COURT REPORTING, INC.*
*(330) 746-7479*
*(800) 964-3376*

EXHIBIT
3

APPEARANCES

On Behalf of Respondent,
Judge John Mason Stuard:

Charles L. Richards, Attorney at Law
Hunter's Square
8600 East Market Street, Suite 1
Warren, OH 44484-2375

On Behalf of Respondents, Kenneth Neil Bailey and Christopher Dean Becker:

Geoffrey Stern, Attorney at Law
Rasheeda Z. Khan, Attorney at Law
Kegler, Brown, Hill & Ritter, L.P.A.
Capitol Square, Suite 1800
65 East State Street
Columbus, OH 43215-4294

On Behalf of Relator:

Robert R. Berger, Attorney at Law
Assistant Disciplinary Counsel of the Supreme Court of Ohio
250 Civic Center Drive, Suite 325
Columbus, OH 43215-7411

Also Present:

Kenneth Neil Bailey, Attorney at Law

INDEX

CROSS EXAMINATION BY MR. BERGER - PAGE 5

CROSS EXAMINATION BY MR. RICHARDS - PAGE 95

DIRECT EXAMINATION BY MS. KHAN - PAGE 97

OBJECTIONS AND MOTIONS:

BY MS. KHAN: PAGE(S) 6, 7, 9, 11, 15, 31, 33, 36, 47, 48, 52, 55, 58, 61, 64, 71, 72, 73, 74, 79, 82, 84, 87, 92, 93

BY MR. STERN: PAGE(S) 79, 81, 84-85

EXHIBITS INTRODUCED:

NO. 1 - PAGE 6
NO. 2 - PAGE 7
NO. 3 - PAGE 9
NO. 4 - PAGE 10
NO. 5 - PAGE 10
NO. 6 - PAGE 37
NO. 7 - PAGE 42
NO. 8 - PAGE 51
NO. 9 - PAGE 70
NO. 10 - PAGE 74
NO. 11 - PAGE 78
NO. 12 - PAGE 82

STIPULATIONS

It is stipulated and agreed by and between counsel for the parties hereto that this deposition may be taken at this time, 9:10 a.m., February 14, 2008, in the offices of Charles L. Richards, Attorney at Law, Hunter's Square, 8600 East Market Street, Suite 1, Warren, Ohio.

It is further stipulated and agreed by and between counsel that the deposition may be taken in shorthand by Mary J. Carney, a Notary Public within and for the State of Ohio, and may be by her transcribed with the use of computer-assisted transcription; and that the witness will read and sign the finished transcript of his deposition.

WHEREUPON,

CHRISTOPHER DEAN BECKER,

of lawful age, being by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, as hereinafter certified, deposes and says as follows:

MR. BERGER: We're here on the Disciplinary Complaint pending against Attorney Christopher Becker, Board of Commissioners on Grievances and Discipline Case No. 07-078. This deposition is being taken pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for the Government of the Bar. Respondent is present with his counsel, Rasheeda Khan and Geoff Stern. Also present are Kenneth Bailey and Charles Richards.

CROSS EXAMINATION:

BY MR. BERGER

Q Would you state your name, please?

A Christopher Dean Becker.

Q And what is your business address, Mr. Becker?

A 160 High Street, N.W., 4th Floor, Warren, Ohio, 44481.

Q All right, Mr. Becker, I'm going to present you with what's been marked as Exhibit 1 and ask if you could identify it?

MS. KHAN: Again I'm just going to object to the use of this document as it was prepared and submitted before the Complaint was certified. It's private under the Gov. Bar rules, and it should have been destroyed.

A It appears to be a letter sent from Mr. Stern dated November 28th, 2006, with an affidavit of Jerry Ingram, a response of Judge Stuard, a witness list, and a portion of the transcript from the Donna Roberts capital murder sentencing hearing.

Q All right. And this letter was in response to an inquiry from our office regarding your conduct in the Donna Roberts matter; isn't that correct?

A Yes.

Q And is this letter accurate?

A I didn't write it. I don't know.

Q Can you turn to Page 2? If you go to the paragraph in the center under the Facts --

A Uh-huh.

Q -- the last sentence states, "These response letters have been edited by me solely to

eliminate repetition within the response letters," and then beyond that it says --

A Where are you at? Where are you at exactly?

Q The last sentence.

A Oh, okay.

Q And then below that it says Mr. Becker's Response?

A Yes.

Q And it has quotation marks?

A Yeah, those, that would be my portion.

Q All right. Is that portion accurate?

A Yes.

Q All right. Any corrections or changes to the letter?

A None that I'm aware of at this time, no. No, I would say not.

Q All right. I'm going to present you with what's been marked as Exhibit 2 and ask if you could identify that?

MS. KHAN: Again I'm going to object to the use of this document for the same reasons that I objected to Exhibit 1.

A This is a three-page letter dated

December 27th, 2006. It looks like it's addressed to you and signed by Geoff Stern.

Q All right. And this is additional information provided by your counsel regarding your conduct in the Donna Roberts matter?

A Yes.

Q And you assisted Mr. Stern in the preparation of this letter?

A I didn't assist him in the preparation of this, no. I mean, we may have talked on the phone. He sent me a copy of it.

Q All right. And is this letter accurate?

A I didn't write it. You'd have to ask Mr. Stern.

Q Are the facts in this letter as stated accurate?

A Page 2, the second full paragraph where it says the sentencing memorandum was composed on my word processor, prior drafts were not preserved; it says, furthermore, my clients' office shares a common hard drive known as an I: drive. It's actually I believe the G: drive, is what the common drive is that we share with the Common Pleas Court. The I: drive is an internal drive in our office. The H: drive is a hard drive specific to

each computer. And I believe the G: drive is actually the drive that we share in common with all four Common Pleas Court Judges, their bailiffs, and their court reporters. Other than that, I'd say it's correct.

Q All right. I'm going to present you with what's been marked as Exhibit 3 and ask if you could identify it?

MS. KHAN: Again I object to the use of this document for the same reasons I objected to Exhibits 1 and 2.

A This is a letter dated September 24th, 2007. It looks as if it's addressed to you. It was signed by Mr. Stern, Mr. Miller, and Rasheeda Khan. It also has a copy of the Nathaniel Jackson judgment entry marked as Exhibit A, and it has a letter from Dave Toepfer dated December 5th, 2006, marked as Exhibit B.

Q And this letter discusses the facts regarding your actions in the Donna Roberts matter?

A Yeah.

Q And are the statements regarding your actions in the Donna Roberts matter correct in this letter?

A Yeah.

Q Any corrections or changes?

A No.

Q Thank you. I'm going to present you with what's been marked as Exhibit 4 and Exhibit 5, ask if you can identify them?

A Exhibit 4 is the nine-page Complaint with a certificate that is the basis of why we're here.

Q And Exhibit 5?

A Exhibit 5 is the six-page Answer of our attorneys and myself and Mr. Bailey. Exhibit A is the affidavit of Judge Stuard. There's no marking of an Exhibit, but there appears to be a relevant portion of the transcript again of the Donna Roberts sentencing hearing. And Exhibit B is marked as a three-page affidavit of Attorney Jerry Ingram.

Q Thank you. If you could turn to Page 2 of Exhibit 4, the Complaint?

A Page 2 of Exhibit 4, okay.

Q Take a look at Paragraph 1 and tell me if there's anything in Paragraph 1 that is not correct?

A I don't know, of the first paragraph, I don't know when Ken Bailey was admitted to law. The remaining portion of that is correct.

Q All right. Paragraph 3, is there anything in that paragraph that's not correct?

A No.

MS. KHAN: Just answer -- I'm objecting to the form of that question --

A Well --

MS. KHAN: -- because, no, it's not correct, or yes, it's correct. Just be clear about it.

A I'm sorry, it is correct that I've been employed as an Assistant Prosecutor for 16 years and I've served as an Assistant Prosecutor for Trumbull County since 2000.

Q All right. You were admitted in 1990?

A That is correct.

Q All right. What was your first job as an attorney?

A I was employed as the Assistant at the Jefferson County Prosecuting Attorney's Office.

Q And how long did you work there?

A From 19 -- well, I might not have actually started until January of '91, but through December of, well, almost the end of 2000, December 2000.

Q All right. And then from there you came to the Trumbull County Prosecutor's Office?

A That's correct.

Q Okay. When you were at the Jefferson

County Prosecutor's Office, what positions did you hold there?

A I was Assistant Prosecutor until the mid-'90's, then I was Chief Prosecutor, Chief Assistant, I guess to be correct.

Q All right. What positions have you held at the Trumbull County Prosecutor's Office?

A I'm Senior Trial Attorney.

Q That was your starting and current position?

A I don't recall if I was appointed Senior Trial Attorney immediately or if that came about sometime after I had worked there.

Q All right. Are you, in the Trumbull County Prosecutor's Office, are you the same rank as Mr. Bailey?

A Essentially, yeah.

Q Okay. Mr. Bailey's not your supervisor?

A No.

Q Okay. Back to Paragraph 4 of Exhibit 4, is there anything in that paragraph that is not accurate?

MS. KHAN: Just understanding he's saying not accurate, so just follow by yes, it's accurate, or no, it's not accurate.

A Yes, it's accurate.

MS. KHAN: Just to be clear for the record.

Q Paragraph 5?

A Yes, that is accurate.

Q Paragraph 6?

A Yes, that is accurate.

Q Paragraph 7?

A Yes, that is accurate.

Q All right. In the prosecution of the Roberts case, both you and Mr. Bailey were responsible for that; you were the two attorneys assigned to it?

A Yes, that is correct.

Q Were there any other attorneys that participated in the prosecution?

A Well, the actual indictment was presented and prepared by Dennis Watkins and Chuck Morrow, who is the Chief of the Criminal Division. They would have -- in our office, if there is a case where there's co-defendants, generally one group of Prosecutors will handle that case including the co-defendants. Shortly after those two cases, the Jackson case and Donna Roberts case, were indicted, Ken and I were assigned to the Donna Roberts case. I don't know; I couldn't -- I could

probably check, but I can't give you an answer today as to when that occurred. But I don't believe myself -- I know Mr. -- I don't believe Mr. Bailey was and I know I was not involved in the actual Grand Jury or preparation of that indictment.

Q All right. But beyond that, it was you and Mr. Bailey that handled the prosecution of the case?

A At some point after the indictment, correct.

Q All right.

A And it may have even been after the arraignment. I'm not sure. I'd have to check, but I don't think we actually participated in the arraignment.

Q All right. Was one of you in charge of the case?

A No more so than the other one, no.

Q Okay. Was one of you considered first chair in the case?

A No, Ken and I aren't egomaniacs like that.

Q So you just divided the tasks between yourselves?

A Essentially, yes.

Q All right. In Paragraph 8, I think

we've previously identified that the 2004 year that's cited should actually be 2003. Is there anything else in Paragraph 8 that is not correct?

A With that correction, that would be an accurate paragraph.

Q All right. Paragraph 9, again I think we've identified that it should say 2003 instead of 2004. Beyond that, is there anything in that paragraph that is not correct?

MS. KHAN: And I object to the characterization of several ex parte communications as stated in Paragraph 4.

THE WITNESS: You mean 9.

MS. KHAN: Oh, I'm sorry, 9. Thanks.

A Yes, I disagree wholeheartedly with the phrase several ex parte communications. With that removed -- well, actually I guess I would -- yeah, with that removed, I would say that -- well, actually I disagree with the Paragraph 9 as well because there was no communication until June 18th. June 4th is actually incorrect as well. That's borne out in the transcript.

Q All right. So it's your recollection that the first communication took place on June 18th?

A That is correct. And that's borne out

by the transcript that's attached to the Complaint and has been the basis of this.

Q But your personal recollection of the facts is that the first communication took place on June 18th?

A The first communication between Judge Stuard and myself -- I can't speak for Mr. Bailey or anyone else --

Q Sure.

A -- was Wednesday, June 18th.

Q All right. And can you explain to me what your concern about the phrase several ex parte communications is?

A I never had a conversation with him regarding the merits of the case.

Q I see. Anything else?

A I did not attempt to influence him in making his decision. When he gave me his notes on June 18th, he had made the decision, the ultimate decision in this case, which was to give, to concur with the jury's recommendation and impose the death sentence.

Q All right. So tell me what happened on June 18th.

A Wednesday, June 18th, would have been a

day where normally I would be in Judge McKay's court, whose courtroom is below Judge Stuard's. However, I believe, I'm certain that Judge McKay did not have court that day. And I had some other things to do regarding our Grand Jury, which is also on the second floor of the courthouse. I had, oftentimes as I do, I stop in to all the courts and see if they need anything; is there anything, you know, what's going on, is there a hearing, something I had missed.

And I stopped into Judge McKay's, or I'm sorry, Judge Stuard's. The setup of the office is, his bailiff and his court reporter sit in an outside office type of area. There's a long hallway that connects their office to Judge Stuard's chambers, maybe 20, 25 feet long hallway. I came in to speak to Mary Ann and Laurie, who are, Mary Ann Mills is his court reporter; Laurie Brown is his bailiff. Actually at the time I think I was there to try to find out if a competency report was done on a guy who had shot a police officer.

But as I was speaking to them, Judge Stuard heard me, or maybe even saw me, because you can see down the hallway, and came out, said something to the effect of how are you doing, pleasant, some type of pleasantry. I told him fine, I was here to get or to check on the competency

evaluation of -- I can't remember the guy's name. But at that point he said, hold on, I want you to -- I'm -- and I'm not quoting him verbatim here -- but words to the effect of, I want you to draft up an entry in the Roberts hearing for Friday. I have some notes here. And I don't know if he went back to his office or if he had them out in the area where I was standing or if they were on -- there's a shelf and a table and a coffee area and then a bathroom before you get to his chambers. They were somewhere in there. But at some point he handed me some handwritten notes. It was actually two pages, I believe, on yellow legal pad.

Q All right. Who was present during this conversation?

A I believe Laurie Brown and Mary Ann Mills would be there, although I'm not a hundred percent sure if Mary Ann was there. Laurie I'm certain was there.

Q And how long did this conversation last?

A A minute, maybe two.

Q Mr. Bailey was not present?

A Not that I recall.

Q What did you say in response to Judge Stuard?

A Well, I think he said something along

the lines of, draft up an entry like we did in Jenkins -- or Jackson. And I said, I think I said, fine, I'll try and get it to you by the end of tomorrow, which was Thursday, because the hearing was already scheduled for Friday, June 20th, at 1:30. And I may have even said something to Laurie to the effect that it will be on the G: drive.

Q What happened next?

A I left.

Q With the information and the notes that you gained from Judge Stuard, what did you do next?

A Well, eventually I went across the street. At some point I asked Chuck Morrow, who had been involved in the Jackson case and who had prepared the Jackson entry, where he had it saved at. I probably asked Joyce Hoffman, our secretary, one of our secretaries across the street, if she had it on her common drive that we share at some point. And I'm certain at some point I pulled up the Jackson entry itself on the computer. And I either -- I don't recall if I printed it out or just pulled it up on the screen; but at some point I had the Jackson entry.

I also advised Ken that we had to get the entry done for Nate Jackson. Or I'm sorry, for Donna Roberts. This

was the first capital case I handled in Trumbull County, but not the first capital case I'd handled personally. So Ken and I were obviously on it. I know sometime after lunch we looked at Jackson. If I didn't print it out in the morning, I printed it out in the afternoon. And we began to work on the Jackson, or I'm sorry, the Donna Roberts entry, incorporating the notes he had given us.

Q You advised Mr. Bailey when you returned to the office of what Judge Stuard had requested?

A I can't say if it was before lunch, but at some point on that Wednesday I did.

Q And what was his response?

A I don't remember what his response was.

Q But he agreed to assist you in drafting the --

A He said he'd help, yeah.

Q What was the process then for preparing the entry?

A Well, we went through the notes that he had. I typed it in, and I know at some point Ken came into my office and started to look over my shoulder as I was typing. We had to change some of the facts in Jackson because they didn't -- they weren't the same facts in Donna Roberts. The one thing that specifically jumps out

at me is there was testimony and evidence, or testimony in a statement in the Jackson entry where Dr. Germaniuk, who is our forensic pathologist, works for our Coroner's Office, had indicated that the gunshot to the victim had dropped him or would have dropped him like a sack of potatoes. Ken and I couldn't recall that that testimony was the same, even though Dr. Germaniuk testified in our case, whether that testimony was the same; so we took that out.

Some of the facts had been a little bit different. We probably changed some of the he's to she's and we's. The format was also a little bit different because the Jackson entry was prepared when our office was using ruled paper. Because we had some budget cuts at the time or prior to this, we had not been using ruled paper anymore, and in fact I had been preparing things on just blank, plain paper, the regular paper without the rules. So I know there was some change in formatting. And at that point I just decided to put headers on there where they had used a paragraph type of form. So I know those changes were specifically made.

Q What amount of time was spent in preparing the entry?

A I couldn't tell you. You mean hours or

minutes?

Q Hours?

A I would say a couple hours on Wednesday afternoon. Thursday I had to be in Judge Stuard's court in the morning because he has criminal morning that day, and we probably wouldn't have started until the afternoon again on Thursday. So I would say another couple hours Thursday. Maybe four hours.

Q And does that include the time spent editing?

A Yeah, that would include that time.

Q Did anyone else participate in the creation of the Roberts entry besides you and Mr. Bailey?

A I don't recall.

Q You prepared the entry based upon notes given to you by Judge Stuard?

A I prepared the entry based upon the evidence and the testimony that was presented in the courtroom, the notes he gave us, and the Jackson entry that we had from the previous entry that we had prepared or that our office had prepared in the Jackson case.

Q All right. And the notes were two pages?

A The only reason I say two pages is

because I know Judge Stuard has maintained they were two pages. I don't know if they were more or less. I know they were notes. How many, I honestly cannot tell you.

Q Handwritten or typed?

A They were handwritten.

Q All right. Written on both sides of paper or just on one?

A No, just on one side.

Q Was the paper full on the one side?

A My recollection was all the paper I remember seeing was full.

Q What was the format that the notes were written in?

A Chicken scratch. They were -- they were basically just -- no, they weren't. They were -- they were -- I shouldn't say that. They were handwritten. Judge Stuard's writing was fairly easy to read. But they were, I don't want to say they were formally like you would write an outline in college or law school, but they were more sort of facts. There were -- I do remember facts were same as Jackson. There was a section aggravating circumstances, mitigating factors, outweigh, agree with jury. There was a mention I think somewhere, or I know there was a mention about the doctor who had

found that she was competent to waive her mitigation. There were some notes about her insulting the jury and requesting the death penalty. I would say short statements of what had happened in the trial. It was a very brief summary of what had happened in the trial and at the mitigation hearing.

Q After you completed this draft entry, what happened next?

A Well, at some point Ken got tired of looking over my shoulder. And I think I got tired of him looking over my shoulder, too. I think at, when I became -- when I was done with the first, and I'll call it a draft although it was just the first product, I printed a copy out; and either Ken was there and I gave it to him or I walked it down to Ken and he reviewed it.

Q All right. And Mr. Bailey had comments for you on the draft?

A Yes. Mr. Bailey would read it, go down to his office. Our offices are probably fifteen feet from each other. He would read it, come back, and have two or three typographical errors that I had made or grammatical errors and things that he felt were more where the facts should have been or maybe where the aggravating circumstances. Whatever his changes were, he would give

them to me. They were really just procedural or typographical type of things. I would print out another copy, and he would find more or he wasn't satisfied, or sometimes he would -- no offense, Ken -- change things back to where they were the first time.

Q All right. At some point in time you and Mr. Bailey agreed that you were finished with your draft?

A Yeah, I think there was an agreement at some point. I don't believe that was until Thursday, though.

Q The 19th, June 19th?

A That's correct.

Q All right. After the two of you reached an agreement that you were finished with your draft on June 19th, what did you do with the draft?

A Because it had been created from the Jackson entry that was prepared in the office, I saved it under Donna Roberts G: drive or in a location, I think I actually put it in Laurie Brown's folder. In her G: drive I can access her folder. I saved it. I can't remember what I called it, but I saved it, I believe, under Laurie Brown, maybe Mary Ann Mills' folder. And I called Laurie Brown and said, the entry for Roberts is done; have the

Judge look at it. It's in the -- it's in your folder.

Q And to your knowledge, did Judge Stuard receive a copy of your draft entry?

A Well, I'm certain he did because I believe I never spoke to Judge Stuard again about the entry from that day when he handed me the notes. I recall getting a call from Laurie Brown saying he had some changes that he wanted made, and she either told me what they were, and I proceeded to pull the document back up on the G: drive and make the changes that he wanted.

Q All right. When did that call take place?

