IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                       : Case No. 01-CR-794

-vs-                                     :

NATHANIEL JACKSON,                       : Judge Stuard

    Defendant.                       :

---

## NATHANIEL JACKSON'S PROFFER

### VOLUME II OF III

---

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5320

*Sandra B. McPherson, Ph.D.*

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

*Sensitive Material – Discretion is Necessary*

## PSYCHOLOGICAL REPORT

SUBJECT: Nathaniel Jackson                     DATE: 11/12/02

REASON FOR REFERRAL:

Mr. Jackson was evaluated as part of developing information relevant to the mitigation phase of his capital murder trial.

PROCEDURE:

Interviews of Mr. Jackson by S. McPherson and D. McPherson; psychological assessment administered by D. McPherson, M.Ed., assisting psychologist: Thematic Apperception Test, WAIS-3, MMPI-2, WRAT-3, and Bender Gestalt. Rorschach administered by S. McPherson. Review of records from discovery and from other sources. Contact with family members.

## RESULTS

Defendant's Retrospective on His Own History:

He was asked to discuss his life in stages. When asked about his first five years, he said that his maternal grandmother was very important to him, as was his mother. He had an older brother, Charles, and a younger sister and brother, Taushia and Anthony, respectively. He did not have very much contact with his biological father (Charles Paige), remembering perhaps two times when he saw the man. He lived with his mother, and he frequently spent time with his maternal grandmother. (Other records indicated the two younger children were the product of his mother's marriage to Anthony Kornegeay.)

With respect to his elementary school years, he said that he tried to do his best and in many ways he really liked school, but he also got into a lot of difficulty and tended to have problems with other students at times. He knew that he had been identified as having a behavior problem, and he stated that when he was placed in the Stambaugh School Special Program he did best. Interestingly, he remembered being taken-out of that program after he had apparently done somewhat well and put back into the mainstream curriculum with the result that he immediately got into trouble again and was put back in

EXHIBIT
6

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5321

Stambaugh's Special Program where, at least per his recollection, he did better once again. He left school at the age of 17 while he was still in the 11th grade.

From that time onward, his life involved basically living on the street in what was a crime-ridden and violent environment. He did have some regular jobs from time to time, but none of them were high paying. His drug use (see below) was also a part of his problem. He began getting into trouble almost immediately upon moving out from his mother's house.

He had a series of relationships, and he began getting into more and more trouble of a legal type (see below). Throughout the ensuing years, he had several relationships, one with the mother of his daughter, now age seven. That individual is now married, but he has tried to have some contacts with his daughter. He also has a son who would now be four years of age. He has had no contact with that child whose life has been a somewhat tragic story in and of itself. The child was born to Mr. Jackson and his then significant other. Shortly after birth, the child had a stroke and went into some seizures and was life-flighted to Rainbow Babies' & Children's Hospital. Over an ensuing period of time, the youngster was stabilized and diagnosed upon exit as having cerebral palsy. To the best of his knowledge, the child continues to be wheelchair bound or in a brace with limited ability. Subsequently, the relationship broke up, and the mother of the child placed the youngster with her mother, essentially abandoning him. When Mr. Jackson tried to visit his son, the maternal grandmother obtained a Restraining Order, and he has never been allowed to see him since.

Mr. Jackson indicated he grew up in an extremely violent neighborhood. (Consistently, there is the letter in the school records from his mother indicating that he should be given an excused absence because a man and a woman had been shooting at him.) After he left his mother's home, he was still primarily living on the street and in a neighborhood of significantly antisocial and violent people. He himself was shot four or five times. He indicated that for the most part, he had not obtained any hospital or medical attention for these events; in fact, he said he carried a bullet in his torso somewhere which causes him periodic difficulty. He sometimes more or less freezes and is unable to move until the spasm passes. He has been shot in the left arm, elbow, and head, all of these wounds involving grazing injuries. In addition, he indicated that he had a significant relationship with a woman and, in fact, was considering a permanent union when she was killed. She was apparently involved in some type of merchandising occupation and was killed by someone who wished not to pay for the merchandise obtained from her. Mr. Jackson also recounted that there was an occasion in which he left some clothes at the home of a person whom he viewed as a friend and with whom he had stayed briefly. When he returned to get his clothing, that individual confronted him with a gun and was not willing to give Mr. Jackson his clothes. He noted that he had a particularly nice set of outfits at the time. He felt the man's turning on him was a major wrong because he had trusted him and viewed him as a friend.

2

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5322

The relationship that he had with Donna was one where he thought he would avoid the problems he had had with some of the younger women with whom he engaged. He acknowledged that Donna was significantly older than he. He said that he thought perhaps it would work out better because she would be more stable and more able to provide responsibly for him. He said that she indicated to him that she was divorced in 1985 and that her ex-husband, though he now lived with her, was not romantically involved with her.

Test Results:

Results from the WAIS-3 were as follows:

| | | | |
|---|---|---|---|
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 6 |
| Arithmetic | 5 | Block Design | 7 |
| Digit Span | 12 | Matrix Reasoning | 13 |
| Information | 5 | Picture Arrangement | 10 |
| Comprehension | 5 | | |

| | | | |
|---|---|---|---|
| Verbal IQ | 82 | Performance IQ | 89 |
| | Full Scale IQ – 84 | | |

Above results showed significant variation among the subtests but overall performance, given test bias factors and educational deficit, reflected low average or better capacity. Deficit areas would be consistent with longstanding learning problems.

Results from the Bender-Gestalt showed no significant deficits of performance. There were some distortions and inadequacies that appear to be reflective of some lack of investment in performance.

Results from the Wide Range Achievement Test – 3 were as follows:

| | Raw Score | Std. Score | %tile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | 36 | 75 | 5 | 5 | 503 |
| Spelling | 43 | 103 | 58 | HS | 524 |
| Arithmetic | 46 | 111 | 77 | HS | 532 |

Above results reflected significant relative deficit in reading skills.

3

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5323

Results from the MMPI-2 indicated a need to present well and to overstate virtues. At the same time, there was a tendency toward some endorsement of symptoms that suggested an over-presentation of pathology. The overall handling of the test was inconsistent at times and interpretation, therefore, has to be somewhat guarded. What can be stated, however, is that there was neither a consistent attempt to look bad nor a consistent attempt to overstate positives. The main scale profile did not show over-statement of pathology. There was a spike 4 configuration that reflects endorsement of antisocial attitudes and/or impulsive behaviors. He showed concerns and anxiety about his current situation and the likely outcome. There were also some problems when it came to storing of angry feeling and he appeared to be an individual who can lose control because he has been storing and suppressing a lot of negative feeling without being aware of the degree to which he does so. Sub-scales reflected his sense that he is being pursued and persecuted, which is not inconsistent with his current reality situation and also that he feels a sense of alienation from his own functioning. He attempts to put on a facade of being in control and not caring what is happening but, in fact, there is an underlying significant apprehension. At the same time, he can affect a kind of cynicism which may mislead others to believe that he is in control of himself and the situation. Critical items include acknowledging misuse of alcohol and use of marijuana as well as endorsing that he has made mistakes in his life. There is some tendency toward blaming of others but it is not a pronounced assertion.

Projective tests provided some; insight into underlying personality characteristics and potentials. Analysis of thematic materials on the TAT indicated an individual who does not know how to go about managing life but who has incorporated that he should know better than he does. He has no real concept of how to proceed and there is no one available to provide him with guidance. Life tends to hand down punishment for bad behavior and he has learned to accept what happens but not to evaluate and plan to avoid negative consequences. He does not see much potential in the workplace, which is consistent with the reality of his environment. He cannot figure out how people fit into situations or what they are thinking. In effect, he is a poor reader of people even though he thinks he knows about them.

Results from the Rorschach, evaluated using the Exner protocol, indicated a valid and reliable record for interpretation. There were no indications of any serious mental health pathology, but rather he appears to be an individual who lacks the capacity to cope adequately with his environment. He tries to keep emotions at bay but doesn't have the wherewithal to do so and still adequately manage other and often pressing demands. He is rather constricted and limited in how he responds to others. The avoidance of processing emotional stimulation is extreme and suggests a defense in order to avoid feeling the painful affect that comes about when he lets himself be vulnerable to contacts by others. This feature is consistent with the history of behavioral deficit and lack of environmental support and effective intervention. There are underlying negative to self attitudes which he also tries to avoid directly experiencing. At the same time, there is self focus, a pattern associated with insecurity and neediness. He is significantly limited when it comes to dealing relationally as might be expected, and again his history has

4

involved difficulties that he has sought to remediate but has not the least idea as to how to handle. He tends to be guarded in how he approaches situations but the defensive stance means that he is not aware of all the aspects of the world that he needs to be in order to manage. He makes decisions on inadequate information and thus adds impulsivity of thinking to the existing disinhibitions that are part of the hyperactivity complex.

## Legal History

His initial problems with the legal system occurred in his mid-teens when he did about six months in detention home. He had been charged in connection with driving violations and unruly behavior. He apparently was absenting himself from school. After he became an adult he worked at various jobs but did not have any regular or ongoing employment of any substance. He was incarcerated four times at Lorain Correctional as follows: 1/92 for aggravated burglary; 2/96 for having a weapon under disability (as a convicted felon he is not allowed to have a gun); 2/01 for charges in connection with a stole vehicle and stolen license plates. He apparently was briefly released but did not follow up appropriately while on parole and was returned to the facility and then released on 12/12, after which the crime took place. He was also arrested in connection with receiving stolen property, unauthorized use of a vehicle, and driving under suspension. According to the defendant and his counsel, during his time in prison he did not present as an adjustment problem.

## School Records:

He did not complete the 11th grade and there was inconsistent attendance and involvement before he finally dropped out. He attended a number of different schools. School records indicated the following.

Behavioral problems were noted as of the 1st grade, or immediately upon his entry into a formal academic setting. Those behavior problems continued throughout the time that he was in school up through the 11th grade level, which was the point at which he left. By the 3rd grade, he had been suspended. He was finally assessed at the 4th grade level and found to have significant problems and to be in need of special educational assistance. At that time, His Wechsler Intelligence Scale results were: Verbal IQ, 72; Performance, IQ, 78; and, Full Scale IQ, 73. Interestingly, while he had below grade level achievement, he was not deficient at the level that the above score, particularly the Verbal one, might have suggested, particularly given that he was coming out of an environment that was not conducive to correcting or assisting him with his problems. However, consistent with the 4th grade results, in 1989 at the 10th grade level, he was tested with the Stanford-Binet and obtained an IQ of 70.

Other information from the school records indicated a pattern of absenteeism which tended to increase over the course of the year, a high potential for getting involved in altercations with peers, behavior problems on the bus and it was also noted as of the 9th grade that he was at high risk for chemical dependency.

5

Axis IV – Problems with primary support group, Problems related to social environment, Educational problems, Legal Problems.

Axis V – GAF = 40; major impairment in several areas of function

Summary:

Mr. Jackson is an individual who was raised in an environment that was significantly violent and dyscontrolled that persons surviving in the situation would have been more likely than not to develop a sense of chronic threat and insecurity. Consistently, his own story is one where he has had to defend himself and where fights have not been infrequent, with fairly serious consequences to those participating. Early educational difficulties and current test results are consistent with the presence of an AD/HD component. The history of significant drug abuse starting at the age of 13 and probable dependency on marijuana is also a pattern that is well known for AD/HD persons. There is vulnerability to use, abuse and dependency on drugs to alleviate the chronic tensions and to escape the punishment that comes from the environment as a result of behavioral dyscontrol. Consistently, he chose not to abuse drugs such as methamphetamines or PCP. His use also reflected an occupational component in that he was living in a drug infested environment and, at least sometimes, involved in the lifestyle of using and selling. Given his educational limitations and social situation, obtaining employment with reasonable compensation in the depressed area in which he lived was unlikely.

His mother was on her own much of the time. Although he loves her and his grandmother, they were unable to intervene effectively with his special behavioral and learning needs. As time went on, the family system fragmented further. At the present time, his mother indicates she does not know the status of his sister and cannot be sure how to reach her. Similarly, she was unsure of the current situation of either of his brothers. She stated she works at a physically demanding job and has little energy except to go home and rest so as to be able to work the next day.

He had no male figure immediately available to him to provide him with alternative guidance from what was occurring as a function of his finding his own way in a hostile situation. There was thus no real functioning family system for him as he tried to deal with his needs for support. He does have the capacity to relate to other human beings, and it has been indicated in the records obtained that he has some artistic potentials.

His vulnerability to influence within the context of the relationship to Donna was high: she was older, apparently stable to his view, held out a promise of a more financially secure existence, and catered to his need to be seen as adequate.

7

He has been able to maintain himself in a stable fashion when he was prior incarcerated and, therefore, it can be reasonably inferred that he can be a productive member of the general population.

Sandra B. McPherson, Ph.D. ABPP
Clinical and Forensic Psychologist

1

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                     DAYTON

5

6                   - - -

7   LAWRENCE LANDRUM,          :

8             Plaintiff,       :

9        Vs.              :    Case No. C-196-641

10  BETTY MITCHELL,            :    Thursday, 9:00 a.m.

11        Defendant.       :    September 4, 2003

12                   - - -

13           EVIDENTIARY HEARING BEFORE

14           JUDGE MICHAEL R. MERZ

15                   - - -

16  APPEARANCES:

17      FOR THE PLAINTIFF:

18           Gerald W. Simmons, Esq.

19           Randall L. Porter, Esq.

20      FOR THE DEFENDANT:

21           Jonathan R. Fulkerson, Esq.

22           Michael L. Collyer, Esq.

23

24  COURT REPORTER:

25           Shandy Ehde, RPR

EXHIBIT
62

74

1   person who did this terrible, terrible thing, you

2   know.

3   Q.   You indicated that at the time you did your work

4   before the post-conviction process, that some of the

5   records that you might have wanted to see had been

6   destroyed or were missing.  And I note that you were

7   initially involved in the case in '91, you were asked

8   to do the social history in '93, you completed the

9   social history in '96.  Do you have any idea why there

10  was such a long delay between trial and

11  post-conviction?

12  A.   No.  I mean every state is different in terms of

13  how it moves cases.

14            THE COURT:   You may step down.

15            THE WITNESS:   Thank you.

16            (Witness was excused.)

17            THE COURT:   Mr. Simmons, you may call your

18  next witness.

19            MR. SIMMONS:   Yes, your Honor.  Dr. Smith.

20                 ROBERT L. SMITH, Ph.D

21  witness herein, being first duly sworn, testified as

22  follows:

23                 DIRECT EXAMINATION

24            MR. SIMMONS:   I think counsel has -- she's

25  going to stay a while to hear the doctor's testimony.

75

1          THE COURT:   Once she's testified, she has a

2     right to be here.

3     BY MR. SIMMONS:

4     Q.    Would you please tell the Court your name and

5     address?

6     A.    Robert Lee Smith, Ph.D.  My address is ▮▮▮▮▮

7     ▮▮▮▮▮▮▮▮▮▮▮  West Lake, Ohio.

8     Q.    Would you please tell the Court what your

9     practice entails?

10    A.    Yes.  I'm a clinical psychologist and a certified

11    addiction specialist.

12    Q.    What is the nature of the certification?  Where

13    does that come from?

14    A.    The license in psychology is from the State of

15    Ohio.  Basically it comes as a result from having my

16    doctorate from an APA approved from an academic

17    program, and then I did an internship and

18    post-doctorate internship in psychology and addiction.

19    The certification addiction specialist is a national

20    certification and is awarded once you're able to

21    demonstrate appropriate educational and clinical

22    experience.

23    Q.    Have you had occasion to testify as an expert

24    witness previously?

25    A.    Yes, I have.

76

1   Q.   Could you please tell the Court in general terms

2   the quantity and nature of the testimony in which

3   you've engaged?

4   A.   I've probably testified in about 25 to 30 cases

5   nationwide.  Most of those have been either death

6   penalty cases or appeals, but I've also worked in some

7   civil litigation as well.

8   Q.   And what is the nature of the testimony that you

9   have generally given?

10  A.   Generally what I've been asked to do is to

11  conduct an evaluation of the defendant and determine

12  whether or not there are any valid psychological

13  diagnoses or disorders that could be presented to the

14  court for mitigation.

15  Q.   Could you please look at Exhibit 7?

16  A.   (Witness complied.)

17  Q.   What is Exhibit 7, please?

18  A.   It's my curriculum vitae.

19  Q.   Is it accurate and complete?

20  A.   As far as I can tell it looks accurate, yes.

21  Q.   Okay.  Now there's a reference here to Behavior

22  Management Associates, Inc,  What is that?

23  A.   It's a private practice group in which I'm one of

24  the associates.  I basically rent space from them and

25  conduct a private practice in a suburb of Cleveland

77

1   with Behavior Management Associates.

2   Q.   What is the nature of your private practice?

3   A.   It's a clinical practice.  I work with adults and

4   adolescents.  Basically a full range of psychological

5   disorders as well as addictive disorders.

6   Q.   What types of people do you deal with in your

7   practice?

8   A.   In my private practice, generally they will be

9   men and women who have marital problems, occasionally

10   will be individuals with depression and anxiety

11   disorders.  Most of the clients that have addictive

12   disorders come because they are having difficulties

13   maintaining abstinence.  Most of them have a history

14   of physical or sexual abuse that has not been

15   adequately addressed so that interferes with their

16   recovery.

17   Q.   Do you do any clinical work in addition to your

18   private practice?

19   A.   Yes, I do.

20   Q.   And tell the Court, please, what that involves.

21   A.   I work as a director of operations for an

22   organization called Stella Maris.  Stella Maris is an

23   alcohol and drug treatment facility in Cleveland.

24   They have a 16-bed detoxification unit in a 42-bed

25   therapeutic community.  I began working with that

78

1    organization about four years ago.

2         Currently I'm a project director on a

3    national federal grant. The goal of the grant is to

4    conduct a research project. We're examining the

5    treatment of homeless, chemically dependent and

6    mentally ill male offenders. These men are referred

7    through the court system in Cleveland. They're all

8    homeless. They have a long-standing history of

9    addiction, and about 60 percent of them have a

10   co-curring mental illness. The treatment model that

11   we have put together is, as a demonstration project,

12   we're about a year and a half through the project.

13   Our goal is to gather information about the

14   effectiveness of the treatment and to hopefully come

15   up with ideas and approaches that are more effective.

16   Q.   Have you applied for, and have you received, any

17   government grants in this area?

18   A.   I have the current grant, and I also had a grant

19   in 1993 with the Federal Government. Again the goal

20   was to look at the treatment of homeless, chemically

21   dependent women. The women who came into treatment

22   were either pregnant or who had custody of one or two

23   children. We developed a treatment design that

24   allowed the women to come into treatment and bring

25   their children with them. Again about 40 percent of

1    the women had a co-curring mental illness, and

2    approximately 80 percent of them had a history of

3    being physically and sexually abused.

4    Q.    Have you done any work with the hospitals in the

5    Cleveland area?

6    A.    Yes, I have.

7    Q.    And would you please tell the Court what that has

8    involved?

9    A.    Currently there's two primary hospitals that I

10   have ongoing work with.  I work with University

11   Hospitals of Cleveland.  I conduct a residency

12   assistance program.  If an intern or a medical

13   resident has some type of personal problem,

14   depression, anxiety, perhaps abuse of alcohol or

15   drugs, marital difficulties, the university -- I mean

16   the hospital will contact me.  I'll do an assessment

17   of the intern or resident, and then either do

18   short-term therapy or link them to appropriate

19   services.

20          I also work with Metro Health Medical Center,

21   which used to be Cleveland Metropolitan General

22   Hospital.  I helped develop the employee assistance

23   program when I worked there many years ago, and so

24   what has happened is they have continued to keep me as

25   a consultant even though I'm in private practice.  So

80

1    I work with them on a weekly basis, looking at more

2    difficult cases and helping the counselors sort of

3    manage those cases.

4    Q.    Have you done any lecturing in this field?

5    A.    Yes, I have.

6    Q.    And could you again tell the Court, please, what

7    you have done in that regard?

8    A.    The bulk of the research -- I mean the lecturing

9    has been related to my research and clinical

10   experience, and it's at Case Western Reserve

11   University.  I currently have an academic appointment

12   with the department of psychology, and last year

13   taught a course on mental illness and substance abuse,

14   but I also have taught for the medical school and for

15   the law school at Case.

16   Q.    Have you done any continuing legal education for

17   attorneys?

18   A.    Yes, I have.

19   Q.    And would you tell the Court, have you written

20   any articles of any significance in this area that you

21   think are pertinent to your experience?

22   A.    I have several articles that we've published.

23   Most of them have focused on identification and

24   diagnosis of addiction, but we also have taken a look

25   at the treatment of minorities and special

81

1    populations, and that's really where my research area

2    is now.

3    Q.   I take it that you have had an opportunity to

4    review the work of Miss Miller, that is, the

5    post-conviction work, the affidavit and the report

6    that she did?

7    A.   Yes, I did.

8    Q.   And I take it you've also had a chance to review

9    the court records of Mr. Landrum's trial, initial

10   trial?

11   A.   That's correct.

12   Q.   Would you please look at Exhibit 4 and -- I'm

13   sorry.  John?

14          MR. FULKERSON:   Before we proceed into the

15   specifics on Mr. Landrum's case, I would like to

16   clarify a few points on the witness' qualifications if

17   this is the proper time to do that.

18          THE COURT:   The voir dire may be allowed.

19          MR. FULKERSON:   Thank you.

20              VOIR DIRE EXAMINATION

21   BY MR. FULKERSON:

22   Q.   May it please the Court, counsel.

23      Dr. Smith, I'm Jonathan Fulkerson.  We met

24   briefly before we started.  I want to ask you a couple

25   questions about some of your qualifications before we

82

1     proceed this morning.

2          Do you have a board certification in psychology?

3     A.   No, I do not.

4     Q.   Are you a member of the, or do you know what the

5     ABPP is; American Board of Professional Psychology?

6     A.   Yes, I am aware of that.

7     Q.   Are you a member of that organization?

8     A.   No, I am not.

9     Q.   You said on your initial testimony that you have

10    a national certification as an addiction specialist?

11    A.   That's correct.

12    Q.   Where is that from?

13    A.   I'm sorry, where is --

14    Q.   Who gave you that certification; what

15    organization?

16    A.   The American Academy of Healthcare Providers and

17    Addictive Disorders.

18    Q.   Okay.  And when did you obtain that

19    certification?  What year, do you remember?

20    A.   No, I don't know offhand.

21    Q.   Was it before 1996?

22    A.   Yes.

23    Q.   Okay.  That organization's certification, you

24    didn't have to take an exam to get that certification,

25    did you?

83

1    A.    No, I did not.

2    Q.    And you were allowed to join without taking a

3    national examination in order to get that

4    certification; correct?

5    A.    That's correct.

6    Q.    Okay.  You said that you do a lot of work as an

7    associate with Behavior Management Associates?

8    A.    I have a small private practice with them.

9    Q.    Small practice.  You do a lot of work with adults

10   and adolescents that have addictive disorders; is that

11   what you said?  Am I correct?

12   A.    Again based on Behavior Management Associates.

13   Q.    I'm sorry, just talking about behavior

14   management.

15   A.    That's correct.

16   Q.    You don't really deal with criminal assessments

17   with Behavior Management Associates, do you?

18   A.    Occasionally I will have a forensic evaluation

19   through the organization, but that's a small part of

20   my caseload there.

21   Q.    But essentially Behavior Management Associates is

22   kind of an employee assistance program; isn't that

23   correct?

24   A.    No, that's not correct.

25   Q.    I want to have you refer to volume I of the

84

1   binder that I have provided to the Court and you, and

2   I'd like to have you look at page 1 of that.  And for

3   your reference and the Court's, I've caused the bottom

4   right corner of all these pages to be Bates stamped

5   for convenience.

6        If I can ask you just to look at page 1, can you

7   identify what that page and the preceding few pages

8   are behind that?

9   A.   Yes.

10  Q.   What is that?

11  A.   That's the employee assistance program that is

12  the subset of what Behavior Management Associates

13  does.

14  Q.   And doesn't that say there that, "Behavior

15  Management Associates provides complete program that

16  addresses employee problems that include comprehensive

17  work/life services and can be enhanced with ancillary

18  service"?

19  A.   That's correct.

20  Q.   But it's not an employee service program?

21  A.   You misunderstood my response.  I said Behavior

22  Management Associates is not an employee assistance

23  program.  This employee assistance program is called

24  Impact, that's the employee assistance program.  I

25  have nothing to do with it.

85

1   Q.   Thank you.  Your CV also says you are a member of

2   the College of Examiners?

3   A.   That's correct.

4   Q.   Are you a life member or yearly member of that

5   organization?

6   A.   I'm not sure of the distinction.

7   Q.   Well, doesn't that organization -- there are two

8   ways you can join.  You can either join every year and

9   pay every year or you can pay a larger fee and be a

10   member for life?

11   A.   I'm an annual member.

12   Q.   Your are an annual member?

13   A.   That's correct.

14   Q.   Isn't it true to become a member of the

15   organization you essentially self-certify yourself and

16   agree to abide by their code of ethics to become a

17   member?

18   A.   That is part of it, correct.

19   Q.   Is there an additional part of that that is

20   required?

21   A.   Yes.  They now have testing.  They also have

22   continuing education requirements --

23   Q.   Could you explain?

24   A.   -- that are part of becoming certified.

25   Q.   Okay.

MR. FULKERSON: That's all I have about his qualifications your Honor. Thank you.

THE COURT: You may resume your examination, Mr. Simmons.

FURTHER DIRECT EXAMINATION

BY MR. SIMMONS:

Q. Thank you, your Honor.

Dr. Smith, I'd like to ask you to please look at Exhibit 4 in the exhibit book.

A. (Witness complied.)

MR. SIMMONS: Just to keep things confusing, your Honor, it actually has an Exhibit 5 in the lower right-hand corner.

THE COURT: I'm going to mark that out on my copy.

THE CLERK: I'm restickering.

THE COURT: Thank you.

Q. Dr. Smith, have you, based upon your review of the records in the initial trial and your review of Miss Miller's work, and the other investigation you've done, formed some opinions about Mr. Landrum's psychological state at the time of the murder and also at the time of his trial?

A. That's correct.

Q. Could you please in a general way state to the

87

1    Court what you have, what these opinions are, and then

2    we'll get into some specifics.

3    A.    Sure.  Basically I believe that at the time of

4    the offense Mr. Landrum was dependent upon several

5    chemicals.  Alcohol, sedatives and cannabis, or

6    marihuana.  I also believe at the time of the offense

7    that he was under the influence of alcohol and

8    sedatives, that he was suffering from a psychological

9    disorder that had been long standing from adolescence.

10        This depressive disorder is called dysthymia or

11   disthymic disorder, and he as a child suffered a

12   number of significant traumas and abuse that led to

13   his development of depression and later his addiction

14   to alcohol and other drugs.

15.         THE COURT:  Before we proceed, would you be

16   gracious enough to spell dysthymia for the record?

17            THE WITNESS:  D-y-s-t-h-y-m-i-a.

18            THE COURT:  Thank you.

19   Q.    And did this disorder that you have described

20   have an impact on his cognitive abilities during this

21   period of time?

22   A.    Absolutely.

23   Q.    And what was that?

24   A.    In order to understand Mr. Landrum's function,

25   you would have to take a look at all the disorders in

88

1    combination.

2        Disthymic disorder in and of itself has a number

3    of influences upon both how a person feels, how they

4    think and how they act.  When a person has this type

5    of chronic depression they often feel hopeless,

6    helpless.  There's a sense of agitation in their

7    ability, low self-esteem, feeling they can't be

8    successful, they can't do anything right.  There's an

9    underlying despair which leads to them to engaging in

10    self-defeating behaviors.

11        Oftentimes they will attempt to do things, but

12    because they believe they'll fail, they do.  And so

13    people with dysthymia have failed relationships,

14    oftentimes are unable to maintain employment, and will

15    turn to alcohol and drugs as a way of coping with this

16    ongoing depression.

17        The use of alcohol and drugs of course changes

18    the way the brain works.  Alcohol is a central nervous

19    system depressant.  It slows down the brain, it

20    results in impulsist mood swings, agitation,

21    irritability, sometimes aggressive behavior.  Mixing

22    that with another drug, which Mr. Landrum did

23    frequently, such as Ativan which is a sedative, in

24    fact Ativan directly enhances the effects of alcohol

25    so that it's not just an additive factor but

1    multi-flexitive factor, so that an individual taking

2    alcohol and Ativan together will be significantly

3    impaired in terms of their ability to focus,

4    concentrate, interpret events that are going on around

5    them.

6        Their motor movements may be, but it depends.

7    People using with high tolerances, abusing substances

8    for a long time, their body develops an ability to

9    adapt to the effects of the chemicals, so they may be

10   able to walk a straight line, they may be able to

11   speak without slurring their words too badly.  But in

12   fact what's happening is their cognitive functioning

13   is significantly impaired, just it's masked by their

14   ability to walk and talk.

15       Putting the depression together with the effects

16   of alcohol and the sedative, the individual's ability

17   to comprehend a situation, concentrate, focus,

18   consider their options, weigh the pros and cons,

19   consider the consequences of their actions would all

20   be significantly impaired.

21   Q.    Was there any effort in the mitigation phase of

22   this case to explain, for example, the relationships

23   that you've just discussed between various drugs and

24   alcohol?

25   A.    I did not see any attempt to make that connection

90

1    explanation.

2    Q.   Was there any discussion of any relationship

3    between Mr. Landrum's depression or this disorder that

4    you've described and his use of these substances?

5    A.   Not that I'm aware of.

6    Q.   In working with -- in coming to your conclusions,

7    could you tell the Court what events or what history

8    of Mr. Landrum, what events in his life to you were

9    significant in coming to your opinions, and in

10   particular if, while you're doing it, you could

11   mention which of those, if any, were not dealt with in

12   the original trial?

13   A.   Yes.

14   Q.   Just sort of go through his life, the

15   significance of the various events and explain whether

16   they were or were not dealt with in your view properly

17   or at all at the original trial.

18   A.   Okay.  As a beginning statement, I think I would

19   say that most of what I'm going to say I do not feel

20   was adequately developed and discussed in the original

21   trial.

22        What I'm looking at when I look at Mr. Landrum's

23   background is a developmental history.  I'm looking at

24   how do these events impact the development of the

25   child, how does that child cope with those events,

91

1    what is their response, what choices do they have

2    available to them, what disorders may they develop,

3    how do those developed disorders then affect ongoing

4    sort of maturation and life choices, and then how,

5    ultimately, did all of those things impact

6    Mr. Landrum's behavior at the time of the offense.

7         I don't believe that the initial trial did

8    much of that at all. I can kind of walk through these.

9         First things to become important are the

10   absence of a father. For the first four years

11   Mr. Landrum has no father figure that's present.  His

12   mother is somewhat present, but because of her

13   schooling and work and because of the home

14   environment, her involvement with Mr. Landrum was also

15   limited.

16        THE COURT:   What about the maternal

17   grandfather?

18        THE WITNESS:   We do have a maternal

19   grandfather.  Now he becomes very significant because

20   he uses alcohol, and it's not every day but it is

21   regular and it's excessive, and when he drinks to

22   excess, he's abusive.  Now that becomes important

23   because Larry's going to be forming some opinions

24   about the use of alcohol and what is appropriate

25   behavior when you drink.  His grandfather uses

1    regularly, becomes out of control, becomes violent.

2    That becomes a socially acceptable behavior in some

3    ways.

4    A.    Then we have maternal aunts and uncles who also

5    abuse alcohol and drugs.  Now there's a couple ways to

6    look at it, and I'm going to kind of talk about the

7    development for Larry in several areas.  If we want to

8    look at his development of addiction, there are three

9    things that put a child at risk for addiction.

10   Genetic factors, environmental factors and

11   psychological factors.

12          In Larry's family, we have genetic factors,

13   we have a maternal grandfather who abuses alcohol and

14   drugs, and we have maternal aunts and uncles, so we

15   know there's a family history of substance abuse.

16          THE COURT:   We don't know.  Of course we

17   know there's a family history.  We don't have any

18   determined, clinically determined patterns of tracing

19   that genetic occurrence, do we have, in the matter of

20   available science?

21          THE WITNESS:   What the literature has shown

22   us, if you have immediate family members, defined as

23   parents, grandparents, aunts and uncles, if you have a

24   significant history of substance abuse, the children

25   are predisposed.  It's not a direct genetic

93

1    inheritance but a predisposition, sort of like with

2    cancer, so that children who come from a family

3    history where there's cancer, we know that they're at

4    risk.  That's what we really know about the children.

5        The literature is suggesting that it's five

6    times greater risk than for children who do not have a

7    significant family history.  But that's only one of

8    the factors.

9    A.    The second factor becomes environment.  Children

10   who grow up in a home where alcohol and drugs are

11   readily available and where the parental figures or

12   adult figures use alcohol and drugs are more likely to

13   experiment and use drugs than their peers.  What we

14   have is, we have a grandfather, we have the aunts and

15   uncles, later we have the stepfather, all who use

16   alcohol and/or drugs on a regular basis, and that's

17   part of family life.  So that is another factor that

18   contributes to it being okay to Larry to begin

19   experimenting with alcohol and drugs.

20       The final factor is that we know that children

21   who suffer physical abuse or sexual abuse are much

22   more likely to begin using alcohol and drugs as

23   adolescents.  When we look at Larry's background, we

24   have sexual abuse at the age of five.  We have

25   physical abuse by the stepfather over a number of

94

1   years.  And we have numerous losses, the death of his

2   grandmother, that he now is trying to cope with.

3       As a result, what we have is all three factors

4   contributing to Larry's use of alcohol and drugs.  It

5   wasn't just one factor, but all three.

6       The other thing you begin to look at is, well,

7   what makes something traumatic for a child?  Why

8   should these events have an impact on Larry?  We've

9   got dad out of the picture, we've got mom who is

10  preoccupied, and then we've got the death of

11  grandmother.  We've got physical and sexual abuse.

12  We've got the stepfather.  Why should all those be

13  significant?

14      Well, what we know from the research now is there

15  are a number of things you can look at.  One is to

16  what extent is the event something that normally

17  occurs in childhood.  If it's a normal event, the

18  child should be able to talk to friends, family and

19  others, and work it through.  It's not something

20  that's strange or odd or something they should be

21  embarrassed or ashamed about.  The problem is that a

22  number of things that happened in Larry's background

23  were not normal events.  Being sexually abused at the

24  age of four and five is not a normal event for a

25  child.

95

1              THE COURT:   How abnormal is it,

2      ideologically speaking, do you know?

3              THE WITNESS:   In terms of percentages we're

4      probably looking at less than three percent of the

5      population overall experiences sexual abuse at the age

6      of four or five.  We do know that for females,

7      adolescence is a more likely period for sexual abuse

8      to occur.

9      A.   The other thing that becomes significant is the

10     age and the mental status of the victim when the

11     trauma occurs.  The less capable they are to process

12     what happened to them, to talk about it, verbalize it

13     and work it through, the more they're going to be

14     traumatized by the event.  So the age becomes

15     significant, the level of maturity, the intellectual

16     functioning are all factors.

17          Many of these events that occurred in Larry's

18     life, he was very young, did not have the mental

19     capability and the maturity to be able to work it

20     through.

21          The next thing becomes how many traumas you have

22     occur in your life.  A single trauma can leave a

23     lasting scar throughout a person's life, but multiple

24     trauma becomes significant, because trauma basically

25     tells me the world is a dangerous place and I have to

96

1    be very cautious, in fact maybe I need to even be

2    aggressive to keep myself safe.  If I have repeated

3    trauma, that just keeps reinforcing to me that the

4    world is dangerous and that life is filled with all

5    sorts of hurt and pain and loss.

6         The last thing has to do with the recovery

7    environment when a child has gone through repeated

8    trauma.  How supportive, how nurturing, how aware of

9    the trauma are the family members, the parents with

10   the child?  Do they talk about it, do they work it

11   through, do they get the child counseling and

12   assistance for those disorders?

13       When we look at Larry's childhood there just

14   wasn't the type of recovery environment to help him

15   work through the traumas that he went through which

16   again then contributes to his turning to alcohol and

17   drugs as a way to sort of medicate himself and deal

18   with his emotional pain.

19   Q.   You have discussed the family situation as a

20   young child, and I just wanted to be sure that you

21   had, you feel you fully explored that.  Have you

22   discussed the situation in Sault Ste. Marie until he

23   moved to the fullest you think appropriate?

24   A.   Well, I think the other part that I would want to

25   add is dysthymia is a chronic underlying depression

97

1   that oftentimes begins in the early adolescence and
2   can persistent for many years.  It is somewhat
3   biologically based, but what we have been able to
4   discover is that ongoing trauma tends to be one of the
5   contributing factors to a person developing this kind
6   of depression.  That sense of helplessness and
7   hopelessness, the inability to correct my situation,
8   make my life better, that I continually seem to fail,
9   no matter what I do I can't seem to make my life right
10  becomes an underlying theme, and so that then builds
11  into a depressive state that persists into adulthood.
12  Q.    Is there any significance to your view in the
13  remarriage of Mr. Landrum's mother and the move to
14  Chillicothe in this analysis?
15          THE COURT:   I think technically we're not
16  talking about a remarriage.  I think we're talking
17  about a first marriage.
18          MR. SIMMONS:   I think we are.  Excuse me.
19  Marriage.
20  A.    The marriage becomes significant in several ways.
21  First, mother moves and lives with in-laws, which
22  allows Larry to be alone without his mother for about
23  a month, which when you're looking at the age that
24  he's at, is pretty traumatic.  Even though the mother
25  was not necessarily the best mother and always

98

1    present, she was there.  Now she's completely absent.

2        Then after about a four- to six-week period, the

3    mother removes Larry from his family completely, moves

4    to another city, and now he's not able to see his

5    grandparents, aunts, uncles, cousins.  He's completely

6    removed from them.  And then lastly he's now adapting

7    to this parental figure who is rather stern, has bouts

8    of rage and abuses alcohol, and then at a later point

9    discovers that this in fact is not his father but is

10   his stepfather.

11       So there were a number of events that occurred in

12   that transition that contributed to Larry's feelings

13   again of loss, depression and attitudes about the use

14   of alcohol.

15   Q.    Is there any significance to Larry's experiences

16   in his teenage years at either Upham Hall, the

17   Fairfield School or elsewhere that you think fit into

18   this analysis?

19   A.    Yes.  I think the records, particularly at Upham

20   Hall, provided significant data regarding Larry's

21   function at age 16.  At that point he had overdosed on

22   drugs, which clearly tells us at that point that his

23   use of alcohol and drugs had already progressed to a

24   point where it was causing significant problems in his

25   life.

99

1      The records repeatedly document his feeling sad

2   and presenting with symptoms of depression, and the

3   problems with the stepfather's violent temper, and

4   that that needed to be addressed and needed to be

5   treated.

6      Unfortunately, it was not treated.  The

7   stepfather opted to not get counseling or therapy for

8   himself.  Larry did not want to go home.  He had asked

9   to go live with relatives in Michigan.  The family,

10  the mother and father, stepfather, decided not to

11  allow that, that Larry needed to come back home.

12     Things did not go well when he went back home.

13  He was violated for his probation, went to Fairfield

14  School, and again removed from the family.  He did

15  fairly well.  His grades improved in school, his

16  behavior was appropriate.

17     What we find is that his behavior deteriorated

18  from the point that his grandmother died, his mother

19  married his stepfather, and the physical abuse began.

20  You can see this progression.  Progression in terms of

21  alcohol and drug use, progression in terms of

22  depression, progression in terms of behavior that

23  becomes more and more erratic and out of control and

24  unpredictable.

25          THE COURT:   Meaning his behavior, not his

100

1    stepfather's?

2              THE WITNESS:   No.   Meaning Larry's behavior.

3    The overdose when he's in the military.   His behavior

4    becomes out of control.   At times he's AWOL for days

5    at a time.   He's not able to maintain his life in an

6    orderly fashion because of the depression and the

7    effects of the alcohol and drugs.

8    Q.   Did you perform any tests or ask Mr. Landrum to

9    undergo any testing in terms of your analysis of his

10   situation?

11   A.   Yes, I did.

12   Q.   And could you please explain to the Court what

13   testing you did and what, if any, significance it has

14   on your overall opinion?

15   A.   I basically did four things.   I conducted the

16   Michigan Alcoholism Screening Test.   This is a

17   screening instrument to look at an individual's use of

18   alcohol.   A score of 5 suggests the person has a

19   problem with alcohol.   Larry's score was 35.

20        I also administered the Drug Abuse Screening

21   Test.   This is used to screen for drugs other than

22   alcohol.   Again the cutoff score is 5 to indicate a

23   problem, and Larry's score was 23.

24        These screening tools just simply reinforced what

25   the records had shown and what my interview had

101

1  demonstrated, that Larry's use of alcohol and drugs

2  was clearly a problem and was at a level to support a

3  diagnosis of dependence.

4      Also I administered the Wechsler Adult

5  Intelligence Scale to screen for intellectual

6  functioning, found that Larry functions in the average

7  range overall, or full scale IQ was 105. Then I also

8  conducted the Minnesota Multiphasic Personality

9  Inventory.

10          THE COURT:   I or II?

11          THE WITNESS:   II.

12  A.   Basically it demonstrated that his clinical

13  scales were all within normal limits.  There were no

14  significant elevations.  The only sub-scale that was

15  significantly elevated was the scale that's used to

16  identify individuals who have a high susceptibility to

17  abusing alcohol and drugs.

18  Q.   Now you know there was some testimony at the

19  trial, I think even in the mitigation phase --

20          THE COURT:   I'm sorry, when were these tests

21  administered?

22          THE WITNESS:   The MAST and DAST were July

23  30th, 1993, and the WAIS and the MMPI were December

24  10th, 1993.

25          THE COURT:   Thank you.

1    Q.    Doctor, as you know, there were some references

2    in the trial, and as I say, even in the mitigation

3    phase that Larry drank too much.  In your view is what

4    you're saying just a repeating that kind of statement

5    or is what you're saying something significantly

6    different?

7    A.    I think it's significantly different in that,

8    yes, that is one of the symptoms that Larry had was

9    that he drank too much.  But more importantly, I think

10   it's imperative that we understand that he had an

11   underlying depression, that his use of alcohol and

12   other drugs, not just alcohol, was a self-medicating

13   approach to treating his depression and dealing with a

14   number of early life traumas and ongoing losses

15   throughout adolescence and into adulthood, he had a

16   number of losses as an adult, and his way of coping

17   was to use alcohol and drugs.

18        So that understanding that, I think we have a

19   better understanding of why the alcohol was there and

20   how the addiction developed, because once an addiction

21   develops, then the individual, yes, they drink because

22   of other factors, but they're also now drinking

23   because they're addicted to the substance.

24             MR. SIMMONS:    That's all I have, your

25   Honor.

103

1          THE COURT:    Thank you.  Cross.

2          Let me ask, I suppose, Mr. Fulkerson, it

3   being 10 minutes of 12:00, whether you anticipate a

4   brief or extended cross-examination such that it would

5   be appropriate to take the lunch break now?

6          MR. FULKERSON:    I would think not more than

7   30 minutes at the most.

8          THE COURT:    All right.  We'll go ahead then.

9          MR. FULKERSON:    Okay.

10                    CROSS-EXAMINATION

11   BY MR. FULKERSON:

12   Q.   Dr. Smith, when did you first become involved

13   with this case?

14   A.   I don't know the exact date.  It was in the early

15   part of 1994.

16   Q.   And you became involved in the case through the

17   Ohio Public Defender's Office?

18   A.   That's correct.

19   Q.   And were you paid for your services at that time

20   to prepare the affidavit that is in the record in this

21   case now?

22   A.   For this affidavit?  Yes.

23   Q.   Correct.  And how much were you paid for your

24   services for the entire post-conviction process that

25   you were involved in in this case?

104

1    A.    I have no idea.  I know what I charge per hour

2    but I don't recall the total amount.

3    Q.    What do you charge per hour?

4    A.    A hundred seventy-five dollars per hour.

5    Q.    Do you have any reasonable estimate of how many

6    hours you put in to prepare the affidavit in your

7    investigation for post-conviction?

8    A.    Not at this point I don't.

9    Q.    Okay.  And you're also being paid for your

10   services today?

11   A.    That's correct.

12   Q.    And you're charging $175 an hour?

13   A.    No, it's $225 an hour for court time and

14   testimony.

15   Q.    It's been almost 10 years since your previous

16   investigation.  How were you contacted to testify in

17   this proceeding?

18   A.    Again I was contacted by the Ohio Public

19   Defender's Office.

20   Q.    That's fine.  Do you support the death penalty?

21   A.    Yes.

22   Q.    Your CV says that you do some work with the

23   Catholic Charity Services of Cuyahoga County?

24   A.    I have in the past.

25   Q.    Are you a practicing Catholic?

105

1   A.   Yes, I am.

2   Q.   And you have no opposition to the death penalty

3   based on your religious beliefs?

4   A.   No, I do not.

5   Q.   Okay.  Would you agree that it's not the role of

6   your role in mitigation to make decisions about what

7   strategies the trial counsel should employ?

8   A.   I'm sorry, can you say that again?

9   Q.   You testified on direct that your role is to

10  present a valid diagnosis of somebody at the time of

11  the crime and provide that to the defense?

12  A.   That's correct.

13  Q.   You would agree with me then that it's not your

14  role to develop trial strategies, it's for a lawyer to

15  do; correct?

16  A.   That's correct.

17  Q.   And you're not a lawyer?

18  A.   No, I'm not.

19  Q.   Would you agree then as a general matter that

20  it's up to counsel to make the decision about what

21  evidence to present in mitigation?

22  A.   Yes.  I just have one qualifier.  Certainly when

23  I'm asked by attorneys to do an evaluation, I will

24  tell them records that I would like to review,

25  individuals that I would like to interview, if I need

106

1    more time with the defendant, so that I want to give

2    them a thorough evaluation so I will ask for those

3    things.  It would be their determination whether or

4    not I receive them, but I will let them know what I

5    need or what I at least feel I need to have a full and

6    comprehensive assessment.

7    Q.   Okay.  In other words then is it important for

8    you testifying in mitigation that you are presenting

9    testimony that is consistent with the defense theory

10   of the case?

11   A.   That's their determination whether or not what I

12   have is consistent with their theory, but what is

13   important to me is that I have as much information as

14   possible to feel confident that the opinions that I'm

15   giving are valid.

16   Q.   Do you know the defense strategy Mr. Landrum's

17   attorneys used at trial, at the guilt phase of the

18   trial?

19   A.   Their strategy?  I'm not sure.

20   Q.   Do you know what their strategy was in the

21   mitigation phase of Mr. Landrum's trial?

22   A.   No, I'm not sure.

23   Q.   You don't know then whether counsel's strategy

24   was to admit Mr. Landrum's guilt or blame someone else

25   for the crime or show that Mr. Landrum was remorseful?

107

1    A.   No, I didn't work with the attorneys so I don't

2    know their strategies.

3    Q.   Of the people that you work with through Stella

4    Maris and Behavior Management Associates and your work

5    with Case Western, those are people that generally are

6    seeking your help; is that a fair statement?

7    A.   No.

8    Q.   That's not a fair statement?

9    A.   No.

10   Q.   People are -- just come to you?  How do they get

11   to you for assistance?

12   A.   I have several different groups that I work with.

13   The Hitchcock Center for Women, probably 80 percent of

14   those are coming on their own.  Twenty percent are

15   court-ordered treatment.

16   Q.   So it's fair to say that some are coming to you

17   really not of their own will, but because of the court

18   direction?

19   A.   Right.  And then the men's program at Stella

20   Maris is one hundred percent offenders, so they have a

21   choice, the choice is to either go to prison or go to

22   treatment.  It's not exactly the same as choosing the

23   treatment.

24   Q.   I understand.  Would you agree then that somebody

25   in that situation might have a motive to fabricate

108

1   information to you as a clinician because they're
2   under judicial pressure to do so?  I don't mean
3   judicial pressure but --
4        THE COURT:  It is judicial pressure.  That's
5   right.
6   Q.   Well, so would you agree with me that someone in
7   that situation has a different motivation than someone
8   who comes to you of their own free will seeking your
9   help?
10  A.   It can.  It can be different.
11  Q.   And when someone's not forthcoming with you about
12  their background and personal information for whatever
13  reason, that's corrupting your opinion; is that true?
14  A.   It limits your opinion.  It may not -- there may
15  be sufficient additional sources or whatever that you
16  can still draw a valid opinion, but it would be
17  helpful if they're forthcoming and give you the
18  information themselves.
19  Q.   But when they're not giving you good data, your
20  opinion is compromised as a result; is that correct?
21  A.   Well, no.  That's why I said no.  I think again
22  it depends on the number of other sources you have.
23  If I have school records and medical records and
24  psychiatric records and mother and father telling me
25  something and the defendant doesn't necessarily

109

1    disclose that, that doesn't necessarily corrupt my

2    opinion.  What it means is I know what the defendant

3    is telling me but I've got 12 other sources that say

4    it's true.

5    Q.   Do you remember testifying in the Mark Brown

6    capital case?

7    A.   No.  Not necessarily, no.

8    Q.   If I refer you to volume II of the book that I've

9    provided, page 126 of that book, and again the page

10   numbers are on the bottom right-hand corner of that.

11   A.   (Witness complied.)

12   Q.   I'll represent to you that that page is from your

13   testimony in the Mark Brown capital case, and if I can

14   refer you down to lines 17 through 20, could you just

15   read that very briefly?  Page 126, lines 17 through

16   20?

17   A.   Yes.

18   Q.   You were asked a question about whether someone

19   is forthcoming with you or not corrupts your opinion

20   and you answered correct?

21   A.   That's true.

22   Q.   Okay.  I just wanted to clarify that.

23        Now you were talking a little bit about testing

24   and interviews.  Would you say as a general matter

25   that it's important for you to personally interview

110

1    someone in a situation like Mr. Landrum before giving

2    your opinion for mitigation purposes?

3    A.    I think it depends upon the circumstances of the

4    request by the attorneys so that I don't know that I

5    can say yes or no to that.  It's a very broad

6    statement.

7    Q.    Do you have to interview somebody to provide the

8    opinions that you're providing?

9    A.    It depends on what the circumstances are and what

10   opinion they're asking for.

11   Q.    If they're asking you to provide an opinion about

12   someone's psychological diagnosis, do you have to

13   interview them or is that just not necessary if you're

14   given, let's say school records, medical records, test

15   records, that kind of thing?

16   A.    I think again it's an awkward question.  If I was

17   shown that the defendant had been given an IQ test

18   four or five different times and all of the IQ's were

19   the same, I would probably say there's not much reason

20   to do a full assessment again.  Why?  We have a steady

21   IQ, there's been no head trauma, the individual's

22   verbal presents normal, I wouldn't see that.  If we're

23   trying to diagnose a very significant psychological

24   disorder that may have been only developed recently,

25   it would be important to be able to see them because

111

1    records may not necessarily reflect that.

2    Q.    But you interviewed Mr. Landrum twice?

3    A.    That's correct.

4    Q.    At least in this case it was important for you to

5    interview him?

6    A.    Correct.

7    Q.    And you also reviewed some of his school records?

8    A.    That's correct.

9    Q.    Would you say that's important to review in

10   preparing your opinion?

11   A.    Again I think that it's useful.

12   Q.    Okay.  Just to recap, you did do diagnostic

13   interviews of Mr. Landrum; correct?

14   A.    Yes.

15   Q.    You gave him four tests which you've described,

16   MMPI-II, the WAIS, you gave him the Michigan

17   Alcoholism Screening Instrument and then the --

18   A.    Drug Abuse Screening Test.

19   Q.    Drug Abuse Screening Instrument.  Did you do any

20   other independent investigation on Mr. Landrum's case

21   other than the tests you did and what was given to you

22   in order to prepare your affidavit?

23   A.    Review of records. (Witness nodded.)

24   Q.    Did you review records not listed in your

25   affidavit?

112

1   A.   No, I did not.

2   Q.   So you reviewed what was given to you by the

3   defense?

4   A.   That's correct.

5   Q.   You didn't do any independent investigation on

6   your own?

7   A.   No, I did not.

8   Q.   You didn't review any other reports or materials,

9   again that were not given to you specifically?

10  A.   The things I reviewed are in my affidavit.

11  Q.   Okay.  Let me talk a little bit about your

12  affidavit and get into some specifics.

13       How many questions are on the Michigan Alcoholism

14  Screening Test?

15  A.   Approximately 28.  Twenty-eight, I think.

16  Q.   And the Drug Abuse Screening Test is 20

17  questions?

18  A.   Twenty-eight as well.

19       THE COURT:  Let me just ask a question about

20  that while it's on my mind.

21       THE WITNESS:  Sure.

22       THE COURT:  If I want to take the MMPI or

23  the Myers-Briggs for example, I have to take it with

24  somebody who's got the right to administer it.  What

25  about the MAST.  Is it on line?

113

1          THE WITNESS:   The MAST is on line, you could

2     get it as well as the DAST.

3          THE COURT:    Go ahead.

4     Q.   Looking at your affidavit, in paragraph 14 that

5     you have in front of you there -- I'm sorry just want

6     to back up one second.  Paragraph 13.  I believe

7     that's on page 7 of your affidavit.  In there, you

8     talked about this on direct examination, you talked a

9     lot about Mr. Landrum's background and family and how

10    that affected him later in life.  Is that fair to say?

11    A.   Yes.

12    Q.   Are you aware that the defense in mitigation

13    tried to show that Mr. Landrum in fact had a good

14    family background?

15    A.   I know that when I reviewed the transcript, that

16    there were statements that certain parts of his life

17    were good, yes.

18    Q.   Don't you think the testimony that you're

19    proposing here today would conflict with what that

20    trial strategy was, that he came from a good family?

21    A.   Again I can't comment on trial strategy.

22    Q.   Okay.  You also testified fairly extensively

23    about Mr. Landrum's addictive disorders and the

24    effects on him.  I'm going to get into that in a

25    little more detail, but are you aware also that

114

1    defense argued in mitigation that Mr. Landrum did have

2    a background with serious drug and alcohol abuse?

3    A.   I know that they mentioned that he abused those

4    substances, yes.

5    Q.   Looking at paragraph 14 of your affidavit, and

6    again you talked about this a little bit on direct,

7    Mr. Landrum's time at the Fairfield School for Boys

8    and his time that he was in the Navy.  How long was he

9    at the Fairfield School for Boys, do you know?

10   A.   I don't recall offhand.

11   Q.   It's fair to say from your review of those

12   records that's a pretty structured environment, it's

13   not an open school?

14   A.   Very structured environment, yes.

15   Q.   But he graduated; correct?

16   A.   He completed that school and had very good grades

17   there.

18   Q.   Got good grades, got a diploma.  Got a driver's

19   license, too, didn't he?

20   A.   That's correct.

21   Q.   Is it fair to say that he did fairly well while

22   he was there for a substantial period of time?

23   A.   I thought that he did exceptionally well there.

24   I was very pleased to see his response to a structured

25   environment without alcohol and drugs.

115

1   Q.   Let's talk a little bit more about the alcohol

2   and drugs, and specifically at the time of the crime.

3   Do you know how much Mr. Landrum weighed at the time

4   of the crime?

5   A.   Not offhand.  I know that he's always been small

6   in stature.

7   Q.   Is it fair to say that your body mass and weight

8   affects the ability, or affects how drugs and alcohol

9   react within your body?

10  A.   Yes.  What we know is the smaller the individual,

11  the less it requires for an individual to become

12  intoxicated.  So someone smaller in stature would

13  require a smaller amount of actual drug in order to be

14  impaired and intoxicated.

15  Q.   But you're not sure what his body weight was at

16  the time of the crime?

17  A.   Not exactly.  I mean I know that he was small in

18  stature.  That was documented throughout the medical

19  records that he was always rather small, and with that

20  in mind, the amount of alcohol, even if he had been a

21  large person, based upon the transcript indicating

22  that he had 12 to 18 beers and somewhere around six to

23  eight Ativan would have been enough for a person who

24  weighed 250 pounds to be grossly intoxicated.

25  Q.   Okay.  Your affidavit, also your direct testimony

116

1    was that you concluded influence of alcohol and

2    sedatives was prominent in Mr. Landrum at the time of

3    the crime; is that fair to say?

4    A.    That's correct.

5    Q.    Would that affect his memory of the events at

6    that time?

7    A.    Absolutely.

8    Q.    Are you aware that Mr. Landrum testified at

9    trial?

10   A.    Yes, I am.

11   Q.    Are you aware that he testified in some detail

12   about going into Mr. White's apartment and what

13   happened?

14   A.    That's correct.

15   Q.    It's fair to say he had a very clear memory of

16   what's going on?

17   A.    I don't know that at all.

18   Q.    In fact, Landrum on cross-examination by the

19   prosecutor said that he knew what he was doing and it

20   was hard to forget what had happened.  Did you read

21   that part of the testimony?

22   A.    Yes, I did.

23   Q.    Mr. Landrum also testified about him and Mr., he

24   and Mr. Swackhamer's drinking a case of beer.  In fact

25   you talked about this a little bit on direct, that he

117

1    had taken eight Ativans and had consumed approximately

2    14 to 18 beers before the crime. Landrum are you

3    aware testified that he had been drinking beers about

4    every five minutes before the crime?

5    A.   Yes.

6    Q.   Is that consistent with someone with the

7    diagnoses that you provided?

8    A.   Yes.

9         THE COURT:   Hang on just a second.

10        Okay.

11   Q.   Pretty fast drinker, isn't he?  Drinking a beer

12   every five minutes is a pretty fast drinker?

13   A.   It's very fast for a social drinker.  Again you

14   have to think about a person who is a heavy drinker,

15   an alcoholic.  I have seen alcoholics to drink two

16   cases of beer a day, fifth of whiskey and a case a

17   beer a day, so no.

18   Q.   Okay.  I want to talk about paragraph 18 of your

19   affidavit.  I'm going to break this down just a little

20   bit.  You concluded within a reasonable degree of

21   psychological certainty that he was dependent on

22   alcohol, sedatives and cannabis at the time of the

23   offense?

24   A.   That's correct.

25   Q.   And that he was under the influence of alcohol

118

1   and sedatives at the time of the offense?

2   A.   That's correct.

3   Q.   And I'm just reading from -- that he was

4   suffering from a depression called dysthymic disorder?

5   A.   Disthymic.

6   Q.   Thank you.  And that was exacerbated by the use

7   of alcohol and sedatives, and that he was in a state

8   of diminished capacity.

9        Are you aware that the State of Ohio doesn't

10  recognize the defense of diminished capacity?

11  A.   I think I've read that.

12  Q.   Okay.  Is it fair to say that your conclusion

13  that Mr. Landrum didn't understand the situation and

14  that his judgment was inappropriate is based on the --

15  Let me strike that.  Start over again.

16       Mr. Landrum, in your opinion, did he know right

17  from wrong at the time of the crime?

18  A.   I believe that he knew that he was committing a

19  robbery and that was going on.

20  Q.   Do you believe that he knew that he was

21  committing a murder?  If he was committing murder

22  would he know that he was doing it?

23  A.   I don't know that there was deliberation to

24  commit a murder so I don't know about that.

25  Q.   But there was a lot of deliberation before the

119

1    murder; correct?

2    A.   Well, there was to break into his home and to rob

3    it.   There was planning for that.

4    Q.   In fact, there was a lot of planning.   That's

5    when he was intoxicated; right?

6    A.   Again I don't know what a lot is, but I know

7    there was planning and that occurred while he was

8    using substances.

9    Q.   We'll walk down it.   He armed himself with a

10   railroad bolt before he went there.   He had the

11   foresight to gather a weapon of some kind; correct?

12   A.   I know that he had a railroad bolt, or someone

13   did.   I don't know that he brought that or who brought

14   that.

15   Q.   He and Mr. Swackhamer cased the apartment before

16   they went there; right?

17   A.   That's my understanding.   (Witness nodded.)

18   Q.   Okay.   He had the foresight to wear surgical

19   gloves during the burglary?

20   A.   Correct.

21   Q.   He told Carolyn Brown that he would kill the

22   victim if the victim returned; right?

23   A.   I've heard of that.   I don't know about that.

24   Q.   Well, the Ohio Supreme Court found that in their

25   factual findings.   Were you aware of that?

120

1    A.    That could be.

2    Q.    Okay.  He waited for White to leave the

3    apartment.  You are aware of that?

4    A.    Yes.

5    Q.    He was given the -- When Mr. White returned,

6    Mr. White, according to the Ohio Supreme Court said

7    something along the lines of, what are you doing, get

8    out of here, and Mr. Landrum didn't leave?

9    A.    That's correct.

10   Q.    So all those things kind of indicate some level

11   of understanding of what's going on.  Isn't that

12   inconsistent with your opinion that he didn't

13   understand the situation?

14   A.    No.

15   Q.    Despite the fact that he did all these things up

16   to the time of the crime?

17   A.    That's correct.

18   Q.    What do you think would have been an appropriate

19   judgment in that situation?  You say Mr. Landrum

20   didn't utilize appropriate judgment.  What would have

21   been appropriate judgment?

22   A.    Well, again I think that what we're looking at is

23   the difference between the ability to think and the

24   ability to think in a logical and in a sort of higher

25   order thinking.  Certainly Mr. Landrum was thinking.

121

1    He's not unconscious, he's not mentally retarded, he's
2    making a plan to do something, but doing it and doing
3    it well are two different things.  And clearly he
4    waited for the victim to leave to rob the house and
5    then everything went wrong from that point on.
6         I would suggest that had he not been depressed,
7    not been under the influence of alcohol and drugs,
8    that his response to the situation might have been
9    much different.
10   Q.   Do you think most people not having Mr. Landrum's
11   condition that are in a situation where they're
12   burglarizing an apartment, are surprised by the owner,
13   wouldn't react in kind of a panicked kind of reaction?
14   A.   I think that would be part of it, and I think
15   adding alcohol and drugs to depression only makes it
16   that much worse.
17   Q.   Okay.  You talk about his inability to comprehend
18   the situation.  What do you understand the situation
19   to have been at the time Mr. White came back into the
20   apartment?
21   A.   I didn't say that he was unable.  I said it was
22   impaired.
23   Q.   His ability to comprehend the situation was
24   impaired?
25   A.   Correct.

122

1    Q.    What do you understand is the facts that actually

2    took place when Mr. White was murdered?

3    A.    Again I don't know all the facts because I don't

4    have that in front of me at this point.  But what I do

5    know is the cognitive functioning of Mr. Landrum at

6    the time, and it's one of those things where it's not

7    really about something willful.  If someone injects

8    certain drugs, they have an effect.  If someone has a

9    psychiatric disorder, it has symptoms.  And the

10   problem with those things, they don't go away.

11   They're persistent, they're present.

12        So a person with depression, those symptoms will

13   be present.  If you have injected these drugs, within

14   a period of time they're going to have the effect they

15   have.  And so we know that his cognitive functioning

16   must be impaired given what he injected only several

17   hours prior to the offense.

18             MR. FULKERSON:    If I can have just a moment?

19             THE COURT:    Sure.

20   Q.    You gave Mr. Landrum an MMPI; correct?

21   A.    That's correct.

22   Q.    And that was the second version?

23   A.    Uh-huh.

24   Q.    The court reporter is taking everything down.

25   A.    Yes.

123

1    Q.   Did you do a validity determination on the MMPI

2    that you gave Mr. Landrum?

3    A.   It has validity scales and reliability scales,

4    and those indicated that the MMPI was both reliable

5    and valid.

6    Q.   Did anyone else review the MMPI that you gave Mr.

7    Landrum?  Has anyone else ever reviewed it?

8    A.   I'm not aware anyone has.

9    Q.   You have given MMPI tests to people in the past

10   in this context, capital cases.  Has anyone ever

11   looked at your results and determined they were

12   invalid, the test was invalid?

13   A.   Looked at the test that I gave that I said was

14   valid and then they found it to be invalid?

15   Q.   Correct.

16   A.   No.

17   Q.   Okay.  You didn't give Mr. Landrum a Symptom

18   Checklist test, did you?

19   A.   No, I did not.

20   Q.   You didn't give him an Impact of Life Events

21   test?

22   A.   No.

23   Q.   And you didn't give him a Millon Clinical

24   Multiaxial test?

25   A.   MCI.  No, I did not.

124

1    Q.   Do you need to give those tests to do a thorough

2    examination in this context?

3    A.   No.  Many of those would be competitive and

4    result in possible invalidity of the test.

5    Q.   Did you diagnose Mr. Landrum with a social

6    personality disorder?

7    A.   No.

8    Q.   Have you ever diagnosed anyone in a capital

9    context with an antisocial disorder?

10   A.   Absolutely.

11   Q.   You have testified in several of these cases;

12   correct?

13   A.   Where I found them to be antisocial?

14   Q.   Just in general, you have testified in several

15   capital cases in this context?

16   A.   Yes, I have.

17   Q.   Would you characterize Mr. Landrum's family life

18   growing up as dysfunctional?

19   A.   Yes.

20   Q.   Isn't it true that not everyone that comes from a

21   dysfunctional family suffers from the kinds of

22   disorders Mr. Landrum does?

23   A.   I think the problem is taking the term

24   dysfunctional and applying it to all families.

25   Individuals who come from Mr. Landrum's dysfunctional

125

1    background will present with the symptoms that he has.

2    Q.    Okay.

3         THE COURT:    Unless he gets treatment, or

4    regardless of whether he gets treatment?

5         THE WITNESS:    It will depend upon the type

6    of treatment.  Part of the difficulty that I had as a

7    professional was reviewing the Upham Hall records.  It

8    was very disappointing to see that they referred to

9    his alcohol and drug abuse repeatedly, yet there was

10   nothing in the treatment plan to address the alcohol

11   and drug addiction.

12   Q.    On the MMPI test that you gave Mr. Landrum, did

13   you disregard any of the answers to any of his

14   questions when you scored the test?

15   A.    No.

16   Q.    Have you ever given an MMPI where you have

17   disregarded answers to questions before that didn't --

18   A.    I'm not sure.  Do you understand the MMPI?

19   Q.    Let me ask this.  Have you ever -- you have given

20   MMPI's in other contexts; correct?

21   A.    I have given MMPI's throughout my career.  In

22   fact my research is on the MMPI.

23   Q.    In giving an MMPI test, have you ever looked at

24   the results and thrown out questions that suggest

25   things that are inconsistent with your diagnosis?

126

1    A.    Absolutely not.  That would be both unethical and
2    inappropriate.  In fact you can't even determine what
3    questions are going to be used or not used.  That's
4    not the way the MMPI is scored.
5    Q.    You're saying that you have never.--
6    A.    It's not based on individual items.
7    Q.    Pick and chose?
8    A.    The whole idea is that the MMPI is 76 or 77 items
9    and it's based upon profiles, not on individual items.
10   And taking items out, any items out based upon the
11   clinician's determination, would be inappropriate.
12   The only time that you ever look at items individually
13   are what are called the critical items of the MMPI.
14   Q.    What are critical items?
15   A.    Critical items are items that suggest very severe
16   pathology.  Suicidal ideation, alcohol, drug addition.
17        MR. FULKERSON:    Can I have just one moment,
18   your Honor?
19        THE COURT:    Of course.
20        MR. FULKERSON:    Thanks.
21        Your Honor, there will be no further
22   questions.
23        THE COURT:    Redirect?
24        MR. SIMMONS:    Yes, your Honor.  Very
25   briefly, I promise.

127

1                    REDIRECT EXAMINATION

2      BY MR. SIMMONS:

3      Q.   I just wanted to be sure if I haven't already

4      covered this, Doctor.  We have in this case as Exhibit

5      3 an affidavit of Jill Miller, which I'm sure you've

6      seen, I know you've seen.  And a confidential

7      memorandum attached to it that she did and submitted

8      as part of her post-conviction proceedings in state

9      court.  You are familiar with those?

10     A.   Yes.

11     Q.   Were those important documents for your analysis?

12     A.   Those are very important.  Oftentimes they are

13     summaries affidavits that are provided regarding

14     interviews that were done with family members and

15     friends that I would then rely upon as additional data

16     to corroborate or not corroborate opinions that I

17     have.

18     Q.   That's all I have.

19               THE COURT:   Anything further based on that?

20               MR. FULKERSON:   No, your Honor.

21               THE COURT:   I have a couple things myself.

22                    EXAMINATION

23     BY THE COURT:

24     Q.   Maybe just one area.  I think you've said that

25     you believe that Mr. Landrum panicked when Mr. White

128

1    returned, and that that panic was exaggerated by the

2    effect of the alcohol and Ativan that he had consumed.

3    Did I hear you correctly?

4    A.    I think that his response was not a logical

5    response but was a reaction, not a thought-through

6    action but a reaction to the situation that then was

7    based upon an impaired mind that's been sedated by

8    both alcohol and Ativan.

9    Q.    Is it at all likely that a person in those

10   circumstances when reacting would chose a pattern of

11   action that he had proposed before?

12   A.    That would be a possibility.  I think that some

13   of it has to do with -- what's going through my mind

14   is that Mr. Landrum has no history of violence that

15   we're aware of.

16   Q.    No history of violence at all?

17   A.    Right.

18   Q.    The point I'm adverting to is his statement prior

19   to the murder during the course of planning the

20   robbery, that if Mr. White comes back, I'll kill him.

21   He may have been rehearsing that in his head.

22   A.    Again I wouldn't want to speculate about what was

23   going on in his head.  When people are intoxicated or

24   sedated, thoughts tend to not be as logical and flow

25   as smoothly as we would expect or anticipate, so that

129

1    oftentimes there's missing logic, there's missing,

2    sort of sequential thinking.  And again it's more

3    reaction to an event rather than I'm thinking about.

4    Q.    Right.

5.   A.    He denies saying this so I don't know.

6    Q.    Right.

7    A.    That statement, I'm not sure what it means.

8    Q.    You may step down.

9    A.    Okay.  Thank you.

10            (Witness excused.)

11            THE COURT:    I believe that concludes the

12   testimony to be presented in this matter, and so the

13   next question is briefing schedule.

14            MR. SIMMONS:    Could we move to admit the

15   exhibits, please?

16            THE COURT:    Of course.

17            MR. COLLYER:    Your Honor, just for the

18   record, we're going to object to the exhibits to the

19   extent there are witnesses they did not call and

20   could have called for purposes of this hearing, and

21   we would rely on Williams vs. Coyle for that.  That

22.  is inadmissible.  When the Court orders an

23   evidentiary hearing even though these are exhibits

24   admitted to the state court, if these witnesses are

25   available then those affidavits and reports are

PARRAN - DIRECT

3-23

1          MR. WILLE: Thank you.

2     (Messrs. Lazarow and Mezibov conferred privately.)

3          MR. LAZAROW: No further questions, Your Honor.

4          THE COURT: Is this witness released?

5          MR. LAZAROW: Yes, Your Honor.

6          MR. WILLE: Yes, Your Honor.

7          THE COURT: Thank you very much, Mrs. Leahy.

8     (Witness excused.)

9          THE COURT: Call your next witness.

10         MR. MEZIBOV: Dr. Parran.

11         THE CLERK: Raise your right hand, please.

12    (Duly sworn by the Clerk.)

13         THE CLERK: Thank you. Please be seated.

14              THEODORE V. PARRAN, JR., M.D.

15    a witness herein, having previously been sworn, testified as

16    follows:

17                    DIRECT EXAMINATION

18    BY MR. MEZIBOV:

19    Q.  Good morning, Dr. Parran.

20    A.  Good morning.

21    Q.  Dr. Parran, before I begin to ask you any questions, the

22    first thing I would ask of you is that you state your full

23    name and spell your last name for the record, please.

24    A.  My that is Theodore Van Doran Parran -- P-a-r-r-a-n --

25    Junior.



EXHIBIT
63

PARRAN - DIRECT

3-24

1  Q.  Dr. Parran, where do you reside?

2  A.  I live in Shaker Heights, Ohio.

3  Q.  And could you tell us your occupation, please?

4  A.  I'm a physician.

5  Q.  And a physician licensed to practice medicine in the

6  State of Ohio?

7  A.  In Ohio, yes.

8  Q.  Dr. Parran, could you give us the benefit of your

9  educational background?

10  A.  I went to college at Kenyon College in Ohio, and then

11  went to medical school at Case Western Reserve University,

12  School of Medicine; graduated in 1982.  I did my residency in

13  internal medicine for three years at Johns Hopkins Hospital,

14  in Baltimore City Hospital, in Baltimore, Maryland, and I

15  spent an additional year as a medical chief residence there,

16  so that is my formal education and training.

17  Q.  And, Dr. Parran, could you give us the benefit of your

18  professional experience as a physician since the time you

19  graduated from medical school?

20  A.  Yes, having graduated from medical school, as I mentioned

21  I spent four years in residency training in Baltimore.  I

22  then spent another two years living in Baltimore working on

23  the faculty at Johns Hopkins School of Medicine and helping

24  to direct both the general internal medicine Clinic as well

25  as a drug and alcohol treatment program in Baltimore City

1   Hospital.  In 1988 I moved back -- I moved back to Cleveland,

2   taking a faculty position at Case Western Reserve University

3   School of Medicine in helping to direct both the general

4   internal medicine Clinic and several drug and alcohol

5   treatment programs and consultation programs in the Greater

6   Cleveland area.

7   Q.  And where are you employed at the present time?

8   A.  Currently I'm employed part-time by Case Western Reserve

9   School of Medicine as the Director of the Clinical Science

10  Program as well as the Director of the Addiction Medicine

11  Fellowship Program.  I'm also employed part-time by the

12  Cleveland V. A. Medical Center helping to -- as the Medical

13  Director of their extensive Drug and Alcohol Treatment

14  Program.  And then finally I am part-time or privately

15  employed as a member of a group practice of two of us

16  providing addiction medicine services to hospitals and

17  substance abuse treatment centers in Cleveland.

18  Q.  How long have you been working at the V. A. at Cleveland?

19  A.  I started working at the V. A. in 19 -- 1993.  In 1993,

20  we applied through the V. A. for a grant to support our

21  addiction medicine fellowship program and that was funded as

22  one of only six in the country, and have been employed

23  part-time with the V.A. since then.

24  Q.  Dr. Parran, over the course of time have you developed

25  certain areas of specialization in the practice of medicine?

PARRAN  -  DIRECT

3-26

1    A.   Yes, I'm board certified in internal medicine and I

2    continue to practice, a small percentage of my time, in

3    general internal medicine.  I'm also certified by the

4    American Society of Addiction Medicine in the area of drug

5    and alcohol dependence and treatment.  And I honestly spend

6    the majority of my time working in the area of substance

7    abuse treatment, as well as researching, education in the

8    area of addictions.

9    Q.   When you say "majority" of your time, could you assign a

10   percentage of your time to that area of practice?

11   A.   Probably 70 percent at this point.

12   Q.   What is the American Society of Drug Addictions?

13   A.   The American Society of Addiction --

14   Q.   Addiction Medicine.  I'm sorry.

15   A.   Yes.  It's a multi-disciplinary group of physicians,

16   about 4,000, maybe 4500 members.  Approximately 3,000 of us

17   are certified --

18   Q.   How do you become certified?

19   A.   -- of the organization.

20        In order to be certified in addictions medicine, you have

21   to be able to provide documentation that you have worked

22   full-time in the area of drug and alcohol dependence

23   treatment for at least two years, and then you have to take a

24   certification examination.

25   Q.   Now, you have treated, I take it, individuals who have

PARRAN - DIRECT

3-27

1   been addicted to alcohol or drugs?

2   A.  Yes.  Since -- since 1985, I've treated somewhere between

3   1200 and 3,000 patients a year, each year, with a history of

4   addictions, approximately split 50/50 between alcohol

5   dependent and drug dependent.

6   Q.  Dr. Parran, in addition to the board certifications that

7   you've told us about, are you a member of any professional

8   boards or associations or organizations?

9   A.  Yes, I'm a member, as I mentioned, of ASAM, the American

10  Society of Addiction Medicine.  I'm also a member and have in

11  the past served on the board of the -- of an organization

12  called AMERSA, which is the Association for Medical Education

13  and Research in Substance Abuse.  I'm a member of the Society

14  for General Internal Medicine.  I'm a fellow in the American

15  College of Physicians.  And I am a fellow and a member of the

16  Executive Committee on the American Academy of Physician and

17  Patient.

18  Q.  Now, Dr. Parran, have you over the course of time

19  published any books or writings or treatises or studies in

20  your particular areas of specialization?

21  A.  Yes, I have.  I've written, oh, probably more than a

22  dozen maybe, close to two dozen but at least a dozen papers,

23  book chapters, syllabus modules on the treatment of

24  addictions, screening for chemical dependency, screening for

25  chemical dependence, how to present the diagnosis, how to

PARRAN - DIRECT

3-28

1   form a treatment plan with patients, management of

2   detoxification and the acute effects of drugs and alcohol,

3   syllabus materials on cocaine dependency, prescription drug

4   abuse, et cetera.

5   Q.  Finally, Dr. Parran, have you had occasion before today

6   to testify in court in matters in which you are a specialist

7   or in areas in which you practice?

8   A. Yes, I have.  I've testified in both criminal and civil

9   proceedings in the area of management of chemical dependency

10  and/or addiction medicine, especially in the area of the

11  management of acute drug induced delirium.  That was a civil

12  case.  In the area of prescription drug abuse and stimulant

13  abuse, especially diet pills, those have been criminal cases.

14  Q.  And, Dr. Parran, at my request did you bring down to us

15  today a copy of your current CV?

16  A.  Yes.

17     (Mr. Mezibov distributing documents to the Court and

18  counsel.)

19  Q.  Dr. Parran, I've handed you what's been marked

20  Plaintiff's Exhibit 14.  Can you identify that for us,

21  please?

22  A.  Yes, it's my C.V. which was updated last summer.

23  Q.  So this is current up through the summer of '96?

24  A.  It's at least current through, oh, probably July of '96.

25  Q.  Now, Dr. Parran, let's turn our attention to this matter

PARRAN  -  DIRECT

3-29

1  involving John Hicks.  Could you tell us when you were first
2  hired by myself and Mr. Lazarow in connection with this
3  matter?

4  A.  It probably was either late 1994 or early 1995.

5  Q.  And do you recall what we asked you to do initially?

6  A.  Yes, you asked me to look at the data about the case,
7  especially the information that was gathered around the time
8  of the events in early August of 1985, in order to form an
9  opinion about whether or not cocaine played a role or
10  appeared to have played a role in those events.  And,
11  secondly, you asked me to look at the trial proceedings and
12  the testimony to see if I could form an opinion about the
13  quality of the information there regarding the pharmacology
14  of cocaine and how it might relate to this case.

15  Q.  And, Dr. Parran, could you tell us how you went about
16  conducting your evaluation in connection with these matters
17  which we asked you to look into?

18  A.  Yes.  I read through a sort of summary or excerpts of
19  both the police investigation, the police interviews, and
20  then some of the testimony in terms of pretrial, trial and
21  mitigation proceedings.

22  Q.  Were you provided the actual trial transcripts then?

23  A.  Yes.  Yes.  And I was able to look at some notes taken by
24  Ms. Leahy.  I was able to look at the affidavits of a couple
25  of different physicians or a couple of different doctors.  I

PARRAN - DIRECT

3-30

1   can give you the doctor's name if you want.

2   Q.   Is that Dr. Baum?

3   A.   Yes, Dr. Baum.

4   Q.   And Julia Hawgood?

5   A.   Hawgood, yes.

6   Q.   Psychologist?

7   A.   And I was able in July of 1995 to actually go in and

8   interview Mr. Hicks.  And, finally, I received the

9   depositions of Dr. Schmidt --

10  Q.   Schmidtgoessling?

11  A.   'Goessling, and Doctor -- starts with an R.

12  Q.   Reardon?

13  A.   Reardon.

14  Q.   All right.

15  A.   Yes.

16  Q.   Could you tell us when you interviewed Mr. Hicks?

17  A.   It was in July of 1995.  I don't remember the exact date.

18  Q.   Okay.  And could you tell us approximately how much time

19  you spent with Mr. Hicks?

20  A.   About an hour-and-a-half.

21  Q.   And what was the purpose of your speaking with Mr. Hicks?

22  A.   I wanted to have a chance to talk with him both about his

23  previous experiences with cocaine prior to the events of

24  August of 1985, to speak with him about how cocaine tended to

25  affect him when he was using it, to get at least his

PARRAN - DIRECT

3-31

1  recollections of that point in 1995 of what went on in August
2  of 1985, and, finally, just to get my own sense of him and
3  his mental status, perhaps psychological or psychiatric
4  background. Although my background is in internal medicine
5  and not in psychiatry or psychology, I spend lots of time
6  interviewing people with issues in those areas and I wanted
7  to get a chance to interview him myself about those kinds of
8  things.
9  Q.  Dr. Parran, when you were provided these materials -- the
10  trial transcripts, the affidavits and depositions and then
11  actually speaking with Mr. Hicks in person -- were there
12  particular matters you were looking for in order to aid you
13  in your evaluation?
14  A.  I was looking for specific descriptions of his mind
15  state, his thinking processes, his sensations when under the
16  influence of cocaine both prior to August of '85 as well as
17  in August of '85, and any descriptions or evidence from
18  interviews that he had provided at that time that might give
19  some evidence or some clue from a clinical standpoint to me
20  as to what state he was in.
21  Q.  At the time these offenses were committed?
22  A.  Yes.
23  Q.  Now, over the course of looking at these materials and
24  speaking with Mr. Hicks, were you able to find any credible
25  evidence of drug use or its effect in connection with

PARRAN - DIRECT

3-32

1  Mr. Hicks?

2  A.  Yes, absolutely.  His history that he provided to

3  interviewers, provided to me as well, the history that his

4  family members had been able to provide to interviewers, as

5  well as some records from previously mandated court -- or

6  court-mandated treatment from the chemical dependency

7  standpoint, all indicated Mr. Hicks had had a significant

8  addiction problem in the past.

9  Q.  You used the term dependence, cocaine dependence.  Can

10  you tell us what that means from your standpoint?

11  A.  Well, there's sort of an over-arching view or diagnosis

12  we use of chemical dependency, which means the person meets a

13  certain criteria in DSM-IV -- which is the Diagnostic and

14  Statistical Manual-IV edition -- criteria for what would be

15  called in the vernacular "addiction."

16      Chemical dependency -- in this case dependency to cocaine

17  and alcohol -- includes:  Compulsive use; use to levels of

18  intoxication that weren't planned; adverse consequences from

19  repetitive use; loss of control of use once initiating that

20  use.  So a person, as long as they haven't used any of the

21  drug in a given day, tends to be fairly predictable; but when

22  they do it again, they tend to lose control and over use,

23  resulting in adverse consequences.

24      (Continuing)  Increase in preoccupation with use; use

25  despite repetitive and multiple, as I mentioned, adverse

PARRAN - DIRECT

3-33

1 consequences; sometimes increased tolerance, and at times

2 physical dependence, including withdrawal from the drug when

3 it's taken away -- although, I must say that 80 percent of

4 people who meet the criteria for a diagnosis of chemical

5 dependency or addiction don't have physical dependence to the

6 drug, meaning they don't use it every day and they don't go

7 through withdrawal when they stop using it.

8 Q. What you've just listed, are those objective signs and

9 symptoms of chemical dependency?

10 A. Yes, they are objective. They're verifiable. They're

11 primarily based on history. But a careful history taken from

12 an individual can generally rule in or rule out chemical

13 dependency.

14 Q. Did you find signs and symptoms of cocaine or chemical

15 dependency in connection with Mr. Hicks?

16 A. Yes, absolutely.

17 Q. Can you describe to us what those objective signs and

18 symptoms of chemical dependency was or were?

19 A. Yes. Mr. Hicks' background with alcohol and drug abuse

20 -- primarily marijuana early on -- resulted in repetitive

21 adverse consequences in his life from a performance

22 standpoint in school, from a performance standpoint at work,

23 from a financial standpoint, and from a legal standpoint from

24 his late teens on.

25    He, during periods of less use or abstinence, tended to

3-34

1    function quite well, and at times of increasing use

2    developed, as I mentioned, repetitive adverse consequences

3    resulting in pain and suffering in his life as well as in

4    those surrounding him.

5        Sometime in, the best of my recollection, the late

6    '70s/early '80s, Mr. Hicks' drug of choice seemed to switch

7    from alcohol and marijuana to cocaine and alcohol.  And he

8    developed, I think, inarguable evidence of cocaine addiction,

9    including in 1982 or '83 going through a significant amount

10   of money -- several thousand dollars that he had in a

11   retirement fund -- in cocaine use, and actually in the year

12   of 1985, earlier that year, going through probably a couple

13   thousand dollars in his bank account and his wife's bank

14   account for cocaine use.  So that indicates cocaine

15   dependence to me.

16       Another thing that indicates cocaine dependence is

17   actually the way he tends to use.  Initially, he started to

18   use cocaine by snorting it, and fairly soon shifted to using

19   I.V.  And the data about cocaine use and the routes of

20   administration indicates that of the 35 million Americans or

21   so who have intermittently tried cocaine, there's about three

22   million or three-and-a-half million, 10 percent, that develop

23   cocaine addiction or cocaine dependence.  And the vast

24   majority of those who shift from intermittent use of cocaine,

25   what might be casual use of cocaine and cocaine dependence,

PARRAN - DIRECT

3-35

1  tend to change their route of administration.  They either
2  use an I.V. or, more recently now, smoking the cocaine.
3  So, when I see a person who has a history of shifting
4  their route of administration to an I.V. form, that is
5  powerful evidence of a move to addiction.
6  And then, finally, the pattern with which he tended to
7  use.  He tended to use an intermittent binge pattern of
8  cocaine.  And, once again, people who are casual users or
9  occasional users of cocaine tend to use it casually and
10  occasionally.  People who tend to lose control of cocaine,
11  like most other stimulants that we have experienced with over
12  the last hundred years or so, tend to shift to a pattern
13  where they intermittently binge on the cocaine where they
14  initially use it, and then use it several times to multiple
15  times over the next few hours to few days until their money
16  runs out, or they become too paranoid, or they become too
17  exhausted, and then they sort of quit using the cocaine and
18  crash and go to sleep and sleep off the binge.  And it tends
19  to be a -- sadly, sort of a payday phenomenon where people
20  get paid on Friday and have strong urges and connect the use
21  of cocaine with the handling of money, and then people tend
22  to binge in the middle part of the week, recover on the
23  weekend to go to work on Monday.
24  Q.  What you describe, is that a phenomenon you observed or
25  found in the history of Mr. Hicks?

1  A.  Absolutely.

2  Q.  Now, can an individual feign or fake cocaine dependency

3  or chemical dependency?

4  A.  No, not really.  It's -- it's really not possible to fake

5  addiction to the point of spending several thousand dollars

6  of a retirement fund in a matter of several weeks to a couple

7  of months intermittent binging on cocaine and then earlier in

8  1985 a couple of thousand dollars' worth of the entire bank

9  account of oneself and one's spouse.  That is just not a

10  pattern that people are able to put on.

11  Q.  What was the significance of this history that you found

12  with regard to Mr. Hicks in your evaluation that we asked you

13  to do for us?

14  A.  Well, the history that I found with Mr. Hicks in terms of

15  his shifting from marijuana to cocaine, people who have

16  previously been dependent on marijuana -- which is a sort of

17  a small scale or fairly weak stimulant on the dopamine

18  system -- a person who's been a habitual dependent or

19  addicted marijuana smoker, if they start using cocaine, tend

20  to in a high percentage of cases, I would say 85 percent of

21  the time, develop cocaine dependence, and it's certainly what

22  happened to Mr. Hicks.

23  Q.  You mentioned the dopamine phenomenon.  What is that?

24  A.  Uh-huh.  Cocaine has three primary effects in the body,

25  three primarily pharmacological effects.  It's first effect

PARRAN - DIRECT

3-37

1  is to basically short circuit the peripheral nerves.  It
2  blocks the sodium potassium-pumping peripheral nerves and,
3  therefore, it is a very good anesthetic, and cocaine is used
4  as a local anesthetic.  Since the peripheral nerves are short
5  circuited, they can't transmit pain sensation and so they
6  become deadened or numb, the area where it's applied.
7      The second effect of cocaine is systemic effect, a
8  through-the-body effect, and that is a blocking of the
9  reuptake of norepinephrine and also to some degree
10  stimulating the release of norepinephrine.
11  Q.  And norepinephrine is?
12  A.  Norepinephrine is known in the vernacular as adrenaline,
13  a hormone, a systemic hormone released by the adrenal gland
14  which tends to stimulate increased heart rate, increased
15  blood pressure, increased reflexes, decreased appetite, gets
16  rid of a need for sleep, so people don't sleep and they don't
17  eat and they're all jazzed up.  And the rush of cocaine, the
18  -- what's described as the initial rush of cocaine, is a
19  norepinephrine or adrenaline surge.
20      The third effect of cocaine is a central effect in the
21  central nervous system where cocaine blocks the reuptake of
22  dopamine and it also stimulates the release of dopamine.
23  Dopamine is a neurotransmitter.
24  Q.  A neurotransmitter is what?
25  A.  A neurotransmitter -- a neurotransmitter is a chemical

PARRAN  -  DIRECT

3-38

1   release by one nerve or neuron in the brain which then
2   stimulates a second nerve or neuron in the brain and produces
3   a reaction or a feeling.  And dopamine is the -- is the
4   neurotransmitter which produces euphoria in the human brain.
5   For example, on the first sunny, warm day in spring, if we
6   were able to measure dopamine levels in our brain compared to
7   the last snowy, cold day in February, all of our dopamine
8   levels would be a little higher because our spirits would be
9   a little higher because of that external stimuli.
10  Q.  Spring fever actually has a physiological effect?
11  A.  Clearly.  Absolutely.  Dopamine is deficient, or the
12  brain is relatively immune to normal levels of dopamine when
13  people have clinical depression and, therefore, most
14  antidepressant medications work either directly or indirectly
15  to intensify the brain's sensitivity to dopamine so that our
16  spirits are lifted and the depression eases.  Dopamine
17  honestly is released during any pleasurable experience.
18      Cocaine is the most potent drug that's been identified
19  which blocks the reuptake and stimulates the release of large
20  amounts of dopamine in the brain, and, hence, it produces
21  variant euphoria.  So, pretty much all addictive drugs that
22  we know of, from nicotine to marijuana, from heroin to
23  cocaine, including things like alcohol and Valium and even
24  prescription pain medications, all either directly or
25  indirectly increase dopamine levels in the brain.  Dopamine

PARRAN - DIRECT

3-39

1  is clearly a final, common pathway of addictive drugs.

2  Q.  Now, Dr. Parran, what I'm going to ask you is this

3  question:  Based on all of the materials you were provided

4  which you reviewed in connection with this matter, and

5  drawing on your professional experience and knowledge, do you

6  have an opinion, to a reasonable degree of medical certainty,

7  whether Mr. Hicks was cocaine- or chemically dependent at the

8  time he committed the offenses in question?

9  A.  Yes, he certainly was cocaine dependent and alcohol

10  dependent and, hence, he had chemical dependence with a drug

11  of choice, of cocaine, and a secondary drug of choice, of

12  alcohol -- that would be the current terminology we use

13  clinically.

14  Q.  You described how the cocaine affects an individual

15  pharmacologically; correct?

16  A.  (Nods head affirmatively.)

17  Q.  Could you tell us what cocaine psychosis is?

18  A.  Yes.  I just described the sort of three pharmacological

19  effects of a single dose of cocaine:  Peripheral nerve

20  numbing, of how the drug was administered, and then sort of

21  systemic rush of a surge of norepinephrine, and then central

22  release of dopamine and euphoria.  That's what happens when

23  anyone takes a single dose of cocaine.

24      As people take more and more cocaine, as people

25  repetitively administer cocaine, several things happen:  Less

PARRAN  -  DIRECT

3-40

1   and less dopamine is released because the dopamine nerves in

2   the brain only have a certain supply.  Since the cocaine

3   stimulates too much release of dopamine and doesn't let the

4   nerve take it back up to recycle it, the nerve becomes

5   depleted of dopamine and, hence, subsequent administrations

6   of the drug produce lower and lower amounts of euphoria.  At

7   the same time when the drug wears off, people have what is

8   called dysphoria, or a hangover.  It's almost better to

9   grasp --

10  Q.  Is it easier to chart that?

11  A.  The euphoria -- it would be easier to draw it out.

12          MR. MEZIBOV:  Your Honor, may I use the chart?

13          THE COURT:  We'll recess and he can draw his

14  diagram.

15          MR. MEZIBOV:  Thank you, Judge.

16          THE CLERK:  All rise.

17      (At 10:12 a.m., a brief recess was taken.)

18                      * * *        (10:35 a.m.)

19          THE COURT:  Is the petitioner ready to proceed?

20          MR. MEZIBOV:  Yes.

21          THE COURT:  Respondent ready to proceed?

22          MR. WILLE:  Yes.

23          THE COURT:  Proceed.

24  BY MR. MEZIBOV:

25  Q.  Dr. Parran, during the break you have prepared a couple

PARRAN - DIRECT

3-41

1   of exhibits for us; have you not?

2   A.   Yes, I have.

3   Q.   And we were talking about cocaine psychosis and the

4   pharmacological effects of that.

5   A.   Yes.

6   Q.   Could you, with the Court's permission, come down and

7   show us what you prepared for us?

8   A.   Okay.

9            THE COURT:   Proceed.

10           MR. MEZIBOV:   Your Honor, with your permission.

11   Maybe if we all came closer.  Is it okay?

12           THE COURT:   I can see.

13           MR. MEZIBOV:   Okay.

14      (Witness positioned by the easel.)

15   A.   What I've tried to graph out here is the effects that one

16   might receive from the administration of a fixed dose of

17   cocaine by two different routes.

18      What I've drawn in a solid line here, sort of this wavy

19   shape, is the effect that one might receive from snorting or

20   intranasally administering perhaps 10 milligrams of cocaine.

21      And along this axis here is sort of a person's mental

22   state, base line, euphoria and dysphoria, and at the bottom

23   end of dysphoria, paranoia.

24      And what I've drawn along this axis is time.

25      If a person snorts, for example, 10 milligrams of

PARRAN  -  DIRECT

3-42

1   cocaine, it takes about two minutes for a person to really
2   start getting high.  It's because cocaine is fairly slowly
3   absorbed across the nose membrane and there isn't very much
4   membrane in the nose to absorb it.

5       Also, we mentioned that one of cocaine's initial effects
6   is to produce a lot of norepinephrine in the system, a lot of
7   adrenaline in the system, and that causes a spasm of smooth
8   muscles which closes down blood vessels.  So, there isn't
9   much blood to the nose when one snorts, so the cocaine is
10  slowly absorbed.  The peak euphoria is after 20 minutes.  The
11  total duration of euphoria is 40 minutes, possibly a little
12  longer, possibly a little shorter, and then there is
13  dysphoria, there is a hangover.  And as with any
14  mood-altering drug that a human self-administers, the
15  euphoria is always followed by dysphoria.  It doesn't matter
16  if it is alcohol or nicotine or cocaine.  And the intensity
17  of the low is pretty directly proportional to the intensity
18  of the high, to use the example of alcohol that many people
19  are more familiar with.  How intoxicated a person gets is
20  proportional to their hangover.  And it'd take approximately
21  the same time to come back to base line from dysphoria to
22  euphoria, that is, if you snort cocaine.

23           THE COURT:  So the episode is 80 minutes?

24           THE WITNESS:  Eighty minutes from snorting cocaine,
25  yes.  When you look at this kind of a curve, you see a curve

PARRAN - DIRECT

3-43

1    that actually resembles having a mixed drink at a party.  A
2    person, after a little while, gradually becomes a little
3    disinhibited (sic) or euphoric.  It wears off after a period
4    of time with dysphoria and a person comes back to base line.
5        If you take those same 10 milligrams of cocaine, instead
6    of administering intranasally, if you use it in an I.V. or if
7    you smoke it -- it is just that the cocaine that was
8    available in 1985 generally was cocaine hydrochloride, the
9    acid form of cocaine, it was not smokeable.  Cocaine
10   carbonate (phonetic) or base, so-called freebase, is crack
11   cocaine.  This is what's marketed now and it is easily
12   smokeable by changing it from its acid to base form, which
13   most people cocaine dependent smoke it.  Back in '85, most
14   people with cocaine dependence couldn't turn cocaine
15   hydrochloride into cocaine chlorate (phonetic) and smoke it,
16   so they tended to use it in an I.V.  And if you take the 10
17   milligrams of cocaine, if I had drawn it proportionally, this
18   area below this curve here should be equal to the area under
19   this curve here because it's the same 10 milligrams of
20   cocaine.  But what happens is this onset of the high begins
21   in 15 to 30 seconds instead of two minutes.
22            THE COURT:  That is I.V.?
23            THE WITNESS:  I.V., or smoking.  But for purposes
24   of this discussion, I.V.  It begins in 15 seconds; takes
25   about that long for blood circulation to move through the arm

PARRAN  -  DIRECT

3-44

1   to the inferior vena cava to the lungs to the brain.  It
2   peaks at about two minutes.  It is pretty much done, in terms
3   of the measurable or reported euphoria, within about ten
4   minutes, and then there is a very deep dysphoria that follows
5   the very high euphoria, and then much more gradually the
6   dysphoria comes back to base line.

7   Q.  What is the impact or the dysphoria with respect to the
8   paranoia that you've also outlined on the chart?
9   A.  Well, if a person uses a small amount of cocaine I.V.,
10  they get very intensively euphoric for a short period of time
11  and then their actual mood, their spirits -- this is what is
12  called dysphoria, depression, despondency, lack of interest
13  in anything in life, except perhaps using more cocaine is
14  what sort of dysphoria would be defined as.  And if the
15  dysphoria gets deep enough, people tend to repetitively
16  report paranoid ideation, paranoid feelings, and that will
17  become more important when I show you the next graph which
18  demonstrates multiple self-administered doses of cocaine.

19      The reason why I said if a person shifts to an I.V. form
20  of cocaine from a snorting form of cocaine that it indicates
21  to me addiction, is that when a person is this high, this is
22  not a "social high."  The high is so intense at this point
23  that the human brain has a tough time processing other
24  stimuli.  When a person is this intoxicated, it's often
25  considered a so-called social lubricant.  When a person is

PARRAN  -  DIRECT

3-45

1   this intoxicated, it probably doesn't matter to the person

2   whether they are at a party or isolated.  It's just tough to

3   interpret much else here.  And then the low is so low, the

4   hangover is so intense, that most social users of the drug,

5   whatever that drug may be, if they're used to do doing this

6   and they ever do this kind of intense experience with the

7   drug, they say "This is too high.  This is too low.  The

8   whole thing was gone too quick.  I'll never do that again."

9        When a person has the disease of addiction, this is

10  interpreted, this intense high is interpreted as Nirvana.

11  And this intense low, by some strange neurochemical mechanism

12  of addiction that we don't -- that we haven't identified yet,

13  this intense low is actually interpreted by the addicted

14  brain as a reason to use again now, which is the difference

15  between social users of mood-altering substances and people

16  with chemical dependency.  It is clearly a brain lesion.  It

17  is clearly a disease of neurochemistry.  But we don't know

18  why this -- what would be a called a negative reinforcer, a

19  reason not to do that behavior again -- is interpreted in the

20  addicted brain as a reason to use now.

21  Q.  Before we turn the chart, for purposes of the record

22  we'll indicate that Dr. Parran has signed his name and

23  initialed his first chart.  We've marked that as Exhibit 15.

24  A.  Seeing this sort of basic pharmacology of cocaine, sort

25  of regardless of chemical dependency or not, this is the same

Case: 4:07-cv-00880-JG  Doc #: 47-16  Filed: 07/14/17  89 of 269.  PageID #: 13094

PARRAN - DIRECT

3-46

1  graph --

2     (New chart displayed.)

3  A.  -- that typifies a cocaine binge or a person who

4  repeatedly self-administers cocaine by the I.V. route, as is

5  evidenced in this case.

6  Q.  This is again marked Exhibit 16 and bears your initials

7  and the date.

8  A.  Yes.  Yes.  What happens is that the initial use of the

9  cocaine produces an intense euphoria that goes away

10 relatively shortly; but the dysphoria lasts a long time.  The

11 dysphoria tends to produce in a person with an addiction an

12 overpowering urge to use again.  And so they use again, but

13 this time the place where they start from is actually at a

14 low level, as opposed to a normal base line.

15            THE COURT:  I'm sorry.  This is your addict?  Is

16 this your addict?  Are we dealing now with an addict?

17            THE WITNESS:  Yes.  A person with addiction, yes.

18            THE COURT:  All right.  And you say "a long time."

19 How long?

20            THE WITNESS:  The dysphoria after a single

21 administration of cocaine can certainly last -- can certainly

22 last 80 minutes.

23            THE COURT:  Well, now on the other chart it was a

24 short time, you told me.

25            THE WITNESS:  The dysphoria peaks soon, but it has

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5408

PARRAN - DIRECT

3-47

1   a gradual tail.

2         THE COURT:  But now you're changing it.  You had it

3   about 50 or 60 minutes, and now you're changing to 80

4   minutes.  Aren't you?

5         THE WITNESS:  Well, this is the dysphoria, or the

6   -- or the intense low that people feel.  They gradually come

7   back to base line, but the craving for more cocaine is

8   described to last -- to last significantly longer than that.

9   But this is actually the low mood state, and this is 60

10  minutes, 50 minutes, somewhere in that range.

11        THE COURT:  I'm just using your charts now.

12        THE WITNESS:  Okay.  That's fine.

13        THE COURT:  So, the line, the diagonal line that

14  you were just talking with before I interrupted you --

15        THE WITNESS:  Yes.

16        THE COURT:  -- is a 60- to 80 minute line?

17        THE WITNESS:  Certainly an hour.

18        THE COURT:  All right.

19        THE WITNESS:  Certainly an hour.

20        THE COURT:  So in Mr. Hicks' case, we're dealing

21  now with the first hour?

22        THE WITNESS:  This would be the first

23  self-administration, so it would be about the first hour.

24        THE COURT:  So the euphoria was felt again --

25  before the euphoria was felt again, we're dealing with an

PARRAN  -  DIRECT

3-48

1   hour of time?

2          THE WITNESS:  I'd have to go back and look through

3   the notes for exactly the period of time that was reported,

4   but it's -- it's my recollection now that the first

5   administration took place, and then within -- between an hour

6   and two hours the second administration took place.  And then

7   once again there is some differing reports of between three

8   and five injections; about an hour or so, maybe two hours,

9   with a third injection, yes.

10          THE COURT:  Proceed.

11          THE WITNESS:  Okay.

12   A.   (Continuing) What will typically happen in a cocaine

13   binge is a person will use cocaine, they'll feel high,

14   they'll feel very low.  They'll grad -- their spirits will be

15   very low here.  They'll self-administer again sometime.  When

16   they self-administer again, the peak of the high is

17   significantly lower than the initial, partly because they're

18   starting from a lower base line state when they use again,

19   but partly because there isn't as much dopamine in the

20   original nerve as there was in the first place because so

21   much was released in the initial -- in the initial use of the

22   drug.  And so you're dealing with a functionally

23   dopamine-depleted nerve and, hence, it can't release as much

24   dopamine.  So, with the second administration, people never

25   report being anywhere near as high as with the first

3-49

1   administration, and always report that the low is much lower

2   than after the first administration.

3       So, if we have a second administration, at some point

4   during that same binge, honestly these administrations in

5   some cocaine binges are every 15 to 20 minutes.  Sometimes

6   they're spaced out by a few to several hours.  Usually it's

7   in the range --

8           THE COURT:  When do they become fatal?

9           THE WITNESS:  Cocaine -- cocaine binges actually

10  are surprisingly rarely fatal, considering we have about

11  three million people intermittently binging on cocaine per

12  year in the United States.  We only have about somewhere

13  between a thousand and 1500 fatal overdoses from cocaine per

14  year.

15          THE COURT:  How much -- how much does that take?

16  Or does it vary with the size of the individual?  Or is it

17  something that can be -- can't be determined except on a

18  case-by-case basis?

19          THE WITNESS:  It is a case-by-case-basis.  The

20  reason being, because the fatality of cocaine tends to

21  involve one of three mechanisms -- actually four; the most

22  common I'll get to last.  The first is spasm of the coronary

23  arteries, smooth muscle in the arteries in the heart which

24  spasm lead to a heart attack and then death.  And that is

25  just sort of an intermittent thing that is unpredictable.

PARRAN  -  DIRECT

· 3-50

1    Secondly, a seizure.  And it's entirely unpredictable
2  when a person can have a seizure associated with cocaine
3  use.

4    Thirdly, rarely will people have a stroke from cocaine
5  use, and it can be a large stroke and produce death.  The
6  most common way that cocaine produces death is suicide, and
7  there's lots of suicides as well as homicides associated with
8  this sort of bizarre paranoid behavior that begins when
9  people are in the midst of a binge.  We don't have good
10  numbers on that.  The numbers that I gave you of about 1500
11  people a year, maybe 2000, who die of cocaine overdoses are
12  from heart attacks, seizures or strokes.

13        THE COURT:  And you say that cocaine base leads to
14  this episode that you've just described in Exhibit 16 more
15  than just powder cocaine?

16        THE WITNESS:  Actually, cocaine hydrochloride,
17  powdered cocaine and cocaine base, rock cocaine or crack
18  cocaine, are pharmaceutically the same thing.  It's -- it's
19  just that in order to get enough cocaine hydrochloride, the
20  powdered cocaine, into one's system to experience this, it
21  really has to be used in an I.V., and most Americans are
22  terrified of needles and won't use an I.V.  Cocaine base is
23  pharmaceutically identical.  It is just if you smoke cocaine,
24  it is all instantly absorbed by the lung.  The nicotine
25  companies have known that any mood-altering substance that

PARRAN - DIRECT

3-51

1  can be volatilized or vaporized and, hence, inhaled, can be
2  instantly absorbed by the lung and, hence, delivered pretty
3  much directly to the brain, and so it's two different
4  delivery systems for really, honestly, the same drug.

5      THE COURT: And it's only cocaine base that can be
6  delivered to the lung?

7      THE WITNESS: Yes. Cocaine hydrochloride, powdered
8  cocaine. If you heat it, you have to heat it to 400 degrees
9  centigrade for it to burn, and then it actually burns and
10 denatures, rather than vaporizes. Cocaine chlorate -- or
11 what we know as crack cocaine, rock cocaine or base -- if you
12 heat it, since it's in the base form, it vaporizes at a
13 hundred degrees centigrade; temperature that is easy to reach
14 in, you know, any sort of smokeable form. And, hence, since
15 it volatilizes and vaporizes, it is able to be smoked,
16 inhaled in the lungs and absorbed directly by the lungs, much
17 like nicotine. And the -- I hate to say it, but the
18 advantage -- but the advantage of delivering a mood-altering
19 drug to the brain by the lung is that it's all absorbed into
20 the lung immediately in a very small -- one heartbeat's worth
21 of blood, when then in the next heartbeat it gets delivered
22 to the left heart, which then in the next heartbeat is
23 delivered to the brain. So, we're really talking from the
24 time you smoke cocaine it is -- from the time you inhaled to
25 the time the cocaine hits your brain is, for all practical

PARRAN  -  DIRECT

3-52

1  purposes, three to four heartbeats, and so it's an even

2  quicker, more concentrated way to deliver a boulis of the

3  drug to the brain, hence, it tends to, if anything, be even a

4  little bit more reinforcing with even a little bit more acute

5  onset and possibly a higher peak than using an I.V.

6         THE COURT: So, the use of cocaine base is more

7  likely to result in an episode that you've described on

8  Exhibit 16 than the use of cocaine hydrochloride?

9         THE WITNESS: The use of cocaine base is just as

10  likely to produce this kind of a binging situation

11  (indicating) as the use of cocaine hydrochloride I.V.  And

12  the use of cocaine hydrochloride by snorting, the intranasal

13  route, tends to be less likely to produce this kind of a

14  phenomenon.

15         THE COURT: And this episode you say results in

16  violence or death?

17         THE WITNESS: Well, yes.

18         THE COURT: Violence against self, violence against

19  others?

20         THE WITNESS: Especially with subsequent

21  self-administrations. Each time a person uses, the high is

22  less high and the low is even more low. With more and more

23  dysphoria, more and more paranoia, more and more intrusive

24  thoughts, more and more difficulty interpreting normal

25  stimuli as being non-threatening. It tends to lead to people

PARRAN  -  DIRECT

3-53

1 arming themselves on often a regular basis, using more and
2 more by themselves, being more paranoid in their ideation,
3 misinterpreting external cues and participating in what
4 everyone else would observe as unprovoked random violence.

5 THE COURT: As a practical matter, a user of
6 cocaine -- "addict," if you will -- the only way they can use
7 it or assimilate it is by self-administration; isn't it?
8 There is only one to administer to?

9 THE WITNESS: No, I've interviewed lots of patients
10 with positive toxicology tests for cocaine, all of which are
11 certain someone slipped it in their drink. And when the
12 story comes out, that doesn't happen.

13 THE COURT: Proceed. I'm sorry.

14 THE WITNESS: No. The important aspect with this
15 kind of a graph is that as people in the midst of a binge
16 with cocaine, repetitive self-administration of cocaine, as
17 they become more and more dysphoric, the paranoia and then
18 more clearly psychotic symptoms of cocaine psychosis become
19 prominent. The estimates are that when people use cocaine
20 I.V. or they smoke it, and if they use it in an intermittent
21 binge crack pattern, the estimates are at least 50 percent
22 and probably 70 percent of people develop significant
23 paranoid ideation during the end -- during binges after the
24 initiation, or binges lasting for a few to several hours
25 after the end of a binge; 50 to 70 percent. One would say,

3-54

1    "Well, if this drug produces euphoria first and then all of
2    this terrible dysphoria and more and more paranoia and after
3    a while a person is using and not getting back to base line,
4    why on earth do people continue to use it?" -- that is
5    addiction.   If I had an answer to that, it would be even
6    simpler to treat people.

7        The paranoia, sort of the continuum from dysphoria to
8    paranoia to psychosis with cocaine -- and it honestly is a
9    continuum, almost like a continuum of white to black with
10   many shades of gray in between -- is one which has clearly
11   been identified and honestly was identified back in the early
12   '80s as a phenomenon which was susceptible to something
13   called the "kindling effect." And let me just describe the
14   kindling effect and then I'll stop and answer questions, I
15   guess.

16       The kindling effect was first identified in manic
17   depressive disease or so-called bipolar disease, where it was
18   observed that if a person had manic depressive disease, when
19   they first developed it, their manic episodes would last a
20   long time and not be real manic and they're depressive
21   episodes would last a long time and not be very depressed.
22   And as a person went through the cycling of manic depressive
23   disease, it required less stimulation of a mania to bring
24   upon a more and more intense depression and then less
25   stimulation of a depression to bring on more an more intense

3-55

1    mania. And it seemed that person seemed to cycle more and

2    more rapidly between mania and depression and it's been

3    hypothesized as an electrical phenomenon in the brain called

4    the Kindling phenomena.

5      It was next demonstrated in the early '60s in Lexington,

6    Kentucky at the Addiction Research Center at the Federal

7    Penitentiary for Drug Offenders that the Kindling phenomenon

8    was clearly present in opium dependents. The way that they

9    studied this is, they basically took federal prison

10    volunteers who had a history of opium dependence and they

11    gave them morphine for six weeks -- six times a day by

12    injection and then they put them in a small room with bizarre

13    wallpaper for five days and let them go through untreated

14    withdrawal. And they took -- and morphine withdrawal lasts

15    for five days. Then they'd take them out of that room and

16    put them back in prison for six months with no morphine, and

17    they would bring them back and just put them back in the room

18    with bizarre wallpaper without any morphine, and 100 out of

19    100 patients would develop dilated pupils, runny noses,

20    objective and substantive signs and symptoms of opiate

21    withdrawal just being in the context where they had been in

22    previously untreated withdrawal before. Sort of a Pavlovian

23    learned response, one might say.

24      What was demonstrated in research in the late '70s and

25    the early '80s with cocaine psychosis and with

1    cocaine-associated seizures is that clearly a kindling

2    phenomenon is present with cocaine as well, especially in the

3    area of cocaine-associated paranoia, cocaine-associated

4    psychosis and cocaine-associated seizures.  The earliest

5    research was with the seizure in the late 1970s.  They

6    identified people tended not to have a cocaine-associated

7    seizure unless they had been on an extensive binge,

8    tremendous quantities of cocaine, a couple thousand dollars

9    worth of cocaine on a weekend, and then they would finally

10   surpass the level of cocaine toxicity in their system where

11   they would have a seizure.  And once they had that one

12   seizure, subsequent use of cocaine to a much lower level --

13   just two or three or four administrations of cocaine -- could

14   produce a seizure in the same person, where previously it had

15   required 20 or 30 self-administrations.  Once the wiring

16   mechanism or the response of a seizure to cocaine

17   intoxication had happened in those people's brains, it took

18   less of an insult from the drug to produce the same effect.

19       What was then identified in the early 1980s is that it

20   was exactly the same with cocaine-associated paranoia and

21   cocaine psychosis.  Then originally when people began using

22   cocaine in an addictive way, it required a lot of cocaine, a

23   heavy, heavy binge maybe for a day and -- a day or two days

24   for a person to really start getting toxic from a paranoid

25   and sort of psychotic delusional standpoint.  But once they

PARRAN - DIRECT

3-57

1   had reached that, subsequently -- even if they had been off

2   cocaine for six months or a year -- subsequently only a

3   couple, three, four, five administrations of cocaine could

4   produce similar paranoid and psychotic symptoms, a kindling

5   phenomena, which was identified in the literature in the

6   early '80s -- clearly in the early '80s but also in --

7   associated with amphetamine psychosis, and cocaine is

8   scheduled as an amphetamine-like drug.  The kindling

9   phenomenon with amphetamine psychosis has been well known

10  since the 1950s. I'll stop.

11  Q.  Dr. Parran, I'm going to ask you to resume your seat, if

12  you would.

13      (Witness regained the witness stand.)

14  Q.  Dr. Parran, you've mentioned three central features, I

15  believe, in this discussion here:  One is cocaine psychosis;

16  two is this concept of binging; and third is that of the

17  concept of kindling, kindling effect.

18      Could you relate all of those concepts or phenomena with

19  the history of John Hicks as you understood it from the

20  materials that you were provided?

21  A.  Yes.  Certainly Mr. Hicks, his past history over the last

22  three to four years prior to the crimes that were committed,

23  demonstrated an intermittent binge-type dependence or

24  addiction on cocaine.  His pattern clearly was a binging-type

25  pattern where he wouldn't use it for several days, often

3-58

1   several weeks; occasionally a few to several months. But

2   then once he did use, he'd use repetitively and then try to

3   stop it. And once -- once he had used, he used repetitively

4   on that occasion and then he stopped it, but he'd only be

5   able to be stopped for a short period of time and then he was

6   repetitively again. Sort of a gradually accelerating

7   intermittent binge pattern. Periods between binges got

8   shorter and shorter. That certainly is what he described in

9   his interview with Dr. Baum in 1990 and it is what he

10  described to some degree in his interview with Ms. Leahy.

11      And certainly the descriptions that Mr. Hicks gave to

12  Ms. Leahy as well as the detectives in Knoxville when they

13  interviewed indicated there was a cocaine binge that he had

14  -- that the events of August 4th or 5th, I can't remember

15  which date it was, had the hallmarks of a binge: Hadn't used

16  for a while, pay day, got paid, got his money, all of his

17  plans for the day went out the window; used cocaine --

18  actually initially had a little bit of trouble getting the

19  initial cocaine and started getting edgy and restless and

20  irritable, used the cocaine, felt very high. As it went

21  away, he got increasingly crescendo urgings or cravings to

22  use more cocaine, again began to cast about on how to get

23  money for more cocaine, et cetera. So, it's -- it's classic

24  for a cocaine binge.

25      The paranoia, moving towards cocaine psychosis, is

3-59

1   actually there's some evidence in the interview done in

2   Knoxville with the detectives that supports there being

3   paranoia, intrusive thoughts, difficulty following through

4   and maintaining one thought pattern, erratic, irrational, and

5   uncharacteristic out-of-control behavior on his part is all

6   there.  Even in the interview it was concluded by people, you

7   know, who will -- who are law enforcement professionals, not

8   clinicians -- had clinicians been conducting that interview,

9   I think several points would have been followed up on and a

10  lot more data in the interview, but, I think there is clearly

11  some data there and then much more data in the interview done

12  by Ms. Leahy about the mental state or the thinking state,

13  psychological state that Mr. Hicks was in after or during

14  this binge of cocaine.

15      And then the kindling phenomenon also is -- there's some

16  evidence for the kindling phenomenon in Mr. Hicks' history in

17  the assessment done by Dr. Baum, the really good chemical

18  dependency evaluation done by Dr. Baum in 1990, as well as

19  some in Ms. Leahy's interview indicating previous sort of

20  binging patterns and suspiciousness and paranoid ideation in

21  the past when he had used the cocaine -- much more heavily

22  in the past than at this time.  So, I think there is evidence

23  of all of that.

24  Q.  Now, let me ask you -- let me ask you some ultimate

25  opinions in a moment.  But before I do, in looking through

PARRAN - DIRECT

3-61

1    paranoia comes on after the intoxication has worn off, when
2    the dysphoria has kicked in, and it tends to get worse and
3    worse with subsequent administrations.  So, the dysphoria
4    paranoia and psychosis tends to increase with subsequent
5    administrations, whereas the intoxication tends to decrease
6    with subsequent administrations.

7        And clearly the literature, both now and in the early
8    1980s, indicates that once this severe paranoia or cocaine
9    psychosis begins, it tends to last for a matter of hours
10   after the last administration of cocaine.  It rarely, if ever
11   -- and, frankly, lasts up until the time of the crash.  What
12   I teach medical student residents -- honestly, what I teach
13   Emergency Room doctors, I have many talks about the cocaine-
14   intoxicated and cocaine-agitated person.  What I especially
15   tell Emergency Room doctors, because they're the ones that
16   see people in this state all the time, is when a person has
17   been binging on cocaine, they're getting more and more
18   agitated, paranoid, irritable, interpreting external stimuli
19   as threats.  They frequently also are experiencing tightness
20   in the chest, chest pain, other things, so they often wind up
21   in the Emergency Room.  And when they come in, they're very
22   dangerous and they need to be sedated immediately in order to
23   -- in order to ensure the safety of the Emergency Room
24   staff.  Once -- what tends to happen is a person binges on
25   cocaine for a certain period of time and then there is a

3-62

1   peri-binge period of a few hours, several hours.  People are

2   restless, irritable, paranoid, and then they crash.  And the

3   crash means basically going to sleep and sleeping it off and

4   eating a lot, because in the midst of a binge, the

5   norepinephrine effects of cocaine cause people not to eat and

6   not to sleep.  So, the recovery -- the crash from cocaine

7   tends to involve hypersomnolence and hyperphasia:  Eating a

8   lot of things and sleeping a lot.

9       Rarely -- in fact, clinically it is almost unheard of now

10  -- people still have some cocaine psychosis after they wake

11  up at the end of the crash.  Very, very rarely.  But,

12  typically, a fair number of people are paranoid right up

13  until the time of the crash, of the time when they fall

14  asleep.

15      When we look at -- at this case and we hear the

16  descriptions of a single use, strong cravings to use more,

17  hocking a VCR, erratic thoughts, commission of a murder, use

18  of more cocaine, commission of another murder and sort of

19  agitated period of time where a person is hypervigilant, goes

20  home, sees their spouse, used some sedating drugs -- people

21  frequently self-treat that agitated, restless time with

22  things such as marijuana or alcohol, sedatives which were

23  self-administered, and then leaving, driving, still being

24  sort of irrational, crashing, going to sleep, waking up and

25  driving to the police station and turning one's self in and

1   confessing, is classic for cocaine psychosis.

2   Q.  Now, I think you've answered in a substantial way my next

3   question, but let me ask you anyways:  What are the outside

4   signs and symptoms of cocaine psychosis?

5   A.  Let me add -- I'll list a few things and then I'll

6   specifically list a few things that are not described with

7   cocaine psychosis which I think have shown up in some of the

8   transcripts as confusing points.  Cocaine psychosis, or --

9   cocaine psychosis is a phenomenon which is characterized by

10  paranoid thoughts, misperceptions, intrusive thoughts.  So

11  the feeling, like thoughts are coming into one's head,

12  suddenly having a thought, frequently irrational, intrusive

13  thoughts, hallucinations, overwhelmingly tend to be either

14  auditory, hearing voices -- although they're usually

15  interpreted as thoughts as coming in their mind -- but

16  hearing voices and tactile -- occasionally people feel what

17  is called cocaine fleas, or feel things crawling on their

18  skin, less and less ability to follow consistently through on

19  a plan, more jumping and jumping from one plan to another and

20  from one thought to another and more and more bizarre ways.

21      What typically is not present with cocaine psychosis is

22  florid delirium.  I mean, these people aren't talking out of

23  their minds, acting, you know, bizarrely, schizophrenic or

24  talking like they're in delirium or DTs, or whatever, but

25  their thoughts and their behaviors are erratic and irrational

1  and frequently moving from being mildly paranoid, to being
2  armed, to being actually violent.
3  Q.  Now, were these classic signs and symptoms of cocaine
4  psychosis present in the record that you have reviewed
5  relating to Mr. Hicks?
6  A.  Yes.  I think as I mentioned there's evidence of it even
7  in the interview with the detectives in Knoxville, although
8  that interview was an interview aimed at an entirely
9  different topic.  I mean, it was a difficult task.  Even
10  given the fact it was, you know, a law enforcement,
11  professional interview, there is evidence in that interview
12  that some of this was going on, and a lot of evidence in the
13  interview done with Ms. Leahy.
14  Q.  And, Dr. Parran, do you have an opinion, to a reasonable
15  degree of medical certainty, whether Mr. Hicks was in the
16  throes of a cocaine psychosis at the time of these two
17  murders?
18  A.  Yes, I -- in reading the -- having read the transcript
19  from the confession and having read the history of the client
20  in terms of the past, my initial opinion and my overwhelming
21  opinion since then is that from a clinical standpoint, if I
22  had to create a differential diagnosis, my differential
23  diagnosis in this case would be cocaine psychosis, cocaine
24  psychosis, cocaine psychosis, cocaine psychosis, and then
25  maybe something else, but I can't imagine what else it would

PARRAN  -  DIRECT

3-65

1   be.

2   Q.  What were the indicia, if you will, of cocaine psychosis

3   that you observed in the record as surrounding the murder of

4   these two individuals?

5   A.  What would be the addition?

6   Q.  The indicia, the indications that Mr. Hicks was in the

7   throes of cocaine psychosis when these two murders were

8   committed.

9   A.  I can -- I can open up the transcript and give you a

10  couple specific examples --

11  Q.  That would be helpful.

12  A.  -- if you like.

13      The first I'll mention is the transcript from the

14  Knoxville Police Department, and this transcript on its

15  second page -- or on the first page, it says, "I went over to

16  this guy's house that I knew and had some cocaine.  So I

17  bought me some."  And then there's some information about the

18  person he bought it from, and then "I used it and some after

19  I went home and then that craving came, you know, to get some

20  more dope.  So what I did, I called the man and asked if he

21  had some for me.  He said okay.  So I took the VCR we had at

22  the home.  So I went over there, and a little bit later I

23  gave it to him, so he gave me some more.  So I told him I

24  would pay him back tomorrow.  I realize I didn't have the

25  money to get the video recorder because it wasn't mine, so I

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5426

PARRAN  -  DIRECT

1   got to thinking -- I said I've got to do something, you know,

2   because the video recorder didn't belong to me.  I knew

3   there'd be a lot of bullshit going on with my wife, so what I

4   did, I got to thinking well, since I'm supposed to have went

5   to the ball game -- well, I didn't. .Okay?  So I called her"

6   and he was calling his mother-in-law.

7       Those sorts of things, indicating sort of the person buys

8   some cocaine, doesn't have any more money, is moving toward a

9   cocaine binge regularly and routinely, hocks about anything

10  they have that's valuable in order to get some more cocaine,

11  and then once that's been done, frequently tries to figure

12  out how to get some more money, it becomes more and more

13  irrational.

14      So, "I need some more money.  Maybe I should go rob my

15  mother-in-law."  That's entirely irrational, compared to

16  robbing someone else who doesn't know you, who you would

17  knock over the head and would never recognize you.  That is

18  crazy.  But this man isn't crazy.  This man does haven't a

19  history of schizophrenia.  He doesn't have a history of

20  serious mental illness.  That is an indication there of

21  cocaine psychosis.

22      He states on the next page, "But getting back to where I

23  was just going to leave," he said to the detective he was

24  just going to leave the apartment, and then -- "So she was

25  wondering about that cage and what the bird cage had in it

3-67

1   and blah, blah, blah.  She turned around and I just grabbed

2   her and started strangling her."  That once again sounds

3   like, you know, sort of the erratic sort of impulsive

4   behavior of a person who's getting more and more sort of

5   psychotic on a cocaine binge.

6       A little further on they talk about finding a gun.  He

7   said -- the interviewer said, "You could not find the gun?"

8   And the defendant said, "Yeah, at first, then all of a sudden

9   I realized that.  I said, well, you know, Brandy knew I was

10  the last one here, so, you know, it was like I was, 'No, I

11  shouldn't do that to her,' you know."  That sounds very much

12  to me -- giving a law enforcement interview as opposed to a

13  clinical interview -- of a person describing intrusive

14  thoughts that are coming in that are bizarre and completely

15  irrational sort of, you know, coming into a person's mind.

16      "And so, after I got the money, I said 'I'll leave and

17  come back and clean up this mess.'  So I called the man and I

18  finally caught up with him."  I think that -- "...finally

19  caught up with him."  In the interview with Shirley Lehmann

20  (sic) later on, he talks about how he couldn't call the

21  person, there was no answer on the phone, the phone was busy,

22  he was pacing around the apartment, more and more edgy,

23  irrational, and dashed out and got more cocaine and came back

24  here and used cocaine right here in the same place.  Despite

25  having already gotten the money and gun and everything else

PARRAN - DIRECT

3-68

1   is -- is -- clearly the most likely clinical explanation is

2   cocaine psychosis.

3       So, he went and got some more cocaine. "And then must

4   have been around 12:30, something like that, I went on ahead

5   and shot up the dope. I got -- I got a 50-cent piece and all

6   of a sudden I got to thinking again" -- "I got to thinking

7   again," just typical cocaine psychosis and shortly thereafter

8   intrusive thoughts, "I started thinking again well, I'd

9   better go ahead and do this because she's going to be the

10  only" -- referring to Brandy, and so, you know, he committed

11  the second murder.

12  Q.  Well, is that evidence of rational thinking, to cover up

13  a crime, or does it reflect something else in your clinical

14  opinion?

15  A.  All of it -- I mean, from -- from the trying to figure

16  out how to unhock the VCR on is some of the most bizarre and

17  irrational thought patterns that one can imagine, or at least

18  that I can imagine, and indicates more and more paranoia and

19  bizarre behavior and is quite indicative of cocaine

20  psychosis.

21      Later, it says "It was in the living room, but I dragged

22  it to the bedroom" -- which is Maxine's body. "...then I got

23  to thinking I need to do something with it before someone

24  discovered it, so I was going to cut her in half and put her

25  in the freezer, and all of sudden I did and then I stopped."

PARRAN - DIRECT

3-69

1   I mean, that is crazy. That is not the actions of a person
2   who is -- whatever. And then --
3        THE COURT: You used the term "crazy," Dr. Parran.
4   Could you relate that to the opinions you've expressed about
5   cocaine and psychosis?
6        THE WITNESS: I'm using the vernacular "crazy,"
7   that is, bizarre thoughts and actions of a person who is --
8   who is clinically most likely involved in a cocaine psychosis
9   given a past history of no mental illness.
10   A. (Continuing) And then finally on the next page there
11   talking about the sexual abuse of the girl: First, you know,
12   I was thinking all weird. Thinking all weird." Here's a
13   person, a day later even, describing his own thoughts of, you
14   know, thinking all weird, and so those are the evidences in
15   the police report.
16     And then it takes some time, but reading through the
17   report from Ms. Leahy, there's what I consider to be just
18   much more data from a trained clinician interviewing about
19   these issues, asking followup questions about "What do you
20   mean 'thinking all weird'? What kind of thoughts were you
21   having?" -- and those sorts of things.
22   Q. Based on the information you were able to obtain from the
23   record, your conversations with Mr. Hicks and any other
24   materials that you were provided, do you have an opinion, to
25   a reasonable degree of medical certainty, as to the duration

PARRAN - DIRECT

3-70

1   of the cocaine psychosis which you've just testified about?

2   A.  The -- my best clinical judgment would be that the

3   cocaine psychosis and -- that the cocaine psychosis certainly

4   continued through the time that Mr. Hicks went home to his --

5   his and his wife's apartment.  Probably until the time that

6   he drove out of town and maybe until the time he actually

7   went to sleep in Knoxville.

8   Q.  Let me ask you this question --

9           THE COURT:  When did it start?

10  Q.  That was my next question, the onset.  In your opinion,

11  to a reasonable degree of medical certainty, what was the

12  onset of this cocaine psychosis?

13  A.  The onset was probably shortly after the second

14  self-administration of cocaine; the cocaine that was used --

15  the cocaine that was bought with the VCR.

16  Q.  Now, Dr. Parran, in your professional opinion, were the

17  Court and the jury properly and accurately informed through

18  the testimony of the witnesses who were presented at trial as

19  to the nature and extent of Mr. Hicks' cocaine dependency and

20  psychosis at the time he committed these acts?

21  A.  No.

22  Q.  And why is that?

23  A.  It's clear from my reading of the transcript that the

24  information that was provided about cocaine pharmacology was

25  inaccurate during the trial; that the information given

3-71

1   regarding the timing of -- the difference between cocaine
2   intoxication and the cocaine psychosis was not entirely but
3   largely inaccurate, and that the information that was given
4   about the signs and symptoms of cocaine psychosis were
5   substantially inaccurate.  The information given regarding
6   the expected onset of cocaine psychosis, based upon the
7   timing of the use of the drug, was inaccurate, as well as the
8   expected duration of cocaine psychosis.  That also was
9   inaccurate.  And, finally, the idea that cocaine psychosis
10  was more likely to happen in a person who was a chronic,
11  daily user of cocaine with day in and day out cocaine use,
12  which is actually very rare for people to actually do that
13  but even more rare for people who have cocaine psychosis, but
14  that was entirely inaccurate.
15  Q.  Dr. Parran, if you're able to do so, are you able to
16  refer to portions of the record in which you feel that there
17  were substantial inaccuracies or errors with respect to the
18  information that was provided to the Court and the jury
19  concerning Mr. Hicks' cocaine --
20  A.  Sure.
21  Q.  -- situation?
22  A.  Sure.  And I'll do it in whichever way is usually most
23  appropriate in these settings.  I can give the page and --
24  the page number and the line number.
25  Q.  Are you able to pinpoint who the witness is?

PARRAN  -  DIRECT

3-72

1   A.   If you want me to read the statement --

2   Q.   If you could summarize perhaps what the statements are,

3   but also if you could indicate which witness is providing

4   this inaccurate information to the jury.

5   A.   Okay.   The primary information which was inaccurate was

6   provided in the testimony of Nancy Schmidtgoessling, and her

7   testimony started on Page 1175.   The areas where the

8   inaccuracies were most notable is on Page 1178 -- I'm sorry

9   1187, where they talk about the difference between snorting

10  cocaine and using cocaine I.V.  And Dr. Schmidtgoessling gave

11  clearly wrong information from Line 22 on that page through

12  Line 6 on Page 1188.  The information -- should I read the

13  information, or just --

14  Q.   If you could summarize it.

15  A.   Okay.   Well, it basically said that that cocaine goes

16  into the bloodstream faster if you snort it than if you use

17  it I.V., which is wrong.  She says that the intensity of the

18  symptoms of the intoxication of cocaine are equal, whether

19  you used an I.V. or snort it, which is clearly wrong.  And

20  she said that the reaction would be -- that the only

21  difference between using cocaine nasally versus I.V. is that

22  the reaction might be quicker nasally rather than I.V., and

23  it is not the only difference and, in fact, that's wrong.

24      Then on Page 1191, starting at Line 11, they talked about

25  the levels of intoxication from cocaine being similar to the

3-73

1    levels of alcohol, various degrees of intoxication.  And the

2    question -- or the response of the expert was that they were

3    similar; that, you know, there were sort of a linear

4    intoxication effect from cocaine similar to alcohol, which is

5    -- which is not the case.  Cocaine has much too short a half

6    life to be able to look at levels of intoxication.

7        Then at the top of the next page on 1192, the question

8    was would cocaine be the same curve of dysfunction?  Can the

9    effect and degree of one's ability to perform depend upon the

10   amount that a person took in? -- meaning if you only took in

11   a little cocaine now, it will have a little effect, and if

12   you took a lot of cocaine, it will have a lot of effect.  And

13   the expert said "Yes," definitely demonstrating no evidence

14   of the knowledge of the kindling phenomena that we talked

15   about before where one has activated kindling with cocaine

16   addiction.  Even reasonably small amounts of the drug can

17   precipitate in large behavior, rational changes.

18       Page 1193, the description of why people die from

19   cocaine:  "In fact, when people die of cocaine overdose, it

20   is usually from a respiratory problem."  Virtually no one

21   dies of a cocaine overdose from a respiratory problem.  It is

22   a seizure, stroke or heart attack.  It has little to do with

23   the lung.

24       She then points out later on that page that this patient

25   -- or this defendant was able to retain his orientation and

1  his goal directedness and, therefore, he was not

2  significantly affected by cocaine when he was committing the

3  crimes.  As I described earlier, it is in the literature, and

4  in the 1980s, in the literature now, when a person is

5  involved in cocaine psychosis, they are oriented, they know

6  who they are, and where they are, and when it is.  They are

7  oriented to person, time and place.  They are nct delirious

8  and they frequently follow through with impulsive actions,

9  although they tend not to be able to follow through in a

10  single plan of action over an extended period of time.

11      And then, finally, throughout this entire section, all of

12  the statements were about the -- about whether he was

13  intoxicated at the time, not whether there was the dysphoria

14  and the paranoia and cocaine psychosis.

15      There's just a couple more here.  On Page 1195, starting

16  at line 18, the question is:

17          "Let's talk about that.  This stuff reaches a peak

18      in fifteen to twenty minutes."

19  And the response from the witness was...

20          "Yes, that is customarily thought to be the

21      peak."

22  Well, that certainly is not when you're using I.V. cocaine.

23  It is gone in ten.

24      The question then was...

25          "Then the person returns to normal later

PARRAN - DIRECT

3-75

1    rapidly?"

2    And the response was...

3            "Yes, usually sort of a crash, as they refer to

4    it.  It usually takes ten to fifteen minutes."

5    Actually, the crash is, after a binge, often a few hours

6    after a binge, which tends to last proportional to the length

7    of the binge.

8            "Question:  The whole thing is less than half an

9    hour?"

10           "Answer:  Not if there is something mixed in, but,

11   yes."

12           "Question: Doctor, did you actually" --

13   I'm sorry, the next page, 1196, pretty close to the end...

14           "Doctor, did you actually make an examination of

15   the life background as part of your history to determine

16   his work record, the way he dealt with his peers and so

17   forth?"

18           "Yes, I did."

19           "Question:  Did you see anything in there that

20   indicated either cocaine usage or chronic usage of

21   cocaine?"

22   And the answer on Page 1197 reads...

23           "I didn't see anything as far as chronic usage.  He

24   was regular to work, he was cooperative with his

25   co-workers, he was a good employee and reliable."

PARRAN  -  DIRECT

3-76

1    All of that information, given a history of binging on
2    several thousand dollars of cocaine a few years earlier, a
3    couple thousand dollars use of cocaine six months earlier,
4    and given the history of a person who went to work and
5    participated normally in working during the day and wound up
6    committing two murders and other things later during the
7    night, is absolutely diagnostic of cocaine addiction and
8    cocaine psychosis, and her statement is that is that it's no
9    indication of chronic use.  I think -- I think that's it.
10   Q.  Dr. Parran, in your professional opinion, based on the
11   information that was presented at trial and which you've just
12   commented on, do you believe the jury was fairly and
13   accurately apprised of the effects of cocaine on Mr. Hicks'
14   conduct that night?
15   A.  Absolutely not.
16   Q.  Okay.  For the reasons you've stated?
17   A.  Yes.
18   Q.  Now, Dr. Parran, this case took place in 1985; that's
19   when the trial took place.  What was the current state of
20   medical knowledge of cocaine and cocaine psychosis at that
21   time?
22   A.  Well, that's a very good question.  Certainly we know
23   more about cocaine now than we knew in 1985 and 1986, but
24   that's because we've experienced our current cocaine epidemic
25   which started honestly in probably 1976.  But we've

PARRAN  -  DIRECT

3-77

1   experienced it for another decade since then.  But in 1985

2   and '86 -- and I think the trial actually took place in

3   February of '86 -- cocaine addiction was well-known.  It was

4   in the DSM-III, and then subsequently published a little

5   later in 1986, the DSM-III-R, and now in 1995 the DSM-IV,

6   cocaine psychosis and stimulant psychosis.  Amphetamine

7   psychosis has been described in the literature since the

8   1950s.  In fact, there are a few descriptions later in the

9   Western European literature, the German literature from the

10  1930s, of paranoid ideation and bizarre behavior from

11  cocaine.

12      But what would be most available to practitioners in our

13  community in Ohio in 1985 are several articles from

14  well-respected psychiatric journals and widely-read

15  psychiatric journals from the mid- to late-'70s right up

16  until 1986, and certainly since.  They talk about cocaine

17  psychosis, paranoia associated with cocaine, these long last

18  -- longer lasting effects of cocaine than just the mere

19  intoxication.

20  Q.  Dr. Parran, let me stop you there and ask if I might hand

21  you an exhibit, Plaintiff's Exhibit 17.

22      Could you identify that exhibit for us, please?

23  A.  Yes, it's a face sheet or a Xeroxed copy of a face sheet

24  of a list of articles in the medical literature, that I wrote

25  down the initial or the earliest one being in 1931, the last

3-78

1  one being in 1986, early 1986 -- I think published in

2  February of 1986 -- basically listing articles in the medical

3  literature about cocaine dependence, cocaine addiction,

4  including references and descriptions of cocaine paranoia,

5  cocaine psychosis.

6  Q. So what Exhibit 17 is, is a compendium or a list of the

7  articles?

8  A. The first page is a list and attached are the actual

9  articles.

10  Q. And these are examples of the type of materials that were

11  available to practitioners by February of 1986?

12  A. Absolutely, yes.

13  Q. Is there anything about which you have testified this

14  morning relating to cocaine, cocaine psychosis, the kindling

15  effect, the binging, the psychosis, the paranoia, the

16  duration of cocaine psychosis which would not have been

17  available to practitioners in this field in 1985 and 1986?

18  A. In general, no. There is one -- I did cite one piece --

19  one statistic where it's thought that 50 to 70 percent of

20  people who -- who use cocaine in a binge-crash pattern

21  experience clinically significant paranoid ideation, with

22  better than half of them actually arming themselves with

23  weapons during cocaine binges, and that was published after

24  1986.

25    But the description of the kindling phenomenon with

PARRAN  -  DIRECT

3-79

1   cocaine psychosis, as well as cocaine seizures, the

2   description of the typical binge-crash pattern and the

3   description of cocaine psychosis itself and cocaine paranoia

4   coming on after the intoxication of cocaine and lasting well

5   beyond the intoxication of cocaine are all very well

6   documented in the medical literature in 1985, '86 and before.

7   Q.  And to your knowledge, Dr. Parran, was that information

8   and examples of that literature available to practitioners in

9   that field of addiction in Cincinnati, Ohio in 1985 and 1986?

10   A.  Oh, absolutely.  One of the articles is from the American

11   Journal of Psychiatry, the most widely distributed, widely

12   read journal, psychiatric journal in the country, and that is

13   from March of 1975 and its titled is "Cocaine Psychosis:

14   A Continuum Model."

15       There is an article from 1976 in the same journal, the

16   American Journal of Psychiatry, and the title is "Cocaine,

17   Kindling, and Psychosis."  That was a decade before these

18   events.

19       And then I have a few here, one in 1986 "Neuroleptic

20   Reduction of Cocaine-Induced Paranoia" in the Journal of

21   psychopharmacology published in February of 1986, the same

22   month of the trial.  Even the Psychiatric Annals in 1984 --

23   the psychiatric annals are very widely distributed -- have

24   articles describing -- describing the same thing.

25            MR. MEZIBOV:  Your Honor, if I may have one minute,

PARRAN - DIRECT

3-80

1   that may be it.

2       (Messrs. Mezibov and Lazarow conferred privately.)

3   Q.  Two final questions, Doctor.  First, with respect to this

4   information and the availability of these materials as an

5   extension of that question, were there, and to your

6   knowledge, practitioners in the field which you study and

7   about which these articles have been written who were

8   available in Cincinnati to have this information at their

9   disposal?

10  A.  Well, certainly there were in the early 1980s.  The

11  Cincinnati V. A. has a big Addiction Medicine Treatment

12  Program that was active then.  They had a specific drug

13  treatment branch, as well as a separate alcohol treatment

14  branch.  They treated them separately then.  We're now

15  treating them together with a psychiatrist as well as

16  internists on their staff.  In fact, the National Institute

17  on Alcohol Abuse and Alcoholism and the National Institute on

18  Drug Abuse, two branches of NIH in 1980 developed a career

19  teacher's program where they supported individuals of medical

20  schools to acquire more education and then teach about

21  addiction and the pharmacology of addictive drugs.  And Don

22  Nelson, who is a clinical pharmacologist at the University of

23  Cincinnati, was a career teacher with NIAAA and NIDA from

24  1981, and was teaching a pharmacology course at the

25  University of Cincinnati Medical School on drugs of abuse in

1   the '80s and is still there now.

2   Q.   Dr. Parran, you also mentioned there was a study that

3   evaluated or reported on the violence associated with cocaine

4   psychosis, people being armed and the like.  What is the

5   correlation between cocaine psychosis and violent behavior?

6   A.   The study that was reported, they studied a couple of

7   hundred people who used cocaine in a binge, binge-crash kind

8   of pattern, either smoking it or using it I.V.  Seventy

9   percent reported clinically significant paranoid ideation

10  happening around the time of cocaine binges.  The -- 50

11  percent of those who had paranoid ideation reported that the

12  paranoid ideation lasted all the way through to the time of

13  the crash, so it lasted for a few to several hours after the

14  cessation of the cocaine use.  Better than half of people

15  with paranoid ideation reported that they had intermittently

16  armed themselves during a cocaine binge with various

17  weapons.  And of that 50 percent who had armed themselves, a

18  quarter reported having actually been violent.  None reported

19  actually ever having killed someone, but a quarter reported

20  having been violent, including jumping out of windows because

21  they were sure the police were coming through the door;

22  beating up a significant other because -- thinking they were

23  sending messages about the person using cocaine to law

24  enforcement; misperceiving external stimuli and then reacting

25  in a violent, arming way.

3-82

1    If you remember, norepinepherine adrenaline is the

2    hormone which produces our fight or flight response. People,

3    when they're overstimulated with norepinepherine, tend to get

4    more and more paranoid, have more and more tough time

5    focusing on something and tend to be hyper-reflexic, and

6    really sort of armed. It's -- it's a hormone which -- which

7    has tremendous survival benefits for humans; but when

8    overstimulated with it, people can be very violent.

9    Q.   The facts that you found in the record in Mr. Hicks'

10   case, they're consistent with the findings of these studies

11   you've just mentioned with respect to violence?

12   A.   Yes.

13            MR. MEZIBOV:   That's all the questions I have of

14   this witness.   Thank you, Doctor.

15            THE COURT:   Doctor, in your history that you

16   accumulated on Mr. Hicks, was there a history of seizures?

17            THE WITNESS:   No, there was no history in his case

18   of cocaine-associated seizures and that sort of kindling

19   phenomenon.   Just a kindling phenomenon in terms of the

20   paranoid thoughts as such.

21            THE COURT:   Can an addict that has become an

22   intermittent binge-type pattern individual, can that addict

23   reasonably be expected to overcome the addiction?

24            THE WITNESS:   I couldn't give you worthwhile

25   information in 1985 because the epidemic was too early at

PARRAN - DIRECT

3-83

1   that point.  But at this point, I think we have some pretty
2   good information, and the information that we have now is
3   that if you take a thousand people with cocaine addiction,
4   intermittent binging, whether they're smoking it or using it
5   I.V., and you follow them up over 15 years or so, at the end
6   of 15 years, better than a third of them will be sober and in
7   stable recovery.  Of the ones that survive -- because there
8   is a highly fatal condition here -- that a third will be
9   sober, in stable recovery, about another third will have
10  switched to a different pattern of drug use, and that's
11  honestly what we're seeing in Ohio now:  People are switching
12  to heroin since cocaine has sort of a short life; people are
13  switching to mixing cocaine with heroin.  They get jazzed up
14  on the first use of cocaine, feel very -- euphoria.  And when
15  the dysphoria of the cocaine should be kicking in, that is
16  when the sort of euphoric period, the mellow high of the
17  heroin kicks in.  And instead of going on a full-blown binge,
18  a person tends to use cocaine and heroin together twice a
19  day.

20      So, we've seen, sadly, about a third of our addicted
21  patients, who normally were bingers on cocaine, just switch
22  pharmacologically to a different approach but still be out of
23  control with chemical dependence.

24      And, finally, another third are either incarcerated or
25  dead.

PARRAN - DIRECT

3-84

1      THE COURT: So, it's reasonable to believe that
2   approximately a third could be sober?

3      THE WITNESS: If -- if people escape either death
4   or jail, the statistics are that 50 percent of the people,
5   whether they have alcoholism or cocaine dependence, over time
6   will eventually get sober and stay sober for outstanding
7   periods of time.

8      THE COURT: Does the snorting of cocaine have any
9   detrimental effect on those membranes and so forth?  Is that
10  permanent?

11     THE WITNESS: That can be permanent.  It's probably
12  not the cocaine itself that damages the nasal membrane, but
13  what happens is when a person snorts cocaine, when the
14  norepinepherine is released, there's spasm of the smooth
15  muscle and the blood vessels that go in the nose, so people
16  stop absorbing it.  The nasal septum is made of cartilage and
17  cartilage doesn't have its own blood supply.  It depends on
18  blood vessels to passively supply oxygen to the cartilage.
19  And so, cartilage is exquisitely sensitive to not enough
20  blood supply, and so what happens is actually the cartilage
21  in the septum dies and deteriorates and falls out.  To cite a
22  famous example, Linda Ronstadt had cocaine addiction and was
23  afraid of needles and didn't know how to turn it into
24  freebase, so she just snorted and snorted and lost her nasal
25  septum, went into treatment and had to have a nasal septum

PARRAN - DIRECT

3-85

1    replaced several years later by a plastic surgeon so she
2    could sing again.
3            THE COURT: Did you conduct any physical
4    examination of Mr. Hicks?
5            THE WITNESS: No.
6            THE COURT: Wouldn't that be medically prudent to
7    help you make your opinion here today?
8            THE WITNESS: It may have been, although it was ten
9    years after the fact.
10           THE COURT: Well -- well, I prefaced my question:
11   Is it permanent --
12           THE WITNESS: The physical --
13           THE COURT: -- and you agreed.
14           THE WITNESS: The permanent signs I'd look at, that
15   if I had thought of that, would honestly be from track marks,
16   from I.V. marks.
17           THE COURT: You didn't see the I.V. track marks?
18           THE WITNESS: No.
19           THE COURT: They would still exist?
20           THE WITNESS: Track marks would probably exist,
21   although the disclaimer that I would give you is that track
22   marks in people who are opiate dependent tend to be much more
23   chronic and long lasting, because people tend to use opiates
24   in a chronic pattern. People tend to do intermittent binging
25   on cocaine. They tend not to use the same vein, and so the

PARRAN - DIRECT

3-86

1  track marks tend to be much less permanent scars with cocaine

2  use.

3        THE COURT:  Did you examine, in reaching your

4  opinion, any criminal history of Mr. Hicks?

5        THE WITNESS:  Very superficially.  I read one of

6  the background psychological reports that talked about his

7  history of domestic violence in the past while intoxicated.

8  I didn't read that extremely carefully.

9        THE COURT:  You don't know of any specific crime or

10  criminal experiences with the law other than domestic

11  violence?

12        THE WITNESS:  At least based on my memory right now

13  it was a domestic violence incident and a court-mandated

14  outpatient counseling program in '82, I think.

15        THE COURT:  Any other history which was not

16  significant in your opinion?

17        THE WITNESS:  Well, when I interviewed him myself

18  and when I quickly looked through the past psychological

19  record, I was looking for evidence of previous psychotic

20  behavior, behavior that would indicate any mental illness or

21  the behavior that indicated extreme violence, and all I saw

22  was the domestic violence.

23        THE COURT:  Thank you, Doctor.  We'll recess until

24  1:15.  1:15.  Thank you, Doctor.

25        THE WITNESS:  You're welcome.



PARRAN - CROSS

3-87

1        THE CLERK:  All rise.

2    (At which time, the luncheon recess was taken.)

3                        *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5448

PARRAN - CROSS

3-88

1                    AFTERNOON SESSION        (1:31 p.m.)

2          THE COURT:  Is the petitioner ready to proceed?

3          MR. MEZIBOV:  We are, Your Honor.

4          THE COURT:  Respondent ready to proceed?

5          MR. WILLE:  Yes, Your Honor.

6          THE COURT:  Doctor, I believe you're on the stand.

7    Proceed, Mr. Wille.

8          MR. WILLE:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. WILLE:

11   Q.  Doctor Parran, have you ever testified at trial in a

12   capital case?

13   A.  No, sir.

14   Q.  Have you ever testified in a criminal case involving

15   cocaine as an issue?

16   A.  No.

17   Q.  Are you familiar with the factors set forth in Ohio law

18   as to mitigation with respect to a capital offense?

19   A.  No, I'm not.

20   Q.  Now, you are not a psychologist or a psychiatrist; is

21   that correct?

22   A.  That is correct.

23   Q.  Now, are you aware that Dr. Schmidtgoessling rendered an

24   opinion in conjunction with this case that Mr. Hicks at one

25   point had been feigning the symptoms of mental illness?

PARRAN - CROSS

3-89

1  You're aware of her opinion in that regard?

2  A.  Yes.

3  Q.  Now, I take it -- or would you consider yourself to be

4  competent, qualified to render an opinion as to the validity

5  of her opinion in the latter regard?

6  A.  I can certainly give you my opinion about that as an

7  internist and a physician.

8  Q.  Would you consider yourself to be an expert with respect

9  to -- I'll withdraw that.

10     Would you offer an expert opinion as to the validity of

11  her expert opinion?

12  A.  I would not offer it regarding her opinion of his

13  diagnosis of malingering or feigned mental illness.

14  Q.  And that's what my question was directed to --

15  A.  Okay.

16  Q.  -- if I was not clear on that.

17     Now, Dr. Parran, would you think that you are qualified

18  to render an opinion as to whether a person is suffering from

19  a mental disease or defect?

20  A.  I'm certainly qualified to render an opinion, but as a

21  non-psychiatrist, I would probably not be considered

22  qualified to render an expert opinion.

23  Q.  Now, Dr. Parran, am I correct you did speak with

24  Mr. Hicks?

25  A.  Yes, I did.

PARRAN - CROSS

3-90

1   Q.  And you mentioned in direct testimony that you were, I
2   guess, I don't know how you put it, but you were looking
3   forward to the opportunity to speak with Mr. Hicks in the
4   sense of the experience of doing so?
5   A.  No, I wouldn't -- I wouldn't -- I wouldn't say that.  I
6   did think that it was important for me to have a chance to
7   talk to Mr. Hicks once I had looked through the materials
8   that had been forwarded to me and was -- and was at the place
9   of beginning to form an opinion about cocaine psychosis.
10  Q.  Would it be fair to say that your experience is somewhat
11  limited in talking with persons who have been convicted of
12  serious felonies?
13  A.  Yes.
14  Q.  And I take it -- it may seem to be an obvious question,
15  but I take it you've never interviewed before someone who had
16  been convicted of murder and sentenced to death?
17  A.  I have interviewed people who been convicted of murder in
18  the past, but no one who has been sentenced to death.
19  Q.  Now, Dr. Parran, in forming your opinion with respect to
20  Mr. Hicks, I take it that you gave weight to what he told you
21  during the interview?
22  A.  Yes.
23  Q.  And now, Dr. Parran, in normally -- in normally dealing
24  with persons with cocaine psychosis, do you on occasion rely
25  on such things as, say, urinalysis tests or blood tests?

3-91

1   A.  Yes; not -- not as it relates to cocaine psychosis, but

2   as it relates to documentation of cocaïne use.

3   Q.  Now, Dr. Parran, you've testified that you assisted with

4   the training of interns with respect to handling persons in

5   emergency situations.  Is that a fair statement?

6   A.  Yes.

7   Q.  And I take it that in that circumstance you would be

8   dealing with a situation where the person that may be

9   suffering from a cocaine psychosis is right before you at the

10  critical time, if you know what I mean?

11  A.  Yes.

12  Q.  So, I take it then that you would consider that to be a

13  very important thing to consider, namely the opportunity to

14  actually observe the person under -- appear or under the

15  possibility -- strike that -- actually observe the person in

16  the highly agitated state which would be consistent with

17  cocaine psychosis?

18  A.  Certainly the people who observe patients the most when

19  patients are actively involved in a state of·cocaine

20  psychosis are people who work in Emergency Rooms, ambulances,

21  intake offices, those sorts of things.

22  Q.  Would you say you're one of those persons?

23  A.  I certainly have done a lot of consultations in Emergency

24  Rooms, yes.

25  Q.  Have you -- in your function as a consultant, would you

PARRAN - CROSS

3-92

1    say that -- I take it you have actually seen people that

2    appear to be under the symptoms of a cocaine psychosis?

3    A.   Yes.

4    Q.   And in this particular case, however, you've never seen

5    Mr. Hicks under --

6    A.   No.

7    Q.   -- apparent influence of a cocaine psychosis?

8    A.   No.

9    Q.   Now, Dr. Parran, are you aware or have you reviewed Dr.

10   Hawgood's report with respect to Mr. Hicks?

11   A.   I'm sure that I have because I'm -- I think it was in the

12   materials that I looked at, yes.

13   Q.   If I were to represent to you that during an interview

14   with Dr. Hawgood Mr. Hicks admitted that at one point he

15   feigned the symptoms of mental illness, that would -- that

16   would be consistent with your recollection of Dr. Hawgood's

17   report?

18   A.   Yes, as well as Dr. Schmidtgoessling's opinion.

19   Q.   Exactly.  And would it be -- or do you recall that in the

20   course of her report, Dr. Hawgood indicated that Mr. Hicks

21   stated that he had been advised by certain jailhouse lawyers

22   to feign these symptoms of mental illness because it might be

23   beneficial to his case?  That would be consistent with your

24   recollection as to her --

25   A.   Yes, I think it was multiple personality disorder, or

PARRAN - CROSS

3-93

1    something like that.

2    Q.  If I were to tell you that Dr. Hawgood testified in a

3    deposition in this case that in fact Mr. Hicks had indicated

4    to her that "Yes, I -- I did feign some mental illness

5    because I was advised by jailhouse lawyers," that would be

6    consistent with your recollection of --

7    A.  Uh-huh.

8    Q.  -- your review of that deposition?

9    A.  Yes.

10   Q.  Now, would it be fair to say, Dr. Parran, that in that

11   circumstance Mr. Hicks appeared to be willing to tell Dr.

12   Hawgood a falsehood -- strike that.

13       Would it appear, based on Dr. Hawgood's statements, that

14   Mr. Hicks had occasion to lie because he thought it would

15   help his case?

16   A.  Yes.

17   Q.  Now, have you considered the possibility that when

18   Mr. Hicks described his cocaine use to you, that perhaps he

19   was entertaining the same intent to lie?

20   A.  Yes; I must -- that's certainly a possibility that I've

21   thought about, and thought about at the time I interviewed

22   him.  I must say that the majority of my opinion is based

23   upon the data in the interview with the detectives in

24   Knoxville and based upon information and, secondarily, based

25   on information in the interview with Ms. Leahy, I think in

PARRAN - CROSS

3-94

1  September of '85, both of which, at least to my review,

2  appear to have taken place prior to much of the other

3  behavior that Mr. Hicks demonstrated with other examiners.

4  Q.  Would you be -- are you aware that Mr. Hicks demonstrated

5  some aberrant and bizarre behavior to Mrs. Leahy?

6  A.  The second -- the second day, the second interview day,

7  yes.

8  Q.  And are you also aware that after Mrs. Leahy's interview

9  with Mr. Hicks, that Mr. Hicks expressed similar -- or showed

10  similar behavior in his interview with Dr. Schmidtgoessling?

11  A.  Yes.  My impression was that his initial interview with

12  Ms. Leahy was an extended interview in which he appeared to

13  be giving consistent information which anticipated to be

14  reasonably backed up with interviews with other family

15  members and the second interview was much more bizarre.  And

16  from there on, the interviews were -- were difficult.

17  Q.  Now, Dr. Parran, you have examined, I take it, much of

18  the information that Mrs. Leahy gathered?

19  A.  Yes, I think I read the report entirely.

20  Q.  Are you aware or do you recall that at one point

21  Mr. Hicks himself stated in the course of

22  Dr. Schmidtgoessling's investigation as to his sanity that

23  he, in fact, did not abuse cocaine or alcohol?

24  A.  Yes.

25  Q.  And would it be fair to say, Dr. Parran, that some of the

PARRAN - CROSS

3-95

1  information cited by Mr. Hicks in support of his -- his

2  allegation or assertion of cocaine psychosis was developed in

3  State post-conviction proceedings? Would that be a fair

4  recollection or statement as to your recollection of the

5  record?

6  A.  I have a problem with Mr. Hicks -- with the beginning

7  part of your statement, because it was not my impression from

8  reading any of the materials that Mr. Hicks claimed a cocaine

9  psychosis.

10  Q.  Are you familiar with the affidavit of Dr. Baum?

11  A.  I'm familiar with Dr. Baum's affidavit, which was

12  obtained in 1990.

13  Q.  Yes.  And, therefore, it was obtained -- you would have

14  no reason to doubt it was obtained in conjunction with

15  Mr. Hicks' post-conviction action; correct?

16  A.  My understanding is that Dr. Baum's opinions were formed

17  in 19 -- late 1989-90, after the conviction.

18  Q.  And isn't it true that Dr. Baum relied on information in

19  forming his opinion that was brought out following Mr. Hicks'

20  conviction and during his post-conviction action?

21  A.  Yes, with -- interviews with Mr. Hicks and others.

22  Q.  So, it is then fair to say that at least in part your

23  diagnosis is based on information which was developed

24  subsequent to Mr. Hicks' conviction?

25  A.  Certainly the information in Dr. Baum's evaluation of

PARRAN  -  CROSS

1   chemical dependency regarding Mr. Hicks was a more thorough

2   evaluation and had more information than was available from

3   the earlier charts, yes.

4   Q.  Well, correct my recollection if I'm wrong, but do you

5   recall Dr. Baum referring to instances of hallucinations and

6   other aberrant behavior by Mr. Hicks?

7   A.  Yes.

8   Q.  And isn't it fair to say that Dr. Baum was relying on, to

9   some extent, on Mr. Hicks' assertions of hallucinations

10  following his apprehension?

11  A.  Yes.

12  Q.  Dr. Parran, you testified that Mr. Hicks' actions on the

13  night of the murders were consistent with the symptoms of

14  cocaine psychosis.  You would agree, I'm sure, that there are

15  persons who commit violent acts that are not necessarily

16  operating under the influence of a cocaine psychosis?

17  A.  Yes.

18  Q.  Now, you stated on direct -- again, tell me if I'm wrong

19  -- 50 to 70 percent of persons under the influence of

20  cocaine psychosis suffer paranoid ideation?

21  A.  That's not quite, but it's --

22  Q.  Pretty fair summary?

23  A.  Actually, 70 percent of people who intermittently binge

24  on cocaine describe clinically significant paranoid ideation.

25  Q.  Could you be more specific as to you say "clinically

PARRAN  -  CROSS

3-97

1  significant of paranoid ideation?" Are you saying 50 to 70
2  or 60, or whatever, persons would exhibit violent behavior
3  comparable to Mr. Hicks' behavior?
4  A.  Well, I think my statement was that most clinically
5  rigorous data we have right now about cocaine binging and
6  paranoid ideation is that 70 percent of people who binge on
7  cocaine have paranoid ideation.  Of those 70 percent who have
8  paranoid ideation, more than half report repetitively having
9  armed themselves with a weapon of some sort because of the
10  paranoid ideation while binging on cocaine.  And that of that
11  half who have armed themselves, half of them, a quarter of
12  the overall 70 percent, report having acted violently toward
13  themselves or others during the cocaine binge subsequent to
14  the paranoid ideation.  That's what I said.
15  Q.  If I understand this correctly then, you have started
16  with 50, 60, 70 percent and you've broken that down to where
17  you're saying now that 25 -- actually 25 percent of these
18  persons exhibit or actually exhibited some form of violent
19  behavior?
20  A.  Might be a little less than that.  Probably in the range
21  of 18 to 20 percent.
22  Q.  Now, I don't know if you have the statistics on this or
23  not, Dr. Parran, but of that 25 percent or less --
24  A.  Yes.
25  Q.  -- of the people who do violent behavior --

PARRAN  -  CROSS

3-98

1   A.  Yes.

2   Q.  -- how many of those people commit two murders?

3   A.  I honestly don't think anyone has that data.  I tried to

4   find credible research data on that and was not able to.

5   What I -- what I can say is that -- is that the leading cause

6   of death from cocaine addiction is violence by several times

7   greater than heart attacks, strokes, seizures, as we

8   discussed before.  But I can't -- that information honestly

9   doesn't exist.

10          THE COURT:  Excuse me.  Before you leave that

11   point, when you say "violence," do you mean

12   self-destruction?

13          THE WITNESS:  Suicide or homicide.

14          THE COURT:  So that --

15          THE WITNESS:  And at times both.

16          THE COURT:  And how -- what is the percentage of

17   suicides, homicides?

18          THE WITNESS:  I tried to find that as well and was

19   not able to.

20          THE COURT:  Thank you.

21   A. (Continuing)  I can give a little bit of information, but

22   it isn't specific to cocaine.  The -- the information I was

23   able to get, or the information that I heard when I was

24   testifying at the American Bar Association's Special

25   Committee on Drug Crisis and Special Committee on Violent

PARRAN  -  CROSS

1   Q.  Now, by doing this, I don't mean to suggest any relative
2   importance; I'm just kind of breaking it down logically.  And
3   Part 2 would be things that Mr. Hicks' family members or
4   contacts or other things from his social history from which
5   you were able to make some determinations as to his possible
6   frequency of cocaine use?
7   A.  Yes.
8   Q.  And the third aspect would be your analysis of Mr. Hicks'
9   behavior on the night of the offenses?
10  A.  That certainly is part of it.  Certainly a big part is
11  the actual interviews by others, the detectives and --
12  especially the detectives and Ms. Leahy of Mr. Hicks.
13  Q.  I guess I'm including that.
14  A.  Lump them in one or the other.
15  Q.  Exactly.  Now, in terms of the third component, wouldn't
16  you agree that an important aspect of your diagnosis is your
17  opinion as to whether Mr. Hicks' behavior was irrational or
18  bizarre?
19  A.  Yes.
20  Q.  And would you agree that perhaps reasonable minds could
21  differ, reasonable expert minds could differ, as to whether
22  Mr. Hicks' behavior manifested irrationality or bizarre
23  character?
24  A.  Yes, I think that reasonable minds could differ on the
25  amount of -- on the amount of weight they lend to the -- to

PARRAN  -  CROSS

3-101

1   the irrationality or the bizarreness of the behavior,

2   although it -- from what I remember from reading through the

3   other people's opinions, pretty much everyone's opinion,

4   especially Dr. Schmidtgoessling's opinion, was that this was

5   irrational, erratic, uncharacteristic behavior for -- for

6   him.

7   Q.  You did review Dr. Reardon's transcript, I take it?

8   A.  Yeah, I just reviewed that in the last couple days.

9   Q.  And it's fair to say that Dr. Reardon -- or Dr. Reardon

10  found some of Mr. Hicks' behavior to be not irrational or

11  erratic in his opinion?

12  A.  Yeah, I think that he found some of the behavior

13  irrational and erratic and some of it not so much.

14  Q.  Now, you mentioned before, Dr. Parran, you used the word

15  "weight" in terms of -- in relationship to the opinion about

16  whether someone's acting irrationally or bizarrely.  Do you

17  have any knowledge or information with respect to a person's

18  behavior in relationship to the mitigating factors that are

19  possible under Ohio law with respect to a capital case?

20  A.  I honestly am not aware.  I am -- I know nothing about

21  mitigating factors in Ohio law regarding capital cases.

22  Q.  Would it be fair to say that in determining the

23  rationality or bizarreness of a person's behavior in

24  relationship to the issue of whether there's a mitigating

25  circumstance which is permissible under Ohio law, that a

PARRAN - CROSS

3-102

1  person who had experience, professional experience, in the

2  latter regard, in the regard of presenting evidence or in

3  assisting in these types of issues, that their opinion might

4  have more validity than yours?

5          MR. MEZIBOV:  Objection.

6          THE COURT:  He may answer.  If you understand the

7  question.

8  Q.  I admit it is a pretty tough question.

9  A.  I think I do.  My opinion was requested about cocaine

10  pharmacology and about the clinical and to give a clinical

11  opinion about what was going on with Mr. Hicks on that day,

12  and that is what my opinion is about.  I think that the

13  weight of my opinion is -- my personal feeling about this is

14  that my personal opinion should be based on my own knowledge

15  of cocaine pharmacology, my knowledge of cocaine dependence,

16  my knowledge of working with patients with cocaine

17  dependence, cocaine psychosis, and my ability to look at an

18  indication and interpret the signs and symptoms that I see in

19  the case in terms of my background.

20  Q.  Now, Dr. Parran, you're aware, of course, that your

21  opinion is being offered with respect to an allegation of

22  ineffective assistance of counsel?

23  A.  I'm sure that I've heard that.  I'm not sure I understand

24  what that means.

25  Q.  I see.  Would it be fair to say -- withdraw that.

PARRAN  -  CROSS

1    And you're aware, Dr. Parran, that the allegation of

2    ineffective assistance of counsel involved the attorneys'

3    alleged negligence in failing to consult an expert such as

4    yourself?

5            MR. MEZIBOV:  Objection.

6            MR. WILLE:  Your Honor, may I state why I'm going

7    into this?  Your Honor, the State's position is that this

8    hearing, of course, is not really at the first instance about

9    Mr. Hicks' cocaine psychosis or state of mind.  In the first

10   instance, it's about his attorneys' reasonableness in

11   deciding whether to pursue this line of defense in either

12   trial or mitigation; therefore, any evidence or any testimony

13   relative to whether this information would have been in fact

14   viewed by the attorneys is relevant to mitigation in Ohio, is

15   relevant and should be explored.

16           THE COURT:  Thank you, Mr. Wille.  Denied.

17           MR. WILLE:  Thank you, Your Honor.

18   Q.  Now, you mentioned, Dr. Parran, that you relied in part

19   on Mr. Hicks' statement to the police?

20           THE COURT:  I'm sorry.  Did he answer the last

21   question?

22           THE WITNESS:  No, I didn't.

23   Q.  I'm sorry?

24   A.  I don't know what it was.

25   Q.  I didn't give you the opportunity to answer the question.

PARRAN - CROSS

3-104

1      MR. WILLE:  Thank you, Your Honor.

2      THE COURT:  I was interested in it.

3      MR. WILLE:  I'm glad you were, Your Honor.  I

4  apologize.  I lost my train.  Could you read it back to me?

5  I don't remember.

6  Q.  Well, are you aware, Dr. Parran, that this case involves

7  the allegation that counsel, Mr. Hicks' counsel, was

8  ineffective for failing to explore or hire an expert such as

9  yourself?

10 A.  I'm aware that that's -- that that's one of the things

11 they asked me about early on, which was to form an opinion

12 about the quality of the testimony as it related to cocaine

13 pharmacology of cocaine psychosis, yes.

14 Q.  You testified on direct that you felt that the jury was

15 given inadequate or inaccurate information --

16 A.  Yes.

17 Q.  -- on this issue, but you would offer no opinion or you

18 do not claim any expertise with respect to whether that

19 inaccuracy in any way is related to a case in mitigation in

20 Ohio.

21 A.  Since I don't know what any criteria are for mitigation,

22 I'd be on pretty thin ice on giving an opinion on it.

23 Q.  Now, Dr. Parran, is it fair to say that you relied in

24 forming your diagnosis on Mr. Hicks' statement to the police;

25 is that a fair statement?

PARRAN - CROSS

3-105

1  A.  Yes, I certainly weighed that very carefully.

2  Q.  Now, Dr. Parran, would you consider Mr. Hicks' statement

3  to the effect that he left the door open of the apartment so

4  he could return later without being detected, would that be

5  an indication of bizarre or irrational behavior in your

6  opinion?

7  A.  Returning to the apartment struck me as fairly irrational

8  behavior, having already taken what he was taking to go get

9  more cocaine.  But, leaving the door open and/or taking the

10 key, I don't remember which, or both --

11 Q.  Well, let me clarify that.  Do you recall Mr. Hicks

12 saying he had left the door open when he left so when he came

13 back he could get in without, I guess, without being detected

14 or being seen?

15 A.  Uh-huh.

16 Q.  Now --

17        MR. MEZIBOV:  There is an objection, unless

18 Mr. Wille can go to the record and be precise, because he's

19 apparently now speculating as to what may or may not be in

20 the record and asking a witness to answer with respect to

21 what may be illusory statements.

22        THE COURT:  This is cross-examination, testing the

23 credibility of the opinion of this witness.  Denied.  And,

24 Doctor, if it's something you didn't consider, just tell us

25 that.  You don't have to -- if you can't recall it or you

PARRAN - CROSS

3-106

1  didn't consider it, just tell us that and we'll go on.
2  A.  It's something that I noticed when reading the
3  statement.  It's not something that struck me one way or the
4  other in terms of whether this individual was paranoid and
5  potentially involved in cocaine psychosis.  The reason I say
6  that is because reading -- reading that statement one way --
7  and I certainly can find it in here, if I need to --
8       (Witness reviewing the transcript.)
9  A.  Hmmm.  Well, I can't find it right at the moment.  But
10  looking at that statement one way, it lended (sic) support
11  for an idea of being paranoid about being seen and being
12  paranoid about or being suspicious and paranoid in
13  behaviors.
14  Q.  Dr. Parran, would you think that a person who's
15  committing a crime may be paranoid about being apprehended or
16  detected even though they're not under the influence of
17  cocaine?
18  A.  Yeah, I think there is certainly a difference between a
19  person being worried or suspicious and being paranoid.
20  Q.  Well, then let me rephrase my question.  You would agree
21  or you would concede that a person that was committing a
22  crime would show some worry and suspicion --
23  A.  Yes.
24  Q.  -- show worry and suspicion about being detected?
25  A.  Certainly.

PARRAN - CROSS

·3-107

1   Q.  Now, do you recall Mr. Hicks' statement to the effect

2   that he brought the tape from the car when he went up to the

3   apartment the second time and murdered Brandy?

4   A.  Yes.

5   Q.  You recall that statement?

6   A.  Yes.

7   Q.  Now, in your opinion is that indicative of irrational or

8   bizarre behavior?

9   A.  No.

10  Q.  Now, Dr. Parran, do you recall a deposition taken by my

11  office with respect to this case?

12  A.  (Nods head affirmatively.)

13  Q.  And you were asked the question, I believe, that did you

14  find anything inconsistent in these facts with your diagnosis

15  of cocaine psychosis?

16  A.  Yes.

17  Q.  And you recall answers that you felt there was nothing

18  inconsistent with a diagnosis of cocaine psychosis?

19  A.  Yes.

20  Q.  Wouldn't it be fair to say your testimony that you've

21  just made that Mr. Hicks' taking the tape with him to go up

22  to the apartment before he murdered Brandy, if viewed as

23  indications of rational and thoughtful behavior, indeed would

24  be inconsistent with your diagnosis that he was under the

25  influence of a cocaine psychosis?

1  A.  By not characterizing it as irrational, I certainly

2  wouldn't characterize it as rational or thoughtful behavior.

3  Secondly, it is not -- I would disagree. As I -- as I tried

4  to explain this morning, and as I think is a widely held

5  misconception, perhaps, regarding this case, but certainly in

6  many areas, a person who has a cocaine psychosis is moving

7  from the paranoia, from mild paranoia of cocaine use to more

8  severe paranoia, and what we would call cocaine psychosis is

9  a person who is not.  And clinically there's no evidence that

10  these people behave like a completely disorganized, paranoid,

11  schizophrenic, delirious individual, that some of their

12  actions and behaviors appear to be and are extremely erratic,

13  impulsive with intrusive thoughts, paranoid ideations

14  oftentimes with auditory hallucination.  Oftentimes their

15  behaviors are those of a person who is much less disorganized

16  than that, although certainly much more disorganized than

17  they would normally be in life.  And these sort of "waxes and

18  wanings" of this phenomenon during the time of the cocaine

19  psychosis is what makes the individual so unpredictable and

20  what makes their -- their actions so unpredictable.

21  Q.  Would it be fair to say, Dr. Parran, that in your opinion

22  during a cocaine psychosis there are times when a person may

23  act rationally and with intent and premeditation with respect

24  to a particular act?

25  A.  I have to make the disclaimer that not being trained in

PARRAN  -  CROSS

3-109

1  forensic psychiatry I'm not in a position to respond to
2  exactly the terms that you used.  But what I can say is that
3  when a person is involved in a paranoid, severely paranoid or
4  psychotic episode around the use of cocaine, some of their
5  actions are less disorganized and more purposeful than
6  others.  But what's characteristic of the overall phenomenon,
7  that is that the person tends to intermittently lose track of
8  their -- of their purpose and -- and go off on various
9  tangents and side behaviors that are fairly indicative of
10  this very unstable sort of psychiatric moment that the
11  patient is in, and that is -- is what actually the cases that
12  you're citing indicate to me.
13  Q.  Let me go back to what you said at the very beginning.
14  You're saying that perhaps you would not feel qualified in
15  terms of rendering an opinion as to the possibilities of --
16  from a psychological standpoint of a person acting rationally
17  and with premeditation and specific intent during a cocaine
18  psychosis?
19  A.  I am not familiar or trained with issues of
20  premeditations, et cetera.  I can, as a clinician, look at
21  patterns of behavior, rationality and irrationality, levels
22  of organization and disorganization of thought and come up
23  with clinical opinions about that.
24  Q.  Doctor, may I refer to your chart?  During these times of
25  cocaine psychosis, would it be possible for a person to act

PARRAN - CROSS

3-110

1  rationally and logically and with premedation during the
2  course of this period?

3  A.  The most consistent actions that people clin --
4  clinically that people pursue during a cocaine binge is
5  seeking more cocaine.  And as they become -- as they progress
6  in the binge and as they self-administer the drug a second or
7  a third or fourth or sometimes many more times than that, the
8  amount of paranoia in their behavior and the irrationality of
9  their behaviors tend to become intensified.

10  Q.  Would it be possible, however, Doctor, for Mr. Hicks,
11  assuming that he was operating under a cocaine psychosis
12  during these periods, to perform purposeful, intentful (sic)
13  and seemingly premed -- acts of premedation, even though in
14  your clinical diagnosis he was suffering under a cocaine
15  psychosis?

16  A.  Certainly people are able to perform purposeful actions;
17  I certainly could agree with that.  There were purposeful
18  actions in this case.  They tended not to be extended,
19  purposeful actions.  They tended to be pretty short lived and
20  then using more cocaine.  But certainly people can do
21  purposeful actions when they're involved in cocaine
22  psychosis.

23      MR. WILLE:  One moment, Your Honor.

24   (Mr. Wille and his colleagues conferred privately.)

25      MR. WILLE:  Just a couple more brief questions.

1　Q.　Dr. Parran, on direct you referenced a Dr. Nelson?

2　A.　Don Nelson, yes.

3　Q.　Could you tell us again who Don Nelson is?

4　A.　Don is a clinical pharmacologist on the staff of the

5　University of Cincinnati School of Medicine who has received

6　a -- who received a training award and was trained in

7　chemical dependence and early -- pharmacology -- in the early

8　1980s and was teaching in this area, teaching about chemical

9　dependence, about pharmacology of mood-altering substances in

10　this area.  He -- and probably knows many of the people in

11　this area who may have been more clinical experts as opposed

12　to pharmacology experts.

13　Q.　In reviewing the materials in this case, did you recall

14　seeing a letter by Mr. Hicks' defense counsel to Mr. Nelson?

15　A.　No, I don't.

16　Q.　Were you aware -- and you would have no knowledge whether

17　they in fact did or did not in fact try to contact

18　Mr. Nelson?

19　A.　No, I do not.  But the reason why Dr. Nelson's name came

20　up is because he is one person who I know is from Cincinnati,

21　lives in the area, I'm certain was practicing in this area in

22　the mid-1980s and had a good deal of experience with

23　amphetamine psychosis and cocaine psychosis as a clinical

24　pharmacologist.

25　　　　　MR. WILLE:  Thank you.

PARRAN  -  REDIRECT

3-112

1                    REDIRECT EXAMINATION

2    BY MR. MEZIBOV:

3    Q.  Dr. Parran, I just have a couple followup questions to

4    Mr. Wille's.

5        The first, Mr. Wille asked you some questions concerning

6    your knowledge that the record contains references to feigned

7    mental illness by Mr. Hicks.  You remember those questions?

8    A.  Yes.

9    Q.  And my question is, what effect does the fact that

10   Mr. Hicks may have feigned mental illness have on the

11   opinions you've offered regarding cocaine psychosis and its

12   impact on Mr. Hicks and the actions which he committed that

13   night?

14   A.  I can't give a clinical opinion about whether there was

15   feigned mental illness or not.  I certainly can give, because

16   I'm not a psychiatrist or psychologist, but I can certainly

17   give my opinion that the people who did the examining seem to

18   be very appropriate in that decision.  Mr. Hicks' history of

19   attempting to feign mental illness, and not very well, didn't

20   really have any negative impact on my opinion; that the

21   record is very clearly supportive of cocaine psychosis.

22   Q.  So, regardless of the fact that Mr. Hicks may or may not

23   have been feigning mental illness with his attorneys or any

24   of the people who interviewed him after the fact, your

25   opinions regarding cocaine psychosis and its impact in

PARRAN - REDIRECT

3-113

1   connection with the acts remains the same?

2   A.  Yes, absolutely.

3   Q.  Now, Mr. Wille also mentioned a Dr. Reardon.  Is that

4   correct?

5   A.  Yes.

6   Q.  And is it accurate that we provided you a copy of

7   Dr. Reardon's deposition --

8   A.  Yes.

9   Q.  -- that we took just a week or so ago?

10  A.  Yes.  I actually read it yesterday, on Tuesday, because I

11  just got back from a week teaching overseas on Monday.

12  Q.  I'm going to ask you -- I don't know if you have the

13  deposition in front of you.

14  A.  I left them in the car.

15  Q.  Let me do this.

16         MR. MEZIBOV:  If I might approach, Your Honor.

17      (Mr. Mezibov handing the witness the document.)

18  Q.  Dr. Parran, what I've done is placed in front of you

19  Dr. Reardon's deposition and I have highlighted excerpts --

20  an excerpt from Page 38 in yellow.

21  A.  Yes.

22  Q.  Which lines does that run from?

23  A.  Page 38, line 12 through 20.

24  Q.  I would ask you to read that passage to us, first.

25  A.  "In my opinion, the description that Mr. Hicks provided

PARRAN - REDIRECT

3-114

1   is not indicative of someone who was in such a state of

2   cocaine psychosis that they were unable to reason, that they

3   were unable to plan, that they were unable to form intent,

4   that they were unable to calculate a course of conduct, delay

5   initiating parts of that course of conduct, plan ahead as

6   opposed to the kind of grossly disorganized, erratic,

7   inconsistent, savage kind of behavior that I have seen in a

8   number of either cocaine psychosis or schizophrenic psychosis

9   cases."

10  Q.  Now, my first question with regard to that passage that

11  you read is, as an individual with the qualifications you

12  have provided to us, do you agree with that comment or that

13  passage by Dr. Reardon?

14  A.  I do not agree with the passage or the comment.

15  Q.  Why not?

16  A.  Because I think that this comment, once again, speaks to

17  the misconception that people with clinically significant,

18  meaningful cocaine -- degrees of cocaine psychosis that are

19  heavily influencing their behavior need to look like "grossly

20  disorganized, erratic, inconsistent, savage kind of behavior

21  seen with schizophrenic psychosis cases."  I have a clinical

22  problem with that.

23  Q.  Why is that?

24  A.  Because cocaine psychosis is something which involves --

25  which certainly involves intermittent intrusive thoughts,

PARRAN - REDIRECT

3-115

1   almost a -- a waxing and waning, of people sort of beginning

2   to exert some control and then losing control of their

3   thought processes, paranoid ideation, sometimes auditory

4   hallucinations and the impulsivity. It certainly waxes and

5   wanes with cocaine psychosis. And as I said, it's one of the

6   reasons why it's so easy from a clinical standpoint to

7   underestimate a patient's dangerousness, for example in the

8   Emergency Room, and to, therefore, take them less seriously

9   than one needs to and then have the person accelerate ten or

10  fifteen minutes later and become extremely dangerous. That

11  is not only my clinical experience, but in the literature and

12  from the literature from the early '80s about cocaine

13  psychosis. And, therefore, the fact that this patient at the

14  time exhibits clearly disorganized -- although in this

15  expert's opinion not grossly disorganized -- but clearly

16  disorganized, clearly erratic, clearly inconsistent behavior

17  with everything in his life, the best I could tell and most

18  other experts, and very savage behavior. I think it's there.

19  Q.  If I understand your testimony correctly; do you take

20  exception to Dr. Reardon's descriptions as either savage or

21  disconnected?

22  A.  Yes, I take exception. I think that the record certainly

23  indicates disorganized thinking and behavior, very erratic

24  behavior, quite inconsistent behavior not only during the

25  evening but entirely inconsistent behavior from -- comparing

1  the evening to his life leading up to there, and a degree of
2  violence and savagery which is shocking, and I think that's
3  all in the case and that is what I see in the case.
4  Q.  And in addition to the descriptions that you take
5  exception to, do you also take exception to the conclusions
6  drawn there by Dr. Reardon?
7  A.  Yes, I do.  I read the beginning of the sentence of
8  Dr. Reardon.  The description that Mr. Hicks provided is not
9  indicative of someone who was in such a state of cocaine
10  psychosis.  I interpret that as an opinion that the patient
11  probably was in a state of cocaine psychosis, but that this
12  person's opinion is that the extent was not great enough to
13  be considered to contribute to the behavior, and I take
14  exception to that conclusion.
15  Q.  Now, Dr. Parran, again as an individual with the
16  experience in cocaine and cocaine psychosis and matters
17  surrounding cocaine, do you have an opinion as to whether or
18  not Dr. Reardon is competent to offer an opinion with respect
19  to cocaine psychosis and its effects?
20  A.  I have some concerns, and let me tell you my concerns.
21  In reading through his deposition yesterday, it concerned me
22  that Dr. Reardon did not know the pharmacology of cocaine;
23  didn't know the appropriate half life of cocaine; the
24  duration of intoxication; didn't know that norepinephrine was
25  the same thing as adrenaline, that they're the same thing;

1  didn't know that norepinephrine -- although he stated it was
2  a neurotransmitter, which is partially true -- is actually a
3  systemic hormone which when it is released from the brain
4  functions as an neurotransmitter, but it is basically a
5  systemic hormone throughout the body. He seemed to think the
6  majority of cocaine effects were through sera -- he seemed to
7  think the majority of euphoric effects were mediated through
8  seratonin, when they are clearly by dopamine; did vaguely
9  recall dopamine and thought that was involved in some ways
10  but at least that's what I saw in the deposition. So that
11  concerned me, from a knowledge of pharmacology standpoint.
12      The other thing that concerned me was his description of
13  his clinical background in addiction medicine. He stated
14  that although -- and certainly he was the clinical director
15  or administrator, director of a big treatment program in the
16  Columbus area for several years, he didn't know what ASAM,
17  American Society of Addiction Medicine was. And, actually,
18  treatment programs in Ohio that have medical directors who
19  are not certified by ASAM, are not able to receive
20  reimbursement by third-party insurers for the treatment they
21  provide because it's considered that an ASAM-certified
22  medical director is one way that insurance companies can
23  verify that it's a legitimate and well-run treatment
24  program. That concerned me that he didn't know what that
25  was.

PARRAN  -  REDIRECT

1    It concerned me he didn't know what an addiction medicine

2    fellowship was, even though he is a psychologist and not a

3    physician.  Being an expert in the field or being able to

4    give expert opinions about aspects of addiction medicine,

5    cocaine psychosis, without even knowing what an addiction

6    medicine fellowship is concerned me.

7        And then, finally, the description that he gave of the

8    treatment program and the cocaine psychosis patients he's

9    seen concerned me.  My impressions -- and this is just an

10   impression based on the -- the deposition as well as his CV,

11   is that a significant amount of the treatment program that he

12   supervised, which sounds like a big comprehensive treatment

13   program, was Methadone maintenance, which is for heroin

14   addiction, residential treatment, which certainly could be

15   for cocaine addicts, but generally well after the cocaine

16   psychosis is done, and outpatient treatment.  And when he was

17   asked whether he had seen patients who had cocaine -- who

18   were acutely using cocaine -- and the question seemed to be

19   framed sort of along the lines of in an Emergency Room

20   setting, or whatever, he stated he certainly saw lots of

21   patients in outpatient treatment within a matter of a few

22   hours of using, or even patients who came in intoxicated, and

23   that was his experience with patients with -- my impression

24   was that was his statement of experience with patients with

25   cocaine psychosis.  Actually, certainly lots of patients who

PARRAN - REDIRECT

1    have just used cocaine recently or just used it on the bus or

2    at the corner to -- before coming into treatment, that

3    happens all the time.  But the ones who use cocaine just

4    before they come to treatment and trigger cocaine psychosis

5    don't walk in the door.  They go off; they go off to get more

6    cocaine.  So, those statements concerned me significantly

7    regarding his qualifications to give an expert opinion about

8    something having to do with cocaine.

9    Q.  Dr. Parran, how important, in your professional

10   estimation, is it to have an expert knowledge of

11   pharmacological effects of cocaine to be able to explain the

12   dynamics and the impact of cocaine psychosis in a given

13   instance?

14   A.  Well, I think especially -- let me back up.  It's perhaps

15   not critically important to have a clear understanding of all

16   the pharmacology of cocaine to be able to talk about cocaine

17   addiction to some degree, although even that would be a

18   serious liability.  Not knowing the pharmacology -- really

19   knowing it well -- of cocaine, and certainly psychologists do

20   know the pharmacology of cocaine -- I worked with many

21   psychologists in our V.A. treatment who know the pharmacology

22   of cocaine quite well.  But, not knowing the pharmacology of

23   cocaine when we're talking about something that is different

24   than cocaine intoxication, that is different than the cocaine

25   crash and is this sort of peri-binge, paranoid, at times

3-120

1   psychotic period, I think is -- renders a person in not a
2   solid position to give an opinion.
3   Q.  And finally, Dr. Parran, in your professional opinion,
4   how important is it to be familiar with or expert in the
5   pharmacology of cocaine in understanding Mr. Hicks' condition
6   in connection with the matters in this case?
7   A.  I think it's very important and it -- not knowing the
8   pharmacology of cocaine and also how the pharmacology of
9   cocaine measures with the disease of addiction to produce
10  typical patterns of cocaine dependence, cocaine binging, the
11  kindling phenomenon, and paranoia and psychosis, not knowing
12  that I think renders a person in -- in a very weak position
13  to be able to give a credible opinion about this case.
14  Q.  From what you read in the transcript of Dr. Reardon, did
15  it appear to you that he had an appreciation of the kindling
16  effect as you've described?
17  A.  No.  My initial reading when he was asked about the
18  kindling phenomenon, it appeared to me it was the first time
19  he ever heard of it.  I can't say that for sure.  But then
20  his response of what his understanding of it was, he thought
21  he had a vague understanding of it, some sort of
22  understanding.  I can read the exact thing if you want --
23  oops, there it is.  Page 49:
24          "Do you know what the kindling effect is?"
25          "Answer:  Kindling?"

PARRAN - REDIRECT

3-121

1       "Question:  Kindling, k-i-n-d-l-i-n-g."

2       "Answer:  Not specifically.  Not that term."

3       "Do you know what it refers to?"

4       "Answer:  Well, I'm assuming it refers to something

5   with regard to timing of onset and so forth."

6   The response indicated that he really did not know what

7   kindling was at all.

8   Q.  And how important in your estimation is or was the

9   kindling effect insofar as Mr. Hicks' situation is concerned?

10  A.  Well, the kindling effect is what explains the reason why

11  some patients -- and apparently at least -- to the best of my

12  professional opinion, in this case a patient can binge on a

13  tremendous amount of cocaine at one time and finally trigger

14  a certain cascade of symptoms in themselves.  In maybe five

15  percent of cocaine addicts, a person by binging on cocaine

16  will trigger a seizure.  And then in that five percent,

17  almost every time they use cocaine after that, even if it is

18  a small amount, they'll have a seizure thereafter, and that's

19  the kindling phenomena.

20      In terms of this case, using a tremendous amount of

21  cocaine in the few years previously, intermittent and huge

22  binges triggered the paranoid ideation when using cocaine,

23  explains the crux of how a person can do somewhere between

24  three and five runs of I.V. cocaine in an evening and develop

25  very bizarre, very savage, very disorganized behavior that

PARRAN - REDIRECT

3-122

1   looks like cocaine psychosis, more than anything else
2   clinically in a differential diagnosis. So I think it is
3   really a critical issue.
4           MR. MEZIBOV: Thank you, Dr. Parran. That's all I
5   have.
6           MR. WILLE: Nothing further, Your Honor.
7           THE COURT: Do I understand that when the kindling
8   effect is invoked or occurs, that then the person will binge
9   on I.V. cocaine?
10          THE WITNESS: The kindling effect can -- the
11  phenomenon of kindling can affect several different --
12  several different parts of cocaine use. Certainly the
13  phenomenon known as kindling can affect whether a person has
14  a subsequent seizure after they've had one.
15          THE COURT: We know Mr. Hicks didn't have seizures.
16          THE WITNESS: Yes.
17          THE COURT: So let's talk --
18          THE WITNESS: The kindling effect certainly
19  explains how people have significant paranoid ideation and
20  psychosis-type actions.
21          THE COURT: As far as we know, that never happened
22  prior to this time with -- of the murders with Mr. Hicks; do
23  we?
24          THE WITNESS: Well, the description -- the
25  description in the 1990 report of Dr. Baum -- I think that's

PARRAN - REDIRECT

3-123

1  his name -- granted, that was after the fact and it was

2  information gathered in 1990, but the description there of

3  the cocaine dependence that Mr. Hicks had had in the previous

4  few years did describe no violent behavior but certainly

5  described intense binges that involved paranoid ideation,

6  using by himself, using in solitary environments, no longer

7  using socially with other people.  All of which is, at least

8  I read, is pretty strong evidence for that.

9        THE COURT:  Well, the only information you have in

10  that regard is the amount of --

11        THE WITNESS:  I can try to look for it here if you

12  want me to.

13        THE COURT:  Well, do you have -- I understood that

14  you based your opinion on the fact that he used his life

15  savings to buy cocaine.

16        THE WITNESS:  That was my opinion regarding cocaine

17  dependence.  My opinion regarding the fact that it's my

18  opinion that he had significant paranoia with previous

19  binges, previous heavy binges with cocaine, was based both on

20  my interview with Mr. Hicks in 1995 as well as data from 1990

21  and Dr. Baum's record which he shifted his pattern of use to

22  more and more solitary use by himself during these binges,

23  which generally happens because of the paranoia coming on

24  with heavier and heavier binges.

25        THE COURT:  And when he is on a binge, the only

PARRAN - REDIRECT

3-124

1   thing he is interested in is getting more cocaine?

2              THE WITNESS: That's what most patients describe.

3              THE COURT: Did Mr. Hicks?

4              THE WITNESS: Mr. Hicks did, yeah, and he described

5   that in his --

6              THE COURT: So Mr. Hicks was on a binge?

7              THE WITNESS: Yes.

8              THE COURT: And all he was interested in was

9   getting more cocaine?

10             THE WITNESS: That -- that sounds --

11             THE COURT: Am --

12             THE WITNESS: I mean, that seemed to be my reading

13  of it.

14             THE COURT: All right. All right. Now, when did

15  he start the binge?

16             THE WITNESS: I'll have to look at it, but it's --

17  from the detective's report, I believe -- I have it right

18  here. He first used --

19             THE COURT: Well, I thought --

20             THE WITNESS: I'm sorry, Your Honor, but it's -- I

21  thought it was about 8 o'clock in the evening.

22             THE COURT: On the Friday?

23             THE WITNESS: On Friday.

24             THE COURT: After --

25             THE WITNESS: Between 8:00 and 9:00 in the evening,

PARRAN  -  REDIRECT

3-125

1   I think.

2           THE COURT:  All right.  And that's when the binge

3   started?

4           THE WITNESS:  That was the first use of cocaine.

5           THE COURT:  Now, when did the binge start?  I

6   understand there is a difference between the simple use of

7   cocaine, if there is such a descriptive phrase, and a binge.

8           THE WITNESS:  What I would say is that once a

9   person has cocaine dependence and they've -- and they've

10  established it in a binge-crash pattern, which is the most

11  common, the initial use of cocaine is the initial start of

12  that binge.

13          THE COURT:  All right.  So, then if Mr. Hicks'

14  situation was such that if he took a drop or a -- any amount

15  of cocaine, it was the start of a binge?

16          THE WITNESS:  That's consistent with the history

17  that I heard in here, especially from Dr. Baum and my history

18  with him.

19          THE COURT:  And so the binge started with the first

20  use of cocaine?

21          THE WITNESS:  Yes.

22          THE COURT:  When did it end?

23          THE WITNESS:  Usually we classify the binges ending

24  with the last use of cocaine.

25          THE COURT:  Last use.  So --

PARRAN - REDIRECT

3-126

1          THE WITNESS:  Maybe ten minutes after that, when
2    the peak goes away.
3          THE COURT:  Now, in this situation the binge was
4    over with the last use of cocaine?
5          THE WITNESS:  I would say, yes.
6          THE COURT:  Around 12:30 that evening?
7          THE WITNESS:  Yeah, I think it was right around
8    then, 12:30.  Maybe -- let's see.  Oh, must have been 12:30;
9    something like that.  "So, I went up ahead and shot up the
10   dope I got."  So, I think he went around 12:30 and got his
11   last cocaine and came back to the apartment and used it.  So,
12   probably sometime between 12:30 and 1:00 or so.
13         THE COURT:  Thank you.
14         THE WITNESS:  Okay.
15         MR. MEZIBOV:  Your Honor, may I clarify one point?
16              FURTHER REDIRECT EXAMINATION
17   BY MR. MEZIBOV:
18   Q.  Dr. Parran, His Honor has asked the onset and the
19   duration of the cocaine binge; correct?
20   A.  Yes.
21   Q.  And what about the onset and the duration of the cocaine
22   psychosis?
23   A.  Most patients -- and I can't say for Mr. Hicks, because
24   by the time I interviewed him in 1995, he said that his
25   recollection of all of the events that evening was not clear

3-127

1   enough to tell me exactly. But, most patients, once they
2   have had cocaine psychosis or paranoia associated with the
3   cocaine binge in the past, get some degree of paranoia,
4   usually mild, after the first use of cocaine and then it is
5   multiplied each time they use the cocaine thereafter. So, I
6   generally consider serious paranoia to be starting after the
7   second time that people use cocaine.

8   Q.  When in connection with Mr. Hicks then would the serious
9   onset of psychosis set in?

10  A.  Once again, the only thing I have to base my opinion on
11  is his confession, and during his confession he said he got
12  edgy, he got restless, that he got an incredible urge to use
13  cocaine after the first I.V. cocaine use and he went and
14  hocked the VCR. When he used the second I.V. cocaine, he
15  suddenly started thinking about robbing his grandmother -- or
16  his mother-in-law; and as that got closer, he began
17  considering murdering his grandmother, and that -- so
18  clinically for me it would be right around the time or
19  shortly after the second I.V. administration of cocaine.

20  Q.  And do you have an opinion, to a reasonable degree of
21  medical certainty, whether Mr. Hicks was in the midst of a
22  cocaine psychosis throughout the times these two murders were
23  committed?

24  A.  Yes.

25          MR. MEZIBOV:  Okay.

PARRAN - REDIRECT

3-128

1          MR. WILLE:  Nothing further, Your Honor.

2          THE COURT:  Is this witness released?

3          MR. MEZIBOV:  Yes, Your Honor.

4          THE COURT:  Is this witness released?

5          MR. WILLE:  Thank you.  Yes.  Thank you, Your

6    Honor.

7          THE COURT:  Thank you, Doctor.

8      (Witness excused.)

9          THE COURT:  We'll have a 15-minute recess.

10         THE CLERK:  All rise.

11     (At 2:43 p.m., a recess was taken.)

12                    * * *          (3:05 p.m.)

13         THE COURT:  Is the petitioner ready to proceed?

14         MR. MEZIBOV:  Yes.

15         THE COURT:  Respondent ready to proceed?

16         MR. WILLE:  Yes, Your Honor.

17         THE COURT:  Call your next witness.

18         MR. MEZIBOV:  Your Honor, we've agreed with

19   Mr. Wille that we can call certain witnesses out of order,

20   and we defer to Mr. Wille.

21         THE COURT:  Proceed.

22         MR. WILLE:  Thank you, Your Honor.  We would call

23   Dr. Reardon.

24         THE CLERK:  Raise your right hand, please.

25     (Duly sworn by the Clerk.)

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

STATE OF OHIO                          :

    Plaintiff                          :          Case No. 01-CR-794

-vs-                                   :

NATHANIEL JACKSON                       :

    Defendant                          :

## EXHIBIT_____

### AFFIDAVIT OF ROBERT G. KAPLAN, PH.D.

STATE OF OHIO          :
              : ss:
COUNTY OF CUYAHOGA  :

Robert G. Kaplan, Ph.D., after being duly sworn according to law states as follows:

1.  I am a clinical and forensic psychologist licensed to practice psychology in the State of Ohio, with professional offices located in Cuyahoga County, Ohio.

2.  My professional background and qualifications are set forth in my Curriculum Vitae which is attached and made part of herein as Exhibit "A".

3.  One of my professional specialties is the assessment and treatment of substance abuse.

4.  I have reviewed, regarding the defendant, Nathaniel Jackson, several documents which contain the following information about him:

    a.  Nathaniel Jackson abused crack cocaine and wanted to stop abusing this substance.

    b.  Nathaniel Jackson stole to support his drug habit.


EXHIBIT
64

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5489

assuming that it is correct, it can be stated, with reasonable psychological certainty that Mr. Nathaniel Jackson requires an evaluation in order to determine if he has a substance abuse problem, if he is chemically dependent and/or if he has any mental disorder.

6. Based upon the information listed above in paragraph four of this affidavit, and assuming it is correct, it can be stated, with reasonable psychological certainty, that Mr. Nathaniel Jackson requires an evaluation in order to determine if any substance abuse problem, chemical dependency problem, and/or any mental disorder was a contributing or mitigating factor with regard to the instant offense.

7. I am available and able to conduct a psychological evaluation of the defendant for the purposes stated in paragraphs five and six of this affidavit.

8. My fees for conducting a psychological evaluation are set forth in my Fee Schedule which is attached and made part of herein as Exhibit "B".

9. I will charge a per-diem rate of $2400.00 (two-thousand, four-hundred dollars and zero cents) for the time that I spend evaluating the defendant and estimate that it will take no longer than one day to evaluate the defendant, including travel time.

3

10.   I will charge an hourly rate of $300.00 (three-hundred dollars and zero cents) per hour for the time that I spend reviewing any additional documents and records, consulting with counsel, and writing any additional reports. I estimate that it will take two to four hours of additional time to review documents and records, two to four hours of additional time to consult with counsel, and one to two hours to write a report of my evaluation.

11.   I will charge a fee of S150.00 (one-hundred, fifty dollars and zero cents) per psychological test that I administer to the defendant. I estimate that I will need to administer three to four tests.

12.   I will charge a per-diem rate of $2400.00 (two-thousand, four-hundred dollars and zero cents) for the time that I spend testifying outside of Cuyahoga County, Ohio. I will charge an hourly rate of $300.00 (three-hundred dollars and zero cents) for any video-taped testimony provided in Cuyahoga County, Ohio, with a two-hour minimum charge.

Further affiant saith naught.

ROBERT G. KAPLAN, PH.D.
DL RM733061

Sworn to and subscribed in my presence this twenty-sixth day of December, 2003.

NOTARY PUBLIC

4

ANNETTE DEL PIZZO
Notary Public, State of Ohio, Cuy. Cty.
My commission expires Mar. 21, 2007

# Curriculum Vitae



**Dr. Robert G. Kaplan**
Clinical Psychologist
Board Certified Forensic Examiner
Fellow, American College of Forensic Examiners
Diplomate, American Board of Psychological Specialties,
Psychological Disability Evaluation

**Kaplan Consulting & Counseling, Inc.**
3401 Enterprise Parkway, Suite 340
Cleveland, Ohio 44122-7340
Call: (216) 766-5743
Fax: (216) 766-5796
Email: Rkaplan@KaplannCC.com
Internet: www.KaplanCC.com

## *Current Employment Position*

President, Kaplan Consulting & Counseling, Inc. (April, 2002 to Present)

A forensic psychologist who specializes in trauma, psychological disability evaluation, workplace violence, sexual harassment, discrimination, substance abuse prevention and criminal behavior. He is an experienced crisis manager who has successfully helped employers and individuals resolve several hundred crises involving suicidal, homicidal, intoxicated and psychotic individuals without the loss of a single life throughout his career. He also advises employers on the development of policies, programs and strategies in his areas of specialization. In his private practice he specializes in treating individuals who suffer from trauma, substance abuse, depression and anxiety.

## *Previous Employment Positions*

**Executive Vice President, Behavior Management Associates, Inc. (May, 1985 to April, 2002)**

A founding principal of a firm that provides employee assistance programs, managed behavioral health care services, organizational training and development programs, and evaluations for hiring and promotion to over 200 employers across the United States and Canada. Services were provided to over 250,000 covered lives of the firm's *IMPACT* Employee Assistance Program. The firm also provides psychological assessment and counseling services to individuals, couples

1

and families in the greater Cleveland metropolitan area. His responsibilities included the management of forensic and assessment services, clinical services, crisis intervention services, program development, employer policy consultation, risk management, information and communication technology, contracting, and development of marketing materials.

### Psychologist, Management Psychologists of Ohio (December, 1983 to June 1984, Part-time, July, 1984 to May, 1985)

An employee of a firm that provided management consulting and employee assistance programs to employers in the greater Cleveland metropolitan area. Responsibilities included individual, group, family and marital psychotherapy, biofeedback, psychological assessment and vocational counseling. Extensive assessment services were provided for attorneys, insurance and rehabilitation companies, employers, the Ohio Bureau of Workers Compensation, the Ohio Bureau of Vocational Rehabilitation and the U.S. Social Security Administration.

### Counselor, City of Cleveland Office of Mental Health & Substance Abuse (October, 1982 to June, 1984)

An employee of a city agency that provided outpatient mental health and substance abuse services primarily to low-income, poor and indigent residents. Responsibilities included individual, group and marital psychotherapy, outreach services, social services, substance abuse counseling and consultation to medical staff in the adult and adolescent clinics of the Thomas F. McCafferty Health Center, an inner-city outpatient health care facility. Psychological assessment and consultation services were performed for agency staff located throughout the City of Cleveland. Additional responsibilities included group therapy for substance abusers, individual psychotherapy, and psychological assessment of prisoners in the City of Cleveland House of Corrections.

## Internship

### Cleveland MetroHealth Medical Center (Formerly Cleveland Metropolitan General Hospital, September, 1981 to September, 1982)

Psychology Intern at a county teaching hospital of Case Western Reserve University Medical School, accredited by the American Psychological Association. Responsibilities included psychological assessment and neuropsychological testing of infants through elderly on both inpatient and outpatient units, individual outpatient psychotherapy of children, adolescents and adults, crisis intervention and emergency services, group psychotherapy of inpatient adolescents, psychological consultation to pediatric and adult medical wards, psychological assessment and intervention with medical patients, psychological support to medical staff, case management of adolescent and adult psychiatric inpatients, and provision of psychological services to multi-disciplinary treatment teams for adolescent and adult psychiatric inpatient units.

2

## *Training Placements*

**Case Western Reserve University Student Health Service (September 1980 to September, 1981)**

Psychology Assistant at a university counseling center. Responsibilities included outpatient psychotherapy with graduate and undergraduate students of the university.

**Cleveland Veterans Administration Medical Center (September, 1978 to September, 1980)**

Psychology Assistant at a large Veterans Administration psychiatric hospital. Responsibilities included one year of providing psychological services for an acute-care psychiatric ward, six months of providing psychological services for the drug dependency treatment unit, six months of providing psychological services for the day hospital program (full-day treatment of hospital outpatients). Services included psychological assessment, individual and group psychotherapy, case management, therapeutic community intervention, biofeedback and multi-disciplinary treatment team planning.

**Lake County Mental Health Center (September, 1977 to September 1978)**

Psychology Assistant at a large suburban mental health center. Responsibilities included individual and group psychotherapy, crisis intervention and psychological assessment of children, adolescents, adults and elderly county residents.

## *Education*

Ph.D., Clinical Psychology, 1983, Case Western Reserve University, Cleveland, Ohio

M.A., Clinical Psychology, 1981, Case Western Reserve University, Cleveland, Ohio

B.A., Cum Laude, Psychology, 1976, University of Pennsylvania, Philadelphia, Pennsylvania

## *License and Certifications*

Psychologist, State of Ohio, License Number 3518, 1984

Fellow, American College of Forensic Examiners, 1999 to Present

Diplomate, American Board of Psychological Specialties, Psychological Disability Evaluation, 1996

3

Board Certified Forensic Examiner of the American College of Forensic Examiners, 1996 to Present

Diplomate, American College of Forensic Examiners, 1996 to 1999

U.S. Dept. of Transportation Substance Abuse Professional 1998 to Present

Critical Incident Stress Debriefing, International Critical Incident Stress Foundation, 1995 to Present

CPR & First Aid, American Red Cross, 1998 to Present

## *Hospital Affiliations*

University Hospitals Health System, Laurelwood Hospital, Cleveland, Ohio, 1992 to Present

Parma Community General Hospital, Cleveland, Ohio 1996 to Present

## *Professional Associations*

President, Cleveland Psychological Association, 1999

Treasurer, Cleveland Psychological Association, 1998

Chief, Information & Referral Service, Cleveland Psychological Association, 1998

Chairperson, Speakers Bureau, Cleveland Psychological Association, 1997

Chairperson, Public Education & Marketing Committee, Cleveland Psychological Association, 1997

Member, International Society of Traumatic Stress Studies, 1994 to Present

Member, Cleveland Psychological Association, 1985 to Present

Member, Ohio Psychological Association, 1985 to Present

Member, American Psychological Association, 1985 to Present

Member, Employee Assistance Professionals Association 1985 to Present

Member, Program Committee, Employee Assistance Professionals Association, Northern Ohio Chapter, 1985 to 1987

4

American Management Association 1985 to 1987

## *Teaching Experience*

Guest Lecturer, Critical Incident Stress Debriefing, Cleveland State University, Cleveland, Ohio, 1997

Instructor, Behavior Modification, Ursuline College, Cleveland, Ohio, 1987

Graduate Assistant, Psychological Assessment, Case Western Reserve University, 1980-1981

Undergraduate Assistant, Statistics, Case Western Reserve University, 1980-1981

## *Professional Publications*

Kaplan, Robert G., (1998) Preventing Workplace Violence, in *The Best of Labor & Employment Law, 1997, Volume #703,* Carl F. Muller, Ed., Columbus, Ohio, Ohio CLE Institute Publications

Workplace Violence Technical Advisor, Gustin, Joseph F. (1996), *Safety Management, A Guide for Facility Managers,* New York, New York, Upword Publishing, Inc.

Weiner, Irving B., & Kaplan, Robert G., (1978), Supervising the Beginning Therapist, in *Psychotherapy Supervision: Theory, Research and Practice,* New York, New York, John Wiley & Sons, Inc.

## *Government Consultation*

Consultant and Expert Witness, Personal Injury, Office of the Attorney General of Ohio, 2003

Expert Witness, Personal Injury, Department of Justice, Canada, Winnipeg, Manitoba, 2002

Expert Witness, Death Penalty, Federal Public Defender, Phoenix, Arizona, 2002

Consultant, Police Homicide, Erie County Prosecutor's Office, Buffalo, New York, 1999

Expert Witness, Death Penalty, Indiana Public Defender's Office, Indianapolis, Indiana, 1997 to 1999

Consultant & Expert Witness, Workers' Compensation, Greater Cleveland Regional Transit Authority, 1997 to Present

Volunteer Mediator, City of Lakewood Prosecutor's Office, Lakewood, Ohio, 1990 to Present

5

Consultant, Stress Management, U.S. National Aeronautics and Space Administration, John Glenn Research Center, (formerly Lewis Research Center), Cleveland, Ohio 1986 to 1988

Expert Witness, Juvenile Homicide, Cuyahoga County Prosecutor's Office, Cleveland, Ohio, 1985

Consultant, Ohio Bureau of Workers Compensation, Cleveland, Ohio 1984 to 1986

Consultant, Ohio Bureau of Vocational Rehabilitation, Cleveland, Ohio 1984 to Present

Consultant, U.S. Social Security Administration, Cleveland, Ohio1984 to 1986

## *Community Affiliations*

Founding Board Member, Cuyahoga County Critical Incident Stress Debriefing for Emergency Responders, Cleveland, Ohio, 1995

Volunteer Coordinator, Mental Health Disaster Team, American Red Cross, Cleveland, Chapter, 1992 to Present

Board Member, Cleveland Clinic Foundation Children's Hospital Advisory Board, 1990 to 1992

Board Member, Glenbeigh Chemical Dependency Hospital Community Advisory Board, Rock Creek, Ohio, 1990 to 1992

Board Member, Adam Walsh Foundation for Missing Children, Cleveland Chapter, 1987

## *Professional Presentations (Partial Listing)*

*Verifying Psychological Claims,* VocWorks Employer Seminar, Cleveland, Ohio October, 2003 and Youngstown, Ohio October, 2003

*Better Evaluation & Management of Candidates and Employees,* Ohio Staffing Services Association, Cleveland, Columbus, Cincinnati, and Dayton, Ohio, September, 2003.

*Workplace Violence Prevention,* Ohio Bar Association, Columbus, Ohio, August, 2003

*Psychological Issues and the Law,* 16th Annual Labor and Employment Conference, Benesch, Friedlander, Coplan & Aronoff, LLP, Cleveland, Ohio, May 16, 2002

*Take a Proactive Approach to Protecting Your Company and Employees From Workplace Violence and Conflict,* Personnel Law Update, Council on Education in Management, June 20, 2000

6

*Stress Management, Healthy People: Mental Health Program,* The Health Museum of Cleveland, February 8, 1997

*Critical Incident Stress,* Business and Industry Council for Emergency Planning and Preparedness, American Red Cross, Cleveland, Ohio, January 14, 1997

*Violence in the Workplace and the Impact it has on Victims and Their Families,* In Your Interest, WQHS-TV, Silver King Broadcasting, Cleveland, Ohio January 10, 1997

*Preventing Violence in the Workplace: The Growing Threat That Can Happen Anywhere at Any Time,* 1996 Ohio Employment Law Seminar, Ohio Chamber of Commerce & Manufacturers Education Council, Columbus, Ohio, October 22, 1996

*The Human Equation,* Business Survival and Recovery Seminar, Contingency Planners of Ohio, Cleveland, Ohio, October 15, 1996

*Managing Employees After a Branch Robbery,* Robbery Seminar, Star Bank, Cleveland, Ohio, September 24, 1996

*Stress Management,* Future Leaders of Medina County, Medina County Schools, Medina, Ohio, March 7, 1996

*Diagnosis & Treatment of Anxiety Disorders with Particular Emphasis on Post Traumatic Stress Disorder,* Continuing Professional Education, Cuyahoga Community College, Cleveland, Ohio, March 5, 1996

*Substance Abuse Prevention,* Representing Closely Held Businesses, Cohen & Company, Cleveland, Ohio, November 14, 1995

*Dealing with Catastrophic Stress,* Business Disaster Recovery, Contingency Planners of Ohio, Cleveland, Ohio, July 19, 1995

*Workplace Violence Prevention,* Crime and Violence in the Ohio Workplace, Institute of Business Law, Cleveland, Ohio, May 17, 1995

*Evaluation of Emotional & Psychological Distress,* 1995 Spring Meeting Program, Ohio Association of Civil Trial Attorneys, Columbus, Ohio, May 12, 1995

*Workplace Violence Prevention,* Crime and Violence in the Ohio Workplace, Institute of Business Law, Columbus, Ohio, May 10, 1995

*Managing Traumatized Employees,* Disaster Planning Symposium, American Red Cross, Cleveland, Ohio, March 21, 1995

7

*Managing Distressed Employees,* Annual Meeting, Personnel Association of Central Ohio, Columbus, Ohio, January 12, 1995

*Warning Signs: How to Identify and Intercept Potential Violence,* Preventing Workplace Violence, Council on Education in Management, Cleveland, Ohio March 30, 1994
*Safe Handling of the Volatile Employee,* Personnel Law Update, 1994, Council on Education in Management, Cleveland, Ohio, January 28, 1994

*Emotional Damages and Claims of Sexual Harassment,* Labor & Employment Law Seminar, Duvin, Cahn, Barnard & Messerman, Cleveland, Ohio, October 28, 1993

*Controlling Emotional Damages in Catastrophic Cases,* Joint Seminar, Mississippi Claims Association & Mississippi Defense lawyers Association, Jackson, Mississippi, April 30, 1993

*Substance Abuse Prevention Program,* Drug Testing and Litigation: Understanding the Process, Ohio State University Continuing Legal Education, Cleveland, Ohio May 8, 1992

## *Training Programs Developed & Presented*

Substance Abuse Prevention (For Employees & Managers)

Sexual Harassment Prevention (For Employees)

Stress Management (For General Public)

Traumatic Stress, Post Traumatic Stress Disorder & Critical Incident Stress Debriefing (For Mental Health Professionals)

Dealing with Catastrophic Stress (For Managers)

Dealing with Victims of Catastrophic Claims (For Insurance Adjusters)

Managing Distressed Employees (For Managers)

Coping with Change (For Managers)

Making the Most of Differences Between Yourself & Others (Diversity Training for Employees)

Proving & Disproving Emotional Damages (For Attorneys)

Dealing with Volatile Customers (For Employees)

Dealing with Volatile or Difficult People (For General Public & Employees)

8

Workplace Violence Prevention (For Employees & Managers)

Verifying Psychological Claims (For Attorneys & Claim Represenatives)

## *Media Appearances*

Wall Street Journal (September 11, 2001, Working in Tall Buildings)

Cleveland Plain Dealer (Employee Assistance Programs, Stress Management, Workplace Violence)

Inside Business Magazine (Psychological Effects of Economic Change in Cleveland, Ohio)

WKYC-TV3, Cleveland, Ohio (September 11, 2001, Murderers, Seasonal Affective Disorder)

WJKW-TV8, Cleveland, Ohio (September 11, 2001, American Red Cross) Named to "America Responds" Team for features on coping with terrorism

WEWS-TV5, Cleveland, Ohio (September 11, 2001, Post Traumatic Stress Disorder)

9

EXHIBIT "B"

PROFESSIONAL FEE SCHEDULE OF ROBERT G. KAPLAN, PH.D.

# Kaplan Consulting & Counseling, Inc.

## Fees for Forensic Evaluation, Consultation and Testimony

### Evaluation

| | |
|---|---|
| Diagnostic Evaluation | $300/hr. |
| Record Review & Analysis | $300/hr. |
| Report Preparation | $300/hr. |
| Consultation in Person or by Phone | $300/hr. |
| Psychological Tests | $150/test |

### Testimony

| | |
|---|---|
| Deposition Testimony* | $300/hr. (2 hr. minimum) |
| Court Testimony* | $300/hr. (4 hr. minimum) |
| Preparation for Testimony | $300/hr. |

### Other Charges

| | |
|---|---|
| Per Diem for Evaluation or Testimony | $2,400/da. (8 hr. maximum) |
| Local Travel Time** | $300/hr. Portal to Portal |
| Non-local Travel Time | $1,200 flat rate each way per separate day |
| Record Copying | $0.20/copy plus $25/hr. Administrative and Secretarial Time |

### Retainer Policy

$3,000 Must be prepaid and will be charged at prevailing rates. Unused portion will be refunded.

*Retainer not required for government entities.*

*Fees for testimony are non-refundable and must be paid seven days in advance to reserve time.

** Local travel time applied for locations within 60 miles of Beachwood or Lakewood, Ohio offices. Non-local travel time applied for locations outside of 60 miles of Beachwood or Lakewood, Ohio offices.

LARRY SOUTHWICK STATEMENT TO
HOOLIHAN & DILLON AT W.P.D.

Larry Southwick, date of birth is ▮▮▮▮ Social is ▮▮▮▮▮▮. He lives at ▮▮▮ ▮▮▮▮▮▮▮. He works full time at MedStar Ambulance as a dispatcher. He is currently the manager of the Warren terminal of the Greyhound Station.

Larry has worked for Fingerhut since 1998. At that time there was a West Warren Terminal. He worked as a ticket agent in the mornings from 8:30 until 12:00 at which time Fingerhut would come in. They would close the terminal, go to lunch together and then re-open the station. Larry then went to his regular job at 1:00.

Larry helped Fingerhut move the West Warren station to it's current location on East Market. In the process of moving Larry asked Robert what was in the bag (which was in a box of stuff they were moving). He told him it was a gun and showed it to him. Larry describes it as a .38 revolver that was silver with light brown handles. In the bag also were an eyeglass repair kit, ammunition and a couple of knives. Larry said this bag was always at the terminal in a little cubbie hole in the wall. When Fingerhut worked it was either in the back office with him or near his briefcase.

Either Robert or Donna would call in to the terminal everyday to see if everything was all right with Larry. He didn't actually meet Donna for approximately 4-6 months after coming on board. Larry describes Robert as a good boss who was laid back and a fair payer. Larry wasn't aware of any relationships outside of the marriage. Robert introduced Donna as his 'wife'. He said that they argued from time to time, like normal couples.

Larry said that Donna spent a lot of time back then at the Youngstown terminal. There was a restaurant in the terminal called Just The Ticket where Donna was most of the time. Apparently she's been arrested at least a half dozen times in that restaurant. He could only recall why on one occasion. The charge was obstruction of justice. There was a white security guard that was always hassling the black customers and Donna would go off on him. Her arrest was the result of this. When Donna would call Robert to bail her out he would call her an idiot and tell her he wasn't going to bail her out.

EXHIBIT
65

The hours of the Youngstown station are approximately 7:00, 7:30 to 9:00, 9:30.

Larry quit the terminal in 2000 because some phone cards came up missing from the safe and Robert blamed him. Robert said it had to be one of Larry's family members or someone he let in the back. He repeatedly said this to Larry and Larry finally wrote Fingerhut a letter and quit. Fingerhut only listed Larry's name as a possible suspect on the arrest report. Larry said he even had some of his own money (rolled coin) in the safe and why would someone leave that behind and just take the cards. Donna let people back there, even passengers (as was witnessed by Larry's wife). Even inmates were in there a lot. Several times a week TCI would bring inmates to the terminal who had been released. Larry quit in October of 2000.

Donna called him to come back to work in November of 2000. Robert wanted him to come back as well and told him he could when things picked up. However, he didn't go back until the Saturday after Robert's funeral.

Larry said there was no indication of marital problems. Fingerhut joked once about "she must have a boyfriend' after a telephone call with Donna. That was a couple of months ago, Larry said.

When Larry came back on December 15th, the bag with the gun was in the cubbie hole. He didn't look inside at that time. The following Monday he looked and sure enough, the gun was gone. He called the Howland Police Department to report it missing.

Larry attended the funeral and said Donna was crying the whole time. She met with him afterwards (at the funeral) and gave him the keys to the Warren terminal to open up the next day.

Larry didn't know of any boyfriends of Donna's and had never seen or heard of Nate. He did witness her writing a long letter a week before Robert's death. He didn't know if Donna carried a gun or not. The target in the terminal was from a target practice she attended next door to the old West Warren terminal. There is apparently a shooting range there.

There was a computer at the Warren terminal with internet access. Larry never witnessed Donna on it.

Larry first heard about the Santiago-gun incident after Fingerhut was murdered.

When police asked him if he thought Donna would have any use for the missing phone cards he said she could use them for private, untraceable calls if she wanted to. He never witnessed this though.

At night, Robert and Donna, would take the daily cash home with them and one would deposit it in the morning on their way to work.

Larry said that Fingerhut was distanced from his son in Florida and that he didn't trust any members of his family.

Larry didn't know EVERYTHING was in Donna's name, only the Greyhound business. Larry was told it would be harder for someone to sue them if it was in Donna's maiden name. Larry also thought Donna was laid back and easy going.

Larry said Fingerhut really liked eBay and that's where he got all the team jackets and other sports memorabilia.

Larry called Donna after the funeral to console her. They never discussed the actual death. Talked about 3 times just consoling. She then asked him to run the station because he was the only one in Warren who knew how and she trusted him.

Larry never saw any bullet holes in the basement of the Warren terminal. He said they weren't there when they moved to the new location.

Robert never mentioned Nate and Larry never saw them together.

Jenny Smith is Larry's Sales Manager. She heard from both, Jamie Wozak for the Akron terminal and Melvin, from the Youngstown terminal that driver (the 5:15 bus), Jimmy McCoy, told them that jokingly he said, upon coming into the Warren terminal and finding Donna on the computer, "You're in a chat room talking to your boyfriend again". And she replies "My man, Nate, is in the back". At that point Nate comes from the back office to the front office. This was one week before the homicide. (???)

CHRISTINE ELLINGTON
INTERVIEW WITH HOOLIHAN AND DILLON (H.P.D) AT THE W.P.D.

Christine owns The Final Cut hair salon at 402 East Market. She lives in Liberty and her Social is ▮▮▮▮▮, date of birth is ▮▮▮ Hours are 9-5 on Tuesday thru Friday, and 7-4 on Saturdays. Closed Sunday and Monday.

She had seen Donna and knew she worked at the Greyhound Station.

Donna brought Nate in on the 11th and said "Here's another cut".

Christine said she didn't converse with Nate at all during the cut because it slows her down and the fact that she didn't know Nate. Donna went back to the terminal.

Chris said Nate was wearing dark clothing, and paid for the cut himself ($13.00).

Christine said that Donna has brought 3 or 4 black guys in for cuts previously and all she would ever say was "I have a cut for you".

Christine said she had never seen Fingerhut and Nate together.



**EXHIBIT**
66

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5506

01-32813

## WARREN MUNICIPAL COURT
141 South St., Warren, Ohio 44483

STATE OF OHIO
CITY OF WARREN

CASE NO. O/HR/J 3570

VS.

COMPLAINT (Rule 4)

SANTIAGO MASON
Name

Soc. Sec. #
D/O/B

Warren, Ohio 44483

Address

Sex

Complainant being duly sworn states that _____ SANTIAGO MASON
Def. Name

at ____ CITY OF WARREN _____ Trumbull Co., Ohio; on or

about ___ November 20 ____ 20 _ 01 _

State essential facts

did with purpose to deprive the owner, Donna Roberts,
one(1) .3d cal Smith & Wesson handgun, Three Hundred
Twenty Dollars in U.S.Currency and telephone cards
the value being over $500.00 knowingly obtained or
exerted control over said property by deception

in violation of ORD/ORC ___ ORC 2913.02 THEFT F 5th dg

complainant ___ Donna Roberts

address _____

_____
Complainant Signature

NOVEMBER 23

Sworn to and subscribed before me on

_____
Judge - Clerk - Deputy Clerk - Notary

## WARRANT ON COMPLAINT

To _____ You are ordered to arrest
above defendant and bring him/her before this court without unnecessary delay. You
may/may not issue a summons in lieu of arrest under Rule 4 (A) (2) or issue summons
after arrest under Rule 4 (F) because _____

State reason if restricted

_____
Judge - Clerk - Deputy Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SUMMONS ENDORSEMENT

This warrant was executed by arrest/by issuing the following summons:
You are hereby summoned and ordered to appear at _____ o'clock ____ M. on
_____ 20____ at Warren Municipal Court. If you fail to
appear at the time and place stated above you may be arrested.

_____
Issuing Officer - Title

EXHIBIT
67

Highlight of the notes of the tape of Santiago Mason at the Prosecutor's
Office.  Detective Hoolihan and Detective Dillon (Howland P.D.) took this
statement.

Santiago is married and he has one kid.  He apparently goes to the
Greyhound bus station in Warren where he was going to purchase a ticket to
go to Cleveland to visit his relatives the next day.  As he is at the window, he
approaches Donna and she is sitting there writing a letter.  He sees a picture
of a black guy and it looks like he is in incarcerated.  Santiago recognized
the bars, because they were both apparently housed in Belmont.  They didn't
know each other though.  He buys the ticket and then Donna starts coming
on to Santiago pretty heavy.  Telling him, "You are so cute.  I always liked
black guys cause they got big dicks."  Santiago in turn says, "I got a big
dick."  One thing leads to another and she is asking him "Can we hook up
later on tonight.  I get off work at 5:00, why don't you come back down to
the station at 5:15 and we'll hang out.  Maybe go to my house."    So,
Santiago goes back to the Greyhound station at 5:15 and he goes around to
the front door and she tells him to go to the back door where she comes out
and tells him she will be right out, she has to lock everything up.  They get

in the car and Donna fires up a bad ass joint. They get to Donna's house and apparently they are in the living room. They are only there for about 45 minutes. Donna proceeds to say, "Let me see how big your dick is." Santiago gets his tool out and Donna has her way with it and she is begging him, "Why don't you fuck me. Why don't you fuck me." Santiago says, "No." He keeps saying no. He's mumbling about he doesn't want to get any disease or anything like that cause he is married. Anyway, Donna finally gets pissed off and Santiago wants to go back to the Greyhound station, he's asking questions about Donna's husband, whether he will be home or not and he was real nervous about being there seeing that he just met her that same day and here he is in her car, in her big house, getting high with her and having sex with her to an extent. Just oral sex on Donna's part.

Donna tells him that Nate…she is always going on about Nate, how much she loves him and how much he loves her and she can't wait until he gets out… That her and Fingerhut don't even sleep in the same rooms, they are actually separated, but they are just living in the same house. She tells him she doesn't want a divorce because everything is in her name. Donna tells him that Nate is going to shoot some guy that's been hitting on her and later on in the tape, it reveals that this happened before Nate went to prison. He

and Donna were in a car and a gang of black guys comes over and they are like sizing her up and saying stuff and that's what that led to. Since they were hitting on Donna he was going to shoot them.

She takes him back to the Greyhound station and he walks home and then two or three days later, Donna calls him and Santiago apparently had her cell phone number. She gave it to him. He actually rattled it off by heart during his interview. She calls him and tells him she wants to see him and suck his dick again. Apparently, they end up going to meet back at the Greyhound station and Santiago comes of course and they get in the car and she is listening to this wild rap music and he was laughing, "What you doing woman? Listening to music like that!" She's all old and everything you know. (Santiago) On the way there, Donna is asking Santiago why don't you drive and he says I drive, I have a car, I just don't have a license. I have fines and costs and it is going to cost money to get unsuspended or whatever and she says, "Well, I will loan you the cash. If you want so you can get your license back." He was like, "Cool, that works for me." She reaches in her pocket and gives him $220.00, by this time they are back at the house. They are in the other living room this time, Donna performs oral sex on him again and she says, "Don't worry about the money honey. I don't ever have

to worry about money. I don't worry about money at all. When you gonna fuck me?" Again he says, "No." She gets mad and she goes back to the bedroom and comes out with another joint and she is smoking it. They were only there at the house for 20 to 25 minutes. She is still mad, so she takes him back to the station and then about one week later she shows up at his place of employment, Vista Windows, (Elm Road?  Old Stambaugh Thompson's behind Perkins, I am not real sure) Anyway, she is all irate, she's mother fucking him up and down and screaming, "I want my money back!" There was a couple of witnesses there, his friend Wali, he spends every night over at his house in the evenings. Another guy name Walt. She is going on and on, mfing him, "You got my money and my gun!" Santiago is like, "Your gun? I don't have your gun, I don't have your money." She is saying, "I am going to have you fucked up." So they keep interrogating him about whether they ever stopped anywhere, have they ever just stopped anywhere at all, other than just go to the Greyhound and straight to her house and back and Santiago is adamant that they have never stopped anywhere. Including the Dairy Mart where supposedly the gun was stolen from her and the money. He swears he has never seen any envelopes or any bags, never saw a gun, he never stopped, but Donna did tell him at one point earlier on the first ride that she kept two guns in the car. She ends up telling

him that she is going to call the police and she filed that report on him November 20th, missing Smith and Wesson 38, phone cards, and cash. He told the detectives that before she wasn't worried about the money, she never had to worry about money, and now she is all pissed off about the money and that she is a liar and that she will fuck any black guy. She's always kissing on the bus drivers all the time at the Greyhound station. He tells Hoolihan that he would take a polygraph when Hoolihan asked him and he wanted Donna take one too. He says she is a psycho type of woman and one other thing that he said was that she was a fast driver. That she drives like a "bat out of hell." (Maybe she was just pissed?) Detective Hoolihan asked Santiago, "Why would Donna file this report on you?" He says, "Because of the sex." He wouldn't give it to her. Santiago called Robert Fingerhut at the Youngstown Greyhound and tells him about everything, that he's had an affair with her and she is accusing him of stealing this gun and money. Fingerhut asks him, "How do you know her?" He says, "From the Greyhound station in Warren." He just says, "Oh, okay." And hangs up the phone.

Early on she told him that she would love to have a three some with two black guys, how it would be great to be sucking on one black guy and have the other black guy in her ass.

His friend's name that he spends every evening with Wali, one of the witnesses at Vista Windows, his last name is Akram. I don't know where he lives or anything.

I guess that's it.

# HOWLAND POLICE DEPARTMENT

### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page 1 of 5



On Wednesday, December 12, 2001 at 1:00pm Donna Roberts came to the Howland Police Department with her brother Ralph Roberts and sister in law Rita Roberts. Donna came into the Detective Bureau Conference Room along with Capt. Compton, Det. Sgt. Dillon and R/O. Ralph and Michael Roberts, Donna's brothers waited in the lobby of the police station.

Donna told officers she last saw Robert Fingerhut alive at 8:00am on 12-11-01 in the master bedroom of their 254 Fonderlac SE residence. Robert was getting ready for work and Donna was lying awake in bed. Donna thought Robert went to work at the Warren Greyhound terminal. Donna said she also helps out at the Warren terminal but never the Youngstown office. She sells tickets in Warren and does basic office work. She told officers she doesn't work in the Youngstown office because everything is computerized and she does not know how to use the equipment.

Donna met Robert in Miami, Florida and married August 22, 1983. Robert was a licensed private investigator in Florida. He had a permit to carry a gun there. Robert bought a BCI badge in Miramar, Florida. Donna worked for Dr. Morton Freiman MD a plastic surgeon in North Miami Beach, Florida. Donna told officers she was the office manager and as part of her duties she conducted billing, kept, wrote and maintained medical records. Donna further told officers she was Dr. Freiman's only employee and also served as his medical assistant during surgical procedures. Donna also traveled to Israel with Freiman and did trauma work with him during two wars on fresh battle injured soldiers in the field. Donna said she provided treatment for gunshot wounds and performed skin graphs.

Donna was born in Youngstown, Ohio and married three times. Her first marriage was to William Raymond and lasted six years. The second marriage was to Bert Gelfand for ten years and then to Robert Fingerhut in 1983 for three years. Donna said the only reason her and Robert were divorced was because of financial benefits in the case of a civil suit against Robert. Donna told officers the divorce was Roberts idea. He wanted to put all of their assets in Donna's name so they would be protected in the case of a lawsuit or failure of their business.

1



EXHIBIT
68

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5514

Donna told officers her and Robert got along great and had no real problems with their relationship. They had small problems like any couple. She stated they argued over little things like changing the dog's water, but nothing major. They purchased their 254 Fonderlac residence in 1995. Donna also mentioned Robert was a collector of sports memorable and World War II relics. Donna bought Robert a Cleveland Browns, Brian Sipe field worn football jersey in the early eighties and that is how he got started collecting jerseys, making jerseys and collecting other memorabilia.

Donna told R/O on the day of Robert's murder she woke up around 8:00am when Robert was leaving for work. Donna said she just stayed in bed relaxing until 9:30 or 10:00am. She got out of bed, washed her hair, did her makeup and took care of the girls, "her dogs". At 12:30 she arrived at the Warren Greyhound Bus Terminal and worked until 5:15pm. When Donna arrived Robert had already left the terminal and Donna did not know where he was. Donna said she called Mr. Daniels at the Youngstown terminal to see if Robert was there. She was told Robert had not yet arrived. During her worked period Donna said everything was normal and nothing unusual happened. She said she spent the day alone in the office.

After work Donna went to Giant Eagle and purchased a cooked roast chicken for her dogs to eat. She arrived at 254 Fonderlac SE at 5:45pm and Robert was not there. Robert usually worked in the Youngstown terminal from 2:30pm until the last bus at 9:00pm. Donna called Robert once at the Youngstown terminal after coming home from work. Robert called Donna a couple of times between 5:45 and 9:00pm. Robert called to see what Donna was doing, ask what was for diner and to tell her things were slow at the office.

At 9:00pm, Donna said she called Robert at the Youngstown terminal, he told her he was going to be a little late, but did not say why. Robert told Donna she should go shopping at the mall and buy herself something nice, because she deserved it. Donna said she did not go to the mall, but to Wal-Mart instead.

Donna then said," there is something you don't know about Robert, and you can't let this get back to anyone because no one knows. Robert goes both ways." Donna has never met any of Robert's male friends, but she knows Robert met one of them at the Avalon Inn sometime last year. He has a friend named Bobbie who would call him at the house until last week. Bobbie would call a couple times a week and ask for Robert. Donna said, "Robert has his friends and I have mine, I guess we are just a pretty cool couple".

Donna said, customers have threatened Robert at the bus terminal in Youngstown. Some of the customers are crazy. Donna had no specific details as to who may have made the threats or who the crazy customers were, just that there were a lot of people like that.

2



Donna told officers Robert has several firearms, a big rifle with a bayonet, 38-caliber Taurus revolver with a short barrel, 38-caliber revolver with an unexposed hammer, unknown brand and a Smith and Wesson 38 caliber revolver.

On November 20, 2001, the Smith and Wesson 38 caliber revolver was stolen from Donna's car while parked at the Dairy Mart on Logan and East Market St. in Warren, Ohio. Donna said, she helped this guy she really didn't know and gave him a ride. She knows him only as Santiago, who is a black male subject. Donna gave him a ride and he stole the gun and $320.00 Greyhound deposit, which was in the car. Donna said, she ran into the store to buy cigarettes and when she returned to the car, Santiago, the gun and money were all gone. Donna immediately reported this theft to the Warren City Police Department.

Donna told officers six months to a year ago she was dating a guy named Carlos. Donna dated Carlos for two or three months, but she cannot remember his last name. Carlos is a male, half black and half Hispanic of average height and weight. Donna met Carlos at the bus terminal in Warren. Donna's relationship with Carlos was for sex and she had no emotional attachment to him. R/O asked Donna if there was anyone else she had any type of relationships with and she said, "no".

R/O asked Donna if she knew Nate Jackson and she said, "oh yea, I forgot about him. He calls me from prison and he just got out on Sunday, 12-09-01". Donna told officers she went to Lorain and picked Nate Jackson up Sunday when he was released from prison. She has known Jackson for two years and seeing him on a regular basis since they met. They met at the Youngstown bus terminal. Donna told officers Jackson was in prison for being a passenger in a stolen car. Donna also told officers Nate has been in and out of jail for stupid little thing, nothing bad. Donna told officers Robert and Nate were friends. When Donna and Nate got back into Youngstown from Lorain on Sunday, 12-09-01 she dropped Nate off at Shelia and Oscars. Their house is somewhere in Youngstown with red shingles on the side of it, instead of siding. Donna didn't talk to Nate again until Tuesday morning, 12-11-01 on the telephone. Nate called Donna, she did not know where he called from, he just called to say hello. Donna did not see Nate on Tuesday, December 11, 2001.

Donna said, "Nate was not jealous of Robert and Robert understood about Nate. Robert knew all about my relationship with Nate". Donna told officers her and Robert had an understanding and out of respect for Robert she would not bring men to their home to have sex. The last time Nate Jackson was at the 254 Fonderlac with Donna was the weekend before Labor Day. Nate was serving time at CCA in Youngstown and was on a weekend pass. During this visit by Nate, Donna said Robert was home and she did not have sex with Jackson. Over Labor Day weekend, Nate was on a pass from CCA and she had sexual relations with him, but not in the house. Donna said, "her relationships were just a game and the game had only one rule. You don't say I love you to whoever you're dating and Robert was very strict about that".

3



Donna told officers the music she likes to listen to is older stuff and pop. Nate likes
listening to rap and rhythm and blues. Donna said she stopped at the house on
Sunday, 12-09-01 with Nate. She said they were both in the house from 1:00pm to
2:00pm, feed her dogs and picked up some pot, "marijuanna". Nate last spoke with
Donna in the morning on the eleventh of December 2001, from a payphone
somewhere in Youngstown.

Donna describes Nate as 5'10", thin but with a muscular build, short black hair
with dark skin. Donna told officers her and Nate wrote each other a lot. They wrote
each other about three times a week. On Thursday and Saturday Nate would call
Donna collect from prison.

Donna told officers Robert was a very hyper person and when he got mad he was
flaky. About a week, week and a half before Robert's death he was acting kind of
nutty up until yesterday. Robert was missing Tuesday, from 11:30am to 2:15pm
when he showed up at the Youngstown Terminal for work. Donna said this is out of
character for Robert to go or do something without her knowing about it. Robert
kept a gun in the center console of his car or tucked between the seat and the
console.

Donna went back over what she had done late Tuesday evening on the eleventh of
December with officers. At 9:00pm she went to Giant Eagle to buy chicken for her
dogs, but they did not have any. Donna was in Giant Eagle approximately five
minutes. Donna then went to Wal-Mart and shopped for approximately 30 minutes.
Donna bought make up and a cigarette lighter. About 10:30 Donna arrived at Super
Kmart and made no stops or detours along the way. Donna told officers she was
there a long time and just looked around. She likes looking around at Super Kmart.
Donna did not buy anything. Donna said she did not see anyone she knew at Super
Kmart, but she did talk with a lady who had a cute little boy with her. Donna left
Super Kmart at 11:30pm and went straight home. Donna came down her street and
pushed the garage door opener. The garage light came on and the overhead door
began to close, so she pushed it again. Donna parked the car in the garage and
closed the overhead door.

Donna told officers she has a pending lawsuit against a policeman who worked in
the Youngstown bus terminal. She thought the officer's name was Bettencougher
and he wore a black uniform. Donna said she did not know what police department
the officer was from. Donna said the suit is a couple years old and was dismissed by
the court. They have file an appeal with the court and she does not know where the
case currently stands. Donna said Attorney Steve Chuparkoff, (330) 744-3010 was
handling the appeal.

Donna told officers Robert has a life insurance policy worth $250,000.00 with State
Farm and she has one worth $50,000.00, their agent is Cathy Thomas. Thomas can
be reached at (330) 793-1136. Donna said Robert was going to increase his life

4



JANET CLAY STATEMENT TO:
HOWLAND POLICE

Janet lives at ▮▮▮▮▮ Youngstown, Ohio. Her date of birth is ▮▮ Her
Social is ▮▮▮▮ Her phone number is ▮▮▮▮

Janet met Nate on the 10th @ Sheila's house in the afternoon. Just Janet, Sheila
and Nate were present.

Donna picked Nate up in her car on the 10th. They came back later that night and
Donna & Nate went into the bedroom to smoke crack. This was done in exchange,
of course, for crack paid to Shiela. Nate gave Sheila a gram for the room rental at
that time.

Janet said she then saw Nate again the next day (11th) when Nate called Sheila
looking for someone to 'kick it' with at the Days Inn. He offered Janet crack and
money to come to the Days Inn to 'kick it'.

John takes Janet and Sheila to the Days Inn. He leaves Janet there with Nate,
and after getting a hit for bringing her, John and Sheila return to Sheila's house.
Sheila told Janet to call for a ride back when she was ready.

Janet said that Nate went to the Kings Motel on the 12th and he had another girl
there.

Nate calls Sheila to come and get Janet and John does so. He goes in and gets his
hit and then takes Sheila and Nate back to Sheila's house. There, at Sheila's they
smoke more crack and Janet said they were up all night. Nate was still there in
the morning (of the 12th).

Nate told Janet he cut his hand. She said he was very nervous and jittery, pacing
back and forth continually looking out the window and peep hole of the door. She
said that Nate was smoking a lot of crack (and this really means something coming
from her). She approximated over a gram.

Janet said that Nate was staying at Sheila's house.



EXHIBIT
69

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5518

On the night he was arrested, (early morning hours of the 20th) Janet said that Nate had been waiting all day for Donna to come pick him up. She never came. Nate was talking to Donna when the police came. Nate was really upset with Donna that she didn't come get him. Donna said she couldn't because she was at her moms and that she couldn't leave her mom because Mom was so upset with everything. Donna never bothered to call Nate and tell him she wasn't coming.

Janet said that Nate and Donna talked to each other numerous times and Nate would always go off to another room to talk to her.

Janet said that even she knew that something happened. She figured Nate just robbed somebody or something.

Janet never saw any gloves, gun or ski mask.

END

# HOWLAND POLICE DEPARTMENT

169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Det. Sgt. Monroe
Page 1 of 5



On Tuesday, December 12, 2001, shortly after 0005 hours R/O was contacted by Ptl. Ray who advised he was at 254 Fonderlac SE where a shooting had occurred. Ptl. Ray advised he was at the crime scene and had one dead male white subject lying on the kitchen floor with a handgun near the body. Ptl. Ray believed the subject had been shot in the head. Ptl. Ray requested assistance processing the crime scene and advised he would also contact Det. Sgt. Dillon and the Corners Office. R/O told Ray to secure the scene and not disturb anything until detectives arrived.

At 0035, R/O arrived at 254 Fonderlac SE and spoke with Ptl. Ray and Ptl. Pollcino. Officers advised there was no sign of forced entry into the residence. Ptl. Pollcino walked around the entire exterior of the residence and found nothing unusual. The victim's wife, Donna Roberts, called 911 and reported the incident. Ptl. Ray further advised Roberts was in the master bedroom.

After quickly surveying the scene, R/O told Captain Phillips of the Howland Fire Departments EMS squad there was no need for his personnel to stand by any long. R/O then contacted Trumbull County Sheriffs Detective Tony Leshnack and Warren City Police Detective Daniel Mason and requested their assistance processing and photographing the crime scene. Det. Sgt. Dillon videotaped the scene.

R/O and Ptl. Ray went into the master bedroom and spoke with the victim. She seemed very excited, anxious, curious and inquisitive as to what had happened. R/O told the victim it appears her husband had been shot. She said, "shot, oh my god, someone murdered my Robert". The victim then started screaming, crying and appeared very emotional for several minutes. R/O told the victim she had to be strong and answer a few questions to assist in the investigation. After a couple of minutes Donna composed her self and began answering questions.

Roberts told officers we have a couple of guns in the house, a small silver gun and a second gun Robert keeps in his car, the silver Chrysler 300 which is missing. R/O



EXHIBIT
70

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5520

asked Donna where her husband's car was and she said, "I already answered all
these questions. Where is Roberts car, someone stole his car".

Donna said her husband does not drink or do any kind of drugs. She told officer,
Robert doesn't have any enemies, and everyone loves him. She said that the pot in
the kitchen was hers and Robert never smokes it. Donna said, when she drove down
the street around midnight, she tried to use the garage door opener from down the
street. She noticed when she pressed the opener the light came on in the garage and
the overhead garage door began to close, so she pushed it again and the door went
back up. She parked on the right side of the garage as usual and got out of the car.
She walked around the back of her car and began to enter the house. She noticed
the man door from the garage to the house was standing open, her husband was
lying on the floor with blood all around him and coming out of his mouth. She went
into the house grabbed the portable telephone and called 911. She then thought an
intruder might still be in the house so she went out the front door and stood on the
front lawn giving information to 911 until the police arrived. R/O asked Donna if
the front door was locked and she said it was. Donna said, she had to turn the
deadbolt to open and unlock the front door. Further she indicated they rarely ever
use the front door.

R/O explained to Donna, the entire house needed to be handled as a crime scene,
searched and officers have no idea where or what the perpetrator may have done or
where in the house the perpetrator may have gone and there may be evidence
somewhere else in the house. Donna told R/O, do what ever you have to do, just find
who ever did this. R/O further explained to Donna, it would be necessary to search
the entire house for evidence and it would probably take all night. Donna said, "I
told you, do what ever you have to do, search the whole place, just find the guy."
R/O asked Donna if anything appeared to be missing and she said no. Donna told
R/O, I saw blood coming from Robert's mouth, and did someone stab him.

R/O asked Donna to tell officers everything she had done since she woke up
Tuesday, morning December 11, 2001. At approximately 8:00am, Donna awoke to
Robert getting ready for work and said goodbye to him. Robert left and went to the
Warren Greyhound Terminal. She told officers she stayed in bed until around
10:00am, but did not go back to sleep she just lye there relaxing. At 10:00 she got
out of bed, washed her hair and got ready for work. She arrived at work around
12:30pm at the Greyhound bus terminal in Warren and stayed there until 5:30pm.
Donna said she was driving the red 2000 Chrysler 300m, which was parked, in the
garage. Donna said that is her car and Robert has a silver one just like it.

After work Donna said she went to the Red Lobster Restaurant and had a nice diner
alone. Donna paid cash for diner but could not remember what she ate. R/O notice a
plastic container on the floor of the passenger side of her vehicle with a clear plastic
lid. There were crab legs in the container. When asked about the container with the



Page 3 of 5

crab legs, Donna said, "Oh yes, I remember, I had the king crab legs and an absolute vodka martini". After diner Donna went straight home.

At 9:00pm Robert Fingerhut called Donna from the Youngstown Greyhound Station and told Donna he was going to be late. Donna said," Robert told me I should go shopping at the mall and get myself something nice, because I deserved it". Donna instead went to Giant Eagle to buy chicken for the dogs at 9:00pm. Donna went from her house on Fonderlac to Firestone to Avalon to East Market Street and pulled into the Giant Eagle parking lot from the traffic light. She said the first handicapped parking space was open and she parked there. Donna ran into the store looking for roasted chicken, which they did not have so she left. Donna said she was in the store approximately five minutes. Donna then went to Wal-Mart on Elm Rd. and took the by-pass to get there. She did not stop anywhere else along the way. While at Wal-Mart, Donna purchased make-up and a cigarette lighter. These items were found on the kitchen table of the residence with at receipt for such, dated 12-11-01 at 9:37pm. Donna thought she was at Wal-Mart approximately ten minutes. She then got back on the by-pass and exited on State Route 46/Niles Cortland Rd. and went to Super Kmart. Donna told officers she arrived a Super Kmart shortly before 10:00pm and walked around the store looking at thing, which she often does. Donna said she did not purchase anything she just looked around. Just before midnight Donna left the store and went straight home. That is when Donna found Robert lying on the floor in the kitchen and called the police. Donna then started.screaming, "Oh my god my Roberts gone, Oh my god my Roberts gone". Donna also told R/O she was seeing Dr. Ariza for postmenopausal depression.

Officers noticed while processing the scene, Donna would start screaming and murmuring loudly when officers were not talking. When officers would begin talking about findings at the scene, Donna would become very quiet, as if she was listening to officers. At one point Sgt. Dillon walked toward the bedroom from the dining room and found Donna standing in the bedroom doorway leaning against the doorframe listening to officers. R/O spoke with Donna and suggested a family member be called to come sit with her and possible take her to another location for the night. Donna provided her brother Ralph Roberts's telephone number to Ptl. Ray.

Donna's brother, Ralph Roberts was contacted by the Austintown Police Department and asked to come to the scene at the request of HPD. Donna spoke with Ralph and decided to leave with her brother and sister in-law Rita Roberts. Donna asked R/O what are you going to do now. R/O told Donna, officers are going to continue processing the crime scene and search for more evidence. Donna said, "Ok you do what ever you have to do". R/O again told Donna officers would need to spend most of the night processing the house and it would be best if she left with her



Page 4 of 5

brother for support. R/O also told Donna officers would need to speak with her later in the day to further discus the investigation. Donna told R/O to contact her anytime at Ralph's. Ralph Roberts provided R/O, his address, ▮, Ohio, telephone number ▮ and told R/O to call if anything was needed. Ralph told R/O, Donna could stay with him as long as needed. Ralph also gave R/O his and Donna's parent's address and telephone number, Mike and Pauline Roberts of ▮.

While conducting the crime scene inventory the telephone rang. At 3:38am R/O answered the portable telephone, which was upon the dining room table. R/O said hello several time and the caller hung up. R/O entered *57 and *69, causing a telephone trace of the call to be done by the telephone company. When R/O entered *69 an electronic transmission indicated the previous telephone call came from (330) 506-0373. At 3:48am, R/O called said telephone number and whoever answered the telephone immediately hung the telephone up without saying anything. R/O observed two life insurance polices on Robert Fingerhut, both together inside a cabinet on the upper left side of the master bedroom headboard. These two policies were on top of all the other documents in the cabinet. One of the life insurance policies was with State Farm Insurance valued at $300,000.00; the effective date was from 08-12-99, policy number ▮ agent Cathy Thomas, (330) 793-1136. The other was with New York Life and it was also a life insurance policy valued at $25,000.00, effective 02-12-01, policy number ▮, telephone number 1 (800) 695-5164.

R/O conducted the inventory at the crime scene and cataloged the items removed. R/O also administered a gunshot residue test on Donna Roberts before she left the residence. Det. Sgt. Dillon noticed what appeared to be a small amount of blood on Donna's shirt. Donna told R/O she never touched anything at the house nor did she touch Robert. R/O asked Donna if she could change her shirt and allow officers to look at the yellow shirt she was wearing and Donna complied. While at the scene R/O opened the trunk compartment of Donna Roberts's vehicle. Red 2000 Chrysler 300m, Ohio license number ▮ Inside the trunk R/O found a brown paper bag with the name Nate Jackson and the number 399-469 upon the bag. R/O looked inside the bag and found men's clothing and a second bag containing the items listed on HPD property form as item # 26. Part of item # 26 is 145 hand written letters to Nathaniel Jackson by Donna Roberts.

Those items remained with the all other items secured at the scene. The vehicle was towed by May's Towing to the Trumbull County Sheriffs Department for further processing. Det. Leshnack followed the vehicle in tow and secured it indoors at the Trumbull County Sheriffs evidence-processing garage. Det. Leshnack and Det. Sgt. Pizzulo of the Trumbull County Sheriffs Department later processed the vehicle. At



# HOWLAND POLICE DEPARTMENT
### 169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #: 01-078868
Date: 12-12-01
Investigator: Sgt. Dillon
Page 1 of 5



0011 Hours – I received a telephone call at my residence from Howland PD Officer Albert E. Ray asking me to respond to 254 Fonderlac Dr. SE in reference to a dead body being discovered in the residence. I told Ptl. Ray that I would be enroute shortly.

0026 Hours – I notified the Trumbull County 911 Dispatch Center that I was enroute to the scene.

0029 Hours – I notified the TC911 that I was on the scene.

Upon my arrival, I spoke with Ptl. Ray who informed me that Donna Roberts had called 911 to inform them that she had returned home and found her husband Robert Fingerhut laying on the kitchen floor. Ptl. Ray told me that he and Ptl. Ron Pollcino arrived on the scene and were met in the front yard by a hysterical Donna Roberts, who came running out the front door of the residence with the phone.

Upon entering the residence, I was informed by Howland Fire Department paramedic George Beck that he had checked the victim's vital signs, he was unable to locate any and that the victim appeared to be expired. I approached the area where the victims body was and noted that the victim was laying face down on the floor to the east of the man doorway that leads from the attached garage into the kitchen. I noted that the victim was laying with his head to the south and his feet to the north. I noted that the victims left arm was raised above his head. I noted that the web of the victim's left hand appeared to have a bleeding wound between his first finger and his thumb. The victim's right arm was resting below his shoulders and was pointing towards his feet. I noted a pool of blood underneath and around the injury to the victim's left hand. I noted a pool of blood underneath and around the victims head and blood drops and smears of blood to the right, (west), of the victims body between his body and the open door. I also noted blood spots north of the victim's feet. A pair of boots rested on the floor above the victims left arm, a green thermos type mug, blood, miscellaneous papers and a case of Pepsi Cola in cans lay between the victims body and the kitchen cabinets and countertops to his east. I noted that a rug at the feet of the victim appeared to have been moved by the victim's feet as he fell to the floor and a case of bottled water was resting to the right



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5524

Page 2 of 5

of his feet. I noted the victim was wearing a red satin Cincinnati Reds medium weight sports jacket, a baseball uniform shirt of some type, (white with red pinstripes), blue jeans, white athletic socks and dirty white high top tennis shoes. The floor to the right, (west), of the victim's torso had scattered blood pooling in many different spots. I noted just outside the door, (on a step in the garage), lay a stainless steel handgun with brown wooden grips. The weapon was lying near the southwest edge of the step, pointing north. There was blood on the step and what appeared to be a partial footprint in the blood near the gun. I noted blood on the kitchen cupboard to the left of the victims body, (on the eastside), below the kitchen counter. Blood was on the wall to the left of the victim's head and the kitchen cabinets below the countertop, (in the southeast corner). There was blood both in the southeast portion of the cupboard below the counter as well as from the southeast corner to the northeast corner. I noted blood just north of the victim's feet on the kitchen floor also.

The victims wife, Donna Roberts told us that the victims vehicle was missing from the garage. I asked Donna if she had any idea who may have the vehicle and she stated she didn't. TC911 was notified and a BOLO was put out on the LEADS/NCIC computer system listing the vehicle as stolen. I asked Donna Roberts if the man door from the garage into the kitchen was routinely kept locked or if it was kept unlocked. Donna Roberts told me that she and the victim kept the door unlocked because they had the electric garage door opener on the overhead door of the garage and that made it very secure. I asked Donna Roberts to calm down long enough to tell me briefly what had happened this evening. Donna began to talk, then suddenly stated, "I can't take this, everywhere I look, everything I see, is Robert laying there on the floor, with all that blood!" I calmed Donna down and again asked what happened tonight. Donna eventually calmed down enough to tell me that she had talked with Robert earlier this evening on the telephone several times, the last time she said she thought it was on his cellular phone. Donna told me that Robert told her that he was going to be a little late and that she should go out shopping since he knew she loved to shop. Donna told me that as a result of her conversation with Robert she left the house and went to Giant Eagle on E. Market St., Wal-Mart on Elm Rd. and Super Kmart on SR46. Donna told me that she didn't buy anything at Giant Eagle or Super Kmart, but she did buy something at Wal-Mart and the bag was on the kitchen table. Donna told me that when she came home, she turned down her street and as she approached her house, she hit the button to open the overhead garage door. Donna told me she was startled because she saw the light come on and the door began to go down. Donna told me that she thought that was unusual because Robert never left the door standing open when they weren't at home. Donna told me that she pulled into the garage, got out of the car, walked around the back of it and over to the door that leads from the garage and it was standing open. Donna told me that was when she saw Robert laying there. Donna then began to shout, Oh My God, Oh My God, I can't believe my Roberts on the floor bleeding, I can't get that picture out of my head!" I gave Donna



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5525

Page 3 of 5

some time to calm down again and asked her what she did when she saw Robert. Donna told me that she, "freaked out," ran into the kitchen and grabbed the portable phone, ran into the bedroom and called 9-1-1. Donna told me that then she realized that someone may still be in the house, so she ran out the front door while on the phone and the police arrived about that time. I asked Donna if she saw anybody near the house or on the property when she was coming down the street and she said no.

As we waited for the arrival of the coroner's office, Ptl. Pollcino and I began checking the interior of the residence for any evidence that someone else may still be in the house as well as any evidence that items may have been taken from the house. Ptl. Pollcino and I checked the entire interior of the residence, no one was located and nothing appeared to be missing from our point of view, (no obvious things such as TV's, VCR's, Stereo Components, Computer Equipment, etc.). However, we did find what appeared to be a droplet of blood on the ceramic tile floor in the hallway that led from the front door to the master bedroom. The droplet was later swabbed by Det. Leshnack and entered into evidence, since it was the only sign of blood evidence in the residence other than the area where the victims was found. After an interior check, I exited the residence and made a complete check of the exterior of the residence for any signs of forced entry, with negative results. Inside the residence itself, I found damage to the main bathroom door near the doorknob. I was unable to locate any signs of damage to any of the exterior man doors or windows. Upon checking the interior of the garage, I noted a metal support bar that ran along the entire inside of the bottom of the overhead door panel was damaged, it appeared to have been partially detached from the door itself and the parts were laying on the garage floor. While checking the exterior of the residence, I noted what appeared to be vehicle tire tracks in the front yard on the north side of the driveway in the northeast corner of the lawn. I also detected slight rubber tire marks on the roadway that appeared to travel south on Fonderlac SE, from the marks on the lawn.

A short time later Trumbull County Forensic Pathologist Dr. Humphrey Germaniuk arrived and began his investigation of the scene. Upon the arrival of Dr. Germaniuk, Shelley Mazanetz of the coroner's office also arrived to assist. At the direction of Howland PD Det. Sgt. Paul Monroe, I began to videotape the area around the body. Upon the arrival of Det. Anthony Leshnack of the Trumbull County Sheriff's Office, photos of the entire residence began.

While conducting our investigation inside the residence, Donna Roberts could be repeatedly heard screaming hysterically, "Oh My God, has Robert been stabbed in the face, Oh My God, why isn't he moving, I can't believe I came home to find my Robert like this," from the master bedroom. At the same time, I noted that Donna would stop shouting hysterically and then become quiet. On one occasion when Donna Roberts stopped screaming, I walked back toward the bedroom from the



dining room and found Donna standing in the bedroom doorway leaning against the door frame listening attentively to any and all conversations the officers on the scene were saying. I startled Donna Roberts and when she noticed me in the hallway, she began to break down again, screaming, "Why isn't my Robert moving, I can't believe that I saw him that way!" I remained in the master bedroom with Donna Roberts while Det. Sgt. Monroe entered and conducted gun shot residue tests on Donna Roberts hands. While in the room, we noticed what appeared to be bloodstains on the front of the shirt Donna Roberts was wearing near the bottom. The shirt was also collected and entered into evidence. Upon my initial entrance into the residence, I noticed a tray on the dining room table with stems and seeds that appeared to be marijuana as well as matches, cigarette rolling machines, cigarette rolling papers, 2 empty plastic sandwich size baggies and several small pipes that are commonly used to smoke marijuana and crack cocaine. Det Sgt. Monroe and I asked Donna if the drug paraphernalia was the victims and she replied that it was not and insisted that it was hers.

I began checking the entire residence for prescription medication that belonged to the victim as well as Donna Roberts and collected a very large inventory list of medication throughout the residence. Donna Roberts informed me that the victim was taking medication for allergies and high cholesterol.

From that time on, I assisted Dr. Germaniuk, Det. Leshnack and Det. Sgt. Monroe with the collection of evidence. Upon the inspection of the handgun on the step outside the man door by Det. Leshnack, it was learned that the weapon was loaded with five live rounds and no spent rounds.

At approximately 0150 hours, Donna Roberts brother Ralph Roberts and his wife Rita Roberts arrived on the scene to assist Donna in her time of need. Det. Sgt. Monroe asked Mr. Roberts if it was possible for him to take Donna to his residence for the night to get her away from the graphic scene at the residence as well as to provide her with the emotional support she would need at this time. Mr. Roberts told Det. Sgt. Monroe that he would take Donna home. I was standing in the dining room of the residence at the time of Mr. Roberts and his wife's arrival. Prior to Donna Roberts leaving the residence and while in the hallway between the master bedroom and the front door, Det. Sgt. Monroe explained to Donna, Ralph and Rita Roberts that it was best that she leave the house because we, (the police), were going to be there for some time and the entire residence would have to be checked for any evidence of this crime. Det. Sgt. Monroe stated to Donna Roberts, "We are going to have to go through the entire house and check everything Donna." I noted Donna's response to Det. Sgt. Monroe to be, "You do whatever you have to do, I don't care." Donna Roberts then began to explain to her brother Ralph for the second time that her Robert was just laying there and wouldn't move and that it looked like someone stabbed him in the face. Dr. Germaniuk began his inspection of the victim's body by rolling him over. Upon my initial look at the front of the victim's body, I noted his



Page 5 of 5

face was covered in blood and snot was evident from his nose. I noted the right side of the victim's face and back of his head were swollen and out of proportion. Dr. Germaniuk inspected the victim's head and found a wound on the back near the top. As Dr. Germaniuk began removing the victims clothing, he discovered a bullet inside the layers of three shirts the victim was wearing, as well as bullet holes in his clothing and jacket. I noted that when all the victims shirts were removed, he had a wound on the back of his right upper arm along with what Dr. Germaniuk described as a graze wound on his back near the top to the right of the center of his back. Ptl. Policino then found a hole in the ceiling of the basement stairway, (which was directly across the kitchen), (directly north), of the man door from the garage into the house. Another bullet was later recovered from inside that ceiling above the basement stairs.

Eventually during the investigation of the interior portion of the crime scene, Donna Roberts car was removed from the garage. Once it was moved, we discovered a pair of glasses with brown plastic frames as well as a lens from the glasses lying on the floor. I videotaped the glasses where they lay as well as the lens, the damaged rail on the interior of the overhead garage door and the parts from it that were on the garage floor.

0627 Hours – I cleared the scene of the crime. Report on file, investigation to continue.

Signature: _____

Date: 12-12-01



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5528

# HOWLAND POLICE DEPARTMENT

169 Niles Cortland Road NE, Warren, Ohio 44484

## SUPPLEMENTAL REPORT

Report #:    01-078868
Date:         12-12-01
Investigator: Sgt. Dillon
Page 1 of 2



The following is a list of prescription medications found in the residence that were
written in the name of the victim Robert S. Fingerhut:

In a Kitchen Cabinet
    1) Naproxen - 500mgFull   3-28-00
    2) Naproxen - 500mgFull   2-16-00
Main Bathroom Cabinet
    1) Naproxen - 500mgFull   Dr, Benjamin Kulper
    2) Sonata - 10mg        8-25-01
    3) Alprazolam - 1mg     12-01-01
    4) Diazepam - 5mg       5-04-01
    5) SodSulfacet - 10% OPSOL 12-05-97
    6) Allegra D - 60    120ER Tab
Master Bedroom Cabinet on the Headboard of the Bed
    1) Allegra - 60mg      10-22-01
    2) Lipitor - 10mg       12-01-01
    3) Metroprolol - 50mg   11-17-01
    4) Metroprolol - 50mg   10-28-01
    5) Lorazepam - 2mg    6-14-01
    6) Lipitor - 10mg      11-03-01
    7) Allegra - 60mg      11-05-01
    8) Metroprolol - 50mg   12-13-98
    9) Allegra - 60mg      12-14-98

Per Donna M. Roberts, Mr. Fingerhut was a non-smoker.



EXHIBIT
72



## Page 2 of 2

The following is a list of prescription medications found in the residence that were written in the name of the victims wife, Donna M. Roberts:

In a Kitchen Cabinet

1) Hydroxyn Pam - 50mg        5-26-00        Full
2) Ibuprofen - 600mg          11-15-99
3) Hydroxyn Pam - 50mg        5-12-00
4) Skelaxin - 400mg           7-26-99
5) Risperdal - 2mg            3-01-01
6) Premarin - 0.9mg    4-28-01
7) Hydroxyz - 25mg    2-25-00
8) Hydroxyz - 50mg    6-08-01
9) Paxil - 20mg               12-09-00
10) Medroxyp AC - 10mg        1-04-01
11) Depakote - 250mg          11-09-00
12) Hydroxyn Pam - 50mg       6-03-00
13) Wellbutrin SR - 100mg     6-08-01
14) Meclizine - 12.5mg        9-12-99
15) Despramine - 25mg         6-25-99
16) Paxil - 10mg              2-03-01
17) Xenical - 120mg           8-31-00
18) Correctol/Laxative Tablets

Front Living room Table

1) Depakote - 250mg           10-21-01
2) Wellbetrin SR - 150mg      11-13-01
3) Wellbetrin SR - 150mg      12-03-01
4) Hydroxyn Pam - 50mg        12-03-01
5) Hydroxyn Pam - 50mg        11-13-01

Donna M. Roberts told me that she was a smoker and smoked Newport brand cigarettes.

Signature: _____          Date: _12-12-01_



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5530

(1.)

MONROE:
ASK FOR LIST OF EFFECTS FOUND ON RSF:

BESIDES $300 IN CASH

A $3500 GOLD BRACELET WITH DIAMOND INITIALS    DMR
                                               BOUGHT IT
A $1200 WATCH (DMR BOUGHT FOR HIM AS A GIFT)   AS A
                                               WEDDING
A SOLID GOLD STAR OF DAVID CHARM               GIFT 1983
5 OR 6 GOLD CHAINS - BIG + THICK
3 OR 4 OTHER CHARMS - SOLID GOLD

MONROE HAD 10 DAYS TO ESTABLISH OWNERSHIP OF
AUTOMOBILE AND HOUSE - HE DID NOT. I ASKED HIM
HOW COULD I STEAL MY OWN PROPERTY. HE DIDN'T CARE.

HE WAS SO HAPHAZARD AND JUDGEMENTAL THAT AS SOON
AS HE READ EXAGGERATED 'PRISON TALK' HE WANTED IT
TO BE CAPITAL MURDER - A BIG CASE FOR HIM TO MA
A NAME FOR HIMSELF - BE IN THE MEDIA.

10 DAYS. ISN'T THIS A CASE OF A "RUSH TO
JUDGEMENT? A WHITE WOMAN + A BLACK MAN - YOUN
A WHITE MAN IS DEAD. HE WAS RELENTLESS.
BY CHARGING DMR + NES WITH A CAPITAL MURDER - HE
KNEW THERE WOULD BE NO BONDING OUT. WE SIT HERE
                                              DMR
NOW FOR ALMOST 11 MONTHS. AS A RESULT - Ⅾ LOST
A HOME, 2 CARS, 2 BUSINESSES, 2 APT. BLDG. A HOUSE
FULL OF FURNISHINGS AND 2 10 YEAR OLD MOMMIES LITTLE
GIRLS - FLUFFY + RINSAM.

EXHIBIT 73

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5531

ADULTERY IS <u>NOT</u> MURDER

BECAUSE MONROE WANTED DRAMA — HE THOUGHT THE
'PRISON' LETTERS + CONVERSATIONS WERE 100% TRUE.
     TALK

THEREFORE, HE WENT TO DMR HOUSE ALMOST DAILY
TO LOOK FOR NATE.
HE <u>HAS TAPES OF CONVERSATIONS OF NEJ</u> +

⭐ DMR THAT HE GOT IN THE BEDROOM WHERE HE
INSTALLED HIS TAPE MACHINE. WHERE ARE <u>THESE</u>
TAPES ??? CONVENIENTLY MISSING? 3 TIMES
HE SENT THE SWAT TEAM WITH <u>DOGS</u> IN
TO ~~ARREST~~ ARREST DMR THINKING IN HIS
MELODRAMATIC MIND THAT THERE WOULD BE
A GOOD OLE WESTERN SHOOT OUT.
                         OUT
WHEN DMR CAME FROM HER GARAGE AND 3 CARS
FOLLOWED HER, STOPPED HER ON THE HIGHWAY
SCARED THE DAYLIGHTS OUT OF HER PULLING HER
TO "CHECK THE TRUNK FOR NEJ!" HONEST.
MONROE WENT TO TCJ ON THE FIRST DAY
OF DMR INCARCERATION TO GET A DNA SAMPLE
TO COMPARE IT WITH DNA THAT WAS ON
CONDOMS IN MOTEL ROOM — JUST TO SHOW HE
THOUGHT A WHITE WOMAN + A BLACK MAN WERE
TOGETHER MERE DAYS AFTER RSF DEATH. WHY.
WHAT DID THIS HAVE TO DO WITH MURDER?

* EVERY GUY IN PRISON
TALKS TOUGH.

"EVEN THE POLICE
SHOULD'T BELIEVE
EVERYTHING THEY
READ OR HEAR." (LETTERS + TAPES)

P. MONROE:

PRESUMED ALL THE MISINFORMATION
AS FACTS.

RUSH TO JUDGEMENT CAUSED JACKSON
AND ROBERTS TO BE ARRESTED FOR CAPITAL
MURDER — NO BOND — HE NEVER CHECKED
OWNERSHIP OF VEHICLES HE SAID WAS STOLEN.

☆ FINGERHUT HAD A $3000 GOLD + DIAMOND
BRACELET ON. HIS $1200 WATCH WAS STILL
ON HIM. CREDIT CARDS AND CASH.

THEY HAD 10 DAYS TO INVESTIGATE
THIS TO BE SURE PROPER CHARGES
WERE FILED

AS SOON AS DMR TOLD HIM ABOUT JACKSON —
HIS MIND WAS MADE-UP OF NEJ GUILT.
HE WENT TO THE HOUSE ALMOST EVERYDAY. HE
TAPED CALLS FROM ROBERTS BEDROOM PHONE TO
JACKSON. FULL CO-OPERATION.
MR. BACON FOLLOWED ROBERTS ONE DAY WITH
OTHER POLICE UNITS — GOT HER OUT + DEMANDED
SHE OPEN THE TRUNK ASSUMING JACKSON WAS IN IT

SWAT TEAM TO ARREST ROBERTS THINKING JACKSON

THIS ENTIRE CASE WAS MISHANDLED AT IT'S ONSET. AS SOON AS MONROE (P.M.) ASK DMR IF SHE HAD A BOYFRIEND AND SHE SAID SO IMMEDIATELY – SHE WAS GUILTY IN HIS MIND. CASE OVER. NOW: A CONCLUSION AND LETS MAKE THE EVIDENCE FIT AROUND IT. TOUGH THUG TALK. TOUGH PRISONER TALK = TAKEN AS THOUGH IT WAS 100% TRUE.

IN 10 DAYS – FROM 12/11 TO 12/21, THE ARREST THAT WAS WHAT THEY WENT BY. IN THEIR EFFORT FOR DRAMA, THEY ADDED BURGLARY AND THEFT SO THAT THE 2 LIVING VICTIMS, DMR + NEJ WOULD BE CHARGED WITH CAPITAL MURDER, HENCE, NO BOND, SINCE 12/21/01. THIS IS AN UNFORGIVEABLE ABOMINATION. ONE WOULD PRESUME THAT BEFORE ARRESTING TWO PEOPLE WITH SUCH SEVERE CHARGES, THERE WOULD BE AT LEAST SOME INVESTIGATING TO ESTABLISH OWNERSHIP OF WHAT THEY CALLING STOLEN PROPERTY THUS SECURING THE CAPITAL CHARGES. DMR EVEN ASKED REPEATEDLY – HOW CAN I POSSIBLY STEAL MY OWN PROPERTY? NEJ ALWAYS DROVE THE CARS. HE HAD ETERNAL PERMISSION FROM THE OWNER: DMR. THEY CAUSED NEJ TO BE IMPRISONED FOR ALMOST A YEAR RATHER THAN – HAVING COME OUT OF PRISON CLEAN, NO PAPERS, HE INTENDED TO SECURE EMPLOYMENT AND START A NEW LIFE. DUE TO NO BOND FOR THE 'CAPITAL' CHARGES, DMR LOST HER LIFE! HOMES, BUSINESSES, CARS, COLLECTIONS – SPORTS, DOLLS, JEWELRY, CRYSTAL, 2 APT BLDG., DOGS. WHO WILL ANSWER FOR THIS PAUL MONROE? WHO? GOT ALL THE ANSWERS? HIDING EVIDENCE ARE YOU PAUL?



**Trumbull County**
**Sheriff's Office**

*Investigative Division*
*Det. Sgt. Peter J. Pizzulo*
| | |
|---|---|
| Administration | (330) 675-2540 |
| Desk / voice mail | (330) 675-2506 |
| Pager | (330) 675-0988 |
| Fax | (330) 675-7012 |

# Lab Report

**Case#** Common Pleas 01-CR-794

**From:** Det. Sgt. Peter J. Pizzulo

**CC:** file, Howland PD, TCSO

**Date:** Wednesday, May 01, 2002

**Re:** Nathaniel E. Jackson , Judgement Entry Order

---

On 24 April 02 Judge Stuard issued an order for Handwriting Exemplars to be taken from Nathaniel Jackson. Mr. Jackson's Council Anthony Consoldane agreed that this would be done on 29 April in Judge Stuard's Jury room.

Investigators met with Attorney Consoldane at 1230 on 29 April and after some discussion with Judge Stuard, it was acceptable that the Exemplars be done in an interview room of the TCSO Jail. Originally Mr. Jackson was to re-write a 4 page letter three times for submission to BCI&I. After some conversation between Attorney Consoldane and Prosecutor Watkins it was acceptable for him to re-write the first and last pages only along with addressing an envelope thee times.

At apprx. 1250 on 29 April with Attorney Consoldane present Mr. Jackson was given the sample pages and asked to re-write them.

At 1320, Hrs Mr. Jackson stated that he did not want to continue due to the discomfort he was experiencing in his hand. (NOTE) Due to an injury that Mr. Jackson had incurred at the time of the alleged offence he can not use is index finger when holding a pen or pencil.

It was agreed by Attorney Consoldane that we would continue on 30 April 02 at 1100 hrs. The Exemplar that was completed so far was sealed in an envelope with Attorney Consoldane Witnessing.

30 April 2002, 1100 hrs Det. Sgt. Monroe and Contacted Mr. Jackson about continuing the Exemplar, he stated that he will no longer comply with the request and that he has contacted the Public Defenders office with his decision. Attorney Consoldane was made aware of Mr. Jackson's unwillingness to continue. County Prosecutors office was made aware of the status.

▪ Page 1

EXHIBIT
75

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5535

01 May 2002, I spoke with Attorney Consoldane via telephone.

Attorney Consoldane indicated that he spoke with Nathaniel Jackson about his unwillingness to continue with the Exemplars and confirms that Mr. Jackson will not be providing further handwriting samples at this time.

The Exemplar that was obtained on 29 April was turned over to Det SGT Monroe for transport to BCI&I.

DET SGT Peter J. Pizzulo , TCSO



Page 2

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5536

## PROPOSITION OF LAW NO. 2

THE DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IS
VIOLATED WHEN COUNSEL'S PERFORMANCE IS DEFICIENT TO THE
DEFENDANT'S PREJUDICE.  U.S. CONSTITUTION, AMENDMENT VI; OHIO
CONSTITUTION, ARTICLE I, SECTION 10.

The Sixth Amendment right to counsel applies to the states through the Fourteenth

Amendment. Gideon v. Wainright (1963), 372 U.S. 335. The test for whether that right has

been violated is found in Strickland v. Washington (1984), 466 U.S. 668, which obliges

reviewing courts to determine if counsel's performance is deficient. Id. at 687. If counsel's

performance is deficient, the reviewing court must determine if the accused was thereby

prejudiced. Id. In order to establish prejudice, the accused need not establish outcome

determinative error. Id. at 693-694. State v. Clifton (1999), 85 Ohio St. 3d 433, 450.

Instead, the accused is prejudiced when the reviewing court loses confidence in the fairness

of the trial. Id.

Strategic choices by appointed counsel are virtually unassailable. Id. at 690.

Strickland makes clear, however, that a reasonable investigation of both the facts and the

applicable law is required before counsel's choice may be deemed strategic. Id. At 691.

Furthermore, Strickland requires that appointed counsel in a criminal case meet a "duty to

advocate the defendant's cause . . . [and] . . . bring to bear such skill and knowledge as will

render the trial a reliable testing process." Id. At 688. Federal courts have consistently

recognized that Strickland's duties to advocate and to employ "skill and knowledge" include

the necessity for trial counsel to object or otherwise preserve federal issues for review.

11


EXHIBIT
76

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5537

Gravely v. Mills (6th Cir. 1996), 87 F.3d 779; State v. Lockhart (8th Cir. 1994), 23 F.3d 1280;

Argument: Nathaniel Jackson's Sixth Amendment right to counsel was violated by defense counsel's prejudicially deficient performance at both phases of this capital case.

Defense counsel failed to object to the prosecution's extraction of guilty verdict and death verdict promises from all twelve impaneled jury members during the voir dire phase of the trial.

It is improper in voir dire to extract promises from a jury. State v. Powers (10th App. Dist.), 1992 Ohio App. LEXIS 1009; State v. Treesh (11th App. Dist.), 1998 Ohio App. LEXIS 4886; State v. Treesh (2001), 90 Ohio St. 3d 460.

In the instant cause, the prosecuting attorney extracted promises from all twelve impaneled jurors that each would render a finding of guilty in the trial phase of the case if the State proved all elements of its case by proof beyond a reasonable doubt, and that each would render a verdict of death if the state in the penalty phase proved beyond a reasonable doubt that the aggravating circumstances in the case outweighed any mitigating factors which the defendant might offer. (TR- 686-87, 936, 952, 955, 1044, 1163, 1165, 1260, 1289, 1316, 1346, 1389, 1400, 1494, 1502).

In general, the purpose of voir dire of a prospective juror is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. Pavilonis v. Valentine (1929), 120 Ohio St. 154, 165 N.E. 730, paragraph one of the syllabus. The primary purpose of voir dire examination in a capital murder case is to determine whether a juror will truly consider aggravating circumstances and mitigating factors in determining appropriate penalty and not ultimately vote to impose the death

12

penalty merely because a murder has been committed. See Morgan v. Illinois (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222. The purpose of voir dire is not to prejudice a jury and predispose its verdict or viewpoint prior to the offer and consideration of evidence.

In State v. Treesh, supra, at 465, this court held that notwithstanding the timely objection by defense counsel to the prosecutor's extraction of promises for a guilty verdict, and counsel's argument that said conduct constituted constitutional misconduct which created a biased and partial jury, that Treesh "ha[d] failed to demonstrate how the question affected a substantial right." Id. at 465. In the case sub judice, defense counsel failed to object to any of the extracted promises from the twelve jurors impaneled who ultimately found defendant guilty and recommended a sentence of death. Although this court has previously held that "'the failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel,'" where "appellant does not show that any particular failure to object substantially violated any essential duty or was otherwise prejudicial..." State v. Hanna (2002), 95 Ohio St. 3d 285, citing State v. Holloway (1988), 38 Ohio St. 3d 239 at 244, appellant notes that failure of counsel to object to the prosecutors extracted promises thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test. State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury and one that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in this duty by allowing the prosecutor to condition and predispose the jury to a guilty and death sentence mindset; and that the so-called "death qualification" of the jury as

13

recognized in Witherspoon took on an expanded and new meaning in the instant cause and thereby prejudiced the right of defendant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Counsel repeatedly failed to object during voir dire to the prosecutor's comments and questions which sought to limit the type of mitigating factors which might justify a sentence other than death.**

During voir dire, the prosecutor questioned ten of the twelve impaneled jurors on matters relating to mitigation, limiting his examples of mitigators that might compel a jury to vote for life instead of death to "mental disease or defect" (TR- 826, 923, 959, 1164, 1258) and to youthful "age" (1288, 1314, 1344, 1396, 1500). Notwithstanding that the purported use of these mitigators was to insure that the jury would nonetheless weigh aggravating circumstances against mitigating factors, regardless of their type or variety, the use of just two mitigators by the prosecutor, which he acknowledged as perhaps justifying life, and which he knew were inapplicable to the appellant, nonetheless conditioned and predisposed the jury to await for those mitigators and those mitigators only during the penalty phase. Defense counsel failed routinely and repeatedly to object to this inappropriate trial tactic, which effectively denigrated appellant's mitigation evidence.

In State v. Jones (2001), 91 Ohio St. 3d 335, this court considered the claimed error of appellant who argued that he should have been permitted to ask prospective jurors about their views on specific mitigating factors; that the trial court's refusal to permit that line of questioning left several jurors confused as to the meaning of mitigation; and that his inability to ask about specific mitigating factors, coupled with juror confusion about the meaning of

14

mitigation, limited his ability to uncover potential biases in prospective jurors and may have resulted in the empanelling of jurors who were unwilling to consider mitigating evidence.

In rejecting appellant's claim, this court held that "[d]uring voir dire, a trial court is under no obligation to discuss, or to permit the attorneys to discuss, specific mitigating factors, State v. Wilson (1996), 74 Ohio St. 3d 381, 385-386, 659 N.E.2d 292, 300-301; State v. Lundgren (1995), 73 Ohio St. 3d 474, 481, 653 N.E.2d 304, 315, [and that] [r]ealistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law." State v. Jones, supra, at 338.

In light of Jones, supra, it is clear that the prosecutor in the instant cause was improperly asking jurors to weigh and consider specific mitigating factors during voir dire, all of which he limited for his own purpose, and all without routine objection from appellant's counsel. Again, by failing to object to the prosecutors misconduct, counsel for appellant thereby waived review of that conduct except under the doctrine of plain error, State v. Hanna, supra at 308, all of which limits review of ineffective assistance for failure to object under an outcome determinative test. State v. Gross (2002), 97 Ohio St. 3d 121.

Appellant submits that his counsel had a duty to seat a fair and impartial jury that was open to considering mitigation evidence of any variety and that was not predisposed to convict and recommend a sentence of death; that counsel failed repeatedly in his duty by allowing the prosecutor to condition and predispose the jury to consider only two mitigating factors which were given the imprimatur by the prosecutor of possibly being worthy of a life sentence verdict; and that the failure, inaction and unawareness of his trial counsel to the law

15

thereby prejudiced the right of appellant to a fair and impartial trial and the effective assistance of counsel therein, all in violation of his constitutional rights.

**Defense counsel failed repeatedly to object to inappropriate statements and misconduct of the prosecutor during voir dire that materially prejudiced and predisposed the jury to guilty and death sentence verdicts.**

During voir dire, the prosecutor made inappropriate statements to five impaneled jurors, either by mis-stating the law or discussing facts and evidence not alleged in the indictments or proven at trial, all of which prejudiced and predisposed the jurors to guilty and death sentence mindsets, namely, (1) that "[t]he first trial deals with the state proving beyond a reasonable doubt, the defendant committed aggravated murder" (TR- 820); (2) "if you found beyond a reasonable doubt even though there were mitigating factors, you would still, under the law, return a verdict recommending the death penalty, do you understand that?" (TR- 826); (3) "So we're dealing with charges where the person committed the crime, the defendant is alleged of killing a homeowner" (TR- 930); (4) "in this case the aggravating circumstances accuse the defendant of purposely killing a homeowner in the commission of an aggravated burglary" (TR- 1046); (5) "So that means that you would be able, if you were one of the 12 jurors, to listen to the evidence and decide the defendant's guilt based only on the evidence, right?'(TR- 1157); and (6) "In this case, the defendant is charged with killing a homeowner in an aggravated murder" (TR- 1392-1393).

During voir dire, it is improper for counsel to discuss evidence. State v. Johnson (8th App. Dist.), 1997 Ohio App. LEXIS 100. In the instant cause, the prosecutor not only mis-stated the law during voir dire, but also scught on three occasions to repeatedly discuss evidence with jurors ultimately empanelled, that would not be proven, namely, that the

16

defendant killed a homeowner, a fact that the prosecutor would ultimately acknowledge

during trial as wrong (TR- 3383, 3397), only to re-assert the mis-statement of fact and

evidence three times during final argument in the penalty phase, namely: that "it was his

specific intent to kill the victim, to commit an aggravated murder against a homeowner"

(Penalty Phase TR- 142/2-4); that "it can't get any worse than being in prison and planning

the execution of a homeowner who just comes home" (Penalty Phase TR- 142/19-21); and

that "[i] t is the worst form. The other is that after he kills a homeowner" (Penalty Phase TR-

143/15-16).

             Appellant's counsel sat silently during voir dire without objection as the

prosecutor mis-stated the law and commented on evidence that would not be proven at trial,

and only finally objected to the prosecutor's mis-statement of fact after the prosecutor's third

re-statement of the error during final argument in the penalty phase (TR- 143/17-18). By

reason of this negligence and inaction, counsel failed repeatedly in their duty to appellant by

allowing the prosecutor to appeal to the passion of the jury and thereby predispose it to a

guilty and death sentence mindset, thereby prejudicing the right of appellant to a fair and

impartial trial and the effective assistance of counsel therein, all in violation of his

constitutional rights.

        **Defense counsel fashioned a defense to death penalty specifications of
Aggravated Burglary and Aggravated Robbery under R.C. 2929.04(A)(7) which
demonstrated counsel's unawareness of the law relative to the proof and elements of
those specifications.**

        Appellant was convicted on counts one and two of the indictment charging appellant

with the aggravated murder of Robert Fingerhut while committing the acts of aggravated

17

to bear such skill and knowledge as will render the trial a reliable testing process." Id. At

688. It cannot reasonably be argued that counsel met that standard in this cause, given

counsel's patent unawareness of the law which only became evident to them after close of

the evidence in the trial stage and discussion of jury instructions thereafter with the court and

opposing counsel (TR- 3344-3371).

Appellant submits that counsel had a responsibility to provide him a reasonable and

legally sound defense to the capital charges brought against him; that they failed in that duty

and obligation, and effectively rendered no defense to the capital specifications at the trial

phase; and that the failure of counsel in this regard calls into question whether the trial in this

matter constituted a reliable testing process causing a reviewing court to lose confidence in

the fairness of the trial. *Strickland v. Washington*, supra.

**Defense counsel failed to object to the admission into evidence of State's Exhibits**
**271D-1 to 271D-139, letters from Donna Roberts to Nathaniel Jackson from January**
**2001 to December 2001, without requiring authentication of writing as a predicate to**
**admission.**

During the offer of State's exhibits into evidence, defense counsel allowed admission

without objection of 139 letters purportedly written by Donna Roberts to Nathaniel Jackson

between January 2001 to December 2001, which were argued by the State to contain

information and evidence regarding Donna Roberts and appellant's plan to murder Robert

Fingerhut (TR- 2076, 2231, 2294-2302, 3151, 3431-3437).

Unlike the letters from Nathaniel Jackson to Donna Roberts which were admitted into

evidence after authentication of the author was established by testimony of a handwriting

19

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5544

analysis expert (TR- 2852-2875), no such authentication was offered for the letters purportedly written by Donna Roberts (TR- 2879). Accordingly, there was no reliable and appropriate predicate for the admission of State's Exhibits 271D-1 to 271D-139. Indeed, the only basis offered for the admission of the letters was through the testimony of Detective Paul Monroe, Howland Police Department, who testified that the letters were recovered from a search of Donna Robert's vehicle and were located in the trunk of her automobile (TR-2294-2295). Given that there was no evidence offered at trial that Donna Roberts admitted authoring the letters that were marked and received as evidence; and given that there was no evidence offered at trial establishing that appellant acknowledged and identified State's Exhibits 271D-1 to 271D-139 as letters he had received from Donna Roberts, the letters purportedly written by Donna Roberts should not have been admitted into evidence.

Because the letters identified by the State as being sent by Donna Roberts to appellant were critical to the State's proof that Donna Roberts and appellant had committed Robert Fingerhut's murder by prior calculation and design, all as set forth in count one of the indictment, for which appellant was convicted and sentenced to death, the admission of said letters through the negligence of defense counsel cannot be considered as a harmless error

Based upon the foregoing, appellant submits that the cumulative effect of the foregoing errors and omissions by trial counsel infringed upon his right to effective assistance of counsel, *Harris v. Wood* (9th Cir. 1995), 64 F. 3d 1432, 1438; that his convictions must be therefore reversed and his case remanded for a new trial; or alternatively, that his death sentence be vacated and his case remanded for re-sentencing.

20



**Attorney General**
**Betty D. Montgomery**

BCI-30 (Rev. 3-95)

Bureau of Criminal Identification and Investigation                    Laboratory Report

| | | | |
|---|---|---|---|
| To: | Howland Police Department | BCI Lab Number: | 01-35755 |
| | 169 Niles Cortland Road, N.E. | | |
| | Warren, Ohio 44484 | | |
| | Attn: Det. Sgt. Monroe | Analysis Date: | 12-14-01 |
| | | | |
| Re: | Homicide | Agency Number: | 2001-078868 |
| | Subject:   None Listed | | |
| | Victim:   Robert S. Fingerhut | | |

Submitted 12-14-01 by Det. Sgt. Monroe

1.        GSR kit from victim's wife

## Findings

Scanning electron microscopy/energy dispersive x-ray spectroscopy analysis was performed on the samples from Donna M. Roberts (item 1).

Gunshot residue was not conclusively identified on the "Left Hand" or Right Hand" samples.

Donna L. Rose
Forensic Scientist

DLR:km
T-7-29-02

**EXHIBIT**
**77**

Please address inquiries to the office indicated, using the BCI case number.

| | | | |
|---|---|---|---|
| [ ] BCI & I-Bowling Green Office | [ ] BCI & I-London Office | [ X ] BCI & I-Richfield Office | [ ] BCI & I-Cambridge Office |
| P. O. Box 928 | P. O. Box 365 | P. O. Box 336 | 60788 Southgate Road |
| Bowling Green, OH 43402 | London, Ohio 43140 | 3355 Brecksville Road | Byesville, Ohio 43723 |
| Phone: (419) 353-5603 | Phone: (740) 245-2000 | Richfield, Ohio 44286 | Phone: (740) 439-3655 |
| | | Phone: (330) 659-4600 | |

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

STATE OF OHIO,                                         :

    Plaintiff,                                      : Case No. 01-CR-794

-vs-                                                         :

NATHANIEL JACKSON,                          :

    Defendant                                     :

**EXHIBIT _____**

**AFFIDAVIT OF THOMAS ANDREW BOYD, PSY.D.**

STATE OF OHIO                    :
                     : ss:
COUNTY OF CUYAHOGA     :

    Dr. Thomas Andrew Boyd, after being duly sworn according to law, states as follows:

    1.    I am a licensed psychologist in the States of Ohio and Rhode Island (though I am currently inactive in Rhode Island).

    2.    I have a Bachelor of Science Degree from the University of Massachusetts (I graduated Magna Cum Laude). I have both a Masters of Science Degree and a Doctor of Psychology Degree in Clinical Psychology from Hahnemann University in Philadelphia, Pennsylvania (the program has since relocated to Widener University).

    3.    I am a diplomate in four areas of psychology, including forensic clinical psychology and forensic neuropsychology.

    4.    I am the director of Clinical and Forensic Services for Behavior Management Associates, Inc. I have previously held faculty appointments at four universities and staff appointments at seven hospitals.

**EXHIBIT 78**

5.     I have attached to this Affidavit a copy of my vitae which is complete and accurate.

6.     Dorian Hall of the Office of the Ohio Public Defender retained my services in the above case. Ms. Hall provided me with the following records: a) mitigation testimony of Dr. Sandra McPherson; b) file of Dr. McPherson; c) the report of Dr. McPherson; and d) records from the Neal Kennedy Recovery Clinic, Community Corrections, and Youngstown Alternative School.

7.     I reviewed the Wechsler Adult Intelligence Scale – Version ("WAIS-III") and the Wide Range Achievement Test – Version III ("WRAT-III") that Dr. McPherson administered to Nathaniel Jackson on or about March 13, 2002.

8.     Dr. McPherson recorded the data from the WAIS-III on a blank sheet of paper, rather than on the full test booklet, as proscribed by the testing protocol.

9.     Dr. McPherson reported on the blank sheet of paper and in her formal report the following results for the WAIS-III:

**VERBAL SCALE**

| Subtest | Raw Score | Scaled Score |
|---|---|---|
| Vocabulary | 18 | 5 |
| Similarities | $11^A$ | 5 |
| Arithmetic | 7 | $5^B$ |
| Digit Span | 20 | 12 |
| Information | 6 | 5 |
| Comprehension | 6 | $5^C$ |
| Sum of Scaled Scores | | $42^D$ |
| VERBAL IQ | | $82^E$ |

**PERFORMANCE SCALE**

| Subtest | Raw Score | Scaled Score |
|---|---|---|
| Picture Completion | 18 | 8 |
| Digit Symbol-Coding | 56 | 6 |
| Block Design | 29 | 7 |
| Matrix Reasoning | 21 | 13 |
| Picture Arrangement | 15 | 10 |
| Sum of Scaled Scores | | $42^F$ |
| PERFORMANCE IQ | | $89^G$ |

FULL SCALE IQ = $84^H$

2

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5548

10.    Dr. McPherson committed eight errors in the computing, recording and reporting of Nathaniel Jackson's scores on the WAIS-III.[1]

A.    The raw score for the Similarities subtest should have been 13, not 11, as reported by Dr. McPherson. This errors was not material, because it yielded the same subtest Scaled Score of 5.

B.    The raw score of 7 on the Arithmetic subtest translates to a Scaled Score of 4, and not 5, as reported by Dr. McPherson.

C.    The raw score of 6 on the Comprehension subtest translates to a Scaled Score of 3, and not 5, as reported by Dr. McPherson.

D.    The Sum of Scaled Scores for the Verbal Scale is equal to the total sum of the Scaled Scores for the individual Verbal subtests. Based on Dr. McPherson's reported Scaled Scores this tally should have been 37, and not 42, as reported by Dr. McPherson. However, as a result of the errors identified in Subparagraphs B and C, the actual Sum of Scaled Scores for the Verbal subtests was 34.

E.    The revised value for the Verbal IQ was 74, and not 82, as was reported by Dr. McPherson.

F.    The Sum of Scaled Scores for the Performance Scale is equal to the total sum of the Scaled Scores for the individual Performance subtests. Dr. McPherson incorrectly added these scores. The actual tally was 44, and not 42, as reported by Dr. McPherson.

G.    The revised value for Nathaniel Jackson's Performance IQ was 91, and not 89, as reported by Dr. McPherson.

---
[1] The following paragraphs refer to the footnoted sections of the previous table.

3

11. The actual Full Scale IQ for Nathaniel Jackson was 80, as opposed to 84, as reported by Dr. McPherson (at footnote H in the previous table).

12. If the WAIS-III results had been scored and recorded correctly, Dr. McPherson would have reported the results as follows:

| VERBAL SCALE | | PERFORMANCE SCALE | |
|---|---|---|---|
| **Subtest** | **Scaled Score** | **Subtest** | **Scaled Score** |
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 6 |
| Arithmetic | 4 | Block Design | 7 |
| Digit Span | 12 | Matrix Reasoning | 13 |
| Information | 5 | Picture Arrangement | 10 |
| Comprehension | 3 | | |
| **VERBAL IQ** | **74** | **PERFORMANCE IQ** | **91** |

**FULL SCALE IQ = 80**

13. In her report, Dr. McPherson reported the following results for the WRAT-III that she administered to Nathaniel Jackson:

| SUBTEST | RAW SCORE | STANDARD SCORE | PERCENTILE | GRADE SCORE | ABSOLUTE SCORE |
|---|---|---|---|---|---|
| Reading[I] | 36[J] | 75[K] | 5[L] | 5[M] | 503[N] |
| Spelling | 43[O] | 103[P] | 58[Q] | High School[R] | 524[S] |
| Arithmetic[I] | 46[T] | 111[U] | 77[V] | High School[W] | 532[X] |

14. Dr. McPherson committed sixteen errors in the computing, recording and reporting of Nathaniel Jackson's scores on the WRAT-III.[2]

15. On February 11, 2004 I administered to Nathaniel Jackson the WAIS-III. He received a Verbal IQ of 71, a Performance IQ of 83, and a Full Scale IQ of 75.

---

[2] Identified errors occurred at the footnoted sections in the above WRAT-III table.

4

Further affiant saith naught.

Thomas A. Boyd, Psy.D.
Licensed Clinical Psychologist

Sworn to and subscribed in my presence this 23rd day of March, 2004.

NOTARY PUBLIC

Noah R. Frient
Notary Public, State of Ohio
My Commission Expires 9/29/07

#194851

5

# CURRICULUM VITAE

2004

*THOMAS ANDREW BOYD, Psy.D.*
Licensed Clinical Psychologist

## PERSONAL INFORMATION

**Date of Birth:**

**Place of Birth:** Malden, Massachusetts

**Citizenship:** USA

**Social Security #:**

**Work Address:** Behavior Management Associates, Inc.
23240 Chagrin Boulevard - Suite 500
Beachwood, Ohio 44122-5471

**Work Telephone:** (216) 292-6007
**Fax:** (216) 292-7352

## EDUCATION

1. **Institution:** Hahnemann University, Philadelphia, PA
   (Now Widener University, Chester, PA)
   **Year:** 1982
   **Degree:** Doctor of Psychology (Psy.D.)
   **Major:** Clinical Psychology (APA-Approved Program)
   Clinical Neuropsychology Track
   **Dissertation:** Neuropsychological Testing of Patients
   with Systemic Lupus Erythematosus
   Chair: Sandra P. Koffler, Ph.D.

2. **Institution:** Hahnemann University, Philadelphia, PA
   **Year:** 1979
   **Degree:** Master of Science (APA-Approved Program)
   **Major:** Clinical Psychology

3. **Institution:** University of Massachusetts, Amherst, MA
   **Year:** 1975
   **Degree:** Bachelor of Science
   **Major:** Psychology
   **Honors:** Magna Cum Laude

## CLINICAL TRAINING

### *Post-Graduate*

1. **Neuropsychology Associate**   Hahnemann University Hospital, Philadelphia, PA   1983 - 1984

| CURRICULUM VITAE | THOMAS ANDREW BOYD, Psy.D. | PAGE 2 |
|---|---|---|
| 2. **Post-Doctoral Fellow in Clinical Neuropsychology** | Department of Psychiatry and Human Behavior Division of Biology and Medicine Brown University and Department of Psychology Bradley Hospital (East Providence, RI) | 1982 - 1983 |

### *Internship*

**Hahnemann University "Captive" Internship Training Program (APA-Approved)**
Integrated with the Doctoral Program in Clinical Psychology
1979 - 1982 (part-time: 3600+ Hours)

**Rotations:**

| 1. | **Neuropsychology Laboratory** | Hahnemann University Hospital, Philadelphia, PA | 1981 - 1982 |
|---|---|---|---|
| 2. | **Hay Associates** | Philadelphia, PA | 1980 - 1981 |
| 3. | **John F. Kennedy CMHC** | Philadelphia, PA | 1979 - 1982 |

### *Psychology Trainee*

**Hahnemann University Graduate Program in Clinical Psychology Field Placements**  1977 - 1980

**Practica:**

| 1. | **Outpatient Psychiatry Clinic** | Jefferson Medical College & Hospital, Philadelphia, PA | 1978 - 1980 |
|---|---|---|---|
| 2. | **Partial Hospitalization Program** | Central Montgomery Community Mental Health Center Norristown, PA | 1977 - 1978 |

## PROFESSIONAL LICENSES & CERTIFICATIONS

| 1. | Licensure in Psychology | # 3893 | Ohio | 1987 to Present |
|---|---|---|---|---|
| 2. | Certification in Psychology | # PS-277 | Rhode Island | 1985 - 1987 Currently Inactive |
| 3. | Certified Neuropsychologist | | National Academy of Neuropsychology | Certification date 1/1/91 |
| 4. | Diplomate Board Certified Forensic Examiner | #8657 | American Board of Forensic Examiners | 1996 to Present |
| 5. | Fellow | #8657 | American College of Forensic Examiners | 1999 to Present |
| 6. | Diplomate and Senior Disability Analyst | #4291-97 | American Board of Disability Analysts | 1997 to Present |
| 7. | Diplomate in Forensic Neuropsychology | #8657 | American Board of Psychological Specialties | 1997 to Present |
| 8. | Diplomate in Forensic Clinical Psychology | #8657 | American Board of Psychological Specialties | 1997 to Present |

**CURRICULUM VITAE**     **THOMAS ANDREW BOYD, Psy.D.**     **PAGE 3**

## PROFESSIONAL POSITIONS

1.  Director of Clinical and Forensic Services                                          2002 to Present

    Behavior Management Associates, Inc.
    23240 Chagrin Boulevard, Suite 500
    Beachwood, Ohio 44122-5471

2.  Associate                                                                          1995 to 2002

    Behavior Management Associates, Inc.

3.  Consulting Psychologist                                                            1996 to 2003

    Caloh, Inc.
    Statewide Independent Medical Examiners
    Specializing in Occupational/Industrial Medicine
    P.O. Box 1307
    Bath, Ohio 44210-1307

4.  Consulting Psychologist                                                            1997 to 2002

    Managed Medical Assurance Company, LTD
    4150 Belden Village Street, Suite 503
    Canton, Ohio 44718

5.  Director, Department of Psychology                                                 1993 to 1995
    The Rehabilitation Hospital at Heather Hill
    12340 Bass Lake Road
    Chardon, Ohio 44024

6.  Director, Psychological Assessment Center (PAC)                                    1987 – 1993
    MetroHealth Medical Center (MHMC)
    (Formerly Cleveland Metropolitan General Hospital)
    2500 MetroHealth Drive
    Cleveland, Ohio 44109-1998

7.  Chief Psychologist, Children's Inpatient Unit                                      1984 - 1987
    Bradley Hospital
    1011 Veterans' Memorial Parkway
    East Providence, Rhode Island

## FACULTY POSITIONS

1.  Assistant Professor of Psychiatry and Psychology                                   1987 to 1998
    Department of Psychiatry
    Case Western Reserve University School of Medicine
    Cleveland, Ohio

                                                    Full-Time Appointment      1987 - 1993
                                                    Adjunct Appointment        1993 to 1998
2.  Clinical Assistant Professor                                                       1984 - 1988
    Department of Psychiatry and Human Behavior
    Division of Biology and Medicine
    Brown University
    Providence, Rhode Island

**CURRICULUM VITAE**      THOMAS ANDREW BOYD, Psy.D.         PAGE 4

3.  Assistant Professor of Psychology in Psychiatry                    1983 - 1984
    Department of Mental Health Sciences
    Hahnemann University
    Philadelphia, PA

4.  Assistant Instructor                                               1982 - 1983
    Department of Psychiatry and Human Behavior
    Division of Biology and Medicine
    Brown University

5.  Instructor                                                         1977 - 1982
    School of Allied Health Professions
    Program in Mental Health Technology
    Hahnemann University
    Philadelphia, PA

6.  Lecturer                                                           1980 - 1982
    Department of Speech Pathology
    The Graduate School
    Hahnemann University
    Philadelphia, PA

7.  Assistant Instructor                                               1972 - 1974
    Orchard Hill Residential College
    University of Massachusetts
    Amherst, MA

## HOSPITAL APPOINTMENTS

|    |                              |                                      |                                                 |              |
|----|------------------------------|--------------------------------------|-------------------------------------------------|--------------|
| 1. | Member                       | Psychiatry/Psychology                | Aultman Hospital                                | 1997 to 2002 |
| 2. | Director                     | Department of Psychology             | Heather Hill, Inc.                              | 1993 to 1995 |
| 3. | Member                       | Medical Staff                        | Rehabilitation Hospital at Heather Hill         | 1993 to 1995 |
| 4. | Director                     | Psychological Assessment Center      | MetroHealth Medical Center                      | 1987 - 1993  |
| 5. | Member                       | Associate Medical Staff              | MetroHealth Medical Center                      | 1994 - 1995  |
| 6. | Member                       | Adjunct Medical Staff                | MetroHealth Medical Center                      | 1987 - 1994  |
| 7. | Consulting Psychologist      | Medical Staff                        | MetroHealth Center for Skilled Nursing Care     | 1988 - 1983  |
| 8. | Member                       | Associate Medical Staff              | Health Hill Hospital                            | 1988 - 1993  |
| 9. | Chief Psychologist           | Children's Inpatient Unit            | Bradley Hospital                                | 1984 - 1987  |
| 10.| Neuropsychology Associate    | Neuropsychology Laboratory           | Hahnemann University Hospital                    | 1983 - 1984  |
| 11.| Postdoctoral Fellow          | Department of Psychology             | Bradley Hospital                                | 1982 - 1983  |

## OTHER APPOINTMENTS

|    |                   |                                                 |                 |
|----|-------------------|-------------------------------------------------|-----------------|
| 1. | Invited Reviewer  | *Journal of Personality Assessment*             | 1988 to Present |
| 2. | Ad Hoc Reviewer   | *International Journal of Psychiatry in Medicine* | 1987 to 1993  |

**CURRICULUM VITAE**     **THOMAS ANDREW BOYD, Psy.D.**     **PAGE 5**

| 3. | Ad Hoc Reviewer | *Neuropsychology* | 1987 – 1990 |
|----|----|----|----|
| 4. | Invited Reviewer | *Archives of Clinical Neuropsychology* | 2002 - Present |
| 5. | Co-Investigator | Cleveland Baby Study | MetroHealth Medical Center CWRU School of Medicine | 1988 to Present |
| 6. | Certified Disability Evaluator Panel | | Ohio Bureau of Worker's Compensation | 1996 to Present |
| 7. | Independent Medical Examiner | | Industrial Commission of Ohio | 1997 to Present |
| 8. | Consultant | CaIoh, Inc., Independent Medical Examiners | | 1996 to 2003 |
| 9. | Board of Trustees | Cleveland Psychological Association | | 1997 to 1998 |
| | Co-Chair | Marketing Committee | | 1997 to 1998 |
| 10. | Consultant, | Department of Thoracic & Cardiovascular Surgery, Aultman Hospital, Canton, Ohio | | 1997 to 2002 |

## HONORS & AWARDS

| 1. | Dean's List, University of Massachusetts; Graduated Magna Cum Laude | 1975 |
|----|----|----|
| 2. | Elected, Outstanding Young Men in America | 1983 |
| 3. | Elected, Who's Who in the Midwest (23rd Edition) | 1992 |
| 4. | Elected, Who's Who Among Human Service Professionals (3rd Edition) | 1992 |

## PROFESSIONAL MEMBERSHIPS

### Present

| 1. | Member (1717-1775) | American Psychological Association | 1983 to Present |
|----|----|----|----|
| | Divisions: | Division 12 – Clinical Psychology Division 40 -- Clinical Neuropsychology Division 41 – American Psychology - Law Society Division 42 – Independent Practice | |
| 2. | Member | International Neuropsychological Society | 1985 to Present |
| 3. | Member | Society for Personality Assessment | 1986 to Present |
| 4. | Member (Professional) | National Academy of Neuropsychology | 1988 to Present |
| | Committees: | Membership Committee Research Consortium | 1991 to 1993 1991 to Present |
| 5. | Member (10290) | Ohio Psychological Association | 1988 to Present |
| | Committees: | Quality Assurance Committee | 1993 - 1996 |
| 6. | Member | Prescribing Psychologist's Register | 1995 to Present |
| 7. | Diplomate | American College of Forensic Examiners | 1996 to Present |
| | Subcommittees for developing Standards: | Neuropsychology, Clinical Psychology, Clinical Psychology, Forensic Psychology, Psychological Assessment, Disabilities Evaluation | |
| 8. | Member | Cleveland Psychological Association | 1997 to Present |
| 9. | Diplomate | American Board of Disability Analysts | 1997 to Present |

**CURRICULUM VITAE**   **THOMAS ANDREW BOYD, Psy.D.**   **PAGE 6**

*Past*

| | | | |
|---|---|---|---|
| 1. | Member | Rhode Island Psychological Association | 1985 - 1988 |
| 2. | Student Affiliate | American Psychological Association | 1980 - 1982 |
| 3. | Associate Member | Pennsylvania Psychological Association | 1980 - 1982 |
| 4. | Student Affiliate | Philadelphia Society of Clinical Psychologists | 1980 - 1982 |

## PUBLICATIONS

1. Boyd, T.A., Ernhart, C.B., & Greene, T.H. Prenatal alcohol exposure and sustained attention in the preschool years. (Abstract). *Psychiatry Digest*, in press.

2. Greene, T., Ernhart, C.B., Sokol, R.J., Martier, S., Boyd, T.A. & Ager, J. Neonatal Diagnosis of Fetal Alcohol Syndrome: Not Necessarily a Hopeless Prognosis. *Alcoholism: Clinical and Experimental Research*, 1995, 19 (6), 1550-1557.

3. Boyd, T.A. What have we forgotten: A developmental framework for clinical memory assessment of children. (Abstract). *Journal of Clinical and Experimental Neuropsychology*, 1995, 1 (4), 381.

4. Boyd, T.A. & Hooper, S.R. WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery. *Perceptual and Motor Skills*, 1993, 77, 683-688.

5. Hooper, S.R., Boyd, T.A., Hynd, G.W., Rubin, J. Definitional issues and neurobiological foundations of selected neurodevelopmental learning disorders. *Archives of Clinical Neuropsychology*, 1993, 8, 279-307.

6. Greene, T., Ernhart, C.B. Boyd, T.A. Contributions of risk factors to elevated blood and dentine lead levels in preschool children. *The Science of the Total Environment*, 1992, 115, 239-260.

7. Cole, M., Winkelman, M., Morris, J., Simon, J.E., Boyd, T.A. Thalamic Amnesia: Korsakoff syndrome due to left thalamic infarction. *Journal of the Neurological Sciences*, 1992, 110, 62-67.

8. Greene, T.H., Ernhart, C.B., & Boyd, T.A. Contributions of risk factors to elevated blood lead levels in preschool children: Methodological implications. (Abstract). *Archives of Environmental Health*, 1991, 46, 187-188.

9. Boyd, T.A., Ernhart, C.B., & Greene, T.H. Prenatal and early childhood lead exposure and sustained attention in the preschool years. (Abstract). *Archives of Clinical Neuropsychology*, 1991, 6 (3), 178-179.

10. Ernhart, C.B., Greene, T. & Boyd, T.A. Response to H.L. Needleman, A. Schell, D. Bellinger, A. Leviton & E.N. Allred: The long-term effects of exposure to low doses of lead in childhood (Vol. 232, No. 2). (Letter). *New England Journal of Medicine*, 1991, 324 (6), 416.

11. Greene, T., Ernhart, C.B., Sokol, R.J., Martier, S., Marler, M., Boyd, T.A & Ager, J. Prenatal alcohol exposure and preschool physical growth: A longitudinal analysis. *Alcoholism: Clinical and Experimental Research*, 1991, 15, 905-913.

12. Boyd, T.A., Ernhart, C.B., Greene, T., Sokol, R. & Martier, S. Prenatal alcohol exposure and sustained attention in preschoolers. *Neurotoxicology and Teratology*, 1991, 13, 49-55.

13. Boyd, T.A., Ernhart, C.B., & Greene, T.H. Prenatal alcohol exposure and sustained attention in the preschool years. (Abstract). *Archives of Clinical Neuropsychology*, 1991, 6 (3), 178.

14. Greene, T., Ernhart, C.B., Ager, J., Sokol, R. Martier, S. & Boyd, T.A. Prenatal alcohol exposure and cognitive development in the preschool years. *Neurotoxicology and Teratology*, 1991, 13, 57-68.

**CURRICULUM VITAE     THOMAS ANDREW BOYD, Psy.D.     PAGE 7**

15. Greene, T., Ernhart, C.B., Ager, J., Sokol, R. Martier, S. & Boyd, T.A. Prenatal alcohol exposure and cognitive development in the preschool years. (Abstract). *Pediatrics Digest*, 1991, 7-8.

16. Boyd, T.A. Clinical assessment of memory in children: Research, theory and prospects for practice. In M.G. Tramontana and S.R. Hooper (Eds.) Assessment Issues in Child Neuropsychology. New York: Plenum, 1988.

17. Boyd, T.A. & Hooper, S.R. WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery. (Abstract). *Bulletin of the National Academy of Neuropsychologists*, 1988, 5 (1), 12.

18. Boyd, T.A. & Hooper, S.R. Psychometric validity of proration and Digit Span substitution for estimating WISC-R Verbal and Full Scale IQs. *Perceptual and Motor Skills*, 1987, 65, 19-25.

19. Hooper, S.R. & Boyd, T.A. Test review: The Denman Neuropsychology Memory Scale. *International Journal of Clinical Neuropsychology*, 1987, 9 (3), 141-144.

20. Boyd, T.A., Tramontana, M.G. & Hooper, S.R. Cross-validation of a psychometric system for screening neuropsychological abnormality in older children. *Archives of Clinical Neuropsychology*, 1987, 1, 387-391.

21. Hooper, S.R. & Boyd, T.A. Neurodevelopmental learning disorders. In J.E Obrzut and G.W. Hynd (Eds.) Child Neuropsychology: Clinical Practice (Vol. II). New York: Academic Press, 1986.

22. Boyd, T.A. & Tramontana, M.G. Application of the Split-Half WISC-R with emotionally and behaviorally disturbed children. *Journal of Psychoeducational Assessment*, 1986, 4 (2), 113-122.

23. Boyd, T.A. & Tramontana, M.G. WISC-R short forms: Long on problems. (Abstract). *Educational Resources Information Center (ERIC)*, U.S. Department of Education, National Institute of Education, February 3, 1986.

24. Tramontana, M.G. & Boyd, T.A. Psychometric screening of neuropsychological abnormality in older children. *International Journal of Clinical Neuropsychology*, 1986, 8 (2), 53-59.

25. Tramontana, M.G., Klee, S.H. & Boyd, T.A. WISC-R interrelationships with the Halstead-Reitan and Children's Luria Neuropsycholgocal Batteries. *International Journal of Clinical Neuropsychology*, 1984, 6, 1-8.

## PRESENTATONS

1. Boyd, T.A., Konrad, K., Bruening, & Goshe, G. Why do they act that way: Brain Injury and Behavior. Interdisciplinary inservice, The Rehabilitation Hospital at Heather Hill, Chardon, Ohio, November, 1994.

2. Boyd, T.A., Konrad, K., & Livingston, R. Understanding adolescents (part I and II). Interdisciplinary inservice, The Rehabilitation Hospital at Heather Hill, Chardon, Ohio, October, 1994.

3. Boyd, T.A., Strenger, V.E., & Dickerson, P.B. Coping with illness: A family affair. Heather Hill Family Education Series. Heather Hill, Inc., Chardon, Ohio, May, 1994.

4. Boyd, T.A. What have we forgotten: A developmental framework for clinical memory assessment of children. Paper presented at the International Neuropsychological Society, Twenty-Second Annual Meeting. Cincinnati, Ohio, February 1994.

   Audiocassette Tape. Contained on G.A. Gioia, Organizer; G. Butterbaugh, Chair; E. Kaplan, Discussant: "Symposium 7: Developmental theory and process in the examination of children's memory. #G117-37AB, InfoMedix, Garden Grove, CA, 1994

**CURRICULUM VITAE    THOMAS ANDREW BOYD, Psy.D.    PAGE 8**

5. Greene, T., Sokol, R.J., Martier, S., Ernhart, C.B., Boyd, T.A., & Ager, J. FAS: Not necessarily a hopeless prognosis. Paper presented at The 6th Congress of The International Society for Biomedical Research on Alcoholism, held jointly with the Research Society on Alcoholism. Marco Island, Florida, June 1991.

6. Boyd, T.A., Ernhart, C.B., & Greene, T.H. Prenatal alcohol exposure and sustained attention in the preschool years. Paper presented at the 10th Annual Meeting of the National Academy of Neuropsychology. Reno, Nevada, November 1990.

7. Boyd, T.A., Ernhart, C.B., & Greene, T.H. Prenatal and early childhood lead exposure and sustained attention in the preschool years. Paper presented at the 10th Annual Meeting of the National Academy of Neuropsychology. Reno, Nevada, November 1990.

8. Boyd, T.A. Comments on the Wide Range Assessment of Memory and Learning (WRAML). Symposium: Assessing Memory in Children: A new test battery. Paper presented at the 98th Annual Convention of the American Psychological Association. Boston, MA, 1990.

9. Greene, T., Ernhart, C.B. & Boyd, T.A. Contributions of risk factors to elevated blood lead levels in preschool children: Methodological implications. Paper presented at The 2nd Annual Meeting of the International Society for Environmental Epidemiology (ISEE). Berkeley, California, August 1990.

10. Greene, T., Ernhart, C.B., Sokol, R.J., Agar, J., Martier, S. & Boyd, T.A. Fetal alcohol exposure and cognitive development. Paper presented at The 5th Congress of The International Society for Biomedical Research on Alcoholism, held jointly with the Research Society on Alcoholism. Toronto, Canada, June 1990.

11. Boyd, T.A. Developmental and psychosocial impact of closed head injuries in children. Paper presented at special conference, Pediatric Seizure Disorders and Closed Head Injuries: A challenge to Health Care Professionals and Families. Continuing Education Division, Education and Training, the MetroHealth System, December 1989.

12. Boyd, T.A., Irwin, M. & Fristad, M.A. Serial Rorschach data in childhood bipolar illness. Paper presented at the Annual Midwinter Meeting of the Society for Personality Assessment. New Orleans, Louisiana, March 1988.

13. Boyd, T.A. & Hooper, S.R. WISC-R IQ estimates from the Luria-Nebraska Neuropsychological Battery. Paper presented at the Seventh Annual Meeting of the National Academy of Neuropsychologists. Chicago, Illinois, October 1987.

14. Boyd, T.A. Clinical assessment of memory in children: Toward a practical solution. Paper presented at the 94th Annual Convention of the American Psychological Association. Washington, DC, 1986.

15. Hayden, R. & Boyd, T.A. MMPI-168 regression equations with Adolescents: Derivation and cross validation. Paper presented at the 94th Annual Convention of the American Psychological Association, Washington, DC, 1986.

16. Boyd, T.A. The utility of neuropsychological testing in detecting CNS impairment in SLE patients. Grand Rounds, Division of Rheumatology, Brown University Program in Medicine and Roger Williams General Hospital, May 1985.

17. Boyd, T.A. & Tramontana, M.G. WISC-R short forms: Long on problems. Paper presented at the 92nd Annual Convention of the American Psychological Association, Toronto, Canada, 1984.

18. Tramontana, M.G., Boyd, T.A. & Sherrets, S.D. Predicting the long range effects of early childhood brain damage: A lesson in humility. Special Grand Rounds, Department of Psychiatry and Human Behavior, Brown University Program in Medicine and Bradley Hospital, August 1983.

19. Tramontana, M.G., Boyd, T.A. & Sherrets, S.D.  Psychometric screening of neuropsychological abnormality in older children.  Paper presented at the 91st Annual Convention of the American Psychological Association, Anaheim, CA, 1983.

# TEACHING ACTIVITIES

## *Training Duties*

1.  Supervisor, PGY-III and PGY-II Residents in Psychiatry, Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth Medical Center, 1988 - 1993.

2.  Supervisor, Practicum in Adult Psychological Assessment, Doctoral students in Clinical Psychology, Case Western Reserve University, MetroHealth Medical Center campus, 1988 - 1993

3.  Supervisor, Field Placement in Adult Psychological Assessment, Doctoral students in Clinical Psychology, Case Western Reserve University, MetroHealth Medical Center campus, 1991 - 1993

4.  Supervisor, Rotations in Clinical Child Psychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1984 - 1987.

5.  Supervisor, Rotations in Clinical Child Neuropsychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1984 - 1987.

6.  Supervisor, Postdoctoral Fellowship in Clinical Child Neuropsychology, Bradley Hospital and Brown University, 1984-1986.

7.  Supervisor, Rotation in Clinical Neuropsychology, Hahnemann University "Captive" Internship Training Program, 1983 - 1984.

8.  Supervisor (partial), Clinical Child Neuropsychology (Bradley Hospital), Brown University Clinical Psychology Internship Consortium, 1982 - 1983.

## *Lectures & Courses Taught*

1.  Adult Psychological Testing, Medical Student Clerkship (Rotation in Psychiatry),Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth Medical Center, 2-Part Lecture (Given quarterly), 1990 - 1993

2.  Adult Psychological Testing, PGYII and PGY-III Residents in Psychiatry, Case Western Reserve University School of Medicine and Department of Psychiatry, MetroHealth Medical Center, 5-Part Seminar (annually), 1988 -1993.

3.  Neuropsychological Assessment in Outcome Studies for Acute Head Injury (partial), Residents in Neurology, Case Western Reserve University School of Medicine and Department of Neurology, MetroHealth Medical Center, Lecture, Spring, 1991.

4.  Introduction to Psychological Testing, School of Nursing, MetroHealth Medical Center, Quarterly Lecture, 1990.

5.  Neuropsychological Assessment in Acute Head Injury, Residents in Neurology and Rehabilitation Medicine, Case Western Reserve University School of Medicine and Department of Neurology, MetroHealth Medical Center, Lecture, Fall 1989 - 1992.

6.  Research Issues in Child Neuropsychology, Case Western Reserve University, Department of Psychology, Graduate Program in Clinical Psychology, Pediatric Psychology Track, Lecture, Fall 1987.

**CURRICULUM VITAE**      **THOMAS ANDREW BOYD, Psy.D.**      **PAGE 10**

7.  Attention Deficit Disorder, Brown University Clinical Psychology Internship Consortium, Spring Lecture, 1986.

8.  Clinical Assessment Methods with Children, Brown University Clinical Psychology Internship Consortium, Fall lecture, 1985 - 1986.

9.  Psychological Assessment, Psychiatry Residents and Fellows in Child Psychiatry, Department of Psychiatry and Human Behavior, Brown University Program in Medicine, Summer lecture, 1985.

10. Basic Measurement in Psychodiagnostics, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Spring Semester, 1984.

11. History of Psychology, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Spring Semester, 1984.

12. Theories of Learning and Motivation, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Fall Semester, 1983.

13. Physiological Basis of Behavior, Department of Mental Health Sciences, The Graduate School, Hahnemann University, Full Course, Fall Semester, 1983.

14. Clinical Neuropsychology, Brown University Clinical Psychology Internship Consortium, 4-Part Seminar (partial), 1982 - 1983.

15. Neuropsychology of Language, Department of Speech Pathology, Hahnemann University, Spring Seminar Lectures, 1982.

16. Social Psychology, College of Allied Health Professions, Hahnemann University, Full Course, 1977 - 1979.

17. Juvenile Delinquency, Orchard Hill Residential College, University of Massachusetts, Amherst, Seminar, 1973 - 1974.

18. Practicum in Youth Work, Orchard Hill Residential College, University of Massachusetts, Amherst, 1973 - 1974.

## GRANTS

1.  Executive Board of the Cuyahoga County Hospital Auxiliary.  December 1987.  Awarded $4,671.00 for purchase of IBM-compatible portable computer for Psychological Assessment Center.

2.  Research Initiation Grant, Ohio Board of Regents and Case Western Reserve University.  1988. Awarded $5,000.00 for study entitled Neuropsychiatric Profiles of Lupus Patients with Patterns of High and Low Utilization of Clinic Services.

**REFERENCES:**  Professional references are available upon request.

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   01-CR-794 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN M. STUARD |
| | ) | |
| -vs- | ) | OPINION OF THE COURT |
| | ) | |
| NATHANIEL E. JACKSON, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW REGARDING |
| Defendant. | ) | IMPOSITION OF DEATH PENALTY |

On November 8, 2002, a Trumbull County Jury returned a verdict finding the

Defendant, Nathaniel E. Jackson, guilty of two (2) counts of Aggravated Murder arising from

the death of Robert S. Fingerhut. Since Count One and Count Two of the Indictment merge for

sentencing purposes, the State elected to dismiss Count Two and proceed to the mitigation phase

on the first count of the indictment. Therefore, for purposes of this opinion, the Defendant was

convicted, under the first count of the indictment, of purposely, and with prior calculation and

design, causing the death of Robert S. Fingerhut. The jury further found that the State had

proved beyond a reasonable doubt two (2) specifications of aggravating circumstances. After

the mitigation hearing, the jury concluded that the State had proved beyond a reasonable doubt

that the aggravating circumstances outweighed the mitigating factors and returned a verdict

recommending that the sentence of death be imposed upon the Defendant.

Factually, the evidence revealed that while the Defendant was in prison for a prior

conviction unrelated to the present case, he along with the Co-Defendant, Donna Roberts, who

is precedently awaiting trial for her involvement, plotted the murder of her house mate, and ex-

husband, Robert S. Fingerhut. Indeed, both of them concocted a plan to kill Fingerhut to permit

-1-

EXHIBIT
**9/**

the Defendant and Roberts to live happily ever after. However, the plan went awry when Jackson, who was in the house where Fingerhut stayed, was shot in the left index finger during the execution of Fingerhut. He then took Fingerhut's car keys, and drove the vehicle which Fingerhut typically operated to Youngstown. Shortly thereafter, Roberts took the Defendant to a motel in Boardman, getting him a room where he could hide out. Ultimately, the Defendant was captured at a home in Youngstown, and he gave a statement to the police alleging self-defense.

More specifically, the State introduced evidence that on December 11, 2001, two (2) days after the Defendant was released from prison, Robert S. Fingerhut, while in his home, was pistol whipped, and shot three(3) times, causing at least four (4) injuries from gun shots. Two of the injuries were to the back, with one grazing the back, and the other entering near the shoulder before exiting out the chest area of the victim. Fingerhut also sustained a defensive gun shot wound to the webbing of his left hand between the thumb and forefinger. The fatal gun shot was to the top of the head and from a short distance. This injury would "would have dropped him like a sack of potatoes," as testified to by Dr. Germaniuk.

Police responded to the crime scene as a result of a 911 call. When they arrived at approximately 12:01 a.m., they were met by the Co-Defendant, who informed them that her husband's car was missing. She also granted them permission to search the residence and her car. During this search, police found more than 140 letters from the Defendant to Roberts in her dresser, and an equal number of letters from Roberts to the Defendant, in the trunk of the Co-Defendant's car, in a paper bag bearing the Defendant's name and prison number.

Additionally, law enforcement officers were able to obtain nineteen (19) telephone

-2-

conversations, lasting more than three (3) hours, which were recorded while the Defendant was incarcerated in Lorain Correctional Institution. These telephone conversations, along with the letters which spanned three (3) months, revealed a continuing and evolving plan to kill Fingerhut immediately upon the Defendant's release from prison.

Specifically, during these telephone conversations, and in the written letters, the Defendant requested that Roberts obtain for him, black gloves to conceal his fingerprints, a ski mask, and a pair of handcuffs. Further, the Defendant, during the December 8, 2001, telephone conversation, which was recorded the day before he was discharged from Lorain, and three (3) days before the murder, stressed to Roberts that he "need[ed] to be in the house [in which Fingerhut lived] before he [got] home " in order to carry out the premeditated murder. Roberts, in a letter written to the Defendant acknowledged that she has found thin, fleece line, leather gloves, but was still looking for the ski mask.

Indeed, the State introduced black leather gloves with fleece lining which were recovered from the house where the Defendant was arrested. These gloves, which had gun shot residue on them, had a hole in the left index finger, and a reddish substance which appeared to be blood was also observed in that same area. This damaged matched the injury that the Defendant had sustained to his finger. Although the actual handcuffs were never recovered by police, an empty handcuff box was found in Donna Robert's car.

The evidence also revealed that Roberts, near the time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, Roberts rented a hotel room for the Defendant. In this room, bloody bandages and other medical supplies were

-3-

found by hotel cleaning people and were subsequently collected by police.

The car which was usually driven by Fingerhut, and which had been reported stolen by the Co-Defendant the night of Fingerhut's murder was recovered in Youngstown, Ohio. Blood stains were located throughout the vehicle and were collected by law enforcement. DNA analysis revealed that the blood matched that of DNA profile of the Defendant.

The State also introduced evidence that Roberts and the Defendant discussed purchasing a "new Lincoln" or "2002 Cadillac DeVille" for the Defendant. Additionally, Fingerhut had two (2) life insurance policies with a total death benefit of $550,00.00, and with Donna Roberts named as the beneficiary.

Based upon this and other evidence, the jury properly concluded that the Defendant committed a burglary to facilitate the premeditated and purposeful murder of the victim Fingerhut along with Roberts. The Defendant after executing his plan then stole Fingerhut's vehicle which allowed the jury to find that the murder was committed while committing the aggravating circumstances of Aggravated Burglary and Aggravated Robbery.

In a case of this nature, pursuant to R.C. 2929.03(D)(3), the Court is required to determine whether the State has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Indeed, the Supreme Court of Ohio has stated in *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344:

> "[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. *** [I]n the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt." *Wogenstahl* (1996), 75 Ohio St. 3d 344 at 356.

-4-

In performing its statutory duty, the a review of the aggravating circumstances is required.

    1.)    *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.*

The evidence presented at trial reflected that the Defendant trespassed in the victim's dwelling and murdered him. The Court finds that the Defendant entered into 254 Fonderlac Drive, in Howland Township. He was wearing gloves and armed with a gun, with which he struck the victim leaving a mark on Fingerhut's face. Once in the house, he fired the gun three times causing four (4) separate wounds. The fatal shot was to the top of Fingerhut's head, and nearly straight down.

From the aforementioned evidence, the Jury concluded that the defendant committed the Aggravated Murder of while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

    2.)    *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.*

After the Defendant had murdered the victim, he took the victim's car keys and his car As he was driving away from the crime scene, and prior to abandoning the vehicle in Youngstown, he left blood evidence throughout the car. This evidence was subjected to DNA testing, which confirmed that forensically, it was his blood. Quite simply, the Defendant committed the Aggravated Robbery to escape the consequences of his prior murderous act.

-5-

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

To be weighed against the aggravating circumstances are the mitigating factors. In this case, the following factors were considered by the Court as possible mitigation against each specification and against the imposition of the death penalty:

1.) *The nature and circumstances of the offense, the history, character, and background of the offender.*

As was noted in *Wogenstahl, supra,* the nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. However, in this case, reviewing the nature and circumstances, the Court does not find any credible evidence which would allow the Court to accord any weight to the nature and circumstances of the offense against the imposition of the death penalty.

In considering the history, character and background of the offender, this Court considered the home life of the Defendant and the fact that he grew up in a relatively poor environment, and that he was cared for and raised by his mother and maternal grandmother. His biological father had little, if any, real involvement with him, and this lack of a father figure likely contributed to his behavioral problems.

Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the Defendant's step-father, his sister, his mother, and Dr. McPherson. These witnesses testified that the Defendant was respectful to both is mother and grandmother. His sister, who described as smart and really kind, noted that they

-6-

attended church. Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused. His mother also declined to say that his home was in a "rough neighborhood, or that the Defendant had any problems in school. Dr. McPherson's report noted that the Defendant had not been hospitalized for any physical or mental condition. The witnesses also noted that they practiced moral tenets and that responsibility and respect were taught.

In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

    2.)   *Whether the victim of the offense induced or facilitated the killing.*

Although under R.C. 2929.04(B)(1), the mitigating factor regarding whether the victim of the offense induced or facilitated it was not specifically argued by the Defendant during the penalty phase of the trail as mitigating, the Court did consider the Defendant's video taped statement presented in evidence during the trial phase. In the self-serving statement, the Defendant claimed that the killing of the victim was as a result of the Defendant protecting himself from an unprovoked attack by the victim.

This statement to the police attempted to construct a scenario wherein the victim approached the Defendant to purchase marijuana and then invited the Defendant into his home. The Defendant then claims that the victim then pulled a gun on him. The Defendant asserted that he attempted to disarm the victim, but the gun went off apparently striking the victim. However, the other facts illustrating the planning and execution of the murder along with the physical evidence introduced causes the Defendant's version not to be credible. As such, the

-7-

Court does not accord any weight to this mitigating factor.

> 3.)     *Whether it is unlikely that the offense would have been committed, but for the*
>        *fact that the offender was under duress, coercion, or strong provocation.*

Again, while the Defendant did not specifically argue this mitigating factor, the Court, upon reviewing the video tape, noticed that the Defendant claimed that the victim made derogatory statements about the Defendant's race which angered the Defendant. However, the this comment is likewise not convincing for the same reasons noted previously. This mitigating factors has no weight.

> 4.)     *Any other factors that are relevant to the issue of whether the offender should*
>        *be sentenced to death.*

Under R.C. 2929.04 (B)(7), commonly referred to as the "catch all provision" the Court reviewed the Defendant's capacity to appreciate the criminality of his conduct in light of the defense expert testimony regarding his mental history and mental state at the time of the offense was considered as a possible factor under R.C. 2929.04(B)(3).

This testimony revealed that the Defendant suffered from Attention Deficit Disorder/Hyperactivity Disorder, Chemical Dependency, and a reported history of alcohol abuse. Further, the evidence disclosed that the Defendant had an Antisocial Personality Disorder and was considered low average or better in intelligence.

Significantly, however, there was no evidence presented that the Defendant, at the time of the offense, had any mental disease or defect or that he lacked the capacity to appreciate the criminality of his conduct. His Antisocial Personality Disorder only showed that he had a history of inappropriate and impulsive behavior from his early childhood to the present. He was

-8-

incarcerated four (4) times. According to the Defendant's own expert, the Defendant, throughout his juvenile and adult life had received repeated treatment and/or probation for his criminal transgressions and his drug and alcohol abuse. He did not learn from his past mistakes, but only escalated his antisocial conduct.

In summary, this Court gives very little weight in mitigation to the Defendant's mental status, and his drug and alcohol abuse history especially in light of the Defendant's elaborate scheme to kill the victim, elude capture, and finally deceive police officers with a statement blaming the victim.

Further under 2929.04(B)(7), the Court examined the Defendant's ability to maintain himself in a stable fashion in a structured setting. Indeed, it was suggested by the Defense that he could be a productive member of the general prison population, and that this should be considered as mitigating. However, the Court gives slight weight to this particular factor.

The Defendant's last incarceration was the result of him not learning from his past mistakes, and from his tendency to act out impulsively without looking at the consequences. Furthermore, he repeatedly was placed on probation, but he continued to digress, committing more serious criminal acts. Indeed, during the last incarceration, the Defendant claimed to have "found God" and that he was going to straighten out his life. At the same time, it is abundantly clear that he was plotting to commit the ultimate criminal act, a premeditated burglary and murder, while pre-textually presenting himself to prison officials as a good candidate for a release program. Quite simply, in the very setting in which the Defense suggests that he could be a productive member, the Defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder Robert S. Fingerhut so that in effect he could assume Fingerhut's lifestyle,

-9-

including running the Greyhound bus business, managing rental properties, and living in his home with his ex-wife.

The Defendant also offered an unsworn statement, wherein he stated that he was "very sorry for what happened." The Court likewise gives this statement slight weight as the statement lacked sincerity. The tone and tenor of the apology did not, in the Court's opinion, come from someone who was genuinely remorseful. Even assuming that the Defendant was remorseful, such retrospective remorse is not entitled to any significant weight. To the contrary, the Court believes that the Defendant's feigned remorse stems from the fact that the Defendant was apprehended. The Defendant was disappointed that the fool-proof, premeditated murder plot ,which he developed over nearly three (3) months, and which included shooting the victim "in the 'F' ing head," failed.

When independently weighing the aggravating circumstances as to the Aggravated Murder as previously outlined against the collective factors in mitigation, this Court finds that the aggravating circumstances not only outweigh the mitigating factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction to any defendant who commits an Aggravated Murder during the commission of these certain felonies. In the case at bar, the underlying felonies are Aggravated Burglary and Aggravated Robbery.

In this particular case, the Court accords substantial weight to the Aggravated Burglary specification. In order to prove an Aggravated Burglary, the State is required to demonstrate that the Defendant trespassed in the occupied structure for the purpose of committing a criminal

-10-

act. In most instances, this criminal act is a theft offense. Occasionally, a Defendant will trespass to commit a kidnapping or even a rape. Such criminal acts provide the basis upon which a Defendant can be convicted of Aggravated Burglary. Then, if during any of these underlying criminal acts, the victim is purposely killed, an Aggravated Murder with the specification of Aggravated Burglary has been committed. These alone can permit the imposition of the death penalty should the aggravating circumstance of the Aggravated Burglary be found to outweigh the mitigating factors.

Under the facts in the instant case, this Court can not foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater. The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but to rather to carry out the premeditated, cold blooded execution Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

The Court further gives weight to the Aggravated Robbery specification. After shooting the Defendant in the head, the Defendant took personal property of the victim to effectuate his escape. Indeed, the Defendant stole the victim's keys and his car.

Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct. From the

-11-

overwhelming evidence, it is this Court's opinion that the Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,00.00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him.

Upon consideration of the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the defendant, and the arguments of counsel, it is the judgment of this Court that the aggravating circumstances, outweighed, by proof beyond a reasonable doubt, the collective mitigating factors.

Dated: 12/9/02

HON. JOHN M. STUARD
Judge, Court of Common Pleas

I hereby certify that a copy of the foregoing opinion was hand delivered to Attorney James Lewis, Attorney Anthony Consoldane, and Prosecutor Dennis Watkins this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

I also hereby certify that a copy of the foregoing opinion was duly mailed by ordinary U.S. Mail to the Clerk of the Supreme Court, Supreme Court of Ohio, State Office Tower, 30 E. Broad Street, Columbus, Ohio 43266-0419, this ___9th___ day of December, 2002.

HON. JOHN M. STUARD

-12-

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5573

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

LEWIS WILLIAMS, JR., and
JOHN G. ROE,

      Plaintiffs,

v.

ROBERT TAFT,
REGINALD WILKINSON, and
JAMES HAVILAND,

      Defendants.

## AFFIDAVIT OF MARK J. S. HEATH, M.D., BOARD CERTIFIED ANESTHESIOLOGIST

I, Mark J. S. Heath, after being duly sworn and cautioned, hereby affirm as follows:

1.      My name is Mark J. S. Heath, M.D., I am an Assistant Professor of Clinical Anesthesiology in the Department of Anesthesiology at Columbia University in New York City, N.Y. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice Medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology, teaching residents, fellows and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar and proficient with the use and pharmacology of the chemicals used to perform lethal injection.

2.      Over the past several years, as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed several hundred hours of research into the techniques that are used during this procedure. I have been admitted as an expert medical witness in courts in Georgia, Tennessee, Pennsylvania, and Louisiana. I have filed affidavits that have been reviewed by courts in the above states and also Virginia, New York, Alabama, and by the United States Supreme Court. During court proceedings I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. My research regarding lethal injection has involved both extensive conversations with recognized experts in the field and personal correspondence with the individuals responsible for introducing lethal injection as a method of execution in Oklahoma and the United States.



**EXHIBIT**
82

3.      My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit A and incorporated by reference as if fully rewritten herein.

4.      I have reviewed the following information regarding Ohio's lethal injection procedures: a letter written by Warden James S. Haviland and dated April 19, 2002, and a letter written by attorney Vincent Lagana, staff counsel for the Ohio Department of Rehabilitation and Correction, and dated May 30, 2002. *See* Exhibit B (Warden Haviland's letter) and Exhibit C (attorney Lagana's letter). This information was provided by attorney Gregory W. Meyers. He informed me that a colleague of his tried to obtain additional details from a representative of Ohio's prison system, but that those attempts proved unsuccessful.

5.      The information contained in these two letters raises the following concerns about the Ohio lethal injection procedure. These concerns arise both from the details disclosed in the letters and from medically relevant, logical inferences drawn from the omission of details in the letters (*e.g.*, details regarding the training of the personnel involved; details of all of the medical equipment used; and details of the precise methods by which the personnel involved use the equipment to carry out an execution by lethal injection).

6.      The letters by Warden Haviland and attorney Lagana state that as part of its protocol for lethal injection Ohio uses the drugs sodium thiopental (also know as "thiopental sodium" and "pentothal"), pancuronium bromide (also know as "pancuronium" and "Pavulon"), and potassium chloride (also known as "KCl")

7.      The information that is provided does not indicate the sequence in which the three drugs are administered during the course of an execution. While no sequence of the above three drugs is acceptable (because of the use of pancuronium), if thiopental is administered as the second or third drug the execution is virtually certain to constitute torture. Even if I assume that thiopental is the first drug administered, significant concerns remain based on the matters discussed below.

8.      A major concern about the protocol relates to the use of the drug pancuronium bromide. Pancuronium paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. If the thiopental and potassium are to be given in doses sufficient to cause death, then it is my opinion held to a reasonable degree of medical certainty that there would be no rational or medically justifiable place in the protocol for pancuronium.

9.      If thiopental is not properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then it is my opinion held to a reasonable degree of medical certainty that the use of pancuronium places the condemned inmate at risk for consciously experiencing paralysis, suffocation, and the excruciating pain of the intravenous injection of high dose potassium chloride.

Affidavit of Mark J.S. Heath, M.D.
Page 2 of 7

10.     Based on the information available to me, it is my opinion held to a reasonable degree of medical certainty that Ohio's lethal injection protocol creates an unacceptable risk that the inmate will not be anesthetized to the point of being unconscious and unaware of pain for the duration of the execution procedure. If the inmate is not first successfully anesthetized, then it is my opinion to a reasonable degree of medical certainty that the pancuronium will paralyze all voluntary muscles and mask external, physical indications of the excruciating pain being experienced by the inmate during the process of suffocating (caused by the pancuronium) and having a cardiac arrest (caused by the potassium chloride).

11.     If administered alone, a lethal dose of pancuronium would not immediately cause a condemned inmate to lose consciousness.  It would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium. Rather, the loss of consciousness would be due to suffocation, and would be preceded by the torment and agony caused by suffocation.

12.     If taken alone, a lethal dose of potassium chloride would not immediately cause a condemned inmate to lose consciousness. It would first cause excruciating pain as it traveled through the venous system to the heart, and, once it reached the heart, it would cause a painful cardiac arrest that would deprive the brain of oxygen and rather quickly (but not immediately) cause death.  If pancuronium were administered prior to the potassium chloride any visible signs of pain or agony caused by the potassium would be completely masked and undetectable to onlookers or witnesses.

13.     It is my understanding that Ohio's execution protocol requires the presence of media witnesses to the execution, and permits the presence of witness chosen by the inmate and chosen by the victim's surviving family members. It is my opinion based on a reasonable degree of medical certainty that the use of pancuronium effectively nullifies the ability of witnesses to discern whether or not the condemned prisoner is experiencing a peaceful or agonizing death. Regardless of the experience of the condemned prisoner, whether he or she is deeply unconscious or experiencing the excruciation of suffocation, paralysis, and potassium injection, he or she will appear to witnesses to be serene and peaceful due to relaxed, totally immobile facial and other skeletal muscles.

14.     Based on my research into issues related to lethal execution, I know that there was a time when pancuronium was an acceptable drug for use by veterinarians in the euthanasia of household pets such as dogs and cats; but that the use of pancuronium is now prohibited by many veterinary guidelines in this and other countries for precisely the reasons outlined above. Veterinary standards forbid creating the risk that household pets would die while pancuronium masks the type of excruciating pain

Affidavit of Mark J.S. Heath, M.D.
Page 3 of 7

human beings are exposed to in Ohio's execution protocol. The use of pancuronium fails to comport with the evolving "standard of decency" regarding the ending of life in household pets. In my medical opinion, based on a reasonable degree of medical certainty, the use of pancuronium in the lethal injection protocol for executing human beings violates standards of decency designed to prevent the infliction of excruciating pain and suffering on human beings.

15.     Another major concern I have based on what I know about Ohio's lethal injection protocol relates to the use of sodium thiopental. Sodium thiopental is an ultrashort-acting barbiturate with a very short shelf life in liquid form. Thiopental is distributed in powder form to increase its shelf life; it must be mixed into a liquid solution by trained personal before it can be injected.

16.     When anesthesiologists use sodium thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical plane" of anesthesia (*i.e.*, a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure). The medical utility of thiopental derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

17.     The benefits of thiopental in the operating room engender serious risks in the execution chamber. Based on the information I have available to me concerning Ohio's execution protocol, a two (2) gram dose of sodium thiopental is apparently administered in a single injection from a single syringe. By contrast, based on my research and the research of others into the procedures for executing human beings by means of lethal injection, the original design of the lethal injection protocol called for the **continuous** intravenous administration of an ultrashort-acting barbiturate. Based on my research and the research of others, the central elements of the lethal-injection procedure used in Ohio is similar to the one adopted many years ago in Oklahoma (which, it appears, many states used as a model without substantive independent research). Oklahoma requires the "continuous intravenous administration of an ultrashort-acting barbiturate" (Oklahoma Statutes, Title 22 Criminal Procedure, Chapter 17 part 1014 A). It does not appear that Ohio's protocol includes this "continuous" requirement. The use of a continuous administration of the ultrashort-acting barbiturate is essential to ensure continued and sustained unconsciousness during the administration of pancuronium and potassium chloride. It is my opinion based on a reasonable degree of medical certainty that the failure to require a continuous infusion of thiopental places the condemned inmate at a needless and significant risk for the conscious experience of paralysis during the excruciating pain of both suffocation and the intravenous injection of potassium chloride.

18.     Based on my research into lethal injection, the dose of pentothal described in the Ohio protocol, 2 grams, is considerably lower than the doses described

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5577

in the protocols of many states and the Federal Government. It is my opinion based on a reasonable degree of medical certainty that Ohio's relatively low dose of thiopental amplifies the concern relating to the single injection (as opposed to continuous infusion) of this ultrashort-acting barbiturate, thereby further elevating the risk that the condemned person will suffer excruciating pain masked by the pancuronium.

19.    The information provides no specifications regarding the timing of the administration of the drugs, thereby compounding the risks I am describing in this affidavit. This concern is greatly amplified by the use of an ultrashort-acting barbiturate.

20.    Above and beyond my concerns stated above about the drugs used in Ohio, the details of Ohio's lethal injection protocol that I have been made aware of do not account for procedures designed to ensure the proper preparation of the drugs used. I have not seen details regarding the credentials, certification, experience, or proficiency of the personnel who will be responsible for the mixing of the thiopental from powder form, or for the drawing up of the drugs into the syringes. Preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. It is my opinion based on a reasonable degree of medical certainty, and based on my review of lethal execution procedures in states that have disclosed more detailed information that what I have seen about Ohio's procedures, that there exist many risks associated with drug preparation that, if not properly accounted for, further elevate the risk that an inmate will consciously experience excruciating pain during the lethal injection procedures.

21.    Based on information in attorney Lagana's letter, it is possible that Ohio intends to employ one or more phlebotomists to administer the drugs by "hand infusion". In general, phlebotomists are neither trained nor certified to administer drugs. Rather, phlebotomists are trained primarily to collect blood specimens by venipuncture and capillary puncture. The personnel performing the lethal injection procedure should be trained, experienced, and proficient in the use and administration of intravenous drugs. It is my opinion based on a reasonable degree of medical certainty, and based on what I know about Ohio's lethal injection procedures, that if Ohio inappropriately relies on phlebotomists during the execution procedure, that fact demonstrates that Ohio designed its procedure without proper guidance from persons with requisite training in the areas of medical science implicated by Ohio's lethal injection protocol.

22.    The information available to me provides inadequate detail regarding the training, credentials, certification, experience, or proficiency of any prison employee, nurse or paramedic who performs the execution procedure. The absence of such detail raises critical questions about the degree to which condemned inmates risk suffering excruciating pain during the lethal injection procedure. It is my opinion based on a reasonable degree of medical certainty that the correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and can not be adequately performed by personnel lacking the requisite

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5578

training and experience. The great majority of nurses are not trained in the use of ultrashort-acting barbiturates; indeed, this class of drugs is essentially only used by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few paramedics are trained or experienced in the use of ultrashort-acting barbiturates. Based on my medical training and experience, and based upon my research of lethal injection procedures and practices, inadequacies in these areas elevate the risk that the lethal injection procedure will cause the condemned to suffer excruciating pain during the execution process.

23.     The information provided includes no exhaustive "equipment list", and is thereby lacking in any assurance that the necessary equipment and supplies are present to ensure that the placement of the intravenous catheter can be performed without needless suffering.

24.     The information I have about Ohio's lethal injection procedure provides no specifications regarding the set-up of the intravenous bag of fluids, the drip chamber, the flow regulator, the intravenous tubing, the stopcocks or injection ports or means of injection. It is my opinion based on a reasonable degree of medical certainty, and based on my review of lethal execution procedures in states that have disclosed more detailed information than what I have seen about Ohio's procedures, that there exist many risks associated with whether the necessary equipment has been set up and utilized correctly by people properly trained in the use of the equipment necessary to properly administer any intravenous drugs, including those designed to cause death.

25.     The information available to me about Ohio's lethal injection execution protocol contains no reference to plans for dealing with the foreseeable circumstance wherein intravenous access cannot be obtained in the arm or leg. In this setting, state lethal injection protocols typically specify the use of a "cut-down" procedure to access a vein adequate for the reliable infusion of the lethal drugs. Based on my medical training and experience, and based on my research into lethal injection procedures and practices, it is my opinion to a reasonable degree of medical certainty that any reliable, humane lethal injection procedure must account for the foreseeable circumstance of a condemned inmate having physical characteristics that prevent intravenous access from being obtained by a needle piercing the skin and entering a superficial vein suitable for the reliable delivery of drugs. No equipment or supplies for performing a cut-down procedure are listed in the Ohio lethal injection protocol, nor is there information regarding the training, experience, expertise, credentials, certification, or proficiency of the personnel who would perform the "cut down" procedure.

26.     Based on my research into methods of lethal injection used by various states and the federal government, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion based on a reasonable degree of medical certainty that, given the apparent absence of a central role for a properly trained medical or veterinary professional in Ohio's execution procedure, it can and should be presumed that the lethal injection procedure Ohio employees creates

medically unacceptable risks of infliction excruciating pain and suffering on inmates during the lethal injection procedure.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that everything I have said in the above document captioned AFFIDAVIT OF MARK J. S. HEATH, M.D., BOARD CERTIFIED ANESTHESIOLOGIST is true to the best of my knowledge.


Mark J. S. Heath, M.D., AFFIANT


Sworn to and subscribed before me on this $30$ day of December, 2003.

LIA PASCALE
Notary Public - State of New York
No. 02PA6095971
Qualified in New York County
My Commission Expires July 21, 2007

Affidavit of Mark J.S. Heath, M.D.
Page 7 of 7

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5580

Curriculum Vitae

1)  Date of preparation:  October 6, 2003

2)  Name:  Mark J. S. Heath

Birth date:
Birthplace:  New York, NY
Citizenship:  United States, United Kingdom

3)  Academic Training:

| | | |
|---|---|---|
| Harvard University | | B.A., Biology, 1983 |
| University of North Carolina, Chapel Hill | | M.D., 1987 |
| Medical License | | New York: 177101-1 |

4)  Traineeship:

1987 – 1988  Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

1988 – 1991  Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

1991 – 1993  Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5)  Board Qualification:

Diplomate, American Board of Anesthesiology, October 1991.

6)  Military Service:  None

7)  Professional Organizations:

American Society of Anesthesiologists
International Anesthesia Research Society
Society of Cardiovascular Anesthesiology

8)  Academic Appointments:

1993 – 2002  Assistant Professor of Anesthesiology, Columbia University, New York, NY

2002 - present  Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)  Hospital/Clinical Appointments:

EXHIBIT
A

1993 – present       Assistant Attending Anesthesiologist, Presbyterian
                     Hospital, New York, NY.

10)   Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident
Presentations, 1991

11)   Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter
Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator
Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH       KO8 "Inducible knockout of the NK1 receptor"
          Principal Investigator, KO8 funding 12/98 - 11/02,
          $431,947 over three years
          (no-cost extension to continue through 11/30/2002)

NIH       RO1 "Tachykinin regulation of anxiety and stress responses"
          Principal Investigator, funding 9/1/2002 – 8/30/2007
          $1,287,000 over 5 years

12)   Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3)
(2003 - present)

13)   Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program,
Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell
University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago,
Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of
Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University
Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave)*, Mt.Sinai
School of Medicine, May 2002

*Anesthetic considerations of LVAD implantation.* Recurrent
lecture at Columbia University LVAD implantation course.

14)    Grant Review Committees:    None

15)    Publications:

**Original peer reviewed articles**

*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. **Proc. Nat. Acad. Sci.**, 98(4), 1912 – 1917.

*    King, T.E. [δ], **Heath M. J. S**[δ]., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    δ authors contributed equally to this work

*    **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.

*    **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S.**, Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S.**, Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S.**, Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. **Journal of Physiology** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. **Journal of Biological Chemistry** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **Cold Spring Harbor Symposia of Quantitative Biology** 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of Clinical Investigation** 97(2), 493 - 500.

**Case reports**                   none

**Review, chapters, editorials**

*       **Heath, M. J. S.**, Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*       Dickstein, M.L., Mets B, **Heath M.J.S.** (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

*       **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

*       **Heath, M.J.S.**, Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

*       **Heath, M. J. S.**,  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. IARS American-Japan Congress A-15.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. Anesthesiology 95:A-811.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.**, Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.**, Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000). NK1 receptor gene disruption alters the development of nociception. Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997).  Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord.  Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons.  Anesthesiology 75; 3A; A1037.

 Ohio Department of Rehabilitation and Correction

SOUTHERN OHIO CORRECTIONAL FACILITY
P.O Box 45699
Lucasville, Ohio 45699-0001

Bob Taft, Governor www.drc.state.oh.us Reginald A. Wilkinson, Director

April 19, 2002

Dear

I am in receipt of your request for information regarding the Scott and Byrd executions. I would like to apologize for the delay in responding to your inquiry. While reviewing files, I discovered your request, which I thought I had previously delegated to be completed. This was my error.

I have enclosed a copy of DRC Policy 001-09, Executions, and I will provide you with information the Department has deemed to be public information. The Department considers the record and names/roles of persons participating in the execution confidential based on security considerations, as well as the need to protect the safety of the persons involved in the process.

The gurney/bed and the restraints are manufactured by O.P.I., Ohio Penal Industries.

The intravenous equipment was purchased from a commercial source and consisted of:

01). Angiocath Abbocath-T
02). Primary IV Set No. 1820 (70 inch)
03). 0.9% Sodium Chloride, 1000 ml

The generic names of the pharmaceuticals used are:

01). Pancuronium Bromide
02). Potassium Chloride
03). Thiopental Sodium

There is no cardiac monitoring equipment used other than a stethoscope.

Once again, I apologize for the delay in responding. If you have further questions, please contact me.

Sincerely,

SOUTHERN OHIO CORRECTIONAL FACILITY

James S. Haviland
Warden

JSH/bn

EXHIBIT
82



I trust this information will be helpful.

Very Truly Yours,

Vincent Lagana
Staff Counsel

Copies: Assistant Director
Warden, SOCF
Chief Counsel