IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                      : Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      : Judge Stuard

    Defendant.                      :

---

## NATHANIEL JACKSON'S PROFFER

### VOLUME III OF III

2012 AUG 14  PM 2: 34

KAREN INFANTE ALLEN
CLERK
TRUMBULL COUNTY
CLERK OF COURTS

ON COMPUTER - TAI

ORIGINAL

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | | Case No. ___03-137 |
| Plaintiff-Appellee | ) | |
| vs. | ) | **DEATH PENALTY CASE** |
| NATHANIEL E. JACKSON | ) | |
| Defendant-Appellant | ) | |

## MERIT BRIEF OF APPELLANT, NATHANIEL E. JACKSON

On Appeal from the Court of Common Pleas, Trumbull County, Ohio
Case Number 01 CR 794

JOHN P. LACZKO  #0051918
4800 Market St., Suite C
Youngstown, Ohio 44512
(330) 788-2480

DENNIS DAY LAGER #0026073
1025 Chapel Ridge St., N.E.
Canton, Ohio 44714
(330) 494-5736
ATTORNEYS FOR DEFENDANT-
APPELLANT-NATHANIEL E.
JACKSON

DENNIS WATKINS #0009949
Trumbull County Prosecutor
LuWAYNE ANNOS #0055651
Assistant Prosecutor
Prosecutor's Office
Trumbull County Administration Bldg.
160 High St. N.W., 4th Floor
Warren, Ohio 44481
(330) 675-2426
ATTORNEYS FOR PLAINTIFF-APPELLEE
THE STATE OF OHIO

FILED

OCT 27 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

**EXHIBIT**

83

indictment decisions allows for arbitrary and indiscriminatory imposition of the death penalty.

The United States Supreme Court's decision in Woodson v. North Carolina (1976) 428 U.S. 280, made it clear that the fatal flaw of mandatory death penalty statutes is that without specific standards the process of deciding who is to be sentenced to death is shielded from judicial review.

Uncontrolled discretion of the prosecutor is one way Ohio's capital statutes circumvent this requirement. Also, the Ohio system has resulted in the imposition of death penalties in a racially discriminatory manner, with blacks and those who killed white victims being much more likely to get the death penalty.

The right to life is a constitutionally protected fundamental right. Commonwealth v. O'Neal (1975) 327 N.E. 2d 662, Roe v. Wade 1973) 410 U.S. 113, Johnson v. Zerbst (1938) 304 U.S. 458, Yick Wo v. Hopkins (1886) 118 U.S. 356. The Fifth and Fourteenth Amendments to the Constitution state explicitly that neither the United States Government nor any of the individual state governments may deprive a person of his life without due process of law. "Aside from its prominent place in due process clause itself, the right to life is the basis for all other rights. In the absence of life all other rights do not exist." O'Neal at 688.

Due process guarantees prohibit the taking of life unless the State can show a legitimate and compelling State interest. Id. at 668; Commonwealth v. O'Neal II (1975) 339 N.E. 2d 676, State v. Pierre (1977) 572 P. 2d 1338. Moreover, when fundamental rights are involved, substantive due process requires that "[e]ven though the governmental purpose

76

virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition

of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because

they lacked standards for imposition of a death sentence and were therefore removed from

judicial review. Woodson v. North Carolina (1976) 428 U.S 280. Prosecutors' uncontrolled

discretion violates this requirement.

Ohio's system imposes death is a racially discriminatory manner. Blacks and

those who kill white victims are much more likely to get the death penalty. While African-

Americans are less than twenty percent of Ohio's population, forty-nine percent (49%) of

Ohio's death row inmates are African-American. See Ohio Public Defender Commission

Report, 1999; see also The Report of the Ohio Commission on Racial Fairness, 1999. While

few Caucasians are sentenced to death for killing African-Americans, over forty African-

Americans sit on Ohio's death row for killing a Caucasian. Id. Ohio's statistical disparity

is tragically consistent with national findings. The General Accounting Office found victim's

race influential at all stages, with stronger evidence involving prosecutorial discretion in

charging and trying cases. "Death Penalty Sentencing: Research Indicates Pattern of Racial

Disparities," U.S. General Accounting Office, Report to Senate and House Committees on

the Judiciary (February 1990).

Ohio courts have not evaluated the implications of these racial disparities.

While the General Assembly established a disparity appeals practice in post-conviction that

may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race,

R.C. 2953.21 (A)(2), no rule has been adopted. Further, this practice does not track the

88

victim's race and does not apply to crimes committed before July 1, 1996. In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest. Commonwealth v. O'Neal II (1975) 339 N.E. 2d 676; Utah v. Pierre (1977) 572 P.2d 1338. Moreover, where fundamental rights are involved personal liberties cannot be broadly stifled "when the end can be more narrowly achieved". Shelton v. Tucker (1960) 364 U.S. 479. To take a life by mandate, the State must show that it is the "least restrictive means" to a "compelling governmental end". O'Neal at 678.

The death penalty is neither the least restrictive nor an effective means of deterrence. Both isolation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty.

The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the State's application of capital punishment. Gregg v. Georgia (1976) 428 U.S. 153: Furman at 255. Ohio's scheme does not meet those requirements. The statute does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty.

The statutory scheme is unconstitutionally vague which leads to the arbitrary imposition of the death penalty. The language "that the aggravating circumstances...outweigh the mitigating factors" invites arbitrary and capricious jury decisions. "Outweigh" preserves reliance on the lesser standard of proof by a preponderance of the evidence. The statute requires only that the sentencing body be convinced beyond a

89

)                                    )

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Roderick Davie,                          )        Case No. 1:99CV2400
                                         )
            Petitioner,                  )        Hon. James G. Carr
                                         )
      v.                                 )
                                         )
Betty Mitchell, Warden,                  )
                                         )
            Respondent.                  )

---

## AFFIDAVIT OF MARTHA PHILLIPS

STATE OF OHIO            )

COUNTY OF FRANKLIN )

Martha Phillips, after being duly sworn according to law, state as follows:

1)   I am an investigator employed by the Office of the Ohio Public Defender.

2)   As part of my duties with this Office I am assigned to Roderick Davie's case.

3)   The attorneys assigned to the case, Richard Kerger and Randall Porter, requested that I identify the procedures that were used to draw Roderick Davie's petit venire in his capital case. He was tried in March 1992.



EXHIBIT
24

)                                      )

4)   I initially spoke with Connie Pierce who is currently one of the jury commissioners for Trumbull County. Valerie Moffet, a former associate of Mr. Kerger's, had initially met with Ms. Pierce.

5)   Ms. Pierce informed me that she was not aware of the procedure employed during the time period of Roderick Davie's trial.

6) Ms. Pierce told me that former jury commissioner, Janet Franklin, presently works for the Trumbull County Probate Court. Ms. Pierce told me that she did not know where Ms. Ferra lived or worked.

7)   I contacted Ms. Franklin by telephone. She informed me that she had been instructed not to speak with me and instead I should make a public records request.

8)   I couldn not locate a telephone number for "Kathy Ferra", but I did find an address and telephone number for an individual named "Charles Ferra.", who may be Kathy Ferra's husband. I have called that number repeatedly. Once I left a message on an answering machine and the other times there was no answer. I left a message on the answering service to return my telephone call, but it was never returned.

Further affiant sayeth naught.

*Martha Phillips*

**MARTHA PHILLIPS**

Sworn to and subscribed before me this 25ᵗʰ day of November 2002.

*Peggy Ann Kent*



PEGGY ANN KENT
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES NOV. 5, 2003

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

STATE OF OHIO,                              :

    Plaintiff,                          :  Case No. 01-CR-794

-vs-                                        :

NATHANIEL JACKSON,                          :

    Defendant.                          :

# AFFIDAVIT OF NATHANIEL JACKSON

STATE OF OHIO            :
                : ss:
COUNTY OF RICHLAND   :

    Nathaniel Jackson, after being duly sworn according to law, states as follows:

    1.    I am the Defendant in the above case.

    2.    I did not have good communications with my attorneys before trial. I think that Jim Lewis only came to see me twice. The other attorney, Tony Consoldane, was the one who most visited with me. About every time that he saw me, it was on the weekend.

    3.    Tony Consoldane was never very helpful. He would ask me at the beginning of our meetings what was happening. That made me really frustrate mad. I was in jail, nothing was happening for me. The question should have been what was happening for Tony since he was not in jail and he was suppose to be working on my case. I would ask him to do stuff and he would never get it done. He did not share with me most of the information that the prosecutor gave him before trial. Basically I got nothing. I wanted to know what the witnesses were going to say.

    4.    I told Tony Consoldane that I wanted a new attorney. He got real mad. He told me that he was working hard on the case and this showed by the fact that he always took his own time to visit me on the weekends. It was not my fault that he never visited me on the week days. He said that the judge knew that he was doing a good job and that I would not get another attorney. He then ended the meeting with me and left.

    5.    I had one meeting with the prosecutor's investigator. The attorneys did not warn me that he was coming to see me. He was a Black man. He showed me the tape of my statement

1

EXHIBIT
85

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5596

to the police. At the end of the tape he starting asking me lots of personal questions concerning Donna and me. He was to know about our sex. He ask me if "it was good" with an older woman and stuff like that. He said I should share that stuff with him since we were both Black. I stopped the meeting and went back to my cell. I told Tony about this and I never saw the Investigator again. One other time I saw the Investigator in the hallway of the jail. He asked me why I told Consoldane about the sex questions. I just walked away.

6. Prior to trial I wrote the Judge a letter to get new attorneys. That letter is attached to this Exhibit. I wrote the letter because my attorneys were not visiting with me like they were suppose to. They would not listen to me. I placed the letter in an envelope with a stamp on it and sent it out to be mailed. I never did hear back form the Judge. I wrote the letter in February 2001. I always thought that the Judge got my letter and ignored it. My post-conviction attorney showed me a copy of the letter. He said that he got it from my trial attorneys' files. I did not know that they got a copy of the letter. The copy of the letter that my attorney showed me has Tony Consoldane's name written to the top. I did not write Consoldane's name on the top left hand corner of the letter. It was not on the letter when I mailed it to the Judge.

7. The trial made me mad. The attorneys would not listed to me or do what I said. That would not ask the questions that I told them to ask. On the break they would go talk to the prosecutors. I was real upset that Consoldane was more worried about taking up the jury's time, then getting it right.

8. At the sentencing hearing I got a new attorney. The first time that I met him was in the courtroom on the day of the sentencing hearing. I did not know him from a bucket of paint. The Judge told me that I could get a continuance. By that time I was so upset with my attorneys that I just wanted to get it over.

9. The handwritten paper that is attached to this affidavit, was part of a letter written sent to me by Donna Roberts.

Futher Affiant sayeth naught

_Nothaniel Lockson_
NATHANIEL JACKSON

Sworn and subscribed to me this the 20th day of May 2004

ROBERT K. LOWE
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147.03 R.C.

Notary Public

2

eason

EXHIBIT

44

1. RSF HAD BEGUN TO GET FAKE ID YEARS AGO.
HE HAD THIS OBSESSION ABOUT FAKING HIS OWN
DEATH BY PARKING HIS CAR SOMEWHERE, SPRINKLING
SOME OF HIS BLOOD AROUND. THEN HE SAID HE
WOULD GO TO MICHAEL'S FOR A YEAR. IN FACT,
HE SAID ST. FARM ASKS NO QUESTIONS AND WOULD
PAY FAST. ~~~~~~~~~~~~~? I TOLD
HIM HE WAS CRAZY AND NEVER BELIEVED HE WOULD
DO SUCH A STUPID THING. HE SAID HE WAS SICK OF
WORKING SO HARD BUT STILL WANTED TO LIVE THE GOOD
LIFE. MICHAEL KNEW ALL ABOUT IT.

AS FAR AS A LOOK ALIKE, I CAN'T BELIEVE YOU HIT
ON THAT! YOUR ATTY. SHOULD SPEAK TO ONE OF OUR
FORMER EMPLOYEES WHO NOW HAS THE WARREN GREYHOUND STATION,
LARRY SOUTHWICK WHO WAS PART TIME WITH US + FULL
TIME FOR AN AMBULANCE CO (IN WARREN) - CAN'T RECALL THE NAME.
BUT HE + RSF WERE ALWAYS TALKING ABOUT GETTING
A VAGRANT'S BODY WHO COULD REPLACE RSF. I KEPT
TELLING THEM THEY WERE NUTS. LARRY ENCOURAGED
HIM SINCE HE WAS AN OPERATOR AND KNEW WHEN PHONE (DISPATCHER)
BODIES CAME IN. LARRY + ROBERT EVEN AGREED ON
LARRY'S 'FEE' OF $100,000 AS I RECALL.

I THINK THAT'S WHY HE KEPT TRYING TO GET TOGETHER
WITH KATHY THOMAS, OUR INSURANCE AGENT FOR ANOTHER
MILLION IN COVERAGE, AND SAYING IT WAS FOR ME BECAUSE
I WOULDN'T BE ABLE TO TAKE CARE OF MYSELF. SHE TESTIFIE
THAT THE 3 OF US WERE PLAYING PHONE TAG IN NOVEMBER,

THE WAY,
POLICE
EARCH
WARREN
2. THEY
D HIS
R BAG-
N-HE
K IT
4 HIM,
THERE
RE AND
R THINGS,
OSE METAL
S YOU

2

BUT THE HOLIDAYS WERE BUSY SO RSF SAID HE'D DO IT
IN JANUARY WHEN THINGS SLOWED DOWN. SO, I KNEW
ABOUT THE MILLION BECAUSE I WAS INVOLVED IN THE PHONE
TAG 'TRYING TO HELP MAKE AN APPOINTMENT. HE WAS
DETERMINED TO GET IT ASAP IN JANUARY. HE HAD TO
SCHEDULE A COMPLETE EXAM TO GET A MILLION. I BELIEVE
HE UPPED THE ST. FARM FROM 250K TO 300K BECAUSE
HE DIDN'T NEED AN EXAM FOR THE EXTRA 50K. I SWEAR
I DID NOT KNOW ABOUT THE EXTRA 50K.
HE HAD A PRIVATE INVESTIGATOR'S LICENSE IN THE STATE
OF FLORIDA AND SOLD IT JUST BEFORE I MET HIM. WAIT —
HE WAS STILL SERVING SUBPOENAS — I WENT FOR THE
RIDES WITH HIM. HE HAD ALREADY BEEN WORKING FOR
W. W. GRANGER, INC. (ON THE STOCK EXCHANGE). BUT A COUPLE
OF YEARS LATER HE WAS AFRAID THEY WERE GOING TO TAKE
PART OF HIS AREA AWAY (LESS COMMISSIONS) SO HE SAID
HE HURT HIS BACK AT THE OFFICE/WAREHOUSE AND WENT ON
WORKMEN'S COMP. FOR A COUPLE OF YEARS AND MADE A
SETTLEMENT, PLUS GOT 100% OF HIS RETIREMENT FUND.
I DIDN'T PAY A LOT OF ATTENTION TO HIS GOINGS ON,
I WAS AFRAID OF HIM SOMETIMES. HE COULD BE QUITE
VIOLENT. IN FACT, WHEN HE MET ME, HE WAS STILL
MARRIED + LIED AND SAID HE WAS DIVORCED BECAUSE HE
WAS AFRAID I WOULDN'T WANT TO GO THROUGH THAT.
HE PAINTED HER SILVER LINCOLN WITH BLACK PAINT WHILE
SHE WAS AT WORK, STOLE HER BAG WITH #?//@#
PICTURES IN IT TOLD EVERYONE SHE SLEPT WITH HER

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5599

<u>3</u>

EX-HUSBANDS FATHER (HER FATHER-IN-LAW). HE SOLD ME THE
HOUSE SO SHE WOULDN'T GET ANY MONEY, HE WAS PLANNING
HOW TO THROW A MOLOTOV COCKTAIL THROUGH HER ATTY'S,
HOUSE WINDOW. AT THE SAME TIME HE WAS FIGHTING
WITH HIS FIRST WIFE OVER CHILD SUPPORT + TRANSFERRED A
25K CD INTO MY NAME. HE SAID HE WAS PENNILESS AND
HAD NO PLACE TO LIVE, HE WAS A VICIOUS MAN, ONE
YOU'D BETTER NEVER PISS OFF. HONEST. HE RIPPED OFF
MANY CREDIT CARD COMPANIES. WE WERE EARNING OVER
200K A YEAR, BUT IT WAS NEVER ENOUGH. IT'S LIKE
HE JUST HAD THAT IN HIM.
AS FOR ME, I WAS ALREADY WORKING FOR THE PLASTIC
SURGEON FOR 9 YEARS WHEN LE MET, IN JUNE, 1981.
WE WERE DIVORCED IN 1985 TO PROTECT MY ASSETS. HE
DIDN'T WANT TO TAKE ANY CHANCE OF HIS TWO SONS EVER
GETTING ANYTHING. JUDGE THOMAS SWIFT (WARREN) IN PROBATE
SAW HIS WILL: 1¢ TO THEM, OF COURSE, HIS KIDS
CAME UP TO OHIO TO FIGHT IT — AFTER HIS FUNERAL.
THEY ARE EXACTLY LIKE HIM, MONEY.GRUBBERS,

KATHY THOMAS          LARRY SOUTHWICK
C/O STATE FARM        C/O GREYHOUND BUS STATION
MAHONING AVE.         E, MARKET ST.
Y-TOWN 44515          WARREN, OHIO 44
330-793-1136

DEAR HONORABLE
                    JUDGE STUARD:

                                    I NATHANIEL JACKSON AM
WRITING IN REGARDS TO DIFFERENT COUNCIL, DUE TO THE
FACT THAT MY ATTORNEY ANTHONY CONSOLDANE IS NOT
REPRESENTING ME RIGHT AN I HAVE A CAPITOL MURDER C
AN NOT ONE TIME HAS HE BEEN TO BRING NONE OF TH
TAPINGS SO THAT I CAN HEAR THEM, AN EVERYTIME HE CAME
TO SEE ME HE WAS ALWAYS SUPPOSE TO BEEN HAVE BRING
THEM BUT KEEP COMING WITH EXCUSES AN ITS STARTING TO
SCARE ME BECAUSE HE'S GOT ME THINKING NOW THAT HE'S
AGAINST ME, AN THEN HE LAUGHED IN MY FACE AN TOLD ME
THAT HE DIDN'T HAVE TO COME IN ON HIS OFF DAY, BUT WH
WAS THE PURPOSE WHEN HE STILL DIDN'T BRING THE INFORMATI
THAT I'VE BEEN ASKING FOR SINCE DECEMBER, AN HE GOT VERY
PERSONAL WHEN I ASKED IF HE HAD TIME TO TAKE MY CASE
BECAUSE WHEN HE CAME IN HE QUOTE I'VE BEEN VERY BUSY
AN HAVEN'T HAD THE TIME TO GET DOWN TO SEE YOU SO I
CAME ON MY OFF DAY AN WHEN I ASKED ABOUT THE INFORMATI
THAT HE'S BEEN PUTTING OFF HE GOT RATHER PERSONAL AN TOLD ME
THAT HE WAS FINISH TALKING WITH ME, BUT YOUR HONOR HE
HAS NOT BEEN WORKING WITH ME AN I WOULD LIKE FOR THE
COURTS TO APPOINT ME NEW COUNCIL BECAUSE IM DEALING
WITH MY LIFE AN HE'S NOT TAKING MY CASE SERIOUS, AN I WOULD
RATHER STAND TRIAL BY MYSELF THEN TO HAVE ANTHONY CONSOLDANE
SO PLEASE YOUR HONOR TAKE THIS REQUEST INTO CONSIDERATION
BECAUSE MY LIFE IS AT STAKE. THANK YOU
                                            NATHANIEL JACKSON

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

STATE OF OHIO,                                    :

    Plaintiff,                                    : Case No. 01-CR-794

-vs-                                                :

NATHANIEL JACKSON,                           :

    Defendant.                                   :

**EXHIBIT** _____

**AFFIDAVIT OF JESSICA LOVE**

STATE OF OHIO                 :
                      : ss:
COUNTY OF FRANKLIN    :

Jessica Love after being duly sworn according to law, states as follows:

1.       I am investigator employed by the Office of the Ohio Public Defender. I have been employed by the Office since June 1997. I have a Bachelor of Arts degree in Sociology and Criminal Justice from Ohio University. I have attended national and state conferences on the death penalty, including mitigation investigation training.

2.       In my capacity as an investigator, I have been assigned primarily to conduct sentencing investigations in capital cases. I have conducted sentencing phase investigations in approximately 30 capital cases. These cases have been both at the trial and post conviction levels.

3.       I was assigned to the above case during the post-conviction process. I had no contact with the trial attorneys, Nathaniel Jackson, or any other witness in relationship to this case prior to the Court imposing the deposing the death penalty upon Nathaniel Jackson.

Further affiant saith naught.

_____
JESSICA LOVE

Sworn to and subscribed in my presence this __21st__ day of May, 2004.

**EXHIBIT**
**4986**

NOTARY PUBLIC

RANDALL L. PORTER    Attorney At Law.
Notary Public, State of Ohio
MY COMMISSION IS NON-EXPIRING

2



Jessica Lovett, Mitigation Specialist
Office of the Ohio Public Defender
8 East Long Street
Columbus, OH 43215-2998

Dr. Sandra McPherson
12434 Cedar Road
Suite 15
Cleveland Hts, OH 44106

EXHIBIT
87

AFFIDAVIT

*The State of Ohio,*
*County of Cuyahoga*

*In the matter of: State of Ohio v. Nathaniel Jackson*

*On the 26ᵗʰ day of November A.D. 2003, before me the undersigned authority wihtin and*
*for said County, duly authorized to administer oaths, personally appeared Sandra B.*
*McPherson, Ph.D. ABPP who, being by me duly sworn, says that*

I am the custodian of records for my psychology practice. The enclosed is a complete
copy of my file for Nathaniel Jackson.

Signed _____     Date  11/26/03

*Subscribed in my presence and sworn to before me, this 26ᵗʰ day of Nov., A.D.*
*2003*

**HEATHER KOVACH**
Notary Public, State of Ohio, Medina Cty.
My commission expires Aug. 18, 2006

### Sandra B. McPherson, Ph.D.

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

*Sensitive Material – Discretion is Necessary*

### PSYCHOLOGICAL REPORT

SUBJECT: Nathaniel Jackson                    DATE: 11/12/02

**REASON FOR REFERRAL:**

Mr. Jackson was evaluated as part of developing information relevant to the mitigation phase of his capital murder trial.

**PROCEDURE:**

Interviews of Mr. Jackson by S. McPherson and D. McPherson; psychological assessment administered by D. McPherson, M.Ed., assisting psychologist: Thematic Apperception Test, WAIS-3, MMPI-2, WRAT-3, and Bender Gestalt. Rorschach administered by S. McPherson. Review of records from discovery and from other sources. Contact with family members.

### RESULTS

Defendant's Retrospective on His Own History:

He was asked to discuss his life in stages. When asked about his first five years, he said that his maternal grandmother was very important to him, as was his mother. He had an older brother, Charles, and a younger sister and brother, Taushia and Anthony, respectively. He did not have very much contact with his biological father (Charles Paige), remembering perhaps two times when he saw the man. He lived with his mother, and he frequently spent time with his maternal grandmother. (Other records indicated the two younger children were the product of his mother's marriage to Anthony Kornegeay.)

With respect to his elementary school years, he said that he tried to do his best and in many ways he really liked school, but he also got into a lot of difficulty and tended to have problems with other students at times. He knew that he had been identified as having a behavior problem, and he stated that when he was placed in the Stambaugh School Special Program he did best. Interestingly, he remembered being taken out of that program after he had apparently done somewhat well and put back into the mainstream curriculum with the result that he immediately got into trouble again and was put back in

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5606

Stambaugh's Special Program where, at least per his recollection, he did better once again. He left school at the age of 17 while he was still in the 11<sup>th</sup> grade.

From that time onward, his life involved basically living on the street in what was a crime-ridden and violent environment. He did have some regular jobs from time to time, but none of them were high paying. His drug use (see below) was also a part of his problem. He began getting into trouble almost immediately upon moving out from his mother's house.

He had a series of relationships, and he began getting into more and more trouble of a legal type (see below). Throughout the ensuing years, he had several relationships, one with the mother of his daughter, now age seven. That individual is now married, but he has tried to have some contacts with his daughter. He also has a son who would now be four years of age. He has had no contact with that child whose life has been a somewhat tragic story in and of itself. The child was born to Mr. Jackson and his then significant other. Shortly after birth, the child had a stroke and went into some seizures and was life-flighted to Rainbow Babies' & Children's Hospital. Over an ensuing period of time, the youngster was stabilized and diagnosed upon exit as having cerebral palsy. To the best of his knowledge, the child continues to be wheelchair bound or in a brace with limited ability. Subsequently, the relationship broke up, and the mother of the child placed the youngster with her mother, essentially abandoning him. When Mr. Jackson tried to visit his son, the maternal grandmother obtained a Restraining Order, and he has never been allowed to see him since.

Mr. Jackson indicated he grew up in an extremely violent neighborhood. (Consistently, there is the letter in the school records from his mother indicating that he should be given an excused absence because a man and a woman had been shooting at him.) After he left his mother's home, he was still primarily living on the street and in a neighborhood of significantly antisocial and violent people. He himself was shot four or five times. He indicated that for the most part, he had not obtained any hospital or medical attention for these events; in fact, he said he carried a bullet in his torso somewhere which causes him periodic difficulty. He sometimes more or less freezes and is unable to move until the spasm passes. He has been shot in the left arm, elbow, and head, all of these wounds involving grazing injuries. In addition, he indicated that he had a significant relationship with a woman and, in fact, was considering a permanent union when she was killed. She was apparently involved in some type of merchandising occupation and was killed by someone who wished not to pay for the merchandise obtained from her. Mr. Jackson also recounted that there was an occasion in which he left some clothes at the home of a person whom he viewed as a friend and with whom he had stayed briefly. When he returned to get his clothing, that individual confronted him with a gun and was not willing to give Mr. Jackson his clothes. He noted that he had a particularly nice set of outfits at the time. He felt the man's turning on him was a major wrong because he had trusted him and viewed him as a friend.

The relationship that he had with Donna was one where he thought he would avoid the problems he had had with some of the younger women with whom he engaged. He acknowledged that Donna was significantly older than he. He said that he thought perhaps it would work out better because she would be more stable and more able to provide responsibly for him. He said that she indicated to him that she was divorced in 1985 and that her ex-husband, though he now lived with her, was not romantically involved with her.

Test Results:

Results from the WAIS-3 were as follows:

| | | | |
|---|---|---|---|
| Vocabulary | 5 | Picture Completion | 8 |
| Similarities | 5 | Digit Symbol-Coding | 6 |
| Arithmetic | 5 | Block Design | 7 |
| Digit Span | 12 | Matrix Reasoning | 13 |
| Information | 5 | Picture Arrangement | 10 |
| Comprehension | 5 | | |
| Verbal IQ | 82 | Performance IQ | 89 |
| | Full Scale IQ – 84 | | |

Above results showed significant variation among the subtests but overall performance, given test bias factors and educational deficit, reflected low average or better capacity. Deficit areas would be consistent with longstanding learning problems.

Results from the Bender-Gestalt showed no significant deficits of performance. There were some distortions and inadequacies that appear to be reflective of some lack of investment in performance.

Results from the Wide Range Achievement Test – 3 were as follows:

| | Raw Score | Std. Score | %tile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | 36 | 75 | 5 | 5 | 503 |
| Spelling | 43 | 103 | 58 | HS | 524 |
| Arithmetic | 46 | 111 | 77 | HS | 532 |

Above results reflected significant relative deficit in reading skills.

Results from the MMPI-2 indicated a need to present well and to overstate virtues. At the same time, there was a tendency toward some endorsement of symptoms that suggested an over-presentation of pathology. The overall handling of the test was inconsistent at times and interpretation, therefore, has to be somewhat guarded. What can be stated, however, is that there was neither a consistent attempt to look bad nor a consistent attempt to overstate positives. The main scale profile did not show over-statement of pathology. There was a spike 4 configuration that reflects endorsement of antisocial attitudes and/or impulsive behaviors. He showed concerns and anxiety about his current situation and the likely outcome. There were also some problems when it came to storing of angry feeling and he appeared to be an individual who can lose control because he has been storing and suppressing a lot of negative feeling without being aware of the degree to which he does so. Sub-scales reflected his sense that he is being pursued and persecuted, which is not inconsistent with his current reality situation and also that he feels a sense of alienation from his own functioning. He attempts to put on a facade of being in control and not caring what is happening but, in fact, there is an underlying significant apprehension. At the same time, he can affect a kind of cynicism which may mislead others to believe that he is in control of himself and the situation. Critical items include acknowledging misuse of alcohol and use of marijuana as well as endorsing that he has made mistakes in his life. There is some tendency toward blaming of others but it is not a pronounced assertion.

Projective tests provided some; insight into underlying personality characteristics and potentials. Analysis of thematic materials on the TAT indicated an individual who does not know how to go about managing life but who has incorporated that he should know better than he does. He has no real concept of how to proceed and there is no one available to provide him with guidance. Life tends to hand down punishment for bad behavior and he has learned to accept what happens but not to evaluate and plan to avoid negative consequences. He does not see much potential in the workplace, which is consistent with the reality of his environment. He cannot figure out how people fit into situations or what they are thinking. In effect, he is a poor reader of people even though he thinks he knows about them.

Results from the Rorschach, evaluated using the Exner protocol, indicated a valid and reliable record for interpretation. There were no indications of any serious mental health pathology, but rather he appears to be an individual who lacks the capacity to cope adequately with his environment. He tries to keep emotions at bay but doesn't have the wherewithal to do so and still adequately manage other and often pressing demands. He is rather constricted and limited in how he responds to others. The avoidance of processing emotional stimulation is extreme and suggests a defense in order to avoid feeling the painful affect that comes about when he lets himself be vulnerable to contacts by others. This feature is consistent with the history of behavioral deficit and lack of environmental support and effective intervention. There are underlying negative to self attitudes which he also tries to avoid directly experiencing. At the same time, there is self focus, a pattern associated with insecurity and neediness. He is significantly limited when it comes to dealing relationally as might be expected, and again his history has

involved difficulties that he has sought to remediate but has not the least idea as to how to handle. He tends to be guarded in how he approaches situations but the defensive stance means that he is not aware of all the aspects of the world that he needs to be in order to manage. He makes decisions on inadequate information and thus adds impulsivity of thinking to the existing disinhibitions that are part of the hyperactivity complex.

Legal History

His initial problems with the legal system occurred in his mid-teens when he did about six months in detention home. He had been charged in connection with driving violations and unruly behavior. He apparently was absenting himself from school. After he became an adult he worked at various jobs but did not have any regular or ongoing employment of any substance. He was incarcerated four times at Lorain Correctional as follows: 1/92 for aggravated burglary; 2/96 for having a weapon under disability (as a convicted felon he is not allowed to have a gun); 2/01 for charges in connection with a stole vehicle and stolen license plates. He apparently was briefly released but did not follow up appropriately while on parole and was returned to the facility and then released on 12/12, after which the crime took place. He was also arrested in connection with receiving stolen property, unauthorized use of a vehicle, and driving under suspension. According to the defendant and his counsel, during his time in prison he did not present as an adjustment problem.

School Records:

He did not complete the 11th grade and there was inconsistent attendance and involvement before he finally dropped out. He attended a number of different schools. School records indicated the following.

Behavioral problems were noted as of the 1st grade, or immediately upon his entry into a formal academic setting. Those behavior problems continued throughout the time that he was in school up through the 11th grade level, which was the point at which he left. By the 3rd grade, he had been suspended. He was finally assessed at the 4th grade level and found to have significant problems and to be in need of special educational assistance. At that time, His Wechsler Intelligence Scale results were: Verbal IQ, 72; Performance, IQ, 78; and, Full Scale IQ, 73. Interestingly, while he had below grade level achievement, he was not deficient at the level that the above score, particularly the Verbal one, might have suggested, particularly given that he was coming out of an environment that was not conducive to correcting or assisting him with his problems. However, consistent with the 4th grade results, in 1989 at the 10th grade level, he was tested with the Stanford-Binet and obtained an IQ of 70.

Other information from the school records indicated a pattern of absenteeism which tended to increase over the course of the year, a high potential for getting involved in altercations with peers, behavior problems on the bus and it was also noted as of the 9th grade that he was at high risk for chemical dependency.

Intriguingly, as of the 8th grade, it was noted that he was sleeping in class. That behavior coincided with his own retrospective on his drug use which began and was problematic fairly soon after his 13th year.

Another intriguing piece of information involved a letter from his mother asking for an excused absence because a man and woman had shot at him the day before.

Other Information:

Mr. Jackson indicated that he began using marijuana when he was 13 years of age and rather rapidly arrived at a point where he would use any marijuana which happened to be available to him when he was in a given situation. He has occasionally used alcohol but, apparently in recent years, is not an alcohol abuser, nor has he engaged with other of the more popular drugs. Consistently, records from prior incarceration and presentence sources, along with the school records, indicate a long-standing involvement in use of substances and a lifestyle consistent with supporting that use. He has had some treatment experiences but has relapsed once out on the street.

Audio tapes involving conversations between Mr. Jackson and Ms. Donna Roberts were reviewed as well as video tape of their interrogations. The audio tapes, of course, precede the video tape, which took place after the arrest. The audio tapes were made of conversations occurring between the two prior to the release of Mr. Jackson form prison. Most of the audio tapes involve repetitive commentary conveying love and sexual intent along with planning for a future together and the demise of Ms. Roberts' husband. Her role is one of a kind of kittenish Southern belle. Her voice is very different from what is seen on her subsequent video tape, where she projected a ~~coy young girlfriend type role~~. victim image. For his part, he asserted a stance of being the man in charge and assuring her of his undying devotion. In subsequent video tapes, Donna presented as distraught over her husband's death and knowing nothing about it. Over time, however, she was presented with more and more information but she nonetheless tried to maintain the victim role.

Diagnosis:

Axis I – Attention Deficit/Hyperactivity Disorder; Chemical Dependency, marijuana, now in remission in a controlled setting; ~~by~~ history of alcohol abuse, history of cocaine abuse.

Axis II – Antisocial Personality Disorder. (However, his antisocial characteristics are a function of his involvement in the counterculture of his neighborhood. He is capable of loyalty to persons who are important to him.)

Axis III – Status post gunshot wound to his hand, now apparently recovered. History of several other gunshot wounds, one of which continues to create periodic symptomatic status. History of mild asthma with periodic need for medication to assist breathing.

Axis IV – Problems with primary support group, Problems related to social environment, Educational problems, Legal Problems.

Axis V – GAF = 40; major impairment in several areas of function

Summary:

Mr. Jackson is an individual who was raised in an environment that was significantly violent and dyscontrolled that persons surviving in the situation would have been more likely than not to develop a sense of chronic threat and insecurity. Consistently, his own story is one where he has had to defend himself and where fights have not been infrequent, with fairly serious consequences to those participating. Early educational difficulties and current test results are consistent with the presence of an AD/HD component. The history of significant drug abuse starting at the age of 13 and probable dependency on marijuana is also a pattern that is well known for AD/HD persons. There is vulnerability to use, abuse and dependency on drugs to alleviate the chronic tensions and to escape the punishment that comes from the environment as a result of behavioral dyscontrol. Consistently, he chose not to abuse drugs such as methamphetamines or PCP. His use also reflected an occupational component in that he was living in a drug infested environment and, at least sometimes, involved in the lifestyle of using and selling. Given his educational limitations and social situation, obtaining employment with reasonable compensation in the depressed area in which he lived was unlikely.

His mother was on her own much of the time. Although he loves her and his grandmother, they were unable to intervene effectively with his special behavioral and learning needs. As time went on, the family system fragmented further. At the present time, his mother indicates she does not know the status of his sister and cannot be sure how to reach her. Similarly, she was unsure of the current situation of either of his brothers. She stated she works at a physically demanding job and has little energy except to go home and rest so as to be able to work the next day.

He had no male figure immediately available to him to provide him with alternative guidance from what was occurring as a function of his finding his own way in a hostile situation. There was thus no real functioning family system for him as he tried to deal with his needs for support. He does have the capacity to relate to other human beings, and it has been indicated in the records obtained that he has some artistic potentials.

His vulnerability to influence within the context of the relationship to Donna was high: she was older, apparently stable to his view, held out a promise of a more financially secure existence, and catered to his need to be seen as adequate.

He has been able to maintain himself in a stable fashion when he was prior incarcerated and, therefore, it can be reasonably inferred that he can be a productive member of the general population.

Sandra B. McPherson, Ph.D. ABPP
Clinical and Forensic Psychologist

8

STATE OF OHIO v. NATHANIEL JACKSON
Case No 01-CR-794

The Defendant's prior record consists of the following:

| May 1, 1995 11-11-96 | RSP - Disposition Unreported WEAPONS & DIS. 1 1/2 CONCURRENT/RELEASED |
| April 21, 1995 | Theft, Criminal Trespass, Drug Abuse - Dismissed |
| Feb. 4, 1997 | Robbery - Disposition Unreported |
| May 5, 1997 | Theft - Disposition Unreported |
| Nov 25, 1997 | Att. Agg. Burg. - Disposition Unreported |
| May 18, 1998 | 2 Counts Theft - Disposition Unreported. |
| July 11, 2001 | RSP, Falsification - Disposition Unreported |
| July 19, 1999 ~~1999~~ | RSP, Possession Drug Para - Disposition Unreported |
| May 9, 2000 | RSP - Disposition Unreported |
| June 13, 2000 AUG 2000 | RSP - Motor Vehicle - Disposition Unreported FTA OPEN CONTAINER |
| Nov 1, 2000 | 2 Cts. RSP - 8 months |
| Feb 28, 2001 | RSP - 1 year + 7 mos. CONCURRENT |
| May 23, 2001 | RSP - Case Held |
| Sep 19, 2001 | RSP - Case Held |
| 1/31/1992 | SUSPENDED SENTENCE/RELEASED AFTER 9 mos (SDCF) 5-25 CONCURRENT 178 DAYS CREDIT AGG. BURGLARY x 3 |
| 11/1991 | RSP |

Page -222-

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5614



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5615



1-330 )75 1212
Jonston
Phn # Chales Paige
CL

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5616

11/6/02  2-call
Mr K.
Drunk — [illegible] unpro n side
a  " of [illegible]ly
L3 9 [illegible] [illegible]
He's a 2 little le etc

Does have Mudg of

re Jackson

Tapes & investig
Δ manipulated by the g.f.'s

Δ's letters
& phone calls

→ Judgment
issues

I need to go over the details
with Δ:
set up time line based
on materials & go over
it with ~~[illegible]~~ Δ

Jackson T.A.

[illegible] [illegible] [illegible]
[illegible] [illegible] Youngstown
[illegible] issued - - [illegible]
Coroner "

[illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible]
[illegible] [illegible]
[illegible] [illegible]

He [illegible] [illegible]
No [illegible] murder ~~[illegible]~~ weapon

Agg 2 Burglary [illegible]
[illegible]

He's

Atty
[illegible]
[illegible]

Nathaniel Jackson

WAIS   administered     Raw Score  Verbal     Perf     VC   PO   WM  PS    Ref Grn Scale Score

Picture Completion . 18                          8.
Vocabulary            18        5
Digit Symbol          56                 6.
Similarities          11        5
Block Design          24                 7
Arithmetic            7         5
Matrix Reasoning      21                 13
Digit Span            20       12
Information           6         5
Picture Arrangement 15                   10
Comprehension         6        5
                     _____
Sums                  42 = IA 82 ( 42 = 5 a 55

                              F5 f 54 = 54 5 a



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5620



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5621

# WRAT3

## WIDE RANGE ACHIEVEMENT TEST ☐ REVISION 3

NAME _Nate Jackson_  GENDER: ☐M ☐F

DATE _7/13/02_ BIRTH DATE _____ AGE _30_

SCHOOL _____ GRADE _____

REFERRED BY _____ EXAMINER _____

by Gary S. Wilkinson

**SPELLING/A MEASURE OF WRITTEN ENCODING**

NAME _____ (1&2)

| (3) (4) | (5) (6) | (7) (8) (9) (10) | (11) | (12) (13) (14) (15) |
|---|---|---|---|---|
| 1. DRESS | C | 16. Illogical | C | 31. EXPADEFENCE |
| 2. TRAIN | C | 17. FAMILLIAR | | 32. BUTONARE |
| 3. SHOUT | C | 18. REVERENCE | C | 33. NEMONIC |
| 4. WATCH | C | 19. PHYSICIAN | C | 34. |
| 5. GROWN | C | 20. PREJUDICE | C | 35. |
| 6. KITCHEN | C | 21. APPROPIATION | C | 36. |
| 7. RESULT | C | 22. NESSECITY | | 37. |
| 8. HEAVEN | C | 23. COMMISSION | C | 38. |
| 9. EDUCATE | C | 24. ACIDUIOUS | | 39. |
| 10. PURCHASE | C | 25. loquaTsous | | 40. |
| 11. INSTITUTE | C | 26. SOVERINTY | | |
| 12. SUGGESTION | C | 27. IRRESISTABLE | | |
| 13. EQUIPMENT | C | 28. OCCUPANCE | | |
| 14. MUSEUM | C | 29. APPICULAR | | |
| 15. OCCUPY | — | 30. IMPERTERRABLE | | |

**5/10 RULES**

15
25
13

COPYRIGHT © 1993 by Jastak Associates. A DIVISION OF WIDE RANGE, INC. All rights reserved. Printed in U.S.A.

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5622



**WRAT 3 ARITHMETIC/** A MEASURE OF NUMBER COMPUTATIONS

☐ ☐ ☐ ☐ ☐

*REDUCE ALL ANSWERS TO LOWEST TERMS*

| | | | | |
|---|---|---|---|---|
| $2 + 1 = \underline{3}$ | $\begin{array}{r} 6 \\ +2 \\ \hline 8 \end{array}$ | $\begin{array}{r} 5 \\ -3 \\ \hline 2 \end{array}$ | $4 - 1 = \underline{3}$ | $\begin{array}{r} 8 \\ -6 \\ \hline 2 \end{array}$ |
| 1 | 2 | 3 | 4 | 5 |
| $\begin{array}{r} 51 \\ +27 \\ \hline 78 \end{array}$ | $\begin{array}{r} 497 \\ -176 \\ \hline 321 \end{array}$ | $4 \times 2 = \underline{8}$ | $\begin{array}{r} 6 \\ \times 3 \\ \hline 18 \end{array}$ | $\begin{array}{r} 417 \\ +534 \\ \hline 931 \end{array}$ |
| 6 | 7 | 8 | 9 | 10 |
| $5)\overline{15}$ | $\begin{array}{r} 452 \\ 137 \\ +245 \\ \hline 834 \end{array}$ | $\begin{array}{r} 512 \\ \times 3 \\ \hline 1536 \end{array}$ | $\begin{array}{r} 46 \\ -29 \\ \hline 17 \end{array}$ | $\begin{array}{r} 34 \\ \times 21 \\ \hline 34 \\ 680 \\ \hline 714 \end{array}$ |
| 11 | 12 | 13 | 14 | 15 |
| $\begin{array}{r} 62.04 \\ -5.03 \\ \hline 57.01 \end{array}$ | $9)\overline{882}\ \ ^{98}_{\ 81\ 72}$ | $1\frac{1}{2}$ hr = $\underline{90}$ min. | $\begin{array}{r} 401 \\ -74 \\ \hline 327 \end{array}$ | $6)\overline{968}\ \ 161\ R2$ |
| 16 | 17 | 18 | 19 | 20 |
| Which is more? $\frac{7}{8}$ or $\underline{\frac{13}{15}}$ | $\begin{array}{r} 809 \\ \times 47 \\ \hline 5663 \\ 3276 \\ \hline 9223 \end{array}$ | $6^2 = \underline{\phantom{xx}}$ | $\frac{3}{4} = \underline{\phantom{xx}}$ % | $\frac{8}{9} \times \frac{1}{2} \times \frac{9}{4} = \underline{\phantom{xx}}$ |
| 21 | 22 | 23 | 24 | 25 |



# WRAT 3 READING/A MEASURE OF WRITTEN DECODING

## CAUTION: EXAMINER USE ONLY!

### A  B  O  S  E    R  T  H  U  P    I  V  Z  J  Q    (15)

| | | | |
|---|---|---|---|
| 1 see<br>see | 2 red<br>red | 3 milk<br>milk | 4 was<br>wuz |
| 5 then<br>*then* | 6 jar<br>jahr | 7 letter<br>let-ĕr | 8 city<br>sit-ee |
| 9 between<br>bi-tween | 10 cliff<br>klif | 11 stalk<br>stawk | 12 grunt<br>grunt |
| 13 huge<br>hyooj | 14 plot<br>plot | 15 sour<br>sowr | 16 humidity<br>hyoo-mid-i-tee |
| 17 clarify<br>klar-i-fī | 18 residence<br>rez-i-dĕns | 19 urge<br>urj | 20 rancid<br>ran-sid |
| 21 conspiracy<br>kŏn-spir-ă-see | 22 deny<br>di-nī | 23 quarantine<br>kwor-ăn-teen | 24 deteriorate<br>di-teer-i-ō-rayt |
| 25 rudimentary<br>roo-di-men-tĕ-ree | 26 mosaic<br>moh-zay-ik | 27 rescinded<br>ri-sind-ed | 28 audacious<br>aw-day-shŭs |
| 29 mitosis<br>mī-toh-sis | 30 protuberance<br>proh-too-bĕ-răns | 31 longevity<br>lon-jev-i-tee | 32 predilection<br>pred-i-lek-shŏn |
| 33 regime<br>re-zheem | 34 beatify<br>bi-at-ī-fī | 35 internecine<br>in-tĕr-nee-seen, -nes-een | 36 regicidal<br>rej-i-sī-dal |
| 37 puerile<br>pyoo-ĕ-rīl | 38 factitious<br>fak-tish-ŭs | 39 lucubration<br>loo-kyuu-bray-shŏn | |
| 40 epithalamion<br>ep-i-tha-lay-mi-ŏn | 41 inefficacious<br>in-ef-i-kay-shŭs | 42 synecdoche<br>si-nek-dō-kee | |
| 5/10 RULES | | | |

| |
|---|
| 15 |
| 3/ |
| 46 |

**OBSERVATIONS/REMARKS:**

COPYRIGHT © 1993 by Jastak Associates<br>A DIVISION OF WIDE RANGE, INC.<br>All rights reserved. Printed in U.S.A.

Photocopying of this test is a violation of copyright law.

WIDE RANGE

NATHANIEL JACKSON v. WARDEN<br>CASE NO. 4:07-cv-0880<br>SUPP. APPENDIX - Page 5625

Nate Jackson - Trumbull County Jail

3/13/02
10:10
Said he just woke up

left hand

No.1 Laugh - What is this? Still him & me. Seems he figuring out how to play it, how he gonna go about playing it. If not to much to say about before, can't tell you what I am thinking. He ought I ought know how to play it.

No.2 Is she going to sch. If they won't it feels a st - Jack just sittin there watching. Ok what she's thinking, has chose Reconginite & hrs. Sk is what's on her mind.

No.3 is a female? If they incarcerate. Thinking what they did to get in there or what they gonna do to get out.

No.4 If she's try to stop him from leaving. If he has or to drink. If he got it in mind to do. If he goes he'll end up getting in trouble.

No.5                    T 12 about up
He wondering anyway else at home. Heard a noise. wanna W out to see what is. He'll call to jar.

No.6 If he got a job on his mind. Studying to figure out how he's gonna get back to work. Got no transportation. Or how it's gonna be on first day of job.

No.7 Two business men discussing some business about t job. Gonna be working a certain point later on down t line. I don't know, shit.

No.8 What's this a gun. If two guys shot. it got art hospital. Ok. so many different things. She'll jump on harge.

# Rorschach Interpretation Assistance Program™
# Interpretive Report

by

John E. Exner, Jr., PhD, and Irving B. Weiner, PhD

## Client Information

| Name: | Nathaniel Jackson | Gender: | – Not specified – |
|---|---|---|---|
| Client ID: | 987 | Ethnicity: | African-American |
| Birthdate: | | Age (years): | 30 |
| Marital Status: | Single | Education (years): | 10 |

## Protocol Information

| Test Date: | 11/12/2002 |
|---|---|

## Caveats

The Rorschach Interpretive Assistance Program (RIAP) Version 4 Plus for Windows® provides computer-generated quantitative data and narrative statements that are based on the Comprehensive System. The scoring guidelines and interpretive strategies were primarily derived from the following sources: *The Rorschach: A Comprehensive System, Volume 1: Basic Foundations* (3rd ed., Exner, 1993); *A Rorschach Workbook for the Comprehensive System* (5th ed., Exner, 2000); *The Rorschach: A Comprehensive System, Volume 3, Assessment of Children and Adolescents* (2nd ed., Exner & Weiner, 1995); and *Principles of Rorschach Interpretation* (Weiner, 1998). The RIAP4 Plus incorporates the new Comprehensive System variables included in *A Rorschach Workbook for the Comprehensive System* (5th ed., Exner, 2001). Additional interpretive information about the Comprehensive System is also presented in *A Primer for Rorschach Interpretation* (Exner, 2000). The quantitative data include a Sequence of Scores, a Structural Summary, a Constellations Table, and a Summary of Response Contents. The narrative statements consist of interpretive hypotheses derived mainly from the structural features of a Rorschach protocol and take only modest account of the thematic imagery contained in individual responses. These computer-based interpretive hypotheses identify various personality characteristics associated with quantitative aspects of Rorschach data and can contribute to forming valid and comprehensive impressions of an individual's psychological functioning. However, the narrative statements produced by the RIAP4 Plus for Windows describe the implications of Rorschach findings among people in general, and they do not necessarily apply in all respects to the functioning of any one person. To ensure a thorough and accurate description of a particular individual's personality characteristics and behavioral tendencies, examiners should consider qualitative as well as quantitative features of the person's Rorschach protocol, and they should also judge the applicability of RIAP4 interpretive hypotheses in light of information from other sources concerning the person's clinical status and past and present life circumstances. This interpretive assistance program is intended for use by or under the supervision of qualified professional persons with training and experience in Rorschach assessment. Utilization of the RIAP4 in the absence of such qualifications may violate ethical guidelines for providing services only within the boundaries of one's competence.

*PAR Psychological Assessment Resources, Inc. / P.O. Box 998 / Odessa, FL 33556 / Toll-Free 1-800-331-TEST*
*© 1976, 1985, 1990, 1994, 1995, 1999, 2001 by Psychological Assessment Resources, Inc. All rights reserved. May not be reproduced in whole or in part in any form or by any means without written permission of Psychological Assessment Resources, Inc. RIAP™ and Rorschach Interpretation Assistance Program™ are trademarks owned by Psychological Assessment Resources, Inc.*
*Version: 4.52.127*

*RIAP™ Interpretive Report*
Client Name:   Nathaniel Jackson
Client ID:        987

## Sequence of Scores

| Card | Resp. No | Location and DQ | Loc. No. | Determinant(s) and Form Quality | (2) | Content(s) | Pop | Z Score | Special Scores |
|------|------|------|------|------|------|------|------|------|------|
| I | 1 | Wo | 1 | F- | | Sc | | 1.0 | INC |
| | 2 | Do | | Mpo | | Hd | | | PHR |
| | 3 | Ddo | | Fu | | Sc | | | |
| | 4 | Ddo | | Fo | | Sc | | | |
| II | 5 | Do | | F- | 2 | A | | | |
| III | 6 | Do | | Mpo | 2 | H | P | | GHR |
| IV | 7 | Wo | 1 | Fo | | (A) | | 2.0 | |
| V | 8 | Wo | 1 | Fo | | A | P | 1.0 | |
| | 9 | Wo | 1 | Fo | | A | P | 1.0 | PSV |
| VI | 10 | Wo | 1 | Fo | | Ad | P | 2.5 | |
| VII | 11 | Do | | Mpo | 2 | Hd | P | | GHR |
| | 12 | Do | | Fo | 2 | Hd | | | PHR |
| VIII | 13 | Do | | FMa- | 2 | A | | | |
| IX | 14 | Do | | Fo | 2 | (H) | | | GHR |
| X | 15 | Do | | Fo | 2 | A | P | | |

## Summary of Approach

| | |
|------|------|
| I : W.D.Dd.Dd | VI : W |
| II : D | VII : D.D |
| III : D | VIII : D |
| IV : W | IX : D |
| V : W.W | X : D |

*RIAP™ Interpretive Report*
Client Name:  Nathaniel Jackson
Client ID:       987

Page 3 of 10

## Structural Summary

**Location Features**

**Determinants**

**Contents**

**S-Constellation**

**DQ**

**Special Scores**

**Form Quality**

### RATIOS, PERCENTAGES, AND DERIVATIONS

**INTERPERSONAL**

**IDEATION**

**MEDIATION**

**PROCESSING**

**SELF-PERCEPTION**

PTI = 0    ☐ DEPI = 3    ☑ CDI = 4    ☐ S-CON = 4    ☐ HVI = No    ☐ OBS = No

© 1976, 1985, 1990, 1994, 1995, 1999, 2001 by Psychological Assessment Resources, Inc. All rights reserved.    Version: 4.52.122

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5629

**RIAP™ Interpretive Report**
Client Name: Nathaniel Jackson
Client ID: 987

*Page 4 of 10*

## CONSTELLATIONS TABLE

| S-Constellation (Suicide Potential) | PTI (Perceptual-Thinking Index) |
|---|---|
| ☐ Positive if 8 or more conditions are true. NOTE: Applicable only for subjects over 14 years old. ☐ FV+VF+V+FD [0] > 2 ☐ Col-Shd Blends [0] > 0 ☑ Ego [0.47] < .31 or > .44 ☐ MOR [0] > 3 ☑ Zd [-6.0] > +3.5 ☐ es [1] > EA [3.0] ☐ CF+C [0] > FC [0] ☐ X+% [0.73] < .70 ☐ S [0] > 3 ☐ P [0] < 3 or > 8 ☑ Pure H [1] < 2 ☑ R [15] < 17 4 Total | ☐ (XA% [0.80] < 0.70) and (WDA% [0.77] ≤ 0.75) ☐ X-% [0.20] > 0.29 ☐ (Sum Level 2 Special Scores [0] > 2) and (FAB2 [0] > 0) ☐ (R [15] > 17) and (WSum6 [2] > 12) or (R [15] > 16) and (WSum6 [2] > 17) ☐ (M- [0] > 1 or X-% [0.20] > 0.40) 0 Total |

| DEPI (Depression Index) | CDI (Coping Deficit Index) |
|---|---|
| ☐ Positive if 5 or more conditions are true. ☐ (FV + VF + V [0] > 0) or (FD [0] > 2) ☐ (Col-Shd Blends [0] > 0) or (S [0] > 2) ☑ (3r + (2)/R [0.47] > 0.44 and Fr + rF [0] = 0) or (3r + (2)/R [0.47] < 0.33) ☑ (Afr [0.25] < 0.46) or (Blends [0] < 4) ☐ (SumShading [0] > FM + m [1]) or (SumC' [0] > 2) ☐ (MOR [0] > 2) or (2xAB + Art + Ay [0] > 3) ☑ (COP [0] < 2) or ([Bt+2xCl+Ge+Ls+2xNa]/R [0.00] > 0.24) 3 Total | ☑ Positive if 4 or more conditions are true. ☑ (EA [3.0] < 6) or (AdjD [0] < 0) ☑ (COP [0] < 2) and (AG [0] < 2) ☑ (Weighted Sum C [0.0] < 2.5) or (Afr [0.25] < 0.46) ☑ (Passive [3] > Active + 1 [2]) or (Pure H [1] < 2) ☐ (Sum T [0] > 1) or (Isolate/R [0.00] > 0.24) or (Food [0] > 0) 4 Total |

| HVI (Hypervigilance Index) | OBS (Obsessive Style Index) |
|---|---|
| ☑ Positive if condition 1 is true and at least 4 of the others are true. ☑ (1) FT + TF + T [0] = 0 ☐ (2) Zf [5] > 12 ☐ (3) Zd [-6.0] > +3.5 ☐ (4) S [0] > 3 ☐ (5) H + (H) + Hd + (Hd) [5] > 6 ☐ (6) (H) + (A) + (Hd) + (Ad) [2] > 3 ☑ (7) H + A : Hd + Ad [8.5] < 4:1 ☐ (8) Cg [0] > 3 | ☐ (1) Dd [2] > 3 ☐ (2) Zf [5] > 12 ☐ (3) Zd [-6.0] > +3.0 ☐ (4) Populars [6] > 7 ☐ (5) FQ+ [0] > 1 ☐ Positive if one or more is true: ☐ Conditions 1 to 5 are all true ☐ 2 or more of 1 to 4 are true and FQ+ [0] > 3 ☐ 3 or more of 1 to 5 are true and X+% [0.73] > 0.89 ☐ FQ+ [0] > 3 and X+% [0.73] > 0.89 |

NOTE: "*" indicates a cutoff that has been adjusted for age norms.

Psychological Assessment Resources, Inc. All rights reserved.  Version: 4.52.127

## Interpretive Hypotheses

The first step in considering the possible interpretive significance of Rorschach findings consists of determining whether a protocol is sufficiently long (more than 13 responses) and complete (no rejections) to be useful, that is, to provide reliable data and support valid inferences. Additionally in this initial process, concerns should be raised if elevations in the S-CON suggest suicide potential. Interpretive cautions may be raised if highly unusual features of the data suggest efforts to simulate serious psychological disturbance.

This record contains a sufficient number of responses to provide reliable information and to support valid interpretations. However, there are also indications of situational guardedness on his/her part and a reluctance to be forthcoming, and he/she has probably not revealed a full measure of either his/her coping capacities or his/her adaptive difficulties. Positive findings in such guarded protocols (i.e., unusual score elevations) can be taken as reliable indicators of the personality assets and limitations with which they are associated, but negative findings (i.e., unusually low scores and indices based on low scores) may be misleading and should be interpreted cautiously, if at all.

### Constellations

| PTI = 0 | ☐ DEPI = 3 | ☑ CDI = 4 | ☐ S-CON = 4 | ☐ HVI = No | ☐ OBS = No |
|---------|-----------|-----------|-------------|------------|------------|

### Interpretive Search Strategy

| Positive Key Variable(s) | Interpretive Search Strategy |
|--------------------------|------------------------------|
| 1. CDI > 3 and EA Low | Controls > Affect > Self-Perception > Interpersonal Perception > Processing > Mediation > Ideation |

### Capacity for Control and Tolerance for Stress

| EB = 3 : 0.0 | EA = 3.0 | | D = 0 |
|--------------|----------|---|-------|
| eb = 1 : 0 | es = 1 | Adj es = 1 | Adj D = 0 |
| | | | |
| FM = 1   C' = 0 | T = 0 | | ☑ CDI = 4 |
| m = 0   V = 0 | Y = 0 | | |

This cluster of variables provides information about a person's psychological resources, ability to manage stress, and capacity to cope consistently and effectively with life events. The relevant Rorschach findings help to identify (a) the extent of adaptive capacity people can muster in planning and implementing ways of dealing with their everyday experiences, (b) the amount and kinds of stressful demands currently present in their lives, (c) how well they can tolerate their level of stress without becoming unduly upset and losing self-control, and (d) the adequacy with which they can bring a cohesive personality style to bear in managing their affairs. Sufficient resources to minimize subjectively felt distress and maintain a consistent coping style promote psychological well-being and successful adaptation to life demands. Conversely, the triumvirate of inadequate resources, excessive experienced stress, and inconsistent coping efforts typically eventuate in lives marked by distress, disappointment, and limited accomplishment.

1. The client appears to be working very hard to keep emotions out of his/her life. The client's determination to avoid affect could constitute a defensive effort on his/her part, intended to keep his/her feelings to himself/herself and to provide insulation against the feelings of others, or it could reflect a basic incapacity to experience and express feelings adaptively. Either way, the amount of effort he/she is putting into emotional containment is likely to detract from his/her ability to think clearly and exercise good judgment, and, as a result, he/she may also suffer from low stress tolerance and limited self-control.

© 1976, 1985, 1990, 1994, 1995, 1999, 2011 Psychological Assessment Resources, Inc. All rights reserved    Version: 4.52.127

*RIAP™ Interpretive Report*
Client Name: Nathaniel Jackson
Client ID:     987

## Affect

| □ DEPI  =   3 | EBPer = N/A | Blends<br>There are no blends |
|---|---|---|
| EB   =   3 : 0.0 | FC:CF+C =   0 : 0 | |
| eb   =   1 : 0 | Pure C =   0 | |
| | SumC':WSumC =   0 : 0.0 | |
| C' = 0    T = 0 | Afr =   0.25 | |
| V = 0    Y = 0 | 2AB+Art+Ay =   0 | |
| | S =   0 | |
| | (S to I, II, and III =   0) | |
| | Blends/R =   0 : 15 | |
| | CP =   0 | |

This cluster of variables provides information about the manner and comfort with which people process emotional experience, with specific respect to how they deal with feelings arising from within themselves and how they respond to the feelings of others and to emotionally charged situations in general. The relevant Rorschach findings help to identify whether people have adequate capacities to experience and express emotion sufficiently, pleasurably, and in moderation, or whether instead they are prone to process affect in a constricted, dysphoric, or overly intense manner that leads to adjustment difficulties.

2. As noted previously, he/she appears to be working very hard to keep emotions out of his/her life. The amount of effort he/she is putting into emotional containment is likely to detract from his/her ability to think clearly and exercise good judgment, and he/she may suffer as a result from low stress tolerance and limited self-control.

3. The client appears much less willing than most people to process emotional stimulation. Because of his/her aversion to becoming engaged in affectively charged situations, he/she is at risk for being socially and emotionally withdrawn. Reluctance to process affect does not preclude a person's being interested in and capable of forming attachments to other people. However, the emergence of strong feelings often leads people like him/her to break off an interpersonal interaction, and their aversion to emotionality may limit their social attractiveness.

4. As discussed in the Ideation cluster of variables, he/she is more inclined than most people to deal with feelings on an intellectual level, rather than directly, as a means of minimizing their impact.

## Self-Perception

| R = 15 | □ OBS = No | □ HVI = No | | |
|---|---|---|---|---|
| 3r+(2)/R = 0.47 | FD = 0 | MOR = 0 | Hx = 0 | An+Xy = 0 |
| Fr+rF = 0 | V = 0 | T = 0 | Sx = 0 | |
| H : (H)+Hd+(Hd) = 1 : 4 | | | | |

| Responses to be read | | | | |
|---|---|---|---|---|
| *MOR Responses* | *FQ- Responses* | *M Responses* | *FM Responses* | *m Responses* |
| None | 1, 5, 13 | 2, 6, 11 | 13 | None |

This cluster of variables provides information about how people view themselves, particularly with respect to their level of self-esteem, the extent of their self-awareness, and the nature of their self-image. The relevant Rorschach findings help to identify whether people feel satisfied and comfortable with themselves or are burdened by negative self-attitudes, whether they are excessively preoccupied with or paying little attention to themselves, and whether they have a clear and stable sense of their identity or an uncertain and unrealistic grasp of the kind of person they are.

5. This person tends to focus on himself/herself more than most people do, at the expense of paying adequate attention to others. This degree of self-centeredness is usually associated with highly positive estimates of one's personal worth. In this instance, however, there is little indication that his/her self-focusing is giving him/her much pleasure. On the contrary, it is likely that his/her inordinate preoccupation with himself/herself is more a source of dissatisfaction than of enjoyment.

............ ...... .... .... ...... ...... ......   ...........  ......... .... All rights reserved    Version: 4.52.127

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5632

*RIAP™ Interpretive Report*
Client Name: Nathaniel Jackson
Client ID: 987

6. Distorted form responses (FQ-) usually involve some projection of a person's underlying attitudes and concerns. Responses 1, 5, and 13 are perceptually inaccurate and should be examined for the possible implications of their thematic imagery.

7. Movement responses often contain projected self and object representations that provide clues to people's underlying concepts of themselves and other people. Responses 2, 6, and 11 in this record include M and response 13 includes FM. The imagery in these responses should be examined for the possible implications of its thematic content.

## Interpersonal Perception

| ☑ CDI = 4 | a:p = 1 : 3 | T = 0 | EA = 3.0 | EB = 3 : 0 | |
| ☐ HVI = No | Food = 0 | PER = 0 | COP = 0 | AG = 0 | S = 0 |
| Sum H = 5 | | H:(H)+Hd+(Hd) = 1 : 4 | Pure H = 1 | | |
| GHR:PHR = 3 : 2 | | | | | |
| Afr = 0.25 | | Isolate/R = 0.00 | | C'+T+V+Y = 0 | |
| | | **Responses to be read** | | | |
| *M with Pair* | *FM with Pair* | *m with Pair* | | *Human Contents* | |
| 6, 11 | 13 | None | | 2, 6, 11, 12, 14 | |

This cluster of variables provides information about how people relate to others, particularly with respect to their attitudes toward other people, the degree of interaction they have with them, and the manner in which they approach and manage interpersonal attachments. The relevant Rorschach findings help to identify whether people (a) are able to sustain a reasonable level of interpersonal interest, involvement, and comfort, or are instead inclined to be disinterested, disengaged, or ill at ease in social situations; (b) anticipate intimacy and security in their interpersonal interactions, or tend instead to regard interpersonal closeness as threatening to their well-being and prefer to keep their distance from others; (c) can strike an adaptive balance in relating to people between collaboration and acquiescence on the one hand and competitiveness and assertiveness on the other hand, or tend instead to become excessively subservient or domineering in their interpersonal relationships; and (d) perceive people and social situations accurately and with empathy, or instead are prone to misinterpreting the motives of others and misconstruing the implications of interpersonal events.

8. This person appears to have limited ability to manage interpersonal relationships in a comfortable and rewarding manner. The client may conduct himself/herself appropriately in social situations and even at times make an initially favorable impression on other people. Nevertheless, as a consequence of inadequate social skills that may not always be apparent, he/she tends to opt for superficial and transient relationships with others and to back away from involved or prolonged relationships out of concern that they will make more demands on him/her than he/she can handle. In addition, his/her social ineptness may make him/her vulnerable to experiencing embarrassment and failure in social situations and to being ignored or rejected by others, who see him/her as a distant, guarded, and ineffective person. Individuals with this pattern of deficient coping can frequently benefit from treatment focused on interpersonal anxiety reduction and social skills training.

9. The client gives evidence of being behaviorally passive and acquiescent in his/her interpersonal relationships. Such people are inclined to subjugate their needs and wishes to those of others, to defer to whatever choices others prefer, and to accommodate their actions to satisfy the requests of those around them. Often individuals who are passive in this way lead their lives at the pleasure of others on whom they depend. They are more comfortable being followers than leaders, they shrink from taking the initiative, and they feel most comfortable when other people make their decisions for them, removing from their shoulders the responsibility for these decisions.

10. This person shows little interest in or expectation of engaging in collaborative or competitive relationships with other people. Because of his/her seeming indifference or aversion to interpersonal involvement, he/she is likely to strike others as being distant and aloof. Although he/she may not be actively disliked by members of social groups to which he/she belongs, he/she has limited prospects for becoming socially popular or well-liked.

11. This person is likely to demonstrate adaptive interpersonal behavior, most of the time.

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5633

12. Movement responses that include a pair often contain projected object representations that provide clues to an individual's underlying concepts of people and how they are likely to interact. Responses 6 and 11 in this record involve M with a pair and response 13 involves FM with a pair. The imagery in these responses should be examined for the possible implications of its thematic content.

·13. The nouns that are used to identify human content and the adjectives that are used to describe human or human-like figures often reveal underlying aspects of an individual's concepts of and attitudes toward people. Responses 2, 6, 11, 12, and 14 in this record involve human content and should be examined for the possible implications of their thematic imagery.

### Information Processing

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| R | = 15 | L | = 2.75 | | | | |
| EB | = 3 : 0.0 | W:D:Dd | = 5 : 8 : 2 | Zd | = -6.0 | DQ+ | = 0 |
| Zf | = 5 | W:M | = 5 : 3 | PSV | = 1 | DQv/+ | = 0 |
| □ HVI | = No | □ OBS | = No | | | DQv | = 0 |

This cluster of variables provides information about the manner in which people focus their attention on events in their lives and how they organize the perceptions that enter their awareness. Successful adaptation is promoted by openness to experience and efficient organization of the impressions one forms, whereas viewing the world with a narrow or disorganized frame of reference makes a person susceptible to various types of adjustment difficulty.

14. As noted previously in considering the validity of this record, his/her elevated Lambda in this valid but short record of fewer than 17 responses suggests situational guardedness on his/her part and a reluctance to be forthcoming. Accordingly, the limited openness to experience and narrow frame of reference that would otherwise be indicated by a high Lambda may not in his/her case accurately characterize the manner in which he/she attends to experience when he/she is not situationally guarded.

15. In attending to his/her experience, he/she tends to take in too little information and to examine his/her experience less thoroughly than most people would consider adequate. As a consequence, he/she is at risk for coming to conclusions hastily, after only cursory attention to relevant considerations; for working carelessly and feeling satisfied with final products that do not reflect the full measure of his/her ability; and for scanning situations in a cursory manner that takes insufficient account of considerations he/she should notice. This predilection for seeking out and being satisfied with only minimal amounts of information defines a pattern of underincorporation that promotes rapid decision making and speedy completion of tasks, but often at the expense of ill-considered conclusions and inferior products. By taking inadequate account of information he/she could easily process, then, this person is at risk for errors of oversight in what he/she chooses to think and do and for lack of accomplishment in what he/she attempts to achieve.

16. The client does not attend very thoroughly to his/her experience and appears to have only limited motivation to grasp complex concepts and attempt ambitious undertakings. This finding is not surprising in light of his/her stylistic preference to keep his/her focus of attention narrow and his/her solutions to problems simple and uncomplicated. The client's narrowness in this regard, together with his/her aversion to complexity and ambiguity, increases the likelihood of his/her behaving at times in ways that take insufficient account of propriety and social expectation.

17. The quality of his/her efforts to focus his/her attention with precision and to synthesize aspects of his/her experience falls below that of most people. This finding is not uncommon among individuals whose cognitive capacities are limited. In the presence of average intellectual ability and otherwise unimpaired cognitive capacities, however, it suggests a simplistic way of looking at the world in which little energy is devoted to seeking out or recognizing complex relationships between events. The client's preference for maintaining a narrow frame of reference and his/her tendency to oversimplify his/her experience are probably contributing to the below average quality of his/her information processing.

18. This person has given a Perseveration response which should be examined to determine whether it is a *Within card* Perseveration. If so, he/she appears to have some occasional difficulty in shifting his/her attention from one matter to another. The client does not have a substantial problem in this regard, and it seems to occur as a result of his/her preferring not to shift set, rather than his/her being unable to do so. Nevertheless, his/her lack of mental flexibility may detract from his/her ability to pay attention to events.

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5634

*RIAP™ Interpretive Report*
Client Name:  Nathaniel Jackson
Client ID:  987

## Cognitive Mediation

| | | | Minus Responses |
|---|---|---|---|
| R = 15 | | | 1, 5, 13 |
| Lambda = 2.75 | P = 6 | ☐ OBS = No | |
| FQx+ = 0 | | WDA% = 0.77 | |
| FQxo = 11 | | XA% = 0.80 | |
| FQxu = 1 | | X+% = 0.73 | |
| FQx- = 3 | | F+% = 0.73 | |
| FQx none = 0 | | X-% = 0.20 | |
| | | S-% = 0.00 | |
| | | Xu% = 0.07 | |
| Pure C = 0 | Pure Y = 0 | M- = 0 | |
| Pure C' = 0 | Pure T = 0 | M none = 0 | |

This cluster of variables provides information about the manner in which people perceive their environment, particularly with respect to whether they perceive people and events the way most other people do. Being able to perceive one's experience realistically and with a modicum of conventionality constitutes a personality strength that typically contributes to good adjustment. Conversely, difficulties in seeing themselves and their world in a realistic light is a personality limitation that often causes adjustment problems, and the same is true for inclinations to be unusually conforming or highly idiosyncratic in forming impressions of one's experience.

19. The client is about as capable as most people of recognizing conventional modes of response. Although this ability and his/her willingness to recognize obvious aspects of reality constitute personality assets, they do not preclude the possibility of his/her distorting less obvious aspects of reality or choosing to see the world in unconventional ways.

20. The client demonstrates generally good ability to form accurate impressions of himself/herself, to interpret the actions and intentions of others without distortion, and to perceive events conventionally without sacrificing his/her individuality. The client is additionally capable of anticipating adequately the consequences of his/her own actions and of recognizing the boundaries of appropriate behavior in various kinds of situations. These indications of good reality testing and sound judgment identify a substantial personality strength that may not preclude his/her encountering adjustment difficulties, but that minimizes their likelihood of occurrence and improves his/her prospects for overcoming them should they arise. However, he/she tends to be less accurate in his/her perceptions when forming impressions of uncommon and unclear situations than when dealing with ordinary and obvious situations. The client's good grasp of reality is nevertheless bolstered by his/her ability to recognize and endorse obvious clues to conventional modes of response.

## Ideation

| R = 15 | | L = 2.75 | PTI = 0 | ☐ DEPI = 3 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Critical Special Scores | |
| EB | = | 3 : 0 | EBPer | = N/A | DV | = 0 | DV2 | = 0 | |
| eb | = | 1 : 0 | MOR | = 0 | INC | = 1 | INC2 | = 0 | |
| FM | = | 1 | m | = 0 | DR | = 0 | DR2 | = 0 | |
| a:p | = | 1 : 3 | M- | = 0 | FAB | = 0 | FAB2 | = 0 | |
| Ma:Mp | = | 0 : 3 | M none | = 0 | ALOG | = 0 | | | |
| | | | 2AB+Art+Ay | = 0 | CONTAM | = 0 | Raw Sum6 | = 1 | |
| | | | | | | | Wgtd Sum6 | = 2 | |
| Responses with Critical Special Scores: | | | | | | | | | |
| 1 | | | | | | | | | |

This cluster of variables provides information about the way people think about the experiences they have and the impressions they form of events in their lives. People adapt best when they are able to think about their experiences and impressions in a logical, coherent, flexible, constructive, and only moderately preoccupying manner. Conversely, being inclined to illogical, incoherent, inflexible, overly fanciful, or excessively preoccupying ways of thinking constitutes a personality liability that interferes with psychological adjustment.

© 1976, 1985, 1990, 1994, 1995, 1999, 2001 by Psychological Assessment Resources, Inc. All rights reserved.        Version: 4.52.127

21. The client is less likely than most people to experience intrusive ideation over which he/she has little control, and he/she is relatively unburdened by either (a) a disconcerting awareness of needs that are not being met, or (b) worrisome thoughts about being unable to prevent other people or events from determining his/her destiny. Although this relative lack of troubling ideation may spare him/her some stress, it may also reflect some emptiness and indifference in his/her life. The possibility should be considered that he/she is a relatively unmotivated, undemanding, and easily satisfied individual who seldom experiences needs or wants, rarely entertains hopes and dreams, and remains bland and unconcerned even in unwelcome circumstances. Another possibility suggested by the data in his/her case involves neither limited need arousal nor self-denial, but instead an orientation toward gratifying needs as soon as they arise, without allowing them to linger unmet as a source of intrusive ideational concerns. Should this be true, he/she may regularly opt for getting his/her needs met rather than worrying about them. Consequently engaging in self-gratifying behaviors without sufficient delay or restraint could contribute to various kinds of conduct problems and actions to which others take exception or offense.

22. This person shows a marked tendency to deal with challenging situations in an escapist manner in which he/she subjugates reality to fantasy. Instead of thinking through what he/she can or should do about situations that call for making decisions or taking actions, he/she imagines how other people or fortuitous events will make these decisions for him/her, thus eliminating the need for him/her to do anything. Such withdrawal into imagination may provide temporary relief from worry and responsibility, but at the expense of decreasing the prospects for getting his/her needs met. People who abuse fantasy in this way may additionally don a mantle of helplessness and dependency that makes them vulnerable to being manipulated by those whom they imagine to be their source of salvation.

23. Generally speaking, he/she displays adaptive capacity to think logically and coherently. The client is as capable as most people of coming to reasonable conclusions about relationships between events and of maintaining a connected flow of associations in which ideas follow each other in a comprehensible manner.

## Overview

This person has produced a valid record that should ordinarily provide reliable information about his/her personality functioning. However, he/she shows some situational guardedness and a reluctance to be forthcoming, and his/her responses may accordingly not reveal the full extent of either his/her coping capacities or his/her adjustment difficulties.

The client demonstrates generally good abilities to perceive events conventionally without sacrificing his/her individuality, to form accurate impressions of himself/herself, to interpret the actions and intentions of others without distortion, to anticipate adequately the consequences of his/her own actions, and to construe correctly what constitutes appropriate behavior in various kinds of situations. The client's good reality testing constitutes a substantial personality strength.

This person is inclined to examine his/her experience in a cursory manner and to take inadequate account of information he/she should consider. The client is consequently at risk for being hasty and careless in the way he/she makes decisions and works on tasks.

The client displays adaptive capacity to think logically and coherently, being for the most part as capable as most people of coming to reasonable conclusions about relationships between events and of maintaining a connected flow of associations in which ideas follow each other in a comprehensible manner.

This person appears to be less capable than most people of dealing effectively with everyday experience, especially with respect to social situations. The client's limited social skills are likely to be contributing to awkward, inept, or inappropriate management of interpersonal relationships.

This person gives evidence of limited capacity to form close attachments to other people. Although he/she may not necessarily avoid interpersonal relationships, these relationships tend to be psychologically at arm's length rather than up close.

This person is likely to be behaviorally passive and acquiescent in his/her interpersonal relationships, preferring to let others take the initiative and make decisions.

This person is likely, for the most part, to engage in adaptive interpersonal behaviors.

## End of Report

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5636

# Extended Score Report

# MMPI-2™

**Minnesota Multiphasic Personality Inventory-2™**

ID Number 5

Nathaniel Jackson

Male

Age 30

Date Assessed 4/09/2002

Copyright © 1989, 1994, 2000 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Portions reproduced from the MMPI-2 test booklet. Copyright © 1942, 1943, (renewed 1970), 1989 REGENTS OF THE
UNIVERSITY OF MINNESOTA. Portions excerpted from the MMPI-2 Manual for Administration, Scoring, and Interpretation,
Revised Edition, copyright © 2001 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Distributed exclusively by NCS Pearson, Inc.

"Minnesota Multiphasic Personality Inventory-2" and "MMPI-2" are trademarks of the University of Minnesota.

[ 3.1 / 5.04 / 1.0 ]

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5637

**MMPI-2™**
**ID 5**

## MMPI-2 VALIDITY AND CLINICAL SCALES PROFILE



| | VRIN | TRIN | F | F(B) | F(P) | L | K | S | Hs | D | Hy | Pd | Mf | Pa | Pt | Sc | Ma | Si |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 9 | 7 | 8 | 3 | 4 | 9 | 17 | 18 | 3 | 20 | 24 | 25 | 24 | 8 | 7 | 16 | 20 | 26 |
| K Correction: | | | | | | | | | 9 | | | 7 | | | 17 | 17 | 3 | |
| T Score: | 65 | 64F | 61 | 55 | 70 | 74 | 54 | 42 | 48 | 54 | 57 | 72 | 46 | 42 | 45 | 62 | 56 | 51 |
| Response %: | 98 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Cannot Say (Raw): 2
F-K (Raw): -9
Welsh Code: 4'+8-3920/1576: L'+F-K/

Percent True: 41
Percent False: 59
Profile Elevation: 54.50

MMPI-2™
ID 5



MMPI-2 CONTENT SCALES PROFILE

|  | ANX | FRS | OBS | DEP | HEA | BIZ | ANG | CYN | ASP | TPA | LSE | SOD | FAM | WRK | TRT |
|---|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Raw Score: | 5 | 12 | 1 | 7 | 5 | 6 | 4 | 20 | 15 | 8 | 2 | 8 | 5 | 5 | 8 |
| T Score: | 50 | 77 | 37 | 56 | 51 | 63 | 46 | 74 | 69 | 48 | 45 | 50 | 50 | 46 | 59 |
| Response %: | 96 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 96 | 100 | 100 | 100 | 100 |



**MMPI-2™**
**ID 5**

## MMPI-2 SUPPLEMENTARY SCALES PROFILE



|  | A | R | Es | Do | Re | Mt | PK | MDS | Ho | O-H | MAC-R | AAS | APS | GM | GF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 7 | 18 | 36 | 11 | 17 | 9 | 8 | 3 | 29 | 20 | 22 | 6 | 14 | 36 | 24 |
| T Score: | 46 | 56 | 47 | 31 | 42 | 46 | 50 | 51 | 63 | 76 | 53 | 65 | 30 | 46 | 42 |
| Response %: | 95 | 100 | 100 | 100 | 100 | 98 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

MMPI-2™
ID 5



MMPI-2 PSY-5 SCALES PROFILE

| | AGGR | PSYC | DISC | NEGE | INTR |
|---|---|---|---|---|---|
| Raw Score: | 11 | 10 | 16 | 6 | 11 |
| T Score: | 59 | 72 | 54 | 44 | 50 |
| Response %: | 100 | 100 | 100 | 100 | 100 |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5641

MMPI-2™
ID 5

## HARRIS-LINGOES SUBSCALES
(to be used as an aid in interpreting the parent scale)

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Depression Subscales** |  |  |  |
| Subjective Depression (D1) | 7 | 50 | 100 |
| Psychomotor Retardation (D2) | 6 | 54 | 100 |
| Physical Malfunctioning (D3) | 3 | 51 | 100 |
| Mental Dullness (D4) | 3 | 53 | 100 |
| Brooding (D5) | 2 | 51 | 100 |
| **Hysteria Subscales** |  |  |  |
| Denial of Social Anxiety (Hy1) | 6 | 61 | 100 |
| Need for Affection (Hy2) | 7 | 51 | 100 |
| Lassitude-Malaise (Hy3) | 2 | 48 | 100 |
| Somatic Complaints (Hy4) | 3 | 52 | 100 |
| Inhibition of Aggression (Hy5) | 5 | 63 | 100 |
| **Psychopathic Deviate Subscales** |  |  |  |
| Familial Discord (Pd1) | 1 | 45 | 100 |
| Authority Problems (Pd2) | 5 | 60 | 100 |
| Social Imperturbability (Pd3) | 6 | 63 | 100 |
| Social Alienation (Pd4) | 5 | 56 | 100 |
| Self-Alienation (Pd5) | 6 | 63 | 100 |
| **Paranoia Subscales** |  |  |  |
| Persecutory Ideas (Pa1) | 5 | 70 | 100 |
| Poignancy (Pa2) | 1 | 41 | 100 |
| Naivete (Pa3) | 1 | 32 | 100 |
| **Schizophrenia Subscales** |  |  |  |
| Social Alienation (Sc1) | 5 | 59 | 100 |
| Emotional Alienation (Sc2) | 3 | 69 | 100 |
| Lack of Ego Mastery, Cognitive (Sc3) | 4 | 66 | 100 |
| Lack of Ego Mastery, Conative (Sc4) | 4 | 60 | 100 |
| Lack of Ego Mastery, Defective Inhibition (Sc5) | 0 | 40 | 100 |
| Bizarre Sensory Experiences (Sc6) | 2 | 51 | 100 |
| **Hypomania Subscales** |  |  |  |
| Amorality (Ma1) | 4 | 66 | 100 |
| Psychomotor Acceleration (Ma2) | 3 | 39 | 100 |
| Imperturbability (Ma3) | 7 | 71 | 100 |
| Ego Inflation (Ma4) | 1 | 37 | 100 |

MMPI-2™
ID 5

Extended Score Report
Page 7

## SOCIAL INTROVERSION SUBSCALES

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| Shyness/Self-Consciousness (Si1) | 2 | 42 | 100 |
| Social Avoidance (Si2) | 5 | 58 | 100 |
| Alienation—Self and Others (Si3) | 6 | 53 | 100 |

**MMPI-2™**
**ID 5**

## CONTENT COMPONENT SCALES

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Fears Subscales** | | | |
| Generalized Fearfulness (FRS1) | 3 | 71 | 100 |
| Multiple Fears (FRS2) | 8 | 72 | 100 |
| **Depression Subscales** | | | |
| Lack of Drive (DEP1) | 4 | 62 | 100 |
| Dysphoria (DEP2) | 0 | 42 | 100 |
| Self-Depreciation (DEP3) | 1 | 48 | 100 |
| Suicidal Ideation (DEP4) | 1 | 62 | 100 |
| **Health Concerns Subscales** | | | |
| Gastrointestinal Symptoms (HEA1) | 0 | 44 | 100 |
| Neurological Symptoms (HEA2) | 1 | 47 | 100 |
| General Health Concerns (HEA3) | 2 | 56 | 100 |
| **Bizarre Mentation Subscales** | | | |
| Psychotic Symptomatology (BIZ1) | 1 | 54 | 100 |
| Schizotypal Characteristics (BIZ2) | 3 | 60 | 100 |
| **Anger Subscales** | | | |
| Explosive Behavior (ANG1) | 2 | 52 | 100 |
| Irritability (ANG2) | 2 | 46 | 100 |
| **Cynicism Subscales** | | | |
| Misanthropic Beliefs (CYN1) | 15 | 74 | 100 |
| Interpersonal Suspiciousness (CYN2) | 5 | 57 | 100 |
| **Antisocial Practices Subscales** | | | |
| Antisocial Attitudes (ASP1) | 12 | 66 | 100 |
| Antisocial Behavior (ASP2) | 3 | 59 | 100 |
| **Type A Subscales** | | | |
| Impatience (TPA1) | 3 | 51 | 100 |
| Competitive Drive (TPA2) | 3 | 50 | 100 |
| **Low Self-Esteem Subscales** | | | |
| Self-Doubt (LSE1) | 1 | 44 | 100 |
| Submissiveness (LSE2) | 1 | 48 | 83 |

**MMPI-2™**
**ID 5**

**Social Discomfort Subscales**
   Introversion (SOD1)           7      56      100
   Shyness (SOD2)             1      41      100

**Family Problems Subscales**
   Family Discord (FAM1)        4      55      100
   Familial Alienation (FAM2)    0      40      100

**Negative Treatment Indicators Subscales**
   Low Motivation (TRT1)       2      54      100
   Inability to Disclose (TRT2)    3      60      100

## OMITTED ITEMS

Those items for which there is no response or for which both true and false responses have been entered are considered "omitted." The potential for lowering the elevation of individual scales or the overall profile and rendering the administration invalid increases with the number of omitted items. Defensiveness, confusion, carelessness, and indecision are among the common reasons for omitting items. Examination of the content of the items that were omitted by the respondent may reveal specific problem areas or suggest reasons for their not responding appropriately to all items, Following are the items that were omitted:

408. I am apt to take disappointments so keenly that I can't put them out of my mind.
421. I am apt to pass up something I want to do because others feel that I am not going about it in the right way.

## CRITICAL ITEMS

The MMPI-2 contains a number of items whose content may indicate the presence of psychological problems when endorsed in the deviant direction. These "critical items," developed for use in clinical settings, may provide an additional source of hypotheses about the respondent. However, caution should be used in interpreting critical items since responses to single items are very unreliable and should not be treated as scores on full-length scales -- for example, an individual could easily mismark or misunderstand a single item and not intend the answer given. The content of the items and the possibility of misinterpretation make it important to keep the test results strictly confidential. Special caution should be exercised when interpreting these items in nonclinical settings.

**Acute Anxiety State (Koss-Butcher Critical Items)**
172. I frequently notice my hand shakes when I try to do something. (True)
444. I am a high-strung person. (True)

**Depressed Suicidal Ideation (Koss-Butcher Critical Items)**
9. My daily life is full of things that keep me interested. (False)
71. These days I find it hard not to give up hope of amounting to something. (True)
273. Life is a strain for me much of the time. (True)
306. No one cares much what happens to you. (True)
454. The future seems hopeless to me. (True)
518. I have made lots of bad mistakes in my life. (True)

**Threatened Assault (Koss-Butcher Critical Items)**
134. At times I feel like picking a fist fight with someone. (True)

**Situational Stress Due to Alcoholism (Koss-Butcher Critical Items)**
264. I have used alcohol excessively. (True)
487. I have enjoyed using marijuana. (True)
518. I have made lots of bad mistakes in my life. (True)

**Mental Confusion (Koss-Butcher Critical Items)**
32. I have had very peculiar and strange experiences. (True)
299. I cannot keep my mind on one thing. (True)

**Persecutory Ideas (Koss-Butcher Critical Items)**
42. If people had not had it in for me, I would have been much more successful. (True)
228. There are persons who are trying to steal my thoughts and ideas. (True)
241. It is safer to trust nobody. (True)
259. I am sure I am being talked about. (True)
333. People say insulting and vulgar things about me. (True)

Case: 4:07-cv-00880-JG  Doc #: 47-17  Filed: 07/14/17  60 of 353.  PageID #: 13334

**Antisocial Attitude (Lachar-Wrobel Critical Items)**
84. I was suspended from school one or more times for bad behavior. (True)
105. In school I was sometimes sent to the principal for bad behavior. (True)
227. I don't blame people for trying to grab everything they can get in this world. (True)
254. Most people make friends because friends are likely to be useful to them. (True)
266. I have never been in trouble with the law. (False)

**Family Conflict (Lachar-Wrobel Critical Items)**
21. At times I have very much wanted to leave home. (True)

**Somatic Symptoms (Lachar-Wrobel Critical Items)**
33. I seldom worry about my health. (False)
295. I have never been paralyzed or had any unusual weakness of any of my muscles. (False)

**Sexual Concern and Deviation (Lachar-Wrobel Critical Items)**
268. I wish I were not bothered by thoughts about sex. (True)

**Anxiety and Tension (Lachar-Wrobel Critical Items)**
172. I frequently notice my hand shakes when I try to do something. (True)
299. I cannot keep my mind on one thing. (True)

**Sleep Disturbance (Lachar-Wrobel Critical Items)**
471. I have often been frightened in the middle of the night. (True)

**Deviant Thinking and Experience (Lachar-Wrobel Critical Items)**
32. I have had very peculiar and strange experiences. (True)
427. I have never seen a vision. (False)

**Depression and Worry (Lachar-Wrobel Critical Items)**
165. My memory seems to be all right. (False)
273. Life is a strain for me much of the time. (True)
454. The future seems hopeless to me. (True)

**Deviant Beliefs (Lachar-Wrobel Critical Items)**
42. If people had not had it in for me, I would have been much more successful. (True)
228. There are persons who are trying to steal my thoughts and ideas. (True)
259. I am sure I am being talked about. (True)
333. People say insulting and vulgar things about me. (True)

**Substance Abuse (Lachar-Wrobel Critical Items)**
264. I have used alcohol excessively. (True)
429. Except by doctor's orders I never take drugs or sleeping pills. (False)

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5648

MMPI-2™
ID 5

**Problematic Anger (Lachar-Wrobel Critical Items)**
134.  At times I feel like picking a fist fight with someone. (True)

Case: 4:07-cv-00880-JG Doc #: 47-17 Filed: 07/14/17 62 of 353. PageID #: 13336

MMPI-2™
ID 5

Extended Score Report
Page 14

## ITEM RESPONSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1: 1 | 2: 1 | 3: 1 | 4: 2 | 5: 2 | 6: 1 | 7: 1 | 8: 1 | 9: 2 | 10: 1 |
| 11: 2 | 12: 1 | 13: 2 | 14: 2 | 15: 2 | 16: 2 | 17: 2 | 18: 2 | 19: 1 | 20: 1 |
| 21: 1 | 22: 2 | 23: 2 | 24: 2 | 25: 2 | 26: 2 | 27: 2 | 28: 2 | 29: 2 | 30: 2 |
| 31: 2 | 32: 1 | 33: 2 | 34: 1 | 35: 2 | 36: 2 | 37: 2 | 38: 2 | 39: 2 | 40: 2 |
| 41: 2 | 42: 1 | 43: 1 | 44: 2 | 45: 1 | 46: 2 | 47: 1 | 48: 2 | 49: 1 | 50: 2 |
| 51: 1 | 52: 1 | 53: 2 | 54: 2 | 55: 2 | 56: 2 | 57: 1 | 58: 1 | 59: 2 | 60: 2 |
| 61: 1 | 62: 2 | 63: 1 | 64: 1 | 65: 2 | 66: 1 | 67: 2 | 68: 2 | 69: 2 | 70: 2 |
| 71: 1 | 72: 2 | 73: 2 | 74: 2 | 75: 1 | 76: 1 | 77: 2 | 78: 1 | 79: 2 | 80: 2 |
| 81: 1 | 82: 2 | 83: 1 | 84: 1 | 85: 2 | 86: 1 | 87: 2 | 88: 1 | 89: 2 | 90: 1 |
| 91: 1 | 92: 2 | 93: 2 | 94: 2 | 95: 1 | 96: 2 | 97: 2 | 98: 2 | 99: 2 | 100: 1 |
| 101: 2 | 102: 1 | 103: 2 | 104: 1 | 105: 1 | 106: 1 | 107: 2 | 108: 1 | 109: 1 | 110: 1 |
| 111: 2 | 112: 2 | 113: 1 | 114: 2 | 115: 2 | 116: 2 | 117: 1 | 118: 2 | 119: 2 | 120: 2 |
| 121: 1 | 122: 2 | 123: 1 | 124: 2 | 125: 1 | 126: 1 | 127: 1 | 128: 2 | 129: 2 | 130: 2 |
| 131: 1 | 132: 2 | 133: 2 | 134: 1 | 135: 2 | 136: 2 | 137: 2 | 138: 2 | 139: 1 | 140: 1 |
| 141: 1 | 142: 1 | 143: 2 | 144: 2 | 145: 2 | 146: 2 | 147: 2 | 148: 2 | 149: 2 | 150: 2 |
| 151: 2 | 152: 1 | 153: 2 | 154: 1 | 155: 2 | 156: 2 | 157: 1 | 158: 2 | 159: 1 | 160: 1 |
| 161: 2 | 162: 2 | 163: 2 | 164: 1 | 165: 2 | 166: 2 | 167: 2 | 168: 2 | 169: 1 | 170: 1 |
| 171: 2 | 172: 1 | 173: 2 | 174: 1 | 175: 2 | 176: 1 | 177: 1 | 178: 2 | 179: 1 | 180: 2 |
| 181: 2 | 182: 2 | 183: 1 | 184: 2 | 185: 2 | 186: 1 | 187: 2 | 188: 1 | 189: 1 | 190: 2 |
| 191: 1 | 192: 1 | 193: 2 | 194: 1 | 195: 2 | 196: 1 | 197: 1 | 198: 2 | 199: 1 | 200: 1 |
| 201: 1 | 202: 2 | 203: 2 | 204: 1 | 205: 1 | 206: 1 | 207: 2 | 208: 1 | 209: 1 | 210: 1 |
| 211: 2 | 212: 2 | 213: 2 | 214: 1 | 215: 2 | 216: 2 | 217: 1 | 218: 2 | 219: 2 | 220: 1 |
| 221: 1 | 222: 1 | 223: 1 | 224: 1 | 225: 1 | 226: 2 | 227: 1 | 228: 1 | 229: 2 | 230: 1 |
| 231: 2 | 232: 2 | 233: 2 | 234: 2 | 235: 2 | 236: 2 | 237: 1 | 238: 2 | 239: 2 | 240: 2 |
| 241: 1 | 242: 2 | 243: 2 | 244: 1 | 245: 2 | 246: 2 | 247: 2 | 248: 2 | 249: 2 | 250: 1 |
| 251: 2 | 252: 2 | 253: 1 | 254: 1 | 255: 1 | 256: 2 | 257: 2 | 258: 2 | 259: 1 | 260: 1 |
| 261: 1 | 262: 1 | 263: 2 | 264: 1 | 265: 2 | 266: 2 | 267: 2 | 268: 1 | 269: 2 | 270: 2 |
| 271: 2 | 272: 1 | 273: 1 | 274: 2 | 275: 2 | 276: 1 | 277: 2 | 278: 2 | 279: 1 | 280: 1 |
| 281: 2 | 282: 2 | 283: 1 | 284: 1 | 285: 2 | 286: 1 | 287: 1 | 288: 2 | 289: 2 | 290: 2 |
| 291: 2 | 292: 2 | 293: 2 | 294: 2 | 295: 2 | 296: 2 | 297: 1 | 298: 2 | 299: 1 | 300: 2 |
| 301: 2 | 302: 2 | 303: 2 | 304: 2 | 305: 1 | 306: 1 | 307: 2 | 308: 2 | 309: 2 | 310: 2 |
| 311: 2 | 312: 2 | 313: 2 | 314: 1 | 315: 1 | 316: 2 | 317: 2 | 318: 1 | 319: 2 | 320: 2 |
| 321: 1 | 322: 2 | 323: 2 | 324: 2 | 325: 2 | 326: 2 | 327: 2 | 328: 2 | 329: 2 | 330: 1 |
| 331: 2 | 332: 2 | 333: 1 | 334: 1 | 335: 1 | 336: 2 | 337: 1 | 338: 1 | 339: 2 | 340: 1 |
| 341: 1 | 342: 2 | 343: 1 | 344: 2 | 345: 1 | 346: 1 | 347: 2 | 348: 2 | 349: 2 | 350: 1 |
| 351: 2 | 352: 1 | 353: 2 | 354: 1 | 355: 2 | 356: 1 | 357: 1 | 358: 1 | 359: 2 | 360: 2 |
| 361: 2 | 362: 1 | 363: 2 | 364: 2 | 365: 1 | 366: 2 | 367: 1 | 368: 2 | 369: 1 | 370: 1 |
| 371: 2 | 372: 1 | 373: 1 | 374: 1 | 375: 2 | 376: 2 | 377: 2 | 378: 2 | 379: 1 | 380: 2 |
| 381: 2 | 382: 2 | 383: 1 | 384: 1 | 385: 2 | 386: 2 | 387: 2 | 388: 1 | 389: 2 | 390: 2 |
| 391: 1 | 392: 1 | 393: 1 | 394: 2 | 395: 2 | 396: 2 | 397: 1 | 398: 1 | 399: 1 | 400: 2 |
| 401: 1 | 402: 2 | 403: 1 | 404: 1 | 405: 1 | 406: 2 | 407: 2 | 408: / | 409: 2 | 410: 2 |
| 411: 2 | 412: 2 | 413: 2 | 414: 1 | 415: 2 | 416: 1 | 417: 2 | 418: 1 | 419: 2 | 420: 2 |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5650

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 421: / | 422: 2 | 423: 1 | 424: 2 | 425: 1 | 426: 2 | 427: 2 | 428: 1 | 429: 2 | 430: 2 |
| 431: 2 | 432: 2 | 433: 2 | 434: 2 | 435: 2 | 436: 1 | 437: 1 | 438: 1 | 439: 1 | 440: 1 |
| 441: 2 | 442: 2 | 443: 1 | 444: 1 | 445: 2 | 446: 2 | 447: 1 | 448: 1 | 449: 1 | 450: 2 |
| 451: 2 | 452: 1 | 453: 2 | 454: 1 | 455: 1 | 456: 1 | 457: 2 | 458: 1 | 459: 2 | 460: 1 |
| 461: 1 | 462: 1 | 463: 2 | 464: 2 | 465: 2 | 466: 2 | 467: 2 | 468: 2 | 469: 2 | 470: 1 |
| 471: 1 | 472: 2 | 473: 1 | 474: 2 | 475: 2 | 476: 2 | 477: 2 | 478: 2 | 479: 2 | 480: 1 |
| 481: 1 | 482: 2 | 483: 2 | 484: 2 | 485: 2 | 486: 2 | 487: 1 | 488: 2 | 489: 2 | 490: 1 |
| 491: 2 | 492: 1 | 493: 1 | 494: 2 | 495: 1 | 496: 1 | 497: 2 | 498: 2 | 499: 2 | 500: 1 |
| 501: 1 | 502: 2 | 503: 2 | 504: 1 | 505: 1 | 506: 2 | 507: 1 | 508: 2 | 509: 2 | 510: 2 |
| 511: 2 | 512: 1 | 513: 2 | 514: 2 | 515: 1 | 516: 2 | 517: 2 | 518: 1 | 519: 2 | 520: 2 |
| 521: 1 | 522: 1 | 523: 1 | 524: 2 | 525: 2 | 526: 2 | 527: 2 | 528: 2 | 529: 2 | 530: 2 |
| 531: 2 | 532: 2 | 533: 2 | 534: 2 | 535: 1 | 536: 1 | 537: 2 | 538: 1 | 539: 2 | 540: 2 |
| 541: 2 | 542: 1 | 543: 2 | 544: 2 | 545: 1 | 546: 2 | 547: 2 | 548: 2 | 549: 1 | 550: 2 |
| 551: 2 | 552: 1 | 553: 2 | 554: 2 | 555: 2 | 556: 2 | 557: 1 | 558: 2 | 559: 1 | 560: 1 |
| 561: 1 | 562: 2 | 563: 1 | 564: 1 | 565: 2 | 566: 2 | 567: 2 | | | |

**End of Report**

Paula Korneagay   Mother
Charles Paige      Father
*Anthony K.        Pro
O*Taushia K.       Sis
*Charles           Bro  ████████████

                   * LW Mom

O Anthritis problems
     O△

8 ½ sibs m Fa's side        Need Fam hx
  1 ½ sib did from          + detail
  asthma - Adults
        were total
        about it

J (Cmisle)

Nathan Jackson          4/27/02        1N
  case                  rare/Tape      DDD

12/20/01  Donna Roberts
  Investigator
     (gft of Δ who collected w/ him re murder
     & husband)

Express confusion / can't remember Conv.
  to Tall attns
  what in we can J say etc
  RO greaten to that
  Tell Conv. during it agt World & promise

  She says he did talk Conv during to $--- 10K
     letters & just prison, they talk y

  She is presenting as very upset crying w/ta
  part of husband's death
         746 1652  Sheila Money # n746 1382
         where Nate stayed
         Sheila v/ Apts Oscar

  Nate & Jr a little boy to me
  I don't believe it - He wouldn't do this to me
RO: Maybe he was confused Und, I      she protests

  He never of any plan       No Junel to have let him
                              so careless around never
  D: you think if I believed he would do
  something, I would keep ur kept the letters
  eg. I did believe he would kill me  he I
  come home!

Q: Did he talk on phone CP
     she den't any conversation. his CP I write time
                                         m man y

(2)

Refused poly -- [illegible] job she [illegible] -
memory capacity ? maybe; loses track

She — she was trying to talk [illegible]
relationship
[illegible] she told him [illegible] girl [illegible] etc
I had [illegible] but in the later [illegible] then
[illegible]

[illegible] Just [illegible]
→ (She indicated she felt old - (having him made her feel young?))

Sheila's { 422 Thornbury [illegible]
{ [illegible] lights [illegible] lights
{ [illegible] there

? [illegible] at store handicapped [illegible] ?
[illegible] - makes illegal [illegible] 49 [illegible]
Nate called need a place to stay

[illegible] uncovered
[illegible] bandage on finger
<? Says she saw Nate [illegible] (UNCERTAIN)>

< Israel [illegible] Freiman ? >

Nate had her all alone. ([illegible] car phone)
[illegible] Nate [illegible] fault
histrionic mannerisms - play acting
Showed [illegible] [illegible]
[illegible]

Jackson Tape

12/21/01
2:18 AM
5:13 ended

L handed
Pulled hand
223 w/ L hand

[illegible]

Robert [illegible]
[illegible]

But she
says [illegible]
2 [illegible] ?

[illegible] aggravating

[illegible]

Is Robert R handed ?
If so he would [illegible] with
L hand & then maybe twist
it away w/ R hand.

Threw gun at [illegible]
[illegible]
[illegible] ?

[illegible]

Gloves - fingerprints - If they were
[illegible] fit with [illegible]





**Office of the Ohio Public Defender**
328 Mahoning Avenue
Warren, Ohio 44483
(216) 393-7727

RECEIVED JAN 2 5 2002

DAVID H. BODIKER
State Public Defender

January 23, 2002

Dr. Sandra McPherson
12434 Cedar Road
#15
Cleveland Heights, OH 44106

RE:  NATHANIEL JACKSON

Dear Dr. McPherson:

Please find enclosed a copy of the Judgment Entry appointing you and Donald. I
have also enclosed the indictment and copy of the affidavit filed by the prosecutor.

The Trial is set to start on October 7, 2002.

See you soon.

ANTHONY V. CONSOLDANE

AVC/cjr
Enclosures

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,               )   Case No. 01-CR-794

     Plaintiff,          )

     -vs-                )   Judge Stuard

NATHANIEL JACKSON,      )

     Defendant.     )   <u>JUDGMENT ENTRY</u>

Motion of the Defendant, NATHANIEL JACKSON, is well-taken.

It is therefore ordered by the Court that the Defense employ Dr. Sandra McPherson, Ph.D, at $150.00 per hour, and Donald McPherson, at $90.00 per hour for _____ hours, with a cap of $5,000.000, as expert assistance to aid in the Defense.

_____                      _____

APPROVED                              JUDGE

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH-
WITH BY ORDINARY MAIL.
JUDGE

Jackson 4/13/02
Case revw

D/SM/P - Listen to tapes audio / video tape ✓

SM/P - finish NNPS

STP - Current family

D - school records

Nathaniel Jackson                    2/12/02

                30
                ss █████████████

born Youngstown
Mom, dad — both have visited here. Not together.
Pauline Korneagy — no works all t time, does packing
Charles Paige — does construction
S  Taushia Korneazey. ████████████ —26 yrs.
(Anthony  Korneazgy — don't know ᵛ at DeLroy
  what he does.
)
    Has arthritis.
    Says he has a lot of broken bones
        " " played a lot / ft. ball & basket ball
        " he took t first bullets.

    Went to 12th grade, but didn't graduate.
    Roosevelt Elem
    Adams
    Strusbugh
    (Hayes Jr. High
Has a brother Rayen High Sch — says he had a lot of behavioral problems.
Charles. Sister Mom's side — fuur oldg
died of asthma. Dad's  "   — eight.
    Says mo & dad still talk.
    J juvenile record
    Trouble when 16 or 17 in DH for six months. Driving charge,
unruly. Then went back to sch for a little bit.

Employment:
  Jim's car wash. In '93, then a few. Was paid by check.
Received about $5.50 hr.
    Always did stuff like landscaping.

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5661





NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5663

N. Jackson ✓

my i 3½ mos
Bry - te 4 Nate
J ? a

4 y.o -- Shaylese
Mo
sister
by self
kids
Fa

Mo & her boyfriend

Need  more info on drug/alc use -- client
Family contacts
Remand  u & # -- unlet #
✓ details of legal rec -- with Troy

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5664

*Sandra B. McPherson, Ph.D.*

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

To: Family of Nathaniel Jackson

From: Sandra B. McPherson, Ph.D.
Donald M. McPherson, M.Ed

I (Donald McPherson) was here at your house today, but you were not at home at the time.

We would like to have an opportunity to speak with you within the next few days. We are responsible to assist Mr. Jackson's attorneys in the mitigation phase of his capital trial that is drawing to a close at this point.

We did not have information about how to contact you until this time.

We would like for you to contact us by phone (please call collect the following number in the evening: 216 371 3976. If the phone is busy, please wait and try again. Your call will be accepted. If by any chance, you are not members of his family, please contact us (collect) and let us know.

Our need to speak with you is most urgent and important. If you have any questions, you can reach Mr. Consoldane or Mr.Lewis, attorneys for Mr. Jackson, at the Public Defenders Office in Warren, Ohio. The number there is 330 393 7727  That office can verify our work on this case and can answer questions you may have.

Please find attached a copy of the Court Order that appointed us to assist Mr. Jackson.

Donald M. McPherson, M.Ed.                    Sandra B. McPherson, Ph.D.

Nathaniel Jackson Case

**Information from the discovery tapes.**

Audio tapes involving conversations between Mr. Jackson and Ms. Donna Roberts were reviewed as well as video tape of their interrogations. The audio tapes, of course, precede the video tape, which took place after the arrest. The audio tapes were made of conversations occurring between the two prior to the release of Mr. Jackson form prison. Most of the audio tapes involve repetitive commentary conveying love and sexual intent along with planning for a future together and the demise of Ms. Roberts' husband. Her role is one of a kind of kittenish Southern belle. Her voice is very different from what is seen on her subsequent video tape and it is clear that she rather enjoys the coy young girlfriend-type role that she is playing with him over the phone. He is obviously equally enjoying being a man in charge and assuring her of his undying devotion.

In the two subsequent video tapes, she is obviously attempting to present as distraught over her husband's death and knowing nothing about it. Over time, however, she gets presented with more and more information. Her attempts to deal with such things as the love letters that also indicated intent to kill the man are unconvincing, amounting to why would she have kept them if she thought he really meant to do her husband in. She clearly has a histrionic flair and an enjoyment of playacting and she is able to take more than one role.

Mr. Jackson, on his tape, presents that he did not go to kill the victim, Robert Fingerhut. There are a few interesting kinds of statements in the course of his tape. He had shot himself in the left hand, although he is apparently left-handed, he both writes and smokes with his left hand and that was obvious on the tape. He indicated he threw the gun out of the right passenger window after driving away and a question can be raised as to why or how he would have the right passenger window down in the middle of the winter. There is a question about the fact that he and Donna Roberts had obtained a mask and gloves for him. His story is that he and the victim were in the kitchen talking and at some point a fight erupted, apparently around the affair he was having with Donna. He would not have had on the gloves and mask in the kitchen. However, the finger of the glove apparently was shot.

1

72 born

1 patterns noted in beh
79 2 some bad pattern acad. diffs
80-81 3 acad. poor ~~hyperactivism~~ suspended; absent unmotivated?; beh patterns "parents" conflict
81 4
82 5
83 6 Glyspared -
84 7 org probs - agg, antisoc, anx, immature, request; repeat; Fseml. A1B 8m2
85 8 Teacher noted "emotl illness" Talks to people not there; sleeps in class
86 9 hyperactivism Des hyper w/ CD
87 10 SBBD
88 11 unfinish [illegible] fighting, fire play; disorder [illegible] fighting; dates [illegible] → susp
89 12 Bus conduct pattern; Stim long pattern

Oppositional pattern -- increase in last [illegible] period
[illegible] 4. 9, 8 [illegible] got shot to Nathaniel (M)

Test Ohio Survey
4th grade 9/81
[illegible] Verbal 20, [illegible] 5
Man 26, Eng 14
[illegible] 21, Math 5

Stanford Binet
1989 - 100 [illegible]
1970

1986 5th grade
WISC-R
VIQ 72 PIQ 78 FSIQ 75
Woodcock Johnson WJ-10 6.4
Calc 4/13 Passage Comp
Reading 5.2 4.6

Nathaniel Jackson

Uncle — Mo's Brother Joe Jackson
address [redacted] Yngstn
His sister — N.Y. Ma lives next door.
"Nathaniel was spoiled" (schoolvac—
Born neighborhood. prophecy/
neglected properties) 2nd grade)
Some houses reenov
Vacant lot

retired — cdbe witness

Search for Father was not fruitful
Woman — in the house — relative down the
Street — Fa's sister (N.Y. aunt)
Rosewood str — down from Fa's old address
does not know N. well (?)
→ Fair → Fa is alcoholic
whereabouts unkn

Decent neighborhood — small homes
well/cared — large lots — trees

sources of info
Interviews of Δ
contacts with family members
review of records and discovery materials
4 of testing 17-2 WAIS-III [illegible]

School recs -- [illegible]

[illegible] fam hx > [illegible]

10 o'clock AM

His life → for everybody
Single Mom
surgery for foot ulcers high blood pressure

father - all right
no contact IDK ... [illegible]
Charles -- oldest [illegible]
Anthony -- he [illegible]

[illegible]

daughter [illegible]
grandkids
[illegible]
IDK [illegible]
[illegible]





NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5671

(2)

Age 17 -- [illegible] 11th.

[illegible] 45th restaurants [illegible] ball jobs.

18 -- moved out to my cousin older [illegible]

Why [illegible] started [illegible]

Drugs? [illegible] RSP little thefts

[illegible] cousin (87) [illegible] police [illegible] watch [illegible] Burglary [illegible]

→ 8 mos -- Lima CI [illegible] CCA

Drugs [illegible] misdemeanor [illegible] probation [illegible] felonies

1994 ~~[illegible]~~ PO terminated my [illegible]

Met ~~[illegible]~~ his daughter [illegible] she was pregnant [illegible]

(3)

[illegible] falling out
Drugs? [illegible]
[illegible] street [illegible]
[illegible]

1995 Met [illegible] fiancee
[illegible] year of '95
[illegible]
[illegible]
[illegible] gun on me.
[illegible]
[illegible] clothes [illegible]
He [illegible] clothes
Left got a gun [illegible]
[illegible] clothes
He [illegible] police [illegible]
[illegible] clothes
arrested
[illegible]
[illegible] PV [illegible]
Dec. 15th '95
None fiancee was murdered
[illegible] NYC
[illegible]
[illegible]
[illegible] Police [illegible]

[illegible] gun [illegible] 1996 Belmont CC
[illegible] 1996
Me [illegible] man [illegible]

[illegible] since [illegible] We met
May 25th 1997 [illegible]
birth [illegible]

(9)

— 6 months [illegible]

1998 [illegible] 7-

7. [illegible] Dymaxall Plastics [illegible] 40 [illegible] CO2 [illegible]

Stayed [illegible] 98-2000.

[illegible] drugs

[illegible] Mos [illegible] plates used them [illegible] car [illegible] requested [illegible] Cert -- sentenced 1 yr -- Belmont CO

Met Donna [illegible] 2000 [illegible] restaurant [illegible] Co. Surprisingly [illegible] 1985 [illegible] He [illegible]

// [illegible]

[illegible] color [illegible]



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5675



Names of [illegible] children (7)

---

[illegible] wife died
alcohol -- [illegible]
[illegible]

---

[illegible]
[illegible]
[illegible]

[illegible]
[illegible]

---

Charles -- prison
[illegible]
[illegible]

---

Anthony ? OK [illegible]
[illegible]

---

alc hx

1st use
@13 [illegible] mj [illegible]
started [illegible]
[illegible]
[illegible]
mellow hungry [illegible] self

@15 Pills - Valium
" Powder - snorted [illegible]
[illegible]
[illegible]





(10)

## S U M M O N S   O N   I N D I C T M E N T
### RULE 9 (B)

TRUMBULL COUNTY COMMON PLEAS COURT
WARREN, OHIO    44481

THE STATE OF OHIO
PLAINTIFF                                   CASE NO. **2001 CR 00794**

VS.

NATHANIEL E JACKSON
DEFENDANT

TO:       **THOMAS ALTIERE, SHERIFF**

An Indictment, a copy of which is attached hereto, has been

filed in the Trumbull County Court of Common Pleas charging

**NATHANIEL E JACKSON with: CT 1: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES CT 2: AGG MURDER (F) W/SPECS OF AGG CIRCUMSTANCES CT 3: AGG BURGLARY (F1)W/FIREARM SPEC CT 4: AGG ROBBERY (F1) W/FIREARM SPEC**

You are commanded to summon **NATHANIEL E JACKSON**, said Defendant to

appear before said court at Trumbull County Common Pleas Courthouse,

before **Judge John M. Stuard on Monday, December 31, 2001 at 11:00 a.m.**

Said Defendant is hereby informed that HE may be arrested if HE

fails to appear at the time and place stated herein.

Special instructions to the executing officer:

**Defendant must appear for arraignment.  No waivers accepted.**

Given under my hand and the seal of said

Court this December 28, 2001.

**MARGARET R. O'BRIEN, Clerk of Courts**

Trumbull County, Ohio

Rochelle Ryan
Deputy Clerk

I certify the foregoing to be a
true copy of the original writ.
Thomas Altiere SHERIFF
_____ DEPUTY

CASE NO. 2001 CR 00794   VS. NATHANIEL E JACKSON

## RETURN

Received this writ on the _____ day of _____, 20___
at _____o'clock ____.m., and on the _____ day of _____, 20___
I served the same on the within named by _____

_____

RETURN OF SERVICE OF SUMMONS (PERSONAL)
      Fees    I received this summons on _____ 20____
Service $_____ at _____ o'clock ____.m., and made personal service o
Mileage _____ upon
  Total $_____ by locating him-them and tendering a copy of summons
Date: _____ accompanying documents, on _____, 20____

                                _____
                                Sheriff, Bailiff, Process Ser

              By _____
                                                 Dep

RETURN OF SERVICE OF SUMMONS (RESIDENCE)
      Fees    I received this summons on _____ 20____
Service $_____ at _____ o'clock ____.m., and made residence service
Mileage _____ it upon the defendant(s) _____
  Total $_____
Date: _____ by leaving, at this their usual place of residence wi

              a person of suitable age and discretion then residing
              therein, a copy of the summons and accompanying docume
              on _____, 20_____.

                                Sheriff, Bailiff, Process Ser

              By_____
                                                 Dep

RETURN OF SERVICE OF SUMMONS (FAILURE OF SERVICE)
      Fees    I received this summons on _____ 20____
Service $_____ at _____ o'clock ____.m., with instructions to make
Mileage _____ personal-residence service upon the defendant(s) ____
  Total _____
Date _____
              and I was unable to serve a copy of the summons upon _
              _____for the following reasons:_____

              _____

                                Sheriff, Bailiff, Process Ser

              By _____
                                                 Dep

01-CR-794                      **INDICTMENT**              AGGRAVATED MURDER (F)
**DIRECT PRESENTMENT**          Crim R. 6, 7               WITH SPECIFICATIONS OF
                                                          A G G R A V A T I N G
                                                          C I R C U M S T A N C E S
                                                          (2903.01(A), 2941.14(C), and
                                                          2929.04(A)(7)

THE STATE OF OHIO                        )
                                         )        **COURT OF COMMON PLEAS**
TRUMBULL ................. COUNTY, ss.)

Of the Term September, in the year two thousand one,

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County*

*aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or*

*about the* 11th *day of* December, 2001, *at* Trumbull County, Ohio, **NATHANIEL E. JACKSON**, *did purposely,*

*and with prior calculation and design, cause the death of* Robert S. Fingerhut, age 56,

SPECIFICATION #1 TO COUNT ONE: Aggravating Circumstance of Aggravated Burglary (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7)

that the offense was committed while **NATHANIEL E. JACKSON** was committing, attempting to commit, or

fleeing immediately after committing or attempting to commit Aggravated Burglary, and **NATHANIEL E.**

**JACKSON** was the principal offender in the commission of the Aggravated Murder.

> You are hereby notified that you are under indictment
> for a felony of violence and pursuant to Section 2923.13
> of the Ohio Revised Code you are prohibited from acquir-
> ing, having, carrying, or using any firearm or dangerous
> ordnance while under indictment.

Case No.      01-CR-794 - DIRECT PRESENTMENT
Defendant     JACKSON, Nathaniel E.                                    Page 1 of 6

SPECIFICATION #2 TO COUNT ONE: Aggravating Circumstance of Aggravated Robbery (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7) that the offense was committed while **NATHANIEL E. JACKSON** was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Robbery, and **NATHANIEL E. JACKSON** was the principal offender in the commission of the Aggravated Murder.

in violation of the Ohio Revised Code, Title 29, Section 2903.01(A), 2941.14(C), and 2929.04(A)(7), *and against the peace and dignity of the State of Ohio.*

Case No.       01-CR-794 - DIRECT PRESENTMENT
Defendant       JACKSON, Nathaniel E.                                                    Page 2 of 6

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5684

**COUNT 2:** AGGRAVATED MURDER (F) WITH SPECIFICATIONS OF AGGRAVATING CIRCUMSTANCES (2903.01(B), 2941.14(C), and 2929.04(A)(7)

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 11th day of December, 2001, at Trumbull County, Ohio, **NATHANIEL E. JACKSON,** did purposely cause the death of Robert S. Fingerhut, age 56, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, Aggravated Burglary and/or Aggravated Robbery,

SPECIFICATION #1 TO COUNT TWO: Aggravating Circumstance of Aggravated Burglary (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7) that the offense was committed while **NATHANIEL E. JACKSON** was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Burglary, and **NATHANIEL E. JACKSON** was the principal offender in the commission of the Aggravated Murder.

SPECIFICATION #2 TO COUNT TWO: Aggravating Circumstance of Aggravated Robbery (2929.04(A)(7)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code section 2929.04(A)(7) that the offense was committed while **NATHANIEL E. JACKSON** was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Aggravated Robbery, and **NATHANIEL E. JACKSON** was the principal offender in the commission of the Aggravated Murder.

in violation of Section 2903.01(B), 2941.14(C), and 2929.04(A)(7) of the Ohio Revised Code, *and against the peace and dignity of the State of Ohio.*

You are hereby notified that you are under indictment for a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance while under indictment.

Case No.      01-CR-794 - DIRECT PRESENTMENT
Defendant     JACKSON, Nathaniel E.

Page 3 of 6

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5685

<u>COUNT 3:</u>    AGGRAVATED BURGLARY (F1) WITH FIREARM SPECIFICATION

*THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County aforesaid,* on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 11th day of December, 2001, at Trumbull County, Ohio, **NATHANIEL E. JACKSON**, by force, stealth, or deception, did trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, to-wit: 254 Fonderlac, Howland Township, Ohio, when Robert S. Fingerhut, age 56, was present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, and **NATHANIEL E. JACKSON** did inflict, or attempted or threatened to inflict physical harm on Robert S. Fingerhut, and **NATHANIEL E. JACKSON** did have a deadly weapon or dangerous ordnance on or about his person or under his control,

<u>SPECIFICATION #1 TO COUNT THREE: Firearm Specification (2941.145)</u>

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code 2941.145 that the said **NATHANIEL E. JACKSON** did at the time of his commission of the crime of Aggravated Burglary have a firearm on or about his person or under his control, and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense, said firearm being defined in Section 2923.11 of the Revised Code,

in violation of Section 2911.11(A)(1)(2) and 2941.145 of the Ohio Revised Code, *and against the peace and dignity of the State of Ohio.*

> You are hereby notified that you are under indictment for a felony of violence and pursuant to Section 2923.13 of the Ohio Revised Code you are prohibited from acquiring, having, carrying, or using any firearm or dangerous ordnance while under indictment.

Case No.       01-CR-794 - DIRECT PRESENTMENT
Defendant     JACKSON, Nathaniel E.

Page 4 of 6

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5686

COUNT 4:    AGGRAVATED ROBBERY (F1) WITH FIREARM SPECIFICATION

THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County

aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about

the 11ᵗʰ day of December, 2001, at Trumbull County, Ohio, NATHANIEL E. JACKSON, in attempting or

committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the

attempt or offense, did have a deadly weapon on or about his person or under his control, and either displayed the

weapon, brandished it, indicated that he possessed it, or used it, and NATHANIEL E. JACKSON did inflict, or

attempt to inflict, serious physical harm on Robert S. Fingerhut, age 56,

SPECIFICATION #1 TO COUNT FOUR: Firearm Specification (2941.145)

THE GRAND JURORS further find and specify pursuant to Ohio Revised Code 2941.145 that the said

NATHANIEL E. JACKSON did at the time of his commission of the crime of Aggravated Robbery have a

firearm on or about his person or under his control, and displayed the firearm, brandished the firearm, indicated

that he possessed the firearm, or used it to facilitate the offense, said firearm being defined in Section 2923.11 of

the Revised Code,

in violation of Section 2911.01(A)(1)(3) and 2941.145 of the Ohio Revised Code, and against the peace and

dignity of the State of Ohio.

You are hereby notified that you are under indictment
for a felony of violence and pursuant to Section 2923.13
of the Ohio Revised Code you are prohibited from acquir-
ing, having, carrying, or using any firearm or dangerous
ordnance while under indictment.

Dennis Watkins, Prosecuting Attorney

Charles L. Morrow, Asst. Pros. Attorney

Case No.        01-CR-794 - DIRECT PRESENTMENT
Defendant      JACKSON, Nathaniel E.

Page 5 of 6

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5687

01-CR-794
DIRECT PRESENTMENT
September Eighth Term, 2001
**COMMON PLEAS COURT**
TRUMBULL COUNTY, OHIO

**THE STATE OF OHIO**
vs.
NATHANIEL E. JACKSON
c/o Trumbull County Jail
Warren, OH  44481
SSN:             DOB:

*Indictment for:* CT 1: AGG MURDER (F) W/SPECS
OF AGG CIRCUMSTANCES (2903.01(A),
2941.14(C), and 2929.04(A)(7);
CT 2: AGG MURDER (F) W/SPECS OF AGG
CIRCUMSTANCES (2903.01(B), 2941.14(C), and
2929.04(A)(7);
CT 3: AGG BURGLARY (F1) W/FIREARM SPEC
(2911.11(A)(1)(2) and 2941.145;
CT 4: AGG ROBBERY (F1) W/FIREARM SPEC
(2911.01(A)(1)(3) and 2941.145

_____
Prosecuting Attorney
**A TRUE BILL**

_____
Foreman of the Grand Jury
This Bill of Indictment found upon testimony sworn and sent before
the Grand Jury at the request of the Prosecuting Attorney

_____
Foreman of the Grand Jury

Filed_____, 20_____

_____
                                    **Clerk**
By_____
                                    *Deputy*

---

On this _____ day of_____ 20___

*the within named*     _____

_____
*Defendant was arraigned, and pleads*

_____ *guilty to this indictment*

_____
                                    Clerk
*By*_____
                                    Deputy

**The State of Ohio**
**Trumbull County.**

    *I, the undersigned, Clerk of the Court of
Common Pleas in and for said County, do hereby
certify that the foregoing is a full, true, and correct
copy of the original indictment, with endorsements
thereon, now on file in my office.*

*WITNESS my hand and seal of said Court at,
Warren,*

*Ohio, this* 28. *day of* Dec, 20 01

        Margaret R O'Brien
                                    Clerk
*By* :     M Whigard
                                    Deputy

Case No.     01-CR-794 - DIRECT PRESENTMENT
Defendant    JACKSON, Nathaniel E.

Page 6 of 6

COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO            )
                        )    SS.
COUNTY OF TRUMBULL       )

## AFFIDAVIT FOR ARREST WARRANT

Before me, the Honorable John M. Stuard, Judge of the Court of Common Pleas, Trumbull
County, Ohio, and for the above-named County, personally came Detective Paul Monroe of the
Howland Township Police Department, 169 Niles-Cortland Road, Warren, Ohio. Affiant has been
employed by the Howland Township Police Department as a police officer for fourteen (14) years.

On December 12, 2001 at approximately 12:00 a.m., Trumbull County 911 dispatch received
an emergency telephone call from the residence of Donna M. Roberts and Robert S. Fingerhut at 254
Fonderlac SE, Warren, Ohio 44484. The caller identified herself as the wife of Fingerhut, told the
dispatcher that there was a problem with her husband, and that he was on the kitchen floor. She was
screaming and complaining of a problem with her heart. Emergency vehicles were immediately sent
to the home.

The Fingerhut home is a large single story brick home with two bedrooms and six other
rooms. The home is located in Howland Township, Trumbull County, Ohio and surrounded by other
large residential houses in what is known as Avalon Estates. Ptlm. Albert Ray arrived at the home
and found Robert Fingerhut dead in a pool of blood near the open kitchen door which leads to an
attached two car garage.

Affiant arrived at the scene at 12:35 a.m. and found other officers and Howland's EMT Unit
along with the victim's wife, Donna M. Roberts. She appeared very excited, curious and asking a

1

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5689

lot of questions. Affiant said to her that it appeared that he had been shot. Ms. Roberts responded saying "Shot. Oh my God someone murdered my Robert." This conversation took place in the master bedroom. Affiant at this time did not know how the victim had died. In fact, it was initially believed that Fingerhut may have committed suicide since a revolver was found in close proximity to the body.

Affiant observed the body of Fingerhut as being face down and fully clothed wearing a lined Cincinnati Reds jacket. The weapon was less than two (2) feet from the body, and there was no evidence of forced entry. Officers at the scene also noticed drops of blood found separate from the pool of blood around the body. In fact, one large drop of blood was found in the hallway near the living room.

Shortly after Affiant arrived, Dr. Humphrey Germaniuk, Forensic Pathologist of the Trumbull County Coroner's Office, arrived at the scene. He photographed the scene as did Officer Anthony Leshnack of the Trumbull County Sheriff's Department and the Trumbull County's Homicide Investigation and Prosecution Unit. Dr. Germaniuk, upon inspecting the area of the body discovered that the 38 revolver next to the victim was fully loaded. Further, upon close inspection of the body, it was determined that the victim had been shot at least three times, including one shot to the back of the head.

Dr. Germaniuk determined that the victim died of multiple gunshot wounds, and the case was ruled a homicide. He also concluded that the victim was probably engaged in a struggle with the assailant since he had suffered other injuries including lacerations, abrasions and contusions. In addition, there appeared to be gunshot residue on the victim's red jacket where one of the gunshot wounds was observed.

2

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5690

After determining that the victim was in fact a homicide victim, your Affiant talked to Donna Roberts a second time. She was told that it was going to take a long time to process the scene, and asked if he could contact a family member to take her from the home and that he would talk to her later. She was emotional and crying at the time. Affiant also asked her for permission to search the whole home. Donna Roberts stated "I told you do whatever you have to do, search the whole place, just find the guy." A written consent was later obtained that morning. Also Roberts informed Affiant that her husband's vehicle, a silver 2001 Chrysler 300M was missing. At approximately 2:00 a.m., Ms. Roberts left with her brother Ralph Roberts to his home in Austintown, Ohio.

During the next few hours, Affiant and other officers searched the home and garage area of the house. In the garage was Donna Roberts' vehicle, a 2000 maroon Chrysler 300M. In the trunk of Ms. Roberts' car, in a brown paper bag with the name Nate Jackson and his prison number on it, officers found 145 handwritten letters from Donna Roberts addressed to Nathaniel E. Jackson, inmate at the Lorain Correctional Institution, Grafton, Ohio. The officers also found male clothing in the bag.

In the master bedroom another 143 handwritten letters were found which were addressed to Donna M. Roberts, PO Box 1483, Warren, Ohio. They were from Nathaniel E. Jackson whose address was Lorain Correctional Institution. Affiant read some of the letters found at both locations and concluded that Donna M. Roberts and Nathaniel E. Jackson were and had been lovers for over 2 years. These letters also established that they were plotting to murder Robert Fingerhut.

After determining that Ms. Roberts was likely involved in her husband's murder, she was requested to come to the Howland Township Police station for a further interview. At 1:00 p.m. December 12, 2001, she arrived with her brothers and was interviewed by Affiant and Captain Karl

3

Compton. She proceeded to tell officers what she had done the day before finding her husband. She said she saw Robert last alive at 8:30 a.m. on December 11th prior to her going to work at the Grey Hound Bus Terminal, Warren, Ohio. (Her husband owned and operated the Warren and Youngstown Grey Hound facilities). She went to work and did not see him the whole day. He had gone to work in Youngstown. At 5:45 p.m. she returned home from work. Then at 9:00 p.m. she spoke to Robert and he told her that he was going to be late and that "she should go shopping at the mall and buy herself something nice because she deserves it."

She stated in part that she went to Giant Eagle, Walmart and K-Mart and that she was gone for approximately three hours shopping. She said she arrived home around mid-night and found her husband laying on the floor. She said she never touched him. She then told Affiant "You don't know something about Robert, that is, he goes both ways" (which Affiant interpreted as meaning that he was gay). She told Affiant that though she had never met his friends, there was a man named "Bobby" who had been calling a couple times a week for several weeks until last week. Furthermore, she claimed that since "Bobby" stopped calling her husband, he had been acting strange. She claimed there had been no big problems between her and her husband.

Affiant asked Ms. Roberts whether she had any boyfriends. She stated that a year or six months ago, she dated a man who was half-black and half-Hispanic named Carlos for two or three months. She said that they (meaning she and her husband) were "just a real cool couple." She did not mention any other names. Affiant then confronted her with the name Nathaniel E. Jackson. Upon hearing his name, she stated that she knew him and that she had been seeing him for two years. She had picked him up from prison on Sunday, December 9, 2001 and "had driven him home to Youngstown and dropped him off" at Oscar and Sheila's house in Youngstown, Ohio after picking

4

up some marijuana at her house. She next had contact with Jackson on Tuesday, December 11, 2001 when he had called her from a pay phone. Other than these two times she had not had contact with Nate. She further said that Robert knew about Nate and that they were friends.

She also mentioned that on Tuesday she had gone alone to Red Lobster and had dinner and one alcoholic beverage. After going over her story again-she remembered that she had also talked to Nate on the phone on Monday. She told Nate that she could not see him again to have sex and that she just wanted to be friends. In summary, the interview lasted one hour and Donna Roberts denied personally seeing Jackson except on Sunday morning and afternoon when she had picked him up from prison and brought him home. She was sure of that.

On Thursday, December 13, 2001, the victim's Chrysler automobile was found by Youngstown Police Department at Pershing and Victoria Streets in Youngstown, Ohio at 6:21 p.m. Affiant and Officer Frank Dillon and the Howland Police Department arrived at the above address at approximately 6:35 p.m. The car was unlocked with the keys in it. Blood drops appeared to be on the outside front passenger's door with what appeared to be blood smears on the door handle itself. Inside the car there appeared to be finger smears of blood on the front seat, and other blood stains on the headlight switch, keys, dashboard and stereo radio. This vehicle was towed to the Howland Township Police Department and then to Attorney General's B.C.I. & I. Laboratory, where Det. Sgt. Peter Pizzulo and B.C.I. Forensic Scientist Cindy Maylee processed the vehicle for fingerprints and blood-DNA evidence.

On Saturday, December 15, 2001 at 4:47 p.m., a tape recorded interview of Donna Roberts was conducted at the Howland Township Police Department by Affiant and Officer Dillion. Roberts was represented by Attorney Steve Chuparkoff. She was not in custody and voluntarily came to the

5

Howland Township Police station on her own accord. Further, she received a verbal and written Miranda warning and knowingly waived her constitutional rights. This interview lasted over one and one-half hours.

During this interview she contradicted her earlier statements and admitted that she had been with Nate Jackson on Sunday, Monday and Tuesday. She stated that she had stayed with him or got him a room at two different motels, the Wagon Wheel (Sunday night) on Market Street in Boardman, Ohio and the Days Inn (Tuesday night) which is also on Market Street in Boardman, Ohio. Further, she admitted that she had dinner with Jackson on the night of the shooting (December 11th) at the Red Lobster in Niles, Ohio at approximately 6:00 p.m. After eating they then went back to her house to feed her dogs and then she took him back to Oscar and Sheila's house on Wirt Street, Youngstown, Ohio. At 9:30 p.m., Roberts was in her car when Jackson called on her car phone and said that he needed her to help him and put him up for a week.

She claimed that she picked up Jackson on Wirt Street in Youngstown. When he got in her car, she stated that Jackson had a bandage over his left index finger which he said was injured with a hammer. He asked her for money and she gave him $200.00. They then drove to a crack house in Youngstown and purchased $100.00 worth of crack. Then she drove to the Days Inn and charged the room on her Master Card at approximately 10:30 p.m. He started to smoke crack and after a few minutes, she left him there. This was the last time she saw Jackson. Further, towards the end of the interview, she changed her story and told Affiant that Jackson, during a telephone call made after the discovery of Roberts' body, said he had been shot in the finger. She also stated that Jackson may have taken her cell phone. Further she said that "she could not believe that Jackson would ever do anything to Robert."

6

On Sunday, December 16, 2001, Affiant went to the Days Inn and verified that Donna Roberts had rented Room 129 for one week. A motel employee stated on Saturday, December 15, 2001, she had been cleaning the room and found used condoms, bloody dressings, wash cloths, and hydrogen peroxide. They were thrown in the trash dumpster and later retrieved by Affiant. One of the bloody medical wraps looked as if it could have been wrapped around an injured finger.

On Tuesday, December 18, 2001, B.C.I. Agent Ed Lulla went to Room 129 of the Days Inn and processed the room and found what appeared to be blood stains on the bed comforter, on wall near the door, on the floor in the bathroom, and on a wash cloth. Also fingerprints were found throughout the room.

Other evidence developed by Affiant and other police officers in this case which include officers from the Howland Township Police Department, Warren Police Department and the Trumbull County Sheriff's Department showed that lay witnesses also contradict the often self-contradicting story given by Donna Roberts. For example, Roberts told investigators that he was working late on Tuesday night and that she should go shopping. In fact, Dep. Jose Sanchez, who was working at the Youngstown Grey Hound Office with Robert Fingerhut, said that he remarked to Fingerhut that he (Fingerhut) was lucky and that he was going to get out of here on time. In fact, Fingerhut left at 9:00 p.m. It takes approximately 20-25 minutes to go from Youngstown to Howland.

Also Donna Roberts said that they were getting along well. However, an employee at the Youngstown Grey Hound business said to investigator that on Monday, December 10, 2001, Donna Roberts asked her husband for $3,000.00 and he said no and she gave him, according to witness, she gave him "the dirtiest look, like she was out to get him." Another employee in Youngstown said that

7

Fingerhut and his wife had an argument a week before his death over the phone and the argument "was the worst argument he ever heard Fingerhut and Donna Roberts ever have."

Furthermore, Affiant has attached to this Affidavit, copies of letters written by Nathaniel E. Jackson and Donna Marie Roberts to each other. (Jackson letters of November 27, 2001, October 29, 2001 and October 26, 2001; Roberts letter November 26, 2001). These letters establish a conspiracy between Nathaniel E. Jackson and Donna Marie Roberts to murder Robert Fingerhut upon Jackson's release from prison on December 9, 2001.

A check into the prison status of Nathaniel E. Jackson showed that on February 22, 2001, Nathaniel Edward Jackson (DOB     , SSN     ) formerly of     . Youngstown, Ohio was sentenced for the third time to prison for two (2) counts of Receiving Stolen Property. Jackson was sentenced by the Mahoning County Common Pleas Court to a term of one (1) year at the Lorain Correctional Institution, Lorain, Ohio. On December 9, 2001 at 8:00 a.m., he was released from prison.

Examples of Roberts and Jackson 's murder plot are numerous. In the Friday, October 26, 2001 letter of Jackson, he writes to Roberts that upon his release they were to get a hotel room together to spend some romantic time before killing Robert Fingerhut. (As previously present in the foregoing Affidavit-Donna Roberts did in fact before his release get a room for Jackson at the Wagon Wheel Motel in Boardman, Ohio). Jackson goes on and writes..."then after that you don't ever have to worry about making known more excusses(sic) to him, because he will no longer be with us after 12-10-01." Jackson then drew a tombstone which read:

```
R          P
E          I
S    IN    S
T          S
```

8

(page 2) (Emphasis added). Later on page 8, he writes:

> "Hey Donna just think come 12-11-01 you'll be waking up to me or maybe we'll
> give it a couple of days to let things look cool an (sic) after the Funeral Baby when
> I come home I'm never leaving an (sic) we're only doing it like that just to make it
> look good...the way that I have it all planned out is so sweet an (sic) alls I need is
> for my Baby not to worry an (sic) leave everything else up to me..." (Emphasis
> added).

In his October 29, 2001letter Jackson writes another letter to Donna and says ...(p. 1) "An
as far as that Robert Problem? Yes I'm taking care of that the next night. Because I told you I'm
tired of living like this when I don't have to. An (sic) After that will you get me a 2002 Cadillac
DeVille? Because I dream of it a lot." (Emphasis added). (It is noted that Affiant has learned from
his investigation and talking to State Farm Insurance that the victim had $325,000 in life insurance
with his wife as beneficiary.) (It is emphasized that the above letters were found in the bedroom of
Donna Roberts-all letters written to her sent to a post office box in her name and not to the Fonderlac
residence.

The most recent letter attached to this Affidavit is the Monday, November 26, 2001 letter
written by Donna Roberts and sent to Nathaniel Jackson at the Lorain Correctional Institution. This
letter was found in Donna Roberts automobile which was parked in the Fonderlac residence at the
time of the homicide. Roberts addresses Jackson as "My dearest sweetheart." This letter is six (6)
handwritten pages. There are many references to the murder plot in the letter. An example, Roberts
state of mind on November 26th is well illustrated on page 4 which in part reads:

> "...And after it's over, I can get a place for you even in Warren for a couple
> weeks because who is to tell me not to? Oh-I have been all over looking for a ski
> mask. I only see those knitted caps. Any suggestions on who might have them?
> And I'm still looking for gloves because I don't think the thick ones I'm seeing
> are good to work with as would be thinner leather ones. Know what I mean?

9

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5697

And yes, sneaking to see you for a couple hours doesn't do it. It leaves
us both with no real life together and when you go your way, you have to fend
for yourself and eat alone and sleep alone and be out with the wolves. And me -
I (live) exist in hell on earth. Like last night - I got so sick of just looking at him.
And hearing the same shit over and over. And smelling his breath. And every
other little thing - it's all bad. And seeing his skin. And watching him walk - or
breathe. I can't hold in my disgust and contempt for him well at all and he sees
it every time he looks at me now. Which makes him feel worse about me in
return. Which makes him talk to me and treat me like dirt."

Affiant further states that Trooper Gerald A. Funelli of the Ohio State Highway Patrol has

obtained copies of eighteen(18) separate telephone conversations which were recorded at the Lorain

Correctional Institution, an Ohio State Prison, located in Grafton Ohio. These recordings were made

between October 25, 2001 and December 8, 2001 and were made from Lorain Correctional

Institution to telephone number 330-609-7812, which number is associated with a telephone

belonging to Donna Roberts.

Your Affiant reasonably believes that these recorded prison conversations were had between

Donna Roberts and Nathaniel Jackson. During these conversations, Nathaniel Jackson, who

identifies himself during the collect calls from prison, and Donna Roberts, discuss the planned

murder of Robert Fingerhut. Donna Roberts made the following statements: "I can't take it anymore

here, " "I even gave you permission to do that to Robert to be with you forever,"

During these conversations Nathaniel Jackson states the following: "I can't wait to get out

to do what has to be done," "We in this 'til death do us part," "We going to wake-up for Christmas

together," (and to which Donna Roberts admits to daydreaming about the same thing); and "You

would like to let him see you suck my dick before he goes away."

Finally, during the final prison conversation which was recorded on December 8, 2001, the

day before Nathaniel Jackson was released from prison, the following exchange took place:

10

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5698

Nathaniel Jackson: "I am going to need just one thing."

Donna Roberts: "What?"

Nathaniel Jackson: "I just need to be in the house when he come home."

WHEREFORE, for the above-given reasons, Affiant truly believes that probable cause his

been established to charge both DONNA ROBERTS, 254 Fonderlac, SE, Warren, OH 44484; DOB

███████ and SS #███████ and NATHANIEL E. JACKSON, ███████

Youngstown, Ohio; DOB ████; SS#█████ with the crimes of AGGRAVATED MURDER

§2903.01(A) and AGGRAVATED BURGLARY §2911.11(A)(1)(3) and after due consideration,

Affiant further prays that this Honorable Court issue upon the Prosecutor's Complaint warrants for

the arrest of said DONNA MARIE ROBERTS and NATHANIEL E. JACKSON.

FURTHER AFFIANT SAYETH NAUGHT.

————————————————————
DETECTIVE PAUL MONROE
AFFIANT

Sworn to and subscribed before me, a Common Pleas Judge, in and for Trumbull County,
Ohio, this

————————————————————
HONORABLE JOHN M. STUARD
JUDGE, COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

11



OK L+
8757 S. Avon Belden Rd.
,RATION, Ohio
44044

Donna Marie Roberts
P.O. Box 1463
Warren, Ohio
44482

844R2+1483

CLEVELAND OH
31 OCT
PM
2001
447

HEy you!        MONDAY OCT 29, 2001        9:00 P.M.

          WhAts going on my love? well ye
BABy I Do have An IDEA OF how much you miss
me. An BABy I know Its A whole lot. An I miss
you even more! An BABy STOP ASking me Do I
REAlly love you, BECAUSE you know I Do.! Right Now
AN FOREVER! oKAy? AN how Do you Know FOR SURE
well Don'T you Think ThAT I would have Been gone
AFTER All OF This TiME? An hell No you'RE NoT Foolin
yourSElF AgAiN, Be you've NEVER Fooled yourSElF FROM
The Beggining BECAUSE My love has NEVER STOPPED.
FOR you An NEVER will! well Tell ME whAT hoTEl
Do you WANNA go To? BECAUSE something wiTh A
JACUZZi, AN Room SERVICE Do SouND good. AN yES ThAT
whAT I WANT, An SoME WEED SoME good WEED, SO
WE CAN REAlly BE RElAxED AN MAKE love FOR A long Tim
An I WANNA Being All OF The FREAK ouT OF you;
AN I WANT A BoTTlE OF HENNESEy FROM The liquoR STORE
oKAy FoR The AFTER PARTy FoR when we geT BACK To
The hoTEl, An AS FAR AS The RoBEET PRoblem? yES I'M
TAKing CARE OF ThAT The NEXT NighT, BECAUSE I Told
you I'm TiREO OF living like This when I Don'T
have To. An AFTER ThAT will you geT ME A 2002
CADillAC DEVille? BECAUSE I DREAM OF iT Alot. SO
DoN'T woRRy No moRE BECAUSE ThAis FoR suRE! AN
No I DoN'T WANT No-ONE ElSE To EVEN KNow
ABouT This, An yES I will BE 100% SAFE oKAy.
AN I DoN'T NEED KNow... moo ...... A .. .. Sao

AS WHAT TIME THAT I'll BE leaving from here? Well i
in the morning sometime, so when I get to the
Bus Station up in Elyria I'll call an let you know
at what Time that it get to the Akron Greyhound
Station an then maybe you can be there waitin
for me will you. Please? An No you are no
allowed to send me a Ticket, But I'm still check
up on that. An as far as where this place is? It's
in Grafton ohio, But from what I saw on the
schedule is that the Bus goes to Cleveland first
An I will be there for awhile so I might have
you to pick me up in Cleveland because I have
To Be with you as soon as possible, An this is how
you will believe that I love you 100%. When I
Take care of business? An then you'll see that I
Really love you an wanna be with you, Because if
I didn't love you an didn't wanna be with you
well I wouldn't be willing to do something this
serious don't you think? An baby I know that you
wouldn't never deny me for nothing That. I really
needed an I told you I was just talking crazy
okay? well what does it make me feel like to
Know that someone really needs me? well honey
Knowing that it's you it makes me feel damn
good! An baby I will never take you for granted
I promise! An how you know that this ain't know
game with you? well you look back to January 13th
2001 to now an figure it out an Tell me am i lyin?

THAT THIS IS A GAME. DONNA I HAVE TO MUCH JOI
FOR YOU TO PLAY A GAME WITH YOU! SOMEONE ELS
YES! YOU HELL NO! BECAUSE YOU ARE 1ᵗᵐ PRICE
SO DON'T EVER THINK THAT! AN AS LONG AS YOU
KEEP THAT BULLSHIT IN YOUR HEAD YOU'RE ALWAYS
GONNA BE FUCKED UP! AN YOU STILL DON'T BELIEVE
ME AN THATS WHATS PISSING ME OFF! I MEAN YO
ASKED FOR THE TRUTH AN I GAVE IT TO YOU BUT
YOU'RE STILL PLAYING ME LIKE I REALLY HAD SOMETHIN
GOING ON, ESPECIALLY WHEN I TOLD YOU THE HONEST
TO GOD TRUTH, SO HOW COULD YOU KEEP BRINGING
UP SHIT THAT YOU READ THAT WASN'T REAL? TALKING
ABOUT WHAT I TELL YOU - YOU CAN THINK OF ME
SAYING IT TO HER, WELL DONNA YOU REALLY ARE FUCKED
UP AINT YOU? FOR THE LAST TIME I DON'T EVER
WANNA HEAR ABOUT THAT SHIT AGAIN! EVER! BECAUSE
DAMN IT YOU CAN'T SEE WHO THE FUCK I REALLY
LOVE AN NEED? HUH? BABY I'M SORRY! BUT I'M
JUST TIRED OF HEARING ABOUT IT, DONNA YOU KNOW
I LOVE YOU, AN NEED YOU. I MEAN MY LETTERS CAN'T
TELL? I MEAN BABY LOOK HOW MUCH I WRITE TO
YOU? AN BABY YOU ARE THE ONLY ONE THAT I
WRITE BECAUSE I HAVE NO TIME FOR KNOW-ONE
ELSE, DONNA DO YOU REALLY REALIZE THAT YOU ARE
ALL I HAVE? NO READ THAT AGAIN! AN I MEAN
I TRUELY LOVE YOU! DONNA I LOVE YOU!!!
AN I NEED YOU IN MY LIFE! AN I KNOW YOU
SAID THAT YOU DON'T WANT ME TO BE STRUNG OUT

OVER YOU, BUT DONNA THIS IS SOMETHING THAT I C(
HELP, BECAUSE IT ALL GOES WITH THE LOVE AN MY
FEELINGS. SO THAT PART I CANT HELP, AN IF I
COULD I WOULDN'T WANT TO ANYWAY BECAUSE I SE
GOOD BEING STRUNG OUT OVER YOU. BECAUSE THAT LE
ME KNOW THAT YOU ARE NOT GOING KNOWHERE.

AN YOU SAY YOU KEEP THINKING ABOUT THE FIRST
DAY I COME HOME AN DO I THINK THAT WE'LL MAKE
LOVE ON THE FIRST DAY? WELL HELL YEAH! NO MATTER
WHAT! AN EVEN IF I GOTTA COME TO THE HOUSE AN
SHOOT ROBERT IN HIS FUCKING HEAD YOU'RE GONNA BE
WITH ME. AN DO YOU KNOW WHAT MANDATORY MEANS?
WELL ITS MANDATORY THAT WE BE TOGETHER. AN YES I
DO BELIEVE THAT I'LL BE IN THIS CELL UNTIL DEC. 9TH
BUT I JUST GET A LETTER IN THE MAIL AN IF YOU
REMEMBER I TOLD YOU THAT I HAD WROTE COLUMBUS
TRYING TO GET DOWN THERE WHERE MY BROTHER IS AT
AN THEY JUST SENT ME A LETTER SAYING THAT THEY HAVE
TO CHECK THEY FILE AN IT HAS TO BE DECIDED THROUGH
A PANEL SO I'LL JUST WAIT AN SEE WHATS GOING ON
BUT UNTIL THEN HELL I DON'T HAVE MUCH TIME LEFT
BECAUSE I'LL BE HOME NEXT MONTH AN BY THE TIME
YOU GET THIS LETTER I KNOW THAT IT WILL BE NOV!

AN YES DONNA MARIE I AM MORE THAN SURE
THAT YOU ARE THE ONLY ONE THAT I'M CUMMING HOME

POINT IN MY LIFE, BECAUSE I LOVE YOU. A KNOW
PROBATION! SO WE REALLY DONT HAVE TO WORRY ABO
GETTING CHECKED UP ON, SO THATS THAT. I'M COMIN
HOME TO MY BABY AN MY BABY ONLY! DONNA
MARIE ROBERTS Jackson HOW WOULD YOU LIKE MY
LAST NAME? YOU WANT IT? REALLY DO YOU? N<
YOU TELL ME HOW MUCH love DO YOU THINK THAT IS?
    DONNA I love YOU, AN I WANT YOU TO MARI
ME, AN DONNA- I MEAN THIS FROM MY HEART! WI
YOU MARRY ME AFTER I TAKE CARE OF THINGS?
SERIOUSLY! WILL YOU? I LOVE YOU DONNA.

            WELL I'll CLOSE FOR NOW

P.S,
HEY DON'T FORGET                    I LOVE YOU
TO GET THE BEST                     NOW AN FOREVER
WEED, A SMALL BOTTLE
OF HENESSEY AN A                    NATHANIEL EDWIN JACKSON
BOX OF BLUNTS, SO.                     LOVES
WE CAN HAVE OUR WAY                 DONNA MARIE ROBERTS
AN I WANT THE BEST                     ONLY!
hOTEL WITH A JACUZZI
SO WHEN THE TIME COMES              P.S.
JUST MAKE RESERVATIONS OKAY?           I'll HAVE YOU SOME
                                       CUM ON MY NEXT
                                       JETTER I PROMISE



Doc C.L.
2075 S. Avon Belden Rd.
Grafton, Ohio
44044.

444B2+1483

Donna Marie Roberts
P.O. Box 1483
Warren, Ohio
44482

Hey you          FRIDAY OCT. 26, 2001     7:45 P.M.

What is going on with my BABY? An how ARE you?. BABY I miss you so much. An can't wait to be with you so that we can share our love juices together, An this time DONNA I want you to let it all out An I don't care how loud you think that you are gonna scream BABY I wanna hear it all An then I'll really know that I'm doing right./ So can I hear it all this time? Promise? I mean BABY let it all out Because I don't want you to. hold nothing BACK from me, An the more. I hear you scream the harder I hit it. An the same goes when I eat that pussy. BABY if you got anything to say BABY just say it Because that turns me on so much when I hear your voice while we're having se. An sometimes Just your voice alone makes me cum so good An hard. As you can see I don't hold BACK on nothing Because you are my woman so I feel good expressing my sexual feelings with you, Because you are so DAMN good & An I wanna make sure that I'm as good for you as you are for me. DONNA you are DAMN good & So listen here even if you can't spend the whole night with me, I still gotta see you Because you have to bring me some money so I can get a hotel room, An like I say Just tell him that TAUSHIA want you to watch the kids while she takes the BABY to the hospital, so that way we can atlease get to spend some hours togather...

AN THEN AFTER THAT YOU DON'T EVER HAVE TO WORRY ABO MAKING KINOW MORE EXCUSSES TO him, BECAUSE he will NO longee BE WITH US AFTER 12-10-01 [R I P] AN THEN IT'll BE me AN YOU TOTALLY AN [E N I S S / T S] COMPLETELY, HEY ! GUESS WHAT I FOUND THE OTHER DAY AFTER I got out of THE SHOWER? WELL I WAS COMBINY MY hair AN GREASING IT AN THERE IT WAS A STRING OF GRAY hair, YOU'RE STILL GONNA love me AINT YOU? ☺ HEY I looKED AT IT AS A good sign BECAUSE I WAS BLESSED long ENOUGH TO SEE A PIECE of GRAY. WHAT YOU THINK? SO WHATS GOING ON WITH MY BABY? DONNA I REALLY love you SO MUCH! AN I'M GONNA KEEP loving you AN NOW AllS I DO IS SIT HERE AN STARE AT MY BABYS PICTURES AN SPEAKING OF PICTURES THEY SENT THE OTHER ONES BACK SO AS SOON AS THEY GET BACK MAIL THEM RIGHT BACK TO ME BUT THIS TIME YOU HAVE TO PUT THREE IN EACH letter SO SEND THEM All BACK BUT JUST PUT THREE IN EACH letter. BECAUSE I DIDN'T KNOW THAT I COULDN'T HAVE THEM All AT ONE TIME, BABY THIS PLACE IS SO STUPID, AN KEEP SENDING ME ENVELOPES TOO BUT DON'T PUT THE ENVELOPES IN THE letter WITH THE PICTURES, AN DON'T WORRY ABOUT WRITING PAPER BECAUSE I HAVE ENOUGH OF THAT NOW, AN PUT YOUR PUSSY IN THE MAIL TO SO THAT I CAN EAT IT, yummy! BABY I love your PUSSY BECAUSE ITS THE BEST! SO ARE YOU GONNA GO AHEAD AN OPEN UP TO ME COMPLETELY AN LET EVERYTHING OUT! PROMISE! AN YOU KNOW THE PART

3

SAID THAT WE'll MAKE love UNTil WE ARE BOTH EXHAUST
AN THEN you'll JUST SUCK my DICK while I JUST lay
THERE AN EVEN iF ITS soFT you'll JUST KEEP SUCHing iT
Well DONNA THATS JUST WHAT I WANT AN I WOULD love
THAT SO MUCH TO JUST lay THERE AN lET you SUCK THiS
DECK As long As you WANT WILL you DO THAT? AFTER
WE FiNish MAKing love TO WHERE WE CANT Go 'KNOWMOR'
AN JUST SUCK my DiCK UNTil you gET TiRED? AN ANOTHER
THing I READ iN youR lETTER WHERE you ASKED ME DO
I THiNK you'Re PRETTy? AN DONNA you KNOW I AlWAyS
TolD you THAT you WERE BEAUTiFul AN you USE TO Tell
ME STOP, Well JUST TO lET you KNOW Hell yeAh you'Re
BEAUTiFul AN I love you so much oKAy? Well AS FAR
As THE C.O. guy JUST ASK him coulD he PlEASE STOP
BoTheRing you BECAUSE you DON'T WANNA BE RUDE BUT he's
MAKing you FEEL THAT he's TRYing To FoRCE hiMSELF
oN you, By hARRASSiNg you, So ASK him oNE MoRE
TiME coulD he PlEASE STOP CAlling IF IT AiNT ABoUT
A Bus TiCKET BECAUSE you DON'T WANT NOThiNg To Do
WiTh him, BECAUSE you DoN'T liKE To BE FoRCED UPON
NOThiNg THAT you DoN'T WANT, AN you DoN'T WANT him
So PlEASE STOP oFFERiNg you oUT, AN TELL hiM JUST
liKE I WRoTE iT DowN. AN I CAN'T WAiT UNTil
DECEMBER, AN ASK him Do he hAvE A PRoBlEM WiTh
gETTing him A WoMAN? AN IF he SAyS No WEll THEN
Tell him Why DoN'T he go AN gET oNE AN lEAvE you
AloNE BECAUSE you DoN'T WANT KNOW PARTs oF him AN
IF he DoN'T gET iT THEN. Well JUST SCARE him ...iTA

THE HARRASMENT CHARGE AN I BET he'll leave you
ALONE Then WELL I JUST READ OVER ONE PART where
you SAID he SAID ThAT I'll JUST hurt you AGAIN wel
DONNA what DO he mean Ill hurt you AGAIN? you
SEE ThAts wHERE you GET youR SELF IN TROUBLE AT
BECAUSE you THINK EVERYBODY is So NICE AN you
WANNA BE so FUCKIN FRIENDLY AN START POURING your
INSIDES OUT TO SOMEONE THAT you DON'T EVEN KNOW
AN MAYBE iF you WOULDN'T BE TELLING EVERY FUCKING
BODY EVE BUSINESS WELL THEY WOULDN'T KEEP TRYING
TO hIT ON you. For ONE I'VE AlWAys Told you THAT
YOU DON'T hAVE KNOW RIGHT TELLING AnyBODY ThAT I'M
locKED UP BECAUSE you AINT Doing NOTHING BUT OPENING
yoURSELF UP, AN THEN IF you STOP TRYING TO BE SO
FRIENDLY TO EVERYBODY MAYBE you WON'T hAVE TO WORRY
ABOUT THAT PEOPLEM, BUT NOT ONLY FRIENDLY! STOP TELLING
My BUSINESS TO PEOPLE I DON'T KNOW! AINT NONE
OF THEY'RE FUCKING BUSINESS wHERE youR MAN is AT
AN BABY I'M SORRY ThAT I CAME DOWN oN you SO
HARD BUT you GOTTA LEARN My WAY IF you'RE GONNA BE
wITh ME, BECAUSE like I SAY I KNOW The gAME! AN
The gAME is SHRUDE! BECAUSE its like This I DON'T KNOW
you FROM A CAN OF PAINT RIGHT? AN you TELL ME you
GOTTA MAN, WELL OKAY I hEARD you BUT I DON'T CARE
AN IF I DID I WOULD hAVE RESPECTED The FACT AN
MOVED oN BUT KNOW I WANNA FUCK you So I'M
GONNA STILL KEEP AT you AS A NICE FRIEND, BUT i

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5710

5

SO I'M GONNA KEEP ON WITH DINNER OR MAYBE A
MOVIE OR EVEN A WALK IN THE PARK, BUT I KNOW YE
GOTTA MAN, AN YOU ALWAYS TELL ME HOW MUCH YOU
LOVE HIM SO I KNOW THAT YOU'LL NOT GONNA LEAVE
HIM, AN I KNOW THIS BUT I JUST KEEP AT YOU
BECAUSE I JUST WANT WHAT I COME FOR? AN THATS
THE PUSSY OR MY DICK SUCKED. AN WHY SO I CAN
HAVE SOMETHING TO TELL MY NIGGAS YEAH I FUCKED THE
WHITE BITCH FROM THE GREYHOUND STATION AN SHE SUCKED
MY DICK AN THE BITCH GOTTA MAN THATS IN THE JOINT AN
SHE'S OUT HERE FUCKIN AN THEN YOU'RE LABELED AS A
HOE BECAUSE WHY ELSE WOULD I WANNA BE YOUR FRIEND
HELL I GOT MY OWN JOB, MY OWN CAR SO ITS SOMETHING
THAT I'M MISSING? EXACTLY THE PUSSY I MEAN WHY ELSE
WOULD I KEEP AFTER YOU AN KNOWING YOU GOTTA MAN!
AN HE FIGURED IT OUT JUST AS HE PLANNED IT WELL I'LL
CALL AN SAY GOOD MORNING AN SOFTEN HER UP A LITTLE AN
THEN MAYBE LATER ON I'LL THINK OF SOMETHING ELSE SURE
AN SOFTEN HER UP A LITTLE MORE, BUT ALL THIS TIME YOU'RE
THINKING THAT THEY'RE YOUR FRIENDS, WELL THERE IS KNOW
FRIENDSHIP WHEN WE DON'T HAVE KNOW UNDERSTANDING
BECAUSE IF YOU CAN'T RESPECT THE FACT THAT I'M WITH
SOMEONE AN LOVE THEM WELL THEN WE AINT GOT NOTHING
TO TALK ABOUT, BECAUSE DONNA WHEN YOU SIT THERE AN
TALK TO SOMEONE ON THE PHONE WELL YEAH I'M GONNA
CALL BACK TO, DONNA YOU HAVE TO TELL THEM STRAIGHT OUT
THAT THIS IS A PLACE OF BUSINESS AN NOT KNOW
DATING GAME AN THE SAME AS TH- D:

6

YOU'RE SCARED TO HANG UP ON THEM, I MEAN YOU HUN
UP ON ME, DONNA YOU HAVE TO STOP BEING SO LOOS
BECAUSE IF THEY SEE A LOOSE OPENING THEY'RE GONNA TRY TO
GO IN ITS AN BABY YOU GOTTA LET THEM KNOW! FUCK
PLEASE! LISTEN HERE STOP PRESSING ME! BECAUSE I DON'T
WANT NOTHING YOU HAVE TO OFFER THANK YOU AN HAVE
A NICE DAY. OR DO THAT MAKE YOU IMPORTANT BY
HAVING ALOT OF FRIENDS AN THEY ALL ARE GUYS! AND
BABY I DON'T GIVE A FUCK ABOUT KNOW FRIENDS, BECAUS
YOU ARE THE ONLY FRIEND I NEED. AN BABY I'M NOT
SAYING ALL OF THIS TO MAKE YOU TURN AGAINST PEOPLE
BUT BABY I LIVED THAT LIFE AN I HAVE DONE THEM
THINGS IN THE PAST, I MEAN YOU AINT MY FRIEND IF
YOU CAN'T RESPECT THE FACT THAT I TOLD YOU THAT I'M
WITH SOMEONE AN THAT I LOVE THEM, BECAUSE WHAT DO
I LOOK LIKE GOING OUT WITH SOMEONE THAT MY MATE
DON'T EVEN KNOW AN I REALLY DON'T EVEN KNOW. SO
ALLS I WOULD BE DOING IS DISRESPECTING MY MATE
AN THATS WHY I SAY THAT THOSE ARE KNOW TYPE OF
FRIENDS NOT THE ONES THAT TRY TO GET YOU TO
DISRESPECT YOUR MATE AN BABY I KNOW YOU WON'T
DO THAT BUT I'M JUST LETTING YOU KNOW HOW THE
GAME GOES ESPECIALLY WHEN YOU THINK THAT THEY ARE
SO SWEET BECAUSE THAT ALONE HURTS ME ITSELF WHEN
YOU TELL ME, BECAUSE THERE IS KNOW OTHER SWEET
WOMAN AN I DON'T CARE HOW NICE SHE BE TO ME
OR HOW FRIENDLY BUT ITS ONLY ONE SWEET ONE FOR

7

WRITE AN TELL ME how hANDSOME ANOTHER MAN IS
OR how SWEET THEY ARE BECAUSE RIGHT THERE you'RE
JUST lETTING ME KNOW THAT you'RE lUSTING, BECAUSE
I COULDN'T NEVER FIX MY MOUTH TO TELL ANY WOMA
THAT ABOUT ANOTHER WOMAN BECAUSE THAT MAKES HER
FEEL lET DOWN, AN BY you TELLING ME THAT JUST
MAKES ME MAD, AN I DON'T WORRY ABOUT GETTING lE
DOWN BECAUSE I KNOW I'M A CHARM BUT ITS JUST
WHERE WE COME FROM WE DON'T SAY THINGS liKE
THAT BECAUSE IT WOULD CAUSE A FIGHT, BECAUSE you
DON'T NEVER TELL ME how hANDSOME ANOTHER MAN
look AN I DON'T NEVER TELL you how good ANOTHER
WOMAN look, BECAUSE ITS ABOUT US! BUT DON'T WORRY
BECAUSE I'M gonna BREAK you iN JUST THE WAY I
WANT you AS SOON AS I TAKE CARE OF BUSINESS A,
ITS gonna BE MY WAY OR NO WAY you hEAR? An
DONNA you KNOW THAT I'M JEAlous SO PLEASE STOP TELLING
ME how SWEET you THINK ANOTHER guy is OR how
hANDSOME you THINK he iS, BECAUSE I DON'T CARE
TO KNOW, AN AllS THAT DO when you TELL ME how
SWEET ANOTHER MAN iS - iS JUST MAKE ME THINK
THINGS THAT i DON'T WANNA THINK, BUT NOT SAYING
you goTTA STOP TELLING ME EVERYTHING BUT THAT hANDSOME
AN SWEET SHiT goTTA go, BECAUSE I DON'T CARE TO
KNOW ABOUT ANOTHER NiggA OKAY! SO STOP THE MADONNA
AN BABY I'M NOT SAYING THAT you ARE GETTING lECTURED
BY ME BUT SOMETiMES DO you STOP AN THINK OF

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5713

8.

OR WHAT MIGHT HAPPEN IF YOU GET TO FRIENDLY WITH
THEM AS YOU PROBABLY DO EVERY OTHER BLACK MAN
THAT COMES IN THERE, AN TELL THAT C.O. LIKE THIS
IF YOU HAVE TO CALL HIS JOB ABOUT HIM HARRASSING
YOU WELL YOU WILL AN BELIEVE ME HE DON'T WANT
KNOW NAME LIKE THAT AN PUT A BIG SIGN OUT
THERE THAT SAYS NO LOITERING FOR BUSINESS PURPOSE
ONLY! ALL OTHERS WILL BE PROSECUTED! THANK YOU.
AN WHEN HE COMES IN JUST LET HIM KNOW THAT YOU
WOULD LIKE FOR HIM TO LEAVE YOU ALONE, BECAUSE
YOU HAVE A BUSINESS TO RUN. AN DONNA I KNOW
THAT YOU ARE FAITHFULL AN TRUE AN THATS WHY I LOVE
YOU SO MUCH BECAUSE YOU ARE A REAL WOMAN AN YOU
LET YOUR MAN KNOWE EVERYTHING THATS GOING ON, AN
DON'T WORRY BABY BECAUSE YOUR MAN WILL BE HOME
REAL REAL REAL SOON, AN BY THE TIME YOU GET THIS
LETTER IT SHOULD BE 39 DAYS LEFT 5 WEEKS TWO DAY
AN THEN I CAN SHOW YOU JUST HOW MUCH I MISSED
YOU AN JUST HOW MUCH I NEED YOU, HEY DONNA JUST
THINK COME 12-11-01 YOU'LL BE WAKING UP TO ME
OR MAYBE WE'LL GIVE IT A COUPLE OF DAYS TO LET
THINGS LOOK COOL AN THEN AFTER THE FUNERAL BABY WHEN
I COME HOME I'M NEVER LEAVING AN WE'RE ONLY DOING
IT LIKE THAT JUST TO MAKE IT LOOK GOOD, BUT THEN
AGAIN WELL WE'LL SIT DOWN AN DISCUSS THIS WHEN
I COME HOME, AN DON'T WORRY BECAUSE I'M GONNA
BE ALRIGHT OKAY! AN I PROMISE YOU THAT, AN THE

Alls I need is for my baby not to worry an leave everything else up to me. An I told you Donna that I'm levely in love with you. An that why its time that we really be together because I'm tired of my baby taking all of that mental an physical punishment. When she doesn't have to, an yes Donna I love you enough to do whatever I have to do to be with you. I love you Donna baby I really do. Well I'm gonna close for now an just keep parking the car around the front because I don't want you leaving from out back an once I get out, I is gonna be alright because Daddy will be there. Okay?

I Love you !!
I miss you !!
I want you !!
I need you !!
I got you !!

Now you wonder where you get so much to say. At nine press Donna wow, an it makes me feel good talking to my bac

I Love you Donna Marie forever !!

P.S.
Don't forget when the pictures come back to send there in each letter.

An don't forget...

Monday, Nov. 26  1:00 pm          12 DAYS 

My dearest sweetheart,

I love you so much honey & And I wish you could
see me & feel me & my warmth when I say that so you
could really know how much those 3 words mean when
they come out of this mouth. This mouth is yours too &
Whatcha gonna do with it?

Note, the more I spend time here at work & meet
certain people, the more I learn about the nature of people.
I guess I have always been too trusting & too gullible because
I never had any reason not to be. You have to remember,
I worked for a high class Miami PLASTIC surgeon, the top of
the medical line. The people I met there for 25 years were
quite affluent. The only exposure I had to the streets
were at Thanksgiving & Christmas when I'd go & feed the
needy. Our patients were high class people who could drop
$10,000-50,000 just to look & feel better! In cash - no
insurance loves cosmetic surgery. Even the drug dealers
who had accidents & needed scar revisions had class & money.
I lived in such a protected & different world & therefore
never developed instincts or knowledge of the real life out
there. Even Michael's dad & I went to college together &
he was a scientist & teacher, marine biologist. So please -
before you get short tempered when I fuck up- remember -
I am just ignorant when it comes to another lifestyle.
I mean - remember when we met? I never thought not to
trust you or to be leery of you. Never once. I mean I
really didn't know you or your history. See how I am?
Well, make that WAS. Because I am sure learning the
hard way. I mean you're dealing with an older woman who
didn't fear going in the hood to buy drugs you know! Any
one with 1/2 a brain would have been scared shitless. Plus, I
always felt like someone was always watching over me & I
guess they were cause I'm still here &

So please don't get angry with me if my guard is
not always up because I am still just your new student
in life! And I know that you will teach me well. In fact
I am 100% depending on you. For real.

Now speaking of being dumb, well I am so fucking
pissed off about that gun. You just can't fathom exactly
how very very pissed off I am. PISSED OFF & FUCKED UP.
That was a beauty.

So I went to where he works, gave him one chance to
return gun & money + he said he did it have it (what else?)
And I called the police. After waiting 1/2 hour I called
back + they then said I need a different police dept, and by
then I had to some back to work. So I called + they
said I could come in after work. Oh - and the bastard
called me this morning again! I didn't talk to him or
say a word until I got to his job. Oh - he's gonna get
his that's for sure! Oh yes because one minute after
the 5:15 bus leaves here tonight - I am at the police
station. And now he can sweat it out. And to think
of all the shit he tried on me! Never again. You see -
one son of a bitch ruins it for everyone + the next person
wonders why you don't trust them one iota.

So don't you worry your pretty head about it +
let's go on with our lives. Okay? And I'll report it
missing + contact State Farm, and do whatever comes
next. It only worries me what he might do because he
got all fucked up every time I said "No, I love Nate."
He may come here + shoot me with my own gun. But I
have my .38 Taurus right here by my right hand + if
he comes barging in here he's a dead man cause I am
a very good shot. An excellent shot baby. And when
it comes down to protecting myself, my son or you -
look out - I am a different person - I am a lunatic
fucking animal. You really don't ever want to see me
like that. Remember inside this gentle veneer is a woman
who has given CPR to dead people trying to get them back +
sewn people back together + worked in 2 wars + I lived
right in North Miami Beach for 28 years! Okay? So don't

ever think I am a complete burden on you. I am tough when I have to be. And also, you know that when I want something bad enough, I'll do anything & everything I have too. Like you. I want you Nate. And you see what I have done to be with you if only for an hour. So fuck, if only to come & see you & get a hug & kiss.

I love you so much honey. Gee, it makes me feel so good when I say that. I love you Nate.

Thank you for the list in advance. I will have whatever you need for you but you already know that. Plus alot more & you know that too. I love to spoil you and be the one who makes you smile with happiness when you know & see who cares about you so much.

I was almost gonna get you silk boxers – they were in my hand – why didn't I? Damn! I'll go back & get them. I love to feel my baby's dick rubbing on it thru silk. Oh that is so sexy! And seeing it get big & hard & poke against that silk. "Hurry home!" Silk covered dick – that's just the basic beginning for the man I love.

Now for the other thing. I only worry about losing you or losing me to incarceration. You know I will be the first one to face questioning. I don't want to have to get an attorney & defend myself. Oh & I have some info to add to our plan. You know there are phone records + CCA pass records. Well – everyone thinks he is gay – did you know that? It's been whispered alot in youngstown. The good part is that he is the one who wrote & paid the checks on the phone bills – his writing. So – he knew about you. (NOT really) But the whole phone thing could be good because it shows you were ~~both~~ of ~~our~~ friend. A friend to both of us. And maybe you were a real good friend of his. Anyway, your hair & prints could be anywhere since you drove the car & were here & all. But I think it's all gonna come down to me when I get that call. And I can handle that because it means everything to us both. I am not even worried about it any longer because I've thought

about it alot & am prepared. Instead of laughing and cheering, I will concentrate on losing someone that I would really gets nuts over & react accordingly. Just tell me how you're gonna be here for weeks without anyone knowing - that will be a real hat trick. Huh? And after it's over, I can get a place for you even here in Warren for a couple weeks because who is to tell me not to? Oh - I have been all over looking for a ski mask. I only see those knitted caps. Any suggestions on who might have them? And I'm still looking for gloves because I don't think the thick ones I'm seeing are good to work with so would be thinner leather ones. Know what I mean?

And yes, sneaking to see you for a couple hours doesn't do it. It leaves us both with no real life together + when you go your way, you have to fend for yourself + eat alone + sleep alone + be out with the wolves. And me - I too exist in hell on earth. Like last night - I got so sick of just looking at him. And hearing the same shit over + over. And smelling his breath. And every other little thing - it's all bad. And seeing his skin. And watching him walk - or breathe. I can't hold in my disgust + contempt for him well at all + he sees it every time he looks at me now. Which makes him feel worse about me in return. Which makes him talk to me + treat me like dirt.

And that reminds me - when you get upset with me about talking to someone or trusting someone - I want you to think about how much I love you + what happened to me on 9/24. Then add him in. Now imagine how thoroughly fucked up I was. I was just about ready to give it all up. All up - even my life. It couldn't get any worse than it was then. I could barely manage each day for weeks. Plus being physically sick too. So you've got to give me a little leeway + not be too upset with me or think I was plain stupid. I had to talk to someone + even that took awhile before I could ever talk. Have mercy on me.

It's 3:00 already. I was busy in between writing. Not busy enough though.

Well, I lost 2 more pounds + now it's beginning to be not so good. I look in the mirror + examine myself + I don't like what I see. My skin is starting to sag! This is not good. Please don't look at me too close okay? But I really do look great in clothes again. You'll be proud of me by your side honey. Well, I sure hope so anyway.

I never got a chance to tell you what I did yesterday. I went to one of the apartments (the one I had to go to court + evict) and cleaned + painted walls all day. It was good to do something physical for a change. The good part is it is already rented again. To a woman + her daughter + I reduced the rent from $400 to $350 to get her in there - good business - better rented for a little less than to remain empty. While I was cleaning I wore rubber gloves - I don't ever like to clean my own dirt! Then last night I started cleaning around the house. I did the one bathroom - boy was it a disaster! Tonight I'll do another room + so on until it's decent. I think the dust in the den is about an inch thick + you know there are a million knick knacks in there! Help !! The trick is for me to keep you in mind + it becomes a pleasure rather than work. I'd like to get some silk sheets but I'll have to wait 'til after I can use my charge accounts again. They are soft + sensuous, don't you think?

Busy again. Dull again.

So how the heck are you anyway? I know you're all excited! Me too. In fact the sleepless nights are here again. I'm like a kid at Christmas - absolutely cannot fall asleep thinking about my own very special XMAS = 12/9. I wonder how the week supply is. I haven't gotten any lately because I have to save up for other stuff. Like weed for US. And goodies + clothes + a room etc. I think I'll be able

to manage it all though. I'll figure out a way. It seems like when it comes to you, I always do.

Last night while I couldn't sleep, from like 11:00 - 3:00 I was thinking again about making love to you - the man I love. Boy, I am so wild for that now that I was thinking of every freaky thing I can do! I wonder how you'll feel inside me after 3 months + one week! It has taken alot of imagination to pretend a little white finger is a big black dick!! But loving you the way I do + thinking of making love to you - well, it's managed to keep that little pink thing okay.

So how has your asthma been? Does it get worse with any particular season? And what about the bump on your head? Any more on that? And no more rashes, right? I asked my gynecologist why a man would get a rash on his dick + she said it could be a topical skin allergy or a yeast infection. I didn't even know men get that. Just take good care of your beautiful eyes, your lips, your dick + your ass until 12/9 + we'll be just fine!

Okay baby, I'd better close for now. I'll write again when I get home + sorta spend the evening with you as I've been doing.

You take good care + before you know it, I'll be pulling up in that parking lot to get your sweet ass! And look out!!! Just look out!

I love you Nathaniel.

Always yours,

Tom Marie

P.S. My ass + my
boobs have gotten
alot smaller -
will you still
love me?



Hey you's                 Tuesday Nov. 27, 2001                    7:50 P.m

I'm just sitting here thinking about my Baby an' how much I miss her. How are you doin' doing my love? An' how did things work out about the rent? Did you go to the Flea Job? Did he call you back for that place? Pray you better not never let John ____ ____ no that ____ could for letting ____ know ____ that room my heart, An' baby please be extra careful on how you ____ money in ____ sure it's a secure place, An' ____ another thing, look ____ ____ can ____ get my blue jean Tennis Shoes, An' ____ ____ ____ if I'm ____ there, An' I should have that yellow shirt with the blue on it, An' if it's in there get that out wash ____ An' bring it, An' as soon as I ____ around here ____ I'll ____ one about ____ ____ ____ here in clothes An' baby I hope things work out so you can come up here Saturday ____

          Donna I've been doing a lot of thinking about the two of us, An' also putting this together in our future An' my living Arrangements for when I come home, An' Donna my wife word would be ____ ____ chance if you go against me now what I learn to the next day I come home because if you do that will just let me know that all of that happiness that we talked about was just really a dream, because if I can't take care of it the next day then the rest of ____ ____

is crushed an over, because for one I don't Know where to go, I don't have no-one but you I don't wanna try to survive in the stress is no more, an I don't wanna come back to this place or no other jails, an baby its gonna be a hard time, so I just hope I'm wrong by thinking that you are gonna be against what I'm gonna do, because if you do just think about my life an what its gonna be like for me is I can't be able to come home to you, an donna this is the only way we can have a life, an that will be my only chance at doing it because won't nobody know that I'm home, an you know if I don't do it then an people start seeing us together again an if we did pay somebody to do it you know the blame is still coming to me because they see us together an then he come up missing, but as long as they know I'm locked up well the finger can't be pointed at me or you, so donna this has got to be done, the next day or my life an everything that I ever dreamed about, that would make the rest of our life wonderful would be certain, because we can't have to keep sneaking an then we won't be able to show ourselves together like we want, an everyother wonderful day that we talked about would be what i donna, donna I have to do this! baby I love you with all of me, an if I can't take it no more, donna

That lonely cold world. Ah, no longer knowing that I
can be coming home to you, an I hate to risk my
life by just walking into the station an doing
it an taking the risk of getting away. So if you
really wanna be with me like you say, an if you really
want me to have a real life, well then you could
just sit back do as I say, don't give me the whole
lecture an let things get done an over with, because
the next lecture that you try to give me I'm just gonna
change my mind an ask you to never talk to me about
it again, because Donna you fail to realize that you're
very weak with true street surviving, an I seen chumps
like him get bumped off about thought my life an
ain't nothing never happened. So if you don't want this
done just tell me, an I don't wanna keep hearing
that shit about what if, fuck what if, I can only
go by what's happening at that time, because in street
life what if is bad luck an I hate that word more
than I hate the life I'm living, so if I tell you I'm
gonna be alright an I know what I'm doing, all I
should hear coming from you is baby just be careful
because Donna this is my last option, because I won't
have a life if I don't do this, baby I need you. Donna
do you understand that I'm scared to be in the streets again
Donna, baby I love you an I need you in my life.
Desperately... well I'll close for now baby just to think about
how far we've come, an how much love that we still have

Consolidate

Nathaniel Jackson

Prism 2 yrs
P 3-4 days
he's black - couple whiskers
[illegible] territorial
[illegible] wife [illegible]
[illegible]
[illegible]
CSA to wife —

[illegible] × 3 of [illegible]

C 2900

(Denso)                    Premeditated
                           agg burg/robbery
                           in guys car

[illegible] [illegible]
[illegible] sister

Judge Stuart $
Jim [illegible]

(was assigned)
No prejudice to both

CoΔ - of guilt/ind -
regil of 90% that she/he had failed
long life style

inflund → get me in curelating this relationshp
(organized letter) letters - any indication ud. pros prove the killer?
(activities)

drugs → Δ using crack day of offense

frail ? → tel conversations - put Δ at te chargis
(diff words) why not handled -

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5727

*Sandra B. McPherson, Ph.D.*

Clinical and Forensic Psychologist

12434 Cedar Road, Suite 15
Cleveland Heights, OH 44106

(216) 721-1961
fax (216) 721-1914

## AUTHORIZATION TO RELEASE INFORMATION

TO: Rayen High

Youngstown City Schools

RE: Nathaniel Jackson

DOB: ███████████

SSN: ███████████

You are hereby authorized to release to:

Sandra B McPherson, Ph D

or Donald M McPherson, MEd

and/or their agents or representatives any and all records or other documents which concern me and which are in your posession. You are hereby requested and authorized to permit the aforementioned individuals and/or their agents or representatives to examine and copy any and all of my medical, psychological, legal, education, and/or employment records or any other records they may deem necessary in their work on my behalf. You are further authorized to discuss these records and any other matters concerning me with the foregoing individuals and are asked to assist them in the current investigation.

Signed: Nathaniel Jackson          Date: 8/19/02

Witness: Donald M McPherson          Date: August 19, 2002

135          Mr. Schulay said OK to

I am Mrs. McPherson, psychologist, working with the Nathaniel Tucker Tim Lewis & Consaldry For defense team.
called him

helped around house

good qualities.

have you attended any of his trial, been following it.
can you attend The sentencing trial and make a statement
pleading for his life.

Birth normal

Early childhood

Said he had a lot of behavior problems in school.

Did you know anything about Nathaniel relationship
with Anna Roberts

First leg
problems 1850, about this time he transferred to the transition school

26 H22
½ 30 TH
A good Kd, never got in trouble.
J.C. Jackson [redacted] — uncle, brother of Nathaniel's mom

[illegible handwritten lines]

Office  11/19/85  or  11/20/85

12:30 p.m

This child exhibited signs of <u>emotional illness</u> ——— he was talking to himself, laughing out loud, jumping up and down, having conversation with invisible people, and playing with his imaginary dog "Butch." There was no one else in the office around him at this time — "empty seats".

I, Mrs. L. McElroy, walked into the office to get mail out of my mailbox and observed this student seated in the office. Principal and other students were in the doorway. My presence did not distract or deter his actions, in the least.

Mrs. L. L. McElroy

11/26/85

Dear teacher)

Please Excuse Nathaniel Jackson from School Monday
he has to go to the place office the appointment
is Thursday at 1:30 so he won't be in school Thursday
at all because a Woman and Man shot at him
so I got to take Nathaniel Back down to the place
office. Wednesday at 1:30 Thursday
            thank You)
            Mrs Pauline Kverneagy

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5731

Senior

Student Number: 0016-77-20

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

NAME JACKSON, NATHANIEL ___ DOB ▓▓▓▓ TEST DATE 1-17-86.

ADDRESS ▓▓▓▓▓▓ SEX M REFERRED BY School
Charles/Pauline
PARENT(S) Korneagay ___ GRADE 7 ___ SCHOOL Adams Jr. High

HOME PHONE ▓▓▓▓ C.A. 13-11 ___ EXAMINER J. Seiser

REASON FOR REFERRAL Disruptive behavior. Low Achievement.

TEST RESULTS..

INTELLIGENCE

Wechsler Intelligence Scale for Children - Revised

Verbal I.Q. 72    Performance I.Q. 72    Full Scale I.Q. 73

Bender-Gestalt Test    1 Errors

ACHIEVEMENT

|  | Grade Placement | Standard Score | Discrepancy Score |
|---|---|---|---|
| **Reading** |  |  |  |
| Woodcock-Johnson Letter-word Ident. | 6.4 | 88 | -1.0 |
| Woodcock-Johnson Passage Compre. | 4.6 | 75 | -.13 |
| **Math** |  |  |  |
| Woodcock-Johnson Calculation | 4.3 | 63 | +.67 |
| Woodcock-Johnson Applied Problems (reasoning) | 5.2 | 75 | -.13 |

12-19-85  Vision Screening - Failed - Referred for further testing.
          Hearing Screening - Passed

| Scales of Independent Behavior | Age Score | Standard Score |
|---|---|---|
| Math Skills | 12-3 | 92 |
| Social & Communication Skills | 6-5 | 55 |
| Personal Living Skills | 9-3 | 63 |
| Community Living Skills | 9-3 | 63 |
| Broad Independence | 9-0 | 58 |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5732

scores may be depressed by a lack of cultural opportunities or by his impulsive responses.

Achievement. Nate's reading and math skills are fairly consistent with his measured ability. He demonstrated ability to decode words promptly. He made accent errors in more difficult words which it is suspected he would have correctly identified in context. His reading comprehension score was weaker and it appeared that he was losing interest In the math calculation, he completed complex addition, subtraction with borrowing, some multiplication and division. He did one, double-divison, division problem by doing repeated addition. He did not attempt more difficult division or fraction work. He was successful in solving word problems involving money. He had no difficulty in restating the word problem and seemed to know what was expected. A few careless errors depressed his math problem solving score.

A teacher checklist on his communicative status indicates that Nate's skills are below average. Further testing may be completed by the speech clinician.

Visual-Motor. Nate copied the nine Bender designs without error. Th work was fairly well organized on the page. While some of the designs wer weak in angulation, visual-motor maturity is adequate for his age.

Social-Emotional. The Scales of Independent Behavior, a measure of adaptive skills, was completed by Mrs. Pavlone, one of Nate's teachers. His gross and fine motor skills are appropriately developed for his age. Independent functioning is subaverage in the areas of social/emotional, personal living, and community living. Specific difficulties include negative peer interaction (hits, fights, name calling, accepts no criticism), inappropriate use of language (vulgarity), cleanliness in personal care, lack of personal responsibility for being in proper place a proper time, and poor work skills (little attention to tasks). Nate also demonstrates disregard for personal property.

The Hahnemann High School Behavior Rating Scale (HHSB), a classroom behavior rating scale, reflects many of these problems. Significant behavior factors on that measure which hamper educational progress include poor interaction, weak reasoning ability, poor work habits, expressed inability, and restless, disturbing behavior. Nate is on task occasionall but not for very long.

In the projectives administered (House-Tree-Person, Incomplete Sentences), Nate made no bones about the fact that he is aggressive, hate: whites (except for one boy) and intends to hurt them or anyone else who tries to get "through him". There was no evidence of positive feelings towards anyone, including his teachers and parents. ("Ain't nothin' to me"). He projected the idea that he is afraid of nothing, including consequences of his own misbehavior and he admits he feels no guilt about

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5733

NATHANIEL
High

it. Nate wants to project a tough guy image and works hard at not letting down his guard. He did admit, but quickly retracted the statement that he is afraid of getting hurt.

He was openly hostile and antagonistic at the beginning of the testing session. While he did let down a bit, he never did relax in the session. It is possible that he views others as a threat and wants everyone to know he's not to be tampered with.

## Summary and Recommendations

Nate's cognitive, academic, and social development scores are all at subaverage levels. As indicated, his behaviors in the testing may have depressed some of the scores somewhat but the ranges are probably appropriate. A major concern is the constant, open expression of hostility, both verbal and physical, towards others. It appears that this is often done without provocation and without a sense of guilt. Nate expressed deep prejudiced feelings and seems to believe it is right to act in aggressive ways. Several teachers have documented persistent, aggressive behavior in his classes which interferes with work production. Nate failed sixth grade classes for two years and is presently failing all classes in seventh grade. Without some intervention, it is conceivable that he will continue to fail and, also, could cause personal injury to others, including student and teachers. A team conference should be held as soon as possible, to review all data and determine appropriate interventions.

1. Nate needs to develop an appropriate set of standards and values to develop a conscience about his actions and to understand the consequences of behavior.

2. He needs to develop tolerance for those he perceives to be unworthy and to learn acceptable behaviors towards them. His prejudices seem to permeate his thoughts and behaviors. Disruptive behaviors must be remediated.

3. Positive interactive skills with peers and respect for authority need to be learned.

4. The possibility of substance abuse should be explored.

Jo Seiser
School Psychologist

fb

The Public Schools
Youngstown, Ohio
Department of Pupil Personnel Services

PSYCHOLOGICAL REPORT
Confidential -- For Professional Use Only

Name: Nathaniel Jackson   DOB: ███████   Report Date: 2-23-89

Address: ███████████   Sex: M   Referred By: S. Gregor

Parent(s): Pauline Korneagay   Grade: 10   School: Stambaugh

Home Phone: none listed   C.A.: 17-0   Examiner: J. Ciarrochi

REASON FOR REFERRAL

Mandatory three-year reevaluation to determine if Nathaniel continues to
qualify for special education services.

SENSORY EVALUATION

Testing by school nurse D. Halloran on 1-18-89, reveals that hearing is
within normal limits. Nathaniel failed visual acuity screening. He passe
the eye muscle balance test. No vision referral was made because Nathanie
was in the process of getting glasses at the time of the screening.

BACKGROUND INFORMATION

Nathaniel said that he lives with his mother, 18-year-old brother Charles
13-year-old sister Tasha, and ten-year-old brother Patrick. HIs brother
Charles will be graduating from the transitional school this year.

Nathaniel was placed in the Severe Behavior Handicapped (SBH) program
during his seventh grade year (2-18-86). Referring behaviors included
disrespect toward authority figures, leaving the classroom without
permission, disrupting the class, threatening others, and passive-
aggressive behavior.

Nathaniel was placed at Stambaugh Transitional with teacher Sara Revetti
for the remainder of his seventh grade year. He remained at Stambaugh for
grade eight. Because of good behavioral progress, he was placed in a less
restrictive setting, the SBH satellite unit at Rayen High School the
following year. During this school year (1988-89), Nathaniel was
transferred back to Stambaugh because of threatening, aggressive behavior
One day he burned his and another student's worksheets, lay across a tabl
in the classroom, and refused to go to timeout. When the teacher

Confidential Psychological Report - N. Jackson

Page 2

Nathaniel's progress in the SBH program has been inconsistent, which may be
due to periodic poor attendance. Current teacher, Suzette Gregory, said
that his behavior is average for her class and that his academic progress
is above average. Nathaniel is on the fifth grade level in math and on the
eighth grade level in spelling and reading. He failed all subjects the
second grade period because of poor attendance, but earned A's, B's and C's
for the first grade period. Nathaniel is on Level IV of the five-step
behavioral management system. His current problem behaviors are frequent
talking out, including drug talk; trying to sleep in class instead of
working; and resisting direction. In general, Nathaniel gets along
adequately with peers and the teacher. However, he often teases others.

While Nathaniel was at Raven, he had a vocational evaluation. The
evaluation report stated that he had a low level of involvement and
excessive absenteeism. He did interact adequately with co-workers and was
receptive to supervision. Marginal consideration for a program was
recommended.

### CLASSROOM OBSERVATION

Nathaniel was observed for 20 minutes in Home Economics class on 2-16-89.
Time-sampling at four second intervals and anecdotal observation were used.
The three other boys in the class served as the rotating comparison peer.
The activity observed was cleanup after cooking.

Nathaniel was on-task for more of the sampled intervals than was the
rotating comparison peer (68% compared to 32%). His off-task behavior
differed from that of the other boys in frequency, not in type. When
Nathaniel was not on-task, he was walking around the room or talking with
others.

### TEST BEHAVIOR

During individual assessment, Nathaniel was sullen, but followed directions
and put forth adequate to good effort. He was guarded and suspicious when
asked to draw a picture of his family.

### TEST RESULTS AND INTERPRETATION

OVERALL ABILITY

Stanford-Binet Intelligence Scale - Form L-M

| | |
|---|---|
| Chronological Age: | 17-0 |
| Mental Age: | 11-6 |
| Quotient (IQ) | 70 |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5736

THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
PUPIL'S ANNUAL SHEET
PRIMARY SCHOOL

ED 158

| | 9-80 | | 8-7 | m. Jackson, Nathaniel Edwin | |
|---|---|---|---|---|---|
| BORN   MO.   DAY   YEAR | ENTRY DATE | | YEAR  MONTH AGE at SEPT. 1 | SEX / (LAST NAME)   (FIRST NAME)   (MIDDLE NAME) | |

| | Charles Pauline | | | |
|---|---|---|---|---|
| ADDRESS | PARENT | OCCUPATION | | TELEPHONE |

| Roosevelt | 1980-81 | 3 | 100 | Diane Wilson |
|---|---|---|---|---|
| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |

Marking code: Subjects printed in large capital letters will receive
letter marks using the following code:

E = Excellent   G = Good   S = Satisfactory   U = Unsatisfactory.

A ☑ indicates the need for improvement. The absence of check-
marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | S |
| MUSIC | S | S | U | S |
| PHYSICAL EDUCATION | S | S | S | S |

| | Report Periods | | | | | Social Growth | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | | 1 | 2 | 3 | 4 |
| READING Level II "Never Give Up" | S | u | u | u | Conduct | U | u | u | S- |
| * Reading level (Ex. 21, etc.) 3¹ Reader | S | 3¹ | 3¹ | 3² | Accepts responsibility | S- | S | S- | S- |
| Applies phonics skills | S | S | S- | S- | Respects authority | U | u | u | S |
| Reads with understanding | S | S | u | u | Respects rights & property of others | U | u | U | S |
| Knows basic sight words | S | S | S- | S- | Observes school and safety rules | U | u | u | S- |
| LANGUAGE | S- | S- | U | u | Is courteous | S- | u | u | S |
| Expresses ideas well orally | S- | S | S- | S- | Works and plays well with others | U | u | u | S- |
| Expresses ideas well in written work | S- | S | u | u | Study Habits | | | | |
| SPELLING | S- | G | S- | u | Listens well in class | U | u | u | u |
| WRITING | U | u | u | u | Follows directions | S- | S | u | u |
| MATHEMATICS | U | u | S | S- | Completes assignments | U | u | u | u |
| Knows number facts | U | u | S- | S- | Works independently | u | u | u | u |
| Works accurately with numbers | U | u | S | S- | Participates in class discussions | U | S- | S- | S |
| Solves problems with understanding | U | u | S- | S- | Supplemental Programs: | | | | |
| SOCIAL STUDIES | U | u | u | u | Lamps (math.) | | | | |
| SCIENCE - HEALTH | u | u | S | u | | | | | |
| HEALTH | | S | S. S | | | | | | |

ATTENDANCE

KEY:
E - ENTERED   / - ABSENT A.M. ONLY   X - ABSENT WHOLE DAY   - - NOT IN SESSIO
W - WITHDRAWN   \ - ABSENT P.M. ONLY   O - TARDY (NO. MINUTES)   EX - EXCLUDED

| REPORT PERIOD BEGINS | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  9-3 | | E | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|    11-7 | X | X | | | | | X | | | | | | | | | X | | | | | | | | | | 113 | 4 | 0 | 47 | sick, suspended |
| 2  11-10 1-23 | | | | | | X | X | X | X | X | | | D | | | X | X | | | | | | | | | 33 | 8 | 1 | 41 | cdd sick bad cold |
| 3  1-26 3-4 | | | | | X | X | X | X | | X | X | | | | X | | | | | | X | X | | | | 36 | 12 | 0 | 48 | cold & weather cond Babysit |
| 4  3-11 1 in 3 | | | | | | | | | | | | | | | | X | X | X | X | X | | X | | | | 31½ | 10½ | 1 | 42 | |

1st Period  11/7/80-

Nathaniel is doing satisfactory work in reading and enjoys reading. He spells his words correctly in tests, but does not complete his daily work. The same goes in Math & other subjects. He has shown some improvement, but still has difficulty in writing. His understanding of Math is very poor and he is attending Lamps. I'm sure Nathaniel's work would improve if his behavior would improve.

9/80 - Reading Level 11

3rd. Period  5/15/81

6/19/81 Completed Units 1 + 2 of Level 12 unsatisfactory

Nathaniel is improving in Math and Working on his Writing. He still does not complete his work and is not progressing well in Reading. Nathaniel still does get into trouble and has not learned to control his behavior. He can be very nice when he tries.

6/19/81 Nathaniel wastes his time and does not do his work. He could do much better than he is doing. Nathaniel's behavior has shown some improvement, but he needs to improve much more.   D. Wilson

Nathaniel's parents came once after school. His father gave Nathaniel to understand that he is to behave himself & learn.

Passed to Grade 4 Rm. 206
6/19/81

_[handwritten name]_ Nathaniel

Reading Test BBB - _[illegible]_

Complete _[illegible]_ in word attacking, word perception
+ word meaning. Needs reinforcement in sight skill
& needs reteaching in comprehension while
— main idea, inference, details + sequence down _[illegible]_

Poor behavior — always talking - talks back
Paddled — fools around —

Finally settled down — Doing daily written
work of Group I — Tried to jump a book — but
it was too hard —

3/10  Completed 2¹ — Competent in everything
except needs reinforcement in comprehension
+ study skills

Does well in S.R.A.

6/10 Completed 2² — reader _Mustard Seed Magic_
last week of school — too late to be
tested. —

Did 1½ yrs reading this year —
Good reader — but fools around
all the time. Must be kept after to
do his work

Promoted to 3' room — Room/00

# MAHONING COUNTY COURT OF COMMON PLEAS

## JUVENILE COURT DIVISION

### James M. McNally
*Judge*

September 19, 1989

Stambaugh Transitional School
2420 Donald Avenue
Youngstown, OH 44509

RE: Nathaniel Jackson
DOB:

*sent 9-26-89*

Dear   To Whom It May Concern:

Enclosed is a release of information form regarding the above
captioned youth.  I would appreciate a copy of  his  grades for
the  past   school year and attendance record.  Please include any
disciplinary reports you may have available.

This information is to be reviewed by  Mark Melnek, Probation Officer

I appreciate your time and cooperation on this matter.

Sincerely,

*Mark Melnek / mj*

Probation Officer

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5740

Nat. Jackson

Nate attended class on 9/9/88, 9/12,
9/13/88 and 9/19/88. At which times
he became extremely unruly and
verbally abusive.

9/9/88 - Received a total of 65 slips
with most of them concentrated in the
negative comment, talking out and swearing
areas. Most favorite line "F-this shit! Man!
received disciplinary referral slips on 9/12/88
for leaving area without permission
did not returning after going to 4th lunch.
9/13/88 - Arrived late would not get admit to
class permit, Brought food in from home
bacon and eggs. Caused great confusion
other students tried to take some of the
food this caused a fight between Raymond
Waller and Nate. Mrs. Siembieda stepped
in to separate the two and got
bruised in the process. Nate after
being separated from Raymond
continued throwing bacon and the
food around the room at others
threw empty milk carton on floor.
9/19/88 - Started the morning off by
harassing Mrs. Quinn and her class.
and was not permitted to leave the room.
When told he became verbally abusive
and then proceeded to light a piece of paper
and then after extinguishing that a few
minutes later tried to light burn the
t... on Letitia Roth's shoe. He did stop

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5741

THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
PUPIL'S ANNUAL SHEET
PRIMARY SCHOOL

101 ⅒ 10 ⅔

| BORN | MO. | DAY | YEAR | ENTRY DATE | YEAR MONTH AGE at SEPT. 1. | SEX | (LAST NAME) (FIRST NAME) (MIDDLE NAME) |
|---|---|---|---|---|---|---|---|
| | | 9-5-78 | | 6-7 | M | Jackson, Nathaniel Ele... |

Charles Theulies

| ADDRESS | | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|---|

| Roosevelt | 1978-79 | 1 | 101 | A. Stanley |
|---|---|---|---|---|
| SCHOOL | SCHOOL YEAR | GRADE | ROOM | TEACHER |

Marking code:  Subjects printed in large capital letters will receive letter marks using the following code:

E = Excellent    G = Good    S = Satisfactory    U = Unsatisfactory.

A ☑ indicates the need for improvement. The absence of check-marks indicates satisfactory progress.

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ART | S | S | S | S |
| MUSIC | S | S | S | |
| PHYSICAL EDUCATION | S | S | S | S |

| | Report Periods | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| READING | S | S | G | G |
| * Reading level (Ex. 21, etc.) | R | P₀ | Pₓ | 1 |
| Applies phonics skills | | | | |
| Reads with understanding | | | | |
| Knows basic sight words | | | | |
| LANGUAGE | S | S | S | S |
| Expresses ideas well orally | | | | |
| Expresses ideas well in written work | | | | |
| SPELLING | ☒ | | | |
| WRITING | U | S | S | S |
| MATHEMATICS | S | S | S | S |
| Knows number facts | | | | |
| Works accurately with numbers | | | | |
| Solves problems with understanding | | | | |
| SOCIAL STUDIES | S | S | S | S |
| SCIENCE - HEALTH | S | S | S | S |

| Social Growth | | | | |
|---|---|---|---|---|
| Conduct | U | U | S | N |
| Accepts responsibility | ✓ | ✓ | - | A |
| Respects authority | | | | |
| Respects rights & property of others | ✓ | ✓ | | |
| Observes school and safety rules | ✓ | ✓ | ✓ | |
| Is courteous | | | | |
| Works and plays well with others | ✓ | ✓ | ✓ | |
| Study Habits | | | | |
| Listens well in class | ✓ | ✓ | | |
| Follows directions | ✓ | ✓ | | |
| Completes assignments | | | | |
| Works independently | ✓ | ✓ | | |
| Participates in class discussions | | | | |
| Supplemental Programs: | | | | |

## ATTENDANCE

KEY:
E - ENTERED
W - WITHDRAWN
/ - ABSENT A.M. ONLY
\ - ABSENT P.M. ONLY
X - ABSENT WHOLE DAY
O - TARDY (NO. MINUTES)
= - NOT IN SESSIO...
EX - EXCLUDED

| REPORT PERIOD BEGINS | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  9/5 | | | E | | | | X | X | X | X | | | | | | | | | | \ | | | | | | 4½ | 0 | | 45 | cold |
| 2  11/10 | | | | = | | | | = | = | | | X | | X | / | | | = | | | | | | | | 2½ | 0 | | 46 | no excuse |
| 3  1/29 | | | | X | | | | | | | | | | = | | | | X | | | | | | | | 2 | 0 | | 44 | no excuse |
| 4  4/1 | | | = | | | | | | | | | | | = | | | | | | | | | | | | 1 | 0 | | 43 | no excuse |

# Youngstown Public Schools

Hayes School
(School)

250 Benita Ave
(Address)

*Principal*

F. Zetts
**Assistant Principal**

Charles/Pauline
(Parent/Guardian)

February 12, 1988
(Date)

(Address)

Youngstown, Ohio 44506
(City)

This is to advise you that following a hearing, ___Nathaniel Jackson___ ___ has been
(Student)          (I.D. No.)

suspended from school for __4__ school days beginning ___February 16, 1988___ He/she is

to return to school on ___February 22, 1988___ The reason(s) for the suspension is/are

as follows: ___disorderly conduct; fighting.___
(Reason(s))

which violates Rule(s) No. ___2___ _____ of the Student Conduct Code

While suspended, ___Nathaniel___ ___, is not to be on school premises (grounds) during

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

____ Please accompany _____ to school on _____ at _____ a.m
p.m

for re-admittance and a conference in _____ office.
(Principal)

____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
notified of the time and date should a hearing be scheduled.

__X__ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied by
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal,
please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc: Treasurer

# Youngstown Public Schools

_____          250 Beaitk Ave.
(School)                                    (Address)

_____          A. Cassano
Principal                                   Assistant Principal

Charles/Pauline                       January 20, 1988
(Parent/Guardian)                     (Date)

_____          Youngstown, Ohio 44505
(Address)                                  (City)

This is to advise you that following a hearing, ___Nathaniel Jackson___ _____ has been
                                                        (Student)                    (I.D. No.)

suspended from school for ___3___ school days beginning ___January 20, 1988___ He/she is

to return to school on ___January 22, 1988___          The reason(s) for the suspension is/are

as follows: ___smoking on school grounds___
                                    (Reason(s))

_____

which violates Rule(s) No.___9a___ _____ of the Student Conduct Code

While suspended, ___Nathaniel___ _____, is not to be on school premises (grounds) during

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

                                                                                          a.m
_____ Please accompany _____ to school on _____ at _____ p.m

        for re-admittance and a conference in _____ office.
                                                        (Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
        notified of the time and date should a hearing be scheduled.

__X__ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied b
a representative of your choice and may request that the hearing be held in executive session. If you intend to appeal
please address a written request for a hearing within five (5) school days from the date of this notification to:

                        Office of School and Community Relations
                        Youngstown City School District
                        P.O. Box 550
                        Youngstown, Ohio 44501

VISITING TEACHER'S REPORT OF HEARING

DATE __5/18/86__

NAME ___Nathaniel Jackson___ ADDRESS ▮▮▮▮▮

SCHOOL ___Stambaugh___ GRADE __7__ DATE OF BIRTH ▮▮▮▮▮

PARENTS: MOTHER __Pauline Kornegay__ FATHER_____

HEARING REQUESTED BY ___Stambaugh___

PLACE ___Board Annex___

REFEREE ___Charles Burrelli___

INTERESTED PERSONS PRESENT ___Nathaniel and Mother___

REASON FOR HEARING ___Truancy___

INFORMATION AND DEVELOPMENTS ___Nathaniel has been absent 86 days from Adams and 7 from Stambaugh___

DISPOSITION ___Charles Burrelli will refer Nathaniel to Joanne Hoxworth.___

00-24

A. Pomponio
Visiting Teacher

**NATHANIEL JACKSON**

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | SEMESTER 1-MARK 2-CONDUCT 3-ABSENT 1 2 3 | SEMESTER 1-MARK 2-CONDUCT 3-ABSENT 1 2 3 | EXAM MARK | 1-MARK 2-CONDUCT 3-ABSENT 1 2 3 | 1-MARK 2-CONDUCT 3-ABSENT 1 2 3 | FINAL EXAM | FINAL MARK |
|---|---|---|---|---|---|---|---|---|---|
| SAO | ENGLISH | HEGEL | F | F | | A | B | D | D+ |
| SBO | READING | HEGEL | F | F | | A | A | D | C |
| SLO | SOCIAL STUDIES | HEGEL | F | F | | A | B | B | C |
| SFO | MATH | HEGEL | F | F | | A | A | A | C |
| SGO | SCIENCE | HEGEL | F | F | | B | B | A | C |
| SIO | ADJ PE | DAVIS | D | F | | C | C | D | - |
| SKO | ART | BARRON | | | | A | A | F | D |
| SLO | MUSIC | CASSELL | | | | A | A | A | A |

**CURRENT YEAR**

| CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|

**CUMULATIVE**

| CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|---|

**ATTENDANCE DATA**

| REPORT PERIOD | ① ABSENT | ① TARDY | ② ABSENT | ② TARDY | ③ ABSENT | ③ TARDY | ④ ABSENT | ④ TARDY |
|---|---|---|---|---|---|---|---|---|
| | 25 | 0 | 31 | 0 | 21 | 0 | 7 | 2 |

**MARKING CODE**
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

**CONDUCT CODE**
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

**REPORT TO PARENTS**

THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR GUARDIAN'S SIGNATURE_____

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5746

Copies:
CIMS
Parent

SE-8

PERIODIC/ANNUAL REVIEW

AND

DEVELOPMENT OF INDIVIDUALIZED EDUCATION PROGRAM (IEP)

Name of Student _Nathaniel Jackson_ Birthdate ███████
School _HAYES JR. HIGH_ Special Program _MH(DH/SBH)_
Date Sent _10-31-86_

Dear Parent(s): _Mrs. Kornegay_

    As stated to you at the time of your child's placement in our special
program, a periodic review of your child's Individualized Education Program
(IEP) would be made at least once a year.

    This letter is to inform you that a periodic review of your child's
Individualized Education Program is scheduled for:

Date: _Nov. 13, 1986_  Time: _8:00_  Place: _Rm. 120_
Participants will include: _Mrs Kornegay   Miss Revett,_
_Mr. Terlesky_

    The purpose of this conference is to review your child's current IEP, and,
if necessary, to develop a new one.

    We hope you will be able to attend the review conference and participate
in the discussions. Your participation in the review process will be helpful
in planning the most effective program for your child. Your cooperation with
the school staff is very much appreciated. If you have questions, or need
additional information, contact:

_Miss Sara Revett_ at _744-7602 744-7603 744-76_
    (name and title) _MH(DH/SBH)_     (phone)
              _Teacher_ Sincerely,

                    _Miss Sara Revett,_
                          (name and title) _MH(DH/SBH_
                                              _Teacher_

    PLEASE VERIFY YOUR RESPONSE BELOW AND SEND THIS REPLY
    BACK TO THE SCHOOL CONTACT PERSON AS SOON AS POSSIBLE

Pupil's Name _____
_____ I can attend the Conference at the time given.
_____ I cannot attend the Conference at the appointed time, but would be able
        to come at the following times: _____
        _____
_____ I hereby waive my right to participate in my child's periodic/annual re-
        view and development of my child's new Individualized Education Program.

                    _____
                    (signature of parent/guardian)   (date)

9/86

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5747

## PROGRESS REPORT

PLEASE RETURN TO THE ATTENDANCE
OFFICE WHEN COMPLETED.

A hearing has been set at the ___ I.E.P. CONFERENCE

for ___ NATHANIEL JACKSON

Please give a concise

report concerning ___ Wed. 11-11-87 ___ attendance, grades, conduct, and

cooperation. Return this report by ___ to the attendance office.

|  | 1st. | 2nd. | 3rd. | 4th. | Total |
|---|---|---|---|---|---|
| Absence | 7 |  |  |  |  |
| Tardiness | O |  |  |  |  |

|  | 1st. | 2nd. | 3rd. | 4th. |
|---|---|---|---|---|
| Grade to Date | D |  |  |  |

Conduct *little + continually disruptive during period, excessive swearing - talking out, verbal language directed toward staff*

Cooperation – *uncooperative, doesn't follow directions. Must be removed from class several times a week.*

Work Habits – *refuses to do assigned work, completed only tasks he wants to.*

Other Comments – *days absent were due to suspension, physical + death threats directed toward staff, fights with other students. disrespect toward staff.*

*Resorts to physical violence when doesn't get own way. (Has been physically aggressive and verbally abusive toward staff).*

*absolutely out of hand at times*



Dear teacher

Please Excuse Nathaniel Jackson. Wednesday thursda
he had went to the Hospital. With his Mom.
his Mom took sick so went with me + the hospi
My Blood pressure was up. Very high. So I needed
him at home. Well me I came Home and God to
thank You so. Back to the H.
Mrs paulia Koraig



**mahoning county alcoholism services**
4214 market street, youngstown, ohio 44512
(216) 782-1188
another service of the alcoholic clinic of youngstown

December 17, 1986

Mr. Saul
Hayes Jr. High School
1616 Ford
Youngstown, Ohio 44504

Re: Nathaniel Jackson

Chemical Dependency Assessment Results

Dear Mr. Saul:

This is to inform you of the impressions gained as a result of the session held with Nathaniel and his parents.

The available data indicated Nathaniel to be harmfully involved with chemicals and at high risk for continued problems.

Nathaniel agreed to sign a 6 month no use contract and he and parents are aware if he violates this contract he will need to be reassessed at Mahoning County Alcoholism Services for further recommendations. It was also recommended that Nathaniel become involved in counseling at Mahoning County Chemcial Dependency Program which the parents agreed to pursue at this time.

If there are further questions please contact me at 782-1188.

Sincerely,

Becky Beck, A.C.
Adolescent Coordinator

BB/ar

-- be helped and are worth helping.

JACKSON, Nathanie

−2−

## ...ABILITY PLANNING:

... ractors into consideration, such as performance scores, interests, ...avioral observations, physical stamina and all other pertinent evaluative data, the following areas of training and employability are suggested for planning:

I.  Nathaniel has indicated a low level of involvement, excessive absenteeism

and no significant strengths in his performance. Marginal consideration

should be taken for placement within the Auto Reconditioning Training

Immediate supportive services suggested:                          Program only.

|     | Remediation in basic academic skills |
|     | Remediation in social skills |
| X   | Vocational counseling |
| X   | Other ancillary services: Nathaniel has shown a high level of absenteeism. This should be taken into consideration. His reliability and dependability |

II.  RATIONALE FOR SUGGESTIONS:                                   were low.

Nathaniel has indicated difficulties attending. He was often observed in his home environment without making a significant effort to obtain transportation and to arrive at the assessment center. He has shown a low level of motivation and no significant involvement in work tasks.

He has indicated a preference for auto body, small engines, auto mechanics and auto reconditioning. Those were the expressions he has indicated in a questionnaire. A subsequent completion of the Career Maturity Inventory has shown deficiencies in career maturity. His low level of involvement and willingness to participate to reduce his chances for completing numerous assignments successfully.

Nathaniel has indicated a minimal functionality in verbal and numerical skills. He was not able to measure, and he could not quantify environmental conditions readily. He has no knowledge of basic concepts in reference to linear and volume measurements. He has shown a moderate ability to follow instructions, and he could manipulate with larger hand tools and equipment successfully.

His absenteeism prevented him from participating successfully in various work samples. He has completed two work samples successfully under time and quality criteria. His performance would be considered limited in general, because of absenteeism and because of his low level of involvement. He was able to manipulate sufficiently in elemental work tasks with a clear three dimensional structure.

He has shown no significant negative behavioral manifestations. He has indicated a tendency to verbalize excessively and to want to engage other members into conversation. This required specific attention. He was cooperative in general, and he interacted appropriately with coworkers and supervision. Please see additional behavioral comments under EMPLOYABILITY ATTITUDES on page 4.

NOTICE OF (INTENT TO SUSPEND)

Name: _Kathaniel J. Ackson_ Date: _5/29/84_

This notice is to tell you that you may be suspended from school.
The reason(s) you may be suspended is/are: _Rule I. Disruption of_
_School, (Fighting)_

To be suspended from school means that while you are suspended you are not permitted to come to school nor attend any extra curricular activities.

You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony Deflos, Jr._
Principal

Assistant Principal

Copy received by student: _Nathaniel Jackson_
Student's Name

Copy refused by student: _____
Witness                                    Ed 200

While suspended, _Nathaniel Jackson_ is not to be on school premises (grounds) duri

normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:

_____ Please accompany _____ to school on _____ at _____

a.
p.

for re-admittance and a conference in _____ office.
                                            (Principal)

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be notified of the time and date should a hearing be scheduled.

__x__ It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanied a representative of your choice and may request that the hearing be held in executive session. If you intend to app please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc: Treasurer

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ ....schools....

## NOTICE OF (INTENT TO SUSPEND)

Name: _Nathaniel Jackson_ Date: _2/1/85_ ✓

This notice is to tell you that you may be suspended from school.

The reason(s) you may be suspended is/are: _Rule 8. Refuse to obey_
_Refuses to_
_School Rules. Afollow directions of teacher. Disrespectful_

To be suspended from school means that while you are suspended you are not permitted to come to school nor attend any extra curricular activities.

You will have the opportunity to meet with me at an informal hearing to ask questions, explain to me your side of what happened, or question my reasons for giving consideration to suspending you.

_Anthony DeNua Jr._
_____
Principal

_____
Assistant Principal

received by student: X _Nathaniel Jackson_
_____
Student's Name

used by student: _____
Witness                                    Ed 200

While suspended, _Nathaniel Jackson_
normal school hours nor is he/she to attend any school sponsored activity.

Please follow the instructions as checked below:                                    a.
_____ to school on _____ at _____ p.

_____ Please accompany _____ office.
for re-admittance and a conference in _____ _(Principal)_

_____ Due to the serious nature of his/her actions, a Board of Education hearing may be scheduled. You will be
notified of the time and date should a hearing be scheduled.

X    It is not necessary for you to accompany him/her to school.

You may appeal this decision to the President of the Board of Education or his designee. You may be accompanie
a representative of your choice and may request that the hearing be held in executive session. If you intend to app
please address a written request for a hearing within five (5) school days from the date of this notification to:

Office of School and Community Relations
Youngstown City School District
P.O. Box 550
Youngstown, Ohio 44501

cc: Treasurer

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5753

Nathaniel hasn't completed his assignments in most areas.

He plays quite a bit with small toys and doesn't follow directions.

He is being retained this year.

5th grade

Retained in 6th grade
Mrs. Heri - Room 300
A. Palagamis

Stanford Achievement

# THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
## PUPIL'S ANNUAL SHEET
### Grades 4, 5, & 6

ED 159

| BORN MO. | DAY | YEAR | ENTRY DATE | YEAR MONTH AGE AT SEPT. 1 | SEX | (LAST NAME) | (FIRST NAME) | (MIDDLE NAME) |
|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | 9-83 | 11-6 | | m | Jackson | Nathaniel | |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| ▮ | Charles / Pauline | | ▮ |

| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1983-84 | 6 | 301 | D. Palizene |

| | REPORT PERIODS 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **1. HEALTH HABITS** Sit, stand and walk correctly | | | | |
| Be more careful of appearance | | | | |
| Practice safety | | | | |
| **2. WORK HABITS** Use greater effort | | | | |
| Follow directions | | | | |
| Carelessness | | | | |
| Complete the work | | | | |
| **3. CITIZENSHIP HABITS** Be Courteous | | | | |
| Respect authority | | | | |
| Respect rights of others | | | | |
| Respect all property | | | | |
| **4. CONDUCT** | | | | |

### PROGRESS IN ACHIEVEMENT — REPORT PERIODS

| SUBJECT | 1 | 2 | 3 | 4 | |
|---|---|---|---|---|---|
| Reading | D⁻ | B⁻ | D⁰ | F⁻ | D |
| English | D | D | C | D | D |
| Spelling | B | B | C | D | C |
| Writing | F | F | F | F | F |
| Social Science | F | D | F | G | F |
| Science | C | D | D | F | D |
| Arithmetic | D | F | F | F | F |
| Health | B | C | C | D | C |
| Art | S | S | S | S | S |
| Music | U | U | U | U | U |
| Physical Education | S | S | S | S | S |

Reading 2.9    Stanine 2
Math 3.1      1

## ATTENDANCE

KEY: E - ENTERED   W - WITHDRAWN   √ - ABSENT A.M. ONLY   / - ABSENT P.M. ONLY   X - ABSENT WHOLE DAY   O - TARDY (NO. MINUTES)   — - NOT IN SESSION   EX - EXCLUDED

| REPORT PERIODS BEGINS | M T W T F | M T W T F | M T W T F | M T W T F | M T W T F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | 4½ | ½ | O | 47 | |
| 2 | | | | | | 44 | 0 | 2 | 44 | |
| 3 | | | | | | 36½ | 2½ | 1 | 39/43 | |
| 4 | | | | | | 35 | 9 | 0 | 44 | |

PERMANENT RECORD – PERSONAL
(Follow Manual of Procedure)

Validation BC

**1.**
NAME: JACKSON NATHANIEL EDWIN Sex: F___ M ✓
Last

ADDRESS: ▮▮▮▮▮▮▮▮▮▮▮
Pencil

TELEPHONE: ▮▮▮▮▮▮ Charles
Pencil

Parents or Guardian Pauline

Address _____
(If different from above)

**2.**
KINDERGARTEN AND PRIMARY

| SCHOOL | ENTRY DATE | GR. | AGE YR. | AGE MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|--------|-----------|-----|---------|---------|---------|------|-------|-----------|
| Roosevelt | 9/77 | K | 5 | 7 | Thompson | 10 | 1 | 1 |

ACADEMIC PROGRESS: _Fairly good progress. Needs more writing readiness for 1st grade._

| SCHOOL | ENTRY DATE | GR. | AGE YR. | AGE MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|--------|-----------|-----|---------|---------|---------|------|-------|-----------|
| Roosevelt | 9/78 | 1 | 6 | 7 | Stanley | 10 | 0 | P 2 |

ACADEMIC PROGRESS: _Good to fair. Behavior problem. Completed Level 8. Completed BK 1 math._

| SCHOOL | ENTRY DATE | GR. | AGE YR. | AGE MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|--------|-----------|-----|---------|---------|---------|------|-------|-----------|
| Roosevelt | 9/79 | 2 | 7 | 7 | Zolman | 9 | 0 | P 3 |

ACADEMIC PROGRESS: _Good progress but still beh. prob. Completed 2nd Reader not titles - in Murland Read Magna_

| SCHOOL | ENTRY DATE | GR. | AGE YR. | AGE MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|--------|-----------|-----|---------|---------|---------|------|-------|-----------|
| Roosevelt | 9/80 | 3 | 8 | 8 | Wilson | 34½ | 1 | 4 |

ACADEMIC PROGRESS: _Unsatisfactory - Level 12. Unit 3 - Poor work habits._

| SCHOOL | ENTRY DATE | GR. | AGE YR. | AGE MO. | TEACHER | ABS. | TARDY | NEXT YEAR |
|--------|-----------|-----|---------|---------|---------|------|-------|-----------|
| | | | | | | | | |

ACADEMIC PROGRESS: _____

ED 103

**3. INTERMEDIATE – 4-5-6**

| | Roosevelt | Burroughs | Burroughs | Roosevelt |
|--------|------|------|------|------|
| SCHOOL | | | | |
| DATE OF ENTRY | 9-81 | 9-82 | 9-83 | 9-84 |
| AGE | 9-7 | 10-6 | 11-6 | 12-6 |
| GRADE | 4 | 5 | 6 | 6 |
| TEACHER | Martin | Gr.M | TAL | Hevi |
| ABSENT | 14½ | 21 | 10 | 48½ |
| TARDY | 2 | 3 | 3 | 15 |
| NEXT YEAR | 5 | 6 | 6 | assigned |
| READING | D⁻ | D | A⁻⁵ | D |
| ENGLISH | C | C | A⁻ | D |
| SPELLING | B | C | C | D |
| WRITING | D⁻ | C | F | D |
| SOCIAL SCIENCE | D⁻ | D | F | A⁻ |
| SCIENCE | C | D | F | D |
| ARITHMETIC | D⁻ | D | F | A⁻ |
| ART | S | S | S | A⁻ |
| MUSIC | S | S | S | A⁻ |
| PHYS. ED. | S | S | S | A⁻ |
| Health | | C | C | C |

**4. TRANSFER AND WITHDRAWAL – Elementary**

| | | |
|--|--|--|
| COMMENT | | |
| DATE REC'D | | 11/21/96 |
| TO WHERE | L | Adams | Franc High |
| FROM WHERE | Roosevelt | Adams S. | Carrawah |
| GRADE | 6 | 6 | 7 |
| DATE | 6/85 | 9/85 | 9/86 |

UNGRADED INTERMEDIATE – 4-5-6.
Academic Progress: Grade 6 _Fair progress in reading. Unsatisfactory progress in math._

Academic Progress: _____

Academic Progress: _____

Academic Progress: _____



STUDENT NUMBER | 1988-89 | 10 | STAMBAUGH

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 2-CONDUCT 3-ABSENT | | | SEMESTER 1 2 3 | | | EXAM | MARK | 1-MARK 2-CONDUCT 3-ABSENT | | | 1 2 3 | | | FINAL EXAM | MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ..0 | S8H HEALTH | SUZETTE GREGORY | A | S | 1 | F | S | 17 | | | C | S | 9 | D | S | 9 | F | D |
| .13 | S8H AD P.E. II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | | | B | S | 9 | D | S | 9 | C | D |
| .F3 | S8H GEN MATH II | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | C | S | 9 | F | D |
| SB3 | S8H READING II | SUZETTE GREGORY | B | S | 1 | F | S | 17 | | | C | S | 9 | C | S | 9 | | D |
| SC3 | S8H WORLD HIST | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | D | S | 9 | A | D |
| SA3 | S8H ENGLISH II | SUZETTE GREGORY | C | S | 1 | F | S | 17 | | | D | S | 9 | D | S | 9 | B | D |
| ST1 | S8H CONS ED | SUZETTE GREGORY | | | | F | S | | | | C | S | 9 | F | S | 9 | F | F |
| JSK4 | S8H ART HANDWK | SUZETTE GREGORY | | | | F | S | 17 | | | C | S | 9 | B | S | 9 | F | C |
| SG3 | S8H BIOLOGY | SUZETTE GREGORY | | | | F | S | 17 | | | D | S | 9 | D | S | 9 | F | D |

CURRENT YEAR

| CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|
| 6.25 | |

CUMULATIVE

| CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|---|
| 13.50 | 12.50 | |

ATTENDANCE ... DATA

| REPORT PERIOD | ABSENT ① | TARDY | ABSENT ② | TARDY | ABSENT ③ | TARDY | ABSENT | TARDY |
|---|---|---|---|---|---|---|---|---|
| | 1.0 | | 17.0 | -2 | 9.5 | | 9.0 | 1 |

MARKING CODE
A - EXCELLENT
B - GOOD
C - AVERAGE
D - POOR
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

REPORT TO PARENTS
THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH HIS TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR
GUARDIAN'S SIGNATURE_____

---

| STUDENT NAME | STUDENT NUMBER | SCHOOL YEAR | GRADE | SCHOOL | HOME ROOM |
|---|---|---|---|---|---|
| JACKSON NATE | 0016-77-20 | 1989-90 | 11 | STAMBAUGH | 107 |

| COURSE CODE | COURSE DESCRIPTION | INSTRUCTOR | 1-MARK 2-CONDUCT 3-ABSENT | | | SEMESTER 1 2 3 | | | EXAM | MARK | 1-MARK 2-CONDUCT 3-ABSENT | | | 1 2 3 | | | FINAL EXAM | MARK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SA4 | ENGLISH III | GREGORY SUZETTE | A | S | | C | S | 5 | | | F | S | 20 | F | S | 44 | F | F |
| SB4 | READING III | GREGORY SUZETTE | C | S | | C | S | 5 | | | F | S | 20 | F | S | 44 | F | F |
| SC5 | U.S. HIST | GREGORY SUZETTE | C | S | | C | S | 5 | | | F | S | 20 | F | S | 44 | F | F |
| SF4 | CON MATH I | GREGORY SUZETTE | C | S | | B | S | 5 | | | F | S | 20 | F | S | 44 | F | F |
| SG4 | ECOLOGY | GREGORY SUZETTE | C | S | | D | S | 5 | | | F | S | 20 | F | S | 44 | F | F |
| SI4 | AD P.E. III | GREGORY SUZETTE | W | S | | D | S | 5 | | | F | S | 20 | F | S | 44 | F | F |

CURRENT YEAR

| CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|
| | |

CUMULATIVE

| CREDITS ATTEMPTED | CREDITS EARNED | GRADE POINT AVERAGE |
|---|---|---|
| 13.75 | 12.50 | |

ATTENDANCE ... DATA

| REPORT PERIOD | ABSENT ① | TARDY | ABSENT ② | TARDY | ABSENT ③ | TARDY | ABSENT | TARDY |
|---|---|---|---|---|---|---|---|---|
| | | | 5.0 | | 29.0 | | 44.0 | |

MARKING CODE
A - EXCELLENT
B - ABOVE AVERAGE
C - AVERAGE
D - BELOW AVERAGE
F - FAILING
W - WITHHELD
P - PASSING
S - SATISFACTORY
U - UNSATISFACTORY
WF - WITHDRAWN FAILING

CONDUCT CODE
S - SATISFACTORY
U - UNSATISFACTORY
I - IMPROVING

REPORT TO PARENTS
THIS IS A REPORT OF YOUR CHILD'S ACHIEVEMENT IN RELATION TO STANDARDS FOR THE COURSES TAKEN. IF AT ANY TIME YOU HAVE QUESTIONS CONCERNING HIS/HER PROGRESS, YOU ARE URGED TO ARRANGE FOR A CONFERENCE WITH THE TEACHER AND/OR THE PRINCIPAL. THIS REPORT MUST BE SIGNED BY THE PARENT OR GUARDIAN AND RETURNED TO THE PUPILS HOME ROOM TEACHER.

PARENT'S OR
GUARDIAN'S SIGNATURE_____

Nathaniel has made slow progress in reading and unsatisfactory progress in math. His attention span is short and he likes to play.

Writing - Unsatisfactory

Spelling - Good

Behavior - Needs to improve.

Conferences - None.

Reading - Completed Unit 5 - Level 13

Next year - Grade 5 - Room 302

June 11, 1982

D. Martin

| OHIO SURVEY TESTS | OHIO SURVEY TESTS | | ACADEMIC ABILITY TEST | | | ACHIEVEMENT TESTS | | |
|---|---|---|---|---|---|---|---|---|
| STUDENT NAME: JACKSON NATHANIE | GRADE: 4A | RAW SCORE | 19 v | 18 | 37 | 19 | 17 | 13 |
| | ADM. | % ILE | 20 | 26 | 21 | 5 | 14 | 5 |
| | DATE: 6/31 | STA 9 | 3 | 4 | 3 | 2 | 3 | 2 |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5758

THE PUBLIC SCHOOLS YOUNGSTOWN, OHIO
PUPIL'S ANNUAL SHEET
Grades 4, 5, & 6.

ED 159

| BORN | MO. | DAY | YEAR | ENTRY DATE | YEAR MONTH AGE AT SEPT. 1 | SEX | (LAST NAME) | (FIRST NAME) | (MIDDLE NAME) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 9-81 | 9-7 | m | Jackson, | Nathaniel Ed | |

| ADDRESS | PARENT | OCCUPATION | TELEPHONE |
|---|---|---|---|
| | Charles / Pauline | | |

| SCHOOL | SCH. YR. | GRADE | ROOM | TEACHER |
|---|---|---|---|---|
| Roosevelt | 1981-82 | 4 | 206 | D. Martin |

| | REPORT PERIODS | | | | PROGRESS IN ACHIEVEMENT | REPORT PERIODS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | SUBJECT | 1 | 2 | 3 | 4 |
| **1. HEALTH HABITS** Sit, stand and walk correctly | | | | | Reading | — | D | C- | D |
| Be more careful of appearance | | | | | English | C | C | D | B |
| Practice safety | | | | | Spelling | B | B | B | B |
| **2. WORK HABITS** Use greater effort | | | | | Writing | D | D | D | D |
| | | | | | Health | C | C | C | C |
| Follow directions | | | | | Social Science | C | F | D | D |
| Carelessness | | | | | Science | D | C | C- | D |
| Complete the work | | | | | Arithmetic | D | D | F | D |
| **3. CITIZENSHIP HABITS** Be Courteous | | | | | Art | 1 | 1 | 1 | 1 |
| Respect authority | | | | | Music | 1 | 1 | 1 | 1 |
| Respect rights of others | | | | | Physical Education | 1 | 1 | 1 | 1 |
| Respect all property | | | | | | | | | |
| **4. CONDUCT** | D | D | C | C | | | | | |

## ATTENDANCE

KEY: E - ENTERED  W - WITHDRAWN  √ - ABSENT A.M. ONLY  ─ ABSENT P.M. ONLY  X - ABSENT WHOLE DAY  ─ TARDY (NO. MINUTES)  EX - NOT IN SESSION EXCLUDED

| REPORT PERIODS BEGINS | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | DAYS IN SESSION | CAUSE OF ABSENCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9-9 81 | | E | | | | | | D | | | | | | | | | | | | | | | | | | 47 | 0 | 1 | 47 | |
| 2 | 11-16 81 | | | * | - | X | | = | = | | = | | X | | | = | X | | | | | | | X | | | 41 | 3 | 0 | 44 | |
| 3 | 2-1 82 | | X | | | = | | | | | | | | | X | = | | | | | | | | | | | 41½ | 2½ | 0 | 43 | |
| | '-12 | X | X | X | X | | | L | M | M | | | | | | X | | | | | | | | | | | 35 | 9 | 0 | 44 | |

"Nate Jackson"  TEACHER _Mrs. Troche_  BUILDING _Adams_  EDUCATI

| DATE | TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT |
|------|------|--------------------|-------------------|---------------|---------|
| 1-20-'85 | 1:50 | Room 219 English class | disturbing out — out of seat — banging desk with comb | asked him several times to sit — let drum 10" rulers | [illegible] |
| 1-17-'86 | 1:50 | same R | walked in with NO books; person, pencil; asked to use law | filled in discipline form and asked him to leave — asked him where his books were. gave him permission. | [illegible] |
| 1-29-'86 | 1:50 → | Room 219 | HE walked in playing a radio(?) and earphones on. Did gave him a SIMPLE [illegible] assignment. | I asked him to put the radio away. I asked him to go to the [illegible] | [illegible] |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5760

NAME: N. Jackson    TEACHER: Killa    BUILDING: ___    EDUCATIONAL PLAC__

| TIME | SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE |
|------|-------------------|-------------------|---------------|------------------|
| 8:05 | Reading in room B4 10.P.P.F | Nathaniel had fallen asleep during sustained silent reading - 10 min. | (1) Called student by name to wake up. | (1) No response from when his name was called. |
| | | | (2) attempt sitting next to him on the rug to wake him up. | (2) No response from he kept sleeping |
| | | | (3) I walked over to Nate and and about him by (3) No response fin Nate, he kept sle his shoulders. | |
| | | | (4) I put my arms around him and sat him straight in his chair. | (4) He woke up and continued his work. |
| 8:30 | Reading in room 104 10.P.P.F | Nathaniel earned a 100% on his spelling test. | Gave him a reading award for his good work. Praised him. | He was very happy and proud of himself. |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5761

TEACHER _____  BUILDING _____  EDUCATIONAL PLACEMENT _____

| SITUATION LOCATION | OBSERVED BEHAVIOR | YOUR REACTION | STUDENT RESPONSE | ESTIMATE INCIDE |
|---|---|---|---|---|
| in 119 science class | Minimizing the class instruction, the class moment his seat talking, will not do assigned act today. | Told him to stop and go back to seat | He finally went back to seat, few minutes later walked out. | 5 min |
| 9 | Walks in, touches everything, runs his feet. | Said nothing | He walks out. | 2 min |
| 19 | Came in, proceeded to Shakirhand's with Speilstein's dept in class. | Tried to stop & sit down. | Refused - Mr. McKinney called to remove from class | 4 min |
| ? | Came in, refused to sit in chair - would keep up in chair - would distur students open, annoyed students doing their | Turn to stop | refused - up I ignored him as it was quiet during so I carried on. | 45 |
| 1 | Shadkea girls, waving coming into class. | Dismissed in time, blating him "stop" | ran around room to get away. Ignored to trades with ran around, sat & did no work. | 2 min 45 min |

88-89

YOUNGSTOWN PUBLIC SCHOOLS
DEPARTMENT OF PUPIL PERSONNEL SERVICES

FOR PROFESSIONAL USE ONLY                    NOT FOR RELEASE

SPECIAL EDUCATION VOCATIONAL PLACEMENT MEETING

STUDENT'S NAME: Nathaniel Jackson           DATE: 6/16/88

HOME SCHOOL: Rayen

SPECIAL SERVICE PROGRAM: SBH

PSYCHO-EDUCATIONAL ASSESSMENTS COMPLETED/RESULTS: 1/17/56 - IQ 73 -
Woodcock - Johnson  Reading 4.6, Math 4.3.
Strengths in auditory, short-term memory, visual
details, oral math problems.
LEVEL OF READING/MATH: 6/88  Reading 7.8, Spelling 6.9,
Math 6.9. Measurement - 1½p.

VOCATIONAL ASSESSMENT RECOMMENDATIONS: 6/88 - Special Needs Program,
Vocational counseling, personal counseling, behavior
monitoring.

PREVIOUS MAINSTREAMING EXPERIENCE: None

COMMITTEE RECOMMENDATIONS (Priority order): Auto Reconditioning
with reservations (marginal) Math/Reading
Support as needed. Monitor behavior.

COMMENTS: Responds to individual attention, praise,
conferences, feedback. Needs glasses. Seat
near front of room.

PARENTS: _____    STUDENT: Nathaniel Jackson
CHOFFIN REP: ___ K. Ellis     TEACHER: Carol M Mill
HOME SCHOOL                   PROGRAM
COUNSELOR: P. Sukey           COORD.: _____ Voc Assest.
                              Marginal placement for
SP. ED. VOC.                  Auto Rec.
COORD: D. Salandro

THREE VISITS                  CHOICE                  AM
1.                            1. Auto Reconditioning
2.  N/A                       2. Auto Body
3.

Original:   CIMS File
White:      Special/Voc. Education Coordinator
Yellow:     Special Ed. Program Coordinator
Pink:       Vocational Supervisor
Goldenrod:  Special Needs

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5763

# YOUNGSTOWN PUBLIC SCHOOLS

### DEPARTMENT OF PUPIL PERSONNEL SERVICES

Form
orm

REQUEST FOR RETURN TO REGULAR CLASS OR TRANSFER OF PROGRAM

Pupil's Name _Nathaniel Jackson_  Student # [redacted]  Birthdate [redacted]

Address [redacted]  Home School _Adams_

Date of Request _10-13-86_  Service to Begin Date _10-17-86_

The following person(s):

_William Steely_      _SBH Coordinator_
Name          Title

_____      _____
Name          Title

Request(s) that the above named student be changed from the:

_MH_     _St Ambrough_     ☒
Name of Program     Name of School     Grade

to

_MH_     _Hayes_     ☒
Name of Program     Name of School     Grade

| D.H. | V.I. | Orthopedic | H.I. | S.B.H. |
|---|---|---|---|---|
| ☐ Vineland | ☐ Acuity | ☐ Orthopedic. | ☐ Audiogram | ☒ Medical |
| ☐ I.E.P. | ☐ Medical | Report | ☐ Medical | ☐ Anecdotal Records |
| | ☐ I.E.P. | ☐ I.E.P. | ☐ I.E.P. | ☒ Devereux |
| | | | | ☒ I.E.P. |
| | Other Medical | L.D. | S.C.D. | |
| | ☐ Devereux | ☐ Devereux | ☐ Medical | |
| | ☐ I.E.P. | ☐ I.E.P. | ☐ Devereux | |
| | | | ☐ I.E.P. | |

Reason(s) for the request: _Student has shown behavior that is_
_appropriate for placement in the MH Unit at Hayes_

_____      _____
Signature of Parent          Signature of Principal

_____      _____
Signature of Spec. Ser. Teacher      Signature of Psychologist

_____      _____
Signature of Sending Coordinator      Signature of Receiving Coordinator

Request approved ____✓____      Denied _____

Date _10/29/86_      _____
Signature of Director of Pupil Personnel Services

PRINCIPAL - WILL FILE THIS REQUEST IN THE CIMS FOLDER AFTER ALL.

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5764

Student's Name __Nathaniel Jackson__    Date of Birth _2-13-72_    School _Stambaugh_

Special Service Program _Multi-Handicapped_    Related Service _Work Study_    School Year _1989-90_

| Annual Goals: | Short Term Instructional Objectives: | Evaluation Procedures & Criteria: |
|---|---|---|
| Nate will complete his job training hours as part of the Try_out Program and be retained as part of the employees regular employees. | Nate will exhibit appropraite retention and execution of learned job task thru-out his training. | Periodic written/oral work evaluations from t employer will be shared with teacher, parent, principal and program coord. |
| Date: February 0, 1990 Chair: _Joanne Hayworth_ Coordinator: _Colli Kostli_ Student: _Nathaniel Jackson_ | Nate will evidence appropriaty school attendance and work attendance. Nate will exhibit appropriate behavors related to employability: Time management, good communication and sociability, appropriate attitude with co-workers and customers, cooperation, responsibility ability to accept constructive criticism. Nate will maintain appropriate academic asttitude and competence and school cooperation thru-out his job graining. * Nate will follow ALL THE RULES AND PROCEDURES AT THE WORKPLACE FOR BEHAVIOR, CALLING OFF AND SIGNING IN. | |

CRITERIA & SCHEDULES FOR PERIODIC (ANNUAL) REVIEW: _Nate refused to attend school and has not shown up for clas_    Date: _April 3 1990_

a. Are Instructional Objectives being achieved? Yes ☐ No ☒ _once he was able to return after an injury. He did not call off or show up on 3/30/90 or 4/3/90. He is being_

   1. Met as stated: Yes ☐ No ☒ _terminated from ACE campus living because of unreliability_

   2. Made progress: Yes ☐ No ☒

b. Is the current placement appropriate? Yes ☐ No ☒ Data Base _School Attendance / Work Attendance_

c. Review Schedule: Annual ☐ Semi-Annual ☐ Other (Specify) _as needed - Nate refuses to attend school_

d. Recommendations for placement and general program for next school year _work would be recommended only if Nate atten_ _school on a regular basis. Right now he refuses to g_

_Joanne Hayworth_ (Conference Chairperson)   _Conference (Verbal) McKinney 4/3/90_ (Parent/Guardian)   _Colli Kostli_ (Teacher) work study coorde

White—Program Coordinator: Canary—CIMS: Pink—Parent: Goldenrod—CIMS

Jackson, Nathaniel ▮▮▮▮▮▮ 9   9/01/87 ____ Hayes

▮▮▮▮▮▮

Youngstown, Ohio 44506

▮▮▮▮                                    9/22/88 Transitiona

Charles, Pauline

1987-88  -  9
1988-89 -  10

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5766

While gone, Nate left the room saying that he was leaving the building (9:15) When I returned Nate was still out of the room. I went for Mr. Cassaro. Nate returned. While I was in the hall Nate walked out by the classroom door and Mr. Cassaro called him at which time he went to time out.

J. Sirbaili

9-19-77

Nate come into class on Monday Sep.
and took his seat with his headgear. A word
search activity was on the desks of the stud
to earn points. Nate started burning his
paper. Mrs. Hall told him to stop. He
stopped momentarily — then got up to burn
another student's (Lottie) paper. Again he
was asked to stop. He did. In his seat,
Nate was constantly talking out & swearing.
He also laid on the table and refused to
leave to go to time out.

Nate was not permitted to leave between
periods but Nate got out of the room
and went to bother another teacher, Miss
Quinn. When he returned he continued
speaking out and swearing. I asked
Nate to go to time out. He refused. I
went to the back of the room by the
door and asked Nate to come with me.
Nate refused again. I went to Nate
and put my hand on Nate to guide
him to time out. Nate jumped up and
swung his hand to me missing my face
by approximately 3 inches. I went for hel

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5768

**FILED**
COURT OF APPEALS

APR 19 1993

TRUMBULL COUNTY, OHIO
MARGARET B. O'BRIEN, Clerk

1    IN THE COURT OF COMMON PLEAS

2              TRUMBULL COUNTY, OHIO

3    State of Ohio,            )   Case No. 91-CR-288
                               )   Court of Appeals #
4    -vs-                      )   Judge John M. Stuard
                               )
5    Roderick Davie,           )   JURY TRIAL TRANSCRIPT
                               )   VOIR DIRE - VOLUME I
6     Defendant                )

7

8

9    Jury Trial Commencing on Tuesday, February 18, 1992

10   Before the Honorable John M. Stuard at the Trumbull

11   County Court of Common Pleas, Courtroom Number 2.

12

13

14

15   APPEARANCES:

16   ON BEHALF OF THE STATE OF OHIO:
        Mr. Dennis Watkins, Prosecuting Attorney
17      Mr. Thomas Gysegem, Assistant Prosecuting Attorney
        Mr. Patrick McCarthy, Assistant Prosecuting Attorney
18

19   ON BEHALF OF THE DEFENDANT, RODERICK DAVIE:
        Mr. James Lewis, Public Defender
20      Mr. Paul Choppa, Public Defender

21

22                          APR 15 1996

23               MARCIA J. MENGEL, CLERK
                 SUPREME COURT OF OHIO
24

25   OFFICIAL COURT REPORTER:  Lori J. Hiland, RPR



EXHIBIT
88

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5769

12

1  in order to maintain the highest degree of integrity in
2  our system.  Shortly, we will proceed with the examination.
3  That will be done by the Court and the attorneys with you
4  individually.

5       Now, we do not ask for the impossible, but we do
6  ask for your understanding and cooperation to make the system
7  work.  We are all involved in this system, not just the
8  Judge and the lawyers up here, but you folks.  You are members
9  of our society.  You are residents of Trumbull County, and
10 you are part of the system.  A very essential part.  Now,
11 ladies and gentlemen, I ask each of you to please stand
12 up at this time and raise your right hand so that the bailiff
13 may administer the oath in preparation for the examination
14 of the attorneys.  If there is anyone who has an objection
15 to being sworn in, just remain standing for an oath of
16 affirmation.

17              (Oath given to all prospective jurors.)
18              THE COURT:  Thank you very much.
19              UNIDENTIFIED PROSPECTIVE JUROR:  Excuse
20 me, maybe I'm out of order.  I can't understand -- I can
21 be out of line.  I can't understand why we have the people --
22 how come he is the only black guy here?
23              THE COURT:  Let me explain it this way.
24 The prospective jurors are called from a voters wheel.  A
25 voters wheel is charged with names from a voters list.  Now,

13

1    that is perfectly or strictly a random selection.  To answer

2    your question, all I can say is that jury selection is accord-

3    ing to statute.  It's by names as drawn.  Sometimes we have

4    different ethnic groups in large abundance.  According to

5    the question of the draw, that is something that these two

6    gentlemen up here are charged with the responsibility of

7    seeing that there has been a fair jury selection.  I think

8    that's about all that I can say on that.

9            If you're inferring that there is a reason

10   for that --

11           UNIDENTIFIED PROSPECTIVE JUROR:  Your

12   Honor, I'm not inferring anything.

13           THE COURT:  That's up to counsel to inquire.

14           UNIDENTIFIED PROSPECTIVE JUROR:  It's

15   kind of strange that you have 50,000 people in the City

16   of Warren and there's only one black man here.

17           THE COURT:  Gentlemen, approach the bench,

18   please.

19           (Conference held at the bench.)

20           THE COURT:  Ladies and gentlemen, as

21   we go through each of you individually, any questions that

22   you have of whatever nature, you will have an opportunity

23   to ask at that time.  Okay.  Although all of you have been

24   called as prospective jurors, only 12 of you may serve as

25   trial jurors in this case, together with a number of

14

1   alternates.  Bearing in mind what I have told you, I will
2   now list the questions that the Court will ask each of you
3   generally and individually when you are questioned by your-
4   self.  You need not answer now, but will have an opportunity
5   when you are questioned individually.  I just wish you to
6   know what some of the questions will be.  Do you hold any
7   personal convictions concerning the death penalty which
8   would preclude your returning a verdict creating the possibility
9   of a death penalty if the facts and the law in the case
10  should warrant?  Do you hold any personal convictions which
11  would prevent you from recommending the death penalty as
12  a punishment in this case if the facts and the law in this
13  case should warrant?  Do you know the Defendant or any member
14  of his family or his attorneys?  Do you know counsel for
15  the State or any member of the staff of the prosecuting
16  attorney?  Do you know the victims of the crime charged;
17  John Coleman, Tracey Jefferys, William J. Everett, or any
18  members of their families?  Do you, of your own personal
19  knowledge, know anything about this case?  Have you heard
20  or read anything about this case from any source?  As a
21  result of what you have heard or read, have you formed an
22  opinion with respect to the guilt or innocence of the Defendant?
23  If so, will you be able to set aside any opinion you may
24  now have and decide this case based upon the evidence presented
25  to you in Court and the law and instructions given by the

15

1  Court?  If you have heard or read anything about this case,
2  will you be able to set aside any such information or know-
3  ledge and make it formally part of your deliberations if
4  called upon to sit in this case?  Would participation in
5  this case as a juror represent a personal hardship of such
6  magnitude that it would interfere with your ability to tent-
7  atively receive the evidence, follow the instructions of
8  law given to you by the Court, and to be fair and impartial
9  on this case, both to the State of Ohio and to the Defendant?
10       Gentlemen, do you have prospective witness lists
11  available in this matter?
12            MR. WATKINS:  Yes, Your Honor.
13            THE COURT:  We're going to ask both the
14  prosecution and the defense to read a list of those witnesses
15  that they anticipate calling at this time.  I would ask
16  you to catalog any of those names with whom you are familiar.
17  That should be brought up when we go through your individual
18  questioning.
19            MR. WATKINS:  Do you want me to read
20  them, Your Honor?
21            THE COURT:  If you would be so kind.
22            MR. WATKINS:  May I approach the bench?
23            THE COURT:  Sure.
24            (Conference held at the bench.)
25            THE COURT:  Ladies and gentlemen, the

16

1   names that are going to be read by both sides do not necess-
2   arily mean that each and every one of those witnesses will
3   be called or doesn't mean that it is all inclusive.  There
4   may be others that both sides may call.  The reason that
5   I ask that this be done is that's another possibility that
6   someone may not be able to be totally impartial if they
7   should find that a witness appears during the trial that
8   they know extremely well.  Whether they look favorably or
9   unfavorably on that witness.  The purpose is to allow you
10  to have some more knowledge of the persons who may be called
11  in this case.  Mr. Watkins.

12              MR. WATKINS:  Thank you.  Sergeant William
13  Carnahan, Warren Police;  Donna J. Smith, Mineral Ridge,
14  Ohio;  Charles Sines, Warren Police Department;  Dennis
15  Steinbeck, Warren Police Department;  Sharon Allen, BCI,
16  Richfield, Ohio, Bureau of Criminal Identification and
17  Investigation.  That's out of the Attorney General's office.
18  Sonya Barnes, Warren, Ohio;  Carl Miller, Warren, Ohio;  Sondra
19  Lough, Warren, Ohio;  Lori Moore, Canfield, Ohio;  William
20  Everett, Warren, Ohio;  Gary Vingle, Warren Police Department;
21  Dale Laux, BCI, Richfield;  Patricia Rogers, St. Joseph's
22  Hospital, Warren, Ohio;  Duane Thomas, Warren, Ohio;  Randy
23  Smith, Warren, Ohio;  Kenneth Morelli, Warren, Ohio;  Joe
24  Wolfe, Warren, Ohio;  Dr. Ted Soboslay, Trumbull County Coroner;
25  Mike Albanese, Warren, Ohio, City Police;  Tim Downs, City

17

Police of Warren, Ohio; Nancy Bulger; Rodney Cole; Jeffrey
Lynn, BCI, Richfield; Dr. Roberto Ruiz; Dr. H. S. Shin,
out of Summit County Coroner's office acting in St. Joseph's
Hospital; Dick Turbock, BCI, Richfield; Dr. Robert Alcorn,
Beechwood, Ohio; Buster Janin, Warren, Ohio. I believe
that's it, Your Honor.

THE COURT: Thank you. Mr. Lewis.

MR. LEWIS: Ladies and gentlemen, on
behalf of the defense, these may be witnesses called in
this case: Roderick Davie; Elaine Davie; William Davie;
Dr. James Brown from Cleveland; Dr. John Kenny from Cleveland;
Sherman Davie; Andre Davie.

THE COURT: Okay. Thank you very much.

Now, you are all aware that it is your duty as
citizens to serve on a jury. It is also your duty to reveal
to the Court any reason whatsoever that you cannot serve
to all involved. You are all undoubtedly qualified to serve
as jurors. You would not be here otherwise. However, there
may be something that would interfere with your ability
to serve as a juror in this particular case. For that reason,
and in order to obtain a fair and impartial jury, questions
will be asked of each of you until we have selected 12 of
your number and five alternates.

Now, you have, through the questionnaires which
you returned to the Court, already answered inquires concerning

18

your background as to your family, employment and so on.
Additional questions will be asked of you. All of these
questions will be of an informal nature. I would ask you
to please be frank and honest in your answers. There will be
nothing asked with any intention to embarrass or to pry
into your personal affairs. You, by now, are aware of what
we're trying to do and the purpose of it. I would ask you
to keep in mind that if there is any question asked that
you do not understand, it's proper for you to call that
to my attention, and I will see that the question is reframed
or restated.

        Now, it is our hope to schedule the voir dire so
that all of you do not have to spend days sitting in the
courthouse waiting to be called. You have each been assigned
a number. And again, please remember that number, the panel
and the number, and we will obtain that when you leave.
You have also been given a phone number to call into the
courthouse. I would ask you to be sure and write it down.
Take it and keep it. That phone number is your link to
this Court for further instructions.

        Okay. At this time, I'm going to ask those who
held their hands up and gave numbers to remain in the court-
room. We'll have 15 from panel 1 also remain for the rest
of the day. Before we get to that, Mr. Prosecutor or Mr.
Lewis, on those numbers that have been written down, if

19

1   we have panel 1, one through 15 of those stay, how many

2   of those are people that have held their hands up?

3                   MR. LEWIS:  We believe just one, Your

4   Honor.

5                   THE COURT:  Just one?

6                   MR. CHOPPA:  There was one I didn't get

7   the last number.  He's on panel 1.  I believe he was in

8   the back there, Your Honor.

9                   THE COURT:  Clear in the back, what is

10  your number?

11                  PROSPECTIVE JUROR 32:  I'm 32, Your Honor.

12                  THE COURT:  Panel 1, 32.

13                  MR. WATKINS:  Yes.  We had No. 7 also

14  for vacation.

15                  THE COURT:  Okay.  I am going to ask

16  on panel 1, one through 20, to remain in the courtroom in

17  addition to those other persons who specifically gave their

18  numbers with problems.  The rest of you I will ask you to

19  phone that number each evening during the week after 4:30,

20  and you will be given instructions.  Please keep in mind

21  that the panel number is as important as your number, you

22  know, whether it's 1 or 2.

23                  Finally, this is important.  You are instructed,

24  each of you, from this time forward until this case is con-

25  cluded to, at no time during this case, to discuss anything

20

1   about this case with anyone else, including other potential

2   jurors.  And you will allow no one to discuss the case with

3   you.  You also will attempt to read nothing or to listen

4   to anything or to do any research concerning any facts about

5   this case.  That applies until I finally discharge you from

6   any further responsibilities in this matter.  Any questions?

7   I trust that you have an idea why we're here and what we

8   are attempting to do.  Ma'am?

9                    PROSPECTIVE JUROR 41:  Who do I talk

10  to -- do I talk to you about being excused?  I have two

11  preschoolers, and I don't have anybody to watch them.

12                   THE COURT:  Okay.  I would ask you to

13  remain.  What is your number, please?

14                   PROSPECTIVE JUROR 41:  Panel 2, 41.

15                   THE COURT:  Yes, sir?

16                   PROSPECTIVE JUROR 55:  Can I talk to

17  you, too?  Panel 1, 55.

18                   THE COURT:  Yes, surely.  Okay.

19                   PROSPECTIVE JUROR 38:  I also have a

20  prepaid vacation.  No one saw me with my hand before.

21                   THE COURT:  What is your number?

22                   PROSPECTIVE JUOR 38:  Thirty-eight, panel

23  1.

24                   THE COURT:  One, 38.  Okay.  Ma'am?

25                   PROSPECTIVE JUROR 67:  I also have a

21

1    lot of medical --

2                    THE COURT:  Your number, please?  Your

3    number, please?

4                    PROSPECTIVE JUROR 67:  Panel 1, 67.

5                    THE COURT:  Okay.  We thank you all for

6    coming this morning.

7                    MR. WATKINS:  Your Honor, may we approach

8    the bench?

9                    THE COURT:  Yes.

10                   (Conference held at the bench.)

11                   THE COURT:  Okay.  Two last points.  Ladies

12   and gentlemen, panel 1, numbers one through 30, rather than

13   one through 20, anyone from No. 1 through 30 on panel No.

14   1, you are requested to remain seated this morning.  Everyone

15   else -- oh, part of my instruction to you is that you will

16   not avail yourself of any reports in the newspaper, TV,

17   in addition to discussing this matter.  You are to keep

18   your own counsel as you presently are in this courtroom

19   and not absorb any other information about this case until

20   I finally discharge you from that instruction.  We thank

21   you very much.

22                   (Designated prospective jurors excused.)

23                   THE COURT:  Ladies and gentlemen, we're

24   going to handle each of you individually, as we will all

25   prospective jurors.  So, you are all free to take a break.

22

1  Wait in the hall.  There's a possibility you may be able
2  to sit in the courtroom downstairs, if it's not being used.
3  In any event, I would ask you to leave.  Make yourself avail-
4  able in the courthouse, and you will be called individually.
5  We will get through this process as quickly as possible.
6  There's a coffee machine downstairs, some other machines
7  dispensing candy and what have you.  Nos. 1 through 7, we
8  would ask you to remain in the courtroom until we begin
9  this process.

10        We have taken Juror No. 22, panel 2, Mr. Arnold
11  A. Fall.

12        Mr. Fall, it is quite noticeable that you have
13  a medical problem.  You have an oxygen supply.  Would you
14  be able to serve as a juror on this case, or would you find
15  that very difficult?

16             PROSPECTIVE JUROR 22:  No, this only
17  lasts four to six hours maximum time.

18             MR. WATKINS:  We have no objection.
19             MR. LEWIS:  We have no objection either.
20             THE COURT:  Thank you for coming.
21             (Prospective Juror Fall excused.)
22             THE COURT:  You have appeared in Court
23  with two children.

24             PROSPECTIVE JUROR 41:  I would be working
25  if I could go out.  I don't have a baby sitter.  My parents

23

1   are old and they can't take care of them.

2               MR. LEWIS:  You have no one available

3   to watch the children?

4               PROSPECTIVE JUROR 41:  No one at all.

5               THE COURT:  Gentlemen, is there an objection?

6               MR. WATKINS:  No objection.

7               MR. LEWIS:  No objection, Your Honor.

8               THE COURT:  You are excused.

9               (Prospective Juror Brenner excused.)

10              MR. LEWIS:  Judge, I'd like to, at this

11  time, renew the motion in regard to the motion filed previously

12  in this case in regard to the choosing out of the venire

13  for selection of jurors out of this case.  We previously

14  filed a motion in regard to allowing the driver's licenses

15  to be used, and it was denied.  The jury commissioners have

16  either chose not to do it, or have not implemented the pro-

17  cedure provided by the statute.  Although it's an alternative

18  procedure, it was placed in there for a reason, to get a

19  more adequate cross section of the jury.  Today, we have

20  venire that has appeared to counsel that I think there has

21  probably been at least 20 of the venire, some of which who

22  did not show originally today, as well as possibly maybe

23  10 who were previously excused.  There is not one black

24  person among the entire venire.  We have approximately 130

25  people in the courtroom, and to me, as far as I know, there

24

1   was not one individual who was a black person in the venire

2   or chosen in this venire.  I don't know the exact person

3   percentage of the population.  The prosecution has indicated

4   six percent.  I'll go along with six percent.  But even

5   if six percent is the population of Trumbull County, it

6   would seem to me that you would get at least five or six

7   out of 100.  In this case, we have 175.  We did not have

8   one black person.  It seems to me that normally, under the

9   circumstances, that if you get an accurate cross section

10  you might have nine, 10 or 11 or somewhere in that area.

11  There was not one black person chosen from the venire.  We

12  are not questioning the actual method in which it was chosen

13  or anything was incorrectly done, but drawing upon only

14  voters does not adequately represent the cross section of

15  the community.  And I think that's the reason, by the statute,

16  for driver's licenses.  I think this is evidence of the

17  fact that it does not draw a cross section of the community.

18  Therefore, I renew my motion.

19              THE COURT:  Okay.  Mr. Watkins.

20              MR. WATKINS:  Your Honor, my response

21  is that the Court has already ruled.  I would add this.

22  When the Court has ruled, its journal entry reflected the

23  Supreme Court of Ohio as to jury selection in this state

24  that to my knowledge, and I think the demographics can be

25  validated through judicial notice of the census, that there

25

1   is six percent of the population in Trumbull County are
2   black.  That any minority in a county of our size with that
3   percentage in the minority, that is a small minority.  There
4   is no possible way that every single case that you're going
5   to get black individuals on the jury.  And it's a case-
6   by-case thing.  Our system is a system where all citizens
7   are to be considered fair and impartial.  And the inference
8   is a sad one.  That that means that people who happen to
9   be of another race or origin can't sit, and I don't think
10  that's a fair inference.  I would also note that there were
11  at least one that I know, because we did some checking,
12  black that was on the original list as selected by the jury
13  commission.  His name is Hugley.  However, he was -- they
14  were unable to serve him.  This is a problem that we have
15  in the jury process in that you don't necessarily have every-
16  body served.

17          THE COURT:  Okay.  The Court, in handling
18  the previous motion similar to this, has gone through the
19  statutes.  The Court participated in the original selection.
20  The Court witnesses the selection from the jury wheel.  Argu-
21  ments can be made on practically everything we do throughout
22  every case.  It's my reasoning that the statute, as it is
23  in place in Ohio, has been complied with strictly in the
24  choosing of this jury.  And, you know, I have no control
25  over what names come up, nor does anyone.  That's the whole

26

1   purpose for having it the way that it is.  The names that

2   go into the jury wheel, you have no control over, nor does

3   anyone, because it is based on the voting list.

4           MR. WATKINS:  Your Honor, may I make

5   a further comment?  I would also note, even if we were going

6   to take the Jim Lewis method, statistically, there would

7   be cases where even with that method you would not have

8   blacks because the number of blacks in the community.  I

9   am talking about the Trumbull County community.  There would

10  probably be a few more.  I don't even know.  But, the point

11  is, it would not change the results necessarily.  We still

12  could have and do have juries that would not have blacks.

13          THE COURT:  The point is, we are dealing

14  with a total unknow.  You can speculate.  There is a method

15  as set forth in the legislature.  We have strenuously tried

16  to and have followed that method.  Your motion will be over-

17  ruled.

18          MR. LEWIS:  I just want to add a further

19  note, Judge.  That the implementation -- this has been

20  implemented in a number of counties.  If the legislation

21  was so absolutely happy in thinking that was just a wonderful

22  thing, then they would have left it alone.  Evidently, they

23  derived a reason for promulgating and putting this section

24  in providing for driver's licenses.  And actually, the Courts

25  do have control over that, as far as what the jury commissioner

27

1  system is that they can utilize. I think the reason and

2  the presence there is that there would be no other reason

3  for it. It is there, and trying to give representation

4  to more people in the community. In the event then I assume

5  the Court is overruling the motion, I would object to the

6  venire in its total, and the Defendant's violation of his

7  constitutional rights in the Sixth and Fourteenth Amendments

8  of the Constitution.

9              THE COURT: Thank you.

10             For the record, I have something here from Edward

11  J. Urban which says, "Please be advised the above patient

12  is unable to participate in jury duty due to health problems."

13  Signed by Dr. Urban. Mr. Slusher, would you find it difficult

14  to sit as a juror in this matter due to health problems?

15             PROSPECTIVE JUROR 7: Yes, Your Honor.

16             THE COURT: Do you gentlemen wish to

17  inquire?

18             MR. WATKINS: I have no objection, Your

19  Honor.

20             MR. LEWIS: If I could, Mr. Slusher,

21  I don't mean to pry. Do you have a specific medical problem?

22             PROSPECTIVE JUROR 7: Yes.

23             MR. LEWIS: Okay. You also have any

24  trouble hearing?

25             PROSPECTIVE JUROR 7: No, I'm okay.

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel Jackson's Appendix to his Memorandum Contra To The Prosecutor's Motion To Dismiss was forwarded by first-class, postage prepaid U.S. Mail to Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481, on this 1ST day of June, 2004.

RANDALL L. PORTER
COUNSEL FOR NATHANIEL JACKSON

✓                          1

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

CASE NO. 01-CR-794

| | | |
|---|---|---|
| STATE OF OHIO, | ) | JUDGE JOHN M. STUARD |
| PLAINTIFF | ) | |
| vs. | ) | JUDGMENT ENTRY |
| | ) | |
| NATHANIEL JACKSON, | ) | ENTRY ON SENTENCE |
| DEFENDANT | ) | |

On August 14, 2012, Defendant, Nathaniel Jackson's
sentencing hearing was held pursuant to O.R.C. Section 2929.19.
Defense Attorneys, Anthony Consoldane and James Lewis, and
Prosecutor Dennis Watkins and Assistant Prosecutor Charles
Morrow were present, as was Defendant, Nathaniel Jackson, who
was afforded all rights pursuant to Criminal Rule 32. The
Court has considered the record and oral statements, as well as
the principles and purposes of sentencing under O.R.C. Section
2929.11,and has balanced the seriousness and recidivism factors
of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, August 14,
2012, having determined in a separate opinion of specific



2001 CR
00794
00085537763
OSEN

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5787

2

findings that the aggravating circumstances as to the count of
Aggravated Murder outweigh the mitigating factors by proof
beyond a reasonable doubt, then made inquiry as to whether the
Defendant had anything to say why judgment should not be
pronounced against him, and the Defendant in answer showed no
good cause or sufficient reason why sentence should not be
pronounced.

The Court has considered the factors under O.R.C.
Section 2929.14 and makes the following findings:

1) The shortest prison term will demean the
seriousness of the Defendant's conduct;

2) The longest prison term is appropriate
because the Defendant committed the worst form of the
offense;

3) Multiple prison terms are necessary to
protect the public from future crime and to punish
the offender;

4) Consecutive prison sentences are not
disproportionate to the seriousness of the Defendant's
conduct and to the danger the offender poses to the
public;

5) The harm caused by the multiple offenses
was so great that no single prison term for any of the

3

offenses committed as part of a single course of conduct
adequately reflects the seriousness of the Defendant's
conduct; and

6) The Defendant's history of criminal
conduct demonstrates that consecutive sentences
are necessary to protect the public from future
crime by the Defendant.

It is, therefore, ORDERED, ADJUDGED and DECREED that the
Defendant, Nathaniel Jackson, be taken from the courtroom to
the Trumbull County Jail and from thence to the Correction
Reception Center at Lorain, Ohio, and thereafter be sentenced
to death on August 15, 2013, on Count One; and imprisoned
therein for the stated prison term of ten (10) years on Count
Three; plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed in Count Three; ten (10) years on Count Four,
plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed on Count Four; sentence in Count Four to be
served consecutively to the sentence imposed on Count Three.
Firearm Specifications in Count Three and Count Four shall
merge as one sentence in Count Three as a matter of law.

4

Defendant is Ordered to the cost of prosecution taxed in the amount of $_____ for which execution is awarded.

_____8/14/12_____                           ꝗM. Stuard
DATE                                    JUDGE JOHN M. STUARD

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF
THIS ENTRY TO ALL COUNSEL OF RECORD.

JUDGE JOHN M. STUARD

        You are hereby notified that
        you have been convicted of a
        felony of violence and pursuant
        to Section 2923.13 of the
        Ohio Revised Code, you are
        prohibited from acquiring,
        having, carrying or using any
        firearm or dangerous ordnance.

                8-15-12
                copies to:
                  Pros.
                  R. Porter

1

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
CASE NO. 01-CR-794

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| Plaintiff | ) | |
| vs. | ) | FINDINGS OF FACTS |
| NATHANIEL E. JACKSON, | ) | AND CONCLUSIONS OF LAW |
| Defendant | ) | |

    The Defendant, Nathaniel E. Jackson, having entered a
plea of not guilty, this matter proceeded to trial, and the
Defendant being found guilty was sentenced by this Court.

    The matter is before the Court on remand from the Supreme
Court of Ohio pursuant to the Court's opinion and order on
remand.  The remand is quite specific wherein having found no
prejudicial error in regard to Defendant, Nathaniel Jackson's
conviction, the conviction and judgment of the Court was
affirmed.  The reviewing Court went on to state the opinion
that the administrative act of typing this Court's opinion
evaluating the appropriateness of the death penalty as required
by R.C. 2929.03(F) was defective.  The Supreme Court apparently
thought the prosecution participated in the Court's conclusions
as set forth in the final opinion.

2001 CR
00794
00076620902
O

2

This writer has presided over the trials of each of the Co-Defendants, Nathaniel Jackson and Donna Roberts. He has reviewed and decided the appropriateness of the death penalty option in both cases as required by O.R.C. 2929.03 and now does so again as ordered by the Ohio Supreme Court.

On November 8, 2002, a Trumbull County jury returned a verdict finding the Defendant, Nathaniel E. Jackson, guilty of two (2) counts of Aggravated Murder arising from the death of Robert S. Fingerhut. Since Count 1 and Count 2 of the indictment merge for sentencing purposes, the State elected to dismiss Count 2 and proceed to the mitigation phase on the 1st count of the indictment. Therefore, for the purposes of this opinion, the Defendant was convicted, under the 1st count of the indictment, of purposely, and with prior calculation and design, of causing the death of Robert S. Fingerhut. The jury further found that the State had proved beyond a reasonable doubt the specifications of Aggravating Circumstances. After the mitigation hearing, the jury concluded that the State had proved beyond a reasonable doubt that the Aggravating Circumstances outweighed the mitigating factors and returned a verdict recommending that the sentence of death be imposed upon the Defendant.

3

Factually, the evidence presented by the State revealed that while the Defendant was in prison for a prior conviction unrelated to the present case, he along with the co-defendant, Donna Roberts, plotted the murder of her housemate and ex-husband, Robert S. Fingerhut.

The police authorities in investigating the death of Robert S. Fingerhut found two (2) boxes of personal letters written between Jackson and Roberts, wherein they planned in great detail how the murder of Robert s. Fingerhut would be carried out. The police also found numerous phone call recordings from the institution in which Jackson had been incarcerated wherein specific preparations were discussed.

The State, therefore, had a plethora of information in the handwriting of both Co-Defendants wherein they plotted the murder of Robert's housemate, and ex-husband, Robert S. Fingerhut. Indeed, both of them conceived and executed a plan to kill Fingerhut in order to permit the Defendant, Roberts, to live "happily ever after." However, the plan went awry when Jackson, who was in the house where Fingerhut resided, was shot in the left index finger during the execution of Fingerhut. He then took Fingerhut's car keys and drove the vehicle which Fingerhut typically operated to his business location in to Youngstown. Shortly thereafter, Roberts took the Defendant to

4

a motel in Boardman and rented a room where Jackson could hide out. Ultimately, the Defendant was captured at a house in Youngstown, and gave a statement to the police alleging self defense.

More specifically, the State introduced evidence that on December 11, 2001, two (2) days after the Defendant was released from prison, Robert S. Fingerhut, while in his home, was pistol whipped and shot 3 times, causing at least four injuries from gunshots. Two of the injuries were to the back, with one grazing the back, and the other entering near the shoulder before exiting out the chest area of the victim. Fingerhut also sustained a defensive gun shot wound to the webbing of his left hand between the thumb and forefinger. The fatal gunshot was to the top of Fingerhut's head and from a short distance. This injury "would have dropped him like a sack of potatoes," as testified to by Dr. Humphrey Germaniuk, the coroner.

Police responded to the crime scene as a result of a 911 call. When they arrived at approximately 12:01 a.m., they were met by the Co-Defendant, Donna Roberts, who informed them that her ex-husband's car was missing. She also granted them permission to search the residence and her car. During this search, police found more than 140 letters from the Defendant

5

to Roberts in her dresser, and an equal number of letters from Roberts to the Defendant in the trunk of Roberts' car, in a paper bag bearing the Defendant's name and prison number.

Additionally, law enforcement officers were able to obtain 19 telephone conversations, lasting more than three (3) hours, which were recorded while the Defendant was incarcerated in Lorain Correctional Institution. These telephone conversations, along with the letters which spanned three (3) months, revealed a continuing and evolving plan to kill Fingerhut immediately upon the Defendant's release from prison.

The evidence also revealed that Roberts, near the time of the murder, was seen driving her automobile in a very slow manner away from the vicinity of the home where Fingerhut lived. Furthermore, within two (2) hours from the last time Fingerhut was seen alive, Roberts rented a hotel room for the Defendant. In this room, bloody bandages and other medical supplies were found by hotel cleaning people and were subsequently collected by police.

The car which was usually driven by Fingerhut, and which had been reported stolen by the Co-Defendant, was recovered in Youngstown, Ohio. Bloodstains were located throughout the vehicle and were collected by law enforcement. DNA analysis revealed that the blood matched that of DNA profile of the

6

Defendant.

The State also introduced evidence that Roberts and the Defendant discussed purchasing a "new Lincoln" or "2002 Cadillac DeVille" for the Defendant. Additionally, Fingerhut had two (2) life insurance policies with a total death benefit of $550,000.00 and with Donna Roberts named as the beneficiary.

Based upon this and other evidence, the jury properly concluded that the Defendant committed a burglary to facilitate the premeditated and the purposeful murder of the victim Fingerhut along with the Co-Defendant Roberts. The Defendant after executing his plan, then stole Fingerhut's vehicle which allowed the jury to find that the murder was committed while committing the aggravating circumstances of Aggravated Burglary and Aggravated Robbery.

In a case of this nature, pursuant to O.R.C. 2929.03(D)(3), the Court is required to determine whether the State has proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. Indeed the Supreme Court of Ohio has stated in State v. Wogenstahl (1996), 75 Ohio St. 3d, 344:

> The nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation...In the penalty phase of a capital trial, the 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in

7

*RC 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt.* (See Wogenstahl at 356)

In performing its statutory duty, a review of the aggravating circumstances is required.

1.) *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.*

The evidence presented at trial reflected that the Defendant trespassed in the victim's dwelling and murdered him. The Court finds that the Defendant entered into 254 Fonderlac Drive in Howland Township. He was wearing gloves and armed with a gun, with which he struck the victim leaving a mark on Fingerhut's face. Once in the house, he fired the gun three times causing four (4) separate wounds. The fatal shot was to the top of Fingerhut's head, and nearly straight down.

From the aforementioned evidence, the Jury concluded that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Burglary and that he was the principal offender.

2.) *The Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and*

8

*that he was the principal offender.*

As he was driving away from the crime scene, and prior to abandoning the vehicle in Youngstown, he left blood evidence throughout the car. This evidence was subjected to DNA testing, which confirmed that forensically, it was his blood. Quite simply, the Defendant committed the Aggravated Robbery to escape the consequences of his prior murderous act.

This evidence permitting the jury to conclude that the Defendant committed the Aggravated Murder while he was committing, attempting to commit, or fleeing immediately after committing Aggravated Robbery and that he was the principal offender.

To be weighed against the aggravating circumstances are the mitigating factors. In this case, the following factors were considered by the Court as possible mitigation against each specification and against the imposition of the death penalty:

1.) *The nature and circumstances of the offense, the history, character, and background of the offender.*

As was noted in <u>Wogenstahl</u>, supra, the nature and circumstances of the offense may only enter into the statutory weighing process on the side of mitigation. However, in this

9

case, reviewing the nature and circumstances, the Court does not find any credible evidence which would allow the Court to accord any weight to the nature and circumstances of the offense against the imposition of the death penalty.

In considering the history, character and background of the offender, this Court considered the home life of the Defendant and the fact that he grew up in a relatively poor environment, and that he was cared for and raised by his mother and maternal grandmother. His biological father had little, if any, real involvement with him, and this lack of a father figure likely contributed to his behavioral problems.

Though the Court gives some weight to the Defendant's upbringing, it deserves little weight because of the credible testimony from the Defendant's step-father, his sister, his mother, and Dr. McPherson. These witnesses testified that the Defendant was respectful to both his mother and grandmother. His sister, who described him as smart and really kind, noted that they attended church. Further, there was testimony offered that he was reared in an environment, where he was not physically or sexually abused. His mother also declined to say that his home was in a "rough neighborhood," or that the Defendant had any problems in school. Dr. McPherson's report noted that the Defendant had not been hospitalized for any

physical or mental condition. The witnesses also notes that they practiced moral tenets and that responsibility and respect were taught.

In conclusion, from the testimony of these witnesses, there is nothing particularly evident to show an unusual childhood or to offer an explanation for the Defendant's behavior which would be entitled any significant weight on the side of mitigation.

    2.) *Whether the victim of the offense induced or facilitated the killing.*

Although under R.C. 2929.04(B)(1), the mitigating factor regarding whether the victim of the offense induced or facilitated it, was not specifically argued by the Defendant during the penalty phase of the trial as mitigating, the Court did consider the Defendant's videotaped statement presented in evidence during the trial phase. In the self-serving statement, the Defendant claimed that the killing of the victim was as a result of the Defendant protecting himself from an unprovoked attack by the victim.

This statement to the police attempted to construct a scenario wherein the victim approached the Defendant to purchase marijuana and then invited the Defendant into his home. The Defendant then claims that the victim then pulled a

11

gun on him. The Defendant asserted that he attempted to disarm
the victim, but the gun went off apparently striking the
victim. However, the other facts illustrating the planning and
execution of the murder, along with the physical evidence
introduced, causes the Defendant's version not to be credible.
As such, the Court does not accord any weight to this
mitigating factor.

> 3.) *Whether it is unlikely that the offense would have*
> *been committed, but for the fact that the offender*
> *was under duress, coercion, or strong provocation.*

Again, while the Defendant did not specifically argue
this mitigating factor, the Court upon reviewing the video
tape, noticed that the Defendant claimed that the victim made
derogatory statements about the Defendant's race which angered
the Defendant. However, this comment is likewise not
convincing for the same reasons noted previously. This
mitigating factor has no weight.

> 4.) *Any other factors that are relevant to the issue of*
> *whether the offender should be sentenced to*
> *death.*

Under R.C. 2929.04(B)(7), commonly referred to as the
"catch all provision," the Court reviewed the Defendant's
capacity to appreciate the criminality of his conduct in light

12

of the defense expert testimony regarding his mental history
and mental state at the time of the offense was considered as a
possible factor under R.C. 2929.04(B)(3).

This testimony revealed that the Defendant suffered from
Attention Deficit Disorder/Hyperactivity Disorder, Chemical
Dependency, and a reported history of alcohol abuse. Further,
the evidence disclosed that the Defendant had an Antisocial
Personality Disorder and was considered low average or better
in intelligence.

Significantly, however, there was no evidence presented
that the Defendant, at the time of the offense, had any mental
disease or defect or that he lacked the capacity to appreciate
the criminality of his conduct. His Antisocial Personality
Disorder only showed that he had a history of inappropriate and
impulsive behavior from his early childhood to the present. He
was incarcerated four (4) times. According to the Defendant's
own expert, the Defendant, throughout his juvenile and adult
life had received repeated treatment and/or probation for his
criminal transgressions and his drug and alcohol abuse. He did
not learn from his past mistakes, but only escalated his
antisocial conduct.

In summary, this Court gives very little weight in
mitigation to the Defendant's mental status, and his drug and

alcohol abuse history especially in light of the Defendant's elaborate scheme to kill the victim, elude capture, and finally his attempt to deceive police officers with a statement blaming the victim.

Further under R.C. 2929.04(B)(7), the Court examined the Defendant's ability to maintain himself in a stable fashion in a structured setting. Indeed, it was suggested by the Defense that he could be a productive member of the general prison population, and that this should be considered as mitigating. However, the Court gives slight weight to this particular factor.

The Defendant's last incarceration was the result of him not learning from his past mistakes, and from his tendency to act out impulsively without looking at the consequences. Furthermore, he repeatedly was placed on probation, but he continued to digress, committing more serious criminal acts. Indeed, during the last incarceration, the Defendant claimed to have "found God" and that he was going to straighten out his life. At the same time, it is abundantly clear that he was plotting to commit the ultimate criminal act, a premeditated burglary and murder, while pre-textually presenting himself to prison officials as a good candidate for a release program. Quite simply, in the very setting in which the Defense suggests

that he could be a productive member, the Defendant defined and refined a plot, involving gloves, a mask and handcuffs, to murder Robert S. Fingerhut so that in effect he could assume Fingerhut's lifestyle, including running the Greyhound bus business, managing rental properties, and living in his home with Fingerhut's ex-wife.

The Defendant also offered an unsworn statement, wherein he stated that he was "very sorry for what happened." The Court likewise gives this statement slight weight as the statement lacked sincerity. The tone and tenor of the apology did not, in the Court's opinion, come from someone who was genuinely remorseful. Even assuming that the Defendant was remorseful, such retrospective remorse is not entitled to any significant weight. To the contrary, the Court believes that the Defendant's feigned remorse stems from the fact that the Defendant was apprehended. The Defendant was disappointed that the fool-proof, premeditated murder plot, which he developed over nearly three (3) months, and which included shooting the victim "in the 'F'ing head," failed.

When independently weighing the aggravating circumstances as to the Aggravated Murder as previously outlined against the collective factors in mitigation, this Court finds that the aggravating circumstances not only outweigh the mitigating

factors by proof beyond a reasonable doubt, but in fact, they almost completely overshadow them.

The State of Ohio has recognized that under certain circumstances, the death penalty is an appropriate sanction for any Defendant who commits an Aggravated Murder during the commission of certain felonies. In the case at bar, the underlying felonies are Aggravated Burglary and Aggravated Robbery.

In this particular case, the Court accords substantial weight to the Aggravated Burglary specification. In order to prove an Aggravated Burglary, the State is required to demonstrate that the Defendant trespassed in the occupied structure for the purpose of committing a criminal act. In most instances, this criminal act is a theft offense. Occasionally, a Defendant will trespass to commit a kidnapping or even a rape. Such criminal acts provide the basis upon which a Defendant can be convicted of Aggravated Burglary. Then, if during any of these underlying criminal acts, the victim is purposely killed, an Aggravated Murder with the specification of Aggravated Burglary has been committed. These alone can permit the imposition of the death penalty should the aggravating circumstance of the Aggravated Burglary be found to outweigh the mitigating factors.

Under the facts in the instant case, this Court cannot foresee of any other form of Aggravated Burglary where the weight to be given to this aggravating circumstance could ever be greater. The evidence reveals that the sole purpose for the Defendant's illegal entry in the Fingerhut residence was not to commit a theft, a kidnapping or a rape, but rather to carry out the premeditated, cold blooded execution of Robert S. Fingerhut. This is the most heinous form of Aggravated Burglary, and it is entitled to unsurpassed weight. Further, in this Court's view, this aggravating circumstance, standing alone, outweighs all of the evidence presented in mitigation.

The Court further gives weight to the Aggravated Robbery specification. After shooting the victim in the head, the Defendant took personal property of the victim to effectuate his escape. Indeed, the Defendant stole the victim's keys and his car.

Against this backdrop, the mitigating factors of the Defendant's background, history and character, his Antisocial Personality Disorder, his Attention Deficit Disorder, his history of drug and alcohol abuse, as well as his unsworn statement, have very little effect in minimizing, lessening, or excusing the degree of the Defendant's murderous conduct. From the overwhelming evidence, it is this Court's opinion that the

17

Defendant and the Co-Defendant plotted the murder of Robert S. Fingerhut solely to collect $550,000.00 in insurance proceeds. This was accomplished by trespassing in the residence where Fingerhut resided, for the sole purpose of ambushing and murdering him.

Upon consideration of the relevant evidence raised at trial, the relevant testimony, the other evidence, the unsworn statement of the Defendant, and the arguments of counsel, it is the judgement of this Court that the aggravating circumstances, outweigh, by proof beyond a reasonable doubt, the collective mitigating factors.

_8/14/12_

DATE

JUDGE JOHN M. STUARD
COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH WITH BY ORDINARY MAIL.

JUDGE

8-15-12

copies to:
Pros.
R. Porter

# WARRANT TO CONVEY

TO THE TRUMBULL COUNTY JAIL
*Revised Code, Sections 2949.12 TO 2949.17*

## COURT OF COMMON PLEAS, TRUMBULL COUNTY, WARREN, OHIO

**2001 CR 00794**
|2Say 1801|

**STATE OF OHIO**

VS.

**NATHANIEL E JACKSON**

**TO THE SHERIFF OF SAID COUNTY:**

*WHEREAS*, OUR SAID COURT, BEGUN AND HELD AT WARREN, OHIO IN SAID COUNTY, THE SAID INMATE,

**NATHANIEL E JACKSON**

TO BE BROUGHT/TAKEN BACK TO THE TRUMBULL COUNTY JAIL.

### *TRUMBULL CORRECTIONAL INSTITUTION*

YOU ARE THEREFORE HEREBY COMMANDED, TO TAKE CHARGE OF AND CONVEY THE SAID **NATHANIEL E JACKSON** TO THE TRUMBULL COUNTY JAIL AT WARREN, OHIO AND MAKE DUE RETURN OF YOUR PROCEEDING HEREIN TO THIS OFFICE FORTHWITH.

*IN TESTIMONY WHEREOF*, I HAVE HEREUNTO SET MY HAND AND AFFIXED THE SEAL OF SAID COURT AT TRUMBULL COUNTY, WARREN, OHIO August 13, 2012

**KAREN INFANTE ALLEN,**
*Clerk of Courts*

By:    KIMBERLY REEVES, Deputy Clerk



2001 CR
00794
00088018280
CRWARR

*411*

2001 CR 00794

**RETURN**

**TRUMBULL COUNTY
COMMON PLEAS COURT**
*Trumbull County, Warren, Ohio*

**STATE OF OHIO**

VS.

**NATHANIEL E JACKSON**

**RECEIVED** THIS WRIT ON THE **13** DAY
OF **August**, 201**2**, AT **1:53**
O'CLOCK **P**.M., AND ON THE **14**
DAY OF **August**, 201**2**,
I EXECUTED THE SAME BY CONVEYING
THE PERSON NAMED TO THE PLACE
DESIGNATED AS SHOWN BY THE
RECEIPT ENDORSED HEREON.

**WARRANT TO CONVEY**

_Thomas L. Altiere_
SHERIFF

By: _Dep. Edwd M. pa____
DEPUTY

**RETURNED AND FILED**

_____, 201___

**KAREN INFANTE ALLEN,**
*Clerk of Courts*

By: _____
**DEPUTY CLERK**

| **FEES** | |
|---|---|
| Mileage: | $ 11.00 |
| Service: | $ 10.00 |
| Other: | $ |
| | $ |
| **TOTAL:** | $ 21.00 |

_____, OHIO

_____, 201___

CLERK OF COURTS
TRUMBULL COUNTY

2012 AUG 15 PM 2 51

TRUMBULL COUNTY
CLERK OF COURTS
KAREN INFANTE ALLEN

**RECEIVED** THIS DAY FROM _____
_____ SHERIFF OF _____
COUNTY, OHIO, THE PRISONER NAMED
IN THE WITHIN WARRANT.

_V. Belser_
*Superintendent*

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          )       CASE NO: 01 CR 794
                                        )
        Plaintiff,                      )
                                        )       JUDGE: JOHN M. STUARD
    v.                                  )
                                        )
NATHANIEL JACKSON,                      )       STATE'S MOTION TO CORRECT
                                        )       ENTRY ON SENTENCE
Defendant.                              )

Now comes the State of Ohio, by and through the undersigned counsel, and hereby files

its *Motion to Correct Entry on Sentence* with respect to the above referenced matter.

In support thereof, counsel would note that on August 15, 2012, while the undersigned

was presenting cases before the Trumbull County Grand Jury, this office was contacted by the

Ohio Department of Corrections ("DRC") and Trumbull Correctional Institution ("TCI")

inquiring about the status of the Defendant's sentencing entry as they had become aware from

local media coverage that the Defendant had been sentenced to death. The DRC was requesting

the sentencing entry so that the Defendant could be transported to the appropriate facility

forthwith. A secretary from this office contacted a member of the judge's staff to inquire about

the status of the entry. The secretary was lead to believe, and the record reflects, that the signed

original had been forwarded to the clerk's office late in the afternoon on August 14, 2012 for

processing, and the secretary received an unsigned copy of that entry via facsimile, which she

subsequently sent to the DRC and TCI. She noted that there appeared to be errors, including that

the wrong defense counsel and prosecuting attorney had been listed as present at the hearing.

Upon counsel's return to the office at approximately 11:30 am, the secretary showed the

entry to the undersigned on this date, who reviewed the entry and observed what counsel



2001 CR
00794
00068007092
CRM

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5810

believed to be several errors and omissions, in addition to those notice by the secretary. These include the omission in the caption of the phrase "DEATH PENALTY CASE," of the notification of post release control for Aggravated Burglary and Aggravated Robbery, the "life time parole" for the Aggravated Murder conviction, and the "good time" provisions.

After reviewing the same, counsel immediately contacted a member of the judge's staff and advised that there appeared to be errors in the unsigned entry and that the same copy should be sent to the appropriate defense attorneys. The undersigned also noted that this office would be filing this instant motion requesting that the entry be corrected. Counsel learned that the original, signed and time-stamped sentencing entry had been filed with the clerk's office on August 14, 2012, a copy of which undersigned counsel obtained from the clerks' office and was being prepared to be sent to counsel.

The State now requests that this Court issue an entry correcting the *Entry On Sentence* dated August 14, 2012 to accurately reflect the Court's oral pronouncements, including adding the phrase "DEATH PENALTY CASE" in the caption, correcting the names of the attorneys present at the proceeding, the post release control notification, the life time parole notification and the "good time" notification. Indeed at the sentencing hearing on August 14, 2012, the Court did orally advise the Defendant of his lifetime parole obligations, his post release control requirements and the "good time" provisions. As the Defendant was properly notified of these, the State respectfully requests that the *Entry on Sentence* be corrected to accurately reflect the sentence imposed.

WHEREFORE the State respectfully requests that the Court issue an entry correcting the *Entry on Sentencing*

2

Respectfully Submitted,

DENNIS WATKINS (#009949)
TRUMBULL COUNTY
PROSECUTING ATTORNEY BY:

CHARLES L. MORROW (#0040575)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. NW, 4th Floor
Warren, Ohio, 44481
Telephone No.: (330) 675-2426
Fax No.: (330) 675-2431

COUNSEL FOR THE PLAINTIFF,
THE STATE OF OHIO

## PROOF OF SERVICE

I do hereby certify that on this 15th day of August, 2012, a copy of the foregoing
pleading by was sent by regular U.S. Mail to:

Atty. John P. Parker(#0041243)          and     Atty. Randall Porter (#0005835)
988 E. 185th Street                             Office of the Ohio Public Defender
Cleveland, Ohio 44119                           250 E. Broad St., Suite 1400
                                                Columbus, Ohio, 43215

                                                And by facsimile to
                                                614-644-0708

CHARLES L. MORROW (#0040575)
Assistant Prosecuting Attorney

3

1

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

CASE NO. 01-CR-794

| | | |
|---|---|---|
| STATE OF OHIO, | ) | JUDGE JOHN M. STUARD |
| PLAINTIFF | ) | |
| vs. | ) | JUDGMENT ENTRY |
| | ) | |
| NATHANIEL JACKSON, | ) | ENTRY ON SENTENCE |
| DEFENDANT | ) | |

On August 14, 2012, Defendant, Nathaniel Jackson's
sentencing hearing was held pursuant to O.R.C. Section 2929.19.
Defense Attorneys, Anthony Consoldane and James Lewis, and
Prosecutor Dennis Watkins and Assistant Prosecutor Charles
Morrow were present, as was Defendant, Nathaniel Jackson, who
was afforded all rights pursuant to Criminal Rule 32. The
Court has considered the record and oral statements, as well as
the principles and purposes of sentencing under O.R.C. Section
2929.11,and has balanced the seriousness and recidivism factors
of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, August 14,
2012, having determined in a separate opinion of specific

2

findings that the aggravating circumstances as to the count of
Aggravated Murder outweigh the mitigating factors by proof
beyond a reasonable doubt, then made inquiry as to whether the
Defendant had anything to say why judgment should not be
pronounced against him, and the Defendant in answer showed no
good cause or sufficient reason why sentence should not be
pronounced.

  The Court has considered the factors under O.R.C.
Section 2929.14 and makes the following findings:

    1) The shortest prison term will demean the
seriousness of the Defendant's conduct;

    2) The longest prison term is appropriate
because the Defendant committed the worst form of the
offense;

    3) Multiple prison terms are necessary to
protect the public from future crime and to punish
the offender;

    4) Consecutive prison sentences are not
disproportionate to the seriousness of the Defendant's
conduct and to the danger the offender poses to the
public;

    5) The harm caused by the multiple offenses
was so great that no single prison term for any of the

3

offenses committed as part of a single course of conduct
adequately reflects the seriousness of the Defendant's
conduct; and

       6) The Defendant's history of criminal
conduct demonstrates that consecutive sentences
are necessary to protect the public from future
crime by the Defendant.

       It is, therefore, ORDERED, ADJUDGED and DECREED that the
Defendant, Nathaniel Jackson, be taken from the courtroom to
the Trumbull County Jail and from thence to the Correction
Reception Center at Lorain, Ohio, and thereafter be sentenced
to death on August 15, 2013, on Count One; and imprisoned
therein for the stated prison term of ten (10) years on Count
Three; plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed in Count Three; ten (10) years on Count Four,
plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed on Count Four; sentence in Count Four to be
served consecutively to the sentence imposed on Count Three.
Firearm Specifications in Count Three and Count Four shall
merge as one sentence in Count Three as a matter of law.

08/15/2012  09:18    3306753078                TRUMBULL CO COURT                    PAGE  04/04

4

Defendant is Ordered to the cost of prosecution taxed in the amount of $_____ for which execution is awarded.

_____          _____

DATE                                JUDGE JOHN M. STUARD

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF
THIS ENTRY TO ALL COUNSEL OF RECORD.

_____
JUDGE JOHN M. STUARD

You are hereby notified that
you have been convicted of a
felony of violence and pursuant
to Section 2923.13 of the
Ohio Revised Code, you are
prohibited from acquiring,
having, carrying or using any
firearm or dangerous ordnance.

1

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

CASE NO. 01-CR-794

| | | |
|---|---|---|
| STATE OF OHIO, | ) | JUDGE JOHN M. STUARD |
| PLAINTIFF | ) | |
| vs. | ) | JUDGMENT ENTRY |
| | ) | |
| NATHANIEL JACKSON, | ) | ENTRY ON SENTENCE |
| DEFENDANT | ) | |

On August 14, 2012, Defendant, Nathaniel Jackson's
sentencing hearing was held pursuant to O.R.C. Section 2929.19.
Defense Attorneys, Anthony Consoldane and James Lewis, and
Prosecutor Dennis Watkins and Assistant Prosecutor Charles
Morrow were present, as was Defendant, Nathaniel Jackson, who
was afforded all rights pursuant to Criminal Rule 32. The
Court has considered the record and oral statements, as well as
the principles and purposes of sentencing under O.R.C. Section
2929.11,and has balanced the seriousness and recidivism factors
of O.R.C. Section 2929.12.

Pursuant to law, the Trial Court this day, August 14,
2012, having determined in a separate opinion of specific

2

findings that the aggravating circumstances as to the count of Aggravated Murder outweigh the mitigating factors by proof beyond a reasonable doubt, then made inquiry as to whether the Defendant had anything to say why judgment should not be pronounced against him, and the Defendant in answer showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under O.R.C. Section 2929.14 and makes the following findings:

1) The shortest prison term will demean the seriousness of the Defendant's conduct;

2) The longest prison term is appropriate because the Defendant committed the worst form of the offense;

3) Multiple prison terms are necessary to protect the public from future crime and to punish the offender;

4) Consecutive prison sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the offender poses to the public;

5) The harm caused by the multiple offenses was so great that no single prison term for any of the

3

offenses committed as part of a single course of conduct
adequately reflects the seriousness of the Defendant's
conduct; and

    6) The Defendant's history of criminal
conduct demonstrates that consecutive sentences
are necessary to protect the public from future
crime by the Defendant.

    It is, therefore, ORDERED, ADJUDGED and DECREED that the
Defendant, Nathaniel Jackson, be taken from the courtroom to
the Trumbull County Jail and from thence to the Correction
Reception Center at Lorain, Ohio, and thereafter be sentenced
to death on August 15, 2013, on Count One; and imprisoned
therein for the stated prison term of ten (10) years on Count
Three; plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed in Count Three; ten (10) years on Count Four,
plus a mandatory term of three (3) years on the Firearm
Specification to be served prior to and consecutive to the
sentence imposed on Count Four; sentence in Count Four to be
served consecutively to the sentence imposed on Count Three.
Firearm Specifications in Count Three and Count Four shall
merge as one sentence in Count Three as a matter of law.

4

Defendant is Ordered to the cost of prosecution taxed in the amount of $_____ for which execution is awarded.

_____8/14/12_____          _____

DATE                                    JUDGE JOHN M. STUARD

THE CLERK OF COURTS IS HEREBY
ORDERED TO SERVE COPIES OF
THIS ENTRY TO ALL COUNSEL OF RECORD.

JUDGE JOHN M. STUARD

You are hereby notified that
you have been convicted of a
felony of violence and pursuant
to Section 2923.13 of the
Ohio Revised Code, you are
prohibited from acquiring,
having, carrying or using any
firearm or dangerous ordnance.



**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER: 2001 CR 00794**

**STATE OF OHIO**
    **PLAINTIFF**

    **vs.**                   **JUDGE JOHN M STUARD**

**NATHANIEL E JACKSON**
    **DEFENDANT**           **JUDGMENT ENTRY**

Defendant's Motion to For Voluntary Recusal is denied.

_____
JUDGE JOHN M STUARD

Date: ___8/16/12___

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

_____
JUDGE

8-16-12
Copies to:
DCS.
R. Porter

2001 CR
00794
00097910584

o



**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER: 2001 CR 00794**

**STATE OF OHIO**
**PLAINTIFF**

vs.

**JUDGE JOHN M STUARD**

**NATHANIEL E JACKSON**
**DEFENDANT**

**JUDGMENT ENTRY**

Defendant's Motion to Dismiss Death Penalty Specifications is denied.

JUDGE JOHN M STUARD

Date: 8/16/12

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

JUDGE

8-16-12
Copies to:
Pros.
R. Porter

2001 CR
00794
00014958362
o

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5822



**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER: 2001 CR 00794**

**STATE OF OHIO**
**PLAINTIFF**

vs.

**JUDGE JOHN M STUARD**

**NATHANIEL E JACKSON**
**DEFENDANT**

**JUDGMENT ENTRY**

Defendant's Renewed Motion for Continuance is denied.

JUDGE JOHN M STUARD

Date: 8/16/12

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.
8/16/12

JUDGE

8-16-12
copy to:
Bros.
R. Porter



2001 CR
00794
00058013451

o

**IN THE COURT OF COMMON PLEAS**
**- GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER: 2001 CR 00794**

**STATE OF OHIO**
**PLAINTIFF**

**VS.**                                          **JUDGE JOHN M STUARD**

**NATHANIEL E JACKSON**         **SENTENCED TO THE LORAIN**
**DEFENDANT**                   **CORRECTIONAL FACILITY**

**NUNC PRO TUNC**
**JUDGMENT ENTRY ON SENTENCE**

**A DEATH PENALTY CASE**

The Court has prepared this Nunc Pro Tunc Judgment Entry on Sentence for the

purpose of correcting the original Entry on Sentence filed in this case on August 14,

2012. On August 15, 2012, Atty. Charles Morrow filed a Motion to Correct Entry on

Sentence alerting the Court to the fact that certain clerical errors were present in the

August 14, 2012 sentencing entry. The Court has reviewed the motion as well as the

August 14, 2012 sentencing entry and finds the entry contained several inadvertent

errors. Therefore, the Court renders this Nunc Pro Tunc Judgment Entry on Sentence

for the purpose of correcting the August 14, 2012 Entry on Sentence previously

prepared by the Court.

On August 14, 2012, Defendant, Nathaniel Jackson, was brought before this

Court for the purposes of re-sentencing after the original sentence was vacated by the

Eleventh District Court of Appeals on October 18, 2010. On August 14, 2012, the

Defendant's sentencing hearing was held pursuant to R.C. 2929.19. The Defendant was

 2001 CR
00794
00084903320
OSEN



represented by Atty. Randall L. Porter. Also present in Court was Atty. John P. Parker.[1]

Atty. Charles L. Morrow and Atty. LuWayne Annos were present in Court on behalf of

the State of Ohio.

The Defendant was afforded all rights pursuant to Crim.R.32. The Court has

considered the record, oral statements, as well as the principles and purposes of

sentencing under R.C. 2929.11 and has balanced the seriousness and recidivism factors

of R.C. 2929.12.

The Court has previously set forth in a separate opinion of specific factual

findings that the aggravating circumstances as to Count One; Aggravated Murder,

outweigh the mitigating factors by proof beyond a reasonable doubt. The Court inquired

of the Defendant at the hearing in this matter as to whether he had anything to say

why judgment should not be pronounced against him. The Defendant, in answer,

showed no good cause or sufficient reason why sentence should not be pronounced.

The Court has considered the factors under R.C. 2929.14 and makes the

following findings: (1) The shortest prison term will demean the seriousness of the

Defendant's conduct; (2) the longest prison term is appropriate because the Defendant

committed the worst form of the offense; (3) multiple prison terms are necessary to

protect the public from future crime and to punish the offender; (4) consecutive prison

sentences are not disproportionate to the seriousness of the Defendant's conduct and to

the danger the offender poses to the public;(5) the harm cause by the multiple offenses

was so great that no single prison term for any of the offenses committed as part of a

single course of conduct adequately reflects the seriousness of the Defendant's conduct;

---

[1] Atty. Parker advised the Court during the sentencing hearing that a conflict existed which prevented him from representing the Defendant for the purposes of this sentencing hearing.

and (6) the Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the Defendant.

It is therefore, ORDERED, ADJUDGED and DECREED that:

1. The Defendant is hereby sentenced to death on August 15, 2013 on Count One;

2. The Defendant serve an prison term of Ten (10) Years on Count Three plus Three (3) Years on the firearm specification;

3. The Three (3) Year imprisonment term on the firearm specification shall be served prior to and consecutive to the imprisonment term for the underlying offense in Count Three for a total imprisonment term of Thirteen (13) Years on Count Three;

4. The Defendant serve a prison term of Ten (10) Years on Count Four plus Three (3) Years on the firearm specification;

5. The Three (3) Year imprisonment term on the firearm specification shall be served prior to and consecutive to the imprisonment term for the underlying offense in Count Four for a total imprisonment term of Thirteen (13) Years on Count Four;

6. The imprisonment term on Count Four shall be served consecutive to the imprisonment term imposed on Count Three;

7. The firearm specifications in Count Three and Count Four shall merge for the purposes of sentencing in Count Three as a matter of law;

8. The Defendant is ordered to submit to DNA testing;

9. The Defendant shall pay the cost of prosecution taxed in the amount of $_____ costs for which execution is awarded.

As to Counts Three and Four, the Court has further notified the Defendant that post-release control is mandatory in this case for Five (5) Years, as well as the consequences for violating conditions of post-release control imposed by the Parole Board under R.C. 2967.28. The Defendant is ordered to serve as part of this sentence any term of post-release control imposed by the Parole Board, and any prison term for violation of that post-release control.

As to Count One, the Court has further notified the Defendant that post-release control is mandatory if the Defendant is released on parole before serving the Death Sentence in Count One. The maximum possible parole period is equal to a Life Sentence imposed for the Aggravated Murder charge in Count One. A violation of any parole rule or condition may result in (1) a more restrictive sanction while released; (2) an increased duration of parole supervision, up to the maximum set out above; and/or (3) re-imprisonment for a period of time equal to the Life Sentence. If the Defendant commits another felony while subject to this period of parole or supervision, or if by some other means violates the conditions of parole, he may be sent back to prison to serve out the remainder of the Life Sentence imposed.

The Defendant is hereby advised that most prison inmates are eligible to earn days of credit against their prison sentences for each completed month of productive participation in educational or employment programs developed by ODRC with specific standards for performance by prisoners. Some inmates, including those confined for sex offenses and the most dangerous first and second degree felonies and homicides are not eligible to earn days of credit.

The Court further disapproves of the Defendant's placement in a program

of shock incarceration pursuant to R.C. 5120.031 or for placement in an intensive prison

program pursuant to R.C. 5120.032.

IT IS SO ORDERED.

_M. Stuard_
JUDGE JOHN M STUARD

Date: 8/16/12

**TO THE CLERK OF COURTS: You Are Ordered to Serve
Copies of this Judgment on all Counsel of Record
or Upon the Parties who are Unrepresented Forthwith
by Ordinary Mail.**

_M. Stuard_
**JUDGE JOHN M STUARD**

8-16-12
Copies to:
Prol.
R. Porter

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

STATE OF OHIO,                          :

    Plaintiff,                          : **Case No. 01-CR-794**

-vs-                                    :

NATHANIEL JACKSON,                      : **Judge Stuard**

    Defendant.                          :

## NATHANIEL JACKSON'S NOTICE OF INTENT TO FILE REPLY TO THE STATE OF OHIO'S AUGUST 15, 2012 MOTION TO CORRECT ENTRY ON SENTENCE

On August 15, 2012, the State filed a pleading entitled "State's Motion to Correct Entry on Sentence." Nathaniel Jackson will file a response to that pleading by August 24, 2012. Undersigned counsel, because of prior commitments, will be unable to file a response prior to that date.

Respectfully submitted,

OFFICE OF THE
OHIO PUBLIC DEFENDER

_Randall Porter (per authority by Jennifer Prillo 0073744)_

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0708 (Facsimile)

Randall.Porter@opd.ohio.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Nathaniel Jackson's Notice Of Intent To File Reply To The State Of Ohio's August 15, 2012 Motion To Correct Entry On Sentence* was forwarded electronically and by first-class, postage prepaid U.S. Mail to Charles L. Morrow and Luwayne Annos, Assistant Prosecuting Attorneys, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481, on this 20th day of August, 2012.

RANDALL L. PORTER (per authority by Jennifer Pillo 0073744)
COUNSEL FOR PETITIONER

2

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,

    Plaintiff,

vs.

NATHANIEL JACKSON,

    Defendant.

Common Pleas Case No. 01-CR-794

From the Trumbull County
Court of Common Pleas

Supreme Court Case No. 12-AP-090

**Judgment Entry**

Randall L. Porter, counsel for the defendant, has filed an affidavit with the Clerk of this Court under R.C. 2701.03 seeking to disqualify Judge John M. Stuard from "further presiding over his resentencing proceedings," in case No. 01-CR-794 in the Court of Common Pleas of Trumbull County.

This is the third affidavit of disqualification Porter has filed in this case against Judge Stuard. The previous affidavits were denied. *See In re Disqualification of Stuard*, 113 Ohio St.3d 1236, 2006-Ohio-7233, 863 N.E.2d 636; *In re Disqualification of Stuard* (Aug. 20, 2008), case No. 08-AP-043, unreported. In general, if an affidavit has been properly filed, a trial judge is without authority to proceed with substantive aspects of the case until the Chief Justice rules on the affidavit. *See* R.C. 2701.03(D)(1). However, R.C. 2701.03(D)(4) provides that if, after the denial of an affidavit of disqualification, a "second or subsequent affidavit of disqualification regarding the same judge and the same proceeding is filed . . . by counsel for the same party . . . the judge against whom the second or subsequent affidavit is filed may preside in the proceeding prior to the ruling of the chief justice . . . on the second or subsequent affidavit."

Porter filed his third affidavit on August 7, 2012, with the stated purpose to disqualify Judge Stuard from presiding over the defendant's "resentencing proceedings," which were



2001 CR
00794
00097770177

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5831

scheduled for August 14, 2012. *See* Porter Aff. at p. 1, ¶¶ 57, 59-60. Because of R.C. 2701.03(D)(4), Judge Stuard was authorized to preside over the matter during the pendency of the affidavit.

On August 16, 2012, Judge Stuard informed the Court he held Jackson's re-sentencing hearing, as scheduled, on August 14. On August 22, 2012, Porter filed a "Notice," which similarly stated Judge Stuard conducted the re-sentencing hearing on August 14.

The Chief Justice's statutory authority to order disqualification of judges extends only to those situations in which "a proceeding [is] pending before the court." R.C. 2701.03(A). Porter's affidavit and his "Notice" indicate he filed the affidavit to disqualify Judge Stuard from presiding over the re-sentencing hearing. Because the re-sentencing hearing has already occurred, and the record does not indicate there is any other matter pending before the judge against whom the affidavit is filed, the affidavit of disqualification against Judge Stuard is dismissed as moot.

Dated this 27th day of August, 2012.

MAUREEN O'CONNOR
Chief Justice

2

Copies to:    Kristina D. Frost, Clerk of the Supreme Court
                Hon. John M. Stuard
                ✓Trumbull County Clerk of Courts
                Randall Porter, Esq.
                Luwayne Annos, Esq.



3

**IN THE COURT OF COMMON PLEAS**
**TRUMBULL COUNTY, OHIO**

| | |
|---|---|
| STATE OF OHIO, | : |
| Plaintiff, | : **Case No. 01-CR-794** |
| -vs- | : |
| NATHANIEL JACKSON, | : **Judge Stuard** |
| Defendant. | : |

## NATHANIEL JACKSON'S MOTION
## FOR APPOINTMENT OF APPELLATE COUNSEL

Nathaniel Jackson moves the Court to appoint appellate counsel on his behalf. He requests that the Court appoint Randall L. Porter and Dennis L. Sipe.

On August 14, 2012, the Court sentenced Nathaniel Jackson to death. The Court indicated that undersigned counsel should move for the appointment of appellate counsel. Nathaniel Jackson requests that the Court appoint Randall L. Porter and Dennis L. Sipe for purposes of his appeal.

Undersigned counsel been certified by the Ohio Supreme Court to act as lead counsel at trial and on appeal in capital cases. He is familiar with the record having represented Jackson for eight years and established a relationship with him.

Mr. Sipe has also been certified by the Ohio Supreme Court to serve as

2001 CR
00794
00085719937



NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5834

lead counsel at trial and on appeal in capital cases. He was previously a member of the Office of the Ohio Attorney General from 1977 to 1987 and for part of that time period served as the chief of the 1983 Section of that office. Since leaving that Office, Mr. Sipe has been counsel of record in countless civil and criminal cases (some which involved complex litigation), including numerous homicide cases some of which involved the death penalty. He has prosecuted or defended more than fifty appeals from the trial court level to the Sixth Circuit. He has or is representing in federal habeas four death sentenced individuals and also represented death sentenced individuals in state post-conviction, applications for reopening, and direct appeal proceedings. Mr. Porter has discussed that matter Mr. Sipe who has indicated that he would be willing to accept the appointment.[1]

Wherefore, Nathaniel Jackson requests that the Court grant this motion and order that attorneys Randall L. Porter and Dennis L. Sipe be appointed for purposes of Nathaniel Jackson's direct appeal to the Ohio Supreme Court.

Respectfully submitted,

Office of the
Ohio Public Defender

RANDALL L. PORTER - 0005835
Assistant State Public Defender

250 E. Broad Street - Suite 1400

---

[1] The contact information for Mr. Sipe is Dennis L. Sipe, Buell & Sipe, Co., L.P.A., 322 Third Street, Marietta, Ohio 45750, Telephone: (740) 373-3219, Facsimile: (740) 373-2892 and Email: dennis@buell.sipecom.

2

Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0708 (Facsimile)
Randall.Porter@opd.ohio.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel Jackson's

Motion for Appointment of Appellate Counsel was forwarded by both electronic

and regular U.S. Mail to Charles L. Morrow and Luwayne Annos, Assistant

Prosecuting Attorneys, 160 High Street, N.W., 4th Floor Administration

Building, Warren, Ohio 44481 on this 31st day of August, 2012.

RANDALL PORTER - 0005835
Assistant State Public Defender

Counsel For Nathaniel Jackson

3

**IN THE COURT OF COMMON PLEAS**
**-GENERAL DIVISION-**
**TRUMBULL COUNTY, OHIO**

**CASE NUMBER:  2001 CR 00794**

**STATE OF OHIO**
**PLAINTIFF**

vs.

**JUDGE JOHN M STUARD**

**NATHANIEL E JACKSON**
**DEFENDANT**

**JUDGMENT ENTRY**

Nathaniel Jackson's Motion for Appointment of Appellate Counsel is granted.

Attorney Randall L. Porter and Attorney Dennis L. Sipe are appointed as Appellate

Counsel in this matter.

JUDGE JOHN M STUARD

Date:___9/6/12___

FILED
COURT OF COMMON PLEAS

SEP 1 2 2012

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

TO THE CLERK OF COURTS: YOU ARE ORDERED TO SERVE
COPIES OF THIS JUDGMENT ON ALL COUNSEL OF RECORD
OR UPON THE PARTIES WHO ARE UNREPRESENTED FORTH
WITH BY ORDINARY MAIL.

JUDGE

9/12/12
Copies To:
PRCS
Atty J. Parker
Atty A. Consoldane
Atty R. Porter
Atty J. Lazzaro

2001 CR
00794
00094594743

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
SUPP. APPENDIX - Page 5837

FILED

COA

# The Supreme Court of Ohio

OCT 03 2012

CLERK OF COURT
SUPREME COURT OF OHIO

To the Clerk of Court of Common Pleas for

Trumbull _____ County

ORDER TO CERTIFY RECORD
IN DEATH PENALTY CASE

S.C. Case No. ____2012-1644____
C.P. Case No. ____01-CR-794____

**The State of Ohio v. Nathaniel Jackson**

You are hereby ORDERED, pursuant to Rule 19.5 of the Rules of Practice of the Supreme Court of Ohio, to prepare and forward the record in the above-captioned case to the Clerk's Office of the Supreme Court, no later than 90 days from the date of this entry, unless the Supreme Court grants **FILED** an extension of time under Rule 19.5(C)(1).  **COURT OF APPEALS**

Pursuant to Rule 19.4(A) and 19.5(B) the record shall consist of the following:  OCT 03 2012

- The original papers filed in the trial court;

**TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK**

- The transcript of proceedings, and computer diskettes of the transcript, if available;

- A certified copy of the docket and journal entries prepared by the clerk of the trial court; and

Pursuant to Rule 19.4(A)(3) the custodian of the record shall only transmit audio exhibits, video exhibits, and documents such as papers, maps, or photographs Pursuant to 19.4(A)(2) no other physical exhibits shall be transmitted unless directed to do so by the Clerk of the Supreme Court.

You are further ORDERED, pursuant to Rule 19.5(B)(1), to number the documents and exhibits comprising the record; to prepare an index of the documents and exhibits, correspondingly numbered and identified; to briefly describe all exhibits listed in the index; and to send a copy of the index to all counsel of record in the case and transmit the index with the record to the Clerk of the Supreme Court.

You are further ORDERED, pursuant to Rule 19.5(D), to make a copy of the record and retain the copy for use in any postconviction proceeding. Pursuant to this Court's order in *In re Reimbursement to Trial Court Clerks for Duplication of Death Penalty Records* (January 25, 1999), a trial court clerk shall be permitted reimbursement to the following extent: five cents per page for photocopying the original papers, transcript of proceedings, and documentary exhibits; the actual costs of duplicating photographs, videotapes, and audiotapes that are part of the record. Any request for reimbursement shall be filed simultaneously with the filing of the record, and reimbursement shall be subject to the availability of funds appropriated by the General Assembly.

1

1    IN THE COURT OF COMMON PLEAS
         TRUMBULL COUNTY, OHIO
2

3    STATE OF OHIO,            ) CASE NO. 01-CR-794
                               )
4        Plaintiff             )
                               )
5    -vs-                      ) JUDGE JOHN M. STUARD
                               )
6                              )
     NATHANIEL E. JACKSON,     )
7                              )
         Defendant             )
8

9           TRANSCRIPT OF PROCEEDINGS

10

11       BE IT REMEMBERED, that on Tuesday, August 14,

12   2012, these proceedings came on to be heard before

13   one of the Judges of this Court, The Honorable Judge

14   John M. Stuard, Court Room No. 2, Trumbull County

15   Court House, Warren, OH.

16

17

18

19

20

21

22
     Mary Ann Mills, RPR
23   Official Court Reporter
     Trumbull County, OH

2

1

<u>APPEARANCES</u>

2

On behalf of the State of Ohio:

3

4          CHARLES L. MORROW
           LuWAYNE ANNOS
           Assistant Prosecuting Attorneys
5          160 High Street
           Warren, OH  44481

6

7    On behalf of the Defendant:

8          RANDALL L. PORTER
           Assistant State Public Defender
9          250 E. Broad Street
           Columbus, OH  43215

10
           JOHN P. PARKER
11         Attorney at Law
           988 East 185th Street
12         Cleveland, OH  44119

13

14

15

16

17

18

19

20

21

22

23

3

1  TUESDAY, AUGUST 14, 2012

2       In Open Court at 1:45 p.m. for Re-sentencing

3  Hearing

4               THE COURT:  This matter has been set

5  this afternoon for re-sentencing of Nathaniel

6  Jackson.  Mr. Jackson now has an appeal pending in

7  the Ohio Supreme Court.  The result of that appeal,

8  this matter has been sent back for re-sentencing.

9       A couple of housekeeping matters here.  Mr.

10 Jackson filed a complaint for writ of prohibition.

11 The Court has been advised that by the Supreme Court

12 of Ohio by letter, that this Court has jurisdiction

13 and may proceed as I see fit and there has not yet

14 issued an alternative or peremptory writ and there

15 is no order from any higher court requiring that the

16 sentencing today not go forward.  So we will,

17 therefore, proceed with that sentencing.

18               MR. PORTER:  Just so, if I might,

19 just so the record is clear, the writ of prohibition

20 is in the Court of Appeals.  There is an affidavit

21 of bias and prejudice.

22               THE COURT:  The Court of Appeals has

23 issued no directive that would speak otherwise than

4

1   allowing this Court to proceed.  Thank you for that.

2        There is also a motion for the Court to

3   voluntarily recuse myself, and I find no reason to

4   do that.  That is what the purpose of your attempts

5   through the Supreme Court to have me removed from

6   this.  I'll respectfully overrule that motion.

7        There is another issue that's been raised.

8   Another matter that's been raised is that concerning

9   the scope of the re-sentencing hearing with the

10  thrust of the motion being to permit additional

11  information on mitigation.  This came up in the

12  Roberts case, and I did not permit that, but I did

13  allow her to submit the evidence that she wanted to

14  put before the Court for the purpose of the

15  re-sentencing.  That was all included in the record

16  for purposes of appeal.  I did not permit it for

17  purposes of re-sentencing.  And let me state why.

18       Mr. Jackson in this case had an opportunity

19  and did present at the trial, mitigating evidence.

20  He had several people testify.  I think his sister

21  and his mother testified.  And I believe he spoke to

22  the jury.  The jury had to take into consideration

23  the evidence presented at trial in order to make its

5

1    determination. This matter is back on the
2    re-sentencing, and I view the matter that this
3    re-sentencing should be conducted as the original
4    was. To allow mitigating factors to come in, in
5    addition at this point, there is no way that that
6    could be presented to that jury, and I think that it
7    completely befuddles the whole process to allow that
8    and the extent would be another restraint I think on
9    permitting that at this time.

10        So I will follow the action taken in the
11   previous case and deny any broadening of the scope
12   other than what has been available to Mr. Jackson at
13   the time of the trial and of which he took
14   advantage.

15        I think the last motion that's been filed
16   today here is in regard to dismissing the death
17   penalty specification. I believe that counsel for
18   the Defendant has proffered here that some of these
19   arguments have not been ruled on previously by the
20   Courts of Appeals. I reviewed them and they all
21   fall within the realm of many arguments that have
22   presented over the last period of time since we have
23   reconstructed our death penalty cases in Ohio. I

6

1  think that all, if not all, any that I have
2  recognized here, and they are quite extensive, have
3  been raised in other cases repeatedly, and I find no
4  reason, nothing that advises me that those should be
5  considered for purposes of this hearing.  I think
6  those are motions addressing matters that are more
7  well put before the upper Courts on the basis of
8  attacking the whole death penalty scheme in Ohio.
9        I see this hearing in a very narrow light as
10  directed by the Supreme Court.  And that is to
11  conduct this re-sentencing based on a review of the
12  evidence that was presented during the trial.
13        You are all aware of the reason why this case
14  is back here.  The Supreme Court I think
15  misunderstood what occurred, but they have made
16  their ruling and I must abide by that.
17        Mr. Porter, I believe that addresses all of
18  the things that you have raised today with new
19  motions.  One other last thing, if I may, there is a
20  pile of documents here that are attached to the
21  various motions.  I have looked through them.  I had
22  some extra time here since Defendant was late in
23  arriving.  And those appear to me to be repetitive

1  and all inclusive of various documents from this
2  trial, the Court has prior knowledge of, and I have
3  considered them in light of your motions.

4       Now, do you have anything further that I have
5  missed as far as getting these motions straightened
6  around?

7       MR. PORTER:  I do.  Thank you, Your
8  Honor.  I have three quick points.  First is, Nate
9  today is technically here without appointed counsel.
10  I'm not appointed for this matter.

11       THE COURT:  I did miss that.  Let me
12  address that, if I may.  We are not here because of
13  pending charges against Mr. Jackson.  We are here
14  solely as a result of the appeal that was filed from
15  the original trial.  Therefore, it appears to me
16  that you are the appropriate counsel.  This Court
17  need not reappoint you.  You are merely handling the
18  appeal process for Mr. Jackson.  Otherwise we
19  wouldn't be here.  I see that you have second
20  counsel.  What is your name, sir, for the record?

21       MR. PARKER:  John Parker.

22       THE COURT:  Mr. Parker, you are also
23  representing him on appeal, is that correct?

1          MR. PARKER: Your Honor, I have been

2    appointed. I was appointed by the Federal District

3    Court to represent Mr. Jackson on his federal habeas

4    petition, which has been pending for a number of

5    years now. I have only been appointed to represent

6    him on that federal petition. Judge Gwinn of the

7    U.S. District Court --

8          THE COURT: Very fine jurist.

9          MR. PARKER: Yes he is. He's

10   handling the matter. And I along with Mr. Doyle out

11   of Cleveland represent Mr. Jackson in that federal

12   habeas. That habeas petition was stayed at our

13   request so we could return to state court and

14   attempt to exhaust some issues that are before the

15   Court now. I have never been appointed in state

16   court to represent Mr. Jackson. In fact, we may

17   have a different viewpoint on the re-sentencing

18   hearing that we have here today, with all due

19   respect, but it is my position that this hearing

20   implicates the Sixth and Fourteenth Amendments. And

21   since I am appointed by federal court to represent

22   him there only, I am here as a courtesy to the Court

23   because I received notice to be here, and I have

9

1    been involved in Mr. Jackson's case, as a courtesy
2    to Mr. Jackson and the Ohio Public Defender's
3    Office.
4              THE COURT: If you wish, after
5    sentencing, it is, of course, incumbent upon this
6    Court to appoint, if you wish to address it at that
7    time, I would be more than happy to do so. But for
8    purposes of this hearing, counsel who represents is
9    present. I understand you feel there maybe a
10   conflict between your duties on the habeas corpus
11   case and this case, is that correct?
12             MR. PARKER: That is correct.
13             THE COURT: That is something I need
14   not determine. That is up to you, whatever you are
15   comfortable with.
16             MR. PARKER: It was my position
17   before the hearing, I think we put it in a motion
18   filed sometime ago, that it was my desire to
19   represent Mr. Jackson at this hearing, because of
20   that potential conflict.
21             THE COURT: Mr. Porter. I didn't
22   mean to interrupt you, but we should take these
23   things one at a time.

1    MR. PORTER:  Mr. Jackson's position
2  today, Your Honor, is he's entitled to two appointed
3  counsel for this hearing.  If Mr. Parker is not
4  appointed, then we are in a position of asking the
5  Court for a continuance until there is a second
6  attorney appointed.
7    THE COURT:  In regard to that point,
8  I think the legislative intent and the main reason
9  that they came up with the two attorney
10  representation is that, without a doubt, the most
11  serious type of case that someone can be confronted
12  with and the two heads are better than one, for
13  purposes of any trial, I think that that is
14  mandatory.
15    Again, this case has been remanded for the
16  simple procedure of re-sentencing.  Since it is as a
17  result of the appeal, you are the appeal attorney,
18  and at the appropriate time, it's my understanding
19  -- are you telling me that there is no other counsel
20  on the appeal case at this time?
21    MR. PORTER:  That is correct.
22    MR. MORROW:  Your Honor, if I may, I
23  hate to interrupt, I would like to add one bit of

11

1   information with respect to the counsel issue at an
2   appropriate time.
3                   THE COURT:  I think this would be an
4   appropriate time.
5                   MR. MORROW:  I believe that Mr.
6   Parker, when he filed his notice of appearance with
7   this Court, he filed a notice of appearance
8   indicating that he was counsel of record in this
9   case.
10                  THE COURT:  I understand that.
11                  MR. MORROW:  And that did not have
12  any qualification, any limitation as to his position
13  in this case.  He has not yet, nor has he ever filed
14  a motion to be relieved from being counsel in this
15  case, and I think to suggest that there is a
16  conflict that arose from his representation on a
17  federal point, would be as a result of his own
18  created conflict.  Since he still is, and the record
19  still reflects, that he is, not necessarily
20  appointed counsel, but he is counsel in this case,
21  and he's accepted that position, and I think needs
22  to be bounded by that, that he is still counsel of
23  record.  So to suggest that there is only one

12

1   attorney for purposes of this re-sentencing, I
2   believe is not supported in the record.
3                   THE COURT:  Well I think what you
4   have stated is true.  I am merely saying that that
5   is up to Mr. Parker.  If he feels there is some
6   conflict, I am not going to insist that he proceed
7   at this time.  You are counsel of record.  That is
8   true.  Let's go on to the next point, Mr. Porter.
9                   MR. PORTER:  Thank you, Your Honor.
10  I appreciate the Court letting me make the record in
11  this matter.  I am renewing, and I understand the
12  Court overruled it yesterday, just renewing the
13  motion for continuance until such time as the
14  affidavit of bias and prejudice and the writ of
15  prohibition is decided.  I understand that there is
16  no legal basis requiring you to continue the
17  hearing.  We are requiring you just to exercise your
18  discretion.  We filed with the Court just a copy, so
19  the record is clear, everyone's performance
20  including my own, will be judged in the future, that
21  the Appellate court will be aware that those two
22  other proceedings are pending.
23                  THE COURT:  That is what your job

13

1   is, Mr. Porter.  The other thing is that I would
2   mention at this juncture is, this case has been
3   delayed for a very long period of time from what I
4   think should be expected to occur.  That has
5   occurred, I believe, at one time I heard that both
6   sides were in agreement to continue the matter.  And
7   I had a difficult time in getting the complete file
8   back from the Supreme Court, and then probably
9   through my error, it was returned, it sat over where
10  we store our records for several months before I
11  became aware that it had even been returned, and
12  that is what I think that was about in April that I
13  finally found that we had the record.  I got it over
14  here, done what I have to do, and that then led to
15  the setting of the case.  There is another factor
16  involved here, although a peripheral matter, I am
17  retiring as of the end of December, and I think it
18  is imperative that this case be disposed of.  To
19  require another judge to come in, I am not even
20  aware of what procedure would be necessary.  It
21  would be quite difficult.  And for that reason, I
22  have insisted that this matter go forward, finding
23  no valid reason not to do so.  Anything further?

1       MR. PORTER:  I have a question.
2   Just so I understand the procedure, and I am able to
3   appropriately represent Mr. Jackson today.  It is my
4   understanding, and I'll accept the Court's ruling on
5   limiting the evidence.  With respect to Miss
6   Roberts, the Court permitted her to file her
7   exhibits.
8       THE COURT:  I'll permit that in this
9   case.  I'm just saying that that would be for
10  purposes of appeal only.
11      MR. PORTER:  And we are requesting
12  that, and Mr. Jackson has brought some exhibits that
13  we have to make the same proffer in this matter.
14      THE COURT:  Any exhibits you feel
15  necessary.
16      MR. PORTER:  Other than that, I have
17  one additional legal argument, which has not been
18  raised in the pleadings.  And it is regarding the
19  case of, and it is a relatively new case, come out
20  since Mr. Jackson was here previously.  It is State
21  vs. Johnson and probably the Court is well aware of
22  it, Ohio Supreme Court, which deals with the issue
23  of merger and allied defenses, the Ohio Supreme

1   Court has changed its position. And the way I read
2   the case now is the same conduct, the Defendant
3   cannot be sentenced twice for the same conduct. We
4   are before the Court today just on the capital
5   offense. Nate's convictions for Aggravated Robbery
6   and Aggravated Burglary, if my understanding is
7   correct, will not be impacted by today's hearing.
8   If that is so, then if the Court was to re-sentence
9   Nathaniel to death and relied upon the
10   specifications which are Aggravated Burglary and
11   Aggravated Robbery, it would violate the Ohio
12   Supreme Court's recent decision in <u>State vs.</u>
13   <u>Johnson</u>. The cite on that is 128 OhSt.3rd, 153.
14               THE COURT: I missed the thrust of
15   your argument here, that both of the underlying
16   charges, what?
17               MR. PORTER: I'm sorry. I wasn't
18   clear. Nate has been convicted of Aggravated
19   Robbery and Aggravated Burglary. And those also are
20   the two capital specifications he has in this case.
21   It is Nathaniel's position today, Your Honor, is
22   that you can not use the --
23               THE COURT: You are saying that they

1  merge.

2            MR. PORTER:  They merge and since

3  the, his convictions for Aggravated Burglary and

4  Aggravated Robbery remain in effect, the Court

5  cannot use that same conduct for purposes of the

6  specifications.

7            THE COURT:  Let me hear argument.

8            MR. MORROW:  Initially, I take issue

9  that Mr. Jackson has any sentence in place at this

10 point in time.  So I think that there is a

11 presumption on the defense counsel that Mr. Jackson

12 has been sentenced on Aggravated Burglary and the

13 Aggravated Robbery.  My position is, and it is based

14 upon the mandate that was issued from the Eleventh

15 District Court of Appeals, is that his sentence was

16 vacated.  There is no sentence right now before this

17 Court.  And so this Court will need to sentence Mr.

18 Jackson accordingly under the law with respect to

19 the four separate counts, or I'm sorry the three

20 separate counts.

21            THE COURT:  Aggravated Robbery and

22 Aggravated Burglary.

23            MR. MORROW:  That's correct.  In

17

1  addition to the Aggravated Murder because as the

2  mandate from the Court of Appeals says, the sentence

3  is vacated and the case remanded for re-sentencing.

4  It didn't limit it to the death case, that Count One

5  is vacated. It said the sentence. And that is the

6  mandate from the Court of Appeals. So I think that

7  they presuppose that there is a pending sentence.

8  As I put in my motion, I believe Mr. Jackson is

9  being held in the state penitentiary and has been

10  held without a sentence. And that is the position

11  that the State maintains. And I think that the

12  merger issue -- just one second. And, Your Honor,

13  with respect to the merger issue, there is a

14  determination as to whether there were separate

15  animus that were related to each of the offenses,

16  and I think quite simply the Court can determine

17  there were indeed separate animus for each of the

18  offenses, for the Aggravated Murder, which was the

19  killing involved in it, the Aggravated Robbery,

20  which included the, I believe the removal of some of

21  Mr. Fingerhut's property, and the burglary, which

22  was the trespass into the house. So I think that

23  each of those constituted a separate animus formed

1  at different times and as such constitutes a

2  sufficient evidence for proceeding forward, without

3  the cases, without the offenses being merged.

4         THE COURT:  You have the right to

5  respond.

6         MR. PORTER:  I do, Your Honor, and I

7  understand the Court wasn't privy to the proceedings

8  in the Court of Appeals.  All that was argued was

9  the same argument that was made in this Court, Your

10  Honor, with regard to the capital conviction itself

11  and not the Aggravated Robbery and Aggravated

12  Burglary.  I think it is important to look at the

13  Court of Appeals decision on remand.  I'm looking at

14  paragraph 27.  We accordingly sustain, I'm sorry.

15  It says, paragraph 33.  It says, "The sentence of

16  the Trumbull County Court of Common Pleas is

17  vacated."  It doesn't say sentences.  It says

18  "sentence."  That was the only issue on appeal was

19  the Aggravated Murder.  The Aggravated Robbery,

20  Aggravated Burglary were never argued on appeal.  It

21  was never before the Court.

22         THE COURT:  As one unit.  They are

23  saying that there was a vacation of the sentence

19

1   period.

2                   MR. PORTER:  I don't read it the

3   same way, Your Honor.

4                   THE COURT:  Read that one more time.

5                   MR. PORTER:  "The sentence of the

6   Trumbull County Court of Common Pleas is vacated."

7   And when you read that in conjunction with the rest

8   of the opinion, it talks solely about the conviction

9   for Aggravated Murder.  The word sentence is

10  important here when you read it in conjunction with

11  the rest of the opinion.

12                  THE COURT:  The Aggravated Murder,

13  of necessity, is predicated on the aggravating

14  circumstances of Aggravated Robbery and Aggravated

15  Burglary.  You are saying for purposes of the

16  hearing, that those two should merge.

17                  MR. PORTER:  What I'm saying is, for

18  purposes of this hearing, the Court is not going to

19  re-sentence Nathaniel on the Aggravated Robbery.

20  I'm sorry.  Should not, excuse me, Your Honor, or

21  should not re-sentence him on the Aggravated

22  Burglary.  The only matter that is before this Court

23  is the Aggravated Murder.

1        THE COURT:  I see your argument.
2   That is a novel argument.  You are saying that the
3   Court of Appeals should have broken it down.
4        MR. PORTER:  Should have, yes, but
5   given the argument in the Court of Appeals, the only
6   thing --
7        THE COURT:  That is a very unique
8   argument as to the validity for the purposes of now.
9   I think that again, I must addresses this matter, as
10  I did the day of the original sentencing.  And that
11  is to take into account the underlying aggravating
12  circumstances.  Your argument, again, would likely
13  or properly be made to the higher Courts, and what
14  they would do with it, I have no idea.  It is a
15  unique argument.
16       MR. PORTER:  Thank you, Your Honor.
17       THE COURT:  I thank you.  I would
18  overrule that argument, however.
19       MR. PORTER:  At this point, we have
20  no other matters to bring to the Court prior to
21  sentencing.  We'll be, with the Courts permission,
22  will be proffering what we would have been arguing
23  at the sentencing hearing at the conclusion.

21

1    THE COURT:  Thank you.  Would you be
2    kind enough to bring your client forward?
3        Good afternoon Mr. Jackson.
4        DEFENDANT:  Good afternoon, Your
5    Honor.
6        THE COURT:  Let me ask.  Counsel, do
7    you have anything further to say at this time?
8        MR. PORTER:  We do not, given the
9    Court's order, limiting the evidence, we'll make our
10   presentation through the proffer.  Mr. Jackson would
11   like to make a statement.
12       THE COURT:  Very good.  Please
13   proceed.
14       DEFENDANT:  Your Honor, I would just
15   like to say, doing my time in Trumbull Correctional,
16   I went down there and obtained a certificate in
17   basic skills computer class and I passed advanced
18   class and also became a tutor down there and also
19   got a certificate in the music program, and I was
20   trying to get into other different programs that
21   they have down there.  I haven't been in any trouble
22   since I have been on death row since 2007 and that
23   was a little minor situation, but I haven't been in

22

1  any trouble or anything since then, Your Honor.

2  Since I have been off of death row, I understand a

3  lot of things.  In a different situation and

4  different environment I was in, I have learned to

5  adjust to the environment without any problem, Your

6  Honor.

7              THE COURT:  It's one of those sad

8  things of life, I see people that come to a

9  revelation at a time that it doesn't do them the

10  good that it would had done, had they been able to

11  do it earlier.  I accept what you are saying.

12          This Court has considered the record and oral

13  statements, as well as the purposes and principles

14  of sentencing under O.R.C. Section 2929.11, and has

15  again, balanced the seriousness and the recidivism

16  factors of Section 2929.12.

17          Now pursuant to law, the Trial Court this

18  day, August 14, 2012, having determined in a

19  separate opinion of specific findings, which will be

20  filed this afternoon, have found that the

21  aggravating circumstances as to the count of

22  Aggravated Murder outweigh the mitigating factors by

23  proof beyond a reasonable doubt.  I have heard from

1    the Defendant today.  And I find that there is no
2    good or sufficient reason why sentence should not be
3    pronounced at this time.  Do you have any reason why
4    I should not do so?
5                       DEFENDANT:  Yes, sir, Your Honor.  I
6    feel that doing my time, I have learned to find
7    myself and I know who I am right now, and I would
8    like to be placed back on, I wouldn't like to be
9    placed back on death row.  I really wouldn't.
10                      THE COURT:  The Court has considered
11   the factors under O.R.C. Section 2929.14 and makes
12   the following findings.
13          1) The shortest prison time will demean the
14   seriousness of the Defendant's conduct.
15          2) The longest prison time is appropriate
16   because the Defendant committed the worst form of
17   offense.
18          3) Multiple prison terms are necessary to
19   protect the public from future crime and to punish
20   the offender.
21          4) Consecutive prison sentences are not
22   disproportionate to the seriousness of the
23   Defendant's conduct and to the danger the offender

24

1   poses to the public.

2         5) The harm caused by the multiple offenses
3   was so great that no single prison term for any of
4   the offenses committed as part of a single course of
5   conduct adequately reflects the seriousness of the
6   Defendant's conduct.

7         6) The Defendant's history of criminal
8   conduct demonstrates that consecutive sentences are
9   necessary to protect the public from future crime by
10  the Defendant.

11        It is therefore, Ordered, Adjudged and
12  Decreed that the Defendant, Nathaniel Jackson, be
13  taken from the courtroom to the Trumbull County jail
14  and from thence to the Correction Reception Center
15  at Lorain, Ohio, and thereafter be sentenced to
16  death on August 15, 2013, on Count One, and
17  imprisoned therein for the stated prison term of ten
18  (10) years on Count Three, plus a mandatory term of
19  three (3) years on the Firearms specification to be
20  served prior to and consecutive to the sentence
21  imposed in Count Three; ten (10) years on Count
22  Four, plus a mandatory term of three (3) years on
23  the Firearms Specification to be served prior to and

1   consecutive to the sentence imposed on Count Four.
2   Sentence on Count Four to be served consecutive to
3   the sentence imposed on Count Three.  The Firearms
4   Specification in Count Three and Four shall merge as
5   one sentence in Count Three as a matter of law.
6           It is Ordered that cost of prosecution be
7   taxed to the Defendant.
8                   MR. PORTER:  Your Honor, could we
9   ask the Court to waive costs.  He's been
10  incarcerated since 2001.  He has no ability to pay
11  the court costs.  He's obviously indigent.
12                  THE COURT:  I would ask you to
13  submit a written affidavit to that effect that he is
14  indigent, and I will approve that.
15                  MR. PORTER:  Thank you, Your Honor.
16                  THE COURT:  Upon release from
17  prison, this is rather -- the law requires what I am
18  about to tell you.
19          Upon release from prison at the option of the
20  Adult Parole Authority, it would be mandatory that
21  they place you on a post release control program for
22  a mandatory five (5) years.  During that time they
23  can add additional sanctions while you are released.

26

1   They can, for a serious enough violation, cause you
2   to be placed back in prison in segments of nine (9)
3   months each, not to exceed more than one half of the
4   prison term.  If you were convicted of a subsequent
5   felony while on that control, there is a statute
6   which would allow the parole board to put you back
7   in prison for twelve (12) months or the amount of
8   time remaining on post release control, whichever is
9   greater.  And any new time picked up for a new
10  felony would have to be served consecutive to any
11  time owed on these particular charges.

12          In regard to the Aggravated Murder charge,
13  even though you have received the death penalty, if
14  for any reason, you receive a sentence of life with
15  no eligibility for parole, and if for any reason you
16  are paroled, you will be on parole for the rest of
17  your life.  You understand that?

18                  DEFENDANT:  Yes, sir.

19                  MR. MORROW:  If I may, Your Honor,
20  that mandatory five (5) year post release control,
21  that is with respect to both counts Three and Four?

22                  THE COURT:  That is for both Counts
23  Three and Four, the Aggravated Burglary and Robbery.

27

1          MR. MORROW:  Thank you, Your Honor.
2          THE COURT:  As I said, the Court's
3     finding on the weighing of mitigating factors will
4     be filed this afternoon.  For the record, is the
5     prosecution satisfied that the Court has addressed
6     the matter?
7          MR. MORROW:  Some additional
8     housekeeping, obviously with the requirement that
9     Mr. Jackson be advised of the good time provision
10    while he may not be eligible for it.
11         THE COURT:  There is one other thing
12    I failed to do here.
13         MR. MORROW:  And his Appellate
14    rights as well.
15         THE COURT:  Rule 32.  Since you have
16    been convicted and sentenced, you have the right to
17    have an appeal filed in this case.  If you are
18    unable to pay the cost of the appeal, those will be
19    paid on your behalf by the State of Ohio.  You have
20    the right, of course, to counsel.  And if you are
21    unable to afford counsel, you have the right to have
22    counsel appointed at the expense of the State.  Any
23    documents that you require, you are entitled to have

28

1   those documents without any cost, if you are unable
2   to pay. You have the right to have the notice of
3   appeal timely filed on your behalf to start that
4   procedure. And upon your request, this Court shall
5   appoint counsel for appeal.

6           I understand Mr. Porter here acknowledges
7   that he is representing you. You are entitled to a
8   second lawyer to represent you. And if you make
9   application to this Court, I will attempt to find
10  someone who is death qualified that is eligible to
11  help. I would suggest, Mr. Porter, that you travel
12  in these circles, it would be helpful if your client
13  wishes appointment of counsel that perhaps you find
14  somebody appropriate that I could appoint. And if
15  you will submit such a motion, I will be glad to
16  address that. The Court of Appeals can also do
17  that. Good luck to you.

18          MR. MORROW: I still think that
19  there is a necessity to advise him of the potential
20  for the good time for each day of credit he gets up
21  to three days.

22          THE COURT: There is a thing, that
23  is right. That is another point. Under the present

1   set up of law, there is an inducement to everybody
2   in prison, you are probably aware of it, that you
3   get good time as well as bad time. And I think that
4   ordinarily applies on a set sentence that you expect
5   to get out of prison. If you were successful in
6   some way, as this matter proceeds through the Court
7   where you did get out on parole someday, then that
8   good time would be something you should keep in
9   mind. Those guards out there try to make sure that
10  that things go smoothly. It is to your benefit to
11  help them have that happen.

12

13            (END OF HEARING AT 2:25 p.m.)

14

15

16

17

18

19

20

21

22

23

30

1

2                    REPORTER'S CERTIFICATE

3          I HEREBY CERTIFY the foregoing is a true

4    and correct transcript of the hearing held on

5    August 14, 2012, as shown by the stenographic

6    notes taken by me at the time of said hearing.

7

8    _10/4/2012_                Mary ann Mills

9    DATE                      MARY ANN MILLS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# The Supreme Court of Ohio

Court of Common Pleas for

~~TRUMBULL~~ _____County,

___WARREN_____, Ohio

CERTIFICATE

S.C. Case No. _2012-1644_

C.P. Case No. _01-CR-794_

___THE STATE OF OHIO_____

v.

___NATHANIEL JACKSON_____

   In accordance with S.Ct. Prac. R. 19.5, I hereby certify that the attached is the record in this case, consisting of the original papers and exhibits to those papers; the transcript of proceedings and exhibits, along with a computer diskette of the transcript, if available; and certified copies of the journal entries and the docket of the case.

   I further certify that an index, prepared in accordance with S.Ct. Prac. R. 19.5(B)(1) is also attached.

   I further certify that I have sent a copy of the index to all counsel of record in this case.



IN TESTIMONY WHEREOF, I have hereunto subscribed my name as Clerk of the Court of Common Pleas for ___TRUMBULL_ County, Ohio, and affixed the seal of the Court, on this _31_ day of _____DECEMBER_____, 20 _12_ .

Clerk of the Court of Common Pleas in and for ____TRUMBULL_ County, Ohio

By _____ Deputy

Telephone: ___(330-675-2557)_____

E-mail: _____

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

     Plaintiff,                      :          Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      :          Judge Ronald J. Rice

     Defendant.                      :

**Nathaniel Jackson's Motion**
**For Leave To File A Motion For A New Mitigation Trial**

    Nathaniel Jackson ("Movant") pursuant to Criminal Rule 33, moves this Court for leave to file a motion for a new sentencing hearing on the following grounds:

(1) There was irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial in the penalty phase of this case [Crim. R. 33(A)(1)];

(2) The verdict of a death sentence in this case is not sustained by sufficient evidence or is contrary to law because the death sentence was imposed in violation of the Sixth and Fourteenth Amendments to the United States Constitution. *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016) [Crim. R. 33(A)(4)]; and

(3) The death sentence in this case is the result of an error of law inasmuch as it was imposed in violation of the Sixth and Fourteenth Amendments to the United States Constitution. *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016) [Crim. R. 33(A)(5)].

    The proposed New Trial Motion is attached. The following memorandum and affidavit support this Motion for Leave to File.

                        Respectfully submitted,



2001 CR
00794
00052747410
CRM

Office of the
Ohio Public Defender

Randall L. Porter – 0005835
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio  43215-9308
(614) 466-5394 (telephone)
(614) 644-0708 (facsimile)
Randall.Porter@opd.ohio.gov

Counsel for Nathaniel Jackson

## MEMORANDUM IN SUPPORT

**I.  Criminal Rule 33 Authorizes Courts to Grant a Motion for New Trial**

A trial court my grant a motion for a new trial when any one of the following grounds exist:  (a) irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial; (b) the verdict is not sustained by sufficient evidence or is contrary to law; or (c) an error of law occurred at trial.  *See,* Crim. R. 33(A)(1)(4) and (5).  As shown in the proposed motion for new trial, attached hereto, all three of these grounds exist in this case.

**II.  Movant was Unavoidably Prevented from Filing His Motion Within 14 Days of the Jury's Verdict**

Pursuant to Criminal Rule 33(B), a Motion for New Trial ordinarily must be filed "within fourteen days after the verdict was rendered, or the decision of

2

the Court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein." Crim. R. 33(B).

The court sentenced Movant to death on December 9, 2002. *Hurst* was decided January 12, 2016. At sentencing, counsel could not have anticipated the United States Supreme Court's holding in *Hurst*. Thus, Thomas could not have filed his motion for new trial within fourteen days of the imposition of sentence. In *State v. Burke*, 10th Dist. No. 03AP-1242, 2005-Ohio-891, ¶12 the court of appeals reversed the denial of a motion for a new trial filed seventeen months after sentencing. The court ruled that the motion for leave to file was timely filed because the case involved the death penalty case and the motion, if granted, could substantially affect the defendant's death sentence. *Id.* Here, the motion for leave to file a new trial motion is being tendered to the Court within 12 months of the United States Supreme Court's announcement in *Hurst*. Furthermore, if granted, the new trial motion would vacate the death sentence and require a new mitigation hearing. *Id.*

## CONCLUSION

Movant respectfully asks the Court to grant him leave to file the attached *Motion for New Mitigation Trial Pursuant to Criminal Rule 33 and Hurst v.*

3

*Florida, instanter,* and deem the attached motion filed effective the date of the Court's Order granting this motion.

Office of the
Ohio Public Defender

Randall L. Porter – 0005835
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215-9308
(614) 466-5394 (telephone)
(614) 644-0708 (facsimile)
Randall.Porter@opd.ohio.gov

Counsel for Nathaniel Jackson

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Nathaniel Jackson's Motion For Leave To File A Motion For A New Mitigation Trial* was served by U.S. mail to Luwayne Annos, Assistant Prosecuting Attorneys, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this the 11th day of January, 2017.

Randall L. Porter – 0005835
Counsel for Nathaniel Jackson

4

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,             :

    Plaintiff,          :      Case No. 01-CR-794

-vs-                  :

NATHANIEL JACKSON,    : Judge Ronald J. Rice

    Defendant.

## AFFIDAVIT

State of Ohio,
Franklin County, ss:

    Randall L. Porter, being first duly cautioned and sworn, deposes and says:

    1.    I am counsel of record for Nathaniel Jackson in the attached *Motion For Leave To File A Motion For A New Mitigation Trial*

    2.    Nathaniel Jackson was sentenced to death on December 9, 2002.

    3.    On January 12, 2016, the United States Supreme Court announced its decision in *Hurst v. Florida,* 136 S.Ct. 616 (2016).

    4.    Counsel could not have filed a motion based on *Hurst* prior to January 12, 2016. *Hurst* is a complex decision, has generated considerable discussion and debate about the parameters of its holding, and takes time to digest and understand.

    5.    All of the statements in this Affidavit are true and within my personal knowledge, to the best of my knowledge and belief.

                    Randall L. Porter, Affiant

    Sworn to before me and subscribed in my presence by Randall L. Porter, who is personally known to me, on January 10, 2017.

                    Notary Public

ROBERT W. LOVE
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 11-23-19



ROBERT W LOVE
NOTARY PUBLIC, STATE OF OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                       :   Case No. 01-CR-794

-vs-                                    :

NATHANIEL JACKSON,                      :   Judge Ronald J. Rice

    Defendant.                       :

---

### Nathaniel Jackson's Motion For A New Mitigation Trial Pursuant To Criminal Rule 33 And *Hurst v. Florida*

---

Nathaniel Jackson ("Movant") pursuant to Criminal Rule 33, moves this Court to grant a new trial on the following grounds:

(1) There was irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial in the penalty phase of this case [Crim. R. 33(A)(1)];

(2) The verdict of a death sentence in this case is not sustained by sufficient evidence or is contrary to law because the death sentence was imposed in violation of the Sixth and Fourteenth Amendments to the United States Constitution. *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016) [Crim. R. 33(A)(4)]; and

(3) The death sentence in this case is the result of an error of law inasmuch as it was imposed in violation of the Sixth and Fourteenth Amendments to the United States Constitution. *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016) [Crim. R. 33(A)(5)].

The following memorandum further supports this motion.

| |
|---|
| **Attachment 1** to *Motion for Leave to File Defendant's Motion for New Mitigation Trial Pursuant to Criminal Rule 33 and* Hurst v. Florida *and to deem this motion filed instanter.* |

Respectfully submitted,

Office of the
Ohio Public Defender

Randall L. Porter – 0005835
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio  43215-9308
(614) 466-5394 (telephone)
(614) 644-0708 (facsimile)
Randall.Porter@opd.ohio.gov

Counsel for Nathaniel Jackson

## MEMORANDUM IN SUPPORT

**I.    Criminal Rule 33 Authorizes Court to Grant a Motion for New Trial in this Case**

Criminal Rule 33 authorizes this Court to grant a new trial when any one several grounds exist:  (1) irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial; (2) the verdict is not sustained by sufficient evidence or is contrary to law; or (3) an error of law occurred at trial. *See,* Crim. R. 33(A)(1)(4) and (5).   As will be shown below, all three of these grounds exist in this case.

**II.    Irregularity in Proceedings, or in Order or Ruling of the Court, or Abuse of Discretion by the Court**

On January 12, 2016, the United States Supreme Court decision in *Hurst* signaled a sea-change in death penalty jurisprudence. *Hurst v. Florida,* __U.S. __, 136 S. Ct. 616, 193 L.Ed.2d 504 (2016). After *Hurst,* it is clear that

2

Ohio's death penalty scheme is unconstitutional. The procedure the trial court employed; to reduce the jury's sentencing verdict to a mere recommendation regarding is an irregularity in the proceedings that deprived Movant of a fair trial during the penalty phase.

**A.     The Supreme Court's Decision in *Hurst v. Florida*.**

*Hurst* held that Florida's capital sentencing structure violated the Sixth Amendment right to trial by jury because it required the judge, not the jury, to make the factual determinations necessary to support a sentence of death. *Hurst,* 136 S.Ct. at 619. Pursuant to *Hurst,* Ohio's capital sentencing is likewise unconstitutional inasmuch as the trial judge, not the jury, makes the factual determinations necessary to impose a sentence of death.

In *Hurst,* a Florida jury convicted Timothy Hurst of first-degree murder. *Id.* at 619-20. In Florida, the maximum sentence a defendant may receive for first degree murder is life imprisonment. Fla. Stat. § 775.082(1). The defendant can only receive the death penalty after an additional sentencing proceeding "results in findings by *the court* that such person shall be punished by death." *Id.* (emphasis added). Otherwise, the defendant is punished by life imprisonment without parole. *Id.*

Accordingly, after Hurst was found guilty of first-degree murder, the judge conducted an evidentiary hearing before the jury. *Hurst,* 136 S. Ct. at 620. At the conclusion of the evidentiary hearing the jury rendered an "advisory sentence" of death without specifying the factual basis of its recommendation. *Id.* Under Florida law, the trial court must give the jury's

3

recommendation "great weight" but must independently weigh the aggravated and mitigating circumstances before entering a sentence of life imprisonment or death. *Id.* The trial court in Hurst's first trial did this, and imposed a death sentence. *Id.*

On post-conviction review, the Florida Supreme Court vacated Hurst's death sentence. *Id.* At his re-sentencing, a jury again recommended death and the judge so sentenced Hurst, basing her decision on the Court's independent findings of aggravating circumstances as well as the jury's recommendation. *Id.*

The United States Supreme Court accepted certiorari of Hurst's appeal to resolve the tension between *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and its earlier decisions, *Hildwin v. Florida,* 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) and *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82. L.Ed.2d 340 (1984). In *Ring,* the Supreme Court held that the Sixth Amendment requires a jury to find any fact necessary to qualify a capital defendant for a death sentence. *Hurst,* 136 S. Ct. at 621. Although *Ring* did not expressly overruled *Hildwin* and *Spaziano,* cases which approved the constitutionality of Florida's capital sentencing scheme, *Ring*'s holding seemed to compel such an outcome. *Hurst* laid the confusion to rest, holding that Florida's law "violates the Sixth Amendment in light of *Ring*." *Id.* at 620. *Hurst* "expressly overrule[d]" *Spaziano* and *Hildwin. Id.* at 623

Justice Sotomayor explained in the 8-1 majority opinion that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. *A mere recommendation is not enough.*" *Id.* at 619

4

(emphasis added). The Supreme Court held that states like Arizona, the state whose sentencing scheme was at issue in *Ring*, "Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts." *Id.* at 622. The Supreme Court continued: "Although Florida incorporates an advisory jury verdict that Arizona lacked, we have previously made clear that this distinction is immaterial." *Id.* Because "the maximum punishment Timothy Hurst could have received, without any judge-made findings, was life in prison without parole," and because "a judge increased Hurst's authorized punishment based on her own factfinding," the Court held that "Hurst's sentence violates the Sixth Amendment." *Id.*

In so holding, the Court rejected Florida's argument that the jury's recommendation necessarily included a finding of an aggravating circumstance, noting "the Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.'" *Id.* (quoting Fla. Stat. § 775.082(1)) (emphasis in opinion). Because "[t]he trial court *alone* must find 'the facts . . . [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances,'" the Court found that a Florida jury's function is solely advisory and does not satisfy the constitutional standard outlined by *Ring*. *Id.* (quoting § 921.141(3)) (emphasis in opinion).

<div align="center">5</div>

**B.**   **Similarities Between Ohio and Florida's Capital Sentencing Schemes.**

Ohio's death-penalty sentencing scheme is similar to Florida's in several significant aspects. Pursuant to R.C. 2929.03(B), a jury in a capital case must find the defendant guilty or not guilty of the principal charge and then it must also decide "whether the offender is guilty or not guilty of each specification." The jury is instructed that each aggravating circumstance "shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification." *Id.*

If the jury finds a defendant guilty of both the charge and one or more of the specifications, then, like in Florida, a sentencing hearing is conducted where:

> The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender.

R.C. 2929.03(D)(1). During this sentencing hearing, the defendant has the burden of introducing evidence of any mitigating factors, but the prosecution has the ultimate burden of "proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing

6

are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death." *Id.*

At the conclusion of the sentencing hearing, if the jury unanimously finds that the prosecutor has met this burden, "the jury shall *recommend* to the court that the sentence of death be imposed on the offender." R.C. 2929.03(D)(2) (emphasis added). The finding is not required to be rendered in writing and the jury's sentencing recommendation verdict does not set forth the factual findings underlying the jury's recommendation.[1]

Once an Ohio jury makes a death-sentence recommendation, then, like in Florida, the  Ohio trial court must independently consider "the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section." R.C. 2929.03(D)(3). The trial court can then sentence a defendant to death if it finds "by proof beyond a reasonable doubt . . .  that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors." *Id.* As in Florida, when the Ohio trial court imposes a death sentence it shall:

> state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

---

[1] In Florida, the jury's recommendation does not need to be unanimous. *Hurst,* 136 S. Ct. at 620. Nevertheless, the point is that, like Florida, Ohio juries make a recommendation to the trial court for imposing a death sentence.

7

R.C. 2929.03(F).

In sum, while a jury in Ohio has the responsibility of finding that one or more aggravating circumstances exist as part of the verdict at the capital defendant's trial; that does not complete the capital sentencing process. Rather, under Ohio law, the jury must then conduct a weighing process during the sentencing hearing. Once the weighing process is complete, the jury may make a death-sentence *recommendation* to the trial court. The Court in *Hurst* emphasized the fact that in Florida the jury's decision was advisory. Because Ohio's scheme similarly classifies a jury's decision as a recommendation (i.e., "advisory"), Ohio's death penalty statute is likewise unconstitutional.

In *Hurst*, the Court broadly criticized the Florida scheme because the jury "does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.'" *Hurst* 136 S. Ct. at 622 (quoting *Walton v. Arizona*, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). The Court's opinion not only pointed out the absence of factual findings about the existence of aggravating circumstances or mitigating factors, but also the absence of any findings about the weighing of those factors. *Id.*

In Ohio, the defendant has "the burden of going forward with the evidence of any factors in mitigation of the imposition of the death sentence." R.C. § 2929.03(D)(1). Ohio law requires a jury to render a unanimous verdict that the aggravating circumstance (alleged in the indictment and proven

8

beyond a reasonable doubt in the guilt determination phase of trial) outweighs the mitigating factors beyond a reasonable doubt before the jury may recommend a sentence of death. *Id.* However, the Ohio statute does not require the jury to make any specific factual findings as to: (1) whether the defendant proved the existence of any mitigating factor (or to what degree defendant did so), (2) which mitigating factors the defendant established; or (3) what weight the jury accorded each mitigating factor. Indeed, the Ohio Supreme Court has rejected all efforts to require that the jury make any factual finding about the existence of mitigating factors.

> As we concluded in *Jenkins, supra,* at 177, such written findings are not an "indispensible ingredient" in assisting appellate courts in determining whether the death sentence was arbitrarily or capriciously imposed. Additionally, while the *jury* is not required to do so, pursuant to R.C. 2929.03(F) the *trial judge* must make specific written findings as to both aggravating and mitigating circumstances including a weight evaluation. As such, these findings serve to enhance the record available upon appellate review. In addition, the statutory requirement that the appellate court make an independent determination of sentence appropriateness is an additional safeguard against arbitrary imposition of the death penalty and is not merely the answer to a constitutional mandate of proportionality review. Issue 5 is not well-taken.

*State v. Buell,* 22 Ohio St. 3d 124, 137, 489 NE.2d 795 (1986), *superseded by statute on other grounds, State v. Riley,* 2007-Ohio-879, ¶¶ 26-27 (emphasis added).

The Ohio statute does not require the jury to make any specific findings of fact about mitigating factors, nor does it ask the jury to make any specific findings about their balancing of the mitigating and aggravating factors.

9

Therefore, the judge must implement a sentence without those critical findings.[2] Absent those factual findings, and given the advisory nature of the jury's sentencing recommendation, the Ohio death penalty scheme suffers from the same constitutional deficiencies as the scheme in Florida and is unconstitutional.

### C.  The Supreme Court of Ohio's Statements Comparing Ohio and Florida.

Going back to at least 1986, and as recently as 2014, the Supreme Court of Ohio has cited the now overruled *Spaziano* as favorable authority to uphold the constitutionality of Ohio's own capital sentencing scheme. In holding Florida's capital sentencing structure to be unconstitutional, *Hurst* also "expressly overrule[d]" *Spaziano v. Florida* and *Hildwin v. Florida*, the United States Supreme Court's prior precedent upholding Florida's scheme. *Hurst*, 136 S. Ct.at 623. The Supreme Court stated, "Time and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*." *Hurst*, 136 S. Ct.at 624. The Court's decision to overrule *Spaziano* is strong evidence of the unconstitutionality of Ohio's own capital sentencing structure. On several occasions, the Supreme Court of Ohio favorably cited *Spaziano* as authority to uphold Ohio's own scheme.

---

[2] Unlike in Ohio, a sentencing judge in Florida could "override" an "advisory jury verdict [recommending life]," but as a practical matter, that did not actually happen in Hurst's case, nor has any judge overridden a jury recommendation in Florida for over 15 years. *Hurst*, 136 S. Ct. at 625-26. Thus in practice, the Florida scheme functions similarly to Ohio's.

10

Perhaps most damning to the constitutionality of Ohio's capital sentencing structure is the decision in *State v. Rogers*, 28 Ohio St. 3d 427, 504 N.E.2d 52 (1986), *rev'd on other grounds*, 32 Ohio St.3d 70. In *Rogers*, the Court stated, "Florida's statutory system, *which is remarkably similar to Ohio's*, was expressly upheld in the case of *Spaziano v. Florida* (1984), 468 U.S. 447. *Rogers*, 28 Ohio St. 3d at 430 (emphasis added). The 1986 version of R.C. 2929.03 at issue in *Rodgers* was substantially similar to the current version of the statute with the same problematic "recommendation" language. *See* R.C. 2929.03(D)(2) (1986) ("If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.").[3]

In 2014, the Supreme Court of Ohio again cited *Spaziano* favorably:

> The starting point for constitutional analysis of Davis's claim is the recognition that although the Sixth Amendment guarantees the right to trial by jury, neither the Sixth nor the Eighth Amendment creates a constitutional right to be *sentenced* by a jury, even in a capital case. "[D]espite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. * * * The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue." *Spaziano v. Florida*, 468 U.S. 447, 459, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). *See also Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion); *Harris v. Alabama*, 513 U.S. 504, 515, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) ("The Constitution permits the trial judge, acting alone, to impose a capital sentence").

---

[3] The 1986 version of the statute is attached to this motion as "Exhibit A."

11

*State v. Davis*, 139 Ohio St. 3d 122, 130, 2014-Ohio-1615 at ¶ 39 (emphasis original). However, *Hurst* stated that "[t]he Sixth Amendment *requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A mere recommendation is not enough.*" *Id.* at 619 (emphasis added). Thus the Supreme Court of Ohio's previous reliance on *Spaziano* is now undermined by the holding in *Hurst*.

Ohio has unabashedly proclaimed that the jury verdict at the mitigation phase of a capital trial is merely a recommendation to the trial court – where the real power to sentence a defendant to death resides. The Supreme Court of Ohio decided that question thirty years ago:

> Ohio has no sentencing jury.  All power to impose the punishment of death resides in the trial court which oversees the mitigation or penalty phase of the trial. The duty of the trial court is set forth in R.C. 2929.03(D)(3).
>
> Immediately obvious is that, under this provision, the jury provides only a *recommendation* as to the imposition of the death penalty. The trial court must thereafter independently re-weigh the aggravating circumstances against the mitigating factors and issue a formal opinion stating its specific findings, before it may impose the death penalty.  R.C. 2929.03(F).  It is the trial court, not the jury, which performs the function of sentencing authority. Thus, no "sentencing jury" was involved in the proceedings below.

*Rogers*, 28 Ohio St. 3d. at 429 (emphasis in opinion). The Ohio Supreme Court has a long history of rejecting defense counsel's claim that it is error to inform a capital jury that their verdict is a mere recommendation, and has done so precisely because telling the jury that its sentencing verdict is merely a recommendation is an accurate statement of Ohio law. *State v. Jenkins*, 15 Ohio St.3d 164, 200-203, 473 N.E.2d 264 (1984) (Jury instruction that

12

mitigation phase death verdict was recommendation held to be accurate statement of Ohio law); *accord, State v. Williams,* 23 Ohio St. 3d 16, 21-22, 490 N.E.2d 906 (1986); *State v. Scott,* 26 Ohio St. 3d 92, 103-104, 497 N.E.2d 55 (1986); *State v. Thompson,* 33 Ohio St. 3d 1, 6, 514 N.E.2d 407 (1987); *State v. Williams,* 38 Ohio St. 3d 346, 356-357, 528 N.E.2d 910 (1988) *State v. Bradley,* 42 Ohio St. 3d 136, 147, 538 N.E.2d 373 (1989) *State v. Steffen,* 31 Ohio St. 3d 111, 113-114, 509 N.E.2d 383 (1987); *State v. DePew,* 38 Ohio St. 3d 275, 280, 528 N.E.2d 542 (1988); *State v. Beuke,* 38 Ohio St. 3d 29, 34-35, 526 N.E.2d 274 (1988); *State v. Poindexter,* 36 Ohio St. 3d 1, 3, 520 N.E.2d 568 (1988); *State v. Johnson,* 46 Ohio St. 3d 96, 105-106, 545 N.Ed.2d 635 (1989); *State v. Durr,* 58 Ohio St. 3d 86, 93-94, 568 N.Ed.2d 674 (1991); *State v. Milles,* 62 Ohio St. 3d 357, 375, 582 N.E.2d 972 (1992); *State v. Grant,* 67 Ohio St. 3d 465, 472, 620 N.E.2d 50 (1993); *State v. Carter,* 72 Ohio St. 3d 545, 559, 651 N.E.2d 965 (1995), *State v. Keith,* 79 Ohio St. 3d 514, 517-519, 684 N.E.2d 47 (1997).

Similarly, when the district courts of appeals considered death sentence cases on an appeal of right, they universally held that a jury verdict of death was only a recommendation under Ohio law. *State v. Roe,* 10th Dist. No. 86AP-59, 1987 Ohio App. LEXIS 8490, *69-70 (Aug. 25, 1987); *State v. Fort,* 8th Dist. No. 52929, 1988 Ohio App. LEXIS 384, *59-61, (Feb. 4, 1988); *State v. Maurer,* 5th Dist. No. CA-7253, 1988 Ohio App. LEXIS 1608, *26-27, (April 25, 1988); *State v. Montgomery,* 1988 Ohio App. LEXIS 3297, *10-11, (, August 12, 1988); *State v. Jackson,* 6th Dist. No. L-86-395, 1989 Ohio App. LEXIS 5064, * 39-40

13

(Oct. 5, 1989); *State v. Moore,* 1st Dist. No. C-950009, 1996 Ohio App. LEXIS 2617, *54 ( June 26, 1996).

Finally, the Federal Courts have recognized that, in Ohio, the jury does not impose a death sentence and thus it is an accurate statement of Ohio law to instruct the jury that its death verdict is merely a recommendation. *Beuke v. Collins,* 1995 U.S. Dist. LEXIS 22095, *102 (S.D. Ohio Oct. 19, 1995).

This long line of cases demonstrates that, in Ohio as in Florida pre-*Hurst,* the trial judge is the sentencing authority: the jury's role is merely to provide an advisory recommendation to the trial court if the jury recommends a death sentence.[4] *Hurst's* holding that Florida's procedure of basing a death sentence on an advisory jury recommendation violated the Sixth Amendment was unconstitutional (*Hurst,* 136 S. Ct. at 621), is equally applicable to Ohio.

### D. The Supreme Court of Ohio Granted Relief Premised on *Hurst.*

In *State v. Kirkland,* the Supreme Court of Ohio granted a motion for relief[5] premised on *Hurst* and remanded the case for a new mitigation and sentencing hearing. *State v. Kirkland,* 2010-0854, 2016-Ohio-2807 (05/04/2016 Case Announcements) at p. 3. Prior to *Hurst,* the Court in *Kirkland* had attempted to cure prejudicial prosecutorial misconduct in the penalty phase by conducting its own deliberations whether the aggravating circumstances outweighed the mitigating factors. *See State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966 at ¶¶ 96, 97. The Court, after *Hurst,* found

---

[4] Unlike Florida, in Ohio the trial court must follow the jury's recommendation if the jury recommends a life sentence. R.C. 2929.03(D)(2).
[5] *See* S. Ct. Prac. Rule 4.01(A), Motion for order or relief.

14

that the jury must weigh the aggravating circumstances against the mitigating factors in a new penalty phase trial. Thus the Supreme Court of Ohio' had held that *Hurst* applies to the penalty phase of Ohio's capital sentencing scheme.

**E.  The Weighing of Aggravating and Mitigating Factors Implicates *Hurst*.**

Both federal and state courts have concluded that weighing determinations are factual findings that must be made by juries. The number of jurisdictions so holding is likely to increase because of the broad language of *Hurst*. "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Hurst*, 136 S. Ct. at 619

A Missouri Federal District Court concluded the Missouri statutory scheme violated the Sixth Amendment in light of *Hurst* and *Ring*. *McLaughlin v. Steele*, 173 F. Supp.3d 855, 896 (E.D. Mo. Mar. 22, 2016). The court found that "the weighing of mitigating and aggravating circumstances is a finding of fact." *Id. See also State v. Whitfield*, 107 S.W.3d 253, 259-61 (Mo. 2003) (en banc) (finding Missouri's requirement that capital jurors determine whether evidence in mitigation was sufficient to outweigh the evidence in aggravation before sentencing defendant to death was a factual finding properly made by jury). The *McLaughlin* court reasoned "all we know from the special interrogatory is what [the jury] did *not* find." *Id.* "[B]ecause the judge could not have known what the jury decided, he could not have relied upon it in imposing the death penalty, and so he must have made the factual finding himself." *Id.* This violated the Sixth Amendment. *Id.*

15

In *Woldt v. People*, the Supreme Court of Colorado found its state statute's requirement that the sentencing body decide "whether the mitigating factors outweighed the aggravating factors" was "fact-finding" that rendered the defendant eligible for a death sentence and must be made by a jury. 64 P.3d 256, 265-66 (Colo. 2003) (en banc). Additionally, while the Supreme Court of Nevada has considered weighing "*mostly* a question of mercy," the process is thereby regarded as retaining some factual inquiry. *Nunnery v. State*, 127 Nev. 749, 263 P.3d 235 (Nev. 2011) (emphasis added).

In Ohio, the jury only weighs aggravating circumstances against mitigating factors in order to arrive at an advisory jury recommendation regarding a death sentence. Even then, the jury does not make any factual findings that identify which mitigating factors, if any, the jury deemed proven. Nor does the jury make any factual finding about the weight the jury accorded each mitigating factor when the jury reached its advisory recommendation that the death penalty be imposed.

### F. Conclusion, Part I.

Ohio's death penalty statute unconstitutionally permits a trial judge, rather than a trial jury, to determine all of the facts necessary to impose the death penalty. *Hurst*, 136 S.Ct. at 619. Like the statute found unconstitutional in *Hurst*, Ohio's death penalty statute requires only that the jury make a recommendation of a death sentence, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Accordingly, Movant was

16

prevented from having a fair trial in the sentencing phase of his case, and is entitled to a new mitigation phase trial pursuant to Crim. R. 33(A)(1).

**III.  Death Sentence Imposed in this Case Is Not Sustained by Sufficient Evidence and/or is Contrary to Law**

As shown above, the Ohio death penalty statute violates the Sixth and Fourteenth Amendments to the United States Constitution because, in Ohio, a Jury's verdict in the mitigation phase is merely a recommendation. *Hurst*, 136 S.Ct. at 619. The death sentence in this case was imposed based upon a jury recommendation and independent fact finding by the trial court. Accordingly, the death sentence was imposed based upon insufficient factual findings (findings only made by a judge) and contrary to law. *Hurst*, 136 S.Ct. at 619. Movant is entitled to a new mitigation phase trial pursuant to Crim. R. 33(A)(4).

**IV.  The Death Sentence Imposed in this Case is the Result of an Error in Law**

As shown above, the Ohio death penalty statute violates the Sixth and Fourteenth Amendments to the United States Constitution because, in Ohio, a jury's verdict in the mitigation phase is merely a recommendation. *Hurst*, 136 S.Ct. at 619. The death sentence in this case was imposed based upon a jury recommendation and independent fact finding by the trial court. Accordingly, the death sentence was imposed contrary to law. *Hurst*, 136 S.Ct. at 619. Movant is entitled to a new mitigation phase trial pursuant to Crim. R. 33(A)(5).

17

## CONCLUSION

Movant was sentenced to death under a statutory scheme that violates the Sixth and Fourteenth Amendments of the United States Constitution because in Ohio, a Jury's verdict in the mitigation phase is merely a recommendation. *Hurst*, 136 S.Ct. at 619. Applying Ohio's unconstitutional death penalty statute to Movant's case constitutes an irregularity in the proceeding, or in any order or ruling of the court, or abuse of discretion by the court, because of which Movant was prevented from having a fair trial in the penalty phase in his case. The death sentence in this case was imposed based upon a jury recommendation and independent fact finding by the trial court. Accordingly, the death sentence was imposed contrary to law and is the result of an error of law. *Hurst*, 136 S.Ct. at 619. Movant is entitled to a new penalty phase trial pursuant to Crim. R. 33(A)(1),(4) and (5).

Respectfully submitted,

Office of the
Ohio Public Defender

Randall L. Porter – 0005835
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215-9308
(614) 466-5394 (telephone)
(614) 644-0708 (facsimile)
Randall.Porter@opd.ohio.gov

Counsel for Nathaniel E. Jackson

18

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Nathaniel Jackson's Motion For A New Mitigation Trial Pursuant To Criminal Rule 33 And *Hurst v. Florida* was served by U.S. mail to Luwayne Annos, Assistant Prosecuting Attorneys, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio  44481 on this the 11th day of January, 2017.

Randall L. Porter - 0005835
Counsel for Nathaniel E. Jackson

19

parole eligibility after serving twenty years of imprisonment on the offender.

(B) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge and, if guilty of the principal charge, whether the offender was eighteen years of age or older at the time of the commission of the offense, if the matter of age was raised by the offender pursuant to section 2929.023 [2929.02.3] of the Revised Code, and whether the offender is guilty or not guilty of each specification. The jury shall be instructed on its duties in this regard, which shall include an instruction that a specification shall be proved beyond a reasonable doubt in order to support a guilty verdict on the specification, but such instruction shall not mention the penalty which may be the consequence of a guilty or not guilty verdict on any charge or specification.

(C)(1) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge but not guilty of each of the specifications, and regardless of whether the offender raised the matter of age pursuant to section 2929.023 [2929.02.3] of the Revised Code, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender.

(2) If the indictment or count in the indictment contains one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, and if the offender is found guilty of both the charge and one or more of the specifications, the penalty to be imposed on the offender shall be death, life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, shall be determined pursuant to divisions (D) and (E) of this section, and shall be determined by one of the following:

(a) By the panel of three judges that tried the offender upon his waiver of the right to trial by jury;

(b) By the trial jury and the trial judge, if the offender was tried by jury.

(D)(1) Death may not be imposed as a penalty for aggravated murder if the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense. When death may be imposed as a penalty for aggravated murder, the court shall proceed under this division. When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court, pursuant to section 2947.06 of the Revised Code. No statement made or information provided by a defendant in a mental examination or proceeding conducted pursuant to this division shall be disclosed to any person, except as provided in this division, or be used in evidence against the defendant on the issue of guilt in any retrial. A pre-sentence investigation or mental examination shall not be made, except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender. The defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and any other factors in mitigation of the imposition of the sentence of death. If the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation.

The defendant shall have the burden of going forward with the evidence of any factors in mitigation of the imposition of the sentence of death. The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

(2) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to divi-

sion (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section.

(3) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

(a) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

(b) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(E) If the offender raised the matter of age at trial pursuant to section 2929.023 [2929.02.3] of the Revised Code, was convicted of aggravated murder and one or more specifications of an aggravating circumstance listed in division (A) of section 2929.04 of the Revised Code, and was not found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court or the panel of three judges shall not impose a sentence of death on the offender. Instead, the court or panel shall impose one of the following sentences on the offender:

(1) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

(2) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

(F) The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. The court or panel, when it imposes life imprisonment under division (D) of this section, shall state in a separate opinion its specific findings of which of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code it found to exist, what other mitigating factors it found to exist, what aggravating circumstances the offender was found guilty of committing, and why it could not find that these aggravating circumstances were sufficient to outweigh the mitigating factors. The court or panel shall file the opinion required to be prepared by this division with the clerk of the appropriate court of appeals and with the clerk of the supreme court within fifteen days after the court or panel imposes sentence. The judgment in a case in which a sentencing hearing is held pursuant to this section is not final until the opinion is filed.

(G) Whenever the court or a panel of three judges imposes sentence of death, the clerk of the court in which the judgment is rendered shall deliver the entire record in the case to the appellate court.

HISTORY: 134 v H 511 (Eff. 1-1-74), 139 v S 1. Eff. 10-19-81.

**Committee Comment to H 511**

This section specifies the procedure to be followed in determining whether the sentence for aggravated murder is to be life imprisonment or death.

The death penalty is precluded unless the indictment contains a specification of one or more of the aggravating circumstances listed in section 2929.04. In the absence of such specifications, life imprisonment must be imposed. If the indictment specifies an aggravating circumstance, it must be proved beyond a reasonable doubt, and the jury must return separate verdicts on the charge and specification. If the verdict is guilty of the charge but not guilty of the specification, the penalty is life imprisonment.

If the verdict is guilty of both the charge and the specification, the jury is discharged and the trial begins a second phase designed to determine the presence or absence of one or more mitigating circumstances. If one of the three mitigating factors listed in section 2929.04 is established by a preponderance of the evidence, the penalty is life imprisonment. If none of such factors is established, the penalty is death. The procedure is essentially the same in the first phase of an aggravated murder trial whether the case is tried by a jury or by a three-judge panel on a waiver of a jury. The burden of proof still rests on the state, the same rules of evidence apply, the specification must be proved beyond a

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                        )
    Plaintiff,                    )        Case No 2001-CR-794
                                  )
                                  )
-vs-                                  )
                                  )
NATHANIEL JACKSON                     )        JUDGE RONALD J. RICE
    Defendant.                    )
                                  )        MOTION TO EXTEND TIME TO
                                           FILE RESPONSE TO
                                           DEFENDANT' MOTION FOR
                                           LEAVE

        Now comes the Plaintiff, the State of Ohio ("State"), by and through undersigned

counsel, who move this Court for an extension of time to file its response to Defendant Nathaniel

Jackson's ("Defendant") Motion for Leave to File a Motion for New Mitigation Trial filed in this

Court January 13, 2017. By the State's calculation, its response is due January 26, 2017. The

State seeks a 30-day extension to February 21, 2017 (accounting for a legal holiday), to file said

response.

        This extension is not sought for purposes of delay, but to fully and fairly address

Defendant's 18-page motion on this very serious matter, to wit, a capital sentencing proceeding.

A single week with an intervening legal holiday is simply insufficient time to respond adequately

to this motion. Therefore, the State requests that this Court set the due date for State's response

at February 21, 2017.

2001 CR
00794
00001100182
CRM

Respectfully submitted by:

*Dennis Watkins*

DENNIS WATKINS (#0009949)
Prosecuting Attorney


*LuWayne Annos*

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio    44481

Telephone: (330) 675-2426
Fax: (330) 675-2431

COUNSEL FOR PLAINTIFF
THE STATE OF OHIO


## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing motion was sent by ordinary U.S. Mail to Atty. Randall L. Porter (#0005835),  Assistant Public Defender, 250 E. Broad St., Suite 1400, Columbus, Ohio 43266, Counsel for Defendant Nathaniel Jackson, on this 17th Day of January 2017.


*LuWayne Annos*

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

# IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

State of Ohio,                          )     Case No. 2001 CR 794
                                        )
        Plaintiff,               )     Judge Ronald J. Rice
                                        )
-vs-                                    )     **JUDGMENT ENTRY**
                                        )
Nathaniel Jackson,                      )
                                        )
        Defendant.               )

    This cause is before the Court on the Plaintiff's Motion to Extend Time to File Response to Defendant's Motion for Leave filed on January 17, 2017. Upon review, the Court finds Plaintiff's Motion is well taken.

    Plaintiff is hereby granted an additional 30 days, until February 21, 2017, to file a response.

    It is so ordered.

Date: 01-18-2017



Judge Ronald J. Rice

FILED
COURT OF COMMON PLEAS
JAN 18 2017
TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

2001 CR
00794
00060822981
OLP

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                        )
    Plaintiff,                    )        Case No 2001-CR-794
                             )
-vs-                                  )
                             )
NATHANIEL JACKSON                     )        JUDGE RONALD J. RICE
    Defendant.                    )
                             )

---

## STATE'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO FILE A MOTION FOR A NEW MITIGATION TRIAL

---

Now comes the Plaintiff, State of Ohio ("State") by and through the undersigned counsel, who moves this Court to **DENY** without hearing Defendant Nathaniel Jackson's ("Defendant") Motion for Leave to File a Motion for New Mitigation Trial filed in this Court January 13, 2017. Defendant is 14 years late with this "motion" which – even when viewed in a light most favorable to him – is completely baseless and unsupported by any Ohio authority whatsoever.

### LAW AND ARGUMENT

**Factual Background**

To recite just a brief history of this case, Defendant in 2002 was convicted and sentenced to death for the December 12, 2001, home invasion and shooting death of area businessman Robert Fingerhut. His guilt in this aggravated murder has never been an issue. Defendant was having an affair with Mr. Fingerhut's ex-wife, Donna Roberts. The pair plotted for three months through a series of penitentiary phone calls and





handwritten letters to shoot and kill Mr. Fingerhut. In exchange for his services as the hit man, Roberts promised Defendant a portion of Mr. Fingerhut's life insurance proceeds, a home in the Howland Township suburbs, a luxury automobile and sex.

With an overwhelming amount of evidence, including the prosecutorial treasure trove of recorded conspiratorial phone calls and the letters, Defendant's jury convicted him of two counts of aggravated murder in violation of R.C. 2903.01(A) and (B) for killing Mr. Fingerhut. Both murder counts carried two felony-murder death-penalty specifications: murder during an aggravated burglary and during an aggravated robbery. R.C. 2929.04(A)(7) as well as separate counts of aggravated burglary and aggravated robbery with a firearm specification on each count. For purposes of Defendant's motion, it is important to note that the jury, and not the judge, found Defendant guilty of the aggravating specifications, and unanimously recommended a sentence of death. The court imposed the death sentence. In 2003, Roberts was also convicted and sentenced to death for her role in her ex-husband's murder in Trumbull County Case No. 2001-CR-793.

On January 4, 2006, the Ohio Supreme Court unanimously affirmed Defendant's conviction and sentence. However, on August 2, 2006, the Ohio Supreme Court affirmed Roberts' conviction; it remanded her case back to the common pleas court for a resentencing hearing because the trial judge failed to afford Roberts her rights under Crim. R. 32(A)(1) and because someone from the prosecutor's office typed her sentencing entry. *State v. Roberts*, 110 Ohio St.3d 71, 2006 -Ohio- 3665, 850 N.E.2d 1168. Adopting a what's- good- for- the- goose-is-good-for-the-gander legal approach, Defendant began to barrage the common pleas court with pleadings aimed at procuring

- 2 -

not just a new sentencing hearing like Roberts, but a new trial as well. Though his

pleadings were all denied by the trial court, the Eleventh District Court of Appeals on

October 15, 2010, overturned the common pleas court's decision denying Defendant's

motion for new trial and/or sentencing. The reviewing court ordered the trial court, then

presided over by trial judge, John Stuard, as follows: "Based on the Supreme Court of

Ohio's holding in *Roberts*, appellant is entitled to the same relief afforded to his co-

defendant. Thus, the trial judge must personally review and evaluate the appropriateness

of the death penalty, prepare an entirely new sentencing entry as required by R.C.

2929.03(F), and conduct whatever other proceedings are required by law and consistent

with this opinion." *State v. Jackson*, 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d

1221, ¶ 29 (11th Dist., 2010).

Judge Stuard complied with that order and re-imposed the death sentence. On

August 24, 2016, the Ohio Supreme Court once again on August 24, 2016, affirmed

Defendant's death sentence. *State v. Jackson*, ---N.E. 3d --, 2016-Ohio-5488, ¶ 115

(Ohio), *reconsideration denied,* 147 Ohio St.3d 1439, 2016-Ohio-7677, 63 N.E.3d 157, ¶

115 (2016). The U.S. Supreme Court decided *Hurst v. Florida*, 577 U.S. ——, 136 S.Ct.

616, 193 L.Ed.2d 504 (2016), the case upon which Defendant bases his motion for leave,

on January 12, 2016. This was after the Defendant's brief on the resentencing hearing

was filed in the Ohio Supreme Court but before oral arguments. Defendant filed the

instant motion for leave, accompanied by a memorandum in support of his motion for

new trial on January 13, 2017. For the reasons set forth below, the State opposes

Defendant's motion for leave and submits his proposed motion for new trial affixed to his

motion for leave is destined for certain denial under Ohio law.

-3-

**New Sentencing Under Crim. R. 33: Inapplicable Anomaly to Defendant**

In his motion for leave, Defendant attempts to bootstrap Crim. R. 33 to trigger a new mitigation hearing arguing that the U.S. Supreme Court's now year-old decision in *Hurst* entitles him to a new mitigation hearing. Very simply, Crim. R. 33, which is clearly labeled "New trial," not new "mitigation trial," is not designed for the relief sought by the Defendant, to wit, a "re-do" of his penalty phase in a death penalty trial. As will be discussed *infra*, the Ohio Supreme Court has already decided that *Hurst* will have absolutely no impact on Ohio death cases because the *Hurst* court found errors in Florida's death penalty provisions which simply do not exist now and did not exist in Ohio when the court sentenced Defendant to death. From that standpoint alone, Defendant's motion for leave is a complete exercise in futility, and an unvarnished delay tactic aimed at stalling his July 15, 2020, scheduled execution date. That being so stated, the State will first address the procedural hurdles encountered in the context of a Crim. R. 33 motion which Jackson cannot clear.

Significantly, the Eleventh District Court of Appeals, which is controlling authority upon this Court, ruled in another Trumbull County death penalty case that Crim. R. 33 cannot be applied to cases wherein a new sentencing hearing – rather than a new trial – is sought. "There is no provision in the Ohio Criminal Rules that provides for a new sentencing hearing. Crim.R. 33, upon which Mr. Davie relies, only applies to motions for a new trial. A 'motion for a new sentencing hearing' is an anomaly and does not fall within the purview of Crim .R. 33. Therefore, Mr. Davie's reliance on Crim.R. 33

- 4 -

is misplaced." *State v. Davie*, 11ᵗʰ Dist. No. 2007-T-6940, 2007-Ohio-6940, ¶ 8. [1]

Defendant does not even acknowledge the *Davie* decision in his motion for leave, let alone explain why an untimely Crim. R. 33 was inapplicable to Davie yet applicable to him. Bottom line: He seeks a relief Crim. R. 33 simply does not provide.

Second, while Defendant tacitly admits he is late with this Crim. R. 33 motion, he neglects to remind the court just *how* late. Defendant was originally sentenced to death for the home-invasion, premeditated murder of area businessman Robert Fingerhut on December 9, 2002. The jury issued a verdict recommending death on November 18, 2002. He was resentenced to death August 14, 2012. Crim. R. 33 does not provide for an indefinite time frame in which to file a motion for new trial. In fact, the rule sets forth very specific deadlines for motions for new trial:

> **(B) Motion for New Trial; Form, Time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein. Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Based on the jury's verdict recommending death, his motion for "new mitigation trial"

---

[1] In the interest of full disclosure, the Eleventh District went on to distinguish *Davie* in *State v. Jackson,* 11ᵗʰ Dist. No. 2009-T-0050, 2010-Ohio-5054, but only because the trial court admitted delegating the typing of Defendant's sentencing entry to the prosecutor's office. Defendant was subsequently resentenced to death as a result of *State v. Jackson,* 11ᵗʰ Dist. No. 2009-T-0050, 2010-Ohio-5054. The re-imposed death sentence was affirmed by the Ohio Supreme Court in *State v. Jackson,* --- N.E.3d ----2016 WL 448593,2016 -Ohio- 5488, reconsideration denied 147 Ohio St. 3d 1439 (2016).

would have been due in this Court, at the latest, March 18, 2003. Therefore, Defendant's

motion is roughly 14 years too late.   As will be discussed *infra*, he does not demonstrate

by any level of proof that he was "unavoidably prevented" from "discovering" the error

raised in *Hurst* before January 2017.

**Crim. R. 33 Incorrect Pleading**

Furthermore, even if this Court brushes aside the timeliness issue – something it

has no authority to do – Crim R. 33 provides no relief for him because even if this Court

grants him leave to file, he fails to articulate any legitimate or legally sustainable grounds

for relief:

> **Rule 33. New Trial  (A) Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial; (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state; (3) Accident or surprise which ordinary prudence could not have guarded against; (4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified; (5) Error of law occurring at the trial; (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

The State submits that a U.S. Supreme Court decision, which finds flaws in a

Florida's – not Ohio's – death penalty scheme does not fall into any of these categories.

At page 1 of his motion for leave, Defendant lists three proposed grounds:

irregularity in the proceedings, insufficient evidence, and error of law. Even if this Court grants leave, a *"Hurst* error" will simply not attach. There was no irregularity in the proceeding. Defendant's convictions and death sentence has been affirmed not once but *twice* by the Ohio Supreme Court. *State v. Jackson,* --N.E. 3d--, 2016-Ohio-5488; *State v. Jackson* 107 Ohio St.3d 300, 839 N.E.2d 362, 2006 -Ohio- 1. He was not denied a fair trial when an Ohio jury and judge properly applied Ohio law to his Ohio aggravated murder case and sent him to Ohio's death row. Since Crim. 33 (A)(4) addresses the sufficiency of the guilty verdict, and not the sufficiency of the sentencing verdict, his "sufficiency" ground does not get off the ground. Finally, the court made no error in law in sentencing him to death after the jury convicted him of two aggravating circumstances and found him to be death eligible. The error of law in the *Hurst* case was that a judge, not a jury, found Hurst guilty of the aggravating circumstances, and then sentenced Hurst to death with a less than unanimous recommendation of death. That did not happen here, so even in light of *Hurst,* Defendant will not be able to demonstrate an error of law.

**Not unavoidably prevented from discovery.**

Defendant hangs his hopes for a grant of leave to file on a woefully time-barred and illusory hook. First, Defendant cites absolutely no authority from any court, let alone an Ohio court, to suggest that a Supreme Court decision rendered fifteen years after a jury verdict constitutes "newly discovered evidence" as contemplated by Crim. R. 33(B). Black's Law Dictionary, 7th Edition defines "evidence" generally as "[s]omething (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." A U.S. Supreme Court opinion falls into none of these categories. There is nothing in *Hurst* that would disprove that Defendant plotted with

- 7 -

Donna Roberts to kill Robert Fingerhut, that he did so during an aggravated burglary of Mr. Fingerhut's private residence, that he stole and abandoned Mr. Fingerhut's automobile to facilitate his getaway, and that a jury unanimously convicted him of two aggravating circumstances (while committing or attempting to commit aggravated burglary and aggravated robbery).

More specifically, Black's Law Dictionary, 7th Edition defines "newly discovered evidence" as "[e]vidence existing at the time of a motion or trial but then unknown to a party, who, upon later discovering it, may assert it as grounds for reconsideration or a new trial." By Defendant's own admission, there was no such "evidence" as *Hurst* was not even decided until January 12, 2016. Thus, *Hurst* cannot be said to have been "existing at the time of a motion or trial."

When a criminal defendant fails to unearth his "newly discovered evidence" within 120 days, Ohio Law is clear, the onus is on the defendant to seek leave and to prove he was "unavoidably prevented" from discovering such evidence. " 'To obtain such leave, the defendant must demonstrate by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days.' *** A party is 'unavoidably prevented' from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence. *State v. Walden*, 19 Ohio App.3d 141, 145–146, 483 N.E.2d 859 (10th Dist.1984)." *State v. Waddy*, 10th Dist. No. 15AP-397, 2016-Ohio-4911, 2016 WL 3667794, ¶18 quoting. *State v. Hoover–Moore*, 2015-Ohio-4863, 50 N.E.3d 1010, at ¶ 13.

- 8 -

"Clear and convincing proof that the defendant was 'unavoidably prevented' from filing 'requires more than a mere allegation that a defendant has been unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial.' " *State v. Lee,* 10th Dist. Franklin No. 05AP–229, 2005-Ohio-6374, 2005 WL 3220245, ¶ 9. The requirement of clear and convincing evidence puts the burden on the defendant to prove he was unavoidably prevented from discovering the evidence in a timely manner. *State v. Rodriguez–Baron,* 7th Dist. Mahoning No. 12–MA–44, 2012-Ohio-5360, 2012 WL 5863613, ¶ 11.

At page 3 of his motion, Defendant argues that because *Hurst* did not exist in 2002 he could not have discovered it, nor could he have anticipated it, therefore he was unavoidably prevented from discovering it. The State posits the following counter argument: how is one prevented from discovering nothing? If there is nothing there to discover, there can be no prevention. But in reality, pursuant to *Waddy, Walden* and *Hoover-Moore,* Defendant had full knowledge in 2002 of how Ohio's death penalty scheme worked to determine death eligibility, so he cannot now argue that he was unavoidably prevented from discovering something printed in black and white and readily available for discovery in R.C. 2929.03 and 2929.04.

**Crim. R. 33: The Wrong Vehicle for Relief**

Moreover, Defendant has simply selected an incorrect vehicle to secure the relief he seeks. Without question, Defendant is arguing a constitutional violation in his quest to "a new penalty phase trial." Ohio Supreme court authority has been clear on this point for 20 years. A defendant's post-appeal, constitutional attack on a conviction or sentence can only flow through a petition for postconviction relief, not a Crim. R. 33 motion. "Where a criminal defendant, subsequent to his or her direct appeal, files a motion seeking vacation or correction of his or her sentence on the basis that his or her constitutional rights have been violated, such a motion is a

- 9 -

petition for postconviction relief as defined in R.C. 2953.21." *State v. Reynolds*, 79 Ohio St.3d 158, 1997-Ohio-304, 679 N.E.2d 1131 (1997), syllabus. In *Reynolds,* a defendant filed what he captioned a "motion to correct or vacate sentence" four years after his conviction and sentence had been affirmed for aggravated robbery and a firearm specification. He argued a constitutional violation because of a "new" Ohio Supreme Court ruling which mandated that the prosecution prove the operability of the firearm. *Id.* at 159.

The *Reynolds* court held that regardless of its labeling, Ohio courts must construe such motions post-appellate pleadings as postconviction petitions filed pursuant to R.C. 2953.21(A)(2). "Reynolds's Motion to Correct or Vacate Sentence, despite its caption, meets the definition of a motion for postconviction relief set forth in R.C. 2953.21(A)(1), because it is a motion that was (1) filed subsequent to Reynolds's direct appeal, (2) claimed a denial of constitutional rights, (3) sought to render the judgment void, and (4) asked for vacation of the judgment and sentence. Accordingly, we find that Reynolds's Motion to Correct or Vacate Sentence is a petition for postconviction relief as defined in R.C. 2953.21." *Id.* at 160. As such, this Court must construe Defendant's "motion" as a postconviction petition.

The Eleventh District has agreed with this logic. "In essence, Mr. Davie is arguing an irregularity in the court's sentencing opinion. Thus, his motion must be construed as a petition for postconviction relief since 'a criminal defendant who files a motion to vacate or correct his or her sentence on the ground that his or her constitutional rights have been violated necessarily embraces the postconviction relief statutes: 'Where a criminal defendant, subsequent to his or her direct appeal, files a motion seeking vacation or correction of his or her sentence on the basis that his or her constitutional rights have been violated, such a motion is a petition for postconviction relief as defined in R.C. 2953.21.' *State v. Foti,* 11th Dist. No.2006-L-138, 2007-

- 10 -

Ohio-887, at ¶ 12-13, citing, *State v. Reynolds* (1997), 79 Ohio St.3d 158, 679 N.E.2d 1131, syllabus." *State v. Davie*, 2007-Ohio-6940, ¶ 9 (11th Dist. Trumbull)

Based on the authority of both the Ohio Supreme Court and the Eleventh District, Defendant's "motion" must be construed as a postconviction petition.

**Time-Barred**

In addition to the untimeliness already discussed with respect to Defendant's motion under Crim. R. 33, his motion is even more time-barred when read in the context of a petition for postconviction relief. Under the former R.C. 2953.21(A)(2), a defendant's petition was due in the trial court 180 days after the filing of the record.[2] The record for Defendant's *second* direct appeal was filed in the Ohio Supreme Court January 2, 2013. (Ohio Supreme Court No. 2012-1644). While Defendant filed a postconviction petition in the trial court June 28, 2013, he did not raise the constitutionality of Ohio's death penalty scheme in that petition. If the defendant files outside those time constraints the trial court may not entertain a postconviction petition unless: 1) Both of the following apply:

(a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.
(b) The petitioner shows by clear and convincing evidence that, but for constitutional error***at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

(2) The petitioner *** was sentenced to death, establish[es], by clear and convincing evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.

---

[2] Under the current statute, the petitioner has 365 days after the record is filed to file a postconviction petition.

- 11 -

R.C. 2953.23(A)(1)&(2).

Defendant does not meet any of these exceptions for an out-of-time postconviction petition. The Court should note that the lone piece of evidence *de hors* the record is an affidavit from Defendant's counsel of the State Public Defender's Office which attempts to excuse his delayed filing by stating *"Hurst* is a complex decision, has generated considerable discussion and debate about the parameters of its holding, and takes time to digest and understand." Defendant waited a full 367 days after *Hurst* to file this motion for leave. No digestive process takes that long. With due diligence, a properly drafted R.C. 2953.21 petition could have been excreted in a more expeditious fashion.

For reasons previously discussed, he was not unavoidably prevented from discovering his *Hurst* claim prior to last month. *Hurst* does not apply a new federal or state right to Ohio death row inmates. It overturned a portion of Florida's death penalty scheme, but has absolutely no impact on the Ohio plan. Even in light of *Hurst,* a reasonable factfinder would still find petitioner eligible for the death sentence. Defendant does not even argue his actual innocence as to the aggravating circumstances which are the basis for his death sentence. Therefore, because Defendant's mislabeled motion does not begin to comply with R.C. 2953.23 he is obviously time-barred from raising his *"Hurst"* claim.

**Res Judicata Barred**

Certainly, Defendant was in no way prohibited from bringing a *"Hurst* claim" prior to the Supreme Court's decision. Lorraine has had fourteen years of State appeals and plethora of post-conviction motions to promote the bogus argument that in Ohio a judge and not a jury makes the factual determinations necessary to impose a sentence of death. This is a total falsehood, but it's the central holding in *Hurst* which he now seeks to exploit.

- 12 -

As discussed previously, Defendant's pleading, in actuality, is an R.C. 2953.21 petition in Crim. R. 33 clothing.  As a result, the doctrine of res judicata bars him from raising *"Hurst"* issue at this time.  "It is well-established that the doctrine of res judicata is applicable to postconviction relief proceedings. In *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), the Supreme Court of Ohio held: 'Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except on appeal from that judgment, any defense or claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in the judgment of conviction or on appeal from that judgment.' Id. at 180, 226 N.E.2d 104. Additionally, in *State v. Cole* (1982), 2 Ohio St.3d 112, 443 N.E.2d 169, the Supreme Court of Ohio specifically indicated that res judicata is a proper basis to dismiss a postconviction relief petition where the issue sought to be presented could have been raised at trial or in a direct appeal, and where 'such issue could fairly have been determined without resort to evidence *dehors* the record.' Id. at paragraph one of the syllabus." *State v. Jackson,* 11th Dist. No. 2004-T-0089, 2006-Ohio-2651, ¶¶ 55-57 (11th Dist. Trumbull), *cause dismissed,* 110 Ohio St.3d 1407, 2006-Ohio-3306, 850 N.E.2d 69, ¶¶ 55-57 (2006)

At least one Ohio appellate court has held that the doctrine of res judicata bars leave to file a motion for new trial when the defendant seeks to promote a claim in a Crim. R. 33 motion that could have been raised in a direct appeal.  *State v. Grinnell,* 10 Dist. No. 09AP-1048, 2010-Ohio-3028. ¶26, quoting *State v. Phillips,* 9th Dist. No. 20692, 2002-Ohio-823. In the civil realm, a motion pursuant to Civ. R.60(B) - which  like Crim. R. 33(A)(6)- addresses newly discovered evidence, cannot be used as a substitute for a direct appeal. "It is well-settled that a party may not use a Civ.R. 60(B) motion as a substitute for a timely appeal." *Doe v. Trumbull Cty. Children*

- 13 -

*Services Bd.* (1986), 28 Ohio St.3d 128, 502 N.E.2d 605, paragraph two of the syllabus.

Moreover, "***the doctrine of *res judicata* would be abrogated if every decision could be relitigated on the ground that it is erroneous, and there would be [no] stability of decision, or no end to litigation." *Belden v. Neff-Perkins Co.*, 11th Dist. Lake Nos. 11-270, 11-135, 1987 WL 5436, *4.

The lack of finality and the endless stream of litigation is the obvious end game here. However, the doctrine of res judicata applies and Defendant's motion for leave can be rejected on that basis alone. Defendant cannot overcome the procedural hurdles firmly in place to block his motion for leave. He was not "unavoidably prevented" from discovering the legal authority for making him death eligible since it was obvious from the face of the Ohio Revised Code at the time of his conviction and sentencing. Finally, his motion is time-barred whether construed as a Crim. R. 33 motion for new trial or a R.C. 2953.21 petition for postconviction relief. For these procedural reasons, the Court must deny relief.

***Hurst* is inapplicable to Ohio Death Penalty Cases**

Though the State views the procedural issues wholly dispositive of Defendant's motion for leave, the Court should be aware of recent Ohio authority which would precluded the relief sought by Defendant. Even if this Court completely ignores the procedural bars to Defendant's motion and allows him to file this untimely, res judicata barred, legally unsupported motion for a new mitigation hearing, it will all be for naught. The Ohio Supreme Court held just weeks after the U.S. Supreme Court released *Hurst* that the case has no bearing whatsoever on Ohio death cases. The constitutional error identified in *Hurst* - that a judge rather than jury determines guilt on the aggravating circumstances – is not a component in Ohio's capital sentencing process.

"In Ohio, a capital case does not proceed to the sentencing phase until *after* the fact-

- 14 -

finder has found a defendant guilty of one or more aggravating circumstances. *See* R.C. 2929.03(D); R.C. 2929.04(B) and (C); *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 147. Because the determination of guilt of an aggravating circumstance renders the defendant eligible for a capital sentence, it is not possible to make a factual finding during the sentencing phase that will expose a defendant to greater punishment. Moreover, in Ohio, if a defendant is tried by a jury, then the judge cannot impose a sentence of death unless the jury has entered a unanimous verdict for a death sentence. R.C. 2929.03(D)(2). In Ohio, a capital case does not proceed to the sentencing phase until *after* the fact-finder has found a defendant guilty of one or more aggravating circumstances. *See* R.C. 2929.03(D); R.C. 2929.04(B) and (C); *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 147. Because the determination of guilt of an aggravating circumstance renders the defendant eligible for a capital sentence, it is not possible to make a factual finding during the sentencing phase that will expose a defendant to greater punishment. Moreover, in Ohio, if a defendant is tried by a jury, then the judge cannot impose a sentence of death unless the jury has entered a unanimous verdict for a death sentence. R.C. 2929.03(D)(2)." (Italics original) *State v. Belton*, ---N.E. 3d ---2016-Ohio-1581, ¶ 59 (Ohio), *reconsideration denied*, 147 Ohio St.3d 1440, 2016-Ohio-7681.

Since the Ohio Supreme Court announced *Belton*, to which Defendant fails to cite in his motion, Ohio's Third Appellate District conducted a far more in depth analysis of why *Hurst* simply does not apply to Ohio death sentences. In so doing, the court overturned a Marion County Common Pleas judge used who *Hurst* to declare Ohio's death penalty scheme unconstitutional and vacated a death sentence:

"Florida's statutory scheme permitted the trial judge to conduct a separate sentencing

- 15 -

hearing, known as a *Spencer* hearing, to hear and consider evidence not heard by the jury. *See Spencer v. State,* 615 So.2d 688, 690691 (Fla.1993); *Engle v. State,* 438 So.2d 803, 813 (Fla.1983). In Ohio, there is no separate hearing or opportunity to present any additional evidence—that is, the trial court is not permitted to consider any evidence not presented to the jury. R.C. 2929.03(D) (1981) (current version at R.C. 2929.03(D) (2008)). Likewise in stark contrast to Ohio's statutory scheme, Florida's death-penalty statute permitted the trial court to impose a death sentence when the jury recommended a life-imprisonment sentence. *See Williams v. State,* 967 So.2d 735, 751 (Fla.2007); *Hurst* at 625 (Alito, J. dissenting), citing *Tedder,* 322 So.2d at 910. Indeed, Florida's statute specifically referred to the jury's sentence as "advisory" and read, 'Notwithstanding the recommendation of a majority of the jury * * *.' *See* Fla. Stat. 921.141(2), (3) (2010) (current version at Fla. Stat. 921.141(2), (3) (2016)). Under Ohio's death-penalty statute, the jury's aggravating-circumstance finding is binding on the trial judge, and the trial judge cannot expose the defendant to a greater penalty than authorized by the jury verdict. *See State v. Cooey,* 46 Ohio St.3d 20, 544 N.E.2d 895 (1989), paragraph three of the syllabus ('Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count.'), *superseded by constitutional amendment on other grounds, State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668 (1997); R.C. 2929.03(D)(2) (1981) (current version at R.C. 2929.43(D)(2)(2008)).

"The stark differences between Ohio's and Florida's death-penalty statutes are outcome-determinative for [appellant's] challenge to Ohio's death-penalty statute under *Hurst. See Hurst* at 624. The trial court in this case ignored the most important feature that renders Ohio's death-penalty statute constitutional under the Sixth Amendment through *Apprendi* [*v. New Jersey,* 503 U.S. 466 (2000)], *Ring* [*v. Arizona,* 536 U.S. 584(2002)] and *Hurst*—that the jury, not the judge,

- 16 -

determines beyond a reasonable doubt the existence of an aggravating circumstance—the feature that subjects a defendant to the possibility of death as a sentence. Accordingly, we hold that the trial court erred in concluding that Ohio's death-penalty statute in effect in 1993 is unconstitutional under *Hurst*."

*State v. Mason*, 3rd Dist. No. 9-16-24 2016-Ohio-8400, ¶¶ 28-29.

While *Mason* is not controlling upon this Court, *Belton* most certainly is. The grant of leave in the instant matter will place this Court face to face with legal authority it cannot ignore: *Hurst* has not impact on Ohio's capital sentencing scheme.

## *Petro* insurmountable

In his proposed motion for new trial, Defendant omits all reference to the controlling case in Ohio regarding Crim. R. 33 motions. It is long-settled Ohio law that in order to obtain a new trial based upon newly discovered evidence – which again the State argues *Hurst* is not – a defendant must show that "the new evidence: (1) discloses a strong probability that it will change the result if a new trial is granted; (2) was discovered after the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to the former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro* 148 Ohio St. 505, 76 N.E.2d 370(1947), syllabus.

Defendant will not be able to meet any of these criteria if this Court grants leave to file. Defendant has been sentenced to death twice by the same common pleas judge and his sentence has been affirmed twice by the Ohio Supreme Court. As a result there is NO probability that the outcome of his sentence would change even if a new jury was empaneled to consider his sentence. As discussed *infra*, Ohio's sentencing methods were not discovered after the trial. Defendant with due diligence could have raised his complaint in pre-trial pleadings, appellate

- 17 -

briefing and post-conviction petitions. He chose not to. *Hurst* is not material to whether or not Defendant shot and killed an innocent man in his own home during the course of an aggravated burglary and aggravated robbery. *Hurst* has no bearing on the evidence whatsoever. As a result, should this Court grant leave, it will prove to be a waste of judicial resources for consideration of a guaranteed losing argument.

### *Kirkland* of no importance

Finally, at page 14 of his proposed motion for new trial, Defendant references the Ohio Supreme Court's post-*Belton* grant of a new mitigation hearing in *State v. Kirkland,* 2010-0854, 2016-Ohio-2807 (05/04/2016 Case Announcements). This Court should be aware that this remand from the Ohio Supreme Court to the Hamilton County Court of Common Pleas was done without explanation by the court in response to a S.Ct. Prac. R. 18.02 motion for reconsideration filed by the State. The same day, the court *denied* S.Ct. Prac. R. 4.01 motions in four other death penalty cases where the inmates sought relief through *Hurst. State v. Sheppard* and *State v. Fears,* 147 Ohio St. 3d 1439 (2016) ; *State v. Myers* and *State v. Gapen* 147 Ohio St. 3d 1440 (2016). As in *Kirkland,* the court gave no explanation for denying these motions. Also on the same day, the court denied reconsideration in *Belton,* 147 Ohio St. 3d 1440 (2016). Therefore, *Kirkland* is no signal from the Ohio Supreme Court that *Hurst* should be read favorably to Defendant's plea for a new mitigation hearing.

## CONCLUSION

Defendant fails to offer a credible or persuasive explanation why it took him 367 days to file either Crim. R. 33 motion or a R.C. 2953.21 postconviction petition to argue that *Hurst* was applicable to him. The State asks this Court to find he was NOT unavoidably prevented from discovering how Ohio death penalty proceedings work. As these proceedings were obvious from

- 18 -

the face of the Ohio Revised Code, Defendant could have argued their alleged unconstitutionality well before the *Hurst* decision.  Further, the State urges this Court to find that *Hurst*, or any other appellate opinion, does not comprise "evidence" as contemplated by Crim. R.33. In addition to having no new evidence, Defendant seeks to deploy a Crim. R. 33 motion to perform the function of a postconviction petition.  When construed as such, there is ample Ohio case law which says his *Hurst* claim is *res judicata* barred.  Even if leave to file is granted, Defendant's claim will fall flat in the face of *Petro*. Alternatively, assuming the Court would grant leave to file his untimely Crim.R. 33 motion, said motion would be subject to dismissal as a matter of law without an evidentiary hearing. *Petro, supra*.

The State urges this Court to deny, without hearing, Defendant's motion for leave to file a time barred motion for new mitigation hearing.

Respectfully submitted,

DENNIS WATKINS (#0009949)
Trumbull County Prosecuting Attorney

LuWAYNE ANNOS (#0055651)
Assistant Trumbull County Prosecuting Attorney
160 High St., N.W., 4th Floor
Warren, Ohio  44481

Telephone: (330) 675-2426
Fax: (330) 675-2431
E-mail: psannos@co.trumbull.oh.us

COUNSEL FOR PLAINTIFF,
STATE OF OHIO

- 19 -

## PROOF OF SERVICE

I do hereby certify that a copy of the foregoing response was sent by ordinary U.S. Mail to Randall L. Porter (#0005835), Counsel for Nathaniel Jackson, Assistant St. Public Defender, 250 E. Broad St., Suite 1400, Columbus, Ohio,   43215-9308 on this 21st Day of February, 2017.

LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

- 20 -

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    :

      Plaintiff,                :    Case No. 01-CR-794

-vs-                              :

NATHANIEL JACKSON,                :    Judge Ronald J. Rice

      Defendant.                :

---

**Nathaniel Jackson's Reply in Support of His Motion for a New Mitigation Trial Pursuant to Criminal Rule 33 and *Hurst V. Florida***

---

    On January 13, 2017, Nathaniel Jackson, pursuant to Criminal Rule 33 and the United States Supreme Court decision in *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616 (2016), moved this Court for leave to file a Motion for a new mitigation trial ("Motion"). He attached thereto his motion for a new mitigation trial. The State filed its response on February 16, 2017 ("State's Response").

    Jackson "stands pat" on the arguments he raised in his motion for leave to file and his motion for a new mitigation trial. He files this reply for the limited purpose of responding to any arguments raised by the State and not already sufficiently addressed in his motions.

I.    **Jackson Properly Raised the *Hurst* Claim in a Motion for a New Trial.**

    The State initially argues that this case is not properly before this Court because Jackson raised his *Hurst* claim in a new trial motion as opposed to a post-conviction petition. (State's Response, pp. 4-5). The State relies on the



Eleventh Appellate District Court's decision in *State v. Davie*, 11th Dist. No. 2007-T-6940, 2007-Ohio-6940 (*Id.* at p. 5). The Court therein held that a death sentenced individual could not employ a new trial motion filed pursuant to Crim. R. 33 to seek a new sentencing proceeding. *Id.* at ¶ 8.

However, the Eleventh Appellate District subsequently ruled otherwise with respect to the propriety of seeking sentencing relief in a new trial motion. *State v. Jackson,* 190 Ohio App.3d 319, 2010-Ohio-5054, 941 N.E.2d 1221. In *Jackson* the defendant filed a motion for a new trial or sentencing hearing because the trial court had improperly relegated to the prosecutor the duty of the drafting of the sentencing opinion. *Id.* at ¶ 12. The trial court denied the motion. *Id.* at ¶ 14. The trial court specifically ruled:

> On July 16, 2008, this Court addressed a similar motion for new trial filed by the Defendant. The underlying basis for that motion was the alleged involvement of the Trumbull County Prosecutor's Office in the preparation of findings of fact and conclusions of law relative to a judgment entry overruling Defendant's Motion to Suppress. The Court stated: There is no provision in the Ohio Criminal Rules that provide for a new sentencing hearing." ***

> The underlying basis of the present motion for a new sentencing hearing before the Court is the alleged involvement of the Trumbull County Prosecutor's Office in the preparation of the Defendant's sentencing hearing entry. For the same reasons set forth in its July 16, 2018 judgment entry, the Court finds that Defendant's motion for a new sentencing hearing to be not taken as well. Therefore, the motion for new sentencing hearing is hereby overruled.

(Exhibit A, pp. 1-2).

Jackson appealed to the Eleventh Appellate District and raised the following issue:

2

[1] THE TRIAL COURT ERRED WHEN IT OVERRULED MR.
JACKSON'S MOTION FOR A NEW SENTENCING HEARING[.]

(*Jackson*, ¶ 15). The Court of Appeals sustained this assignment of error.

It ruled in pertinent part:

> In his first assignment of error, appellant argues that the trial
> court erred by overruling his motion for a new sentencing hearing.
> We agree.

(*Id.* at ¶ 17).

> For the foregoing reasons, appellant's first assignment of error is
> well-taken, and his second assignment of error is moot. The
> sentence of the Trumbull County Court of Common Pleas is
> vacated. This case is remanded for resentencing and for
> proceedings consistent with this opinion.

(*Id.* at ¶ 33).

The State attempts to reconcile the decisions in *David* and *Jackson* by

claiming that "the Eleventh District went on to distinguish *Davie* in *State v.*

*Jackson*, 11ᵗʰ Dist. No. 2009-T-0050, 2010-Ohio-5054, but only because the

trial court admitted delegating the typing of Defendant's sentencing entry to the

prosecutor's office." (State's Response, p. 5, n. 1). This is incorrect, the *Jackson*

Court found *Davie* distinguishable because Jackson, unlike Davie had

demonstrated that the trial court had involved the prosecutor in the drafting

process. *Jackson* at ¶ 28.

Therefore, contrary to the State's assertions, Jackson properly raised the

constitutional issue in a new trial motion.[1]

---

[1] The State subsequently repeats the same argument in its pleading. (State's
Response, pp. 9-11). The fact that the State re-raises the identical issue
renders it no more persuasive.

3

## II.    Jackson's Constitutional Claim Is Not Time Barred.

The State argues that Jackson, within the last fifteen years with the exercise of reasonable diligence, could have discovered the evidence on which his new sentencing trial is premised. (State's Response, pp. 5-6). The State misunderstands Jackson's pleading. It is not premised on newly discovered evidence, but on a recent decision of the United States Supreme Court. The State's argument conflates the two separate and distinct grounds for a motion for new trial.

Jackson's constitutional issue is not time barred.[2]

## III.    Jackson's Constitutional Claim Is Not Barred by the Doctrine of Res Judicata.

The State, evidently not having faith in the persuasiveness of its first two procedural arguments, offers the Court yet another procedural argument, Jackson's claim is barred by res judicata. (State's Response, pp. 12-14).

The State begins its argument by citing two Ohio Supreme Court cases, *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967) and *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). (State's Response, p. 13). However, both those cases involve post-conviction proceedings and Jackson's constitutional claim is properly brought in a motion for new trial. *See* Section I, *supra*.

---

[2]The State also claims that Jackson's *Hurst* claim is barred by R.C. 2053.23(A), the statutory provision governing successor post-conviction petitions. (State's Response, pp. 11-12). Because Jackson's constitutional issue is properly before this Court in a new trial motion, the State's argument concerning the statutory provisions for successor post-conviction petitions is irrelevant.

4

The State offers an alternative argument, support of its res judicata defense, Jackson is attempting to use Crim R. 33 to raise a claim that he should have raised on direct appeal. (State's Response, pp. 13-14). The State fails to explain the manner that Jackson could have raised a *Hurst* claim on direct appeal. The Supreme Court of Ohio decided his direct appeal on January 1, 2006. *State v. Jackson,* 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362 (2006). The Supreme Court of the United States decided *Hurst* more than ten years later, on January 12, 2016. *Hurst v. Florida,* 136 S. Ct. 616 (2016). The State claims that Jackson was "'not unavoidably prevented' from discovering the legal authority," presumably referring to *Hurst.* (State's Response, p. 14). The State does not identify the manner in which Jackson could have identified during his direct appeal the decision in *Hurst,* given that the Supreme Court of the United States did not issue the opinion until 2016.

**IV.   *Hurst* Is Applicable to Ohio Capital Cases.**

The State premises its argument on three cases and its attempt to distinguish a fourth case. None of the State's efforts are persuasive.

**A.   The State's reliance on *State v. Belton* is misplaced.**

The State cites *State v. Belton,* 2016-Ohio-581. (State's Response pp. 14-15). *Belton* involved a defendant who waived his right to a jury trial and was sentenced to death by a three-judge panel. Thus, the Supreme Court's decision in *Belton,* with respect to the sentencing duties of the trial judge as opposed to a jury, clearly constitutes *dicta.*

5

In addition, the Supreme Court of Ohio's references in *Belton* to *Hurst* were made without the benefit of any briefing on the *Hurst* holding. *See State v. Belton*, Case No. 2012-0902, Supreme Court of Ohio electronic docket: https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2012/0902. Belton first cited *Hurst* (without any discussion) in his Notice of Supplemental Authorities, filed on January 21, 2016, five days prior to oral argument. At the oral argument, counsel for Belton did not raise the *Hurst* issue, and when questioned by the Court, stated that he was not prepared to argue the issue.[3]

Finally, the Supreme Court of Ohio decided *Belton* on April 20, 2016. It granted the defendant's motion to remand for *Hurst* error in *State v. Kirkland*, Ohio Supreme Court No. 2010-0854, 2016-Ohio-2807 on May 4, 2016. *See* Motion for a New Mitigation Trial, pp. 14-15.[4] If the Court had definitively decided the *Hurst* issue in *Belton*, as the State argues, then the Court would not have granted the *Hurst* motion in *Kirkland*.

**B.    The State's reliance on *State v. Mason* is also *misplaced*.**

The State copies more than two pages of the decision in *State v. Mason*, 3rd Dist. No. 9-16-24, 2016-Ohio-8400 in which that appellate court found *Hurst* inapplicable to the State of Ohio. (State's Response, pp. 15-17). However, as the State concedes, "Mason is not controlling upon this court . . . ." (State's

---

[3] Counsel for the State of Ohio at oral argument discussed the *Hurst* decision for eight minutes. *See*, http://www.ohiochannel.org/video/case-no-2012-0902-anthony-belton-v-state-of-ohio. (Throughout remainder of State's argument beginning at 25:25.)
[4] Unlike *Belton*, the *Kirkland* decision arose in the context of a capital sentence handed down by a jury at trial. This distinction is crucial under any *Hurst* analysis.

6.

Response, p. 17).

**C.     The State's reliance on *State v. Petro* is also misplaced.**

The State cites the Court to *State v. Petro,* 148 Ohio St. 505, 76 N.E.2d 370 (1947). (State's Response, pp. 17-18). The Supreme Court of Ohio therein established the test that a trial court should apply when deciding a motion premised on newly discovered evidence and Crim. R. 33(A)(6). *Petro, syllabus.* Because Jackson's motion for a new trial is not based on newly discovered evidence or Crim. R. 33(A)(6), *Petro* has no applicability to this case.

**D.     The State's reliance on *State v. Sheppard, State v. Fears, State v. Myers,* and *State v. Gapen* is also misplaced.**

In an effort to reduce the persuasiveness of the Supreme Court remand order in *State v. Kirkland,* the State observes "the same the day [the Court granted the motion in *Kirkland*] the court *denied Hurst*-related motions in four other death penalty cases where the inmates sought the same relief. *State v. Sheppard and State v. Fears,* 147 Ohio St.3d 1439 (2016): *State v. Myers, and State v. Gapen,* 147 Ohio St.3d 1440 (2016)." (State's Response, p. 18).

After the Supreme Court of Ohio, on May 4, 2016, granted the motion in *Kirkland,* the State of Ohio moved for reconsideration. The Ohio Prosecuting Attorney's Association submitted an amicus pleading in support of the motion. On November 9, 2016, the Supreme Court denied the State's motion for reconsideration. *State v. Kirkland,* 147 Ohio St.3d 1440, 2016-Ohio-7681, 63 N.E.3d 158. Thus, the State's argument concerning the impact of the orders in *Sheppard, Fears, Myers,* and *Gapen* is not well taken.

7

## Conclusion

For the reasons set forth in his motion and this reply, Nathaniel Jackson respectfully requests that this Court grant him leave to file his motion for new mitigation trial which is attached to his motion to for leave to file.

Office of the
Ohio Public Defender

Randall L. Porter – 0005835
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215-9308
(614) 466-5394 (telephone)
(614) 644-0708 (facsimile)
Randall.Porter@opd.ohio.gov

Counsel for Nathaniel Jackson

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Nathaniel Jackson's Reply in Support of his Motion For Leave To File A Motion For A New Mitigation Trial* was served by U.S. mail to Luwayne Annos, Assistant Prosecuting Attorneys, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this the 2nd day of March, 2017.

Randall L. Porter – 0005835
Counsel for Nathaniel Jackson

8

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,
      Plaintiff,

-vs-

NATHANIEL JACKSON
      Defendant.

)
)
)
)
)
)
)
)
)

Case No 2001-CR-794

JUDGE RONALD J. RICE

**PROPOSED JUDGMENT
ENTRY**

     Now comes the Plaintiff, State of Ohio, by and through undersigned counsel who adopt

and incorporate all previous arguments here from its Memorandum in Opposition to Defendant's

Motion for Leave to file a Motion for New Mitigation Trial filed in this Court February 21, 2017,

in lieu of further briefing on this issue.  Per request of this Court, the State files the attached

Proposed Judgment Entry denying leave to file a belated Crim. R. 33 Motion for New Mitigation

Hearing.

KAREN INFANTE ALLEN
CLERK OF COURTS
TRUMBULL COUNTY

2017 MAR 22 AM 9: 02

TRUMBULL COUNTY
CLERK OF COURTS


**ORIGINAL**

2001 CR
00794
00023997471
CRM

Respectfully submitted by:

_Dennis Watkins_
DENNIS WATKINS (#0009949)
Prosecuting Attorney

_CLM_
CHARLES L. MORROW (#0040575)

_LuWayne Annos_
LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorneys
Trumbull County Prosecutor's Office
160 High St. 4th Floor
Warren, Ohio    44481

Telephone: (330) 675-2426
Fax: (330) 675-2431

COUNSEL FOR PLAINTIFF
THE STATE OF OHIO

PROOF OF SERVICE

    I do hereby certify that a copy of the foregoing proposed entry was sent by ordinary U.S. Mail to Atty. Randall L. Porter (#0005835), Assistant Public Defender, 250 E. Broad St., Suite 1400, Columbus, Ohio 43266, Counsel for Defendant Nathaniel Jackson, on this 22nd Day of March, 2017.

_LuWayne Annos_
LuWAYNE ANNOS (#0055651)
Assistant Prosecuting Attorney

IN THE COURT OF COMMON PLEAS
- GENERAL DIVISION –
TRUMBULL COUNTY, OHIO

CASE NUMBER:  2001 CR 00794

STATE OF OHIO
    PLAINTIFF

VS.                                                JUDGE RONALD J. RICE

NATHANIEL E JACKSON
    DEFENDANT                         __JUDGMENT ENTRY__

This matter is before the Court on the Motion for Leave to File a Motion for New Mitigation Trial filed by Defendant, Nathaniel Jackson. The Court has reviewed the motion and memoranda, opposition in response, reply, pleadings and the relevant applicable law.

The Court finds there are procedural as well as substantive deficiencies in Jackson's request. Initially, the Court finds the motion for leave to file motion for a new mitigation trial is akin to seeking leave to file a request for a new trial pursuant to Crim.R. 33. Jackson claims irregularity in the sentencing proceedings as the basis for the motion. However, the Court finds the motion is untimely. Pursuant to Crim.R. 33(B), motions such as this must be filed within fourteen days after the verdict was rendered. Jackson is entirely outside this time frame. Therefore, the Court finds no basis on which to grant leave to file a request under Crim.R. 33.

In addition, if the Court were to construe Jackson's motion as a post-conviction relief request pursuant to R.C. 2953.21, the Court finds no basis on which to grant such a request. The Court finds such a post-conviction request would be time barred as the request was filed well beyond the 180-day statutory period.



2001 CR
00794
000608003465
0

Even if the Court did not find the requests were time barred as explained herein, the Court finds the reliance upon the *Hurst v. Florida*, 136 S. Ct. 616 (2016), decision is misplaced. "*Hurst*, *** does not invalidate Ohio's capital sentencing scheme because Ohio's scheme is materially different from Florida's." *McKnight v. Bobby*, S.D.Ohio No. 2:09-CV-059, 2017 WL 631411, *3-4. In fact, the Ohio mechanism provides an additional layer of protection not present in *Hurst*. Id. Indeed, "Ohio's capital-sentencing scheme is unlike the laws at issue in *Ring* and *Hurst*." *State v. Belton*, 2016-Ohio-1581, ¶59.

Therefore, the Court finds there is no applicable law, criminal rule or case precedent on which to base Jackson's recent filing for leave to file a motion for new mitigation trial. Accordingly, the Court finds the request for leave is not well taken and the same is hereby denied.

IT IS SO ORDERED.

JUDGE RONALD J. RICE

Date: 03 - 29 - 2017
Copies to:
RANDALL L PORTER
LUWAYNE ANNOS

KAREN INFANTE ALLEN
CLERK OF COURTS
TRUMBULL COUNTY
2017 MAR 29 AM 11:35
TRUMBULL COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

KAREN INFANTE ALLEN
CLERK OF COURTS
TRUMBULL COUNTY
2001 MAR 25 PM 12: 02
TRUMBULL COUNTY
CLERK OF COURTS

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| Respondent | ) | Trial Case No. 2001 CR 00794 |
| | ) | |
| v. | ) | Court of Appeals No. _____ |
| | ) | |
| NATHANIEL E. JACKSON, | ) | JUDGE RONALD J. RICE |
| Petitioner | ) | |

---

### Nathaniel E. Jackson's Praecipe

---

This is to direct the Clerk of the Trumbull County Common Pleas Court to prepare a record of the original papers and exhibits filed in the court during the trial proceeding, post-conviction proceedings, and new trial proceedings before the Court, a certified copy of the docket and all journal entries, and a certified copy of the trial transcript, including exhibits, in the above-captioned case, pursuant to Appellate Rule 9, along with the affidavit of indigency and all documents necessary under the local appellate rules. The transcript was previously prepared for his direct appeals. These documents are to be forwarded to the Eleventh District Court of Appeals, Trumbull County, Ohio.

Respectfully submitted,

Office of the Ohio Public Defender

Randall L. Porter (0005835)
Assistant State Public Defender
250 East Broad Street
Columbus, Ohio 43215-9308

```
2001 CR
00794
00034257652
CRN
```

(614) 466-5394 (Voice)
(614) 644-0708 (Facsimile)
Email: Randall.Porter@opd.ohio.gov

Counsel for Nathaniel E. Jackson

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Nathaniel E. Jackson's Praecipe* was served by both electronic and U.S. mail Luwayne Annos, Assistant Prosecuting Attorney, Trumbull County Prosecutor's Office, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this the 25th day of April, 2017.

Randall L. Porter (0005831)
Counsel for Nathaniel E. Jackson

2

# NOTICE OF APPEAL

<u>Trumbull County Court of Common Pleas</u>

(ENTER NAME OF TRIAL COURT)

State of Ohio                                        Trial Court No. 2001 CR 00794

Plaintiff-Appell ee                     Court of Appeals No. *2017 TR 41*

**FILED**
**COURT OF COMMON PLEAS**

- vs -

Nathaniel E. Jackson

APR 2 5 2017

**FILED**
**COURT OF APPEALS**

APR 2 5 2017

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

Defendant-Appell ant

Notice is hereby given that (name each Appellant) Nathaniel E. Jackson

appeals to the Eleventh District Court of Appeals from the trial court Judgment Entry time-stamped March 29, 2017

(describe it and attach a copy of each Judgment Entry being appealed) <u>denying his Motion For Leave To File A</u>

<u>Motion For A New Mitigation Trial</u>

[ ] Check here if court-appointed and attach copy of appointment and Financial Disclosure/Affidavit of Indigency.

[ ] Check here if any co-counsel for Appellant and attach a separate sheet indicating name, address, telephone no. and fax no.

**TRANSCRIPT OF PROCEEDINGS INFORMATION - App. R. 9(B)**
**Counsel or Appellant is responsible for obtaining required information from**
**Court Reporter at the time of filing the Notice of Appeal if a transcript will be ordered.**

[ ] I have ordered a complete transcript from the court reporter
Estimated completion date: _____        Estimated number of pages: _____

[ ] I have ordered a partial transcript from the court
Estimated completion date: _____        Estimated number of pages: _____

[ ] A statement pursuant to App. R. 9(C) or (D) is to be prepared in lieu of a transcript.

[ ] Videotapes to be filed.  See App. R. 9(A) or (B)

[ ] No transcript or statement pursuant to either App. R. 9(C) or (D) is necessary.

[X] Transcript has been completed and already made part of the record.

See brief template on this court's website for direction regarding form - www.11thcourt.co.trumbull.oh.us

April 25, 2017
Date

Signature of Attorney or Appellant
Randall L. Porter
Name

Office of the Ohio Public Defender 250 East Broad Street- Suite 1400
Address

Columbus, Ohio 43215
City, State, Zip Code

0005835
Atty. Regis. No.

614-466-5394                              614-644-0708
Telephone No.                             Fax No.

Randall.Porter@opd.ohio.gov
E-Mail Address

Admin/Forms/New NA.4
Revised 04/12/2010

ORIGINAL

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Nathaniel Jackson's Notice of Appeal with the Attached Judgment Entry and Docketing Statement* was served by both electronic and U.S. mail to Luwayne Annos, Assistant Prosecuting Attorneys, 160 High Street, N.W., 4th Floor Administration Building, Warren, Ohio 44481 on this the 25th day of April, 2017.

Randall L. Porter – 0005835
Counsel for Nathaniel Jackson

# ELEVENTH DISTRICT COURT OF APPEALS
## DOCKETING STATEMENT
### (To be attached to and filed with Notice of Appeal)

State of Ohio

Name of Trial Court  Trumbull County Common Pleas Court

Trial Court No.  2001 CR 00794

Plaintiff-Appell ee

- vs -

Nathaniel E. Jackson

Court of Appeals No. 2017 TR 41

FILED
**COURT OF APPEALS**

APR 2 5 2017

**TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK**

Defendant-Appell ant

## REGULAR CALENDAR

☒ Case should be assigned to the Regular Calendar with full briefing.

## ACCELERATED CALENDAR - (Check if this applies)

☐ I have read Loc.R.11.1. This appeal meets those requirements, and I request that it be briefed and decided on the Accelerated Calendar.

## EXPEDITED APPEAL

☐ This case should be heard as an expedited appeal as defined under App.R. 11.2 because: (State provision of App.R. 11.2 or applicable statute):

## ORAL ARGUMENT

☐ To expedite oral argument, I am willing to travel to whichever adjoining county in which the Eleventh District has the first available date.

☒ I want oral argument in this appeal set in the county in which the appeal originates.

## CASE TYPE

☒ **A. Criminal**
Specify nature of offense(s) (e.g., assault, burglary, rape:)   This appeal is from the denial of leave to file a new trial motion
Aggravated Murder with capital specifications, Aggravated Burglary, and Aggravated Robbery

(1) Is the defendant presently in jail? ☒ Yes  ☐ No   If the answer is "Yes," give date of incarceration  12/20/2001
When is he/she due to be released (if you know)?  Under a sentence of death

(2) Has a stay been filed in the trial court?  ☐ Yes  ☒ No   If granted, what are the terms?

(3) Does the judgment entry comply with Crim.R. 32(C) by including the plea, verdict or findings, and a sentence?
Appeal from denial of a motion for Leave to file a New Trial Motion
☐ Yes  ☒ No   If the answer is "No," this is not a final appealable order.

☐ **B. Post-Conviction Relief**  Date of Conviction:

☐ **C. Civil**
Specify cause(s) of action:

☐ **App.R. 11.2 (Abortion, Adoption, or Termination of Parental Rights Appeal).**

**PROBABLE ISSUE FOR REVIEW**  Whether Appellant timely filed his motion for a new trial and the applicability of Hurst v. Florida 136 S. Ct. 616 (2016) to the sentencing procedures employed in Appellant's case.

## THE FOLLOWING QUESTIONS APPLY TO ALL CIVIL AND ADMINISTRATIVE APPEALS

1. **FINAL APPEALABLE ORDER**

(a) Has the trial court disposed of all claims by and against all parties?

   ☒ Yes **(Attach copies of all judgments and orders indicating that all claims against all parties have been concluded.)**

   ☐ No

(b) If the answer to (a) is "No," has the trial court made an express determination that there is "no just reason for delay," pursuant to Civ.R. 54(B), with respect to the judgment or order from which the appeal is taken?

   ☐ Yes (Attach a copy of that order.)

   ☐ No

(c) Is the judgment order subject to immediate appeal under R.C. 2505.02?  If so, set forth the specific provision(s) that authorize this appeal: _____

(d) Does the right to an immediate appeal arise from a provision of a statute other than R.C. 2505.02?  If so, identify that statute: _____

2. **MEDIATION**

(a) Would a pre-hearing conference or mediation assist in the resolution of this matter?

   ☐ Yes     ☒ No     ☐ Maybe

Please explain (optional) _____

CERTIFICATE OF SERVICE: I certify that I have mailed or otherwise delivered a copy of this Docketing Statement to all counsel of record, or to the parties if unrepresented. The following is a listing of the name, address and telephone number of all counsel and the parties they represent and any parties not represented by counsel: (attach extra sheet if necessary)

Assistant Public Defender Randall L. Porter (0005835)

250 East Broad Street, Columbus, Ohio 43215

614-466-5394 (Phone); 614-644-0708 (Fax)

Counsel for Nathaniel E. Jackson

Assistant Prosecutor Luwayne Annos (0055651)

160 High Street, N.W., 4th Floor, Warren, ohio 44481

330-675-2426 (Phone); 330-675-2431 (Fax)

Counsel for the State of Ohio

DATE  April 25, 2017

SIGNATURE

Admin/Forms/New Dkt Stmt. 4
Revised 04/26/2011

IN THE COURT OF COMMON PLEAS
- GENERAL DIVISION –
TRUMBULL COUNTY, OHIO

CASE NUMBER:  2001 CR 00794

STATE OF OHIO
PLAINTIFF

VS.                                    JUDGE RONALD J. RICE

NATHANIEL E JACKSON
DEFENDANT                              JUDGMENT ENTRY

This matter is before the Court on the Motion for Leave to File a Motion for New Mitigation Trial filed by Defendant, Nathaniel Jackson. The Court has reviewed the motion and memoranda, opposition in response, reply, pleadings and the relevant applicable law.

The Court finds there are procedural as well as substantive deficiencies in Jackson's request. Initially, the Court finds the motion for leave to file motion for a new mitigation trial is akin to seeking leave to file a request for a new trial pursuant to Crim.R. 33. Jackson claims irregularity in the sentencing proceedings as the basis for the motion. However, the Court finds the motion is untimely. Pursuant to Crim.R. 33(B), motions such as this must be filed within fourteen days after the verdict was rendered. Jackson is entirely outside this time frame. Therefore, the Court finds no basis on which to grant leave to file a request under Crim.R. 33.

In addition, if the Court were to construe Jackson's motion as a post-conviction relief request pursuant to R.C. 2953.21, the Court finds no basis on which to grant such a request. The Court finds such a post-conviction request would be time barred as the request was filed well beyond the 180-day statutory period.

2001 CR
00794
000696903465
0



Even if the Court did not find the requests were time barred as explained herein, the Court finds the reliance upon the *Hurst v. Florida*, 136 S. Ct. 616 (2016), decision is misplaced. "*Hurst*, *** does not invalidate Ohio's capital sentencing scheme because Ohio's scheme is materially different from Florida's." *McKnight v. Bobby*, S.D.Ohio No. 2:09-CV-059, 2017 WL 631411, *3–4. In fact, the Ohio mechanism provides an additional layer of protection not present in *Hurst*. Id. Indeed, "Ohio's capital-sentencing scheme is unlike the laws at issue in *Ring* and *Hurst*." *State v. Belton*, 2016-Ohio-1581, ¶59.

Therefore, the Court finds there is no applicable law, criminal rule or case precedent on which to base Jackson's recent filing for leave to file a motion for new mitigation trial. Accordingly, the Court finds the request for leave is not well taken and the same is hereby denied.

IT IS SO ORDERED.

JUDGE RONALD J. RICE

Date: 03 – 29 – 2017
Copies to:
RANDALL L PORTER
LUWAYNE ANNOS

KAREN INFANTE ALLEN
CLERK OF COURTES
TRUMBULL COUNTY
2017 MAR 29  AM 11:35
TRUMBULL COUNTY
CLERK OF COURTS

**FILED**
**COURT OF APPEALS**

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

APR 2 5 2017

TRUMBULL COUNTY, OH
KAREN INFANTE ALLEN, CLERK

STATE OF OHIO                    )
                                 )
      Plaintiff,                 )
                                 )
v.                               )   Case No. 2001 CR 00794
                                 )
NATHANIEL E. JACKONS,            )   JUDGE RONALD J. RICE
                                 )
      Defendant.                 )

AFFIDAVIT OF INDIGENCY

County of Ross      )
State of Ohio       )

    I, Nathaniel E. Jackson do solemnly swear that I presently, have no means of financial support and no assets of any value and, therefore, cannot afford to pay for any legal services, fees, or costs on my behalf in the above-styled case; that I am presently incarcerated at the Chillicothe Correctional Facility; and that I have $ 17.00 income per month.

NATHANIEL E. JACKSON
#440-891
P.O. Box 5500
Chillicothe, Ohio 45601

Sworn and subscribed in my presence this 21 day of April 2017.

NOTARY PUBLIC
My Commission Expires: 12-27-2020



JOHNATHAN R JOHNSON
NOTARY PUBLIC - OHIO
COUNTY OF PIKE
MY COMMISSION EXPIRES
12-27-2020