# VOLUME 1

FILED
JUL 09 2003
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

```
1              IN THE COURT OF COMMON PLEAS
                   TRUMBULL COUNTY, OHIO
2              TRIAL COURT CASE NO. 01-CR-794
             SUPREME COURT OF OHIO CASE NO. 03-137
3

4
     STATE OF OHIO         )
5                          )
             Plaintiff     )    SEARCH WARRANT
6                          )    INITIAL APPEARANCE
     -vs-                  )    MOTION TO INTERVENE
7                          )    ARRAIGNMENT
     NATHANIEL JACKSON      )    TIME WAIVER
8                          )       MOTIONS
             Defendant     )    MOTIONS TO SUPPRESS
9

10

11        BE IT REMEMBERED, that on December 20, 2001,

12   December 21, 2001, December 31, 2001, January 23,

13   2002, March 20, 2002, and April 17, 2002, these

14   proceedings came on to be heard before one of

15   the Judges of this Court, John M. Stuard, in

16   Courtroom No. 2, on High Street, Warren, Ohio,

17   before the case heretofore filed herein.

18

19

20   Mary Ann Mills, RPR
     Official Court Reporter
21   Trumbull County, Ohio

22
```

2

1

2        A P P E A R A N C E S

3

4   On Behalf of the State of Ohio:
      Dennis Watkins, Prosecuting Attorney
5      Charles L. Morrow, Ass't. Prosecuting Attorney
      160 High Street, N.W.
6      Warren, OH 44481

7   On Behalf of the Defendant, Nathaniel Jackson:
      Anthony V. Consoldane, Attorney at Law
8      James F. Lewis, Attorney at Law
      State of Ohio Public Defendant's Office
9      328 Mahoning Avenue, N.W.
      Warren, OH 44481

10  On Behalf of the Defendant, Donna Roberts:
      John B. Juhasz, Attorney at Law
11     J. Gerald Ingram, Attorney at Law
      7330 Market Street
12     Youngstown, OH 44512

13  On Behalf of The Vindicator Printing Co.
      Ann Millette, Attorney at Law
14     3200 National City Center
      1900 East Ninth Street
15     Cleveland, OH 44114

16  On Behalf of WFMJ Television, Inc.:
      Stephen T. Bolton, Attorney at Law
17     201 E. Commerce Street, Atrium Level Two
      Youngstown, Oh 44503

18

19

20

21

22

i

1                        I N D E X

2                                            PAGE NO.

3    Search Warrant Hearing                      3
     (December 20, 2001)
4
     Initial Appearance of Nathaniel Jackson     9
5    Hearing (December 21, 2001)

6    Initial Appearance of Donna Roberts        12
     Hearing (December 21, 2001)
7
     Motion to Intervene                        19
8    (December 31, 2001)

9    Arraignment of Donna Roberts (co-defendant) 57
     Arraignment of Nathaniel Jackson
10
     Waiver of Speedy Trial                     64
11   (January 23, 2002)

12   Hearing on Motions                         67
     (March 20, 2002)
13
     Hearing on Motion to Suppress Evidence    185
14   (April 17, 2002)

15   WITNESSES AT SUPPRESSION HEARING:

16   JEFFREY R. HOOLIHAN
         Direct Examination by Mr. Watkins     190
17       Cross Examination by Mr. Lewis        231
         Redirect Examination by Mr. Watkins   274
18       Recross Examination by Mr. Lewis      280

19   DET. SGT. PAUL MONROE
         Direct Examination by Mr. Lewis       288
20       Examination by The Court              312

21   NATHANIEL JACKSON
         Direct Examination by Mr. Consoldane  314
22       Cross Examination by Mr. Watkins      324

ii

INDEX - Continued                                    PAGE NO.

Court's Opening Remarks (Volume 2)                     381
Motion for Mistrial                                    415

VOIR DIRE
    Hardship Excuses                                   422
    Death Penalty Qualification & Media                664
    (Volume 3)
    Motion for Change of Venue & Motion to
     Dismiss                                          1835

GENERAL VOIR DIRE                                     1857

OPENING STATEMENT ON BEHALF OF STATE OF OHIO          2064
OPENING STATEMENT ON BEHALF OF THE DEFENDANT          2093

STATE'S WITNESSES:

PAULA CARSON
    Direct Examination by Mr. Morrow                  2100
    Cross Examination by Mr. Lewis                    2105

JAMES C. DANIELS
    Direct Examination by Mr. Watkins                 2111
    Cross Examination by Mr. Lewis                    2124
    Redirect Examination by Mr. Watkins               2138

JOSE SANCHEZ
    Direct Examination by Mr. Watkins                 2139
    Cross Examination by Mr. Lewis                    2156
    Redirect Examination by Mr. Watkins               2168

FRANK E. REYNOLDS
    Direct Examination by Mr. Watkins                 2172
    Cross Examination by Mr. Lewis                    2191
    Redirect Examination by Mr. Watkins               2201

PAUL MONROE
    Direct Examination by Mr. Watkins                 2202
    Cross Examination by Mr. Consoldane               2392

iii

1   INDEX - Continued                                    PAGE NO.

2   MIKE YANNUCCI
        Direct Examination by Mr. Morrow                  2406
3       Cross Examination by Mr. Lewis                    2418
        Redirect Examination by Mr. Morrow               2428
4
    RICHARD TACKETT
5       Direct Examination by Mr. Morrow                  2428
        Cross Examination by Mr. Lewis                    2434
6
    ANTHONY LESHNACK
7       Direct Examination by Mr. Watkins                 2445
        Cross Examination by Mr. Consoldane               2455
8
    FRANK DILLON
9       Direct Examination by Mr. Watkins                 2457
        Cross Examination by Mr. Lewis                    2480
10
    DR. THEODORE SOBOSLAY
11      Direct Examination by Mr. Watkins                 2512

12  DR. HUMPHREY GERMANIUK
        Direct Examination by Mr. Watkins                 2520
13      Cross Examination by Mr. Consoldane               2576
        Redirect Examination by Mr. Watkins               2583
14      Recross Examination by Mr. Consoldane             2585
        Redirect Examination by Mr. Watkins               2586
15
    JOSE FLORES
16      Direct Examination by Mr. Watkins                 2587
        Cross Examination by Mr. Lewis                    2599
17
    EDWARD LULLA
18      Direct Examination by Mr. Watkins                 2604
        Cross Examination by Mr. Lewis                    2624
19
    JOHN STAMPER
20      Direct Examination by Mr. Watkins                 2645
        Cross Examination by Mr. Lewis                    2652
21

22

iv

1    INDEX - Continued                                    PAGE NO.

2    JEFF DIAMANTES
         Direct Examination by Mr. Watkins               2654
3        Cross Examination by Mr. Lewis                   2659
         Redirect Examination by Mr. Watkins             2661
4
     MICHAEL ROBERTS
5        Direct Examination by Mr. Morrow                2663
         Cross Examination by Mr. Consoldane             2695
6        Redirect Examination by Mr. Morrow              2704
         Recross Examination by Mr. Consoldane           2706
7
     CYNTHIA MAYLE
8        Direct Examination by Mr. Watkins               2706
         Cross Examination by Mr. Consoldane             2728
9
     DALE LAUX
10       Direct Examination by Mr. Watkins               2735
         Cross Examination by Mr. Consoldane             2751
11       Redirect Examination by Mr. Watkins             2790
         Recross Examination by Mr. Lewis                2798
12
     BRENDA GERARDI
13       Direct Examination by Mr. Watkins               2803
         Cross Examination by Mr. Lewis                  2840
14
     STEVE GREENE
15       Direct Examination by Mr. Morrow                2851
         Cross Examination by Mr. Lewis                  2875
16
     CHRIS ELLINGTON
17       Direct Examination by Mr. Morrow                2881
         Cross Examination by Mr. Consoldane             2888
18
     JIM McCOY
19       Direct Examination by Mr. Morrow                2890
         Cross Examination by Mr. Lewis                  2899
20
     JILL KENYON
21       Direct Examination by Mr. Morrow                2900
         Cross Examination by Mr. Consoldane             2908
22

v

| | | PAGE NO. |
|---|---|---|
| 1 | <u>INDEX - Continued</u> | |
| 2 | <u>JENNIFER ROBINSON</u> | |
| | Direct Examination by Mr. Morrow | 2911 |
| 3 | Cross Examination by Mr. Lewis | 2920 |
| 4 | <u>KATHY KIHM</u> | |
| | Direct Examination by Mr. Morrow | 2921 |
| 5 | Cross Examination by Mr. Lewis | 2924 |
| 6 | <u>BRIDGET PAUL</u> | |
| | Direct Examination by Mr. Morrow | 2925 |
| 7 | Cross Examination by Mr. Consoldane | 2934 |
| 8 | <u>KATHERINE THOMAS</u> | |
| | Direct Examination by Mr. Morrow | 2936 |
| 9 | Cross Examination by Mr. Lewis | 2952 |
| | Redirect Examination by Mr. Morrow | 2973 |
| 10 | Recross Examination by Mr. Lewis | 2976 |
| 11 | <u>JAMES CAMPBELL</u> | |
| | Direct Examination by Mr. Watkins | 2977 |
| 12 | Cross Examination by Mr. Consoldane | 2982 |
| 13 | <u>LINDA THOMAS</u> | |
| | Direct Examination by Mr. Morrow | 2994 |
| 14 | Cross Examination by Mr. Consoldane | 3002 |
| 15 | <u>CHRISTOPHER MONYAK</u> | |
| | Direct Examination by Mr. Morrow | 3003 |
| 16 | Cross Examination by Mr. Lewis | 3023 |
| | Redirect Examination by Mr. Morrow | 3037 |
| 17 | | |
| 18 | <u>TROOPER GERALD FUNELLI</u> | |
| | Direct Examination by Mr. Morrow | 3038 |
| | Cross Examination by Mr. Lewis | 3046 |
| 19 | | |
| 20 | <u>DET. SGT. PAUL MONROE</u> | |
| | Redirect Examination by Mr. Watkins | 3049 |
| | Recross Examination by Mr. Lewis | 3063 |
| 21 | | |
| 22 | <u>BRAD CAIN</u> | |
| | Direct Examination by Mr. Lewis | 3106 |

vi

| | INDEX - Continued | PAGE NO. |
|---|---|---|
| 1 | | |
| 2 | TAMMIE KAYE | |
| | Direct Examination by Mr. Consoldane | 3118 |
| 3 | | |
| | ROBERT STANTON | |
| 4 | Direct Examination by Mr. Lewis | 3119 |
| | Cross Examination by Mr. Watkins | 3127 |
| 5 | | |
| | MOTIONS | 3200 |
| 6 | | |
| | CARMEN OLIVA | |
| 7 | Direct Examination by Mr. Watkins | 3267 |
| | Cross Examination by Mr. Lewis | 3278 |
| 8 | | |
| | BARRY RICKER | |
| 9 | Direct Examination by Mr. Watkins | 3290 |
| | Cross Examination by Mr. Lewis | 3300 |
| 10 | | |
| | DIANA MARCHESE | |
| 11 | Direct Examination by Mr. Watkins | 3309 |
| | Cross Examination by Mr. Consoldane | 3314 |
| 12 | Redirect Examination by Mr. Watkins | 3319 |
| | Recross Examination by Mr. Consoldane | 3319 |
| 13 | | |
| | MOTION RE JURY INSTRUCTIONS | 3334 |
| 14 | | |
| | FINAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3390 |
| 15 | FINAL ARGUMENT ON BEHALF OF THE DEFENDANT | 3438 |
| | FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT | 3495 |
| 16 | REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3505 |
| 17 | CHARGE OF THE COURT | 3541 |
| 18 | NOVEMBER 7, 2002 (Deliberations) | 3601 |
| 19 | NOVEMBER 8, 2002 (Deliberations) | 3602 |
| 20 | VERDICT | 3612 |
| 21 | (SEE SEPARATE VOLUME FOR TRANSCRIPT OF MITIGATION HEARING) | |
| 22 | | |

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | Withdrawn |
| 36 | Photo | Withdrawn |
| 37 | Photo | No Objection |
| 38 | Photo | No Objection |
| 39 | Photo | Withdrawn |
| 40 | Photo | No Objection |
| 41 | Photo | Withdrawn |
| 42 | Photo | Withdrawn |
| 43 | Photo | No Objection |
| 44 | Photo | No Objection |
| 45 | Photo | Withdrawn |
| 46 | Photo | Withdrawn |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | Withdrawn |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

vii

| 61 | Photo Shirt | No Objection | viii |
| 62 | Photo Shirt | No Objection | |
| 63 | Photo  - Victim | Withdrawn | |
| 64 | Bullet Recovered from Brain of Victim | No Objection | |
| 65 | Bullet Recovered from Brain of Victim | No Objection | |
| 66 | Clothes and Jewerly | No Objection | |
| 67 | Photo X-Ray | No Objection | |
| 68 | Photo Reds Jacket | No Objection | |
| 69 | Tire Marks in Grass | No Objection | |
| 70 | N. Side Exterior of House | No Objection | |
| 71 | Front Exterior of House | No Objection | |
| 72 | Rear Extrerior of House | No Objection | |
| 73 | S Side Exterior of House | No Objection | |
| 74 | Main Bathroom | No Objection | |
| 75 | View of man door screen from house | No Objection | |
| 76 | View of man door screen from garage | No Objection | |
| 77 | Spare Bedroom | No Objection | |
| 78 | Clothing- Spare Bedroom | No Objection | |
| 79 | Blood spatter - peninisula | Withdrawn | |
| 80 | Blood Spatters- on wall by door | Withdrawn | |
| 81 | Blood Spatters and smear | Withdrawn | |
| 82 | Blood Spatters | Withdrawn | |
| 83 | Inside Garage looking into residence | No Objection | |
| 84 | Blood drops - garage | No Objection | |
| 85 | Garage | Withdrawn | |
| 86 | Blood Spatters - garage | No Objection | |
| 87 | Overview garage | No Objection | |
| 88 | Peninusla & Wall - blood splatters | Withdrawn | |
| 89 | Different view as in 88 | Withdrawn | |
| 90 | Blood Drops in garage | No Objection | |
| 91 | Kitchen door closed | No Objection | |
| 92 | Overview garage | No Objection | |
| 93 | Back of man door w/ blood | No Objection | |
| 94 | Interior side of man door | No Objection | |
| 95 | Eye glasses and broken lag bolt -garage | No Objection | |
| 96 | Eye glasses - garage | No Objection | |
| 97 | Stairwell ceiling | No Objection | |
| 98 | receipt dated 9-26-01 | No Objection | |
| 99 | Victim | Withdrawn | |
| 100 | Victim -back close up | Withdrawn | |
| 101 | Small key found under victim | No Objection | |
| 102 | overview bedroom | No Objection | |
| 103 | bedroom master | No Objection | |
| 104 | bedroom closet | No Objection | |
| 105 | Photo | No Objection | |
| 105A | Photo | No Objection | |
| 106 | Photo | No Objection | |
| 106A | Photo | No Objection | |
| 107 | Photo | No Objection | |
| 107A | photo | Withdrawn | |
| 108 | Victim | No Objection | |
| 108A | Victim Face down | Withdrawn | |
| 109 | Dry Wall Hole | Withdrawn | |
| 109A | Victim face down | Withdrawn | |
| 110 | Victim in Kitchen | No Objection | |
| 111 | Victim lower torso | Withdrawn | |
| 112 | Victim - Footprints w/ small dots | Withdrawn | |
| 113 | Ashtray | No Objection | |
| 114 | Ashtray | No Objection | |
| 115 | Living Room | No Objection | |
| 116 | Living Room | No Objection | |
| 117 | Living Room | No Objection | |

| | | |
|---|---|---|
| 118 | Office Area | No Objection |
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door, Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angle Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Bllod Smear | No Objection |
| 176 | Floormat | Withdrawn |
| 177 | Trunk Open | No Objection |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

ix

| | | | |
|---|---|---|---|
| 180 | Driver Side Console | No Objection | x |
| 181 | Passenger Side Dashboard | No Objection | |
| 182 | Passenger side door - interior | No Objection | |
| 183 | Driver side - steering wheel p garage door opener | No Objection | |
| 184 | Left side of car w/ dashboard | No Objection | |
| 185 | Rt side back seat | No Objection | |
| 186 | Front driver compartment | No Objection | |
| 187 | Exterior thru rear left door | No Objection | |
| 188 | keys | Withdrawn | |
| 189 | Cell Phone | Withdrawn | |
| 190 | Keys - Blue Matt | Withdrawn | |
| 191 | Driver side - release button | No Objection | |
| 192 | Wagon Wheel Photo | Objection Sustained | |
| 193 | Wagon Wheel Photo | Objection Sustained | |
| 194 | Wagon Wheel Photo | Admitted over Obj | |
| 195 | Wagon Wheel Photo | Admitted over Obj | |
| 196 | Wagon Wheel Photo | Objection Sustained | |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj | |
| 198 | No Exhibit | | |
| 199 | Days Innn Photographs | Withdrawn | |
| 200 | Days Innn Photographs | Withdrawn | |
| 201 | Days Innn Photographs | Admitted over Obj | |
| 202 | Days Innn Photographs | Objection Sustained | |
| 203 | Days Innn Photographs | Withdrawn | |
| 204 | Days Innn Photographs | Objection Sustained | |
| 205 | Days Innn Photographs | Withdrawn | |
| 206 | Days Innn Photographs | Withdrawn | |
| 207 | Days Innn Photographs | Withdrawn | |
| 208 | Days Innn Photographs | Withdrawn | |
| 208 | Days Innn Photographs | Withdrawn | |
| 210 | Days Innn Photographs | Withdrawn | |
| 211 | Days Innn Photographs | Withdrawn | |
| 212 | Days Innn Photographs | Withdrawn | |
| 213 | Days Innn Photographs | Withdrawn | |
| 214 | Days Innn Photographs | Withdrawn | |
| 215 | Days Innn Photographs | Withdrawn | |
| 216 | Days Innn Photographs | Withdrawn | |
| 217 | Days Innn Photographs | Withdrawn | |
| 218 | Days Innn Photographs | Withdrawn | |
| 219 | Days Innn Photographs | Withdrawn | |
| 220 | Days Innn Photographs | Withdrawn | |
| 221 | Days Innn Photographs | Withdrawn | |
| 222 | Days Innn Photographs | Withdrawn | |
| 223 | Days Innn Photographs | Withdrawn | |
| 224 | Days Innn Photographs | Admitted over Obj | |
| 225 | Days Innn Photographs | Withdrawn | |
| 226 | Days Innn Photographs | Admitted over Obj | |
| 227 | Photographs of Wirt Street | Admitted over Obj | |
| 228 | Photographs of Wirt Street | Out | |
| 229 | Photographs of Wirt Street | Out | |
| 230 | Photographs of Wirt Street | Admitted over Obj | |
| 231 | Photographs of Wirt Street | Admitted over Obj | |
| 232 | Photographs of Wirt Street | Out | |
| 233 | WIrt Street Photographs | Out | |
| 234 | Wirt Street Photographs | Admitted over Obj | |
| 235 | Front view - Nate Jackson | No Objection | |
| 236 | Rear view Nate Jackson | No Objection | |
| 237 | Full body shot | No Objection | |
| 238 | Rt arm and Hand | No Objection | |
| 239 | Front view - Nate Jackson | No Objection | |
| 240 | Left & Rt knee | No Objection | |
| 241 | View of Hands & Wound | No Objection | |

| 271D | Letters From Donna to Nate | | |
|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/26/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |
| 271D60 | Halloween card | | Admitted |
| 271D61 | | 10/31/01 | Admitted |

xi

| | | | | |
|---|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted | xii |
| 271D63 | | 10/29/01 | Admitted | |
| 271D64 | | 10/29/01 | Admitted | |
| 271D65 | | 10/28/01 | Admitted | |
| 271D66 | | 10/27/01 | Admitted | |
| 271D67 | | 10/26/01 | Admitted | |
| 271D68 | | 10/26/01 | Admitted | |
| 271D69 | | 10/26/01 | Admitted | |
| 271D70 | | 10/25/01 | Admitted | |
| 271D71 | | 10/25/01 | Admitted | |
| 271D72 | | 10/24/01 | Admitted | |
| 271D73 | | 10/24/01 | Admitted | |
| 271D74 | | 10/23/01 | Admitted | |
| 271D75 | | 10/23/01 | Admitted | |
| 271D76 | | 10/23/01 | Admitted | |
| 271D77 | | 10/23/01 | Admitted | |
| 271D78 | | 10/22/01 | Admitted | |
| 271D79 | Empty | | Admitted | |
| 271D80 | | 10/21/01 | Admitted | |
| 271D81 | | 10/20/01 | Admitted | |
| 271D82 | | 10/20/01 | Admitted | |
| 271D83 | | 10/20/01 | Admitted | |
| 271D84 | | 10/20/01 | Admitted | |
| 271D85 | | 10/19/01 | Admitted | |
| 271D86 | | 10/19/01 | Admitted | |
| 271D87 | | 10/19/01 | Admitted | |
| 271D88 | | 10/19/01 | Admitted | |
| 271D89 | | 10/18/01 | Admitted | |
| 271D90 | Empty | | Admitted | |
| 271D91 | | 10/18/01 | Admitted | |
| 271D92 | | 10/17/01 | Admitted | |
| 271D93 | | 10/16/01 | Admitted | |
| 271D94 | | 10/16/01 | Admitted | |
| 271D95 | | 10/15/01 | Admitted | |
| 271D96 | | 10/15/01 | Admitted | |
| 271D97 | | 10/15/01 | Admitted | |
| 271D98 | | 10/13/01 | Admitted | |
| 271D99 | | 10/13/01 | Admitted | |
| 271D100 | | 10/13/01 | Admitted | |
| 271D101 | | 10/12/01 | Admitted | |
| 271D102 | | 10/12/01 | Admitted | |
| 271D103 | | 10/12/01 | Admitted | |
| 271D104 | Empty | | Admitted | |
| 271D105 | | 10/12/01 | Admitted | |
| 271D106 | | 10/12/01 | Admitted | |
| 271D107 | | 10/11/01 | Admitted | |
| 271D108 | | 10/11/01 | Admitted | |
| 271D109 | | 10/11/01 | Admitted | |
| 271D110 | | 10/10/01 | Admitted | |
| 271D111 | | 10/10/01 | Admitted | |
| 271D112 | | 10/10/01 | Admitted | |
| 271D113 | | 10/08/01 | Admitted | |
| 271D114 | | 10/08/01 | Admitted | |
| 271D115 | | 10/06/01 | Admitted | |
| 271D116 | | 10/06/01 | Admitted | |
| 271D117 | | 10/06/01 | Admitted | |
| 271D118 | | 10/05/01 | Admitted | |
| 271D119 | | 10/05/01 | Admitted | |
| 271D120 | | 10/05/01 | Admitted | |
| 271D121 | | 10/05/01 | Admitted | |
| 271D122 | | 10/05/01 | Admitted | |
| 271D123 | | 10/05/01 | Admitted | |

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

xiii

xiv

| 273N | Letters from Nate to Donna | Admitted | |
|------|------|------|------|
| 273N1 | | 12/01/01 | Admitted |
| 273N2 | | 11/30/01 | Admitted |
| 273N3 | | 11/29/01 | Admitted |
| 273N4 | | 11/28/01 | Admitted |
| 273N5 | | 11/27/01 | Admitted |
| 273N6 | | 11/26/01 | Admitted |
| 273N7 | | 11/25/01 | Admitted |
| 273N8 | | 11/23/01 | Admitted |
| 273N9 | | 11/22/01 | Admitted |
| 273N10 | | 11/20/01 | Admitted |
| 273N11 | | 11/19/01 | Admitted |
| 273N12 | | 11/17/01 | Admitted |
| 273N13 | | 11/16/01 | Admitted |
| 273N14 | | 11/14/01 | Admitted |
| 273N15 | | 11/14/01 | Admitted |
| 273N16 | | 11/13/01 | Admitted |
| 273N17 | | 11/12/01 | Admitted |
| 273N18 | | 11/12/01 | Admitted |
| 273N19 | | 11/10/01 | Admitted |
| 273N20 | | 11/09/01 | Admitted |
| 273N21 | | 11/07/01 | Admitted |
| 273N22 | | 11/06/01 | Admitted |
| 273N23 | | 11/08/01 | Admitted |
| 273N24 | | 11/05/01 | Admitted |
| 273N25 | | 11/03/01 | Admitted |
| 273N26 | | 11/01/01 | Admitted |
| 273N27 | | 11/01/01 | Admitted |
| 273N28 | | 10/31/01 | Admitted |
| 273N29 | | 10/30/01 | Admitted |
| 273N30 | 273N31 | | 273N32 |
| 273N31 | | 10/28/01 | Admitted |
| 273N32 | | 10/27/01 | Admitted |
| 273N33 | 273N34 | | 273N35 |
| 273N34 | | 10/25/01 | Admitted |
| 273N35 | | 10/25/01 | Admitted |
| 273N36 | | 10/25/01 | Admitted |
| 273N37 | | 10/24/01 | Admitted |
| 273N38 | | 10/23/01 | Admitted |
| 273N39 | | 10/22/01 | Admitted |
| 273N40 | | 10/21/01 | Admitted |
| 273N41 | | 10/21/01 | Admitted |
| 273N42 | | 10/20/01 | Admitted |
| 273N43 | | 10/19/01 | Admitted |
| 273N44 | | 10/18/01 | Admitted |
| 273N45 | | 10/17/01 | Admitted |
| 273N46 | | 10/16/01 | Admitted |
| 273N47 | | 10/16/01 | Admitted |
| 273N48 | | 10/15/01 | Admitted |
| 273N49 | | 10/14/01 | Admitted |
| 273N50 | | 10/12/01 | Admitted |
| 273N51 | | 10/10/01 | Admitted |
| 273N52 | | 10/10/01 | Admitted |
| 273N53 | | 10/08/01 | Admitted |
| 273N54 | | 10/05/01 | Admitted |
| 273N55 | | 10/07/01 | Admitted |
| 273N56 | | 10/04/01 | Admitted |
| 273N57 | | 10/04/01 | Admitted |
| 273N58 | | 10/02/01 | Admitted |
| 273N59 | | 10/01/01 | Admitted |
| 273N60 | | 10/01/01 | Admitted |
| 273N61 | | 09/30/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

xvii

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Intorduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

xviii

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Intorduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Enevlope #29 | No Objection |
| 310 | Empty Days Inn Room Key Enevlope #138 w/ To | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Containing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X  5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

| | | | |
|---|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj | xix |
| 324 | Constitutional Rights Waiver | No Objection | |
| 325 | Video Tape Confession | No Objection | |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection | |
| 327A | Certification - ATF - 1page | Admitted over Obj | |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj | |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj | |
| 360 | Cd containing 19 Telephone Conversations | No Objection | |
| 361 | Telephone Log Record 3 pages | No Objection | |
| 362 | Audio Tape of 10-05-01 Recording | No Objection | |
| 362A | Transcript of 10-05-01 Recording | No Objection | |
| 363 | Audio Tape of 10-25-01 Recording | No Objection | |
| 363A | Transcript of 10-25-01 Recording | No Objection | |
| 364 | Audio Tape of 10-27-01 Recording | No Objection | |
| 364A | Transcript of 10-27-01 Recording | No Objection | |
| 365 | Audio Tape of 11-03-01 Recording | No Objection | |
| 365A | Transcript of 11-03-01 Recording | No Objection | |
| 366 | Audio Tape of 11-08-01 Recording | No Objection | |
| 366A | Transcript of 11-08-01 Recording | No Objection | |
| 367 | Audio Tape of 11-10-01 Recording | No Objection | |
| 367A | Transcript of 11-10-01 Recording | No Objection | |
| 368 | Audio Tape of 11-11-01 Recording | No Objection | |
| 368A | Transcript of 11-11-01 Recording | No Objection | |
| 369 | Audio Tape of 11-15-01 Recording | No Objection | |
| 369A | Transcript of 11-15-01 Recording | No Objection | |
| 370 | Audio Tape of 11-17-01 Recording | No Objection | |
| 370A | Transcript of 11-17-01 Recording | No Objection | |
| 371 | Audio Tape of 11-22-01 Recording | No Objection | |
| 371A | Transcript of 11-22-01 Recording | No Objection | |
| 372 | Audio Tape of 11-24-01Recording | No Objection | |
| 372A | Transcript of 11-24-01 Recording | No Objection | |
| 373 | Audio Tape of 11-24-01Recording | No Objection | |
| 373A | Transcript of 11-24-01 Recording | No Objection | |
| 374 | Audio Tape of 11-25-01 Recording | No Objection | |
| 374A | Transcript of 11-25-01 Recording | No Objection | |
| 375 | Audio Tape of 11-29-01Recording | No Objection | |
| 375A | Transcript of 11-29-01 Recording | No Objection | |
| 376 | Audio Tape of 12-01-01Recording | No Objection | |
| 376A | Transcript of 12-01-01 Recording | No Objection | |
| 377 | Audio Tape of 12-02-01Recording | No Objection | |
| 377A | Transcript of 12-02-01 Recording | No Objection | |
| 379 | Audio Tape of 12-06-01Recording | No Objection | |
| 379A | Transcript of 12-06-01 Recording | No Objection | |
| 380 | Audio Tape of 12-08-01Recording | No Objection | |
| 380A | Transcript of 12-08-01 Recording | No Objection | |
| 381 | Audio Tape of 12-08-01Recording | No Objection | |
| 381A | Transcript of 12-08-01 Recording | No Objection | |
| 349 | Photographic Line-Up - Frank Reynolds | Not Intorduced | |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection | |
| 351 | (2) two cotton tipped swabs | No Objection | |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn | |
| 385 | Swabs | No Objection | |
| 386 | Swabs | No Objection | |
| 387 | Swabs | No Objection | |
| 388 | Swabs | No Objection | |
| 389 | Swabs | No Objection | |
| 390 | Gerardi - Cutting | No Objection | |
| 391 | Enevlope Containing Jackson Prints | No Objection | |
| 391A | Jackson Prints | No Objection | |
| 392 | Photograph - Lifts | No Objection | |
| 393 | Photograph - Lifts | No Objection | |
| 394 | Enevlope Containing 2 Photos | No Objection | |

| | | | |
|---|---|---|---|
| 395 | Enevlope Containing Lift Sheets | No Objection | xx |
| 395A | Lift Sheets | No Objection | |
| 395B | Lift Sheets | No Objection | |
| 396 | Walmart Receipt | Admitted over Obj | |
| 397 | Audio Tape of Excerpts | Objection Sustained | |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained | |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj | |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj | |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj | |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj | |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj | |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj | |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj | |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj | |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj | |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj | |
| 403A-403RR | Defendant's school records | No Objection | |
| | | | |
| Defendant's Exhibits | | | |
| Deft A | Dreft.'s Criminal HIstory | No Objection | |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection | |
| Deft F | Credit Application | No Objection | |
| Deft G | BMV Registration Card | No Objection | |
| Deft H | Sales Agreement | No Objection | |
| Deft I | Lease Agreement | No Objection | |
| Deft J | Car Registration | No Objection | |
| Deft K | Credit Application | No Objection | |
| Deft L | BMV Registration Card | No Objection | |
| Deft M | Real Estate Records | No Objection | |
| Deft N | Real Estate Records | No Objection | |
| Deft O | Real Estate Records | No Objection | |
| Deft P | Psychological Report | No Objection | |
| Joint 1 | Fingerhut Jewelry | No Objection | |
| | | | |
| Court Exhibit 1 | Orientation Instructions | | |
| Court Exhibit 2 | Exhibit List | | |
| Court Exhibit 3 | Brief In Oppostion to Acquittal | | |
| Court Exhibit 4 | Jury Charge | | |
| Court Exhibit 5 | Corrected Instruction | | |
| Court Exhibit 6 | Jury Question | | |
| Court Exhibit 7 | Penalty Instruction | | |

3

1

2               DECEMBER 20, 2001, AT 6:05 P.M.

3                        IN-CHAMBERS

4

5               THE COURT:  For the record, it is

6       about 6:05 p.m., December 20, 2001.  I have been

7       requested to make myself available by Dennis

8       Watkins, County Prosecutor, for purposes of a matter

9       for which I have, as a result thereof, have been

10      given certain information by way of primarily

11      letters that appear to have been written between one

12      Donna Marie Roberts and Nathaniel E. Jackson over a

13      period of the last several months or years.  At this

14      time, Mr. Watkins and Detective Sergeant Monroe,

15      please raise your hand.

16

17      (Whereupon, Mr. Watkins & Detective Monroe were

18      sworn by the Court.)

19

20              THE COURT:  I have reviewed this

21      information to see whether or not there is probable

22      cause to permit the filing of a complaint by the

23      Prosecuting Attorney upon affidavit.  Would you be

4

1    Monroe, you have reviewed that affidavit which you

2    have presented to me and which you have written and

3    caused to be prepared?

4                    DETECTIVE MONROE:  Yes, I have.

5                    THE COURT:  And what is contained

6    therein is true to the best of your knowledge from

7    the evidence that you have gathered in working on

8    this case the last couple of days?

9                    DETECTIVE MONROE:  Yes, it is.

10                    THE COURT:  And although apparently

11   it does not intend to state all of the evidence

12   because a lot of it hasn't been developed yet, you

13   have, in talking with various persons and what's

14   contained in and reviewing these articles and some

15   of which have been shown to me, have come to the

16   conclusion in your mind, after consultation with the

17   Prosecutor, that this matter should be presented to

18   a Judge on the basis of there being sufficient

19   probable cause to file the warrant?

20                    DETECTIVE MONROE:  Yes.

21                    THE COURT:  Okay, would you be kind

22   enough to sign that?

23

5

1     (Whereupon, the Affiant, Detective Sergeant Paul

2     Monroe signed the affidavit.)

3

4                    ATTY. WATKINS:  If the Court

5     please, I am going to have Detective Sergeant Monroe

6     also sign copies of the Affidavit for Arrest,

7     Warrant for Arrest, Howland Police Department and

8     the Prosecutor's Office.

9                    THE COURT:  Okay, I am accepting

10    the affidavit and after reviewing it and speaking

11    with Detective Monroe, and Detective Monroe affixing

12    his name to it, having been sworn prior to signing.

13    And do you have anything further Prosecutor Watkins?

14                    ATTY. WATKINS:  I understand

15    further, Judge, you have found probable cause from

16    the many pages of the letters, and the record speaks

17    for itself, and the affidavits speak for itself.

18                    THE COURT:  There is no question,

19    if I have ever reviewed a case, there does appear to

20    be probable cause and surely this fits that bill and

21    there is more than sufficient probable cause to

22    execute the arrest warrant.  What happens thereafter

23    is another matter, but there is sufficient probable

6

1    cause.

2                    ATTY. WATKINS:  And we are also

3    requesting that the warrant be issued for their

4    arrest, to wit, the arrest of Donna Marie Roberts

5    and Nathaniel E. Jackson, and we also request for

6    the Court to sign an order sealing the record until

7    the arrest of both of these individuals.

8                    THE COURT:  That motion will be

9    granted.  The motion will be sealed and the warrant

10   to be served and that record will not be opened

11   without permission of the Court.  I am also signing

12   the warrants as prepared, the complaints that have

13   been duly signed by the Prosecutor, Dennis Watkins,

14   who has been previously sworn before signing.  And I

15   am also signing the warrant to arrest.  And I am

16   signing the motion and order to seal the record

17   until the warrants are executed.  Check it, I think

18   I got everything.

19                   ATTY. WATKINS:  Paul, you know you

20   have the original and you will serve the Defendants

21   the warrant and you will make a return on the

22   original and bring it to the Court.  And I am going

23   to request, Your Honor, if possible, to have the

7

1    Court seal the affidavit and have it kept in its own

2    secure room or assigned by the court reporter to

3    seal the envelope and not file it with the Clerk of

4    Courts until both are arrested.

5                    THE COURT:  That will be fine.

6    Should we not have a date issuing on the warrant?

7                    ATTY. WATKINS:  Yes, that should

8    be.

9                    THE COURT:  For the record, I am

10   going to instruct the court reporter to retain under

11   seal all the information here other than the

12   original warrant, which will be issued to the

13   police.  And that once you have been notified that a

14   return is made on that, please properly file it with

15   the Clerk of Court's Office.

16                    ATTY. WATKINS:  And the complaint

17   and warrant are sealed along with the affidavits

18   correct, Judge?

19                    THE COURT:  Correct.

20                    ATTY. WATKINS:  After both have

21   been arrested.

22

23   (End of proceedings at 6:20 p.m.)

8

1

2

<u>REPORTER'S CERTIFICATE</u>

4

5       This is to certify the foregoing represents a

6   true and correct copy of the proceedings had in the

7   aforementioned cause as reflected by the stenotype

8   notes taken by me on the same.

9

10

11

12

13

14   DATE:   September 10, 2002   Maribeth Hoolihan

15                               Official Court Reporter

16

17

18

19

20

21

22

23

9

1   <u>FRIDAY, DECEMBER 21, 2001;  In Open Court</u>:

2               THE COURT:  Mr. Consoldane, do you

3   want to bring your client up here, please?  Mr.

4   Consoldane, has your client received a copy of the

5   Complaint?

6               ATTY. CONSOLDANE:  Yes, Your Honor.

7   Mr. Jackson has received a copy of the Complaint.

8   He was served with that earlier today at the county

9   jail.  He understands it and waives any further

10  reading in Open Court.  He would like to enter a

11  plea of not guilty and request that reasonable bond

12  be set.

13              THE COURT:  This plea of not guilty

14  will be entered on your client's behalf.  The

15  Prosecution wish to speak to the issue of bond?

16              ATTY. WATKINS:  Yes, Your Honor.

17  The charges are Aggravated Murder with second count

18  of Aggravated Burglary.  We believe the evidence

19  presented shows that this is a potential capital

20  case and we request under the circumstances as

21  presented to the Court and in the affidavit, that

22  no bond be set.

10

1           THE COURT:  This Court has had

2    occasion in the issuance of the Complaint to review

3    some of the State's evidence and I've made a

4    finding of probable cause to file a Complaint.  I

5    believe that there is good and sufficient evidence

6    that as to the filing of this charge, that I would

7    not set a bond at the present time due to the

8    seriousness of the charges.  Your client has a

9    right to a preliminary hearing.  I would ask you to

10   get together with the Prosecutor and pick an

11   appropriate date within that time frame permitted

12   by statute.  Anything else, Mr. Consoldane?

13           ATTY. CONSOLDANE:  Yes, Your Honor.

14   Earlier today the Prosecutor approached me and

15   asked about giving consent to look at Mr. Jackson's

16   finger.  They said they wanted to remove the

17   bandage and take pictures of it.  I said that we

18   would not give consent to that, and he said that

19   would be fine, that he would get a search warrant.

20   Well, I was talking with Mr. Jackson and the

21   Sheriff's department had already done that without

22   a search warrant.  They had already removed his

11

1  band-aid and took pictures of his finger.  I would

2  just request the Court to instruct the Prosecutor

3  and the Sheriff's department to not take any

4  further evidence from Mr. Jackson without first

5  obtaining a search warrant.  We unilaterally

6  disagreed with any type of consent, and I think

7  that's not proper and they shouldn't be allowed to

8  do this.

9          THE COURT:  Well, you will have the

10 appropriate time to enter any objections you have

11 to any of the procedures used.  We have a very

12 capable, in my opinion, law enforcement personnel

13 around, and I think that they are well aware that

14 anything of that nature has to be obtained either

15 with the consent or by a search warrant.  I'm sure

16 that Mr. Watkins will see that everything is done

17 in an appropriate manner.

18          ATTY. WATKINS:  I believe it has

19 been, Your Honor.  This man went for medical

20 treatment.  This should be litigated in the proper

21 forum.

22          THE COURT:  That's what I'm saying.

12

1          ATTY. CONSOLDANE:  I'm just saying

2    this happened, and I don't want it happening any

3    more.

4          THE COURT:  It's on the record.

5          ATTY. WATKINS:  It may happen

6    depending on the facts and circumstances.

7          THE COURT:  I understand.  We'll get

8    into that at the appropriate time.  Anything

9    further?

10          ATTY. CONSOLDANE:  No, Your Honor.

11          THE COURT:  Mr. Ingram, do you want

12    to bring your client forward?

13          ATTY. INGRAM:  Your Honor, this is

14    the Defendant, Donna Roberts.  She will acknowledge

15    receipt of a copy of the Complaint filed herein.

16    This is an initial appearance and we will abide by

17    the Ohio Rules of Criminal Procedure, which

18    provides that you are not called upon to enter a

19    plea in a felony case at an initial appearance.

20    So, we will not do that.  We will not request bail

21    at this time, but we reserve the right to raise

22    that issue at a later time.

```
                                                          13
1                 THE COURT:  It's always an issue to
2      be raised.  Okay, you do acknowledge receipt of the
3      Complaint?
4                 ATTY. INGRAM:  Yes.
5                 THE COURT:  You've read it and
6      understand it?
7                 ATTY. INGRAM:  Yes.  We do waive the
8      reading.
9                 THE COURT:  Do you have a date for
10     preliminary hearing you wish to set?
11                ATTY. WATKINS:  Your Honor, we would
12     request considering the holiday, a preliminary
13     hearing on December 31st at 11:00 a.m.
14                THE COURT:  Is that convenient to
15     both counsel?
16                ATTY. CONSOLDANE:  Yes, Your Honor.
17                ATTY. INGRAM:  I'll make it
18     convenient.
19                THE COURT:  There will be no bond
20     set on this matter at the present and defense has
21     reserve the right to enter a plea at a later date.
22     (OFF THE RECORD)
```

14

1          ATTY. WATKINS:  Your Honor, the

2    affidavits pursuant to the filing of our charges

3    yesterday were sealed and the order is until both

4    parties were arrested and therefore, I at this

5    point would request the Court to unseal the record

6    unless the Court --

7          THE COURT:  I have already

8    instructed the reporter to file those.

9          ATTY. WATKINS:  I wanted to make

10   sure we were conforming with the public records

11   law.

12   (OFF THE RECORD)

13          ATTY. INGRAM:  On behalf of Donna

14   Roberts, I would request that the affidavit for

15   arrest warrant remain unsealed.  It contains

16   references to evidentiary matters.  Attached to it

17   are several letters, which I have not had an

18   opportunity to review, but I imagine that the State

19   will allege that these letters constitute

20   documentary evidence in this matter.  Eventually,

21   we are going to have to pick a jury, our pool of

22   jurors is in Trumbull County.  They will be exposed

15

1   to this pre-trial and I would respectfully submit

2   that the affidavits should remain sealed, at least

3   until we empanel a jury.

4              ATTY. CONSOLDANE:  I would join in

5   that motion, on behalf of Mr. Jackson.  The

6   Complaint should be enough to satisfy the needs of

7   the press at this time.  I don't believe that there

8   is any reason to unseal the affidavit at this time.

9              ATTY. WATKINS:  Your Honor, the

10  public records law on this issue, I believe is

11  clear.  We have had cases before where affidavits

12  have been filed with this Court, and always they

13  have been released as a public record at the

14  appropriate time.  I have joined in with defense

15  counsel on various times for example to eliminate

16  disclosure of video confessions prior to trial,

17  which are always litigated prior to trial, and in

18  fact, the State lost on that case and that is the

19  Danny Lee Hill case and another one was the case

20  against a man named Parks.  Therefore, it is the

21  State's position from its knowledge of the law and

22  looking at the circumstances that it is a public

16

1    record, just like all filings and all hearings

2    before the trial and the State does not object to

3    its release.

4                    ATTY. INGRAM:  I think I would

5    request that you at least not unseal the affidavit

6    until Monday and that you give us an opportunity to

7    brief the public records.

8                    THE COURT:  Well, that is exactly

9    where I'm going.  The Court -- I don't want to get

10   into a situation where we are going to have a

11   problem with empaneling a jury in this county

12   because of pre-trial publicity.  I think the press

13   at some point has every right to review

14   particularly what has been filed.  I think that the

15   Prosecutor is correct on that, but I'm going to

16   allow you, because of the nature of the contents,

17   until Monday to brief the thing, to find out why

18   Mr. Watkins is not correct.  Part of that was the

19   material you are referring to was used as a basis

20   of the probable cause by way of affidavit, to have

21   the Complaint issued.  That is a matter of public

22   record probably.  Your task is to explain to the

17

1   Court, convince the Court that there is some

2   prejudice or bias that is going to be put upon your

3   Defendant, other than any other Defendant in the

4   similar circumstance.  So, I'll allow you until

5   Monday.  I'll order that that portion of the record

6   be sealed.

7               ATTY. WATKINS:  I would suggest that

8   if the Court is going to do that, that under public

9   records law that the press be invited to

10  participate, because they have an interest in

11  litigating this and I think the law requires that

12  the press --

13              THE COURT:  We have many spokesmen

14  here.  Who wishes to address this?

15              ATTY. WATKINS:  I think they would

16  have the opportunity.

17              THE COURT:  For purposes of this

18  motion, do you have anything further than what you

19  have heard?

20              ATTY. WATKINS:  I would suggest to

21  give them until Monday so their attorney can

22  respond.

18

1              ATTY. CONSOLDANE:  The Court is

2    closed Monday and Tuesday.

3              ATTY. INGRAM:  I'll do a memorandum.

4    I'll then send a copy of that memorandum to Mr.

5    Watkins, and I'll also send a copy of it to the

6    Warren _Tribune_ and the Youngstown _Vindicator_ and if

7    they then choose to move to intervene, that is

8    certainly something that they are entitled to do.

9              THE COURT:  I am thinking of time

10   element here.

11             ATTY. WATKINS:  It would have to be

12   early next week.  I don't know how you could do it

13   otherwise.

14             THE COURT:  I think the appropriate

15   thing here, we have this set for 11:00 on the 31st,

16   that gives everyone sufficient time to get your

17   briefs filed.  I think that is appropriate.

18             ATTY. CONSOLDANE:  Thank you.

19   (End of Hearing at 11:15 a.m.)

20

21

22

19

1    Monday, December 31, 2001:

2    (In-chambers at 11:00 a.m.)

3                THE COURT:  At the request of the

4    Court, we are conducting some preliminary matters

5    in-chambers, prior to going into Court.  The Court

6    has several motions before it this morning.  The

7    first I would like to deal with is Motion to

8    Intervene, filed by Steve Bolton on behalf of WFMJ

9    Television, Inc.  And there is a motion by the

10   Vindicator Printing Company in opposition, too.

11   Vindicator has filed a motion in opposition to

12   Defendant Roberts' motion to seal Court records.  I

13   have also received Defendant's motion in memorandum

14   to hold affidavit and Exhibits under seal.  Are

15   there any other motions that have been filed?

16               ATTY. CONSOLDANE:  First of all, I'd

17   object to Mr. Bolton's motion being heard.  I have

18   not been given a copy of that.  I didn't know he

19   was going to intervene.  I don't think he has any

20   business to intervene in this matter.  He hasn't

21   served me with a copy and I represent one of the

22   Defendants in a capital murder case.  I don't

20

1   believe he has any right to have this motion heard

2   today.  The other motion as far as the Vindicator,

3   I was handed the motion just as we walked into

4   Court today and I would like to clarify one thing.

5   One thing on that motion, is that motion is

6   opposing the Defendant's request to seal the

7   record, and we did not request to seal the record.

8   The Prosecutor, on their own, sealed that affidavit

9   with the Court.  We are only opposing them trying

10  to unseal at this time.  They sealed it, we think

11  that it should remain sealed.

12          THE COURT:  Steve, it is your

13  motion.  You should address the thing.

14          ATTY. BOLTON:  You are talking about

15  just the motion?

16          ATTY. WATKINS:  This is the motion

17  to intervene.  You are going to hear our responses

18  to that.

19          THE COURT:  It is his motion.

20          ATTY. CONSOLDANE:  Even though I

21  object.

22          ATTY. WATKINS:  I'm going to object

21

1    to the intervening.

2              THE COURT:  He has the right to

3    address the motion.  You have the right to object

4    to it.

5              ATTY. CONSOLDANE:  I can't object to

6    it, if I haven't seen it.

7              THE COURT:  Mr. Bolton, what is the

8    reason that you can give why that motion should be

9    granted?

10             ATTY. BOLTON:  Your Honor, this

11   obviously affects the First Amendment rights of the

12   news media, both the news media who are present

13   here by counsel as well as other news media who,

14   for reasons best known to them, decided not to

15   appear by counsel.  I understand that perhaps one

16   segment of the news medium, a local newspaper here

17   appeared by letter or asked you by letter to

18   consider this matter.

19             THE COURT:  Let me interrupt you.

20   For the record, besides the Vindicator and WFMJ, I

21   have also received correspondence from the Tribune,

22   from a Frank Robinson, Editor, whereby he calls

22

1   upon the freedom of information act, 5 U.S.(c) 552

2   for eliciting response from the Court as to justify

3   the actions that have been taken.  Go ahead.

4              ATTY. BOLTON:  After I filed this

5   motion, I did serve Mr. Juhasz and Mr. Ingram.  I

6   was not aware of Mr. Consoldane's involvement, but

7   I served them with a copy of my motion.  And I will

8   point out that my similar motion in a case some

9   years ago had been denied and that that denial had

10  been affirmed by the Court of Appeals or been

11  denied by the Court of Appeals, had actually been

12  filed in the Court of Appeals and the idea of

13  intervention in the Eleventh District, I can't

14  misrepresent the situation to the Court, in the

15  Eleventh District, the State, the case which Mr.

16  Juhasz cites is still good law.  I would submit

17  that it is distinguishable because at the time, the

18  State, ex rel Vindicator Printing Company vs.

19  Watkins was tried.  The issue in that case was

20  whether the paper could have access to the

21  Prosecutor file, to portions of the Prosecutor

22  file, as opposed to a document which was filed in

23

1   the Court.  We simply seek a way in which we can be

2   heard, which we come before the Court and make some

3   effort to protect our client's rights, our First

4   Amendment rights to examine matters which are

5   consedingly public records.  An affidavit filed

6   with the Court is by definition, any definition, a

7   public record, but certainly statutorily a public

8   record.  We simply seek a vehicle by which we can

9   be heard and protect our rights.  Short of mandamus

10  at this point, we feel there is no reason to file a

11  mandamus action.  The Court has not taken any

12  action which would warrant a mandamus action at

13  this point.  We simply seek a vehicle to be heard,

14  and to express to the Court such law as we believe

15  might be appropriate in guiding the Court, which

16  might be of assistance in guiding the Court towards

17  a decision in this matter.  We have no wish to

18  effect the outcome of the criminal case or

19  interfere or intervene in it for the purpose of

20  affecting any substantive result in the criminal

21  case.

22              THE COURT:  Fair enough.  Dennis?

24

1          ATTY. WATKINS:  I would indicate in

2     prefacing the record that this began as a result of

3     the State requesting the Court to seal the record

4     when we received warrants for the arrest of the

5     Defendants in this case, pursuant to an affidavit

6     filed by Detectives from the Howland Police

7     Department and that has been done in this county

8     for years and counties throughout Ohio for years

9     and the reason that we do that is that an officer,

10    and officers that go out with arrest warrants,

11    there could be danger, if this were to be released

12    at the point in time before a person is

13    apprehended, that it is necessary to have a period

14    of time, the affidavit be secret until the person

15    is arrested and charged.  This is commonly done

16    with secret indictments, however, Grand Jury

17    transcript is not made public record pursuant to

18    criminal rules.  Once the person has been or

19    persons have been arrested, the purpose of the

20    dealing is finished, is completed, and becomes

21    public record, and that has been the policy of the

22    Trumbull County Common Pleas Courts, since I can

25

1  remember in the early 80's, and that is why at that

2  point, that I indicated in as far as I was

3  concerned, my motion was limited for the purpose of

4  having these Defendants arrested.  They were

5  arrested and there is now a public case number, a

6  public complaint and a public affidavit.  And my

7  view is that that would be a public record.

8  However, there are Exhibits that are attached to

9  the affidavit, that are pieces of evidence, such as

10  a confession, heretofore the Supreme Court of Ohio

11  and I believe still the law has maintained that and

12  a change of venue is a remedy, if there is pretrial

13  publicity and I have for a long period of time been

14  dealing with cases where the press has access to

15  affidavits and information and we still are able to

16  obtain trials locally for example in the Stanley

17  Adams case, even though this Honorable Court had a

18  trial the year before, we tried Adams, and even

19  though the media endlessly printed in the paper

20  stories about his being, about him being a serial

21  killer and going through his record, to the

22  astonishment of many, there are people in this

26

1    county who do not read the newspapers and who do

2    not watch local T.V. and we were able to obtain a

3    jury.  I believe that I would go personally to the

4    English system where we have very little

5    information when the case is tried.  However, that

6    is not the law and that is why I express my opinion

7    to the Court at the time that these Defendants were

8    arraigned on affidavit of complaints.  I believe

9    further, however, that at this point in time, and

10   Attorney Bolton has mentioned, that I don't believe

11   the newspaper or the media can intervene in a

12   criminal case, and their remedy would be mandamus,

13   so I'll object as a matter of principle that they

14   can not intervene in this case.

15               THE COURT:  You have already stated

16   your objection?

17               ATTY. CONSOLDANE:  I'll go last.

18               ATTY. MILLETTE:  We base our motion

19   on our First Amendment right to public access

20   documents and this is particularly important in the

21   context of these documents, these are police

22   affidavits supports the arrest warrant, and the

27

1    First Amendment is in public records to access, is

2    most important in that context and the Government's

3    exercise of that kind of power.  There are many

4    other ways in which the Defendants' rights can be

5    protected, other than keeping these documents

6    sealed.  There is a change of venue.  There is Voir

7    Dire, as Attorney Watkins said, there are many

8    people who aren't going to read the papers, don't

9    even get the papers, won't see this news and I

10   think the case law strongly supports that position.

11                   THE COURT:  John?

12                   ATTY. JUHASZ:  Judge, one of the

13   first things I want to say is I understand what Mr.

14   Watkins has said about the Supreme Court's decision

15   about change of venue.  Two things strike me as

16   curious about that.  The first is that seldom do

17   they cite or go into any analysis of what I think

18   is still the seminal case, which is the Sheppard

19   case.  And that is the case that makes it very

20   clear that it is the obligation of the trial judge

21   to do what is necessary, before a trial starts,

22   before it becomes a media circus to make certain

28

1    that the Defendant's rights to a fair trial are

2    protected.  Secondly, it is easy and with all due

3    respect, I would have to say a bit cavalier for

4    representatives of the media to say, "Well, don't

5    worry, you can have a change of venue or all sorts

6    of other things that can be done."  That is easy to

7    say, but there are to my recollection about two

8    hundred people on death row, and I believe only

9    eight cases where venue has been changed and some

10   of those had to do with the Lucasville riots and

11   the reason I bring that up is because as a

12   practical matter, while everybody stands here in a

13   hearing like this and says, "Don't worry, don't

14   worry, there is a change of venue."  The fact of

15   the matter is this doesn't happen very often.  I

16   know you and I were involved in a case where it did

17   happen.  I have submitted there were other issues

18   besides pre-trial publicity that warranted that

19   particular change of venue.  With regard to the

20   media, I would have to mirror what Mr. Watkins and

21   Mr. Consoldane have said and even what Mr. Bolton

22   has agreed to and that is that the Watkins case

29

1   outside of the Eleventh District, which was tacitly

2   affirmed by that point by the Supreme Court of Ohio

3   is good law in this district.

4           THE COURT:  Do you agree John or

5   Steve that it is somewhat distinguishable from the

6   fact situation here?

7           ATTY. JUHASZ:  I don't and I'll tell

8   you why.  If you look through the Supreme Court

9   opinion, when the case got to the Supreme Court,

10  one of the things they talk about and one of the

11  things we quoted in our memo was the concern that

12  trial judges also should have, to insure that a

13  Defendant has his right to a fair trial.  There are

14  as we set forth, at least two reasons these are not

15  public records in our estimation.  Without

16  question, I think that is clear and I, and Mr.

17  Watkins have conceded as much, that is clear about

18  the items which are potentially evidentiary

19  materials.  Setting the affidavit to one side.  But

20  as we also tried to make clear in our memorandum,

21  the Watkins case and I don't see that Steckman,

22  which was the later Supreme Court case and I guess

30

1   the seminal public records case, from the Supreme

2   Court, I don't see anything in Steckman that has

3   changed what happened in the Watkins case, and in

4   those cases, they make it clear that when the

5   disclosure of those items is prohibited by State or

6   Federal law, then they are not public records.

7   That goes to the Constitutional fair trial stuff.

8           THE COURT:  Did not the previous

9   Vindicator, Watkins case go on (a)(2) of that

10  section of confidential enforcement?

11          ATTY. WATKINS:  Dealt with work

12  product and investigatory.

13          ATTY. CONSOLDANE:  I think that

14  neither the T.V. or the newspaper, or the newspaper

15  can intervene in a criminal case.  I think they

16  have a proper remedy, and it is not a motion to

17  intervene.  They can certainly file for writ of

18  mandamus to enforce that.  I don't think it is

19  proper for them to intervene in a criminal case.

20  Then, secondly, is that at this point in time, both

21  Defendants have been indicted by the Grand Jury.

22  The minutes in the Grand Jury are secret and they

31

1   are not going to be released.  If they would have

2   directly presented this to the Grand Jury, there

3   would be no need for this affidavit to have been

4   filed.  This affidavit also contained a lot more in

5   that, than what was necessary to go out and arrest

6   these two individuals.  There is a lot of things

7   that were put in there, just to appeal to people's

8   pure interest and I think that is wrong upon the

9   State to do something of that nature and also is

10  that of all of these cases that we have, in these

11  death penalty cases that do get press, it is

12  amazing that everybody comes in here and says that

13  they don't remember reading anything about it, or

14  formed any opinion, but that gets stuck in the back

15  of their minds and as soon as it is brought up in

16  Court, it triggers something and they remember, and

17  it is too late at that time for them to raise their

18  hand.  Nobody wants to admit that they read the

19  newspaper and have already formed an opinion, when

20  they come in here to sit in a trial, and it is

21  unfair to the Defendant to have to phrase it.  It

22  is the whole procedure of a death penalty case is

32

1   unfair, because you have to get jurors that wanted

2   to say, "Yes, I can invoke the death penalty."  And

3   they are already slanted towards law and order.  To

4   get this type of pre-trial publicity on things that

5   we can't comment about, and actually the Prosecutor

6   can't comment about, is a lot of that stuff is

7   evidence and a lot of stuff in that affidavit are

8   purely conjecture of what the police officer thinks

9   might have happened, because of a couple other

10  things that he has picked up as evidence.

11              THE COURT:  That is what an

12  affidavit is.  Many times it contains some

13  assumptions and conjecture based on facts that are

14  presented and then the probably cause, of course,

15  is a different standard from beyond a reasonable

16  doubt.

17              ATTY. CONSOLDANE:  One last thing, I

18  think that the newspaper and the press should be

19  able to look at that, but not until it is presented

20  in Court.  What is the difference?  They are going

21  to get it.  They are going to get to see this

22  information eventually, after it's presented in

33

1    Court.  Why is it so necessary that they have it

2    now before the Defendants go to trial?  They are

3    going to get the information.  Everything that is

4    contained in the affidavits will probably be

5    presented at trial, after a jury has been picked

6    and they have been admonished.  To keep that sealed

7    until we pick a jury, what is the different?  They

8    are going to get the information anyhow.  What is

9    the difference in the time?

10            ATTY. BOLTON:  The holding or the

11   language in <u>State, ex rel Vindicator vs. Watkins</u>,

12   that newspapers or media couldn't intervene in a

13   criminal case was essentially in that case dicta.

14   It was simply supporting the holding.  The Supreme

15   Court has made in that case and elsewhere that the

16   proper remedy after a Court has acted is mandamus,

17   which is, that is in the statute.  But as the Court

18   knows, there is a long history in Ohio of media

19   intervening in criminal cases.  For example, before

20   it was established that the media had a right to be

21   present at certain parts of the criminal case, the

22   media regularly intervened in criminal cases to

34

1   gain access to suppression hearings and matters of

2   that kind.

3                  THE COURT:  That is on a different

4   issue.

5                  ATTY. BOLTON:  I understand, but the

6   principle is the same.  We are not intervening in

7   any substantive way, we are simply speaking in a

8   forum to be heard before the possibility of our

9   rights being foreclosed comes up, and trying to

10  foreclose other lengthy litigation, which may well

11  have the effect of prejudicing the Defendant, far

12  more than anything that might be done here today.

13  The second point here is that both the statute and

14  all of the case law which bears on this issue,

15  clearly indicate that an affidavit filed with the

16  Court, filed with the Clerk of Courts here in the

17  Courthouse is a public record, and the Defendant,

18  the Defendants have the duty to show why it should

19  not be disclosed.  What they are arguing is, they

20  are arguing, "Well, this might prejudice a

21  Defendant, somehow this information might be

22  difficult for the Defendant to overcome in Voir

35

1    Dire.  Somehow this information might be

2    prejudicial if let out in the community."  But what

3    they are not able to show is why it is not a public

4    record, and why it should not be disclosed under

5    149.143 and there is a good reason for that.  There

6    is no reason why it should not be disclosed under

7    149.143 and the statute and case law is quite

8    explicit that cases, all of the cases decided under

9    149.143 says if it is filed with the Court, it is a

10   public record and even counsel for the Defendants

11   have agreed.  If an Exhibit is filed with the

12   Court, it is a public record.  Nobody even

13   questions that, well an affidavit is filed with the

14   Court, public record.  That is the end of the story

15   and whether we are simply heard on the issue, or

16   whether we are allowed to intervene on the issue,

17   that doesn't, substantially that does not matter at

18   all, what does matter is that the Court in looking

19   at the statute, hold the Defendant to their burden

20   of proof in this matter, and if they are hold to

21   their burden of proof, they can't meet it.

22

36

1           ATTY. CONSOLDANE:  He's right that

2     it is a public record, but this Court sealed that

3     public record, and we are not saying that he

4     shouldn't be entitled to it some day, I'm saying to

5     protect the Defendants' interest, leave it sealed

6     for a while longer.  And then allow it to be

7     reviewed by the press.  What harm is that going to

8     cause to the First Amendment?  It is already

9     sealed.  Give our clients a fair trial and then

10    release all of the information to the press.

11          ATTY. WATKINS:  Just to make the

12    record, the record was, we made a motion in-camera

13    pursuant to the affidavits and the warrants, for a

14    sealment for a finite period of time.  And they

15    made a motion, and I think it was Jerry, you wanted

16    to object to that, and they made a motion.

17          THE COURT:  I never granted their

18    motion, what I did was fail to act on their motion.

19    The seal was maintained.

20          ATTY. INGRAM:  The Prosecution moved

21    to seal, the Prosecution then moved to unseal.  I

22    objected.

37

1        ATTY. WATKINS:  No.  The original

2   motion ex-parte was, we made a motion, when we got

3   together and Paul Monroe came in, we made a motion

4   to seal until the Defendants were arrested.  That

5   was the motion.

6        ATTY. CONSOLDANE:  We don't know

7   that.

8        ATTY. WATKINS:  I mentioned to the

9   Court under the motion granted, that it should be

10  unsealed.  That is the standard motion that I make

11  in all of these for the last 20 some years.

12       THE COURT:  Let the Court of Appeals

13  deal with that.  Criminal case is a case between

14  the State and an individual or individuals.  They

15  are the only parties to the action.  The news media

16  have no right to intervene in this action.  They do

17  have a right to mandamus under the information act

18  for public records.  There is no question the

19  affidavit, upon which the warrants were issued has

20  been filed.  I think anybody other than somebody

21  representing a news organization would have to

22  agree that the English have a better system to see

38

1    that this abstract thing of justice is probably

2    done, because inevitably, it divulges upon so many

3    people to sit and listen to the facts.  We can

4    argue both sides all day and never come to any

5    reasonable conclusion as to what effect it has on a

6    trial.  Any sane person has to acknowledge that

7    pre-trial publicity has at times a monumental

8    affect upon a fair trial.  But we happen to live in

9    a country, which has, thank God, the bill of rights

10   and one of those is the First Amendment right.

11   Although the newspapers seem to think that is

12   exclusively their right.  It is a right that

13   belongs to everyone.  The newspapers have no

14   greater right than any other individual to the

15   rights contained in the First Amendment.  You

16   wouldn't believe that by reading some of the cases.

17   In any event, the public record law has exemptions.

18   The case alluded to before against Mr. Watkins from

19   the Vindicator dealt with this (a)(2) which was

20   confidential law even for the investigator, and the

21   case went through great length through the history

22   of what happened and how they were called in.  The

39

1  newspaper was trying to get the material found by

2  that investigation.  There is another essential,

3  (a)(4) that says trial preparation record means any

4  record that contains information that is

5  specifically compiled in reasonable anticipation of

6  in defense of, a civil or criminal action.  I don't

7  know that that directly applies here.  It goes on

8  to say including the independent thought process

9  and personal trial preparation but that says,

10  specifically compiled in reasonable anticipation

11  of.  I would think that this affidavit is

12  specifically compiled in anticipation of, but it is

13  filed as a public record, and here's the rub on

14  this whole thing, which the upper Courts are going

15  to have to deal with.  We all start out and say, we

16  got to balance the First and Sixth Amendment right

17  of Defendant to have a fair trial.  If you accept

18  the undebatable fact that pre-trial publicity

19  contained at trial, the Courts have held, well, you

20  have right to Voir Dire, and then you end up with

21  what the Defense is afraid of here, people get up

22  and say, "No, I don't remember anything about it.

40

1    I read something about it, and I don't recall the
2    details." That is for anybody who reads the
3    newspapers, a person who takes the time of reading
4    a newspaper is usually of the level of intelligence
5    that they aren't going to be so cavalier as I would
6    get, but that is part of the system. The Courts
7    say, Voir Dire can cure that. And they say that if
8    you can't, then you have the change of venue to
9    cure it. And then it is transferred to another
10   jurisdiction, where it is put in the news media
11   again. I would note, for the Appeals Court that
12   the affidavit contains facts, some conclusions,
13   which are absolutely necessary in order to get a
14   probable cause finding. The thing that does
15   concern me is so many quotes contained in here,
16   that I think should be evidentiary material. I
17   think it is possible to go through this affidavit,
18   to give to the media all of the necessary details.
19   I don't really agree, although I have ruled, you
20   are not a part of it, you will be granted an
21   opportunity to express your opinion. The whole
22   purpose for the First Amendment is to keep

41

1    Government honest.  Things don't happen in secret,

2    what have you.  You have perhaps the duty, by way

3    of the media to make sure that when the Government

4    is prosecuting, that the public is informed as to

5    the basis of it, otherwise you could hold people

6    for long periods of time and nobody would know

7    whether or not the Government is acting on good

8    grounds or not, so that is the right we don't want

9    to give up.  But the other aspect and I think it is

10   very present in this case is there is a salacious

11   part of this that everyone just kind of has picked

12   up, must be present.  That is the part that

13   concerns me, because that doesn't add anything to

14   the First Amendment, it might be good for selling

15   newspapers or T.V. programs, but that is the part

16   that concerns me where we start getting into the

17   balancing act with the Sixth Amendment right being

18   affected.  Mr. Juhasz has mentioned that the Court

19   has to do a balancing act at some point.  I think

20   that this public records act is short sides in some

21   way, but it is the law we must follow.  I think

22   what I'm going to do here is to order that the

42

1    Prosecution turn over most of this affidavit, with

2    certain parts redacted and I am doing that, by

3    saying that those portions may be very essential to

4    the Defense, does not hinder the Prosecution in any

5    way, except that it keeps out some of these matters

6    that have no justifiable use at this point, other

7    than to possibly taint a future jury pool.

8              ATTY. BOLTON:  Speaking perhaps as

9    an officer of the Court and not as an intervenor,

10   if I may, I had heard, I don't know what is in this

11   affidavit, but I have heard perhaps rumors that

12   there was some material in it that might be

13   interesting, but not particularly publishable.

14             THE COURT:  That is true.  I think

15   some of this you would not publish because of its

16   very nature.  It would not be in good taste.

17             ATTY. INGRAM:  You can't speak for

18   the Tribune.

19             ATTY. BOLTON:  Anticipating that

20   such an issue might come up, I believe that the

21   Supreme Court has spoken to this issue, and I refer

22   to State ex rel Beacon Journal Publishing Company

43

1   vs. Maurer, 91 Ohio St. 3rd, 74.  It was decided on

2   February 14th of this year and if I might read a

3   little portion of this.  This was about incident

4   reports, which everybody considers to be public

5   records, and incident reports don't even rise to

6   the level of filing like an affidavit, which is far

7   more clear.  The Court ruled that incident reports

8   which contain material from 911 tapes were public

9   records, even though the stuff from the 911 tapes

10  might not be otherwise public records and it said,

11  "We rule this way despite the risk that the report

12  may disclose the identity of an uncharged suspect.

13  A deputy incorporated the typed narrative

14  statements by reference in the incident report.

15  He consequently incorporated them in a public

16  record.  He can not now remove the public records

17  cloak."  "It does not matter that release of the

18  tapes might reveal the identity of an uncharged

19  suspect or contain information, which if disclosed,

20  would endanger the life of physical safety of a

21  witness."  "Once clothed with the public records

22  cloak, the records can not be defrocked of their

44

1    status."  Now, what this case says and what the

2    Supreme Court has said, is that once material that

3    would otherwise be prohibited from disclosure under

4    the public records act is placed in a public record

5    act, in a --

6                    THE COURT:  You are saying once it

7    is turned over you can't ever get it back?

8                    ATTY. BOLTON:  In this cae, it was

9    an incident report, what the Court has before it is

10   an affidavit.  Everybody concedes an affidavit is a

11   public record.  This affidavit may contain

12   material, which the Court believes in good

13   conscience ought not to see the light of day, for

14   reasons of either good taste or for reasons that it

15   might make it more difficult to pick a jury, but it

16   is an obtained public record status by reason of

17   the fact that it is included in the body or

18   attached to an affidavit and therefore, I believe

19   the Supreme Court has ruled that it must be

20   disclosed.

21                    THE COURT:  You are saying that the

22   Supreme Court by virtue of that case, just gives

45

1    the total power to the Prosecution, the State, to

2    put it all out there, and let the newspaper grind

3    it up.

4              ATTY. BOLTON:  Having defended, I

5    have never been a Prosecutor, but I have defended a

6    few people here and there, and as we all know,

7    there is more than one type of affidavit.  There is

8    a notice affidavit, which basically sets out the

9    basic elements of the crime and little else, and

10   then there are affidavits such as we have seen come

11   through in the course of all of the prosecutions

12   from Mahoning County, against the judges and

13   lawyers, which are extra ordinarily detailed.

14   Extra ordinarily detailed and contain virtually the

15   Government's entire case.  And the Government has a

16   right to do that.  They have the right to, they

17   have the right to file an affidavit which contains

18   their whole case, and risk the possibility that it

19   may, that the defense may come back and say, you

20   prejudiced our client, we have to have a change of

21   venue, and force the Prosecution to go out of the

22   county.  Now the Prosecution knows that when it

46

1    files the affidavit and knows that it is giving the

2    Defendant's remedies, both at the trial level and

3    subsequent, down the years on appeal on a capital

4    case.  Now, the Prosecutor in this county is

5    unusually experienced in capital cases.  He's had

6    quite a number of them, which he's tried himself,

7    so the Prosecutor in this case knows what he's

8    doing in capital cases.  Whatever other

9    disagreements I have had with Mr. Watkins over the

10   years, he does know what he's doing in capital

11   cases and if he chooses to say put the matter in an

12   affidavit, it is because he thinks the public ought

13   to know about it and Court ought to know about it.

14              ATTY. CONSOLDANE:  Let me say one

15   thing, is that Mr. Watkins would not go and say any

16   of these things in the newspaper.  He'd be barred

17   under the code of ethics, you can't talk about the

18   case.  This is a way around him being able to

19   discuss his case, to the public, by putting it in

20   an affidavit.  It is an affidavit, I have to agree,

21   it is filed there, and it is subject to being

22   public information, but there is nobody that said

47

1   when it has to be released.  It doesn't have to be

2   released today, tomorrow or next week.

3                    THE COURT:  If it is a public

4   record, it's a public record.

5                    ATTY. CONSOLDANE:  If it was just a

6   public record if it was just filed, that is correct

7   but it was under seal, there is not one case that

8   says when it has to be unsealed.

9                    ATTY. WATKINS:  May I respond?

10  John, do you want to go first?

11

12                   ATTY. JUHASZ:  I wanted to clear up

13  a couple of things, one if it is not clear, our

14  motion is that we don't agree with Mr. Bolton that

15  it is a public record.  I understand what the Court

16  is saying, and the authority for that is not only

17  in the Statutes, but in the Watkins case.

18                   THE COURT:  Where do you get the

19  authority under the statute?

20                   ATTY. JUHASZ:  Under statute and I

21  am talking about the statute as it is presently

22  numbered.  It is (a)(1)(q) and basically if you

48

1   will permit me to paraphrase it, it defines public

2   record as being records kept by public office

3   except that public record does not mean any of the

4   following, and when you drop down to (q), it says

5   records the release which is prohibited by State or

6   federal law.  Now, while that might sound

7   unnecessarily broad, that doesn't give us a whole

8   lot of guidance.  Let me direct the Court to the

9   quote we have on page 3 of our memo which is from

10  the Ohio Supreme Court in again, <u>Vindicator</u>

11  <u>Printing vs. Watkins</u>, and the first thing to do of

12  course is talk about the concerns the United States

13  Supreme Court had in <u>Sheppard vs. Maxwell</u>.  "Many

14  devices are available to a trial court to prevent

15  the prejudicial effect of such pretrial publicity,

16  including a change of venue and sequestration of a

17  jury.  However, if during the pendency of the

18  criminal proceeding, such measures have not been

19  undertaken or are ineffective in assuring an

20  impartial determination of the issues and a danger

21  of material prejudice to a criminal defendant is

22  posed thereby, the criminal defendant clearly

49

1  possesses standing to challenge the release of such

2  information in an action brought pursuant to R.C.

3  149.43.  Inasmuch as such disclosure would

4  prejudice the Defendant's rights under the State

5  and Federal Constitutions, the information at issue

6  would constitute records the release of which is

7  prohibited by State or Federal law."  The Ohio

8  Supreme Court has said that if these are records,

9  the disclosure of which would prejudice the

10  Defendant's rights under the State and Federal

11  Constitutions, and again by implication, state

12  Constitutional rights, then under (q), they are not

13  in fact public records.

14          ATTY. BOLTON:  Assuming you're

15  right, where's the beef?  Where's your showing of

16  prejudice?

17          THE COURT:  That gets to the very

18  heart of this argument here.

19          ATTY. WATKINS:  I need to respond.

20  I would like to indicate that the affidavit that

21  was filed, I think it is clear that in our opinion

22  that there is some discretion with the Court and I

50

1  have already reiterated it twice, once the reason

2  for the sealment is completed, per the original

3  motion, then it becomes a public record.  I want to

4  go back to a case with Dave McLain, with the Danny

5  Lee Hill case where Jim Lewis made a motion to

6  close the Courtroom for the suppression hearing

7  confession, video confession, which is as awful and

8  salacious as any confession anyone would hear, and

9  I agreed with Defense counsel to close the

10  Courtroom.

11           THE COURT:  And that, of course, is

12  improper.

13           ATTY. WATKINS:  And participation,

14  but the bottom line is that Ohio law, well, you can

15  close the Courtroom, but you have to have a hearing

16  to show that there is this prejudice which John

17  alluded to, and at that point in time, Judge McLain

18  overruled both motions, where I joined in, and it

19  was made public, and there are a lot of confessions

20  that right before trial, that we ar going to play

21  in Court that are very salacious and these other

22  evidence and letters are going to be public.  This

51

1    is prejudicial.  Timing may be of importance as to

2    when something is released at suppression right

3    before trial or at the initial appearance.  If I

4    had my way, I would have the -- I think the other

5    problem here is that you have a number of cases,

6    since Sheppard that modify and we are dealing with

7    McVeigh, just looking at the publicity of the

8    McVeigh case, Murphy vs. Florida which discusses

9    pre-trial publication where we deal with the media

10   presence in the Courtroom, right to T.V. cameras,

11   we have historically taken the First Amendment and

12   given the information to the press, and we have

13   been able to go through the process.  I objected

14   when Robert Parks, when the T.V. cameras wanted to

15   go into the Courtroom, because I have felt this

16   kind of publicity is negative.  I still have great

17   concern for it, but in my opinion, the Court has

18   here, a public document, that contains in my

19   opinion, evidence that goes to circumstantial

20   evidence dealing with motivation, which proves

21   probably cause in this case.  And so it is subject

22   to some control and should be subject to more

52

1   control by the Court, but the problem I see is the

2   historical development in the past 20 or so years

3   against the Sheppard case, especially with the

4   public records law.  I have no problem with the

5   Court ruling in the sense that I agree with the

6   fact that there should be some control dealing with

7   for example letters or maybe parts of the

8   affidavit, but I'm not too much in favor of the

9   climate here is not as good as it should be and I

10  think the law dealing with, that dealing with the

11  911 tape, where it is an incident report, it is a

12  public record, is different from when we are

13  dealing with filing an affidavit and the control of

14  the proceedings and the Court record, so I think it

15  is a gray area here and I guess that is where I am

16  ending.

17          THE COURT:  I think we have a public

18  record that's been filed.  The Court has listened

19  to arguments from all sides.  I agree with the case

20  cited by Mr. Bolton that once you have a cocoon

21  that goes into a butterfly, you can't put it back

22  into the cocoon.  So it is a public record.  But I

53

1    think that the Court still has a duty to see that

2    the First Amendment is complied with and that is to

3    give the media the basic information as to why this

4    charge is pending.  I think there are portions of

5    this affidavit, that there is no legitimate use for

6    the newspaper to have when balancing against the

7    right of the Defendants.  This information will

8    come out during trial.  There is no harm done to

9    the public in the meantime, and I'm going to order

10   that portions of it be redacted.  I would suggest

11   that that be done with both input from the State

12   and the Defense and the balance of that will be

13   turned over to the news media as soon as possible.

14   That is the only thing I can see here.  If I had my

15   druthers, I would give the press none of this,

16   because it does nothing except cause possible

17   prejudice in picking a Jury.  They will find out

18   about it in due course, but I don't think that the

19   law permits me to take that position.  I think that

20   the public records law quite clearly explains this

21   or shows this to be a public record and I don't

22   think the exceptions apply, with all due respect,

54

1   Mr. Juhasz, I see a difference between this and the

2   argument made in the previous <u>Watkins</u> case.  Jerry,

3   you have been awful quiet.  That bothers me, but

4   that will be my ruling.  I would ask someone from

5   both sides here to get together with this affidavit

6   and go through that and give them that as soon as

7   possible.

8                ATTY. WATKINS:  Then the Court will

9   decide if we can't agree.

10               ATTY. BOLTON:  Your Honor, may it

11  please the Court, having heard the Court's ruling,

12  it is my understanding that the Court intends that

13  the parties review this affidavit, then submit and

14  ten say, "All right, these are the parts that we

15  would jointly like to be redacted."  I would

16  request that the Court, nevertheless exercise its

17  independent judgment.

18               THE COURT:  I'm asking them to get a

19  proposal.  It will be my call on it, and I'm sure

20  they are not going to agree on all parts.  Of

21  course, the original affidavits are a part of the

22  record that will be available for review by the

55

1   Court of Appeals.

2            ATTY. BOLTON:  And the second

3   request I have is that the Court place a deadline,

4   so that the news media, this is a --

5            THE COURT:  I would hope by tomorrow

6   morning this could be done, if not today.

7   Wednesday morning.  Tell them by mid-morning, if

8   somebody wants to stop here and pick it up.

9            ATTY. WATKINS:  I'd like to go on

10  record, once the press leaves.

11           THE COURT:  Do you waive the

12  presence of your client?

13           ATTY. CONSOLDANE:  Depends on what

14  he's going to say.

15           THE COURT:  Waive his presence until

16  we find out?

17           ATTY. CONSOLDANE:  Until we find

18  out.

19           ATTY. WATKINS:  I will say this that

20  the State is taking the position --

21           ATTY. JUHASZ:  We also waive the

22  presence of the Defendant.

56

1            ATTY. WATKINS:  We take the

2    position, looking at the history of affidavits and

3    referring to confessions and to different things

4    that to be consistent, it is our position that the

5    affidavit, as it stands is public record, and we'll

6    participate, but that is our position that the

7    affidavit -- however, I believe that the Exhibits

8    are excludable because that is in my mind evidence.

9            ATTY. CONSOLDANE:  How about the

10   drawings?

11            ATTY. WATKINS:  I think that the

12   Exhibits themselves, the letters themselves are

13   going to be introduced, however, to go through a

14   journey of picking out what is good and bad in the

15   affidavit for release, which we'll do pursuant to

16   Court order, we would note we would object as a

17   matter of policy.

18            THE COURT:  They are not part of the

19   thing.  I'm going to order that the Exhibits are

20   not included.  That is not to be given to the

21   media.  That is evidence.

22            ATTY. WATKINS:  I can defend the

57

1   Exhibits, but I cannot defend the redacting of an

2   affidavit, because there are many in the past and

3   in the future, where we'll be doing this quite a

4   bit.

5          THE COURT:  I am looking here this

6   morning and I couldn't see -- there's a whole bunch

7   of evidence that is -- what I was thinking to begin

8   with that should not be in here.  I'll make this

9   very simple.

10          ATTY. WATKINS:  We have quotes from

11   evidence and there are going to be confessions and

12   motivation, we can't create the scenario here.

13          THE COURT:  The affidavit will be

14   given, no attachment.  You don't have to redact.

15   (End of in-chamber discussion.)

16

17   IN OPEN COURT AT 12:05 P.M.:

18   Arraignments before Judge Stuard

19          THE COURT:  Case number 01-CR-793,

20   State of Ohio versus Donna Roberts.

21          ATTY. INGRAM:  This is the

22   Defendant, Donna Roberts.  She will acknowledge

58

1   receipt of the copy of the indictment, she has read

2   the indictment, she's discussed it with counsel.

3   She understands the allegations contained therein,

4   and at this time, she would waive the reading and

5   she would enter a plea of not guilty to each count,

6   and each specification attached to each count.

7               THE COURT:  That plea of not guilty

8   is entered for the record.  Concerning bond, Mr.

9   Watkins?

10              ATTY. WATKINS:  This is a capital

11  offense, where the presumption is great from the

12  evidence contained in the affidavit, no bond should

13  be given.  It is the State's position, there should

14  be no bail in this case, and for both cases.

15              ATTY. INGRAM:  Donna is 57 years of

16  age.  She has no prior criminal record.  She has

17  been a resident of Trumbull County for a prolonged

18  period of time.  She owns real estate here.  Her

19  family resides in this area.  And we would

20  accordingly request that the Court set a reasonable

21  bail.

22              THE COURT:  I'm not going to set any

59

1   bail at the present time.  I'm going to ask, if you

2   wish to have a pre-trial set now, or if you wish to

3   take care of that.  We should have a definite date

4   as to the next step on this.  Do you have a date in

5   mind?

6                ATTY. INGRAM:  I would suggest 30

7   days.  It would be incumbent upon the Defense to

8   request discovery and in order for a pre-trial to

9   be meaningful, we should have some discovery in our

10  possession by the date of pre-trial.  30 days would

11  seem reasonable to me.

12               ATTY. WATKINS:  That is fine.

13               THE COURT:  I'm going to set this

14  for the afternoon of January 30, which is a

15  Wednesday, and at that time, if need be, we'll

16  revisit the question of bail, but for the time

17  being, there is no bail set.

18               ATTY. INGRAM:  Thank you, Your

19  Honor.

20               THE COURT:  State of Ohio versus

21  Nathaniel Jackson.  Case number 01-CR-794.

22               ATTY. CONSOLDANE:  This is Nathaniel

60

1   Jackson and he's received a copy of his indictment,

2   has read it, and understands the same, including

3   the possible penalties.  Waives any further reading

4   in open Court, and would like to enter a plea of

5   not guilty and request that a reasonable bond be

6   set.

7              THE COURT:  Pleas of not guilty are

8   entered.  Mr. Watkins?

9              ATTY. WATKINS:  We make the same

10  recommendation, no bail.

11             THE COURT:  There will be no bail

12  set.  Pre-trial will be the same date, January 30,

13  2002.  There is another matter before the Court,

14  which we have had extensive discussion with all

15  parties, including representatives of the press,

16  and although the Court has ruled that the press

17  cannot intervene in this matter, I did extend the

18  courtesy of allowing their counsel to participate

19  by way of assisting the Court in resolving the

20  matter.  The Court sealed the affidavits in this

21  matter, prior to the warrants being issued.  That

22  is commonly done.  There was a motion by both

61

1   Defendants at the initial hearing, wherein it was

2   requested the Court not break that seal until

3   further argument had occurred.  We had extensive

4   argument from all interested parties this morning,

5   and the Court's resolution is that once the

6   affidavit was filed, it is a public record.  There

7   was also, there were also attachments to that

8   affidavit, which the Court has ruled, based on the

9   Sixth Amendment rights of the Defendants, that

10  those will not be unsealed, until they are

11  introduced at trial, and at that time, they will be

12  within the public record domain.  The Court is

13  called upon to, at times, balance the Sixth

14  Amendment rights of any particular Defendant

15  against the right of the public to know under the

16  First Amendment.  The public will have access by

17  way of the affidavit to all factual matters and

18  content upon which the affidavit was originally

19  filed to get the arrest warrant, and that is my

20  humble attempt to try to rationalize the situation

21  that we are at presently.  The media will have an

22  opportunity to pick up a copy of the affidavit this

62

1    morning, if they wish to wait around, and the Court

2    will have the matter, has the matter set for

3    hearing on January 30, 2002.  Everyone have a nice

4    New Year.

5              ATTY. CONSOLDANE:  Do you want to

6    pick a date for motions, we are going to need a

7    date for that.

8              THE COURT:  I anticipate that

9    discovery will be given.  You will get your motions

10   filed within the next two months.

11             ATTY. WATKINS:  We'll have to

12   consider speedy trial and evidentiary problems,

13   with a number of witnesses from all over.

14             THE COURT:  Let me ask that the

15   parties involved here, get a schedule and submit it

16   to me for approval.  We have the overriding problem

17   here.

18             ATTY. WATKINS:  I'll talk to both

19   sides.  We'll talk to both sides and try to work

20   out a schedule and get back to the Court within a

21   week or so.

22             THE COURT:  That is fine.

63

1          ATTY. CONSOLDANE:  Even though I

2    made a lot of my reasons on the record in there, I

3    wanted to make it clear that I am still objecting

4    to the release.

5          THE COURT:  All objections are

6    noted.

7    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

8    HEARING)

9          ATTY. WATKINS:  The Court at side

10   bar, the Court also included a two page affidavit

11   for a search warrant as being the public record,

12   with the same caveat that none of the letters or

13   Exhibits are to be given for that second affidavit.

14   I am simply clarifying what was discussed at side

15   bar.

16   (COURT IN RECESS)

17

18

19

20

21

22

64

1   Wednesday, January 23, 2002,  In Open Court

2   at 2:00 p.m.:

3   WAIVER OF SPEEDY TRIAL:

4           THE COURT:  This matter is before

5   the Court this afternoon after having engaged in

6   pre-trial a discussion with counsel for the State

7   and the Defendant, Mr. Nathaniel Jackson.  I

8   understand, Mr. Jackson, that you have talked with

9   your attorneys concerning a waiver of speedy trial,

10  is that correct?

11          THE DEFENDANT:  Yes, Sir.

12          THE COURT:  This matter would have

13  to be brought to trial by the end of March of this

14  year.  That does not allow either side very much

15  time for preparation.  It is my understanding from

16  talking to both sides that there's an agreement

17  that the matter would be set over until October 7

18  of this year which would allow sufficient time for

19  both sides to prepare, is that correct?

20          MR. WATKINS:  Yes, Sir.

21          THE COURT:  You understand that you

22  have a Constitutional and statutory right to have

65

1   this matter brought to trial within that 90 day

2   period, and that by your agreeing to waive that

3   time period, you are in effect permitting the State

4   to bring this to trial at a later date.  You

5   understand that?

6               THE DEFENDANT:  Yes, Sir.

7               THE COURT:  Is it your wish that I

8   approve that?

9               THE DEFENDANT:  Yes, Sir.

10              THE COURT:  I have the waiver of

11  speedy trial, which has been duly signed by the

12  Defendant and counsel.  This matter will be set for

13  Jury trial on October 7, 2002, which is

14  approximately a 250 day continuance.  I'm sorry,

15  October 8th.  I'll approve that waiver.  We have

16  agreed upon a time for the usual motions that are

17  filed in March and you will -- and do you have a

18  definite date?

19              MR. WATKINS:  For the record, I

20  understand that counsel have discussed with the

21  Defendant the waiver of speedy trial and there's a

22  written waiver.

66

1              MR. LEWIS:  Yes.

2              THE COURT:  I asked if he talked

3     with his attorneys.  They have answered all of your

4     questions, so you know what you are doing here, is

5     that correct?

6              THE DEFENDANT:  Yes, Sir.

7              THE COURT:  Do you have any

8     questions at all about what you are doing?

9              THE DEFENDANT:  No, Sir.

10             MR. CONSOLDANE:  We have a motions

11    hearing set for March 20th and a suppression

12    hearing, if needed, set for April 17th.

13             THE COURT:  I trust that discovery

14    will take place between both sides.  In the

15    meantime you get back here, we'll handle those

16    motions and see where we're at.  Anything further

17    before the Court on this matter today?

18             MR. CONSOLDANE:  No, Your Honor.

19             MR. WATKINS:  No, Your Honor.

20             THE COURT:  Thank you all very much.

21    (Court adjourned at 2:03 p.m.)

22

67

1    Wednesday, March 20, 2002; In Open Court at 9:45 a.m.

2    Hearing on motions:

3                    THE COURT:  We're here this morning

4    on Case No. 01-CR-794, State of Ohio versus

5    Nathaniel Jackson.  There is before the Court 73

6    separate motions, which are to be argued filed by

7    Defendant.  Mr. Consoldane, do you wish to address

8    your first motion?

9                    MR. CONSOLDANE:  Yes, Your Honor.

10                   THE COURT:  For the record, I'm not

11   going to rule directly on all of these today.  I

12   may rule on some of them.  Others may be

13   appropriate for me to write an opinion on.  Let's

14   proceed.

15                   MR. CONSOLDANE:  We request that you

16   rule on all of these motions prior to the beginning

17   of trial.

18                   THE COURT:  The Court will do that.

19                   MR. MORROW:  Some of them are not

20   appropriate to rule on.

21                   THE COURT:  Other than those that

22   can't be ruled on until trial or during trial.

68

1           MR. CONSOLDANE:  The first three

2   motions, the motion for Bill of Particulars and the

3   motion for Discovery have been partially complied

4   with by the State, and I don't think they have any

5   objection to you granting those two motions, and I

6   imagine they have always have in the past and will

7   continue to comply with the statute.

8           THE COURT:  They are in the process

9   of complying with it.

10           MR. CONSOLDANE:  That is correct.

11   And motion number three has already been granted by

12   the Court and we have already employed the use of

13   our mitigation expert.

14           Then coming to motion number four is that

15   we were asking for a comprehensive Voir Dire.  We

16   think that that is important in a capital case and

17   we believe that it is necessary to preserve the

18   rights and I believe that the State has filed an

19   answer to that.

20           THE COURT:  That will be granted and

21   the Voir Dire will be conducted as we have done in

22   the past cases.

69

1          MR. WATKINS:  For the record, we did

2    file a response and our position is as the Court

3    has indicated, that it be done as in the past.  Our

4    concern that the Morgan v. Illinois case, which

5    dealt with a person that is always asking for the

6    death penalty would not be qualified for the case.

7    He or she would not be a fair juror.  However, we

8    believe that the gist of the Defense motion

9    suggests that there's an unlimited time period and

10   Ohio law is very clear that this Court has

11   discretion to control the questioning and give wide

12   latitude and we would cite and factor State v.

13   Getsy in dealing of how it should approached.

14          THE COURT:  It is without argument,

15   I guess, that the comprehensive has to be

16   determined by the Court.  Number five.

17          MR. CONSOLDANE:  That is for

18   individual sequestered Voir Dire.  In the past,

19   Courts have always agreed to allow us to do it this

20   way and we would like to continue.

21          THE COURT:  That will be granted

22   under the guidelines as utilized in the past.

70

1  Number six.

2              MR. CONSOLDANE:  This particular

3  motion we're asking that we be able to have a

4  hearing to determine what experts are going to say

5  before they come into trial.

6              THE COURT:  The State's response to

7  that?

8              MR. WATKINS:  Looking at number six,

9  we have filed a memorandum in opposition because

10  the basis of the motion is that we should be having

11  a hearing as to admissibility virtually on

12  everything that is going to take place.

13         And looking at 104 and a review of Rule

14  104, would suggest that we would have an in-camera

15  or preliminary hearing dealing with such things as

16  suppression, motion in limine, but not to deal with

17  everything that would be taking place at trial.

18  Obviously we would have a mini trial, if we take a

19  literal interpretation of 104 that all of our

20  evidence, we would have to have a hearing

21  concerning its admissibility.

22              THE COURT:  I did not read 104 in

71

1   that light.  I think the proper ruling at this

2   point is that the Court will take the motion under

3   advisement and any portion of the trial that the

4   Defense feels that some sort of in-camera or motion

5   in limine examination be conducted by the Court,

6   then I'll consider it at that appropriate time.

7            MR. CONSOLDANE:  Motion number 7 is

8   that all side bar proceedings be recorded.

9            THE COURT:  Well, we ran into this

10  in one of our cases prior.  I think Dennis was

11  involved in that and it caused some additional work

12  on the appeal because there were some times when

13  somebody approached to say, "I have got to use the

14  bathroom," and we didn't put it on the record what

15  the side bar conversation was.  So, the way I'm

16  going to handle this is I'll make every effort to

17  ensure that all side bar conversations are on the

18  record, but it is up to the parties themselves to

19  have an equal responsibility to protect the record.

20  If somebody doesn't get on there, you are on notice

21  that you are doing that at your own jeopardy if you

22  fail to.

72

1          MR. CONSOLDANE:  Also I think that

2    probably we should put on -- a lot of times we

3    approach the bench just for a matter of whether

4    we're going to take a break or go to lunch and it

5    has been the policy in the past to then inform the

6    Court Reporter that that is all we discussed.

7          THE COURT:  What I usually have done

8    here since this last case I am referring to is say

9    something to the effect, "Do you waive any

10   recording of the side bar?  The side bar was

11   nothing of substance, do you waive the record?"

12         MR. WATKINS:  I think that any time

13   that Attorney Consoldane and Attorney Lewis wants

14   it on the record, we go to side bar, it should be

15   incumbent upon them, "We want it on the record,"

16   because if I have something substantive, I'll say,

17   "That is going to be on the record."  And I'm sure

18   Attorney Consoldane and Attorney Lewis will do the

19   same.  Most of the time when we have these side

20   bars, one side or the other is asking for a break

21   and need to go to the bathroom, it is not

22   consequential.  And if it is consequential, I

73

1  should say it to the Court or the Defense should

2  say it to the Court.

3          THE COURT:  Right.  I agree.  I'll

4  make every effort to make sure that something is

5  placed on the record.

6          MR. CONSOLDANE:  Motion number eight

7  is that regarding the Defendant's other acts that

8  we're requesting that the State not be permitted to

9  say anything about his record until such time as

10  the Court rules that that would be admissible.

11          MR. WATKINS:  We filed an answer.

12  The exclusion of other evidence is within the

13  discretion of the Court heretofore, and it will be

14  and it is the State's policy, if we intend to go

15  into other acts, other crimes, we'll make a motion

16  or bring it to the attention of the Defense before

17  we would do that at the trial setting.  There are a

18  number of situations, for example in this case,

19  that you have the Defendant in prison and making

20  telephone calls dealing with a plan to kill the

21  victim.  Obviously the background dealing with the

22  fact that he's under sentence is relevant and

74

1    material as background information, so it is going

2    to be difficult at this point to deal with all of

3    the possibilities in this case, save and except

4    that the State would as it always has, bring it to

5    the attention of the Court that if we're going to

6    try to go into other acts.  Otherwise with

7    discovery, I think Attorney Consoldane and Attorney

8    Lewis would know where we're going and would be

9    able to make their motions at the appropriate time.

10          MR. CONSOLDANE:  That is the reason

11   we're making the motion at this time, basically for

12   a motion in limine that they not talk about this

13   during Voir Dire or opening.  That will give us a

14   chance, when they get into the case, we can look at

15   what specifically, whether they are going to bring

16   that up and address it.

17          THE COURT:  Here's the problem with

18   what you have just said.  In the opening statement,

19   if I followed literally what you are asking for,

20   that would mean that the Prosecution would not be

21   able to get into the fact that your client was in

22   prison at the time, that part of this started to

75

1   develop as according to the theory of their case.

2              MR. CONSOLDANE:  If they have

3   recorded and written conversation, where does it

4   matter that it came from at this point in their

5   opening?  They don't have to say that it came from

6   prison at that point.

7              THE COURT:  I don't know how -- it

8   is a fact, he was in prison.  It is a fact that

9   that is something that is not going to be excluded

10  on the basis of other acts.  Now if they try to get

11  into why he was in there or something, that is

12  similar to this incident, then that falls within

13  the purview of where we would have to sit down and

14  I would have to make a ruling as to whether I'm

15  going to allow them to have it in.  I don't think

16  it extends to the extent that you do and that will

17  be my ruling on it.

18             MR. CONSOLDANE:  We want to note our

19  objection for the record.

20             Motion number 9.  We have gone through

21  this one before that to prohibit the Prosecution

22  from telling the Jury that a verdict as to death is

76

1   only a recommendation, that we're objecting to the

2   State being able to tell the Jury that the sentence

3   of death is only a recommendation to the judge.

4            THE COURT:  The State's position?

5            MR. WATKINS:  This issue has come up

6   repeatedly and the law is that the Jury's role is

7   to recommend an appropriate penalty.  I'll agree

8   with the Defense that if the State and a

9   representative of the law would say it is only a

10  recommendation that we would diminish the

11  responsibility of the Jury.  We would never do

12  that.  That would be something we would not do and

13  I would cite that there's a number of cases dealing

14  with it.  Citing the law or representing the law to

15  the Jury, whether it is the Court or the Prosecutor

16  or the Defense is appropriate, if it is represented

17  in a true and legitimate manner.  The case that I

18  would cite is State v. Davie, where this issue was

19  litigated and the Supreme Court said it is

20  appropriate to say recommendation, because that is

21  the law.

22           THE COURT:  It is the law.  It is up

77

1    to the Judge to instruct on the law, but there are

2    many times where both the Defendant and the

3    Prosecution -- an example is beyond a reasonable

4    doubt.  It is not unusual at various portions of

5    the trial, during the opening statement, closing

6    argument for points of law to be given by counsel

7    because they are basic points of law that are very

8    essential to the case.

9         Again, I think it is a matter of degree

10   as counsel points out, if there was some attempt on

11   behalf of either side actually to say, "Well, your

12   job isn't that important."  You merely make a

13   recommendation.  The Judge has to make the decision

14   there, because that isn't the true content of the

15   law.  The Jury decides the recommendation, which as

16   we all know, the Court has to review, and if

17   there's a basis for that recommendation, to accept.

18   The Court has ultimate power to reject that, but it

19   can't be just on the Judge's personal feelings.  It

20   has to be on some basis of law.  I think we all

21   understand where we're at on that one.  I'll grant

22   the motion to the extent of my commentary here.

78

1          MR. CONSOLDANE:  Motion number ten

2    is that we're requesting that the State disclose

3    their rebuttal witnesses.  For us to wait until

4    after trial is completed won't give us enough time

5    to properly prepare.

6          MR. WATKINS:  Your Honor, in this

7    case, we have provided discovery and a list of

8    witnesses and those witnesses would include the

9    ones that we intend to call on direct and ones that

10   we reasonably anticipate in rebuttal.  Obviously we

11   don't know some of the witnesses that any

12   Prosecutor would call or any Plaintiff would call

13   until the Defense would present their side of the

14   case.  So, in light of the case of State v. Howard,

15   which is cited in our memo, we'll do our best to

16   follow the law.  And I would note that in this

17   case, as we have with others, on a per case basis,

18   we're going to make available three weeks to a

19   month before trial the complete file that the

20   Prosecution has in this case including witness

21   statements.

22          THE COURT:  I thank you for that.

79

1   Makes it a lot easier on my part.  In regard to

2   this disclosure of rebuttal witnesses, I think that

3   rule is there for a very good reason, and applies

4   to both sides because things come up during the

5   course of the trial many times that are not

6   anticipated, may require a new person to be brought

7   in to testify, and --

8              MR. CONSOLDANE:  I think that is a

9   very cavalier offer by the Prosecutor, but I think

10  that three weeks prior to trial is not really

11  enough time.  I mean we need to have that

12  information prior to the three weeks before trial

13  starts.

14             THE COURT:  Under Rule 16, they are

15  not required to do that.  There's been a movement

16  on behalf of the Prosecution, in my opinion over

17  the last year or so on the more serious cases, to

18  give in effect open file discovery.  That avoids a

19  lot of problems that have occurred in the past by

20  way of argument on the defense's side.  I think --

21  my opinion is that it is a wise thing for the

22  Prosecution to do and I think that the ends of

80

1    justice are served much more readily by a full

2    disclosure.

3           As to the time element, I think that that

4    should be sufficient time.  If there's some

5    particular reason why it is not, then that should

6    be raised at the appropriate time and I'll deal

7    with it.

8           MR. WATKINS:  May I further respond?

9    We have yet to get discovery from the Defense and

10   we have made our motion for reciprocal discovery,

11   and I think that would be part and parcel of

12   providing for information if there's something that

13   they have, that we would know where they are going.

14           THE COURT:  Both sides have the

15   option of asking for sanctions if you are not

16   notified under the rules.

17           MR. WATKINS:  I just mentioned it to

18   the Court.  I think Attorney Consoldane would

19   indicate to the Court, because he's gotten a great

20   deal of information, in fact, letters in this case

21   will probably take a couple of weeks to read.  I

22   mean there are tremendous amounts of information

81

1   received to this point in time.

2              THE COURT:  Number 11, motion to

3   suppress.

4              MR. CONSOLDANE:  Motion 11 we have

5   continued to a later date, to the 17th of April.

6              Motion number 12, this is basically a

7   motion in limine to prevent the Prosecutor from

8   commenting on things that they shouldn't really be

9   commenting on anyways.  Did you even file a

10  response to that?  They didn't file a response, I

11  guess they have no objection to that.

12             MR. WATKINS:  Let us speak to it.

13             MR. CONSOLDANE:  You didn't file an

14  objection.

15             MR. WATKINS:  We don't have to

16  necessarily file to each one.

17             MR. CONSOLDANE:  I think you ought

18  to just grant it.

19             MR. WATKINS:  I think that looking

20  at the motion, we won't make comments on the

21  Defense witness list.  I take it Tony is going to

22  follow the same rule, he should not make any

82

1    comments on the prosecution witness list.  The fact

2    that the Defense expert did not produce written

3    reports, that is a problem because we'll be

4    objecting because we're entitled to reports, if

5    they intend to call an expert to the witness stand,

6    which as Tony knows, we very often do not get the

7    report until the time that the witness is

8    testifying, and for example in the mitigation

9    phase, so we object to that part.

10             MR. CONSOLDANE:  That is not true.

11   We always provide them with the report as soon as

12   we get it.

13             MR. WATKINS:  I obviously, Judge, in

14   all seriousness, we would never comment to the

15   Jury.  And I agree, now the cost connected with

16   Defense experts -- when we call an expert, it is

17   proper cross examination to show that the State

18   paid that expert, just as if the Defense produces

19   an expert, it is proper cross examination to show

20   the remuneration that the Defense witness got from

21   the Defense.  I think that is appropriate cross

22   examination.  So, we would object to that portion.

83

1    Agree in part and object in part.

2              THE COURT:  I agree that it is

3    proper to ask if any expert witness is being

4    compensated and who is paying that.  The

5    stipulation, as I understand it here, is that there

6    will be no comments on the Defense witnesses list.

7    The question of whether there was a written report

8    or not, there's a duty to disclose the written

9    expert's report if a report is made.  I think that

10   also implies that whoever is getting an expert

11   opinion should make a request that it be delivered

12   prior to trial and in writing and that be

13   delivered.  This comes up in several cases all the

14   time where the expert never gets around to writing

15   a report and there's a motion to not allow him to

16   testify.  So that can be avoided by having the

17   expert give a report.  Quite often, they are very

18   summary reports and some idea of what their

19   testimony will be.  Number 13?

20             MR. CONSOLDANE:  We would request

21   that the State make sure that all evidence gathered

22   in this case is properly preserved and cataloged.

84

1    They have a habit of just preserving the evidence

2    that is favorable to them and not -- and there may

3    be something that may be of either mitigating

4    factor or exculpatory in nature and it gets buried

5    because the police don't turn it over to anybody.

6    All of that stuff should be cataloged.

7              MR. WATKINS:  This motion should

8    be -- we oppose it and should be denied.  It is

9    pure speculation.  There's no factual basis that

10   we're not going to properly preserve evidence or

11   that we're going to purposely destroy or do

12   anything to the evidence.  The fact of the matter,

13   common sense would tell everyone that if we were

14   involved with some plan, it would never be

15   cataloged, it would never be found.  And in this

16   particular case, as with all cases that I am going

17   to be involved in or Chuck or my office, we're

18   going to do our damnest to have everything

19   available for the Defense or the Court, depending

20   on for example, Grand Jury testimony.  We want to

21   have a fair trial.

22              THE COURT:  I trust that that is

85

1   true on all parties' behalf.  Mr. Consoldane has

2   merely recited an urban legend that is among

3   Defense lawyers and that is that the State hides

4   and does not present Brady material.

5          MR. CONSOLDANE:  It is not legend.

6   I have seen it happen.

7          THE COURT:  There are times, I'm

8   sure in the past, particularly in other

9   jurisdictions where that has occurred.  There's

10  case law that shows that.  There's a duty here on

11  behalf of the State, which I need not go over, but

12  I will request for the record that they collect,

13  catalogue and preserve all information.  This Court

14  has previously ruled on another case that is Brady

15  plus material and I feel confident that the

16  Prosecution will do that.  If Defense has any

17  suspicion otherwise, that should be brought to my

18  attention.

19         MR. CONSOLDANE:  The motion number

20  14 requests that Mr. Jackson be allowed to appear

21  in all Court proceedings in civilian clothes.

22         THE COURT:  There should be no

86

1   argument about that.

2              MR. WATKINS:  For example, today is

3   not in my opinion necessary.  The jail has its own

4   procedure.  Certainly during any trial setting --

5              THE COURT:  Any time he has a chance

6   of appearing before the Jury.

7              MR. WATKINS:  I agree.

8              THE COURT:  Some hearing that the

9   Jury is not part of, then there's no necessity to

10  that.

11             MR. CONSOLDANE:  Motion number 15 is

12  a motion in limine to prohibit the State from

13  displaying Exhibits before they have been admitted

14  into evidence.

15             THE COURT:  I don't understand that

16  motion.  You mean before they are admitted?

17             MR. CONSOLDANE:  Yes, to show them

18  to the Jury before they have been admitted into

19  evidence.

20             THE COURT:  Now this comes up all

21  the time in both civil and criminal cases.  Many

22  times during the examination, there may be a

87

1   photograph, it is proper if whoever is doing the

2   inquiry with the Jury, if they feel it is important

3   at that point that the Jury see the photograph,

4   proper procedure is to request of the Court, "Can I

5   introduce this or show this?"  That gives the other

6   side an opportunity to object.  If there's an

7   objection, then I'll have to make a ruling on it

8   and probably have a side bar.

9              MR. CONSOLDANE:  What we have done

10  in the past, if they are just going through the

11  photographs, is that they identify them without

12  showing them to the Jury, but in cases where they

13  have to use a visual aid or a video tape or

14  something, that the Court review it first and make

15  a decision as to whether or not the Jury can see

16  it.

17             THE COURT:  You get into the

18  questions about repetition, whether it is, the

19  value may be outweighed of its evidentiary value by

20  the shock value.  Those are items.  That is the

21  reason by following the procedure, I am suggesting

22  the other side has an opportunity to object.  No

88

1  one should show any evidence of that nature to the

2  Jury without having approval beforehand.

3          MR. WATKINS:  Your Honor, we go

4  through this every time and I can't think, I'm sure

5  Attorney Consoldane can think back, when it comes

6  to photographs, we always instruct the witnesses to

7  keep the photographs to themselves.  When it comes

8  to the audio -- well, audio, video and the slides.

9  We have an in-camera.  This is a matter of course.

10  The Prosecution will never intend or make any

11  effort to show photographs without a prior ruling.

12  The thing that we object to and put on notice to

13  the Court and Attorney Consoldane, is that in this

14  case as with major cases, we'll bring in packages

15  in the Courtroom, for example of clothing or other

16  items, that we'll be bringing in the Courtroom

17  before we give it to our witness and the Jury

18  obviously is going to see a package or clothing.

19          THE COURT:  That is one of the

20  reasons for discovery.  He's going to be aware of

21  what those items are.

22          MR. WATKINS:  You can't keep that

89

1    out, for the fluency of the trial, for continuity

2    of the trial and to get through these things.  Our

3    police officer prepared and marked some things, so

4    the Jury is going to see some of them before it is

5    admitted.

6                THE COURT:  If he thinks there's

7    something the Jury should not see, he has the right

8    to object.  I think the motion goes primarily to

9    charts you may have prepared, pictures of the scene

10   or whatever.

11               MR. CONSOLDANE:  And power point.

12               THE COURT:  That is a whole

13   different area.  We'll get into that.

14               MR. WATKINS:  We have never had a

15   problem with a reversible error or even a strong

16   objection that I can remember dealing with this

17   issue.

18               THE COURT:  It would be rather

19   insane on behalf of the Prosecution to do something

20   of that nature because all you are doing is putting

21   error in the record.  I have never seen the

22   Prosecution engage in that.  I have seen it in

90

1    several trials, but not in the criminal.

2           MR. CONSOLDANE:  The motion number

3    16 is that we're requesting disclosure of any

4    agreements, benefits, deals involving any of their

5    witnesses.  You don't object to that, do you?

6           MR. WATKINS:  I would indicate --

7    there's only one witness that I can think of where

8    that may be involved, and it is Santiago Mason,

9    which we'll discuss with you as the case was

10   dismissed by another Court, but it dealt with

11   cooperation and he would be a witness in this case,

12   and we'll discuss that with Defense counsel.  But

13   as far as any deal that we make by way of plea

14   bargain, we would absolutely give it to the

15   Defense.

16           THE COURT:  I think that it is only

17   proper for purposes of cross examination, primarily

18   if there's some agreement between the Prosecution

19   and any witness called, that that should be

20   disclosed and I would expect that that be done.

21           MR. CONSOLDANE:  17, the disclosure

22   of witness statements prior to trial.  This speeds

91

1   up the trial.  It doesn't clog it down.  I guess

2   that Dennis has already agreed to show us the

3   statements.

4                    THE COURT:  He's agreed to open

5   file.

6                    MR. WATKINS:  Just as the last

7   couple you have gotten.

8                    MR. CONSOLDANE:  Some of the

9   statements, the last death penalty I tried, I

10  didn't get them until we already started trial.

11                   MR. WATKINS:  Which one?

12                   MR. CONSOLDANE:  Stanley Adams.

13                   MR. WATKINS:  That open file took

14  place close to trial.  It is true, but the last

15  couple that I have been involved in, you weren't

16  involved with the last one, we gave plenty of time.

17  This case, you will get them.

18                   MR. CONSOLDANE:  18 is kind of a

19  housekeeping motion that we're asking the time to

20  be extended to file motions that we have got two

21  death penalty cases plus a multiple murder.

22  There's some time limits for motions, being that

92

1   this case is set off until October, that you grant

2   us a little extra time to file motions that we deem

3   that might be necessary.

4           THE COURT:  With the exception of

5   motions to suppress and possibly motion of alibi,

6   the Court would tend to be liberal on its extension

7   of any times.  I don't know of any substantive time

8   periods that we're talking about.  There may be

9   some, but I think the motion to suppress should be

10  filed well in advance of trial.

11          MR. CONSOLDANE:  We already have

12  filed that.

13          THE COURT:  And even notice of alibi

14  would have to be under the statute.  Any objection

15  to that?

16          MR. WATKINS:  I think that you hit

17  the nail on the head as far as our position is

18  concerned.  October date, October 8th is the trial

19  date, and I could see that there could be a

20  situation where they may have to file a motion with

21  reasonable causes beyond a deadline, but I think

22  that there should be at least a pretty steadfast

93

1    rule that sometime in the Summer, there wouldn't be

2    motions filed in this case unless there's good

3    cause, because otherwise, I don't think we should

4    be going through suppression hearings in September

5    when we have other cases and you have other cases,

6    when we can get that out of the way within a

7    reasonable period of time.  And there's been plenty

8    of time given to the Defense in this case.

9            MR. CONSOLDANE:  Your Honor, the

10   problem with that is that they are not going to

11   give us open file discovery until three weeks prior

12   to trial.  Something may come up.

13            MR. WATKINS:  And then you have

14   reasonable cause.  I wouldn't disagree with that.

15            MR. CONSOLDANE:  Motion 19, they

16   have not filed an answer to and I guess they don't

17   have any objection that we get the transcripts of

18   the proceedings before the Grand Jury.

19            MR. WATKINS:  We did file a

20   response.  You just didn't read it.

21            MR. CONSOLDANE:  I don't have it.

22            MR. WATKINS:  Did you lose it?  It

94

1    was just filed yesterday.

2              MR. CONSOLDANE:  You didn't give me

3    that one.

4              MR. WATKINS:  The Grand Jury

5    testimony is by rule and the law not disclosed

6    unless there's particularized need and that is our

7    position.

8              THE COURT:  The law has a long

9    history of holding that sacrosanct and unless

10   there's some particularized need shown on behalf of

11   the Defendant after hearing, that secrecy will not

12   be violated.

13             MR. CONSOLDANE:  Motion number 20 is

14   we're requesting that the jurors be sequestered

15   during the trial.  We believe that that is

16   necessary, that the newspapers tend to bring too

17   much stuff in the papers, even though the Court

18   instructs the jurors not to watch T.V. or read the

19   newspapers, it has been my experience, I found that

20   this inadvertently does happen.

21             THE COURT:  The State?

22             MR. WATKINS:  Your Honor, it has

95

1   never happened to my knowledge anywhere in the

2   State and none of our capital cases where the Jury,

3   for a lot of good policy reasons, would be

4   sequestered from beginning to the end of the trial.

5   So we object.

6           THE COURT:  There's a very strong

7   presumption that the jurors follow the admonition

8   given.  My experience and I think probably the

9   experience of counsel here that that seems to be a

10  duty that they take as a sacred trust.  I think

11  that the sequestration of jurors is proper, once

12  the case has been delivered to them, because there

13  should be nothing to interfere with the total

14  concentration on the case.  It is enough of an

15  imposition on jurors to bring them in here and have

16  them sit for weeks at a time, and to deny them the

17  ability to go home in the evenings, I think adds

18  nothing to them doing their job, and I find no

19  reason to vary the past practice.  So, the motion

20  to sequester during the entire duration of the

21  trial will be denied.  They will be sequestered

22  upon having the case delivered to them for

96

1    determination.

2              MR. CONSOLDANE:  Motion 21 is that

3    we be allowed to permit, be permitted to introduce

4    all relevant evidence at the mitigation phase and

5    not just be confined to what is listed in the

6    statutory reasons.

7              MR. WATKINS:  Your Honor, I think

8    our response citing State vs. Depew is still the

9    law in the State of Ohio that the question of

10   relevancy and materiality is a question of law for

11   the Court to decide on an ad hoc basis during that

12   phase, and the motion infusions with the idea that

13   they decide what is relevant and not the Court, and

14   that is not the law.  The Court decides what is

15   relevant and material.

16             THE COURT:  I think any evidence

17   presented to the Jury has to be relevant.  That has

18   to be within the province of the Court to decide.

19   I think if you get to the mitigation phase, then

20   the defense has a right to present anything they

21   feel is proper.  If the Prosecution feels something

22   is being raised that is improper, then they have

97

1   the right to object to it.  The Court has the last

2   word on it.

3                    MR. CONSOLDANE:  That motion granted

4   or denied?

5                    THE COURT:  The Court will permit

6   the Defense to admit all relevant and material

7   evidence according to law at the mitigation phase.

8                    MR. WATKINS:  Granted to the extent

9   that the relevant evidence is determined by the

10  Court to be relevant and material at the time.

11                   THE COURT:  Yes.

12                   MR. CONSOLDANE:  Motion number 22 is

13  that we --

14                   THE COURT:  Let me say one thing.

15  In that mitigation, you get to that phase, I think

16  there's a tendency on all Courts to be rather

17  liberal.  But it doesn't mean that there aren't

18  limits to it, because there are, and if objected

19  to, then that is when the Court has to make the

20  call.

21                   MR. CONSOLDANE:  Motion number 22 is

22  that we request that the Court instruct the Jury to

98

1   articulate the method by which they weigh the

2   aggravating circumstances, aggravating factors

3   against the mitigating circumstances.

4                MR. WATKINS:  We object and feel

5   that the present system works.

6                THE COURT:  That is not required or

7   permitted by law.

8                MR. WATKINS:  That was recently

9   argued in State vs. Green.

10                THE COURT:  That motion will be

11   denied.

12                MR. CONSOLDANE:  Motion 23 is that

13   in regard to the instruction by the Court in

14   regards to any remaining doubt about guilt and

15   mercy as to mitigating factors, to be included in

16   the instructions by the Court.

17                MR. WATKINS:  It is residual doubt.

18                THE COURT:  What is the State's

19   position?

20                MR. WATKINS:  It is clear that

21   the -- there's no instruction required dealing with

22   the theory of residual doubt or mercy.  It is in

99

1    fact, there's two recent cases dealing with this

2    issue.  It has been decided by this Court and

3    others.  State vs. Green, 90 Oh. State 3rd, it's a

4    case and they note sympathy instruction, which has

5    been upheld repeatedly, most recently by State vs.

6    O'Neil.  It is a 2000 case.  The law has not

7    changed.  It has been upheld many, many times.

8              THE COURT:  My view is that it is

9    proper for the Court to give the instructions that

10   prejudice, sympathy -- prejudice, bias is not to be

11   utilized in making their decision.  Inherent in the

12   entire process is the ability, if not the right of

13   a Jury to take into account, mercy in making their

14   determination, but the law does not instruct them

15   to consider that.  And I think it would be

16   improper, that is one of the things where the Jury

17   has the right to nullify what the law actually is,

18   if they are so inclined.  They are not to be

19   apprised of that fact, however.  That motion will

20   be denied.

21             MR. CONSOLDANE:  Motion 24 to limit

22   the State's arguments at mitigation to the

100

1    aggravating circumstances proven at trial.  Those

2    have already been proven to the Court.  In other

3    words, if you get there, that those aggravating

4    circumstances should not be able to be argued again

5    by the Court.  They have already been proven at

6    trial, the first phase to get that, and they are

7    just -- it would be unfair to allow them to argue

8    that again and there's quite an extensive motion

9    that requests that the Court review that and the

10   case law in regard to that.

11            MR. WATKINS:  Your Honor, I would

12   indicate -- well, we have covered at least two,

13   this is precocious in the sense that we're making

14   the rulings before we have gotten to this

15   Defendant's conviction.  This presupposes that the

16   Defendant is going to be convicted of capital

17   murder, and some of the Courts have continued these

18   types of motions until the appropriate time.

19   Though we have briefed it, I would bring that to

20   the Court's attention, and I would ask the Court --

21            THE COURT:  The motion, as several

22   of these, is a bit premature at this point.  This

101

1   is one of the motions that is regularly raised in

2   capital cases.  I find no fault with the

3   Prosecution's suggestions here that if we get to

4   that point, then we can have a motion in limine and

5   review.  I would just say as a general statement

6   that the State will spend two to three weeks in

7   presenting the case.  It would be of little benefit

8   on behalf of the State to retry the case in the

9   mitigation phase, and I have never seen that done.

10  I think that what the Defense is trying to

11  accomplish here is to have some kind of a bar on

12  mentioning any of the underlying facts in arguing

13  the aggravating circumstances.  I think that is

14  virtually impossible to do.

15              MR. WATKINS:  And Davie and Getsy,

16  it shouldn't be done.

17              THE COURT:  I think it is again a

18  matter of degree and discretion on behalf of the

19  Prosecution, to not go beyond that magical line

20  where you get into impropriety.  I trust, since

21  this case is in such able hands on behalf of the

22  Prosecution, that won't occur.

102

1          MR. WATKINS:  Your ruling on it at

2     this time?

3          THE COURT:  I'll withhold the

4     ruling.

5          MR. CONSOLDANE:  Motion 25 is that

6     request that the State not be allowed to comment on

7     the Defendant's unsworn statement.

8          MR. WATKINS:  You are going to

9     continue that one, too?

10         MR. CONSOLDANE:  I think they are

11    not allowed to do that anyway.

12         THE COURT:  He's not allowed to do

13    that and the Prosecutor is not allowed to do that,

14    but I don't know that that again is without

15    limitations.

16         MR. WATKINS:  We're prepared to

17    argue that.  It is very clear that we're allowed to

18    bring to the attention of the Jury that the

19    Defendant has not taken the witness stand and has

20    not been subject to cross examination.  That is

21    what we're allowed to do, if he gives an unsworn

22    statement.

103

1          THE COURT:  In regard to the

2     mitigation phase?

3          MR. WATKINS:  Yes, but again we're

4     presupposing we're going to get there.

5          THE COURT:  I'll withhold ruling on

6     that, also.

7          MR. CONSOLDANE:  Number 26 is to

8     allow a second Voir Dire of the Jury if the

9     Defendant is found guilty in the trial phase and to

10    allow us to -- at that point if the Jurors say they

11    returned an automatic death penalty that at that

12    time, he should be excused and replaced by one of

13    the alternates.

14         MR. WATKINS:  This again is

15    premature, but there's no case that I know where

16    there's been a second Voir Dire granted.  There's

17    numerous cases, the Supreme Court saying there's no

18    second Voir Dire between stages.

19         MR. CONSOLDANE:  There's been times

20    throughout trial where Voir Dire of the Jury

21    becomes necessary.

22         MR. WATKINS:  I agree with that, if

104

1    something comes up that requires the Voir Dire.  It

2    was done in Stanley Adams.  I agree.  Your motion

3    is that there should be Voir Dire for the second

4    stage and there isn't.

5                    THE COURT:  Barring something

6    happening as just mentioned, common law, there was

7    no mitigation phase.  You had a trial and the Jury

8    made its decision.  We have this bifurcated trial,

9    which is merely a creature of statute.  This Court

10   will take the position that the statute is to be

11   followed.  If you have any remedy, it is won on

12   appeal if he's convicted of anything, arguing some

13   violation of due process.  But the statutory rule

14   says it is to be handled in the manner in which you

15   have handled it in the past.  That does not take

16   into account second Voir Dire.  So the Court would

17   overrule that motion.

18                    Something may come up where something

19   happened in between, where it would be legitimate

20   for you to raise the issue again, but at this point

21   in time saying we're going to go against the

22   statute, I'm not willing to do that.  There's no

105

1   basis for it.

2           MR. CONSOLDANE:  Your Honor, the

3   only thing is that during the trial, they may

4   become so presupposed to the death penalty, we

5   ought to be able to find that out.  In other words,

6   if some people may say the evidence was just too

7   overwhelming that I can't consider anything but the

8   death penalty and thus they become an unfair juror.

9           THE COURT:  One or more of the

10  jurors may say during the course of the trial, "I

11  don't like those Prosecutors, they are a bunch of

12  SOB's."  That doesn't give them the right to come

13  in and ask for a Voir Dire.

14          MR. CONSOLDANE:  That has happened

15  in the past.

16          THE COURT:  Let's go on.

17          MR. CONSOLDANE:  Number 27, motion

18  to allow the full statement of Defense objections

19  at trial and to require a statement of reasonable

20  ruling that we be allowed to put our entire

21  objection on the record and for the Court to

22  completely rule on our objections.

106

1              THE COURT:  Well, without hearing

2     argument of the State, unless it is something that

3     is very apparent like a hearsay objection or

4     something, I'll usually ask you what your objection

5     is.  If it is going to be something that is of

6     substance, again it would be side bar on the

7     record.  The Court would then be called upon to

8     place on the record the reason for any judgment I

9     would make on the motion.  That is granted.  Do you

10    have any objection to that?

11             MR. WATKINS:  My suggestion would be

12    that the wording of the ruling would be that as we

13    know, during trial I may object.  You are going to

14    say overruled and we just go on.  If there is on

15    either side the inclination or the desire to have

16    it on the record, it should be incumbent on either

17    side to have the reasons in the record.

18             THE COURT:  That is a good point and

19    it goes with what I said at the beginning, unless

20    it is something that is very apparent, since we're

21    trying to have a total complete record here, let me

22    make the understanding at this point, that I may

107

1   think that something is very run of the mill.  You

2   may have a different point from your position.  If

3   there's an objection made and I grant it without

4   comment, if you want something on the record, it is

5   your duty to raise the issue at that point, so we

6   can do so.  I'll extend that courtesy at any time

7   during the trial.

8                MR. WATKINS:  That would be in a

9   journal, so down the road if it isn't in there, you

10  won't have an order saying you had to do it on your

11  own in every situation.  It should be incumbent on

12  the parties.

13               THE COURT:  It is incumbent on both

14  sides if you want some motion preserved.

15               MR. WATKINS:  We're going to draft a

16  judgment entry.

17               THE COURT:  Okay.

18               MR. CONSOLDANE:  Number 28.  We

19  request that from now on all pre-trial hearings be

20  closed so that we don't taint the Jury pool.  That

21  will be included in the motion to suppress.  I see

22  the State has not filed a response to that.

108

1          MR. WATKINS:  Yes, we did.  We filed

2   a response.

3          MR. LEWIS:  It was filed yesterday.

4          MR. CONSOLDANE:  It is kind of

5   unfair for them to file responses the day before

6   the hearing.  I object to that.  They have had

7   plenty of time to file these.  You are objecting to

8   having the pre-trial hearings closed?

9          MR. WATKINS:  Yes, I think that the

10  law is clear and that goes all the way back to

11  Danny Lee Hill that the closure of the Courtroom to

12  the public is not to be done unless there's

13  extraordinary circumstances.

14          THE COURT:  It has to be something

15  of extreme danger to somebody involved or whatever.

16  The Defendant has a right to a public trial, and I

17  think you will find numerous cases that say that

18  that is a right also of the public to be able to be

19  present at a public trial.

20          MR. CONSOLDANE:  We agree with that,

21  that they have a right to a public trial, but these

22  hearings prior to the trial starting is just a

109

1   means that the Prosecution used to taint the Jury

2   pool.  We think that that is unfair.

3                THE COURT:  I disagree with that

4   from this standpoint.  It is conflict of the First

5   and Sixth Amendment, if the newspapers choose to be

6   here and print something about it, that is not at

7   the Prosecution's request.  It may work to their

8   benefit, but that is the reason you have the

9   safeguard of the Voir Dire.  And if you cannot pick

10  a Jury that is not tainted, then you have the right

11  to have a motion for change of venue.

12               MR. CONSOLDANE:  Number 29 is motion

13  to exclude the photographs of the decedent.  A lot

14  of times the State introduces these photographs

15  just to inflame the Jury, and that their probative

16  value is far outweighed by the --

17               THE COURT:  That is something I'll

18  take under advisement and the Court always reviews

19  the photographs of that nature and makes a

20  determination prior to submission to the Jury.

21               MR. WATKINS:  Your Honor, it is case

22  law throughout Ohio, in State vs. Davie is the one

110

1   where we had gruesome photographs.  If they are

2   relevant and material, a combination of evidence is

3   admissible, which would include slides, videos and

4   photographs, so long as the Court would rule on the

5   relevancy of photographs of the decedent to make

6   sure that they are first, relevant and material and

7   secondly, it is not repetitive.  We would expect

8   the Court to follow that procedure and that is our

9   position.

10          THE COURT:  The Court will endeavor

11  to do that at the appropriate time.

12          MR. CONSOLDANE:  Motion number 30 is

13  we're requesting the Court to order that the

14  employees of the Sheriff's Department and the

15  Prosecutor's office and other peripheral people

16  over there at the jail not be allowed to discuss

17  this case with Mr. Jackson.  He has retained

18  counsel at this time or has counsel at this time

19  and it would not be fair for them to discuss it

20  without us being there.

21          MR. WATKINS:  The State, in its

22  response, cites the disciplinary rules.  We

111

1   absolutely cannot and will not communicate with

2   this Defendant for obvious reasons.  It is

3   inappropriate.  However, this order which is

4   requesting, would suggest that the Defendant, if he

5   chose to contact the policeman or the press or

6   whoever, that he couldn't do so.  That there be

7   some orders excluding the parties that aren't

8   participants in this trial and it is our position

9   that there's not even a service here to have

10  restraining orders as to parties, and that the best

11  method here is for the attorney representing the

12  Defendant to tell him not to talk to anyone.

13              THE COURT:  That came to mind.  I

14  think that, I'm sure that Mr. Consoldane has

15  informed Mr. Jackson that he should not discuss

16  anything about this case with anyone other than

17  through his counsel.  I would find it difficult to

18  understand why any deputy would try to solicit

19  information from Mr. Jackson.  And I trust that the

20  Prosecutor probably has forwarned these gentlemen

21  in the past on every case.

22              MR. WATKINS:  It is inadmissible, if

112

1    he would voluntarily do it, then it is admissible.

2                THE COURT:  Yes.  It is a question

3    of whether, if something should arise, who

4    initiated the contacts or whatever.  But I'll go so

5    far to say to rule that no one should attempt to

6    obtain information, no one in the position of

7    authority should attempt to obtain information from

8    Mr. Jackson without his counsel being present.

9    Mr. Jackson chooses to speak with somebody

10   voluntarily, that is another matter.  We'll have to

11   deal with that if it should arise.

12               MR. CONSOLDANE:  Motion 31 is that

13   we're requesting that the Court order the Sheriff's

14   department in transporting Mr. Jackson back and

15   forth to Court while trial is being conducted, that

16   they not allow him to appear in front of the Jury

17   with shackles on.

18               THE COURT:  Dennis?

19               MR. WATKINS:  The Sheriff's

20   department does an excellent job in transporting

21   the prisoners to and from the Courtroom.  There's

22   been always an effort to make sure that it is not

1    done in front of the Jury, but there are going to

2    be occasions possibly where that could occur.

3                    THE COURT:  We had occasions where

4    it occurred and after investigation, found out to

5    be situations could not be avoided.

6                    MR. WATKINS:  They know he's in

7    custody.  So it is not a big deal in my opinion,

8    unless there's some intentional part on the part of

9    the officers to do these things in front of the

10   Jury.

11                   THE COURT:  The Jury is going to

12   know after a very short period of time that the

13   Defendant is in custody.  I agree that every effort

14   should be made to not cause the added burden on the

15   Defendant of having provision of him being shackled

16   presented to the Jury.  The officers are well aware

17   of that.  I expect that they will make every

18   attempt to see that that doesn't occur.  But the

19   primary reason for the shackling is for the safety

20   of the Defendant, the safety of others.  And I also

21   expect that the deputies will do their job with the

22   thought of safety in mind as the primary account.

114

1   It is kind of a secondary thing about not having

2   him shackled in front of the Jury.  I think that

3   everyone is cognizant of the bad appearance that

4   makes and the added burden put on the Defendant.

5   No matter what anyone does, no one is going to

6   attempt to cause him undue grief in that regard.

7   Now if something occurs where Defense counsel

8   thinks that that general rule is being violated,

9   then I think it is your duty to put that on the

10  record to address the Court about it, and we'll try

11  to see where we're at.

12          MR. CONSOLDANE:  Just trying to

13  prevent the possibility of a mistrial and I think

14  that if the Court would order this to the Sheriff's

15  department, that they will comply within the

16  parameters.  They brought him up here, normally

17  what they have done, they have brought him over

18  while the Jury is still secluded in another room.

19  Brought him up here, take the shackles off, that

20  when the Jury comes in, that they don't have to do

21  that without the order from the Court, instructing

22  them to do that --

115

1          THE COURT:  I have done it both

2    ways.  I have no problem with ordering them to do

3    that, it is just that I'll not allow the Defense to

4    take advantage of that, if something occurs that

5    could not be avoided, and that I know is the whole

6    purpose or one of the purposes of your motion.

7          MR. CONSOLDANE:  Circumstances

8    always arise at trial, I understand that.

9          THE COURT:  It is always a question

10   of degree and the question of propriety.  We all

11   deal with this issue on many different levels and

12   many different times, and my experience has never

13   been that the deputies tried to embarrass a

14   Defendant in regard to the shackles.  I can put

15   that into the ruling, that whenever it is possible,

16   keeping the ultimate question of safety in mind,

17   that the Defendant need not be shackled,

18   particularly in view of the Jury, and the Sheriff's

19   department is to comply with that.

20         MR. CONSOLDANE:  Thank you.  Motion

21   32.  It is a motion that we would request the Court

22   order that the news media not be allowed to film,

116

1  photograph or video tape Mr. Jackson while he's in

2  the Courtroom.

3          MR. WATKINS:  It is very clear that

4  he's a party.  He can be photographed and video

5  taped, recorded, pursuant to the Rules of

6  Superintendence, however, if he chooses to take the

7  witness stand and becomes a witness, then he can

8  say, at this time --

9          THE COURT:  That is pretty clear

10  under the Rules of Superintendence that again, the

11  First Amendment, the right of public trial, that

12  they have a right to photograph everyone except the

13  jurors, and any person who is testifying that

14  expresses a desire not to be photographed.  That

15  also covers the Defendant when he takes the stand

16  if he should do so.

17          MR. CONSOLDANE:  Motion 33, I think

18  it is a long time coming, I believe I requested the

19  Court raise the bar to require the State to have

20  the burden of proof of beyond all doubt in both the

21  trial and the sentencing phase.  This is a very

22  serious matter and --

117

1        THE COURT:  Do you have some case

2   law on that?

3        MR. CONSOLDANE:  Well, there is

4   attached to the motion, but I think it is more than

5   that, I think the time has arrived in the death

6   penalty cases that this standard ought to be

7   adhered to.

8        MR. WATKINS:  Your Honor, in our

9   brief we cited several cases, including Jenkins,

10  that there's no requirements that the State prove

11  its case beyond all doubt.  In fact, I'll tell the

12  Court and I'll tell counsel that I think it is

13  almost an impossibility to prove anything beyond

14  all doubt and that would mean more freedom for many

15  more Defendants, just as a matter of law.  And our

16  legislature, in defining our requirements in Ohio,

17  as with all of the States, require in different

18  ways for the Government to prove beyond a

19  reasonable doubt a person's guilt, and to prove

20  beyond all doubt is an insurmountable burden in

21  most instances.

22        MR. LEWIS:  A specialized

118

1   proceeding.  They are attempting to try to take

2   somebody's life in these proceedings.  I believe --

3              THE COURT:  I agree there can't be

4   anything more serious that we handle, but the law

5   deals in concepts of the words.  The statute on

6   beyond a reasonable doubt deals with moral

7   certainty.  It is the highest burden placed at law

8   upon any party to prove, to require the burden of

9   beyond all doubt is to get into the metaphysical

10  perhaps and I think moral certainty is about as far

11  into that area as you are going to get.  I know of

12  no case that has said that the standard questioning

13  is beyond all doubt is appropriate and quite

14  clearly it is not appropriate under the State of

15  the law.  That motion will be denied.

16             MR. CONSOLDANE:  Number 34 is that

17  we request that all motions be heard on the record.

18             MR. WATKINS:  I have no objection.

19  I think that the proviso should be that if we're

20  off the record that again it is incumbent upon the

21  Defendant to come forward and say, "We want to be

22  on the record."

119

1          THE COURT:  We have all been through

2    this numerous times in other cases.  There will be

3    something by way of a brief motion, that I'm sure

4    will not be transcribed because of no request being

5    made to Mary Ann, and it is going to appear on the

6    record -- well, what was the motion on appeal?

7    Again, so that there's no question, anyone who has

8    a motion at any time, it is incumbent upon you, if

9    you wish to have it preserved by way of record.

10         MR. CONSOLDANE:  Motion 35 is that

11   we request for the Court to rule on all motions

12   prior to the commencement of trial.  I understand

13   that you reserved some of the motions.

14         THE COURT:  Some of it is impossible

15   to rule on.  All motions that can be appropriately

16   ruled on prior to trial will be done.

17         MR. CONSOLDANE:  Number 26 is for

18   having transcripts, that it may be necessary that

19   we have daily transcripts of the proceedings and be

20   able to properly defend our client.

21         MR. WATKINS:  I'll let Mary Ann

22   answer that.

120

1          MR. CONSOLDANE:  I object.  I don't

2    think Mary Ann would have any objection to that.

3          MR. WATKINS:  We object to that.

4    This is a matter of practicalities of trial.

5          THE COURT:  I'll not grant that as a

6    blanket rule.  I'll say that there are times, many

7    times during a lot of trials that a certain portion

8    of the record may need to be typed, that usually is

9    not more than a couple of pages.  And if anyone

10   finds that they are in a situation like that, I'll

11   entertain a motion, of course, to provide that for

12   them.  The motion is overruled with the exception

13   of being brought to the Court's attention on a

14   specific matter.

15         MR. CONSOLDANE:  Motion 37 is that

16   we feel that we should have an increase in the

17   number of peremptory challenges for the Defense.

18   This, the legislature has already allowed for extra

19   preemptory challenges, and so that is not unheard

20   of, and I think that in particular in this case

21   that we ought to be granted more than the present

22   number allows.

121

1              THE COURT:  How many would you

2     suggest?

3              MR. CONSOLDANE:  24.

4              MR. WATKINS:  The case law is very

5     clear that Criminal Rule 24(C) is Constitutional

6     and the six is sufficient.  It is cited in our

7     Memorandum in opposition.  Obviously to increase

8     the challenges from 6 to 24 would increase the time

9     of Voir Dire about fourfold.  That would hamstring

10    the administration of justice to go through each

11    case.

12             THE COURT:  I find no reason -- I

13    think from the history, you are allowed more in

14    this type of case, and if you had 24 or 48, it

15    makes no difference other than the time involved.

16    The statutory amount or the rule amounts is more

17    than sufficient in my opinion to allow both sides

18    to clear the Jury of anyone who you feel is

19    inappropriate.  And --

20             MR. WATKINS:  You have cause

21    anyways.

22             THE COURT:  You always have cause.

122

1    I'll overrule motion number 37.

2              MR. CONSOLDANE:  Motion number 38 is

3    that we request for alternating Voir Dire.  There's

4    no reason to deny this.  It is just a matter of

5    fairness, rather than allowing them to go first all

6    the time, that we can alternate.  They go first and

7    then we go first with the next one.

8              MR. MORROW:  I would note that the

9    practice has been established that the State

10   proceed first in all Voir Dire.  Furthermore in

11   response, we talk about the case that allows the

12   procedure as has been practiced.

13             THE COURT:  The law is evolved in

14   the manner that the burden of proof is on the

15   State.  Technically as we all know, the Defendant

16   need do nothing.  The things have evolved through

17   many years and there's a set pattern, it doesn't

18   mean it can't be varied, but it should only be

19   varied for some very good reason.  The State goes

20   first, the State goes last, in this or any other

21   criminal trial.  The argument is based on the fact

22   that you perceive some violation -- it has to be

123

1  perceived on some fact.  Perceive some violation of

2  due process.

3              MR. CONSOLDANE:  They go first in

4  the trial.  We're talking about the Voir Dire.

5              THE COURT:  It is the way it works

6  in every other trial.

7              MR. CONSOLDANE:  There's no burden

8  of proof in the Voir Dire.

9              THE COURT:  I understand.  I'm

10 saying that because they have the burden of proof,

11 they have always traditionally gone first, and

12 last.  They have a very heavy burden of proof, and

13 you can't argue procedural due process because it

14 has always been done this way.  You have to argue

15 substantive due processes and I have heard no

16 argument.  I see nothing in your pleadings raising

17 a substantive due process argument.

18             MR. LEWIS:  The Memorandum really

19 directs itself to the idea that the Prosecutor once

20 they start the Voir Dire, and let's put it this

21 way.  In a capital case, we have eliminated

22 everybody that has basically qualms against the

124

1   death penalty.  They are out.  We have what are
2   known as the ADB, all different biases against the
3   death penalty.  You are really getting people who
4   believe in the death penalty as a pool of jurors.
5   Then when the Prosecutor starts off with the Voir
6   Dire, they ask the question, "Do you believe in the
7   death penalty?  Yes, I do.  Take a life, a life
8   should be taken."  Now you understand, so they
9   start indoctrinating them with the idea, now you
10  can't believe that.  You have got to follow the
11  rules.  A lot of times, we could ask that person
12  and their views would be very, very strong views,
13  but the Prosecutor immediately goes into this idea
14  of indoctrinating them, which he should.  Dennis is
15  good at that.  He's basically rehabilitating people
16  who automatically will say, "If the guy is found
17  guilty of murder, he's dead," and that is very
18  often what we have and that is not unusual.  We
19  expect that.
20          But the problem is, you have people with
21  a lot of bias to begin with, and there really isn't
22  anything in there, except for the fact that the

125

1    Prosecutor gets to talk to them and indoctrinate

2    them first and sometimes, it almost gets laughable

3    because he indoctrinates them, wait a minute,

4    there's going to be a sentencing phase.  You have

5    to listen to these mitigating circumstances, then

6    what would your decision be.  Then they drop back

7    into their mode.

8             What happens if he's found guilty of

9    aggravated murder?  Gets the death penalty.  All

10   I'm saying is, I understand what you are saying.

11   If there isn't some substantive reason, then we

12   should do it that way forever.  At the same time if

13   you look at it, the rationale for it, if you say

14   there's the burden of proof, there's no burden of

15   proof in Voir Dire.  None whatsoever.  As a matter

16   of fact, the uniqueness of this case is the sense

17   that they are ultimately looking for the death

18   penalty.  It is not like any conventional trial,

19   because the sentencing is left up to the Judge.

20   The end result is they are looking for death and

21   they are getting a death qualified Jury.

22            The question is, who is going to be in

126

1    that pool of jurors.  He's already got the deck

2    pretty well stacked and then you are going to stack

3    it some more by letting them figure out, listen

4    folks -- just keep saying, you have got to

5    understand, there's mitigating factors here.  You

6    can listen to those, but a lot of these people,

7    they will openly tell you their views and I

8    understand what their views are and I understand

9    why their views are that way.  They are frustrated

10   with all this.  The idea of somebody killing

11   somebody.

12          But at the same time, there isn't any

13   reason why we shouldn't be able to at least

14   alternate that.  That is fair.  Fifty-fifty, it is

15   all 100 percent theirs.  There isn't any rule per

16   se and you are not going to set any.  This isn't

17   some great thing that is going to upset the apple

18   cart, and I don't know why the Prosecutor would be

19   worried about it.  Why would you be worried about

20   letting the Defense go first?

21          MR. WATKINS:  I would like to

22   respond.  I disagree.  I think that the traditional

127

1    ways of doing things should be maintained unless

2    there's good reasons to change things.  I look at

3    things more conservatively than Jim Lewis.  I think

4    it gives a structure to the whole trial.  I would

5    note that first, our procedure, the Court asks the

6    questions generally of each juror, regarding death

7    qualification, and I think the last two trials that

8    the Defense counsel did a very able job with the

9    present procedure and there was no death penalty

10   given by the Jury.  So, they were able to get

11   through these jurors and this whole system that

12   seems to be so negative rather successfully, the

13   last two Jury trials they tried.  I think the

14   present procedure works for both sides.

15              MR. LEWIS:  Our sister State, which

16   is Pennsylvania, Pennsylvania allows alternating

17   Voir Dire.  They are right across Ohio.  It seems

18   like they have come of age and said there's no

19   reason --

20              THE COURT:  That surprises me,

21   because they are more tradition bound than we are.

22   There's a procedure, there's a set pattern, which

128

1    that is that is the positive approach to the law.

2    This higher law argument that you are raising

3    something extraneous to, again I think it has to be

4    based on some substantive due process argument.  I

5    don't think you actually have any, other than your

6    misgivings.  You stated something which I know that

7    all Defense counsel truly believes, and that is

8    that the process weeds out all of those who are

9    incapable because of philosophical or religious

10   views of finding a death penalty.  I don't agree

11   that that in any way causes the Jury to be an

12   unfair Jury to the Defendant or to the Prosecution.

13   Because you have many people on a Jury, we go

14   through extensive questioning.  The Court goes

15   through the thing, you go through the thing, the

16   Prosecutor does.  All that they are asked is no

17   matter what your feelings are, can you set them

18   aside and follow the law.  That could include

19   somebody who is in favor of the death penalty, but

20   is willing on the facts to not impose the death

21   penalty because of the mitigation factor.

22                    MR. LEWIS:  No question about it.

129

1    Absolutely correct.

2                    THE COURT:  It would be totally

3    improper for the State to allow somebody on who

4    says, "I can't follow the law, because I couldn't

5    find anybody guilty."

6                    MR. LEWIS:  They are gone all the

7    time.  They stick out like sore thumbs.  The only

8    thing I'm saying is that the interesting thing

9    about it, we have individual Voir Dire, and we have

10   it for a real good reason.  The real reason is that

11   we want people, they can live their life out there

12   in the outside world.  They get in here, we're

13   doing a very serious thing.  We have got to find

14   out what their true feelings are.  Most people

15   aren't totally open about it.  They don't sit there

16   and say, "I wanted to kill somebody."  If they hold

17   views that are pretty strong and they come in and

18   they pick up on the idea, "Well, if I just say this

19   and say that, I know what to say now," whatever,

20   and it is a matter of privacy, if you have a chance

21   to talk to them openly and get their feelings out

22   about something, fine.  I think that you have a

130

1   better shot at getting people that honestly feel

2   the way they think about this, and I can

3   indoctrinate people.  This isn't politically

4   correct.  You shouldn't say this kind of thing.  By

5   God we don't say those kinds of things, if we

6   didn't hear anybody say don't say that stuff, our

7   true feelings might say --

8           THE COURT:  That is the reason we

9   have individual Voir Dire.  They are not exposed to

10  what all of the correct answers are.  It is safe to

11  say that somebody that wants to be on the Jury, no

12  matter what their moral foundation is,

13  philosophical beliefs, instinctively they can give

14  the right answer to be on the Jury.  When you get

15  somebody up here and you have seen them, they say,

16  "Under no circumstances could I impose the death

17  penalty."  We have also had the reverse.  We have

18  had people say in Voir Dire, "If the person is

19  found guilty, I think you should suffer the death

20  penalty."  Those people are excused.  Or if you

21  have any doubt in your mind, you have the

22  preemptory challenges.  That is the process.

131

1           MR. LEWIS:  I just want to say that

2    in the entire context in all of the cases we have

3    ever tried here, and this case will be no

4    different, you will always hear, "Yes, I believe he

5    should get the death penalty."  You are going to

6    hear that 99 times, but it is when we go ahead and

7    say, "Wait a minute, there's something called a

8    sentencing phase in this trial.  There's something

9    called mitigating factors we want you to consider

10   those.  Those are ones you are going to have to

11   consider."  That is when you are changing your

12   mind.  That is when you are saying, "Okay, even

13   though you believe this is what should happen in

14   your own personal belief, we're going to change it

15   over."  That is what we always run across.  That is

16   99 percent.  The question always becomes is that in

17   my mind, as a Defense lawyer, and I think even in

18   the Court's minds that the people, are they going

19   to go along just to go along because they don't

20   want to aggravate the Judge and the Defense lawyer

21   and just say, "I'll consider that.  I'll take that

22   into consideration.  I'll do that."  Whatever, that

132

1   is the problem.  Who do you have that really is

2   going to own up to it and say, "Yes, I can really

3   do that."  Who is going to give this lip service --

4           THE COURT:  James, I can say because

5   of your position as a Defense lawyer and a fine job

6   you do, I think that you sell the average citizen

7   short.  I understand why.  But we go to a doctor,

8   we don't ask him to show us his credentials.

9           MR. LEWIS:  I do nowadays.

10          THE COURT:  We deal on the basis of

11  trust every day in our lives with many people.  The

12  process in my mind is not perfect.  Never will be,

13  but it is run by all us, by humans, but the process

14  has addressed all the various arguments that you

15  are making here, you are not comfortable with them.

16  I'm not at times, but the process is as it is, and

17  we try to work them to the best of our ability.

18  That is all that anyone can ask of us.

19          MR. LEWIS:  I know.  He wants me to

20  move to Pennsylvania.

21          THE COURT:  Even in light of your

22  eloquent argument, I'm going to overrule it.

133

1              MR. CONSOLDANE:  Motion 39 is that

2    we address this many times before, that taking the

3    Jury list only from the voters' registration is

4    completely unfair to most Defendants in these type

5    cases and that it would be much better for us to

6    take the Jury pool from the drivers' registration.

7              MR. MORROW:  Consistently, the voter

8    registration list has been deemed to be a

9    sufficient sampling of the draw.  Mr. Watkins

10   informs me that I failed to cite the Getsy, which

11   has recently been cited and affirmed, the fact that

12   the voter registration is an appropriate sampling

13   from which to draw.

14              MR. CONSOLDANE:  That is bad law.

15              THE COURT:  I think there's another

16   point --

17              MR. WATKINS:  There's several in the

18   last couple of years, including the U. S. Supreme

19   Court.

20              THE COURT:  All of the other methods

21   that went to the other method, the driver's

22   license, the last I knew had gone back to the voter

134

1    registration.  You have got another factor also in

2    the voter registration role in my opinion, those

3    are people who at least are able to read and write,

4    are able to observe what is going on around them.

5    Usually a little bit, perhaps more educated,

6    whatever.

7            Now the argument can be made, that it is

8    not a cross section.  Again the legislature has

9    come up with this method, and any argument that is

10   going to be made contrary to the statute has to be

11   again based on some substantive due process.

12           MR. LEWIS:  They enacted the statute

13   to allow for the licensee.  That is why they put

14   the statute in.  If they thought everything was

15   hunky doory, but we don't want anybody that doesn't

16   vote.  The only people that vote in this country

17   are going to be able to sit on the Jury.  Everybody

18   else is stupid, they don't care about society.

19           THE COURT:  That is the reason that

20   the statute allows the county to make the decision

21   to go with the drivers' registration, but every

22   county that has tried that has found that it is

135

1    totally unproductive.  Doesn't work.  People change

2    their addresses.

3              MR. LEWIS:  Voters change their

4    addresses, too.  The only problem is that because

5    the licenses, because you go four years apart and

6    that is a real problem in that sense, but does that

7    make it any less than every six months we go out

8    and vote for somebody like Traficant or Maridee

9    Costanzo or whatever.

10             THE COURT:  Maybe that proves --

11             MR. LEWIS:  I don't think anybody is

12   going to vote this year.  I'm saying they enacted a

13   statute for that.  The legislature at one point

14   says, let's use the voters.  And at the same time,

15   they went ahead and enacted the statute to be used

16   in order to build and get more of a cross section.

17   There's no question that the voter list itself, you

18   are defining a certain group or whatever.  There

19   are other groups that are left out, but they are no

20   less a part of our society.

21             THE COURT:  That was the argument in

22   getting the driver's license was that it is a more

136

1   comprehensive selection from society.  In practice,

2   it hasn't turned out that way and it became

3   extremely burdensome financially for the counties

4   to try to do that.  We could also just go out here

5   and grab 12 people on the street and say, "You are

6   on the Jury."  You have to have some process.

7           My whole point is this, James.  I won't

8   beat this to death anymore.  The legislature has to

9   draw up the law.  The Supreme Court has to set

10  rules by which we're governed.  Those must stand on

11  their face.  Unless the higher law says, "This just

12  ain't right."  But that is the burden on the

13  Defendant, to prove that that higher law says

14  something different.

15          MR. LEWIS:  That is a very difficult

16  thing.  You mentioned a while back, you mentioned

17  that when you death qualify a Jury, they did some

18  studies.  There were more guilt prone type people.

19  The conviction is a higher degree.  They did the

20  studies.  The unfortunate thing is that nobody

21  wanted to hear it.  First it started out with this.

22  You got a point -- well, you haven't proved -- oh

137

1   no, they did the studies and said the studies don't

2   really say that.  It is okay.  I think their

3   rationale was that the guilty people ought to be

4   found guilty by guilt prone jurors.

5           The point being is that a lot of times we

6   have all of these things that go on and they may be

7   incorrect or whatever, and the questions come back

8   in the study.  Who is going to be able to determine

9   the study to find out whether, and have more young

10  people involved in the system?  They don't get

11  picked because they don't vote.  Young people as a

12  whole, don't go to the voter pools.  The problem

13  is, this is the justice system, it is not an

14  election.  That is the whole point.  The whole

15  point is, this is the judicial system.  This is the

16  United States.  We have got people in here, we have

17  got Trumbull County.  All of the citizens of

18  Trumbull County should be eligible to come in.  It

19  has nothing do with whether you vote or don't vote.

20  The election process has nothing to do with the

21  judicial system.  The judicial system says, you get

22  a cross section of your people, what is the most

138

1    efficient, whatever.  It is not really from the

2    drivers' list.  All you do is combine the two is

3    really what you are doing.  So, probably

4    three-fourths of it is going to be coming out of

5    the voter registration anyway.  But the point is,

6    you combine the two with technology.  That is why

7    they allow it.  Sure, to come out and say, great

8    study.  The study has happened.  They are saying

9    that they are under represented.  Especially the

10   young.  They are really unrepresented, because they

11   don't really register to vote.  They are off at

12   college, like Dennis and I did.  Who cared?  As

13   long as we were down at the local pub and had a

14   good time, we were all right.  But the point being

15   is that it has nothing to do with the election

16   process.  What it has to do with is the cross

17   section of people who are in this county.  It is as

18   simple as that.  And if you are going to use the

19   system, that arbitrary, because you have got to

20   sign up to vote in order to participate in the

21   judicial system, that's what it boils down to.

22              If you want to reverse the argument, in

139

1    order to be a juror in this county, in order to

2    participate in the judicial system, you have to

3    register to vote.  If you never register to vote,

4    you will never participate.  You won't have access

5    to anybody in Trumbull County as a juror, unless

6    you register to vote.

7                    THE COURT:  That's statutory --

8                    MR. LEWIS:  That is a

9    pre-qualification to be a juror.  Why is there a

10   pre-qualification to be a juror that you register

11   to vote?

12                   THE COURT:  It is not a

13   pre-qualification, it is an exclusion that you can

14   pretty well overcome by registering to vote.  I

15   don't think there's any conscious effort if you

16   read the legislation on the drafting of that

17   statute, making the voter rolls, where the source

18   of jurors.  Any attempt to exclude anybody, it is

19   tried to get, what do you do, go to the phone book?

20                   MR. LEWIS:  It was done for

21   convenience.

22                   THE COURT:  If you go to the phone

140

1    book, people don't have phones.

2              MR. LEWIS:  There's another place

3    that they had all of the names.  Let's see, who is

4    collecting all of these names?  That Board of

5    Elections, they have got a big group down there.

6              THE COURT:  As long as there's not

7    an attempt on behalf of the selection process to

8    exclude any person or group of people.

9              MR. LEWIS:  What it does, it does do

10   that.  It is not a conscious thing.  Saying we

11   don't want young people on Juries.  They just look

12   for a source where they can find a large group, but

13   technology has come along and say, we have got a

14   way to combine the groups to bring more people into

15   the system and it isn't that difficult.

16             THE COURT:  I understand your

17   argument and I don't say that I am totally in

18   disagreement with it, but again I'm going to go

19   with what the law is.  Denied.

20             MR. LEWIS:  Number 40.  It is the

21   individual sequestered Voir Dire on the topics.

22   That is being venue publicity.

141

1        MR. MORROW:  Those items which we

2    typically do such as the death qualification and

3    venue, we don't have any objection to.

4        THE COURT:  That will be granted.

5        MR. CONSOLDANE:  Motion number 41,

6    we request that the State give us the reasons why

7    they are exercising their preemptory challenges.  A

8    lot of times they do this just to get rid of people

9    they think are not in favor of the death penalty.

10   That is unfair.

11       MR. MORROW:  Quite simply,

12   preemptory allow us to pick and choose the people

13   we wish.  Unless it is something that is protected

14   under a Batson problem.  At that point, it can be

15   appropriately addressed at that time.

16       THE COURT:  I think preemptory is a

17   private matter, unless there's some issue raised as

18   to gender or some discriminatory exercise on the

19   preemptory challenge, there need not be any reason

20   given.  The opposite side always has the right to

21   call into question any preemptory challenge.

22   Batson case will be followed.

142

1              MR. LEWIS:  Number 42 is the

2    questionnaire.  Over the years, we have attempted

3    to get our questionnaire in and every year it

4    really is coming down in size.  If you take a look

5    at what is attached here, it is a very short

6    questionnaire.  It is only 12 pages and it is big

7    print, so there's only 20 questions on there and it

8    encompasses a lot of what the conventional

9    questionnaire includes that is sent out by the

10   Court, and I would think, if the Court looks at it,

11   there's some other additional information that we

12   always ask the jurors anyway, so I think it would

13   be appropriate to ask the Court to adopt this

14   questionnaire and send it out.

15              MR. MORROW:  The State has not

16   submitted a questionnaire.  It believes that the

17   one the Court presently uses encompasses all of the

18   same information that the Defense is requesting and

19   it is done on two pages.

20              THE COURT:  I think it is

21   appropriate to use the questionnaire we have used

22   in the past, unless the Defendant has something

143

1  that is peculiar to this case that you wish to have

2  added to that.  I'll entertain their motion in that

3  regard, otherwise the regular questionnaire will go

4  out.

5          MR. CONSOLDANE:  Number 43 is that

6  we would request that the State be prohibited from

7  excusing jurors who express a concern about the

8  death penalty.  At this point in the trial,

9  everybody on that Jury is going to have to say that

10  they could impose the death penalty.  Just that it

11  would be unfair for them to then further stack the

12  Jury by getting rid of everybody that expresses

13  that they have any concern about the Jury, about

14  the death penalty.

15          MR. MORROW:  Quite simply, again the

16  rationale for the preemptories need not be

17  identified by the State unless there's some

18  suggestions that it is rationally motivated similar

19  to those in the Batson case.  The State does not

20  feel this is an appropriate motion to be granted.

21  Likewise, what if we have jurors that the Defense

22  wishes to strike about if they express something

144

1   about not executing somebody?

2          THE COURT:  It cuts both ways.  I

3   think that most people in Voir Dire, the cases that

4   I have had occasion to sit through, there's a

5   reluctance on most people's part to think that they

6   might be in a position of having to consider

7   recommending a death penalty, so it is not unusual

8   that they express that.  The whole object of that

9   individual Voir Dire is to get a person who can

10  conscientiously listen to the evidence and follow

11  the law wherever that leads them.  If somebody

12  expresses doubt as to whether or not they could

13  impose the death penalty, they may, after this

14  procedure that Jim is afraid of, where to quote

15  him, they have been indoctrinated either by the

16  Court or the Defendant or the Prosecutor, where

17  they end up saying, "Well, I can do that."  Both

18  sides have the right in that case to exercise

19  preemptory and there should not be any

20  justification need be given for it absent the

21  Batson case.  So for that reason, I'm going to

22  overrule that.  Again you have the right to bring

145

1    that up at any particular exercise of the

2    preemptory challenges.

3            MR. LEWIS:  Motion number 44 is a

4    motion in regard to prior to death qualification to

5    the Jury.  The question becomes did the State show

6    probable cause.  Obviously this case was directly

7    indicted.  There was no probable cause hearing.

8    We're asking that the State produce enough evidence

9    to show probable cause that the case would go

10   forward into the mitigation phase.  Are the

11   aggravating circumstances there?  And we move into

12   that phase before we death qualify a Jury.

13           MR. MORROW:  Aside from the

14   practical impossibilities of having 45 or 50

15   alternates sitting through the guilty phase, this

16   proposition has been expressly objected through

17   State vs. Jenkins which is an Ohio State Supreme

18   Court.

19           THE COURT:  I think that would upset

20   the entire statutory procedure set-up and cause

21   nothing but havoc.  Could very well be that you

22   would have to go through a trial and then find that

146

1  none of them were qualified to go forward.  With

2  the second phase, you have to start all over again.

3  That is not workable.  I think the Defendant's

4  rights are protected up front by having that

5  determined in the usual manner.  Overruled.

6          MR. CONSOLDANE:  Motion number 45

7  deals with a very important issue that we have

8  faced in the past, and it is that the police

9  officers that have gathered information in cases

10  know that when they come across something that is

11  not going to help their case, they don't give it to

12  the State.  And I don't know that even if the Court

13  grants this motion, that that is going to prevent

14  these officers from continuing to do that conduct.

15  We have found this in the past, but I think that

16  maybe, if you do grant this motion, that it might

17  instill upon the police officers their duty to do

18  what they should do.  There's no question that they

19  should get all of the information that they gather

20  in investigating a crime should be turned over to

21  the State, and the State should then turn it over

22  to the Defense.  They don't do it as a matter of

147

1   course.  And even though that they are supposed to,

2   and quite frankly, I think even if the Court does

3   grant the motion, that a few of these officers

4   probably still won't do it, but I believe that if

5   the Court does grant this motion as it should, that

6   it may instill upon these officers to have a second

7   thought of not hiding information.

8              MR. MORROW:  We filed an opposition

9   in respect to number 45.  I would also note this is

10  similar to the motion previously argued with

11  respect to properly cataloguing the evidence as

12  Mr. Watkins has indicated.  Our office provides

13  those materials, which are required to be provided

14  in those materials which need to be turned over

15  through the discovery process in the event that

16  somebody wants to hide something in spite of the

17  Court order, they are going to do it anyway.  But

18  that isn't the case that exists.  This office

19  provides full discovery and evidence that is

20  available.  There's no harm for the Court to give

21  an order as to what they are supposed to do.

22             THE COURT:  There's no reason why

148

1   the order can't be -- I really in my mind, think

2   that most police officers don't try to be Judge and

3   Jury.  They do their job.  They investigate the

4   case, they find evidence and they submit it.  Now

5   it is conceivable that an officer may be looking

6   for evidence of a prosecutorial nature and may

7   overlook or think unimportant something that may

8   turn out to be exculpatory.  So I find no problem

9   with saying to the officers, "Look, gather

10  everything and anything related to this case and

11  turn it over to the Prosecutor and let them make

12  the decision and not you, as to what evidence is

13  required here."

14          MR. WATKINS:  Your Honor, if I am

15  understanding correctly, that the order is to us to

16  tell them to turn it over.

17          THE COURT:  Turn over all and every

18  piece of evidence related to the case.  It should

19  not be the officers or -- this is part of what

20  their concern, that the officer is making the

21  determination, it is truly, should be made by the

22  Prosecutor.  You may have evidence that doesn't

149

1  necessarily, in the officer's mind help in

2  prosecuting the case, but that evidence may well be

3  exculpatory evidence that they would have a right

4  to.  You can't make that decision unless you are

5  told that such evidence exists.

6  　　　　　　　MR. CONSOLDANE:  And the police

7  officers don't have that duty.  You have that duty.

8  There's no burden --

9  　　　　　　　MR. WATKINS:  As a Prosecutor,

10  whenever we meet witnesses, we want all of the

11  evidence.

12  　　　　　　　THE COURT:  I understand that.

13  　　　　　　　MR. WATKINS:  And we discuss in

14  terms of everything exists, and to the extent we're

15  already doing this that you are suggesting.

16  　　　　　　　THE COURT:  Let me clarify this

17  further --

18  　　　　　　　MR. WATKINS:  I think if the Court

19  wants to bring all of the officers and say, you

20  have got an order to do this --

21  　　　　　　　THE COURT:  Let me do it this way --

22  　　　　　　　MR. WATKINS:  It implies that we're

150

1   not doing that.

2               THE COURT:  That is what they are

3   always afraid of, and I suspect that it may be in

4   some cases unintentionally done for this reason.

5   If I am an officer going out and investigating

6   something, I may talk to somebody that says

7   something that isn't going to help in the

8   prosecution of the case.  My job is to find

9   material to prosecute it.  That person, just by

10  virtue of the fact they talked with them, should be

11  written down provided to the Defense if you are

12  going to have open file because they may find

13  something exculpatory in that.  You catch that

14  distinction, that everything they do by way of

15  investigation --

16              MR. WATKINS:  I think it is very

17  clear from the U.S. Supreme Court, we have that

18  duty, so that is incumbent on us.

19              MR. LEWIS:  Listen, what the Judge

20  is asking you to do is you emphasize to the

21  officer, "Listen, give me everything you have."

22  I --

151

1          THE COURT:  Everything that can help

2     in the prosecution.

3          MR. LEWIS:  Just give me everything

4     you have got on this case.

5          MR. WATKINS:  That is what we do.

6          THE COURT:  The average officer

7     can't make that determination of anything that

8     might be exculpatory.  They may have information

9     that is exculpatory, but they feel it is

10    unimportant because it isn't helping the

11    Prosecution.  They don't even put it in terms.

12    That is all they are saying.  You should direct the

13    officers to turn over all information, even though

14    they think it isn't necessary.

15          MR. WATKINS:  That is what we do.

16          MR. CONSOLDANE:  Then why do you

17    have an objection to us ordering you to do that?

18          MR. MORROW:  Let's say an officer

19    goes out and knocks on the door, "I want to

20    interview John Doe."  John Doe is not there.  Then

21    he has to prepare a report and say, "I went to

22    interview John Doe on Wednesday, went there

152

1    Thursday, Friday, Saturday, by issuing an order."

2              MR. WATKINS:  I don't think that is

3    what the Judge is saying.

4              THE COURT:  In doing their

5    investigation, somebody says, this person knows all

6    about -- they go talk to that person, they

7    interview them.  The person says a bunch of things

8    that the officer thinks isn't directly involved

9    with the prosecution.  That is the type of

10   information that still should be turned over to

11   you, and I suspect it isn't most of the time.  I

12   don't think that is any additional work on the

13   police part.  Something they should do.  This was

14   my investigation in to-to.  Not selective parts.

15             MR. WATKINS:  That is what I'm

16   saying.  That is what we do.

17             THE COURT:  I have changed, I'm not

18   going to order that directly, but I would request

19   that you make that request known to your officers.

20   Dennis, I don't think there's any doubt that an

21   officer is not going to be in a position to even

22   recognize at times exculpatory evidence.  If it

153

1    doesn't help prosecute, it is not evidence as far

2    as he's concerned.

3              MR. WATKINS:  If I meet an officer

4    and I say, "What do you have?"  And I go to the

5    negative and the positive, that is why we have 20,

6    30 percent no bills.  I don't want, if there's

7    exculpatory out there to indict people --

8              THE COURT:  That is your job to make

9    that determination, not the officers.

10             MR. WATKINS:  That is what we do.

11             MR. CONSOLDANE:  We're asking for an

12   order --

13             MR. WATKINS:  The Supreme Court is

14   incumbent on us to make inquiry.

15             MR. CONSOLDANE:  Then why are you

16   objecting to the order?

17             THE COURT:  It is just that the

18   defense always assumes, rightly or wrongly that the

19   Prosecutor doesn't get all of the information.

20             MR. WATKINS:  "We order the

21   Prosecutor to turn over Brady material."  Well, I

22   don't need an order.  It is the law.  You can spend

154

1  your time ordering us to do our jobs.

2              THE COURT:  I'm not going to order

3  here.  I'm just saying to you, tell your officers,

4  not just the ones in this case, all of them, so it

5  doesn't come up in the future.

6              MR. CONSOLDANE:  Is the motion

7  denied then?

8              THE COURT:  The motion is denied --

9              MR. WATKINS:  To compel State

10  agents, you would have to have an order to them.

11              MR. CONSOLDANE:  We're not asking

12  that, we're asking you to compel the Prosecutor to

13  do what he's supposed to do.

14              MR. WATKINS:  I can only do what we

15  do.  We say what do you have.  We want your

16  complete case file.  When you are dealing with your

17  witnesses, you tell them you want everything.

18              THE COURT:  There's one other avenue

19  and that is the Defense has the right to cross

20  examine anybody at any point.

21              MR. WATKINS:  They do.  They say,

22  "Did you give everything to the Prosecutor in this

155

1  case, did you hold anything?"

2          THE COURT:  I am denying because the

3  duty is already on the -- the duty is already on

4  the officers to provide all information.

5          MR. CONSOLDANE:  You are denying it

6  even though it is their requirement to do it?

7          MR. LEWIS:  All this is asking --

8          MR. CONSOLDANE:  Leave it alone.

9          MR. LEWIS:  The next one is 46.

10  Defendant's motion to compel disclosure --

11          THE COURT:  You may wish to frame

12  that some other way than denied.  The point is,

13  they are already under a duty it turn over.

14          MR. LEWIS:  Number 46.

15          THE COURT:  Defendant's motion to

16  compel disclosure of exculpatory and impeachment

17  evidence.

18          MR. LEWIS:  As Dennis aptly put.  It

19  is his obligation and the interesting thing even if

20  he doesn't know about it, he could be held

21  responsible for it and he should have given it to

22  us.  The Courts are starting to close in.

156

1          THE COURT:  Even when he doesn't

2   know about it?

3          MR. LEWIS:  That is the law.  Now

4   listen, you can't give an excuse because that is

5   what the other motion was about.  You can't say or

6   you can't leave the gap there.

7          THE COURT:  And say I didn't know

8   about it.

9          MR. LEWIS:  I knew about it, but it

10  was innocent and the Prosecutor says, I didn't know

11  about it because he didn't give it to me.  Get all

12  of the good stuff and doesn't get any bad stuff.

13  You break the link in the chain, then there's no

14  responsibility.  Theoretically, you wouldn't have

15  to give any exculpatory evidence because the

16  officer would hold onto everything good.  The

17  motion is simply asking the Prosecutor to make sure

18  that he orders, asking the officer to give him

19  everything in the file.  He doesn't -- especially

20  if it is anything favorable to the Defendant, cough

21  it up.  Most officers, they are not too crazy about

22  it.  A lot of times, they don't know what is good

157

1    or bad, they know what is bad for the Defendant.

2    What potentially is good.  Sometimes they don't see

3    it.

4                    THE COURT:  I don't know any good

5    answer to that question.

6                    MR. CONSOLDANE:  Is number 46

7    granted or denied?

8                    THE COURT:  Again, it is already

9    something that they are duty bound to do.  I'll

10   grant it.

11                   MR. WATKINS:  I don't have any

12   problem.  You can grant all of these to the extent

13   that the Brady and its progeny require the State in

14   the rules of discovery to give all this information

15   is granted.

16                   MR. CONSOLDANE:  That moves us to

17   motion number 47 and that is that we're letting

18   the -- letting them, the Prosecutor guard the hen

19   house.  They determine what we should get and what

20   we shouldn't get, and I request -- we requested

21   this in the past that their entire file be

22   presented to the Court and be sealed and let the

158

1   Court of Appeals decide whether or not they gave us

2   everything that they should have.  Otherwise,

3   there's no way we can figure out whether we got

4   what we were supposed to get or not if they bury

5   it.  This way, if they have to turn over their

6   entire file, seal it and let it go up to the Court

7   of Appeals after the case is over, let them

8   determine whether or not they made the proper

9   decision.  Otherwise, nobody else is making the

10  decision as to whether it is <u>Brady</u> material or not,

11  except for the Prosecutor.

12          MR. MORROW:  Quite simply, first of

13  all, this in essence is going to be rendered moot

14  by the fact that we're going to provide open file

15  discovery.  Secondly, if we're going to provide

16  open file discovery, if we're going to hide it,

17  we're going to hide it from the Court anyway.  This

18  is kind of a factitious argument.

19          The third thing is this presupposes

20  there's some illegitimate purpose on behalf of the

21  State or the Prosecutor's office, and the Court is

22  well aware of the fact that we provide open file

159

1    discovery.  They are going to have an opportunity

2    to review it.  It is another one of these

3    circuitous motions.  They want to us do it, but

4    they want us to turn over the file.  If we want to

5    hide something, we're going to hide it from the

6    Court as well.

7                    THE COURT:  That thought crossed my

8    mind.  If you are so devious that you are going to

9    withhold it from the Defense, nothing to prevent

10   you from not putting it in the file to begin with.

11                   MR. WATKINS:  The purpose of this

12   motion is to, when we didn't do open file -- this

13   is getting ridiculous, we're going to go over,

14   we're trying to give complete discovery.

15                   MR. LEWIS:  It boils down to

16   something very simple.  It is this.  They control

17   the investigation, they control all of that.  They

18   have the information.  They are Prosecutors.  They

19   think like Prosecutors.  They are supposed to think

20   like Prosecutors.  They are after that.  We're

21   Defense lawyers.  We defend the guy.  That is their

22   bias.  That is their thinking, when they look at a

160

1   lot of things.  We have been in chambers and we

2   have gone through this and all of these death

3   penalty cases.  We'll look at something and I'll

4   go, "This is kind of important.  I think I want to

5   work on it."  They say, "That is not important.

6   What is important about that?"  There's a mind

7   frame.  It is a mind set, that is the problem with

8   this.  There's a mind set.  I'm not saying that

9   they shouldn't have it, because they should have

10  because they are Prosecutors.  They are not going

11  to look at the case the way we look at it.  They

12  never will.  That is the problem, when they are

13  sitting on that pile of evidence and looking at it.

14  You have to, that is why they say have an

15  independent review.  That is why we have Judges.

16  You have got one side.  You have got the other

17  side.  You are in the middle.  You are supposed to

18  be unbiased and unprejudiced and just look at the

19  evidence.  The problem is, it is all over there.

20  The question is, does he have the mind set to see

21  what is going to be favorable to us?  He doesn't

22  want to look for anything favorable.  He's looking

161

1   for how to prosecute the man.  That is his mind

2   set.  I understand that.  That makes sense because

3   he's supposed to be a Prosecutor.

4                MR. WATKINS:  If the Public

5   Defender's office wants to make copies of

6   everything so they can have this file at their

7   expense, they can do it.  This is ridiculous.

8                MR. LEWIS:  If it is open file, and

9   everything is in there, then we get a shot at it,

10  then it is okay.  That in essence takes care of the

11  bulk.  As long as everything that has been provided

12  by the police to them.

13               MR. CONSOLDANE:  The other problem

14  with the open file that I have had, okay, you have

15  open file, you can come over and look at it, then

16  we get into trial and they bring something up and

17  say we had open file.  It was in there, you should

18  have seen it when it wasn't in there.  Then it is

19  my word against there's.  I don't like open file

20  discovery for that -- I want them to give it to us,

21  not just come over and look at it.  I want the

22  discovery.  I want them to give it to us and say

162

1  this is what we gave you, so they can't come back

2  later and say, I showed that to you, when they

3  didn't.

4  MR. WATKINS:  That is why we have

5  you sign an index on most everything.  We'll have

6  an index.

7  THE COURT:  You should insist on

8  them getting a list.  I have to agree, the

9  Prosecution tends to see themselves on a white

10  charger with white armor and you see them on a

11  black charger with black armor.  No question, it's

12  a state of minds.  I find nothing unusual about

13  that.  I'm going to deny 47.

14  MR. LEWIS:  Number 48 is the big

15  thick one.  That is all of the Constitutional

16  arguments.

17  THE COURT:  I'll deal with that in

18  writing.

19  MR. CONSOLDANE:  Number 49 is we're

20  asking for a charge by the Court to the Jury in

21  regards that they do not have to unanimously decide

22  against the death penalty before they can move onto

163

1  the other possibilities, and the last couple of

2  cases that I have had, the Court has done that, has

3  instructed the Jury that if they can't reach an

4  unanimous decision as to death, they can move on

5  and consider one of the life options.  They don't

6  have to necessarily unanimously agree or not agree

7  on the death penalty first before they can move on.

8           MR. WATKINS:  I think some of this

9  stuff can be continued to when we get to that point

10  in time.

11           MR. CONSOLDANE:  We have done it in

12  the past.

13           MR. LEWIS:  The motions here, that

14  is the way the instructions have been worded

15  before.  It is the same thing as lessor included

16  offenses.  Say you cannot unanimously agree

17  whatever, the point is, you don't have to be

18  unanimously against the death penalty to move to

19  the other.  There's a disagreement.  That means you

20  move to the other.  You don't have six people

21  beating up on the other six people or vice versa

22  and have a war.

164

1          THE COURT:  I would suggest that we

2    deal with this if we get to that point in time.

3    You have adequate time.

4          MR. CONSOLDANE:  Sometimes these

5    motions get lost and this is a very -- this has

6    been done --

7          MR. WATKINS:  You argue Jury

8    instructions on every case.  We have got other

9    cases we can go by.  We're going to be arguing Jury

10   instructions.

11         MR. LEWIS:  If you don't have any

12   objection to this, he can write down granted.

13         MR. WATKINS:  I would say let's take

14   the Jury instructions from Adams and Getsy.

15         MR. CONSOLDANE:  And that was in

16   there.  We have argued it.  Why do you object to

17   it?

18         MR. WATKINS:  The way yours is

19   worded is not the way the instruction is.

20         MR. CONSOLDANE:  Yes, it is.

21         MR. WATKINS:  That is why I say take

22   up instructions at the appropriate time.

165

1        THE COURT:  Let's take it under

2    advisement.  That is taken under advisement.

3        MR. WATKINS:  I think there's some

4    recent case law dealing with Jury instructions in

5    the past year.  I want to take a look at them at

6    the appropriate time.  I'm sure the Court would

7    consider the most recent Supreme Court cases.

8        THE COURT:  I have a similar

9    wariness here that the way that some of these are

10   worded, if I just carte blanche grant them or deny

11   them, I may not be taking everything into account.

12   I wanted some time to review these, also.  Motion

13   to instruct the Jury regarding parole, motion

14   number 50.

15       MR. LEWIS:  That would be another

16   one to put on hold.

17       THE COURT:  You mean to go on

18   further to tell them that one of the choices is

19   life without chance of parole before 30 years,

20   whatever?

21       MR. CONSOLDANE:  Do you want to

22   grant it?

166

1          MR. MORROW:  49, 50, 51 we're going

2     to reserve; 52 we're going to reserve.  Number 51

3     is another motion regarding instructions.  We'll

4     put that on reserve.  Number 49, 50, 51 are all

5     instructions.  52 is instructions.  53 is

6     instruction.  They are all reserved.  Number 54 is

7     an instruction.

8          MR. WATKINS:  The same with 55, 56,

9     57, 58, 59, 60, 61.

10          MR. CONSOLDANE:  Number 57, there's

11     no objection to that, is there?

12          MR. MORROW:  No.  It is what we do

13     anyway.

14          MR. CONSOLDANE:  57 is granted?

15          THE COURT:  57 will be granted.

16          MR. WATKINS:  All of these others

17     from 49 through 62 are reserved or continued.

18          MR. LEWIS:  That gets us to number

19     63.

20          MR. CONSOLDANE:  Number 63 is just a

21     motion to prohibit the reference of the first part

22     of the trial being referred to as the guilt phase.

167

1          THE COURT:  Has anyone else come up

2    with anything different than that in case law,

3    still guilt phase?

4          MR. MORROW:  It is still referred to

5    as the guilt phase.  Even though in our last

6    efforts we were in with Mr. Consoldane and Mr.

7    Lewis, we agreed to stay away from this.  Low and

8    behold, Mr. Consoldane and Mr. Lewis started

9    referring it to it as the guilt phase.

10         MR. CONSOLDANE:  I objected to it

11   when Jim did it.

12         MR. MORROW:  It is impossible to

13   differentiate it other than the guilt phase and the

14   phase.

15         MR. LEWIS:  The point being, even if

16   I have got Alzheimer's disease, the word guilt

17   phase -- we don't come to a conventional trial and

18   say, "Hey, ladies and gentlemen, we're going to

19   have a guilt trial today."  It is called a trial.

20   We have a trial.  We have a sentencing.  That is

21   it.  We're asking for that.  Whatever.  If I screw

22   it up and I screwed it up or whatever, let's put it

168

1   on.

2                   THE COURT:  But the Jury has to be

3   made aware at some points that there are two trials

4   in effect.

5                   MR. LEWIS:  It is not really two

6   trials.  It's a trial --

7                   MR. WATKINS:  It's a bifurcated

8   trial.

9                   MR. LEWIS:  It would make sense to

10  jurors --

11                  THE COURT:  What are you going to

12  use to refer to the first stage of the trial?

13                  MR. LEWIS:  Your introductory

14  instructions, unless it is Judge McKay that uses

15  those.  He talks about it.  He puts it in the

16  parallel of the trial and the sentencing.  Like

17  when he sentences a person, he uses that, which

18  jurors understand that.  It is pretty simple once

19  you catch the drift or whatever.  You start using

20  all of the different terminology, but a trial is a

21  trial.  It figures out whether you are guilty or

22  not guilty, and the sentencing is a sentencing.  It

169

1  just so happens in this case, the Jury participates

2  in the sentencing.  I don't know why we're

3  reinventing the horse, the cart, the wagon, the car

4  and everything.

5          MR. WATKINS:  Let Mr. Lewis describe

6  it the way he wants.  Let the State describe it the

7  way we want.  As long as it is not objectionable

8  and to curtail the way we say things is to me, it

9  is getting ridiculous.

10          MR. CONSOLDANE:  We're just asking

11  that he not refer to it as the guilt phase.  That

12  is implying that Mr. Jackson is guilty.

13          THE COURT:  I don't agree with it.

14  It is the determination.

15          MR. WATKINS:  It is never said that

16  way, the way you are saying it.  The way I would

17  say it, there's two parts of the trial; the first

18  part is to determine whether or not the Defendant

19  is guilty; and the second part, if you would

20  find --

21          MR. LEWIS:  Let's call it the

22  innocence phase.

170

1           MR. WATKINS:  You can call it that.

2     I'll call it the guilt phase.

3           THE COURT:  I'll withhold the

4     ruling.  If the thing becomes onerous on one part

5     or the other, I can deal with it.  On its face, the

6     use of the term guilt phase, I don't find to be

7     detrimental or prejudicial to either side.  I

8     guess, if used in the right context, it would be

9     interpreted, then you have the right to object to

10    it.

11          Motion to allow the Defendants to argue

12    first and last at the sentencing hearing, that is

13    number 64.

14          MR. LEWIS:  The rationale, it seems

15    correct, if you follow the logic and rationale that

16    the State has already proved, you have aggravated

17    murder, and if they have already got the

18    aggravating circumstances, move into the second

19    phase, and at that second phase if Anthony and I

20    don't do anything, we just sit over here and say

21    rest, the Jury is left with nothing but guilty.

22    So, the problem is, we do have the burden of going

171

1    forward in that phase.  And if we have the burden

2    of going forward, they still have the burden of

3    proof, but we still have the burden of going

4    forward and it seems as though we should have the

5    first and the last response to the Jury.

6                    THE COURT:  Isn't it a fact that the

7    State has to prove, the aggravating factors

8    outweigh?

9                    MR. LEWIS:  They have the burden of

10   proof.  The problem is if we don't go forward with

11   anything, they have won automatically.  They have

12   won by default.  If we don't do anything in that

13   mitigation phase, that sentencing phase, I have got

14   to get used to that sentencing phase, they already

15   got their aggravating circumstances.  You have to

16   weigh aggravating circumstances to get to the

17   mitigating factors.  If there are no mitigating

18   factors, you have automatically got it, you are a

19   winner.

20                    MR. WATKINS:  I don't agree.

21                    MR. LEWIS:  If we don't go forward

22   with anything, they are winners.  Who really has

172

1    the burden?  We have the burden.

2              MR. WATKINS:  We have the burden.

3              MR. LEWIS:  We have the burden to

4    produce that evidence.  That is what it is about.

5              THE COURT:  If you do nothing, I

6    don't instruct them and say like a directed

7    verdict, you lose because they didn't present any

8    evidence.  They have to determine that the

9    aggravating factors outweigh mitigation.

10             MR. LEWIS:  But remember, there's no

11   mitigating factors.  We didn't produce anything.

12   If we don't produce anything, it is simple logic.

13             MR. WATKINS:  The argument is that

14   the Jury can always find when I argue and the

15   burden of proof beyond a reasonable doubt,

16   mitigating factors, that this is purely in a

17   theoretical sense, because I think there's

18   ineffectiveness because the Supreme Court has said

19   that you can argue residual doubt and the weight of

20   the evidence.  You are creating a scenario that has

21   never existed, will never exist.  The bottom line

22   is the burden of proof is on the State of Ohio and

173

1   we must convince the Jury beyond a reasonable

2   doubt, the aggravating factors outweigh the

3   mitigating factors.

4          THE COURT:  You don't get up and do

5   anything during the closing.

6          MR. WATKINS:  State vs. Rogers, the

7   Supreme Court of Ohio, that is the appropriate way

8   of doing it.

9          THE COURT:  That is what happened in

10  the Amanda Yates trial.

11         MR. WATKINS:  There's a lot of times

12  I have not presented evidence, but evidence from

13  the first part comes in for the second part.  That

14  is what they did in Yates.  There's several cases

15  we haven't presented any evidence in the mitigation

16  phase; and Stanley Adams, we didn't present any.

17         MR. LEWIS:  What do you mean?

18         MR. WATKINS:  We didn't introduce

19  anything new.

20         MR. LEWIS:  You only rebut what we

21  introduce.

22         MR. WATKINS:  We didn't present any

174

1   rebuttal.

2            MR. LEWIS:  I don't care how many

3   times Dennis says this.  The logic and rationale, I

4   can't get around it.  When they have aggravated

5   murder and aggravating circumstances, the burden

6   goes to us.  It's burden of going forward, and we

7   don't do anything --

8            THE COURT:  For the time being, I'm

9   going to deny this motion.  I'll entertain any

10  further discussion or arguments that you have.  I

11  would like to think about that a little bit.

12           MR. LEWIS:  Add this to it, is that

13  the first thing they consider is not life

14  sentences.  The first thing they consider basically

15  is the death penalty.  If they consider that first,

16  they are at their end of the spectrum.  They are

17  already there.  If they are already there, then it

18  should be us given the opportunity to argue first

19  and last.

20           MR. CONSOLDANE:  Motion number 46

21  and 65, we would like to reserve those until later

22  date.  They are premature.

175

1                    MR. MORROW:  You mean 65 and 66?

2                    MR. CONSOLDANE:  Yes, 65 and 66 are

3     actually premature.  We would like to preserve

4     those.  Number 64 is challenging the array of the

5     Jury.  The Jury hasn't been picked yet and 65 or 66

6     rather is the motion for change of venue, and we'll

7     wait until we start picking the Jury.

8                    THE COURT:  65, I think motion for

9     change of venue, can only arise after you have

10    questioned the jurors.  But 65 is something that

11    can be one of those preliminary motions that is

12    dealt with before we get too far involved here.

13    I'll allow you some time.  That's not something we

14    should wait until three weeks before the trial.

15                   MR. CONSOLDANE:  Number 67, Your

16    Honor, on this motion here, the Court, and the last

17    case I have had you have allowed this, is when,

18    during the Voir Dire, when something comes up

19    with -- they have reservations about the death

20    penalty, before you automatically excuse them,

21    allow us to be able to talk to them.  You have done

22    that in the past.  But we're just making this as a

176

1  formal request.

2          MR. MORROW:  The only codicil I

3  would include on this, if the reason for their

4  excusal is something along the lines of they are

5  unable to hear, they shouldn't be able to delve

6  into the death penalty.  If the person has

7  testified they can't hear, they can't see, a reason

8  that is not related to the death penalty.  They

9  shouldn't be able to delve into death penalty

10  issues.

11          THE COURT:  That is a good point.  I

12  assume he refers to somebody that says I can't make

13  a finding and therefore they are excused.  We'll

14  handle that on a case by case basis.

15          MR. LEWIS:  Motion number 68.  What

16  we're talking about here are the jurors who,

17  prospective jurors that indicate that they can not

18  fairly consider any of the mitigating information

19  or circumstances presented by the Defense during

20  the course of the trial.  We don't know exactly

21  what those are going to be, but we have to have a

22  potential juror or prospective juror with an open

177

1    mind enough to accept and understand first off, it

2    is the law that they would have to follow and

3    that --

4                 THE COURT:  No objection to that.

5                 MR. MORROW:  I think it is

6    conclusive that they are not going to follow, it

7    would be appropriate.  It works both ways.

8                 THE COURT:  That is granted.

9                 MR. LEWIS:  Motion number 69 is more

10   a really bifurcated trial.  In other words, the

11   trial in regard to the trial phase, seating of the

12   Jury and a Jury seated for the sentencing phase.

13   Only because of the studies that are referred to

14   earlier that indicate that death qualified Juries

15   are more guilty prone strangely, but they are.

16   Studies show it.  But after the studies were

17   released and brought to the Courts, the Courts had

18   to look the other way.  But there's a propensity

19   for a death qualified Jury, they are more guilty

20   prone.

21                 THE COURT:  Any comments from the

22   State?

178

1          MR. WATKINS:  I don't believe that

2     there's any empirical evidence to prove that

3     proposition one way or the other.  The only thing I

4     would indicate that Mr. Lewis and his team has been

5     fairly successful in getting life sentences in this

6     county and I think the whole system is pretty well

7     thought out and works.

8          THE COURT:  Okay.  I tend to agree

9     with that view.  Number 69 will be denied.

10          MR. LEWIS:  Number 70 asks for the

11    information that is accessible to the Prosecution

12    to also be provided to the Defense.  An example of

13    that would be sometimes they will -- if they don't

14    run the LEADS or anything else to find out if

15    anybody has had a record or been convicted of a

16    crime or whatever, if they don't do it, I am

17    satisfied with that.  But if they do do it, it is

18    something that we don't have access to, and if they

19    do it, they have that information regarding the

20    potential jurors.  And I know in one case, it was

21    very innocuous that somebody had been convicted of

22    a DWI, and unfortunately, it wasn't phrased in the

179

1    sense, "Were you ever arrested or convicted of a

2    crime?"  They say, "Were you ever a Plaintiff or

3    Defendant in a case?"  And the potential juror had

4    no idea, just went over his head.  Then later on

5    came back and said we want to excuse this juror for

6    cause, because they basically lied because they

7    were a Defendant in a DWI case.  Of course, the

8    individual, he was a layman, he didn't catch or

9    understand it.  What I'm saying is, we should have

10   access to that.  They have access to it, we should

11   have access to it, only because we're back to that

12   whole idea, there's not a burden of proof or

13   anything else as far as the Jury goes, but if they

14   have access to that information, I think the

15   Defense should have access.

16              THE COURT:  Does the Prosecution run

17   the records of prospective jurors?

18              MR. WATKINS:  We do not run record

19   check on all of the Jury, we do not do that.

20              THE COURT:  I would ask you I think

21   it would be proper and I think you probably do it

22   anyways, if you did have an occasion to check any

180

1   specific record, that should be divulged.

2           MR. WATKINS:  May I speak to this

3   issue?  I would wish the Court to read our response

4   and I think it sets out that certain trial

5   information, there's strategy information, whether

6   the Defense gets it or the Prosecution gets it,

7   that is not discoverable.  And in fact, there's

8   federal case law dealing with FBI reports on jurors

9   that is not discoverable.  It is part of a trial

10  preparation that every lawyer has a right to have.

11  For example, if Jim Lewis would go down, he didn't

12  particularly care for a juror and he went down in

13  Warren Muni Court and pulled -- or went to some

14  Court and pulled a record on that person, it

15  wouldn't be incumbent on Jim to give us some of

16  his --

17          MR. LEWIS:  I'll gladly give it to

18  you.  You have the resources.

19          MR. WATKINS:  I'm only arguing to

20  the Court the law.  You don't get into our trial

21  preparation stuff as we don't get into your trial

22  preparation stuff.

181

1          THE COURT:  Let me read you this,

2    James.  In Costello, the Defendant contended on

3    appeal that, "The trial was unfair, because during

4    the Jury examination, the Government had access to

5    information not available to him or even to the

6    wealthiest."  "The Court rejected this contention

7    as stated that not all information properly

8    available to the Prosecutor must be made available

9    to the Defendant."  The Court added that the

10   District Court decision of refusion to permit

11   Defendants to inspect FBI reports on prospective

12   jurors were upheld in Best vs. U.S. and several

13   others.  "Most states including Ohio adhere to the

14   rule and that the Prosecutor's investigatory report

15   on prospective jurors is not discoverable by the

16   Defendant."  I'll allow you an opportunity to brief

17   that if you feel that that is not proper.

18          MR. LEWIS:  Well, then may be

19   indicate to the jurors that the Prosecution has

20   probably had them investigated.  We'll make that

21   comment.  We'll be satisfied with that.

22          THE COURT:  I'm going to overrule

182

1   your motion, gentleman, to review.

2              MR. MORROW:  With respect to 71 is

3   that they argue last.  It is the same as 69, which

4   is denied, and motion 64 that should be denied they

5   argue last at the sentencing phase.  We would ask

6   that the Court follow that same ruling.

7              MR. WATKINS:  That is State vs.

8   Rogers.

9              MR. LEWIS:  Number 72 is regarding

10  the standard qualification for jurors to sit and

11  what they are able to do according to Witherspoon

12  and even if they have scruples against the death

13  penalty, they should be entitled to sit as a juror

14  if they can answer the question properly according

15  to the instruction given by the Court.  Of course,

16  obviously this ties and dovetails back into the

17  motions previously.  Those would be the first

18  people knocked off by the Prosecution, and I'll

19  wager money on it probably, even though it is

20  illegal to gamble in Ohio.  I'll be willing to put

21  some money on that.

22             MR. WATKINS:  Your Honor, are we

183

1   dealing with 72 and 73?

2           MR. LEWIS:  Even the previous one we

3   did.  The next motion is the same thing.

4           MR. WATKINS:  If we would have a

5   juror that said, "You know, Jim Lewis, I really

6   think an eye for an eye is a pretty good thing, but

7   I'm going to accept Judge Stuard's ruling," you

8   would use your preemptory to get rid of that

9   person.  I think it is both sides here.  We're

10  going to be trial lawyers representing the position

11  that we hold.  And that is the purpose of

12  peremptories.  If I have a juror that says, "I

13  don't believe in the death penalty, but I can

14  follow it."  I'm probably going to exclude, just

15  like he's going to exclude somebody that is going

16  to say the other.  And that is the way our system

17  works and the way it should work.

18          THE COURT:  You have the right

19  without comment as to why you are exercising that,

20  absent the Batson case approach.

21          MR. LEWIS:  The Prosecutor is right

22  except for one thing.  The deck was already

184

1   stacked.  They are all in favor of the death

2   penalty.

3              THE COURT:  They are not all in

4   favor of the death penalty.

5              MR. LEWIS:  It's a question of

6   degree.

7              MR. WATKINS:  Look at the last two

8   Juries.  We had people who believed in the death

9   penalty and you got life sentences.

10             MR. LEWIS:  I understand that, but I

11  am greedy.  I wanted more.

12             THE COURT:  The last two are denied

13  in conjunction with the ruling on the previous

14  motion that addressed in effect the same issue.

15  They have to be dealt with on a case by case basis

16  with the Jury.

17  (End of hearing at 12:25 p.m.)

18

19

20

21

22

185

1   <u>Wednesday, April 17, 2002</u>:

2   <u>Hearing on Motion to Suppress Evidence</u>:

3   <u>(In Open Court at 9:40 A.M.)</u>:

4              THE COURT:  We're here this morning

5   on motion to suppress.  Are there any opening

6   remarks by the Prosecution?

7              MR. WATKINS:  No, Your Honor.

8              THE COURT:  Defense?

9              MR. LEWIS:  No.

10             MR. WATKINS:  May I make a

11  statement?  The only exception I would take to not

12  making an opening statement would be that my

13  understanding from the Defense's motion to suppress

14  that we're here today to deal with the issue of any

15  and all statements that the Defendant gave to law

16  enforcement authorities; is that correct?  We're

17  here today regarding the issue of any and all

18  statements by the Defendant to law enforcement?

19             MR. LEWIS:  Correct.

20             MR. WATKINS:  There's no other

21  issue?

22             MR. CONSOLDANE:  Anything derivative

186

1    from that, anything as a result of that, if that is

2    to be found and taken in violation of his rights

3    and any derivatives therefrom would be also.

4                    MR. WATKINS:  I would agree with

5    that.

6                    THE COURT:  The question is

7    primarily, James, this deals with statements, not

8    other types of physical evidence that you are aware

9    of?

10                   MR. LEWIS:  Per se, no.

11                   MR. WATKINS:  And we reserve the

12   right to argue other alternative theories if that

13   be the case.

14                   MR. CONSOLDANE:  True.

15                   THE COURT:  The State may proceed.

16                   MR. WATKINS:  The State would call

17   Jeffrey Hoolihan.

18                   MR. LEWIS:  We would make the motion

19   regarding preliminary matters that there be a

20   separation of witnesses.

21                   THE COURT:  All parties who are

22   going to testify in this matter other than whoever

187

1  Dennis chooses as a representative of the State,

2  will please remove themselves until called.

3          MR. WATKINS:  We understand that

4  under the law that our representative will be here

5  throughout the trial, but for purposes of this

6  suppression hearing.  Under the law he is permitted

7  to stay in.  If the Court is saying he's to get out

8  for this limited purpose --

9          THE COURT:  I'm not saying that.  I

10  think the State has a right to have one person as a

11  representative of the State be present.  That can't

12  be changed.  If you are going to choose Sergeant

13  Monroe, then he will remain in that way throughout

14  the trial.

15          MR. CONSOLDANE:  That is not the

16  law.

17          MR. LEWIS:  I know it has been said

18  the State is entitled to a representative.  That is

19  a qualified thing where the person has a special

20  expertise or a special way to aid the Prosecution

21  to handle the case.

22          THE COURT:  It is not a monumental

188

1    problem.  For purposes of this hearing only, I'm

2    going to ask Sergeant Monroe to have a seat

3    outside.  For the record, the State has a right to

4    have whoever is handling the case or whoever they

5    choose to represent the State during the course of

6    the trial.  For the purpose of this hearing, there

7    may be some merit to the Defense's argument,

8    because I assume Sergeant Monroe is going to have

9    some direct testimony on the issue at hand which

10   usually doesn't occur in that capacity during the

11   trial.

12                MR. CONSOLDANE:  Just for the

13   record, that is a qualified right.  It is not a

14   blanket right.  They have to show that they need

15   him.

16                THE COURT:  I disagree.  You have to

17   show that need is overridden.  You have just done

18   so by my ruling.

19                MR. CONSOLDANE:  It is the other way

20   around.  I'm not going to debate that at this

21   point.

22                MR. WATKINS:  I would request that

189

1    before trial begins, that the Court instruct

2    Defense that if they wish to bring this to the

3    forefront that they bring a motion.  We have

4    litigated this twice before, but I think that is an

5    appropriate motion.

6              MR. LEWIS:  We'll do so.

7              MR. CONSOLDANE:  We'll not.

8              MR. WATKINS:  Also for the record,

9    we have given Defense counsel discovery and prior

10   to this hearing, copies of our four Exhibits.  Also

11   I would note that Exhibit No. 4, which is a

12   transcript of the video statement that we'll offer

13   has been provided to the Court.

14             THE COURT:  The Court has received

15   that.

16             MR. WATKINS:  And in total, we

17   intend to introduce five Exhibits.  The fifth

18   Exhibit would be the video tape.

19             THE COURT:  Very good.

20             JEFFREY R. HOOLIHAN

21   being duly sworn according to law, on his oath,

22   testified as follows:

190

1   DIRECT EXAMINATION BY MR. WATKINS:

2   Q.   Detective Hoolihan, would you give your full

3          name to the Court please?

4   A.   Jeffrey R. Hoolihan.

5   Q.   And how long have you been an officer for the

6          Warren Police Department?

7   A.   I am in my 12th year.

8   Q.   What position do you hold?

9   A.   Investigator, detective assigned to major

10         crimes unit of the Warren Police

11         Department.

12  Q.   What rank do you hold?

13  A.   Patrolman.

14  Q.   And as an investigator detective, have you

15         been assigned any special duties outside

16         your normal duties with the Warren Police

17         Department?

18  A.   Yes.

19  Q.   What are they?

20  A.   I am assigned to the State of Ohio Organized

21         Crime Task Force along with the Trumbull

22         County Homicide Investigative Unit.

191

```
 1   Q.   And therefore, you at times would be involved
 2            working with other agencies as a joint
 3            effort in cases?
 4   A.   That is correct.
 5   Q.   Now, I wanted to direct your attention to on
 6            or about December 20, 2001, and in the
 7            evening hours, did you become involved
 8            with a homicide in the Township of
 9            Howland?
10   A.   Yes.
11   Q.   And would you give a background to the Court
12            how your involvement took place?
13   A.   The initial involvement started on December
14            13th of 2001.  I received a call from
15            Sergeant Dillon of the Howland Police
16            Department, who had asked me to do some
17            further investigation on a theft report
18            that was filed by Donna Roberts regarding
19            Santiago Mason and to assist in some
20            interviews at the Greyhound bus terminal
21            on East Market Street which is in Warren,
22            Ohio.
```

192

1  Q.  For the Court's edification, the Greyhound bus

2       terminal had relevance in that

3       investigation because of what factor?

4  A.  Donna Roberts and Robert Fingerhut both ran

5       that terminal and there were some

6       interviews that needed to be conducted

7       there.

8  Q.  And Robert Fingerhut was the victim in the

9       homicide that is before this Court, is

10      that correct?

11 A.  Yes, Sir.

12 Q.  And so is Donna Roberts, who is a codefendant?

13 A.  That is correct.

14 Q.  And both resided, that is, Donna Roberts and

15      Robert Fingerhut, in Howland, Ohio?

16 A.  Yes.

17 Q.  And that homicide it is alleged, occurred

18      somewhere on December 12, 2001?

19 A.  Yes.

20 Q.  Now, following your involvement, going to the

21      issue at hand, did there come a time that

22      you had contact, personal contact with

193

1              Nathaniel Jackson?

2    A.    Yes, there was.

3    Q.    And first, before going into that contact, did

4              you know Nathaniel Jackson?

5    A.    Not by sight.  I did some preliminary work

6              based on my involvement from December

7              13th, and I did a records check on him

8              along with looked at some photographs

9              from the Bureau of Motor Vehicles at the

10             Trumbull County jail.

11   Q.    And were you aware of any criminal record

12             where he had been in the past involved

13             with law enforcement agencies?

14   A.    Yes.

15   Q.    And would that record include repeat

16             occurrences with law enforcement?

17   A.    Yes.

18   Q.    And at the time of this homicide, were you

19             aware whether or not he had been in

20             prison?

21   A.    Yes, I was made aware by the investigators

22             from Howland that he was just been

194

```
1              released from a prison facility.

2    Q.   And that was where?

3    A.   I believe in Lorain Correctional Institute.

4    Q.   Grafton?

5    A.   Grafton.

6    Q.   Now, knowing this and having some background

7              information, explain to Judge Stuard how

8              you came into contact with the Defendant.

9    A.   On December 20, 2001, I was made aware that

10             there was a warrant that was issued for

11             aggravated murder through Judge Stuard's

12             Court for Nathaniel Jackson.  At that

13             time we put a plan together after

14             receiving information that he may be

15             located at an address on Wirt Street in

16             Youngstown, Ohio.  After that information

17             was received, members of the Trumbull

18             County SWAT team, members of the Mahoning

19             Valley Violent Crimes Task Force along

20             with myself, had met at Sparkle

21             supermarket, located in Liberty Township,

22             at Gypsy Lane and 193.
```

195

```
 1   Q.    What time was that?

 2   A.    That was approximately I want to say 11:45,

 3              10:30, 11:45 p.m.

 4   Q.    10:30?

 5   A.    I'm sorry, 11:30 to 11:45 p.m. on December 20,

 6              2001.

 7   Q.    And that is an approximation?

 8   A.    Yes.

 9   Q.    And was this effort one that dealt also with

10              the Howland Police Department?

11   A.    Yes, Sir.

12   Q.    And was anyone cooperating with the Howland

13              Police Department in attempting to locate

14              Nathaniel Jackson?

15   A.    Yes, Donna Roberts.

16   Q.    And to your knowledge, how was that occurring?

17   A.    Throughout that day -- Donna Roberts was

18              arrested earlier that evening,

19              approximately 7:20, 7:30 p.m.  She was

20              transported to Trumbull County jail to be

21              interviewed.  After her interview, she

22              agreed to cooperate with law enforcement
```

196

```
 1            and she gave us an address where
 2            Nathaniel Jackson could be located and a
 3            phone number.
 4   Q.   And so that information was given to you or
 5            others working on this case and that is
 6            why you ended up at that Sparkle Market
 7            that evening?
 8   A.   Yes.
 9   Q.   Now, when you went to the Sparkle Market,
10            which I believe is right across the line,
11            it is in Mahoning County, is that
12            correct?
13   A.   Yes, Sir.
14   Q.   In Youngstown?
15   A.   Yes.
16   Q.   How did you proceed?  What vehicle were you
17            in?
18   A.   I had rode with Captain Bacon in his black
19            Chevy Blazer.
20   Q.   And this Wirt Street address, is this in an
21            area that officers had concern about
22            security for them in making any arrest?
```

197

```
 1   A.   Yes.

 2   Q.   And would you explain why?

 3   A.   Based on our meeting with Lee Hopper, who

 4             heads the Violent Crimes Task Force, who

 5             works for the FBI, advised us that it was

 6             a dangerous area we were going into.  It

 7             was a high drug area and he initiated the

 8             plan and assignment for the arrest.

 9   Q.   And how many officers were involved in this

10             operation?

11   A.   Approximately 20.

12   Q.   Explain to the Court what you do next after

13             11:30, 11:45.  You are at this location

14             meeting with other officers, how do you

15             proceed, describe what happens.

16   A.   Once -- well, Agent Hopper from the Violent

17             Crimes Task Force had a briefing with all

18             officers.  Each officer was assigned a

19             partner and an area in the location of

20             Wirt Street that they were going to

21             cover, the side of the house, the back of

22             the house, the alley, street.  Once those
```

198

1          assignments were made and everybody, it

2          was clear, then we proceeded in a caravan

3          to the address of Wirt Street, to effect

4          the arrest.

5   Q.   Well, how was that accomplished?  Who said

6          what, how did he get out of the house and

7          where did you locate yourself?

8   A.   Once we arrived at the scene, the house was

9          surrounded by law enforcement personnel,

10         and Youngstown Police Department was on

11         the scene to assist us with traffic in

12         closing the roadway.  Agent Hopper placed

13         his vehicle in the middle of the roadway

14         at an angle, communicated to the

15         residents inside the Wirt Street address

16         with a microphone and advised Nathaniel

17         Jackson to come out of the house, the

18         house was surrounded by law enforcement,

19         that there was a warrant for him to come

20         out of the house.

21  Q.   Now, this house, would you describe the house?

22  A.   It is an older type home, two story brick.

199

1           Normal size, maybe a little bit bigger

2           than a Cape Cod.

3    Q.   Would you describe this as an older

4           residential area?

5    A.   Yes.

6    Q.   And for the Court's understanding, can you

7           describe where Wirt Street is in

8           Youngstown?

9    A.   Wirt Street runs between Belmont Avenue and

10          422 and the closest mark would be near

11          St. E's Hospital.

12   Q.   There's a 680 bypass off of 422, is that close

13          to where Wirt Street goes?

14   A.   Yes.

15   Q.   And does it go up towards Earl Schieb, which

16          is a place that does business on Belmont?

17   A.   Yes.

18   Q.   And so it runs more or less north and south?

19   A.   That is correct.

20   Q.   And therefore, St. Elizabeth's would be to the

21          east?

22   A.   That is correct.

200

```
1    Q.   And this home was located on the east or the
2              west the side of the road?
3    A.   It would be the east side of the road.
4    Q.   And when Lee Hopper and others indicated by
5              name Nathaniel Jackson to come out, did
6              the police identify themselves?
7    A.   Yes.
8    Q.   Were there police cars there?
9    A.   Yes.
10   Q.   Were there policemen in uniform?
11   A.   Yes.
12   Q.   And this process, was a megaphone or what was
13              used?
14   A.   A bullhorn.
15   Q.   And did people come out of this residence?
16   A.   After about 15 minutes, yes.
17   Q.   Were there any shots or any force used?
18   A.   No.
19   Q.   It was peaceful?
20   A.   Yes.
21   Q.   And did Nathaniel Jackson come out?
22   A.   Yes, he did.
```

201

1    Q.   Do you see Nathaniel Jackson today?

2    A.   Yes, I do.

3    Q.   Would you point him out for Judge Stuard?

4    A.   He's sitting at the Defendant's table with his

5           Attorneys, Jim Lewis and Tony Consoldane.

6               MR. WATKINS:  May the record reflect

7   the Defendant has been selected?

8               THE COURT:  The record will so

9   reflect.

10   Q.   Now you indicated to the Court you had seen

11           photographs of him prior to that time?

12   A.   Yes.

13   Q.   Now, describe where you first see, and by the

14           way, what time is it now?

15   A.   Right now it is approximately pretty close to

16           midnight on the 21st.

17   Q.   So, we're in the next day?

18   A.   Yes.

19   Q.   Describe what occurs and how you see him.

20   A.   After approximately ten to 15 minutes

21           negotiating through the bullhorn,

22           Nathaniel Jackson came out of the front

202

```
 1              door of the residence with his hands up,

 2              walking backwards, as he was instructed

 3              to by Agent Hopper.

 4   Q.   How far did he walk outside of the house

 5              backwards?

 6   A.   Approximately 15 feet.

 7   Q.   And did he ever go down any steps?

 8   A.   There was approximately three to four concrete

 9              stairs.

10   Q.   And his hands are up?

11   A.   Yes.

12   Q.   And these are per the instructions of Lee

13              Hopper?

14   A.   Yes.

15   Q.   Hands up and he's walking backwards?

16   A.   Yes.

17   Q.   Did you notice any inability from any physical

18              or physiological problem that he couldn't

19              follow those instructions?

20   A.   No.

21   Q.   He's able to do that?

22   A.   Yes.
```

203

1   Q.   Now, when he had his hands up, did you notice

2        anything unusual about his hands?

3   A.   Yes, on his left front index finger, he had a

4        white bandage wrapped around.  It was

5        pretty thick.

6   Q.   To your knowledge, from the affidavit or from

7        the information you had, was the fact

8        that the finger was bandaged relevant to

9        you?

10  A.   Yes.

11  Q.   Why was that?

12  A.   Because information that was provided through

13       the investigation was that he was shot in

14       the finger.

15  Q.   During the homicide?

16  A.   Yes.

17  Q.   Now, where does he go?

18  A.   At that time, once he reached the sidewalk in

19       front of the house, he was instructed to

20       walk backwards towards me which was about

21       ten to 15 feet away.  He did that good

22       and then once he came within arm's reach

204

```
1              of myself, he was handcuffed behind the

2              back and placed into custody.

3    Q.   And did you inform him for the reason that he

4              was under arrest?

5    A.   Yes.

6    Q.   What did you tell him?

7    A.   That he's under arrest and that I was going to

8              place him in the back of this marked

9              Youngstown police unit that was parked in

10             the street.

11   Q.   Did you tell him what the charges were?

12   A.   Yes.

13   Q.   What did you tell him?

14   A.   For aggravated murder.

15   Q.   Did you tell him you had a warrant?

16   A.   Yes.

17   Q.   Who transported him in that vehicle?

18   A.   He was placed into the marked Youngstown

19             police cruiser in the rear along with

20             myself -- the uniformed officers from

21             Youngstown Police Department was

22             directing traffic, and Captain Gary Bacon
```

205

| | | |
|---|---|---|
| 1 | | called for a marked Trumbull County |
| 2 | | Sheriff's unit to pick myself and |
| 3 | | Nathaniel Jackson up at the scene, and |
| 4 | | transport to the Trumbull County jail. |
| 5 | Q. | In the vehicle, did you have any conversation |
| 6 | | with him? |
| 7 | A. | Yes, I did. |
| 8 | Q. | Did you, during that conversation, advise |
| 9 | | Nathaniel Jackson of his Constitutional |
| 10 | | rights under the Miranda decision? |
| 11 | A. | Yes, I did. |
| 12 | Q. | Would you tell Judge Stuard what you said to |
| 13 | | him? |
| 14 | A. | I told Nathaniel Jackson that he was under |
| 15 | | arrest for aggravated murder, there was a |
| 16 | | warrant for him.  That he had the right |
| 17 | | to remain silent, and anything he said |
| 18 | | could be used against him, and that if he |
| 19 | | could not afford an attorney, one would |
| 20 | | be provided for him. |
| 21 | Q. | You told him he had a right to an attorney? |
| 22 | A. | Yes, I did. |

206

```
1   Q.   And if he couldn't afford one, he would have
2             one appointed?
3   A.   Yes, I did.
4   Q.   You are positive?
5   A.   Yes, Sir.
6   Q.   And was he able, during this conversation in
7             the car from your perception, to
8             understand your conversation and respond?
9   A.   Yes, Sir.
10  Q.   Did you smell any alcohol?
11  A.   No.
12  Q.   Did you notice anything about him that would
13            indicate that he was under any
14            disabilities?
15  A.   No.
16  Q.   After you orally -- and I take it, did you
17            have a rights form?
18  A.   Not with me.
19  Q.   And after you gave him his rights, what did he
20            say?
21  A.   May I refer to my notes?
22  Q.   Yes, you may.  If your notes reflect an
```

207

```
1              accurate summary -- that is what they do?

2    A.    Yes, Sir.

3    Q.    Okay.

4    A.    "Nathaniel Jackson stated that, man, I did not

5              kill anybody, man, and asked that he has

6              the right to an attorney at any time.  I

7              advised him yes, he has the right to an

8              attorney.  Nathaniel said, man, I was on

9              the phone with Donna and looked out the

10             window and sees all of the police cars

11             and wondered what was going on.  I

12             advised Nathaniel that Donna Roberts had

13             snitched him out and that is how we knew

14             where to find him and she agreed to make

15             the phone call to verify that you were in

16             the house.  Nathaniel said, man, I did

17             not kill nobody.  I advised Nathaniel

18             that Donna was at the Trumbull County

19             Jail and was cooperating with

20             investigators, and told them all about

21             the murder of her husband Robert and that

22             when we got to the Trumbull County Jail,
```

208

1               that he would have a chance to tell his

2               side of the story and would be asked some

3               questions.  Nathaniel said, man, I cannot

4               believe that she did that to me.  I told

5               Nathaniel once again that Donna told us

6               everything, and that he would have an

7               opportunity to tell investigators his

8               side of the story."

9    Q.   Now, this summary, which I'm going to hand to

10              you as Exhibit 1, would you describe that

11              copy to the Court?

12   A.   This is a copy of my investigative notes.

13   Q.   And when did you make those notes?

14   A.   During the investigation.

15   Q.   And would you explain for Judge Stuard's

16              benefit how do you make notes?

17   A.   What we do initially is we write things down

18              on a legal pad, and as we go through the

19              investigation and then once we get to a

20              point to where the investigation is over,

21              we take the handwritten notes and type

22              them into a computer and those are our

209

1            record and then we get rid of the

2            handwritten notes.

3    Q.   The handwritten notes were made by you at the

4            time?

5    A.   Yes.

6    Q.   And then they were typed out?

7    A.   That is correct.

8    Q.   And when did you turn those over to my office?

9    A.   Approximately two weeks ago.

10   Q.   So, it took you some time to get those

11           prepared, as far as on print form or

12           typed form?

13   A.   Yes.

14   Q.   Now, you tell Judge Stuard that he stated

15           that, "I didn't kill anybody," is that

16           correct?

17   A.   Yes, Sir.

18   Q.   When you are taking this information during

19           this car ride with you and Hoso, are you

20           asking questions of him or is he

21           volunteering things to you?

22   A.   At this point once -- this conversation took

210

1          place in the rear of the Youngstown

2          police marked unit.  When officer Hoso

3          arrived there was no conversation between

4          myself and Nathaniel Jackson.

5   Q.   So, this is in the Youngstown car, and for the

6          Judge's benefit, were you interrogating

7          him and asking questions or was he

8          volunteering things after he was given

9          his Miranda warning?

10  A.   I was not interrogating him or asking him

11         questions.  He volunteered this

12         information after his Miranda warning.

13  Q.   Then you told him about Donna was snitching on

14         him?

15  A.   Yes.

16  Q.   And he was responding?

17  A.   Yes.

18  Q.   Now, how long do you talk to him in that

19         police cruiser that belongs to Youngstown

20         Police Department?

21  A.   He was taken into custody at 10 after midnight

22         on the 21st.  And we were en route to the

211

```
1              Trumbull County jail from the scene at 29
2              minutes after midnight, approximately 27,
3              28 minutes.
4    Q.   And you are proceeding to the Trumbull County
5              jail?
6    A.   Yes.
7    Q.   And approximately what time do you arrive at
8              the Trumbull County jail?
9    A.   Approximately 12:45 A.M.
10   Q.   On the 21st of December?
11   A.   That is correct.
12   Q.   And where is Jackson taken?
13   A.   Jackson was taken into the Trumbull County
14             jail.  He was placed into the weight
15             room.  And Sergeant Dillon from the
16             Howland Police Department sat there with
17             him along with a corrections officer.
18   Q.   And how long would you say he was there in the
19             weight room?
20   A.   Approximately one hour.
21   Q.   You are in the weight room at 12:45.  You
22             arrive at the jail at 12:45, is that
```

```
                                                    212
1            correct?

2   A.   Yes.

3   Q.   And what time are you taking a statement from

4            him?

5   A.   2:13 A.M. on the 21st.

6   Q.   During that period of time to your knowledge,

7            at least in the weight room, were any

8            statements being obtained or any effort

9            to obtain statements being made?

10  A.   No.

11  Q.   During the ride back or during any time that

12           you were aware in the weight room, did

13           Nathaniel Jackson, did the Defendant make

14           any complaints?

15  A.   No.

16  Q.   Did he ask to see an attorney or not cooperate

17           or not talk?

18  A.   No.

19  Q.   Would you describe him as -- what was his

20           attitude?

21  A.   His demeanor, he was very polite, very

22           cooperative.  Very alert.  Really didn't
```

213

```
 1              have any complaints.
 2    Q.   Was he nervous, intimidated by the fact he was
 3              in police custody?
 4    A.   No.
 5    Q.   At least you didn't perceive that?
 6    A.   I didn't perceive that.
 7    Q.   Did there come a time that it was decided that
 8              you or anybody else was going to talk to
 9              him further about this matter?
10    A.   Yes, there was.
11    Q.   Who made that decision?
12    A.   The decision was made by -- there was a
13              meeting between myself, Captain Bacon,
14              Major Phillips and Detective Monroe from
15              Howland P.D.  The decision was made that
16              myself and Detective Monroe would do the
17              interview with Nathaniel Jackson.
18    Q.   Where does that take place?
19    A.   Inside the Trumbull County Sheriff's
20              department, Captain Bacon's office.
21    Q.   Approximately what time did the start of that
22              interview occur?
```

214

1    A.   Approximately 13 minutes -- well, 2:13 A.M.

2    Q.   Was there any conversation before it went on

3         tape at 2:13?

4    A.   Yes.

5    Q.   What time was that?

6    A.   Approximately 1:45 A.M.

7    Q.   Where was that?

8    A.   Captain Bacon's office.

9    Q.   There was a conversation prior to the tape?

10   A.   Yes.

11   Q.   So, you are correcting yourself?

12   A.   Yes.

13   Q.   So, approximately 1:45, which is approximately

14        one hour and 45 minutes after his arrest,

15        you now have him in Captain Bacon's

16        office and you and Detective Sergeant

17        Monroe are talking to him?

18   A.   Yes.

19   Q.   And did you give him any coffee or any

20        cigarettes, anything transpire as far as

21        comforts for him?

22   A.   He was asked if he wanted something to drink,

215

```
 1              provided with coffee and a few

 2              cigarettes.

 3    Q.   Tell the Court what conversation occurs at

 4              1:45 or thereafter?

 5    A.   May I refer to my notes from Detective Monroe?

 6              Prior to entering the room with Nathaniel

 7              Jackson, I advised Detective Monroe that

 8              I had given Nathaniel Jackson his rights

 9              in the rear of the marked police unit of

10              the Youngstown Police car and Nathaniel

11              went on to say that he was at Greyhound

12              bus station in Warren on the day of the

13              murder.  He had dinner with Donna

14              Roberts.  After dinner, Donna dropped him

15              off at Sheila's house on Wirt Street in

16              Youngstown.  And then once he got there,

17              he went for a walk in downtown

18              Youngstown.  And he walked to the

19              Greyhound bus terminal in Youngstown, and

20              he seen Robert Fingerhut loading a bus.

21              He got in a conversation at the terminal

22              with Robert Fingerhut regarding Nathaniel
```

216

1    Jackson to get employment with Greyhound

2    bus.  He stated that Robert Fingerhut

3    wanted to purchase $100 worth of

4    marijuana, and that once Robert Fingerhut

5    got off work, he would meet Nathaniel

6    Jackson at C Staples in the parking lot,

7    which is a barbeque facility in

8    Youngstown, Ohio.  After Robert Fingerhut

9    got off work, he arrived at C Staples in

10   his silver Chrysler.  Nathaniel Jackson

11   got into the car with Robert Fingerhut,

12   sold him some marijuana, and then they

13   got into more conversation and Nathaniel

14   Jackson asked Robert Fingerhut if he

15   could hang out with him for a while, and

16   go back to his place.  So, Robert

17   Fingerhut and Nathaniel Jackson travel to

18   the residence of Robert Fingerhut on

19   Fonderlac Drive in Howland Township.

20   They pull the car -- Robert Fingerhut

21   pulls the car into the garage with

22   Nathaniel Jackson as a passenger.  They

217

1          went into the residence, and they went

2          into the kitchen area.  Robert Fingerhut

3          and Nathaniel Jackson got into a

4          conversation.  Nathaniel stated that

5          Robert Fingerhut was starting to down

6          play him, like for an example, "Black

7          people never get ahead, and that you guys

8          never do nothing right."  And Nathaniel

9          Jackson stated that he got upset over

10          that and he thought that that was

11          offensive.  And then all of a sudden,

12          Robert Fingerhut pulls out a gun and

13          shoots Nathaniel Jackson in the left fore

14          finger, index finger.

15     Q.   That is the one that had the bandage on it?

16     A.   Yes, left index finger.  At that time, a

17          struggle ensued with Mr. Fingerhut and

18          Nathaniel Jackson.  Nathaniel Jackson

19          took the gun off Robert Fingerhut and

20          shot him twice.  Nathaniel also stated

21          that Mr. Fingerhut was still living,

22          still breathing, he could hear him

218

```
 1              gurgling.  Then Nathaniel Jackson leaves

 2              the residence, jumps into the Chrysler,

 3              silver Chrysler of Robert Fingerhut, and

 4              drives to Youngstown, Ohio to Wirt

 5              Street.  And during that ride from Robert

 6              Fingerhut's residence to Sheila's house

 7              on Wirt Street, he disposed of a gun

 8              somewhere on Route 82.

 9   Q.    Now that is a summary of what you recall

10              referring to your notes?

11   A.    Yes.

12   Q.    Now, I'm going to hand you what has been

13              marked as State's Exhibit 2.  That is a

14              summary made by Detective Monroe, a copy

15              thereof, and can you identify that

16              document?

17   A.    This is a summary done by Detective Sergeant

18              Monroe from the Howland Police

19              Department.  This is a fair and accurate

20              summary interview of myself and Detective

21              Monroe's interview prior to the video

22              interview.
```

219

1    Q.   Did you personally make notes of this
2         particular interview?
3    A.   I think that Detective Monroe made them, took
4         the notes.  I didn't take notes.
5    Q.   So, because it was his case, you were
6         participating with him?
7    A.   Yes.
8    Q.   And he was more or less the person that
9         started the conversation?
10   A.   He would be the lead investigator, lead
11        interrogator.
12   Q.   Now had a you chance to look -- well, have you
13        seen this before?
14   A.   Yes.
15   Q.   And that is an accurate summary of a
16        conversation between the Defendant, you
17        and Monroe, between 11:45 and 2:13 or
18        thereabouts?
19   A.   Yes.
20   Q.   On that day in question?
21   A.   Yes, Sir.
22   Q.   No doubt in your mind that is complete, an

220

1           accurate summary?

2   A.   No doubt in my mind.

3   Q.   Now I notice the summary contains a little bit

4           more than what you told Judge Stuard.

5   A.   That is correct.

6   Q.   Because you did not read verbatim, is that

7           correct?

8   A.   That is correct.

9   Q.   And for example, there was a point that when

10          the Defendant alleged that he was being

11          talked down to that he asked to go back

12          to the hood?

13  A.   Yes.

14  Q.   This was in line with the conversation that

15          you had in the car at the Youngstown P.D.

16          somewhere after 12:00 midnight where you

17          said that he would be given an

18          opportunity to tell you what his side was

19          or his version was?

20  A.   Yes.

21  Q.   And when he was in the car, he agreed to that?

22  A.   Yes.

221

1    Q.   He said that is okay?

2    A.   Yes.

3    Q.   So, and this was asked of him in the car after

4         he had been given his rights, is that

5         correct?

6    A.   That is correct.

7    Q.   And at no time did he assert his

8         Constitutional rights throughout this

9         period of time as far as we have gone?

10   A.   No.

11   Q.   Now it comes somewhere about 2:13 A.M.

12   A.   Yes.

13   Q.   Is there an effort at this point or do you or

14        Monroe in fact provide the Defendant with

15        a written form that has his

16        Constitutional rights under the Miranda

17        decision?

18   A.   Yes.

19   Q.   And I'm going to hand you what has been marked

20        as State's Exhibit 3.  Can you identify

21        State's Exhibit 3?

22   A.   Yes, this is a Constitutional rights Miranda

222

1          waiver that was read by Detective Monroe

2          to Nathaniel Jackson in my presence, on

3          video, at the Trumbull County Sheriff's

4          department.

5     Q.   It says Captain Bacon's office, 12-21-01 at

6          2:13 A.M?

7     A.   Yes.

8     Q.   Whose handwriting is that?

9     A.   Detective Paul Monroe.

10    Q.   I notice that after his rights are given, for

11         example, "You must understand your

12         rights, you have a right to remain silent

13         and anything you can say could be used

14         against you.  You have the right to talk

15         to a lawyer for advice before we ask any

16         questions, to have him with you during

17         questioning.  If you can not afford a

18         lawyer, one will be appointed before any

19         questions, if you wish.  If you decide to

20         now answer questions without a lawyer

21         present, you still have the right to stop

22         at any time.  And also you have a right

223

1          to stop at any time and talk to a

2          lawyer," is that correct?

3    A.    Yes.

4    Q.    There's six lines with N.J., is that correct?

5    A.    Yes.

6    Q.    This is a copy of the original document?

7    A.    Yes.

8    Q.    It is an accurate copy?

9    A.    Yes, Sir.

10   Q.    Who put the N.J.?

11   A.    Nathaniel Jackson.

12   Q.    So, that indicates that when you talk to an

13         individual, that you go over each

14         Constitutional provision, and if he

15         understands them, he puts his initials?

16   A.    Yes.

17   Q.    Then you have waiver of rights, "I have read

18         or have had read to me, my Constitutional

19         rights," and without going through all of

20         this dealing with that he didn't want a

21         lawyer, there's been no promises or

22         threats, and were there any promises or

224

1           threats made at any time?

2   A.    No.

3   Q.    It says, "I waive my rights and agree to make

4           a statement," is that correct?

5   A.    Yes.

6   Q.    It says waiver of rights?

7   A.    Yes.

8   Q.    Did the Defendant sign this waiver?

9   A.    Yes, he did.

10  Q.    Before you went on film, was he given an

11          opportunity to see this statement or was

12          it given to him while it was being

13          videoed?

14  A.    It was given to him while it was being

15          videoed.

16  Q.    And it was read to him according to your

17          testimony, is that correct?

18  A.    Yes, Sir.

19  Q.    And then who signs the waiver?

20  A.    Nathaniel Jackson signs the waiver, and it is

21          witnessed by myself and Detective

22          Sergeant Paul Monroe.

225

1  Q.   And that is at 2:15 A.M., is that correct?

2  A.   Yes.

3  Q.   And that is State's Exhibit 3?

4  A.   Yes.

5  Q.   And that is your signature as a witness?

6  A.   Yes, Sir.

7  Q.   Who set up the video?

8  A.   Captain Bacon from the Trumbull County

9          Sheriff's department.

10              MR. WATKINS:  At this point, either

11  a short recess or we'll start playing the tape,

12  which is about 55 minutes long.

13              THE COURT:  Let's take a ten minute

14  break.

15  (Resumed in Open Court at 10:40 A.M.)

16              MR. WATKINS:  I'm going to hand you

17  State's Exhibit 5, which is a video that has been

18  talked about and testified to previous to our break

19  by Sergeant Hoolihan.  It is my understanding that

20  the tape will be played once the appropriate

21  foundation is made, and then it would be

22  unnecessary for the Court Reporter to take it down,

226

1   since the tape speaks for itself.

2                   MR. LEWIS:  Agreed.

3                   THE COURT:  Thank you.

4   Q.   (By Mr. Watkins)  I'm going to hand you what

5           has been marked as State's Exhibit 5.

6           And that is what?

7   A.   This is the video taped interview of Nathaniel

8           Jackson.

9   Q.   And you talked about the Miranda warning being

10          given and that you and Detective Paul

11          Monroe were present in Captain Bacon's

12          office on the 21st of 2001, December 21,

13          2001, is that correct?

14  A.   Yes, Sir.

15  Q.   And the tape lasted approximately one hour?

16  A.   Yes, Sir.

17  Q.   And this tape is taken while you and Sergeant

18          Monroe and the Defendant are the only

19          ones present?

20  A.   Yes, Sir.

21  Q.   And after the tape was made, did you have an

22          occasion to look at the tape?

227

```
 1    A.    Yes, Sir.
 2    Q.    Did you have an occasion to go through a
 3          transcript?
 4    A.    Yes, Sir.
 5    Q.    And did you have an occasion in fact to make
 6          some corrections?
 7    A.    Yes, Sir.
 8    Q.    And it was last week or early this week?
 9    A.    It was the end of last week.
10    Q.    And that is what has been forwarded to Defense
11          counsel and the Court and it says REV on
12          the transcript, and I'm going to hand you
13          what has been marked as State's Exhibit
14          4, and it is your testimony that you
15          looked at State's Exhibit 5 and this is a
16          copy thereof, and then you looked at a
17          transcript that was not made by you?
18    A.    That is correct.
19    Q.    And you went through to the best of your
20          ability to make sure that the transcript
21          was accurate with the tape recording, is
22          that correct?
```

228

1   A.   Yes, Sir.

2   Q.   And was the tape recording that you reviewed

3        and the transcription that you corrected

4        and the one that is now offered as

5        Exhibit 4, contain everything that

6        occurred on that Friday in December, and

7        were there -- first, was that everything

8        that occurred?

9   A.   Yes.

10  Q.   Any deletions, any additions as far as the

11       tape?

12  A.   No.

13  Q.   The point is this tape is accurate and there

14       was never any editing of the tape?

15  A.   No editing.

16  Q.   And you will have an opportunity to see the

17       tape once again to see, to insure that

18       this is the total tape?

19  A.   Yes, Sir.

20            MR. WATKINS:  With the Court's

21  permission, I'll play State's Exhibit 5 that has

22  been identified by the witness.

229

1          THE COURT:  Please proceed.

2   (State's Exhibit 5, video tape played for the Court

3   at this time.)

4          THE COURT:  For the record, the

5   Court has watched the video tape.

6   Q.    (By Mr. Watkins)  Detective Hoolihan, you

7          reviewed with all of the parties and the

8          Court the video tape that has just been

9          played?

10  A.    Yes.

11  Q.    And that is the video tape that you described

12         before it was played?

13  A.    Yes.

14  Q.    And it is an accurate and complete video?

15  A.    Yes.

16  Q.    Now, during the time that you gave at the

17         beginning, the rights to the Defendant,

18         did you make a determination whether he

19         could read or write?

20  A.    Yes.

21  Q.    And was that determination in part based on

22         letters that you had read?

230

1    A.    Yes.

2    Q.    And you indicated that, to the Court, that you

3          went from Youngstown to the Trumbull

4          County jail and he never was booked; is

5          that correct at that point?

6    A.    That is correct.

7    Q.    So, he was booked into jail after this

8          statement was completed?

9    A.    Yes.

10   Q.    And within approximately three hours of his

11         arrest?

12   A.    That is correct.

13   Q.    And who booked him into Trumbull County jail

14         for aggravated murder?

15   A.    I'm not sure who did it.

16   Q.    You did not?

17   A.    That is correct.

18              MR. WATKINS:  I have no further

19   questions.

20              THE COURT:  Let's come back at 1:00.

21   (Court in recess at 11:50 A.M.)

22   (Resumed in Open Court at 1:05 P.M.)

231

| | |
|---|---|
| 1 | CROSS EXAMINATION OF MR. HOOLIHAN BY MR. LEWIS: |
| 2 | Q.   Officer Hoolihan, you indicated, I believe |
| 3 | that you got involved in this case, was |
| 4 | it on December 13th? |
| 5 | A.   Yes, Sir. |
| 6 | Q.   2001.  You can refer to those notes.  As a |
| 7 | result, was this a task force type |
| 8 | operation -- in other words, if there was |
| 9 | a murder or homicide.  Was it the |
| 10 | Trumbull County task force that was |
| 11 | involved or did you become involved |
| 12 | because something referred back into |
| 13 | Warren, Ohio here? |
| 14 | A.   Actually there were three reasons why I got |
| 15 | involved.  The first reason was because I |
| 16 | received a phone call from Sergeant |
| 17 | Dillon from Howland Police Department and |
| 18 | he wanted me to pull the theft report |
| 19 | from Donna Roberts regarding the theft of |
| 20 | a gun. |
| 21 | Q.   That was allegedly a weapon stolen or taken |
| 22 | from her by a Santiago Mason, is that |

232

1           correct?

2    A.    Yes, Sir.  The second reason would be because

3           there were some interviews that needed to

4           be conducted at the Greyhound bus

5           terminal located in Warren, Ohio on West

6           Market Street; and thirdly, because I am

7           a member of the Trumbull County homicide

8           task force and I was asked to assist in

9           the investigation.

10   Q.    So, we have got three reasons why you got

11          involved in this?

12   A.    Yes, Sir.

13   Q.    And you did in the meantime, shortly after

14          being involved, you did check out the

15          Santiago Mason, that report in regard to

16          him supposedly taking the weapon and so

17          forth?

18   A.    Yes, Sir.

19   Q.    You also did go to the Greyhound bus station

20          to conduct some interviews?

21   A.    Yes, Sir.

22   Q.    And you also did a records check, of course,

233

```
 1              in regard to the Defendant, Mr -- well,
 2              the Defendant, I mean you did a records
 3              check --
 4   A.   A criminal history background.
 5   Q.   Okay.  As a result of that, did it come out in
 6              a LEADS form or combination of both?
 7   A.   The one that I would refer to that I did would
 8              be the Warren Police Department.  It is
 9              like a public global inquiry.
10   Q.   That one is a public one?
11   A.   Yes, Sir.
12   Q.   Was there any hits on that?
13   A.   Well, there was a record there, but I can't
14              tell you what it said.
15   Q.   And there was the LEADS, you did the LEADS,
16              also?
17   A.   I did not.
18   Q.   So, you really just did the local?
19   A.   Yes, Sir.
20   Q.   And the next event of importance came on
21              December 20, is that correct?
22   A.   Yes, Sir.
```

234

| | | |
|---|---|---|
| 1 | Q. | Do you happen to recall what day of the week |
| 2 | | that was by any chance? |
| 3 | A. | I believe it was a Thursday. |
| 4 | Q. | And on that date, there was a warrant secured |
| 5 | | for the arrest of Nathaniel Jackson? |
| 6 | A. | Yes, Sir. |
| 7 | Q. | And that was a warrant issued by Judge Stuard, |
| 8 | | is that correct? |
| 9 | A. | Yes, Sir. |
| 10 | Q. | And the warrant indicated that the crime for |
| 11 | | which the warrant was issued was |
| 12 | | aggravated murder? |
| 13 | A. | Yes, Sir. |
| 14 | Q. | And did you physically take possession of that |
| 15 | | warrant? |
| 16 | A. | No, Sir. |
| 17 | Q. | Do you know who did? |
| 18 | A. | I believe Detective Sergeant Paul Monroe and |
| 19 | | Sergeant Frank Dillon of the Howland |
| 20 | | Police Department. |
| 21 | Q. | So, when you went to Youngstown that night, |
| 22 | | then Officer Monroe had the warrant? |

235

1   A.   Officer Monroe did not go to Youngstown.

2   Q.   Did anybody go into Youngstown?  Did they have

3        the warrant?

4   A.   Not that I am aware of.

5   Q.   That same night, prior in time to going to

6        Liberty, and in the staging area for the

7        SWAT team, you indicated statements were

8        taken from Donna Roberts?

9   A.   Yes, Sir.

10  Q.   As a result of her cooperation, the phone call

11       was supposed to be placed to this Wirt

12       Street address to find out if Nathaniel

13       Jackson was in fact there and to possibly

14       keep him on the phone, right?

15  A.   Yes, Sir.

16  Q.   So, that was the plan to make sure he was

17       there and maybe keep him on the phone

18       while the police encircled the area; is

19       that basically it?

20  A.   Yes, Sir.

21  Q.   And you indicated there was probably about 20

22       officers involved?

236

```
 1   A.   Yes, Sir.

 2   Q.   And a bullhorn was used and everybody in the

 3        house was told to come out?

 4   A.   Yes, Sir.

 5   Q.   With their hands up or something to that

 6        effect?

 7   A.   That is correct.

 8   Q.   And how many people came out to your

 9        recollection?

10   A.   I believe there were three, including

11        Nathaniel.

12   Q.   And as you indicated, they were told to come

13        out, hands up and actually asked him to

14        walk backwards?

15   A.   Yes.

16   Q.   And all of the people did that?

17   A.   Yes, Sir.

18   Q.   Was there any attempt from that point or that

19        point forward or that point back where

20        Nathaniel Jackson was attempting to

21        escape or to run or anything of that

22        nature?
```

237

1    A.    No, Sir.

2    Q.    And once he came out of the house, what did

3          you do?

4    A.    He was ordered to walk towards me by Agent

5          Hopper from the Violent Crimes Task Force

6          in which he complied.  Once he came

7          within arm's reach of myself, I

8          handcuffed him.

9    Q.    And what did you do after you handcuffed him?

10   A.    I searched him.

11   Q.    Did you find anything on him?

12   A.    No.

13   Q.    Did you do anything else at that point?

14   A.    At that time, Captain Bacon walked over.  He

15         was secured in the rear of a Youngstown

16         police marked unit.  That was in the

17         middle of the road blocking traffic and

18         myself and Nathaniel were in the back

19         seat.

20   Q.    Well, he was secured in the back seat of the

21         cruiser, right?

22   A.    He was secured in the back seat of the

238

1          cruiser.  I was sitting next to him and

2          Captain Bacon called for a marked

3          Trumbull County Sheriff's deputy unit to

4          come and pick us up.

5   Q.   Why did you get in the back of the car with

6          him?  Is there any special reason?  The

7          doors are locked and the screen is up?

8   A.   He was a prisoner and I had to stay with him.

9   Q.   What happened next?

10  A.   At that time, the members of the task force

11         along with the SWAT team were still

12         having people removed from the residence,

13         securing the scene.  Once the persons

14         were removed from the house, an entry was

15         made and several law enforcements entered

16         the residence to check for other persons

17         and make sure that there were no weapons

18         or any danger to the officers' safety.

19  Q.   Was the house searched then, basically?

20  A.   Yes, it was.

21  Q.   Did you have a search warrant or anything for

22         the house?

239

1   A.   No, Sir.

2   Q.   And at the time they went in and searched the

3        house, the occupants were already

4        outside, is that correct?

5   A.   Yes, Sir.

6   Q.   And Nathaniel was in the back of a Youngstown

7        police cruiser?

8   A.   During the search -- what search are you

9        talking about?

10  Q.   I am talking about the search of the house?

11  A.   At that time, I believe we were in the back of

12       the cruiser and getting ready to go back

13       to Trumbull County jail.

14  Q.   And you are in the back of the cruiser, and

15       there was a call made to the Sheriff's

16       department for transport?

17  A.   Yes, Sir.  It would have been the 911 dispatch

18       center.

19  Q.   Who responded in regard to that transport?

20  A.   Deputy Jeff Hoso.

21  Q.   And when Officer Hoso arrived, what did you do

22       then?

240

1   A.   He came over to the Youngstown police cruiser,

2        myself along with him, put Nathaniel

3        Jackson in the rear of the marked

4        Trumbull County Sheriff's deputy unit,

5        and I then got into the back seat with

6        Nathaniel and Deputy Hoso, then went to

7        the Trumbull County jail.

8   Q.   So, you rode along with Mr. Jackson?

9   A.   Yes, Sir.

10  Q.   Were you in the back or in the front of the

11       cruiser?

12  A.   I was in the back.

13  Q.   What if anything happened in the back of the

14       cruiser, anything?

15  A.   Nothing.

16  Q.   Let's get back, when I was asking you what

17       were you doing and what happened, you --

18       let's go back to Youngstown.  Did any

19       conversation occur between you and

20       Nathaniel Jackson when the handcuffs were

21       put on him?

22  A.   Well, I told him that I was going to put him

241

1        in the back of this marked unit until

2        another cruiser arrived.

3   Q.  And that is what you did?

4   A.  Yes.

5   Q.  So, in essence, that is the entirety of it?

6   A.  Right.

7   Q.  So then you are being transported by Jeff

8        Hoso.  He's driving the Trumbull County

9        Sheriff's car, you are in the back seat

10       with Nathaniel and he's being brought to

11       the Sheriff's department, correct?

12  A.  Yes, Sir.

13  Q.  And the best recollection of time on that

14       is -- I have got 12:29 here.

15  A.  12:29 would be the time that Jeff Hoso arrived

16       to transport myself and Nathaniel Jackson

17       to the Trumbull County jail.

18  Q.  I have another time written down here, 12:45

19       arrived.  Is that when you arrived?

20  A.  That is correct.

21  Q.  Did you have any conversation with Mr. Jackson

22       in the car enroute from the Youngstown

242

```
 1              scene at Wirt Street to the Trumbull
 2              County jail?
 3   A.    No.
 4   Q.    And he was actually placed under arrest or he
 5              was secured in custody in Mahoning
 6              County, was he not?
 7   A.    Yes, Sir.
 8   Q.    Once you got Mr. Jackson to the Sheriff's
 9              department, you indicated that he was
10              placed in a weight room.  You mean a
11              weight lifting weight room?
12   A.    Yes, what happened there, when we arrived
13              there, the Sheriff's Department Detective
14              Bureau was locked.  Each office has a
15              separate key.  The place was locked down.
16              The only access that we could have gained
17              was from the rear door entrance into the
18              hallway.  So, there was no place to put
19              Nathaniel Jackson unless we put him in
20              the jail, which at that time, we didn't
21              want to do, so we placed him into the
22              weight room until Captain Bacon could
```

243

1        finish at the scene on Wirt Street and

2        return to the Trumbull County Sheriff's

3        department to open the doors.

4   Q.   So, Officer Bacon had the key, but he was

5        still at Wirt Street in Youngstown?

6   A.   Yes.

7   Q.   In any event, he was placed in the weight

8        room?  Who was placed in there with him?

9   A.   Sergeant Dillon was in there.  He was the last

10       person that I saw him with.

11  Q.   And Sergeant Dillon, what police department is

12       he from?

13  A.   Howland Police Department.

14  Q.   Is that room, do you have any audio to that

15       room or when the door is closed, could

16       you hear what was going on?

17  A.   The door was opened into the entrance of the

18       weight room.

19  Q.   And where did you go during the time that he

20       was in there with Officer Dillon?

21  A.   I went down the hall to the lobby area where

22       they have coffee, vending machines and so

244

```
 1          forth.
 2   Q.   Do you have any idea whether Mr. Jackson and
 3          Mr. Dillon had any conversation or not?
 4   A.   None that I believe so.
 5   Q.   None that you heard?
 6   A.   None that I am aware of.
 7   Q.   So, it would could have been that Officer
 8          Dillon did talk to Mr. Jackson?
 9   A.   I'm not aware of that.
10   Q.   I know you are not aware of it, but he was in
11          the room alone with Officer Dillon and
12          you were down at the other end with the
13          coffee and the cream and so forth, so he
14          could have talked to him and you wouldn't
15          know it, right?
16   A.   That is correct.
17   Q.   And a short time after that, I assume that
18          Officer Bacon arrived at the Sheriff's
19          department, right?
20   A.   Yes.
21   Q.   And was Officer Monroe also there -- did he
22          come?  When did he come?  He had to be
```

245

```
 1              there.
 2    A.    When I arrived at the Trumbull County jail
 3              with Nathaniel Jackson, Detective Dillon
 4              and Sergeant Monroe were already there.
 5    Q.    So, Officer Monroe is there, Officer Bacon,
 6              yourself, Officer Dillon is watching
 7              Nathaniel Jackson in the weight room, and
 8              what is it that you devised a plan or you
 9              talked about what you are going to do
10              next, right, basically?
11    A.    Well, it wasn't a short time when Captain
12              Bacon came back.  It was some time.  When
13              Captain Bacon arrived, he unlocked his
14              office and the room was to be -- to make
15              sure it was set up for interview and then
16              myself, along with Captain Bacon, Major
17              Phillips and Detective Monroe discussed
18              who was going to do the interview.
19    Q.    In fact, I think you indicated that he was
20              probably in the weight room almost an
21              hour of time with Officer Dillon,
22              correct?
```

246

```
 1   A.   And I believe that once Captain Bacon arrived,
 2             Nathaniel Jackson was transported from
 3             the weight room to Captain Bacon's
 4             office.
 5   Q.   And of course, that is where the video tape
 6             was taken?
 7   A.   Yes, Sir.
 8   Q.   Once you determined what the procedure was
 9             going to be, you wanted to question
10             obviously Mr. Jackson, correct?
11   A.   Yes, Sir.
12   Q.   And it was determined then I think that
13             Officer Bacon set the equipment up?
14   A.   The equipment was set up prior to the
15             interview by Captain Bacon.
16   Q.   So, it was determined that you and Officer
17             Monroe would be the ones to question
18             Mr. Jackson, is that correct?
19   A.   Yes, Sir.
20   Q.   And did you have any conversation with
21             Mr. Jackson before you started the video
22             tape?
```

247

```
 1   A.   Yes, we did.

 2   Q.   And when was that?

 3   A.   It was when we entered the interview room, I

 4             brought him coffee and he was smoking a

 5             cigarette, and we closed the door, and

 6             sat down and started talking.

 7   Q.   And how did the conversation go, do you

 8             remember?

 9   A.   The conversation is detailed in the summary of

10             Detective Monroe from Howland Police

11             Department.

12   Q.   In other words, Officer Monroe was there as

13             well?

14   A.   Yes.

15   Q.   The three of you.  Once you talked to

16             Mr. Jackson as it is outlined in the

17             Exhibit 1 -- 2, I'm sorry.  Exhibit 2,

18             that is a summary of what the

19             conversation was when Officer Monroe and

20             yourself were talking to Mr. Jackson,

21             right?

22   A.   Yes, Sir.
```

248

1    Q.    After having that conversation, then you moved

2          on to the video tape, is that correct?

3    A.    Yes, Sir.

4    Q.    Let's go back now.  When was the first time

5          you talked or had a conversation with

6          Mr. Jackson?

7    A.    When he was placed into custody.

8    Q.    And what did you tell him?

9    A.    That I'm going to place him in the rear of the

10         Youngstown marked police unit.

11   Q.    And after you put him or took him into custody

12         and put him in the police cruiser, what

13         did you tell him or what did he tell you?

14   A.    May I refer to my notes?

15   Q.    Yes.  Incidentally, let me ask you, you say

16         you refer to your notes, those aren't

17         really the original notes, are they?

18         These are all typewritten?

19   A.    Yes, Sir.

20   Q.    I assume the original notes, I think you

21         mentioned something about a legal pad?

22   A.    Yes, Sir.

249

```
1   Q.   And that is normally what you would take along
2            with you for interviews or when you talk
3            to people or you talk to them in the
4            police station?
5   A.   You keep them in your possession.
6   Q.   You wanted to be able to take things down?
7   A.   Right.
8   Q.   Do you use tape recorders, cassette recorders?
9   A.   Yes, Sir.
10  Q.   And you use those for interviews with various
11           people, correct?
12  A.   Yes, Sir.
13  Q.   Do you ever use them for your own note taking
14           capabilities instead of writing something
15           down, you know how the lawyers walk
16           around and they are talking into their
17           recorders all the time just to remember
18           things.  "I talked to John Doe, it was
19           Saturday at 12:00.  He looked messed up.
20           He actually smelled like alcohol."
21  A.   No, I don't use that method.
22  Q.   You would be a note taker?
```

250

1   A.   Yes, Sir.

2   Q.   So, when you got into the police cruiser over

3             on Wirt Street in Youngstown, what did

4             you do with Mr. Jackson at that time?

5   A.   Put him in the back of the police cruiser.

6   Q.   What else did you do, anything else?

7   A.   Just placed him in the back and sat in there

8             with him.

9   Q.   That is the total extent of it?

10  A.   Yes.

11  Q.   Did you tell him anything?

12  A.   Yes, after I advised him of his rights, I told

13            him some things.

14  Q.   Let me ask you about advising of the rights.

15            How did you exactly do that?

16  A.   From memory.

17  Q.   By memory?

18  A.   Yes, Sir.

19  Q.   And you don't have the card?

20  A.   I have a card, but I don't carry it with me.

21  Q.   You had a legal pad though, right?

22  A.   No.

251

```
1   Q.   Didn't have anything out in the field?

2   A.   No.

3   Q.   There were 20 officers at the scene when

4            Mr. Jackson was taken into custody,

5            correct?

6   A.   In the area, yes.

7   Q.   And you indicated that you gave him his

8            rights?

9   A.   Yes, Sir.

10  Q.   And that was from memory?

11  A.   Yes, Sir.

12  Q.   And go ahead and give me those as you remember

13           giving them to Nathaniel that particular

14           night.

15  A.   "You have the right to remain silent.

16           Anything you say can and will be used

17           against you.  If you cannot afford an

18           attorney, one will be appointed for you."

19           That is what I told him.

20  Q.   What happened after you gave him the rights as

21           you just gave them?

22  A.   He started talking on his own.
```

252

```
1    Q.    What did he tell you?

2    A.    He stated that, "Man, I did not kill anybody,

3               man, and asked that he has the right to

4               an attorney at any time.  I advised him

5               yes, he has the right to an attorney.

6               Nathaniel said, man, I was on the phone

7               with Donna and looked out the window and

8               sees all the police cars, and wondered

9               what was going on.  I advised Nathaniel

10              that Donna Roberts had snitched him out

11              and that is how we knew where to find

12              him, and she agreed to make the phone

13              call to verify that you were in the

14              house.  Nathaniel said, man, I did not

15              kill nobody.  I advised Nathaniel that

16              Donna was at the Trumbull County Jail and

17              was cooperating with investigators and

18              told them all about the murder of her

19              husband, Robert, and that when we got to

20              the Trumbull County Jail that he would

21              have a chance to tell his side of the

22              story, and would be asked some questions.
```

253

```
 1              Nathaniel said, man, I cannot believe
 2              that she did that to me.  I told
 3              Nathaniel once again that Donna told us
 4              everything, and that he would have an
 5              opportunity to tell investigators his
 6              side of the story."
 7   Q.   Obviously you didn't have anything in written
 8              form, the rights form or anything else at
 9              that point in time?
10   A.   No, Sir.
11   Q.   So there's nothing signed by him saying he was
12              given rights, correct?
13   A.   No, Sir.
14   Q.   There wasn't any tape recorder used when you
15              were talking to him advising him of his
16              rights and acknowledgment of rights, is
17              that correct?
18   A.   Yes, Sir.
19   Q.   You did not take the police cruiser microphone
20              and plug it in or turn it on, let's put
21              it that way and just have it recorded
22              over the system?
```

254

1    A.    I have no authority to do that.

2    Q.    It was a Youngstown police cruiser, you mean

3          if you asked them to do that, they

4          wouldn't do that?

5    A.    No, Sir, because I believe that police radio

6          is used for emergency traffic and

7          communications.  I wasn't aware of any

8          situation that the Youngstown Police

9          Department was involved in, so I think it

10         would be very odd for an unknown law

11         enforcement officer to come over a radio

12         and start talking.

13   Q.    We just had Mr. Lucic do that in another case,

14         where he wanted the confession on record.

15         In any event, you got into a Sheriff's

16         cruiser, you still didn't do it in any

17         form or fashion?

18   A.    No, Sir.

19   Q.    Is that the entire extent of what you talked

20         to and told Mr. Jackson over on Wirt

21         Street?

22   A.    Yes, Sir.

255

```
 1   Q.   That is the entirety of it?  Was there
 2             anything else that you may have told him?
 3   A.   No.
 4   Q.   I am talking from what I have asked you right
 5             here.  Is there anything else?
 6   A.   No, Sir.
 7   Q.   What you are telling me is you really didn't
 8             tell him that he was under arrest for
 9             aggravated murder or anything?
10   A.   I told him that.
11   Q.   That is what I'm asking you.
12   A.   It is contained in my notes.
13   Q.   Those aren't really the notes though, are
14             they?
15   A.   Yes, they are.
16   Q.   These are the notes you prepared that night?
17   A.   These are the notes based on my conversation
18             with Nathaniel Jackson.
19   Q.   Those aren't really the notes, the notes that
20             you wrote on the legal pad, is it?
21   A.   No.
22   Q.   That is a compilation in sentence form of what
```

256

1          your notes supposedly have in them,

2          right?

3    A.    Yes, Sir.

4    Q.    You do have your notes some place, in fact I

5          see the yellow paper, is that actually

6          the notes?

7    A.    No, Sir, the notes are not here.

8    Q.    But you do have those notes, right?

9    A.    No, Sir.  Once I put them in the computer, I

10         destroy them.

11   Q.    Once you take the notes, then you destroy

12         them?

13   A.    Yes, Sir.

14   Q.    When did you put those into the computer and

15         produce the written form, the summary

16         here?

17   A.    Approximately two to three weeks ago.

18   Q.    This happened back on December 21st, right?

19   A.    Yes.

20   Q.    So, you are telling us that you didn't reduce

21         your notes into written or sentence form

22         until just two or three weeks ago?

257

1    A.   That is correct.

2    Q.   Then you went ahead and destroyed your notes?

3    A.   Yes, Sir.

4    Q.   So, we have to rely on that your notes, were

5         your notes as full and elaborate as what

6         the sentences are here?

7    A.   What I do is when I take notes, I write down

8         on a legal pad and then I translate it

9         into the computer and that is a matter of

10        record.

11   Q.   I understand.  What I'm asking though, the

12        notes usually aren't written out in

13        sentence form or whatever.  They are

14        notes, 12-21 walked backwards out of the

15        house, handcuffs.  Police cruiser,

16        Mahoning County.  Things like that.

17   A.   The way I do notes, as I write it the way I'm

18        going to type it and say it.

19   Q.   You are telling me that this is the way you

20        wrote the notes out?

21   A.   Yes.

22   Q.   And because they were placed in a computer,

258

```
 1            you went ahead and destroyed your notes?
 2   A.   Yes.
 3   Q.   What was the reason for that?
 4   A.   That is a normal practice.  When we take notes
 5            and then we translate them into the
 6            computer, we get rid of them.
 7   Q.   So, we don't really have the original notes
 8            here?
 9   A.   No, Sir.
10   Q.   We have what you have in the computer.  Then
11            when you arrived back, you arrive with
12            Nathaniel Jackson and you are in the back
13            of the car with Officer Hoso and there's
14            no conversation that takes place, is that
15            correct, with Nathaniel Jackson?
16   A.   That is correct.
17   Q.   He's brought to the Trumbull County Sheriff's
18            department and he's placed in the weight
19            room?
20   A.   Yes, Sir.
21   Q.   Your intent is to question him, right?
22   A.   Yes.
```

259

```
 1   Q.   You go in and the first thing you do is give
 2            him his rights forms?
 3   A.   No, there was a conversation prior with him
 4            and myself.
 5   Q.   Let me ask you something.  We're at the
 6            Sheriff's office.  Officer Bacon came
 7            back, he's the man with all of the keys.
 8            He can get into all of the doors, all of
 9            the offices.  There's an office, his own
10            office where the equipment is set up or
11            whatever and this vast complex of the
12            Sheriff's office, there must be the
13            rights form.  It is Exhibit No. 3, a
14            rights form.  You have seen those before,
15            haven't you?
16   A.   Yes, Sir.
17   Q.   And you didn't give him the actual form or
18            have him sign the form out in Mahoning
19            County on Wirt Street because you didn't
20            have one, right?
21   A.   Right.
22   Q.   When you got back to the Sheriff's department,
```

260

```
 1              and when you interrogate somebody or you
 2              take someone to the Warren Police
 3              Department and question them, the rights
 4              forms are at least there, aren't they?
 5   A.   Yes, Sir.
 6   Q.   Why wasn't the rights form given to him or was
 7              he advised of his rights?
 8   A.   Because I advised Detective Monroe prior to
 9              the interview that I already advised him
10              of his rights at the scene on Wirt
11              Street.
12   Q.   Officer Monroe just said, "Well, that is fine,
13              I'm not going to advise him of his rights
14              any more," or whatever, that was it?
15   A.   Right.
16   Q.   Is that your normal practice to verbally give
17              it, just go ahead and talk to someone
18              then get the written form of the rights?
19   A.   Depends -- I can't speak for other
20              investigators.  I wasn't the lead
21              detective here.
22   Q.   Officer Monroe was the lead detective?
```

261

1    A.    Yes, Sir.

2    Q.    So, in essence though, when you went back in

3          to interrogate Mr. Jackson with Officer

4          Monroe, these forms were available before

5          you went to talk to him, right?

6    A.    When?

7    Q.    When you were talking to him at the Sheriff's

8          department?

9    A.    Yes.

10   Q.    He was taken out of the weight room and

11         brought to Officer Bacon's room, right?

12   A.    Right.

13   Q.    No question about it.  Later on he's in that

14         room and he does sign a form?

15   A.    Yes, Sir.

16   Q.    The form was available an hour before?

17   A.    Yes, Sir.

18   Q.    But it was not given to him or acknowledged

19         supposedly, correct?

20   A.    That is correct.

21   Q.    Incidentally, the form, the form is to

22         acknowledge the rights given, correct?

```
                                                          262
1    A.    Yes, Sir.

2    Q.    And down below the waiver is down below

3          waiving your rights?

4    A.    Yes, Sir.

5    Q.    Did you have Mr. Jackson read that aloud?

6    A.    No.  The rights form was read and shown to him

7          by Detective Monroe and Nathaniel Jackson

8          stated that he understood it, signed it,

9          and I asked him at the end of the

10         signature, if he had any questions

11         regarding his rights and he said no.

12   Q.    There's only room on the form for one

13         signature by the Defendant, correct?

14   A.    Yes, Sir.

15   Q.    So really when he signs it down there, it

16         means supposedly acknowledgment of

17         rights, but it also means waiver of

18         rights?

19   A.    Yes, Sir.

20   Q.    There isn't any way to sign just for

21         acknowledgment of rights and then leave

22         the bottom blank, right?  There's no two
```

263

```
 1            signature lines?
 2  A.   It is two separate sections of the Miranda.
 3            If he didn't want to sign it and waive
 4            his rights, then he didn't have to sign
 5            it.
 6  Q.   The top part is the acknowledgment of rights.
 7            Were his rights given to him?  As a
 8            Defendant, I can say, Officer, you gave
 9            me my rights.  I acknowledge my rights,
10            but I'm not going to waive my rights.  So
11            you have a signature line up here that
12            was an acknowledgment, right?
13  A.   The Miranda forms are all standard.
14  Q.   When you talked to him originally with Officer
15            Monroe, we're in Officer Bacon's office,
16            right?
17  A.   Yes, Sir.
18  Q.   Are there tape recorders around the office?
19  A.   I'm not sure.  I don't know what Captain Bacon
20            contains in his office.
21  Q.   So, the long and short is that what we have
22            are notes, we have cassette recorders
```

264

```
 1              that are used.  In fact, didn't you use

 2              cassette recorders with Donna Roberts?

 3              Were you around when the statement was

 4              taken from Donna Roberts?  Was that

 5              recorded?

 6   A.   I wasn't a part of that interview.

 7   Q.   The long and short is, we're at the Sheriff's

 8              office, you are going to go in and

 9              interrogate Mr. Jackson.  We have the

10              forms available, we have recorders, we

11              have even video equipment to begin with

12              or whatever and somehow, the conversation

13              takes place before that.  Does that seem

14              odd to you?

15   A.   No.

16   Q.   When was it that you told him he was under

17              arrest for aggravated murder?

18   A.   When I placed him in the rear of the police

19              vehicle in Youngstown.

20   Q.   Do you ever mention on the video tape when you

21              are on the video tape that he's been

22              placed under arrest?
```

265

1    A.    I don't believe so.

2    Q.    Did you ever indicate on the video tape, where

3          we can hear it that he was under arrest

4          for aggravated murder?

5    A.    I don't believe so.

6    Q.    Was he given the warrant, the arrest warrant

7          for aggravated murder before he talked to

8          you when he was back at the station,

9          where the lead detective, Officer Monroe

10         was, who had the warrant?  Was he served

11         with the warrant?

12   A.    I don't know that.

13   Q.    But you were there with Officer Monroe, right?

14   A.    I wasn't together with him the whole time.

15   Q.    So, you are thinking that maybe he was

16         actually served with the warrant by

17         Officer Monroe while you weren't looking,

18         when you weren't paying attention at the

19         Sheriff's office?

20   A.    Possible.

21   Q.    But we know that you didn't see the warrant or

22         serve it on Mr. Jackson, is that correct?

266

| | | |
|---|---|---|
| 1 | A. | That is correct. |
| 2 | Q. | What we have here is based on your notes, |
| 3 | | which the original of the notes were |
| 4 | | destroyed three weeks ago, and this is |
| 5 | | supposed to be the compilation of them, |
| 6 | | this State's Exhibit? |
| 7 | A. | Yes, Sir. |
| 8 | Q. | That would indicate that number one, that you |
| 9 | | actually indicated to Mr. Jackson that he |
| 10 | | was under arrest for aggravated murder, |
| 11 | | is that correct? |
| 12 | A. | Yes, Sir. |
| 13 | Q. | We don't have anything on tape, on the video |
| 14 | | and in written form or anything to |
| 15 | | indicate that that would be the case, is |
| 16 | | that correct? |
| 17 | A. | Just my testimony. |
| 18 | Q. | Number two, we don't have anything in written, |
| 19 | | video or audio form to indicate that he |
| 20 | | was given his rights in Youngstown on |
| 21 | | Wirt Street in the police cruiser owned |
| 22 | | by the Trumbull County Sheriff's |

267

1          Department, only your testimony?

2    A.    That is correct.

3    Q.    And prior to talking to him in the Trumbull

4          County Sheriff's department, where the

5          forms were available, this is the first

6          conversation, the forms were available,

7          you did not have him read or sign or

8          waive his rights in regard to any

9          statements he would give prior to the

10         time you had the conversation with him at

11         the Sheriff's Department with Officer

12         Monroe?

13   A.    That was, I advised Detective Monroe that I

14         advised him of his Miranda warnings and

15         he took over from there.  I'm not aware

16         of any forms that were signed prior to

17         the video.

18   Q.    Exactly.  The only forms signed and the waiver

19         of rights is on the video?

20   A.    Yes, Sir.

21   Q.    And at time of the video, not prior to that

22         time?

268

1   A.    Correct.

2   Q.    Officer Hoolihan, there was in your notes an

3               indication that during that verbal

4               conversation you had with Mr. Jackson and

5               Mr. Monroe, Officer Monroe, that as he

6               tried to detail what happened at the

7               Fingerhut residence, the argument once it

8               got going, that Mr. Jackson evidently,

9               wanted to go back to Youngstown.  In

10              other words, did he indicate to you,

11              which I think is in your notes, that he

12              was transported to the Fingerhut

13              residence by Mr. Fingerhut and that after

14              the argument got going, that he wanted

15              him to take him back to Youngstown.  In

16              other words, he had no way to go back, is

17              that correct?

18  A.    Yes, Sir.

19  Q.    Let me ask you this.  Is it a departmental

20              policy for the Warren Police Department

21              to do as you indicated what you talked

22              about before, when you took notes in

269

1        regard to this case, this is a homicide

2        case, this is a death penalty case,

3        right?

4    A.  Yes, Sir.

5    Q.  And is that a departmental policy where they

6        have you destroy notes or destroy

7        anything in regard to what you --

8    A.  It wasn't destroyed.  I would say threw them

9        away.

10   Q.  Can we go get them now?

11   A.  No.

12   Q.  Are they destroyed then?

13   A.  Yes.

14   Q.  And this is what you say is the compilation,

15       word for word from your notes?

16   A.  This here is the Exhibit No. 2, is the

17       supplement that Detective Monroe typed up

18       which is a fair and accurate conversation

19       between myself, Detective Monroe and

20       Nathaniel Jackson prior to the video.

21   Q.  Let me ask you this.  When did you see this

22       summary composed by Officer Monroe?  When

```
                                                           270
 1                did you first see that summary?

 2    A.   That was several weeks ago.

 3    Q.   This is April 17th, we'll go back three weeks,

 4              put it in the last week of March, so we

 5              have gone January, February, three and a

 6              half months, and that is the first time

 7              you see the summary of what supposedly

 8              happened three and a half months ago at

 9              the Sheriff's department?

10    A.   That is not what I said.

11    Q.   Go ahead.

12    A.   What I'm saying is when Detective Monroe got

13              done with the summary, I reviewed it for

14              accuracy.

15    Q.   When did you review it for accuracy?

16    A.   Within a few days shortly after he was

17              finished typing it.

18    Q.   Did you review it with your own notes?

19    A.   I didn't take notes.

20    Q.   You didn't take any notes at all?

21    A.   No.

22    Q.   So, Officer Monroe was the only one who took
```

271

```
 1              notes during this conversation at the
 2              Sheriff's department?
 3   A.   Yes, Sir.
 4   Q.   And you are indicating to me that that was
 5              available to you, you saw that within a
 6              couple of days after the incident?
 7   A.   No.
 8   Q.   Or after his arrest, or his interrogation, it
 9              was on the 21st  or whatever of December?
10   A.   That is not what I'm saying.
11   Q.   Help me out.  When did you see the notes
12              compiled by Officer Monroe regarding the
13              conversation you had with Nathaniel
14              Jackson and Officer Monroe of the
15              Trumbull County Sheriff's Department?
16              When did you first see those notes?
17   A.   It was a day or two after Detective Monroe
18              completed this summary.  It was brought
19              to me.
20   Q.   That is a day or two after he completed the
21              summary.  I'm not worried about when he
22              completed it.  When was the first time
```

272

1              you saw it in sequence of time going back

2              from December 21st to April 17th today,

3              when was that?

4    A.    I don't know.

5    Q.    Is it within three days of the 21st or was it

6              that time?

7    A.    It is not dated on here when it was completed.

8    Q.    What I'm asking you, do you have any idea,

9              ballpark, when you saw that?  Was it just

10              a couple of weeks ago?

11   A.    I would have to say from a guess,

12              approximately maybe a week to two weeks

13              after the incident.

14   Q.    A week or two weeks after the incident.  So he

15              had those notes compiled in that form and

16              you read that and you believe maybe two

17              or three weeks after the incident

18              happened at the latest?

19   A.    Yes, Sir.

20   Q.    We received that from the Prosecutor just two

21              weeks ago.  And how was it that you got

22              together and went over the summary?

273

```
 1   A.   We sat down and we had a meeting at the
 2           Howland Police Department and discussed
 3           several issues and Detective Monroe
 4           wanted me to read the interview.
 5   Q.   And you agree with what is in there?
 6   A.   Yes, Sir.
 7   Q.   And nobody suggested that you do the video
 8           from the very beginning, correct, for an
 9           interview?
10   A.   No.
11   Q.   When you are going to interrogate him for the
12           first time, nobody suggested you do it on
13           video, even though the room was there and
14           it was all set up in Officer Bacon's
15           office, right?
16   A.   Right.
17   Q.   Nobody suggested we're going to give him
18           rights, do it in written form, let's get
19           an audio cassette and record this?
20   A.   No.
21   Q.   Nobody suggested that?
22   A.   No.
```

274

1          MR. LEWIS:  Nothing further.  Thank

2     you.

3     REDIRECT EXAMINATION BY MR. WATKINS:

4     Q.   I understand that you took your notes and then

5               as the way you usually handle it, you

6               just --

7               MR. LEWIS:  Officer Dillon is in the

8     Courtroom.  We may end up calling him in regard to

9     this hearing.

10              MR. WATKINS:  I'll be done.  If you

11    want me to have him go outside, that is fine.

12              MR. LEWIS:  I would rather have him

13    outside, yes.

14    Q.   You went through Exhibit No. 3, which are your

15              typewritten notes, correct?

16    A.   Yes, Sir.

17    Q.   And it is a summary of what took place in the

18              vehicle with the Defendant when you first

19              saw him after his arrest?

20    A.   Yes, Sir.

21    Q.   And he was handcuffed?

22    A.   Yes, Sir.

275

1   Q.   And you testified that the FBI agents in this

2          case was on the bullhorn telling him to

3          come, he's wanted by authorities, is that

4          correct?

5   A.   Yes, Sir.

6   Q.   And you testified on direct and on cross that

7          you told him the reason for his arrest

8          was a charge of aggravated murder, is

9          that correct?

10   A.   Yes, Sir.

11   Q.   And you advised him of his rights including

12         the fact that anything you say could be

13         used against him, the right to counsel

14         and if he couldn't afford counsel, an

15         attorney would be appointed for him, is

16         that collect?

17   A.   Yes, Sir.

18   Q.   And he also asked you whether or not he could

19         have an attorney?

20   A.   Yes, Sir.

21   Q.   And you said at any time?

22   A.   Yes, Sir.

276

1  Q.  And then he started to tell you about, he was

2         on the phone with Donna?

3  A.  Yes, Sir.

4  Q.  Without referring to your notes, can you tell

5         the Judge in this case, how certain are

6         you that that happened that way?

7  A.  100 percent.

8  Q.  And the notes that you prepared today, which

9         are typewritten from your handwritten

10        notes, how sure are you that they are

11        accurate as they were as you took them?

12 A.  100 percent.

13 Q.  And by the way, you were writing down what he

14        was telling you and as you told the

15        Judge, it is just your word against his

16        in the sense that he's the only one that

17        is in that vehicle, correct?

18 A.  Yes, Sir.

19 Q.  And you are preparing and came to testify

20        under oath, "I did not kill anybody,

21        man," correct?

22 A.  Yes, Sir.

277

1   Q.   That written summary, he made no incriminating

2        remarks, correct?

3   A.   Correct.

4   Q.   And that is what you testified to Judge

5        Stuard?

6   A.   Yes, Sir.

7   Q.   And it was your word?

8   A.   Yes, Sir.

9   Q.   That Nathaniel Jackson, in that car

10       conversation said he didn't kill anybody?

11  A.   Yes, Sir.

12  Q.   Now at any time did you threaten, coerce,

13       promise Nathaniel Jackson anything?

14  A.   No, Sir.

15  Q.   You testified at all times he was cooperating?

16  A.   Yes, Sir.

17  Q.   Save and except for the answer that one can

18       interpret he had a conversation with you,

19       the tape speaks for itself, right?

20  A.   Yes, Sir.

21  Q.   Now, the other part that Attorney Lewis went

22       in with you was to point out for the

278

```
 1              Court that when you went into that
 2              initial conversation at the Trumbull
 3              County Jail, in that room, to-wit the
 4              room of Captain Bacon, it is you, Officer
 5              Monroe and the Defendant, correct?
 6              Nobody else in the world is there?
 7   A.   That is correct.
 8   Q.   And you do refer to this prior story on the
 9              video tape, one or two occasions,
10              correct?
11   A.   Yes, Sir.
12   Q.   And he acknowledged that there was a prior
13              conversation, correct?
14   A.   Yes, Sir.
15   Q.   And that Exhibit, that contains what you on
16              your oath say is true, that was prepared
17              by Monroe and went over by you as a
18              summary of what he said, sometime after
19              11:45, correct, A.M. on that Friday?
20   A.   Yes, Sir.
21   Q.   Is that a summary of what he did and that
22              summary goes from going to the Greyhound
```

279

```
 1              bus terminal, getting in the vehicle of
 2              Robert Fingerhut, going to get marijuana,
 3              coming to Warren, and how he was in a
 4              situation where because of words by
 5              Mr. Fingerhut that a gun was drawn on him
 6              by Fingerhut and that he in fact was
 7              shot, and then in this process of
 8              self-defense, took the gun and killed
 9              him; is that fair to state?
10    A.   Yes, Sir.
11    Q.   That is a summary of all of the facts that he
12              told you orally unrecorded, correct?
13    A.   Yes, Sir.
14    Q.   Then, and you are swearing those facts are
15              true?
16    A.   Yes, Sir.
17    Q.   Then you place him in a room which the Court
18              has just seen and it was on video,
19              including the rights form that was given
20              him, correct?
21    A.   Yes, Sir.
22    Q.   And he tells the same facts?
```

280

1   A.    It is almost verbatim.

2   Q.    Exhibit 2, Monroe gives you no more than what

3         is on the video tape?

4   A.    Correct.

5               MR. WATKINS:  Thank you.

6   RECROSS EXAMINATION BY MR. LEWIS:

7   Q.    Did Mr. Jackson ever request to have an

8         attorney in regard to the little dilemma

9         he found himself in at any time?  The

10        reason I note is in reference to your

11        notes, it indicates that he's asking does

12        he have a right to an attorney or

13        something to that effect.  "Nathaniel

14        stated, I did not kill anybody, man, and

15        asked that he has the right to an

16        attorney at any time.  I advised him,

17        yes, he does have the right to an

18        attorney."  He was inquiring about the

19        right to an attorney to some extent?

20  A.    He asked if he had the right to an attorney

21        and I told him, yes.

22  Q.    When you talked to him originally over on Wirt

281

1        Street in Mahoning County, you made it a

2        point normally, instead of asking

3        questions you kind of told him how you

4        got there, right?

5   A.   Yes, Sir.

6   Q.   And the reason for that obviously, I would

7        think is by saying that Donna snitched

8        him out, whatever, is to loosen him up a

9        little bit and maybe he will tell a

10       story, is that fair to say?

11  A.   It was based on the response of him.  He's the

12       one that initiated the conversation about

13       being on the phone with Donna Roberts and

14       looking outside and seeing police cars.

15       I responded to his comment.

16  Q.   And you could have said, "Well, Donna told us

17       you were at the Wirt Street address,"

18       right?  Would that cover?

19  A.   What I said is what is detailed in my notes.

20  Q.   The notes go a little bit further.  What they

21       say is, "She snitched you out.  She's

22       down there and gave us a full statement,"

1            and all of that, "and it will be your

2            turn to get down to the station and be

3            able to tell your side of the story."  It

4            was playing the bad guy after the bad

5            guy?

6    A.   I was being honest with the man.  That was a

7            fair and accurate statement.

8    Q.   You did tell him?

9    A.   Yes, Sir.

10   Q.   Some of that motivation, that works pretty

11           well with multiple people involved in the

12           crime.  The other guy snitched on you, it

13           is all your fault and that gets them

14           talking pretty quick?

15   A.   It can be used as an investigative technique.

16              MR. LEWIS:  Thank you.

17              MR. WATKINS:  We would rest at this

18   point and thank the witness.

19              THE COURT:  I thank the witness,

20   also.

21              MR. WATKINS:  For purposes of the

22   suppression hearing, we proffer the State's

283

1   Exhibits.

2              THE COURT:  Any objection?

3              MR. LEWIS:  Yes.  State's Exhibit

4   No. 1 is supposed to be a summary of the notes of

5   Officer Hoolihan, which I believe should not be

6   introduced only because of the original notes were

7   destroyed.  He indicated that and we don't know if

8   that is a true and accurate recompilation of the

9   same thing.  Number two, this compilation, even

10  though Officer Hoolihan indicated that to his

11  knowledge it is accurate, we haven't had the person

12  who did the compilation, Officer Monroe from the

13  Howland Police Department.  So, I would say that

14  should not be introduced.  That is our objection to

15  that.  If he was able to do that, he would be able

16  to repeat it word for word, if he could remember it

17  that well.  The rights form, that should not be

18  introduced as well.  That was given after the fact.

19  These officers should have secured confirmation of

20  the fact they gave the rights to the Defendant.

21  They didn't do it by audio form, written form, any

22  form whatsoever, and in fact that second

284

1  conversation in the Trumbull County Jail, there

2  wasn't any indication that he was given his rights

3  again.  The only indication we have is rights given

4  at the Mahoning County Wirt Street address in the

5  police cruiser and the video tape statement that

6  should be out for reasons stated he was not

7  properly given his rights, and there's no

8  indication in here that he actually understood his

9  rights in regard to these matters.

10           MR. WATKINS:  I would respond that

11  the purpose of this hearing is to establish whether

12  or not the Defendant's Constitutional rights were

13  violated under the Fifth Amendment and the Miranda

14  decision and case law.

15           First, the summaries would not be

16  admissible at trial.  It would be the testimony and

17  so what we're dealing with here, is the testimony

18  of this officer regarding what was said, and I

19  think the record is clear that he's 100 percent

20  certain this was told him, to-wit the conversation

21  in the vehicle and to-wit the two conversations in

22  jail.  The one is clearly reproduced by the

285

1     video tape.  And therefore, whether or not he's

2     testifying as to Monroe's summary, it is not as

3     important as the legal issues of whether or not

4     from the totality of the circumstances, these

5     witnesses, to-wit the police officers, obtained

6     voluntary statements that were not in violation of

7     any of the Constitutional rights of the Defendant

8     from the time of his arrest until the end of that

9     video tape.  We feel that we have met the threshold

10    of proving our case, that the evidence shows that

11    these statements were obtained as voluntary

12    statements and in compliance with Miranda.  At this

13    point in time, I think because this is a hearing

14    dealing with whether it is illegal conduct, I don't

15    think the admissibility of the statements are

16    important because that is a different legal issue

17    at trial because we're dealing with Constitutional

18    misconduct and we're not dealing with the

19    admissibility per se of for example the summaries.

20              THE COURT:  Whether anything is

21    admitted for purposes of this hearing is actually

22    admissible at trial is a question for a later date.

286

1          MR. WATKINS:  I further state, I

2    would request that if the legal issues that

3    Attorney Lewis has made, that both sides should

4    brief the law as to legal issues that he's arguing

5    and then we could, after submitting briefs, make an

6    argument on the briefs.

7          THE COURT:  I'll of course allow an

8    opportunity for you to do that, but I think the

9    question is quite clear here as to what is proper.

10   First off, Miranda only says that a person upon

11   arrest before interrogation has to be informed of

12   the so-called Miranda rights.  There's nothing that

13   I recall that requires that to be in writing.  That

14   is, early on the police started to put it in

15   writing because it is always a question of did the

16   officer give them or not.  From this hearing this

17   morning, I have unrebutted testimony from the

18   officer that he gave the rights.  Nothing to

19   indicate that the officer is not telling the truth

20   or that he didn't give the Miranda warning upon

21   placing Defendant in the cruiser.

22         MR. LEWIS:  Excuse me.  We want to

287

1   put a witness on.  This is not the end.

2           THE COURT:  I'm just talking about

3   the Exhibits.  This is just for purposes of this

4   motion.  The question about the notes prepared, the

5   summary, the officer has testified that that is in

6   the usual course of business at the Warren Police

7   Department, and that the notes are not, the

8   generating notes are not usually kept, were not

9   kept here, and his testimony again is that he has

10  given a good compilation of that raw material by

11  way of his summary.  The summary prepared by

12  Officer Monroe, granted the State has not presented

13  Sergeant Monroe to testify to that, but there was

14  testimony from Mr. Hoolihan that he had in fact

15  reviewed, and I assume was asked to do so to state

16  his opinion as to the correctness of them and he

17  seemed to indicate that in his opinion they were a

18  correct summation.  So, for purposes of this

19  hearing, both, I'll let both State's Exhibits No. 1

20  and 2 in.  The rights form is, was taken, was given

21  at the time of the video tape.  He had numerous

22  cases where they have three or four different

288

1   rights forms given to a Defendant.  I still say

2   that in my opinion, the initial verbal giving is

3   all that is necessary to comply with Miranda.  So 3

4   and 4 will also be admitted at this point.  The

5   State has rested.

6               MR. LEWIS:  I would like to call

7   Officer Paul Monroe.

8               MR. WATKINS:  Judge, there's five

9   Exhibits.

10              THE COURT:  All five of the State's

11  Exhibits are admitted for this hearing and are for

12  the purpose of this hearing only.

13              DET. SGT. PAUL MONROE

14  being duly sworn according to law, on his oath,

15  testified as follows:

16  DIRECT EXAMINATION BY MR. LEWIS:

17  Q.   Would you please state your name for the

18          record?

19  A.   Paul Monroe.

20  Q.   And Paul, what is your employment?

21  A.   Detective Sergeant with the Howland Police

22          Department.

289

1    Q.   And how long have you been -- or how long have

2         you been involved in law enforcement?

3    A.   Seventeen years.

4    Q.   How long have you been with the Howland Police

5         Department?

6    A.   Seventeen years.

7    Q.   And are you specifically in a detective

8         category now?

9    A.   Yes.

10   Q.   And how long have you been detective?

11   A.   Approximately eight years.

12   Q.   And calling your attention back to December of

13        2001, there was a homicide or what has

14        been labeled as a homicide in Howland

15        jurisdiction, correct?

16   A.   Yes.

17   Q.   And that was Robert Fingerhut?

18   A.   Yes.

19   Q.   And I assume you were involved from the very

20        moment that the phone call came through

21        to 911, correct, or shortly thereafter?

22   A.   Shortly thereafter.

290

1   Q.   You went to the scene, correct?

2   A.   Yes.

3   Q.   The coroner was notified, Mr. Germaniuk?

4   A.   Yes.

5   Q.   And you processed the scene?

6   A.   I assisted.

7   Q.   Helped to process the scene.  Photographs were

8        taken, the house was later, with the

9        permission of Donna Roberts, supposedly

10       searched and other things were found and

11       potentially to be utilized as evidence in

12       this case, correct?

13  A.   Yes.

14  Q.   And calling your attention to the date of

15       close to December 21st -- I'm sorry, the

16       20th, December 20th.  A Thursday, the

17       20th.  Did you end up securing a warrant

18       from this Court in regard to the arrest

19       of this Defendant?

20  A.   Yes, I did.

21  Q.   And that arrest warrant was for what crime?

22  A.   Aggravated murder.

291

```
1   Q.   And did you personally take charge of the
2             warrants?  Did you have it physically
3             with you?
4   A.   Yes, I did.
5   Q.   And on the 21st, there was an interview with
6             Donna Roberts, was there not?
7   A.   No, the 20th.
8   Q.   Okay the 20th.  On the 20th.  And as a result
9             of that particular conversation with her,
10            you were going to execute the warrant in
11            regard to Mr. Nathaniel Jackson, were you
12            not?
13  A.   Yes.
14  Q.   And she was going to facilitate that by -- and
15            she did by making a phone call to a Wirt
16            Street address over in Youngstown,
17            correct?
18  A.   Yes.
19  Q.   Did you go and assist in regard to the arrest
20            of Mr. Jackson over on Wirt Street?
21  A.   No, I did not.
22  Q.   To your knowledge, who went from the Trumbull
```

292

1          County task force?  We have Officer

2          Hoolihan, obviously.  Do you recall

3          anybody else that went?

4    A.    Major Phillips, Captain Bacon.  Several

5          members of the SWAT team.  Detective

6          Yannucci, Detective Tackett, Detective

7          McBride.

8    Q.    We have a group, the last four or five you

9          mentioned were all from the Sheriff's

10         department, right?

11   A.    Yes, Sir.

12   Q.    And Officer Hoolihan went as well?

13   A.    Correct.

14   Q.    He's from the Warren Police Department, and

15         did you go?

16   A.    No, I did not.

17   Q.    Is there any reason why you did not go?

18   A.    Yes.

19   Q.    What was that?

20   A.    I stayed with Donna Roberts, Detective Dillon

21         and a female corrections officer from

22         Trumbull County Sheriff's office, and we

293

```
 1              went to the Fingerhut residence and made
 2              a controlled phone call to the Wirt
 3              Street address.
 4   Q.   So, at the time that the SWAT team and the
 5              other Sheriff's department personnel and
 6              Officer Hoolihan were going to the Wirt
 7              Street address, you were really at the
 8              Fingerhut residence making this phone
 9              call that would identify his location and
10              hopefully keep him on the phone while
11              they surrounded the house and ready to
12              take him into custody.  That was the
13              plan?
14   A.   Yes.
15   Q.   And you had the warrant at that time for the
16              arrest of Mr. Nathaniel Jackson.  What
17              happened to it?
18   A.   I had the warrant.
19   Q.   Did you give it to any of the officers who
20              were going to go and arrest Mr. Jackson?
21   A.   I don't know.
22   Q.   Where is the warrant to?
```

294

1    A.    It was filed with the Clerk of Courts

2              downstairs.

3    Q.    Did you ever serve the warrant on Mr. Jackson?

4    A.    Yes, I did.

5    Q.    And when did you serve the warrants on

6              Mr. Jackson?

7    A.    During the interview that we conducted at the

8              Sheriff's department on the 21st.

9    Q.    He returned, Nathaniel Jackson, along with

10             Officer Hoolihan to the Sheriff's

11             department and this is early morning

12             hours, was that correct, on the 21st?

13   A.    On the 21st.

14   Q.    And you were also present and Officer Bacon

15             came later, I think, a little time later?

16   A.    I was present where?

17   Q.    At the Sheriff's department.

18   A.    Yes.

19   Q.    That is the first time you saw Nathaniel

20             Jackson is when they brought him to the

21             Sheriff's department that night.  I mean

22             in reference to this matter.

                                                            295

1    A.    First time I personally seen him, yes.

2    Q.    In reference to this matter?

3    A.    Yes.

4    Q.    And where was he placed when he arrived at the

5              Sheriff's department?  You are the lead

6              detective on this case, are you not?

7    A.    Yes, Sir.

8    Q.    When I say lead detective, I don't know

9              whether that glorifies you or makes you

10             the poor goat for things.  Are you the

11             guy that says, "This is what we're going

12             to do.  This is how we're going to

13             proceed.  This is our plan.  I want three

14             officers over here, I want five officers

15             over here."  Is that the idea, you are in

16             charge of the investigation, right?

17   A.    Yes.

18   Q.    So, you are basically the mastermind that

19             pulls it all together and gets the

20             information from different officers and

21             gives directions, right, you are smiling,

22             that is a good job?

296

```
 1   A.    Basically, I am responsible if something has
 2             gone awry, I have to account for
 3             anything.
 4   Q.    Well, you get the bad with the glory, too.
 5             So, Mr. Jackson is brought back to the
 6             Sheriff's department, Officer Hoolihan is
 7             there, Officer Bacon is there, and tell
 8             me what exactly happens when you first
 9             see or talk to -- strike that.  What does
10             Officer Hoolihan tell you when you get
11             back to the Sheriff's department that
12             night?
13   A.    Initially, Hoolihan went to the booking area,
14             I am assuming this, he came back and
15             spoke with me.  Nathaniel Jackson came
16             back, we were in the detective area.  I
17             don't know how long they were in the
18             booking area of the Sheriff's department.
19             When they came into the Detective Bureau
20             where I was, there were no Sheriff's
21             deputies with us.  We had no access to
22             their facilities other than the hallway
```

297

```
 1              and the weight room.  Detective Dillon
 2              and I were there, we had been let in by
 3              the Sheriff's department.  We put Jackson
 4              in the weight room.  I was in there a
 5              short time with Nathaniel Jackson, and
 6              Detective Dillon, then Hoolihan and I
 7              left the weight room and we discussed
 8              what happened in Youngstown.
 9    Q.   Mr. Jackson is left in the weight room with
10              Officer Dillon?
11    A.   Yes.
12    Q.   From the Howland Police Department?
13    A.   Yes, Sir.
14    Q.   Then you conversed with Officer Hoolihan?
15    A.   Correct.
16    Q.   Was anybody else, did you converse with
17              Officer Bacon there?  Were you talking
18              with more than Officer Hoolihan or just
19              Jeff?
20    A.   Initially, it was just Hoolihan that came in.
21              We had to wait for Bacon to arrive and
22              they came in separate vehicles.
```

298

| | | |
|---|---|---|
| 1 | Q. | From the Wirt Street address, because he was |
| 2 | | out there, also? |
| 3 | A. | Bacon? |
| 4 | Q. | Yes. |
| 5 | A. | Yes. |
| 6 | Q. | He's the guy that had the magic keys that |
| 7 | | opened the door in the Sheriff's |
| 8 | | department? |
| 9 | A. | Right. |
| 10 | Q. | What did Officer Hoolihan tell you? |
| 11 | A. | Hoolihan had told me that they had received |
| 12 | | permission to search the residence from |
| 13 | | Sheila Fields, who is not really known to |
| 14 | | me at that time. |
| 15 | Q. | This was over on Wirt Street? |
| 16 | A. | Correct.  He told me that they had arrested |
| 17 | | Jackson without incident.  He didn't put |
| 18 | | up a struggle.  He told me that he had |
| 19 | | planted a seed in Jackson's head that |
| 20 | | Donna Roberts had been cooperating with |
| 21 | | us, and that he had made that known to |
| 22 | | Jackson. |

299

```
 1   Q.   Did he tell you anything else?

 2   A.   We discussed interviewing him, needing access

 3             to the offices.  Told me he had advised

 4             him of his rights.

 5   Q.   Anything else?

 6   A.   Discussed his finger injury.

 7   Q.   That is it.  Officer Bacon ended up coming

 8             back obviously to the Sheriff's

 9             department, right?

10   A.   Yes, Sir.

11   Q.   Once he was back, his office would be opened

12             up and you could interrogate or interview

13             Mr. Jackson, correct?

14   A.   Yes.

15   Q.   And prior to the interview, did you desire to

16             in any way give Mr. Jackson his rights or

17             get the written form out for his rights?

18   A.   I did read him his rights.

19   Q.   When did you read him his rights?

20   A.   We had a -- first of all we had -- we talked,

21             we sat down, the three of us,

22             Mr. Jackson, Detective Hoolihan and
```

300

```
 1              myself.  At 1:45 I believe we began

 2              speaking with Jackson.  He told us he

 3              made a statement to us as to what had

 4              happened.  He agreed to make a video

 5              taped statement.  At that time, we turned

 6              the video camera, I readvised

 7              Mr. Jackson --

 8    Q.   Actually, Mr. Hoolihan indicated that he had

 9              given Mr. Jackson his rights, correct?

10    A.   Yes, he did.

11    Q.   But he didn't have any written form, what we

12              usually have here in regard to the rights

13              forms, right?

14    A.   Correct.

15    Q.   And you did decide though, you did want to

16              interrogate him and interview him in

17              regard to the homicide of Mr. Fingerhut,

18              right?

19    A.   Yes.

20    Q.   And we're at the police department, we're in

21              Officer Bacon's office, correct?

22    A.   Yes.
```

301

```
 1   Q.   And later on, when you go to turn the video
 2             tape on or video tape him, you have him
 3             finally in written form, and even audio
 4             form, video form, sign his rights; in
 5             other words, acknowledgment of his
 6             rights?
 7   A.   Yes.
 8   Q.   Is there any reason why you didn't have him,
 9             since the form was available, an hour
10             later, why you didn't take the form in
11             with you and have him acknowledge the
12             rights before you interviewed him at the
13             Sheriff's department?
14   A.   He had already been advised of his rights.  It
15             is a procedure that we always follow when
16             we video tape a suspect, we always try to
17             put it on video.  We read them their
18             rights again.
19   Q.   But you didn't feel it was necessary to go in
20             and have them before you had the
21             conversation with him?
22   A.   Hoolihan told me he had already advised him of
```

302

```
 1              his rights.
 2    Q.   But you don't have anything in written form or
 3              signed by Mr. Jackson, or to hear his
 4              voice or to see his image, saying that he
 5              waived his rights, just a matter of he
 6              was given his rights and that is it,
 7              correct?
 8    A.   Yes.
 9    Q.   So, the only formalistic proof we have of the
10              rights being given, him signing, that is
11              actually on the video tape?
12    A.   I have Officer Hoolihan telling me.
13    Q.   I understand.  He said yes.  He was under
14              oath.  He said he gave his rights.  I'm
15              saying we have something tangible.  I
16              have got a form here and I can see
17              Nathaniel's signature, and on the video
18              tape I can hear somebody say, "You have
19              the right to remain silent."  I'm saying
20              the previous rights, we don't have
21              anything, do we?
22    A.   No, Sir.
```

303

```
1    Q.   You and Officer Hoolihan went in Officer

2         Bacon's office and talked to Mr. Jackson

3         in regard to this, correct?

4    A.   Yes.

5    Q.   And as you indicated, Officer Hoolihan planted

6         the seed and indicated to Nathaniel that

7         the woman gave him up, basically, and

8         that is an investigative technique or

9         tactic or whatever, if somebody or more

10        than one person was involved in the

11        crime, it is always nice to say the other

12        guy squealed on you or giving it all up

13        and he's going to blame you.  That kind

14        of loosens up the tongue?

15   A.   That is what was done.

16   Q.   You went in and you had the conversation with

17        Nathaniel and Nathaniel basically gave

18        what is contained in this summary, which

19        is Exhibit No. 2.  Is that correct?

20   A.   What is your question?

21   Q.   Once you had the conversation with, in regard

22        to Mr. Jackson along with Mr. Hoolihan
```

304

```
 1              there, this is a summary of what was said
 2              and done in that interview room, that
 3              contains a little bit more, but contains
 4              that?
 5   A.   Yes.
 6   Q.   Can you tell me how that interview went with
 7              Officer Hoolihan, Nathaniel over there
 8              and yourself?
 9   A.   It was very informal.  I was sitting behind a
10              desk, Hoolihan was sitting to my left and
11              Jackson was sitting on the other side of
12              us.  We began talking about what
13              happened.  There was no indication by
14              Jackson that he wasn't involved in this.
15              He basically told the story.  He told his
16              side of the story as to what happened and
17              we told him that is what we're here to do
18              is to hear his side of the story and
19              document what he had to say.
20   Q.   Document.  That is a good use of the word.
21              There wasn't any compulsion at that point
22              to get the cassette recorder out and say,
```

305

1        "Nathaniel, we want to record this," or

2        "Nathaniel, let's turn that video on

3        right now and put it all on tape," or

4        anything?

5   A.   We were going to do that.  We did do that.

6   Q.   I'm saying this is the initial interview.

7        This is the one where hopefully he would

8        spill his guts.  You wanted evidence

9        here.  You wanted a confession?

10  A.   We wanted his side of the story.

11  Q.   And Officer Hoolihan was to your left,

12       Nathaniel was over there.  Who was doing

13       the questioning or was there any

14       questioning involved or what?

15  A.   Both of us were asking questions.

16  Q.   You both asked questions of Nathaniel.  Was

17       Nathaniel cooperative?

18  A.   Yes, he was.

19  Q.   And did you record that conversation in any

20       form, manner or way at all?

21  A.   With electronic equipment.

22  Q.   We know electronics were involved.

306

1    A.    It was written down.

2    Q.    Notes?

3    A.    Yes.

4    Q.    You wrote notes.  Do you know shorthand?

5    A.    No, I do not.

6    Q.    It has to be in long hand words, right?

7    A.    Yes.

8    Q.    Let me ask you this.  Do you still have the

9          notes that -- this obviously, these

10         aren't the notes themselves, this is a

11         compilation?

12   A.    This is a summation of my notes.

13   Q.    Do you still have the notes?

14   A.    No.

15   Q.    Can you tell me what happened to the notes?

16   A.    I compile a lot of notes through my

17         investigations.  Once I type up my

18         report, I destroy them.

19   Q.    You destroy them.  Just out of curiosity, when

20         you make your notes out, do you do it in

21         sentence form as just appears here or do

22         you use the key words?  In other words,

307

```
 1              somebody uses instead of saying a whole
 2              sentence, if I said, "I cross examined
 3              Paul Monroe today in Judge Stuard's
 4              Court," I would go, "Monroe cross
 5              examined, Stuard," and that would tell me
 6              the whole story.
 7   A.   Do I write down what I say and he says -- no.
 8   Q.   What I'm asking, your notes, is that exactly
 9              what your notes had in them or did you
10              put them in sentence form?
11   A.   Put them in sentence form.
12   Q.   It is not an exact transcription of what is in
13              the notes.  This is more elaborate?
14   A.   It is more paraphrased.
15   Q.   When did you compile this from your notes?
16   A.   Approximately two days afterwards.
17   Q.   When did you give that to the Prosecutor's
18              office, do you recall?
19   A.   No, I don't.
20   Q.   You don't have any idea when you gave it to
21              them?
22   A.   No.
```

308

| 1 | Q. | Did you give that to him originally you think |
| 2 | | in this case?  It is an important thing. |
| 3 | A. | As soon as it was prepared I gave it to them. |
| 4 | Q. | As soon as it was prepared, you gave it to |
| 5 | | them.  I think you would.  It is |
| 6 | | important.  This is where the guy talks |
| 7 | | about how the homicide took place, I |
| 8 | | think that is pretty important.  So, you |
| 9 | | are pretty sure, you are sure you gave |
| 10 | | that right to them right after the |
| 11 | | homicide? |
| 12 | A. | This would have been Christmas weekend. |
| 13 | Q. | It is after you took it from your notes, |
| 14 | | compiled it, then you gave it to them? |
| 15 | A. | Are you saying did I type it and then run down |
| 16 | | to the Prosecutor's office to give it to |
| 17 | | them? |
| 18 | Q. | I don't want you running.  It is dangerous, it |
| 19 | | is Wintertime.  The point is, did that |
| 20 | | just get to the Prosecutor's office in |
| 21 | | the last two weeks or was it in their |
| 22 | | possession for a longer period of time? |

309

1   A.   Should have been in their possession a longer
2        period of time.
3   Q.   So, we don't have the original notes, this is
4        the compilation and this is the best you
5        recall of what happened between Nathaniel
6        Jackson, yourself, and Officer Hoolihan,
7        right?
8   A.   Yes.
9   Q.   You could have just put the video on right
10       away, could you not, or asked him to do a
11       video, but you decided not do that?
12  A.   Initially I didn't know whether Mr. Jackson
13       would want to go on video right away.  We
14       were developing a rapport with him.
15  Q.   Tell me about the rapport.
16  A.   Mr. Jackson seemed to be somewhat despondent.
17       He didn't want to look at either of us.
18       He would frequently -- you and I were
19       talking right now.  He would always look
20       away from me.  He didn't want to talk
21       directly at me.  Always looked the other
22       way.

310

1    Q.   So, you had to develop some rapport with him?

2    A.   He seemed to have been having some emotional

3         difficulties with the fact that he had

4         killed somebody.

5    Q.   So you talked to him.  Jeff could be a pretty

6         gentle guy and you can be a pretty gentle

7         guy with people?

8    A.   I don't understand your question.

9    Q.   You can talk to somebody in a very relaxed

10        form or whatever, and try to get their

11        attention, talk to them about what

12        happened, right?

13   A.   Yes.

14   Q.   And it is obvious from that summary, that is

15        what you did here, somewhere along the

16        line you got his confidence and you were

17        talking to him and he told you basically

18        what happened?

19   A.   Correct.

20   Q.   And is there anything else that you did or did

21        you give him anything during that

22        interview or on the video tape?  Is there

311

1           anything else you can remember?

2   A.   I don't understand what you are asking me for.

3   Q.   What I'm asking you is this.  Since you had

4           the warrant for his arrest for aggravated

5           murder, did you ever serve the warrant on

6           him?

7   A.   Yes, I did.

8   Q.   When did you serve the warrant on him?

9   A.   I would have to look on the warrant to see

10          exactly what time it was served.

11  Q.   Suffice to say, was it that night sometime?

12  A.   Yes.

13  Q.   Are you sure?

14  A.   No, without looking at the warrant.

15  Q.   On the video tape, since he was under arrest

16          for aggravated murder and this is not jay

17          walking, this is aggravated murder, there

18          isn't any reference in the video tape

19          that he's under arrest.  Do you recall

20          anything in the video tape or anything on

21          the form saying, "You are under arrest"?

22  A.   No.

312

1    Q.    Is there anything in the video tape or on the

2          form saying, you know, "Nathaniel, you

3          are under arrest for aggravated murder"?

4          Is there anything in there to indicate

5          that?

6    A.    On the video tape?

7    Q.    Yes.

8    A.    No.

9    Q.    We don't have anything, as I go back to that

10         same old thing, we don't have any

11         documentation to say that he was ever

12         told he was under arrest for aggravated

13         murder other than the fact that he was

14         told that by Officer Hoolihan, and by

15         yourself or at least he was served.  We

16         don't know if he was served after the

17         fact or before the fact of the video

18         tape, right?

19   A.    Yes.

20              MR. LEWIS:  Thank you.

21              MR. WATKINS:  No questions.

22   EXAMINATION BY THE COURT:

313

```
1   Q.   Sergeant, you say you don't remember when the
2            warrant was served.  You recall about
3            being able to check on the warrant
4            itself?
5   A.   On the warrant -- I filled out the warrant,
6            the return on the warrant, I made the
7            return myself to the Clerk of Courts.
8   Q.   That return doesn't necessarily show the time
9            of day in which it was served, does it?
10           I'm trying to remember, do they?
11  A.   I believe it does.
12                THE COURT:  Anything further?
13                MR. LEWIS:  What was that?
14                THE COURT:  You asked the question
15  when it was served.  I wanted a clarification for
16  my own.
17                MR. LEWIS:  The warrant should be in
18  the file.
19                THE COURT:  You have no questions?
20                MR. WATKINS:  No.
21                THE COURT:  You may step down.
22  Thank you.
```

314

1    (Court in recess at 2:30 p.m.)

2    (Resumed in Open Court at 2:35 p.m.)

3                    MR. CONSOLDANE:  At this time, we

4    would like to call Nathaniel Jackson only for the

5    purposes of this hearing and he does not waive his

6    Fifth Amendment right as far as the trial goes.

7                    THE COURT:  That is fine.

8                    NATHANIEL JACKSON

9    being duly sworn according to law, on his oath,

10   testified as follows:

11   DIRECT EXAMINATION BY MR. CONSOLDANE:

12   Q.   Nathaniel, would you state your name for the

13             record?

14   A.   Nathaniel Jackson.

15   Q.   And your address is Trumbull County jail at

16             this point, is it not?

17   A.   Yes, Sir.

18   Q.   I want to direct your attention back to the

19             night of December 21st.  Do you remember

20             that night or that would have been the

21             night of December 20th and then after

22             midnight it would have been December

315

1           21st, the following day?

2  A.   Yes, Sir.

3  Q.   And it seems like from the testimony that

4           there was a whole group of police

5           officers that besieged your house that

6           night, is that correct?

7  A.   I didn't know that they were outside the

8           house.  I was in the house in the back

9           room, the telephone rang and they brought

10          me the telephone and I get on the phone

11          and it was Donna.  At the same time I am

12          still in the back room, I am talking to

13          her on the telephone, and then all I hear

14          is them say, "Nathaniel Jackson, we got

15          the house surrounded, come on out."  I

16          said, "I got to go.  The police are out

17          here to get me."  I hung up the phone and

18          when I came to the front, the other girls

19          that was in there, they kept on saying,

20          "What is going on?"  I said, "They want

21          me."  I said, "I'm going out, don't worry

22          about it."  So, I come outside, did what

316

1          the officers told me to.  I cooperated

2          with them.  When we get outside, the

3          officer right there, handcuffed me and

4          put me in the back of the cruiser.  As I

5          was in the back of the cruiser, I did not

6          want to say nothing.

7    Q.   Did you ask him for a lawyer?

8    A.   I asked him for an attorney.  I said, "I want

9          to speak to an attorney."  He said, "You

10         got your chance to put everything out in

11         the open."  He said, "You know, Donna,

12         you know your partner snitched on you."

13         I said, "About what?  I don't know what

14         you are here for.  I don't know what you

15         are here for."  I'm still in the back

16         seat of the car and he's lined up against

17         the door and he looked over at me and he

18         said, "Are you all right?"  I said, "Man,

19         what is wrong with you?  Why are you

20         asking me if I am all right?"  And I

21         leaned back against the door again, then

22         he turned over and looked at me and said,

317

```
1              "Don't be nervous, it is going to be all
2              right."  And I turned back around and
3              said, "What are you talking about?"  I
4              asked him, I said, "What are you talking
5              about?"  He kept telling me, "It is going
6              to be all right.  Your partner snitched
7              you out."  I said, "Snitched me out about
8              what?"  As we get to Trumbull County
9              jail, they --
10   Q.   I want to back up just a minute.  Did he give
11          you the -- did he serve the warrant on
12          you -- when did he serve you the warrant?
13   A.   I ain't seen no warrant until before they were
14          ready to process me.
15   Q.   Do you know what time that was in the morning?
16   A.   It was late.  It was really late.
17   Q.   Did they give you that warrant before they
18          video taped you?
19   A.   No, they didn't give me no warrant.
20   Q.   They didn't give you the warrant until after
21          they video taped you?
22   A.   No, it was later.
```

318

```
 1   Q.   And did they tell you that you were under

 2        arrest?

 3   A.   When he first handcuffed me, he did not tell

 4        me nothing, but he kept looking at me

 5        saying, "It is going to be all right."

 6        And I said -- I said, "What is going to

 7        be all right?" If he would have told me

 8        that I am under arrest for aggravated

 9        murder, then I could have understood.

10        Not one time did I tell him that I did

11        not kill anybody. I didn't want to speak

12        to this man because for one thing, I

13        know -- I knew already what they are

14        coming to get me for. I knew it. So

15        therefore, I didn't want to speak to them

16        unless I had an attorney around.

17   Q.   And you told them that you wanted a lawyer?

18   A.   I told him I wanted an attorney. The man that

19        just walked out of the Courtroom.

20   Q.   And he still kept asking you questions?

21   A.   He kept asking me questions. I said, "I don't

22        want to talk to nobody." He said, "Well,
```

319

```
 1            this is a chance you can go ahead -- all
 2            the weight is shifting down on you."  I
 3            said, "Shifting down on me for what?"
 4    Q.   When you got to the jail, you did sign a
 5            waiver of your rights?  Did you not sign
 6            this?
 7    A.   Yes, I did sign that.
 8    Q.   And did anybody read your rights to you before
 9            you signed that?
10    A.   What?
11    Q.   Did anybody give you your rights?
12    A.   No.
13    Q.   How about when you were in the car, did they
14            give you your rights in the car?
15    A.   They did not give me nothing.  All he was
16            trying to do was get some information out
17            of me.
18    Q.   This was the first time that anybody told you
19            about your rights?
20    A.   Right.  When he brought me this paper.  He set
21            this paper in front of me saying, "Well,
22            the questions I asked you, sign right
```

320

1          here and sign right here."  That was it.

2          He did not tell me that you was under

3          arrest.  All he was trying to do was get

4          some information out of me and I kept

5          telling him, even during the time, I

6          said -- I kept saying, "Well, I don't

7          want to speak no more."  I said, "I told

8          you what I had to say.  I want to talk to

9          my attorney.  Anything else, you talk to

10          my attorney about it."  And he kept on

11          trying to get further information out of

12          me saying, "Just tell us just one more

13          thing."

14 Q.  How much time -- for how long did they do that

15          before you signed the rights waiver?

16 A.   This was until it was about over.  Until it

17          was about over, the video thing and

18          everything, and I put that on my right

19          hand.  That is when he came and brought

20          me that paper and sit that paper in front

21          of me.  I talked all the way throughout

22          the whole thing and then he throwed that

321

```
 1              paper in front of me.
 2   Q.   This says it was 2:13 in the morning?
 3   A.   This was after they got through videoing me,
 4              that is when it took place.  I don't know
 5              what time it was.  That is when they put
 6              that piece of paper in front of me,
 7              telling me to sign right here.  I didn't
 8              know if it was signed before a waiver or
 9              nothing.  All he said was, "Sign right
10              here."
11   Q.   How long did you stay in the weight room?
12   A.   I didn't stay in the weight room that long.
13              They brought me in the weight room for a
14              little while.  I stayed in the weight
15              room approximately about 10, 15 minutes.
16              Then they took me to the medical
17              department and housed me in the medical
18              department.
19   Q.   How long did you stay in the medical
20              department?
21   A.   I stayed in the medical department for
22              probably about a half hour.
```

322

1    Q.    And then they brought you to the video?

2    A.    Then they brought me around to the little

3          office room.

4    Q.    Did they turn the video camera on right away

5          when were you taken in there?

6    A.    No.

7    Q.    They talked to you first?

8    A.    Right.

9    Q.    How long did they talk to you before they

10         turned the video camera on?

11   A.    They talked to me for, I would say he talked

12         to me a good 15, 20 minutes, asked me did

13         I want anything and I kept telling him, I

14         said, "I would just like to speak to an

15         attorney."

16   Q.    What did they say to you when you told them

17         that you wanted an attorney?

18   A.    He said, "Look," he said, "This is the chance

19         to defend yourself."  He kept telling me

20         all the weight is being shifted down on

21         you.

22   Q.    What did he say about the lawyer?

323

```
1   A.   All he kept on going around the lawyer part.
2            He kept on going around the lawyer part.
3            He wasn't really trying to hear the
4            lawyer part.
5   Q.   Did he ignore you when you told him that you
6            wanted a lawyer?  Did he ignore that
7            request?
8   A.   He just came up with some more questions about
9            the case.  Every time I would say, "I am
10           finished, I don't want to speak no more,
11           I don't want to speak no more."  "Well,
12           Nathaniel," such and such, he just kept
13           wanting to put in more questions and I
14           told him, "I don't want to talk no more,
15           which I didn't."
16  Q.   So, just one last thing.  They didn't ever
17           tell you that you were being arrested for
18           murder until after the video tape was
19           over?
20  A.   Until afterward.  He did not one time tell me
21           that I am being arrested for murder,
22           because every time he kept looking over
```

```
                                                     324
 1              at me, he kept saying, "It is going to be

 2              all right.  Are you nervous?"  "Nervous

 3              about what?"  I kept telling him,

 4              "Nervous about what?"  Then I leaned back

 5              over towards the door, because I took

 6              some Victorines for the pain for my

 7              finger and I had smoked a blunt earlier

 8              and I was high.  I am sitting in there,

 9              I'm trying to just finish enjoying my

10              high.  You already got me.  I ain't got

11              nothing to say to you all, I want my

12              attorney.

13                   MR. CONSOLDANE:  Nothing further.

14     CROSS EXAMINATION BY MR. WATKINS:

15     Q.   Mr. Jackson, I have a few questions, okay?

16     A.   Yes, Sir.

17     Q.   If you don't understand the question, just let

18              me know.  Now, I understand that this

19              isn't the first time you have been

20              involved with being arrested, is that

21              fair to state?

22     A.   Yes, Sir.
```

325

1   Q.   Approximately how many times have you been

2        arrested?

3   A.   I never tried to count.

4   Q.   Fair to state it could be something like 15 or

5        20 times?

6   A.   Possibly.

7   Q.   And have you had the occasion to have to talk

8        to police officers like Hoolihan before?

9   A.   No, I never talked to the police.

10  Q.   Have you been arrested and been given your

11       Miranda warnings before?

12  A.   Yes.

13  Q.   You had been -- in fact, you were in prison on

14       receiving stolen property shortly before

15       this crime you have been charged with,

16       correct?

17  A.   Yes.

18  Q.   And you were in prison before for another

19       receiving stolen property, correct?

20  A.   It was the same one.  I just got out.  The

21       Judge brought me back on judicial and

22       sent me to the halfway house and the

326

```
 1            halfway house violated me and sent me
 2            back down.
 3   Q.   You had an aggravated burglary conviction some
 4            time ago, too; isn't that correct?
 5   A.   Yes.
 6   Q.   You went to prison for that?
 7   A.   Yes.
 8   Q.   And there were other times that you were
 9            arrested for various theft offenses,
10            right?
11   A.   Yes.
12   Q.   And some of those times the police officers
13            would give you a Miranda warning?
14   A.   Yes.
15   Q.   So, you understood from your experience with
16            police, what a Miranda warning is, right?
17   A.   Most definitely.
18   Q.   Would you tell the Judge what Miranda means?
19   A.   I guess it is right there.
20   Q.   I mean in your own words, what rights do you
21            have when the police arrest you?
22   A.   I am arrested.  That is it.  I am arrested.
```

```
                                                          327
1    Q.   Do you have a right to an attorney?

2    A.   I don't want to be hearing that.  I don't want

3              to be hearing that.  You are talking

4              about this paper.

5    Q.   These other cases you had an attorney, right?

6    A.   Right.

7    Q.   You knew you had the right to an attorney with

8              your experience with the law, right, in

9              the Courts?  You know about that?

10   A.   I knew.

11   Q.   You knew.  And you understand, you knew you

12             didn't have to tell the cops anything,

13             right?  You knew you had that right,

14             didn't you?

15   A.   Right.

16   Q.   And were there times when you were arrested,

17             isn't it true there's times you told the

18             police, "Get lost, I'm not going to talk

19             to you," right?

20   A.   I was high, and I really at the time, I kept

21             telling them, I said, "I want to talk to

22             an attorney."  I was off on pills,
```

328

```
 1              because my finger was in pain and I had

 2              smoked some marijuana earlier that day

 3              and I was high.  I'm figuring I'm just

 4              cooperating with them, trying to go ahead

 5              and stop asking me these questions.

 6    Q.   The times before when you were arrested, there

 7              were times when you told the police, "I

 8              don't want to talk to you," right?  Isn't

 9              that true?

10    A.   I never been in a situation like this.

11    Q.   You have never been arrested?

12    A.   I ain't never been in a situation like this I

13              been arrested for.  I mean I understood

14              it.

15    Q.   But you were given Miranda warnings before,

16              correct, by other police departments,

17              correct?  Am I correct?

18    A.   I don't know what you mean by that.

19    Q.   I'm asking you, on your prior arrest, were you

20              given Miranda warnings?

21    A.   What is the Miranda warnings, Sir?

22    Q.   What you just --
```

329

1   A.   That piece of paper?

2   Q.   Yes.

3   A.   That piece of paper?

4   Q.   How many times have you seen that piece of

5        paper before with other arrests?

6   A.   One time.

7   Q.   When was that?

8   A.   That is on my aggravated burglary.

9   Q.   And what did you do in that aggravated

10        burglary?  Did you give a confession?

11   A.   Yes, I gave a confession -- no, I didn't give

12        a confession.

13   Q.   You said no, you didn't talk to them in that

14        aggravated burglary?

15   A.   There was no need to give a confession.

16   Q.   When you signed that warning in that

17        aggravated burglary, would you tell the

18        Court what you did.  After you signed

19        that paper in that aggravated burglary,

20        what did you do?  Did you give a

21        statement?

22   A.   No.  It was over.

330

```
 1   Q.   It was over?

 2   A.   Yes.

 3   Q.   Why was it over?

 4   A.   Because they gave me this to sign and that is

 5        it.

 6   Q.   And you signed it?

 7   A.   Yes.

 8   Q.   And did you give a statement?

 9   A.   I don't know nothing about this.  A statement

10        for what?  There was no need for a

11        statement, if you get caught red handed.

12   Q.   You said, "I'm not going to give a statement,"

13        in that case?

14   A.   There was no need for a statement.

15   Q.   You told the police, "I'm not going to give

16        you a statement"?

17   A.   I didn't tell the police nothing.  They didn't

18        ask me for no statement.

19   Q.   Why did they give you Miranda?

20   A.   Those people gave me this and told me, "Here,

21        sign this paper."  That is all I know.

22        "Sign this paper."  Okay, I signed the
```

331

1              paper.

2    Q.   Now you are testifying that you had no idea

3              why you are being arrested when the

4              bullhorns came and they were telling you

5              to, "Nathaniel Jackson, come on out, we

6              got you surrounded."  You had no idea?

7    A.   Me?

8    Q.   Yes, you.

9    A.   I had an idea, but they didn't tell me that.

10   Q.   You had an idea?

11   A.   Right.

12   Q.   What was your idea?

13   A.   My idea?

14   Q.   Yes.

15   A.   I knew what happened.  I knew what I did

16             wrong.  That is why I don't understand

17             why that people put down on that paper

18             that I did not kill anybody, because I

19             didn't tell anybody that.  I did not tell

20             that man that.

21   Q.   Did you tell him you killed somebody then?

22   A.   I didn't tell him nothing.  I didn't want to

```
                                                    332
1              talk to him in the car.
2    Q.   You are telling me that Hoolihan here, when he
3              told the Judge under oath that he never
4              told you you were under arrest for
5              aggravated murder?
6    A.   He did not tell me I was under arrest for no
7              aggravated murder.
8    Q.   Did he give you your Constitutional rights
9              when you were in that car, police
10             cruiser?
11   A.   All that man tried to get was some
12             information.
13   Q.   Did the man give you your Constitutional
14             rights?
15   A.   No, Sir.
16             MR. LEWIS:  He answered the
17   question.
18             THE COURT:  It is a simple question
19   yes or no and he's evading the question.
20             MR. LEWIS:  I think he's asked about
21   three or four times.  Go ahead.
22             THE COURT:  Overruled.
```

333

| | | |
|---|---|---|
| 1 | Q. | So, it is your testimony when Hoolihan |
| 2 | | testified that you were under arrest, |
| 3 | | there's a warrant for aggravated murder, |
| 4 | | that is not true? |
| 5 | A. | That is not true. |
| 6 | Q. | And when Hoolihan testified that you had a |
| 7 | | right to an attorney, and you had a right |
| 8 | | to an appointed attorney, if you couldn't |
| 9 | | afford one, that is not true? |
| 10 | A. | He did not tell me that.  I asked for my own |
| 11 | | attorney. |
| 12 | Q. | Yes or no? |
| 13 | A. | No. |
| 14 | Q. | When Hoolihan testified that he told you you |
| 15 | | had a right not to incriminate yourself, |
| 16 | | you have a right against self |
| 17 | | incrimination, was that true? |
| 18 | A. | He didn't tell me that. |
| 19 | Q. | That is not true? |
| 20 | A. | I don't know nothing about any self |
| 21 | | incrimination. |
| 22 | Q. | What else was not true regarding what Hoolihan |

334

1              testified to?

2                    MR. CONSOLDANE:  I'm going to object

3    to that question.  That is way too broad.

4                    THE COURT:  Sustained.

5    Q.   Hoolihan gave a summary of what happened in

6              the vehicle.  You agree you were in the

7              vehicle with Hoolihan, correct?

8    A.   Yes.

9    Q.   Do you agree that you were there for some

10             period of time along with Hoolihan, is

11             that correct?

12   A.   Yes.

13   Q.   You agree that you came out of the house with

14             your hands up and walked out backwards?

15   A.   Yes, Sir.

16   Q.   And you agree that you had a bandage on your

17             finger?

18   A.   Yes, Sir.

19   Q.   And by the way, did you get any treatment for

20             that at the hospital?

21   A.   Yes, Sir.

22   Q.   You agree that you were in that car for a few

335

1          minutes?

2    A.    I was in there until they came and transported

3          me.

4    Q.    You agree that he mentioned that Donna Roberts

5          had put the finger on you and was

6          cooperating with police?

7    A.    Yes.

8    Q.    That's true?

9    A.    Yes.

10   Q.    He did tell you that?

11   A.    Yes.  He said that all the weight was being

12         shifted on me.  I said, "I don't want to

13         talk."  He said, "Well, this is your

14         chance, go ahead and defend yourself.

15         Everything is being shifted on you."  I

16         mean what is being shifted on me?  He

17         said, "You know what happened."

18   Q.    Now, were you under the influence of drugs or

19         alcohol at that time?

20   A.    I was Vicodined up.  I had popped about eight

21         Vicodins and I smoked a half blunt.

22   Q.    But you have a good memory of what happened?

336

1   A.   At the time, I know what was going on.

2   Q.   You had no problem, even at this point in

3        time, what happened back then, is that

4        correct?

5   A.   I was high.  I was high then.

6   Q.   If you were high, is it possible that Hoolihan

7        was telling the truth, that he did give

8        you your rights and you might not

9        remember?

10  A.   He did not give me no rights.

11  Q.   Now, you ended up going to the Trumbull County

12       Sheriff's Department, correct?

13  A.   Yes, Sir.

14  Q.   And you end up with Hoolihan and with Monroe

15       and I think you fairly agree that you

16       were in the Trumbull County jail for a

17       short time, less than an hour, and you

18       were questioned by those two officers; is

19       that true?

20  A.   Yes.

21  Q.   And the story that you gave about the whole

22       story about going to the Greyhound

337

```
 1              terminal, going and picking up Robert
 2              Fingerhut, going and getting an ounce of
 3              marijuana, how he gave you $100 and how
 4              you end up, you had a place to go, and
 5              you were going to go along with him and
 6              you went in his Chrysler and you end up
 7              going to Howland and you knew Fonderlac
 8              because had you been over Donna's house
 9              before, right?
10   A.   Right.
11   Q.   And you went into the house, and then how he
12              talked to you, and talked down to you and
13              then you said you want to go back to the
14              hood, right?
15   A.   Yes.
16              MR. CONSOLDANE:  Is there a question
17   here?
18              MR. WATKINS:  I think there's a
19   question.
20              MR. LEWIS:  It is his rights.  It is
21   not the story or anything else.
22              MR. WATKINS:  He's saying that he's
```

338

1    not voluntarily cooperating.

2              MR. CONSOLDANE:  He didn't say he

3    didn't cooperate.  He said he asked for a lawyer

4    and they didn't give one.

5              THE COURT:  He also says he doesn't

6    understand and he does understand.  He has the

7    right to explore which is which.

8    Q.   (By Mr. Watkins)  You at that point in time,

9              are giving this story to the police, is

10             that correct?  Yes or no?

11   A.   Yes.

12   Q.   And then after you give that story, they asked

13             you to go on video tape, is that correct?

14   A.   Right.

15   Q.   And you know for the world that it is on

16             video, correct?

17   A.   Right.

18   Q.   You saw the video here?

19   A.   Right.

20   Q.   I think you testified that you weren't given

21             your rights at the beginning of the

22             video, is that correct?

339

```
1    A.    Right.

2    Q.    And so you are stating that if the video shows

3                you receiving your Constitutional rights

4                at the beginning of the video, then that

5                video is not correct, is that what you

6                are saying?

7    A.    I didn't receive none.  I can't remember, I

8                was high.

9    Q.    You distinctly remembered and told Judge

10               Stuard that you absolutely remember that

11               they didn't give you the -- that is

12               Hoolihan did not give you your

13               Constitutional rights an hour and a half

14               before in the car, so you should be less

15               on drugs now?

16   A.    I know when they first picked me up, I know

17               about that.

18   Q.    But now you are not so sure about what happens

19               at 2:00 or 1:45, an hour and 45 minutes

20               later; is that what you're saying?

21   A.    The pills started kicking in.

22   Q.    The pills started kicking in.  Well, is it
```

340

```
 1              fair to state that you saw the video, you

 2              gave that same story on video tape that

 3              you gave right before, correct?

 4   A.   I guess so.

 5   Q.   And is it also correct that at the end of that

 6              video tape you said you didn't want to

 7              talk any more and you were very firm

 8              about it and you didn't talk any more, is

 9              that fair to state?

10   A.   I told him that from the beginning.

11   Q.   At the beginning you were given your rights --

12   A.   He kept on asking me questions to get stuff

13              out of me, to get stuff out of me.

14   Q.   Mr. Jackson, isn't it true that you wanted to

15              give that story because that was the

16              story that you had in your mind and you

17              were given your Constitutional rights,

18              signed the waiver and gave that story and

19              you gave that because that is what you

20              wanted to do, and you certainly

21              understood your Constitutional rights?

22   A.   I was trying to get away, man, so these people
```

341

```
 1              can go ahead and just let me go ahead to
 2              the lock up.  It seemed like they ain't
 3              going to go ahead and let me go without
 4              saying something.
 5    Q.   You are not the type of person that would
 6              stand up for yourself and say, "I'm not
 7              talking"?
 8    A.   What can I do?  If I got a police breathing
 9              down my back, like I got to just tell
10              them something.  What am I going to do?
11    Q.   You thought they were breathing down your
12              back?
13    A.   When I told them a couple of times that I
14              would like to talk to an attorney, and I
15              don't want to say nothing, even when I
16              was in the car and told him that, it
17              should have been left right there.  It
18              seemed like they wanted to keep on and
19              keep on.
20    Q.   And you keep on, keep on yourself?
21    A.   I was under pressure.  I couldn't take it.
22    Q.   You felt that there was a lot of pressure
```

342

1           exerted by the police in that question

2           and answer type proceeding, is that what

3           you are saying?

4  A.   Yes.  I didn't want to talk to them.  It was

5           like I had no choice.

6  Q.   Basically it comes down to what you recall as

7           happening and what the police officers

8           recall what happened, right?

9  A.   What did you say?

10 Q.   The events of what happened, it is your memory

11          versus their memory, and you are saying

12          that initially you had a better memory

13          because the pills didn't kick in, is that

14          fair to state?

15 A.   I didn't know what was going on.

16 Q.   You didn't know what was going on?  You know

17          what is going on today?

18 A.   Yes.  I'm functioning today.

19          MR. WATKINS:  I have no other

20 questions.

21          MR. CONSOLDANE:  Nothing further.

22          THE COURT:  You may step down.

343

1    Thank you.

2              MR. CONSOLDANE:  We would rest at

3    this time.

4              THE COURT:  You have no Exhibits, is

5    that correct?

6              MR. CONSOLDANE:  No Exhibits.

7              THE COURT:  Argument?

8              MR. WATKINS:  I thought we were

9    going to agree to submit briefs.

10             MR. CONSOLDANE:  I would and see if

11   I'm not correct on this, but I think we have got

12   two issues here.  We've got whether or not the

13   video tape confession is admissible.  I think that

14   is separate and with what is said in the car.  We

15   have got two.

16             THE COURT:  Everything prior to the

17   video and after the written, yes.

18             MR. WATKINS:  I would like to get

19   their brief and then we'll --

20             MR. CONSOLDANE:  We want yours

21   first.

22             MR. WATKINS:  It's your burden of

344

1   proof.

2           MR. CONSOLDANE:  The burden of proof

3   never shifts to us.

4           MR. WATKINS:  The burden of going

5   forward.

6           MR. CONSOLDANE:  We have gone

7   forward.

8           MR. WATKINS:  You are the moving

9   party to have it suppressed.  You want both in?

10  Whatever you want.

11          THE COURT:  I would suggest, the

12  questions are very simple.  You may wish to file a

13  reply to the other brief, but I think you can both

14  prepare your briefs on the question at the same

15  time.

16          MR. WATKINS:  Two weeks.

17          MR. LEWIS:  Make it three weeks.

18          THE COURT:  That is fine.  I thank

19  you all.

20  (End of Hearing at 3:05 p.m.)

21

22

345

1   (Back on the record on Wednesday, April 17, 2001)

2              THE COURT:  Do you waive presence of

3   the Defendant for purposes of this motion?

4              MR. LEWIS:  Yes.

5              THE COURT:  The Court has before it

6   a motion for an order to take handwriting samples

7   from Mr. Jackson.  I understand there's an

8   objection that has been voiced by the defense.  You

9   like to state that?

10             MR. CONSOLDANE:  Looking at their

11  brief that they attached as Memorandum in support,

12  they don't have a case there that is under 20 years

13  old.  This is old law.  The law since then has

14  changed and they can't force us to give self

15  incrimination to give this type of evidence against

16  himself.  These are just old cases that they are

17  citing and they shouldn't be -- they should be

18  chastised for citing such old cases.

19             THE COURT:  One might argue that the

20  case law has so well established itself that no one

21  brings it up any more.  We'll go from there.

22             MR. WATKINS:  Your Honor, the

346

1    _Seminole_ case I believe is _U.S. vs. Mara_, out of

2    U.S. Supreme Court dealing with two basic issues,

3    that handwriting like speech is repeatedly shown to

4    the public and there is no more expectation of

5    privacy, so there would be no Fourth Amendment

6    violation.  And additionally the _Gilbert vs._

7    _California_, U.S. Supreme Court says, "Compulsion of

8    handwriting exemplars is neither a search or

9    seizure subject to Fourth Amendment protections."

10   Taking the next step, the Ohio Supreme Court also

11   considered whether handwriting exemplars would

12   violate the Fifth Amendment, and _State vs. Kiser_,

13   U.S. Supreme Court said that a Trial Court may

14   order a Defendant to give handwriting exemplars,

15   and there's no Fifth Amendment protection.  And in

16   fact, in _State vs. Flinn_, it would be punishable

17   by contempt not to give the exemplars and _Hawk vs._

18   _Superior Court_ was an interesting case where the

19   Defense attorneys were placed in jail for telling

20   their clients not to give exemplars.

21              THE COURT:  Interesting case.

22              MR. CONSOLDANE:  I would like to put

347

1    a comment on the record in this case to be sealed.

2    I would like to do it exparte, and it has to do

3    with -- well, one of the main defenses in this, and

4    it is in regards to this request.

5            THE COURT:  This case or the motion

6    granted here, I made a statement before and I think

7    it is probably pretty much on the mark, and that is

8    that this case, the case law has been just for

9    years without exception on this point, that there's

10   no violation of a Fourth or Fifth Amendment right.

11   You might be hard pressed to find recent cases on

12   this point.  Your point is preserved for the record

13   as to the objection, you may be able to convince

14   the Supreme Court at some point that this is not

15   the way that it is and should be.  Under the Fourth

16   Amendment, this is not a seizure of papers or

17   property as contemplated by the Fourth Amendment,

18   and it has been constantly litigated that there's

19   no violation of the Fifth Amendment, but to cause a

20   person to testify against himself in one form or

21   another.  They can hold you down, put your feet in

22   a plaster cast, they can take blood from you, they

348

1   can do a whole series of things, they just can't

2   beat you until you give a confession.  That is what

3   the Fifth Amendment protects.  That is the ruling.

4   I'll grant the right to take handwriting samples.

5              MR. CONSOLDANE:  In regards to this,

6   can we clear the Courtroom?  I would like to put

7   something on the record, exparte.

8              THE COURT:  You can put anything on

9   the record that you wish and it is what you got the

10  Court of Appeals for.

11             MR. WATKINS:  Is the Court going to

12  rule that this is to be exparte?

13             MR. CONSOLDANE:  I'll give my reason

14  first before I do it and if you don't agree that it

15  should be, then I'll walk out.

16             THE COURT:  He can put, as you can,

17  an exparte on the record for appeal purposes only,

18  nothing to do with the hearing of the trial.

19             MR. CONSOLDANE:  We're in Court now,

20  there's no one in the Courtroom except for the

21  Court Reporter, my Judge and myself.  One of the

22  theories that they are propounding right now is

349

1    that my client grabbed the back of the coat of

2    Mr. Fingerhut and shot the gun and it scraped his

3    back and penetrated his finger, rather than this

4    his being shot in the scuffle.  What they don't

5    realize at this time is that Mr. Fingerhut is left

6    handed.  So, he would have been holding the gun in

7    his left hand, which is an argument, but allowing

8    them to go over and take these writing samples,

9    they are going to learn really fast that he's left

10   handed and make up some other different theory for

11   what they have already propounded to me.  I think

12   it is kind of unfair if you are going to order them

13   to give the handwriting exemplar, I would like to

14   have them do it through me, rather than having a

15   deputy go over and take it.  I have done these

16   before for other experts.  And then also, I guess

17   I'll --

18              THE COURT:  The only way I can

19   handle that is to have him brought over, and I'm

20   going to have to have a deputy in the room.

21              MR. CONSOLDANE:  I'm going to

22   Cleveland.  I won't be back until Friday night, but

350

1   I can go over on Saturday or Monday, when I get

2   back.  I can go over to the jail into the visiting

3   room.

4              THE COURT:  We can do this.  Have

5   your client come over with you in front of Mary Ann

6   and put it on the record that the Court is

7   observing the handwriting samples and there should

8   be no argument about that.  Monday -- you tell

9   Dennis because he's going to be asking me

10  questions.  You tell Dennis, Monday, that the Court

11  has indicated I would allow your request, that

12  rather than somebody over there getting the

13  handwriting samples that you would like to appear

14  in front of the reporter and put on record that

15  your client is giving handwriting samples, find out

16  what they want.

17             MR. CONSOLDANE:  One final thing is

18  they did say they don't object to me getting the

19  expert.  I think in the sake of time, I'll get a

20  motion and entry in there, but I want your approval

21  to go ahead and pursue one.

22             THE COURT:  I would ask you not to

351

1   hire one until you are sure they are going to use

2   it.  I suspect they are though, because they have

3   to prove those letters were written by him.

4                MR. CONSOLDANE:  I might have said

5   that Fingerhut was left handed, but I meant that

6   Jackson was left handed.

7   (End of proffer by Mr. Consoldane.)

8   (OFF THE RECORD)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

352

1

2

3

4                           REPORTER'S   CERTIFICATE

5

6               I do hereby certify that the above and

7      foregoing is a true and correct transcript

8      of the proceedings had in the within hearing

9      as shown by stenotype notes written by me in the

10     presence of the witnesses at the time of the

11     hearing.

12

13                              _Mary Ann Mills_____
                                MARY ANN MILLS, R.P.R.
14                              Official Court Reporter
                                Trumbull County, Ohio
15

16

17

18

19

20

21

22