03-0137

FILED

JUL 0 9 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

1          IN THE COURT OF COMMON PLEAS

2             TRUMBULL COUNTY, OHIO

3   STATE OF OHIO,           ) Case No. 01-CR-794
         Plaintiff          )
4                           )
    -vs-                     ) Judge John M. Stuard
5                           )
    NATHANIEL JACKSON,       )      VOLUME X
6        Defendant          ) TRANSCRIPT OF PROCEEDINGS

7

8   Jury Trial proceedings held October 21, 2002 through October

9   25, 2002,

10  BEFORE:     HONORABLE JOHN M. STUARD

11  AT:         Trumbull County Court of Common Pleas
                Courtroom Number 2
12              161 High Street, NW
                Warren, Ohio 44481
13

14  APPEARANCES:

15  On behalf of the State of Ohio:

16      Messrs. Dennis Watkins & Charles Morrow
        Prosecuting Attorney & Assistant Prosecuting Attorney
17      Warren, Ohio

18  On behalf of the Defendant:

19      Messrs. James Lewis & Anthony Consoldane
        Attorneys at Law
20      Warren, Ohio

21

22

23  Official Court Reporter:  Lori J. Rittwage

i

1                        I N D E X

2                                              PAGE NO.

3    Search Warrant Hearing                        3
     (December 20, 2001)

4
     Initial Appearance of Nathaniel Jackson       9
5    Hearing (December 21, 2001)

6    Initial Appearance of Donna Roberts           12
     Hearing (December 21, 2001)

7
     Motion to Intervene                           19
8    (December 31, 2001)

9    Arraignment of Donna Roberts (co-defendant)   57
     Arraignment of Nathaniel Jackson
10
     Waiver of Speedy Trial                        64
11   (January 23, 2002)

12   Hearing on Motions                            67
     (March 20, 2002)
13
     Hearing on Motion to Suppress Evidence        185
14   (April 17, 2002)

15   WITNESSES AT SUPPRESSION HEARING:

16   JEFFREY R. HOOLIHAN
         Direct Examination by Mr. Watkins         190
17       Cross Examination by Mr. Lewis            231
         Redirect Examination by Mr. Watkins       274
18       Recross Examination by Mr. Lewis          280

19   DET. SGT. PAUL MONROE
         Direct Examination by Mr. Lewis           288
20       Examination by The Court                  312

21   NATHANIEL JACKSON
         Direct Examination by Mr. Consoldane      314
22       Cross Examination by Mr. Watkins          324



ii

INDEX - Continued                                      PAGE NO.

Court's Opening Remarks (Volume 2)                          381
Motion for Mistrial                                         415

VOIR DIRE
    Hardship Excuses                                        422
    Death Penalty Qualification & Media                     664
    (Volume 3)
    Motion for Change of Venue & Motion to
      Dismiss                                              1835

GENERAL VOIR DIRE                                          1857

OPENING STATEMENT ON BEHALF OF STATE OF OHIO              2064
OPENING STATEMENT ON BEHALF OF THE DEFENDANT             2093

STATE'S WITNESSES:

PAULA CARSON
    Direct Examination by Mr. Morrow                       2100
    Cross Examination by Mr. Lewis                         2105

JAMES C. DANIELS
    Direct Examination by Mr. Watkins                      2111
    Cross Examination by Mr. Lewis                         2124
    Redirect Examination by Mr. Watkins                    2138

JOSE SANCHEZ
    Direct Examination by Mr. Watkins                      2139
    Cross Examination by Mr. Lewis                         2156
    Redirect Examination by Mr. Watkins                    2168

FRANK E. REYNOLDS
    Direct Examination by Mr. Watkins                      2172
    Cross Examination by Mr. Lewis                         2191
    Redirect Examination by Mr. Watkins                    2201

PAUL MONROE
    Direct Examination by Mr. Watkins                      2202
    Cross Examination by Mr. Consoldane                    2392

iii

1   INDEX - Continued         PAGE NO.

2   MIKE YANNUCCI

3      Direct Examination by Mr. Morrow    2406
       Cross Examination by Mr. Lewis     2418
       Redirect Examination by Mr. Morrow  2428

4

5   RICHARD TACKETT
       Direct Examination by Mr. Morrow    2428
       Cross Examination by Mr. Lewis     2434

6

7   ANTHONY LESHNACK
       Direct Examination by Mr. Watkins   2445
       Cross Examination by Mr. Consoldane  2455

8

9   FRANK DILLON
       Direct Examination by Mr. Watkins   2457
       Cross Examination by Mr. Lewis     2480

10

11  DR. THEODORE SOBOSLAY
       Direct Examination by Mr. Watkins   2512

12  DR. HUMPHREY GERMANIUK
       Direct Examination by Mr. Watkins   2520
13      Cross Examination by Mr. Consoldane  2576
       Redirect Examination by Mr. Watkins  2583
14      Recross Examination by Mr. Consoldane  2585
       Redirect Examination by Mr. Watkins  2586

15

16  JOSE FLORES
       Direct Examination by Mr. Watkins   2587
17      Cross Examination by Mr. Lewis     2599

18  EDWARD LULLA
       Direct Examination by Mr. Watkins   2604
19      Cross Examination by Mr. Lewis     2624

20  JOHN STAMPER
       Direct Examination by Mr. Watkins   2645
       Cross Examination by Mr. Lewis     2652

21

22

iv

1    INDEX - Continued                              PAGE NO.

2    JEFF DIAMANTES
        Direct Examination by Mr. Watkins            2654
3       Cross Examination by Mr. Lewis               2659
        Redirect Examination by Mr. Watkins          2661
4
     MICHAEL ROBERTS
5       Direct Examination by Mr. Morrow             2663
        Cross Examination by Mr. Consoldane          2695
6       Redirect Examination by Mr. Morrow           2704
        Recross Examination by Mr. Consoldane        2706
7
     CYNTHIA MAYLE
8       Direct Examination by Mr. Watkins            2706
        Cross Examination by Mr. Consoldane          2728
9
     DALE LAUX
10      Direct Examination by Mr. Watkins            2735
        Cross Examination by Mr. Consoldane          2751
11      Redirect Examination by Mr. Watkins          2790
        Recross Examination by Mr. Lewis             2798
12
     BRENDA GERARDI
13      Direct Examination by Mr. Watkins            2803
        Cross Examination by Mr. Lewis               2840
14
     STEVE GREENE
15      Direct Examination by Mr. Morrow             2851
        Cross Examination by Mr. Lewis               2875
16
     CHRIS ELLINGTON
17      Direct Examination by Mr. Morrow             2881
        Cross Examination by Mr. Consoldane          2888
18
     JIM McCOY
19      Direct Examination by Mr. Morrow             2890
        Cross Examination by Mr. Lewis               2899
20
     JILL KENYON
21      Direct Examination by Mr. Morrow             2900
        Cross Examination by Mr. Consoldane          2908
22

v

1 | INDEX - Continued                                        PAGE NO.

2 | JENNIFER ROBINSON
        Direct Examination by Mr. Morrow          2911
3 |     Cross Examination by Mr. Lewis            2920

4 | KATHY KIHM
        Direct Examination by Mr. Morrow          2921
5 |     Cross Examination by Mr. Lewis            2924

6 | BRIDGET PAUL
        Direct Examination by Mr. Morrow          2925
7 |     Cross Examination by Mr. Consoldane       2934

8 | KATHERINE THOMAS
        Direct Examination by Mr. Morrow          2936
9 |     Cross Examination by Mr. Lewis            2952
        Redirect Examination by Mr. Morrow        2973
10 |    Recross Examination by Mr. Lewis          2976

11 | JAMES CAMPBELL
        Direct Examination by Mr. Watkins         2977
12 |    Cross Examination by Mr. Consoldane       2982

13 | LINDA THOMAS
        Direct Examination by Mr. Morrow          2994
14 |    Cross Examination by Mr. Consoldane       3002

15 | CHRISTOPHER MONYAK
        Direct Examination by Mr. Morrow          3003
16 |    Cross Examination by Mr. Lewis            3023
        Redirect Examination by Mr. Morrow        3037
17 |

18 | TROOPER GERALD FUNELLI
        Direct Examination by Mr. Morrow          3038
        Cross Examination by Mr. Lewis            3046
19 |

20 | DET. SGT. PAUL MONROE
        Redirect Examination by Mr. Watkins       3049
        Recross Examination by Mr. Lewis          3063
21 |

22 | BRAD CAIN
        Direct Examination by Mr. Lewis           3106

vi

INDEX - Continued                                    PAGE NO.

TAMMIE KAYE
    Direct Examination by Mr. Consoldane         3118

ROBERT STANTON
    Direct Examination by Mr. Lewis             3119
    Cross Examination by Mr. Watkins            3127

MOTIONS                                          3200

CARMEN OLIVA
    Direct Examination by Mr. Watkins           3267
    Cross Examination by Mr. Lewis              3278

BARRY RICKER
    Direct Examination by Mr. Watkins           3290
    Cross Examination by Mr. Lewis              3300

DIANA MARCHESE
    Direct Examination by Mr. Watkins           3309
    Cross Examination by Mr. Consoldane         3314
    Redirect Examination by Mr. Watkins         3319
    Recross Examination by Mr. Consoldane       3319

MOTION RE JURY INSTRUCTIONS                      3334

FINAL ARGUMENT ON BEHALF OF STATE OF OHIO        3390
FINAL ARGUMENT ON BEHALF OF THE DEFENDANT        3438
FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT      3495
REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO     3505

CHARGE OF THE COURT                              3541

NOVEMBER 7, 2002 (Deliberations)                 3601

NOVEMBER 8, 2002 (Deliberations)                 3602

VERDICT                                          3612

(SEE SEPARATE VOLUME FOR TRANSCRIPT OF
    MITIGATION HEARING)

vii

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | Withdrawn |
| 36 | Photo | Withdrawn |
| 37 | Photo | No Objection |
| 38 | Photo | No Objection |
| 39 | Photo | Withdrawn |
| 40 | Photo | No Objection |
| 41 | Photo | Withdrawn |
| 42 | Photo | Withdrawn |
| 43 | Photo | No Objection |
| 44 | Photo | No Objection |
| 45 | Photo | Withdrawn |
| 46 | Photo | Withdrawn |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | Withdrawn |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | No Objection |
| 64 | Bullet Recovered from Brain of Victim | Withdrawn |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewelry | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninsula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | Withdrawn |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | No Objection |
| 86 | Blood Spatters - garage | Withdrawn |
| 87 | Overview garage | No Objection |
| 88 | Peninusia & Wall - blood splatters | No Objection |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | Withdrawn |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | No Objection |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | Withdrawn |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | No Objection |
| 108 | Victim | Withdrawn |
| 108A | Victim Face down | No Objection |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | Withdrawn |
| 111 | Victim lower torso | No Objection |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | Withdrawn |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |
| | | No Objection |

viii

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
STATE COURT TRANSCRIPTS - Page 2528

| | | |
|---|---|---|
| 118 | Office Area | No Objection |
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door. Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angle Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Bllod Smear | No Objection |
| 176 | Floormat | Withdrawn |
| 177 | Trunk Open | No Objection |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

ix

| | | |
|---|---|---|
| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Innn Photographs | Admitted over Obj |
| 202 | Days Innn Photographs | Objection Sustained |
| 203 | Days Innn Photographs | Withdrawn |
| 204 | Days Innn Photographs | Objection Sustained |
| 205 | Days Innn Photographs | Withdrawn |
| 206 | Days Innn Photographs | Withdrawn |
| 207 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 210 | Days Innn Photographs | Withdrawn |
| 211 | Days Innn Photographs | Withdrawn |
| 212 | Days Innn Photographs | Withdrawn |
| 213 | Days Innn Photographs | Withdrawn |
| 214 | Days Innn Photographs | Withdrawn |
| 215 | Days Innn Photographs | Withdrawn |
| 216 | Days Innn Photographs | Withdrawn |
| 217 | Days Innn Photographs | Withdrawn |
| 218 | Days Innn Photographs | Withdrawn |
| 219 | Days Innn Photographs | Withdrawn |
| 220 | Days Innn Photographs | Withdrawn |
| 221 | Days Innn Photographs | Withdrawn |
| 222 | Days Innn Photographs | Withdrawn |
| 223 | Days Innn Photographs | Withdrawn |
| 224 | Days Innn Photographs | Admitted over Obj |
| 225 | Days Innn Photographs | Withdrawn |
| 226 | Days Innn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | |
|------|------|------|------|
| 271D1 | | 12/03/01 | Admitted | xi |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/26/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |
| 271D60 | Halloween card | | Admitted |
| 271D61 | | 10/31/01 | Admitted |





| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

xii

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

xiii

| | | | | xiv |
|---|---|---|---|---|
| 273N | Letters from Nate to Donna | | Admitted | |
| 273N1 | | 12/01/01 | Admitted | |
| 273N2 | | 11/30/01 | Admitted | |
| 273N3 | | 11/29/01 | Admitted | |
| 273N4 | | 11/28/01 | Admitted | |
| 273N5 | | 11/27/01 | Admitted | |
| 273N6 | | 11/26/01 | Admitted | |
| 273N7 | | 11/25/01 | Admitted | |
| 273N8 | | 11/23/01 | Admitted | |
| 273N9 | | 11/22/01 | Admitted | |
| 273N10 | | 11/20/01 | Admitted | |
| 273N11 | | 11/19/01 | Admitted | |
| 273N12 | | 11/17/01 | Admitted | |
| 273N13 | | 11/16/01 | Admitted | |
| 273N14 | | 11/14/01 | Admitted | |
| 273N15 | | 11/14/01 | Admitted | |
| 273N16 | | 11/13/01 | Admitted | |
| 273N17 | | 11/12/01 | Admitted | |
| 273N18 | | 11/12/01 | Admitted | |
| 273N19 | | 11/10/01 | Admitted | |
| 273N20 | | 11/09/01 | Admitted | |
| 273N21 | | 11/07/01 | Admitted | |
| 273N22 | | 11/06/01 | Admitted | |
| 273N23 | | 11/08/01 | Admitted | |
| 273N24 | | 11/05/01 | Admitted | |
| 273N25 | | 11/03/01 | Admitted | |
| 273N26 | | 11/01/01 | Admitted | |
| 273N27 | | 11/01/01 | Admitted | |
| 273N28 | | 10/31/01 | Admitted | |
| 273N29 | | 10/30/01 | Admitted | |
| 273N30 | 273N31 | | 273N32 | |
| 273N31 | | 10/28/01 | Admitted | |
| 273N32 | | 10/27/01 | Admitted | |
| 273N33 | 273N34 | | 273N35 | |
| 273N34 | | 10/25/01 | Admitted | |
| 273N35 | | 10/25/01 | Admitted | |
| 273N36 | | 10/25/01 | Admitted | |
| 273N37 | | 10/24/01 | Admitted | |
| 273N38 | | 10/23/01 | Admitted | |
| 273N39 | | 10/22/01 | Admitted | |
| 273N40 | | 10/21/01 | Admitted | |
| 273N41 | | 10/21/01 | Admitted | |
| 273N42 | | 10/20/01 | Admitted | |
| 273N43 | | 10/19/01 | Admitted | |
| 273N44 | | 10/18/01 | Admitted | |
| 273N45 | | 10/17/01 | Admitted | |
| 273N46 | | 10/16/01 | Admitted | |
| 273N47 | | 10/16/01 | Admitted | |
| 273N48 | | 10/15/01 | Admitted | |
| 273N49 | | 10/14/01 | Admitted | |
| 273N50 | | 10/12/01 | Admitted | |
| 273N51 | | 10/10/01 | Admitted | |
| 273N52 | | 10/10/01 | Admitted | |
| 273N53 | | 10/08/01 | Admitted | |
| 273N54 | | 10/05/01 | Admitted | |
| 273N55 | | 10/07/01 | Admitted | |
| 273N56 | | 10/04/01 | Admitted | |
| 273N57 | | 10/04/01 | Admitted | |
| 273N58 | | 10/02/01 | Admitted | |
| 273N59 | | 10/01/01 | Admitted | |
| 273N60 | | 10/01/01 | Admitted | |
| 273N61 | | 09/30/01 | Admitted | |

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Envelope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maviee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

xvii

| Exhibit | Description | Ruling |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Introduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Card Envelope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Envelope #138 w/ Te | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photographic Line -Up Jose Flores | No Objection |
| 314 | Envelope Containing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photographic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Envelope Containing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X 5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Admitted over Obj |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Withdrawn |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

xviii

| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1 page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic  Line-Up - Frank Reynolds | Not Introduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Envelope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Envelope Containing 2 Photos | No Objection |

| | | |
|---|---|---|
| 395 | Eneviope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | Admitted over Obj |
| 397 | Audio Tape of Excerpts | Objection Sustained |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A-403RR | Defendant's school records | No Objection |
| | | |
| Defendant's Exhibits | | |
| Deft A | Dreft.'s Criminal History | No Objection |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Joint 1 | Fingerhut Jewelry | No Objection |
| | | |
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief in Opposition to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

2342

1              FRIDAY, OCTOBER 25, 2002 AT 9:29 A.M.

2                    THE COURT:  Good morning, folks.

3         Mr. Watkins.

4                    MR. WATKINS:  Thank you, Your Honor.

5    Continue with Paul Monroe.

6         <u>CONTINUING DIRECT EXAMINATION OF PAUL MONROE</u>

7    <u>BY MR. WATKINS</u>:

8    Q      Ready?

9    A      Yes.

10   Q      Paul, you indicated to me yesterday that there were

11   some corrections that you thought about?

12   A      Yes.

13   Q      That you wanted to bring to the attention of the

14   jury?

15   A      Yes.  In-between some of the sessions, I had an

16   opportunity to go through the file which contained the

17   letters.  I did notice that in my testimony I indicated that

18   there were no letters that went to 254 Fonderlac from

19   Mr. Jackson.  There were actually 15 letters, some of which

20   were cards.  They weren't just letters.  There were greeting

21   cards which were mailed to the residence.  And there was also

22   one letter that went back beyond the January 2000.  It

23   actually went from December of 2000.  There was another

2343

1    letter.

2    Q        Now, the letters that were sent from the summer or I

3    should say October of 2002 to December of, October 2001 to

4    December of 2001, those letters, were they sent to the post

5    office box, the ones from Nate Jackson?

6    A        Yes, they were.

7    Q        Okay.  Anything else?

8    A        Yes.  I testified that the writing samples, the

9    letters, the standard that was submitted to BCI in London for

10   testing, that was actually submitted to Richfield, not

11   London, and then consequently the Richfield lab transported

12   that to London.  I did not take that to London to be done.

13   Q        Okay.  Now, we were going through your conversation

14   with the defendant on December 21st, 2001?

15   A        Yes.

16   Q        And that was at the Trumbull County Sheriff's

17   Department?

18   A        Yes, it was.

19   Q        And you had described to the Jury how you gave him

20   his Miranda warning?

21   A        Yes, I did.

22   Q        And you further indicated that he waived his rights

23   and agreed to talk to you?



2344

1   A       Yes, he did.

2   Q       Now, you had an occasion -- by the way, who did the

3   videotaping?

4   A       I did.

5   Q       And I'm gonna show you what's been marked as State's

6   Exhibit 325.  Do you recognize that document?

7   A       Yes.  This is a copy of the original statement made

8   by Nathaniel Jackson to myself and Detective Sergeant Jeff

9   Hoolihan of the Warren Police Department on December 21st,

10  2001, and it's marked State's Exhibit 325.

11  Q       You've had an occasion to fully review it?

12  A       Yes, I have.

13  Q       And is that a complete and accurate copy of exactly

14  what happened on that date?

15  A       Yes, it is.

16  Q       And the participants to that videotape would be?

17  A       Myself, Nathaniel E. Jackson and Detective Sergeant

18  -- or Detective Jeff Hoolihan of the Warren Police

19  Department.

20  Q       Now, following that, a transcription was typed of

21  that to your knowledge?

22  A       Yes, there was.

23  Q       And I'm gonna hand you 326.  Can you identify that

2345

1    document?

2    A        This is a transcription which was made of the

3    videotape which indicates the words which were said during

4    the video and who was saying what.  On the left side, it'll

5    indicate which detective was speaking or when Mr. Jackson was

6    speaking.

7    Q        Now, you did not personally type that?

8    A        No, I did not.

9    Q        Did you personally review that?

10   A        Yes, I did.

11   Q        And is that, to the best of your knowledge, accurate

12   of what transpired between the three of you on that date?

13   A        Yes.

14                MR. WATKINS:  Your Honor, at this time,

15   I'd like to play for the jury State's Exhibit 325.

16   (Whereupon, the following proceedings occurred in chambers.)

17                THE COURT:  Before showing the videotape

18   to the jury, the defense has an objection?

19                MR. LEWIS:  Yes, Judge.  We would renew

20   our motion based upon the motion to suppress that it

21   shouldn't be introduced based upon Constitutional grounds and

22   the facts set forth in the suppression hearing.  We believe

23   that makes it inadmissible.

2346

1          We would also note for the record that yesterday we

2     had a request of the Court and the Court indicated that the

3     prosecutor would provide photographs or make some arrangement

4     for the copies thereof.  I did secure from Officer Monroe,

5     evidently it is the Trumbull County Sheriff's or I guess it's

6     his copy of all the photographs as far as I know.  He said it

7     was all the photographs.  It's more than what's been

8     introduced so far and I think that it's probably all the

9     photographs.  At least they indicated that to me.  I didn't

10     count the number, but it appears to be the same photographs I

11     looked at about three or four weeks ago.  So I think I have

12     all the photographs, at least what they gave me.

13                    MR. MORROW:  And also what you received on

14     CD rom.

15                    MR. LEWIS:  Oh, yeah.

16                    MR. MORROW:  The ones that you looked at

17     two weeks ago were the same ones we provided way back.

18                    MR. LEWIS:  Yeah.  There's no question we

19     have the photographs on CD rom.  The problem was that we

20     couldn't look at 'em at the same time.

21                    THE COURT:  You acknowledge, then, that

22     you received all the copies of photographs?

23                    MR. LEWIS:  Yeah.  There was only one

2347

1    proviso.  Officer Monroe wanted those photographs back.  All

2    I need to do is use them during the course of the trial for

3    reference sake so that's, I don't have any problem.

4                     THE COURT:  We're in chambers out of the

5    presence of the jury and the defendant's presence is waived;

6    is that correct?

7                     MR. LEWIS:  That's correct, Judge.

8                     THE COURT:  Your objection is noted, your

9    continuing objection on the so called confession.  Anything

10   else you wish to put on?

11                    MR. WATKINS:  Yes, Your Honor.  I intend

12   to go through this witness.  I'm almost done.  There are

13   several tie-in evidentiary matters and there may be a couple,

14   three things to identify yet and the significant issue

15   yesterday was the phone records and I'm not even sure of the

16   state of the record, but what I would like to do is proffer

17   my witness and that exhibit which I am not sure of the

18   exhibit number dealing with the Dobson phone records which

19   are Sprint records; is that correct?

20                    MR. MORROW:  Alltel.

21                    MR. WATKINS:  Alltel, excuse me.  And

22   they're out of what city is it?  Kansas City?

23                    MR. MORROW:  Kansas.

2348

1              MR. WATKINS:  And we have law on that

2     issue and I think one of the ways to handle it instead of

3     arguing in front of the jury would be for Mr. Monroe to come

4     back here or dismiss the jury and just go through.

5              THE COURT:  Proffer it on the record?

6              MR. WATKINS:  Proffer it on the record and

7     with the reasons why we think it's admissible.

8              THE COURT:  That's acceptable.  Okay.

9              MR. CONSOLDANE:  You're gonna do that

10    before you release him?

11             MR. WATKINS:  Right.  And then I may ask

12    to call him back.

13             MR. LEWIS:  He's not going anywhere.

14    You've got him sitting out there for the whole trial.

15             MR. WATKINS:  I know.

16    (End of proceedings in chambers.)

17    (Whereupon, the following proceedings occurred in open

18    court.)

19             THE COURT:  Are you ready to proceed?

20    (Whereupon, State's Exhibit 325 was played for the jury

21    commencing at 9:39 a.m. and concluding at 10:38 a.m.)

22             MR. WATKINS:  Time for a break, Your

23    Honor?

2349

1      THE COURT:  Take a ten-minute break.  You

2  folks are not to discuss anything or form any opinion until

3  you return.

4  (Whereupon, a recess was had commencing at 10:39 a.m. and

5  concluding at 10:59 a.m.)

6  (Whereupon, the following proceedings occurred in chambers

7  with the witness, Paul Monroe, present.)

8      THE COURT:  We are in chambers out of the

9  presence of the jury.  The defendant's presence is waived I

10  understand?

11     MR. CONSOLDANE:  That's correct.

12     THE COURT:  We're revisiting this issue of

13  yesterday on the record concerning this Alltel -- Sprint did

14  you say?  Sprint or Alltel?

15     THE WITNESS:  All the bills are with

16  Alltel, which is owned by Dobson Communications.

17     THE COURT:  Okay.  What exhibit is that?

18     MR. WATKINS:  That's 321.

19     THE COURT:  Okay.  Can I see that again?

20     MR. WATKINS:  And we're gonna have another

21  one, 321A.

22     THE COURT:  Okay.  321 and 321A.  This

23  appears to be a document provided by Dobson Communications

2350



1    Corporation covered with a declaration of custodian of

2    records which says that the person was, received a subpoena

3    requesting specified records and attached are records

4    responsive to that subpoena and the affiant certifies the

5    record attached was made at or near the time of the

6    occurrence of the matters set forth in the records, by, or

7    from information transmitted by, a person with knowledge of

8    those matters; two, were kept in the course of regularly

9    conducted business activity; and, three, remain by the

10   regularly conducted business activity as a regular practice

11   under penalty of perjury declare that they are true and

12   correct.  That's signed by Andrea Ray, custodian of records

13   of Dobson Communication Corporation.  And it is notarized by

14   a notary from Oklahoma County, State of Oklahoma.

15                    MR. CONSOLDANE:  Who is it addressed to,

16   Your Honor?

17                    THE COURT:  What's that?

18                    MR. CONSOLDANE:  Who is it addressed to?

19                    THE COURT:  It isn't.  It's just titled

20   Declaration of Custodian of Records.  Doesn't even say who

21   the subpoena was issued by, except that they are responding

22   and whatever.

23                    Exhibit 321A is another list which purports to be,

2351

1    this says Donna, Donna's portable cell phone records.  I

2    assume this is a compilation taken by that?

3                        MR. WATKINS:  That's correct.  Done by the

4    witness.

5                        THE COURT:  That's a work product of the

6    prosecutor's office?

7                        MR. WATKINS:  Can I make our argument

8    before we start testimony?

9                        THE COURT:  Please.  Let me frame the

10   argument first as to what the problem is and you correct me

11   if I don't have this quite right.

12       In identifying and marking the records for exhibit

13   to have before the, have in the record, there is an issue

14   that has arisen by way of objection of the defense that the

15   prosecution should not be allowed to introduce these records

16   under any of the exceptions to the hearsay rule.  We had some

17   discussion, and this is to further clarify that matter.

18                        MR. WATKINS:  Thank you, Your Honor.  326,

19   as described by the Court, and 326A further described by the

20   Court --

21                        THE COURT:  It's 321, Dennis.

22                        MR. WATKINS:  Oh, geez.  321.  Sorry.  Are

23   exhibits that were compiled regarding the phones that were

2352

1    leased and used by Donna Roberts.   Those were obtained

2    through subpoena in preparation of this case from Kansas

3    City.   Shortly, I'll have Chuck Morrow give our law that

4    we've researched upon this matter.   But in brief, we believe

5    that, one, under the Rules of Evidence, this document is

6    relevant and can be recognized by the Court for the law that

7    Mr. Morrow will give.

8            Secondly, we believe that the case law would suggest

9    that there needs to be some prima facie evidence showing and

10   that the record is what it is.   That would be achieved

11   through a totality of the circumstances in the matter.   Paul

12   Monroe will testify he's familiar with phone records.   I

13   think it's used by all of us when we get our bills to look on

14   long distance calls for the time and the charge for the

15   calls.   This is not some document that can't be understood.

16   People understand it every day in our mass communications

17   when we have cell phone bills.   So we have a document that is

18   compiled for specific telephone numbers and a specific name.

19           But further than that, Your Honor, the videotape

20   that was just played and is admissible evidence corroborates

21   the vitality of these records as to accuracy.   The defendant

22   gives the general time period and the specific number of

23   Donna Roberts' car phone in the videotape.   So we have an

2353



1    admission that the number of the car phone is called by him.

2    And then when you correlate all three phones and he admits

3    that on the visor he had another phone in use that belonged

4    to Robert or Robert Fingerhut.  Those times and those dates

5    and those records correspond with the defendant's answer in

6    the admissible evidence in this case.  So we believe that

7    this is relevant, it is a document that Chuck Morrow will now

8    give our legal points as far as law is concerned.

9              MR. MORROW:  May it please the Court.

10   Your Honor, in order for documents to be admissible, they

11   must either be authenticated by someone or have some level,



12   some recognized exception for authenticity for admissability.

13   And if the Court looks at Evidence Rule 901 from Ohio which

14   provides, "The requirement of authentication or

15   identification as a condition precedent to admissability is

16   satisfied by evidence sufficient to support a finding that

17   the matter in question is what its proponent claims."

18        Then if you turn to 902, which provides for

19   self-authentication, "Extrinsic evidence of authenticity as a

20   condition precedent to admissability is not required with

21   respect to the following," and if I could direct the Court's

22   attention to subparagraph eight, which talks about

23   acknowledged documents.



2354

1    "Documents accompanied by a certificate of

2    acknowledgment executed in the manner provided by law by a

3    notary public or other officer authorized by law to take

4    acknowledgments."

5    In essence, it says if we have an acknowledged

6    document, which these are by way of certifications attached

7    thereto, they then become self-authenticating and are

8    admissible.

9    Furthermore, subparagraph ten provides for

10   presumptions created by law.

11   "Any signature, document, or other matter declared

12   by any law of a jurisdiction, state or federal, to be

13   presumptively or prima facie genuine or authenticate."

14   Taking that and looking at Revised Code Section

15   1301.08 which provides for prima facia evidence of

16   authenticity of third party documents provides, "A document

17   in due form purporting to be a bill of lading, policy or

18   certificate of insurance, official weigher's or inspector's

19   certificate, consular invoice, or any other document

20   authorized or required by the contract to be issued by a

21   third party shall be prima facie evidence of its own

22   authenticity and genuineness and of the facts stated in the

23   document by the third party."



2355



1        In essence, the phone records come in under 902(8).

2    The insurance policies come in under 902(10), as well as

3    902(8) because they do contain certificates of authenticity.

4        Now, with respect to interpreting or looking at the

5    documents themselves, in *United States of America* versus

6    *Guerna*, g-u-e-r-n-a, which is 142 F 3d 446, the Court

7    discussed admissability of Mexican cell phone records.  And

8    if I may, Your Honor, "We find no abuse of discretion in the

9    district court's decision to admit Mexican cellular phone

10   records into evidence.  Authentication of evidence is

11   'satisfied by evidence sufficient to support a finding that



12   the matter in question is what the proponent claims.'"  I

13   will omit the citations.

14       "Documents may be authenticated through appearance,

15   contents, substance, internal patterns, or other distinctive

16   characteristics, taken in conjunction with circumstances."  I

17   will omit citations again.

18       "The government need only make a prima facie showing

19   of authenticity 'so that a reasonable juror could find in

20   favor of authenticity or identification.'"

21       "The government could not authenticate the records

22   through their custodian at Baja Cellular, but the

23   government's two American witnesses were able to testify that

2356

1    the records listed the dates, times, and numbers called in a

2    pattern unique to cellular telephone bills and appeared

3    authentic.  These witnesses identified enough of the

4    appearance, content, and internal patterns of the phone bills

5    to create a prima facie case of authenticity."

6            Those are the citations that are listed in that.

7            Furthermore, looking specifically to another federal

8    decision, which is *United States* versus *Dhinsa*, d-h-i-n-s-a,

9    which is cited as 234 F.3d 635 -- and by the way, that first

10   citation was a 1998 case.  This is a 2001 decision.

11           "Rule 901(a) of the Federal Rules of Evidence

12   provides that 'the requirement of authentication or

13   identification as a condition precedent to admissability is

14   satisfied by evidence sufficient to support a finding that

15   the matter in question is what its proponent claims.'"

16           "Rule 901 does not erect a particularly high

17   hurdle."

18           "The requirement under Rule 901 is satisfied 'if

19   sufficient proof has been introduced so that a reasonable

20   juror could find in favor of authenticity or identification."

21           "The standard for authentication, and hence for

22   admissability, is one of reasonable likelihood.  'If in the

23   court's judgment it seems reasonably probable that the



1   evidence is what it purports to be, the command of Rule

2   901(a) is satisfied, and the evidence's persuasive force is

3   left to the jury.'"

4        And again, Judge, I left out some of the citations

5   as I went through that. Quite simply, Your Honor, as

6   Mr. Watkins has indicated, we believe that Officer Monroe

7   will be able to lay a proper predicate to be able to testify

8   from the records. As such, based upon 902(8) and 902(10),

9   the records come in under the certificate attached and

10  independently come in under the self-authentication pursuant

11  to the insurance policies by law.

12        MR. WATKINS: And, Your Honor, I just

13  would add, that case dealt with phone calls between parties,

14  cellular phones, and the only evidence of the phone calls are

15  the records. We have in this case much stronger evidence

16  because the defendant, one, he admits and, secondly, gives

17  the very telephone number, one of 'em, that is right in

18  testimony before this Court now through the audio and video

19  statement.

20        MR. CONSOLDANE: Your Honor, I'm gonna go

21  first and then Jim is gonna follow me. First of all is that,

22  you know, if they're gonna start using federal rules then I

23  wish we could use all the federal rules, especially on



2358

1  discovery and evidence in this court.  You just can't pick

2  and choose what federal rules you want to apply in a state

3  court.

4         Second of all is that I have found many mistakes in

5  both my regular telephone bill and my cell phone bill.  As a

6  matter of fact, I got a charge which I couldn't figure out

7  what it was for months on a bill.  I think if you bring

8  something in on a criminal case like that to show times and

9  all, you have to have somebody that's able to be

10  cross-examined.

11         And then to also have this 321A that's coming on,

12  this is nothing more than what he compiled out of it.  Now

13  this is his interpretation of what the bill is.  You know, we

14  need somebody from the telephone company to be able to

15  cross-examine that bill.  If that bill was self-explanatory

16  and was admitted, they wouldn't need this.  This shows that

17  it's not acceptable to be given to the jury.  It needs to be

18  able to be cross-examined.

19         Go ahead, James.

20         MR. LEWIS:  Yeah.  Your Honor, for the

21  record, what Mr. Morrow has indicated in his pronouncements

22  of law and everything else simply go to authentication.

23  There wasn't anything in there that talked about the

2359

1   interpretation or the understanding of how the bill is

2   compiled and how the phone numbers are arranged or the

3   communication takes place, the duration time, whether

4   duration time accumulates the moment the cell phone has made

5   connection or whether one has to be activated for hearing

6   purposes or whatever.  We don't have that information.  That

7   information is only available through the people who are

8   knowledgeable in the compilation of these bills.  All phone

9   companies differ as to how they operate in regard to that.

10  We don't know if these are subject to call forwarding where

11  one number is called and it's transmitted to another number,

12  whether that other number is recorded or not recorded, and

13  there's a lot of things in here that are the providence of

14  people who are qualified.  Normally what happens is you do

15  have, you can have self-authenticating documents.  There's no

16  question about that.  But you cannot have, for example, if,

17  you know, if we're not physics engineers for the jury, if we

18  get the certified copy of $E = MC^2$ and bring that formula in

19  there and try to interpret it, that's what this boils down

20  to.

21         The same applies to the insurance policies.  There

22  isn't anybody that's going to say how this insurance policy

23  operates.  What the significance is in regard to the

2360

1    designation of his beneficiary on the insurance policy when

2    he said wife and actually it wasn't his wife and the payout

3    provisions, how that operates and all the other concepts that

4    come into question in regard to insurance policies.  If what

5    they say, if what they say, Judge, is that we can just

6    authenticate every piece of record or whatever, then why

7    don't we go down and say, well, Investigator Monroe has this

8    beautiful black book, okay, I don't know where it is, Paul,

9    there it is, here's the whole case, we're just going to go up

10   and have Mr. Monroe authenticate.  "I did this in the

11   ordinary course of my business.  I compiled all those

12   records."

13          "Is that the real record?"

14          "Yes, it is."

15          Certify.  Give it to the jury.  Trial over.  I don't

16   think so, Judge.  That's not the way it operates.  That's

17   what they're attempting to do here.  There is no way, no how

18   that they can operate under that guise.  You need somebody

19   from an insurance company to understand and to tell you about

20   those insurance policies, what the payout provision is.

21   There's a section that may mean this person only gets $9,000

22   a year.  Okay?

23          See, Mr. Morrow looks and his eyes are wandering

2361

1    now.  He didn't read it.  He doesn't know.  That's the point.

2    You have to have people who know what those are.  And

3    usually, usually it works out as the people who actually

4    produce the records are the ones who come in and testify and

5    leave the certified copy of the record because they didn't

6    compile it themselves, but they can explain what it is and

7    how it was compiled.  That's the reason we have that law.

8    That's the reason we have that Rule of Evidence, not what

9    they're trying to create here.

10           In both instances, they need somebody to come in

11   here and tell people what those are, how they were compiled

12   and what's the interpretation of them.

13           MR. CONSOLDANE:  Okay.  You know, I can't

14   think of the quotation right now, but our Court of Appeals

15   here overruled a case that Mitch Shaker had that I tried

16   where they allowed the certified records of a car to come in

17   because they didn't have the owner to testify that the car

18   was stolen.  And the Court, our own Court of Appeals said you

19   can't just drop a certified record on the, on the bench and

20   have that, presume that's the ownership of the car.  And

21   after lunch, if I can go research that case because the only

22   reason I remember is I personally tried the case, I didn't do

23   the appeal, but our own District Court of Appeals says you

2362

1  can't just prove something by certified record.  You can talk

2  about all these other federal cases.  Why don't you just go

3  over there, Chuck?  You worked there.  You can get that

4  record.  It tells you what you can't do.

5          MR. WATKINS:  Your Honor, I would, Chuck

6  has some more, but this is done every day throughout courts

7  in Ohio and the United States.  The point is it's prima

8  facie.  They can bring witnesses in if they feel there's

9  something about the document.  They have every opportunity to

10  attack the document through those witnesses.  The question is

11  whether or not it can be admitted for the purpose for which

12  we want to admit it and that there's policies and these face

13  amounts.  We should be able to do that.

14          Chuck, go ahead and finish with what I was saying.

15          MR. MORROW:  First, I would note that the

16  committee comments to both 901 and 902 provides that 902

17  follows the federal rules.  901(a), which is what I cited on

18  that second case, also tracks the language of the federal

19  rules.  And as such, I think the discussions about the

20  applicability or the case law that deals with 901 and 902 for

21  those parts which follow the federal rules, you can look to

22  the cases in there that discuss both of those.  And, in deed,

23  again, I make note that that's the committee comment to 902

2363

1   says that Rule 902 follows the language of the Federal Rules

2   of Evidence.

3          Furthermore, as noted in 901, it likewise provides

4   that 901(a), which is talking about the authenticity of it

5   and the reliability of it, also follows Federal Rule 901(a).

6          Therefore, I think the case law that follows from

7   the federal interpretations or the interpretations of federal

8   rules are likewise persuasive on this Court.

9          Now, Your Honor, again, you have to remember the

10  sole purpose for this is for purposes of introduction and

11  admission into the Jury.  The argument that counsel wants to

12  make about what type of weight is to be given to those

13  policies, whether or not the questions that Mr. Lewis wants

14  to raise are likewise issues that can be presented to the

15  jury.  And that's, in deed, what the case law says.  The

16  material gets to the jury.  The jury decides how much weight

17  they want to give to it.  Whether they want to accept it at

18  its face or whether they want to accept prosecutorial

19  arguments on it or defensive argument on it, it is up to the

20  jury.

21          MR. CONSOLDANE:  How can you argue if you

22  don't have the evidence?

23          MR. MORROW:  Your Honor, the reason for

2364

1    the rules was to eliminate the necessity of tracking in 27

2    different people to discuss the documents.  You have a

3    document.  People are familiar with insurance policies.  The

4    State is going to contend that after Officer Monroe testifies

5    he's going to be able to establish a requisite predicate that

6    he can testify as to what's contained within the phone

7    records.  All we need to do is get the phone records

8    admitted.  Once they're admitted, if we establish the

9    appropriate predicate for Officer Monroe's ability to testify

10   as to those records, they can come in.  Obviously the defense

11   -- I mean he can testify as to the contents.  The defense

12   obviously would have an ability to cross-examine him about

13   his skills and his ability to interpret the phone records.

14          The insurance policies, they in themselves speak for

15   themselves.  And that is what is provided by 1301.08.  It

16   says they come in as self-authenticating documents.  And as

17   such, the contents of them are -- it's like a photograph,

18   Your Honor.  We identify a photograph.  We can argue that the

19   photograph shows a blood drop.  The defense could argue that

20   the photograph shows a wine spot.  The jury makes the

21   decision as to whether they want to believe it is a wine

22   drop, a blood drop or a grape juice drop.  I mean they decide

23   how much weight they want to give to that photograph.  The

2365

1   question is as to authenticity of the document for purposes

2   of admissability to go back to the jury.  For the jury to

3   decide how much weight, if any, they want to give to

4   either --

5                   MR. CONSOLDANE:  How can you overrule --

6   the Eleventh District Court of Appeals says you can't do

7   that.

8                   MR. WATKINS:  That is not true.

9                   MR. CONSOLDANE:  That is true.

10                  THE COURT:  Do you have a case on that?

11                  MR. CONSOLDANE:  Yes.

12                  MR. WATKINS:  Go get the case.

13                  MR. CONSOLDANE:  I tried the case.  It was

14  appealed in the Eleventh District Court of Appeals.  Judge

15  Shaker was the Judge.  It was while he was still downstairs.

16  They said you can't do that.  Why would you, you even were

17  working there at the time, Chuck.  You should know that case.

18                  MR. WATKINS:  It specifically says in the

19  rule insurance policies come in.

20                  MR. MORROW:  Insurance policies come in by

21  themselves.

22                  MR. WATKINS:  Under the law.

23                  MR. LEWIS:  Fine.  What's the payout

2366

1    provisions?

2                    MR. WATKINS:  It doesn't matter, Jim.  You

3    can argue that.  That's exactly what the rule says.

4                    MR. MORROW:  State Farm, it's --

5                    MR. CONSOLDANE:  How can you argue?

6                    THE COURT:  Over lunch, come up with the

7    case that varies my opinion at this time.  I think that the

8    phone record comes in.  That one case mentioned the -- the

9    predicate here is whether there is sufficient evidence to

10   support a finding in question is what it proposes to be.  I

11   don't think that there's any question, even by the defense at

12   this point, that that record is what it purports to be.

13                   MR. CONSOLDANE:  What about this, though,

14   321A?

15                   THE COURT:  Well, I'll get to that.

16                   MR. CONSOLDANE:  Okay.

17                   THE COURT:  That also comes under 902, the

18   phone record, 902(8).  It's accompanied by a certificate

19   authorized by law.  It's notarized.  The question on the

20   compilation, that's something that I don't think is proper

21   for an exhibit because it's a duplication of a portion of

22   321.

23                   MR. LEWIS:  Of the authenticated one.



2367

1          THE COURT:  This is a work product that is

2  not evidence, although that's something that for purposes of

3  the State's case they're quite capable of using.  It's not

4  evidence as such for the jury.

5          The question of the insurance policy, that's

6  different I think.  I think that it's admissable, but I think

7  that it's something that the jury can read, as well as

8  anybody else.  To allow anybody to get up and say that Donna

9  Roberts was going to be the recipient, you're gonna have to

10  have somebody from the insurance business or a lawyer who is

11  gonna take the stand and give an opinion as to what it says.

12  Anyone else is giving an opinion of something that should not

13  be allowed.  So it's admissible under 902(10), but it stands

14  on its own merits as far as the jury's interpretation unless

15  someone who can be qualified as an expert to read insurance

16  policies is able to interpret it.

17          MR. WATKINS:  I don't understand.

18          MR. LEWIS:  You're saying, Judge, you're

19  going to admit it?

20          THE COURT:  I'm going to admit it.

21          MR. LEWIS:  They can interpret it anyway.

22  I can say anything I want about that insurance policy.

23          THE COURT:  No.  That's what I'm saying.

2368

1    I think it's improper comment for Mr. Monroe or whoever to

2    say she's going to get the money.  He can testify this is the

3    insurance policy.  It has her name as a beneficiary.  You

4    have every right to argue, "So what?"

5             It has her listed as a wife, but that's an argument.

6    He is not in a position to do anything more than say, "We

7    found this policy."

8                     MR. LEWIS:  That's right.  The implication

9    becomes, just by his testimony, he's giving the impression to

10   the jury that she is the beneficiary.  He's dead, there's the

11   amount, and she gets it.  That's what they're left with.

12                    THE COURT:  You have the right to rebut

13   that as not being the fact.

14                    MR. LEWIS:  Okay.  So we can cross-examine

15   him regarding the insurance policy?

16                    THE COURT:  What's that?

17                    MR. LEWIS:  We can cross-examine him about

18   the insurance policy?

19                    THE COURT:  He doesn't know anything about

20   the insurance policy.

21                    MR. LEWIS:  That's the whole point.  First

22   off, he didn't find either one of these insurance policies.

23   Okay?  I don't know why he's identifying them.  He should

2369

1  have --

2                  MR. WATKINS:  He found one of them.

3                  THE WITNESS:  I found the State Farm

4  insurance policy.  And then through our investigation,

5  through the investigation --

6                  MR. LEWIS:  Skip that.  They didn't find

7  it.

8                  THE WITNESS:  I got information that there

9  was an additional policy through Zurich and we subpoenaed

10  records from Zurich on policies for Robert Fingerhut.

11                  MR. LEWIS:  Okay.

12                  THE WITNESS:  The prosecutor's office

13  discovered it.

14                  THE COURT:  There again, I think you cut

15  the line too fine.  It doesn't matter, you know, the State is

16  no person.  They have to have a body up there, in this case

17  Mr. Monroe, to introduce the evidence wherever they found it.

18  We got to look to whether it's going to come in or not come

19  in under one of the rules.

20                  MR. LEWIS:  Well, Judge, if it's

21  self-authenticating, if you've got a certified copy of the

22  record, you don't need his body to present it.  All you do is

23  present it.  These gentlemen give it to you and you go, okay,

2370

1   mark it as an exhibit.  We don't have to talk about it.

2               THE COURT:  You're missing my point.  I'm

3   saying that's all that Mr. Monroe can do.  Whether it's

4   Mr. Monroe's --

5               MR. LEWIS:  He shouldn't be doing it at

6   all.  If these are self-authenticated, it's like getting a

7   record of the weather report.  You don't take any Tom, Dick

8   and Harry off the street to start talking about it because he

9   doesn't know anything about it.

10               THE COURT:  I agree with that.  That

11   raises the whole problem about something of this nature and

12   that is the right of the defendant to cross-examine

13   something.  If Mr. Monroe is permitted to get on and say this

14   is an insurance policy and it means that she's going to get X

15   amount of dollars, he's gonna cross-examine Mr. Monroe on the

16   policy.

17               MR. CONSOLDANE:  No.  See, the other

18   thing, who do we ask --

19               THE COURT:  What Paul can read, the jurors

20   can read.

21               MR. WATKINS:  I have, Judge, if what

22   you're saying, I don't have -- we can get on with this.

23   You're saying that the documents, whatever they read, they

2371

1    are what they are.

2                 THE COURT:  It speaks for itself.

3                 MR. WATKINS:  We can't have him talk about

4    it?

5                 THE COURT:  Exactly.  The document is his

6    evidence, not his testimony.

7                 MR. WATKINS:  Right.  The only reason,

8    it's just a vehicle to get it in.  Other than the fact that

9    it's an insurance policy and I mean that's what it is.  I

10    guess --

11                 THE COURT:  It's fair comment I think for

12    closing that the State takes a position that this is what the

13    policy says.  They have the right to argue otherwise.

14                 MR. WATKINS:  I understand that.  We're

15    gonna simply say that there's 250 and there's 300 and in the

16    name of the, of Donna Roberts.

17                 MR. CONSOLDANE:  How do we cross-examine

18    somebody as to what effect that he lied on an insurance

19    policy have to do with its validity?

20                 MR. MORROW:  You subpoena your own witness

21    and have your witness come in and testify as to that.

22                 MR. CONSOLDANE:  That's your duty to make

23    them available if you're going to bring the instrument is.

2372

1           MR. MORROW:  Absolutely not.  That's not

2     our responsibility.

3           MR. LEWIS:  Let's go back to my example.

4     Take the black book, introduce it and then we have to get the

5     insurance man, we got to get this and that and it turns the

6     whole system up on its head.

7           THE COURT:  Here's what we're going to do

8     for this morning.  We are going to have these marked, have

9     them identified as to what it is.  There will be no testimony

10    or questions asked about the contents.

11          MR. CONSOLDANE:  Or even the amount.

12          THE COURT:  Or the amount.

13          MR. LEWIS:  It's too late for that.

14          THE COURT:  Okay?

15          MR. LEWIS:  Yeah.  Yes.

16          THE COURT:  You have an opportunity over

17    lunch to get me some law that tells me I'm wrong on this.

18    What concerns me is by anyone testifying as to the contents

19    of those by giving any information that the jury can glean

20    the same information by itself is that we raise the question

21    of the defendant not having the right to cross-examine

22    anybody on this information.  And I don't know the answer to

23    that at this point.  I will attempt to find something more

2373

1    over lunch too.

2                      MR. CONSOLDANE:  That's exactly what the

3    Court of Appeals said.

4                      THE COURT:  Give me that case.  It might

5    be helpful.

6                      MR. CONSOLDANE:  I don't remember what

7    number it was.  It's been --

8                      MR. LEWIS:  We're gonna have to figure it

9    out.

10                     MR. CONSOLDANE:  I can't remember the name

11   of it.

12                     THE COURT:  I think it's clear that both

13   of these are admissible.  The manner in which they're used is

14   the question.

15   (End of proceedings in chambers.)

16   (Whereupon, the following proceedings occurred in open

17   court.)

18                     THE COURT:  Mr. Watkins, you may proceed.

19                     MR. WATKINS:  Thank you, Your Honor.

20   Q       (By Mr. Watkins) Sergeant Monroe, there came a time

21   after the defendant's arrest that you obtained a search

22   warrant for oral swabs for the purpose of DNA?

23   A       Yes.

2374

1    Q        Without discussing the document, would you verify

2    whether that particular document, which is State's Exhibit

3    352, is a search warrant you obtained for the purpose of

4    obtaining oral swabs from the defendant?

5    A        State's Exhibit 352 is a search warrant which I

6    obtained on December 21st, 2001 for oral swabs of Nathaniel

7    E. Jackson.

8    Q        And you received a court order to get oral swabs; is

9    that correct?

10   A        Yes, I did.

11   Q        And pursuant to that court order, did you see the

12   defendant?

13   A        Yes, I did.

14   Q        And when was that?

15   A        December 21st of 2001.

16   Q        And would you tell the jury where that was?

17   A        I went to the Trumbull County Jail and requested to

18   see Nathaniel Jackson.  He was brought to the medical unit of

19   the Trumbull County Jail where oral swabbings were taken from

20   the inside of his mouth.

21   Q        What time was this?

22   A        1:55 p.m.

23   Q        And who took the oral swabs?



2375

1    A        Carla Oles.

2    Q        Okay.  And what position did she have if you know?

3    A        She's an LPN employed by the, a local practical

4    nurse employed by the Trumbull County Jail.

5    Q        Okay.  And were you present when the swab was taken?

6    A        Yes, I was.

7    Q        Anybody else present?

8    A        Detective Daniel Mason.

9    Q        Warren?

10   A        Warren Police Department.

11   Q        Would you identify 351?

12   A        State's Exhibit 351 is a manila envelope with the

13   Howland Police Department evidence label on it.  It also has

14   my signature upon the envelope.  It says that this contains

15   two cotton tipped swabs.

16   Q        Okay.  And it was placed in that envelope at that

17   time?

18   A        It was placed in this envelope and sealed.  I put my

19   initials upon the seal across the envelope.

20   Q        And what did you do with it afterwards?

21   A        After this evidence was collected, I submitted it to

22   BCI & I Laboratories in Richfield for analysis.

23   Q        I'm gonna show you State's Exhibit 265.  Can you

2376



1    identify it?

2    A      Yes, I can.

3    Q      And what is it, please?

4    A      State's Exhibit 265 is a purple capped glass vial

5    containing the blood of Robert Fingerhut.

6    Q      And who did you receive that from?

7    A      I received this from Patrolman Campbell.

8    Q      And that was kept in your evidence room?

9    A      Yes, it was.

10   Q      And was there a time it was taken anywhere?

11   A      Yes.  I submitted this to BCI & I Laboratories in

12   Richfield, Ohio for analysis.



13   Q      Okay.  266, would you identify it, please?

14   A      Item, State's Exhibit 266 is a spent bullet.

15   Q      And that was received from whom?

16   A      This was received from Patrolman Campbell.

17   Q      And you also ended up taking that to BCI & I in

18   Richfield?

19   A      Yes.  I submitted this to BCI & I Laboratories in

20   Richfield, Ohio for analysis.

21   Q      And what was the purpose -- oh, and by the way, the

22   blood that you received, was it itemized whose blood it was?

23   A      Yes, it was.

2377

1   Q       And whose blood?

2   A       Robert Fingerhut's.

3   Q       And the bullet, what was the reason to take that to

4   Richfield?

5   A       To check the striations on the bullet to see if they

6   matched other bullets recovered at the scene and try to match

7   these bullets to the murder weapon.

8   Q       Okay.  275A, B, would you identify those, please, if

9   you can?

10  A       State's Exhibit 275-A contains the Howland Police

11  Department evidence label on it.  This was evidence that,

12  this is a five-page letter, handwritten letter, from

13  Nathaniel E. Jackson to Donna Marie Roberts dated 10-29-01.

14  Postmark on the envelope is 10-31-01.

15  Q       Is that one of the letters you took from the total

16  letters that you received?

17  A       Yes, it is.

18  Q       Okay.  Continue.

19  A       State's Exhibit 275-B is ten pages of Nathaniel

20  Jackson's writing dated 10-26-01 inside an envelope

21  postmarked 10-27-01 and addressed to Donna Marie Roberts.

22  Q       And you personally took that from the total pile of

23  letters that you recovered?

2378

1   A        Yes, I did.

2   Q        And you put it in that envelope?

3   A        Yes, I did.

4   Q        So both of those were taken where?

5   A        These were both taken to BCI & I Laboratory in

6   Richfield, Ohio.

7   Q        276A, B and C, would you attempt to identify them if

8   you can, please?

9   A        State's Exhibit 276-A, this is a writing standard

10  which was written in my presence on April 29th of 2002 at the

11  Trumbull County Jail by Nathaniel E. Jackson.  I submitted

12  item 267-A to BCI & I Laboratory in Richfield, Ohio.

13           State's Exhibit 276B, these are seven original pages

14  of documentation by Nathaniel E. Jackson with his signature

15  and printed handwriting which I received from Kathy Kim who

16  is the keeper of records at Community Corrections Association

17  in Youngstown, Ohio.

18           Item 276B was submitted to BCI & I in Richfield for

19  analysis.

20           State's Exhibit 276-C, these are documents which I

21  received from Trooper Funelli of the Ohio State Highway

22  Patrol which came from the Lorain Correctional Institution.

23  This envelope contains a release service form, inmate

2379



1    employment history and two other forms of documentation which

2    were filled out by Nathaniel Jackson.

3    Q        So they were writings of Nathaniel Jackson to your

4    knowledge?

5                     MR. LEWIS:  Objection, Your Honor.  Are we

6    gonna authenticate it or are you just gonna have him say

7    something?

8                     THE COURT:  I'm sorry, James.  I don't

9    understand.

10                    MR. LEWIS:  It's the same old argument.

11   Is he gonna -- he doesn't know for sure.  Are you gonna



12   authenticate it from prison or are you gonna have him

13   testify?

14                    MR. WATKINS:  Yes.  We'll get into that.

15                    THE COURT:  Okay.  Your objection is

16   overruled at this point.  Reserved.  We're merely

17   identifying.  We're not explaining anything about what this

18   stuff is at this point.  Your objection is the same as

19   what --

20                    MR. LEWIS:  It's the same as it's gonna be

21   throughout this trial evidently.  It's the same thing.  If he

22   doesn't know, if they're gonna bring another witness in,

23   fine, he can go ahead and give something that he doesn't know

2380

1    about.

2                    THE COURT:  Well, the Court has ruled that

3    some of these things are self-authenticating.  May I see that

4    particular document?

5                    MR. LEWIS:  Well, it's records that were

6    secured at LCI, something like that, but it's not a record he

7    compiled.

8                    MR. WATKINS:  Your Honor, I have no other

9    questions.  We probably can get going and we can argue this

10   later.

11                   MR. LEWIS:  Of course.

12                   THE COURT:  Yes.  I would agree with the

13   defendant on this particular form here that that is not

14   self-authenticating.  At this point, I think that should not

15   be brought in.

16        Approach the bench.

17                   MR. WATKINS:  Your Honor, we are going to

18   bring other witnesses in.  This is simply to show he took it.

19   That's all the purpose of this witness is.

20                   THE COURT:  Okay.

21                   MR. WATKINS:  To show what he took.

22   That's all I was doing.

23                   MR. CONSOLDANE:  That's fine.

2381

1           THE COURT:  That's fine.  There will be no

2    comment on what it is further then.  If you're identifying

3    specifically by name what the thing is, but any of the

4    contents will not, won't come in at this time.

5                     MR. WATKINS:  No.

6    Q       (By Mr. Watkins) Those items, was that 276A, B and

7    C?

8    A       Yes.

9    Q       Were documents that you sent to where?

10   A       To BCI & I in Richfield, Ohio.

11   Q       And they were sent for the purpose of analysis?

12   A       Yes, they were.

13   Q       Now, I would like you to give the dates and list of

14   all items and dates that you took items to BCI & I and when

15   you brought them back.

16   A       On December 14th of 2001 at 1:10 p.m. in the

17   afternoon, I submitted 28 items to BCI & I Laboratory in

18   Richfield, Ohio for analysis.

19           Item number one is a gunshot residue kit from the

20   victim's wife.

21           Item number two is a brown paper bag containing a

22   shirt from the victim's wife.

23           Item number three is a brown paper bag containing

2382

1    one Taurus .38-caliber revolver, serial number JH14188.

2         Item number four is a brown paper bag containing

3    live rounds.

4         Item number five is a white envelope containing

5    spent rounds, a spent bullet.

6         Item number six is a plastic container containing a

7    spent bullet.

8         Item number seven is a plastic container containing

9    a spent bullet.

10        Item number eight is a brown paper bag containing a

11   jacket from the victim.

12        Item number nine is a brown paper bag containing the

13   victim's shirt.

14        Item number ten is a plastic bag containing a blood

15   standard from the victim.

16        Item number eleven is a white envelope containing

17   rectal swabs from the victim.

18        Item number twelve is a white envelope containing

19   oral swabs from the victim.

20        Item number thirteen is a white envelope containing

21   a hair standard from the victim.

22        Item number fourteen is a brown envelope containing

23   a swab with an unknown stain.

2383

1          Item fifteen is a brown envelope containing a swab

2    with an unknown stain.

3          Item sixteen is a brown envelope containing a swab

4    with an unknown stain.

5          Item seventeen is a brown envelope containing a swab

6    with an unknown stain.

7          Item eighteen is a brown envelope containing a swab

8    with an unknown stain.

9          Item nineteen is a brown envelope containing a swab

10   with an unknown stain.

11         Item twenty is a brown envelope containing a swab

12   with an unknown stain.

13         Item twenty-one is a brown envelope containing a

14   swab with an unknown stain.

15         Item twenty-two is a brown envelope containing a

16   swab with an unknown stain.

17         Item twenty-three is a brown envelope containing an

18   unknown hair.

19         Item twenty-four is a brown paper bag containing a

20   plastic place mat with an unknown stain.

21         Item twenty-five is a brown paper bag containing a

22   plastic tray.

23         Item twenty-six is an envelope containing postmortem

2384

1   fingerprints from the victim.

2          Item twenty-seven is a brown envelope containing

3   copies of fingerprint cards bearing the name Nathaniel E.

4   Jackson.

5          Item twenty-eight is a sealed 2001 Chrysler 300M

6   license plate ████, vehicle identification number

7   ██████████████

8          Item one was returned on October 9th of 2002 to the

9   Howland Police Department evidence room.  It was brought

10  there by Detective Captain Carl Compton.

11         Item two was received by me on October 8th of 2002.

12         Items three, four, five, six, seven, eight and nine

13  were returned to me on April 9th of 2002.

14         Items ten, eleven, twelve, thirteen, fourteen,

15  fifteen, sixteen, seventeen, eighteen, nineteen, twenty,

16  twenty-one, twenty-two, and twenty-three were returned to me

17  from BCI & I on October 8th of 2002.

18         Items twenty-four, twenty-five and twenty-six were

19  returned to me on October 9th of 2002.

20         Item twenty-seven was retained by BCI & I.  It's

21  still in their custody.

22         Item twenty-eight was returned to Detective Captain

23  Carl Compton on December 19th of 2001.

2385

1          On December 18th of 2001 at 1:10 p.m., I submitted

2     25 items to BCI & I Laboratory in Richfield, Ohio for

3     analysis.

4          Item A1 is a brown paper bag containing one clump of

5     napkin, dishcloth, duct tape and unknown stains.

6          Item A2 is a brown paper bag containing a dishcloth

7     with unknown stains.

8          Item A3 is a brown paper bag containing gauze with a

9     stain.

10         Item A4 is a brown paper bag containing gauze with a

11    stain.

12         Item A5 is a brown paper bag containing gauze with a

13    stain and a piece of tape.

14         Item A6 is a brown paper bag containing a napkin

15    with stain.

16         Item A7 is a brown paper bag containing a washcloth

17    with a stain.

18         Item A8 is a brown paper bag containing a condom.

19         Item A9 is a brown paper bag containing a condom.

20         Item A10 is a brown paper bag containing a plastic

21    bottle with liquid.

22         Item A11 is a brown paper bag containing an empty

23    bandage container.

2386

1          Item A12 is a brown paper bag containing empty paper
2    tape package.
3          Item A13 is a brown paper bag containing empty
4    bandage container.
5          Item A14 is a brown paper bag containing an empty
6    sponge container.
7          Item A15 is a brown paper bag containing an empty
8    sponge container.
9          Item A16 is a brown paper bag containing an empty
10   sponge container.
11         Item A17 is a brown paper bag containing an empty
12   sponge container.
13         Item A18 is a brown paper bag containing an empty
14   envelope.
15         Item A19 is a brown paper bag containing an empty
16   envelope.
17         Items A20, A21, A22, A23 and A24 are all items which
18   were removed from the original submission which is on the
19   first sheet which is item 28 which is a silver 2001 300M and
20   those items are a brown paper bag containing keys.
21         Item A21 is a brown paper bag containing a cell
22   phone.
23         Item A22 is a brown paper bag containing a garage

2387

1    door opener.

2            Item A23 is a brown paper bag containing a CD.

3            Item A24 is a brown paper bag containing a piece of

4    chicken.

5            Item A25 is a brown paper bag containing a napkin.

6            Items A1, A2, A3, A4 were returned to me on October

7    8th of 2002.

8            Item A5 was returned to me on April 9th of 2002.

9            Items A6, A7, A8, A9 were returned to me October 8th

10   of 2002.

11           Items A10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,

12   21, and 22 were all from the A submission were returned to me

13   on April 9th of 2002.

14           Items A23 -- A23 was also returned to me on April

15   9th of 2002.

16           Items A24 and A25 were returned to me on October 8th

17   of 2002.

18           On December 19th of 2001 at 9:25 a.m., the following

19   items were submitted to BCI & I Laboratory for analysis by

20   BCI Special Agent Ed Lulla.

21   Q       Now that was -- Ed sent those; correct?

22   A       Yes.  Ed Lulla submitted all the items.

23   Q       Well, that's, I didn't, I wanted you just to go with

2388



1    the ones you took.

2    A        Okay.

3    Q        You covered those?

4    A        There are additional submissions on the C

5    submission, the D submissions and the B items were returned

6    to me.

7    Q        Okay.  Continue with what was returned to you,

8    anything that you personally handled.

9    A        On October 8 of 2002, items B1 through B7 were

10   returned to my custody.

11            Item B1 is a paper bag containing one comforter from

12   a bed with a stain.

13            Item B2 is one box containing a suspect stain.

14            Item B3 is one box containing a suspect stain.

15            Item B4 is one bag containing one washcloth with

16   suspect stain.

17            Item B5, one bag containing one hand towel with a

18   suspect stain.

19            Item B6 is one box containing suspect stain.

20            Item B7 was returned to me on October 8th and it's

21   one envelope containing tape lifts containing hair from

22   toilet area.

23            Item B8 is retained by BCI.  It's still in their



2389

1    custody.

2    Q        And what is that?

3    A        It's one envelope containing latent lifts.

4    Q        Continue.

5    A        Item B9 was returned to me on April 9th, 2002.  This

6    is one envelope containing acetate sheets containing

7    elimination fingerprint and palm prints of Jennifer Robinson,

8    Days Inn housekeeping staff.

9             On December 4th of 2002 at 9:55 a.m., the following

10   items were submitted to BCI & I in Richfield for analysis.

11            Item C1 is a brown paper envelope containing swabs

12   from the mouth of Donna Roberts.

13            Item C2 is a brown paper envelope containing swabs

14   from the mouth of Nathaniel E. Jackson.

15            Item C3 is a brown paper bag containing a six-page

16   letter and paper envelope from Nathaniel Jackson.

17            Item C4 is a paper bag, is a pair of black gloves

18   with a hole in the tip of the left index finger with stain

19   and residue.

20            Item C5 is a pair of rubber gloves with stain.

21            Item C6 is a pair of red Nike tennis shoes, red and

22   black Nike tennis shoes.

23            Item C7 is a pair of blue tennis shoes with yellow

2390

1    laces.

2              Item C8 is a black leather jacket.

3              Items C1, C3, C5, C6, C7 and C8 were all returned to

4    me on October 8th of 2002.

5              Item C4 was returned to me April 9th of 2002.

6              On the D submission sheet, five items were submitted

7    to analysis to the BCI Laboratory in Richfield, Ohio May 6th

8    of 2002 at 12:39 p.m.

9              D1 is a handwriting standard from Nathaniel E.

10   Jackson dated 4-29-2002.

11             D2 is a handwritten letter from Nathaniel Jackson to

12   Donna Marie Roberts dated 10-29 of 2001.

13             Item D3 is a handwritten letter from Nathaniel E.

14   Jackson to Donna Marie Roberts dated 10-26 of 2001.

15             Item D4, seven handwritten pages of documents with

16   Nathaniel Jackson's printing and signature from CCA.

17             Item D5, four pages of documentation written by

18   Nathaniel E. Jackson from Lorain Correctional Institution.

19             Items D1, D2, D3, D4 and D5 were sent to me via

20   certified mail on June 10th.  The certification number is

21   70011940000240578974.

22   Q        That's it; right?

23   A        Yes, sir.

2391

1    Q        Okay.  Every item that's been introduced that you

2    have identified were covered in that scenario of items that

3    went to BCI and came back from BCI?

4    A        Yes, they were.

5    Q        Many of those were not analyzed?

6    A        Many of those items that were submitted were not

7    analyzed by BCI.

8    Q        And many of them have not been submitted formally as

9    exhibits here; correct?

10   A        Correct.

11   Q        I'm going to give you one last exhibit that was sent

12   to BCI.  We're not going to go any further than that.  Can

13   you identify that and indicate when you received it and what

14   it is?

15   A        State's Exhibit 317 was given to me, was put in my

16   custody on December 21st of 2001 by Detective Michael

17   Yannucci of the Trumbull County Sheriff's Department.  This

18   bag contains a pair of black leather gloves with a hole in

19   the left index finger.  This item was submitted by me to

20   BCI & I Laboratories in Richfield, Ohio as their item C

21   number 4.

22   Q        And your writing is on there and you can identify

23   it?

2392

1    A        Yes, it is.

2    Q        And it's not necessary for you to open it.  You can

3    say from what you know that is what it is?

4    A        Yes, it is.

5    Q        And that was returned by you, as you indicated to

6    the jury, regarding the other items?

7    A        Yes, it was.

8                    MR. WATKINS:  Thank you very much.

9              I have no further questions, Your Honor, at this

10   time.

11                   THE COURT:  Okay.  Before we begin cross,

12   this is an opportune time to stop for lunch.  Folks have an

13   hour.  Be back at 1, please.  You're not to discuss anything

14   or form any opinion until you return.  Thank you.

15   (Whereupon, a recess was had commencing at 12:06 p.m. and

16   concluding at 1:24 p.m.)

17                   THE COURT:  Defendant wish to cross?

18                   MR. CONSOLDANE:  Thank you.

19                   THE COURT:  Yes.

20                   <u>CROSS EXAMINATION</u>

21   <u>BY MR. CONSOLDANE:</u>

22   Q        Good afternoon, Paul.

23   A        Good afternoon.



2393

1    Q        How are you today?

2    A        Good.

3    Q        Just a couple questions.  I'm not gonna keep you on

4    a day and a half like Dennis.  Never more than ten or fifteen

5    minutes.  If I can't find enough questions in that amount of

6    time, they don't deserve to be answered.

7             Paul, how soon did you talk with Nate after you

8    picked him up?

9    A        I didn't pick him up.  He was picked up in

10   Youngstown shortly after midnight and left the 791 Wirt

11   Street address approximately 12:30.  Took him about 15

12   minutes to be transported to the Trumbull County Jail.

13   Probably within a half hour of that, he was brought into an

14   area of the building where I was at.  I briefly introduced

15   myself.  At that time, we didn't have keys to the Sheriff's

16   facilities as far as their office.  We were outside their

17   offices inside the building, but we couldn't get into a room

18   to really set things up.  I would say around 1:45 a.m. I

19   began talking with Mr. Jackson.

20   Q        So approximately about an hour or so after his,

21   hour, hour and a half after he was arrested?

22   A        Yes.

23   Q        And did you talk to him before the videotape started

2394

1    to run?

2    A       Yes, I did.

3    Q       Okay.  Did he appear high to you?

4    A       No, he didn't.

5    Q       Didn't appear to be under the influence of anything?

6    A       No, he didn't.

7    Q       You saw the tape today.  You still think that he

8    wasn't, didn't appear to you that he was kind of high on the

9    tape?

10   A       Absolutely no.

11   Q       Okay.  Did you ever arrest anybody for driving under

12   the influence?

13   A       Yes, I have.

14   Q       Do you know Mo Hill?

15   A       Yes, I do.

16   Q       Maurice?  Okay.  How long have you known him

17   roughly?

18   A       Probably 15 years.  Since I started.

19   Q       And do you know where he used to work?

20   A       Yes, I do.

21   Q       And where was that?

22   A       He was a patrolman and then a detective at the

23   Warren Police Department.

2395

1    Q      And do you know who he works for now?

2    A      Yes, I do.

3    Q      He works for us; right?

4    A      Works for the County Public Defender's Office.

5    Q      Do you remember when we went out to look at the

6    house on Fonderlac, the Fingerhut or the Donna Roberts house?

7    A      Yes.  On Monday.

8    Q      And Morris Hill was with us?

9    A      Yes.

10   Q      No, not with the jury.  We went, when Morris Hill

11   was with us.

12   A      Right.  The Friday before or Thursday before.

13   Q      Yes.  Has the house changed any since you first saw

14   it?

15   A      Yes, it has.

16   Q      So that the crime scene basically isn't intact now,

17   is it?

18   A      No.

19   Q      There was many things moved out of the house?

20   A      That would be an understatement.

21   Q      Okay.  So whatever evidence there was there at one

22   time is gone now?

23   A      Yes.

2396

1    Q       Did you, when you first went there to the house on

2    Fonderlac, did you notice any signs of a forced entry?

3    A       No.

4    Q       And do you have your book handy with you?

5    A       Yes, sir.

6    Q       Do you have it, is it marked the same as the other

7    exhibits, like Exhibit Number 67 through 70, 75?

8    A       Each page in the book or my pages marked?

9    Q       Leave me show you and then maybe you can kind of

10   find it in your book.

11   A       Grab the first book.

12   Q       Pardon?

13   A       The first book on the table.

14   Q       First book?  Can you explain to the jury what those

15   are?

16   A       Yes, I can.  I'm sorry.  The second book.

17   Q       Pardon?

18   A       The second book.

19   Q       Oh, the second book?  Well, it wouldn't be the first

20   mistake you've made today.

21   A       What the defense counsel has shown me are copies of

22   evidence receipts, property receipts that routinely we fill

23   out.  Whether one of our patrolmen would find a piece of mail

2397

1    on the street or we're at a crime scene and we're collecting

2    evidence, we fill these forms out and write down what we

3    recover from the scene.  It has slots where we can write down

4    who was the unit receiving the sequence number because

5    there's a lot of pages.  Sometimes you might have item number

6    one on our property receipts listed ten times, but the

7    sequence number on the top would change to correlate with

8    those pages.  And also, there's a case, a spot on the top of

9    the page for a case number.

10   Q        On, is your page listed number 67 or not?

11   A        No, sir.  If you look at the very top of the page in

12   the middle where it says sequence number, that would --

13   Q        When they copied it, that's cut off?

14   A        Okay.

15   Q        Have you got this, this page right here?

16   A        Yes, I do.

17   Q        Okay.  You see that's, mine is cut off.  Or no, is

18   it?

19   A        Yes, it is.

20   Q        So I don't have that, the sequence number?

21   A        No, you don't.

22   Q        Okay.  Would you read what you, what you have on the

23   first page and where you got it?

2398

1   A        Item number one is one woman's yellow shirt.

2   Q        Well, where did you get that?

3   A        I got that from Donna Roberts.

4   Q        Okay.  Well, I'll tell you what.  We don't need to

5   go through this.  To speed this up, did you recover any

6   money?

7   A        Yes.

8   Q        And how much money did you recover?  On that first

9   page, it says something about $231?

10  A        Item number -- the victim had two wallets in his

11  pocket.

12  Q        Okay.

13  A        Item number eight was from the left rear pocket.

14  There was $231 in that wallet.

15  Q        Okay.  How about that number nine, front pocket,

16  $130?

17  A        The right front pocket of the victim was $130.

18  Q        Okay.  Well, was there any money in the other

19  wallet?

20  A        The only other place I see cash which was recovered

21  is item number ten, which was in the front left pocket.

22  There was two dollars, totalling roughly $265, which was on

23  the victim.  Or I'm sorry, $365.



2399

1   Q       $365?

2   A       Yes, sir.

3   Q       And this was all found in Robert Fingerhut's

4   pockets?

5   A       Yes, sir.

6   Q       Was, when you talked with Donna Roberts, was

7   anything missing from the house?

8   A       No, sir.  Excuse me, sir.  There was also a vehicle

9   missing from the house.

10  Q       That -- well, that was in the garage or could have

11  been parked outside or somewhere, but I mean the only thing,

12  there was nothing else missing from the house though?

13  A       The vehicle, the car keys.

14  Q       Well, I mean I think Nate told you he took that back

15  to Youngstown to get a ride back to Youngstown?

16              MR. WATKINS:  Your Honor, I think that's

17  argumentative.

18              THE COURT:  I would agree.  Leave it

19  there.

20              MR. CONSOLDANE:  I'll withdraw that.

21              THE COURT:  Jury is to disregard it.

22  Q       (By Mr. Consoldane) You were at the jail when item

23  276 was taken?



2400

1   A       What's item 276?

2   Q       Well, that's, I'm sorry, it's not item, it's a

3   State's Exhibit 276.  That's the writing samples from Nate

4   Jackson.

5   A       Is that what that is?  If 276 is the writing sample,

6   I was there when that standard was taken.

7   Q       And did you observe anything when those writing

8   samples were taken?

9   A       I watched him do some of the writing.  Mr. Jackson

10  complained that his hand hurt, he couldn't continue.

11  Q       Do you recall I was there?

12  A       Yes, sir.

13  Q       And he had a tough time writing those samples?

14  A       That's what he told us.

15  Q       I mean you observed him having a tough time doing

16  it, didn't you?

17  A       (No response.)

18  Q       Do you know why he had a tough time writing those

19  samples?

20  A       I could speculate.

21              MR. WATKINS:  Your Honor, I'm gonna

22  object.  He can't speculate.

23              MR. CONSOLDANE:  Well, he was shot in

2401

1    his --

2              THE COURT:  Just a minute.  If he knows

3    the answer.

4    Q       (By Mr. Consoldane) Yeah.  Do you know?

5              THE COURT:  Do you know any specific

6    reason?

7              THE WITNESS:  He didn't tell us.

8    Q       (By Mr. Consoldane) Well, leave me ask you this.  Is

9    that you saw a bandage on his left hand, didn't you?

10   A       Yes, sir.

11   Q       Do you know, you have, you talked about a gunshot

12   wound in his left hand?

13   A       Yes, sir.

14   Q       And did you not mention to me that day that you

15   didn't realize he was left-handed?

16   A       No, sir.

17   Q       Okay.  You didn't say that?

18   A       No.  I knew he was left-handed.

19   Q       Pardon?

20   A       I knew he was left-handed.  He had told me that.

21   Q       You knew he was left-handed.  All right.

22           You mentioned that you found some checkbooks at the

23   house?



2402

1   A       Yes.

2   Q       Did you, that checkbook, what was it in the name of?

3   A       I don't know.

4   Q       You don't know who was on the check, what name was

5   on the check?

6   A       No, I don't.

7   Q       Did you find any papers that were from Rob -- Donna

8   Roberts, dba Robert Fingerhut Enterprises?

9   A       Mr. Consoldane, I don't know.  There were a lot of

10  papers.  To say that specific company, I don't know.

11  Q       Okay.  How about Just the Ticket, Inc?  Did you find

12  any papers from that?

13  A       No.

14  Q       Did you find any papers for DMR Agency, Inc?

15  A       No.  I don't recall finding anything like that.

16  Q       Just take a look at that.  That lists some of the

17  companies that --

18                  MR. MORROW:  Objection, Your Honor.

19  Counsel is testifying.

20                  MR. CONSOLDANE:  Well, all right.

21  Q       (By Mr. Consoldane) Do you recognize anything on

22  that piece of paper?  It's from the State of Ohio.

23                  THE COURT:  What's your question,

2403

1   Mr. Consoldane?

2                   MR. CONSOLDANE:  I said do you recognize

3   anything, any of those companies?  Did you find anything from

4   any of those companies?  Those are just the back.  That was

5   all on the front.

6   A        There was a lot of paperwork at the house.  As I

7   testified, there was an office area.  I don't want to say

8   that that stuff couldn't have been there, but we didn't go

9   through those records.  I don't recognize, the only thing I

10  recognize there is the name Donna Roberts and Just the Ticket

11  Restaurant and the addresses, the Fonderlac address.

12  Q        Was there any time that you went to or talked with

13  anybody from the Greyhound company?

14  A        Yes, sir.

15  Q        Okay.  And who did you talk to from the Greyhound

16  company?

17  A        I had spoken with Larry Southwick.

18  Q        I'm sorry.  Who?

19  A        Larry Southwick.

20  Q        Larry.  Could you spell the last name?

21  A        S-o-u-t-h-w-i-c-k.

22  Q        And what is his position with Greyhound?

23  A        Currently, he's the manager of the Warren station.

2404

1  Q      Did you talk with anybody higher up in the company?

2  A      I spoke with Mr. Daniels, James Daniels.

3  Q      James Daniels?

4  A      Yeah.  I don't know that he's higher up in the

5  company.  He's the Youngstown terminal supervisor.

6  Q      He's the Youngstown supervisor?

7  A      Yes.

8  Q      Anybody else?

9  A      Frank Reynolds.

10  Q      Was he the gentleman that was here?

11  A      (Witness nods head.)

12  Q      Okay.  Did you talk to anybody that was responsible

13  for leasing those stations?

14  A      There was somebody that I spoke to, but I do not

15  recall what their name is.  They actually had called the

16  police station and requested that a call be made back to them

17  to find out what the status was as far as Donna Roberts and

18  also the homicide investigation and indicated that they were

19  going to take control of the Greyhound franchise for a

20  temporary basis.

21  Q      Well, do you know whose name the franchise was in?

22  A      No, I don't.

23  Q      So you don't know whether it was in Bob Fingerhut's

2405

1  or Donna Roberts' name?

2  A      No, sir.

3  Q      Paul, there was a bag with Robert Stevens' name on

4  it with some papers in the headboard; do you know whatever

5  happened to that?

6  A      What was the name you used?

7  Q      Robert Stevens.

8  A      It's still in the possession of the police

9  department.

10  Q      You still have that?

11  A      With me right here, no.  But, yes, at the police

12  department we still have that.

13  Q      Okay.  And do you know which bag I'm talking about?

14  A      Yes.

15  Q      Okay.  Did you go through the paperwork in there?

16  A      Yes, I did.

17  Q      You say it's at the police station intact now?

18  A      Yes.

19  Q      Is there anything else you, any other mistakes you

20  want to clear up before I sit down?

21  A      Not unless you can bring 'em to my attention.

22                MR. CONSOLDANE:  Thank you.

23                MR. WATKINS:  We have no other questions.

2406

1    Thank you.

2                    THE COURT:  Officer, you may step down.

3    Thank you.

4            Get pretty close to that mike if you will so we can

5    hear you.

6    WHEREUPON,

7                        MIKE YANNUCCI,

8    having been first duly sworn, according to law, was examined

9    and testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. MORROW:

12   Q       Hi, Mike.  Can you please identify yourself to the

13   jury?

14   A       Detective Mike Yannucci of the Trumbull County

15   Sheriff's Office.

16   Q       And Mike, how long have you worked at the Trumbull

17   County Sheriff's Office?

18   A       Almost seven years now.

19   Q       And what do you do at the Trumbull County Sheriff's

20   Office?

21   A       I'm in the detective division, currently assigned to

22   the narcotics unit.

23   Q       Okay.  And are there other duties that you have in



2407

1    addition to narcotics detective?

2    A      I'm a member of the SWAT team also.

3    Q      Okay.  And before we get into that, tell us a little

4    bit about your background, your training and your experience

5    prior to this day.

6    A      I've gone to the basic police academy of course,

7    gone to several schools, FBI SWAT schools, several narcotics

8    schools.  When I was working the road, several crash schools.

9    Several schools.  A lot of schools, a lot of training.

10   Q      Okay.  And you graduated from the academy?

11   A      Yes.

12   Q      And you graduated from the other schools that you've

13   been involved with?

14   A      Yes.

15   Q      Okay.  And in particular, you said you were also

16   working for the SWAT unit?

17   A      That's correct.

18   Q      And what types of duties do you have with respect to

19   the SWAT unit?

20   A      We get called out to high incident arrests.  We do a

21   lot of drug raids on drug houses.  Any type of high risk

22   warrant arrests or anything like that, we'll take care of.

23   Q      Also involved in hostage situations?

2408

1  A        That's correct.

2  Q        And as part of your duties with the SWAT team, do

3  you cooperate with other organizations?

4  A        Yes.

5  Q        And in particular, could you tell us some of the

6  other police organizations that you cooperate with?

7  A        We'll assist any other police department.  We're the

8  only SWAT team in the county.  We'll assist any police

9  department that calls us.  And also Youngstown Violent Crimes

10 Task Force.  We've worked with them on several occasions

11 also.

12 Q        Okay.  Any other duties that you have?

13 A        No.

14 Q        I'm going to direct your attention now to the night

15 of December 21st of 2001.  Were you called out and was the

16 SWAT team called out that evening?

17 A        Yes.  We were called out that evening.  We were

18 called out to the Fonderlac address for Howland Township.

19 Q        Okay.  And do you recall what the purpose of the

20 call-out was?

21 A        We were gonna do a raid on the house.  Possible

22 suspect inside involved in a homicide.

23 Q        And do you recall the address where that suspect was



2409

1  located?

2  A     Are you, the raid in Howland?

3  Q     Initially on the 21st of December?

4  A     Yeah.  That was the Fonderlac address.

5  Q     Okay.  And did you then conduct a raid of the

6  Fonderlac address?

7  A     Yes, we did.

8  Q     And did you find any suspects in the residence?

9  A     Donna Roberts was taken into custody at that

10  address.

11  Q     Okay.  Did there come a point in time when you went

12  down to Wirt Street in Youngstown?

13  A     Yes.

14  Q     And could you tell us when that was?

15  A     That was later that evening, early morning hours.

16  We assisted the Violent Crimes Task Force, 91 Wirt Street was

17  the address, and we went there with them.

18  Q     Okay.  And do you recall approximately what time

19  that was?

20  A     That was probably 1, 2:00 in the morning I believe.

21  Q     Okay.  And when you were called out to that

22  location, did you conduct a staging?

23  A     Yes, we did.



2410

Q        Could you explain to the Ladies and Gentlemen of the
jury what a staging is?

                MR. LEWIS:  Objection.  Let's stop.  Let's
stop.  Let's approach the bench here and --

(Whereupon, the following proceedings occurred in chambers.)

                MR. LEWIS:  Waive presence of the
defendant.

                MR. CONSOLDANE:  Waive presence.

                MR. LEWIS:  Judge, we are gonna make an
objection based upon I don't know where this is going.  If
it's just a matter of they're just putting on this stage,
this hostage and putting all this stuff in there just to say
that Nate was arrested and that Donna Roberts was arrested,
that's the only purpose I see for it.  If there's some other
purpose or something relevant.

                MR. MORROW:  Mike recovered the gloves.

                MR. WATKINS:  We can go through how many
people were there, how many people were arrested.  Now the
staging, if that bothers you, the facts are the facts, Jim.

                MR. LEWIS:  Okay.  Yannucci, he's gonna
identify the objects that were recovered?

                MR. WATKINS:  Yeah.  He's gonna
identify --

2411

1          MR. MORROW:  -- the gloves and the shoes.

2          MR. LEWIS:  He's the one that picked 'em

3  up and got 'em?  So Hoolihan didn't get 'em?

4          MR. WATKINS:  No.  He got the gloves and

5  shoes.

6          MR. MORROW:  No.  Tackett got the shoes.

7  So Tackett is coming in to get the shoes.

8          MR. LEWIS:  Why don't we just get to this?

9          MR. WATKINS:  You don't object, we get

10  there.

11          MR. LEWIS:  You can get there, make an

12  arrest, but SWAT team staging and all this?

13          MR. WATKINS:  That's the fact.  They did

14  have a SWAT team there.  Can't change the facts.

15          MR. LEWIS:  Our objection is on the

16  record, Judge.

17          THE COURT:  Thank you.

18  (End of proceedings in chambers.)

19  (Whereupon, the following proceedings occurred in open

20  court.)

21  Q       (By Mr. Morrow) Fair to say a staging is just

22  preparation to go to a house?

23  A          Correct.



2412

1  Q       Okay.  And you ultimately ended up going to 791 Wirt

2  Street?

3  A       That's correct.

4  Q       I'm gonna hand you State's Exhibits 227 through 234.

5  Could you take a look at those, please?  Hold them to

6  yourself.

7  A       Okay.

8  Q       Okay?  And if you could, briefly describe, tell me

9  what the number is and describe what each of those exhibits

10 is, please.

11 A       Number 227 is a picture, there's a door, it's the

12 main part of the picture, on the lower left side of the

13 picture there's a pair of red and black tennis shoes.

14 Q       Okay.  That's the door to where?

15 A       That's a side bedroom which was located off the

16 dining room area.

17 Q       Okay.  Is that the 791 Wirt Street?

18 A       Yes.

19 Q       Okay.  Go ahead.

20 A       Number 228, that would be the front door to the 791

21 Wirt Street address.

22 Q       Okay.

23 A       Number 229, it's a picture of the front of 291 Wirt



2413

1    Street.

2    Q        791?

3    A        Yeah.   791.

4    Q        Okay.

5    A        230 is also a front view of 791 Wirt Street.

6             231 would be, it's a closet.   The top part is

7    folding doors.   The bottom part, there should be three

8    drawers in there.   The drawers are missing and there's stuff

9    accumulated in the bottom of the closet.   In this one,

10   there's no gloves.   This is where the gloves were found.

11   Q        Okay.

12   A        Exhibit 232 is a picture of the door that goes off

13   the kitchen that opens leading to the hallway where that

14   closet was in the previous exhibit.

15            Exhibit 233, it's a closet where the gloves were

16   found with the gloves on the floor amongst the other debris

17   that was down there.

18            Exhibit 234, a close-up shot of the gloves laying in

19   the bottom of that closet.

20   Q        Okay.   Let's go back and let's just back up just a

21   little bit.   You respond to 791 Wirt Street?

22   A        That's correct.

23   Q        How many officers were with you?

2414

| | | |
|---|---|---|
| 1 | A | There were five from our department and probably ten |

A       There were five from our department and probably ten
I would say, taking a guess, of the Violent Crimes Task
Force.

Q       Total of 15, then?

A       Probably.

Q       That responded to this location?

A       Yeah.

Q       And when you arrived at that location, where did you
go?

A       I went around to the back of the house.  We
surrounded the house.

Q       And while you were there, was anyone brought out of
the house?

A       Yes.

Q       Do you know how many people were brought out of the
house?

A       There were three females and one male.

Q       Okay.  And the one male, do you see him sitting in
the courtroom?

A       Yes.

Q       And could you describe where he's seated, please?

A       He's seated next to Mr. Consoldane and Lewis.

                   MR. MORROW:  Record reflect he's

2415

1   identified the defendant?

2            THE COURT:  The record may so reflect.

3   Q       (By Mr. Morrow) And when he came out of the house,

4   did you notice anything about him in particular?

5   A       Yeah.  When he was coming out of the house, I went

6   around to the front to cover behind a vehicle.  He came out

7   of the house with his hands in the air and he was backing up

8   and he had a bandage wrapped around his left index finger.

9   Q       Okay.  And was he then secured?

10  A       Yes.

11  Q       And then what happened?

12  A       Then the 15 of us or so that were there, we got

13  together, conducted a secondary search of the house to make

14  sure no other subjects were in the house and we cleared the

15  house.  Nobody else was found in there.

16  Q       No one else was found in the house?

17  A       No.

18  Q       And then?  What happened then?

19  A       I contained a consent to search from Sheila Fields.

20  Q       Okay.

21  A       Who had custody of the house.

22  Q       I'm gonna hand you what's been marked as State's

23  Exhibit 350 and ask you to take a look at that, please?

2416

1    A        (Witness complies.)  Okay.

2    Q        Are you able to identify that?

3    A        Yeah.  That's a consent to search the residence.

4    Q        And you, were you the one that administered that?

5    A        Yes, I was.

6    Q        Okay.  And your signature is on that document?

7    A        That's correct.

8    Q        That was given to who?

9    A        Sheila Fields.

10   Q        And did she sign that document giving you permission

11   to search the house?

12   A        Yes, she did.

13   Q        And then was a search subsequently undertaken?

14   A        Yes, it was.

15   Q        And how many officers took part in the actual, that

16   subsequent search of the house?

17   A        I believe there was three of us.

18   Q        And who would that be?

19   A        Myself, Lieutenant McBride and Detective Tackett.

20   Q        All right.  And you've talked about some gloves that

21   were displayed in Exhibit 233, 234 and also in the location

22   of 231.  You observed some gloves in the house?

23   A        That's correct.



2417

1  Q      Tell us how that came about.

2  A      We were doing the search for any type of evidence we

3  could turn up at the scene.  I was looking through that

4  hallway area.  I came to this closet, I bent down and looked

5  and I saw a pair of gloves.

6  Q      You previously said that the pictures showed that

7  there were no drawers in there.  Is that the way it was when

8  you got there?

9  A      That's correct.

10  Q      Okay.  And what kind of gloves did you observe?

11  A      They were not real heavy.  They were black leather

12  gloves.  Kind of thin.

13  Q      And did you notice anything strange about the

14  gloves?

15  A      Yeah.  The index finger of the left glove was

16  removed, looked like it had been torn off and there was red

17  substance on the finger.

18  Q      Okay.  And what did you do with those gloves?

19  A      I placed them into evidence and then I turned them

20  over to Lieutenant McBride.

21  Q      I'm gonna show you what's been previously marked as

22  State's Exhibit 317.  Without opening it, can you take a look

23  at that, please, at the outside of the bag.

2418

1   A       Okay.

2   Q       Are you able to identify that?

3   A       Yeah.  This is the bag I placed the gloves into.

4   Q       Okay.

5   A       That's my handwriting on there.

6   Q       And what, if anything, did you do with that bag

7   then?

8   A       I gave it to Detective McBride.

9   Q       Okay.  Did you recover any other evidence from that

10  location?

11  A       Not myself, no.

12              MR. MORROW:  Okay.  No further questions,

13  Your Honor.

14              THE COURT:  Cross.

15                    CROSS EXAMINATION

16  BY MR. LEWIS:

17  Q       Mike, what was your last name?  I didn't hear it.

18  A       Yannucci, y-a-n-n-u-c-c-i.

19  Q       Oh, with a y.  Okay.  Okay.  All right.  Okay.  Got

20  ya.  How about if I just call you Mike; is that fair?

21  A       That's fine, sir.

22  Q       Okay.  You've been with the Sheriff's Department now

23  for about, what, seven years?

2419

1   A        Yes.

2   Q        Okay.  And they've got you pretty well trained like

3   a paramilitary guy?  You said hostage teams, SWAT teams,

4   anything that eventually would come up?

5   A        That's the way the SWAT teams train.  They're not

6   separate teams.  It's just the way the SWAT team is trained.

7   We're trained to handle any type of high-risk incident like

8   that.

9   Q        So if Al Quaida is coming into the neighborhood, you

10  guys could take care of it; right?

11  A        We'd probably need a little help.

12  Q        Okay.  Good enough.  This is back on December 21st.

13  Originally you went and executed an arrest warrant in regard

14  to that Fonderlac address; is that correct?

15  A        That's correct.

16  Q        And then you, as a result of that, was it on the,

17  what date was it actually that you, same date that you went

18  to --

19  A        That might have been late in the evening and then it

20  carried on into early morning hours.

21  Q        Okay.  All right.  Okay.  But within a short time,

22  hours or whatever?

23  A        Right.

2420

1   Q      Okay.  All right.  And was there any special

2   arrangements made in regard to Donna Roberts in regard to the

3   arrest of Mr. Jackson?

4   A      Not that I'm aware of.

5   Q      Not that you're aware of at all.  Okay.

6          And you indicated there were five officers from

7   Trumbull County; is that correct?

8   A      That's correct.

9   Q      Okay.  And we've got --

10   A      That went to the Wirt Street address.

11   Q      What's that?

12   A      Five from Trumbull County that went to the Wirt

13   Street address.

14   Q      Exactly.  Yeah.  That's what I'm saying.  And two of

15   which are brother McBride and Detective Tackett?

16   A      That's correct.

17   Q      Okay.  And you also had ten other officers from,

18   what, Mahoning County?

19   A      Violent Crime Task Force.

20   Q      Okay.  And I take it you surrounded the house?

21   A      That's correct.

22   Q      You probably got a bull horn?

23   A      That's correct.

2421

1  Q       And you put some lights on the place I'm sure?

2  A       That's correct.

3  Q       Okay.  And you kind of circled it like the Indians

4  do when they're attacking the wagons?

5  A       That's correct.

6  Q       Okay.  And everybody was told to come out of the

7  house?

8  A       That's correct.

9  Q       Okay.  And to make sure that nobody gets hurt, you

10  told 'em to come out backwards I'm sure; right?

11  A       I didn't tell 'em.

12  Q       Okay.  Well, you didn't tell 'em, but did somebody

13  tell 'em?

14  A       Yes.

15  Q       Okay.  Well, the reason being is it's a lot easier

16  if somebody is facing, you can shoot or whatever.  That's a

17  tactic; right?

18  A       Right.  That's correct.

19  Q       Okay.  And at the same time, the hands up in the

20  air.  If you see two hands up there, chances are they aren't

21  gonna shoot with their foot; right?

22  A       That's correct.

23  Q       Okay.  Good enough.  Did everybody in the house do

2422

1    that?

2    A       For the first, when the females came out, I was

3    still around the back of the house.  My original assignment

4    was to go to the back of the house.  When the three females

5    came out and when they started bringing the male subject out,

6    I came around to the front and established cover behind a

7    parked vehicle.

8    Q       Okay.  And Nate, was he backing up and walking out

9    of the house and going across the yard or whatever?

10    A       Yeah.  He was walking right out the front steps

11    backwards.

12    Q       Okay.  So he didn't, he didn't try to shoot or do

13    anything to anybody, did he?

14    A       No.

15    Q       Okay.  Did he fight with anybody?

16    A       No.

17    Q       Okay.  All right.  Okay.  So he basically did

18    everything that he was told to do?

19    A       Correct.

20    Q       By the team or the, by the team.  Yeah.  Right?

21    A       Correct.

22    Q       Okay.  He was handcuffed I'm sure?

23    A       Correct.

2423

1    Q      Okay.  And who was it that actually had the warrant

2    and told him what he was under arrest for?  Do you remember

3    who that was?

4    A      No.  I can't answer that question.

5    Q      Okay.  You weren't there when they actually put the

6    handcuffs on him?

7    A      I saw 'em handcuff him and then we went in to do the

8    secondary search.  And I'm not, I can't tell you who had the

9    warrant.

10   Q      Okay.  The secondary search, you went in with

11   Officer Tackett and Officer McBride?

12   A      Well actually, the majority of the Violent Crimes

13   Task Force was with us on that.  That's a secondary search.

14   You go in there, make sure there's no other subjects in the

15   house.

16   Q      Oh, okay.  All right.  That's what I get for not

17   going in the military or whatever.  Okay.  The secondary

18   search is to make sure no more persons or more, okay, so I'm

19   sure you took the appropriate action for that.  I mean you

20   just didn't walk in?  I mean you kind of moved room to room

21   and everything else?

22   A      Right.  Exactly.

23   Q      All right.  After you established that there wasn't,

2424

1   that nobody else was in there, that, you went ahead and --

2                  MR. LEWIS:  Excuse me, Judge.

3                  THE COURT:  Sure.

4   (Whereupon, a brief recess was taken.)

5                  MR. LEWIS:  It's hard to get good help now

6   a days.

7   Q       (By Mr. Lewis) So after the secondary, there's a

8   decision to go ahead and search in the house; correct?

9   A       That's correct.  After obtaining a consent.

10  Q       And as I understand it, everybody was outside at

11  this point.  The secondary search went in and made sure there

12  were no other human bodies around or whatever; right?

13  A       That's correct.

14  Q       No more people inside.  But Nate was outside,

15  everybody else was outside.  So the secondary search got the

16  people out.  So the house was secured at that point; right?

17  A       Yes.

18  Q       Okay.  And you really, you didn't have a warrant or

19  anything per se to search the house, did you?

20  A       No.

21  Q       Okay.  All right.  But on orders of the, of

22  Mr. McBride or Mr. Tackett or -- was Gary down there?  Was

23  Gary Bacon down there too?

2425

1    A       Yes.

2    Q       All right.  Gary was down there too.  So you decided

3    to go ahead and search the house; right?

4    A       After we got consent.

5    Q       After you got consent.  Okay.  And that was from

6    Sheila Fields?

7    A       That's correct.

8    Q       She got the, I'm glad you hung onto that.  That

9    makes it easier.  Why don't you put the pictures right there.

10   That way I won't lose 'em.  The consent to search -- geez,

11   you write like I do.

12   A       Yeah.

13   Q       Well anyhow, did you see her sign this?

14   A       Yes.

15   Q       About that?

16   A       Yeah.  I read it to her, was sitting there, and

17   that's her signature and that's my signature and that's a

18   member of the Violent Crimes Task Force.

19   Q       That's your signature?

20   A       Yeah.  It's pretty rough.

21   Q       Yeah.  I think you win.  Okay.

22           You went about and searched the house; right?

23   A       That's correct.



2426

1   Q        Was there anything between Mr. McBride and

2   Mr. Tackett and everything else, anything specific you were

3   looking for or you were just searching?

4   A        Searching.  Any type of evidence that might be

5   pertinent to the case.

6   Q        Okay.  All right.  Okay.  We've got some photographs

7   here of the house.  Wow.  Oh, this is, okay, that's a shot

8   from the street?

9   A        From the street.  It's just real dark.

10  Q        From the street.  Yeah.  So all we see are the

11  lights.  Those lights are actually the windows.  Okay.

12           I assume, I don't know if the prosecutor asked you,

13  but this is an accurate representation of what it looked like

14  that night, the photographs?

15  A        That's correct.

16  Q        Okay.  I'm looking for the one where the shoes or

17  the glove was.  Oh, you didn't pick up the shoes.  I'm sorry.

18  A        No, I didn't pick up the shoes.  Right there.

19  Q        Oh, okay.

20  A        And right there.

21  Q        Oh, okay.  All right.  Okay.  So it's Exhibit 233

22  and Exhibit 234 are the pictures that show the gloves that

23  you picked up from the residence; right?

2427

1    A       That's correct.

2    Q       And you indicated to Mr. Morrow that there was

3    damage to the left-hand glove?

4    A       That's correct.

5    Q       That was the index finger; correct?

6    A       Correct.

7    Q       And your recollection was it seemed to be torn off

8    at the end?

9    A       Yeah.  It was removed.

10   Q       And there was a red substance on it?

11   A       Yes.

12   Q       Okay.  Good enough.  After you recovered that, you

13   gave it to which officer?  Do you remember?

14   A       I placed it in the bag and handed it over to

15   Lieutenant McBride.

16   Q       Lieutenant McBride.  Okay.  Good.  All right.  Okay.

17   One last thing.  To your knowledge, and you were there, did

18   Nate, did Nate resist or give any bad time to anybody in any

19   sense, form or manner?

20   A       No.

21                    MR. LEWIS:  Okay.  Thanks.

22                    THE COURT:  Redirect.

23                           *  *  *



2428

1                          REDIRECT EXAMINATION

2    BY MR. MORROW:

3    Q        Those are true and accurate representations of the

4    night of December 21st, all those pictures?

5    A        That's correct.

6    Q        And this bag is substantially in the same condition

7    as when you turned it over to Sergeant McBride?

8    A        That's correct.

9                       MR. MORROW:  No further questions.

10                      THE COURT:  Any recross?

11                      MR. CONSOLDANE:  Nothing further.

12                      THE COURT:  You may step down, sir.  Thank

13   you very much.

14                      THE WITNESS:  Thank you.

15   WHEREUPON,

16                       RICHARD TACKETT,

17   having been first duly sworn, according to law, was examined

18   and testified as follows:

19                        DIRECT EXAMINATION

20   BY MR. MORROW:

21   Q        Hi, Rick.

22   A        Good afternoon.

23   Q        Could you please introduce yourself to the jury?



2429

1   A       Yes.  My name is Richard L. Tackett.

2   Q       And where are you employed?

3   A       The Trumbull County Sheriff's Department.

4   Q       And how long have you been employed there?

5   A       Thirteen years.

6   Q       And in what capacity are you employed?

7   A       Currently as a detective.

8   Q       Can you please tell us a little bit about your

9   background, your training and experience?

10  A       I've been in law enforcement for the last 16 years.

11  I have the basic police training and quite a few upgrades,

12  investigative training.

13  Q       And as part of your duties as a detective, do you

14  respond to crime scenes?

15  A       Yes, I do.

16  Q       And you also provide assistance to other Trumbull

17  County agencies if requested?

18  A       Yes.

19  Q       And would that also include traveling to other

20  counties if requested?

21  A       Yes.

22  Q       I'm gonna direct your attention to December 21st of

23  2001.  Were you called to an investigation at 791 Wirt Street



2430

1    in Youngstown, Ohio?

2    A        Yes.

3    Q        And how, what were you called in relation to?

4    A        We were trying to apprehend a suspect in a possible

5    homicide.

6    Q        Okay.  And are there any other, any other duties or

7    groups that you belong to associated with the Trumbull County

8    Sheriff's Office?

9    A        Yes.  I belong to our hostage negotiation team.

10   Q        Okay.  Is that also part of the SWAT team?

11   A        Yes.

12   Q        And do you remember, was the SWAT team called out

13   that evening?

14   A        Yes, they were.

15   Q        And how many officers from Trumbull County

16   responded?

17   A        To Youngstown?

18   Q        Yes.

19   A        I believe there was only about five or six.

20   Q        And do you recall if there were any other agencies

21   involved?

22   A        Yes.  The Youngstown Violent Crimes Task Force was

23   also there.

2431

1   Q        And do you recall how many officers responded to

2   that?

3   A        It was quite a few.  I don't know how many were

4   there.

5   Q        Okay.  And when you arrived on scene, where were you

6   located?  Where were you stationed?

7   A        To the rear of the house.

8   Q        All right.  And were you there when people were,

9   came out of 791 Wirt Street?

10  A        I was in the rear of the house.  I did not see

11  anyone come out.

12  Q        Okay.  And then what happened?

13  A        I think we were told to come up front and I was told

14  by my supervisors to go into the house.

15  Q        Okay.  And was that done?

16  A        Yes.

17  Q        And when you went in the house what, if anything,

18  did you do?

19  A        I talked to three females that were currently in the

20  house.

21  Q        Okay.

22  A        And interviewed them.  And one of them informed me

23  that they had, there was some clothing items there that

2432

1    belonged to our suspect there.

2    Q       And as a result of that information what, if

3    anything, did you do?

4    A       I collected a pair of tennis shoes that we believed

5    belonged to Nathaniel Jackson.

6    Q       Okay.  I'm gonna show you what's been marked as

7    State's Exhibit Number 227 and ask you to take a look at

8    that, please.

9    A       Yes.

10   Q       Are you able to identify that?

11   A       Yes.

12   Q       And could you briefly tell the Ladies and Gentlemen

13   of the jury what that is?

14   A       That is a hallway off of, I believe it was off the

15   dining room area and there was a pair of tennis shoes there.

16   Those are the ones that I collected at the scene.

17   Q       Okay.  And that hallway and dining area is located

18   where?

19   A       At 791 Wirt Street, Youngstown, Ohio.

20   Q       And does that picture accurately represent what you

21   saw on December 21st of 2001?

22   A       Yes.

23   Q       Okay.  I'm gonna hand you what's been marked as



2433

1    State's Exhibit 318 and ask you to take a look at the

2    exterior of the bag, please.

3    A          (Witness complies.)  Okay.

4    Q          Are you able to identify that?

5    A          Well, it was processed by the Howland Police

6    Department so I have not seen the bag since it was taken,

7    since it was done.

8    Q          Okay.  But was that bag initially prepared by you?

9    A          No, it was not.

10   Q          Okay.  Who was that bag prepared by?

11   A          Well, I turned them over to Howland Police so I'm

12   assuming probably, I don't see the name on it.  I turned 'em

13   over to Detective Dillon from Howland.

14   Q          Okay.  When you're talking about turning something

15   over, what did you turn over?

16   A          The pair of tennis shoes.

17   Q          Okay.  I'm gonna hand you a pair of scissors and ask

18   you if you could open up that bag, please.

19   A          (Witness complies.)

20   Q          Do those appear to be the red tennis shoes that you

21   recovered at 791 Wirt Street?

22   A          Yes.

23   Q          And are those the same red tennis shoes that appear



2434

1    to be in the photograph that's labeled as State's Exhibit

2    227?

3    A        Yes.

4    Q        And those were recovered by you?

5    A        Yes.

6    Q        And you turned those over to Detective Dillon?

7    A        Yes.

8    Q        Is there any other way that you're able to identify

9    those tennis shoes?

10   A        Just by sight.

11            MR. MORROW:  No further questions.

12                        CROSS EXAMINATION

13   BY MR. LEWIS:

14   Q        Rick, how you doing?

15   A        Good.

16   Q        Okay.  Listen, you can go ahead and put those tennis

17   shoes back in there.

18   A        Okay.

19   Q        All right?  To your knowledge, did, did -- there's a

20   candy store right in the courtroom.  I love it.

21            To your knowledge, did Nate give anybody any trouble

22   at that, at the arrest on the 21st?

23   A        Not to my knowledge.



2435

1  Q       Okay.  Did Nate, in any way, hinder anybody to go in

2  and search the house or do anything as far as you know?

3  A       I was not around the front so I don't know that for

4  a fact.

5  Q       Okay.  If a consent to search was given by I think

6  Sheila Fields, Officer -- or Mike indicated that he signed

7  that.  Were you the other officer that signed it or somebody

8  else?

9  A       No.

10  Q       Okay.  All right.  Okay.  And those are, to your

11  knowledge, those are the shoes that you recovered?

12  A       Correct.

13  Q       No question about it?

14  A       No.

15                     MR. LEWIS:  Very good.  Thanks, Rick.

16                     THE WITNESS:  You're welcome.  Thank you.

17                     THE COURT:  Redirect?

18                     MR. MORROW:  No further questions.

19                     THE COURT:  Officer, you may step down.

20                     THE WITNESS:  Thanks, Your Honor.

21                     THE COURT:  Take a ten-minute break a

22  little bit early here, folks.  Not to discuss anything or

23  form any opinion until you get back.

2436



1    (Whereupon, a recess was had commencing at 2:14 p.m. and

2    concluding at 2:27 p.m.)

3    (Whereupon, the following proceedings occurred in chambers.)

4                    THE COURT:   In chambers out of the hearing

5    of the jury.   The defendant's presence waived?

6                    MR. LEWIS:   Waive presence, yes, Judge.

7              My understanding is the prosecutor is going to

8    introduce on videotape portions of the security tape that was

9    taken from the cameras of the RTA that was previously

10   introduced, not the video, but still photographs that were

11   extracted from that and were supposedly identified by



12   Mr. Sanchez, the security, yeah, he's the security officer

13   for RTA, but he's not the guy that operated the cameras or

14   anything else.   I don't know what the purpose of it is.

15   We've already got the photographs of Mr. Fingerhut in there,

16   and I just think it's cumulative.   I don't get the idea of

17   why they're introducing it.   I just think it's cumulative,

18   Judge.   It doesn't have any relevance.

19                    THE COURT:   Sanchez testified to some

20   photographs showing, establishing he was there at a certain

21   time.

22                    MR. WATKINS:   Right.   And what the

23   testimony is is that they had nine or five cameras, depending

2437

1  on which one you believe, I think there were nine, but this

2  witness is gonna testify that he got the video tape, Dillon,

3  and he went to Super K and that, because they needed a

4  certain type of machine to play this stuff and they played

5  it.  And what he did was two things.  Made some photographs

6  of the victim at whatever time because the allegation from,

7  I'm talking about the testimony in the videotape is the fact

8  that he was there and saw him unloading luggage and there are

9  different shots of, from the beginning at 2:00, 2:30 until

10  9:00 when this guy leaves that are above and beyond what we

11  have and are video just showing him when the camera hits him

12  from the time he gets to work until the time he leaves and it

13  shows that there's no individual, black individual with him

14  at any time during that.  That's all.  I mean the witness has

15  already testified that he did not see when the buses were

16  loaded so we have that in the evidence.  This is simply other

17  evidence concerning whether or not anybody is with the

18  victim.  It also shows the victim on video as to what he was

19  wearing.

20           THE COURT:  It's part of the defendant's

21  story so far and from what he said on the tape is that he

22  went over and was invited to the home.  The State is trying

23  to show that there's no evidence of the fact he was there.

2438

1          MR. WATKINS:  That's correct.  It also, it

2    does two things.  It shows what he was wearing when he was

3    killed and it, and I don't, it may be cumulative, that may be

4    an argument.  Even if it were, that would go at the time we

5    would admit things.  You know.

6          MR. LEWIS:  Does it account for

7    Mr. Fingerhut constantly?

8          MR. WATKINS:  No.

9          MR. LEWIS:  For all the hours from 2:00

10   until --

11         MR. WATKINS:  Well, Dillon is gonna say it

12   accounts for him at different, if you don't go in that

13   camera, you're not gonna, you don't have a camera on where

14   you're located.  Every time he shows up on the camera, he's

15   on this film.

16         THE COURT:  Let me suggest this.  It

17   appears to me to be cumulative from the standpoint that it

18   doesn't cover every moment of time.  It can't.  It's arguable

19   that the guy appeared and they were off camera somewhere.

20   Okay?  Isn't that something that if they try to establish

21   that he was at a place, but then on rebuttal you just show

22   the tapes that, you know, here's all these tapes.  He doesn't

23   appear in the thing one time.  I don't know.

2439

1          MR. WATKINS:  I think it can be attacked

2  because of the fact it doesn't show.

3          MR. LEWIS:  It's fine if Fingerhut were in

4  the film constantly, but if Fingerhut is not in the film

5  constantly, you don't know what's going on.

6          THE COURT:  From his standpoint, Jim, if

7  that's the case, at least they have some additional evidence

8  to show.

9          MR. WATKINS:  It also went to 2 because

10 Tony said in his opening statement he was there at 5.  And

11 they have this tape run from 2 to 5, 2 to 10 or 2 to 9.

12          MR. LEWIS:  This isn't the whole tape.

13          MR. WATKINS:  Wherever Fingerhut is.

14 Okay.  Your guy is saying he was there at 5:00.

15          MR. LEWIS:  It only runs for, you said,

16 ten minutes?

17          MR. WATKINS: It just snaps him real

18 quickly in all the places and it shows that nobody is with

19 him.

20          MR. LEWIS:  What do you mean it snaps?  Is

21 it a movie?

22          MR. WATKINS:  It's a movie of the clips.

23 What you do is take a video and you --

2440

1           MR. LEWIS:  Is it a video itself?

2           MR. WATKINS:  It's a video, yeah.

3           MR. LEWIS:  Okay.  And it's going to show,

4    it's like a chopped-up video?

5           THE COURT:  It's a condensed version.

6           MR. WATKINS:  He was there and looked at

7    it for six hours.  That's what he did.  He took his work

8    product and put it in there.  If we wouldn't show it, he

9    would say you guys didn't even check it out.

10          MR. LEWIS:  Okay.

11          MR. WATKINS:  That's what you would be

12   doing.

13          MR. LEWIS:  We're still objecting, Judge.

14          THE COURT:  I mean it's different from if

15   you had some indication that there's some video that your guy

16   shows up that they're not introducing.  Well, I am going to

17   permit that with the caveat if the State uses it, the defense

18   will have an opportunity, if they care to, to review the

19   entire six hours.

20          MR. WATKINS:  No problem.

21          THE COURT:  Okay.

22          MR. WATKINS:  He's gonna testify that he

23   looked at it for six hours.

2441

1          THE COURT:  You can do that this evening,

2    Tony.

3    (Whereupon, a brief recess was had.)

4          THE COURT:  Defendant has a motion?

5          MR. LEWIS:  Judge, at this time, we'd move

6    the Court to exclude the testimony of Mr. Frank Dillon and

7    any exhibits to be introduced in regard to I think it's a

8    videotape which is a compilation of supposedly the original

9    tape that was produced by RTA as a security measure on

10   December 11th I think it is of 2001 in which Mr. Dillon

11   supposedly reviewed it and then cut out all of the excerpts

12   for the videotape and sliced them together indicating where

13   Mr. Fingerhut was or when he was on camera.  Let's put it

14   that way.  Originally, we were given in discovery I think it

15   was three or four photographs showing Mr. Fingerhut at the

16   RTA station or at the, in the area of the Greyhound station,

17   which is really RTA is where this camera is located at and we

18   were given those in discovery.  However, we were never given

19   the actual videotape for the entire whatever it is, six hours

20   of time or whatever the situation is.  Now they're going to

21   produce a condensed version of that and enter it into

22   evidence.

23          MR. CONSOLDANE:  And three things.  First,

2442

1    they never gave us the tape.  Second is that it's, by their

2    own version, a cut tape and they cut out more than likely

3    where Nate would be on there.  And thirdly is that the tape

4    itself is faulty because it doesn't cover the entire bus

5    station.  Nate could have been there talking to Fingerhut and

6    not been caught on camera and this is, they're tying to show

7    something is false, that he wasn't there by showing something

8    through the negative, which they can't do.

9              MR. WATKINS:  We did give the tape, Your

10   Honor.  Eighth supplemental response.

11             MR. MORROW:  The tape we plan on

12   introducing we provided to them on September 24th by way of

13   eighth supplemental discovery.

14             MR. LEWIS:  The six-hour tape?

15             MR. WATKINS:  No.  The one we're

16   introducing.

17             MR. MORROW:  The one we're planning on

18   introducing.

19             MR. LEWIS:  What was the date?

20             MR. MORROW:  September 24th we provided

21   it.  We filed discovery, State's supplemental response to

22   discovery.  It lists Greyhound terminal tape, 12-11-01, along

23   with four Walgreen's tapes.

2443

1          THE COURT:  I am not gonna change my

2    ruling from what it was before.  I think if there's any doubt

3    in the defendant's mind, if they want to see this original

4    six hours, they're entitled to do that.

5          The other thing here is that the photographs from

6    this tape that were introduced through Phillips or whatever

7    his name was --

8                    MR. LEWIS:  Sanchez.  Joe Sanchez.

9                    THE COURT:  Sanchez.  Concern a very slim

10   time period, between 8:30 and 9.

11                   MR. WATKINS:  No.  It covered 6 to 9.

12                   THE COURT:  6 to 9?

13                   MR. WATKINS:  Yeah.

14                   THE COURT:  And because, as I understand

15   it --

16                   MR. WATKINS:  This is 2:30 to 9.

17                   THE COURT:  Because of the time being

18   pushed back, that's the reason the State is trying to counter

19   with this montage of all photographs of Fingerhut that appear

20   on the tapes.

21          Now, if the defendant has any suspicion that the

22   prosecution is not being totally forthright, the only way I

23   can see to remedy that is to review the entire tapes, but I

2444

1    have to give the prosecutor credit at this point that you

2    know that would be very foolish because that could blow their

3    entire case if they tried to pull something like that.

4            That being said, I am going to allow you to proceed

5    with this.

6                    MR. LEWIS:  Okay.

7    (End of proceedings in chambers.)

8    (Whereupon, the following proceedings occurred in open

9    court.)

10                   THE COURT:  Gentlemen, Mr. Lewis has a

11   proffer here.

12   (Whereupon, Mr. Lewis made the following proffer out of the

13   hearing of the jury:)

14                   MR. LEWIS:  In addition to the foregoing

15   objections in regard to the admission of the condensed

16   version of the videotape from RTA, we have not had anybody

17   from the actual RTA Corporation come in and authenticate the

18   actual tape or produce it and say that it was unaltered

19   before they delivered it or before anybody else reviewed it.

20   We haven't had anybody identify it per se to say how it was

21   accumulated and whether anybody has made any splices, cuts,

22   or anything else to the tape itself.

23   (End of proffer.)



2445

1        THE COURT:  For the record, my ruling is

2    consistent with the prior rulings.

3        Ready to proceed?

4    WHEREUPON,

5                    ANTHONY LESHNACK,

6    having been first duly sworn, according to law, was examined

7    and testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. WATKINS:

10   Q     Are you ready?

11   A     Yes, sir.

12   Q     Tony, would you give your full name, please?

13   A     Anthony Leshnack.

14   Q     And you are a deputy with the Trumbull County

15   Sheriff's Department?

16   A     I'm a sergeant right now.

17   Q     I was gonna get to that.

18   A     Oh.

19   Q     Tell the jury how long you've been there, Sergeant,

20   and in what capacity do you serve?

21   A     I've been employed since 1995 full time.  My

22   capacity right now is I hold the rank of sergeant.  I'm also

23   a firearms instructor, evidence technician and a member of

2446

1  the county's homicide task force.

2  Q        And did there come an occasion that you were called

3  to a scene on December 12th, 2001 in Howland Township on

4  Fonderlac?

5  A        Yes, there was.

6  Q        And why were you called?

7  A        I was called to assist in photographing and

8  processing the crime scene.

9  Q        Now, who is the senior officer at the Sheriff's

10  Department involved with that process?

11  A        Detective Sergeant Pizzulo.

12  Q        And you work with him; is that correct?

13  A        Yes, it is.

14  Q        And did he go or was he able to go that night?

15  A        He was not available for work that evening.

16  Q        And are you and your department a member of the

17  homicide task force?

18  A        Yes, I am.

19  Q        And tell the jury what time you got there.

20  A        I'm going to refer to my notes.  I was called at

21  12:12 a.m. at home.  The exact time I arrived, I'm not sure.

22  It would have to be probably within 45 minutes of that time.

23  Q        And so somewhere before 1 a.m., you were there?

2447



1   A       That's correct.

2   Q       And what did you have on?  How was the weather when

3   you went there?

4   A       It was cool.  I had I believe a light sweat shirt,

5   slacks and probably boots.

6   Q       Okay.  Do you wear gloves, winter gloves?

7   A       No.  No gloves.

8   Q       Okay.  Would you tell the jury what you did once you

9   got there?

10  A       Once I got there, I spoke with the person who was in

11  charge of the crime scene, which was Sergeant Monroe of

12  Howland Township.  I spoke with him.  We went over the scene

13  briefly and I took photographs while I was there of the

14  outside and inside of the residence.

15  Q       And how many photographs did you take?

16  A       I can't be sure.  There was numerous rolls.  I don't

17  have the log with me.

18  Q       And you turned those photographs over to the Howland

19  Township Police Department?

20  A       Yes, I did.

21  Q       And when you took the photographs, was Sergeant

22  Monroe with you?

23  A       Yes, he was.

2448

1   Q       And did you do anything else at the crime scene?

2   A       Yes, I did.   I also at one point processed for

3   fingerprints various areas and I also took some evidence

4   samples.   I lifted some blood samples.

5   Q       And then you ultimately did a diagram?

6   A       And I, yes, I volunteered to sketch the scene, which

7   I did.

8   Q       Now when you looked for fingerprints, in this case,

9   what area were you looking?

10  A       Where the body was found, the entrance and exit

11  points on the doorways, the doors themselves, the handles,

12  the countertop area and there were various cups and glasses

13  there that were processed.

14  Q       And were you able to lift anything of significance?

15  A       Nothing that was, had significant ridge detail used.

16  Q       And would you explain to the jury what you mean by

17  significant ridge detail?

18  A       In fingerprints, the ridge detail is used, you have

19  to get minutia points in ridges that are able to be compared

20  to either fingerprints or enough of a fingerprint that can be

21  entered into our AFIS system, which is an automated

22  fingerprint identification system.

23  Q       And the area that you looked at, what equipment did

2449

1   you use?  Would you just explain what you used?

2   A       I used black powder.  I believe I used some

3   fluorescent powder on some darker surfaces to try and lift

4   any prints.

5   Q       Now, the blood that you said that you were involved

6   in, the swabbing, did you turn that over to Howland?

7   A       Yes, I did.

8   Q       Was there any evidence that you took with you?

9   A       None.

10  Q       Okay.  This was a Howland Township homicide?

11  A       Correct.  I was just there to assist.

12  Q       Okay.  Now, you did do a diagram?

13  A       Yes, I did.

14  Q       And I would like you to look at State's Exhibit 3.

15  You may get down.  And if you could, would you tell the jury

16  whether or not you recognize that?

17  A       Yes, I do.

18  Q       And what is it?

19  A       It's the sketch I made of the scene.

20  Q       And that sketch, was that the size of it when you

21  made it?

22  A       No, it is not.

23  Q       What size was it?

2450

1    A        A regular, I believe it's eight and a half by eleven

2    sheet of paper.

3    Q        Do you have it with you?

4    A        I have a copy of it.

5    Q        Okay.  And you prepared that yourself?

6    A        Yes, I did.

7    Q        And what did you do in preparing that?  How did you

8    prepare it?

9    A        Well, I took a rough draft there of the scene, took,

10   did the whole outline of the house.  It is not to scale, as I

11   noted.  I am not an architect.  I used normal rulers and, I

12   don't know, it was done in pencil.  I took various points,

13   AA1, BB1, for specific points where we can relocate the body

14   or any evidence that we picked up.

15   Q        Would you briefly go through the various points as

16   you have them written on the left-hand side so the jury -- I

17   take it that these are all the rooms?

18   A        Yes.

19   Q        And you have them all marked?

20   A        Yes, I do.

21   Q        And you have a diagram of a body to signify the

22   location of Mr. Fingerhut?

23   A        Yes.

2451

1    Q        And you also have, I noticed, a red spot?

2    A        Yeah.

3    Q        And what is that?

4    A        The red spot, I didn't, I thought it to be blood.  I

5    didn't know for sure.  I wrote it as a red spot and I swabbed

6    it up with a sterile swab in distilled water for evidence to

7    be tested later.

8    Q        And you gave that to Detective Monroe?

9    A        Yes, I did.

10   Q        Right there?

11   A        Yes.

12   Q        Okay.  Now, I noticed that you have a stairway going

13   down next to the kitchen.

14   A        That's correct.

15   Q        And you have, "stairwell, bullet hole;" what is

16   that?

17   A        There was a hole found when we scoured the scene for

18   any bullets, shell casing, any type of evidence.  I don't

19   know exactly who noticed it in the wall, but there was a hole

20   which we found out, you know, we cut out later and discovered

21   that it was, in fact, a bullet.

22   Q        And you, therefore, included it in your diagram?

23   A        Yes.

2452

1    Q       Now, I noticed that you have, you have "countertop"

2    and a measurement of fifteen feet six inches.  What does that

3    measure?

4    A       That is, I believe that is the side of the room.

5    Q       So that would go there until you get to the dining

6    room?

7    A       I believe fifteen feet six inches was from this room

8    to this room across.

9    Q       Okay.  Now, you have here various points marked; is

10   that true?

11   A       Yes.

12   Q       And you have point A, point B, point A1 and point

13   B1; is that correct?

14   A       That's correct.

15   Q       And you also have in the garage a car and glasses,

16   lenses, brackets, screw and bracket all marked separately;

17   correct?

18   A       Correct.

19   Q       And you have arrows pointing to those objects; is

20   that where they were?

21   A       The general location, yes.  It's not, again, it's

22   not to scale, but it's close in proximity.

23   Q       Okay.  And you also have a gun listed?

2453

1   A       Yes.

2   Q       And where was the gun?

3   A       The gun was on the step just outside where the body

4   was going into the garage on that half.

5   Q       Now, would you give the jury what measurements you

6   took in whatever way you feel comfortable going over that?

7   Those are the only measurements you basically took?

8   A       That's correct.

9   Q       Okay.  Would you go over them, please?

10  A       So later the body could be located along with the,

11  this diagram is done just to go along with photographs.

12  Again, it wasn't to scale.  But from point A to point B,

13  which is the frame of the door on the inside, I triangulated

14  points to the left hand, which would have been at 00 inches

15  which was resting actually at the starting point.

16          The right hand was triangulated 25 inches from point

17  A, which would be here, and that's his center of the right

18  hand, 38 inches from point B to the right hand.

19          The left shoe from point A was triangulated at 72

20  inches from point A, 74 inches from point B.

21          The right shoe, 63 inches from point A, 67 inches

22  from point B.

23          If you go the opposite way, I used the opposite door

2454

1    frame on the other side which I labeled A1 and B1.  The gun

2    was measured at ten inches from point A1, and that's the

3    center of the gun.  And point B, 29 inches to the center from

4    point B1.

5          A white step was measured from point A3 three feet

6    four inches from point A1, which would be the white step here

7    from point A1.  And from point B1, four feet five inches.

8          There were glasses with a left lens missing which

9    was found underneath the vehicle which was found in the

10   garage five feet five inches from point A1, six feet five

11   inches from point B1.

12         The right, a right lens of glasses was found right

13   here near the glasses.  It measured nine feet four inches

14   from point A1 and ten feet eleven inches from B1.

15         There was a bracket with a screw which seemed to

16   come from the garage door which was damaged.  And the bracket

17   with the screw was found at nine feet two inches from point

18   A1 and ten feet seven inches from A1.  There was also another

19   bracket here twelve feet five inches from point A1 and

20   fourteen feet two inches from point B1.

21   Q    So those were the measurements you took?

22   A    Correct.  They're triangulated measurements.

23   Q    That diagram was the diagram that you personally put

2455

1    together.  It's not to scale, but it places the various items

2    you've testified to in the perspective of what you saw

3    somewhere around 1 a.m. on December 12th at 254 Fonderlac?

4    A       That is correct.

5                    MR. WATKINS:  Thank you.

6                    MR. CONSOLDANE:  Are you done?

7                    MR. WATKINS:  Yes.

8                         CROSS EXAMINATION

9    BY MR. CONSOLDANE:

10   Q       Hi, Tony.

11   A       Hi, sir.

12   Q       How are you today?

13   A       Very good, thank you.

14   Q       You and your partner, Pete, have a nickname on the

15   streets?

16   A       Not that I'm aware of, sir.

17   Q       No.  Not that you're aware of?  All right.

18           You said you found a spot of, this red spot over

19   here?

20   A       Yes.

21   Q       That's quite a ways, that's through the kitchen and

22   almost to the front door; right?

23   A       That's correct.

2456

1    Q       Could that have been carried on somebody's foot?

2    A       From?

3    Q       From the blood that was down here.  We saw some

4    footprints in the blood.  Do you think somebody could have

5    carried it over there?

6    A       It's a possibility.

7    Q       Possibly.  When's the last time you were at this

8    house on Fonderlac?

9    A       I'm gonna refer to the notes here.

10   Q       Sure.

11   A       I believe it was two days later, but I want to be

12   sure.

13   Q       No.  I mean when is the last time?  That was the

14   last time you were there?  Have you been there in the last

15   couple weeks, the last month?

16   A       No.

17   Q       Were you in charge of the scene?

18   A       No.

19   Q       Pardon?

20   A       No, I wasn't in charge.  I was assisting.

21   Q       Just assisting?

22   A       Sergeant Monroe.

23   Q       Do you know if the scene was secured?

2457

1   A       When?  While we were there?

2   Q       No.  After you left.

3   A       I don't know.

4   Q       Do you know if it's the same today as it was back

5   then?

6   A       I do not know.

7                       MR. CONSOLDANE:  Thank you.

8                       THE COURT:  Any redirect?

9                       MR. WATKINS:  No, Your Honor.  We'd thank

10  the witness and  --

11                      THE COURT:  Sergeant, thank you.

12                      MR. WATKINS:  -- call Sergeant Dillon.

13  WHEREUPON,

14                          FRANK DILLON,

15  having been first duly sworn, according to law, was examined

16  and testified as follows:

17                      DIRECT EXAMINATION

18  BY MR. WATKINS:

19  Q       Good afternoon, Frank.

20  A       Good afternoon, sir.

21  Q       Would you give your full name to the jury?

22  A       Sergeant Frank J. Dillon.

23  Q       And how long have you been with the Howland Police



2458

1   Department?

2   A      Fifteen years.

3   Q      And would you briefly go through your training and

4   what position you now hold?

5   A      I was a patrol officer.  I went to the basic police

6   academy for ten years and then I was promoted to patrol

7   sergeant several years ago and I was a patrol sergeant until

8   August of last year, or August of 2001, and then I became a

9   detective and I've been doing detective work since then.

10  Q      You were involved with the schools at one time,

11  weren't you?

12  A      Yes.  I was a D.A.R.E. officer in the school system

13  for nine years.  I taught a drug education program for 17

14  weeks a year to the sixth graders.

15  Q      And so now as a detective, you are called to crime

16  scenes and obviously you were in the case of the death of

17  Robert Fingerhut?

18  A      Yes, sir.

19  Q      And when did you arrive?

20  A      Approximately I believe 25 or 26 minutes after

21  midnight.

22  Q      And what other officers were there?

23  A      Patrolman Albert Ray, Patrolman Ron Pollcino.

2459

1    Q        And who was the detective in charge from your

2    department?

3    A        Sergeant Paul Monroe.

4    Q        And have you, since that point in time, been working

5    on this case in various ways?

6    A        Yes, sir, I have.

7    Q        You've been working and going, for example, to the

8    Days Inn and the Wagon Wheel?

9    A        Yes, sir, I have.

10   Q        And let's take -- and by the way, when you went to

11   the scene, would you describe how the weather was and how

12   cold it was?

13   A        It was average out.  I believe I wore a coat that I

14   wear this time of year and a baseball hat because they got me

15   out of bed and my hair was messed up.

16   Q        Okay.

17   A        So I usually throw a baseball hat on.

18   Q        We didn't have any real cold weather or snow on the

19   ground?

20   A        No, sir.

21   Q        Or raining or anything like that?

22   A        No, sir.

23   Q        Now, I want to hand you Exhibit 312 and could you



2460

1    identify it for me?

2    A        It's a guest register receipt from the Wagon Wheel

3    Motel in Boardman.

4    Q        And would you tell the jury why you went to the

5    Wagon Wheel?

6    A        I went to the Wagon Wheel because our investigation

7    led us to the knowledge that Nathaniel Jackson and Donna

8    Roberts had spent the night there.

9    Q        And what night were you looking at?

10   A        December 9th of 2001.

11   Q        And who did you talk to there?

12   A        The manager, Jose Flores.

13   Q        Now, did you take a statement from him?

14   A        Yes, sir, I did.

15   Q        And did he give you anything that was important to

16   you in that investigation regarding who went there?

17   A        Yes, sir.  Originally he gave me this guest

18   register, the original, and I asked if I could keep it at the

19   time and he said they needed it for their business records,

20   but he said I could make a copy of it that night that I was

21   there.  So I, there was a Kinko's down the street and I ran

22   and made a copy of it for our records.

23   Q        So you made a copy of his record?

2461

1  A       Of the original, yes, sir.

2  Q       And what is that?

3  A       This is the original.  This is what he gave me to

4  make a copy of.

5  Q       Okay.  So you have the original record?

6  A       Yes, sir.  In my hand.

7  Q       And would you describe what that record is?

8  A       It's a guest register receipt for room 101 on 12-9

9  in the name of Nathaniel Jackson of ███████████

10 Youngstown, Ohio.

11         It also describes the make of a vehicle that they

12 were in.  It says a 300M Chrysler 2000.  It says number in

13 party, two.  The room rate was $95.  And the total for the

14 bill was $106.40.

15 Q       And that's been marked as State's Exhibit 312?

16 A       Yes, sir.

17 Q       And the time the room was obtained was on 12-9-02?

18 A       '01.

19 Q       '01.  Sorry.

20         Now, while you were there, did you show any

21 photographs --

22                     MR. LEWIS:  No.

23                     MR. WATKINS:  Do you want to approach?

2462

1                    MR. LEWIS:  Don't  --

2                    MR. WATKINS:  Let's approach.

3      (At sidebar:)

4                    MR. LEWIS:  Judge, I'm going to object in

5      the sense that the format has not been laid.  If any

6      statement is given to Mr. Flores or Mr. Flores to Mr. Dillon

7      is going to be hearsay.  I know Mr. Watkins is going to have

8      him say, well, did he identify anybody in a photograph and

9      he's going to say, yes, he identified probably number six I

10     guess, yeah, he identified number six, whatever.  And then

11     he's gonna put or fill in a little bit to help orientate the

12     guy as to if that was the man there or he saw him run the

13     place or whatever.  It's still hearsay information, Judge.

14     You got to bring the person in.

15                    MR. WATKINS:  He is coming.

16                    MR. CONSOLDANE:  You should bring him in

17     first.

18                    MR. WATKINS:  It's admissible evidence

19     that if he picks out a man in a showup, it's admissible.  The

20     police officer shows it, it's by statute admissible, Jim.

21                    MR. LEWIS:  I understand the statute;

22     okay?  What I'm saying, Judge, is this.

23                    MR. WATKINS:  What's your problem?

2463

1          MR. LEWIS:  What I'm saying is this,

2     Judge.  All he has to do is say, "I showed some photographs

3     to Mr. Flores," and then you bring Mr. Flores and he does

4     this.  All he is doing is repeating and repeating.  He's

5     accumulating all of this.  It makes it look like there's

6     more.  He's doing it three or four times over.  That's not

7     the way you do it.

8          THE COURT:  Jim, you know, the prosecutor

9     has the right to go through what the officer did.  The

10    officer says what he's already said.  "Did you show a photo

11    array?"

12         MR. LEWIS:  Right.

13         THE COURT:  "Was he able to identify

14    anybody?"

15        "Yes."

16        Period.  Okay?  I agree if you go beyond.

17         MR. LEWIS:  Are you going beyond that?

18         MR. MORROW:  I think he's allowed to say,

19    "Is this the photo array you showed him?"

20         MR. WATKINS:  I think he's allowed to say

21    he picked out this photo, yeah.

22         THE COURT:  He's allowed to say that he

23    picked out someone from the photo.  That doesn't establish --

2464



1    you still have to have somebody identify that.

2                    MR. WATKINS:  I haven't researched this

3    point, but I will be glad to get the law and I can call him

4    back.  I will go on.  I can show you, Judge, in my opinion,

5    unless the law has been changed.  He can say he picked out of

6    six photographs Nate Jackson.  That's all he can say.

7                    THE COURT:  Well that, to me, is what I

8    believe the law is.  Just a minute.  That's if Dillon knows

9    Nathaniel Jackson or if Dillon knows those photographs show

10   Nate Jackson from the files for which he was responsible.  I

11   don't know where he got it from.



12                   MR. WATKINS:  Yeah.  He would say that,

13   first off, this has been given in discovery.  So they're well

14   aware of it.  He is simply gonna say he put six individuals

15   together, including the suspect, in your case the defendant,

16   at this point in time.

17                   THE COURT:  So Dillon is the one that

18   arranged this photo array?

19                   MR. WATKINS:  Yeah.  Yeah.  This is a

20   photo array he showed.

21                   THE COURT:  Where we're going here is if

22   he doesn't know at the time this was done who Jackson was.

23                   MR. WATKINS:  Oh, yeah.

2465

1          THE COURT:  Just because somebody picked

2    six out, it's hearsay.

3          MR. WATKINS:  The reason, Judge, is that

4    he hears Jackson and Roberts are there.

5          MR. LEWIS:  That's when this was done,

6    October 14th of '02.

7          THE COURT:  Did Dillon know who Jackson

8    was prior to giving the photo array?  You see what their

9    objection is based on.  I think there's some foundation.

10          MR. WATKINS:  Oh, this is the wrong one.

11    Let me get the right one.  I'm sorry.  I'm sorry.  I didn't

12    bring the right one.

13          MR. LEWIS:  Well, what is that one of?

14          THE COURT:  What's the date on this one?

15          MR. WATKINS:  December 9th.

16          MR. LEWIS:  December 9th of 2001.  Okay.

17    Wait.  Oh, rented a room on December 9th at the Wagon Wheel

18    or whatever.  So what's the, what's the date of this?

19          MR. WATKINS:  That's when he, I'm pretty

20    sure he showed him at that time.

21          THE COURT:  Dennis, my point is, I think

22    it's proper for the officer to show, it's proper for you to

23    have him testify to it.  The point that I haven't gotten

2466

1  straight because I don't know yet is whether when Dillon

2  asked this person to identify this, okay, he picked out

3  number six.  If Dillon goes beyond that then he either had to

4  know at the time who Jackson was or you have to put somebody

5  on to prove.

6              MR. WATKINS:  Yeah.  He knew Jackson at

7  that time.

8              THE COURT:  He knew him from now?

9              MR. WATKINS:  Because that's who they were

10 investigating.

11             THE COURT:  He had already seen him?

12             MR. WATKINS:  Yeah.  Because he was a

13 suspect in the case.

14             THE COURT:  That picture was taken because

15 of this case?

16             MR. WATKINS:  Yeah.

17             MR. LEWIS:  No, it wasn't taken because of

18 this case.

19             MR. WATKINS:  Why don't we bring him in

20 and let him --

21             THE COURT:  Bring him in.  That's the

22 simplest way.

23 (Whereupon, Officer Frank Dillon was brought into chambers.)

2467

1          THE COURT:  Here's a question.  When you

2  showed this photo array to this person, did you know

3  personally the identity of Jackson?  Did you know any of

4  those people?  Did you have familiarity with Jackson by

5  having had previous contact with him?

6          OFFICER FRANK DILLON:  No.  I never talked

7  to him or anything.

8          THE COURT:  No.  But did you know what he

9  looked like, who he was?

10          OFFICER FRANK DILLON:  Yes.  I knew who he

11  was.

12          THE COURT:  You saw him and you could

13  identify him?  You could have picked him out of a photo

14  array?

15          OFFICER FRANK DILLON:  Yes.

16          MR. CONSOLDANE:  Where did you see him?

17          OFFICER FRANK DILLON:  From the jail

18  photos of him.

19          MR. CONSOLDANE:  Oh, you never saw him?

20          OFFICER FRANK DILLON:  No.  I never saw

21  him personally.

22          THE COURT:  But you had, within your

23  possession as a law enforcement officer, photos of various

2468

1  people that are on file and this photo?

2              OFFICER FRANK DILLON:  Yes, sir.

3              THE COURT:  You had identified that file

4  as Jackson?

5              OFFICER FRANK DILLON:  Yes, sir.  That's

6  how that was made originally, from booking photos at the

7  Trumbull County Jail.  He had been an inmate at one time at

8  the Trumbull County Jail.

9              THE COURT:  So you believed at the time

10  that that photo was, in fact, Jackson?

11              OFFICER FRANK DILLON:  Yes, sir.

12              MR. LEWIS:  Our objection still stands,

13  Judge.  I mean, you know, he can't, Mr. Flores is the one who

14  is going to come in.  All he says is, "I showed Mr. Flores a

15  photographic lineup," and that's it.

16              MR. WATKINS:  And he picked out this guy.

17              MR. LEWIS:  Flores says, "This is the

18  photographic lineup I saw, and this is the man I identified,

19  number six."

20          That's all it is.  That's the way it should be done.

21              THE COURT:  That seems to me to be the

22  iron clad way that it's done.  But because it's Flores

23  picking it out, not his testimony that he picked out that's

2469

1    relevant evidence here.  He can supplement it by saying --

2                        MR. WATKINS:  He can say he picked out.

3    Now Flores is coming what day?

4                        OFFICER FRANK DILLON:  Monday.

5                        THE COURT:  Okay.  Your objection is

6    noted.  I am going to allow him to identify, not that it was

7    Jackson, but number six was picked out.  Flores can testify

8    it was Jackson.

9    (End of proceedings in chambers.)

10   (Whereupon, the following proceedings occurred in open

11   court.)

12                       THE COURT:  Please proceed, Mr. Watkins.

13   Q        (By Mr. Watkins)  I'm gonna hand you 313.  Do you

14   recognize that exhibit?

15   A        Yes, sir.  It's a photo lineup.

16   Q        And did you show that particular lineup to anyone?

17   A        Jose Flores, the manager of the Wagon Wheel.

18   Q        And was that on what date?

19   A        That was on the 14th of December, 2001.

20   Q        And just answer my specific question.  What

21   photograph, if any, did he pick out?

22   A        Number six.

23   Q        And was he positive?



2470

1   A       Yes, sir.

2   Q       Okay.

3   A       Could I correct myself?  I believe that was the 18th

4   that I showed him that photo.  On the 18th.

5   Q       The 18th?

6   A       I believe so.

7   Q       Okay.  You're saying it was December 18th?

8   A       Yes, sir.  I would have to look at my supplemental

9   report to verify that.

10  Q       Now, you also went to another motel, the Days Inn;

11  is that correct?

12  A       Yes, sir.

13  Q       And that was also on the 16th?

14  A       It was on the 18th I believe.

15  Q       Both times were on the 18th?

16  A       Yes, sir.

17  Q       Okay.

18  A       We went to the Days Inn first.

19  Q       Okay.  Now, what did you do at the Days Inn?

20  A       At the Days Inn, I met with the desk clerk and had

21  him conduct an audit of their credit card transaction machine

22  to determine the accuracy of the time that it printed on

23  receipts.

2471

1    Q       Now I'm gonna show you State's Exhibit 311 and

2    there's documents inside.  Would you tell the jury whether or

3    not you recognize that exhibit?

4    A       Yes, sir.  The top one.

5    Q       And what is it?

6    A       That is the transaction that we conducted, the

7    audit, to determine what time the machines showed it was when

8    the transaction was made.

9    Q       And who conducted the audit?

10   A       The employee, Jeff Pescarella, the desk clerk, and

11   with myself standing there.

12   Q       And you were participating?

13   A       Yes, sir.

14   Q       And explain exactly what was done.

15   A       However he uses the machine, he ran a transaction

16   through and had it print a receipt to show what the date and

17   time were at the actual date and time that we were conducting

18   this audit.

19   Q       And what did you find?

20   A       We found that the machine itself was off by

21   approximately 46 minutes I believe.  It was 46 minutes faster

22   than the actual time.

23   Q       And what document did you receive in there, and you

2472

1   may take them out, that you personally received?

2   A       This document.  It's a double receipt.

3   Q       Okay.

4   A       Carbonated receipt.  Carbon receipt.  And it shows,

5   it shows it to be December 18th, 2001, and the time to be

6   12:40 p.m. and it was actually 46 minutes earlier than 12:40.

7   I can't do the math in my head.

8   Q       Okay.  And so that, what is the number of that

9   particular exhibit other than being 311?  It's 311 what?

10  A       C.

11  Q       And that was done in your presence to establish --

12  A       Yes.

13  Q       -- that the clock was, that the time was off?

14  A       Yes, sir.

15  Q       Did you also go to the Greyhound bus terminal?

16  A       Yes, sir.

17  Q       And when did you go there?

18  A       I believe that was on the 14th.

19  Q       Okay.

20  A       Of December 2001.

21  Q       And what did you do there?

22  A       I spoke with several employees there about

23  Mr. Fingerhut and the day, the last day that he had worked

2473

1    there.

2    Q        Uh-huh.  And did you receive anything from anyone at

3    that time?

4    A        Yes, sir.

5    Q        And what did you receive and from whom?

6    A        I took, the bus terminal has an in-house closed

7    circuit television system that runs 24 hours a day and tapes

8    from nine different cameras within the inside and the outside

9    of the building.  And the videotape goes every day.  And I

10   took the videotapes from December 11th, 2001 or marked

11   December 11th, 2001 and December 12th, 2001, Monday and

12   Tuesday of that week.  I got those from a Miguel or Michael

13   Diaz.  He's the human resource and security director for

14   WRTA.

15   Q        And what did you do with the tape?

16   A        I took it back to Howland PD and entered it into

17   evidence.

18   Q        And did you subsequently do something?

19   A        Yes, sir.

20   Q        Would you tell the jury what was that?

21   A        Eventually I took the tape to our local Super KMart

22   because the tape is taped in what's known as a, what's known

23   as a machine called a multiplexor.  If you view the tape as

2474

1   it's taping, you see actually, on that machine, 12 frames at

2   a time, 12 little pictures on a television screen.  Nine of

3   them actually being, taping something and three being black

4   because there's no camera hooked up to them.  And they

5   continuously tape.  In order to view that videotape, you have

6   to take it, either view it where the machine taped it through

7   the same multiplexor video system or to one that's

8   compatible.  We did not have one at Howland PD.  No local

9   agency had one.  So I took it to Super KMart because I knew

10  they had the machinery to do that because their system works

11  that way.  And we were able to view the tape there.

12  Q       And did you personally view the tape?

13  A       Yes, sir, I did.

14  Q       And how long did it take you to view that tape?

15  A       I went two different days.  It took probably eight

16  hours, maybe ten hours.

17  Q       And what time period did that tape cover?

18  A       I can't tell you the exact time period without

19  actually looking at the tape, but it was roughly from the

20  time we found Robert Fingerhut in a video frame until the

21  time we saw him leave, which was roughly between 2:25 and

22  9:01, 9:02 p.m. on December 11th, 2001.

23  Q       So you looked eight or ten hours, all the tape, and

2475

1    what did you pick out?

2    A        I looked for any frame that showed Mr. Fingerhut in

3    it anywhere in the bus terminal, inside or outside, on any

4    one of those cameras anywhere that they were taping.  And I

5    also looked to see if there was anybody with him that spent

6    any time with him as he did his job throughout that day.

7    Q        And do you recognize the defendant?

8    A        Yes, sir, I do.

9    Q        Nate Jackson?

10   A        Yes, sir, I do.

11   Q        And he's here in the courtroom?

12   A        Yes, sir, he is.

13                   MR. WATKINS:  And may the record reflect

14   he has pointed to the defendant?

15                   THE COURT:  It will reflect that.

16   Q        (By Mr. Watkins) Did you see him anywhere on the

17   film that you looked at that was eight hours?

18   A        I couldn't positively identify him anywhere in the

19   videotape.

20   Q        And did you make photographs?

21   A        Yes, sir, I did.  On one occasion when I viewed the

22   video, I had Captain Kenneth Criswell from the Niles Police

23   Department meet me at Super KMart because the Niles Police

2476

1    Department has a machine that can take still pictures from

2    video, which Howland, the Howland Police Department does not

3    have.  And we took several pictures from the video.

4            We also went to NASA Research Center in Cleveland

5    and had them make still pictures from the tape.

6    Q        I'm gonna hand you the exhibits.  And would you go

7    through each one and it really doesn't matter the order, but

8    it matters that you identify each one if you can.

9    A        Exhibit 320H, I -- I'm sorry -- E, F, G, H and I are

10   the photographs that were made at the NASA Research Center by

11   their technician, Hugh Aylward, for us from the actual

12   original videotape from the bus terminal.  It shows

13   Mr. Fingerhut walking in the terminal, in the main concourse

14   of the terminal in three of the photos and the back room of

15   the terminal in one of the photos and actually out attending

16   to a bus outside the building, a Greyhound bus, in the last

17   picture.

18   Q        Are those photographs accurate photographs except

19   they're enlargements of what you saw?

20   A        Yes, sir.

21   Q        And what are the numbers there?  Would you just read

22   the numbers?

23   A        320E, 320F, 320G, 320H and 320I.

2477

1    Q       Now, I noticed that the time on there is different

2    than the time on the smaller ones?

3    A       Yes, sir.

4    Q       And would you first identify the smaller ones?

5    A       Okay.  The smaller pictures, which are 320A, B, C

6    and D, were taken by Captain Criswell's machine on the day

7    that we viewed the tapes for this purpose.

8    Q       Now the times.  There are two different separate

9    times on there?

10   A       Yes, sir.  There was a time discrepancy.  So on

11   another occasion, I met with Jose Sanchez, the deputy who

12   works security at the bus terminal, and we went to the

13   machines themselves and checked the times on the machines.

14   If you look at these photos or any video generated from this

15   machine, you'll see that there's two different times, but the

16   same date.  The larger time at the bottom of the page is the

17   time of the video recorder, the time that the video recorder

18   is set at.

19          The smaller time at the top of the page is the time

20   that the multiplexor machine is set at.

21          In viewing the times on these machines on the day

22   that we looked at them to try and verify a time, we found

23   that the larger number, which is the video recorder, was 59

2478



1    minutes faster than the multiplexor time.  And the

2    multiplexor time was accurate with the current time that we

3    were looking at the machine.

4    Q       So in the small picture, you can see the numbers on

5    the top, and that's the accurate time?

6    A       Yes, sir, it is.

7    Q       The blowups, you couldn't get that in because of

8    increasing the size?

9    A       Correct.

10   Q       Now, did you do anything else in the way of bringing

11   forth documents or a review of specifically the time that you

12   saw Robert Fingerhut?



13   A       Yes, sir, I did.

14   Q       What did you do?

15   A       The Warren Police Department has another machine

16   that's capable of making a super eight videotape from a VHS

17   videotape.  In this particular machine, you're able to single

18   out the tracks of the those twelve pictures that I explained

19   that you would see on a television screen if you looked at

20   this tape.

21           And what we did was we went in and we went from the

22   first time we saw Robert Fingerhut inside the building on

23   videotape and we singled out every time throughout the day

2479



1   that we saw Robert Fingerhut on videotape in the building or

2   outside the building until he left the building.  And we

3   singled, put that on a single track.  Actually, we isolated

4   it and videotaped each one of those tracks to make a rough,

5   it's very, you'll, to make a tape that shows from the time

6   that we actually ever saw him on the videotape enter the

7   building or inside the building until the time we saw him

8   leave the building at the end of the day.

9   Q        And, therefore, only when he's in front of the

10  camera at a particular time will you see him?

11  A        Yes, sir.

12  Q        And there's many times he's not seen?

13  A        Yes, sir.

14  Q        Now, how long approximately is the videotape?

15  A        I would venture to say it's ten to twelve minutes at

16  the most.

17  Q        Okay.  And I'm gonna show you State's Exhibit 319.

18  Is that a product of your work?

19  A        Yes, sir, it is.

20                  MR. WATKINS:  I'd like to play 319, Your

21  Honor.

22                  THE COURT:  Yes.

23  (Whereupon, State's Exhibit 319 was played for the jury.  The

2480

1   following testimony occurred during the playing of the tape.)

2   A      That's Mr. Fingerhut.

3   Q      That's it, Frank?

4   A      No.  That was the first part.  This is the last

5   part. This is Mr. Fingerhut leaving for the night.  That's

6   it.

7   (Whereupon, the tape concluded at 3:56 p.m.)

8                    MR. WATKINS:  May I continue?

9                    THE COURT:  Please.

10  Q      (By Mr. Watkins)  That last time was, on that video

11  was what time?

12  A      I believe it was 9:06.  Wait a minute.

13  Q      I thought it was about 9:01?

14  A      9:01.  Yes, sir.

15                   MR. WATKINS:  Thank you.  No other

16  questions.

17                   <u>CROSS EXAMINATION</u>

18  <u>BY MR. LEWIS</u>:

19  Q      Frank, how you doing today?

20  A      I'm good, sir.  How are you?

21  Q      Oh, I'm fine.  You're part of the homicide task

22  force; right?

23  A      No, sir.

2481

1    Q        Oh, you aren't?

2    A        No, sir.

3    Q        Oh, okay.  I thought you were.  Okay.

4             The Exhibit 311D, it's a Days Inn receipt and it's

5    dated December 16th, 2001; right?  Is that what it says?

6    A        December 16th, 2001.  Uh-huh.

7    Q        Okay.  To your knowledge, is that, is that the date

8    they, that's the date it was paid for; right?

9    A        No.  That's the date that the charge was paid for,

10   whatever it is.

11   Q        Oh.  8:40.  Okay.  We got a couple things in here,

12   don't we?

13   A        Uh-huh.

14   Q        Okay.  The receipt dated December; let's see,

15   December 11th, the Days Inn account number, the amount is

16   $235; right?

17   A        Yes, sir.

18   Q        I'm sorry.  Okay.  And it's signed by who?  Even

19   though that's a copy, that's signed by who?

20   A        No one.

21   Q        Huh?

22   A        No one.

23   Q        Oh, it is blank.  Okay.  All right.  Let's go to

2482

1    that December 16th.  Who signed that one?

2    A        No one.

3    Q        No one.  Okay.  All right.  These are the receipts

4    kept by the hotel?  These are the receipts you got from the

5    hotel?

6    A        Yes, sir.

7    Q        Okay.

8    A        It's a computer-generated copy.

9    Q        A computer-generated copy?

10   A        Of the transaction.

11   Q        Okay.

12   A        That was charged to that account.

13   Q        Okay.  This is the carbon copy, though, is it not?

14   See the writing up there?  It's a carbon; right?

15   A        Yes, sir.

16   Q        You know.  You use your Mastercard and Visa.  Come

17   on.  We keep the economy going.  Isn't that how we -- that's

18   a carbon copy, okay, but it's just, it's not signed; right?

19   A        No, sir.

20   Q        Okay.  Okay.  The December 11th one, the unsigned

21   one for, yeah, it's December 11th, what time is that?  It is

22   not military time.  That's conventional, it's civilian time;

23   right?

2483

1   A       Yeah.

2   Q       What time is it?

3   A       11:33 p.m.

4   Q       Yeah.  11:33 p.m.  Okay.  Is this the one that

5   turned out to be wrong time wise?

6   A       Yes, sir.

7   Q       Okay.  And when did you secure these receipts from

8   the Days Inn?  When did you go?

9   A       I would have to go to my notes.

10  Q       Just tell me where they are and I'll get 'em for

11  you.

12  A       I believe it was the 14th or the 16th.  I'm sorry.

13  Q       Oh, you're gonna get the big book too.  It looks

14  like the bible.

15  A       The 16th.

16  Q       December 16th?

17  A       Yes, sir.

18  Q       Okay.  And the receipt we were just talking about

19  was, that was the earlier one?

20  A       This one.

21  Q       Oh, I'm sorry.  Okay.  For December 11th.  And it

22  was 11:33.  Is this the one you said it was audited and it

23  was 46 minutes off?

2484

1    A        No.  This one.

2    Q        Oh, this one.  We're having a heck of a time with

3    the time factor.  Okay.  Forty-six minutes off.  Not a whole

4    hour for a change of eastern standard time, that kind of

5    stuff?

6    A        No.

7    Q        Nothing?  Okay.  Well when did he, did he indicate

8    to you when the time got off?  In other words, you went there

9    on what date was it?

10   A        The 14th or the 16th.

11   Q        The 14th or the 16th?  Okay.

12   A        The 16th.

13   Q        The 16th.  Okay.  And this was, the receipt was

14   issued or generated on the 11th?

15   A        Yes, sir.

16   Q        December 11th.  Okay.  At what point in time, what

17   day was it or what was the time when the time was changed?  I

18   mean --

19   A        I have no idea.

20   Q        I mean this is all after the fact, see?

21   A        Yes.

22   Q        How do we know?  When was it altered?  Was it

23   altered before the 11th or after the 11th or what?  Do you

2485

1    know?

2    A        I have no idea.

3    Q        You have no idea.  That's what I thought.

4    A        May I?

5    Q        Sure.  Go ahead.  What?

6    A        These are generated from inside the computer.  This

7    isn't the one that the customer would sign.

8    Q        Okay.

9    A        It's just a computer-generated transaction.

10   Q        All right.  You're being helpful, Frank.  Yeah, I

11   know.  We already said that.  You said it was

12   computer-generated, but it's also a carbon copy as well,

13   isn't it?  I mean it does.  Isn't that what your carbon copy

14   looks like when you --

15   A        Yes, sir.

16   Q        Yeah, okay.  All right.  Okay.  All right.  So we

17   don't know when the time went off.  We really don't know

18   that, do we?  All we know, it was after the fact; right?

19   A        Right.

20   Q        Yeah.  The time was off.  We don't know when it was

21   wrong or what.

22            And not only that, if they really didn't set the

23   clocks right or get all that eastern standard time or



2486

1   daylight savings time, what kind of screw up is 46 minutes?

2   Isn't that usually an hour?

3   A       Yes.

4   Q       Isn't that how the time zones work?

5   A       Yes, sir.

6   Q       Yeah.  Okay.  All right.  Okay.

7           On State's Exhibit Number 313, this is the photo

8   array that you showed a Mr. Flores I believe at the Wagon

9   Wheel; is that correct?

10  A       Yes, sir.

11  Q       Okay.  And on what date?  Don't you normally date

12  when you show this to somebody, the photographic lineups?

13  Don't you normally put --

14  A       I don't normally do it, but --

15  Q       You don't?

16  A       Could have been a mistake on my part by not

17  documenting it.

18  Q       Yeah.  So the best we got is that you think you did

19  it and you put it, you put it down in your report there?

20  A       I know I did it.

21  Q       You did that?

22  A       Because I put it in my report.

23  Q       Okay.  And what's it say?  What's it say?

2487

1   A        I showed Mr. Flores a photo lineup that included a

2   picture --

3   Q        Okay.  What date?  Just show me.  What was the date

4   or I mean --

5   A        The 18th.

6   Q        Oh, that's the date of your report?  You did

7   everything on that date?

8   A        That's the actual day, yes.

9   Q        Okay.  Well, this is dated, okay, 12-18?

10  A        Yes, sir.

11  Q        Okay.  But in the context, you say you were there on

12  the --

13  A        18th.

14  Q        The 18th.  Okay.  So that's everything you did on

15  the 18th?

16  A        Yes, sir.

17  Q        Okay.  Now I got ya.  Now I got ya.  Okay.

18           And on the small photographs, that's, that small

19  number on top, we saw on the video, the small number on top

20  which we didn't see in the photographs which kind of misled

21  me, which is not hard to do, they're missing on the big

22  photographs; right?

23  A        Yes.

2488

1   Q        Or on the small photographs.  So the video machine,

2   that is supposed to be the correct one?

3   A        This is the correct time.

4   Q        Right.  The 2100.  Yeah.

5   A        That is the VCR.

6   Q        And this is a little closer?  This is almost right

7   on the hour, isn't it?

8   A        Yes.

9   Q        So I guess that's eastern standard time, daylight

10  savings time.  The video is right.  The other security, they

11  don't worry about it?  They just put it on and let it go?

12  They don't change the time when the time changes in October

13  or in the spring?

14  A        I don't know.

15  Q        Okay.  Well, it -- okay.  Well, all you know is

16  you're thinking this is the  right time, then, up on top?

17  A        Yes, sir.

18  Q        Okay.  Well, what I just asked you was, well, it's

19  an hour off.  Which one -- they just told you the top one was

20  right?

21  A        No.  I had a watch on when we looked at the video.

22  Q        Okay.

23  A        The system.

2489

1    Q        Right.

2    A        The day that I was there.

3    Q        Right.  And that was in December; right?

4    A        Yes, sir.

5    Q        And what, and we're in this time zone.  What are we

6    in?

7    A        Daylight Savings Time.

8    Q        Okay.  So that's how you figured it was the hour

9    off?  Is that why it was an hour off?  They don't change the

10   machine?

11   A        Apparently not.

12   Q        This machine.  Apparently not.  Okay.

13   A        The video machine.

14   Q        Okay.  And you went to NASA up in Cleveland?

15   A        Yes, sir.

16   Q        To get these big photographs.  Okay.  All right.

17            Now, you got the, you give me a lot of technical

18   stuff in regard to this, was it multiplex?

19   A        Multiplexor it's called.

20   Q        Okay.  Let's go back.  You go to the RTA, okay, and

21   it's a complex and it has the Greyhound station.  Does it

22   have anything else in there besides Greyhound and the RTA?

23   A        Yes, sir.  It has a restaurant, but it was closed at

2490

1    the time.

2    Q       It was closed at the time.  Anything else?

3    A       Restrooms, a back, a back room.

4    Q       Okay.

5    A       Where they have luggage and they have an officer for

6    the WRTA part of it.

7    Q       Okay.  And now you say there were nine cameras;

8    right?

9    A       Yes, sir.

10   Q       Okay.  And did you check out the location of all

11   nine cameras by any chance?

12   A       No, sir.  I went by what the video showed.

13   Q       What the video showed?

14   A       Because that's what it's recording.

15   Q       Okay.  Now, when the video is going, okay, there are

16   nine cameras; right?

17   A       Yes, sir.

18   Q       Okay.  Is there a separate video for each camera?

19   Are there nine tapes being produced?

20   A       No, sir.  There is one tape.

21   Q       There's one tape?

22   A       Yes.

23   Q       Okay.  Is it going from camera to camera?



2491

1   A       Yes, sir, it is.

2   Q       What is the sequence of time from camera to camera?

3   A       I have no idea.  Probably seconds.  A few seconds.

4   I have no idea.

5   Q       A few seconds.  Okay.  Okay.  Two, three?

6   A       I can't answer that question.

7   Q       Dennis doesn't know either.  Don't look at him.  He

8   won't help you.  Two, three, four, five?

9   A       I can't answer that.

10  Q       Do you have any idea?

11  A       I have no idea.

12  Q       You have no idea, right, Frank?

13          So the idea is that the video is really capturing a

14  single shot every three or four seconds from each camera?

15  Well, would that be right?

16  A       Yes.  It goes --

17  Q       Between the nine cameras?

18  A       It goes from camera to camera to camera to camera in

19  a continuous loop.

20  Q       All right.  So we would get the sequence.  Let's say

21  it's five seconds.  Five times nine is how much?

22  A       Forty-five.

23  Q       Forty-five.  And we're within the minute; right?

2492

1    A       Yes, sir.

2    Q       So we'd be able to figure out if anybody was in any

3    of those cameras every like 45 seconds; right?

4    A       Yes.

5    Q       If I was in camera number one and it rotated, it

6    would spend, what, 42 seconds getting back to me; right?

7    A       Yes.

8    Q       And I would be there.  I would be going like that,

9    "Hey, Frank, I'm in the photo."  Okay?

10          You, in regard to what you produced here is that you

11   sat down and watched the video, right, that the RTA

12   supposedly produced?

13   A       Uh-huh.

14   Q       You didn't really produce that film, did you?

15   A       No, sir.  RTA did.

16   Q       RTA did.  And you didn't have control of it until

17   the day you picked it up, which would be what?

18   A       The 14th of December, 2001.

19   Q       Okay.  The 14th of December.  So you don't know who

20   had it or what happened to it before that or really how it

21   was compiled other than what you're trying to tell me right

22   now; right?

23   A       No, sir.

2493

1   Q        Okay.  You sat down and you looked, you put it on

2   the machine and it came up; right?

3   A        Yes, sir.

4   Q        The poor guy was going bankrupt.  You didn't do it,

5   did you?

6   A        No.

7   Q        You watched the machine, okay, and you watched it

8   for what?  You said six to eight hours?  Eight to ten hours?

9   A        I was there more than once.

10  Q        More than once.  Okay.  Your best guess is what?

11  Eight to ten hours?  Six to eight?  Four to six hours?

12  A        Six to eight.

13  Q        Okay.  And every 45 seconds it's going past nine

14  cameras.  Okay.  And you watched for every instance when you

15  could recognize or see Robert Fingerhut; is that correct?

16  A        Yes.

17  Q        Okay.  And you extracted what?  A still photograph

18  or what?  How did you extract or copy onto this videotape

19  every time you saw him?

20  A        Every time he was on a camera block of the nine

21  camera blocks.

22  Q        Right.  Yeah.

23  A        We would transpose that time frame onto this video.

2494

1    Q        Okay.  Now the time frame on this video, when we put

2    the video in there, it shows even, it shows in big print,

3    okay, which I got messed up on the NASA photographs, the

4    wrong time, really, it's the other one, the small video that

5    you think, according to what you took out your watch and said

6    that's wrong.  So we got the time up there on top; right?

7    A        Yes, sir.

8    Q        All right.  And every time we watch this video

9    sequence, it would change.  I don't care whether it's the

10   wrong time or the right time, but they were all going in

11   unison, weren't they?  They were an hour off, but number

12   wise?

13   A        Yes.

14   Q        Okay.  Did you total up the amount of time on this

15   videotape that you actually saw Robert Fingerhut?

16   A        No, sir.

17   Q        In or in that area?

18   A        No, sir, I didn't.

19   Q        Do you have any idea how long it was?

20   A        No, sir, I don't.

21   Q        Okay.  Well let's just say, how long is this

22   videotape?

23   A        You watched it.  I don't have the total time.



2495

1   Q        Well, you were good.  You were telling me where

2   Fingerhut was.  I didn't see him a whole lot of time.  What

3   would you say it is?  Fifteen minutes, twenty minutes?

4   A        Ten to fifteen minutes.

5   Q        Okay.  Let's say that for ten or fifteen minutes he

6   was in the picture constantly.  Let's assume that.  Unless my

7   eyes are totally gone.  I don't think he was, but let's just

8   assume that.  Then you can account for him for only about ten

9   or fifteen minutes or maybe twenty minutes maybe out of how

10  much time?

11  A        Six hours.

12  Q        Six.  Twenty minutes out of six hours.  Okay.  Well,

13  let me ask you this.  Where was he the other five and a half

14  hours?

15  A        I don't know.  I wasn't there.  I can't tell you

16  that.

17  Q        You can't tell me that.  Who was he talking to?

18  A        I can't tell you that.

19  Q        Was he inside or outside?

20  A        I can't tell you that.

21  Q        Was he working his books or not working his books?

22  A        Can't tell you that.

23  Q        Okay.  If I put the tape in and run it, how much



2496

1    actual time?  We're talking ten or fifteen minutes or maybe

2    fifteen to twenty minutes.  How much actual time?  Because I

3    was looking and I didn't see him a whole lot of time.  How

4    much time do you think we actually could see him?

5    A        I have no idea.

6    Q        Would you say it might be, it probably couldn't be

7    more than maybe five or seven minutes?  About half that time?

8    A        I'd say more than that.

9    Q        Your eyes are better than mine.  In fact, let me ask

10   you something.  Were there some pictures on there where

11   Mr. Fingerhut was there and then I mean it kept showing that.

12   So it's the same frame, but he disappeared.  Was he in front

13   of the bus, back of the bus?  Did he go in the building or

14   what?  I missed something.  I couldn't figure that one out.

15   Because I'd see him in one shot and then all of a sudden

16   he'd disappear and then it would still be there and show the

17   buses.  And all of a sudden, a little bit later, he'd come

18   back.  Is that the idea where he went someplace and then came

19   back or went out front and came back?

20   A        He could have.  Any time he went where there was a

21   video camera, though, you saw the change.

22   Q        Uh-huh.

23   A        From one video view to the next.

2497

1   Q       Right.  How many different views did we have of

2   Mr. Fingerhut?

3   A       I have no idea.

4   Q       We got nine cameras.  Well, now, wait a minute.  We

5   had nine cameras.  Now figure it out.  We had one back by

6   that door.  Remember those back doors where he left?

7   A       Yes, sir.

8   Q       Do you remember the one out by the bus?

9   A       Yes.

10  Q       Okay.  Do you remember the one in the center?

11  A       Yes, sir.

12  Q       Were there any other shots at all?  Any other

13  locations?  It's like Steven Spielberg.  Were there any other

14  locations for the movie?

15  A       The last photograph.

16  Q       Right.  The last photo, which is basically of the

17  bus, it was the same bus, one of the buses had left by that

18  time; right?

19  A       But there was one more that was --

20  Q       One more?

21  A       -- that was there.

22  Q       So we got four.  So we actually have four cameras

23  that picked up on him?

2498

1    A      Yes.

2    Q      There's nine cameras.  So there's five cameras that

3    never saw him the entire time anywhere?

4    A      Yes.

5    Q      Okay.  Okay.  Yeah.  Let's play this.  I'd ask Jim

6    to do this, but I break 'em all the time.  Very good, Frank.

7            So we're actually watching what, the still

8    photograph?

9    A      No.  It's moving.  It's moving.  You'll see the

10   people moving.

11   Q      Okay.  Where is Robert?  Where is Robert in this

12   one?  Is this him?  Is that him?  Is that him?  That's pretty

13   short.  That must be in baggage or a midget; right?  Where is

14   he in this?  Where is he?

15   A      At this point, I can't tell you if he's in there.

16   Q      Okay.  Okay.  So we don't know if he's in front of

17   the bus, back here or what.  We don't know, do we?

18           Tell me when you see him.  Is that him?

19   A      No, sir.

20   Q      Is that him?

21   A      No, sir.

22   Q      Okay.  We're rolling.  Watch the time.  Watch the

23   time up here.  Watch the time roll.  Is that him?

2499

```
 1   A      No, sir.

 2   Q      Is that him?

 3   A      No, sir.

 4   Q      Okay.

 5   A      That's him.

 6   Q      That's him.  Thank you.

 7   A      You have to understand the way this machine works.

 8   We can't chop a piece of it off to get just where he's at.

 9   Q      It's okay, Frank.  Okay.  Is he still in view?

10   A      Right there.

11   Q      Okay.  Let's watch the time.   I'll give you 30

12   seconds on that one.  All right?  Is he still there?

13   A      Yes, sir.

14   Q      Still there?

15   A      Yes, sir.

16   Q      Still there?

17   A      Yes, sir.

18   Q      Give you about a minute.  Still there?

19   A      Yes, sir.

20   Q      Okay.  Still there?

21   A      Yes, sir.

22   Q      Still there?

23   A      Yes, sir.
```

2500

1    Q       Still there?

2    A       No, sir.

3    Q       Okay.  Minute and a half.  Give you a minute and a

4    half.

5    A       (Witness nods head.)

6    Q       Let's see this one.  Want to time it?

7    A       This goes from where you last saw him.

8    Q       Uh-huh.

9    A       This is the door he's gonna come in.

10   Q       Uh-huh.

11   A       But you can't see it from that other camera.

12   Q       That's okay.  We've got him on tape for a minute and

13   a half.  We're gonna get him on tape here again.  Let's see

14   how long we got him.

15   A       There he is.

16   Q       Okay.  1635.  Obviously some seconds.

17           Now we go to another sequence.  So in total, what

18   would you think you have here?  Maybe five or six minutes

19   where you actually, these cameras saw Mr. Fingerhut or filmed

20   Mr. Fingerhut?

21   A       I couldn't tell you unless I added it up.

22   Q       Be generous.  Go ahead.  Take a guess.

23   A       I believe five to ten minutes.

2501

1    Q        Five to ten minutes.  And was he supposed to be

2    there for what?

3    A        Six hours.

4    Q        For six hours.  Okay.  Sit down, Frank.  Go ahead.

5    A        (Witness resumes witness stand.)

6    Q        Long and short, Frank, is that out of six hours of

7    time of a person that was supposed to be at the gas station

8    or at the bus station or in the area of the RTA, you've only

9    got him on film with nine cameras with maybe about five

10   minutes, seven minutes total?

11   A        Yes, sir.

12   Q        Okay.  You don't have any idea where he was any of

13   the other time, the other five hours or maybe five and a half

14   hours or six hours?  You don't have any idea; right?

15   A        Not that I could testify to.  It would be hearsay.

16   Q        Frank, Frank, you just don't know; right?

17   A        Exactly.  Yes, sir.

18   Q        You don't know who he talked to, what he did or

19   anything else; right?  Right?

20   A        Yes, sir.

21                    THE COURT:  Any redirect?

22                    MR. WATKINS:  I'm sorry, Your Honor?

23                    THE COURT:  Any redirect?

2502

1          MR. WATKINS:  No.  I'm finished.  I

2   thought Jim was still going.

3          MR. LEWIS:  Well, I was still going, but

4   I'm boring these good folks.  They want to go watch a movie.

5   Q      (By Mr. Lewis)  But, Frank, you said that you

6   watched all that, but you didn't happen to see Mr. Jackson,

7   Nate?

8   A      No, sir.

9   Q      Is that right?  If the film is right.  Mr. Fingerhut

10  was supposed to be there for six hours and we only got him

11  for five minutes; right?

12  A      Yes.

13         MR. LEWIS:  Great security system.

14  Thanks.

15         THE COURT:  Sergeant, thank you very much.

16  You're excused.

17         THE WITNESS:  Thank you, sir.

18         THE COURT:  Okay, folks.  I would request

19  that you be back here at 9:00 Monday morning.  And I trust

20  you will all have a very pleasant weekend.  Not to discuss

21  anything, watch anything on TV, listen to anything.  You know

22  the ropes by now.  Okay?  Very good.  Thank you.

23  (At 4:20 p.m., court was adjourned to Monday, October 28,

2503

1    2002.)

2    (NOTE:  FOR FURTHER PROCEEDINGS IN THIS MATTER, PLEASE REFER

3    TO VOLUME XI PREPARED BY MARY ANN MILLS.)

4

5                        REPORTER'S CERTIFICATE

6

7        This is to certify the foregoing represents a true and

8    correct copy of the proceedings had in the aforementioned

9    cause as reflected by the stenotype notes taken by me on the

10   same.

11

12

13

14

15   March 7, 2003              Lori J. Rittwage, RPR
16                              Official Court Reporter

17

18

19

20

21

22

23

# VOLUME II

FILED

2504

JUL 09 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

```
 1              IN THE COURT OF COMMON PLEAS
                    TRUMBULL COUNTY, OHIO
 2            TRIAL COURT CASE NO. 01-CR-794
            SUPREME COURT OF OHIO CASE NO. 03-137
 3

 4   STATE OF OHIO          )
                            )
 5              Plaintiff   )
                            )
 6   -vs-                   )        TESTIMONY
                            )
 7   NATHANIEL JACKSON      )
                            )
 8              Defendant   )
 9
10        BE IT REMEMBERED, that on Monday, October 28,

11   2002 and Tuesday, October 29, 2002, these proceedings

12   came on to be heard before one of the Judges of this

13   Court, John M. Stuard, in Courtroom No. 2, on High

14   Street, Warren, Ohio, before the case heretofore

15   filed herein.

16

17

18

19

20   Mary Ann Mills, RPR
     Official Court Reporter
21   Trumbull County, Ohio

22
```

2505

<u>A P P E A R A N C E S</u>


On Behalf of the State of Ohio:
    Dennis Watkins
    Trumbull County Prosecutor
    Charles L. Morrow
    Assistant Prosecuting Attorney
    160 High Street, N.W.
    Warren, Ohio

On Behalf of the Defendant:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defender's Office
    328 Mahoning Ave., N.W.
    Warren, Ohio

i

I N D E X

                                                    PAGE NO.

Search Warrant Hearing                                 3
(December 20, 2001)

Initial Appearance of Nathaniel Jackson               9
Hearing (December 21, 2001)

Initial Appearance of Donna Roberts                  12
Hearing (December 21, 2001)

Motion to Intervene                                  19
(December 31, 2001)

Arraignment of Donna Roberts (co-defendant)          57
Arraignment of Nathaniel Jackson

Waiver of Speedy Trial                               64
(January 23, 2002)

Hearing on Motions                                   67
(March 20, 2002)

Hearing on Motion to Suppress Evidence              185
(April 17, 2002)

WITNESSES AT SUPPRESSION HEARING:

JEFFREY R. HOOLIHAN
    Direct Examination by Mr. Watkins               190
    Cross Examination by Mr. Lewis                  231
    Redirect Examination by Mr. Watkins             274
    Recross Examination by Mr. Lewis                280

DET. SGT. PAUL MONROE
    Direct Examination by Mr. Lewis                 288
    Examination by The Court                        312

NATHANIEL JACKSON
    Direct Examination by Mr. Consoldane            314
    Cross Examination by Mr. Watkins                324

INDEX - Continued                                        PAGE NO.

Court's Opening Remarks (Volume 2)                          381
Motion for Mistrial                                         415

VOIR DIRE
    Hardship Excuses                                        422
    Death Penalty Qualification & Media                     664
    (Volume 3)
    Motion for Change of Venue & Motion to
     Dismiss                                               1835

GENERAL VOIR DIRE                                          1857

OPENING STATEMENT ON BEHALF OF STATE OF OHIO              2064
OPENING STATEMENT ON BEHALF OF THE DEFENDANT             2093

STATE'S WITNESSES:

PAULA CARSON
    Direct Examination by Mr. Morrow                       2100
    Cross Examination by Mr. Lewis                         2105

JAMES C. DANIELS
    Direct Examination by Mr. Watkins                      2111
    Cross Examination by Mr. Lewis                         2124
    Redirect Examination by Mr. Watkins                    2138

JOSE SANCHEZ
    Direct Examination by Mr. Watkins                      2139
    Cross Examination by Mr. Lewis                         2156
    Redirect Examination by Mr. Watkins                    2168

FRANK E. REYNOLDS
    Direct Examination by Mr. Watkins                      2172
    Cross Examination by Mr. Lewis                         2191
    Redirect Examination by Mr. Watkins                    2201

PAUL MONROE
    Direct Examination by Mr. Watkins                      2202
    Cross Examination by Mr. Consoldane                    2392

iii

1   INDEX - Continued                                    PAGE NO.

2   MIKE YANNUCCI
        Direct Examination by Mr. Morrow                 2406
3       Cross Examination by Mr. Lewis                   2418
        Redirect Examination by Mr. Morrow              2428
4
5   RICHARD TACKETT
        Direct Examination by Mr. Morrow                 2428
        Cross Examination by Mr. Lewis                   2434
6
7   ANTHONY LESHNACK
        Direct Examination by Mr. Watkins                2445
        Cross Examination by Mr. Consoldane              2455
8
9   FRANK DILLON
        Direct Examination by Mr. Watkins                2457
        Cross Examination by Mr. Lewis                   2480
10
11  DR. THEODORE SOBOSLAY
        Direct Examination by Mr. Watkins                2512
12
    DR. HUMPHREY GERMANIUK
        Direct Examination by Mr. Watkins                2520
13      Cross Examination by Mr. Consoldane              2576
        Redirect Examination by Mr. Watkins              2583
14      Recross Examination by Mr. Consoldane            2585
        Redirect Examination by Mr. Watkins              2586
15
16  JOSE FLORES
        Direct Examination by Mr. Watkins                2587
        Cross Examination by Mr. Lewis                   2599
17
18  EDWARD LULLA
        Direct Examination by Mr. Watkins                2604
        Cross Examination by Mr. Lewis                   2624
19
20  JOHN STAMPER
        Direct Examination by Mr. Watkins                2645
        Cross Examination by Mr. Lewis                   2652

21

22

iv

INDEX - Continued                                    PAGE NO.

JEFF DIAMANTES
    Direct Examination by Mr. Watkins               2654
    Cross Examination by Mr. Lewis                  2659
    Redirect Examination by Mr. Watkins            2661

MICHAEL ROBERTS
    Direct Examination by Mr. Morrow                2663
    Cross Examination by Mr. Consoldane            2695
    Redirect Examination by Mr. Morrow             2704
    Recross Examination by Mr. Consoldane          2706

CYNTHIA MAYLE
    Direct Examination by Mr. Watkins               2706
    Cross Examination by Mr. Consoldane            2728

DALE LAUX
    Direct Examination by Mr. Watkins               2735
    Cross Examination by Mr. Consoldane            2751
    Redirect Examination by Mr. Watkins            2790
    Recross Examination by Mr. Lewis               2798

BRENDA GERARDI
    Direct Examination by Mr. Watkins               2803
    Cross Examination by Mr. Lewis                  2840

STEVE GREENE
    Direct Examination by Mr. Morrow                2851
    Cross Examination by Mr. Lewis                  2875

CHRIS ELLINGTON
    Direct Examination by Mr. Morrow                2881
    Cross Examination by Mr. Consoldane            2888

JIM McCOY
    Direct Examination by Mr. Morrow                2890
    Cross Examination by Mr. Lewis                  2899

JILL KENYON
    Direct Examination by Mr. Morrow                2900
    Cross Examination by Mr. Consoldane            2908

v

1 | INDEX - Continued                                    PAGE NO.

2 | JENNIFER ROBINSON
      Direct Examination by Mr. Morrow              2911
3 |   Cross Examination by Mr. Lewis                 2920

4 | KATHY KIHM
      Direct Examination by Mr. Morrow              2921
5 |   Cross Examination by Mr. Lewis                 2924

6 | BRIDGET PAUL
      Direct Examination by Mr. Morrow              2925
7 |   Cross Examination by Mr. Consoldane           2934

8 | KATHERINE THOMAS
      Direct Examination by Mr. Morrow              2936
9 |   Cross Examination by Mr. Lewis                 2952
      Redirect Examination by Mr. Morrow            2973
10 |  Recross Examination by Mr. Lewis               2976

11 | JAMES CAMPBELL
      Direct Examination by Mr. Watkins             2977
12 |  Cross Examination by Mr. Consoldane           2982

13 | LINDA THOMAS
      Direct Examination by Mr. Morrow              2994
14 |  Cross Examination by Mr. Consoldane           3002

15 | CHRISTOPHER MONYAK
      Direct Examination by Mr. Morrow              3003
16 |  Cross Examination by Mr. Lewis                 3023
      Redirect Examination by Mr. Morrow            3037

17 |
    TROOPER GERALD FUNELLI
18 |  Direct Examination by Mr. Morrow              3038
      Cross Examination by Mr. Lewis                3046
19 |
    DET. SGT. PAUL MONROE
20 |  Redirect Examination by Mr. Watkins           3049
      Recross Examination by Mr. Lewis              3063
21 |
    BRAD CAIN
22 |  Direct Examination by Mr. Lewis               3106

vi

| | INDEX - Continued | PAGE NO. |
|---|---|---|
| 1 | | |
| 2 | TAMMIE KAYE | |
| | Direct Examination by Mr. Consoldane | 3118 |
| 3 | | |
| | ROBERT STANTON | |
| 4 | Direct Examination by Mr. Lewis | 3119 |
| | Cross Examination by Mr. Watkins | 3127 |
| 5 | | |
| | MOTIONS | 3200 |
| 6 | | |
| | CARMEN OLIVA | |
| 7 | Direct Examination by Mr. Watkins | 3267 |
| | Cross Examination by Mr. Lewis | 3278 |
| 8 | | |
| | BARRY RICKER | |
| 9 | Direct Examination by Mr. Watkins | 3290 |
| | Cross Examination by Mr. Lewis | 3300 |
| 10 | | |
| 11 | DIANA MARCHESE | |
| | Direct Examination by Mr. Watkins | 3309 |
| | Cross Examination by Mr. Consoldane | 3314 |
| 12 | Redirect Examination by Mr. Watkins | 3319 |
| | Recross Examination by Mr. Consoldane | 3319 |
| 13 | | |
| | MOTION RE JURY INSTRUCTIONS | 3334 |
| 14 | | |
| 15 | FINAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3390 |
| | FINAL ARGUMENT ON BEHALF OF THE DEFENDANT | 3438 |
| | FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT | 3495 |
| 16 | REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3505 |
| 17 | CHARGE OF THE COURT | 3541 |
| 18 | NOVEMBER 7, 2002 (Deliberations) | 3601 |
| 19 | NOVEMBER 8, 2002 (Deliberations) | 3602 |
| 20 | VERDICT | 3612 |
| 21 | (SEE SEPARATE VOLUME FOR TRANSCRIPT OF | |
| 22 | MITIGATION HEARING) | |

vii

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | Withdrawn |
| 36 | Photo | Withdrawn |
| 37 | Photo | No Objection |
| 38 | Photo | No Objection |
| 39 | Photo | Withdrawn |
| 40 | Photo | No Objection |
| 41 | Photo | Withdrawn |
| 42 | Photo | Withdrawn |
| 43 | Photo | No Objection |
| 44 | Photo | No Objection |
| 45 | Photo | Withdrawn |
| 46 | Photo | Withdrawn |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | Withdrawn |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

viii

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninisula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | Withdrawn |
| 86 | Blood Spatters - garage | No Objection |
| 87 | Overview garage | No Objection |
| 88 | Peninusla & Wall - blood splatters | Withdrawn |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | No Objection |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | Withdrawn |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | No Objection |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | Withdrawn |
| 108 | Victim | No Objection |
| 108A | Victim Face down | Withdrawn |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | No Objection |
| 111 | Victim lower torso | Withdrawn |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | No Objection |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

| | | | ix |
|---|---|---|---|
| 118 | Office Area | No Objection | |
| 119 | Office Area | No Objection | |
| 120 | Office Area | No Objection | |
| 121 | Office Area | No Objection | |
| 122 | Front Door Looking In | No Objection | |
| 123 | Dining Room - Orioles Jacket | No Objection | |
| 124 | Office Area w/ ball cap | No Objection | |
| 125 | Dry Wall Hole | No Objection | |
| 126 | Front View of Car | No Objection | |
| 127 | left rear red car | No Objection | |
| 128 | left view red car | No Objection | |
| 129 | Garage door & Driver door | No Objection | |
| 130 | Family Room - overview | No Objection | |
| 131 | Table w/ 2 roaches | No Objection | |
| 132 | Garage w/ view of Gun | No Objection | |
| 133 | Blood Drops in garage | Withdrawn | |
| 134 | Overview - Office | No Objection | |
| 135 | Kitchen - Door | Withdrawn | |
| 136 | Open Door, Kitchen area | Withdrawn | |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection | |
| 138 | Stainless Steel Revolover | No Objection | |
| 139 | Close - up Footprint & Garage | No Objection | |
| 140 | Stairwell & Basement | No Objection | |
| 141 | Stairwell & Basement | No Objection | |
| 142 | Cabinet | No Objection | |
| 143 | Close - Up Cabinet | No Objection | |
| 144 | Kitchen - Different View | No Objection | |
| 145 | Pier One Import Bag w/ wine glasses | No Objection | |
| 146 | Front View of Car | No Objection | |
| 147 | Rt Side View of Car | No Objection | |
| 148 | Rear view of Car | No Objection | |
| 149 | Left Side view of Car | No Objection | |
| 150 | Double Lined Bag "Nate Jackson" | No Objection | |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection | |
| 152 | Assorted Candy, toothpaste | No Objection | |
| 153 | Cuetomer Reciept | No Objection | |
| 154 | Handcuff Box w/ key - no cuffs | No Objection | |
| 155 | Hair Comb | No Objection | |
| 156 | Front View of Car | No Objection | |
| 157 | Rear view of Car | No Objection | |
| 158 | Wide Angle Rear of Car | Withdrawn | |
| 159 | Rt Side View of Car | No Objection | |
| 160 | Front View of Car - Left Corner | No Objection | |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn | |
| 162 | Front View of Car | No Objection | |
| 163 | Exterior to Interior - Blood Smears | No Objection | |
| 164 | Visor Area | No Objection | |
| 165 | Interior area above head w/ blood | No Objection | |
| 166 | Exterior | No Objection | |
| 167 | Front Driver Seat | Withdrawn | |
| 168 | Visor Area - Removed | No Objection | |
| 169 | Door Handle | No Objection | |
| 170 | Door Handle w/ blood | No Objection | |
| 171 | Dirver side visor clamp | No Objection | |
| 172 | Front Passenger Seat - Cell Phone | No Objection | |
| 173 | Front Passenger Seat - Cell Phone | No Objection | |
| 174 | Interior -Left Console | No Objection | |
| 175 | Napkin w/ Bllod Smear | No Objection | |
| 176 | Floormat | Withdrawn | |
| 177 | Trunk Open | No Objection | |
| 178 | Keys in Ignition | No Objection | |
| 179 | Rt interior head rest | Withdrawn | |

| | | |
|---|---|---|
| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Inn Photographs | Admitted over Obj |
| 202 | Days Inn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | Withdrawn |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Inn Photographs | Withdrawn |
| 206 | Days Inn Photographs | Withdrawn |
| 207 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 210 | Days Inn Photographs | Withdrawn |
| 211 | Days Inn Photographs | Withdrawn |
| 212 | Days Inn Photographs | Withdrawn |
| 213 | Days Inn Photographs | Withdrawn |
| 214 | Days Inn Photographs | Withdrawn |
| 215 | Days Inn Photographs | Withdrawn |
| 216 | Days Inn Photographs | Withdrawn |
| 217 | Days Inn Photographs | Withdrawn |
| 218 | Days Innn Photographs | Withdrawn |
| 219 | Days Inn Photographs | Withdrawn |
| 220 | Days Inn Photographs | Withdrawn |
| 221 | Days Inn Photographs | Withdrawn |
| 222 | Days Inn Photographs | Withdrawn |
| 223 | Days Innn Photographs | Withdrawn |
| 224 | Days Inn Photographs | Admitted over Obj |
| 225 | Days Inn Photographs | Withdrawn |
| 226 | Days Inn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | | |
|---|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted | xi |
| 271D2 | | 11/29/01 | Admitted | |
| 271D3 | | 11/29/01 | Admitted | |
| 271D4 | | 11/28/01 | Admitted | |
| 271D5 | | 11/28/01 | Admitted | |
| 271D6 | | 11/27/01 | Admitted | |
| 271D7 | | 11/27/01 | Admitted | |
| 271D8 | | 11/26/01 | Admitted | |
| 271D9 | | 11/26/01 | Admitted | |
| 271D10 | | 11/24/01 | Admitted | |
| 271D11 | | 11/23/01 | Admitted | |
| 271D12 | | 11/23/01 | Admitted | |
| 271D13 | | 11/22/01 | Admitted | |
| 271D14 | | 11/22/01 | Admitted | |
| 271D15 | | 11/22/01 | Admitted | |
| 271D16 | | 11/22/01 | Admitted | |
| 271D17 | | 11/21/01 | Admitted | |
| 271D18 | | 11/21/01 | Admitted | |
| 271D19 | | 11/20/01 | Admitted | |
| 271D20 | | 11/20/01 | Admitted | |
| 271D21 | | 11/20/01 | Admitted | |
| 271D22 | | 11/20/01 | Admitted | |
| 271D23 | | 11/19/01 | Admitted | |
| 271D24 | | 11/19/01 | Admitted | |
| 271D25 | | 11/19/01 | Admitted | |
| 271D26 | Empty | | Admitted | |
| 271D27 | | 11/16/01 | Admitted | |
| 271D28 | | 11/16/01 | Admitted | |
| 271D29 | | 11/15/01 | Admitted | |
| 271D30 | Empty | | Admitted | |
| 271D31 | | 11/12/01 | Admitted | |
| 271D32 | | 11/10/01 | Admitted | |
| 271D33 | | 11/10/01 | Admitted | |
| 271D34 | | 11/10/01 | Admitted | |
| 271D35 | | 11/10/01 | Admitted | |
| 271D36 | | 11/09/01 | Admitted | |
| 271D37 | | 11/09/01 | Admitted | |
| 271D38 | | 11/09/01 | Admitted | |
| 271D39 | | 11/09/01 | Admitted | |
| 271D40 | | 11/08/01 | Admitted | |
| 271D41 | | 11/08/01 | Admitted | |
| 271D42 | | 11/08/01 | Admitted | |
| 271D43 | | 11/07/01 | Admitted | |
| 271D44 | | 11/07/01 | Admitted | |
| 271D45 | | 11/07/01 | Admitted | |
| 271D46 | | 11/07/01 | Admitted | |
| 271D47 | Empty | | Admitted | |
| 271D48 | | 11/06/01 | Admitted | |
| 271D49 | | 11/06/01 | Admitted | |
| 271D50 | Empty | | Admitted | |
| 271D51 | | 11/05/01 | Admitted | |
| 271D52 | | 11/05/01 | Admitted | |
| 271D53 | | 11/03/01 | Admitted | |
| 271D54 | | 11/03/01 | Admitted | |
| 271D55 | | 11/02/01 | Admitted | |
| 271D56 | | 11/02/01 | Admitted | |
| 271D57 | | 11/02/01 | Admitted | |
| 271D58 | | 11/01/01 | Admitted | |
| 271D59 | | 11/01/01 | Admitted | |
| 271D60 | Halloween card | | Admitted | |
| 271D61 | | 10/31/01 | Admitted | |

xii

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

| 271D124 |         | 10/05/01 | Admitted |
| 271D125 |         | 10/04/01 | Admitted |
| 271D126 |         | 10/04/01 | Admitted |
| 271D127 |         | 10/02/01 | Admitted |
| 271D128 |         | 10/02/01 | Admitted |
| 271D129 |         | 10/02/01 | Admitted |
| 271D130 | Unknown |          | Admitted |
| 271D131 | Unknown |          | Admitted |
| 271D132 | Unknown |          | Admitted |
| 271D133 | Unknown |          | Admitted |
| 271D134 | Unknown |          | Admitted |
| 271D135 | Unknown |          | Admitted |
| 271D136 | Unknown |          | Admitted |
| 271D137 | Unknown |          | Admitted |
| 271D138 | Unknown |          | Admitted |
| 271D139 |         | 11/26/01 | Admitted |

xiii

| 273N | Letters from Nate to Donna | | Admitted | xiv |
|------|---------|---------|----------|-----|
| 273N1 | | 12/01/01 | Admitted | |
| 273N2 | | 11/30/01 | Admitted | |
| 273N3 | | 11/29/01 | Admitted | |
| 273N4 | | 11/28/01 | Admitted | |
| 273N5 | | 11/27/01 | Admitted | |
| 273N6 | | 11/26/01 | Admitted | |
| 273N7 | | 11/25/01 | Admitted | |
| 273N8 | | 11/23/01 | Admitted | |
| 273N9 | | 11/22/01 | Admitted | |
| 273N10 | | 11/20/01 | Admitted | |
| 273N11 | | 11/19/01 | Admitted | |
| 273N12 | | 11/17/01 | Admitted | |
| 273N13 | | 11/16/01 | Admitted | |
| 273N14 | | 11/14/01 | Admitted | |
| 273N15 | | 11/14/01 | Admitted | |
| 273N16 | | 11/13/01 | Admitted | |
| 273N17 | | 11/12/01 | Admitted | |
| 273N18 | | 11/12/01 | Admitted | |
| 273N19 | | 11/10/01 | Admitted | |
| 273N20 | | 11/09/01 | Admitted | |
| 273N21 | | 11/07/01 | Admitted | |
| 273N22 | | 11/06/01 | Admitted | |
| 273N23 | | 11/08/01 | Admitted | |
| 273N24 | | 11/05/01 | Admitted | |
| 273N25 | | 11/03/01 | Admitted | |
| 273N26 | | 11/01/01 | Admitted | |
| 273N27 | | 11/01/01 | Admitted | |
| 273N28 | | 10/31/01 | Admitted | |
| 273N29 | | 10/30/01 | Admitted | |
| 273N30 | 273N31 | | 273N32 | |
| 273N31 | | 10/28/01 | Admitted | |
| 273N32 | | 10/27/01 | Admitted | |
| 273N33 | 273N34 | | 273N35 | |
| 273N34 | | 10/25/01 | Admitted | |
| 273N35 | | 10/25/01 | Admitted | |
| 273N36 | | 10/25/01 | Admitted | |
| 273N37 | | 10/24/01 | Admitted | |
| 273N38 | | 10/23/01 | Admitted | |
| 273N39 | | 10/22/01 | Admitted | |
| 273N40 | | 10/21/01 | Admitted | |
| 273N41 | | 10/21/01 | Admitted | |
| 273N42 | | 10/20/01 | Admitted | |
| 273N43 | | 10/19/01 | Admitted | |
| 273N44 | | 10/18/01 | Admitted | |
| 273N45 | | 10/17/01 | Admitted | |
| 273N46 | | 10/16/01 | Admitted | |
| 273N47 | | 10/16/01 | Admitted | |
| 273N48 | | 10/15/01 | Admitted | |
| 273N49 | | 10/14/01 | Admitted | |
| 273N50 | | 10/12/01 | Admitted | |
| 273N51 | | 10/10/01 | Admitted | |
| 273N52 | | 10/10/01 | Admitted | |
| 273N53 | | 10/08/01 | Admitted | |
| 273N54 | | 10/05/01 | Admitted | |
| 273N55 | | 10/07/01 | Admitted | |
| 273N56 | | 10/04/01 | Admitted | |
| 273N57 | | 10/04/01 | Admitted | |
| 273N58 | | 10/02/01 | Admitted | |
| 273N59 | | 10/01/01 | Admitted | |
| 273N60 | | 10/01/01 | Admitted | |
| 273N61 | | 09/30/01 | Admitted | |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | No Objection | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

xvii

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Introduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Card Enevlope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Enevlope #138 w/ Te | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Enevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X  5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

xviii

| | | |
|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic Line-Up - Frank Reynolds | Not Intorduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Envelope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Envelope Containing 2 Photos | No Objection |

xix

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
STATE COURT TRANSCRIPTS - Page 2723

| | | | |
|---|---|---|---|
| | 395 | Envelope Containing Lift Sheets | No Objection |
| | 395A | Lift Sheets | No Objection |
| | 395B | Lift Sheets | No Objection |
| | 396 | Walmart Receipt | Admitted over Obj |
| | 397 | Audio Tape of Excerpts | Objection Sustained |
| | 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| | 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| | 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| | 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| | 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| | 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| | 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| | 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| | 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| | 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| | 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| | 403A-403RR | Defendant's school records | No Objection |
| | | | |
| | Defendant's Exhibits | | |
| | Deft A | Dreft.'s Criminal History | No Objection |
| | Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| | Deft F | Credit Application | No Objection |
| | Deft G | BMV Registration Card | No Objection |
| | Deft H | Sales Agreement | No Objection |
| | Deft I | Lease Agreement | No Objection |
| | Deft J | Car Registration | No Objection |
| | Deft K | Credit Application | No Objection |
| | Deft L | BMV Registration Card | No Objection |
| | Deft M | Real Estate Records | No Objection |
| | Deft N | Real Estate Records | No Objection |
| | Deft O | Real Estate Records | No Objection |
| | Deft P | Psychological Report | No Objection |
| | Joint 1 | Fingerhut Jewelry | No Objection |
| | | | |
| | Court Exhibit 1 | Orientation Instructions | |
| | Court Exhibit 2 | Exhibit List | |
| | Court Exhibit 3 | Brief In Opposition to Acquittal | |
| | Court Exhibit 4 | Jury Charge | |
| | Court Exhibit 5 | Corrected Instruction | |
| | Court Exhibit 6 | Jury Question | |
| | Court Exhibit 7 | Penalty Instruction | |

2506

1   Monday, October 28, 2002; In-chambers at 9:20 a.m.:

2   Continuing with State's case in chief.

3               MR. LEWIS:  We waive presence of the

4   Defendant for this hearing.

5               THE COURT:  We're in-chambers out of

6   the hearing of the Jury.  The Defense waive

7   presence of the Defendant?

8               MR. LEWIS:  Yes.

9               THE COURT:  We're here to review

10  certain forensic slides, which the State is

11  proposing to show to the Jury.  Will you,

12  Mr. Watkins, please state what these items are?

13              MR. WATKINS:  We have had marked as

14  State's Exhibits, and I believe they are 4 to 60.

15  They are the autopsy and crime scene photographs

16  taken by Dr. Germaniuk who was at the scene at

17  approximately 12:45 a.m., as part of his duties as

18  a forensic pathologist for the Trumbull County

19  Coroner.  What we had done are to have taken all of

20  his slides, because he used a camera and then he

21  develops them as slides, the 35 millimeter, and we

22  took approximately half of his slides, it may be

2507

1   two-thirds, but in that vicinity, that we took and

2   had photographs made of the slides, and we have

3   taken out all nude frontal shots, all dissection of

4   the body, including shots of taking the bullet out

5   of the brain.  The shots here are of the wounds, of

6   the crime scene.  All of the shots are different

7   angles and the most graphic shots would be those of

8   the head, but we believe they are to be relevant

9   and show how the bullet goes in and it will

10  interlock with other testimony.  In short, we have

11  removed most of the inflammatory shots that

12  Dr. Germaniuk had.  By the way, the doctor has gone

13  through these.  He can authenticate them as to

14  exact duplicates of his slides, and right as we sit

15  here, while the Court sits and I stand, but as

16  we're here today, he's prepared to go forward with

17  his slide presentation in the order that they are

18  right now, 4 through 60.  In the past, we have

19  always gone through all of the slides and then the

20  Court would make rulings on each and every one.

21  What we have done is try to expedite it and I

22  understand Defense may have objections, but that is

2508

1    what we have done as Prosecutor in the case.

2              THE COURT:  Fine.  The Court has

3    also reviewed all of those Exhibits.  Gentlemen of

4    the Defense, have you had an opportunity to review

5    these?

6              MR. CONSOLDANE:  Yes.  I appreciate

7    that he did take out the frontal nude shots and the

8    gory pictures, but they seem to be duplicitous.  A

9    lot of the same things.

10             THE COURT:  Would you care to go

11   through these and show me what your specific

12   objections are, starting with State's Exhibit 4

13   here?

14             MR. CONSOLDANE:  There's three

15   pictures of him laying on the floor, like this one

16   here.  I don't understand what this would be.

17             MR. WATKINS:  It shows the scene.

18             THE COURT:  Let me use this as

19   possible criteria.  There are many pictures in

20   there that show the same thing, particularly the

21   layout on the floor and the shirts, clothing.  I

22   don't know what the State's case is.  If there's

2509

1   some particular point that the State wishes to make

2   from these, what appear to be somewhat cumulative

3   photographs, then I would like to hear that.

4   Otherwise, like on the pictures of the skull, I

5   think one showing the entrance wound, because I

6   don't believe there was no exit wound; one showing

7   the entrance wound as the Coroner first saw the

8   body, and then there's another one there with the

9   skull laid back to show very clearly the damage to

10  the cranium.  I think, perhaps, that should suffice

11  from what the State wishes to prove.

12            MR. CONSOLDANE:  These three of

13  these?

14            MR. WATKINS:  Tony, take the ones

15  you want out and then I'll look through them.  Take

16  every one of them out and then we'll argue them.

17  (OFF THE RECORD)

18            THE COURT:  It is my understanding

19  that after reviewing the proposed Exhibits by all

20  parties and the Court, it is agreed that State's

21  Exhibits 22, 23, 29, 30, 32, 35, 36, 39, 41, 42,

22  45, 46, and 50 will be removed from the

2510

1  presentation to the Jury.  These will become part

2  of the record of the case, but not for the Jury's

3  view.  It is agreed by all parties, without

4  objection, the State will show State's Exhibits 4,

5  5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18,

6  19, 20, 21, 24, 25, 26, 27, 28, 31, --

7            MR. WATKINS:  There should be 29.

8  I'm sorry, 29 was excluded.  I'm sorry.

9            THE COURT:  28 and 31, 34, 37, 38,

10  40, 43, 44, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57,

11  58, 59, and 60.

12            MR. WATKINS:  Judge, number 33 is

13  in.  Did you mention 33?

14            THE COURT:  I got 33 here.

15            MR. WATKINS:  Number 33 is in?

16            THE COURT:  Yes.  Anything else for

17  the record on this point?

18            MR. WATKINS:  No, Your Honor.

19  (End of in-chamber discussion.)

20  (In Open Court at 10:05 A.M.)

21            THE COURT:  Good morning, folks I

22  trust you all had a nice weekend.  Not too bad, a

2511

1    little bit of rain on Saturday, but the trees are

2    about as pretty right now as we're going to have.

3    You have asked a couple of questions, let me answer

4    that.  During breaks, some of you may smoke or

5    something and you want to go outside and have a

6    cigarette.  You should probably all try to stay

7    together as much as possible, but there's no hard

8    and fast rule that you all have to be at the same

9    place.  Whenever we have a longer period of time,

10   you should probably go down to the Jury room.  When

11   you take a ten minute break and you come back and

12   have a seat, and you think we forgot about you,

13   that isn't the case believe me, neither side ever

14   forgets about the Jury.  We want to keep you happy.

15   We have had instances in the past where Juries

16   collectively thought that they had been mistreated

17   and they turn a little bit nasty.

18         Well, with that in mind, we're always

19   cognizant of your time as well as our own.  There

20   are many times, however, that during a break,

21   something will occur that we can not be back in

22   when we said that we would be.  I use "we"

2512

1    collectively, myself and the attorneys.  I have

2    made it a habit over the years that I have sat

3    here, that if we take an undue amount of time, I

4    try to either come in and explain to the Jury what

5    is going on or to send the bailiff in, but please

6    don't ever get the idea that we're just wasting

7    your time or forgotten about you, because that

8    isn't the case.  Mr. Watkins?

9                    MR. WATKINS:  We would call Dr.

10   Soboslay.

11                    DR. THEODORE SOBOSLAY

12   being duly sworn according to law, on his oath,

13   testified as follows:

14   DIRECT EXAMINATION BY MR. WATKINS:

15   Q.   Good morning.  Would you give your full name

16            and occupation to the Jury, please?

17   A.   My name is Dr. Ted Soboslay.  I am a

18            physician, and in addition I am also

19            Coroner of Trumbull County.

20   Q.   And when did you become Coroner of Trumbull

21            County?

22   A.   I have been Coroner of Trumbull County

2513

1              since -- well, it's 14 years now.

2    Q.    You were elected in 1988?

3    A.    That is correct.

4    Q.    And would you briefly tell the Jury what your

5              duties are as the Coroner for Trumbull

6              County?

7    A.    Basically, our job is to investigate any

8              untoward cause of death, that will

9              include homicides, suicides, unclaimed or

10             unnotified bodies.  Any time that there's

11             a problem existing as to the manner of

12             death or means of death, we're called to

13             investigate.

14   Q.    When they are unnatural deaths?

15   A.    Unnatural, that is correct.

16   Q.    Your office has a duty to investigate the

17             deaths?

18   A.    That is correct.

19   Q.    And would you briefly give us your training

20             and background?

21   A.    Yes.  I am a graduate of University of

22             Pittsburgh, and also the University of

2514

```
 1          Bonn, West Germany School of Medicine.  I
 2          followed that up with a year of
 3          internship at Trumbull Memorial Hospital.
 4          Following that, subsequently three years
 5          of training as a medical resident, also
 6          at Trumbull Memorial Hospital.  I am a
 7          member of the usual medical societies,
 8          but in addition, a member of the American
 9          Society of Internal Medicine and the
10          State Society of Internal Medicine.  In
11          addition, I am a board certified medical
12          examiner, and I am also board certified
13          in forensic medicine.
14    Q.    And you practice at what local hospital?
15    A.    Trumbull Memorial Hospital.
16    Q.    And you have held positions at that hospital?
17    A.    Yes.  For four terms, I was president of
18          Trumbull Memorial Hospital and for six
19          years I was deputy chief of medicine.
20    Q.    Now, when you investigate untimely deaths of
21          persons that are located in Trumbull
22          County, do you file with any governmental
```

2515

1      agency a certificate of death?

2  A.   Yes, we do.

3  Q.   And are you required also in certain cases to

4           file Coroner's verdicts?

5  A.   Yes, we do.

6  Q.   And you regularly do that?

7  A.   Yes.

8  Q.   Now, in the case of a homicide, would there be

9           an autopsy performed?

10  A.   Yes.

11  Q.   And have you hired a forensic pathologist to

12           work as your deputy?

13  A.   Yes, Dr. Humphrey Germaniuk is my deputy.

14  Q.   And Dr. Germaniuk has been your deputy for how

15           many years?

16  A.   Dr. Germaniuk has been my deputy for about

17           five years.

18  Q.   And if he were to investigate a homicide and

19           perform an autopsy, where would that

20           ordinarily be done at?

21  A.   This would be done at the morgue at Trumbull

22           Memorial Hospital.

2516

```
 1   Q.    And would you have other deputies that -- or

 2              investigators that work with you on

 3              collection of evidence in making

 4              determinations as to deaths?

 5   A.    Yes, we would.  We would have the usual

 6              laboratory personnel, the Bureau of

 7              Criminal Investigation for the State, and

 8              just every diagnostic investigative

 9              branch that is available to us.

10   Q.    And you also have investigators that work with

11              Dr. Germaniuk?

12   A.    Yes, I have four medical investigators.  They

13              are all registered nurses, and in

14              addition, they are also certified in

15              their respective medical sciences.

16   Q.    Now, I would like for you to tell the Jury

17              whether or not the death of Robert

18              Fingerhut on or about December 11th or

19              12th of 2001 was investigated by your

20              office?

21   A.    Yes, it was.

22   Q.    And who was assigned to do the autopsy work in
```

2517

1           that matter?

2    A.    Dr. Germaniuk.

3    Q.    And to your knowledge, was an autopsy

4           performed on or about December 12, 2001

5           at the Trumbull Memorial Hospital,

6           otherwise known as Forum Health?

7    A.    Yes, it was.

8    Q.    And do you rely on information from

9           Dr. Germaniuk to make a determination, as

10          to cause of death?

11   A.    Yes, I do.

12   Q.    And therefore, though you are not personally

13          involved, you take information from

14          Dr. Germaniuk and others in your employ,

15          so you could file the necessary documents

16          the law requires?

17   A.    That is correct.

18   Q.    I'm going to hand you what has been marked as

19          State's Exhibit 260, certificate of

20          death.  Could you identify that document

21          and tell the Jury whether or not it is an

22          exact copy and it bears your signature?

2518

1    A.   Yes, this is an exact copy of the document

2         that I signed.  It is a death certificate

3         of Robert S. Fingerhut.  The cause of

4         death listed by me is multiple gunshot

5         wounds.

6    Q.   And that was signed by you?

7    A.   Yes, it was.

8    Q.   And it was filed with the City of Warren?

9    A.   Yes, filed by our Ohio Department of Health.

10   Q.   I'm going to hand you what has been marked as

11        State's Exhibit 261.  Can you identify

12        it?

13   A.   This is a Coroner's verdict sheet.  We must

14        file a Coroner's verdict sheet on every

15        case that is referred to us.  The cause

16        of death again is listed as multiple

17        gunshot wounds and the manner of death is

18        listed as homicide.

19   Q.   So, the Coroner's verdict filed with the

20        Common Pleas Court was cause of death,

21        multiple gunshot wounds, and it was ruled

22        a homicide?

2519

1   A.   That is correct.

2   Q.   And that is in the caption of Robert

3        Fingerhut?

4   A.   Yes, that is right.

5   Q.   What residence did you have him at?

6   A.   I had him on 254 Fonderlac Drive in the City

7        of Howland Township, Trumbull County.

8   Q.   The information that you have in that

9        document, if I may, is information that

10       you received in part from Dr. Germaniuk?

11  A.   Yes, that is correct.

12  Q.   And the estimated time of death, did you give

13       that?

14  A.   I refer to the time given by Dr. Germaniuk.

15  Q.   And this document says -- what conclusion did

16       you make?

17  A.   I came to the conclusion that the death was a

18       homicide, and this was secondary to

19       multiple gunshot wounds.

20  Q.   And do you give a -- I am looking at the

21       pronounced death at what time?

22  A.   Pronounced death at 12:45 A.M. on December 12.

2520

1   Q.   Now that information was gained from

2            Dr. Germaniuk?

3   A.   Yes, and from my investigators, yes.

4                MR. WATKINS:  Thank you very much.

5                MR. LEWIS:  Have a nice day.  No

6   questions.

7                THE COURT:  Thank you, Doctor.

8                MR. WATKINS:  The State would call

9   Dr. Germaniuk.

10            DR. HUMPHREY GERMANIUK

11  being duly sworn according to law, on his oath,

12  testified as follows:

13  DIRECT EXAMINATION BY MR. WATKINS:

14  Q.   Good morning.

15  A.   Good morning.

16  Q.   Dr. Germaniuk, if you would, please give the

17            Jury your name and occupation.

18  A.   My name is Humphrey Don Germaniuk, and my

19            occupation is the forensic pathologist

20            for Trumbull County.

21  Q.   And how long have you been so employed?

22  A.   Since January of 1998.

2521

1    Q.   And would you briefly go through your resume

2              as far as your accreditations and

3              experience in the field of forensic

4              pathology?

5    A.   My training and education and experience began

6              more than 29 years ago when I was 19

7              years old, and volunteered at the

8              Manhattan Medical Examiner's Office in

9              New York City.  It was love at first

10             sight, because I knew exactly what I

11             wanted to do the rest of my life.  I was

12             there from 1973 to 1975 where I assisted

13             in approximately one thousand autopsies.

14             At that time, I was also a Sophomore in

15             college, Wagner College in Staton Island,

16             New York.  I was there as a biology

17             major, a nursing major and a chemistry

18             minor.  I graduated from Wagner College

19             in 1975 with a Bachelor of Science degree

20             in biology.  From there, I went to the

21             University of Turin for forensic medicine

22             in  Perugia, P E R U G I A, Italy, where

2522

1     for a year I took various courses in

2     Liberal Arts such as philosophy,

3     architecture, literature and the like.  I

4     began my medical education at the

5     University of Turin in Italy in 1977, and

6     transferred to the University of Rome,

7     Italy in 1981, graduating there with an

8     M.D. degree in 1984.  From there I went

9     to Columbus, Ohio, and the Ohio State

10    University Hospitals, where for four

11    years, I began my specialty training in

12    pathology, and I was there from 1984

13    until 1988, where I specialized in

14    anatomic and clinical pathology.  From

15    there I went to Dade County in Miami,

16    Florida where I was an assistant medical

17    examiner from 1988 to 1989.  From there,

18    I proceeded to Syracuse, New York and I

19    was associate medical examiner in

20    Syracuse from 1989 until 1994.  In

21    January of 1994, I proceeded to

22    Washington, D.C., where I was the deputy

2523

```
 1              chief of medical examiners -- where I was
 2              a deputy chief medical examiner for our
 3              nation's Capitol from 1994 until 1996,
 4              where I was then appointed the acting
 5              chief medical examiner for Washington,
 6              D.C., and I was finally appointed as the
 7              chief medical examiner for Washington,
 8              D.C. in 1997, a position which I held
 9              until 1998, until arriving here in
10              Trumbull County.
11    Q.   And would you tell the Jury what clinical and
12              anatomical pathology means in lay terms?
13    A.   Basically, pathology is the study of abnormal
14              structures and abnormal function.  When
15              you go to medical school, you learn how
16              the body is put together.  That is called
17              anatomy.  The study of abnormal anatomy
18              or abnormal structure is called anatomic
19              pathology.  When you go to medical school
20              you learn how the body functions.  That
21              is called physiology.  The study of
22              abnormal or diseased function is called
```

2524

```
 1              clinical pathology.  So, those are the
 2              two basic groups that form the specialty
 3              of pathology, anatomic pathology, dealing
 4              with abnormal or diseased structure and
 5              clinical pathology, which deals with
 6              abnormal or diseased functions.
 7    Q.   As a medical doctor, you can go beyond in your
 8              training and take examinations to show
 9              that you are Board certified in those
10              areas?
11    A.   Yes.
12    Q.   Did you do so?
13    A.   Yes.
14    Q.   And would you tell the Jury when you became
15              Board certified?
16    A.   I became Board certified in anatomic pathology
17              in 1992.
18    Q.   And did there come a time that you also got
19              certification in forensic pathology?
20    A.   Yes.
21    Q.   Would you explain to the Jury when that was
22              and what it is to be a forensic
```

```
                                                           2525

 1              pathologist?

 2   A.    I was Board certified by the American Board of

 3              Pathology or regulatory agencies in 1993,

 4              and I was certified in the subspecialty

 5              of forensic pathology.

 6   Q.    And in forensic pathology, what does that do

 7              as far as adding to your ability to

 8              communicate to the Jury a cause of death?

 9   A.    Forensic pathology is that subspecialty of

10              pathology which specifically deals with

11              the determining of a cause of death, a

12              manner of death, and investigating the

13              circumstances surrounding death.

14   Q.    And how much training was involved in your

15              forensic --

16   A.    After I completed my specialty training in

17              anatomic and clinical pathology at OSU,

18              I went on to take an additional year in

19              forensic pathology in Dade County, in

20              Florida.

21   Q.    You came to Trumbull County in 1998, correct?

22   A.    Yes.
```

2526

1   Q.   And how many autopsies and homicides would you

2        say you were involved with prior to

3        coming to Trumbull County?

4   A.   In D.C., we had a lot.  I would have to sit

5        back and take a look at my numbers and

6        statistics.  Up until now, I had probably

7        done about 3,800 legal autopsies,

8        probably hundreds of homicides among

9        those.

10  Q.   Now, when you investigate a homicide, do you

11       go to the scene?

12  A.   First we don't know if it is a homicide.

13  Q.   When you investigate a death?

14  A.   Yes.  Any time there's an unnatural, unusual,

15       suspicious, strange death, our office

16       receives a call, and we respond to the

17       scene.  Usually, an investigator from the

18       Trumbull County Coroner's office responds

19       as well as myself.

20  Q.   And I want to direct your attention to

21       December 12, Doctor, in the year of 2001,

22       whether or not you went to the residence

2527

1      of Robert S. Fingerhut, 254 Fonderlac

2      Drive, Howland Township?

3   A.   Can I refer to my notes?

4   Q.   Sure.

5   A.   On the 12th of December, I responded to 254

6        Fonderlac Drive in Trumbull County.

7   Q.   And that is Trumbull County, Ohio, is that

8        correct?

9   A.   Yes.

10  Q.   And tell the Jury what you saw and what you

11       did.

12  A.   Basically, I arrived at the address at

13       approximately 12:45 that morning on the

14       12th of September, and the first thing

15       you want to do is you want to get some

16       initial information, what have we got and

17       what are we dealing with.  When I first

18       received telephone call at about 12:30 in

19       the morning.  The call came as a suicide

20       so we respond to all suicides in Trumbull

21       County as well, and so you talk to the

22       original responders and the police

2528

1   officers that are there.  And what we

2   found out was that according to police,

3   this individual's wife returned shortly

4   home, before midnight, and that she was

5   startled, because when she pushed the

6   garage door opener, instead of the garage

7   door opening, the garage door instead

8   closed and the light went on.  And again,

9   this is according to the police.  The

10  wife went into -- she pulled into the

11  garage and found her husband unresponsive

12  in the kitchen by the doorway and

13  subsequently called the police.  What I

14  saw was kind of a neat and somewhat tidy

15  home, except for the kitchen, which was a

16  bit messy, but not really unusual.  Went

17  in through the front door of the house,

18  to our right hand side was sort of a

19  parlor or sitting area.  To the left hand

20  side was a dining room area, and as I

21  turned into the dining room area, there's

22  a large glass table, and as I proceeded,

2529

1          the dining room was relatively neat.  The

2          only thing that I noted in the dining

3          room of interest was that there was a

4          plate or platter which had rolling

5          papers, possibly a roach clip and some

6          green leafy substance.  So, as I'm

7          standing in the dining room with my back

8          towards the living room -- I am sorry, as

9          I'm standing in the dining room with my

10         back facing or in the dining room, on the

11         left hand side was the kitchen, it was

12         untidy.  As I went over more, about

13         midway, there was an island which

14         separated the kitchen from a small

15         hallway, and in that hallway, there was

16         the body of the individual in question.

17         And this individual was laying face down

18         and his head was sort of wedged up by the

19         counter and by the doorway that led to

20         the garage.

21    Q.   What did you do next?

22    A.   Well, first thing you do is basically, before

2530

1      touching anything, you photograph, try to

2      document your findings before anything is

3      disturbed.  So, I documented my findings

4      as I first encountered the body, then you

5      want to have a rough idea, because like I

6      said, initially, I received my phone call

7      that we were dealing with a suicide and

8      just the circumstances and the situation,

9      did not look like a suicide.  You

10     document things that may be relevant to

11     the subsequent work, after we documented

12     the firearm that was on the step, after

13     we documented the position of the body,

14     after we documented some of the

15     perforations -- one of the perforations

16     in the wall, we then began to examine the

17     body to try to determine why did he die.

18     Is this due to a gunshot wound?  Have we

19     got any type of blunt force trauma?  If

20     it is due to a gunshot wound, how many?

21     So basically, you also examine the body

22     to see or get an estimate as to how long

2531

1              this individual was dead.  Essentially,

2          the body was still somewhat tepid to

3          slightly warm.  The body was not in full

4          rigor mortis, so he didn't die too long

5          after the authorities got the telephone

6          call.  In addition, when we examined the

7          body, just to give the police some idea

8          of how many gunshots wounds, types of

9          gunshot wounds, we also recovered

10         projectile in between his black T-shirt

11         and his skin.  So again that was the

12         cursory examination at the scene.  And

13         again, after you perform your cursory

14         examination, you dictate your findings

15         and you opine a speculative cause of

16         death and a speculative manner of death.

17  Q.    Did you find any firearm?

18  A.    Yes.

19  Q.    Would you tell the Jury where that was?

20  A.    Basically, if we take a look in the kitchen,

21         coming out of the dining room, you have

22         the island that separates the small

2532

1          hallway, and you have the door that leads

2          into the garage.  On the first step down,

3          leading into the garage, there was a

4          silver colored revolver.

5   Q.   And did you determine or anyone in your

6          presence determine whether or not that

7          revolver was loaded?

8   A.   Basically, we examined, we opened up the

9          cylinder, we looked at the cartridges in

10          the revolver and none of the cartridges

11          had any firing pin impressions, so

12          therefore, the firearm had not been

13          discharged with those cartridges in

14          there.

15   Q.   Now, you indicated that there was a bullet

16          recovered?

17   A.   Yes.

18   Q.   Where was that?

19   A.   Basically, that projectile was recovered in

20          between the black T-shirt and the skin.

21   Q.   And what was done with that bullet?

22   A.   I photographed the bullet and turned it over

2533

1           to the police.

2  Q.    Is that unusual, in your experience to have a

3           gunshot, perhaps take place where a

4           bullet is recovered, outside the body?

5  A.    No, it is not unusual.  It does occur.  I

6           wouldn't say it is an every day

7           occurrence, but you have to be very

8           careful, because sometimes projectiles,

9           after passing through individuals, may

10          get lodged in clothing and jackets, and

11          you have to be careful not to lose those

12          projectiles.

13  Q.    Did you determine where that bullet, if indeed

14          it hit the victim, where it entered?

15  A.    Well, more likely than not, after you have all

16          of the information, after you examine the

17          body, after you perform the autopsy, then

18          you can basically opine and say, more

19          likely than not, that was the projectile

20          from the gunshot wound to be, that was to

21          the right back.

22  Q.    And so, you attribute it to a gunshot wound to

2534

1               the back of the victim?

2   A.   Yes.

3   Q.   And it exited where?

4   A.   On the right side of the chest, I believe.

5   Q.   Now, Doctor, we'll get to the report and your

6               slides from this when we go into that in

7               more detail.  Briefly, since you are

8               initially at the scene, would you

9               describe the area that had blood and the

10              type of blood trace evidence that you

11              saw?

12  A.   Well, I'm not a blood spatter expert, but

13              again there was blood on the floor.  The

14              individual was lying in a pool of blood.

15              There was some smearing.  There appeared

16              to be several footprints that you could

17              make out in the blood, and also, where

18              that kitchen counter met the wall by the

19              garage, there was also some spray or

20              splatter in that area there.

21  Q.   Would you describe what you mean by splatter?

22  A.   Splatter, sort of speaks for itself, spraying,

2535

1              splatters of blood.

2   Q.   Blood that has some force?

3   A.   Spray or splatter.

4              MR. CONSOLDANE:  I object to the way

5   he phrased that question.  That was leading.

6              THE COURT:  Your objection is what,

7   Tony?

8              MR. CONSOLDANE:  He was trying to

9   say that it was with force and the Doctor did not

10  say that.

11             THE COURT:  The Doctor has testified

12  that there was a splatter of blood.  I think that

13  that is something within common knowledge.

14  Q.   For example, did you see any smears?

15  A.   Yes.

16  Q.   And did you see spots or drops of blood?

17  A.   Yes.

18  Q.   And they are all different?

19  A.   Yes.

20  Q.   And are they all important to you?

21  A.   Not in this particular case.  It is a function

22       of the case, what we have is you take a

2536

1          look at the scene, and you take a look at

2          what you find in the scene, you try to

3          correlate that with the body and have

4          some idea as to the turn of events.  In

5          this case, the blood that was by the

6          kitchen counter on the wall, again, would

7          indicate to me, based on this

8          individual's injury, that either he came

9          in contact with those surfaces  or

10          because of the nature of the wound, some

11          of the blood may have gushed forth as a

12          result of the wounds.

13   Q.   And that was in the area that was below the

14          counter top?

15   A.   Right.  That island that separates the main

16          part of the kitchen from that little

17          hallway that had the door leading to the

18          garage, it was on that wooden counter.

19   Q.   Now, Doctor, when you document what you see

20          and you write that down, do you not?

21   A.   Yes.

22   Q.   And then the body is subsequently removed?

2537

1   A.   Yes.

2   Q.   And where did you take the body?

3   A.   The body went to Trumbull Memorial Hospital.

4   Q.   And did you on December 12th, around 1:00,

5        perform an autopsy?

6   A.   Yes.

7   Q.   And would you tell the Jury what you did and

8        who was involved?

9   A.   Basically, as I said earlier, you try to get

10       as much information as possible from the

11       police, you try to get EMS run sheets,

12       and after you got as much of that

13       information as possible, once the body

14       arrives at the autopsy suite, you have to

15       be careful as far as clothing removal.  I

16       believe that there were certain items of

17       clothing that were given to the police

18       there at the scene, so that they don't

19       become too blocked off by blood, that

20       might obscure some of the vital evidence.

21       Basically, you take your X-rays to

22       basically see if there are any retained

2538

1            projectiles or anything there and begin

2       with the autopsy.

3  Q.    Did your X-ray find anything?

4  A.    Yes.

5  Q.    And would you tell the Jury what that was?

6  A.    There was one projectile that was inside his

7            head.

8  Q.    And what else did you see when you reviewed?

9  A.    Basically, when you do the autopsy, do the

10           external examination, what does this

11           person look like without any injury,

12           without any trauma, any scars or any

13           tattoos.  You then concentrate or hone in

14           on medical therapy, what has been done to

15           this person medically.  You then

16           concentrate on evidence of injury.  What

17           injuries does this individual have?  And

18           then finally, when you complete the

19           examination, you have your autopsy

20           findings, which that second or word or

21           phrase, you document the major findings.

22  Q.    How long did it take you to do the autopsy?

2539

A.    I began at 1:00 in the afternoon and I

      finished up at 5:30 that afternoon on the

      12th of December.  Basically five and a

      half hours.

Q.    Were there any officers present from Howland

      Police Department?

A.    I believe there were.

Q.    And did you turn over blood and a bullet to

      the Howland Police Department?

A.    I turned over a projectile from the brain to

      James Campbell who is from the Howland

      Police Department.

Q.    Doctor, you have been going through one of the

      documents that you have, several there,

      would be State's Exhibit 262; could you

      identify it, please?

A.    State's Exhibit 262 consists of 11 pages of

      the narrative and it is a true and

      accurate copy of the autopsy report, the

      original autopsy report that is in the

      case file.

Q.    And in your findings, what injuries did you

2540

```
 1              find to the victim, and by the way, what
 2              size of a man was Robert Fingerhut?
 3    A.    He was five foot six to five foot seven, and
 4              estimated to weigh between 215 and 225
 5              pounds.
 6    Q.    And what age was he?
 7    A.    He was 56 years old.
 8    Q.    And his full name was Robert S. Fingerhut?
 9    A.    Yes.
10    Q.    White male?
11    A.    Yes.
12    Q.    And what injuries did you find and report that
13              he suffered?
14    A.    Basically, there were four areas of injury.
15              The first one was gunshot wounds.  The
16              second area was lacerations or tears.
17              The third area was abrasions or scrapes
18              and the fourth area was contusions or
19              bruises.
20    Q.    Now as to the first area, how many gunshot
21              wounds?
22    A.    There were three.
```

2541

```
1   Q.   And what part of his body sustained the
2             initial strike?
3   A.   As far as the initial strike, I don't know
4             which one came first.
5   Q.   I mean parts of the body?
6   A.   Basically, gunshot wound A was a penetrating
7             gunshot wound of the left side of the
8             head on the top.  Gunshot wound B was a
9             perforating gunshot wound involving the
10            right side of the back and chest; and
11            gunshot wound C was a graze wound of the
12            back, that was on the upper right back.
13  Q.   And B and C both, the entrance wound or
14            entrance area was the back?
15  A.   Yes.
16  Q.   And the top of the head, would you tell the
17            Jury what direction the bullet traveled?
18  A.   Basically, the top of the head, which is
19            gunshot wound A, that went straight down.
20            It involved the left side of the scalp
21            and just basically went straight down
22            into his brain.
```

2542

1   Q.   It went down like that?

2   A.   Yes, straight down.

3   Q.   Now, the lacerations, would you describe

4        those?

5   A.   Basically, in between the webbing of the left

6        thumb and left index finger, when I got

7        to the scene, it appeared to be a gunshot

8        wound, and then at autopsy I simply

9        described it as a laceration or tear.  So

10       the webbing here was torn and that could

11       have come from a number of various

12       things.  If someone is struck with a

13       blunt object, it can certainly create

14       that type of tearing.  If one is shot, I

15       have seen projectiles give you the same

16       type of tearing, and with the naked eye,

17       I was unable to distinguish whether we're

18       dealing with a gunshot wound or a tear,

19       because that part of the hand was struck

20       by something.  And so, with that

21       particular gunshot wound, I had to wait

22       until I reviewed the tissues underneath

2543

1       the microscope to understand that type of

2       question.  The answer as to what the

3       tearing is in between the webbing or his

4       index finger or thumb of the left hand,

5       that is through a gunshot wound, because

6       under the microscope, you could see the

7       black carbon like debris which is

8       consistent with soot from a firearm.

9   Q.  That would sometimes be referred to as gunshot

10      residue?

11  A.  Yes.

12  Q.  And when you have that soot, does that denote

13      to you close distance from the firearm?

14  A.  Yes.

15  Q.  And did you find any of that soot in the

16      dermis and epidermis of his head?

17  A.  Yes.  In the skin of his head, again, look at

18      it with the naked eye.  I couldn't really

19      distinguish, do we have gun powder

20      residue there or not.  I had to wait

21      until my microscopic slides came back to

22      look at it under the microscope, to see

2544

1              that truly indeed there was black carbon

2       debris consistent with soot.

3    Q.   And it was both epidermis and dermis?

4    A.   Skin.

5    Q.   You do make a differential on your report, I

6              believe?

7    A.   Yes.  Basically, the skin is almost like a

8              sandwich, you got your one slice of bread

9              and you got your salami, and also would

10             be on the slice of bread and the salami.

11             The epidermis would be the top part and

12             the dermis would be the salami part.  It

13             was black soot in both of those parts.

14   Q.   And how close of a distance would that be if

15             you have an opinion?

16   A.   When you have soot, unless you have the

17             suspect firearm in custody, and that

18             suspect firearm is test fired with

19             similar ammunition, it becomes a range,

20             and usually, the farthest distance out,

21             would still get some of that gunshot or

22             gun powder deposit, is about 24 inches.

2545

```
 1              So, when I see soot or black particulate
 2              material consistent with soot, we're
 3              talking about 24 inches or under for the
 4              distance from the muzzle of the firearm
 5              to the target.
 6    Q.   Would a revolver with a two or four inch
 7              barrel be different than one with a six
 8              or eight inch barrel?
 9    A.   Yes.
10    Q.   And explain.
11    A.   Well, I don't know how many people here are
12              hunters or deal with firearms.  My
13              limited experience with firearms, let's
14              take a look at a barrel that is maybe
15              about six inches or four inches,
16              probably.  What happens when you have a
17              firearm that is discharged, firing pin
18              strikes, either the primer or the rim, an
19              explosion takes place, and what happens
20              in the barrel of the gun, all of that gun
21              powder is burning, and as a result of
22              that, it will burn down the length of the
```

2546

1          barrel.  Now, if I have a barrel that is
2          almost two feet, most of that gun powder
3          is going to end up burning so you are
4          going to have very unburnt gun powder
5          coming out of the end.  Because
6          throughout the entire distance of the
7          barrel, it is burnt.  If I take the same
8          projectile and put it in a very short
9          barrel, what is going to happen, I don't
10         have enough barrel to allow for all of
11         that gun powder to burn, so I'm going to
12         have more unburnt gun powder coming out.
13         Now, the finer points of ballistics
14         between disposition and the two-inch,
15         four-inch, six-inch-inch barrel, probably
16         get someone from ballistics to talk about
17         that, but if you take a similar firearm
18         with a two-inch barrel, let's say for
19         argument sake, a .38 caliber barrel with
20         a two-inch, four-inch barrel, six-inch
21         barrel, fire at same distance from the
22         target.  You are going to see three

2547

1          different patterns of soot.  In answer to

2          your question, usually in a shorter

3          barrel you would expect to see more of

4          the residue or gun powder come out,

5          simply because you ain't got enough

6          barrel for all of that gun powder to burn

7          out.

8    Q.   But you give as a general rule, 24 inches.

9    A.   As a general rule about 24 inches.

10   Q.   Did you, when you described gunshot wound A to

11         the top of the head, did you notice

12         anything about the entry of the bullet

13         into the skull?

14   A.   Yes.

15   Q.   Could you tell what findings you made?

16   A.   Basically, in gunshot wound A, it was an

17         atypical gunshot wound for a number of

18         reasons.  Most of the time, in fact, when

19         you fire a projectile, what happens to

20         that projectile, it will travel straight.

21         And what will you get when that

22         projectile strikes a target?  You will

2548

1          get a round hole.  And the same thing you

2          can see on the skin, you will get a round

3          hole, and the gunshot wounds to the head

4          is the projectile penetrated the skull,

5          is that you get a round hole.  In this

6          case, we had an oval hole, which tells me

7          that projectile was either tumbling or

8          coming at the skull on its side.  The

9          other unique feature is in forensic

10         pathology, this is referred to as open

11         quotation marks, a keyhole type entrance

12         wound, which told me that the projectile

13         was tumbling to give me that particular

14         atypical, unusual, but characteristic

15         wound of entrance in the skull.

16   Q.    Now, assume that the laceration that you

17         described was struck by the bullet prior

18         to hitting the head, such in this manner.

19   A.    Yes.

20   Q.    Would that explain tumbling?

21   A.    Yes.  Projectile will travel in a straight

22         line unless it hits an intermediary

2549

1          target.  Once it hits either an arm,

2          jewelry, it will deviate the path of that

3          projectile.  That bullet will deform.  It

4          will begin to tumble.  It will not travel

5          no longer in a straight line, and so

6          therefore, taking a look at gunshot wound

7          A to the top of his head, which was in

8          atypical gunshot wound, getting my

9          microscopic back, it taught me that there

10         was soot in between here.  The most

11         likely explanation for that, the typical

12         gunshot wound would be that it penetrated

13         his hand first in the area of the webbing

14         in between the thumb and the index

15         finger.

16    Q.   Taking the location of the body, and the

17         significance of gunshot wound A as far as

18         what fatal effect would that wound have?

19    A.   Gunshot wound A, went straight into his brain

20         and it will drop you like a sack of

21         potatoes.

22    Q.   Looking at his body and the splatters that

2550

1      were present, can you give an opinion as

2      to how a gunshot wound, how he would have

3      to be located with the wound to the web

4      of his hand, his left hand, and the top

5      of his head?

6   A.   Basically, it was straight on, so there's a

7      number of location that this individual

8      could have been in.  Again, with the

9      projectile coming straight down like

10     this, the head is a ball.  It can move in

11     a wide variety of positions.  Let's say

12     if you are going to shoot me, to have

13     this type of projectory, my head would

14     have to be down, and where would my hand

15     be to give me the soot?  It would have to

16     be in this type of position.  So that is

17     one hypothetical location, to give you

18     that type of a wound.  Another type of

19     hypothetical location, is that someone is

20     down in the corner.  Let's say this is

21     the doorway right here leading to the

22     garage, and on this side is where the

2551

1          counter is.  If someone is in this

2          position, in a crouching stance, you

3          would get the same type trajectory.

4   Q.   And if one were down next to a counter, say

5          right here, down here, and a wound went

6          into the head, would you get splatters

7          from that type of wound?

8   A.   You would expect to see splatters from the

9          area of the wrist -- I'm sorry, the area

10         in between the webbing of the thumb and

11         the index finger, and also from the

12         gunshot wound to the head, you would

13         expect that to bleed as well.

14  Q.   Now, did you notice, and I think you described

15         a bullet hole, that was a graze wound?

16  A.   Yes.

17  Q.   Which was C?

18  A.   Yes.

19  Q.   And that wound was not of significance as far

20         as cause of death?

21  A.   Again, all gunshot wounds have the ability to

22         be lethal or fatal.  Out of all of these

2552

1      gunshot wounds, it was certainly less

2      lethal than the others, but I can't

3      exclude the fact that he may have died

4      from infection on the basis of that

5      gunshot wound.  It was certainly less

6      lethal than the others.

7  Q.   You found a bullet that was in the basement

8       area?

9  A.   I found a hole in the wall as one went down to

10      the steps leading to the basement.  Now

11      whether a projectile was recovered from

12      that perforation, you have to ask other

13      individuals.

14 Q.   Did you notice the type of hole that was

15      there.

16 A.   It was an irregularly shaped hole.

17 Q.   Sort of like a keyhole type?

18 A.   It wasn't round.  It was more cylindrical or

19      oblong.

20 Q.   That would be consistent with what you told

21      the Jury with the hand up there.  If the

22      bullet hit the shoulder, back shoulder,

2553

1    and then went and hit the wall or the

2    area where the steps were, that you would

3    have this tumbling of the bullet?

4 A. Once you have a projectile that strikes an

5    intermediary target.  That of course is

6    deviated, the projectile can begin to

7    wobble, began to tumble, it can travel

8    sideways.  And so, if you take a look, if

9    your question is, is that hole on the

10   basement steps consistent with the

11   projectile traveling sideways, the answer

12   is yes.

13 Q. And also, if one were shooting the victim, and

14   his finger got in the way, that would

15   also, could cause tumbling?

16 A. Yes, any time you have an intermediary target

17   which interferes with the trajectory or

18   path of the bullet, you can cause that

19   projectile to deviate.

20 Q. Now, Doctor, I am going to hand you what has

21   been marked as State's Exhibit 263.

22   Would you identify that document, if you

2554

1           are able, please?

2  A.   State's Exhibit 263 is a copy of our

3           microscopic examination and it is a true

4           and accurate copy of the original in the

5           case file.

6  Q.   And that mentions the soot that you found in

7           the two areas of the victim?

8  A.   Yes.

9  Q.   The head and the hand?

10  A.   Yes.

11  Q.   Number 264.

12  A.   State's Exhibit 264 is a true and accurate

13           copy of our toxicology report that we

14           received from the Cuyahoga County

15           Coroner's office, and it is a true and

16           accurate copy of the original in the case

17           file.

18  Q.   And would you tell the Jury what toxicology is

19           and what was done in this case?

20  A.   Toxicology is that branch of chemistry where

21           bodily fluids, such as blood, urine, are

22           analyzed for the presence or the absence

2555

1             of certain drugs.

2    Q.   And did you find any drugs in the system of

3             Robert S. Fingerhut?

4    A.   The report we received back was completely

5             negative for drugs, in both the blood and

6             the urine.

7    Q.   And was there any alcohol in his system?

8    A.   No.

9    Q.   Number 264-A, if you could please identify it?

10   A.   264-A is simply the standard bureaucratic form

11            that we receive from Trumbull Memorial

12            Hospital, stating that they took X-rays

13            for us and that I reviewed the X-rays and

14            it is a true and accurate copy of the

15            original in the case file.

16   Q.   Now, did you find any injury to the right

17            forehead of Robert Fingerhut?

18   A.   Yes.

19   Q.   And did you find a laceration or lacerations?

20   A.   Yes.

21   Q.   And would you describe those to the Jury,

22            please?

2556

1   A.    On the right forehead, the upper outer right

2         forehead had a three-quarters of an inch,

3         by less than 1/16th of an inch, linear

4         laceration, or tear, that was two and a

5         half inches below the top of the head,

6         and the center of it was more than

7         three-quarters of an inch to the right of

8         the anterior mid line.  The mid line is

9         that imaginary line that divides the body

10        into a right and left half.  So on the

11        right side of the forehead, basically, he

12        had a three-quarters of an inch by less

13        than 1/16th of an inch tear or

14        laceration.

15  Q.    And the difference between a laceration and

16        abrasion?

17  A.    When dealing with blunt force injury, a

18        laceration is a more severe injury.  It

19        is a tear of the skin, and the way you

20        know that, is that you can see what is

21        known as connective tissue bridging.  Not

22        all of our tissue is made the same way.

2557

1       The blood develops, the fibrous tissue is

2       a lot tougher than the regular stuff that

3       makes up skin.  So, if one receives a

4       blow with a blunt object, the skin will

5       have a tendency to tear, and if you look

6       inside the tear, what you will see are

7       some of the blood vessels, some of the

8       fibrous tissue and some of the other

9       strong tissue still in the area of

10      injury.  And that is called connective

11      tissue bridging and that is one of the

12      ways to distinguish what type of blunt

13      force you are dealing with.  An abrasion

14      on the other hand is simply a scrape, and

15      bicycle riding as a kid, we probably have

16      fallen at one time, skinned our knee and

17      so an abrasion is simply scraping the top

18      layers of the skin off.  And that would

19      be the basic difference between the

20      abrasion and the laceration.

21  Q.  Now the laceration which you described or

22      associate with blunt force trauma, would

2558

1       that be consistent with being hit with a

2       pistol?

3   A.   Yes.   It would be consistent with being hit by

4        some blunt object.

5   Q.   And the nose of the victim, did you notice

6        anything about the nose area of the

7        victim?

8   A.   Yes.

9   Q.   And would you tell the Jury what you noticed?

10  A.   On the left side of the bridge of the nose,

11       there was a one-quarter of an inch by

12       one-quarter of an inch upside down V type

13       of abrasion or scrape.

14  Q.   And do you know whether or not the victim wore

15       glasses or did you find glasses or a set

16       of glasses at the scene?

17  A.   I believe that there were glasses at the

18       scene.

19  Q.   And if one were subject to blunt force trauma

20       with glasses on, would that type of

21       injury possibly could have been made?

22  A.   It is consistent with that.  Many times, like

2559

1      I said, you respond to all types of

2      unnatural deaths and there are times when

3      we respond to traffic fatalities in the

4      middle of the night where everything is

5      all over the place and you have poor

6      lighting and the question comes up, was

7      this driver or passenger wearing glasses.

8      Instead of going through all of the glass

9      and grass and bushes, sometimes you can

10     basically look at the individual's face

11     and see marks that would be consistent

12     with impact and the bridge of the nose

13     part of glasses creating an impression.

14     It is consistent with a blow to the face

15     while wearing glasses.

16  Q.  Now, Doctor, you took photographs and in fact,

17      you generally take 35 millimeter slide

18      type of photographs?

19  A.  Yes.

20  Q.  And you have -- we have already marked some

21      photographs, and you have reviewed them?

22  A.  Yes.

2560

1  Q.   Keeping these to yourself at this point, I

2         would like you to go through the

3         photographs and, one, tell us if you

4         recognize them and can identify each one

5         of them; and two, whether or not your

6         carousel is set up, so you can show the

7         exact photographs in order on the screen

8         that is in the courtroom.

9  A.   State's Exhibits 4 through 60 are true and

10        accurate duplicates of the originals that

11        are in the case file, and in the

12        carousel.

13  Q.   And Doctor, some of the photographs, they are

14        not in numerical order, but they are 4

15        through 60?

16  A.   That is correct.

17  Q.   Would you please -- I would like to show the

18        slides now.

19          THE COURT:  Yes.

20  A.   Basically, this is what I described earlier as

21        I walked into the dining room area, over

22        here would be the glass table that I

2561

1    described in the dining room, and on the

2    edge of that table, was the platter or

3    plate that contained a green leafy

4    substance, some rolling papers.  You

5    could basically see a pair of tweezers

6    here, or a roach clip, and a rolling

7    machine, some ash.  And again, this is

8    the same matter from a different angle.

9    Once again you can see the rolling

10    papers, rolling machine, some green leafy

11    substance.  This is the body, as I

12    described it when I first saw him, and we

13    can see the kitchen counter over here.

14    We can basically see the doorway that

15    leads to the garage.  On this side would

16    be the kitchen, and we have our counter

17    here, and here we're basically seeing the

18    body as I had first seen him.  This is

19    some of the blood spatter that we were

20    talking about earlier on the wall, and on

21    parts of the cabinet.  We have a lottery

22    ticket here.  His head is pretty much

2562

1    nestled in a pair of boots.  This is a

2    photograph from the garage.  I was inside

3    the garage and I took this photograph to

4    demonstrate that we have a puddle of

5    blood here, that there's some droplets in

6    this particular area.  And what I

7    described earlier, some type of smearing,

8    you can see some area of smearing over

9    here.  I believe there's a footprint in

10   this area as well.  This is the door

11   here, that would close into the garage,

12   closing off the garage.  This is what I

13   described earlier, you had one step

14   leading down into the garage, and again,

15   we see another footprint here, and on

16   that step leading into the garage, we

17   have a silver colored revolver.  The

18   revolver was examined and then as I had

19   stated earlier, on all of the cartridges,

20   there were no firing pin impression which

21   would tell me that none of these

22   cartridges were discharged or fired from

2563

1    that particular revolver.  Again, going

2    back, we can basically see that there's a

3    bag of unopened potato chips over here

4    and it gives us a better view of the

5    garage door and its location.  This is a

6    close-up photograph of what we discussed

7    earlier with some of the blood splatter

8    on the cabinet door.  And again, just

9    documenting how his body was wedged up

10   against the counter, we had the unopened

11   bag of potato chips.  We had a large

12   insulated drinking cup, a case of Pepsi.

13   On top of that is a bottle of water,

14   drinking type water, and here on the

15   other side, we can see how his right leg

16   is wedged up against a case of dog food,

17   and how his left leg is up against the

18   crumpled carpet.  There's another view

19   where you can see his right leg up

20   against the dog food.  His left leg up

21   against the crumpled carpet.  When we

22   photographed him and examined him, just

2564

1      going through his clothing, this was the

2      projectile I recovered that was in

3      between his clothing, his black T-shirt

4      and the skin.  Photographed that and

5      turned it over to the police.  And again,

6      this is a close-up of what we talked

7      about earlier, the laceration or injury,

8      in between the thumb and index finger of

9      his left hand.  Now, the Prosecutor

10     brought up the hole on the stairs.  To

11     get some perspective here, these are the

12     stairs leading down into the basement.

13     And as we go straight out, we can barely

14     make out the foot of Mr. Fingerhut, and

15     straight ahead where the light bulb is,

16     is the garage.  Right here I am standing

17     on the stairs which lead to the basement,

18     looking directly out into the area of the

19     garage, and where Mr. Fingerhut is.  Now,

20     I'm standing where Mr. Fingerhut is and

21     as you look back, right to the right side

22     of Chief Wahoo, we basically see this

2565

1    perforation, or hole in the dry wall.

2    And this is a close-up of the perforation

3    in the hole in the drywall, and as

4    discussed earlier, it is not a straight

5    on round perforation, it is sort of a

6    cylindrical or sideways type of

7    perforation.  And that is basically it as

8    far as the scene is concerned.

9         Here we're at the autopsy suite.

10   What we normally do with our victims is

11   we do overall photographs; in other

12   words, we take complete photographs of

13   the body, front and back.  And then we

14   begin to concentrate on our areas of

15   injury.  This is gunshot wound A,

16   Mr. Fingerhut is lying on his right side

17   and you can basically see the wound for

18   gunshot wound A on the top of the left

19   side of his head.  Again, it shows you a

20   different perspective.  It is an atypical

21   gunshot wound.  It is not round.  This is

22   what is known as a stellate laceration,

2566

1 measures two inches by two inches by two

2 inches. And this is the atypical or

3 unusual wound of entrance. Instead of

4 being round, it is somewhat oval, and if

5 we notice the back part here, this is

6 what is known as external beveling, and

7 this is what showed me that the

8 projectile was tumbling when it struck

9 his skull. The human skull is simply

10 like a peanut butter and jelly sandwich

11 on toast. You have got one slice of

12 bread, in between the bread you have got

13 your bone marrow and then you have got

14 another section of bone underneath, so we

15 can picture a peanut butter and jelly

16 sandwich on toast. What happens when you

17 have a projectile coming in straight on

18 and if we had an easel here, I could

19 probably demonstrate a lot easier. You

20 will have a hole, and then go throughout

21 the marrow and then the bottom layer of

22 bone will be beveled out. It is almost

2567

1    like a laundromat where the kids shoot

2    out the windows with the BB's.  You have

3    all of that glass beveling out.  It is

4    the same thing and what we see in order

5    to determine directionality, especially

6    in gunshot wounds of the head is we look

7    for beveling, so as it strikes that first

8    layer of toast, you are going to have a

9    small hole.  It is going through the

10   peanut butter and jelly or the marrow and

11   as it pops out, you will have an area of

12   bone that is beveled.  In a gunshot wound

13   where the projectile wound is tumbling

14   and coming at its side, what we have is

15   as it strikes, this part underneath this

16   layer of bone is going to be beveled

17   inside as the projectile tumbles and

18   turns, it will kick this side of the bone

19   out and that would be the external

20   beveling which tells me, that this

21   projectile's pathway has already been

22   deviated by an intermediary target.  It

2568

1          already struck something.

2  Q.   After that struck the victim, how soon would

3          death follow?

4  A.   He would go down like a sack of potatoes, a

5          couple of heart beats, a couple of

6          breaths, not much.  That basically went

7          straight on down directly into his brain.

8          And this is the projectile that I

9          recovered from the brain of

10          Mr. Fingerhut.  This is gun shot wound B.

11          This is the one that involves the back,

12          his right back, right above the armpit,

13          and that pretty much went through his

14          soft tissue and muscle of his back and

15          his chest, it didn't enter the chest

16          cavity, didn't strike his lungs, didn't

17          break any ribs, it just went through all

18          of the soft tissue and muscles.  And

19          again, here we can see gunshot wound B,

20          the entrance, as we talked about earlier,

21          you have a nice round perforation.  And

22          that basically went through his soft

2569

1          tissue and muscle and exited on the front

2          part of the right side of his chest,

3          without penetrating the lung or striking

4          the lung.

5     Q.   No ribs were struck, either?

6     A.   No, I was surprised.

7     Q.   That was the bullet that was recovered in your

8          opinion?

9     A.   More likely than not, yes.

10    Q.   At the scene?

11    A.   Yes.  And this is gunshot wound C, which is a

12         graze type gunshot wound, and graze

13         gunshot wounds are very characteristic.

14         Usually, a graze will strike the body

15         tangentially, coming across like that or

16         straight across like that.  It really

17         won't perforate the body itself, and the

18         way to tell directionality in a grazed

19         gunshot wound is to take a look at the

20         various skin tags and as you can see, I

21         have delineated or marked off a skin tag

22         here and they usually point in the

2570

1    direction that the projectile is coming

2    from.  So, here the overall path would be

3    front to back, and basically, downwards

4    and right to left.  And finally, the

5    laceration or tear which I found in

6    between his index finger and his thumb in

7    the webbing there, and again nothing

8    obvious to the naked eye as far as any

9    kind of soot or gun powder residue, we

10   had to wait for the microscopic slides to

11   come out to view that.  And now if we

12   take a look at all of those gunshot

13   wounds and try to correlate it with the

14   clothing; this is basically the red

15   jacket that he was wearing.  And if we

16   notice, there's a perforation here which

17   would correspond with gunshot wound B and

18   we can see a perforation here, and a

19   perforation here.  I put the arrows.  The

20   first photograph did not have the arrows.

21   The second photograph does have the

22   arrows to demonstrate the perforations

2571

1        and here you can basically see that this

2        one here is consistent with the right

3        back, and this would be the graze wound C

4        to the back, entrance, exit.  And again,

5        the next layer of clothing, he was

6        wearing a young baseball jersey.  And

7        this would be his red shirt, which was

8        next, and once again with the arrows, I

9        have marked where the perforations are.

10       This would correspond with the gunshot

11       wound B; this would correspond with

12       gunshot wound C; and the back again you

13       see no arrows, and here are the arrows

14       delineating the holes.  And finally, this

15       is his final layer of clothing, his black

16       T-shirt, and once again on the back side,

17       there are two holes that I have marked

18       with arrows, which would correspond to

19       gunshot wound C and one hole here that

20       would correspond to gunshot wound B on

21       the back.  This is the front of the

22       shirt, and again, on the front of the

2572

1          shirt, we have two perforations which

2          would be responsible for the projectile

3          exiting, and one of the reasons why we

4          have two perforations is simply if

5          clothing is folded, the projectile can

6          come out, stop.  It loses most of its

7          energy so that would give us two

8          perforations.  And finally, this is what

9          we talked about earlier, as far as his

10         right forehead goes, this is the

11         laceration or tear that we see here, and

12         then a second such laceration or tear

13         underneath that.  And this is what I

14         referred to earlier, that upside down V

15         on the bridge of his nose that you can

16         see here.  And a small scrape on his

17         right hand as well as a bruise or

18         contusion on his left forehead.

19    Q.   Now lacerations to bruises and a scrape on his

20         hand, are those premortal?

21    A.   Yes, they happened while he was alive.

22    Q.   I'm going to hand you 265 and 266.  Can you

2573

1         identify those items and tell the Jury

2         what you did with them?

3    A.   State's Exhibit 265 is one purple topped tube

4              of blood that we took at the time

5              autopsy.

6    Q.   The blood of Robert Fingerhut?

7    A.   Yes, and that was turned over to Officer

8              Campbell from the Howland Police

9              Department.  State's Exhibit 266 is an

10             envelope marked Howland P.D., number

11             five.  There's also a number there,

12             51-35755, it has our little sticky label

13             that we attach to the evidence that we

14             give.  It has the case number, the

15             individual's name, his age, race, sex,

16             the date, and what it is.  And here on my

17             sticky label, it says, "projectile A

18             recovered from brain."  And inside is a

19             second sticky label.  Basically, when

20             dealing with evidence, we have got to be

21             careful so any time I get a projectile I

22             always throw a sticky label in with the

2574

```
 1              projectile which means this label has to

 2              follow the projectile wherever it goes.

 3              It has our case number, the name, Robert

 4              Fingerhut, age, race, sex, the date and

 5              what it is.  Projectile A, recovered from

 6              the brain.  And this is indeed the

 7              projectile that I recovered from Mr.

 8              Fingerhut's brain.

 9    Q.    And what did you do with that?

10    A.    Basically, I turned it over to Officer

11              Campbell of the Howland Police

12              Department.

13    Q.    And that was on December 12, 2001?

14    A.    That is correct.

15    Q.    Briefly, the slides that you showed to the

16              Jury are the same exact slides of the

17              photographs that you have identified as

18              being numbered between 4 and 60?

19    A.    Yes.

20    Q.    And there were approximately 40 photographs?

21    A.    Yes.

22    Q.    And there were approximately 40 photographs?
```

2575

1  A.  Yes.

2  Q.  What kind of disease process, if any, what

3          condition was Mr. Fingerhut in,

4          physiologically speaking, without the

5          gunshot wounds?

6  A.  He needed to exercise a little bit more, and

7          probably needed to lay off the beer.

8  Q.  But he was in relatively good health?

9  A.  Yes.

10 Q.  And what was your determination as to cause

11         and manner of death and the time of

12         death?

13 A.  Well, as far as the cause of death, after

14         completing the examination, and having

15         gone to the scene, my opinion regarding

16         cause of death is multiple gunshot

17         wounds.  And my opinion regarding manner

18         of death is homicide.  And as far as time

19         of death, I examined Mr. Fingerhut

20         somewhere about 12:45, 1:00 in the

21         morning.  And on the physical findings

22         there, I would probably put him as six

2576

1          hours or under.  I examined him at about

2          1:00, so the window of time frame could

3          be six hours, four hours, somewhere like

4          that.  Somewhere between 7:00, 9:00,

5          could be closer to midnight as well, but

6          that is the outside part of the window.

7  Q.   9:30 is consistent with your findings?

8  A.   Yes, Sir.

9  Q.   To 11 p.m.?

10  A.   Yes, Sir.

11              MR. WATKINS:  Thank you.

12  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

13  OF HEARING)

14              THE COURT:  Ladies and gentlemen,

15  you have been seated quite a while here.  Let's

16  take a ten minute break.  You are not discuss

17  anything or form any opinion until you return.

18  (Court in recess at 11:25 A.M.)

19  (Resumed in Open Court at 11:40 A.M.:

20  CROSS EXAMINATION BY MR. CONSOLDANE:

21  Q.   Good morning, Doctor.

22  A.   Good morning.

2577

1   Q.   Just a couple of quick questions.  First of

2        all, the overall condition of Mr.

3        Fingerhut's body.  If you take away the

4        gunshot wounds and just look at the

5        abrasions and contusions, and other

6        marks, was that kind of indicative that

7        he was in a fight?

8   A.   It is consistent with being in a struggle.

9   Q.   And I'm going to show you what has been marked

10       as State's Exhibit 21.  And there's a

11       contusion and cut above his eye.

12  A.   There's a bruise or a contusion on the left

13       side of his forehead and a laceration or

14       tear above his right eye.

15  Q.   Doctor, I'm going to hand you what has been

16       marked as -- well, this says 268.  I got

17       the wrong one.  I am looking for number

18       251.  I'm going to hand you what has been

19       marked as Exhibit 251.  And have you seen

20       that before, Doctor?

21  A.   I don't know.

22  Q.   Does that look like the gun that you found at

2578

```
 1              the scene?
 2   A.   Yes.
 3   Q.   And if somebody had been holding the gun, and
 4              somebody grabbed their hand, could that
 5              have caused that mark above his eye?
 6   A.   Yes.
 7   Q.   So, in other words, if you would grab me with
 8              your left hand here like that and pushed
 9              back up, that could cause that mark?
10   A.   Right.
11   Q.   And the place where you found the body was on
12              the kitchen floor?
13   A.   It was in that hallway, which would be
14              considered part of the kitchen area.  It
15              leads from the dining room into the
16              garage.
17   Q.   Now, was that hall -- but there was a step
18              down to the garage?
19   A.   Yes.
20   Q.   And how many steps was there?
21   A.   One.
22   Q.   And how many feet higher was the floor in the
```

2579

```
 1              kitchen than the garage?
 2   A.    I didn't measure that, but probably no
 3              different than anybody else's step, up
 4              into their kitchen.  I'm not an engineer,
 5              I don't know what the current code is for
 6              how many inches you have to have between
 7              the step and the floor, so four inches,
 8              five inches, I don't know.
 9   Q.    Let's go on with taking the hole that you
10              found in the cellarway going down, going
11              down the steps.  You said it was oblong?
12   A.    Right.
13   Q.    Now, if Mr. Fingerhut had been holding a gun
14              in his right hand, and Nathaniel had
15              grabbed his -- went to grab it with his
16              left hand and it was shot, that would
17              have been enough to turn the bullet to
18              make it go into the wall in an oblong
19              fashion?
20   A.    I don't know if it would have been enough or
21              not enough, but if you proffer the
22              hypothetical in that particular
```

2580

1          situation, that that projectile striking

2          the intermediary target, it certainly is

3          consistent with deviating the pathway of

4          that projectile causing it to go oblong.

5    Q.    Have you ever had to deal with people shooting

6          themselves?

7    A.    Yes.

8    Q.    Accidentally?

9    A.    Rarely, usually those are homicides disguised

10         to look like accidents, but those are

11         extremely rare.

12   Q.    If somebody is right handed, it is pretty hard

13         to shoot themselves in the right hand

14         under normal circumstances?

15   A.    What is normal?  What is abnormal?  There's

16         exceptions to every rule.  Depending on

17         the circumstances, the person who is

18         normally right handed may switch and hold

19         the firearm in the other hand to fend off

20         an individual who may have another

21         instrument.  It is variable if you are

22         asking, if you're right handed and you

2581

1           hold the firearm in your right hand, I
2           think it would be difficult to shoot
3           yourself in the right hand, because that
4           is the hand holding the firearm.
5    Q.  Now, have you been back to the scene lately?
6    A.  No.
7    Q.  Just that night was the only night you were
8           there?
9    A.  Yes.
10   Q.  Now, if -- would it have been possible, that
11          if this was the -- this was the counter
12          where Mr. Fingerhut was, if he was down
13          like this with the gun, holding the gun,
14          and Nathaniel was standing maybe
15          approximately, well, over this way, over
16          here --
17   A.  By the garage door.
18   Q.  Right, and he shot him, could have fired two
19          shots from pretty much the same angle,
20          one could have grazed his back and the
21          other one could have hit his head as he
22          was down like this.  He may have put up

2582

1           his hand like this, would that have been

2           possible?

3   A.   Yes.

4   Q.   So, actually both of those shots, the one

5           grazing the back, and the one that hit

6           the head, could have came pretty much at

7           the same angle and fairly close together,

8           too?

9   A.   That is correct.

10  Q.   You don't know what the sequence of the shots

11          could be?

12  A.   Probably the last one is gunshot wound A to

13          the head.  As I said, that would drop

14          Mr. Fingerhut like a sack of potatoes.

15          With gunshot wound B or C, I don't know.

16  Q.   If you fired A, I understand where the gunshot

17          wound on the side had been, but if you

18          shot A and then as you fall, he shot the

19          other one, that could have been --

20  A.   In other words A and C?

21  Q.   Yes.

22  A.   Again, what you have to do is in order to

2583

1              create a straight line, simply would have

2              to take the gunshot wound C, you would

3              have to take a string from a volunteer

4              and then run that string directly into

5              the hole, that is in the wall and this

6              would give you some idea or pretty much a

7              pretty good approximation of the position

8              as gunshot wound C was fired.

9    Q.    But it could have been, it could have

10              happened?

11   A.    Again, if you take a look at the angle and the

12              projectory of gunshot wound C, pretty

13              much coming across like that, gunshot

14              wound A will drop him, and so as he's

15              dropping, you would expect a much lower

16              angle there.

17              MR. CONSOLDANE:  Thank you.

18   REDIRECT EXAMINATION BY MR. WATKINS:

19   Q.    By the way, Doctor, were there any gunshot

20              wounds, gunshot holes in the floor by the

21              body?

22   A.    None that I saw.

2584

```
 1   Q.   And the firearm, you don't know who possessed
 2            this gun, do you?
 3   A.   No.
 4   Q.   There's no evidence that Mr. Fingerhut had a
 5            gun in his hand, is there?
 6   A.   To the best of my knowledge, I have no idea
 7            whose firearm that is.
 8   Q.   And a firearm such as the one that was shown
 9            you, the one that you described, that was
10            fully loaded?
11   A.   Yes.
12   Q.   Attorney Consoldane asked whether or not that
13            could have been made in one manner?
14   A.   Yes.
15   Q.   Isn't it also possible that an assailant
16            struck him with a similar firearm right
17            over the forehead?
18   A.   That is also possible.
19   Q.   You don't know that, do you?
20   A.   That is correct.
21   Q.   And the sequence of the shots, as to where the
22            wound had entered, that grazed the right
```

2585

1          back, and the one that went in the

2          shoulder and out the front, you don't

3          know exactly where those shots occurred,

4          do you?

5    A.   No, I don't.

6    Q.   And the hypothetical that was given by

7          Attorney Consoldane was simply a

8          hypothetical.  You have no evidence that

9          it happened that way, do you?

10   A.   No, I don't.

11              MR. WATKINS:  Thank you.

12   RECROSS EXAMINATION BY MR. CONSOLDANE:

13   Q.   But it could have happened that way?

14   A.   Yes.

15   Q.   And one other thing is, you have a picture of

16          the gun laying there.  And this is Mr.

17          Fingerhut's hand?

18   A.   In Exhibit No. 9, yes, it is a photograph that

19          shows the one step leading to the garage,

20          the revolver on the stair next to the

21          case of diet Pepsi and Mr. Fingerhut's

22          hand.

2586

1    Q.   And how far would you say his hand is from the

2         edge of that step?

3    A.   I measured the tiles, the tiles were eight

4              inches, so basically, if you take a look

5              at the diameter, about eight inches.

6    Q.   If the gun -- if he dropped the gun, it could

7              have dropped to there?

8    A.   Certainly could have bounced.

9              MR. CONSOLDANE:  Thank you.

10   REDIRECT EXAMINATION BY MR. WATKINS:

11   Q.   That gun could have been placed there by

12        somebody?

13   A.   There's a wide variety of hypothetical.

14         There's nothing to say one way or another

15         that it wasn't placed there either.

16   Q.   Did you notice any blood on that gun?

17   A.   Nothing obvious.

18              MR. WATKINS:  Thank you.

19              MR. CONSOLDANE:  Nothing further.

20              THE COURT:  Thank you very much for

21   your time.  Ladies and gentlemen, it is a good time

22   to take a break for lunch.  Mr. Consoldane, you

2587

1   asked for an extra few minutes.  If you will be

2   back at 1:05 p.m.  You are not to discuss anything

3   or form any opinions until you return.  Thank you.

4   (Court in recess at 11:55 A.M.)

5   (Resumed in Open Court at 1:30 p.m.)

6          THE COURT:  Ladies and gentlemen, we

7   had another matter that delayed us in starting.  We

8   just concluded that.  Is the State ready to call

9   your next witness?

10          MR. WATKINS:  We'll call Jose

11   Flores.

12                  JOSE FLORES

13   being duly sworn according to law, on his oath,

14   testified as follows:

15   DIRECT EXAMINATION BY MR. WATKINS:

16          THE COURT:  Let me ask one question

17   of the witness.  Do you mind being photographed?

18          THE WITNESS:  No, I don't mind.

19          THE COURT:  Thank you.

20   Q.   Jose, would you give your full name and where

21        you live to the Jury, please?

22   A.   Jose Flores.  Right now I live in Mansfield,

2588

1                Ohio.

2    Q.   And how old are you?

3    A.   24 years old.

4    Q.   And I wanted to direct your attention to I

5              guess back in December of 2001?  Where

6              were you living?

7    A.   I was living in Youngstown.  Market Street.  I

8         was manager of a motel.

9    Q.   What motel were you the manager of?

10   A.   Wagon Wheel.

11   Q.   When did you become manager of the Wagon

12             Wheel?

13   A.   In August of 2001.

14   Q.   Now, where is that located?

15   A.   7015 Market Street.

16   Q.   And what type motel is it, would you describe

17             the size and what you do?

18   A.   It is a single level motel, 21 rooms.  Two

19             Jacuzzi suites, and I was the general

20             manager.

21   Q.   Where would it be located, as far as the

22             Southern Park Mall?  Would it be going

2589

1                    towards Youngstown?

2    A.   If you turn from the Southern Park Mall, it is

3         going towards Youngstown.

4    Q.   And that would also be known as Route 7?

5    A.   Yes.

6    Q.   It is also known as Market Street?

7    A.   Right.

8    Q.   And would it be on your right or left, as you

9         were going from the Southern Park Mall

10        towards Youngstown on Market Street?

11   A.   It would be on your right.

12   Q.   And you were working there since August of

13        2001 and you were the manager?

14   A.   That is correct.

15   Q.   And I want to direct your attention to

16        December 6th.  Do you recall seeing

17        someone, a woman, that paid for a room in

18        cash?

19   A.   Yes.

20   Q.   And would you describe that transaction to the

21        Jury, please?

22   A.   She came in, she wanted a room for the

```
                                                        2590
 1              weekend.  She reserved it, paid for it,

 2              and you have to take a customer receipt,

 3              so you can verify that you did pay for

 4              the room when you come back.

 5    Q.   Would you tell the Jury how much the room was?

 6    A.   It was 106 point 40.

 7    Q.   106 dollars and 40 cents?

 8    A.   Yes.

 9    Q.   What room specifically was it?

10    A.   It was room 101.

11    Q.   Does that room have anything special in it?

12    A.   It is a Jacuzzi suite.

13    Q.   And is it one of your larger or better rooms?

14    A.   Yes.

15    Q.   And I want you to look at States Exhibit 312.

16              Number 312.  Do you recognize it?

17    A.   Yes.

18    Q.   Would you tell the Jury whether or not you

19              were involved with making that receipt?

20    A.   I am the one that billed this receipt, that

21              wrote this receipt out.

22    Q.   What does it say?
```

2591

1  A.    The date is 12-9, the name is Nathaniel

2        Jackson.  The address is █████████,

3        City of Youngstown, State of Ohio.  The

4        make of car was a 300-M Chrysler 2000,

5        number in party was two.

6  Q.    Did it give a color of the vehicle?

7  A.    No.

8  Q.    That information you took on December 6?

9  A.    Yes.

10 Q.    And you received $106 in cash and some change?

11 A.    Yes.

12 Q.    And the registration was for what date?

13 A.    December 9.

14 Q.    December 9, 2001?

15 A.    Yes.

16 Q.    And this was transacted on December 6, is that

17        correct?

18 A.    That is correct.

19 Q.    And did you receive cash?

20 A.    Yes.

21 Q.    And would you describe to the Jury the person

22        that paid for that room?

2592

1  A.   It was a lady in her mid-forties.  She had red

2       hair.  She was thin, kind of short.

3  Q.   Is that unusual, that someone would come in

4       early and rent a room in the name of a

5       man and it is a woman?

6  A.   Yes, it is sort of unusual.  We have people

7       register.  Other names.

8  Q.   Do you recall what time you were working that

9       day?

10  A.   I worked there all day long, all night long.

11       I never leave.

12  Q.   And going to December 9, I take it you were

13       there in the morning?

14  A.   I was there the whole day.

15  Q.   Even into the next day, December 10?

16  A.   That is correct.

17  Q.   Did you see someone that claimed to be

18       Nathaniel Jackson that claimed the key?

19  A.   Yes.

20  Q.   When did that occur?

21  A.   That was on December 9.

22  Q.   You recall whether it was in the afternoon or

2593

1              in the evening?

2    A.   It was in the afternoon.

3    Q.   And did you see what kind of vehicle he was

4              in?

5    A.   Yes.

6    Q.   What kind of vehicle was he in?

7    A.   It was a reddish or burgundy Chrysler, like a

8              new one.

9    Q.   And was anyone in that vehicle?

10   A.   Yes.

11   Q.   Would you describe who was in that vehicle?

12   A.   The woman that paid for the room a few days

13              earlier.

14   Q.   Now, was she a white or black woman?

15   A.   She was white.

16   Q.   And did the person who got the key, identify

17              himself?  What did he say to you?

18   A.   He said he was Nathaniel Jackson, the person

19              that the receipt was in his name.

20   Q.   Do you see Nathaniel Jackson in this

21              Courtroom?

22   A.   Yes.

2594

1  Q.   And would you point him out, please?

2  A.   Right there.  (Indicating)

3              MR. WATKINS:  May the record reflect

4  the Defendant has been selected.

5              THE COURT:  The record will so

6  reflect.

7  Q.   Now, did he get the room right away?

8  A.   No, he did not.

9  Q.   Would you tell the Jury what happened?

10 A.   The room wasn't done being cleaned.  They had

11         to wait for the room to be finished

12         before they could enter it.  They waited

13         right there in the parking spot.

14 Q.   Did you notice what they were doing, that is

15         Nathaniel Jackson and the woman?

16 A.   They were just in the car talking, there was

17         music playing.

18 Q.   Were they polite?

19 A.   Yes.

20 Q.   And how long did it take for you to get the

21         room in order?

22 A.   It took about ten, 15 minutes.

```
                                                              2595
1    Q.   And did you have any conversation with

2              Mr. Jackson about the room?

3    A.   He called later on about the room.

4    Q.   What was that call about?

5    A.   It was about the Jacuzzi, said it was dirty

6              and I told him that it was cleaned.  It

7              was just stains.  It was old.

8    Q.   Now, after going into the room, the contact,

9              you told the Jury, he called while he was

10             in the room?

11   A.   They called me from their room.

12   Q.   And did you receive any other calls?

13   A.   Yes, I received the call, I believe it was

14             later in the night, and I really couldn't

15             understand what they were talking about

16             on the phone, but I remember it was

17             something about the heat, but I never

18             went to the room to fix the heat or

19             anything.  I couldn't really understand

20             them.  I think it was a problem with the

21             heat.

22   Q.   And was there any noise going on in the room?
```

2596

1          How would you describe what you heard?

2    A.    It was just, I don't know, didn't make any

3          sense.  They were having a good time.

4    Q.    Did there come a time that they would have to

5          check out?

6    A.    Yes, they called -- well, he asked about check

7          out.

8    Q.    Now what is normal check out?

9    A.    Eleven A.M.

10   Q.    So if they came in on Sunday the 9th, they

11         would have to be out at 11 A.M. on

12         Monday?

13   A.    That is correct.

14   Q.    And was there a call from 101, the male,

15         regarding check out?

16   A.    Yes.

17   Q.    And what was that request?

18   A.    If they could stay a little longer, and I had

19         told them that they could, since they did

20         wake up late, but they need to be out at

21         12 and they were gone before 12.

22   Q.    Now, did you have an occasion to see inside

2597

1              that room after they had left?

2  A.  Yes.

3  Q.  And was anything left behind?

4  A.  Yes.

5  Q.  Would you tell the Jury what that was?

6  A.  It was a pair of red thong underwear that were

7         left.

8  Q.  Are you sure they weren't in the room before?

9  A.  No, they were not in the room before.

10  Q.  How do you know?

11  A.  I cleaned that room the day before and he was

12         waiting while I was cleaning the room.

13  Q.  Now there came a time that you talked to the

14         Howland Township Police Department about

15         this case?

16  A.  Yes.

17  Q.  And they showed you photographs?

18  A.  Yes, they showed me a line-up photograph.

19  Q.  Were you able to pick someone out?

20  A.  Yes.

21  Q.  Were you sure of the identification you made?

22  A.  Well, I was positive that there was someone

2598

1              else on there that I thought I knew, but

2              I couldn't pinpoint who they were.

3    Q.   As you are here today, you are positive that

4              is Nathaniel Jackson?

5    A.   It's been since December.  It kind of looks

6              like him.

7    Q.   You are saying it looks like him?

8    A.   It looks like him.

9    Q.   You only saw him that one day?

10   A.   Yes.

11   Q.   Now, on or about the 19th or 18th of December,

12              you received this, did you not?

13   A.   Yes.

14   Q.   Of 2001.

15   A.   That is correct.

16   Q.   How many photographs were shown to you?

17   A.   These six right here.

18   Q.   And did you pick out one?

19   A.   Yes, I did.

20   Q.   Which one did you pick out, number-wise?

21   A.   Number six.

22   Q.   And you believe it is that man, the Defendant?

2599

1  A.  Yes.

2           MR. WATKINS:  Thank you.  Excuse me,

3  if I may have -- well, no, I am fine.

4  CROSS EXAMINATION BY MR. LEWIS:

5  Q.  Jose, as I understand it, you kind of moved

6           on, moved to Mansfield, correct?

7  A.  I moved to Mansfield in June 6, 2002.

8  Q.  And you were the manager though at Wagon Wheel

9           back in 2001, right, December?

10 A.  Yes.

11 Q.  And my understanding is that a woman came in,

12           that was on December 6, and she went

13           ahead and gave you the $106.40 in cash

14           for the room, reserving it for -- it is

15           room 101, reserves it for December 9?

16 A.  That is correct.

17 Q.  And they arrived early, the room wasn't ready

18           on December 9, which was, that was a

19           Sunday?

20 A.  I don't remember what day it was.

21 Q.  But anyhow, it was on December 9 though?

22 A.  Yes.

2600

1   Q.   And the receipt though is made out for

2        December 6, I assume, for the payment in

3        cash for the room in advance, right?

4   A.   No, the receipt has to be made out the day

5        that they are going to have the room.

6   Q.   But you do give them, even though the receipt

7        is made out in advance date-wise, you

8        still give them a receipt to the

9        individual, so it shows payment has been

10       made?

11  A.   That is right.

12  Q.   In any event, the woman came in, she rented

13       the Wagon Wheel suite.  That is the one

14       with the Jacuzzi?

15  A.   That is right.

16  Q.   It was room 101?

17  A.   Yes.

18  Q.   She was driving a 300 Chrysler or a Chrysler,

19       red Chrysler?

20  A.   Yes.

21  Q.   And the next time you saw them on December 9,

22       did you also see the red Chrysler?

2601

1  A.    It was a red Chrysler on December 9.  It

2        wasn't a red Chrysler on December 6.

3  Q.    Do you recall what kind of car it was on

4        December 6?

5  A.    It was a Chrysler, a brand new one, just like

6        the red one.  I don't know if it was the

7        same model.

8  Q.    Could it have been a silver one?

9  A.    Yes.

10 Q.    Same car, just a newer model?

11 A.    They looked the same in the front.

12 Q.    So, the lady came and she was driving a newer

13       model, same look and everything else, it

14       was a 2001 Chrysler?

15 A.    I don't know what year it was, but it was new.

16 Q.    In any event, then the 9th, came back and they

17       were in a red Chrysler.  And did you have

18       any particular problems with either the

19       woman?  Did you talk to the woman at all,

20       do you recall?

21 A.    I talked to her on December 6 when she got the

22       room.

2602

1  Q.  Not on the 9th?

2  A.  I don't remember having any real conversation

3         with her.

4  Q.  You talked to somebody that you believe is

5         Mr. Jackson over there, right?

6  A.  That is correct.

7  Q.  And did he give you any particular trouble?

8  A.  No, he didn't give me any trouble at all.  We

9         were talking.

10  Q.  Once the room was ready, they went into the

11         room, I take it?

12  A.  Yes.

13  Q.  And you said you received some phone calls but

14         that was about the heat and the Jacuzzi

15         or something, right?

16  A.  Yes.

17  Q.  Is it a newer motel?  I'm not going to call it

18         a complex, is it a newer one or old one?

19  A.  Older one.

20  Q.  Do you have any idea the age of it?

21  A.  I don't know.  The last actual picture of it

22         was the Plaza Motel and it was in 1978.

2603

1  Q.   So, it was probably a few years old?

2  A.   Yes.

3  Q.   And as I understand it, on Monday they asked

4          to stay for a few more minutes.  That was

5          around 11:00 A.M. and by 12:00 they were

6          gone?

7  A.   Yes.

8  Q.   It was on December 18 that one of the Howland

9          police officer's -- do you remember the

10          police officer's name by any chance?

11  A.   Detective Frank Dillon.

12  Q.   And he showed you the photo array here, and

13          you picked out, I think it is written

14          down as number six?

15  A.   Yes.

16  Q.   And did you write that out in your own

17          handwriting?  Is that your handwriting or

18          did you just sign it?

19  A.   I signed it here.

20  Q.   And that's one you picked out?

21  A.   Yes.

22              MR. LEWIS:  Thank you very much.

2604

1           MR. WATKINS:  No redirect.

2           THE COURT:  Thank you Sir.  You are

3    excused.

4                EDWARD LULLA

5    being duly sworn according to law, on his oath,

6    testified as follows:

7    DIRECT EXAMINATION BY MR. WATKINS:

8    Q.   Good afternoon.  You have done this before.

9              Would you please give your full name and

10             where you work?

11   A.   I my name is Edward Lulla, special agent with

12             the Ohio Bureau of Criminal

13             Identification and Investigation.

14   Q.   Would you briefly give your experience and

15             training to the Jury?

16   A.   I was a police officer for 13 years in

17             Jefferson County, Stuebenville Police

18             Department.  I then came to the Bureau of

19             Criminal Identification about four and a

20             half years ago where I was assigned to

21             the crime scene unit.

22   Q.   And the crime scene unit, out of what office,

```
                                                              2605
 1              where is the office located?

 2    A.    Located in Boardman, Ohio office.

 3    Q.    And, what would you do as a member of the

 4              crime scene unit?

 5    A.    We assist agencies throughout the State of

 6              Ohio in processing crime scenes.

 7    Q.    Now, I want to direct your attention to, I

 8              guess it is 12-18.

 9    A.    Yes.

10    Q.    That is December 18, '01?

11    A.    That is correct.

12    Q.    Did you receive a call to assist the homicide

13              investigation into the death of Robert

14              Fingerhut?

15    A.    Yes, Sir, I did.

16    Q.    And did you meet someone at a particular

17              location from Howland Police Department?

18    A.    Yes, Sir, I did.

19    Q.    Would you tell the Jury who that was?

20    A.    Detective Frank Dillon.

21    Q.    And when did you meet him there?

22    A.    I met him on the 18th of December, 2001 at
```

2606

```
 1              approximately 12:22 in the afternoon.
 2   Q.   And what was your purpose to meet him?
 3   A.   It was requested by the Prosecutor's Office,
 4             to assist him in processing the hotel
 5             room on Market Street, that's the Days
 6             Inn Motel, in an attempt to locate
 7             possible blood evidence in the hotel
 8             room.
 9   Q.   Did you talk to anyone that was in authority
10             at the motel?
11   A.   Myself, I did not.  I believe Detective Dillon
12             and an officer from the Boardman Police
13             Department did, but I personally did not.
14   Q.   They were there before you were?
15   A.   Yes.
16   Q.   And did you gain access to a particular room?
17   A.   Yes, Sir, I did.
18   Q.   And what room was that?
19   A.   That was, I believe, room 129.
20   Q.   And that is the Days Inn Motel?
21   A.   Yes, Sir.
22   Q.   At 8390 Market Street?
```

2607

1   A.   I got several different addresses.  First I

2        had 8392, then 8390, but it is the Days

3        Inn on Market Street.

4   Q.   Would you describe how large a facility it is?

5   A.   One floor facility.  Just numerous hotel rooms

6        along the front and along the back.

7   Q.   Now, you indicated that you were looking at or

8        looking for evidence that might be

9        related to blood?

10  A.   Yes, Sir.

11  Q.   Were you trained to take fingerprints or

12       latent fingerprints?

13  A.   Yes, Sir, I was.

14  Q.   Were you involved in that activity that day?

15  A.   Yes, Sir, after we attempted to locate some

16       blood evidence, I did fingerprint the

17       hotel room.

18  Q.   Now, what room, I think you said 129, is that

19       correct?

20  A.   That is correct.

21  Q.   And describe the room, please.

22  A.   Walk in the door, it would be a large bedroom,

2608

1               a bed, and towards the rear of the room,

2               would be a small bathroom.

3    Q.   And were there anything that you observed,

4               visually?

5    A.   Yes.

6    Q.   And would you tell the Jury what you observed?

7    A.   Upon entering the room, I did a quick glance,

8               looked around to see if I could see

9               anything with my naked eye.  I observed a

10              suspect stain on the comforter on the bed

11              and I then tested that stain with a

12              presumptive test for blood and received a

13              positive recharge which indicates that

14              the substance probably is blood.

15   Q.   Now, the Jury is not necessarily familiar with

16              what a presumptive test is.  Maybe you

17              can better explain what that test is,

18              what it serves?

19   A.   It is a test, we use phenolphthalein.  We go

20              to a crime scene, we have several

21              different stains through the crime scene.

22              We want to try to locate what is and what

2609

1           is not blood.  We can take a sterile

2           cotton swab.  We dip it with distilled

3           water.  We absorb a small portion of that

4           stain.  We then apply the phenolphthalein

5           and a little bit of hydrogen peroxide.

6           If that substance is blood it should turn

7           pink.  If we can't say positively, 100

8           percent it is blood, but more likely than

9           not, that substance should be blood if it

10          turns pink.  If turns pink, we then

11          collect that stain.  If that stain during

12          the test, if it does not turn pink, we

13          probably do not take the stain because

14          the chances are that stain is not blood.

15  Q.  When you entered that room, was it cleaned or

16          unoccupied?

17  A.  It was unoccupied.

18  Q.  What else did you observe?

19  A.  I observed the stain on the comforter, I then

20          observed what appeared to be a blood

21          stain on the wall, as you entered the

22          room, right on your left hand side,

2610

```
 1              between the door and the air-conditioning
 2              unit.  I then observed what appeared to
 3              be blood stains on the bathroom floor.
 4              And when I opened up the sink, there's
 5              like a little door underneath the sink, I
 6              observed two towels, washcloth and hand
 7              towel, both of those towels appeared to
 8              have blood on them, and also a yellowish
 9              substance, crusty, kind of hard.  I
10              didn't have a semen test with me, but it
11              appeared to be possibly semen.  Using
12              what I have seen of semen before in rape
13              cases, it appeared to have the same
14              consistency of semen.  I also observed a
15              small stain on the bottom of the trash
16              bucket that was in the bedroom itself,
17              and I also tested that stain, and had a
18              positive reaction for blood.
19  Q.    How about fingerprints?
20  A.    After I obtained these blood samples, except
21              for the comforter itself, I took it in a
22              large paper bag.  He took the other
```

2611

1          stains after I received positive

2          indications that they were possibly

3          blood.  I collected those with cotton

4          swabs.  I then observed some small black,

5          what appeared to be pubic hairs around

6          the toilet.  I collected those, using

7          tape and I would pick up the little small

8          hairs and place them on a piece of

9          plastic.  I then fingerprinted the room,

10         the items that should be conducive for

11         fingerprints.  Can't get fingerprints off

12         the mattresses or carpeting.  Some walls

13         I can.  Phone, mirrors, glass, the

14         bathroom walls were coarse, I

15         fingerprinted those -- the sink, the

16         toilet.

17    Q.   The back of the door?

18    A.   Yes.

19    Q.   I'm going to hand you some photographs, and

20         would you go through them?  They are 199

21         through 226.

22    A.   I have examined all of these.

2612

1    Q.    Those are photographs taken by you on the

2          18th?

3    A.    Yes, they are.

4    Q.    And would you go through each one and describe

5                them to the Jury as to whether or not

6                they accurately depict what you saw?

7    A.    This is the outside of room 129, the hotel or

8          motel room.

9                      MR. CONSOLDANE:  We would ask that

10   he not display those to the Jury at this point.

11   He's holding them and showing them to the Jury.

12                     MR. WATKINS:  Keep them to yourself,

13   please.

14   Q.    Just describe them without showing them to the

15          Jury.

16   A.    I have a photograph of the hotel room,

17                comforter with a placard number one,

18                yellow placard.  The front door, if you

19                are on the inside, looking to the main

20                door of the hotel room.  Picture of a

21                T.V. area and the opening of the bathroom

22                door.  Second photograph showing the

2613

1        inside of the bathroom.  Comforter

2        without the placard on it.  Photograph of

3        a bed with the comforter on it, and the

4        air-conditioning unit.  Picture of the

5        opening of the bathroom.  Another picture

6        of the opening of the bathroom.  Close-up

7        photograph of the suspect stain on the

8        comforter.  Photograph of the wall,

9        placard number two, close-up of the

10       placard number two.  Another close-up of

11       placard number two.  Bathroom floor with

12       a placard number three, three purple

13       arrows, each arrow --

14  Q.   Would you give the number of the Exhibit?

15  A.   That is Exhibit 212.  Each arrow is

16       identifying the small stain.  The next

17       photo is the same photograph, but far

18       away shot.

19  Q.   Would you give the number, also?

20  A.   That would be 213.  Number 214 is just the

21       same photograph, but taken from further

22       away.  Number 215 is the bathroom sink.

2614

1            Underneath the sink the doors are open

2            and you can see what appears to be two

3            white towels.  Number four are the towels

4            placed upon the mattress, after the

5            comforter and sheets had been removed, so

6            I could see what was underneath.

7    Q.   What number is that again?

8    A.   That is number 216.  It appears like a

9            washcloth and hand towel.  A little bit

10           bigger than a washcloth.  Number 217

11           shows a placard number five, a gray

12           colored gray plastic container.

13   Q.   What is in the garbage container?

14   A.   It indicates that is where I got stain number

15           five from.  Number 218 shows a trash can

16           looking downward with a little purple

17           arrow indicating where the stain is.

18           Number 219 is a close-up of the arrow and

19           the placard inside the garbage container.

20   Q.   These arrows you put there yourself?

21   A.   Yes.

22   Q.   To designate where the stain is?

2615

1   A.   Yes.

2   Q.   Continue.

3   A.   Number 220 are three purple arrows in front of

4        the toilet, indicating the location of

5        small pubic hairs.  Number 221 is a

6        close-up of the previous photograph.

7        Number 222 is a photograph of the toilet,

8        with two small purple arrows, each arrow

9        indicating the presence of small pubic

10       hair.  Number 223, a close-up of the

11       previous photograph.  Number 224,

12       photograph of a BFI dumpster, which is

13       located in the rear of the building

14       outside the building.

15  Q.   What color was that?

16  A.   Blue in color, purple fence around it.  225 is

17       the same photograph of the dumpster,

18       taken further away.  And number 226 is a

19       photograph of the hotel room, further

20       back.

21  Q.   All of those photographs were taken by you?

22  A.   Yes, Sir.

2616

1   Q.   All of them accurately depict the scene

2        including the inside of the room,

3        different areas you collected evidence?

4   A.   Yes, Sir, they do.

5   Q.   How many presumptive tests did you make in

6        that particular room, number 129?

7   A.   Five.

8   Q.   And they all turned out positive?

9   A.   Yes, they did.

10  Q.   And how many lifts did you attempt to make?

11  A.   Fingerprint lifts?

12  Q.   Yes.

13  A.   I don't recall, I'm sorry.

14  Q.   Everything that you did do, as far as

15       preservation of evidence, you packaged

16       and delivered to BCI&I in Richfield?

17  A.   I transported to the Boardman office, and then

18       the evidence transport will transport to

19       Richfield.

20  Q.   And that is done in the ordinary course of

21       business that if you would take evidence

22       to your Boardman office, that a

2617

1           transporter or some person is assigned to

2           regularly take evidence to the lab?

3    A.    Yes.

4    Q.    And this person would be an employee of the

5           Attorney General's Office?

6    A.    That is their main job.

7    Q.    Now, I'm going to hand you Exhibit 279.  You

8           recognize that document?

9    A.    Yes, I do.

10   Q.    What is it?

11   A.    This is the Ohio BCI evidence submission

12          sheet.

13   Q.    And is that your submission sheet?

14   A.    Yes, it is.

15   Q.    And what is listed on that sheet?

16   A.    These are the items I collected.

17   Q.    Would you go through those?

18   A.    This is lab number 01-35755-B, item B-1, one

19          paper bag containing one comforter from

20          bed with the suspect stain.  B-2, one box

21          containing suspect stain from wall, photo

22          ID No. 2.  B-3, one box containing a

2618

1          suspect stain from bathroom floor, photo

2          ID number three.  B-4, one bag containing

3          one washcloth with suspect stain from

4          bottom of bathroom sink, photo ID number

5          four.  B-5, one bag containing one hand

6          towel with suspect stain from photo ID

7          number four.  B-6, one box containing

8          suspect stain, from bottom of trash can,

9          photo ID number five.  B-7, one envelope

10         containing tape lifts containing hair

11         from toilet area.  B-7, I'm sorry, B-8,

12         one envelope containing latent lifts,

13         which are fingerprints.  B-9, one

14         envelope containing acetate sheets

15         containing elimination finger and palm

16         prints of Jennifer Robinson, Days Inn

17         housekeeping staff.

18   Q.    Jennifer Robinson, would you identify her to

19         the Jury, please?

20   A.    She was directed to me when she was at the

21         scene.  She was the housecleaning staff

22         that had cleaned the room last.

2619

1  Q.  She's the person that cleaned the room?

2  A.  Yes.

3  Q.  Were you present when anything was taken out

4         of the trash, dumpster?

5  A.  No, I was not.

6  Q.  Now, did you personally take her fingerprints?

7  A.  Yes, I did.

8  Q.  And those were her prints that were submitted

9         as B-9 to Richfield; is that correct?

10  A.  That is correct.

11  Q.  And what date do you have on the submission?

12  A.  I submitted those on the 19th of December,

13         2001.

14  Q.  Have you seen those items since you submitted

15         them?

16  A.  Some of the items, I have seen.

17  Q.  Such as?

18  A.  I think everything but the fingerprints.

19  Q.  I'll have you go through 287, 290, 291.  You

20         don't have to open these, if you can

21         identify the marks as to what you put in

22         the bags you sealed it.

```
                                                    2620
 1   A.    Number 287 contains three white boxes.  One
 2              white box is the suspect stain, number
 3              two, which I collected from the wall, the
 4              box would contain a cotton swab, which
 5              had distilled water on it, and actually
 6              absorbed the stain on to the cotton swab.
 7              The second box of suspect stain number
 8              three, which again it is a small cotton
 9              swab with the absorbed stain, which I
10              obtained from the bathroom floor.  The
11              third one is suspect stain number five,
12              which contained a cotton swab, which I
13              had collected from the bottom of the
14              trash can.  All three of those are
15              contained in State's Exhibit 287.  Number
16              288 contains one washcloth, which I
17              located underneath the bathroom sink.
18              Number 289 contains one hand towel, which
19              I located underneath the bathroom sink.
20              Number 290 contains the acetate sheet
21              with the suspected pubic hair lifts,
22              which I lifted with tape.  That is
```

2621

```
 1            State's Exhibit 290.  And State's Exhibit
 2            291 containing elimination fingerprints I
 3            obtained from Jennifer Robinson,
 4            housekeeping staff.
 5   Q.   What other items are not in that collection?
 6   A.   The actual fingerprints that I lifted from the
 7            scene.
 8   Q.   B-7 and B-8, is that correct?
 9   A.   B-7 is here.  B-8 is missing.
10   Q.   There came a time, you were done, you spent a
11            couple of three hours there?
12   A.   Approximately.
13   Q.   Did you go to another motel after leaving the
14            Days Inn?
15   A.   Yes, Sir, did.
16   Q.   Where did you go?
17   A.   We went, myself and Detective Dillon, we went
18            to the Wagon Wheel Motel which was
19            located at 7015 Market Street in
20            Boardman, Ohio.
21   Q.   The Days Inn was going towards the Ohio
22            turnpike on Route 7 on the right?
```

2622

1    A.    Yes, Sir, that is correct.

2    Q.    Now you would be going south on Route 7 on

3          Market Street, going towards the other

4          motel, is that correct?

5    A.    Correct.

6    Q.    How far apart were they, if you have got an

7          estimate?

8    A.    Maybe two miles, three miles.

9    Q.    Now, what time did you get there?

10   A.    We arrived there at 1649, which is 4:49 p.m.

11   Q.    I am going to hand you what has been marked --

12         by the way, when you arrived at the Wagon

13         Wheel on that day, who was with you?

14   A.    Myself and Detective Dillon.

15   Q.    Did you have an opportunity to get into a

16         room, specifically, room 101?

17   A.    Yes, we did.

18   Q.    And did you take photographs of the motel in

19         general and 101 in particular?

20   A.    Yes, Sir, I did.

21   Q.    Would you please, and I'll take that note off,

22         look at the photograph, identify it by

2623

1           the sticker on the back and go through

2           them chronologically and I believe we

3           start with the top one is 192?

4    A.   Number 192 shows exterior photograph of the

5           hotel room.  Number 193 shows photograph

6           of the office.  Number 194 shows a

7           photograph of the interior of the hotel

8           room, showing the bed.  Number 195 shows

9           the photograph of the interior of the

10          hotel room, showing the Jacuzzi shower

11          area.  Number 196 shows the sign on the

12          outside, Wagon Wheel Hotel.

13   Q.   What does the room look like, 101?  Describe

14          it for the Jury.

15   A.   They are Jacuzzi slash hotel rooms.  Rather

16          large room.  A T.V., bed, red carpeting,

17          standard shower.

18   Q.   Mirrors all around?

19   A.   Yes.

20   Q.   Those all are accurate photos of what you saw

21          that day?

22   A.   Yes, Sir.

2624

1              MR. WATKINS:   Thank you.

2   CROSS EXAMINATION BY MR. LEWIS:

3   Q.   Can I call you Ed?

4   A.   That is fine.

5   Q.   You have been with BCI how long?

6   A.   A little over four years.

7   Q.   And you were a police officer previously?

8   A.   Yes.

9   Q.   And you went through some training with BCI or

10          where, they send you off to a criminal

11          school?

12  A.   Yes, BCI.

13  Q.   BCI trained you?

14  A.   Yes.

15  Q.   You were trained specifically in crime scene

16          investigation?

17  A.   Yes, Sir.

18  Q.   And that entails -- they have you do anything

19          special?  Crime scene can mean a lot of

20          things, are you just there to collect the

21          evidence, recognize what it is and

22          collect it?

2625

1   A.   Mainly, that is what it is.

2   Q.   What we're talking about now -- let me jump

3        ahead.  The Wagon Wheel.  I was just

4        curious.  He had you identify some

5        photographs of the Wagon Wheel.  What

6        evidence did you collect at the Wagon

7        Wheel?

8   A.   Nothing.

9   Q.   You didn't collect any evidence?

10  A.   No, Sir.

11  Q.   That was your job though, that day, wasn't it?

12  A.   We attempted to find some evidence, but I

13       couldn't find any blood or semen or hair.

14  Q.   Pubic hairs down around the toilet and all of

15       that stuff?

16  A.   Yes.

17  Q.   But, you and Officer Dillon were there and you

18       took some photographs, is that correct?

19  A.   That is correct.

20  Q.   And the photographs are the ones you referred

21       to, those were State's Exhibits 193, 192,

22       194 and 195, right?

2626

1  A.   Yes.

2  Q.   But you didn't really find anything in the

3       room?

4  A.   That is correct.

5  Q.   Did you look around for it?

6  A.   Yes, I did.

7  Q.   Must have done a pretty good job of cleaning

8       up around the toilet and stuff?

9  A.   Better than the first hotel, yes.

10 Q.   Let's get back to that first hotel.  That is

11      the Days Inn and that is, you indicated

12      about two or three miles from the Wagon

13      Wheel on Market Street?

14 A.   Approximately, yes.

15 Q.   And there was a gal by the name of Jennifer

16      Robinson who was the maid who did the

17      work in regard to cleaning the room,

18      correct?

19 A.   That is what I was told, yes.

20 Q.   And she had cleaned the room already?

21 A.   That was what I was led to believe, yes.

22 Q.   So, we already have a room that supposedly is

2627

1          cleaned?

2    A.   Supposedly, yes, Sir.

3    Q.   And you and Officer Dillon were there.  What

4             time approximately of the day was it?

5    A.   I believe I arrived at 12:22.

6    Q.   About 12:22.  And as soon as you went in, you

7             indicated that you operate with sight,

8             right off the bat, right?

9    A.   Yes.

10   Q.   And just for your eyesight, you wear glasses,

11            too?

12   A.   Yes, Sir.

13   Q.   It sounds like you could see pretty well.  The

14            room is already clean, but just looking

15            at the comforter, you already saw what

16            you thought could be blood?

17   A.   Yes, Sir.

18   Q.   You went ahead and did the presumptive test

19            and it came out to be blood, right?

20   A.   It was a positive reaction for blood, yes.

21   Q.   The idea, is, I think the Prosecutor got into

22            it, is that it is a superficial test for

2628

1                 blood, right?

2    A.    Correct.

3    Q.    In other words, if you are in a room and

4                 there's potentially 100 spots there that

5                 could be blood, some could be cherry pop,

6                 you want to get some idea right off the

7                 bat what you are dealing with and later

8                 on you can send it to the lab and they

9                 can do a more detailed study or analysis

10                 of it, right?

11    A.    That is correct.

12    Q.    Just out of curiosity, presumptive test, how

13                 many other substances will that give you

14                 mistaken identity on, as blood?  In other

15                 words, presumptively, would it give you

16                 an erroneous idea that it is blood there

17                 and there's no blood at all?  Have you

18                 run against any substance?

19    A.    Personally I have not, but when we were told,

20                 it is possible that rust, possible

21                 vegetation could, some kinds of oil, some

22                 kinds of grease.

2629

1  Q.   Just out of curiosity and for my own
2            knowledge, what is precisely -- do you
3            know the chemical, what the reaction is,
4            what it is reacting with in the blood,
5            the stain, do you know?
6  A.   No, I'm sorry, I do not.
7  Q.   The point being, you got in the room, you took
8            a look around, you saw on the comforter,
9            you went ahead and put the liquid on and
10            you got a presumptive there and there's
11            four other places you saw with your naked
12            eye?
13  A.   Yes, Sir.
14  Q.   And that room had already been cleaned, but
15            you were still just visibly look and see?
16  A.   Correct.
17  Q.   So, it seems like there was quite a bit of
18            blood there, pretty easy to find with the
19            naked eye?
20  A.   I had no trouble finding it.
21  Q.   Well, you took that, you also did
22            fingerprints?

2630

1   A.   Correct.

2   Q.   And how many lifts do you remember taking?

3   A.   Several.  We take the fingerprint, we lift it

4        with a piece of tape.  We then place that

5        tape on a piece of plastic.  We write

6        beside the lift, the location where we

7        received it from.  We would have the

8        fingerprints here.  We could tell you

9        exactly where we obtained those

10       fingerprints from.

11  Q.   And the submission sheet has that on there,

12       doesn't it?

13  A.   Yes, Sir.

14  Q.   Does it ever tell you how many, one envelope

15       containing latent lifts.  You don't put

16       in there how many you really took then?

17  A.   That is correct.

18  Q.   So you could have taken -- could you have

19       taken ten, 20?

20  A.   My recollection it was about 12, maybe more,

21       maybe less.

22  Q.   These were the items that were sent and of

2631

1          course, this is kind of unusual, because

2          you work for BCI&I, right?

3    A.   Yes.

4    Q.   Normally, the officers of the local police

5          department, sometimes will collect

6          evidence, like other evidence in this

7          case and they will send it to BCI, right?

8    A.   Yes.

9    Q.   You are actually from BCI, so you came here?

10   A.   Yes, that is correct.

11   Q.   Is there anybody from BCI&I who was actually

12         involved in going to this Fingerhut house

13         in Howland, do you know?

14   A.   Not to my knowledge, no.

15   Q.   And the submission sheet here, when you submit

16         that, and since you are from BCI

17         yourself, do you put the request down

18         here to have it analyzed and how to have

19         it analyzed and what for?

20   A.   No.

21   Q.   Who would do that?

22   A.   Usually it is sent in for blood.  They will

2632

| | | |
|---|---|---|
| 1 | | know we're trying to check for DNA.  Up |
| 2 | | towards the top.  It will go to the DNA |
| 3 | | lab.  And the pubic hair would go to |
| 4 | | trace. |
| 5 | Q. | You are the submitting officer, right? |
| 6 | A. | Yes. |
| 7 | Q. | You marked those boxes, you want DNA on the |
| 8 | | blood and you want in fact -- you can do |
| 9 | | DNA on just about, just about everything |
| 10 | | on here, can't we?  Well, latent prints, |
| 11 | | you can do DNA? |
| 12 | A. | It is coming through. |
| 13 | Q. | So this request, this is what you asked BCI to |
| 14 | | do, that is your organization, right? |
| 15 | A. | Yes. |
| 16 | Q. | Do you know in fact if they did all of that? |
| 17 | A. | I would not have that, Sir. |
| 18 | Q. | Since you are the submitting officer, you |
| 19 | | never get a report back yourself?  Most |
| 20 | | officers, like Howland, they got reports |
| 21 | | back from BCI, stating what they did and |
| 22 | | didn't do.  Since you are the submitting |

2633

1          officer, did you ever get anything back

2          from your own Attorney General, saying

3          what they did with all that?

4    A.    We'll get back -- it would go back to the

5          Howland Police Department.

6    Q.    So the results would have been sent to the

7          Howland P.D.?

8    A.    Yes.

9    Q.    You don't personally know?

10   A.    No.

11   Q.    You don't have any -- you don't do any of the

12         analysis yourself?

13   A.    No.

14   Q.    Check fingerprints, do the DNA work?

15   A.    No.

16   Q.    So, it is a simple collection.  Do you also

17         utilize, it used to be called the woods,

18         what is the other mechanism they use to

19         detect stains in rooms, like blood and

20         things like that?

21   A.    We have Luminol.

22   Q.    Did you use that on this room, at the Days

2634

1          Inn?

2   A.   No, Sir.  We only use that as a last resort.

3   Q.   If it is not obvious or you can't see it, then

4          you use it?

5   A.   Correct.

6   Q.   Wasn't there something, I remember it was ABC,

7          20-20, that they showed, they put Luminol

8          in a lot of motel rooms and the whole

9          thing lit up like a Christmas tree.  It

10         will pick up semen, won't it?

11  A.   No, just blood.

12  Q.   Are you sure about that?

13  A.   Yes, Sir.

14              MR. LEWIS:  Thank you.

15              MR. WATKINS:  We have no further

16  questions.  Thank you very much.

17  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

18  OF HEARING)

19              THE COURT:  Ladies and gentlemen,

20  we're going to take a ten minute break.  You are

21  not to discuss anything or form any opinion.

22  (Court in recess at 2:30 P.M.)

2635

1    (In-chambers at 2:45 P.M.)

2              MR. LEWIS:  We waive presence of the

3    Defendant.

4              THE COURT:  We're in-chambers out of

5    the hearing of the Jury.  The Defendant's presence

6    is waived?

7              MR. LEWIS:  Correct.

8              THE COURT:  You want to put

9    something on the record?

10             MR. WATKINS:  Yes.  John Stamper is

11   a witness that will testify next, who was with the

12   Defendant in Youngstown at Sheila Fields' residence

13   on Wirt Street.  He will testify that he met the

14   Defendant on Monday, the 9th, and drove him to get

15   drugs, and the drugs were marijuana and/or crack,

16   and spent some time with him Monday and is able to

17   identify him.  He also made some comment that he

18   was in street slang, going to have some

19   "come-upens," that he was going to come into some

20   money or something good, and this is the day before

21   this happens.  After that, and after they leave, or

22   the witness leaves Youngstown, the Sheila Fields'

2636

1  residence, that Monday, the next day in the

2  evening, he goes to Sheila Fields, and takes the --

3  takes two women to the room 129 and he would

4  identify it as a motel out in Boardman, North Lima

5  area, and is in the motel room with Nathaniel, and

6  the two women, and there's some drugs, partying

7  activity in his presence.  So, I feel it is

8  relevant because it deals with the scenario and it

9  is especially in light of some of the letters and

10  other evidence in this case.  However, the State,

11  if there's an objection, would instruct the witness

12  not to answer that they were taking drugs but would

13  refer that they were just partying.  I'll do either

14  one depending on what the Court would rule or what

15  counsel and the State could agree to.

16          MR. CONSOLDANE:  I can't see where

17  any of his testimony is relevant.

18          THE COURT:  I agree.  I don't

19  believe any of it is relevant either, except for

20  the fact that if he made some indication that he's

21  going to come into money or something, that fits

22  with the State's case.

2637

1          MR. WATKINS:  He also can identify

2  the hand on that Tuesday and bandaging and all that

3  corroborates this other testimony.

4          THE COURT:  Anything with the women

5  and the drugs, I don't know how that is relevant.

6  Some of that may be necessary to explain the

7  situation of why he would say this to this guy, but

8  to place any undue emphasis on the fact he spent

9  time with a woman in a motel --

10          MR. WATKINS:  He doesn't know what

11  went on in the motel.  He left, but he did come to

12  bring him back.  He's not going to testify about

13  sex acts.

14          THE COURT:  I don't see that the

15  drugs are really relevant, either.  What you have

16  to do is set up a scenario to explain why this guy

17  would have been in a position to understand that

18  Nathaniel was going to come into some money.

19          MR. CONSOLDANE:  I don't think he

20  said that.

21          THE COURT:  Is that the statement

22  there?

2638

1              MR. WATKINS:  The statement is

2    "come-upens," either going to come up with money or

3    drugs.  Come into something good.

4              MR. LEWIS:  Let's see the statement.

5    (OFF THE RECORD)

6              THE COURT:  After conversation, the

7    tape, although delivered to the Defense, I'm not

8    going to listen --

9              MR. CONSOLDANE:  It was not

10   delivered to us.

11             THE COURT:  It was available.  I'm

12   going to allow this testimony to proceed, the

13   Prosecutor does not object that the Defense may

14   reserve their cross examination until they have an

15   opportunity to hear this tape once more, before

16   they conduct that cross examination.  It is up to

17   you folks.

18             MR. LEWIS:  We can hear him tonight.

19   We have got to make sure what he's talking about.

20   He's talking about --

21             MR. WATKINS:  It is something that

22   is available, yes.

2639

1        THE COURT:  Let's do that.  You

2   fellows have a right to object if you think the

3   Prosecutor gets too far.

4        MR. WATKINS:  My point is, why bring

5   him back if there's anything on the tape to impeach

6   him with, but bring him back if you find something.

7   Then call him and bring him back.  Why have this

8   guy miss work tomorrow morning when you can call

9   him back?  I am assuming you are going to do some

10  cross examination now?

11       THE COURT:  You can cross now,

12  reserving the right if you find something on the

13  tape to bring him back.

14       MR. CONSOLDANE:  I'm going to object

15  to them putting him on the stand at all.  All it is

16  going to do is try and color Nathaniel in a

17  different light.  It has nothing at all to do with

18  whether or not he committed this murder or whether

19  or not it was done as a conspiracy with Donna.  Him

20  being in this motel room has nothing to do with

21  what he's being charged with, and it is just trying

22  to add more cumulative evidence.  In front of the

2640

1   Jury, that tends to make Nathaniel Jackson look

2   bad.  I think that is unfair and should not be

3   allowed by the Court.  The probative value of it

4   does not outweigh what harm it can do to the Jury.

5              MR. LEWIS:  There's one added

6   ingredient here in regard to this testimony and

7   that is the fact that, supposedly, its purpose,

8   according to the Prosecutor, is to say that he saw

9   Mr. Jackson's injured finger or whatever, and that

10  is the bulk or supposed to be substantially the

11  reason he's being brought on.  At the same time,

12  they have DNA evidence they are going to bring in,

13  that is going to match up with the gauze that were

14  found at the Days Inn and the blood samples and

15  they are going to match it by DNA as opposed to

16  somebody saying, "It looks like he had an injured

17  finger," which says that conclusively, all of the

18  blood they found goes back to Nathaniel Jackson and

19  they found it in the room.  It is pretty obvious

20  that they are going to be able to prove the wound,

21  which nobody has denied at this point anyhow.

22             MR. CONSOLDANE:  Even have pictures

2641

1    of his finger.

2            MR. WATKINS:  Your Honor, the

3    State's evidence in this case thus far has shown

4    that the Defendant, after shooting the victim,

5    called Donna Roberts, which he admits on his own

6    statement, and that she checked him in the motel at

7    10:30, and that is the Days Inn Motel.  This is the

8    man that takes him to the motel and substantiates

9    he's in that room, that she checked him in, to-wit

10   129.  That is all relevant and material to show

11   that one, that Donna Roberts is involved with him

12   in the conspiracy after the act in covering it up.

13   This is not an issue where we have a Defendant that

14   is trying to explain what he was doing, but was

15   doing everything to cover it up.  And in fact, this

16   witness is going to substantiate he didn't have an

17   injury that Monday.  He does have an injury Tuesday

18   and he takes him to the motel that Donna Roberts

19   gets.  That is relevant and we get to choose the

20   evidence and not the defense.

21           MR. LEWIS:  You don't get to choose

22   it all, Mr. Prosecutor.  Come on.

2642

1          THE COURT:  A lot of the Defendant's

2    argument here is to the weight of the evidence that

3    the Prosecutor is attempting to bring in, and I

4    believe I understand from the Defense side, why you

5    would like to minimize that, but the Prosecution

6    has a right to present their case, as long as any

7    information so presented is relevant and material

8    to the questions involved.  And on the basis of

9    what I am hearing, I was not aware that there were

10   two different motels and that she signed for both

11   of them.  So, going back to this witness' testimony

12   is relevant to show that there was a continuing

13   conspiracy after the fact here.

14          MR. CONSOLDANE:  You already had the

15   guy testify that he went to two different motels

16   and took samples.

17          MR. WATKINS:  This is the guy that

18   puts him in the room.

19          MR. LEWIS:  He's been identified.

20          THE COURT:  You are not limited to

21   one bite of the apple of evidence.

22          MR. WATKINS:  He's not been

2643

1    identified in the Days Inn yet.  Nobody has

2    identified him in the Days Inn.  At Days Inn, only

3    the clerk can identify her.  This is the one we do

4    not have an identification so far in our evidence.

5                THE COURT:  Nobody else to put him

6    in that hotel room?

7                MR. WATKINS:  Absolutely.

8                THE COURT:  Your objection is on the

9    record.  I'm going to allow Dennis to go forward

10   with the caveat still, that I don't think that

11   there should be any attempt to bring in on the

12   drugs or these other women possibly in that room

13   with him.  That is not really material to the issue

14   at hand.  The taking him there, the one bit of

15   conversation if that comes in, in the manner in

16   which you think it will, that could be relevant,

17   but beating a dead horse on how bad this guy is,

18   there's no point to that.

19               MR. WATKINS:  I'm not going to go

20   into come-upens.  I see that hard to explain

21   without going into the drug context, so I'll leave

22   that out.

2644

1    (End of in-chamber discussion.)

2              MR. MORROW:  I want to add for the

3    record, that we had previously provided to Mr.

4    Lewis, a copy of Mr. Stamper's audio tape.  I was

5    reminded by Mr. Teeple that he had prepared

6    multiple copies and I do have the receipt

7    reflecting that we have given him a 911 tape, a

8    Chris Ellington tape, Sheila Fields' tape, a John

9    Stamper tape.  Tapes of Larry Southwick and phone

10   calls that were made between James and Donna and

11   Nathaniel and Donna.  That was previously provided.

12   I wanted to correct that we have given them actual

13   copies of those tapes.

14              THE COURT:  Just so there's no

15   question for the record, it is my understanding

16   that those were available in open file.

17              MR. MORROW:  Those were always

18   available.  We had not had transcripts made of

19   them, and in order to continue with our open file

20   discovery, we actually provided them with the

21   actual copies of those tapes.

22              THE COURT:  The fact is, that

2645

1   everybody apparently listened to whatever during

2   the discovery, but at the time we were just talking

3   in-chambers, there was no printed text from which

4   we could refer back to.  That is the reason those

5   are being delivered to the Defense.

6   (Resumed in Open Court at 3:15 p.m.)

7                      JOHN STAMPER

8   being duly sworn according to law, on his oath,

9   testified as follows:

10  DIRECT EXAMINATION BY MR. WATKINS:

11  Q.   Good afternoon, John.  John, would you give

12            your full name to the Jury?

13  A.   John Emerson Stamper.

14  Q.   And where do you reside?

15  A.   ███████████████████ Austintown, Ohio.

16  Q.   How old are you?

17  A.   41.

18  Q.   Where are you currently employed?

19  A.   Nannicola Bingo Supply.

20  Q.   What do you do for Nannicola?

21  A.   I'm what they call a resupply driver.

22  Q.   Now, I would like to ask how long you have

2646

1           been working there?

A.    Five months.

Q.    Now, going back to December 9th and 10th, were

4           you employed at that point in time?

A.    No, Sir.

Q.    Of 2001?

A.    No, Sir.

Q.    I want to direct your attention to Monday,

9           December 10.  Do you recall being at a

10          residence on Wirt Street?

A.    Yes, Sir.

Q.    On the north side of Youngstown?

A.    Yes, Sir.

Q.    And whose residence were you at?

A.    Sheila Fields.

Q.    And where did she live on Wirt Street, if you

17          know?

A.    It was a corner house.  I can't remember

19          offhand the address.

Q.    And how long had you known Sheila Fields?

A.    Years.

Q.    She a friend?

2647

1   A.   Yes.

2   Q.   And did you meet sometime on the afternoon of

3            Monday, December 10th, a person by the

4            name of Nathaniel?

5   A.   Yes.

6   Q.   And who was there, what were the circumstances

7            that you met him?

8   A.   I was there doing some odd jobs around the

9            house, and I met him.  He came to visit

10            Sheila and I met him when he came to

11            visit Sheila, then proceeded to give him

12            a ride to a friend of his house.

13  Q.   And do you see the Nathaniel that you gave a

14            ride to, in the Courtroom?

15  A.   Yes, I do.

16  Q.   And would you point him out, please?

17  A.   The gentleman over here in the beige and black

18            sweater.

19            MR. WATKINS:  May the record reflect

20  the Defendant has been selected.

21            THE COURT:  The record will so

22  reflect.

2648

1   Q.   Now, I take it that you gave him a ride in

2        your own vehicle?

3   A.   Yes.

4   Q.   What kind of vehicle was that?

5   A.   It is a 1982 Chevrolet pick-up truck.

6   Q.   Just looking at the total time that you spent

7        with him at Sheila Fields that afternoon,

8        that Monday afternoon, what would that

9        total time be?

10  A.   At the most an hour, hour and a half.

11  Q.   And who else was present?

12  A.   That Monday was Sheila, me, Nathaniel, one or

13       two other people; offhand, I couldn't

14       recollect.

15  Q.   Did Nathaniel have any injury to his hand or

16       any injuries that you noticed?

17  A.   On Monday, no.

18  Q.   And did you get along with him?

19  A.   Yes, I did.

20  Q.   Was he friendly?

21  A.   Yes.

22  Q.   Now, did you on Tuesday, also go over to

2649

1           Sheila Fields in Youngstown, Ohio, on

2           Wirt street?

3    A.    Yes, I did.

4    Q.    And did there come a time that you took

5           somebody to visit Nathaniel?

6    A.    Yes, there was.

7    Q.    And who did you take?

8    A.    I took Sheila who lived there and a friend of

9           hers, Janet, to a motel room in North

10          Lima, where Nathaniel was staying.

11   Q.    And approximately what time did you take them?

12   A.    It was roughly between 10 and 11 o'clock in

13          the evening.

14   Q.    The three of you went in your vehicle?

15   A.    Yes.

16   Q.    And do you recall where the motel was that you

17          went to?

18   A.    North Lima, on Market Street.

19   Q.    Do you recall the name of the motel?

20   A.    No, I do not.

21   Q.    And was it on the right or left hand side of

22          the road as you were traveling?

2650

1  A.  The right hand side heading towards North

2      Lima.

3  Q.  Was it past Southern Park Mall?

4  A.  Yes.

5  Q.  And was this a one story motel if you know, or

6      multi-story?

7  A.  Single story from what I remember.

8  Q.  And do you recall what room you went to?

9  A.  No, I do not.

10 Q.  Do you recall where the room was located in

11     the motel?

12 A.  It was on the back side of the motel.  There's

13     a drive that went around, and it was

14     around the back area of the motel.

15 Q.  And did you go into the room?

16 A.  Yes, I did.

17 Q.  And who else went into the room?

18 A.  Sheila and Janet, the two girls that were with

19     me.

20 Q.  And did you party there and have a good time?

21 A.  We partied there for ten, 15 minutes.

22 Q.  And did you see the Defendant at that time?

2651

```
 1   A.   Yes, I did.

 2   Q.   And was he in the room with anyone when you

 3        arrived?

 4   A.   No, he was by himself.

 5   Q.   Did you notice anything unusual about his

 6        person?

 7   A.   All three of us noticed that his hand was

 8        bandaged up.

 9   Q.   And did you notice any blood?

10   A.   There was blood seeping through the bandage he

11        had on it.

12   Q.   And how was his mood?  How would you describe

13        his mood?

14   A.   He was pretty casual, pretty -- not excited or

15        anything, just pretty calm, all things

16        considered.

17   Q.   And did he say anything to you as to how he

18        injured this bloody hand?

19   A.   We asked him what happened and he said, he had

20        an accident.

21   Q.   You said you stayed there ten or 15 minutes?

22   A.   Yes.
```

2652

1   Q.   And who went back to Youngstown?

2   A.   Me and Sheila went back to Youngstown.

3   Q.   And Janet stayed?

4   A.   Yes.

5   Q.   Did there come a time you went back to the

6        motel?

7   A.   Yes, roughly an hour and a half later, I was

8        called to come back to the motel to pick

9        up Janet.

10  Q.   And did you do that?

11  A.   Yes.

12  Q.   Do you recall what Janet's last name was?

13  A.   Janet Clay.

14  CROSS EXAMINATION BY MR. LEWIS:

15  Q.   You met Nathaniel for the first time on Monday

16        afternoon, that was December 10?

17  A.   Yes.

18  Q.   And Nathaniel wanted you to -- you gave him a

19        ride, right?

20  A.   Yes.

21  Q.   And then, on Tuesday, December 10 or 11?

22  A.   Yes.

2653

1  Q.   You end up going to the Days Inn out on Market

2       Street?

3  A.   Yes.

4  Q.   And after that, did he return to Sheila's

5       house that night?

6  A.   Yes.

7  Q.   Did he ask you to take him to the Cleveland

8       airport?

9  A.   No.

10  Q.   Did he ask you to take him across state lines

11       towards California?

12  A.   No.

13  Q.   Did he ask you to take him to a bus station so

14       he could go someplace?

15  A.   No.

16  Q.   So, you ended up taking him back to Sheila's

17       house on Wirt Street in Youngstown?

18  A.   Yes.

19            MR. LEWIS:   Nothing further.   Thank

20  you.

21            THE COURT:   Thank you.   You are

22  excused.

2654

1 <u>JEFF DIAMANTES</u>

2 being duly sworn according to law, on his oath,

3 testified as follows:

4 <u>DIRECT EXAMINATION BY MR. WATKINS</u>:

5 Q.    Jeff, would you give your full name to the

6             Jury, please?

7 A.    Jeffrey Paul Diamantes.

8 Q.    And how old are you?

9 A.    23 years old.

10 Q.    You live where?

11 A.    I live in Boardman.

12 Q.    And you at one point in time worked at the

13            Days Inn?

14 A.    I did.

15 Q.    And that was located where?

16 A.    On Market Street.

17 Q.    And you recall the address?

18 A.    Not offhand.  It was Boardman, North Lima

19             borderline.

20 Q.    And how long had you worked there?

21 A.    About a year.

22 Q.    And what job did you have?

2655

1    A.    I was front desk clerk, night auditor.

2    Q.    And what would you do?

3    A.    I would check people in and out, answer the

4          phone calls and do the night audit on the

5          computer.

6    Q.    And I want to direct your attention to

7          December 11 in the evening hours.  Do you

8          recall a person coming in and renting a

9          room for one week?

10   A.    I do.

11   Q.    And would you in your own words, tell what

12         happened to the Jury?

13   A.    A woman came in, she asked if we had weekly

14         rates.  I said we did and she asked how

15         much and I said -- I asked if it was for

16         one or two people.  She said just one and

17         I told her it was 210 plus tax.  From

18         there, I checked her in the room.  I

19         checked her I.D. and gave her a room key.

20   Q.    You checked her I.D.?

21   A.    Yes.

22   Q.    What did you check?

2656

```
 1   A.    Just to see if the names matched with the

 2             credit card.

 3   Q.    And would you describe this woman to the Jury?

 4   A.    She was short, probably about lower to

 5             mid-forties, reddish-brownish hair.

 6   Q.    Was she by herself?

 7   A.    Yes.

 8   Q.    While she was seeing you, was she in the

 9             waiting room?

10   A.    She was in the lobby.

11   Q.    And did you notice how she was acting?

12   A.    She was pacing around back and forth and

13             looking out the windows.

14   Q.    How long did you spend with her?

15   A.    No more than ten minutes.

16   Q.    And how did she pay for the seven day rental

17             of the room?

18   A.    With credit card.

19   Q.    Do many women or men, come for that matter to

20             rent rooms for that period of time?

21   A.    Just people that are doing work in the area,

22             like construction workers for example.
```

2657

```
1   Q.   So this was unusual?

2   A.   Yes.

3   Q.   I'm going to hand you what has been marked as

4            State's Exhibit 311.  And in particular,

5            311-A.  Can you identify it?

6   A.   Yes.

7   Q.   What is that?

8   A.   This is our slip that we use when we check in

9            people.  They have got to put in their

10           name and address and sign it.

11  Q.   You had that filled out by the woman with the

12           red hair?

13  A.   Correct.

14  Q.   And what was her name?

15  A.   D. M. Roberts.

16  Q.   And what address did she give?

17  A.   254 Fonderlac, Warren, Ohio.

18  Q.   And did you use a credit card, in this

19           transaction?

20  A.   I did.

21  Q.   Do you recall what kind of credit card?

22  A.   I believe it was a Visa.
```

2658

1   Q.   Now there are other documents here and I want

2        you to look at them and I'm going to hand

3        you -- do you recognize 311-D?

4   A.   I did not print this out.

5   Q.   Were you involved with any other documents?

6   A.   No, I was not.

7   Q.   How about the receipt for the credit card?

8   A.   This one.

9   Q.   Number 311-B?

10  A.   Correct.

11  Q.   This is the one that you ran on Donna Roberts,

12       D.M. Roberts?

13  A.   Yes.

14  Q.   And that is how the room was paid for?

15  A.   Yes.

16  Q.   And the time on this was 11:33?

17  A.   Yes.

18  Q.   Do you know if that was the correct time?

19  A.   I'm not sure.

20  Q.   You weren't involved in any check of that?

21  A.   No.

22  Q.   Do you independently on your own recollection,

2659

1           remember what time this woman came in and
2           rented number 129?
3    A.    I knew it was around ten and 12:00.
4    Q.    And that is all you can say?
5    A.    Yes.
6    Q.    And that was room 129?
7    A.    Yes.
8    Q.    And it was for one week?
9    A.    Yes.
10   Q.    Did you ever see anybody with her?
11   A.    No.
12   Q.    Did you ever deal with her again?
13   A.    No.
14   Q.    Did you ever deal with anybody that was in
15          that room?
16   A.    No.
17              MR. WATKINS:  Thank you.
18   CROSS EXAMINATION BY MR. LEWIS:
19   Q.    Jeff, even though you didn't actually make out
20          the receipt, your own independent
21          recollection was that it was between ten
22          and 12:00 at night?

2660

1   A.   Yes.

2   Q.   It was late, right?

3   A.   Yes.

4   Q.   Are you positive about that?

5   A.   Yes.

6   Q.   So, you are absolutely sure and this was

7        December 11, was it a Tuesday?

8   A.   Yes.

9   Q.   So, the woman didn't come in and rent the room

10       before 10:00, right?

11  A.   No.

12  Q.   Couldn't have, so she didn't rent it at 3:00

13       in the afternoon?

14  A.   No.

15  Q.   She didn't rent it for the previous day, she

16       hasn't made reservations for it?

17  A.   No.

18  Q.   It was just came in at 10:00 or at least after

19       10:00 and rented the room?

20  A.   Yes.

21  Q.   And she placed it in the name of Donna M.

22       Roberts?

2661

1   A.   It was D.M. Roberts.

2   Q.   D.M. Roberts and that was at 254 Fonderlac?

3   A.   Correct.

4   Q.   In the Visa card that she used, does it

5        indicate who it is issued to?  When you

6        put it through and get the okay on it, it

7        puts the number or a transaction number,

8        does it check who the issuer is, or I

9        mean the holder of the card is?

10  A.   I'm not quite sure about that.

11  Q.   You never saw anybody that actually occupied

12       the room or anything?

13  A.   No.

14  Q.   Do you know when that room became available,

15       even though it was rented out for a week,

16       that would have been on a Tuesday night,

17       maybe after 10:00 sometime.  Were you

18       there when the room became available?

19  A.   I have no clue when it became available.

20            MR. LEWIS:  Thank you.

21  REDIRECT EXAMINATION BY MR. WATKINS:

22  Q.   Looking at the receipt, is there any way that

2662

1           you can tell the difference between a

2           Visa card and Master card?

3    A.    Yes.

4    Q.    Take a look at that.  Tell the Jury how.

5    A.    This one was a Master card.  Very first

6           number, if it is a four, it's a Visa.  If

7           it's a five, it is a Master card and this

8           was a Master card.

9    Q.    And that is Exhibit 311-B?

10   A.    Yes.

11              MR. WATKINS:  Thank you.

12              THE COURT:  You are excused.  Thank

13   you very much.

14              MR. WATKINS:  That is our last

15   witness for the day.

16              THE COURT:  Folks, if you will be

17   back here tomorrow at 9:00.  We'll start again.

18   You have not heard all of the evidence.  You have

19   heard a portion of it, and I would again remind you

20   not to come to any conclusions or express any

21   opinion or discuss anything, read anything in the

22   newspaper, or watch anything on T.V., until you

2663

1    return.   I hope you have a nice evening and we

2    thank you again.

3    (Court in Recess at 3:30 P.M.)

4

5

6    <u>Tuesday, October 29, 2002; in Open Court at 9:20 A.M.:</u>

7                    MICHAEL ROBERTS

8    being duly sworn according to law, on his oath,

9    testified as follows:

10   <u>DIRECT EXAMINATION BY MR. MORROW:</u>

11   Q.    Good morning.  Could you please introduce

12               yourself, please?

13   A.    Michael E. Roberts.  I am a forensic scientist

14               assigned to the firearms department, at

15               the Bureau of Criminal Identification and

16               Investigation, or as more commonly

17               referred to as BCI, which essentially is

18               the State crime lab, and we're under the

19               Department of Attorney General, State of

20               Ohio.

21   Q.    And how long have you worked at BCI&I?

22   A.    A little over ten years.

2664

1    Q.   Were you employed anyplace prior to BCI&I as

2         forensic scientist?

3    A.   No, Sir.

4    Q.   Could you detail a little bit about your

5         educational background?

6    A.   I have a Bachelor of Arts degree in biology

7         from Berea College, which is located in

8         Berea, Kentucky.  I have completed

9         several armor courses, such as Beretta,

10        Smith and Wesson and Glock Armor School,

11        which essentially is a class put on by

12        the manufacturer of various weapons to

13        show the internal mechanisms of the

14        weapon.  Also, I have attended and

15        completed the McCrome Microscopy

16        schooling which is a school about

17        analyzing microscopic elements.

18   Q.   Do you have any certificates or any special

19        accommodations?

20   A.   Yes.  Each class we have taken, I have taken

21        and completed, I have got a certificate

22        for.

2665

```
1    Q.   And what are your specific duties at BCI&I?

2    A.   I am assigned to the firearms department.  I

3              analyze all evidence pertaining to

4              firearms, such as firearms themselves and

5              also fired projectiles, to match back or

6              attempt to match back to a particular

7              firearm.  That is the majority of our

8              work.  Also we attempt to raise

9              obliterated or gouged out serial numbers

10             on various metal objects.  Also we do

11             muzzle garment approximations to attempt

12             to see how far away a person was shot.

13             Also, we do tool mark compressions to

14             attempt to match back suspect tools to

15             marks left at the crime scene.

16   Q.   And have you previously testified in firearms

17             identification in Ohio Courts?

18   A.   Yes, I have.

19   Q.   And approximately how many times?

20   A.   I would say approximately 90 times.

21   Q.   Have you been qualified as an expert in the

22             State of Ohio?
```

2666

1    A.    Yes, in every Court that I have testified.

2    Q.    And has that included Trumbull County?

3    A.    Yes, Sir, including this Courtroom.

4    Q.    And that includes, that is in the field of

5                firearms analysis?

6    A.    Yes, Sir.

7                    MR. MORROW:  At this time, the State

8    would ask that we would move to have this witness

9    identified as a firearms expert.

10                   THE COURT:  Yes.  Any objection?

11                   MR. LEWIS:  No objection.

12   Q.    Mike, can you tell us what firearms

13               identification is, please?

14   A.    Firearms identification is the matching back

15               fired projectiles to a particular

16               firearm.  In regards to a bullet, as the

17               bullet travels down the barrel of the

18               firearm, it picks up unique markings or

19               scratches from the internal portion of

20               the barrel.  This is going to vary from

21               barrel to barrel, meaning that each

22               firearm is going to leave a unique

2667

1          impression or pattern.  That is the way

2          we identify a particular bullet back to a

3          particular firearm.  If I could, I could

4          draw it on the easel to better assist the

5          Jury.

6  Q.   Please feel free.

7  A.   There's three major steps of making a barrel

8          of a firearm, and roughly, the three

9          major steps -- also there's little steps

10         that is in between each step, but for the

11         overall view, this is the major part.

12         First of all, this would be like the

13         barrel is pointing towards the wall, so

14         the end or the muzzle of the firearm or

15         the barrel would be pointing towards the

16         wall.  The manufacturer starts with a

17         solid rod, then they bore out or remount

18         the internal part to a particular

19         diameter or caliber.  Caliber is a term

20         in firearms designated to the size or the

21         diameter of the barrel.  The next step,

22         the manufacturer cuts grooves from one

2668

1       end of the barrel to the other end, so

2       that when -- or also it is put into

3       either right hand or left handed twist,

4       so that when the bullet is fired through

5       the barrel, it picks up these portions in

6       between, called lands, and starts

7       twisting the bullet. So, as the bullet

8       leaves the barrel, it is in a twisting

9       motion, so that the bullet will be more

10      precise in its target, so that when the

11      bullet is leaving it is spiraling and it

12      is going to maintain its velocity for a

13      higher period of time and its accuracy is

14      going to be higher than if it were a

15      solid bore.  If it was a solid bore, the

16      bullet would travel through the barrel,

17      straight and out, and the bullet would

18      eventually start tumbling end over end

19      and it wouldn't be as accurate.  It is

20      the same as the quarterback who wants to

21      throw an accurate pass.  You see the

22      quarterback throw a spiral and the

2669

1          football is spinning and that way it is

2          going to be more accurate and the

3          receiver can catch the ball easier, the

4          same principle as the bullet.  It is

5          spinning as it travels out the barrel.

6          Also, through the manufacturing process,

7          there's incidental marks, ridges and

8          grooves, inside each portion.  Now these

9          ridges and valleys are going to be

10         incidental marks and they are going to be

11         the marks that we're looking for under

12         the microscope that is going to be unique

13         from one barrel to another.  A bullet

14         here, as it is being fired, it has these

15         raised portions of the barrel impressed

16         into the side of the bullet.  Whereas the

17         grooves would also be the portion in

18         between, which would be the raised

19         portion.  So, what we look for, first of

20         all in our analysis, is these grooves,

21         and these portions in between called

22         lands, so we have lands and grooves.

2670

1          This is called general characteristics.

2      Now, manufacturers designate the general

3      characteristics, or the number of lands

4      and grooves for a particular model.  Such

5      as a Beretta firearm, a particular model,

6      we'll just pick, say Beretta 92.  Beretta

7      92.  It has a number of six lands and six

8      grooves in a right twist.  So all Beretta

9      92 models are going to have the same six

10      lands and six grooves, with the

11      right-handed twist.  So, under the

12      microscope, what we can do is look for

13      these unique patterns that are inside

14      these lands and grooves, that is going to

15      enable us to distinguish between one

16      Beretta 92 to another Beretta 92.

17      There's general characteristics or GRC's

18      that are shared from one model to

19      another.  So --

20  Q.   All Beretta 92's are going to have six lands

21          and grooves and the right hand twist,

22          meaning the way the bullet is going to

2671

1           twist.

A.    Exactly, that is designated by the

2           manufacturer.  Those are general

3           characteristics that are set by the

4           manufacturer.  These microscopic details

5           are incidental marks.  They are made by

6           the manufacturer of the barrel.  They are

7           not put on there -- not put on there on

8           purpose.

Q.    Each different Beretta is going to have

10          different marks or scuffs inside the

11          barrel that makes it specific to each

12          specific Beretta?

A.    It is going to be consistent.  One firearm is

14          going to have the same pattern, as it

15          fires bullet to bullet to bullet.

16          Whereas if you had two weapons they are

17          going to have different patterns.  Let me

18          recap here.  Manufacturing, they bore out

19          the internal part to a particular

20          diameter or caliber, then they cut in the

21          grooves from either right hand or left

2672

1              handed twist and that is going to

2              establish lands and grooves or the

3              general rifling characteristics.  And

4              from there, they have the incidental

5              marks that are put on as well through

6              this manufacturing process since it's a

7              metal to metal, when they remount the

8              internal part, they are doing it by a

9              metal object.  It will leave wear marks

10             and that is why you have little

11             incidental marks and that is what we use

12             to identify a particular firearm to a

13             particular bullet.

14  Q.   As a bullet is being fired down the specific

15             gun, it will pick up those individual

16             characteristics from the barrel?

17  A.   That is right, yes.

18  Q.   So the projectile -- the bullet as the

19             projectile is traveling down the barrel,

20             it will pick up the left or right hand

21             twist, it will pick up the six lands or

22             six grooves and more specifically will

2673

1          pick up the microscopic variations?

2  A.   Exactly.

3  Q.   And those microscopic variations are what you

4          use to distinguish between Berettas,

5          between the same type of gun, the little

6          tiny microscopic differences?

7  A.   Yes, Sir.

8  Q.   And to date, have you found any guns that have

9          had the same microscopic differences?

10 A.   No, I have not.  I have actually examined

11         firearms that had been made

12         consecutively, meaning that one barrel

13         was made right after the other, so that

14         you have the most likely chance of having

15         that reproducible pattern from one barrel

16         to another, that we can distinguish from

17         one barrel to another, even when it is

18         consecutively made.

19 Q.   And that has been referred to as almost a

20         fingerprint of a gun?

21 A.   I have seen that, yes, in newspaper articles.

22         I have seen that.

2674

```
 1   Q.   And as part of your job, do you also do
 2        projectile comparisons, comparing
 3        different makes, manufacturers of
 4        projectiles?
 5   A.   Yes.
 6   Q.   There's different guns, and there's different
 7        types of bullets as well?
 8   A.   Yes.  We have for example, full metal jacket,
 9        meaning that the outer coating is metal
10        such as a copper metal.  Whereas we have
11        a lead bullet that is actually just pure
12        or it is just lead, or you have semi
13        jacket meaning that there's some bullets
14        that have some part of the bullets
15        covered with the jacket where the other
16        part is lead.
17   Q.   And you also can compare shell casings as
18        well?
19   A.   Yes, shell casings or cartridge casings are
20        part of the ammunition that houses the
21        primer or ignition and the smokeless
22        powder.
```

2675

1  Q.  And do you also do comparisons based upon the

2      size, the weight and the design?

3  A.  Yes.

4  Q.  And what about bullet holes?  Have you done

5      bullet hole analysis?

6  A.  Not as much as the firearms identification,

7      but yes, we have actually examined bullet

8      holes in particular in clothing.

9  Q.  And when you examined clothing for bullet

10     holes, what types of things are you

11     looking for?

12 A.  We're looking for distances, whereas the

13     gunshot residue, which would help us in

14     our distance from muzzle to garment to

15     see how far away the firearm was at time

16     of discharge.

17 Q.  Are there different general classifications

18     for distances?

19 A.  Yes, you can break it down into three major

20     classifications.  A contact,

21     intermediate, where you have gunshot

22     residue pattern, and outside of that,

2676

1           which would be approximately four to six

2           feet further, you wouldn't have the

3           gunshot residue.  The principle being

4           when the firearm is discharged, the

5           bullet travels out the barrel and the

6           gunshot residue, which is the powder

7           residue, follows out in a cone shaped

8           pattern.  As the powder is being burned,

9           it is not a complete burn, there's

10          partial particles being thrown out the

11          barrel, and it is in a cone shaped

12          pattern, pretty much like a flashlight

13          beam, and at various distances depending

14          on the weapon, it is approximately four

15          to six feet, sometimes would start to

16          fall down to the ground whereas you would

17          have a bullet hole without any gunshot

18          residue.

19    Q.    And that would be undetermined range?

20    A.    Yes.

21    Q.    And explain, you do testing for gunshot

22          residue?

2677

1  A.    Yes, we do.  We look for two common components

2        of gunshot residue.  We look for lead and

3        also any nitrites.

4  Q.    Explain what that process entails, please.

5  A.    First of all, if we have submitted a clothing

6        item.  We examine the clothing item for

7        any contact characteristics.  When a

8        bullet or a firearm is pressed against an

9        article of clothing and is discharged,

10       there's hot gases from the powder

11       released and it's going to leave,

12       depending on the type of material, it is

13       going to leave either a burning or

14       melting of the material around the bullet

15       hole.  Also, there's going to be what is

16       called a starring pattern, since there's

17       a lot of pressure build-up, a spewing out

18       of the muzzle onto the article of

19       clothing, the bullet hole is going to go

20       through the article and then the article

21       of clothing is going to rip into a

22       starring pattern or cross pattern at the

2678

1           90 degree angle, the material is going to

2           have to give way.  Also, we look for any

3           kind of particles that would be nearby

4           the hole.  If it was near contact, the

5           contact we look for inside the article of

6           clothing to see if any of the gases and

7           particles had actually gone through the

8           hole and on the inside of the clothing

9           items.  At the intermediate distances, we

10          look for the nitrate patterns and lead

11          patterns.  It is a series of tests that

12          we do on the article of clothing to

13          establish what kind of pattern it is, on

14          the article of clothing.  The principle

15          being at three feet for example, it is

16          going to leave the same type of pattern

17          at three feet from shot to shot to shot.

18          So, if there's a pattern there, on the

19          article of clothing, we can go ahead and

20          if we have a suspect weapon, test fire

21          that weapon at various distances and

22          recover the same type of pattern, the

2679

1          nitrites and the leads.  We're actually

2          doing a comparison of our test patterns

3          from the suspect firearm to the pattern

4          recovered from the clothing.  It is very

5          difficult, if there's no pattern at all,

6          it could be a series of reasons why there

7          isn't a residue pattern present, outside

8          of being greater than six feet.

9     Q.   And are there certain things that can affect

10          the pattern, if for example, if there's

11          something between the gun and the

12          ultimate object, where you were looking

13          at the pattern, will that effect whether

14          or not there's gunshot residue or the

15          amount of gunshot residue?

16    A.    Sure.  If there's any intermediate object in

17          between the end of the gun and the

18          clothing item, the gunshot residue is

19          going to be left on that intermediate

20          object and not on the clothing item.

21    Q.    It would be wiped off the projectile?

22    A.    Yes.

2680

1   Q.   And what about the passage of time, will that

2        affect the amount of gunshot residue that

3        is left on an item?

4   A.   Well, the time itself would not, but if an

5        object was wiped or rubbed, that could

6        also wipe off the residue pattern, but

7        time itself, it is not going to evaporate

8        into the air.

9   Q.   And will liquid also affect gunshot residue?

10  A.   Yes, it will.

11  Q.   With respect to gunshot residue, will the size

12       of the weapon impact upon the gunshot

13       residue?

14  A.   Yes, it will.

15  Q.   And will the size of the barrel also impact

16       upon the gunshot residue?

17  A.   It could, yes.

18  Q.   A shorter barrel may disperse quicker?

19  A.   Yes.  The longer the barrel, the more concise

20       the pattern will be for a greater period

21       of time, yes.

22  Q.   Did there come a time when you became involved

2681

1           in a case for the Howland Police

2           Department involving a Robert Fingerhut?

3    A.    Yes.

4    Q.    And in particular, were you provided with a

5           number of items from the Howland Township

6           Police Department to examine?

7    A.    Several items, yes.

8    Q.    I'm going to hand you first what has been

9           marked as State's Exhibit 251.  Take a

10          look at that, please.  Are you able to

11          identify that?

12   A.    Yes, I can.

13   Q.    And can you tell me what or how are you able

14          to identify it?

15   A.    Has the unique BCI case number on the side

16          along with my initials, and it is also

17          the make, model and serial number that

18          that is unique to the particular weapon

19          that I analyzed pertaining to this case.

20   Q.    And that would be a Taurus brand 38 special

21          caliber revolver?

22   A.    Yes.

2682

1   Q.   And what is the serial number on that, please?

2   A.   It would be JH14188.

3   Q.   And did you perform any test or examinations

4        on that weapon?

5   A.   Yes, I did.

6   Q.   Could you please detail what you did with that

7        gun?

8   A.   I examined first of all the weapon for any

9        defects.  For our safety, we examine the

10       weapons before test firing, just in case

11       there's a cracked barrel or some other

12       malfunction that would cause danger to

13       us.  Also, we examined the internal part

14       of the barrel to see if there's any kind

15       of alteration or any residue of gunshot

16       residue present.  Also, we do what is

17       called a trigger pull analysis to

18       determine how much force is necessary to

19       actually discharge the weapon.  In this

20       case, we have what is called single

21       action and double action modes.  It is

22       cleared.  There's no ammunition.  This

2683

1         gun will not discharge.  This gun is now

2         in what is called the double action mode,

3         meaning that the pull of the trigger is

4         going to cause two actions of the hammer

5         to discharge.  You start pulling the

6         trigger and the hammer goes backwards to

7         a particular distance and then is

8         released to the second mode.  It is the

9         double action mode.  It pulls back and

10        you pull.  In the single action mode just

11        like the name says, it takes one mode or

12        action to discharge.  The hammer is

13        pulled back as you can see the trigger is

14        pulled back a little bit as well, and

15        then the slight pull of the trigger and

16        the hammer then is released and takes one

17        mode for it to discharge.  So we have a

18        single and double action mode and we

19        measure the amount of force necessary to

20        discharge the weapon in both single and

21        double actions.

22   Q.   And then were you provided with State's

2684

```
 1          Exhibit, I believe it is 252.  Can you

 2          open that, please, and take a look at

 3          that?  Is there a little bag inside of

 4          252?

 5   A.    Yes, a little envelope inside.

 6   Q.    And that is marked 282-A?

 7   A.    Actually it is 252.

 8   Q.    My mistake.

 9   A.    252-A, yes.

10   Q.    Tell me how that came to you, please.

11   A.    Well, all of the evidence was submitted to our

12          agency through the Howland Police

13          Department.

14   Q.    When those specific items, 252 and 252-A were

15          submitted to you, it was submitted as

16          five live rounds?

17   A.    Yes, five rounds.

18   Q.    Did you then do something with two of the

19          rounds?

20   A.    Yes.  I used two of the rounds to test fire

21          the weapon.  Another part of our analysis

22          of the weapon is to make sure the gun is
```

2685

1          operable.  I took two of the submitted

2          unfired cartridges, put them into the

3          weapon and fired into what we call the

4          water tank, recovery tank, where we can

5          shoot a weapon into the water tank and

6          recover the fired projectiles or bullets.

7          We do this so that we can compare the

8          test fired bullets to the bullets that

9          were recovered from the scene.

10  Q.   And so all five of those rounds, can you tell

11          me a little bit about the five rounds?

12          Are they of the same type,

13          characteristic?

14  A.   Yes, they are.  They are full metal jacket .38

15          special Remington-Peters brand; .38

16          special being the caliber or the size of

17          the bullet.  The diameter of the bullet

18          is going to be approximately point 357

19          inches.  There's another cartridge,

20          called a .357 magnum which was not

21          submitted, but they used the same size of

22          the bullet or diameter of the bullet.

2686

1              This was a Remington-Peters .38 special

2              cartridge.  All five were the same.

3  Q.    Next, I'm going to hand you what has been

4              marked as State's Exhibit 257, 259, and

5              266.  I'll ask you to take a look at

6              those, please?

7  A.    Okay.

8  Q.    Are you able to identify those?

9  A.    Yes, I can.

10  Q.    Are those three bullets that were submitted to

11              you by the Howland Township Police

12              Department in connection with this case?

13  A.    Yes, Sir, they are.

14  Q.    And were you asked to perform analysis on

15              those three bullets?

16  A.    Yes, I was.

17  Q.    Or projectiles, I guess, and can you tell us

18              what analysis you performed and what your

19              results were?

20  A.    First of all, we examined the bullets to

21              determine the size or the caliber and I

22              was able to determine based on the

2687

1   diameter, the rifling measurements or the
2   general rifling characteristics along
3   with the way, that is a .38 special or
4   .357 magnum caliber bullet.  Like I said,
5   both calibers use the same bullet.  The
6   only difference being there's more power
7   in a .357 meaning that the cartridge case
8   is a little longer in a .357 than a .38
9   special.  Then from there, we
10  microscopically compared the bullets to
11  each other, to see if they have the
12  same -- first of all, the same general
13  rifling characteristics or the same
14  numbers of lands and grooves and
15  direction of twist.  And from there we
16  compared the unique pattern or
17  microscopic detail.  We call it barrel
18  striations.  You can establish that they
19  do or do not have the same pattern.  That
20  is how we can tell if they were all fired
21  from the same weapon.  In this case, I
22  was able to establish that they were all

2688

1          fired from the same weapon, they have the

2          same unique pattern.

3   Q.   And were you able to compare those against the

4          other two bullets that you test fired?

5   A.   Yes, I was.

6   Q.   And what were your results against that

7          comparison?

8   A.   Well, in regards to all three, were compared

9          to the test fired bullets, meaning that

10         the internal characteristics when

11         compared to the test fired bullets, I was

12         able to establish that there was not the

13         same pattern.  They had similar class

14         characteristics or the same numbers of

15         lands and grooves; however, the patterns,

16         the microscopic patterns were different.

17         So, with that, in establishing that there

18         was no alteration of the internal barrel

19         through my analysis, I was able to

20         establish that this weapon, submitted

21         weapon, did not fire the three bullets

22         that were recovered from the body at the

2689

1           crime scene.

2     Q.    And when you talk about -- that is the

3           submitted weapon, was a Taurus?

4     A.    Yes, Sir.

5     Q.    And the three bullets that were recovered,

6           they were from the same class and

7           characteristics as the Taurus?

8     A.    Yes. There's manufacturers that share the

9           same general rifling characteristics, and

10          there's many guns out there that would

11          have six grooves and lands, with the

12          right handed twist.  There's several

13          manufacturers out there with five lands

14          and five grooves with the right handed

15          twist, such as the gun that fired the

16          submitted bullets.

17    Q.    So, those would be consistent with coming from

18          a Taurus?

19    A.    Yes, Sir.

20    Q.    You also had an opportunity, actually, if you

21          would just take a quick look at the bag.

22          Are you able to recognize this bag?

2690

1   A.   Yes.

2   Q.   How is that?

3   A.   It has our unique BCI case number that is

4            given to this particular case, and no

5            other cases submitted to BCI.  Also, the

6            date that I started my analysis followed

7            by my initials and the BCI, and the date

8            that I finished my analysis.

9   Q.   And that contained a Cincinnati Reds baseball

10           jacket?

11  A.   Yes, Sir.

12  Q.   And did you do some analysis on the Cincinnati

13           Reds baseball jacket?

14  A.   Yes.

15  Q.   And in particular, did you do any gunshot

16           residue analysis?

17  A.   Yes, Sir, I did.

18  Q.   And were you able to locate any gunshot

19           residue on the Cincinnati Reds jacket?

20  A.   There was very few particles that were

21           recovered from the jacket.  There's

22           approximately four nitrate specs found

2691

1           around the holes of the jacket.

2    Q.    Do you recall which hole that was that you

3           found those nitrites?

4    A.    The hole in the armpit.

5    Q.    That is what you identified in your report as

6           which hole?

7    A.    I believe C.

8    Q.    It was the hole in the armpit that you found

9           the nitrites?

10   A.    Actually, I'm sorry, I checked my report.  It

11          was hole A, which is near the armpit

12          area.

13   Q.    I'm going to hand you what has been previously

14          marked as State's Exhibit 317.  Could you

15          take a look at that, please?  Are you

16          able to identify those?

17   A.    Yes, I can.

18   Q.    How are you able to identify those?

19   A.    The BCI evidence tape.  That has my initials

20          with BCI case number on each glove.

21   Q.    Those gloves were received from the Howland

22          Township Police Department in connection

2692

1              with the Robert Fingerhut case?

2  A.   Yes, Sir.

3  Q.   And did you perform an examination of those

4          items?

5  A.   Yes, I did.

6  Q.   And before, did you perform a visual

7          inspection?

8  A.   Yes, I did.

9  Q.   Could you briefly detail what your visual

10         inspection revealed?

11 A.   We're looking for the contact characteristics

12         to see if there's any melting or gun

13         powder particles left on the area of the

14         defect on the finger.

15 Q.   And those are black leather gloves?

16 A.   Yes, Sir, they are black leather gloves.

17 Q.   And which glove do you have the defect on?

18 A.   I have the left glove and it is the index

19         finger.

20 Q.   And you were able to observe some damage to

21         the left index finger?

22 A.   Yes, Sir.

2693

1  Q.  Did you notice anything else that caused you

2      to take some other action?

3  A.  Just the defect area and then we examined it

4      for the gunshot residue, the lead and

5      nitrites.  I was able to detect a

6      vaporous lead, meaning that the finger is

7      consistent with being near a firearm at

8      the time of discharge.  Vaporous lead is

9      another characteristic that is indicative

10     of very close range of a firearm as it is

11     being discharged.

12 Q.  And did you detect a vaporous lead on the left

13     index finger?

14 A.  Yes, I did.

15 Q.  Did you also observe anything that would cause

16     you to submit that glove to any one of

17     your other departments?

18 A.  Yes.  There was a material on there,

19     substance, that appeared to be blood, or

20     consistent with blood.  So, I contacted

21     the serology, DNA section for them to

22     recover some of the unknown substance or

2694

1           suspected blood and they did so.

2    Q.    In connection with your analysis did you

3          prepare a report that were prepared in

4          relation to these different items?

5    A.    Yes, Sir.

6    Q.    I'm going to hand you what has been marked as

7          State's Exhibit 282-A and ask you to take

8          a look at that, please.  Do you recognize

9          that?

10   A.    Yes, Sir.

11   Q.    Could you tell the ladies and gentlemen what

12         that is?

13   A.    This is a report that summarizes my results of

14         my analysis of the evidence submitted to

15         our agency pertaining to this case.

16   Q.    And I am also going to hand you what has been

17         marked as 282-C.  Can you identify that?

18   A.    Yes.  This would be a supplemental report,

19         which again establishes my results and my

20         analysis pertaining to some of the

21         particular items in this case.

22   Q.    Are those true and accurate copies?

2695

1   A.   Yes, Sir, they are.

2              MR. MORROW:  No further questions.

3   CROSS EXAMINATION BY MR. CONSOLDANE:

4   Q.   My name is Tony Consoldane.  I don't think I

5            have met you before, have I?

6   A.   I think we have.  You look familiar.

7   Q.   And that is Mr. Lewis and we're representing

8            Nathaniel Jackson.  What all was

9            submitted to you?  Do you have a

10           submission sheet?

11  A.   Yes, we do.  On the original submission,

12           because there were several submissions.

13  Q.   Everything that was submitted to you?

14  A.   I have two submission sheets that are copies

15           of the original and the C addition, every

16           time the agency comes into our department

17           to submit more evidence to a particular

18           case, they are given a sequential letter.

19           For example, the original submission

20           wouldn't have a letter.  The next

21           submission would have A, B and so on.  So

22           the only submission sheets that I have

2696

1          are the original and C, that is the

2          evidence that I analyzed whereas my

3          coworkers that are in the hall, would

4          have submission sheets that they analyze

5          that evidence.

6     Q.   What all was submitted to you?

7     A.   To my department in particular, in the

8          firearms?

9     Q.   Yes.

10    A.   There's weapon, five cartridges, three

11         bullets, jacket from the victim, a shirt

12         from the victim, and one pair of black

13         gloves.

14    Q.   And did you analyze all of that?

15    A.   Yes, Sir.

16    Q.   And that is contained in this report that you

17         just read from?

18    A.   Yes, Sir.

19    Q.   What is the difference between a .38 and a

20         .38 special?

21    A.   I'm not sure I understand your question.

22    Q.   You were saying that there's a .38 caliber and

2697

1            you said these were .38 special bullets.

2        What is the difference?

3   A.   .38 caliber, in what area?

4   Q.   You were discussing the shells here, what is

5            this gun right here?

6   A.   .38 special.

7   Q.   Is there such a gun as a .38?

8   A.   Without --

9   Q.   What makes this gun special?

10  A.   It is the same designation for that.  Yes,

11           there's other .38's, yes, like .38 Smith

12           & Wesson and there's other .38's, yes.

13  Q.   Is there a Colt .38 special?

14  A.   There's a .38 Colt.

15  Q.   But it is not called a special?

16  A.   I would have to look that one up, Sir.  I'm

17           not sure.

18  Q.   Is there any difference in the bullets?

19  A.   Yes.

20  Q.   What is the difference?

21  A.   It would be weight and there could be diameter

22           itself, like in particular, the .38 S&W

2698

1          or .38 Smith & Wesson would be a little

2          bit wider than the typical .38 special.

3          Also the .38 Smith & Wesson are typically

4          lead bullets, whereas the .38 special

5          could be lead or jacketed bullets, such

6          as the submitted rounds.

7    Q.   And what is the difference between a .38

8          special and the .357?

9    A.   They actually can use the same bullets, but

10         the cartridge case length is a little bit

11         longer in a .357 magnum, so that they can

12         hold more powder, so the diameter of the

13         barrel of the .38 special and .357 magnum

14         weapons actually can be the same

15         diameter, whereas the cartridge case

16         length or the cylinder part of the

17         revolver, since they are typically

18         revolvers, doesn't mean they are always

19         revolvers, the cylinder is going to be a

20         little bit longer or fluted out a little

21         bit longer in a .357 magnum than it is in

22         a .38 special.

2699

```
1    Q.   And were any of the bullets that were
2              submitted to you, these right here, were
3              these .357 or .38 specials?
4    A.   These are .38 specials.
5    Q.   There was no .357 submitted to you?
6    A.   In regards to the unfired cartridges, the .38
7              specials, but the bullets, like I said in
8              my report, they are the same design,
9              diameter and weight as the unfired
10             cartridges, which were Remington and
11             Peter .38 special.
12   Q.   And these were fired from a gun like this one
13             here?
14   A.   It could have, yes, Sir.  They have the
15             similar characteristics.  Also, let me
16             clarify, since they have the same
17             diameter, in regards to .38 special and
18             .357 magnum, the .357 magnum is longer,
19             so a .357 magnum gun could fire .38
20             special bullets.  Whereas, the .38
21             special gun, such as submitted, would be
22             very dangerous to fire a .357 magnum
```

2700

1         since it has higher pressure and it is

2         typically not designed for it.  If you

3         could fit it into the cylinder, then it

4         would be dangerous to fire.

5    Q.   So, the bottom line is that the bullets, the

6         projectiles, such as this one here that

7         you examined, did not come from this gun?

8    A.   Correct.

9    Q.   But it came from another gun of the same make?

10   A.   Yes.

11   Q.   Could it have been -- could that have been

12        fired by a Colt?

13   A.   Typically Colts are what we call six left

14        meaning they had six lands and six

15        grooves and the left handed twist.  This

16        was a five right.  Meaning five lands,

17        five grooves and right handed twist.  I

18        would have to actually go back and

19        research the Colt.  The only Colt I am

20        aware of that had a right handed twist,

21        was I believe the Colt 2000 which is a

22        semi-automatic pistol.  Once again, I

2701

1          would have to research that to be more

2          accurate.

Q.    And what about a Smith & Wesson?  Could it

          have been fired from the Smith & Wesson?

A.    Yes, Sir, it could have.  The Smith & Wesson

          typically have five right.

Q.    And the same grooves and lands?

A.    Yes, and the same general rifling

          characteristics, the same numbers of

          lands and grooves with the right-handed

          twist.

Q.    Is this a very expensive gun?

A.    I don't know the exact price on it, but I

          would have to compare it.  Depending on

          what you consider expensive.

Q.    Is it a very well made gun?

A.    Once again, I would think, the quality, I

          would think it is an okay gun.

Q.    It would be equivalent to a Smith & Wesson and

          a Colt?

A.    It depends on who you are asking.  That is an

          opinionated question.

2702

1   Q.   Is it the same quality?

2   A.   I would say it is close to it.

3   Q.   There's one thing, and this is going to

4            digress, it is something I have often

5            wondered.  This is a double action gun?

6   A.   It is actually a single and double action,

7            yes.

8   Q.   And back in the days of the cowboys, the

9            westerns, they used to have the single

10           action guns and you see the guy hold it

11           back and fan it.  Those are single

12           actions -- those are single action.  You

13           just hold it back and fan the hammer?

14  A.   Yes.

15  Q.   You can't do that on a double action?

16  A.   I don't think so.  Typically the question is,

17           if one is faster than the other, if you

18           can pull the trigger faster, then someone

19           can pull back the hammer and release the

20           hammer.  I would have to practice with

21           this one.

22  Q.   Have you done that before?

2703

1   A.   I haven't fired, but yes, I have done that to

2         weapons before, yes.

3   Q.   Going back to this gun here if the barrel had

4         been tampered with, after it fired these

5         shots, it is possible that these shells

6         could have come from that gun?

7   A.   If I saw any signs of tampering, yes.

8   Q.   Could the grooves have been changed just by

9         firing full metal jackets?  In other

10        words, when you shoot a projectile that

11        is lead, it is softer and it goes through

12        the barrel without scarring or anything,

13        but when you shoot full metal jackets and

14        it goes through the grooving, it tends to

15        either wear them down, erode them or if

16        it wobbles a little bit, can alter the

17        grooves in the barrel?

18   A.   No.   I think you're right in one part of that

19        statement.  I'm not sure what your

20        question is, but lead is softer than the

21        full metal jacket and rounds, whereas you

22        have more striations given onto the lead.

2704

```
 1              However, the microscopic detail that
 2              we're looking for is going to be
 3              consistent with from shot to shot to
 4              shot.  That is what makes firearms
 5              identification possible, because you are
 6              going to have that consistency.
 7                   MR. CONSOLDANE:  Thank you.
```

REDIRECT EXAMINATION BY MR. MORROW:

```
 9    Q.   I'm going to hand you what has been marked as
10         State's Exhibit 277.  I'll ask you to
11         take a look at that, please.
12    A.   Okay.
13    Q.   Is that a copy of the submission sheet that
14         would have been given to BCI?
15    A.   Yes.  This is the original submission sheet
16         pertaining to this case, which is a
17         unique BCI case number, 01-35755.
18    Q.   And that also is reflected in your reports as
19         well, the numbers where it indicates
20         number three, that is item number three
21         off this sheet?
22    A.   Yes.
```

2705

1   Q.   And consistent are the same as the submission?

2   A.   Yes.

3   Q.   I'm going to hand you number 280.  Is that a

4           supplemental submission sheet?

5   A.   It is the C submission to the same case.

6   Q.   That would have the C-4 submission that talks

7           about the leather gloves that were

8           submitted?

9   A.   Yes, Sir.

10   Q.   And just to make sure, I know Attorney

11           Consoldane was talking about the three

12           bullets that you did the comparison with,

13           this gun, it is your opinion that the

14           three bullets that were provided, the

15           three projectiles that were provided were

16           not fired from that gun?

17   A.   They were not.

18   Q.   Without a doubt?

19   A.   Without a doubt.

20   Q.   And last, he was talking about whether that is

21           comparable to a Colt or Smith & Wesson,

22           it is like asking some people if a Ford

2706

```
 1              is comparable to a Chrysler.  Some people
 2          have very strong opinions about Fords and
 3          Chryslers?
 4    A.    Exactly, yes, Sir.
 5              MR. MORROW:  Thank you.
 6    RECROSS EXAMINATION BY MR. CONSOLDANE:
 7    Q.    Those two papers that Mr. Morrow just handed
 8          you, those are the same you just read to
 9          me from your --
10    A.    I actually read from my report.
11    Q.    Those are the same ones?
12    A.    Yes.
13              MR. CONSOLDANE:  Thank you.
14              THE COURT:  Mr. Roberts, we thank
15    you very much.
16              CYNTHIA MAYLE
17    being duly sworn according to law, on his oath,
18    testified as follows:
19    DIRECT EXAMINATION BY MR. WATKINS:
20    Q.    Good morning.  Would you please give your full
21          name and occupation to the Jury?
22    A.    I am Cynthia Mayle from the Attorney General
```

2707

```
 1              Betty Montgomery's office.  It is the
 2              Bureau of Criminal Identification and
 3              Investigation.
 4    Q.   And would you tell the Jury what you do there?
 5    A.   I am a latent print examiner, forensic
 6              scientist, also a forensic scientist
 7              coordinator for the State of Ohio for the
 8              latent prints section.  In that duty, I
 9              examine and test proficiencies and
10              accreditation procedures for the latent
11              prints section for the State of Ohio.
12    Q.   Would you briefly go through your training?
13              You have been how long at the BCI&I lab?
14    A.   At the lab in Richfield, I have been there, I
15              am now currently in my eighth year.
16    Q.   And prior to that, what was your experience
17              and education do you have?
18    A.   I had approximately one year at the
19              Philadelphia Police Department in
20              Philadelphia, Pennsylvania, and ten years
21              at the Cleveland Police Department in
22              Cleveland, Ohio.
```

2708

1  Q.   And where did you receive your degree from?

2  A.   I attended Cleveland State University.

3  Q.   And how many hours of continuing education

4       have you had while working at the BCI&I,

5       or at the Cleveland facility?

6  A.   I had in excess of one thousand hours of

7       continuing education, specifically in the

8       forensic field of fingerprints.

9       Fingerprint identification.

10  Q.   And would you explain what that field is, and

11       what you do and how it has scientific

12       validity?

13  A.   Fingerprints have been used for over 100 years

14       as a means of identification.  In other

15       words, the ridge detail on the fingers,

16       and the palm of your hand as well as the

17       soles of your feet, is different from the

18       other areas of your body.  This skin has

19       ridges, what we call fingerprint ridge

20       flow.  And it doesn't flow from one side

21       of the hand to the other or one side of

22       the finger to the other.  But rather is

2709

1          broken and non-continuous and these form

2          patterns.  These patterns are unique to

3          you and are individualized by means of

4          comparing a known impression.  In other

5          words, an ink impression of your specific

6          ridge detail to a latent detail that was

7          collected perhaps from a crime scene or

8          other means.

9    Q.   And how many times have you testified in Court

10         as an expert witness on fingerprint

11         analysis?

12   A.   Approximately 100 times.

13   Q.   And what tools do you use in making your

14         analysis?

15   A.   In the development of latent print, we have

16         several tools that we can use.  We have

17         traditional laboratory methods, such as

18         applications, using the fume hood to make

19         latent prints, develop and make them

20         visible.  Originally they are non-visible

21         to the eye.  We also, when we go to

22         compare the prints, we also utilize

2710

```
 1              several instruments; 1A is a digital
 2              imagining system which is a computer,
 3              system, as well as AFA system which is
 4              another computerized system, as well as
 5              the traditional method of just a
 6              magnifying glass or a loop.
 7   Q.   I am going to show you what has been marked as
 8              State's Exhibit 283.  Could you identify
 9              that, please?
10   A.   Yes.  This is a copy of the report that I
11              completed at the laboratory.
12   Q.   And that is an exact copy of your report
13              signed by you?
14   A.   Yes.
15   Q.   You did an analysis on various items submitted
16              by the Howland Police Department, and the
17              Trumbull County Sheriff's Department?
18   A.   Yes, I did.
19   Q.   And also by Ed Lulla of the BCI&I
20              investigative agency?
21   A.   Yes.
22   Q.   And your analysis date was on or about
```

2711

1          2-13-02?

2    A.    That is correct.

3    Q.    Would you tell the Jury what you received and

4              analyzed.

5    A.    Certainly.  Submitted to the laboratory on

6              12-14-2001 for latent print examination,

7              was the Item No. 3, a Taurus .38 caliber

8              revolver, serial No. JH14188.  Item No.

9              4, live rounds; Item No. 24, a plastic

10             place mat.  Item No. 25, a plastic tray.

11             Item No. 26, post mortem fingerprints of

12             Robert Fingerhut.  Item No. 27, copies of

13             fingerprint cards of Nathaniel E Jackson.

14             Item No. 28, a Chrysler 300-M, license

15             plate number CPA 8225.  Submitted on

16             12-18 of 2001, Item No. A-5, gauze

17             containing and a piece of tape.  Excuse

18             me.  Correct that.  Item A-5 is gauze

19             with a stain, and a piece of tape.  A-10

20             is a plastic bottle.  A-11, a bandage

21             container, A-12 is an empty paper tape

22             package.  A-13 is an empty bandage

2712

1              container.  A-14 is an empty sponge

2              container, A-15 is an empty sponge

3              container, A-16 is an empty sponge

4              container, A-17 is an empty sponge

5              container.  A-18 is an empty envelope.

6              A-19 is an empty envelope.  A-20 are

7              keys.  A-21, cell phone.  A-22,  a garage

8              door opener.  A-23, a CD.  And items

9              submitted on 12-19-2001, Item No. B-8,

10             latent lifts, and Item No. B-9, inked

11             fingerprints, inked finger and palm print

12             cards of Jennifer Robinson.

13  Q.   Now, you received those items, and did you

14             look at those items?

15  A.   Yes, I did.

16  Q.   Which items did you find prints on?

17  A.   May I refer to my notes?

18  Q.   Yes.

19  A.   Items A-18, and items B-8 were examined and

20             found to have latent prints, with

21             sufficient ridge detail in order for me

22             to make comparisons against them.

2713

1  Q.  The other items you did not find fingerprints?

2  A.  There were fingerprints on several of the

3        items but we term this fingerprints of no

4        value.  In other words, there was not

5        significant amount of ridge detail or

6        sufficient amount of ridge detail for me

7        to make a comparison against that ridge

8        detail.  Those are ridge detail called of

9        no value that we can not examine.

10  Q.  Now for example, you looked at a bandage

11        container, a sponge, a cell phone, keys;

12        is it unusual that you wouldn't find

13        prints on items?

14  A.  No.  There's several factors why we would not

15        find latent print ridge detail, or

16        sufficient quantity of latent ridge

17        detail.

18  Q.  Would you explain that?

19  A.  Sure.  Basically there are four primary

20        factors why we do not get sufficient

21        ridge detail or do not find ridge detail

22        on an item.  The four are sweat, surface,

2714

1      contact and environment.  If you think of

2      a hand touching an item, if I place my

3      hand here on this wood table top and I

4      lift my hand away, my sweat would

5      determine the quality of a fingerprint

6      that I would leave behind.  If I was

7      perspiring profusely I might not leave a

8      sufficient fingerprint.  Contact is how I

9      handle that item, that I leave a

10     fingerprint behind on.  If I handle this

11     pair of scissors that are here, my

12     movement in handling these scissors, a

13     movement that requires a lot of action,

14     so the ridge detail would be smeared and

15     the surface would be smeared with ridge

16     detail and not clear enough for me to

17     examine.  Surface is the surface of the

18     item itself.  A lot of surfaces today are

19     bumpy and textured, such as

20     refrigerators, dashboards, that type of

21     thing.  If the surface is textured, you

22     won't get continuous ridge detail.  It

2715

1      will be broken up and not be able to

2      determine the actual detail within that

3      fingerprint.  And environment is

4      basically just that.  How the item, what

5      environment it was in, if it was in the

6      rain exposed to the elements.  Was it

7      cold?  In other words, if it was cold I

8      might not be perspiring, might not have

9      any perspiration or foreign material on

10     my hand if I washed my hands or it was

11     cold to leave a latent print behind at

12     all.  There are a number of factors as to

13     why we do not leave latent prints at all

14     or why we do not leave ones that I can

15     make sufficient comparisons against.

16  Q.    Now, we hear sometimes, the points of

17        comparison.  Does that have any validity

18        as far as how many points you need in a

19        comparison?

20  A.    What points of comparison are, is within the

21        ridge detail that I described to you.

22        There are specific pattern ridge flows,

2716

1        and what we call identifying

2        characteristics.  Common terminology is

3        points of identification, and when I make

4        a comparison, I need to have sufficient

5        quantity of point identification between

6        the latent print, and the inked

7        impression that I am comparing against.

8        And that quantity is not specifically

9        defined as to how many total points you

10       need for identification.  The number of

11       specifics are taken into consideration

12       when making an examination, so each

13       latent print is judged on its own merit

14       for identification purposes.

15   Q.  And when you find sufficient points that you

16       feel you can make a match, you make that

17       based on reasonable scientific certainty?

18   A.  Yes, Sir.

19   Q.  And have you been familiar with any two

20       persons having the same prints?

21   A.  No, I have not.

22   Q.  How about identical twins?

2717

```
 1   A.   Identical twins do not have the same
 2             fingerprints or footprints or palm
 3             prints.
 4   Q.   I take it in your business that when you make
 5             a comparison with prints, other
 6             scientists, for example, that the Defense
 7             hire at times, will look at your prints?
 8   A.   Yes, they can.
 9   Q.   Because whatever you have, has been perhaps
10             subject to challenge at times, correct?
11   A.   Yes, it is.  Every identification made in our
12             laboratory is verified by another
13             scientist.
14   Q.   And as I understand it, if I would put my
15             print on my glasses here, you may or may
16             not depend on the moisture to get a
17             print?
18   A.   Correct.
19   Q.   If I go like that, I would smear it?
20   A.   Correct.
21   Q.   Or if I wipe it off, you might not have
22             enough, except there may be a little bit
```

2718

1              of ridge detail?

2    A.   Correct.

3    Q.   There's a lot of variables as to whether you

4              get a print on my glasses?

5    A.   Exactly.  Those are the factors I mentioned

6              previously.

7    Q.   Now, you did have an opportunity to examine a

8              Taurus revolver, State's Exhibit 251.

9              Take a look at that.  Do you recognize

10             that Exhibit?

11   A.   Yes, I do.  I have initialed the bag upon

12             opening and examining this evidence as

13             well as initialed upon sealing date.   I

14             also have labeled the item itself with

15             the case number submitted to the lab, the

16             item number, the date, and my initials.

17   Q.   Now, would you ordinarily examine that before

18             it would go on to ballistics?

19   A.   Yes.

20   Q.   And would you explain why would you be the

21             first forensic scientist to get that

22             particular item?

2719

```
 1   A.   Most often, the laboratory, the latent prints
 2        section is the section to examine most
 3        evidence first.  The reason for that is
 4        that latent prints are very tentative.
 5        As you wipe your windows, you wipe them
 6        off very easily, so in order to secure
 7        the most tentative evidence which is
 8        latent prints that can be wiped off just
 9        in handling an item, we examine those
10        first in the latent print section for a
11        number of pieces of evidence.
12   Q.   And that particular item, did you use a
13        magnifying glass or what did you do
14        exactly?
15   A.   With this item, I did a visual examination.  I
16        applied the process of what we call
17        cyanoacrylate fuming.  That is super glue
18        fuming.  I also applied a fingerprint
19        pattern, and then a fluorescent dye stain
20        which makes very faint fingerprints,
21        fluoresce under a forensic light source.
22        And all of those different steps and
```

```
                                                    2720
1              processes in between each examination, I
2              would use a magnifying glass or a high
3              powered magnifying glass of what we term
4              is a loop, to determine if there's any
5              ridge detail sufficient for me to make a
6              comparison against.
7    Q.   And I take it you made a visual before you did
8              all of that?
9    A.   Yes, every examination begins with a visual.
10   Q.   Did you notice any blood or debris or dirt on
11             that weapon?
12   A.    No, I did not.
13   Q.   And did you notice anything unusual in the way
14             of debris or blood when you used a
15             magnifying glass?
16   A.   No, I did not.
17   Q.   And did you find any fingerprints on that gun?
18   A.   This gun does have fingerprint ridge detail on
19             it, however, there was not sufficient for
20             me to make a comparison against it.
21   Q.   So, you had ridge detail, but nothing
22             sufficient for a comparison?
```

2721

1    A.    Correct.

2    Q.    Do you know where the ridge detail was?

3    A.    I believe there's ridge detail on the side of

4          the weapon that has the logo area right

5          here.

6    Q.    Now, you indicated to the Jury that you found

7          latent prints, is that correct?

8    A.    Yes, I did.

9    Q.    And whose prints were you comparing the

10          latents with?

11   A.    The fingerprints standards that were submitted

12          to the laboratory were standards of

13          Nathaniel E. Jackson, Robert Fingerhut,

14          and fingerprints and palm prints were

15          submitted of Jennifer Robinson.

16   Q.    What Exhibits do you have with you?

17   A.    I have Exhibit 27, the fingerprint cards

18          labeled as the fingerprint cards of

19          Nathaniel E. Jackson.  I also have items

20          B-8, which are the latent lifts

21          submitted.  And I have photographs from

22          item A-18.

2722

1   Q.    Give me the order that is most convenient for

2         you.

3   A.    These are the fingerprints of Nathaniel

4               Jackson.  These are the photographs from

5               items A-18, or excuse me, item A-18.

6               This is the second photograph.

7   Q.    Anything else?

8   A.    This is item B-8.  They were latent lifts

9               submitted to the laboratory.

10  Q.    You have got a print off of B-8?

11  A.    Yes.

12  Q.    Anything else?

13  A.    No.

14  Q.    I would like you to, in chronological order,

15              identify 391?

16              MR. CONSOLDANE:  What all did you

17  have her mark?

18              MR. WATKINS:  You want to have a

19  break so they can inspect this?

20              THE COURT:  Let's take a ten minute

21  break.  You are not to discuss anything or form any

22  opinion.

2723

1   (Court in Recess at 10:30 A.M.)

2   (Resumed in Open Court at 11:00 A.M.)

3   Q.   Before we go to what we marked during the

4        recess, I'll hand you what has been

5        marked previously as submission sheets,

6        277 and 278.  You recognize those?

7   A.   Yes.  These are submission sheets that were

8        produced or are produced when items are

9        submitted to the lab.  For each

10       submission of evidence by the department

11       or agency, it is logged on the submission

12       sheet individually, each item that is

13       submitted.

14  Q.   And that would include the Taurus and other

15       items that you were testifying to, or at

16       least some of which?

17  A.   Yes.

18  Q.   Now, I want you to identify, if you can, item

19       391.

20  A.   Item 391, State's Exhibit, is an envelope,

21       item number for the lab submission

22       number, number 27, submitted by Howland

2724

1          Police Department on 12-14-2001.

2    Q.    What is it, what is contained inside?

3    A.    Inside the envelope is State's Exhibit 391-A,

4          and this is a copy of the fingerprint

5          card bearing the name of Nathaniel Edward

6          Jackson.

7    Q.    And did you use those fingerprint cards?

8    A.    Yes, I did.

9    Q.    And 392?

10   A.    392 is a photograph that I have taken in the

11         laboratory during examination of State's

12         Exhibit No. 309.  309 is submitted to the

13         laboratory under the A submission and

14         that was submitted on 12-18-2001.

15         Submitted to the lab for examination for

16         latent prints, it is labeled as one empty

17         Days Inn room key, card envelope, with

18         quotations, number 129 marked on it.

19   Q.    309 was from what?

20   A.    309 was submitted on 12-18-01 by Sergeant

21         Pizzulo.

22   Q.    And 290.  Do you have number 290 there?

2725

1   A.   I think you gave me 277 and 278.

2   Q.   Okay.  Continue.

3   A.   I also have State's Exhibit 293 and 294.  293

4            is photographs taken in the lab of latent

5            prints on the same item, State's Exhibit

6            309 and 394 is an envelope I made to

7            retain the photographs taken in the lab.

8   Q.   Now, taking the key card that you received

9            from Days Inn?

10  A.   Yes.

11  Q.   And that you received as you have outlined in

12           this case, what did you do with that?

13  A.   This particular item is an envelope submitted

14           to the lab.  This envelope was -- first I

15           conducted a visual examination of the

16           item.  Upon not seeing any ridge detail

17           or any other forensic evidence that might

18           need to be collected, I applied

19           ninhydrin.  Ninhydrin is a chemical that

20           we mix into a liquid form that reacts

21           with amino acids and fingerprint ridge

22           detail and fingerprints may appear on the

2726

1         item.  In this case, two latent

2         fingerprints were developed on this item.

3    Q.   Whose fingerprints were developed?

4    A.   The fingerprints developed on the item are

5         displayed on State's Exhibit 392 and 393,

6         the photographs I previously mentioned.

7         The comparison made against these three

8         latent prints were found to identify the

9         right thumb, the right middle finger and

10        the right ring finger of Nathaniel E

11        Jackson.

12   Q.   And this has room 129 on it?

13   A.   Yes, there's a number 129 written on the red

14        line that says room number.

15   Q.   And that was found where?  What number did you

16        find that.  Where did you get this?

17   A.   This was in the bag containing -- the bag

18        labeled Howland Police Department,

19        description, one empty Days Inn room key

20        card envelope with number 129 marked on

21        it.

22   Q.   And that is 309?

2727

1    A.    The 309 and the envelope, yes.

2    Q.    Now, would you go on to the findings regarding

3          the interior door that you have marked as

4          the interior door of 129?

5    A.    Certainly.  This envelope is labeled as

6          State's Exhibit 395, laboratory

7          submission number 0135755.  It was

8          submitted to the lab on 12-19-2001, by

9          special agent Ed Lulla.  Inside the

10         envelope is State's Exhibit 395-A and

11         395-B.  These are two acetate sheets

12         bearing latent lifts, lifted by special

13         agent Lulla.  On these latent lifts, were

14         five latent fingerprints and one latent

15         palm print labeled identifiable for

16         latent print comparison.  These four

17         fingerprints, excuse me, five

18         fingerprints, were identified as the

19         right index, two to the right little

20         finger, one to the right middle finger

21         and one to the right ring finger of

22         Nathaniel E. Jackson.

2728

1   Q.   Now Nathaniel Jackson that you have

2        fingerprints of, would you give his full

3        name?

4   A.   The full name recorded on the fingerprint card

5        is Nathaniel Edward Jackson.

6   Q.   And his address?

7   A.   There is no address.

8   Q.   A D.O.B.?

9   A.   ████████

10  Q.   And your report reflects all of your findings,

11       is that correct?

12  A.   Yes, it does.

13            MR. WATKINS:  Thank you very much.

14  CROSS EXAMINATION BY MR. CONSOLDANE:

15  Q.   Good morning.  Do you have that submission

16       sheet?

17  A.   These are the two Exhibits that were given to

18       me.

19  Q.   And these are what were submitted to you for

20       testing?

21  A.   The Exhibits are submission sheets, is that

22       what you are asking me?

2729

1    Q.    What was submitted to you, to test?

2    A.    Read from my report?

3    Q.    Yes.  What is the first thing that was

4          submitted to you?

5    A.    Item number three, Taurus .38 caliber

6          revolver.

7    Q.    And this is this revolver that is sitting in

8          front of you, right?

9    A.    Correct.

10   Q.    Were you able to find any prints that you

11         could compare on this?

12   A.    No, I was not.

13   Q.    Go on to the next item.

14   A.    Item number four, live rounds.

15   Q.    Were there any prints that you could compare

16         on those?

17   A.    Item number four, there was no ridge detail

18         present on the live rounds.

19   Q.    And the next item?

20   A.    Item number 24.

21   Q.    Was there any --

22   A.    I'm sorry, that is a plastic place mat.

2730

1   Q.   Was there any prints that were compared on
2        that?
3   A.   There was no prints with sufficient ridge
4        detail for comparison purposes.
5   Q.   The next item?
6   A.   A plastic tray, item 25.
7   Q.   Were there any prints on that?
8   A.   No prints with sufficient ridge detail for
9        comparison purposes.
10  Q.   Go on to the next item.
11  A.   Item 26.  Post mortem prints of Robert
12       Fingerhut.
13  Q.   Go on to the next item.
14  A.   Item 27, copies of fingerprint cards of
15       Nathaniel E. Jackson.
16  Q.   And the next item?
17  A.   Item number 28 is a Chrysler 300-M license
18       plate ████████.
19  Q.   They brought you the whole car?
20  A.   Yes.
21  Q.   Did you check over the whole car?
22  A.   Yes.

2731

1   Q.   Were there any prints that you were able to

2        take off of that car to compare anything

3        with?

4   A.   Yes.  Excuse me, no.  There were seven latent

5        lifts taken from the car.  All of the

6        lifts were insufficient ridge detail for

7        comparison purposes.

8   Q.   You mean you checked over the whole car and

9        could not find any prints at all in the

10       car that you could compare with?

11  A.   No, Sir.

12  Q.   Go on, what is the next item?

13  A.   Item from the A submission, submitted on

14       12-18-2001, item A-5, gauze with stain

15       and a piece of tape.

16  Q.   And that, where did that print come from?

17  A.   I'm sorry?

18  Q.   You are talking about that piece of tape, that

19       tape contains a print on it?

20  A.   No, it did not.

21  Q.   So were you not able to find any prints on

22       that?

2732

1   A.    On A-5, there was no ridge detail present.

2   Q.    And the next item?

3   A.    A-10, a plastic bottle.  On that item, there

4         was no ridge detail present.

5   Q.    The next item?

6   A.    A-11 a bandage container.  And that was no

7         value, ridge detail that was insufficient

8         for comparison purposes.  Item 12, an

9         empty tape paper package.  And there was

10        no ridge detail.

11  Q.    The next item?

12  A.    Item 13, A-13, empty bandage container.  And

13        there was no ridge detail present.  Item

14        14 is an empty sponge container, and this

15        item had ridge detail, but was

16        insufficient for comparison purposes.

17        A-15 is an empty sponge container, and

18        that item had ridge detail but was

19        insufficient for comparison purposes.

20        A-16 is an empty sponge container, and

21        that did not have any ridge detail

22        present.  A-17 is an empty sponge

2733

1           container, and that had no ridge detail

2           present.  Item A-18 is an empty envelope

3           and it has a number of 129 on the

4           envelope.  There were three fingerprints

5           developed on that item and photographed.

6      Q.   Continue.

7      A.   Number A-19 is an empty envelope, and there

8           was ridge detail that was insufficient

9           for comparison purposes.  A-20 is a key,

10          an envelope containing keys, and that

11          item had ridge detail present, but it was

12          insufficient for comparison purposes.

13          A-21 was a cell phone.  Cell phone had

14          ridge detail present, but it was

15          insufficient for comparison purposes.

16          A-22 is a garage door opener, and this

17          opener did have ridge detail, but it was

18          insufficient for comparison purposes.

19          A-23 is a CD, and the CD had no ridge

20          detail present.  Submitted on 12-19-01

21          under the B submission is item B-8, which

22          is latent lifts, and those latent lifts

2734

1          had a total of five identified latent

2          fingerprints developed, and one

3          unidentified latent palm print.  Item B-9

4          are the inked finger and palm print cards

5          of Jennifer Robinson.

6     Q.   How many items -- now take out the fingerprint

7          standards from Donna Roberts and

8          Nathaniel Jackson, and Mr. Fingerhut.

9          How many items were submitted to you to

10         analyze?

11    A.   The lifts, 21.

12    Q.   And that included the gun, keys, and the

13         automobile.  Out of those 21 items, you

14         were only able to identify prints on that

15         one item, the envelope?

16    A.   No, Sir, that is not correct.  There were

17         identifiable prints on the envelope with

18         the number 129 and on the latent lifts

19         submitted by special agent Ed Lulla --

20         item, I believe it is B-9.  Excuse me,

21         B-8.

22    Q.   Which two?

2735

1   A.    Item number A-18 had three fingerprints.  And

2         item B-8 had five fingerprints and one

3         palm print.

4   Q.    So those were the only two items you were able

5         to find prints on?

6   A.    Correct.

7   Q.    And the rest of the other 21 items, the other

8         19 items which included the gun, the car

9         keys and the car, you didn't find any

10        prints that you were able to compare?

11  A.    No, I did not.

12              MR. CONSOLDANE:  Thank you very

13  much.

14              MR. WATKINS:  No redirect.  Thank

15  you.

16                  DALE LAUX

17  being duly sworn according to law, on his oath,

18  testified as follows:

19  DIRECT EXAMINATION BY MR. WATKINS:

20  Q.    Would you give your full name and occupation

21        for the Jury, please?

22  A.    Dale Laux, L A U X, forensic scientist with

2736

```
 1              Ohio Bureau of Criminal Identification
 2              and Investigation.
 3    Q.   And would you tell the Jury how long you have
 4              been so employed?
 5    A.   Over 23 years.
 6    Q.   And would you briefly go into your education?
 7    A.   I have a Bachelor's of Science degree from
 8              Heidelberg College in Science and I have
 9              a Master's of Science degree from Ohio
10              State University.  I received in-service
11              training in our headquarters lab in
12              London, Ohio, and over the years I have
13              attended many workshops and seminars,
14              schools, on forensic science.  Some of
15              these were from the FBI academy in
16              Quantico, Virginia, on the analysis of
17              blood stains, semen stains, trace
18              analysis and over the years, I have
19              attended many other seminars in this
20              area.
21    Q.   As a forensic scientist, what are you
22              specifically doing at BCI Richfield?
```

2737

```
 1   A.    I am in the lab, and I primarily examine
 2         clothing, items and rape kits, weapons,
 3         things of that nature, that are brought
 4         into the lab.  These items have been --
 5         they're evidence of items that have been
 6         collected from crime scenes or from
 7         people involved in crimes, and my duties
 8         include the analysis of blood and semen
 9         stains, body fluids, anything that I
10         might find on these items.
11   Q.    Now, not so long ago when you were doing
12         serology -- maybe you can explain what is
13         serology?
14   A.    Serology is the typing of a body fluid, and
15         years ago we started -- when I started,
16         we did ABO blood groupings and some of
17         you are familiar with your ABO blood
18         status.  We moved into genetic markers
19         which are proteins that we can separate
20         by electrophoresis and this was back in
21         the eighties.  And then, with the advent
22         of DNA, which probably many of you have
```

2738

1           heard of, it has taken the place of that

2           type of analysis.  And the information

3           that we can generate from biological

4           fluids, primarily semen and blood, has

5           been greatly enhanced using DNA.

6   Q.   Early on, you would be able to tell from your

7           analysis, the ABO group type initials,

8           and you could break that down by

9           proteins, but not significantly?

10  A.   Correct.  Typically, the results we would

11          obtain on a semen stain, would be perhaps

12          one in 100, and on a blood stain, one in

13          a thousand.  So in other words, if we

14          would type a blood stain on a piece of

15          clothing, one out of every one-thousand

16          people might match that.  Whereas today

17          with the DNA numbers, you will see that

18          they are staggering.

19  Q.   And what role do you play as far as the system

20          that you now have at BCI when you have

21          for example, a bloody piece of clothing

22          or something that has blood on it, that

2739

1       is sent from the police agency to your

2       laboratory, what is the process that

3       would go on and how do you fit in that

4       process if you are going to end up doing

5       DNA analysis?

6    A.   I am sort of a point man, I guess.  I take a

7       look at the items that are brought in and

8       my experience, I am good at locating

9       stains and finding tiny bits of evidence

10      in clothing, items, shoes and things like

11      that, so I'll go through the items, rape

12      kits, and collect and isolate these

13      materials.  And then we have hired a

14      large number of individuals, younger, and

15      these people have been trained in the DNA

16      analysis, and although they do some

17      serology, they primarily do a lot of the

18      DNA work.

19   Q.   What would you do with for example, a piece of

20      clothing when you would find blood and

21      what test would you use to determine

22      whether or not there's presence of blood?

2740

1   A.   Well, those presumptive tests that we use and

2        these are tests, chemical tests that

3        indicate the presence of blood.  So, to

4        give a little understanding if something

5        came in, a pair of blue jeans come in,

6        there's a stain on the clothing that

7        looks like blood, I would swab it with a

8        cotton swab and add a chemical and if it

9        changed color, that indicates that it

10       could be blood, and besides looking like

11       blood, that chemical reaction indicates

12       that it could be blood.  And I can do a

13       sophisticated test to determine if it is

14       human, or quite likely, I'll cut out the

15       stain especially if it's a limited

16       sample, and retain that for DNA analysis,

17       and we'll go through and we'll pick out

18       relevant materials, some items that we

19       think are very important and can help us

20       in solving a crime.

21  Q.   Now, if you would receive blood, for example,

22       if there's an autopsy and you have blood

2741

1           from the victim, what would you do with

2           that blood in the chain of events, when

3           it would end up with the DNA expert?

4    A.    Apparently from an autopsy, they will come in

5           a tube, and what we'll do is open that

6           tube, and we have photo paper, it is a

7           very absorbent paper that is commonly

8           called a DNA card and I'll take a sample

9           of that blood, dry it on this card, and

10          retain that in the freezer and that is

11          known as a standard.  That will be a

12          blood standard from a certain individual,

13          a victim perhaps, and then we'll compare

14          the DNA profile from that person with

15          unknown stains.

16   Q.    And how about with a swab, as far as a swab to

17          a person that we would be looking at for

18          a comparison?

19   A.    Living individuals, suspects, and victims, we

20          can collect DNA quite easily from an oral

21          swab, just a cotton swab that is placed

22          inside a person's mouth rubbed against

2742

1          the cheek and that collects enough cells

2          to -- without causing any pain or

3          anything, and those swabs would be

4          retained in the freezer along with

5          unknown stains.

6    Q.   And would you ordinarily do a presumptive test

7          and another test or what exactly would

8          you ordinarily do?

9    A.   On those items if I know that they were

10         collected, and the chain of evidence is

11         solid, I would just retain those items.

12   Q.   Now, are there times that you would go out in

13         the field, I know you have on other

14         cases, but for example, would you look at

15         a car and go into the car, looking for

16         blood stains?

17   A.   Yes.

18   Q.   And you in fact did this, in this particular

19         case?

20   A.   Yes.

21   Q.   I am going to hand you a report captioned as

22         State's Exhibit 284.  Do you recognize

2743

1          it?

2   A.   Yes.  It is a copy of a report that I sent to

3          Howland Police Department in reference to

4          this case.

5   Q.   And also, 280, this is a submission sheet

6          regarding oral swabs?

7   A.   Yes, it is a copy of a submission sheet with

8          our case number at the top, and --

9   Q.   That is 280, correct?

10  A.   Yes.

11  Q.   Would you tell the Jury when you got involved

12          with the case involving Robert Fingerhut?

13  A.   Yes.  The case was brought in on December 14,

14          2001, and I think within a couple of days

15          after that, I was involved in this case.

16          I began looking at the automobile that

17          was brought in with Cindy Mayle.

18  Q.   And you received a variety of evidence, or in

19          fact, personally retrieved some evidence?

20  A.   Yes.

21  Q.   I'm going to hand you number 255.  Do you

22          recognize it?

2744

1   A.   Yes.

2   Q.   And would you tell the Jury what it is?

3   A.   The sealed manila envelope, it is labeled with

4        our case number and item 14.  It is

5        labeled one cotton swab of possible blood

6        stain from floor found in front door

7        hallway.

8   Q.   And what did you do with that particular item?

9   A.   I opened this item, and ran a presumptive test

10       on a small portion of the stained swab.

11       This was a swab inside this envelope with

12       a red stain, and it indicated the

13       presence of blood, and I retained that

14       swab.

15  Q.   And was that swab turned over to someone in

16       your laboratory for DNA?

17  A.   Yes.

18  Q.   Who would that be?

19  A.   Brenda Gerardi.

20  Q.   Also hand number 294 to you.  Did you also

21       receive that particular item?

22  A.   Yes, I did.

2745

1    Q.    And would you characterize it, please?

2    A.    It is a sealed brown paper bag, has our BCI

3          case number, item number A as in apple 3,

4          and it contained a piece of stained

5          cotton dressing, and it was obtained

6          from, it states a dumpster behind the

7          Days Inn South, 8392 Market Street.

8    Q.    It's a gauze?

9    A.    Yes.

10   Q.    And did you inspect it and test it?

11   A.    Yes.

12   Q.    What did you find?

13   A.    Red stains on this gauze and presumptive test

14         indicated presence of blood.

15   Q.    And did you turn that over to Brenda Gerardi

16         for DNA testing?

17   A.    Yes.

18   Q.    I'm going to hand you State's Exhibit 265.  Do

19         you recognize it?

20   A.    Yes, 265 is a plastic zip lock biohazard bag

21         containing one purple top tube of blood.

22         And this is blood from the victim.

2746

```
 1   Q.   Robert Fingerhut?

 2   A.   Yes, Sir.

 3   Q.   And what did you do with it?

 4   A.   I opened the tube, took a sample of the blood

 5        and dried it onto a DNA card.  Let that

 6        dry thoroughly and then retained that in

 7        a manila envelope in the freezer.

 8   Q.   And did you turn over your example or sample

 9        to Brenda Gerardi?

10   A.   Yes.

11   Q.   And this was done for DNA testing also?

12   A.   Yes.

13   Q.   Now, there came a time that you inspected an

14        automobile?

15   A.   Yes.

16   Q.   And do you recall what date that was?

17   A.   On December 18, 2001.

18   Q.   And what did you find in that automobile?

19   A.   I looked at the outside of the automobile,

20        primarily the door handles, passenger

21        side door handle, and noticed a stain,

22        and then there were numerous stains
```

2747

1          inside the automobile by the console that

2          I examined, ran presumptive tests on

3          these stains and the ones that indicated

4          presence of blood, I retained those

5          stains.

6    Q.   And what kind of automobile was it?

7    A.   A silver Chrysler.  I can tell you the VIN

8         number if you like.

9    Q.   Yes.

10   A.   Number ████████████, I'm sorry ██████

11   Q.   And that is in your report?

12   A.   No.  That is on submission sheet.

13   Q.   Now, were there Howland police officers there

14        at the time?

15   A.   Yes.

16   Q.   Was Cindy Mayle there at the time?

17   A.   Yes.

18   Q.   Now, did you take any parts or take anything

19        from the car that it was in its original

20        state that you could further test or

21        analyze?

22   A.   There was an item that was taken out by

2748

1           Sergeant Pizzulo from the automobile.  It

2           was the visor.

3    Q.    It was done in your presence?

4    A.    Yes.

5    Q.    I'm going to show you what has been marked as

6           State's Exhibit 267 and 268.

7    A.    I recognize this.

8    Q.    Is that the visor from the Chrysler

9           automobile?

10   A.    Yes.

11   Q.    And do you know what size, whether it was

12          driver or passenger side visor?

13   A.    Driver's side.

14   Q.    268?

15   A.    This is a brown paper bag, sealed, my labeling

16          occurs right there.  I labeled it 28.6,

17          because the automobile was item 28 and

18          this is the metal bracket that holds the

19          visor onto the automobile.

20   Q.    And did you get anything off the visor that

21          was given to Brenda Gerardi for testing?

22   A.    Yes.

2749

1    Q.   What was that?

2    A.   Swabbed an area on the visor that appeared to

3         be blood and presumptive test indicated

4         that it was blood and I retained that.

5    Q.   And how about off of the clamp?

6    A.   Yes, I retained two swabs from the clamp.

7    Q.   Now, did you also bring with you today, some

8         other items?

9    A.   Yes.

10   Q.   And do you have those, please?

11   A.   Yes.

12   Q.   These have been pre-marked?

13   A.   Yes.  Those were the envelopes that I

14        prepared, the sample that I retained.

15   Q.   They were in your custody and you brought them

16        with you today?

17   A.   Yes.

18   Q.   There are 2 -- I mean 385, 386, 387, 388 and

19        389, correct?

20   A.   Yes.

21   Q.   And would you go through them individually and

22        tell the Jury what they are and identify

2750

1          them by each number.

2    A.    State's Exhibit 387 is a sealed manila

3          envelope, which was our case number item

4          14.  This was a swab that was collected,

5          just states unknown stain that was

6          collected, I believe from the scene.

7          That was 387.  Number 386 is a manila

8          envelope, and it is a stain that I

9          collected from above the trunk release

10         button that is inside the car by the

11         console.  State's Exhibit 385, sealed

12         manila envelope which contains a stain

13         that I collected from the visor, driver's

14         side visor.  State's Exhibit 388 is a

15         blood standard from Robert Fingerhut.

16         This was the tube of blood, this was a

17         stain that I prepared and dried and

18         retained.  And State's Exhibit 389 is the

19         gauze that was collected in the dumpster

20         outside the hotel.

21   Q.    Did you turn over those also for testing by

22         Brenda Gerardi?

2751

1   A.   Yes.

2   Q.   Is there anything else you did in this

3        particular case?

4   A.   That is about it.

5   Q.   And your report basically reflects everything

6        you received, and you brought with you,

7        those items and identified the ones we

8        have had heretofore?

9   A.   Yes.

10               MR. WATKINS:  Thank you very much.

11  CROSS EXAMINATION BY MR. LEWIS:

12  Q.   We go back a long way, even as a Prosecutor,

13       right?

14  A.   Yes.

15  Q.   We're both getting old.  You received a

16       submission sheet, correct?  You have a

17       submission sheet?

18  A.   Yes.

19  Q.   And that is how BCI&I operates, a local law

20       enforcement unit will submit things or

21       bring them to the BCI lab, and you will

22       create a submission sheet?

2752

1   A.   Yes.

2   Q.   And itemize all of the items, you create a

3        case number?

4   A.   Yes.

5   Q.   Then you put your own numbers on there and at

6        the same time, there's blocks up there to

7        ask -- you good folks to either do

8        serology or trace evidence or ballistics,

9        it is not really ballistics, that's the

10       wrong word?

11  A.   It is misused.  Ballistics is trajectory of

12       the bullet and the actual comparison is

13       firearms examination.

14  Q.   And the itemized submission sheet here is, you

15       were given how many items to analyze, can

16       you give me?

17  A.   28 items, the first submission.

18  Q.   28 items in the first submission.  How many on

19       any subsequent submission?  We have got

20       28.

21  A.   25 items on the A submission.

22  Q.   You have got 28 on the first one, then 25.

2753

1              What submission is this?

2    A.   A -- the first one is just blank and this

3             becomes A.

4    Q.   The first one is just nothing?

5    A.   Right.

6    Q.   So, in total, you received 28 and 25 items to

7             analyze, correct?

8    A.   Then there was a B with nine.  C with eight.

9    Q.   Nine items on B, right?

10   A.   And a C with eight.  Eight items on the C

11            submission.

12   Q.   Now all of the items in these submissions and

13            everything else, were they to go to

14            serology?

15   A.   No.

16   Q.   And how many out of these groups were to go to

17            serology, do you know?

18   A.   Well, I can count them up.

19   Q.   Start on the first submission at 28.

20   A.   It looks like 13 of the first 28.

21   Q.   And how about on submission A, letter A, the

22            25?

2754

1   A.   11.

2   Q.   And how about on submission B?

3   A.   Six.

4   Q.   And on C?

5   A.   Four.

6   Q.   So, out of a total, we have 24 items to go to

7        serology, right?

8   A.   Yes.

9   Q.   Now as Mr. Watkins indicated, sometimes you

10       actually go out in the field and collect

11       the evidence.  We had one of your fellows

12       testify yesterday, Ed Lulla, and he was

13       one of the people that went out in the

14       field and you have gone out in the field

15       yourself and done the work, right?

16  A.   Yes.

17  Q.   Collect the trace evidence.  Go to the actual

18       crime scene and instead of officers

19       looking for it, taking it and

20       transmitting it on to you, you have

21       actually gone to the scene, which may be

22       a little bit more helpful, because you

2755

1    are used to dealing with this as opposed

2    to local police departments that may not

3    be that well trained or what to look for,

4    right?

5  A.  Yes.  In the old days, but now, training has

6    become very good for law enforcement.  It

7    is probably why I'm not out there as

8    often.

9  Q.  But in this case, to your knowledge was

10    anybody from BCI&I actually sent to the

11    254 Fonderlac address to collect

12    evidence, do you know?

13  A.  I don't know.

14  Q.  And these submission sheets, why don't you

15    start off, let's start with this one, the

16    original.  It is all in chronological

17    order.  These are actually the times when

18    they are submitted, goes down, so the

19    time factor has to be in this direction?

20  A.  Yes.

21  Q.  Let's start with the first one.  What was the

22    first item submitted?

2756

1    A.    A gunshot residue kit.  That wasn't for me.

2    Q.    It is not an exhibit.

3                 MR. WATKINS:  I didn't make it an

4    Exhibit.

5    Q.    Did you get a subpoena yet?  You have to come

6                 back here Friday.  Do you know it is

7                 going to snow.

8    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

9    OF HEARING)

10                THE COURT:  Conference Side Bar

11   waived or do you wish something on the record?  Do

12   you waive anything said at Side Bar?

13                MR. LEWIS:  We're all right on that.

14   Q.    The first item was a gunshot residue kit?

15   A.    Yes.

16   Q.    And what is that?  You know what it is, don't

17                you?

18   A.    It is a plastic box that has little probes

19                that have sticky tape on them and they

20                are run over the hand to collect any

21                gunshot residue.

22   Q.    To figure out if anybody fired a weapon,

2757

1          right, a firearm?

2   A.   Yes, I'm not really trained in that area.

3   Q.   That is generally what it is for?

4   A.   Yes.

5   Q.   If I shoot, the residue can come out the

6          barrel, it could come out the sides, and

7          the nitrites can end up on the hand?

8   A.   Yes.

9   Q.   There was such a submission?

10  A.   Yes.

11  Q.   And now this in reference only to serology,

12         what was the next thing that was

13         submitted to you for serology?

14  A.   For serology, the victim's shirt -- I'm sorry,

15         it is from the victim's wife, the shirt

16         that she was wearing.

17  Q.   The shirt she was wearing.

18              MR. LEWIS:  We don't have that.

19              MR. MORROW:  There's a picture of

20  it.

21              MR. LEWIS:  You have the shirt

22  though, right?

2758

1              MR. MORROW:  Yes.

2    Q.   So it was a shirt, correct, and did you do a

3         presumptive test on it?

4    A.   No.

5    Q.   You did not?

6    A.   No.

7    Q.   Tell me why not.  It was sent to you for

8         serology, right?

9    A.   Yes.

10   Q.   You do the presumptive test for the serology,

11        then send them on to DNA, right?  That is

12        what you did with a lot of these things?

13   A.   I didn't examine every item, obviously.  You

14        saw my report and that summarizes the

15        items and the items I didn't mention, I

16        didn't examine and when we approach a

17        case, I talk to the investigators and

18        some items were discussed that they would

19        like to have examined, and those items

20        were looked at and then what we typically

21        do is see what kind of evidence or what

22        kind of results that examination is going

2759

1          to provide.  So that means that the items
2          that I sent to Brenda, she's going to do
3          DNA analysis on these and then we kind of
4          examine those results, and see where we
5          want to go from there.  And in this case,
6          there was no further need to go on any
7          farther.
8    Q.   So there's no need to go on any farther, you
9          had a shirt submitted to you to BCI&I,
10         you work for BCI&I, you work for Betty,
11         and the shirt had a spot of what looked
12         like blood, didn't it?
13   A.   No, I didn't examine it.
14   Q.   You didn't examine it at all?
15   A.   No.
16   Q.   Who told you not to examine it?
17   A.   No one.
18   Q.   Were you working with the officers in the
19         case?
20   A.   Yes.
21   Q.   You were?
22   A.   They didn't say don't examine this.

2760

1  Q.   If they said don't examine it, or they didn't

2       say don't examine it, did you take it on

3       yourself not to examine it?

4  A.   Yes.

5  Q.   And on what basis?  On what basis?

6  A.   I thought I explained that.

7  Q.   No.  Do it one more time.  You made a

8       decision.  Here's what I'm having a hard

9       time with.  Material sent to you on

10      submission sheets for you to examine, you

11      do the serology.  And it comes to you,

12      you just willy nilly go down there and

13      pick what you want to do and don't want

14      to do?

15 A.   Not willy nilly.

16 Q.   Who is directing you?

17 A.   I make these choices.  I have the luxury and I

18      worked in the field and I also work in

19      the lab now, and having worked in the

20      field, I know that you get one

21      opportunity, so Mr. Monroe here, Paul

22      Monroe, he will collect items perhaps,

2761

```
 1              and I used to do this, too, and you are

 2              collecting these and you don't exactly

 3              know what significance they may have in

 4              the case.  There may be no significance

 5              at all.  So, you submit those --

 6     Q.   But they may have significance?

 7     A.   They may, and they may not.

 8              MR. WATKINS:  Let the witness

 9     answer.  He's almost being argumentative.

10     Q.   Officer Monroe is a very good officer.  He

11              collects things for the heck of it?

12     A.   I'll collect up many, many things and I think

13              that maybe there's some relevance to the

14              case, I'm not sure, what this piece of

15              dirt on the floor means, but I'll collect

16              it.  And it turns out that perhaps it is

17              not very relevant at all.  And we have

18              got other items that we really want to

19              concentrate on.  So it makes sense to lab

20              personnel that we're going to pick those

21              items we think might get at the truth, to

22              determine what happened, who is involved,
```

2762

1          and then move on to the next case.  And

2          as you know, we have plenty of work, that

3          is why we do what we do.

4    Q.    I'm glad we're all employed and not on the

5          unemployment line.  You figured that the

6          shirt, and it is even put on there

7          serology, human blood.  That was the

8          request of Mr. Monroe, right?  He was

9          asking you for that?

10   A.    Yes.

11   Q.    And you decide on your own, that no, that

12         doesn't have a very good fitting into the

13         case, not very important?

14   A.    I talked to Sergeant Monroe, and I said,

15         "Okay, Paul, what would you like real

16         quick, what are you really interested

17         in?"  And he said I like this, this and

18         this.  I did that.  We have to work

19         together with law enforcement personnel.

20   Q.    Let me ask you this then.  Is this kind of

21         they talk to you, you talk to them and

22         you kind of pick and choose what evidence

2763

1          you like?  If you want to set a

2          direction, in other words, in order to

3          pick out or to go after somebody, you

4          have to have in your mind, something else

5          already in mind, right?  In other words,

6          the shirt, even though it had blood,

7          maybe it has blood on it and belonged to

8          the victim's wife, for some reason, these

9          gentlemen didn't think it was very

10         important and you didn't think it was

11         that important.  So you make that

12         arbitrary decision, "Well, we don't want

13         to go after the wife.  We want to go

14         after someone else."

15              MR. WATKINS:  Your Honor, who is

16    testifying?

17              MR. LEWIS:  I'm just asking the

18    question.

19    A.   Can you repeat the question?

20    Q.   The question is, Dale, you are picking and

21         choosing what evidence you decide to

22         analyze here because you already have

2764

1           something in mind, isn't that it?

2  A.   No.

3  Q.   If you don't have something in mind, how do

4           you pick and choose?

5  A.   There's a hypothesis in any scientific

6           experiment.  A hypothesis is a theory of

7           what took place or what may take place so

8           a scientist then says, if this took place

9           and this hypothesis is true, let's

10          analyze this item and see if it supports

11          or negates that hypothesis.  That is what

12          scientists do, and that is what I did.  I

13          had no predetermined idea what I might

14          find on examining these items, but we

15          certainly then go through the analysis,

16          look at our results, and see if it

17          supports or negates the hypothesis.

18 Q.   What was the hypothesis in this case?  You

19          already had hypothesis, that is a little

20          bit different than what I called it.

21          That's the same thing.  You already had

22          hypothesis, you had certain evidence so

                                                      2765

1              the hypothesis was that the shirt or that

2              shirt, if she had blood on it, wouldn't

3              fit into the hypothesis, is that right?

4              That is why you didn't analyze it, right?

5    A.   The hypothesis is that the victim's wife is

6              there and perhaps called police, and

7              grabbed her husband, "Oh, my Lord, what

8              happened," and got blood on her shirt.

9    Q.   That is your hypothesis?

10   A.   No.  I said that is one possible hypothesis.

11             The shirt wasn't tested to determine

12             anything.

13   Q.   What happens if she had a gun and she shot

14             somebody and blood splattered on her?

15             Isn't that a hypothesis?

16   A.   We had other hypotheses.

17   Q.   You didn't like the other one.  All right, I'm

18             not going to argue with you anymore.  So

19             you didn't do the victim's shirt, right?

20   A.   Correct.

21   Q.   They wanted it done for human blood serology.

22             Evidently, there's something red on it?

2766

1    A.    I don't know.  I didn't examine it.

2    Q.    You didn't look at it?

3    A.    No.

4    Q.    The brown bag containing the Taurus gun, you

5          looked at that and you determined that

6          there wasn't any blood on it?

7    A.    No, I didn't look at that.  It was just for

8          firearms, it wasn't for serology.

9    Q.    Plastic bag contains the standard from the

10          victim.  The rectal swabs from the

11          victim, did you analyze those at all?

12    A.    No.

13    Q.    And the oral swabs from the victim?

14    A.    No.

15    Q.    Because you already had blood standard?

16    A.    Yes.

17    Q.    Brown bag containing swab with an unknown

18          stain, 14.  Did that have blood on it?

19    A.    Yes.

20    Q.    You did presumptive test for blood?

21    A.    Yes.

22    Q.    And the presumptive test, it doesn't give you

2767

1              break downs as far as the blood type, the

2              proteins, it doesn't go with DNA, doesn't

3              do anything, it just says blood.  Does it

4              say human blood?

5    A.   It says it could be blood.

6    Q.   And 14, that moved on to DNA?

7    A.   Yes.

8    Q.   Number 15, swab, unknown.  Did that go on to

9              DNA?

10   A.   No.

11   Q.   What is 15?

12   A.   I don't know.  These items were collected.

13   Q.   We don't have that as an Exhibit, No. 15.

14              MR. MORROW:  It is an unknown stain.

15              MR. LEWIS:  From?

16              MR. WATKINS:  There's a number of

17   stains that we went through.

18              MR. LEWIS:  Where's the evidence?

19              MR. WATKINS:  I didn't bring them.

20              MR. LEWIS:  Bring them.

21              MR. WATKINS:  He can present his

22   case.

2768

1    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

2    OF HEARING)

3              THE COURT:  Ladies and gentlemen,

4    this is a good time for you to go to lunch.  You

5    are not to discuss anything or form any opinion

6    until you return.  Be back here at 1:00.  Thank

7    you.

8    (Court in Recess at 12:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

2769

### REPORTER'S CERTIFICATE

I do hereby certify that the above and foregoing is a true and correct transcript of the proceedings had in the within hearing as shown by stenotype notes written by me in the presence of the witnesses at the time of the hearing.

*Mary Ann Mills*
MARY ANN MILLS, R.P.R.
Official Court Reporter
Trumbull County, Ohio