# VOLUME 12

FILED

2770

JUL 09 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO
TRIAL COURT CASE NO. 01-CR-794
SUPREME COURT OF OHIO CASE NO. 03-137

STATE OF OHIO            )
                         )
          Plaintiff      )
                         )            TESTIMONY
-vs-                     )
                         )
NATHANIEL JACKSON        )
                         )
          Defendant      )

        BE IT REMEMBERED, that on Tuesday, October 29,

2002, Wednesday, October 30, 2002, and Thursday,

October 31, 2002, these proceedings came on to be

heard before one of the Judges of this Court, John M.

Stuard, in Courtroom No. 2, on High Street, Warren,

Ohio, before the case heretofore filed herein.


Mary Ann Mills, RPR
Official Court Reporter
Trumbull County, Ohio

2771

1

## A P P E A R A N C E S

2

3

On Behalf of the State of Ohio:
    Dennis Watkins
    Trumbull County Prosecutor
    Charles L. Morrow
    Assistant Prosecuting Attorney
    160 High Street, N.W.
    Warren, Ohio

4

5

6

7

On Behalf of the Defendant:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defender's Office
    328 Mahoning Ave., N.W.
    Warren, Ohio

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

i

1                    I N D E X

2                                          PAGE NO.

3    Search Warrant Hearing                    3
     (December 20, 2001)

4
     Initial Appearance of Nathaniel Jackson    9
5    Hearing (December 21, 2001)

6    Initial Appearance of Donna Roberts       12
     Hearing (December 21, 2001)

7
     Motion to Intervene                       19
8    (December 31, 2001)

9    Arraignment of Donna Roberts (co-defendant)   57
     Arraignment of Nathaniel Jackson

10
     Waiver of Speedy Trial                    64
11   (January 23, 2002)

12   Hearing on Motions                        67
     (March 20, 2002)

13
     Hearing on Motion to Suppress Evidence   185
14   (April 17, 2002)

15   WITNESSES AT SUPPRESSION HEARING:

16   JEFFREY R. HOOLIHAN
         Direct Examination by Mr. Watkins     190
17       Cross Examination by Mr. Lewis        231
         Redirect Examination by Mr. Watkins   274
18       Recross Examination by Mr. Lewis      280

19   DET. SGT. PAUL MONROE
         Direct Examination by Mr. Lewis       288
20       Examination by The Court              312

21   NATHANIEL JACKSON
         Direct Examination by Mr. Consoldane  314
22       Cross Examination by Mr. Watkins      324

ii

1 | <u>INDEX - Continued</u>                                    <u>PAGE NO.</u>

2 | Court's Opening Remarks (Volume 2)                  381
Motion for Mistrial                                 415

3 |

<u>VOIR DIRE</u>

4 |     Hardship Excuses                                422
    Death Penalty Qualification & Media             664

5 |     (Volume 3)
    Motion for Change of Venue & Motion to

6 |      Dismiss                                       1835

7 | GENERAL VOIR DIRE                                   1857

8 | OPENING STATEMENT ON BEHALF OF STATE OF OHIO        2064
OPENING STATEMENT ON BEHALF OF THE DEFENDANT        2093

9 |

STATE'S WITNESSES:

10 |

<u>PAULA CARSON</u>

11 |     Direct Examination by Mr. Morrow               2100
    Cross Examination by Mr. Lewis                 2105

12 |

<u>JAMES C. DANIELS</u>

13 |     Direct Examination by Mr. Watkins             2111
    Cross Examination by Mr. Lewis                 2124

14 |     Redirect Examination by Mr. Watkins           2138

15 | <u>JOSE SANCHEZ</u>
    Direct Examination by Mr. Watkins             2139

16 |     Cross Examination by Mr. Lewis                 2156
    Redirect Examination by Mr. Watkins           2168

17 |

<u>FRANK E. REYNOLDS</u>

18 |     Direct Examination by Mr. Watkins             2172
    Cross Examination by Mr. Lewis                 2191

19 |     Redirect Examination by Mr. Watkins           2201

20 | <u>PAUL MONROE</u>
    Direct Examination by Mr. Watkins             2202

21 |     Cross Examination by Mr. Consoldane           2392

22 |

iii

1 <u>INDEX</u> - Continued                                      <u>PAGE NO.</u>

2 <u>MIKE YANNUCCI</u>
    Direct Examination by Mr. Morrow              2406
3   Cross Examination by Mr. Lewis                2418
    Redirect Examination by Mr. Morrow           2428

4
<u>RICHARD TACKETT</u>
5   Direct Examination by Mr. Morrow             2428
    Cross Examination by Mr. Lewis               2434

6
<u>ANTHONY LESHNACK</u>
7   Direct Examination by Mr. Watkins            2445
    Cross Examination by Mr. Consoldane          2455

8
<u>FRANK DILLON</u>
9   Direct Examination by Mr. Watkins            2457
    Cross Examination by Mr. Lewis               2480

10
<u>DR. THEODORE SOBOSLAY</u>
11   Direct Examination by Mr. Watkins           2512

12 <u>DR. HUMPHREY GERMANIUK</u>
    Direct Examination by Mr. Watkins            2520
13   Cross Examination by Mr. Consoldane          2576
    Redirect Examination by Mr. Watkins          2583
14   Recross Examination by Mr. Consoldane        2585
    Redirect Examination by Mr. Watkins          2586

15
<u>JOSE FLORES</u>
16   Direct Examination by Mr. Watkins           2587
    Cross Examination by Mr. Lewis               2599

17
<u>EDWARD LULLA</u>
18   Direct Examination by Mr. Watkins           2604
    Cross Examination by Mr. Lewis               2624

19
<u>JOHN STAMPER</u>
20   Direct Examination by Mr. Watkins           2645
    Cross Examination by Mr. Lewis               2652

21

22

iv

| 1 | INDEX - Continued | PAGE NO. |
|---|---|---|
| 2 | **JEFF DIAMANTES** | |
|   | Direct Examination by Mr. Watkins | 2654 |
| 3 | Cross Examination by Mr. Lewis | 2659 |
|   | Redirect Examination by Mr. Watkins | 2661 |
| 4 | | |
|   | **MICHAEL ROBERTS** | |
| 5 | Direct Examination by Mr. Morrow | 2663 |
|   | Cross Examination by Mr. Consoldane | 2695 |
| 6 | Redirect Examination by Mr. Morrow | 2704 |
|   | Recross Examination by Mr. Consoldane | 2706 |
| 7 | | |
|   | **CYNTHIA MAYLE** | |
| 8 | Direct Examination by Mr. Watkins | 2706 |
|   | Cross Examination by Mr. Consoldane | 2728 |
| 9 | | |
|   | **DALE LAUX** | |
| 10 | Direct Examination by Mr. Watkins | 2735 |
|   | Cross Examination by Mr. Consoldane | 2751 |
| 11 | Redirect Examination by Mr. Watkins | 2790 |
|   | Recross Examination by Mr. Lewis | 2798 |
| 12 | | |
|   | **BRENDA GERARDI** | |
| 13 | Direct Examination by Mr. Watkins | 2803 |
|   | Cross Examination by Mr. Lewis | 2840 |
| 14 | | |
|   | **STEVE GREENE** | |
| 15 | Direct Examination by Mr. Morrow | 2851 |
|   | Cross Examination by Mr. Lewis | 2875 |
| 16 | | |
|   | **CHRIS ELLINGTON** | |
| 17 | Direct Examination by Mr. Morrow | 2881 |
|   | Cross Examination by Mr. Consoldane | 2888 |
| 18 | | |
|   | **JIM McCOY** | |
| 19 | Direct Examination by Mr. Morrow | 2890 |
|   | Cross Examination by Mr. Lewis | 2899 |
| 20 | | |
|   | **JILL KENYON** | |
| 21 | Direct Examination by Mr. Morrow | 2900 |
|   | Cross Examination by Mr. Consoldane | 2908 |
| 22 | | |

v

| 1 | INDEX - Continued | PAGE NO. |
|---|---|---|

**JENNIFER ROBINSON**
- Direct Examination by Mr. Morrow — 2911
- Cross Examination by Mr. Lewis — 2920

**KATHY KIHM**
- Direct Examination by Mr. Morrow — 2921
- Cross Examination by Mr. Lewis — 2924

**BRIDGET PAUL**
- Direct Examination by Mr. Morrow — 2925
- Cross Examination by Mr. Consoldane — 2934

**KATHERINE THOMAS**
- Direct Examination by Mr. Morrow — 2936
- Cross Examination by Mr. Lewis — 2952
- Redirect Examination by Mr. Morrow — 2973
- Recross Examination by Mr. Lewis — 2976

**JAMES CAMPBELL**
- Direct Examination by Mr. Watkins — 2977
- Cross Examination by Mr. Consoldane — 2982

**LINDA THOMAS**
- Direct Examination by Mr. Morrow — 2994
- Cross Examination by Mr. Consoldane — 3002

**CHRISTOPHER MONYAK**
- Direct Examination by Mr. Morrow — 3003
- Cross Examination by Mr. Lewis — 3023
- Redirect Examination by Mr. Morrow — 3037

**TROOPER GERALD FUNELLI**
- Direct Examination by Mr. Morrow — 3038
- Cross Examination by Mr. Lewis — 3046

**DET. SGT. PAUL MONROE**
- Redirect Examination by Mr. Watkins — 3049
- Recross Examination by Mr. Lewis — 3063

**BRAD CAIN**
- Direct Examination by Mr. Lewis — 3106

vi

| | INDEX - Continued | PAGE NO. |
|---|---|---|
| 1 | | |
| 2 | TAMMIE KAYE | |
| | Direct Examination by Mr. Consoldane | 3118 |
| 3 | | |
| | ROBERT STANTON | |
| 4 | Direct Examination by Mr. Lewis | 3119 |
| | Cross Examination by Mr. Watkins | 3127 |
| 5 | | |
| | MOTIONS | 3200 |
| 6 | | |
| | CARMEN OLIVA | |
| 7 | Direct Examination by Mr. Watkins | 3267 |
| | Cross Examination by Mr. Lewis | 3278 |
| 8 | | |
| | BARRY RICKER | |
| 9 | Direct Examination by Mr. Watkins | 3290 |
| | Cross Examination by Mr. Lewis | 3300 |
| 10 | | |
| | DIANA MARCHESE | |
| 11 | Direct Examination by Mr. Watkins | 3309 |
| | Cross Examination by Mr. Consoldane | 3314 |
| 12 | Redirect Examination by Mr. Watkins | 3319 |
| | Recross Examination by Mr. Consoldane | 3319 |
| 13 | | |
| | MOTION RE JURY INSTRUCTIONS | 3334 |
| 14 | | |
| | FINAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3390 |
| 15 | FINAL ARGUMENT ON BEHALF OF THE DEFENDANT | 3438 |
| | FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT | 3495 |
| 16 | REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO | 3505 |
| 17 | CHARGE OF THE COURT | 3541 |
| 18 | NOVEMBER 7, 2002 (Deliberations) | 3601 |
| 19 | NOVEMBER 8, 2002 (Deliberations) | 3602 |
| 20 | VERDICT | 3612 |
| 21 | (SEE SEPARATE VOLUME FOR TRANSCRIPT OF MITIGATION HEARING) | |
| 22 | | |

vii

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | Withdrawn |
| 36 | Photo | Withdrawn |
| 37 | Photo | No Objection |
| 38 | Photo | No Objection |
| 39 | Photo | Withdrawn |
| 40 | Photo | No Objection |
| 41 | Photo | Withdrawn |
| 42 | Photo | Withdrawn |
| 43 | Photo | No Objection |
| 44 | Photo | No Objection |
| 45 | Photo | Withdrawn |
| 46 | Photo | Withdrawn |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | Withdrawn |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

viii

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninisula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | Withdrawn |
| 86 | Blood Spatters - garage | No Objection |
| 87 | Overview garage | No Objection |
| 88 | Peninusla & Wall - blood splatters | Withdrawn |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | No Objection |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | Withdrawn |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | No Objection |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | Withdrawn |
| 108 | Victim | No Objection |
| 108A | Victim Face down | Withdrawn |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | No Objection |
| 111 | Victim lower torso | Withdrawn |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | No Objection |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

| | | | |
|---|---|---|---|
| 118 | Office Area | No Objection | |
| 119 | Office Area | No Objection | ix |
| 120 | Office Area | No Objection | |
| 121 | Office Area | No Objection | |
| 122 | Front Door Looking In | No Objection | |
| 123 | Dining Room - Orioles Jacket | No Objection | |
| 124 | Office Area w/ ball cap | No Objection | |
| 125 | Dry Wall Hole | No Objection | |
| 126 | Front View of Car | No Objection | |
| 127 | left rear red car | No Objection | |
| 128 | left view red car | No Objection | |
| 129 | Garage door & Driver door | No Objection | |
| 130 | Family Room - overview | No Objection | |
| 131 | Table w/ 2 roaches | No Objection | |
| 132 | Garage w/ view of Gun | No Objection | |
| 133 | Blood Drops in garage | Withdrawn | |
| 134 | Overview - Office | No Objection | |
| 135 | Kitchen - Door | Withdrawn | |
| 136 | Open Door, Kitchen area | Withdrawn | |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection | |
| 138 | Stainless Steel Revolover | No Objection | |
| 139 | Close - up Footprint & Garage | No Objection | |
| 140 | Stairwell & Basement | No Objection | |
| 141 | Stairwell & Basement | No Objection | |
| 142 | Cabinet | No Objection | |
| 143 | Close - Up Cabinet | No Objection | |
| 144 | Kitchen - Different View | No Objection | |
| 145 | Pier One Import Bag w/ wine glasses | No Objection | |
| 146 | Front View of Car | No Objection | |
| 147 | Rt Side View of Car | No Objection | |
| 148 | Rear view of Car | No Objection | |
| 149 | Left Side view of Car | No Objection | |
| 150 | Double Lined Bag "Nate Jackson" | No Objection | |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection | |
| 152 | Assorted Candy, toothpaste | No Objection | |
| 153 | Customer Reciept | No Objection | |
| 154 | Handcuff Box w/ key - no cuffs | No Objection | |
| 155 | Hair Comb | No Objection | |
| 156 | Front View of Car | No Objection | |
| 157 | Rear view of Car | No Objection | |
| 158 | Wide Angle Rear of Car | Withdrawn | |
| 159 | Rt Side View of Car | No Objection | |
| 160 | Front View of Car - Left Corner | No Objection | |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn | |
| 162 | Front View of Car | No Objection | |
| 163 | Exterior to Interior - Blood Smears | No Objection | |
| 164 | Visor Area | No Objection | |
| 165 | Interior area above head w/ blood | No Objection | |
| 166 | Exterior | No Objection | |
| 167 | Front Driver Seat | Withdrawn | |
| 168 | Visor Area - Removed | No Objection | |
| 169 | Door Handle | No Objection | |
| 170 | Door Handle w/ blood | No Objection | |
| 171 | Driver side visor clamp | No Objection | |
| 172 | Front Passenger Seat - Cell Phone | No Objection | |
| 173 | Front Passenger Seat - Cell Phone | No Objection | |
| 174 | Interior -Left Console | No Objection | |
| 175 | Napkin w/ Blod Smear | No Objection | |
| 176 | Floormat | Withdrawn | |
| 177 | Trunk Open | No Objection | |
| 178 | Keys in Ignition | No Objection | |
| 179 | Rt interior head rest | Withdrawn | |

| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Inn Photographs | Admitted over Obj |
| 202 | Days Inn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | Withdrawn |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Inn Photographs | Withdrawn |
| 206 | Days Inn Photographs | Withdrawn |
| 207 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 210 | Days Inn Photographs | Withdrawn |
| 211 | Days Inn Photographs | Withdrawn |
| 212 | Days Inn Photographs | Withdrawn |
| 213 | Days Inn Photographs | Withdrawn |
| 214 | Days Inn Photographs | Withdrawn |
| 215 | Days Inn Photographs | Withdrawn |
| 216 | Days Inn Photographs | Withdrawn |
| 217 | Days Inn Photographs | Withdrawn |
| 218 | Days Inn Photographs | Withdrawn |
| 219 | Days Inn Photographs | Withdrawn |
| 220 | Days Inn Photographs | Withdrawn |
| 221 | Days Inn Photographs | Withdrawn |
| 222 | Days Inn Photographs | Withdrawn |
| 223 | Days Inn Photographs | Withdrawn |
| 224 | Days Inn Photographs | Admitted over Obj |
| 225 | Days Inn Photographs | Withdrawn |
| 226 | Days Inn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | | xi |
|---|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted | |
| 271D2 | | 11/29/01 | Admitted | |
| 271D3 | | 11/29/01 | Admitted | |
| 271D4 | | 11/28/01 | Admitted | |
| 271D5 | | 11/28/01 | Admitted | |
| 271D6 | | 11/27/01 | Admitted | |
| 271D7 | | 11/27/01 | Admitted | |
| 271D8 | | 11/26/01 | Admitted | |
| 271D9 | | 11/26/01 | Admitted | |
| 271D10 | | 11/24/01 | Admitted | |
| 271D11 | | 11/23/01 | Admitted | |
| 271D12 | | 11/23/01 | Admitted | |
| 271D13 | | 11/22/01 | Admitted | |
| 271D14 | | 11/22/01 | Admitted | |
| 271D15 | | 11/22/01 | Admitted | |
| 271D16 | | 11/22/01 | Admitted | |
| 271D17 | | 11/21/01 | Admitted | |
| 271D18 | | 11/21/01 | Admitted | |
| 271D19 | | 11/20/01 | Admitted | |
| 271D20 | | 11/20/01 | Admitted | |
| 271D21 | | 11/20/01 | Admitted | |
| 271D22 | | 11/20/01 | Admitted | |
| 271D23 | | 11/19/01 | Admitted | |
| 271D24 | | 11/19/01 | Admitted | |
| 271D25 | | 11/19/01 | Admitted | |
| 271D26 | Empty | | Admitted | |
| 271D27 | | 11/16/01 | Admitted | |
| 271D28 | | 11/16/01 | Admitted | |
| 271D29 | | 11/15/01 | Admitted | |
| 271D30 | Empty | | Admitted | |
| 271D31 | | 11/12/01 | Admitted | |
| 271D32 | | 11/10/01 | Admitted | |
| 271D33 | | 11/10/01 | Admitted | |
| 271D34 | | 11/10/01 | Admitted | |
| 271D35 | | 11/10/01 | Admitted | |
| 271D36 | | 11/09/01 | Admitted | |
| 271D37 | | 11/09/01 | Admitted | |
| 271D38 | | 11/09/01 | Admitted | |
| 271D39 | | 11/09/01 | Admitted | |
| 271D40 | | 11/08/01 | Admitted | |
| 271D41 | | 11/08/01 | Admitted | |
| 271D42 | | 11/08/01 | Admitted | |
| 271D43 | | 11/07/01 | Admitted | |
| 271D44 | | 11/07/01 | Admitted | |
| 271D45 | | 11/07/01 | Admitted | |
| 271D46 | | 11/07/01 | Admitted | |
| 271D47 | Empty | | Admitted | |
| 271D48 | | 11/06/01 | Admitted | |
| 271D49 | | 11/06/01 | Admitted | |
| 271D50 | Empty | | Admitted | |
| 271D51 | | 11/05/01 | Admitted | |
| 271D52 | | 11/05/01 | Admitted | |
| 271D53 | | 11/03/01 | Admitted | |
| 271D54 | | 11/03/01 | Admitted | |
| 271D55 | | 11/02/01 | Admitted | |
| 271D56 | | 11/02/01 | Admitted | |
| 271D57 | | 11/02/01 | Admitted | |
| 271D58 | | 11/01/01 | Admitted | |
| 271D59 | | 11/01/01 | Admitted | |
| 271D60 | Halloween card | | Admitted | |
| 271D61 | | 10/31/01 | Admitted | |

| Exhibit | Note | Date | Status | |
|---|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted | xii |
| 271D63 | | 10/29/01 | Admitted | |
| 271D64 | | 10/29/01 | Admitted | |
| 271D65 | | 10/28/01 | Admitted | |
| 271D66 | | 10/27/01 | Admitted | |
| 271D67 | | 10/26/01 | Admitted | |
| 271D68 | | 10/26/01 | Admitted | |
| 271D69 | | 10/26/01 | Admitted | |
| 271D70 | | 10/25/01 | Admitted | |
| 271D71 | | 10/25/01 | Admitted | |
| 271D72 | | 10/24/01 | Admitted | |
| 271D73 | | 10/24/01 | Admitted | |
| 271D74 | | 10/23/01 | Admitted | |
| 271D75 | | 10/23/01 | Admitted | |
| 271D76 | | 10/23/01 | Admitted | |
| 271D77 | | 10/23/01 | Admitted | |
| 271D78 | | 10/22/01 | Admitted | |
| 271D79 | Empty | | Admitted | |
| 271D80 | | 10/21/01 | Admitted | |
| 271D81 | | 10/20/01 | Admitted | |
| 271D82 | | 10/20/01 | Admitted | |
| 271D83 | | 10/20/01 | Admitted | |
| 271D84 | | 10/20/01 | Admitted | |
| 271D85 | | 10/19/01 | Admitted | |
| 271D86 | | 10/19/01 | Admitted | |
| 271D87 | | 10/19/01 | Admitted | |
| 271D88 | | 10/19/01 | Admitted | |
| 271D89 | | 10/18/01 | Admitted | |
| 271D90 | Empty | | Admitted | |
| 271D91 | | 10/18/01 | Admitted | |
| 271D92 | | 10/17/01 | Admitted | |
| 271D93 | | 10/16/01 | Admitted | |
| 271D94 | | 10/16/01 | Admitted | |
| 271D95 | | 10/15/01 | Admitted | |
| 271D96 | | 10/15/01 | Admitted | |
| 271D97 | | 10/15/01 | Admitted | |
| 271D98 | | 10/13/01 | Admitted | |
| 271D99 | | 10/13/01 | Admitted | |
| 271D100 | | 10/13/01 | Admitted | |
| 271D101 | | 10/12/01 | Admitted | |
| 271D102 | | 10/12/01 | Admitted | |
| 271D103 | | 10/12/01 | Admitted | |
| 271D104 | Empty | | Admitted | |
| 271D105 | | 10/12/01 | Admitted | |
| 271D106 | | 10/12/01 | Admitted | |
| 271D107 | | 10/11/01 | Admitted | |
| 271D108 | | 10/11/01 | Admitted | |
| 271D109 | | 10/11/01 | Admitted | |
| 271D110 | | 10/10/01 | Admitted | |
| 271D111 | | 10/10/01 | Admitted | |
| 271D112 | | 10/10/01 | Admitted | |
| 271D113 | | 10/08/01 | Admitted | |
| 271D114 | | 10/08/01 | Admitted | |
| 271D115 | | 10/06/01 | Admitted | |
| 271D116 | | 10/06/01 | Admitted | |
| 271D117 | | 10/06/01 | Admitted | |
| 271D118 | | 10/05/01 | Admitted | |
| 271D119 | | 10/05/01 | Admitted | |
| 271D120 | | 10/05/01 | Admitted | |
| 271D121 | | 10/05/01 | Admitted | |
| 271D122 | | 10/05/01 | Admitted | |
| 271D123 | | 10/05/01 | Admitted | |

| | | | |
|---|---|---|---|
| 271D124 | x1v | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

xiii

xiv

| 273N | Letters from Nate to Donna | Admitted |
|---|---|---|
| 273N1 | 12/01/01 | Admitted |
| 273N2 | 11/30/01 | Admitted |
| 273N3 | 11/29/01 | Admitted |
| 273N4 | 11/28/01 | Admitted |
| 273N5 | 11/27/01 | Admitted |
| 273N6 | 11/26/01 | Admitted |
| 273N7 | 11/25/01 | Admitted |
| 273N8 | 11/23/01 | Admitted |
| 273N9 | 11/22/01 | Admitted |
| 273N10 | 11/20/01 | Admitted |
| 273N11 | 11/19/01 | Admitted |
| 273N12 | 11/17/01 | Admitted |
| 273N13 | 11/16/01 | Admitted |
| 273N14 | 11/14/01 | Admitted |
| 273N15 | 11/14/01 | Admitted |
| 273N16 | 11/13/01 | Admitted |
| 273N17 | 11/12/01 | Admitted |
| 273N18 | 11/12/01 | Admitted |
| 273N19 | 11/10/01 | Admitted |
| 273N20 | 11/09/01 | Admitted |
| 273N21 | 11/07/01 | Admitted |
| 273N22 | 11/06/01 | Admitted |
| 273N23 | 11/08/01 | Admitted |
| 273N24 | 11/05/01 | Admitted |
| 273N25 | 11/03/01 | Admitted |
| 273N26 | 11/01/01 | Admitted |
| 273N27 | 11/01/01 | Admitted |
| 273N28 | 10/31/01 | Admitted |
| 273N29 | 10/30/01 | Admitted |
| 273N30 | 273N31 | 273N32 |
| 273N31 | 10/28/01 | Admitted |
| 273N32 | 10/27/01 | Admitted |
| 273N33 | 273N34 | 273N35 |
| 273N34 | 10/25/01 | Admitted |
| 273N35 | 10/25/01 | Admitted |
| 273N36 | 10/25/01 | Admitted |
| 273N37 | 10/24/01 | Admitted |
| 273N38 | 10/23/01 | Admitted |
| 273N39 | 10/22/01 | Admitted |
| 273N40 | 10/21/01 | Admitted |
| 273N41 | 10/21/01 | Admitted |
| 273N42 | 10/20/01 | Admitted |
| 273N43 | 10/19/01 | Admitted |
| 273N44 | 10/18/01 | Admitted |
| 273N45 | 10/17/01 | Admitted |
| 273N46 | 10/16/01 | Admitted |
| 273N47 | 10/16/01 | Admitted |
| 273N48 | 10/15/01 | Admitted |
| 273N49 | 10/14/01 | Admitted |
| 273N50 | 10/12/01 | Admitted |
| 273N51 | 10/10/01 | Admitted |
| 273N52 | 10/10/01 | Admitted |
| 273N53 | 10/08/01 | Admitted |
| 273N54 | 10/05/01 | Admitted |
| 273N55 | 10/07/01 | Admitted |
| 273N56 | 10/04/01 | Admitted |
| 273N57 | 10/04/01 | Admitted |
| 273N58 | 10/02/01 | Admitted |
| 273N59 | 10/01/01 | Admitted |
| 273N60 | 10/01/01 | Admitted |
| 273N61 | 09/30/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

xvii

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

xviii

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3 Pages) | No Objection |
| 286B | | Not Intorduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Enevlope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Enevlope #138 w/ To | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Envelope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X  5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

| | | |
|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic  Line-Up - Frank Reynolds | Not Intorduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Enevlope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Enevlope Containing 2 Photos | No Objection |

xix

| | | | |
|---|---|---|---|
| 395 | Envelope Containing Lift Sheets | No Objection | |
| 395A | Lift Sheets | No Objection | xx |
| 395B | Lift Sheets | No Objection | |
| 396 | Walmart Receipt | Admitted over Obj | |
| 397 | Audio Tape of Excerpts | Objection Sustained | |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained | |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj | |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj | |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj | |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj | |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj | |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj | |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj | |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj | |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj | |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj | |
| 403A-403RR | Defendant's school records | No Objection | |
| | | | |
| Defendant's Exhibits | | | |
| Deft A | Dreft.'s Criminal History | No Objection | |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection | |
| Deft F | Credit Application | No Objection | |
| Deft G | BMV Registration Card | No Objection | |
| Deft H | Sales Agreement | No Objection | |
| Deft I | Lease Agreement | No Objection | |
| Deft J | Car Registration | No Objection | |
| Deft K | Credit Application | No Objection | |
| Deft L | BMV Registration Card | No Objection | |
| Deft M | Real Estate Records | No Objection | |
| Deft N | Real Estate Records | No Objection | |
| Deft O | Real Estate Records | No Objection | |
| DeftP | Psychological Report | No Objection | |
| Joint 1 | Fingerhut Jewelry | No Objection | |
| | | | |
| Court Exhibit 1 | Orientation Instructions | | |
| Court Exhibit 2 | Exhibit List | | |
| Court Exhibit 3 | Brief In Opposition to Acquittal | | |
| Court Exhibit 4 | Jury Charge | | |
| Court Exhibit 5 | Corrected Instruction | | |
| Court Exhibit 6 | Jury Question | | |
| Court Exhibit 7 | Penalty Instruction | | |

2772

1   (In-chambers at 12:00 noon.)

2                MR. LEWIS:  We waive presence of the

3   Defendant.

4                THE COURT:  We're in-chambers, out

5   of the hearing of the Jury.  The Jury is out to

6   lunch.  The Defendant's presence is waived.  The

7   items that you are after, we have one of two

8   choices here, James, and you have every right to

9   see any evidence they have, and I don't think the

10  State is disputing that.  I just ask as a practical

11  matter, do you want them to haul everything over

12  that they might have?  I don't know what the extent

13  of that is.  If there are specific items, if you

14  want to just say so, we'll have everything hauled

15  over here, but if there's specific items.

16                MR. LEWIS:  Anything that was not

17  analyzed on this.

18                THE COURT:  Anything that was sent

19  to him that he did not analyze.

20                MR. LEWIS:  Exactly.  Everything

21  that was not analyzed.

22                MR. WATKINS:  We have it.

2773

1          MR. LEWIS:  Bring it over and we'll

2     have him identify it.  We have got seven numbers

3     that say unknown blood stains.

4          MR. WATKINS:  You can mark them as

5     your Exhibits.

6          THE COURT:  He's not after

7     everything, because you have probably got a bunch

8     of stuff over there.  He's after specific items

9     that were sent to this man for examination, and he

10    for whatever reason, did not.  Can you locate those

11    over lunch?

12         MR. WATKINS:  Yes.  I am assuming we

13    have them over there.

14         MR. LEWIS:  And doing them for

15    Brenda Gerardi that will testify.

16         MR. WATKINS:  What she gets, it

17    isn't the same.  First off, there's some items that

18    are not sent which you have seen.  Then there's

19    items we send, and then there's items that they

20    test, and what they test is pursuant to our

21    request, or police request, and for a variety of

22    reasons, there are not tests on every item.  For

2774

1  example, in this case --

2          MR. LEWIS:  That is fine.  I don't

3  care what excuse you have.  The items that were

4  submitted, but never examined.

5          MR. WATKINS:  We'll get the items

6  that were submitted.

7          MR. LEWIS:  I want that for Dale

8  Laux and for Brenda Gerardi.

9          MR. WATKINS:  I'm saying, all of the

10  items that this guy has, that is Dale Laux, will be

11  the items, because she doesn't get it unless he

12  gets it.

13          MR. LEWIS:  That is what I am

14  assuming.

15          THE COURT:  That solves this

16  problem.

17  (End of in-chamber discussion.)

18  (Resumed in Open Court at 1:30 p.m.)

19          THE COURT:  For the record,

20  everything was accomplished that we discussed over

21  lunch, correct?

22          MR. WATKINS:  Yes.

2775

1  CONTINUING CROSS EXAMINATION BY MR. LEWIS:

2  Q.    Dale, I believe we left off with the idea,

3         once the police department or the

4         investigating officials plus yourself,

5         you have the hypothesis that the

6         direction you travel, basically when you

7         analyze the evidence, is that how you are

8         making some of the decisions?

9  A.    Yes, we test that hypothesis.

10 Q.    I'm going to have to use your sheet.  We're

11        down to -- we were at item number two --

12        well, actually went past that, but let's

13        go back to number two, the brown paper

14        bag containing the shirt from the

15        victim's wife, and serology and search

16        for human blood was to be done or at

17        least the request was there?

18 A.    Yes.

19 Q.    I'll show you Defendant's Exhibit A.  Could

20        you identify the bag?  Does it have an

21        indication of the fact that it was

22        submitted to BCI, submitted to yourself

2776

```
 1            and so forth?
 2   A.   It was submitted to BCI.  Our case number up
 3            here is at the top and the item number is
 4            item two.
 5   Q.   And that is the shirt referred to in there,
 6            correct?
 7   A.   Yes.
 8   Q.   This is the one you didn't do any analysis on
 9            this whatsoever, right?
10   A.   Yes.
11   Q.   The next item.  The rectal swabs, no problem.
12            The oral swabs, you already got the
13            standard from Mr. Fingerhut?
14   A.   Yes.
15   Q.   Moving down to number 14.  It is labeled as
16            State's Exhibit 255.  This is one that
17            you did analyze, correct?
18   A.   Yes.
19   Q.   You did the presumptive test for blood?
20   A.   Yes.
21   Q.   That was sent on to Brenda Gerardi?
22   A.   Right.
```

2777

1   Q.   For DNA?

2   A.   Yes.

3   Q.   Now, the next one is a brown envelope.  They

4          all say the same thing.  Brown envelope

5          containing swab with unknown stain.  It

6          is all the same down to item No. 21?

7   A.   22.

8   Q.   Did you test those?

9   A.   No.

10  Q.   I'll show you what has been labeled as

11         Defendant's Exhibit B.  I'll show you

12         what has been marked as Defendant's

13         Exhibit B.  Could you look at those

14         envelopes and tell me if you recognize

15         them and give us the numbers and if you

16         had seen them before.

17  A.   Nine manila envelopes, I have not seen these

18         before.  Each one has been labeled with

19         our BCI case number, and the item numbers

20         are 15, 16, 17, 18, 19, 20, 21 and 22,

21         and also item 23 was not for serology,

22         but it is in this Exhibit.

2778

```
1   Q.   You say you haven't seen those before?
2   A.   No.
3   Q.   They were submitted to BCI.  These are the
4            items we're talking about?
5   A.   Yes.
6   Q.   Okay.
7   A.   I don't have my initials on these, these were
8            not examined.  14 was examined by me.  I
9            do recall that one, but I don't remember
10           seeing these.  They may have been in the
11           bag, but I don't recall looking at these.
12  Q.   Although they were submitted to BCI, you don't
13           remember seeing them, is that what you
14           are telling me?
15  A.   I know they were submitted, but I did not
16           examine those.
17  Q.   Didn't examine them?  On all of them it says
18           blood sample from garage floor.  Blood
19           sample from garage floor, blood sample
20           from garage floor?
21  A.   Yes.
22  Q.   Blood sample from garage floor?
```

2779

1   A.   Yes.

2   Q.   Different cotton swab containing blood sample

3        from garage side?

4   A.   Yes.  Everything you said, I can read.  By

5        kitchen door.

6   Q.   Cotton swab containing blood sample from back

7        side kitchen side, south kitchen door

8        into garage?

9   A.   Yes.

10  Q.   Cotton swab containing blood sample from back

11       side kitchen?

12  A.   Of south kitchen door.  Cotton swab containing

13       blood sample from cabinet near south

14       kitchen door.

15  Q.   These were not examined or given the

16       presumptive test for blood or sent on?

17  A.   That is correct.

18  Q.   The next item for serology was what?

19  A.   The car.

20  Q.   The 300 Chrysler.  What Exhibits do you have

21       there for the 300 Chrysler?  Did you

22       subdivide those?

2780

1   A.   Yes.

2   Q.   Where's the subdivision?

3   A.   They are in my notes.  You want to know where

4        the stains came from?

5   Q.   Yes.

6   A.   28.1 was a stain on the outside door handle,

7        underneath the door, passenger side.

8        Item number 28.2 was a small stain in the

9        same location, near stain one.  So it was

10       very near the other stain on the door

11       handle, on the underside of it.

12  Q.   These were analyzed?

13  A.   Yes.

14  Q.   You did the presumptive test, came out blood?

15  A.   Yes.  Stain three was a stain in the trunk, it

16       was on the carpet, it was very dirty

17       looking and the stain was negative.  That

18       was not contained.  Stain four was on the

19       plastic vinyl passenger door handle area,

20       and I swabbed down inside the handle.

21       Cindy Mayle thought there might be some

22       latent print detail.  I left that area

2781

1            alone and obtained the swab from the

2            handle area and that was positive for,

3            presumptive test positive.  And stain

4            five was from the outer passenger seat

5            area, two swabs were obtained from that

6            area.  Those stains were indicated the

7            presence of blood.  A stain on the

8            bracket holding the driver's visor in

9            place which was swabbed, swabs were

10           retained along with the bracket.  A stain

11           below the light switch that was above the

12           trunk button, the trunk release button,

13           and two swabs were obtained and

14           presumptive test indicated the appearance

15           of blood on those and those swabs were

16           retained.  Finally, the visor was

17           removed.

18   Q.   So you had at least -- oh, there's about eight

19           or nine places you had presumptive test

20           for blood was positive and these are the

21           State's Exhibits that you referred to

22           earlier?

2782

```
 1   A.   Some of those are, they are not all here.  I

 2        believe Brenda has some and she's

 3        outside.

 4   Q.   Were those all sent on for DNA analysis?

 5   A.   Yes.

 6   Q.   Incidentally, did you ever have an actual

 7        registration for that vehicle?  Did BCI

 8        ever run a registration for the vehicle?

 9        You gave us the VIN number?

10   A.   I'm not sure that was done.

11   Q.   When you saw the vehicle, did you take any

12        pictures of it yourself, the interior of

13        the vehicle we're talking about, the 300

14        Chrysler?

15   A.   No.  The detectives were there doing that.

16   Q.   When you observed it personally, and you saw

17        it and you inspected it, and by

18        observation, you didn't have to use

19        Luminol to find the blood.  There was a

20        lot of it out there?

21   A.   It was visible to the naked eye.

22   Q.   The next item to go to serology would be what?
```

2783

1   A.   The A submission.

2   Q.   A-1 the brown paper bag containing a clump of

3        napkin -- did you do the presumptive test

4        on that?

5   A.   No.

6   Q.   Brown paper bag containing dish cloth with

7        unknown stain, did you do that?

8   A.   No.

9   Q.   Brown paper bag containing gauze with a stain,

10       did you do that?

11  A.   Yes, that one I did.  I examined the gauze,

12       and I stated previously that presumptive

13       test indicated the presence of blood and

14       the gauze was retained.

15  Q.   We have got the next one brown paper bag

16       containing with gauze and piece of tape.

17  A.   A-4 is not checked.

18  Q.   They didn't print it?  The brown paper bag

19       containing napkin with stain, did you

20       check for blood on that?

21  A.   No.

22  Q.   The brown paper bag containing a washcloth

2784

1           with a stain, did you check for that?

2  A.   No.

3  Q.   The brown paper bag containing -- no.  Do you

4           know here?

5              MR. WATKINS:  You're not naming

6  them.

7  Q.   Empty bandage container, did you check that?

8           It says for latent.  Latent means you

9           want prints?

10  A.   It was requested that we ask for prints.

11  Q.   I am going to assume you didn't test it for

12           blood?

13  A.   No.

14  Q.   The empty paper tape package, that is also

15           latent, so you didn't test for blood?

16  A.   Correct.

17  Q.   And I assume it says latent, is that you

18           wouldn't test for blood?

19  A.   Right.

20  Q.   Down here it says, brown paper bag containing

21           the key.  It says check for blood and

22           latent.  Did you check for blood?

2785

1   A.   No.

2   Q.   The brown paper bag containing the cell phone,

3        did you check for blood?

4   A.   No.

5   Q.   The brown paper bag containing garage door

6        opener, check for blood latent, did you

7        check for the blood?

8   A.   No.

9   Q.   Brown paper bag containing the CD, check for

10       blood and latent.  Did you check for

11       blood?

12  A.   No.

13  Q.   Piece of chicken, did you check for that?

14  A.   No.

15  Q.   One contained four napkins, did you check for

16       blood on that?

17  A.   No.

18  Q.   Brown paper bag containing -- one paper bag

19       containing one comforter from bed with

20       suspect stain, did you check that?

21  A.   No.

22  Q.   One box containing suspect stain, did you

2786

1      check that?

2  A.    No.

3  Q.    One box containing suspect stain from the

4          bathroom floor, did you check for that?

5  A.    No.

6  Q.    One bag containing one washcloth with suspect

7          stain, did you check for that?

8  A.    No.

9  Q.    One bag containing one hand tool with suspect

10          stain, did you check for that?

11  A.    No.

12  Q.    One box containing suspect stain from bottom

13          of the trash can, did you check for that?

14  A.    No.

15  Q.    One envelope containing -- that is it.  That

16          is the swab from Donna Roberts for DNA,

17          right?

18  A.    Yes.

19  Q.    Swabbings from Nathaniel Jackson.  The pair of

20          black gloves with the hole in the tip,

21          left index finger stain and residue?

22  A.    I didn't check for that.

2787

1   Q.   One pair of rubber gloves with a stain?

2   A.   No, I did not examine that.

3   Q.   One pair of black and red Nike tennis shoes?

4   A.   I did not examine those.

5   Q.   One black leather jacket?

6   A.   No.

7   Q.   Out of all of the items, how many would you

8        say that you actually checked for human

9        blood on all of that?

10  A.   I didn't check for human blood.  I checked for

11       presumptive test on the swab, several

12       locations.  I think we said seven or

13       eight locations from the car, and a piece

14       of gauze from A-3, that was from the

15       hotel.

16  Q.   Out of the 24 we got, is that six, seven,

17       eight?

18  A.   One from the 24.

19  Q.   Out of the 24 was how many?

20  A.   One.

21  Q.   Let me ask you this, can you describe to the

22       Jury what is the presumptive test for

2788

1        blood?

2    A.   If something looks like blood, I moisten a

3         cotton swab and swab a portion of the

4         stain and add a chemical.  If this swab

5         turns a color, purple or purplish blue

6         color, then it indicates that blood might

7         be present.  There are other substances.

8         For example you can rub a penny or I

9         believe, cauliflower gives a false

10        positive.  There are other materials that

11        can look like blood, can give a false

12        positive, that is when we say it is

13        presumptive and then we do further

14        testing if it is human blood and the DNA

15        tells us who it might have come from.

16   Q.   In this particular case, the presumptive test,

17        was it the one that you earlier referred

18        to, taking the Q-tip and putting it with

19        the solution?

20   A.   Yes.

21   Q.   Do you know what the solution is?

22   A.   It is tetramethylbenzene.

2789

1   Q.   And after how many hours, can you figure out

2        that you have presumptively blood or

3        possibly blood?

4   A.   It happens within three seconds.

5   Q.   So, out of 24 items of serology, it only takes

6        you about three seconds and you only end

7        up doing one, three seconds for each one?

8   A.   You can't multiply three seconds times 24, you

9        have to open up the bag, write in my

10       notes, but it is not a difficult

11       analysis.

12  Q.   All I'm asking is that if you have the item,

13       you open the bag or whatever, it takes

14       about three seconds to figure out whether

15       you got it or not possibly and then you

16       move on from there, right?

17  A.   Yes.

18            MR. LEWIS:  Thank you very much.

19  Q.   (By Mr. Lewis) Were you given any bullets to

20       look for possibly the presence of blood?

21  A.   No.

22            MR. LEWIS:  Thank you.

2790

1          MR. WATKINS:  Jim, are you going to

2  submit these, what we brought over for you?

3          MR. CONSOLDANE:  He marked some of

4  them.

5          MR. LEWIS:  We can mark them.

6          MR. CONSOLDANE:  He marked them

7  already.

8          MR. WATKINS:  We have Exhibit labels

9  and none but a couple of them are marked.  You are

10  not going to do it, I guess.  I am letting you do

11  it.

12          MR. LEWIS:  I know, you are a nice

13  fellow.

14  <u>CONTINUING CROSS EXAMINATION BY MR. LEWIS</u>

15  Q.   Dale, any of the items that were sent to BCI

16          would always have the -- this on it?

17  A.   They would have our BCI number and then the

18          submitting agency, yes.

19          MR. LEWIS:  We're finished.  Thank

20  you.

21  <u>REDIRECT EXAMINATION BY MR. WATKINS:</u>

22  Q.   Dale, when you receive items as a general

2791

1          practice, do you do testing on every

2          single item you receive from police

3          agencies?

4    A.    No.

5    Q.    And if you would do a presumptive test for

6          blood and do a DNA card to send it up to

7          DNA, it was brought out that it doesn't

8          take that long to do the presumptive

9          test, correct?

10   A.    That is correct.

11   Q.    But you do a sample of blood, say a swab from

12         the floor or swab from a piece of cloth,

13         whatever it would be to do DNA, would it

14         take quite a bit of time and resources?

15   A.    Yes.

16   Q.    And approximately how long does it take to do

17         a DNA test, if you know?

18   A.    A week.

19   Q.    Now, when you identified the Exhibits that

20         Detective Monroe made on 12-14-01, which

21         was right after this homicide, the

22         inclusion dealt with a number of unknown

2792

1              stains, is that correct?

2   A.   Yes.

3   Q.   I think we're dealing with one, two, three,

4             four, five, six, seven, eight, nine --

5             nine of them?

6   A.   Yes.

7   Q.   And you end up doing one of them?

8   A.   Yes.

9   Q.   And it was all blood, correct, those stains

10            from what you knew, from what the

11            appearance was, it could have been blood

12            put it that way?

13  A.   Well, I suspected that the officer collecting

14            those samples was collecting blood, just

15            like 14 was so I assumed that the rest

16            were blood from the scene.

17  Q.   Some of the things that you didn't do, for

18            example, the oral and rectal swabs of the

19            victim?

20  A.   Yes.

21  Q.   You didn't do it because nobody requested it,

22            right?

2793

```
 1   A.    They requested it, but as I said, we discussed
 2         items that they wanted analyzed quickly
 3         and to know the results quickly and those
 4         were not included in that group.
 5   Q.    And when you discussed it, it was discussed
 6         with whom?
 7   A.    Detective or Sergeant Paul Monroe.
 8   Q.    It was decided not to do the victim's oral or
 9         rectal swabs?
10   A.    Yes.
11   Q.    And you did do the blood standard from the
12         victim?
13   A.    Yes.
14   Q.    And for DNA purposes, you had his sample?
15   A.    Yes.
16   Q.    Now, there were a number of items brought and
17         marked initially from a submission
18         dealing with items from a trash bin that
19         was found in Boardman, Ohio, and they
20         were identified including napkin, dish
21         cloths, gauze, gauze, gauze, napkin,
22         washcloth, it wasn't mentioned but
```

2794

```
 1              included two condoms, and keys, cell
 2              phone, garage door opener, CD, chicken
 3              and napkin?
 4    A.   Yes.
 5    Q.   And the latter keys, cell phone, garage door,
 6              CD, the chicken and napkin, came from the
 7              vehicle to the best of your knowledge?
 8    A.   Yes.
 9    Q.   That is the silver vehicle you got blood from?
10    A.   Yes.
11    Q.   It turned out that you testified that you did
12              submit one of the submissions from the
13              trash barrel, the gauze, correct?
14    A.   Yes.
15    Q.   Which would be A-4.  So, what in fact you had,
16              were a series of items that appeared to
17              have had blood on it that came from a
18              trash bin?
19    A.   Yes.
20    Q.   And one of them was submitted to identify that
21              blood through DNA, is that correct?
22    A.   Yes.
```

2795

1   Q.   Are you aware of what the results were on

2        that?

3   A.   Yes.

4   Q.   And were they positive?

5   A.   Yes.

6   Q.   And did they match?

7   A.   Yes.

8   Q.   Do you know who it matched to?

9   A.   Yes.

10  Q.   Who?

11              MR. LEWIS:  Gerardi will testify to

12  that.

13              MR. WATKINS:  I withdraw that

14  question.

15  Q.   The bottom line, you had a number of items,

16       bandages, napkins, wash cloths, that if I

17       cut myself, and I would submit to you all

18       of these items, and you got one of them

19       and you had a positive test showing it

20       was my blood, would you test the other

21       six or eight items?

22  A.   No.

2796

1    Q.    Why not?

2    A.    The results on those other six items won't

3          change the fact that I have made an

4          identification already.  It would just

5          give me more information, that it is

6          probably that person's blood.  If I was

7          not able to get a result, for some reason

8          it was negative, then I would go on and

9          do another sample.  If I made an

10         identification, it's not going to change.

11         Doing the rest of those stains will not

12         change the results I obtained.

13   Q.    You would duplicate it?

14   A.    Yes.

15   Q.    If you have an item that is submitted to your

16         lab, is that item available to the

17         Defense if they would want to inspect it?

18         Have you had those things done in the

19         past?

20   A.    Yes.

21   Q.    So they, the Defense could test through their

22         own experts, correct?

2797

```
 1   A.   Yes, we would get them back to the police

 2        department and they would be submitted to

 3        the Defense.

 4   Q.   You are testing what is requested by Officer

 5        Monroe, or the Prosecutor's Office, in

 6        the case?

 7   A.   Yes.

 8   Q.   And in given situations such as the gauze, the

 9        tape, the band-aids, the cloth, that is

10        found in a motel room or a bin by the

11        motel room, if you are requested to do

12        one and there's a finding, you don't have

13        the resources and time to do the six or

14        eight or ten others?

15   A.   That is correct.

16   Q.   And it would take one week to do each test

17        with one DNA examiner for each test of

18        blood for DNA?

19   A.   We would combine them, naturally, but it would

20        take a week to get results on all of

21        those items.

22             MR. WATKINS:   I think that is it.
```

2798

1    Thank you.

2    RECROSS EXAMINATION BY MR. LEWIS:

3    Q.    Dale, pursuant to Mr. Watkins' question, if

4          you had six items out there, they are all

5          blood droppings on the floor, the garage,

6          and you examine one presumptively for

7          blood, you could examine them all for

8          blood, presumptively for blood, couldn't

9          you?

10   A.    Yes.

11   Q.    You didn't do it in this case?

12   A.    Why would I do that?  It tells me it could be

13         blood, but what value is that and even to

14         do a human -- so it is human blood, but

15         the things that people want to know when

16         you go to Court is whose blood is it.

17         You actually wouldn't stop.  You would go

18         on.

19   Q.    Your philosophy and what you are really

20         telling me is this, if I got -- you got

21         one suspect and we're looking for this

22         guy, and we have got 12 things of blood,

2799

1           we pick up one, we get one and it is
2           presumptive for blood and we analyze it,
3           you don't worry about the other 11, that
4           is what you are telling me, is you just
5           don't worry about it?
6   A.   In this case --
7   Q.   It is not important to you?
8   A.   Not in this case, no.  There may be cases
9           where you want to find out if the person
10          was leaving and you checked drops on a
11          sidewalk to see where they were headed,
12          or I could come up with scenarios where
13          it might be helpful to determine whose
14          blood that is in six different locations,
15          but I think that the agency requested
16          blood analysis to see who was bleeding
17          there and that was determined.
18  Q.   The point is, they told you that Nathaniel is
19          the guy that did this, so basically, find
20          something that ties him, and that is why
21          we have the Days Inn, we have all of
22          these gauze and all this stuff, because

2800

1          we're going to place him in the Days Inn?

2  A.  You know that is not true.

3  Q.  It isn't true?

4  A.  No.  Just what you say is not true.

5  Q.  We have all of the blood droppings at the

6          scene, in the garage, where supposedly

7          the crime occurred, and then we have --

8  A.  They said whose blood could it be?

9  Q.  Yes.

10 A.  And we determined that.  They didn't say to go

11         and find a certain individual's blood.

12 Q.  Well, the point is, let's go get all of the

13         stuff we can find with blood on it and

14         see if one pops up with Nathaniel's blood

15         on it.  That is really what we're looking

16         for?

17 A.  I wouldn't say that, either.

18 Q.  We're going around in circles, maybe I'm the

19         one doing the circling?

20 A.  I'm trying to be honest.

21 Q.  I know you are being honest, the point being

22         is when you find something, you don't go

2801

1              any further, that is basically what it

2              says here.  And you have already told us

3              why you don't do it?

4    A.   Yes.

5    Q.   It is a waste of time and money, right?

6    A.   I guess in this case, it would have been.

7    Q.   How close were you to the investigation in

8              this case?  It sounds like you were

9              consulting with them on a daily basis or

10             something?

11   A.   It seemed like that at the beginning, three,

12             four days in a row.  We asked for

13             synopsis and Detective Monroe was very

14             good in providing a very good synopsis

15             and what he believed occurred and

16             collected the items and that is how

17             things have to be done.  We have to know

18             a little bit.

19   Q.   When you come across a situation, you start

20             putting the pieces together?

21   A.   Yes.

22   Q.   It is like a huge puzzle.  Sometimes the

2802

1          pieces come fast, sometimes they come in

2          different shapes and forms, whatever.

3          But when you investigate something from a

4          criminal standpoint, or whatever, we

5          never know what the final outcome is,

6          we're just on a track.  There's no great

7          picture up there when we work the puzzle

8          and the pieces are right there, we know

9          what the end objective is.  The pieces

10         are supposed to create the picture.  If

11         you will pick the right pieces, it may

12         create a different picture.  That is the

13         point, you cover all the bases, that is

14         the idea, I would think.  This is a

15         little bit more narrowing.  Once you have

16         a hypothesis that is what you pursue and

17         the more you believe it, that's the

18         direction you go?

19   A.    Yes.

20               MR. LEWIS:  Thank you.

21               MR. WATKINS:  No further questions.

22               THE COURT:  Thank you.

2803

1                          BRENDA GERARDI

2    being duly sworn according to law, on her oath,

3    testified as follows:

4    DIRECT EXAMINATION BY MR. WATKINS

5    Q.   Good afternoon, Brenda.

6    A.   Good afternoon.

7    Q.   Would you -- I know you speak softly.  Would

8         you tell the Jury your name and where you

9              work?

10   A.   My name is Brenda Gerardi.  I work for the

11           Ohio Bureau of Identification and

12           Investigation.

13   Q.   Would you tell the Jury where you received

14           your education?

15   A.   I have a Bachelor of Science degree in Biology

16           from Kent State University.

17   Q.   And you became employed at BCI&I in Richfield

18           when?

19   A.   In 1997.

20   Q.   And where were you employed, as far as

21           position, initially?

22   A.   Forensic scientist in the serology, DNA

2804

1            section.

2  Q.  What do you do as a forensic scientist in

3            serology, briefly?

4  A.   I analyze physical evidence for the

5            identification of physiological fluids,

6            such as blood, urine, feces, semen and

7            saliva.

8  Q.  You have been doing that as has Dale Laux and

9            others, working for the Attorney

10            General's Office?

11  A.   Yes.

12  Q.   And then, there came a time that the Attorney

13            General in London initially, I want to

14            say around 1999, 2000, started a DNA lab

15            for the State of Ohio?

16  A.   That is correct.

17  Q.   And who is that office under?

18  A.   The Attorney General's Office.

19  Q.   The DNA lab?

20  A.   It is run by Elizabeth Bensinger.

21  Q.   And wasn't there another?

22  A.   Dr. Rodger Conn.

2805

```
 1   Q.   Isn't he still with the office?

 2   A.   He's now our DNA lab director.

 3   Q.   And your laboratory then expanded to include

 4        Richfield?

 5   A.   That is correct.

 6   Q.   And were you trained in DNA analysis?

 7   A.   Yes.  We specialized in DNA analysis.  It took

 8        about a year and a half of written exams,

 9        qualifying exams.  We had proficiency

10        tests that were graded by an outside

11        agency.

12   Q.   And how many DNA forensic scientists are there

13        working for the Attorney General's

14        Office, approximately?

15   A.   I believe there's around 12.

16   Q.   And how many are at the Richfield office?

17   A.   Five.

18   Q.   And is your laboratory certified nationally?

19   A.   Yes.

20   Q.   And would you explain what quality control and

21        what things have to be done to make sure

22        your laboratory is functioning according
```

2806

1          to standard?

2   A.    We have guidelines for the certification that

3          are all written in manuals that we must

4          follow.  We are audited by other

5          laboratories to insure the reliability of

6          all our results and our testing and our

7          procedures.

8   Q.    And when did you go on line personally doing

9          DNA?

10  A.    I believe it was March of 2000.

11  Q.    And approximately how many times have you been

12         qualified and have testified in Common

13         Pleas Court in Ohio?

14  A.    For DNA?

15  Q.    Yes.

16  A.    Twice.

17  Q.    And for other testing, approximately?

18  A.    I have testified 15 times in Ohio.

19  Q.    And when you do a DNA analysis, would you just

20         explain to the Jury exactly what you are

21         doing?

22  A.    I break it up into a four step procedure.  We

2807

1          have procedures that we follow through a
2          manual. But to give it to you in four
3          stages and the first stage is extraction,
4          which is when I remove the DNA from the
5          cellular material or stain.  The cells --
6          the second step would be quantification
7          step which is to allow me to know how
8          much DNA I have extracted from the cells.
9          The third step would be amplication, and
10         that is a chemical Xerox process that
11         allows me to make millions of copies of a
12         target area that we're going to do the
13         DNA analysis on.  The final procedure
14         would be the DNA analysis itself, which
15         the date that it is retrieved allows me
16         to make comparisons from a known
17         reference sample to an unknown forensic
18         sample to determine whether or not an
19         individual can be included or excluded as
20         a potential donor to the sample found at
21         a crime scene.
22    Q.    What is DNA?

2808

1   A.   DNA stands for deoxyribo nucleic acid, and it
2        is like a blueprint or is a code of
3        life -- a code for life, and it is found
4        in all cells, with the exception of red
5        blood cells.  It is unique to each
6        individual except for identical twins.
7   Q.   And when you look for DNA in forensic samples,
8        what items would have DNA?  That is, what
9        things do I have and you have, that can
10       be traced by DNA analysis?
11  A.   All cells have DNA, so any type of transfer
12       from one individual to another, would
13       leave skin cells; there are saliva will
14       have DNA, if it was a semen sample found
15       in a vaginal cavity, I can retrieve the
16       DNA from that.  Any kind of transfer,
17       even a fingerprint could leave DNA.
18  Q.   Which means your sweat would leave DNA?
19  A.   Exactly.
20  Q.   How about your hair?
21  A.   Yes.
22  Q.   All of the things that we have physiologically

2809

1          speaking, I don't want to say all, I'm

2          sure we could find some things that

3          don't.  It goes through our bodies and it

4          is a permanent record, so to speak, if we

5          can retrieve it?

6   A.   Yes, it is a permanent record and it is the

7          same permanent record in each cell of the

8          body.  So for example, a saliva cell

9          would have the same exact DNA as say, a

10         skin cell in an individual's body, so you

11         can compare one to the other.

12  Q.   Now, when you test the DNA, or for DNA, are

13         there different types of methods that are

14         used?

15  A.   Definitely, there's different types of

16         methods.  It has been developed through

17         the years and has gone through stages,

18         with the final, and I should say finally,

19         but the one we're using today, is called

20         STR, short tandem repeat procedure, that

21         is the type of DNA that we do and it is

22         processed through a procedure called PCR,

2810

1       which is polymerace chain reaction, so

2       that is the most common, the most

3       advanced DNA that we have been trained

4       with.  I'm sure there's more upcoming.

5   Q.  Do other laboratories throughout the United

6       States use STR and PCR?

7   A.  Yes, it is widely accepted and used with other

8       agencies.

9   Q.  And it is accepted in the scientific community

10      as reliable?

11  A.  Reliable and used by the FBI.

12  Q.  And the test has been shown to be valid and

13      does what it is supposed to do?

14  A.  That is correct.

15  Q.  Now, when you would, say for example, get

16      blood off of a shirt or a sweater, and

17      the blood would come from a third party,

18      not the owner, would you find often that

19      the person, I have this jacket on, that

20      the person wearing the sweater or wearing

21      the jacket, will have cells that they

22      would shed?

2811

1  A.   Cellular debris, skin cells do contain the

2       DNA.

3  Q.   And therefore, if somebody would cut

4            themselves and bleed on me or on the

5            sweater, would you have the combination

6            of two separate person's DNA?

7  A.   That is correct.  I can identify in some cases

8       both of the individuals in the mixture.

9  Q.   And it would be considered a mixture?

10 A.   That is correct.

11 Q.   And in the mixture, can you at times with your

12          testing, identify a major and minor

13          contributor?

14 A.   Yes, sometimes it is possible to separate the

15          major and the minor within the

16          interpretation guidelines that we have.

17 Q.   And what is a major contributor?

18 A.   A major contributor would be the person that

19          you would find the most in the stain, if

20          it was a mixture of blood and skin cells,

21          in my experience, I have seen that the

22          blood overpowered just the minor skin

2812

1          cell shedding on the clothes, because

2          we're only cutting out that stain, I

3          would see as the major as the blood

4          stain.

5  Q.   When you have a mixture or when you have DNA

6          on its own from one individual, are you

7          able to quantify in a statistical sense,

8          the frequency of having that same pattern

9          in other population or other persons in

10         the population?

11  A.   Yes, I am.  I can do that also for a mixture,

12         as long as I can, like we're talking

13         about, separate the major and the minor,

14         I can do it with a frequency of the major

15         and of the minor, if possible, to

16         separate them out.

17  Q.   And will the frequencies often differ?

18  A.   Frequencies will differ, because everybody is

19         different, so your DNA type would occur

20         different at a different frequency than

21         somebody else's, yes.

22  Q.   Now, when you do the testing itself, there's a

2813

1           term called loci?

2   A.    It could be loci, sometimes we say location.

3   Q.    And what does that mean?  What location or

4           locations are involved in the testing?

5   A.    We talk about locations for DNA, we have

6           several.  DNA is a very long string-like

7           molecule that has a ton of information.

8           There's 99 percent of our DNA is exactly

9           the same as another person's DNA, which

10          seems kind of odd, but there's that one

11          percent that is different and that is

12          what makes each person unique.  It is

13          that area that we're looking at to do our

14          forensics to do the analysis.  We don't

15          need to compare the 99 percent that is

16          exactly the same.  We want the unique

17          areas, the location that we're speaking

18          of is the location on the chromosome.

19          Those are the houses for the DNA in your

20          cells, and that location is found on a

21          specific cellular chromosome.  When we

22          speak of location, we have 13 core

2814

1          locations that we look at on a
2          chromosome.
3   Q.   I take it the more that match, location, the
4          higher the frequency?
5   A.   The more that match the more of the 13
6          locations that we have, the frequency
7          numbers will be higher, yes.
8   Q.   Now, from your experience, you know the
9          population of the world?
10  A.   Population of the world is around six point
11         one billion.
12  Q.   And will your results in DNA testing, how high
13         up do they go?  For example, do they go
14         over six point one billion to one?
15  A.   Very much so, billions times larger than the
16         world population.
17  Q.   And will you get into trillions and
18         quadrillions?
19  A.   Trillions, quadrillions and quintillions.
20  Q.   It is fair to state that statistically
21         speaking, you can narrow a finding down
22         to one person on earth, as a reasonable

2815

1          conclusion?

2    A.   That is correct, using statistics.

3    Q.   Now, I would like you to explain to the Jury

4          what you are seeing and looking at when

5          you are doing this testing.  What are you

6          seeing and doing so they can understand

7          what you are looking at?

8    A.   What I am seeing, are our instruments just

9          measure length of DNA, and we actually

10         visualize peaks, and these peaks are

11         transferred into what we call calls, and

12         those are designated a number at each

13         location.  The number that is designated

14         itself has a frequency, so at one

15         location I can determine a frequency.  So

16         if you have a location -- and let me

17         backtrack and explain to you that a

18         location will have both two parts to it,

19         a donor from your mother and a donor from

20         your father, so most people understand

21         that you will have two parts to a

22         location.  So, in each part will have its

2816

```
 1              own frequency, so if the first part has
 2              frequency of one in ten, and the second
 3              part has a frequency which means it will
 4              happen in one in ten people, we multiply
 5              those together and we get one in 100 and
 6              that is one location.  So each location
 7              these numbers will multiply and we'll get
 8              these huge numbers of frequencies to have
 9              these in combination.  It is very much
10              like a lottery to have these come
11              together in the exact manner to make a
12              match.
13    Q.   Now, I wanted to refer you to a case involving
14              a subject by the name of Nathaniel E.
15              Jackson, and victim by the name of Robert
16              Fingerhut.  Did you do multiple testing
17              regarding these subjects in requests from
18              the Howland Township Police Department?
19    A.   Yes, I did.
20    Q.   And did you bring with you today, items that
21              you had coming to town?
22                   THE COURT:  Excuse me, do you have a
```

2817

1   question?

2           JUROR:  Can we take a break before

3   we start going through the evidence?

4           THE COURT:  Sure.  Let's take a ten

5   minute break.  You are not to discuss anything or

6   form any opinions.

7   (Court in Recess at 2:20 p.m.)

8   (Resumed in Open Court at 2:45 p.m.)

9   CONTINUING DIRECT EXAMINATION BY MR. WATKINS:

10  Q.   Brenda, on the break I put before you a number

11          of Exhibits, and before we go to your

12          reports, I would like you to go through

13          the Exhibits that were part of your

14          analysis and what you can identify.  And

15          would you do that, please?

16  A.   First Exhibit No. 255, I can recognize as by

17          our BCI case numbers as the stain from

18          the floor, found in the front door

19          hallway.  State's Exhibit 387, I can

20          identify again by BCI case number, and my

21          initials and the date I opened it and

22          sealed it.  State's Exhibit 386, I can

2818

1        identify this by the BCI case number and
2        as the stain above the trunk release in
3        the car.  State's Exhibit 385, I can
4        identify again by our BCI case number and
5        it is the stain from the visor.  State's
6        Exhibit 390, I can identify by the BCI
7        case number as a stain from the lower
8        right back of the jacket.  State's
9        Exhibit 294, I can recognize by the BCI
10       case number as the original packaging of
11       it.  It just says dumpster behind the
12       Days Inn; it would be the gauze, the
13       original packaging.  And State's Exhibit
14       389 is the gauze, I can recognize that by
15       the BCI case number.  State's Exhibit 351
16       is the standard collected from Daniel --
17       Nathaniel Jackson and I can recognize
18       that by our BCI case number.  State's
19       Exhibit 265 is the blood standard of
20       Robert Fingerhut and I can recognize that
21       by our BCI case number as the original
22       packaging.  And State's Exhibit 388 is

2819

1           the retained evidence of the blood

2           standard of Robert Fingerhut.  I can

3           identify that by our BCI case number.

4    Q.   Of all those items, which one did you just

5           have marked, just marked that you brought

6           with you?

7    A.   I brought with me, State's Exhibit 390, which

8           was a swabbing from the lower right back

9           of the jacket.  That was item eight.

10   Q.   All of the items that you tested, you have

11          before you?

12   A.   That is correct.

13   Q.   And I'm going to hand you State's Exhibit

14          386-A.  Can you identify it?

15   A.   Yes, I can identify this as a true and

16          accurate copy of my original report.

17   Q.   And would you go through and explain what, and

18          by the way, again how long does it take

19          you to test an item?

20   A.   Start to finish, it would be at least a week.

21   Q.   And you would have to run a test on the

22          Defendant and the victim?

2820

1    A.    Yes, for comparison.

2    Q.    And then you would take the unknown?

3    A.    That is correct.

4    Q.    And then you would see if they compare?

5    A.    Right.

6    Q.    Now, are there times when you will come back

7          with no results?

8    A.    That is correct.  If there was a limited

9          sample or there was something wrong with

10         the sample or just for some reason, the

11         sample did not work, amplify, the stages

12         that I explained to you earlier.

13         Sometimes there's chemicals involved,

14         that the bleach was involved, our DNA

15         could be destroyed.  I need to go back

16         sometimes and do more evidence, yes.

17   Q.    There will be occasions that you may run a

18         test where -- say by the way, do you have

19         any more samples from that area?

20   A.    Yes.

21   Q.    So you could test again, to see if you come up

22         with something?

2821

1   A.   Yes, and that has been done.

2   Q.   Now, would you go through what you did in the

3            first analysis, which is, I want to refer

4            you to, and for purposes of the record,

5            my understanding is that the first

6            analysis was done by you on 3-5-02?

7   A.   That was the completion date, the date that I

8            typed this report.

9   Q.   But when did you do the analysis?

10  A.   It would be -- I would have to refer to my

11           notes for exact dates, but primarily

12           weeks before this date.

13  Q.   Your first report was typed or prepared by you

14           on 3-5-02?

15  A.   That is correct.

16  Q.   That was sent to the police and the Prosecutor

17           in this case?

18  A.   That is correct.

19  Q.   And would you go through what you did and your

20           results?

21  A.   We chose what items to be worked, and I had

22           chosen the one swab from inside the

2822

1                    house, a swab from the visor in the car,

2                    and gauze found in a dumpster outside of

3                    the hotel room.  I also did DNA analysis

4                    on two standards; one of Nathaniel

5                    Jackson and one of Robert Fingerhut, to

6                    do the comparison from the unknown to the

7                    known.

8    Q.    So, the first report covers testing of a swab

9                    from the home of Robert Fingerhut?

10   A.    That is correct.

11   Q.    And also a visor, some blood that was swabbed

12                   from the visor from the silver Chrysler

13                   automobile?

14   A.    That is correct.

15   Q.    And also a piece of gauze that was alleged to

16                   have been found at the dumpster behind

17                   the Days Inn?

18   A.    That is correct.

19   Q.    And would you tell the Jury what you found as

20                   to the swab in the house, the first one?

21   A.    The swab in the house was consistent with the

22                   DNA profile of Robert Fingerhut.

2823

1   Q.   So the swab in the house, was tested by you,

2        came back to the victim, Robert

3        Fingerhut?

4   A.   Yes, I cannot exclude him as being the donor

5        of the blood found on the swab from the

6        house.

7   Q.   As to item two, would you --

8   A.   On the visor, I found a mixture that was

9        consistent with both Nathaniel Jackson

10       and Robert Fingerhut.  So therefore, I

11       cannot exclude either as being possible

12       donors to the mixture.

13  Q.   So, the swab of the blood was a mixture where

14       you could not exclude Nathaniel Jackson

15       or Robert Fingerhut, is that correct?

16  A.   That is correct.

17  Q.   And do you have the statistical analysis in

18       your report, regarding those?

19  A.   Yes, I do.

20  Q.   Would you give your findings?

21  A.   Do you want the statistic?

22  Q.   Yes, as to item --

2824

1          MR. CONSOLDANE:  I'm going to

2   object.  She's been qualified as an expert in DNA,

3   but not in statistics.  I would object to her

4   giving statistical numbers.

5          THE COURT:  Isn't that part of what

6   a DNA expert does?

7          MR. CONSOLDANE:  She's expert in

8   testing, not in statistics.  Can we approach?

9   (In-chamber with counsel and witness, Brenda

10  Gerardi.)

11         THE COURT:  We're in-chambers out of

12  the hearing of the Jury.  The Defense waives

13  presence of Defendant?

14         MR. CONSOLDANE:  Yes.

15         THE COURT:  What is your objection?

16         MR. CONSOLDANE:  This young lady has

17  been qualified as an expert in DNA.  I understand

18  she knows how to run the test, how to perform the

19  test, how to read the test, but she has not been

20  qualified as a professional in the field of

21  statistics, and that is an entirely different

22  presented animal.  And to be able to give numbers

2825

1   like that in front of a Jury is -- it is out of her

2   field and it shouldn't be allowed.  It is only

3   someone that is an expert in statistics that can

4   testify as to the numbers.

5             THE COURT:  What is your response?

6             MR. WATKINS:  You have testified

7   previously, as to your reports?

8             THE WITNESS:  Yes.

9             MR. WATKINS:  The reports you

10  reported?  The report that you are testifying

11  about, is a report that you prepared?

12            THE WITNESS:  Yes.

13            MR. WATKINS:  And it is a standard

14  report?

15            THE WITNESS:  Yes.

16            MR. WATKINS:  That you do through

17  your training?

18            THE WITNESS:  Yes.

19            MR. WATKINS:  As a DNA expert?

20            THE WITNESS:  Yes.

21            MR. WATKINS:  And as part of your

22  training, and a part of your scientific work, you

2826

1    give frequencies that you have calculated through

2    the location of various loci?

3             THE WITNESS:  It is a formula that

4    is produced by the FBI and we're trained on how to

5    use this formula.  We took a statistics course on

6    this to determine frequency.  So, I personally

7    don't do the math.  We're trained specifically on

8    the statistics that we do.

9             MR. WATKINS:  So --

10            MR. CONSOLDANE:  I think that should

11   have been put on.  I'm sorry, go ahead.

12            MR. WATKINS:  Your training in

13   statistics and the methodology you use, is accepted

14   in the scientific community?

15            THE WITNESS:  Yes.

16            MR. WATKINS:  And you recall

17   calculations, are a result of your training and

18   course work in statistics?

19            THE WITNESS:  Yes.

20            MR. WATKINS:  And you feel that

21   those numbers that you are given, you have given,

22   are scientifically based through your training and

2827

1    are accepted in the practice as far as your

2    testimony here concerning DNA analysis?

3                    THE WITNESS:  Yes.

4                    MR. WATKINS:  Thank you.

5                    MR. CONSOLDANE:  What kind of course

6    in statistics did you take?

7                    THE WITNESS:  I took a course, it

8    was by Columbus State University, or I'm sorry,

9    Columbus Community College, through BCI allowed me

10   to take that, plus we had a known statistician from

11   California, I believe, Charles Brenner came to us,

12   personally, to give us a statistics course on how

13   to do forensic statistics and he's world-wide

14   known.

15                   MR. CONSOLDANE:  How long was this

16   course that you took at Columbus Community College?

17                   THE WITNESS:  It was a day.

18                   MR. CONSOLDANE:  One day course?

19                   THE WITNESS:  Yes.

20                   MR. CONSOLDANE:  And how long was

21   the course that you had with this expert that came

22   in?

2828

1          THE WITNESS:  That was also a day,

2     but that does not cover all of the statistics

3     training that I have had.

4          MR. CONSOLDANE:  What other

5     statistics training have you had?

6          THE WITNESS:  Through out the whole

7     training of the two years that I have had --

8     throughout the training for two years, every case

9     that we work we have a statistic frequencies that

10    we're doing the math.  We have to read articles on

11    how the data basing has been produced through the

12    FBI, and we also have the FBI's manuals on how they

13    have come up.  Now I have not committed to memory

14    on how they have come up with their data base and

15    how the frequencies are collected, because those

16    are still ongoing.

17         MR. CONSOLDANE:  That is the point

18    I'm making.  You really don't know how they come up

19    with them.  You just read a manual and apply to

20    them.  If you apply it wrongfully, you end up with

21    the wrong statistics.

22         THE WITNESS:  FBI data base that

2829

1  comes through our computer, that is an FBI computer

2  and that cannot be tampered with.  We actually log

3  in our report and it generates the numbers for us.

4  The FBI does it.

5           MR. CONSOLDANE:  Then you didn't

6  generate this number yourself, it was generated by

7  someone else?

8           THE WITNESS:  It is a computer

9  generated formula.

10          MR. CONSOLDANE:  That is hearsay if

11  she didn't do it.

12          THE COURT:  Here's the way I see the

13  thing.

14          MR. WATKINS:  There's case law on

15  this.

16          THE COURT:  I know there's case law.

17  The Courts of Ohio have accepted it.  I personally

18  have problems with it, because I think the

19  foundation material upon which it is based is not

20  as complete as it could be, but that may not be

21  even a valid argument.  The manner in which it is

22  done, you only run certain portions of the total

2830

1   that could possibly be run, right?  You don't run

2   the DNA sequence out --

3                  THE WITNESS:  No, Sir.

4                  THE COURT:  That would be

5   economically impossible.

6                  THE WITNESS:  Right.

7                  THE COURT:  What the Courts have

8   accepted is that the amounts that they do gets it

9   into the statistics of having a probability in

10  favor of being correct.  The argument that this

11  lady or anyone else who does this is relying on

12  someone else's statistics.  Every time we get a

13  mortality table in there, we're doing the same

14  thing.  You tell the Jury that life expectancy is

15  such and such.  We rely on tables that are accepted

16  as being valid in our daily lives all the time.  It

17  has been accepted in the Courts of Ohio.  I see no

18  reason why this lady is not as qualified as any

19  other DNA expert to testify.  Part of her job, part

20  of her training is to utilize those statistics, and

21  to come up with a statistical analysis based on the

22  findings that she's had in this particular case.  I

2831

1    think your argument is better put to the methods

2    used. That O.J. Simpson trial, that one attorney

3    from New York, he tore them apart on the

4    methodology used, but on the basis of your

5    objection, at this point I have to overrule it.

6              MR. CONSOLDANE:  I want to note my

7    exception.  I think that number one, that she's

8    relying on somebody else's work product which is

9    not subject to cross examination.

10             THE COURT:  That's entirely correct.

11             MR. CONSOLDANE:  And secondly, that

12   she doesn't have the admitted expertise, just two

13   days and some other work to be able to correctly

14   give what the statistics should be in the case.

15             THE COURT:  I doubt if there's a

16   person in the United States that could meet that

17   criteria.

18             MR. CONSOLDANE:  Then we shouldn't

19   be allowed to use DNA in Courts anyhow.  It is as

20   spurious as polygraph machines.

21             THE COURT:  It is a very valid

22   scientific thing, but it would cost a million bucks

2832

1   to do it, so there was absolutely no question about

2   the results, but the probabilities are on what

3   she's doing, the Court said it is enough to rely

4   on.

5           MR. WATKINS:  And that is why the

6   Defense can have their own witnesses if you have

7   contest on DNA.  Ohio allows to present whatever

8   statistical evidence they have.

9           THE COURT:  This guy doesn't happen

10  to be O.J. Simpson.

11          MR. WATKINS:  There are indigent

12  experts at times.  This Court has been generous in

13  its appointment throughout the years.

14          THE COURT:  That is the Court's

15  ruling.

16  (End of in-chamber discussion.)

17  Q.   (By Mr. Watkins)  Brenda, you indicated that

18           the visor had a mixture consistent with

19           the contributions from Robert Fingerhut

20           and Nathaniel Jackson, is that correct?

21  A.   That is correct.

22  Q.   And on the visor, what were your conclusions?

2833

1   A.   I need the report.

2   Q.   Which report do you have?

3   A.   I have the original report.  I would need the

4        supplemental one.

5   Q.   Let's go to the gauze.  That is on that

6        report?

7   A.   That is correct.

8   Q.   Item three, would you tell the Jury your

9        results of the statistical information

10       you give in the report regarding a

11       comparison of the gauze, which was

12       identified by you as being the gauze from

13       the dumpster behind the Days Inn, and the

14       Defendant and/or Robert Fingerhut?

15  A.   I have identified the gauze, as being

16       consistent with Nathaniel Jackson,

17       therefore, it means that Nathaniel

18       Jackson cannot be excluded as being the

19       source of the blood found on the gauze.

20  Q.   There's only one single source on the gauze?

21  A.   One source, not a mixture.

22  Q.   And that was blood that was analyzed by Dale

2834

1              Laux?

2  A.   Yes.

3  Q.   And given to you?

4  A.   That is correct.

5  Q.   And what frequency did you find using the

6          BCI -- I'm sorry, the FBI data base?

7  A.   Using the FBI data base, I can tell you that

8          only one in 45 quintillion, 170

9          quadrillion people in the Caucasian

10         people will be found to have this profile

11         in the African American population, I

12         would expect to only find one in 29

13         quadrillion, 860 trillion people.  In the

14         Hispanic population, I would expect to

15         find that profile on the gauze, one in 22

16         quintillion, 400 quadrillion.

17 Q.   Can you identify number 286-C?

18 A.   I can identify 286-C as being a true and

19         accurate copy of my supplemental report.

20 Q.   And that is dated when?

21 A.   Dated 3-28-02.

22 Q.   And what did you analyze for that?

2835

1   A.   No further analysis was done.  I just did not

2        do a statistic on the mixture on the

3        visor from my first report, so I did a

4        mixture statistic for the visor on the

5        supplemental report.

6   Q.   The blood stain that Dale Laux gave you, which

7        was put on a DNA card was compared with

8        Robert Fingerhut and Nathaniel Jackson?

9   A.   Yes, and I believe Dale cut out the stain or

10       swabbed the visor, and sealed those and

11       gave them to me for DNA analysis.

12  Q.   Which you have identified?

13  A.   Which I have identified as a mixture of both

14       Nathaniel Jackson and Robert Fingerhut.

15  Q.   And again, what were the results regarding

16       frequency?

17  A.   For frequency in the Caucasian population, I

18       would expect to find someone that could

19       be a donor to this mixture, one in 16

20       million 10,000.  For the African-American

21       population, I would expect to find one in

22       five million, 491 thousand.  That

2836

1           statistic would mean only one in five

2           million 491 thousand people would be a

3           contributor, could be a contributor to

4           that mixture.  In the Hispanic

5           population, you would expect to find for

6           this mixture profile, one in six million,

7           835 thousand people.  Just to help you

8           understand, one in that many people would

9           be expected to be found with the profiles

10          that would fit into that mixture.

11   Q.   Now, the mixture, knowing that it was blood

12          that was found on the visor, does that

13          mean in your analysis that we have the

14          blood of both parties identified, Robert

15          Fingerhut and Nathaniel Jackson?

16   A.   No, it just means there's a mixture of blood

17          and something else or it could be blood

18          and blood.  I cannot tell you the

19          mixture, quantity, however I can tell you

20          that there's a mixture that I cannot

21          separate out major and minor and

22          therefore, have a true mixture, so not

2837

```
 1                one type overpowers the other.  They are
 2                in almost equal proportions on the visor.
 3   Q.   If one were driving that car, assume that the
 4                victim was driving that car, and was
 5                using that car, and he would continually
 6                move the visor with his hands, would you
 7                expect to have cells on that visor?
 8   A.   I would expect to have cells, yes.
 9   Q.   And if the Defendant would go in that car, and
10                with blood on his hand move the visor,
11                and it went on the visor, you could have
12                the cells of Robert Fingerhut with the
13                blood of the Defendant?
14   A.   That is correct.
15   Q.   Now, would you please go onto your last
16                report, and I'll hand that to you.
17                State's Exhibit 286-D.  Are you able to
18                identify that?
19   A.   I can recognize this as a true and accurate
20                copy of my supplemental two report.
21   Q.   And would you explain, and by the way, that is
22                dated 6-17-02.  And you are now doing
```

2838

1           additional testing?

2   A.   Yes.

3   Q.   And would you tell the Jury exactly what you

4           are doing?

5   A.   I did the stain from the jacket of the victim,

6           on the right back side of the jacket, a

7           blood stain, and I also did a blood stain

8           found from the trunk release inside the

9           car.  I also found and compared those

10          again to the two standards that were

11          given to me of Nathaniel Jackson and

12          Robert Fingerhut.

13  Q.   As to the jacket, and that would be the jacket

14          you received from Howland police, the

15          baseball jacket?

16  A.   Yes.

17  Q.   Continue.  What were your results?

18  A.   My findings were that the DNA profile from the

19          jacket was consistent with Robert

20          Fingerhut; therefore, Robert Fingerhut

21          cannot be excluded as a source of the DNA

22          on his own jacket.

2839

1  Q.  Now, you also took a swab from the silver

2      Chrysler automobile that Dale Laux had

3      gotten?

4  A.  That is correct.

5  Q.  And that was from the trunk release area of

6      the silver Chrysler?

7  A.  That is correct.

8  Q.  And that was a swab of blood?

9  A.  That was a swab of blood.

10 Q.  And that was given to you and identified, you

11     have it before you?

12 A.  That is correct.

13 Q.  And would you tell the Jury what your results

14     and statistical information, based on the

15     FBI data base are?

16 A.  I did develop a mixture on the stain from

17     inside the trunk release, however, I can

18     separate out major and minor and the

19     major profile is consistent with

20     Nathaniel Jackson and the minor was

21     consistent with Robert Fingerhut.

22     Therefore, Nathaniel Jackson cannot be

2840

1          excluded as a major type of DNA found on

2          the trunk release, and Robert Fingerhut

3          as the minor source of DNA found on the

4          trunk release, and because I separated

5          out truly into major and minor, I do a

6          statistic on the major portion found on

7          the trunk release and those numbers are

8          as follows.  In the Caucasian population,

9          one in quintillion, 170 quadrillion

10         people; in the African-American

11         population, one in 29 quadrillion, 860

12         trillion; in the Hispanic population, you

13         would expect to find a profile of one in

14         22 quintillion, 400 quadrillion.

15   Q.    So, assuming that the Defendant were

16         African-American, it would be one in over

17         29 quadrillion?

18   A.    That is correct.

19   Q.    Which would be 15 zeros?

20   A.    15 zeros.

21              MR. WATKINS:  Thank you very much.

22   CROSS EXAMINATION BY MR. LEWIS:

2841

1    Q.   How long have you been with BCI&I?

2    A.   Around five and a half years.

3    Q.   And I am curious about the it takes one week

4              to do an analysis, DNA analysis, is that

5              what we're talking about, one object, if

6              you take one cotton swab and try to have

7              a material, I don't care whether it is

8              saliva or blood, whatever it is, it takes

9              a week to do that analysis, is that

10             correct?

11   A.   It is a generalization to say one week, but

12             when an item comes into the office, it

13             goes to our serology section first,

14             therefore, that identification of blood

15             or urine, feces, is not what I am talking

16             about, it takes a week for the DNA

17             analysis and it is not just one thing,

18             I'll work a whole case together at one

19             time to take one week.  Does that answer

20             your question?

21   Q.   That was good, but, what I'm trying to figure

22             out is, there's a big issue about time

2842

1           consumption here and I got the impression

2           it takes one week to do an analysis, so

3           that is 52 tests a year for one human

4           being, forensic scientist, am I wrong on

5           that?

6    A.    Yes.

7    Q.    Do it for me one more time.  Let me ask you

8          this question.  If you have six swabs and

9          you are looking for DNA, can you do all

10         six at the same time, put it through the

11         steps?

12   A.    They are through the steps, not at the same

13         time, but in sequence.

14   Q.    You can only handle one at a time, is that

15         what you are telling me?

16   A.    That is correct.  One open at a time.

17   Q.    And let me ask you this simple question.  How

18         much time is consumed by whatever

19         material has to be worked with, or

20         whatever, when you say a week what I am

21         having a hard time with, are you doing

22         one swab because of so many steps it

2843

1          takes you one week to process?

2  A.   I can tell you about the process if you would

3          like.

4  Q.   I would really like the time.  I can

5          understand the process.  What I'm trying

6          to do is break down the time.  It has

7          already been said it takes a week to

8          process this.  Mr. Dale Laux told us and

9          Mr. Watkins has emphasized it takes a

10          week do each one of these and that is

11          what I'm trying to figure out.  Does it

12          take a week for each one of these?

13  A.   It takes a week to do the stages that I have

14          explained.  The extraction stage through

15          the analysis and interpretation of that

16          data would take me approximately a week.

17  Q.   The week, are you constantly working on that

18          eight hours a day, then?

19  A.   No.

20  Q.   Would you give me an idea of does the material

21          have to combine with something, and just

22          sit for awhile?

2844

1    A.   Yes, Sir, that is what happens is the

2         extraction step, we add things to it.  To

3         clean up the DNA to extract it we extract

4         it, that takes time, it takes hours,

5         sometimes overnight.  The next day, we

6         finish the extraction, and then the

7         amplication takes time.  The

8         quantification step that I said takes

9         time.  The instrument itself that we use

10        to do the DNA analysis.  It is one-half

11        hour a sample, so if I have 48 samples on

12        my tray, then it is going to take me two

13        days.

14   Q.   So, suffice to say, a lot of it is consumed by

15        stages of the processing of it itself, it

16        is not handled by you, humanly it's a

17        staging process?

18   A.   That is correct.

19   Q.   The DNA, when we got to the end of the direct

20        examination, or actually the middle of

21        it, we're talking about DNA, comes from

22        skin cells, saliva, hair.  It can come

2845

1          from pubic hairs, it can come from blood

2          cells?

3  A.   That is correct.

4  Q.   And come from white blood cells?

5  A.   White blood cells.

6  Q.   All of the component -- actually blood cells

7          are the component of our whole body in

8          one form or another?

9  A.   DNA is found in all types of cells, with the

10         exception of red blood cells.

11 Q.   Teeth?

12 A.   Yes, bone cells also.

13 Q.   The interesting thing is, tell me if I am

14         wrong, is when you actually do the

15         extraction, the DNA, you don't actually

16         know what substance you are working with,

17         whether it be blood, saliva, be it the

18         sweat from the hand, you don't actually

19         know where it came from, except from an

20         initial report, right?

21 A.   Well, if it is a blood standard from the

22         subject collected from the department, I

2846

```
 1           know that that is the blood sample.  If
 2           it is a blood stain that was identified
 3           by a previous analyst or myself, for
 4           example on the visor, we know that we're
 5           working with at least a human blood
 6           stain.
 7   Q.  So that the point being, is that on the visor,
 8           we're talking about a human blood stain?
 9   A.  Right.
10   Q.  And that is what you were given, right?
11   A.  Exactly.
12   Q.  So, it very well could be that as you
13           indicated here, the mixture, whatever the
14           figures are, one in umpteen number of
15           zeros, that could have been the blood of
16           Mr. Fingerhut and this could have been
17           the blood of Mr. Nathaniel Jackson?
18   A.  It could be a mixture of both, yes.
19   Q.  And logically, I suppose, if someone were to
20           come in contact with blood on another
21           human, clothing, the hands, whatever, I
22           got it on my hand and my hand was cut,
```

2847

1    you may end up with a mixture, you took

2    it off the end, right?

3   A.   If I swabbed your hand and you had somebody's

4        blood on you?

5   Q.   Yes, you recall cut -- I am cut, I touch it

6        where I am cut and I deposit it, you

7        might get a mixture?

8   A.   That is correct.

9   Q.   And in this case you did get a mixture in

10       regard to what was on the visor in the

11       car?

12  A.   That is correct.

13  Q.   And the other DNA in regard to the blood spot

14       that was one found on the floor in the

15       hallway of a residence, correct?

16  A.   That is correct.

17  Q.   The statistical when we throw out all of these

18       umpteen number of zeros, you indicated

19       that really comes from the FBI data base,

20       is that correct?

21  A.   The FBI data base has a computer system that

22       we utilize, and the formula, for all of

2848

1          these frequencies has already been

2          generated and well accepted throughout

3          the forensic community, and we add our

4          information, our data to that, and it

5          generates the frequency that you have

6          been given today.

7  Q.   It is kind of like a little calculator, you

8          want to multiply 12 times 12 times 12,

9          you put it in and punch the button and it

10         gives you the number?

11 A.   Pretty much, yes.

12 Q.   So, you don't really do the analysis yourself,

13         you are putting the input data in and the

14         computer tells you exactly what the

15         statistical thing is and it is in the

16         report?

17 A.   Yes, I don't do the statistics.  I do the

18         analysis to get the data, to do the

19         statistics.

20 Q.   So this, all of these big zeros, this down

21         here is really out of the computer data

22         base from the FBI?

2849

1   A.   That is correct.

2   Q.   And you are the one who fed the data in,

3        correct?

4   A.   That is correct.

5   Q.   And the loci are really -- you said there's a

6        total of 13?

7   A.   13 location, plus a gender site, that will ask

8        me if my sample is male or female.

9   Q.   For each loci, are there two things, you said

10       male and female or just one?

11  A.   At each location, you can have up to two types

12       at each location.  It could be what we

13       call a homozygote, which is one type at

14       that location.  All it means is that both

15       of your two types match, from your Mom,

16       from your Dad, gave you the same type.

17       So we just write one number instead of

18       the two.

19  Q.   Where was that second report?  We got a

20       mixture from the visor, correct?

21  A.   From the visor.

22  Q.   We have singly, the gauze, that is just

```
                                                              2850
 1              strictly Nathaniel Jackson?

 2    A.   That is correct.

 3    Q.   I'm going to use the figure, it is blowing me

 4              away.  It is 15 zeros and it is Nathaniel

 5              Jackson on the gauze, and then the drop

 6              in the hallway of blood, in the hallway

 7              of the home, that was Robert Fingerhut?

 8    A.   That is correct.

 9    Q.   It was not a mixture?

10    A.   It was not a mixture.

11    Q.   And on the supplemental report, you also did

12              the -- you tested for the jacket which

13              was the was that the Cincinnati Reds

14              jacket?

15    A.   The jacket was in firearms.  I went to collect

16              my samples, I didn't have the whole

17              description of the jacket.

18    Q.   And the one, it was the jacket and the inside

19              of the car, correct?

20    A.   Yes.

21    Q.   And the jacket came out as Robert Fingerhut?

22    A.   That is correct.
```

2851

1  Q.   The inside of the car came out as --

2  A.   The major source of the DNA, Nathaniel

3           Jackson.

4  Q.   And the minor source was?

5  A.   Robert Fingerhut.

6  Q.   Once again, contact with blood, let's say I

7           had blood all over me, and I was there

8           and I was cut, I could pick it up all

9           over the place, and wherever I went,

10          here, grabbed that, I could put the

11          mixture anywhere, right?

12  A.   You could put the mixture anywhere, yes.

13          MR. LEWIS:  Thank you very much.

14          MR. WATKINS:  No further questions.

15  Thank the witness.

16          STEVE GREENE

17  being duly sworn according to law, on his oath,

18  testified as follows:

19  DIRECT EXAMINATION BY MR. MORROW:

20  Q.   Good afternoon, Steve.

21  A.   Hi.

22  Q.   Would you please introduce yourself?

2852

1   A.   Steve Greene.

2   Q.   And Steve, where are you employed?

3   A.   Ohio Bureau of Criminal Identification and

4        Investigation.

5   Q.   And how long have you been employed there?

6   A.   Almost 25 years.

7   Q.   And in what capacity are you employed with

8        BCI?

9   A.   For the past 23 years, I have been employed in

10       the laboratory as a document examiner.

11  Q.   And when you talk about document examiner,

12       what does that entail?

13  A.   We make examinations and comparisons of

14       anything that contains written

15       communication.  This includes the

16       comparison of handwriting, hand printing,

17       and examination of documents for

18       alterations, obliterations, examination

19       of documents for any indented writing and

20       at one time, we looked at documents

21       compared with various types of office

22       equipment, desk top publishing -- we see

2853

1              very little of that anymore.

2    Q.    And can you detail a little bit about your

3              education and training background for us,

4              please?

5    A.    Yes, Sir.  I have approximately three years of

6              college.  The training as a document

7              examiner was an apprenticeship.  I

8              studied with Walter Knight for two years,

9              and continued to work with him for the

10             following ten years.  In addition to

11             that, I have had two weeks school with

12             the Secret Service and two weeks school

13             with FBI and attended various other

14             training classes for the past 20 years.

15   Q.    Do you obtain any certification or degrees or

16             recognition to be a document examiner?

17   A.    No, Sir.

18   Q.    You had a rather lengthy apprenticeship?

19   A.    Yes, Sir.

20   Q.    At some point in time, does the master tell

21             you, you are no longer an apprentice?

22   A.    Yes.

2854

1   Q.   And he cuts you loose to do your own?

2   A.   Yes.

3   Q.   And that did happen, ultimately, from

4             Mr. Knight?

5   A.   That is correct.

6   Q.   And have you ever had anyone work under you to

7             be an apprentice?

8   A.   Yes, Sir.

9   Q.   How many people have you trained as

10            apprentices?

11  A.   Only one.

12  Q.   And how long ago was that?

13  A.   About ten years ago.

14  Q.   And document analysis also include handwriting

15            identification or handwriting analysis?

16  A.   Yes, Sir.

17  Q.   And what makes that type of analysis possible?

18  A.   Each of us have our own individual unique

19            style of writing, even though we're

20            taught to write the same way, we deviate

21            from that style of writing we're taught

22            in school and create individual

2855

1          characteristics within our own writing,

2          and with that, those individual

3          characteristics can be compared with

4          other documents to make a determination

5          of whether or not an individual may or

6          may not have written something in

7          particular.

8    Q.   And what types of tools do you employ in order

9          to make a comparison of handwriting

10         analysis?

11   A.   Most of it is visual, but we also use a

12         magnifier and stereo microscope.

13   Q.   And in particular, did you have occasion to

14         conduct an investigation with respect to

15         a homicide involving an individual by the

16         name of Robert Fingerhut?  More

17         importantly, did you have the opportunity

18         to undertake handwriting analysis of an

19         individual known as Nathaniel E. Jackson?

20   A.   Yes, Sir, I did.

21   Q.   Don't remember what case it was in relation

22         to?

2856

1    A.   No, Sir, I'm sorry.

2    Q.   I'm going to hand you what is marked as

3         State's Exhibit 281.  Could you please

4         tell me if you recognize that, please?

5    A.   Yes, Sir.

6    Q.   Could you detail to the ladies and gentlemen

7         what that is?

8    A.   This is a copy of the laboratory submission

9         sheet, which was prepared referencing the

10        documentary evidence that was submitted

11        in this case.

12   Q.   In particular, what items were submitted to

13        you?

14   A.   Items D-1 through D-5, item D-1, handwriting

15        standard from Nathaniel E. Jackson, dated

16        4-29-02, handwritten letter from

17        Nathaniel E. Jackson to Donna Marie

18        Roberts, dated 10-29-01; a handwritten

19        letter from Nathaniel E. Jackson to Donna

20        Marie Roberts, dated 10-26-01, seven

21        handwritten pages of documents from

22        Nathaniel Jackson's printing and

2857

1              signature, from CCA, and item D-5, four

2              pages of documentation written by

3              Nathaniel E. Jackson from Lorain

4              Correctional Institute.

5    Q.   I'm going to hand you what is marked as

6              State's Exhibit 275-A and B, are you able

7              to identify those?

8    A.   Yes, Sir, I am.

9    Q.   And how are you able to identify those?

10   A.   It bears the case identifier and my initials

11             on the seal.

12   Q.   And please tell the ladies and gentlemen, what

13             those are.

14   A.   Item D-2 is a handwritten letter from

15             Nathaniel E. Jackson to Donna Marie

16             Roberts, dated 10-29-01.  And item D-3 is

17             a handwritten letter from Nathaniel E.

18             Jackson to Donna Marie Roberts, dated

19             10-26-01.

20   Q.   And those are the D-2 and D-3, those are your

21             numbers?

22   A.   That is correct.

2858

1   Q.   And D-3, your number is actually State's

2          Exhibit 275-B?

3   A.   Yes.

4   Q.   And D-2 is State's Exhibit 275-A?

5   A.   That is correct.

6   Q.   I am also going to hand you what has been

7          marked as State's Exhibit 276-A, B and C.

8          Could you please take a look at those and

9          tell me if you are able to identify them?

10   A.   Yes, Sir.

11   Q.   And how are you able to identify those?

12   A.   In the same fashion.  These three also have

13          the case identifiers, and my initials are

14          on the seal.

15   Q.   And in particular, those are the other three

16          submissions contained on the submission

17          sheet to you?

18   A.   Yes, Sir.

19   Q.   Also, in your capacity with BCI, have you had

20          an occasion to testify in Court before?

21   A.   Yes, Sir.

22   Q.   And approximately how many times have you

```
                                                      2859
 1           testified in Court?
 2    A.   250.
 3    Q.   Of those times that you have testified, have
 4           you testified as a handwriting expert or
 5           a documents expert?
 6    A.   Yes, Sir.
 7    Q.   How many times approximately, have you
 8           testified with respect to handwriting
 9           analysis?
10    A.   The vast majority of those times.
11    Q.   And have you been qualified as an expert to
12           give opinions with respect to handwriting
13           analysis in the State of Ohio?
14    A.   Yes, Sir.
15    Q.   And have you been qualified as an expert in
16           Trumbull County to give opinions as to
17           handwriting analysis?
18    A.   Yes, Sir.
19    Q.   And do you recall the last time you were in
20           Trumbull County?
21    A.   No, Sir, I don't.
22    Q.   Quite sometime ago?
```

2860

1   A.   Yes, Sir.

2   Q.   At this time, the State would move to have

3          this witness qualified as an expert in

4          handwriting analysis.

5          THE COURT: Any objection?

6          MR. CONSOLDANE: Yes.

7          THE COURT: What is your objection?

8          MR. LEWIS: Cross examination hasn't

9   taken place, Judge. We don't do it this way.

10   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

11   HEARING)

12   Q.   Let's do this, with respect to this case, did

13          you prepare a written report in this

14          matter?

15   A.   Yes, Sir, I did.

16   Q.   And I'm going to hand you what has been marked

17          as State's Exhibit 285. Can you identify

18          that, please?

19   A.   Yes, Sir, this is the report prepared in

20          reference to this particular case.

21   Q.   And that is a true and accurate copy of the

22          report prepared by you?

2861

1    A.    It may be the original, but it is a true and

2          accurate document.

3    Q.    If you could, please detail to the ladies and

4          gentlemen what you did in preparing that

5          report and how you came about your

6          conclusions.

7    A.    In the preparation of the report, followed the

8          comparison of the handwriting samples to

9          the questioned documents, and in this

10         particular case, item D-1, D-4 and D-5,

11         were all submitted as bearing known

12         handwriting of Nathaniel Jackson.  Those

13         known handwritings were then compared

14         with questioned documents, which in my

15         report, or item D-2 and D-3, side by side

16         compare some of the known writing where

17         the questioned writing was made in an

18         attempt to first look for individual

19         characteristics contained in the

20         questioned and then compare those

21         individual characteristics to what may be

22         in the known handwriting samples.  After

2862

1           having made those comparisons, I arrived

2           at an opinion.

3                THE COURT:  Just a moment.  We have

4    an outstanding objection before we proceed.  Put on

5    the record that the objection is overruled.  I

6    think this gentleman is qualified to testify as an

7    expert. He's testified many times.

8    Q.   And in particular, I guess, for the long and

9           short of it, you get something that

10          someone says this is written by an

11          individual?

12   A.   Yes, Sir.

13   Q.   Then you have another document which you don't

14          know whether or not it was written by

15          that same person?

16   A.   That is correct.

17   Q.   You put the two side by side and you compare

18          them to see if they have similar traits

19          and characteristics?

20   A.   That is correct.

21   Q.   And what types of things are you looking at in

22          making that determination?

2863

1    A.    We look for deviations from classic copy book

2          style of writing, the size of the

3          writing, the size relationship within the

4          writing, the slant of the writing, the

5          actual make-up of the letters themselves.

6          All of those things go into an

7          individual's writing and could come into

8          play to help you make an identification

9          or elimination.

10   Q.    And that was what was done in this case?

11   A.    Yes, Sir.

12   Q.    If you would, at this time, I would like to

13         display the handwriting standards versus

14         the handwriting unknowns for comparison

15         purposes.

16                THE COURT:  Yes.

17   Q.    First thing I'm going to put on the screen

18         what is identified as State's Exhibit

19         276-A.  Would you please tell the Jury

20         what is in that document, please, or what

21         is in that envelope?

22   A.    State's Exhibit 276-A contains my item D-1, an

2864

1        envelope and a sheet of paper, both

2        submitted as bearing the known

3        handwriting of Nathaniel Jackson.

4   Q.   And this was an item you received from who, if

5        you know?

6   A.   I would have to refer back to the submission

7        sheet.  These documents were submitted by

8        the Howland Police Department, Detective

9        Paul Monroe.

10  Q.   What was the date of the submission and the

11       date of your analysis?

12  A.   The date of submission was 5-6-02.  The date

13       of my analysis was 5-29-02.

14  Q.   And this was the one document that you

15       understood to be belonging to the

16       Defendant, the handwriting sampler from

17       Nathaniel Jackson?

18  A.   There are actually two documents, a letter and

19       a copy of a letter and envelope.

20  Q.   I'm going to show you what is marked as 276-B.

21       Can you look at that, please, and explain

22       to the ladies and gentlemen what is in

2865

1          there?

2   A.    Item 276-B is my item D-4, and these are seven

3          documents which were submitted which

4          contained the known handwriting of

5          Nathaniel Jackson.

6   Q.    And any documents in particular from that,

7          that you utilized in making your

8          comparison?

9   A.    All of the documents were used, but none of

10         these in particular were ones that we're

11         going to use for demonstration purposes.

12  Q.    I'll hand you 276-C.  Take a look at that,

13         please, and explain to the ladies and

14         gentlemen what that document consists of.

15  A.    Item 276-C is my item D-5, and these were

16         documents submitted as bearing the known

17         handwriting and hand printing of

18         Nathaniel Jackson, from Lorain

19         Correctional institution.

20  Q.    Were there any documents in that in particular

21         that you utilized in making your

22         comparison or that were used for

2866

1          demonstration and comparison?

2   A.   Yes, Sir, the employment history.

3   Q.   And we'll mark that as 276-C-1.

4   A.   Yes, Sir.

5   Q.   I'm going to hand you what has been marked as

6          275-B.  Take a look at that, please.

7   A.   Yes, Sir.

8   Q.   And briefly explain to the ladies and

9          gentlemen what that is.

10  A.   It is an envelope containing a letter which

11         was submitted as a questioned document.

12  Q.   And is that letter compared against the items

13         of 276-C-1 and the 276-B -- I'm sorry,

14         276-A, the handwriting standard?

15  A.   Yes, Sir.

16  Q.   And there are certain portions of that letter

17         that you were able to look at, to be able

18         to allow you to make your comparisons?

19  A.   The entire letters were looked at in

20         comparison to the known sample.

21  Q.   And how many pages is this document, contained

22         inside?

2867

1    A.    Nine white pages and one yellow page.

2    Q.    On 275-A?

3    A.    It also is an envelope containing the letter.

4          The letter is five pages in length, all

5          of them on white paper.

6    Q.    And at this time, what I would like to do, is

7          I would like to put the Exhibit from

8          275-B -- I'm sorry, 275-A -- 275-A on the

9          screen, and have you identify how you are

10         able to make your comparison.  First,

11         we'll put the first page.  Explain to us

12         how you were able to make your

13         comparisons with the other document.

14         First of all, let me show you the

15         standards.  Tell me what types of things

16         you are looking for from the standard.

17   A.    On the standard, the type of characteristics

18         that were noted were -- you will notice

19         the size and relationship between the 0

20         and the 7 and 2705 in the address, and

21         also the length of the upper portion of

22         the 7 in comparison to the surrounding

2868

1           letters.  The lower case S have a

2           somewhat left hand slant to them.  They

3           are back end slant, and the majority of

4           the other letters are fore hand slant.

5           The use of an upper case N throughout

6           printing, there are no lower case N's

7           present.  The very small lower case I in

8           relation to the surrounding letters --

9           the strokes on these two Y's drop

10          straight down, an example of another type

11          of Y in some of the other documents.  The

12          T H combinations with an upper case T and

13          lower case H, with the cross bar going

14          over the top of the H.  The use of a

15          cursive or Greek style E in the printing,

16          and it also has a back hand or left hand

17          slant.  Those are the types of things

18          that were looked at in comparison with

19          the questioned document.

20  Q.   Now in reference to your D-2.  D-2, I'm going

21          to direct your attention to, down to this

22          area here where I have got, direct your

2869

1          attention down here where my finger is

2          where it begins, "inasfar as the Robert

3          problem."  Do you see similarities there

4          that would allow you to arrive at a

5          conclusion as to who penned that second

6          letter?

7    A.    Yes, Sir.

8    Q.    And if you could, explain to the jurors what

9          those similarities are and how you were

10         able to arrive at those conclusions?

11   A.    The individual characteristics are the

12         characteristics known in the known

13         writing were also looked for in the

14         questioned writing.  Again, we have the

15         lower case F with a back hand slant.  We

16         have the T-H combination of that, the

17         very small I in will.  The very straight

18         lower extension on the U.  The use of the

19         Greek E in because with a back hand

20         slant.

21   Q.    And that Greek E was something in other

22         documents as well?

2870

1   A.   Yes, other known standards.  Again, we have

2          comparison between the printing and the

3          known as well as the printing in the

4          questioned.

5   Q.   And were there anything in terms of the R's

6          and P's that you recognized; the R's, the

7          capital R's and the capital P's that you

8          recognized throughout the known standard?

9   A.   All of the letters were comparable, but yes,

10         Sir, the P's, some of the P's.  You

11         notice the R and P, the upper recurving

12         stroke does not connect to the staff of

13         the letter.  Again that would be

14         something individual to the writer.

15   Q.   And that is contained on the first page of

16         that document as well as other pages as

17         well?

18   A.   Yes, Sir, these were consistent throughout the

19         letters.

20   Q.   If I direct your attention down to where it

21         indicates, where it begins, "This is how

22         you believe that I love you 100 percent"

2871

1          you see the same characteristics there,

2          the capital T H as well?

3    A.    We have the T H combination.  We have the use

4          of the Greek E's with the back hand

5          slant.  We have the use of the upper case

6          N throughout the printing itself.  The

7          straight extension of the Y, all of these

8          things are consistent throughout the

9          letters.

10   Q.    Did you also notice something unique about his

11         double T's?

12   A.    Yes, Sir, when you have double T combination,

13         the cross stroke, it is not a single

14         cross stroke, each of the T's are crossed

15         individually and that combination was

16         found on the employment history form as

17         well as in the questioned documents

18         themselves.

19   Q.    If I direct your attention to this area here,

20         is that the double T stroke that you are

21         talking about?

22   A.    Yes, Sir.

2872

1  Q.  And that is what made that stand out

2      characteristically in this particular

3      letter?

4  A.  Yes, Sir.  In conjunction with all of the

5      other characteristics.

6  Q.  You also made some comparisons on that other

7      letter which is the D-3 submission, is

8      that correct?

9  A.  Yes, Sir.

10 Q.  The first letter that I handed to you, what

11     was the date that that letter was

12     written, if you know?

13 A.  October 29, 2001.

14 Q.  Is that the date that that letter is dated?

15 A.  Yes, Sir, it is.

16 Q.  And in D-3 submission, can you tell me the

17     date that that was dated?

18 A.  D-3 was dated October 26, 2001.

19 Q.  And if we take the D-3 submission and compare

20     it with the D-1 submission, first of all,

21     do we have some of the similar language

22     in the two documents?

2873

1   A.   The language was a part of the comparison the

2        characteristics themselves were.

3   Q.   Is it a practice to try to obtain the same,

4        have someone provide the same sample from

5        the one you are comparing against?

6   A.   Yes.

7   Q.   Is that beneficial?

8   A.   Yes.

9   Q.   So if you get an unknown, and a person writes

10       that unknown and you get a standard, you

11       can compare it against that?

12  A.   Yes, Sir, it provides a side by side

13       comparison.

14  Q.   And in particular, with the D-1 submission and

15       the D-3 submission, does it appear that

16       those were of the same language?

17  A.   Yes, Sir.  It starts out the same language.

18  Q.   And if we look at the second to the last page,

19       directing your attention to under the

20       fold of the letter where it begins right

21       here it says, "Hey, Donna," are you able

22       to make some comparison and

2874

1              identifications from that as well?

2    A.    Yes, Sir, again the same characteristics

3              occurred throughout the letters.  We look

4              over here to the margin, we have the T H

5              combination of the very small lower case

6              I and the upper case formation of the N.

7              The use of the Greek E, that is also of

8              the back hand formation and the word

9              "funeral," you have the lower case F, it

10             is also back hand.  We have another T H

11             combination, the same types of formation

12             that are consistent throughout all of the

13             questioned documents as well as the known

14             items.

15   Q.    And finally, turning to the second page of the

16             document, were you able to make

17             comparisons on the top as well?

18   A.    Yes, Sir.  We have the T H combination, the

19             lower case F, and back hand slant, the

20             use of the upper case N, the Greek E with

21             the back hand slant.  These double T's

22             are not beside each other.  It is not

2875

1          double T crossing except that you will

2          notice that the cross stroke and staff

3          are disjointed, which is also found in

4          known handwriting.  The similarities

5          previously noted and there are other

6          similarities.

7   Q.    And these were -- each of these, both of those

8          two letters based upon your analysis,

9          your analysis, are from the same

10         individual as the known standard?

11  A.    Yes, Sir, that would be my opinion.

12                MR. MORROW:  I have no further

13  questions at this time.

14  CROSS EXAMINATION BY MR. LEWIS:

15  Q.    Mr. Greene, you have been with the BCI&I -- it

16         was only one I before?

17  A.    Well it has been BCI&I since I was there.  At

18         one time, it was only one I.

19  Q.    How many years have you been with them?

20  A.    25 years.

21  Q.    And to become an expert in handwriting

22         analysis, do that one more time for me,

2876

1          you worked under somebody else?

2   A.   Yes, Sir.

3   Q.   Is there a handwriting school?  In other

4          words, they send people like the FBI or

5          handwriting analysis, or some

6          professional entity that trains people on

7          a standard.  Is there some standard out

8          there or something or what?

9   A.   No, Sir.  There's not one school that will

10          train document examiners.

11  Q.   So there isn't anything organized in the sense

12          that you know, like we have these

13          fingerprint comparisons, and normally, we

14          forgot to ask the gal when she was there,

15          but normally an FBI will have a standard.

16          They need nine points of comparison or we

17          need five points of comparison or

18          something like that, there's no national

19          standard?

20  A.   In documents?

21  Q.   Yes.

22  A.   In documents, there's not a number associated

2877

```
 1              with the standard, it is similarities

 2         with no unexplainable differences.

 3   Q.   It is kind of like the Wills -- they got into

 4              a fight about Wills, are they

 5              authenticate?  Are they written by

 6              somebody else?  Who was the famous one,

 7              they had the Will contest and handwriting

 8              experts?  Was it really written or phony

 9              or whatever?

10   A.   Yes, Sir.

11   Q.   You get involved in those?

12   A.   Civil work?

13   Q.   Yes, actually, you can have a Will involved in

14              a murder case, if it is a phony Will, it

15              would be nice to write yourself in as the

16              beneficiary, write the person?

17   A.   I suppose holographic document, whether it be

18              a Will or something like these letters.

19   Q.   Those were the only letters that they

20              submitted to you?

21   A.   That is correct.

22   Q.   In regard for analysis?
```

2878

1   A.   Yes, Sir.

2   Q.   And since there really -- there isn't a

3        standard then when you are saying, we got

4        the two T's, the two double T's, will

5        normally cross the center line, you are

6        looking for something distinctive and you

7        see the separate T's, you are looking for

8        individual letters of some distinction,

9        right?  Is that what you are doing there?

10  A.   Yes, Sir.

11  Q.   And if you see those repeated or whatever,

12       your assumption is that they wrote the

13       document.  The two compare favorably?

14  A.   Yes, Sir.

15  Q.   And of course, all of the folks that go home

16       here today along with yourself -- you

17       work for the Attorney General, right?

18  A.   Yes, Sir.

19  Q.   The Attorney General actually is the law

20       enforcement officer for the State of

21       Ohio, right?

22  A.   I'm not sure of that.  I heard her referred to

2879

1          as that, but it becomes a point of law

2          and I'm not really sure.

3   Q.   But, normally, in the normal course of things

4          as all of the other people from BCI&I,

5          you get the documentation and everything

6          from either the police or the Prosecutor,

7          right?

8   A.   Yes, Sir.

9   Q.   And make a comparison.  Did you do any other

10         analysis in regard to Donna Roberts?

11  A.   No, Sir.

12  Q.   You didn't do any comparison of writings for

13         Donna Roberts?

14  A.   No, Sir.

15  Q.   Nothing was submitted to you whatsoever, any

16         standards for Donna Roberts?

17  A.   No, Sir.

18  Q.   Does anybody else examine the documents for

19         BCI&I?

20  A.   There's one other examiner.

21  Q.   Who is that?

22  A.   David Hall.

2880

1              MR. LEWIS:  Thank you.

2              MR. MORROW:  No redirect.

3              THE COURT:  Do you have one more

4    witness?

5              MR. WATKINS:  We don't have any more

6    today.

7              THE COURT:  That completes the

8    testimony for today then, ladies and gentlemen.

9    Again, I remind you, you are not to watch any T.V.,

10   read anything in the newspaper or have any

11   discussion about anything.

12             JUROR:  Thursday is it going to be

13   the same way it was?

14             THE COURT:  Yes, Thursday morning,

15   we'll start at 1:00.  You will not be here in the

16   morning.  Have a nice evening.  You are not to

17   discuss anything or form any opinions.

18   (Court in Recess at 4:10 p.m.)

19

20

21

22   <u>Wednesday, October 30, 2002:</u>

2881

1   In open Court at 9:35 A.M.:

2          THE COURT:  There was a question put

3   to the Jury Commissioner about if a juror,

4   concerning any questions that jurors might have

5   during the course of the trial.  Historically it

6   has been discouraged to have questions from the

7   jurors, but if there's something that someone has;

8   that is, that they consider to be important enough,

9   you should write your question down on a piece of

10  paper and sometime during the day, give it to Mary

11  Ann.  If it is possible or proper for that question

12  to be answered, I'll do so in some manner.  Many

13  times, it would not be proper for me to do so, and

14  I would just ignore it.  Is the State ready to

15  proceed?

16          MR. MORROW:  We are.  Call Chris

17  Ellington.

18              CHRIS ELLINGTON

19  being duly sworn according to law, on his oath,

20  testified as follows:

21  DIRECT EXAMINATION BY MR. MORROW:

22  Q.   Good morning.  Can you tell us your name,

2882

```
 1              please?
 2   A.    Chris Ellington.
 3   Q.    And Chris, are you employed?
 4   A.    Yes, I am.
 5   Q.    Where are you employed?
 6   A.    Final Cut Barber Shop.
 7   Q.    And where is the Final Cut located?
 8   A.    402 East Market.
 9   Q.    Is that in the City of Warren?
10   A.    Yes, it is.
11   Q.    And how long have you been employed there?
12   A.    Since November of last year.
13   Q.    November of 2001?
14   A.    Yes.
15   Q.    And are you the owner of the place?
16   A.    Yes, I am.
17   Q.    And are there any other employees that work
18            there with you?
19   A.    Yes.
20   Q.    How many?
21   A.    One.
22   Q.    And what are your hours of operation?
```

2883

1   A.   Nine to five, Tuesday through Friday, and

2        seven to four on Saturdays.

3   Q.   Closed Sunday and Monday?

4   A.   Yes.

5   Q.   And I'm going to direct your attention back to

6        November of last year.  Was that the same

7        hours you had back in November, December,

8        of last year?

9   A.   Yes.

10  Q.   You have had those hours since you have opened

11       the shop?

12  A.   Yes.

13  Q.   When you first opened your shop last year, was

14       any business besides yours in the same

15       building or next to you?

16  A.   Yes.

17  Q.   What business was that?

18  A.   There was the bus station.  There was the

19       ministry and a bakery.

20  Q.   And was the bus station there in December of

21       last year?

22  A.   Yes.

2884

1   Q.   And do you know who operated that station?

2   A.   I don't know their names.

3   Q.   Was it a man or woman?

4   A.   It was a man and a woman.

5   Q.   And could you describe what the woman looked

6        like?

7   A.   She was kind of Caucasian, short, like reddish

8        hair, reddish, auburn hair.

9   Q.   Any idea approximate of her age?

10  A.   Probably I would say around 50.  I'm not sure.

11  Q.   And the man who was there, can you describe

12       him?

13  A.   Just gray hair.  I only saw him in the car.

14  Q.   And when you saw him in the car, what car did

15       you see him in?

16  A.   It was a gray or silver Chrysler.

17  Q.   Newer car, older car?

18  A.   Newer.

19  Q.   And what, being her, did you ever see her

20       driving a car?

21  A.   Yes.

22  Q.   What kind of car did you see her driving?

2885

1   A.   Also a Chrysler, like a burgundy.

2   Q.   Now I want to try to focus your attention in

3        or around December 10, 11, and 12, and

4        ask if you remember some incidents that

5        happened back then.  Do you remember

6        hearing about the man being killed?

7   A.   Yes.

8   Q.   And do you remember when it was that you first

9        learned about him being killed?

10  A.   On the news.

11  Q.   It was on the news.  Would that have been the

12       next day?

13  A.   Yes.

14  Q.   And as a result -- and then did you learn

15       about some people being arrested in

16       connection with his murder?

17  A.   Yes.

18  Q.   And approximately how much later in time was

19       that?

20  A.   Maybe a week.

21  Q.   And was there something about that arrest that

22       you had contacted the police or the

2886

1          police came and talked to you?

2  A.   Yes, they came and talked to me.

3  Q.   And when they talked to you, you gave them

4          some information about something that

5          stuck in your mind that you had

6          remembered from the day before the

7          murder?

8  A.   Correct.

9  Q.   And why don't you tell the ladies and

10         gentlemen what it was that you learned or

11         that you told the police about the day

12         before the murder?  There's somebody that

13         came into your store?

14  A.   Yes.  The lady that worked at the bus station,

15         and she brought someone in there to have

16         their hair cut.

17  Q.   And could you describe the person that she

18         brought in to have their hair cut?

19  A.   Just a black male, afro.

20  Q.   Could you give approximate age?

21  A.   Maybe late twenties.

22  Q.   And do you remember if he was heavy or thin?

2887

1   A.   I think he was thin.

2   Q.   Do you know if he was tall or short?

3   A.   Probably around my height.

4   Q.   How tall are you?

5   A.   Five foot six.

6   Q.   That was in December, right?

7   A.   Yes.

8   Q.   And again, you were closed on Monday?

9   A.   Yes.

10  Q.   And if we found out that Mr. Fingerhut, the

11           guy next door, died on a Wednesday, this

12           would have been a Tuesday that they were

13           in your store?

14  A.   Yes.

15  Q.   Do you remember about what time of day they

16           came in?

17  A.   No, I don't.

18  Q.   Had you ever seen that man either before or

19           after that time?

20  A.   No.

21  Q.   Do you remember seeing anything strange with

22           his hands?

2888

1   A.   No.

2   Q.   He didn't have any bandages on his fingers

3        that you remember?

4   A.   Not that I remember.

5   Q.   And after this individual finished getting his

6        hair cut, what happened?

7   A.   He left.

8   Q.   Could you recognize him today if you saw him?

9   A.   I only saw him that one time.

10  Q.   Do you see anybody in the Courtroom that looks

11       like him?

12  A.   Yes.

13  Q.   Could you tell us where he's seated?

14  A.   Over there next to the two gentlemen in the

15       suits.

16            MR. MORROW:  May the record reflect

17  she's identified the Defendant.

18            THE COURT:  The record will so

19  reflect.

20            MR. MORROW:  No further questions.

21  CROSS EXAMINATION BY MR. CONSOLDANE:

22  Q.   Christine, how are you this morning?

2889

1  A.  Good.

2  Q.  My name is Tony Consoldane.  I am representing

3      Nathaniel Jackson along with Jim Lewis.

4  A.  Okay.

5  Q.  Just got a couple of quick questions.  What

6      caused you to remember this?  Well, first

7      of all, I'm not quite sure.  Did you call

8      the police or did the police call you?

9  A.  They came by to see me.

10 Q.  And they asked you if you knew Donna.  What

11     did they ask you?

12 A.  They just asked me if I knew the people at the

13     bus station.

14 Q.  And they asked you, did you know the woman at

15     the bus station?

16 A.  Yes.

17 Q.  And did they ask you if she was with another

18     man besides your husband?

19 A.  No, they asked if she had brought someone in.

20 Q.  And you said you don't remember what time of

21     day it was?

22 A.  No.

2890

1   Q.   Do you know if it was morning or afternoon?

2   A.   No.

3   Q.   What time did you quit working that day?

4   A.   We close at five.

5   Q.   And you stayed there until five?

6   A.   Yes.

7   Q.   Could it have been later in the afternoon that

8        he was in?

9   A.   I don't know, it could have been.

10  Q.   It could have been in the afternoon?

11  A.   Could have been, yes.

12           MR. CONSOLDANE:  Thank you.  Nothing

13  further.

14           THE COURT:  Any redirect?

15           MR. MORROW:  No.  Thank you.

16           THE COURT:  Thank you.  You are

17  excused.

18                JIM McCOY

19  being duly sworn according to law, on his oath,

20  testified as follows:

21  DIRECT EXAMINATION BY MR. MORROW:

22  Q.   Good morning.  Could you please tell the

2891

```
 1            ladies and gentlemen your name?
 2    A.   Jim McCoy.
 3    Q.   Are you employed anyplace?
 4    A.   Yes, I work for Greyhound out of Cleveland.
 5    Q.   How long have you worked for Greyhound?
 6    A.   23 years.
 7    Q.   As a Greyhound bus driver, do you drive a
 8         specific route for Greyhound?
 9    A.   Yes.
10    Q.   What route do you drive?
11    A.   Presently I drive from Cleveland to New York
12         City and from Cleveland to Washington,
13         D.C.
14    Q.   I want to direct your attention back to
15         December of last year.  Did you drive the
16         same route?
17    A.   No.
18    Q.   What routes did you drive last December?
19    A.   I worked schedule from Cleveland to Pittsburgh
20         and Pittsburgh to Erie and back.
21    Q.   And did those routes include stops at the
22         Youngstown and Warren bus terminal?
```

2892

1    A.    Yes, it did.

2    Q.    And I assume that you operate on a pretty

3          tight schedule?

4    A.    Yes.

5    Q.    How many stops during the day do you make at

6          the Warren terminal?

7    A.    One, once a day.

8    Q.    And what time is it that you make that stop at

9          the -- well, again back in December of

10         last year, what time did you make your

11         stop at the Warren terminal?

12   A.    5:15 P.M.

13   Q.    And you also stopped at the Youngstown

14         terminal?

15   A.    Yes.

16   Q.    What time?

17   A.    Scheduled in Youngstown at 4:35 and out at

18         4:45.

19   Q.    And in turn I want to direct your attention to

20         December, the day of December 11, 2001.

21         Do you remember that day?

22   A.    Yes.

2893

1   Q.   And what is it that you remember, why is it

2        that you remember that day?

3   A.   That is the day I came through Youngstown and

4        they were doing construction on the

5        parking lot, and I had to park my bus out

6        in front of the bus station but it was a

7        driver that came from Cleveland on his

8        way to New York and he pulled on to the

9        parking lot where they were doing the

10       construction and I walked back there to

11       talk to him, and asked him why did he

12       park back in and Mr. Fingerhut came back

13       and he told me that I could bring my bus

14       in there, also.

15   Q.   Let me do this.  You knew Mr. Robert

16        Fingerhut?

17   A.   I seen him, yes, from time to time at the

18        Youngstown station.

19   Q.   And to the best of your knowledge, what did he

20        do at the Youngstown station?

21   A.   He was in charge of the Youngstown and Warren

22        station.

2894

1  Q.   And what about Donna Roberts, are you familiar
2       with her?
3  A.   Yes, she used to work at the Warren station.
4  Q.   And if you had to describe Donna Roberts, how
5       would you describe her?
6  A.   I really don't know how to really describe
7       her, because me and her didn't really hit
8       it off when she started working there.
9  Q.   Do you remember what color her hair was?
10  A.   Brownish.
11  Q.   Tall or short?
12  A.   Short.
13  Q.   Approximately any idea how old she would be?
14  A.   I'm going to say 50's maybe.
15  Q.   And as part of your route, you ended up going
16       to -- you were on your way back to
17       Cleveland in the evening?
18  A.   Yes.
19  Q.   And so your first stop was the Youngstown
20       terminal?
21  A.   Yes.
22  Q.   And you spoke with Mr. Fingerhut at the

2895

```
 1              Youngstown terminal?
 2   A.    Yes.  Normally, it is two people there, and
 3              that day, there was only one, just him.
 4   Q.    He was the only one working the Youngstown
 5              terminal?
 6   A.    Yes.
 7   Q.    When you say work, what does that include?
 8   A.    They have someone that comes out and works the
 9              buses and the other person usually stays
10              in and sells tickets, and that particular
11              day, he was doing both.
12   Q.    Would that include loading and unloading the
13              baggage?
14   A.    Yes.
15   Q.    When you were there, what time were you there?
16   A.    4:35.
17   Q.    And he was the only one that you saw loading
18              and unloading your bus?
19   A.    Yes.  He never unloaded my bus.  He unloaded
20              the other guy's bus.
21   Q.    There was a second bus that was there, too?
22   A.    Yes.
```

2896

1  Q.  He was the only one that unloaded that bus as

2      well?

3  A.  Yes.

4  Q.  What time did you park at the Youngstown bus

5      terminal?

6  A.  4:45.

7  Q.  Where did you head to?

8  A.  Warren.

9  Q.  How long did it take you to get to Warren?

10 A.  Approximately 30 minutes.

11 Q.  And so you would have arrived at approximately

12     what time in Warren?

13 A.  5:15.

14 Q.  When you got there, did you see anyone at the

15     station?

16 A.  When I got there, we have to park on the side

17     and pick up passengers.  Then we have to

18     walk around in front into the station and

19     ask, "Is there any passengers or

20     luggage," and when I walked in, I seen

21     Mrs. Fingerhut.

22 Q.  Where was she at?

2897

```
 1   A.   Behind the counter.

 2   Q.   And what was she doing, if anything?

 3   A.   She was working on the computer, because I

 4             asked her, I said, "What are you doing,"

 5             and she said, "I'm trying to get the

 6             computer shut down.  I can't get the

 7             computer shut down."

 8   Q.   And did you ask her anything else?

 9   A.   Yes, I said, "What are you doing in that chat

10             room."  I said, "Are you in that chat

11             room talking to some men," and she said,

12             "no, I'm not in no chat room talking to

13             any men."  And I said, "Who is the man

14             you are talking to?"  She said, "I'm not

15             talking to a man."  I said, "Come on,

16             tell me."  She said his name is Nathaniel

17             and by that time a guy walked out the

18             back.

19   Q.   And you say a guy walked out of the back.

20             Could you describe what he looked like?

21   A.   A black man about five feet nine, maybe ten,

22             I'm not sure.
```

2898

```
1    Q.   Was he heavy or thin?

2    A.   Kind of thin.

3    Q.   And is there anyone in the Courtroom that

4              appears to look like that individual that

5              you can see today?

6    A.   No, I can't really say.

7    Q.   But so this individual walked out of the back

8              behind the counter?

9    A.   Yes.

10   Q.   And did he say anything to you?

11   A.   Well, I asked him, I said, "Are you

12             Nathaniel?"  After she said his name was

13             Nathaniel, I said, "Are you Nathaniel?"

14             He said, "Yes, I am Nathaniel," like that

15             and I said, "You all are trying to get

16             out of here," and he said, "Yes, we're

17             trying to get out of here."  I said, "I

18             won't hold you up, I'll get on out of

19             here.  I'll leave."

20   Q.   So to you, they appeared to be in a hurry to

21             leave the store?

22   A.   Yes.
```

2899

1   Q.   And that was at 5:15?

2   A.   Yes.

3   Q.   And you finished up and got out of there?

4   A.   Yes, I walked out and walked back to the bus.

5              MR. MORROW:  Nothing further.

6   CROSS EXAMINATION BY MR. LEWIS:

7   Q.   Jim, my name is Jim Lewis and I represent

8              Nathaniel in this case.  Do you really

9              know -- well, let me go back.  You don't

10             recognize the individual that you saw at

11             the Warren bus terminal that day?

12  A.   No, I don't.

13  Q.   And your timing, you indicated that you came

14             to the Warren station, what time would

15             that have been?

16  A.   5:15 P.M.

17  Q.   And I was trying to figure out the

18             construction, was construction being done

19             at the Youngstown or the Warren store?

20  A.   Youngstown.

21  Q.   So, you are at the Warren station at 5:15?

22  A.   Yes.

2900

1    Q.   And how long were you there?

2    A.   Probably about five minutes at the most.

3    Q.   Was anybody else at the Warren terminal?

4    A.   You mean --

5    Q.   Other than Donna Roberts and the man you

6         called Nathaniel?

7    A.   Not inside the terminal, no.

8    Q.   How about outside?

9    A.   Outside, I picked up, I think it was two

10        passengers that day.

11              MR. LEWIS:  No further questions.

12   Thank you.

13              THE COURT:  Any redirect?

14              MR. MORROW:  No.

15                   JILL KENYON

16   being duly sworn according to law, on her oath,

17   testified as follows:

18   DIRECT EXAMINATION BY MR. MORROW:

19   Q.   Good morning, Jill.  Could you tell us your

20        name, please?

21   A.   Jill Kenyon.

22   Q.   Are you working anyplace?

2901

```
1    A.    I work at Red Lobster in Niles.

2    Q.    How long have you worked at the Red Lobster?

3    A.    Four years.

4    Q.    Could you tell us where that is in Niles?

5    A.    Right on the strip, right in front of the

6          Mall.

7    Q.    And approximately how far is it from downtown

8          Warren?

9    A.    About ten, 15 minutes.

10   Q.    And how long have you been there?

11   A.    Four years.

12   Q.    And you have always been a waitress?

13   A.    Yes.

14   Q.    What shift do you typically work?

15   A.    It varies, afternoons, day turn.

16   Q.    No particular shift one way or the other?

17   A.    No.

18   Q.    And was there some point in time when some

19         police officers came and talked with you

20         about some customers that came to the Red

21         Lobster?

22   A.    Yes.
```

2902

1   Q.   And in particular, do you remember where those

2        officers were from?

3   A.   Howland.

4   Q.   And do you remember them asking you some

5        questions?

6   A.   Yes.

7   Q.   And you started to describe to them waiting on

8        a certain couple on December 11th, of

9        2001; do you remember that?

10  A.   Yes.

11  Q.   What did you tell them, if you remember?

12  A.   Well --

13  Q.   You had these customers come in?

14  A.   Yes.  Nothing specific really.

15  Q.   Can you describe the couple?

16  A.   She had shoulder length red hair, he was

17        black.

18  Q.   She was Caucasian?

19  A.   Yes.

20  Q.   Could you describe how old she was?

21  A.   Mid-fifties.

22  Q.   And do you remember how old he was?

2903

1   A.   I think he was early 30's.

2   Q.   And as part of the waitress, you take orders

3        from these people?

4   A.   Yes.

5   Q.   And when you take an order, do you enter into

6        a computer system?

7   A.   Yes.

8   Q.   And what happens when you enter that

9        information into the computer system?

10  A.   The order will go straight to the kitchen, but

11       we can process and give a report of the

12       time of everything was done.

13  Q.   There's a report that is kept by the

14       restaurant as to the customer orders?

15  A.   Yes.

16  Q.   And did this couple make any orders from you?

17  A.   Yes.

18  Q.   And do you remember what it was that they

19       ordered?

20  A.   Yes, I do.  One was a crab stuffed flounder

21       and one was king crab legs.

22  Q.   Do you remember who ordered what?

2904

```
1   A.   I do think the gentleman had the king crab

2            legs and she had the flounder.

3   Q.   Does this order sheet show every time you take

4            an order?

5   A.   Yes.

6   Q.   Sometimes you will have a drink order, and you

7            might have appetizers and dinner and

8            dessert?

9   A.   It will tell you everything that was ordered.

10  Q.   I'll hand you what has been marked as State's

11           Exhibit 314 and inside the envelope

12           there's 314-A, 314-B and 314-C, 314-D and

13           314-E.  I'll ask you to take a look at

14           those, please.

15  A.   Okay.

16  Q.   Are you able to recognize those?

17  A.   Yes.

18  Q.   Can you tell the ladies and gentlemen what

19           those are?

20  A.   It's a print-out of exactly what time the

21           drinks were ordered because they ordered

22           drinks first and I ran the drinks in.
```

2905

1    Q.   What time was that, if you know?

2    A.   1754.

3    Q.   If 12:00 is 12 hundred hours, 1754 would be

4             5:54 P.M.?

5    A.   I think that is right.

6    Q.   But it is printed in military time?

7    A.   Yes.

8    Q.   So the first time they were -- they ordered

9             drinks?

10   A.   Yes.

11   Q.   Do you remember how long you were in the store

12            before you got to them?

13   A.   Could have been maybe a minute.

14   Q.   And then what happened after that?

15   A.   After they ordered the drinks, they ordered

16            food.  I put their food in.

17   Q.   What time did they order their food?

18   A.   I'm not sure which paper is which.

19   Q.   They ordered a food order?

20   A.   Yes.

21   Q.   Did they order and then the food was taken out

22            to them?

2906

1   A.   Yes.

2   Q.   And did they then order anything else after

3        they ordered food?

4   A.   No.

5   Q.   And of course, after they were done, you

6        provided them with a bill?

7   A.   Yes.

8   Q.   I'm going to show you what has been marked as

9        State's Exhibit 315.  Can you take a look

10       at that, please?

11  A.   Yes, that's the receipt, the final guest

12       check.

13  Q.   And was that final guest check given to them?

14  A.   Yes.

15  Q.   And is there a time that that final guest

16       check was printed?

17  A.   Yes.  6:43 P.M.

18  Q.   They were there for approximately an hour?

19  A.   Yes.

20  Q.   And this was the final guest check?

21  A.   Yes.

22  Q.   And that is printed with the time as to

2907

1            everything that is on there?

2  A.    Yes.

3  Q.    And the police also asked you if you were able

4            to recognize the individuals, is that

5            correct?

6  A.    Yes.

7  Q.    They showed you a photographic line-up?

8  A.    Yes.

9  Q.    I'm going to hand you what has been marked as

10           State's Exhibit 316.  Can you recognize

11           that?

12  A.    Yes.

13  Q.    Can you tell the ladies and gentlemen what

14           that is?

15  A.    It is a line-up.

16  Q.    Is that the line-up that was shown to you?

17  A.    Yes.

18  Q.    And is your signature on that?

19  A.    Yes.

20  Q.    And did you pick someone out of that line-up?

21  A.    Yes.

22  Q.    And which number did you pick out?

2908

1  A.    Number six.

2  Q.    And that person that you picked out is number

3        six, do you see him in the Courtroom

4        today?

5  A.    Yes.

6  Q.    And could you tell the ladies and gentlemen

7        where he's seated?

8  A.    Over there.  (Indicating)

9  Q.    Is he in between the two?

10 A.    Yes.

11 Q.    Is that the same man that was at the

12       restaurant on the night of December 11?

13 A.    Yes.

14              MR. MORROW:  Can the record reflect

15 that she's identified the Defendant?

16              THE COURT:  It will so reflect.

17              MR. MORROW:  No further questions,

18 Sir.

19 CROSS EXAMINATION BY MR. CONSOLDANE:

20 Q.    Jill, how are you today?

21 A.    Good.

22 Q.    My name is Tony Consoldane, and along with Mr.

```
                                                        2909
 1              Lewis over there, we're representing

 2         Nathaniel Jackson.  Are you originally

 3         from Warren?

 4   A.    Yes.

 5   Q.    Where did you go to school?

 6   A.    Mineral Ridge.

 7   Q.    And you graduated from Mineral Ridge High

 8         School?

 9   A.    Yes.

10   Q.    Did you go to any college?

11   A.    No.

12   Q.    And right after high school, you went to work

13         for Red Lobster?

14   A.    Yes.

15   Q.    And you have been there ever since?

16   A.    I took a break, but yes, basically, I have

17              been there ever since.

18   Q.    And you have a lot of people that come in

19              there?

20   A.    Yes.

21   Q.    About how many people do you wait on a night?

22   A.    30 or 40, sometimes less, sometimes more, but
```

2910

1           on the average, 30.

2    Q.    Do you know what day it was that the police

3           came in and talked to you?

4    A.    I do believe it was December 13.

5    Q.    And did you know about the murder?

6    A.    No.

7    Q.    What made you remember these two people?

8    A.    Nothing specific, once they showed me the food

9           order, I remembered them.

10   Q.    Who showed you the food order?

11   A.    My managers.

12   Q.    And did the police talk with your manager

13          first?

14   A.    Yes.

15   Q.    And then the manager went and got the food

16          order and showed it to you?

17   A.    Yes.

18   Q.    How did these people pay for their food?

19   A.    Cash.

20   Q.    And do you know if they stayed around long

21          after they paid the bill?

22   A.    No, they left right after.

2911

1           MR. CONSOLDANE:  Thank you.

2           MR. MORROW:  Nothing further.  Thank

3  you.

4                  JENNIFER ROBINSON

5  being duly sworn according to law, on her oath,

6  testified as follows:

7  DIRECT EXAMINATION BY MR. MORROW:

8  Q.  Good morning.

9  A.  Good morning.

10  Q.  Could you please tell us your name?

11  A.  Jennifer Robinson.

12  Q.  And Jennifer, how old are you?

13  A.  37.

14  Q.  And are you employed anyplace?

15  A.  Yes, I am.

16  Q.  Where are you employed?

17  A.  At the Days Inn Motel.

18  Q.  And where is that located?

19  A.  It is located on Market Street in Boardman, in

20        Youngstown, Ohio.

21  Q.  And in relation to the Southern Park Mall, is

22        it south of the Southern Park Mall?

2912

1   A.   Yes.

2   Q.   Is it away from Youngstown?

3   A.   It is away from Youngstown.

4   Q.   And how long have you worked there?

5   A.   About seven years.

6   Q.   And what do you do at the Days Inn?

7   A.   I am a housekeeper.

8   Q.   And what are your duties as a housekeeper?

9   A.   Once the clients check out, I go in and clean

10           the room.

11  Q.   And you clean all of the rooms, or most of the

12           rooms at the hotel?

13  A.   There's more than just one.  We split them up.

14  Q.   Now, was there a point in time when some

15           police officers from Howland Police

16           Department came and talked to you last

17           year?

18  A.   Yes.

19  Q.   And that would have been last December?

20  A.   Yes.

21  Q.   And do you remember what they came to talk to

22           you about?

2913

1    A.   About one of the rooms, the people that stayed

2            in one of our rooms out there.

3    Q.   Do you remember what room number that was?

4    A.   Room 129.

5    Q.   And do you remember the first day that you

6            were supposed to clean the room?

7    A.   Yes, I do.

8    Q.   What day would that have been?

9    A.   That would have been on a Thursday.

10   Q.   And if I told you that the Thursday would have

11           been December 13, would that bring your

12           recollection?

13   A.   Yes.

14   Q.   But you talked to the police close in time to

15           when you were supposed to clean the room

16           and when they came out and did it, would

17           that be fair to say?

18   A.   Yes, it would.

19   Q.   And so you were to clean the room on a

20           Thursday.  Why didn't you clean it on

21           Wednesday?

22   A.   I was off Wednesday.

2914

1   Q.   Wednesday was your normal day off?

2   A.   Yes.

3   Q.   And so you were going to clean it for the

4        first time on Thursday?

5   A.   Yes, I was.

6   Q.   And did you clean the room on Thursday?

7   A.   No, I did not.

8   Q.   And why did you not clean the room?

9   A.   It had a do not disturb sign on the door.

10  Q.   Did you find anything out about that room, the

11       type of rental or the type of pay that

12       that room was?

13  A.   Just that it was a stay over room.

14  Q.   And when you stay over -- what is a stay over

15       mean?

16  A.   When they come in, pay for the room for at

17       least two to three days, sometimes

18       longer.

19  Q.   And when the room is a stay over, do you treat

20       it differently than a room that is not a

21       stay over?

22  A.   Yes.

2915

1   Q.   What's the difference?

2   A.   Well, when you get in the room and clean it,

3        you just go in and do the bathroom and

4        the trash, then you leave the room.

5   Q.   That is a stay over?

6   A.   That is what you do in a stay over room.  In

7        a regular check out, you strip everything

8        down and clean it that way.

9   Q.   So, on Thursday, you didn't go in the room

10       though because they had a do not disturb

11       sign?

12  A.   Right.

13  Q.   Did you clean the room on Friday?

14  A.   No, I did not.

15  Q.   And why didn't you clean it on Friday?

16  A.   The do not disturb sign was still on the door.

17  Q.   And did you then clean it on Saturday?

18  A.   Yes, I did.

19  Q.   And when you went into the room, was the do

20       not disturb sign still on the door for

21       Saturday?

22  A.   No, it was not.

2916

1    Q.   Do you know if the people had checked out?

2    A.   As far as I know, they did.

3    Q.   So, you opened up the room and you went in?

4    A.   Yes.

5    Q.   And when you got in the room, what did you

6         see?

7    A.   The room key was laying on the dresser, and I

8         went and walked into the bathroom.  There

9         was really no personal items left in

10        there, so I called the front desk to ask

11        if they were check out or stay over to

12        see how I should clean the room.

13   Q.   And at that point, how did you decide to clean

14        the room?

15   A.   When they don't leave any personal items such

16        as deodorant, toothpaste, toothbrush,

17        then we go ahead and clean the room as a

18        check out.

19   Q.   And as part of your cleaning process, when you

20        go to clean rooms, do you put anything on

21        your hands, do you wear gloves?

22   A.   Occasionally, we wear gloves.

2917

1  Q.   And do you recall if you were wearing gloves

2        on this day?

3  A.   No, I don't believe I was.

4  Q.   And then did you start to clean the room?

5  A.   Yes, I did.

6                 MR. MORROW:   May we approach?

7  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

8  OF HEARING)

9                 THE COURT:   Waive anything on the

10  record on Side Bar?

11                 MR. LEWIS:   Yes.

12                 MR. MORROW:   Yes.

13  Q.   When you started to clean the room, there were

14        certain items that you cleaned up in the

15        room, correct?

16  A.   Yes.

17  Q.   And in particular, you started looking through

18        the different drawers and dressers at the

19        room?

20  A.   Yes.

21  Q.   And did you find any kind of clothing in the

22        room?

```
                                                        2918
 1    A.    No clothing.

 2    Q.    And you opened up the dresser drawers to clean

 3          them out?

 4    A.    Yes.

 5    Q.    And if you opened up the dresser drawers, did

 6          you find any kinds of boxes or materials

 7          in them?

 8    A.    Yes.  There was a bottle of peroxide in one of

 9          the dresser drawers.

10    Q.    Did you also find an empty bandage box?

11    A.    Yes.  Empty bandage box and some used ones in

12          the room.

13    Q.    Did you also find some gauze?

14    A.    Yes.

15    Q.    And what did you do with those items?

16    A.    Put everything in a small bathroom garbage can

17          and then I took and put it in another

18          plastic bag, and then I put it in the

19          garbage bag that is on my cart.

20    Q.    And what happened with that bag after you

21          collected it all up?

22    A.    At the end of the day, I take it and tied it
```

2919

1              up and throw it in our dumpster.

2    Q.   Did you see anything become of that bag that

3              you threw in the dumpster after that day?

4    A.   Yes.  Two detectives came out and one of them

5              was asking me about it, and he went in

6              the dumpster and got the bag out and

7              opened it up and went through it, and

8              asked me if I recognized any of the stuff

9              in there.

10   Q.   And that was the peroxide.  I am going to show

11             you what has been marked as State's

12             Exhibit 197.  Does that look like the

13             garbage you collected from the room and

14             put in the bag?

15   A.   Yes.

16   Q.   And that was the bag that the officers then

17             collected from the dumpster?

18   A.   Yes.

19   Q.   Did you notice any kind of substance or

20             material on those bandages?

21   A.   Some of them had blood on the gauze and stuff

22             that I threw away.

2920

1    Q.    Did you see anybody other than the police

2          officers in the room?

3    A.    No, I did not.

4              MR. MORROW:  No further questions.

5    CROSS EXAMINATION BY MR. LEWIS:

6    Q.    Jennifer, when you went into that room did you

7          see any signs of blood or what you

8          thought might be blood, any spots or

9          anything?

10   A.    Not that I recall, no.

11   Q.    Do you recall seeing who the occupants were or

12         occupant of the room?

13   A.    No.

14   Q.    Didn't see anybody?

15   A.    No, I did not.

16              MR. LEWIS:  Thank you.

17              THE COURT:  You are excused.  Thank

18   you.  Let's take a 15 minute break.  You are not to

19   discuss anything or form any opinion.

20   (Court in Recess at 10:15 A.M.)

21   (Resumed in Open Court at 10:50 A.M.)

22

2921

<u>KATHY KIHM</u>

1

2    being duly sworn according to law, on her oath,

3    testified as follows:

4    <u>DIRECT EXAMINATION BY MR. MORROW</u>:

5    Q.    Good morning.  Could you please tell your name

6               to the ladies and gentlemen?

7    A.    Kathy Kihm.

8    Q.    And Kathy, where do you work?

9    A.    Community Corrections Association.

10   Q.    And where is Community Corrections Association

11              located?

12   A.    Market Street in Youngstown, Ohio.

13   Q.    How long have you worked there?

14   A.    About 13 years.

15   Q.    And what do you do there?

16   A.    Executive secretary.

17   Q.    And as executive secretary, are you also

18              responsible for keeping track of the

19              records that are made at Community

20              Corrections?

21   A.    Yes.

22   Q.    And are there records that are made with

2922

1           respect to individuals that are staying

2           at Community Corrections Association?

3    A.    Yes.

4    Q.    Are those records kept in the regular course

5           of business?

6    A.    Yes, they are.

7    Q.    Are they made and kept close in time to the

8           events that happened?

9    A.    Yes.

10   Q.    I'm going to hand you what has been marked as

11          State's Exhibit 276-B.  It contains seven

12          pieces of paper, numbered 276 B-1 through

13          276 B-7 and ask you to take a look at

14          those, please.

15   A.    Okay.

16   Q.    Are you able to identify those records?

17   A.    I don't know exactly -- I know these came out

18          of Nathaniel's Jackson's case file.  I

19          personally am not familiar with documents

20          because I don't deal directly with them.

21   Q.    But you keep -- but other people prepare those

22          documents and they are kept in the

2923

1           regular course of the business at

2           Community Corrections?

3  A.   Yes.

4  Q.   And those were kept in Nathaniel E. Jackson's

5           file?

6  A.   Yes, they were.

7  Q.   Were you issued a subpoena to produce those

8           records?

9  A.   Yes, I was.

10 Q.   As a result of that subpoena, what did you do

11          with those seven documents?

12 A.   I wasn't issued a subpoena to --

13 Q.   You were issued a subpoena to produce those

14          before?

15 A.   No.

16 Q.   You were requested before to produce those

17          records?

18 A.   Yes, yes, I was.

19 Q.   Did you give those records to the Howland

20          Police Department?

21 A.   Yes.

22 Q.   Those are the original documents that you gave

2924

```
 1              to the Howland Police Department?

 2   A.   Yes, they are.

 3   Q.   Do you recall whom you gave them to?

 4   A.   I know one gentleman was a Sergeant.  I don't

 5             recall his name.

 6   Q.   But those are the same records that you gave

 7             to him?

 8   A.   Yes, they are.

 9   Q.   And the individual is Nathaniel E. Jackson?

10   A.   Yes.

11              MR. MORROW:  Nothing further.

12   CROSS EXAMINATION BY MR. LEWIS:

13   Q.   Kathy, my name is Jim Lewis, I represent

14             Nathaniel in this case along with

15             Mr. Consoldane.  Can I see the Exhibits

16             there?

17   A.   Yes.

18              MR. LEWIS:  Thank you very much.

19              THE COURT:  You may step down.

20   Thank you.

21              BRIDGET PAUL

22   being duly sworn according to law, on her oath,
```

2925

```
 1   testified as follows:
 2   DIRECT EXAMINATION BY MR. MORROW:
 3   Q.   Could you please introduce yourself?
 4   A.   I am Bridget Paul.
 5   Q.   And Bridget, where do you live?
 6   A.   ███████████████████
 7   Q.   Where is ██████████ located?
 8   A.   In Howland.
 9   Q.   Where is that in relation to Fonderlac?
10   A.   ████████████████████████████
11   Q.   And are you employed anyplace outside the
12        home?
13   A.   No.
14   Q.   And did you become familiar with a woman by
15        the name of Donna Roberts?
16   A.   In passing, yes.
17   Q.   And in particular, did you become familiar
18        with the kind of car that Donna Roberts
19        drives?
20   A.   I could recognize it.
21   Q.   If you could, just describe what the car kind
22        of looks like.
```

2926

1  A.    Burgundy and a sports car, and in good

2        condition.  Actually I'm not good at

3        brands of cars, but if I saw it, I would

4        know it.

5  Q.    I'm going to hand you what has been marked

6        previously as State's Exhibits 246, 247,

7        248 and 249 and ask you to take a look at

8        those, please.

9  A.    Okay.

10  Q.   Are you able to recognize those?

11  A.   Yes.

12  Q.   And if you could, tell the ladies and

13       gentlemen what they are.

14  A.   The last time you saw the car, this one, it

15       was the back end --

16  Q.   Does that appear to be the red burgundy car

17       that Donna Roberts would be driving?

18  A.   Yes.

19  Q.   And those four pictures show four different

20       angles of the car?

21  A.   Yes.

22  Q.   And what was it in particular that you

2927

1          remember about that car now?

2    A.    The bumper.

3    Q.    And the back end?

4    A.    Yes.  It was very unusual because I was behind

5          it sitting and wanting it to go faster

6          and I realized that it was different.  It

7          had the license plate and then you had

8          two orange reflecters on both sides.

9    Q.    And the one picture there has the rear of the

10         car with those two orange reflecters?

11   A.    Right.

12   Q.    Now I am going to take you back to December

13         11, 2001.  Do you remember seeing that

14         car that evening?

15   A.    Yes.

16   Q.    And why do you remember that date in

17         particular?

18   A.    I was returning some tapes and I was behind

19         the car.

20   Q.    And did you get some information the next day

21         that made you remember that day in

22         particular?

2928

1  A.  A friend called and said there was a homicide

2      in Howland, down the street and I kind

3      made a joke because I knew whose car I

4      was behind.  I said I bet it is this

5      person here and it was.

6  Q.  And as a result of that, did you then contact

7      the police and provide them with some

8      information?

9  A.  Yes.

10  Q.  And in particular, tell us when you first

11      remember seeing that car on Tuesday,

12      December 11?

13  A.  It was about 9:30, between nine and ten and I

14      saw it on Old 82.

15  Q.  And where is that in relation to your house?

16  A.  I am a block, I am actually -- my house is in

17      between ███████ and ███████ and I was

18      taking ██████, which is ████████████

19      north of my house.

20  Q.  And where were you planning on going?

21  A.  To Giant Eagle.

22  Q.  What were you going to do at Giant Eagle?

2929

1   A.   Return tapes.

2   Q.   You started to leave your house with the tapes

3        to go back to Giant Eagle?

4   A.   Yes.

5   Q.   Where did you first see -- you saw this car on

6        Old 82?

7   A.   Yes.

8   Q.   And which direction was that car going?

9   A.   It was going towards Warren, which is west.

10  Q.   And it was on Old 82 as well?

11  A.   Yes.

12  Q.   And as you head -- why don't you describe a

13       little bit about the area, Old 82, where

14       it is around your house, how many lanes

15       are on Old 82?

16  A.   It is two lanes.

17  Q.   One in each direction?

18  A.   Yes.

19  Q.   And as you continue, you said you were heading

20       west towards Warren?

21  A.   Yes.

22  Q.   And what is the first major crossroad that you

2930

1          would come to?

2   A.   46, it would be Howland Corners.

3   Q.   And 46 is --

4   A.   The first light you are saying.

5   Q.   The first major intersection?

6   A.   Okay, Route 46.

7   Q.   And does that 46 take you down, if you go
8          south, it takes you towards Eastwood
9          Mall?

10  A.   Yes.

11  Q.   And that is the back way into the mall?

12  A.   Yes.

13  Q.   And what is right there on the corner of 46
14          and 82?

15  A.   Giant Eagle.

16  Q.   It is kind of a plaza?

17  A.   A plaza, yes.

18  Q.   And are there other stores besides Giant Eagle
19          that is there?

20  A.   Yes.

21  Q.   And how do you get into the Giant Eagle
22          parking lot?  Are there a number of

2931

1          entrances to get into it?

2    A.   It would be on your left as you are going down

3          towards Howland, you would make a left.

4    Q.   And is Old 82 still two lanes at that point?

5    A.   No.  As soon as you cross through the light.

6          It goes into four lanes going towards

7          Warren.

8    Q.   And you have seen the car that Donna Roberts

9          has driven before, is that correct?

10   A.   Yes.

11   Q.   And was there anything characteristic about

12         the driver, that the driver of the car

13         would do that caught your attention?

14   A.   She would always when she smoked, she would

15         always put her hand out the window in a

16         certain manner and she would kind of

17         flick it like Hollywood style.  We would

18         make fun of it whenever we would see it

19         and once I got in the light, I could see

20         the hand and then I realized it was her.

21   Q.   So you followed this car from your allotment

22         down to 46?

2932

1    A.   Yes.

2    Q.   And approximately how far is that?

3    A.   I'm not good at miles, maybe a mile.

4    Q.   And you are directly behind this red car?

5    A.   Yes.

6    Q.   And did you have to stop at the light at 46?

7    A.   Yes, we stopped.  Actually we were just going

8         very slow, I think it just turned and we

9         went through, so I don't think it was a

10        red one, the one before that we stopped,

11        which would be on the Howland-Wilson

12        Road.

13   Q.   And that light changed and you proceeded on

14        down to 46?

15   A.   Yes.

16   Q.   Do you know what the speed limit is out there?

17   A.   I think it is 40.

18   Q.   Do you know if you were doing the speed limit?

19   A.   No.

20   Q.   Did that appear odd to you?

21   A.   Yes, because no one was on the road but us and

22        I was in a hurry and she was going very

2933

1              slow and it was agitating me, so that is

2              why I was right on her tail and I

3              couldn't miss her license, because it was

4              right there and it took forever to get

5              down to Howland Corners.

6     Q.   And once you got to Howland Corners, what

7              happened then?

8     A.   She stayed in the right lane to the next light

9              and then I went off into Giant Eagle, I

10             cut the light there and went into the

11             Plaza on the left.

12    Q.   And what happened with her car?

13    A.   As I was going up to Giant Eagle, there was

14             like across, I glanced back and I saw her

15             car still sitting there, and I was just

16             wondering what is she doing, because it

17             was taking her forever to get down the

18             road, and then she was pausing awhile and

19             I don't think it was a red light.  Then I

20             went over and put my tape in the box and

21             I looked back and it looked like she was

22             moving.  As I pulled up, I dropped the

2934

1          tape off, I glanced over, and the car was

2          there and then I looked back again and it

3          wasn't there.

4    Q.   Did the length of time that she appeared to be

5          taking appear odd to you?

6    A.   It seemed, but now as I think back at how she

7          used to drive, she used to drive slow all

8          the time.  I don't know.  If no one was

9          on the road, I always go fast and I

10         thought she would be going faster, but

11         she was going pretty slow.

12   Q.   And this was approximately what time?

13   A.   Between 9:30 and 10:00.

14              MR. MORROW:  No further questions.

15   CROSS EXAMINATION BY MR. CONSOLDANE:

16   Q.   My name is Tony Consoldane, and I represent

17         Nathaniel and I'm going to ask you a

18         couple of questions.  How well do you

19         know Donna Roberts?

20   A.   I don't.

21   Q.   You have never met her?

22   A.   No.

2935

1    Q.   Have you ever seen her in the store shopping

2         or at any function?

3    A.   I have seen her in passing, but I never

4         stopped to make a conversation with her.

5    Q.   I guess the point I'm trying to make, have you

6         ever seen her outside of her automobile?

7    A.   Yes.

8    Q.   And where would that have been?

9    A.   At the store, Giant Eagle, and actually most

10        of the time in the car.

11   Q.   Did you ever see her drive any other car

12        besides this one?

13   A.   No.

14   Q.   And every time she would drive, she would have

15        her hand out with a cigarette in it?

16   A.   Pretty much.

17   Q.   Even in the Winter when it was cold?

18   A.   Actually, that night, it was a nice night and,

19        yes, she had her window down and her hand

20        was out, because I saw her flick the

21        cigarette and I am thinking -- she was

22        that type of person.

2936

1  Q.   You left your house on █████ and you came up

2       to Market Street or Old 82.  Was she

3       already there at the stop sign or had she

4       already turned?

5  A.   You know, I don't know.  I didn't realize it

6       was her until --

7  Q.   You got to Howland Wilson?

8  A.   Yes.

9  Q.   So you don't know when she was coming out of

10      that street?

11 A.   I saw a light because the lighting is not good

12      in the allotment there and when I pull

13      out, there was a car, but I can't say if

14      it was her.

15          MR. CONSOLDANE:  Thank you.

16          MR. MORROW:  Nothing further.

17          THE COURT:  Thank you.

18              KATHERINE THOMAS

19 being duly sworn according to law, on her oath,

20 testified as follows:

21 DIRECT EXAMINATION BY MR. MORROW:

22 Q.   Could you please tell us your name?

2937

1   A.   Katherine Thomas.

2   Q.   Where are you employed at?

3   A.   I am self employed.  I am an exclusive agent

4        for State Farm Insurance.

5   Q.   How long have you been so employed there?

6   A.   Since April 1, 1988.

7   Q.   And do you work with any other employees in

8        that office?

9   A.   Yes.

10  Q.   What other kind of employees are there?

11  A.   Currently, I have an office manager.  That is

12       all I have at this particular moment.

13       I'm interviewing right now for additional

14       staff.

15  Q.   And do you have any kinds of licenses or

16       certificates?

17  A.   Yes, I do.

18  Q.   Could you please tell the ladies and gentlemen

19       what kinds of licenses and certificates

20       you have?

21  A.   I have a license by the State of Ohio in

22       casualty and life and health insurance

2938

1           and a series six license.

2    Q.   What is a series six license?

3    A.   That allows me to sell mutual funds.

4    Q.   And how long have you been licensed --

5    A.   And variable products.

6    Q.   And how long have you been licensed as an

7           insurance agent?

8    A.   Since 12-9-88.

9    Q.   Have you been licensed in all of those lines

10          since 1988?

11   A.   Variable products, to sell variable products,

12          I need a series six license and I

13          received that in 1998 because State Farm

14          didn't sell variable products before that

15          time.

16   Q.   But you have done -- you have been a life

17          insurance agent, a property agent since

18          that time?

19   A.   Yes, since 1988.

20   Q.   In that capacity, are you familiar with

21          different insurance policies?

22   A.   Yes.

2939

1    Q.   And have you been trained in interpreting

2         different insurance policies?

3    A.   Yes.

4    Q.   And have you, did you have a client by the

5         name of Robert Fingerhut?

6    A.   Yes.

7    Q.   Do you recall when Robert Fingerhut became a

8         client of yours?

9    A.   I can't tell you the specific date he became a

10        client, but I had him insured for several

11        years.  He had been a State Farm client

12        for many, many years in Florida.  He came

13        back here to this area, and he wanted to

14        get back with State Farm.

15   Q.   And were you then assigned to become his agent

16        or did he contact you?  How did that take

17        place?

18   A.   He contacted me.

19   Q.   And do you recall what kinds of insurance

20        Mr. Fingerhut had with State Farm?

21   A.   I had several lines.  I had his home, his

22        vehicles, his business insurance, rental

2940

```
 1              property, and life insurance.
 2   Q.   And in particular, do you recall if you
 3              insured any vehicles?
 4   A.   Yes.
 5   Q.   Do you remember what kinds of vehicles were
 6              insured?
 7   A.   We had two Chryslers insured, a truck.  I have
 8              my file here.  We had 2001 Chrysler.  A
 9              2000 Chrysler.  They were the same type
10              of vehicle.  A 1998 Ford Contour.  A 1985
11              Pontiac Grand Prix.
12   Q.   And the vehicle information that you have, as
13              part of your job as an agent, are you
14              required to determine who the owner of
15              those vehicles are?
16   A.   At the time, we did not require that we
17              actually see the title.  We just take the
18              information from the client.
19   Q.   And did Mr. Fingerhut indicate to you who the
20              owners were of those vehicles?
21              MR. CONSOLDANE:  Objection.
22              THE COURT:  Again, I think it is
```

2941

1  objectionable unless there's some designation on

2  the policy signifying that.

3  Q.    Did Mr. Fingerhut signify who the owners of

4              that vehicle were?

5  A.    He instructed me to put them in Donna Roberts'

6              name.

7  Q.    And is there something that is known as an

8              additional driver or covered driver on

9              the insurance parlance?

10  A.    Yes.

11  Q.    If you could, please explain to the ladies and

12              gentlemen what that means?

13  A.    Any household we insure, we take the

14              underwriting information for all drivers

15              that have access to the vehicles, and

16              we'll insure the entire household, and we

17              did, even though she was the named

18              insured, he was underwritten to drive any

19              car in the household.

20  Q.    So Mr. Fingerhut was able to drive, he was

21              insured under all of the cars that were

22              at that household?

2942

1   A.    Yes.

2   Q.    That would include both those Chryslers?

3   A.    Yes.

4   Q.    The 2000 and 2001?

5   A.    Yes.

6   Q.    Now, in addition, did you insure the

7          residence?

8   A.    Yes.

9   Q.    And actually first, who paid for the

10         automobile insurance?

11   A.    The couple of times that I had interaction

12         with them, I was instructed by Robert to

13         get a check from Donna to pay for the

14         insurance.

15   Q.    And did you then receive a check?

16   A.    Yes.

17   Q.    Do you remember who signed the check?

18   A.    I can't be positive.  I believe Donna, but I'm

19         not sure.

20   Q.    But Robert had instructed you that Donna would

21         be bringing the check?

22   A.    Right.

2943

1   Q.   Now, with respect to the house, did you also

2        insure the house?

3   A.   Yes.

4   Q.   Do you recall what the address was of the

5        house?

6   A.   It is on Fonderlac.  254 Fonderlac, Southeast,

7        Warren, Ohio, 44484.

8   Q.   And as part of that policy on the house, did

9        that also include insurance on contents

10       of the house?

11  A.   Yes.

12  Q.   And would that have included Mr. Fingerhut's

13       personal contents as well?

14  A.   Yes.

15  Q.   That would include his clothing, any personal

16       items that he would have at that house?

17  A.   Yes.

18  Q.   Did you also insure any businesses?

19  A.   Yes.

20  Q.   And what businesses did you insure?

21  A.   His two Greyhound ticket offices, one in

22       Warren and one in downtown Youngstown.

2944

1   Q.   And who was the owner to the best of your

2        understanding, based upon the insurance

3        policy?

4   A.   That was also in Donna Roberts' name.

5   Q.   And finally, did you maintain an insurance

6        policy on Mr. Fingerhut's life?

7   A.   Yes, I did.

8   Q.   I'm going to hand you what has been marked as

9        State's Exhibit 323 and ask you to take a

10       look at that, please?

11  A.   Okay.

12  Q.   Are you able to identify that?

13  A.   Yes.

14  Q.   And if you could just briefly tell the ladies

15       and gentlemen what that is.

16  A.   That is a life policy that was issued by State

17       Farm for Robert Fingerhut.

18  Q.   And is there an application page attached to

19       the page of that document?

20  A.   Yes.

21  Q.   And were you involved in preparing that?

22  A.   Yes, I was.

2945

1   Q.   Were you the actual agent that sold that

2        policy?

3   A.   Yes.

4   Q.   To whom did you sell that policy?

5   A.   Robert Fingerhut.

6   Q.   And do you recall when that policy was sold to

7        Mr. Fingerhut?

8   A.   August 12, 1999.

9   Q.   And life insurance policies carry a

10       designation as a beneficiary?

11  A.   Yes.

12  Q.   Could you tell the ladies and gentlemen what a

13       beneficiary is?

14  A.   The beneficiary is the -- upon the insured's

15       death, that is the person who would

16       receive the proceeds from that policy.

17  Q.   And does a policy typically make a designation

18       of a beneficiary?

19  A.   Yes.

20  Q.   And is there any requirement that the

21       beneficiary have any relationship to the

22       insured?

2946

1   A.   No.  You do not have to be related.

2   Q.   And is there any requirement that such a

3        policy go to a spouse?

4   A.   No, it doesn't necessarily have to go to the

5        spouse.

6   Q.   Are you familiar with beneficiary payments in

7        the State of Ohio, how benefits are paid

8        out under a life insurance policy?

9   A.   To the best of my knowledge, if it is a

10       contract between, in this case, State

11       Farm, the named insured and whoever they

12       designate as their beneficiary, that is

13       who it goes to.

14  Q.   And if an individual is named as a

15       beneficiary, that is a spouse, and if

16       those people subsequently divorce and the

17       individual then dies, what happens to the

18       life insurance policy proceedings?

19            MR. LEWIS:  I'm going to object.

20  That is not the situation here.  We know they were

21  divorced in 1985.  This policy was taken out in

22  1999.  It doesn't apply.

2947

1           MR. MORROW:  Just a hypothetical.

2    I'll reword it.

3    Q.    Assuming that an individual comes in and takes

4          out a life insurance policy and names

5          another person to be his beneficiary or

6          her beneficiary, and designates that

7          person on the policy as a spouse, when in

8          fact the person is not his spouse, does

9          that affect the life insurance payments?

10   A.    No.

11   Q.    And in particular, in the policy that is

12         before you, did Mr. Robert Fingerhut

13         designate a beneficiary?

14   A.    Yes, he did.

15   Q.    And who did he designate as his beneficiary?

16   A.    Donna Roberts.

17   Q.    And do you know the face amount of the policy

18         that was on Mr. Fingerhut at the time of

19         his death?

20   A.    300,000.

21           MR. CONSOLDANE:  Can we approach?

22   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT OF

2948

1    HEARING)

2    (At Side Bar with Reporter present.)

3                    MR. CONSOLDANE:  The State is

4    attempting to introduce two cards that say

5    insurance identification cards from State Farm.  We

6    have never seen those before.  We don't know where

7    they came from, and for them just to be able to

8    introduce them through this witness, I think it is

9    improper, plus it is a surprise on the Defense's

10   part.

11                   MR. LEWIS:  I saw those last night.

12   I think I saw those cards last night, not that they

13   were going to be introduced.

14                   THE COURT:  These cards are on

15   automobile insurance coverage.  What does that have

16   to do --

17                   MR. MORROW:  It reflects names.

18   State Farm.  Those were the vehicles that were

19   insured that she's already testified to.

20                   THE COURT:  She's testified that

21   they had house, car, life insurance.

22                   MR. WATKINS:  Just corroborates.  It

2949

```
 1    is further evidence and --
 2              THE COURT: Her testimony is the
 3    evidence.  This is duplicative.  Adds nothing to
 4    her testimony.
 5              MR. CONSOLDANE:  We would object.
 6              MR. WATKINS:  They were issued
 7    cards.
 8              THE COURT:  You can ask her if they
 9    were issued cards.  That itself doesn't add
10    anything.
11    (End of Side Bar.)
12    Q.   (By Mr. Morrow)  As an insurance agent have
13              you ever had occasion to examine another
14              company's insurance policy?
15    A.   Yes.
16    Q.   Are you able to interpret some revisions in
17              other insurance policies?
18    A.   Yes.
19    Q.   That is because of your training, your
20              background, your experience and your
21              education?
22    A.   Yes.
```

2950

Q.    I'm going to hand you what has been marked

          previously as State's Exhibit 322 and ask

          you to take a look at that, please.

                    MR. LEWIS:  We have to put an

objection on the record before he goes any further.

(In-chambers with Reporter present.)

                    THE COURT:  We're in-chambers

outside of the presence of the Jury.  The Defense

waives presence of the Defendant?

                    MR. LEWIS:  Waive presence of the

Defendant.  I believe Mr. Morrow is going to the

point where he's going to show the Exhibit to the

witness and really it is a Zurich life insurance

policy.  It is not a State Farm insurance policy

and he's going to have her testify in regard to it.

He's going to have her testify regarding the

interpretation of terms or whatever the case may

be, as he has with State Farm.  However, that is

not a State Farm insurance policy, it is another

insurance company.  The language could be

different, and she wouldn't be qualified to give

any opinions in regard to that insurance policy.

2951

1          MR. CONSOLDANE:  Further, she can't

2    testify whether that policy is still in force or

3    whether it has been assigned to anybody.  For her

4    to testify is completely wrong.

5          MR. MORROW:  If I may, there's a

6    certification on the cover of that policy, which

7    has been previously provided to the Court,

8    previously discussed, that indicates that is a true

9    and accurate copy of the policy that was presently

10   in full force and effect on the date that Robert

11   Fingerhut passed away.  She's testified she's been

12   an agent in excess of 15 years.

13         THE COURT:  She's registered as an

14   insurance agent.  She can be asked if she -- what

15   it is.  It is a policy.  The policy is

16   self-authenticating in that it is certified by

17   Zurich as being a valid document.  So I think that

18   is a valid way for them to get this in.  The other

19   way would be to bring somebody from Zurich and that

20   is not necessary in this case.  So your objection

21   is noted and overruled.

22   (End of Side Bar discussion.)

2952

1    Q.    (By Mr. Morrow)  You had an opportunity to

2          look at that policy?

3    A.    Yes.

4    Q.    And are you able to determine who the named

5          insured is on that policy?

6    A.    The named insured is Robert Fingerhut.

7    Q.    And does that policy have a designation of a

8          beneficiary?

9    A.    Yes, primary beneficiary is Donna Roberts.

10   Q.    And are you able to determine the face amount

11         of that policy?

12   A.    Yes, $250,000.

13   Q.    Is there an effective date on that policy that

14         you are able to determine?

15   A.    August 19, 1998.

16               MR. MORROW:  Thank you.  No further

17   questions.

18   CROSS EXAMINATION BY MR. LEWIS:

19   Q.    Kathy, how is the insurance business going?

20   A.    Good.

21   Q.    Everybody needs it.  You have been an agent

22         since 1988, correct?

2953

```
 1   A.    Correct.

 2   Q.    And you did a lot of business, we said Robert

 3               Fingerhut but actually, I guess -- strike

 4               that.  Tell the ladies and gentlemen,

 5               what an insurable interest is.

 6   A.    Well, with the State Farm, you insure someone,

 7               I mean if you designate a beneficiary, if

 8               it is not a spouse, children, that type

 9               of thing, immediate family members, they

10               want to know what the insurable interest

11               is.  In other words, just a friend down

12               the street couldn't take a life insurance

13               policy out on me especially without my

14               knowledge.  We have to know what the

15               insurable interest is and that is

16               designated to us by the named insured.

17   Q.    Well, insurable interest, isn't that really

18               the value of something, like I'm alive, I

19               am breathing, I work, I support --

20               insurable interest is my life, that's the

21               life insurance business, right?

22   A.    Right.
```

2954

```
 1   Q.   If it is a motor vehicle, the insured interest
 2        would be the person who owns the vehicle,
 3        right?
 4   A.   Correct.
 5   Q.   And the title holder of that is the person
 6        that has that little yellow certificate
 7        and it is recorded over in the County
 8        Recorder's office, right, the Title
 9        Bureau?
10   A.   Right.
11   Q.   And let's just talk about these cars for a
12        minute.  The insurance was actually in
13        the name of Donna M. Roberts, correct?
14   A.   Right.
15   Q.   And she's the one who had insurable interest
16        in the property, right?
17   A.   Yes.
18   Q.   So that means that she was the title holder of
19        those motor vehicles, or I think in this
20        case, they were leased vehicles?
21   A.   The two Chryslers were.
22   Q.   And what was the insurable interest of
```

2955

1          Mr. Robert Fingerhut in those vehicles?

2  A.    I was told they were used for business.

3  Q.    Used for business, but what I'm asking you is,

4            what insurable interest did he have in

5            it?  Did he have any insurable interest

6            in it?  Was he the owner of the vehicle

7            or the leaser of the vehicle?

8  A.    I would have to see the title.  I'm just

9            telling you to my knowledge I was told to

10           make Donna Roberts the named insured, and

11           at that particular time, I was under the

12           impression that they were married.

13  Q.   You were under the impression that they were

14           married?

15  A.    Yes.  He referred to her as his wife.

16  Q.   Does it surprise you to know that he was

17           divorced from her in 1985?

18  A.    I was shocked when I found out.

19  Q.   A lot of things -- okay.  Maybe that is the

20           reason why he told you to put it in Donna

21           Roberts' name.  I guess she was the

22           leaser and the title holder, that is the

2956

1              insurable interest, right?

2    A.   Correct.

3    Q.   So, Mr. Fingerhut isn't an owner or leaser of

4              the car and he's not the spouse of Donna

5              Roberts, so the insurance cards, I think

6              you just showed us, all of that did was

7              gave him permission to operate the motor

8              vehicle and he would be covered, right?

9    A.   Correct.

10   Q.   You can have that situation where you could

11            have -- I am the owner of the vehicle,

12            and my lovely fiancee', I like her a lot

13            and I say, you know, call my State Farm

14            agent up -- its competition up, State

15            Farm agent up, and all I have to do is I

16            can put her on the policy, can't I?

17   A.   Yes.

18   Q.   And be covered?

19   A.   Yes.

20   Q.   If I am the title holder, or if I leased my

21            vehicle, she doesn't have any insurable

22            interest or anything in the vehicle, does

2957

```
 1            she?  She doesn't own it, right?

 2   A.   Correct.

 3   Q.   So, if I had a fight with her, which I don't

 4            do, but if I had a fight with her and I

 5            said, that is it, baby at 12:00 today or

 6            whatever time it is, it is 20 to 12, I

 7            said, "That's it, you can't use my car

 8            anymore." And she took my car, I could

 9            go down and file criminal charges against

10            her, couldn't I?

11   A.   I suppose you could.

12   Q.   I can report it stolen to you, right?

13   A.   Yes.

14   Q.   So, there's no insurable interest there.  You

15            are just insuring that somebody else can

16            operate it.  It doesn't really belong to

17            Mr. Fingerhut, it really belonged to

18            Donna Roberts, right?

19   A.   Right.

20   Q.   And as a matter of fact, it wasn't just the

21            2001, it was also the 2000.  That is the

22            silver and burgundy one.  Do you remember
```

2958

1             the colors?

2   A.   They stated them.  I didn't.  I think I only

3             saw the silver.

4   Q.   The file you brought, is that their entire

5             file for all of the years for insurance?

6   A.   It is not complete, but it is quite a few

7             things that they had.

8   Q.   Was it Mr. Morrow here and Mr. Watkins that

9             asked you to bring whatever, certain

10            things in there or did you just happen to

11            bring what you thought was necessary?

12  A.   They just told me to bring the file that I had

13            in my office.

14  Q.   Let's go back, there's a couple of other

15            things, too.  The residence insurance.

16            That is the 254 Fonderlac?

17  A.   Yes.

18  Q.   And is Mr. Fingerhut named as the insured on

19            that policy?

20  A.   No, it was Donna Roberts.

21  Q.   Let's go back again to definition of insurable

22            interest.  She would have been the owner

2959

1              of the property then, correct?

2   A.   Correct.

3   Q.   Mr. Fingerhut, he's divorced so he had no

4             insurable interest in the property,

5             right?

6   A.   No.

7   Q.   If anything happened to that residence, if

8             there was a fire, you would pay the

9             proceedings to who?

10  A.   Donna Roberts and the mortgage company.

11  Q.   And incidentally that mortgage, the mortgage

12            on that property, do you recall whose

13            name that is in or who was the obligator?

14  A.   I don't have that in the file.  I could get

15            that for you.

16  Q.   So, Mr. Fingerhut wasn't the owner of 254

17            Fonderlac, he had no insurable interest.

18            He was not the owner or leaser of the

19            2001 Chrysler.  He wasn't the owner or

20            leaser of the 2000 Chrysler.  So he

21            didn't own any of that.  He had no

22            insurable interest.  No interest at all

2960

1          in it, right?

2    A.   Correct.

3    Q.   He was divorced in 1985.  So, the relation of

4         these two parties -- actually, once you

5         are divorced, that is almost like naming

6         a stranger down the street, isn't it?

7         Ex-wives don't come back and live with

8         husbands.  Just go right over here two

9         blocks to Domestic Court.  It doesn't

10        normally happen that way.  It's a

11        stranger as far as the law is?

12   A.   You have to tell me.  I don't know the law.

13   Q.   What I'm saying is, that once you are

14        divorced, as far as the law is concerned,

15        forgetting child support or the children,

16        you are two separate people, you can do

17        what you want and date who you want and

18        see who you want?

19   A.   Correct.

20   Q.   And you can kick anybody out of the house you

21        want if it is your house and you can kick

22        anybody out and stop them from using a

2961

1           car if it is your car, right?

2    A.   Right.

3    Q.   Let's talk about -- there's some other real

4           estate, is there not or some other

5           properties?

6    A.   Yes.

7    Q.   Whose name was the insurable interest in those

8           properties?

9    A.   Donna Roberts.

10   Q.   Did Robert Fingerhut have any insurable

11          interest at all in any of those, is he

12          named?

13   A.   No.

14   Q.   So, Donna Roberts was a titled holder of all

15          of the real estate?

16   A.   Correct.

17   Q.   There was also the business.  You said you

18          insured the business.  The business,

19          let's take the Warren business, the

20          terminal.  What was the -- do you recall

21          what the business name is for that?

22   A.   They didn't give me an actual business name.

2962

```
 1          They just had it as Donna Roberts.
 2  Q.   One more time.  Insurable interest, the
 3          insurable interest in the business would
 4          be the person named, so that is Donna
 5          Roberts?
 6  A.   Yes.
 7  Q.   If anything happened to the business, the
 8          proceedings of any insurance policy would
 9          be paid to who?
10  A.   Donna Roberts.
11  Q.   And Robert Fingerhut don't appear anywhere,
12          does he?
13  A.   Correct.
14  Q.   The Youngstown terminal, whose name is that
15          insured interest in?
16  A.   Donna Roberts.
17  Q.   If anything happened to the Youngstown
18          terminal, all of the proceedings of
19          insurance to be paid to the owner who
20          is --
21  A.   Donna Roberts.
22  Q.   It is amazing.  Mr. Fingerhut calls and talks
```

2963

1          to you, but he doesn't exist anywhere as

2          an owner, does he?  Kind of unusual?

3   A.    I thought so.  There was an occasion where I

4          did put him down and he told me no,

5          change it to Donna.

6   Q.    Let me ask you another question.  Let's say

7          for instance that -- how much was the

8          insurance on the house, say for instance,

9          just ballpark?

10  A.    I think it was, the dwelling was 170,000

11         ballpark.

12  Q.    Let's say that there was a party over there.

13         And all of the guests came in and it is a

14         residence in Howland and all of the

15         people and Mr. Fingerhut or Donna,

16         whatever, two separate people, but let's

17         say they let the booze flow and everybody

18         gets a little topsy turvy and they pull

19         out of the Avalon Estates and go down 82,

20         hopefully they won't hit Bridget.  And

21         they came down and hit five people and

22         they were sued for a billion dollars.

2964

1          They would be suing, let's see, Donna

2          Roberts has the insurable interest in the

3          house, it's her policy.  You might be

4          able to cover, I don't know what the

5          liability was that was for the residence

6          for fire, if it was liability, let's say

7          500,000, right?

8  A.  I don't think it was that high.

9  Q.  Two hundred thousand.  If they were sued, and

10         they got a judgment for a billion dollars

11         from a nice Jury sitting in a box like

12         this, the insurance company says, "Here's

13         your check, I'll give you the 200,000."

14         Donna Roberts is on the hook, isn't she?

15  A.  Correct.

16  Q.  Where is Robert Fingerhut?  Is Robert

17         Fingerhut anywhere in there

18         theoretically?

19  A.  Not according to the insurance company.

20  Q.  He's nowhere to be found.  The same would

21         apply to the bus terminal.  The same

22         would apply to the two motor vehicles.

2965

1              The same would apply to all of the

2              property, real estate, right?

3   A.    Right.

4   Q.    On the insurance policies, the State Farm

5              insurance policy -- well, this would be

6              bad.  If Robert and Donna got in a real

7              big fight, you know, what he's done is

8              kind of goofed himself up, hasn't he?

9              Everything is in her name, isn't it?

10             she's divorced, everything is in her

11             name.  It is her property, right?

12  A.    Correct.

13  Q.    Everything.  Let's talk about State Farm

14             insurance policy.  There are two

15             provisions in there; one is the

16             beneficiary designation, correct?

17  A.    Correct.

18  Q.    You indicated to Mr. Morrow that Mr. Fingerhut

19             designated Donna as the beneficiary,

20             correct?

21  A.    Correct.

22  Q.    And on that, if you look at the beneficiary

2966

```
 1              page -- would you do that for me?
 2   A.   Yes.
 3   Q.   Are there any alternative beneficiaries in
 4             case Donna Roberts is no longer with us?
 5   A.   No.
 6   Q.   So that is all blank, it is just Donna
 7             Roberts, right?
 8   A.   Correct.
 9   Q.   Now, in order to change a beneficiary, they
10             would have to fill out the requisite
11             forms for State Farm in regard to change
12             of beneficiary, correct?
13   A.   Yes.
14   Q.   Just out of curiosity, those forms require
15             witnesses and a notary or how formal are
16             they?
17   A.   They require that I visually witness his
18             signature and I have to sign too and date
19             it.
20   Q.   Now there's another provision in the insurance
21             policy called the assignment provision.
22             Are you familiar with that?
```

2967

```
 1   A.    Yes.
 2   Q.    They can assign, he can assign this insurance
 3               policy, actually to somebody else,
 4               because technically, he was, I take it
 5               back -- he didn't exist.  He was the
 6               owner of the policy, right?
 7   A.    Correct.
 8   Q.    In this case, he was also the owner?
 9   A.    Right.
10   Q.    And of course he could stop paying at any time
11               or cancel it.  They could call up in two
12               seconds and cancel it, right?
13   A.    Correct.
14   Q.    Gone.  But he could also assign the policy,
15               can he not?
16   A.    As being someone else owning the policy?
17   Q.    Yes.
18   A.    Yes.
19   Q.    And in order to assign it, how would -- do you
20               have the forms that require assignment?
21   A.    We do the same type of form.  It's a request
22               letter and we would change the ownership.
```

2968

```
 1              We would get the owner's name, address,
 2         Social Security number.  They both would
 3         have to sign.  Individual to witness
 4         that.
 5   Q.    That is not what the policy says though.
 6         That's maybe with State Farm, but the
 7         assignment just says this --
 8   A.    Are you saying to assign ownership to somebody
 9         else?
10   Q.    Right.  "You may assign this policy or any
11         interest in it.  We'll recognize any
12         interest only if it's in writing and
13         filed with us.  We're not responsible for
14         validity or affect of any assignment."
15         The assignment may limit that of any
16         beneficiary.  What it says basically is
17         the policy can be assigned.  Correct?
18   A.    Yes.
19   Q.    You will only recognize it if you have receipt
20         of it, that makes sense?
21   A.    Right.
22   Q.    So, Mr. Fingerhut could go down and say, for
```

2969

```
 1          instance he wanted to make sure that

 2          maybe his kids got some money.  So he

 3          would take out what is called an

 4          assignment form, and he could designate

 5          what the policy is, designate the

 6          instrument.  Identifies the tangible

 7          object being the policy which the paper

 8          is reflective of that.  I hereby assign

 9          to Michael Fingerhut, the net proceeds of

10          this policy, whatever, and once it is

11          assigned to Michael Fingerhut, he becomes

12          the owner.  The owner has the power in

13          that policy to do what, can he designate

14          the beneficiary?

15     A.   Yes, he can once you become the owner.

16     Q.   In other words, he can become the owner; once

17          the owner, the owner can change it, and

18          where is Donna Roberts, D.M.R., out the

19          window, right?

20     A.   Right.  If he changes the beneficiary.

21     Q.   It can be done both ways in the assignment,

22          that can be done.  It could have been
```

2970

1          sitting somewhere right now as far as we

2          know.  We don't know.  It doesn't require

3          filing with the company, it just requires

4          that if the proceeds can be paid, it has

5          to get to the company.  So we don't know

6          if he did assign.  He could have assigned

7          it and it is sitting someplace, right?

8    A.    If I understand you correctly, you are saying

9          that he could have assigned the ownership

10         to another individual, and just State

11         Farm didn't receive that.

12   Q.    Correct.

13              MR. MORROW:  I object to this whole

14   line unless he has some evidence that this has

15   happened.

16              MR. LEWIS:  They did a hypothetical.

17              THE COURT:  I don't know where you

18   are going, but overruled.

19   Q.    The assignment can be made of the ownership of

20         the policy, then the owner becomes a new

21         owner and can change the beneficiary any

22         time, right?

2971

1    A.    Yes, that can happen.

2    Q.    In regard to the Zurich policy.  I know you're

3          not a Zurich agent or anything else, but

4          that has the assignment provisions and

5          the beneficiary very similar to this,

6          right?

7    A.    Yes.

8    Q.    A lot of this is codified in the insurance

9          code in the State of Ohio, right?

10   A.    Correct.

11   Q.    It says insurance companies don't take

12         advantage of us poor folk out here,

13         right?  It is a regulated industry?

14   A.    Exactly, and if we make changes to our policy,

15         we do have to file it with the State for

16         approval.

17   Q.    Right.  He has to approve and the State

18         Department of Insurance has to approve

19         that.

20   A.    Right.

21   Q.    So, in essence, everything that you have

22         insured has always been in the name of

2972

1           Donna M. Roberts, correct?

2    A.   Correct.

3    Q.   You have never insured or have anything that

4              is indicated any ownership by Robert

5              Fingerhut, any property, motor vehicles,

6              anything?

7    A.   Correct.

8    Q.   And Donna is the one who could call up and

9              say, "Cancel insurance for house,

10             terminal, Youngstown, Warren, cancel for

11             cars."  She has complete control

12             theoretically, correct?

13   A.   If she called and told me to cancel, I would

14             be obligated to do that.

15   Q.   If Robert Fingerhut called and said, "Cancel,"

16             would you cancel?

17   A.   I would be obligated to call Donna and say,

18             "He told me to cancel, is that your

19             wish?"

20   Q.   And why is the reason?

21   A.   Because she's the named insured on the policy.

22             MR. LEWIS:  Thank you very much.  I

2973

1    have another question.

2    Q.    (By Mr. Lewis)  One other question.  You did

3              indicate before that if Robert Fingerhut

4              took this policy out and named somebody

5              totally unrelated to him or whatever, you

6              would want to know, the insurance company

7              would investigate that?

8    A.    They would ask what was the insurable

9              interest.

10   Q.    What is the insurable interest -- but in order

11             to get around that, if you just take

12             somebody that is supposedly, you say is

13             my wife, and just put her name down, no

14             questions are asked, are they?

15   A.    Right.

16   Q.    And they may not be the wife at all?

17   A.    I found that out.

18   REDIRECT EXAMINATION BY MR. MORROW:

19   Q.    To the best of your knowledge, was there ever

20             an assignment done on the State Farm

21             Insurance policy?

22   A.    No.

2974

1   Q.   To the best of your knowledge, was there ever

2        a change of beneficiary done on the State

3        Farm Insurance policy?

4   A.   No.

5   Q.   To the best of your knowledge, who was paying

6        the premiums on the life insurance

7        policy?

8   A.   I was under the impression it was Robert

9        Fingerhut.

10  Q.   And to the best of your knowledge, Robert was

11       insured under the policies on the house

12       and the cars.  If he was operating the

13       cars, was injured at the house, was

14       injured at the businesses, Robert would

15       be insured under the policies from State

16       Farm if he was operating the cars and was

17       injured?

18  A.   Yes.

19  Q.   He would be insured under the house if his

20       personal property was destroyed at the

21       house?

22  A.   Yes.

2975

1   Q.   And he would be insured under the businesses?

2              MR. LEWIS:   That is not true.  He's

3   not the insured under the resident policy.

4              MR. MORROW:   That's not my question.

5              THE COURT:   Do you have an

6   objection?  I'll sustain the objection.  Rephrase

7   your question.

8   Q.   If Mr. Fingerhut had personal property at the

9            residence that was destroyed at the

10           residence, would it be covered?

11  A.   Yes.

12  Q.   And would he receive payment for those items

13           that he lost at the residence?

14  A.   We would not pay directly to him.  It would

15           still have to come to Donna Roberts, but

16           we would cover his property.

17  Q.   Do you know how much the premiums were to

18           insure Mr. Fingerhut's life?

19  A.   The annual premium which I believe he was

20           paying monthly, however, was $1,368 was

21           the annual premium.  Monthly payment was

22           $156.

2976

1    Q.   Who had the right to stop making payments on

2              that life insurance policy?

3    A.   Mr. Fingerhut.

4    Q.   At the time of his death, that policy was

5              still in full force and effect?

6    A.   Yes, it was.

7    Q.   He never stopped making any payment on it?

8    A.   No.

9              MR. MORROW:  No further questions.

10   RECROSS EXAMINATION BY MR. LEWIS:

11   Q.   In regard to any change of beneficiary or the

12             assignment, it is just what you know,

13             correct?  You haven't received anything?

14             You didn't receive anything prior to

15             December 11, is that correct?

16   A.   No.

17             MR. LEWIS:  Thank you.

18             THE COURT:  Thank you very much,

19   Mrs. Thomas.

20             JAMES CAMPBELL

21   being duly sworn according to law, on his oath,

22   testified as follows:

2977

1    DIRECT EXAMINATION BY MR. WATKINS:

2    Q.   Good afternoon.

3    A.   Good afternoon.

4    Q.   You will be short?

5    A.   I hope.

6    Q.   Would you please give your name and

7              occupation?

8    A.   My name is Jim Campbell, Patrolman with the

9              Howland Police Department.

10   Q.   How long have you worked for the Howland

11             Police Department?

12   A.   Since 1988.

13   Q.   And prior to that, you were employed where?

14   A.   Sheriff's department.

15   Q.   And how many years of police work do you have?

16   A.   I have 26 years.

17   Q.   And at the Howland Police Department, on

18             December 12, what duties did you have in

19             the year 2001?

20   A.   I was assigned to the patrol division, but I

21             was to go down and attend the autopsy of

22             Robert Fingerhut.

2978

1   Q.   And did you take a camera with you?

2   A.   Yes, I did.

3   Q.   And who was at that autopsy?

4   A.   Myself and the Coroner.

5   Q.   And was that the autopsy that was done by

6        Dr. Germaniuk?

7   A.   Yes, it was.

8   Q.   And I'm going to hand you what has been marked

9        as Exhibits, various photographs, State's

10       Exhibit 61, 62, 63, 64 -- Exhibits 61

11       through 68.  Look at them and then

12       identify the photograph as to whether or

13       not they are accurate of the scene that

14       you saw and also identified by number,

15       please?

16  A.   State's Exhibit 61 was a photograph taken of

17       the Jersey shirt down at the Coroner's

18       office.  This is a representation of the

19       actual photograph here that I have taken

20       down at the Coroner's office.  Number 62,

21       a black -- appears to be dark black

22       clothing, also with my initials as an

2979

1              Exhibit that was taken down there.

2    Q.    This is at Forum Health Hospital?

3    A.    Trumbull Memorial Hospital.  The Coroner's

4              office downstairs, correct.  Exhibit 63

5              is a photograph of the victim.

6    Q.    Robert Fingerhut?

7    A.    Robert Fingerhut with my initials on the back

8              also.

9    Q.    What does it show?

10   A.    This particular one here shows a wound to the

11             chest.  State's Exhibit 64 is the

12             projectile recovered from the brain of

13             Robert Fingerhut by the Coroner at the

14             autopsy.

15   Q.    And that photograph, is that the X-ray

16             photograph?

17   A.    No.  This is the bullet itself.  State's

18             Exhibit 65 is also a photograph of the

19             bullet, a closer picture of the bullet

20             with my initials on the back.  State's

21             Exhibit 66 is the victim's clothing and

22             jewelry that were removed from the body

2980

1       at the autopsy.  State's Exhibit 67 is

2       the X-ray that showed the projectile in

3       the brain of Robert Fingerhut.  That was

4       done at TMH that day.

5   Q.  Was that X-ray shown to you by Dr. Germaniuk?

6   A.  Yes.  It was viewed by both him and I.

7       State's Exhibit 68 shows the Cincinnati

8       Reds jacket that the victim was wearing.

9   Q.  That was on the afternoon of December 12 when

10      you were at the Trumbull Memorial

11      Hospital?

12  A.  That is correct.

13  Q.  How long were you there?

14  A.  I can't recall exactly the timed duration.  It

15      was three, four hours I was there.

16  Q.  Did you receive from the doctor to put into

17      your evidence room to subsequently be

18      given to Detective Monroe, a bullet?

19  A.  Yes, I did.

20  Q.  I'm going to hand you what has been marked as

21      State's Exhibit 267 -- I'm sorry, 266.

22      Can you identify that?

2981

1   A.   Yes, this is the projectile that the Coroner

2        sealed down at the autopsy once the

3        bullet was removed from the brain of the

4        victim.

5   Q.   That was taken to the Howland Police

6        Department?

7   A.   That is correct.

8   Q.   And to your knowledge, it was subsequently

9        given to Detective Monroe?

10  A.   That is correct.

11  Q.   Did you also receive blood, a vial of blood

12       from the victim, Robert Fingerhut?

13  A.   I got a vial of blood from a registered nurse

14       from TMH.

15  Q.   And that was the time you were there also on

16       December 12?

17  A.   At the time of the autopsy, yes.

18  Q.   I'm going to show you what has been marked as

19       Exhibit 265.

20  A.   That's correct.  It's so marked on the vial by

21       the hospital.

22  Q.   That is the blood that was of the victim?

2982

1   A.   Yes, that is from Robert Fingerhut.

2   Q.   And that was also taken and put in your

3        evidence room?

4   A.   Everything, yes.

5   Q.   And subsequently, that was also turned over to

6        Detective Monroe?

7   A.   Correct.

8   Q.   Would you tell the Jury what role you played

9        in this particular case as an officer for

10       Howland, other than what we have just

11       described to the Jury.

12  A.   The only portion that I had was the autopsy.

13       The rest of the investigation was done by

14       the lead criminal investigators, Sergeant

15       Monroe.

16  Q.   So that is about it?

17  A.   That is it.

18                MR. WATKINS:   Thank you.

19  CROSS EXAMINATION BY MR. CONSOLDANE:

20  Q.   Good morning, Jim.  How are you?

21  A.   Good morning.

22  Q.   You had a picture that you said had some of

2983

1                   the jewelry?

2   A.   Number 66.

3   Q.   How much jewelry did he have?

4   A.   Without looking at the sheet, it shows the

5             inventory and appears to be a watch, some

6             rings, a necklace, bracelet.  It is hard

7             to tell from the photograph.

8   Q.   Did you look at the jewelry?

9   A.   Yes, I did.

10  Q.   Was it good jewelry?

11  A.   It appeared to be.

12  Q.   Gold?

13  A.   Gold, yes.

14              MR. CONSOLDANE:  Thank you.

15              MR. WATKINS:  Thank you.  We don't

16  have any more witnesses for today.  We have

17  witnesses for tomorrow.  Most of them are out of

18  town.

19              THE COURT:  Ladies and gentlemen,

20  you will be back here please at 1:00 tomorrow

21  afternoon.  Let me give you, try to get you some

22  idea of where we're at time-wise here.  There's no

2984

1  way we can predict, but it appears as if the State

2  may get through their evidence tomorrow, is that

3  correct?

4           MR. WATKINS:  Yes.

5           THE COURT:  If it isn't completed

6  tomorrow, it would be early on Friday, and the

7  Defense will have an opportunity then to present

8  any evidence they care to present if they care to

9  do so.  And in any event, we'll probably return on

10  Monday for closing arguments and instruction of

11  law.  It might go into Monday afternoon before we

12  get around to that or possibly Tuesday.  It gives

13  you some time frame.  The reason I even mention

14  this is that you might expect that as of Monday,

15  you may wish to bring clothing with you or make

16  arrangements to get clothing.  So when you are

17  sequestered, you will have everything that is

18  necessary.  Whatever you pack to go for a couple of

19  days on vacation, that is what you need.  You

20  should make arrangements also, if you go into the

21  second day for someone to drop things off for you

22  or whatever.  Because no one knows how long it will

2985

1   take the Jury to arrive at a verdict.  That being

2   said, we thank you again.  We'll see you back here

3   tomorrow at 1:00.

4         You are not to discuss anything or watch

5   anything on T.V.  See you tomorrow at 1:00.

6   (Court in Recess at 12:10 p.m.)

7

8

9   Thursday, October 31, 2002; (In-chambers at 1:15 p.m.)

10        THE COURT:  We're in-chambers out of

11  the hearing of the Jury.  The defense waives

12  presence of the Defendant?

13        MR. LEWIS:  We waive presence of the

14  Defendant.

15        THE COURT:  The State is going to

16  show what they call power point presentation with

17  the tapes that will be played of conversations from

18  prison to Mrs. Roberts.  And in conversation,

19  there's been an objection by the Defense, to the

20  photographs of Mrs. Roberts and Jackson being shown

21  in conjunction with the typed portion of the

22  conversation.  I have granted the Defense motion.

2986

1   The Prosecution has removed that from the

2   presentation, and it will be strictly the typed

3   portion of the transcript.

4              MR. CONSOLDANE:  I would still

5   object to that on the basis that by putting it up

6   on the large screen like that, gives it more impact

7   than it would if they just heard it on the tape.  I

8   think that that is placing more emphasis on certain

9   evidence than what it would fairly be given,

10  without putting letters on the screen.

11             THE COURT:  Your objection is noted

12  and overruled.

13             MR. CONSOLDANE:  I do have another

14  motion at this point for a mistrial, based on

15  prosecutorial misconduct.  This morning, I woke up

16  to the television report that the Prosecutor plans

17  to play these tapes from the prison, that are going

18  to implicate that Nathaniel Jackson and Donna

19  Roberts planned the murder from prison, and also

20  that there was going to be a power point

21  presentation along with these tapes, and that was

22  also in the newspaper.  Your Honor, the State is

2987

1  not supposed to discuss the evidence that is going

2  to be presented in Court with the news media before

3  it is even presented in Court.  That is against the

4  canons of ethics, and to try this case in the

5  newspaper, and the news media the way they have

6  been doing it, it just is not giving my clients a

7  fair trial.  You could not have missed it if you

8  just happened to flip the T.V. on this morning, it

9  blasted out.  I think he's been prejudiced beyond

10  repair.

11          MR. WATKINS:  The power point

12  presentation, I believe, first off, we were here

13  all afternoon preparing to do this.  In the

14  opening, we mentioned we're going to play tapes.

15  There's nothing in the newspaper quoting Mr. Morrow

16  or myself about any evidence.  It is hard to

17  conceal especially when we mentioned in opening

18  that we're going to present these tapes in Court.

19  Nothing was revealed in the newspaper about the

20  content of the tapes; and furthermore, I mentioned

21  in my opening statement, and to take the next step,

22  the Jury has been admonished not to read the

2988

1    newspaper.  I don't see how it has any prejudicial

2    impact.  There's nothing mentioned specifically

3    about the evidence.

4              THE COURT:  I think the main point

5    is that the Jury has to be assumed, unless

6    something would come to light, that shows he --

7              MR. WATKINS:  Even if the Jury read

8    the newspaper, there's nothing in the paper that is

9    prejudiced other than what we're going to put on in

10   the presentation.

11             MR. CONSOLDANE:  The headline reads

12   "damaging tapes."

13             THE COURT:  If the Jury is following

14   the instructions, which assuming they are.

15             MR. CONSOLDANE:  That is still not

16   right.

17             THE COURT:  You mentioned ethics,

18   that is not something that I am caused, nor charged

19   with dealing with, unless it is something that

20   happens in my presence, and something that if

21   something of that nature is brought to my

22   attention, if the person who brings it to my

2989

1    attention does not notify the Ethics Bureau, then I

2    am obligated to do so.  From what you say and put

3    on the record, I see nothing at all that even gets

4    into the realm of that.  Unless this Jury at some

5    time would have a Perry Mason juror that stands up

6    and says, "Oh my God, I have been tainted, I read

7    the newspaper."  I don't think -- I'm going to

8    continue to assume that they would not have read

9    anything of that nature.

10           MR. CONSOLDANE:  It is not so much

11   that the T.V., I mean the newspaper, is that a lot

12   of people turn on the T.V. in the morning to see

13   what the weather is going to be like.  That is

14   where it was blasted out.  They could have

15   inadvertently heard that on T.V.

16           THE COURT:  I don't think I need to

17   Voir Dire the Jury on this question.  I can see

18   where certain things that might occur that that

19   would be called for.  I don't think this is one of

20   those cases.  Your objection is noted for the

21   record.

22           MR. WATKINS:  As I understand it,

2990

1  we're going to present our final witnesses, and

2  then tomorrow we'll move for admission of our

3  Exhibits and debate whatever, and the Court would

4  entertain the objections of Defense counsel, and

5  then we would take up the State's motion regarding

6  the relevancy of evidence that may be presented by

7  the Defense, that is, we're making a motion in

8  limine to exclude what we feel is irrelevant

9  evidence.

10            THE COURT:  What am I going to do

11  with the Jury in the meantime?

12            MR. WATKINS:  My own thinking is, I

13  don't know, I think there's two stages of this.

14  How long they are going to be with your

15  presentation of evidence.

16            THE COURT:  I don't think it is

17  proper to ask them at this point.

18            MR. WATKINS:  That is none of my

19  business, unless they wish to offer that.  I think

20  that if we're going to argue some of this stuff

21  tomorrow, maybe it is better to bring the Jury back

22  Monday to hear the Defense side.

2991

1          MR. LEWIS:  I have got the witnesses

2     coming in tomorrow.

3          MR. WATKINS:  Then you can start

4     tomorrow.

5          MR. LEWIS:  They are only going to

6     take probably an hour at the most maybe.

7          MR. WATKINS:  The reason I say, Jim,

8     that we argue some of these questions of law and

9     judge, is that I may stipulate to some of the stuff

10    if it is relevant.

11         MR. LEWIS:  Dennis, you are not

12    going to stipulate.  I want to be able to present

13    my case.  I don't want your stipulation.  I want to

14    present my case.

15         MR. WATKINS:  No problem.  I said if

16    you want to entertain it.

17         MR. LEWIS:  No.  I want to present

18    my case.

19    (OFF THE RECORD)

20         THE COURT:  Tell me what you are

21    agreeing on by way of proceeding from this point

22    on.

2992

1    (OFF THE RECORD)

2              THE COURT:  It is my understanding

3    from our conversation we have had here, that once

4    the State rests, the Defense has no objection to

5    putting your case on at that point, before the

6    Court has ruled on all of the Exhibits that are to

7    be admitted on the State's case.

8              MR. CONSOLDANE:  They are going to

9    rest, and move for the admission of their Exhibits.

10   We have done that in the past.  I have no objection

11   to doing that.

12             THE COURT:  That is in agreement?

13             MR. CONSOLDANE:  Yes.  Rather than

14   keeping a Jury.  It is a good thing to do.

15             MR. WATKINS:  I agree.  The

16   understanding is that in the event we have to

17   present more evidence, we have that opening.

18             THE COURT:  You always have the

19   right to rebuttal.

20             MR. WATKINS:  I meant in the sense

21   when we move our Exhibits.  We close pending the

22   ruling.

2993

1              THE COURT:  Yes.

2   (End of In-chamber discussion.)

3   (In Open Court with Jury present at 1:50 p.m.)

4              THE COURT:  Folks, this case is

5   going to go into next week, as you know, and the

6   question has been asked by several of you,

7   concerning election day.  You have one of two

8   options, and that is, the way that it looks like

9   you will be available probably to leave early,

10  somewhat early on Monday, and the final arguments

11  will not be on Monday, but on Tuesday.  If you are

12  going to vote, you should take the chance Monday

13  afternoon to go to the election board.  I

14  understand you are able to vote early that way at

15  the election board.

16             MR. CONSOLDANE:  Or tomorrow

17  afternoon.

18             THE COURT:  Wait.  What am I talking

19  about?

20  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

21  OF HEARING)

22             THE COURT:  There's a provision

2994

1    whereby you can vote early, but the polls open at

2    6:30 on Tuesday.  We won't be starting until 9:00,

3    possibly 10:00, but it may be 9:00.  You are

4    voting, the place where you vote is always close to

5    home, so that should not be too much of an

6    inconvenience to get up a little bit early and go

7    vote.  You do have the two options, if you want to

8    check into the voting early possibility if that is

9    going to cause an inconvenience for you on Tuesday

10   morning.  We want to make sure that everybody

11   votes.  Is the State ready to call your next

12   witness?

13           MR. WATKINS:  We are.  The State

14   would call Linda Thomas.

15                    LINDA THOMAS

16   being duly sworn according to law, on her oath,

17   testified as follows:

18   DIRECT EXAMINATION BY MR. MORROW:

19           THE COURT:  Do you mind being

20   photographed?

21   A.  No.

22   Q.  Would you tell us your name, please?

2995

1   A.   Linda Thomas.

2   Q.   And where are you employed?

3   A.   I am the warden of Lorain Correctional

4         Institution in Cleveland.

5   Q.   How long have you been employed there?

6   A.   About 18 months.

7   Q.   Is that also known as Lorain Correctional

8         Institution?

9   A.   It is.

10   Q.   And is there an abbreviation?

11   A.   LCI.

12   Q.   And prior to becoming a warden at Lorain, had

13         you been employed elsewhere?

14   A.   I have been in the Department of Corrections

15         for 14 years at seven other facilities.

16   Q.   You are originally from the Mahoning Valley?

17   A.   Yes.

18   Q.   So this is kind of a little bit of a

19         homecoming?

20   A.   Yes.

21   Q.   In your position as warden, are you

22         responsible for overseeing the entire

2996

1          operations of the Lorain Correctional

2          Institution?

3  A.   Yes, I am.  I have 2,000 inmates and

4          approximately 500 employees.

5  Q.   And in that capacity, do you also supervise

6          the records that are generated at Lorain

7          Correctional Institution?

8  A.   Yes.

9  Q.   And are those records kept in the regular

10         course of business?

11 A.   Yes.

12 Q.   And are those records generated with respect

13         to various inmates that come into the

14         institution?

15 A.   Yes.

16 Q.   And those records are collected at the same

17         time, or maintained or created in close

18         proximity --

19               MR. LEWIS:  We're going to object.

20  She's able to tell us.  Just ask what the records

21  are.  They are leading questions.

22               THE COURT:  Go ahead.  Sustain the

2997

1    objection to the leading nature.

2    Q.    I'm going to hand you what has been previously

3          marked as State's Exhibit 276-C.  Can you

4          take a look at that document, please, and

5          there are four documents inside of it,

6          marked within 276-C, C-1, C-2, C-3 and

7          C-4.

8    A.    Sure.

9    Q.    Are you able to identify those?

10   A.    Yes.

11   Q.    Have you seen those documents before today?

12   A.    Yes.

13   Q.    And can you tell us what brought those

14         documents to your attention or how you

15         were requested to produce those

16         documents?

17   A.    Trooper Funelli contacted my office and my

18         investigator, Chris Monyak, and just

19         requested the records, so I signed them

20         over to the Highway Patrol.

21   Q.    And they requested the records of who?

22   A.    Nathaniel Jackson.

2998

1  Q.   And were those records kept in the regular

2       course of your business at the Prison?

3  A.   Yes.

4  Q.   And are those the original records that were

5       produced?

6  A.   Yes.

7  Q.   And those records were then provided to

8       Trooper Funelli?

9  A.   Yes.

10 Q.   I am going to ask you to take a look at the

11      back of State's Exhibit 276-C.  It is the

12      envelope.  That is 276-C.  Is there a

13      document on the back of it?

14 A.   Yes.

15 Q.   Could you briefly tell the ladies and

16      gentlemen what that document reflects?

17 A.   That Trooper Funelli requested the records.  I

18      signed them over to him and he signed

19      that he accepted them.

20 Q.   Is that sheet reflecting the record of the

21      transfer of the documents?

22 A.   Yes.

2999

1   Q.   Do those records reflect the dates that those

2           records were created?

3   A.   Yes.

4   Q.   And what dates are on those records?

5   A.   The intake form was completed on February 26,

6           2001.  Two package lists, when property

7           was sent to him, were completed on April

8           18, 2001.  And the employment history for

9           the inmate was completed on April 4,

10          2001.

11   Q.   And these documents, are these documents

12          prepared by all inmates as they come into

13          the institution?

14   A.   Correct.

15   Q.   And they are generated by each of the inmates?

16   A.   Correct.

17   Q.   And each of the inmates fills out those forms?

18   A.   Correct.  On the intake form, the inmate signs

19          it.  On the employment form, the inmate

20          completes it, and on the inmate package

21          list, they sign for what they were given.

22   Q.   In State's Exhibit 276-C-1, you said that

```
                                                    3000
```

1        document is prepared by the inmate

2        himself or herself?

3  A.   Correct.

4  Q.   In their handwriting?

5  A.   Yes.

6  Q.   When were you requested to provide that

7        information with respect to this

8        individual?  Do you recall what

9        information was provided to you to locate

10       this material?

11  A.   Basically that it was an investigation, that

12       the inmate had been at my facility, and

13       just that Trooper Funelli needed the

14       records.

15  Q.   How did you know which inmate to look for?

16  A.   Trooper Funelli gave me the name.

17  Q.   Did he give you any other additional

18       information?

19  A.   Briefly talked about the case, what the inmate

20       was suspected of.

21       MR. LEWIS:  Objection.

22       THE COURT:  Your objection is

3001

1   possible hearsay coming in?

2              MR. LEWIS:  Yes.

3              THE COURT:  There hasn't been any

4   hearsay yet.

5   Q.   Were you provided with his date of birth?

6   A.   Yes.

7   Q.   And his Social Security number?

8   A.   Yes.

9   Q.   Do you remember what those are?

10  A.   Do I have them on record or do I know them?

11  Q.   Do you have them on records there?

12  A.   Just his number and the inmate name.

13  Q.   And when we talk about inmate number, tell us

14         a little bit about an inmate number.

15  A.   Lorain is the reception center for the

16         Northeast part of Ohio.  When an offender

17         comes in, they are all given a number and

18         that follows them through the Department

19         of Corrections.

20  Q.   And is that number placed on all documents

21         that the inmates fill out?

22  A.   Yes.

3002

1   Q.   Is this number that is on the bottom

2        consistent with the inmate number of

3        Nathaniel Jackson, to the best of your

4        knowledge?

5   A.   Yes.

6   Q.   That is Nathaniel E. Jackson?

7   A.   Correct.

8   CROSS EXAMINATION BY MR. CONSOLDANE:

9   Q.   My name is Tony Consoldane, and I am

10       representing Nathaniel Jackson along with

11       Mr. Lewis over there.  These papers that

12       you just identified, you didn't prepare

13       those, did you?

14  A.   No.

15  Q.   And you didn't see them being prepared?

16  A.   No.

17  Q.   They were just in his file?

18  A.   Correct.

19  Q.   And how long ago did you pull those out of his

20       file?

21  A.   April 17, 2002.

22  Q.   Did you happen to look through his file when

3003

1          you pulled those papers out?

2  A.   I don't recall.

3  Q.   Do you recall if he was a pretty good

4          prisoner?

5  A.   I have 2,000 inmates.  I don't remember.

6  Q.   Did you know a fellow by the name of Terry

7          Lyons?

8  A.   No.

9  Q.   Used to work for the Adult Parole Authority in

10          Columbus?

11  A.   No.

12              MR. MORROW:  Nothing further.

13              CHRISTOPHER MONYAK

14  being duly sworn according to law, on his oath,

15  testified as follows:

16  DIRECT EXAMINATION BY MR. MORROW:

17  Q.   Good afternoon.  Would you please introduce

18          yourself?

19  A.   Christopher Monyak, investigator at Lorain

20          Correctional Institution.

21  Q.   And as an investigator at Lorain Correctional

22          Institution, what do your duties include?

3004

```
 1   A.    Conducting administrative investigations and

 2              assisting the State Patrol in conducting

 3              criminal investigations.

 4   Q.    Did there come a point in time, when you were

 5              called to assist an investigation

 6              regarding an individual by the name of

 7              Nathaniel E. Jackson?

 8   A.    Yes, Sir, I was.

 9   Q.    And how were you familiar with Mr. Jackson?

10   A.    Trooper Funelli from the State patrol

11              contacted me, and indicated that he

12              wanted to review some phone calls that

13              Mr. Jackson had made when he was

14              incarcerated at the institution.

15   Q.    Was Mr. Jackson, were you able to determine

16              whether or not Nathaniel E. Jackson was

17              incarcerated at the institution?

18   A.    Yes, he was.

19   Q.    And how did you determine who Mr. Nathaniel

20              Jackson is?  Were you provided with a

21              social security number?

22   A.    Social Security number, date of birth and full
```

3005

```
1          name.
2   Q.   Were you also able to determine whether or not
3          he had an inmate number?
4   A.   Yes, he did.
5   Q.   And you were able to -- is each inmate
6          assigned a very specific number?
7   A.   Unique number for each inmate, yes.
8   Q.   And do you recall what that number is?
9   A.   Not off the top of my head, no.
10  Q.   And when an inmate comes into the facility,
11         are they processed into the facility?
12  A.   Correct.  We're a reception center, so we get
13         all of the inmates from all of the
14         northern counties in Ohio.
15  Q.   And are inmates permitted to make telephone
16         calls?
17  A.   Yes, they are.
18  Q.   Tell us about the telephone system and
19         telephone process dealing with inmates at
20         Lorain Correctional Institution.
21  A.   As far as the telephone system, there's 57
22         phones throughout the institution in the
```

3006

1          different housing units, and there's

2          times designated for each inmate to make

3          phone calls depending on what unit they

4          are assigned to.  When they initiate a

5          phone call, they will pick up a hand set,

6          and there's an 11 digit number that they

7          need to enter in to be able to make a

8          phone call.  What that includes is their

9          inmate number and their date of birth.

10   Q.   And when they make those, when they make those

11          phone calls, is that information recorded

12          anyplace?

13   A.   Yes, it is.  It is digitally recorded.

14   Q.   The telephone calls are digitally recorded?

15   A.   Correct.

16   Q.   What about the entry of the pin number?

17   A.   That is also logged on the computer.

18   Q.   So if you were able to look at the pin number,

19          you could determine an inmate's

20          institution number along with his date of

21          birth from that information?

22   A.   Correct.

3007

1    Q.    And the telephone conversations, when the

2          inmate makes a telephone conversation,

3          you testified that they are digitally

4          recorded?

5    A.    Yes.

6    Q.    Are those records maintained at the facility?

7    A.    Yes, they are.

8    Q.    How long are they maintained there?

9    A.    A minimum of six months.

10   Q.    And in particular, tell us a little bit about

11         the digital recording system.  How

12         accurate of a system is it,

13         tamperability, that kind of information?

14   A.    There's security features built into the

15         system that you are not able to alter the

16         recordings in any way.  Basically when it

17         is recorded on a hard drive, you need to

18         have the program that comes with the

19         system to be able to bring that phone

20         call back up and listen to it.  There's

21         no way to alter it or to change it in any

22         way.

3008

1  Q.   Is that part of your duties as an investigator

2       as well as working the phone system?

3  A.   Yes.

4  Q.   Who is in charge of the phone system?

5  A.   It is actually provided to the institution by

6       MCI and the institutional investigator of

7       each institution is responsible for it.

8  Q.   Is that your ultimate responsibility?

9  A.   Yes, it is.

10 Q.   And you have had -- what kind of training have

11      you had with respect to that phone

12      system?

13 A.   Actually, when it was first installed back in

14      1997, they sent us to Columbus for

15      training, and then we had like on the job

16      training with it also, and then they

17      updated it approximately a year ago, and

18      we had additional training with that.

19 Q.   And in your job as investigator, are you able

20      to extract the phone calls from the

21      system?

22 A.   Yes, we are.

3009

1   Q.   And how is that done?

2   A.   Got a computer in my office that searches all

3        of the phone calls, and there's different

4        fields that we can search to pull up a

5        phone call.  We can search it by the

6        destination or the number that was

7        actually called.  We can search it by the

8        pin number that was entered to make the

9        phone call.  We can search it by the

10       housing unit that the phone call

11       originated from.  There's many different

12       ways to pull up the phone calls.

13  Q.   And are the phone calls tracked under each of

14       those different scenarios?

15  A.   Yes, they are.

16  Q.   Are they tracked by the phone call to where it

17       is made?

18  A.   The destination number, the actual phone in

19       the facility, which phone was used, the

20       pin number that was used to make the

21       phone call, or the duration of the phone

22       call.

3010

1    Q.    And did there come a point in time when you

2          compiled information with respect to an

3          inmate by the name of Nathaniel E.

4          Jackson?

5    A.    That is correct.

6    Q.    I'm going to hand you what has been marked as

7          State's Exhibit 360 and ask you to take a

8          look at that, please?

9    A.    Okay.

10   Q.    Have you seen that before?

11   A.    Yes, I have.

12   Q.    And where have you seen that at?

13   A.    This is the report that I generated for

14         Trooper Funelli, when he came into the

15         institution.

16   Q.    And when Trooper Funelli came into the

17         institution, what information was being

18         requested?

19   A.    All phone calls that Mr. Jackson had made

20         while being incarcerated.

21   Q.    If you could, could you please identify what

22         Mr. Jackson's inmate number is?  Are you

3011

1          able to do so from that document?

2    A.   Yes, I can.

3    Q.   Can you explain to the ladies and gentlemen

4          where that information is located?

5    A.   There are, I would say approximately 12

6          columns in this report.  Right in the

7          middle of the report is a column labeled

8          pin ID.  Pin stands for personal

9          identification number, and it is an 11

10         digit number that includes his inmate

11         number, which is 399469, and then the

12         four digit date of birth, which is the

13         month and the day and that is ████, which

14         is ████████.

15   Q.   And you generate this report, and was able to

16         define how many phone calls?

17   A.   There were 72 phone calls all together that

18         had been attempted, using that pin

19         number, and 18 that had been actually

20         recorded, which means that they were

21         completed phone calls.

22   Q.   Let me back up.  This process that you have,

3012

1         it records the phone call that is being

2         called?

3    A.   Yes.

4    Q.   How is that generated?

5    A.   It is stored in the computer along with the

6         actual phone call recording, and when we

7         do a query or search in the computer, as

8         I stated earlier, we can search by the

9         phone number that was called or pin

10        number that was used to make those phone

11        calls.

12   Q.   And are there any safeguards built into the

13        system with respect to three way phone

14        calls?

15   A.   There's a detection system built in that if it

16        detects a tone or ring, actually --

17   Q.   First, could you explain to the ladies and

18        gentlemen what a three way call is?

19   A.   A three way call is as far as a correctional

20        institution, an inmate would call

21        somebody that would -- a collect call and

22        that person would call a third person and

3013

1          connect the two individuals, and that way

2          it prevents or circumvents the collect

3          call process.

4   Q.   And is there a device built in to preclude

5          that from happening in the system?

6   A.   There's software built into the system that

7          will detect three way phone calls.

8          Basically it gives three choices.  We can

9          either just ignore the alert, we can

10         identify the alert or we can disconnect

11         the call.

12  Q.   And you are also able to identify the number

13         that the call is being made to?

14  A.   As far as the third party call, it will not

15         detect that.  It will only detect the

16         initial phone number that was put into

17         the system.

18  Q.   And so there were 78 different phone calls

19         attempted?

20  A.   72.

21  Q.   And how many of those were accepted phone

22         calls?

3014

1    A.    18.

2    Q.    And of those 18 phone calls, how many

3          different telephone numbers were called?

4    A.    Of the 18 that went through, they were all to

5          the same phone number.

6    Q.    And what is that phone number?

7    A.    ████████████

8    Q.    A possibility that another inmate can use one

9          inmate's numbers to make phone calls?

10   A.    It is possible, yes.

11   Q.    And in this particular case, was that issue

12         presented to you?

13   A.    Yes, it was.

14   Q.    And what if anything, were you able to do?

15   A.    Along with tracking the pin number, we also

16         look at the location of where the phone

17         call was made from, and compare that to

18         the location where the inmate is actually

19         housed at, and if we see phone calls that

20         are being made in areas where he isn't

21         assigned, then that verifies that there's

22         another individual using his pin number.

3015

1   Q.   And the -- what is the time frame of the 18

2        accepted phone calls, between what dates?

3   A.   The first one that was accepted was on this

4        report, October 25 and the last phone

5        call was December 8.

6   Q.   Of what year?

7   A.   2001.

8   Q.   And during that time frame, were you able to

9        track Mr. Jackson's locations?

10  A.   Yes, we were.

11  Q.   And how many different locations was he in

12       during that time frame?

13  A.   He was in three separate locations during that

14       incarceration.

15  Q.   And how many different moves were done between

16       those different locations?

17  A.   As far as the unit where he initially went

18       in --

19  Q.   What I'm asking, he was in three separate

20       housing units?

21  A.   Correct.

22  Q.   Was he moved back and forth between housing

3016

1          units at any time or did he stay in one

2          housing unit before he moved to the

3          second and stayed there and moved to a

4          third?

5   A.   Correct.

6   Q.   You were able to track his movement at that

7          point?

8   A.   Yes.

9   Q.   And the pin numbers correspond with his move

10         in the institution as well?

11  A.   All of the pin numbers that were in there were

12         entered in housing units where he was

13         assigned.

14  Q.   Did there come a point in time when you were

15         able to track a 19th phone call that was

16         accepted?

17  A.   Yes, I was.

18  Q.   Could you explain that to the ladies and

19         gentlemen?

20  A.   When Trooper Funelli first came in, I did a

21         search report by his pin number, which

22         gave me all of the phone calls that were

3017

1          made using his pin number.  Subsequently,

2          probably about I would say a month later

3          or so, I went back and I made a second

4          search, and I searched phone calls going

5          specifically to that phone number, the

6          phone number where the first 18 went to

7          and I was able to locate a 19th call that

8          was made to that phone number using a

9          different pin number.

10   Q.    And were you able to connect that phone call

11          as well?

12   A.    Yes, I was.

13   Q.    I'm going to hand you what has been marked as

14          State's Exhibit 361 and ask you to take a

15          look at that, please?

16   A.    Okay.

17   Q.    Are you able to identify that?

18   A.    Yes, I am.

19   Q.    How are you able to identify that?

20   A.    It is my handwriting on the front of the CD.

21   Q.    If you could, please explain to the ladies and

22          gentlemen, what that is?

3018

1   A.   It is his name and number, the number of phone

2        calls, and the dates that the phone calls

3        were made, October 5, 2001 through

4        December 8, 2001.

5   Q.   Could you explain what that is actually, what

6        that CD is?

7   A.   The system, rather than using cassette tapes,

8        the system since it is digitally

9        recorded, we transfer it into digital

10       format onto a CD that is able to be

11       played on any laptop computer or desk top

12       computer.  All 19 phone calls that are

13       made are all on this one CD.

14  Q.   I'm going to hand you what has been previously

15       marked as State's Exhibits 276-C-1, C-2,

16       C-3, and C-4.  I'll ask you to take a

17       look at those documents, please.  Are you

18       able to assign inmate numbers on those

19       documents?

20  A.   Yes.

21  Q.   And can you tell me what those inmate numbers

22       are, please?

3019

```
 1    A.   Again, it is 399469.  And that is on all four
 2              forms.
 3    Q.   And is that the same inmate number that you
 4              have with the information with respect to
 5              Nathaniel Jackson?
 6    A.   Yes.
 7    Q.   The date of birth was ███████████?
 8    A.   Correct.
 9    Q.   After you compiled that CD with the 19 phone
10              calls on it, what did you do with it?
11              Who did you give it to?
12    A.   I gave it to Trooper Funelli.
13    Q.   And is that the end of your involvement with
14              respect to this case?
15    A.   Basically, yes.
16              MR. MORROW:  Nothing further.  Thank
17    you.
18
19
20
21
22
```

3020

1

2              REPORTER'S  CERTIFICATE

3

4          I do hereby certify that the above and

5  foregoing is a true and correct transcript

6  of the proceedings had in the within hearing

7  as shown by stenotype notes written by me in the

8  presence of the witnesses at the time of the

9  hearing.

10

11                          _Mary Ann Mills_____

12                          MARY ANN MILLS, R.P.R.
                           Official Court Reporter
13                          Trumbull County, Ohio

14

15

16

17

18

19

20

21

22

# VOLUME 13

FILED

JUL 09 2001

3021

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

1      IN THE COURT OF COMMON PLEAS
           TRUMBULL COUNTY, OHIO
2       TRIAL COURT CASE NO. 01-CR-794
       SUPREME COURT OF OHIO CASE NO. 03-137
3

4   STATE OF OHIO          )
                           )
5            Plaintiff     )
                           )        **TESTIMONY**
6   -vs-                   )
                           )
7   NATHANIEL JACKSON      )
                           )
8            Defendant     )
9
10          BE IT REMEMBERED, that on Thursday, October 31,

11   2002, and Friday, November 1, 2002, these proceedings

12   came on to be heard before one of the Judges of this

13   Court, John M. Stuard, in Courtroom No. 2, on High

14   Street, Warren, Ohio, before the case heretofore

     filed herein.

15

16

17

18

19
20   Mary Ann Mills, RPR
     Official Court Reporter
21   Trumbull County, Ohio
22

3022

<u>A P P E A R A N C E S</u>


On Behalf of the State of Ohio:
    Dennis Watkins
    Trumbull County Prosecutor
    Charles L. Morrow
    Assistant Prosecuting Attorney
    160 High Street, N.W.
    Warren, Ohio

On Behalf of the Defendant:
    Anthony V. Consoldane, Attorney at Law
    James F. Lewis, Attorney at Law
    State of Ohio Public Defender's Office
    328 Mahoning Ave., N.W.
    Warren, Ohio

i

1                         I N D E X

2                                              PAGE NO.

3       Search Warrant Hearing                    3
        (December 20, 2001)
4
        Initial Appearance of Nathaniel Jackson   9
5       Hearing (December 21, 2001)

6       Initial Appearance of Donna Roberts      12
        Hearing (December 21, 2001)
7
        Motion to Intervene                      19
8       (December 31, 2001)

9       Arraignment of Donna Roberts (co-defendant)  57
        Arraignment of Nathaniel Jackson
10
        Waiver of Speedy Trial                   64
11      (January 23, 2002)

12      Hearing on Motions                       67
        (March 20, 2002)
13
        Hearing on Motion to Suppress Evidence  185
14      (April 17, 2002)

15      WITNESSES AT SUPPRESSION HEARING:

16      JEFFREY R. HOOLIHAN
            Direct Examination by Mr. Watkins    190
17          Cross Examination by Mr. Lewis       231
            Redirect Examination by Mr. Watkins  274
18          Recross Examination by Mr. Lewis     280

19      DET. SGT. PAUL MONROE
            Direct Examination by Mr. Lewis      288
20          Examination by The Court             312

21      NATHANIEL JACKSON
            Direct Examination by Mr. Consoldane 314
22          Cross Examination by Mr. Watkins     324

ii

INDEX - Continued                                           PAGE NO.

Court's Opening Remarks (Volume 2)                            381
Motion for Mistrial                                           415

VOIR DIRE
    Hardship Excuses                                          422
    Death Penalty Qualification & Media                       664
    (Volume 3)
    Motion for Change of Venue & Motion to
     Dismiss                                                 1835

GENERAL VOIR DIRE                                            1857

OPENING STATEMENT ON BEHALF OF STATE OF OHIO                2064
OPENING STATEMENT ON BEHALF OF THE DEFENDANT                2093

STATE'S WITNESSES:

PAULA CARSON
    Direct Examination by Mr. Morrow                         2100
    Cross Examination by Mr. Lewis                           2105

JAMES C. DANIELS
    Direct Examination by Mr. Watkins                        2111
    Cross Examination by Mr. Lewis                           2124
    Redirect Examination by Mr. Watkins                      2138

JOSE SANCHEZ
    Direct Examination by Mr. Watkins                        2139
    Cross Examination by Mr. Lewis                           2156
    Redirect Examination by Mr. Watkins                      2168

FRANK E. REYNOLDS
    Direct Examination by Mr. Watkins                        2172
    Cross Examination by Mr. Lewis                           2191
    Redirect Examination by Mr. Watkins                      2201

PAUL MONROE
    Direct Examination by Mr. Watkins                        2202
    Cross Examination by Mr. Consoldane                      2392

1    INDEX - Continued                                    PAGE NO.

2    MIKE YANNUCCI
         Direct Examination by Mr. Morrow              2406
3        Cross Examination by Mr. Lewis                2418
         Redirect Examination by Mr. Morrow            2428
4
     RICHARD TACKETT
5        Direct Examination by Mr. Morrow              2428
         Cross Examination by Mr. Lewis                2434
6
     ANTHONY LESHNACK
7        Direct Examination by Mr. Watkins             2445
         Cross Examination by Mr. Consoldane           2455
8
     FRANK DILLON
9        Direct Examination by Mr. Watkins             2457
         Cross Examination by Mr. Lewis                2480
10
     DR. THEODORE SOBOSLAY
11       Direct Examination by Mr. Watkins             2512

12   DR. HUMPHREY GERMANIUK
         Direct Examination by Mr. Watkins             2520
13       Cross Examination by Mr. Consoldane           2576
         Redirect Examination by Mr. Watkins           2583
14       Recross Examination by Mr. Consoldane         2585
         Redirect Examination by Mr. Watkins           2586
15
     JOSE FLORES
16       Direct Examination by Mr. Watkins             2587
         Cross Examination by Mr. Lewis                2599
17
     EDWARD LULLA
18       Direct Examination by Mr. Watkins             2604
         Cross Examination by Mr. Lewis                2624
19
     JOHN STAMPER
20       Direct Examination by Mr. Watkins             2645
         Cross Examination by Mr. Lewis                2652
21

22

1    INDEX - Continued                              PAGE NO.

2    JEFF DIAMANTES
         Direct Examination by Mr. Watkins           2654
3        Cross Examination by Mr. Lewis              2659
         Redirect Examination by Mr. Watkins         2661
4
     MICHAEL ROBERTS
5        Direct Examination by Mr. Morrow            2663
         Cross Examination by Mr. Consoldane         2695
6        Redirect Examination by Mr. Morrow          2704
         Recross Examination by Mr. Consoldane       2706
7
     CYNTHIA MAYLE
8        Direct Examination by Mr. Watkins           2706
         Cross Examination by Mr. Consoldane         2728
9
     DALE LAUX
10       Direct Examination by Mr. Watkins           2735
         Cross Examination by Mr. Consoldane         2751
11       Redirect Examination by Mr. Watkins         2790
         Recross Examination by Mr. Lewis            2798
12
     BRENDA GERARDI
13       Direct Examination by Mr. Watkins           2803
         Cross Examination by Mr. Lewis              2840
14
     STEVE GREENE
15       Direct Examination by Mr. Morrow            2851
         Cross Examination by Mr. Lewis              2875
16
     CHRIS ELLINGTON
17       Direct Examination by Mr. Morrow            2881
         Cross Examination by Mr. Consoldane         2888
18
     JIM McCOY
19       Direct Examination by Mr. Morrow            2890
         Cross Examination by Mr. Lewis              2899
20
     JILL KENYON
21       Direct Examination by Mr. Morrow            2900
         Cross Examination by Mr. Consoldane         2908
22

v

1  INDEX - Continued                                          PAGE NO.

2  JENNIFER ROBINSON
       Direct Examination by Mr. Morrow                        2911
3      Cross Examination by Mr. Lewis                           2920

4  KATHY KIHM
       Direct Examination by Mr. Morrow                        2921
5      Cross Examination by Mr. Lewis                           2924

6  BRIDGET PAUL
       Direct Examination by Mr. Morrow                        2925
7      Cross Examination by Mr. Consoldane                      2934

8  KATHERINE THOMAS
       Direct Examination by Mr. Morrow                        2936
9      Cross Examination by Mr. Lewis                           2952
       Redirect Examination by Mr. Morrow                      2973
10     Recross Examination by Mr. Lewis                         2976

11 JAMES CAMPBELL
       Direct Examination by Mr. Watkins                        2977
12     Cross Examination by Mr. Consoldane                      2982

13 LINDA THOMAS
       Direct Examination by Mr. Morrow                        2994
14     Cross Examination by Mr. Consoldane                      3002

15 CHRISTOPHER MONYAK
       Direct Examination by Mr. Morrow                        3003
16     Cross Examination by Mr. Lewis                           3023
       Redirect Examination by Mr. Morrow                       3037
17
   TROOPER GERALD FUNELLI
18     Direct Examination by Mr. Morrow                         3038
       Cross Examination by Mr. Lewis                           3046
19
   DET. SGT. PAUL MONROE
20     Redirect Examination by Mr. Watkins                      3049
       Recross Examination by Mr. Lewis                         3063
21
   BRAD CAIN
22     Direct Examination by Mr. Lewis                          3106

1   INDEX - Continued                                    PAGE NO.

2   TAMMIE KAYE
        Direct Examination by Mr. Consoldane         3118
3
    ROBERT STANTON
4       Direct Examination by Mr. Lewis              3119
        Cross Examination by Mr. Watkins             3127
5
    MOTIONS                                          3200
6
    CARMEN OLIVA
7       Direct Examination by Mr. Watkins            3267
        Cross Examination by Mr. Lewis               3278
8
    BARRY RICKER
9       Direct Examination by Mr. Watkins            3290
        Cross Examination by Mr. Lewis               3300
10
    DIANA MARCHESE
11      Direct Examination by Mr. Watkins            3309
        Cross Examination by Mr. Consoldane          3314
12      Redirect Examination by Mr. Watkins          3319
        Recross Examination by Mr. Consoldane        3319
13
    MOTION RE JURY INSTRUCTIONS                       3334
14
    FINAL ARGUMENT ON BEHALF OF STATE OF OHIO         3390
15  FINAL ARGUMENT ON BEHALF OF THE DEFENDANT         3438
    FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT       3495
16  REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO      3505

17  CHARGE OF THE COURT                               3541

18  NOVEMBER 7, 2002 (Deliberations)                  3601

19  NOVEMBER 8, 2002 (Deliberations)                  3602

20  VERDICT                                           3612

21  (SEE SEPARATE VOLUME FOR TRANSCRIPT OF
     MITIGATION HEARING)
22

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | Withdrawn |
| 34 | Photo | No Objection |
| 35 | Photo | No Objection |
| 36 | Photo | Withdrawn |
| 37 | Photo | Withdrawn |
| 38 | Photo | No Objection |
| 39 | Photo | No Objection |
| 40 | Photo | Withdrawn |
| 41 | Photo | No Objection |
| 42 | Photo | Withdrawn |
| 43 | Photo | Withdrawn |
| 44 | Photo | No Objection |
| 45 | Photo | No Objection |
| 46 | Photo | Withdrawn |
| 47 | Photo | Withdrawn |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | No Objection |
| 51 | Photo | Withdrawn |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

vii

| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterrior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninisula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | No Objection |
| 86 | Blood Spatters - garage | Withdrawn |
| 87 | Overview garage | No Objection |
| 88 | Peninusla & Wall - blood splatters | No Objection |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | Withdrawn |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | Withdrawn |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | No Objection |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | Withdrawn |
| 108 | Victim | No Objection |
| 108A | Victim Face down | Withdrawn |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | No Objection |
| 111 | Victim lower torso | Withdrawn |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | No Objection |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

viii

| | | |
|---|---|---|
| 118 | Office Area | No Objection |
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door, Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angle Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Blod Smear | No Objection |
| 176 | Floormat | Withdrawn |
| 177 | Trunk Open | No Objection |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

ix

| 180 | Driver Side Console | No Objection |
|-----|---------------------|--------------|
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Inn Photographs | Admitted over Obj |
| 202 | Days Inn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | Withdrawn |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Inn Photographs | Withdrawn |
| 206 | Days Inn Photographs | Withdrawn |
| 207 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 210 | Days Inn Photographs | Withdrawn |
| 211 | Days Inn Photographs | Withdrawn |
| 212 | Days Inn Photographs | Withdrawn |
| 213 | Days Inn Photographs | Withdrawn |
| 214 | Days Inn Photographs | Withdrawn |
| 215 | Days Inn Photographs | Withdrawn |
| 216 | Days Inn Photographs | Withdrawn |
| 217 | Days Inn Photographs | Withdrawn |
| 218 | Days Innn Photographs | Withdrawn |
| 219 | Days Inn Photographs | Withdrawn |
| 220 | Days Inn Photographs | Withdrawn |
| 221 | Days Inn Photographs | Withdrawn |
| 222 | Days Inn Photographs | Withdrawn |
| 223 | Days Inn Photographs | Withdrawn |
| 224 | Days Inn Photographs | Admitted over Obj |
| 225 | Days Inn Photographs | Withdrawn |
| 226 | Days Inn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | | |
|------|---------------------------|----------|----------|-----|
| 271D1 | | 12/03/01 | Admitted | xi |
| 271D2 | | 11/29/01 | Admitted | |
| 271D3 | | 11/29/01 | Admitted | |
| 271D4 | | 11/28/01 | Admitted | |
| 271D5 | | 11/28/01 | Admitted | |
| 271D6 | | 11/27/01 | Admitted | |
| 271D7 | | 11/27/01 | Admitted | |
| 271D8 | | 11/26/01 | Admitted | |
| 271D9 | | 11/26/01 | Admitted | |
| 271D10 | | 11/24/01 | Admitted | |
| 271D11 | | 11/23/01 | Admitted | |
| 271D12 | | 11/23/01 | Admitted | |
| 271D13 | | 11/22/01 | Admitted | |
| 271D14 | | 11/22/01 | Admitted | |
| 271D15 | | 11/22/01 | Admitted | |
| 271D16 | | 11/22/01 | Admitted | |
| 271D17 | | 11/21/01 | Admitted | |
| 271D18 | | 11/21/01 | Admitted | |
| 271D19 | | 11/20/01 | Admitted | |
| 271D20 | | 11/20/01 | Admitted | |
| 271D21 | | 11/20/01 | Admitted | |
| 271D22 | | 11/20/01 | Admitted | |
| 271D23 | | 11/19/01 | Admitted | |
| 271D24 | | 11/19/01 | Admitted | |
| 271D25 | | 11/19/01 | Admitted | |
| 271D26 | Empty | | Admitted | |
| 271D27 | | 11/16/01 | Admitted | |
| 271D28 | | 11/16/01 | Admitted | |
| 271D29 | | 11/15/01 | Admitted | |
| 271D30 | Empty | | Admitted | |
| 271D31 | | 11/12/01 | Admitted | |
| 271D32 | | 11/10/01 | Admitted | |
| 271D33 | | 11/10/01 | Admitted | |
| 271D34 | | 11/10/01 | Admitted | |
| 271D35 | | 11/10/01 | Admitted | |
| 271D36 | | 11/09/01 | Admitted | |
| 271D37 | | 11/09/01 | Admitted | |
| 271D38 | | 11/09/01 | Admitted | |
| 271D39 | | 11/09/01 | Admitted | |
| 271D40 | | 11/08/01 | Admitted | |
| 271D41 | | 11/08/01 | Admitted | |
| 271D42 | | 11/08/01 | Admitted | |
| 271D43 | | 11/07/01 | Admitted | |
| 271D44 | | 11/07/01 | Admitted | |
| 271D45 | | 11/07/01 | Admitted | |
| 271D46 | | 11/07/01 | Admitted | |
| 271D47 | Empty | | Admitted | |
| 271D48 | | 11/06/01 | Admitted | |
| 271D49 | | 11/06/01 | Admitted | |
| 271D50 | Empty | | Admitted | |
| 271D51 | | 11/05/01 | Admitted | |
| 271D52 | | 11/05/01 | Admitted | |
| 271D53 | | 11/03/01 | Admitted | |
| 271D54 | | 11/03/01 | Admitted | |
| 271D55 | | 11/02/01 | Admitted | |
| 271D56 | | 11/02/01 | Admitted | |
| 271D57 | | 11/02/01 | Admitted | |
| 271D58 | | 11/01/01 | Admitted | |
| 271D59 | | 11/01/01 | Admitted | |
| 271D60 | Halloween card | | Admitted | |
| 271D61 | | 10/31/01 | Admitted | |

| | | | |
|---|---|---|---|
| 271D124 | | 10/05 | |
| 271D125 | | 10/04 | |
| 271D126 | | | |

xii

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

| | | | | |
|---|---|---|---|---|
| 271D124 | | | 10/05/01 | Admitted |
| 271D125 | | | 10/04/01 | Admitted |
| 271D126 | | | 10/04/01 | Admitted |
| 271D127 | | | 10/02/01 | Admitted |
| 271D128 | | | 10/02/01 | Admitted |
| 271D129 | | | 10/02/01 | Admitted |
| 271D130 | Unknown | | | Admitted |
| 271D131 | Unknown | | | Admitted |
| 271D132 | Unknown | | | Admitted |
| 271D133 | Unknown | | | Admitted |
| 271D134 | Unknown | | | Admitted |
| 271D135 | Unknown | | | Admitted |
| 271D136 | Unknown | | | Admitted |
| 271D137 | Unknown | | | Admitted |
| 271D138 | Unknown | | | Admitted |
| 271D139 | | | 11/26/01 | Admitted |

xiii

xiv

| 273N | Letters from Nate to Donna | | Admitted |
|------|------|------|------|
| 273N1 | | 12/01/01 | Admitted |
| 273N2 | | 11/30/01 | Admitted |
| 273N3 | | 11/29/01 | Admitted |
| 273N4 | | 11/28/01 | Admitted |
| 273N5 | | 11/27/01 | Admitted |
| 273N6 | | 11/26/01 | Admitted |
| 273N7 | | 11/25/01 | Admitted |
| 273N8 | | 11/23/01 | Admitted |
| 273N9 | | 11/22/01 | Admitted |
| 273N10 | | 11/20/01 | Admitted |
| 273N11 | | 11/19/01 | Admitted |
| 273N12 | | 11/17/01 | Admitted |
| 273N13 | | 11/16/01 | Admitted |
| 273N14 | | 11/14/01 | Admitted |
| 273N15 | | 11/14/01 | Admitted |
| 273N16 | | 11/13/01 | Admitted |
| 273N17 | | 11/12/01 | Admitted |
| 273N18 | | 11/12/01 | Admitted |
| 273N19 | | 11/10/01 | Admitted |
| 273N20 | | 11/09/01 | Admitted |
| 273N21 | | 11/07/01 | Admitted |
| 273N22 | | 11/06/01 | Admitted |
| 273N23 | | 11/08/01 | Admitted |
| 273N24 | | 11/05/01 | Admitted |
| 273N25 | | 11/03/01 | Admitted |
| 273N26 | | 11/01/01 | Admitted |
| 273N27 | | 11/01/01 | Admitted |
| 273N28 | | 10/31/01 | Admitted |
| 273N29 | | 10/30/01 | Admitted |
| 273N30 | 273N31 | | 273N32 |
| 273N31 | | 10/28/01 | Admitted |
| 273N32 | | 10/27/01 | Admitted |
| 273N33 | 273N34 | | 273N35 |
| 273N34 | | 10/25/01 | Admitted |
| 273N35 | | 10/25/01 | Admitted |
| 273N36 | | 10/25/01 | Admitted |
| 273N37 | | 10/24/01 | Admitted |
| 273N38 | | 10/23/01 | Admitted |
| 273N39 | | 10/22/01 | Admitted |
| 273N40 | | 10/21/01 | Admitted |
| 273N41 | | 10/21/01 | Admitted |
| 273N42 | | 10/20/01 | Admitted |
| 273N43 | | 10/19/01 | Admitted |
| 273N44 | | 10/18/01 | Admitted |
| 273N45 | | 10/17/01 | Admitted |
| 273N46 | | 10/16/01 | Admitted |
| 273N47 | | 10/16/01 | Admitted |
| 273N48 | | 10/15/01 | Admitted |
| 273N49 | | 10/14/01 | Admitted |
| 273N50 | | 10/12/01 | Admitted |
| 273N51 | | 10/10/01 | Admitted |
| 273N52 | | 10/10/01 | Admitted |
| 273N53 | | 10/08/01 | Admitted |
| 273N54 | | 10/05/01 | Admitted |
| 273N55 | | 10/07/01 | Admitted |
| 273N56 | | 10/04/01 | Admitted |
| 273N57 | | 10/04/01 | Admitted |
| 273N58 | | 10/02/01 | Admitted |
| 273N59 | | 10/01/01 | Admitted |
| 273N60 | | 10/01/01 | Admitted |
| 273N61 | | 09/30/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

xvii

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Mavlee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Sieve Green (1) Page | Admitted over Obj |

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Intorduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2  - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Enevlope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Enevlope #138 w/ To | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X 5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

xviii

| | | |
|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic  Line-Uo - Frank Reynolds | Not Intorduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Enevlope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Eneviope Containing 2 Photos | No Objection |

xix

| | | |
|---|---|---|
| 395 | Enevlope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | Admitted over Obj |
| 397 | Audio Tape of Excerpts | Objection Sustained |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A-403RR | Defendant's school records | No Objection |
| | | |
| Defendant's Exhibits | | |
| Deft A | Dreft.'s Criminal HIstory | No Objection |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| DeftP | Psychological Report | No Objection |
| Joint 1 | Fingerhut Jewelry | No Objection |
| | | |
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief In Oppostion to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

3023

1  CONTINUING WITH EXAMINATION OF CHRIS MONYAK:

2  CROSS EXAMINATION BY MR. LEWIS:

3  Q.   What was the last name, Chris?

4  A.   Monyak.

5  Q.   How about if I call you Chris?

6  A.   That is fine.

7  Q.   Chris, how long have you been employed by the

8       Department of Corrections?

9  A.   The Ohio Department of Corrections, I have

10      been employed since 1988.

11 Q.   And how long have you been employed as a

12      security officer, the whole time?

13 A.   Started out as a correctional officer and

14      moved up through the ranks, yes.

15 Q.   And basically, the correctional officer, what

16      were your general duties as corrections

17      officer, very briefly?

18 A.   Normally, just supervise the inmates that are

19      assigned to your areas.

20 Q.   You are a guard?

21 A.   Yes.

22 Q.   And when was it that you moved up to security?

3024

1    A.   In 1995, I became institutional inspector and

2         then in 1996, I became the institutional

3         investigator.

4    Q.   And institutional investigator, what

5         specifically are your duties?  The

6         government, they have got all of these

7         sheets and you have got these duties?

8    A.   Right.

9    Q.   Do you remember what the duties are?

10   A.   My main duties are to conduct administrative

11        investigations and that deals with both

12        staff members of the institution and the

13        inmates that are assigned to that

14        institution.

15   Q.   Maybe like complaints, between the corrections

16        officers and the inmates, you investigate

17        that?

18   A.   In some instances, yes.

19   Q.   Would you investigate anything between inmate

20        and inmate?

21   A.   Assaults or fights, yes.

22   Q.   Are there any other investigative or security

3025

1          officers at Lorain?

2  A.   There's a State Trooper that is assigned to

3          the institution, but as far as

4          investigators, there's only one.

5  Q.   You are the one and only security man since

6          1996?

7  A.   Investigator, yes.

8  Q.   And in regard to this recording system, I

9          assume, to start off with, that was

10          installed by MCI, right?

11  A.   Correct.

12  Q.   It was functioning?

13  A.   Yes.

14  Q.   That was installed in what year, do you

15          recall?

16  A.   System that this recorded was installed I

17          believe in 1999.

18  Q.   And the way they have it set up, if I

19          understand this correctly, is that

20          there's phones -- well, let me ask you

21          this.  Can you only make collect calls?

22  A.   Only collect calls, that is correct.

3026

1   Q.   And MCI, those are pretty expensive calls?

2   A.   Depending on the duration and if it is an out

3            of state call, it can be pretty

4            expensive.

5   Q.   So, it is only collect calls, right?

6   A.   Correct.

7   Q.   And how many phones are in Lorain Correctional

8            facility that can be utilized by inmates

9            for these collect calls?

10  A.   57 phones all together.

11  Q.   And those are broken down into various places

12           or units, if it is in a building A,

13           building B, C, D, that kind of thing?

14  A.   Correct.

15  Q.   How many buildings are we looking at or how

16           many blocks of phones?

17  A.   There's probably about 12 different areas that

18           have phones and most of the areas, there

19           are four phones.

20  Q.   Four times 12 is what, 48?

21  A.   Right.

22  Q.   So, you have got 12 areas, four in each one.

3027

1        Each one of those phones would record

2        first, I think my understanding is that

3        any inmate that uses that phone

4        regardless of what building they were

5        from, when they use the phone, they put

6        in the numerical number.  It is an pin

7        number and D.O.B?

8  A.   Right.

9  Q.   If I am ████, do they put █████, that

10     would be five digit or six digit?

11  A.   All of the numbers, there's a number that

12     starts a sequence and it designates that

13     it is a male inmate.  That is the number

14     2.  They have separate numbers for male

15     inmates, female inmates and reformatory

16     numbers.

17  Q.   I thought Lorain was only for males?

18  A.   It is, but I am talking system wide.

19  Q.   So you have got one digit for male or female?

20  A.   Correct.  Digit for male inmates is a digit

21     number 2.  So all pin numbers will start

22     with the number 2.

3028

1  Q.   Are women number one?

2  A.   Actually women are number nine.  You will see

3          letters on the numbers, a male inmate

4          number always starts with the letter A,

5          and designates A is on the number 2 on

6          the phone.  Women starts with a W, so it

7          indicates the number nine.  And then we

8          also have reformatory numbers, which are

9          designated with the number seven and that

10         corresponds with the letters that are on

11         the key pad of the phone.

12  Q.   Now, the first digit takes care of that, then

13         what number goes in?

14  A.   You have the six digit inmate number.

15  Q.   Okay.  And they are assigned that as soon as

16         they arrive at the institution?

17  A.   Correct.

18  Q.   Is it their actual prison number or anything

19         of that nature?

20  A.   It is the prison number.

21  Q.   And then I'm going to assume the last is the

22         D.O.B?

3029

```
 1   A.   The last four numbers are the month and day.
 2   Q.   And do you have any surveillance video of the
 3        location where the phone calls are made?
 4        Do you make a surveillance?
 5   A.   There's only one area of the prison that has a
 6        camera in the phone area and that is in
 7        the segregation unit.  All of the normal
 8        housing units do not have cameras in that
 9        area.
10   Q.   The point I'm getting to, is that somebody
11        else technically could actually make a
12        phone call and use somebody else's pin?
13   A.   Yes.  As I stated earlier, there's nothing to
14        prevent any inmate from going up and
15        entering anybody's pin number.
16   Q.   And Mr. Jackson did a search and you could
17        search by a number called.  You can
18        search by pin number, you can search by
19        building?
20   A.   Correct.
21   Q.   Are there any other searches you can run?
22   A.   You can search by not only building, there's
```

3030

1          four phones in the building, you can

2          search down to a specific phone.  You can

3          narrow it down to duration.  I may be

4          searching for phone calls that are two

5          minutes or less or ten minutes or more.

6          Just about every field that is shown on

7          that report, you can search by that

8          field.

9     Q.   That was the total number of phone calls made

10         by Mr. Jackson for what period of time

11         are we talking?

12    A.   Are you referring to the Exhibit?

13    Q.   Yes.  Did they ask you to go back and go to a

14         certain time or to go back when he

15         arrived?

16    A.   What I did when I was first given his number,

17         I determined how long he was at the

18         institution, and so I searched for his

19         entire incarceration, which was October

20         through December.

21    Q.   Do we have on this CD, do we have all phone

22         calls for his entire time he was there

3031

1              where he actually spoke on the phone?

2    A.   Yes.

3    Q.   We have all of them?

4    A.   Yes.

5    Q.   All of the rest of these are denied, things of

6              that nature, correct?

7    A.   Correct.  That lists 18 phone calls, there

8              were actually 19.  There was one recorded

9              on here that is not on that report.

10   Q.   You indicated also, there's no way -- you

11             can't pick up on an extension, if

12             somebody is listening on the other end of

13             an extension if you have got 15

14             extensions and you are on one.  Fourteen

15             people could be on the other end and you

16             wouldn't know it?

17   A.   Correct.

18   Q.   So you have got a total of 19 phone calls,

19             right?

20   A.   Correct.

21   Q.   And you indicated that if there's -- well, if

22             there's a three way call, that is

3032

1              detected.  Once that call goes to a

2              certain number and it is going to be

3              transferred out to another number, then a

4              warning system comes up or something?

5    A.    Basically, what the system listens for are

6              tones or rings.  A lot of times when

7              somebody makes a three way phone call,

8              they will click off, and then dial the

9              second number, and then they will click

10             back on.  If the inmate can hear that

11             ringing in the phone, that means that the

12             system can also hear that ringing, and

13             that is what the system detects.  It

14             really didn't take that long for the

15             inmates to realize that if they told the

16             person that was making the three way call

17             to not click back over until you have

18             already been connected, then the system

19             would not detect any tone or any ringing

20             sound and it wouldn't flag as a three way

21             phone call.

22   Q.    What I am getting to, you said the system had

3033

1      three choices in regard to that kind of

2      thing?

3  A.   Correct.

4  Q.   Is this a mechanized choice?  Is the machine

5         doing it itself or is someone monitoring

6         this?

7  A.   It is set from the manufacturer or MCI to

8         disconnect all three way phone calls.

9         The operator of the system does have the

10        capability of changing that setting, but

11        I have not changed it.

12  Q.   Okay, so the three choices, but it was preset

13        to disconnect and it would disconnect?

14  A.   Yes.

15  Q.   Do you as security officer or anybody else

16        listen to these phone calls on a daily

17        basis?

18  A.   I do some daily monitoring of phone calls,

19        although most of my time is taken up with

20        usually I am looking at specific inmates

21        for illegal activity and I'll monitor

22        their phone calls.  As far as randomly

```
                                                              3034
 1              monitoring phone calls, I would say that
 2              probably happens two to three hours a
 3              week and that is done by me.
 4    Q.   The system is in place to do exactly what
 5              besides -- what is the system in place
 6              for, to monitor everybody's phone calls?
 7              What is the reason?
 8    A.   We have a problem within the facility of drugs
 9              being conveyed into the facility, and a
10              lot of that information to try to curtail
11              that, can be obtained off the phone
12              calls.  And we have some harassing phone
13              calls that originate from the facilities
14              and that also catches that.
15    Q.   Do you have any idea whether any of these
16              phone calls were listened to at the time
17              they were made or after the time they
18              were made and when they were recorded?
19    A.   I know that after I was notified of the -- by
20              Trooper Funelli to pull up these phone
21              calls, I monitored them at that time.  If
22              they were monitored prior to that, I
```

3035

1          can't recall.  It would have been myself

2          that would have monitored it, but I

3          listened to thousands of phone calls over

4          the months.  To say a specific phone call

5          was monitored, I can't say that.

6     Q.   The system is in place in order to stop any

7          illegal activity, drugs coming in and

8          drugs coming out.  Everybody talking

9          about bad things, and yet if nobody

10         listens to it, it is not really going to

11         prevent anything.  After the fact, it may

12         be helpful in some form or fashion.

13    A.   Not necessarily.  I may get information that a

14         certain inmate is having drugs come in.

15         I can go back and listen to his previous

16         conversations and if it is mentioned then

17         that would kind of verify that and it

18         would give me the avenue to continue.

19    Q.   I understand that.  If you don't have a lead

20         or somebody go to that phone call or to

21         watch that person or plug in their pin

22         number and do it, then things can slip

3036

1           by, correct?

2  A.  Correct.

3  Q.  How many different -- did you search, you

4           searched by pin.  You searched by

5           building.  Did you do all of the searches

6           in order to find these calls?

7  A.  Initially I searched by the pin number and

8           then subsequently, I searched by the

9           destination number and that is where I

10          was able to come up with the 19th call.

11 Q.  Did you search by any other criteria?

12 A.  No.

13 Q.  So, these may not be the only phone calls

14          we're talking about?

15 A.  If they were either made to that destination

16          or using that pin number, these are all

17          of the phone calls.  If a phone call was

18          made from a different housing unit,

19          either using that pin number or calling

20          that destination, it would have come up

21          in this report.

22 Q.  So, actually, it wouldn't be super difficult

3037

1              for any of the inmates just to switch

2              pins or to use somebody else's pin and

3              their date of birth.  Seems kind of easy?

4  A.  It wouldn't be difficult.

5             MR. LEWIS:  Thank you very much.

6             MR. MORROW:  No further questions.

7  <u>REDIRECT EXAMINATION BY MR. MORROW:</u>

8  Q.  Do you know approximately how long the phone

9              calls were that Mr. Jackson made?

10  A.  The system is set up to automatically

11             disconnect after ten minutes.  The vast

12             majority of his phone calls lasted ten

13             minutes.

14  Q.  How many calls are made out of the institution

15             on a daily basis?

16  A.  Four thousand calls a day that are attempted.

17  Q.  Prior to speaking with Trooper Funelli, did

18             you have any information that Mr. Jackson

19             had been involved in any criminal

20             activity that would warrant monitoring?

21  A.  No.

22             MR. CONSOLDANE:  I'm going to

3038

1  object. This is not proper redirect.

2           THE COURT:  The answer is no.  If it

3  was yes -- overruled.

4  Q.  The answer is no?

5  A.  The answer is no.

6           MR. MORROW:  Nothing further.

7           MR. LEWIS:  Nothing further.

8           THE COURT:  Thank you.  You are

9  excused.

10         TROOPER GERALD FUNELLI

11  being duly sworn according to law, on his oath,

12  testified as follows:

13  DIRECT EXAMINATION BY MR. MORROW:

14  Q.  Could you please introduce yourself to the

15       ladies and gentlemen?

16  A.  My name is Gerald Funelli.  I am employed with

17       the Ohio State Highway Patrol.  I have

18       been employed as a trooper since 1978.

19  Q.  And what is your current position?

20  A.  I am currently assigned to the office of

21       investigative services.

22  Q.  And in that what, do you assist other

3039

1          departments in investigations?

2    A.    Yes.

3    Q.    Did there come a time when your assistance was

4          requested by the Howland Township Police

5          Department to investigate a homicide in

6          Howland Township?

7    A.    Yes, Sir.

8    Q.    And in particular, did they request assistance

9          in reference to a man by the name of

10         Nathaniel Jackson?

11   A.    Yes, Sir.

12   Q.    What did they request of you to do with

13         respect to -- with respect to

14         Mr. Jackson?

15   A.    Mr. Jackson was an inmate in the Ohio State

16         correctional system.  He was an inmate at

17         Lorain Correctional.  I was requested to

18         obtain some information regarding

19         Mr. Jackson's housing and also phone

20         calls that were made from the institution

21         by Mr. Jackson.

22   Q.    And did you then do that?

3040

1   A.    Yes, Sir.

2   Q.    And from whom did you request that information

3            with respect to the phone calls?

4   A.    I contacted first, our district three

5            investigator, and he in turn turned me

6            over to talk to the institutional

7            investigator there, Chris Monyak.

8   Q.    And did you provide Mr. Monyak with any

9            information?

10   A.    Yes, I did.

11   Q.    What information did you provide to him?

12   A.    There was a list of five phone numbers that

13            were given to me to check.  Mr. Jackson's

14            name, and the time span in which we

15            wanted to check the phone calls.

16   Q.    And were you given any identification

17            information with respect to Mr. Jackson?

18            Were you provided with a date of birth,

19            Social Security number?

20   A.    Yes.

21   Q.    Did you give that information to Mr. Monyak as

22            well?

3041

1    A.    Yes.

2    Q.    And at some point in time did Mr. Monyak

3          return any material to you?

4    A.    Yes, he did.  When I first was requested to

5          assist in this, it was December 14,

6          Friday, and the following Tuesday was

7          when I obtained a copy of the disk of the

8          conversations that Mr. Jackson made.

9    Q.    I'm going to hand you what has been marked

10         State's Exhibit 261.  Do you recognize

11         that?

12   A.    Yes.

13   Q.    And could you tell the ladies and gentlemen

14         what that is, please?

15   A.    This is the CD of the conversations that were

16         provided by the investigator, Chris

17         Monyak to me, phone calls that

18         Mr. Jackson made.

19   Q.    If you take a look at State's Exhibit 360, do

20         you recognize that?

21   A.    Yes.  That is basically the log of the phone

22         calls that Mr. Jackson made out of the

3042

1          institution to the numbers that are

2          listed on here.

3    Q.    And was that provided to you?

4    A.    Yes, it was.

5    Q.    Finally, let me show you what has been marked

6          as State's Exhibits 276-C, it is C-1

7          through 4 along with the envelope.  Can

8          you take a look at those, please?

9    A.    Yes.

10   Q.    Are you able to identify those?

11   A.    These are the intake form that I obtained from

12         the institution, special services

13         department inmate employee history, and a

14         food packages list, two of them that were

15         obtained from the institution.  I

16         obtained them from the warden on 4-16-02

17         at 1020 hours.

18   Q.    And what did you do with those documents?

19   A.    I hand delivered them to Howland Police

20         Department.

21   Q.    Now, after you received a copy of that, after

22         you received that CD, what if anything

3043

1          did you do with it?

2  A.   I turned it over the same day I received it to

3          Detective Monroe in the Prosecutor's

4          office.

5  Q.   I guess my question is, did there come a point

6          in time when you listened to that CD?

7  A.   Yes, I did.

8  Q.   And how many phone calls were on that CD?

9  A.   19.

10  Q.   And do you recall approximately how long those

11          different phone calls were?

12  A.   They were all ten minutes which is the length

13          of time that the phones, that they are

14          allowed on the phone, except for one call

15          that was cut short and that was due to

16          trying to make a three way call.

17  Q.   I'm going to hand you what has been marked as

18          State's Exhibits 362 through and

19          including State's Exhibit 380.  Can you

20          tell me what those are, please?

21  A.   These are audio cassettes that were given to

22          me, which are the copies of the phone

3044

```
 1              conversations that were made by

 2              Mr. Jackson at Lorain Correctional

 3              facility.

 4    Q.   Did you listen to each of those audio

 5              cassettes?

 6    A.   Yes, I did.

 7    Q.   Did you compare them to the originals on the

 8              audio CD?

 9    A.   Yes, I did, along with the transcripts.

10    Q.   Along with the transcripts?

11    A.   Yes.

12    Q.   Are audio tapes true and accurate copies of

13              each of the separate phone calls on the

14              audio CD?

15    A.   Yes, they are.

16    Q.   And is there any way that you have indicated

17              on those tapes that you reviewed them?

18    A.   Yes, on the top right hand corner, I put a

19              little check mark on each one that I

20              listened to, which is all of them.

21    Q.   All 19 phone calls?

22    A.   Yes, Sir.
```

3045

1    Q.    I am also going to hand you what has been

2          marked as State's Exhibits 362-A, 363-A

3          through and including 380-A, each of the

4          Exhibits with the A designation.  Can you

5          take a look at those, please?

6    A.    Yes.

7    Q.    Are you able to identify those?

8    A.    Yes.  They are the transcriptions of the phone

9          conversations that were made on, whatever

10         days is on the top of the transcripts.

11         They are phone conversations of

12         Mr. Jackson.

13   Q.    That is the transcript of each of the audio

14         tapes?

15   A.    Yes.

16   Q.    And did you compare those transcripts against

17         the audio tapes?

18   A.    Yes, I did.

19   Q.    And are those transcripts substantially

20         correct with respect to the audio tapes?

21   A.    Yes, they are.

22   Q.    And is there any kind of identification system

3046

1              that exists on the top of the transcripts

2              so that they can be cross referenced with

3              the audio tapes and the CD's to the best

4              of your knowledge?

5     A.    Yes, there's some of them, starts off like A,

6              B, numbers, C numbers, which indicates

7              the phone call, and also next to it is

8              the date of which the phone call is made,

9              and correlates to the cassette tape, and

10             if you open up the CD, it also shows you

11             the same numbers which correlate to the

12             phone call and the transcripts.

13    Q.    When did those phone calls commence?  What is

14             the first transcript date?

15    A.    October 5, 2001 and the last one is December

16             8, 2001.

17             MR. MORROW:  No further questions.

18    CROSS EXAMINATION BY MR. LEWIS:

19    Q.    Gerry, we have been doing this a long time,

20             haven't we?

21    A.    Yes, Sir.

22    Q.    They have prepared or you have gone over what

3047

```
 1             was on the CD, which is 361.  That became
 2             the audio cassettes.  You reviewed those,
 3             matches this, right?
 4   A.    Yes, Sir.
 5   Q.    And the transcripts were made up from these,
 6             correct?
 7   A.    I followed the transcripts with the CD's and
 8             then I followed them with the cassettes.
 9   Q.    It worked out, they were all the same?
10   A.    Yes, Sir.
11   Q.    And the first conversation you had, you
12             indicated that the first transcript, the
13             first call was back on October 5, 2001?
14   A.    Yes, Sir.
15   Q.    You checked with Chris at the Lorain
16             Correctional facility.  Well, are you
17             assigned to Lorain?
18   A.    No, Sir.
19   Q.    You indicated there was one officer, Highway
20             Patrol officer, that was assigned -- that
21             was assigned to each prison along with a
22             security officer?
```

3048

1    A.    We have a trooper assigned to each

2              institution.  Lorain falls within

3              district three.  Trooper Weber is the

4              trooper that handles that.

5    Q.    Because you are in this district, that is how

6              you got involved?

7    A.    Yes, sir.

8              MR. LEWIS:  Thank you very much.

9              MR. MORROW:  Nothing further.

10              THE COURT:  Thank you.

11              MR. WATKINS:  We would request a

12   brief recess to set up.

13              THE COURT:  Let's take ten minutes.

14   You are not discuss anything or form any opinions

15   until you return.

16   (Court in recess at 2:45 p.m.)

17   (Resumed in Open Court at 3:05 p.m.)

18              THE COURT:  The State ready to

19   proceed?

20              MR. WATKINS:  We'll call Paul

21   Monroe.

22              THE COURT:  For the record, this

3049

1    witness has been has been previously sworn.

2

3              DET. SGT. PAUL MONROE

4    having been previously sworn, testified as follows:

5    REDIRECT EXAMINATION BY MR. WATKINS:

6    Q.   Paul, you previously testified, and I want to

7              cover a couple of things that we didn't

8              get to.  When you took the statement from

9              the Defendant, he indicated in that

10             statement that he had thrown a gun out of

11             the car on his way back to Youngstown?

12   A.   Yes.

13             MR. CONSOLDANE:  I'm going to

14   object.  This is redirect.  That was not covered on

15   cross.  He has no right to go back into that on

16   redirect.

17             MR. WATKINS:  I'm asking him.

18             THE COURT:  The State has not closed

19   yet.

20             MR. CONSOLDANE:  It doesn't matter.

21   He has testified.  We have cross examined him.

22   He's calling him on redirect.  He can't go into

3050

1   something on redirect that we did not get into on

2   cross examination.

3   (At Side Bar with Reporter present.)

4              THE COURT:  We're at Side Bar

5   outside of the hearing of the Jury.  Defendant's

6   presence waived?

7              MR. CONSOLDANE:  Yes.

8              THE COURT:  You are objecting to

9   what specifically?

10             MR. CONSOLDANE:  Paul Monroe has

11  been called already on direct examination by the

12  State.  He has testified.  He has been cross

13  examined by the Defense.  During the cross

14  examination, we did not bring anything up about the

15  gun, or anything about how he threw it or about the

16  Wal-Mart tape.  Now the State is trying to call,

17  has called Paul Monroe on redirect, and getting

18  into areas that we never touched on cross

19  examination, which is clearly improper.

20             MR. WATKINS:  First off, I asked

21  leave to recall him when he left the stand.  I

22  never curtailed what I would recall him for.

3051

1   Secondly, the law clearly allows the Court to allow

2   leave to ask these questions, so I'm saying on both

3   bases --

4            THE COURT:  There's a third basis,

5   too, that it appears to the Court the State if

6   required to, could bring in the FFL dealer to show

7   that the gun was purchased, so the same evidence is

8   going to come in.  It seems to be needless to delay

9   the trial and for the State --

10           MR. CONSOLDANE:  He's not getting

11  into who purchased the gun.  He's getting into the

12  fact about him throwing the gun out the window.

13  The search for the gun.

14           MR. WATKINS:  That is correct.

15           MR. CONSOLDANE:  Not about who

16  bought the gun.

17           MR. WATKINS:  I never released this

18  witness as a matter of record.

19           THE COURT:  I'm going to overrule

20  the Defense's objection and allow the testimony to

21  come in.  I don't think that this is -- I think

22  that the State has a right to supplement and they

3052

1    did reserve the right to call.  Monroe is their

2    primary witness.

3                    MR. CONSOLDANE:  He's been sitting

4    there listening to everything.

5                    THE COURT:  I think if this

6    testimony was in contradiction of something else,

7    but it isn't.  The record is complete.

8                    MR. LEWIS:  One additional thing

9    we're going to object to the prior point on a

10   selective basis.  What they have done is they have

11   the CD rom which has all of the conversations they

12   are talking about.  They have reproduced audio

13   cassettes, which reproduced all of the

14   conversations and they also have transcripts of all

15   of the conversations, the 19 conversations that

16   were produced.  There's three different forms.

17   They are all available to the Jury.  What they have

18   selectively done is created the power point.  The

19   screen is about ten feet by 14 feet in proportions.

20                   THE COURT:  I think your figure is

21   excessive, but go on.  It is a big screen.

22                   MR. LEWIS:  It takes up the whole

3053

1    side of the room here.  In any event, that is

2    selected.  Now if we ask for portions to be shown

3    on the screen, it can't be done.  They just did it

4    for them.  We can't even get into it.  In fact, I

5    have to have somebody read -- I was going to ask

6    that the Prosecutor, after he finishes Mr. Monroe,

7    that one of the Prosecutors can take the stand and

8    read some of the transcripts I want read, if

9    nothing else.  I'm objecting to the power point in

10   that form and fashion, because we're deprived from

11   using that and we don't have a power point to use.

12   We don't have it financially.  We don't have access

13   to it.  We don't have access to it.  They can

14   produce their own case and their selected portions

15   the way they want to present it.  We're financially

16   unable to do that.

17            MR. WATKINS:  I think that they have

18   every right to present their case.  They have had

19   the tapes.  They have had the transcripts.  They

20   could ask questions.  Obviously the Prosecutor is

21   not going to get on and read, if he wants

22   Mr. Consoldane to read whatever he wants.  He has a

3054

1   right in his own way to present his own case.

2   We're allowed to present our case.

3            THE COURT:  I think this raises an

4   interesting argument, but it is beyond my kin to be

5   able to understand what the correct answer is.  The

6   Defense is asserting that they do not have the

7   wherewithal to come to combat in that similar form,

8   that is the Defense, through the Public Defender's

9   office, do not have the money to present their own

10  power point.  They do have access to the same

11  material.  It is just the difference of format.

12  The suspicion of the Defense is that the power

13  point is something of the nature that people from

14  watching T.V., have the visual, will be more even

15  influenced by the State's presentation.  That is

16  something for greater minds than mine to figure

17  out, whether that is a violation of due process and

18  fairness of the trial.  Personally, I would like to

19  see it otherwise, but I know of no practical or

20  possible way that that could be accomplished.  I

21  think the Defense has two very abled lawyers.  They

22  have the material that they can deal with, and I'm

3055

1   sure they will deal with it in the proper fashion.

2   Your objection is noted.  I guess your motion goes

3   to the affect this should not be permitted.  That

4   is overruled.

5   (End of Side Bar discussion.)

6   Q.    (By Mr. Watkins)  Detective Monroe, would you

7           continue and tell the Jury whether or not

8           you conducted a search for a weapon as to

9           the area that was given by the Defendant

10          on the way back to Youngstown?

11  A.    Mr. Jackson indicated to me that on the early

12          morning hours of December 21 when we

13          interviewed him, that shortly after the

14          crime he got on the freeway and headed

15          back towards Youngstown.  That he

16          discarded the firearm that was used in

17          this crime along the right hand side of

18          the road by throwing the gun out through

19          the passenger window.  On that same day,

20          later that morning, or late afternoon, we

21          were able to amass 22 policemen and we

22          walked the berm area, and then there's a

3056

1          fence that runs along State Route 82,

2          which separates the private property area

3          with property owned by the State.  The

4          men all walked shoulder to shoulder

5          through that entire length of highway out

6          to Route 11.  We did not find anything.

7          The following day, myself and Patrolman

8          Jeff Urso from the Howland Police

9          Department, went back to the same area,

10         we researched that area and continued to

11         search along Interstate or Route 11, out

12         to Tibbetts-Wick Road.  We also checked

13         the center of the road between the lanes

14         and we didn't find anything during that

15         search.

16    Q.   Now, when you testified previously, you

17         described a Wal-Mart receipt that you had

18         identified as belonging to Donna Roberts

19         on the kitchen table?

20    A.   Yes.

21    Q.   And you collected that and what number is on

22         that Exhibit?

3057

1    A.    Exhibit No. 396.

2    Q.    And you collected that Exhibit?

3    A.    Yes, I did.

4    Q.    And what time was that Exhibit, the receipt

5          for Wal-Mart?

6    A.    It is dated December 11, 2001, the time of the

7          purchase is 2137 or 9:37 p.m.

8    Q.    How much time would it take, if you know, to

9          drive from the Roberts' residence to the

10         Wal-Mart store on that receipt?

11   A.    Anywhere from five to ten minutes, you can

12         drive from 254 Fonderlac to Wal-Mart on

13         Elm Road.

14   Q.    Would you tell the Jury where the Wal-Mart

15         store is located?

16   A.    What they refer to as 82 bypass, which runs

17         between East Market Street and Elm Road,

18         and get off on the Elm Road exit.  It is

19         literally right there at that

20         intersection at Elm Road and the bypass.

21   Q.    If one were proceeding east, or west on East

22         Market or Old 82, you would go past Giant

3058

1      Eagle before you got to that exit to go

2          onto the bypass?

3  A.    Yes.

4  Q.    How far past Giant Eagle is that exit to go

5              towards the Wal-Mart store approximately?

6  A.    Half mile.

7  Q.    Now, Paul, did you give telephone numbers to

8          the Highway Patrol, in particular Gerry

9              Funelli, that were relevant to your

10             investigation when they went to the

11             Lorain Correctional Institute, to check

12             in to digital phone recordings?

13  A.    Yes, I did.

14  Q.    And did you give the number ████████████

15  A.    Yes, I did.

16  Q.    And would you tell the Jury whose number that

17             is, if you know?

18             MR. LEWIS:  Objection.  It is not a

19  telephone company.

20             MR. WATKINS:  I think he can testify

21  to the numbers he knows.

22             THE COURT:  I believe there's

3059

1    evidence in the case that establishes that is the

2    phone number. I'll overrule your objection.

3    Q.    Whose telephone number?

4    A.    During the course of the investigation, I was

5          able to determine the phone number area

6          code ██████████ comes back to Donna

7          Roberts.

8    Q.    Did you have any occasion to call in a number

9          and talk to Donna Roberts at that number?

10   A.    Yes, I have.

11   Q.    And would you tell the Jury the date of birth

12         of the Defendant?

13   A.    ██████████.

14   Q.    Now, subsequent to receiving, you in fact

15         received recordings or a CD from Lorain

16         Correctional Institute?

17   A.    Yes, I did.  From Trooper Gerry Funelli.

18   Q.    And did you go and listen to all of those

19         recordings?

20   A.    Yes, I did.

21   Q.    And did you have an occasion to recently

22         listen to excerpts from the recordings?

3060

1   A.   Yes, I have.

2   Q.   I'm going to hand you what has been marked as

3        State's Exhibit 397.  Are you able to

4        identify that cassette tape?

5   A.   State's Exhibit 397 is a voice recording of

6        Nathaniel Jackson and Donna Marie

7        Roberts.  It is a condensed version of

8        some of the telephone calls that were

9        recorded.

10  Q.   And how many different recordings are found on

11       that condensed version?

12  A.   There's six recordings on this tape.

13  Q.   Approximately how long is that tape?

14  A.   Approximately 36 minutes.

15  Q.   And is that tape an accurate reproduction of

16       the tapes that you listened to, or the CD

17       that you listened to that was received in

18       this case.

19            MR. CONSOLDANE:  I object.  It is

20  not an accurate reproduction.  He can rephrase the

21  question.

22            THE COURT:  Are you asking him if

3061

1    this tape is an accurate representation?

2                    MR. WATKINS:  It is an accurate

3    reproduction of the excerpt of all of the tapes.

4                    MR. CONSOLDANE:  Okay.

5                    THE COURT:  You have listened to

6    them all and reviewed the excerpts?

7                    THE WITNESS:  Yes, I have.

8                    THE COURT:  Overruled.

9    A.    Yes.

10   Q.    And did you have an occasion to read over the

11         transcript of the recordings, which is

12         number 397?

13   A.    Yes, I have.

14   Q.    And is that transcript a reproduction that is

15         accurate, of the tape?

16   A.    Yes, it is.

17   Q.    And in your investigation did you spend

18         sufficient time with Donna Roberts and

19         Nathaniel Jackson, to recognize their

20         voices in your opinion?

21   A.    Yes, I have.

22   Q.    And from listening to the tapes, including

3062

1    397, do you recognize the voice of

2    Nathaniel Jackson on the tape?

3  A.   Yes, I do.  The voice on this tape is

4       Nathaniel Jackson's.

5  Q.   Do you recognize a female voice that is on the

6       tape?

7  A.   Yes, I do.

8  Q.   And whose voice is it?

9  A.   The female voice that is on this tape is Donna

10      Marie Roberts.

11 Q.   And how many hours did you spend talking to

12      Donna Marie Roberts?

13 A.   I would say Donna Roberts, I spent more than

14      six hours with her.

15 Q.   And to your knowledge, is there any other

16      voice on the tape recording that you have

17      identified on 397?

18 A.   There's a digital voice that comes on during

19      portions of this tape that indicates that

20      the tape is being monitored and recorded.

21      As far as someone's voice, my

22      understanding is that it is a digital

3063

1          voice made by MCI notifying the persons

2          involved in the conversation, that the

3          conversation that they are about to have

4          or they are having, may be monitored and

5          it is being recorded.

6  Q.   But other than that, the two voices are the

7          Defendant, Nathaniel Jackson and Donna

8          Marie Roberts?

9  A.   Yes, Sir.

10          MR. WATKINS:  We would like to play

11  the tape at this point, with a transcript that is

12  on the tape.

13          MR. CONSOLDANE:  Note our objection.

14          THE COURT:  Your objection is on the

15  record.

16  (State's Exhibit 397, an audio cassette, played

17  for the Jury at this time.)

18          MR. WATKINS:  We have no further

19  questions.

20  RECROSS EXAMINATION BY MR. LEWIS:

21  Q.   Paul, if I were to ask you to come over here

22          and play some of the other conversations

3064

```
 1          or whatever, would you be able to do that

 2          for me on this power point?

 3    A.    From that tape?

 4    Q.    Yes.

 5    A.    Just excerpts from the six recordings that are

 6              on that tape?

 7    Q.    It is what these two gentlemen picked out, out

 8              of the tapes?

 9    A.    We picked those out together.

10    Q.    Did you help them?

11    A.    Yes, Sir.

12    Q.    I don't think you picked out anything that was

13              too good for Nathaniel, right?

14    A.    There were some things that probably weren't

15              appropriate for the Courtroom.

16    Q.    Well, we have got a grown up Jury here and

17              they are going to see it all anyhow, all

18              of the letters there are and they are

19              going to hear all of the tapes.  And I

20              suppose we got a case involving the

21              death, so I guess that is the way it is

22              going to be.  We're all grownups.
```

3065

1   A.   Yes.

2   Q.   Mr. Watkins got you back up here and asking

3          you about a gun.  There were some other

4          things you had a chance -- you

5          inventoried the car that belonged to

6          Donna Roberts, but Robert Fingerhut was

7          driving, correct?

8   A.   Which car?

9   Q.   That would be the silver one?

10  A.   Yes.

11  Q.   They are both Donna's cars, it is just

12         Mr. Fingerhut was operating it, right, as

13         far as you know?

14  A.   They are both leased and they are both in her

15         name.

16  Q.   That is right.  And the point being, is you

17         had a chance to inventory what was in the

18         Chrysler, is that correct?

19  A.   Yes, Sir.

20  Q.   You also had an opportunity at the morgue to

21         collect items that were on the body of

22         Mr. Fingerhut, correct?

3066

1    A.    I wasn't at the morgue, Sir.

2    Q.    Come a time where you came into possession of

3          items that were on him, say for instance,

4          he carried two wallets?

5    A.    Yes, he did.

6    Q.    Which was good enough to give a backache, but

7          he carried two wallets, and did you have

8          a chance to go through the contents of

9          those wallets?

10   A.    Yes, I did.

11   Q.    Did you also have an occasion to indicate or

12         to have Mr. Watkins, or Mr. Morrow to

13         your knowledge, did they go through the

14         wallets?  Do you know offhand?

15   A.    I don't know if they went through them.

16   Q.    And in those wallets, did you find so-called

17         identification cards?

18   A.    Yes.

19   Q.    For Mr. Fingerhut.  Did you find a card in

20         there that indicated the fact that

21         Mr. Fingerhut was supposedly a special

22         agent for the Department of Justice?

3067

1   A.   I think it was United States Marshal Service.

2   Q.   It was issued by the United States Marshal

3        Service?

4   A.   Yes.

5   Q.   And did you have an occasion to indicate that

6        to Mr. Watkins or did you have an

7        occasion to check that out, it seems

8        rather important in some way?

9   A.   I don't understand the importance.

10              MR. WATKINS:  I'm going to object on

11  relevancy.  I object on relevancy.

12              MR. LEWIS:  He put Mr. Monroe back

13  up here.

14              THE COURT:  I'm going to overrule

15  the objection to his last question.  Did you follow

16  that at all?

17  A.   No, I did not.

18  Q.   So, did you have any curiosity about it?

19  A.   Not really.

20  Q.   He also had a badge in there from supposedly

21        the State's Attorney's office in Florida.

22        Did you ever check that out?

3068

```
1    A.    No, Sir.
2    Q.    You don't really know, was it bogus or you
3          don't know anything about them?
4    A.    I was investigating Mr. Jackson, not
5          Mr. Fingerhut.
6    Q.    You're right.  And I assume that the
7          Prosecutor's office, they had no -- or
8          they didn't care to look into it either?
9    A.    I was in charge of the investigation.
10   Q.    The Wal-Mart receipt that you looked at, that
11         was State's Exhibit 396?  It doesn't give
12         a name or anything else on this.  Was a
13         credit card used?
14   A.    Cash.
15   Q.    It doesn't give a name, so in essence, you
16         really don't know who was at the Wal-Mart
17         store or do you?
18   A.    I was told by Donna Roberts that this was --
19         when she was asked about the bags on the
20         table.  That is where it came from.
21   Q.    But that is just what she said?
22   A.    That is what she said.
```

3069

1   Q.   You have had a chance to go through -- let's

2         talk a little bit about the letters and

3         conversations on the tapes.  I'm just

4         going to ask you, you did read them,

5         correct?

6   A.   Yes, Sir.

7   Q.   And of course, you listened to the tapes,

8         right?

9   A.   Yes, I did.

10   Q.   And do you recall some of the conversations or

11         something to the effect the dialogue,

12         either in the conversations in the tapes

13         or in the written context of the letters

14         where supposedly, this plot or this plan

15         was supposed to happen way back in the

16         early part of the year?

17   A.   Yes.

18   Q.   And you recall that in the letters where Donna

19         indicated to Nathaniel or Nathaniel said

20         basically is that, "Well, I should have

21         done it then and you stopped me," and

22         Donna said, "You didn't stop me.  I just

3070

1      didn't want to do it at all."  Do you

2      remember that context at all?

3  A.   I do, but I don't remember exactly.

4  Q.   Do you remember something general to that

5         effect?

6              MR. WATKINS:  I'm going to object

7  for the same reason that they objected that we

8  couldn't read the letters.  The letters speak for

9  themselves.  They are available for them to put the

10 contents.

11             THE COURT:  Just a minute.  I agree

12 with that objection, unless you have some point to

13 bring out, where you are going, other than just to

14 get into the content of the letters.

15             MR. LEWIS:  We're not going to be

16 able to talk about the letters.

17             THE COURT:  I think you may be able

18 to generally talk about the letters.  It was ruled

19 on previously that the Prosecution would not be

20 allowed to read from the letters.  You are in

21 effect, asking him questions about the contents of

22 the letters, which would be good for the goose, but

3071

1    if you have another point to make, then it is

2    necessary to use examples from the letters.  I

3    won't stop you from doing that.

4    Q.    Let me ask you this, Mr. Monroe, is that do

5          you remember generally in either, well,

6          it happened on here, I guess we just

7          heard it a few minutes ago, is there some

8          question in mind of Nathaniel Jackson

9          about the fact is that whether they are

10         going to do it or aren't going to do it,

11         do you remember that?

12   A.    Yes, I do.

13   Q.    Sounds like a solid plan, yet Nathaniel is

14         telling about whether you really want me

15         to do it or not do it, right?

16   A.    Are you asking me my opinion?

17   Q.    I'm just asking you, isn't that the general

18         drift of what actually we saw in the

19         general portion of this?

20   A.    My drift of what I heard from Mr. Jackson's

21         point is he had his mind made up what he

22         was going to do.

3072

```
 1   Q.   So he had his mind made up and it was going to
 2        happen as soon as he got home that
 3        Sunday.  Monday night, he's going to go
 4        do something?
 5   A.   That is what Mr. Jackson said.
 6   Q.   And we know for a fact since you have been
 7        sitting here, on Monday night, they ended
 8        up at the Red Lobster in front of 100 or
 9        200 people having dinner?
10   A.   No, Sir.
11   Q.   They didn't?
12   A.   They ended up at Red Lobster on Tuesday night.
13   Q.   Then something didn't happen on Monday night?
14   A.   No, Sir.
15   Q.   And then on Tuesday night, I think I remember,
16        didn't Nathaniel say they would never
17        know because they wouldn't know I was
18        released from prison?  Do you remember
19        him saying that?
20   A.   That is what Nathaniel said.
21   Q.   If they didn't know he was released from
22        prison, so he went to the Red Lobster on
```

3073

1          Tuesday night, I guess, and sat in front
2          or talked in front of 100 people or
3          whatever, had the waitress who was a nice
4          lady.  She was in there.  She said, "I
5          remember those people.  They were out
6          there in plain sight of everybody."
7          Nathaniel himself, right down the street,
8          right there at the Red Lobster, right?
9    A.   Yes.
10   Q.   Matter of fact, it was on Monday that he was
11        at the Warren terminal and Mr. McCoy came
12        in and said, that is Nathaniel?
13   A.   No, Sir, that was Tuesday.
14   Q.   Nothing happened on Monday, that was the day
15        it was supposed to happen?
16   A.   Yes, Sir.
17        MR. WATKINS:  I'm going to object to
18   this line of questioning.
19        THE COURT:  I don't know where you
20   are going with this, but again, I'm going to
21   overrule your objection at this point.
22   Q.   So it was Tuesday that he was at the Warren

3074

1           terminal and Mr. McCoy who was introduced

2           to Mr. McCoy as Nathaniel?

3    A.    Yes.

4    Q.    He didn't hide that day, right?

5    A.    Is that a question?

6    Q.    He didn't hide.  He wasn't hiding from

7           Mr. McCoy, was he?

8    A.    No, Sir.

9    Q.    During the conversations, the telephone

10          conversations, there was some

11          conversations to the extent, this is

12          strictly on the telephone, not the

13          letters, but the telephone conversations,

14          they were going to break up at one time

15          in some of those telephone conversations?

16   A.    There was talk of that.

17   Q.    And Donna said that he was fooling around with

18          other women, right?

19   A.    Donna had found a phone number for a female

20          and surmised that that is what was going

21          on.

22   Q.    And Donna talked a lot about sex, we had a

3075

1          little bit of an inkling here, but there

2          was some more spicy sexual conversations,

3          weren't there?

4     A.   Both of them did.

5     Q.   Nathaniel was at Lorain Correctional facility

6          and I don't think it is a coed deal where

7          he was.  He was in a four by ten cell for

8          about 24 hours a day.  They talked about

9          sex, they almost broke up.  Did Donna

10         talk about any white or black men, that

11         were nice to her at the office, the

12         terminal?

13    A.   Yes.

14    Q.   Told Nathaniel that, too.  Did she also talk

15         about Robert close in time to probably

16         about somewhere in the area of maybe the

17         latter part of November, early part of

18         December, where he found the letters and

19         he talked with another man and he beat

20         her up and she had to wear sunglasses in

21         the middle of Summer with black eyes

22         because he found out about Nathaniel and

3076

1          Donna?

2              MR. WATKINS:  I'll object.

3              MR. LEWIS:  It is on there.

4              MR. WATKINS:  It is not on the tape.

5              THE COURT:  I don't wish to restrict

6   anything that is relevant or material, but that in

7   and of itself would not be relevant to what

8   happened here unless there's some basis you are

9   trying to build to make it relevant.

10  Q.   I am looking for this.  Do you recall that in

11       the telephone conversations?

12  A.   What is the question, Sir?

13  Q.   The question was that Robert had found out

14       about Nathaniel and Donna?

15  A.   In the telephone conversations?

16  Q.   Yes.

17  A.   I don't recall that in the telephone

18       conversations.

19  Q.   Are you sure?

20  A.   No, Sir.

21  Q.   Do you recall any other instances from the

22       telephone conversations where Robert was

3077

1              rather nasty to Donna?

2    A.    I don't have any conversations between Donna

3              and Robert.

4    Q.    I mean where Robert wasn't very kind to Donna

5              and Donna was conveying that to

6              Nathaniel?

7    A.    No, I do not.

8    Q.    You don't recall any of that?  Do you recall

9              in the telephone conversations about the

10             man that stole the gun and Nathaniel told

11             Donna to report it to the police?

12   A.    I don't know if he told her that on the phone

13             conversation or one of the letters.

14   Q.    I know it is impossible for you Paul, to

15             remember all of this, but what they

16             extracted here is just excerpts or

17             whatever.  This -- it is a transcript.

18             This is on 11-24-01.  That is November

19             24, '01.  Would you read where the yellow

20             is highlighted?

21   A.    The caption in the transcript I have been

22             handed on the left side says, Nathaniel:

3078

1        "Call and report that gun, man.  Man,

2        call and report this cat, man.  You don't

3        even know his whole name, do you?"

4        Donna:  "Yes, and you know what, I know

5        what kind of place he works at and I just

6        looked at every one of those kinds in the

7        phone book and I'm going there Monday."

8        Nathaniel: "No, don't go."  Donna:

9        "Because I want my fucking gun back."

10       Nathaniel:  "Don't go there".  Donna:

11       "Because I was gonna give you that gun

12       for your car and it was the nicest one

13       and you took it out and looked at it alot

14       and you loved it.  And that's why I'm so

15       fucking mad.  You think I give a shit

16       about money and guns?"  Nathaniel:  "Call

17       the police, report it, okay?  Hello?  You

18       hear me?"  Donna:  "Yes."  Nathaniel:

19       "Call the police and report it man,

20       because if he do something with that gun,

21       man, you are going to get in trouble,

22       man.  Call them when you get off the

3079

1            phone with me, man.  Tell them somebody

2            come in and stole it.  Tell them you know

3            who it is, man."  Donna: "Oh no."

4            Nathaniel:  "Tell them he took your

5            money, huh."

6    Q.    So, Nathaniel is indicating to Donna to go

7            ahead and call the police, or report to

8            the police somebody stole her weapon,

9            right?

10   A.    Right.

11   Q.    There's an October 5 conversation.  This is

12           Nathaniel talking to Donna.  Start right

13           there.

14   A.    This is transcript A50D1OUL October 5, 2001,

15           page two.  Halfway down the page.

16           "Nathaniel:  I just wrote you, you know

17           what I'm saying.  I wrote a six page

18           letter last night, and I hope you

19           understand this one, man.  You know what

20           I'm saying."  Donna, "Nate."  "I mean, I

21           really realize Donna, you know what I'm

22           saying, I mean, I have what I did, I have

3080

1    what I did.  You know what I'm saying.  I

2    mean, Donna, you know what I mean.  When

3    I got down here, man, you know what I

4    mean.  I like know, I found God, and you

5    know.  Got him into my life.  You know

6    what I mean.  And it is like, you know,

7    it just made me change  everything,

8    Donna.  You know what I'm saying.  I mean

9    like, I said I'm sorry I hurt you, Donna.

10   You know, I mean, I really, I really need

11   you in my life, Donna.  You know what I

12   mean.  I'm hurt right now, and you know

13   what I mean.  I am lost.  You know, I

14   mean.  And like I say, you know, I mean,

15   you know I got closer, you know, closer

16   relationship with God.  You know, I mean,

17   and I just, you know, I hope you know,

18   you realize it, you know, and um, it's

19   like, you know, it gave me time, you

20   know.  This really gave me time to think,

21   you know.  I mean, Donna, before you

22   know, I mean, it was just like always

3081

1            out.  I was always wanting to run, you

2            know.  What I'm saying, but now, I ran at

3            the end of the road, where I can't run no

4            more, you know what I'm saying, I mean I

5            am tired of hurting myself, you know and

6            other people.  You know what I mean.  I

7            am willing to change everything I got,

8            you know what I mean.  As far as you

9            know, the people I hang out with, you

10           know, what I'm saying, all of the places,

11           you know, and the things you know, I mean

12           in order, you know to establish, you know

13           what I believe in, Donna.  You know I am

14           willing to do all of that, get out and

15           get a job."

16 Q.  That was the good part.  You are getting

17           there.  Go ahead.

18 A.  "You know what I'm saying.  Get my own place

19           and everything.  I want, you know, I

20           mean, I want to do everything you know

21           that I can, you know, to prove to you

22           Donna, you know what I'm saying.  I mean

3082

```
 1              I'm really sorry, Donna.  You know what I
 2         mean.  And it would never, you know, what
 3         I'm saying, I would never do this again,
 4         man, you know, I mean I just, I wrote so
 5         much last night, man, you know, I mean I
 6         really realize that Donna, you know what
 7         I'm saying.  You are a damn good woman, a
 8         damned good woman.  You know.  You,
 9         Donna, a damned good woman.  It hurts me
10         so bad, you know, every time I think
11         about it."
12  Q.   I think you covered most of it.  Read this
13         one.
14  A.   This is a conversation on November 3, 2001,
15         page four, starting on line four.
16         Nathaniel:  "What?"  Donna:  "Well, I had
17         to come in and do the report, so I waited
18         until like 2:00 for you to call.  Then I
19         came in here, I went over to the -- I was
20         writing you a letter and I went over to
21         the bakery to get a cup of coffee."
22         Nathaniel:  "And he found the letter."
```

3083

1   Donna:  "And he came to check up on me

2   and he found or read the letter on the

3   desk."  Nathaniel.  "Oh, my Goodness."

4   Donna:  "Yep."  Nathaniel: "Oh."  Donna:

5   "Now he knows for sure, but he doesn't

6   know your name, because I put hi,

7   sweetheart or hi, honey or something."

8   Nathaniel:  "Oh, man."  Donna:  "Oh man."

9 Q.  He, referring to Mr. Fingerhut?

10 A.  I don't know.

11 Q.  You have no idea?  No speculation?

12    MR. WATKINS:  I'll object.  He's not

13 here to speculate.

14    THE COURT:  Sustained.

15 Q.  I see.  You don't recall any conversation

16   where Donna actually said that

17   Mr. Fingerhut, Robert, knew about her and

18   Nathaniel?  You don't remember that

19   anywhere in the telephonic conversations,

20   you don't remember it at all?

21 A.  I don't remember that in the phone

22   conversations.

3084

1   Q.   You don't remember that?  Okay.

2             MR. LEWIS:  Thank you very much.

3             MR. WATKINS:  No redirect.  We thank

4   the witness.

5   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

6   OF HEARING)

7             THE COURT:  Folks, if you will be

8   back here in the morning at 9:00.  We'll see how

9   long we have.  We have at least four witnesses, it

10  may go into the afternoon.  I don't know.  None of

11  us know.  We have some matters the rest of tomorrow

12  afternoon in any event, we have to handle in

13  regards to the case.  Tomorrow after 4:30, each of

14  you will call that number to see whether you are to

15  report Monday or not.  There's a possibility you

16  may have to come in Monday, there's a possibility

17  that you won't have to come in until Tuesday, but

18  you will definitely be here on Tuesday.  Through

19  the course of the morning, early afternoon, I

20  expect that this case will probably be given to you

21  for deliberation.  So, you need not worry about

22  bringing anything with you Monday, if you are

3085

1   notified to be here.  You will not be sequestered

2   on Monday.  Tuesday, there's a good possibility of

3   that.  You make whatever arrangements.

4              Now, we have gotten through this trial to

5   this point.  You folks have done everything that

6   has been requested of you.  I would again remind

7   you that you're not to discuss anything, form any

8   opinions.  You haven't heard all of the evidence

9   yet.  There's been some interest with the news

10  media, you are not to watch anything on T.V.,

11  newspapers and whatever.  And, keep up the good

12  work.

13             JUROR:  If we're sequestered

14  Tuesday, will we need to provide arrangements?

15             THE COURT:  You will stay right

16  across the street here.  I'll see you back here

17  tomorrow at 9:00 in the morning.

18  (Court in Recess at 4:35 p.m.)

19

20

21  Friday, November 1, 2002:

22  (In-chambers at 9:20 A.M.)

3086

1              MR. CONSOLDANE:  We're here

2    in-chambers, out of the hearing of the Jury, and I

3    am waiving the presence of our client.  Yesterday

4    Mr. Lewis attempted to get some information from

5    Paul Monroe on to the record and the State objected

6    saying that they do not allow to attack the

7    credibility of a witness or the character of a

8    witness.  And I have never heard of anything of

9    that before.  I went home last night and tried to

10   research it.  I thought maybe this victims' rights

11   had been able to pass a new law or something, but

12   that is not true.  Nothing in there that says you

13   can't attack the character of the victim, and for

14   him to stop him from doing that was wrong.  It is

15   another reason to add to the list of the mistrial,

16   the reasons we should have a mistrial in this case.

17   And on top of that is that Mr. Watkins opened the

18   door.  He asked one of his own witnesses on direct

19   testimony, what kind of a guy was Robert Fingerhut,

20   and the guy went on to say, "Well, he was always

21   having jokes and he always had something to say."

22   Once he does that and he opens the doors, there's

3087

1   no reason why we can't talk about his character.

2   And we have indications that there are even some

3   credit card problems that happened, some credit

4   card fraud in his past, and the State has that

5   information, and I think that they should give that

6   to us, give it to Paul Monroe or Jim Teeple, and

7   let us get it in that way.

8          MR. LEWIS:  I would like to add,

9   Tony is correct, because the rules in evidence

10  actually indicate the fact is that if we have a

11  self-defense, which we're asserting here, that

12  we're allowed to go into the character of the

13  victim here.  The victim, as Mr. Watkins tried to

14  portray in the first part of the case, as a real

15  nice guy, everything above board, whatever, is not

16  true.  We have evidence of the fact that he

17  produced and had in his wallet, carrying with him,

18  a badge as a State's Attorney Special Investigator

19  from Florida which is a bogus thing.  He was never

20  ever a special investigator for the State office in

21  Florida.  He also carries a card and had in his

22  wallet he was carrying, was supposedly, he was a

3088

1   special agent for the Department of Justice and was

2   supposed to be issued by the U.S. Marshal's office

3   out of Cleveland.  Well, I contacted Cleveland and

4   David Harlow is the chief Marshal up there, and

5   before I indicated to him that Mr. Fingerhut was

6   deceased, he was going to have officers come down

7   here and talk to Mr. Fingerhut in regard to that

8   fraudulent card he was carrying, trying to

9   impersonate a special agent of the Department of

10  Justice.  And the point being is that Mr. Fingerhut

11  obviously is a violater of the law, and at the same

12  time the Prosecutor opened the door in regard to

13  that, so I think, and it is all relevant in regard

14  to this whole situation as to what means or what

15  steps he would take in order to try to secure his

16  own position in regard to this whole situation

17  involving all of the property in the name of Donna

18  Roberts.

19          This becomes very important because he's

20  the one who has the absolute motive in order to get

21  rid of Mr. Nathaniel Jackson.  Nathaniel Jackson is

22  a potential problem, and Donna Roberts could easily

3089

1  have married him or brought him in the house and

2  there's nothing in the name of Robert Fingerhut,

3  and that gives Mr. Fingerhut every motive in the

4  world to get rid of Mr. Nathaniel Jackson.  Because

5  he becomes the problem and if Donna Roberts says,

6  "Leave the house, it is not your car," everything

7  was in her name.  So, he had every reason in the

8  world to try and kill or to get rid of Nathaniel

9  Jackson.  There's no doubt about it because

10  everything that he enjoyed or whatever you want to

11  call it, belonged to Donna Roberts and he would be

12  out the door.  All of this is relevant.  It should

13  be brought in.  The Jury should know about it, and

14  there isn't anything about you can't attack the

15  character of a victim.  That is absolutely

16  incorrect.  Especially when you have a self-defense

17  according to the rules of evidence.

18          Now they can come back and say he was a

19  peaceful guy, but they have opened the door

20  already.  That is exactly what they have done.

21  They have started off with the idea that he's

22  peaceful, nice guy, and that is not the case.

3090

1          MR. WATKINS:  Your Honor, to start

2    with, the ruling that the Court made concerning the

3    collateral matters such as a badge or what he may

4    have done in Florida relative to a private

5    investigator, those matters clearly are not

6    relevant to this case, and there's nothing in the

7    record that in fact, the record would reflect that

8    the Defendant's version exactly, what happened, it

9    is already in the record.  What he was or what

10   identification he had, regarding Florida or what

11   credit cards he had, has nothing to do with this

12   case.  His character as to the past is irrelevant.

13   There's no information from the Defendant or

14   anyone, that that information has any bearing on

15   this case.  It is simply an effort to put on trial

16   the victim and there's plenty of law, that when you

17   go into character evidence, you have to have a

18   foundation.  And this is pure hearsay, what they

19   are talking about.  Secondly, the general rule on

20   self-defense and the rules of evidence would

21   clearly indicate that if the Defendant knew acts of

22   violence, obviously that could come in to be

3091

1  relevant in self-defense.  Even acts of violence

2  that were on record, we have no evidence, there's

3  nothing in our file.  They have had access to our

4  file regarding violence on the part of this victim.

5  That is irrelevant to this case because they don't

6  have anything regarding acts of violence by the

7  victim.  Therefore, the victim's character cannot

8  be an issue, because there's no evidence that deals

9  with the character of the victim as to propensity

10  for violence.  There's zero.  They have had

11  complete access and the reason they have

12  information about credit cards because they have

13  seen our whole file, and I think the rulings

14  yesterday were completely appropriate, and that

15  this case has to end at an appropriate time and

16  that this case should be dealing with what the

17  evidence is in the case, not Mr. Lewis'

18  speculation, not Mr. Consoldane's speculation of

19  what if, if this is possible.  We know that

20  Nathaniel Jackson, his only evidence is what the

21  admission is he made in his tape.  This stuff has

22  nothing to do with what Nathaniel Jackson said

3092

1   happened.

2        Now, I'm going to make a further motion

3   on my own.  I believe that the witnesses this

4   morning were listed by Mr. Lewis and

5   Mr. Consoldane, which deal with the lease dealing

6   with the vehicle or vehicles of the co-defendant in

7   this case, Donna Roberts, the business, the house

8   title, are totally irrelevant under Ohio law.

9   There's nothing in Ohio law that requires as a

10  matter of proof in evidence that a victim be the

11  owner of a vehicle.  In fact, the victim under Ohio

12  law, could be an owner that has possession, even if

13  it is unlawful.  So this evidence that we're

14  getting this morning is totally irrelevant, and

15  Your Honor, I would only request instead of making

16  a motion after each witness to strike, that we have

17  an opportunity that the Court would wait until

18  Monday, and let both sides brief this issue.  It is

19  important to the case because it is obvious that if

20  it isn't relevant, it can be confusing and the

21  purpose of Jury instructions and the purpose of

22  rulings is to make sure that the trial stays on

3093

1   track.

2            MR. CONSOLDANE:  Your track.

3            MR. WATKINS:  I said I am only

4   suggesting, Your Honor, that we brief this, as to

5   this issue, and then before the Jury, then the

6   Court could decide.

7            MR. CONSOLDANE:  First of all, he

8   opened the door.  He opened the door when he talked

9   about his character.  He can't close it now.

10           MR. WATKINS:  I was going to let

11  Chuck say a few words.

12           THE COURT:  Go ahead.

13           MR. MORROW:  Judge, evidence rule

14  404 talks about character evidence being

15  inadmissible to prove conduct, and indeed it says,

16  "Evidence of a persons's character or trait of his

17  character is not admissible for the purpose of

18  proving that he acted in conformity therewith on a

19  particular occasion, subject, to the following

20  exceptions.  Character of the accused."  And that

21  is 404-A(1).  "Evidence of a pertinent trait of his

22  character offered by an accused, or by the

3094

1   Prosecution to rebut the same is admissible;

2   however, in prosecutions for rape, gross sexual

3   imposition and prostitution, the exceptions

4   provided by the statute enacted by the General

5   Assembly applicable.  (2) Character evidence of the

6   victim.  Evidence of a pertinent trait of the

7   character of the victim of the crime offered by an

8   accused, or by the prosecution to rebut the same,

9   or evidence of a character trait of peacefulness of

10  the victim offered by the Prosecution in a homicide

11  case to rebut evidence that the victim was the

12  first aggressor is admissible."  In this case,

13  there has not been any evidence presented by the

14  Defense to suggest that the deceased was the first

15  aggressor.  We have speculation and allegations by

16  the Defendant that that is the case.  Indeed, now

17  that is the Defendant's own self-serving statement

18  that was made, and I think to allow -- to allow

19  allegations in respect to his character for

20  purposes of this badge that he was carrying, for

21  purposes of impeaching his character beyond

22  aggressiveness is irrelevant, and that is what they

3095

1   want to get into.  They are attacking his character

2   as a person, not his character as to whether he was

3   the first aggressor or not, so allow them to get

4   into questions about whether or not he had this

5   badge.  Whether or not the Cleveland Federal Office

6   was going to investigate him has nothing to do with

7   his aggressiveness tendencies.

8              MR. WATKINS:  And Jim Lewis would

9   have to bring witnesses to go into what position he

10  had in Florida, what position he had here.  That is

11  why you have the collateral evidence rule.

12             MR. LEWIS:  It is bogus.

13             MR. WATKINS:  You have to prove it.

14             MR. MORROW:  We're not attacking

15  whether he's truthful or not and that what their

16  attempt is to do to show that this man --

17             THE COURT:  I have been through this

18  with the Court of Appeals before and here's where

19  we're at.

20             MR. LEWIS:  Let me finish.  Now,

21  what Mr. Morrow said is that basically, just

22  because the Defendant's statement says

3096

1  self-defense, he calls it speculation, all of that,

2  and he doesn't consider that evidence at all.  It

3  is evidence.  The Jury can consider that.  They may

4  well believe that that is the fact in this case.

5  And in regard to the fact that Mr. Watkins says

6  there's not one iota of evidence in here that

7  Mr. Fingerhut was aggressive or did any violence,

8  whatever, that's not true.  And the letters from

9  Donna Roberts to Nathaniel Jackson within four or

10  five days of the time that this occurred, there's

11  an indication of the fact that he beat her up so

12  bad, he gave her black eyes, and she called

13  Someplace Safe and she also ran around town with

14  sunglasses on because he beat her up.  They

15  introduced it.  It is their letters.  They

16  introduced it.  It is in the record now.  So

17  there's evidence of that.

18          Let me make this simple.  In regard to

19  the witnesses we have this morning regarding these

20  properties, I'll give the Judge -- I'll give a

21  hypothetical.  Let's turn this around.  Let's turn

22  this around where Donna Roberts ends up dead.

3097

1  Mr. Fingerhut is the suspect and it just so happens

2  that Donna Roberts had a boyfriend named Nathaniel

3  Jackson.  And the Prosecution goes through and

4  finds out that all of the property was in the name

5  of Donna Roberts.  So Donna Roberts, it was all her

6  property to begin with.  Then they happen to find a

7  Will that says Donna Roberts decides to give

8  everything to a man by the name of Robert

9  Fingerhut.  Now, the State would turn around and

10  say that is introducible, this is evidence of

11  motive for him to kill her.  And if it is

12  introducible this way, it is introducible the other

13  way to show that this man had a motive to kill

14  Nathaniel Jackson because he was a threat to

15  whatever this man used and operated, during his

16  lifetime.  Even though he didn't own it, he was a

17  threat to him, and that is evidence of motive.

18  We're allowed to bring that in, and I don't care if

19  he calls it speculation, because that is evidence.

20  What we're doing, what he's trying to do is stop us

21  from presenting any defense at all and that is

22  ridiculous.

3098

1          MR. CONSOLDANE:  One other thing is
2     that whatever argument they had about character,
3     went out the door when they put a witness on the
4     stand and asked him what kind of a guy
5     Mr. Fingerhut was.  They did that.  If they did
6     that, once the door is opened, we're allowed to
7     walk through.
8          MR. WATKINS:  The questions about
9     employees' relationship is relevant in the sense of
10    to show that they knew, how well they knew him.
11    They had every opportunity with every employee to
12    deal with the relationship dealing with the
13    employee and the victim in this case.  They had
14    ample opportunity.  This evidence most importantly,
15    is the question of whether or not and the fact of
16    self-defense, they want to go into crimes dealing
17    with dishonesty or theft and fraud, dealing with
18    the self-defense case.  That is not appropriate.
19    It is not what the law --
20          MR. CONSOLDANE:  You opened the
21    door.
22          MR. WATKINS:  I did not.  I'll let

3099

1  the Court rule.

2  THE COURT:  Self-defense is an

3  affirmative defense.  And self-defense primarily is

4  based on the mental state of the, in this case, the

5  Defendant, at the time that the incident leading to

6  the claim of self-defense arises.  The Jury is told

7  through the instruction, you have to look within

8  the mind of the Defendant at the time that this

9  murder occurred, to see if a reasonable man would

10  think that he was justified in defending his own

11  life.  Now, the character of the victim is totally

12  irrelevant unless and until something occurs,

13  whereby it is made relevant and that is for the

14  presentation of the affirmative defense of

15  self-defense.  At that time, the Defense has a

16  right to go back and to review and to, if need be,

17  call the State's previous witnesses to establish

18  any actions maybe to establish that the victim had

19  a reputation for being aggressive, had made

20  threats.  But to bring that all up at this point it

21  is immaterial.  It is irrelevant because it only

22  becomes relevant if the affirmative defense of

3100

1   self-defense is raised.  You wish the Prosecution

2   to take it on good faith that you are going to

3   assert -- you have no duty to do anything.  So, you

4   get into the situation where you can get all kinds

5   of evidence in here.  If it exists, I don't know if

6   it does or not, of the deceased being this total

7   bad guy and a bum.  You know, one could infer that

8   he's some kind of a nut, because he carries these

9   bogus identifications around.  Or you can just as

10  easily infer, hey this guy collects these kinds of

11  things.  People collect all kinds of things.  You

12  ascribe a sinister motive to the fact that he had

13  those things, which may or may not be true.  It

14  only becomes relevant if self-defense is put up,

15  because the character of the victim himself, has

16  nothing to do with a justification for murder,

17  other than the relationship to the Jury question of

18  whether Nathaniel Jackson acted in self-defense.

19  If he had, within his knowledge, certain

20  propensities, or something had been said or done,

21  including the fact that he had beat up the wife a

22  couple of weeks before, only to lay the groundwork,

3101

1    as to what the Defendant was thinking at the time

2    he asserted the right of self-defense.  That is the

3    only relevancy that the character or history of

4    this victim has to this case.

5                    MR. CONSOLDANE:  How about the fact

6    that they made it an issue when they asked him what

7    kind of guy was Robert Fingerhut?  Now, am I

8    supposed to just ignore that and let them put that

9    in?

10                   THE COURT:  You didn't object to it.

11   The question was irrelevant to where we're at in

12   the case.

13                   MR. CONSOLDANE:  I didn't object.

14                   MR. WATKINS:  Also showed he was a

15   jokester.  Had all kinds of stupid stuff.

16                   MR. CONSOLDANE:  Once they go there

17   then, I am permitted to go there, also.

18                   THE COURT:  Tony, my point is, I

19   have no problem with whenever I have a close call,

20   I make it a practice to go with the Defendant, you

21   can't go wrong there.

22   (OFF THE RECORD)

3102

1          THE COURT:  We're on the record.

2          MR. WATKINS:   The State is objecting

3    to the next three or four witnesses, which are

4    witnesses that the Defense will present testimony

5    as to ownership or title to vehicles and to home,

6    business, that are in the name of Donna Roberts.

7    The State believes it is irrelevant and is making a

8    motion that, in limine, that this evidence be not

9    allowed on relevancy grounds.

10          Further, it has been discussed

11   in-chambers that in lieu of objecting and making

12   motions to strike, that the State is now making

13   that motion and will brief this since some of this

14   will tie into instructions and questions of law,

15   subsequent to the dismissal of the Jury for the day

16   and prior to the commencement of the trial.

17          THE COURT:  We have gone over this

18   repeatedly and the Court's position is that I think

19   that it is relevant from the standpoint that

20   Mr. Jackson's charged with the specification of

21   murder and robbery.  Since the Prosecution is

22   alleging that there was this conspiracy, it is

3103

1   arguable, I would imagine on Mr. Jackson's part

2   that there could be no burglary or robbery, because

3   he had permission to take the property of Donna

4   Roberts.   The State assures me that they have case

5   law that shows that that is not a defensible

6   position for Defendant to take, but I think at this

7   juncture, it is a factual reality, and that the

8   Defense should be afforded an opportunity to

9   establish that.   There's already evidence in here

10  alluding to that.   The question of the character of

11  the deceased is something that I'm going to allow

12  both sides an opportunity to present some briefing

13  on.   I think that it is only, as I have stated, it

14  is only relevant in regard to self-defense.   The

15  real issue, I guess, is whether at this point, the

16  Defense has a right to lay the groundwork towards

17  that end prior to the time that it is actually

18  asserted, and that is what I'm not sure about.

19              MR. CONSOLDANE:   I think it has

20  already been asserted in the tape that the

21  Prosecution presented.   He said about him arguing,

22  pulled the gun, he grabbed him and that is how his

3104

1    finger got shot.  That shows self-defense right

2    there.  Can't be any more plainer than that.

3                    THE COURT:  That is true.

4                    MR. WATKINS:  May I add?  I guess

5    the self-defense issue is something that we could

6    take up obviously later.  I may be in agreement

7    that that instruction should be given.  So there

8    may not be a contest from the State's view.  I feel

9    strongly, however, that the Court should reconsider

10   at the appropriate time, with briefs, that in fact

11   that there's no evidence for example in this case,

12   that there was any consent given to Jackson to take

13   the man's car that he just come home in, under all

14   of the evidence.

15                    THE COURT:  I agree --

16                    MR. WATKINS:  I think the Court

17   alluded to that.

18                    MR. CONSOLDANE:  He's putting the

19   cart before the horse.  We don't have to prove

20   anything.  He has to prove he did not have

21   permission to take the car.  That is one of the

22   elements of the crime.  He has to prove that he did

3105

1   not have permission.

2            MR. WATKINS:  The evidence in this

3   case is overwhelming that this victim was going

4   home in his car.  That is all the evidence that any

5   reasonable person can conclude from the evidence in

6   my opinion at this stage.

7            MR. CONSOLDANE:  That is an element

8   of the offense that needs to be proven by the State

9   period.  Check it.  Look it up.  It is in the

10  elements of the crime.

11           MR. WATKINS:  I'll prepare a brief.

12           THE COURT:  Let's go on and put the

13  testimony on.

14  (End of in-chamber discussion.)

15  In Open Court at 9:50 A.M.:

16           THE COURT:  Good morning everyone.

17  Mr. Lewis, are you ready to proceed?

18           MR. LEWIS:  Yes, I am.

19           THE COURT:  Let's keep the record

20  straight.  The State has rested on your

21  presentation, is that correct?

22           MR. WATKINS:  Subject to later

3106

1    ruling on the admission of Exhibits.  We'll rest

2    after that ruling.

3                    THE COURT:  You wish to produce

4    evidence on behalf of Mr. Jackson?

5                    MR. LEWIS:  Yes.

6                    BRAD CAIN

7    being duly sworn according to law, on his oath,

8    testified as follows:

9    DIRECT EXAMINATION BY MR. LEWIS:

10   Q.   Brad, would you please give your full name for

11        the Jury?

12   A.   Brad Cain.

13   Q.   And where do you reside?

14   A.   New Castle, Pennsylvania.

15   Q.   Can you tell us your occupation?

16   A.   Business manager at Preston Auto Mall.

17   Q.   How long have you been doing that?

18   A.   Three and a half years.

19   Q.   Is the economy going to go into the tank or

20        are you going to save it?

21   A.   It's a little slow right now.

22   Q.   Can you give us an idea of what your duties

3107

1              are in regard to your position with

2         Preston Auto?

3    A.   I process the paperwork for registration and

4              bank paperwork for approvals on

5              automobile deals at the dealership.

6    Q.   And Preston Auto is located, the specific

7              dealership, where is that located?

8    A.   Youngstown Road in Warren, Ohio, 3843

9              Youngstown Road.

10   Q.   And in regard to the automobiles, obviously,

11             you sell automobiles outright, and banks

12             will finance those.  You also do auto

13             leasing, do you not?

14   A.   Correct.

15   Q.   Can you give the Jury an idea how the auto

16             leasing works?

17   A.   When someone leases a vehicle, it is

18             registered to the leasing company.  They

19             have the rights to the vehicle for "x"

20             amount of years.  It could be three-year,

21             four-year, five-year.  "X" amount of

22             miles per year, just like they own the

3108

```
 1            vehicle.  It is just that it is

 2      registered to the leasing company like

 3      they are renting that vehicle for that

 4      amount of time.

 5  Q.  And it is actually the bank's or listed as the

 6      title owner, correct?

 7  A.  Yes, the bank is the registered owner.

 8  Q.  Through their authority, they have the

 9      individual, who is actually leasing the

10      car, who eventually can buy it out?

11  A.  Yes.

12  Q.  But then they become the lessee for the term?

13  A.  Yes.

14  Q.  Did you have an occasion in the last three or

15      four years to lease cars to a Donna M.

16      Roberts?

17  A.  That is correct.

18  Q.  And do you have the documents with you?

19  A.  I do.

20  Q.  First off, do you have leasing agreements, the

21      actual agreement where she leased the

22      vehicles?
```

3109

1   A.   Yes, I do.

2   Q.   Do you have a leasing agreement by Donna

3        Roberts for a 2000 Chrysler?

4   A.   2000 Chrysler 300-M, correct.

5   Q.   On that leasing agreement, whose name appears

6        as the lessee?

7   A.   Donna Roberts.

8   Q.   Does the name Robert Fingerhut appear anywhere

9        on that leasing agreement having any

10       interest in the property or as a lessee?

11  A.   No.

12  Q.   And that was leased as of what date to her?

13  A.   The lease date is August 28, 1999.

14  Q.   And in regard to people leasing cars, I'm sure

15       you just don't lease them to anybody, you

16       want to check out and see if they have

17       got any credit.

18  A.   Yes.

19  Q.   I am sure the bank wants to know that, too?

20  A.   Correct.

21  Q.   Did you do a credit application on that in

22       regard to Donna M. Roberts?

3110

1   A.   Yes.  Yes, I did.

2   Q.   Did you get a return on that credit

3        application that you filled out?

4   A.   Yes.

5   Q.   And do you have that credit application with

6        you?

7   A.   Yes, I do.

8   Q.   Could you pull that out for us for that

9        particular vehicle, that 300 Chrysler?

10  A.   Okay.

11  Q.   The credit application is in the name of who?

12  A.   Donna M. Roberts.

13  Q.   Just out of curiosity, does the name Robert

14       Fingerhut appear anywhere on the

15       application?

16  A.   No.

17  Q.   What is the occupation she puts down?

18  A.   Youngstown Greyhound franchise, operator

19       owner.

20  Q.   And I am assuming when individuals such as

21       Mrs. Roberts there fill that out, you put

22       that in the computer and it gives you,

3111

1              you check it out basically, right, gives

2              you an okay or a no?

3    A.    We fax it to the bank.

4    Q.    And in this case, it was approved, and you

5              went ahead and executed that lease

6              agreement to Donna Roberts, correct?

7    A.    Correct.

8    Q.    Did you also get a copy of the registration

9              statement required by the State of Ohio,

10             as far as indication of ownership, that

11             would be carried by the owner of the

12             vehicle?

13   A.    When we lease the vehicle, we register the

14             vehicle, we get the plates for the

15             lessee.

16   Q.    And in this case, do you have the registration

17             statement there or a copy of it?

18   A.    Yes, I do.

19   Q.    And it is in the name of who?

20   A.    First National Bank of PA and additional owner

21             Donna Roberts.

22   Q.    Does the name Robert Fingerhut appear anywhere

3112

1          in that registration statement?

2    A.    No.

3    Q.    Now, going on to -- I'll tell you what, would

4          it be permissible, I would like to have

5          those marked as Exhibits, but I think,

6          Brad, you want those original documents

7          back?

8    A.    Yes, please.

9    Q.    Could we have a stipulation that we could have

10         those?

11              THE COURT:  Any objection to marking

12   those and making copies for the record?

13              MR. WATKINS:  My objection will

14   continue, but I'll stipulate as to the copies.  Are

15   you talking about the two cars, the lease of the

16   two cars?

17              MR. LEWIS:  Yes.

18   Q.    There was another vehicle leased by Donna

19         Roberts?

20   A.    Correct.

21   Q.    And in regard to that transaction, it will be

22         the same as the previous transaction,

3113

1          would it not?

2     A.   Correct.

3     Q.   And you have a lease agreement for a 300

4          Chrysler 2001, and that was in the name

5          of who?

6     A.   Donna Roberts.

7     Q.   And does that lease agreement have the name of

8          Robert Fingerhut on it, or any interest

9          in the lease agreement?

10    A.   No.

11    Q.   And that lease agreement, there's the credit

12         application, is there not?

13    A.   Correct.

14    Q.   And the credit application is in the name who?

15    A.   Donna Roberts.

16    Q.   The name Robert Fingerhut appear anywhere on

17         the credit application?

18    A.   No, it does not.

19    Q.   And Donna Roberts, what is she indicated, what

20         is her occupation?

21    A.   Greyhound transportation, general manager.

22    Q.   And likewise, that credit application was sent

3114

1              on to the bank for approval and it was

2              approved?

3  A.   Correct.

4  Q.   And the lease agreement was executed for Donna

5              Roberts through Preston, correct?

6  A.   Correct.

7  Q.   And in addition to that, you took care of the

8              registration of the vehicles, did you

9              not?

10 A.   Yes.

11 Q.   Do you have a registration there?

12 A.   Yes.

13 Q.   And that is the name of who?

14 A.   Fifth Third Auto Leasing and Donna Roberts as

15              the additional owner.

16 Q.   The name Robert Fingerhut appear anywhere on

17              the registration?

18 A.   No.

19 Q.   I'll show you what has been marked as

20              Defendant's Exhibit F.  Can you tell us

21              what that is?

22 A.   That is a credit application in the name of

3115

1          Donna Roberts.

2  Q.  That is the one you previously referred to?

3  A.  Yes, on the 2000 Chrysler 300-M.

4  Q.  Is that a true and correct copy of the

5          application you had in regard to that?

6  A.  Yes, it is.

7  Q.  I'll show you what has been labeled

8          Defendant's Exhibit G, can you tell us?

9  A.  Registration on the same vehicle.

10  Q.  That is the one you previously testified to?

11  A.  Correct.

12  Q.  Is that a true and correct copy of the

13          registration statement in the file?

14  A.  Yes.

15  Q.  And H, there's really two sheets, put them

16          together.

17  A.  That is the lease agreement.

18  Q.  And that is the one signed by Donna Roberts as

19          the lessee?

20  A.  Correct.

21  Q.  Incidentally, all of the records we're talking

22          about here, they are kept, I think you

3116

1           actually witnessed a couple of these, but

2           they are all kept in the normal course of

3           business at Preston Auto Mall?

4    A.    Yes.

5    Q.    In regard to -- we had the credit application

6           on that one and registration statement

7           and lease agreement?

8    A.    Correct, that is the 2001 lease.

9    Q.    In regard to the lease agreements, the

10          technical owner or the owner of the

11          vehicle technically is the bank.  It is

12          like the other situation where you buy a

13          vehicle, you would be the title holder

14          and they would hold a lien against it,

15          right?  That is the other way?

16   A.    When you purchase a vehicle, on a lease the

17          bank is the registered owner.

18   Q.    And the lessee is the person who has the

19          ownership interest as a lessee, correct?

20   A.    Yes.

21   Q.    And you indicated earlier, that because of the

22          lease agreements, they normally have

3117

1          provisions in there about mileage and so

2          forth, but the lessees at the end of the

3          lease, either purchase the vehicle or

4          return it and turn it in basically; is

5          that it?

6  A.    That is correct.

7  Q.    The lessee and the bank are the only ones that

8          have the ownership interest in the motor

9          vehicle, is that correct?

10  A.    Yes.

11              MR. WATKINS:  We'll stipulate what

12  they are going to bring back is true.

13              MR. LEWIS:  The State stipulated the

14  next three Exhibits admissible.

15              MR. WATKINS:  For purposes of

16  identification.

17              MR. LEWIS:  For purposes of

18  identification.

19              THE COURT:  Stipulated?

20              MR. WATKINS:  Yes.  No questions.

21              MR. LEWIS:  Thank you very much.  I

22  appreciate it.

3118

1                    TAMMIE KAYE

2  being duly sworn according to law, on her oath,

3  testified as follows:

4  DIRECT EXAMINATION BY MR. CONSOLDANE:

5  Q.   Tammie, state your name for the Jury.

6  A.   Tammie Kaye.

7  Q.   And where do you work, Tammie?

8  A.   Deputy Registrar at Elm Road for the Bureau of

9            Motor Vehicles.

10  Q.   And when you need to get your driver's license

11            renewed or registration for their car,

12            they see you?

13  A.   Right.

14  Q.   You brought us some papers today that have

15            been marked as Defendant's Exhibit L.

16            Could you explain to the Jury what those

17            are?

18  A.   Those are just the computer records showing

19            the registration to this particular

20            vehicle.

21  Q.   And what vehicle is that?

22  A.   2001 Chrysler four door, and the VIN number.

3119

1    Q.    Does it list the license number?

2    A.    Yes.

3    Q.    Would you read that?

4    A.    ███████.

5    Q.    And who is that car registered to?

6    A.    It is registered to Fifth Third Auto Leasing

7          and the vehicle is leased to Donna

8          Roberts.

9                  MR. CONSOLDANE:  Thank you.  I have

10   no further questions.

11                 MR. WATKINS:  No questions.

12                 THE COURT:  You may step down.

13   Thank you.

14                 ROBERT STANTON

15   being duly sworn according to law, on his oath,

16   testified as follows:

17   DIRECT EXAMINATION BY MR. LEWIS:

18   Q.    Bob, would you please state your name for the

19         record?

20   A.    Robert J. Stanton.

21   Q.    And where do you live?

22   A.    ███████████, Girard, Ohio, 44420.

```
                                                              3120

1    Q.   And what is your present occupation?

2    A.   I am the chief deputy appraiser in the

3              Auditor's Office of Trumbull County.

4    Q.   And who is the Auditor of Trumbull County?

5    A.   David A. Hines.

6    Q.   You are here representing David, is that

7              correct?

8    A.   That is correct.

9    Q.   And how long have you been in the Auditor's

10             Office of Trumbull County?

11   A.   Since 1980.

12   Q.   And I assume that you have had different

13             positions along the years?

14   A.   That is correct.  My current position I have

15             held since 1985.

16   Q.   And can you give the Jury some idea, just your

17             general duties in regard to the Auditor's

18             Office?

19   A.   Well, I supervise our real estate appraisal

20             staff, in conjunction with working on all

21             of the State mandated programs that go

22             through the Auditor's Office dealing with
```

3121

1           real estate evaluation.

2   Q.   And the Auditor's Office is more or less like

3           the financial or the accountant for the

4           county, is that what it is basically?

5   A.   That is correct.  Mr. Hines is the chief

6           fiscal agent for the State of Ohio.

7   Q.   And as a part of that, you do and maintain

8           real estate appraisal records, correct?

9   A.   That is correct.

10  Q.   Those appraisal records actually contain a lot

11          more information, such as ownership,

12          dimensions, square footage, tax values,

13          all of that, correct?

14  A.   Yes, Sir.

15  Q.   And all of that information is collected by

16          the Auditor's Office, and of course, it

17          is also generated by virtue of the

18          appraisers that you have appraising real

19          estate of all of us here in Trumbull

20          County, right?

21  A.   Correct.

22  Q.   And that is how we arrive at what the tax is

```
                                                        3122
1              going to be on the real estate every year

2              basically, based on the rate, as it

3              adjusts during the year, right?

4    A.   The starting place is the market value times

5              35 percent becomes the tax or assessed

6              value, and that value is applied to the

7              tax rate in the taxing district.

8    Q.   And pursuant to the subpoena, were you

9              requested that you bring in, if there was

10             on record, any properties owned by Donna

11             M. Roberts, is that correct?

12   A.   That is correct.

13   Q.   And did you find any such records in regard to

14             Donna M. Roberts?

15   A.   We found three records.

16   Q.   If you could, are these actual copies of what

17             you have gotten out of the data base on

18             file with the Trumbull County Auditor's

19             Office?

20   A.   That is correct.

21   Q.   Do they accurately reflect the records

22             maintained by the Trumbull County
```

3123

1          Auditor, David Hines?

2    A.    That is correct.

3    Q.    And these were normally compiled in the

4          day-to-day business of the Auditor's

5          Office, performing its functions?

6    A.    They are already a matter of public record, so

7          they are there.

8    Q.    The Auditor's Office is the one who generates

9          these documents, are in the Auditor's

10         Office as well -- as well as the Web

11         site?

12   A.    That is correct.

13   Q.    The first one I'll show is what has been

14         labeled as Defendant's Exhibit M.  Can

15         you tell the Jury what that document

16         represents?

17   A.    These are the current real estate records for

18         254 Fonderlac in Howland.

19   Q.    And those records contain indications of

20         ownership, correct?

21   A.    Ownership and valuation and history of

22         ownership.

3124

1    Q.   And as ownership or history of ownership,

2         whose name appears there at least as far

3         as ownership goes?

4    A.   Donna M. Roberts.

5    Q.   And anywhere in the history or anywhere else

6         in the documents, is there any occasion

7         of any ownership by the name of Robert S.

8         Fingerhut?

9    A.   No, Sir.

10   Q.   The valuation on the property was how much as

11        of the last reporting period?

12   A.   As of our tax lien date, January 1, 2002, our

13        value, market value, that is $174,500.

14   Q.   On Defendant's Exhibit N, can you indicate

15        what that record is?

16   A.   These are the real estate records for ████████

17        ████████████████████████ in Warren City.

18   Q.   And the property address is actually what on

19        there, do you have it?

20   A.   ████████████████████████

21   Q.   You said that.  And ownership-wise, who is the

22        title holder, or the owner of that

3125

1          property?

2    A.   The current owner is Dwayne Lang.

3    Q.   And who was the previous owner, who

4          transferred that property?

5    A.   Donna Roberts.

6    Q.   Does the name Robert S. Fingerhut appear

7          anywhere in the records as having any

8          interest or ownership in the property?

9    A.   No, it does not.

10   Q.   The value of the property is listed as what

11         for tax purposes?

12   A.   Again for January 1, 2002, our valuation,

13         market value-wise for this property is

14         $48,200.

15   Q.   And the next Exhibit there, Defendant's

16         Exhibit O.  What is that?

17   A.   These are the real estate records for ▮▮▮

18         ▮▮▮▮▮▮▮

19   Q.   And the name ownership-wise as of December of

20         2001 would have been who?

21   A.   That would have been in December 2001, it was

22         Donna M. Roberts.

3126

1    Q.   And the appraised value?

2    A.   Our appraised value is $28,400.

3    Q.   Does the name Robert S. Fingerhut appear

4           anywhere there as having any ownership

5           interest whatsoever?

6    A.   No, it does not and this property has

7           transferred hands.

8    Q.   And who was it sold to?

9    A.   The current owners on record is Adea L. Riley,

10          along with Andre B. Riley.

11    Q.   And that would have been transferred by only

12          Donna M. Roberts, correct?

13    A.   One would assume so, since she was the owner

14          on record and would have the name on the

15          deed.

16    Q.   These are all accurate records that are

17          currently on file at the Trumbull County

18          Auditor's Office, and they accurately

19          depict what is portrayed and what you

20          testified to?

21    A.   That is correct.  They are all a matter of

22          public record.

3127

1               MR. LEWIS:  Thank you very much.

2   CROSS EXAMINATION BY MR. WATKINS:

3   Q.   Do you have any record of mortgages on those

4            homes with you?

5   A.   No, we were not asked to supply any

6            information on mortgages at this time.

7               MR. WATKINS:  Thank you.

8               THE COURT:  Thank you.

9   (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

10  OF HEARING)

11              THE COURT:  We have just had Side

12  Bar.  The Court is attempting to discuss the

13  schedule as to how we're going to handle this and

14  Mr. Consoldane feels that we were getting into

15  other matters, so I had to put a stop to that, and

16  we'll put on the record everything at the right

17  time.

18              MR. CONSOLDANE:  I just wanted

19  time-wise, I didn't want to get into any arguments,

20  not to be put on the record.

21              THE COURT:  Fair enough.

22  (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

3128

1    OF HEARING)

2              THE COURT:  We have had continuation

3    of Side Bar on the scheduling here, is that

4    correct, gentlemen?

5              MR. WATKINS:  Yes.

6              MR. CONSOLDANE:  Yes.

7              THE COURT:  The Defense, I

8    understand that you have called your last witness

9    for the day, is that it?

10             MR. LEWIS:  That is correct.

11             THE COURT:  Folks, you are going to

12   be released at this point with the intention that

13   you be back here Tuesday morning.  There will be

14   nothing Monday.  You should come prepared, if you

15   have to stay and be put up in the hotel overnight.

16   There's an outside chance, and I think it is a very

17   slim chance that that would not occur, that you

18   would not be sequestered Monday, I think that you

19   all -- that we have to get done during the work day

20   Monday, that the case would be in your hands.  If

21   it turns out that that isn't the case, it would be

22   Tuesday, but we're going to plan on Monday having

3129

1    that occur.

2                MR. WATKINS:  Tuesday.

3                THE COURT:  Tuesday.  You are

4    probably asking yourselves, why is this so

5    disjointed at this point.  There are numerous

6    reasons and it is something that you should not

7    concern yourself with.  We're trying to get the

8    evidence to you as quickly as we can accomplish

9    here, but there are various things that have to be

10   argued, have to be decided, and that takes time at

11   this juncture.  It is just part of the process.

12                So, that being said, I'll again remind

13   you, you know by now, but I must remind you, you

14   are not to watch anything on T.V., nor read

15   anything in the newspaper or have any discussion

16   with anyone else.  You should keep your own

17   counsel.  Beginning next week, this will be in your

18   hands and you will have plenty of time to discuss

19   the evidence that you have heard.  And you will

20   have the advantage at that time of having an

21   instruction of law with you, which will make it

22   much easier to go through these legal concepts and

3130

1    apply the evidence to the law.

2          We thank you all for your patience.  You

3    are still a very attentive Jury, that is unusual.

4    I haven't seen anybody sleeping yet.  The Judge is

5    allowed to close his eyes, I'm not sleeping.  I'm

6    not allowed to do that.  Have a nice evening.

7    We'll see you Tuesday morning.

8          Folks, before you leave, I did not

9    explain to you, I apologize.  We have had in the

10   past, situations where people have gone to work, at

11   this juncture of the trial, and it causes nothing

12   but problems, but people just warm, wanting to have

13   you talk about it and that sometimes is almost more

14   than can be resisted.  So, I trust that none of you

15   are suffering too much on the financial end of it.

16   I would ask you or tell you, not to go to work

17   tomorrow or Monday.

18         JUROR:  What about this afternoon?

19   I am a waitress.

20         THE COURT:  You have been working

21   during the course of the trial on weekends, of

22   course.  The only reason I started to do this is

3131

1   that we have had jurors tell me, "I went to work

2   and everybody wants to know all about it." It

3   makes it difficult. Any of you who do not have to

4   go to work, some of you, if you have collective

5   bargaining and that, you are getting paid, don't go

6   to work. If it is creating an economic hardship

7   for you not to work, there's nothing that says you

8   can't, but just please remember, because we have

9   had so many cases over the years, that we have had

10  trouble with after the trial was over, with things

11  coming up where jurors have talked to somebody, and

12  all of this, your work as well as ours, that goes

13  into a trial. It is foolish to have that come into

14  the picture. If any of you have to go to work, do

15  so, but just remember the admonition. You cannot

16  let anybody come and try to talk to you about the

17  thing.

18          MR. LEWIS:  Fair enough.

19          MR. WATKINS:  Thank you.

20  (Court in Recess at 10:45 A.M.)

21  (Jurors excused.)

22          THE COURT:  On the record, are you

3132

1  ready to review the proffer of admission of the

2  various State's Exhibits?  Has the Defendant had an

3  opportunity to review the recent compilation made

4  by Attorney Morrow?

5              MR. CONSOLDANE:  Yes.

6              THE COURT:  This looks pretty much

7  in order.  The easiest way, if you have done this,

8  is to go through and see which Exhibits you do not

9  object to or we can take them in order.

10             MR. LEWIS:  It is probably easier to

11  go right down the line.

12             THE COURT:  All right.

13             MR. CONSOLDANE:  We have gone

14  through this, between Dennis and I, and then report

15  to you which ones we object to, but if you want to

16  sit in on the whole thing.

17             THE COURT:  I don't wish to, but

18  whatever is workable, you tell me.  Number one, the

19  911 tape.

20             MR. CONSOLDANE:  We object to that,

21  that nobody ever identified as to whose voice that

22  was on the phone.  Could have been anybody calling

3133

1   and saying anything.  They never verified that that

2   was Donna Roberts' voice on the tape, and she's not

3   been a witness in this case, so I would object to

4   Exhibit No. 1.

5            MR. WATKINS:  That operator

6   testified that this telephone number, which we have

7   had testimony amply substantiating that she called

8   and the emergency team went there, and sufficiently

9   is identified by all of the circumstances that are

10  in this record.

11           MR. CONSOLDANE:  I don't object that

12  it was called from that number and that somebody

13  called from that number, and they legitimately

14  replied what was said on the tape.  It was never

15  verified as to who said it.  Just because they want

16  to imply it was Donna Roberts, this is a death

17  penalty case.  They shouldn't be allowed to imply

18  things of that nature.

19           THE COURT:  Well, I don't know that

20  it is necessary that it be established who made the

21  phone call.  The fact is that the initiating

22  contact of the police that prompted them to arrive

3134

1    at the scene was a 911 tape.  As to who made the

2    call --

3              MR. LEWIS:  The next Exhibit is a --

4    the next exhibit is the paperwork from the 911

5    center, which is perfectly legitimate that they

6    received a 911 call that generated the paperwork

7    and that is the residence they went to.  The actual

8    phone call itself, as Mr. Consoldane indicated,

9    she didn't identify herself and they only

10   identified the residence by virtue of the computers

11   which they are supposed to do as to location.  It

12   hasn't been authenticated and verified.  Of course,

13   the paperwork could come in, but the 911 call came

14   in and they dispatched the vehicles and the

15   emergency and the police to the location, to

16   Fonderlac.  That is perfectly legitimate, and he

17   they can testify to that.  They can't testify as to

18   who they were talking to or anything of that

19   nature.  The voice hasn't been identified and she

20   didn't indicate who she was.

21             MR. WATKINS:  She identified herself

22   as Donna.  She said that her husband is on the

3135

1   floor.  The police went there.  There's only one

2   person there, Donna Roberts, which was identified

3   by Detective Monroe.  It comes in, it has always

4   been admissible evidence, a 911 call.

5                    MR. CONSOLDANE:  It has not.  We

6   only had 911 for the last year.  You make it sound

7   like it has been for 20 years.

8                    THE COURT:  Whether or not they have

9   always been admissible, I think it is admissible at

10  this point and again that it is necessary to

11  identify who the caller was.  Even if the person

12  were unknown, it is evidence that prompted the

13  police to arrive at the scene.  The Defendant's

14  objection is overruled.  The Exhibit 1 will be

15  admitted.  Exhibit 1-A.  I have to assume from your

16  last comment that there's no objection on 1-A.

17                   MR. CONSOLDANE:  We're going to

18  object to the crime scene video, because they

19  already have the photographs in.

20                   THE COURT:  1-A is admitted.

21                   MR. CONSOLDANE:  It is duplicative.

22  They don't need to have -- it is not showing

3136

1    anything different.  It is all showing the same.

2                    THE COURT:  1-A is the paperwork of

3    911.

4                    MR. CONSOLDANE:  1-A is the 911.

5                    MR. LEWIS:  1-A is okay.

6                    THE COURT:  I just noticed that the

7    Defendant has been taken back to jail.  Are you

8    waiving the presence of the Defendant?

9                    MR. CONSOLDANE:  He wants to be here

10   tomorrow.  I mean Monday.

11                   THE COURT:  Number two is the crime

12   scene video.  What is the objection to that?

13                   MR. CONSOLDANE:  We objected to

14   number one; 1-A we have no objection to.  We object

15   to number two, the crime scene video because they

16   have all of the other still photographs in there.

17                   MR. LEWIS:  It is duplistic and

18   cumulative.  They have already got probably about

19   50 photographs of the interior of the house, the

20   area that was actually videoed, and of course, they

21   have the blow-ups, which are the ten by 12's of the

22   actual victim showing the wounds or whatever.  We

3137

1   just think --

2          MR. WATKINS:  There are a number of

3   Supreme Court decisions, including out of Trumbull

4   County.

5          MR. CONSOLDANE:  I object to him

6   saying numerous Supreme Court decisions.  If you

7   have a decision in mind, name it.  Otherwise don't

8   say numerous Supreme Court decisions.  You do this

9   all the time and you don't have one case, and then

10  a lot of times, you refer to old cases that you

11  tried, and the Supreme Court has said you were

12  wrong, but we'll go ahead, there's so much other

13  evidence.  Because you were wrong, and they didn't

14  overrule it, doesn't mean you are allowed to do it

15  again.

16         MR. WATKINS:  I'll give a couple of

17  cases.

18         THE COURT:  The Court is going to

19  cut your arguments short on this point.  Two and

20  three are out and the reason for that is, I think

21  that the crime scene video and the diagram were

22  usable as, to set the tone so that the Jury was

3138

1   able to understand from the beginning.  They had a

2   view of the scene, that is not evidence.  The video

3   also acclimated them to the scene as did the

4   diagram.  You have photographs in abundance here,

5   that show everything, I believe, that was in that

6   crime scene video.  I'll go with the Defense on

7   that.  Two and three will not go to the Jury.  Your

8   objection is noted.

9               MR. WATKINS:  I wasn't given an

10  opportunity to state.  State vs. Getsy.  I have

11  case law I can produce fairly quickly that diagrams

12  and video, even slides and photographs are not

13  inadmissible because they are duplicative.

14              THE COURT:  They are not only not

15  admissible if they are duplicative to the point

16  where they become prejudicial.  The point here is

17  that they are useful tools for the Jury to be aware

18  of the location of bodies which a still photograph,

19  in and of itself, without some explanation, does

20  not necessarily provide, but based on the objection

21  and the reasoning, valid or not, I understand that

22  they are admitted at times.  There was a famous

3139

1    U.S. case here about two years ago, out of

2    Cincinnati, on a crime scene.

3                MR. WATKINS:  I can understand the

4    video on the cumulative which is the discretion of

5    the Court, but I don't understand the diagram which

6    gives certain measurements and how that would not

7    be considered admissible.

8                THE COURT:  I think the crime scene

9    diagram is something like a piece of demonstrative

10   evidence.  It is used for the edification.  Okay,

11   I'll change my ruling.

12               MR. CONSOLDANE:  The only objection

13   we really have to the diagram is it is not to

14   scale.

15               THE COURT:  That was explained.

16               MR. LEWIS:  It is not to scale.

17               THE COURT:  I think that on

18   hindsight that is probably something that the Jury

19   would find useful.  State's Exhibit 2 will be out.

20   Three will be in.  Your objections are noted.

21   Exhibits 4 to 60, these are the pictures of the

22   autopsy.  I think we have selected through those

3140

1   and removed quite a few of them.  That appears on

2   record.

3                   MR. LEWIS:  These are the small

4   photographs.  The only ones we went through were

5   the large.

6                   MR. WATKINS:  These are the

7   photographs of the slides.  These are the ones that

8   the Court ruled on.

9                   THE COURT:  These are the ones we

10  have already gone through.

11                  MR. CONSOLDANE:  I didn't hear that.

12                  MR. LEWIS:  I'm sorry.

13                  THE COURT:  My memory is that we

14  were in agreement on those photographs that were to

15  be shown.  The ones that actually were shown.  Do

16  you have any other objections in reference to those

17  photographs?

18                  MR. LEWIS:  No.

19                  THE COURT:  Do you wish to go

20  through those photographs again?

21                  MR. WATKINS:  These are the autopsy

22  ones that Dr. Germaniuk presented.

3141

1              MR. CONSOLDANE:  These are the ones

2    he took of the house.  We have already gone through

3    these, and the only objections that I would have to

4    these, is the ones I have already put on the record

5    and you have already taken under consideration.

6              THE COURT:  Those are the only ones?

7              MR. CONSOLDANE:  We have no new

8    objections to these.

9              THE COURT:  Other than what you had

10   at the time.

11             MR. CONSOLDANE:  Right.

12             THE COURT:  State's Exhibits 4

13   through 60 are admitted.  Who has separated those?

14             MR. CONSOLDANE:  Only the ones that

15   we were presented are in there now.

16             MR. WATKINS:  They are marked as

17   withdrawn on our list there.

18             MR. MORROW:  22 is out, 23 is out,

19   29, 30, 32 is out.  35 is out.  36 is out.  39 is

20   out.  41 is out.  42 is out.  45 is out and 46 is

21   out.  50 is out.  The remainder are in.  Those

22   Exhibits are withdrawn by agreement of the parties.

3142

1              THE COURT:  61 to 68 are the camera

2    autopsy photographs.  Those are the Campbell

3    autopsy photographs.

4              MR. LEWIS:  Number one and six are

5    duplicate.  That is close enough for me to say.

6              MR. WATKINS:  You went through

7    those.

8              MR. LEWIS:  Number 6 and number 11.

9              THE COURT:  They do appear to be

10   very similar, but they are not actually duplicates,

11   I don't think.

12             MR. LEWIS:  Show me what the

13   difference is in those two.

14             THE COURT:  It is the difference of

15   the camera, distance.

16             MR. WATKINS:  I don't think there's

17   much difference.  I agree.

18             THE COURT:  The State wish to

19   withdraw one of those?

20             MR. WATKINS:  Yes.  We'll withdraw

21   number 6.

22             THE COURT:  Number 6 is withdrawn

3143

1   from the Jury's view.  All of the remaining

2   photographs not admitted will become part of the

3   permanent record but not for the Jury's use.

4   Number 61 to 68.  Those have been shown without

5   objection or at least the Court had ruled.

6              MR. WATKINS:  Those are Jim

7   Campbell's photographs.

8              MR. CONSOLDANE:  61 to 68, we had an

9   objection at the time, but there's no new

10  objection.

11             MR. MORROW:  We'll withdraw number

12  63.  They are objecting that it is a big one and a

13  small one.

14             MR. WATKINS:  A lot of the small

15  ones deal with the house and the areas that aren't

16  on the big ones.

17             MR. LEWIS:  Object to the ones where

18  he's laying on the ground.

19             MR. WATKINS:  I am talking about the

20  scene that is outside the body.  I agreed with you

21  on the other.

22             MR. MORROW:  The State is

3144

1    withdrawing the following Exhibits.  '79, '80, '81,

2    '82, '85, '86, '88, 89, 99, 100, 107-A, 108-A, 109

3    and 109-A.

4                THE COURT:  So 69 through 44, with

5    the exception of those just listed are admitted.

6    Is that correct?  I'm sorry -- through, I'm sorry,

7    69 through 144 are admitted except the ones that

8    Chuck listed.  That is 69 through 144.

9                MR. MORROW:  The parties are

10   agreeing to withdraw the following.  111, 112, 133,

11   135, 136.

12               MR. CONSOLDANE:  145 through 155 are

13   okay.

14               MR. WATKINS:  It is a stipulation

15   that 145 through 155 are admitted.

16               MR. MORROW:  Judge, we have agreed,

17   State has agreed to withdraw 111, 113, 133, 135,

18   136, the remainder of 110 through 144.  Those are

19   admitted by agreement; furthermore, 145 through 155

20   are admitted by agreement.

21               MR. WATKINS:  I need to correct

22   something.  111 and 112 is out.  113 is in.

3145

1              MR. MORROW:  Beginning with State's

2     Exhibit 156 to 191, the State has agreed to

3     withdraw the following Exhibits.  158, 161, 167,

4     176, 179, 179, and 190.  That is 179, 188, 189 and

5     190.  The rest are admitted by agreement.  With

6     respect to State's Exhibits 192 through 197, the

7     Defense has objected to each of those Exhibits.

8              MR. LEWIS:  We're going to object to

9     the pictures of Donna Roberts used in photographic

10    line-ups for her case.  We're going to object to

11    that.  It has no relevancy to this one.

12              THE COURT:  What is the Defense's

13    objection?

14              MR. LEWIS:  The Wagon Wheel photos,

15    simply because they already testified about the

16    receipts, the things at the Wagon Wheel.  Pictures

17    of the interior, the exterior is not relevant

18    regarding this.  They already got the receipts in,

19    and the room, or whatever, there's no evidence

20    collected from the room, or anything of that

21    nature.  We think it is irrelevant and it is only

22    there to inflame the Jury with the idea they got a

3146

1  nice Jacuzzi room with mirrors all over and all of

2  that hot to trot stuff.

3              THE COURT:  192 through 196 --

4              MR. WATKINS:  Can I respond?  I

5  think when you look at the letters and the audio

6  tapes, and his description of what the room is

7  like, and the conspiracy and what they are doing up

8  until the time that they are going to kill this

9  victim, that that corroborates what he's saying the

10  room looks like.  I think it is relevant.  It is

11  different than the receipt.  It is simply evidence

12  going along with what our case is concerning room

13  101 and what the Defendant talks about.  He talks

14  about the big bed.  He talks about the mirrors in

15  his letters and on the recorded conversations.

16  That corroborates what he's talking about.

17              THE COURT:  Number 197 is a

18  photograph of what they found in the garbage bin,

19  which will remain in.  There's already evidence

20  establishing they rented, they stayed there.

21              MR. WATKINS:  It is what is inside.

22  The description of how he says --

3147

1              THE COURT:  Pick one of these

2    pictures then to show the interior of the room.

3    The rest of it doesn't lend anything to the State's

4    case.

5              MR. WATKINS:  We would request these

6    two pictures.

7              THE COURT:  These are two different

8    views, one from one direction and one from the

9    other.

10             MR. WATKINS:  I would request this

11   one.

12             THE COURT:  It has already been

13   identified.  I'll allow 194, 195 and 197.  The

14   others will be stricken.  Number 192, 193 and 196

15   are out.

16             MR. CONSOLDANE:  We object to all of

17   the photos from 199 to 226 are objected to also as

18   being not relevant to their case.

19             MR. MORROW:  With respect to the

20   defense objections to 199 through 226, the State

21   would move only for admissions of items 201, 202,

22   204, and 226.  Also 224 is in.  The State on that

3148

1    whole collection, the State is seeking 201, 202,

2    204, 224 and 226.  We would agree to withdraw the

3    others in the category of 199 through 226.

4              MR. LEWIS:  We would maintain our

5    objection to the remainder of these.  The basis is,

6    I think, besides showing the room.  I think they

7    are trying to show the location of the blood.  They

8    didn't do it close enough.

9              MR. WATKINS:  The trash bin is where

10   they found it and the door in the room in general

11   where the fingerprints were.  We have taken out 80

12   percent of the photographs.

13             THE COURT:  I can see the trash bin

14   picture.

15             MR. WATKINS:  We have fingerprints

16   from that room and the back of the door is one of

17   the places where we got fingerprints.  In addition,

18   there's testimony about blood evidence.

19             THE COURT:  What about specifically

20   204 and 202?

21             MR. WATKINS:  That shows the room.

22   There's testimony about blood on the bed and it

3149

1    shows the room in general and like I said, the door

2    and the, which you have, so I think it is relevant

3    that they see the room that was described by the

4    witnesses.

5               THE COURT:  With that in mind, I'll

6    allow 201, 226 and 224.  That is the picture of the

7    bin, the exterior door and the interior door where

8    the blood was found.

9               MR. CONSOLDANE:  Would you read

10   those numbers one more time?

11              MR. WATKINS:  Number 202 is out.

12   204 is out.  201 is in.  202 is out.  204 is out.

13   224 is admitted and 226 is admitted.  Then 227

14   through 234 the Defense is objecting to those

15   photographs of Wirt Street.

16              MR. CONSOLDANE:  Why do you need

17   those?

18              MR. MORROW:  The glove was

19   recovered.  The shoes were recovered.

20              THE COURT:  Of number 230, 231, 234

21   will be admitted.  There's another one, and 227 has

22   the shoes in it.  That is relevant.  The remaining

3150

1   pictures, 228, 229, 232 and 233 will not go to the

2   Jury.

3                  MR. CONSOLDANE:  We have no

4   objection to 235 to 248.

5                  MR. MORROW:  We have 249 and 250 is

6   two pictures of the co-defendant, Donna Roberts

7   which the Defense is objecting to.

8                  THE COURT:  You are not objecting

9   to any of the photographs that one from 235 to 248?

10                 MR. CONSOLDANE:  That is correct.

11  We're not objecting to 235 to 248.

12                 THE COURT:  You are objecting to 249

13  and 250?

14                 MR. LEWIS:  Yes.  Relevancy.  They

15  were just introduced to say this is Donna Roberts.

16  They were used for, I guess photo line-ups and

17  whatever in her case.  They were not utilized.

18                 MR. WATKINS:  That was her at the

19  home that you went there that night?  That was at

20  time of the homicide?

21                 PAUL MONROE:  Yes.

22                 MR. MORROW:  We also have witnesses

3151

1     describing her --

2                   MR. LEWIS:  That was taken on

3     December 15.  It wasn't the night of the homicide.

4                   THE COURT:  249 will be in.  250

5     will be out.  There's testimony describing her.

6     (Court in Recess at 12:05 p.m.)

7     (After Recess in Open Court at 2:20 p.m.)

8                   MR. MORROW:  May it please the

9     Court, by way of agreement the parties have agreed

10    to the admission of the following Exhibits.

11    Commencing, this is a continuation, we're starting

12    with 251 through and including 276 -- I'm sorry,

13    273.  There's no objection from the Defense from

14    251 through and including 273?

15                   MR. CONSOLDANE:  The next two we're

16    objecting to is 275-A and 275-B, and these are the

17    two letters that were sent to BCI for their

18    examination.

19                   THE COURT:  Those are on the desk

20    here.

21                   MR. MORROW:  That is correct.  The

22    Defense also agreed to the admission of 276-A

3152

1    through 280.

2         MR. CONSOLDANE:  We objected to 281.

3         MR. MORROW:  By way of agreement,

4    they agree to 282-A; 282-B was withdrawn or was

5    never introduced -- excuse me, 282-C, 283, 284 were

6    admitted by agreement.  285, the Defense is

7    objecting to.  286-A, they agreed to admit.  286-B

8    was not introduced.  286-C was entered by

9    agreement.  286-D was also admitted.  State's

10   Exhibits 287 through 291, the State is withdrawing.

11   The State is also withdrawing 292, 293.  The

12   Defense is objecting to 294.  The State is

13   withdrawing 295 through 308.  The Defense is

14   objecting to 309.

15        MR. CONSOLDANE:  No.

16        MR. MORROW:  They are admitting 309.

17   Number 310 is being withdrawn.  Number 309 includes

18   309-A.  The State is -- or the Defense is objecting

19   to Exhibit 311, which contains five sub-parts A

20   through E.  The parties have agreed to admit 312

21   and 313 as well as 314 with sub-parts 315 and 316.

22   317 and 318 are admitted.  319, the Defense is

3153

1   objecting to.  320, with all sub-parts is being

2   objected to.

3                   MR. CONSOLDANE:  We object to 317,

4   318 and 319, 320.

5                   MR. MORROW:  I'm sorry.  The Defense

6   is not objecting to 317 and 318, is that correct?

7                   MR. CONSOLDANE:  Right.

8                   MR. MORROW:  Then they are also

9   objecting to 319, 320 with sub-parts.  321, there's

10  an objection, 322, 323.

11                  MR. LEWIS:  Right.

12                  MR. MORROW:  324, 325 and 326 are

13  being admitted.  327 with sub-parts is objected to.

14                  MR. LEWIS:  Right.

15                  MR. MORROW:  360 through 381-A,

16  which are the 19 audio tapes, along with the

17  transcriptions, the CD and the telephone log are

18  all being admitted by the Defendant or by both

19  parties.  350 -- I'm sorry, 349 was not introduced.

20  350, Consent to Search was admitted.  351 was

21  admitted.  352 is being objected to.  385 through

22  395-B are being admitted.  396, 397 and 397-A are

3154

1    being objected to.  Additionally, with respect to

2    State's Exhibit 271, that was not being objected

3    to.  That is 271 D-1 through 271 D-139 are not

4    being objected to.  Then 273-N one through 273-N(4)

5    are also being admitted.  There were not Exhibits

6    at 273-N 30 and 273-N 33.  There were no Exhibits

7    under either of those two labels.  I'll also

8    prepare a complete listing of all of these by way

9    of print out, so that it can be compiled with the

10   record to go to the Court of Appeals, because that

11   shows the number and the sequence.  If there's no

12   objection from the Defense, I'll present it to them

13   and we can give it to the Court of Appeals.

14            THE COURT:  That would be very

15   helpful.  Thank you.

16            MR. MORROW:  The Defense Exhibit A

17   and Defense Exhibit B, which consist of, I'm sorry,

18   nine packages, the State has no objection to the

19   admission of those.  Defendant's Exhibits F through

20   O are the items that we have discussed in-chambers,

21   and are the items that the State is reserving its

22   objection on, pending discussions on relevancy.

3155

1          MR. WATKINS:  We're objecting at

2     this point.

3          THE COURT:  You are objecting?

4          MR. WATKINS:  As to relevance, not

5     as to authenticity.

6          THE COURT:  Let's start with 273.

7          MR. MORROW:  It is 275-A.

8          THE COURT:  What is the objection to

9     275-A and B?

10          MR. LEWIS:  The objection in regard

11     to this, these purport to be two letters, each one

12     is a letter, supposedly written by Nathaniel

13     Jackson to Donna Roberts, and these were sent onto

14     BCI for the handwriting analysis.  There's an

15     improper chain of custody in regard to the two

16     particular letters, and at the same time, there's

17     no authentication to the fact that in fact, the

18     letters were actually written by Nathaniel Jackson.

19          THE COURT:  What do you feel is

20     improper chain of custody?  What is improper about

21     the chain of custody?

22          MR. LEWIS:  The chain of custody on

3156

1    here is there's no indication, I don't recall

2    anything from Paul Monroe.  I think Paul Monroe

3    recovered these letters in the rear of the trunk of

4    the red Chrysler.  I'm sorry.  He recovered the

5    letters, this is from a dresser in the master

6    bedroom at the home at 254 Fonderlac.  They were

7    recovered in there.  I don't know that there was

8    anything on here indicating that Paul Monroe had

9    these in his custody the whole time and then sent

10   them onto BCI and came back.  I don't think there's

11   a proper chain of custody, because Steven Greene

12   was the one who analyzed them.  There's no

13   indication on the outside of the envelopes as far

14   as I know that says collected by Paul Monroe, but

15   there's no send out time and return time.

16            PAUL MONROE:  If you look on the D

17   submission sheet, those will show when those were

18   taken to BCI in Richfield and on the analysis

19   sheet.  It also shows Richfield ships them to

20   London, and then via certified mail, they are

21   shipped back to me.

22            MR. WATKINS:  It is the

3157

1    preponderance of the evidence on chain of custody.

2    It is a kind of item that is not like drugs. It is

3    apparent on its face especially in light of Mr.

4    Greene's testimony, comparing the other writings.

5             THE COURT: My understanding was

6    that Paul delivered them and they got to Greene,

7    and then were sent back to him. That should

8    appear, I think, in the record itself.

9             MR. LEWIS: I don't recall it as

10   that being said. I know that the forms are on

11   there as submission, whatever, but they actually

12   weren't delivered, nor was Paul on the envelope

13   here. There's no indication of the date he sent it

14   out, the date he received it back or anything of

15   that nature.

16            THE COURT: Your submission form?

17            MR. WATKINS: He testified to that.

18   There's also corroboration in Mr. Greene's

19   testimony and what the item was that he identified.

20            THE COURT: That is my

21   understanding. Your objection goes to what the

22   record already is. If I am incorrect on that, the

3158

1  record will reflect that.  I think that the chain

2  of custody is, was proven sufficiently to have that

3  come in.  The objection is 275-A and B are

4  overruled.

5  　　　　　MR. MORROW:  The next should be 281.

6  　　　　　MR. LEWIS:  Our objection is in

7  regard to the reports, the submission report and

8  the return report and the findings, and it is in

9  reference to D-2 and D-3, which are referencing

10  these supposed handwriting letters, handwritten

11  letters.  There's no other identification.  The

12  problem I'm having is that these are the submission

13  sheets and the findings.

14  　　　　　THE COURT:  What is the State's

15  position?

16  　　　　　MR. WATKINS:  Your Honor, the

17  witness identified those documents, identified

18  sample handwriting.  The witnesses all for the

19  State, testified sufficiently to tie in all

20  Exhibits that you have before you.  And I would

21  also note, Your Honor, that the type of evidence

22  that we're dealing with, are letters that are very

3159

1    much in line with address, identification, by way

2    of address, or who they are sent to, with all of

3    the letters, have been admissible and most

4    importantly, Greene was using a variety of

5    documents that he testified that in his opinion,

6    that the letters were indeed written by Nathaniel

7    Jackson. So once the chain is proven by only a

8    preponderance, and then I think it should be those

9    reports come in, especially in light of all of the

10   testimony and the identification process.

11           THE COURT:  The testimony on this

12   point that has the maximum content is Mr. Greene's

13   testimony.  The State's Exhibits 281 and 285 are

14   part of the mechanism to achieve that in that all

15   that these say is that they are forwarding to you

16   these items.  275-A and B are the letters that were

17   actually forwarded from which Mr. Greene gave his

18   testimony.

19           MR. WATKINS:  Along with the other

20   documents.

21           THE COURT:  Yes, along with whatever

22   he took into account, but there was a test

3160

1    handwriting sample included.

2              MR. WATKINS:  Yes.

3              THE COURT:  I think these come in as

4    part of the testimony.  It merely substantiates the

5    chain of evidence that those documents in and of

6    themselves, don't testify to anything, but it

7    merely is being proffered, I assume, to show the

8    mechanism by which they got to the officer.

9              MR. LEWIS:  I understand.  The only

10   thing I'm saying is the letters themselves were not

11   marked or identified as far as I know to indicate

12   that those are the letters that were actually sent.

13   Those letters could have been switched with any

14   other letter in there.

15             THE COURT:  Not for the fact they

16   have been separated and kept in those envelopes,

17   which weren't opened until we started the trial.

18   Your objection is to the fact that they were not

19   clarified as most Exhibits are as they come down

20   through.

21             MR. LEWIS:  What I'm trying to get

22   at is that the stamp was put on after the fact.

3161

1    The letters themselves, they put an item number on

2    it, but this is the Howland P.D. number, whatever.

3    What I am looking for is the -- well, I guess they

4    wrote on the bottom, but I don't know who wrote it.

5    I don't know who put the identification on the

6    letter.  It wasn't indicated in the testimony.

7            THE COURT:  The main point is he

8    identified them as the letters he testified from,

9    and I think that is sufficient.

10           MR. CONSOLDANE:  I further object to

11   Mr. Greene's report on the basis that he even

12   admitted he's had no formal education outside of

13   high school as far as determining this.  He merely

14   worked with another guy that knew something about

15   studying handwriting and he did not in any way, I

16   believe, fully qualify as an expert in the field.

17   He works for BCI, which is an arm of the Attorney

18   General, which is basically just to help out the

19   police and Prosecutor in the State, to prove their

20   case.  I think it is strictly self-serving.

21           THE COURT:  I would suggest --

22           MR. LEWIS:  I have to add, of all of

```
                                                    3162
```

1   the experts we did have here, all of them had some

2   kind of an actual organization or some standards

3   that would apply to what they do and they are

4   licensed or they are qualified through schooling

5   and all of that, and I was kind of surprised, too,

6   at the same time.

7                   THE COURT:  He testified there's no

8   such licensing or school.

9                   MR. LEWIS:  That is the whole thing.

10  There's no set standards.

11                  MR. WATKINS:  He's testified 250

12  times.

13                  THE COURT:  I would suggest you are

14  two days late in your objection.  He testified.

15  You had an opportunity to object.  Even over

16  objection --

17                  MR. LEWIS:  We objected at the time.

18                  THE COURT:  If you did, I overruled

19  it, and there's no standard.  It is experience.

20  He's testified in many other cases.  His testimony

21  is accepted as an expert.  There's so many areas,

22  as time goes on that there's no formal schooling

3163

1    for and that is the junk science argument, and each

2    Court has to make its own call.

3            MR. LEWIS:  There's one other thing

4    in regard to the course of this trial, when an

5    expert is up there and the Prosecutor elicits on

6    direct examination, their qualifications, they turn

7    around and ask the Court to qualify them as an

8    expert.  That is totally improper, because we

9    haven't had a chance to cross examine.  That is not

10    the way to proceed.  They just put the credentials

11    on.  The Court does not qualify them as an expert

12    in that area at that point.  That is not correct.

13    If you qualify him as an expert and I get up there

14    and prove that all of their credentials are phony,

15    where does that leave us?  You have qualified him

16    as an expert.

17            THE COURT:  I think the proper

18    manner is for a foundation to be laid by the person

19    calling the expert as a witness.

20            MR. LEWIS:  Then they move on in

21    direct examination.

22            THE COURT:  If you recall, I turn to

3164

1  you each time they ask to have somebody qualified

2  as an expert and I said, "Is there any objection"?

3              MR. CONSOLDANE:  We objected to

4  Greene.

5              THE COURT:  And then I ruled on it.

6              MR. CONSOLDANE:  We never got a

7  chance to cross examine him on it.  You already

8  ruled.

9              THE COURT:  You had a chance to

10  cross examine.  There were several experts that the

11  State did not specifically request that they

12  declare an expert and in light of no objection to

13  that, then they can testify and they did.

14              MR. LEWIS:  We have never done that

15  before.

16              MR. WATKINS:  I generally don't do

17  that.

18              MR. LEWIS:  That is not the proper

19  procedure.

20              THE COURT:  It happens all the time

21  in civil cases.

22              MR. LEWIS:  We're criminal people.

3165

1    You can do it either way.

2              THE COURT:  I believe the rules of

3    evidence are the same.

4              MR. LEWIS:  I'm saying that it is

5    obvious.

6              THE COURT:  Let me suggest to you

7    that in the future when that arises, you have the

8    right to request that of the Court, or to have the

9    Court inquire further, and I have done that.

10             MR. LEWIS:  I'm going to ask for

11   separate Voir Dire examination out of the hearing

12   of the Jury.  From now on, I'll have to do that.

13   Okay.  Let's move on.

14             THE COURT:  The upper Court can

15   review this problem and deal with it.

16             MR. LEWIS:  I hope they take 2,000

17   years doing it.

18             THE COURT:  Number 281, is that the

19   next one?

20             MR. LEWIS:  I think 311.

21             MR. MORROW:  281 was part of Mr.

22   Greene's report.  281 and 285, that is that whole

3166

1    combination and you found those to be admissible.

2    You then go to 294.

3                    MR. LEWIS:  I think we agreed to it.

4    All right, if we did, we'll withdraw it.

5                    THE COURT:  Was there DNA on it?

6                    MR. WATKINS:  Yes.

7                    THE COURT:  That is a tie that fits

8    in with the State's case.

9                    MR. MORROW:  Number 311.

10                    THE COURT:  Unless there's some

11    point of why it should be excluded.

12                    MR. LEWIS:  We'll move onto number

13    311.  Number 311 is the purported receipts from the

14    Days Inn.  It is an unsigned -- I'm sorry, I have

15    got the one that is unsigned, we're objecting to.

16    It's a phone log.  Also a receipt made out and a

17    receipt, various documents from Days Inn.  The

18    point is, it was never identified in the sense

19    supposedly Donna Roberts filled that out or

20    whatever, and there's no line-up or anything else

21    that she actually was the one that did this in

22    regards to procuring the room on that night.

3167

1   Anybody can go in there with Donna Roberts' card or

2   anything else.  There's nothing on there.

3                   MR. CONSOLDANE:  Further that was

4   one --

5                   THE COURT:  Your point is there was

6   no one identifying Donna Roberts as being the

7   person -- that described the woman that it could

8   not be Donna Roberts.

9                   MR. LEWIS:  They said a woman in her

10  late forties and was short.

11                  THE COURT:  Small stature and

12  reddish hair.

13                  MR. WATKINS:  Jeffrey Diamantes

14  identified her as having red hair, small stature,

15  and also said that he asked for identification when

16  he took the credit card.  She signed Donna Roberts

17  and gave the Fonderlac address on the room and paid

18  the amount of money.  Interestingly, the Defendant

19  admits on his statement that Donna took him to a

20  motel.

21                  THE COURT:  The Defendant's argument

22  does not go to admissibility, but to the weight and

3168

1   it is arguable that this may not have been the

2   person, but the State has gone through a logical

3   sequence of events to put that evidence before the

4   Jury.  Those documents have been identified by the

5   person that worked at the motel.  They were

6   generated at the motel.  As to the question of

7   identification, that is something that you can

8   argue, that you're right, the State would not have

9   proven beyond a reasonable doubt that that person

10   that signed those things was in fact Donna Roberts,

11   but the Jury may infer that that is true.  They

12   have the information where that inference can be

13   made.  So that will be admitted.

14          MR. MORROW:  Then we go to number

15   319.

16          MR. CONSOLDANE:  It is another piece

17   of manufactured evidence by the Prosecutor.

18          MR. LEWIS:  Judge, this comes down

19   to the phone logs, through this whole trial, they

20   take what is legitimate evidence and they compile

21   what they like and manufacture new evidence, so

22   they are framing it in their own light.  If you

3169

1   have got evidence, you have got all of the tapes.

2   You can't manufacture pieces of it to give to the

3   Jury.

4           MR. WATKINS:  I would like to

5   respond.  The tapes are relevant and material.

6   First off, these are, this has been authenticated

7   by Mr. Dillon and others that have identified some

8   stills from it, but 319 deals with the date in

9   question, that is, December 11th, and it deals with

10  a video from a camera that takes pictures and

11  snapshots through the video of Mr. Fingerhut, who

12  at approximately 4:30, somewhat after 7:30 and at

13  9:00, is unloading buses.  According to the

14  Defendant, that he saw the Defendant while he was

15  loading and unloading buses.  There's three buses

16  there, and the testimony, there were only ten buses

17  all day, and I think the totality of the evidence

18  suggests that the finite period of time that we're

19  looking at deals with whether buses are there.  Mr.

20  Lewis did a fine job on cross examination, cameras

21  there only for a certain period of time, and this

22  goes to weight.  But most importantly it has 9:01,

3170

1   it shows the victim leaving, what clothing he has

2   on, as do the photographs.  This is, in the State's

3   position, relevant and material for the reasons

4   dealing with the bus, and also dealing with showing

5   what the victim looked like, and the time that the

6   victim left.  The fact that it is a composite of

7   the film doesn't take away its legitimate

8   circumstances.  It was testified with the proper

9   foundation.  It is the exact copy of what was

10   there, for that whole period of time.

11         MR. LEWIS:  We don't have what that

12   was produced from.  We don't have the original.

13   That is what the problem here is, is that Frank

14   Dillon supposedly sent her out for six or eight

15   hours Saturday and looking for photographs of a

16   camera that only picks up every 45 seconds to 60

17   seconds a shot, out of nine cameras, it doesn't

18   show the Greyhound bus terminal or area, or where

19   they operate from, and you have only got him on

20   tape for a matter of five to seven minutes,

21   supposedly, and you can't even see one minute he's

22   in the picture, the next minute he disappears 60

3171

1   feet away.  Disappears.  We can't see in front of

2   the bus, the buses that are out there in pitch

3   black, and you can't identify him by face on these

4   things.

5           That is ridiculous and we don't have the

6   original of this of where it was compiled from.

7   You have to have the original.  Now we're getting

8   their idea of what they think is important here and

9   we don't have the original tape from the RTA.

10          THE COURT:  We visited this problem

11  some days ago and I thought that there were six

12  hours of tape, which was available for view if

13  there was some suspicion that the State had either

14  doctored it or left something out or whatever.

15          MR. WATKINS:  It was available.

16          MR. LEWIS:  We had to go to K-Mart

17  to watch this, but the point is that is the

18  original.  That is what should be introduced.  If

19  they want to try to get a compilation, that is

20  fine.  It is not out there someplace.  You can go

21  check this out.  The U. S. Marshal's office up

22  there -- you can check him out and Mr. Bogus is

3172

1  running around with phony cards that are illegal.

2      THE COURT:  I understand Defense's

3  consternation of this, but the alternative is one

4  of two choices here, not to allow this compilation

5  to be shown, or to show the entire six hours, and I

6  don't think anybody was up to accepting the latter.

7      MR. LEWIS:  The problem is it has

8  already been shown to the Jury.  That is the point.

9      THE COURT:  I'm saying --

10      MR. LEWIS:  We object.

11      MR. CONSOLDANE:  Your Honor, they

12  should have provided us with the entire copy and

13  shown what they extrapolated from.

14      MR. WATKINS:  They had it.  It was

15  always available.

16      THE COURT:  I understand that that

17  has been available.  That is fundamental of what my

18  ruling has been all through this.

19      MR. CONSOLDANE:  I never saw it.

20      MR. MORROW:  We provided to them the

21  compilation video to them.  Put them on notice that

22  that was a potential Exhibit that was going to be

3173

1    introduced.  They were on notice, having received

2    that tape way back when it was delivered and

3    received by defense counsel, they had more than

4    ample opportunity to either request an opportunity

5    to view, to request an opportunity to have that

6    produced, or to play that for the Jury.  They have

7    been on notice since they received those

8    compilations that were being provided to them.

9              MR. LEWIS:  Go to the discovery and

10   show me where that tells you it is a compilation of

11   this.  Does this tell you it is a compilation of

12   anything?  It just says the Greyhound bus station,

13   and what they did is they gave us photographs of

14   him, which are the other Exhibits.  That is what we

15   had, and that is what they told us.  These are the

16   still photographs we have of this thing, supposedly

17   the cameras took.  Then all of a sudden, later on,

18   they end up with a compilation of it and we don't

19   have the original tape.

20              MR. CONSOLDANE:  We thought that was

21   the entire tape at the time.

22              MR. LEWIS:  They gave us some

3174

1   photographs, which were eventually introduced.

2          THE COURT:  Let me ask this

3   question.  Are you of a mind that the State has

4   left out evidence that would be favorable to your

5   client or is it just that you are disagreeing with

6   the fact that somebody on the State's side made

7   this compilation, narrowing it down to the

8   testimony of the person that put this together

9   was -- they took all scenes, where the victim was

10  shown in that six hours of tape, and they put those

11  sections together.  I guess it is arguable on the

12  Defendant's side that, well, our client may have

13  shown up in some of the other ones that the victim

14  wasn't in.  I have no way of knowing that.  I just

15  understood from the beginning that the Defense had

16  the ability to review the entire six hours.

17          MR. LEWIS:  The base problem is that

18  there's a compilation and pictures, operated by

19  RTA.  There's nine cameras.  It does not show the

20  Greyhound.  These are for RTA.  The other cameras,

21  I'm sure, show the inter-office and the one you see

22  going out in the hall in the center of that room is

3175

1    from RTA.  It doesn't even show you the Greyhound

2    agency or where they are at or the door or anything

3    else.  That is the problem with this.  It is geared

4    for RTA.  There's other areas, that anybody can

5    walk through those front doors and walk.  They got

6    a whole minute.  How long does it take to walk

7    across a lobby to a desk or to be out in front of a

8    bush?  That is the problem with this.

9                THE COURT:  You are saying in affect

10   then, that because it doesn't show everything, it

11   should not be allowed to show anything?

12               MR. LEWIS:  Exactly.  If it covers

13   the territory.  How can you say he wasn't there?

14   It's like taking a movie in here, we're going to

15   watch all day long and say somebody didn't come

16   into the Courthouse.  You can't do that.  It is

17   misleading.

18               MR. MORROW:  That all goes to the

19   weight of the evidence which Mr. Lewis brought on

20   cross examination and in the event that the State

21   had not produced the video, it is one of those

22   damned if we do, damned if we don't.  Then the

3176

1   cross examination becomes, you guys had the tape

2   down at the RTA.  Why didn't you play it?  Quite

3   simply, we had the evidence that we had available,

4   we presented it.  Sure, we presented it in a light

5   favorable to the State, because that is what our

6   job is, to present our evidence.  We compiled the

7   video, compiled it down.  Detective Dillon

8   testified as to what he did.  Mr. Lewis had an

9   opportunity to cross examine him as to whether or

10  not the accuracy of what he did and that all goes

11  to the weight.

12          MR. WATKINS:  One other thing, the

13  testimony is very clear.  Dillon was asked what was

14  his purpose.  The purpose was to go through the

15  film and was Nathaniel Jackson in this anywhere in

16  this eight hours, and the answer was no.

17          MR. LEWIS:  One other thing, if you

18  look at the photographs and you also look at that

19  film, you can't tell who is who.  The only reason

20  he can identify Fingerhut in it, is because he was

21  wearing that white shirt.  You look at the

22  photographs, you can't see their faces.  You can't

3177

1   see nothing.  You can't tell whether they are black

2   or white persons, and that is ridiculous evidence.

3   It should never be allowed in.  This is a

4   competency issue.  That is the most incompetent

5   evidence of all time.  It is not a matter of

6   weight.  It is incompetent.

7                   MR. CONSOLDANE:  Besides that, if

8   they were going to introduce it, they should have

9   told us it was a compilation to begin with and in

10  turn provided us what they took the compilation

11  from.  Even looking at that, we probably wouldn't

12  have been able to do any good anyhow.  It shouldn't

13  have been shown to the Jury.

14                  THE COURT:  If you are correct on

15  that, the damage has been done.

16                  MR. LEWIS:  We argued it before.

17                  THE COURT:  You are better off on

18  appeal if I leave it go into the Jury now, rather

19  than changing mid stream.

20                  MR. LEWIS:  We have lost everything

21  else.

22                  MR. CONSOLDANE:  It should not go to

3178

1   the Jury.  We'll handle whatever we have to on

2   appeal.  It should not go to the Jury.

3                   THE COURT:  As I say, this is a

4   rehash of what I went through before.  I made my

5   decision originally to leave it in and I'm not

6   going to change that.  If I am wrong, thank God for

7   the Court of Appeals.  I think it has been properly

8   allowed in, that the quality of it is not the

9   issue.  It is the authenticity of it, and we had

10  testimony to the effect that what it was, what it

11  professed to show, and I'll overrule the objection.

12  Number 320.

13                  MR. LEWIS:  It is the same thing.

14  These are the still shots that were taken from the

15  compilation which we just argued about.  Everything

16  we argued about in regard to that applies as well

17  as all of the additional circling.

18                  MR. CONSOLDANE:  They have been

19  altered by the Prosecution.

20                  MR. LEWIS:  There's a blow-up.

21  There's Mr. Fingerhut.  You can see his face.  They

22  happen to put a circle around him because he's got

3179

1   a white shirt on.  You tell me if you can identify

2   him by face on that.  That is nonsense.

3                    THE COURT:  Dennis?

4                    MR. WATKINS:  Your Honor, where are

5   the small ones?  They are in there.  We'll withdraw

6   all of the ones with the circles.  And request that

7   the Court, and these were also identified by

8   Sanches who was with him and said that is what he

9   identified him leaving -- as he was leaving in

10  that, and that is how he was dressed.  The numbers

11  I am withdrawing are 320-F, 320-E, 320-H and 320-G.

12                   THE COURT:  Which one of these do

13  you want in?

14                   MR. WATKINS:  It doesn't matter.

15                   THE COURT:  The Defense motion will

16  be granted as to the exclusion from that series of

17  320 except for 320-I and 320-D.  320-I shows quite

18  clearly Mr. Fingerhut and 320-D shows the red

19  jacket and the time that there's testimony that he

20  left.  Number 321, 322, 323.

21                   MR. WATKINS:  I missed two and I

22  think it is the same thing.  It shows him leaving

3180

1    shortly before that.  320-A and B.

2              THE COURT:  Again, I let you pick

3    between the three.  The one I said one of these, I

4    don't see any reason for anything more than one of

5    them.  They are all approximately the same time.

6    It shows he's leaving it, corresponds with the

7    testimony.  You pick the ones you want.

8              MR. WATKINS:  320-A and B are out.

9              THE COURT:  Your objection on the

10   phone records?

11             MR. LEWIS:  The records, Judge, I

12   didn't realize that Alltel evidently got eaten up

13   or bought by Dobson Communications.  The point is

14   that we have so-called phone records, which the

15   phone records, I believe they have some numbers on

16   there.  They have not authenticated number one, who

17   the numbers are actually in; two, the duration of

18   the calls that were called.  They put the time on

19   there, but they don't tell you whether that their

20   timing or their duration starts from the moment

21   that there's connection made to the telephone, or

22   whether when the receiver is lifted and the

3181

1    connection is made for a human voice.  It doesn't

2    tell you how long the conversations are.  It

3    doesn't tell you whether the numbers were forwarded

4    on to a third party, whether it shows on a bill or

5    not, such as we were talking with the people from

6    Lorain Correctional facility, that would not be

7    able to tell or the number would never show if it

8    was passed onto another number, which obviously

9    could be forwarded any time.  It doesn't tell you

10   whether the calls were forwarded in any form or

11   fashion.  It doesn't tell you whether they would

12   record them or not in that time frame.  So, there's

13   a lot of interpretations that you can get.  Out of

14   potentially those records, it doesn't tell you what

15   these things are.  And just to give those point

16   blank to a Jury and start saying, well, this, this,

17   this.  It doesn't tell you that.  You have to have

18   somebody come in here and testify that if a number

19   is called, and this duration of time starts from

20   the moment the thing is dialing or does it start

21   from the moment that the connection is made.  Does

22   it actually start from the time the receiver is

3182

1    picked up and there's communication.  It doesn't

2    tell you any of that.  You have got to have that in

3    order to figure out to get some interpretation of

4    what is going on between these phones, whether they

5    are forwarded onto a third party.  You can't tell

6    from that.  All of these calls could have been --

7    if they don't record a forwarding mechanism.  If

8    they forward them, every one of these calls that

9    give us a complete incorrect record of where the

10   phone calls ended up.  It is ridiculous, you can't

11   use it.  You have got to have somebody come in here

12   and testify whether it does or doesn't.  So you can

13   say this is the call, this was actually a calling

14   to this number.  He didn't go any farther.  Or they

15   have to come in and say, we can't tell you if it

16   didn't go any farther.  If they got call

17   forwarding, we didn't record that.  It is the first

18   number that gets billed all the time and in

19   reality, wouldn't be true.  That is the problem.

20   We need somebody who knows and who is a telephone

21   company person, not layman, because I can't even

22   read my own telephone bill, and the point is that

3183

1   every telephone company is different.  They have

2   charging mechanisms, the time they show for the

3   calls, all of that is different depending on the

4   telephone company.

5              MR. CONSOLDANE:  Judge, if I call

6   somebody and that phone rings and nobody answers, I

7   still get billed the minute.

8              THE COURT:  You need a different

9   service.

10              MR. LEWIS:  You just answered the

11   question.  Exactly that, we don't know.

12              THE COURT:  What is your response?

13              MR. WATKINS:  We spent a lot of time

14   covering this issue before the testimony came in

15   and we gave the Court case law.  I believe there's

16   sufficient foundation.  In addition, the record

17   reflected at the time this Court ruled this

18   admissible, that there were, the numbers included,

19   in the transcript of the Defendant's own statement,

20   and admitting making specific calls to Donna

21   Roberts' car phone to a specific number, which are

22   exactly the numbers there.  And the Court excluded

3184

1    our compilation, but the Court ruled admissible,

2    based on Federal case law that Mr. Morrow cited and

3    the rules of evidence, and we feel that there's no

4    evidence to change the ruling now especially in

5    light of the fact that the Defendant's own

6    transcript and admissible statement verifies that

7    telephone calls were being made to the car phone.

8         MR. LEWIS:  Doesn't say when,

9    whether they were forwarded, and also at the same

10   time it was testified to, it was just testified to

11   the fact that that is the record that Mr. Monroe

12   received.  He didn't know anything about the record

13   or how to interpret the record and the prior

14   argument about the fact is that these are totally

15   admissible.  Without any indication of how they are

16   compiled, what is the effect of them, how they are

17   interpreted, whatever, just a point blank deal,

18   they come in, is not correct.  The law he cited

19   was, it could be authentic.  It didn't say whether

20   they could be arbitrarily placed into evidence

21   without someone interpreting what they are.  Can

22   the records be admitted?  Sure they can, but you

3185

```
 1   have to have somebody say how they operate, this
 2   and that.  So, if they want to introduce that
 3   stuff, that is fine.  I am allowed to argue that
 4   the time duration, there was no connections made,
 5   because there was time.  I can argue anything I
 6   want from those records, because they can't tell me
 7   different and we don't have any evidence that is
 8   any different.  Every one of those phone calls were
 9   all forwarded.  I can say that without any problem.
10   Because there was no evidence in the case that they
11   weren't.
12              THE COURT:  The Court is going to
13   stand with its prior ruling.  You have built a
14   record, Mr. Lewis, Mr. Consoldane, that the Court
15   of Appeals will have adequate opportunity to review
16   your argument.
17              MR. MORROW:  The next two, 322 and
18   323 are the insurance policies, the State Farm
19   policy which was independently testified to by Miss
20   Kathy Thomas.  Not only do we have certification in
21   the record, but we also have Mrs. Thomas testifying
22   as being the agent that prepared that policy, and
```

3186

1    there's the one that actually sold it to --

2                    THE COURT:  She testified as an

3    expert on insurance.

4                    MR. LEWIS:  The records came in.

5                    MR. MORROW:  He's standing by his

6    prior ruling.

7                    MR. LEWIS:  We're arguing the

8    insurance policies.  The insurance policies with

9    Kathy Thomas, the first problem you have is with

10   Zurich.  That is not an insurance policy issued by

11   State Farm.  She doesn't know anything about the

12   policy.  She doesn't see it signed or issued by

13   Robert Fingerhut.  We don't have any information in

14   regard to that.  We don't have information in

15   regard to either one of them.  Whether there was

16   any assignment of the policy or any change of

17   beneficiaries by virtue of any assignment of the

18   policy, and -- I think that is it.

19                    THE COURT:  That is essentially the

20   same argument that was made before and for the same

21   reasons as put on the record previously, I'll admit

22   those items.

3187

1              MR. MORROW:  Next, we have the

2      certification, 327-A, B and C, which are

3      certification from the ATF on the two firearms

4      traces to the two revolvers.

5              MR. LEWIS:  The certification, there

6      wasn't any agents from the ATF.  We would love to

7      have one of the guys in, love to have them in there

8      to find out what they are doing.  There wasn't

9      anybody in here to authenticate that, and actually

10     that is a trace document.  Those are just, I

11     believe, that is originally compiled.  There's

12     something wrong with those documents, I can't

13     remember exactly how it works.  Those are like, I

14     think like getting a copy of a registration or

15     something, but it is not really.  ATF, let's put it

16     this way, there's no explanation as to how ATF has

17     the information.  Those are not bill of sales, they

18     are not anything indicating that.  We're just

19     objecting.

20             THE COURT:  It does say on this,

21     trace history of this firearm was derived from a

22     federal licensed dealer.  That has discontinued

3188

1   business and has submitted their business.

2   Everybody who buys a gun is on a computer

3   somewhere.  There's a certification here and the

4   firearms trace worked through the manufacturer to

5   the dealer, to the purchaser, and I think that is a

6   valid way to have that information come in.

7           MR. LEWIS:  All right.  Number 352

8   is the search warrant.  There isn't any reason --

9           MR. WATKINS:  That is out.

10          MR. LEWIS:  Thank you.  He wanted

11  the whole story to be right there in the affidavit.

12          MR. MORROW:  Number 396.

13          MR. LEWIS:  The Wal-Mart receipt

14  Paul Monroe supposedly identified.  Our argument in

15  regard to the Wal-Mart receipt was the fact that it

16  has cash.  Doesn't have any indication of who

17  actually went to the store, or actually who

18  produced it or who got the receipt, and there's no

19  credit card account or anything of that nature.  No

20  signatures whatsoever.  Just a receipt for certain

21  time at Wal-Mart and without some other testimony

22  regarding when it was compiled and who actually was

3189

1   there --

2                THE COURT:  What did this have to do

3   with this?

4                MR. WATKINS:  This is a receipt that

5   Paul Monroe testified to on his direct examination

6   that was on the kitchen table, that was found dated

7   12-11 at 9:34 p.m. and it was identified as being

8   belonging to Donna Roberts.  The value is that

9   Donna Roberts is at home.  The receipt is on the

10  kitchen table, and it goes along with showing that

11  Donna Roberts, at the time when we say the homicide

12  occurred, was not at home, she was seen by another

13  witness driving her car, and --

14               THE COURT:  Okay.

15               MR. WATKINS:  Only a reasonable

16  person, a reasonable person would conclude that

17  that receipt is hers.

18               THE COURT:  There was a sufficient

19  basis laid through testimony, to explain the

20  presence of this in the home.  It is up to the Jury

21  to decide whether they are going to draw the same

22  inference that the State has or not.  That will be

3190

1    admitted.

2                    MR. MORROW:  Number 397, 397-A, it

3    is the compilation of the power point.

4                    MR. LEWIS:  I'm going to object.  We

5    have a CD disk, we have a transcripts and we have

6    the audio cassettes for all of the taped

7    conversations from the prison.  They have picked

8    out what they like the most and they got a

9    transcript and what they are doing is highlighting

10   certain evidence they want in, and we have the

11   original.  The Jury should not be pushed in some

12   direction of special transcripts.  They have

13   already done that in the presentation of the

14   evidence.  There's no reason to give that, because

15   that is duplicitous of what they already have.

16   There's no way, no how.

17                    THE COURT:  Would you like the Jury

18   to have the opportunity to listen to all of the

19   tapes?

20                    MR. LEWIS:  Of course.  They have

21   that, they presented that.  The problem is they

22   just picked what they liked and put it up on a 12

3191

1    by eight foot screen and let the Jury hear what

2    they want them to hear and we couldn't do anything

3    like that, because we don't have power point, and

4    all they are doing is compiling what they like out

5    of this.

6              THE COURT:  We're not ever going to

7    agree on this, but it is an economy of time, unless

8    that procedure in this case, selected some of it,

9    works to your client's detriment by omitting things

10   that may be helpful.

11             MR. CONSOLDANE:  We didn't object to

12   all of the tapes coming in.

13             MR. LEWIS:  They should all come in

14   on equal footing.

15             THE COURT:  I understand.  The point

16   is that the tapes meet the criteria to come in.

17   All of the tapes that were taken, they laid a

18   foundation to bring these tapes in.

19             MR. CONSOLDANE:  They are in.  They

20   are in.  The original.  I don't see why they should

21   come in twice.

22             MR. LEWIS:  That is what they are

3192

1   doing.  They are picking and selecting and bringing

2   it in twice.  It is already there.  It is already

3   there.  It is like taking a picture.  We only have

4   one gross shot of the bullet going through the

5   man's head.  What you are doing in the same text

6   here, saying, "Well, I'll tell you what, that was

7   all right."  But the Prosecutor is going to produce

8   a larger one and one from 20 different angles and

9   we'll be able to get that in, but it is already

10  there.  The problem is, this is already an absolute

11  duplicate of what is there.  There's no reason in

12  the world they should be able to have or to

13  pinpoint or to have a separate thing, because they

14  can manufacture all of the evidence that way.  They

15  can take all of the evidence and say, "We're going

16  to take this conversation, this conversation, and

17  we're going to produce 50 more tapes," just the

18  word we want.  The Jury should get everything on an

19  equal footing.

20            THE COURT:  That is what I'm saying.

21  Do you wish to have all of the tapes?

22            MR. LEWIS:  Yes.  If you are going

3193

1  to allow that portion of the tape in, then we want

2  a transcript of all of the rest of the tapes.

3              THE COURT:  What is the basis for

4  you making that request?

5              MR. LEWIS:  What I'm saying here is,

6  they have the CD with all of the telephone

7  conversations on.  Not picked out, which ones to

8  like, whatever.  They have the audio tapes of all

9  of the conversations.  We want to hear them all.

10 And we have the transcripts.  We want them to read

11 them all.  Why should the Prosecution be able to

12 turn around and say, "We like these portions so

13 we're going to produce another tape and we're going

14 to produce another transcript of the stuff we like

15 and introduce that as an Exhibit."  It is

16 duplicity.  They have the originals.  They should

17 have an equal shot listening to all of the tapes,

18 not something manufactured by the Prosecution.

19             THE COURT:  Mr. Teeple, do you have

20 a recording device that plays that CD?

21             MR. WATKINS:  We have cassette

22 copies.  Cassettes of every conversation has been

3194

1    admitted, along with a transcript.  We have

2    transcripts and cassettes that have already been

3    admitted by agreement.

4                    THE COURT:  I wasn't aware of that.

5                    MR. LEWIS:  That is what I was

6    saying.

7                    THE COURT:  You didn't say that.

8                    MR. LEWIS:  They have 19 -- they

9    want to introduce the additional, what they showed

10   is duplicities of this.  It is their version.

11                   THE COURT:  They are duplicating

12   what the Jury will already have.

13                   MR. LEWIS:  They are picking out

14   what they like out of it.

15                   THE COURT:  You have had an

16   opportunity to select those portions and show it

17   for the Jury.  There's no reason to send this back.

18   The Jury is going to have all of these.

19                   MR. WATKINS:  My only point and that

20   is my only observation, is that the Jury may want

21   to -- this is evidence presented in Court.  They

22   may want to hear that without going through 18

3195

1    separate ten minute tapes.

2                   MR. LEWIS:  No.

3                   MR. WATKINS:  I don't think that the

4    Defense controls what is admissible evidence.  The

5    question is whether or not it makes some sense.

6                   THE COURT:  The point is, if you

7    have two photographs showing the same thing, you

8    don't send both photographs back usually.  It is

9    the same thing here.  If they are going to have all

10   of these tapes of all of the conversations, their

11   objection is to you having the advantage of sending

12   this information.  You have already had the

13   advantage of showing it.  They have already had

14   your view of the selection.

15                  MR. WATKINS:  I know.  In my

16   opinion, this will make it more difficult for the

17   Jury to review what they have heard in Court,

18   because they don't have that opportunity, unless

19   they go through 19 different tapes.

20                  MR. LEWIS:  You don't want them to

21   go through the evidence?  You don't want them to

22   listen to the evidence?

3196

1              MR. WATKINS:  It is up to them to go

2      through whatever form of evidence they want to go

3      through, including what was played in Court.  They

4      have both.

5              THE COURT:  I'm not going to send

6      this back with them.  They have heard it.  They can

7      find out what they want from the original tapes.

8              MR. CONSOLDANE:  For the record, has

9      the State rested?

10             MR. WATKINS:  No, not until we take

11     up the motions here.

12             MR. CONSOLDANE:  We can't argue our

13     motions until they rest.

14             MR. WATKINS:  What are you talking

15     about?

16             MR. LEWIS:  This becomes a little

17     bit of a problem.  If they don't rest, then

18     anything we bring up, they go, they can throw

19     another witness on.

20             MR. CONSOLDANE:  When they rest,

21     we'll argue.

22             MR. WATKINS:  We'll have to take it

3197

1    in two parts.  My relevance argument first and then

2    we go into the other one.

3                  MR. CONSOLDANE:  What does relevance

4    argument have?

5                  THE COURT:  I think they are right

6    that before their Rule 29 motion makes any sense

7    that the State has to close.  You will have to

8    decide whether you have everything in or not.

9    Their Rule 29 motion, I would expect, is going to

10   have to examine the elements of the crimes and as

11   to whether or not all of those --

12                  MR. WATKINS:  I understand that and

13   I am prepared for that, too.

14                  THE COURT:  I'll see you Monday at

15   1:00.

16   (Court in Recess at 3:30 p.m.)

17

18   (SEE SEPARATE VOLUME FILED BY KELLY WILSON FOR

19   RECORD OF PROCEEDINGS ON NOVEMBER 4, 2002 AND

20   NOVEMBER 5, 2002.)

21

22

3198

1    ### REPORTER'S CERTIFICATE

2

3        I do hereby certify that the above and

4    foregoing is a true and correct transcript of the

5    proceedings had in the within hearing as shown by

6    stenotype notes written by me in the presence of

7    the witnesses at the time of the hearing.

8

9

10                        _Mary Ann Mills_
                      MARY ANN MILLS, R.P.R.
11                    Official Court Reporter
                      Trumbull County, Ohio
12

13

14

15

16

17

18

19

20

21

22