3199

IN THE COURT OF COMMON PLEAS
TRUMBULL COUNTY, OHIO

STATE OF OHIO,                    )    Case No.2001-CR-794
                                  )
        Plaintiff                 )
                                  )
-vs-                              )    JUDGE JOHN M. STUARD
                                  )
NATHANIEL E. JACKSON,             )
                                  )              PARTIAL
        Defendant                 )    TRANSCRIPT OF PROCEEDINGS

VOLUME 14

**NOVEMBER 4, 2002 - HEARING ON MOTIONS**

**NOVEMBER 5, 2002 - HEARING ON MOTIONS**
                    **THREE WITNESSES**
                    **HEARING ON MOTIONS - JURY INSTRUCTIONS**

BEFORE:        HONORABLE JOHN M. STUARD

AT:            Trumbull Co. Court of Common Pleas
               Courtroom Number 2
               160 High Street, NW
               Warren, Ohio 44481

APPEARANCES:

On behalf of the Plaintiff:
     MESSRS. DENNIS WATKINS
     and CHARLES L. MORROW
     Attorneys at Law


On behalf of the Defendant:
     MESSRES. JAMES F. LEWIS
     and ANTHONY V. CONSOLDANE
     Attorneys at Law

03-0137

FILED

JUL 0 9 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Official Court Reporter:  Kelly J. Wilson

i

1                          I N D E X

2                                                    PAGE NO.

3    Search Warrant Hearing                              3
     (December 20, 2001)

4

     Initial Appearance of Nathaniel Jackson            9
5    Hearing (December 21, 2001)

6    Initial Appearance of Donna Roberts               12
     Hearing (December 21, 2001)

7

     Motion to Intervene                               19
8    (December 31, 2001)

9    Arraignment of Donna Roberts (co-defendant)       57
     Arraignment of Nathaniel Jackson

10

     Waiver of Speedy Trial                            64
11   (January 23, 2002)

12   Hearing on Motions                                67
     (March 20, 2002)

13

     Hearing on Motion to Suppress Evidence           185
14   (April 17, 2002)

15   WITNESSES AT SUPPRESSION HEARING:

16   JEFFREY R. HOOLIHAN
         Direct Examination by Mr. Watkins            190
17       Cross Examination by Mr. Lewis               231
         Redirect Examination by Mr. Watkins          274
18       Recross Examination by Mr. Lewis             280

19   DET. SGT. PAUL MONROE
         Direct Examination by Mr. Lewis              288
20       Examination by The Court                     312

21   NATHANIEL JACKSON
         Direct Examination by Mr. Consoldane         314
22       Cross Examination by Mr. Watkins             324

ii

| INDEX - Continued | PAGE NO. |
|---|---|
| 1 | |
| 2   Court's Opening Remarks (Volume 2) | 381 |
|     Motion for Mistrial | 415 |
| 3 | |
|     VOIR DIRE | |
| 4       Hardship Excuses | 422 |
|         Death Penalty Qualification & Media | 664 |
| 5       (Volume 3) | |
|         Motion for Change of Venue & Motion to | |
| 6        Dismiss | 1835 |
| 7   GENERAL VOIR DIRE | 1857 |
| 8   OPENING STATEMENT ON BEHALF OF STATE OF OHIO | 2064 |
|     OPENING STATEMENT ON BEHALF OF THE DEFENDANT | 2093 |
| 9   STATE'S WITNESSES: | |
| 10 | |
|     PAULA CARSON | |
| 11      Direct Examination by Mr. Morrow | 2100 |
|         Cross Examination by Mr. Lewis | 2105 |
| 12 | |
|     JAMES C. DANIELS | |
| 13      Direct Examination by Mr. Watkins | 2111 |
|         Cross Examination by Mr. Lewis | 2124 |
| 14      Redirect Examination by Mr. Watkins | 2138 |
| 15  JOSE SANCHEZ | |
|         Direct Examination by Mr. Watkins | 2139 |
| 16      Cross Examination by Mr. Lewis | 2156 |
|         Redirect Examination by Mr. Watkins | 2168 |
| 17 | |
|     FRANK E. REYNOLDS | |
| 18      Direct Examination by Mr. Watkins | 2172 |
|         Cross Examination by Mr. Lewis | 2191 |
| 19      Redirect Examination by Mr. Watkins | 2201 |
| 20  PAUL MONROE | |
|         Direct Examination by Mr. Watkins | 2202 |
| 21      Cross Examination by Mr. Consoldane | 2392 |
| 22 | |

iii

INDEX - Continued                                    PAGE NO.

MIKE YANNUCCI
     Direct Examination by Mr. Morrow              2406
     Cross Examination by Mr. Lewis                2418
     Redirect Examination by Mr. Morrow            2428

RICHARD TACKETT
     Direct Examination by Mr. Morrow              2428
     Cross Examination by Mr. Lewis                2434

ANTHONY LESHNACK
     Direct Examination by Mr. Watkins             2445
     Cross Examination by Mr. Consoldane           2455

FRANK DILLON
     Direct Examination by Mr. Watkins             2457
     Cross Examination by Mr. Lewis                2480

DR. THEODORE SOBOSLAY
     Direct Examination by Mr. Watkins             2512

DR. HUMPHREY GERMANIUK
     Direct Examination by Mr. Watkins             2520
     Cross Examination by Mr. Consoldane           2576
     Redirect Examination by Mr. Watkins           2583
     Recross Examination by Mr. Consoldane         2585
     Redirect Examination by Mr. Watkins           2586

JOSE FLORES
     Direct Examination by Mr. Watkins             2587
     Cross Examination by Mr. Lewis                2599

EDWARD LULLA
     Direct Examination by Mr. Watkins             2604
     Cross Examination by Mr. Lewis                2624

JOHN STAMPER
     Direct Examination by Mr. Watkins             2645
     Cross Examination by Mr. Lewis                2652

iv

| | |
|---|---|
| 1 | **INDEX - Continued**     **PAGE NO.** |
| 2 | **JEFF DIAMANTES** |
| | Direct Examination by Mr. Watkins     2654 |
| 3 | Cross Examination by Mr. Lewis     2659 |
| | Redirect Examination by Mr. Watkins     2661 |
| 4 | |
| | **MICHAEL ROBERTS** |
| 5 | Direct Examination by Mr. Morrow     2663 |
| | Cross Examination by Mr. Consoldane     2695 |
| 6 | Redirect Examination by Mr. Morrow     2704 |
| | Recross Examination by Mr. Consoldane     2706 |
| 7 | |
| | **CYNTHIA MAYLE** |
| 8 | Direct Examination by Mr. Watkins     2706 |
| | Cross Examination by Mr. Consoldane     2728 |
| 9 | |
| | **DALE LAUX** |
| 10 | Direct Examination by Mr. Watkins     2735 |
| | Cross Examination by Mr. Consoldane     2751 |
| 11 | Redirect Examination by Mr. Watkins     2790 |
| | Recross Examination by Mr. Lewis     2798 |
| 12 | |
| | **BRENDA GERARDI** |
| 13 | Direct Examination by Mr. Watkins     2803 |
| | Cross Examination by Mr. Lewis     2840 |
| 14 | |
| | **STEVE GREENE** |
| 15 | Direct Examination by Mr. Morrow     2851 |
| | Cross Examination by Mr. Lewis     2875 |
| 16 | |
| | **CHRIS ELLINGTON** |
| 17 | Direct Examination by Mr. Morrow     2881 |
| | Cross Examination by Mr. Consoldane     2888 |
| 18 | |
| | **JIM McCOY** |
| 19 | Direct Examination by Mr. Morrow     2890 |
| | Cross Examination by Mr. Lewis     2899 |
| 20 | |
| | **JILL KENYON** |
| 21 | Direct Examination by Mr. Morrow     2900 |
| | Cross Examination by Mr. Consoldane     2908 |
| 22 | |

v

INDEX - Continued                                    PAGE NO.

JENNIFER ROBINSON
     Direct Examination by Mr. Morrow              2911
     Cross Examination by Mr. Lewis               2920

KATHY KIHM
     Direct Examination by Mr. Morrow              2921
     Cross Examination by Mr. Lewis               2924

BRIDGET PAUL
     Direct Examination by Mr. Morrow              2925
     Cross Examination by Mr. Consoldane          2934

KATHERINE THOMAS
     Direct Examination by Mr. Morrow              2936
     Cross Examination by Mr. Lewis               2952
     Redirect Examination by Mr. Morrow           2973
     Recross Examination by Mr. Lewis             2976

JAMES CAMPBELL
     Direct Examination by Mr. Watkins             2977
     Cross Examination by Mr. Consoldane          2982

LINDA THOMAS
     Direct Examination by Mr. Morrow              2994
     Cross Examination by Mr. Consoldane          3002

CHRISTOPHER MONYAK
     Direct Examination by Mr. Morrow              3003
     Cross Examination by Mr. Lewis               3023
     Redirect Examination by Mr. Morrow           3037

TROOPER GERALD FUNELLI
     Direct Examination by Mr. Morrow              3038
     Cross Examination by Mr. Lewis               3046

DET. SGT. PAUL MONROE
     Redirect Examination by Mr. Watkins          3049
     Recross Examination by Mr. Lewis             3063

BRAD CAIN
     Direct Examination by Mr. Lewis               3106



vi

1  INDEX - Continued                              PAGE NO.

2  TAMMIE KAYE
       Direct Examination by Mr. Consoldane        3118
3
   ROBERT STANTON
4      Direct Examination by Mr. Lewis             3119
       Cross Examination by Mr. Watkins            3127
5
   MOTIONS                                         3200
6
   CARMEN OLIVA
7      Direct Examination by Mr. Watkins           3267
       Cross Examination by Mr. Lewis              3278
8
   BARRY RICKER
9      Direct Examination by Mr. Watkins           3290
       Cross Examination by Mr. Lewis              3300
10
   DIANA MARCHESE
11     Direct Examination by Mr. Watkins           3309
       Cross Examination by Mr. Consoldane         3314
12     Redirect Examination by Mr. Watkins         3319
       Recross Examination by Mr. Consoldane       3319
13
   MOTION RE JURY INSTRUCTIONS                     3334
14
   FINAL ARGUMENT ON BEHALF OF STATE OF OHIO       3390
15 FINAL ARGUMENT ON BEHALF OF THE DEFENDANT       3438
   FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT     3495
16 REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO    3505

17 CHARGE OF THE COURT                             3541

18 NOVEMBER 7, 2002 (Deliberations)                3601

19 NOVEMBER 8, 2002 (Deliberations)                3602

20 VERDICT                                         3612

21 (SEE SEPARATE VOLUME FOR TRANSCRIPT OF
      MITIGATION HEARING)
22

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | Withdrawn |
| 36 | Photo | Withdrawn |
| 37 | Photo | No Objection |
| 38 | Photo | No Objection |
| 39 | Photo | Withdrawn |
| 40 | Photo | No Objection |
| 41 | Photo | Withdrawn |
| 42 | Photo | Withdrawn |
| 43 | Photo | No Objection |
| 44 | Photo | No Objection |
| 45 | Photo | Withdrawn |
| 46 | Photo | Withdrawn |
| 47 | Photo | No Objection |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | Withdrawn |
| 51 | Photo | No Objection |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

vii

viii

| No. | Description | Objection |
|-----|-------------|-----------|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewelry | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Extrerior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninisula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | Withdrawn |
| 86 | Blood Spatters - garage | No Objection |
| 87 | Overview garage | No Objection |
| 88 | Peninusla & Wall - blood splatters | Withdrawn |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | No Objection |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | Withdrawn |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | No Objection |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | No Objection |
| 108 | Victim | Withdrawn |
| 108A | Victim Face down | No Objection |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | Withdrawn |
| 111 | Victim lower torso | No Objection |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | Withdrawn |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

| | | |
|---|---|---|
| 118 | Office Area | No Objection |
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door, Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angle Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Bllod Smear | No Objection |
| 176 | Floormat | Withdrawn |
| 177 | Trunk Open | No Objection |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

ix

| | | |
|---|---|---|
| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Innn Photographs | Admitted over Obj |
| 202 | Days Innn Photographs | Objection Sustained |
| 203 | Days Innn Photographs | Withdrawn |
| 204 | Days Innn Photographs | Objection Sustained |
| 205 | Days Innn Photographs | Withdrawn |
| 206 | Days Innn Photographs | Withdrawn |
| 207 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 210 | Days Innn Photographs | Withdrawn |
| 211 | Days Innn Photographs | Withdrawn |
| 212 | Days Innn Photographs | Withdrawn |
| 213 | Days Innn Photographs | Withdrawn |
| 214 | Days Innn Photographs | Withdrawn |
| 215 | Days Innn Photographs | Withdrawn |
| 216 | Days Innn Photographs | Withdrawn |
| 217 | Days Innn Photographs | Withdrawn |
| 218 | Days Innn Photographs | Withdrawn |
| 219 | Days Innn Photographs | Withdrawn |
| 220 | Days Innn Photographs | Withdrawn |
| 221 | Days Innn Photographs | Withdrawn |
| 222 | Days Innn Photographs | Withdrawn |
| 223 | Days Innn Photographs | Withdrawn |
| 224 | Days Innn Photographs | Admitted over Obj |
| 225 | Days Innn Photographs | Withdrawn |
| 226 | Days Innn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | | |
|---|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted |  |
| 271D2 | | 11/29/01 | Admitted | |
| 271D3 | | 11/29/01 | Admitted | |
| 271D4 | | 11/28/01 | Admitted | |
| 271D5 | | 11/28/01 | Admitted | |
| 271D6 | | 11/27/01 | Admitted | |
| 271D7 | | 11/27/01 | Admitted | |
| 271D8 | | 11/26/01 | Admitted | |
| 271D9 | | 11/26/01 | Admitted | |
| 271D10 | | 11/24/01 | Admitted | |
| 271D11 | | 11/23/01 | Admitted | |
| 271D12 | | 11/23/01 | Admitted | |
| 271D13 | | 11/22/01 | Admitted | |
| 271D14 | | 11/22/01 | Admitted | |
| 271D15 | | 11/22/01 | Admitted | |
| 271D16 | | 11/22/01 | Admitted | |
| 271D17 | | 11/21/01 | Admitted | |
| 271D18 | | 11/21/01 | Admitted | |
| 271D19 | | 11/20/01 | Admitted | |
| 271D20 | | 11/20/01 | Admitted | |
| 271D21 | | 11/20/01 | Admitted | |
| 271D22 | | 11/20/01 | Admitted | |
| 271D23 | | 11/19/01 | Admitted | |
| 271D24 | | 11/19/01 | Admitted | |
| 271D25 | | 11/19/01 | Admitted | |
| 271D26 | Empty | | Admitted | |
| 271D27 | | 11/16/01 | Admitted | |
| 271D28 | | 11/16/01 | Admitted | |
| 271D29 | | 11/15/01 | Admitted | |
| 271D30 | Empty | | Admitted | |
| 271D31 | | 11/12/01 | Admitted | |
| 271D32 | | 11/10/01 | Admitted | |
| 271D33 | | 11/10/01 | Admitted | |
| 271D34 | | 11/10/01 | Admitted | |
| 271D35 | | 11/10/01 | Admitted | |
| 271D36 | | 11/09/01 | Admitted | |
| 271D37 | | 11/09/01 | Admitted | |
| 271D38 | | 11/09/01 | Admitted | |
| 271D39 | | 11/09/01 | Admitted | |
| 271D40 | | 11/08/01 | Admitted | |
| 271D41 | | 11/08/01 | Admitted | |
| 271D42 | | 11/08/01 | Admitted | |
| 271D43 | | 11/07/01 | Admitted | |
| 271D44 | | 11/07/01 | Admitted | |
| 271D45 | | 11/07/01 | Admitted | |
| 271D46 | | 11/07/01 | Admitted | |
| 271D47 | Empty | | Admitted | |
| 271D48 | | 11/06/01 | Admitted | |
| 271D49 | | 11/06/01 | Admitted | |
| 271D50 | Empty | | Admitted | |
| 271D51 | | 11/05/01 | Admitted | |
| 271D52 | | 11/05/01 | Admitted | |
| 271D53 | | 11/03/01 | Admitted | |
| 271D54 | | 11/03/01 | Admitted | |
| 271D55 | | 11/02/01 | Admitted | |
| 271D56 | | 11/02/01 | Admitted | |
| 271D57 | | 11/02/01 | Admitted | |
| 271D58 | | 11/01/01 | Admitted | |
| 271D59 | | 11/01/01 | Admitted | |
| 271D60 | Halloween card | | Admitted | |
| 271D61 | | 10/31/01 | Admitted | |

| Exhibit | Note | Date | Status |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

xii

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

xiii

xiv

| 273N | Letters from Nate to Donna | | Admitted |
|------|------|------|------|
| 273N1 | | 12/01/01 | Admitted |
| 273N2 | | 11/30/01 | Admitted |
| 273N3 | | 11/29/01 | Admitted |
| 273N4 | | 11/28/01 | Admitted |
| 273N5 | | 11/27/01 | Admitted |
| 273N6 | | 11/26/01 | Admitted |
| 273N7 | | 11/25/01 | Admitted |
| 273N8 | | 11/23/01 | Admitted |
| 273N9 | | 11/22/01 | Admitted |
| 273N10 | | 11/20/01 | Admitted |
| 273N11 | | 11/19/01 | Admitted |
| 273N12 | | 11/17/01 | Admitted |
| 273N13 | | 11/16/01 | Admitted |
| 273N14 | | 11/14/01 | Admitted |
| 273N15 | | 11/14/01 | Admitted |
| 273N16 | | 11/13/01 | Admitted |
| 273N17 | | 11/12/01 | Admitted |
| 273N18 | | 11/12/01 | Admitted |
| 273N19 | | 11/10/01 | Admitted |
| 273N20 | | 11/09/01 | Admitted |
| 273N21 | | 11/07/01 | Admitted |
| 273N22 | | 11/06/01 | Admitted |
| 273N23 | | 11/08/01 | Admitted |
| 273N24 | | 11/05/01 | Admitted |
| 273N25 | | 11/03/01 | Admitted |
| 273N26 | | 11/01/01 | Admitted |
| 273N27 | | 11/01/01 | Admitted |
| 273N28 | | 10/31/01 | Admitted |
| 273N29 | | 10/30/01 | Admitted |
| 273N30 | 273N31 | | 273N32 |
| 273N31 | | 10/28/01 | Admitted |
| 273N32 | | 10/27/01 | Admitted |
| 273N33 | 273N34 | | 273N35 |
| 273N34 | | 10/25/01 | Admitted |
| 273N35 | | 10/25/01 | Admitted |
| 273N36 | | 10/25/01 | Admitted |
| 273N37 | | 10/24/01 | Admitted |
| 273N38 | | 10/23/01 | Admitted |
| 273N39 | | 10/22/01 | Admitted |
| 273N40 | | 10/21/01 | Admitted |
| 273N41 | | 10/21/01 | Admitted |
| 273N42 | | 10/20/01 | Admitted |
| 273N43 | | 10/19/01 | Admitted |
| 273N44 | | 10/18/01 | Admitted |
| 273N45 | | 10/17/01 | Admitted |
| 273N46 | | 10/16/01 | Admitted |
| 273N47 | | 10/16/01 | Admitted |
| 273N48 | | 10/15/01 | Admitted |
| 273N49 | | 10/14/01 | Admitted |
| 273N50 | | 10/12/01 | Admitted |
| 273N51 | | 10/10/01 | Admitted |
| 273N52 | | 10/10/01 | Admitted |
| 273N53 | | 10/08/01 | Admitted |
| 273N54 | | 10/05/01 | Admitted |
| 273N55 | | 10/07/01 | Admitted |
| 273N56 | | 10/04/01 | Admitted |
| 273N57 | | 10/04/01 | Admitted |
| 273N58 | | 10/02/01 | Admitted |
| 273N59 | | 10/01/01 | Admitted |
| 273N60 | | 10/01/01 | Admitted |
| 273N61 | | 09/30/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

xvi

xvii

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Envelope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
STATE COURT TRANSCRIPTS - Page 3475

xviii

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Introduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Card Envelope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Envelope #138 w/ To | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | No Objection |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X  5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

xix

| | | |
|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1 page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic Line-Up - Frank Reynolds | Not Intorduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Enevlope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Enevlope Containing 2 Photos | No Objection |

| | | |
|---|---|---|
| 395 | Enevlope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | Admitted over Obj |
| 397 | Audio Tape of Excerpts | Objection Sustained |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A-403RR | Defendant's school records | No Objection |
| | | |
| Defendant's Exhibits | | |
| Deft A | Dreft.'s Criminal History | No Objection |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Joint 1 | Fingerhut Jewelry | No Objection |
| | | |
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief In Oppostion to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

xx

3200




1    **(November 4, 2002 - 1:23 p.m.)**

2                          (Whereupon, the following proceedings

3    occurred outside the presence of the jury.)

4                          THE COURT:  For the record, it is my

5    understanding, correct me if I'm wrong, that the State has

6    rested presentation of evidence at this point.

7                          MR. WATKINS:  Yes, Your Honor.

8                          THE COURT:  Okay.

9                          MR. WATKINS:  Move for the admission, and

10   we have moved for admission of our exhibits which the Court

11   has, I believe, ruled on.

12                          THE COURT:  Right.  That appears as a

13   matter of record as to what exhibits have been mutually

14   agreed to and which ones the Court has excluded or included,

15   and we spent quite a bit of time in going over that so there

16   should be no problem about what evidence will go to the jury.

17   The question is does the State or the defense wish to proceed

18   with anything?

19                          MR. CONSOLDANE:  Your Honor, the defense

20   at this time has presented its witnesses and is also going to

21   rest, and we're requesting that our exhibits be admitted.  I

22   think that the Court has already ruled on those, and the ones

23   that we weren't in agreement on.  Is that correct or not?

3201

1    Did we already work that out?

2              MR. WATKINS:  I think, but we haven't

3    looked at them.

4              MR. MORROW:  No.  O through -- or F

5    through O we weren't going to raise objections to those.

6    Those were --

7              MR. WATKINS:  That was one --

8              MR. LEWIS:  Those were all the records.

9              MR. WATKINS:  We withdraw our motion on

10   relevance and we would like to inspect before I would make --

11   I didn't look at all of the documents so.

12             THE COURT:  I thought we had covered them

13   but that's okay.  Okay.  For the record, one thing for the

14   record, there was a proffer of evidence by agreement.

15   Defense presented some witnesses that were really out of turn

16   at the point because the prosecution had not technically

17   rested.  It's a matter of convenience, everybody's agreement.

18   Those witnesses were put on, their testimony was taken, and

19   you're moving for the introduction of any exhibits.  It's my

20   understanding now that those will be admitted subject to the

21   State's right before we go to the final arguments to review

22   and to have the Court revisit if necessary.

23             MR. WATKINS:  And present possible

3202

1    rebuttal witnesses.

2                    MR. CONSOLDANE:  All right.  Your Honor,

3    we are also -- we also would like the opportunity to, before

4    it goes to final arguments, to review the State's exhibits

5    and present any other objections that we may have.

6                    THE COURT:  Well, you mean anything that

7    comes in from this point on?

8                    MR. CONSOLDANE:  No.  We have some, we

9    have an objection to -- we made some objections to some of

10   their exhibits and we would like to possibly revisit one or

11   two of those.

12                   THE COURT:  I understood --

13                   MR. CONSOLDANE:  I mean, they just made

14   the same argument and request that you granted them, to check

15   over our exhibits before they're admitted, and I just want

16   the same courtesy.

17                   MR. WATKINS:  Your Honor, I think we

18   should take things as they should come in order.  Right now

19   we are dealing with the State resting.

20                   THE COURT:  That would surely be the most

21   or the proper way to do it.  We have to get -- Mary Ann is

22   taking a trial down there.  We need those exhibits, Kelly.

23   You got them back there?  Well, maybe we can get them.  You

3203

1    have a key for that?

2                    MR. MORROW:  I'll get it, Your Honor.

3                    MR. WATKINS:  I don't, I don't understand.

4    What are we doing now?

5                    MR. LEWIS:  We're going to do the

6    defendant's exhibits.

7                    THE COURT:  We're going to go over the

8    defendant's exhibits so you can object to anything right now.

9    What they're saying is if you're going to reserve that right

10   they're going to reserve the right.

11                   MR. WATKINS:  Well.

12                   THE COURT:  I think we already are past

13   that point but --

14                   MR. WATKINS:  Yeah.  I thought that we've

15   already ruled on exhibits that the State had.

16                   THE COURT:  I thought I ruled on all of

17   them, including the defense.

18                   MR. WATKINS:  That's what the record

19   reflects.

20                   MR. CONSOLDANE:  I mean, if you're going

21   to reserve arguing about our exhibits, we want to reserve

22   arguing about your exhibits.

23                   THE COURT:  Let's just get them.  There

3204

1    aren't that many. We'll go through them.

2                      MR. WATKINS: Yeah, but we're dealing with

3    two different things. We're dealing with the State's direct

4    case and we're dealing with your rebuttal case.

5                      THE COURT: No.

6                      MR. LEWIS: It's not rebuttal.

7                      MR. WATKINS: Oh, I have no objection to

8    -- oh, to their evidence? Okay.

9                      THE COURT: Their exhibits introduced in

10   their evidence in chief.

11                     MR. LEWIS: Right.

12                     MR. WATKINS: Okay. Okay. You're right.

13                     MR. MORROW: Teeple is on his way over

14   with the key.

15                     THE COURT: Okay. Let's keep the record

16   straight now. Chuck, do you recall, I thought we went over

17   the defendant's exhibits.

18                     MR. WATKINS: Yeah. I haven't looked at

19   them, judge, and that's why. We just want to inspect them.

20                     MR. MORROW: Jim Teeple is bringing the

21   key, Your Honor, so we can get into the room.

22                     THE COURT: I got a key to get in there.

23   Do you want a key to get in?

3206                                                    3205

1                    MR. WATKINS:  I just want to look at them.

2      It will take me five minutes to look at them.

3                    SHERIFF DEPUTY:  Laurie has a key.

4                    MR. MORROW:  No, Laurie gave that key to

5      Jim Teeple.  I guess he is on his way over.

6                         (Whereupon, a brief recess was taken.)

7                    THE COURT:  Kelly, for the record, I think

8      we probably need not have it, but we're doing this in open

9      court.  None of the jury, of course, is here.

10                        (Whereupon, a brief recess was taken.)

11                   MR. WATKINS:  I think we are ready, Your

12     Honor.

13                   THE COURT:  Are you ready?

14                   MR. WATKINS:  We don't have any objections

15     to their exhibits.

16                   THE COURT:  Okay.  Defendant's Exhibits

17     which are designated what specifically, Mr. Consoldane?

18                   MR. CONSOLDANE:  I believe it's A through

19     F?  No.  There's -- no, there's more than that.

20                   THE COURT:  Just read them out.

21                   MR. CONSOLDANE:  F, G, H, I, J, K.  I

22     don't see L.  M, N, O, P.

23                   MR. MORROW:  L is probably attached to the

3206

1    back one of those.

2                          MR. CONSOLDANE:  Okay.  Now this I can't

3    -- I don't know what this is.  This is A.

4                          MR. MORROW:  That's B.

5                          MR. CONSOLDANE:  Is this B?

6                          MR. MORROW:  B.

7                          THE COURT:  Okay.

8                          MR. CONSOLDANE:  I don't know where C, D,

9    E or L is.

10                         MR. WATKINS:  Because we didn't know,

11   that's why we just picked a number.

12                         THE COURT:  They weren't  -- there was

13   nothing marked with those numbers.

14                         MR. MORROW:  We just started with F, we

15   didn't have C, D and E, and L is attached to the back of one

16   of those I'm sure, Tony.  If you take the one with the paper

17   clip on it, L is behind it.

18                         MR. CONSOLDANE:  All right.  This one

19   here?

20                         MR. MORROW:  I think so.

21                         MR. CONSOLDANE:  You say L is attached to

22   that?

23                         MR. MORROW:  It might be paper clipped

3207

1    together.

2                    MR. CONSOLDANE:  Yeah, okay.  Yes, it is.

3    All right.

4                    THE COURT:  Is that clear enough for the

5    record then?

6                    MR. MORROW:  A, B and F through O.

7                    THE COURT:  A, B and --

8                    MR. MORROW:  F through O.

9                    THE COURT:  Okay.  Those will be admitted,

10   become part of the evidence that goes to the jury then.

11                   MR. CONSOLDANE:  With the admittance of

12   our evidence, then the defense rests also, Your Honor.

13                   THE COURT:  Approach.

14                   (Whereupon, a bench conference was held.)

15                   MR. CONSOLDANE:  Your Honor, this has been

16   disjointed and I was going to make a motion to dismiss, but

17   the State has already indicated they're going to call more

18   witnesses and now they said that they have rested and they're

19   going to call them as rebuttal.  But we do have several

20   motions --

21                   THE COURT:  Okay.  Make your motion then.

22                   MR. CONSOLDANE:  -- to make and I don't

23   know whether we should make them now or after they make their

1    rebuttal case, but if you wish I'll make them now.  Okay.

2    Your Honor, first of all, we believe that all the charges,

3    including the two murder counts and the aggravated robbery

4    and aggravated burglary, ought to be dismissed being that the

5    State has not proved each and every element of the offense

6    beyond a reasonable doubt.

7                    THE COURT:  Do you wish to be more

8    specific than that?

9                    MR. CONSOLDANE:  Well, not for the general

10   motion, Your Honor.  I'm going to tack on each one of them,

11   there's other things that I want to go over, but that's just

12   a general motion that I want to make at this time.

13                   MR. WATKINS:  Do you want me to respond to

14   that, Your Honor?

15                   THE COURT:  Yeah.  Let me get one book

16   first.  Does the State wish to give your side of the

17   argument?

18                   MR. WATKINS:  Your Honor, there is

19   sufficient evidence that a jury could reasonably find that

20   the defendant committed every charge as contained in the

21   indictment when considering all of the 29 witnesses and the

22   many exhibits that have been admitted.

23                   MR. CONSOLDANE:  Your Honor, then I would

3209

 1   like to specifically then go, at this time go through each of

 2   the charges that we've had.  As far as the murder cases, they

 3   have chose to charge him with two counts of aggravated murder

 4   although be it there's only been one person that's deceased

 5   at this time.  I think that they had the right to charge him

 6   but before, before trial they should have had to make an

 7   election as to which one they are going to proceed on and

 8   which one that they can prove.

 9           At this point certainly they have rested, they know

10   what their evidence is, and I believe that to have two counts

11   of murder go to the jury is highly prejudicial upon Mr.

12   Jackson and that they should either have to indicate whether

13   this murder was planned, was premeditated and committed with

14   prior calculation and design, or whether this was a homicide

15   that occurred during either attempt of an aggravated burglary

16   or because of the result of an aggravated robbery.

17           THE COURT:  Do you wish to respond?

18           MR. WATKINS:  Your Honor, the case law is

19   very clear that if one is charged with the A and B sections

20   of the aggravated murder charge, count one being prior

21   calculation and design, count two being the felony murder

22   charge, that the election would take place at the second

23   stage assuming the defendant would be convicted of one or

3210



1    both -- I mean, assuming he would be convicted of both.  This

2    very issue was decided by the Ohio Supreme Court in State

3    versus Getsy where Getsy was charged with felony murder and

4    prior calculation and design murder.

5              The reason is very simple.  A jury could reasonably

6    find that there's not sufficient evidence in a case, for

7    whatever reason, that there's not prior calculation and

8    design, and, on the other hand, a jury could find to the

9    contrary, that there was an intentional killing during the

10   commission of felony murder.  So that is why the Ohio Supreme

11   Court has uniformly held, and I know Chuck and I even

12   discussed the case within the past year, affirming that,

13   which we could get for the Court, but it's very clear that at

14   this point in time it's appropriate, even though there's one

15   death, to have two charges go to the jury.

16             THE COURT:  It is possible, is it not,

17   that the jury could find a question of guilt on one or both?

18             MR. WATKINS:  Right.  They could find a

19   felony wasn't committed, so the jury has the choice.

20             THE COURT:  Does the State agree that in

21   case of a finding of guilty on, say, both that the defendant

22   can only be sentenced on one?

23             MR. WATKINS:  Interestingly, the Supreme

3211

1    Court allowed a death penalty panel to go with both and the

2    Supreme Court upheld it saying that the better procedure is

3    to elect.  We would elect before the jury gets it.

4                    THE COURT:  I think, if that were the

5    occurrence, that would be the proper way to do it.

6                    For this portion of the motion the State has

7    presented good and sufficient evidence wherein a reasonable

8    mind might find from the facts that this was a purposeful

9    killing with prior calculation and design which caused the

10   death of another and have established the question of venue.

11   I say that based on the evidence that has been presented to

12   this jury primarily from the letters, content of some of the

13   letters, the telephone conversations from the prison, the

14   conduct of the defendant, that the jury accepts the State's

15   evidence as to the conduct of the defendant following the

16   alleged murder.

17                   The State has also presented good and sufficient

18   evidence where a reasonable mind could find that there was a

19   purposeful causing of the death of another during the

20   commission of an aggravated robbery or aggravated burglary.

21   And I'll get into those other two points later because I

22   think you want to argue those.  Venue was established in

23   that, of course, in that case also.

3213                                                                          3212

1              MR. CONSOLDANE:  All right.  Your Honor,

2      we would also like to move that both the count -- I believe

3      it's three, aggravated -- count three, aggravated burglary,

4      yeah, that that be, that that be dismissed being that they

5      did not show by any evidence that Mr. Jackson did not have

6      permission to be upon the property.  The property was owned

7      by Donna Roberts.  And if you believe Nate Jackson's

8      statement that the State played to the jury, they presented

9      it, we didn't, but in that, in that statement Mr. Jackson

10     says that Robert Fingerhut picked him up at C. Staples

11     Restaurant on Belmont Avenue in Youngstown on the guise of

12     taking him to the Warren bus station and on the way he said

13     he had to stop at the house on Fonderlac for a minute; and he

14     pulled into the garage and got out and that's where the

15     altercation took place; that he certainly was brought there.

16              If you believe the prosecutor's argument that he and

17     Donna Roberts somehow or another contrived to plan to kill

18     Fingerhut, he would have had express consent from Donna

19     Roberts to enter upon the property to carry out their mutual

20     plan.  So either story that you believe would necessitate

21     having the aggravated burglary charge dismissed because it's

22     failing in one of the essential elements in that they have

23     not shown that he did not have permission to be on the

3213

1    property or, in essence, that he was a trespasser.

2           I know they have some arguments that said that if

3    somebody enters on the property and then decides to commit a

4    felony, that that permission is thereby degradated, but then

5    again we have just two arguments that were presented to the

6    jury.  One from Mr. Jackson that this altercation was

7    provoked by him, which means that his right to be on the

8    property was never terminated, or two, that he and Donna

9    planned this and that was the permission given to him to

10   begin with for the purpose for him going on that property.

11   So in either event the aggravated burglary should be

12   dismissed.

13          Is there anything you want to add to that, James?

14          MR. LEWIS:  Judge, in regard to the

15   aggravated burglary, the question is his privilege.  And it

16   becomes interesting to note that based upon the story given

17   by Nate Jackson that he was actually picked up at C. Staples

18   to be taken to the Warren terminal.  That once Mr. Fingerhut

19   decided not to take him to the Warren terminal but took him

20   to the Fonderlac address, that basically he was in the

21   commission of an abduction or a kidnapping where he had by

22   deception got Mr. Jackson in the car, and once in the car

23   then he decided to take him to some other place other than

3214

1    what he had proposed to take him in the first place and went

2    to the house.  There was no indication whatsoever.

3         If, in fact, that was the case and he did deceive

4    him and there was a kidnapping or an abduction going on, as

5    soon as he entered the house, that is Mr. Fingerhut, then he

6    was, in fact, committing an aggravated burglary when he

7    decided to pull a gun and to shoot at Mr. Jackson.

8         The State is proposing that Mr. Jackson somehow

9    became a trespasser when the argument ensued and, according

10    to their brief, once Mr. Fingerhut pulled out a gun to shoot

11    Mr. Jackson, then poor Mr. Jackson becomes the trespasser.

12    That is a very novel theory in the sense that what that says

13    to you, judge, is that I can invite Mr. Chris Bobby here, a

14    fine fellow from the Warren Tribune, I can invite him over to

15    my house, and as soon as I pull out a gun and go ahead and

16    shoot him he becomes a trespasser and he committed aggravated

17    burglary and I can just kill him at will.  That's pretty

18    nonsensical and that's what the State is proposing here.

19         There is no indication whatsoever, there is no

20    testimony per se in here or credible evidence indicating the

21    fact that Mr. Nate Jackson did not have permission to be in

22    that house.  There's nothing whatsoever.

23         The State keeps saying, well, Donna Roberts called

3215

1    up, said my husband.  Well, we know that's not a fact in

2    reality.  The point being here is that the State is alluding

3    to all the so-called statements made and all the other

4    information but it's not the actual evidence in trial in the

5    sense it doesn't prove anything.  If I call up and say, "My

6    god, my wife, my wife Peggy over there has just been shot,"

7    okay, and I go to court and Peggy says I'm not her husband

8    and she's not my wife.  Just because I got on 911 and said my

9    wife got shot, does that make it reality?  No, it doesn't,

10   and it doesn't change the legal relationship.

11          The point being is that in the first two pages of

12   their brief they indicate that all of this is supposedly true

13   when, in fact, we know it isn't.  They keep referring even in

14   their briefs now, they say Robert Fingerhut's car.  We know

15   for a fact in reality, it's been proved in this courtroom,

16   that it is not his car.  He doesn't have any possessory

17   interest in that car whatsoever as far as that's concerned.

18   Not only that, the State's own evidence shows that in the

19   letters, that as of 11/29, five or six days before this

20   incident, Robert Fingerhut was beating, was beating Donna

21   Roberts to a pulp.  There's indications in there.

22          If he was beating her in her house, which she says

23   happened and it's in the letters and everything else, I think

3216

1    Mr. Fingerhut is a felon. He's committing -- he has

2    withdrawn his permission to be there because he had no

3    possessory interest in that house, he had no legal interest

4    in that house whatsoever. Donna Roberts is the owner. He

5    beat the owner so he's violated by deception. He got in that

6    house and committed a crime against Donna Roberts, which is a

7    felonious assault, and therefore he, in fact, is the one who

8    is guilty of aggravated burglary.

9        You can take these sequences on to forever. It's

10    ridiculous, because they're changing and trying to turn

11    upside down completely everything. What they're proposing to

12    say is that a burglar can go out to 254 Fonderlac, it's empty

13    right now, he can go in there and sit in there and enjoy

14    himself. And if the police come, if the police come or

15    somebody else comes to evict him out of there, they come in

16    the house, since he's a possessor, he's there, he's got

17    custody of it, he's got custody of it, that's all they're

18    saying. He's just a possessor, his body is there, he can use

19    legal force against somebody, perhaps the owner. The owner

20    comes back and says I want my house back. Oh, no, if you

21    come in and try to hurt the guy that's possessing it then

22    you're guilty of aggravated burglary and if you kill him it's

23    aggravated murder. Nonsense. This is all nonsense, judge.

3217

1        They've turned this thing completely upside down
2    because the ownership has a lot to do with this.  It has a
3    lot to do with the way Mr. Jackson got to the house.  And
4    under any theory they still have to say without privilege to
5    be there.  And nonsense about pulling a gun out.  Once
6    Fingerhut pulls a gun out then somebody becomes a trespasser?
7    He's going to kill somebody.  Then the other person, the
8    victim, becomes the trespasser?  He's going to shoot and kill
9    him, he's going to sit there and say oh, my God, the
10   prosecutor said I am trespassing, now go ahead and shoot me.
11   That's nonsense.  That's nonsense.  That can't be the law.
12   It's not the law.
13        So, in fact, the reality here, judge, there isn't
14   any aggravated burglary whatsoever.  It has to do with
15   permission to be there and they haven't proved in any sense
16   of the manner, nor can you infer from this, that he had no
17   permission to be there.  Mr. Fingerhut had not the legal
18   authority one way or the other to pronounce who could be
19   there and who can't be there.  I don't care if he lies or
20   whatever or says anything, he still is not the person that
21   has the ownership or control of that property.  It's really
22   Donna Roberts.  He was -- as soon as he does anything wrong
23   he becomes a trespasser in the residence.  I don't care if he

3218

1    steals her money from her accounts, does anything, he becomes

2    the criminal.  If she called him up the night before and said

3    get out, I got news for you, he's an aggravated burglar at

4    that point.  That's what it boils down to.

5                    THE COURT:  Okay.

6                    MR. LEWIS:  That's it, judge.

7                    MR. WATKINS:  And, Your Honor, maybe we

8    attended a different trial and I will make a few comments.

9    Seldom does a Court have so much evidence to substantiate a

10   plan to murder and ambush a person as we have here.  We have

11   the defendant's words, we have the defendant's declarations

12   in letters that are repeated time and time again that when he

13   gets out of prison he is going to take care of the Robert

14   problem.  He even describes that when he does the guy that he

15   wants -- in fact, they both discussed they want to commit a

16   sex act in front of the victim.  It is as malicious as you

17   can get if the Court or the jury decides to believe the

18   State's evidence.

19        I would note that the defendant's statement is not a

20   statement we're vouching for, it is a statement that has

21   admissions.  It's up to the State or any party that is the

22   plaintiff or defendant to construct the evidence and what

23   they believe is reasonable and true.  In my opening statement

3220

3219

1    I made it very clear that the evidence outside the

2    defendant's statement is going to show he was lying about

3    being in Youngstown and many of the things he said, including

4    the fact that the victim had a gun, an epiphany appeared

5    where the gun appeared and pulled it on the defendant; and

6    dealing with the logic of how the victim was shot in the top

7    of the head, shot twice in the back; dealing with the

8    statement at the end where he said Donna knew nothing about

9    it, had nothing to do with it; is contrary to the taped

10   conversation that was taken two days before at prison where

11   he says, "One thing you have to do, I have to be in the

12   house," and Donna responds, "No, no, not in the house."  And

13   what does the defendant say?  "It's not going to be in the

14   house."

15          In fact, it is clear from the letters that there

16   were things that the defendant wanted.  Black leather gloves.

17   He got the black leather gloves.  Three witnesses testified

18   it wasn't that cold.  And, in fact, the description in the

19   letter that's going to go to the jury, black leather gloves,

20   fleece inside; exactly the same black leather that has the

21   left index finger shot off.  Handcuffs.  There is an argument

22   on the tape and in the letters about why do you want it so

23   complicated with --

3220





1          MR. CONSOLDANE:  Your Honor, we were

2  arguing aggravated burglary, we're not arguing the murder.  I

3  don't know where he's going with this.

4          MR. WATKINS:  It deals with burglary.

5          THE COURT:  I think he is trying to rebut

6  your argument.

7          MR. CONSOLDANE:  I'd just like to remind

8  the Court that I have to leave, we have to take a break

9  around 2:30, quarter to 3:00.  I have a doctor's appointment

10 I have to go to and come back.  I just --

11         THE COURT:  Let's go on.

12         MR. WATKINS:  Thank you, Your Honor.  The

13 evidence in short shows that there was a state of mind to go

14 to that house and kill the victim who was coming home from

15 work.  Look at the clothing that's been demonstrated that he

16 had at work, where he's shot, exactly the fact that he's

17 reading the mail, according to the defendant's own statement,

18 that this man is in his home.  The purposes of bringing in

19 Donna Roberts' 911 and the letters and the conversations,

20 he's at home, he's at home, is the fact of the matter that

21 this man is living there as a co-resident, as a co-occupier.

22      Mr. Lewis and Mr. Consoldane says the title is the

23 important thing.  Not in the case law and not in the

3221

1    legislative service.  The purpose of an aggravated burglary

2    law is to protect people that are in homes, are in occupied

3    structures.  Has nothing to do with title.  All of us have

4    children, have people visit a home, and the fact that the

5    children may not have title, that's their home and they are

6    protected as a co-occupier of the home.  The law protects

7    them.

8              In this case it's the worst possible scenario, and

9    we have case law that is in our brief that if you're in there

10   invited and you commit a violent felony to an occupier of the

11   home you become a trespasser by the commission of the act.

12   Our evidence is very clear that he intended to go there and

13   take the man by force and put him in the trunk whether dead

14   or alive, and we know in the struggle he was shot, according

15   to the State's evidence as we would believe any reasonable

16   finder of fact would find.  And at that point when he's in

17   that house under State versus Steffen he is a trespasser as

18   to the co-occupier, Mr. Fingerhut.  He came home, went into

19   the house, irrespective of whether or not he was invited to

20   be there by the defendant, the codefendant, which I believe

21   he was, according to our evidence.  He was in there for the

22   purpose of taking the life and ambush the fellow resident,

23   the man that Donna Roberts was living with, for the purpose

3222

1    of collecting money.  That is all the State has to show, that

2    he was a person in the house.  In this case there's two

3    subsections dealing with aggravated burglary; one, it was his

4    habitation where he was living; two, he was present in that

5    house.  And no one, including the legal owner, can tell

6    somebody to go in and kill in that house and commit a crime

7    against someone else who is a co-occupant.

8            There is nothing in the record that showed that

9    Donna Roberts ever told Robert Fingerhut to get out.   In

10   fact, if you look at the one letter it's very clear that the

11   defendant says, "Make sure everything is okay.  Keep him in

12   the house until I get out of prison."  That's in evidence.

13   So it's very clear the question of law is whether or not by

14   allowing someone in the house, that another resident comes

15   home, whether or not he could kill.  And as a matter of

16   public policy and the matter of State versus Steffen, he

17   commits the trespass, the felony, against a person that's in

18   his occupied habitation or he's present in that home lawfully

19   and, therefore, the purpose to kill the man at home is

20   clearly sufficient by the evidence to let this go to the jury

21   on the charge of aggravated burglary, which is also one of

22   the underlying felonies on the charge of aggravated murder.

23            MR. CONSOLDANE:  Your Honor, I just real

3223

1   briefly, I just -- he's evading the issue as to whether or

2   not he had permission.  It's up to them, they have to show

3   that he did not have permission to be there, not just add

4   inference upon inference that this could have happened or

5   that could have happened.  They have to prove their case and

6   they didn't prove it.

7                MR. WATKINS:  Judge, we proved he's in his

8   home.  It's his home, it's his structure.

9                MR. LEWIS:  Wait.  Don't say, don't say --

10               MR. WATKINS:  It's his home for --

11               MR. LEWIS:  No.  In the letter in

12  November, in November a couple days before this happened he

13  was staying at motels, for god sake.  It was right in the

14  letter, judge, that he was out of that home, he was staying

15  in a motel room.

16               MR. WATKINS:  He was not --

17               MR. LEWIS:  This is Robert Fingerhut.  It

18  wasn't his home.  Don't say that.

19               MR. WATKINS:  It's his home.

20               THE COURT:  I don't think there's any

21  question from the evidence produced by one side or the other,

22  this was not a house that was in the name of Mr. Fingerhut.

23  He was not the legal title holder.  However, if I for some

3224

1   reason am carrying my wife's purse down the street, which

2   I've done on occasion, always creates embarrassment, to

3   follow the defense's argument, if somebody comes by and grabs

4   the purse then I have not had a robbery committed on me.  If

5   I'm a month-to-month tenant on a lease --

6                    MR. LEWIS:  That's not the argument,

7   judge.

8                    THE COURT:  No.  If I'm a month-to-month

9   tenant -- I'll allow you -- and I have possessory interest in

10  my dwelling, then no one can come in and commit burglary on

11  me because I'm not the legal title holder.  I don't think

12  that that is the law.

13                   MR. CONSOLDANE:  Your Honor, everybody is

14  misinterpreting that.  We don't care, that's not the issue.

15                   THE COURT:  No, I understand.  I'm getting

16  to the issue.  I'm getting to the issue that you're -- you

17  are contending here that Mr. Fingerhut was not living at the

18  house.  Now, the State has produced evidence to show that he

19  drove one of the vehicles that was owned by Donna Roberts.

20  It's the testimony that he always drove that vehicle.  There

21  was some testimony of one person who saw him driving her

22  vehicle at one time, which I think merely substantiates the

23  State's allegations.  That you had the letters that talked

3225

1    about him in regard to the house, you had conversations on

2    the phone.

3          Now, the State has presented some evidence.  I don't

4    know, it's up to the jury to decide how convincing the

5    evidence is, but evidence to put forth the theory that

6    Ms. Roberts dropped the defendant off that night and he was

7    perhaps waiting in the house.  Fingerhut apparently had a key

8    to come and go in the house, but there's no evidence on that.

9    Somehow he was able to get into the house.  The jury could

10   infer that he had a key on that basis.  If you accept the

11   State's one proposal that the defendant was dropped off and

12   allowed access to the house, then the question becomes, even

13   though she is the titled holder of the house, can she give

14   permission that would stand at law to go in and do what the

15   jury could find had been planned to be done, and that is to

16   kill her ex-husband?  The State has raised case law that

17   seems to me to be pretty convincing that that could not be a

18   legal defense, "Well, I had permission to go into the house

19   to kill him."

20         If you accept the -- if the jury should accept the

21   defendant's version of how he came to be there, that

22   aggravated burglary -- and none of you have mentioned this

23   portion here, a person who enters by force, stealth or

3226

1   deception.  The jury could I think very logically concur that

2   they had planned this thing, that whether it was Fingerhut's

3   suggestion or the defendant's suggestion that they go to the

4   house, that would be by deception on the defendant's part.

5        Now, that's all predicated in overruling the defense

6   position that Fingerhut had any possessory interest in the

7   house.  That's for the jury to decide.  But there is good,

8   sufficient, credible evidence before this jury that they can

9   conclude logically that Fingerhut was, in fact, a dweller in

10  that house with the permission of the title holder.

11       And there was one other point.  Oh.  You have not

12  specifically argued this I don't think, but I'm going to

13  cover it anyways in regard to the robbery because your same

14  argument would apply on the robbery, that the title of the

15  car was in Donna Roberts' name.  I think again there is

16  sufficient evidence before the jury to show that he was a

17  continual and constant and almost sole driver of that

18  automobile, and again that comes into mind that if he cannot

19  have -- it could not be a robbery because he didn't own the

20  car.  It's the same as if I'm given a cash deposit from a

21  business to take to a bank and I'm robbed of it, it's still a

22  robbery whether I owned the money or not.  For that reason I

23  am willing to listen to other argument on any points you take

3227

1  umbrage with.

2          MR. CONSOLDANE:  We haven't even argued

3  the robbery.  I was going to argue that next.

4          THE COURT:  Well, you can go ahead and

5  argue it.  I'm just saying that the same thing applies on

6  that point.

7          MR. CONSOLDANE:  Well, yeah.  But, Your

8  Honor, I think the Court is missing the point, it's that it's

9  not upon us to prove anything.  It's the State's duty to

10 prove each and every one of the elements.

11         THE COURT:  I agree, I agree with that

12 totally, and I think that Mr. Watkins will of necessity agree

13 with you because that's the law.  But I'm saying that the

14 State has constructed a case that the jury may find your side

15 of it, but for purposes of this motion is to determine

16 whether or not there is evidence where the jury might find

17 that the elements are true, is there good and sufficient and

18 credible evidence in the record.

19         MR. CONSOLDANE:  They have no, they have

20 presented no evidence to this jury to show that Nathaniel

21 Jackson did not have permission to be on the property of

22 Donna Roberts.  They have not one place.  They haven't shown

23 -- and they admit there is no force and there is no stealth.

1    The only thing they're claiming is deception and, you know,

2    that he entered, that's No. 1; and No. 2, without the

3    permission of the owner, and there's no way, they have

4    presented absolutely no evidence to show that he did not have

5    permission of the owner to be on the property.

6              MR. LEWIS:  Judge, let me just for

7    example, the examples you just gave us, okay.  First off,

8    you're carrying your wife's purse down there, that's very

9    helpful, but somebody comes up and steals it.  Chris comes

10   along and steals the purse, supposedly steals it, takes it

11   away from you, okay, and they go to court and charge him with

12   theft, okay.  And they bring in John Stuard and John says,

13   "Yeah, I was walking down the street and this guy grabbed

14   this purse."  Well, the first thing you want to find out,

15   "Well, it's your purse, Mr. Stuard?"  "No, it's not."  "Well,

16   whose purse is it?"  "Well, it belongs to my wife."  And the

17   wife gets on and says, "I never gave permission for Chris to

18   go ahead and take this purse."

19              You always have to have that because here's the

20   problem:  The example that you're talking about is you're

21   driving down the street, I'm deciding to drive Chris's car.

22   I'm driving down the street and the police arrest me and they

23   say, okay, "Are you the owner of the car?"  "No, Chris Bobby

3230                                                                                    3229

1    is the owner of the car."  And they say, "Well, tough luck.

2    We're going to charge you with theft of a motor vehicle and

3    unauthorized use of a motor vehicle," they go and they indict

4    me because they found me in Chris's car and they don't bring

5    in Chris to show that he's the owner and he actually gave me

6    permission to drive the car.

7         What you are saying to us is that it makes no

8    difference who the owner is, you can't imply that there is no

9    permission or ability to use that vehicle because, if that

10   were the case, what they're proposing to do here is exactly

11   that.  They're saying if I'm found in a house, if I'm found

12   in his house and they say, "Okay, whose house is this?"  "It

13   belongs to Chris Bobby."  "Who are you?"  "I'm Jim Lewis."

14   "Okay.  You're charged with burglary," take me down and

15   charge me.  And what we're saying here is that the

16   prosecution can indict me for burglary, put me on trial,

17   never bring in Chris and just say it was Chris's house, he

18   was with her, somebody possessory.

19        Or let's say somebody else was there that doesn't

20   even own the house, just a neighbor or somebody around there,

21   or a friend and neighbor comes in every day so he's the

22   possessory interest.  And they go, well, this guy has a

23   possessory interest so naturally he says Lewis doesn't belong

3230





1    here so they convict me of aggravated burglary.  Chris says,

2    " Lewis is my friend too, he's allowed in my house."  There's

3    the problem, judge.  That opens the complete door to the idea

4    of what they're saying is anybody found anywhere in

5    possession of anything, they become paramount to the owner of

6    that, and that's really -- you can't have that.

7         I'm picking up this thing right here, I'm the

8    possessor of it, and he decides to take it away from me,

9    okay, so we charge him with theft.  But the owner of the

10   property is Trumbull County and Trumbull County, the

11   commissioners said, "You know something, Dennis is allowed to

12   use the Scotch tape."  That's the problem here.  That's the

13   problem in regard to the car.  That's the problem in regard

14   to the house.  You cannot go beyond those limits.  They have

15   got to prove it, and Anthony is right, they're the ones who

16   have to prove that there was no privilege.  They're the ones

17   that have to prove.  You can't just infer it because what

18   you're inferring is that something that is a positive element

19   they have to prove and you can't do it without the owner of

20   the property, you can't do it, because he doesn't have an

21   ownership interest.  He's just found there.  It can't be

22   done.  You're going to open the door to everything I just

23   indicated.

3231

1          Somebody will be guilty of aggravated burglary if

2     they're -- somebody just decides, oh, you don't belong here.

3     I'm over -- we go to a hotel and I say, "Yeah, nice to see

4     you, Chris."  I'm in my room and I say, "You know something,

5     I don't like you being in here."  That's an aggravated

6     burglary, okay, and it turns out, okay, you don't belong in

7     the room, whatever.  But it turns out he paid and the hotel

8     said, "Oh, yeah, he paid, he's entitled to be in there," but

9     they don't bring him in, they just said I was in there and I

10    don't like that guy.  That's an aggravated burglary.  He

11    stole my toothpaste.  There's the problem here, that's the

12    problem.  That opens Pandora's box.

13          We're going to have burglars where people just are

14    in a place where they're supposed to be and they don't have

15    to bring in the owner anymore.  Forget the title holder,

16    forget the guy that controls it who had the possessory

17    interest in it, the real possessory interest in it.  That's

18    what it is going to open up.  Every time a car is stolen we

19    don't have to prove title anymore.  What do you mean prove

20    title?  That always had to be proven.  Now we don't even have

21    to worry about it.  We don't even have to prove who owned the

22    damn thing.  House burglarized?  Forget the owner.  Who

23    cares.

3232

1              MR. CONSOLDANE:  Your Honor, the problem

2     with this thing is --

3              MR. LEWIS:  That's the problem.

4              MR. CONSOLDANE:  -- that this is actually,

5     this is actually either an aggravated murder with prior

6     calculation and design or there's an argument of

7     self-defense.  They've bootstrapped this case to prevent us

8     from putting on a defense of self-defense and it's

9     unconscionable.

10              The same arguments do apply for both the robbery and

11     the burglary, is that there's no proof that he did not have

12     permission to drive that car, but there is one other further

13     point that I don't think that the Court has considered, is

14     that when -- one of the elements in an aggravated robbery is

15     that the person has to commit a theft offense, and under the

16     theft section, No. 5 in the subsection of that is that he has

17     to intend to permanently keep that item away from the person

18     he took it from.  And even if he had taken that car he had no

19     intentions of keeping that car.  He abandoned it with the

20     keys less than 10 miles away from where he took it, seven or

21     eight miles from where he took the car.  So they, you know,

22     they don't have --

23              THE COURT:  Asportation.

3233

1          MR. CONSOLDANE:  Right.

2          THE COURT:  Remember asportation?

3          MR. CONSOLDANE:  Could be transportation,

4  unauthorized use, but it's not a theft.  And that's the

5  reason --

6          THE COURT:  The only thing that could give

7  credence to your argument would be that if he had permission

8  -- it doesn't apply to the burglary but it might apply to the

9  robbery, if he had permission to drive the automobile by the

10  title owner then I think there's credence to your argument.

11          MR. CONSOLDANE:  Well, we don't have to

12  prove that.  They have to prove he didn't and they didn't do

13  that.

14          THE COURT:  Well, I understand.

15          MR. LEWIS:  Not only that, judge, there is

16  evidence.  It is in the letters indicating she thinks he's a

17  great driver, he can always drive the cars.

18          THE COURT:  What's your response?

19          MR. WATKINS:  Your Honor, it's -- I mean,

20  I think the travesty here is that the woman who was the

21  witness or title owner is involved with the conspiracy to

22  kill the man.

23          THE COURT:  And she's not going to testify

3235                                                                 3234

1      about anything.

2                      MR. WATKINS:  Yeah.  And so as a matter of

3      public policy it's sort of ridiculous and it's certainly

4      contrary to --

5                      MR. CONSOLDANE:  It is no more ridiculous

6      than --

7                      MR. WATKINS:  Well, listen, did I

8      interrupt you?  Your Honor, repeatedly they've been doing

9      this.

10                     MR. CONSOLDANE:  All right.  All right.

11     I'm sorry.  I apologize.

12                     MR. WATKINS:  Your Honor.

13                     THE COURT:  Go ahead.

14                     MR. WATKINS:  Your Honor, this title, you

15     know, definition of owner for personal property does not say

16     title owner.  Owner under Ohio law, if they would read the

17     law, includes --

18                     MR. CONSOLDANE:  Now I object to that.

19                     MR. WATKINS:  Well, okay.

20                     THE COURT:  You just called him

21     unconscionable though.  Take umbrage.

22                     MR. LEWIS:  We're worried about a house

23     and we're worried about a car.

3235

1          MR. WATKINS:  Listen.

2          MR. LEWIS:  A car has a title.

3          MR. WATKINS:  Your Honor.

4          MR. LEWIS:  A house has a deed.

5          MR. WATKINS:  Your Honor.

6          MR. LEWIS:  Don't say something else.

7    Those are the two things we're talking about.

8          MR. WATKINS:  Your Honor, I'm going to go

9    -- I just got it.  Revised Code section 2913.01, under Ohio

10   law owner means any person, other than the actor, who is the

11   owner of or who has possession or control, and it even goes

12   further that even if the controller possession is unlawful.

13   That is an owner under Ohio law.

14         THE COURT:  I understand.

15         MR. WATKINS:  And that goes to my basic

16   point where I'm getting objection when I'm saying the car, he

17   has it, he's the owner.  I can say that because that's Ohio

18   law.

19         THE COURT:  I understand.  Their point is

20   much more narrowly drawn and that is that the State has to

21   prove each and every element and they're arguing, I don't

22   know how legitimately, but they're arguing, Jim Lewis makes

23   it sound very good, that the State has to prove the lack of

3236

1    permission.  Now, you got a dead guy -- or, I'm sorry, the

2    deceased person who can't testify to anything, you got a

3    codefendant who can't testify to anything.  You have only the

4    defendant who has not testified to anything.

5                    MR. WATKINS:  Yeah.

6                    THE COURT:  Okay.  But what has the State

7    proven?  They've proven that the car was taken, if you

8    believe the forensic, by Mr. Jackson.

9                    MR. WATKINS:  I think that whether -- if

10   you take Mr. Jackson's statement, he says it was the man's

11   car.  Okay.  And then if you take the other evidence, the

12   workers, that he drives that car home.  How did he get home?

13                   THE COURT:  There's sufficient evidence to

14   indicate that he had possession.

15                   MR. WATKINS:  His property is in the car,

16   his DNA is in the car, his keys were identified.

17                   THE COURT:  I'm not arguing that point

18   with you.

19                   MR. WATKINS:  It was his car under

20   circumstantial evidence.  That's all we need to do.

21                   THE COURT:  That -- I agree with you.

22                   MR. WATKINS:  So, therefore, if he has a

23   deadly weapon and kills the man and takes the car, there's

3238                                              3237

1    Ohio Supreme Court law if you take a car and abandon it it's

2    still a theft offense.  If you take it after you kill it's

3    still a theft offense.  And State versus Palmer says even if

4    you only decide to steal after the death it's while

5    committing, and that's in line with State versus Biros, which

6    we won in the Supreme Court when the Court of Appeals

7    reversed us, the fact that he killed the person and took the

8    ring.  The defense argued oh, you can't steal after a person

9    is dead.  Wrong.  And that's what we're entitled to argue,

10   Your Honor.  We're entitled to argue the law of Ohio, not

11   Mr. Lewis's interpretation of title.  It's not important in

12   this case.

13              THE COURT:  Mr. Watkins, you are preaching

14   to the choir here.  I agree with you.

15              MR. WATKINS:  So that's my statement.

16              MR. MORROW:  Judge, if I may add.

17              MR. CONSOLDANE:  Your Honor, they're

18   bootstrapping us in both cases.  They say they can't prove

19   something, you know, because of -- you know, it's the same

20   way.  They're trying to bootstrap us with the burglary and

21   robbery and then they're saying it's not fair that they get

22   bootstrapped, they can't get a witness.

23              THE COURT:  I see the examples that

1   Mr. Lewis gave.  I don't disagree with those, that would be

2   no way, but in this particular case, this is a case where the

3   State has put in a bunch of evidence and that instruction

4   about the jury may infer, not inference on inference but the

5   jury may infer.  They have more than sufficient evidence here

6   to infer based on the facts presented that Mr. Fingerhut was

7   the possessory owner of that car, that Mr. Fingerhut would

8   not have given him permission to drive the car after the

9   murder occurred.  Therefore, the elements are met of the

10  aggravated robbery.

11      I don't know what the jury is going to do.  They may

12  find that that evidence is not convincing.  But for purposes

13  of this motion there is sufficient evidence to prove those

14  points that the jury makes the inferences which the State

15  wishes them to make.  It's up to the jury to decide whether

16  those inferences are reasonable or not.

17      That being said, the motion, the Rule 29 motion is

18  overruled.  The Court of Appeals has a record to second guess

19  on.  Okay.

20                  MR. WATKINS:  Thank you.

21                  THE COURT:  Not the Court of Appeals --

22  well, yeah, the Court of Appeals possibly.

23                  MR. WATKINS:  It depends on what the

3240                                                            3239

1    verdict is.

2                          THE COURT:  Mr. Lewis, please do not look

3    so down.

4                          MR. CONSOLDANE:  Pardon?

5                          THE COURT:  Jim had a long face there.

6                          MR. LEWIS:  Oh, I've just begun to fight.

7                          MR. CONSOLDANE:  All right.  The next

8    issue is whether or not they're going to present their

9    rebuttal.

10                         THE COURT:  Rebuttal witnesses.

11                         MR. WATKINS:  I don't think that's -- how

12   is that an issue?

13                         MR. CONSOLDANE:  I just want to know

14   whether you're going to or not.

15                         MR. WATKINS:  Oh, yeah, we are, tomorrow

16   morning.

17                         MR. CONSOLDANE:  Your Honor, and the two

18   witnesses?

19                         MR. WATKINS:  Yeah, two or three at most.

20                         MR. CONSOLDANE:  We're going --

21                         MR. LEWIS:  Wait a minute.  Wait a minute.

22   This rebuttal evidence is going to rebut the fact that she

23   was the owner of the property or what?

3240

1                 MR. WATKINS:  It is going to rebut your

2  witnesses on the car and the property which you brought in.

3                 MR. CONSOLDANE:  We object to that.

4                 MR. WATKINS:  It's going to go to what

5  your evidence was.

6                 MR. LEWIS:  Okay.  So you're going to

7  prove that she wasn't the lessee, somebody else was the

8  lessee?

9                 MR. WATKINS:  You're --

10                MR. LEWIS:  Oh, bring them on, Dennis.

11  Bring them on.

12                MR. CONSOLDANE:  We won't -- in no way

13  will we be able to be prepared to give final arguments

14  tomorrow if they're going to put rebuttal witnesses on.

15  They've asked for, you know, the time.  I think I should be

16  given that amount of time also to do final arguments.

17               THE COURT:  Do you have any rebuttal?

18                MR. CONSOLDANE:  I don't know until I hear

19  their rebuttal witnesses, and so I just, you know, there's

20  just no way we'll be able to prepare and give final arguments

21  tomorrow.  Let's see what they do and maybe, maybe we can on

22  Wednesday.

23               MR. WATKINS:  I don't mind doing it

3241

1    Wednesday, Your Honor.  That's okay with me.  I mean, the

2    State was in a position that they presented witnesses and we

3    talked to some of the witnesses and we're -- just like they

4    have a right, they just presented evidence and I said that we

5    would let you know if we have rebuttal witnesses and we do,

6    and they won't take half an hour.

7                THE COURT:  Well, I don't know if it's

8    possible for us to call all the jurors and tell them to bring

9    their swag in with them the following day because I don't

10   want them all traipsing in here tomorrow with all their

11   impedimenta, is that it?

12               MR. CONSOLDANE:  What is that?

13               THE COURT:  And then have --

14               MR. WATKINS:  Well, judge, I don't know

15   what else to say, I mean.  I would be willing to give what

16   exactly they're going to testify to, if that's helpful.  I

17   don't think it's very much other than it deals with the

18   control and possession of the silver car by the victim.  The

19   day before he's servicing it.  It's relevant evidence in

20   response to their title testimony.

21               THE COURT:  Well, we had the other issue

22   of the final instructions, too.

23               MR. LEWIS:  He stole the car and took it

3242

1    to Preston's.

2                    THE COURT:  How will this work out if I

3    have somebody call the jury, tell them to be here in the

4    morning for whatever evidence we have to put in yet; send

5    them home again; we spend tomorrow going over the

6    instructions; get those typed up; have them come in

7    Wednesday?  That way they'll all have a chance to vote, too.

8    That's going to --

9                    MR. CONSOLDANE:  Yeah.

10                    THE COURT:  Is that okay?

11                    MR. CONSOLDANE:  And hope they vote the

12    right way.

13                    THE COURT:  Yeah.  I should probably check

14    with which way they're going to vote beforehand.

15                    MR. LEWIS:  Judge, just for procedure,

16    they gave us a motion in limine in regard to the evidence

17    regarding his phoney department of justice stuff and his

18    phoney bags from Florida and all that kind of stuff.  I

19    thought you already ruled on that.  Didn't you rule?

20                    MR. CONSOLDANE:  Yeah.

21                    MR. WATKINS:  I thought you did too, but I

22    just wanted to make sure when we put the instructions back

23    together.

3243

1                    THE COURT:  Yeah, I found that that was

2     not relevant --

3                    MR. LEWIS:  Okay.  I just wanted to make

4     sure.

5                    THE COURT:  -- unless he took the stand

6     and was trying to put forth a self-defense, you know.  It

7     might come in that way.

8                    MR. LEWIS:  All right.  I thought I had

9     forgotten.

10                    MR. WATKINS:  Thank you, Your Honor.

11                    THE COURT:  Okay.

12                    MR. CONSOLDANE:  Well, Your Honor, to

13     answer your question as far as that goes, I believe that I'll

14     be able to answer that better after they finish with their

15     rebuttal as to whether we're going to have any rebuttal.

16     Now, if we don't have --

17                    THE COURT:  My question is, though, is

18     that going to take another day then to do that because --

19                    MR. CONSOLDANE:  Well, I don't know what

20     they have.  And, you know, maybe -- if it's something that we

21     can --

22                    THE COURT:  You have to decide that before

23     I dismiss the jury tomorrow.

3:45                                                                                3244

1              MR. CONSOLDANE:  Yes, yes, I will do that.

2    We can take a break and then I can, you know, we can dismiss

3    the jury, then we can work on jury instructions.

4              THE COURT:  Kelly, this is going to be a

5    long week.  Okay.

6              MR. CONSOLDANE:  All right.

7              THE COURT:  I'll see you all tomorrow at

8    9:00.  I will try to contact all the jurors then.  Thank you.

9              (Whereupon, the proceedings were concluded

10   at 2:39 p.m.)

11                        *  *  *

12   (NOVEMBER 5, 2002 - 9:33 A.M.)

13              (Whereupon, the following proceedings

14   occurred in chambers outside the presence of the jury.)

15              THE COURT:  We are in chambers out of the

16   hearing of the jury.  Waive the presence of the defendant?

17              MR. CONSOLDANE:  Yes, Your Honor, waive.

18              THE COURT:  You have -- as of yesterday

19   the record reflects that prosecution is going to call

20   rebuttal witnesses.  The defense has something you want to

21   put on the record.

22              MR. LEWIS:  Well, okay.  Why don't you

23   have Dennis premise it?

3245

1          MR. WATKINS:  I think you should rest now,

2   Tony.  You mistakenly rested before.

3          MR. CONSOLDANE:  We -- at this time the

4   defense exhibits have been admitted and, you know, we will

5   formally rest at this time.

6          THE COURT:  Okay, fine.  Mr. Consoldane,

7   do you have a motion at this time or --

8          MR. CONSOLDANE:  Well, okay, yeah.  The

9   prosecution wants to call three witnesses, one of which is

10  Diana Marchese, which we don't have any objection to, but the

11  two witnesses he intends to call from the Chrysler dealership

12  we would object to.  The records speaks for itself with the

13  evidence that's in there now that these two cars were owned

14  by Donna Roberts.  It doesn't make any difference who drove

15  what car.  She owned both cars, period.  To have them come in

16  and say -- they had enough witnesses already that have said

17  that they saw him driving usually the silver car, although

18  sometimes Donna drove it.  That's been the evidence so far.

19  To have some more on it at this time I think is wrong.  The

20  issue is not who drove the car, the issue is, we argue, who

21  owns the car, and I just don't think that the Court should

22  allow that.

23          And as long as I'm on that is that I also -- I was

3246

1    reading last night, was reading over the motion that the

2    State filed in regards to not allowing to attack the

3    character of Mr. Fingerhut and that what I read on that, that

4    is absolutely correct what they said.  However, when

5    Mr. Watkins asked his own witnesses what kind of a man was

6    Roberts Fingerhut, I think at that point he opened the door

7    and that we should be allowed to bring in those witnesses,

8    and I think that the Court can allow us to do that on

9    surrebuttal.

10                    MR. LEWIS:  One other thing, judge, in

11   regard to the proposed evidence by Mr. Watkins, the

12   prosecutor, in regard to if you are going to bring the

13   maintenance records in in regard to these two vehicles, that

14   in and of itself --

15                    THE COURT:  Off the record.

16                    (Whereupon, a brief recess was taken.)

17                    MR. LEWIS:  Okay.  I was -- the prosecutor

18   is going to introduce maintenance records in regard to the

19   two Chrysler automobiles that were released and registered

20   under the name of Donna Roberts, evidently to establish in

21   some form or manner some possessory right or whatever in

22   Robert Fingerhut.  However, judge, I would indicate that

23   that's totally incompetent evidence in regard to any

1    possessory right or any control that he had over the vehicle

2    in the sense that anybody can bring a motor vehicle in to

3    have it serviced at a dealership, whatever.  The dealership

4    is not going to have qualms about who brings it in as long as

5    the bill is paid.

6           If the bill is not paid they can tentatively sue the

7    other party who brought the motor vehicle in and formed the

8    contract with the dealership.  However, they have a lien on

9    the vehicle, they would retain the lien, and that would be

10   enforced against the owner of the vehicle, which would

11   indicate the five days that they can't enforce the possessory

12   right in regard to the person who brings in the car.  That in

13   no way, shape or form would indicate that Mr. Fingerhut had a

14   possessory interest in this motor vehicle.  That would apply

15   across to boats, that applies to anything.

16          The dealership is interested in one thing, just

17   doing the maintenance work and making money for it and

18   whatever.  Who brings the motor vehicle in is of no

19   consequence whatsoever and does not indicate or produce any

20   possessory interest in the motor vehicle.

21                  MR. WATKINS:  Are you done?  Are both of

22   you done?

23                  MR. LEWIS:  Oh, we would -- yeah, for

3248

```
 1   that, for countering that.

 2                   THE COURT:  Go ahead.

 3                   MR. CONSOLDANE:  Well, we had two motions

 4   there.  We have a third to make, but go ahead.

 5                   MR. WATKINS:  Your Honor, the State will

 6   present evidence that will show what the law allows and what

 7   is relevant in this case.  Repeatedly defense counsel

 8   misrepresents the law.

 9                   MR. CONSOLDANE:  We do not.

10                   THE COURT:  Okay.  Come on.

11                   MR. LEWIS:  Let me understand what he's

12   saying.

13                   MR. WATKINS:  Your Honor, and this has

14   been typical, I don't interrupt them but it's constant.

15                   MR. CONSOLDANE:  When you say things like

16   that, Dennis, that just upsets me.

17                   THE COURT:  He is giving his opinion on

18   things, that's all.

19                   MR. WATKINS:  Your Honor, the question of

20   legal title is not material as a matter of fact and law.  The

21   question in Ohio law is owner includes people who have

22   control and possession.

23                   The evidence that we are about to present is in
```

3249

1    rebuttal to the evidence they presented by way of an employee

2    from Preston Auto Group concerning the title.  They are going

3    to be prepared to argue and I think they can.  I don't

4    disagree with the ability of defense counsel to present their

5    defense in the sense that they are going to argue that look,

6    here's the title, it's in Donna Roberts' name.  However, we

7    have witnesses that are going to testify, one, they've dealt

8    numerous times with this deceased, they know him, and that,

9    in fact, as late as of the day before the homicide he brought

10    in the silver car himself and took the silver car himself the

11    day before the homicide.

12         Other witnesses will include the salesman that is

13    going to go into the fact that he negotiated the terms for

14    the cars.  And, additionally, one of the witnesses is going

15    to testify that on these receipts that Mr. Fingerhut charged

16    and signed his name.  So he can be identified in different

17    ways as being a person who regularly brought in the silver

18    vehicle and, in fact, brought in both vehicles and, in fact,

19    negotiated the purchase for both vehicles; that Donna Roberts

20    came in once, signed the paperwork, and that was about it.

21    And one other time they brought the vehicle in.

22         That is relevant, Your Honor, in our opinion, and it

23    is appropriate evidence in response to rebuttal since we are

3250

1    going, we are going to prove by the evidence, in our opinion,

2    that he was the legal possessor of the car under law.

3             MR. CONSOLDANE:  There is no such thing as

4    a legal possessor.

5             MR. WATKINS:  Well, you better read the

6    law because that's what it says.

7             MR. CONSOLDANE:  No.

8             MR. LEWIS:  Judge, in retort of that is

9    even if Mr. Fingerhut brought these cars in, they still don't

10   have the necessary element.  They don't know or they can't

11   establish by chain here that he actually had permission on

12   that day to operate that motor vehicle, and the only way you

13   can establish is by ownership.  The argument here is that we

14   have, in fact, in both instances here, and I am getting a bit

15   off the track, but the point is say, for instance, what the

16   State is contending here and even with the aggravated

17   burglary is that once so-called proof of the criminal act --

18   I'm getting off the track.

19            I'm going to go back to the burglary in a minute,

20   but the point, let me get back to the deal here, the motor

21   vehicle, is that there's no indication in the record, okay,

22   whether Donna, Donna Roberts, withdrew her permission for

23   Robert Fingerhut to operate that motor vehicle.  There is

3251

1    every indication also possible in the letters indicating the

2    fact that she said, "You can drive those cars, Nate," and

3    it's in the letters that are submitted to the Court.

4         Not only that, in reference to -- I'll jump to the

5    aggravated burglary -- there's references in there about him

6    being in the house and she had him in the house, tacit

7    permission to be in that house.  That's before he left prison

8    there's letters about that.

9         The problem here, and I'll give you an example on

10   the aggravated burglary, is that the State's position here is

11   that when a crime is committed, any crime is committed in any

12   place where human beings are, and that's temporary,

13   permanent, it could be a house, it could be a building, it

14   could be this courtroom, it could be this chambers, once

15   there is some kind of criminal offense committed, no matter

16   what it is, that somehow a trespass occurred because your

17   permission to be here is no longer valid.  That means that in

18   every case the prosecutor -- if a husband owns a house and

19   the wife comes in and the husband commits a criminal act

20   against the wife, at that point then, even though he's the

21   owner of the house, that somehow his permission to be there

22   is no longer valid, okay, so then he's committed an

23   aggravated burglary.  If he happens to kill her then all of a

3252

1    sudden we have a death penalty case.  This is not -- he's

2    emasculating the law.  It is getting emasculated to where

3    this would be the obvious position in any case.

4         You can have somebody get in an argument at Kmart

5    with the actual owner of the store, the manager or whatever,

6    who had a right to be there or whatever, but say the owner.

7    He got in argument and he killed one of the patrons.  Well,

8    okay.  Is his position, because he got in the fight and was

9    the aggressor, that his permission is gone so he becomes a

10   trespasser?  If he is a trespasser then he's in a place where

11   people are, even on a temporary basis, so all of a sudden we

12   have an aggravated murder case by bootstrapping, and say it

13   is aggravated burglary.  They're emasculating the law, judge.

14   You cannot do that.  You may have an aggravated murder here.

15   You may have prior calculation and design, but you do not

16   have an aggravated burglary.  You do not have an aggravated

17   robbery.

18        The point being is if you're not the owner of the

19   vehicles, whatever, and you don't have somebody to establish

20   that he didn't have permission, okay, to operate these motor

21   vehicles, okay, then fine, then it comes in.  The owner -- it

22   has -- that's Mr. Fingerhut's work.  He is the one that did

23   it, okay, and all she had to do is to call the dealership and

3254                                                                    3253

1    say don't give him back my car and they wouldn't have to give

2    him back the car.  In fact, if they gave him that car they

3    would be libel.  They would be libel for that vehicle if they

4    gave that car back to him when she says no.  That's the

5    point.  That's the point.

6          The law has to stop and get to ownership.  You have

7    to have that.  If you are going to turn around and turn

8    everything upside down here and property rights or whatever

9    don't have any effect at all.  And not only that, you are

10   going to emasculate everything because, as I indicated

11   before, if they are permitted, permitted to just say you're

12   not the owner of this vehicle, therefore you stole it, we are

13   going to prosecute you and we don't care where the owner is

14   or who he is or whatever.  We know that's not the case, but

15   that's what they are pretending to do.

16         "You're in a house.  We don't care how you get in

17   the house, it's not your house.  You are a burglar.  We are

18   going to prove it and we don't care what the owner has to

19   establish," or whatever.  That's not the law.  The law says

20   without the privilege or it says that it's actual permission

21   to be there, and that's what it boils down to.  If they are

22   going to obviate that element they have to prove, all right,

23   then that's where we're going here.

3254

1          THE COURT:  Here is the problem.

2          MR. WATKINS:  May I briefly respond?

3          THE COURT:  Let me answer this while I

4   have it in mind.

5          MR. WATKINS:  Go ahead, judge.

6          THE COURT:  And then we can add to it.

7   Your example of husband and wife doesn't fit because a person

8   who owns the property can never be a trespasser on their own

9   property, a legal title holder.  There's no evidence that the

10  possessory interest was, in fact, taken back by Donna as far

11  as his right to use the car.  There is evidence before the

12  jury that he had consent to use the vehicle.  The jury has

13  evidence that they can interpret that that possessory

14  interest was still in effect as of the night of this

15  incident.  There's no evidence to the contrary of that.

16          The evidence about, you know, the one of two

17  theories here that Donna dropped him off, he was in there by

18  stealth in regard to Fingerhut is one view that the jury

19  could accept.  And as we went over yesterday, you can't give

20  somebody permission to do an illegal act even though you are

21  the title holder of the property.  If he went in there with

22  Fingerhut's invitation and he did so by deception, that his

23  intent was to go in and kill Fingerhut, then that vitiated

3255

1    any permission to be there and it became a trespass the

2    moment that he took up arms against the fellow.

3        There was one other point on your objection, your

4    example of Walmart.  Yes.  But becoming a trespasser does not

5    give anyone the right to take your life.  You have the right

6    to remove a trespasser using any reasonable force.  In a

7    trespass situation the only way that you can justify a

8    homicide would be in self-defense, so your arguments, I

9    think, don't stand up to the test that we have to apply here.

10        And I understand what your primary objection to the

11   Court's rulings on a lot of this evidence is and it boils

12   down to the single fact that the State has to prove each and

13   every element, and one of them for the burglary charge is,

14   starts out at the first part of the statute, trespass.

15        Now, we've gone through all this on the record and

16   I've given my reasoning.  You have the right to request, I

17   think, that this issue be put before the jury as to whether

18   or not he was a trespasser.  The jury can conclude that he

19   was.  They could also conclude that he wasn't a trespasser if

20   they believe that Donna gave him permission to be there, but

21   then they have to ignore the instruction of law that says

22   that he becomes a trespasser once he embarked on some

23   wrongdoing.

3256

1                    MR. CONSOLDANE:  Your Honor, but what if,

2    what if also we have -- there's two other scenarios that

3    everybody just keeps ignoring.  What if Donna asked Nate to

4    come in the house to stay there to protect her from being

5    beaten, --

6                    MR. MORROW:  There's no evidence.

7                    MR. CONSOLDANE:  -- you know, by

8    Fingerhut?

9                    THE COURT:  But there's no evidence that

10   she was in the house at the time.

11                   MR. CONSOLDANE:  Well, no, but she was

12   going to go back.

13                   MR. WATKINS:  This is --

14                   MR. CONSOLDANE:  Allow him into the house

15   not with the purpose of killing him.

16                   THE COURT:  That I think gets into the

17   area of not inference but speculation as to what --

18                   MR. CONSOLDANE:  They were doing a lot of

19   speculation, too.  And then also is that we already have the

20   evidence, the tape that the prosecutor introduced showing

21   that, you know, where Nate was telling him that he was

22   brought into the house, you know, and Fingerhut was the

23   aggressor, he was just protecting himself.  Now, that is

3257

1   evidence that they brought in.  We didn't bring that in, they

2   brought it in.

3                    THE COURT:  That's where the jury has the

4   right, if the jury found that that was what happened, then

5   they, by the very nature of believing that testimony, would

6   not believe that he was a trespasser.

7                    MR. CONSOLDANE:  There's no evidence to

8   say that it happened any other way.

9                    THE COURT:  There's no direct evidence

10  otherwise, but there's circumstantial evidence, and they both

11  stand on equal basis.  You -- I cut you off, Dennis.

12                    MR. WATKINS:  Yeah.  I just need to

13  indicate first off that defense counsel has yet to cite a

14  case.  There is nothing from their argument -- and let me

15  respond without being interrupted.

16                    THE COURT:  Lewis makes it sound so damn

17  good though.

18                    MR. WATKINS:  State versus Steffen and

19  Lilly and the case that is cited in our brief I think cover

20  the situation.

21                    THE COURT:  I have to say I find no reason

22  to not accept your argument because I think it's good law.

23                    MR. WATKINS:  And I just want for the

3258

1    record, Your Honor, to indicate there is factual evidence.

2    That res gestae, the 911 tape, is to me very important direct

3    evidence that Donna says they took my husband's car.  At that

4    point, "My husband's dead, do anything.  They took his car."

5    That's in the evidence from what Paul Monroe said.

6                         THE COURT:  Well, there is more than

7    enough here for --

8                         MR. WATKINS:  You see what I'm saying,

9    Your Honor?  So if it had been revoked it's contrary to

10   Donna's own declaration.

11                        THE COURT:  That's what the jury has to

12   sort through.  And for purposes of these motions it's

13   apparent to see if there is evidence upon which the jury can

14   make a decision one way or the other, and there is.

15                        MR. CONSOLDANE:  But, Your Honor, that was

16   hearsay that never should have been allowed in.

17                        MR. WATKINS:  That's admissible evidence.

18                        MR. CONSOLDANE:  No, it's hearsay.  I

19   objected.  It shouldn't have been said.

20                        MR. WATKINS:  You were overruled.  This is

21   what is happening with this record.  The rulings of the Court

22   are the rulings of the Court.  They can go up on appeal.  The

23   evidence that's in is the evidence that we can argue.

3259

1          And the last thing I would like to say is that

2    Mr. Lewis gave a hypothetical; if the car Robert was driving,

3    if she would call, "Don't give him the car," but if he took

4    the car in spite of the revocation, under Ohio law a person

5    who even has an unlawful possessory interest can't be robbed

6    at gunpoint to get the car back.  Even a thief can be robbed

7    under Ohio law and that's very clear.

8          THE COURT:  I don't disagree with that.

9          MR. WATKINS:  So I feel comfortable that

10   every ruling of the Court is right in line with Ohio law.

11         MR. CONSOLDANE:  What about the ruling

12   there, you know, on Dennis opened the door to

13   Fingerhut's character?

14         MR. WATKINS:  I want to respond to that,

15   please.  I never opened the door because the brief shows that

16   the trait here is for peacefulness.  When I said, "What kind

17   of guy was he to work with," I never brought into issue, I

18   never ever said was he a peaceful guy.  I didn't bring that

19   into issue.  That is what --

20         THE COURT:  I stand with my prior ruling

21   that his character does not come into account unless it has

22   something to do with state of mind.

23         MR. CONSOLDANE:  Well, Your Honor, that is

3260





1    true, but a second year law student knows you can open the

2    door to something.  They opened it.  Why can't -- you know,

3    they got in, they got in, oh, he was a nice guy, he made

4    jokes, he did this.  If they get into all that why can't I

5    get into that area?  Why is he allowed to do that and I am

6    not?

7                    THE COURT:  Because you can't attack the

8    character of the deceased unless it's material, relevant to

9    the part of the case.

10                    MR. CONSOLDANE:  That's absolutely true

11   unless the State opens the door.

12                    THE COURT:  The defendant is not -- the

13   deceased is not on trial here.

14                    MR. CONSOLDANE:  And that's absolutely

15   true, Your Honor, and I agree with that a hundred percent,

16   except for the fact that he opened the door.  He said what

17   kind of guy was Fingerhut?

18                    THE COURT:  Let me ask you this, Tony,

19   along that line.  Assume that it were permissible to bring

20   testimony in so you say he has a federal officer's badge, he

21   has some kind of detective license from Florida and he beat

22   his wife up once in a while.  That would be the sum and

23   substance of the bad character?

3261

1    MR. CONSOLDANE:  No.  There's some credit

2    card problems.

3    THE COURT:  Okay.  He wrote --

4    MR. LEWIS:  He created a whole different

5    name, judge.  He created a whole different name.

6    MR. CONSOLDANE:  A whole different name.

7    THE COURT:  The he had credit card fraud

8    and he didn't pay his employees but a slave's wages, okay.

9    What does that have to do with anything?

10    MR. LEWIS:  Because he said he was a nice

11    guy; he paid slave wages; doesn't report to the IRS; pays

12    under the table; he runs around with a badge from the Florida

13    State Attorney's office which is bogus.  He was never a

14    special agent for the Florida State Attorney's office.  He

15    has a card indicating that he's a special agent from the

16    Department of Justice issued by the U.S. Marshal Service

17    which is totally bogus, which they want to come and talk to

18    him.  Unfortunately I told them he was dead, so that in and

19    of itself, carrying that, is a crime in and of itself, all

20    right.

21    The point and the fact is he beat his wife up, he

22    beat her up and everything else.  That is violence.  Aren't

23    we going to count wives?  Are we going to count women?

3262

1          THE COURT:  My point is it only becomes

2     relevant --

3          MR. LEWIS:  It is relevant now because,

4     judge, everybody in this case is saying we don't care what

5     Nate said, we know that's bogus and we didn't believe any of

6     that.  You can't do that.  You can't do that.

7          THE COURT:  I agree with you his view is

8     before the jury that he did this out of self-defense, but the

9     only way the character comes in to account is if Nate had

10     taken the stand, and he has a right to give to the jury what

11     his thought process was at the time of the killing.  And if

12     he gets on and says I know this guy is a violent SOB and

13     that's what prompted me, and any other reasonable person in

14     my position would have acted as I did, then it becomes

15     relevant.

16          MR. LEWIS:  Judge, no.  He doesn't have to

17     take the stand to establish that.  The tape in and of itself,

18     the evidence the prosecutor brought in.  You can have

19     self-defense, judge, without the man taking the stand.  He

20     can put it in his statement, he can say this is what

21     happened.  What happened is that Fingerhut got into the

22     house, all right, and Fingerhut had every motive in the world

23     to get rid of Nate Jackson or to do something about him

3263

1   because --

2                         THE COURT:  Now that takes -- you have

3   to --

4                         MR. LEWIS:  I have motive and I have a

5   story.

6                         THE COURT:  Jim, Jim, one thing.  Let me

7   stop you.  You have to make a big assumption there that I

8   don't think there's any evidence of.  Is there any evidence

9   that Fingerhut was aware of this liaison between --

10                        MR. LEWIS:  Oh, absolutely.

11                        MR. CONSOLDANE:  It's in the letters.

12  It's in the tape.

13                        MR. LEWIS:  It's in the telephone calls.

14  That's how she got beat up.

15                        MR. CONSOLDANE:  They haven't played it.

16  Maybe we should play it to the jury.  It's in there.  It's

17  marked as evidence.  The jury is going to be able to read it.

18  We're going to tell them to read it.

19                        MR. LEWIS:  It's in there.

20                        MR. WATKINS:  Your Honor, I have Diana

21  Marchese waiting and she needs to be out of here.

22                        MR. LEWIS:  I can show you the excerpts,

23  judge.  I can show you where within eight days of this or 10

3264

1    days where she got beat up because he found out because

2    somebody called him.  Well, he knew that before as far as I'm

3    concerned.  The letters were in his bedroom, for God sake.

4    He knew this.  But the point is --

5                    THE COURT:  Well, that's in the record.

6                    MR. WATKINS:  Yeah, there's no question

7    that the guy, the guy, they had confrontation.  There was

8    another man involved, there is no question about that.  We're

9    not --

10                   MR. LEWIS:  There was another man

11   involved.  The point is she's divorced, she can be with any

12   man she wants.

13                   MR. MORROW:  Fine, argue it.  Argue it.

14                   MR. LEWIS:  The point is --

15                   THE COURT:  Well, --

16                   MR. LEWIS:  -- I'll show you where she was

17   beat up and all of this.

18                   MR. WATKINS:  And she got two punches in.

19   That's the 27th of -- 29th of November letter where she got

20   two punches in in this.

21                   THE COURT:  Okay.  Let's put a stop to

22   this.

23                   MR. CONSOLDANE:  Your Honor, we have two

3265

1   prongs to it, the one on the self-defense and also the one

2   that he opened the door, and I think that is more important

3   than anything.  I will let -- I've made my objections enough

4   times.

5               THE COURT:  Your objection is on the

6   record.  I'm overruling that.  If that is as important to the

7   court of appeals as it is to you, then I'm wrong on the

8   thing, but I think that I'm correct and I think it's getting

9   too far afield here on the evidence as it is to this point.

10  The Rule 29 is overruled for the same reasons that appear on

11  the record before.  Nothing was changed by the evidence put

12  on to vary that ruling.

13              You are going to put your rebuttal on?

14              MR. WATKINS:  I've got them all out there.

15  They are waiting.  We have three witnesses and then that's

16  it.

17              THE COURT:  And then you folks have, I

18  think, a complete record here on all these points.  This one

19  point we're just talking about, we've been over three times,

20  so there's a complete record that the court of appeals can

21  decide the issue with.  You guys have done your job.

22              MR. LEWIS:  Based on that, we did renew

23  our Rule 29, didn't we?

3267                                                                        3266

1              MR. CONSOLDANE:  Yes, yes, yes.

2              MR. LEWIS:  Okay.  All right.

3              THE COURT:  Thank you.

4              (Whereupon, the proceedings in chambers

5     were concluded and the following proceedings occurred in open

6     court with the jury present.)

7              THE COURT:  Good morning, folks.  The

8     State has presented its case, the defendant has presented his

9     case, and the State is now going to call a few more witnesses

10    for what we call rebuttal evidence.  That is an opportunity

11    for the State to bring forth witnesses to rebut something

12    that has been presented by the defense evidence.

13             As you know, the burden is upon the State to prove

14    this case beyond a reasonable doubt.  Therefore, the State

15    has the opportunity to present rebuttal evidence as well as

16    giving the last argument in closing arguments because of the

17    burden of proof.

18             Mr. Watkins, are you ready to call your witness?

19             MR. WATKINS:  Yes, Your Honor.  Mr. Oliva.

20             (Whereupon, the oath was administered to

21    Mr. Carmen Oliva by the Court.)

22                        *  *  *

23    WHEREUPON,

3267

## MR. CARMEN OLIVA

having been first duly sworn, was called as a witness and

testified as follows:

### DIRECT EXAMINATION

By Mr. Watkins

Q        Good morning, Carmen.

A        Good morning.

Q        If you can, pull that microphone near you, then the
jury will be able to hear you.  I think you speak fairly loud
so I don't think that would be a problem.  It's important to
speak up.

A        Sure.

Q        Would you tell the jury your name, please?

A        It's Carmen Oliva.

Q        And where are you from, Carmen?

A        New Castle, PA.

Q        And you are a salesperson at the Preston Auto Mall?

A        Yes, sir.

Q        And would you tell the jury where that's located?

A        That's on 3843 Youngstown Road, Warren, Ohio.

Q        And how long have you been in business?

A        I've been with the company nine years.

Q        Okay.  And how long have you been at the Warren

3268

1    office or Warren auto mall?

2    A       Five years October 1st.

3    Q       And did there come a time in December, sometime

4    after December 11th, that you became aware that one of your

5    customers had been killed?

6    A       Yes, I did.

7    Q       And, in your own words, tell the jury how you became

8    aware of that.

9    A       We heard it on the news.

10              MR. LEWIS:  Judge, we're going to object

11   to that.  What's the relevancy?  I mean, he's a salesman.

12              MR. WATKINS:  I'm going to tie it in.

13   A       I said I heard it on the news --

14              MR. CONSOLDANE:  Wait a minute.

15   A       -- and that next morning I heard it from a

16   co-worker.

17              MR. CONSOLDANE:  Carmen.

18              MR. LEWIS:  Carmen, hang on.

19              THE COURT:  Just one minute, sir.  What's

20   your objection?

21              MR. LEWIS:  The objection simply is,

22   judge, he's going to talk about what happened before

23   Mr. Fingerhut's death.  That's what posing the relevancy of

3269

1    this is.  It's not a story about what happened afterward or

2    anything else.

3                    THE COURT:  Well, I don't think that it

4    has to be.  Part of the State's case here is in regard to the

5    automobile.  We've gone over this out of the jury's hearing

6    on the purpose of the State calling this witness.  The

7    relationship of time as to whether the defendant is required

8    to only put something that happened after this alleged

9    incident I think is incorrect.  They have a right to pursue

10   the course that they're taking, okay?

11                   MR. LEWIS:  All right.

12                   THE COURT:  So the objection is overruled.

13   Q       When you heard it on the news did you see a

14   photograph or a picture of the victim?

15   A       Yes, I did.

16   Q       And did you recognize the victim?

17   A       Absolutely.

18   Q       And how well did you know him?

19   A       He was a great customer to me.

20   Q       And was there something about the name that was

21   given on the TV that --

22   A       I knew him by Mr. Roberts, period, as a customer.

23   That's what we called him.

3270

1   Q        And the picture of the deceased was what name that

2   person was going by on the TV?

3   A        On the news?  Fingerhut.

4   Q        Okay.  So the customer you described as a customer

5   you knew very well, you knew him as Mr. Roberts?

6   A        Yes, sir.

7   Q        And how many years did you know him?

8   A        '98, '99, 2000, '01.  Five years.

9   Q        A little bit louder, please.

10  A        Almost five years.

11  Q        Okay.  And how many cars did you negotiate with him?

12  A        Four cars.

13  Q        And would you tell the jury what cars they were?

14  A        A '98 Sebring, a '99 300M, 2000 300M and 2001 300M.

15  Q        And when you negotiated with him was Donna Roberts

16  with him?

17  A        Never, not once.

18  Q        And when the cars were purchased how was it

19  purchased, in whose name?

20  A        Donna Roberts, period, only.

21  Q        And that was pursuant to whose instructions?

22  A        Excuse me?

23  Q        Is that what Mr. Roberts told you, the way he wanted

3271

```
 1    it?

 2    A       Sure.

 3    Q       Okay.

 4    A       He never signed one bill.

 5    Q       Okay.  But he was the only person you dealt with

 6    picking out the cars?

 7    A       He picked the car out and negotiated.  He didn't

 8    negotiate much.  He wasn't that type of guy.

 9    Q       And after he would get these cars would you see him

10    very often?

11    A       Absolutely.

12    Q       And would you explain to the jury why you would see

13    him very often?

14    A       We have a feature or benefit of our dealership where

15    you buy a car and you come in Monday through Saturday

16    anytime, you never have to pick the phone up or call, we have

17    a courtesy where we'll wash your car for you.  If you buy a

18    $500 car, you come in and we wash it for you.  It's a

19    courtesy.  That's a feature and benefit that Mr. Preston has

20    had for 14 years.

21            Mr. Roberts was very particular with his cars

22    obviously.  You see he bought three 300Ms, named Motor Trend

23    car of the year.  He loved the car.  Got Mrs. Roberts
```

3272

1    whatever she wanted.  He was the gentleman that would bring

2    the car in, all the cars, to get washed, cleaned and

3    serviced.  In the five years that I've known him I seen Donna

4    Roberts maybe four times, and that was only to get her

5    signature on a contract, and from the time of delivery of

6    that vehicle when it went over the curb she never came in to

7    get it washed, to come to our dealership for service, and

8    that's it.

9         He was a great customer.  He was a great guy.  He's

10   very well missed.

11              MR. CONSOLDANE:  Objection.

12   Q    Carmen, would you please --

13              THE COURT:  Just a minute.  What's your

14   objection?

15              MR. CONSOLDANE:  Your Honor, you told us

16   we can't get into Mr. Fingerhut's character and here he is,

17   Dennis is getting into it again right now.

18   A    I'm talking about his character.

19              THE COURT:  Just one moment.

20   A    That's me.  Excuse me if I can't -- judge, if you

21   don't want me --

22              THE COURT:  No.  Just one minute.

23   A    I had a rapport.  He wasn't just a customer.  If you



3273

1   have a problem with me talking --

2                    THE COURT:  I have to sustain the

3   objection --

4                    MR. WATKINS:  Yeah.  Carmen, --

5                    THE COURT:  -- because the character, the

6   Court has ruled, is not part of the case, it has no relevancy

7   to it.  So don't give any opinion on that, please.

8                    MR. CONSOLDANE:  Your Honor, I would like

9   also an instruction to have the jury disregard any of those

10  comments.  This is the second time that the State has done

11  this.

12                   THE COURT:  Ladies and gentlemen of the

13  jury, the character of a person by the rules of evidence

14  usually does not come in unless there is a specific reason

15  under the rules that it is relevant to the case.  Whether

16  Mr. Fingerhut was an angel or a devil, this Court has ruled

17  under the evidence as it's been presented, is not something

18  for the jury to take into account.  That's neither here nor

19  there as far as what you have to decide.

20       Now, there was some testimony that was given earlier

21  and I think someone expressed a certain view of the good

22  character of Mr. Fingerhut.  That was not objected to at the

23  time or the Court -- I don't think it was objected to at the

3274

1    time.

2                    MR. CONSOLDANE:  No, it wasn't, Your

3    Honor.  I mean, we figured if the State wanted to get into it

4    we would get into his character also.

5                    THE COURT:  Okay.  In any event, there's

6    been an objection to any further evidence in that regard and

7    the Court has ruled that the character of the deceased is not

8    part of the information this jury needs to make a decision.

9    You will be given instruction of law that covers all

10   necessary parts.  So I am instructing you at this point in

11   time that any reference that has been made good or ill of the

12   character of the deceased is irrelevant, you are not to use

13   for any purpose.  Please continue.

14   Q        (By Mr. Watkins)  Carmen, would you please tell the

15   jury, and listen to my question, how many times did you see

16   Mr. Fingerhut, or Mr. Roberts as you knew him, with the

17   silver car?

18   A        Over 20 times, if not more.

19   Q        And when he would bring the car in those 20 times

20   would you at times take him somewhere?

21   A        Sure.  We'd give him the courtesy of taking him back

22   to the business 99 percent of the time.  We didn't make him

23   wait.

3276                                        3275

1    Q        And with the red car, did you see him at times bring

2    the red car in?

3    A        Did I see him?

4    Q        Yes.

5    A        He was 99 percent the person coming in to our store.

6    Q        Yeah.  My question is you saw him bring both cars

7    in?

8    A        Yes, both cars.  Every car.

9    Q        And what were the last two cars that he purchased

10   from you, the years and the models, please, and their colors?

11   A        A 2000 --

12                  MR. CONSOLDANE:  Objection.

13                  MR. LEWIS:  He didn't purchase them.

14   Judge, he never --

15                  THE COURT:  Okay.  Sustained.  Redraft

16   your question.

17                  MR. LEWIS:  Jesus.  Please.  You know.

18   Q        When he negotiated with you for Donna Roberts to

19   come and sign for it, what were the last two cars?

20   A        Inferno red 2000; 2001 300M, silver mist, was the

21   last one.

22   Q        And that was a 2001 300M?

23   A        2001.

3277                                                                    3276

1   Q        And how much did those cars cost?

2   A        They had an MSRP of about 33,000.

3   Q        And were those cars leased?

4   A        Yes, sir.

5   Q        And did you notice the keys that Mr. Fingerhut

6   personally had for the silver car?

7   A        I didn't even have to see them, I describe them.

8   Q        Just tell the jury what they looked like.

9   A        He had a baseball, a little -- like a little thing

10  of a gym bag, he had a little metal ring, and he carried a

11  lot of keys.

12  Q        Okay.  I'm going to show you what's been marked

13  State's Exhibit 269.  Do you recognize those keys?

14  A        (Witness nods head affirmatively.)

15  Q        Whose keys are they?

16  A        Mr. Roberts'.

17  Q        And approximately when was the last time you saw

18  him?

19  A        He was in our dealership December 10th.

20  Q        Did you see him that day?

21  A        I said hello to him and greeted him, absolutely.

22  Q        And when was the last time that you drove him after

23  he had brought his car in approximately?

3279                                                    3277

1    A        I can't, I can't exactly give you -- I would say

2    approximately a month and a half, two months I personally

3    brought him to the Warren Greyhound station.

4    Q        And that's where you would take him?

5    A        I always take him there.

6    Q        Thank you very much.

7                    THE COURT:  Cross.

8                    MR. LEWIS:  Judge, if I could approach.

9    Kelly, I want it on the record here.  Just move over here a

10   little bit.  Judge, just for a moment.

11                   (Whereupon, the following proceedings

12   occurred at side bar outside the hearing of the jury.)

13                   MR. LEWIS:  Judge, in regard to the

14   earlier meeting with the Court, the prosecutor proffered what

15   he was going to have him introduce.  He said he was going to

16   negotiate the sales of cars, that's all he was going to go

17   into.  It is obvious he testified to a lot more than that,

18   identified keys, testified about the car washings, testified

19   about a lot of other things that were beyond the scope of

20   what the prosecutor proffered at that time.  We would raise

21   an objection in regard to this and just indicate to the Court

22   that he didn't tell us in full detail exactly what he was

23   going to introduce.  He prefaced it with he negotiated a

3279                                                        3278

1    couple sales of two cars.  And obviously this witness is

2    going to be rather hostile towards me, there is no question

3    about it, he wants to talk on his own, so if it gets out of

4    hand I want the Court to caution him in regard to the

5    testimony.  I need your keys to get in the back room.

6              THE COURT:  The back room?

7              MR. LEWIS:  I need the exhibits.

8              THE COURT:  Objection is noted and I guess

9    it is an objection to the entire testimony.  It's overruled.

10             (Whereupon, the side bar conference was

11   concluded.)

12   <u>CROSS EXAMINATION OF MR. CARMEN OLIVA</u>

13   By Mr. Lewis

14   Q       Mr. Oliva, before we get started I got to ask you a

15   question.  I had an investigator who was a fine gentleman, he

16   worked in Washington DC and he worked for my office.  He has

17   since died.  John Oliva.  Are you any relation to John Oliva

18   in Girard?

19   A       No, sir.

20   Q       Not at all?

21   A       Everybody asks me though, sir, if I'm related to the

22   Olivas in Girard.  I'm from New Castle, PA and my family is

23   in Italy.  My dad lives in Italy.  My mother lives in New

3279

1    Castle.  But the five years I've established here they do ask

2    me that.

3    Q        They do ask you?

4    A        Yes, sir.

5    Q        You would have been pretty well off if you would

6    have been related to him.

7    A        Excuse me?

8    Q        I say you would have been well off if you had been

9    related to him I think.

10   A        No relation.

11   Q        Carmen, I'm not going to fight with you, okay?

12   A        Okay.

13   Q        I know you feel for Mr. Fingerhut.  Okay.  I'm not

14   going to fight with you, all right?

15   A        No, sir.  No problem.

16   Q        Okay?

17   A        Sure.

18   Q        All right.  You knew -- it's Mr. Roberts?

19   A        Yes, sir.

20   Q        And you knew him for approximately those five years?

21   A        Approximately five years.

22   Q        He came into Preston and you are a -- are you a

23   salesman, a salesman, I mean just general, like they have



3280

1    BMW, they have Chrysler, --

2    A        I do it all.

3    Q        -- they have Jeep, they have all that?

4    A        I do Chrysler, Jeep, BMW, Plymouth.

5    Q        Okay.  All right.  And did you ever refer to

6    Mr. Fingerhut as Mr. Roberts in those five years?

7    A        Did I refer?

8    Q        Yeah, like "Mr. Roberts, how are you today?  Good to

9    see you.  I got some great cars here."

10   A        That's the only -- that's how I know him,

11   Mr. Roberts, period.

12   Q        Yeah, Mr. Roberts.  He never told you his name was

13   really Fingerhut?

14   A        No.

15   Q        He never did in five years?

16   A        He didn't tell me his last name was Fingerhut.  I

17   called him Mr. Roberts.

18   Q        Well, how did you get the idea he was Mr. Roberts?

19   A        That's what he told me to call him by.

20   Q        He told you to call him by Mr. Roberts?

21   A        Didn't tell me, didn't tell me.

22   Q        Okay.  Don't get --

23   A        I'm just saying.



3282                                                                                    3281

1    Q        Can you tell me how it came about that --

2    A        It's respect, it's out of respect.  I know him to

3    call him Mr. Roberts.

4    Q        Okay.

5    A        I'm swearing to the -- judge, I'm just answering as

6    best I could.

7    Q        Okay, Carmen, I understand that, okay, and I

8    understand your response, okay, and I told you we're not

9    going to fight, okay?

10   A        No.  Sir, I'm not going to fight.

11   Q        All I'm asking --

12   A        You're asking me --

13   Q        Wait, wait, wait, wait, wait.  All I'm asking you is

14   how is it that you came about to call him Mr. Roberts, do you

15   recall how it happened?

16   A        Our dealership in Warren, Ohio knows to call him

17   Mr. Roberts.

18   Q        Okay.

19   A        I was aware of Fingerhut from the news --

20   Q        I understand.

21   A        -- that following day after his death.

22   Q        Okay.  Good enough, good enough answer.  Okay.  So

23   the dealership knew him as Mr. Roberts?

3282

1    A      Yes, sir.

2    Q      Okay.  The first car you negotiated with him, for

3    him -- well, wait, negotiated to buy.  When we say

4    negotiation, that's where we argue about price, right?  Pick

5    out the car and argue about price, is that what we are going

6    to say is negotiate?

7    A      Yeah.

8    Q      Okay.  And the first time did you ask him -- do you

9    do any of the paperwork at all, Carmen, let me ask you, do

10    you do any of the paperwork, sign the contract?

11    A      Excuse me?

12    Q      Do you as a salesman -- okay, I know how dealerships

13    work.  You have a salesman, usually a couple salesmen on the

14    floor, okay.

15    A      Yeah.

16    Q      And when it comes to signing the actual contracts,

17    some small dealerships the salesman actually goes in, does

18    the paperwork and has him sign the agreement.

19    A      Uh-huh.

20    Q      Do you do that and did you do that?

21    A      (Shaking head negatively.)

22    Q      Okay.  So you turned him over to somebody else, who

23    would be?

3283

1    A        Right.  That would be our finance manager.

2    Q        The finance manager.  Okay?

3    A        The salesman is not allowed to touch any contract.

4    Q        Not allowed to touch any contract?

5    A        No, we don't.

6    Q        So you saw -- that's bad English, saw under

7    contract.  You didn't see any contracts, right?

8    A        Did I see it?

9    Q        Yeah.

10   A        My business manager handles the final contract and

11   the titling.

12   Q        Okay.  And title?

13   A        And so forth, yes, sir.

14   Q        You know a gentleman by the name of Brad Kane?

15   A        Absolutely.  He's a personal friend of mine from New

16   Castle.

17   Q        Okay.  He's a personal friend, but does he also work

18   at --

19   A        Preston Auto Mall, yes.

20   Q        Preston Auto Mall.  Okay.  And does he do paperwork

21   in regard to people signing and doing credit checks and

22   getting registrations for motor vehicles?

23   A        Yes.

3285                                   3284

1    Q        Okay.  All right.  And in regard to this, did you

2    ever see any of the contracts that were actually signed for

3    the lease of the motor vehicles?

4    A        Did I see them?

5    Q        Yeah, did you ever see them?

6    A        Yeah.

7    Q        Okay.  And whose name were they in?

8    A        Donna Roberts.

9    Q        Okay.  Did Mr. Fingerhut ever tell you why they were

10   in the name of Donna Roberts?

11   A        Never.

12   Q        Okay.  Did you ever ask?

13   A        Never.

14   Q        Okay.  I'll show you what's been labeled as Defense

15   Exhibit F.

16   A        Okay.

17   Q        Have you ever seen a document like that before?

18   A        It's a credit app.

19   Q        A credit app, right, exactly.  Okay.  And whose name

20   is on the credit app?

21   A        Donna M. Roberts.

22   Q        Okay.  Do you see a Mr. Robert Roberts on there by

23   any chance?  Is there a Mr. Robert Roberts' name on there,

3285

1    the credit app?

2    A        No, sir.

3    Q        Is there a Robert Fingerhut on there?

4    A        No, sir.

5    Q        Okay.  And what was your understanding, do you know

6    what Mr. Fingerhut -- or Mr. Roberts, I'm sorry, Mr. Roberts

7    did, what his business was?

8    A        Sure.  He was an owner and an operator of two busing

9    operations.

10   Q        He was?

11   A        Yes, he was, Youngstown and Warren.

12   Q        Okay.  What does the credit app say that Donna

13   Roberts does?

14   A        Owner/operator.

15   Q        Okay.  So Mr. Fingerhut told you he was the

16   owner/operator.  You don't know if that is true?

17   A        Excuse me?

18   Q        Did you know if that was true or not?

19   A        If I knew what was true?

20   Q        That he was the owner/operator.

21   A        Yeah, I know it's true.

22   Q        You know it's true?

23   A        Yes, I do.

3287                                                                                    3286

1    Q       Okay.  And you never knew for five years that his

2    name was Fingerhut?

3    A       No, sir.  I won't lie to you.

4    Q       Okay.  All right.

5    A       He was an owner and operator though.  Physically I

6    was in his business seeing him run this place behind the

7    glass, behind the counter, okay?

8    Q       Okay.  Well, all right.  Well, people can be behind

9    a counter and they may not own the business.

10   A       Sir, you're asking me to answer you.  I'm telling

11   you I can describe the glass, the counter, everything --

12   Q       I understand you can describe it.

13   A       -- to you physically.

14   Q       You just believed he was the owner/operator, right?

15   A       No.

16   Q       You believed that, right?

17   A       Yes, I do.

18   Q       Okay.  And all of the leases, the names on the

19   leases ended up being Donna Roberts, correct?

20   A       Yeah.

21   Q       Okay.  She's the one that actually came in and

22   signed up for the motor vehicles, right?

23   A       That's about all she did.

3287

```
 1    Q        That's about all she did?

 2    A        Yeah.

 3    Q        You didn't like her, huh?

 4    A        I never said that.  You said that.  I thought she

 5   was a good person.  I liked her.

 6    Q        Okay.  But that's all she did?

 7    A        You said I didn't like her.

 8    Q        No.  I'll retract that.

 9    A        Yes, sir.

10    Q        What you're telling us --

11    A        I did like her.

12    Q        What you really want to tell me is that Mr. Roberts

13   was the guy always there and you very rarely, only maybe

14   once, you ever saw Donna Roberts?

15    A        I didn't say once.

16    Q        Okay.  Can you tell us how many times you saw Donna

17   Roberts?

18    A        Maybe four times.  I thought she was a nice person.

19    Q        Okay.  And did Mr. Roberts say that that was his

20   wife?

21    A        Yes, absolutely.

22    Q        Okay.  And you're absolutely sure then or you

23   believe that they were married?
```

3288

```
1    A        Yes, sir.

2    Q        And you --

3    A        He would do anything for her.

4    Q        -- weren't aware of the fact that they were

5    divorced?

6    A        Excuse me?

7    Q        You weren't aware of the fact they were divorced?

8    A        No, I didn't know that, sir.

9    Q        When Mr. Fingerhut came in, you saw him on at least

10   20 occasions, right?

11   A        If not better.

12   Q        Okay, if not better.  And was he -- did he wear a

13   lot of jewelry?  Did you ever see his jewelry?

14   A        He wore bracelets.

15   Q        Okay.  What kind of bracelets, do you recall?

16   A        He had link, nugget, Turkish, a lot of, a lot of

17   like link, flat gold I mean.

18   Q        Platinum gold?

19   A        Platinum gold?  Gold, it was gold.

20   Q        Okay.  How about necklaces, did he have a couple of

21   gold --

22   A        I couldn't see no necklaces on him, no.  He was

23   always in a jersey and I couldn't see, I mean, I didn't know
```

3290                                                        3289

1   if he had one under there or not.

2   Q        Okay.  So, in essence, Donna Roberts was the one

3   that always the leases went into, right, was the owner of the

4   car?

5   A        Yes, sir.

6   Q        Okay.  And you knew Mr. Fingerhut for five years but

7   you knew him as Mr. Roberts, correct?

8   A        Yeah.

9   Q        And he never told you any differently?

10  A        No, sir.

11                   THE COURT:  Any redirect?

12                   MR. WATKINS:  No, Your Honor.  We're

13  satisfied.

14                   THE COURT:  Carmen, thank you very much.

15  You're excused.

16  A        Okay, sir.

17                   MR. WATKINS:  Barry.

18                   (Whereupon, the oath was administered to

19  Mr. Barry Ricker by the Court.)

20                        *  *  *

21  WHEREUPON,

22                   <u>MR. BARRY RICKER</u>

23  having been first duly sworn, was called as a witness and

3290



1    testified as follows:

2    **DIRECT EXAMINATION**

3    By Mr. Watkins

4    Q        Good morning, Barry.

5    A        Good morning.

6    Q        Would you give your full name for the jury, please?

7    A        Barry Gerald Ricker.

8    Q        And where are you employed?

9    A        I'm employed at Preston Auto Mall here in Warren,

10   Ohio.

11   Q        And would you tell the jury how long you've been

12   employed there?

13   A        I've been employed there a little over five years.

14   Q        And what position do you hold?

15   A        Service advisor I am.

16   Q        And would you tell the jury what you do as a service

17   advisor?

18   A        We're the people who accept the phone calls,

19   schedule appointments, get cars repaired, call customers to

20   let them know the repairs that need to be done on the cars

21   and also inform them when they're done, and the associated

22   jobs with that, arranging transportation and things like

23   that.



3291

1    Q       Now, did there come a time that you would service a

2    car that was -- or cars owned by Donna Roberts?

3    A       Correct.

4    Q       And did you also deal with a male subject dealing

5    with those cars?

6    A       Uh-huh.  From day one when Mr. Fingerhut, who I had

7    always known as Mr. Roberts, when Mr. Fingerhut would bring

8    vehicles by or call for appointments I always assumed that he

9    was Mr. Roberts.  I had never met Mrs. Roberts before and I

10   had always dealt with Mr. Fingerhut as far as the repairs for

11   the two automobiles that he would bring in.

12   Q       And how would he appear, how would he dress and how

13   big a person was he?

14   A       A casual man.  He's probably a little bit shorter

15   than I am, maybe five 10.  He's probably close to maybe 185,

16   190, maybe a little bit heavier than that.  Casual dresser,

17   he would dress in usually blue jeans and athletic coats,

18   things like that.

19   Q       And when the car would be brought in, or let's, for

20   example, do you recall what the last two vehicles that were

21   owned at the same time that Mr. Roberts had?

22   A       Yeah, he had two Chrysler 300Ms, one was silver that

23   he would bring in for service and the other was reddish, like

3292

1    a cranberry color.

2    Q        And would he or Donna Roberts usually bring the

3    vehicles in for service?

4    A        It was always Mr. Fingerhut, I guess I'll call him,

5    yes.  Again, I know him as Mr. Roberts, but he would always

6    bring the cars in.  I never met Donna Roberts until one time

7    that she came and picked the vehicle up on one occasion.  The

8    rest of the time it was always Mr. Fingerhut.

9    Q        Okay.  Now, when you would service a vehicle, I take

10   it because they are relatively new cars, they are warrantied?

11   A        Uh-huh.

12   Q        And at times there would be service that wouldn't be

13   charged?

14   A        That's correct.  He had purchased for both vehicles

15   what we call certified maintenance.  At the time of purchase

16   you are eligible to purchase what's called certified

17   maintenance which pays for oil changes and tire rotations for

18   a certain period of time, anywhere from one year up to three

19   years, and those are all prepaid.  So when a customer would

20   come to pick the vehicle up, in Mr. Fingerhut's case, he

21   would only have to sign the paperwork and then he would be

22   gone, there would be no transaction of money, unless there

23   was a repair that was done on the car that he asked to have

1    something special done like a cleaning, a detail or something

2    like that.

3    Q       Now, if there were a charge would he have to pay for

4    it?

5    A       That's correct, he would, yeah, and we would --

6    whenever he would drop the automobile off we would make

7    arrangements to get him transportation back to his place of

8    work, either we would run him back with our shuttle service

9    or one of the sales department would run him back.  And then

10   we would also, if necessary, come pick him up after the

11   repairs were done, and that's when the transaction was done

12   as far as him signing the paperwork and taking care of any

13   bill, if there was one.

14   Q       And where was his place of employment?

15   A       He worked downtown in Warren at the bus station.

16   Q       And would you see him sign or charge, sign documents

17   or sign charge receipts?

18   A       Yeah.  We would escort him over to the -- and it's

19   the usual custom with all our customers, we escort them over

20   to the cashier's counter, explain to them any charges that

21   are there, ask if there is any questions, make sure they get

22   their keys and their paperwork and make sure everything is

23   okay.  So I would escort him over to the counter and make

3294

1    sure the paperwork and keys and everything were processed

2    there, and if he had no questions they would just take off.

3    Q        I'm going to hand you what's been marked as State's

4    Exhibit 398, and you have records with you?

5    A        Yes, sir.

6    Q        The records that are in your custody and care and

7    ordinarily kept in the course of your business at Preston?

8    A        That's correct.

9    Q        And, in fact, we met yesterday and we made copies.

10   A        Uh-huh.

11   Q        398-A through 398-N.

12   A        In a quick glance that looks like that's the red

13   vehicle.

14   Q        Yeah.

15   A        Yes, uh-huh.

16   Q        Now, would you tell the jury whether or not those

17   are true and accurate copies of your records?

18   A        Repair orders written up.  This is the actual

19   accounting copies but the same copy is given to the customer

20   when they come pick the vehicle up.  The other paperwork

21   that's here is information that we need at the dealership as

22   in we run what's called a dial, which gives all the basic

23   information on the car, including warranty and things like

that, so we know whether a repair is a warranty item or a
customer pay item.  And then this, yeah, this is the back of
the repair order where the technicians make comments and
their time is flagged, things like that, but this is typical
copies of a standard repair.

Q        And that's the red vehicle?

A        This is the red one, yes.

Q        And that's the 2000 300M?

A        That is correct.

Q        And that's the vehicle that Donna Roberts had longer
in time?

A        Uh-huh, correct.

Q        And in those documents are there signatures of
Mr. Roberts?

A        Mr. Roberts as I knew him, Mr. Fingerhut, yes.  He
would come in here and his signature was very, very
discernible as in it's very, very easy to tell his signature.

Q        And do you have any of Donna Roberts in there?

A        In the file for the red 300M, no, I do not.

Q        And, therefore, all the signatures that you have in
that file is Mr. Fingerhut?

A        Would be Mr. Fingerhut's signature, correct.

Q        Which you knew as Mr. Roberts?

3296

1    A       Correct.

2    Q       Okay.  By the way, can you read his signature?

3    A       If I didn't know that was him I wouldn't have been

4    able to read it, no.

5    Q       That is you saw him do it?

6    A       Correct.  Oh, yes.

7    Q       399, that's the silver car?

8    A       Uh-huh.  Again, same situation, copies of front and

9    back of the repair orders, I'm sure they're in here.  They

10   have the technicians' comments and things like that,

11   including there's a special order part that we had ordered

12   for the vehicle.  The last time Mr. Fingerhut, slash

13   Mr. Roberts, was in the store he had his vehicle in here, we

14   had to order a part for it, so there's even a copy of the

15   special order slip that's there and his distinctive signature

16   at the bottom.

17   Q       And when was the last time that you saw him write

18   that signature?

19   A       I saw him write the signature, that would have been

20   December the 10th, which was Monday, December the 10th.

21   Q       2001?

22   A       Correct.

23   Q       And what time in the morning?

3297

1    A        He usually like clockwork had his vehicle there

2    between 8:00 and 8:30 in the morning, and according to the

3    repair order here it actually shows the time that the repair

4    order was written and I wrote it as he was there and it's

5    8:11.

6    Q        And what color was that vehicle?

7    A        This would have been the silver car.

8    Q        And what time, if you know, did he pick up the

9    vehicle?

10   A        His pickup time was also just about the same time,

11   anywhere between 5:00 and 6:00 o'clock in the afternoon.  And

12   again, we would contract him, I would contact him and let him

13   know that the car was done and ask him at that time if he

14   needed transportation.  If he did not, he could find his own

15   way up.  If he did need transportation we would send somebody

16   down to pick him up.

17   Q        Do you recall seeing him pick up the car?

18   A        This particular day?  I don't actually remember him

19   actually picking the vehicle up.  With the volume of

20   customers coming through at the shop, especially between the

21   hours of 5:00 and 6:00, there's a lot of times they'll come

22   in -- and Mr. Fingerhut, Mr. Roberts, was familiar enough

23   with the routine there that he knew that if he came to the

3298

```
 1   counter and there was no one there that his paperwork and

 2   keys would always be with the cashier.

 3   Q        Now, you indicate that there were other times that

 4   he brought that silver car in?

 5   A        Correct.

 6   Q        And there was one occasion that Donna Roberts

 7   brought it in?

 8   A        Uh-huh, that I remembered distinctly after going

 9   over the repair orders on this because the signature is

10   different.  There was one time I recall informing him of the

11   fact that his vehicle was done and it was ready for pick up

12   and that he said, "I'm probably going to end up sending Donna

13   to pick the car up," he didn't come pick the vehicle up, and

14   the signature is different.

15   Q        And that, that is one of the --

16   A        That would actually have been this.  That's all,

17   that's all that repair order there, and that would have been

18   the time.

19   Q        And that's 399D?

20   A        Uh-huh.  And that would have been sometime in I

21   think in October.

22   Q        In August.

23   A        In August.  Okay.  Well, it's actually -- there's
```

3299

1      the --

2      Q        Oh, I'm sorry.

3      A        The date of the repair.  This is when the car went

4      into service, this is the date of the repair, so it would

5      have been October 30th.

6      Q        But take a look at this.

7      A        Oh, there it is down there.  August 16th.  I stand

8      corrected.

9      Q        Okay.  Now, I take it that these documents, which

10     I'll indicate you have looked through, are 399A through 399H

11     and they're all -- J, okay?

12     A        Okay.

13     Q        They're all accurate copies and complete

14     reproductions of your original records, is that correct?

15     A        That's correct.

16     Q        Now, when a customer would come in you would deal

17     with that customer for service on the vehicle, oil change,

18     part, whatever it is?

19     A        Uh-huh.

20     Q        You would be personally dealing with the customer?

21     A        Correct.

22     Q        Would there be times that customers could go and get

23     their car washed from the sales person where you wouldn't see

3300

the customer?

A        One of the perks that we offer as far as buying a

vehicle at Preston Auto Mall is we offer free lifetime car

washes for as long as you own the car and instruct customers

to let them know that any time they would like to have the

car washed they just come to the dealership and go to their

salesman and turn the keys over to their salesman and their

salesman takes the vehicle back and gets it washed.

Q        So many times the salesman would take the car and

get it washed, you wouldn't even know the customer was there?

A        I wouldn't even know he was there.  Or he could come

walking through the shop and say hello to me on his way

through and then go get his car washed.

Q        Thank you very much.

            THE COURT:  Mr. Lewis.

CROSS EXAMINATION OF MR. BARRY RICKER

By Mr. Lewis

Q        Barry, how you doing?

A        Good.  How are you today?

Q        It's almost time for me to bring my car in, isn't

it?

A        Yes, it is.

Q        You also knew Mr. Fingerhut as Mr. Roberts?

3301

1   A        That's correct.

2   Q        Okay.  And this is for a period of almost what, five

3   years or something to that effect?

4   A        Well, his particular cars that I dealt with him,

5   probably a period of about two years.

6   Q        About two years?

7   A        The two vehicles that he owned were both 2000, one

8   was a little bit older than the other, but it had been a

9   period of approximately two years.

10  Q        Okay.  And when he would come in, and of course

11  Preston wants to take care of its customers and make

12  everybody happy.  On an economic downturn the maintenance can

13  get you over the hump, right?

14  A        Uh-huh.

15  Q        He was referred to as Mr. Roberts?

16  A        Yes.  The reason being is I would take his

17  information as far as what he would want done on the car and

18  then pull the car around for service, around to the service

19  line, bring his car information inside, as in car information

20  being the vehicle ID number and the number of miles on the

21  car.  I punch the numbers into the computer and with both

22  cars it would come up under Donna Roberts, so I made an

23  assumption from his first visit there that he was

3303                                                              3302

 1    Mr. Roberts.  And any correspondence, as in any phone

 2    conversations that I had with him, if I had to call down to

 3    the bus station to let him know his car was done, I would ask

 4    for Mr. Roberts and only on one occasion did someone tell me

 5    there's no Mr. Roberts here.  The rest of the time they all

 6    understood the fact that I didn't know his actual first name.

 7    I did not know his first name until after the fact here.

 8    Q        Okay.  So you knew him as Mr. Roberts?

 9    A        I knew him as Mr. Roberts.

10    Q        Not the classic Mr. Roberts in the movie but as

11    Mr. Roberts?

12    A        Uh-huh.

13    Q        Incidently, all of the bills that you have and

14    you've identified here, that 399A through -- A through -- oh,

15    okay, they're out of order.  Okay.  All of those actually are

16    in the name of Donna Roberts, are they not?

17    A        Correct, yes, every one.

18    Q        And why would that be, why would they put it in her

19    name?

20    A        Why would they put it in Donna's name?

21    Q        Yeah.

22    A        That's pretty much -- I have no idea why they would

23    do that back there in service, whether it's titled in her

1    name because she's the actual owner or whatever reason it's

2    titled in, both cars were titled in her name.  Back there in

3    the service department we're counting on the fact that the

4    paperwork up front is done properly as far as it's entered

5    into the computer that this is a vehicle that's owned by

6    Donna Roberts.

7    Q        Okay.  Let me ask you a question.

8    A        Sure.

9    Q        If somebody comes in, if I decide my good friend

10   Tony over here, we're not married, and I say what the heck, I

11   got a wonderful BMW, I'm going to take it in and have it

12   repaired, and I take it to Preston Chrysler, are you going to

13   even check to find out if I have the authority to bring the

14   motor vehicle in or if I'm the owner or anything?

15   A        I have many occasions, especially with the BMW

16   customers in fact, that they never bring the cars in.  They

17   have either secretaries or assistants or something like that

18   bring their automobiles in.  So a lot of times, and

19   especially with the BMWs, I never get to meet the owners of

20   the car.

21   Q        So somebody else can own it and someone else can

22   bring it in, it doesn't mean the person that brings it in

23   owns the car or anything else?

3304

1   A       Correct.  Correct.

2   Q       In fact, they could have stolen it and they just

3   want to come down and get that free perk and get that thing

4   washed so they can get out of town in a nice car, right?

5   A       Possible.

6   Q       Sure, it's possible.  But if somebody does come in

7   and say, for instance, they don't want to pay the bill and it

8   actually turns out they're not the owner of the vehicle, the

9   dealership has an option, don't they, in regard to that?  Do

10  you know how that works?

11  A       As far as what?

12  Q       Well, when you take a car in and you put the

13  maintenance and the work and the labor and everything else,

14  you have a lien against that car, correct?

15  A       Correct.

16  Q       And that lien is only against that car, it only

17  works against the owner of the vehicle, right?

18  A       Correct, uh-huh.

19  Q       It doesn't work against my friend Tony, my friend

20  Dennis or anybody else that brings that car in, right?

21  A       Uh-huh, correct.

22  Q       It goes against the owner?

23  A       Uh-huh.

1    Q    And that's the one you look for payment from, right?

2    A    Correct.

3    Q    And as long as you have that car you got a good

4    chance of getting payment because they don't get it back,

5    right, until it's paid?

6    A    Uh-huh.

7    Q    All right.  The same would apply for -- this is the

8    silver car.  As a matter of fact, I'll tell you what, when

9    people come in, or let's say, for instance, a car is sold or

10   leased from Preston and the keys are in the car and you're

11   coming down and you're picking up your brand new vehicle and

12   the salesman or Carmen comes down and says this is it, baby,

13   here's your car, they give the keys -- do they ever give the

14   keys -- they give the keys to the owner or the lessee of the

15   vehicle, right?

16   A    Correct.

17   Q    Okay.  So if Tony leased the vehicle and I said,

18   "Well, I'm coming down, I'm going to pick up the car," or

19   whatever, you wouldn't do that, you would give it to the

20   owner?

21   A    On a sale, yes.

22   Q    He can give the keys, if he wants, to anybody else,

23   right?

3307                                                                3306

1   A       Uh-huh.

2   Q       Okay.  But the keys belong with the car and the car

3   belongs to the owner, right?

4   A       Right.

5   Q       Or the lessee.  Okay.  All right.  On the occasions

6   you saw him in the last two years, --

7   A       Uh-huh.

8   Q       -- when you say he's pretty casually dressed and

9   everything else, even though he's casually dressed and maybe

10  wearing some sports things, did you ever notice his jewelry?

11  A       He would on -- I honestly don't remember any

12  specifics of that at all because we deal with, I personally

13  deal with probably 25 to 30 different customers a day, so

14  when it comes down to individual attire and things like that

15  I really, I must admit, I don't recall him wearing anything

16  specific.

17  Q       Okay.  So the most you remember is he's a casual, he

18  was a casual dresser?

19  A       Very casual dresser, very sports more oriented

20  person because he would sometimes have a sports jacket on and

21  we would talk sports, things like that.

22  Q       Okay.  And you would see him -- oh, let me get back

23  to this before I forget.  On 398A through -- gee, that's a

3307

1   lot of maintenance, you guys are doing all right -- N, that's

2   on the red car, all those are in the name of Donna Roberts,

3   right, as the owner?

4   A      Correct, uh-huh.

5   Q      Okay.  And would you -- when you said you saw him

6   sign, as Mr. Watkins indicated, you saw him sign and put his

7   signature on there.

8   A      Uh-huh.

9   Q      And you said it's a very distinctive signature,

10  right?

11  A      Uh-huh.

12  Q      It's a scribble really is what it kind of boils down

13  to, right?

14  A      Uh-huh.

15  Q      So you thought that was Mr. Roberts' signature, in

16  other words he was signing Robert Roberts?

17  A      He was -- yes.  And he was signing his name,

18  actually not signing Donna's name, he would always sign what

19  I assumed to look at was his name whenever he picked the

20  vehicles up.

21  Q      All right.  So that scribble, as far as you're

22  concerned, is Roberts?

23  A      Uh-huh.

3308

Q      It's not Fingerhut, right?

A      It could be anything.

Q      It could be anything, that's the point.  Yeah,
that's the point.  But you were under the impression for two
years that he was Mr. Roberts, you called him Mr. Roberts,
right?

A      Uh-huh, and he answered to that, too.

Q      And he answered to that.  And he never told you
otherwise?

A      Not at all.

Q      Thanks very much, Barry.

           THE COURT:  Any redirect?

           MR. WATKINS:  No, Your Honor.  We thank
the witness.  Thank you, Barry.

           THE COURT:  Thank you very much, sir.

           MR. WATKINS:  Call now Diana Marchese.

           THE COURT:  Ms. Marchese, please come
around here and raise your right hand to be sworn.  Good
morning.

           MS. MARCHESE:  Good morning.

           (Whereupon, the oath was administered to
Ms. Diana Marchese by the Court.)

                        * * *

3309

1    WHEREUPON,

2                        <u>MS. DIANA MARCHESE</u>

3    having been first duly sworn, was called as a witness and

4    testified as follows:

5    <u>DIRECT EXAMINATION</u>

6    By Mr. Watkins

7    Q        Good morning, Diana.

8    A        Good morning.

9    Q        Would you please tell the jury your name and what

10   you do?

11   A        I'm Diana Marchese and I'm the Trumbull County

12   recorder.

13   Q        And how long have you been the elected recorder for

14   the county?

15   A        I'm in my third term.

16   Q        And would you tell the jury briefly what you do?

17   A        Okay.  The recorder's office records land documents

18   such as your deeds and mortgages, powers of attorneys, zoning

19   records, things concerning the land, and we also do military

20   discharges.

21   Q        And so you would have deeds and mortgages in your

22   record room?

23   A        Yes.

3310

1   Q        And did I request of you to get mortgages on three

2   particular properties?

3   A        Yes, you did.

4   Q        In the name of Donna M. Roberts?

5   A        Yes.

6   Q        And those properties were ███████████████████

7   both in Warren?

8   A        Yes.

9   Q        And 254 Fonderlac in Howland?

10  A        Yes.

11  Q        And were you able to find deeds and mortgages on

12  those properties?

13  A        Yes.

14  Q        And would you tell the jury, if you could, what

15  mortgage was on the property at Washington as of December

16  11th, 2002?

17  A        I'd have to look for it.

18  Q        Yeah.  Would you, please?

19  A        The Washington Street property had a mortgage of

20  $29,800 and that was recorded July 16th, 2001.

21  Q        And the ████████████ property in the name of

22  Donna Roberts?

23  A        That had a mortgage of $13,900 and that was recorded

3311

1    on July 13th, 2001.

2    Q        And, finally, 254 Fonderlac?

3    A        The Fonderlac property had one mortgage that was

4    $31,200 and then there was a second one that was for $75,000.

5    Q        So the total mortgages on the Fonderlac property was

6    what?

7    A        75,000 plus 31,200, so what, 101,200.

8    Q        In a mortgage, in mortgages?

9    A        Yes.

10   Q        What companies had the mortgages, do you know?

11   A        On the Fonderlac or all of them?

12   Q        On Fonderlac.

13   A        Metropolitan Savings Bank of Ohio had the 31,200 and

14   First Deposit National Bank had the 75,000.  No, I'm sorry,

15   that was the 31,200.  Here's another one.  There was one for

16   80,000 also.  The Metropolitan was 80,000.  That was March

17   13th, 1995.  That was the oldest one.  And the 31,200 was

18   with First Deposit and First Union National Bank of Delaware

19   had the $75,000 one.  So there was an additional $80,000 I

20   had failed to tell you about.

21   Q        So the total mortgage would be?

22   A        About $181,200.

23   Q        In mortgages?

3312                                                                            3312

```
 1    A        In mortgages.

 2    Q        And that's of December 11th, 2001?

 3    A        Prior to, yes.  These were all before then.

 4    Q        I'm going to hand you 401 -- 400, 401 and 402, and I

 5    believe these are certified copies by you of what you just

 6    testified to.

 7    A        Okay.

 8    Q        I'm going to hand you what's been marked as State's

 9    Exhibit 401.

10    A        Okay.

11    Q        And, if you could, please indicate that they are the

12    records that you verify as belonging to the three residences?

13    A        This is a deed and it's -- Donna Roberts owns the

14    property, this is when she obtained the property, and this is

15    for Washington, this is the ███████████       And this is the

16    mortgage.

17                     MR. CONSOLDANE:  Dennis, I can't see what

18    she's saying when you're standing in front of her.

19    A        I'm sorry.  This is the deed to the property at ███

20    ████████  and then there's a mortgage.  This one is from

21    Sky Bank.  And this is the ███████████ one.  And this is

22    the deed to the ██████████ when she sold the property and

23    this is the satisfaction of mortgage.
```

3313

1    Q        Which was after December 11th?

2    A        That was in May of 2002, the satisfaction was, and

3    that means it was paid off.

4    Q        That means the mortgage was paid off?

5    A        Yes.

6    Q        And that's State's Exhibit 400?

7    A        400, yes.

8    Q        Which would include 400A through 400B.  Now I will

9    hand you 401, and that would be 401A to 401C, and would you

10   indicate whether or not they are the records you've testified

11   about the ███ home, ███████████ home owned by Donna

12   Roberts?

13   A        This is the Olive, ████████████████████████.

14   Q        And that would include the deed and the mortgage?

15   A        This is the deed and the mortgage follows, and that

16   was July of 2001 for both of them, July 13th.

17   Q        And this would be 402, which would be the Fonderlac

18   property?

19   A        Yes, this is the deed when she obtained the property

20   and this is one mortgage, the Metropolitan one, for 80,000,

21   the First Deposit Bank for 31,200, and the $75,000 one from

22   First Union National Bank of Delaware.  Did you want the

23   dates?

3315                                                                3314

1    Q      No, that's all right.  I have no further questions.

2    CROSS EXAMINATION OF MS. DIANA MARCHESE

3    By Mr. Consoldane

4    Q      Hi.

5    A      Hi, Tony.

6    Q      Good.  How are you today?

7    A      Good, thank you.

8    Q      Just a couple quick questions.

9    A      Uh-huh.

10   Q      On any of these mortgages that you've just testified

11   to, is there anything on those papers that would indicate

12   whether those are an open-end type of mortgage, you know what

13   I mean, like a home equity loan where you can draw against

14   it?  Is there anything on there that would tell us that?

15   A      Well, usually the document, the mortgage, it will

16   say if it's an open-end mortgage, but that's not something we

17   really pay attention to when we record them.  That's not --

18   Q      That's not on there?

19   A      -- a factor for us.

20   Q      Okay.

21   A      It would say on the mortgage.  Like if it's an

22   open-end mortgage it would say at the beginning of the

23   mortgage.

3315

Q       So you really can't tell whether these are home
equity loans or whether they're just straight mortgages?

A       I couldn't tell you that.

Q       Okay.  And also --

A       But usually when it follows the deed it is on the
property so it's not an equity loan.

Q       I'm sorry?

A       If the deed is recorded and then the mortgage
immediately follows it, --

Q       Yes.

A       -- then that's usually, because it's on the property
that was just purchased and it's to pay for that property.

Q       Sure, I can understand that, but there's nothing
there that -- those other mortgages that came by, there's no
way to indicate, there's nothing -- you can't tell the jury
that those are not home equity loans or that they are home
equity loans, you can't tell me either way?

A       No.  That's not something that my office looks for
and it's not something we --

Q       And also you can't tell by what documents you have
there how much money has been paid on those mortgages?

A       No.

Q       Okay.

17                                                                          3316

1    A        Other than the satisfaction shows that it was paid

2    off.

3    Q        Yeah, when they pay it off in full they issue a

4    satisfaction.

5    A        Yes.

6    Q        And have you had trouble with banks over there not

7    coming in and satisfying mortgages after they've been paid?

8    A        There's a new law out that they have I believe 90

9    days, that they have to record a satisfaction now within 90

10   days, but we don't have that problem.  Sometimes we have

11   someone call and want to know if their mortgage was satisfied

12   and we tell them yes or no according to the record.

13   Q        But there has been problems in the past with that,

14   that's why they passed the law?

15   A        Right.  They -- yes, because they probably weren't

16   doing them in a timely fashion.

17   Q        The bank is real happy to put the mortgage on but

18   they were real reluctant to take it off?

19   A        Take them off, yeah.

20   Q        But going back, my point is that even though there

21   is an $80,000 mortgage, $75,000 could have been paid on that

22   mortgage, there was no way you could tell that?

23   A        No.

3317

1    Q       Okay.  The only way that you can tell is after it's

2    paid in full when they release the mortgage?

3    A       Right, yes.

4    Q       Okay.  One, one final question.  On any of the

5    paperwork that you have there does anybody's name appear on

6    there as the owner of any of that real estate other than

7    Donna Roberts?

8    A       No.

9    Q       Okay.

10   A       Other than when she sold it, I mean, you know.

11   Q       Right.

12   A       But no, it was just her name alone.  And that's what

13   I searched under for these records was for under her name

14   only.

15   Q       And did Robert Fingerhut own any real estate over

16   there?

17   A       I never searched for his name, no.  I don't know.

18   Q       On anything that you have there is there any mention

19   of Mr. Robert Fingerhut?

20   A       No.

21   Q       Is there any indication of Mr. Roberts?

22   A       No, not on these documents.

23   Q       Pardon?

3318

1    A      Well, just Donna Roberts.

2    Q      On any of that does it say -- when they normally

3    have deeds don't they usually issue Mr. and Mrs., you know,

4    as husband and wife?

5    A      They give their marital status on a deed.  Like here

6    it says Donna Roberts -- wait a minute.  Somewhere here.

7    It's the party that's selling it, they give their marital

8    status, but not she when she purchased it, no, it didn't

9    here.  On the mortgage -- no, that's another deed.  It just

10   gives the marital status of those who are selling it so you

11   know who has to sign.

12   Q      There is no indication on any of that paperwork that

13   Donna Robert was married to anybody?

14   A      I believe -- I don't want to say without looking

15   first.  Okay, here's a mortgage.  It says Donna Roberts,

16   single, and that was July 13th, 2001.

17   Q      I'm sorry, what was the date of that again?

18   A      July 13th, 2001.

19   Q      July 13th.  So no indications on there, other than

20   Donna Roberts single, no mention of Fingerhut, Robert

21   Fingerhut, and no mention of a Mr. Roberts either?

22   A      Not that I saw.

23   Q      Thank you.

3319

1                    THE COURT:  Any other questions?

2    REDIRECT EXAMINATION OF MS. DIANA MARCHESE

3    By Mr. Watkins

4    Q        Yeah, just one question, Donna -- Diana.  The

5    mortgages on the property, the Fonderlac property, are still

6    outstanding, they haven't been satisfied, is that correct?

7    A        Let me make sure.  The one satisfaction went with --

8    yeah, there is one, and that one was, that was the $31,200

9    one was satisfied.

10   Q        The other two haven't been?

11   A        Are still open according to our records, yes.

12   Q        Okay.  Thank you.

13   RECROSS EXAMINATION OF MS. DIANA MARCHESE

14   By Mr. Consoldane

15   Q        Diana, but still you can't tell how much is actually

16   still owed on those two mortgages?

17   A        No, I wouldn't know.

18   Q        You only know that there was three mortgages at one

19   time, one is satisfied, there are two more, but there's no

20   way to tell how much is still owed on those two mortgages?

21   A        Not from our records, no.

22   Q        Thank you.

23                    THE COURT:  Mrs. Marchese, thank you very

3320

1    much.

2    A          Uh-huh.

3                        THE COURT:   The State have anything else

4    to present?

5                        MR. WATKINS:   No, Your Honor.   We are

6    resting on rebuttal.

7                        THE COURT:   Resting on your rebuttal?

8                        MR. WATKINS:   Yes.

9                        THE COURT:   Okay.

10                       MR. WATKINS:   With admission of our

11   exhibits, we move for exhibits.

12                       THE COURT:   We'll take that up.   Okay.

13   Ladies and gentlemen, you've heard all the evidence which

14   will be presented in this case.   We are going to spend the

15   rest -- yes.

16                       MR. CONSOLDANE:   We need to put something

17   on at side bar.   It will just be quick.

18                       (Whereupon, the following proceedings were

19   held at side bar outside the hearing of the jury.)

20                       MR. CONSOLDANE:   Your Honor, before we

21   release the jury we would, we would request to bring a

22   witness in on surrebuttal.   We would like to bring Paul

23   Monroe back on the stand and have him identify the complete



3321

1    ensemble that he found Mr. Fingerhut was wearing.  He's

2    testified to the clothes, there's been mentioned again about

3    the jewelry, and I would like to have him show the jury just

4    what jewelry he was wearing.

5              MR. WATKINS:  May I respond, Your Honor?

6    Your Honor, the purpose of the surrebuttal is to rebut what's

7    in issue.  The jewelry is a collateral matter they brought in

8    and it's already in evidence, he had jewelry on, the

9    deceased.  I think it's not in issue at this point.  It's

10   already been covered.

11             MR. CONSOLDANE:  Has the jewelry already

12   been marked as an exhibit?

13             MR. WATKINS:  No, the jewelry hasn't, but

14   you covered that on examination, he had jewelry, he had money

15   on him when he was killed.

16             MR. LEWIS:  We want the jewelry that's --

17   he wanted it marked as an exhibit.

18             MR. WATKINS:  It's not relevant at this

19   stage.  It should have been done before.

20             THE COURT:  What is the relevancy of the

21   jewelry?  There's testimony that he had --

22             MR. WATKINS:  The issues here dealt with

23   the property, the real estate, and it dealt with the car.

3322

1    That's all.  That's all we focussed on.

2              MR. CONSOLDANE:  His own witness started

3    telling, you know, about the jewelry that he was wearing.  I

4    think that we have -- I would ask leave to be able to call

5    Paul Monroe to the stand, have him introduce that and mark it

6    as an exhibit.

7              THE COURT:  That was something brought up

8    on cross.

9              MR. LEWIS:  Yeah, we brought it up.

10             MR. WATKINS:  Yeah, it was brought out in

11   cross.  It is not appropriate surrebuttal.

12             MR. LEWIS:  No, I'm talking about cross

13   back in the case when you talked to him about the jewelry and

14   everything else and they indicated he had the jewelry,

15   whatever.  We just wanted it marked as an exhibit.  That's

16   what he identified, that's it, mark it as an exhibit.

17             MR. CONSOLDANE:  That's all.  As a matter

18   of fact, if they will stipulate to it we don't even need to

19   put him on.

20             MR. LEWIS:  He listed the jewelry that he

21   found on the body, was recovered from the autopsy at the

22   morgue, and it's in there.

23             THE COURT:  You want that in to show

3323

1  physically if it was robbery he would have taken the jewelry?

2              MR. CONSOLDANE:  Yeah.  And also kind of

3  goes on what he wears, you know, what he --

4              THE COURT:  What does what he wears have

5  anything to do?

6              MR. WATKINS:  There are photographs.  All

7  this was covered except they didn't choose to put the

8  physical exhibits in.

9              THE COURT:  Will you stipulate that the

10  jewelry is what he had on?

11              MR. CONSOLDANE:  And then introduce it?

12              MR. WATKINS:  I think whatever is listed

13  in the coroner's papers, which I think are part of this

14  record, yeah, they can argue that he had the jewelry on.

15              MR. CONSOLDANE:  But would you mark the

16  actual jewelry as an exhibit?

17              MR. WATKINS:  I think you've passed up on

18  that, Tony.  I don't think we can.

19              MR. CONSOLDANE:  So I'm ineffective

20  assistance of counsel and the guy loses the case because we

21  didn't bring it in at that time.  Go ahead.

22              MR. WATKINS:  I think it's already in.

23              THE COURT:  Don't get on your high horse.

3324

1  I just don't see where it has any relevancy at all except for

2  the argument that could be made I guess that if I was going

3  to rob the guy I would have taken his jewelry.  He was right

4  there, I didn't take it, therefore I'm not guilty of robbery.

5  Yes, it's either --

6           MR. WATKINS:  I agree, judge, and that's

7  in the record.  That's all I'm saying.

8           MR. LEWIS:  That infers.

9           THE COURT:  It has not been marked as an

10 exhibit as the jewelry that he had on his person, right?

11          MR. LEWIS:  No.

12          THE COURT:  Either let him do it, I will

13 either let them do it or you both agree to mark it, have it

14 admitted as an exhibit, that this was the jewelry he had on

15 his person.  I can't make you do that, Mr. Prosecutor.

16          MR. WATKINS:  Are you going to let them

17 reopen to do that?  Okay, we'll stipulate, Your Honor.

18          THE COURT:  You'll stipulate to that.

19 Okay.  That will be marked then as a further exhibit, as a

20 joint exhibit.

21          MR. WATKINS:  No.  Joint exhibit is fine.

22          THE COURT:  Joint exhibit.  So you have

23 nothing else to call then?

3325

1          MR. CONSOLDANE:  No.

2          (Whereupon, the side bar conference was

3 concluded.)

4          THE COURT:  Okay.  Both sides have now

5 rested their presentation of evidence and there will be no

6 further evidence that will be presented to this jury.  I am

7 going to release you until 9:00 o'clock in the morning and

8 the rest of the day will be spent by myself reviewing with

9 both sides the final instruction of law which you will hear

10 tomorrow.

11          When you return in the morning -- we're a day late.

12 We had some things come up.  I told you at the beginning this

13 happens.  You will listen to the closing arguments in the

14 morning tomorrow.  That would take up probably most of the

15 morning.  I hope, however, to also have time to give you the

16 closing instructions, and by noon or shortly thereafter you

17 should have this case for deliberation.

18          As you know, once the case is delivered into your

19 hands then you are all sequestered until you've reached a

20 verdict.  No one knows, you don't have any idea any better

21 than we do at this point, how long that's going to take you.

22 I'll explain to you once you start as to some of the other

23 things that you must know, but if you would be back here at

3326

1    9:00 o'clock in the morning we will get started with the

2    balance of this trial.  And again I would remind you not to

3    watch anything on TV, read anything in the newspaper, have

4    any conversation with anyone else, or allow anyone else to

5    approach and talk with you about the matter.

6            Anything else, gentlemen, that you wish me to inform

7    -- oh, by the way, I hope you all got to vote today.  Did

8    you?  You still have the rest of the day anyways.  I won't

9    tell you how to vote, that's your choice, okay.  I would like

10   to but I won't.  Okay.  You all have a nice evening here.

11           (Whereupon, the jury was excused for the

12   evening and the following proceedings occurred thereafter.)

13           THE COURT:  Okay.  Gentlemen, we have the

14   exhibits and I believe the defense has one more motion before

15   we're done.

16           MR. LEWIS:  Yes, judge, as soon as my

17   compatriot gets back or whatever.  All right.

18           MR. WATKINS:  Do we have something else,

19   judge?

20           THE COURT:  You want to put your exhibits

21   in?

22           MR. WATKINS:  Yes.

23           (Whereupon, a brief recess was taken.)

3327

1              MR. LEWIS:  The prosecution, I assume,

2    judge, is moving for the introduction of their exhibits that

3    was presented on rebuttal here.

4              THE COURT:  May we proceed without Tony or

5    what do you want to do?

6              MR. LEWIS:  Oh, sure, judge.  I'm just

7    waiting for Dennis.  If he doesn't say he wants to introduce

8    them I'm fine with that.  You want to introduce them, Tony,

9    or Dennis?

10              THE COURT:  Mr. Watkins, you want to

11    address those exhibits?

12              MR. WATKINS:  Yes.  We move to admit the

13    exhibits, which include 400 and -- I think it's 401, 400, 402

14    and then --

15              MR. MORROW:  398A through N, 399A through

16    J I believe.

17              MR. WATKINS:  398 through 402, we move

18    that all the exhibits be admitted.

19              THE COURT:  There's a move to admit those

20    exhibits just designated on the record.  Is there any

21    objection?

22              MR. LEWIS:  Yes, judge, we would object to

23    all the exhibits except for the deeds.  First off, we would

3328

1   object to the introduction of the maintenance records in

2   regard to both motor vehicles based upon our prior objections

3   to that.  The State evidently is trying to show through the

4   maintenance or the introduction of those records that the

5   possession or -- well, possession, custody or control,

6   whatever he's trying to prove, which doesn't necessarily

7   prove.  If somebody brings a car in and takes it back out it

8   doesn't mean they necessarily have control in between time,

9   after time, before time, it doesn't really prove that.

10        But, in any event, the argument would be this, is he

11   brought the cars in supposedly by these records.  These

12   records don't prove that at all.  They knew him as

13   Mr. Roberts, for God's sake, they didn't even know him as

14   Mr. Robert Fingerhut.  So just on that basis alone, judge, we

15   would indicate that not only the exhibits in regard to the

16   maintenance of both vehicles but also the testimony of

17   Mr. Carmen Oliva and also the testimony of Mr. Barry Ricker,

18   I think his name is, be stricken from the record because it's

19   pretty obvious that Mr. Fingerhut just wanted everybody to

20   know that he was known as Mr. Roberts and he didn't want to

21   tell them his true name.  And he signed as Mr. Roberts,

22   that's what the understanding was from Preston, so he signed

23   as Mr. Roberts, so we have Mr. Fingerhut using fictitious

3329

1    names again as usual, which is some of the evidence we wanted

2    to bring in.  Now the State has even brought it in on their

3    own indicating the fact that Mr. Roberts for five years had

4    Mr. Carmen Oliva under the impression that he was Mr. Roberts

5    and he never told him he was Mr. Fingerhut, and that's nice

6    for a five-year relationship.

7         And the same with the actual maintenance records.

8    It is one thing to tell a salesman.  It's another thing to go

9    in there and sign statements and billings and all that kind

10   of stuff under the impression that the person that's signing

11   is really Mr. Roberts, who, of course, he wasn't.  And that's

12   the reason we object to those two entries.

13        We would object in regard to the entries and the

14   exhibits referring to the mortgages because those do not

15   represent the current values.  That's obviously what the

16   prosecution is trying to do is introduce those mortgages and

17   say that the value of the property was this and if you

18   subtract the mortgages there's no value here, therefore

19   there's no money in the house.

20        However, as Diana Marchese indicated, there is no

21   way for her to tell without a satisfaction of the mortgage to

22   say how much the balances are so it becomes incompetent

23   evidence, judge, at that point.  You can't tell from that,



1    you can't tell whether the mortgage -- three-fourths of that

2    could be paid off already.  People go out and take mortgages

3    out on houses and if three-fourths of it's paid off you don't

4    know that until you contact the bank.  The bank is the only

5    one that can tell you how much the balance of the mortgage

6    is, and for that reason I would say that the mortgages are

7    incompetent evidence as to what they were placed in evidence

8    for, and that's the reason to figure out the value of the

9    property after you subtract the mortgages.  Therefore, it's

10    incompetent and should be excluded.

11                    MR. WATKINS:  May I respond, Your Honor?

12                    MR. LEWIS:  The only thing that we are

13    allowing is the deeds.  We have no objection to the deeds.

14    They're in the name of Donna Roberts.

15                    MR. WATKINS:  Your Honor, this is proper

16    evidence in rebuttal.  We believe that the relevant material

17    goes to weight, not admissibility.  And I would further note

18    that all the documents that we have sought to have admitted,

19    including the mortgages, go in line with evidence that we are

20    going to argue, as defense counsel will argue it would be

21    proper surrebuttal, for example, as to how much mortgage

22    value it is now.  They could bring in and show that they take

23    a 75,000 and they don't owe 75,000.  But it's the State's



3331

1    position that we're permitted to show that there were

2    mortgages out on these properties, every single one had

3    mortgages, and there are still outstanding mortgages on the

4    property of Donna Roberts regarding the Fonderlac address.

5              THE COURT:  Okay.  The last argument

6    first.  I think the term was used incompetent evidence as far

7    as the mortgage.  I think that may not be the most correct

8    term.  It's incomplete evidence to give the jury all the

9    picture that is necessary, but I don't know for what purpose

10   that was brought in other than, as Mr. Lewis fears, to show

11   that there was a large amount of money there for the killing

12   to get the insurance.

13             But, in any event, I suspect that every juror knows

14   that the face amount of a mortgage is not necessarily the

15   present value of that mortgage and that's subject to

16   argument.  It's not improper evidence.  As I say, it may be

17   incomplete evidence, but that's not the test.

18             As far as the objection to the records, a part, a

19   big part of the argument that's gone on in this case is all

20   the evidence that's been submitted to show the State's view

21   of legal title not being necessary to have several of these

22   statutes apply as opposed to the defense's argument that

23   legal title is, in effect, everything and that the State --

3332

1    or, I'm sorry, the defense disagrees with the State's

2    contention that a possessor of property as well as a legal

3    titled holder of property can be robbed or burglarized.

4    That's the essence of this whole argument that's gone on

5    through the trial and the Court has ruled that the statute

6    quite clearly defines owner as a legal title holder, a legal

7    possessor of property, and in some cases, a person who holds

8    a particular piece of property without any good title,

9    equitable or legal.  A robber can be robbed of things.

10   Therefore, consistent I think with prior rulings, I will

11   overrule the objection as raised.

12                 MR. MORROW:  Your Honor, I just want to

13   clarify the record.  It's actually 398A through P, 399A

14   through K, 400A through D, 401A through C, and 402A through F

15   are the exhibits that the State had presented.

16                 THE COURT:  Yeah, those were not really

17   clarified on the record.  They were read three or four times.

18   Thank you for that.  Those are admitted.

19          Now, the jury is gone.  I would propose that we meet

20   here at 1:00 o'clock, and do both sides have your proposed --

21                 MR. WATKINS:  We will be prepared at 1:00

22   o'clock with ours.

23                 MR. LEWIS:  They have it proposed.  I just

3333

1   have to bring OJI, I mean, you know.  We're archaic over

2   there.  I've got a monk and he's so tired over there, he's

3   writing.

4                    THE COURT:  Well, there's one point that

5   we talked about at some time on side bar -- I've lost --

6   maybe it will come back -- that the defense may have wanted a

7   specific explanation on something.  Do you recall what that

8   was?  We'll come upon it when we go through it.  I'll see you

9   all at 1:00.

10                   MR. WATKINS:  Thank you, Your Honor.

11                   THE COURT:  Thank you, folks.

12                   MR. LEWIS:  Oh, judge, we should for the

13  record, our Rule 29, move for that again.

14                   THE COURT:  Oh, yeah.  Rule 29, your

15  motion is proffered.

16                   MR. LEWIS:  Yeah, since there was --

17                   THE COURT:  And for the same reasons as

18  previously given, the Rule 29 motion is denied.

19                   (Whereupon, a recess was taken.)

20                        *   *   *

21

22

23

3334

1  <u>Tuesday, November 5, 2002:</u>

2  (In-chambers with all counsel present at 2:45 p.m.)

3              THE COURT:  We're in-chambers out of

4  the hearing of the Jury.  We have been going over

5  the charge of the Court.

6              MR. LEWIS:  Waive the presence of

7  the Defendant.

8              THE COURT:  I think we have narrowed

9  it down to an instruction that is agreeable.  That

10  doesn't mean that the Defense agrees with the

11  content of some of the instructions, but they are

12  in agreement that the Court will give them in a

13  manner in which we'll presently put on the record.

14              MR. LEWIS:  That is a fair

15  statement.  To cut this short, I'll just indicate

16  to the Court, I'll indicate in the instructions

17  here that things we disagree with, I know the Court

18  is going to probably allow and the rest of the

19  items we have agreed to, and the Prosecution will

20  type it up the way we talked about it.

21              THE COURT:  I suggest this.  We'll

22  have these, a printed copy to give to the Jury,

3335

1  specifically, I think you should put on the record

2  those portions that I have said I would give that

3  your --

4            MR. LEWIS:  That is what I'm going

5  to do.  The first item would be item -- it is on

6  page four of the proposed instructions.  I got the

7  wrong one.

8            MR. CONSOLDANE:  Actually we're

9  going to start with on page two, direct and

10  circumstantial evidence are of equal weight or

11  probative value.  I think that it is more

12  correctly, "May be of equal weight and probative

13  value."

14            MR. WATKINS:  Whatever the OJI is.

15            MR. MORROW:  Apparently in State vs.

16  Jenks, 1991, 61 Ohio State 3rd, 259, the Supreme

17  Court opined that the law requires that

18  circumstantial and direct evidence be given the

19  same value.  Therefore I think the language in "R"

20  is correct.

21            THE COURT:  Your objection is noted.

22  I'll go with the language "R".

3336

1          MR. CONSOLDANE:  Then the second

2    objection is on page four with regard to the

3    flight.  There's no evidence introduced in there

4    that he was purposely trying to elude anybody.  He

5    was simply spending some time in a motel room with

6    Donna Roberts.  I don't think that instruction

7    belongs there.  They were the ones that were going

8    to talk about him having sex and alcohol and

9    cigars.

10          THE COURT:  We have had discussion

11   on this, and the State has raised the citation of

12   two cases.

13          MR. MORROW:  That would be State vs.

14   Owens, which is 1996.  West law 648760, 11th

15   District Court of Appeals case.  Number 95-L-078.

16   That is where we took the exact language from the

17   decision rendered by the 11th District Court of

18   Appeals.  Also we have reference to State vs.

19   Taylor, 1997.  Cited at '78 Ohio State 3rd (15).

20   Where the Supreme Court has held that a Defendant's

21   flight from justice may be indicative of

22   consciousness of guilt.  I think in this case, we

3337

1    have a Defendant, as maintained is in an accidental

2    death of an individual, yet he goes and hides

3    himself at a hotel and then hides himself at

4    another location and flees from the residence and

5    takes the car and abandons the car on the street in

6    Youngstown.

7              MR. CONSOLDANE:  I think that is

8    unnecessary and the prejudice of that type of an

9    instruction outweighs any value that it would have

10   in the ordinary instructions.  They have never

11   brought into the fact that he was evading anybody

12   when he left the house.  He certainly left the

13   house and wanted to get out of there and abandoned

14   the car, but that was all at the instructions of

15   Donna Roberts and then he went and spent the time

16   with her in the motel.

17             THE COURT:  I think from the

18   evidence presented there is -- there's several

19   different things that the State presented, which

20   shows that if the Jury accepts the fact he was

21   there, he did the murder, that he took the car and

22   then in affect hid out during a period of time.  I

3338

1    can visualize that that question may well be posed

2    back in the Jury room.  Well, look folks, he ran

3    and tried to hide after this.  What does that mean

4    or can we use that?  This instruction says, yes,

5    you can use that if you make that finding, and I

6    think that is helpful to the Jury.

7              MR. LEWIS:  I want to add in regard

8    to a flight instruction, the problem with that is

9    that there's no definitive limits as to what

10   constitutes flight.  How far do you have to be from

11   the scene?  How long do you have to be away from

12   that and what the criteria is?  It is a totally

13   nebulous thing.  If somebody walks away from the --

14   or walks a half a block and wants to report it to

15   somebody else, have they fled the scene?  Who

16   knows?  In this particular case, the indication

17   would be the fact is that what the State has

18   produced is evidence of the fact that he went to

19   the Days Inn and without any prompting or coaxing

20   on behalf of law enforcement authorities, he

21   actually returned to a Wirt Street address where he

22   was known to reside, and that is exactly where they

3339

1    found him.  They had Donna Roberts call him on the

2    phone.  It is not where he kind of gravitates back

3    to a place where they know they can find him is

4    basically what it boils down to.

5            THE COURT:  I would merely say in

6    response to that that the question of flight is not

7    defined.  I think that would be part of the

8    definition, but I would suggest that it would

9    become a question of reasonableness.  You have

10   here, a duration of distance and time that I think

11   that the Jury could, you know, conclude that this

12   was indeed a flight.  If your example, they went a

13   half a block to try and find somebody, that would

14   not be reasonable to say that was a flight, but

15   here it is over a matter of days.  If he had any

16   intention of notifying the police of this incident,

17   I'm sure it would have been done in a rather quick

18   manner.

19           MR. CONSOLDANE:  Your Honor, he

20   didn't fall into the category of flight.  He left

21   the Fonderlac address, that is true, but from

22   there, he went and spent time, either one of two

3340

1   places, either in the motel with Donna Roberts or

2   back home.  Flight would indicate that he left the

3   State of Ohio, left the area, at least left the

4   region and went down to Columbus or somewhere, but

5   he stayed in this entire area the whole time.  That

6   is not under the definition of flight.

7           MR. WATKINS:  Your Honor, if I may

8   respond, first off, the flight here is involving

9   going from Warren to Youngstown into Boardman,

10  which is a distance of 15 to 20 miles.  We're

11  dealing with days.  He was apprehended according to

12  record by a violent crimes task force, where they

13  had horns to announce to come out with your hands

14  up.  The residence, there's nothing in the record

15  that he lived at the Wirt Street address living --

16  has been in prison in the past year, so there's

17  nothing in the record to suggest that he lived

18  there.  The most important thing, however, and to

19  repeat, this case, that Chuck Morrow cited from the

20  11th Appellate District, to-wit the Owens case, the

21  instructions in that case was given.  "When the

22  appellant was leaving the scene, exited the

3341

1    Interstate, panicked, drove home and did not inform

2    anyone of the incident."  They said that flight was

3    justified.  With the person in this case we have an

4    Interstate, and didn't go home.  He went to a motel

5    room and had Donna check him in.  He didn't check

6    in himself and he abandoned the car somewhere in

7    Youngstown by nobody.  If that isn't flight --

8              THE COURT:  I think it is.  That

9    remains in.  The Defendant's objection is noted.

10             MR. LEWIS:  Page six.  Trespass.

11             MR. CONSOLDANE:  There's one before

12   that.  I believe that the order that the

13   instructions follow is improper.  I think the

14   instructions should start with the Count 1 in the

15   indictment, and move to Count two, three, and four.

16   That is the only logical way that it makes sense.

17   I know they have done it in other cases.  Other

18   cases that didn't make a difference.  In this case,

19   it will make a difference, and just because they

20   have done something in another case where I didn't

21   object to it, doesn't mean that it is proper to do

22   it in this case, and I believe that the

3342

1  instructions should follow the indictment.

2            MR. WATKINS:  Your Honor, the State

3  would note that it is within the discretion to put

4  a charge together in whatever fashion.  It makes

5  sense to include the felonies first, because of

6  definitions that are involved with the aggravated

7  murder charge.  This has been done in cases that go

8  back at least five years, and including this

9  Court's very last capital case.  There's been no

10  law cited that it is improper, and I think with

11  what has been worked out by way of having

12  definitions of the aggravated burglary charge, that

13  there's not going to be a definition problem.

14            THE COURT:  I do not believe that

15  bad habits should ever become custom, but I have

16  asked for, from both sides, authority to do it, and

17  authority where it should not be done.  I have

18  heard none and I assume there's none.  I think this

19  is something that is within the realm of discretion

20  of the Court.  And I have done it in the past, and

21  I cannot for the life of me see how it would be

22  prejudicial to the Defendant.  I think that has to

3343

1    be the bottom line.  I think it does make it more

2    understandable.  But in any event, this Jury is

3    going to have a copy of this.  They can read it

4    over to their heart's content, and the manner which

5    it is given, I don't think is important.  The

6    important part is that they understand the

7    inter-relationship between these terms and I think

8    this will provide as much as I possibly think would

9    be necessary.

10                  MR. CONSOLDANE:  You are going to

11   give a copy of this to the Jury?

12                  THE COURT:  That is my intent.

13                  MR. CONSOLDANE:  I would object to

14   that.

15                  MR. WATKINS:  We favor that.

16                  THE COURT:  There's case law on

17   that?

18                  MR. WATKINS:  Absolutely.

19                  THE COURT:  It is highly favored by

20   the Appellate Courts.  We can not usually do it,

21   but with the technology that is available now, it

22   has become possible to do it.  Whenever possible in

3344

1    doing it, I think it is most helpful in civil cases

2    as well as criminal.  Your objection is noted.

3    Next one.

4              MR. LEWIS:  Page six.  Under the

5    section, trespass.  The OJI definition for trespass

6    means knowingly entering the land or premises of

7    another, without privilege to do so.  It also,

8    basically what it refers you to is the trespass

9    statute.  The Prosecutor has proposed other

10   language here, and the other language is as

11   follows.  "Any entrance or remaining in knowingly

12   made in the structure of another that is unlawful

13   if it is without the authority, consent or

14   privilege to do so."  I don't know if that is -- I

15   take it back it, that is almost part of the

16   definition of trespass.  The next two paragraphs,

17   however, are not.  "Where a Defendant lawfully

18   entered a residential premises, the privilege to be

19   in or upon this premises can be inferred to have

20   been revoked where the Defendant thereafter commits

21   a violent felony directed against another person in

22   the premises who had the ability and authority to

3345

1    revoke the privilege." That paragraph in and of

2    itself, that has been extracted from evidently case

3    law, however, it is not committed to nor is it

4    contained within OJI. OJI simply gives you the

5    idea of what deception is. Gives you definition,

6    gives you the definition of trespass. Gives you

7    the definition of privilege, and it is up to the

8    Jury to interpret the evidence, to fall within

9    those categories and they are perfectly capable of

10   doing that. The next paragraph "Where one enters

11   upon the property of another as an invitee or

12   licensee, that person loses his status as an

13   invitee or licensee and becomes a trespasser when

14   it becomes evident that the purpose of such entry

15   is to commit a criminal offense against the owner."

16   Likewise --

17              MR. WATKINS: "The owner" was taken

18   out.

19              MR. LEWIS: It didn't work out to

20   their advantage on that one.

21              MR. WATKINS: That is not the law.

22              MR. LEWIS: The problem here is that

3346

1    if they take and craft specific instructions that

2    come from factual cases and construct it so that

3    you are telling the Jury, basically, as this, this,

4    this and this comes in, and define this. We're

5    going way outside the realm of instructions. The

6    instructions are already given. When it says

7    trespass, whether it says burglary, when it gives

8    the definitions of deception, trespass, privilege,

9    occupied structure, it is all up to the Jury to

10   interpret and define and apply that to the facts of

11   the case. What they are doing is, and when you put

12   that in the instructions here, you are almost

13   leading the Jury to believe and assume, that the

14   Court believes, that this is what has been proved

15   in this case, and in other words, "The Defendant

16   revoked when he submitted an offense." If they

17   don't find he committed an offense, you are

18   revoked. You are indicating to them and hinting

19   towards the idea is that, yes, an offense was

20   committed and there's no privilege to be there. It

21   is the same thing as saying, going back to say for

22   instance the aggravated burglary statute and

3347

1   saying, going to be a special instruction.  If you

2   find that he was in there after dark, you can

3   presume that he could have been without authority.

4   You can take that in any case.  You can take any

5   set of facts and craft some instruction.  What you

6   are doing is, you are invading the province of the

7   Jury to determine, that is why it has the standard

8   definitions for stealth, deception, trespass.

9   We're not crafting instructions based on special

10  cases to infer or to lead the Jury to the idea that

11  this happened.  They can come to that conclusion

12  without that.  What it does is it almost convinces

13  them and psychologically tells them, that okay,

14  well this is exactly what we're talking about here.

15  This fits right in, and this is -- no, it doesn't.

16  It all can be determined from that, because let's

17  put it this way.  OJI doesn't have that in there

18  and if they believe that Juries are smart enough to

19  come to the right conclusion based on OJI, why does

20  the Prosecution get a chance to plug in

21  instructions, supposed instructions, that gives

22  them their right.  It doesn't make any sense to me.

3348

1          THE COURT:  Before I listen to

2  argument, I find an anomaly here between OJI and

3  the code.  There's two sections that deal, there's

4  criminal trespass and aggravated trespass.

5  Criminal trespass reads "No person, without

6  privilege to do so, shall do any of the following.

7  Knowingly enter or remain on the land or premises

8  of another.  Knowingly enter or remain on the land

9  or premises of another, the use of which is

10  lawfully restricted.  Recklessly enter or remain on

11  the land or premises of another.  Being on the land

12  or premises of another, negligently fail or refuse

13  to leave upon being notified to do so by the owner

14  or occupant or the agent or servant of either."

15  There's some other stuff about defenses which

16  wouldn't apply.  "Whoever violates this section is

17  guilty of criminal trespass, misdemeanor of the

18  fourth degree."

19          Aggravated.  "No person shall enter or

20  remain on the land or premises of another with

21  purpose to commit on that land or those premises a

22  misdemeanor."  This burglary charge starts with,

3349

1    "No person shall trespass."

2                    MR. WATKINS:  We're citing an

3    interpretation of the aggravated burglary statute

4    dealing with that issue in <u>State vs. Steffen</u>.

5    We're using interpretive law from the Ohio Supreme

6    Court for this instruction.

7                    MR. MORROW:  I'll note when you have

8    a situation involving Jury instructions, and

9    there's a confusion or misleading issue, the Court

10   is at liberty to expound upon Ohio Jury

11   Instructions, so a Jury is properly and adequately

12   educated as to the status of the law and the Court

13   is clear, based upon the arguments that preside,

14   these instructions with respect to the Defense's

15   motion for acquittal, and the discussions that have

16   been had over the last three or four days as to

17   what constitutes a trespass and whether or not the

18   Defendant's actions constitute a trespass.  And

19   since it is an issue that is confusing in this

20   case, because you have questions about permission,

21   non-permission, authority, possession, all of those

22   things, then the Court is in a position to further

3350

1   expound upon the definitions.  And when we talk

2   about State versus Steffen, there's the discussion

3   in Steffen, which is cited as 31 Ohio State 3rd,

4   111, which is a 1987 case, where they talk about

5   that a person "becomes a trespasser subject to

6   conviction for burglary by virtue of the commission

7   of the felony on the premises."  In this case, it

8   allows the discussion in that case, allowed the

9   Jury to infer that the Defendant's rightful acts of

10  being on the property, could be terminated by his

11  subsequent actions.

12              THE COURT:  Let me stop you right

13  here.  What you are saying then is that trespass in

14  that case is used as a generic term and not in

15  reference to the criminal or aggravated trespass as

16  defined in the statute?

17              MR. MORROW:  Correct.

18              THE COURT:  It is the only way it

19  makes sense.

20              MR. MORROW:  We're talking about a

21  generic trespass and trespass can be either of a

22  criminal trespass or aggravated trespass.  It is

3351

1  the appropriate definition, given the facts and

2  circumstances of each particular case as to what

3  constitutes quote unquote trespass, and in this

4  case you have the Steffen case, which refers to

5  that trespass. You also have State vs. Lilly,

6  which is 87 Ohio State 3rd (97), 1999 case where

7  they talk about that a person committed a trespass

8  against the property of which one is the legal

9  owner if another has custody or control over that

10  property. And furthermore, then in State vs.

11  O'Neil, which we also list which was 87 Ohio State

12  3rd, 402, it talks about that these crimes can be

13  committed when people are lawfully in those

14  premises. Finally, with respect to the second full

15  paragraph, that is University, Cincinnati or City

16  of University Heights vs. Conley, which is 252

17  Northeast 2nd, 197, and again, that language was

18  taken directly from that case where it says where

19  one enters upon the property of another as an

20  invitee or licensee, that person loses his status

21  as an invitee or licensee and becomes a trespasser,

22  when it becomes evident that the purpose of such

3352

1  entry is to commit a criminal offense.  And that is

2  the language that is taken directly from that.  And

3  again, in this kind of situation, it is up to the

4  Court to provide further enlightenment to the

5  jurors to understand what the true status of the

6  law is and in this case, the status of the law, is

7  that a person, not the owner, who is in possession

8  of the property, or who has custody and control

9  over the property, can grant someone permission to

10  be there, can revoke that person's permission to be

11  there.  And similarly, in the event that someone

12  institutes a criminal act against the person that

13  is in custody or control of that property, they

14  then, the Jury is in a position to infer, that that

15  person has now committed a trespass, and quite

16  simply, that would be the situation where you have

17  an invitee, a traveling door to door salesman,

18  comes into the property is invited in.  While in

19  that property, gets into a heated discussion with

20  the property owner over the merits of the quality

21  of the vacuum cleaner, pulls it out and commits an

22  offense against the property owner or the person

3353

1   that is in custody or control of that property.

2   They were an invitee, but at the point in time that

3   they now commit that criminal act against them, the

4   Jury is proper to infer that they had been, that

5   their permission to be on that property had been

6   revoked and in essence, they become a trespasser.

7            MR. WATKINS:  And you can have joint

8   occupy which we have in this case.

9            MR. CONSOLDANE:  I have never had a

10  case where they have had so much, want the Jury to

11  infer so much about a case that hasn't been proven.

12  For them to just extrapolate certain parts of

13  sentences out of cases to fit into a Jury

14  instruction, I think is clearly wrong.  OJI looks

15  at all of these possible things, puts it in there

16  and puts it in such a way that both sides get a

17  fair shake at it.  This has been strictly put in

18  there just to benefit them.  Not to help the Jury,

19  but to help the Jury convict the Defendant is the

20  only thing that they are trying to do.  It is not

21  according to OJI and doesn't belong there.

22  Especially, they even took out from the first set

3354

that they gave me, they even cut off the last part

of the sentence because it didn't suit them.  It is

not fair.

            THE COURT:  I have no question in my

mind that the Prosecutor does not put anything in

here with any other alternative but to get a

conviction in this case.

            MR. CONSOLDANE:  That is why I

object to them doing this instruction.  We think

that this is strictly something the Court should do

and the Prosecutor shouldn't have this much input.

            THE COURT:  I go through this every

time with you.  The Court is overseeing the

preparation of this.  And as far as this

description to the Jury of what trespass is.  It is

by anyone's definition tailored to the facts of

this case to agree, but that tailoring is based on

prior case law, and on a reading of 2911.21.  And

therein contains all of the arguments that we have

been talking about.  The answer to them, I think,

as to the answer on the question the Court

previously ruled on, it is quite clear from reading

3355

1   2911.21 that owner or occupant or agent or a

2   variant of either, can make a person a trespasser

3   by telling them to leave.  We have gone through

4   this argument about the title or the right of

5   possession.  I think inherent in that portion of

6   the statute is the answer to what we have been

7   arguing about.  The law is based on common sense

8   and a person can become a trespasser through the

9   means by which the language has been drafted in

10  this case, and I would be very surprised, if any

11  Courts of Appeal would take umbrage with that

12  wording.  I think it is fair wording, because I

13  think it is the way that the law is or will be once

14  the Court of Appeals reviews it.  It just doesn't

15  make any sense to do it otherwise.  To accept the

16  arguments here that he was not a trespasser because

17  the wife gave him permission to be there, to kill

18  her husband, or that he was invited into the house

19  and anything that flowed there from was not a

20  trespass, just doesn't make common sense to me.  I

21  don't think that the law intends that.  I think by

22  any reading of the law, that this is a good and

3356

1    sufficient explanation of what the law of trespass

2    is.  A portion of the law of trespass.  What else?

3               MR. CONSOLDANE:  Only that I think

4    trespass -- trespass is trespass.  Murder is

5    murder.  I don't even know, trespass is not an

6    element of murder, it is only an element of either

7    the burglary or the robbery and that is so far

8    removed from the fact that nothing was ever even

9    taken.  I think the whole thing is insane.

10              THE COURT:  Took the automobile.

11              MR. WATKINS:  The keys and the

12   automobile.  It is uncontradicted.

13              THE COURT:  You care to give me a

14   definition of what you think the limitations of

15   trespass here are?

16              MR. LEWIS:  In the first instance

17   when it refers to that, OJI, this is the 202

18   version, all of the cases they have referred to

19   have already occurred.  They are already indicated

20   in here.  And they do it supplementally and they

21   don't do it necessarily in the language of what the

22   Prosecutors have proposed, but the point is -- the

3357

1    point is, that is the amazing part.  If OJI, and

2    these are the scholars that put this together and

3    it is kind of amazing to me that they wouldn't go

4    ahead and say, if this is your fact pattern, then

5    go ahead and give this instruction.  And they

6    really don't do that.  And if that is the case,

7    then they would put in there and craft certain

8    things, but they continue to put in here, when you

9    have trespass or when you have the trespass, it

10   says refer to and you go to the trespass statute.

11   You have to put the elements of the trespass

12   statute in there and that is what it really says to

13   do.  Then it elaborates down below.  But some of

14   the things the Court just referred to, as going in

15   with the husband or to kill the husband or

16   whatever, that is not the case here.  We don't have

17   a husband.  We don't have that.

18              THE COURT:  I should say significant

19   other.  You're right.

20              MR. CONSOLDANE:  That is something

21   they should argue.  It is not something you should

22   tell the Jury.

3358

1          THE COURT:  I don't plan on telling

2    the Jury that.  It was a miss slip on my part to

3    use the term "husband".  Mr. Watkins has been doing

4    it.

5          MR. LEWIS:  That is one of the

6    problems, also.

7          MR. WATKINS:  We'll get to some of

8    this, what we can argue and not argue.

9          THE COURT:  First off, OJI is a

10   guide.  Whenever in doubt, go with the OJI and you

11   can't do much wrong.  But OJI is merely a proposal

12   of something that is safe for purposes of appeal.

13   This has all been tested through case law.  If you

14   notice on the instructions of aggravated trespass,

15   it says, "The Defendant is charged with aggravated

16   trespass.  Before you can find the Defendant guilty

17   of this offense, you must find beyond a reasonable

18   doubt that on or about the blank day of blank in

19   the count, the Defendant entered on the premises,

20   it says a certain name of the owner or occupants,

21   with purpose to commit on that land or premises,

22   the offense of, and then it says, insert

3359

1    description of either an offense, the elements of

2    either an offense, the elements of which involved

3    caused physical harm, or to cause a person to

4    believe they were about -- in the face of imminent

5    physical harm." You notice they don't limit that

6    to a misdemeanor. The statute does. What if you

7    have somebody going on the property to commit a

8    trespass. If I follow OJI and refer to that

9    section of law, 2911.21, I can't ever follow OJI

10   and get a description of trespass that makes any

11   sense in this case. Therefore, there's no

12   trespass, that is what you are arguing.

13            MR. LEWIS: We can argue that and

14   they can argue that there was a trespass. I don't

15   believe that the Court should be in a position to

16   tell the Jury that there's a trespass.

17            THE COURT: The definition of the

18   Jury that fits this particular case and I think

19   we're doing that by giving the wording that we have

20   in there. Your objection is noted for the record.

21   What else?

22   (OFF THE RECORD)

3360

1        MR. CONSOLDANE:  A lot of this stuff

2  that we have been talking about hasn't been on the

3  record and a lot of this stuff --

4        THE COURT:  What specifically?  You

5  agree there's nothing of substance left off other

6  than our battering back and forth?

7        MR. CONSOLDANE:  That is correct.

8        MR. MORROW:  Mr. Lewis asked me

9  about serious physical harm and OJI lists through

10  five.  I added six.  "Death.  Serious physical harm

11  to persons," because what more serious physical

12  harm to a person can you have than death?

13        THE COURT:  Pretty hard to think of

14  one.

15        MR. LEWIS:  They put the definitions

16  in.

17        MR. WATKINS:  You want it out?

18        MR. LEWIS:  Yes.

19        MR. WATKINS:  We'll take it out.  It

20  is not material.

21        MR. CONSOLDANE:  Page 10.  Owner.

22  We disagree with that definition.

3361

1            MR. MORROW:  Your Honor, that is

2   right out of 2913.01 (D).

3            THE COURT:  That is reading from the

4   statute there.  You still object?

5            MR. CONSOLDANE:  It is not out of

6   OJI.  Let me just say this, that this definition of

7   owner is unconstitutional as far as I am concerned.

8   They have indicated that the -- that a license to

9   possession is unlawful.  The fact is if they are

10  saying that if I take something from you, then

11  nobody can take it from me, that I'm a lawful

12  owner.  Well, if I am a lawful owner, then you

13  can't charge me with theft of the thing.  They have

14  gone completely overboard with this stuff.  If they

15  are going to say that somebody is illegally in

16  possession of something, and they are protected by

17  law, that nobody can take it away from them and

18  doesn't say who they are talking about.  If they --

19  you are in possession of it.  It is way beyond this

20  interest is unlawful.  It is ludicrous, that is

21  absolutely ludicrous.  You can steal anything, and

22  I can keep ahold of it, I have committed a felony,

3362

1  and --

2            THE COURT:  You would be charged.

3            MR. LEWIS:  He's going to be guilty

4  of the crime, he takes it away from me.  It is

5  ludicrous.  That is an absolute ludicrous premise.

6  It is unconstitutional.

7            THE COURT:  You mean a thief can't

8  steal from a thief?

9            MR. LEWIS:  The implications are

10  greater than that.

11            MR. WATKINS:  I think Mr. Lewis,

12  that this is probably one of the more clear areas

13  that the legislative service commission cites this,

14  make it very clear that in fact in Ohio, and I

15  think virtually in every state, a thief can steal

16  from a thief.  If I would take your book, and I

17  didn't have your authority, and I walk out in the

18  street and somebody would shoot me and take the

19  book, they would be committing aggravated robbery.

20  If I would have a leased vehicle and I am beyond

21  the lease of Hertz Company and it is illegal for me

22  to possess the vehicle which a lot of citizens do,

3363

1   they are protected by the law that a person with a

2   gun can't steal that car, and say, "Oh, that person

3   did not have legal title," and therefore, there's

4   no robbery.  That is the law, as clear as day.

5                    MR. LEWIS:  I'll tell you what.  If

6   we're going to craft some instruction, if that is

7   what Mr. Watkins says.

8                    MR. WATKINS:  It is the law.

9                    MR. LEWIS:  Okay.  We have some

10  facts indicated in this case that Mr. Fingerhut

11  regardless of whether the Defendant was in the

12  house, how he brought the Defendant with him.  He

13  got out of his motor vehicle, he left that motor

14  vehicle.  He left touching that motor vehicle.  At

15  that point in time, he was not in possession of

16  that vehicle.  He went into a house, and if he left

17  that vehicle, then anybody can hold or have custody

18  of that.  Even if Mr. Jackson is a criminal, he can

19  go out and go into possession of that.  He's

20  allowed to have possession it says to be lawful.

21  It is lawful if he's in possession of it.

22  Mr. Fingerhut abandoned that vehicle.  It was in

3364

1   the garage.  It was no longer in his possession.

2   Mr. Jackson, according to what that says, he

3   becomes the owner, he's in possession.  As long as

4   he's in possession doesn't matter how it got there.

5   It is his.  We would like an instruction to the

6   Jury that Mr. Fingerhut left the vehicle, was no

7   longer in possession of that vehicle and Nathaniel

8   Jackson, even if he stole it, he's a lawful

9   possessor of it.  That is exactly what that kind of

10  definition leads to.

11              MR. MORROW:  There's no proof that

12  he abandoned the vehicle.

13              MR. WATKINS:  The fact that his keys

14  were taken and you got blood on the floor shows it

15  is his vehicle.

16              MR. LEWIS:  He left it.  He wasn't

17  the owner.

18              MR. WATKINS:  That is not the law.

19              THE COURT:  The point is, that in

20  your fact situation, he has stolen the car, as far

21  as the true owner is concerned.  He's stolen the

22  car as far as the constructive licensee, or

3365

1    licensee if the car is concerned, if Mr. Jackson

2    steals the car and takes it down on Wick Avenue or

3    wherever and somebody puts a gun in his hand and

4    steals the car, they are guilty of theft, of

5    robbery.  He didn't legally have the car.  He

6    illegally had the car.

7              MR. LEWIS:  He stole from the legal

8    owner.

9              THE COURT:  He steals from the legal

10   owner and somebody steals.

11             MR. LEWIS:  Are you talking about

12   legal, legal owner?

13             THE COURT:  Jackson could be charged

14   with the illegality of stealing the car from the

15   licensee, but another person could be charged with

16   forcibly taking the car from Jackson, even though

17   he has no legal right to the car.  Society couldn't

18   operate otherwise.

19             MR. CONSOLDANE:  If you carry that

20   one step farther, if the titled owner of the car

21   gave permission for somebody else to use the car,

22   if somebody had stolen Mr. Fingerhut's car and she

3366

1  gave Nathaniel Jackson permission to go and

2  retrieve it, then he's not unlawfully in possession

3  of the car.

4          THE COURT:  You're right, but that

5  isn't the case here.

6          MR. MORROW:  That would be a defense

7  which would be provable by fact.

8          MR. LEWIS:  All I would indicate is

9  that is that there's, everybody keeps saying that

10  is not the fact, but I'll indicate for the purposes

11  of record.  In the letters it indicates that

12  Nathaniel is able to drive the cars by Donna

13  Roberts, who is the lease holder of that and also

14  there's an indication in the letters in October or

15  November of 2001 that he was also, he's been in the

16  house and whatever, and there's tacit permission to

17  go into the house by who is really the title

18  holder, deed holder to the property.  Those are in

19  there.  I would just say that.  Whether you believe

20  it or not --

21          THE COURT:  The Jury could find

22  that.

3367

1          MR. CONSOLDANE:  I think the Court

2     ought to instruct the Jury that if the, if the

3     title owner gives a person permission to enter upon

4     the property, then he's not a trespasser.

5          MR. WATKINS:  You can't give

6     permission to give somebody to take a vehicle.

7          MR. CONSOLDANE:  I said if he gave

8     him permission to be on the property.

9          MR. WATKINS:  Your client has given

10    a version contrary to what you are making up.

11         MR. CONSOLDANE:  That is up to the

12    Jury to decide.  The Judge should give the

13    instruction that if there was given permission to

14    be on property, it is not a trespass.

15         MR. WATKINS:  Your client indicated

16    he took the man's keys.  He didn't talk about

17    possession.  That he was given permission.

18         MR. CONSOLDANE:  She said he had a

19    right to drive the cars any time he wanted and he

20    had been in the house before.

21         MR. WATKINS:  The record shows that

22    on the day right when this happened, she said that

3368



1  his car was stolen, and they put an APB, all points

2  bulletin for the vehicle.  Because that is what the

3  woman said.

4          MR. CONSOLDANE:  She didn't know who

5  took it.

6          MR. MORROW:  Your client calls on

7  the cell phone in the car and says, "Come get me"

8  from your husband's car.  He admits to calling her

9  on the cell phone.

10          MR. WATKINS:  The whole state of the



11  evidence is this man did not know what is coming,

12  that's the only reasonable interpretation.

13          THE COURT:  All I can suggest is you

14  draw the thing and have it tomorrow, we'll spend a

15  couple of minutes over whether there's any

16  instruction of that nature.  You can at least put

17  it in the record as something you offered that the

18  Court refused, if I refuse it.

19          MR. CONSOLDANE:  I am requesting

20  that you make an instruction that you tell the Jury

21  that if he has been given permission by the, either

22  the license holder of the vehicle to drive it, or

3369

1   the owner of the deed to the property, that then it

2   is no longer trespass, and it is up to them.

3            MR. WATKINS:  He's got to revoke it

4   from the other person's possession.

5            MR. CONSOLDANE:  You can give the

6   instruction, it is up to the Jury to determine

7   whether or not that permission has been terminated.

8            MR. MORROW:  There has to be some

9   evidence in the case --

10            THE COURT:  And you have to have an

11   instruction to follow as to that point.

12            MR. CONSOLDANE:  You are already

13   giving that.  I think you ought to give this before

14   that.

15            THE COURT:  If you go to that point,

16   then I have to go into the whole deal of saying

17   even though initial permission may have been

18   granted by the legal title holder, that the actions

19   of the Defendant in regard to the person in the

20   house, and the person who had the license to drive

21   the car by and attacked upon him would revoke any

22   such permission given.  Again, I don't know how you



3370

1   can have an indication that would operate under the

2   principles you are putting forward.

3               MR. CONSOLDANE:  You maybe argue

4   that the permission to enter upon the house was

5   terminated if he decided that he went there with

6   the purpose to kill, but that has nothing to do

7   with terminating the permission to use the

8   automobile.  If she gave him permission to use the

9   automobile, he didn't use that in the commission of

10  any offense.

11              THE COURT:  Where is the evidence



12  before the Jury to substantiate that?

13              MR. CONSOLDANE:  It is in the

14  letters.

15              MR. WATKINS:  This goes back, he's

16  going to get cars after he kills.  The Cadillac and

17  Lincoln.

18              MR. CONSOLDANE:  She said, "You can

19  drive any of my cars."

20              MR. WATKINS:  It is after he's dead.

21              MR. LEWIS:  It was before.  If you

22  say it is not in there, we say it is in there.

3371

1           THE COURT:  I am giving you the
2     opportunity to draft up something for me to
3     consider whether it is going to be appropriate to
4     give or not.  I think it is three steps beyond the
5     bounds of what is proper here.  At least you can
6     put something in the record.
7           MR. LEWIS:  On the old set, page 12.
8     Purpose.  Purpose has been previously defined for
9     you.  And it says in addition -- well, it is just
10    the way -- it is an instruction from OJI.  Okay.
11          MR. CONSOLDANE:  That is a very
12    rough reading paragraph.
13          MR. LEWIS:  It is out of OJI.
14    Normally what they do is they simply put a heading,
15    dangerous weapon.  It doesn't say purpose.  That is
16    true.  It says dangerous weapon.  Just put
17    dangerous weapon.
18          MR. MORROW:  I'll put dangerous
19    weapon.
20          MR. LEWIS:  Correct.
21          MR. MORROW:  This is the one from
22    Shaffer on prior calculation and design.  I know

3372

1    that was one that you argued quite extensively in

2    State vs. Shaffer case.

3                    MR. LEWIS:  I guess we're all right.

4                    MR. MORROW:  The bottom of page 12

5    is the self-defense, which was straight out of OJI.

6    The Defendant is asserting affirmative defense

7    known as self-defense.

8                    MR. CONSOLDANE:  The only thing that

9    I would request there is that you put everything in

10   caps, put self-defense in caps there.

11                   MR. MORROW:  Okay.

12                   THE COURT:  Those will be the

13   instructions with the possible exception that the

14   Court will consider a draft that the Defense may

15   wish to submit about the question of trespass.

16   (OFF THE RECORD)

17   (End of In-chamber discussion at 3:50 p.m.)

18

19   (SEE SEPARATE VOLUME FILED BY KELLY WILSON FOR RECORD

20   TAKEN ON WEDNESDAY, NOVEMBER 6, 2002.)

21

22

1
2
3
4
5
6                    REPORTER'S CERTIFICATE
7
8        This is to certify the foregoing represents a true and
9   correct copy of the proceedings had in the aforementioned
10  cause as reflected by the stenotype notes taken by me on the
11  same.
12
13
14
15
16                                    _____
17                                    Kelly J. Wilson
                                      Official Court Reporter
18
19
20
21
22
23

3373

IN THE COURT OF COMMON PLEAS

TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No.2001-CR-794 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| -vs- | ) | JUDGE JOHN M. STUARD |
| | ) | |
| NATHANIEL E. JACKSON, | ) | |
| | ) | PARTIAL |
| Defendant | ) | TRANSCRIPT OF PROCEEDINGS |

VOLUME 15

**FINAL ARGUMENTS, CHARGE OF COURT AND VERDICT**
**NOVEMBER 6, 7 and 8, 2002**

BEFORE:      HONORABLE JOHN M. STUARD

AT:          Trumbull Co. Court of Common Pleas
             Courtroom Number 2
             160 High Street, NW
             Warren, Ohio 44481

APPEARANCES:

On behalf of the Plaintiff:
    MESSRS. DENNIS WATKINS
    and CHARLES L. MORROW
    Attorneys at Law

03-0137

On behalf of the Defendant:
    MESSRES. JAMES F. LEWIS
    and ANTHONY V. CONSOLDANE
    Attorneys at Law

FILED

JUL 09 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Official Court Reporter:  Kelly J. Wilson

i

1                         I N D E X

2                                               PAGE NO.

3     Search Warrant Hearing                      3
      (December 20, 2001)
4
      Initial Appearance of Nathaniel Jackson     9
5     Hearing (December 21, 2001)

6     Initial Appearance of Donna Roberts         12
      Hearing (December 21, 2001)
7
      Motion to Intervene                         19
8     (December 31, 2001)

9     Arraignment of Donna Roberts (co-defendant) 57
      Arraignment of Nathaniel Jackson
10
      Waiver of Speedy Trial                      64
11    (January 23, 2002)

12    Hearing on Motions                          67
      (March 20, 2002)
13
      Hearing on Motion to Suppress Evidence     185
14    (April 17, 2002)

15    WITNESSES AT SUPPRESSION HEARING:

16    JEFFREY R. HOOLIHAN
          Direct Examination by Mr. Watkins      190
17        Cross Examination by Mr. Lewis         231
          Redirect Examination by Mr. Watkins    274
18        Recross Examination by Mr. Lewis       280

19    DET. SGT. PAUL MONROE
          Direct Examination by Mr. Lewis        288
20        Examination by The Court               312

21    NATHANIEL JACKSON
          Direct Examination by Mr. Consoldane   314
22        Cross Examination by Mr. Watkins       324

NATHANIEL JACKSON v. WARDEN
CASE NO. 4:07-cv-0880
STATE COURT TRANSCRIPTS - Page 3654

ii

1    INDEX - Continued                              PAGE NO.

2    Court's Opening Remarks (Volume 2)               381
     Motion for Mistrial                              415
3
     VOIR DIRE
4        Hardship Excuses                             422
         Death Penalty Qualification & Media          664
5        (Volume 3)
         Motion for Change of Venue & Motion to
6        Dismiss                                     1835

7    GENERAL VOIR DIRE                               1857

8    OPENING STATEMENT ON BEHALF OF STATE OF OHIO    2064
     OPENING STATEMENT ON BEHALF OF THE DEFENDANT    2093
9
     STATE'S WITNESSES:
10
     PAULA CARSON
11       Direct Examination by Mr. Morrow            2100
         Cross Examination by Mr. Lewis              2105
12
     JAMES C. DANIELS
13       Direct Examination by Mr. Watkins           2111
         Cross Examination by Mr. Lewis              2124
14       Redirect Examination by Mr. Watkins         2138

15   JOSE SANCHEZ
         Direct Examination by Mr. Watkins           2139
16       Cross Examination by Mr. Lewis              2156
         Redirect Examination by Mr. Watkins         2168
17
     FRANK E. REYNOLDS
18       Direct Examination by Mr. Watkins           2172
         Cross Examination by Mr. Lewis              2191
19       Redirect Examination by Mr. Watkins         2201

20   PAUL MONROE
         Direct Examination by Mr. Watkins           2202
21       Cross Examination by Mr. Consoldane         2392

22

iii

1  INDEX - Continued                                      PAGE NO.

2  MIKE YANNUCCI
      Direct Examination by Mr. Morrow                      2406
3     Cross Examination by Mr. Lewis                         2418
      Redirect Examination by Mr. Morrow                     2428
4
   RICHARD TACKETT
5     Direct Examination by Mr. Morrow                       2428
      Cross Examination by Mr. Lewis                         2434
6
   ANTHONY LESHNACK
7     Direct Examination by Mr. Watkins                      2445
      Cross Examination by Mr. Consoldane                    2455
8
   FRANK DILLON
9     Direct Examination by Mr. Watkins                      2457
      Cross Examination by Mr. Lewis                         2480
10
   DR. THEODORE SOBOSLAY
11    Direct Examination by Mr. Watkins                      2512

12 DR. HUMPHREY GERMANIUK
      Direct Examination by Mr. Watkins                      2520
13    Cross Examination by Mr. Consoldane                    2576
      Redirect Examination by Mr. Watkins                    2583
14    Recross Examination by Mr. Consoldane                  2585
      Redirect Examination by Mr. Watkins                    2586
15
   JOSE FLORES
16    Direct Examination by Mr. Watkins                      2587
      Cross Examination by Mr. Lewis                         2599
17
   EDWARD LULLA
18    Direct Examination by Mr. Watkins                      2604
      Cross Examination by Mr. Lewis                         2624
19
   JOHN STAMPER
20    Direct Examination by Mr. Watkins                      2645
      Cross Examination by Mr. Lewis                         2652
21

22

iv

1

<u>INDEX - Continued</u>                                                <u>PAGE NO.</u>

2

<u>JEFF DIAMANTES</u>
    Direct Examination by Mr. Watkins                    2654
3   Cross Examination by Mr. Lewis                        2659
    Redirect Examination by Mr. Watkins                  2661

4

5   <u>MICHAEL ROBERTS</u>
    Direct Examination by Mr. Morrow                      2663
    Cross Examination by Mr. Consoldane                   2695
6   Redirect Examination by Mr. Morrow                    2704
    Recross Examination by Mr. Consoldane                 2706

7   <u>CYNTHIA MAYLE</u>
8   Direct Examination by Mr. Watkins                     2706
    Cross Examination by Mr. Consoldane                   2728
9

    <u>DALE LAUX</u>
10  Direct Examination by Mr. Watkins                     2735
    Cross Examination by Mr. Consoldane                   2751
11  Redirect Examination by Mr. Watkins                   2790
    Recross Examination by Mr. Lewis                      2798
12

13  <u>BRENDA GERARDI</u>
    Direct Examination by Mr. Watkins                     2803
    Cross Examination by Mr. Lewis                        2840
14

15  <u>STEVE GREENE</u>
    Direct Examination by Mr. Morrow                      2851
    Cross Examination by Mr. Lewis                        2875
16

17  <u>CHRIS ELLINGTON</u>
    Direct Examination by Mr. Morrow                      2881
    Cross Examination by Mr. Consoldane                   2888
18

19  <u>JIM McCOY</u>
    Direct Examination by Mr. Morrow                      2890
    Cross Examination by Mr. Lewis                        2899
20

    <u>JILL KENYON</u>
21  Direct Examination by Mr. Morrow                      2900
    Cross Examination by Mr. Consoldane                   2908
22

v

1  INDEX - Continued                                        PAGE NO.

2  JENNIFER ROBINSON
       Direct Examination by Mr. Morrow                        2911
3      Cross Examination by Mr. Lewis                          2920

4  KATHY KIHM
       Direct Examination by Mr. Morrow                        2921
5      Cross Examination by Mr. Lewis                          2924

6  BRIDGET PAUL
       Direct Examination by Mr. Morrow                        2925
7      Cross Examination by Mr. Consoldane                     2934

8  KATHERINE THOMAS
       Direct Examination by Mr. Morrow                        2936
9      Cross Examination by Mr. Lewis                          2952
       Redirect Examination by Mr. Morrow                      2973
10     Recross Examination by Mr. Lewis                        2976

11 JAMES CAMPBELL
       Direct Examination by Mr. Watkins                       2977
12     Cross Examination by Mr. Consoldane                     2982

13 LINDA THOMAS
       Direct Examination by Mr. Morrow                        2994
14     Cross Examination by Mr. Consoldane                     3002

15 CHRISTOPHER MONYAK
       Direct Examination by Mr. Morrow                        3003
16     Cross Examination by Mr. Lewis                          3023
       Redirect Examination by Mr. Morrow                      3037
17
   TROOPER GERALD FUNELLI
18     Direct Examination by Mr. Morrow                        3038
       Cross Examination by Mr. Lewis                          3046
19
   DET. SGT. PAUL MONROE
20     Redirect Examination by Mr. Watkins                     3049
       Recross Examination by Mr. Lewis                        3063
21
   BRAD CAIN
22     Direct Examination by Mr. Lewis                         3106

vi

1    INDEX - Continued                        PAGE NO.

2    TAMMIE KAYE
          Direct Examination by Mr. Consoldane      3118
3
     ROBERT STANTON
4         Direct Examination by Mr. Lewis           3119
          Cross Examination by Mr. Watkins          3127
5
     MOTIONS                                        3200
6
     CARMEN OLIVA
7         Direct Examination by Mr. Watkins         3267
          Cross Examination by Mr. Lewis            3278
8
     BARRY RICKER
9         Direct Examination by Mr. Watkins         3290
          Cross Examination by Mr. Lewis            3300
10
     DIANA MARCHESE
11        Direct Examination by Mr. Watkins         3309
          Cross Examination by Mr. Consoldane       3314
12        Redirect Examination by Mr. Watkins       3319
          Recross Examination by Mr. Consoldane     3319
13
14   MOTION RE JURY INSTRUCTIONS                    3334

     FINAL ARGUMENT ON BEHALF OF STATE OF OHIO      3390
15   FINAL ARGUMENT ON BEHALF OF THE DEFENDANT      3438
     FINAL ARGUMENT CONT. ON BEHALF OF DEFENDANT    3495
16   REBUTTAL ARGUMENT ON BEHALF OF STATE OF OHIO   3505

17   CHARGE OF THE COURT                            3541

18   NOVEMBER 7, 2002 (Deliberations)               3601

19   NOVEMBER 8, 2002 (Deliberations)               3602

20   VERDICT                                        3612

21   (SEE SEPARATE VOLUME FOR TRANSCRIPT OF
       MITIGATION HEARING)
22

vii

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | Withdrawn |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | No Objection |
| 30 | Photo | Withdrawn |
| 31 | Photo | Withdrawn |
| 32 | Photo | No Objection |
| 33 | Photo | Withdrawn |
| 34 | Photo | No Objection |
| 35 | Photo | No Objection |
| 36 | Photo | Withdrawn |
| 37 | Photo | Withdrawn |
| 38 | Photo | No Objection |
| 39 | Photo | No Objection |
| 40 | Photo | Withdrawn |
| 41 | Photo | No Objection |
| 42 | Photo | Withdrawn |
| 43 | Photo | Withdrawn |
| 44 | Photo | No Objection |
| 45 | Photo | No Objection |
| 46 | Photo | Withdrawn |
| 47 | Photo | Withdrawn |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | No Objection |
| 51 | Photo | Withdrawn |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewelry | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninsula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | No Objection |
| 86 | Blood Spatters - garage | Withdrawn |
| 87 | Overview garage | No Objection |
| 88 | Peninsula & Wall - blood splatters | No Objection |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | Withdrawn |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | No Objection |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | Withdrawn |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | No Objection |
| 108 | Victim | Withdrawn |
| 108A | Victim Face down | No Objection |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | Withdrawn |
| 111 | Victim lower torso | No Objection |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | Withdrawn |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

viii

| | | |
|---|---|---|
| 118 | Office Area | No Objection |
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door, Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angie Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Bllod Smear | No Objection |
| 176 | Floormat | Withdrawn |
| 177 | Trunk Open | No Objection |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

| | | |
|---|---|---|
| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Innn Photographs | Admitted over Obj |
| 202 | Days Inn Photographs | Objection Sustained |
| 203 | Days Inn Photographs | Withdrawn |
| 204 | Days Inn Photographs | Objection Sustained |
| 205 | Days Inn Photographs | Withdrawn |
| 206 | Days Inn Photographs | Withdrawn |
| 207 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 208 | Days Inn Photographs | Withdrawn |
| 210 | Days Inn Photographs | Withdrawn |
| 211 | Days Inn Photographs | Withdrawn |
| 212 | Days Inn Photographs | Withdrawn |
| 213 | Days Inn Photographs | Withdrawn |
| 214 | Days Inn Photographs | Withdrawn |
| 215 | Days Inn Photographs | Withdrawn |
| 216 | Days Inn Photographs | Withdrawn |
| 217 | Days Inn Photographs | Withdrawn |
| 218 | Days Inn Photographs | Withdrawn |
| 219 | Days Inn Photographs | Withdrawn |
| 220 | Days Inn Photographs | Withdrawn |
| 221 | Days Inn Photographs | Withdrawn |
| 222 | Days Inn Photographs | Withdrawn |
| 223 | Days Inn Photographs | Withdrawn |
| 224 | Days Inn Photographs | Admitted over Obj |
| 225 | Days Inn Photographs | Withdrawn |
| 226 | Days Inn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | Wirt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

| 271D | Letters From Donna to Nate | | |
|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/26/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |
| 271D60 | Halloween card | | Admitted |
| 271D61 | | 10/31/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

xii

| 271D124 |         | 10/05/01 | Admitted |
|---------|---------|----------|----------|
| 271D125 |         | 10/04/01 | Admitted |
| 271D126 |         | 10/04/01 | Admitted |
| 271D127 |         | 10/02/01 | Admitted |
| 271D128 |         | 10/02/01 | Admitted |
| 271D129 |         | 10/02/01 | Admitted |
| 271D130 | Unknown |          | Admitted |
| 271D131 | Unknown |          | Admitted |
| 271D132 | Unknown |          | Admitted |
| 271D133 | Unknown |          | Admitted |
| 271D134 | Unknown |          | Admitted |
| 271D135 | Unknown |          | Admitted |
| 271D136 | Unknown |          | Admitted |
| 271D137 | Unknown |          | Admitted |
| 271D138 | Unknown |          | Admitted |
| 271D139 |         | 11/26/01 | Admitted |

xiii

| 273N | Letters from Nate to Donna | | Admitted |
|---|---|---|---|
| 273N1 | | 12/01/01 | Admitted |
| 273N2 | | 11/30/01 | Admitted |
| 273N3 | | 11/29/01 | Admitted |
| 273N4 | | 11/28/01 | Admitted |
| 273N5 | | 11/27/01 | Admitted |
| 273N6 | | 11/26/01 | Admitted |
| 273N7 | | 11/25/01 | Admitted |
| 273N8 | | 11/23/01 | Admitted |
| 273N9 | | 11/22/01 | Admitted |
| 273N10 | | 11/20/01 | Admitted |
| 273N11 | | 11/19/01 | Admitted |
| 273N12 | | 11/17/01 | Admitted |
| 273N13 | | 11/16/01 | Admitted |
| 273N14 | | 11/14/01 | Admitted |
| 273N15 | | 11/14/01 | Admitted |
| 273N16 | | 11/13/01 | Admitted |
| 273N17 | | 11/12/01 | Admitted |
| 273N18 | | 11/12/01 | Admitted |
| 273N19 | | 11/10/01 | Admitted |
| 273N20 | | 11/09/01 | Admitted |
| 273N21 | | 11/07/01 | Admitted |
| 273N22 | | 11/06/01 | Admitted |
| 273N23 | | 11/08/01 | Admitted |
| 273N24 | | 11/05/01 | Admitted |
| 273N25 | | 11/03/01 | Admitted |
| 273N26 | | 11/01/01 | Admitted |
| 273N27 | | 11/01/01 | Admitted |
| 273N28 | | 10/31/01 | Admitted |
| 273N29 | | 10/30/01 | Admitted |
| 273N30 | 273N31 | | 273N32 |
| 273N31 | | 10/28/01 | Admitted |
| 273N32 | | 10/27/01 | Admitted |
| 273N33 | 273N34 | | 273N35 |
| 273N34 | | 10/25/01 | Admitted |
| 273N35 | | 10/25/01 | Admitted |
| 273N36 | | 10/25/01 | Admitted |
| 273N37 | | 10/24/01 | Admitted |
| 273N38 | | 10/23/01 | Admitted |
| 273N39 | | 10/22/01 | Admitted |
| 273N40 | | 10/21/01 | Admitted |
| 273N41 | | 10/21/01 | Admitted |
| 273N42 | | 10/20/01 | Admitted |
| 273N43 | | 10/19/01 | Admitted |
| 273N44 | | 10/18/01 | Admitted |
| 273N45 | | 10/17/01 | Admitted |
| 273N46 | | 10/16/01 | Admitted |
| 273N47 | | 10/16/01 | Admitted |
| 273N48 | | 10/15/01 | Admitted |
| 273N49 | | 10/14/01 | Admitted |
| 273N50 | | 10/12/01 | Admitted |
| 273N51 | | 10/10/01 | Admitted |
| 273N52 | | 10/10/01 | Admitted |
| 273N53 | | 10/08/01 | Admitted |
| 273N54 | | 10/05/01 | Admitted |
| 273N55 | | 10/07/01 | Admitted |
| 273N56 | | 10/04/01 | Admitted |
| 273N57 | | 10/04/01 | Admitted |
| 273N58 | | 10/02/01 | Admitted |
| 273N59 | | 10/01/01 | Admitted |
| 273N60 | | 10/01/01 | Admitted |
| 273N61 | | 09/30/01 | Admitted |

xv

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

| | | | | |
|---|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted | xvi |
| 273N125 | | 02/07/01 | Admitted | |
| 273N126 | | 02/04/01 | Admitted | |
| 273N127 | | 02/01/01 | Admitted | |
| 273N128 | | 02/01/01 | Admitted | |
| 273N129 | | 01/26/01 | Admitted | |
| 273N130 | | 01/19/01 | Admitted | |
| 273N131 | | 01/17/01 | Admitted | |
| 273N132 | | 01/21/01 | Admitted | |
| 273N133 | | 01/16/01 | Admitted | |
| 273N134 | | 01/12/01 | Admitted | |
| 273N135 | | 01/05/01 | Admitted | |
| 273N136 | | 01/01/01 | Admitted | |
| 273N137 | | 12/27/00 | Admitted | |
| 273N138 | | 12/27/00 | Admitted | |
| 273N139 | Unknown | | Admitted | |
| 273N140 | | 12/11/00 | Admitted | |
| 273N141 | Unknown | | Admitted | |
| 273N142 | Unknown | | Admitted | |
| 273N143 | | 05/01/01 | Admitted | |

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Envelope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert Fingerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2 Pages | No Objection |
| 282B | | Not introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2 Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

xvii

| | | |
|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection |
| 286B | | Not Intorduced |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection |
| 286D | Brenda Gerardi Supplemental 2  - (3) Pages | No Objection |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn |
| 289 | Hand Towel - Days Inn | Withdrawn |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn |
| 292 | White Stain Napkins from Dumpster | Withdrawn |
| 293 | Dish Cloth - From Dumpster | Withdrawn |
| 294 | Dressing from Dumpster | No Objection |
| 295 | Dressing from Dumpster | Withdrawn |
| 296 | Dressing and Tape from Dumpster | Withdrawn |
| 297 | White Stain Napkins | Withdrawn |
| 298 | Stained White Wash Cloth | Withdrawn |
| 299 | One (1) Condom | Withdrawn |
| 300 | One (1) Condom | Withdrawn |
| 301 | Hydrogen Peroxide Bottle | Withdrawn |
| 302 | Empty Package for Bandage | Withdrawn |
| 303 | Empty First Aid Tape Box | Withdrawn |
| 304 | Empty Bandage Roll | Withdrawn |
| 305 | Empty First Aid Sponge Package | Withdrawn |
| 306 | Empty First Aid Sponge Package | Withdrawn |
| 307 | Empty First Aid Sponge Package | Withdrawn |
| 308 | Empty First Aid Sponge Package | Withdrawn |
| 309 | Empty Days Inn Room Key Card Envelope #29 | No Objection |
| 310 | Empty Days Inn Room Key Card Envelope #138 w/ To | Withdrawn |
| 311 | Envelope Containing Receipts | Admitted over Obj |
| 311A | Check Inn | Admitted over Obj |
| 311B | Credit Card Receipt | Admitted over Obj |
| 311C | Register Audit | Admitted over Obj |
| 311D | Phone Log | Admitted over Obj |
| 311E | Credit Card Receipt | Admitted over Obj |
| 312 | Check Inn | No Objection |
| 313 | Photgraphic Line -Up Jose Flores | No Objection |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection |
| 314A | Guest Log | No Objection |
| 314B | Guest Log | No Objection |
| 314C | Guest Log | No Objection |
| 314D | Guest Log | No Objection |
| 314E | Final Bill | No Objection |
| 315 | Guest Check | No Objection |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection |
| 317 | Black Gloves | No Objection |
| 318 | Black & Red Nike Tennis Shoes | No Objection |
| 319 | Composite Video Tape | Admitted over Obj |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained |
| 320B | 4 X 5 Black and White Photo | Objection Sustained |
| 320C | 4 X 5 Color Phot | Objection Sustained |
| 320D | 4 X  5 Color Photo | Admitted over Obj |
| 320E | 8 1/2 X 11 Photo | Withdrawn |
| 320F | 8 1/2 X 11 Photo | Withdrawn |
| 320G | 8 1/2 X 11 Photo | Withdrawn |
| 320H | 8 1/2 X 11 Photo | Withdrawn |
| 320I | 8 1/2 X 11 Photo | Withdrawn |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj |
| 322 | S250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj |

xix

| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj |
| 324 | Constitutional Rights Waiver | No Objection |
| 325 | Video Tape Confession | No Objection |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection |
| 327A | Certification - ATF - 1page | Admitted over Obj |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj |
| 360 | Cd containing 19 Telephone Conversations | No Objection |
| 361 | Telephone Log Record 3 pages | No Objection |
| 362 | Audio Tape of 10-05-01 Recording | No Objection |
| 362A | Transcript of 10-05-01 Recording | No Objection |
| 363 | Audio Tape of 10-25-01 Recording | No Objection |
| 363A | Transcript of 10-25-01 Recording | No Objection |
| 364 | Audio Tape of 10-27-01 Recording | No Objection |
| 364A | Transcript of 10-27-01 Recording | No Objection |
| 365 | Audio Tape of 11-03-01 Recording | No Objection |
| 365A | Transcript of 11-03-01 Recording | No Objection |
| 366 | Audio Tape of 11-08-01 Recording | No Objection |
| 366A | Transcript of 11-08-01 Recording | No Objection |
| 367 | Audio Tape of 11-10-01 Recording | No Objection |
| 367A | Transcript of 11-10-01 Recording | No Objection |
| 368 | Audio Tape of 11-11-01 Recording | No Objection |
| 368A | Transcript of 11-11-01 Recording | No Objection |
| 369 | Audio Tape of 11-15-01 Recording | No Objection |
| 369A | Transcript of 11-15-01 Recording | No Objection |
| 370 | Audio Tape of 11-17-01 Recording | No Objection |
| 370A | Transcript of 11-17-01 Recording | No Objection |
| 371 | Audio Tape of 11-22-01 Recording | No Objection |
| 371A | Transcript of 11-22-01 Recording | No Objection |
| 372 | Audio Tape of 11-24-01 Recording | No Objection |
| 372A | Transcript of 11-24-01 Recording | No Objection |
| 373 | Audio Tape of 11-24-01 Recording | No Objection |
| 373A | Transcript of 11-24-01 Recording | No Objection |
| 374 | Audio Tape of 11-25-01 Recording | No Objection |
| 374A | Transcript of 11-25-01 Recording | No Objection |
| 375 | Audio Tape of 11-29-01 Recording | No Objection |
| 375A | Transcript of 11-29-01 Recording | No Objection |
| 376 | Audio Tape of 12-01-01 Recording | No Objection |
| 376A | Transcript of 12-01-01 Recording | No Objection |
| 377 | Audio Tape of 12-02-01 Recording | No Objection |
| 377A | Transcript of 12-02-01 Recording | No Objection |
| 379 | Audio Tape of 12-06-01 Recording | No Objection |
| 379A | Transcript of 12-06-01 Recording | No Objection |
| 380 | Audio Tape of 12-08-01 Recording | No Objection |
| 380A | Transcript of 12-08-01 Recording | No Objection |
| 381 | Audio Tape of 12-08-01 Recording | No Objection |
| 381A | Transcript of 12-08-01 Recording | No Objection |
| 349 | Photographic Line-Up - Frank Reynolds | Not Introduced |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection |
| 351 | (2) two cotton tipped swabs | No Objection |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn |
| 385 | Swabs | No Objection |
| 386 | Swabs | No Objection |
| 387 | Swabs | No Objection |
| 388 | Swabs | No Objection |
| 389 | Swabs | No Objection |
| 390 | Gerardi - Cutting | No Objection |
| 391 | Enevlope Containing Jackson Prints | No Objection |
| 391A | Jackson Prints | No Objection |
| 392 | Photograph - Lifts | No Objection |
| 393 | Photograph - Lifts | No Objection |
| 394 | Enevlope Containing 2 Photos | No Objection |

| | | |
|---|---|---|
| 395 | Enevlope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | Admitted over Obj |
| 397 | Audio Tape of Excerpts | Objection Sustained |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A-403RR | Defendant's school records | No Objection |
| | | |
| Defendant's Exhibits | | |
| | | |
| Deft A | Dreft.'s Criminal History | No Objection |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Joint 1 | Fingerhut Jewelry | No Objection |
| | | |
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief in Opposition to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

3374

1    (NOVEMBER 6TH, 2002)

2                     (Whereupon, Court's Exhibit No. 2 and

3    Joint Exhibit No. 1 were marked for identification.)

4                     THE COURT:  Court's Exhibit 2 was marked

5    and it is submitted by the State and is reflective of the

6    previous record, and Joint Exhibit 1.

7                     (Whereupon, a brief recess was taken,

8    after which the following proceedings occurred outside the

9    presence of the jury.)

10                    THE COURT:  Mr. Consoldane, I believe you

11   had a motion that you wish to put on the record before we

12   begin closing arguments.

13                    MR. CONSOLDANE:  Yes, Your Honor.  The --

14   yesterday before when we left and walked out of here and I

15   had my notes and inadvertently forgot to request the Court

16   that I wanted a charge on unauthorized use of a motor vehicle

17   pursuant to Ohio Revised Code section 2913.03, and I had

18   called the prosecutors and made that request.  I think by the

19   evidence introduced in court, No. 1, the letters that the

20   prosecutor introduced in court, Donna gave Nate permission to

21   drive the cars and she owned the car, albeit though that he

22   took it and left it in Youngstown, I think that could be the

23   elements of unauthorized use.  That he didn't have --

3376                                                                                     3375

1    although he had permission generally to use the car, that it

2    could be they can argue that specifically at that time he did

3    not have permission to use it.

4                        MR. WATKINS:  Your Honor, I believe that

5    the various conversations in the letters, and there may be

6    one on the tape, deal with Donna saying that she was going to

7    give Nate anything he wants, anything from a Cadillac to a

8    Lincoln, and further that he could, he could have anything

9    she had, including the cars.  And in the context of all the

10   letters there's only one reasonable conclusion, that that was

11   made plain, that it was after Nate killed the victim.

12                        MR. CONSOLDANE:  Your Honor, I disagree

13   with that.  That does not --

14                        THE COURT:  Well, --

15                        MR. CONSOLDANE:  That's his speculation.

16                        MR. WATKINS:  Let him point to the

17   evidence.

18                        THE COURT:  We discussed this yesterday

19   when we were going over it.  I thought we had settled the

20   issue, but apparently not.  I think the facts here do not

21   raise the question of whether or not there was an

22   unauthorized use of the vehicle, it was either factually a

23   situation where there was a theft of the automobile or there

3376

1    wasn't.  The reference to the letters and the automobiles and

2    the evidence that has been put in does not raise the question

3    where a reasonable mind could interpret that facts, those

4    facts to come up with a conclusion that this was an

5    unauthorized use of a motor vehicle.

6            Your motion is on the record and we had discussion

7    on the record yesterday about the thing.  That is my ruling

8    on the matter.

9            Does the defense have anything further you wish to

10   place on the record prior to closing?

11           MR. CONSOLDANE:  Well, only, Your Honor,

12   that I would reserve some time to go over these jury

13   instructions they just handed me.  They changed quite a bit.

14           THE COURT:  Well, that's no problem.  We

15   can do that.

16           MR. CONSOLDANE:  So, I mean, I just want

17   to review it.

18           THE COURT:  For the record I would say

19   that we went over them in great detail yesterday and there

20   were changes to be made.  Those have been made over the

21   course of the last evening and been presented this morning to

22   the defense.  They have not had an opportunity to read them

23   and have a right to do so.  I would hope that it doesn't take

3377

1    up much of the morning because I would like to get this

2    going, but that's up to you.

3         Mr. Watkins, do you have anything further?

4              MR. WATKINS:  Yes, Your Honor.  I'm

5    prepared to offer Black's Law Dictionary and other

6    dictionaries dealing with definitions, that in opening

7    statement I was interrupted many times or several times

8    dealing with particularly three issues.  One, and I corrected

9    myself when I said that they were married; that is, that

10   Robert Fingerhut and Donna Roberts were not married.

11   However, in the application for insurance, in the 911 tape

12   and virtually all the witnesses, they were holding themselves

13   out as married.  That to me is factual.  That's something

14   that I can argue to the jury with the caveat that I want to

15   make it clear that they were not legally married but they

16   were holding themselves out --

17              THE COURT:  If I'm not mistaken, I think

18   there was a stipulation that these folks were not man and

19   wife at law.

20              MR. LEWIS:  They weren't.  They're

21   divorced.

22              THE COURT:  Yeah.  They --

23              MR. CONSOLDANE:  Your Honor, --

3379                                                           3378

1          MR. WATKINS:  Your Honor, I am not, I'm

2    not even arguing that.

3          THE COURT:  No.  I'm just saying that's

4    more for the defendant's response at this point.  That was

5    stipulated right at the beginning of the trial when this came

6    up that they were not legally married, but there is evidence

7    contained in it that they held themselves -- the last witness

8    that testified here the other day, Mr. Roberts.  So what is

9    your point on --

10          MR. WATKINS:  My point is I'm going to

11    argue exactly what the evidence is and I don't think I should

12    be objected when I say people believed they were married and

13    that Donna said that was her husband on 911 or whatever.

14    Anything that's in the record, I'm entitled to argue the

15    record.  And it's relevant because the intent here of the

16    declarant is relevant dealing with --

17          THE COURT:  You're anticipating the

18    defense every time you --

19          MR. WATKINS:  Well, they did before.

20          THE COURT:  -- say something to the effect

21    of the husband or wife or something like that.

22          MR. WATKINS:  Right.

23          MR. CONSOLDANE:  And I will again.  You

3379



1   know, I mean, if he says it again I'm going to object.  I was

2   chastised by the -- I even had to answer a grievance because

3   I didn't object when something was said wrong in final

4   arguments.

5                    MR. WATKINS:  They can make their

6   objection.

7                    MR. CONSOLDANE:  Your Honor, they did away

8   with the common law marriage in Ohio.  There is no such thing

9   now as common law marriage in Ohio.  You, you know, when you

10  hold somebody out, you say this is your wife, it doesn't

11  matter.  It's not an issue anymore and he knows that it's not

12  an issue in common -- there is no common law marriage and he

13  can't say wife.  He can say ex-wife, he can say lover, he can

14  say friend, but he can't say wife because that would be

15  misleading the jury.

16                   THE COURT:  Well, not if the jury is aware

17  of the situation.

18                   MR. CONSOLDANE:  Yes.  I don't care, Your

19  Honor.  If he says something wrong --

20                   THE COURT:  What it boils down to is how

21  does the State or the defense refer to these folks?  It's

22  only common, only to be expected that those terms are going

23  to at some point from either side, or both perhaps, come in.



3380



1    The only way that that can be avoided is to refer to them by

2    Mr. Fingerhut or Robert or Donna rather than using the term

3    husband and wife.  I don't know that that's so critical if

4    the jury is made aware, they are aware, these folks were not

5    legally married.

6         I don't wish to have this case -- you know, there's

7    nothing worse for either side on opening or closing than to

8    have an objection.  Sometimes it's necessary.  I know you

9    feel it's necessary here.

10            MR. CONSOLDANE:  Well, Your Honor, I mean,

11   I had -- they filed a grievance, I had a grievance filed

12   because I didn't object in a case right downstairs here, that

13   the prosecutor kept saying things on the record and I

14   objected once and it was sustained and I thought that was

15   enough.  And I try not to object in final argument.  I had to

16   answer to the State Bar Association for ineffective

17   assistance of counsel that I didn't argue enough, I didn't

18   object enough in final argument.

19            THE COURT:  Well, let me assure you, in my

20   opinion, that won't be the case here.  You've objected

21   sufficiently to avoid that problem.

22            MR. WATKINS:  Well, Your Honor, I think

23   that there is precedent that if the Court would rule



3381

1    something, counsel can say it's a continuing objection and

2    then there is not a problem.  My only point here I'm trying

3    to say is that Donna applied on the insurance policy that she

4    was married.  That's a fact.

5                    THE COURT:  Mr. Watkins, there is no

6    question you have a right to argue the facts.

7                    MR. WATKINS:  That's all I'm asking, Your

8    Honor.

9                    THE COURT:  On several occasions they were

10   holding out as a husband and wife.

11                   MR. WATKINS:  That's all I'm going to say.

12   I'm not going to say they are, I'm saying that they held --

13                   THE COURT:  I think his objection is that

14   if you continually refer to them as husband and wife.

15                   MR. WATKINS:  I'm not going to.

16                   THE COURT:  Okay.  I'm going to at this

17   point, with that in mind, state on the record that this has

18   been a continuing objection voiced by the defense throughout

19   this trial.  I'm going to ask that that not continue during

20   the closing argument, unless the State abuses that term you,

21   of course, have the right to object.  I will probably stop

22   them if that happens.

23                   MR. CONSOLDANE:  Your Honor, okay, that's

3382

1    fine.  I wish then for the record to just note my continuing

2    objection.

3                    THE COURT:  You have a continuing

4    objection to the fact that these folks are not husband and

5    wife.

6                    MR. CONSOLDANE:  You know, this issue is

7    not relevant to the murder, you know, and it is nothing but

8    trying to pull something over on the jury.

9                    THE COURT:  Well, I don't know that, I

10   don't know that I agree with the statement that it isn't

11   relevant to the case because I think their relationship on

12   several levels is very important.  But you have the right to

13   not have -- to have the State not try to project the fact

14   that they were husband and wife because the jury knows now,

15   as well as we do, that that they were not legally man and

16   wife, but they were holding out quite apparently as to that

17   being the situation.

18                   MR. CONSOLDANE:  Well, then, Your Honor, I

19   would ask that you also remind them again in the jury

20   instructions that they were not legally married.

21                   THE COURT:  I will do that before, before

22   you begin your closing argument.  Anything else?

23                   MR. WATKINS:  Yes, Your Honor.  I am going

3334                                                                                              3383

1    to refer to the residence, the house, as his and I'm going to

2    refer to the car as his.  And I think that, one, the

3    definition of ownership shows possession and I should be able

4    to argue that he's driving his car home from work.  That is

5    his car under the law.

6                        THE COURT:  I would advise the jury --

7                        MR. WATKINS:  They can argue the other

8    way.

9                        THE COURT:  -- before opening statements

10   that, I believe it was stipulated, they are not legally

11   husband and wife.  The jury has evidence before it that Donna

12   was the legal title holder and they have to conclude whether

13   or not he had a possessory interest.  That's one of the

14   things the jury has to decide here.

15                        MR. WATKINS:  Yeah.

16                        MR. CONSOLDANE:  Well, Your Honor, he can

17   argue it but I don't believe he can just come out and just

18   say it.  He can say that -- he can argue and say that that

19   was the car that he drove, but why can't he refer to Donna

20   Roberts as Donna Roberts, the silver Chrysler as the silver

21   Chrysler and the house as 233 Fonderlac?

22                        MR. WATKINS:  Because factually it's his,

23   and you can argue otherwise.

3384

THE COURT:  I have to agree, you have the
right to counter argument that --

MR. WATKINS:  And home, and home and house
is synonymous for residence.

THE COURT:  That's the State's theory of
the case.

MR. WATKINS:  And they can argue the
other, but I'm allowed to argue without interruption.

THE COURT:  And your theory is it was not
his automobile.

MR. LEWIS:  All right.  Judge, we want a
blanket objection any time he refers to or uses possessive
pronouns with regard to any of these items, whatever.  If he
doesn't preface it with "It's our theory" or "We believe the
evidence will show," or whatever, if he just goes ahead and
says, well, he went to his house, he got in his car,
whatever, that's a different animal.  We're objecting to all
of that.  We're going on the record right now with a
continuing objection any time he gets into that situation.

THE COURT:  Here's where we disagree,
James, and your objection is again noted, the theory of their
case is that this was his automobile.

MR. LEWIS:  I understand that, judge.  I

3386                                                                    3385

1    just want to protect the record because we are going to

2    get --

3                    THE COURT:  I'm saying that you are

4    protecting the record right now, you have a continuing

5    objection, but there's no sense to every time he uses a

6    pronoun that you disagree with you're going to have an

7    objection.  We'll never get through this thing.  You are

8    objecting.  It's clear on the record what your objection is.

9    I'm allowing your objection.  I'm overruling it for the

10   purpose of allowing this to proceed.

11                   Now, if he starts, whoever is arguing for the State,

12   to misquote the factual presentation to the jury, then, of

13   course, you have the right to object.  But as long as he

14   stays within the terms of the theory of their case, then I'm

15   asking that you not object every time that that reference is

16   made.

17                   MR. LEWIS:  Okay, judge, that's the

18   relevance.  But the problem, the problem really here is this,

19   he's telling the Court up front "I'm going to go ahead and do

20   this," all right.  And the point is he knows what he's doing,

21   he can stop from doing it, but he's going to tell the Court

22   "I can go do this anyhow," and that's what this is.  Getting

23   really, really out of hand.

3386

1          THE COURT:  No, he's not telling the Court

2     anything.  He has requested the Court to make a ruling on it

3     and that's what I'm trying to do.

4          MR. LEWIS:  Then phrase it the way it's

5     allowed.

6          MR. WATKINS:  That's the way it's allowed,

7     James.  I'm prepared to argue the law.

8          MR. LEWIS:  All right.

9          THE COURT:  The State has the right to

10    argue the theory of their case as the defense has the right

11    to argue the theory of their case, and if that requires the

12    use of these objectionable terms, so be it.  The jury has to

13    make the decision.  The jury, as I said, I will inform.  They

14    already know from the evidence.  There's a question of

15    titles --

16          MR. CONSOLDANE:  We would, we would also

17    then request a jury instruction indicating to the jury that

18    the legal title holder to the house and the cars is Donna

19    Roberts.  I mean, if they're going to cause this gray area to

20    come up, I think that we need to have that in the charge of

21    the court, you know, on the final jury instructions that --

22          THE COURT:  There is no dispute on that

23    that I have heard.

3388                                                    3387

1              MR. CONSOLDANE:  Yeah, but I just, I want

2    -- I just, if you would put that in the final instructions to

3    the jury, that Donna Roberts was the legal title holder to

4    the Fonderlac residence and both, both Chryslers.

5              THE COURT:  I think that's --

6              MR. WATKINS:  That's a fact.

7              THE COURT:  -- an infringement on the

8    Court's part on the function the jury.  The jury is called

9    upon, there is no evidence rebutting the fact that she was

10   title holder.  There's probably many other things in this

11   case that I could instruct the jury as a matter of law.  I

12   don't think it's proper to do that.  The Court is not to

13   interfere with the function of the jury on the finding of

14   fact.  I will overrule that motion.

15             MR. CONSOLDANE:  So you're going to allow

16   them to set up a ruse in front of the jury that he is the

17   owner of the car and not clear it up and say that --

18             THE COURT:  No, you are mistaken from what

19   I've said.  I've told you that I --

20             MR. WATKINS:  Your Honor, he just

21   misquoted the law.  The law says an owner includes a

22   possessor.  That's the law.  He is perverting the law right

23   now.

1      THE COURT:  Well, I don't think that --

2      MR. CONSOLDANE:  I'm not.  I think that's

3  more of a perversion than possessor is.  The title owner is

4  the owner of the property, and I don't know why that it's so

5  a problem for the Court to instruct the jury that evidence

6  has been introduced to show who the legal title holder of the

7  automobile and the real estate is.

8      MR. WATKINS:  But that's not in dispute.

9      THE COURT:  I think we're arguing a paper

10  tiger here.  I don't think that this is -- the definition of

11  owner is not limited to title holder by law.  That's a

12  statute.  I can't change the statute.

13      MR. CONSOLDANE:  All I'm asking is for the

14  Court to instruct the jury that evidence has been produced to

15  show who the title holder, who the legal title holder is to

16  the real estate and the automobiles.

17      THE COURT:  And there's no evidence to

18  rebut that, I agree, but they still have the power, if not

19  the right, to make a finding that she was not the title

20  holder.  The jury is the complete finder of fact.  Whatever

21  they find, unless there's some wrongdoing on the jury's part

22  during deliberations, their finding is supreme to anything

23  else that occurs in this case.

3389

```
 1              Do you have anything further?

 2                        MR. CONSOLDANE:  No.

 3                        THE COURT:  The State?

 4                        MR. WATKINS:  I would just like to have a

 5    couple minutes, Your Honor, and I will be ready.

 6                        THE COURT:  Yeah.  Well, Tony wants to

 7    look over these.  Please do this as quickly as possible so we

 8    can get the jury up here.

 9                        (Whereupon, a brief recess was taken.)

10                        (Whereupon, the following proceedings

11    occurred with only the Court and stenographer present.)

12                        THE COURT:  For the record, I think the

13    State has filed this brief in opposition, but part of the

14    rulings that the Court made are based on case law that was

15    submitted by the State that's contained in that brief.  If

16    they have not filed it I will mark this as the Court's

17    Exhibit for the purpose of those cases.

18                        (Whereupon, Court's Exhibit No. 3 was

19    marked for identification.)

20                        (Whereupon, a brief recess was taken,

21    after which the following proceedings occurred in open

22    court.)

23                        THE COURT:  Good morning, everyone.
```

3390

1                    (Whereupon, the jury responded).

2                    THE COURT:  You have heard all the

3      evidence that will be presented in this case.  You are now

4      going to listen to the closing arguments of counsel.  I would

5      again remind you that what you're about to hear is not

6      evidence, that this is the last opportunity that both sides

7      have to address you directly, and the purpose is for them to

8      give you their thoughts on what they feel the evidence does

9      show.

10                   Closing arguments are, like opening statements, I

11     think a very important part of the case because it gives you

12     the benefit of viewing things as both sides see some of the

13     evidence.  That adds to your knowledge so that when you get

14     back into the jury room you have that to draw upon.  But I

15     must again advise that what you're about to hear is not

16     evidence.  You have to apply what they say to the evidence

17     that was presented, okay?

18                   Is the State ready to proceed?

19                        MR. WATKINS:  Yes, Your Honor.

20                        THE COURT:  Okay.  You may do so.

21     **FINAL ARGUMENT ON BEHALF OF THE STATE OF OHIO**

22                        MR. WATKINS:  Thank you, Your Honor.

23     Mr. Monroe, Paul, Mr. Lewis, Mr. Consoldane, Your Honor,

3392                                                             3391

1    ladies and gentlemen of the jury:  It's been almost a month

2    since we started this case.  The Court has carefully asked

3    questions of you, as counsel also followed, so we can

4    determine whether or not you could be jurors in this case.

5    Maybe after going through this you might question the

6    desirability of going through what you've gone through and

7    what you are going through, but I think you all understand

8    the importance.

9          You've taken time out of your lives to decide the

10   fate of this defendant, who is presumed innocent, who, as you

11   understand, the State must prove is guilty on every charge,

12   and prove beyond a reasonable doubt.  We are in the courtroom

13   today because there is a person that can't sit; there is a

14   victim, Robert Fingerhut.  The balance is in your hands.  The

15   State, if it can prove its case beyond a reasonable doubt as

16   to the charges, there is justice.  If the State does not

17   prove its case beyond a reasonable doubt and the defendant is

18   acquitted, there is justice.  But the quality of life in our

19   community depends on jurors doing justice.  Both sides are

20   entitled to have a fair trial.

21          The indictment in this case charges the defendant

22   with two counts of aggravated murder.  The first count

23   charges that the defendant, with prior calculation and

3392

1   design, purposely caused the death of Robert Fingerhut, age

2   56, who lived at 254 Fonderlac in Howland Township, Trumbull

3   County, Ohio.   His Honor will instruct you that we need to

4   prove beyond a reasonable doubt that the crime occurred in

5   Trumbull County where Mr. Monroe was employed.   That's

6   uncontroverted.

7        It is uncontroverted that we have a victim that was

8   killed with three shots from a firearm.   There are a lot of

9   facts in this case that are uncontroverted.

10        When we proceeded in this case we told you that we

11   would have a number of witnesses.   We had 33 witnesses.   His

12   Honor has ruled that hundreds of exhibits are going to be for

13   your review.   Now, when considering the charges obviously

14   this includes a lot of evidence.   For example, the letters

15   that this man wrote to Donna Roberts are important.   I will

16   go through in the next hour or so dealing with what I think

17   is important about what he wrote.

18        Also in this case you will have letters from Donna

19   Roberts.   They are important.   They show the communication,

20   the State of mind, and they prove what happens and why it

21   happens.

22        You will also have a recorder, a player, so you can

23   listen to tapes.   As you can recall, one of the last exhibits

1    that we presented to you was a compilation of four or five

2    conversations between the defendant and Donna Roberts.  Those

3    are going to be with you in the jury room, but it's not the

4    tape that was played in court.  It will be 19 separate

5    cassettes that are 10 minutes long, and there are transcripts

6    of that that go along with the recordings that you can have

7    and review.  Obviously it's important to the State that you

8    fully and fairly consider our evidence.

9            Aggravated murder I describe.  His Honor, first off,

10   His Honor will instruct you, and that's the end of the case

11   before you deliberate, and the jury instructions of the law

12   will go with you to the jury room.  Therefore, if there's

13   some question as to the law you will be able to review the

14   jury instructions because what I am telling you now and what

15   I'm going to go into as far as the evidence, as His Honor has

16   pointed out, is my opinion, it's not the facts.  It's what I

17   believe the evidence shows beyond any reasonable doubt.  I

18   believe this evidence and it's my opinion.  And when defense

19   counsel follows their presentation is their opinion also,

20   it's not the facts.  The facts are the witnesses.

21           Now, His Honor allows both sides to comment on the

22   law in the sense that we have to prove that these charges

23   have been proven, that is the elements of each and every

3395                                                                                    3394

1    charge have been proven.  And I want to mention that, as you

2    are aware from opening statements -- and by the way, both

3    sides have copies of the opening statement, which was typed

4    up by the court reporter, and we made promises to you in

5    opening statement.  And I will go through what I believe we

6    have produced and I will comment upon, as defense will

7    comment upon my comments, what defense counsel said the

8    evidence was going to show.  I believe what the defense said

9    was not shown in any way.

10            Now, the charges specifically, aggravated murder I

11   talked about, that's premeditated in the sense there has to

12   be prior calculation and design.  His Honor is going to

13   define that for you.  But basically common sense will tell

14   you, you watch TV, you have what is known as premeditated

15   murder, but if somebody walks up and takes a gun out and

16   spontaneously shoots someone, that's known as murder.  But if

17   someone with a mental design and plan and takes an effort to

18   get the means for committing the crime, and it doesn't have

19   to even be hours, it could be minutes where you could have a

20   premeditated murder, and the judge will instruct you, but it

21   certainly means there's more than just intentionally killing.

22   It means there's some plan, a mental design, to take human

23   life.  Shortly I will go through the evidence that this plan

3206

3395



1    was in months.  This defendant was talking and encouraging,

2    along with Donna Roberts, to kill the victim for everything

3    that was available, and that meant, and I will go through

4    evidence, there's $550,000 of life insurance.

5         Now, on the first charge there are two

6    specifications.  As you are aware from Judge Stuard's

7    empaneling process where we participated, that in order to

8    get to any second stage, this is the stage you determine

9    guilt, you must consider the aggravating circumstances.  In

10   this case on the first count, prior calculation and design

11   aggravated murder, there are two specifications; aggravated

12   burglary and aggravated robbery.

13        On the second count, same murder, same date,

14   December 11th, 2001, the State has charged that the defendant

15   purposely took the life of the victim, Robert Fingerhut,

16   while committing or attempting to commit aggravated burglary

17   and aggravated robbery.  The same two specifications are

18   contained in the second count.  So this jury will have a

19   charge that will mean that you have to determine guilt or

20   innocence on the first count of aggravated murder and two

21   specifications, guilt or innocence on the second count of

22   aggravated murder, and guilt or innocence on the two

23   specifications, which are the same on the second count of

1  aggravated murder.  That's all in the charge.

2        The third and fourth counts are the crimes of

3  aggravated burglary and aggravated robbery, and there's also

4  a specification of a firearm which you must consider.

5        Now, the question of elements I'm going to go into

6  shortly, but I would like you to know that His Honor will

7  also include in the charge definitions of proof beyond a

8  reasonable doubt, we discussed that, credibility of

9  witnesses, and that's important.  I think that you could

10  understand that people who are telling stories or testifying,

11  you have to judge their demeanor, whether they had an

12  interest in the case, whether or not they were in the

13  position to see and know what they testified to, and the

14  general tests that Judge Stuard will discuss with you in the

15  charge.

16        We believe that our evidence from our witnesses is

17  solid as a rock, that our witnesses had no interest to come

18  in this court and tell anything but the truth.  And that's

19  what we believe our evidence will show, the truth.  Whether

20  it's the pathologist, whether it's the people that worked at

21  the bus station, the experts, the police, we believe that the

22  evidence will establish beyond a reasonable doubt that there

23  were two evil doers in this case.

3397

1           And, sadly, Donna Roberts, who when you read the

2    letters and you listen to the tapes, this woman had a pretty

3    good life. She had the ability to walk out of the

4    relationship with her significant other.  There wasn't a

5    marriage; there was a divorce.  And she had legal title to

6    cars, legal title to the home, she had everything.  But we

7    will go into when you read and listen to the evidence that

8    she depended on Robert and she was not in a position to

9    financially take on the relationship and have the way of life

10   she had been used to with this guy.

11           MR. CONSOLDANE:  Your Honor, I'm going to

12   object.  There's been no evidence of that in this trial.

13           MR. WATKINS:  Your Honor.

14           MR. LEWIS:  All the evidence is that

15   she --

16           THE COURT:  This is argument.  I don't

17   think that's beyond the scope of his interpretation of the

18   facts and the matter.

19           MR. LEWIS:  Yeah, sure it is.

20           THE COURT:  Your objection is noted for

21   the record.  Overruled.

22           MR. WATKINS:  Thank you, Your Honor.  In

23   fact, there is a letter that I'm going to read to you, for

3398

example, where she writes him and says that she's having
financial problems and that Robert is taking her 32 credit
cards away and she doesn't know how she's going to do
anything because of the restrictions he's made and that she's
used to having money so she can do whatever she wants.  And
she will trace for you a history of living in Miami and going
to Rome and going to Italy, going do Jerusalem and having new
cars, which you saw in the evidence and will see in the
photographs, you haven't seen them yet but you've heard about
them, the two 300M automobiles.  And I will spend some time
going through the letters and the tapes and the conversations
and show how the weave is so clear and so tight of his guilt
of every charge in the indictment.

       Now, there are facts that are for you to decide and
certain provisions of law may or may not apply.  For example,
there will be an instruction on flight where -- and, by the
way, I'm skipping ahead, sometimes I do that.  In the case
when the judge instructs, in this case the defense has an
instruction that's been given by the Court of self-defense,
and in self-defense the defendant has the burden of proof
that by a preponderance of the evidence, that is there's more
evidence in favor, that the defendant's life was in danger by
action by the victim that he had to use force to kill the

3400                                                                    3399

1    victim.

2              Now, the burden of going forward on self-defense,

3    which is also in the instructions, is one piece of evidence

4    the defense is relying on.  The only evidence in this case of

5    self-defense is the video statement that was played for you;

6    self-serving and, we submit, full of holes, contradictions

7    and pure nonsense under the facts and the evidence.  But

8    because --

9              MR. CONSOLDANE:  Your Honor, I object to

10   him saying it's nonsense.  He's the one that admitted the

11   tape.  I mean, he can say it's full of holes, but to say it's

12   nonsense is wrong.  The Court has already ruled that that

13   videotape is --

14             THE COURT:  It is evidence, but it's the

15   comment by the prosecutor of his opinion.  The jury is the

16   one that has to determine whatever the validity is of the

17   thing.  What Mr. Watkins says is merely something for them to

18   consider, it's not something that they have to take at face

19   value, as they don't have to take anything at face value that

20   the defense says.  Overruled.  Please proceed.

21             MR. WATKINS:  Thank you.  And I will go

22   through what in my opinion the evidence will show, that it's

23   prevarication, prevarication and pure nonsense.  Excuse me.

3400

1          Now, in order to explain the evidence I need to

2      start with going through these instructions so I can comment

3      how I'm going to tie my case into what you're going to get in

4      the law.  For example, the instruction on self-defense, I'm

5      not going to spend much time on it because I don't think it

6      exists, but because he said that he defended his life and it

7      was taken the instruction is there, but he has to prove that

8      by that tape.  And then because there is in the tape -- and

9      it's interesting, the tape, for example, he contradicts

10     himself within one page when you read the transcript.  On

11     page 10 of the transcript he goes into Robert's house and is

12     sitting at the table after he went to the bathroom.  And then

13     Mr. Monroe asks the question, the same question, he says

14     where were you when you went into the house right before the

15     struggle and the shot?  He says, well, Robert was standing by

16     the counter.  He just said he was sitting down with Robert

17     and then all of a sudden 30 seconds later he's standing by

18     the counter.  Now, that's some of what I'm going to go

19     through, what in my opinion is that the statement is

20     absolutely a falsehood and it's self-serving.

21         Now, in the event that you don't find self-defense

22     then you can go to lesser offenses like murder or

23     manslaughter because they had a fight.  That's if you believe

3401

1    the evidence that they're going to present.  I'm going to end

2    it there because I don't think it exists in this case.

3          Now, what I do think is important from the State's

4    point of view of the evidence is a recognition of what the

5    law says as to what an owner is.  In our daily lives we have

6    families that don't have title to vehicles that may be used

7    by other family members.  We have children that may use our

8    car and we have children that come into their house and

9    they'll say that's my home, that's my house.  The fact that

10   the child doesn't own the home, doesn't have title, doesn't

11   mean that he isn't a possessor of that home.  A home is a

12   place that you dwell.  A home is a residence.  It's where you

13   live.  This is where Mr. Fingerhut lived.  This is where his

14   clothes was.  This is where he lived and breathed.  I don't

15   care who had title.

16         If your child has a car and somebody takes a gun

17   while he gets out of his car and shoots the child and takes

18   the car, is the defense going to be hey, the title is not in

19   the child, it's in --

20                    MR. LEWIS:  That's not the facts of the

21   case.  Judge, I mean, he can say --

22                    MR. WATKINS:  Your Honor, this is

23   argument.

3402

```
 1                    THE COURT:  Well, he's arguing his point.
 2    The jury, I think, understands it's argument.
 3                    MR. LEWIS:  All right.  As long as the
 4    defense is allowed to do that.
 5                    THE COURT:  He's not limited to the
 6    stipulation or the facts of the case, Mr. Lewis.
 7                    MR. LEWIS:  The defense is allowed then,
 8    we can do the same thing obviously, right?
 9                    THE COURT:  What's that?
10                    MR. LEWIS:  I say we can do the same thing
11    then, judge?
12                    THE COURT:  You can do the same thing in
13    the same context, absolutely.
14                    MR. LEWIS:  Thank you, sir.
15                    THE COURT:  Overruled.
16                    MR. WATKINS:  The point is that when you
17    hear the definition of owner it includes someone who has
18    possession.  The law also protects people that are in the
19    home.  They don't have to have title if they have the right
20    to be in that home, if that's their dwelling.  And where
21    someone enters a premises, for example, in this case it's our
22    theory that we believe the last conversation from this man on
23    the 8th of December, "One thing you got to do for me is let
```

3403

1    me in the house, let me in the home."

2         In that same tape Donna is talking about picking up

3    Nate at prison and she says, "I'm going to leave before he

4    gets home."  Nate Jackson went in that home and Donna gave

5    her permission, gave him permission to go in that home.  When

6    Judge Stuard instructs you, if you find that he went in that

7    home with the purpose to kill the owner he is a trespasser as

8    to -- excuse me, as to Mr. Fingerhut who lives there, he is a

9    trespasser as to Mr. Fingerhut when he comes home, which

10   means an aggravated burglary is committed.  That is, the wife

11   is not in a position, the owner of the home is not in a

12   position to authorize some other person to come in and kill

13   another resident of the home.  It's basic law.  And whether

14   or not it is a significant other, a child or a neighbor, it

15   doesn't matter.

16        If you were away and you have your children and one

17   child authorizes another neighbor kid to come in and the

18   neighbor kid starts destroying property and the older sibling

19   says, "You're committing a violent crime to the house, you

20   got to get out," that is a crime against the older child if

21   there's some violence because there is no authorization if a

22   person has a lawful right to be in the home for any other

23   person to commit a violent crime against a person who lives

3404

1    in the home.  That is why it is important when listening to

2    the jury instructions that you understand that it really

3    doesn't matter who owned 254 Fonderlac.  If you find that

4    Mr. Fingerhut was a resident, he had a right to go into his

5    house and not have somebody there and kill him.  And he had

6    the right to drive that car home if he had lawful possession.

7          And, by the way, when Mr. Monroe, it's

8    uncontradicted, went there she said her husband's car was

9    stolen.  Her husband's car was stolen.  And if it's in his

10   possession and if it's taken with force, that's aggravated

11   robbery.  That simple.  If you find he had the right to

12   possess the car and that he was using it, if you find that it

13   was his home and he had the right to be there, no person,

14   including the owner of the home, can authorize a third party

15   such as Nate Jackson to go in and commit a crime and ambush

16   that person who had the right to be there.  It's common

17   sense. It is the State's concern that there not be confusion.

18   And, in fact, when the judge instructs you about proof beyond

19   a reasonable doubt he will tell you to use common sense.

20         The evidence includes, and I'm going to -- when you

21   see the exhibits of the life insurance policy, Donna Roberts

22   applies as spouse.  When you heard from all the witnesses how

23   did they view these two people, they had twin cars.  I know,

3405

1    the last witnesses called him Mr. Roberts.  That's evidence

2    of the type of relationship.  I know that they're not

3    married, but a lot of people live together and have

4    significant others.  And if that relationship is such that it

5    is reasonable to assume that the car is lawfully being used

6    by the other significant other or the guy is living in the

7    house with the woman, he has the right to be there and nobody

8    can authorize somebody else to go into that house and kill

9    him and take his property, including the owner.  And I

10   believe when you read the instructions that's what you're

11   going to find the law is and I believe our evidence is going

12   to show exactly what I'm saying to you now, if you believe

13   it, and I think it's numerous and from many different sources

14   that didn't even know each other.

15           Now, this is the 911 tape.  Please listen.  Please

16   listen to how --

17           MR. CONSOLDANE:  Your Honor, I'm going to

18   object to him playing that at this time.  That's already been

19   played.  For him to -- I think the jury can play it back in

20   the room.  They're going to have the recorder.  There's no

21   need to play that now.

22           THE COURT:  Mr. Watkins.

23           MR. WATKINS:  Your Honor, the State is

3406

1  allowed to play, play its -- every party is allowed to do

2  what they want with its evidence.  It's only going to be two

3  or three minutes.

4                    THE COURT:  Is there an objection that the

5  State has the right to review the evidence with the jury and

6  to take it through logical order?

7                    MR. CONSOLDANE:  Well, I just think he's

8  already played it once and they can play it back in the jury

9  room.  I can't see why he's doing it now.

10                    THE COURT:  Well, I understand, but I

11  think it's proper if Mr. Watkins wishes to --

12                    MR. WATKINS:  Your Honor, may I be allowed

13  to continue, please?

14                    THE COURT:  I'm sorry?

15                    MR. WATKINS:  Am I going to be allowed to

16  continue?

17                    THE COURT:  Please.  Overruled.

18                    (Whereupon, State's Exhibit No. 1 (911

19  tape) was played to the jury.)

20                    MR. WATKINS:  Husband.

21                    (Whereupon, State's Exhibit No. 1 (911

22  tape) continued to be played to its conclusion.)

23                    MR. CONSOLDANE:  Your Honor, I just want

```
 1    to note for the record that while the tape was playing

 2    Mr. Watkins said "husband" and made a gesture to the jury.

 3    That was improper.  He can say after the tape was over or

 4    they can listen to what the tape says, but for him to tell

 5    them what the tape says while it's going on is improper.

 6                 THE COURT:  I didn't hear any -- I didn't

 7    catch that, but anything that was said, disregard it, by

 8    Mr. Watkins, while the tape was being played.  You were

 9    listening to the tape.  Please proceed.

10                 MR. WATKINS:  Thank you, Your Honor.  "My

11    husband."  Play it later on and you can play it in the room,

12    it says, "Oh, my husband."

13                 There will be letters that you will read from Donna

14    Roberts to this guy saying one of the hardest things for her

15    to do in this case is to make it sound like I'm sorry he's

16    dead.  "I don't know if I can fake it," and she writes when

17    they go through the letters dealing with "the problem is

18    going to be for me to put on a show."  That will be in

19    letters that you have.  She didn't know if she could be an

20    actress.

21                 Now, I think I've gone through the importance of

22    jury instructions, definition of trespasser and owner, and

23    the different charges that you are going to get because of,
```

3408

1    for example, the self-defense because of the tape we played.

2    And, again, the burden of proof is on them.  I would like to

3    cover the other side at this time.

4            We promised that we were going to show a number of

5    things in my opening statement, and they have it, they can go

6    through it.  I think I've presented that evidence with

7    Mr. Morrow.  There might be a few little things that might be

8    off that's not perfect or not going to conform but we

9    presented evidence that went in line with what we promised in

10   our opening statement.

11           The other side that was given in the opening

12   statement by the defendant, it was stated that the defense

13   would prove or show by the evidence that Nate worked at the

14   bus station, both the one in Youngstown and the one in

15   Warren, and that he helped out a lot of times just unloading

16   luggage but he also worked behind the counter.  Not true.

17   Jose Sanchez, you know Nate Jackson?  He worked there?  No.

18   James Daniels who's been there for years, he doesn't work

19   there.  Frank Reynolds, not that long.  Has he worked there?

20   No.  Jimmy McCoy when he came to Warren; now, it's true that

21   he was with Donna.  Jimmy McCoy is a bus driver for 16 years,

22   he goes to Warren all the time.  He couldn't even identify

23   Nate Jackson.  He knew him as Nate and that was given on the

day, December 11th, when he met him as Nate.  There is no
evidence that this man worked at the bus station.

Chris Ellington worked next, at the hair shop next
to the -- he said the first time -- and remember Chris
Ellington?  She identified what Donna looked like, she talked
about the two cars.  She had a hair shop, a beauty shop right
next to the bus station.  Nate came in on December 11th, got
a hair cut.  First time she knew him.  No proof.

Now, it's true if you believe Nate when -- and I'll
get to -- when he gives his statement on December 21st that,
you know, Mr. Fingerhut worked all day and that you saw him
leaving with the bag at 9:00 o'clock.  Nate says that
Mr. Fingerhut, when he went to visit him, and I'll get into
the time factor which makes no sense, at 5:00 o'clock.  We
have witnesses he's in Warren at 5:00 o'clock.  I guess when
you hit 50 sometimes your thoughts, you know, just go.  Geez,
I had an important thing and forgot, but I'll get there.

Anyways, yeah, Mr. Fingerhut, what I was getting to
when I got distracted dealing with the time factor, which
I'll get to, here is Mr. Fingerhut in dealing with the tape,
the tape that you're going to see and if you play it and
read, the one you saw, play it, the defendant's version was
that this man who worked all day who was walking out with his

3410

1    bag that you see the picture at 9:01, that Fingerhut is going

2    to pick him up to go get the marijuana and then ultimately he

3    was going to give him a job, and I'll get into that

4    specifically.  In fact, let's go there.  I'll come to that

5    shortly.  So Nate worked at the bus station, both the one in

6    Youngstown and one in Warren, helped out a lot unloading

7    luggage; defense.  No.

8         After the Wagon Wheel, the next day Donna dropped

9    him off at his family's house with the understanding he was

10   going to get a job down at the bus station.  The job at the

11   bus station again is in Nate's statement, which you will

12   read.  The defense then goes on and says on Tuesday, December

13   11th, around 5:00 o'clock, Nate went to the bus station to

14   talk to Bob Fingerhut as to the job and Fingerhut had told

15   him that he could probably work in the Warren office, which

16   was fine with Nate because he would be more there with Donna.

17        Now, first, Nate in his statement said he was

18   dropped off at Youngstown at 7:00 o'clock on December 12th,

19   and around 5:00 o'clock, Attorney Consoldane said to you that

20   he was going to show by the evidence, that Nate was in

21   Youngstown and went where the luggage was at and that's where

22   he talked to Fingerhut about hey, after work come up to

23   C. Staples because we're going to go to Warren.  And first

3411

1    they went to get marijuana, according to the defendant.  No

2    marijuana in his system.  And when he was questioned on the

3    tape where was the marijuana, it's apparent that Nate had no

4    explanation because there wasn't any marijuana.  He never

5    picked up Mr. Fingerhut.

6         Jimmy McCoy testified 5:15 is the time he was there.

7    He's on a regular route from Youngstown to Warren so he's not

8    5:00 o'clock in Warren, in Youngstown, because he's 5:00

9    o'clock in Warren, according to the State's evidence, if you

10   believe him.

11        You have Chris Ellington.  Where is he at on

12   December 12th?  He's in Warren with Donna.  So we have two

13   witnesses in the afternoon, it was sometime during the day;

14   Chris Ellington, we got Nate and Donna.  At 5:00 o'clock Nate

15   and Donna.  They're maintaining that Nate at 5:00 o'clock is

16   in Youngstown talking to Robert about hey, let's go out, I

17   want to work.

18        Where else do we have him?  We had a young lady come

19   in from Red Lobster.  So after he leaves the Youngstown

20   office with Donna he goes to the Red Lobster.  We have

21   witnesses that account for the presence of the defendant in

22   Warren, Ohio with Donna Roberts from the afternoon, the 5:00

23   o'clock, to 6:00 to 7:00 at the Red Lobster if you believe

3412

1    our evidence.  So the opening comment, he's in Youngstown

2    meeting Robert at 5:00, not true if you believe our evidence.

3    In fact, Jill Kenyon testified there were receipts

4    and she positively identified the parties, Donna and -- Nate

5    she identified.  Excuse me.  5:54 she puts the drinks in;

6    6:43 the bill.  Not in Youngstown.  Nate and Donna are

7    together as they were at the Wagon Wheel the night before

8    preparing to kill the victim.

9                        MR. LEWIS:  That was two nights before I

10   guess.

11                        THE COURT:  I'm sorry?

12                        MR. LEWIS:  The Wagon Wheel was Sunday

13   night, wasn't it?

14                        MR. WATKINS:  Yes, it was Sunday night.

15                        MR. LEWIS:  Okay.

16                        MR. WATKINS:  And into Monday.  It was

17   into Monday.

18                        MR. LEWIS:  Whatever.

19                        THE COURT:  Is there an objection?

20                        MR. LEWIS:  Well, the evidence, he

21   misquoted the evidence.

22                        MR. WATKINS:  I didn't.  They were in that

23   motel under the evidence until Monday morning somewhere

3413

1    between 11:00 and 12:00 o'clock.

2                    THE COURT:  Yeah.  As far as what they

3    were doing in the motel, the evidence --

4                    MR. LEWIS:  Okay.  That's -- I apologize.

5                    THE COURT:  -- doesn't necessarily

6    support.  That would be a conclusion.

7                    MR. LEWIS:  I apologize.  Go ahead.  Go

8    ahead.  Go ahead.

9                    MR. WATKINS:  Now, Attorney Consoldane

10   goes on and says, he told the jury he's going to show you

11   that Nate wanted -- excuse me, that Robert -- I'm quoting,

12   this is transcript I'm quoting--  wanted to take Nate, that

13   Robert wanted to take Nate to the Warren office and show him

14   how the computer was run.  9:00 o'clock the guy is getting

15   off and, according to defense counsel, that Robert wants --

16   he picked Nate up at C. Staples, was going to take him to

17   Warren at 9:00 o'clock at night after working all day and

18   show him how to run a computer?  That's opening statement.

19   No evidence of that.  Zero.  Not even the defendant in his

20   own statement given to police says that he was going to go

21   work on the computer at night.

22         What else are you told?  Robert picked him up

23   somewhere around 9:00 o'clock.  Well, one of the pretenses is

3415                                                                3414

1    that they were going to the Warren bus terminal but he said

2    he had to stop off at home first.   Okay.   Defense counsel

3    version of the events is he's going, he's going to go from

4    C. Staples to home, which is a little different than, well,

5    we're going to go to the computer but they stopped off at

6    home.   Forgot one thing.   The defendant's own statement was

7    that at 9:00 o'clock he picks him up and then they go out and

8    get drugs.   Well, we know from the time factors of using the

9    phone of 9:45 that there was no drug purchase, so that was

10   left out.   That is, the defense version of the evidence does

11   not include what the defendant is telling through his video,

12   that they went and got drugs, he and Robert.   And you can

13   listen to it.

14        Then there is a summary that there was an argument.

15   "He got out of the car and went into the house and he came

16   out shortly.   There was an argument between Nate and Robert

17   Fingerhut."   That's the defense version in opening statement.

18   "Fingerhut pulled out a gun and there was a struggle.   Nate

19   grabbed the gun, the gun went off, injured his finger.   Nate

20   is left-handed, he wouldn't be holding a gun in his right

21   hand."   There is no evidence of that.   You can shoot a gun in

22   either hand.   "And, you know, we don't have the gun so we

23   really don't know how many shots were fired."   That's not

3416                                                            3415

1    true.  We know how many shots were fired.

2                   MR. CONSOLDANE:  You know, I'm going to

3    object.  The crime scene was disturbed before we ever got to

4    see it.  They alleged there was -- they found the three

5    shots.

6                   THE COURT:  Mr. Consoldane, that's

7    something that you have a right to raise in argument.  The

8    State has the right to present their theory of the case and

9    it sounds to me like that's what he's attempting to do.

10                  MR. CONSOLDANE:  Well, but he's saying

11   that I said something that's not true and it's my theory.

12                  MR. WATKINS:  Well, I'm saying it's not

13   true, his theory is not true.

14                  MR. LEWIS:  All right, Dennis.  Go ahead.

15                  THE COURT:  Overruled.  Let's proceed.

16                  MR. LEWIS:  Go ahead.

17                  MR. WATKINS:  We know how many shots,

18   ladies and gentlemen, because the police and the coroner

19   testified that we have the victim shot three times and that

20   there was only -- there was two bullets recovered, one in the

21   brain of the victim, the other went through the victim's

22   right from the back and was recovered in his clothing, and

23   the other bullet was in the wall or the plastered area or the

3417                                                          3416

1    drywall area of the stairwell leading to the basement.  They

2    testified there were no other bullet holes.  And when the

3    defendant says he shot down, there were no -- which is

4    contrary to the defendant's statement -- there was no bullet

5    holes in the floor.  There were no other bullet holes.  So we

6    do know there were three shots fired as far as we are

7    concerned from the evidence.

8            Now, Fingerhut, according to defense version,

9    Fingerhut then ran into the house and grabbed another gun.

10   Oh, wait a minute.  Defense counsel said that their evidence

11   is going to prove that Fingerhut went in the house and got

12   another gun and that the shooting was outside the house.

13   Please listen to the defendant's own version.  The defendant

14   unequivocally says there was only one gun, there was one

15   struggle and it was in the house.  There has been no other

16   evidence that Fingerhut ran into the house and grabbed

17   another gun.

18           "And he started pointing it at Nate and that's when

19   Nate, who now had Fingerhut's gun, shot him back a couple of

20   times."  "Shot him back" should be "shot him in the back" two

21   times.  One, the second gun, the defense version is that the

22   gun is taken from the victim after he shot the finger, that

23   is the defendant shot the finger.  Fingerhut goes and gets

3418                                                                      3417

1      another gun.  What, is he just standing there?  And then it

2      said that, that he had Fingerhut's gun.  Okay.  That is that

3      the defendant, Nate, now had Fingerhut's gun.  Not true.

4              You have the registration of the two guns.  And, in

5      fact, Donna Roberts, they even conversed about the fact there

6      were two guns in the house after the one gun is reported

7      missing.  The gun that was found is a Taurus and a Taurus has

8      three, five -- it twists to the right five twists.  And this

9      gun, the gun that was found on the floor, it didn't have any

10     blood.  It wasn't seen by the defendant in his statement.  It

11     belongs to Robert Fingerhut.  Unshot gun.  Unshot gun.

12     Robert Fingerhut's gun was on the floor unshot, unused.

13             The missing gun, twin guns, and you heard

14     ballistics, the bullets that killed the victim could have

15     come from a Taurus, the missing gun.  Donna Roberts.  He had

16     Donna Roberts' gun.  That's the murder weapon.  So we got him

17     shot differently, we've got the players in different

18     positions, the defense version, which there's not been any

19     evidence additional to what his statement was that you saw.

20     They contradict each other.

21             Nate went and looked at Robert Fingerhut.  So he

22     shot him -- Fingerhut has got another gun and he's coming at

23     him and as he's coming at him he's turning like this and he's

3418

shot in the back and doesn't shoot Nate.  Nate's not shot.  I
mean, here's -- I mean, what a miraculous situation here.
Unbelievable from all the evidence.

He was scared, according to defense, and he got in
the car and drove back to Youngstown and he called Donna.
And he's telling you on the tape several times Donna, he
doesn't know if Donna knew that he shot the victim.  That is
Nate doesn't know that.  Do you believe that?  I believe from
the evidence it's not believable.  That's my opinion.
Ridiculous.  He's calling Donna with Donna's cell phone, and
you got the phone records, at a quarter to 10:00, five or six
times, and then Donna checks him in at the Days Inn.

And is he scared?  You heard the evidence.  What is
he doing?  This guy is scared?  I don't think this guy is
scared.  He's getting Mr. Stamper to take him -- to take two
women to visit him and have a good time.  According to
Stamper he was calm.  Injured his finger.  Other than that,
he's calm.  He just murdered someone.

And he abandons the car in Youngstown and the car
has blood.  You'll see the pictures.  He's dropping blood
when he left that house into the garage and into the car.
That's how we figured it out, or how the police figured it
out as part of the evidence.  And we have the DNA, even the

3420                                                                           3419

1    mixture of this guy's DNA with the victim.  Who is using that

2    car?  Whose personal property is in that car?  Whose keys?

3    They say that's not his car?  Come on.

4              Tony Consoldane said shot in the back a couple of

5    times.  The man, he was shot three times.  Uncontradicted.

6    The defendant in his video statement, he can't remember,

7    doesn't know where he shot him.  Yeah, right in the top of

8    the head.  And you have this confrontation.  Ladies and

9    gentlemen, the uncontradicted evidence is the victim, when

10   you have the blood all down here in this area, and you'll see

11   the pictures, splatters, and you see his webbing of his left

12   hand blown out and you got a bullet hole down here, goes

13   straight down his head.  And guess what?  There's soot in the

14   epidermis and dermis of the brain, the skin over the brain,

15   and here within 24 inches.  Like this is two guys going at it

16   in the old west.  I don't think so.  Malarky.

17             Continuing the defense version, Robert Fingerhut

18   beat Donna Roberts, beat her up about a week before this

19   happened.  Santiago told Fingerhut about the affair.  It's

20   important in the State's view of the evidence to recognize

21   you got 280 letters, there's a lot of things said from early

22   -- some of the few letters come from early 2002 and then many

23   letters, Donna Roberts writes multiple, up to five letters a

3420

1    day.  And we don't have all of them because you're going to

2    read in some of them that destroy those letters.  In fact,

3    that was one of the biggest mistakes ever made is to preserve

4    letters and along with the tapes.  Seldom does the jury have

5    the quality and quantity of evidence in a case that you can

6    hear the words and see the writing of the plan to kill.

7    Seldom does the jury get so much evidence.  But the diversion

8    here, and it's truly a diversion in my opinion --

9                        MR. CONSOLDANE:  Did he say diversion?

10                       MR. WATKINS:  Diversion.

11                       MR. CONSOLDANE:  That I'm creating a

12   diversion?

13                       MR. WATKINS:  Absolutely.

14                       MR. CONSOLDANE:  I object to that, Your

15   Honor.

16                       THE COURT:  Okay.  Just a minute.  Just a

17   minute.

18                       MR. WATKINS:  That's what I believe the

19   evidence is, Your Honor.

20                       MR. LEWIS:  He's fair game too, judge.

21                       THE COURT:  Just a minute.  Just a minute.

22   Ladies and gentlemen, please disregard this little exchange.

23   It's not part of this case.  Please approach the bench.

3421

1                    (Whereupon, a bench conference was held.)

2                    THE COURT:  Ladies and gentlemen, let's

3   take a 10-minute break.  You're not to discuss anything or

4   form any opinions.

5                    (Whereupon, a brief recess was taken by

6   the jury during which the following proceedings occurred in

7   chambers outside their presence.).

8                    THE COURT:  Okay.  We are on the record in

9   chambers out of the presence of the jury.  Defendant's

10  presence waived?

11                   MR. CONSOLDANE:  Yes, Your Honor.

12                   THE COURT:  Listen, although the defense

13  is usually the one personalizing the prosecution as being the

14  ogres, the objection here is made by the defense that or you

15  have taken umbrage with the fact that the prosecutor perhaps

16  is giving a little bit of tit or tat again.  I don't think

17  it's proper in either case.  I think that the State has the

18  right to review what was said on opening and to point out his

19  opinion of whether or not those statements were upheld by way

20  of the evidence presented.  The one word that they did use

21  was deception.

22                   MR. WATKINS:  No.  I used diversion.

23                   THE COURT:  Oh, diversion.

3422

1              MR. WATKINS:  Of the affair, and I was

2      trying to go into simply that the affair --

3              THE COURT:  Admonition.  Whatever.

4      Whatever.  You were saying you used the word --

5              MR. WATKINS:  Diversion to the point of an

6      affair.  Was going to go in and explain this was a diversion.

7              THE COURT:  Do you think that is improper

8      comment?

9              MR. CONSOLDANE:  I thought he said

10     deception.

11             MR. LEWIS:  No.  What he said was, judge,

12     that the defense is creating a diversion and he says creating

13     and so it sounds like we're doing the trickery, we are

14     falsifying something, we are defrauding the Court.  That's

15     what it implies.  And --

16             THE COURT:  Well, the advocation is

17     probably there, but I think it is proper comment because

18     that's what he does, do you not, on behalf of the defense

19     often times?  Probably in this case it may come up, say, the

20     State is misrepresenting the facts here, the State is.

21             MR. LEWIS:  I never say that.  I really

22     truly don't.  I use the facts the State presents.  That's the

23     only witnesses they believe in the first place so I have to

3423

```
 1   use their facts supposedly.

 2                    THE COURT:  Well, as far as this.

 3        MR. LEWIS:  Okay, judge.

 4                    THE COURT:  I'm telling both sides that

 5   you cannot transfer your argument to the point of where you

 6   are attacking opposing counsel for the way -- to give

 7   sinister motives or objectives for the way they have

 8   presented the case.  The case is the defense, the defense is

 9   the defendant.  You are merely the operators for his defense.

10   The State is the State and the prosecution is merely the

11   representative of the State.  There is no need to use any

12   adjectives or anything that personalizes either the opposite

13   side as to wrongdoing unless there has really been some

14   objective wrongdoing.  Okay?

15                    MR. LEWIS:  Well, at this point in the

16   game, okay, he's already said to the jury fine, we've created

17   a diversion.  If that's fair game then fine, I will be glad

18   to say that.  He's also said it is malarky, all this other

19   stuff, and nonsense.  Well, whatever he says it's equal law,

20   I can use it, and if that's okay with the Court and he's

21   allowed to do it then I am going to be more than pleased to

22   go do it.

23                    MR. WATKINS:  I think Jim can say it's
```

3424

1    malarky if he quotes the evidence, which I'm quoting the

2    evidence, a statement.  I think that's fair game.  There's

3    nothing wrong with that, and you've done it.

4                    THE COURT:  James, I've heard defense

5    counsel say a hundred thousand times, say the State is trying

6    to mislead this jury.

7                    MR. CONSOLDANE:  I never said that.

8                    THE COURT:  Maybe not using the word

9    misleading but that is the implication, and what you are

10    objecting to is the implication.

11                    MR. LEWIS:  We don't say that, judge.  We

12    are a little smarter than that.  But that's all right, I

13    understand what you're telling me, but I'm just saying there

14    shouldn't be anything.  The nonsense, the malarky, that's

15    okay, but there shouldn't be any implication of fact that the

16    defense is somehow lying or creating or deceiving or in that

17    sense of the word.  That is absolutely prohibited commentary

18    and it's just -- it, it shouldn't be allowed.

19                    MR. WATKINS:  I'm saying there is a

20    diversion.  It is not relevant to the case.  I was going to

21    get into why lawyers do that all the time.

22                    THE COURT:  Well, I just had the feeling

23    throughout this case that -- well, strike that.  Let's go

3425

1    forward.

2                        (Whereupon, the proceedings in chambers

3    were concluded and a brief recess was taken, after which the

4    proceedings commenced in open court.)

5                        THE COURT:  Please keep your seats.  Okay.

6    Mr. Watkins, you may continue.

7                        MR. WATKINS:  I may proceed, Your Honor?

8                        THE COURT:  (Nods head affirmatively.)

9                        MR. WATKINS:  Thank you.  As I was saying,

10   this is my opinion, that there was -- that it's really not

11   relevant and it's a diversion from what I think what's

12   important.  I'm not aspiring anything to Mr. Consoldane

13   personally, it's not a personal thing.  I'm doing my job, or

14   trying to.

15                   And to go through it again, that it was the defense

16   position in their opening statement and they said that Robert

17   Fingerhut beat Donna Roberts, beat her up about a week before

18   this happened.  Santiago told Fingerhut about the affair.

19                   You're going to see in letters, end of November,

20   that -- and there is -- the deceased is not here but there is

21   evidence that would go together here that he knew something

22   was wrong and in a lot of what Donna describes about her

23   relationship with the husband and how she couldn't stand him.

3426

1   There's comments like on his birthday, it was in October, the

2   only thing that she wished for his birthday was his death.

3   But then you're going to see a lot of other things about how

4   she's dependent on him working, getting money for her, and

5   the discovery of, which was a call to Mr. Fingerhut, that

6   your wife -- strike "wife".  I'm sorry I used that term.

7   Donna was having an affair with a black guy.

8            And she says in her letter that Robert and her got

9   into a tussle, a fight, and I'm going to read, and this is

10   two weeks before the killing and you will have this, but it

11   is the November 28th letter.  And I'm going to read part of

12   it and I don't, I truly believe if you read everything it's

13   going to -- I'm not trying to make something look like it's

14   not.  You're going to have the ability to read it all.  I

15   don't know if you can read it all, there's so much to read,

16   but whatever you read is going to be up to you, but I'm going

17   to try to give you guidance as to the way the State views its

18   evidence.

19            First, she had charged somebody for stealing a gun.

20   On the tape you heard about one of the guns was missing.

21   Well, she ended up charging this man for stealing the gun and

22   there's some conversation for a few days about her safety and

23   no, you better go charge the guy, the gun is taken, and

3427

1    that's when, "Well, you have two left."  And this man,

2    apparently from what she is stating, informed Robert because

3    he's mad and he was charged.

4        And Donna is writing the defendant, "We really got

5    into it last night.  Proud to say I got in two good punches.

6    But I did sustain a dog bite to my right leg - Fluffy went

7    nuts when we were fighting."  And then, "Also I hope all my

8    black and blue marks are gone by 12/9."  Now, that's the kind

9    of thing that you have in some of these letters painting this

10   guy in the light that she does, and it goes on to something

11   else.

12       It's obvious -- I got two good punches in and then

13   the next day she writes a letter and the riot act is given to

14   the defendant.  Now, after his bad deed the next day, she

15   discovers in one of his shoes or one of his bags the numbers

16   to five different women, and you will read every name in the

17   book, that her whole mind the next day is on how can Nate

18   have all these girlfriends?  You lied to me, you lied to me

19   again.  I can't trust you, I can't trust you.  So then you

20   can read a couple days of these kinds of letters.  And she

21   even threatens him, she's going to terminate her

22   relationship, but then when you get into November, this is

23   two weeks before, they're all back on track with the same

3429                                                                    3428

1    plan that's been existing.

2            And, in fact, interestingly, and I will -- and

3    again, this is November 28th, 12:30 p.m.  When she writes

4    Nate she puts the time and says "10 days."  She got beat up,

5    this is Mr. Consoldane talking about that Fingerhut beat her

6    up about a week before, really two weeks, and so I just went

7    into what the conversation is about how she's beat up.

8            The next day, the 29th, the 29th, the next day after

9    this, first paragraph, "Why do I love you so much?  Huh?  I

10   do honey.  So anyway, I went to AAA and got a map to Grafton

11   and the institution is right on there.  I also went to four

12   stores and finally found your ski mask and boxers and a pair

13   of beautiful fleeced lined black ... gloves."  Fleece lined

14   black gloves.  You'll find it and you'll find them in the

15   exhibits, black fleece gloves.  And you will also find in the

16   letters and on the tapes how he needed gloves, handcuffs and

17   a ski mask.

18           The defense presented next in their opening

19   statement, "There is plenty of evidence to show that he had

20   no interest at all in that house."  He had no interest at all

21   in that house.  That's where he lived, that's where he has

22   clothes, that's where he's going home to.  You will determine

23   whether or not he had an interest or he had a right to be in

3430

3429

1    the house and he was killed in the course of an aggravated

2    burglary.  We believe all the evidence shows that he had an

3    interest in that house.  He was in a relationship where he

4    had absolute access and control of that house, and there's no

5    evidence you're going to find at the time of this homicide he

6    was out of that house at all.  And we're dealing with

7    December 11th.  Not two weeks before, not five weeks before,

8    we're dealing with December 11th.

9         And the best proof that he was in that house

10   properly is Donna Roberts right there, that's how you know.

11   And you also can take Nate's statement when Nate in his own

12   statement says he's looking at the mail.  You can believe

13   part of his statement.  That is sort of corroborated by the

14   physical evidence.  When the man was shot there was mail in

15   that vicinity.

16        Then it is presented, "We know that Fingerhut had

17   plenty of reason to be upset with Nate.  The letters that

18   Nate wrote were found in the bedroom in the Fingerhut house.

19   Very likely that Fingerhut could have read these letters, and

20   especially the letter that indicated that they wanted to move

21   Nate into the house."  If Mr. Fingerhut read those letters is

22   there any way in this world that Mr. Fingerhut would be

23   driving Robert from Youngstown to get some drugs and coming

3430

1   to the house and going to show him how to use a computer or

2   going there?  This man did not know what was coming.

3   Incredibly as it seems, we believe the evidence shows that he

4   did not know the plans that you will see in the letters and

5   you will hear on the tapes.

6        And I want to go through the letters in part that

7   I'm talking about, the letters that if he would have seen,

8   that is Mr. Fingerhut, would have been out of the house and

9   Mr. Fingerhut would be nowhere around this man if he would

10  have read those letters.  In fact, you will read letters

11  where she says he came in, I couldn't write you a letter that

12  afternoon because he came in.  You got to read all of it to

13  really understand, or at least a lot of it.

14       Nate to Donna letters, approximately 141 letters.

15  3/19/01, "I'm really in love with you, ... I want you all to

16  myself... I'm willing to go through any extreme to make that

17  happen."  March 19th, '01.

18       Nate to Donna letter on April 28th, '01, "... like I

19  said baby it won't be long an I promise we will live happy

20  with out him an I promise you that from my heart, baby I

21  can't stand him!  Thats right!!"  You listen to the tape.

22  The defendant says Mr. Fingerhut was a cool guy, got along

23  with him, he's an all right guy.

3431

1      May 9th, '01 Donna gets a letter from Nate.  This is

2  in part because these letters are five, six pages long.  And

3  when you read these letters, some of it has so much vulgarity

4  that it's beyond belief and I'm not going to read much of

5  that.  "Donna baby i've just read your letter an when he said

6  that he think that yo'll should seperate, an the first thing

7  that came to my mind was can i do what i wanna do, or what do

8  you want me to do?  because what i wanna do to him is gonna

9  leave you with everything, so what you think?"  May 9th, '01.

10      September 27th, '01 Nate writes, "... I've always

11  said can't nobody keep me away from you I mean nobody an

12  Donna when I come home I comeing straight for you an Robert

13  or nobody else cant stop me, because I be damn if you think

14  that you're gonna make love to me an then just leave me.

15  Hell no!!"

16      October 2nd, '01, "... let me do what I was gonna do

17  to him, ...  Its getting done when I come home."  October

18  2nd, '01.

19      October 8th, '01, "Donna I got it already planned

20  out on how we are gonna take care of the Robert situation?

21  An baby its the best plan ever!" "... I promise on my

22  kids..."  Nate.

23      10/10/01, letter by Nate, "An Donna I'm ready to

3432

1    take you away from all of the pain that you are suffering at

2    home with that asshole ..."

3         10/12/01, I know, I know -- "... I now have

4    something in my life that i never had, an thats God!"

5    "... he has forgiven me an gave me another chance so why

6    can't you?"

7         Right after that, 10/14/01, "... put the gun to that

8    dummys head..." referring to Robert.

9         10/23/01, "... Robert has to go this time for sure

10   an ... no stopping me!"  "... first Christmas together..."

11        10/20/01.  Should be read before the 10/23.

12   10/20/01, "... but Robert has to go!"  "... Im not gonna let

13   you stop me this time."  "... I'm not gonna be happy until

14   that happens!"

15        10/24/01, October 24th, "... I promise ... I'll take

16   care of it the next night, I get out Sunday the 9th an

17   Monday the 10th I promise to take care of it so ... we can be

18   happy like we suppose to be ..."  "... be together for ...

19   Christmas ... our ... house ... our big bed."  "... an baby I

20   have it planned ... so sweet, to where won't knowbody know

21   nothing but me an you, ... I'll give you the full detail."

22        In that letter, the 10/24, he also mentions these

23   black leather gloves, she finally gets them at the end of

3433

1    November.

2            On the 25th of October, "... you know ... I think

3    about taking care of that situation everytime I lay down ...

4    you're not gonna stop me ... my mind is made up ..."

5            10/26/01, and by the way, the exhibits, I believe

6    they are 275, the letters that were done by Mr. Greene that

7    were analyzed, "... he will no longer be with us after

8    12-10-01.." in that letter, and then he has a tombstone in

9    the October 26th of 2001 letter, that is Nate drew a

10    tombstone, "Rest in piss." Mr. Fingerhut is reading these

11    letters?

12            10/29/2001, "... you will get me a 2002 Cadillac

13    Deville?"  "An even if I gotta come to the house an shoot

14    Robert in his f-ing head you're gonna be with me.  An do you

15    know what mandatory means?"  "... I want you to marry me."

16    "Will you marry me after I take care of things?"  October

17    29th.

18            October 30th, again another solicitation by Nate to

19    get the equipment to kill so he's not going to be discovered.

20    "... get me a size large leather gloves an see if you can

21    find me a ski mask ..."  "An I need them handcuffs you have

22    an its mandatory, ..."  If you can recall the evidence,

23    you'll see a photograph in Donna's car, there's a box of

3434



1    handcuffs that's empty, the handcuffs in her car, a box that

2    originally had handcuffs.

3         And that goes along with one of the tapes where

4    Donna was confused, this trunk business, the handcuffs.  It's

5    what I said in opening statement.  And as he closed in that

6    last taped conversation of 12/8, I'm not going to do it in

7    the house, I'm going to take him and do it somewhere else so

8    there wouldn't be any discovery in the house.  The victim

9    didn't go.

10        10/30/2001, that's get the large size leather gloves

11   I just read.  11/6, I'll live with my mom until it cools

12   down.

13        11/7, now this goes in line with the videotape --

14   not the video, the audiotape.  "I want our package to watch

15   you ..." perform oral sex "... before it get delivered what

16   you think?"  "An I hope your answer be yes, because you know

17   that I'll have it to where it can't do anything but sit there

18   an watch before I take it out an put it in the trunk an take

19   it to where I'm gonna take care of it at an dispose."  Nate

20   Jackson, 11/7/01.

21        11/14, "... delivering that package the next day ...

22   show you ... how much I love you ..."

23        11/23, "... please let me go ahead ..."  "... nobody



3435

1    know I'm coming ... on the 9th ..."  "... know prints ..."

2    Donna, you are "... to negative especially with all of that

3    DNA shit ..."  And there's more.

4         11/27, another letter.  Donna -- he's pressuring

5    Donna, and I'm paraphrasing.  Get the 11/27/01 letter about

6    he wants to do this, and he says, "... I seen chumps like him

7    get bumped off alot throught my life an aint nothing never

8    happened ..."  Nate Jackson.

9         Then the defense goes and says in opening statement

10   that the evidence is going to show if we have a conspiracy to

11   kill Robert Fingerhut who benefits?  Donna.  She's the

12   beneficiary of the insurance policy.  "She doesn't get

13   anything else because she has everything else."  Well, we

14   know we got the mortgages on all the property so everything

15   else is not as much.  But I want to read concerning this

16   issue Nate letters.  There's just a couple here and I think

17   they're important.  I hope you can bear with me.

18        I read this already but the letter on 5/9 is the

19   letter that "... i wanna do to him ..." what "... is gonna

20   leave you with everything ..."  Now, when you go to the 11/5,

21   and we know everything includes, in my opinion, the

22   insurance, Jackson here, the defendant, on 11/5 writes,

23   "... please do whatever you can to keep him around until I

3436

1   come home okay?"  This man is paying that insurance and it's

2   paid up, as we know, $158 a month.  The man knows what's

3   happening.  He walks out of the house, the insurance could be

4   changed at any time.  He wants him kept around.  Why?

5        11/5, now Donna -- right after that, November 9th,

6   there is a number of things in the November 9th letter, but

7   the part I want to read to you dealing with this sentence, "I

8   found out --" this is Donna to Nate, "I found out that those

9   things with the zeros are paid up to the end of the year as

10  per our accountant's suggestion.  Yes.  I didn't want you to

11  worry about that."

12       10 -- October 20th there's two letters, 11:05 a.m.

13  and 1:00 p.m., Donna to Nate.  "Last night he said he wished

14  he was dead.  He said all he does is work and sleep and pay

15  bills and has no one who loves him ..."  "That is one wish I

16  hope comes true for him."  "I hate his face, hair, ... eyes,

17  body - everything about him makes me nauseous."  11:00

18  o'clock.

19       At 1:00 p.m. she writes, "And I haven't been allowed

20  to use any of my 52 charge cards - emergency only.  I am not

21  used to living like this.  I am used to loving plenty of cash

22  for whatever I want and buying everything I want.  Maybe

23  those days will return again soon."  550,000.  "Do whatever

3437

1    you want to him ASAP.  Amen."

2              In its close the defense says that the evidence will

3    show that the conspiracy, and this is page 45, "If we have a

4    conspiracy to kill Robert Fingerhut, who benefits?  Donna.

5    She's the beneficiary of his insurance policies.  She doesn't

6    get anything else because she already has everything else."

7              "Fingerhut, you know, how can he benefit by some

8    type of conspiracy?"  The suggestion here is that Fingerhut

9    is going after Nate.  "He could always argue to police that

10   Nate came to do something to him and he shot him right there

11   in the house."  He didn't argue that.  "That gets rid of Nate

12   and, well, that gets rid of Donna.  It gets rid of both of

13   them and leaves him with the house and the business."  That's

14   not true.  How much time have we spent on that?  The house

15   wasn't in his title, the business wasn't in his title.

16             Ladies and gentlemen, we have, in my opinion, weaved

17   a factual pattern here that comes from all angles and covers

18   every base and shows that this police department that handled

19   the case and the pathologist and everybody else did their

20   jobs.  And we submit after considering that evidence that you

21   will find beyond a reasonable doubt that he is enshrouded

22   with guilt from the evidence.  It covers him and it will

23   always cover him because it's true.  He committed each and

3439                                                                      3438

1   every one of the offenses in the indictment.  Thank you very

2   much.

3                    THE COURT:  Thank you, Mr. Watkins.  Will

4   you gentlemen approach for a minute, please?

5                    (Whereupon, a bench conference was held.)

6                    THE COURT:  This side bar was merely

7   scheduling, nothing of substance.  Is that correct,

8   gentlemen?

9                    MR. CONSOLDANE:  That's correct, Your

10  Honor.

11                   MR. WATKINS:  Yes.

12                   THE COURT:  Anyone on the jury need a

13  break right now or can you go until we're going to break at

14  noon?  Anyone need a break right now?  Okay.  I should ask,

15  anybody hold your hand up if you want a break.  Okay.

16       Mr. Lewis.

17       <u>**FINAL ARGUMENT ON BEHALF OF THE DEFENDANT**</u>

18                   MR. LEWIS:  Thank you, judge.  Probably

19  going to need a lot of liquid, ladies and gentlemen.  I'm

20  taking Ibuprofen.  I got tendonitis but it's working pretty

21  good.  They told me to be careful with it because they said

22  the studies now on what was so safe before may not be so safe

23  now.

3440                                                                    3439

1              I didn't get an opportunity in the early, in the

2    beginning to really introduce myself.  Mr. Consoldane and

3    Mr. Watkins had an opportunity to do that.  And, of course,

4    you know my name is Jim Lewis and I worked with the

5    prosecutor's office for approximately 15 years back in the

6    '70s and '80s and I since became the director of the Public

7    Defender's office and I've been there ever since.

8              I take pride in the fact that during the years as a

9    prosecutor, okay, I, I, I tried one of the only triple murder

10   cases in the county in the number of years that I've been

11   practicing.  But, you know, there's something else I was more

12   proud of and I take a lot of pride in is that our office

13   ended up indicting somebody for murder, and I didn't seek the

14   indictment, I didn't have it, but the case was assigned to me

15   within moments of the time I had to go to court.  And I'll

16   never forget that because after I started looking at the case

17   and everything else I determined in my own mind that I had a

18   lot of doubt about this case whatsoever and I went about and

19   proved the man innocent, okay, so I take my job, my job very

20   seriously, okay.  And in our, in our great mechanized world

21   we just don't think mistakes can be made or this and that,

22   whatever.

23             Our lives depend on mechanics.  Our lives depend on

3440

1    a lot of things.  And it's tough in a jury situation.  We're

2    human beings and that's what makes it really tough.  And not

3    only that, this is all the human element.  These are just

4    objects, folks.  I hate these (indicating), I really do.  All

5    they do is harm.  I'm not going to offend the hunters, I

6    hope.  But these are all tangible objects and all that kind

7    of stuff.  We're living, breathing.  We have cells, we talk

8    and we think.  We are a product of every experience that we

9    ever encounter.

10            And when we present a case, Mr. Watkins or

11    Mr. Morrow and Paul, Paul sits on the stand -- he's a fine

12    officer, by the way.  I've known him for years.  He's a fine

13    officer.  He does the job as best he can.  As a matter of

14    fact, it's kind of curious, I like Dale Laux.  He was the guy

15    from BCI and Dale was up there.  I've known Dale all my life,

16    too.  Well, not all my life but, I mean, since I've been

17    practicing, which is back in '72.  And Dale, we would send

18    him materials to BCI Laboratories, get the results back, and

19    the one thing I argued a little bit with Dale about was that

20    BCI always when they said, "We'll get the best evidence," and

21    they kind of labeled it the best evidence rule and it really

22    isn't the best evidence rule.  As a matter of fact, it's a

23    legal term used in legal jargon.  What it really, what it

42                                                    3441

1    really means, and I think you're smart enough to hear that

2    what he said was as soon as we get evidence we like we're

3    going to move on.  We're not going to check any of this other

4    stuff if it fits or theory.

5         See, that's the point.  If somebody, if the police,

6    which they're supposed to do, they're supposed to come in

7    here, they're supposed to develop a theory, if they get a

8    theory or whatever, they start to develop it.  The problem is

9    when you start developing it very early on and you get tunnel

10   vision to it, then you're only going to look for stuff that

11   is really going to help bolster that theory.  You may not do

12   something, you may not look for anything else that may go in

13   the opposite direction.  And that's just human nature and

14   that's the way the police operate.

15        But you know something -- I just diverted myself

16   from something.  Here's what I want to say at this point.

17   You may not like how I present this case or how I act or my

18   demeanor or anything else, okay.  I'm a lawyer.  There are no

19   scripts here.  This isn't "The Practice" you see on Sunday

20   night.  There are no scripts.  We don't have the writers.  We

21   don't have any of that.  Nate gets what he gets.  He came

22   into court, they brought him in, and the Judge calls Tony and

23   I and says, "Here's your client," and that's the way it goes.

3442

1           I may do a lot of things and I get emotional and you

2      see it.  He triggers me.  When he says certain things and

3      everything else, I blow up, and that's probably pretty stupid

4      on my part.  But I haven't -- I'm still human, and even

5      though I've been practicing this many years, I will react to

6      those things.  If I have offended any one of you in this jury

7      box, okay, I would ask you to forgive me.  And if you don't

8      want to forgive me, that's okay.  I'm a big kid.  I can take

9      it.  You can tell me afterwards, "You're an idiot, Lewis,"

10     and it's all right.  Don't take it out on the case in regards

11     to Nate Jackson.  Please don't do that.  That's not what you

12     would want, okay.  Just, just please, don't.  Get the

13     personalities out of it.  But we're all human and sometimes

14     that has an effect.

15           The objections, well, the State, they're the ones

16     that produced probably, I don't know, was it 500 and some

17     exhibits and all that, and we objected.  Tony and I objected.

18     We think the rules aren't being followed.  We have certain

19     rules to do things, and even if they're going to get the

20     evidence in, there's a certain way you got to do it.  If you

21     have direct examination, if you have an expert, you got to do

22     it a certain way, whatever, okay?  When we object we're

23     obligated to do that.  I took an oath, I got to defend.  If I

3444                                                            3443

1   don't do it the Supreme Court wants to take my license away

2   from me, so I got to do it, but sometimes it looks like we're

3   obstructing in some form or manner or we're trying to hide

4   something from you.  The judge told you and he's telling you

5   the truth, we're not trying to hide anything from you, okay?

6           Cross examination, sometimes you see a cross

7   examination in a story or in a show, in a movie, or I don't

8   know if "The Practice" has it.  You know, if they had told me

9   I might get rid of these Magoo glasses.  She's probably

10  right.  You see it on a show like "The Practice", something

11  like that, and you see somebody beat somebody up or whatever

12  in cross examination, or something or whatever.  All cross

13  examination is, folks, when they bring the witnesses on, they

14  put Paul here, a fine fellow, they get him up here and they

15  put him on the stand and they ask him, you know, did you

16  investigate this case?  Did you take care of this and take

17  care of that?  They're going to bring out, Mr. Watkins and

18  Mr. Morrow are going to bring out the things that they think

19  is important for the development of their case, the

20  development of their theory.  That's all they're doing, okay?

21          On the other side of the coin, when we call it cross

22  examination, which is kind of a -- it sounds like a sinister

23  term in some form or manner.  All we're trying to do is bring

3444

 1   out facts that may be helpful to our side of the case.   In

 2   other words, to try to get you a full picture.

 3         If you think about it, sometimes when you ask people

 4   things, if you ask them a certain way you're going to get a

 5   certain answer.  If you turn it around and asked them other

 6   things you're going to get some different answers, okay?  So

 7   we're trying to get the whole story.  And what it is is a

 8   Paul Harvey thing, it's the rest of the story.  You are

 9   entitled to all of the story, okay, and that's what it boils

10   down to.

11         And in every case, in every case the defendant, I

12   don't care whether it's a speeding ticket or anything else,

13   all prosecutors are going to get up and say, well, I don't

14   care what the defendant testified to; I don't care what he

15   said on the stand; I don't care, everything else; it's

16   self-serving; he's charged with a crime so he has to be lying

17   about everything.  That kind of puts you behind the eight

18   ball, doesn't it?  What he's saying basically is if you were

19   in a traffic case and you are a defendant and you get up

20   there and you gave a statement, said, "No, I didn't speed,"

21   or whatever, that's a self-serving statement.  But you're a

22   defendant, you're charged, so you got to be lying and

23   somebody else has got to be telling the truth.  Well, no, it

1  doesn't work that way.  It just doesn't.

2       You are jurors, okay.  You are the most powerful

3  element and component to the judicial system.  You are more

4  powerful than I am, he is, or even the gentleman up there in

5  black.  You determine the facts.  You have the sole and

6  exclusive power to determine the facts.  He, the prosecutor,

7  can't get up there and just say "I have overwhelming

8  evidence.  Ladies and gentlemen, it's this, it's this."  He's

9  preaching to you.  He wants you to believe that.

10       In this whole case we've been arguing about the use

11  of the terms his, her, pronouns, was it her property, that

12  property, whatever.  You folks are smart enough to understand

13  where we're going with this and what the exhibits tell you.

14  And I'm going to go into a story here and I'm going to give

15  it to you, okay.  It's my opinion as to what some of the

16  evidence has shown you in this case, okay.  It's not going to

17  be his version.

18       And that's interesting, too, because when he says

19  it's a diversion, the State -- or the defense is going to

20  give you a diversion, he wants you to believe that I'm going

21  to trick you somehow, okay.  Well, I'm not going to trick

22  you.  You're smarter than that, I just told you.  You're

23  smarter than I am, you're smarter than he is.  Okay.  You're

3446

1   individual jurors with your life experiences.  There's 12.

2   You individually can beat all of us hands down.  We put you

3   together as 12, that makes you the most powerful people,

4   because you will be able to remember all the facts.  You will

5   remember something, you will remember something, and it will

6   fit in.  You've been given a huge, huge puzzle here, jigsaw

7   puzzle, and the question is how do you put the pieces

8   together.

9           And I don't care what the prosecutor tells you and I

10  don't care what the defense lawyer tells you, this, this, you

11  chose where it goes.  You figure out for yourself.  You

12  determine this case.  Because all the letters are here and

13  it's noticeable that all he did is one line or a couple lines

14  here.  Oh, there are statements about oh, we're going to

15  kill, we're going to do this, whatever, but wait until you

16  get into the letters and read them all, okay.

17          The one thing in this case is the standard of proof.

18  It's a very powerful thing.  It's called beyond a reasonable

19  doubt.  Okay.  Prosecutors, they talk about it, say firmly

20  convinced.  We have a very loose -- we have a -- ours is not

21  a very high standard in comparison to a lot of other states,

22  but the wording of reasonable doubt is going to be given to

23  you in your final charge here given by the judge.  And

3447

1    there's -- the last line is probably I think, in my opinion,

2    is probably the most important line in here and what it says

3    is proof beyond a reasonable doubt is proof of such character

4    that an ordinary person, i.e. us, all, right, would be

5    willing to rely and act, rely and act upon it in the most

6    important of his or her own affairs.  Okay.  How do you

7    interpret that?  How do you define that?  Each one of you,

8    it's up to you.

9            Some may think, well, that's no big deal, and other

10   people say that sounds pretty serious.  Well, start thinking

11   about it.  Maybe it's a situation where we have, we're

12   getting married, you know, and you ask your future partner

13   will you marry me and your future partner hesitates.  He

14   doesn't give you an answer right away.  What happens?  I

15   don't know.  I'm a guy.  I ask her to marry me, she's oh,

16   yeah, well, I think we are going to do it next May.  That

17   hesitation, that's one of the most important things in your

18   life.  Who are you going to spend the rest of your life with?

19   Who are you going to raise children with, whatever?  You

20   would expect a quick, probably a crisp answer I would hope,

21   but if they hesitate and don't say anything, what does that

22   do to you?  It puts doubt in your mind.  We're not talking

23   about whether to go to the grocery store today, we're talking

3448

1    about the most important things in your life.

2         How about a child in medical care.  Your child has,

3    his leg is bruised, it's swollen, it's red.  You take him to

4    the doctor, you take him to an HMO, you take him to whatever.

5    The doctor looks at it, goes in, supposedly examines it,

6    comes back out and says we have to amputate your child's leg

7    right now.  Okay.  And do you really as a parent, would you

8    really just say okay, let's go?  Would you really do that?

9    He's a professional.  He's supposed to know what he's talking

10   about.

11        We had professionals, Dr. Germaniuk.  And you know

12   something, Dr. Germaniuk, he's a straight shooter, he's a

13   good guy, he really is.  I'm not defiling their witnesses.

14   I'm not going to attack their witnesses.  I'm going to use

15   their witnesses because he says these are good witnesses.

16   I'll use his witnesses because we all know that we can't

17   believe a defendant or anybody the defendant puts on because

18   somehow we're defrauding.  Well, I'll use his witnesses.

19        Getting back to Dr. Germaniuk, he is a straight

20   shooter.  The point is that even professionals, whatever,

21   they may not have the right answer or you may not just trust

22   them, you've got to have a little bit more.  I want that

23   second opinion.  I want to find out what the deal is here.

Your child has a bacterial infection, da, da, da, da, da. First thing comes in mind, well, bacteria, let's see, antibiotics. Antibiotics are good against bacteria, they aren't good against viruses. You start thinking, okay. I got a second opinion. You want a third opinion. You know what a lot of parents do when they start getting into that situation? They even go on the internet, they go to the medical schools, they get the medical books out and what do they do? They do it for themselves. Okay. They find out because they're concerned enough and they're not just going to take somebody's word for it, okay, and that's what I want you to do in this case. I just don't want you to take his word for it because that's not what this case is about. And it's not just my word, okay.

I want you -- you took an oath, okay, you took an oath and now you're a juror. You're here. You're good people. You have character. You were chosen for your intellect, you were chosen for your fairness, you were chosen for you open-mindedness, and you were chosen with one great idea in mind is that you would take an oath seriously. I'm here, I've listened to this and this is my country, this is my system. This man up here in the black robe told me what my job is, okay. The question is take it seriously. If you

3450

1    don't want to and blow it off, fine, you just have to live

2    with yourself.  That's what it boils down to, okay.  But I

3    know you're going to do a good job in this case, okay.

4           Judge, I would like to -- we can break now and get

5    these good people out to lunch and bring them back and

6    I'll --

7                    THE COURT:  Fine.

8                    MR. LEWIS:  -- finish up.

9                    THE COURT:  Yeah, because we'll be a while

10   yet with rebuttal.  One hour please.  Be back at 1:00.  Not

11   to discuss anything, form any opinions until you return.

12   Thank you.  Have a good lunch.

13                    (Whereupon, a luncheon recess was taken.)

14                    THE COURT:  Okay.  The jurors are all

15   returned and seated.  Everyone is here.  Mr. Lewis, you were

16   in the middle of your closing.

17                    MR. LEWIS:  Most people hope it was the

18   middle, judge.  Maybe it's not.  Folks, what I want to talk

19   to you about now is try to put the whole scenario into

20   perspective for you, put it into something you can understand

21   and talk about.  Draw on your own personal experiences.  I'm

22   going to use the evidence that was produced here.  And what

23   we're talking -- am I loud enough?  I'm trying to be soft and

3452                                                                        3451

1    I'm trying to be slow.  I go too fast.  The court reporters,

2    I don't get any Christmas cards from them, I go too fast, so

3    I'm going to slow down, and Kelly wants me to make sure that

4    my voice stays up.  I'm starting to lose my voice.  I told

5    the prosecutor that I'm worn out, I'm exhausted.  This is --

6    I've got to find a different line of work here I think.  This

7    wears you out.

8          Let's talk about Donna Roberts.  Let's talk about

9    Robert Fingerhut.  Those people were in Miami, Florida, Dade

10   County.  In 1985 they got divorced.  For whatever reason,

11   they decided to move north, they came to Trumbull County

12   probably about 1992 or '93, and when they came to Trumbull

13   County, to Ohio, okay, if you're divorced, you're divorced.

14   The law doesn't recognize any relationship between the two of

15   you.  You go down to domestic court, you may have children,

16   support, that kind of thing.  You're all familiar with that

17   kind of situation.  But for some reason they came to Trumbull

18   County and Mr. Fingerhut decided, and Donna Roberts, he got

19   into business.  And it starts off with they buy a house,

20   okay.

21         When I say "they" I'm totally incorrect about that.

22   Donna Roberts bought a house because the law only recognizes

23   the owner of a piece of property, real estate, as the title

3452

1   holder, the deed holder.  It's in the evidence that it's

2   Donna Roberts, okay.  The prosecutor, what they're saying in

3   this case is it doesn't make any difference, you know, how he

4   was there or whatever he was there, he had a right to be

5   there or that kind of thing or whatever, okay.  Anthony will

6   give you the law in regard to that.  What I'm getting to is

7   something that's very unusual about this case.

8       When I first got involved in it, like I said, the

9   judge calls me up, sends me over, and, you know, we started

10  looking at the case, and the more and more I see I start to

11  wonder and wonder and wonder.  And I'm a curious animal, I

12  always am.  When something just doesn't look right, doesn't

13  smell right, it's like something is wrong here.  So in 1995

14  Robert Fingerhut, Donna Roberts, aren't married, already

15  divorced, Donna Roberts buys a house up in 254 Fonderlac.

16  The deed is taken in her name.  She takes a mortgage on it.

17  She's the only one liable.  Okay.  Unusual.

18      A lot of times you'll have this situation; you'll

19  have a husband and wife, they'll buy a piece of property.  If

20  the man is in a business his name will be on the business,

21  the wife will be on the deed to the house.  What it does is

22  basically protect them from liability, okay, and that is not

23  an unusual situation.  But this, this, this didn't make any

1   sense to me, so let me go through it.

2          Buy a house in Fonderlac.  She's on the deed, she's

3   on the mortgage.  Okay.  They're not married but evidently

4   they reside in the same house.  The situation would be this,

5   is that if she owns the house, she has the deed, they're

6   unmarried, then basically in order for Mr. Fingerhut to stay

7   in control and keep whatever he has in regard to that house

8   he has to control her.  Okay.  It's simple.  Because if she

9   gets mad one day and wises up or figures this out and says to

10  him, "You know something, Robert, you've been treating me

11  ugly and bad," or whatever.  "We don't have any relationship

12  at all.  I'm going to call the police," Howland, wonderful

13  officer, Paul Monroe, "I'm going to call him right now and I

14  want you out of the house," and she has every legal right to

15  do it.  If he wouldn't leave the police would escort him out.

16  If he would attempt to take anything out of the house

17  technically he committed a burglary.  That's the problem with

18  this whole situation if you start thinking about it.  That's

19  what makes it so unusual.  And it gets more unusual, it makes

20  sense, when you get down the road here because it comes into

21  play.

22          The prosecutor says or tries to minimize that.  This

23  is my so-called diversion that I'm giving you.  Well, I'm not

3454

1  giving you any diversion, it is what's in the evidence, okay.

2  It's right here, it's in the paperwork, and you can see it.

3       So she's on the deed, she's on the mortgages.  She

4  has complete control over that house.  Whether she actually

5  knows it mentally I don't know.  The point is Mr. Fingerhut

6  has got her convinced and he has to control her because if

7  she decides for any reason to throw him out, she could have

8  him thrown out immediately.  It's her house.  The law would

9  say it's her house.  He has no interest.  I don't care if

10  it's a $50,000 mortgage on it or 70,000, subtract it, that's

11  hers.  I don't care if it's 170,000 and 100,000 sitting

12  there.  I don't care.  It's her house.  She has complete

13  control over that, although Robert Fingerhut is the one here

14  who has to control her in order to keep himself in that

15  house.  That's what it boils down to.

16       If she would go talk to any lawyer, this fine

17  gentleman, myself, she says, you know what I'd tell her?

18  That's your house.  You don't want him in your house, he's

19  not a husband.  There's no interest.  If you would get

20  divorced there would be a split of property, but you don't.

21  You're divorced.  You buy it.  It's not.  So, you know, you

22  start thinking, well, why would Robert Fingerhut do that?

23  Why?  Why was he, why is he doing this, because it is

456                                                                                    3455

1    unusual?

2              What's worse is that if she decides to find somebody

3    else and she decides to fall in love, or whatever you want to

4    call it, and bring somebody else in the house, she could do

5    it.  In this case she could quite literally, if she knew

6    better, she could go pick up Nate from prison, stop off at

7    the local chapel and just bring him on home.  She can go

8    home, it's her house, bring him right in, and Mr. Fingerhut

9    was smart enough to figure that out because he's the one that

10   developed the whole thing.

11             It's interesting because in the letters, those

12   letters -- I tell you what, the letters, there's a lot.  I'm

13   going to talk about those in a few minutes more so, and

14   there's so many letters.  There's everything in those

15   letters.  There's sex, you name it.  The point being is

16   you're going to have to be good people and plow through it,

17   do the best you can with it.  But one of the letters in the

18   late -- and the most important I think of the letters is

19   really, it's the October, November and then a little bit into

20   December, and you got the 20 tapes, okay.

21             And let me interject this right now.  I'm going, I'm

22   going to quote some passages out of these letters, but what's

23   important later on is you have to listen and read the whole

3456

1    letter or you have to listen to the whole tape.  It's going

2    to become very important.  But at the end she writes, well,

3    he's gone crazy.  He's really treating me ugly and this kind

4    of thing.  You'll hear about it.  And she says, well, he's

5    going to come home and lock me out, change the locks on the

6    doors.  That's kind of interesting.  The law doesn't

7    recognize him as an owner to do that.  She's the one.  He

8    goes changes the locks, she can call the police and out he

9    goes.  But evidently she doesn't know that, and it would be

10    important that she not know that.

11        Rental properties, okay, it becomes the same

12    situation.  Donna May Roberts becomes the title holder, the

13    deed holder, she's liable on the mortgages, okay, and for

14    rental properties, assuming that she would receive the income

15    from the rental properties.  Robert Fingerhut has no legal

16    interest in the properties.  Okay.

17        Mr. Watkins was saying that Donna had a great life,

18    okay, she was spending too much money.  Well, if that was the

19    case in this relationship, if that was so bad and everything

20    else, Robert Fingerhut couldn't be stupid enough to do all

21    this, put everything in her name, if she was that

22    spendthrift, so he would put it in his name to make sure she

23    couldn't spend it.  Well, see, it doesn't make any sense if

3457

1    you think about it for a minute.  It's in his name.

2         Kathy Thomas, the insurance agent.  Fonderlac, the

3    insurance was in her name because Robert Fingerhut had no

4    interest in the property.  The rental properties, all the

5    insurance was in her name, not Robert Fingerhut's.  He had no

6    power.  What did Kathy say?  I asked her, I said Kathy, if

7    Robert Fingerhut called you up to cancel that insurance, what

8    did she say?  I can't cancel that.  She's the owner.  She's

9    the insured.  He has no insurable interest.  So you got a

10   house, they have rental properties.  The rental properties

11   produce money.

12        There's another letter in there you'll see that as

13   the situation deteriorated over about the last year, year and

14   a half before this happened, you're going to see one of the

15   letters where Donna says, you know, all I was living on was

16   an allowance of $100 a week, and at the end he even cut off

17   the $100.  And at that point figure that out, she got an

18   allowance of $100 a week.  That's $5200 a year.

19        When you see the credit apps on here, the yearly

20   income of that business was 250,000 or 100,000 in business

21   revenue.  These are the credit apps, incidently, that went

22   through Preston, went to the bank and came back and said

23   you're A-okay, babe, and that's Donna Roberts, that's not

1-59                                                          3458

1    Robert Fingerhut, because she was the owner and operator and

2    franchisee.  So you have the rental properties but evidently

3    Donna wasn't getting the money out of those properties.

4            Get to the automobiles.  Okay.  We have automobiles.

5    Robert Fingerhut goes and he negotiates the sales of these

6    motor vehicles to buy them, as Carmen would say.  And Carmen,

7    he got a lot of good business out of Robert Fingerhut.

8    Excuse me, it was Mr. Roberts.  Mr. Roberts.  Carmen knew he

9    bought five vehicles, I think it was five vehicles, he knew

10   him for five years, okay, and he didn't know, he didn't know

11   until he saw the picture in the paper that his name was

12   Robert Fingerhut.  Now, it's an amazing thing.  And if you go

13   to Barry Ricker who does the maintenance, two years, that man

14   is Mr. Roberts.  There was a movie, Henry Fonda.  I don't

15   know.  But he wanted the world to believe that he was

16   Mr. Roberts.

17          Now, think about this, folks.  The prosecutor says,

18   well, you know, they're carrying on this marriage

19   relationship so we have, I guess, Mr. Fingerhut now takes the

20   maiden name of Donna Roberts.  Okay.  Think.  How many people

21   do you know do that?  Or how many people are called by

22   another name for five years and don't say I'm Mr. Fingerhut?

23   That's so unusual.  Can I give you an exact answer?  No.  I

3459

1   don't even know, according to all the assets and the income

2   and the ownership of the franchise and everything else, we

3   don't even know if Mr. Fingerhut ever filed a tax return.  I

4   know she did because she passed a credit report and that's

5   where all the money was, through her.  Did he exist?  What,

6   you know -- I can't -- I don't know the answer.  I don't know

7   what he's hiding from or who he's hiding from, but it is too

8   bizarre to be just something that just happened.

9           The motor vehicles are insured.  They are leased by

10  her.  The mortgages through the banks in regard to that,

11  those leases, in her name, so she has the vehicles.

12          The next item is the Greyhound business.  Who owns

13  the Greyhound business?  Donna M. Roberts.  She's the owner/

14  operator.  She would be the one who receives all the money in

15  her name, but evidently somebody else controls it, okay, but

16  she's the owner.  So the business is insured by Kathy Thomas,

17  she told you.  It was insured, Donna Roberts.  Would you

18  change the insurance?  No, huh-uh, because she's the

19  franchisee, she's the owner of the Greyhound business.  Okay.

20          Is this a deal where supposedly that Donna Roberts

21  is -- I don't know.  The prosecutor hinted that -- oh, that's

22  right, the prosecutor said that this woman was I guess

23  evidently too dumb or whatever to run the businesses, okay.

3460

1    I guess that was his philosophy about this.  But the reality

2    of it is this:  You cut through everything, Mr. Fingerhut was

3    controlling everything.  Donna Roberts owned everything.  In

4    order for Robert Fingerhut's life to continue as it did

5    before this, he has to do one thing, he has to control and

6    make sure Donna Roberts doesn't decide to throw him out, call

7    an attorney, fall in love with anybody, bring anybody else

8    in, because otherwise he doesn't exist.  He wouldn't exist.

9    Think about that for a minute.

10          Mr. Monroe comes over, Fingerhut, you're out of this

11   house.  Mr. Fingerhut, you are not to have those two cars.

12   Touch them, you'll be arrested.  Mr. Fingerhut, that's no

13   longer your business, that's Donna Roberts' business.

14   Greyhound contracted with her.  She gets the money.  The

15   Greyhound business is the engine that produced the profits,

16   that produced the money every year, okay, so you start

17   thinking about it.  It makes some sense.

18          Not only that, let me just give you a picture here.

19   Let's just flip this around and see what happens here.  Let's

20   do a scenario like this:  Let's just say that we got what we

21   got here, Robert controls everything, owns nothing.  Doesn't

22   exist.  We have Donna Roberts and we have Nate Jackson as a

23   boyfriend and Donna Roberts turns up dead and there's a will

3461

1    and the will is Donna Roberts' will and that will says I

2    leave everything to Robert Fingerhut.  The prosecution and

3    the police would be looking very seriously at Mr. Fingerhut.

4    They would be in a trial and he would be up here telling you

5    that Robert Fingerhut had every motive in the world, more

6    motive than anybody else obviously, to get rid of Donna

7    Roberts because how is he going to get his property from her

8    to him?  Is he going to hold a gun to her head and force her?

9    How is he going to do this?  That's what becomes the problem

10   here.  That's what becomes the whole crux of what we're

11   talking about here.  The man that doesn't exist.  Okay.

12        So what have they got?  When you go on, and let me

13   just quote some of these letters, okay, and some of the

14   phrases out of them.  You'll see them, but these letters

15   really have to be read, the whole thing, and the taped

16   conversations have to be listened to.  The question is does

17   Robert know he's in trouble?  Does Robert know about Nate

18   Jackson?  Well, the interesting thing was that Mr. Sanchez,

19   the security guard at RTA, he said did you ever see Donna

20   Roberts?  Yeah, I saw Donna.  Did you ever see Nate Jackson

21   down at the terminal?  Yeah, I saw Nate Jackson down at the

22   terminal.  Did Robert Fingerhut know who Nate Jackson was?

23   Oh, yeah.  There was no doubt in my mind.  He knew who he

3462

1    was.

2          And as this thing gets closer and goes through the

3    beginning of 2'01 and getting up through December you can

4    tell from the letters where he starts trying to -- he abuses

5    her, he yells at her.  Not probably the right procedure,

6    shouldn't have done that, but he was just giving her all the

7    grief he possibly could because two things happen.  No. 1, he

8    has to get it turned around so she decides not to pull the

9    plug.  No. 2, he's got to make sure that he keeps some kind

10   of control over her, otherwise the plug is gone anyway, it

11   doesn't make any difference whether Nate Jackson exists or

12   not.

13         The letter of 10/2, "Why didn't you leave Robert an

14   come be with me when he use to beat you or piss in your bath

15   water," I don't know about that one, "or send you to the

16   hospital like you were for some days when ..." I first met

17   you.

18         10/16/01, "I go straight home - feed the girls and

19   lay down and think.  I am not out there with anyone else -

20   how could I be in this frame of mind?  Plus the fact that he

21   is on the warpath again taking it all out on me.  He calls me

22   a piece of shit now along with other sweet greetings.  You

23   have to understand how bad it is for me ... besides our

3463

1    situation."

2           10/20, "Nate, if you only knew how difficult it is

3    at home now - you wouldn't believe it.  He is almost

4    irrational at times.  And oh - guess what?  Remember how I

5    told you he guesses like right on the money sometimes?"  He

6    was a PI in Florida, you know.  This man is not dumb.  "Well,

7    he did it again!  He came home one night and said you've been

8    home now for over a month and the phone ..." calls "...  the

9    phone bill is high - I see your boyfriend must be back in

10   jail."  Robert knows who Nate Jackson is.

11           11/9/01, getting down to crunch time, folks, because

12   I think Mr. Fingerhut knew, or he did know later on for sure

13   when Nate was coming out of prison.  "And I'd better get that

14   hallway at home widened because we keep brushing by each

15   other.  Last night we passed in the hallway and he must he

16   just really full of rage because he shoved me real hard into

17   the wall and said - I don't want no n---r lover coming near

18   me.  I just picked myself up and didn't even say a word.  And

19   for some reason he left me alone the rest of the night."

20           11/9 again, "Well there was a long silence and he

21   called me a n---r loving bitch again and hung up.  Oh and he

22   said not to call him for anything that he doesn't want to

23   even hear my voice and I'd better stay out of his way tonight

3464

1    because - well - who cares..."

2         11/10, "I guess I'll just let him continue to bully

3    me and lash out at me and just stay cool..."

4         There's numerous examples in here, ladies and

5    gentlemen, of the fact that Robert knew.  And even if you

6    don't pick it up in the letters, okay, now, here's -- okay,

7    what, what the prosecution wanted to do was say listen, we

8    want all of the good stuff out of these letters, okay, we

9    want this wonderful plot to kill, we want that out of there,

10   but anything else you read in there that says something

11   different, then we don't want you to believe it.  I mean,

12   that's the way their attitude is always going to be, whatever

13   the evidence.  I don't care if they introduced it or what, if

14   it's not beneficial or a little bit contrary to their case,

15   no, don't believe it, it's irrelevant.  But the letters tell

16   you.  You follow the chronology of the letters, okay, and

17   they will get you to the point where you will see that he

18   gets worse and worse and more wild as it goes along.

19        And it's not just an abuse thing, okay, it's a

20   problem he's got that he can't cure.  He's lost control over

21   her.  Nate is coming home.  But it doesn't really make any

22   difference about Nate in theory because he's losing control,

23   period.  Forget Nate for a minute, forget he's coming home

3465

1    from prison.  Forget he's even coming home.  All she had to

2    do is go down to the lawyer's office and say, you know,

3    that's enough, you're out, and that's it and he's out.  How

4    would any of us feel if our whole existence, the house where

5    I lived, the cars that I drove, the business that I had,

6    everything, was going to go down the drain just like that?

7    Is it the kind of thing you just sit back and say, ah, c'est

8    la vie?  No big deal.  No problem.  You know, who cares?

9         But we know for sure on 11/29 that Robert knows.

10   There's a guy named Sandy, who is really Santiago Mason, and

11   he ends up probably about two months before, December, in

12   November sometime, with Donna, ends up stealing the Smith &

13   Wesson .32 from her and some money.  And she had befriended

14   him and she went down to the police at, I might tell you, at

15   Nate Jackson's begging and pleading, and filed charges.  And

16   Mr. Santiago called up Mr. Fingerhut and you'll see it in the

17   telephone conversation, in the letters, that he told him

18   everything about Nate was coming out, what he's going to do

19   and everything.  I mean, it's as point blank as possible.

20        The conversation of 11/29/01, "And then he got to

21   mine, he read it and he came out and he says he charging him

22   with fifth degree felony," down at the prosecutor's office.

23   "Looked him up, he came up on the computer and his ass is in

3466

1    big trouble now.  So you didn't get my other Tuesday letter,

2    how it said that he called Robert."

3         "Un-huh."

4         "Yeah he called Robert ... when he was at

5    Greyhound."

6         "Yeah."

7         "Told him about you and me, everything he knew that

8    I told him for two months."

9         "What?"

10         "Yep."

11         "See ... what I'm saying sweetheart."

12         Same conversation, here's the deal where -- "You

13    know what, I was ... down Tuesday because Robert called me.

14    He wasn't coming home, he's staying in a motel now sometimes.

15    I'm not getting any more money and he's ready to ... change

16    the locks on the house now and he's.  All he does is say go

17    suck some nigger's dick, why don't you get out you nigger

18    lover.  He even told ... I sent you money.  That was the

19    worst part he could of told him."  That's what Santiago.

20    Sandy, tells Mr. Fingerhut.

21         Mr. Fingerhut at this point would be getting a

22    little bit desperate.  He doesn't give a damn about Donna and

23    Nate in that sense of the word.  He doesn't love her.  He's

3468                                                              3467

1    got another problem.

2            Same conversation, "I mean, he is ... crazy man now.

3    He beat the fuckin' shit out of me.  You should see me.  I

4    wrote in my letter, if you saw me you would kill him with

5    your bare hands.  I got two good punches in though.  I

6    punched him.  I had to and ... I kept bending down into a

7    little ball so he wouldn't hit my face but he got me."

8            "Does your face look bad?"

9            "How does a woman look with a black eye?  Good or

10   bad?"

11           "Oh man."

12           "I'm wearing fucking sunglasses in the winter here.

13   People think I'm out of my mind."

14           "I broke a middle, oh never mind," something or

15   other.

16           Robert knew.  Robert knew so well.  What's Robert

17   going to do about this?  What's Robert going to do about

18   this?  What are you going to do, are you going to try to

19   coerce Donna to transfer all the property?  Well, we're not

20   getting along too good with Donna.  That may not work.  Nate

21   is coming home.  I wonder if we can talk to Nate.  If I can

22   get him to back off or if I can get him out of the picture a

23   little bit maybe this will all settle down somehow in some

way. But Robert has got to do something. He's got to do something, otherwise his existence is gone. And when I say that fast I mean that fast. The prosecutor knows it.

Like I said, if you turned the tables he'd be pounding this podium and saying ladies and gentlemen, Robert Fingerhut had every motive in the world to kill her. I believe it too and that's the way the lines go, okay.

Now let's talk about we've got those two, we've got Donna and we've got Robert Fingerhut, got to December 9th, okay. All right. That's the scenario. Those are the characters, okay. Let's talk about Donna and Nate, okay.



It's about a two-year relationship. They obviously saw each other down at the Youngstown terminal and other places, okay. In the winter of 2000, 2001 he was in prison, then for four or five months during the spring or summer he was home, and then he ended up back in prison for the fall and winter up until December 9th, okay. And he lived in a spacious flat. It was four feet by 10 feet. I don't know whether that's the bed up or down or whatever, but it's a pretty small place, and he had a bunkee, too, so I don't know. I don't know if he exactly measured it, but even the officer that came in, the security officer, indicated that for most of the time, for 23 hours out of 24, he's in a cell, whatever the case may

3469

1    be.

2          He had a relationship with Donna Roberts, no

3    question about it.  They could date.  She's divorced.  She

4    could be with anybody she wanted to be, okay, so they keep

5    communicating.  He was in a jail cell.  He didn't have

6    anybody to talk to.  He's not going anywhere, he's in a

7    cubical.  Is he going to communicate?  Sure is.  Got a

8    girlfriend?  That's nice.  So they go ahead and communicate

9    and you end up with all these letters.

10          And when you read the letters and listen to the

11    phone calls, the prosecution, I know what they want.  They

12    want you just to kind of ignore everything until you hit that

13    one thing that says oh, this is the plan, we're going to do

14    this, whatever.  Okay.  What I would like you to do, and

15    you're good jurors and you're going to do it I think, is you

16    are going to read the whole letters and figure out what's

17    going on.

18          Donna Roberts, you will see even in the brief

19    telephone conversation you heard, she uses everything she can

20    possibly use with Nate.  You got to remember, Nate is in a

21    cell.  He ain't going anywhere.  He can't do anything.  So

22    she does the old "I love you, baby," this kind of stuff,

23    whatever.  Well, I don't think anybody was loving Nate when

3470

1   he was in prison, whatever, so it's nice to hear somebody

2   loves him.

3        Sex?  Oh, yeah.  She wrote letters and he wrote,

4   responded back, sexually.  You're going to read them and be

5   embarrassed, whatever.  The point is they are high powered.

6   I've never seen anything like that in my life, and it's sex.

7   But here he is, he's in a four by 10 cell.  He doesn't have

8   any women and he can't call a collect number out of there and

9   get a sex line, so she's going to give him sex.  They talk

10  about it and talk about it.  She does that.

11       She uses the jealousy thing.  In fact, it's kind of

12  curious.  The prosecutor mentioned it.  In November, December

13  they broke up basically.  You'll hear the telephone

14  conversations and also the letters, they literally broke up,

15  says that's it, we're finished, because he had the five

16  girls' names in his sneakers or something like that, and

17  we're calling it quits.  That's the end of the relationship,

18  boom.  Okay.  And, of course, Nate, he wasn't -- he didn't

19  want to cut it off.  He wanted the letters.  He didn't want

20  to cut it off.  Donna, I'll do anything for you.  I'll do

21  anything for you.  Yeah, yeah.

22       So read the letters, and when you start seeing the

23  plan come up notice where the plan comes up.  The plan always

3471

1   comes to fruition or it's mentioned or something when he's

2   trying to please her.  Is this what she wants?  Yeah.  Let's

3   talk about it, this is what she wants.

4        There were two instances, one with the phone numbers

5   and then some other phone number for a girl that had an

6   apartment, and he tried to explain that he was probably going

7   to stay there to try to get an apartment when he got out of

8   prison.  She also used the jealously thing with some neat

9   looking or handsome looking customers.  There's some other

10  black men here hitting on me, she hits him with that.

11       Be my protector.  Oh, save me, save me from all of

12  this.  Save me from this.  You're a strong guy.  And knowing

13  Nate, having his background, it's like, you know, he's not

14  going to impress a woman with money, cars, he doesn't have

15  nothing, so I'm going to be protective.  I'm going to help

16  you, babe.  I'm going to do this for you.  He's in a cell but

17  he's going to say he's going to do those things for you.

18       Sometimes she actually puts him down and calls him

19  stupid.  He's not too happy with that but he tries to turn

20  around and says how smart he is.  Boom, here comes the plan.

21  Sometimes she builds him up, says Nate, you know, if you just

22  hadn't have been involved in all this stuff or whatever you

23  would have been a very smart guy, you would have been a

1    success, puts that in there so she gets him pumped that way.

2    Nate, this is the good life.  There can be a good life out

3    there for you.

4         You're smart jurors, okay.  Yeah, there's casual

5    mention of the so-called plan in there, but read and see how

6    she works him.  She works him good, because every time

7    there's a problem she's after him, or whatever he does he

8    retorts and says oh, well, let's do the plan, or let's do it,

9    because he's trying to please her and he's trying to not cut

10   this thing off.  It's all he's got, folks.  He's in a 10 foot

11   cell.

12        And not only that, you think about this for a

13   minute.  The prosecutor showed you or read to you the letter

14   way back in May or April and he was in prison at that time.

15   He came out and he was down at CCA walking around town and

16   everything else and this plan supposedly developed back when

17   he was in prison the first time.  And there was a letter in

18   there indicating well, I would have done it, I would have

19   done it, but you stopped me.  Watch in there how many times

20   he says I would have done this but you stopped me.  That's an

21   interesting concept.  It's kind of like -- I can't get the

22   analogy.  It sounds like, it sounds like, you know, when you

23   are husband and wife and the wife says I want you to do this.

3473

1   Oh, I'll do it.  Well, I didn't think you wanted me to do it

2   right now.  I mean, it's kind of like an analogy.  I'm really

3   trying to get out of it but I want to say it was you that

4   stopped me.  Okay.

5       I believe Nate Jackson is a big chicken.  He wasn't

6   going to do nothing.  He said all this macho stuff, decided

7   to talk to her, make her happy, say what he wanted to say,

8   exchange the sex words, all of that kind of good stuff, but

9   if you read carefully and you see it, you can tell.  Like in

10   November 27th he hedges.  Every time he talks about it he

11   hedges.  I see.  Oh, wait a minute.  I'm sorry.  I'm on the

12   plan, the other plan.  Okay.

13       If you look at it, though, the letters, and I'll

14   show you in a minute, is that he hedges.  He always keeps

15   saying you stopped me from doing it, if you don't want me to

16   do this then just tell me you don't want to do this.  Thou

17   does protest too much.  That's what it boils down to, he

18   ain't going to do it.  He just says -- he wants to be the

19   hero and say those things, and then when the time gets short

20   and he's got to come home, I ain't really going to do it but

21   I don't want you -- I don't want to have to say I'm not going

22   to do this because then I ain't a man, or whatever, I'll

23   displease you.  But he keeps asking her well, do you want me

475                                                                              3474

1    to do it, huh?  Yeah?  No?  He wants out.  He ain't going to

2    do it, it's as pure and simple as that.

3            All right.  Let's talk about the plan.  There were

4    so many letters and so many phone calls about the plan.  Let

5    me give you an example.  Evidently the last plan, or the one

6    the prosecutor keeps throwing out, wasn't the first plan or

7    it wasn't the favorite plan, it's his favorite plan, but

8    here's the example.  This the letter of November 27th, okay.

9    Whoops, I should probably -- yeah, okay.  "... I hate to risk

10   my life by just walking into the station an doing it an

11   taking the risk of getting away, so if you really wanna be

12   with me like you say, an if you really want ... to have a

13   real life, well then you would just sit back do as I say

14   don't give me no lecture an let ..." me get things "... done

15   an over with, because the next lecture that you try to give

16   me I'm just gonna change my mind an ask you to never talk to

17   me about it again."  I guess his plan wasn't good so he got

18   mad and he says fine, don't talk about it again, or you don't

19   want to go along with me, then fine, I'm just not going to do

20   it.  Well, it's a macho way of trying to get out of it.  Oh,

21   I can do it, I can do that, but doesn't do it.

22           So that plan was he was going to run into the

23   station and shoot Robert evidently.  That's all I can figure

3475

1   from this thing, okay, because in her letters in addressing

2   that here's what she says, "Anyway I am so worried about that

3   delivery. I mean, a moron could figure it out." Also, "I

4   may also be - no, not may, I will be in the line of fire too.

5   I could end up you know where." I guess she's at the

6   Youngstown station or whatever and she's not getting shot. I

7   guess that wasn't a good plan. Okay. Let's scrap that baby

8   and not worry about it. That was down the drain. Let's go

9   back to the drawing board and figure this out.

10          So then we get to the plan, the one the prosecutor

11   likes and everything else. We got to have a ski mask, okay.

12   Donna, get me a ski mask. In the letters you'll see she'll

13   say, well, I went shopping and everything else and I really

14   couldn't find one, I really couldn't. I don't know how hard

15   it is to find a ski mask, I mean, they sell them in every

16   store, but she couldn't find one for some reason. And then

17   on -- right close in the last part of November you will hear

18   the conversation here, no, he don't want any mask because

19   she's a tough guy. Whatever. Okay. It will happen the next

20   day he told you, it's gonna happen, Donna, I promise you,

21   it's going to happen the next day. The next day, the next

22   day. As far as I know that was Monday the 10th. They had

23   their romantic get together. They were in the Wagon Wheel,

1    okay, he got her to get the room.  He had his sex, okay.

2    It's gonna happen on Monday, I promise you, I made up my mind

3    this is going to be over with on 12/10.

4            Gloves, did you find the gloves?  I guess the

5    prosecutor found something.  According to one letter, she

6    couldn't find the right kind of gloves or whatever.  Very

7    hard to find evidently, but evidently she found some gloves.

8            And no one is to know that Nate, Nate is out of

9    prison.  I mean, we can't have Nate running around.  I mean,

10   the greatest alibi in the world is to be in prison, or at

11   least you don't want to be seen, you don't want to be seen,

12   and that's what they talk about.  Oh, it's going to be a

13   trick.  You're going to stay here for two weeks without

14   anybody seeing you.  Yeah, I'm going to do that.  Everybody

15   is going to think I'm still in prison.  Okay.

16           Get rid of the letters.  He's right.  We got this

17   great plot going, we got to get rid of these letters.  We

18   don't want them be found in the dresser of the room in which

19   was called the master bedroom in which Robert Fingerhut, I

20   guess, was sleeping because Donna was sleeping in the other

21   room.  I wonder if Robert Fingerhut ever found those letters?

22   What a PI.  I think he found the letters, folks.  He knew

23   everything that was going on.  But, you know, the curious

3477

1    thing is that, you know, this is going on but if he calls the

2    police that doesn't help him at all.  That's still her

3    property.  He can't win that way.  He can't win.  He got

4    himself in a hole, and a big fat hole, and he can't do

5    anything about it.

6            And another thing Donna Robert says, hey, this would

7    not be a good time with the Santiago problem, this would not

8    be a good time to be contacting the police because, you know,

9    we got this plan, we got this plan.  I think that's pretty

10   smart, too.  I don't think I would be running around

11   contacting police and five days later the person that lives

12   in your house ends up dead.  So you have that premise, that

13   would be I think the plan, supposedly going to be at the

14   house.  A couple of things that says well, maybe be in the

15   house or whatever so it's all over the place.  We have

16   generally the idea.  Okay.

17           So before I talk about the plan that didn't exist or

18   didn't happen there's one thing that's important about this,

19   folks, is you know it was all set up and everything else,

20   then after the fact some of plan would fall into line.  Here

21   is some of the letters that show you that basically -- if I

22   got the right thing.  There's the October 20th, '01, "An

23   Donna I don't care what you say but Robert has to go!  An I'm

3478

1    not gonna let you stop me this time.  An Donna you know that

2    I've always wanted to live my life with you an only you ..."

3    It is always tied to this "I want to live with you forever"

4    and "I love you so much," you know.  It's always something

5    with all the other stuff.  You will see in some of the

6    letters they break up.  They want to make love, he talks

7    about sex, and then they talk about the plan.  I mean, it is

8    like multifaceted.  But you will read it, you will figure it

9    out.  You will see between the lines, as they say.  Okay.

10   All you have to do is read the line and it is right there for

11   you.

12          And another one, this is 10/16, "An another thing

13   Donna you keep writing talking about finding --" oh, yeah,

14   here, "-- finding you a younger nigga well is thats what you

15   really want?  Because you sure have been throwing it in my

16   face an awfully lot of times ... an as far as the Robert plan

17   oh yes I meant it but it was you that wouldn't let me do it

18   ..."  He's in trouble.  He's what -- she talks about the

19   other guy.  That's the jealousy angle.  What's he do?  He

20   gravitates back to, oh, the plan, yeah, but you wouldn't let

21   me do it.  Was he out there?  They could have done it in May,

22   June, July, August, any time.  Did he do it?  No.  He didn't

23   want to do it.  He was chicken.  It was just bad talk or

3479

 1   whatever, that's what it really boils down to, because he is
 2   just a shyster.  That's all he's ever been all his life.
 3   This is 10/24/01, this is Donna writing back to him,
 4   "I never once stopped you from doing anything about Robert.
 5   Yes, you can do whatever you want to accomplish our goal.
 6   But I really don't believe you want to do it.  So there."  He
 7   didn't want to do it.  Tough guy Nate.  Oh, well, let's see.
 8        Or the one thing I had -- this is the other plan,
 9   this is where he's supposed to go in the station and shoot,
10   "... an let things get done an over with, because the next
11   lecture that you try to give me I'm just gonna change my
12   mind..."  Back and forth, back and forth, back and forth.
13   Hey, if you're going to do something you do it, I don't care.
14   There's a lot of cheap talk in the world, you notice that?
15   But when it comes to did you ever really do it?  No.  Because
16   that's the way it goes.  I don't care how many letters they
17   write or how many conversations they have.
18        And then finally, this is on 12/6, this is on 12/6.
19   He's within three days of coming out, this is the telephone
20   conversation, okay.  You got the tapes in there, listen to
21   them.  On 12/6, "You know, cause the way I got it planned out
22   man, you know what I'm saying, I mean I ain't gonna be in no
23   hood..."  Okay.  Well, he doesn't want the mask now.  No, he



1   doesn't want the mask.  What the hell would he get a mask

2   for?  I mean, why would he have to be in a mask?  In fact, if

3   he had a mask on and he is driving down Avalon Estate, that

4   nice place that the guy went, and he's running around, I

5   mean, who is going to say wait a second, whoa.

6         You know, if you think about this it's ridiculous

7   that he would go to a house, and he even says it.  He says

8   you can kill anybody in Youngstown.  But that's another

9   story.

10        Here's what he says.  "... you know what I'm saying,

11  it's like, I want,".



12        "I don't think you really want to do that."  That's

13  Donna.

14        "Huh.  You don't want me to?"

15        "I just don't think you really want to have to do

16  that."

17        "Cause you don't want me to?"

18        "No."

19        "Ok then, well, like I was saying ..."  Then the

20  plan goes on again.  He's trying to back out and just say he

21  ain't going to do it but he doesn't want to do it the way

22  anybody else would say, Donna, I just don't want to do it,

23  because then she's going to turn around and say you don't



3481

1    love me, you don't do this, and that's the end of the ball

2    game, Donna leaves, because he has to please her, and that's

3    all it really boils down to. That's all it boils down to,

4    folks.

5           So what happens to the plan? Let's talk about that.

6    Okay. First off, well, not only -- the back and forth about

7    doing it and all that kind of stuff. Okay. All right.

8    Well, let's see. He gets out. The plan was they get to the

9    Wagon Wheel. We know they get to the Wagon Wheel. She goes

10   and gets that nice room. The prosecutor wants you to see, I

11   think he wanted you to see the nice jaccuzi and the nice room

12   and all the mirrors. It's all the sex and all that kind of

13   great stuff so that's supposed to, you're supposed to get

14   some idea built out of that. They had a sex room is what it

15   boils down to. That's why it's there and people use it. So

16   the Wagon Wheel is secured. He had his night of sex when he

17   comes home. She went and got him. The plan is okay.

18          The next night is when it's supposed to happen,

19   Monday night. What happens on Monday? What happens on

20   Monday? Nothing. Nothing happens on Monday. He promised he

21   was going to do it. I'm absolutely going to do it. I made

22   my mind up. I got this plan all worked out. They had to

23   have all the stuff by then. I want to do this. Did it

3482

1    happen?  Nah.  No.

2         And not only that, if we go back just a few days and

3    I said Donna Roberts says I don't think I should go to the

4    police about this Santiago guy or whatever, which I think it

5    probably would have been a good idea too not to go to the

6    police if you're really going to do something, okay.  You'll

7    see in the phone conversations on 11/24, "Nate, he would come

8    here after work all the time and stand there for a half hour

9    and talk to me like a homeless person."

10        "Why don't you never call the police man?"

11        "Why didn't you, why didn't you never call the

12   police man?"  Nate is saying call the police.

13        Nate, "Call and report that gun man.  Man, call and

14   report this cat, man.  You don't even know his whole name

15   ..."  This is on -- what date did I say?  She just keeps

16   talking about it.  Okay.

17        "Call the police and report it ..."  "Call the

18   police and report it man, because ..."  That's all he's

19   doing.  He's running through here screaming at her to go call

20   the police.  Take the police with you when you go to pick him

21   up, don't you go.  Call the policeman, call the policeman.

22   Nate is going to kill somebody supposedly, all right, and

23   he's going to have Donna go down to the prosecutor's office,

3483

1    file charges, have all the police come out and get involved

2    in all this and all of a sudden Robert Fingerhut ends up

3    dead.  No.  Nate Jackson wasn't going to do anything.  He did

4    the simple thing that anybody would.  The guy stole your gun,

5    he stole your money.  Go call the police.

6           In fact, it's humorous in here.  Some guy was

7    giving, I guess, Donna a bad time and he says file harassment

8    charges.  Okay.  He's kind of like more of a legal beagle

9    than any threat to anybody.  But you'll see it in all these

10   conversations.  So he did the opposite of what he was

11   supposed to do, got the police involved.  And there was a

12   report and that's how they figured out who Santiago was.  Of

13   course, Santiago was also the person that called up and told

14   Fingerhut everything.

15          It's in every one of the conversations, you'll see

16   it in about five or six telephone conversations, go call the

17   police, talk to them, do this, file charges.  Go down to that

18   prosecutor's, do that.  What's Robert -- isn't Robert going

19   to do anything about this?  Sure doesn't sound like a plot of

20   murder.

21          Nothing happens on Monday.  He was given a ride by

22   John Stamper.  John Stamper came in and said he gave him a

23   ride on Monday to see a friend or something like that, okay,

3484

1    but nothing happens.  Tuesday comes around.  What happens on

2    Tuesday?  Well, he wanted to stay out of sight and be cool

3    and lay low, so much that he ends up where?  Remember?  The

4    prosecutor told you in his final argument, he went down to

5    the Warren bus terminal and went next door and Donna took him

6    over there and got a hair cut at the Final Cut.  Okay.  That

7    was Chris Ellington, nice lady.  Business, she wants to make

8    money, looks like she would be talented.  So there's Nate at

9    the Warren terminal right next door at the Final Cut.  He's

10   going to go kill somebody and nobody is supposed to know the

11   relationship between the two of them.  Oh, that's ingenious.

12   He didn't kill anybody.

13          The next thing, in the afternoon, 5:15, kind of

14   cutting it close or whatever, okay, Nate may -- he was down

15   at that bus station terminal.  There's tapes.  You know,

16   that's kind of a strange animal.  It only comes around every

17   one minute and people disappear, appear.  It's so fuzzy it

18   can't see who is who and whatever.  And it wasn't even

19   developed for the bus station itself, Greyhound, it was

20   developed for RTA, so he never even saw where the people were

21   that came in and out of the doors to go to the Greyhound, but

22   be that as it may.

23          So what happens?  Jim McCoy comes down there, brings

3486                                                                                           3485

1    the bus down from Youngstown, gets there at 5:15.  Actually

2    about 5:30 I think it was.  He comes in and Nate comes out

3    and he knows now, he introduces himself as Nate.  There he

4    is.  Here I am.  Here I am, Mr. Prosecutor, I'm at the Warren

5    terminal, I'm with Donna Roberts and here I am.  Hello.  And

6    Jim McCoy comes in and identifies him.  It's evidence.  What

7    happened to the plan?  Got to lay low, get out of sight.  No,

8    no.

9              What happens next?  They go out to eat.  They go to

10   Red Lobster.  Do they hide in the corner?  Do they wear

11   masks?  Was it Halloween?  No.  They went to a table.

12   Probably a hundred people in the place.  They spent about an

13   hour there.  They ate and they had a Long Island iced tea or

14   something like that or whatever.  She remembers who he was,

15   comes in and identifies the photograph, this is the guy that

16   was with Donna Roberts.  It's right at the Eastwood Mall.  In

17   fact, it's only probably about a mile from where the

18   Fonderlac address is.  Yeah, they followed the plan.  Bull

19   crap, they didn't follow any plan.  They weren't going to

20   carry it out.  Nate wasn't going to carry that out.  He

21   wasn't going to do it.  He's chicken.  But he had his sex,

22   she got him a hair cut.  That's Nate, he's going to go along

23   with the flow.  He ends up getting the Red Lobster meal, he

3486

1     gets that.  Okay.

2           But what happens?  Now we have Nate and we have

3     Robert Fingerhut, we've got the two.  Robert Fingerhut, Nate

4     is home.  What is Robert going to do?  This can only get

5     worse.  If she realizes and goes to an attorney or she

6     decides to just move Nate in there, or if she just says the

7     hell with Nate.  She broke up with him twice in there in one

8     month supposedly, broke up with the guy, says we're finished,

9     we're finished.  If we're finished is he going to go out and

10    try to kill somebody?  I don't think so.  I don't really

11    think so.  I don't think that's going to happen.

12          Fingerhut has to do something about either Donna or

13    Nate.  Nate is probably the most logical here.  He meets him

14    down there, fine, says come on, I'll get you a job.  That's a

15    good -- that's a good way to get him going, I'll get you a

16    job.  Okay.  Well, Nate probably thinks well, what the heck,

17    this isn't too bad, you know.  I know this guy, I'm plotting,

18    saying all these bad things about him, but if he gets me a

19    job at the Greyhound station down in Warren, that's where

20    Donna works, I get some bucks and I'm there, too.  That's

21    okay.  I don't, I don't -- you know, what the heck, that's

22    okay, so he gets him to go with him.

23          Do they buy marijuana?  I think so.  Donna smoked

3487

1    it. You saw it in the ashtrays and everything else. The

2    house was loaded with it. Robert smoked marijuana. So he

3    drives him to Warren. They don't go to the terminal and I

4    can't tell you, I can't tell you, I don't know. You're going

5    to have to figure it. I don't know what he had in mind. He

6    was nice to him on the way down and, as Nate said in his

7    statement, when they got to the house, when they got to the

8    house even Nate said the words that -- of course, Nate, you

9    know, he doesn't talk like anybody that I know. He really

10   doesn't. Yeah, man; oh, man, whatever. That kind of stuff.

11   But don't let that -- you figure out what's he's saying.

12        And the one thing he said that really struck me and

13   it made sense is he said he was like Dr. Jekyll and Mr. Hyde

14   because he got in there and he's talking about this job and

15   he gets him there and all of a sudden he says he was

16   disrespecting him. Well, the thing is that Robert was

17   turning on him and the reason that Robert is turning on him

18   is that -- I don't know what Robert was going to do. Maybe

19   he was just going to pull the gun out and threaten him. I

20   don't know what he was going to do. But as Robert kept

21   talking to this guy what he was looking at, he was looking at

22   Nate Jackson, who was the guy that could walk into that

23   house, he could marry Donna and move him right out of his



3488

1  house, move him right out of his business, move him right out

2  of his cars and move him out of the rental properties.  He's

3  gone.  Okay.

4        And maybe he just got, Fingerhut just got madder and

5  madder.  You can see it in the letters how he erupts.  And

6  whether he was just going to pull a gun to scare him -- he

7  carried a gun.  He had a gun in his bag.  Whether he had two

8  guns or not, I don't know.  Well, I think he did.  But he

9  carried it in the bag, he carried it in the Cincinnati Reds

10  jacket.  After all, he was a special agent for the Department

11  of Justice.  Bogus.  But he had guns.

12        So Nate is in there, he gets Nate in there and pulls

13  a gun on Nate and he's going to do -- I don't know what he's

14  going to do.  I don't know if he's going to threaten, say

15  listen, buddy, I don't want you fooling around with my wife,

16  I want you out of here, whatever.  I don't know if he wanted

17  to pay him off.  God knows he had all the money, he could pay

18  him in cash, whatever he wanted to pay.  He didn't show up

19  anywhere, he had her money.  I don't know what happened.  I

20  don't know whether he actually meant to shoot him, he was

21  going to kill Nate.  I don't know.  The point is when he

22  pulls the gun, the point is when he pulls the gun, okay, Nate

23  is not going to sit and wait to figure out gee, what are you

3489

1    going to do, so they get in a struggle.  Nate is going to try

2    to keep himself from getting shot, it's as simple as that.

3         What did Dr. Germaniuk tell you?  He basically told

4    you that, these guys struggled.  Both of them had injuries.

5    Take a look at the pictures of Nate.  He's got banged up

6    legs, he's got other bruises.  That, that was after, that's

7    on December 21st.  Robert Fingerhut had the cut in the head,

8    or it could have been the gun going up against it or

9    whatever, okay.  The men struggled.  They both had blood on

10   them.  They both had injuries.  Okay.  Both were shot,

11   Mr. Fingerhut, though, lethally.  There's any number of

12   scenarios you can put together for how this happened.  Okay.

13   Nate indicates when he pulled him down he was on top of him.

14   You pull to the side and you end up shooting, you shoot right

15   over the top, hit your own finger and shoot and hit him in

16   the head.

17        The problem is this, is if he's going to just kill

18   him or whatever, you're not -- he's just going to bang, bang,

19   bang.  In fact, I don't like these things, but you open this

20   cylinder, whatever, let's go (pulls trigger three times.)

21   See, folks, it only takes that long to fire off three shots.

22   If you're in a fight with someone, if you're in a human

23   struggle with somebody and you're fighting with them, and

3490

1    it's not a choreographed thing.  This is not "The Practice"

2    or this is not stunt men doing it working everything out.

3    When it happens spontaneously how are you going to explain?

4    Well, but if you were there then you must have moved here and

5    you must have moved -- you don't do that.  It happened in a

6    few seconds.  That's all it would have taken.  You can see

7    how fast the gun goes off.  That's all that happened.  How is

8    it exactly?  No.  Nate is trying to explain to the officers

9    and the officers go well, were you at this angle, were you at

10   that angle or this?  The prosecutor goes whoa, there has to

11   be a hole in the floor.  No, no, no, no.

12        You can put this all together, folks.  If he's down

13   here and Nate is on the bottom and he's got a gun and they're

14   trying to struggle for it, if he has another gun and the gun

15   was right there, you can shoot right over top of the back and

16   he ended up shooting him in the head.  It's as simple as

17   that.  It's as simple as that.  If he's laying right on top

18   that's exactly what happened.  Nate isn't 220 pounds.

19   Mr. Fingerhut was.  Okay.  Forensics will tell you that.  The

20   forensics in this will tell you that.

21        There was nitrate in the wounds, his hand.  He had

22   nitrates on the glove.  The blood.  Look what happened.  So

23   it happens.  He doesn't know, that's why he can't figure --

1  he doesn't even understand why it happened.  He doesn't even

2  know.  He doesn't even know now.  He doesn't even know now.

3  But that's what happened.

4      So what does he do?  Well, hey, as long as I'm here

5  I'll tell you what, murdered a guy, well, let's take some of

6  those gold bracelets and some of those gold necklaces and

7  some of the other stuff and let's empty his pockets out, for

8  God sake.  He's loaded with money.  Every pocket had money.

9  Every pocket had all kind of credit cards in it, phoney

10  badges, phoney identification.  Robbed him?  No.  He takes

11  the keys, goes out and gets in the silver car and goes to

12  Youngstown, abandons it and calls Donna and says get me a

13  room.  Whether he told her or not, I don't know what the

14  sequence.

15      They've got the Dobson records here from Dobson

16  Communications.  I didn't realize, I got an Alltel bill and

17  they tell me that Alltel was bought out by Dobson but Alltel

18  still owns Dobson, so I don't know who is who.  But, in any

19  event, they got the records.  The problem is they're going to

20  give them to you, folks.  Cell phone records, I don't -- you

21  know, they got them there but they don't have anybody to

22  interpret them for you.  In a duration of time -- you know,

23  these guys were hurting for money so I don't know, as soon as

3492

1  you call and make a connection, you know, does the duration

2  of time go then?  Even if you don't answer?  It looks like

3  there's a bunch of calls in there, frantic calls, about 9:45,

4  it's like about half a minute, a minute, and it's right in

5  sequence within three or four minutes.  Somebody is calling

6  somebody trying to get a hold of them.  And later on you're

7  going to see some more time involved.

8      But you know what the interesting thing about it is?

9  You don't even know if these calls theoretically were

10  transferred.  You don't even know if theoretically they have

11  a message service to receive the message or anything.  We

12  don't know any of that stuff.  That's okay.

13      Like I said, folks, the forensics bear all that out.

14  You have the gunshot residue and the tumbling, the tumbling

15  of the bullet in the wall.  That hit something before it got

16  there.  The tumble that hit the head, that hit something

17  before it got there.  What it tells you is there's

18  confrontation, there's confrontation, whatever.  One on one.

19  That's all it boils down to.

20      Did Robert Fingerhut have a reason to warrant it?

21  God, yeah, he did.  Sure he did.  Was he going to stand by

22  and let it happen?  I doubt it, I really doubt it.  Did he

23  know everything about Nate?  Yeah, he knew everything about

194                                                                3493

1    Nate.

2         Poor Frank Reynolds out there.  I don't know, I

3    don't know -- of course, Robert didn't tell Nate what he was

4    going to pay him or anything, but he said go down to the

5    terminal or whatever.  Frank Reynolds is out there, he works

6    14 hours and gets 35 bucks.  And, of course, it's under the

7    table.  You know, that's the interesting thing about

8    Mr. Fingerhut.  I don't know the answer to all of what he

9    does.  I know people do this a little bit and this a little

10   bit, whatever, but everything, you know.  He's Mr. Roberts to

11   the Preston Auto dealership for five years.  I don't

12   understand that.  He's the man who didn't want to exist and

13   there has to be something more to it.

14        Remember Gerardi, they had blood on each other.  The

15   blood, they had a mixture of blood, and she got it from the

16   visor of the silver car.  It was a mixture of Robert

17   Fingerhut's and Nate Jackson's.  They were in close

18   proximity.  They were touching it each.  They got blood on

19   it.  That's what you have.

20        Listen, you people have been really good.  I thank

21   you for your attention.  I know you'll do a good job with

22   this.  You don't have to do anything that anybody tells you

23   to do.  Do the best you can with it.  Anthony is going to

3495                                                                                                3494

1    stand up here, he won't be as long as I was, so you're going

2    to smile and thank God for that.  Okay.  Thanks very much.

3                        THE COURT:  Thank you, Mr. Lewis.  Does

4    the State wish to have the last word?  Oh, you're going to

5    have --

6                        MR. WATKINS:  Are we going to take a

7    break, Your Honor?

8                        MR. CONSOLDANE:  Yeah.  You want a break?

9                        THE COURT:  Oh, okay.  I'm sorry.  I

10   thought Jim was doing the whole thing.

11                       MR. MORROW:  Take a five minute break?

12                       JUROR:  Your Honor, how long is our break?

13   How long is our break, please?

14                       THE COURT:  You want a break?

15                       JUROR:  Please.

16                       THE COURT:  Yeah, okay.  That's fine.

17                       MR. CONSOLDANE:  Five minutes.

18                       THE COURT:  Take 10 minutes.

19                       MR. CONSOLDANE:  Ten.

20                       (Whereupon, a brief recess was taken,

21   after which the following proceedings occurred outside the

22   presence of the jury.)

23                       THE COURT:  On the record, I am going to

3495

1   give the oath to the officers of the jury that will be

2   sequestered in this matter.  Some of them have to get out of

3   here early so when they come in this evening they will have

4   been sworn.  If you all will raise your right hand?

5                    (Whereupon, the oath was given to Officer

6   Adrianne Bradley, Officer Dario Poledica, Officer Jolene

7   Marcello and Officer LaJuane Freeman.

8                    THE COURT:  Let me say one thing in

9   addition to that.  If anything comes up to their comfort you

10  should pass that on to the bailiff and you know what to do.

11  Okay.

12                   (Whereupon, a brief recess was taken,

13  after which the following proceedings commenced in open

14  court.)

15                   MR. CONSOLDANE:  Your Honor.

16                   THE COURT:  Just one moment.

17                   MR. CONSOLDANE:  Oh, I'm sorry.

18                   THE COURT:  We have one alternate here.

19                   MR. CONSOLDANE:  Are we all here now?

20                   THE COURT:  Yeah, we're all here now.

21  Okay, Mr. Consoldane.

22       **FINAL ARGUMENT CONTINUED ON BEHALF OF THE DEFENDANT**

23                   MR. CONSOLDANE:  Okay.  Thank you.  Your

1   Honor, Mr. Lewis, Mr. Jackson, Mr. Watkins, Mr. Morrow,

2   Mr. Monroe.  Good afternoon, ladies and gentlemen.  I tell

3   you one thing, that I always am short and I won't be -- 15,

4   20 minutes, you won't have to put up with me any longer than

5   that.  I feel if you can't say what you got to say in that

6   period of time it doesn't deserve to be said.

7           Three points real quick.  One is that Mr. Watkins

8   was saying about, you know, talking about everything I said

9   on opening.  Well, the judge has told you at the beginning

10  that what I say on opening is not evidence.  You know, why he

11  talked so long about what I said on my opening remarks and he

12  avoided talking about the evidence.  Talk about a diversion,

13  that's a diversion, trying to talk about what I said.

14          And, second of all, they talked about some

15  marijuana.  If you'll look through the pictures in the

16  evidence there is a picture of marijuana and rolling paper on

17  the table, and I'm not sure -- it's at the crime scene and I

18  don't remember whether Dr. Germaniuk took them or one of the

19  police officers, but it's in there and you will be able to

20  see the marijuana is sitting on the table.

21          And the other thing is that Mr. Watkins said about

22  children, they say it's their home.  Well, naturally it's

23  their home.  They can't sell it, though, and they can't go

3497

borrow money against it, but it is their home.  And actually
children stand a better chance of inheriting their home from
their parents than ex-wives or ex-husbands do.  So, you know,
to say that was his home, he was living there but that was
not his home.

     And then the last point that I wanted to bring up to
you about was that the scene had been altered by the time
that Jim and I and our investigator got to take a look at it.
It was entirely different than it was when Mr. Monroe found
it so we really can't tell you how many shots were fired.  We
didn't get a chance to look.  We know that Robert Fingerhut
was shot three times.  There was one that grazed him on the
back -- one that went through his back, one that grazed him
on the back and one that went though the head.  And we know
that Nathaniel Jackson got shot in the left finger and we
also know, you heard the evidence, that Nate is left handed.
Okay.

     During the second world war at the beginning of the
war we had probably the best bombers in the world.  They flew
high and were able to pretty much bomb at will, and they had
tail gunners, turret gunners and they a lot of times had
fighters to escort them.  But around towards the middle or
the end of the second world war the axis powers developed

1    anti-aircraft guns that were able to hit these planes, they

2    were able to travel high enough to hit the planes, and these

3    bombers couldn't take any evasive action, they were too big

4    for that, and a lot of them got hit by anti-aircraft fire.

5            Well, when this happened and they came back they had

6    an engineer down.  When every plane landed he had a chart of

7    the plane and he would mark everywhere on that plane that it

8    was hit.  And after he collected all of his data the general

9    that was in charge of that wing had them all come in for a

10   meeting and this engineer, they had another engineer, to

11   discuss where maybe they could fortify these airplanes

12   without ruining the integrity of the airplane.  And there was

13   this colonel in the back of the room, he had his feet up and

14   he was sleeping and he was older.  As a matter of fact, he

15   probably would have been retired from the Air Force had it

16   not been war had broke out.  And the general went up to him

17   and woke him up and he said, "Aren't you interested in this?

18   You know, we're trying to see if we can fix these airplanes."

19   And he said, "To be quite honest with you, general," he says,

20   "I'm not very much interested.  I would be more interested in

21   knowing where the planes got hit that never made it back."

22   And in this particular case I think it's a lot more important

23   to know what they didn't prove as to what they did prove.

3499

1            When you go back -- well, no.  Strike that.  I'll

2       talk about this first.  They're going to talk to you about

3       aggravated burglary first.  That's what they had asked to

4       have the judge instruct you about and so it would flow easier

5       rather than talking about the murder first.  The aggravated

6       burglary, Mr. Monroe right there on the stand, no sign of

7       forced entry.  No signs of forced entry.  One of the elements

8       in burglary is you have to show that they entered the house

9       by force, stealth or deception.  They want you to infer how

10      he got into the house, but there was no proof from the stand

11      as to how he got into the house.  They played a tape that

12      said that Fingerhut invited him.  They kind of said that

13      maybe Nate and Donna kind of planned this and he got in there

14      some other way, but there was no evidence to show how he got

15      into the house.

16            And remember when we were talking earlier on voir

17      dire about the cake, about all the elements you need?  You

18      need, you need that.  If that's not there it's not a cake.

19      It's not aggravated burglary.

20            Same thing moves as you come down to aggravated

21      robbery.  It has to be a theft offense.  Exert control over

22      property with the purpose to deprive the owner.  If you --

23      well, look, this is joint exhibit, it's going to go back to





1   you.  Go back there and take a look at these things.  A

2   watch, gold jewelry, there's diamonds in it, the star of

3   David.  I don't know, it seems to me there's got to be a good

4   quarter pound of gold in here.  This is going to go back, and

5   a lot of you know more about jewelry than I do.  Nothing was

6   taken.  That was all found there.  Not only that, all of the

7   money in his wallet was still there.  Aggravated robbery?  I

8   don't think so.

9        They're going to say, well, he took the keys to the

10  car.  Might have.  Bunch of keys there.  Probably keys to the

11  Warren bus station, keys to the Youngstown bus station, keys

12  to the house, keys to the other car, maybe even some keys to

13  the rental property, all owned by Donna Roberts.  Everything

14  was owned in Donna Roberts' name.  They have to prove

15  ownership.  They have to prove that Nathaniel Jackson took

16  something, exerted control over something against the will of

17  the owner of it.  He had to deprive the owner.  There is no

18  proof to that.

19       I'm going to try to make this a little bit easy for

20  you, is that when you go back into the jury room along with

21  instructions you're going to be sent with a lot of jury

22  verdict forms.  Count 1 is the aggravated murder with prior

23  calculation and design.  Premeditated murder.  Okay.  That

3501



1    you are going to have to consider.  The next two specs, you

2    got a spec of aggravated robbery, a spec of aggravated

3    burglary, forget about them.  That doesn't apply.

4           Along with count one you're going to have a lesser

5    included offense of murder, you've got to consider that, and

6    also a lesser included offense of manslaughter.  The reason

7    that you're going to have to consider those other charges is

8    because the tape that the prosecution played and the Court

9    ruled was competent evidence, was allowed to be played in

10   this courtroom, that indicates that Nathaniel Jackson, at

11   least at one time, had a self-defense.  He was trying to

12   protect himself and that's when he got shot.  Now, if you

13   don't believe the self-defense then you can move up the

14   ladder to either manslaughter or murder or even to aggravated

15   murder.  These three verdict forms do need your concern.

16          Then we move on to count two, aggravated murder.  We

17   only have one murder.  Only one person was shot.  This is a

18   felony murder.  You don't have to consider that.  This is the

19   specs, one and two.  This is also with the robbery and the

20   burglary.  This is what supports count two.  You don't have

21   to worry about those either.

22          MR. WATKINS:  Your Honor, I'm going to

23   object.



3502

              MR. CONSOLDANE:  I would, too.  I'm just
telling them the way it is, Dennis.

              MR. WATKINS:  I objected once and now I'm
just objecting.

              THE COURT:  Well, your objection is noted.
Overruled.  This is argument.  The Court has repeatedly told
the jury you must follow my instructions of law, okay?

              MR. CONSOLDANE:  What I'm saying, I'm just
trying to make it easy for you.  You get back there, forget
about the rest of these.  These are the three you have to
concern, and this actually is very serious.  You've got
aggravated murder, premeditated murder.  You know, there's
enough evidence that really you should consider that.
There's also murder and there's also manslaughter, and then
at the end we've got self-defense.  As far as the burglary
and the robbery goes, don't waste your time.  The evidence
isn't there.

              You know, I know they would like to have you believe
that evidence is there and they're trying to actually even
get you to think by circumstantial evidence that they can
somehow or another have you infer that the burglary or the
robbery occurred.  On -- as you remember on voir dire, I
talked a lot about circumstantial evidence, told you a little

3504                                                                    3503

1    story about the dog and the blueberry pie, and, you know,

2    there's another story I have that really kind of explains the

3    circumstantial evidence.

4         If you have a box and inside that box you put a

5    little tiny mouse and put a cat in that box and you close

6    that box up.  When you come back after an hour and you open

7    the box up and pull the cat out and it's got a big Cheshire

8    grin on its face and you look down inside there and there's

9    no mouse, that's pretty good circumstantial evidence that the

10   cat ate the mouse.

11        However, if you pull that same experiment and you

12   put the mouse in the box, put the cat in there, tie it up.

13   Come back in an hour and you pick up the box, open it up and

14   take the cat out, and you look inside and there's no mouse,

15   but you pick that box up and you hold it to the light and you

16   see a tiny little mouse-size hole.  That, ladies and

17   gentlemen, is reasonable doubt, and this case has several

18   little mouse holes.

19        If we -- if you look at it, there is the Nate is

20   left handed, got shot in his left finger.  There was two

21   guns.  The gun they found had never been shot.  There was

22   nothing taken.  And, you know, they, they -- they're going to

23   tell you a lot of reasons and they're going to have the --

3504

1    want the judge to tell you the instructions that once you

2    enter upon a property, that if you have some evil, sinister

3    thing in mind then your right to be on the property

4    terminates, and this is all things that they want you to try

5    and figure out what was in the mind of Nathaniel Jackson.

6            There's no doubt that he wrote letters back and

7    forth to Donna Roberts and he promised her a lot of things in

8    those letters.  He really wanted king crab legs when he got

9    out and sex and a bottle of brandy.  You know, he would

10   probably say anything.  He had been locked up for a year,

11   nine months.  You don't know what was in his mind when he

12   first walked into that house.  They want you to infer that

13   something was in his mind, but we really don't know, and we

14   don't know who made the first move.  These are all mouse

15   holes.  These are all things that bring up reasonable doubt.

16           You are going to have to use your common sense.  The

17   judge is going to tell you what the law is, but you can only

18   apply it.  You're the only ones that are allowed to apply

19   that law to what evidence has been brought in this case.  And

20   I, I think that if you look at it clearly that you'll see

21   that these three verdict forms are the only ones that you

22   should really have to consider.

23           You know, this is -- I'm going to have to sit down

3505

1    now.  This is probably the last thing I'll be able to say,

2    and I don't think I went too much past the 15, 20 minutes.

3    If I did, I apologize for it.  But it's been very nice

4    talking with all of you, and if I have said anything that has

5    offended you, you know, please don't take it out against

6    Nate.

7           And one last thing, I asked you all one question

8    before you were on the jury, is that would you be satisfied

9    to have someone such as yourself sit on a jury, you know, in

10   this case and you all said yes, and I really hope that you

11   can be as fair as you can to Nathaniel Jackson.  Thank you.

12          THE COURT:  Thank you, Mr. Consoldane.

13   Mr. Morrow, you have the last word.

14        **REBUTTAL ARGUMENT ON BEHALF OF THE STATE OF OHIO**

15          MR. MORROW:  Thank you, Your Honor.  We

16   sit here at 3:00 o'clock in the afternoon on Wednesday of a

17   case that was supposed to be done by last Thursday.  One

18   thing Mr. Watkins and I want to thank all of you for is your

19   time.  That is the one thing you've given to us that we

20   cannot return to you, but again, it is something that is very

21   important, that each and every one of you be here and to give

22   us your time so that justice is done in this case.

23          Everyone in terms of the defense has danced around

3506

1    the scenario and danced around what happened at 254 Fonderlac

2    on December 11th, 2001.  Ladies and gentlemen of the jury, it

3    is Mr. Watkins' position and mine that quite simply what

4    happened is that that man, Nathaniel Jackson, and Donna

5    Roberts plotted the murder of Robert Fingerhut over the

6    course of about nine months.  We have the letters going back

7    to February where they begin talking about putting together a

8    plan to take care of the situation.

9         What happened?  Well, I don't know for certain, but

10   I think what the evidence is going to disclose is here is

11   what happened.  This man and Donna Roberts plotted the murder

12   and what their plan was was to go to the house and when

13   Robert Fingerhut got home pull a gun on Robert Fingerhut,

14   handcuff him and forcibly take him from the house at 254

15   Fonderlac, take him down to Youngstown and execute him in

16   Youngstown and leave the car there.  That was the plan.  Then

17   after they were done, had finished executing him--

18                    MR. CONSOLDANE:  Your Honor, I'm going to

19   object.  There is no evidence of that plan.

20                    MR. MORROW:  This is my -- this is what we

21   believe the evidence will show.

22                    THE COURT:  Yeah.

23                    MR. MORROW:  Or what we believe the

3507

1    evidence --

2                    THE COURT:  Objection noted and overruled.

3    Okay.

4                    MR. MORROW:  What we believe the evidence

5    in this case suggests was going to happen.  Unfortunately, --

6    oh, and then after they were concluded with their plan of

7    murdering Robert Fingerhut they were going to dispose of the

8    letters that were found in the dresser and they were going to

9    dispose of the letters that were found in Donna Roberts' car.

10   But guess what?  The best laid plans of men and

11   hunters or men and mice went astray.  And how did that plan

12   go astray?  Why did it go astray?  Because when Robert

13   Fingerhut saw this man armed with a gun he had no choice but

14   to defend himself and to try to attack him.  And what

15   happened?  He got smacked in the forehead.  You know, I may

16   even be mistaken here.  He may have actually shot him in the

17   back first and that's when Robert Fingerhut turned and

18   realized it was him.  And what does Robert Fingerhut do?  He

19   starts to go down, and that's why the second shot comes

20   across his back.  And where is the third shot?  The third

21   shot is when Robert Fingerhut is on the ground beside the

22   counter.  And where is that shot?  It is through his hand

23   into the top of his head from the garage.

Now, ladies and gentlemen, the best laid plans go wrong.  What happened?  At some point during this Nathaniel Jackson does one thing.  What does he do?  Shoots himself in the finger.  Now, imagine if you're there and you have these plans and you shoot yourself in the finger.  What happens?  You lose sight of what you want to do.  You lose track of what your plan was going to be.  And not only that, instead of executing him in his car in Youngstown he ends up killing him in the house.  Shots go off.  Neighbors could hear them. What kinds of things start going through your mind?  He panicked.  That's what happens.

And how do we know this?  Because the phone records that you are going to see are going to show that around 9:45 there are phone calls made between Donna Roberts' car phone and the cell phone that he was using.  And what else do we have confirming that takes place?  We have Donna Roberts all of a sudden driving incredibly slowly on Old Route 82.  And why is she driving slowly?  Because she's on the phone and this man is saying I'm shot, what are we going to do?  She drives down Old 82 slower than what people believe she should be driving.  She stopped at a light for longer than she should be there because they're trying to figure out what to do.  Ladies and gentlemen, the best laid plans, the plans for

3510                                                                                    3509

1    this man to take Robert Fingerhut out of his house and

2    execute him, went wrong because he shot himself in the left

3    finger.  That's the bullet that tumbles through and hits the

4    wall, ladies and gentlemen.

5         Now, one of the things that Mr. Lewis tells you is

6    he says don't take his words for what happens.  That's right.

7    Let's take the defendant's words and Donna Roberts' words and

8    we're going to find out what really happened.  But before I

9    do that I want to talk about a couple of things that they

10   want to suggest to you is what's going on.

11        Mr. Consoldane tells you you only have to consider

12   three charges.  You know, actually the judge is going to read

13   you an instruction that tells you the only way that you

14   consider involuntary manslaughter and that you consider

15   murder is if we are unable to prove that this man purposely,

16   with prior calculation and design, killed Robert Fingerhut.

17   And his words, ladies and gentlemen, are going to prove that

18   he planned the murder and executed the murder.

19        Mr. Consoldane wants to talk to you about ownership

20   of the house and trespass and occupied structure.  Ladies and

21   gentlemen, you are going to have these instructions back in

22   the jury room with you.  Trespass.  Trespass means knowingly

23   entering the land or premises of another without privilege to

3510



1    do so.  Any entrance or remaining in knowingly made in a

2    structure of another that is unlawful if it is without

3    authority, consent or privilege to do so.

4         Where a defendant lawfully enters a residential

5    premises, the privilege to be in or upon this premises can be

6    inferred to have been revoked where the defendant thereafter

7    commits a violent felony directed against another person in

8    the premises who had ability and authority to revoke the

9    privilege.

10        When one enters upon the property of another as an

11   invitee or licensee, that person loses his status as an



12   invitee or licensee and becomes a trespasser when it becomes

13   evident that the purpose of such entry is to commit a

14   criminal offense.

15        Ladies and gentlemen, the purpose of his entry,

16   which is going to be detailed in all of his letters and his

17   phone conversations, was to kill Robert Fingerhut.  That, in

18   essence, equals a trespass, and that is the burglary of going

19   into the place.

20        Occupied structure.  Occupied structure means any

21   house, building or other structure which is maintained as a

22   permanent or temporary dwelling.  It doesn't matter whether

23   Donna Roberts was the titled owner or not.  Think about it in

3512                                                          3511

1   this context; applying the defendant's logic, a renter, a

2   person who was renting an apartment from somebody, could

3   never have a burglary committed against them.  Why?  Because

4   they're not the titled owner, right?  That's the whole thing

5   of what a renter is.

6                   MR. LEWIS:  No, that's not --

7                   MR. CONSOLDANE:  We never said that, Your

8   Honor.  Objection.  We never talked about renters and that's

9   a bad analogy.

10                  THE COURT:  Your objection is noted.

11  Overruled.  Okay.  Let's go on.

12                  MR. MORROW:  Thank you, Your Honor.  In

13  other words, they are trying to tell you that since Robert

14  Fingerhut wasn't the titled owner of the house, wasn't the

15  titled owner of the car, he has no interest in the house and

16  he had no interest in that car.  Ladies and gentlemen, your

17  common sense tells you that's wrong independently.

18              An owner means any person, other than the actor, who

19  is the owner of or who has possession or control of, or any

20  licensee or interest in property or services, even if such

21  ownership, control, license or interest is unlawful.  In

22  other words, a thief can steal from a thief, that is an adage

23  of law, meaning that if you have a possessory right to be in



3512

1  property, have a possessory right to hold that property, you

2  are the owner of it.  Therefore, a renter is an owner.  I

3  give my car keys to my next-door neighbor and say drive my

4  car.  For purposes of law, my next-door neighbor is an owner.

5  Think about the logic of their argument.  There isn't any.

6          Mr. Consoldane also wants to tell you that Robert

7  Fingerhut wasn't robbed because all his jewelry, all of these

8  fine things weren't taken from him.  Well, you know what,

9  ladies and gentlemen, these were.  The keys were taken from

10  Robert Fingerhut when the defendant left the house.  And you

11  know what?  Carmen, I forgot his name, and Barry both told

12  you without a doubt these were Mr. Fingerhut's keys.

13  Actually they were Mr. Roberts' keys, as he called him, but

14  they were Mr. Fingerhut's keys.  Secondly, use your common

15  sense.  How many women carry a gym bag, a buoy eyeball, a

16  finger knife?  Quite simply, ladies and gentlemen, these were

17  Mr. Fingerhut's keys and he took them.

18          Go to the car, and you're going to have pictures in

19  the back of the car.  What was in the back of the car?

20  Mr. Fingerhut's clothing.  Mr. Fingerhut's jacket.

21  Mr. Fingerhut's personal items.  And he took his car.  When

22  took Mr. Fingerhut's car, the car that Mr. Fingerhut drove,

23  and he took his personal items, that also constitutes a

3513



1    robbery.  Ladies and gentlemen, property means any property,

2    real or personal, tangible or intangible, or any interest or

3    license in such property.  It doesn't have to be a $33,000

4    car, it can be as simple as these keys.

5         I would concede, as Dennis and I have done already,

6    that Donna Roberts was the titled owner of all the business

7    property; Donna Roberts was the titled owner of the house;

8    Donna Roberts was the titled owner of the car.  Interestingly

9    enough, he's right, she could have taken everything and

10   booted Robert out.  But what's the one thing she couldn't get

11   while he was still alive?  What's the one thing?  Actually,



12   ladies and gentlemen, it's 550,000 things.  $550,000 for

13   Robert Fingerhut's death, that's what she gets, and, as a

14   result, that's what he gets.  That's the one thing she

15   couldn't get.  And you know why she needed that?  Because her

16   business was in trouble.  And you know why the business was

17   in trouble?  Remember when this happened, three months after

18   September 11th.  How many of you traveled after September

19   11th?  How many of you decided to stay home and not go

20   anywhere after September 11th?  That's what was going on.

21   And you're going to hear that the business -- I'm going to

22   read a letter that says the business lost $19,000 because

23   nobody was traveling.

3514




1     She was cut off.  Dennis read you the letter about

2  the 52 credit cards.  She was cut off.  She had no money.

3  Why?  Because Robert was giving it to her all.  So she's got

4  to kill Robert to get the $550,000.  Mr. Lewis suggests, you

5  know, Donna could have kicked him out.  Donna could have

6  said, "Robert, leave."  Donna could have said, "Robert, get

7  out of here."  Yeah, she could have, but did she?  No.  We're

8  not talking about hypotheticals, ladies and gentlemen, we're

9  talking about what was going on at the time of the murder,

10  and at the time of the murder Robert Fingerhut was worth

11  $550,000 to her dead.

12     Also, it's interesting, there's two phrases, de

13  facto and de jure.  They are two terms used in law.  De facto

14  means in fact.  De jure means in law.  Well, Donna Roberts

15  was the de jure owner; in law she was the owner.  But the

16  evidence I submit to you suggests that Robert Fingerhut was

17  the de facto owner.

18           MR. CONSOLDANE:  I object, Your Honor.  He

19  can't argue against his own evidence.

20           THE COURT:  I don't believe that he is.

21           MR. CONSOLDANE:  Well, I mean, the

22  evidence, he can't --

23           THE COURT:  Overruled.  Overruled.

3515

1              MR. CONSOLDANE:  And besides, it's up to

2    you to inform them what the law is, not the prosecutor.

3              THE COURT:  Okay.

4              MR. CONSOLDANE:  And that's not in the

5    jury instructions.

6              THE COURT:  Overruled.  You are on the

7    record, your objection is noted.

8              MR. MORROW:  Thank you, Your Honor.  In

9    reality Robert Fingerhut, even as Mr. Lewis tells you, ran

10   the business, ran the house, controlled the money, did all

11   that stuff, and maybe Donna didn't know the law in Ohio.

12   Maybe she didn't.  Maybe she thought there was a common law

13   marriage because they were from Florida.  We don't know that.

14   But we do know she wanted him dead.

15       Mr. Lewis suggests that Robert Fingerhut knew about

16   Nate Jackson.  I would submit to you that Robert Fingerhut

17   knew about someone, he didn't know about Nate Jackson.  As a

18   matter of fact, when you have the letter from Donna Roberts

19   which is dated November 26th at 1:00 p.m., you're going to

20   read this letter, and it is says "I only worry about losing

21   you or losing me to incarceration.  You know I will be the

22   first one to face questioning.  I don't want to have to get

23   an attorney and defend myself.  Oh and I have some info to

3516

1   add to our plan.  You know there are phone records and CCA

2   pass records.  Well - everyone thinks he is gay - did you

3   know that?  It's been whispered alot in Youngstown.  The good

4   part is that he is the one who wrote and paid the checks on

5   the phone bills - his writing.  So - he knew about you."  The

6   nice thing, though, you're going to see this, parentheses,

7   "(not really)  But the whole phone thing could be good

8   because it shows you were a friend to both of us.  And maybe

9   you were a real good friend of his.  Anyway, your hair and

10  prints could be anywhere since you drove the car and were

11  here and all.  But I think it's all gonna come down to me

12  when I get that call.  And I can handle that because it means

13  everything to us both.  I am not even worried about it any

14  longer because I've thought about it alot and am prepared.

15  Instead of laughing and cheering, I will concentrate on

16  losing someone that I ... really get nuts over and react

17  accordingly."

18          You're also going to see letters, and Dennis has

19  read a couple of those to you already, that talk about how

20  she hid the letters from him.  October 20th, page two, I know

21  but I keep forgetting.  And in every letter that you mention

22  anything about Robert, well, I think you better throw them

23  out and maybe you should do the same with mine."

1           Donna, November 9th, 11:00 o'clock, "He walked right

2    in again to check up on me.  Man I threw your letter and this

3    letter under the desk so fast."  "I ... can't believe ... he

4    hasn't put this together yet ..."

5           That November 26th letter I forgot, I forgot this

6    "...  I have been all over looking for a ski mask.  I only

7    see ... knitted caps.  Any suggestions on who might have

8    them?  And I'm still looking for gloves because I don't think

9    the thick ones I'm seeing are good to work with as ...

10   thinner leather ones.  Know what I mean?"

11          Oh, just as an aside, Mr. Lewis talked about him not

12   wearing a hood.  No, Mr. Lewis is confused.  The hood he is

13   talking about is the hood, the neighborhood, the slang for

14   the neighborhood that the defendant lives in, not that he's

15   not going to wear a hood.  Read through his letters when he

16   talks about I ain't going back to the hood.  What he's saying

17   is I'm not going back to the ghetto.  Why?  Because he's sick

18   and tired of living in the ghetto.  And what's his way out of

19   the ghetto?  Killing Robert Fingerhut.

20          Mr. Lewis talks about a bunch of different plans and

21   he talks about keeping the letters and he talks about the

22   phone calls.  Well, unfortunately we are probably all too

23   familiar with stupid criminals in the news.  I don't submit

3518



 1    any criminal is a smart criminal.  I think they're all pretty

 2    stupid.  But you know what, when you kill somebody that's

 3    probably the biggest form of stupidity that you can show.

 4    And, you know, the fact that they didn't dispose of the

 5    letters in a timely fashion and the fact that they were

 6    recorded on phone conversations doesn't mean somebody didn't

 7    murder Robert Fingerhut.  The fact that he was not smart in

 8    their plan, or not smart in carrying out the plan is the way

 9    they had it figured out, doesn't mean it didn't happen.  This

10    wanna-be over here wanted to be a tough guy and he wanted to

11    kill Robert Fingerhut and he did.

12            Please bear with me for just a few moments.  I want

13    to read just a couple more excerpts from the phone

14    conversations, or from phone conversations and letters.

15    You're going to have them all back there.  Two hundred and

16    eighty-eight letters.  Actually 283, I believe, total

17    letters.  But, ladies and gentlemen, they're right, we are

18    picking out the ones that show the plan because, having read

19    through every single one of those and having her talk about

20    performing oral sex on him or using different kind of toys or

21    different kinds of sexual activities, I don't think it's

22    necessary for you to read through all that stuff.  It's up to

23    you.

3519

1           MR. LEWIS:  Objection, Your Honor.  He's

2  telling them not to look at the evidence.  Now, that's

3  ridiculous.  He can't do that.

4           THE COURT:  He is giving his opinion.  The

5  jury has the right, of course, to read through every last

6  letter if they wish to.  He is merely giving his opinion.

7  Objection noted.  Overruled.

8           MR. MORROW:  Thank you, Your Honor.  And

9  to begin with I just want to talk a little about the money

10 issue.  The October 20th letter, 2001, 11:00 o'clock, "I hate

11 it when he talks to me too.  I hate to look at him.  And I

12 get sick when he is about to come home at night.  I wonder

13 what's going to happen in our house."  She even tells you

14 folks that it's their house, hers and Robert's.  "This

15 certainly is no way to live.  I can't stand to ... handle ...

16 his laundry anymore."  "If there was any way I could leave

17 and just live half as well as I do - I would leave that house

18 right now."  Ladies and gentlemen, she thinks the only way

19 out is to kill him.

20          December 20th again at 1:00 o'clock, "It'll just be

21 a little tougher now because he gives me $100 a week for

22 everything and then makes me write checks to keep track of it

23 all.  And I haven't been allowed to use any of my 52 charge

3520

1    cards - emergency only."  This is what Dennis read to you and

2    this is what Mr. Lewis read to you.  Do you know what that

3    means?  She's got no money.

4         October 29th, "... as far as the Robert problem?

5    Yes I'm taking care of that the next night ..." this is from

6    Nate to her, "... because I told you I'm tired of living like

7    this when I don't have to.  An after that will you get me a

8    2002 Cadillac Deville?"

9         Donna, November 2nd, "... I don't want you to feel

10   insecure so you can rest assured that I will always look out

11   for your best interest.  I will always make sure that if

12   anything happens to me - well - you'll be taken care of.  You

13   know I have already begun to think about that aspect of our

14   relationship."

15        "Maybe you want to eliminate me too, get your

16   inheritance and be gone with your young girlfriend!"

17   Inheritance issues there.  She's already contemplating that

18   she's going to get Robert's inheritance when he dies and

19   that's why she puts it in.  She is going to take care of him.

20        November 10th from Donna, "Guess what - I have no

21   money and no weed as of right now.  $6.00 that's all I got!

22   I am used to having at least a couple of hundred on me ... I

23   sure miss that.  I have got to figure a way to get some money

3521

1    before you get home!  That's for sure.  He has me on a real

2    short rope here.  He watches me every fucking minute."  "He

3    examines every check I write.  I HAVE TO ASK PERMISSION TO

4    USE A CREDIT CARD OR WRITE A FUCKING CHECK!  What the fuck is

5    that all about!"

6          Finally, November 20th, "... just got the word from

7    Y-town.  We're $19,000.00 down in business there which

8    translates to $2470 for us at 15%.  So you see how bad it is

9    and I forgot how far down we are ... in Warren.  I don't

10   think its as bad as Y-town but we are down alot too.  That's

11   alot for a month you know."

12         I just got -- the defense also wants to suggest,

13   first Mr. Lewis suggests there's only one gun and

14   Mr. Consoldane wants to suggest there's two guns.  Actually,

15   ladies and gentlemen, I'm going to tell you that Donna

16   Roberts by her own admission tells you she had three guns

17   prior to one being stolen.  We are down to two.  And what two

18   guns do we have left?  Well, for sure we know this one.  This

19   is Robert Fingerhut's Taurus.  This is the gun that's found

20   at the crime scene on the step.  This is the gun that was not

21   used to kill Robert Fingerhut.  This was the one that had all

22   five spent or all five shells left in it.  We clearly know

23   that Robert, that this gun was not used to kill Robert.

3522

1          Donna, by her own statement, tells us that she has

2     guns.  November 24th telephone conversation; remember, we

3     played this the other day where she talks about the guns

4     getting stolen.  "Donna:  It's a big 38."  Nate, "The big

5     one."

6          "Donna:  Yeah.  I had, I had both of them in there.

7     That little one you know, and that, and for some reason I

8     took the little one and put it in the bedroom by me because I

9     heard a noise one night ..."

10          Nate, "Yeah."

11          "Donna:  Or they ... both ..." would have "...been

12     gone."

13          Nate, "So you still got two of them don't you?"

14          "Donna:  Yes."

15          Donna's letter November 26th, "... I have my .38

16     Taurus right here by my right hand..."

17          Donna's November 27th letter, "This .38 Taurus looks

18     like a piece of junk compared to it.  Wait ... just ...

19     another ... look at it - it's not ..." all that bad.  "But

20     it's not my favorite S and W," which I believe is Smith &

21     Wesson.  "I wonder where I can get another one like it.  Or

22     maybe two guns are enough."

23          Also the defense raises some suggestion that Robert

824                                                                      3523

1    was smoking marijuana or that this defendant's story is

2    correct because he and Robert went to C. Staples to get the

3    marijuana. Two pieces of evidence I want you to remember,

4    the toxicology report from Dr. Germaniuk who testified that

5    Robert Fingerhut had not a single drug in his system.  That's

6    a toxicology report taken from a dead man.  Second, remember

7    this officer's testimony.  The roaches that were found in the

8    house had pink lipstick on them.  You draw the conclusion you

9    want. And I guess maybe third, think about the letter I just

10   read to you when Donna is telling you she didn't have weed.

11   I would suggest it wasn't Robert that smoked the weed but it

12   was Donna.

13            You are going to have the letters back there with

14   you, ladies and gentlemen.  There is -- Dennis went through

15   15 letters detailing this plan and there are more letters

16   that you're going to have.  And indeed, if you remember the

17   one that Dennis read to you, it was where they talked about

18   having Robert watch while Donna performs oral sex on this

19   man.  If you remember what that letter talked about it talked

20   about that he is going to be tied up and there isn't anything

21   he can do about it, or words to that effect.  How is that

22   going to happen?  It was going to happen because they were

23   going to handcuff him, and that was before he was going to,

3524

1    quote, leave planet earth, if you remember.

2        Not only did we have this conversation about her

3    having -- Donna initiating the idea about having Robert

4    perform on her, we have this defendant confirming it in his

5    letter and we have this defendant confirming it in his spoken

6    words.

7        As you go through the letters you're going to hear,

8    you're going to read things that initially may not make sense

9    to you, and I'll submit to you that once you get done reading

10   the letters everything will start to come into place.  And in

11   those are terms like situation, package and delivery.  I

12   suggest that the letters explain that the situation was the

13   Robert situation, the delivery and the package was making his

14   initial plan of killing Robert at the Greyhound bus terminal,

15   only he decided maybe the better thing to do was to do it at

16   the house because they were going to be able to take him down

17   to Youngstown and dump him.  You're going to see that, ladies

18   and gentlemen.

19       Mr. Lewis and Mr. Consoldane, actually it was

20   Mr. Lewis that told you don't listen to his words.  They're

21   right, ladies and gentlemen.  Don't listen to Dennis' words.

22   Don't listen to my words.  Listen to the defendant's words on

23   the tapes.  Read the defendant's words in the letters.  And

3525

1    remember just two statements I want to give to you.  On

2    December 8th he tells Donna, "I just need to be in that house

3    when he come(s) home," and "You an I are gonna be together if

4    I have to shoot Robert in the fucking head to make it so."

5    Listen to his words and then give him your words, and your

6    words should be guilty.

7                    THE COURT:  Thank you, Mr. Morrow.

8                    MR. CONSOLDANE:  Your Honor, can we

9    approach the bench?  This doesn't need to be on the record,

10   just a housekeeping matter.

11                   THE COURT:  Kelly, you want to join us?

12   You want to join us?

13                   MR. CONSOLDANE:  We don't need the record.

14                   THE COURT:  You don't need that?

15                   MR. CONSOLDANE:  No.

16                   (Whereupon, a bench conference was held.)

17                   THE COURT:  Ladies and gentlemen, this

18   will take -- let me, for the record here, you've heard the

19   closing arguments of counsel.  I would again remind you what

20   you've heard is not evidence.  Of course, you've heard the

21   evidence through the witnesses and these exhibits.  You can

22   use any portion or none of anything you've heard by closing

23   arguments, that's up to you, folks.  It's merely to help you

3527                                                                    3526

1  think through as they see it.  You apply your thinking,

2  however, independently of that.

3         I am going to give you a 10-minute break.  When you

4  come back I will then read you the closing instructions.

5  This will probably take about a half hour to 45 minutes and

6  then the case will be delivered to you and we'll go through

7  all that.  Very important, I'm sure you remember not to

8  discuss anything or form any opinion until you return.  So

9  we'll give you a buzz.  We have a couple things we have to

10  put on the record here.  It might take a little bit longer

11  than 10 minutes but I don't think much longer, so you're

12  excused.  Thank you.

13               (Whereupon, a brief recess was taken by

14  the jury during which the following proceedings commenced.)

15               THE COURT:  Okay.  The jury is not in the

16  courtroom.  The defendant is present with counsel and the

17  State.  Do you have something to say for the record, defense?

18               MR. CONSOLDANE:  Yes, Your Honor.  First

19  of all, I would like to renew all of my objections that I had

20  placed on the record yesterday as to the jury instructions

21  that you are about to read, you know, to the jury,

22  specifically those added instructions as to the trespass.  I

23  think they are uncalled for.  And then -- and those, I mean,

3527

1    have already been ruled on by the Court to be admissible, I

2    understand that, but I just want, just to preserve the

3    record, I would like to put those on the record again now.

4         And then my other objection to these, to the ones

5    that they just added today.  Yesterday they did not have the

6    lesser included offenses that later on they did add in --

7              MR. MORROW:  Murder and voluntary

8    manslaughter?

9              MR. CONSOLDANE:  No, the self-defense is

10   what, you know, they added in.

11             THE COURT:  Self-defense has been added.

12             MR. CONSOLDANE:  But you moved -- what

13   page is that on?  Oh, I see.  Never mind.  It's on page 13.

14   They did put that back in in the bold print.  But when they

15   moved to the lesser included offenses of murder --

16             THE COURT:  They're capitalized.

17             MR. CONSOLDANE:  Okay.  Yeah, they have

18   aggravated murder is coming, you know, they have that, you

19   know, capitalized, several.  As a matter of fact, they keep

20   capitalizing that all the time, and I would object to that.

21   I think that, you know, they should only capitalize that

22   once.

23             THE COURT:  Your objection is noted for

3528

1   the record.  Overruled.

2                    MR. CONSOLDANE:  And then when they come

3   to the murder offense, you know, all of a sudden they

4   capitalize aggravated murder again and then all throughout

5   that entire, entire charge they never capitalize murder

6   again.  Now, it's kind of just saying, you know, that

7   aggravated murder is important for you to consider, don't

8   consider or read these instructions on murder.  And then even

9   further than that, they never even bring up the heading of

10  manslaughter, they just stick it down at the end.  The last,

11  the middle of the page on 18 is that not found guilty of

12  murder then guilty of voluntary manslaughter and, you know,

13  that should be, that should be a separate charge showing what

14  the elements of voluntary manslaughter are because they could

15  -- if they find him not guilty of murder they could find him

16  just not guilty.  They don't have to say if you find him not

17  guilty of murder you have to find him guilty of voluntary

18  manslaughter, is that they should have what the different --

19                    THE COURT:  I don't think that that -- if

20  they go down through them all and find him not guilty on all

21  the various subcategories then he would be found not guilty.

22  I don't --

23                    MR. MORROW:  Quite simply, Your Honor, in

3520                                                                 3529

1    order to get to voluntary manslaughter they have to find him

2    guilty of murder and find him, his culpability reduced by

3    provocation or sudden passion.  So if they find in the jury

4    instructions -- and to be honest with you, judge, I took this

5    directly from Ohio Jury Instructions and it uses this exact

6    same language.  At 8:30 last night as I sat down preparing

7    these at the Court's request, I apologize for omitting the

8    bolds on a couple of murders, but at 8:30 last night I tried

9    to go over to the public defender's office and there was no

10   one at the office for me to deliver them to.

11                  MR. CONSOLDANE:  Jimmy was there.

12                  MR. LEWIS:  Chuck, why didn't you go -- I

13   was there.  I was there.  The light was in the back room, the

14   lights were on.

15                  MR. MORROW:  Well, I apologize.  I didn't

16   pull up to the door.  The lights were off.  And if you were

17   there, I apologize, Jim.

18                  MR. LEWIS:  The lights were on.  I can't

19   read.

20                  THE COURT:  We established several times

21   on the record yesterday that the defense has no objection to

22   OJI, pure OJI being used, so that is what is contained in

23   this.  Your objection, though, to the failure to capitalize

3530





1    murder three or four times is --

2                    MR. CONSOLDANE:  Well, I mean, and then

3    also they didn't capitalize the voluntary manslaughter.  It's

4    like an afterthought.

5                    THE COURT:  Okay.

6                    MR. CONSOLDANE:  And, I mean, if you are

7    going to capitalize aggravated murder then let's capitalize

8    voluntary manslaughter.

9                    THE COURT:  Well, it's noted on the

10   record.  It's overruled, your motion is overruled to --

11                   MR. MORROW:  To be honest with you, judge,

12   I got the stuff here, I can add the bolds in 30 seconds.  And

13   after you are done charging the jury, while we're submitting

14   all the exhibits back to them and they're milling about, I

15   will make that correction, we'll substitute that page with

16   the bolds on it.

17                   THE COURT:  That's fine if you want to do

18   that.  No objection to it, I just don't think that it's

19   anything that should delay this.  If it isn't going to delay

20   that any longer than a reasonable time, that's fine, we'll do

21   it that way.  Anything else by the defense?

22                   MR. LEWIS:  Judge, on page 19 it says

23   while committing or attempting to commit.  I understand the

3531

1    first sentence which lays out while committing or attempting

2    to commit means that the aggravated burglary must occur as

3    part of acts --

4                    MR. MORROW:  I can't understand you, Jim.

5                    MR. LEWIS:  Let me just ask you, while

6    committing or attempting to commit, is that OJI?  That whole

7    thing, that last sentence, "The question of whether the

8    Defendant killed Robert Fingerhut before or after he

9    committed a theft offense is of no consequence."

10                   MR. WATKINS:  That was discussed and that

11   was in the Supreme Court decisions.

12                   MR. CONSOLDANE:  That's not OJI?

13                   MR. WATKINS:  No, it's not OJI.

14                   MR. LEWIS:  Then, judge, we're objecting

15   to the last sentence there.  The first sentence, "'While

16   committing or attempting to commit' means that the aggravated

17   burglary must occur as part of acts leading up to, or

18   occurring during, or immediately after the murder set out in

19   this charge and that the murder was directly associated with

20   the theft offense set out in the charge."  That's where it

21   should be -- the last sentence should be -- we're asking that

22   it be deleted.  That would also apply in the case of the

23   aggravated robbery.  "The question of whether the defendant

3532

```
 1   killed Robert Fingerhut before or after he committed a theft

 2   offense is of no consequence" should --

 3              MR. CONSOLDANE:  Yeah, that shouldn't be

 4   in there.  That is --

 5              MR. WATKINS:  Yes, it is, Your Honor.

 6              THE COURT:  Well, I think in the Biros

 7   case, and what was the name of the case --

 8              MR. WATKINS:  Biros and Palmer and there's

 9   one other case on that point.  It is a consequence because

10   the evidence shows that this was taken after he was shot and

11   he immediately died.

12              THE COURT:  Yeah.

13              MR. LEWIS:  I understand that.

14              THE COURT:  You don't have to show that

15   there was intent prior to the meeting.

16              MR. LEWIS:  But the first sentence says

17   that the murder was directly associated with the theft

18   offense, okay.  Then you turn right around and say, then you

19   turn right around and distinguish that and say the question

20   of whether the defendant killed Robert Fingerhut before or

21   after he committed a theft offense is of no consequence.

22   Well, what it says is that basically is that he murdered

23   Mr. Fingerhut and five years later took his property so no
```

1    consequence.  Well, it is a consequence.  The first sentence

2    sets it out and then the last sentence tells you okay, forget

3    it, it doesn't make any difference.  It does make it, it's a

4    consequence.  That's what it tells you.  It simply

5    obliterates the first sentence.

6                    THE COURT:  Well, you can add there of no

7    consequence as long as it was a stream of -- occurred during

8    a stream of events.

9                    MR. WATKINS:  Course of events.

10                   THE COURT:  Course of events.

11                   MR. LEWIS:  Well, it already says that in

12   the first sentence.  The second sentence is the one that

13   turns around and says it doesn't make any difference.

14                   MR. CONSOLDANE:  It already says that in

15   the first part.  That second part is just too confusing to

16   add to it.  It already says that in the first part.  You

17   don't need to say it twice.

18                   MR. LEWIS:  You're saying what they have

19   to find, it has to be associated with the course of events in

20   regard to the theft offense.  Then you turn right around and

21   say, well, forget that, you don't have to worry about it.

22   That's not --

23                   THE COURT:  That merely complies with the

3534

definition of aggravated burglary must occur as a part of the

acts leading up to, occurring during or immediately after the

murder set out in this charge. All that the courts of appeal

has done is said the same thing applies to the theft, you can

have the thought before, during or after, it doesn't make any

difference as long as it's part of the acts, you know, series

of acts or events.

MR. LEWIS:  Well, we're objecting to that

sentence, judge, and then I assume it's -- well, that's the

only place it is that I can find, right?

MR. MORROW:  Uh-huh.

MR. LEWIS:  Okay.

MR. CONSOLDANE:  Yeah, the first part of

it is all right, it's just that last sentence that doesn't

belong here. And, you know, is that they keep quoting all

these other cases that, you know, they haven't been

overturned. However, the supreme court and the court of

appeals have said, you know, Mr. Prosecutor, this is wrong.

You know, there's enough evidence. Don't do it again. Just

because they didn't overturn it --

THE COURT:  That doesn't happen to be the

case on this point though from these cases.

MR. WATKINS:  That's from State versus

3535

1    Biros and other supreme court cases.

2              THE COURT:  You'll find cases from all

3    over the State where they've said, well, the prosecutor went

4    beyond the pale but it isn't reversible error and don't do it

5    again, but I don't think that the point we're talking about

6    here is a circumstance of that nature.

7              MR. CONSOLDANE:  But, you know, Your

8    Honor, the question of whether this happened has never been

9    an issue during this trial.

10             THE COURT:  I don't follow you.

11             MR. CONSOLDANE:  Well, in other words,

12   we've never said that the, that the -- we've never contested

13   that there was no, that there was no robbery because it

14   happened after he was dead or anything, that has never been

15   an issue in this trial, and this, this sentence is just too

16   confusing.  If that had been an issue in the trial that they

17   took something, we said, after he was dead and therefore it

18   couldn't be a robbery, I'd understand for that sentence then

19   to be in there, but this is not -- we have never asserted

20   that defense nor or even said it to the jury, that it

21   happened after his death.  We claim that there may not have

22   been a robbery at all but we never --

23             THE COURT:  Mr. Consoldane, the testimony

3536

1    here was that he got shot in the head and went down like a

2    sack of potatoes and probably took no more than a couple

3    breaths and died.

4                    MR. CONSOLDANE:  But you never heard us

5    arguing that --

6                    MR. WATKINS:  Well, we're requesting it,

7    Tony.  We're allowed to ask for a clarification and that's

8    what we did.

9                    THE COURT:  The point is that unless the

10   defendant was very swift he would not have gotten in the car

11   and left after the death -- or before the death, if the

12   forensics, you know, doctor is correct.  Your objection,

13   Anthony, will be, you know, I'm overruling it.

14                   MR. CONSOLDANE:  Okay.  And there's one

15   more point to that same thing, Your Honor, is that they say

16   that the question of whether the defendant killed Robert

17   Fingerhut, you know, they're assuming that he killed him in

18   this sentence.  Before he committed the offense is of no

19   consequence.  And it's just like they're telling the jury

20   that he killed Mr. Fingerhut and he committed this robbery,

21   and because he did it before or after is of no consequence,

22   and I think that that is just very misleading to the jury.

23                   THE COURT:  No.  I think you are again

3538                                                              3537

1    leaving something out.  The whole thing is framed with the

2    sentence that starts the whole thing, if your verdict is, if

3    your verdict is.  If your verdict is this then blah, blah,

4    blah.  That doesn't direct them to find anything.

5                      MR. CONSOLDANE:  It doesn't say if.

6                      THE COURT:  It is their choice as to what

7    they find.

8                      MR. CONSOLDANE:  It doesn't say if

9    anywhere in this.

10                     THE COURT:  Not in that particular

11   paragraph, but you don't get to that particular paragraph

12   until you get to the point of finding guilt up above.

13                     MR. CONSOLDANE:  Well, I just think that

14   sentence on the end is highly prejudicial to the defendant.

15                     THE COURT:  Well, it is right out of OJI,

16   that portion you're talking about.

17                     MR. CONSOLDANE:  You know, especially in

18   this case, Your Honor, when no issue has been made that the

19   theft offense occurred after his death.  I mean, if we had

20   made that an issue I can understand that this may be

21   important.

22                     THE COURT:  My reasoning is, Anthony, I

23   would agree with you if it had no part of this, but my

3538

1    reasoning is based on the fact, as I said, that the jury can

2    very logically find that the deceased did not live for any

3    period of time other than seconds.  And they could get back

4    there and say to themselves, well, he couldn't have taken

5    this car during the burglary because the defendant had died,

6    therefore it doesn't fit within the context of the

7    definition.  And I'm saying that that question which complies

8    with case law says that if they get to that point it doesn't

9    matter whether he was dead before or after the theft

10   commenced, the offense.

11                  MR. CONSOLDANE:  But, Your Honor, it says

12   up here during or immediately after, you know, so why do we

13   have to say it again?  And these words are very --

14                  THE COURT:  Where are you reading from?

15                  MR. CONSOLDANE:  Well, on page 19 you

16   start out "While committing or attempting to commit."

17                  THE COURT:  Or fleeing immediately after?

18                  MR. CONSOLDANE:  Yeah.  Okay.  Now, if you

19   come down here, if you read down there it says that the

20   aggravated burglary must occur as a part of the acts leading

21   up to, or occurring during, or immediately after the

22   murder --

23                  THE COURT:  Right.

3539

1              MR. CONSOLDANE:  -- as set forth, and,

2      you know, it goes on directly associated.

3              THE COURT:  And all that last sentence

4      does is say that the same thing applies to the theft as

5      applies to the aggravated burglary, before, during or after.

6      That's all they're doing.

7              MR. LEWIS:  Well, --

8              MR. CONSOLDANE:  It just it's coming in,

9      it's coming in double.  I -- is that every --

10             THE COURT:  No, it isn't.  We're talking

11     about burglary in one case and we're talking about a theft

12     associated with a burglary in the other.  It's two different

13     things.

14             MR. LEWIS:  But while committing or

15     attempting, the definition of while committing or attempting

16     to commit means the aggravated burglary must occur as a part

17     of the acts leading up to, or occurring during, or

18     immediately after the murder set out in this charge and that

19     the murder was directly associated with the theft offense set

20     out in this charge.  Now, that sets parameters for those

21     jurors to understand that yeah, it can happen before, it can

22     happen after and it can happen during, and you have to

23     associate, it has to be associated with it, whatever.  What

1    the next sentence does is just turns the whole thing upside

2    down and eliminates that whole sentence and what they have to

3    find.  It says the question of whether the defendant killed

4    Robert Fingerhut before or after he committed a theft offense

5    is of no consequence.

6                   THE COURT:  Well, the only thing that

7    would comply with your request is that you would read the

8    question or the sentence as follows:  The question of whether

9    the defendant killed Robert Fingerhut before or after he

10   committed the theft offense is of no consequence but it must

11   occur as part of the acts leading up to, occurring during or

12   immediately after the murder set out.  Now, do you want that

13   added?

14                  MR. CONSOLDANE:  Well, or -- yeah, and

15   take out the last sentence.

16                  THE COURT:  No, adding to the last

17   sentence. The last sentence is proper.

18                  MR. WATKINS:  Your Honor, we have a jury.

19   I don't know why -- Tony said it three times.  He goes over

20   and over and over.  Whatever he gets he gets, but, I mean,

21   this jury is waiting.

22                  MR. LEWIS:  Okay.  The objection is on the

23   record, judge.  All right.  Anthony.

3542                                                                          3541

1                              THE COURT:  Yeah, your objection is noted

2      for the record.  Overruled.

3                              MR. LEWIS:  Anything else?

4                              THE COURT:  Anything else?  I hate to ask.

5                              MR. CONSOLDANE:  Wait.  I'm not -- let me

6      just -- I had it marked somewhere.

7                              THE COURT:  Nothing?  Thank you.  Anything

8      by the State?

9                              MR. WATKINS:  No, Your Honor.  We're ready

10     to go.

11                             THE COURT:  Okay.  Let's get the jury up

12     here.

13                             (Whereupon, the jury was seated in the

14     jury box and the following proceedings commenced.)

15                             **CHARGE OF THE COURT**

16                             THE COURT:  Be seated, please.  Okay.

17     We're all back.  Can you hear me okay?  No?  If I get up

18     closer to this can you hear me?

19                             Now, ladies and gentlemen, you've heard everything

20     except the charge of the Court, the closing instructions.

21     I've often thought that it would take a Richard Burton or a

22     Sean Connery to make closing instructions sound good, but

23     they are very important.  There is some repetition and it's

3542

1    necessary that we do that.  The important thing is that you

2    try to grasp the content of the instructions.  The nice part

3    is that with our advent of computers it now becomes possible

4    to give the jury a written copy of the instructions.  That's

5    always been a problem in the past, it would take somebody to

6    type them, but now it can be done rather quickly, so you will

7    have a copy of these but it is necessary that I try to

8    explain them to you beforehand.

9        Members of the jury, you have heard the evidence and

10   the arguments of counsel.  The Court and the jury have

11   separate functions.  You are called upon to decide the

12   disputed facts and the Court provides the instruction of law.

13   It is your sworn duty to accept these instructions and to

14   apply the law as it is given to you.  You are not permitted

15   to change the law nor to apply your own conception of what

16   you think the law should be.  Similarly, the Court may not

17   interfere in any way with your function as jurors.

18       Now, a criminal case begins with the filing of an

19   indictment.  The indictment informs the defendant that he has

20   been charged with an offense.  The fact that an indictment

21   was filed may not be considered by you for any purpose.  The

22   plea of guilty entered in this case -- I'm sorry, the plea of

23   not guilty.  We wouldn't be here if there was a plea of

3543

1    guilty.  The plea of not guilty is a denial of the charges

2    and specifications and that puts in issue all of the

3    essential elements of each charge and specification.  That

4    puts the burden of proof upon the State to prove each and

5    every element of each offense.

6         Now, the defendant is presumed innocent unless his

7    guilt is established beyond a reasonable doubt, and the

8    defendant must be acquitted of an offense unless the State

9    produces evidence which convinces you beyond a reasonable

10   doubt of every essential element of that offense and

11   specification charged in the indictment.

12        Now, reasonable doubt is present when, after you

13   have carefully considered and compared all of the evidence,

14   no matter who produced it, you cannot say that you are firmly

15   convinced of the truth of the charge.  Reasonable doubt is a

16   doubt based on reason and common sense.  Reasonable doubt is

17   not mere possible doubt because everything relating to human

18   affairs or depending on moral evidence is open to some

19   possible or imaginary doubt.  Proof beyond a reasonable doubt

20   is proof of such character that an ordinary person would be

21   willing to rely and act upon it in the most important of his

22   or her own personal affairs.

23        Now, you must determine the issues in this case from

3544

1    the evidence and the evidence is all the testimony received

2    from the witnesses, the exhibits admitted during the trial,

3    and any stipulations or agreement by counsel.  Evidence

4    itself may be either direct or circumstantial or both.

5              Direct evidence is the testimony given by a witness

6    who has seen or heard the facts to which they've testified,

7    and it also includes the exhibits admitted during the trial

8    which you will have with you, of course, back in the jury

9    room.  Now, circumstantial evidence is the proof of facts or

10   circumstances by direct evidence from which you may

11   reasonably infer other related or connected facts which

12   naturally and logically follow according to the common

13   experience of mankind.

14             To infer or to make an inference is to reach a

15   reasonable conclusion or deduction of fact which you may, but

16   are not required to, make from other facts which you find

17   have been established by direct evidence.  Now, whether an

18   inference is made or not rests entirely with you, but direct

19   and circumstantial evidence are of equal weight or probative

20   value.

21             Now, the evidence does not include the indictment or

22   the opening statements or closing arguments of counsel.  The

23   opening statements and the closing arguments of counsel are

1    designed to assist you but they are not evidence.

2            Statements or answers that were stricken by the

3    Court or which you were instructed to disregard, that

4    happened several times, are not evidence and must be treated

5    as though you never heard them.  You must not speculate as to

6    why the Court sustained any objection to any question or what

7    the answer to such question might have been, and you also

8    must not draw any inference or speculate upon the truth of

9    any suggestion included in a question that was not answered.

10   The things you saw during the jury view are not evidence

11   either, but they may be of some help for you to understand

12   the evidence.

13           As I've repeatedly told you, you are the sole judge

14   of the facts in this case, also the credibility of the

15   witnesses and the weight of the evidence.  To weigh the

16   evidence you must consider the credibility of the witnesses.

17   You will apply the tests of truthfulness which you apply in

18   your daily lives.  These tests include the appearance of each

19   witness upon the stand; his or her manner of testifying; the

20   reasonableness of his or her testimony; the opportunity that

21   person had to see, hear or know about that to which they have

22   testified; his or her accuracy of memory; their frankness or

23   lack of it; their intelligence, interest and bias, if any;

3547                                                                                      3546

1    put together with all the facts and circumstances surrounding

2    the testimony.  Applying these tests you will assign to the

3    testimony of each witness such weight as you deem proper.

4         You are not required to believe the testimony of any

5    witness simply because he or she was under oath.  You may

6    believe or disbelieve all or any part of the testimony of any

7    witness.  It is within your province to determine what

8    testimony is worthy of belief and what testimony is not

9    worthy of belief.

10        Now, generally a witness may not express an opinion

11   from the stand.  However, one who follows a profession or

12   special line of work may express his or her opinion because

13   of that person's education, their knowledge or experience.

14   Such testimony is admitted for whatever assistance it may

15   provide to help you in arriving at a just verdict because all

16   that they are giving is their opinion but it's for your

17   information and help.

18        As with other witnesses, upon you alone rests the

19   duty to decide what weight is to be given to the testimony of

20   any expert.  In determining an expert's testimony you will

21   determine its weight, and you may take into consideration his

22   or her skill, experience, knowledge, veracity, familiarity

23   with the facts of the case, and the usual rules for testing

3547

1    credibility and determining the weight to be given to that

2    testimony.

3        It is not necessary that the defendant take the

4    witness stand in his own defense.  He has a constitutional

5    right, as we all do, not to testify.  The fact that the

6    defendant did not testify must not be considered by you for

7    any purpose.

8        In this case it has been indicated that the

9    defendant fled from the vicinity of the crime and remained at

10   large for a period of approximately 10 days.  In regard to

11   this evidence you are instructed that flight in and of itself

12   does not raise any presumption of guilt, but it may tend to

13   show consciousness of guilt or a guilty connection with the

14   crime.  If, therefore, you find that the defendant did flee

15   from the scene of the alleged crime you may consider the

16   circumstances in the case in determining the question of

17   guilt or innocence of the defendant, but upon you alone rests

18   the decision to determine what weight, if any, you place upon

19   the evidence you find, if any, which bears on this issue.

20       I merely mention that because the State has alleged

21   certain things along that line, depending on what your

22   finding is, whether or not that would be appropriate or not.

23       The right of the Court to try the defendant depends

3548

upon proof that the offense was committed in Trumbull County,
Ohio.  This is called venue and venue is an essential element
of the offenses charged in the indictment, and as with other
elements, must be proven by the State beyond a reasonable
doubt.

Now, getting to the indictment itself, the defendant
is charged with a total of four counts and six specifications
as follows:  Count One, aggravated murder with two
specifications; Count Two, aggravated murder with two
specifications; Count Three, aggravated burglary with one
specification; and Count Four, aggravated robbery with one
specification.

Although the counts are numbered in chronological
order, it may be best that I instruct you on the aggravated
burglary and aggravated robbery counts before I instruct you
on the aggravated murder counts as some of the same terms
that I am going to define for you relative to those charges
will also be used in the aggravated murderer instructions and
to avoid having to repeat the same thing I've already told
you.

In Count Three of the indictment the defendant has
been charged with, on Count Three, aggravated burglary.  Now,
before you can find the defendant guilty of aggravated

3550                                                                                  3549



1    burglary you must find beyond a reasonable doubt that on or

2    about the 11th day of December, 2001, and in Trumbull County,

3    Ohio, the defendant did by force, stealth or deception,

4    trespass in an occupied structure when a person other than an

5    accomplice of the offender was present and with purpose to

6    commit aggravated murder or aggravated robbery, and that at

7    the time the defendant did inflict or attempted or threatened

8    to inflict physical harm on others and/or the defendant had a

9    deadly weapon on or about his person or under his control; in

10   this case, a firearm.

11          Some terms now I must define for you.  Force means

12   any violence, compulsion or constraint used by any means upon

13   or against a person or thing to gain entrance.

14          Stealth means a secret, sly or clandestine act to

15   gain entrance.

16          Deception means knowingly deceiving or causing

17   another to be deceived by any false or misleading

18   representation or by any other conduct, act or omission which

19   creates, confirms or perpetuates a false impression in

20   another's mind to gain entrance.

21          Trespass means knowingly entering upon the land or

22   premises of another without privilege to do so.  Any entrance

23   or remaining is knowingly made in a structure of another that



1    is unlawful if it is without the authority, consent or

2    privilege to do so.

3         Where a defendant lawfully entered a residential

4    premises, the privilege to be in or upon this premises can be

5    inferred to have been revoked where the defendant thereafter

6    commits a violent felony directed against another person in

7    the premises who had the ability and authority to revoke the

8    privilege.

9         Where one enters upon the property of another as an

10   invitee or licensee, that person loses his status as an

11   invitee or licensee and becomes a trespasser when it becomes

12   evident that the purpose of such entry is to commit a

13   criminal offense against the owner.

14        Occupied structure means any house, building or

15   other structure which is maintained as a permanent or

16   temporary dwelling.

17        A person acts purposely when it is his or her

18   specific intention to cause a certain result.  It must be

19   established in this case that at all times in question there

20   was present in the mind of the defendant a specific intention

21   to murder Robert Fingerhut and/or rob him.

22        Purpose is a decision of the mind to do an act with

23   a conscious objective of producing a specific result.  To do

3551

1    an act purposely is to do it intentionally and not

2    accidentally.  Purpose and intent mean the same thing.  The

3    purpose with which a person does an act is known only to

4    himself, unless that person expresses it to others or

5    indicates it by his conduct.

6            The purpose with which a person does an act is

7    determined from the manner in which it is done, the means and

8    weapons used, and all the other facts and circumstances in

9    evidence.

10           Proof of motive is not required.  The presence or

11   absence of motive is in and of itself -- let me reread that.

12   The purpose or absence of motive is one of the circumstances

13   bearing upon privilege.

14           MR. LEWIS:  I'm sorry.  Go ahead, judge.

15           THE COURT:  I've read that correctly,

16   though there was a letter missing.

17           MR. LEWIS:  I'm sorry.

18           THE COURT:  Yeah.

19           MR. MORROW:  Can we approach one moment,

20   Your Honor?

21           (Whereupon, a bench conference was held.)

22           MR. LEWIS:  Are you going to read it over?

23           THE COURT:  Yeah.  I made the correction

3552

1   where there was a typo but then I read one of the words

2   wrong.  That won't do.  Okay.  Let me read that over.

3                   MR. CONSOLDANE:  Yeah.  I objected to what

4   they just -- just note an objection on the record.

5                   THE COURT:  Well, for the record, the

6   prosecution in coming up with counsel for the defendant to

7   advise me that I had misread a word, the prosecutor got here

8   first so I listened to him, but defense counsel was right

9   beside him.

10              Proof of motive is not required.  The presence or

11  absence of motive is one of the circumstances bearing upon

12  purpose.  I said privilege.  Upon purpose.

13              Privilege means an immunity, license or right

14  conferred by law or bestowed by express or implicit grant, or

15  arising out of status, position, office, or relationship, or

16  growing out of necessity.

17              Aggravated murder will be defined below.

18              Physical harm to persons.  Physical harm to persons

19  means any injury, illness or other physiological impairment

20  regardless of its gravity or duration.

21              Deadly weapon means any instrument, device or thing

22  capable of inflicting death, or designed or specifically

23  adapted for use as a weapon, or possessed, carried or used as

3553

1    a weapon.

2         If you find that the State proved beyond a

3    reasonable doubt all of the essential elements of the offense

4    of aggravated burglary, your verdict must be guilty of

5    aggravated burglary.  If you find that the State failed to

6    prove any one of the essential elements of the offense of

7    aggravated burglary, your verdict must be not guilty.

8         Now, if you find the defendant guilty of Count Three

9    of aggravated burglary it is your duty to deliberate further

10   and decide one specification attached to Count Three.  You

11   will proceed to consider whether the specification has been

12   proven, again beyond a reasonable doubt, if, and only if, you

13   determine that the defendant is guilty of aggravated

14   burglary.  If your verdict is not guilty, then you would not

15   consider the specification.  If your verdict is guilty, the

16   defendant may be found guilty or not guilty of the

17   specification.  Understand?

18        The specification is that Nathaniel E. Jackson did

19   at the time of the commission of the offense have a firearm

20   on or about his person or under his control, and displayed

21   the firearm, brandished the firearm, or used it to facilitate

22   the offense.

23        Firearm means any deadly weapon capable of expelling

3554

1   or propelling one or more projectiles by the action of an

2   explosive or combustible propellant.  Firearm includes an

3   unloaded firearm and any firearm which is inoperable but

4   which can be readily made operable.  Let me read that again.

5   Firearm includes an unloaded firearm and any firearm which is

6   inoperable but which can be readily rendered operable.

7          When deciding whether a firearm is capable of

8   expelling or propelling one or more projectiles by the action

9   of an explosive or combustible propellant you may rely on

10  circumstantial evidence, including but not limited to the

11  statements and actions of the individual exercising control

12  over the firearm, if there be such.

13         On or about the defendant's person or under the

14  defendant's control means that the firearm was on the

15  defendant's person or so near the defendant as to be

16  conveniently accessible and within the defendant's immediate

17  physical reach.

18         Thus, if as to this specification you find that the

19  State proved beyond a reasonable doubt all of the essential

20  elements of the specification, your verdict must be guilty of

21  that specification.  If you find that the State failed to

22  prove beyond a reasonable doubt any one of the essential

23  elements of the specification, then you must find the

1    defendant not guilty of that specification.

2         Now, in Count Four of the indictment the defendant

3    is charged with, on Count Four, aggravated robbery.  Before

4    you can find the defendant guilty of aggravated robbery you

5    must find beyond a reasonable doubt that on or about the 11th

6    day of December, 2001, and in Trumbull County, Ohio, the

7    defendant, while committing or attempting to commit a theft

8    offense, had a deadly weapon on or about his person or under

9    his control and either brandished it or used it, or that the

10   defendant inflicted serious physical harm on others.

11        Some more terms.  An attempt is one -- is when one

12   purposely does anything which is an act constituting a

13   substantial step in a course of conduct planned to culminate

14   in his commission of the crime.  To constitute a substantial

15   step the conduct must be strongly corroborative of the

16   actor's criminal purpose.

17        While committing or attempting to commit means that

18   having a deadly weapon on or about his person or under his

19   control or the infliction of serious physical harm must occur

20   as part of acts leading up to, occurring during or

21   immediately after the theft or attempted theft set out in

22   this charge, and that the having of a deadly weapon on or

23   about the person or under his control or the infliction of

3556

1    serious physical harm was directly associated with the theft

2    offense set out in this charge.  Now, the question of whether

3    the defendant had a deadly weapon on or about his person or

4    under his control or the inflicted serious physical harm

5    before or after he stole or attempted to steal is of no

6    consequence.

7            A theft offense occurs when a person, with purpose

8    of deprive the owner of property, knowingly obtains or exerts

9    control over that property without the consent of the owner

10   or beyond the scope of the express or implied consent of the

11   owner or person authorized to give consent, or by deception,

12   or by threat.

13           A person acts knowingly, regardless of his purpose,

14   when he is aware that his conduct will probably cause a

15   certain result or that he is aware that his conduct will

16   probably be of a certain nature.  A person has knowledge of

17   circumstances when he is aware that such circumstances

18   probably exist.

19           Since you cannot look within the mind of another,

20   knowledge is determined from all the facts and circumstances

21   in evidence.  You will determine from these facts and

22   circumstances whether there existed at the time in the mind

23   of the defendant the intent to obtain or exert control over



3557

1    the property.

2         Property means any property, real or personal,

3    tangible or intangible, and any interest or license in such

4    property.

5         Deprive means to withhold property of another

6    permanently, or for such a period as to appropriate a

7    substantial portion of its value or use, or to dispose of

8    property as to make it unlikely that the owner will recover

9    it.

10        Owner means any person, other than the actor, who is

11   the owner of or who has possession or control of, or any

12   license or interest in property or services, even if such

13   ownership, possession, control, license or interest is

14   unlawful.

15        Consent may -- I'm sorry.  Consent may be either

16   express or implied consent.  Express consent is determined by

17   the written or spoken words of the person involved.  Implied

18   consent is determined by the facts and circumstances which

19   surround those involved, including their words and acts, from

20   which you may infer that consent was given to the defendant.

21        Now, threat includes both a direct threat or an

22   indirect threat.

23        Deadly weapon I have previously defined for you.

3559                                                                    3558

1       Serious physical harm to persons means any of the

2  following:  Any mental illness or condition of such gravity

3  as would normally require hospitalization or prolonged

4  psychiatric treatment; any physical harm that carries a

5  substantial risk of death; any physical harm that involves

6  some permanent incapacity, whether partial or total, and that

7  involves some temporary, substantial incapacity; any physical

8  harm that involves some permanent disfigurement or that

9  involves some temporary, serious disfigurement; or any

10  physical harm that involves acute pain of such duration as to

11  result in substantial suffering or that involves any degree

12  of prolonged or intractable pain.

13       Now, if you find that the State has proved beyond a

14  reasonable doubt all of the essential elements of the offense

15  of aggravated robbery, then your verdict must be guilty of

16  aggravated robbery.  If you find that the State has failed to

17  prove any one of the essential elements of the offense of

18  aggravated robbery, your verdict must be not guilty.

19       If you find the defendant guilty of Count Four of

20  aggravated robbery it is your duty to deliberate further and

21  decide one specification attached to Count Four.  You will

22  proceed to consider whether the specification has been proven

23  beyond a reasonable doubt if, and only if, you determine that

3559

the defendant is guilty of aggravated robbery.  If your
verdict is not guilty, then you would not consider the
specification.  If your verdict is guilty, then the defendant
may be found guilty or not guilty of the specification.

Now, the specification attached is that Nathaniel E.
Jackson did at the time of the commission of the offense have
a firearm on or about his person or under his control and
displayed the firearm, brandished the firearm, or used it to
facilitate the offense.

I defined all the relevant terms in that definition
previously to you on the prior specification.

Thus, if as to this specification you find that the
State proved beyond a reasonable doubt all of the essential
elements of the specification, your verdict must be guilty on
that specification.  If you find that the State failed to
prove beyond a reasonable doubt any one of the essential
elements of the specification, then you must find the
defendant not guilty of that specification.

Now, in Count One of the indictment the defendant is
charged with aggravated murder.  With respect to this count,
aggravated murder is purposely causing the death of another
with prior calculation and design.

Before you can find the defendant guilty of

3560

aggravated murder in Count One you must find beyond a

reasonable doubt that on or about the 11th day of December,

2001, and in Trumbull County, Ohio, the defendant purposely,

and with prior calculation and design, caused the death of

Robert S. Fingerhut.

Some more terms.  I previously defined purpose.

Dangerous weapon.  In addition, if a wound is

inflicted upon a person with a deadly weapon in a manner

calculated to destroy life or inflict great bodily harm, the

purpose to cause death may be inferred from the use of the

weapon.

No person shall be convicted of aggravated murder

unless he or she is specifically found to have intended to

cause the death of another.

Prior calculation and design means that the purpose

to cause death was reached by a definite process of reasoning

in advance of the homicide, which process of reasoning must

have included a mental plan involving studied consideration

of the method and the means by which to cause the death of

another.

To be prior calculation there must have been

sufficient time and opportunity for the planning of an act of

homicide, and the circumstances surrounding the homicide must

3561

1   show a scheme designed to carry out the calculated decision

2   to cause death.  No definite period of time must elapse and

3   no particular amount of consideration must be given, but

4   acting on the spur of the moment or after momentary

5   consideration of the purpose to cause death is not

6   sufficient.

7        The State charges that the act of the defendant

8   caused the death of Robert S. Fingerhut.  Cause is an

9   essential element of the offense.  Cause is an act or failure

10  to act which in a natural and continuous sequence directly

11  produces the death, and without which it would not have

12  occurred.

13       The defendant is asserting an affirmative defense

14  known as self-defense.  The burden of going forward with the

15  evidence of self-defense and the burden of proving an

16  affirmative defense are upon the defendant.  He must

17  establish such a defense by a preponderance of the evidence.

18       Preponderance of the evidence is the greater weight

19  of the evidence; that is, evidence that you believe because

20  it outweighs or overbalances in your mind the evidence

21  opposed to it.  A preponderance means evidence that is more

22  probable, more persuasive, or of greater probative value.  It

23  is the quality of the evidence that must be weighed.  Quality

3562

1    may or may not be identical with the quantity of witnesses.

2         Now, in determining whether or not an affirmative

3    defense has been proven by a preponderance of the evidence

4    you should consider all of the evidence bearing upon that

5    affirmative defense regardless of who produced it.  If the

6    weight of the evidence is equally balanced or if you are

7    unable to determine which side of an affirmative defense has

8    the preponderance, then the defendant has not established

9    such affirmative defense.

10        If the defendant fails to establish the defense of

11   self-defense, the State still must prove to you beyond a

12   reasonable doubt all of the elements of the crime charged or

13   any lesser included offense.

14        Now, to establish self-defense the defendant must

15   prove, A, he was not at fault in creating the situation

16   giving rise to the shooting of Robert Fingerhut; B, he had

17   reasonable grounds to believe and an honest belief that he

18   was in imminent danger of death or great bodily harm, and

19   that his only means of escape from such danger was by the use

20   of deadly force; and, C, he had not violated any duty to

21   retreat to avoid the danger.

22        Now, the defendant had a duty to retreat if, A, the

23   defendant was at fault in creating the situation giving rise



3563

1    to the shooting of Robert Fingerhut; or, B, the defendant did

2    not have reasonable grounds to believe and an honest belief

3    that he was in imminent danger of death or great bodily harm,

4    and that his only means of escape from the danger was by the

5    use of deadly force.  But if the defendant retreated from the

6    situation, he no longer had a duty to retreat, and if the

7    defendant then had reasonable grounds to believe and an

8    honest belief that he was in imminent danger of death or

9    great bodily harm and that the only means of escape from that

10   danger was by the use of deadly force, then the defendant was

11   justified in using deadly force, even though he was mistaken

12   as to the existence of the danger.

13       Words alone do not justify the use of deadly force.

14   Resort to such force is not justified by abusive language,

15   verbal threats or other words, no matter how provocative.  In

16   deciding whether the defendant had reasonable grounds to

17   believe and an honest belief that he was in imminent danger

18   of death or great bodily harm, you must put yourself in the

19   position of the defendant with his characteristics and his

20   knowledge, or lack of knowledge, and under the circumstances

21   and conditions that surrounded him or her at the time.  You

22   must consider the conduct of Robert Fingerhut and decide if

23   his acts and words caused the defendant reasonably and

3564

1    honestly to believe that he was about to be killed or receive

2    great bodily harm.

3        Excessive force. The law does not measure nicely

4    the degree of force which may be used to repel an attack.

5    However, if the defendant used more force than reasonably

6    appears to be necessary under the circumstances and if the

7    force used is so greatly disproportionate to his apparent

8    danger as to show an unreasonable purpose to injure Robert

9    Fingerhut, then the defense of self-defense is not available.

10       If you find that the State proved beyond a

11   reasonable doubt all of the elements, essential elements of

12   the offense of aggravated murder as charged in Count One of

13   the indictment and the defendant has failed to prove by a

14   preponderance of the essential elements of self-defense, then

15   your verdict must be guilty as to Count One, and in that

16   event you will not consider any lesser offense.  If you find

17   that the State failed to prove beyond a reasonable doubt that

18   the aggravated murder was done purposely, or any of the other

19   essential elements of the offense of aggravated murder as

20   charged in Count One, or if you find that the defendant has

21   proven by a preponderance of the evidence all of the

22   essential elements of self-defense, your verdict must be not

23   guilty of that offense.

3565

1          So, on the other hand, if you find that the State

2     failed to prove beyond a reasonable doubt that the aggravated

3     murder was done purposely or any of the other essential

4     elements of the offense of aggravated murder as charged in

5     Count One of the indictment, and the defendant has failed to

6     prove by a preponderance all of the essential elements of

7     self-defense, then your verdict must be not guilty of that

8     offense; and in that event, you will continue your

9     deliberations to decide whether the State has proven beyond a

10    reasonable doubt all of the essential elements of the lesser

11    included offense of murder.

12          Now, the offense of murder is distinguished from

13    aggravated murder in this count by the absence or failure to

14    prove prior calculation and design.

15          Before you can find the defendant guilty of the

16    lesser included offense of murder you must find beyond a

17    reasonable doubt that on or about the 11th day of December,

18    2001, and in Trumbull County, Ohio, the defendant purposely

19    caused the death of Robert S. Fingerhut.

20          I believe all the relevant terms have been

21    previously defined for you.

22          Now, with respect to this lesser included offense,

23    the defendant claims that at the time of the offense he acted

3566

1    knowingly while under the influence of sudden passion or in a

2    sudden fit of rage, either of which was brought on by serious

3    provocation occasioned by Robert S. Fingerhut that was

4    reasonably sufficient to incite the defendant into using

5    deadly force.

6          The defendant is asserting an affirmative defense

7    known as serious provocation or sudden fit of rage.  The

8    burden of going forward with the evidence of this and the

9    burden of proving an affirmative defense are upon the

10   defendant.  He must establish such a defense by a

11   preponderance of the evidence, which has been previously

12   defined for you.  And if the defendant fails to establish the

13   defense of serious provocation or sudden fit of rage, the

14   State must still prove to you beyond a reasonable doubt all

15   the elements of the crime charged, being murder, or any

16   lesser included offense.

17         Now, the defendant is under the influence of sudden

18   passion or in sudden fit of rage when there is serious

19   provocation occasioned by the victim that is reasonably

20   sufficient to incite a person into using deadly force and is

21   an act done in the heat of blood without time to reflect or

22   for passions to cool.

23         For provocation to be reasonably sufficient to bring



3567

1 on sudden passion or a sudden fit of rage you must determine

2 that the provocation was sufficient to arouse the passions of

3 an ordinary person beyond the power of his control.

4      In determining whether the defendant was actually

5 under the influence of sudden passion or a sudden fit of rage

6 you must consider the emotional and mental state of the

7 defendant and the conditions and circumstances that

8 surrounded him at the time of his act.

9      I have previously defined deadly force for you.

10      Substantial risk means a strong possibility as

11 contrasted with a remote or even a significant --

12 insignificant possibility -- is that correct, what's written

13 there?  Substantial risk means a strong possibility as

14 contrasted with a remote --

15           MR. LEWIS:  Even a significant

16 possibility, judge.  That's what I have here, yeah.

17           THE COURT:  Or even a significant

18 possibility?

19           MR. LEWIS:  Yeah, it says significant.

20           THE COURT:  Significant.  Okay.  So it's

21 distinguishing between a strong possibility and a significant

22 possibility.  Let me start over again.

23           Substantial risk means a strong possibility as

3568

1   contrasted with a remote or even a significant possibility

2   that a certain result may occur or that certain circumstances

3   may exist.

4       If you find that the State proved beyond a

5   reasonable doubt that the defendant purposely caused the

6   death of Robert Fingerhut and you also find that the

7   defendant failed to prove by the greater weight of the

8   evidence that he knowingly acted while under the influence of

9   sudden passion or in a sudden fit of rage, either of which

10  was brought on by serious provocation occasioned by the

11  victim that was reasonably sufficient to incite the defendant

12  into using deadly force, then you must find the defendant

13  guilty of murder.

14      If you find that the State failed to prove beyond a

15  reasonable doubt that the defendant purposely caused the

16  death of Robert Fingerhut, then you must find the defendant

17  not guilty of murder.

18      If you find that the State proved beyond a

19  reasonable doubt that the defendant purposely caused the

20  death of Robert Fingerhut but you also find that the

21  defendant proved by the greater weight of the evidence that

22  he acted knowingly while under the influence of sudden

23  passion or in a sudden fit of rage, either of which was

1    brought on by serious provocation occasioned by the victim

2    that was reasonably sufficient to incite the defendant into

3    using deadly force, then you must find the defendant not

4    guilty of murder and guilty of voluntary manslaughter.

5              Excuse me.  Now, if the evidence warrants it, you

6    may find the defendant guilty of an offense lesser than that

7    charged in the indictment.  However, notwithstanding this

8    right, it is your duty to accept the law as given to you by

9    the Court, and if the facts and the law warrant a conviction

10   of the offense charged in the indictment, then it is your

11   duty to make such finding uninfluenced by your power to find

12   a lesser offense.  This provision is not designed to relieve

13   you from the performance of an unpleasant duty.  It is

14   included to prevent failure of justice if the evidence fails

15   to prove the original charge but does justify a verdict for

16   the lesser offense.

17             Now, if you find the defendant guilty of aggravated

18   murder as charged in the indictment it is your duty to

19   deliberate further and to decide additional factual

20   questions, which we call specifications, relative to that

21   count.

22             This count sets forth two specifications.  You will

23   proceed to consider whether each specification to this count

3570

1    has been proven beyond a reasonable doubt if, and only if --

2    excuse me, I'm losing my voice.  My father had a loud,

3    booming voice and I didn't get it.  Excuse me.

4           I'm on paragraph two right on page 19 there?  I lost

5    my place.

6                        MR. MORROW:  This count.

7                        MR. CONSOLDANE:  Top of page 19.

8                        THE COURT:  Okay.  Let me start on the

9    first paragraph on that page.  This count sets forth two

10   specifications.  You will proceed to consider whether each

11   specification to this count has been proven beyond a

12   reasonable doubt if, and only if, you determine that the

13   defendant is guilty of this count.  If your verdict is not

14   guilty as to the aggravated murder, then you would not

15   consider any of the specifications attached to this count.

16   Give me a minute, okay?  I apologize, folks.

17                        MR. LEWIS:  Want some water, judge?

18                        THE COURT:  Oh, sure.

19                        MR. LEWIS:  This is yours.  I took it.

20                        THE COURT:  Yeah.  You wish me to wait for

21   Anthony?

22                        MR. LEWIS:  No, judge.

23                        THE COURT:  Specification One to Count One

3571

1    charges that the defendant committed the aggravated murder

2    while committing, attempting to commit, or fleeing

3    immediately after committing aggravated burglary, and that

4    the defendant was either the principal offender in the

5    commission of the aggravated murder or, if not the principal

6    offender, he committed the aggravated murder with prior

7    calculation and design.

8         Aggravated burglary has already been defined for

9    you.

10        Principal offender means one who personally performs

11   every act constituting the offense which, relative to this

12   specification, is aggravated murder.

13        While committing or attempting to commit means that

14   the aggravated burglary must occur as part of acts leading up

15   to or occurring during or immediately after the murder set

16   out in this charge and that the murder was directly

17   associated with the theft offense set out in this charge.

18   The question of whether the defendant killed Robert Fingerhut

19   before or after he committed a theft offense is not of any

20   consequence, that is it could occur leading up to, during, or

21   at the conclusion or immediately after.

22        Prior calculation and design has been previously

23   defined.

3572

Before you can find the defendant guilty of
Specification One to Count One you must find that the State
has proven beyond a reasonable doubt that the defendant
committed the aggravated murder while he was committing,
attempting to commit, or fleeing immediately after committing
aggravated burglary, and that the defendant was either the
principal offender in the commission of the aggravated murder
or, if not the principal offender, he committed the
aggravated murder with prior calculation and design.

If you find that the State proved beyond a
reasonable doubt all of the essential elements of this
specification, then your verdict must be guilty as to that
specification.  If you find that the State failed to prove
beyond a reasonable doubt any one of the essential elements
of this specification, your verdict must be not guilty as to
that specification.

Specification Two to Count One charges that the
defendant committed the aggravated murder while committing,
attempting to commit, or fleeing immediately after committing
aggravated robbery, and that the defendant was either the
principal offender in the commission of the aggravated murder
or, if not the principal offender, he committed the
aggravated murder with prior calculation and design.

3573

1          I have previously defined, I believe, all relevant

2     terms to that.

3          Before you can find the defendant guilty of

4     Specification Two to Count One you must find that the State

5     has proven beyond a reasonable doubt that the defendant

6     committed the aggravated murder while he was committing,

7     attempting to commit, or fleeing immediately after committing

8     aggravated robbery, and that the defendant was either the

9     principal offender in the commission of the aggravated murder

10    or, if not the principal offender, he committed the

11    aggravated murder with prior calculation and design.

12          In Count Two of the indictment the defendant is

13    charged with, Count Two, aggravated murder.  Now, with

14    respect to this count, aggravated murder is purposely causing

15    the death of another while committing, attempting to commit,

16    or fleeing immediately after committing aggravated robbery

17    and/or aggravated burglary.

18          Before you can find the defendant guilty of

19    aggravated murder on this count you must find beyond a

20    reasonable doubt that on or about the 11th day of December,

21    2001, and in Trumbull County, Ohio, the defendant purposely

22    caused the death of Robert S. Fingerhut while the defendant

23    was committing, attempting to commit, or fleeing immediately

3574

1    after committing or attempting to commit aggravated robbery

2    and/or aggravated burglary.

3            Again, I've defined all relevant terms for you.

4            As with Count One, the defendant is asserting the

5    defense of self-defense.  All relevant terms with respect to

6    self-defense have been previously defined for you.

7            If you find that the State proved beyond a

8    reasonable doubt all of the essential elements of the offense

9    of aggravated murder as charged in Count Two and the

10   defendant has failed to prove by a preponderance all of the

11   essential elements of self-defense, your verdict must be

12   guilty as to Count Two, and in that event you would not

13   consider any lesser offense.

14           On the other hand, if you find that the State failed

15   to prove beyond a reasonable doubt that the aggravated murder

16   was done purposely, or any of the other essential elements of

17   the offense of aggravated murder as charged in Count One of

18   the indictment, and the defendant has failed to prove by a

19   preponderance all of the essential elements of self-defense,

20   then your verdict must be not guilty of that offense, and in

21   that event you will continue your deliberations to decide

22   whether the State has proved beyond a reasonable doubt all of

23   the essential elements of the lesser included offense of

3575

1    murder.

2         The offense of murder is distinguished from

3    aggravated murder in this count by the absence or failure to

4    prove that the murder was purposely committed.

5         Before you can find the defendant guilty of the

6    lesser included offense of murder you must find beyond a

7    reasonable doubt that on or about the 11th day of December,

8    2001, and in Trumbull County, Ohio, that the defendant caused

9    the death of Robert S. Fingerhut as a proximate result of the

10   defendant committing, attempting to commit, or attempting to

11   commit aggravated burglary or aggravated robbery.  That

12   should be and/or, right?

13              MR. LEWIS:  And/or, yes, judge.

14              THE COURT:  Yeah.  I've previously defined

15   all relevant terms.

16         With respect to this lesser included offense, the

17   defendant claims that at the time of the offense he acted

18   while under the influence of sudden passion or a sudden fit

19   of rage, either of which was brought on by serious

20   provocation occasioned by Robert Fingerhut that was

21   reasonably sufficient to incite the defendant into using

22   deadly force.

23         I've defined all those on the previous definition

3576

1    which is the same.

2           Now, if you find that the State proved beyond a

3    reasonable doubt that the defendant caused the death of

4    Robert S. Fingerhut as a proximate result of the defendant

5    committing or attempting to commit aggravated burglary or

6    aggravated robbery, and you also find that the defendant

7    failed to prove by a greater weight of the evidence that he

8    knowingly acted while under the influence of sudden passion

9    or a sudden fit of rage, either of which was brought on by

10   serious provocation occasioned by the victim that was

11   reasonably sufficient to incite the defendant into using

12   deadly force, then you must find the defendant guilty of

13   murder.

14          Conversely, if you find that the State failed to

15   prove beyond a reasonable doubt that the defendant caused the

16   death of Robert S. Fingerhut as a proximate result of the

17   defendant committing, attempting to commit, or attempting to

18   commit aggravated burglary or aggravated robbery, then you

19   must find the defendant not guilty of murder.

20          If you find that the State proved beyond a

21   reasonable doubt that the defendant caused the death of

22   Robert S. Fingerhut as a proximate result of the defendant

23   committing or attempting to commit aggravated burglary or

1   aggravated robbery but you also find that the defendant

2   proved by a greater weight of the evidence that he acted

3   knowingly while under the influence of sudden -- or sudden

4   passion -- influence of sudden passion or in a sudden fit of

5   rage, either of which was brought on by serious provocation

6   occasioned by the victim that was reasonably sufficient to

7   incite the defendant into using deadly force, then you must

8   find the defendant not guilty of murder and guilty of

9   voluntary manslaughter.

10          If you find defendant not guilty of aggravated

11  murder as charged in Count Two, you will not consider any

12  specification relative to Count Two.

13          If you find the defendant guilty of aggravated

14  murder as charged in the indictment, it is your duty to

15  deliberate further, this is aggravated murder on Count Two,

16  you must then decide additional factual questions, which we

17  call specifications, relative to this count.  This count sets

18  forth two specifications.  You will proceed to consider

19  whether each specification to this count has been proven

20  beyond a reasonable doubt if, and only if, you determine that

21  the defendant is guilty of this count.  If your verdict is

22  not guilty as to this count, then you would not consider any

23  of the specification attached.  If your verdict is guilty as

3579                                                        3578

1    to this count, the defendant may be found guilty or not

2    guilty of any, of either or both of the specifications.

3         Now, Specification One and Two charges the defendant

4    committed the aggravated murder while committing, attempting

5    to commit, or fleeing immediately after committing aggravated

6    burglary, and that the defendant was either the principal

7    offender in the commission of the aggravated murder or, if

8    not the principal offender, he committed the aggravated

9    murder with prior calculation and design.

10        All of the relevant terms have been previously

11   defined for you.

12        Before you can find the defendant guilty of

13   Specification Two to Count One you must find that the

14   defendant has proven beyond a reasonable doubt that the

15   defendant committed the aggravated murder while he was

16   committing, attempting to commit, or fleeing immediately

17   after committing aggravated burglary, and that the defendant

18   was either the principal offender in the commission of the

19   aggravated murder or, if not the principal offender, he

20   committed the aggravated murder with prior calculation and

21   design.

22        If you find that the State proved beyond a

23   reasonable doubt all of the essential elements of this



1    specification, then your verdict must be guilty as to that

2    specification.  If you find that the State failed to prove

3    beyond a reasonable doubt any one of the essential elements

4    of the specification, your verdict must be not guilty as to

5    that specification.

6          Specification Two as contained in Count Two charges

7    that the defendant committed the aggravated murder while

8    committing, attempting to commit, or fleeing immediately

9    after committing aggravated robbery, and that the defendant

10   was either the principal offender in the commission of the

11   aggravated murder or, if not the principal offender, he

12   committed the aggravated murder with prior calculation and

13   design.  And again I've defined all those terms for you.

14         Before you can find the defendant guilty of

15   Specification Two attached to Count Two you must find that

16   the State has proven beyond a reasonable doubt that defendant

17   committed the aggravated murder while he was committing,

18   attempting to commit, or fleeing immediately after committing

19   aggravated robbery, and that the defendant was either the

20   principal offender in the commission of the aggravated murder

21   or, if not the principal offender, he committed the

22   aggravated murder with prior calculation and design.

23         The specifications set forth in the indictment each

3580



1   constitute a separate and distinct matter.  You must consider

2   each count and each specification and the evidence applicable

3   to each count and each specification separately, and you must

4   state your findings as to each count and each specification

5   uninfluenced by your verdict as to the other counts or

6   specifications, except that should you find the defendant not

7   guilty of a particular count, you will not consider the

8   specification or specifications for that count.  The

9   defendant may be found guilty or not guilty of any of the

10  offenses or any of the specifications.

11          Now, folks, some of that sounds repetitious.  It is



12  not actually repetitious when you read through this, and

13  you'll have an opportunity to do that.  It's all logically

14  set forth.

15          Now, you may not discuss or consider the subject of

16  punishment.  Your duty is confined to the determination of

17  whether the defendant is guilty or not guilty of the counts

18  and specifications I've read to you.

19          You must not be influenced by any consideration of

20  sympathy or prejudice.  It is your duty to carefully weigh

21  the evidence, to decide all disputed questions of fact, to

22  apply the instructions of the Court to your findings, and to

23  render your verdicts accordingly.  In fulfilling your duty

3581

1   your efforts must be, of course, to arrive at a just verdict,

2   so consider all the evidence and make your findings with

3   intelligence and impartiality and without bias, sympathy or

4   prejudice towards anybody involved in the trial so that both

5   of State of Ohio and Nathaniel E. Jackson will feel that

6   their case was fairly and impartially tried.

7          Now, if during the course of the trial the Court has

8   said or done anything that you consider an indication of the

9   Court's view on the facts in this case, you are instructed to

10  disregard that.  That would be most improper for any judge to

11  try to send hidden signals to the jury.  You folks have to

12  decide the facts.  That's not my job.

13         Now, it may be difficult to remember all the

14  instructions that I've given you so to assist you you will

15  have a copy back there in the courtroom.

16         A couple other matters.  Your initial conduct upon

17  entering the jury room is a matter of importance, I believe.

18  I would suggest it not to be wise to immediately express a

19  determination or to insist upon a certain verdict because if

20  you do so and you later becomes convinced that you were

21  initially wrong, your sense of pride may be aroused and you

22  may hesitate to change your position.  You should consult

23  with each other, consider each other's views, and deliberate

3582

1   with the objective of reaching an agreement, but you must do

2   that only if you can do so, excuse me, without disturbing

3   your individual judgment.  Each of you must decide this case

4   for yourself to begin with, but you should do so only after a

5   discussion and consideration of the opinion of the other

6   jurors.  You should not hesitate to change an opinion if you

7   become convinced that you were initially wrong.  But just as

8   important, no one should give up honest convictions just to

9   be congenial or just to go along with a verdict.  You don't

10  go along with something you don't believe in, either way.

11              You will have with you in the jury room 10 verdict

12  forms.  I am not going to read them in their entirety, I

13  think they explain themselves adequately, but all of them are

14  captioned with the case number and the name of this case.

15              MR. CONSOLDANE:  Your Honor, I believe

16  there's more than 10, isn't there?

17              THE COURT:  What?

18              MR. CONSOLDANE:  I believe there's more

19  than 10, isn't there?

20              MR. MORROW:  There's 14.

21              MR. CONSOLDANE:  Fourteen.

22              THE COURT:  Oh, we added the other ones,

23  that's right.  Yeah.  I'm sorry, 14.  The first one is Count

3583

1    One, indictment for aggravated murder, and it reads quite

2    simply, "We, the jury in this case, being duly impaneled and

3    sworn or affirmed, find the defendant Nathaniel E. Jackson,

4    ..." and there's a blank space.  There's an asterisk beside

5    the name and down below there is an instruction, insert

6    whatever your decision is, guilty or not guilty, "... of

7    aggravated murder, did purposely cause the death of Robert

8    Fingerhut with prior calculation and design," on the date in

9    question and the manner and form as which he stands charged

10   in the indictment.

11        Now, you will notice that there is a signature line

12   for a date.  The fore person that you pick should make sure

13   that each verdict form signed has the date on it.  There are

14   then 12 signature lines.  This being a criminal trial you

15   have to have the unanimous verdict on anything you decide to

16   have a proper finding.  Let me put that another way.  You

17   have to have the unanimous finding by 12 people in agreement

18   to have a guilty finding, okay?

19        The second verdict is on the specification attached

20   to Count One.  The third form is Specification Two to the

21   first count of the indictment.  And depending on where you

22   are at according to the instructions that I've given, you

23   will also have, if you reach that point, Count One, lesser

3584

1   included offense on murder.

2           The next is Count One again, lesser included offense

3   of murder, voluntary manslaughter.  And you have, of course,

4   Count Two, which is the indictment for aggravated murder

5   also, the purposeful killing while committing a felony.  You

6   have the next Specification One and Specification Two to that

7   Count Two.  Again, the lesser included offense of murder and

8   the lesser included offense of murder, voluntary manslaughter

9   on Count Two.

10          Then you have Count Three, which is the indictment

11  for aggravated burglary, and these all have that blank line

12  where you fill in your verdict, the 12 signatures and the

13  date.  And next is Specification One to the third count of

14  the indictment.

15          Next is Count Four, indictment for aggravated

16  robbery.  Attached to that is a specification to the fourth

17  count of the indictment.

18          I'm getting Laurie in here.  I just buzzed her.

19  Now, from this time on you will be in charge of the bailiff.

20  You will follow her instructions in every regard.  She's

21  responsible for you folks.  If you desire to communicate with

22  the Court for any reason you should do so in writing and only

23  after careful consideration of the language used so that the

3585

1  same does not necessarily disclose the status of your

2  deliberations and making sure that any inquiry is as clear

3  and unambiguous as you can make it.  These requests should be

4  submitted in writing and signed by the fore person.  You

5  should also put the date and the time of day when any

6  question is sent out.  I need that form, too, to swear you

7  in.

8          THE BAILIFF:  Oh, sorry.

9          THE COURT:  Now, during all of the breaks

10  in your deliberations you will follow the instructions of the

11  bailiff.  She is not permitted to discuss anything about the

12  case with you.  Her sole function is see that you are

13  comfortable and that you have everything necessary to conduct

14  your deliberations.  You should contact her when you want a

15  break for lunch or dinner or for the evening, whatever.  I'll

16  get into that in a minute.

17          During any time that you are out of that jury room,

18  you are at lunch, some of you are going to be sharing rooms

19  over the course of however many evenings it takes you, you

20  still cannot talk about the case because it has to be a group

21  effort.  All 12 have to be there at the same time.  But even

22  if all 12 of you are sitting at a table outside of that one,

23  you can't talk about the case.  It has to be done back there

1   in the room.

2        You will have with you in the jury room the exhibits

3   and the verdict forms.  You will also have with you in the

4   jury room a VCR and a TV and cassette player.

5        One of the first things you should do in getting

6   back to these instructions, they don't have it in, but you

7   should pick one of yourselves as a fore person.  That person

8   has no greater or less authority than the rest of you.

9   Complete democracy back there.  You all stand on even ground.

10  You should pick one person, and the most important thing I

11  think that that fore person can do, is to see that everybody

12  participates.  Some of us by nature are reluctant to express

13  our opinion.  Others of us, you can't shut us up.  But the

14  fore person should be sure that everybody participates.

15  That's the value of having all 12 of you back there.  As I

16  said before, you each bring your own life experience plus

17  your sense of community and we end up with a good result

18  almost invariably that way.

19       That fore person is also charged with, once a

20  verdict is returned, of bringing the verdict forms in with

21  them, be seated, and then at the appropriate time I will ask

22  that those be delivered to the bailiff.  The fore person

23  should be the spokesman for the jury to the bailiff when at

3588                                                    3587

1    all possible.  If any of you have any individual problems or

2    concerns dealing with your comfort or that, you can ask

3    Laurie individually of course, but whenever possible have one

4    spokesman for any communication with the Court.

5              Now, the evidence is before you.  I've never seen a

6    case where evidence was supplemented after the jury has been

7    given the case.  It's been done I guess.  I've never seen it

8    done.  I think you will have at your disposal complete recall

9    of all information that was given to you in the court that

10   isn't provided in the exhibits.  If you have a question it

11   will be probably a question of law.  Reduce it to writing,

12   sign by the fore person and date it.  Sometimes I can answer

13   those after I've discussed whether it's proper with the

14   attorneys.  If I'm permitted to do so, I will send a written

15   answer back to you.  If I send an answer back which says

16   please continue with your deliberations, that means it's not

17   proper for me to answer that specific question, okay?

18             Until your verdict is announced in open court you

19   are again reminded you are not to disclose to anyone else the

20   status of your deliberations or the nature of your verdict or

21   discuss anything with anybody other than the other 11 people.

22             For the record, I am going to swear the bailiff in

23   to take charge of this jury.

3588

1          (Whereupon, the oath was administered to

2     the bailiff by the Court.)

3          THE COURT:  Okay.  Okay, folks, you are

4     from this point on until you --

5          MR. WATKINS:  Your Honor, may we approach?

6          THE COURT:  Yeah.

7          (Whereupon, a bench conference was held.)

8          THE COURT:  Okay, let's get -- this is

9     some housekeeping we've been discussing here.

10          THE BAILIFF:  I'm going to call and tell

11     them we're coming then.

12          THE COURT:  Okay.  Folks, I have not

13     formally sent you out as the jury yet at this point.  There

14     is a correction that is going to be made on one of the

15     instructions.  It's very short.  We'll have to get that typed

16     so I will read that to you when you come back.  Since you're

17     not formally the jury we're not supposed to pay for your

18     lunch or your dinner, supper, if you like, but we are going

19     to do it anyway, okay.  We are going to send you out with

20     the bailiff and a couple deputies as we ordinarily do.  And

21     just, it is most important that you remember the admonition.

22          We had a case here one time before where at -- the

23     jury was deliberating and during lunch or dinner a couple of

3589

1    the jurors sitting together were overheard discussing the

2    case.  Not good.  We might have to start the whole thing over

3    again and it's just a mess.  That's the reason it is so

4    important.  You folks have all been very reasonable and very

5    attentive, remarkably so, and please, just keep that going.

6    No discussion of anything.

7              Let me discuss a couple other things before I

8    release you here.  When you come back and I read this slight

9    change, then you will be sent back to the jury room.  You

10   take whatever time this evening you wish to take.  When you

11   get over to those, that hotel room you won't have any TV,

12   radio or newspapers, so unless you brought -- or telephone.

13   Unless you happen to be very lucky and get a very interesting

14   roommate that you have a lot in common with, that can be a

15   boring evening, so you may want to go a little bit longer

16   here, I don't know.

17                      THE BAILIFF: Judge, 20 minutes.

18                      THE COURT:  Okay.

19                      THE BAILIFF:  They won't be ready for 20

20   minutes.

21                      THE COURT:  That's good.  You can get them

22   over there.  You are going to the Saratoga?  Yeah.  They're

23   going to set a place up probably in the back there for you so

3590

1   whatever, you can hang around for 20 minutes.  Figure that

2   out with Laurie   They said they would be ready for you in 20

3   minutes and you all have a nice dinner.  We'll see you back

4   here when you're done.  Take about an hour or so, if you

5   will, okay?

6                    THE BAILIFF:  It's going to take us an

7   hour to get our food.

8                    MR. WATKINS:  You mean an hour and 20

9   minutes, Your Honor?

10                   THE COURT:  Well, whatever.  When they get

11  back.  We got to go through this other stuff so whenever they

12  get back, okay?

13                   THE BAILIFF:  It will take them that long

14  to get the food.

15                   THE COURT:  Yeah.  Well, they're pretty

16  quick over there.  Hey, you're the bailiff, get it

17  straightened out.

18                   THE BAILIFF:  It will be 20 till over

19  there.

20                   THE COURT:  What do you want them to do

21  here, meet out in the hall and be there and get --

22                   THE BAILIFF:  Well, they won't be ready

23  for us for about 20 minutes.

3591



```
 1                      THE COURT:  Why don't you all go down and
 2   have a seat in the jury room and then she'll come get you and
 3   you can walk over.  It's just right across there.
 4                      (Whereupon, a dinner recess was taken.)
 5                      (Whereupon, Deputy Anthony Leshnack was
 6   sworn in by the Court, after which a recess was taken.)
 7                      (Whereupon, the following proceedings
 8   occurred outside the presence of the jury.)
 9                      THE COURT:  For the record, it's come to
10   my attention upon conclusion of reading the instructions that
11   there are either -- there were a couple portions that were
12   either not correct or not complete and during the lunch hour
13   when the jury went out to lunch --
14                      DEPUTY:  Dinner.
15                      THE COURT:  -- the prospective -- or
16   during the lunch hour --
17                      DEPUTY:  Dinner.  Dinner.
18                      THE COURT:  Summer.  Supper.
19                      MR. WATKINS:  Dinner.  Dinner.
20                      THE COURT:  Dinner.  It's whether you're
21   fancy or more anglo-saxon, see.  Supper, Maryann.  Okay,
22   dinner.  Mr. Morrow of the prosecutor's office has been kind
23   enough to type up a form which we've reviewed and it gives a
```

1   correct definition of deprive and explains the Specification

2   One to Counts One and Two.

3                        MR. CONSOLDANE:  You know, that's -- I

4   have really an objection.  I'm not clear on what he's

5   changing.

6                        (Whereupon, a discussion was had off the

7   record.)

8                        THE COURT:  Just so the record is clear, I

9   have not sent the jury out to deliberate yet.  They went for

10  dinner.  In the meantime we have corrected whatever mistake

11  was perceived to be present.  Both sides have had a copy to

12  review and the Court is going to bring the jury back in and

13  instruct them as will appear on the record.  I would order

14  that a copy of the original instruction as I read be put into

15  the permanent record and then a corrected copy go back to the

16  jury, okay?  You want to get the jury up?  You got something

17  else, Chuck?

18                       MR. WATKINS:  And before Tony objects, may

19  the record reflect that it was discovered through our reading

20  when the Court --

21                       THE COURT:  In the reading.  We all missed

22  it, yeah.

23                       MR. WATKINS:  -- was going over the

1  charge.  And under the law, after you read the charge both

2  sides have an opportunity --

3                    THE COURT:  Have an opportunity to

4  correct.

5                    MR. WATKINS:  -- to bring it to the

6  attention that there was a mistake and that is what we did.

7                    THE COURT:  And the Court agrees that

8  there was incomplete at least so.

9                    MR. CONSOLDANE:  Well, Your Honor, I would

10  object to you reading that and I have got a couple reasons.

11  First of all, you know, I have long objected to the

12  prosecutor preparing the jury charge, you know.  This puts

13  the defense at a great disadvantage.  They prepare it and

14  they prepared it wrong, you know.  That was their fault with

15  it.  And on one charge that I can see where they want to

16  correct that, you know, I can understand that that may be

17  possible, but when we left here at the lunch time there was

18  never anything mentioned about changing the or adding to the

19  definition of deprive.  I knew nothing about that until just

20  30 seconds ago.  I tell you what, I would like, I would like

21  some time to look at that and see if that is correct.  And I

22  would object to doing that anyways at this particular time --

23                    THE COURT:  Would you rather have,

3595                                                                           3594

1    Mr. Consoldane, an incorrect jury instruction?

2                    MR. CONSOLDANE:  Well, Your Honor, we have

3    two things.  We have one section which they mentioned before

4    we broke for lunch that was incorrect and I had a chance to

5    look at that and I understand that and I can see where the

6    Court might want to correct that.  That was caught right away

7    when that was said.  Nothing was ever mentioned about adding

8    on to the information about the definition of deprive and

9    that was just thrown at me, you know, five minutes ago and I

10   think that that's not necessary.  I think that the definition

11   of deprive that the prosecutor has in there is enough.  If

12   that's not, then I would like at least this evening to go

13   over and look and see, you know, what other mistakes, number

14   one, what other mistakes they might have made, and number

15   two, whether that is a correct definition of deprive that is

16   going to fit the facts of this case, and, three, whether we

17   might want to request another ancillary instruction.  I think

18   for them to go and do that at this time is wrong.

19                    And, also, I think if you are going to correct, make

20   that many corrections in the jury instructions, I think that

21   they should be read again in whole rather than just piecemeal

22   giving them directions.

23                    MR. WATKINS:  Your Honor, can we respond?

3595

1              THE COURT:  Is this right out of OJI or

2    what?

3              MR. MORROW:  Your Honor, what happens is

4    in OJI they say deprive is refer to R.C. 2913 -- deprive,

5    they refer you to Revised Code Section 2913.01(C).  Initial

6    instructions as I included has only the definitions for

7    (C)(1) and (C)(2).  The addition includes the (C)(3)

8    provision.  Under 2913.01(C) there are three subsections and

9    I left, I left out the three provision which begins with

10   "accept, use or appropriate money, property or services..."

11   through the remainder, so I just added that to make the

12   definition of deprive complete.

13              THE COURT:  That's directly from the

14   statute.

15              MR. MORROW:  That is correct, Your Honor.

16              MR. CONSOLDANE:  But to do that, Your

17   Honor, out of context, it's like you're telling the jury

18   they, you know, that they have to find this.  I think it is

19   unfair --

20              THE COURT:  No.  That's the argument

21   that's already raised.  Whenever one side convinces the Court

22   to make, to correct something, then the other side always

23   says that's unfair.  I don't believe it is unfair.  I think

3596

1    it is fair to make sure that the jury doesn't have an

2    incorrect definition of one sort or another.

3                          MR. CONSOLDANE:  But, Your Honor, if they

4    left it out why should I be punished by it?

5                          THE COURT:  They didn't leave it out.

6                          MR. MORROW:  It's not a matter of

7    punishment.

8                          THE COURT:  This has -- we all went over

9    these instructions.  This is a mistake that I would submit

10   you are as guilty of as we are or I am or they are.

11                         MR. CONSOLDANE:  No.  I was happy with

12   that definition.  I was satisfied with that definition.  It

13   doesn't need any more to it.  What is there is enough.

14                         THE COURT:  There was a -- it doesn't

15   conform with the -- you know, why not put the second half in

16   and not the whole thing, leave the first half out?

17                         MR. CONSOLDANE:  We do that a lot.  We do

18   that a lot of times, they don't put the whole OJI in, only

19   what sections apply.  I read it, I saw it, I thought it was

20   fine, and I didn't object to it, but I object to amending it

21   now.

22                         MR. MORROW:  The Court's responsibility is

23   to instruct on the full course of the law, and if deprive is

3597

1    defined in three subsections and there is an omission, an

2    omission, then it is --

3                    THE COURT:  Well, I don't know how you can

4    go wrong by quoting what the law is and that's what this

5    does, so your objection is noted and it's overruled.  Let's

6    bring the jury in here and go on with this.

7                    MR. CONSOLDANE:  Your Honor, I would

8    request that that paper that they want you to read, that I

9    would like to have it marked as an exhibit.

10                    (Whereupon, Court's Exhibits 4 and 5 were

11    marked for identification, after which the jury was seated in

12    the jury box and the following proceedings commenced.)

13                    THE COURT:  I trust you all ate well.

14    Okay.  Tony, you are waiving Jim's presence, is that correct?

15                    MR. CONSOLDANE:  Yes.

16                    THE COURT:  Okay.  Thank you.  Ladies and

17    gentlemen, this Court has previously instructed you

18    concerning a number of terms.  It's come to my attention, I

19    have become aware that a couple of those were either

20    incomplete or incorrect.  I think it's more a question of

21    incompleteness.  But, in any event, I am going to read

22    through three different short paragraphs here and the

23    instruction that you will have will have these corrections in

3598

1   there rather than what I read to you.  So what I read in

2   regard to these items you should set aside and follow the

3   instructions I'm now giving you.

4        Deprive means to withhold property of another

5   permanently, or for such a period as to appropriate a

6   substantial portion of its value or use, or to dispose of

7   property as to make it unlikely that the owner will recover

8   it; or accept, use or appropriate money, property or

9   services, with purpose not to give proper consideration in

10   return for the money, property or services, and without

11   reasonable justification for not giving proper consideration.

12        Now, for purposes of Specification One to Counts One

13   and Two, while committing or attempting to commit means that

14   the aggravated burglary must occur as part of acts leading up

15   to, or occurring during, or immediately after the murder set

16   out in this charge and that the murder was directly

17   associated with the aggravated burglary.

18        For purposes of Specification Two to Counts One and

19   Two, while committing or attempting to commit means that the

20   aggravated robbery must occur as part of acts leading up to,

21   or occurring during or immediately after the murder set out

22   in this charge and that murder was directly associated with

23   the aggravated robbery.

3599

1          You are to disregard any instructions I gave

2     previously that are contrary to this and follow this

3     instruction which, as I said, you will have in the charge to

4     the jury with you.

5          Ladies and gentlemen, are the 12 members of the jury

6     ready to begin deliberations?  Are there any problems?

7                    (Whereupon, no juror responded in the

8     affirmative.)

9                    THE COURT:  Okay.  I am at this time then

10    putting you in the care and custody of Laurie.  And, as I

11    said, you should pick a foreman.  I went through all of that.

12    You folks tell us when you wish to break for the evening,

13    okay?

14         Now, to the alternates, you got a whole pot of

15    coffee down there  You sit down there by yourselves.  Please

16    stay together, though.  And the same admonition, of course,

17    you're not to discuss anything about this case, because if

18    you should be called upon, hopefully that won't occur, but if

19    you should have to sit on the jury we don't want that messed

20    up, okay?  So you all behave yourselves down there.

21         You folks let us know when you are ready to go.

22    When you are ready to go over then all of you will go over

23    for the evening, okay?  Very good.  Laurie, you have

3600

1    everything.  The exhibits are back there.

2                      THE BAILIFF:  Is that for the jury?

3                      THE COURT:  Let's see here which one we

4    got.  This is the new one here.  Have him check that, but

5    that's the new one.  I'll have you mark this one when you get

6    time as the one that was incorrect.  Okay, folks, please be

7    kind enough to go with Laurie then.

8                      (Whereupon, the jury began their

9    deliberations at 7:35 p.m.)

10                      (Whereupon, Court's Exhibit No. 6 was

11   marked for identification.)

12                      (Whereupon, the jury was seated in the

13   jury box at 11:15 p.m., the defendant being present, and the

14   following proceedings commenced.)

15                      THE COURT:  I understand you all wish to

16   pack it in for tonight.  I will again remind you you are not

17   to watch any TV, read anything, to have any discussion among

18   yourselves.  And what time will they be up for breakfast in

19   the morning?  You will take care of that.  Get them back over

20   here by 8:30 or 9:00 o'clock in the morning.  You will have

21   all day to continue on your deliberations.  Thank you.  You

22   all have a nice evening.

23                      (Whereupon, Court was recessed at

3601

1    11:22 p.m.)

2    (THURSDAY, NOVEMBER 7, 2002)

3              (Whereupon, the jury resumed deliberations

4    at 9:30 a.m.)

5              (Whereupon, the jury and alternates were

6    seated in the jury box at 1:00 a.m, with the defendant

7    present, and the following proceedings commenced.)

8              THE COURT:  Ladies and gentlemen of the

9    jury, you sure have had a full day.  It is my understanding

10   you wish to call it a day.  Laurie and these deputies will

11   escort you over to the hotel again.  Same instruction.  I

12   know you are getting tired of hearing it.  You are not to

13   take advantage of any TV presentation, read any newspaper or

14   have any individual discussion among yourselves over the

15   course of the evening.  I have been requested by counsel to

16   ask if you wish to start at 9:00 in the morning or perhaps a

17   little bit later.

18             (Whereupon, the jury agreed on 9:00 a.m as

19   the time to resume deliberations.)

20             THE COURT:  I trust you will have a

21   restful evening and we will see you back here in the morning.

22   You are not to discuss anything over the evening.

23        There is no need for us all to meet in the morning.

3602

1    You will all continue your deliberations.  We just ask that

2    when you get here -- you will all be pretty much in one

3    group.  You might be split up among the three people that

4    have charge of you, but none of you should go back into the

5    jury room by yourselves.  Wait until you are all together and

6    then go back together.

7                        (Whereupon, Court was recessed at

8    1:03 a.m.)

9    **(FRIDAY, NOVEMBER 8, 2002)**

10                       (Whereupon, the jury resumed their

11   deliberations at 9:25 a.m)

12                       (Whereupon, the following proceedings

13   commenced in chambers at 4:55 p.m. outside the hearing of the

14   jury, Attorney James Lewis not being present.)

15                       THE COURT:  We are in chambers out of the

16   presence of hearing -- you waive the presence of the

17   defendant?  He is being brought over?

18                       MR. CONSOLDANE:  Yes, I waive his presence

19   and also the presence of my co-counsel.

20                       THE COURT:  Thank you.  It is 10 to 5:00

21   and the jury has sent out a request.  Can I see what the

22   request is?

23                       MR. CONSOLDANE:  Okay.

3603

1          THE COURT:  Okay.  This, I will have this
2    marked as an exhibit, whatever the next number, I think it is
3    like 6, and it reads, message from the jury to the Court, "We
4    need another copy of Specification 1 to the fourth count of
5    the indictment."  In reviewing that we find that there is an
6    inclusion under the double asterisk which reads on the one
7    that they had taken with them, which I assume they have
8    caught the mistake, it says, "To be completed if, and only
9    if, your finding on the charge of Count Two, kidnapping or
10   lesser included offense of abduction, is guilty."
11         After consultation with both sides here we've made
12   an amended on that double asterisk to read "To be completed
13   if, and only if, your finding on the charge on Count Four,
14   aggravated robbery, is guilty."  That was done in error and
15   this correction will be sent back with them.  Are there any
16   objections?  Is there anything that anyone wishes to place on
17   the record?
18         MR. CONSOLDANE:  Dennis?
19         MR. WATKINS:  No.
20         MR. CONSOLDANE:  Okay.  I have looked it
21   over and I believe that that is correct what you have stated.
22         THE COURT:  Okay.  I will direct the
23   bailiff then to deliver this to the jury.

3604

1          MR. CONSOLDANE:  There is --

2          THE COURT:  Just need the one copy to go

3  back to them.

4          MR. CONSOLDANE:  There is one other thing

5  just while we have the court reporter here, and it is the

6  first time the court reporter has been available since last

7  night, but as we were leaving last night I was walking down

8  the steps and got down to the first floor and they had all

9  the jurors assembled, ready to take them to the hotel, and

10 standing in the middle of them was two of the ladies from

11 Dennis's office that's on the second floor.  Now, you know

12 I've been harping about this and bitching about it since this

13 trial has started.

14         MR. WATKINS:  Let's get that back to the

15 jury.

16         THE BAILIFF:  If you want to talk to Jim,

17 I don't know, Jim is on the phone.

18         MR. CONSOLDANE:  Just let me finish this

19 and I will talk to him.  You know that I don't believe that

20 that is, you know, is proper for them to be mingling with the

21 jury.  I've been complaining about this and bringing it to

22 the Court's attention since this trial started.  They have

23 the jury room right across from that room, and for what

3605

1   reason were these people here last night at 1:30 in the

2   morning?  There are no victim's relatives here, you know,

3   they haven't been in court for the last several days.  For

4   what reason would they be standing around with the jury at

5   1:30 in the morning if only to try and influence them in some

6   way?  I don't know of any reason.  I didn't hear of anything

7   that they said or done, but it just doesn't look right.

8            THE COURT:  Prosecution or the State.

9            MR. WATKINS:  Your Honor, I think this is

10  a continuing effort to misrepresent the plain fact of the

11  matter that, first off, that these two women -- and would you

12  identify who they are?

13           MR. CONSOLDANE:  I don't know them by

14  names.  I just know that they, that they come in and out of

15  your office.  And for what reason were they here at 1:30 in

16  the morning?

17           MR. WATKINS:  Well, first off, you don't

18  know who they are, correct, Tony?

19           MR. CONSOLDANE:  I just know they work in

20  the office.

21           MR. WATKINS:  Are you saying they are

22  employees of the office?

23           MR. CONSOLDANE:  Dennis, I don't know who

3606



1    you employ or who you don't employ.  I know they got keys to

2    your office and they go in and out of the office.  I would

3    assume they have some type of relationship.

4                    MR. WATKINS:  They don't have keys and I

5    know who they are, I believe, and it's Becky Peece and

6    another woman by the name of Joyce -- do you know her last

7    name?

8                    MR. MORROW:  I don't even know her last

9    name.

10                   MR. WATKINS:  They are involved with the

11   victim/witness program.  They are citizens, they are not

12   employees of our office.

13                   THE COURT:  They contribute their time?

14                   MR. WATKINS:  Right, and they simply have

15   an interest to watch the trial and they were in the hallway

16   like we were in the hallway.  And to say that when we are

17   leaving the court, whether it's Attorney Consoldane or

18   Attorney Morrow or whether or not it's at any point in any

19   floor of the courthouse, everybody has a right, and they are

20   citizens, to be there.  And again he indicates that somehow

21   the fact that they are here and they have an interest in a

22   trial where somebody was killed, that everybody has a right,

23   including the defendant's family, whoever wants to be in this

1  public courthouse has a right to be in the public courthouse,

2  and they have a right to be in the halls.  If he has specific

3  facts, and he just mentioned they are just there.  And the

4  fact is the jury wouldn't even know who they are.

5              MR. CONSOLDANE:  Your Honor, maybe I'm

6  getting a bit paranoid.  They are under Dennis's control.

7              MR. WATKINS:  No, they aren't under my

8  control.

9              MR. CONSOLDANE:  Well, they have access to

10  your office.  They are in and out of your office.  They camp

11  in your office all the time on the second floor right across

12  from where the jury is.

13              MR. WATKINS:  That's the victim/witness

14  office.

15              MR. CONSOLDANE:  Well, that's where they

16  are.  That's your office.  Isn't that where you hold grand

17  jury?

18              MR. WATKINS:  That is also the Court's

19  office.  The grand jury is part of the function of the Court.

20  That's what we do.

21              MR. CONSOLDANE:  Well, it just for them --

22  it just doesn't look right.  And I don't know why, what

23  business they had to be here at 1:30 in the morning.

3609                    3608



1            MR. MORROW:  Just like it didn't look

2    right last night with you walking out right behind all the

3    jurors, if you want to make allegations of misconduct.  That

4    is the exact same thing.  You walked out right behind the

5    jurors as they were walking out the door.

6            MR. CONSOLDANE:  Not behind them.  After

7    they left I walked out.

8            MR. MORROW:  Absolutely not.  Dennis and I

9    stood on the step and watched you follow them right out the

10   door.

11           THE COURT:  Let me get my two cents into

12   this, if I may.  This has been a continuing argument being

13   made by the defense during this trial and I think it's also

14   made by the defense in other trials similar to this.  I had

15   occasion last evening when leaving, which was probably 10

16   minutes after the jury had left the room here, walking down

17   the steps with Maryann, the reporter.  Laurie was standing

18   out in the hall before going out giving some directions to

19   the jurors.  The two people that counsel refers to, who have

20   some association with the victim/witness group, were standing

21   but they were standing by the steps on the right-hand side.

22   I came down the left.  They weren't in with the jury.  I

23   didn't see that.



3609

1              MR. CONSOLDANE:  Okay.  Well, close

2    proximity.

3              THE COURT:  And there's another factor I

4    think that is of some importance, and that is I don't know

5    how the jury would have any idea who these people are because

6    they haven't appeared in this trial, unless they would know

7    them from prior contact or something.  But your concern about

8    them even being here is something that you are noting

9    primarily, I don't think you are saying that there was any

10   conversations or anything untoward of that nature which you

11   observed.

12              MR. CONSOLDANE:  No, I didn't.

13              THE COURT:  Just that they were there,

14   right?

15              MR. CONSOLDANE:  Right.  I didn't see them

16   say anything, but I guess it's just that they, they come in

17   and out of the office right across from where the jury goes

18   and the jury sees them in and out of that office and, you

19   know, I don't know what they, you know, I really don't know

20   what they perceive it to be.  But, you know, and I can

21   understand their need to be here if they've got relatives of

22   the victim to console, maybe that, but at 1:30 in the morning

23   while the jury is out, nothing is going on in court.

3610

1          THE COURT:  Well, I can pass this on.  I

2   believe that Miriam was going to stay herself and she told me

3   that the reason -- and I approached and talked to Miriam, the

4   head of the victims of crime.  I said to her, "What are you

5   doing here," and she said that I promised to notify --

6          MR. WATKINS:  The victim.

7          THE COURT:  -- the victim's family --

8          MR. WATKINS:  That's correct.

9          THE COURT:  -- when the jury came back.

10          MR. WATKINS:  And that's what they do.

11          THE COURT:  And one of the girls told me

12   that these two ladies told Miriam, "Go on home, we'll stay."

13          MR. WATKINS:  Ike is in the hospital.

14          THE COURT:  What's that?

15          MR. WATKINS:  Miriam's husband went in the

16   hospital last early evening around 5:00 o'clock.

17          THE COURT:  Well, that might have been --

18   I know Miriam was intending on staying.

19          MR. WATKINS:  And that's the role that

20   they play, to make phone calls if there were a verdict.

21          THE COURT:  In any event, anybody else

22   have anything to add?  That is the situation, James.  Are you

23   still there?  Jim Lewis is on speaker phone here and he's

3611

1   heard this entire conversation.  He had called in to talk to

2   Tony.  Do you wish to talk privately to Tony, Jim?

3                    MR. LEWIS BY SPEAKER PHONE:  Yeah.  The

4   only thing is I would -- you can put this on the record.  My

5   view of the whole thing is that victim/witness, they know who

6   the jurors are and I think they should just stay away from

7   them.  I think they should just give them a clear berth and

8   they shouldn't be anywhere around them really.  They know who

9   they are, the victim/witness people come in and know who the

10  jurors are, and they can see them in the group, and

11  everything else, and should stay clear.  I really believe we

12  try to stay clear of them.

13                    MR. WATKINS:  And they do.

14                    MR. LEWIS:  And I just think they ought to

15  do that.  So that's enough on the record for me.

16                    THE COURT:  It is a valid point and I'm

17  sure that they should know that.  And I have not again had

18  anything brought to my attention that's contrary to that

19  except this particular incident.  Okay.  Tony, you want to

20  talk to Jimmy?

21                    MR. CONSOLDANE:  Yeah.  Can I take him out

22  here?

23                    (Whereupon, the proceedings in chambers

3612

1    were concluded; Court's Exhibit 6, the jury question, was

2    marked for identification; and a recess was taken while the

3    jury continued their deliberations.)

4                              **VERDICT**

5                    (Whereupon, the jury was seated in the

6    jury box and the following proceedings commenced at

7    6:09 p.m. as follows.)

8                    THE COURT:  Please be seated.  Thank you.

9    Ladies and gentlemen of the jury, have you rendered a verdict

10   in this matter?

11                   (Whereupon, the jury answered in the

12   affirmative.)

13                   THE COURT:  Okay.  Would the fore person

14   please deliver that to the bailiff?

15            Okay.  The verdict delivered to me from this jury

16   reads on Count One, Indictment for Aggravated Murder, "We,

17   the jury in this case, duly impaneled and sworn or affirmed,

18   find the Defendant, NATHANIEL E. JACKSON, guilty of

19   Aggravated Murder (did purposely cause the death of Robert

20   Fingerhut with prior calculation and design) on December 11,

21   2001, in the manner and form as he stands charged in Count

22   One of the indictment."  That is dated this date and there

23   are 12 signatures affixed thereto.

3613

1          On the Specification One to the First Count of the

2     Indictment it reads, "We, the jury in this case, duly

3     impaneled and sworn or affirmed, find and specify by proof

4     beyond a reasonable doubt that the Defendant, NATHANIEL E.

5     JACKSON, is guilty of committing the offense of Aggravated

6     Murder while he was committing, attempting to commit, or

7     fleeing immediately after committing Aggravated Burglary and

8     that the said NATHANIEL E. JACKSON was the principal offender

9     in the commission of the Aggravated Murder, or committed the

10    Aggravated Murder with prior calculation and design."  Dated

11    this date and signed by all 12 members of the jury.

12          On Specification Two to the First Count of the

13    Indictment it reads, "We, the jury in this case, duly

14    impaneled and sworn or affirmed, find and specify by proof

15    beyond a reasonable doubt that the Defendant, NATHANIEL E.

16    JACKSON, is guilty of committing the offense of Aggravated

17    Murder while he was committing, attempting to commit, or

18    fleeing immediately after committing Aggravated Robbery and

19    that the said NATHANIEL E. JACKSON was the principal offender

20    in the commission of the Aggravated Murder, or committed the

21    Aggravated Murder with prior calculation and design.  Again

22    dated this date and signed by all 12 members of the jury.

23          On Count Two, Indictment for Aggravated Murder, "We,

3614

1    the jury in this case, duly impaneled and sworn or affirmed,

2    find the Defendant, NATHANIEL E. JACKSON, guilty of

3    Aggravated Murder (did purposely cause the death of Robert

4    Fingerhut, while committing, attempting to commit, or fleeing

5    immediately after committing Aggravated Burglary and/or

6    Aggravated Robbery on December 11th, 2001, in the manner and

7    form as he stands charged in Count Two of the indictment."

8    Dated this date and signed by all 12 members of the jury.

9            On Specification One to the Second Count of the

10   Indictment, "We, the jury in the case, duly impaneled and

11   sworn or affirmed, find and specify by proof beyond a

12   reasonable doubt that the Defendant, NATHANIEL E. JACKSON, is

13   guilty of committing the offense of Aggravated Murder while

14   he was committing, attempting to commit, or fleeing

15   immediately after committing Aggravated Burglary and that the

16   said NATHANIEL E. JACKSON was the principal offender in the

17   commission of the Aggravated Murder, or committed the

18   Aggravated Murder with prior calculation and design."  Dated

19   this date and signed by all 12 members of the jury.

20           On Specification Two to the Second Count of the

21   Indictment, "We, the jury in this case, duly impaneled and

22   sworn or affirmed, find and specify by proof beyond a

23   reasonable doubt that the Defendant, NATHANIEL E. JACKSON, is

3615

1  guilty of committing the offense of Aggravated Murder while

2  he was committing, attempting to commit, or fleeing

3  immediately after committing Aggravated Robbery and that the

4  said NATHANIEL E. JACKSON was the principal offender in the

5  commission of the Aggravated Murder, or committed the

6  Aggravated Murder with prior calculation and design."  Dated

7  this date, excuse me, it's signed by all 12 members of the

8  jury.

9       On Count Three of the Indictment for Aggravated

10  Burglary, "We, the jury in this case, duly impaneled and

11  sworn or affirmed, find the Defendant, NATHANIEL E. JACKSON,

12  guilt of Aggravated Burglary on December 11, 2001, in the

13  manner and form as he stands charged in Count Three of the

14  Indictment."  That is dated this date and signed by all 12

15  members of the jury.

16       Specification attached to the Third Count of the

17  Indictment, "We, the jury in this case, duly impaneled and

18  sworn or affirmed, find and specify that the Defendant,

19  NATHANIEL E. JACKSON, did have a firearm on or about the

20  offender's person or under the person's control while

21  committing the offense and displayed the firearm, brandished

22  the firearm, indicated that the offender possessed the

23  firearm, or used it to commit the offense of Aggravated

3616

1    Burglary."  Signed November 8th, 2002, and signed by all 12

2    members of the jury.

3          Count Four, Indictment for Aggravated Robbery, "We,

4    the jury in this case, duly impaneled and sworn or affirmed,

5    find the Defendant, NATHANIEL E. JACKSON, guilty of

6    Aggravated Robbery on December 11th, 2001, in the manner and

7    form as he stands charged in Count Four of the indictment."

8    That is also signed this date by all 12 members of the jury.

9          Specification One to the Fourth Count of the

10   Indictment, "We, the jury in this case, duly impaneled and

11   sworn or affirmed, find and specify that the Defendant,

12   NATHANIEL E. JACKSON, did have a firearm on or about the

13   offender's person's control while committing the offense and

14   displayed the firearm, brandished the firearm, indicated that

15   the offender possessed the firearm, or used it to commit the

16   offense of Aggravated Robbery."  Dated today and signed by

17   all 12 members of the jury.

18          The lesser counts have not been completed, which is

19   proper with the verdict rendered.

20          Ladies and gentlemen of the jury, have I properly

21   read the verdict as rendered by you?

22                  (Whereupon, the jury answered in the

23   affirmative.)

618                                                                      3617

```
 1                          THE COURT:  Okay.  Thank you.  Does the

 2        State wish to poll the jury?

 3                          MR. WATKINS:  No, Your Honor.

 4                          THE COURT:  Does the defense?

 5                          MR. CONSOLDANE:  No.

 6                          THE COURT:  Okay.  Very good.

 7                          MR. CONSOLDANE:  I would like to inspect

 8        the jury verdicts.

 9                          THE COURT:  Yeah.  You want to look at

10        that before we proceed, look these over?  Ladies and

11        gentlemen of the jury, because of the form of the verdict

12        that means that I must have you come back for a separate

13        hearing.  I've explained that all to you before and will

14        explain further once we commence that hearing.  I am going to

15        ask that you return at 12:00 o'clock this coming Thursday.

16        It's agreed, right?

17                          MR. WATKINS:  That's correct, Your Honor.

18                          MR. CONSOLDANE:  Yeah.

19                          THE COURT:  At that time you need not

20        bring anything for overnight, but Friday when you return you

21        will want to bring those items with you as you did recently

22        because if the matter is not concluded by way of your

23        decision on Friday then you, of course, will have to be
```

519                                                                    3618

1    sequestered that evening, so make preparations according to

2    that.

3              The alternates have been most patient, and I know

4    that's very boring sitting down there not being able to watch

5    TV.  You probably all know each other very well by now.  I

6    would ask that you return at the same time.  Well, I will

7    give you further instructions when you come back in on

8    Thursday.

9              You folks have labored long and diligently in this

10   matter.  The case is not over yet.  It is most important --

11   you are going to be free to go home, of course, now.  It is

12   still very important that you observe the admonition not to

13   discuss anything.  You see the press here.  There will be

14   things in the newspaper, there will be things on TV.  Please

15   do not watch any of that or read anything about this case.

16              When you return the hearing will probably -- the

17   evidence that remains to be put before you will be much more

18   brief than what you listened to on the main part of the case,

19   but until you have that information and make your

20   determination in the second phase the case is not over.

21   We're just taking a couple days off here, so please don't

22   talk with anyone, let anyone talk with you.

23              Now, I know that anybody who is aware that you were

3619

1   on this jury, particularly after they read what the verdict

2   has been, you're going to have people come up to you and say,

3   "Oh, boy, tell me about it," and some of you will probably

4   want to tell them about it.  You can't.  Please.

5           Okay.  You all have a nice weekend.  We'll see you

6   back here Thursday at noon and we will finish the second

7   phase.  Just a second.  Oh, yeah, yeah, that's another thing.

8   Let me explain this to you.

9           Some of you asked, I believe some of you who worked

10   at different restaurants, whether you could go to work and

11   everybody agreed that was okay at that period.  I'm going to

12   direct you to not return to work during this period of time

13   because you will be faced with something that's going to be

14   almost impossible.  You won't get any work done anyways,

15   people will be asking you questions, so please stay home.

16   Back here Thursday.  When we're done then you will be free to

17   talk about whatever with whomever, but until that time you

18   just cannot do it, okay?  Very good.  Thank you all very

19   much.

20           MR. WATKINS:  Your Honor, may we approach?

21           (Whereupon, a bench conference was held.)

22           THE COURT:  You folks gets your things and

23   we'll get you out of here before anybody else leaves, okay?

3620

1   Thank you.  I am going to ask everybody in here to remain

2   until the jury has left.

3                    (Whereupon, the jury was excused at

4   6:18 p.m. and Court was recessed for the evening.)

5                          *   *   *

6

7

8

9                    REPORTER'S CERTIFICATE

10

11      This is to certify the foregoing represents a true and

12  correct copy of the proceedings had in the aforementioned

13  cause as reflected by the stenotype notes taken by me on the

14  same.

15

16

17

18

19  _____

20  Kelly J. Wilson
    Official Court Reporter

21

22

23

