# VOLUME 16

1    IN THE COURT OF COMMON PLEAS
     TRUMBULL COUNTY, OHIO
2        CASE NO. 01-CR-794

3

4    STATE OF OHIO        )        **MITIGATION HEARING**

5              Plaintiff  )            **VERDICT**

6    -vs-                 )            **MOTIONS**

7    NATHANIEL JACKSON     )          **SENTENCING**

8              Defendant  )

9

10        BE IT REMEMBERED, that on Thursday,

11   November 14, 2002, and Friday, November 15, 2002,

12   these proceedings came on to be heard before one

13   of the Judges of this Court, John M. Stuard, in

14   Courtroom No. 2, on High Street, Warren, Ohio,

15   before the case heretofore filed herein.

16

17                                    03-0137

18

19

20   Mary Ann Mills, RPR
     Official Court Reporter
21   Trumbull County, Ohio

22

FILED

JUL 09 2003

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

2

1

### A P P E A R A N C E S

2

3

On Behalf of the State of Ohio:

4      Dennis Watkins, Prosecuting Attorney
       Charles Morrow, Ass't. Prosecuting Attorney

5      160 High Street
       Warren, Ohio 44481

6

On Behalf of the Defendant:

7      Anthony V. Consoldane, Public Defender
       Thomas Wright, Public Defender

8      James F. Lewis, Public Defender
       328 Mahoning Ave., N.W.

9      Warren, Ohio 44483

10

11

12

13

14

15

16

17

18

19

20

21

22

3

1

<u>I N D E X</u>

2

<u>WITNESSES</u>:                                    <u>PAGE NO.</u>

3

<u>RAYMOND DICKERSON</u>

4        Direct Examination by Mr. Consoldane           23

5    <u>TAUSHIA KORNEAGAY</u>
         Direct Examination by Mr. Consoldane           25
6        Cross Examination by Mr. Watkins               27
         Redirect Examination by Mr. Consoldane         29
7
     <u>LORRAINE RUE</u>
8        Direct Examination by Mr. Consoldane           30

9    <u>S██████ T██████ J███████</u>
         Direct Examination by Mr. Consoldane           30
10
     <u>PAULINE KORNEAGAY</u>
11       Direct Examination by Mr. Consoldane           31

12   <u>DR. SANDRA McPHERSON</u>
         Direct Examination by Mr. Consoldane           33
13       Cross Examination by Mr. Watkins               59
         Redirect Examination by Mr. Consoldane        101
14       Recross Examination by Mr. Watkins            103
         Redirect Examination by Mr. Consoldane        105
15
     <u>DEFENDANT'S UNSWORN STATEMENT</u>                  106
16
     <u>CLOSING ARGUMENTS</u>
17       By Mr. Consoldane                             129
         By Mr. Watkins                                135
18
     <u>JURY INSTRUCTIONS</u>                            159
19
     <u>VERDICT</u>                                      181
20   <u>EXHIBITS ADMITTED</u>                            108
     <u>SENTENCING</u>                                   211
21   <u>MOTIONS</u>                                      219

22

| Exhibit No. | Description | Admitted |
|---|---|---|
| 1 | 911 Tape | Admitted over Obj |
| 1A | 911 Paper work | No Objection |
| 2 | Crime Scene Video | Objection Sustained |
| 3 | Crime Scene Diagram | Admitted over Obj |
| 4 | Photo | No Objection |
| 5 | Photo | No Objection |
| 6 | Photo | Withdrawn |
| 7 | Photo | No Objection |
| 8 | Photo | No Objection |
| 9 | Photo | No Objection |
| 10 | Photo | No Objection |
| 11 | Photo | No Objection |
| 12 | Photo | No Objection |
| 13 | Photo | No Objection |
| 14 | Photo | No Objection |
| 15 | Photo | No Objection |
| 16 | Photo | No Objection |
| 17 | Photo | No Objection |
| 18 | Photo | No Objection |
| 19 | Photo | No Objection |
| 20 | Photo | No Objection |
| 21 | Photo | No Objection |
| 22 | Photo | Withdrawn |
| 23 | Photo | Withdrawn |
| 24 | Photo | No Objection |
| 25 | Photo | No Objection |
| 26 | Photo | No Objection |
| 27 | Photo | No Objection |
| 28 | Photo | No Objection |
| 29 | Photo | Withdrawn |
| 30 | Photo | Withdrawn |
| 31 | Photo | No Objection |
| 32 | Photo | Withdrawn |
| 33 | Photo | No Objection |
| 34 | Photo | No Objection |
| 35 | Photo | No Objection |
| 36 | Photo | Withdrawn |
| 37 | Photo | Withdrawn |
| 38 | Photo | No Objection |
| 39 | Photo | No Objection |
| 40 | Photo | Withdrawn |
| 41 | Photo | No Objection |
| 42 | Photo | Withdrawn |
| 43 | Photo | Withdrawn |
| 44 | Photo | No Objection |
| 45 | Photo | No Objection |
| 46 | Photo | Withdrawn |
| 47 | Photo | Withdrawn |
| 48 | Photo | No Objection |
| 49 | Photo | No Objection |
| 50 | Photo | No Objection |
| 51 | Photo | Withdrawn |
| 52 | Photo | No Objection |
| 53 | Photo | No Objection |
| 54 | Photo | No Objection |
| 55 | Photo | No Objection |
| 56 | Photo | No Objection |
| 57 | Photo | No Objection |
| 58 | Photo | No Objection |
| 59 | Photo | No Objection |
| 60 | Photo | No Objection |

| | | |
|---|---|---|
| 61 | Photo Shirt | No Objection |
| 62 | Photo Shirt | No Objection |
| 63 | Photo  - Victim | Withdrawn |
| 64 | Bullet Recovered from Brain of Victim | No Objection |
| 65 | Bullet Recovered from Brain of Victim | No Objection |
| 66 | Clothes and Jewerly | No Objection |
| 67 | Photo X-Ray | No Objection |
| 68 | Photo Reds Jacket | No Objection |
| 69 | Tire Marks in Grass | No Objection |
| 70 | N. Side Exterior of House | No Objection |
| 71 | Front Exterior of House | No Objection |
| 72 | Rear Exterior of House | No Objection |
| 73 | S Side Exterior of House | No Objection |
| 74 | Main Bathroom | No Objection |
| 75 | View of man door screen from house | No Objection |
| 76 | View of man door screen from garage | No Objection |
| 77 | Spare Bedroom | No Objection |
| 78 | Clothing- Spare Bedroom | No Objection |
| 79 | Blood spatter - peninisula | Withdrawn |
| 80 | Blood Spatters- on wall by door | Withdrawn |
| 81 | Blood Spatters and smear | Withdrawn |
| 82 | Blood Spatters | Withdrawn |
| 83 | Inside Garage looking into residence | No Objection |
| 84 | Blood drops - garage | No Objection |
| 85 | Garage | Withdrawn |
| 86 | Blood Spatters - garage | No Objection |
| 87 | Overview garage | No Objection |
| 88 | Peninusla & Wall - blood splatters | Withdrawn |
| 89 | Different view as in 88 | Withdrawn |
| 90 | Blood Drops in garage | No Objection |
| 91 | Kitchen door closed | No Objection |
| 92 | Overview garage | No Objection |
| 93 | Back of man door w/ blood | No Objection |
| 94 | Interior side of man door | No Objection |
| 95 | Eye glasses and broken lag bolt -garage | No Objection |
| 96 | Eye glasses - garage | No Objection |
| 97 | Stairwell ceiling | No Objection |
| 98 | receipt dated 9-26-01 | No Objection |
| 99 | Victim | Withdrawn |
| 100 | Victim -back close up | Withdrawn |
| 101 | Small key found under victim | No Objection |
| 102 | overview bedroom | No Objection |
| 103 | bedroom master | No Objection |
| 104 | bedroom closet | No Objection |
| 105 | Photo | No Objection |
| 105A | Photo | No Objection |
| 106 | Photo | No Objection |
| 106A | Photo | No Objection |
| 107 | Photo | No Objection |
| 107A | photo | No Objection |
| 108 | Victim | Withdrawn |
| 108A | Victim Face down | No Objection |
| 109 | Dry Wall Hole | Withdrawn |
| 109A | Victim face down | Withdrawn |
| 110 | Victim in Kitchen | Withdrawn |
| 111 | Victim lower torso | No Objection |
| 112 | Victim - Footprints w/ small dots | Withdrawn |
| 113 | Ashtray | Withdrawn |
| 114 | Ashtray | No Objection |
| 115 | Living Room | No Objection |
| 116 | Living Room | No Objection |
| 117 | Living Room | No Objection |

iii

| 118 | Office Area | No Objection |
|---|---|---|
| 119 | Office Area | No Objection |
| 120 | Office Area | No Objection |
| 121 | Office Area | No Objection |
| 122 | Front Door Looking In | No Objection |
| 123 | Dining Room - Orioles Jacket | No Objection |
| 124 | Office Area w/ ball cap | No Objection |
| 125 | Dry Wall Hole | No Objection |
| 126 | Front View of Car | No Objection |
| 127 | left rear red car | No Objection |
| 128 | left view red car | No Objection |
| 129 | Garage door & Driver door | No Objection |
| 130 | Family Room - overview | No Objection |
| 131 | Table w/ 2 roaches | No Objection |
| 132 | Garage w/ view of Gun | No Objection |
| 133 | Blood Drops in garage | Withdrawn |
| 134 | Overview - Office | No Objection |
| 135 | Kitchen - Door | Withdrawn |
| 136 | Open Door, Kitchen area | Withdrawn |
| 137 | Kitchen - receipt Wallmart 9:33 p.m. | No Objection |
| 138 | Stainless Steel Revolover | No Objection |
| 139 | Close - up Footprint & Garage | No Objection |
| 140 | Stairwell & Basement | No Objection |
| 141 | Stairwell & Basement | No Objection |
| 142 | Cabinet | No Objection |
| 143 | Close - Up Cabinet | No Objection |
| 144 | Kitchen - Different View | No Objection |
| 145 | Pier One Import Bag w/ wine glasses | No Objection |
| 146 | Front View of Car | No Objection |
| 147 | Rt Side View of Car | No Objection |
| 148 | Rear view of Car | No Objection |
| 149 | Left Side view of Car | No Objection |
| 150 | Double Lined Bag "Nate Jackson" | No Objection |
| 151 | Receipt - Pier One Import - Lorain Rd | No Objection |
| 152 | Assorted Candy, toothpaste | No Objection |
| 153 | Cuetomer Reciept | No Objection |
| 154 | Handcuff Box w/ key - no cuffs | No Objection |
| 155 | Hair Comb | No Objection |
| 156 | Front View of Car | No Objection |
| 157 | Rear view of Car | No Objection |
| 158 | Wide Angle Rear of Car | Withdrawn |
| 159 | Rt Side View of Car | No Objection |
| 160 | Front View of Car - Left Corner | No Objection |
| 161 | Rear view of Car - Damage to Bumper | Withdrawn |
| 162 | Front View of Car | No Objection |
| 163 | Exterior to Interior - Blood Smears | No Objection |
| 164 | Visor Area | No Objection |
| 165 | Interior area above head w/ blood | No Objection |
| 166 | Exterior | No Objection |
| 167 | Front Driver Seat | Withdrawn |
| 168 | Visor Area - Removed | No Objection |
| 169 | Door Handle | No Objection |
| 170 | Door Handle w/ blood | No Objection |
| 171 | Dirver side visor clamp | No Objection |
| 172 | Front Passenger Seat - Cell Phone | No Objection |
| 173 | Front Passenger Seat - Cell Phone | No Objection |
| 174 | Interior -Left Console | No Objection |
| 175 | Napkin w/ Bllod Smear | No Objection |
| 176 | Floormat | No Objection |
| 177 | Trunk Open | Withdrawn |
| 178 | Keys in Ignition | No Objection |
| 179 | Rt interior head rest | Withdrawn |

| 180 | Driver Side Console | No Objection |
| 181 | Passenger Side Dashboard | No Objection |
| 182 | Passenger side door - interior | No Objection |
| 183 | Driver side - steering wheel p garage door opener | No Objection |
| 184 | Left side of car w/ dashboard | No Objection |
| 185 | Rt side back seat | No Objection |
| 186 | Front driver compartment | No Objection |
| 187 | Exterior thru rear left door | No Objection |
| 188 | keys | Withdrawn |
| 189 | Cell Phone | Withdrawn |
| 190 | Keys - Blue Matt | Withdrawn |
| 191 | Driver side - release button | No Objection |
| 192 | Wagon Wheel Photo | Objection Sustained |
| 193 | Wagon Wheel Photo | Objection Sustained |
| 194 | Wagon Wheel Photo | Admitted over Obj |
| 195 | Wagon Wheel Photo | Admitted over Obj |
| 196 | Wagon Wheel Photo | Objection Sustained |
| 197 | Photograph Items Recovered Days Inn | Admitted over Obj |
| 198 | No Exhibit | |
| 199 | Days Innn Photographs | Withdrawn |
| 200 | Days Innn Photographs | Withdrawn |
| 201 | Days Innn Photographs | Admitted over Obj |
| 202 | Days Innn Photographs | Objection Sustained |
| 203 | Days Innn Photographs | Withdrawn |
| 204 | Days Innn Photographs | Objection Sustained |
| 205 | Days Innn Photographs | Withdrawn |
| 206 | Days Innn Photographs | Withdrawn |
| 207 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 208 | Days Innn Photographs | Withdrawn |
| 210 | Days Innn Photographs | Withdrawn |
| 211 | Days Innn Photographs | Withdrawn |
| 212 | Days Innn Photographs | Withdrawn |
| 213 | Days Innn Photographs | Withdrawn |
| 214 | Days Innn Photographs | Withdrawn |
| 215 | Days Innn Photographs | Withdrawn |
| 216 | Days Innn Photographs | Withdrawn |
| 217 | Days Innn Photographs | Withdrawn |
| 218 | Days Innn Photographs | Withdrawn |
| 219 | Days Innn Photographs | Withdrawn |
| 220 | Days Innn Photographs | Withdrawn |
| 221 | Days Innn Photographs | Withdrawn |
| 222 | Days Innn Photographs | Withdrawn |
| 223 | Days Innn Photographs | Withdrawn |
| 224 | Days Innn Photographs | Admitted over Obj |
| 225 | Days Innn Photographs | Withdrawn |
| 226 | Days Innn Photographs | Admitted over Obj |
| 227 | Photographs of Wirt Street | Admitted over Obj |
| 228 | Photographs of Wirt Street | Out |
| 229 | Photographs of Wirt Street | Out |
| 230 | Photographs of Wirt Street | Admitted over Obj |
| 231 | Photographs of Wirt Street | Admitted over Obj |
| 232 | Photographs of Wirt Street | Out |
| 233 | WIrt Street Photographs | Out |
| 234 | Wirt Street Photographs | Admitted over Obj |
| 235 | Front view - Nate Jackson | No Objection |
| 236 | Rear view Nate Jackson | No Objection |
| 237 | Full body shot | No Objection |
| 238 | Rt arm and Hand | No Objection |
| 239 | Front view - Nate Jackson | No Objection |
| 240 | Left & Rt knee | No Objection |
| 241 | View of Hands & Wound | No Objection |

iv

| 271D | Letters From Donna to Nate | | |
|---|---|---|---|
| 271D1 | | 12/03/01 | Admitted |
| 271D2 | | 11/29/01 | Admitted |
| 271D3 | | 11/29/01 | Admitted |
| 271D4 | | 11/28/01 | Admitted |
| 271D5 | | 11/28/01 | Admitted |
| 271D6 | | 11/27/01 | Admitted |
| 271D7 | | 11/27/01 | Admitted |
| 271D8 | | 11/26/01 | Admitted |
| 271D9 | | 11/26/01 | Admitted |
| 271D10 | | 11/24/01 | Admitted |
| 271D11 | | 11/23/01 | Admitted |
| 271D12 | | 11/23/01 | Admitted |
| 271D13 | | 11/22/01 | Admitted |
| 271D14 | | 11/22/01 | Admitted |
| 271D15 | | 11/22/01 | Admitted |
| 271D16 | | 11/22/01 | Admitted |
| 271D17 | | 11/21/01 | Admitted |
| 271D18 | | 11/21/01 | Admitted |
| 271D19 | | 11/20/01 | Admitted |
| 271D20 | | 11/20/01 | Admitted |
| 271D21 | | 11/20/01 | Admitted |
| 271D22 | | 11/20/01 | Admitted |
| 271D23 | | 11/19/01 | Admitted |
| 271D24 | | 11/19/01 | Admitted |
| 271D25 | | 11/19/01 | Admitted |
| 271D26 | Empty | | Admitted |
| 271D27 | | 11/16/01 | Admitted |
| 271D28 | | 11/16/01 | Admitted |
| 271D29 | | 11/15/01 | Admitted |
| 271D30 | Empty | | Admitted |
| 271D31 | | 11/12/01 | Admitted |
| 271D32 | | 11/10/01 | Admitted |
| 271D33 | | 11/10/01 | Admitted |
| 271D34 | | 11/10/01 | Admitted |
| 271D35 | | 11/10/01 | Admitted |
| 271D36 | | 11/09/01 | Admitted |
| 271D37 | | 11/09/01 | Admitted |
| 271D38 | | 11/09/01 | Admitted |
| 271D39 | | 11/09/01 | Admitted |
| 271D40 | | 11/08/01 | Admitted |
| 271D41 | | 11/08/01 | Admitted |
| 271D42 | | 11/08/01 | Admitted |
| 271D43 | | 11/07/01 | Admitted |
| 271D44 | | 11/07/01 | Admitted |
| 271D45 | | 11/07/01 | Admitted |
| 271D46 | | 11/07/01 | Admitted |
| 271D47 | Empty | | Admitted |
| 271D48 | | 11/06/01 | Admitted |
| 271D49 | | 11/06/01 | Admitted |
| 271D50 | Empty | | Admitted |
| 271D51 | | 11/05/01 | Admitted |
| 271D52 | | 11/05/01 | Admitted |
| 271D53 | | 11/03/01 | Admitted |
| 271D54 | | 11/03/01 | Admitted |
| 271D55 | | 11/02/01 | Admitted |
| 271D56 | | 11/02/01 | Admitted |
| 271D57 | | 11/02/01 | Admitted |
| 271D58 | | 11/01/01 | Admitted |
| 271D59 | | 11/01/01 | Admitted |
| 271D60 | Halloween card | | Admitted |
| 271D61 | | 10/31/01 | Admitted |

| | | | |
|---|---|---|---|
| 271D62 | | 10/30/01 | Admitted |
| 271D63 | | 10/29/01 | Admitted |
| 271D64 | | 10/29/01 | Admitted |
| 271D65 | | 10/28/01 | Admitted |
| 271D66 | | 10/27/01 | Admitted |
| 271D67 | | 10/26/01 | Admitted |
| 271D68 | | 10/26/01 | Admitted |
| 271D69 | | 10/26/01 | Admitted |
| 271D70 | | 10/25/01 | Admitted |
| 271D71 | | 10/25/01 | Admitted |
| 271D72 | | 10/24/01 | Admitted |
| 271D73 | | 10/24/01 | Admitted |
| 271D74 | | 10/23/01 | Admitted |
| 271D75 | | 10/23/01 | Admitted |
| 271D76 | | 10/23/01 | Admitted |
| 271D77 | | 10/23/01 | Admitted |
| 271D78 | | 10/22/01 | Admitted |
| 271D79 | Empty | | Admitted |
| 271D80 | | 10/21/01 | Admitted |
| 271D81 | | 10/20/01 | Admitted |
| 271D82 | | 10/20/01 | Admitted |
| 271D83 | | 10/20/01 | Admitted |
| 271D84 | | 10/20/01 | Admitted |
| 271D85 | | 10/19/01 | Admitted |
| 271D86 | | 10/19/01 | Admitted |
| 271D87 | | 10/19/01 | Admitted |
| 271D88 | | 10/19/01 | Admitted |
| 271D89 | | 10/18/01 | Admitted |
| 271D90 | Empty | | Admitted |
| 271D91 | | 10/18/01 | Admitted |
| 271D92 | | 10/17/01 | Admitted |
| 271D93 | | 10/16/01 | Admitted |
| 271D94 | | 10/16/01 | Admitted |
| 271D95 | | 10/15/01 | Admitted |
| 271D96 | | 10/15/01 | Admitted |
| 271D97 | | 10/15/01 | Admitted |
| 271D98 | | 10/13/01 | Admitted |
| 271D99 | | 10/13/01 | Admitted |
| 271D100 | | 10/13/01 | Admitted |
| 271D101 | | 10/12/01 | Admitted |
| 271D102 | | 10/12/01 | Admitted |
| 271D103 | | 10/12/01 | Admitted |
| 271D104 | Empty | | Admitted |
| 271D105 | | 10/12/01 | Admitted |
| 271D106 | | 10/12/01 | Admitted |
| 271D107 | | 10/11/01 | Admitted |
| 271D108 | | 10/11/01 | Admitted |
| 271D109 | | 10/11/01 | Admitted |
| 271D110 | | 10/10/01 | Admitted |
| 271D111 | | 10/10/01 | Admitted |
| 271D112 | | 10/10/01 | Admitted |
| 271D113 | | 10/08/01 | Admitted |
| 271D114 | | 10/08/01 | Admitted |
| 271D115 | | 10/06/01 | Admitted |
| 271D116 | | 10/06/01 | Admitted |
| 271D117 | | 10/06/01 | Admitted |
| 271D118 | | 10/05/01 | Admitted |
| 271D119 | | 10/05/01 | Admitted |
| 271D120 | | 10/05/01 | Admitted |
| 271D121 | | 10/05/01 | Admitted |
| 271D122 | | 10/05/01 | Admitted |
| 271D123 | | 10/05/01 | Admitted |

vi

| | | | |
|---|---|---|---|
| 271D124 | | 10/05/01 | Admitted |
| 271D125 | | 10/04/01 | Admitted |
| 271D126 | | 10/04/01 | Admitted |
| 271D127 | | 10/02/01 | Admitted |
| 271D128 | | 10/02/01 | Admitted |
| 271D129 | | 10/02/01 | Admitted |
| 271D130 | Unknown | | Admitted |
| 271D131 | Unknown | | Admitted |
| 271D132 | Unknown | | Admitted |
| 271D133 | Unknown | | Admitted |
| 271D134 | Unknown | | Admitted |
| 271D135 | Unknown | | Admitted |
| 271D136 | Unknown | | Admitted |
| 271D137 | Unknown | | Admitted |
| 271D138 | Unknown | | Admitted |
| 271D139 | | 11/26/01 | Admitted |

vii

viii

| 273N | Letters from Nate to Donna | Admitted |
|------|-----------|----------|
| 273N1 | 12/01/01 | Admitted |
| 273N2 | 11/30/01 | Admitted |
| 273N3 | 11/29/01 | Admitted |
| 273N4 | 11/28/01 | Admitted |
| 273N5 | 11/27/01 | Admitted |
| 273N6 | 11/26/01 | Admitted |
| 273N7 | 11/25/01 | Admitted |
| 273N8 | 11/23/01 | Admitted |
| 273N9 | 11/22/01 | Admitted |
| 273N10 | 11/20/01 | Admitted |
| 273N11 | 11/19/01 | Admitted |
| 273N12 | 11/17/01 | Admitted |
| 273N13 | 11/16/01 | Admitted |
| 273N14 | 11/14/01 | Admitted |
| 273N15 | 11/14/01 | Admitted |
| 273N16 | 11/13/01 | Admitted |
| 273N17 | 11/12/01 | Admitted |
| 273N18 | 11/12/01 | Admitted |
| 273N19 | 11/10/01 | Admitted |
| 273N20 | 11/09/01 | Admitted |
| 273N21 | 11/07/01 | Admitted |
| 273N22 | 11/06/01 | Admitted |
| 273N23 | 11/08/01 | Admitted |
| 273N24 | 11/05/01 | Admitted |
| 273N25 | 11/03/01 | Admitted |
| 273N26 | 11/01/01 | Admitted |
| 273N27 | 11/01/01 | Admitted |
| 273N28 | 10/31/01 | Admitted |
| 273N29 | 10/30/01 | Admitted |
| 273N30 | 273N31 | 273N32 |
| 273N31 | 10/28/01 | Admitted |
| 273N32 | 10/27/01 | Admitted |
| 273N33 | 273N34 | 273N35 |
| 273N34 | 10/25/01 | Admitted |
| 273N35 | 10/25/01 | Admitted |
| 273N36 | 10/25/01 | Admitted |
| 273N37 | 10/24/01 | Admitted |
| 273N38 | 10/23/01 | Admitted |
| 273N39 | 10/22/01 | Admitted |
| 273N40 | 10/21/01 | Admitted |
| 273N41 | 10/21/01 | Admitted |
| 273N42 | 10/20/01 | Admitted |
| 273N43 | 10/19/01 | Admitted |
| 273N44 | 10/18/01 | Admitted |
| 273N45 | 10/17/01 | Admitted |
| 273N46 | 10/16/01 | Admitted |
| 273N47 | 10/16/01 | Admitted |
| 273N48 | 10/15/01 | Admitted |
| 273N49 | 10/14/01 | Admitted |
| 273N50 | 10/12/01 | Admitted |
| 273N51 | 10/10/01 | Admitted |
| 273N52 | 10/10/01 | Admitted |
| 273N53 | 10/08/01 | Admitted |
| 273N54 | 10/05/01 | Admitted |
| 273N55 | 10/07/01 | Admitted |
| 273N56 | 10/04/01 | Admitted |
| 273N57 | 10/04/01 | Admitted |
| 273N58 | 10/02/01 | Admitted |
| 273N59 | 10/01/01 | Admitted |
| 273N60 | 10/01/01 | Admitted |
| 273N61 | 09/30/01 | Admitted |

| | | | |
|---|---|---|---|
| 273N62 | | 09/27/01 | Admitted |
| 273N63 | | 09/27/01 | Admitted |
| 273N64 | | 07/12/01 | Admitted |
| 273N65 | | 06/28/01 | Admitted |
| 273N66 | | 06/09/01 | Admitted |
| 273N67 | | 05/18/01 | Admitted |
| 273N68 | | 05/15/01 | Admitted |
| 273N69 | | 05/12/01 | Admitted |
| 273N70 | | 05/10/01 | Admitted |
| 273N71 | | 05/09/01 | Admitted |
| 273N72 | | 05/06/01 | Admitted |
| 273N73 | | 05/04/01 | Admitted |
| 273N74 | | 05/03/01 | Admitted |
| 273N75 | | 04/28/01 | Admitted |
| 273N76 | | 02/24/01 | Admitted |
| 273N77 | | 04/23/01 | Admitted |
| 273N78 | | 04/22/01 | Admitted |
| 273N79 | | 04/19/01 | Admitted |
| 273N80 | | 04/16/01 | Admitted |
| 273N81 | | 04/16/01 | Admitted |
| 273N82 | | 04/15/01 | Admitted |
| 273N83 | | 04/11/02 | Admitted |
| 273N84 | | 04/10/01 | Admitted |
| 273N85 | | 04/10/01 | Admitted |
| 273N86 | | 04/09/01 | Admitted |
| 273N87 | | 04/08/01 | Admitted |
| 273N88 | | 04/04/01 | Admitted |
| 273N89 | | 04/02/01 | Admitted |
| 273N90 | Unknown | | Admitted |
| 273N91 | | 03/31/01 | Admitted |
| 273N92 | | 03/29/01 | Admitted |
| 273N93 | | 03/26/01 | Admitted |
| 273N94 | | 03/25/01 | Admitted |
| 273N95 | | 03/23/01 | Admitted |
| 273N96 | | 03/22/01 | Admitted |
| 273N97 | | 03/20/01 | Admitted |
| 273N98 | | 03/20/01 | Admitted |
| 273N99 | | 03/20/01 | Admitted |
| 273N100 | | 03/19/01 | Admitted |
| 273N101 | | 03/19/01 | Admitted |
| 273N102 | | 03/19/01 | Admitted |
| 273N103 | | 03/19/01 | Admitted |
| 273N104 | | 03/15/01 | Admitted |
| 273N105 | | 03/13/01 | Admitted |
| 273N106 | | 03/12/01 | Admitted |
| 273N107 | | 03/11/01 | Admitted |
| 273N108 | | 03/09/01 | Admitted |
| 273N109 | | 03/06/01 | Admitted |
| 273N110 | | 03/04/01 | Admitted |
| 273N111 | | 03/03/01 | Admitted |
| 273N112 | | 03/02/01 | Admitted |
| 273N113 | | 02/27/01 | Admitted |
| 273N114 | | 02/25/01 | Admitted |
| 273N115 | | 02/20/01 | Admitted |
| 273N116 | | 02/23/01 | Admitted |
| 273N117 | | 02/22/01 | Admitted |
| 273N118 | | 02/19/01 | Admitted |
| 273N119 | | 02/16/01 | Admitted |
| 273N120 | | 02/15/01 | Admitted |
| 273N121 | Unknown | | Admitted |
| 273N122 | | 02/13/01 | Admitted |
| 273N123 | | 02/12/01 | Admitted |