A Well, that was on Thursday. It had to be after I had advised her that it was done.

Q And do you recall what Laurie Brown said to you?

A As to what changes he wanted done?

Q Just the conversation which would have included that, anything else?

A No.

Q Do you recall how long this conversation was?

A Maybe two or three minutes.

Q And what did you tell Ms. Brown in

response to her request?

A I said I'll get it done and call you back when it's done.

Q Did you advise Mr. Bailey of this telephone call?

A Don't recall.

Q Did you make the changes?

A Yes.

Q And when did you do that?

A That would have been Thursday afternoon.

Q Do you recall how long that took?

A No.

Q Did Mr. Bailey assist you with the changes?

A I don't recall that.

Q After the changes were completed, what did you do?

A Well, I printed out another -- well, I don't know what I did. I put it back on the -- or I resaved the document and I called Laurie Brown. I know I did that. Whether I printed out Mr. Bailey a copy so he could have one, that I don't recall. He has been saying and I've heard him say throughout these proceedings that I must have because that's what he had in court, but I don't

recall doing that.

Q All right. I just, I want to just briefly go through the time line to make sure that I understand.

A Okay.

Q On June 18th of 2003, you stopped by Judge Stuard's courtroom. He came out and gave you two pages of notes and said, would you please create the Roberts sentencing entry?

A Whether it was two pages of notes, I mean, I know that's what he's saying. I don't remember how many pages.

Q Okay.

A But, yeah, that's correct with respect to that.

Q As a result of that, you worked with Mr. Bailey to create an entry. You saved that entry on the computer. You then called one of Judge Stuard's assistants -- whether it's Ms. Brown or Ms. Mills, you don't recall -- and advised them it was completed and available on the computer?

A Yes.

Q All right. And I'm sorry, that was on the 19th that you made the telephone call?

A Yes.

Q Sometime later on the 19th you received a call from Laurie Brown and during which she advised you of several changes to be made to the draft at the request of Judge Stuard?

A I don't know if it was several changes or one.

Q Okay.

A There was something, and specifically what it was, I don't know. But I know he had a change that she relayed to me.

Q All right.

A Or changes.

Q All right. And as a result of that, you made whatever correction or corrections were necessary, saved that on the computer, and contacted Laurie Brown and let her know that whatever needed to be changed was and that the document was available for the Judge?

A And again, I don't know if it was -- it probably would have been Laurie Brown, but it may have been Mary Ann Mills. It was one of -- it was either his court reporter or bailiff. But that is accurate.

Q All right. Did you print off a final copy of the entry for yourself?

A No.

Q Is there a reason why you didn't?

A I normally don't print -- I -- I don't want anything in my file unless it's time-stamped or signed by a Judge. Or, you know, if -- I don't want -- I knew that entry wasn't going to be final until the Judge had signed it and it had been time-stamped, so I didn't want to put it in the file to clutter, I mean, literally the Donna Roberts case is now four banker's boxes. Well, it was at that time; it's probably eight now. But I didn't need the clutter. And I'm a kid of the '70's; I didn't want to kill any more trees.

Q Those communications that I just described, are those the only communications that you participated in with Judge Stuard or his staff regarding the creation of the entry?

A Those are the only ones that I recall.

Q All right. Are you aware of any other communications between somebody else at the Prosecutor's Office and the Judge or his staff regarding creation of the entry?

A I'm unaware of any other communication.

Q All right. Back to Exhibit 4, the Complaint, Paragraph 10, if you could take a look at that

and tell me if there's anything that's not accurate in that?

MS. KHAN: I'm going to object to the use of the conclusion and the use of the term ex parte communications.

A With, again, I would say that they were not ex parte communications. I disagree with that. And I don't recall having a telephone conversation with Judge Stuard. I had a conversation with his staff, but not him.

Q All right. If you could take a look at Exhibit 1, Page 14?

A Okay.

Q The second-to-last paragraph that begins with, "I would note," if you want to go ahead and read that paragraph to yourself, and then I want to ask you a couple of questions about it.

A Okay, "I would" -- you want me to read it to myself?

Q You can read it to yourself, yeah.

A Okay.

Q That paragraph is something that you wrote; correct?

A Yeah.

Q And I mean, there's a quotation mark at

the end?

A Right.

Q Indicating that's the end of the portion of the letter that was written by you?

A Right.

Q If you take a look at the one, two, three, four, fifth line towards the end of that line, there's a sentence that begins with, "I am certain." Do you see where I'm referring to?

A "I am certain that after a careful review," okay.

Q In that sentence and the next sentence you describe your communications as ex parte communications?

A Okay.

Q So are you now disavowing that description in your letter?

A I'm disavowing it for the purposes of what you're trying to nail me for, which is that I talked to him about the substance of the case; and I never spoke to him about the merits of the Donna Roberts case. In fact, there was never any conversation between myself and he regarding giving her the death penalty. I never influenced him as the term ex parte would be used to argue

the case for the State.

Q So just so that I understand you, explain to me what the difference is between your description of your communications as ex parte in Exhibit 1 and the description of your communications as ex parte in Paragraph 10.

A I would say I had a conversation with him when he gave me the notes and said, prepare an entry. I'll admit that I had that conversation with him about preparing an entry, which in my mind is a ministerial function, an administrative function, and as an officer of the court I'm performing a duty. I never had a communication with him regarding the merits of the case in terms of trying to influence his decision-making process as a Judge.

Q And you believe the use of ex parte in Paragraph 10 suggests impropriety, whereas your use in Exhibit 1 does not?

MS. KHAN: Objection.

A Absolutely. You're trying -- you're charging me with ex parte communications. As I'm using the term in this letter, I'm referring to a communication I had not regarding the merits. You've taken that and turned it into a discussion to influence his decision

improperly. That was never done.

Q All right. I think I understand the distinction you're making. Other than your concern about the term ex parte and your issue with the telephone conversation being with Judge Stuard versus one of his staff members, any other concerns about Paragraph 10?

A No.

Q Exhibit 5 is your Answer. If you could turn to Page 2?

A Okay.

Q Paragraph 10, if you want to just read it to yourself, I have a question to ask you about it.

A Okay.

Q In Paragraph 10 you state that the communications involved strictly administrative matters. Do you see where I'm referring to?

A Yes.

Q All right. I have a couple of questions for you about that.

A Okay.

Q Is typing a strictly administrative matter?

A Yes.

Q How about proofreading?

A Yes.

Q How about copying language from the Nathaniel Jackson sentencing opinion?

A Yes.

Q How about choosing words to put into the sentencing opinion?

A Yes.

Q How about filling in blanks?

A Yes.

Q Where there isn't information provided in the notes from Judge Stuard, is that strictly administrative?

A Yeah.

Q How about writing and creating sentences, is that strictly administrative?

A Yes.

Q And writing and creating paragraphs?

A Yes.

Q Selecting facts?

A Yes.

Q All right, thank you. Let's go back to Exhibit 4, Paragraph 11. As we discussed previously, we all know that the correct year should be 2003.

A Okay.

Q Beyond that, could you identify if there's anything in that paragraph that is not correct?

MS. KHAN: I'm just going to object in that we've already gone over the communications that took place numerous times.

A I'm not a hundred percent certain whether it was two pages.

Q Anything else?

A No.

Q All right. Let's go back to Page 2 of Exhibit 5, your Answer, again.

A Okay.

Q This time if you want to read Paragraph 11 to yourself, and then I have a question to ask you about it.

A Okay.

Q In Paragraph 11 of your Answer there's a quotation purportedly from Judge Stuard, "Here are my notes. Please type up a sentencing opinion like the one I used in Jackson"?

A Uh-huh.

Q Is that an exact quote?

A Yeah.

Q So that's your specific recollection of

what the Judge said to you?

A Yeah. Or yes.

Q I'm going to present you with what's been marked as Exhibit 6.

A Okay.

Q Ask if you can identify it?

A This looks to be the Donna Roberts opinion of the Court imposing death sentence and findings of fact and conclusions of law.

Q All right. And this is the opinion we've been talking about that you drafted for Judge Stuard; isn't that correct?

A It's kind of a poor copy, but yes.

Q All right.

A It looks like it was copied from the Clerk of Court's archives rather than what was actually -- well, it is what was filed -- but because it's smaller; it's shrunk down.

Q The first section of Exhibit 6 is entitled History?

A Yeah.

Q Looks like there's a little bit more than a page, part of Page 1 and then part of Page 2?

A That's correct.

Q Do you recall, was the history portion provided to you by Judge Stuard?

A I don't recall.

Q On Page 2 there's a section entitled Facts that looks like it continues to Page 7?

A That's correct.

Q Was the facts portion of this opinion provided to you by Judge Stuard?

A Yes.

Q And how so?

A In his notes.

Q All right. So his two pages of notes included the facts that are listed on Pages 2 through 7?

A Well, I think he put, facts, use Jackson facts or same facts or something along those lines.

Q All right. So --

A Same facts as Jackson might have been the notation.

Q So the information provided to you by Judge Stuard on the facts was to consult the Jackson entry?

A There may have been another line or something, but I don't recall.

Q But what you do recall is some sort of a

sentence that said something like, same facts as Jackson?

A Yeah, I do recall words to that effect.

Q All right. The next section that begins on Page 7 is entitled Aggravating Circumstances, and it continues to Page 10; correct?

A Yes.

Q And Judge Stuard, did he provide you information for this section?

A Yes.

Q And tell me about that.

A As best as I could recall, he had a, either a heading or a line marked Aggravating Circumstances, and then he had noted in the notes what they were. The, you know, I think there were, in this case they were aggravated robbery and aggravated burglary, or committing the aggravated murder during the course of an aggravated robbery, committing aggravated murder during the course of an aggravated burglary.

Q All right. Was that basically the information?

A Well, I mean, he had -- I don't recall. There was more to it, but I don't recall what those details were.

Q All right. Do you recall any other

information that Judge Stuard provided you regarding the aggravating circumstances?

A No.

Q All right. On Page 10 begins a section entitled Mitigating Factors?

A Uh-huh.

Q And that continues through Page 14; correct?

A Yeah.

Q All right. Tell me about the information that Judge Stuard provided to you regarding the mitigating factors.

A That was essentially again a -- I can't recall if it was a separate heading or off to the side; but there was a notation of mitigating factors. And I don't know why I remember, but I do remember there was a specific mention of the psychologist she used regarding her competency to waive mitigation. And there were some notes in there, but I don't remember what they said.

Q All right.

A But I know there was a specific notation of, and I don't know if he said Dr. Eberle or, you know, if he said the word psychologist or both; but there was some mention of inserting Dr. Eberle's competency in

there. How it was worded, I can't recall.

Q Anything else Judge Stuard provided you in his notes?

A Yes, there was something in there about the unsworn testimony. I do recall that. Specifically what it said, I do not recall. As best as I recall, that section of the notes had the most detail in it.

Q The mitigating factors?

A Yeah.

Q Do you recall what portion of the notes? Fifty percent?

A No, I don't recall that.

Q Anything else you recall about the mitigating factor information?

A No.

Q All right. On Page 14 is a section entitled Conclusions of Law, and that goes through Page 17; correct?

A Yes.

Q Tell me what information Judge Stuard provided you regarding that section.

A I don't recall other than one of the last probably statements was, concur with jury's recommendation.

Q Just to make sure I understand, are you testifying that was what he advised you or that's what you remember he advised you?

A I think he said it when I spoke to him, although I've -- I don't recall if he said that to me or if it was in the notes or both.

Q All right. Anything else he --

A That's the only thing I was glad that he did. I was happy to either see it in notes or hear it or both. But that was the decision. That was the ultimate --

Q Sure.

A -- what we were there for.

Q Anything else that you recall that was in the notes from Judge Stuard regarding the conclusions of law?

A You know, it's been so long ago, I don't recall. I had specifically, like I told you, recalled the doctor, his mentioning that, and the mitigating factors being, even though they were -- he didn't find any, those being a -- those jump out in my mind more.

Q I'm going to present you with what's been marked as Exhibit 7 --

A Okay.

Q -- and ask if you can identify that?

A This looks like the opinion and the findings of fact and conclusions of law imposing the death sentence for Nathaniel Jackson.

Q All right. And Exhibit 7 is the document that you consulted when preparing the facts for the Roberts sentencing opinion?

A That's correct.

Q Okay. Is there anything else in Exhibit 7 that you utilized in the creation of the Roberts sentencing opinion?

A I don't think I understand your question.

Q I'm sorry. You told me that the Judge directed you, with regard to the facts, look at the Jackson sentencing opinion?

A I don't know if he said look at the facts. I think he -- I think it was along the lines of, get me an entry like the Jackson entry or prepare an entry and look at -- I mean, he might have said look at it or do an entry like you guys did in Jackson, like your office did in Jackson.;

Q All right. I thought you told me a moment ago the Judge told you with regard to the facts, to

rely on the facts recited in the Jackson entry?

A The notes were not very detailed about -- I think the facts -- obviously the facts were different. So I don't know if he personally -- there was some kind of indication that facts same as Jackson or use Jackson's or something. But I think in the context of the facts, I think it was the entry that really is -- I may have -- and I apologize if I've blurred that. What he directed me to do, the impression I got, was to do an entry like Nate Jackson's. I don't know he wanted -- I'm certain he didn't want the facts verbatim because they were different facts. They were two different co-conspirators. So if I said that, I apologize, because that's not the impression. They were different facts. I'm certain he wouldn't say to me, use the same facts. So if I told you that, I apologize; I misstated.

Q All right. Where did you obtain the facts from in the Roberts sentencing entry?

A From the testimony that was presented in court.

Q All right. So in order to create that section, you relied on your recollection, the Exhibits, and the transcript?

A And I think I did use some of the facts

from the Jackson case to save myself -- I mean, I may have cut and paste or just, you know, started fresh.

Q All right.

A Like I said, I can tell you -- and I don't know why this sticks out in my mind -- on Page 2, if you read the second paragraph, or actually the first full paragraph, it says, this injury would have, quote, "dropped him like a sack of potatoes," as testified by Dr. Germaniuk. I don't think Dr. Germaniuk ever -- well, Ken and I both agree that Dr. Germaniuk never made that statement in our case. He testified, but he didn't make that exact quote, so we knew that had to come out. I don't know why that sticks out.

Q All right. So the directive from Judge Stuard was to create the entry for Roberts that would be like the entry for Jackson?

A Yeah.

Q And what did you interpret that to mean?

A To spell out the facts, to weigh the aggravating circumstances against the mitigating factors, and then come to a conclusion.

Q All right. That's the format that's required by the law, isn't it?

A Yes.

Q All right. So it would be necessary for the Judge to tell you to do that?

A Well, I wouldn't do it on my own unless he told me to.

Q Well, no, no, I'm not saying create the entry. I'm saying, you're saying the Judge told you to consult the Jackson entry and use the same format?

A I don't know if he said format, but get me an entry like Jackson's.

Q All right. The Jackson entry is stylistically different than the one you created; isn't that correct?

A I don't know. How do you mean stylistically different?

Q You've divided yours into sections with headings; correct? Exhibit 6?

A Yeah, I would say there's a heading rather, as opposed to more of a paragraph form in the one that the other Prosecutors prepared.

Q All right. Is there a reason why you chose to use the different format?

MS. KHAN: He's already explained why he used a different format.

A Yeah, as I explained earlier, the lined

paper that Jackson's was done on we had quit using due to some budget constraints, because it's actually a blue line; it's harder paper. We were just using regular copy paper. I don't know. I mean, that's just the way I do my entries when I do them for the Court. I break them down in paragraph form, or heading form.

Q All right.

MS. KHAN: You want to take a break? Let's take a break.

MR. BERGER: All right.

(A recess was taken.)

Q (BY MR. BERGER) All right. Mr. Becker, if you want to take a look at Paragraph 12 on Exhibit 4, the Complaint?

A Okay.

Q And if you could tell me if there's anything in Paragraph 12 that is not correct?

MS. KHAN: Let me get there first.

THE WITNESS: Page 3.

MS. KHAN: Okay. Again I object to the term ex parte communication or conversation; and also, the witness has already testified as to the facts regarding the conversation.

A Again, I would state that it was not an

ex parte conversation as that term is being used in this proceeding. And it's obviously a very bare bones statement. It was drafted using the Judge's notes and the Jackson entry and the applicable testimony.

Q Anything else?

A No.

Q Do you want to take a look at Paragraph 13 and let me know if there's anything that's not accurate in that?

MS. KHAN: And again, objection to the use of the word ex parte communications, and the witness has already testified regarding the allegation in Paragraph 13.

A I would disagree with that entire statement. I don't ever recall having another conversation with Judge Stuard.

Q Because your recollection is the conversation took place with Judge Stuard's staff?

A Correct.

Q Take a look at Exhibit 5, your Answer, Page 2. Read Paragraph 13 to yourself, and then I want to ask you about it.

A Okay.

Q Paragraph 13 states, "In response to

Paragraph 13 of the Complaint, Respondents state that the only communications between Judge Stuard and Respondents following the Court's request to type the order were to correct typographical errors identified by Judge Stuard." Did I read that correctly?

A Yes.

Q All right. So are you modifying this statement to now be that the communications were between Judge Stuard's staff?

MS. KHAN: I think he only indicated or testified regarding one communication.

A Again, I don't believe there was any communication between myself and Judge Stuard personally after the notes were given to me.

Q Do you know what this is referring to, the only communications between Judge Stuard and Respondents following the Court's request to type the order?

A I didn't write it, no.

Q Are you aware of any communications with Judge Stuard and anyone from your office following the Court's request to type the order regarding typographical errors identified by Judge Stuard?

A Am I aware of any communication between

Judge Stuard and anyone else in the office; is that the question?

Q Yes. You've said you didn't have any communications with Judge Stuard after the initial one?

A That's the best of my recollection four years later; correct.

Q Right. Your response in Paragraph 13 suggests that there was a communication between Judge Stuard?

A Well, if you look at Paragraph 11, the only communication that I had directly with him was --

Q Let's focus on Paragraph 13.

MS. KHAN: You should let him answer the question.

MR. STERN: He's answering the question.

A You know, I realize that you are -- well, I'm not going to comment. I did not have direct communication with Judge Stuard after the notes that I recall four years later here.

Q Are you aware of anyone else that had a communication with Judge Stuard about typographical errors identified by Judge Stuard?

A No.

Q I'm going to present you with what's

been marked as Exhibit 8. Can you identify what Exhibit 8 is?

A It appears to be a portion of the transcript of the Donna Roberts trial.

Q And in fact, it's the portion that contains the side bar discussion that took place after Mr. Ingram raised an objection regarding the sentencing entry; isn't that correct?

A Correct.

Q When you were at the sentencing entry, you were sitting at counsel table next to Mr. Bailey?

MS. KHAN: You mean sentencing hearing?

A When I was at the sentencing hearing?

Q I'm sorry, sentencing hearing.

A I'm sorry, repeat the question?

Q Sure. When you were at the sentencing hearing, you were sitting next to Mr. Bailey at counsel table?

A That's incorrect.

Q All right. Where were you seated?

A Can I demonstrate for you?

Q Sure.

A All right. The courtroom has two counsel tables that are long like this. He was seated

behind me.

Q All right. Were you aware that Mr. Bailey had a copy of the draft or final sentencing entry at the hearing?

MS. KHAN: Objection. There's no evidence to suggest that Mr. Bailey ever had a copy of the final entry.

A He didn't have a copy of the final. It wasn't -- I don't know what he had.

Q All right. Whatever the document was that he had in his possession, were you aware that he had it at the hearing prior to the objection being raised?

A No, I was not.

Q All right. So it's been suggested by Mr. Ingram that he was reading it and following along. You weren't aware he was doing that?

A No.

Q All right. With regard to Exhibit 8, there are page numbers in the upper right-hand corner. Go to Page 6370.

A Okay.

Q Midway on the page there is a section that contains a statement by you?

A Uh-huh.

Q If you want to go ahead and read it to yourself, and then I want to ask you some questions about it.
A Okay.
Q All right. The second sentence says, "This is my understanding of what we were supposed to do." Agreed?
A Yes.
Q All right. What is that; what are you referring to?
MS. KHAN: You want to look back?
A Prepare the entry.
Q All right. The third sentence says, "We were to take that and put it on the computer and print out the hard copy of the sentencing order, which is what we did." Did I read that correctly?
A Yes.
Q When you say we were to take that, what are you referring to?
A The notes.
Q All right. You refer to printing out the hard copy?
A Uh-huh.
Q Earlier in your testimony you indicated

you didn't print out?

A I still don't think I did.

Q Well, what are you referring to there?

A Printing out a hard copy, but I don't think we did. I know I didn't.

Q Well, "We were to take that and put it on the computer and print out the hard copy of the sentencing order, which is what we did." Did I read that correctly?