ix

| | | | |
|---|---|---|---|
| 273N124 | | 02/09/01 | Admitted |
| 273N125 | | 02/07/01 | Admitted |
| 273N126 | | 02/04/01 | Admitted |
| 273N127 | | 02/01/01 | Admitted |
| 273N128 | | 02/01/01 | Admitted |
| 273N129 | | 01/26/01 | Admitted |
| 273N130 | | 01/19/01 | Admitted |
| 273N131 | | 01/17/01 | Admitted |
| 273N132 | | 01/21/01 | Admitted |
| 273N133 | | 01/16/01 | Admitted |
| 273N134 | | 01/12/01 | Admitted |
| 273N135 | | 01/05/01 | Admitted |
| 273N136 | | 01/01/01 | Admitted |
| 273N137 | | 12/27/00 | Admitted |
| 273N138 | | 12/27/00 | Admitted |
| 273N139 | Unknown | | Admitted |
| 273N140 | | 12/11/00 | Admitted |
| 273N141 | Unknown | | Admitted |
| 273N142 | Unknown | | Admitted |
| 273N143 | | 05/01/01 | Admitted |

x

xi

| | | |
|---|---|---|
| 242 | Left Hand - Wound | No Objection |
| 243 | Front view w/ bandage | No Objection |
| 244 | Side view Finger | No Objection |
| 245 | Left Hand - wrist to finger tip | No Objection |
| 246 | Left Hand Palm up | No Objection |
| 247 | Back side of Hand | No Objection |
| 248 | Both Hands | No Objection |
| 249 | Head and Shoulders | Admitted over Obj |
| 250 | Full body shot | Objection Sustained |
| 251 | Handgun - .38 Taurus | No Objection |
| 252 | Five (5) Live Rounds from Taurus | No Objection |
| 252A | Enevlope Containing Test Fire Rounds | No Objection |
| 253 | Right Eye glass Lens | No Objection |
| 254 | Eye glasses Missing Right Lens | No Objection |
| 255 | Cotton Swab - Front Door Hallway | No Objection |
| 256 | Dry Wall Cut out w/ Bullet Hole | No Objection |
| 257 | Bullet Recovered from Dry Wall | No Objection |
| 258 | Cincinnatti Red's Jacket - From Victim | No Objection |
| 259 | Bullet Recovered from Clothing of Victim | No Objection |
| 260 | Death Certificate | No Objection |
| 261 | Coroner's Verdict | No Objection |
| 262 | Autopsy Protocol - 11 pages | No Objection |
| 263 | Microscopic Examination | No Objection |
| 264 | Toxicology - 1 page Front and Back | No Objection |
| 264A | Radiology Report | No Objection |
| 265 | Blood - Drawn from Robert FIngerhut | No Objection |
| 266 | Bullet Recovered from Brain of Victim | No Objection |
| 267 | Driver's Side Visor | No Objection |
| 268 | Visor Clamp | No Objection |
| 269 | Keys Recovered from Ignition | No Objection |
| 270 | Bag Containing Letters | No Objection |
| 271 | Letters from Donna to Nate (See attached) | No Objection |
| 272 | No Exhibit | |
| 273 | Letters from Nate to Donna (See Attached) | No Objection |
| 274 | No Exhibit | |
| 275A | Hand Writing Analysis | Admitted over Obj |
| 275B | Hand Writing Analysis | Admitted over Obj |
| 276A | Hand Writing Standard | No Objection |
| 276B | Hand Writing Standard | No Objection |
| 276b1 | CCA Records | No Objection |
| 276B2 | CCA Records | No Objection |
| 276B3 | CCA Records | No Objection |
| 276B4 | CCA Records | No Objection |
| 276B5 | CCA Records | No Objection |
| 276B6 | CCA Records | No Objection |
| 276B7 | CCA Records | No Objection |
| 276C | Hand Writing Standard | No Objection |
| 276C1 | Prison Records | No Objection |
| 276C2 | Prison Records | No Objection |
| 276C3 | Prison Records | No Objection |
| 276C4 | Prison Records | No Objection |
| 277 | 01-35755- Two (2) pages | No Objection |
| 278 | 01-35755-A | No Objection |
| 279 | 01-35755-B | No Objection |
| 280 | 01-35755-C | No Objection |
| 281 | 01-35755-D | Admitted over Obj |
| 282A | 01-35755 - Mike Roberts (2) Pages | No Objection |
| 282B | | Not Introduced |
| 282C | 01-35755 - Mike Roberts Supplemental | No Objection |
| 283 | 01-35755 - Cindy Maylee (2) Pages | No Objection |
| 284 | Dale Laux - (2) Pages | No Objection |
| 285 | Steve Green (1) Page | Admitted over Obj |

| | | | |
|---|---|---|---|
| 286A | Brenda Gerardi (3) Pages | No Objection | xii |
| 286B | | Not Intorduced | |
| 286C | Brenda Gerardi Supplemental 1 Corrected (2) Pages | No Objection | |
| 286D | Brenda Gerardi Supplemental 2 - (3) Pages | No Objection | |
| 287 | Plastic Bag With Three (3) Boxes of Swabs | Withdrawn | |
| 287A | Box Containing Blood Swab - Days Inn | Withdrawn | |
| 287B | Box Containing Blood Swab - Days Inn | Withdrawn | |
| 287C | Box Containing Blood Stain - Days Inn | Withdrawn | |
| 288 | Wash Cloth - Days Inn - Days Inn | Withdrawn | |
| 289 | Hand Towel - Days Inn | Withdrawn | |
| 290 | Tape Lifts - Hairs Toilet | Withdrawn | |
| 291 | Finger Print Cards - Jennifer Robinson | Withdrawn | |
| 292 | White Stain Napkins from Dumpster | Withdrawn | |
| 293 | Dish Cloth - From Dumpster | Withdrawn | |
| 294 | Dressing from Dumpster | No Objection | |
| 295 | Dressing from Dumpster | Withdrawn | |
| 296 | Dressing and Tape from Dumpster | Withdrawn | |
| 297 | White Stain Napkins | Withdrawn | |
| 298 | Stained White Wash Cloth | Withdrawn | |
| 299 | One (1) Condom | Withdrawn | |
| 300 | One (1) Condom | Withdrawn | |
| 301 | Hydrogen Peroxide Bottle | Withdrawn | |
| 302 | Empty Package for Bandage | Withdrawn | |
| 303 | Empty First Aid Tape Box | Withdrawn | |
| 304 | Empty Bandage Roll | Withdrawn | |
| 305 | Empty First Aid Sponge Package | Withdrawn | |
| 306 | Empty First Aid Sponge Package | Withdrawn | |
| 307 | Empty First Aid Sponge Package | Withdrawn | |
| 308 | Empty First Aid Sponge Package | Withdrawn | |
| 309 | Empty Days Inn Room Key Card Enevlope #29 | No Objection | |
| 310 | Empty Days Inn Room Key Card Enevlope #138 w/ To | Withdrawn | |
| 311 | Envelope Containing Receipts | Admitted over Obj | |
| 311A | Check Inn | Admitted over Obj | |
| 311B | Credit Card Receipt | Admitted over Obj | |
| 311C | Register Audit | Admitted over Obj | |
| 311D | Phone Log | Admitted over Obj | |
| 311E | Credit Card Receipt | Admitted over Obj | |
| 312 | Check Inn | No Objection | |
| 313 | Photgraphic Line -Up Jose Flores | No Objection | |
| 314 | Evevlope Continaing Guest Log (5) pages | No Objection | |
| 314A | Guest Log | No Objection | |
| 314B | Guest Log | No Objection | |
| 314C | Guest Log | No Objection | |
| 314D | Guest Log | No Objection | |
| 314E | Final Bill | No Objection | |
| 315 | Guest Check | No Objection | |
| 316 | Photgraphic Line - Up Jill Kenyon | No Objection | |
| 317 | Black Gloves | No Objection | |
| 318 | Black & Red Nike Tennis Shoes | No Objection | |
| 319 | Composite Video Tape | Admitted over Obj | |
| 320 | Enevlope Continaing 9 Photos | Admitted over Obj | |
| 320A | 4 X 5 Black and WHite Photo | Objection Sustained | |
| 320B | 4 X 5 Black and White Photo | Objection Sustained | |
| 320C | 4 X 5 Color Phot | Objection Sustained | |
| 320D | 4 X  5 Color Photo | Admitted over Obj | |
| 320E | 8 1/2 X 11 Photo | Withdrawn | |
| 320F | 8 1/2 X 11 Photo | Withdrawn | |
| 320G | 8 1/2 X 11 Photo | Withdrawn | |
| 320H | 8 1/2 X 11 Photo | Withdrawn | |
| 320I | 8 1/2 X 11 Photo | Admitted over Obj | |
| 321 | Dobson Communication Phone Records 17 pages | Admitted over Obj | |
| 322 | $250,000 - ZurichLife Insurance Policy 24 pages | Admitted over Obj | |

| | | | |
|---|---|---|---|
| 323 | $300,000 - State Farm Insurance Policy 17 pages | Admitted over Obj | xiii |
| 324 | Constitutional Rights Waiver | No Objection | |
| 325 | Video Tape Confession | No Objection | |
| 326 | Transcript of Video Tape Confession 38 Pages | No Objection | |
| 327A | Certification - ATF - 1page | Admitted over Obj | |
| 327B | Taurus IL46854 - 2 pages | Admitted over Obj | |
| 327C | Taurus JH14188 - 1 page | Admitted over Obj | |
| 360 | Cd containing 19 Telephone Conversations | No Objection | |
| 361 | Telephone Log Record 3 pages | No Objection | |
| 362 | Audio Tape of 10-05-01 Recording | No Objection | |
| 362A | Transcript of 10-05-01 Recording | No Objection | |
| 363 | Audio Tape of 10-25-01 Recording | No Objection | |
| 363A | Transcript of 10-25-01 Recording | No Objection | |
| 364 | Audio Tape of 10-27-01 Recording | No Objection | |
| 364A | Transcript of 10-27-01 Recording | No Objection | |
| 365 | Audio Tape of 11-03-01 Recording | No Objection | |
| 365A | Transcript of 11-03-01 Recording | No Objection | |
| 366 | Audio Tape of 11-08-01 Recording | No Objection | |
| 366A | Transcript of 11-08-01 Recording | No Objection | |
| 367 | Audio Tape of 11-10-01 Recording | No Objection | |
| 367A | Transcript of 11-10-01 Recording | No Objection | |
| 368 | Audio Tape of 11-11-01 Recording | No Objection | |
| 368A | Transcript of 11-11-01 Recording | No Objection | |
| 369 | Audio Tape of 11-15-01 Recording | No Objection | |
| 369A | Transcript of 11-15-01 Recording | No Objection | |
| 370 | Audio Tape of 11-17-01 Recording | No Objection | |
| 370A | Transcript of 11-17-01 Recording | No Objection | |
| 371 | Audio Tape of 11-22-01 Recording | No Objection | |
| 371A | Transcript of 11-22-01 Recording | No Objection | |
| 372 | Audio Tape of 11-24-01Recording | No Objection | |
| 372A | Transcript of 11-24-01 Recording | No Objection | |
| 373 | Audio Tape of 11-24-01Recording | No Objection | |
| 373A | Transcript of 11-24-01 Recording | No Objection | |
| 374 | Audio Tape of 11-25-01 Recording | No Objection | |
| 374A | Transcript of 11-25-01 Recording | No Objection | |
| 375 | Audio Tape of 11-29-01Recording | No Objection | |
| 375A | Transcript of 11-29-01 Recording | No Objection | |
| 376 | Audio Tape of 12-01-01Recording | No Objection | |
| 376A | Transcript of 12-01-01 Recording | No Objection | |
| 377 | Audio Tape of 12-02-01Recording | No Objection | |
| 377A | Transcript of 12-02-01 Recording | No Objection | |
| 379 | Audio Tape of 12-06-01Recording | No Objection | |
| 379A | Transcript of 12-06-01 Recording | No Objection | |
| 380 | Audio Tape of 12-08-01Recording | No Objection | |
| 380A | Transcript of 12-08-01 Recording | No Objection | |
| 381 | Audio Tape of 12-08-01Recording | No Objection | |
| 381A | Transcript of 12-08-01 Recording | No Objection | |
| 349 | Photographic  Line-Up - Frank Reynolds | Not Intorduced | |
| 350 | Consent to Search - Wirt Street - Shelia Fields | No Objection | |
| 351 | (2) two cotton tipped swabs | No Objection | |
| 352 | Search Warrant for Oral Swabs and Photographs | Withdrawn | |
| 385 | Swabs | | |
| 386 | Swabs | No Objection | |
| 387 | Swabs | No Objection | |
| 388 | Swabs | No Objection | |
| 389 | Swabs | No Objection | |
| 390 | Gerardi - Cutting | No Objection | |
| 391 | Enevlope Containing Jackson Prints | No Objection | |
| 391A | Jackson Prints | No Objection | |
| 392 | Photograph - Lifts | No Objection | |
| 393 | Photograph - Lifts | No Objection | |
| 394 | Enevlope Containing 2 Photos | No Objection | |

xiv

| | | |
|---|---|---|
| 395 | Enevlope Containing Lift Sheets | No Objection |
| 395A | Lift Sheets | No Objection |
| 395B | Lift Sheets | No Objection |
| 396 | Walmart Receipt | Admitted over Obj |
| 397 | Audio Tape of Excerpts | Objection Sustained |
| 397A | Transcript of Audio Tape Excerpts | Objection Sustained |
| 398 | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 398 A-P | Preston Automobile Service Records Red Chrysler | Admitted over Obj |
| 399 | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 399 A-J | Preston Automobile Service Records Silver Chrysler | Admitted over Obj |
| 400 | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 400 A-C | Trumbull County Recorder 494 Olive Street | Admitted over Obj |
| 401 | Trumbull County Recorder Washington Street | Admitted over Obj |
| 401 A-D | Trumbull County Recorder Washington Street | Admitted over Obj |
| 402 | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 402 A-F | Trumbull County Recorder - Fonderlac | Admitted over Obj |
| 403A-403RR | Defendant's school records | No Objection |
| | | |
| Defendant's Exhibits | | |
| Deft A | Dreft.'s Criminal History | No Objection |
| Deft B | Contains 9 subparts of Blood Swabs | No Objection |
| Deft F | Credit Application | No Objection |
| Deft G | BMV Registration Card | No Objection |
| Deft H | Sales Agreement | No Objection |
| Deft I | Lease Agreement | No Objection |
| Deft J | Car Registration | No Objection |
| Deft K | Credit Application | No Objection |
| Deft L | BMV Registration Card | No Objection |
| Deft M | Real Estate Records | No Objection |
| Deft N | Real Estate Records | No Objection |
| Deft O | Real Estate Records | No Objection |
| Deft P | Psychological Report | No Objection |
| Joint 1 | Fingerhut Jewelry | No Objection |
| | | |
| Court Exhibit 1 | Orientation Instructions | |
| Court Exhibit 2 | Exhibit List | |
| Court Exhibit 3 | Brief In Oppostion to Acquittal | |
| Court Exhibit 4 | Jury Charge | |
| Court Exhibit 5 | Corrected Instruction | |
| Court Exhibit 6 | Jury Question | |
| Court Exhibit 7 | Penalty Instruction | |

4

1    Thursday, November 14, 2002, Mitigation Hearing,

2    In Open Court at 1:00 p.m.:

3                    THE COURT:  We have several matters

4    for the record before we call the Jury up.  It is

5    come to my attention that Mr. Lewis, co-counsel on

6    the defense team, has had a little stay in the

7    hospital, nothing serious.  He's back home now, but

8    because he's medicated, does not feel it would be

9    appropriate to appear on the defense team today.

10   Mr. Consoldane, I have asked you, with the

11   Prosecutor, whether or not you had any motion or

12   wish to have this matter continued until Mr. Lewis

13   is available, and what is your reply to that?

14                   MR. CONSOLDANE:  I have talked with

15   Mr. Jackson and we do not think that any delay at

16   this point would be wise.  I have also talked with

17   Tom Wright, who has a contract to work with our

18   office.  Mr. Wright has gone through the three day

19   death penalty seminar.  He also meets the other

20   requirements.  He, however, is not certified.  He

21   has not applied for the certification and would ask

22   the Court to permit him to sit as co-counsel in

5

1   this case with me, so we can get this finished.

2                    THE COURT:  May I speak to your

3   client?

4                    MR. CONSOLDANE:  Yes.

5                    THE COURT:  Mr. Jackson, are you in

6   agreement with proceeding without Mr. Lewis being

7   here and having Mr. Wright and Mr. Consoldane?

8                    THE DEFENDANT:  Yes, Sir, Your

9   Honor.

10                   THE COURT:  I understand that I

11  would consider a continuance until probably Monday,

12  if you wished.

13                   THE DEFENDANT:  Yes, Sir.

14                   THE COURT:  You have talked with

15  your attorney and have agreed with him that it is

16  in your best interest to go forward today?

17                   THE DEFENDANT:  Yes, Sir, Your

18  Honor.

19                   THE COURT:  Fine.  In regard to Mr.

20  Wright, the Court is aware that he practices in our

21  county and practices before this Court on a regular

22  basis.  And I have no problem with allowing him for

6

1    the purposes of this particular part of the

2    proceeding to proceed. I think that even if Mr.

3    Lewis is not available and Mr. Consoldane and his

4    client wishes to proceed with just the one lawyer,

5    that I would find no problem with that, but two

6    heads are better than one. The request of

7    Mr. Consoldane to have Mr. Wright seated at counsel

8    table to assist in any way possible, is approved.

9    The State have any objection to that?

10              MR. WATKINS:  No.  The State would

11   make it clear that we would not object to a

12   continuance if the Defendant and his counsel, and I

13   recognize that Attorney Consoldane is first chair

14   in this case, and I respect their desire, but I

15   want the record to reflect that the State also

16   would concur with the continuance if the Defendant

17   desired to have that in order that Mr. Lewis

18   participate in the second chair.

19              MR. CONSOLDANE:  Dennis, do you

20   object to Mr. Wright sitting as co-counsel, even

21   though he doesn't have the actual certification at

22   this point?

7

1          MR. WATKINS:  I have no objection

2 with Mr. Wright.  I think he could fill in and as I

3 understand it, the Defendant is waiving any right

4 that he would have under the statute to have

5 someone certified; is that right, Tony?

6          MR. CONSOLDANE:  That is right.

7          THE COURT:  Very good.  Now was

8 there another issue?

9          MR. CONSOLDANE:  Yes.  Dr. McPherson

10 is our expert, which we were allowed to hire

11 through permission of the Court and she has written

12 a summary and a background about Mr. Jackson, but I

13 think it is also important that she be able to talk

14 to the Jury about his family members and she's

15 going to, but I think it would be better able to

16 help me in Court, when I am interviewing the family

17 members, if she's here with me.  She knows far more

18 about the background of the family than I do, and

19 it was -- I got a little shorthanded with Mr. Lewis

20 going into the hospital and I just got ahold of Mr.

21 Wright this morning, and there's nothing that she's

22 going to testify to any differently.  She's already

8

1    filed her report and given a copy to the

2    Prosecutor, and I'll have a copy for the Court.

3    And I just believe that her aid in this matter

4    would help me a lot.

5              THE COURT:  The State?

6              MR. WATKINS:  We object to the

7    presence of an expert witness in the Courtroom.

8    Obviously, these witnesses that testify, I may have

9    questions of the expert and if the expert were

10   here, it would defeat the purpose of separation of

11   witnesses.  At no time in my memory, has any expert

12   witness been at trial table in this kind of

13   scenario, and therefore, we strongly object.  I

14   would further note that if Attorney Consoldane

15   feels he's not prepared because of the short

16   notice, that this case should be continued until

17   he's prepared and able to go forward without the

18   witness being in the courtroom, because to me that

19   is not good reason to have a witness in the

20   courtroom, when there's a separation of witness

21   order.

22             MR. CONSOLDANE:  We had the

9

1    separation of witnesses and you allowed the State

2    to have Paul Monroe sit at counsel table through

3    the entire trial.  He was a witness in the same

4    manner, and if it is fair for them, I don't see why

5    it should not be fair for the defense.

6              THE COURT:  The reason that is

7    permitted is because the State of Ohio is here as a

8    non-entity as far as a physical body and the

9    tradition has always been that the State of Ohio

10   has the right to have a person represent them and

11   that is the reason the officer is always allowed,

12   in my experience.  I have never seen that varied.

13             MR. CONSOLDANE:  He's still a

14   witness.

15             THE COURT:  This is kind of an

16   interesting situation here.  It is true that we

17   have had for purposes of this trial, a motion to

18   exclude witnesses.  The purpose we all know is that

19   one person can't correlate their testimony with

20   that of other people, if they are allowed an

21   opportunity to sit here and listen to other people,

22   that may vary their testimony in some way.  In this

10

1    particular case, we have a Defendant who is here

2    trying to keep this Jury from taking his life.  The

3    State raises the objection on a ground that may be

4    valid.  I am sitting here and trying to think of a

5    situation, but the psychologist has to take into

6    account all matters in giving her opinion.  It is

7    nothing but her opinion, subject to cross

8    examination.  I think in looking at the entire

9    situation it may, Mr. Watkins, vary past practice,

10    I don't know.  I don't remember on any other cases

11    that I have had, what had happened on that.

12           MR. WATKINS:  I'm not aware of any

13    case.  That would open a Pandora's box.

14           THE COURT:  I can see during the

15    main phase of the trial.  You do not have an expert

16    on this phase of the hearing.  No real call to

17    raise further evidentiary matters because that was

18    done during the first phase.  Approach the bench

19    here for a minute.

20    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

21    OF HEARING)

22           THE COURT:  I have had side bar

11

1    conferences.  I have asked counsel if they have any

2    case law on this point.  Counsel for the defense

3    has brought forth Evidence Rule 703.  State your

4    position on the record.

5            MR. WRIGHT:  Judge, this goes to the

6    issue of whether Dr. McPherson should be permitted

7    in the courtroom during the testimony of the other

8    witnesses who will testify.  It is the State's

9    position that she should not be able to.  It is our

10   request that she be permitted to.  Evidence Rule

11   703 essentially states, what an expert is allowed

12   to consider in rendering an opinion.  That would

13   include facts or data, upon which the expert bases

14   an opinion or inference may be those perceived by

15   him or her or admitted in evidence at the hearing.

16           Our point is this.  Dr. McPherson is an

17   expert who knows a heck of a lot more about this

18   stuff than we do.  As an expert, she will be able

19   to recognize factual matters that are presented in

20   the courtroom better than we would, as to what

21   would form her basis and her opinion.  She's

22   allowed to offer an opinion based upon evidence

12

1   presented in the courtroom, and she's the one in

2   the best position to recognize which aspects of the

3   factual testimony presented by the other witnesses

4   would be relevant.

5           In light of that, we would ask that she

6   be permitted in the courtroom during the testimony

7   of the other witnesses so that she can properly

8   form a basis as permitted pursuant to Evidence Rule

9   703.

10          THE COURT:  Mr. Watkins?

11          MR. WATKINS:  I don't think that is

12  an appropriate interpretation of the evidence rule.

13  I would note that the Defendant in this case is

14  represented by counsel, who has used this witness

15  on at least three occasions that I can recall.  And

16  on two of those occasions, he's been successful in

17  not having the death penalty recommended by the

18  Jury.  So, the tradition here, and in all

19  Courtrooms of this County and to my knowledge, all

20  Courtrooms in Ohio, an expert witness is not to be

21  at the trial table with either side.  And precedent

22  here, clearly establishes that this has not been

13

1  done.

2         I would also respond in this way.  One,

3  that if she would be permitted to sit at the trial

4  table it gives to the Jury, the impression that

5  she's somehow a much more significant expert in

6  this case than for example the pathologist that the

7  State would present or any expert that we had

8  presented, such as the BCI experts, that this is

9  outside the realm of what is procedurally correct

10  in any case.  Moreover, if defense counsel believes

11  that this witness should know the evidence, there's

12  no reason why she could not have talked to the

13  witnesses that are coming.  I am assuming she may

14  have and there's no reason to give extra time, if

15  the Court felt so disposed, that the witness could

16  talk to these witnesses, who are defense witnesses,

17  prior to coming in, and that would also be

18  something they could do, and normally would be

19  done, because I believe she does talk to a lot of

20  the witnesses as part of her repertoire in

21  testifying as a defense witness.

22         So, to clear the idea that she should be

14

1    here is not idea that is supported in any cases

2    that they have presented, and the tradition

3    certainly is not there, and I think policy reasons,

4    it magnifies her support and that should not be

5    done, and therefore, the State feels it should not

6    be permitted.

7                    MR. CONSOLDANE:  Is that why you

8    have Paul Monroe sit there, to magnify his support?

9                    MR. WATKINS:  That is a separate

10   issue.

11                   THE COURT:  I don't think there's

12   any comparison between the State having a body

13   sitting there.

14                   MR. CONSOLDANE:  I want to clear one

15   thing up.  Is that they are not entitled to have a

16   representative sit at the table.  That is not true.

17   What they are entitled to have, they are entitled

18   to have someone there to aid with them if they have

19   a complicated case, to help them.  This case is

20   over.  There's no reason for him to be sitting

21   there any longer.  I object to him sitting there,

22   too.  If you check the case law on this, they are

15

1    entitled to have a representative that can aid them

2    in presenting the evidence.  Not just to sit there

3    because he's a representative.

4                    MR. WATKINS:  I'll agree with

5    defense counsel and request Sergeant Monroe not to

6    be part of the proceedings.

7                    THE COURT:  Okay.  Whatever.  I

8    don't have anything to tip this one way or the

9    other.  I think there are legitimate arguments on

10   both sides.  The fact is, that perhaps what I said

11   before about this being a very serious matter,

12   which it definitely is, that should not tip the

13   thing against the State, either.  That is not being

14   fair to the State.  Traditionally, when a motion to

15   exclude or separate is filed, and that is handled

16   throughout the trial in that manner, I have not

17   heard any arguments that have convinced me that I

18   should vary that very common practice that has

19   always been followed, but your objections are noted

20   on the record.

21                    MR. CONSOLDANE:  It was my motion to

22   separate the witnesses, and it wasn't done.  They

16

1   let Mr. Monroe in the entire trial.  I'll withdraw

2   my motion to separate witnesses and if they are

3   offended about her sitting at the trial table, she

4   can sit in the audience, that would be fine.

5              THE COURT:  I understand,

6   Mr. Watkins --

7              MR. WATKINS:  I would move to

8   separate witnesses on the State's motion on this

9   phase.

10             THE COURT:  As far as him sitting at

11  counsel table during phase one, I find that

12  appropriate, and if it isn't, then virtually every

13  case I have ever sat on has not been tried

14  properly.  But that is a matter again that you can

15  raise on The Court of Appeals level to see if they

16  agree with that.  For purposes of this hearing,

17  that motion to exclude will remain in effect for

18  all parties.

19             MR. WATKINS:  Let the record reflect

20  that Detective Monroe will not be in the courtroom

21  during this stage of the proceeding.

22  (End of Hearing on motion)

17

1    Jury present at 1:20 p.m.)

2              THE COURT:  Good afternoon.  We're

3    now ready to proceed with the second phase of this

4    trial, which is necessary because of the finding on

5    phase one.  You will be requested at the conclusion

6    of this presentation to make a recommendation on

7    sentencing to this Court.  I would like to tell you

8    that that word recommendation is argued back and

9    forth between counsel as to the meaning of it.

10   Under our law, a Judge has no power to ever

11   increase a penalty, only to decrease a penalty, but

12   only if after an independent finding by the Court,

13   the Judge, there's a finding that there was not

14   sufficient evidence for the Jury, to make the

15   finding that they did.  So, your recommendation is

16   a recommendation to the Court, and it is more than

17   that.  It is your decision, and it would not be

18   tampered with by the Judge unless you have gone

19   awry somewhere.  I would like to know at this time,

20   if any of you have now formed such a fixed opinion

21   on what sentence you should -- that should be

22   entered in this second phase, or has so closed your

18

1   mind that you could not hear and fairly consider

2   evidence which might be presented here that is

3   favorable to the Defendant, which might cause you

4   to conclude that the death penalty is or is not

5   appropriate?  What I'm trying to say is, is each of

6   the jurors of such a mind that you can go from

7   where you are at here, with no conclusions in your

8   own mind, as to what the proper penalty will be

9   here, that you will be able to fairly listen to

10  both sides and to make your determination on that

11  evidence which is presented.  I see every one

12  shaking their head.  Is there anyone that has any

13  reservation in their mind about that?  Okay.  Fair

14  enough.  Are any of you of such a frame of mind

15  that you could not fairly consider evidence that

16  the State might present in an effort to convince

17  you that the death penalty is appropriate?  You get

18  the picture.  Both sides are entitled to a new,

19  fair and unbiased and unprejudiced hearing on the

20  merits of what is about to be presented setting

21  aside for the moment, what led you up to the Jury

22  verdict last Friday.  You are all comfortable with

19

1    that?  Very good.

2         One other point I would like to touch on,

3    are there any of you that because of your

4    experience, and this has been a long trying

5    experience for all of you and I know that.  Is

6    there anything from that, the last three weeks or

7    so, that makes you feel that you would not like to

8    continue on this, that you are not able to continue

9    it, rather than would not like to?  You have all

10   embarked on a very serious undertaking here and you

11   performed that so far, exactly as we were

12   requesting you to do.  Are you all comfortable with

13   going into the second phase?

14   (All nodded affirmatively.)

15             THE COURT:  Very good.  You are now

16   going to listen to testimony.  I'll give you an

17   instruction at the appropriate time, once the

18   evidence is presented here and you have heard this

19   100 times by yourselves and then together.  The

20   burden is always on the State.  And the burden

21   remains on the State in this phase, and the State

22   has to prove beyond a reasonable doubt that the

20

1    aggravating circumstances outweigh any mitigating

2    factors that might be found in favor of the

3    Defendant.   The State ready to proceed?

4              MR. WATKINS:   Yes Your Honor.

5    (At Side Bar with reporter present.)