A Yeah.

Q So your testimony is that your statement at the Roberts hearing isn't correct?

A I believe that's incorrect because I believe the Court's staff printed it out.

Q Any idea about why you said that you did it?

A I misspoke. I disagree. I didn't say I did it.

Q Any explanation for why you said we did it?

A No. Well, I -- no, no, never mind.

Q Farther down on the page there's a statement by Judge Stuard. It says, "THE COURT: I made one phone call back to you." And then there's your

response, "And the Court had indicated some changes." Is there a reason why you didn't point out to the Court that the Court didn't actually make the call to you; it was somebody else?

A No. I think I'm referring -- I'm referring to the Court as the Court and its staff.

Q But the Judge is saying he made the call to you?

A Well, at this time the discussion wasn't mincing words. We were -- we were explaining what had happened. It was insignificant at that point to change the Judge's comment.

MR. STERN: Mincing is the wrong word. Parsing.

MS. KHAN: You mean parsing, not mincing.

Q All right, let's go back to the Complaint, Exhibit 4. I understand your concern about the use of the term ex parte in Paragraph 14. Beyond that, is there anything in Paragraph 14 that is not accurate?

MS. KHAN: Again, it's not just a concern; it's an objection to the use of ex parte. I also object to the use of the term lengthy.

A Yeah, I disagree with the whole last

paragraph, transforming, handwritten, two pages of handwritten notes into a lengthy and detailed 17-page typewritten sentencing opinion.

Q You'll agree the sentencing opinion was 17 pages?

A If that's what it is.

Q Take a look at it and tell me what it is.

A 1, 2, 3, 4, 5 -- 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 pages.

Q Anything else regarding Paragraph 14 of Exhibit 4?

A Other than what I've already mentioned, no.

Q All right. Explain to me what this G: drive is.

A Well, I thought I explained it earlier, but I will endeavor to explain it again. The G: drive, all of our computers at the Prosecutor's Office are connected to not only the office in the Prosecutor's Office but all the other county agencies. We are on a network. That network connects us to various county offices, including the Courts, all four Common Pleas Courts. Every computer in our office has an H: drive.

That is an H: drive that is only accessible to the person who is at that terminal. The G: drive is a shared drive between the Courts and our office where we can exchange communications and files.

Q And what sorts of things have you shared using the G: drive with the Court?

A Sentencing entries, memorandums, entries, jury instructions. Our office prepares jury instructions for all but one of the Common Pleas Court Judges. Entries denying motions to suppress. Entries denying pro se motions of defendants. I'm probably not even being close to the items that we share file-wise.

Q And at the Prosecutor's Office, who has access to this G: drive?

A I don't know. I do.

Q And at the court, who has access to the G: drive?

A The Court's bailiffs, the Court's secretary, and the Court, the Judges themselves, and maybe more. Let me -- let me correct that. In our office, I believe all the attorneys and all the secretarial staff have access to that.

Q When we were looking earlier at some of the letters that had been provided to my office by your

counsel, at least one of them contained an affidavit from Attorney Jerry Ingram; do you remember that? I'm not going to ask you to find it, I mean, unless you want to look at it.

A Yes.

Q You recall that? You've read that affidavit?

A Yes.

Q All right. Mr. Ingram was one of the attorneys for Donna Roberts?

A Is that a statement or question?

Q Question.

A Yes.

Q Her other attorney was John Juhasz?

A Correct.

Q Are you aware of any affidavit from John Juhasz regarding the Donna Roberts case?

A No.

MR. RICHARDS: Off the record.

(Discussion off the record.)

Q All right, let's go back to Exhibit 4, the Complaint, Paragraph 16. If you could tell me if there's anything that is not correct in Paragraph 16?

MS. KHAN: Again, objection to the use

of the phrase ex parte communications.

A I object, yeah, to that. I don't believe they were ex parte communications on the merits of the case. And I don't know whether they were or were not consulted or informed.

Q Did you inform or consult them?

A No.

Q Is there a reason why?

A I was performing a ministerial act.

Q Anything else?

A I was performing an administrative act.

Q Anything else?

A The decision had been made.

Q In your Answer you suggest that the Roberts defense counsel were familiar with what you describe as a decades-old practice of the Prosecutor drafting entries for the Court. Could you tell me how you know that?

MS. KHAN: Do you need to see it? Is there a specific paragraph you're referring to in the Answer?

Q You don't have a recollection without examining the documents?

MS. KHAN: You're referring to in your

Answer.

A You're referring to the Answer. I'm trying to find the Answer. I don't know where you're referring to in the Answer. I somehow have misplaced the Answer.

MS. KHAN: This is the Answer.

A This is the Answer right here. Where are you referring to in the Answer?

Q Page 3, what's numbered 16 through 18.

A I believe they knew, yes.

Q And what is that based on?

A The affidavit of Jerry Ingram and conversations I've had with Jerry and John.

Q And can you show me in the affidavit where it indicates that he was aware of the practice?

A When he says there was no effort to conceal the --

Q Wait, wait.

A Paragraph 5 of his affidavit. "Neither the Prosecuting Attorney nor Judge Stuard made any effort to conceal the process, and at all times Judge Stuard and the Prosecuting Attorneys maintained that the preparation of the sentencing decision by the State was a ministerial function provided to the Court as a courtesy."

Q And what part of that sentence indicates that he was aware of the process?

A That sentence does, that paragraph.

Q What part of it?

A The whole paragraph.

Q All right. So after the comma, "At all times Judge Stuard and the Prosecuting Attorneys maintained that the preparation of the sentencing decision by the State was a ministerial function provided to the Court as a courtesy," that indicates that -- show me what --

MS. KHAN: Objection. He's already answered twice, and he's also testified that he bases his conclusion on conversations he had with defense counsel as well as what's stated in the affidavit.

A I've spoken to John and Jerry numerous times since this happened.

Q Let's go ahead and go back to this first. Is there anything in the portion of the sentence after the comma?

MS. KHAN: In Paragraph 5?

A Paragraph 5?

Q Yes.

MS. KHAN: What's the question?

MR. BERGER: He indicated that Mr. Ingram was aware of it, and it was based upon the statement in the affidavit, Paragraph 5.

MS. KHAN: And he also indicated it was based upon his conversations with the defense counsel.

MR. BERGER: Right; but we're focusing on Paragraph 5 right now.

MS. KHAN: And he's testified that that paragraph is what assists him in making his conclusion that they were aware.

A I would say the whole affidavit, if you want to take the affidavit in its whole.

Q All right, let's do this. Let's go back to Exhibit 8, the second page. Towards the middle of the second page is a statement by Mr. Ingram when he's raising his objection regarding the entry-drafting process. Do you see where I'm referring to?

A Uh-huh.

Q It states, "MR. INGRAM: Well, the record should reflect the vehement Defense objection to the State's participation in the drafting of the Court's sentencing decision in ex parte proceeding. We did not know this; we did not know of this. That is prohibited. I would ask that those documents be sealed and become part

of the Appellate record in this case." Did I read that correctly?

A Yes.

Q Did you give any consideration to his statement there regarding whether or not he knew about the process?

A I've included in my answer to your question my conversations with Mr. Ingram, my conversations with Mr. Juhasz, and the affidavit.

Q All right. Why don't you tell me about your conversations with Mr. Ingram?

A Which conversations?

Q Whichever ones that you had in which he indicated he was aware of the entry-drafting process prior to the June 20th sentencing hearing.

A I've spoken to him numerous times about the fact that we prepare the jury instructions and many entries, including sentencing entries.

Q You're referring to conversations prior to June 20th, 2003?

A I'm referring to conversations after June 20th, 2003.

Q All right. Did you have any conversations with Mr. Ingram prior to June 20th, 2003, in

which he indicated to you that he was aware of the sentencing entry-drafting process?

A I don't recall.

Q All right. How about Mr. Juhasz?

A I've had a conversation with him regarding the process as well.

Q Any conversations prior to June 20th, 2003?

A I don't recall.

Q This practice of drafting the sentencing entries I believe that you previously indicated in some of the documents that you provided to this office began 34 years ago. Can you tell me where that number came from?

MS. KHAN: Objection. We didn't say -- nobody -- none of the documents indicate that the process started exactly 34 years ago. I believe it said something to the effect that we know that it's at least 34 years old.

A Yeah, that would be my recollection.

Q So where did you come up with that date from?

A Well, is it in the document? You referred to a document. Is it in a document that you want me to look at?

Q I don't need for you to look at it if you're saying you don't recall it.

A I don't recall an exact number being used.

Q All right.

A If that was -- well, go ahead.

Q I can show it to you, and if you want me to, I can ask Mr. Richards if he'd be kind enough to make copies of it.

MS. KHAN: I believe we used the number of 34 years as based on the number of years that --

MR. BERGER: Are you testifying?

MS. KHAN: I'm explaining to you what I wrote in the document. That's the number of years that Mr. Bailey's been aware of the practice.

A All right, you put at least 34 years. That's as far back as we can go in history to -- I suppose we could find some attorneys that were around longer than that.

Q And where did this number come from?

A Probably from Mr. Bailey and Mr. Watkins, who have been there, well, Mr. Watkins, in particular, has been in Trumbull County 34 years.

Q Since you began working for the Trumbull

County Prosecutor's Office, has it been your experience that all of the Common Pleas Judges have used the Prosecutor's Office to draft the sentencing entries?

A Yes.

Q And have there been any exceptions?

A None that I'm aware of.

Q Why don't you take a look at Exhibit 1. All right, if you could go to Page 3, the one, two, three, the third full paragraph that begins with, "I have been an Assistant Prosecuting Attorney." Do you see where I'm referring to?

A Uh-huh.

Q Go ahead and read that to yourself and --

A Okay.

Q The last sentence says, "To my knowledge, with little or no exceptions, the Trumbull County Common Pleas Court directs the Assistance Prosecutor in charge of a particular case to prepare the felony sentencing entries where the Defendant is sentenced to prison." Did I read that correctly?

A Yes.

Q In your testimony a moment ago you indicated that you were unaware of any exceptions to that.

Here you indicated that there's little or no exceptions. Is there a reason for that difference?

A I'm sure if you're the hard-working attorney that you are, there's probably an exception to every rule. I cannot say without doubt under oath that every sentencing entry is prepared by our office. I would say 99.9 percent of them probably are, so if you're looking for an exception, there might be an exception out there some way, somehow.

Q How about petitions for post-conviction relief?

A They are prepared by our office. Well, the entries.

Q And is that all of the time, most of the time, some of the time?

MR. STERN: If you know.

A I don't know.

Q How about orders overruling motions to suppress, who prepares those entries?

A With -- and I can only speak to the cases that I have handled and those that I've overheard other Prosecutors handle -- with the exception of a few that have been prepared by Judge Stuard, our office prepares those.

Q All right. Does your office prepare the entries on motions to suppress in circumstances in which the motion is granted?

A I don't know.

Q Have you had a case in which a motion to suppress was granted?

A No, I'm good. I don't recall. I don't believe I've had one since I've been in Trumbull County where it was granted.

Q The reason why I ask --

A Actually I take that back. I recently have done one. State versus -- actually I think I agreed it should be -- it was an agreed entry that it should be stipulated, or I agreed on the record. So I am aware of one that was granted. I simply agreed on the record not to use the evidence in a DUI case.

Q Are you aware of defense counsel preparing the entries when motions to suppress are granted?

A No.

Q How about sexual predator determinations, who prepares the entries in those?

A In speaking to the members of our CAP Unit, it's my understanding that they prepare those.

MS. KHAN: Want to take another break? Let's take another break.

(A recess was taken.)

Q (BY MR. BERGER) All right, Mr. Becker, after you started working at the Trumbull County Prosecutor's Office in 2000, when did you first learn of the entry-drafting process?

A Almost immediately.

Q All right. And when was your first occasion to draft an entry for the Court?

A I don't recall.

Q All right. When the Court requested that you draft an entry, was it the Court's usual practice to make this request in the presence of opposing counsel?

A Ask me that question again?

Q When the Court made a request for you to draft an entry, was it the Court's normal practice to make this request in the presence of defense counsel?

A It varied. Sometimes it was made in the presence. Sometimes -- I -- I can't say that it was normally done that way. It was done all kinds of different ways.

Q All right. And what were the ways it was done?

A Judge McKay routinely will pick up the phone and call me and say, we had a motion to suppress last week on whatever case; I'm overruling the defendant's motion; get me an entry. Judge Kontos more often than not will send over a pleading, whether it be pro se or from a defendant, with a note on it saying, prepare entry overruling motion. Judge Logan's staff usually calls me, and Judge Stuard's staff usually calls me. So, and it varies even within those parameters. Sometimes it is made on the record when we're there and the Court and the defense attorney is there.

Q All right.

A So there's a myriad of ways that it can happen.

Q I'm going to present you with what's been marked as Exhibit 9, ask if you can identify it?

A Well, it says the Trumbull County Common Pleas (General Division). It's a document with no numbered pages purporting to be the Rules of the County Clerk of Courts.

Q The Rules of the Clerk of Courts?

A It says Trumbull County Clerk of Courts. Well, there's a cost schedule. It says Rules of Court of Common Pleas.

Q Have you seen this document before?
A Never.
Q Turn to Rule 15, which is probably seven-eighths of the way through the document.
A Okay.
Q Are you familiar with Rule 15 entitled Judgment Entries?
A Never saw it.
Q Is there any sort of local rule that memorialized the entry-drafting process that was used in the Donna Roberts case that you're aware of?
A No.
Q Let's go back to the Complaint, Exhibit 4, Paragraph 17. If you could tell me if there's anything in Paragraph 17 that is not correct?
MS. KHAN: Excuse me. Again I object to the phrase ex parte sentencing entry. I also object because Mr. Becker's already testified regarding his knowledge of what defense counsel knew about the process.
A And again, I would state I have no idea what they were informed or consulted of regarding that drafting process. And I disagree that it was an ex parte communication on the merits of the case.
Q Did you inform or consult with them

regarding the sentencing entry-drafting process?

MS. KHAN: Objection. We've already discussed this.

A No.

Q All right. Paragraph 18, if you could tell me if there's anything in that paragraph that is not correct?

MS. KHAN: Again object to the phrase ex parte sentencing entry.

A Again, I did not engage in an ex parte communication. And I have no idea whether they received a copy or didn't receive a copy.

Q You didn't provide them with a copy, though; is that correct?

A No.

Q Paragraph 19, is there anything in that paragraph that's not correct?

A That paragraph is correct.

Q Paragraph 20, is there anything in that paragraph that's not correct?

MS. KHAN: Again I object. I object to the witness being asked to testify as to what Mr. Ingram noticed, what Mr. Ingram noted, and what Mr. Bailey appeared to be doing.

A Yeah, I don't -- I don't know what he saw. I don't know what Ken was doing.

Q What who saw?

A What Ingram saw.

Q **All right. Anything else?**

A No.

Q Paragraph 21, is there anything in that paragraph that's not correct?

MS. KHAN: I object to the use of the phrase apparent ex parte involvement. I also object to your continued emphasis of the phrase vehement objection.

A I disagree with the paragraph that there was an apparent ex parte involvement with the sentencing entry.

Q Anything else?

A No.

Q Do you understand the basis for Mr. Ingram's objection?

A No.

Q Paragraph 22, is there anything that's not accurate there?

A No.

Q As a result of the side bar discussion, one or more documents were entered into evidence at that

time; isn't that correct?

A I believe that's correct.

Q Do you know what those documents were, or document?

A Whatever Ken had.

Q And do you know what that was?

A No.

Q All right. Paragraph 23, is there anything in that that's not correct?

A I don't have personal knowledge of the dates. I didn't handle the appeal.

Q All right. Paragraph 25, anything in there that's not correct?

MS. KHAN: Again I object to your reference to the appeal. The appeal and what's included in the pleadings speaks for itself. Whether or not it's accurate, unless it's put in front of him, I don't know if he can really accurately say whether it's correct or not.

A Yeah, I don't know how many propositions of law there were. I'm not sure how the objection was included or how that process was included in the appeal. I didn't handle the appeal.

Q I'm going to present you with what's been marked as Exhibit 10, ask if you can identify it?

A It appears to be the opinion, a copy of the written opinion in the Donna Roberts direct appeal to the Supreme Court.

Q All right. You've seen this document before?

A Yes, I have.

Q You've read it before?

A Yes, I have.

Q All right. Turn to Page 32, Paragraph 159.

A Uh-huh.

Q Go ahead and read the first sentence to yourself.

MS. KHAN: Wait a minute. We're on Page 32?

THE WITNESS: 32.

A Okay.

Q The sentence says, "In this case, our confidence in the Trial Court's sentencing opinion is undermined by the fact that the Trial Judge directly involved the Prosecutor in preparing the sentencing opinion and did so on an ex parte basis." Did I read that correctly?

A Uh-huh.

Q I want to direct your attention just to a part of that sentence that alleges the Trial Judge directly involved the Prosecutor in preparing the sentencing opinion. Do you agree that the Trial Judge directly involved the Prosecutor in preparing the sentencing opinion?

A No.

Q What part of that sentence do you not agree with?

A I think the Trial Judge -- I don't agree with the whole sentence.

Q Well, there was a Trial Judge; right?

A Yes.

Q You agree with that. There was a Prosecutor?

A That's correct.

Q There was a sentencing opinion that was prepared; correct?

A That's correct.

Q All right. So that leaves us with directly involved. Is that the part that you disagree with, or is there some different --

MR. STERN: It's not just that.

A I think with all due respect to the Ohio

Supreme Court, they don't understand the process. They did not understand the process that was used.

Q What was the process that was used that was not understood?

MS. KHAN: He's already testified repeatedly about the process.

A The process was that, as an administrative, ministerial function, and as an officer of the court, without imparting my arguments or opinion or any other influencing type of conversation, I prepared an entry for the Court. And I believe it's wholly, with all due respect to the Supreme Court, wholly inappropriate for them to have prejudged myself, Judge Stuard, and Mr. Bailey as to this, which has led to this investigation, which has led to what I would consider a case where I'm certain, with all due respect, that I'm not going to get a fair shake because the decision's already been made.

And regardless of what you decide to do from this point forward, Maureen O'Connor and the other seven Justices have determined that I've made a decision -- or I've violated an ethics rule. And so regardless of where this goes, I'm sure I'm going to be reprimanded at the very least. So I disagree with the conclusion without her having the facts and the Supreme Court having all the

facts. It wasn't just this Trial Judge. It was the entire court system.

Q Explain what you mean?

A It was a system. It was not the Trial Judge directly involving the Prosecutor. It was a system of acting in a ministerial, administrative, and officer of the court function.

Q This entry-drafting process that we've been discussing this morning was ended by the Prosecutor's Office in December of '06; is that correct?

A I would say for a brief period of -- well, I can't answer that. I don't know.

Q What is the current process?

A The current process is that the Judge will state on the record, with defense counsel present, and order us to prepare the entry and ask if there's any objection by defense counsel. Some of the Judges are still asking us to prepare the entries by contacting us through their bailiff or through their staff or directly.

Q I'm going to present you with what's been marked as Exhibit 11. Have you seen Exhibit 11 before?

A Yes.

Q And can you tell me what it is?

A It's a letter from Dave Toepfer, Administrator of our Criminal Division, to the four Common Pleas Court Judges.

Q And in fact, this is the letter informing the Judges that there's going to be a new process for drafting entries that you just described; isn't that correct?

MS. KHAN: Objection. The document speaks for itself.

A The last paragraph indicates that the process that is currently in place could be used.

Q When you receive a telephone call from a Judge, since, after the issuance of this letter, when you receive a telephone call from a Judge or the Judge's staff requesting that you prepare an entry without informing opposing counsel, do you inform opposing counsel?

A Yes.

Q And why is that?

A Because apparently you folks in Columbus think that this system is somehow corrupt or unethical.

MR. STERN: I'm also going to enter an objection here that, if the intention of this letter, the use of this letter by ODC is to take what they perceive to be a remedial action in order to imply antecedent fault,

that is inadmissible in this or any other kind of proceeding.

Q Since you've been operating under this new procedure, has it created any hardships or difficulties for you?

A It has created more work and it has created more expense.

Q Can you tell me what the more work is?

A Rather than place the entry on the hard drive and advise the Court or the Court's staff that the entry is available, I am now mailing a copy entitled Proposed Findings to the, whatever defense counsel's on board.

Q Anything else with regard to more work?

A Phone call here or there occasionally. Sometimes the defense attorney will call me.

Q And what regarding more expense?

A Well, it's costing the county paper to print it out on, ink, copy, copies. It's taking up secretarial time in preparing a letter, putting it in an envelope, and 41 cents, soon to be God knows what, postage.