6              THE COURT:   I have asked counsel to

7    approach side bar because I thought that Dennis --

8    Dennis thought I left something out.   I'll explain

9    one point to them, that the burden of going forward

10   is on the Defendant, but the burden of proof is

11   still on the State.   And I understand the State is

12   only going to move to introduce your evidence at

13   this time.

14             MR. WATKINS:   The State is going to

15   move to introduce its evidence that was admitted in

16   the first phase.   It believes it is relevant or may

17   be relevant, depending on testimony from witnesses

18   that the defense presents.   My understanding is

19   that Attorney Consoldane wishes to reserve his

20   right to object to any evidence.

21             MR. CONSOLDANE:   I'm going to enter

22   an objection to it now before you admit it, I'll

21

1  address each particular one that I have.  I just

2  have a general blanket objection to it at this

3  point.  I'll be more specific later.

4          MR. WATKINS:  I have no problem with

5  that.

6          THE COURT:  For the record, the

7  State is going to move to admit -- I'm not ruling

8  on the admission, the failure to object to any

9  particular item as we go through it, though, say

10  there's no objections to any piece of evidence, and

11  for the record at the conclusion of this hearing,

12  those Exhibits will be admitted because they have

13  already been admitted in phase one.  That allows

14  you an opportunity to question any particular

15  exhibit again, that you may wish to question.  He's

16  moving.  I'm not ruling.

17          MR. CONSOLDANE:  I objected.

18          MR. WATKINS:  And we understand that

19  the Court, that Attorney Consoldane has the right

20  to object to any particular item we bring up at

21  this time or in the future.  He's not losing that

22  right to object.

22

1          MR. CONSOLDANE:  That is fine.

2    (End of Side Bar discussion.)

3          THE COURT:  Let me explain one thing

4    that I left hanging.  The State has the burden of

5    proving beyond a reasonable doubt the aggregating

6    circumstances outweigh the mitigating factors.

7    They have the burden of proof.  The defense has the

8    burden of going forward.

9          One other thing, Attorney Jim Lewis has

10   had a few unpleasant days and he has been in the

11   hospital.  He's out now and I understand he's doing

12   fine, but because of some medication, he did not

13   feel it would be appropriate that he would appear

14   today in this matter.  And by everyone's agreement,

15   no one wanted this case continued any further, so

16   to fill in for Mr. Lewis, Mr. Thomas Wright, the

17   gentleman seated at the end of the table -- Tom,

18   please stand up.  Attorney Wright has practiced for

19   some years in our town and if I may give him a

20   compliment.  He's a very capable younger attorney,

21   so he has agreed to assist Mr. Consoldane in this

22   phase of the trial.  The State has moved to

```
                                                              23
 1    introduce the evidence that was on the record and

 2    admitted under phase one.  You wish to proceed?

 3              MR. CONSOLDANE:  I'll enter an

 4    objection at this time until they can prove that

 5    what individual pieces of evidence are necessary

 6    for the second portion.

 7              THE COURT:  We have reserved that

 8    right to you on the record.  You may proceed.

 9                   RAYMOND DICKERSON

10    having been duly sworn according to law, on his oath,

11    testified as follows:

12    DIRECT EXAMINATION BY MR. CONSOLDANE:

13              MR. CONSOLDANE:  Before I start, all

14    of the witnesses have requested that they not be

15    photographed.

16              THE COURT:  They have been notified.

17    Q.    Raymond, would you state your name for the

18          Jury?

19    A.    Raymond Dickerson.

20    Q.    Where do you live?

21    A.    I live in Youngstown.  I live at ███████

22          ███████████████
```

24

1   Q.   Do you know Nathaniel sitting over there?

2   A.   He's my stepson.

3   Q.   You have known him since he's been about 15?

4   A.   Since 15 years old, I have known Nathaniel.

5   Q.   And the entire time that you have known him,

6        has he always been respectful to you?

7   A.   Yes, Sir.

8   Q.   Has he been respectful to his mother?

9   A.   Yes, he has.

10  Q.   And was his grandmother, how about his

11       grandmother?

12  A.   Very respectful with his grandmother.

13  Q.   You didn't know him much before 13, but after

14       the age of 15, did he continue to live

15       with his mother?

16  A.   Yes, he has.

17  Q.   And did there come a time when he moved out?

18  A.   He got older, when he moved out.

19  Q.   How old was he, 17 when he moved out?

20  A.   About 17, somewhere like that.

21  Q.   And do you know where he moved, when he moved

22       out?

25

1   A.   No, I did not.

2   Q.   After age 17, you didn't see a whole lot of

3        Nathaniel?

4   A.   No, I haven't, no, I didn't.

5            MR. CONSOLDANE:  Thank you.  Nothing

6   further.

7            MR. WATKINS:  No questions.  We

8   thank the witness.

9            THE COURT:  You may step down.

10           <u>TAUSHIA KORNEAGAY</u>

11  being duly sworn according to law on her oath,

12  testified as follows:

13  <u>DIRECT EXAMINATION BY MR. CONSOLDANE</u>:

14  Q.   How are you today?

15  A.   Fine.

16  Q.   Would you introduce yourself to the Jury,

17        please?

18  A.   Taushia Korneagay.

19  Q.   And where do you live, Taushia?

20  A.   ████████████████████████

21  Q.   And how are you related to Nathaniel Jackson?

22  A.   I am his sister.

26

```
1    Q.    You have known him pretty much all of your
2          life?
3    A.    Yes, I have.
4    Q.    Are you older or younger?
5    A.    I am the next to the youngest.  There's four
6          of us.
7    Q.    And how has Nathaniel treated you?
8    A.    He treated me really good.  He loved me just
9          like I love him.  He's really kind.  He
10         did a lot for me.  I got four kids.
11   Q.    He come over and help out with the kids?
12   A.    Yes, he helped out a lot with the kids.  Kept
13         them, washed them, everything.  He kept
14         them, he loved them.  He did a lot for
15         us.
16   Q.    And did there come a time when you were still
17         living at home and Nathaniel moved out?
18   A.    Yes.
19   Q.    And do you know where he went out and moved
20         to?
21   A.    I was young at the time, because I am only 25.
22         He stayed with my grandmother.
```

27

1  Q.   Pretty much living on the street?

2  A.   He ain't living on the street, because my

3       grandma took him in.

4  Q.   You like to see -- would you like to see the

5       Jury save his life?

6  A.   Yes, I would.

7  Q.   Would you like to be able to write to your

8       brother in prison?

9  A.   Yes.

10              MR. CONSOLDANE:  Thank you.  Nothing

11  further.

12  CROSS EXAMINATION BY MR. WATKINS:

13  Q.   Taushia, you remember me, we have talked a

14       couple of times?

15  A.   Yes.

16  Q.   You are 25 and your brother is 30 years old?

17  A.   Yes.

18  Q.   And have you visited him in jail?

19  A.   Yes, I have.

20  Q.   And when you were raised in Youngstown, you

21       had your mother and your grandmother next

22       door?

28

```
 1   A.   Yes.
 2   Q.   And would you describe Nathaniel as a very
 3          smart person?
 4   A.   I describe him as very smart.
 5   Q.   Did he have talent as an artist?  Could he
 6          draw?
 7   A.   Yes.  He always kept busy, yes.
 8   Q.   When you were a child growing up, did you ever
 9          see your brother abused?
10   A.   No.
11   Q.   He was treated well by your mother and your
12          grandmother?
13   A.   Yes, he was.
14   Q.   And by his stepfather?
15   A.   Yes.
16   Q.   And you really didn't know his father, did
17          you?
18   A.   No, not too good.
19   Q.   And you work pretty hard yourself to bring up
20          your four children?
21   A.   Yes, I have.
22   Q.   And you haven't been in any real problem, have
```

29

1              you?

2  A.   No.

3  Q.   And when you were a child and when he was a

4              child, were you taught right from wrong?

5  A.   Yes, we have been.

6  Q.   Did Nathaniel Jackson go to church?

7  A.   Yes, my Mom kept us at church.

8  Q.   He knew right from wrong?

9  A.   He knows right from wrong.

10 Q.   And your mother bring you up to be responsible

11              for what you do to others?

12 A.   Yes.

13              MR. WATKINS:   Thank you.

14              THE COURT:   Any redirect?

15 REDIRECT EXAMINATION BY MR. CONSOLDANE:

16 Q.   You still keep in contact with Nathaniel?

17 A.   I still have contact with him.

18              MR. CONSOLDANE:   Thank you.   Nothing

19 further.

20              THE COURT:   You may step down.

21 Thank you very much.

22

30

1                    LORRAINE RUE

2     having been duly sworn according to law, on her oath,

3     testified as follows:

4                    MR. WATKINS:  I have no objection

5     for her to remain, the mother to remain there.

6     (Also seated on the witness chair is S█████████

7     T████████ J████████.  Both Lorraine and S█████████ are

8     on the witness chair.)

9     DIRECT EXAMINATION BY MR. CONSOLDANE:

10    Q.    Lorraine, S████████ is your daughter?

11    A.    Yes.

12    Q.    It is also Nathaniel's daughter?

13    A.    Yes.

14    Q.    Has Nathaniel seen his daughter before?

15    A.    Yes.

16    Q.    And has he brought her things?

17    A.    Yes.

18    Q.    And what grade is S████████ in school now?

19    A.    Second grade.

20    Q.    S████████, what is your favorite subject in

21          school?

22    A.    (S████████)  Playing games.

31

1  Q.   What do you like the least, what don't you

2       like about school?

3  A.   (S⬛⬛⬛⬛)  I don't know.

4  Q.   Is that your Daddy sitting over there?

5  A.   (S⬛⬛⬛⬛)  Yes.

6  Q.   Has he brought you toys?

7  A.   (S⬛⬛⬛⬛)  Yes.

8  Q.   Would you like to continue to see him?

9  A.   (S⬛⬛⬛⬛)  Yes.

10  Q.   Sorry to see him setting over there like that?

11  A.   (S⬛⬛⬛⬛)  Yes.

12           MR. CONSOLDANE:  I have nothing

13  further.

14           MR. WATKINS:  I have no questions.

15  We would thank them.

16           PAULINE KORNEAGAY

17  having been duly sworn according to law on her oath,

18  testified as follows:

19  DIRECT EXAMINATION BY MR. CONSOLDANE:

20  Q.   Pauline, would you introduce yourself to the

21       Jury, please?

22  A.   Pauline Korneagay, Nathaniel's mother.

32

1   Q.   Pauline, I'm going to direct your attention

2           back to when Nathaniel was growing up.

3           When he went to school, how did he do in

4           school?

5   A.   He did pretty good in school.

6   Q.   Did he have any problems in school?

7   A.   No, not really.

8   Q.   There come a time when Nathaniel quit school?

9   A.   Yes, he did.

10  Q.   Where did he go to live at after that?

11  A.   He was staying with me and my mother.  I was

12          staying with my mother at the time.

13  Q.   Was this a pretty rough neighborhood?

14  A.   No.  We don't stay in a rough neighborhood.

15  Q.   One time you wrote a letter to the school

16          telling them to excuse Nathaniel, because

17          he had been shot?

18  A.   No.

19  Q.   You don't remember that?

20  A.   No.

21  Q.   You don't remember Nathaniel being shot?

22  A.   No, I don't.  Our neighborhood was not rough.

33

1   Q.   Do you keep in touch with Nathaniel?

2   A.   Yes, I do.

3   Q.   You come visit him?

4   A.   Yes.

5   Q.   And if he was going to be sent to prison,

6        would you continue to visit him?

7   A.   Yes, I would.  I would love to.

8   Q.   You would rather visit him in prison than

9        visit his grave?

10  A.   I would visit him in prison, yes.

11               MR. CONSOLDANE:  Thank you.

12               MR. WATKINS:  No questions.

13               THE COURT:  You may step down.

14               DR. SANDRA McPHERSON

15  having been duly sworn according to law, on her oath,

16  testified as follows:

17  DIRECT EXAMINATION BY MR. CONSOLDANE:

18  (Defendant's Exhibit P Marked for Identification.)

19  Q.   Doctor, how are you this afternoon?

20  A.   Just fine.

21  Q.   Would you introduce yourself to the Jury,

22        please?

34

```
 1   A.   Dr. Sandy McPherson, last name
 2        M c P H E R S O N.  I'm a clinical and
 3             forensic psychologist and I have been a
 4             member of the defense team.  My purpose
 5             was to understand the Defendant and to
 6             develop information for this mitigation
 7             trial.
 8   Q.   In regards to that, you made up a report,
 9             which I gave a copy to the Prosecutor and
10             the Judge has a copy, is that correct?
11   A.   That is correct.
12   Q.   And Dr. McPherson, where did you go to school?
13   A.   Case Western Reserve University for my Ph.D.
14             Prior to that, Kent State University for
15             a Bachelor's degree.
16   Q.   And how long have you been engaged in private
17             practice?
18   A.   Since 1968.
19   Q.   And prior to that, did you work anywhere else?
20   A.   I worked other places, as well as being in
21             private practice.  I worked as a director
22             of research for the Child Guidance
```

35

```
 1              Center, which was a combined research and
 2              clinical position.  I was a consultant,
 3              and am a consultant to the Veterans
 4              Administration in their training program.
 5              I have been a member of the University
 6              Hospitals' group practice during, for a
 7              period of about three years, and then
 8              went back out into a solo practice.  I am
 9              currently also on the Fielding Institute
10              graduate training program and faculty.
11              I'm consultant to the FBI and some of the
12              police forces on victim witness
13              refreshment.
14   Q.   Were you also on the Board of Examiners for
15              psychologists in Ohio?
16   A.   Yes.  I have served on that Board as its
17              examiner and as the president of that
18              Board.  I was appointed to the first
19              Board that the State had.
20   Q.   And as a forensic psychologist, you have
21              testified numerous times in Court, have
22              you not?
```

36

1    A.    I have.

2              MR. CONSOLDANE:  I would wish that

3    Dr. McPherson be declared an expert in this matter.

4              THE COURT:  Any objection?

5              MR. WATKINS:  No.

6              THE COURT:  She's so qualified.

7    Q.  In compiling this report, you had to, you went

8    and looked into Nathaniel Jackson's

9              background and what could you tell the

10             Jury about what you have discovered?

11   A.    Well, the sources of information about his

12             background included himself and also

13             records such as school records and

14             records from other sources that had

15             contact with him.  The kind of things

16             that I found out included that he's

17             obviously been born and raised in this

18             area, he grew up and was cared for by his

19             mother and by his maternal grandmother.

20             His father had little, if any real

21             involvement with him.  I guess there was

22             occasional contact.  We have been unable

37

1          to locate his father.  His schooling from

2          the time he entered showed that he had

3          fairly serious problems.  He had behavior

4          problems that were obvious and noted in

5          the record from the first grade on, which

6          is fairly unusual.  By the third grade,

7          he had already been suspended because of

8          his behavior difficulties.  All of which

9          were classic for an ADHD configuration,

10         that was impulsivity and inability to

11         stop his behavior.  Quick reactivity,

12         that sort of thing.

13    Q.   Would you explain to the Jury what ADHD is?

14    A.   Attention deficit, hyperactivity disorder.  A

15         disorder which can be at least addressed

16         through, when it presents in severe form,

17         through a combination of medication,

18         cognitive therapies, behavior therapies,

19         that sort of thing and highly structured

20         school programming.  He did not get into

21         any kind of structured program until he

22         was about in the eighth grade.  I have to

38

1    look at the exact date.  He went to the
2    Stambaugh program, which was the only
3    time that he recalls liking school,
4    really doing fine.  When he was in that
5    program, he apparently did all right.  It
6    was very structured.  The situation was
7    one in which he got a lot of one on one
8    attention, and he was exited from that
9    program.  Did not manage to hold up and
10    was put back in that program and once
11    again did fairly well while in that
12    program.  In common with most kids who
13    have this kind of difficulty, he was
14    early on into drugs.  Never -- he used
15    alcohol periodically, but does not seem
16    to have developed a primary alcohol
17    dependency.  He did rapidly become
18    dependent on marijuana, starting use at
19    about 13 and according to his own
20    retrospectives, he was using rather
21    quickly at a very high level, basically
22    using whatever he could get his hands

39

```
 1              on -- marijuana, when he could get his
 2         hands on it.  He also was involved with
 3         cocaine to some degree.  He never used
 4         any of the other so-called -- well, other
 5         what we might call serious drugs, like
 6         PCP or methamphetamine.  One of the
 7         things we know again about ADHD is that
 8         they have an underlying neurological
 9         disorder and that neurological disorder
10         involves some depletion of substances in
11         the brain.  The potential to get drug
12         involved is much higher for this group
13         than for other people, because the drugs
14         take the edge off.  They make the person
15         feel better.  They slow down some of the
16         hyperactivity.  Some of the drugs,
17         cocaine, notably, will then worsen the
18         hyperactivity condition, especially as
19         they come down off of the cocaine, but
20         the initial impact is one that is
21         helpful -- helpful at least subjectively.
22         It is not helpful from the standpoint of
```

40

1     those who work with them.  He has had
2     very little in the way of work history.
3     He's 30 years old, but I think his
4     longest period of work was about six
5     months, maybe less.  Perhaps less.  And
6     it was a piece work or periodic work
7     situation.  He was never full time.  He
8     dropped out of school at the 11th grade,
9     and his involvement or his record at that
10    point included juvenile offenses.  He
11    wound up once he was an adult, going off
12    and living on his own.  He talked about
13    deciding he wanted to be on his own.  His
14    mother kind of hoping he wouldn't leave,
15    but supporting him in being independent
16    as he saw it.  Unfortunately, his idea of
17    independence was to basically survive on
18    the streets and the streets he was
19    surviving on were fairly violent ones.
20    During the ensuing ten years or so, he
21    was shot at least four or five times.
22    When he was -- well, before he left the

41

1    school at the 11th grade, there was a

2    note that his mother sent to the school,

3    which asked for him to be excused because

4    two people were shooting at him and he

5    had to make a police report.  It gives a

6    flavor of the kind of environment within

7    which he was coping at the time or not

8    coping as the case may be.  He was

9    recommended for treatment for his

10   dependency, his drug abuse and dependency

11   during school.  At one point, a contract

12   approach was made with him to not use,

13   but again, obviously it did not hold up.

14   He was repeatedly involved in non-violent

15   crimes during his adulthood.  Many of

16   which, probably all of which but many of

17   which were involved, were related to his

18   drug habit.

19        In order to have that kind of life

20   style, one has to operate in an

21   anti-social or illegal fashion, and

22   indeed that was true of his life.  He was

42

1          recommended for treatment at a couple of

2          different points, but did not complete

3          it, so he's never been effectively

4          treated for either his drug abuse,

5          dependency habits or for his ADHD.  He

6          has had a series of relationships.  In

7          one relationship produced a little girl

8          that he maintains some involvement with.

9          Periodically would go and take something

10          to her.  He was never in a position to

11          really assume responsibilities as a

12          father or a supporter.  He had a second

13          child, now age four.  That child was born

14          to, within the context of a relationship

15          to a person whom he refers to as his

16          fiancee or someone with whom he was very

17          close and intending to be together.  The

18          child was born.  He was involved in the

19          relationship at the time.  There was a

20          medical emergency and the child was life

21          flighted to the University Hospitals.

22          And subsequently, after being treated for

43

```
1        the problems that the child had, which

2        included a stroke and some seizures and

3        that sort of thing, the youngster was

4        diagnosed with cerebral palsy.  At this

5        point, the status of that child is

6        unknown, because the mother took -- the

7        relationship broke up, the mother took

8        the child to her mother and left, and

9        when the Defendant went to visit that

10       child, the maternal grandmother refused

11       him access and has never allowed any

12       contact.  So he does not know the

13       situation of that child except that

14       there's some degree of a crippled

15       condition and limitations on mobility.

16            He lost another relationship where

17       he was intending to be married

18       apparently.  At least as he saw it.  The

19       individual was killed over a dispute

20       around whether or not a fair sale was

21       taking place in the context of some kind

22       of little business she was running.  He
```

44

1   then continued -- essentially the life

2   style continued.  He met the individual

3   who is his codefendant in this or is a

4   codefendant in this crime, and that

5   brings him up to the present day in terms

6   of his life history.  Some efforts were

7   made to try to find his father.  People

8   give different stories about how the

9   father is functioning.  Mr. Jackson

10  believes his father to have a somewhat

11  stable life style.  Others have indicated

12  that he does not.  I do not know the

13  actual status of that man.  His mother

14  and sister, I know, have already spoken

15  here.  He has two brothers.  One brother

16  is a full brother, the sister and the

17  other brother are half siblings.  His one

18  brother has just returned from a period

19  of incarceration and is apparently trying

20  to make a life for himself, but has not

21  been available.  The other brother is

22  somewhere, but again has not been

45

1              accessible.

2                   My read on his situation is that the

3              family has been able to function only in

4              a relatively marginal fashion and

5              certainly has not been able to intervene

6              in the patterns of behavior that have

7              been present practically since he was

8              visible in the community.

9    Q.   One thing as part of this process, you and the

10             psychologist you work with, have

11             administered several tests to Nathaniel,

12             is that not correct?

13   A.   That is correct.

14   Q.   First of all, would you explain to the Jury

15             what the level of mental retardation

16             would be?

17   A.   We generally consider a person to have mild

18             mental retardation if they are testing at

19             or below 60 on an I Q test and also if

20             there are other indications, that their

21             life adjustment is impaired and in need

22             of certain kinds of support or help.  A

46

1         person who is functioning above that

2         level is in a borderline range and as we

3         move on upward into a low average range,

4         an average range and above.

5    Q.   What I noticed is that you tested Nathaniel

6         and he had a full scale IQ of 84.  Is

7         that correct?

8    A.   That is correct.

9    Q.   And but looking at where you cited in the

10        school records, is that he had an IQ of

11        about 70 when he was tested twice in

12        school?

13   A.   Correct.

14   Q.   That is kind of amazing that somebody could

15        raise their IQ so many points?

16   A.   Yes, it is.  It is a very unusual pattern.

17        There were two testings during school and

18        I realize the report I put down fourth

19        grade and tenth.  It was actually seventh

20        and tenth grade.  In both of those

21        testings he was at or around the 70

22        level.  His improvement and IQ quite

47

1    frankly, I attribute it to a couple of

2    things.  First of all, his level of

3    cooperation and attention and focus was

4    very poor during his school years,

5    throughout.  At no time was he ever

6    tested, for example, after being

7    medicated for his condition, because he's

8    never been medicated for his condition

9    except what he might be doing to himself.

10   When we tested him, he was in an entirely

11   structured situation in the jail and he

12   had spent some time in a structured

13   situation prior to that time when he was

14   incarcerated.  His degree of attentional

15   deficit was somewhat less and certainly

16   his degree of cooperation was higher in

17   that he wanted to try and produce what he

18   could for us, since we were working on a

19   defense for him.  So, he did better.  The

20   pattern of the scores is consistent with

21   the educational deficit and also with

22   some underlying learning disabilities.

48

1          But his full scale IQ is 84.  In fact,

2      based partly on the sub test and partly

3          on what we know about the test bias, he's

4          an African American who has not had a

5          good education, the test is biased

6          against him.  The chances are he's of

7          average ability, and under the right

8          circumstances could have been quite

9          reasonably successful in life.

10  Q.  And he even has a little bit of artistic

11          ability, too?

12  A.  This is noted in the records and mentioned by

13          others, yes.

14  Q.  Now, you mentioned that he kind of self

15          medicated himself.  The proper medication

16          for him at the time, probably would have

17          been Ritalin?

18  A.   Ritalin or there's psycho-stimulants is what

19          they are, but what they appear to do is

20          to intervene in the operation of the

21          systems, so that it works better.  They

22          don't appear, for at least for those for

49

```
 1              whom they work, and we need to know more
 2              about that, but for that subsection of
 3              people for whom they work, they appear to
 4              allow the inhibiters to work better.
 5              Clearly he was never tried, even tried on
 6              any kind of medication program.  There's
 7              a letter in the school records from a
 8              teacher, who identifies him in her eyes
 9              as being emotionally ill and talks about
10              his behavior, talking to himself and
11              talking to something which is not there.
12              There are no signs that he's psychotic,
13              but I am quite sure she was seeing a lot
14              of discontrolled verbal behavior, that is
15              part of his situation.
16    Q.   Matter of fact, in your summary, one of your
17              diagnoses was a major impairment.  What
18              does that mean?
19    A.   I am looking at the --
20    Q.   That would be Axis V.
21    A.   That is the -- it is an adjustment scale and
22              40, there are behavior descriptions for
```

50

1            assigning different level numbers.  His

2            behavior and functioning allows me to

3            assign him a score of 40, which is

4            indicative of major impairment in several

5            areas of function.  You can also get a 40

6            if you have an impairment in one specific

7            area of function, if it is psychotic,

8            lack of ability to appreciate reality.

9            That is not the case here, but what we

10           have is a number of areas where he has

11           not got the skills to succeed, most of

12           them relating to society, but also his

13           ability to deal in relationship context,

14           his ability to work in a consistent

15           fashion, to use whatever abilities he has

16           have never been in evidence.

17  Q.   And then on Axis II, you indicated he has an

18           anti-social personality disorder.

19  A.   That is correct.

20  Q.   You added a caveat to that though?

21  A.   The anti-social personality disorder is a

22           diagnosis that describes a long term

51

```
1              impairment in an individual's ability to
2              conform their behavior to social
3              expectations, to stay out of trouble, to
4              not get into legal difficulties, to
5              control their reactions and not behave
6              impulsively indestructive ways.  All of
7              which describe aspects of this
8              Defendant's behavior.  However, the
9              category also overlaps with a group of
10             people who are particularly serious, we
11             call them psychopaths or sociopaths and
12             they have no ability or very little
13             ability to identify with the needs of
14             others, to exhibit loyalty, to have any
15             real kind of connectness to others and
16             they often commit extraordinarily heinous
17             crimes when they are seen in the context
18             such as this.  This gentleman certainly
19             meets the requirements for an anti-social
20             personality disorder.  He does not meet
21             the requirements for that other category
22             and he has shown the capacity to be loyal
```

52

1          within his own group.  In his discussion

2          of his own life, one of the

3          disappointments he detailed was finding

4          out that a friend betrayed him.  He

5          expected, since he had a friendship, that

6          that wouldn't happen, so he has the sense

7          of what a friend is supposed to do, and

8          he was surprised when that doesn't take

9          place.  He himself was loyal to the

10          codefendant, rather than simply trying to

11          get out of it and blame everything on

12          her.  People who would do the latter are

13          more in that category of sociopathic

14          behavior.  So he's clearly a person whose

15          behavior has been formed in an

16          anti-social world and who has exhibited

17          anti-social qualities.  He merits the

18          diagnosis as do a significant proportion

19          of those who are incarcerated, but he

20          does not mirror the diagnosis of an

21          individual who is incapable of relating

22          to people.

53

```
1   Q.    Another thing is that he talked to you a
2         little bit about his legal history.  He
3         has been in prison before?
4   A.    He has.
5   Q.    And outside of a couple of minor infractions,
6         I believe not cutting his fingernails,
7         Nathaniel's using somebody else's radio
8         and having contraband, which I believe
9         was a tape recorder, he has done quite
10        well in prison?
11  A.    Yes, he has.
12  Q.    And would you expect somebody that had his
13        problems to do better in prison?
14  A.    Yes.  First of all, he did better in the
15        structured program way back when he was a
16        kid in school.  With structure, he
17        performs much better than when he's on
18        his own making his own decisions.  His
19        judgment is poor.  He gets involved in
20        drugs and his judgment is poorer.  In
21        prison, he can't do that.  In prison he
22        has a very definite life program to
```

54

1       follow.  The fact that he tends not to

2       get into trouble also fits with the fact

3       that he does have the capacity to get

4       along with other people and to have some

5       people oriented skills.  So, he also

6       retains, of course, a loyalty and a love

7       for his family.  So, there's human

8       feeling that is part of the way in which

9       he operates.

10  Q.   And how about the relationship with Donna

11       Roberts?

12  A.   It was clearly a very destructive relationship

13       for the victim most assuredly, but also

14       for the people involved.  Up until the

15       time that relationship took place,

16       Mr. Jackson, although he had an

17       anti-social life style, criminal life

18       style in many respects, he had not been

19       involved in this kind of activity that

20       leads to murder or serious harm to other

21       human beings.  He's basically an

22       individual -- well, he's an individual

55

1    who has had some bad experiences in a

2    relatial context.  He's very

3    insecure, though he tries to pretend that

4    he's very adequate.  Again, something

5    that we find in ADHD kids who have been

6    in an environment that basically tells

7    them they are bad kids, so they have to

8    do something about how they feel about

9    themselves.  In this relationship, I

10   think he received a certain amount of

11   reassurance.  He was told that he was a

12   great guy.  It made him feel good.  It

13   made him feel like he was somebody

14   special.  The relationship was built on

15   that.  The relationship has a couple of

16   interesting characteristics.  It was a

17   bi-racial relationship.  And it was also

18   a relationship between Mr. Jackson and a

19   much older woman.  Mr. Jackson's prior

20   relationships though at least in one

21   instance, perhaps more than one, but

22   certainly in one, there was a white

56

1  female involved.  Suggesting that he's

2  capable of being attracted to persons of

3  both races.  However, none of them

4  involved older woman.  The attraction to

5  an older woman could possibly reflect his

6  knowledge that he needed somebody to

7  provide him with structure and he thought

8  that she might do that.  I also can't

9  ignore, of course, that there was a

10  pecuniary motive as well.