Q Prior to the issue being raised in the Roberts case about the sentencing entry-drafting process,

are you aware of anyone objecting to this process previously?

A No.

Q Prior to this issue being raised in the Roberts case, did you ever have any concerns about the entry-drafting process?

A No.

Q Can you tell me what your definition of an ex parte communication is?

MR. STERN: Asked and answered half a dozen times.

A Well, I would say today it is a communication made to influence the decision of a Judge, without the input or participation of opposing counsel.

Q Okay. And did you hold a different opinion at some time prior to today?

A Well --

MR. STERN: Let me object on relevancy. It's his state of mind that I don't think is relevant. You can answer it if you can.

A Outside of the context of this proceeding and until today, I would say that some ex parte communication are merely for ministerial, administrative, officer of the court type of discussions as to scheduling,

preparing entries, doing the work, doing work for the Court that has no argumentative component, I guess.

Q I'm going to present you with what's been marked as Exhibit 12, ask if you can identify it for me?

A It is Disciplinary Rule 7-110.

Q And you're familiar with this rule?

A Uh-huh. Yes, yes.

Q And you were familiar with this rule prior to June of 2003?

A Yes.

Q And this is the rule that governs ex parte communications?

A Yes.

Q And this rule provides four exceptions?

MS. KHAN: Again objection. Just as I stated in the previous deposition, this is -- the rule speaks for itself.

A Yes.

Q And is it your belief that your conduct falls into one of these exceptions?

A I believe there's two reasons that, one of the exceptions and one definitionally.

Q All right. Why don't you start with the

definitional?

A Definitionally, my conduct did not involve the merits of the cause with the Judge. The merits of the cause, that is, imposing the death sentence on Donna Roberts, was decided some point before Judge Stuard ever handed me his notes. And as a fallback position, I would say as otherwise authorized by law. I think as an officer of the court, I am entitled to prepare entries and to do administrative secretarial, administrative ministerial types of things for the Court as an officer of the court.

So I would say yes as to an exception, and definitionally I don't believe this applies to us because we didn't do anything on the merits of the cause. The merits are defined as the final outcome. The final outcome was, does she get the death penalty. That decision was made long before Judge Stuard ever handed me his notes, and it was made wholly and independently by Judge Stuard.

Q All right. Regarding exception No. 4, as otherwise authorized by law --

A Uh-huh.

Q -- can you tell me where you derive the authorization in law?

A I believe as an officer of the court, I am to assist the Court.

Q Is there a specific law that you're relying on?

A I couldn't cite it directly, but I believe that I'm required under the ethics to assist the Court as an officer of the court in general.

Q Are you able to direct me to a section of the Revised Code or an area, a rule?

MS. KHAN: Objection. He's already answered.

MR. STERN: Reserve on that. We'll reserve.

A I don't have access to Westlaw here today. I'm not prepared to do legal research for you. So, no, I cannot answer that for you. Although I will, well, I will direct you to the decisions of other courts that are in our letter.

Q Is it your position that there is no tactical or procedural advantage gained by a party who drafts a court entry without any input from opposing counsel?

A Yes.

MR. STERN: I'd also enter a post

objection. Tactical or procedural? I believe in this context you're outside the parameters of merits of the cause, outside the parameters of ex parte.

Q There was a post-conviction petition filed in the Roberts matter?

A I don't know.

Q You weren't involved in that kind of a proceeding?

A No.

Q All right. Let's go back to Exhibit 1 for a moment, the November 28, 2006 letter, and let's go to Page 4. The second full paragraph that begins, "First and foremost," if you want to go ahead and read that to yourself, I want to ask you a couple questions about it.

A Okay.

MR. RICHARDS: This is Exhibit 1, Rob?

MR. BERGER: Yes.

MR. RICHARDS: 1.

MR. STERN: He asked about that.

MS. KHAN: Yeah, he asked, yeah, that same question.

A Okay.

Q That paragraph suggests that it makes sense for the Prosecutor's Office to draft entries that

you may be required to defend upon appeal; isn't that correct?

A Yes.

Q Why is that?

A Why is what?

Q Why does it make sense for you to do it if you're going to have to defend it on appeal?

A It helps the administration of justice. It helps the court system. It helps ultimately the defendant. It helps the entire judicial system.

Q How?

A So we don't end up in situations where we're coming back and, with all due respect, if you followed, for instance, some of the Foster material, where there was, prior to Foster, we had to -- the Court had to make specific findings and entries. The Court sometimes would leave those findings out, in other jurisdictions in other places, come back, get the same sentence. It's a waste of time for the system, for the defendant, for the defense counsel, for the courts, for everyone. Why not get it right the first time?

Q So your office makes sure that the entry contains all the information it needs to contain?

A As officers of the court, in our

administrative and ministerial function, and to assist the court in the administration of justice, yes.

Q And you advise the Judges on what they need to include?

MS. KHAN: Objection.

A We have in the past, yes. We've had -- we've discussed various entries in a general sense with the Court.

Q And if a Judge leaves something out, you will insert it in?

A I don't know about that. We may advise the Court that something needs to be put in.

Q If you notice it's not there?

A Correct. Well, wait a minute. Strike that. We're -- we're preparing the entries. We're not inserting anything.

Q So normally you don't get any notes?

MS. KHAN: Objection. That's not what he said. I also object to your characterization that he's surreptitiously inserting information that the Judge didn't intend to be there in an entry.

A The sentencing entries are based upon the record and the format that has been developed with our Judges.

Q And the Judges previously, prior to the change in the Exhibit 11, were they providing you with detailed notes of what needed to go in the opinion?

A I don't know the answer to that question.

Q What was being provided to you?

MS. KHAN: He already went into great detail as to each Judge and how he gets the information as to what to put -- how and the circumstances under which he gets information to draft or type the sentencing entries.

A In some instances we've received notes from Judges, yes, or their staff.

Q All right. And in the other instances?

A We received oral communication or written communication.

Q All right. I'm almost finished; I'm just double-checking.

(Discussion off the record.)

Q Mr. Becker, who is Diane Barber?

A Diane Barber is the Chief of the CAP Unit and former Administrator of the Criminal Division.

Q And Michael Burnett?

A Michael Burnett is an Assistant Prosecutor in the Trumbull County Prosecutor's Office who

was formerly employed in the CAP Unit.

Q And Stanley Elkins?

A Stanley Elkins is an Assistant Prosecutor in the Juvenile Court Division.

Q Jeff Adler?

A Jeff Adler is a civil -- is an Assistant Prosecutor in the Civil Division, formerly Mahoning County Prosecutor and formerly a Criminal Prosecutor in the Trumbull County Prosecutor's Office.

Q In prior communication with our office, you identified Judge Cynthia Westcott Rice as a potential witness. Can you tell me what her relationship is to this matter?

A Judge Rice was formerly employed as a U.S. District Attorney, and prior to that -- well, let me strike that. Prior to becoming Court of Appeals Judge, she was employed as an Assistant Prosecutor in our office. Prior to that she was a U.S. District Attorney, Assistant U.S. District Attorney; and prior to that she was an Assistant Prosecutor in the Criminal Division and I believe that for a period of time the Chief of the Criminal Division.

Q All right. The Ohio Supreme Court issued their decision in the Roberts matter, I think it

was in August of 2006; is that your recollection?

A Correct.

Q All right. A short time after that you received a letter of inquiry from the Office of Disciplinary Counsel; right?

A Correct. I don't know the exact date.

Q All right. After you received the letter from the Office of Disciplinary Counsel, did you discuss your recollections of what happened in June 2003 with Mr. Bailey?

A Yes.

Q And do you know how many times you've had discussions about it?

A No.

Q Tell me about what you do recall.

A About the discussion?

Q Yes.

A Or the opinion?

Q Discussions about your recollections of what happened in June of 2003.

A I think we -- I don't know how to answer. I mean, we discussed what we recalled happening.

Q All right. And basically you told him what you've told us today?

A Basically, yeah.

Q All right. And what did he tell you?

A What he remembered, pretty much what he told you yesterday.

Q All right. So he told you that the only thing he remembered was what's in the transcript from the sentencing hearing?

A Ken has not had a good recollection, yes, of -- and we've had different recollections, I think.

Q Did he share with you any recollection about communications with Judge Stuard?

A I don't recall that.

Q Did he indicate to you where he obtained that copy of the sentencing entry from?

A Yes.

Q And where did he tell you?

MS. KHAN: Hold on a second.

MR. STERN: He's putting words in his mouth saying that he didn't know anything but the transcript. I guess, well, let's let it go for the time being, see what he recalls, if anything.

MS. KHAN: Go ahead.

THE WITNESS: I don't know if you were --

MS. KHAN: Yeah, we're done.

A Okay. I believe at some point he told me that I had given him the copy or the paperwork that he had.

Q That you had given him the copy?

A That's what he recalled.

Q All right. And then you said the paperwork that he had, you --

A Well, the -- I don't know what to refer to it as. The document.

Q Okay. When was the last time that you and Mr. Bailey talked about your recollections of what happened in June of 2003?

A Last night.

Q All right. You were present yesterday for Mr. Bailey's deposition?

A Yes.

Q And was what Mr. Bailey told you last night consistent with his testimony yesterday?

MS. KHAN: Objection. Any discussions that he had with Mr. Bailey with his counsel is privileged, and I'm going to instruct him not to answer about the substance of what he discussed with his attorneys yesterday.

MR. BERGER: I'm not asking for any discussions with his attorneys. I'm talking about private conversations between the two of them.

MS. KHAN: So just to be clear, you're going to be --

MR. STERN: That would be protected by work product.

A Yeah, yeah, the conversation, the entire conversation I had with Mr. Bailey was with counsel present.

Q All right. Well, when was the last time you discussed your recollections of what happened in June 2003 with Mr. Bailey when you did not have counsel present?

A I don't recall.

Q Have you had that sort of a discussion with him in the past 30 days?

MS. KHAN: Objection. He's just answered your question.

A I don't recall.

Q You heard Mr. Bailey testify yesterday that he was having some memory problems?

A Yes.

Q When did you first learn of Mr. Bailey's

memory problems?

A I don't recall. Sounds like I've got a memory problem.

Q Have you seen evidence yourself of his memory problems?

A I don't really work that close with Ken anymore, so it's hard for me to answer that.

Q I believe Mr. Bailey testified that he'd been experiencing problems for the past eight or nine years. In that time frame have you noted any evidence?

A I know he's not in the best of health. We tried a case a year and a half ago, and he had some problems staying awake.

Q Regarding memory?

MS. KHAN: I don't want you to guess, Chris.

A Yeah, I -- I don't recall. I don't really recall.

MR. BERGER: All right. I believe that's the last of my questions. If you have any questions, or I guess we just need to have you state whether he's going to review or --

MS. KHAN: Well --

MR. STERN: I think Mr. Richards has the

opportunity to ask questions.

CROSS EXAMINATION:

BY MR. RICHARDS

Q I just wanted to ask, to clear up some confusion in my mind, Chris, let me just ask a question or two about, and this relates to the preparation of the Roberts sentencing opinion by using the Jackson.

A Okay.

Q Apparently you had the understanding that you could prepare the Roberts by reference to the Jackson wherever that made sense; is that true? I mean, is that a way to look at it?

A That is correct.

Q All right. Now, and I gather that apparently, in your understanding of these two cases and of these two entries, or at least the Jackson entry, there were some facts that were common to both cases?

A That is correct.

Q All right. Now, you recall evidence about a pair of black leather gloves that were recovered from the house, and there was a bullet hole I guess in the one in the one finger?

A That is correct.

Q All right. Now, just by way of example,

is that pair of black leather gloves, which I find reference to that in both entries, is that the kind of factual basis or factual matter common to both cases that you could pull out of Jackson and put into Roberts; is that what you're telling us?

A That's how we did it, yes.

Q All right. Now, I want to take the most extreme example I can think of to go the other direction.

A Okay.

Q Was the only shooter Nate Jackson?

A Yes.

Q Okay. So you couldn't put into the Roberts entry anything about her being a shooter because the only shooter was Nate Jackson; it wouldn't fit?

A That would be correct.

Q To be extreme about it. Okay, so when you tell Mr. Berger that you pulled the facts from the Jackson case, or to some extent from the evidence presented, is that what you mean, that you used what you could, and what you couldn't use you didn't and had to go to the evidence?

A That's my understanding of what we were supposed to do, yes.

Q Is that what you did?

A And that is what I did.

MR. RICHARDS: That's all I have.

MS. KHAN: I just want to make clear, just ask you one question. I'm sorry, were you -- go ahead, go ahead.

MR. RICHARDS: I do have one more.

Q (BY MR. RICHARDS) I just want to clear up one other thing.

A Okay.

Q You gave Mr. Berger an answer about, he had a question about what's the definition of an ex parte communication. And you appropriately referenced the matter about talking with the Judge about the merits of the case. I have just this direct question of you. On that Wednesday when you were over in Judge Stuard's chambers and he came out with the notes, did you or did you not discuss with him the merits of the case using that term as expansively as you can think of it?

A I did not.

MR. RICHARDS: All right, that's all I have.

DIRECT EXAMINATION:

BY MS. KHAN

Q And just by way of clarification, Mr.

Becker, Mr. Berger asked you a number of questions and inserted the word create a sentencing entry. I just want you to explain to us whether you agree with that term when he's describing your conduct involving your typing or preparing or however you explain the entry?

A I did not create the sentencing entry. I prepared the sentencing entry as an administrative, ministerial function as an officer of the court based upon the notes, the Nate Jackson transcript -- or I'm sorry, entry -- and, as Mr. Richards described, the facts.

MS. KHAN: Okay.

MR. STERN: We read.

MS. KHAN: Yes, we read.

MR. BERGER: All right. And just as we said before, there'll be a 7-day review time.

MR. STERN: Uh-huh.

MR. BERGER: All right, thank you very much.

(Deposition concluded at 11:58 a.m.)

SIGNATURE NOT WAIVED

REPORTER'S CERTIFICATE

I HEREBY CERTIFY that the above and foregoing is a true and correct transcript of all the testimony introduced and proceedings had in the taking of the testimony in the above-entitled matter, as shown by my stenotype notes taken by me at the time said testimony was taken.

Mary J. Carney
Registered Merit Reporter

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

I, CHRISTOPHER DEAN BECKER, have read the foregoing pages of my testimony or have had the foregoing pages of my testimony read to me and have noted any changes in form or substance of my testimony together with their respective corrections and the reasons therefor on the following errata sheet(s).

(Signature) [signature]

(Date) 2-21-08

******************************************************

TO BE COMPLETED BY NOTARY PUBLIC:

I, FRANCES A. HIVELY, a Notary Public in and for the State of OHIO, hereby acknowledge that the above-named deponent personally appeared before me, swore to the truth of the foregoing statements and affixed his/her signature above as his/her own true act and deed.

(Signature) Frances A. Hively

(Date) February 21, 2008

My Commission Expires: 6-30-08

MC

6-30-08

TO THE WITNESS: DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN. Please note any word changes/corrections on this sheet only. Thank you.

TO THE REPORTER: I have read the entire transcript of my deposition taken on the 14th Day of February, 2008, or the same has been read to me. I request that the following changes be entered upon the record for reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

PAGE LINE CORRECTION OR CHANGE & REASON THEREFOR

2-21-08
Today's Date

CHRISTOPHER DEAN BECKER

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
(800) 964-3376

BEFORE THE BOARD OF COMMISSIONERS
ON
GRIEVANCES AND DISCIPLINE
OF
THE SUPREME COURT OF OHIO

CASE NO. 07-078

FILED
MAR 0 3 2008
BOARD OF COMMISSIONERS
ON GRIEVANCES & DISCIPLINE

| | | |
|---|---|---|
| In Re:<br>Complaint Against<br><br>KENNETH NEIL BAILEY and<br>CHRISTOPHER DEAN BECKER and<br>JUDGE JOHN MASON STUARD<br><br>Respondents,<br><br>DISCIPLINARY COUNSEL<br><br>Relator. | ) | DEPOSITION<br><br>OF<br><br>KENNETH NEIL BAILEY |

DEPOSITION taken before me, Mary J. Carney, a Notary Public within and for the State of Ohio, on the 13th Day of February, 2008, pursuant to Agreement and at the time and place therein specified, to be used pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for Government of the Bar in the aforesaid cause of action, pending before the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio.

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
(800) 964-3376

EXHIBIT
4

APPEARANCES

On Behalf of Respondent,
Judge John Mason Stuard:

Charles L. Richards, Attorney at Law
Hunter's Square
8600 East Market Street, Suite 1
Warren, OH 44484-2375

On Behalf of Respondents, Kenneth Neil Bailey and Christopher Dean Becker:

Geoffrey Stern, Attorney at Law
Rasheeda Z. Khan, Attorney at Law
Kegler, Brown, Hill & Ritter, L.P.A.
Capitol Square, Suite 1800
65 East State Street
Columbus, OH 43215-4294

On Behalf of Relator:

Robert R. Berger, Attorney at Law
Assistant Disciplinary Counsel of the Supreme Court of Ohio
250 Civic Center Drive, Suite 325
Columbus, OH 43215-7411

Also Present:

Christopher Dean Becker, Attorney at Law

INDEX

CROSS EXAMINATION BY MR. BERGER - PAGE 5

OBJECTIONS AND MOTIONS:

BY MS. KHAN: PAGE(S) 6, 8, 9, 17, 25, 28, 45, 54, 55, 56, 58, 62, 64, 72, 75, 76, 77, 78, 79, 80, 83, 86, 87, 88, 89, 90, 93, 98, 99, 100, 101, 103, 106

BY MR. BERGER: PAGE(S) 11

EXHIBITS INTRODUCED:

NO. 1 - PAGE 6
NO. 2 - PAGE 8
NO. 3 - PAGE 9
NO. 4 - PAGE 12
NO. 5 - PAGE 12
NO. 6 - PAGE 51
NO. 7 - PAGE 69
NO. 8 - PAGE 89
NO. 9 - PAGE 92

STIPULATIONS

It is stipulated and agreed by and between counsel for the parties hereto that this deposition may be taken at this time, 1:45 p.m., February 13, 2008, in the offices of Charles L. Richards, Attorney at Law, Hunter's Square, 8600 East Market Street, Suite 1, Warren, Ohio.

It is further stipulated and agreed by and between counsel that the deposition may be taken in shorthand by Mary J. Carney, a Notary Public within and for the State of Ohio, and may be by her transcribed with the use of computer-assisted transcription; and that the witness will read and sign the finished transcript of his deposition.

WHEREUPON,

KENNETH NEIL BAILEY,

of lawful age, being by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, as hereinafter certified, deposes and says as follows:

MR. BERGER: We're here today on the Disciplinary Complaint pending against Attorney Kenneth Bailey, Board of Commissioners on Grievances and Discipline Case No. 07-078. This deposition is being taken pursuant to the Ohio Rules of Civil Procedure and the Ohio Rules for the Government of the Bar. Respondent is present with counsel, Geoff Stern and Rasheeda Khan. Also present is Chris Becker and Attorney Charles Richards.

CROSS EXAMINATION:

BY MR. BERGER

Q Could you state your full name, please?

A Kenneth Bailey.

Q And, Mr. Bailey, what's your business address?

A It's High Street. It's Trumbull County Prosecutor's Office on High Street in Warren, Ohio.

Q All right. I'm going to present you with what's been marked as Exhibit 1.

MS. KHAN: Did you -- the previous Exhibits were 1 Stuard or are you going to --

MR. BERGER: Yes.

MS. KHAN: You're going through a whole other set?

MR. BERGER: Yeah, it will just make it easier, rather than try to refer back and forth.

MS. KHAN: Okay.

A Thank you.

Q Could you identify what Exhibit 1 is?

MS. KHAN: You know, I'm going to first just object to the use of this document because this was sent in response to the -- this was sent before the Complaint was certified, and therefore it's private under the Gov. Bar rules.

Q All right. If you want to go ahead?

THE WITNESS: I should answer?

MS. KHAN: Go ahead.

A This is, it's marked Exhibit 1, dated November 28th, 2006. It's a letter to you, and it's from my counsel, Geoff Stern.

Q All right. That's --

A And there's -- there are other attachments. There's another letter attached to this below it also dated November 28, '06, to you. Let's see.

Q That's sufficient for my purposes, unless you want to identify the rest of the attachments. I mean, if you want to, go ahead; but I'm not asking for you to.

A Oh, okay, that's fine.

Q All right. And is this letter accurate?

A Let me see what's in here. Are you asking me if the letter or the attachments or what?

Q The letter.

A The letter, oh.

MS. KHAN: If you don't remember or you don't know, just say you don't know.