11  Q.  And Doctor, this report that has been marked

12  Exhibit P, that has been prepared by

13  yourself with the aid of the information

14  you obtained along with, I believe Donald

15  McPherson did a lot of the testing?

16  A.  Yes.

17  Q.  That is the report you provided myself, the

18  State and the Court?

19  A.  That is correct.

20  Q.  And I notice that kind of talk a little bit

21  more about Donna's relationship, kind of

22  offered Nathaniel some stability in life

57

1          too, did it not?

2    A.   Yes, at least apparently, she would have been

3          seen as the person.  She had a job, she

4          had an adequate living situation,

5          certainly more adequate than he had ever

6          experienced.

7    Q.   And he was kind of seeking out some type of

8          stability?

9    A.   Yes, and that is how he at least views it in

10         his own retrospective.  He thought he

11         would be more stable with her.

12   Q.   And in preparing for this, did you have a

13         chance to listen to some of the tapes

14         that were recorded between Donna Roberts

15         and Nathaniel Jackson from the prison and

16         also review some of the letters?

17   A.   I did.

18   Q.   And did it appear to you that Donna Roberts

19         was playing some type of a role?

20   A.   Yes.  That was obvious.  She was responding.

21         He was asserting a sort of crude

22         masculinity, which he acknowledges in his

58

```
 1              discussions with me.  She was playing
 2              back to him.  Her voice is sexy, it is
 3              breathy, it plays back and forth with the
 4              same content.  Sometimes been called
 5              phone sex.  And the letters, however, are
 6              of a similar type.
 7    Q.   Is there anything particular that we haven't
 8         covered that you think is important?
 9    A.   No.  I think we have covered just about
10              everything.
11    Q.   I have one final question.  If you had to sum
12              up, is Nathaniel Jackson a product of his
13              own physical problems or is he a product
14              of his environment?
15    A.   As it is with all of us, he's a product of a
16              combination of factors.  The underlying
17              ADHD means that he has a physical
18              neurological disability.  It affected his
19              behavior in his capacity to conform that
20              behavior to expectations.  The school did
21              not recognize the nature of that problem,
22              nor was there effective intervention made
```

59

1    until very late, and that was not a

2    complete one.  He grew up in an

3    environment where in order to survive,

4    you have to learn certain amounts of

5    aggression and how to deal with

6    aggression.  And he used drugs, which

7    would then interact to make his own

8    functioning worse.  All of those things

9    put together began to explain the

10   totality that he is.

11              MR. CONSOLDANE:  Thank you.

12              MR. WATKINS:  I would request maybe

13   a 15 minute break.  I would like to look at some of

14   the records.

15              THE COURT:  Folks, let's take 15

16   minutes.  You are not to discuss anything or form

17   an opinion until you return.

18   (Court in recess at 2:25 p.m.)

19   (Resumed in Open Court at 3:00 p.m.)

20   CROSS EXAMINATION BY MR. WATKINS:

21   Q.   Dr. McPherson, I know I thanked you for your

22              records and I'm going to mark those as an

60

1              Exhibit.

2    A.   That is fine.

3    Q.   I'm going to ask you some questions, maybe two

4              or three from those records.

5    A.   That is fine.

6    Q.   And since you and I know each other from past

7              cases, it makes it a little bit easier or

8              maybe a little bit harder to endure, I

9              don't know whatever it would be.  I

10             recognize and from your past testimony,

11             you have testified on behalf of the

12             defense numerous times?

13   A.   That is correct.

14   Q.   And these cases, you don't testify on behalf

15             of the Prosecutor?

16   A.   That is also right.

17   Q.   And you personally are against the death

18             penalty, is that fair to state?

19   A.   That is fair to state.

20   Q.   When you do the examination in this case, and

21             look at the things that you look at, you

22             are doing something that you are quite

61

```
 1              familiar with, that is dealing with the
 2              death penalty case?
 3   A.   Yes.
 4   Q.   And as a forensic psychologist, you are
 5              different from a psychiatrist in the
 6              sense that you don't prescribe medicine
 7              and there's certain things you do
 8              differently?
 9   A.   Correct.
10   Q.   But, I think both you and a forensic
11              psychiatrist would use a DSM IV?
12   A.   Yes.
13   Q.   And therefore, in order to communicate to a
14              Jury such as the one we have here, you
15              try to agree on terms and definitions?
16   A.   Correct.
17   Q.   So we could understand better what you are
18              telling us?
19   A.   Correct.
20   Q.   Now, I understand that in this case, you were
21              retained by the defense, and when was
22              that?
```

62

1    A.    There was a motion for my appointment.    The

2          Judgment Entry is stamped March 25, 2002.

3    Q.    And how many hours did you spend with him?

4    A.    With the Defendant, probably myself, I spent

5          about between two and four hours with

6          him.   My husband, who is working with us,

7          spent several hours with him doing the

8          test administration.

9    Q.    Did he do the testing, your husband?

10   A.    Well, he did the administration of the test

11         and provided me with the data, and

12         interacted with the Defendant during that

13         time.  And I also administered the

14         Rorschach myself.

15   Q.    So you don't have anything other than the two

16         to four hour period total that you

17         personally spent?

18   A.    Yes, that is correct.

19   Q.    Now you did have discovery materials and other

20         things that the defense provided you,

21         such as the school records, is that

22         correct?

63

1   A.   Well, we actually went down and got the school

2        records.  There were a lot of other

3        materials relative to his past record and

4        this offense that were part of the

5        discovery materials that we discussed or

6        reviewed with counsel.

7   Q.   Did you find any records dealing with

8        hospitalization for mental illness?

9   A.   No.

10  Q.   Did you find any records of hospitalization

11       dealing with any neurological problem?

12  A.   No.

13  Q.   Now, when you went through the things that the

14       State gave, you have already talked about

15       the video tape?

16  A.   Correct.

17  Q.   And you talked about the letters?

18  A.   Yes.

19  Q.   And you talked about the prison tape?

20  A.   Yes.

21  Q.   Would you tell the Jury how much time you

22       spent reviewing the letters and the tapes

64

1      and all of the evidence or things that

2      the defense gave you?

3   A.    I actually don't have an hour count at hand.

4         There were, I spent a couple of hours

5         listening to the tape, various tapes.  I

6         did not listen to every one of them, but

7         sampled them.  I spent time reviewing

8         records probably several hours, but I

9         would have to go back to my office and

10        start looking at the hour counts to tell

11        you about that.

12  Q.   When you say several hours, could you ballpark

13        it for the Jury?

14  A.   As long as it is understood that my memory in

15        trying to estimate my time isn't as good

16        as my secretary's ability to track it,

17        probably between five and ten hours, but

18        I'm not sure.

19  Q.   How many letters did you read?

20  A.    I don't remember.  There was a stack of them.

21        I remember reading in detail, looking in

22        detail at some of the more recent ones

65

1          and more or less sampling those.  I was

2          interested in the quality of the

3          relationship, but not in the facts of the

4          case per se.

5   Q.   Let me ask you this.  How would you make a

6          determination what letters would deal

7          with the quality of the relationship?

8   A.   By the wording they used.

9   Q.   And so did you look at all 280 letters?

10  A.   No, I did not read all 280 letters.

11  Q.   Did you read 180 letters?

12  A.   Probably not.  Probably more in the area of

13          ten to 12.

14  Q.   So, there may have been important facts in

15          those letters that you missed?

16  A.   That could be.

17  Q.   Now, you said that you listened to two hours

18          of tape.  Would that include the video

19          statement of Nathaniel Jackson?

20  A.   I also listened to that.  But that was some

21          time ago.

22  Q.   You did see the video?

66

1   A.   Yes.

2   Q.   And you also listened to the prison tapes?

3   A.   Yes, those as I said, I sampled through.  I

4        did not listen to all of them.

5   Q.   Did you listen to the last one on December 8?

6   A.   I think so.

7   Q.   And how many hours did you spend listening?

8   A.   Again, I am really uncomfortable with this,

9        because I am estimating and I'm not at

10       all sure that I am doing it accurately.

11       A lot of that listening took place back

12       last Spring and my ability to forecast or

13       remember how much I was listening to them

14       is really quite limited.  My recollection

15       is I listened for about two hours.

16  Q.   If I told you there were over three hours, it

17       is obvious you didn't listen to all of

18       that?

19  A.   And I have stated that consistently.

20  Q.   Now, you did tell the Jury that you noticed

21       that Donna Roberts talked sort of, I want

22       to say that you used a term, "Southern

67

1            belle"?

A.    Yes.

Q.    That is how you described Donna Roberts?

A.    It seemed like a descriptor of her voice and
      the cadence in which she played back to
      him.  That was the role that she aroused
      to my mind.

Q.    Now, did you notice the different -- and you
      indicated that she talked differently
      with Nathaniel basically, right?

A.    With Nathaniel, versus when she was speaking
      for herself.

Q.    On the video?

A.    On the video.

Q.    Did you notice the difference between the way
      Nathaniel Jackson was on the video tape
      with the police, and the way he was
      talking to Donna?

A.    Yes.

Q.    So, both were behaving differently with each
      other?

A.    Yes.

68

1  Q.   Now, you took down a history from the

2       Defendant, is that correct?

3  A.   That is correct.

4  Q.   And that is part of your report, which has

5            been Exhibit P, and when you take a

6            history, you are basically taking it from

7       the person?

8  A.   Correct.

9  Q.   And they may or may not be telling you the

10           truth?

11 A.   That is also correct.

12 Q.   And so you have to make some assumptions?

13 A.   Sometimes.

14 Q.   Now, in your report, you said that the

15           Defendant said he was brought up in an

16           extremely violent neighborhood?

17 A.   Correct.

18 Q.   And did you talk to anyone else, when he was

19           initially brought before he left home?

20           Did you talk to anyone else to make a

21           determination that that was true?

22 A.   No.

69

1   Q.   Assuming that his mother said that it wasn't a

2        bad neighborhood, it wasn't a rough

3        neighborhood, it could well be that the

4        neighborhood may have been pretty good?

5   A.   It could have been, but it wasn't.

6   Q.   So you would disregard the mother?

7   A.   Well, yes.  We have been to the neighborhood,

8        or Mr. McPherson was at the neighborhood

9        and we have the evidence from the school

10       records.  It is fairly unusual to have a

11       letter asking for a child to be excused

12       because of gun play and we also have the

13       evidence of his body with the several

14       razing injuries on his arm which came

15       about as a result of his being shot at as

16       an adult all of which was taking place in

17       the neighborhood.

18  Q.   First off, your point about your husband being

19       there, you are dealing with 2002.  The

20       neighborhood back in the seventies and

21       eighties may well have been a different

22       neighborhood?

70

1   A.   I suppose that is possible.

2   Q.   And also you mentioned that his mother, not

3          his mother, but the school records

4          indicated he was shot at or someone shot

5          him?

6   A.   The letter from his mother, sent to the

7          school.

8   Q.   But it was in the school records?

9   A.   It was in the school records, correct.

10   Q.   It didn't say where, did it?

11   A.   No.

12   Q.   And the fact of the matter is, when he was

13         shot, you don't know where he was living,

14         do you?

15   A.   At the time --

16   Q.   When he was an adult?

17   A.   As an adult, no, he was not living with his

18         mother.

19   Q.   I am talking about when he was shot, you

20         cannot verify where he was when he was

21         shot, can you?

22   A.   That is correct.

71

Q.   Now, do you believe that the Defendant was
     truthful to you?

A.   I believe the Defendant was truthful to me.  I
     think he was truthful in the things, in
     the things where I had independent
     corroborating evidence, he was truthful.
     I cannot tell you that I know him to be
     truthful in every statement that he has
     made, because I don't have corroboration
     for every statement he's made.

Q.   And that would be an example of the
     neighborhood, because you have to have
     corroboration, correct, whatever it may
     be, is that fair to state?

A.   I think I have some corroboration.

Q.   You indicate in your testimony that he got
     into a lot of difficulty and he tended to
     have problems with other students at
     times, is that correct?

A.   That is correct.

Q.   In fact, I think the record and your report
     indicate that he was having problems from

72

1           grade one through grade eleven?

2    A.    That is correct.

3    Q.    And I would like to -- this has been marked

4           State's Exhibit 403-A.  403-AA through

5           403-RR.  State's Exhibit 403-A through

6           403-RR.  These are the records that you

7           brought with you?

8    A.    They are.

9    Q.    Now, I want to -- I want you to tell me if you

10          recall reading in particular, a report,

11          Jay Seiser, S E I S I E R, which was done

12          on January 17, 1986.  And the

13          house-tree-person projective test, was

14          that administered by you or your husband?

15   A.    No.

16   Q.    But you did administer some projective test?

17   A.    Yes.

18   Q.    You recognize that as a test that is used by

19          psychologists?

20   A.    It is a technique.  It is actually not a test,

21          although it is referred to rather loosely

22          as a test, but there's a technical

73

```
1              definition between test and technique.

2              It doesn't have the kind of normative

3              psychometric properties that are formally

4              ascribed to a test.  It is often used to

5              get a feeling of a person's aspects of

6              his self presentation.

7    Q.   When a person in this case, would be a student

8              14 years of age would say something, you

9              would listen to what he had to say?

10   A.   That would be true regardless of his age.

11   Q.   That is why you would include significant

12             things that are said in the report, fair

13             to state?

14   A.   Yes, that is fair to state.

15   Q.   And you looked at this.  And it indicated

16             during this administered, what is called

17             the house-tree-person, in complete

18             sentences?

19   A.   Yes.

20   Q.   Nathaniel made no bones about the fact, "He's

21             aggressive, hates whites, except for one

22             boy, and tends to hurt them or anyone
```

74

1          else who tries to get through him.  There

2          was no evidence of positive feelings

3          towards anyone, including his teachers

4          and parents.  Ain't nothing to me.  He

5          projected the idea that he's afraid of

6          nothing, including consequences of his

7          own misbehavior and that he admits he

8          feels no guilt about it."  Then the

9          examiner says that Nathaniel wants to

10         project a tough guy image.  Is that fair

11         to state?

12    A.   That is fair to state.

13    Q.   Going on to another report on 2-23, on

14         February 23, 1989, 403-G.  You mentioned

15         that he was in the Stambaugh Traditional

16         School?

17    A.   Correct.

18    Q.   And in fact, he was in a number of programs

19         including probation for at least seven

20         times?

21    A.   Yes.

22    Q.   And he went to drug treatment?

75

```
 1   A.   Yes.

 2   Q.   He went to community corrections for months on

 3             end in 1992, 1993?

 4   A.   Yes.

 5   Q.   And so there was a lot of intervention, not

 6             only from the schools, but from the

 7             criminal justice system, fair to state?

 8   A.   Into his drug use, yes.

 9   Q.   Now, it states here, "Nathaniel was placed at

10             Stambaugh Traditional, with teacher Sara

11             Raveti for the remainder of his seventh

12             grade year.  He remained at Stambaugh for

13             grade eight, because of good behavior

14             progress, he was placed in a less

15             restrictive setting, the SPH satellite

16             unit at Rayen High School the following

17             year.  During this school year, 1988,

18             1989, Nathaniel was transferred back to

19             Stambaugh because of threatening,

20             aggressive behavior.  One day he burned

21             his and another student's work sheets,

22             laid across a table in the classroom, and
```

76

1              refused to go to time out.  When a
2              teacher approached him, he swung at him."
3    A.   Yes.
4    Q.   So, at this point in time, again we see, and
5              this is 1989, he's at this time 17 years
6              of age, and he's aggressive and
7              threatening to people around him in
8              school?
9    A.   Yes.
10   Q.   And this is a structured setting school?
11   A.   This is the step down program.  Then they
12              return him.
13   Q.   You don't consider a high school a structured
14              setting?
15   A.   Not anywhere near structured as he needed,
16              evidently.
17   Q.   Now, another teacher also -- I refer to 403-N.
18              And this is, I believe 1988.  It was in
19              the order that you gave it to me.  This
20              is another teacher who tried to remove
21              him from his seat.
22   A.   I think that is the same incident, actually.

77

1  Q.    If it is, it is a different named teacher.

2  A.    I would have to check that.

3  Q.    This is 1988.  The other one was in 1989.

4  A.    Okay.

5  Q.    The last one was 1989.  This one is 1988?

6  A.    This is 1988.  And whatever that is.

7  Q.    The other one I read to you is 1989?

8  A.    Where's the other one?  I think it is a

9        report, is it not?

10  Q.   You think it's the same?

11  A.   That report is written after this incident,

12       and I think he's referencing to this

13       incident as part of it.  There are two

14       reports here written at that time.  The

15       one you just showed me written, which

16       begins, "Nathaniel attended class on

17       9-9-98," and continues, and then there's

18       a second report signed by a teacher

19       referencing 9-9-1988.

20  Q.   The records, I don't want to spend time and

21       I'll give you that and the records will

22       be available to the Jury, but the purpose

78

1          here is that the teacher tried to remove

2          Nathaniel from his seat and bring to

3          him -- to bring him to time out.  He

4          became very hostile and verbally abusive.

5          Mrs. Semanti managed to get him out of

6          his seat, at which time he flung his arm

7          out and thrust his pointy finger very

8          close to his face saying, "You better

9          never touch me again or it will be the

10         last M F-ing thing you ever do."

11    A.   Yes.

12    Q.   So, it is apparent that he was aggressive, and

13         very threatening throughout his school

14         history?

15    A.   That is correct.

16    Q.   Now, would you say that he had conduct

17         disorder by the age of 17?

18    A.   Yes, I would.

19    Q.   And conduct disorder, again, is not and I

20         should not say again, but it is not a

21         mental disease or defect?

22    A.   That is correct.

79

1   Q.   And in a mitigation phase of a trial, you are

2        familiar with the one subsection dealing

3        with whether or not a person has a mental

4        disease or defect that substantially

5        impacts his conduct?

6   A.   I'm familiar with that, yes.

7   Q.   He doesn't qualify?

8   A.   That is also correct.

9   Q.   So, he's not a person suffering from a mental

10       disease, or a mental defect, that

11       affected the criminality in this case?

12  A.   That is correct.

13  Q.   Now, were you familiar with, during his

14       childhood, whether or not he was sexually

15       or physically abused?

16  A.   He denied being sexually or physically abused.

17  Q.   And in fact, there's no evidence in any

18       records that he was ever sexually or

19       physically abused?

20  A.   That is also correct.

21  Q.   And did you talk to other family members of

22       his family?

```
                                                              80
 1    A.    I did.

 2    Q.    Who did you talk to?

 3    A.    I talked to his mother and to his sister.

 4    Q.    And did his sister tell you that, and his

 5          mother tell you that he went to church?

 6    A.    I don't believe I asked them that question.  I

 7          would not be surprised one way or the

 8          other.

 9    Q.    So, is that an important thing to know how he

10          was being brought up?  To me that would

11          be somewhat important if you're looking

12          at a child, even if he's in a poor

13          neighborhood that a parent or grandparent

14          takes the time to take a child to church

15          in his formative years, that that may be

16          a positive thing.  Yes or no?  Is it

17          important?

18    A.    I don't know.  Depends on the person.  Some

19          families go to church regularly.  Some

20          families do not.  Some families do not

21          hold a belief in God, some do.  But those

22          things do not separate out people with
```

81

```
 1            problems from those who have them.
 2   Q.  But certainly people who were being brought up
 3            without physical, sexual abuse and being
 4            taken care of as best the parents can, is
 5            better than a lot of people you see that
 6            are abused physically, sexually and don't
 7            ever have any guidance as to right or
 8            wrong; would you agree with that?
 9   A.  I would certainly agree with that.
10   Q.  Now, you indicate that you learned that he had
11            two children?
12   A.  Yes.
13   Q.  And the one child is seven and you told a
14            story about the cerebral palsy child?
15   A.  That is correct.
16   Q.  And in your report, however, you mentioned
17            that there's a restraining order against
18            him?
19   A.  That was what he told me.
20   Q.  Did he tell you why there was a restraining
21            order against him to see the one year
22            old?
```

82

```
 1    A.    He said that he simply said that he made an
 2          overture to come and see her, and he was
 3          accused of stalking and was not allowed
 4          to do that.  It is a boy, I think.
 5    Q.    Now, going to the test, you testified and
 6          Attorney Consoldane brought up the issue
 7          of mental retardation.  He said mental
 8          retardation and then you answered
 9          regarding his IQ.  At one point, he had
10          70 in school, correct?
11    A.    Correct.
12    Q.    And I think there was a full test of 72 or 73?
13    A.    Yes.
14    Q.    And every single test he was given, even ones
15          that were given 15 years ago, he was not
16          tested at a mental retarded range, is
17          that correct?
18    A.    That is correct.
19    Q.    And the test that he took from you --
20    A.    Correct.
21    Q.    -- established that he was in average or low
22          average range?
```

83

```
 1   A.    Dull normal is sometimes used or low average,
 2         and I think I already explained the ways
 3         in which I'll interpret that score as
 4         referencing probably, slightly better
 5         ability than it would indicate.
 6   Q.    I think you said low average or better in your
 7         report?
 8   A.    Or better, right.
 9   Q.    When you indicated now, the IQ test, which
10         test did you give?
11   A.    The one that we gave was the Wechsler Adult
12         Intelligence Scale, third revision.
13   Q.    And that is where he had the full scale 84 and
14         the performance IQ of 89?
15   A.    Correct.
16   Q.    And you indicated in the one test, the Bender?
17   A.    Bender-Gestalt.
18   Q.    There were some distortions and in
19         inadequacies that appeared to be
20         reflective of some lack of investment in
21         performance.  Do you remember writing
22         that?
```

84

A.    Yes.

Q.    What does this mean?

A.    It meant that it was somewhat sloppily
      executed, but I did not see the kinds of
      signs that I would expect to see if there
      was a gross neurological defect of a type
      that you might get with serious cerebral
      damage.

Q.    Was the Defendant at times like indifferent,
      didn't care?

A.    The performance would suggest he was not
      invested in this test.

Q.    Then you dealt with the wide range of
      achievement tests; do you recall that?

A.    Correct.

Q.    And then you conclude above results reflected
      significant relative deficit in reading
      skills?

A.    Correct.

Q.    What does that mean?

A.    It means that the reading sub test, he did not
      do as well as he did on the spelling and

85

1          arithmetic sub test, which were clearly

2          at an average or better level.  Reaching

3          a high school grade equivalent

4          performance, whereas his reading grade

5          level on this test was fifth grade.  In

6          all cases, the achievement was adequate

7          for day-to-day living.

8    Q.    You read Donna Roberts' letters, the

9          communication between the two?

10   A.    Correct.

11   Q.    Did you find that there was pretty good

12         communication and use of words, even

13         though some words he would not spell

14         correctly?

15   A.    That is a reasonable statement.

16   Q.    Now, what is the MMPI II?

17   A.    The Minnesota Multi-Phasic Personal Inventory,

18         second revision is a true, false item

19         test, which allows one to make inferences

20         as to whether there are any serious

21         psychological or mental illness problems,

22         whether there are some character traits

86

1         or personality problems and how a person

2     may be reacting at the moment.  Various

3         scales are within the test and are looked

4         at.

5  Q.    And in that test, you found no serious mental

6         illness problem, is that correct?

7  A.    That is correct.

8  Q.    And in that test, you write that there was a

9         spike four configuration, that reflects

10        endorsements of anti-social attitudes, or

11        impulsive behaviors?

12 A.    That is correct.

13 Q.    And that would be the scale that would look at

14        whether or not a person is an anti-social

15        personality or sociopathic personality?

16 A.    Not exactly.  It was originally thought to be

17        such a scale, but it has been found to be

18        a combination of alienation, attempting

19        to deny any problems when problems exist,

20        having difficulty getting along with

21        authority, and feeling uncomfortable with

22        himself.  It is a multiple -- it's a

87

1           scale with multiple factors.  It is,

2           however, associated with the things that

3           I have done here which is anti-social

4           attitudes with impulsivity with getting

5           into difficult, quite frankly, it is also

6           associated with being independent of some

7           of the social niceties that can come

8           about if you happen to work in certain

9           fields.

10  Q.    You indicate more or less that he's a type of

11          person that hasn't learned from his past

12          mistakes and tends to act out impulsively

13          without looking at the consequences?

14  A.    That is correct.

15  Q.    And he's done that repeatedly and repeatedly?

16  A.    Correct.

17  Q.    And he can lose control in that scenario?

18  A.    That is correct.

19  Q.    And we know that his, and I'll get to this,

20          but he has escalated from certain types

21          of crimes and we'll get into the ultimate

22          crime?

```
                                                              88

 1    A.    Yes.

 2    Q.    It is fair to state that when you look at the

 3          Rorschach and you look at the TAT test

 4          and the test that you gave him, that he

 5          doesn't learn from his mistakes even

 6          though he's 30 years of age?

 7    A.    That is certainly true in many aspects of his

 8          life, yes.

 9    Q.    Now, his legal history which you cover on page

10          five?

11    A.    Correct.

12    Q.    You indicate that he was incarcerated four

13          times, is that correct?

14    A.    Correct.

15    Q.    And you mention that you had found that during

16          that period of time, that he was involved

17          in non-violent behavior?

18    A.    Non-violent at the level of the current

19          offense.  He did not cause, to my

20          knowledge, he did not cause bodily harm.

21    Q.    So, if I told you by law breaking into

22          somebody's home is considered a violent
```

89

1          crime, you would disagree with that?

2   A.   No.   I would accept that, because I know that

3          to be a true statement.   However, I was

4          using the word violence in the more

5          colloquial sense of having actually done

6          violence to another human being.

7   Q.   Well, he was involved with aggravated

8          burglaries as a teen?

9   A.   Correct.

10  Q.   And then he continued as an adult, and his

11         first incarceration at Lorain in your

12         report is 1-92 for aggravated burglary,

13         is that correct?

14  A.   That is correct.

15  Q.   Then he went back in February 1996 for having

16         a weapon as a convicted felon.   He had a

17         gun?

18  A.   Yes.

19  Q.   And then he went back two other times?

20  A.   Correct.

21  Q.   And again, you go through in your report,

22         school records, which I have already

90

1          covered.  Now, when he did things, he

2          made a choice.  There's some evidence for

3          this Jury that he understood, his sister

4          said he knew right from wrong?

5  A.   Yes.

6  Q.   And he made a choice at 13 to take marijuana;

7          is that fair to state?

8  A.   That is fair to state.

9  Q.   And that he engaged with other more popular

10          drugs, including cocaine and crack

11          cocaine?

12  A.   Yes.

13  Q.   And again, he made the choice to do that?

14  A.   Correct.

15  Q.   And then when he would occasionally get

16          involved in the use of alcohol, he made

17          the choice to do that?

18  A.   Also correct.

19  Q.   And throughout his misbehavior and criminal

20          conduct, you find in the records, that he

21          had treatment and he had probation and

22          probation and probation?

91

```
 1   A.   That is correct.
 2   Q.   And things did not get better.  They got
 3             worse?
 4   A.   That is correct.
 5   Q.   And every time, for example the last time he
 6             went to prison, he said that going to
 7             CCA, that he's found God and he's going
 8             to straighten out his life?
 9   A.   Yes.
10   Q.   You remember reading that?
11   A.   I remember reading something to that effect.
12   Q.   Where the examiner felt he was being sincere?
13   A.   Yes.
14   Q.   Obviously people can con individuals at times,
15             right?
16   A.   Yes.
17   Q.   And people can manipulate people at times?
18   A.   Yes.
19   Q.   And anti-social personalities are pretty good
20             at that?
21   A.   Some.
22   Q.   And you indicate in your direct testimony that
```

```
                                                            92
  1            there's what you classify as good and bad
  2            anti-social personality disorders?
  3   A.    Not exactly.  I said there was a category
  4            known as psychopathic or sociopathic
  5            behavior that represents a sub set of
  6            anti-social behavior or an overlapping
  7            category with it, but was not
  8            coincidental with it.
  9   Q.   I want to know if you agree with the statement
 10            made in DSM-IV.  Take a look at that.
 11            You recognize DSM-IV?
 12   A.    Yes.
 13   Q.   You use this?
 14   A.    Yes.
 15   Q.   Your diagnosis on Axis II was 301.7,
 16            anti-social personality disorder?
 17   A.    Correct.
 18   Q.   The essential feature of anti-social
 19            personalities disorder is a pervasive
 20            pattern of disregard for and in violation
 21            of the rights of others, that begins in
 22            childhood, or early adolescence and
```

93

```
 1              continues into adulthood?
 2    A.    Correct.
 3    Q.    That fits Nathaniel Jackson?
 4    A.    Yes.
 5    Q.    This pattern has also been referred to as
 6              psychopathy, sociopathy or dissocial
 7              personality disorder because to seek
 8              manipulation or central features of
 9              anti-social disorder, it may be
10              especially helpful to integrate
11              information required from systematic
12              clinical assessment with information
13              collected from collateral sources?
14    A.    Correct.
15    Q.    And therefore, the pattern is one dealing with
16              psychopathy and sociopathy, you are
17              simply saying from what you see in this
18              Defendant, that he's not as bad as some
19              others?
20    A.    Correct.
21    Q.    How many others have you testified about that
22              were in prison planning to murder a
```

94

```
 1              person when they got out of the prison?
 2   A.   This case has its unique characteristics, not
 3              the least of which is that feature.
 4   Q.   Did you read a letter that this man wrote
 5              saying that when he got out, he would
 6              shoot the victim in the F'ing head?
 7   A.   Yes.
 8   Q.   So, you don't put that in as bad as others?
 9   A.   There have been crimes in cases I have
10              covered, where what was done to people
11              was clearly worse, if one is going to
12              start ranking that sort of thing, than
13              what was done to this victim.  The fact
14              is all of them resulted in the death of
15              an individual.
16   Q.    I agree.  I'm asking if you have ever had one
17              like this one?
18                   MR. CONSOLDANE:  I'll object.  I
19   don't think that is a proper question.  Whether
20   she's had any other cases like this in the past is
21   really of no consequence.
22                   THE COURT:  Unless you wish to draw
```

95

1    some comparison as to other cases like this, I

2    don't know where that is relevant.  Sustained.