A I -- I don't know. I don't remember what's in here, but let me see what it is. Is this mine or Chris's? "Mr. Bailey's letter is identical." Is this my letter?

MR. STERN: What's the caption?

A It says it's --

Q It's your letter, 2191, A6-2191.

A Well, then yes, it would be. If it's mine, it's, yeah.

Q You received a copy of this letter, you're saying?

A Yes, I'm sure I did.

Q All right. Any corrections or changes to this letter?

A Are you just asking me about the top copy?

Q Yes.

MS. KHAN: If you need time to go through and review it and confirm that.

A Yeah, let me take a look.

Q Sure.

A You want me to read through it?

Q You do whatever you need to do to answer my question.

A Okay, I would assume I would have read it at the time. I'm sure it would have been accurate, but -- okay, yeah, this is -- this would be accurate.

Q All right, I'm going to present you with a copy of what's been marked as Exhibit 2 and ask if you can identify that?

MS. KHAN: Hang on a second. I'm also going to object to the use of this Exhibit as well for the same reasons that I objected to Exhibit 1. You can go

ahead and answer the question.

A Okay, this is a letter dated December 27th, 2006. It's to you. It's from my counsel, Geoff Stern. What is it? And they're responding to a request for additional information.

Q All right. And is this letter accurate?

A Yes.

Q Any corrections or changes?

A There's -- the only thing I can think of here is, as previously indicated on Page 2 in the first full paragraph, it says six to seven changes of a typographical/grammatical nature were made. It could have been five or six or seven.

Q All right.

A Okay, that's the only thing I can think of based on my recollection today.

Q All right.

A But six or seven is probably right because it was closer in time.

Q Okay. I'm going to present you with what's been marked as Exhibit 3 and ask if you can identify that?

MS. KHAN: And again I'm going to object to the use of this document for the same reasons I've

objected to Exhibit 1 and 2, in that they're -- this is not part of the record. This is documents that were prepared prior to the certification of the Complaint and therefore are supposed to be kept private. Or destroyed, actually.

MR. STERN: Is there a question pending?

A You want me to identify it?

Q Yes.

A Okay, this is a letter to you dated September 24th, 2007, and it's in response to a Notice of Intent to File of August 17th, 2007. Is that good enough? I mean, there is attachments.

Q All right. Is Exhibit 3 accurate?

A Yeah, I would assume so.

Q Any corrections or changes?

A I don't -- I don't think so.

MS. KHAN: Based upon your brief review.

A Based, yeah, I mean, looking at this really quickly.

Q Well, if you need to take more time to look at it, go ahead.

A Let's see. I --

MS. KHAN: To your knowledge does it appear to be accurate?

A To my knowledge it appears to be accurate.

MR. BERGER: I'm going to object to you instructing your client as to what to say in response to an answer to my question.

A I mean, there's a letter here from Dave Toepfer. There's a letter from -- what is this? This is part of the first letter. I -- I would say it's accurate. I mean, it's been a while, but, yeah, it's got to be accurate.

Q Any corrections or changes?

A No, I, at this time, no.

Q All right.

A And without reading through it completely. I just --

Q Do you want to read through it completely?

A Not really at this point.

Q All right. Do you have any reason to believe that there's a correction or a change that needs to be made to the letter?

A At this point, no.

Q All right.

A Unless you have a specific question as

to part of it.

Q I'm going to present you with what's been marked as Exhibits 4 and 5.

MS. KHAN: Okay, 4 is your Complaint? Is that yes?

MR. BERGER: Oh, I'm sorry.

MS. KHAN: 4 is the Complaint?

MR. BERGER: I didn't understand your question. Yes.

A Oh, you want me to identify that?

Q Yes, go ahead.

A Okay, Exhibit 4 is a Complaint and Certificate against both me and Chris Becker from -- it's before the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio, and it's -- the date that's stamped received is September 26, 2007, and it's -- who's it from? It's from Jonathan, is it Coughlan or Coughlan or --

Q Coughlan.

A Coughlan. Coughlan, okay, Disciplinary Counsel.

Q All right.

A And Exhibit 5 is an Answer of Respondents Kenneth Neil Bailey and Christopher Dean

Becker. It's filed October 31st, 2007, before the Board of Commissioners on Grievances and Discipline. And this has our -- it has attachments. And this is accurate, both of them. I mean I -- because I remember these, okay.

Q All right. I'm going to ask you some questions about Exhibit 4, the Complaint.

A Okay.

Q If you want to turn to Page 2 and take a look at Paragraph 1, and tell me if there's anything in Paragraph 1 that is not correct?

A No, that's -- well, I don't know when Chris was admitted to the Bar, but --

Q All right.

A I can tell you, yeah, it's correct.

Q Okay. Paragraph 2, is there anything that is not correct?

A No, that's -- it's correct.

Q All right. Let's talk a little bit about your legal career. You were admitted in 1971?

A Right.

Q After you were admitted, what did you first do as an attorney?

A 1971? I worked for, '71 would have been Gold, Rotatori, Messerman & Hanna in Cleveland, Ohio, on

defense.

Q And how long did you work there?

A Well, I'd been working there since 1969, and I worked there through '71, through '71, okay, and I worked on criminal cases.

Q All right. So --

A Mostly, I think they were mostly murder cases.

Q All right. So you left there in 1971 then?

A '71 I took some time off and so that I could go to -- I took a year off to go to Europe. I spent '72 in Europe, in the Middle East, and the British Isles. Came back to the States at the end of 1972 and worked on a civil case with three other attorneys in Cleveland, a civil suit against I think the Cleveland Clinic and some doctors, for a few months; and before the case was completed, I got a job in Portage County at the Portage County Prosecutor's Office in Ravenna, Ohio, and began May 14th of 1973.

Q All right. What positions did you hold at the Portage County Prosecutor's Office?

A I was an Assistant Prosecutor and I was Chief of the Criminal Division. And I was there from

1973, May 14th of '73 to the end of the year in 1988.

Q And at what point did you become Chief of the Criminal Division?

A I think January 1st of 1976.

Q All right. After you left the Portage County Prosecutor's Office in 1988, what did you do next?

A I immediately started at the Mahoning County Prosecutor's Office, and I worked there from, I think it was the second day that we started. We started -- we had to come in early because the office, we had to put the office in order. And I think it was January 2nd of 1989, and worked there through the end of 19 -- or 20 -- no, 1989 to the end of 1996.

Q All right. And what positions did you hold at the Mahoning County Prosecutor's Office?

A I was First Assistant Prosecutor.

Q All right. That was the only position that you held there?

A Well, for the first six months we didn't have a First Assistant. It was agreed that I was going to be First Assistant, but we wanted to see how it was going for the first six months. And as soon as the six months were over, I was First Assistant.

Q All right. After you left the Mahoning

County Prosecutor's Office in 1996, where did you go next?

A I left there and immediately started at my current place of employment, which is the Trumbull County Prosecutor's Office, and I was Senior Assistant Prosecutor because Dennis had a Chief.

Q All right. So your current position is the same as the position --

A Right.

Q -- when you first started?

A Senior Assistant.

Q All right, thank you.

A You're welcome.

Q All right, if you could take a look, let's go back to Exhibit 4, the Complaint. If you could take a look at Paragraph 4 and tell me if there's anything in that paragraph that is not accurate?

A I don't believe so.

Q All right. Paragraph 5? Oh, I was just, the same question, is there anything in Paragraph 5 that's not accurate?

A No.

Q Sorry. Same question for Paragraph 6?

A No, that's fine.

Q Paragraph 7?

A That's correct.

Q In Paragraph 8 it's already been established that the June 4th, 2004, date should actually be June 4th, 2003; that that's an error in the Complaint. Other than that, is there anything in Paragraph 8 that is not correct?

A I don't believe so.

Q All right. Paragraph 9 continues the 2004 error where it should be 2003. Other than that, is there anything in Paragraph 9 that is incorrect?

MS. KHAN: I object to the conclusory statement in Paragraph 9 and the use of the conclusion that they engaged in ex parte communications. You can answer the question.

A Several. I -- I believe -- I don't remember. Well, I don't know. I assume it's correct, except there are certain -- let me think. I don't remember talking to Judge Stuard during that period of time. I may have, but I have no recollection of it. And I never -- if I did, it was only in regards to preparing an entry. I believe Chris talked to him, but I might have been there. I just don't know.

Q You have no recollection of any interaction with Judge Stuard regarding the preparation of

the entry?

A Right now I have no recollection.

Q Who did Judge Stuard request prepare the Roberts sentencing entry?

A He asked our office to prepare the entry.

Q What person?

A It had to be either Chris or Chris and me.

Q All right. Do you know for a fact that he asked Chris to do it?

A Well, it had to be, yeah, it had to be one of us.

Q Right, no, but I'm asking you specifically, do you have knowledge that Judge Stuard specifically asked Chris to prepare the sentencing entry?

MS. KHAN: I think he's already answered your question.

Q Go ahead.

A If he asked just Chris, then Chris would have told me. I mean, I know he asked us to prepare an entry, okay. I don't know; I don't remember how that came about. I don't know if he talked to both of us or if he just talked to Chris. But I have -- I don't have any

recollection of that. I don't know. I just know that as a result of that, we prepared the entry.

Q Do you have any specific knowledge about communications between Judge Stuard and somebody in your office regarding the creation of the Roberts sentencing entry?

MS. KHAN: If you don't remember, you don't remember.

A Ask -- I'm not quite sure what you're asking. Ask me again.

Q Has anyone told you that Judge Stuard spoke with them about creating the sentencing entry?

A Either -- if I was there, I don't remember. But otherwise, Chris would have told me, the Judge made a decision and we have to prepare the entry.

Q Let me --

A He would have had notes, okay.

Q Has anyone from June 4th, 2003, through today told you that they had a conversation with Judge Stuard about preparing the sentencing entry?

A Yeah, Chris told me that the Judge said we were to prepare the sentencing entry, but I don't remember if I was actually there or not when the Judge told him that.

Q All right. And when was it that Mr. Becker told you this?

A It would have been at, probably at the time right after the Judge told him.

Q All right.

A Maybe -- see, I could have been there, but I don't know.

MR. STERN: Take a break.

MS. KHAN: Yeah, let's take a break.

MR. BERGER: We've only gone for a few minutes here.

MR. STERN: I think it's our right to take a break if you don't have a question pending.

MR. BERGER: Take a break.

MR. STERN: Thank you.

(A recess was taken.)

Q (BY MR. BERGER) This initial conversation with Judge Stuard that we were just speaking about a moment ago that you may or may not have been a participant in but that you believe Chris Becker was a participant in, when did that take place?

A I don't know. I don't remember.

Q Was it a telephone call, in person, email; what was the form of communication?

A I don't know. Or I don't remember.

Q After that communication, what happened?

A A rough draft of the entry was -- well, I guess I'll call it a draft of the entry -- the entry was prepared in a computer, on a computer by Chris. And when it was -- when it was completed, I went into Chris's office, and he had it up on the monitor on the computer. And I looked at it and we went through the entry for changes. And there were some typographical errors, and I told him, I can't work on a computer screen, to print me out a paper copy of what's up on the screen. So he printed it out. I took it back to my office, sat down and went through it and found a number of typos. And I made corrections. And I took it back to Chris, and he put it into the computer with the changes, and I had him print out another paper copy. And that went on a number of times. And I kept finding typos, until we got done. And there were, I don't know, five or six or seven drafts of it.

Q All right. What happened next?

A I don't know. Well, what do you mean, what happened next?

Q At that point were you finished with creating the draft entry?

A I believe so.

Q All right. What did you then do with the draft entry?

A Well, I think I kept one, the final copy of it. I think I wrote Draft 1, Draft 2, Draft 3, stapled them together, because it was getting confusing on my desk. And I pitched all the prior ones and kept the last one and put it in my copy of the file. And I think Chris was going to take it over to the Judge when he printed it out from the computer.

Q So you didn't deliver it to the Judge?

A No.

Q Why is it that you think Mr. Becker delivered it to the Judge?

A Because I didn't.

Q Did he tell you he was going to?

A I believe so.

Q All right. After the draft was delivered to the Judge, what happened next?

A Then at some point there was the sentencing hearing.

Q Did Judge Stuard ever provide you or Mr. Becker with comments on the draft?

A I don't know.

Q Did Judge Stuard ever provide you with comments on the draft?

A No.

Q Were there any other subsequent communications with Judge Stuard regarding the sentencing entry?

A At what point?

Q After the delivery of the draft.

MS. KHAN: Between Mr. Bailey and the Judge or --

MR. BERGER: At all.

A Not that I'm aware of. I don't know. As far as I'm aware of?

Q Yes.

A No.

Q Do you have any knowledge of a second version of the sentencing entry being provided to Judge Stuard?

A What do you mean, a second version?

Q There was some sort of conversation with Judge Stuard at which he provided notes and said, draft the sentencing entry; right?

A I don't -- I have -- I don't think --

MS. KHAN: He said, he just testified he

wasn't there during any conversation or didn't recall.

A Yeah, I don't recall. I have no recollection of him providing me with any notes.

Q All right. At some point Judge Stuard requested that the sentencing entry be drafted by your office?

A Right.

Q You and Mr. Becker then prepared a draft sentencing entry?

A Right.

Q That draft sentencing entry was then provided to Judge Stuard?

A Right.

Q Were there any other edited versions after that draft version of the sentencing entry provided to Judge Stuard?

A I don't know. I mean, not that I'm aware of. I don't know.

Q Did you or Mr. Becker receive a telephone call from Judge Stuard regarding the draft sentencing entry?

A I don't remember. I don't remember ever talking to Judge Stuard about the sentencing entry.

Q Do you have any knowledge about a

telephone call between Mr. Becker and Judge Stuard about the sentencing entry?

A My recollection is, I don't -- I don't remember what Chris said. I know Chris got, got notes from the Judge, and maybe together we might have prepared something initially, or he prepared it. I don't really remember. Okay, my only recollection is of standing over his shoulder looking at the computer screen and correcting the stuff at my desk. That's -- that's really my, my recollection of the entry.

Q All right. So you don't have any knowledge about any telephone call between Mr. Becker and Judge Stuard?

A I can't remember.

Q Take a look at Paragraph 10 on Exhibit 4.

MS. KHAN: Again I object to this. I object to the question and I object to the form. I object to the form of the question and in particular the statement that these were ex parte communications.

Q Is there anything in Paragraph 10 that is not correct?

A All I can tell you is, I don't remember engaging in a telephone conversation with the Judge or

talking to the Judge in person.

Q Anything else?

A What do you mean?

Q In Paragraph 10, I asked you if it was correct. I was asking if there was anything else that wasn't correct?

A I don't know if it's correct or not, I mean, because I don't have any personal memory of that.

Q But you have discussed it with Mr. Becker?

A Yeah.

Q So not only do you have your own recall of it, you also have his recall of it?

MS. KHAN: He just said he didn't recall it.

A I don't recall. If Chris said that he talked to the Judge by phone and in person, then that's what happened.

Q And you've not discussed any of this with Mr. Becker in recent time about what his recollection is?

A No, I haven't gone over it with, in detail, any of this stuff.

Q So he's never advised you whether or not

he's the person that spoke with the Judge by telephone or in person?

A I'm sure he told me that. I just don't remember it right now.

Q You're sure he told you what?

A If -- if this is what happened, then he would have told me that, that the Judge advised him that he'd reached a decision and the Judge gave him notes and we were to do the entry.

Q All right. I just, I want to make sure I understand your answer. Between June of 2003 when all of this was going on and now, Mr. Becker, you don't recall any instance in which Mr. Becker specifically told you, I spoke to the Judge in person or I talked to the Judge on the phone?

A He --

MS. KHAN: I believe he's already testified that he doesn't recall.

A I don't have a current recollection of it.

Q So there's no instance in present time when he's advised you what happened? I'm not talking about what he told you back in 2003.

A Well, he might have told me in 2004,

2005, or when was this, 2007; but I don't have a current recollection --

Q All right.

A -- of it. I can't answer that.

Q All right. Paragraph 11 of Exhibit 4, again it lists June 2004 when the correct date should be June 2003. Other than that, is there anything in Paragraph 11 that is not correct?

MS. KHAN: I object just because it sets forth the same facts that you've repeatedly already asked about.

A I mean, let me -- let me put it this way. I don't have any current recollection of this, but, okay. Okay. If I wasn't there, I wouldn't remember it, okay. And I don't know how to answer that except for I don't remember.

MS. KHAN: Can we just stop for one second?

(Counsel and witness conferring.)

MS. KHAN: Okay, hold on a second.

MR. STERN: Let's go off the record.

MS. KHAN: Okay, can we go off the record for a minute?

MR. STERN: If it's all right with him.

THE WITNESS: Yeah, it's fine with me.

MS. KHAN: Is it okay? Oh, I'm sorry. Is it okay we talk about this or --

THE WITNESS: Yeah, go ahead.

(Discussion off the record followed by a recess.)

MS. KHAN: During a break, after discussing with our clients, it's come to our attention that Mr. Bailey has been under some medication due to an ongoing medical condition that affects his memory. We have communicated to Mr. Berger that we're willing to provide some materials to further explain his medical condition, and that Mr. Bailey is wanting to go forward with this deposition and cooperate; however, if he feels that at some point he cannot go forward, that we will just ask for a recess at that time.

MR. BERGER: All right. I'm going to ask Mr. Bailey just a couple of questions about some of the things that we discussed off the record, if that's all right.

Q (BY MR. BERGER) Mr. Bailey, what is the specific diagnosis that we're dealing with?

A As far as?

Q The medical condition.

A Medical conditions?

Q Yes.

A I'm on medication for a number of things. Rosacea, gastric reflux. Wait, what am I taking? Enlarged prostate. Let's see. And then some supplements and stuff because of the statins removing -- oh, cholesterol, high cholesterol. And as a result of that, I'm taking medications.

Q All right. I believe you indicated a moment ago that one of those conditions required you to take medication that then resulted in some memory problems; is that correct?

A Correct.

Q All right. Which diagnosis is it that the medication is causing the memory problems?

A That's -- well, it was several. When I -- maybe eight or nine years ago, I don't know when, when they found out I had gastric reflux, the doctor prescribed Prilosec. When I took Prilosec, it was great for the gastric reflux, but it caused some serious problems. One of the problems was I suffered memory loss at that time which was rather severe over a period of time. I didn't know what was happening. And then I went to a specialist, and we stopped the Prilosec and he put me on a couple other medications, Reglan, and then its

generic, Metoclopramide, and I take another pill, Protonix.

Also, I had high cholesterol, which is hereditary, and they put me on Crestor, and I've been switched to -- what am I taking -- a generic called Simvastatin. And a combination of those drugs, the side effects, there were a lot of side effects which affect my ability to sleep, including the enlarged prostate. You're probably too young to know what that's like. But I don't sleep a whole lot. I don't get very much REM sleep. And as a result of that, I noticed that, among other effects -- there were a lot of side effects -- but among that, it affects my, I believe my short-term memory. Because I can remember stuff that happened 30 years ago, but the last like eight or nine years, I tend to lose things.

And my doctor, when I talked to him about the memory loss, he said that they think there's a link now between one of the statins, Lipitor, and Alzheimer's. And he, the way he explained it to me was that the human body is composed of cells. The cell walls use cholesterol to make them healthy, and they need cholesterol for healthy walls to be able to communicate with each other. And the statins tend to remove the cholesterol from the cell walls; and the way he put it was, you can either die of a

heart attack or you can die stupid. So it has some effect on my memory.

Q All right. Just to make sure I understand your answer, so the medical conditions that are related to the memory loss are the high cholesterol and the gastric reflux?

A And probably the enlarged prostate because that affects my ability to sleep.

Q Okay.

A Because I may be up maybe five or six or seven times during the night.

Q Okay. And so with regard to the prostate, the issue is inability to sleep?

A Well --

Q That's related --

A Let me put it this way: It affects your, one's ability to urinate.

Q All right.

A Or you may have to urinate and you get a sudden urgency and stuff like that, and you got to take medications for that, and it results in you getting up in the middle of the night a bunch of times.

Q All right. And with regard to the high cholesterol, the memory-loss-related issue is connected to

the medication taken for the high cholesterol?

A It may -- I don't know -- it may be the statin or it could be a combination of the side effects of all the drugs and the lack of sleep. Might have sleep apnea. I don't know.

Q Is the statin a part of the cholesterol problem, or is the statin a part of the medication that you take?

A It's the drug. They call the drugs, the anti-cholesterol drugs or cholesterol-reducing drugs are statins.

Q All right.

A And that would include like Zocor or probably Pravachol or something and Lipitor and Crestor. I was on Crestor, but the pharmacy company said it was too expensive and they switched me to Simvastatin. And I, instead of 10 milligrams, they put me on 40; and that didn't work, so I had to take 80.