3    Q.    Now, I notice -- well, I already covered your

4          report dealing with other information in

5          part, but we talked about the Southern

6          belle and that, and you indicated in your

7          report that they were planning the demise

8          of Mrs. Roberts' husband?

9    A.    Or ex-husband as the case may be.

10   Q.    But you said husband, right?

11   A.    But I realized that they were living together,

12         but there had been a divorce.  There was

13         ambiguous status.

14   Q.    And the information -- well, never mind.  I

15         won't go any further with that.  You

16         indicate that, and I go into this

17         anti-social personality disorder, before

18         I go into that, your diagnosis is

19         attention deficit hyperactivity disorder,

20         chemical dependency, and then there's

21         status, post-gunshot wound.  None of

22         those are connected with any mental

96

1           disease?

2  A.   Not as that term is used in the legal system,

3           correct.

4  Q.   And you say that his anti-social

5           characteristics are a function of his

6           involvement in his counter culture of his

7           neighborhood, correct?

8  A.   I say that, yes.

9  Q.   And his neighborhood as you know it, is where?

10          What is his neighborhood?

11 A.   His neighborhood would consist of those places

12          where he lives and the people with whom

13          he interacts.  It would include the

14          places he lived as a child, but it would

15          also include those places where he lives

16          as an adult, in which he refers to as his

17          neighborhood.

18 Q.   And the neighborhood that he was involved

19          with, being incarcerated, was the

20          neighborhood of drugs, violence and

21          burglaries?

22 A.   During incarceration?

97

1    Q.    Yes.

2    A.    No, that neighborhood would have much less in

3          the way of drugs, and less in the way of

4          violence.  They both happen to be

5          regrettably enough present, but it is a

6          much lessor level of undisciplined

7          behavior.

8    Q.    Didn't you get the impression from reading the

9          letters and listening to the tape that

10         Nathaniel Jackson was leaving his

11         neighborhood, the hood and going to 254

12         Fonderlac and was increasing his lot in

13         life, more or less?

14   A.    I'm not sure I understand your question.

15   Q.    There's a lot of money here.  You mentioned

16         the pecuniary interest, and the bottom

17         line is that while he's in prison, he's

18         planning to kill Robert Fingerhut, and

19         he's going to graduate to a new

20         neighborhood.

21               MR. CONSOLDANE:  I'm going to

22   object.  Is he testifying?

98

1              MR. WATKINS:  I asked a question.

2              THE COURT:  He's asking a question.

3    You are drawing, not exactly a hypothetical but a

4    question, as a hypothetical from the information in

5    her report.  Overruled.

6    Q.   You see what I am getting at?

7    A.   I don't know what the question is.  I

8         understand what you have been saying.

9    Q.   You indicate that his functional involvement

10             is -- I am only pointing out that his

11             neighborhood is changing when he goes to

12             254 Fonderlac?

13   A.   The neighborhood is going to be different as

14             he anticipates it or sees it.

15   Q.   His plan is to kill this man for money?

16   A.   Yes.

17   Q.   And to be with Donna?

18   A.   And to be with Donna, right.

19   Q.   And you mentioned that Donna denied in her

20             video tape, her involvement until the

21             end?

22   A.   Correct.

99

```
1   Q.    And Nathaniel Jackson denied Donna's
2         involvement in the end of his video, is
3              that correct?
4   A.    That is also correct.
5   Q.    So they were loyal to that respect?
6   A.    In that respect, yes.
7   Q.    And you mentioned that he's capable of loyalty
8         to persons who are important to him, fair
9         to state?
10  A.    Fair to state.
11  Q.    He was willing to kill for loyalty, right?
12  A.    Apparently.  At least in response to the plan
13             that they made together, yes.
14  Q.    And when he's been in prison and you state the
15             structured environment, prison is the
16             place that he could be controlled, is
17             that correct?
18  A.    Correct.
19  Q.    His experience in prison has been short term
20             prison, correct?
21  A.    Correct.
22  Q.    And if he's in prison and he becomes loyal to
```

100

1          somebody, and if that is somebody wants

2          somebody killed in prison, like a guard

3          or other prisoner, could he or would he

4          impulsively kill that person?

5    A.    I don't have any basis for answering that

6          question, because the crime took place

7          under conditions of a sexual romantic

8          relationship, and I have no basis for

9          saying that a friendship with another

10         male would lead to the same kind of

11         output, if you will, is especially

12         lacking any real payoff which is the

13         other component of this crime, that both

14         of these people thought they were going

15         to wind up with a new life.  If you kill

16         a guard in prison, you don't get a new

17         life.  If you don't get caught, you may

18         not get a terrible outcome, but --

19   Q.    There are a lot of reasons people get angry

20         with people in prison?

21   A.    Absolutely.

22   Q.    And you read or you should have read, and

101

1      probably read how he made up his mind,

2      when he makes up his mind he wants to do

3      something, he does it, and in this case,

4      not only he planned, he asked for gloves,

5      asked for handcuffs, because he made up

6      his mind, and every single time he

7      committed a crime in the past, he didn't

8      learn and it escalated and he committed

9      other crimes?

10 A.   That is correct.

11 Q.   If you would have been here two years ago on

12     his theft offense, you wouldn't have

13     predicted what he did to Robert

14     Fingerhut, would you?

15 A.   That is right.  I would not have a basis for

16     that.

17         MR. WATKINS:  Thank you.  No other

18 questions.

19 REDIRECT EXAMINATION BY MR. CONSOLDANE:

20 Q.   Just a couple of short questions.  You

21     wouldn't have been able to predict that,

22     because he had no history of violence,

102

1           did he?

2    A.   Correct.

3    Q.   This is the first time that he's had any type

4         of problem that involved violence?

5    A.   In the sense that I used it earlier regarding

6         to violence against another person

7         causing physical harm.

8    Q.   I notice that the Prosecutor made a point to

9         say that there was no mental defect and

10        that is correct?

11   A.   That is correct.

12   Q.   But, by looking at all of his problems that he

13        had both environmental and physical, it

14        kind of explains what kind of control

15        that Donna Roberts would have over him,

16        is that not correct?

17   A.   It is consistent with his entire history and

18        the basis or the way of behaving are

19        consistent with winding up in a

20        relationship that exerts considerable

21        power over him, yes.

22   Q.   And one other thing, from looking over the

103

1        prison records that Mr. Watkins was

2        talking about, were you able to form an

3        opinion as to how you believe he will

4        behave in prison now?

5   A.   Yes.

6   Q.   And what is that?

7   A.   Past behavior is the best predictor of future

8        behavior, and his past behavior, whenever

9        in prison, has been to conform to prison

10       rules and regulations.  So the best

11       estimate of his future behavior is that

12       he will function best in prison

13       environment.

14            MR. CONSOLDANE:  Thank you.

15  RECROSS EXAMINATION BY MR. WATKINS:

16  Q.   Just one question.  When he told you about

17       being shot, numerous times?

18  A.   Yes.

19  Q.   Did he tell you about seeing other chumps

20       killed?

21  A.   No, not what he's told me about.

22  Q.   Do you remember reading about that?

104

1   A.   Vaguely at this point.  You will have to

2        refresh my memory a little bit.

3   Q.   There was a letter where he talked about how

4        chumps like Robert Fingerhut, he sees

5        them killed on the streets every day?

6   A.   All right.

7   Q.   Did he tell you whether or not he shot back

8        and killed anyone?

9   A.   Yes.

10  Q.   When he was shot, what did he tell you?  Did

11       he have a gun?

12  A.   The reason why I am hesitating I'm really

13       trying to remember exactly what was said.

14  Q.   You might not remember that?

15  A.   The problem I'm having is that I know there

16       was a gun involved, clearly, and I know

17       that his intention was to have a gun.  I

18       believe he had a gun going in, but I also

19       think I remember that there was some gun

20       available in the environment as well.

21       I'm having some trouble putting all of

22       that together.

105

1   Q.   You don't know how many people he shot, if

2             there was more than one?  You don't know

3             that?

4   A.   In the course of this crime, there was one

5             person shot.

6   Q.   I am talking about before.

7   A.   Before, I have no knowledge of him shooting

8             anyone.

9   Q.   He never told you?

10  A.   He's never told me that he shot anyone, yes.

11            MR. WATKINS:  No other questions.

12  REDIRECT EXAMINATION BY MR. CONSOLDANE:

13  Q.   In all of the interviews, there's indications

14            that Nathaniel Jackson had been shot, but

15            there's no indication that he ever shot

16            at anybody else, is that correct?

17  A.   That is correct.

18            MR. CONSOLDANE:  Thank you.

19            MR. WATKINS:  Nothing further.

20            THE COURT:  You are excused.  We

21  thank you very much.  The defense have anything

22  further?

106

1          MR. CONSOLDANE:  Yes.  Mr. Jackson

2     would like to make a statement.

3          THE DEFENDANT:  I would like to

4     apologize for what happened to the victim.  I am

5     very sorry for what happened and I know by me

6     saying sorry ain't going to bring his life back.

7     This is something I have to live with for the rest

8     of my life, and also like for my daughter, to know

9     that she still has a father that is alive and I

10    would like to see her grow up.

11         MR. CONSOLDANE:  Was everybody able

12    to hear that?

13    (All nodded affirmatively.)

14         MR. CONSOLDANE:  Your Honor, with

15    that, we would request the admission of our Exhibit

16    and we would rest at this time.

17         THE COURT:  We'll discuss that and

18    reserve your right, and you have some motions to

19    make on that.  I would suggest we let the Jury --

20         MR. WATKINS:  The State has no

21    evidence.

22         THE COURT:  All evidence is in at

107

1   this point on this phase, is that correct?

2                   MR. CONSOLDANE:  That is correct.

3                   MR. WATKINS:  Yes.

4                   THE COURT:  Ladies and gentlemen, I

5   would ask you if you will be kind enough to be back

6   here tomorrow at 9:30 in the morning.  We have

7   several matters in the morning that we have to take

8   care of.  And we expect 9:30 would be a good time

9   to start.

10              You should make arrangements again, we

11  don't know how long you are going to take on this

12  phase of the trial.  So, if you care to bring

13  something with you for overnight or make

14  arrangements, if it goes into that time period,

15  that you could call somebody and have them drop it

16  off down at the hotel.  Again, I caution that you

17  are not to watch any T.V., read anything in the

18  newspaper, have any discussion with anybody.  Wait

19  until you get back into the Jury room to start

20  going through this evidence and before you arrive

21  at your decision.

22              So, with that, you all have a nice

108

1    evening.  We'll see you tomorrow at 9:30.  Thank

2    you.

3    (Jury excused at 3:55 p.m.)

4              THE COURT:  The Jury is out of the

5    room?  Do you want to cover these Exhibits before

6    we leave.

7              MR. CONSOLDANE:  I just have Exhibit

8    P.  Do you have any objection?

9              MR. WATKINS:  I have no objection.

10             THE COURT:  Exhibit P will be

11   admitted.  You have moved to admit all of the

12   Exhibits.  Only a couple have been used at this

13   time.  Is there any reason to send all of those

14   Exhibits back again?

15             MR. WATKINS:  I think they show the

16   history and she went through the history of the

17   school and I think they should be given to the

18   Jury.

19             THE COURT:  I am talking about --

20   these are fine here.  Do you have any objection to

21   those?  I am talking about the trial Exhibits.

22             MR. WATKINS:  I think we'll withdraw

109

1    some of those, but there's not many.  I guess we

2    need to go through the list, but I'll wait to see

3    what Tony is going to object to.

4                    THE COURT:  Those are the records

5    that you reviewed?

6                    MR. CONSOLDANE:  As far as Exhibits

7    403-A through 403-RR, I have no objection.

8                    THE COURT:  Those will be admitted.

9    On your original proffer, I'll admit all of those.

10   We'll not send those back to the Jury.  If they

11   need any of that though, it will be available for

12   their use.  They went over the evidence in great

13   detail in phase one, but I see no reason, nor to

14   send it back again.  In any event, they should

15   request anything, then I'll make it available to

16   them.

17                    MR. CONSOLDANE:  I think just

18   because they requested it, I still think it has to

19   meet a probative standard before it can go back.

20   They were admitted in the --

21                    THE COURT:  Let's take it one step

22   further.  I'll reserve your right to object to any

110

1   particular thing.  I don't know how it can be

2   objectionable, but it might be.  You reserve that

3   right.  All motions that haven't been ruled on are

4   overruled.  I think I said that previously.  It

5   applies at this point.  Are there any further

6   motions before we start tomorrow with the closing

7   arguments and give the instruction?  Other than a

8   rehash of everything that we have had on the

9   record?

10              MR. CONSOLDANE:  I'll just renew all

11  of my motions that I made before, including the

12  ones orally and written.

13              THE COURT:  I'll rule on each of

14  those as I previously ruled.  The State?

15              MR. WATKINS:  Nothing.

16  (Off the record)

17              THE COURT:  For the record,

18  Mr. Consoldane is waiving presence of the Defendant

19  while we discuss the last minute changes in the

20  Jury instructions, is that correct?

21              MR. CONSOLDANE:  Yes.

22  (Off the record)

111

1          MR. CONSOLDANE:  We waive the

2   presence of the Defendant.  Page two.  You are

3   going to change the word convictions to singular,

4   conviction, instead of plural?

5          MR. MORROW:  Yes.

6          MR. CONSOLDANE:  Then page five, the

7   paragraph is, "that generally a witness may not

8   express an opinion ".  I would like to have that

9   same paragraph that they used in the original

10  instructions.  They have changed it to slant more

11  towards the Prosecution in this.  I don't know why

12  they would have to change that particular

13  paragraph, different than what it was in the

14  original instructions.

15         THE COURT:  What changed there?

16         MR. CONSOLDANE:  They didn't put

17  down, "However, as with other witnesses, upon you

18  alone rests the duty  to determine the weight --"

19         THE COURT:  Isn't that OJI?

20         MR. MORROW:  All I did was deleted

21  things.

22         MR. CONSOLDANE:  You can check that.

112

1    My main objection is the next page, page six.

2         THE COURT:  Are you agreeable to

3    going along with OJI on the opinion evidence?  I

4    think that is OJI.

5              MR. CONSOLDANE:  It is not the same

6    as they had.  I'll go with the same that was in the

7    first set of instructions.

8              THE COURT:  That is standard OJI.

9              MR. WATKINS:  I have no problem

10   using the same one.

11             MR. MORROW:  If I made a mistake, I

12   apologize.  It was not done with any thought.

13             MR. CONSOLDANE:  On page six, the

14   top of that, that is not correct.  There are two

15   aggravating circumstances relating to Count 1.

16   That should be just the aggravated burglary and the

17   aggravated robbery.  Don't need to say the

18   Defendant committed the aggravated murder while he

19   was committing, attempting to commit or immediately

20   fleeing after committing the aggravated burglary.

21             MR. WATKINS:  It is a proper

22   statement of law.

113

1              MR. CONSOLDANE:  It doesn't belong

2    in this.  All it is, is the aggravating

3    circumstances; one is the aggravated murder, two is

4    the aggravated robbery.  This business about prior

5    calculation and design.  They have already been

6    found guilty of that.  That is not part of the

7    aggravating circumstances.

8              MR. WATKINS:  The aggravated murder.

9    They get the aggravated murder --

10             MR. CONSOLDANE:  It is the

11   aggravated burglary or the aggravated robbery.

12             MR. MORROW:  That is incorrect.  It

13   has to be aggravated murder with prior calculation

14   and design or while committing.  That is what the

15   specification requires for them just to find that

16   he did it and aggravated burglary is an incorrect

17   statement of law.

18             THE COURT:  An aggravated burglary

19   is an aggravated burglary, it is not a

20   specification to anything.

21             MR. CONSOLDANE:  That is what they

22   found.  They found the specification and they found

114

1   the specification of aggravated burglary.  That is

2   all that they are to consider.  Not the aggravated

3   murder.

4             THE COURT:  They explain that the

5   murder is not an aggravating circumstance.

6             MR. CONSOLDANE:  It shouldn't be in

7   this definition.

8             MR. WATKINS:  My only comment is

9   that you got numerous cases; Getsy has been upheld

10  by the Supreme Court and we have used through Judge

11  McKay, who had Getsy.

12            MR. CONSOLDANE:  You may have used

13  it in Getsy, but you didn't use it in Foster or

14  Burrows.  I kept you from doing it.  That is two

15  against one.

16            MR. WATKINS:  We're going to bring

17  the instructions tomorrow and show you.  We have

18  them over there.

19            MR. CONSOLDANE:  The ones that you

20  weren't allowed to use?

21            MR. WATKINS:  I am bringing the

22  instructions of the Court.

115

1          MR. MORROW:  What was the other case

2     you were referring to?

3          MR. CONSOLDANE:  Foster and Burrows.

4          THE COURT:  Check Foster and

5     Burrows.

6          MR. WATKINS:  I'll bring it.  I have

7     no problem.

8          THE COURT:  If it isn't, we'll

9     change it.

10          MR. WATKINS:  I agree.

11          THE COURT:  What is the next one?

12          MR. CONSOLDANE:  Right after that

13    they say, "The aggravated murder itself is not to

14    be considered as an aggravating circumstances or to

15    determine penalty."  And then they go in, "except"

16    and that is not true.  There's no exception.  It is

17    not supposed to be considered.  The paragraph

18    should end right there.

19          MR. WATKINS:  No.  Not in this case.

20          THE COURT:  Again, Anthony, will you

21    accept the word, if it is the same as in Burrows

22    and the other case?

116

1           MR. WATKINS:  I think this is

2   tailored.

3           MR. MORROW:  With respect to that

4   language in which they are talking about, I would

5   suggest that in most cases that the instruction

6   that they are not to consider the aggravated murder

7   as part of the aggravating circumstances.  When you

8   look at case law, under Wogenstahl.  And Gumm,

9   G U M M, which I have interpreted when it is proper

10  for the Prosecuting Attorney to talk about the

11  aggravated murder itself being part of the

12  aggravating circumstances.  When you have a case

13  such as this, which is the Defendant committed the

14  aggravated burglary for the purpose of committing

15  the aggravated murder.  If you remember, the

16  definition --

17          MR. WATKINS:  That is the felony,

18  the predicate felony is the aggravated murder and

19  the aggravated burglary.

20          THE COURT:  I understand that.

21          MR. CONSOLDANE:  They are boot

22  strapping.

117

1                    MR. MORROW:  In that case, it is

2      appropriate for them to consider what the crime is.

3      If you are talking about them looking into

4      aggravated burglary that is being committed.  You

5      are talking about while committing.  When you are

6      not talking about the aggravated murder, you can

7      talk about the underlying burglary, they did it at

8      nighttime.  They broke into the house, they held

9      someone hostage.  They did those kinds of things

10     which are admissible for purposes of committing the

11     aggravated burglary, in this case, case, the

12     criminal offense which led to the aggravated

13     burglary was the aggravated murder itself.  And

14     that is what the evidence supports in this case,

15     that they planned to keep, he planned to break in

16     to commit the murder.

17                    THE COURT:  Commit the aggravating

18     circumstances along with the commission of the

19     murder.

20                    MR. CONSOLDANE:  That is not OJI and

21     that is not the way it is supposed to be.  They are

22     trying to boot strap to boot strap.  Just tacking

118

1    one onto the other.  That is not fair.  Why don't

2    they give me a level playing field?

3                      MR. MORROW:  I have a case --

4                      THE COURT:  How would you like this

5    to read at the top of the page?  There are two

6    aggravating circumstances running to Count 1 which

7    are aggravated burglary --

8                      MR. CONSOLDANE:  Number one, there

9    was an aggravated burglary and number two, it was

10   an aggravated robbery, and then the next paragraph

11   should read the aggravated murder itself is not to

12   be considered as an aggravating circumstance, or to

13   determine the penalty.  Period.

14                     MR. WATKINS:  That is where he's

15   wrong, in at least in argument, because there's no

16   way we can argue our case without arguing the

17   aggravating circumstances.  His intent to commit an

18   aggravated murder, which is the felony and what

19   Tony is suggesting, is that we can't argue the

20   facts in this case because he happened to pick as

21   his predicate felony in the aggravated burglary, is

22   to kill the man that is the homeowner, to kill the

119

1    guy in his house.  He didn't go in there to rob

2    him.  He didn't go in there to burn the house.  He

3    went in there with the specific intent to take his

4    life, the intent to take his life, and there's one

5    case, State vs. Bonnell, where we have the

6    aggravated burglary and where the felony element on

7    the aggravated burglary was a premeditated murder

8    of the person in the home.

9                    THE COURT:  I am going to let this

10   stand as it is unless, Anthony, you can show me

11   that this is improper.  The best way to show it has

12   never been given in other cases.

13                   MR. CONSOLDANE:  It has never been

14   given in any of the other cases.  It is not in OJI.

15                   THE COURT:  This is nothing but,

16   although it is under the prior calculation and

17   design, it is still just a felony murder doctrine,

18   right?

19                   MR. WATKINS:  We have selected the

20   prior calculation and design.

21                   THE COURT:  I understand that.  But

22   the specifications only have meaning if they refer

120

1   back to the aggravated murder.  That is what Tony,

2   you have been arguing about all along through this.

3   I have been overruling you.  You are saying that it

4   is just an aggravated murder, it is not an

5   aggravated murder with specifications.

6                    MR. CONSOLDANE:  Right.

7                    THE COURT:  I'm saying that the

8   State has convinced me that it is proper with the

9   prior calculation and design, this fellow went into

10  the house, committed a burglary in going in,

11  committed a robbery later.  Those become

12  specifications attached to the aggravated murder.

13  I know you disagree with that, but that is what

14  this entire case --

15                    MR. CONSOLDANE:  I disagree with

16  that.  I understand that there are specifications

17  and they are specifications in themselves.  They

18  are not to be -- they can't now, they boot strap

19  the burglary, which I think is a clear boot strap.

20  Now they want to turn it around and they want to

21  bring in the burglary and boot strap the murder to

22  the burglary.  You are not supposed to be able to

121

1    talk about the aggravated murder in itself.  It is

2    only the two aggravated circumstances, robbery and

3    burglary.  And now, they want to boot strap it and

4    bring it in and talk about the murder.  You can't

5    do that.  The legislature was clear about that.  We

6    have never done it in any other case.  We have had

7    on Burrows, they went in and committed the robbery.

8    We had Foster, was a rape.  They never brought

9    those things in with the murder itself.

10              THE COURT:  Will you go with the

11   wording in those cases?

12              MR. WATKINS:  This case may be taken

13   with you and read it.

14              MR. MORROW:  You are not going to

15   find this language in those cases, because those

16   cases didn't involve prior calculation and design.

17   That is the difference.  In this case, there's

18   proof of prior calculation and design and proof

19   that the purpose for the aggravated burglary was to

20   commit the murder.  That is why they broke into the

21   house was to kill Mr. Fingerhut.  They didn't break

22   into the house to steal from him.  They didn't

122

1    break into the house to hold him hostage or rape

2    him. They broke in to kill him.

3                    MR. WATKINS:  Jim Lewis and we

4    argued this, and Tony agreed, that in the first

5    phase, it said intent to commit any criminal

6    offense.  They said we want what you committed and

7    that was in the charge that the intent was to

8    commit aggravated murder and or aggravated robbery

9    in the penalty phase charge.  To be consistent that

10   is what we have to be able to argue, the elements

11   of what the penalty phase charge was.

12                   MR. CONSOLDANE:  It said commit a

13   crime.

14                   MR. WATKINS:  Jim and Tony wanted --

15   they wanted that and the Court gave it.

16                   MR. CONSOLDANE:  It said commit a

17   crime.

18                   MR. WATKINS:  Get the charge.  You

19   can look at it.

20                   THE COURT:  I don't want to try this

21   case over again.  If you are so dead set and they

22   are so dead wrong, then at least, if they come back

123

1   with a death penalty, you are going to get knocked

2   down to something less.  I don't know what you are

3   complaining about.

4              MR. CONSOLDANE:  I don't know why I

5   can't get a fair deal on the instructions.  We

6   haven't had one ruling go our way yet and you ask

7   him --

8              THE COURT:  You have had several

9   rulings go your way.

10             MR. CONSOLDANE:  You ask him is it

11  in other instructions.  No, it is not in Foster,

12  Burrows.  What about Getsy?  That was premeditated.

13  It wasn't in there either.

14             MR. WATKINS:  Getsy is a good case

15  to follow, but there were multiple people in that

16  one.  All I'll request for the record is that, and

17  Mary Ann, whoever did it, if you get the record,

18  dealing with the original penalty phase

19  instruction, I know that you are going to find in

20  the record an objection.  It was by Attorney Lewis,

21  that this instruction, any crime is not any crime,

22  you have to put what he went in there for and this

124

1    Court ruled on behalf of the Defense and put

2    aggravated murder and aggravated robbery.  That was

3    in the instruction per the Defense's request and

4    that record is going to speak for itself.

5            MR. CONSOLDANE:  Jim asked for it,

6    but he was on drugs when he asked for it.

7            THE COURT:  You know the argument is

8    here.  Prepare that accordingly and we'll go over

9    it in the morning.  I'm not spending much time on

10   argument in the morning.

11           MR. CONSOLDANE:  Why doesn't he take

12   it out now?  It has never been in any other charge.

13   Why do they get to stick it in here now?

14           THE COURT:  I keep getting the

15   feeling you think I'm just going with the

16   Prosecution.  It sounds to me like this is a proper

17   charge.  They say that the Defendant or the Jury is

18   not to take into consideration a murder for any

19   purpose, but the specifications are only

20   specifications, because they are committed with the

21   intent to the prior calculation and design of

22   committing the murder.

125

1          MR. CONSOLDANE:  That is just it.

2    Prior calculation and design does not get you to

3    the death penalty.  The burglary and robbery do.

4          MR. WATKINS:  And you go into a

5    house to commit the felony of prior calculation and

6    design, murder is the felony.  That is the Bonnell

7    case.

8          MR. CONSOLDANE:  Now you are talking

9    out of the other side of your mouth.  When you say

10   prior calculation and design, it doesn't get you

11   there.

12         MR. WATKINS:  We have researched

13   this and there's plenty of case law that deal with

14   that.

15         THE COURT:  You are saying, Tony,

16   that there's no way that this could be a death

17   penalty case.  Is that what you are saying?

18         MR. CONSOLDANE:  It shouldn't be,

19   but it is.

20         THE COURT:  If you're right and they

21   are boot strapping it, to coin a new phrase, then

22   there's no way this can be an aggravated murder

126

1   with the death penalty.

2                MR. WATKINS:  That is what they

3   argued to the Jury and the Jury rejected it and

4   that is not the law.  Bonnell is dealing with the

5   same thing.  If you planned to kill somebody in

6   their home, you are not going to have a death

7   penalty offense?  But if you go in there and steal

8   five cents off a chair, it's a death penalty

9   offense.  I'm sorry, that is not the law.

10               MR. CONSOLDANE:  I don't know why

11  they got to change it.  We have never had this

12  instruction on any other death penalty case, I have

13  been on.

14               MR. WATKINS:  You have never had one

15  like this.

16               THE COURT:  I'm not convinced they

17  have changed anything.

18               MR. CONSOLDANE:  They have.

19               THE COURT:  You show me.  Bring them

20  in the morning.

21  (Off the record)

22               MR. CONSOLDANE:  According to

127

1    section 2929.04, subsection A-7.  It reads,

2    "Neither the offender was the principal offender in

3    the commission of the aggravated murder, or if not

4    the principal offender, committed the aggravated

5    murder with prior calculation and design."  You are

6    alleging he is, he shouldn't have both in there.

7    He was alleging that he's the principal offender,

8    then you leave out the other section of the prior

9    calculation and design.

10              MR. WRIGHT:  Point is this, I guess.

11    The, "or if not the principal offender committed

12    the aggravated murder with prior calculation and

13    design," is a generally true and correct statement

14    of law with no application whatsoever to this case.

15    There's no evidence that he was anything but the

16    principal offender.  Therefore, the remainder of

17    that, with the or, should be negated from the Jury

18    instructions.

19              MR. WATKINS:  We don't have a

20    problem taking that out.  I know there's case law.

21    Biros, I went through that.  That part of the

22    specification, I don't think there's a problem

128

1    taking that out.  They didn't object to the other

2    phase.  It can go either way.  The purpose of that

3    section is, if you have an accomplice, to get the

4    death penalty such as John Santine, you had to show

5    prior calculation and design.  Biros we use the

6    same language and the Supreme Court of Ohio says

7    the Jury can get both, but there's no defense here

8    that the State didn't prove prior calculation and

9    design in Biros, because the only evidence was he

10   was the principal offender.  We didn't show prior

11   calculation and design.  We showed intent.  This

12   part of it is not a problem.

13   (Court in recess at 4:40 p.m.)

14

15

16   Friday, November 15, 2002:

17   In Open Court at 10:15 A.M.:

18              THE COURT:  Good morning, folks.

19   You are now going to listen to the arguments of

20   counsel in regard to the evidence that you have

21   heard yesterday.  The State ready to proceed?