Q All right. And then regarding the gastric reflux, is it the medication that you take for that that you believe also contributes to the memory loss issue?

A That has side effects, and it may. I take -- I take Protonix. I was on the Metoclopramide,

which is the Reglan, and I was on that for, I don't know, a whole bunch of years. But last year I switched the order of the drugs. I have to take drugs apart, an hour apart at night. And I switched that so I was taking that one last. And I didn't wake up a number of months ago to take the second drug, the Metoclopramide, and I was having some really bad side effects. And like I'd wake up in the morning and like getting hit in the back of the neck with a sledgehammer, and I'd be shaking and I couldn't get up, and I'd be like drugged.

And I checked with one of my other doctors and he said, stop that drug. And he said, talk to your specialist on that. So they told me to cut it out. So I cut it out and some of the symptoms stopped, and the drugged feeling stopped, okay, but, and I felt really good for three days, and then I started getting tired. And I think that's a side effect of all the drugs. It might be the after-effects of the Reglan. I don't know. But I think it all combines together.

Q And who is the doctor that's treating you?

A I have a number of doctors. One is Dr. Maged Awadalla, A-W-A-D-A-L-L-A, M-A-G-E-D, Maged, for, he's my general family doctor. Dr., is it Sayed Yossef,

Y-O-S-S-E-F, I think it's S-A-Y-E-D, is my doctor for -- he's the specialist for the stomach problems, for the gastric reflux. He does the scopes. Let me think. What are the other drugs?

MR. STERN: Do you have a cardiologist?

THE WITNESS: Huh? No, they thought I had a problem, but that was okay.

MR. STERN: Urologist?

A Urologist, right. Dr. Thomas Picklow, P-I-C-K-L-O-W. Dr. Thomas Picklow prescribes Proscar, or Finasteride is the generic. And what's the other drug?

MS. KHAN: He's asking your doctors, your doctors.

A Oh, yeah, and one of the other -- Cardura, and I take the generic for that, which is, oh, yeah, Cardura, it's the generic for Cardura. And that makes me tired.

MS. KHAN: But he's asking you for your doctors.

A Oh, Dr. Picklow, okay.

MS. KHAN: Is that all?

A I have a dermatologist, but those are topical for the rosacea.

Q All right, thank you.

A They did -- well, that's what started it sort of, okay.

Q When did you first notice a memory loss problem?

A Whenever I was on Prilosec.

Q And do you recall the time period that that was?

A Maybe, I don't know, eight or nine years ago or something like that.

Q All right.

A Maybe. I'm not real sure.

Q And when did you first discuss it with your doctor?

A Let me think. That was -- Prilosec, who put me on that? You know, that might have been Dr. Ruiz. He was my general physician at that time before Dr. Awadalla. And I'm trying to think what came first. Might have been Ruiz, because he was prescribing antibiotics for the rosacea, and the stomach acid ate up the lining of the esophagus and the stomach. So I don't know. I don't know. I don't know who I discussed it with. I know I was talking about the side effects with the different doctors, and they wanted me to continue on with the medications, because it was a combination of the drugs probably.

MS. KHAN: He asked when. When.

THE WITNESS: Oh, when?

MR. STERN: No, he asked with whom.

MS. KHAN: Oh, sorry.

A Yeah, it would have been probably with each doctor, with all the medications back then.

Q And when was that, the first time?

A The first time they mentioned it?

Q Yes, the first time that you had -- you told me that you first noticed it eight or nine years ago, so when was it that you first discussed it with your doctor?

A Probably about that time probably. I don't -- I don't know.

Q And what did your doctor advise you to do?

MR. STERN: Well --

A I don't --

MR. STERN: Do you want to start waiving a privilege like that? I --

A I don't --

MR. STERN: Well, I guess, I think we've tried to in the best faith we know how to make this disclosure and so on like that. Now, if this is going to

become some kind of investigative deposition on his medical condition, we've said we'll supply objective material, but I guess, I mean, are we -- is this going to be an ongoing line of questioning by you?

MR. BERGER: I was just seeking some basic information. I wasn't planning on exploring that area, that particular area any further than that question.

MR. STERN: Okay, that's fine.

Q I'm sorry, the question was, when you first spoke with your doctor about the fact that you were noticing some memory loss, what was it that the doctor told you you needed to do?

A I don't remember. I mean, I switched -- I was on Prilosec for a while, and then they switched me to another drug. I think it was Dr. Yossef prescribed the other drugs than the Prilosec. It was the two drugs, the Protonix and the Reglan.

Q Did you ever see any notes that Judge Stuard gave to somebody in your office as the basis for drafting the sentencing opinion in the Roberts case?

A No.

Q Do you have any knowledge about what any notes from Judge Stuard may have included?

A No, I didn't see the notes, so I

never -- I don't know.

Q Let's go back to Exhibit 4, Paragraph 12. I understand you have a concern about the characterization of the interaction with Judge Stuard as being ex parte. Other than that, is there anything in Paragraph 12 that is not correct?

A No.

Q In your Answer you described your role as serving as the Court's secretary. Can you explain to me what that means?

A Oh, yeah. I've been taught that, as a Prosecutor, I have a number of roles. One of those roles is to make sure that there's substantial justice done. Another role is to prosecute the guilty and protect everybody's rights. Another role is as an officer of the court, and that includes being the Court's secretary to a certain extent. That means if the Judge wants an entry done, the Judge would tell us. It's a ministerial duty. And we prepare the entries for the Judges. At least that's what I've been told at the national seminars. I've been told by other Prosecutors over the years that we act as the Court's secretary, or paralegal or however you want to -- whatever you want to call it. And it's because, probably because we had a bigger staff. And it was done

historically, and we -- we do that as a courtesy for the Court.

Q And what duties does being the Court's secretary entail?

A It means preparing entries for the Court.

Q And what duties does preparing entries entail?

A The Judge tells us, like after a suppression hearing, for example, the Judge would get ahold of me and say, I've reached a decision. Here is my findings. These are the findings of fact. These are the conclusions of law. Put it into an entry and put in whatever the words are that are required, because it's changed over the years, over the last 34 years. And we would have the entry typed up and submit it to the Court, and if the Court wants to make any changes, they make any changes, and we get it typed. And then the Judge, it's the Court's entry. We do -- we've done sentencing entries and suppression hearing entries and post-conviction relief entries and whatever the Judge wants us to type. Entries as far as pretrials, if the Judge is going to toll speedy trial or something, we may prepare those entries, too, at the direction of the Court.

Q These instructions to prepare the entries, are they normally verbal?

A Yes.

Q And how long do these conversations normally last? Are they lengthy?

A Depends on the type of entry.

Q All right. Is it normal for the Judge to give you anything written along with the verbal instructions?

A On occasion the Judge might provide some notes or something like that.

Q The Judges don't tell you word for word what to put in the entry?

A Word for word? Not word for word.

Q There's a portion of the entry that you create?

A Well, entries, entries are generally standard entries. Okay, they follow a certain format. And you put in all the words that are required in a standard entry. The Judge makes his finding. If there are findings of fact, the Judge could say something like, I'm adopting all of the facts. Because what the Judge does in a suppression hearing, the Judge will usually ask for both sides to submit briefs or memos or something like

that. And you submit that, and he'll say, well, I'm adopting this one or I'm not adopting that one, and draw it up; this is what I'm finding. These are the findings of fact and conclusions of law. And generally that's, and whichever side he picks, that's what you do.

Q Take a look at Paragraph 13 on Exhibit 4. You previously testified that you don't have a recollection of any conversations with Judge Stuard about making corrections --

A Right.

Q -- to the entry?

A Right.

Q So you don't have any knowledge or recollection about whether or not Paragraph 13 is accurate?

A Right.

Q One more question going back to the medical issues that we were discussing. Has there been anything that you've been able to do in the past to bring back a memory? Is there any change in medicine that you take or treatments that you have that have improved your memory that you've noticed?

A Anything to bring back a memory?

Q I guess I didn't ask the question very

artfully. This, the memory loss, is it something that you've had consistently for the past eight or nine years, or is it dependent on the medication that you're taking and the treatment that you're undergoing?

A When I was on the Prilosec, it got severe, okay, the memory loss. And when I stopped taking the Prilosec -- and I don't know if I related it to the Prilosec. I don't think I knew what was happening to me at the time. There was another side effect when I first took the Prilosec. I -- I think my memory improved when I stopped taking it. But then I was on other drugs, and I think it's a combination of the different medications, the side effects of the medications.

MS. KHAN: Do you remember the question?

A You asked is there anything that I would do that would bring back a memory or would --

Q Have you had that experience? Has your memory loss been consistent since it first began?

A I think it was bad, then it got a little better, then it got worse.

Q Have you ever had the experience where you weren't able to remember something and then sometime later you were able to recall it?

A Yes.

Q Is there anything that you're aware of that brought about that improved memory?

A Well, I think you're talking about two different things, okay. I think it's normal for people to forget things and have it like on the tip of their tongue and the tip of their mind or something like that. And that happens to everybody, I think. Like if you can't remember the name of something and then it comes back to you later that day. And I think we've all experienced that. But this is a little different. This is where I may not be able to remember what happened two days ago. Okay, now, if I write something down and I look at it, then I may be able to jog that memory. Or if I'm working on a case file, I write things down in detail, I can remember that because I have it there; I've written it down. If it's something I haven't written down, then I may not be able to remember it.

Q Have you had the experience where you weren't able to remember something that happened two days ago on Monday, and then on Thursday you could remember what happened two days ago?

A Maybe. I don't know.

Q Let's go back and take a look at Exhibit 2, which is the December 27th, 2006, letter.

THE WITNESS: This is 4.

MS. KHAN: That's 4. Did I mix them up?

Q It's a like really small --

MS. KHAN: Oh, here you go.

A Got it.

MS. KHAN: I'll just have a, I'm sorry, I'll just have a standing objection to any of the documents that we prepared or submitted prior to the certification of the Complaint.

Q All right. If you could please read the second paragraph just to yourself, and I'm going to ask you a couple questions about it.

MS. KHAN: Oh, here.

A Okay.

Q Is there anything in that paragraph referring to the interaction between your office and Judge Stuard that you recall?

A No. Well, how do you mean? Do you mean was I there or --

Q Do you have a recollection of any of this taking place?

A No.

Q The description of what happened here?

A I know it happened; but, no, I don't

have any recollection.

Q All right. And how is it that you know it happened?

A Because it -- we've -- because we prepared the entry.

Q All right. Take a look at the second paragraph. Go ahead and read it to yourself.

MR. STERN: Isn't that the one he just looked at?

MS. KHAN: Didn't you just ask about the second paragraph?

MR. STERN: Yeah.

MR. BERGER: Oh, I'm sorry, the third paragraph. Thank you, Geoff. I'm sorry.

A Okay.

Q In the third paragraph it describes an additional scenario between your office and Judge Stuard. Is there anything that's described in that paragraph that you specifically recall happening?

A No.

Q All right, let's go to the first full paragraph on Page 2 that begins, "The sentencing entry."

A Okay.

Q Is there anything as described in that

first full paragraph on Page 2 that you recall specifically?

A Yeah, I remember standing in Chris's office looking over his shoulder at the computer screen, and I remember being in my office and making corrections to typos.

Q Anything else?

A No.

Q So anything else that's alluded to in that paragraph, you do not recall?

A No.

Q All right, take a look at the next paragraph that begins, "As noted."

A Okay.

Q Is there anything that's referred to in that paragraph that you do not have a specific recollection of?

A I'm not sure; what are you asking? Are you asking me --

Q All right. That paragraph states that the sentencing memorandum was composed on Mr. Becker's word processor. I believe you indicated a moment ago that you recall that?

A The computer; right.

Q Yes. And that prior drafts were not preserved?

A Right. I pitched those.

Q Okay, so you recall that?

A Yeah, I dumped them in the wastebasket.

Q All right. And that your office shares a common hard drive with the Common Pleas Court Judges?

A Right; they call it an I: drive.

Q All right. And you believe that the draft was communicated to Judge Stuard through that?

A I don't know.

Q Okay. You don't have a recollection of that?

A I don't have a recollection of that.

Q All right. Why don't you go ahead and take Exhibit 3, which is the September 24th, 2007, letter.

A Okay.

Q And the second paragraph on Page 1, why don't you read that to yourself, and then I'll ask you a question about it.

A Okay.

Q All right. In the middle of that paragraph there is, I guess it's the one, two, three, four, fifth -- I'm sorry, one, two, three -- the fourth

line towards the end of the line where it says, "It is undisputed"?

A Okay.

Q Do you see where I'm referring to? "It is undisputed that the communications between Respondents and Judge Stuard were only to correct typographical errors"?

A Okay.

Q Is that your recollection?

A I have no recollection of talking to Judge Stuard.

Q So you don't recall whether or not that's an accurate statement?

A I don't know.

Q All right.

A Because I don't remember talking to Judge Stuard.

Q All right. Turn to Page 2.

A Okay.

Q And the third full paragraph that begins, "On Wednesday," if you see where I'm referring to, go ahead and read that, and I'll just ask you a couple of questions about that.

A Okay.

Q The first sentence that begins with, "On Wednesday" --
A Okay.
Q -- do you have a recollection of that?
A No.
Q All right. The second sentence that begins with, "In compliance," do you have a recollection of that?
A No.
Q So you have no knowledge whether or not Judge Stuard said, here are my notes, please type up a sentencing opinion like the one I used in Jackson?
A I have no recollection. I -- I don't remember.
Q All right. The next paragraph that begins with, "The Court's decision," go ahead and read that.
A Okay.
Q The second sentence that begins, "The only" --
A Right.
Q -- do you have any specific recollection of the communications that this sentence is referring to?
A I have no recollection of communicating

with the Court. I can tell you I never would have discussed the merits of the case with the Court, just because that I know, so --

Q Just one second. We're done with that letter. You can put that down.

A Oh, okay.

Q I am going to present you with what's been marked at Exhibit 6 and ask if you could identify it?

A It looks like a transcript of the court sentencing; right? Or part of the transcript.

Q In the Roberts matter?

A In, right. Where -- let's see. Well, maybe, okay, this is out of -- this is the side bar discussion, okay.

Q This is the portion of the transcript where Mr. Ingram raised his concern about the sentencing entry; isn't that correct?

A Right, right.

Q Okay, just a couple of questions. Turn to what is numbered at the top right-hand page as 6369. And towards the middle of the page there is a statement by you and I'll read it: "MR. BAILEY: The only thing left is the final one. All prior ones were thrown out. There were six or seven of them." Did I read that correctly?

A Right.

Q All right. The thing that you were referring to was the sentencing entry for the Roberts case?

A Yeah, it was the last copy that I kept.

Q All right. And the prior ones that you were referring to were the ones that you had printed out when changes were being made, when you were editing by hand?

A Right.

Q Okay. Do you have a present recollection of this side bar conversation that's preserved in Exhibit 6?

A I think so.

Q All right.

A I remember that we were there. I remember Jerry raising it, and I remember that we went into chambers to talk about it.

Q All right, let's go back to the Complaint, which is Exhibit 4, and Paragraph 14.

MR. STERN: Excuse me. Is this a good time for a break?

MR. BERGER: Fine with me.

(Discussion off the record followed by a recess.)

Q (BY MR. BERGER) All right, let's go back to Exhibit 4, Paragraph 14.
A Okay.
Q I understand your concern about the use of the term ex parte. Beyond that, is there anything in Paragraph 14 that is not correct?
A No.
Q All right. We talked about this just real briefly before. Can you tell me what the I: drive is?
A It's a computer thing. I mean, it's a special part of the computer, I think, that our office and the Court can access. You'd have to ask -- Chris probably can explain that.
Q All right. And this I: drive somehow allows you to share documents with the Court; is that the purpose of it?
A I'm not the person to ask computer stuff about, about the office computer stuff.
Q Have you ever used the I: drive?
A No.
Q Okay. Do you know what's kept on the I: drive?
A No.

Q All right, let's go to Paragraph 15. And is there anything that is not correct in Paragraph 15?

MS. KHAN: Objection. The document speaks for itself. Do you know what --

A I haven't looked at it for a while, but I assume that this is correct; right.

Q All right. I've got a copy. I mean, if you want to take a look at it, I've got a copy of it. You should feel free to do so.

A I assume this has got to be correct; right.

Q All right, just one second. Take a look at Page 3 of your Answer, which is Exhibit 5.

A Got it.

Q All right. On Page 3, the paragraph that begins 16-18, do you see that?

A Got it.

Q Okay, let me count down here. On the sixth line, read the sentence that begins, to yourself, "Further answering."

A Okay.

Q I understand and have received a copy of the Ingram affidavit. Was there an affidavit obtained from Mr. Juhasz as well?

A I don't know.

Q All right. So you don't know whether Mr. Juhasz or not holds that position?

A Can I talk to my attorney for a sec?

Q I'd prefer if you'd answer the question first.

MS. KHAN: Either you know or you don't know.

A Well, I don't know what his thought process is.

Q All right. Have you obtained information from Mr. Juhasz indicating that it's his belief that there was no effort to conceal the process and that at all times Judge Stuard and you and Mr. Becker maintained that the preparation of the sentencing decision was a ministerial function?

A I don't remember talking to John at all.

Q All right. So any suggestion that Mr. Juhasz holds this opinion is not correct?

MS. KHAN: Objection. That's not what he said.

A That's not what I'm saying.

Q All right. You don't know whether Mr. Juhasz holds that opinion or not?

A That's right; I don't know his, what he currently thinks.

Q All right. And you don't know what he's previously thought on that topic?

A Can I talk to my --

MS. KHAN: Objection.

A Okay. I don't know his thought process. I mean, I can't go inside his mind.

Q I understand that, but -- maybe I'm making this more complicated than it needs to be. It appears from your Answer that you're suggesting that both defense counsel didn't have a problem with what was done, and that's in part based upon the affidavit obtained from Mr. Ingram; correct?

A Yeah.

Q All right.

A I think that's fair.

Q Have you obtained any information from Mr. Juhasz that supports that claim?

A I haven't talked to John about this.

Q All right. Are you aware of whether or not Mr. Becker has talked to John about this?

A No.

Q All right, go ahead and take out Exhibit

1, the November 28th, 2006, letter.

A Got it.

Q Go to the Page 6, third paragraph.

A I'm sorry, Page?

Q 6.

A 6. Okay, what paragraph?

Q Third paragraph.

A "Both attorneys who were in" --

Q Yeah, I'm going to go ahead and read that.

A Okay, got it.

Q "Both attorneys who were in court with Donna Roberts at sentencing have signed affidavits that they did not believe any ethical violations occurred by either the State or the Court." Did I read that correctly?

A Right.

Q Are you aware of any affidavit from Mr. Juhasz?

A I don't know. I haven't looked at the pleadings for a long time.

Q Have you ever seen an affidavit from Mr. Juhasz?

A I don't remember if I did or not. I

don't know.

Q Let's go back to Exhibit 4, the Complaint, Paragraph 16.

A Okay.

Q Is there anything in Paragraph 16 that is not correct?

MS. KHAN: Again objecting to the use of the term ex parte communications.

Q Besides your concern about the use of that term, is there anything that's not correct?

A I don't believe so.

Q All right. Is there a reason why defense counsel were not informed or consulted regarding the communications with Judge Stuard?

A Is there a reason? I don't know; it's just been practice that the Judge calls you to do an entry, you do the entry. And I don't know.

Q In your Answer you referred to this entry-drafting process as being decades old?

A Right.

Q How is it that you know that this process has existed for decades?

A Because when I started in Portage County, Chuck Kirkwood was Chief of the Criminal Division,

and Chuck told me it's been the practice in the county for the Prosecutor's Office to prepare the entries for the Judges.

Q So the decades that you're referring to are not decades in this county but decades in the different counties that you've worked in?

A No, it's my understanding -- oh, no, you're talking about Trumbull County?

Q Yes.

A In Trumbull County it's my understanding that historically it goes back, the practice of the Prosecutor's Office preparing the entries, because Dennis has been in the office -- we probably started pretty much about the same time. And that was the practice when -- who was the old Prosecutor, Walter Dragelevich -- Walter was Prosecutor. It goes way back.

Q And how is it that you know it goes way back; did somebody tell you that?

A Right.

Q All right. Who was it that advised you of that?

A I don't know. Maybe Dennis.

Q Dennis?

A Watkins.