22              MR. WATKINS:  Yes.

129

1            THE COURT:  The Defense?

2            MR. CONSOLDANE:  Yes.

3            THE COURT:  You may begin.

4    (SIDE BAR DISCUSSION, OFF THE RECORD AND OUT

5    OF HEARING)

6            THE COURT:  Mr. Watkins, you wish to

7    proceed?

8            MR. WATKINS:  We'll waive our

9    opening remarks.

10           THE COURT:  Defense?

11   CLOSING ARGUMENT BY MR. CONSOLDANE:

12           MR. CONSOLDANE:  Mr. Wright,

13   Mr. Jackson, Mr. Watkins, Mr. Monroe.  Good

14   morning, ladies and gentlemen.  It has been a long

15   trial.  I am getting towards the end, getting a

16   little hoarse towards the end.  I hope I can

17   continue.  As you notice, I have already lost my

18   co-counsel and Mr. Wright has stepped in to help.

19   I would like to take this time, because it will be

20   the last chance I'll get to talk to you to tell you

21   how much I appreciate your attention and also would

22   like to ask you if I have done anything that has

130

1  offended you, I ask for your forgiveness and not to
2  hold it against Nathaniel.  As you know, I usually
3  don't talk very long.  If I am 15, 20 minutes, then
4  that is going to be about it.  Kind of would like
5  to just go through some of the witnesses that I
6  presented yesterday, and the reason for these
7  witnesses are to show you that Nathaniel is a human
8  and he has a family like everyone else, and you saw
9  Ray, his stepfather, and seemed like a very nice
10  gentleman.  It is just a shame that he didn't get
11  to meet Nathaniel until he was 15.  I think that if
12  he had gotten into his life four or five years
13  earlier, that we all wouldn't be here today.  But,
14  we are and that is just to look back, and Taushia,
15  his sister, you see that she said he was very good
16  around her children.  Somebody that is that evil,
17  can't be good around children.  Children are
18  usually very good judges of character.  And
19  Pauline, his mother, tried to get him help, just
20  wasn't able to do it.  He had that attention
21  deficit problem, AD/HD and he should have gotten
22  probably on Ritalin when he was in the first or

131

1  second grade. That might have solved it. There's

2  a lot of pros and cons against the Ritalin, but at

3  least he should have gotten some more structured

4  help. When he did get the structured help, he did

5  seem to progress. And finally, that cute little

6  girl, Shaylese, anybody that would have a daughter

7  like that, can't be too bad. He would like a

8  chance to see her grow up, even if it be from

9  prison.

10         And finally, Dr. McPherson.  Dr.

11  McPherson and I have worked together for about ten

12  years now and she's a very fine, competent lady. I

13  know that Mr. Watkins asked her whether or not she

14  believed in the death penalty, and that really has

15  no bearing. What her private beliefs are is of no

16  concern, but she does -- very competent

17  psychologist and very good at what she's done.

18  Matter of fact, you heard that she was on the

19  Board, the Review Board that granted the license.

20  I believe she even signed Mr. Wrenn's license who

21  is sitting back there, that she's been very well

22  respected in the State of Ohio.

132

1              Now, she did talk about the AD/HD, and

2    probably figured that it was evident even when he

3    was in the first grade, got into trouble.  Matter

4    of fact, by the third grade, he was even suspended.

5    He did get help when they put him in that

6    structured center, and he did quite well, but as

7    soon as he did well, they figured they could put

8    him back in the mainstream classroom where he

9    turned around and he failed again.  With him, he

10   had a double whammy, so to speak with this, is that

11   he had a physical impairment, and also there was

12   environmental impairment to live in a neighborhood

13   where guns and drugs are common, is just not

14   conducive to have somebody grow up with the right

15   set of values.

16              That brings us to another thing, which is

17   kind of interesting, and you are going to get her

18   report.  This report here is going to go back to

19   the Jury, it is not real long.  It is about seven

20   pages.  And in there, he had an IQ, when he was in

21   high school he was tested twice, right around 70.

22   And since then, she has retested him, and he's

133

1    about 84.  And that is kind of unheard of to jump

2    that many points, but it just showed how he was

3    able to actually excel in a structured environment

4    as long as there's someone that can tell him where

5    he has to go and what he has to do.  He seems to

6    come along all right, which kind of shows that he

7    will actually be able to survive quite well in

8    prison.  He's done well before in prison.

9            That brings us to another thing that Dr.

10   McPherson was talking about.  On page three of the

11   report, she talks about the relationship that

12   Nathaniel had with Donna Roberts, and that she

13   offered him the stability, she offered him a home,

14   even though she was 57 and he was 30, she was still

15   able to offer him what he needed.  And also that if

16   you look at page 7, that his vulnerability to be

17   influenced by Donna was extremely high.  All in

18   all, if you take the report like I told you before

19   and just look it over, you will see a lot of

20   reasons why you shouldn't impose the death penalty

21   on Nathaniel.

22           And that brings me to a couple of things

134

1    I want to mention about the instructions.  These

2    are the instructions that the Judge is going to

3    read to you, and in there he's going to tell you

4    two things.  One, that the murder itself is not an

5    aggravated circumstance.  The aggravated

6    circumstances are the burglary and the robbery.

7    That is what you have to weigh against the

8    mitigating factors.  And also that another

9    instruction that the Judge is going to tell you

10   that if you all can't agree on the death penalty,

11   then you are to move onto one of the life

12   penalties.  It will take all 12 of you to decide

13   whether Nathaniel is to get the death penalty or if

14   you can't agree, there's three different life

15   options, which you can move onto.  I don't know if

16   many of you have read the Merchant of Venice

17   written by Shakespeare.  I know I read it back in

18   high school.  I don't know if they require you to

19   read that any longer, but if you recall, that is

20   when Sheylock demanded payment of a pound of flesh,

21   and he could have gotten any type of flesh that he

22   wanted, he demanded his heart.  And they said,

135

1   well, take the heart if you don't disturb the rest

2   of me.  In this particular case, I think that a

3   certain amount of punishment must be imposed for

4   what Nathaniel did, but don't take his heart.

5   Don't kill him.  From that same play, there was a

6   little quote about mercy and it said, "The quality

7   of mercy is not strained.  It droppeth as the

8   gentle rain from heaven upon the place beneath."

9   And mercy is twice blessed.  "It blesseth him that

10  gives and him that takes."  Please spare his life.

11  Thank you.

12  CLOSING ARGUMENT BY MR. WATKINS:

13          MR. WATKINS:  Mr. Consoldane, Mr.

14  Wright, Mr. Monroe, Your Honor.  Ladies and

15  gentlemen, I know it has been a long road.  I know

16  that this Jury has put a lot of time and effort.  I

17  know His Honor has done a tremendous job in keeping

18  balance and instructing the Jury that this is a

19  case where the Jury has to have an open mind to

20  decide the case, not on sympathy or bias or

21  prejudice, but on the law and the evidence.

22          The aggravating circumstances versus the

136

1  mitigating factors is not an easy decision.  I

2  wouldn't want to be in your shoes.  I have done

3  this before.  I hope I don't do it again, but

4  unfortunately, Chuck and I may be doing this again.

5  I haven't won and gotten a recommendation on every

6  case.  I don't expect to win every case.  But I

7  expect that the jurors are going to do what they

8  told me they are going to do.  And the most

9  important thing, I would never ever criticize a

10  Jury.  I believe it is the bastion of our

11  protections of freedom because in the balance is

12  our civilization of doing what is right, not what

13  is convenient.  Whatever you do, I respect your

14  decision.

15        All of you have to ask one basic

16  question.  When I get up tomorrow or the next day,

17  whenever it is, can I look in the mirror and say I

18  did the right thing.  As long as you can do that,

19  that is all I can ask.  I obviously have strong

20  feelings.  I'm not going to apologize.  That is my

21  job.  That is Chuck's job to present the evidence

22  to you what we believe is right.  You will decide

137

1  what is right.

2          Now, it is important that you consider

3  and I know this Jury knows the importance, this

4  Jury was out 15 hours on one occasion, and I think

5  it is somewhat important and Mrs. McPherson or Dr.

6  McPherson is a very nice person, and I surely would

7  tell Mr. Consoldane that I'm not criticizing her

8  because of her position on the death penalty.  She

9  has never testified for a Prosecutor, but you

10  remember the instructions dealing with witnesses.

11  Some may have a bias and we're entitled to bring

12  that out, simply that there is a bias, however, I

13  think when you read her report, which is an

14  exhibit, along with the records, there's some

15  partial records that were made State's Exhibits

16  dealing with the school activity of the Defendant,

17  that you will find from the evidence and the law

18  gives, that there's no mitigating evidence of

19  significant value from her testimony.

20          Just before I go into detail on that, I

21  would just mention that if you can recall, one of

22  the statutory mitigating factors was whether or not

138

1    a person has a mental disease or defect that

2    substantially impacts behavior.  That is where the

3    law requires you to give weight to that.  This lady

4    testified that there was no mental disease or

5    defect, that mitigating factor does not exist in

6    this case.  However, his Honor will instruct you --

7                MR. CONSOLDANE:  I'm going to

8    object.

9    (At Side Bar with reporter present.)

10               MR. CONSOLDANE:  It has long been

11   established by the case law, that the Prosecutor

12   cannot comment on what mitigating factors I did not

13   present.  He can only discuss on what mitigation

14   that I can.  He can't say that I didn't bring up

15   this or didn't bring up that.  That is improper

16   argument and I would object to that.

17               MR. WATKINS:  I'm not going to go

18   through the mitigating factors at all.  This

19   particular factor was covered in the testimony of

20   the psychologist and I directly asked her and she's

21   saying that this factor exists and she said no.

22   What I was about to say was however, you can

139

1  consider history, background, and character, and

2  the catch-all phrase that you can consider what she

3  says is mitigating, if you let me continue.

4           MR. CONSOLDANE:  It is still

5  improper to mention something that I didn't prove.

6           It is like showing -- it is an improper

7  thing.  He only can talk about the quality of the

8  evidence I did present, not what I did not present.

9  I told you at the start, I was not going to bring

10  in anything about mental defect.  I put that on the

11  record before we started.  It was an improper

12  question that you asked her to begin with.  I

13  didn't have a chance to object.  I knew what the

14  answer would be, but it still cannot be brought up

15  in final argument and I would request that the Jury

16  be instructed that they have to, that whatever

17  mitigating that I didn't bring up.

18           THE COURT:  His argument is to

19  counter what argument she gave on this.  Let me see

20  what I can say.  If I don't say it right, come back

21  up.

22  (End of Side Bar discussion.)

140

1          THE COURT:  Ladies and gentlemen,

2     there's been an objection raised, and I don't know

3     that Mr. Watkins had gotten to the point where it

4     might be a perfectly valid objection or not, but

5     let me state this to you to correct any

6     misunderstanding.  The State at this point, is

7     limited to the bounds of rebutting any evidence or

8     argument that has been put on in the mitigation

9     phase of the trial.  I don't think that from the

10    question which was only a partial question, had

11    Mr. Watkins continued along the line that he might

12    have, then he would be getting outside the

13    boundaries of proper argument.  Mr. Watkins,  I

14    would ask you to rephrase your question.

15          MR. WATKINS:  What I said was not

16    wrong.

17          THE COURT:  Anything you said up to

18    this point, I don't think at all was improper, but

19    please continue.

20          MR. WATKINS:  Thank you.  I was

21    going to continue that his Honor will give you an

22    instruction, it is very clear, you can consider

141

1  what Mrs. McPherson, Dr. McPherson said as

2  mitigating.  I was simply pointing out there was no

3  mental defect or disease or mental retardation.

4  The law allows, and for you to decide what is

5  mitigating, I would not ever suggest you couldn't.

6  As you know, this is my opinion.  This is the way I

7  view the law.  You decide the law as given by the

8  Judge and you decide the facts.  Now, when you go

9  back and listen to the Judge -- after you listen to

10  the Judge, we have under the law, two aggravating

11  circumstances that you found the Defendant guilty

12  of beyond a reasonable doubt.  Aggravated burglary,

13  aggravated robbery.  One is all that is necessary,

14  if the quality of the evidence outweighs the

15  mitigating factor or factors you find beyond a

16  reasonable doubt, then it is your duty to recommend

17  the death penalty.  I'm sure you are aware of that.

18  In this particular case, the aggravated murder that

19  is involved, as you have found the Defendant guilty

20  of, he committed an aggravated murder with prior

21  calculation and design.  That is a fact.  That is

22  your conclusion.  It is also your conclusion that

142

1    this Defendant, when he trespassed in the house of

2    the victim, the home where he lived, it was his

3    specific intent to kill the victim, to commit an

4    aggravated murder against a homeowner, which was

5    planned in prison where Dr. McPherson said to you

6    that he had made a good adjustment.  His behavior,

7    the words you read, voiced, the voice that you

8    heard of the Defendant, established beyond a

9    reasonable doubt he committed the worst aggravated

10   burglary you can commit.  He planned for months,

11   the death of the victim in his home, and he did it.

12   Aggravated burglary, any criminal offense you can

13   commit in a house, you go into a house and steal

14   something and then intentionally kill him.  But

15   what crime did he enter that home to commit?  That

16   is for you to decide, what weight and quality you

17   give the crime that you found the Defendant is

18   guilty of.

19          I submit to you, it can't get any worse

20   than being in prison and planning the execution of

21   a homeowner who just comes home.  It is not a case

22   where you have somebody that goes in and breaks in

143

1    to make a few dollars, and then a homeowner comes

2    home and impulsively shoots someone.  It is not

3    even a case where you break in to rape the woman

4    that lives inside, and leave her alive.  This is a

5    cold blooded psychopathic killing that takes place

6    in its planning stage in prison.

7              MR. CONSOLDANE:  I object to him

8    saying psychopathic killer.  There's no evidence to

9    that.

10             THE COURT:  I would instruct the

11   Jury to disregard that.  I'll sustain that.

12             MR. WATKINS:  The planning takes

13   place in prison.  That is what I believe the

14   evidence in this case shows, as to that aggravating

15   circumstance.  It is the worst form.  The other is

16   that after he kills the homeowner --

17             MR. CONSOLDANE:  I object.  He's not

18   the homeowner.  He resided in the home.

19             THE COURT:  Overrule the objection.

20   The Jury is well aware of the arguments.  That is

21   up for them to decide.

22             MR. WATKINS:  After he kills this

144

1    man in his home, he takes his vehicle, that is the

2    second aggravating circumstance.  So you have two

3    aggravating circumstances.  I am suggesting to you

4    that the quality of the evidence as to Count 1,

5    aggravated burglary is strongest of aggravating

6    circumstances, is the evidence; and the second one

7    is also strong, and independent, but you have two

8    aggravating circumstances.  You will have the

9    Exhibits that are relevant to this stage with you,

10   if you need to have them.

11         I would briefly like to go through and

12   comment on the mitigation evidence.  Obviously I

13   had briefly gone through the aggravating

14   circumstances.  Raymond Dickerson.  As I see his

15   testimony, this man, the stepfather, testified that

16   he had not seen the Defendant since he was 17 years

17   of age, when he left home.  He had not seen him for

18   13 years almost.  What weight, what knowledge does

19   he have to add to this case?  I think very little.

20   And I think it is important to recognize that his

21   sister and mother talk about this neighborhood and

22   this home is not that rough, not that bad of a

145

1  neighborhood, and he's telling us it is extremely

2  violent.  Well, we know after he left the

3  neighborhood, his adult history of going in and out

4  of prison is prevalent and not being at home is

5  prevalent, and we also know that his sister, who

6  testified, Taushia, who is a nice young woman, not

7  had any problem, came up in the same household,

8  talked of her brother as being smart, being

9  somewhat artistic, who knew right from wrong, went

10  to church, and appeared to her to be a very nice

11  person.  In my opinion, that is not mitigating

12  because it shows that he had what a lot of people

13  didn't have.  He had a hard working mother.  He had

14  a loving sister, and he was given an opportunity to

15  go on in life like his sister did, but as even

16  Mrs. McPherson said, he made choices and he

17  repeatedly made choices and made mistakes and

18  repeatedly manipulated and the chameleon that he

19  is, he adapts his personality to manipulate and

20  control and use people, and he did it time and time

21  again.  There was the time he was in prison, the

22  time he was planning the death of the victim, he

146

1    said that he felt that this is going to change his

2    life, that he had remorse.  He says what is

3    necessary, but inside his being, he's an

4    anti-social personality who does not have the

5    conscience, who has a pattern.

6                    MR. CONSOLDANE:  I object.

7                    MR. WATKINS:  I think I can comment

8    on the evidence.

9                    MR. CONSOLDANE:  Not having a

10   conscience?

11                   MR. WATKINS:  That is an anti-social

12   personality.

13                   THE COURT:  This is argument.  The

14   Jury can accept Mr. Watkins' view or not.  I think

15   it is proper argument.  Overruled.

16                   MR. WATKINS:  So you have this

17   person where you have to consider according to the

18   Judge, his history, character and background.  I am

19   only trying to point out this history, character

20   and background is not mitigating.  It is not worth

21   very much.  He doesn't have any hospitalization for

22   mental illness.  He doesn't have any evidence of

147

1    neurological problems.  He has behavior problems,

2    he has had them from the beginning and has gone

3    through many interventions.  And has escalated his

4    conduct.  His daughter, and the mother testified,

5    and it is too bad.  It seemed like the mother is

6    doing a good job.  You saw the letters.  You heard

7    the tapes.  You heard the evidence.  Was this a man

8    that was concerned about his children, who provided

9    for his children?  Was he talking about getting out

10   of prison to see his seven year old daughter?  When

11   he got out of the prison did he go see his seven

12   year old daughter?  He went to a motel with Donna.

13   If he would have done what he's supposed to have

14   done, he would not have killed.  Sometimes you get

15   caught and sometimes the evidence is overwhelming,

16   and sometimes you are just darn guilty and

17   sometimes there's no mitigation.  That is the way

18   it is.  I don't make and choose the evidence.  The

19   witnesses do.  The mother testified, Pauline, who

20   works hard, not a rough neighborhood.  Put her on

21   trial now because it doesn't fit into the Defense's

22   position to portray this guy.  He had no choice, he

148

1   was brought up in this culture of violence.  He did

2   have choices.  In fact, he's a very smart man from

3   his letters, and that is what makes it so awful.

4   He could have done things differently.  But he

5   doesn't care.  He made an unsworn statement.

6   Wasn't subject to cross examination as other

7   witnesses.  He said he was sorry.  He was sorry.

8   That is not the way the evidence shows.  We see a

9   man that commits aggravated murder, and what is he

10  doing afterwards?  He's going to a motel.  And we

11  speak about loyalty.  When we talk about loyalty

12  that Dr. McPherson said, he's going there with a

13  bloody hand and bringing a woman in to have sex

14  after murdering somebody.  And what is it they say,

15  he's having a party.  No conscience.  And when you

16  read the letters, and when you listen to the tapes,

17  "I'm going to shoot the guy in the F'ing head."  It

18  is mandatory.  "I made up my mind, I'm going to do

19  it."  Repeatedly.  He's pushing this plan.  Even

20  the last thing that you hear from, there's one

21  thing you have got to do for me.  December 8, let

22  me in the house.  The gloves, the handcuffs, the

149

1   whole plan of action here.  The reality of not

2   being concerned about taking human life, to make

3   this decision and in such a cold blooded and

4   planned way, for the sake of Donna, or what I say

5   for the sake of a lot of money, he kills.

6          In the report, and please read the

7   report, please read the records where he threatened

8   to kill a teacher.  The hatred that he expresses

9   may not be here now, but look at his practice and

10  that is what Dr. McPherson said.  I am looking at

11  his practice in his escalation.  Whether or not

12  life imprisonment is a mitigating factor, that is

13  for you to decide.  Whatever you find from his

14  history, character, background or anything else, it

15  is for you to decide.

16         I submit there's virtually no mitigation

17  in this particular case, but one thing I want to

18  hit upon in my closing, because I'm not going to be

19  here much longer, you have been here long enough

20  and I know you want to go to your daily lives and

21  finish this in the way you have done this

22  throughout the trial, what you think is right, and

150

1    what you believe is the just decision, but we have

2    evidence that, well, he made an adjustment in

3    prison.  That gives him life because he's okay in

4    prison.  That was testified to by the defense.  He

5    didn't make an adjustment when he's planning to

6    murder in prison, and every time he's been able to

7    manipulate the system and get out early, he's in

8    there for life and whether it is out of loyalty or

9    whatever, if it is a guard or a fellow prisoner,

10   he's the kind of person that if he makes up his

11   mind and thinks about it, he will do it.  He did

12   it.  And that is why Dr. McPherson's testimony is

13   that this is a person that is good in prison, that

14   we can give a life sentence to as a mitigating

15   factor and I don't think it is mitigating, but they

16   brought it up, I said that is not true in this

17   case.  This is not a person that made a split

18   second decision to kill.  This is as planned as it

19   gets.  But most importantly, the quality of the

20   State's evidence is there.  There's no lingering

21   doubt.  There's no residual doubt.  It is there.

22   His words, his voice, his actions.  The reason if

151

1    he's on death row, the reason for the

2    recommendation is not anybody's fault but his.  He

3    puts himself there.  Thank you, ladies and

4    gentlemen.

5                    THE COURT:  Thank you.  Ladies and

6    gentlemen, let's take a ten minute break.  You are

7    not to discuss anything or form any opinion until

8    you return.

9    (Court in recess at 10:55 A.M.)

10   (Proffer into the record.)

11                   MR. CONSOLDANE:  During the closing

12   arguments and I objected enough, I didn't want to

13   object any more, is that Mr. Watkins made a

14   statement that Nathaniel Jackson was a manipulator

15   and he could manipulate himself to get out of

16   prison early.  With your instructions, I would like

17   to also tell the Jury that no matter what

18   manipulation, the sentence is life with 30 years.

19   It is 30 actual years or life without parole.  That

20   was an improper comment for him to make to the

21   Jury, because he cannot manipulate himself.  I know

22   he's allowed to argue, but I would request the

152

1  Court to either grant a mistrial or curative

2  instruction.

3            MR. WATKINS:  The testimony in the

4  context of my comment on manipulation deals with

5  Dr. McPherson of my cross examination.  I went

6  through DSM-III that she agreed that he

7  manipulates.  He uses the system.  There's clear

8  evidence that I am permitted to argue the evidence

9  in this case.  And he said he was sorry, and he

10 wasn't, because he's in prison planning a man's

11 death.  That is appropriate conduct from the

12 evidence.

13           MR. CONSOLDANE:  I don't disagree

14 that he can say he manipulated.  Only when he added

15 that he can manipulate his way out of prison

16 earlier.  That is improper.

17           THE COURT:  He's referring to the

18 past.

19           MR. WATKINS:  I'm talking about the

20 past.

21           MR. CONSOLDANE:  I'm saying that

22 gives the idea to the Jury that if they give him a

153

1   life sentence, that he will be able to manipulate

2   his way out.  I would like you to clear that up

3   with the Jury.

4              MR. WATKINS:  I did not say that.

5              THE COURT:  The Court does not

6   believe that that rises to the position where a

7   mistrial should be granted, and I did not hear any

8   reference to the future in the argument.

9              MR. WATKINS:  It was not.

10             THE COURT:  It was to the past.

11             MR. CONSOLDANE:  He said he would be

12  able to manipulate his way out of prison.

13             MR. WATKINS:  I did not say that.

14             THE COURT:  This Jury has been

15  repeatedly told that once a person is given life

16  without chance of parole, that there's no

17  possibility of parole.  Unless they will disregard

18  what they have been told in that regard, to think

19  that if they accept the fact that the Defendant is

20  manipulative that he would somehow be able to

21  change the law.

22             MR. CONSOLDANE:  I would request the

154

1   Court instruct the Jury on that again in lieu of

2   what he said.

3            THE COURT:  I'm going to, no -- no,

4   I'm not going to in the Jury instructions tell them

5   anything more than I did before about life without

6   chance of parole.  Let me ask the Prosecution and I

7   would not think you would have any opinion to my

8   telling them that, ladies and gentlemen, life in

9   prison meant without chance of parole, means

10  without any chance of ever getting out of prison

11  here.

12           MR. WATKINS:  That has already been

13  done.  I don't think that the Court should

14  emphasize one opinion over the other.

15           THE COURT:  That is a danger.  I

16  agree with that.

17           MR. WATKINS:  The instructions are

18  okay.

19           THE COURT:  The Jury can take it

20  that that is what the Court wishes them to do, and

21  that is not good.  For the record, your objection

22  is noted.  I am overruling your motion for mistrial

155

1   and I'll go with the instructions that we have

2   agreed upon.

3              MR. CONSOLDANE:  You won't give the

4   instruction that I requested?

5              THE COURT:  I'm not going to point

6   out one instruction over another, because I am

7   afraid that the Jury might think it is a hidden

8   signal from the Court.  We try to avoid that, as

9   you know.  I also want to call, to put on the

10  record, to the attention of the record, that Mr.

11  Lewis is still unable to be with us due to his

12  medical problems.

13             MR. CONSOLDANE:  That is correct,

14  and Your Honor, we do not want to delay this.  And

15  Nathaniel, is that correct that you wanted to

16  proceed?

17             THE DEFENDANT:  Yes.

18             MR. CONSOLDANE:  You are satisfied

19  with Mr. Wright's help?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Mr. Wright is merely

22  doing this as an accommodation, pro bono.

156

1              MR. CONSOLDANE:  I want to say one

2    other thing that Mr. Wright has offered his

3    services pro bono when I requested of him.  He's

4    not appointed.

5              MR. WATKINS:  I think further the

6    record is clear that the State, at the time it

7    heard that Mr. Lewis was ill, that we had no

8    problem.  In fact, we said if they wanted a

9    continuance until next week the State's position

10   was that would be no problem.  However,

11   Mr. Consoldane is lead counsel and he made that

12   decision, waived any continuance, so we feel very

13   comfortable with the decision in this case based on

14   all of the things that we have done to protect the

15   Defendant's rights.

16             THE COURT:  The Court had indicated,

17   I believe as soon as the problem became apparent,

18   that that was a possibility of continuing the case,

19   but there's another factor that entered into this,

20   that none of you mentioned, I'm sure crossed your

21   mind, and that is that we have had this Jury,

22   several of them are waitresses, they lost money on

157

1   weekends, and I have ordered them not to go to work

2   and to continue this thing.  That was another

3   factor that you are starting to cause undue

4   hardship on the Jury.

5            MR. CONSOLDANE:  Besides that, for

6   the last ten years on the cases that Mr. Lewis and

7   I have tried together, I pretty much have handled

8   most of mitigation.  I had the witnesses here.  I

9   didn't want to have them come back.

10           THE COURT:  That is the reason you

11  felt there was no problem with you proceeding.

12  Anything else?

13           MR. WATKINS:  Other than the

14  Exhibits, that we would move that the Jury have the

15  Exhibits in the Jury room.

16           THE COURT:  The Jury will have the

17  Exhibits available.

18           MR. CONSOLDANE:  Both Exhibit P on

19  my part and also the Prosecutor's Exhibits.  I

20  would renew all of my objections to those Exhibits

21  that I made during the trial.  I'm not waiving

22  those at this time, and still would restate them

158

1    now as if they were originally made.

2              THE COURT:  Court's rulings will be

3    as they were made at the time you argued each

4    point.  There were some Jury instructions made this

5    morning.  The one issue on page eight, where the

6    Defense had requested that the instruction be

7    changed to read as it did in the Shaffer case and

8    the Burrows case.  And the Court agreed that that

9    was appropriate over the objection of the State.

10   The question still is, is there any other objection

11   to the instructions?

12             MR. CONSOLDANE:  I object to the

13   mentioning of the murder as part of one of the

14   mitigating factors.  I have been arguing that

15   constantly.

16             MR. WATKINS:  Not mitigating.  One

17   of the aggravating.

18             MR. CONSOLDANE:  One of the

19   aggravating circumstances.

20             THE COURT:  I think we have been

21   through that point on the record before.  The Court

22   will note your objection.

159

1    (Resumed in Open Court with Jury at 11:15 a.m.)

2    JURY INSTRUCTIONS:

3                    THE COURT:  Ladies and gentlemen,

4    first of all, on behalf of everybody concerned

5    here, I would like to take this opportunity to

6    thank you all for your patience, your diligence and

7    your attention.  You have been a very exemplary

8    Jury.  I mean that.  We thank you for that.  At the

9    first phase of this trial, you decided that the

10   Defendant was guilty of two counts of aggravated

11   murder, as well as two specifications of

12   aggravating circumstances that were attached to the

13   first count, and two specifications that were

14   attached to the second count.  Because the acts for

15   which the Defendant stands convicted as to Count

16   One and Two, constitute only one event, he can only

17   be punished for one offense of aggravated murder of

18   Robert S. Fingerhut.  As a result, the State of

19   Ohio has elected to dismiss the second count of the

20   indictment at this second phase of this trial.

21                  This means that the Defendant stands

22   convicted for penalty purposes of Count One of the

160

1    indictment, together with the two specifications to

2    Count One only.

3            Now, you are instructed to disregard the

4    Second Count of aggravated murder, and its

5    specifications and not consider them for any

6    purpose.

7            In this phase of the proceedings, the

8    Defendant has presented evidence and arguments of

9    counsel relative to mitigating factors.  That is,

10   as to reasons why the Defense argues that one of

11   the life sentences should be imposed instead of the

12   death penalty.  The State has offered arguments

13   that the evidence of the aggravating circumstances

14   outweighs, by proof beyond a reasonable doubt, the

15   mitigating factors, and the State seeks the death

16   penalty rather than one of the life sentences.