Q All right. Is it your position that defense counsel were aware of this process?
A Oh, yeah. Well, okay, yes.
Q And what leads you to that conclusion?
A You mean in Trumbull County or all together?
Q Yes, yes.
A Just Trumbull County?
Q I'm just talking about Trumbull County.
A Well, I had talked to Jerry about it, Jerry Ingram, and Jerry was aware of the -- of this being a practice in Trumbull County. But it's been a long-standing practice in other counties, too, and I'm aware that counsel were -- defense counsel were aware of it being a practice in other counties.
Q Just specifically with Trumbull County, how do you know that defense counsel, in general, were aware of this process?
A These two defense counsel?
Q No, no, just in general.
A Just counsel in general? Well, some --
Q The defense bar.
A Defense bar, because ofttimes people start out practicing at some point in the Prosecutor's

Office and then they go from the Prosecutor's Office into private practice, and a lot of defense attorneys used to be Prosecutors. And that happens in different counties. And people who have worked in the Prosecutor's Office are aware that this is the process in felony cases.

And not -- there are a lot of attorneys in a county. A limited number of them do criminal practice. Those who are engaged in criminal practice -- people in civil practice probably have no clue -- but the people who are engaged in criminal practice, there are those who do misdemeanor work and those who do felony work and some do both. The ones who are engaged in felony work are, I would say, aware of the practice.

Q Based upon the fact that they formerly worked in the Prosecutor's Office?

A And even if they haven't, I think they're aware that this is how the process gets done. It's not a secret.

Q What other ways that you're aware of have criminal defense counsel learned of this process if they weren't a former Prosecutor's Office employee?

A I think a lot of them are aware that the Prosecutor -- they just learn through practicing that the Prosecutor's Office does the entries, or did the entries.

Q All right. You stated a moment ago that you had had a conversation with Attorney Ingram about this practice?

A I know we talked during the course of these proceedings over the last several years at some point about it.

Q All right.

A That would be probably before he gave us the affidavit.

Q All right. Are you suggesting that Mr. Ingram was aware of this process prior to the sentencing of Donna Roberts?

A I believe so.

Q All right. You will agree that Mr. Ingram made several statements during the side bar that indicated he wasn't aware?

MS. KHAN: Objection.

A I think he was asking --

THE WITNESS: You want me -- can I answer that?

MS. KHAN: If you understand the question. I mean, the transcript of the side bar discussion speaks for itself.

Q Well, go ahead and answer the question,

and then we can talk about --

A Which questions are you asking me specifically?

Q I'm asking you, do you agree that Mr. Ingram indicated that day, that you indicated you recall, that he wasn't familiar with that process; do you recall him saying that?

A I don't recall what part of this you're talking about.

MS. KHAN: Then you don't recall.

Q All right. Exhibit 6, which is the transcript, the second page --

A Okay.

Q -- towards the middle of the page, see where it says Mr. Ingram?

A Oh.

Q "MR. INGRAM: Well, the record should reflect the vehement Defense objection to the State's participation in the drafting of the Court's sentencing decision in ex parte proceeding. We did not know this; we did not know of this. That is prohibited. I would ask that those documents be sealed and become part of the Appellate record in this case." Did I read that correctly?

A You read it correctly.

Q All right. So you agree that Mr. Ingram raised an objection?

A I agree he raised an objection.

Q And indicated that he didn't know about it?

MS. KHAN: Objection. Again, the transcript speaks for itself.

A I think he was aware of the procedure.

Q Tell me what you recall about this conversation with Mr. Ingram.

A I just know we had a conversation. He didn't have any problem with it, and I think he said he was aware of it.

Q When did the conversation take place?

A In the last, what, three and a half years.

Q Do you recall where the conversation took place?

A No. Either in our office or maybe the Courthouse. Probably in our office. I don't know.

Q And what led to this discussion; do you recall that? How did it come up?

A Probably these proceedings.

Q When you say these proceedings, you're referring to?
A The Complaint being filed.
Q The Disciplinary Complaint being filed?
A Right. Well, it would have been before he -- before he filed his affidavit. But there would have been a conversation obviously to obtain the affidavit.
Q All right. I just, I want to make sure I understand. So the conversation that you had with Mr. Ingram about the sentencing entry-drafting process occurred after the Donna Roberts sentencing?
A Yes.
Q Okay, I think I misunderstood your answer before. I'm sorry. Thank you.
A You're welcome.
Q Let's continue on with Exhibit 6. On Page 1 towards the bottom of the page, there's another statement by Mr. Ingram. Go ahead and read it to yourself, and I want to ask you a question about it.
A Okay.
Q Is Mr. Ingram's description of you sitting at the prosecution table reviewing the documents as if you were reading along correct?
A Yes.

Q And do you specifically recall that?

A Yes.

Q Mr. Ingram then asked that you be required to identify the documents which were sitting in front of you?

A What page are you on?

Q Still on Page 1, I'm sorry.

MS. KHAN: Let me see. "I would now ask on the record."

A Oh, oh, okay. Sorry, okay. Yeah, right, uh-huh.

Q Okay. What documents were sitting in front of you?

A The last draft.

Q All right. And that was a copy of what had been presented to Judge Stuard?

A I believe so, yeah.

Q All right. Is there something else it could have been?

A Well, I didn't know if the Judge had made any changes.

Q All right. As you were reading along with the Judge, did you notice any changes?

A No.

Q Do you know when the practice of having the Prosecutor's Office draft the sentencing entries began?

A In which county?

Q I'm sorry, in Trumbull County.

A No.

Q All right. Do you know who initiated or created this process?

A No.

Q In your personal experience working for the Prosecutor's Office since 1997, are there any Judges that have not utilized that process?

A Kontos, McKay, Stuard, Logan, there are four criminal Judges, and I've done entries for all four Judges.

Q Are there instances in which the Judges drafted their own entries instead of having your office draft them?

A I believe so, yes.

Q What situations did that occur in?

A I think there are times where Judge McKay will send over an entry; it just says "Denied" on a defense motion. And I'm sure there have been times where Judge Stuard's done that, or he's prepared something. And

I think all the Judges probably, you know, have at times done something like that, or prepared an entry or maybe something lengthier.

Q When you say something lengthier, do you have any specific recollections of a Judge producing a lengthy entry for themselves?

A Specific recollection, I think Judge Stuard has. I can't remember specifically, but I -- I'm sure he has.

Q Any of the other Judges?

A Maybe. I don't know. I can't remember. Most entries, I think we do most entries. Like all sentencing entries, except for when somebody gets probation, or community control sanctions they call it now, Probation Department does those. But out of the others, like sentencing entries, I think we do all the sentencing entries. Somebody's going to prison, we do all the sentencing entries.

Q Was it normal practice that the Judge would initiate the drafting of the sentencing entry or other entry by making a call to somebody in your office?

A It could be a phone call or we could be there in person.

Q All right. And was this conversation

ever communicated to opposing counsel as, we had a conversation with the Judge and they asked us to draft the -- or I'm sorry -- and the Judge asked us to draft the sentencing entry?

A No.

Q All right. When you provided this draft entry to the Judge, were there instances where you also provided a copy to defense counsel?

A No.

MS. KHAN: You're talking about the process in general?

MR. BERGER: Yes.

A No.

Q I'm going to present you with what's been marked as Exhibit 7 and ask if you could identify it?

A It's the Trumbull County Common Pleas Court (General Division), it says on the front page, and the second page is the Trumbull County Clerk of Courts Civil Cost Schedule Revised 08-01-01. What's this? Rules of the Court of Common Pleas (General Division) is on the third page. It's a table of contents. Looks like it's the court rules; right.

Q All right. And you're familiar with this document?

A I'm sure I've seen it in the past.

Q You've consulted it in the prosecution of criminal cases?

MS. KHAN: Can you recall consulting it?

A Consulting it? I don't recall consulting it. I mean, what do you mean by that?

Q Have you ever looked at it prior to today?

A Probably sometime since I started there.

Q And you're aware it exists?

A I'm aware it exists.

MR. STERN: Excuse me. Wasn't your question in the context of criminal matters two questions ago?

MR. BERGER: I'm sorry, what's your question, Geoff?

MR. STERN: I thought that the question you asked two questions ago was whether he was familiar with it in some kind of use in a criminal law context, and then the next two questions were general. I just need to clarify or it would be nice to be able to clarify whether you're talking about, he consulted it for criminal purposes or for general purposes?

MR. BERGER: I was referring to in his

employment.

MR. STERN: Okay. Thank you.

MS. KHAN: Do you have a question pending? What's the question?

A Yeah, I'm not sure. I probably looked at this at one point, and I don't know -- I don't know if I've looked at it since then.

Q All right. The entry-drafting process that we've been talking about today, is it represented somewhere here in the local rules?

A I don't know.

Q All right. Do you want to take a look at the table of contents and see if you can, on Page 3, see if you can identify --

A Now, is there some particular rule you want to draw my attention to?

Q I just want to know if there's anywhere in here that you can point out to me where it deals with the process of the Prosecutor drafting the sentencing entries?

A And without reading through it line by line, I don't know.

Q All right. Did you see anything in the titles that appeared to you as if it would cover that?

A For entries?

MS. KHAN: I'm going to object.

A Without going through it --

MS. KHAN: Hold on a second. Hold on a second. Just, I'm just going to object. I mean, the rules, the document speaks for itself. Whether it addresses the procedure that Mr. Bailey already described, that it is in there or not, again, the document speaks for itself.

Q Why don't you take a look at Rule 15, which is probably about three-fourths of the way through the document. Do you see where I'm referring to?

A Right; I've got 15.

MS. KHAN: Wait 'til I get there.

A Okay.

MS. KHAN: Okay.

A I've got 15.

Q All right, I'm going to read it if you want to follow along. "Rule 15, Judgment Entries. Counsel for the party in whose favor an order, judgment or degree is announced shall, within 14 days thereafter unless the time is extended by the Court, prepare a proper judgment entry and submit the same to counsel for the opposite party, who shall approve or reject the same

within 5 days after its receipt by him and may, in case of rejection, file objections thereto in writing with the Court." Did I read that correctly?

A That's correct.

Q All right. Is that the procedure that you followed in preparing?

A No, that's the civil procedure, for civil cases.

Q And what about that tells you it's for a civil case?

A Well, there's nothing that says in the rule itself that it's just for a civil case.

Q Well, what leads you to the conclusion it's just for a civil case then?

A The practice that's been going on in the county and different counties for as long as I've been a Prosecutor, that there's -- the only time I'm aware of a defense attorney preparing an entry is in an expungement, where the Judge grants the expungement and the Judge tells them that they have to prepare the paperwork for the expungement, and there are a lot of things they have to put in there, because we don't do the expungement entries.

Q You agree that Rule 15 deals more than just with preparation of an entry; it also deals with an

opportunity for input and objection?

A Right; but that's for civil cases. You're dealing with monetary awards or various orders by a Court, and it's different in criminal law. I mean, you're dealing with certain time limits. You've got a 5-day time limit when you send somebody to prison, and it's advisory, but you, if you go through that process, you're going to cost the county a ton of money by having people sit in jail a lot longer than they should if you're waiting for somebody on the other side to approve it. And in real criminal practice, there are some attorneys who won't get it back to you or to the Court. And if you've ever dealt with felony criminal law, it's a whole different world. It's not civil.

Q All right. So why not send the other side a copy of the entry that you provide to the Judge?

A They're supposed to after the Judge signs it, because I don't know if the Judge is going to approve that entry a hundred percent or not. The Judge can change his mind. I don't know. We prepare the entry. Judge says, I want this entry. The Judge may come back later and say, I changed my mind; get me another entry. Until the Judge signs it and it's final, I don't know. And they're supposed to send -- when we do it, we put

something on there to send copy to both sides, for the Clerk to do that.

Q Do you agree that sending the Judge an entry prepared by your office is communicating with the Judge?

A No.

MS. KHAN: Objection.

A Well, depends what you mean by the word communicate. There are certain types of communications that are permissible and certain types that aren't. I'm not allowed to communicate as to the merits of a case. I'm not allowed to argue my case once we've done that. Because when you do that, both sides have to be present. But when the Judge says, hey, I've made up my mind, he's completed his decision-making process, this is a ministerial function. It's like an administrative duty. And that's the hat that I'm wearing when I do that.

Q Let's go back to Exhibit 4, the Complaint, Paragraph 17. And I understand your concern about the use of the term ex parte. Other than that, is there anything in that paragraph that's not correct?

A No.

MS. KHAN: Objection. He's already answered this question regarding whether they were

consulted. I also object to the form of the question.

Q Paragraph 18?

A Got it.

Q Other than your concern about the use of the term ex parte, is there anything in that paragraph that is not correct?

A No.

MS. KHAN: Object to the form of the question.

THE WITNESS: Okay, sorry.

Q Whose job is it normally to provide defense counsel with a copy of the entry?

A Which entry, the --

Q The final entry.

A In a case?

Q I'm sorry.

A The Clerk.

Q Let me back up. After Judge Stuard was provided the final entry, whose job was it to provide a copy to defense counsel? Is it the job of your office to do that or the job of the Court or somebody else?

MS. KHAN: Objection. He doesn't know whether that was the final version or not.

Q I'm speaking generally, not

specifically.

A Generally who provides the --

Q What's the general practice?

A General practice, we prepare, like a sentencing entry or any other entry, we prepare the entry for the Court. The Court reviews the entry and the Court signs the entry. Then the Court, or the Court's secretary, I presume, or the bailiff, whoever, files the entry, or somebody comes down and takes it to the Clerk's Office. There should be something stamped on the entry that says, copies to so-and-so. And the Clerk then provides copies maybe to us and to the other people that are named on the entry. And there may be -- it may go to the forensic center; a copy goes to defense counsel and maybe a bunch of people. But the Clerk provides that.

Q So at the time of the Roberts case, the practice was for your office to have a final copy of the sentencing entry on the day of the sentencing hearing and defense counsel to have nothing?

MS. KHAN: Objection. That's not what he's testified to.

A No.

Q How did the defense counsel get a copy of the final sentencing hearing or final sentencing entry

on, at the sentencing hearing?

A The Court, the Court should have provided a copy to both of us at some point.

Q All right. So the practice is for the Court to provide a copy to Prosecutor and defense counsel prior to the sentencing hearing?

A Or after.

Q All right. But you have your copy before?

A I had the draft.

MS. KHAN: Objection. That's not what he's testified to.

Q You had a copy of this Roberts sentencing entry before the hearing?

MS. KHAN: Objection. He's indicated that he had a draft of the sentencing entry.

MR. BERGER: I didn't say final copy. I said a copy of the entry.

MS. KHAN: You said the sentencing entry. Just to be clear, he's testified that it was a draft of the sentencing entry that he had in his hand at the time that he recited the sentence.

A I didn't have a copy of, signed by the Judge, of the entry. I had my final corrected draft. And

I didn't know what the Judge was going to be reading. That's one of the reasons I was reading along with it.

Q And the defense counsel didn't have the benefit of a copy?

MS. KHAN: Objection.

A No, that was my only copy.

Q All right, let's go to Paragraph 19 of Exhibit 4. Is there anything in that paragraph that's not correct?

A No.

Q Paragraph 20, is there anything in that that's not correct?

MS. KHAN: Object to the form of the question.

A No.

MS. KHAN: Hold on a second.

A Okay.

MS. KHAN: I'm just also going to object to the way the Paragraph 20 is stated, that he doesn't know what Defense Counsel Ingram noticed or what Ingram noted.

Q I was waiting for you to tell me what was not correct in Paragraph 20.

A Let's see. As -- oh --

Q We can go sentence by sentence if you want.

A Okay. At the sentencing hearing, the Judge was reading aloud his sentencing opinion, and I was reading along at the same time on my draft copy. And Ingram at that point, somewhere in there, objected, or brought, objected to the Court, or whatever was on the transcript.

Q All right. Paragraph 21, is there anything that's not correct in that paragraph?

MS. KHAN: Object to the form of the question.

A Yeah, I would object to the ex parte, the use of the term ex parte.

MS. KHAN: Thank you.

THE WITNESS: You're welcome.

Q Anything else?

A No.

Q All right. Paragraph 22, anything that's not correct?

A No.

MS. KHAN: Again, object to the form of the question.

Q All right. As a result of that side bar

discussion, there were one or more documents that were entered into evidence; is that correct?

A I believe so.

Q I assume that one of those would have been the sentencing entry that you were reading along on?

A Right.

Q Is there anything else that was entered into evidence?

A Without reading this, I don't remember.

MS. KHAN: That was included in the Exhibit that you're referring to?

MR. BERGER: I'm not sure I understand your question.

MS. KHAN: I guess I'm not understanding your question. You're asking --

Q Here, let me put us towards the place in the transcript. Bear with me here, see if I can find it. Okay, it's actually on Page 1, Mr. Ingram's statement at the bottom.

MS. KHAN: Yeah, okay.

Q The last sentence says, "I would now ask on the record that Mr. Bailey be required to identify the documents which are sitting in front of him."

A Okay.

Q So your recollection is that was the sentencing entry that you were reading along?

A That was the final draft, right, that I had.

Q **All right. And you don't have a** specific recollection of if there was another document or documents besides that?

A You mean admitted into --

Q Yes.

A At the hearing?

Q Yes.

A I don't know. I have to read through this. If it's in here, point it out to me and I'll tell you.

Q I pointed out the reference to you. Just, he refers to documents, so that's the reason why I'm asking. And then I'm assuming you presented something to the Court; it was marked as an Exhibit?

A Well, there weren't documents. It was just one final, my final, like Draft 5, 6, or 7, whatever number was on it that I wrote on there. That's what I had. I'd say it was a document and not documents.

Q All right. Paragraph 23, is there anything that's not correct in that?

A I didn't remember the dates, but, yeah, if that's -- if those are the dates, yeah, this is correct.

Q All right. Paragraph 24, I know you have concerns about the use of the word ex parte. Other than that, is there anything that's not accurate in that paragraph?

MS. KHAN: Objection. The Roberts pleading that's referred to in Paragraph 24 speaks for itself.

THE WITNESS: Should I answer that?

MS. KHAN: If you understand the question.

A I don't remember how many propositions of law she raised, but appealed. And I know that the objection to Chris and my, our preparing the entry, I'll object to the ex parte characterization; but, yeah, I think that that would be accurate, other than that ex parte.

Q All right. The next several paragraphs deal with the opinion from the Supreme Court of Ohio, and I understand that you do not agree with some of the conclusions reached by the Court in its opinion. What I'm simply going to be asking you is whether or not these

paragraphs are accurate in their representation of the ruling by the Court. Do you understand the --

A When the Court's -- and if it accurately states what's in the Court opinion --

Q Right.

A -- then I'll agree with that.

Q Right, right.

A Okay, with all of that. You don't have to go through it paragraph --

MS. KHAN: Hold on a second.

THE WITNESS: Oh, okay.

MS. KHAN: What's the question again?

MR. BERGER: I'm beginning with Paragraph 25.

MS. KHAN: Okay.

MR. BERGER: And it's a series of paragraphs that deal with the Supreme Court's opinion.

MS. KHAN: Right.

MR. BERGER: And I wanted to acknowledge that I understand that he disputes some of the factual conclusions made by the Supreme Court. When I ask him if these paragraphs are accurate, I will just be asking him, do they accurately represent what the Court's entry says; not do they accurately represent what you believe

occurred. Do you understand what I'm --

MS. KHAN: Well, okay.

MR. STERN: You mean the Court's opinion?

MR. BERGER: Yes.

MS. KHAN: You're asking him whether he agrees whether you're accurately quoting what's included in the Supreme Court opinion?

MR. BERGER: If the paragraph is correct.

MS. KHAN: Do you have a copy of the Court opinion?

MR. BERGER: Sure. And I can cite you to the paragraphs where the individual material is at.

A If you tell me that --

Q Should I mark it as an Exhibit or do you just want to look at it?

A Well, I'll trust you. If you tell me that this accurately represents what's in the Court opinion, I'll agree that these are all accurate then.

Q Well, it's up to you. I mean, I did get the date wrong. I had 2004 in a couple of paragraphs.

A Just with the correction of the date, then, then if the rest of it is accurate as to what the

Court said, I'll agree with that, okay, as to what the Court said.

Q All right.

MS. KHAN: Based on his representation that what he's -- that he's accurately recorded what's in the Complaint.

THE WITNESS: He's not going to lie to me.

MS. KHAN: Okay.

MR. STERN: The opinion speaks for itself.

MS. KHAN: Yeah, I've already made that objection, that the opinion speaks for itself.

Q (BY MR. BERGER) All right. So based upon what you've said, if you want to follow along, that would address Paragraph 25, 26, 27, 28, 29, 30, and 31, so I guess everything except for the paragraph that alleges the rule violations?

A Okay.

Q That's what you're telling me?

MS. KHAN: What's the question?

MR. BERGER: That's what he's acknowledging?

A He's saying that these paragraphs all

state what is in the Supreme Court opinion.

Q Right.

A And aside from the characterization or the findings of fact; right.