17   Your duty now is to determine if the aggravating

18   circumstances outweigh, by proof beyond a

19   reasonable doubt, the mitigating factors offered by

20   the Defendant and based upon your findings, you

21   must make a determination on the sentence to be

22   imposed for the aggravated murder conviction.

161

1    It is now my duty to instruct you in the

2  law which applies to these proceedings.  Again, the

3  Court and the Jury have separate functions.  You

4  decide the disputed facts and the Court provides

5  the instructions of law.  It is your sworn duty to

6  accept these instructions and to apply the law, as

7  it is given to you.  You are not permitted to

8  change the law, nor to apply your own conception of

9  what you think the law should be, nor are you to

10  disregard the law.

11    The State has the burden of proving, by

12  proof beyond a reasonable doubt, that one or all of

13  the aggravating circumstances, in the first and or

14  second -- let me star that over.  Gentlemen, that

15  was not left out.  The State has the burden of

16  proving by proof beyond a reasonable doubt that one

17  or all of the aggravating circumstances in the

18  first count of the indictment, which the Defendant

19  has been found guilty of committing, outweigh any

20  or all of the factors in mitigation.

21    Now the Defendant has no such burden of

22  proof, however, the Defendant does have the burden

162

1    to go forward with the evidence on mitigating

2    factors.  As noted, the State has already proven in

3    the first phase of his case, that aggravating

4    circumstances exist in this case.  In reaching your

5    verdict, you are instructed that you will consider

6    all of the evidence, and Exhibits which the Court

7    has admitted as relevant to the aggravating

8    circumstances in this phase of the trial, along

9    with all of the additional evidence, and Exhibits

10   which the Court has admitted as relevant to the

11   mitigating factors, offered by the Defendant.

12            Now you have heard the term "outweigh"

13   quite a bit during these proceedings.  To outweigh,

14   means to weigh more than, to be more important

15   than.  In that regard, it is the quality of the

16   evidence that must be given consideration by you.

17   And again, the quality of the evidence may or may

18   not be commensurate with the quality of the

19   evidence, that is, the number of witnesses, or

20   Exhibits presented.

21            Remember that reasonable doubt is

22   presented when after you have carefully considered

163

1   and compared all of the evidence, you cannot say

2   you are firmly convinced that the aggravating

3   circumstances outweigh the factors in mitigation.

4         Reasonable doubt is a doubt based on

5   reason and common sense.  And reasonable doubt is

6   not mere possible doubt because everything relating

7   to human affairs and depending on moral evidence,

8   is open to some possible or imaginary doubt.  Proof

9   beyond a reasonable doubt is proof of such a

10  character that an ordinary person would be willing

11  to rely and act upon it in the most important of

12  his or her own affairs.

13        If you are convinced that the aggravating

14  circumstances, which the Defendant was found guilty

15  of committing as set forth in Count One are

16  sufficient to outweigh by proof beyond a reasonable

17  doubt, the factors in mitigation, then the State

18  has met its burden of proof and the Jury shall

19  recommend to the Court, that the sentence of death

20  should be imposed on the Defendant.

21        If, on the other hand, you are not

22  convinced that the aggravating circumstances, which

164

1    the Defendant was found guilty of committing in

2    Count One are sufficient to outweigh by proof

3    beyond a reasonable doubt, then the State has not

4    met its burden of proof and the Jury shall

5    recommend the Defendant be sentenced to life

6    imprisonment without parole eligibility, or to life

7    imprisonment with parole eligibility after serving

8    30 full years, or life imprisonment, with parole

9    eligibility after serving 25 full years.

10          Now, what is and what is not evidence in

11   this proceeding?  Again, the indictment is not

12   evidence.  It simply informed the Defendant that he

13   was charged with two counts of aggravated murder

14   and specifications of aggravating circumstances.

15   And was the vehicle for bringing this matter to

16   Court.  Again, the opening statements of the

17   attorneys, and the closing arguments, that you have

18   just heard are not evidence.  The opening

19   statements and the closing arguments by the

20   attorneys are designed to assist you, but they are

21   not evidence.

22          Then what is the evidence in this

165

1    proceeding?  Well, it is all the testimony you

2    heard in the first phase of this trial, and all of

3    the Exhibits admitted into evidence in the first

4    phase, which this Court has determined to be

5    relevant to proving any of the aggravating

6    circumstances, or mitigating factors, in which you

7    had the opportunity to examine and which you will

8    have with you again, when you deliberate in this

9    proceeding.

10            Evidence is also, all of the testimony

11   from the witnesses, who testify during this

12   proceeding and any additional Exhibits admitted in

13   this proceeding.

14            Once again, you are the sole judges of

15   the facts of this case.  Also the credibility of

16   the witnesses and the weight of the evidence.

17   Again, to weigh the evidence, you must consider the

18   credibility of each witness and to do this, you

19   will apply the tests of truthfulness you apply in

20   your daily lives.

21            These tests include the appearance of

22   each witness upon the stand, the manner of

166

1   testifying, the reasonableness of the testimony,

2   the opportunity the witness had to hear, see or

3   know about the things, concerning which they have

4   testified, their accuracy of memory, their

5   frankness, their lack of it, their intelligence,

6   interest and bias if any, but together with all of

7   the facts and circumstances, surrounding that

8   person's testimony.

9        Applying these tests, you will assign to

10  the testimony of each witness such weight as you

11  deem proper.  You are not required to believe the

12  testimony of any witness, simply because he or she

13  was under oath.  You may believe or disbelieve all

14  or any part of the testimony of any witness, and it

15  is your province to determine what testimony is

16  worthy of belief, and what testimony is not worthy

17  of belief.

18       Generally a witness may not express an

19  opinion.  However, one who follows a profession or

20  special line of work may express such an opinion,

21  because of his or her education, knowledge and

22  experience.  Such testimony is admitted for

167

1    whatever assistance it may provide in helping you

2    to arrive at a just verdict.

3            As with other witnesses, upon you alone

4    rests the duty to determine what weight is to be

5    given to the testimony of the experts.  In

6    determining its weight, you may take into

7    consideration, his or her skill, experience,

8    knowledge, veracity, familiarity with the facts of

9    this case, and the usual rules for testing

10   credibility and determining the weight to be given

11   to that testimony.

12           The Defendant gave an unsworn statement

13   in this matter and therefore, cross examination was

14   not permitted.  It is his right, under Ohio law to

15   do so, and his statement, although not considered

16   as evidence, may be considered by you for whatever

17   purpose you may assign.

18           I repeat that the purpose of this

19   proceeding is to have you decide whether or not the

20   aggravating circumstances the Defendant was found

21   guilty of committing are sufficient by proof beyond

22   a reasonable doubt to outweigh the factors in

168

1    mitigation of the imposition of the sentence of

2    death.

3            What are aggravating circumstances?  In

4    this particular case, the aggravating circumstances

5    are precisely set out in the specifications

6    contained in the verdict forms on these

7    specifications.  There are two aggravating

8    circumstances relating to Count One.  The first is,

9    that I apologize to you folks.  I just need a drink

10   of water.

11           The first aggravating circumstance as

12   attached to Count One is that the Defendant

13   committed the aggravated murder, while he was

14   committing, attempting to commit or fleeing

15   immediately after committing aggravated burglary.

16   And he was the principal offender in the commission

17   of the aggravated murder.

18           The second is that the Defendant

19   committed the aggravated murder while he was

20   committing, attempting to commit or fleeing

21   immediately after committing aggravated robbery,

22   and that he was the principal offender in the

169

1   commission of the aggravated murder.

2       Now the aggravated murder itself is not

3   to be considered as aggravating circumstances, or

4   to determine penalty herein except as it relates to

5   specification one, to Count One, alleging that the

6   aggravated murder of Robert S. Fingerhut, was the

7   criminal offense for which the Defendant trespassed

8   in the commission of the aggravated burglary.  The

9   nature and circumstances of the aggravated murder

10  are relevant only insofar as they may relate to any

11  mitigating factors alleged by the Defendant or any

12  of the aggravating circumstances for which the

13  Defendant was found guilty.

14      What are mitigating factors?  Mitigating

15  factors are factors that while they do not justify

16  or excuse the crimes of aggravated murder,

17  nevertheless, if you find they exist, shall be

18  considered by you as extenuating, lessening,

19  weakening, excusing to some extent or reducing the

20  degree of the sentence.  Mitigating factors are not

21  related to Nathaniel E. Jackson's culpability, but

22  rather are those factors that are relevant to the

170

1   issue of whether Nathaniel E. Jackson should be

2   sentenced to death.

3          Therefore, you are to weigh as mitigating

4   factors, including, but not limited to, the

5   history, character, and background of the

6   Defendant, and number two, any other factors in

7   mitigation that are relevant to the issue of

8   whether Nathaniel E. Jackson should be sentenced to

9   death.

10          Ladies and gentlemen, when you retire to

11  commence these deliberations, remember your initial

12  conduct upon entering the Jury room is a matter of

13  importance.  It is not wise, I would suggest, to

14  immediately express a determination or to insist

15  upon a certain verdict because if your sense of

16  pride is aroused, you may hesitate to change your

17  position even if you later decide that you are

18  wrong.

19          You should consult with one another and

20  consider each other's views and deliberate with the

21  objective of reaching an agreement.  Each of you

22  must decide this matter for yourself, but you

171

1   should do so only after a discussion and

2   consideration with your fellow jurors of all of the

3   evidence and the Exhibits which this Court has

4   determined to be relevant in this phase of the

5   proceeding.  Do not hesitate to change an opinion,

6   if you become convinced that that opinion is wrong.

7   Just as important, you should not surrender honest

8   convictions in order to just to be congenial or in

9   order to reach a verdict solely because of the

10  opinion of the other jurors.

11          In reaching a verdict in this proceeding,

12  you must consider all of the evidence applicable to

13  the statutory aggravating circumstances, and the

14  mitigating factors admitted at both phases of this

15  trial and the arguments of counsel in this phase of

16  the trial.  You must then determine whether the

17  aggravating circumstances which the Defendant,

18  Nathaniel E. Jackson was found guilty of committing

19  in the aggravated murder of Robert S. Fingerhut,

20  are sufficient by proof beyond a reasonable doubt,

21  to outweigh the mitigating factors present in this

22  case.

172

1          Now, again, all 12 jurors must agree on a

2    recommendation of a death sentence.  If all 12

3    jurors find that the aggravating circumstances

4    which the Defendant, Nathaniel E. Jackson was found

5    guilty of committing in the death of Robert S.

6    Fingerhut, outweigh by proof beyond a reasonable

7    doubt, the mitigating factors, then you shall

8    return such a finding to the Court and as a matter

9    of law, make a recommendation that the sentence of

10   death be ordered.

11          On the other hand, if after considering

12   all of the evidence relevant to the statutory

13   aggravating circumstances, and the mitigating

14   factors admitted at the two phases of this trial

15   and the arguments of counsel, you find that the

16   State has failed to prove, by proof beyond a

17   reasonable doubt, that the aggravating

18   circumstances which the Defendant, Nathaniel E.

19   Jackson was found guilty of committing, in the

20   death of Robert S. Fingerhut, outweigh the

21   mitigating factors, or if you are unable to reach a

22   unanimous verdict, recommending the death penalty,

173

1    then in either of these events and as a matter of

2    law, you would have no choice but to determine

3    which of the three possible life imprisonment

4    sentences will be imposed.

5         Those three life imprisonment sentences

6    are as follows.  One, that the Defendant be

7    sentenced to life imprisonment without parole

8    eligibility.  Two, that the Defendant be sentenced

9    to life imprisonment with parole eligibility after

10   30 full years of imprisonment.  And your third

11   option, that the Defendant be sentenced to life

12   imprisonment with parole eligibility, after 25 full

13   years of imprisonment.

14        Now you will have with you two verdict

15   forms.  I'll read each of these to you.  This is

16   captioned as the other forms.  The first reads, "We

17   the Jury, being duly impaneled and sworn or

18   affirmed, do hereby find that the aggravating

19   circumstances, that the Defendant, Nathaniel E.

20   Jackson was found guilty of committing, with

21   reference to the death of Robert S. Fingerhut,

22   outweigh by proof beyond a reasonable doubt, the

174

1    mitigating factors presented in this case.  We

2    therefore find and recommend that the sentence of

3    death be imposed upon the Defendant, Nathaniel E.

4    Jackson."  A line to put the date, and again, 12

5    signatures for the Jury.

6              And the second verdict form reads, "We

7    the Jury, being duly impaneled and sworn or

8    affirmed, do hereby find that the State has not

9    proved that the aggravating circumstances that the

10   Defendant, Nathaniel E. Jackson was found guilty of

11   committing in reference to the death of Robert S.

12   Fingerhut, outweigh by proof beyond a reasonable

13   doubt, the mitigating factors presented in this

14   case, or that the Jury is unable to reach a

15   unanimous verdict, recommending the sentence of

16   death.  We therefore find and recommend that the

17   following sentence be imposed upon the Defendant,

18   Nathaniel E. Jackson."  You have three choices

19   which are listed there, with a blank line to put a

20   check mark on, which indicates whatever your

21   decision is.  It should be dated by the foreperson,

22   12 signature lines.

175

1            As I have stated and as you know by now,

2     this being a criminal case, you must all agree upon

3     the verdict, whatever that verdict might be.

4            When you have reached your verdict in

5     this matter, you will complete the verdict form

6     which corresponds with your decision, signing the

7     respective lines and date it.  That should be done

8     in ink, of course.

9            That is your duty to carefully weigh the

10    evidence, decide all disputed questions of fact,

11    apply the instructions of the Court to your

12    findings and render your verdict accordingly.  In

13    fulfilling your duty, your efforts must be to

14    arrive at a just verdict.  Remember, you must not

15    be influenced in your deliberations by any

16    consideration of bias, sympathy, or prejudice.  You

17    should consider all of the evidence, and make your

18    findings with intelligence, and impartiality so

19    that the State of Ohio, and this Defendant will

20    feel that this proceeding was fairly and

21    impartially tried.

22            Once more, if during the course of the

176

1    last three or weeks, the Court has said or done

2    anything that you consider an indication of the

3    Court's view on the issue of sentencing, you are

4    instructed to disregard that.  That would not ever

5    be my intent, that would be most improper.

6            Now the Court is going to place into your

7    possession the Exhibits, which the Court admitted

8    into evidence during the course of both phases of

9    this trial, in fact, they are already back in the

10   Jury room.  And the verdict forms, which I have

11   just read to you.

12           The foreperson should retain possession

13   of the Exhibits and the verdict forms, and return

14   the verdict forms into the Courtroom, when you have

15   reached your decision in this matter.  I'll at the

16   appropriate time, have Laurie come over and pick

17   that up from you.  So, until your verdict is

18   announced in Open Court, you are not to disclose to

19   anyone else the status of your deliberations, or

20   the nature of your verdict.  Whenever all 12, and I

21   repeat, all 12 of you agree on your verdict, you

22   will notify the bailiff that you are ready to

177

1   return to the Courtroom.

2            You will have with you in the Jury room,

3   as I have said, the Exhibits, the verdict forms and

4   copy of the verdicts of the first phase of the

5   trial and a complete exact copy of the instructions

6   I have just given to you.

7            Ladies and gentlemen, are you ready to

8   begin deliberations?

9   (All nodded affirmatively.)

10           THE COURT:  You are still in the

11  care and custody of Laurie Brown and the deputies

12  that were sworn in.  So, until you reach a verdict

13  now, you are sequestered.

14           MR. WATKINS:  I think it should be

15  in the record that we're satisfied with the

16  instructions.

17           MR. CONSOLDANE:  I need to put

18  something on the record.

19  (At Side Bar with reporter present.)

20           MR. CONSOLDANE:  I object to the

21  verdict from the first phase as being sent back at

22  this time.  It hasn't been done in the past and I

178

```
1   don't see why it should be done in this case.
2              THE COURT:  I don't know what law
3   applies to that.
4              MR. CONSOLDANE:  We have never done
5   it in the past.
6              MR. WATKINS:  It was done in
7   Shaffer.  I don't think it makes a difference.
8              THE COURT:  I'm going to tell the
9   Jury, so is that the only thing?
10             MR. CONSOLDANE:  That is all.
11  There's no other objections outside of what I have
12  already made.
13             THE COURT:  I'm going to tell the
14  Jury that they will not have the verdict --
15             MR. CONSOLDANE:  I don't think you
16  need to say anything.  Just don't send them.
17             THE COURT:  If they should request
18  it, then we'll address it.
19  (End of Side Bar.)
20             THE COURT:  For the record, I made
21  the interlineation crossing out those two words.
22             MR. CONSOLDANE:  Thank you.
```

193 of 239. PageID #: 23281

179

1           MR. WATKINS:  Thank you.  Take ten

2  minutes and assemble outside.  Do not express

3  anything or form any opinion until you get back

4  there.

5  (Jurors in recess at 11:45 A.M.)

6  (Jurors commenced deliberations at 11:55 A.M.)

7           THE COURT:  To the alternates, we

8  have had a meeting at Side Bar, and at this point,

9  it is proper that I discharge you from any further

10  duties.  We could not put you into the Jury at this

11  point if something would happen to one of them.  We

12  would have to deal with that on its own merits.  It

13  is only possible to put you in up to the point

14  where I sent them out just now.

15           I do wish to sincerely thank each of you.

16  You have been very attentive.  I can't stress to

17  you how unusual that is.  We get this many people,

18  and I have been watching the Jury, whenever I had

19  my eyes open, I have been watching the Jury and I

20  have never seen anybody other than giving full

21  attention to what is going on.  It's unusual.  You

22  folks have served us well.  Thankfully, we did not

180

1    have to replace any of the jurors because that

2    causes potential other problems, when that does

3    occur, but I can't pay you any more than the County

4    is paying you, but you have done everything and

5    done it well, that we have requested and you have

6    served, I think a very important part of your

7    citizenship by being here.  I hope the experience

8    wasn't too unpleasant.  I know it took from your

9    personal lives, but it has been most helpful to all

10   of us.  I know the State and Mr. Jackson appreciate

11   it.

12              MR. CONSOLDANE:  We have had cases

13   where we have gone through all four of the

14   alternates, that we need them to back up.  It is

15   like having a bench.  We have, especially during

16   flu season, we have lost some people and had to go

17   through all four in the past.

18              THE COURT:  Many things can happen

19   even over four weeks in all of our lives.  You are

20   under no further obligation in this case.  I would

21   instruct you to not discuss with anybody your

22   thoughts on the matter until the Jury has rendered

181

1   their verdict.  Once the Jury has rendered their

2   verdict, then you are free to do that.

3   (Alternates excused.)

4

5   JURY VERDICT AT 4:30 P.M.

6                    THE COURT:  Have the Jury come out,

7   please.  Please be seated.  Ladies and gentlemen of

8   the Jury, have you arrived at a verdict in this

9   matter?

10                   JURY:  Yes, we have.

11                   THE COURT:  Would the foreperson

12  please deliver that to the bailiff?  Thank you.

13  "State of Ohio versus Nathaniel E. Jackson.  We,

14  the Jury, being duly impaneled and sworn or

15  affirmed do hereby find that the aggravated

16  circumstances that the Defendant Nathaniel E.

17  Jackson was found guilty of committing with

18  reference to the death of Robert S. Fingerhut

19  outweigh by proof beyond a reasonable doubt the

20  mitigating factors presented in this case.  We

21  therefore find and recommend that the sentence of

22  death be imposed upon Defendant Nathaniel E.

182

1    Jackson."  That is dated November 15 this 2002, and
2    the verdict had been duly signed by all 12 members.
3    Ladies and gentlemen of the Jury, have I properly
4    read the verdict rendered by you?
5                    JURY:  Yes.
6                    THE COURT:  Thank you.  Does the
7    State wish to poll the Jury?
8                    MR. WATKINS:  No, Your Honor.
9                    THE COURT:  Does the Defense?
10                   MR. CONSOLDANE:  Yes, Your Honor.
11                   THE COURT:  Juror No. 1, have I
12   properly read your verdict?
13   A.   Yes, you have.
14                   THE COURT:  Number two?
15   A.   Yes, you have.
16                   THE COURT:  Number three?
17   A.   Yes, Your Honor.
18                   THE COURT:  Number four?
19   A.   Yes, Your Honor.
20                   THE COURT:  Number five?
21   A.   Yes, Your Honor.
22                   THE COURT:  Number six?

183

1    A.    Yes.

2                  THE COURT:  Number seven?

3    A.    Yes, Your Honor.

4                  THE COURT:   Eight?

5    A.    Yes, Your Honor.

6                  THE COURT:   Nine?

7    A.    Yes, Your Honor.

8                  THE COURT:   Ten?

9    A.    Yes, Your Honor.

10                  THE COURT:   Eleven?

11    A.    Yes, Your Honor.

12                  THE COURT:   And 12?

13    A.    Yes, Your Honor.

14                  THE COURT:   Thank you, folks.

15   Ladies and gentlemen, this has been a very

16   difficult and time consuming and arduous task for

17   all of you.  This is never a pleasant thing to call

18   anybody to do.  But it is something that is

19   required if our system is to maintain what we call

20   justice.  Most of the people avoid such a duty and

21   you folks I know have had fixed feelings.  Many of

22   you have expressed them as we went through the

184

1   whole process.  But without folks like yourself to

2   step up and do this duty we wouldn't have much of a

3   system.  The most I can say to you and it is

4   heartfelt is thank you very much.  I'm able at this

5   time to release you from any further responsibility

6   in this matter.  As I stated to you before, you are

7   at liberty to discuss your experiences as a juror

8   with anyone with whom you wish to talk or you may

9   of course, not wish to speak to anybody and that is

10   your business.  But for all of us involved here, I

11   would say thank you very much.  You are excused.

12              MR. WATKINS:  Your Honor, are you

13   going to let everyone else stay in the room until

14   the Jury leaves?

15              THE COURT:  Yes.  Please everybody

16   remain here until the Jury has had an opportunity

17   to leave.  We'll give you folks time to leave the

18   Courthouse.  If you want to go back to your cars

19   and leave, that's fine.  If you wish to stay around

20   of course you are welcome to do that.  But we'll

21   keep everybody in the Courtroom for probably about

22   five minutes or so.  Okay.  Thank you so much.

185

1   Everybody can have a seat.

2                THE BAILIFF:  Excuse me, can the

3   alternates go back?  They requested they wanted to

4   see the alternates.  Can they go back in the Jury

5   room now?

6                THE COURT:  Yes, the alternates are

7   welcome to go back.

8                THE BAILIFF:  They do not want to

9   talk to the press.  They do not want the press to

10  bother them.  They said they are going to their

11  cars and they have no comment.

12               THE COURT:  Okay.

13               MR. WATKINS:  Your Honor, I would

14  request that maybe a deputy go with them.

15               THE COURT:  Okay, that will be fine.

16  This matter will be set for the first of the week

17  sometime.  I would like to see counsel sometime

18  Monday.  And we'll get a date picked then for any

19  sentencing.  I, of course, have to review the

20  entire record and that will take some period of

21  time but Mr. Jackson will be held in the meantime

22  at the County jail until the appropriate date for

186

1   sentencing.  The Court is adjourned.  Public is

2   able to leave if they wish and you heard the

3   request from the Jury.  Thank you all.

4   (COURT IN RECESS)

5

6

7   Tuesday, November 26, 2002: Motion In Limine and

8   Defendant's Motion for Proportionality Review:

9   (In-chambers at 1:30 p.m.)

10          THE COURT:  We're in-chambers on a

11  motion in limine at the conclusion of the trial

12  prior to the sentencing date coming up on December

13  9th.  I failed to mention all parties are present,

14  the representatives from the Prosecutor's Office

15  and the Defense, including the Defendant,

16  Mr. Jackson.  The motion in limine, the Court has

17  previously upon motion of the Defense, granted this

18  hearing which is unusual, I guess, at this

19  juncture, but counsel indicated that they had

20  something that they thought was proper to be argued

21  prior to the Court's determination in the matter.

22  So, I have afforded this opportunity.  You have

187

1    your motion in limine, Mr. Watkins?

2            MR. WATKINS:  Yes.  The Court has

3    granted Attorney Consoldane the opportunity when

4    the Jury made its decision and recommended the

5    death sentence, that Attorney Consoldane requested

6    to present case law concerning proportionality.  I

7    would note that in all of the death penalty cases

8    that I have tried and from the research, that

9    ordinarily the process is for the Court to

10   determine whether or not, the aggravating

11   circumstances outweighed the mitigating factors

12   beyond a reasonable doubt from a reading of the

13   record or review of the case.  In this particular

14   case, he has asked to present cases regarding

15   proportionality, which in my opinion is usually and

16   by law, reserved to the Ohio Supreme Court under

17   our present system.  And today, he indicated that

18   he wanted to go into a different item, such as

19   prosecutorial misconduct, such as judicial

20   indiscretions concerning the case, concerning final

21   argument, whatever.  That is not appropriate at

22   this point.  In fact, I don't think we should be

188

1    even here on proportionality issues, and that he

2    has a right to make a motion for a new trial after

3    sentence.  And he can argue whatever, and it has

4    been done in the past, and I expect the motion for

5    new trial to occur.  It needs to take place after

6    the sentence; and therefore, I am moving that the

7    Court limit the argument today to what was the

8    understanding, that is, to areas regarding

9    proportionality.

10              THE COURT:  Defense?

11              MR. CONSOLDANE:  Several things

12   happened throughout the trial which I made

13   objections and are part of the record and would

14   plan to raise either in a new trial or on appeal.

15   However, the incidents that occurred during the

16   final arguments of the sentencing phase was

17   prevented from making an objection.  Number one, I

18   couldn't object after you had told the Jury that it

19   was a recommendation that you could lower, but not

20   raise.  There was nothing I could say to object.

21   If I had objected  to try to cure that, it would

22   just make it worse, and there's no way --

189

1          THE COURT:  Let me interrupt you at

2    this point, Mr. Consoldane.  Are you -- in your

3    view, did the Court make an improper instruction as

4    to what the law is?

5          MR. CONSOLDANE:  I don't think that

6    the Court said anything that was not correct as far

7    as the law goes, however, there's been several

8    Court cases that have held that when you explain to

9    the Jury that their function is just that of a

10   recommendation --

11         THE COURT:  I believe those cases

12   dealt with the Prosecutor trying to tell the Jury.

13         MR. CONSOLDANE:  It is maybe

14   typically bad when the Judge does it.

15         THE COURT:  The Judge's duty is to

16   instruct on the law.

17         MR. CONSOLDANE:  That was not in any

18   written instructions that we reviewed before you

19   talked to the Jury.  This was, I have never heard

20   an instruction given like that in any of the death

21   penalty cases that I have tried.

22         THE COURT:  The Court of Appeals

190

1  will have to deal with that part.

2          MR. WATKINS:  The Supreme Court.

3          THE COURT:  I'm sorry, the Supreme

4  Court.

5          MR. CONSOLDANE:  I wanted to call

6  that to the Court's attention, and maybe regarding

7  the recommendation that the Jury did give, that it

8  may be faulty and I thought maybe the Court would

9  like to look into that now, rather than letting

10  the -- take that under consideration rather than

11  letting it go to the Supreme Court to decide

12  whether or not that was a faulty instruction.

13          THE COURT:  The Court does not

14  believe it was a faulty instruction.

15          MR. CONSOLDANE:  Every instruction

16  that you give the Jury, we get to review ahead of

17  time, and this was not in any of the Jury

18  instructions.

19          THE COURT:  You have a right to

20  object to that, but you also are carrying it one

21  step further than that and saying that the Court's

22  instruction was wrong, or was in some way

191

1    prejudicial.  I gave the instruction.  That has

2    already been done.  That is for review for a later

3    day for another Court to determine.

4                    MR. CONSOLDANE:  I imagine then

5    likewise that I'm not allowed to get into any of

6    the things like Mr. Watkins saying he would connive

7    his way out of prison.

8                    THE COURT:  That's a motion for new

9    trial perhaps.

10                   MR. CONSOLDANE:  Then I'll reserve

11   those.

12                   THE COURT:  Today I think anything

13   that you wish to present should be any information

14   you wish to impart to the Court.

15                   MR. CONSOLDANE:  I can do that very

16   quickly.  We don't need to go in as long as you are

17   here.

18                   THE COURT:  We have the sentencing.

19   Anything you feel is relevant.

20                   MR. CONSOLDANE:  I think that the

21   Court is well aware that I have had, there was

22   George Foster, who was found guilty --

192

1          MR. WATKINS:  The press is out

2    there.

3          MR. CONSOLDANE:  Why should they

4    hear half of it?

5          MR. WATKINS:  It should be done in

6    Court on this issue.  It shouldn't be done here.

7    That is why this hearing is set up.

8          MR. CONSOLDANE:  I object.  If we're

9    going to do it, let's do it now.

10         THE COURT:  We have gone from the

11   argument on the motion in limine to the question of

12   the purpose of the primary motion filed today.  It

13   is a public hearing.  Let's go out there.  For the

14   record, I'm granting the motion in limine to limit

15   the testimony or anything -- not testimony but

16   anything that is going to be put on before the

17   Court today to the issue of relevancy to

18   sentencing.