MS. KHAN: And his own, and his individual commentary --

A Right.

MS. KHAN: -- those statements included in the --

A Yeah, if the Court said that --

MS. KHAN: -- quotations are accurate quotations.

A -- then that's what the Court said.

THE COURT REPORTER: Excuse me. You're both talking at the same time. I can't discern; sorry. Actually, do you want to repeat what you were saying?

MS. KHAN: I have a standing objection that the Supreme Court opinion speaks for itself, and it's really just a waste of time asking the witness to agree that ODC has accurately quoted what the Supreme Court has said in their opinion.

Q (BY MR. BERGER) All right. Let's go to some specific questions about those paragraphs. Paragraph 28, Paragraph 28 has an excerpt from the Court's opinion

that states that Judge Stuard directly involved the Prosecutor in preparing the sentencing opinion. Do you agree with the Court's characterization that the Prosecutor was directly involved in preparing the sentencing opinion?

A Directly involved?

MS. KHAN: Do you agree or disagree with that statement?

A Let me -- we prepared the entry based on what the Court told us. We did what the Court asked us to do. So in the sense that we typed it up, yeah, that's directly involved in the sense that we typed it up. We didn't make the decision. We didn't make the findings of fact or the other findings. The Court had already reached his decision.

Q Paragraph 29 quotes the Court decision as saying that Judge Stuard provided his notes to the Prosecutor's Office. Based on your prior testimony, I'm assuming you agree with that characterization?

MS. KHAN: Objection. Hold on. He's already testified he doesn't have any recollection of that.

A I don't have any current recollection of how, how this happened, okay.

Q All right. I'm going to present you with what's been marked as Exhibit 8, ask if you can identify it?

A Okay, this is a letter from Dave Toepfer, who's an Assistant Prosecutor in our office, dated December 5th, 2006, to the four Judges of the Trumbull County Common Pleas Court regarding drafting entries.

Q All right. And in fact, this letter discontinues the process that was used in the Roberts matter; correct?

MS. KHAN: Objection. The letter speaks for itself. Go ahead, answer the question if you understand the question.

A Oh, okay. Dave is telling the Judges in this letter that they're going -- if they want us to continue to do entries, that they make the request on the record in the presence of the defense while giving defense an opportunity to object and/or an opportunity to submit their own entry.

Q Which is a new process; this is adopting a new process, something that's different than what was used in the Roberts proceeding; correct?

A Yeah.

Q The letter indicates that the request will be made on the record?
A Yes.
Q That defense will have an opportunity to object?
MS. KHAN: Again objection. The letter speaks for itself.
THE WITNESS: Can I answer that?
MS. KHAN: Yeah.
A Yes.
Q That the request on the record needs to be made in the presence of defense counsel?
A Yeah.
Q And defense counsel will be given an opportunity to submit their own entry?
A Yes.
Q All right. The second paragraph, second sentence states that the Prosecutor's Office's position is that the sentencing entry-drafting process is appropriate as it was done prior to this letter?
A Yes.
Q Is that your position?
A Yes.
Q Prior to a concern from Mr. Ingram about

the drafting process in the Roberts case, are you aware of anyone else raising an objection about that process?

A No.

Q Prior to this issue being raised in the Roberts case, did you ever have any concerns about this entry-drafting process?

A No.

Q Can you tell me what your definition of ex parte communication is?

A There are different types of ex parte communications. Some are permissible; some are not. An impermissible ex parte communication is where an attorney goes to a Judge without the other side present and discusses the merits of his case, talks about, tries to influence the Judge in some way in reaching a decision in that case.

There are certain types of ex parte communications that are permissible. They may cover scheduling of events where you're allowed to have a communication with the Court. It would cover, until this case came up, drafting of entries, where we act as secretary for the Judge. It would cover -- what do you call it -- protective orders where we file for a protective order. And originally when the law was first passed back in '73 under the rules, I

believe, criminal rules, you'd go to the Trial Judge and you would tell the Judge certain facts to get a protective -- I don't know; are you familiar with protective orders?

Q (Nodding).

A Okay. So you'd go to that Judge and, who would be your Trial Judge, and obtain a protective order in the case. You'd file an ex parte motion. The procedure changed when the Supreme Court considered the matter later on and said, you have to go to a different Judge, which would insulate the Trial Judge. So, but that's still an ex parte communication that's permissible. And there are a couple other things like that that are allowed by law. And sometimes we were told at seminars that ethically, if you ran into an ethical problem, you could approach your Judge and ask for his advice on what to do, like if you had a witness who you believe lied.

Q I'm going to present you with what's been marked as Exhibit 9. You agree that Exhibit 9 is a copy of Disciplinary Rule 7-110, Contact with Officials?

A Yes.

Q You agree that 7-110(B) is the rule that sets forth the prohibitions against ex parte communications with a Judge?

A As to the merits, yes.
Q You're familiar with this rule?
A Yes.
Q And you were familiar with it prior to June of 2003?
A Yes.
Q You agree that the rule sets out four situations in which, numbered 1, 2, 3, and 4, in which an ex parte communication is permitted?
MS. KHAN: Objection. The rule speaks for itself.
THE WITNESS: Can I answer that?
MS. KHAN: If you understand the question.
A Okay, I'm sorry, the question was?
Q Do you agree that the rule sets out four different instances in which ex parte communications are permitted?
A Yes, as to the merits.
Q The exception in (B)(1) doesn't apply to the Roberts matter; do you agree with that?
A I'm sorry?
Q The exception in (B)(1) that would allow an ex parte communication in the course of official

proceedings in the cause, that's not what happened in the Roberts matter; correct?

A You're talking about what we did here with the entry?

Q Yes.

A Okay, that didn't go to the merits.

MS. KHAN: He's just asking you about the rule.

THE WITNESS: Oh.

MS. KHAN: Not about the facts of this case. Oh, I'm sorry, he was.

MR. BECKER: I was going to say.

MS. KHAN: Yeah, he was.

A Now I'm confused. Wait a minute.

MS. KHAN: Sorry. Go ahead, ask him again.

Q All right.

A Wait a minute.

Q Let me attempt to do this another way.

A Okay.

Q The exception that you're relying upon to allow the communication that took place between your office and Judge Stuard --

A Uh-huh.

Q -- is that (B)(4)?

A I'm saying this doesn't apply. It's not as to the merits.

Q Okay.

A We didn't have any discussion as to the merits of the case. It only dealt with an administrative or ministerial function of preparing an entry for the Court.

Q All right.

A That's the whole gist of the case, of this proceeding.

MR. BERGER: I'm thinking this may take me a minute or two. Do you want to just go ahead and take a brief break, and that way you guys won't be waiting on me? You can stretch your legs or whatever you want to do.

MS. KHAN: Okay.

THE WITNESS: Okay.

MR. BERGER: I'll also tell you that I'm on Page 22 of 25, so --

THE WITNESS: In here or -- oh, your stuff.

MR. BERGER: Of my questions.

THE WITNESS: Oh, okay.

MR. BERGER: So we're doing good.

THE WITNESS: Okay.

(A recess was taken.)

Q (BY MR. BERGER) All right, Mr. Bailey, we've spent a good part of the time today talking about the entry-drafting procedure that was used in the Roberts matter. Was that process also used for your office preparing orders overruling motions to suppress?

A Yes.

Q How about entries denying post-conviction relief?

A Yes.

Q Felony sentencing entries?

A Yes.

Q Sexual predator determinations?

A Yes.

Q And just to make sure that we're on the same page, the process would be that the Judge would request the entry be prepared, and the Prosecutor's Office would prepare it and provide it to the Judge?

A Yes.

Q But not provide a copy to the defense counsel or inform the defense counsel that the Judge had requested you prepare the entry?

A Right.

Q All right, let's go back to Exhibit 1, the November 28, 2006, letter. If you want to take a look at Page 2, the last paragraph all the way at the bottom of the page. I'm going to read it if you want to follow along. "First and foremost is the fact that if any sentence is appealed, it is the Trumbull County Prosecutor's Office that must defend the sentencing entry at the appellate level. Therefore, it naturally makes sense that the Prosecutor's Office should draft the entries that it may ultimately have to defend." Did I read that correctly?

A Right.

Q All right. Can you explain to me what that means?

A What does it mean? We have an Appellate Division. Luwayne Annos is our appellate person in the office. Our office, because we do all the entries, almost all the entries, we have to stay up with the changes in the law. There have been a lot of changes. Anytime the Supreme Court or the Court of Appeals comes up with a decision that requires things be added to the entries, the Judges, if -- it's a lot easier for us to make sure that the required language that the court, that the higher court requires be in the entry, that we're consistent in

those entries. Sometimes Judges tend to forget to put the language in if they would do it themselves. If they -- I think there's -- we have to defend the entry, so because if it comes up on appeal, somebody says, this language isn't there, and the case has to be set aside or the sentencing be set aside and sent back for resentencing. Like we've gone through the last ten years with the new sentencing law, with the different things that have to be in entries or not in entries. I don't know; do you want me to elaborate on that or no?

Q I understand the concept you're describing.

A Okay.

Q So there's an advantage to your office to preparing the entries for the Court?

MS. KHAN: Objection.

A An advantage? What? I don't understand. What do you mean, an advantage?

Q If you can make sure that the entry says what you believe it needs to say, you'll be successful on appeal?

MS. KHAN: Is that a question?

A No, what I -- what I'm saying is, if language is left out in the entry, the case goes back and

the Court has to resentence a person, and it's basically the same sentence; but the Court has to put the -- the language has to be in the entry under the decisions for the last ten years. And the courts, the higher courts flip-flopped on whether the language has to be in there or not be in there. What were we doing that -- Courts had to make findings, and they have to put the findings in their entry for the new sentencing law for felonies, different, different degrees of felonies. And if they weren't in the entry, it would get, and if the Court didn't say on the record and put in the entry, it would get reversed by a higher court and get sent back, and the Court would have to do it all over again, okay. We've got to make sure the entries are correct. We put in all the magic language required by the case law.

Q So there's a benefit to your office in being the ones to draft the entries?

MS. KHAN: Objection.

A Is there a benefit? Well, I think part of it is the Court didn't have the staff to do it. Their staff didn't know how to do the entries. The Court would have to probably write it out longhand otherwise in every case and give it to their secretary to do otherwise. It's just, it's an administrative function. The Court says,

hey, I want an entry, I want this language in it, put all this stuff in it; and we would do it for the Court. And we'd give it to the Court. If the Court didn't like it, the Court would make any changes. And it's the Court's entry, and we're just putting down what the Court wants in the entry. It's like being a secretary.

Q So are you saying there's no benefit to your office drafting the entries?

MS. KHAN: Objection.

A I -- I think there's a benefit in the sense that it's done in a more timely fashion. We're going to get it done, like a sentencing entry, we're going to get it done probably within a day or something like that. And if the Court -- the Court staff, sometimes the Court staff, I don't know; I don't know if they're sometimes -- who else is the Court going to give it to?

Q If you take a look at the last paragraph on Page 2 of Exhibit 1, though, it suggests that there's some other benefit to your office drafting the entries. It says, "Therefore, it naturally makes sense that the Prosecutor's Office should draft the entries that it may ultimately have to defend;" right?

A Right.

Q Why would that make sense?

A Because we would make sure that all the required language is in there.

Q So when the Judges tell you to draft entries, they don't know what needs to go in the entry?

MS. KHAN: Objection.

A No, I assume the Judge knows what to go in there. He's the Judge, and the Judge knows the law. He's presumed to know the law.

Q But a moment ago you talked about how it was necessary to make sure that everything was in there because a lot of times the Judges didn't know?

A I didn't say they didn't know. I think what happens is sometimes the Judge -- can I get that for a second?

Q Sure.

A Sorry.

MR. BERGER: Let's go off the record.

(Discussion off the record.)

A Sorry about that.

Q That's all right.

A I'm sorry, where were we?

Q I was asking you why it would make sense that the Prosecutor's Office draft the entries that you would have to defend?

A I think in a general case, they're form entries basically. I mean, everything is in there that the Judge needs. If the Judge's secretary might do it, I don't know. It's the Judge's entry, so the Judge is the final arbiter of what goes into that entry. We don't get involved in his decision-making process. The Judge at that point, when he tells us to make an entry, has made his decision. And we put in whatever the language is that's in the sentencing entry or whatever the entry is, whatever the Judge has. Sometimes -- and if it's there, if all the language that's required is there, and the Judge says, yeah, this is it, this is what I want, it's not going to get reversed for leaving something out. And so you don't have to do it all over again. I think it's a practical matter.

Q So some --

A It benefits the -- it benefits the Court.

Q So sometimes you've advised the Court that something needed to be added in?

A No, it's just part of the entry. The Judge says, put all this language in, put all that in.

Q So based upon the case, you determine what the required language should be?

MS. KHAN: Objection.

A No, the Judge tells us what he wants. The Judge makes his findings. He says, I've reached -- like let's say a suppression, okay. The Judge rules on suppression. The Judge says, I'm adopting all these things in this particular brief. I want all this in; I want this in. And these are my findings of fact and my conclusions of law. Put it into the entry. And we'll type it up for him.

Q And does the Judge tell you what statutorily required boilerplate needs to go into the decision?

A The boilerplate?

MS. KHAN: You mean in general?

MR. BERGER: Yes.

A No. No. Like there are things, he's not going to say, look, this matter came on for consideration on defendant's motion to suppress on such and such a date, and so-and-so was present and so-and-so was present represented by so-and-so. No, he doesn't tell me that. I mean, that's like stuff we would put into the entry because it's part of the form.

Q Sure, and there's other things that the law requires be a part of --

A Right, right.

Q And those are the things that you add in based upon the knowledge that you have that they're required?

A Right, right. And then we submit that to the Judge.

Q Right. All right. After the Roberts case was appealed to the Supreme Court, then there was also a second concern raised about the Nathaniel Jackson case, about the drafting of the sentencing entry in that case; are you familiar with that?

A I'm -- I don't know. What are you talking about?

Q All right. Are you familiar with the Nathaniel Jackson case?

A I didn't try it, no.

Q Okay.

A I know it was tried. I know that other people in our office tried it.

Q All right. And it was a connected case to the Roberts case?

A It was a companion case.

Q Right. And Jackson's attorneys have since requested that he be resentenced based upon the fact

that the Prosecutor's Office prepared the sentencing entry in that case?

A Okay, I haven't been involved in that.

Q All right. So you don't know whether or not that's true?

A That the case was tried or that an entry was prepared? I don't know. I didn't get -- I wasn't involved in that.

MR. STERN: Now, three times he said he wasn't involved.

Q Who is the person that's in charge of the Criminal Division for the Prosecutor's Office?

A The Chief of the Criminal Division is Chuck Morrow.

Q All right. And then is there someone below him that supervises all of the death penalty cases?

A Somebody below Chuck?

Q Yes. Is there someone else that would be --

A No.

Q -- supervising all of the death penalty cases?

A I -- no, Dennis is the Prosecutor, Dennis Watkins.

Q Right.

A So Dennis would be the -- he would probably be the Prosecutor. He's the Prosecutor in charge of the office.

Q **So it would be Mr. Watkins, Mr. Morrow,** and then the individual Prosecutors within the Criminal Division?

A Right.

Q There's no --

A We have an Administrative Prosecutor.

Q All right. Dennis Watkins is the County Prosecutor?

A Yes.

Q And do you know what his personal knowledge is about the disciplinary case that's pending?

MS. KHAN: Objection.

A I have no idea what's in his mind. I don't know what he knows and what he doesn't know.

Q All right. David, is it Toepfer?

A Toepfer.

Q Toepfer, what is his role with the Prosecutor's Office?

A He was the Administrative Prosecutor.

Q He's no longer the Administrative

Prosecutor?

A I think -- I think Diane's the Administrative -- no, no, not Diane. Dave.is still the Administrative Prosecutor.

Q All right. And what was his involvement with the Roberts case?

A He didn't have any.

Q All right. Who is Laurie Brown?

A Lori Brown is Disciplinary Counsel for the Supreme Court.

Q All right.

A Office of Disciplinary Counsel.

MR. STERN: What a rapid ride.

A Oh, Laurie Brown? I'm sorry. Judge Stuard's -- God, what is she -- she's secretary -- she's a bailiff. Laurie's the bailiff for Judge Stuard.

Q All right. And who is Mary Ann Mills?

A Mary Ann's the court reporter.

Q For?

A Judge Stuard.

Q Oh, okay.

MR. BERGER: That's the last of my questions, but I wanted to address the issue that you raised before about the medical information. I guess we

need to reach some sort of an agreement on what's going to be provided and when it will be provided.

MR. STERN: Well, what are you -- what do you want?

MR. BERGER: Well, if this is going to be an issue in the upcoming disciplinary hearing, I guess I would like a -- well, actually, the easiest thing would be a release to speak with his general practitioner and find out some specifics.

MS. KHAN: We'll have to discuss that with the client and get back to you. We're not --

MR. STERN: I'll have to let you know how accessible -- you know, some doctors, doesn't matter. You know, it's hard to get them to do this. We'll discuss it and we'll respond to you Friday? Monday?

MS. KHAN: We're not responding Friday.

MR. STERN: Okay, I'm gone.

MR. BECKER: Monday is a holiday.

MR. BERGER: Well, when you earlier said that you would provide me with documentation, what was it that you were proposing to provide?

MR. STERN: Some kind of -- I had in mind -- I didn't have it, you know, really specifically delineated -- but some kind of report or letter so that

there would be some level of professional substantiation to that which Ms. Khan put on the record.

MR. BERGER: All right. Well, I would be interested in that and then a release. So I guess if you want to go ahead and obtain the report or the letter, and then you could get back with me on your position on the release. And so when will that be that I should --

MR. STERN: Oh, I have no idea. We'll try to find out and promptly advise you. I have no idea. I can't -- we have no control over the doctor.

MR. BERGER: No, no, no, no, I'm talking about the report or the letter and the response to whether or not you're going to provide a release. When should I expect that?

MS. KHAN: Well, I think he just answered your question about the report. We don't know how soon we'll be able to get the doctor to provide the report, but --

MR. BERGER: So you haven't had a conversation with the doctor yet?

MS. KHAN: No, I haven't had a conversation with the doctor.

MR. BERGER: Okay. I didn't --

MR. STERN: This all arose --

MS. KHAN: Can we go off the record on this, please?

MR. BERGER: Sure.

(Discussion off the record.)

MR. BERGER: All right. So we have agreed that Mr. Bailey's counsel will provide some sort of a report or a letter regarding Mr. Bailey's condition and response to my request for a release to speak with his doctor and will make every reasonable effort to do so by the 22nd, with the understanding that they haven't spoken with the doctor yet and do not know the doctor's availability, and some changes in the timing may be necessary.

MR. STERN: We agree.

MR. BERGER: All right. I guess I just need to know whether you are going to review the transcript and --

MS. KHAN: He's going to read the transcript, yes.

MR. BERGER: All right. And I think you guys were present before, but it will just be a 7-day review time based upon the scheduling, so just so that we're all on the same page on that.

MR. STERN: Right.

MR. BERGER: All right. Thank you very much.

MR. STERN: Thank you.

(Deposition concluded at 5:10 p.m. )

SIGNATURE NOT WAIVED

REPORTER'S CERTIFICATE

I HEREBY CERTIFY that the above and foregoing is a true and correct transcript of all the testimony introduced and proceedings had in the taking of the testimony in the above-entitled matter, as shown by my stenotype notes taken by me at the time said testimony was taken.

Mary J. Carney
Registered Merit Reporter

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

I, KENNETH NEIL BAILEY, have read the foregoing pages of my testimony or have had the foregoing pages of my testimony read to me and have noted any changes in form or substance of my testimony together with their respective corrections and the reasons therefor on the following errata sheet(s).

(Signature) Kenneth N. Bailey

(Date) 2-25-2008

*****************************************************

TO BE COMPLETED BY NOTARY PUBLIC:

I, FRANCES A. HIVELY, a Notary Public in and for the State of OHIO, hereby acknowledge that the above-named deponent personally appeared before me, swore to the truth of the foregoing statements and affixed his/her signature above as his/her own true act and deed.

(Signature) [illegible]

(Date) February 25, 2008

My Commission Expires: 6/30/08

MC

FRANCES A. HIVELY, Notary Public ... 6-30-08

TO THE WITNESS: DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN. Please note any word changes/corrections on this sheet only. Thank you.

TO THE REPORTER: I have read the entire transcript of my deposition taken on the 13th Day of February, 2008, or the same has been read to me. I request that the following changes be entered upon the record for reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

PAGE LINE CORRECTION OR CHANGE & REASON THEREFOR

2-25-08
Today's Date

[signature]
KENNETH NEIL BAILEY