19         MR. CONSOLDANE:  All right.  Just

20   for clarification, I believe that all of these

21   things are relevant to sentencing.  They may be

22   arguments for a new trial, and they very well are,

193

1   but I think that they also are arguments for

2   sentencing. I believe that a lot of these things

3   should be considered, that like I say, Mr. Lewis

4   and I have gone through the transcript of the

5   argument and marked all of the spots in here that

6   have been incorrect and that were unfair to

7   Mr. Jackson, and --

8            THE COURT:  Those are all questions

9   of appeal of the record.  The only reason for this

10  hearing is the Court has to independently analyze

11  and review the evidence that was presented, and the

12  decision of the Jury made upon that evidence.  If

13  there's some instruction or error in the

14  instructions of law given, some prosecutorial

15  misconduct, anything else that dealt with the trial

16  itself, that is a matter of appeal, not for this

17  Court to at this point deal with.  Now, that being

18  said, on a motion for new trial, of course this

19  Court has to listen to certain items of that nature

20  to see if in my opinion there was some sort of an

21  abuse of due process, but that again is for a later

22  date.

194

1        MR. CONSOLDANE:  Then Mr. Watkins'

2   remark that the proportionality argument is

3   reserved to the Supreme Court, so am I barred from

4   discussing that, also?

5        THE COURT:  That is the purpose I

6   understood, of this hearing.

7        MR. WATKINS:  He granted it.  The

8   Court has ruled that way.

9        THE COURT:  Since you have raised

10  the issue, I'm going to deal with it.  I don't want

11  this to be something for the Court above to wonder

12  why didn't the Judge do something, or what would he

13  have done.  I'll listen to your argument, and take

14  that into consideration.  I don't know as I sit

15  here, I don't know that I have ever seen where a

16  lower Court dealt with the argument of

17  proportionality, but it is something that I fully

18  intend on exploring and seeing if it is proper or

19  if that is something that is to be left again, to

20  the Supreme Court.  One can argue that the

21  proportionality should not be county by county.

22  That would lead to a disastrous result, I think.

195

1    It should at least be state-wide, but I don't know.

2    I haven't reviewed that idea or looked to see if

3    there's any other cases that deal with it.  I hope

4    someone has some cases that might aid me in that

5    regard, but let's hear what your arguments are.

6    (OFF THE RECORD)

7                    MR. CONSOLDANE:  I have nothing

8    further.

9                    THE COURT:  Do you want to proceed?

10   You have nothing further by way of your motion

11   today?

12                   MR. CONSOLDANE:  I have nothing

13   further in here.

14                   MR. WATKINS:  Judge, I just want the

15   record to reflect that when the transcripts are

16   prepared, Attorney Consoldane represented that he

17   did not object.  The record is going to reflect

18   that he did object and he was never curtailed

19   during the mitigation phase from objecting.  He

20   represented that he did not object.

21                   MR. CONSOLDANE:  I'm saying I did

22   not object when the Court instructed the Jury that

196

1    it was not in there.  It probably should have been

2    made, but I felt to make it at that time would call

3    more attention to something that I didn't want to

4    call attention to.  I didn't do that.

5              MR. WATKINS:  The procedure is to go

6    to the bench afterwards and make an objection.  You

7    can argue plain error.  I won't disagree with that.

8    (End of in-chamber hearing)

9    In Open Court at 1:45 p.m.

10             THE COURT:  Good afternoon.  We're

11   here this afternoon on a motion of the Defendant to

12   present matters which they feel should be put

13   before the Court prior to my decision on the review

14   of the sentence in this matter.  Is Defendant ready

15   to present your motion?

16             MR. CONSOLDANE:  Yes, Your Honor.

17             THE COURT:  You may proceed.

18             MR. CONSOLDANE:  The other items

19   that I mentioned should be included in any type of

20   argument like this, however, I'll limit myself as

21   the Court has instructed, just to the

22   proportionality.  Your Honor, I don't need to go

197

1   back too many years, but to start out with, there

2   was a Bernie Lee that was convicted of breaking

3   into a lady's home and robbing her, an elderly

4   lady.  And he did not get the death penalty.  And

5   then after that, we had two other ones that were

6   pretty much the same.  We had Scott Burrows and

7   Shaffer.  Now both the Burrows and Shaffer case,

8   they were both pre-planned.  They both involved a

9   breaking into a home, and they both involved

10  multiple killings, not just a single killing.

11  There were multiple killings.  And neither one of

12  those cases was the death penalty invoked in this

13  county.  And then also George Foster, which was not

14  a planned killing, but it was the rape of a young

15  girl under the age of 13, and killing her.  And he

16  still did not get the death penalty.  And it just

17  does not seem fair and proportionate to invoke the

18  death penalty on Mr. Jackson when the rest of these

19  did not receive the death penalty for either.  In

20  some cases, equal type of culpability and in some

21  cases involving more destruction of life, more than

22  one person was killed.  So I think that this is

198

1    something that the Court should take into

2    consideration along with reviewing the record,

3    before imposing the death penalty.

4            THE COURT:  Thank you.  Mr. Watkins?

5           MR. WATKINS:  May it please the

6    Court, the law in my opinion will reflect that the

7    question of proportionality is a question that --

8           MR. CONSOLDANE:  I'm going to

9    object.  If that is the case, we shouldn't be

10    arguing this today.  If he's saying that is not

11    proper.  You already, already --

12           THE COURT:  He has the right to

13    state his position.  The Court has to decide

14    whether it is proper or not.  The objection is

15    noted.

16           MR. WATKINS:  If he would have

17    waited, I simply was going to say that the law of

18    proportionality involves a state-wide application,

19    rather than a local application and I'll address in

20    my opinion the difference between this Defendant

21    and the other cases in Trumbull County.  First

22    Bernie Lee, that was mentioned, dealt with one

199

1    specification.  It dealt with a man over 30 some

2    years of age that from all accounts committed the

3    crime impulsively under the influence of drugs.  He

4    had no criminal record.  The Defendants, Burrows

5    and Shaffer were 19 years old.  That is a

6    mitigating factor, the age.  In addition, Burrows

7    had a much different history than this Defendant,

8    and every Defendant is to be individualized when

9    one compares death penalty to other cases in

10   application.  George Foster had a history of

11   schizophrenia and again committed a crime

12   impulsively.  If you would look at in Trumbull

13   County, you had a case involving a man that --

14   Stanley Adams has a similar criminal history as

15   this Defendant; repeatedly in prison, that was

16   brought out in mitigation.  You also have a man

17   that is 30 years of age, Stanley Adams was 35.  And

18   further, you have other cases in Trumbull County

19   where the death penalty was given in burglaries.

20   Shawn Carter, even though he was 19 years of age.

21   Even though he was adopted, even though there was

22   evidence of abuse, he was sentenced to death.  And

200

1   the Supreme Court of Ohio upheld his sentence and

2   he had a mitigating factor of age.  Kenny Biros had

3   no criminal history.  He had evidence of alcoholism

4   and abuse in his family, and he committed a crime

5   that the evidence would suggest was committed

6   intentionally and not planned, premeditated.  He

7   received the death penalty.  In short, you could

8   look at Trumbull County cases and find cases that

9   are proportional  to what this Defendant has

10  received by way of recommendation by the Jury.  But

11  most importantly, it is our position that what the

12  Court should look at would be the Supreme Court of

13  Ohio, in its cases including State vs. Carter, and

14  I would also mention State vs. Getsy, even though

15  Getsy was 19 years of age, he was involved in a

16  planned, premeditated murder.  The attempt was to

17  kill Charles Serafino, but in fact intentionally

18  killed, as this Court is aware, being the trial

19  Judge on the case, killed the mother of

20  Mr. Serafino.  He's on death row, even though he

21  had a mitigating factor and he had more evidence of

22  mitigation by way of family background than this

201

1    Defendant in my opinion.  I would note that there

2    are cases I would like to cite and I'll have copies

3    of various cases, State vs. Goff, 82 Oh. St. 3rd,

4    123, 1998.  The Ohio Supreme Court had to determine

5    whether or not the aggravating circumstances of

6    aggravated burglary outweighed the mitigating

7    factors by way of review.  And in that case, it was

8    brought out that the appellant was 19 years of age

9    which was a statutory mitigating factor, that he

10   had significant drug and alcohol problems, and he

11   was convicted of one aggravating circumstance.  The

12   Supreme Court of Ohio said that is sufficient to

13   sustain with one aggravating circumstance, and even

14   though there was drugs and alcohol and even though

15   he was 19 years of age, that that was an

16   appropriate penalty in the State of Ohio, to-wit

17   the death penalty.

18        In State vs. Goff, other cases are cited

19   dealing with one aggravating circumstance, and in

20   my opinion, the major aggravating circumstance in

21   this case is the most overwhelming evidentiary

22   aggravating circumstance that I have ever

202

1    prosecuted and seen, where this Defendant planned

2    to commit an offense in the home, to-wit an

3    aggravated murder while in prison.  In State vs.

4    Bonnell, State vs. Franklin, and State vs.

5    Campbell, 61 Oh. St. 3rd, 179, 62 Oh. St. 3rd, 118,

6    and 69 Oh. St. 3rd 38; two 1991 Ohio Supreme Court

7    cases, and a 1994 Ohio Supreme Court case.  Those

8    cases deal with one aggravating circumstance,

9    to-wit again, aggravated burglary.  In Franklin,

10   the Defendant broke into the victim's apartment,

11   beat the victim to death with a claw hammer and

12   took money from the victim.  Franklin presented to

13   the Jury, evidence that his age was 21, that there

14   was residual doubt, since it was all circumstantial

15   evidence.  That he had no serious criminal history,

16   and that he had childhood illnesses that resulted

17   in a poor school performance and did not have a

18   loving or nurturing family, the Ohio Supreme Court

19   upheld the death penalty in spite of those

20   mitigating factors.  There are other cases which

21   are numerous and I'll have for the Court.  I don't

22   have right at hand --

203

1          THE COURT:  Since you have run those

2   off, I would appreciate seeing them.

3          MR. WATKINS:  That have multiple and

4   I believe it is <u>State vs. Holloway</u>, that have

5   multiple aggravated robbery, aggravated burglary or

6   different combinations; but Your Honor, there are a

7   plethora of cases that clearly have individuals

8   currently on death row that had more mitigation

9   than this Defendant, who committed a crime with

10   less evidence being shown in Court.  And if

11   anything, with all due respect, the evidence that

12   this Jury had justified their recommendation, and

13   if you compare with other persons on death row, he

14   will have to go in front of them with all due

15   respect.  Thank you, Your Honor.

16          THE COURT:  You have last word, if

17   you care.

18          MR. CONSOLDANE:  Just two things.

19   Jim would like to have last word but I would like

20   to call the Court's attention to a few cases and

21   let Jim talk.  These cases that I'm going to be

22   discussing aren't Supreme Court cases.  These are

204

1    Common Pleas cases, in which the Judge overrode the

2    Jury's recommendation.  They had State vs. Brian

3    Siler.  That is a case out of Ashland County on

4    June 14th of this year.  And after that, there was

5    State vs. Timothy Hancock from Warren County, that

6    was in December of 2001.  State vs. Christopher

7    Fuller, Butler County, October 18, 2000; State vs.

8    Gregory Crawford, Wayne County, May 24, 1999.

9    State vs. John Parsons, 1988, Franklin County.

10   State vs. Eddie Robertson, 1988-CR-3179, Montgomery

11   County.  State vs. Alonzo Wright, Cuyahoga County,

12   and State vs. Drewey Kiser, Ross County.  These

13   have all been cases that after reviewing the Jury's

14   recommendation, that the Judge has overturned the

15   death penalty.

16                THE COURT:  Are those all reported

17   cases of ones that have gone up or not?

18                MR. CONSOLDANE:  Yes.

19                THE COURT:  Perhaps you can leave

20   your list with me so I can review those.  Anything

21   else?

22                MR. CONSOLDANE:  Just Mr. Lewis has

205

1   something to say.

2           MR. LEWIS:  We'll get you copies of

3   those cases.  It is interesting in all of the years

4   that I have been defending cases involving death

5   penalty and Mr. Watkins has been the adversary as

6   the Prosecutor, and every case when he gets up in

7   front of the Jury and at the very end he says,

8   "This is the worse death penalty case I have ever

9   seen."  He did it in Bernie Lee.  He's more than

10  kind, all of a sudden, at this juncture to say,

11  "Well, Bernie Lee, that was just a spontaneous

12  thing, he broke into the lady's house and he

13  stabbed her only 59 times or something."

14          MR. WATKINS:  82 times.

15          MR. LEWIS:  The problem becomes at

16  this juncture, that somehow he minimizes that at

17  the time it was a diabolic ploy.  He was going to

18  rob the poor woman and he was charged with burglary

19  as a spec.  Then you move into the areas of George

20  Foster and I remember being in the Courtroom

21  downstairs, and the same thing applied in that

22  particular case.  This was the most heinous crime

206

1   and the death penalty should apply and the Jury

2   didn't think so.  The two cases that are most

3   similar to this, and even the Prosecutor at the

4   time, of course, said they were the most outrageous

5   and heinous crimes are Scott Burrows and

6   Mr. Worley, involving the death of two elderly

7   people.  And the Prosecutor got up and in opening

8   statement and closing argument, said this was

9   planned out, these two guys had this whole thing

10  planned out.  Took the man out of the house, killed

11  him, put him in the Mahoning River, came back and

12  killed the wife.  It was all planned out.  He said

13  it was a plan.  And he invaded the home, same

14  thing, it was an aggravated robbery.  It was

15  aggravated burglary and we have the death of two

16  people.  Still ends up with a life sentence.  And

17  then we move on to Ron Shaffer.  Ron Shaffer with

18  others, went to a house.  It was a home in Newton

19  Falls where people are to be safe, went in the

20  home, shot two individuals, killed them, and

21  attempted to murder a third individual.  And yet,

22  that was an aggravated robbery.  That was an

207

1   aggravated burglary, same thing we have here.  And
2   yet, life sentence was there.  Were these good guys
3   without records?  No, they weren't good guys
4   without records.  They have all had run-ins with
5   the law and even though Mr. Watkins now is kind of
6   kind to George Foster saying he's schizophrenic.
7   He didn't say that down in that Courtroom.  He said
8   George knew exactly what he was doing and all of
9   that mumbo jumbo about being in hospitals.  That is
10  not true at all, and this guy knows what he's
11  doing, right from wrong.
12            MR. WATKINS:  I'll object.  That is
13  not reflective of what happened.
14            THE COURT:  This is argument.
15            MR. LEWIS:  Here's where I am.
16  Where I am is simply this, and it is pretty
17  understandable.  The Prosecutor takes one stance in
18  one area and turns around and says something
19  different here.  Whenever you get in the Court, I
20  don't care whether it's a defense lawyer or
21  Mr. Watkins, whatever, you say it, you should live
22  by it.  All of the cases I have mentioned, the

208

1  Getsy -- every one of these cases he's gone and

2  said this is the worst possible crime, and still we

3  have a lot of life sentences in here.  So,

4  regardless of what he says and what he pronounces

5  and whatever, the proportionality idea is simply

6  this, is to weigh this particular crime against

7  some of the others, and if life sentences were

8  appropriate in the killing of more than one

9  individual, two, and almost three and a couple of

10  incidences where life sentences were granted.  I

11  think there there's a lot to be said for that.

12  Thank you.

13          THE COURT:  Thank you.  Here's the

14  problem that I have with this Court being called

15  upon, and I don't know what I'm going to do yet.  I

16  have to review all of this.  I think at a minimum

17  that is required.  All of the cases that you cite,

18  Mr. Lewis, are cases in our county where the Jury

19  made the decision.  Some cases they have given life

20  imprisonment, some cases they have given death.  I

21  think Mr. Watkins has attempted to explain

22  similarities and differences with those, wherein

209

```
1   the death penalty was given.  I'm not aware of any
2   case in our county yet where a Judge has found it
3   appropriate to set aside a death penalty because
4   they have decided from the evidence and the review
5   that the Jury had sufficient evidence at law to
6   impose the death penalty.  In attempting to -- this
7   is the part that concerns me, in attempting to take
8   this small number of cases we have in this county,
9   you have to have some criteria, and the only
10  criteria I could see would be to call upon each
11  individual Judge to apply his individual sense of
12  fairness.  Every Judge is different.  Every Judge
13  has his own opinion on things.  Nothing wrong with
14  that.  If you carry that to its logical extreme,
15  then you are going to have a situation where you
16  are not going to want to have a case tried before
17  this Judge because he believes in the death
18  penalty.  This other Judge, I don't think believes
19  in the death penalty, so that is the Judge we want.
20  Our system is supposed to be more consistent than
21  that.  It is a fact that the legislature of Ohio
22  which is the voice of the people, many people feel
```

210

1    it is 20 years behind present sentiment, but be

2    that what it is, that's the way our Government is

3    set up.  The will of people is expressed through

4    the laws passed by the legislature.  The law of

5    Ohio, is that if evidence beyond a reasonable doubt

6    proves that the aggravating circumstances outweigh

7    any mitigating factors, then the Jury is called

8    upon to make a decision as to whether or not they

9    feel the imposition of a death penalty or life

10   imprisonment is proper.  I do not disagree that

11   proportionality should be something that is taken

12   into account on a review.  Because it is quite

13   possible that some areas of the State might be

14   applying the standard that we all read in the law

15   in a different manner, than what another portion of

16   the State, that would be unfair.  The question I

17   have to decide based on this motion is whether or

18   not there's a legitimate criteria that I should

19   apply based on our county's history alone.  I have

20   no practical way to search the entire record of the

21   State, but I wonder if that is my function.  As I

22   said, I have allowed this argument to be made

211

1   because legitimately it may be something that the

2   upper Court will feel is proper at this level.  I

3   don't know.  But it just is very apparent that it

4   would be a real shot in the dark because of the

5   lack of information to make an informed decision.

6   But I would ask each of you to give me those cases.

7   I wish to read those over and see if there's some

8   indication that I am overlooking something.

9   Anything else before this Court?

10                  MR. WATKINS:  No, Your Honor.

11                  MR. CONSOLDANE:  No, Your Honor.

12                  THE COURT:  I thank you all.

13   (Court in recess at 2:10 p.m.)

14

15

16   Monday, December 9, 2002:

17   (In Open Court at 10:15 A.M.:

18   SENTENCING HEARING:

19                  THE COURT:  We're here today for the

20   sentencing in the case of State of Ohio vs.

21   Nathaniel E. Jackson.  Would the Defendant please

22   come forward with counsel?

212

1          Mr. Jackson, you have been found guilty

2   of aggravated murder with specifications by a Jury

3   of your peers.  Is there anything that you or your

4   counsel wish to place on the record prior to

5   sentencing?

6              THE DEFENDANT:  I'd just like for

7   the Court to spare me my life.  I'm sorry for what

8   happened, happened.  I never meant for it to

9   happen.

10             THE COURT:  Counsel, do you have

11  anything you wish to place on the record?

12             MR. CONSOLDANE:  Not at this time.

13  We do have a motion to make at the conclusion.

14             THE COURT:  I have prepared and

15  signed a finding of fact and conclusion of law

16  regarding the imposition of the death sentence.

17  I'm not going to read through this, I think it

18  speaks for itself.  I'm going to refer only to one

19  section of it.

20         Under the facts of the instant case, the

21  Court cannot foresee of any other form of

22  Aggravated Burglary where the weight to be given to

213

1    this aggravating circumstance could ever be

2    greater.  The evidence presented in this case

3    reveals that the sole purpose for the Defendant's

4    illegal entry into the Fingerhut residence was not

5    to commit a theft, a kidnapping or even a rape, but

6    to rather carry out the premeditated, cold blooded

7    execution of Robert S. Fingerhut.  This is the most

8    heinous form of Aggravated Burglary, and it is

9    entitled to unsurpassed weight.  Further in this

10   Court's view, this aggravating circumstance,

11   standing alone, outweighs all of the evidence

12   presented in mitigation.

13         And in conclusion, I have entered in this

14   record, upon consideration of the relevant evidence

15   raised at trial, relevant testimony, and the other

16   evidence, the unsworn statement of the Defendant,

17   and the arguments of counsel, it is the judgment of

18   this Court that the aggravating circumstances,

19   outweighed, by proof beyond a reasonable doubt, the

20   collective mitigating factors.

21         Throughout the history of mankind, there

22   have been and continue to be numerous reasons,

214

1   leading to murder.  Murder is often committed out

2   of fear, passion, anger, or due to some misguided

3   religious or political belief.  All such killing is

4   condemned, but killings based on those factors have

5   an emotional basis, no matter how irrational it may

6   be.  But to take the life of another human being,

7   however, for personal gain or profit, is an act

8   done rationally, without emotion, without any

9   consideration of a fellow human being's life, and

10  that life was treated with little concern, or as it

11  had little worth.  Now Robert Fingerhut had the

12  absolute right to not have his life taken.  And

13  this Jury has determined you were responsible for

14  that unlawful taking of life.  Your actions have

15  affected for all time the lives of the persons who

16  loved Mr. Fingerhut, and sadly, you have also

17  affected those persons who love and have depended

18  upon you.

19          Is there anything further that counsel

20  has to put on the record?

21               MR. CONSOLDANE:  No.  I think we

22  would just reiterate what we said at the last

215

1    hearing.

2              THE COURT:  I have not asked, is

3    there anything that the State wishes to place on

4    the record?

5              MR. WATKINS:  No, Your Honor.

6              THE COURT:  Thank you.  It is the

7    sentence of this Court that Nathaniel E. Jackson,

8    will be taken from the Trumbull County Jail and

9    delivered to the Lorain Correctional Facility on

10   count three to serve a period of ten years, with

11   the mandatory three-year gun specification charge

12   to be served consecutive with and prior to that ten

13   year sentence.  That is on the Aggravated Burglary.

14             On the Aggravated Robbery, the Defendant

15   will serve a period of ten years with a three-year

16   gun specification, which will merge with the prior

17   specification to be served prior to and consecutive

18   to the ten year sentence on the robbery charge,

19   Aggravated Robbery.

20             Now this Court has considered the factors

21   under Ohio Revised Code Section 2929.14 and makes

22   the following further findings.

216

1        Number 1:  The shortest prison term would

2    demean the seriousness of the Defendant's conduct.

3        Number 2:  The longest prison term is

4    appropriate because the Defendant committed the

5    worse form of the offense.

6        Number 3:  Multiple prison terms are

7    necessary to protect the public from future crime

8    and to punish the offender.

9        Number 4:  Consecutive prison sentences

10   are not disproportionate to the seriousness of the

11   Defendant's conduct and the danger the offender

12   poses to the public.

13       Number 5:  The harm caused by the

14   multiple offenses was so great that no single

15   prison term for any of the offenses committed is

16   part of a single course of conduct, adequately

17   reflects the seriousness of the Defendant's

18   conduct.

19       Number 6:  The Defendant's history of

20   criminal conduct demonstrates that consecutive

21   sentences are necessary to protect the public from

22   future crime by the Defendant.

217

1          And on Count 1, it is therefore Ordered,

2    Adjudged and Decreed that the Defendant, Nathaniel

3    E. Jackson, be taken from the Courtroom to the

4    Trumbull County Jail and from thence to the

5    Correctional Reception Center in Lorain, Ohio, and

6    therefore, be sentenced to death on December 10,

7    2003.  And that he pay court costs.  I'll prepare

8    the warrant to convey prisoner for execution of the

9    death penalty.

10          Now Mr. Jackson, pursuant to Criminal

11   Rule 32, I have to advise you of your right of

12   appeal.  You have an automatic right to have this

13   case appealed and because it is a death penalty

14   case, it will be appealed directly to the Ohio

15   Supreme Court.  If you are still unable to pay the

16   cost of the appeal, you have the right to appeal

17   without payment, and if you are unable to obtain

18   counsel for that appeal, this Court will appoint

19   counsel, without cost.  If you are unable to pay

20   the cost of documents necessary for the appeal, the

21   documents will be provided to you, without cost.

22   You have the right to have a notice of appeal

218

1    timely filed, on your behalf, and that you have the

2    right to have counsel appointed.

3              I'll ask counsel at this time, there has

4    been no change in the status of your client's

5    indigency?

6              MR. CONSOLDANE:  No, he's still

7    indigent, and we would request that he be appointed

8    counsel.  I think we cannot do that.  There is a

9    conflict.

10             THE COURT:  I have had some

11   conversation with counsel this morning.  Most of

12   our local counsel that are able to handle such

13   appeals, are tied up on other cases, one case in

14   particular which will conflict with their ability

15   to handle this.  I think I'm going to have to

16   contact some of the attorneys in Columbus to see if

17   we can find someone to handle this appeal.  That

18   will be more workable as the appeal will go through

19   the Supreme Court in any event.  I would ask you to

20   please file a formal motion, if you will.  I'll see

21   that counsel is appointed within that time period.

22   Is there anything else?

219

1          MR. CONSOLDANE:  Yes.

2          THE COURT:  Just one minute.

3          MR. WATKINS:  For the record, I

4   would request that defense counsel at least file a

5   notice of appeal, until this is done.

6          THE COURT:  The Court has a duty to

7   do that, and I'm asking if you will file your

8   notice of appeal, that will be something on the

9   record.  I'll see that counsel is obtained for that

10  appeal.  Anything else, Mr. Watkins?

11         MR. WATKINS:  No.

12         THE COURT:  Mr. Consoldane.

13         MR. CONSOLDANE:  Yes, at this time,

14  we would like to make a motion for a new trial, and

15  in making this motion, I would like to restate as

16  fully incorporated at this time, all of the

17  objections and motions for mistrial that I made

18  throughout the trial, and be incorporated also in

19  this motion today.

20         But there are several points that

21  happened during the mitigation hearing, that some

22  were objected to and some were not, that would be

220

1   grounds for a mistrial.  There were several items

2   that I felt was Prosecutorial misconduct, is that

3   the number one was when Mr. Watkins mentioned to

4   the Jury about mental disease.  This was not a

5   statutory element that we raised and it is clear

6   he's not allowed to raise, to tell the Jury, well,

7   he did not prove this particular statutory item

8   that would have been a mitigation factor, to say

9   that well, we didn't prove this or didn't prove

10  that, they can only comment on what we did put

11  forward to the Jury.

12          Also, he mentioned in his closing

13  argument, that Mr. Jackson was a cold blooded

14  psychopathic killer.  The mitigation hearing is

15  supposed to go to the facts of the aggravated

16  circumstances, not the murder itself, and I think

17  that was improper.

18          Also he mentioned the mental illness, the

19  background doesn't mean much.  That was an unfair

20  comment on his part and also, when he mentioned,

21  when he talked about the unsworn statement.  That

22  was also in the final argument, and was not dealing

221

1   with it fairly. He's allowed to give an unsworn

2   statement and it is not subject to cross

3   examination, and for Mr. Watkins to try and cross

4   examine him with the Jury, was unfair.

5          Also, when Mr. Watkins mentioned to the

6   Jury that he's been able to manipulate the system

7   before and that he could get out of jail early, and

8   I asked the Court to instruct the Jury that it was

9   a life, that life without parole meant that there

10  was no way he can manipulate himself out of jail

11  early. That was an unfair comment to leave the

12  Jury with. I had nothing to say after that. That

13  was in Mr. Watkins closing argument.

14         And also, he was discussing about the

15  murder again, that it being planned and there is

16  lingering doubt, no residual doubt. These were

17  unfair comments that the Prosecutor made.

18         Probably the number one reason, that I

19  think we should have a mistrial, it was

20  unfortunate, it was something that the Court had

21  mentioned to the Jury, and when you said the Court

22  can only reduce the penalty and has no power to

222

1   increase it.  That left the Jury with the only out

2   that we would have to give the death penalty, and

3   let the Court decide on whether it was proper or

4   not.  It left them with the feeling if they came

5   back with a life sentence and death would have been

6   appropriate, that you as much as told them, that

7   you had no power to increase it, and I think that

8   that was an instruction to the Jury, that we didn't

9   get a chance to review ahead of time.  And we

10  usually, even though the Prosecutor draws up a lot

11  of instructions for the Court, at least, we have

12  the advantage of looking those over, and making our

13  arguments, before we come out into the Courtroom.

14  And this particular instance, it was not included

15  in the instructions to the Jury and it really

16  worked as a bias to Mr. Jackson.

17              THE COURT:  Are you saying that was

18  an improper statement of law?

19              MR. CONSOLDANE:  No, Your Honor, I'm

20  not saying that anything you said was untrue.  What

21  you said was a correct statement of the law.  I

22  just don't think that that particular statement

223

1  should have been told to the Jury.  I think there's

2  been cases where that is not a proper thing for the

3  Jury to be told and moreover, is that if you were

4  going to tell the Jury that at least we should have

5  had a chance to argue this in-chambers before we

6  came out, rather than being blind sided by it.

7          THE COURT:  Are you going to file a

8  formal written motion?

9          MR. CONSOLDANE:  This is my motion

10  for new trial.

11          THE COURT:  I'll take that under

12  advisement and issue an opinion.  Anything further?

13          MR. WATKINS:  Yes.  I think that

14  this ordinarily is not done this way, and that

15  Attorney Consoldane should be required to file a

16  memorandum in support of his motion for new trial,

17  which we can respond to.

18          MR. CONSOLDANE:  I have made my

19  motion.  They can respond to it.

20          THE COURT:  The motion is usually to

21  be fortified with case law, but if that is all you

22  wish to present, then that is fine.  That concludes

224

1    the sentencing in this matter.  Thank you.

2    (End of Hearing at 10:30 A.M.)

3

4    (END OF PROCEEDINGS)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

225

## C E R T I F I C A T E

I do hereby certify that the above
and foregoing is a true and correct transcript of
the proceedings had in the within hearing as shown
by stenotype notes written by me in the presence of
the witnesses at the time of the hearing.


*Mary Ann Mills*
MARY ANN MILLS, R.P.R.
Official Court Reporter
Trumbull County, Ohio